1   LAWYERS' COMMITTEE FOR CIVIL
    RIGHTS OF THE SAN FRANCISCO BAY AREA
2   Zal K. Shroff, MJP 804620*
    Elisa Della-Piana, SBN 226462
3   131 Steuart Street, Ste. 400
    San Francisco, CA 94105
4   Telephone: (415) 543-9444
5   zshroff@lccrsf.org
    edellapiana@lccrsf.org
6
7   *application pro hac vice pending

8   Attorneys for Plaintiffs

9   Additional Counsel on Signature Page

10              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
11

12  COALITION ON HOMELESSNESS; TORO          Case No. 3:22-cv-05502
    CASTAÑO; SARAH CRONK; JOSHUA
13  DONOHOE; MOLIQUE FRANK; DAVID            **PLAINTIFFS' NOTICE OF MOTION
    MARTINEZ; TERESA SANDOVAL;               AND MOTION FOR PRELIMINARY
14  NATHANIEL VAUGHN,                        INJUNCTION; MEMORANDUM OF
                                             POINTS AND AUTHORITIES**
15                      Plaintiffs.
                 v.                          *[Declarations and Proposed Order Filed
16                                           Concurrently]*

17  CITY AND COUNTY OF SAN FRANCISCO;         Date: TBD
    SAN FRANCISCO POLICE DEPARTMENT;          Time: TBD
18  SAN FRANCISCO DEPARTMENT OF
    PUBLIC WORKS; SAN FRANCISCO
19  DEPARTMENT OF HOMELESSNESS AND
    SUPPORTIVE HOUSING; SAN FRANCISCO
20  FIRE DEPARTMENT; SAN FRANCISCO
    DEPARTMENT OF EMERGENCY
21  MANAGEMENT; LONDON BREED, in her
    official capacity as Mayor; and SAM DODGE,
22  in his official capacity as Director of the Healthy
    Streets Operation Center (HSOC),
23
                        Defendants.
24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

1  ACLU FOUNDATION OF NORTHERN CALIFORNIA
   John Thomas H. Do, SBN 285075
2  Brandon L. Greene, SBN 293783
3  39 Drumm Street
   San Francisco, CA 94111
4  Telephone: (415) 621-2493
   jdo@aclunc.org
5  bgreene@aclunc.org

6  LATHAM & WATKINS LLP
7  Alfred C. Pfeiffer, SBN 120965
   Wesley Tiu, SBN 336580
8  505 Montgomery Street, Ste 2000
   San Francisco, CA 94111
9  Telephone: (415) 391-0600
   al.pfeiffer@lw.com
10 wesley.tiu@lw.com

11 LATHAM & WATKINS LLP
12 Joseph H. Lee, SBN 248046
   650 Town Center Drive, 20th Floor
13 Costa Mesa, CA 92626
   Telephone: (714) 540-1235
14 joseph.lee@lw.com

15 LATHAM & WATKINS LLP
16 Regina Wang, SBN 326262
   10250 Constellation Blvd., Suite 1100
17 Los Angeles, CA 90067
   Telephone: (424) 653-5500
18 regina.wang@lw.com

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

**PLEASE TAKE NOTICE THAT**, as soon as counsel may be heard at a hearing date and time to be determined once this case is assigned, Plaintiffs Coalition on Homelessness ("Coalition"), Toro Castaño, Sarah Cronk, Joshua Donohoe, Molique Frank, David Martinez, Teresa Sandoval, and Nathaniel Vaughn (collectively, "Plaintiffs") will and respectfully do move the Court for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Civil L.R. 7-2 of the Civil Local Rules of the U.S. District Court for the Northern District of California

Plaintiffs respectfully request the Court grant their Motion for a Preliminary Injunction as follows:

i.      To prohibit Defendants from citing, arresting, stopping, searching, questioning, or otherwise investigating or enforcing—or threatening to investigate or enforce—any ordinance that punishes sleeping, lodging, or camping on public property. This includes a prohibition on the issuance of "move along" orders or other police orders under threat of citation and arrest. The prohibition shall last unless and until Defendants can confirm that San Francisco's unhoused residents have immediately available, appropriate, accessible, and voluntary shelter such that they are not being punished for the involuntary status of homelessness. At a minimum, enforcement of the following ordinances is to be enjoined:

a.      Cal. Penal Code § 647(e) (no lodging without permission);

b.      Cal. Penal Code § 148(a) (resisting, delaying, or obstructing an officer);

c.      Cal. Penal Code §§ 370, 372 (public nuisance),

d.      S.F. Police Code §§ 97(b), 168-169 (anti-camping, "sit/lie" ordinances, prohibition on living in passenger vehicles)

e.      S.F. Park Code §§ 3.12-3.13 (no lodging or sleeping); and

f.      S.F. Port Code §§ 2.9-2.10 (no lodging or sleeping).

ii.      To prohibit Defendants from summarily seizing and destroying the personal property of homeless individuals, including momentarily unattended property, and to prohibit the confiscation of unhoused individuals' personal property except when bagged and tagged in

1    accordance with Defendants' own written policies. This includes a prohibition on the summary

2    seizure and destruction of bulky items, which may not be confiscated except when properly

3    bagged and tagged consistent with Defendants' written policies for personal items; and

4        iii.       To appoint a Special Master at Defendants' expense to assist with the

5    implementation of this preliminary injunction, to monitor compliance with the terms of this

6    injunction, and to resolve disputes among the parties or other interested persons.

7        Plaintiffs' Motion is brought pursuant to Fed. R. Civ. Proc. 65(a), on the ground that

8    Plaintiffs have articulated "serious questions going to the merits" on their claims that Defendants'

9    criminalization of homelessness and property destruction practices are unconstitutional and that

10   "the balance of hardships tips sharply in Plaintiffs' favor" because unhoused individuals continue

11   to have their survival belongings destroyed and are being targeted, policed, and punished for the

12   involuntary status of being homeless. *See Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281,

13   1291 (9th Cir. 2013).

14       Plaintiffs' Motion is limited to specific causes of action from Plaintiffs' Complaint for

15   Declaratory and Injunctive Relief. Specifically, Plaintiffs' Motion corresponds to the First Cause

16   of Action ("Violation of Prohibition Against Cruel and Unusual Punishment Under the Eighth

17   Amendment") and the Fifth Cause of Action ("Property Destruction: Unreasonable Search and

18   Seizure Under the Fourth Amendment") in Plaintiffs' Complaint.

19       Plaintiffs' Motion is based upon this Notice of Motion and Motion for Preliminary

20   Injunction, the accompanying Memorandum of Points and Authorities, the Declarations in Support

21   of the Preliminary Injunction and all exhibits and attachments thereto, upon all the pleadings and

22   papers on file in this action, and upon all oral and documentary evidence that may be presented at

23   the time of the hearing on this Motion.

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

1

**TABLE OF CONTENTS**

2

Page

3   I.       INTRODUCTION ................................................................................................. 1

4   II.      STATEMENT OF ISSUES TO BE DECIDED ................................................... 2

5   III.     STATEMENT OF FACTS .................................................................................... 2

6
          A.    The City Does Not Have Enough Shelter Beds to House
7                Thousands of Its Unhoused Residents, Forcing Unhoused People
                 to Sleep on the Streets. ............................................................................... 3
8
          B.    The City's Healthy Streets Operation Center Conducts Regular
9                Sweeps to Conceal, Not Address, Homelessness. .................................... 4

10        C.    Anatomy and Timeline of an HSOC Sweep Operation: Law
                 Enforcement Threats, Intimidation, and Property Destruction With
11               No Viable Shelter. ...................................................................................... 6

12        D.    Outside of Formal HSOC Sweeps, DPW and SFPD Also
13               Summarily Destroy the Property of and Impose and Threaten
                 Penalties on Homeless Individuals. ........................................................... 8
14
          E.    The City's Own Records Demonstrate a Pattern of Citing,
15               Arresting, and Issuing "Move-Along" Orders to Homeless
                 Individuals Despite Failing to Provide Access to Shelter. ........................ 9
16
          F.    The City's Own Records Demonstrate a Pattern of Summarily
17               Destroying the Property of Unhoused Residents in Violation of the
18               City's Own Policies. ................................................................................. 12

19        G.    Thirty-One Sworn Declarants Confirm the City's Criminalization
20               and Property Destruction Practices. ........................................................ 14

21        H.    Plaintiffs Suffer Significant Harm as a Result of the City's
                 Conduct. ................................................................................................... 16
22
    IV.      LEGAL STANDARD ........................................................................................ 16
23
    V.       ARGUMENT ...................................................................................................... 17
24
          A.    Plaintiffs Are Likely to Succeed on the Merits of Their Eighth
25               Amendment Claim Against the City for the Criminalization of
                 Involuntary Homelessness. ...................................................................... 17
26
                 1.    San Francisco Is Thousands of Shelter Beds Short and
27                     Therefore Any Criminal Enforcement Within the City Is
                       Unconstitutional *Per Se*. ............................................................. 18
28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

2. The City's Ongoing Criminal Enforcement Violates the Eighth Amendment's Core Protections Against Criminalizing Involuntary Acts. ............................................................ 18

3. The City's Pretextual Weaponization of Shelter Unconstitutionally Punishes Involuntary Homelessness. ....................... 19

4. The City Has a Pattern of Punishing Unhoused Individuals with Law Enforcement Consequences Regardless of Whether Shelter Is Offered to Them, in Violation of the Eighth Amendment and the City's Own Problematic Pre-Enforcement Standards. .......................................................................... 20

5. Even When Limited Shelter Is Available, the City Has a Pattern of Punishing Unhoused Individuals *Before* Ever Offering Them Shelter—Which Is Squarely Unconstitutional. ..................................................................................... 21

B. Plaintiffs Are Likely to Succeed on the Merits of their Fourth Amendment Claim Against the City for Summarily Seizing and Destroying Unhoused Individuals' Belongings. .................................................. 22

C. Plaintiffs Have Demonstrated a Likelihood of Irreparable Harm, That Injunction is in the Public Interest, and that the Balance of Harms Tips *Sharply* in Plaintiffs' Favor. ............................................................. 24

VI. CONCLUSION ......................................................................................................... 26

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*All. for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) .................................................................................16, 17

5

6

*Arizona Dream Act Coalition v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ......................................................................................25

7

8

*C.B. v. Sonora School District*,
    691 F. Supp. 2d 1170 (E.D. Cal. 2010)........................................................................24

9

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010).............................................................................................17

10

11

*Cobine v. City of Eureka*,
    250 F. Supp. 3d 423 (N.D. Cal. 2017) ........................................................................22

12

13

*Garcia v. City of L.A.*,
    11 F.4th 1113 (9th Cir. 2021) ......................................................................................23

14

*Garcia v. City of L.A.*,
    481 F.Supp.3d 1031 (C. D. Cal. 2020) .................................................................25, 26

15

16

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) .......................................................................................17

17

*Jones v. City of Los Angeles*,
    444 F.3d 1118 (9th Cir. 2006), *vacated by settlement*, 505 F.3d 1006 (9th Cir. 2007) ...............................................................................................................................22

18

19

*Kincaid v. City of Fresno*,
    No. 106CV-1445 OWW SMS, 2006 WL 3542732 (E.D. Cal. Dec. 8, 2006) ........................25

20

21

*Lavan v. City of L.A.*,
    693 F.3d 1022 (9th Cir. 2019) .....................................................................................23

22

23

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) .....................................................................................17

24

25

*Martin v. City of Boise*,
    920 F.3d 584 (9th Cir. 2019), *cert. denied sub nom. City of Boise, Idaho v. Martin*, 140 S. Ct. 674, 205 L. Ed. 2d 438 (2019)............................................ *passim*

26

27

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) .......................................................................................25

28

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

v

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

*Mitchell v. City of L.A.*,
  No. CV1601750SJOGJSX, 2016 WL 11519288 (C.D. Cal. Apr. 13, 2016)..........................25

*Phillips v. City of Cincinnati*,
  479 F. Supp. 3d 611 (S.D. Oh. 2020) ...................................................................................22

*Pottinger v. City of Miami*,
  810 F. Supp. 1551 (S.D. Fla. 1992) .......................................................................................24

*Powell v. Texas*,
  392 U.S. 514 (1968)..........................................................................................................18, 19

*Price v. City of Stockton, Cal.*,
  394 F. Supp. 2d 1256 (E.D. Cal. 2005).................................................................................26

*Redman v. County of San Diego*,
  942 F.2d 1435 (9th Cir. 1991), *abrogated on other grounds by Farmer v.*
  *Brennan,* 511 U.S. 825 (1994) ..............................................................................................24

*Rios v. Cnty. of Sacramento*,
  562 F. Supp. 3d 999 (E.D. Cal. 2021)...................................................................................25

*Robinson v. California*,
  370 U.S. 660 (1962).................................................................................................................18

*Sausalito/Marin Cnty. Chapter of California Homeless Union v. City of Sausalito*,
  522 F. Supp. 3d 648 (N.D. Cal. 2021) ..................................................................................25

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
  709 F.3d 1281 (9th Cir. 2013) .........................................................................................24, 26

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................................................................16

**Statutes**

Cal. Penal Code § 148(a) ................................................................................................................10

Cal. Penal Code § 647(e) ................................................................................................................10

S.F. Police Code § 169....................................................................................................................11

S.F. Police Code § 169(d) ...............................................................................................................20

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

vi

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

## I.   INTRODUCTION

For decades, the City of San Francisco (the "City") has failed to adequately invest in affordable housing and sufficient and adequate shelter, forcing thousands of its most vulnerable residents to set up tents and other makeshift structures on public sidewalks and in parks just to survive. Rather than addressing these underlying structural problems and devoting sufficient resources to create long-term solutions to homelessness, the City has instead embarked on a campaign to criminalize homelessness and destroy the property of unhoused people in clear violation of their Eighth and Fourth Amendment rights.

San Francisco's official response to homelessness takes the form of an interagency task force known as the Healthy Streets Operation Center ("HSOC"). That name is misleading. HSOC is designed not to help homeless individuals, but to keep concealed the extent of the City's homelessness crisis. The City pours money into HSOC's illegal law enforcement operations so that the City can clear all visible signs of homelessness from the City streets.

To achieve this goal, the City routinely threatens, cites, and arrests unhoused San Franciscans in an attempt to drive them out of sight—punishing them for the involuntary status of homelessness when the City knows it has categorically failed to provide shelter for thousands of its unhoused residents and those unhoused residents have no voluntary access to shelter within the City. The City also has a pattern of destroying unhoused individuals' tents and other survival belongings to eliminate evidence of street homelessness. These actions are unconstitutional. The City should know: the City is routinely violating its own policies.

This misguided, brutal, and unlawful approach only entrenches the City's homelessness crisis and reinforces decades of failed tough-on-crime policies that harm the entire San Francisco community by creating more poverty. In short, the City has created an ongoing emergency.

The Coalition on Homelessness has dedicated the last three years to documenting HSOC's unconstitutional practices, and now seeks to enjoin the City's pattern and practice of violating the constitutional rights of unhoused people. The Coalition is joined by several unhoused individuals who have directly experienced the City's unconstitutional arrest and property destruction practices, and who risk exposure to those same practices in the future.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

## II.    STATEMENT OF ISSUES TO BE DECIDED

1.    Whether Plaintiffs have presented "serious questions going to the merits" on their claim that Defendants' violate the Eighth Amendment by imposing civil and criminal penalties for the involuntary act of sleeping outside because San Francisco has failed to provide shelter for thousands of its unhoused residents and unhoused people have no voluntary access to shelter within the City (First Cause of Action in Plaintiffs' Complaint);

2.    Whether Plaintiffs have presented "serious questions going to the merits" on their claim that Defendants violate the Fourth Amendment by summarily seizing and destroying homeless individuals' property without proper notice or adequate means of retrieval (Fifth Cause of Action in Plaintiffs' Complaint); and

3.    Whether Plaintiffs have demonstrated a likelihood of irreparable harm; that the balance of equities tips sharply in Plaintiffs' favor; and that the public interest favors a preliminary injunction.

## III.    STATEMENT OF FACTS

San Francisco has a long history of mistreating unhoused people, and this problem has only gotten worse with the establishment of HSOC—a coordinated effort among different City agencies to respond to homeless encampments. The Coalition and its members have observed (and experienced) the systematic criminalization of involuntary homelessness and wholesale destruction of unhoused individuals' survival belongings on a regular basis—both within large-scale HSOC sweep operations and in other daily enforcement actions carried out by the San Francisco Police Department ("SFPD") and the Department of Public Works ("DPW"). These harmful practices are confirmed by the City's own extensive public records documenting its sweep operations, by an expert review of the City's records, by the direct observations of the Coalition and many of its staff and volunteers over the last two years, by the declarations of almost two dozen unhoused people who have had their belongings recently destroyed under threat of citation or arrest, and by a former City employee who participated in the City's sweep operations and has attested to the City's misconduct. In short, the evidence is overwhelming.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

A.      **The City Does Not Have Enough Shelter Beds to House Thousands of Its**
**Unhoused Residents, Forcing Unhoused People to Sleep on the Streets.**

San Francisco has a long history of inadequately caring for the unhoused, including a chronic and dramatic shortfall of affordable housing and adequate shelter. According to San Francisco's 2019 Homeless Count and Survey, there were approximately 8,035 homeless individuals residing in the City. Della-Piana Decl. Ex. 5 at 10.[1] But San Francisco had only approximately 3,493 shelter beds available in 2019. *Id.* Ex. 6 at 4. Because not all of these beds are immediately available for people experiencing homelessness, approximately 5,180 individuals—or 64 percent of the City's homeless population—were forced to live unsheltered. *Id.* Ex. 5 at 10. That trend continues today.

According to San Francisco's 2022 Homeless Count and Survey, there were *at least* 7,754 homeless individuals residing in the City this year. *Id.* Ex. 7 at 19. Meanwhile, in 2021—the last time the City reported on its total shelter bed availability—it reported having only 5,080 shelter beds. *Id.* Ex. 6 at 3. The City is thus, by its own count, at least 2,600 shelter beds short. *Id.* But this is likely a massive underestimate of the shortfall. Declaration of Chris Herring ("Herring Decl.") ¶¶ 24-28. For example, the 2022 Homeless Count and Survey indicated that only 3,357 individuals were actually sheltered at the time of the survey. Della-Piana Decl. Ex. 7 at 19. This is because San Francisco's current shelter bed inventory includes 2,263 *temporary* shelter beds in Shelter-in-Place (SIP) hotels that were in use during the pandemic but that the City is keeping vacant in anticipation of an end to federal funding. *Id, see also* Herring Decl. ¶ 26. Removing these unusable beds, the City only has about 2,817 available shelter beds, and the City's shelter bed shortage is likely 4,000 beds or higher. In other words, the City's shelters have no available capacity. *Id.* ¶ 27.

Earlier this year, even as the City congratulated itself on its decreasing unsheltered population, the City still counted 4,397 unsheltered people—which is more than half of the City's

---

[1] For the Court's convenience, all of the numerous exhibits and declarations filed in support of this motion have been filed as exhibits to the Declaration of Elisa Della-Piana ("Della-Piana Decl."). For fact witness declarations (Exhibits 1 through 4), citations throughout identify in brackets the Bates Stamped page on which the Court may find the relevant portion of each declaration. The remaining exhibits are identified by exhibit number.

total homeless population. Della-Piana Decl. Ex. 7 at 19. And that is by the City's own estimation; non-City estimates of the unsheltered homeless population are much higher. *See, e.g.* Della-Piana Decl. Ex. 21 ("the latest best estimates of homelessness range from almost 8,000 to more than 19,000. San Francisco's categorical failure to provide sufficient shelter has forced the *majority* of the City's unhoused residents to sleep on public sidewalks and in parks to survive.

The City's extreme shortage of shelter beds means that unhoused people do not have sufficient access to shelter even when they actively seek it out. Prior to the start of the COVID-19 pandemic, City shelters could nominally be accessed through the 311 waitlist and same-day lines at shelters, albeit with wait lists of over 1000 people. Della-Piana Decl. Ex. 8; Herring Decl. ¶¶ 29-30. But shelter supply never met shelter demand. *Id.*[2]

Now, things are even worse. The City closed its 311 shelter waitlist during COVID-19 and never re-opened it. Della-Piana Decl., Ex. 9; Herring Decl. ¶ 31. The City has also closed same-day shelter so there is no ability to secure even a one-night shelter through a same-day line. *Id.* Therefore, the City currently provides no direct and obvious means of accessing shelter. *Id.* ¶ 39. The only way unhoused people can even ask about shelter currently is to leave a voicemail on a public telephone line. Della-Piana Decl., Ex. 10. The City's Homeless Outreach Team ("HOT") purports to respond to each voicemail within 72 hours— but there is no guarantee that unhoused people will hear back and no specific timeline on which they may be guaranteed a shelter bed. *Id.* ("Please note that shelter space is limited […] we might not be able to immediately place you in a shelter"); Herring Decl. ¶ 32.

**B.** **The City's Healthy Streets Operation Center Conducts Regular Sweeps to Conceal, Not Address, Homelessness.**

In 2018, the City established HSOC to "coordinate the City's response both to homeless encampments and to behaviors that impact quality of life." Della-Piana Decl. Ex. 11 at 3. That

---

[2] Between approximately January 2015 and March 2020, the 311 wait-list for a 90-day bed was nearly always over 1,000 people and had wait times of up to three to eight weeks to secure a bed. Della-Piana Decl. Ex. 8; Herring Decl. ¶¶ 29-30. Meanwhile, securing even a one-night shelter required standing in line for two to eight hours before receiving a bed—with often as many as a hundred people waiting in line being turned away each night. *Id.* Under these circumstances, shelter has never been functionally available to those individuals. *Id.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

highly coded language obfuscates HSOC's true purpose—to remove signs of homelessness from the City at all costs. Today, HSOC is led by its Director, Sam Dodge, and is a massive bureaucratic operation comprised of, and coordinates with, numerous City agencies. Della-Piana Decl. Ex. 12 at 4.

As part of its mandate, HSOC conducts major operations designed to remove visible unhoused communities, which it refers to as "encampment resolutions." These operations are also informally referred to as "sweeps," revealing their true nature to sweep away evidence of the homelessness crisis. Della-Piana Decl. Ex. 25. Based on public complaints and reports of congregations of homeless individuals, HSOC decides which encampments to prioritize. Herring Decl. ¶¶ 33, 46. The *purported* goal of an "encampment resolution" is to engage with and offer services (i.e. shelter beds) to homeless individuals living in encampments. Della-Piana Decl. Ex. 11 at 21. But HSOC's on-the-ground actions demonstrate a different goal: not to provide shelter to homeless individuals, but rather to clear the encampment, force homeless individuals to vacate the area, and destroy all visible signs of homelessness—all under the threat of criminal enforcement. *See generally* Della-Piana Decl. Ex. 15; Wadkins Decl. ¶¶ 7-24 [1-42]; Cutler Decl. ¶¶ 7-26 [1-14]; Ackerman Decl. ¶¶ 7-11 [1-10]; Evans Decl. ¶¶ 7-26 [1-22]; and Bennett Decl. ¶¶ 6-31 [3-2]. Any assistance to homeless individuals is often provided as an afterthought, if it is offered at all. *See, e.g.*, Della-Piana Decl., Ex. 20 ("[N]o members of the city's homeless outreach teams showed up to offer shelter or other resources when city officials began dismantling the encampment early Friday."). These brutal removal operations, conducted with obvious knowledge that San Francisco never has enough shelter beds to offer all its unhoused residents, reveals HSOC's true mission, to "sweep" the streets clean of any signs of homelessness, rather than to address the underlying issues. HSOC sweeps displace unhoused people, destroy their only sure sources of shelter, safety, and resources for survival, and leave them with nothing in return, only worsening the City's homeless crisis. Wadkins Decl. ¶¶ 13-24 [1-43]; Friedenbach Decl. ¶¶ 12-16 [1-3]. SFPD and DPW employees harass unhoused people and destroy their property almost every day. Cutler Decl. ¶ 24 [1-17]; Jones Decl. ¶ 12 [4-51]; Hurd Decl. ¶¶ 3-5 [4-45]; Frank Decl. ¶ 3 [2-15]. This all begs a question raised by UCSF researchers in a recent article on the health impacts

of HSOC's sweeps: "Is our motive for addressing homelessness to promote the image of clean streets free of unhoused people, even if it means forcibly displacing people? Or do we care for the underlying needs of those on the streets?" Della-Piana Decl. Ex. 19.

**C.**     **Anatomy and Timeline of an HSOC Sweep Operation: Law Enforcement Threats, Intimidation, and Property Destruction With No Viable Shelter.**

An HSOC sweep is a multi-hour operation that involves various City agencies. *See, e.g.* Bennett Decl. ¶¶ 6-14 [3-2]; Wadkins Decl. ¶¶ 13, 16 [1-43]; Cutler Decl. ¶¶ 8-10 [1-14]. The City averages two of these large-scale sweep operations weekly. Herring Decl. ¶ 45. Each sweep begins early in the morning, with SFPD and DPW arriving around 6:50 or 7 a.m. Bennett Decl. ¶¶ 6-8 [3-2]; Evans Decl. ¶ 12 [1-23]; Wadkins Decl. ¶ 18 [1-44]. Most unhoused people at the site learn about the sweep for the first time when DPW or SFPD starts shaking them out of their tents at 7 a.m. Bennett Decl. ¶¶ 6-8 [3-2]; Evans Decl. ¶ 13 [1-23]; Wadkins Decl. ¶¶ 19-22 [1-44]. DPW and SFPD tell all unhoused residents they need to clear out of the area immediately. Hurd Decl. ¶ 5 [4-45]; Wadkins Decl. ¶¶ 19-22 [1-44]. Unhoused individuals begin to frantically pack their belongings. Bennett Decl. ¶¶ 6-8 [3-2]; Jones Decl. ¶ 5 [4-49]; Wadkins Decl. ¶¶ 22 [1-45].

Members of the City's HOT team show up onsite between 7 and 7:30 a.m. Bennett Decl. ¶¶ 6-8 [3-2]; Wadkins Decl. ¶ 18 [1-44]; Cutler Decl. ¶¶ 11-12 [1-15]. HOT's job is to approach unhoused individuals and ask if they would be interested in receiving services—i.e. shelter. Bennett Decl. ¶¶ 6-8 [3-2]; Wadkins Decl. ¶ 18 [1-44]; Cutler Decl. ¶¶ 11-12 [1-15]. This is largely performative. HOT has no idea if it can offer shelter to any of the individuals onsite at this time— or if any shelter will become available that day at all. *See* Bennett Decl. ¶¶ 6-8, 15-18 [3-2]; Wadkins Decl. ¶ 18 [1-44]; Cutler Decl. ¶¶ 11-12 [1-15]. Nonetheless, the City uses the guise of potential shelter offers as a justification to continue the sweep operation—despite the fact that there is not sufficient shelter to offer. Herring Decl. ¶¶ 24-29, 33, 42.

By 8:00 a.m., DPW has already started to take people's belongings, while SFPD stands watch. Bennett Decl. ¶ 9 [3-2]; Wadkins Decl. ¶¶ 19-22 [1-44]; Cutler Decl. ¶¶ 13-17 [1-15]. DPW does not wait. Cleaning crews race to take any belongings that unhoused people have not already managed to pack up and move. Bennett Decl. ¶¶ 9-14 [3-2]; Wadkins Decl. ¶¶ 19-22 [1-44];

Ackerman Decl. ¶ 8 [1-10]; Cutler Decl. ¶¶ 13-17 [1-15]. DPW workers may also begin power-washing the street—soaking unhoused people and their belongings and creating a noisy, chaotic environment. Cutler Decl. ¶ 13 [1-15]. Although there are times when DPW purports to differentiate between trash and people's belongings, DPW more often indiscriminately throws unhoused individuals' essential items, survival gear, and precious personal property directly into crusher trucks. Bennett Decl. ¶¶ 9-11 [3-2]; Wadkins Decl. ¶¶ 19-22, 26-27 [1-44]; Ackerman Decl. ¶ 10 [1-10]; Cutler Decl. ¶¶ 13-17 [1-15]; Jones Decl. ¶ 10 [4-51]; Hill Decl. ¶¶ 6-7 [4-31]; Solis Decl. ¶¶ 6-7 [4-69]. DPW does not "bag and tag" any of this valuable and essential property for safekeeping, and it is often immediately destroyed rather than stored. Bennett Decl. ¶¶ 9-11 [3-2]; Wadkins Decl. ¶¶ 19-22, 26-27 [1-44]; Ackerman Decl. ¶ 8 [1-10]; Cutler Decl. ¶¶ 13-17 [1-15]; Castaño Decl. ¶¶ 11-12 [2-3]; Orona Decl. ¶¶ 16-18 [4-59]; Delamora Decl. ¶¶ 3-4, 6-7 [4-12]; Howard Decl. ¶¶ 9-13 [4-41]; Hurd Decl. ¶ 8 [4-46]; Dubose Decl. ¶ 7 [4-18]; Frank Decl. ¶ 6 [2-15]; Hill Decl. ¶ 11 [4-31]; Solis Decl. ¶ 12 [4-70]. If unhoused people are not present at the time of the sweep to vouch for their property—even when it is obviously the property of an unhoused individual and arranged in a way that would obviously suggest the owner was relying on it and wanted it—DPW will immediately throw away all of their belongings. Jones Decl. ¶ 10 [4-49], Hurd Decl. ¶ 9 [4-46], Dubose Decl. ¶ 8 [4-18]. Many unhoused individuals will leave their tents momentarily unattended to use the restroom, or to seek employment or housing opportunities in the community—only to find that DPW destroyed their belongings in their absence. Delamora Decl. ¶¶ 3-4 [4-12], Sparks Decl. ¶ 6 [4-66], Jones Decl. ¶ 15 [4-51], Hurd Decl. ¶¶ 9-10 [4-46], Dubose Decl. ¶ 8 [4-18], Frank Decl. ¶ 4 [2-15]. This happens even when unhoused individuals have friends present to watch their property, as DPW will not let the friends safeguard the property. Bryant Decl. ¶ 21 [4-4]; Howard Decl. ¶ 12 [4-42]; Martinez Decl. ¶ 5 [2-19].

DPW finishes its clearing of the area—including removing and destroying tents and other property—around 9:30 or 10:00 a.m. Bennett Decl. ¶ 14 [3-3]; Wadkins Decl. ¶ 19 [1-44]; Cutler Decl. ¶ 16 [1-16]. During this time, if an unhoused person is not packing up and leaving quickly enough, SFPD often intervenes and threatens them with arrest or citation for refusing to "move along." Bennett Decl. ¶¶ 12-14 [3-3]; Wadkins Decl. ¶¶ 20-21 [1-44]. SFPD also often intervenes

1    whenever an unhoused person protests the destruction of their property—ordering them to leave

2    the area or risk citation or arrest. Orona Decl. ¶ 10 [4-57]; Castaño Decl. ¶ 5 [2-2]; Delamora Decl.

3    ¶ 7 [4-13]. SFPD officers threaten these consequences even though the individuals have been given

4    no access to shelter. Bennett Decl. ¶¶ 12, 15 [3-3]; Wadkins Decl. ¶¶ 20-21 [1-44].

5           When HOT members finally return, usually not until 9:30 or 10:00 a.m. at the earliest, they

6    often have at best a few shelter beds to offer some of the homeless people still onsite. Evans Decl.

7    ¶¶ 17-18 [1-24]; Bennett Decl. ¶¶ 15-18 [3-3]; Wadkins Decl. ¶¶ 23-24 [1-45]; Cutler Decl. ¶ 17

8    [1-16]. By this point, many unhoused individuals have already left the area after being told to

9    "move along" by DPW and SFPD or after being cited or arrested.  Bennett Decl. ¶¶ 15-18 [3-3];

10   Wadkins Decl. ¶ 23 [1-45]. Even after the forced dispersal of most unhoused people onsite, HOT

11   often does not have enough shelter beds or shelter beds that are appropriate for the few individuals

12   remaining onsite. Bennett Decl. ¶¶ 15-18 [3-3]; Wadkins Decl. ¶ 23 [1-45]; Cutler Decl. ¶ 17 [1-

13   16]; James Decl. ¶ 14 [1-37]; Orona Decl. ¶¶ 19-21 [4-59]; Castaño Decl. ¶ 5 [2-2]; Delamora

14   Decl. ¶ 8 [4-14]; Brown Decl. ¶ 5 [4-7]; Howard Decl. ¶ 5 [4-40]; Murdock Decl. ¶ 5 [4-54]. When

15   HOT has nothing to offer, its members simply leave without engaging with the unhoused people

16   onsite to inform them that no shelter will be available to them. Bennett Decl. ¶ 17 [3-4]; Brown

17   Decl. ¶ 5 [4-7]. By the time the entire HSOC operation wraps up around 11:30 a.m., almost

18   everyone at the site has been displaced. They are stranded without shelter, and without many of

19   their survival belongings—most of which have been destroyed. Evans Decl. ¶ 20 [1-24]; Cutler

20   Decl. ¶¶ 8-17 [1-14]; Bennett Decl. ¶¶ 7-18 [3-2]; Wadkins Decl. ¶ 24 [1-45]; Brown Decl. ¶ 5 [4-

21   7]; Ackerman Decl. ¶¶ 8-9 [1-10].

22          **D.      Outside of Formal HSOC Sweeps, DPW and SFPD Also Summarily Destroy
                     the Property of and Impose and Threaten Penalties on Homeless Individuals.**
23

24          Even when they are not working on specific HSOC initiatives, DPW and SFPD personnel

25   have a daily practice of summarily destroying the property of homeless people without proper bag

26   and tag, and of imposing or threatening civil and criminal penalties on homeless people simply for

27   being homeless. *See, e.g.*, Evans Decl. ¶ 25 [1-25]; Wadkins Decl. ¶ 30  [1-46]; Cutler Decl. ¶ 24

28   [1-17]; Hurd Decl. ¶¶ 8, 11 [4-46]; Hill Decl. ¶ 8 [4-31]; Solis Decl. ¶ 9 [4-69]. Specifically, police

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

officers are dispatched daily and constantly in response to calls about homelessness. Herring Decl. ¶¶ 61-65, 68-69. When SFPD arrives onsite, officers often order unhoused people to "move along" under threat of citation or arrest even though there is not even the guise of an offer of services because no HOT worker is present. Bryant Decl. ¶¶ 8, 23 [4-2]; Harrison Decl. ¶ 2 [4-22]; Hill Decl. ¶ 8 [4-31]; Solis Decl. ¶ 9 [4-69]; Solomon Decl. ¶ 3 [4-78]. SFPD has an explicit practice of authorizing its officers to cite and arrest unhoused people for failing to "move along" without any attempt to offer shelter—as long as the officers are policing in an area where an HSOC sweep has already taken place. Cutler Decl. ¶ 25 [1-17]; *see* Della-Piana Decl. Ex. 17 at 79; Bryant Decl. ¶ 23 [4-4]; Freehoffer Decl. ¶ 4 [4-20]; Harrison Decl. ¶ 3 [4-22]; Partee Decl. ¶ 7 [4-63]. SFPD calls this practice "re-encampment prevention" and uses it to threaten individuals with citation or arrest whether or not there is present shelter available to them, and regardless of whether they even received an offer of services at a prior sweep operation. Cutler Decl. ¶ 25 [1-17]; Della-Piana Decl. Ex. 17 at 79; Bryant Decl. ¶ 23 [4-4]. These SFPD enforcement operations happen across San Francisco with no safe harbor at any location within the City. *See, e.g.* Evans Decl. ¶ 26 [1-26]; Cutler Decl. ¶ 26 [1-18]; Hurd Decl. ¶¶ 8-11 [4-45]; Frank Decl. ¶ 6 [2-15]; Hill Decl. ¶ 11 [4-31]; Solis Decl. ¶ 12 [4-70]. SFPD often threatens unhoused people with arrest in the middle of the night. *See* Brown Decl. ¶ 3 [4-6]; Orona Decl. ¶ 9 [4-57].

Similarly, DPW dispatches to perform street cleaning in different neighborhoods across San Francisco on a daily basis and conducts informal sweep operations to displace unhoused people as a part of that process. Friedenbach Decl. ¶ 11 [1-3]. At informal sweeps, DPW consistently seizes and disposes of homeless individuals' valuable personal property and survival gear without bagging, tagging, and storing that property. Friedenbach Decl. ¶¶ 21-22 [1-6]; Bryant Decl. ¶ 6 [4-2]; Harrison Decl. ¶ 6 [4-23]; Cronk Decl. ¶¶ 3-6 [2-8]; Donohoe Decl. ¶¶ 3-6 [2-12].

E.   **The City's Own Records Demonstrate a Pattern of Citing, Arresting, and Issuing "Move-Along" Orders to Homeless Individuals Despite Failing to Provide Access to Shelter.**

Public records make clear that the City is engaging in widespread enforcement of "quality of life" offenses that criminalize homelessness despite a complete lack of available shelter across

the City—meaning that involuntarily homeless people are being criminally enforced against. *See supra* Subsection III(A); Herring Decl. ¶ 58-79. The City's own signs threaten that "[l]odging on public property without permission is unlawful" under Cal. Penal Code § 647(e). *See, e.g.*, Della-Piana Decl. Ex. 18 (a "no illegal lodging" sign from Woodward Street). A Policy Analysis Report from the Budget and Legislative Analyst's Office to the Board of Supervisors notes  police officers as a highly visible and active presence during encampment clearings. Della-Piana Decl. Ex. 14 at 16. SFPD citation and arrest data from encampment resolutions indicates that over the three-year period from July 2018 to October 2021, SFPD cited or arrested unhoused people for illegal lodging under Cal. Penal Code § 647(e) at least 360 times. Herring Decl. ¶ 70; Della-Piana Decl. Exs. 35, 36.  During the same three-year period, SFPD cited or arrested unhoused people under Cal. Penal Code § 148(a) for refusal to obey a law enforcement order to vacate or "move along" at least 2,652 times. Herring Decl. ¶ 70; *see also* Della-Piana Decl. Ex. 27 ("officers may cite an individual for violating Penal Code § 148(a), where […] the individual refuses to vacate an encampment"). This is likely a massive undercount of actual arrests made and citations issued at encampments due to gaps in reporting. Herring Decl. ¶¶ 71-73. It also does not appear to includes arrests and citations for various other related San Francisco anti-homelessness ordinances. *Id.* ¶ 71.

SFPD also repeatedly issues "move along" orders under threat of citation and arrest in response to dispatch calls related to homeless encampments. Wadkins Decl. ¶ 20 [1-44] ("I have also seen SFPD threaten to give people a citation if they did not move."), *see, e.g.* Harrison Decl. ¶¶ 2, 7 [4-22];  Delamora Decl. ¶ 8 [4-13]. These "move along" orders short of citation and arrest are seldom recorded. However, from July to September 2021 alone, SFPD was dispatched to respond to a "homeless complaint" between at least 744 and 965 times each month. Herring Decl. ¶¶ 60-61; Della-Piana Decl. Exs. 35, 36. Given that the City's own analysis shows that as many as 89% of SFPD dispatches for "homeless-related" issues resulted in law enforcement issuing a move-along order under threat of citation or arrest, while another 10% resulted in a formal citation, the SFPD has likely subjected *thousands* of unhoused individuals to "move along" orders under threat of citation and arrest.  *Id.* ¶¶ 67, 69-70.

Despite a lack of available shelter across the City and the fact that unhoused individuals

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

1    have no meaningful ability to seek shelter even when beds are available (*see supra* Subsection

2    III(A)), the City nonetheless justifies its sweep operations by purporting to hold specific shelter

3    beds open for law enforcement to offer when they threaten unhoused individuals with citation and

4    arrest for sleeping in public. Herring Decl. ¶ 33, 42.  The City's shelter shortage is so extreme,

5    however, that the City lacks sufficient shelter even for the specific homeless individuals it targets

6    for enforcement. In fact, when SFPD conducts enforcement during HSOC encampment operations,

7    the City knows that it can only manage to cobble together shelter for about 40% of the unhoused

8    people it displaces *at that very site*. Della-Piana Decl., Ex. 22 ("Sam Dodge, the newly appointed

9    director of the Healthy Streets Operation Center, told the San Francisco Public Press in October

10   2021 that the formula changes each week, and at the moment teams head out with enough shelter

11   beds available for around 40% of any encampment"). Often, the City has even less shelter to offer

12   than that. Bennett Decl. ¶¶ 15-18 [3-3]; Herring Decl. ¶¶ 24, 28-45-50.

13           This does not stop the City from citing and arresting unhoused individuals for being

14   homeless. In fact, public records from January 1, 2021 to June 30, 2021 reveal that SFPD cited

15   and arrested unhoused individuals for being homeless on at least 70% of days when HSOC's own

16   records confirm that the City did not have nearly enough shelter to offer each unhoused person

17   targeted for enforcement that day. Herring Decl. ¶ 75; Della-Piana Decl. Ex. 22. In other words,

18   the City fails to meet even its own pre-enforcement standards. *See* S.F. Police Code § 169 (the

19   City is required to "offer Housing or Shelter to *all residents of the Encampment who are present*"

20   and "shall not enforce the prohibition […] unless there is available Housing or Shelter for the

21   person or persons in the Encampment.") (emphasis added). Moreover, SFPD often conducts its

22   citations and arrests at encampment resolutions even *before* limited shelter offers are made to the

23   few individuals onsite lucky enough to receive them. Bennett Decl. ¶¶ 12-14 [3-3] (former City

24   worker confirming the practice); Friedenbach Decl. ¶ 14 [1-4]; Cutler Decl. ¶¶ 11-17 [1-15]; *see*

25   *also supra* Subsection III(C) at 7:16-8:7. This likewise violates the City's own pre-enforcement

26   standards. Della-Piana Decl. Ex. 27 (before an order to vacate can be criminally enforced for non-

27   compliance, SFPD policy requires that there has been a "written offer of shelter or housing at least

28   24 hours before ordering removal of a tent or encampment"). However the City arranges the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

numbers, they do not add up. Della-Piana Decl. Ex. 23 (DPW employee writes that "40+ tents will be cleared" even though they were only offering "at least 18 HSH shelter beds + whatever safe sleep is available"). And the City conducts these law enforcement operations knowing full well that *none* of the unhoused people it targets would be able to meaningfully access shelter through the City's shelter placement process. *Id.* Ex. 24 ("There is always a waiting list of at least 1,000 people wanting a shelter bed" so there are not "enough shelter beds available to match the number of people who are homeless[.]").

F.    **The City's Own Records Demonstrate a Pattern of Summarily Destroying the Property of Unhoused Residents in Violation of the City's Own Policies.**

As noted above, the City's regular practice is to seize and destroy the property of unhoused individuals—rather than "bagging and tagging" that property for storage and safekeeping. *See* Subsection III(C)-III(D)); *see also* Bennett Decl. ¶¶ 9-11 [3-2]; Cutler Decl. ¶ 22 [1-17]; Wadkins Decl. ¶¶ 25-27 [1-45]; Orona Decl. ¶¶ 15-18 [4-58]; Hill Decl. ¶¶ 10-115 [4-31]; Solis Decl. ¶¶ 11-12 [4-69]. The City's DPW work crews engage in wholesale property destruction by purporting that unhoused people have abandoned their property simply because it is momentarily unattended. Vaughn Decl. ¶ 5 [2-25]; Sandoval Decl. ¶ 7 [2-22]. DPW also classifies survival belongings and personal property of homeless individuals as trash without making any attempt to store belongings or return them to their owners, even when unhoused individuals are begging to keep their belongings as DPW carts them away. Wadkins Decl. ¶¶ 19-23 [1-44] ("There is no sorting and no attempt to safeguard any property of value—from tents to medications to expensive technology and heirlooms."); Evans Decl. ¶ 15-16 [1-23]; Cutler Decl. ¶ 22 [1-17]; Ackerman Decl. ¶ 8 [1-10]. Knowing in advance that it will destroy substantial amounts of homeless individuals' property, DPW often brings a crusher truck to facilitate the mass destruction of personal property. Evans Decl. ¶ 15 [1-24]; Cutler Decl. ¶¶ 10, 15 [1-15]; Wadkins Decl. ¶¶ 19-23 [1-23] ("DPW has brought its crusher truck to throw all of [the] belongings away").

These widespread practices are directly contrary to the City's own written policies that require City employees to "bag and tag" all valuable personal property of unhoused people for safekeeping regardless of whether or not that property is momentarily unattended. *See* Della-Piana

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

Decl. Ex. 26 ("[u]nattended property is not abandoned if it is accompanied by signs of ownership, for example, an unattended tent that is filled with personal belongings or items that are being stored in an orderly manner (i.e., packed up, wrapped or covered)" […] "all unattended personal property that is collected for storage will be bagged and tagged upon collection […] the department will store personal items for 90 days"). The City's policies also require appropriate sorting of belongings to ensure that valuable property is not haphazardly discarded as trash and is instead properly stored and returned to the owner. *Id.* ("If staff has a reasonable doubt as to whether an item constitutes trash, it should be collected and stored"). Indeed, items are only to be destroyed if they clearly pose an immediate health and safety risk. *Id.* (property only to be immediately destroyed if it poses an immediate health or safety risk, such as "needles, scissors, knives," "human waste, body fluids, moldy, mildewed items," or "items infested by rodents and insects").[3]

Public records make clear that the City is destroying the property of unhoused people on a regular basis notwithstanding these written policies. For example, between January 1, 2021 and June 30, 2021, the City reported displacing at least 1,282 homeless people through HSOC sweeps. Della-Piana Decl., Exs. 30, 31; Herring Decl. ¶¶ 54, 84. DPW or SFPD were dispatched to respond to and/or clear individual tents *thousands* more times. Herring Decl. ¶¶ 60-61, 84. However, in that same time period, DPW logs only indicated 195 bag and tags. Della-Piana Decl. Exs. 30-31; Herring Decl. ¶¶ 83-84.[4]  Again, the City's numbers do not add up.

This data is consistent with field research. A 2019 study identified that 42% of San Francisco's unhoused residents reported having belongings confiscated or destroyed by City employees. Herring Decl. ¶ 87. This reality is confirmed by DPW records from January 2018

---

[3] DPW's apparently revised, but unpublished, August 2021 policy purports to include even more expansive protections—particularly requiring the City to store even so-called "Bulky Items" for safekeeping and storage. Della-Piana Decl. ¶¶ 32-33.

[4] Indeed, the actual number of bag and tag logs is probably even smaller, as it appears that a number of these logs are duplicates. *See* Ex. 30. DPW's recent PRA response shows similarly few bag and tag records—only 27 bag and tag logs in July 2021, 44 bag and tag logs in August 2021, 38 bag and tag logs in September 2021, 30 bag and tag logs in October 2021, 25 bag and tag logs in November 2021, 31 bag and tag logs in December 2021, 21 bag and tag logs in January 2022, 27 bag and tag logs in February 2022, 38 bag and tag logs in March 2022, 27 bag and tag logs in April 2022, 22 bag and tag logs in May 2022, 30 bag and tag logs in June 2022, 29 bag and tag logs in July 2022, and 59 bag and tag logs in August 2022. Della-Piana Decl. Ex. 32.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

1  through September 2021, which contain insufficient information to identify whether any property

2  is actually being safely stored and collected. *Id.* ¶ 88.

3  　　　　The City's destruction of property has also been the subject of prior litigation. In August

4  2021, for example, the Honorable Judge Michelle Tong of the San Francisco Superior Court

5  determined that the City had unlawfully destroyed the property of 10 unhoused individuals during

6  an HSOC sweep operation—and noted in the decision that "DPW notices for bagging and tagging

7  […] were not provided to the Court by any of the Defense witnesses." Della-Piana Decl. Ex. 41-

8  50.  These public records collectively demonstrate the City's pattern and practice of destroying the

9  survival belongings of unhoused individuals on a regular basis. Herring Decl. ¶¶ 85-89.

10  　　G.　　**Thirty-One Sworn Declarants Confirm the City's Criminalization and**
11  　　　　**Property Destruction Practices.**

12  　　　　Plaintiffs have submitted a series of declarations in support of this motion. Twenty-five of

13  those declarations come directly from unhoused people and report their recent experiences with

14  being cited, arrested, or threatened to "move along" simply because they were sleeping in

15  public[5]—as well as each unhoused individual's detailed experience with the City's destruction of

16  personal property.[6] Many have provided an itemized list of the critical survival gear the City took

17  from them (tents, blankets, warm clothing, etc.), as well as other valuable personal property such

18  as laptops, cellphones, jewelry, and precious family keepsakes. *See, e.g.*, Bryant Decl. ¶ 18 [4-3]

19  ("all of my tools I had used for my work as an automobile technician" that "cost thousands of

20  dollars"); Martinez Decl. ¶ 5 [2-19] (items included a "brand new pop-up tent from Coleman that

21

22  [5] *See, e.g.* Brown Decl. ¶¶ 3-4 [4-6]; Bryant Decl. ¶¶ 8, 16-17, 23 [4-2]; Castaño Decl. ¶¶ 5-9 [2-2]; Connick Decl. ¶ 4 [4-10]; Cronk Decl. ¶ 8 [2-9]; Donohoe Decl. ¶ 8 [2-9]; Delamora Decl. ¶ 7
23  [4-13]; Dubose Decl. ¶ 4 [4-17]; Frank Decl. ¶ 7 [2-16]; Freehoffer Decl. ¶ 4 [4-20]; Harrison Decl. ¶ 7 [4-23]; Hill Decl. ¶ 8 [4-31]; Hurd Decl. ¶ 6 [4-46]; Martinez Decl. ¶ 3 [2-18]; Orona
24  Decl. ¶ 9 [4-57]; Sandoval Decl. ¶ 3 [2-21]; Solis Decl. ¶ 9 [4-69]; Sparks Decl. ¶ 11 [4-66]; Vaughn Decl. ¶ 3 [2-24]; Vetter Decl. ¶¶ 8-11 [4-82].
   [6] *See, e.g.*, Brown Decl. ¶ 10 [4-8]; Bryant Decl. ¶¶ 9-22 [4-2]; Castaño Decl. ¶¶ 11-12, 14-15 [2-
25  3]; Cronk Decl. ¶¶ 3-6 [2-8]; Delamora Decl. ¶¶ 3-4, 6-7 [4-12]; Donohoe Decl. ¶¶ 3-7 [2-12];
   Dubose Decl. ¶¶ 4, 7-9 [4-17]; Frank Decl. ¶¶ 3-6, 8-10 [2-15, 2-16]; Freehoffer Decl. ¶ 5 [4-21];
26  Hill Decl. ¶¶ 3, 5-8, 10-17 [4-68]; Howard Decl. ¶ 9-13 [4-41]; Hurd Decl. ¶¶ 3, 5-6, 9-10 [4-45];
   Jones Decl. ¶¶ 4, 5, 8-10  [4-49]; Martinez Decl. ¶¶ 5-8 [2-19]; Partee Decl. ¶ 12 [4-64]; Sandoval
27  Decl. ¶¶ 5-8 [2-22]; Sparks Decl. ¶ 11 [4-66]; Solis Decl. ¶¶ 2, 5-9, 11-18 [4-68]; Vaughn Decl. ¶
   7 [2-25]; Vetter Decl. ¶¶ 8, 10-14 [4-82].

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

1  I was living in," "[m]y laptop and two cell phones that I used to look for work and stay in contact

2  with family members," and "[m]y congestive heart failure medication"), Vaughn Decl. ¶ 5 [2-25]

3  (listing at least sixteen items destroyed by the City).[7]  All describe how the City's sweeps have

4  disrupted their lives and their sense of safety. Bryant Decl. ¶ 25 [4-5]. Remarkably, one unhoused

5  individual was employed by the City at the time that the City destroyed his survival belongings.

6  Delamora Decl. ¶ 3 [4-12]. Other accounts corroborate Plaintiffs' accounts of property loss. *See*

7  Della-Piana Decl. Ex. 16 at 26.[8]

8          Plaintiffs have also submitted five declarations from staff and volunteers at the Coalition

9  on Homelessness—who together have directly witnessed, recorded, and reported on well over

10 thirty sweep operations. These five trained observers— including three organizers staffed with the

11 Coalition, a scientist from UCSF, and a small business owner in the Haight-Ashbury—have

12 documented the property destruction, law enforcement threats, and shelter scarcity they observed

13 at the City sweep operations they attended. Ackerman Decl. ¶¶ 7-10 [1-10]; Cutler Decl. ¶¶ 8-26

14 [1-14]; Evans Decl. ¶¶ 7-26 [1-22]; James Decl. ¶¶ 15-19 [1-37]; Wadkins Decl. ¶¶ 13-30 [1-43].

15         Plaintiffs also submit the declaration of a former City employee who worked for the City's

16 HOT, participated in countless City sweep operations, and attested to the City's criminalization of

17 homelessness and destruction of property. The former employee confirmed that HOT often had no

18 ability to connect unhoused individuals with the shelter or resources the City claimed that it was

19 providing. Bennett Decl. ¶ 27 [3-6] ("The reality is that, no matter the number of tents identified

20 at an encampment, the HSOC schedule would estimate that only a small fraction of people would

21 need services. In other words, we never once showed up prepared to provide everyone a shelter

22 bed."); *see generally* Herring Decl. ¶¶ 58-88 (demonstrating that unhoused people are regularly

23 exposed to the City's criminalization and property destruction practices on an ongoing basis).

24

25 _____
[7] *See, e.g.* Castaño Decl. ¶ 15 [2-4]; Connick Decl. ¶ 4 [4-10]; Delamora Decl. ¶ 7 [4-13]; Frank
26 Decl. ¶ 10 [2-16]; Freehoffer Decl. ¶ 5 [4-21]; Harrison Decl. ¶ 8 [4-23]; Hill Decl. ¶ 17 [4-33];
   Howard Decl. ¶ 14 [4-42]; Hurd Decl. ¶ 10 [4-46]; Partee Decl. ¶ 8 [4-63]; Sparks Decl. ¶ 12 [4-
27 66]; Solis Decl. ¶18 [4-71].
[8] A 2022 campaign by the Latino Task Force which engaged with 110 unhoused individuals
28 reported that nearly three quarters of respondents recently had property confiscated by the city
   without proper bag and tag, in violation of the city's own policies. *Id.* at 3, 26.

**H.**     **Plaintiffs Suffer Significant Harm as a Result of the City's Conduct.**

Plaintiff Coalition on Homelessness is an advocacy organization of, by, and for unhoused San Franciscans. Friedenbach Decl. ¶ 6 [1-2]. Over the past several years, the Coalition made the difficult choice to depart from its mission-related activities—proactive housing and community empowerment work—to focus on the dire need to protect unhoused people from the City's ongoing criminalization and property destruction practices. Friedenbach Decl. ¶¶ 11-22 [1-3]. The Coalition's unplanned, reactive work to monitor and protect unhoused people from Defendants' sweeps has had a measurable fiscal impact on the organization. Friedenbach Decl. ¶¶ 17-20 [1-5]. The Coalition has also spent its limited donor dollars to replace survival gear for unhoused people that the City of San Francisco has destroyed. Friedenbach Decl. ¶ 22 [1-6].

Individual Plaintiffs are unhoused individuals who have each experienced the City's criminalization and property destruction practices in the past, and who fear that the City will subject them to those same practices in the future because they are homeless or at imminent risk of becoming homeless again. Castaño Decl. ¶¶ 20-21 [2-5]; Cronk Decl. ¶ 13 [2-10]; Donohoe Decl. ¶ 12 [2-14]; Frank Decl. ¶ 2, 15 [2-15], Martinez Decl. ¶ 11 [2-20]; Sandoval Decl. ¶ 9 [2-22]; Vaughn Decl. ¶ 3 [2-24]. A significant body of research shows that law enforcement threats and destruction of survival belongings seriously harm unhoused individuals' physical and mental health, can damage their employment prospects and their ability to exit homelessness, and exposes them to a much greater risk of criminal violence. Herring Decl. ¶¶ 90-105. In other words, Individual Plaintiffs face significant and documented harm in light of the City's enforcement practices, as anyone would if everything they owned were destroyed.

## IV.   LEGAL STANDARD

Plaintiffs are entitled to obtain a preliminary injunction if they can show (1) "that [they are] likely to succeed on the merits," (2) "that [they are] likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [their] favor," and (4) "that an injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). These elements "must be balanced, so that a stronger showing of one element may offset a weaker showing of

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

1   another." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). For example, "a stronger showing

2   of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the

3   merits." *Cottrell*, 632 F.3d at 1131. Thus, "serious questions going to the merits and a balance of

4   hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction,

5   so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

6   injunction is in the public interest." *Id*. at 1135 (internal quotation marks omitted).  This "serious

7   questions" standard "permits a district court to grant a preliminary injunction in situations where

8   it cannot determine with certainty that the moving party is more likely than not to prevail on the

9   merits of the underlying claims, but where the costs outweigh the benefits of not granting the

10  injunction." *Id.* at 1133 (quoting *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities*

11  *Master Fund Ltd*., 598 F.3d 30, 35 (2d Cir. 2010)).[9]

12  **V.     ARGUMENT**

13      **A.     Plaintiffs Are Likely to Succeed on the Merits of Their Eighth Amendment**
14           **Claim Against the City for the Criminalization of Involuntary Homelessness.**

15      "[T]he Eighth Amendment prohibits the imposition of criminal penalties for sitting,

16  sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter."

17  *Martin v. City of Boise*, 920 F.3d 584, 616 (9th Cir. 2019), *cert. denied sub nom. City of Boise,*

18  *Idaho v. Martin*, 140 S. Ct. 674, 205 L. Ed. 2d 438 (2019). "That is, as long as there is no option

19  of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping

20  outdoors, on public property, on the false premise they had a choice in the matter." *Id*. at 617.

21  Whether enforcement "is consistent with the Eighth Amendment will depend . . . on whether it

22  punishes a person for lacking the means to live out the 'universal and unavoidable consequences

23  of being human.'" *Id.* at 617 n.8. Under this framework, the City's criminalization of homelessness

24  is plainly unconstitutional.

25

26

---

27  [9] Plaintiffs seek a prohibitory, not mandatory, injunction. *See Hernandez v. Sessions*, 872 F.3d
28  976, 998 (9th Cir. 2017) (an injunction that "prevents future constitutional violations [is] a classic
    form of prohibitory injunction").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

1        1.      San Francisco Is Thousands of Shelter Beds Short and Therefore Any
2                Criminal Enforcement Within the City Is Unconstitutional *Per Se*.

3        In *Martin*, the Ninth Circuit held that "so long as there is a greater number of homeless
4  individuals in jurisdictions than the number of available beds [in shelters], the jurisdiction cannot
5  prosecute homeless individuals for involuntarily sitting, lying, and sleeping in public." *Id.* at 617
6  (citation omitted). San Francisco has never had enough shelter for its unhoused residents, and has
7  indeed fallen short by *thousands* of beds. The City's present shelter shortage is, at a minimum,
8  anywhere between 2,600 and 4,000 beds (by the City's own estimates), which forces the vast
9  majority of the City's homeless population to live unsheltered. *See supra* Subsection III(A).
10 Despite clearly insufficient shelter resources, SFPD has cited, arrested, and forced unhoused
11 individuals to "move along" under threat of citation and arrest well over 3,000 times over the last
12 three years for the mere fact of sleeping outside or failing to move from such shelter when
13 ordered—with no safe harbor for unhoused individuals anywhere within the City. *See supra*
14 Subsection III(E); Herring Decl. ¶¶ 70, 73. This is the end of the constitutional inquiry. The City
15 is criminalizing the status of homelessness in clear violation of *Martin*'s express holding. *See*
16 *Martin*, 920 F.3d at 617 ("[S]o long as there is a greater number of homeless individuals in [a
17 jurisdiction] than the number of available beds [in shelters], the jurisdiction cannot prosecute
18 homeless individuals for involuntarily sitting, lying, and sleeping in public.") (citation omitted).

19       2.      The City's Ongoing Criminal Enforcement Violates the Eighth
20               Amendment's Core Protections Against Criminalizing Involuntary Acts.

21       Beyond the City's enforcement campaign in the clear absence of sufficient shelter beds—
22 which alone establishes a violation of *Martin*—the City's criminalization of homelessness also
23 violates the Eighth Amendment's core protection against punishing conduct that is involuntary.
24 *See Robinson v. California*, 370 U.S. 660, 666 (1962) (striking down a statute "which makes the
25 'status' of narcotic addiction a criminal offense"); *Powell v. Texas*, 392 U.S. 514, 550 n.2 (1968)
26 (White, J., concurring in the result) ("[t]he proper subject of inquiry is whether volitional acts
27 brought about" the condition that is criminalized). These principles animate *Martin*'s requirement
28 that "as long as there is no option of sleeping indoors, the government cannot criminalize indigent,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18                                              PLAINTIFFS' MOTION FOR
                                                PRELIM. INJUNCTION
                                                CASE NO. 3:22-cv-05502

homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter." *Martin*, 920 F.3d at 617.

Unhoused individuals in San Francisco have no such choice. The City's shelters are at full capacity, the City's shelter waitlist has been disbanded, unhoused individuals can no longer wait in same-day lines for even a temporary shelter stay, and unhoused individuals must resort to leaving a voicemail and waiting 72 hours with no guarantee of a response before they *might* be able to be connected with shelter—if the City's extremely limited shelter system can accommodate them at all. *See supra* Subsection III(A). This reality means that unhoused individuals genuinely cannot access shelter, and therefore have no choice but to sleep outdoors. *See* Herring Decl. ¶ 39. The City's widespread citations, arrests, and "move along" orders under threat of citation and arrest therefore punish involuntary homelessness in violation of the Eighth Amendment's core protections. *See Martin*, 920 F.3d at 617; *Powell*, 392 U.S. at 550.

3.   The City's Pretextual Weaponization of Shelter Unconstitutionally Punishes Involuntary Homelessness.

The City apparently seeks to avoid the square holdings of *Martin* by purporting that—despite a clear lack of sufficient shelter availability across the City—it can hold its limited shelter beds open to justify threatening specific unhoused people with citation or arrest. *See* Herring Decl. ¶¶ 33, 42. This is a well-documented and persistent practice in San Francisco—weaponizing shelter as a means to carry out criminal enforcement despite insufficient shelter availability and individuals having no voluntary access to shelter anywhere in the City. *See supra* Subsection III(A). But this scheme fundamentally misconstrues Eighth Amendment doctrine. The City's scheme is such that the *only* way for unhoused people to access shelter is, paradoxically, to be subjected to a "move along" order or threatened by law enforcement for the involuntary act of sleeping in public, and even then there is no guarantee of shelter. The result is perverse, particularly because the few shelter beds that become available and which unhoused people could otherwise access to avoid law enforcement scrutiny are intentionally withheld to justify the City's ongoing enforcement actions. At its core, the City's withholding of shelter beds for the purposes of criminal enforcement actually perpetuates the criminalization of involuntary homelessness—because no

unhoused person has any genuine option to obtain shelter until they are first subject to law enforcement consequences. *See Martin*, 920 F.3d at 616 ("[T]he Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside . . . for homeless individuals who cannot obtain shelter.").

> 4.   <u>The City Has a Pattern of Punishing Unhoused Individuals with Law Enforcement Consequences Regardless of Whether Shelter Is Offered to Them, in Violation of the Eighth Amendment and the City's Own Problematic Pre-Enforcement Standards.</u>

In addition, the City's weaponized shelter scheme fails on its own terms: the shelter shortage is so severe that the City lacks sufficient shelter to provide even to the specific homeless individuals it targets with enforcement. *See supra* Subsection III(A); Herring Decl. ¶¶ 42-43. The City readily admits that it is only prepared to offer shelter to about 40% of the unhoused people it displaces through its formal HSOC sweep operations (i.e., out of 10 individuals living in an encampment, the City will only have 4 potentially available beds). *See* Della-Piana Decl., Ex. 22.

Often, the City has even less shelter to offer than that—as regularly there are only a couple of beds available for dozens of unhoused people onsite. Evans Decl. ¶¶ 17-18 [1-24]; Bennett Decl. ¶¶ 15-18 [3-3]; Herring Decl. ¶¶ 45-53.  The City is then clearly failing to meet even its own problematic pre-enforcement standards. *See supra* Subsection III(B); *cf.* S.F. Police Code § 169(d) (the City is required to "offer Housing or Shelter to *all residents of the Encampment who are present*" and "shall not enforce the prohibition . . . unless there is available Housing or Shelter for the person or persons in the Encampment") (emphasis added).

The City nonetheless continues to cite and arrest unhoused individuals for the involuntary status of being homeless. For example, between January 1 and June 30, 2021, the City conducted HSOC enforcement actions on 83 days, which resulted in the displacement of at least 1,282 individuals experiencing homelessness in the City. Herring Decl. ¶¶ 45-53. But SFPD cited and arrested unhoused individuals on at least 51 of these days when HSOC's *own records* reveal that the City did not have nearly enough shelter to offer each unhoused person targeted for enforcement

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

that day. Herring Decl. ¶ 75.[10] As noted above, this data does not even begin to account for SFPD's regular dispatches and informal enforcement actions across the City that occur without even the guise of offering shelter to unhoused people. *See supra* Subsection III(D). The City's practice is, unquestionably, "criminaliz[ing] indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter." *Martin*, 920 F.3d at 617.

5.   Even When Limited Shelter Is Available, the City Has a Pattern of Punishing Unhoused Individuals *Before* Ever Offering Them Shelter—Which Is Squarely Unconstitutional.

At formal HSOC sweep operations, the City will often, but not always, eventually offer shelter to at least *some* of the individuals on site. *See supra* Subsection III(C); Bennett Decl. ¶¶ 6-8 [3-2]. But *none* of the unhoused individuals onsite are offered shelter before SFPD and DPW work crews seize and destroy their belongings and order them to leave the area under threat of citation and arrest. *Id.* Instead, SFPD cites and arrests individuals at encampment resolutions well before limited shelter offers are made to any few individuals remaining. Bennett Decl. ¶¶ 12-14 [3-3] (recent former City worker confirming the practice); Wadkins Decl. ¶¶ 20-21 [1-44]; *see also supra* Subsection III(C). This is because HOT has no information about what shelter may become available that day until *after* SFPD and DPW have already completed their brutal sweep of the area and have forced the unhoused people onsite to disperse after destroying their belongings. Bennett Decl. ¶¶ 6-8, 15-18 [3-2]; Wadkins Decl. ¶ 18 [1-44]; Cutler Decl. ¶¶ 11-12 [1-15]. Under these circumstances, the City's conduct fails to meet the constitutional standards articulated in *Martin*. *See Martin*, 920 F.3d at 617 ("[T]he Eighth Amendment prohibits the imposition of criminal penalties […] for homeless individuals who cannot obtain shelter").[11]

---

[10] It is unsurprising that the City categorically lacks enough shelter to conduct these enforcement actions even by the City's own stated pre-enforcement standards. In order to displace 1,282 unhoused individuals under the City's own purported standards, the City would have needed to make available nearly a *third* of the City's entire shelter bed capacity. This is impossible given that the City's entire shelter system is at functional capacity. Herring Decl. ¶¶ 24-39.

[11]  This pattern of conduct violates the City's own pre-enforcement standards. Della-Piana Decl. Ex. 27 at 3 (before an order to vacate can be criminally enforced for non-compliance, SFPD policy requires that there has been a "written offer of shelter or housing at least 24 hours before ordering removal of a tent or encampment").

1    Citations, arrests, orders to "move along" under threat of citation and arrest, and property

2    destruction in response to involuntary homelessness—without first providing viable access to

3    shelter—have each been found to be actionable as unconstitutional punishment under the Eighth

4    Amendment. *See Martin*, 920 F.3d at 617-18 (citations identified as impermissible punishment);

5    *Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 428, 432 (N.D. Cal. 2017) (denying motion to

6    dismiss Eighth Amendment claim where "Notice to Vacate" identified that homeless individuals

7    would be prosecuted for refusing to leave the area); *Jones v. City of Los Angeles*, 444 F.3d 1118,

8    1138 (9th Cir. 2006) (unhoused individuals "suffer[ing] the loss of their personal property" at the

9    hands of law enforcement was a "preconviction harm" that established standing for Eighth

10   Amendment claim), *vacated by settlement*, 505 F.3d 1006 (9th Cir. 2007); *Phillips v. City of*

11   *Cincinnati*, 479 F. Supp. 3d 611, 654-55 (S.D. Oh. 2020) (Eighth Amendment claim proper where

12   "Plaintiffs alleg[ing] they do not have access to permanent shelter" were "forced to move multiple

13   times under threat of arrest by police").

14   The City has repeatedly engaged in conduct proscribed by the Eight Amendment, as it has

15   cited and arrested thousands of individuals for illegal lodging or failing to comply with a "move

16   along" order in recent years—has threatened to cite or arrest thousands more—and has engaged in

17   widespread property destruction, all despite the City's failure to provide access to shelter. *See*

18   Herring Decl. ¶¶ 70-73, 80-85. The Eighth Amendment does not permit these punishments for

19   involuntary homelessness. *See Martin*, 920 F.3d at 617.

20   **B.    Plaintiffs Are Likely to Succeed on the Merits of their Fourth Amendment**

21   **Claim Against the City for Summarily Seizing and Destroying Unhoused**

22   **Individuals' Belongings.**

23   The Fourth Amendment prohibits local governments from summarily seizing and

24   destroying the personal property of unhoused individuals. *See Garcia v. City of L.A.*, 11 F.4th

25   1113, 1124 (9th Cir. 2021) (stating clearly that "the government may not summarily destroy the

26   unabandoned personal property of homeless individuals that is kept in public areas"); *Lavan v.*

27   *City of L.A.*, 693 F.3d 1022, 1030 (9th Cir. 2019) (affirming district court holding that the Fourth

28   Amendment protects homeless persons from government seizure and summary destruction of their

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

22

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

unabandoned, but momentarily unattended, personal property). "[E]ven if the seizure of the property would have been deemed reasonable had the City held it for return to its owner instead of immediately destroying it, the City's destruction of the property rendered the seizure unreasonable." *Id.* at 1030. The requirement that property be safeguarded and stored applies equally to so-called "bulky items" such as tents, mattresses, and other larger survival belongings. *See Garcia*, 11 F.4th at 1119 ("The fact that Plaintiffs' items are larger than sixty gallons does not reduce their possessory interests in those items").

The City's stated policies make clear that City employees are required to store personal property so unhoused people can reclaim it—i.e. "bag and tag".[12] *See supra* Subsection III(F); Della-Piana Decl. Ex. 26. However it is also clear that the City regularly destroys the belongings of unhoused individuals—indiscriminately and aggressively— in violation of its own policies. *See supra* Subsections III(F), (G). Despite its near-daily sweeps at homeless encampments over the last several years, the City has jarringly sparse logs associated with the storage of property. Herring Decl. ¶ 86; Della-Piana Decl. Ex. 30. The City's limited bag and tag records reveal that at least hundreds of unhoused people have had their property destroyed by the City. *Id.* at ¶¶ 80-85. Additionally, 42% of unhoused residents reported having their belongings destroyed by the City in a recent survey of unhoused San Franciscans. *Id.* at ¶ 87. This data is supported, *inter alia*, by the declarations of 25 unhoused individuals who had their property destroyed by the City; by the eyewitness accounts of various volunteers from the Coalition after observing over 30 sweep operations; and by the account of a recent City employee who watched the City destroy the belongings of unhoused people. *See supra* Subsection III(G); Bennett Decl. ¶¶ 9-11 [3-2].

In short, significant evidence demonstrates that the City has a pattern and practice of violating its own written policies designed to ensure compliance with Fourth Amendment requirements. *See Redman v. County of San Diego*, 942 F.2d 1435, 1445-46 (9th Cir. 1991) ("even if it could be said that the general policy [was sound], the routine failure (or claimed inability) to

---

[12] The City's published policy does NOT instruct City employees to properly bag and tag "bulky items," although the City has represented that the published policy has been amended to expressly require that these items are also safely collected and stored. *See supra* at 13 n.1; Della-Piana Decl. ¶ 33 [referencing revised bag and tag policy].

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

follow the general policy at the SBDF constitutes a custom or policy which overrides, for *Monell* purposes, the general policy"), *abrogated on other grounds by Farmer v. Brennan*, 511 U.S. 825 (1994); *C.B. v. Sonora School District*, 691 F. Supp. 2d 1170, 1185-86 (E.D. Cal. 2010). The overwhelming evidence of this pattern and practice demonstrates "strong questions"—and more forcefully, a likelihood of success on the merits—of Plaintiffs' Fourth Amendment claim. *See Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013).

The City has in the past tried to defend its summary destruction of unhoused individuals' property by alleging: (1) that the property was abandoned; and (2) that the property created a safety issue or was trash. But neither argument is sufficient. *First*, every declaration submitted in support of this motion attests that the property the City destroyed was *not* abandoned. *See Pottinger v. City of Miami*, 810 F. Supp. 1551, 1559 (S.D. Fla. 1992) (observing homeless "property . . . is reasonably distinguishable from truly abandoned property" because it can be "reasonably identifiable by its nature and organization"); *supra* Subsection III(G).[13] Second, claims that property is creating a safety issue or is trash are indefensible when the City indiscriminately destroys all of a person's clearly valuable property without sorting, collecting, and storing anything that can be salvaged. *See Mitchell v. City of L.A.*, No. CV1601750SJOGJSX, 2016 WL 11519288, at *3 (C.D. Cal. Apr. 13, 2016) (unreasonable seizure where the government "summarily dispose[d] of essential medications and medical equipment, without distinguishing contaminated property from other property and without separating each individual's property").[14]

## C.      Plaintiffs Have Demonstrated a Likelihood of Irreparable Harm, That Injunction is in the Public Interest, and that the Balance of Harms Tips *Sharply* in Plaintiffs' Favor.

Individual Plaintiffs have clearly articulated a credible fear that they will again be subject to the City's pattern and practice of criminalizing involuntary homelessness and destroying the

---

[13] Unhoused people have had belongings destroyed that clearly included survival gear and valuable personal property that had not been abandoned. *See* Wadkins Decl. ¶ 25 [1-45]; Evans Decl. ¶ 23 [1-25]. Declarants attest that they had no intention of abandoning their property and had arranged it in the place which they considered their home. *See, e.g.*, Hurd Decl. ¶ 13. But, although they begged the City to return these items as they were being heaped into piles and destroyed, the City ignored those requests and simply removed the property for destruction. *See* Ackerman Decl. ¶ 8 [1-10], *See* Howard Decl. ¶ 12 [4-42]; Castaño Decl. ¶¶ 14-15 [2-3]; Evans Decl. ¶ 26 [1-26].

[14] *See also Kincaid v. City of Fresno*, No. 106CV-1445 OWW SMS, 2006 WL 3542732, at *37 (E.D. Cal. Dec. 8, 2006); *Rios v. Cnty. of Sacramento*, 562 F. Supp. 3d 999, 1016 (E.D. Cal. 2021).

1  valuable personal property of unhoused individuals. *See*, *e.g.*, Sandoval Decl. ¶¶ 2-9 [2-21]; *see*
2  *also Martin*, 920 F.3d at 608 (credible threat of future enforcement confers standing). The
3  Coalition has also articulated that it has standing to sue both on behalf of its many unhoused
4  members and for its own sake—as the organization is continuing to divert its limited resources to
5  address the City's repeated unconstitutional conduct. Friedenbach Decl. ¶¶ 11-22 [1-4]; James
6  Decl. ¶ 4 [1-35]; *see also Garcia v. City of L.A.*, 481 F.Supp.3d 1031, 1041 (C. D. Cal. 2020).

7  Deprivation of Plaintiffs' constitutional rights establishes irreparable harm *per se*. *See*
8  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation
9  of constitutional rights 'unquestionably constitutes irreparable injury'"). Furthermore, when a
10  plaintiff establishes "a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs
11  have also established that both the public interest and the balance of the equities favor a preliminary
12  injunction." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

13  The nature of this deprivation and unhoused individual Plaintiffs' particular vulnerability
14  tips the balance of equities *sharply* in Plaintiffs' favor as a matter of law. *See*, *e.g.*, *Sausalito/Marin*
15  *Cnty. Chapter of California Homeless Union v. City of Sausalito*, 522 F. Supp. 3d 648, 658 (N.D.
16  Cal. 2021) (holding that a ban on day camping would pose a risk to unhoused plaintiffs' health
17  and safety such that the balance of equities "tip[] decidedly in Plaintiffs' favor"); *Price v. City of*
18  *Stockton, Cal.*, 394 F. Supp. 2d 1256, 1268-69 (E.D. Cal. 2005) (stating that the harm unhoused
19  plaintiffs would face by being forced to vacate SROs would "work[] a profound hardship" that
20  would "far outweigh[]" any hardship defendants might suffer); *Garcia v. City of Los Angeles*, 481
21  F. Supp. 3d 1031, 1051 (C.D. Cal. 2020), *aff'd*, 11 F.4th 1113 (9th Cir. 2021) (holding that, where
22  a city took or destroyed personal property from homeless individuals during cleanups, the "balance
23  of the equities and the public interest tip[ped] sharply in Plaintiffs' favor").[15] Every day that an
24  injunction is not in place, the risk is high that more unhoused San Franciscans will traumatically
25  and irreparably lose their only possessions.

26  ---
27  [15] This clear balance of equities means that Plaintiffs can secure a preliminary injunction even on a diminished showing on the merits. However, as identified above, Plaintiffs have clearly asserted that they have a likelihood of success on the merits—which is sufficient to secure a preliminary injunction even under ordinary circumstances where the balance of equities is less obvious. *See*
28  *Shell Offshore, Inc.*, 709 F.3d at 1291.

1

**VI.    CONCLUSION**

2        For the foregoing reasons, Plaintiffs request that the Court grant their application for a

3   preliminary injunction.

4   Dated: September 27, 2022

5                                                    By: */s/ Zal K. Shroff*

6                                                    LAWYERS' COMMITTEE FOR CIVIL
                                                     RIGHTS OF THE SAN FRANCISCO BAY
                                                     AREA
7                                                    Zal K. Shroff, MJP 804620*
                                                     Elisa Della-Piana, SBN 226462
8                                                    131 Steuart Street, Ste. 400
                                                     San Francisco, CA 94105
9                                                    Telephone: (415) 543-9444
                                                     zshroff@lccrsf.org
10                                                   edellapiana@lccrsf.org

11                                                   *application pro hac vice pending*

12                                                   By: */s/ John Thomas H. Do*

13                                                   ACLU FOUNDATION OF NORTHERN
                                                     CALIFORNIA
14                                                   John Thomas H. Do, SBN 285075
                                                     Brandon L. Greene, SBN 293783
15                                                   39 Drumm Street
                                                     San Francisco, CA 94111
16                                                   Telephone: (415) 293-6333
                                                     jdo@aclunc.org
17                                                   bgreene@aclunc.org

18                                                   By: */s/ Alfred C. Pfeiffer, Jr.*

19                                                   LATHAM & WATKINS LLP
                                                     Alfred C. Pfeiffer, Jr., SBN 120965
20                                                   Wesley Tiu, SBN 336580
                                                     505 Montgomery Street, Ste 2000
21                                                   San Francisco, CA 94111
                                                     Telephone: (415) 391-0600
22                                                   Al.Pfeiffer@lw.com
                                                     Wesley.Tiu@lw.com
23
                                                     LATHAM & WATKINS LLP
24                                                   Joseph H. Lee, SBN 248046
                                                     Town Center Drive, 20th Floor
25                                                   Costa Mesa, CA 92626
                                                     Telephone: (714) 540-1235
26                                                   Joseph.Lee@lw.com

27                                                   LATHAM & WATKINS LLP
                                                     Regina Wang, SBN 326262
28                                                   10250 Constellation Blvd., Suite 1100

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Los Angeles, CA 90067
Telephone: (424) 653-5500
Regina.Wang@lw.com

*Attorneys for Plaintiffs*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

27

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502

1

## ATTORNEY ATTESTATION

2

3        I am the ECF User whose identification and password are being use to file the foregoing

4    Plaintiffs' Notice of Motion and Motion for Preliminary Injunction; Memorandum of Points and

5    Authorities. Pursuant to Civil Local Rule 5-1(h)(3) regarding signatures, I, Alfred C. Pfeiffer,

6    Jr., attest that concurrence in the filing of this document has been obtained. Executed this 27th

7    day of September 2022, in San Francisco, California.

8    DATED: September 27, 2022                              */s/ Alfred C. Pfeiffer, Jr.*

9                                                            Alfred C. Pfeiffer, Jr.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

28

PLAINTIFFS' MOTION FOR
PRELIM. INJUNCTION
CASE NO. 3:22-cv-05502