1
2
3
4
5
6

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY AREA
Zal K. Shroff, MJP 804620*
Elisa Della-Piana, SBN 226462
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
zshroff@lccrsf.org
edellapiana@lccrsf.org

7

*Attorneys for Plaintiffs*

8

*application *pro hac vice* pending

9

*Additional Counsel below*

10

11
12

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

13
14
15
16
17

COALITION ON HOMELESSNESS, TORO
CASTAÑO, SARAH CRONK, JOSHUA
DONOHOE, MOLIQUE FRANK, DAVID
MARTINEZ, TERESA SANDOVAL,
NATHANIEL VAUGHN.

        Plaintiffs,

18

        v.

19
20
21
22
23
24
25
26

CITY AND COUNTY OF SAN FRANCISCO,
SAN FRANCISCO POLICE DEPARTMENT,
SAN FRANCISCO DEPARTMENT OF
PUBLIC WORKS, SAN FRANCISCO
DEPARTMENT OF HOMELESSNESS AND
SUPPORTIVE HOUSING, SAN FRANCISCO
FIRE DEPARTMENT, SAN FRANCISCO
DEPARTMENT OF EMERGENCY
MANAGEMENT, LONDON BREED, in her
official capacity as Mayor, SAM DODGE, in his
official capacity as Director of the Healthy
Streets Operation Center (HSOC),

        Defendants.

27
28

Case No. 3:22-cv-05502

**EXPERT DECLARATION OF
CHRISTOPHER JOHN HERRING,
PH.D. IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION**

Complaint Filed: September 27, 2022

Date: TBD
Time: TBD

ACLU FOUNDATION OF NORTHERN CALIFORNIA
John Thomas H. Do, SBN 285075
Brandon L. Greene, SBN 293783
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
jdo@aclunc.org
bgreene@aclunc.org

LATHAM & WATKINS LLP
Alfred C. Pfeiffer, Jr., SBN 120965
Wesley Tiu, SBN 336580
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
Al.Pfeiffer@lw.com
Wesley.Tiu@lw.com

Joseph H. Lee, SBN 248046
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
Joseph.Lee@lw.com

Regina Wang, SBN 326262
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: (424) 653-5500
Regina.Wang@lw.com

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

I, Christopher John Herring, hereby declare pursuant to 28 U.S.C. § 1746:

1.   I am an Assistant Professor of Sociology at the University of California Los Angeles (UCLA). Attached as **Appendix A** is my Curriculum Vitae.

2.   Prior to my appointment at UCLA, I was appointed as a postdoctoral fellow at Harvard University's Faculty of Arts and Sciences. I received my Ph.D. in Sociology from the University of California, Berkeley. I also hold a Master's Degree in Social Anthropology from Central European University and a B.A. in Economics from Bard College.

### Qualifications and Expertise

3.   My areas of expertise as a professor and academic researcher include homelessness, housing, poverty, criminal justice, and welfare. I have taught undergraduate and graduate level university courses on homelessness since 2012. I have also conducted over a decade of research on homelessness, homeless encampments, shelters, affordable housing, and the impact of local government policies on homelessness and housing in the United States. I regularly peer-review scientific articles on these topics for leading journals in the social sciences. I also regularly conduct ethnographic research observing those experiencing homelessness in both unsheltered and sheltered settings.

4.   I have written and published extensively on local government responses to homelessness—and often particularly on San Francisco's response to homelessness. These publications include seven peer-reviewed articles in leading journals and four book chapters in volumes of academic scholarship. *See* **Appendix A**. I am also currently writing a book on the policing and punishment of homelessness in San Francisco.

5.   My research and commentary on these areas of expertise have been featured in the New York Times, Washington Post, Los Angeles Times, UK Guardian, and several other journalistic outlets.[1] I have also served as an external reviewer for Seattle University Law School's

---

[1] *See, e.g.*, Sarah Holder, *Why Calling the Police About Homeless People Isn't Working*, BLOOMBERG (Sept. 25, 2019), https://www.bloomberg.com/news/articles/2019-09-25/should-you-call-to-report-a-homeless-person; Benjamin Oreskes, *San Francisco tests campsites as a homelessness solution*, LOS ANGELES TIMES (May 7. 2021), https://www.latimes.com/homeless-housing/story/2021-05-07/san-francisco-tests-campsites-homelessness-solution.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

Homeless Advocacy Project and the University of California (Berkeley) Law School's Policy Advocacy Clinic on issues related to homelessness and the law—which has resulted in those institutions producing five full-length reports on the subject.[2]

6. Homelessness in San Francisco has been one of my major areas of study since I began my career as an academic. In addition to significant research and fieldwork on the ground with local government in San Francisco and with unhoused communities, I have also co-directed two major community-based surveys of people experiencing homelessness in San Francisco.[3] I am therefore deeply knowledgeable about homeless encampments, shelter availability, law enforcement practices, and the local government response to homelessness in San Francisco.

7. The opinions contained in this expert declaration are the result of my years of experience as a researcher and expert on homelessness in San Francisco and across the United States, as well as a collection of public records about San Francisco's recent response to homeless encampments. These public records—which were provided to me by Plaintiffs' counsel—specifically include recent data regarding San Francisco's daily shelter availability, encampment sweep and cleaning schedules, citation and arrest data, and property storage logs related to homeless encampments. A list of the public records provided to me by Plaintiffs' counsel as well as the documents in which I considered in developing my opinions contained in this declaration, is attached as **Appendix B**.

8. I have not been compensated for any services performed in writing this expert declaration. All opinions contained herein are based on my significant expertise and the public records and other public documents I have reviewed. I also reserve the right to amend my

---

[2] *See, e.g.*, Selbin, Jeffrey and Campos-Bui, Stephanie and Epstein, Joshua and Lim, Laura and Nacino, Shelby and Wilhlem, Paula and Stommel, Hannah, Homeless Exclusion Districts: How California Business Improvement Districts Use Policy Advocacy and Policing Practices to Exclude Homeless People from Public Space (July 27, 2018). UC Berkeley Public Law Research Paper, *available at* SSRN: https://ssrn.com/abstract=3221446.

[3] *See* Herring, Chris, Olivia Glowacki, Sam Lew, Christoph Hansmann, Jamie Chang, Pike Long, Dilara Yarbrough, Kelsey Ludwig, and Jenny Friedenbach. 2020. "Stop the Revolving Door: A Street Level Framework for a New System." *San Francisco: San Francisco Coalition on Homelessness*, https://www.cohsf.org/wp-content/uploads/2020/11/Stop-the-Revolving-1.pdf; and Chris Herring & Dilara Yarbrough, *Punishing the Poorest: How the Criminalization of Homelessness Perpetuates Poverty in San Francisco* (June 18, 2015), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2620426.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

testimony with any new information as additional evidence becomes available, and to modify my

analysis and resulting conclusions accordingly.

**Prior Sociological and Field Research on Homelessness in San Francisco**

9.      My ethnographic and field research on homelessness in San Francisco began in 2014. Between 2014 and 2015, I conducted an ethnographic study of San Francisco's unhoused population. During the course of the study, I spent 57 nights sleeping out on sidewalks, parks, and beneath underpasses in San Francisco; 96 nights living among hundreds of other men in shelters; and 76 nights staying in daily or weekly hotels with people who were marginally housed.

10.     I spent most days during the study period alongside a variety of homeless men and women acquiring the means of survival through charity, informal work, begging, and the illicit economy or through interacting with the local welfare and justice systems. I observed homeless individuals as they navigated access to shelter, meals, and benefits, and as they struggled to navigate the criminal process both in courts and in jails.

11.     On a weekly basis—and often daily—I witnessed interactions between police and unhoused people. These law enforcement interactions primarily took place on the streets, but also in shelters and supportive housing programs. I have also witnessed countless arrests, citations, and "move-along" orders issued against unhoused people by law enforcement.[4] While residing on the streets of San Francisco for the purposes of this study, I was personally given dozens of "move-along" orders and threatened with citation and arrest on numerous occasions.

12.     I also have first-hand experience observing front-line workers addressing homelessness in San Francisco through my ethnographic research. Between 2015 and 2017, I conducted 23 ride-alongs with police officers, shadowed public health workers on street outreach, and observed sanitation workers on encampment cleanings, clearances, and resolutions.

13.     In 2016, I worked for three months in San Francisco City Hall as the research assistant to Samuel Dodge—who is the present director of the Healthy Streets Operation Center (HSOC) but who at the time was the Director of the Mayor's Housing Opportunity, Partnerships

---

[4] A "move-along" order occurs when police officers order unhoused people to move from their location or face arrest or citation.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

and Engagement office. My work primarily focused on reforming City policies and linking people into supportive housing. I also worked with the San Francisco Treasurer's Office Financial Justice Initiative and the San Francisco Superior Court on reforms around unpaid citations for "quality of life" ordinances that punished homelessness.[5]

14.     I have also co-directed two major community-based surveys of people experiencing homelessness in San Francisco from 2014-2015 and 2019-2020.[6] One survey examined the impacts of policing on those experiencing homelessness in San Francisco with a sample of 351 survey participants and including 43 in-depth interviews of currently homeless San Franciscans (2014-2015). The other survey was a needs-assessment study involving 589 survey participants and 25 focus groups, each comprised of between five and twelve participants who were homeless at the time (2019-2020). These studies have been completed in collaboration with other academics, advocacy groups, and service providers.

15.     As a result of these research studies and my expertise, I have been called on to provide expert testimony on my research to the San Francisco Board of Supervisors, San Francisco's Local Homeless Coordinating Board, and the San Francisco Police Commission on at least six occasions from 2015 to 2020.

16.     From 2014-2020, I also volunteered with the Coalition on Homelessness. Among other activities, I performed outreach to unhoused individuals as well as proposed improvements to San Francisco's law enforcement and street cleaning policies to prevent the unwanted destruction of homeless people's property.

17.     My sociological and ethnographic work in San Francisco is reflective of the kind of research work I have done across California and the United States more broadly. For example, between 2010 and 2011, I spent three months residing in both legally sanctioned encampments and informal settlements in Fresno, California as part of an ethnographic study aimed at understanding the social organization of encampments and the impacts of state regulations on

---

[5] The SFPD and Courts define "homeless related quality of life ordinances" to include penal and municipal code violations that predominantly involve homelessness such as their sit-lie ordinance, illegal lodging, panhandling, blocking sidewalk, ban on tents, etc.
[6] See Chris Herring, supra note 3.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

1  surviving homelessness. From 2008 to 2012, I also completed a comparative study of twelve large

2  sanctioned and informal homeless encampments across eight West Coast cities. For that study, I

3  interviewed 14 city officials, 23 non-profit administrators and staff, and 32 homeless residents in

4  various local jurisdictions.

5       18.    This intensive ethnographic and field research into homelessness in San Francisco

6  and beyond heavily informs my expertise in the field, in addition to my academic research and

7  peer-reviewed publications on local government responses to homelessness in the United States.

8      **Expert Opinions Regarding San Francisco's Recent Response to Homelessness**

9       19.    As described above, my expert opinions and conclusions identified in this

10  declaration are based on my significant experience and familiarity with San Francisco's response

11  to homelessness as an academic researcher, my general body of knowledge in the field of sociology

12  and the study of homelessness in the United States, publicly available information regarding

13  homelessness in San Francisco, and a review of the public records provided to me by Plaintiffs'

14  counsel detailing San Francisco's recent response to homelessness—which includes information

15  about the day-to-day operations of the Healthy Streets Operation Center (HSOC), San Francisco's

16  latest homelessness task force. The foundation of these opinions is also based on my long-term

17  embedded first-hand research observations alongside those experiencing homelessness on the

18  streets, with city agency employees, and officials. This research—detailed in paragraphs 3 to 18—

19  has resulted in academic publications that I have authored or co-authored in the journals *American*

20  *Sociological Review* (2019)*, Social Problems* (2020), and the *Annals of the American Academy of*

21  *Political and Social Sciences* (2021). I have remained actively involved in following and shaping

22  San Francisco agencies' responses to homelessness, particularly the COVID-19 response to

23  homelessness and efforts of alternative responses to homelessness with the Department of

24  Emergency Management and SF Police Commission.

25       20.    Generally, the public records provided by Plaintiffs' counsel spanned

26  approximately three years of available data regarding HSOC sweeps at homeless encampments,

27  arrests and citations, property storage, and shelter availability—as well as San Francisco agency

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

policies relating to homelessness, housing, and enforcement. *See* **Appendix B**. The public data records included the following categories:

- Encampment Resolution Schedules and Reports. San Francisco's encampment resolution schedules and reports include information about when and where sweeps of homeless individuals and their belongings were scheduled to and did in fact take place over the last several years. These schedules and reports include information about the number of unhoused people at the site, and the number of people who were offered or successfully entered housing after the sweep.

- Bag and Tag Logs. Per City policy, San Francisco's Department of Public Works (DPW) crews are required to keep a log of all property of unhoused people taken and stored following a sweep. These logs indicate where the property was located when it was removed, what the property was, and information about who it belonged to. Summary logs include general information about the amount of property logged and stored by the City each month. San Francisco Police Department (SFPD) also has similar property storage logs incident to the citation or arrest of unhoused people for "quality of life" offenses.

- Citation and Arrest Logs. SFPD keeps logs of all citations and arrests that were made incident to an encampment resolution or involving the property of homeless individuals. SFPD has information regarding the number of citations or arrests it has made where the incident report included "encampment resolution" and/or "homeless property," and where a citation was issued or an arrest was made pursuant to Cal. Penal Code § 647(e) (no lodging on public property without permission) and Cal. Penal Code § 148(a) (willfully resisting city staff, including refusal to comply with a "move along" order to vacate the premises)—the main quality of life offenses San Francisco regularly enforces against homeless individuals.

- Shelter Availability Data. The Department of Homelessness and Supportive Housing (HSH) records the daily shelter bed availability in all shelters and shelter placements

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

1    throughout the City. This data includes the number of shelter beds expected to be

2    available on a given day and the location of those beds.

3    21.    I understand that the public data Plaintiffs' counsel has provided to me is the extent

4    of the data that was provided to Plaintiffs' counsel via Public Records Requests to a variety of City

5    agencies including DPW, SFPD, and HSH—among others. To the extent my opinions below draw

6    upon these public records, I draw my conclusions based on the data as it has been provided to me.

7    I reserve the opportunity to supplement my opinions in this matter if and when additional data

8    becomes available. However, my findings below are opinions I hold based on my expertise in the

9    field, my knowledge of San Francisco in particular, and the information currently available to me.

10    22.    I also reviewed declarations from individuals who have had direct personal

11    experience with HSOC sweeps and San Francisco's response to homelessness. *See* **Appendix B.**

12    23.    My review of the data, analysis, and research described in the above and foregoing

13    paragraphs and my general expertise as an academic and researcher studying homelessness in San

14    Francisco has led me to the following opinions:

15    **Opinion #1:** Voluntary access to shelter has been functionally inaccessible to unhoused

16    people in San Francisco since the onset of the pandemic in April 2020 and

17    has long been systematically inadequate for a large portion of the population.

18    **Opinion #2:** HSOC clears encampments and displaces homeless individuals despite the

19    clear lack of available shelter on a daily basis.

20    **Opinion # 3:** HSOC conducts police enforcement against homeless individuals despite the

21    lack of available shelter, including citing and arresting individuals during

22    camp clearances even when adequate shelter was not available or offered.

23    **Opinion #4:** HSOC engages in widespread property destruction instead of appropriately

24    safeguarding and storing the property of unhoused individuals in accordance

25    with federal guidelines.

26    **Opinion #5:** Move-along orders and property confiscation against unhoused people results

27    in serious and irreparable Harm.

28

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

**Opinion # 1:** Voluntary access to shelter has been functionally inaccessible to unhoused people in San Francisco since the onset of the pandemic in April 2020 and has long been systematically inadequate for a large portion of the population.

24.     According to San Francisco's 2022 Homeless Count and Survey, there were 7,754 homeless individuals residing in the City on a single night in January.[7] There is consensus among both academics and policymakers that this is always an undercount and conservative number, due to difficulties counting people who have not yet bedded down for the night at the time of the count, are hidden, residing in vehicles but not identified as homeless, etc.[8]

25.     Meanwhile, in 2021—the last time the City reported on its total shelter bed availability—it reported having only 5,080 shelter beds.[9] The City is thus, by its own count, thousands of shelter beds short on any given night.[10]

26.     However, this number of 5,080 shelter beds in the count is not a meaningful indication of currently available shelter beds. Rather, 2,263 of the 5,080 available shelter beds are part of San Francisco's 'shelter in place' hotel programs and are being phased out in FY 2021-2022.[11] In fact, the 2022 Homeless Count and Survey indicated that only 3,357 individuals were

---

[7] San Francisco Department of Homelessness and Supportive Housing (HSH). 2022. "2022 Point-in-Time Count: Preliminary Results." https://hsh.sfgov.org/get-involved/2022-pit-count/.

[8] See Hopper, Kim, Marybeth Shinn, Eugene Laska, Morris Meisner, and Joseph Wanderling. 2008. "Estimating Numbers of Unsheltered Homeless People through Plant-Capture and Postcount Survey Methods." *American Journal of Public Health* 98(8):1438–42.; Agans, Robert P., Malcolm T. Jefferson, James M. Bowling, Donglin Zeng, Jenny Yang, and Mark Silverbush. 2014. "Enumerating the Hidden Homeless: Strategies to Estimate the Homeless Gone Missing From a Point-in-Time Count." *Journal of Official Statistics (JOS)* 30(2); Schneider, Monika, Daniel Brisson, and Donald Burnes. 2016. "Do We Really Know How Many Are Homeless?: An Analysis of the Point-in-Time Homelessness Count." *Families in Society* 97(4):321–29; Smith, Curtis, and Ernesto Castañeda-Tinoco. 2019. "Improving Homeless Point-in-Time Counts: Uncovering the Marginally Housed." *Social Currents* 6(2):91–104; Tsai, Jack, and Jemma Alarcón. 2022. "The Annual Homeless Point-in-Time Count: Limitations and Two Different Solutions." *American Journal of Public Health* 112(4):633–37.

[9] *San Francisco 2021 Sheltered Point-in-Time Count*, S.F. DEP'T OF HOMELESSNESS & SUPPORTIVE HOUSING (2021), at 4, https://hsh.sfgov.org/wp-content/uploads/2021/09/2021-Sheltered-PIT-Count.pdf.

[10] While the counts of homelessness individuals and beds I reference in my declaration are from different time periods, these numbers are close enough in time to serve as a reasonable approximation for the combined time periods.

[11] *See* 2021 Sheltered Point-in-Time Count, *supra* note 9, at 4 (identifying that 2,263 temporary shelter beds added due to COVID-19 "will be phased out in FY21-22").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

actually sheltered at the time of the survey—meaning that only 43% of the reported unhoused population in San Francisco was sheltered.[12] This is not because there were somehow approximately 1,700 beds lying vacant and available for unhoused individuals to take advantage of. San Francisco has been keeping the majority of these temporary COVID-19 shelter beds—which is hundreds of shelter beds—vacant in anticipation of an end to supplemental federal funding for the temporary Shelter-in-Place program.

27.     A more accurate count of the shelter beds that are typically available to unhoused people in San Francisco is reflected in the City's 2019 Homeless Count and Survey taken shortly before the COVID-19 pandemic, where the City reported that it had only 3,493 shelter beds available.[13] By that metric, shelter beds in San Francisco are effectively at capacity because there are approximately 3,357 individuals presently in shelter on any given night in 2022.[14]

28.     Therefore, while San Francisco currently reports a shelter bed shortage of approximately 2,674 beds (7,754 reported unhoused individuals – 5,080 reportedly available shelter beds), San Francisco's shelter bed shortage is likely to be closer to approximately 4,261 beds (7,754 reported unhoused individuals – 3,493 permanent shelter beds). As previously noted, the shelter bed shortage may be even more dramatic if, as expected, San Francisco's 2022 Homeless Count and Survey underreports the number of unhoused individuals living unsheltered in the City.[15]

29.     The City's extreme shortage of shelter beds means that unhoused people also functionally lack access to shelter when they seek it. Prior to the start of the COVID-19 pandemic, City shelters could be accessed through the 311 waitlist and same-day lines. However, shelter supply never met shelter demand. Between approximately January 2015 and March 2020, the 311 wait-list for a 90-day bed was nearly always over 1,000 people.[16] Based on my research and

---

[12] *See supra* note 7.

[13] *Id.* at 3 (noting 3,493 available shelter beds as of January 2019).

[14] *See supra* note 7.

[15] *How Many People Are Homeless in San Francisco? Here's What the Data Shows,* S.F. Chronicle, May 9, 2022 ("the latest best estimates of homelessness range from almost 8,000 to more than 19,000"), last accessed August 5, 2022.

[16] *HSH 90 Day Emergency Shelter Waitlist*, DataSF (last updated: Aug. 23, 2021), https://data.sfgov.org/Health-and-Social-Services/HSH-90-day-emergency-shelter-waitlist/w4sk-

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

experience interviewing unhoused individuals and government officials, this meant the usual wait time to receive a shelter bed was between three to eight weeks. Thus, beds for one-night stays were functionally full.

30.     Although homeless individuals could wait in a same-day line to seek shelter, most waits involved standing in line or sitting in chairs for two to eight hours before receiving a bed, without any guarantee they would be able to secure a bed for the night. This in turn worked as a deterrent from accessing shelter. On most nights anywhere from fifty to over one-hundred people would be left in line or sleeping in chairs waiting for a bed. Shelter was not functionally available to any of these individuals.[17]

31.     After the start of the COVID-19 pandemic, San Francisco closed the 311 waitlist and it remains closed as of this writing. Individuals can also no longer access same-day shelter beds at point of access as they could at least try to do prior to April 2020. In other words, since April 2020, the ability to access shelters voluntarily has been almost completely shut-off.

32.     Based on my research and experience interviewing unhoused individuals and government officials after COVID-19, unhoused people seeking shelter in San Francisco no longer have any immediate shelter options available to them because the traditional avenues to seek

nq57 (identifying that there were 1,339 individuals waiting for shelter in San Francisco before the waitlist was put on hold due to COVID-19).

[17] In 2019, despite a persistent lack of viable shelter, police officers began stockpiling the few shelter beds that became available in order to be able to occasionally offer shelter beds for just one night—for the express purpose of justifying the enforcement of homelessness-related quality of life ordinances. This is clear from my research and interviews with unhoused individuals in San Francisco. Those experiencing homelessness were instructed that to avoid citation or arrest they would either need to leave the area—i.e. "move along"—or take a one-night shelter bed. But if they accepted the one-night shelter, they would only be able to bring in a backpack and would need to surrender their tent and other survival gear. *See* Herring, Chris. 2021. "Complaint-Oriented 'Services': Shelters as Tools for Criminalizing Homelessness." *The ANNALS of the American Academy of Political and Social Science* 693(1):264–83. As one might expect, most made what they saw as a rational decision to simply follow the officer's orders to move-along rather than taking the shelter bed for a single night, which would cause them to lose the gear necessary to survive outdoors, when they would inevitably be returning to the street the next day without the opportunity to seek shelter. Some would be cited or arrested and have their tent confiscated as evidence for failing to "move along" despite the lack of a viable and permanent shelter option. Commander David Lazar publicly confirmed this process before the SF Police Commission, including SFPD's offers of one-night shelter beds for the purpose of enforcement despite a functional lack of shelter beds across the City. San Francisco Police Commission Meeting. August 8, 2019. https://sanfrancisco.granicus.com/TranscriptViewer.php?view_id=21&clip_id=33774.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

shelter are closed. Individuals may call to inquire about shelter, but there is no guarantee that they will hear back and no specific timeline on which they may be guaranteed a shelter bed. The result is that a typical unhoused person lacks access to shelter altogether—even if they are actively seeking it—and most would generally be unaware of how to access it.

33.     At present, the only clear way to access shelter is via an encampment resolution while under threat from law enforcement. This is a process that prioritizes shelter entry based on enforcement and sanitation activity driven largely by 311 complaints, 911 complaints, and concentrated areas of tents rather than assessments of individual needs led by social workers.[18] Furthermore, it means that individuals are being threatened with criminal punishment when they genuinely had no voluntary means to access shelter on their own.

34.     Even when some limited number of shelter beds become available to unhoused residents, San Francisco shelters have been shown to exclude people formally or informally for various reasons—effectively making shelter unavailable to them.[19] Barriers that I found in my research in San Francisco include strict curfews that prevent evening hours of employment and familial obligations; meagre limits on the amount of personal property allowed; widespread theft due to an inability to secure belongings; violence; abusive staff; a lack of privacy; long waiting periods or lines; prohibitions against people bringing in their pets, and unhealthy and unsanitary conditions.[20]

35.     Congregate shelter settings have also been shown to aggravate certain mental health conditions and some shelters do not fully accommodate the disabled. Prohibitions on drug or alcohol use can prevent those with substance use disorders from entering shelter, while those that do allow drug use on or off site deter those in recovery. Shelters divided along gendered lines prevent couples who wish to stay together from entering, while mixed gendered shelters can deter

---

[18]  Herring, Chris. 2021. "Complaint-Oriented 'Services': Shelters as Tools for Criminalizing Homelessness." *The ANNALS of the American Academy of Political and Social Science* 693(1):264–83. *See also supra* note 15 (describing SFPD's practice of weaponizing shelter as a means to enforce criminal statutes despite general lack of shelter availability).

[19] Snow, David A., and Leon Anderson. 1993. *Down on Their Luck: A Study of Homeless Street People*. University of California Press; Gowan, Teresa. 2010. *Hobos, Hustlers, and Backsliders: Homeless in San Francisco*. Univ Of Minnesota Press.

[20] *See supra* note 3.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

individuals who do not feel safe in such an environment, and trans people experiencing homelessness face discrimination from all sides including clients, staff, and shelter administration.[21] In short, the total lack of available shelter means that the few shelter bed openings unhoused people might be able to take advantage of are often not adequate for their needs, conditions, or status.

36.    Research shows that when adequate shelter is offered, the large majority of those residing in public space will accept shelter offers. For example, during the pandemic, when San Francisco offered Shelter-in-Place hotel and motel rooms, the Department of Emergency Management (DEM) and former HSH Director Jeff Kositsky reported that data had shown "about 90% accepted assistance." Similar rates of acceptance were seen during the initial operation of the first Navigation Centers in San Francisco in 2015 and 2016 when they were not overloaded and were actually capable of meeting community need.

37.    The United States Federal Interagency Council on Homelessness (USICH) has issued authoritative guidance to local governments in 2015 and 2022 regarding best practices in responding to homelessness.[22] Both sets of federal guidelines stress the importance of *ensuring access to shelter or housing options, that are both "low-barrier" and meet the varying needs of a diverse population*.

38.    As the 2015 guidelines recognize, "People experiencing unsheltered homelessness, including those who live in encampments, are not uniform in their housing and services needs." According to the 2022 guidelines, "Interim shelter solutions should ensure voluntary, sanitary, and safe shelter with few programmatic requirements to serve all those in need. Interim solutions

---

[21] Greene, Joss T. 2019. "Categorical Exclusions: How Racialized Gender Regulation Reproduces Reentry Hardship." *Social Problems* 66(4):548–63; Yarbrough, Dilara. 2021. "The Carceral Production of Transgender Poverty: How Racialized Gender Policing Deprives Transgender Women of Housing and Safety." *Punishment & Society*.

[22] US Interagency Council on Homelessness. 2015. "Ending Homelessness For People Living in Encampments." Washington DC. https://www.usich.gov/resources/uploads/asset_library/Ending_Homelessness_for_People_Living_in_Encampments_Aug2015.pdf; US Interagency Council on Homelessness. 2022. "7 Principles for Addressing Encampments." Washington DC. https://www.usich.gov/resources/uploads/asset_library/Principles_for_Addressing_Encampments_1.pdf

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

should include a range of person-centered options, with as much individual choice as possible, including trauma-informed services and other models based on principles of harm reduction, which keep people alive and create pathways to mental health care, substance use treatment, and housing." San Francisco has failed to meet these federal guidelines by maintaining an inadequate shelter system that is extremely difficult to access and cannot accommodate the needs of the unhoused people it is meant to serve.

39.     In conclusion, it is my opinion that San Francisco's shelter bed shortage of anywhere between approximately 2,674 and 4,261 beds, the current inability of unhoused people to access even temporary shelter upon request due to bed shortage and the lack of a functioning shelter request system, and the extremely limited and inadequate offers of shelter made to unhoused people when available— all render shelter in San Francisco functionally unavailable to unhoused residents.

**Opinion # 2: HSOC Clears Encampments and Displaces Homeless Individuals Despite the Clear Lack of Available Shelter on a Daily Basis.**

40.     I am deeply familiar with San Francisco's Healthy Streets Operation Center (HSOC) based on my research and interview work with unhoused individuals and local San Francisco officials over the last several years. HSOC is an interagency coordinating task force that leads the City's response to homeless encampments across the City.

41.     As described above, the City only maintains approximately 3,400-3,500 shelter beds at any given time even though there are at least 7,754 people experiencing homelessness in San Francisco as of 2022. HSOC's camp clearances, resolutions, and enforcement therefore occur in a general context of significant shelter scarcity.

42.     Notwithstanding the clear lack of sufficient shelter across San Francisco, HSOC appears to justify its sweep operations by purporting to hold specific shelter beds open for law enforcement to offer when they threaten unhoused individuals with citation and arrest for sleeping in public. However, across my research, I continually found that during these operations, not all people present are offered shelter. Furthermore, shelter supply never met shelter demand by any measure since I began research in 2014 to the present.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

43.     Based on my review of the City's recent public records the City's shelter shortage is so severe that it lacks the capacity to provide sufficient shelter to even the specific homeless individuals it targets with enforcement. In short, the City fails to meet its own pre-enforcement standards.

44.     The camp clearances, resolutions, and enforcement actions documented in the public records and data provided to me by Plaintiffs' counsel reflect that HSOC has continued to perform camp clearances despite what is often an unambiguous absence of the shelter adequate to meet the needs of the unhoused people onsite.

45.     **HSOC Report Data v. Daily Shelter Availability:** Between January 1, 2021 – June 30, 2021, HSOC conducted sweep operations on 83 days—which effectively corresponds to two major sweep operations involving all participating HSOC agencies every week for the entire 6-month period.[23] Of these 83 days, shelter was only available for all camp residents evicted by HSOC on 10 days. In other words on 73 out of 83 days, HSOC did not have an adequate or sufficient number of shelter beds to offer all those removed during its camp removal operations.

46.     We can see this by comparing HSH's "Shelter Bed Availability" data and HSOC's "Encampment Reports" for the relevant period. The shelter bed availability data are reflected in daily reports emailed to the heads of various homeless response teams each day. The shelter availability emails list the number of shelter beds available at each city-managed shelter on a given day and the specific response teams that can access them. Meanwhile, the HSOC encampment schedule and report data is maintained by the HSOC agencies to coordinate their activities and identify the number of unhoused people present at a given site. The HSOC encampment reports that I reviewed are issued weekly. The reports list the number of "total clients" engaged with at each encampment resolution. "Total clients" engaged represents the number of people experiencing homelessness living at a given encampment that HSOC employees interacted with prior to or during a given camp clearance. This would be a conservative number of the total number

---

[23] While the data in this six month period is a representative sample, I also note that there are missing weeks in this data. It is unclear whether there were no HSOC camp resolutions occurring, a lapse in reporting, or an incomplete response to the records request from which this data is drawn.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

of unhoused residents displaced during a given HSOC resolution as this might exclude others who were not present during the limited times of HSOC engagement.

47.     In the table below, I combine the relevant portions of each data set to show the number of shelter beds available in congregate and non-congregate settings for each day an HSOC encampment resolution occurred—alongside the number of "total clients" that were present at each encampment when HSOC conducted its sweep operations.

48.     On some days there was more than one HSOC resolution, in which case the total clients listed in the table below represents the total clients across all resolutions that took place that day. The HSOC reports also listed "clients already housed/sheltered," which may be people who were visiting the camp at the time of resolutions or have partners or friends who they sometimes reside with. For purpose of analysis, I have excluded these clients from the numbers listed in the chart below, since the analysis is aimed at identifying the gap between available shelter and the number of individuals displaced by a given operation. The data includes all days HSOC camp resolutions were reported between January 1 – June 30, 2021.

*Percentage of Required Shelter Actually Available for HSOC Operations: January-June 2021*

| DATE OF SWEEP OPERATION | TOTAL UNSHELTERED CLIENTS ENGAGED | NON-CONGREGATE SHELTER BEDS AVAILABLE | CONGREGATE SHELTER BEDS AVAILABLE | TOTAL AVAILABLE SHELTER BEDS | % OF REQUIRED SHELTER AVAILABLE |
|---|---|---|---|---|---|
| 5-JAN | 16 | 2 | 5 | 7 | 44% |
| 6-JAN | 21 | 2 | 4 | 6 | 29% |
| 7-JAN | 12 | 2 | 4 | 6 | 50% |
| 8-JAN | 7 | 1 | 4 | 5 | 71% |
| **11-JAN** | **11** | **1** | **10** | **11** | **100%** |
| 12-JAN | 14 | 2 | 6 | 8 | 57% |
| 13-JAN | 25 | 0 | 10 | 10 | 40% |
| 14-JAN | 36 | 0 | 10 | 10 | 28% |
| 15-JAN | 5 | 0 | 10 | 10 | **200%** |
| 19-JAN | 23 | 0 | 10 | 10 | 43% |
| 20-JAN | 50 | 0 | 10 | 10 | 20% |
| **21-JAN** | **7** | **0** | **8** | **8** | **114%** |
| 22-JAN | 8 | 0 | 5 | 5 | 63% |
| 25-JAN | 23 | 0 | 5 | 5 | 22% |
| 26-JAN | 23 | 3 | 5 | 8 | 35% |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

| | | | | | |
|---|---|---|---|---|---|
| 27-JAN | 9 | 3 | 5 | 8 | 89% |
| 28-JAN | 9 | 3 | 5 | 8 | 89% |
| 29-JAN | 10 | 0 | 2 | 2 | 20% |
| 1-FEB | 13 | 1 | 5 | 6 | 46% |
| 2-FEB | 16 | 2 | 0 | 2 | 13% |
| 3-FEB | 10 | 2 | 5 | 7 | 70% |
| 4-FEB | 15 | 2 | 5 | 7 | 47% |
| 5-FEB | 47 | No Data | No Data | No Data | No Data |
| 8-FEB | 21 | 2 | 4 | 6 | 29% |
| 9-FEB | 24 | 4 | 6 | 10 | 42% |
| 10-FEB | 12 | 3 | 4 | 7 | 58% |
| 11-FEB | 14 | 3 | 5 | 8 | 57% |
| 12-FEB | 18 | 3 | 7 | 10 | 56% |
| **16-FEB** | **3** | **2** | **6** | **8** | **267%** |
| 17-FEB | 16 | 2 | 6 | 8 | 50% |
| 18-FEB | 10 | 2 | 6 | 8 | 80% |
| 19-FEB | 11 | 4 | 5 | 9 | 82% |
| 22-FEB | 15 | 2 | 5 | 7 | 47% |
| 23-FEB | 13 | 2 | 5 | 7 | 54% |
| 24-FEB | 13 | 3 | 5 | 8 | 62% |
| 25-FEB | 12 | 2 | 6 | 8 | 67% |
| 26-FEB | 14 | 2 | 2 | 4 | 29% |
| 1-MAR | 17 | 2 | 6 | 8 | 47% |
| 2-MAR | 18 | 2 | 6 | 8 | 44% |
| **3-MAR** | **5** | **2** | **6** | **8** | **160%** |
| 4-MAR | 14 | 2 | 6 | 8 | 57% |
| 5-MAR | 13 | 2 | 6 | 8 | 62% |
| 8-MAR | 11 | 2 | 5 | 7 | 64% |
| 9-MAR | 14 | 2 | 8 | 10 | 71% |
| 10-MAR | 12 | 2 | 5 | 7 | 58% |
| **11-MAR** | **7** | **2** | **5** | **7** | **100%** |
| 12-MAR | 46 | 5 | 8 | 13 | 28% |
| 22-MAR | 11 | 2 | 8 | 10 | 91% |
| 23-MAR | 25 | 4 | 6 | 10 | 40% |
| **24-MAR** | **6** | **2** | **6** | **8** | **133%** |
| 25-MAR | 15 | 2 | 5 | 7 | 47% |
| 26-MAR | 5 | No Data | No Data | No Data | No Data |
| 19-APR | 11 | 4 | 6 | 10 | 91% |
| 20-APR | 25 | 4 | 8 | 12 | 48% |
| **21-APR** | **10** | **2** | **8** | **10** | **100%** |
| 22-APR | 45 | 2 | 8 | 10 | 22% |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

| Date | | | | | |
|---|---|---|---|---|---|
| 23-APR | 21 | 2 | 8 | 10 | 48% |
| 26-APR | 9 | 2 | 5 | 7 | 78% |
| 28-APR | 12 | 1 | 5 | 6 | 50% |
| 29-APR | 12 | 1 | 9 | 10 | 83% |
| 30-APR | 14 | 2 | 8 | 10 | 71% |
| 24-MAY | 23 | 0 | 5 | 5 | 22% |
| 25-MAY | 14 | 1 | 5 | 6 | 43% |
| 26-MAY | 18 | 1 | 5 | 6 | 33% |
| 27-MAY | 20 | 1 | 6 | 7 | 35% |
| 28-MAY | 15 | 1 | 5 | 6 | 40% |
| 1-JUN | 21 | 0 | 6 | 6 | 29% |
| 2-JUN | 17 | 0 | 4 | 4 | 24% |
| 3-JUN | 8 | No Data | No Data | No Data | No Data |
| 4-JUN | 7 | 0 | 4 | 4 | 57% |
| 7-JUN | 8 | 0 | 4 | 4 | 50% |
| 8-JUN | 13 | 0 | 4 | 4 | 31% |
| 9-JUN | 22 | No Data | No Data | No Data | No Data |
| 10-JUN | 12 | 0 | 2 | 2 | 17% |
| 11-JUN | 9 | 0 | 4 | 4 | 44% |
| 14-JUN | 6 | 0 | 5 | 5 | 83% |
| 15-JUN | 13 | 0 | 7 | 7 | 54% |
| 16-JUN | 11 | 0 | 5 | 5 | 45% |
| **17-JUN** | **2** | **0** | **4** | **4** | **200%** |
| 21-JUN | 23 | No Data | No Data | No Data | No Data |
| 23-JUN | 13 | 0 | 7 | 7 | 54% |
| 24-JUN | 18 | 0 | 5 | 5 | 28% |
| **25-JUN** | **5** | **0** | **6** | **6** | **120%** |

49.     As demonstrated in the table above, HSOC actually had enough shelter availability to offer each person it displaced during its daily sweep operations on 10 days (i.e. % of required shelter available ≥ 100%). As the table demonstrates, comparing the HSOC records of unsheltered "clients engaged" and the records of daily shelter availability, there were only 10 days out of 83 (12%) where HSOC had enough shelter beds to offer a bed to everyone, i.e. where the number of shelter beds was equal to or exceeded the number of people forcibly displaced.

50.     The daily median of available beds during this period was 50%, or one bed available for every two persons displaced. However, as seen in the data, the daily availability of beds

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

fluctuated wildly. Sometimes this enforcement occurred with as few as only 1, 2, or 3 beds available for every ten persons displaced on a given day.

51.     In the table, I am also careful to distinguish between beds that were available to HSOC in congregate group shelters and in non-congregate shelter-in-place hotel rooms. This distinction is relevant considering the question of shelter adequacy in relation to individual and public health according to federal CDC guidelines. In other words, just because HSOC had enough shelter bed availability on 10 occasions does not mean that the shelter it had available was in fact adequate or appropriate for the needs of the unhoused individuals present—who may still have been locked out of the available shelter beds by virtue of their gender, status as coupled or single, disability status, or some other exclusionary criterion.[24]

52.     In my professional opinion as an academic studying local government responses to homelessness such resource constraints can often pressure front-line workers to restrict and/or set-aside shelter offers based on personal discretions and bias or to engage in other workarounds to accomplish supervisors' goals and meet performance metrics, which in the case of HSOC is primarily the removal of tents, property, and persons as well as preventing re-encampment. This finding is consistent with other researchers studying "street-level bureaucrats" interacting with those in poverty.[25]

53.     Regardless, it is clear from the above that in the six months between January 1 and June 30, 2021, HSOC displaced at least 1,282 people experiencing unsheltered homelessness from sites they were inhabiting, over the course of 73 days, without nearly enough shelter to house these individuals.

54.     HSOC's conduct during this period was in clear violation of both federal CDC and USICH guidelines. See CDC, "Interim Guidance on People Experiencing Unsheltered Homelessness" ("if individual housing options are not available, allow people who are living

---

[24] *See* Opinion #1, *infra*, at 8-12.
[25] See Brodkin, Evelyn Z. 2012. "Reflections on Street-Level Bureaucracy: Past, Present, and Future." *Public Administration Review* 72(6):940–49.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

unsheltered or in encampments to remain where they are")[26]; 2022 USICH Guidelines (" Encampment closures should only occur after outreach teams have had time to engage with residents to find alternative shelter, housing, and service options"); 2015 USICH Guidelines ("Efforts that rush events or prematurely disperse people without connecting them to housing could cause relocation to a different encampment setting. There is also a risk that premature dispersal might threaten the partners' ability to build trusting relationships with residents, which is vital to successful housing outcomes").[27]

55.     In my opinion, the rapid and routine schedule of HSOC camp clearances makes it impossible to undertake the planning, engagement, and comprehensive outreach called for in the federal guidelines. In successful camp resolutions in other locales that carry out comprehensive engagement and outreach that I have studied, I see linkage to shelters and services over 90%. In the January and February 2021 period of this analysis, however, only 29% of "total clients" were linked to shelter and housing.

56.     Based on my experience researching HSOC and conducting interviews with unhoused individuals and local government officials in San Francisco, I have no reason to believe that HSOC has changed its practices to adequately provide shelter to all unhoused residents it seeks to displace through sweep activities. In fact, in November 2021, HSOC even admitted that its practice was to conduct sweep operations without sufficient shelter bed availability.[28]

57.     The data provided to me and my own research and experience in San Francisco therefore lead me to the conclusion that HSOC continues to clear encampments and displace homeless individuals despite a clear lack of available shelter on a weekly basis.

---

[26]     Guidelines   Issued   in   April   2020.   Accessed   July   29,   2022. https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html. These guidelines remain in place today.
[27] *See* USICH, *supra* note 22.
[28] Laura Wenus, *SF Encampment Clearings Mostly Fail to Connect Residents to Services, Report Alleges*, San Francisco Public Press (Nov. 4, 2021), https://www.sfpublicpress.org/sf-encampment-clearings-mostly-fail-to-connect-residents-to-services-report-alleges/   ("Workers with the city's Healthy Streets Operations Center clear encampments when there are enough open beds in the city's shelter system to accommodate about 40% of that encampment's residents in shelters. According to the center's director, Sam Dodge, the formula is adjusted each week.").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

1    **Opinion # 3: HSOC Conducts Police Enforcement Against Homeless Individuals Despite the**
2    **Lack of Available Shelter, Including Citing and Arresting Individuals During Camp**
     **Clearances Even When Adequate Shelter Was Not Available or Offered.**

3          58.      San Francisco agency records demonstrate that police enforcement was occurring
4 even when there was no adequate shelter available in direct contradiction to the federal CDC and
5 USICH guidelines described above. Furthermore, those on the receiving end of this enforcement
6 have had no clear path to seeking or accessing shelter voluntarily since April 2020.[29] These
findings are consistent with my longstanding academic research and ethnographic surveys
7 concerning the ongoing criminalization of homelessness in San Francisco.[30]

8          59.      The SFPD response, citation, and arrest data related to homeless encampments and
9 homeless property provided by Plaintiffs' counsel for this analysis correspond to all such
10 activity—whether carried out during a scheduled HSOC operation with all participating City
11 agencies, or whether SFPD was responding alone and without coordinating with other City
12 agencies. The SFPD data I have been provided is location-specific and can be cross-referenced
13 with HSOC Encampment Reports for a more robust analysis of SFPD activity at HSOC sweeps in
particular. For the purposes of this analysis, however, the distinction is largely irrelevant: it is clear
14 that SFPD is engaging in widespread enforcement of quality-of-life offenses that criminalize
15 homelessness despite a complete lack of daily shelter availability and the fact that unhoused
16 individuals have had no voluntary option to seek shelter from the City since April 2020. I address
17 the most salient public records in the discussion below, and provide further insights on San
18 Francisco's criminalization practices—and law enforcement's participation in HSOC sweeps in
particular.
19

20          60.      **Data Regarding Calls for "Service" from SFPD:** SFPD has provided detailed
records about the calls it has received and responded to regarding homelessness in San Francisco.
21 According to available data over the four-month period between July and September 2021,[31] police
22 were dispatched in response to "homeless complaints" (also known as 915 calls) at least 3,606
23 times. That data, by month, is reflected in the chart below:

24
25 | 2021 | SFPD Dispatches for 915's |
|---|---|
| October | 744 |
26

---

27 [29] *See* Opinion #1, *infra*, at 8-12.
[30] See supra notes 3 and 18.
28 [31] This was the complete time period for which I understand SFPD provided public call/response records to Plaintiffs' counsel.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

| September | 960 |
|-----------|-----|
| August | 965 |
| July | 937 |
| Total | 3606 |

61.     This data indicates that a law enforcement officer was dispatched to respond to a "homeless complaint" between 744 and 965 times each month, as opposed to a Homeless Outreach Team (HOT) member who aims to provide support and services to unhoused individuals if available.

62.     But this is a severe undercount of the City's police-led response to calls about homelessness. First it is important to recognize that these 915 dispatches for "homeless complaints" are but a small subset of total police dispatches in response to homelessness. SFPD's involvement with HSOC camp resolutions and most HSOC activities are not captured in this number and operate through 311 complaints, transfers, and dispatches, meaning that these dispatches are *in addition to* SFPD's bi-weekly involvement at HSOC sweeps.[32]

63.     Furthermore, Department of Emergency Management dispatches SFPD officers to respond to homelessness issues under a far wider range of dispatch codes for which we do not have current data, including 917 (suspicious person) 919 (person sitting/lying on a sidewalk), 920 (aggressive solicitor), and 800cr (mentally disturbed person). These dispatches are not included in this recent data.

64.     Despite these limits and that this is likely a severe undercount, the data is clear that SFPD was dispatching to respond to complaints about homeless people almost one thousand times a month towards the end of 2021. This is fully consistent with much greater numbers reported by the City from 2019. According to a presentation given by the Department of Emergency Management in 2019, the Department dispatched SFPD officers to what the department defines as "homeless related issues" (all 915–homeless related calls, 917–suspicious person, 919–person sitting/lying on sidewalk, 920–aggressive solicitor, and 800cr–mentally disturbed person) a total of 80,829 times.[33] Of these calls, 65,333 were dispatched to SFPD patrol cars to respond to

---

[32] Herring, Chris. 2019. "Complaint-Oriented Policing: Regulating Homelessness in Public Space." *American Sociological Review* 84(5):769–800.

[33] San Francisco Department of Emergency Management PowerPoint Presentation cited in Camarena, Adriana, Stella Kunkat, Jennifer Friedenbach, John Hamanski, Chris Herring, Samantha Lew, Courtney McDonald, Sara Shortt, John Stiefell. 2021. "Compassionate Alternative Response Team (CART): A Community Plan for San Francisco." San Francisco Coalition to End the Policing of Homelessness. San Francisco.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

homelessness. The other approximately 15,000 were transferred to 311 to open a ticket for an HSOC sweep of the area.[34] These HSOC responses in nearly all cases also included a documented police response.

65.     We also know that police officers regularly respond as escorts to Department of Public Works (DPW) encampment crews when they go to remove the property of unhoused people. These police interactions are in addition to the 911 dispatches, as well as 911 calls transferred to 311, and can be generated directly by 311 requests for "encampments." Since the creation of HSOC, the number of officers assigned to DPW assignments has significantly increased. In 2016, there were typically 24 full-time SFPD officers addressing homelessness. In 2018 this number had increased dramatically.

66.     Between 2018-2020, HSOC operations were predominantly instigated by 911 and 311 complaints, directed by SFPD and DPW, and predominantly comprised of SFPD and DPW staff as compared to HOT team workers.[35] Although the operational director of HSOC is no longer an SFPD commander, the staffing and resource discrepancies between policing and sanitation vs. outreach remains.

67.     SFPD's recent dispatch data does not directly show how many dispatch calls resulted in actual law enforcement conduct, including the issuance of move-along orders to unhoused individuals or orders for them to vacate an area under threat of citation or arrest. But from my prior research SFPD almost always threatens or carries out these enforcement functions in response to a dispatch. A Budget Legislative Analyst Report found that of 911 dispatches that were "homeless-related" between 2014 and 2015, for example, fully 89% of dispatches when an unhoused person was present resulted in law enforcement issuing them a move-along order, while 10% resulted in a formal citation against un unhoused person.[36]

68.     As discussed further below, it is important to note that even if SFPD does not actually issue citations or make arrests, move-along orders under the threat of these consequences

---

[34] DEM training guide document "919 vs. Encampment vs. 915" cited in Camarena et al., *supra* note 28.
[35] See *supra* note 3.
[36] Budget and Legislative Analyst of the City and County of San Francisco (BLA). 2016 "Homelessness and the Cost of Quality-of-Life Laws." San Francisco, CA.

LATHAM&WATKINS⊔ᴘ
ATTORNEYS AT LAW
SAN FRANCISCO

24

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

are experienced as punitive forms of enforcement in their own right and can have devastating negative consequences. In other words, SFPD dispatches mean that police officers are almost always enforcing quality-of-life offenses against unhoused individuals.

69.   **SFPD Citation and Arrest Data:** The significant dispatch and enforcement data above are only confirmed by SFPD's recent citation and arrest data—which shows extensive enforcement of criminal penalties against unhoused individuals during a time when San Francisco clearly lacked daily shelter availability and unhoused individuals had no voluntary option to seek shelter.

70.   The available SFPD data provided to me includes all citations and arrests where "SFPD officers have been dispatched to, arrived at, or assisted in an encampment resolution or the removal of homeless individuals' property—whether part of an HSOC operation or otherwise." The citation data demonstrates that between July 2018 and October 2021—the period of time for which I was given data—SFPD cited or arrested unhoused people for illegal lodging under Cal. Penal Code § 647(e) at least 360 times. During the same three-year period, SFPD cited or arrested unhoused people under Cal. Penal Code § 148(a) for refusal to obey a law enforcement order to vacate or "move along" at least 2,652 times.[37]

71.   Based on my academic and field research in San Francisco, I believe that these numbers are likely a massive undercount of actual citations and arrests. SFPD data has consistently vastly under-recorded its citations against unhoused individuals in the past. The request from which this data was drawn refers only to those cases that "SFPD officers have been dispatched to, arrived at, or assisted in an encampment resolution or the removal of homeless individuals' property—whether part of an HSOC operation or otherwise." "Encampments" as defined by HSH refers to groups of two or more tents or structures, meaning that this data may exclude situations involving unhoused people in lone tents or those sleeping or resting in public space without

---

[37] For every instance in which someone was cited for failing to comply with a "move along" order, it can be inferred that countless others also were subject to a move along order and likely complied with that order to avoid citation and arrest. SFPD data on move-along orders has not been effectively captured since 2015. But, as described below, this conduct is unquestionably criminal enforcement activity and generally widespread whenever there has been a recorded citation and arrest.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

structures or in situations where property is not a major issue.[38] Furthermore, it is unclear whether SFPD actually included or provided arrest and citation data with respect to a variety of other quality-of-life offenses targeting unhoused individuals, including: S.F. Park Code §§ 3.12-3.13 (no lodging or sleeping); Cal. Penal Code §§ 370, 372, S.F. Health Code §§ 581, 596 (public nuisance, including obstructing streets or sidewalks).

72.     Additionally, there are often major discrepancies in SFPD's self-reporting of citations and arrests for homelessness. For example, from 2014 to 2017 San Francisco Superior Court reported citation data for what they classified as "homeless related quality of life violations." In the nine months from January 1, 2017 to October 1, 2017, the Court reported that 8,018 such citations were issued against unhoused people.[39] SFPD, by contrast, provided their own citation totals for the year 2017 and reported a total of 397 such citations *for the entire year*, when the Court had reported 8,018 citations in just the first nine months of the year.[40] This was because the SFPD data only recorded citations that resulted in an incident report being filed, and SFPD did not actually count the paper citations that existed independent of an incident report. The recent data I have reviewed here appears to suffer from the same defect—SFPD provided only those citations for which an incident report was created.

73.     Regardless, we know for certain that SFPD has cited or arrested at least 3,000 individuals for sleeping or residing in public over the last three years during a time when San Francisco had insufficient and inadequate shelter to provide to its unhoused residents—and that there are likely hundreds to thousands more citations and arrests than have been reported.

---

[38] There are other limits to this data. The SFPD data reporting is crude, listing only "cite or arrest adult" with no distinction as to whether a citation was given, or an arrest made. The "incode description" are similarly blanketed listing "resisting, delaying, or obstructing peace officers' duties" for more than 99% of the entries as opposed to listing the precise offense that a citation or arrest was made for. From my own observations and interviews, officers would typically instruct individuals to leave behind property to be thrown out or bag and tagged or face a citation or arrest. This interaction could be coded as a form of resistance, delay, or obstruction. The data on citations and arrests is likely only a small subset of the total number of citations and arrests related to homelessness and people sleeping or resting outside with no other alternative.

[39] March 13, 2017 email from Anne Stuhldreher, San Francisco Treasury Office.

[40] August 13, 2019 response to public records request from SFPD Inspector Lance Bosshard, on file with the author.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

26

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

74.    **Comparing SFPD Citation Data with HSOC Sweep and Shelter Records:** A specific snapshot across different data sets is illustrative. For example, between January 1, 2021 and June 30, 2021—the period for which we know the City lacked daily shelter bed availability despite bi-weekly HSOC sweeps that displaced unhoused people,[41] SFPD continued to regularly issue citations and make arrests. The chart below reflects SFPD's own report of the number of citations issued and arrests made against unhoused individuals during the relevant period:

| 2021 | SFPD Citations or Arrests |
|---|---|
| June | 45 |
| May | 42 |
| April | 42 |
| March | 51 |
| February | 63 |
| January | 53 |
| **Total** | **296** |

75.    By comparing the dates on which the City conducted an enforcement resolution despite not having sufficient shelter bed availability (see *supra* Opinion #2), I determined that the SFPD officers issued citations and arrests against unhoused individuals for lodging without permission, maintaining a public nuisance, or failure to obey a police officer on at least 51 of those 73 days (69.9%) *even though* there were not enough shelter beds available. Further examination of the available individualized arrest data would likely reveal that many of these arrests took place at or during the HSOC encampment resolutions taking place that day.

76.    Again, it is likely that the reporting above is a significant undercount of actual citations and arrests. But these records confirm that the City has been criminalizing homelessness without adequate shelter on specific days for which there is complete comparison data. With more comprehensive data, more robust analysis can be performed to capture the full extent of this reality on a day-to-day basis.

77.    Such a process of using citations and arrests as a means to clear encampments and dispossess people of their property has precedence in San Francisco. Between 2014-2016, my

---

[41] *See* Opinion # 2, *infra*, at 14-20.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

research showed that San Francisco police officers commonly arrested people on outstanding bench warrants that had been issued based on unpaid citations.[42] Individuals would be brought to the jail, oftentimes for just a few hours during which time their warrants and fines would be cleared. However, during this period at the jail their belongings would often either be seized or officers would notify DPW—which would often throw away their belongings after erroneously defining it as "abandoned property."

78.      **Bag and Tag Records**: The City's Bag and Tag records similarly demonstrate that the SFPD was conducting enforcement actions against homeless individuals during camp clearances even though little to no congregate shelter was available. In a review of a representative sample of DPW Bag and Tag records from August and September 2021, DPW recorded processing 73 "bag and tags," meaning that DPW reported collecting and storing the belongings of unhoused people following a property or encampment sweep. Of these, 65 records included enough data to determine if the pick-up involved the police or not. 57 of the 65 records (88%) indicated that an SFPD officer was involved in the bag and tag and confiscated the property as "evidence."[43] A cursory review of the Bag and Tag records from January to July 2021 suggest a similar trend. This indicates the active role of police enforcement on encampments during this period—consistent with recent dispatch, arrest, and citation data demonstrating criminal enforcement efforts.

79.      The City and HSOC are subjecting unhoused individuals to criminal enforcement despite a lack of adequate shelter based on recent SFPD dispatch data and SFPD's history of issuing "move along" orders to unhoused individuals, SFPD citation and arrest records documenting thousands of enforcement actions in recent years, recent bag and tag logs identifying law enforcement presence at sweeps, and a snapshot of comparative data showing for certain that SFPD enforcement activity took place on specific days when HSOC conducted sweep operations and there were insufficient shelter beds available. As described above, this criminalization occurs despite the reality that unhoused people in San Francisco have no voluntary access to shelter before being threatened by law enforcement.

---

[42] Herring, *supra* note 20.
[43] This was because the intake form listed an officer name, badge number, or police station as the pickup location on the intake form.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

28

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

**Opinion # 4: HSOC Engages in Widespread Property Destruction Instead of Appropriately Safeguarding and Storing the Property of Unhoused Individuals in Accordance with Federal Guidelines.**

80.    The 2022 USICH guidance from the federal government makes clear that storing the valuable personal property of unhoused individuals is of paramount importance. "Communities should take special care to avoid destroying personal belongings when an encampment closes and provide storage for an adequate period to allow a person the opportunity to collect their belongings. Fear of losing belongings can be a determining factor in whether a person chooses to move into a shelter or not. When an encampment is closing, or a person chooses to go into a shelter or treatment program that cannot accommodate all their belongings, providing secure, accessible storage options can ensure that they do not lose personal items, including clothing and identification."[44]

81.    San Francisco agencies *require* its employees to collect and store the property of unhoused people following a sweep operation. *See*, *e.g.*, Department of Public Works Procedure 16.05.08.

82.    DPW's Bag and Tag logs—which are meant to reflect the extent of property safely collected and stored for unhoused individuals—reflect a profound lack of documentation, accountability, and oversight in property removal and storage and instead suggest that there is property destruction occurring at encampment sweeps and street cleanings in San Francisco in direct violation of federal guidelines and City policies.

83.    Below, I have identified the number of bag and tags logged by the DPW on their summary sheets between January to June 2021—the period for which we have already analyzed HSOC sweeps in the absence of available shelter.[45] It is also important to note that there are systematic discrepancies, inconsistencies, and inaccuracies in the logs and summaries across these months in the DPW recording process, which points to a broader issue of record-keeping and storage, but these summaries indicate bag and tags that were likely stored in their facility. Below are counted the total number of bag and tag sheets filed by DPW workers, presumably associated

---

[44] *See* USICH, *supra* note 22.

[45] My analysis focuses on a representative sample of available bag and tag logs from January to June 2021, which allows me to compare those logs against the most recent HSOC reports that were available to me.

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
SAN FRANCISCO

with an individual or couples' belongings. When actual bag and tag sheets were not submitted in the data files, the number of tags recorded on the monthly summary sheets were counted.

| 2021 | DPW Logged Bag and Tags |
|---|---|
| June | 27 |
| May | 60 |
| April | 29 |
| March | 23 |
| February | 29 |
| January | 27 |
| **Total** | **195** |

84.     Between January 1, 2021 and June 30, 2021, DPW only logged 195 bag and tag forms. However, in that same time period and as identified above, San Francisco reports displacing at least 1,282 people experiencing unsheltered homelessness from across sites they were inhabiting in 83 formally scheduled HSOC encampment resolutions alone (*see* Opinion #2).

85.     Just as importantly, the addresses identified on these bag and tag records do not match the addresses of HSOC resolutions. I compared the bag and tag records to the excel spreadsheets produced by DPW documenting the HSOC encampment operations for the months of January and February 2021. Across the 56 bag and tags forms logged for these months, only 4 seem to be possibly related to the 37 HSOC operation locations recorded during these same two months. That suggests that no bag and tags were recorded during 89% of HSOC operations during this period.

86.     The disparity between the sheer number of people subjected to encampment resolutions and the number of logged bag and tags by DPW suggests that San Francisco fails to comply with its bag and tag policies during interactions with individuals experiencing homelessness. This is before even considering any additional DPW and SFPD sweep activity that is not captured in the scheduled HSOC sweep data—which may further widen the gap between DPW's property collection logs and the actual number of unhoused people the City has displaced.

87.     In a recent survey I conducted with several colleagues in 2019, 42% of unhoused residents reported that they have had belongings confiscated or destroyed by City employees while

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

30

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

experiencing homelessness.[46] This research suggests that the City systematically engages in frequent property destruction when it interacts with unhoused individuals.

88.     The limited DPW bag and tag records appear to confirm this high rate of dispossession. I have generally reviewed the DPW bag and tag logs from December 2016 through September 2021. Nearly all the bag and tag forms filled out by DPW workers or SFPD officers across the years are missing data in one or more fields on the form. This includes specifics on the pick-up date, intake date, item descriptions, or original locations of encampments that would be critical for the successful retrieval of someone's property. Across these forms the field for the disposal/retrieval date is hardly ever recorded. This makes it impossible to determine if DPW ever actually stored the property and/or followed their storage policy. In some cases, we see that the pick-up date matched the disposal date—meaning that DPW acknowledges actually destroying someone's property. This poor record-keeping is entirely inconsistent with a system that genuinely means to safely store and return property to unhoused people.

89.     I have reviewed the declarations of Coalition on Homelessness volunteers and unhoused individuals who shared their recent and personal experiences with property destruction in conjunction with this case. Their experiences with property destruction are consistent with the experiences of hundreds of the unhoused individuals I interviewed in my research in San Francisco. Their experiences also confirm what the data itself implies—that the City is failing to record the collection and storage of property following encampment resolutions because the City is in fact engaging in widespread property destruction when it interacts with unhoused individuals.

**Opinion # 5: Move-Along Orders and Property Confiscation Against Unhoused People Results in Serious and Irreparable Harm.**

90.     According to the 2022 USICH federal guidance, camp clearances that do not provide offers of adequate shelter or housing can "result in adverse health outcomes, exacerbate racial disparities, and create traumatic stress, loss of identification and belongings, and

---

[46] Herring, Chris, Dilara Yarbrough, and Lisa Marie Alatorre. 2020. "Pervasive Penality: How the Criminalization of Poverty Perpetuates Homelessness." *Social Problems* 67(1):131–49 and Herring, Chris, Olivia Glowacki, Sam Lew, Christoph Hansmann, Jamie Chang, Pike Long, Dilara Yarbrough, Kelsey Ludwig, and Jenny Friedenbach. 2020. "Stop the Revolving Door: A Street Level Framework for a New System." *San Francisco: San Francisco Coalition on Homelessness.*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

31

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

disconnection from much-needed services. While these efforts may have the short-term effect of clearing an encampment from public view, without connection to adequate shelter, housing, and supportive services, they will not succeed. When people's housing and service needs are left unaddressed, encampments may appear again in another neighborhood or even in the same place they had previously been."[47]

91.     As acknowledged in the federal guidelines, a growing body of social scientific research shows how damaging move-along orders and confiscation of property are to unhoused people who are not connected to permanent shelter or housing resources, and capture the negative impacts of these policy decisions on our communities more broadly. I am deeply familiar with this research and it forms a part of my expertise in this field, as does my significant sociological research interviewing unhoused individuals, service providers, and government officials in San Francisco.

92.     For example, move-along orders and property confiscation have been shown to negatively impact health in various ways. In both of my recent surveys of unhoused people in San Francisco where many described that the City destroyed their property, interviewees described losing expensive daily medicine for HIV and Hepatitis C, and ID and benefit cards that were key to accessing healthcare.[48] I witnessed camp clearances first-hand where research participants lost medicine and identification, even in cases where no citations or arrests were given. In 2018, a group of doctors and nurses became so concerned over the increased reports of lost, confiscated, or destroyed medicine as the result of sweeps among their homeless clients that they reached out to the Coalition on Homelessness to work to reform these practices.

93.     Depriving people of tents and other makeshift structures that protect them from the elements increases risk of exposure and environmental hazards that negatively impact health. Move-along orders also tend to push people towards marginalized areas that receive less 911 and 311 requests, but these areas also often hold greater environmental, health, and safety hazards such as highways and railroad yards/tracks.

---

[47] USICH, *supra* note 22.
[48] See *supra* note 3.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

32

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

94.     Policing and camp clearances also push people away from health and social services and undermine provisions of care. Public health outreach workers I observed and spoke with during my field research in San Francisco were regularly frustrated when clients lost access to medicine or services. Because their clients had been relocated from a camp clearance, they were unable to locate their clients on the streets to distribute medicine or notify them that they had in fact been granted access to shelter, rehabilitation, or even permanent housing. Move-along orders can also push people away from access to water, toilets, and sanitation; nearby social service providers; and social networks that provide support.

95.     Policing and camp clearances can deter people from seeking or accepting medical care. During my observations out with public health workers on outreach and residing in camps I witnessed people refusing hospitalization in the face of gruesome infections, debilitating pain, and churning stomach sicknesses primarily out of fear of losing their belongings at the hands of City workers. One of the elderly men who participated in my research who had lost his property during a prior hospitalization, called my cell phone before calling 911 as he lay paralyzed on a City sidewalk during a stroke—hoping I could watch his property for him before he was taken into the ER.[49] Camp clearances and enforcement also counter the best practices of street medicine for the unhoused, which call for increasing stability, developing trust, and maintaining ongoing contact with outreach workers and health systems.[50]

96.     Camp clearances also have uniquely negative impact on mental health. A regular sleeping spot gives a modicum of stability and self-regulation, which can sometimes sustain people's mental health in the face of adverse conditions.[51] Removal from such spaces can be destabilizing and confusing, and exacerbate mental health challenges and symptoms or even psychotic episodes.[52]

---

[49] See *supra* note 32.
[50] Stefanowicz, Michael, Brett Feldman, and Jehni Robinson. 2021. "House Calls Without Walls: Street Medicine Delivers Primary Care to Unsheltered Persons Experiencing Homelessness." *Annals of Family Medicine* 19(1):84–85; Withers, Jim. 2011. "Street Medicine: An Example of Reality-Based Health Care." *Journal of Health Care for the Poor and Underserved* 22(1):1–4.
[51] Knowles, Caroline. 2000. "Burger King, Dunkin Donuts and Community Mental Health Care." *Health & Place* 6(3):213–24.
[52] Rowe, Stacy, and Jennifer Wolch. 1990. "Social Networks in Time and Space: Homeless

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

97.     Move-along orders and confiscated and/or destroyed property also negatively impacted the employment of some of my research participants. On the one hand, move-along orders can move people further away from employment sites, public transport, and sources of income. On several occasions that city officials had or were threatening camp clearances, research participants missed work to safeguard their property. For some, this resulted in the loss of employment.

98.     Camp clearances and move-along orders can also lead to increased social tensions and conflict between those experiencing homelessness. First, by disrupting the security and trust established within existing encampments through eviction and second, by forcing people into territories of other unhoused people. Many of those interviewed in the 2015 study and those I came to know in my later ethnographic research reported experiencing violence and insecurity directly related to a camp eviction. While research shows that those residing outside are exposed to much higher levels of violence than the housed, sweeps further heightened risk of assault and caused fear and anxiety.[53]

99.     Of the 23 women interviewed in the 2015 study, two reported being sexually assaulted immediately following a police move-along order and attributed the assaults to this state action.[54] This is especially significant since there were no questions about sexual assault in the interview schedule. Transgender and gender variant participants most frequently reported feeling "less safe" after City officials forced them to move to a new location. While 30 percent of survey participants overall reported feeling less safe after being forced to move, 59 percent of trans and gender non-conforming participants felt less safe after a forced eviction.

100.     Due to the illegality of camping, sleeping, or resting in public space, some research participants discussed the lack of any feasible legal recourse or protection in the event of

Women in Skid Row, Los Angeles." *Annals of the Association of American Geographers* 80(2):184–204; Sparks, Tony, 2018. "Reproducing Disorder: The Effects of Broken Windows Policing on Homeless People with Mental Illness in San Francisco." *Social Justice* 45(2/3 (152/153)):51–74.
[53] Meinbresse, Molly, Lauren Brinkley-Rubinstein, Amy Grassette, Joseph Benson, Carol Hall, Reginald Hamilton, Marianne Malott, and Darlene Jenkins. 2014. "Exploring the Experiences of Violence among Individuals Who Are Homeless Using a Consumer-Led Approach." *Violence and Victims* 29(1):122–36.
[54] Herring et al., *supra* note 3.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

1    emergency or danger. Calling the police or 911 about any given incident could jeopardize their

2    own illegal dwelling and/or those around them, which could result in further retribution.

3    　　101.　　In the face of conflict there was rarely feasible legal recourse available to the

4    victims. Like sociologists Desmond and Valdez who found among the housed that "the

5    enforcement of nuisance property ordinances has the effect of forcing abused women to choose

6    between calling the police on their abusers (only to risk eviction) or staying in their apartments

7    (only to risk more abuse)," the unhoused similarly avoided calling the police in the face of abuse

8    or theft for fear of eviction from public space.[55]

9    　　102.　　The punitive nature and negative outcomes of camp clearances, move-along orders,

10   and property confiscation are compounded when understood in their cumulative effect. Even

11   though each quality-of-life ordinance, move-along order, and citation alone may seem

12   inconsequential, collectively, the inability to access public property or a safe place where one can

13   legally dwell keeps one in constant anxiety and risk of future enforcement. This produces a

14   sequence of criminal justice contact that is more powerful than the sum of its parts that deepens

15   suffering, poverty, and perpetuates homelessness.[56]

16   　　103.　　In my research, sanitation operations that involved forced displacement and/or

17   confiscated property even in the absence of police officers was understood by those experiencing

18   homelessness in San Francisco as inherently backed by the threat of police and law enforcement.

19   Many unhoused research participants described the loss of their property as a punishment worse

20   than citation or arrest and feared Department of Public Works crews more than SFPD officers.[57]

21   　　104.　　Similar findings regarding the negative impacts of move-along orders and camp

22   clearances on health and access to human services in San Francisco have also been found by

23   researchers in Santa Clara County, Honolulu, Seattle, and Denver.[58]

24

---

[55] Desmond, Matthew, and Nicol Valdez. 2013. "Unpolicing the Urban Poor: Consequences of
Third-Party Policing for Inner-City Women." *American Sociological Review* 78(1):117–41.
[56] Herring et al., *supra* note 3.
[57] Herring, *supra* note 3.
[58] Darrah-Okike, Jennifer, Sarah Soakai, Susan Nakaoka, Tai Dunson-Strane, and Karen
Umemoto. 2018. "'It Was Like I Lost Everything': The Harmful Impacts of Homeless-Targeted
Policies." *Housing Policy Debate* 28(4):635–51; Robinson, Tony. 2017. "No Right to Rest: Police
Enforcement Patterns and Quality of Life Consequences of the Criminalization of Homelessness."

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

105.    In other words, San Francisco's practice of displacing unhoused individuals under the threat of criminal enforcement and pattern of destroying the property of unhoused individuals has real, long-term consequences that ultimately undermine the health of unhoused people, entrench poverty and homelessness, and make it far less likely that individuals will be able to exit homelessness. The "solutions" are part of what fuels San Francisco's ongoing homelessness crisis.

**Conclusion**

106.    As identified above, my review of the data, analysis, and research described in the above and foregoing paragraphs and my general expertise as an academic and researcher studying homelessness in San Francisco has led me to the following opinions:

**Opinion #1:** Voluntary access to shelter has been functionally inaccessible to unhoused people in San Francisco since the onset of the pandemic in April 2020 and has long been systematically inadequate for a large portion of the population.

**Opinion #2:** HSOC clears encampments and displaces homeless individuals despite the clear lack of available shelter on a daily basis.

**Opinion # 3:** HSOC conducts police enforcement against homeless individuals despite the lack of available shelter, including citing and arresting individuals during camp clearances even when adequate shelter was not available or offered.

**Opinion #4:** HSOC engages in widespread property destruction instead of appropriately safeguarding and storing the property of unhoused individuals in accordance with federal guidelines.

**Opinion #5:** Move-along orders and property confiscation against unhoused people results in serious and irreparable harm.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that I executed this declaration on September 24, 2022 in Los Angeles, California.

_____
Christopher John Herring, PHD

*Urban Affairs Review*; Chang, Jamie Suki, Philip Boo Riley, Robert J. Aguirre, Katherine Lin, Marius Corwin, Nicole Nelson, and Madison Rodriguez. 2022. "Harms of Encampment Abatements on the Health of Unhoused People." *SSM-Qualitative Research in Health* 2.

DECL. OF CHRIS HERRING
ISO PI MOTION
CASE NO. 3:22-cv-05502

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# Appendix A

cherring@fas.harvard.edu
@cherring_soc
chrisherring.org



# CHRIS HERRING

## Appointments

2021 – present    Assistant Professor of Sociology, University of California Los Angeles
2020 – 2022       Postdoctoral Fellow, Inequality in America Initiative, Harvard University

## Education

Ph.D.          Sociology, University of California, Berkeley 2020
M.A.           Sociology, University of California, Berkeley, 2013
M.A.           Social Anthropology, Central European University, 2010
B.A.           Economics, Bard College, 2008

## Research and Teaching Interests

Urban Sociology, Poverty, Housing and Homelessness, Criminal Justice, Welfare, Employment, Social Theory, Ethnography, Community Action Research, Social Policy.

## Publications

### Journal Articles

Chris Herring. 2021. "Complaint-Oriented 'Services:' Shelters as Tools for Criminalizing Homelessness." *The Annals of the American Academy of Political and Social Sciences*, *693*(1), 264-283.

Chris Herring, Dilara Yarbrough, and Lisa Marie Alatorre. 2020. "Pervasive Penality: How the Criminalization of Homelessness Perpetuates Poverty." *Social Problems*, 67(1), 131-149.

Chris Herring. 2019. "Complaint-Oriented Policing: Regulating Homelessness in Public Space." *American Sociological Review*, *84*(5), 769-800.
*American Society of Criminology Joan Petersilia Outstanding Article Award. 2021.

Chris Herring and Emily Rosenman. 2016. "Engels in the Crescent City: Revisiting the Housing Question in Post-Katrina New Orleans." *ACME: An International Journal for Critical Geographies*, 15(3), 616-638.

Chris Herring, Manual Rosaldo, Josh Seim, and Benjamin Shestakovsky. 2016. "Living Theory: Principles and Practices for Teaching Social Theory Ethnographically." *Teaching Sociology*, 12(1), 1-12.

Chris Herring and Manuel Lutz. 2015. "The Roots and Implications of the United States' Homeless Tent Cities." *City*, 19 (5), 689-701.

Chris Herring. 2014."The New Logics of Homeless Seclusion: A Comparative Study of Homeless Encampments in the Western United States." *City and Community*, 13(4), 285-309.

### Book Chapters

Chris Herring. In Press. "Regulating Homeless Encampments." In D. Culhane, S. Fitzpatrick, G. Johnson, S. Metreaux, and E. O'Sullivan (eds), *"Research Handbook on Homelessness."* Edward Elgar Publishing.

Chris Herring. In Press. "Housing Deprivation: Homelessness and the Reproduction of Poverty." In B. McCabe and E. Rosen (eds), *The Sociology of Housing*. Chicago: University of Chicago Press.

Bilal Ali, Lisa Marie Alatorre, Jennifer Friedenbach, Chris Herring, TJ Johnston, and Dilara Yarbrough. 2020. "Fighting Anti-Homeless Laws through Participatory Action Research: Reflections from the San Francisco Coalition on Homelessness' Criminalization Study." In S. Greenbaum and P. Zinn (eds), *Collaborating for Change: A Participatory Action Research Casebook*. New Brunswick: Rutgers University Press. \*Society of Social Problems, Community Partner Paper Award. 2019.

Chris Herring. 2019. "Between Street and Shelter: Homeless Seclusion and the  Neutralization of Poverty." In J. Flint and R. Powell (eds.) *Class, Ethnicity, and State in the Polarized Metropolis: Putting Wacquant to Work*. London: Palgrave.

Chris Herring. 2013. "The Housing Question of Disaster Reconstruction: Rebuilding New Orleans on the Tenants of an Ownership Society." In E. Murphy and N. Hourani (eds.), *The Housing Question: Tensions, Continuities, and Contingencies in the Modern City*. Ashgate Press.

Zoltan Gluck and Chris Herring. 2012. "The Homeless Question of Occupy." In *Occupy!: Scenes from Occupy America.* New York: Verso Press.

Essays, Reviews, and Commentary

Chris Herring and Paul Boden. 2021. "Criminalizing Homelessness" in *Counterpoints: A Bay Area Atlas by the Anti-Eviction Mapping Project*. Oakland, CA: PM Press.

Neil Gong and Chris Herring. 2020. "The Case for Commandeering Hotel Rooms: San Francisco Has a Model to House the Homeless During the COVID-19 Pandemic." *Cal Matters*.

Chris Herring and Neil Gong. 2020. "San Francisco Has the Authority, Vacancies, and Funds to House Homeless People in Hotels." *San Francisco Examiner*.

Chris Herring. 2019. "Democrats hate Trump's plan for homelessness: But it's their plan too." *The Washington Post*. Outlook sections front-page feature of the Sunday print edition.

Chris Herring. 2019. "Concentrated Poverty." In *The Wiley-Blackwell Encyclopedia of Urban and Regional Studies*, 1-10. Wiley-Blackwell.

Chris Herring. 2019. "Evicting the Evicted: Zur Kriminalisierung von Obdachlosigkeit. Ein Gespräch mit dem Soziologen Chris Herring" in *Technopolis: Urbane Kämpfe in der San Francisco Bay Area*. Katja Schwaller (ed). Berlin: Association A.

Gretchen Purser, Lisa Bates, Erin McElroy, Manissa McCleave Maharawal, Daniela Aiello, Pamela Phan, Terra Graziani.  2018. "Eviction Lab Misses the Mark." *Shelterforce*.

Chris Herring, Miranda Smith, and Thomas Gilbert (eds). 2017. "The Roots and Implications of the Trump Election." *Berkeley Journal of Sociology*. 61: 23-42.

Chris Herring. 2015. "Tent City, America." *Places: Public Scholarship of Architecture, Landscape and Urbanism*. December.

Chris Herring. 2015. "Evicting the Evicted: The Spurious Rationales of 'Homeless Sweeps.'" *Progressive Planning Magazine*. Fall, 29-32.

Chris Herring. 2015. "Sheltering Those in Need: Architects Confront Homelessness." Introductory Essay for the 2016 Berkeley Prize Essay Competition. UC Berkeley, College of Environmental Design.

Chris Herring, Dilara Yarbrough, and Tony Sparks. 2015. "Punishing the Poorest." *Street Sheet*. San Francisco. Six articles for San Francisco's Homeless Street newspaper based on the report *Punishing the Poorest*.

Chris Herring. 2014. "Four Fallacies of the Jungle Eviction." *Beyond Chron* op-ed. San Francisco.

Manissa McCleave Maharawal and Chris Herring (eds). 2014. "Struggles for the Public University." *Berkeley Journal of Sociology*. 58: 23-42.

Chris Herring. 2014. "The Magical Bum: The Cinematic Paradox of Positive Portrayals of Homelessness." *The State of Things Film Journal.* Los Angeles.

Chris Herring. 2013. *California Historical Society Magazine.* Mark Wyman, Hoboes: Bindlestiffs, fruit tramps, and the harvesting of the west. (New York: Hill and Wang, 2010), 336 pp. & Art Hazelwood, Hobos to Street People: Artists Responses to Homelessness from the New Deal to the Present. (San Francisco: Freedom Voices, 2011).

Zoltan Gluck and Chris Herring. 2012. "Rearticulating the Struggle for Education." *The Occupy Gazette*. New York: N+1 Publishing.

Chris Herring. 2012. "Occupy Academia!" London School of Economics' Impact Blog.

Chris Herring. 2010. *Central European University Journal of Political Science.* Loïc Wacquant, Punishing the Poor: The Neoliberal Government of Social Insecurity (London: Duke University Press, 2009), 365 pp.

Policy Reports

Sandra Smith and Chris Herring. 2022. "The Limits of Ban the Box." Institute for Labor and Employment Research. University of California, Berkeley. Berkeley.

Adriana Camarena, Stella Kunkat, Jennifer Friedenbach, John Hamanski, Chris Herring, Samantha Lew, Courtney McDonald, Sara Shortt, John Stiefell. 2021. "Compassionate Alternative Response Team (CART): A Community Plan for San Francisco." San Francisco Coalition to End the Policing of Homelessness. San Francisco.

Chris Herring, Dilara Yarbrough, Jamie Chang, Mark Flemming, Chris Hanssmann, Pike Long, Kelsey Ludwig. 2020. "Stop the Revolving Door: A Street Level Framework for a New System." Our City Our Home Coalition. San Francisco.

Kamran Abri Lavasani, Haruna Aridomi, Collette Auerswald, Zachary Butzin-Dozier, Brigid Cakouros, Joey Chiang, Brandon Chu, Jack Colford, Hoaian Dang, Sarah Ferrell, Jay Graham, Madeleine Kane, Toshali Katyal, Christine Ma, Dough Martin, Matt Matusieqicz, Sandra McCoy. 2020. "For the Good of Us All: Addressing the Needs of Our Unhoused Neighbors During the Covid-19 Pandemic." UC Berkeley School of Public Health. Berkeley.

Chris Herring, Dilara Yarborough, Lisa Marie Alattore, and the San Francisco Coalition on Homelessness. 2015. "Punishing the Poorest: How San Francisco's Criminalization of Homelessness Perpetuates Poverty." San Francisco Coalition on Homelessness. San Francisco.

Chris Herring, Dilara Yarbrough, and Lisa Marie Alattore. 2015. "How Quality of Life Enforcement Affects Homelessness." Policy brief for California State Senate Bill SB608 "The Right to Rest Act."

Chris Herring. 2010. "Tent Cities in America: A Pacific Coast Report." National Coalition for the Homeless. Washington DC.

Under Review / In Progress

Chris Herring. *Cruel Survival: Policing and Punishing the Unhoused in the American City* (Under contract with University of California Press)

Chris Herring. "Precarious Housing Fixes: The Limits of Homeless Housing Programs in San Francisco."

Chris Herring. "Therapeutic Penal Populism and the Criminalization of Poverty in the Progressive City"

Jeff Garnand and Chris Herring. "Public-Private Parasites: How Business Improvement Districts Criminalize Homelessness."

Sandra Smith and Chris Herring. "Undoing the Mark of a Criminal Record: Ban the Box and the Limits of Fair Chance Employment Policies."

## Presentations
<u>2018-2022</u>

"Organizing Against Homelessness in the Pandemic City"
- Invited panelist. University of Oregon Housing Conference. Eugene. 2022.
- American Anthropological Association Annual Meeting. Baltimore. 2021.
- Invited panelist. Verso Books and Relational Poverty Network. Virtual. 2020.

"Complaint-Oriented 'Services:' Shelters as Tools for Criminalizing Homelessness"
- Invited lecture. University of Southern California Price School of Public Policy. 2022.
- Invited panelist. Webinar on "Ending Family Homelessness" hosted by the American Academy of Political and Social Sciences. 2021.
- Law and Society Association Annual Meeting. Virtual. 2021.
- Invited panelist. Conference for the special issue *Dynamics of Homelessness* in the Annals of the American Academy of Political and Social Sciences. Virtual. 2020.

"Complaint-Oriented Policing: Regulating Homelessness in Public Space"
- Invited panelist. "Policing the Crisis" Conference Rockefeller College, SUNY Albany. 2022
- American Association of Geographers Annual Conference. New York. 2022.
- Invited panelist. Harvard Faculty of Arts and Science's Symposium. 2021.
- Invited lecture. Harvard Urban Theory and Data Lab. 2021.
- Invited panelist. UC Berkeley Social Science Matrix. 2020.
- Invited lecture. Northeastern University, Urban Anthropology Graduate Workshop. 2020.
- Invited lecture. University of Illinois Urbana Champaign. Department of Sociology. 2019.
- Invited lecture. UCLA, Department of Sociology. 2019.
- Invited lecture. UC Berkeley Global Urban Humanities colloquium. 2019.

"Pervasive Penality: How the Criminalization of Homelessness Perpetuates Poverty"
- Invited lecture. Penn State Criminology Department Graduate Workshop. 2022.
- Invited panelist. National Law Center on Homelessness Criminalization Report Release. Virtual. 2020.
- Society of Social Problems Annual Meeting. With Dilara Yarbrough and Lisa Marie Alattore. New York. 2019.
- American Sociological Association Meeting. With Dilara Yarbrough. Philadelphia. 2018.
- Power at the Margins: An Academic and Organizing Conference. With Dilara Yarbrough and Kelley Cutler. University of Minnesota, Minneapolis. 2018.

"Precarious Housing Fixes: The Limits of Homeless Housing Programs in San Francisco."
- Invited panelist. University of Oregon Housing Conference. Eugene. 2022.
- Power at the Margins: An Academic and Organizing Conference. UC Berkeley. 2020 (Cancelled due to pandemic).
- Invited panelist. *The Sociology of Housing*. Georgetown University. 2019.

"Fighting Anti-Homeless Laws through Participatory Action Research: Lessons from the San Francisco Coalition on Homelessness' Criminalization Study."
- Invited lecture. American University Anthropology Department's Graduate Workshop in Public Anthropology. 2021.
- Panel co-organizer with Faranak Miraftab, "Engaged Scholarship for Social Justice." American Sociological Association Annual Meeting. With Dilara Yarbrough. 2020 (Cancelled due to pandemic).

- Society of Social Problems Annual Meeting. With Dilara Yarbrough and Lisa Marie Alatorre. New York City. 2019.
- UC Berkeley Human Rights Center. With Dilara Yarbrough. 2016.

"Compassionate Alternative Response Team (CART): A Community Plan for San Francisco."
- Press conference for the report release. With research team members. 2021.

"Stop the Revolving Door: A Street Level Framework for a New System."
- Press conference for the report release. With research team members. 2020.
- Invited presentation to San Francisco Department of Public Health and Homeless Emergency Services Provider Association. 2019.
- Invited panelist. Code for America. San Francisco. 2018.

"For the Good of Us All: Addressing the Needs of Our Unhoused Neighbors During the Covid-19 Pandemic."
- Press conference for the report release. With research team members. 2020.

"Therapeutic Penal Populism: Criminalizing Poverty in the Progressive City."
- Bay Area Politics Workshop. University of San Francisco and UC Berkeley Political Science Departments. Berkeley. 2019.

"Public-Private Parasites: How Business Improvement Districts Criminalize Homelessness."
- Urban Affairs Association Annual Meeting. With Jeff Garnand. Los Angeles. 2019.

"New Logics of Homeless Seclusion: A Comparative Study of Large-Scale Homeless Encampments."
- Invited lecture. Santa Clara University. 2019.
- Invited lecture. Santa Clara Homelessness Task Force. San Jose. 2019.
- Invited lecture and two policy roundtables on homeless encampments. West Coast Poverty Center. University of Washington. 2017.
- Invited lecture. Metropolitan Dallas Homeless Alliance. Dallas. 2015.
- Invited lecture. Pyatok Architects. Oakland. 2015.
- RC21 International Sociological Association Committee on Urban Research. Berlin. 2013.
- American Association of Geographers Annual Meeting. Los Angeles. 2013.
- Urban Affairs Association Annual Meeting. San Francisco. 2013.
- American Anthropological Association Annual Meeting. San Francisco. 2012.
- Spaces and Flows: An international conference of urban and extraurban studies. UCLA. 2011.
- American Sociological Association Annual Meeting. Las Vegas. 2011.

"Healthy Streets Operation Center's Impact on the Criminalization of Homelessness in San Francisco."
- Invited presentation. San Francisco Police Commission. 2019.
- Invited presentation. San Francisco Police Commission. 2018.
- Invited presentation. San Francisco Homeless Coordinating Board. 2018.
- Invited presentation. San Francisco Board of Supervisors. 2018.

"Urban Revanchism Reloaded: Gentrification, Homelessness, and Policing."
- Session organizer with Manissa Maharawal, Don Mitchell, and Amanda Huron. American Association of Geographers Annual Meeting. New Orleans. 2018.

Invited Discussant
- Law and Society Association Panel. "Legal actors and criminal justice reform: potential, limitations and resistance." Lisbon. 2022.

- Book Launch for "Better Lives: Hope, Freedom, and Home-Making Among People Sleeping Rough in Paris" by Johannes Lenhard. Virtual. 2022.

>2018

"Punishing the Poorest: How the Criminalization of Homelessness Perpetuates Poverty in San Francisco."
- Invited presentation to UN Special Rapporteur on Human Rights and Extreme Poverty. With Dilara Yarbrough. San Francisco. 2017.
- Invited presentations with peer researchers Dilara Yarbrough and Lisa Marie Alattore to 13 San Francisco city agencies and commissions, 11 city supervisors, 6 state senators, and 13 community forums. San Francisco and Sacramento. 2015-2017.
- Invited presentation to investigators of the US Department of Justice. 2016.
- Invited panelist. Center for Solutions Based Journalism. San Francisco. 2016.

"Re-evaluating Expertise and Reversing Stigma: A Community Action Research Approach to Empirical Legal Studies."
- Invited lecture. With TJ Johnston. UC Berkeley School of Social Work's Annual Social Justice Symposium. Berkeley. 2016.
- Invited panelist. With Dilara Yarbrough. UC Berkeley and Sciences Po Mini Conference, "Social Solidarity." Berkeley. 2016.

"Towards a Compassionate City."
- Co-organizer, moderator, and speaker on three panels over three evenings at San Francisco's Storefront Lab examining encampments and addressing interim measures for addressing homelessness. San Francisco. 2016.

"The Roots and Implications of US Tent Cities."
- American Sociological Association Annual Meeting. Chicago. 2015.

"Advocacy and Research"
- Invited panelist. With Dilara Yarbrough and Jennifer Friedenbach. National Summit to End the Criminalization of Homelessness. National Coalition on Homelessness. Denver. 2015.

"The Housing Question of Disaster Reconstruction: Homeownership as the Sine Qua Non of Citizenship."
- "Infrastructures of Home and City: The Problem of Housing in Modern Urban Society" Conference. Michigan State University. 2012.
- American Association of Geographers Annual Meeting. New York City. 2012.
- Urban Affairs Association Annual Meeting. New Orleans. 2010.
- World Ecologies Conference. Lund University. 2010.

"Homeless by Law: Crafting a Photo-ethnography of California's Transient Sex-Offenders."
- Invited lecture. with Getty award winning photographer Ian Martin. UC Berkeley Center for Urban Ethnography "Images from the Field" lecture series. Berkeley. 2012.

"Author Meets Critic: Teresa Gowan, *Hobos, Hustlers, and Backsliders*."
- Invited discussant. Ann Lucas Lecture Series, San Jose State University. San Jose. 2011.

## Grants and Awards

American Society of Criminology Joan Petersilia Outstanding Article Award. 2021.
American Sociological Society Community and Urban Sociology Student Paper Award, Honorable Mention. 2020.
Society of Social Problems, Community Partner Paper Award. With Dilara Yarbrough and Lisa Marie Alatorre. 2019.
UC Berkeley Sociology Alumni Prize for Public Sociology. 2016.
UC Berkeley Sociology Alumni Prize for Public Sociology. With the Berkeley Journal of Sociology Editorial Collective. 2015.
UC Berkeley Teaching Effectiveness Award. 2015.
UC Berkeley Outstanding Graduate Student Instructor Award. 2014.

Central European University Department of Social Anthropology Academic Achievement Award. Highest ranked student in MA program. 2010.

Leon Botstein Award. Bard College. Highest interdisciplinary achievement of graduating class. 2008.

Horowitz Foundation for Social Policy Dissertation Grant. 2019.

Center for Engaged Scholarship Fellow. 2018.

Herbert Blumer Teaching Fellow, UC Berkeley Sociology Department. 2018.

UC Berkeley Empirical Legal Studies Fellow, UC Berkeley Law School and Center for the Study of Law and Society. 2017.

National Science Foundation Dissertation Improvement Grant. 2016.

UC Berkeley Global Metropolitan Studies Summer Research Fellowship, 2015.

UC Berkeley Sociology Social Justice Fellowship. 2015.

UC Berkeley Human Rights Fellowship, UC Berkeley Law School. 2015.

Sociological Initiatives Foundation Grant. with Dilara Yarbrough and the San Francisco Coalition on Homelessness. 2015.

National Science Foundation Graduate Research Fellow. 2011-2015.

Thomas J. Watson Fellowship (Declined). 2008.

## Teaching

*Courses @ UC Los Angeles*
Urban Sociology Undergraduate Lecture
Urban Sociology Graduate Seminar
Poverty Ethnography Undergraduate Seminar

*Courses @ UC Berkeley*
Pedagogy Graduate Seminar
Divided Cities Undergraduate Seminar
Poverty Ethnography Undergraduate Seminar
Workshop in Qualitative Methods Undergraduate Seminar
Contemporary Social Theory (TA for Prof Burawoy)
Classical Social Theory (TA for Prof. Burawoy)
Urban Sociology (TA for Prof. Reed)

## University and Editorial Service

Reviewer for *American Journal of Sociology, American Sociological Review, Social Problems, Social Forces, Ethnography, City and Community, Law and Society, Urban Affairs Review, Urban Geography, Urban Studies, Annals of the American Association of Geographers, CITY, Journal of Planning Education and Research, Environment and Planning C: Politics and Space, Environment and Planning D: Society and Space, Social Movement Studies, Criminal Justice Studies, Political Geography, Antipode, Radical Housing Journal, The Howard Journal of Crime and Justice, Qualitative Research in Health, Socius, Social Currents, Sociological Compass, Sociological Forum, Journal of Social Distress and Homelessness, Yale State and Local Policy Review*.

Managing Editor and Co-Founder of the revised online-first Berkeley Journal of Sociology. 2012-2014. 2016-2017. Editorial Collective Member, Berkeley Journal of Sociology, 2010-2019.

*University of California, Berkeley*
Co-organizer with Laura Belik, Eric Goldfischer, and Rob Robinson of multi-day conference

"Power at the Margins: Mobilizing Across Housing Injustice." Spring 2020.
Jury Member for the Berkeley Prize Essay Competition. UC Berkeley, College of
   Environmental Design, 2016.
Coordinator of Center for Ethnographic Research Speakers Series, 2013 – 2018.
Director of Departmental Conference, "Critical Approaches to Financialization," 2013.
Berkeley Journal of Sociology Conference Organizer: 2011, 2012.

*Central European University, Budapest*
Student Representative to the Provost, 2009-2010.
Social Anthropology Representative to the Student Senate, 2009-2010.

*Bard College*
Editor of the Bard Journal of Social Research, 2006-2008.
Student representative of Economics Department faculty search committee, 2008.
Social Studies Representative of Educational Policies Committee, 2005-2007 (Chair, 2007).

## Policy and Community Engagement

Advisory Board Member. Reimagining Public Safety @ New York University School of
   Law's Policing Project. 2022 – present.
Expert Witness in San Francisco Coalition on Homelessness vs. City of San Francisco. With
   Latham and Watkins LLP.  2022 – present.
Expert Witness in Berry vs. Hennepin County. With ACLU Minnesota.  2021- present.
Member. Coalition for Alternatives to Policing Homelessness. Compassionate Alternative
   Response Team (CART) implementation committee. 2020 – present.
Cal Humanities Grant Supervisor. "We are Home" community arts project with DISH
   Supportive Housing, San Francisco. 2022.
Director of Research. San Francisco Homeless Needs Assessment sponsored by the Our City
   Our Home Coalition. 2018-2020.
Member. San Francisco Police Department Homeless Advisory Board. 2017-2020.
Member. San Francisco Coalition on Homelessness Human Rights Workgroup. 2014-2020.
Member. Bay Area Safe and Organized Spaces Coalition. 2017-2018.
Research Affiliate. SF Department of Homelessness and Supportive Housing. Summer 2016.
Research Affiliate. National Coalition for the Homeless. 2009-2010.
Project Manager. New York City Department of Housing Preservation and Development,
   division of multi-family housing new construction, New York, NY. 2008-2009.

## Media Appearances

Commentary and coverage of my research has appeared multiple times in the LA Times, San
Francisco Chronicle, Bloomberg City Lab, San Francisco Examiner, UK Guardian,
Huffington Post, San Jose Mercury, San Francisco Public Press, SF Weekly, The Bold Italic,
48 Hills, The Frisc, Mission Local, and NPR affiliates.

Commentary and coverage of my research has appeared in the New York Times, Washington
Post, Harpers, Newsweek, Daily Telegraph (London), Miami Herald, Baltimore Sun, The
Globe and Mail (Canada), New Statesmen City Monitor (London), Vice, The Appeal, Curbed
LA, Long Beach Post, Vanity Fair Italy, San Francisco Standard, San Francisco Bay View
National Black Newspaper, VT Digger, United Nations Newsletter, California Planning
Association's Newsletter, Urban Institute's Housing Matters Newsletter, Education News,
and California Healthline.

I've been featured in program-length interviews on the podcasts/radio shows "Against the Grain" on KPFA, "Civic" by the SF Public Press, "Your Call with Rose Aguilar" on KPFA, and "Simply Superior" on Wisconsin Public Radio.  I've made appearances or my research has been referenced on Al Jazeera, NBC, CBS, Fox News, San Francisco Kron 4 News, KCBS San Francisco, CBS Austin, WFFA Dallas Evening News, 99% Invisible Podcast, and Last Week Tonight with John Oliver. For links to media coverage visit chrisherring.org.

## Professional Affiliations

American Sociological Association                    Scholars Strategy Network
Society for the Study of Social Problems             Unequal Cities Network
Law and Society Association                          American Society of Criminology
Urban Affairs Association                            American Anthropological Association
American Association of Geographers

# Appendix B

**Appendix B: Materials Considered**

**City of San Francisco Public Records**

1. San Francisco Department of Homelessness and Supportive Housing (HSH). 2022. "2022 Point-in-Time Count: Preliminary Results." https://hsh.sfgov.org/get-involved/2022-pit-count/.

2. San Francisco 2021 Sheltered Point-in-Time Count, S.F. DEP'T OF HOMELESSNESS & SUPPORTIVE HOUSING (2021), at 4, https://hsh.sfgov.org/wp-content/uploads/2021/09/2021-Sheltered-PIT-Count.pdf.

3. HSH 90 Day Emergency Shelter Waitlist, DATASF (last updated: Aug. 23, 2021), https://data.sfgov.org/Health-and-Social-Services/HSH-90-day-emergency-shelter-waitlist/w4sk-nq57

4. Department of Public Works' Procedure No. 16-05-08, Revised, dated August 2021.

5. Department of Public Works' Procedure No. 16-05-08, dated December 2016.

6. San Francisco Police Department's Bulletin No. 18-088, dated May 2, 2018.

7. San Francisco Police Department's Bulletin No. 18-089, dated May 2, 2018.

8. San Francisco Police Department's Bulletin No. A18-137, dated July 16, 2018.

9. San Francisco Police Department's Bulletin No. 19-080, dated April 16, 2019.

10. San Francisco Police Department's Bulletin No. 20-100, dated June 12, 2020.

11. San Francisco Police Department's Bulletin No. 20-167, dated December 15, 2020.

12. Department of Emergency Management's 919, Encampment, and 915 Documents.

13. Department of Homelessness and Supportive Housing's Policy and Procedure regarding Section 169, dated June 8, 2017.

14. Department of Recreation and Parks' Policy Memorandum – Property Found on Park Property – Revised, dated February 6, 2020.

15. San Francisco Police Commission Meeting. August 8, 2019. https://sanfrancisco.granicus.com/TranscriptViewer.php?view_id=21&clip_id=33774

**Documents Responsive to Public Records Act Requests**

1. City of San Francisco Shelter Bed Availability Records dated between 2020 and 2021.

2. HSOC Encampment Reports and Schedules dated between 2019 and 2021.

3. Department of Public Works' Bag and Tag Records dated between 2016 and 2021.

4. San Francisco Police Department Dispatch, Arrest, and Citation Records dated between 2018 and 2021

**Publications**

1. Sarah Holder, Why Calling the Police About Homeless People Isn't Working, BLOOMBERG (Sept. 25, 2019), https://www.bloomberg.com/news/articles/2019-09-25/should-you-call-to-report-a-homeless-person.

2. Benjamin Oreskes, San Francisco tests campsites as a homelessness solution, LOS ANGELES TIMES (May 7. 2021), https://www.latimes.com/homeless-housing/story/2021-05-07/san-francisco-tests-campsites-homelessness-solution.

3. Selbin, Jeffrey and Campos-Bui, Stephanie and Epstein, Joshua and Lim, Laura and Nacino, Shelby and Wilhlem, Paula and Stommel, Hannah, Homeless Exclusion Districts: How California Business Improvement Districts Use Policy Advocacy and Policing Practices to Exclude Homeless People from Public Space (July 27, 2018). UC Berkeley Public Law Research Paper, available at SSRN: https://ssrn.com/abstract=3221446.

4. Herring, Chris, Olivia Glowacki, Sam Lew, Christoph Hansmann, Jamie Chang, Pike Long, Dilara Yarbrough, Kelsey Ludwig, and Jenny Friedenbach. 2020. "Stop the Revolving Door: A Street Level Framework for a New System." San Francisco: San Francisco Coalition on Homelessness, https://www.cohsf.org/wp-content/uploads/2020/11/Stop-the-Revolving-1.pdf.

5. Chris Herring & Dilara Yarbrough, Punishing the Poorest: How the Criminalization of Homelessness Perpetuates Poverty in San Francisco (June 18, 2015), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2620426.

6. Hopper, Kim, Marybeth Shinn, Eugene Laska, Morris Meisner, and Joseph Wanderling. 2008. "Estimating Numbers of Unsheltered Homeless People through Plant-Capture and Postcount Survey Methods." American Journal of Public Health 98(8):1438–42.

7. Agans, Robert P., Malcolm T. Jefferson, James M. Bowling, Donglin Zeng, Jenny Yang, and Mark Silverbush. 2014. "Enumerating the Hidden Homeless: Strategies to Estimate the Homeless Gone Missing From a Point-in-Time Count." Journal of Official Statistics (JOS) 30(2).

8. Schneider, Monika, Daniel Brisson, and Donald Burnes. 2016. "Do We Really Know How Many Are Homeless?: An Analysis of the Point-in-Time Homelessness Count." Families in Society 97(4):321–29.

9. Smith, Curtis, and Ernesto Castañeda-Tinoco. 2019. "Improving Homeless Point-in-Time Counts: Uncovering the Marginally Housed." Social Currents 6(2):91–104.

10. Tsai, Jack, and Jemma Alarcón. 2022. "The Annual Homeless Point-in-Time Count: Limitations and Two Different Solutions." American Journal of Public Health 112(4):633–37.

11. How Many People Are Homeless in San Francisco? Here's What the Data Shows, S.F. Chronicle, May 9, 2022.

12. Herring, Chris. 2021. "Complaint-Oriented 'Services': Shelters as Tools for Criminalizing Homelessness." The ANNALS of the American Academy of Political and Social Science 693(1):264–83.

13. Snow, David A., and Leon Anderson. 1993. Down on Their Luck: A Study of Homeless Street People. University of California Press.

14. Gowan, Teresa. 2010. Hobos, Hustlers, and Backsliders: Homeless in San Francisco. Univ Of Minnesota Press.

15. Greene, Joss T. 2019. "Categorical Exclusions: How Racialized Gender Regulation Reproduces Reentry Hardship." Social Problems 66(4):548–63.

16. Yarbrough, Dilara. 2021. "The Carceral Production of Transgender Poverty: How Racialized Gender Policing Deprives Transgender Women of Housing and Safety." Punishment & Society.

17. US Interagency Council on Homelessness. 2015. "Ending Homelessness For People Living in Encampments." Washington DC.

https://www.usich.gov/resources/uploads/asset_library/Ending_Homelessness_for_Peopl e_Living_in_Encampments_Aug2015.pdf.

18. US Interagency Council on Homelessness. 2022. "7 Principles for Addressing Encampments." Washington DC. https://www.usich.gov/resources/uploads/asset_library/Principles_for_Addressing_Enca mpments_1.pdf.

19. Brodkin, Evelyn Z. 2012. "Reflections on Street-Level Bureaucracy: Past, Present, and Future." Public Administration Review 72(6):940–49.

20. Center for Disease Control, Guidelines Issued in April 2020. https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html.

21. Laura Wenus, SF Encampment Clearings Mostly Fail to Connect Residents to Services, Report Alleges, San Francisco Public Press (Nov. 4, 2021)

22. Herring, Chris. 2019. "Complaint-Oriented Policing: Regulating Homelessness in Public Space." American Sociological Review 84(5):769–800.

23. Camarena, Adriana, Stella Kunkat, Jennifer Friedenbach, John Hamanski, Chris Herring, Samantha Lew, Courtney McDonald, Sara Shortt, John Stiefell. 2021. "Compassionate Alternative Response Team (CART): A Community Plan for San Francisco." San Francisco Coalition to End the Policing of Homelessness. San Francisco.

24. Budget and Legislative Analyst of the City and County of San Francisco (BLA). 2016 "Homelessness and the Cost of Quality-of-Life Laws." San Francisco, CA.

25. Herring, Chris, Dilara Yarbrough, and Lisa Marie Alatorre. 2020. "Pervasive Penality: How the Criminalization of Poverty Perpetuates Homelessness." Social Problems 67(1):131–49.

26. Herring, Chris, Olivia Glowacki, Sam Lew, Christoph Hansmann, Jamie Chang, Pike Long, Dilara Yarbrough, Kelsey Ludwig, and Jenny Friedenbach. 2020. "Stop the Revolving Door: A Street Level Framework for a New System." San Francisco: San Francisco Coalition on Homelessness.

27. Stefanowicz, Michael, Brett Feldman, and Jehni Robinson. 2021. "House Calls Without Walls: Street Medicine Delivers Primary Care to Unsheltered Persons Experiencing Homelessness." Annals of Family Medicine 19(1):84–85.

28. Withers, Jim. 2011. "Street Medicine: An Example of Reality-Based Health Care." Journal of Health Care for the Poor and Underserved 22(1):1–4.

29. Knowles, Caroline. 2000. "Burger King, Dunkin Donuts and Community Mental Health Care." Health & Place 6(3):213–24.

30. Rowe, Stacy, and Jennifer Wolch. 1990. "Social Networks in Time and Space: Homeless Women in Skid Row, Los Angeles." Annals of the Association of American Geographers 80(2):184–204.

31. Sparks, Tony, 2018. "Reproducing Disorder: The Effects of Broken Windows Policing on Homeless People with Mental Illness in San Francisco." Social Justice 45(2/3 (152/153)):51–74.

32. Meinbresse, Molly, Lauren Brinkley-Rubinstein, Amy Grassette, Joseph Benson, Carol Hall, Reginald Hamilton, Marianne Malott, and Darlene Jenkins. 2014. "Exploring the Experiences of Violence among Individuals Who Are Homeless Using a Consumer-Led Approach." Violence and Victims 29(1):122–36.

33. Desmond, Matthew, and Nicol Valdez. 2013. "Unpolicing the Urban Poor: Consequences of Third-Party Policing for Inner-City Women." American Sociological Review 78(1):117–41.

34. Darrah-Okike, Jennifer, Sarah Soakai, Susan Nakaoka, Tai Dunson-Strane, and Karen Umemoto. 2018. "'It Was Like I Lost Everything': The Harmful Impacts of Homeless-Targeted Policies." Housing Policy Debate 28(4):635–51.

35. Robinson, Tony. 2017. "No Right to Rest: Police Enforcement Patterns and Quality of Life Consequences of the Criminalization of Homelessness." Urban Affairs Review.

36. Chang, Jamie Suki, Philip Boo Riley, Robert J. Aguirre, Katherine Lin, Marius Corwin, Nicole Nelson, and Madison Rodriguez. 2022. "Harms of Encampment Abatements on the Health of Unhoused People." SSM-Qualitative Research in Health 2.

**Declarations**

1. Declaration of Toro Castano, dated September 27, 2021.

2. Declaration of Shanna Couper Orona, dated October 27, 2021.

3. Declaration of Nichelle Solis, dated November 4, 2021.

4. Declaration of Christin Evans, dated November 5, 2021.

5. Declaration of Damon Bennett, dated November 15, 2021.

6. Declaration of Larry Ackerman, dated April 4, 2022.

7. Declaration of Andrew Howard, dated May 10, 2022.

8. Declaration of Carlos Wadkins, May 25, 2022.

**Miscellaneous**

1. March 13, 2017 email from Anne Stuhldreher, San Francisco Treasury Office.

2. August 13, 2019 response to public records request from SFPD Inspector Lance Bosshard.