1  LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY AREA
2  Zal K. Shroff, MJP 804620*
Elisa Della-Piana, SBN 226462
3  131 Steuart Street, Ste. 400
San Francisco, CA 94105
4  Telephone: (415) 543-9444
edellapiana@lccrsf.org
5  zshroff@lccrsf.org
6
7  *application pro hac vice pending

8  *Attorneys for Plaintiffs*

9  *Additional Counsel below*

10
**UNITED STATES DISTRICT COURT
11  NORTHERN DISTRICT OF CALIFORNIA**
12

13  COALITION ON HOMELESSNESS; TORO
CASTAÑO; SARAH CRONK; JOSHUA
14  DONOHOE; MOLIQUE FRANK; DAVID
MARTINEZ; TERESA SANDOVAL;
15  NATHANIEL VAUGHN,

16              Plaintiffs.
    v.
17
CITY AND COUNTY OF SAN FRANCISCO;
18  SAN FRANCISCO POLICE DEPARTMENT;
SAN FRANCISCO DEPARTMENT OF
19  PUBLIC WORKS; SAN FRANCISCO
DEPARTMENT OF HOMELESSNESS AND
20  SUPPORTIVE HOUSING; SAN FRANCISCO
FIRE DEPARTMENT; SAN FRANCISCO
21  DEPARTMENT OF EMERGENCY
MANAGEMENT; LONDON BREED, in her
22  official capacity as Mayor; and SAM DODGE,
in his official capacity as Director of the Healthy
23  Streets Operation Center (HSOC),
24
              Defendants.
25

26

27

28

CASE NO. 3:22-cv-05502

**EXHIBIT 1
DECLARATIONS OF JENNIFER
FRIEDENBACH, LARRY
ACKERMAN, KELLEY CUTLER,
CHRISTIN EVANS, IAN JAMES AND
CARLOS WADKINS IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ACLU FOUNDATION OF
NORTHERN CALIFORNIA
John Thomas H. Do, SBN 285075
Brandon L. Greene, SBN 293783
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
jdo@aclunc.org
bgreene@aclunc.org

LATHAM & WATKINS LLP
Alfred C. Pfeiffer, Jr., SBN 120965
Wesley Tiu, SBN 336580
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
al.pfeiffer@lw.com
wesley.tiu@lw.com

LATHAM & WATKINS LLP
Joseph H. Lee, SBN 248046
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
joseph.lee@lw.com

LATHAM & WATKINS LLP
Regina Wang, SBN 326262
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: (424) 653-5500
regina.wang@lw.com

EXHIBIT 1 COALITION ON HOMELESSNESS DECL. ISO MOT. FOR PRELIM. INJ.
CASE NO. 3:22-cv-05502

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

Case No. 3:22-cv-05502

**DECLARATION OF THE COALITION ON HOMELESSNESS**

I, Jennifer Friedenbach, hereby declare pursuant to 28 U.S.C. § 1746:

1.        My name is Jennifer Friedenbach and I am the Executive Director of the Coalition on Homelessness. I have personal knowledge of the facts contained in this declaration including the organization's mission, programmatic work, finances, and staffing. If called upon to testify, I could and would testify competently as to the truth of the facts in this declaration.

**<u>Mission and Work of the Coalition on Homelessness</u>**

2.        The Coalition on Homelessness (the "Coalition") is a 501(c)(3) non-profit corporation founded in 1986. The Coalition was established to research, plan, and monitor long-term strategies to alleviate homelessness in the City and County of San Francisco. The Coalition's mission is to find permanent solutions to homelessness while recognizing the dignity and human rights of unhoused people. I have served as the Executive Director of the Coalition since 2007, and worked on staff since 1995—a career spanning almost thirty years.

3.        Through community organizing and advocacy, the Coalition fights to prevent people from becoming homeless, presses for affordable housing in San Francisco, and advocates to expand resources available to unhoused people including mental health treatment, emergency shelter, and basic necessities. The Coalition regularly reviews and writes legislation—and participates in budget advocacy—on these issues and organizes unhoused people to advocate on their own behalf. As part of its advocacy, the Coalition conducts surveys of unhoused people and prepares reports and recommendations. The Coalition also connects and coordinates with service providers that serve unhoused people across San Francisco.

1

4.      The Coalition envisions a San Francisco in which every human being can have and maintain decent, habitable, safe, and secure housing. This means that economic justice, housing advocacy, and supports to exit homelessness have always been the main focus of the Coalition's work. The Coalition's housing-related work has included getting the City to fund an emergency hotel voucher program for families and winning housing subsidies for unhoused individuals. In 2018, for example, the Coalition was the author of Proposition C—which was a ballot measure calling for a gross receipts tax on all businesses receiving more than $50 million in revenues annually. The tax was to help fund the City's affordable housing projects. With the Coalition's sustained advocacy, Proposition C passed. It has already brought more than $492 million to fund affordable housing programs that will help end homelessness in San Francisco. Mayor London Breed actively opposed the measure.

5.      The Coalition also serves more immediate, short-term goals as a part of its mission. We seek to build networks of support for unhoused people through organizer-led outreach campaigns and to connect unhoused people to social services and resources. This proactive work requires daily engagement with unhoused communities across San Francisco. We also engage volunteers and donors to provide unhoused people with the basic necessities they need to survive while living unsheltered.

**Membership in the Coalition**

6.      The Coalition is an advocacy organization of, by, and for unhoused people in San Francisco. Our members are comprised almost entirely of unhoused people or people with lived experience who supervise, direct, and lead the Coalition's work. The Coalition has dozens of active members at any given time and has had hundreds of active members over the years. It also has thousands of inactive members.

7.      Because the Coalition's membership is comprised of unhoused people—many of whom do not have cell phones—the membership structure is informal. The Coalition defines active membership as regular participation in Coalition meetings or volunteering activities. Members join the Coalition by engaging in these activities with us on a regular basis. Membership activities include performing outreach with the Coalition, helping administer surveys to unhoused people, speaking to the media and at press conferences on behalf of the Coalition, organizing people to turn out at events and demonstrations, preparing signs and attending protests, helping with the Coalition's video and social media efforts, or providing input on upcoming legislation in San Francisco.

8.      The Coalition currently has between 50 and 60 active members, and at least 70%

of those members are individuals presently experiencing homelessness. These members are recorded in the organization's database. The Coalition is also in touch with many more unhoused individuals through our outreach on the streets, where we connect with about 150 to 200 unhoused people every week. We also have an email distribution list that includes about three thousand unhoused people and volunteers.

9.      We ensure that the Coalition's members—and unhoused people more broadly—shape and direct every aspect of our work. This is because the Coalition's core activities are conceived of and led by two member-led working groups: Housing Justice and Human Rights. The Housing Justice working group at the Coalition has 20 active members. Almost all of these members are currently unhoused or have previously experienced homelessness. The Human Rights working group has about 10 active members. Three to four of these members are unhoused or were recently unhoused. Both working groups draw from a much larger group of active members who participate in specific projects. The Coalition's working groups meet every week to plan the organization's next steps and guide its work.

10.      The Coalition also forms its strategic priorities after consulting with the hundreds of unhoused people the Coalition interacts with on outreach and through shelter visits. This includes formal meetings with surveys and focus groups about specific topics and more informal meetings with Coalition staff or members.

**Diversion of the Coalition's Resources to Stop the City's "Healthy Streets" Sweeps.**

11.      Over the past twenty years, the Coalition has always paid some attention to the City's homeless sweeps. This is because our staff would hear about sweeps sporadically during outreach to unhoused people. But in the last several years, the reports have become much more severe. Since 2018— after the City began running its "Healthy Streets Operation Center" (HSOC)— the Coalition has been hearing about property destruction and threats of arrest at astronomical rates. That is because HSOC has resulted in much more methodical, cruel, and repetitive sweeps, with the City planning major sweeps in San Francisco neighborhoods almost every day of the year.

12.      As a result, the Coalition made the difficult choice to depart from its mission-related activities—proactive housing and homelessness prevention and support work—to focus on the dire need to protect unhoused people from the City's ongoing criminalization and property destruction practices. The Coalition responded this way because the criminalization of homelessness and destruction of survival property makes it extremely difficult to achieve the Coalition's mission. The City's sweep operations are traumatic episodes that result in unhoused

people losing the only belongings they have to protect themselves. Under the constant threat of law enforcement harassment, unhoused people do not have the bandwidth to find employment and other supports to get back on their feet. Instead, they live in constant fear that everything they have will be taken away from them. That fear is based in reality. Sweeps fundamentally disrupt the ability of unhoused people to rebuild their lives and can set them back months to years or indefinitely.

13.     These circumstances impose a tremendous burden on the Coalition, and directly interfere with our ability to help unhoused people exit homelessness or to help organize the unhoused community to advocate for housing reform. Instead of supporting unhoused people with the resources to achieve self-sustainability, the Coalition is fighting to keep them safe and alive. The City's aggressive sweeps have had the effect of preventing the Coalition from serving its clients. They force the Coalition to divert resources away from the ultimate goal—which is to press for *proactive* solutions to San Francisco's homelessness crisis. The Coalition's unplanned, reactive work to monitor and protect unhoused people from the City's sweeps has had a clear and diversionary impact on the way the organization uses its limited staff and volunteer resources.

14.     We have watched as the City's unhoused residents have had their property, including survival gear and medications, seized and destroyed during HSOC sweeps and increased sweep activity from the Department of Public Works (DPW), San Francisco Police Department (SFPD), and other agencies. We have also watched as these agencies threaten arrest without offering housing or shelter. As a result, we have built a rapid response network of staff and volunteers to monitor these daily legal and policy violations across the City.

15.     Specifically, the Coalition has diverted its staff and volunteer time away from advocating for affordable housing and improved shelter to instead focus on minimizing the harm from the City's sweeps by: sending staff and volunteers to monitor daily large-scale sweep operations, training staff and volunteers to approach City workers and stop them from violating their own policies and the law, and deploying staff and volunteers to advocate on behalf of unhoused people who are having their survival belongings seized, are being threatened with arrest, or who are not being offered appropriate shelter.  This work has become all-consuming for our staff and volunteers.

16.     Sweeps also cause unhoused people to be displaced in large numbers. This displacement—which occurs almost on a daily basis—makes it much more difficult for the Coalition to stay in contact with its clients or to maintain and secure new active members.

Without the ability to build deep, lasting, and stable connections with unhoused people, the Coalition cannot perform its work. The City's sweeps have resulted in the Coalition losing touch with countless members over the past several years, and has presented significant obstacles that have prevented the Coalition from being able to secure new membership.

17.      The Coalition's unplanned, reactive work to monitor and protect unhoused people from the City's sweeps has had a measurable fiscal impact on the organization. In 2018 when the City's HSOC sweeps began, the Coalition had to assign one staff member to work half of their time on monitoring homeless sweeps—with the rest of the organization's staff efforts focused on its proactive work to advocate for housing and shelter. With the total compensation to one full-time employee of $58,244.69 (including benefits), the approximate cost to the Coalition of sweeps monitoring at that time was $29,122.34.

18.      In 2019, however, recognizing the need for more direct monitoring, the Coalition began dedicating one full-time and one part-time employee to sweep monitoring and response work, with each employee spending at least half of their time monitoring sweeps. With the total compensation to 1.5 full-time employees of $90,080.66, the approximate cost to the Coalition of sweeps monitoring that year increased to $45,040.33.

19.      In 2020, with the increased frequency and destructiveness of HSOC sweeps—even with HSOC halting some regular sweep activity for four months because of the COVID-19 pandemic—the Coalition was again forced to increase its sweeps monitoring work to include two full-time employees—each spending at least two-thirds of their time on this reactive monitoring work. With the total compensation to 2 full-time employees of $130,947.86 that year, the approximate cost to the Coalition of sweeps monitoring jumped to $86,425.58. Unfortunately, these adjustments took two of our employees almost entirely away from their proactive work as organizers and community-builders looking to help unhoused people exit homelessness and connect them to community resources and other supports.

20.      In 2021, the Coalition was forced to engage staff from all program areas to help monitor and stop the City's sweeps—including producing a report on sweeps, monitoring police activities at sweeps, setting up a volunteer network, and setting up administrative clinics to file claims related to property confiscated at sweeps.[1] This required the Coalition to dedicate three full-time employees to this effort. The total cost to the Coalition of sweep monitoring during

---

[1] *See* Coalition on Homelessness, *Behind the Healthy Street Operation Curtain: The True Story of San Francisco's Abusive Encampment Response* (2021), *available at* https://www.cohsf.org/wp-content/uploads/2021/10/HSOC-Report-Draft-10.6.pdf.

1 - 5

this year skyrocketed to approximately $134,246.56—which is greater than the compensation for the time of two full-time employees. These are annual costs the Coalition could and should have been spending on its proactive work to end homelessness or its campaigns to build affordable housing and shelter.

21.    In addition to Coalition staff, we now use about ten volunteers to monitor and advocate on behalf of unhoused folks for shelter, services, and to prevent the destruction of survival gear at sweeps. Unfortunately, this reflects about 75% of the Coalition's total volunteer hours. These volunteer hours used to go to—and should be going to—doing public education around Proposition C and making sure affordable housing funding is used effectively, advocating for the return of the self-referral process for shelter beds, conducting shelter outreach and working to improve shelter conditions, and generally doing work with Coordinated Entry, the centralized system for people to access homelessness resources based on their assessed need for housing.

22.    The Coalition has also had to divert its limited cash and donor assets to respond to the City's homeless sweeps. During the COVID-19 pandemic, HSOC continued to confiscate tents even as it ordered individuals to shelter in place. At that time, the Coalition put together a special fundraiser to raise money to purchase replacement blankets and tents to make sure these unhoused individuals could meet their basic survival needs. We replaced what the City destroyed. In 2020, the Coalition spent $28,000 on tents and survival belongings in the face of HSOC's sweeps.  The money the Coalition used to purchase tents was from cash donations that otherwise could have been spent on emergency support, payment to unhoused people for conducting and participating in surveys, and meeting staffing needs. The staff time conducting this fundraiser likewise could have been spent on fundraising for the Coalition's core mission activities.

**The Coalition's Active Members Have Experienced the City's Criminalization and Property Destruction First-Hand**

23.    The Coalition's staff and volunteers speak with countless numbers of unhoused people every week who have been victimized by the City's harmful criminalization and sweep policies in recent years. We have started drafting administrative claims against the City on behalf of many of these individuals—with a total of 17 administrative claims filed since September of 2021.

24.    We also know that individual members of the Coalition have been directly impacted by the City's criminalization and sweep policies. This includes some of our most

active members and volunteers. For example, Toro Castaño, Couper Arona, and Shyhyene Brown are unhoused people who have been active members in the coalition and help lead the Coalition's human rights working group. But each of these individuals has also lived through threats of arrest and have lost their valuable personal property as a result of the City's sweeps over the last several years. Toro Castaño has actually been arrested in the past for illegal camping because he was homeless. He also recently secured a settlement against the City as a result of the destruction of his property during an HSOC sweep operation.[2]

25.     Todd Bryant is another active member of the Coalition who is unhoused. Todd was integrally involved in our media campaign called *Stolen Belonging*—which drew early attention to the City's escalating sweeps practices. Ironically, Todd yet again had his belongings destroyed by the City earlier this year.

26.     Andrew Howard is another active member with the Coalition. He helps educate fellow unhoused individuals of their property rights, and brings individuals who have had those rights violated into the Coalition Office to speak with us. I interviewed Andrew about his experiences with property destruction and law enforcement harassment as recently as April 2022—when his property was repeatedly and cruelly destroyed by public work crews while he was attempting to seek housing and employment opportunities.[3]

27.     These are the experiences of just some of our members—but they are experiences shared by so many of our active members and the hundreds of unhoused people we speak with when we do outreach.

**Reflections on the City's Conduct**.

28.     If the City stopped its unlawful practices at sweeps, where it fails to provide adequate notice, destroys property instead of appropriately bagging and tagging it, and threatens to inflict criminal penalties on unhoused individuals without appropriate offers of shelters—in short, if it just followed the law— the Coalition would be able to return to its real work: ending homelessness in the City of San Francisco.

29.     The presence of mass homelessness in San Francisco is driven by deep systemic inequities based on race, economic standing and disability. While these broader systemic challenges do not fall entirely on the City of San Francisco to solve, certainly responding to the crisis with inhumane and harmful practices can and should be halted by the City.

---

[2] *See* Administrative Claim No. 21-01261.
[3] *See* Twitter Feed of Jennifer Friedenbach from April 8, 2022, *available at* https://twitter.com/fbach4/status/1512550217433825281?s=21&t=4iNi5TIHpGES-D_UHWb_wQ.

30.      Losing the stability of a home and attempting to survive without the safety of a door to lock is one of the most traumatic events a human can endure.  Yet, the policy, practice, and pattern of the City of San Francisco is to approach street encampments with brutality—which only exacerbates the homelessness crisis by forcing unhoused people to start over again from zero.

31.      There are humane practices to address homelessness that actually work. The relocation of the encampment on King Street in San Francisco in 2012 is one example. Additionally, federal guidelines have recently been issued by the United States Interagency Council on Homelessness.[4] Rather than leading with punishment, the City should lead with holistic assessments that actually help connect unhoused people to temporary lodging and permanent housing. This is the only solution to homelessness.

I have reviewed the information contained in this declaration by telephone. I declare under the penalty of perjury that the contents are true and correct to the best of my knowledge.

Executed on: June 28, 2022

Jennifer Friedenbach, Executive Director
Coalition on Homelessness

---

[4] U.S. Interagency Council on Homelessness, *7 Principles for Addressing Encampments* (June 2022), https://www.usich.gov/resources/uploads/asset_library/Principles_for_Addressing_Encampments_1.pdf.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Case No. 3:22-cv-05502

**DECLARATION OF LARRY ACKERMAN**

I, Larry Ackerman, hereby declare pursuant to 28 U.S.C. § 1746:

1.      My name is Larry Ackerman, and I am 71 years old. All facts set forth in this declaration are based upon my personal knowledge, and, if called upon to testify as to the truth of these facts, I could and would competently do so.

2.       I have been a scientist for 45 years and built a career in biomedical research. I came to San Francisco in September 1983 to join a lab at the University of California, San Francisco (UCSF). I have lived in San Francisco ever since. My publication credits as a research scientist at UCSF are available online.[1]

**Volunteer Work with the Coalition on Homelessness**

3.      I first became aware of the Coalition on Homelessness ("COH" or "the Coalition") in 2018, when the Coalition was campaigning around Proposition C—a ballot proposal that allows the City to tax large businesses to fund homelessness initiatives and programs.

4.      I was impressed by the Coalition's work on this issue, and in 2019 I began attending the organization's Human Rights Workgroup meetings. After attending some of these meetings and hearing directly from unhoused people about their experiences, I was determined to see the City's response to homelessness with my own eyes. That was when I began volunteering and doing outreach to unhoused people with the Coalition.

5.      Outreach includes talking to unhoused people living in encampments, in their vehicles, or in shelters. I ask about their general situation, including whether they are

---

[1] See UCSF Profiles, Larry Ackerman, *available at* https://profiles.ucsf.edu/larry.ackerman.

experiencing harassment. I also speak with individuals about their quality of life. During these conversations, I also sometimes give referrals to various different programs and nonprofits.

6.      I have been a fairly active volunteer with the Coalition since 2019. In that time conducting outreach, I have personally witnessed the City conduct at least ten sweeps of unhoused people and their belongings.

**The City Ignores its Own Policies**

7.      I know the City has policies about storing the property of homeless individuals and offering them shelter before conducting a sweep. But based on my observations of at least ten sweeps, those policies are rarely followed. During the sweeps I observed, I saw written notice posted at the site prior to the sweep only once. But I believe those notices were from Caltrans for a sweep on Caltrans land, and not notice posted by the City of San Francisco. There were sometimes reports of verbal notification before a sweep. On those few occasions, the amount of time given by a verbal notice could be as little as an hour.

8.      In my observation of at least ten sweeps, I have never seen the City bag and tag individuals' property. The Department of Public Works (DPW) just throws people's belongings into the back of their trucks. There is no attempt to bag and tag this property or otherwise organize it so they can track it or so that individuals would be able to identify and recover their property. Once DPW touches something or puts it in their truck, they claim it as theirs and there is no way to retrieve it—even if an individual is present and makes it clear that the items taken were not trash. I have personally been yelled at by DPW employees when I have tried to retrieve people's belongings after individuals present at the time have specifically requested their property back.

9.      The Homeless Outreach Team (HOT) has been at several of the sweeps that I have observed. But there have only been a few instances where I saw HOT arrange some type of shelter for individuals. However, in these instances, HOT has tended to only be able to place one or two people out of a group of individuals encountered at a sweep. HOT has not been transparent as to how they choose whom to offer services to. In my observation, individuals who are successfully placed—even only temporarily—are individuals with a medical issue or individuals who are older. On one occasion a woman told me she was in the coordinated entry system (the City's shelter waitlist). But during the sweep I saw that she was not given a shelter offer. It appeared to be because the HOT team did not have the resources to offer her shelter.

**Documenting the City's Destructive Sweep Operations**

10.      Below, I have memorialized the specific information I can recall about several of the sweeps I have witnessed in the past few years.

| Date | Location | Agencies | Description of the Sweep |
|---|---|---|---|
| 6/11/20 | 16th St., near Church | DPW | This was an informal sweep with just DPW present. No notice was posted and no services were offered because HOT was not present. Eight DPW workers faced off against one middle-aged Black woman. They drove up with their truck and started trying to sweep her belongings off of the sidewalk. They tried to pick up and throw away a bottle of milk, and I heard her say, "I just bought that!" DPW left after taking some of her property. |
| 6/18/20 | 16th St. & Market | SFPD, DPW | Unhoused people had been trying to consolidate their belongings in preparation of moving when DPW swarmed in to start seizing property. They took the property of several individuals over their objection and placed it indiscriminately in the back of their trucks. I was unable to assist any of these individuals in recovering their belongings.  One individual owned a motorcycle but SFPD would not accept proof of ownership of the motorcycle. The motorcycle was also confiscated during the sweep. No notice was posted at the site. |
| 6/26/20 | Prosper & Harlow St near 16th St | SFPD, DPW, SFFD | I did not see written notice posted before this sweep. I did not see HOT when I was there either. But nonetheless, the sweep began and property was taken. One police officer present at the scene was named Sgt. Lee, badge number 522. |
| 8/11/20 | Noe between 14th & Duboce | SFPD, DPW, HOT, SFFD | No notice was posted at the site. One individual about a block away from where the sweep was taking place told us he had spoken with police officers, who said that he would not have to move. Later in the day, though, we saw the City order him to move. He struggled to collect his belongings and leave the site. Additionally, one individual who was successfully placed in shelter gave his tent to a friend who was not given a shelter offer. Despite this, DPW workers attempted to take the tent. After SFFD confirmed that the tent now belonged to the person claiming it, the DPW supervisor got angry and slashed the tent. |
| January 2021 | 24th St. & Grandview under Market St. | SFPD, DPW, HOT, SFFD | I did not see any notice posted at the site. There were no services offered that day other than a few congregate shelter beds, during the pandemic; DPW allowed one individual to move their belongings down the hill with my help and the assistance of another COH volunteer. |
| 1/16/21 | 16th & Dolores | SFPD, DPW, HOT, DPH | I did not see any notice posted at the site. I learned from the manager of the neighboring synagogue that they had specifically requested to have the unhoused people moved from their block. |

| 1/7/22 | 16th St., near Market | SFPD, DPW, HOT | I did not see any notice posted at the site. One person was momentarily absent from his tent. His tent and his belongings inside of it were thrown away—despite the objections of other individuals at the site who knew he wanted to keep his survival belongings. |
|--------|----------------------|----------------|---|
| March 2022 | 15th & Church | SFPD | Two unhoused women were told by police in the morning that they had to move. I did not see any notice posted at the site, and no services were offered because HOT was not present. The women were told that they would be cited or arrested if they did not move. |

**Reflections on the City's Conduct**

11.     As a scientist, I go by the data. The City is making an empirical mistake here. Property destruction and criminalization do not end homelessness. Instead, they make it worse. These sweeps are disrupting communities and creating additional traumatic circumstances for unhoused people.

I have reviewed the information contained in this declaration by telephone. I declare under the pains and penalties of perjury that the contents are true and correct to the best of my knowledge.

Executed on: 4/4/22

*Larry Ackerman*

Larry Ackerman

4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

Case No. 3:22-cv-05502

**DECLARATION OF KELLEY CUTLER**

I, Kelley Cutler, hereby declare pursuant to 28 U.S.C. § 1746:

1.      My name is Kelley Cutler, and I am above eighteen years of age. All facts set forth in this declaration are based upon my personal knowledge, and, if called upon to testify as to the truth of these facts, I could and would competently do so.

2.      I have been a resident of San Francisco for 20 years. Since 2002—and for more than 20 years now—I have dedicated my career to working with unhoused communities in San Francisco. I have significant experience working with a variety of agencies and faith communities to help unhoused individuals in the City. My work has predominantly taken the form of outreach and organizing to educate, empower, and connect unhoused individuals as they seek to break the cycles of homelessness. A copy of my most recent resume is attached as **Exhibit A** to this declaration.

3. From 2012-2013 during my social work studies, I interned with the Housing Opportunity Partnership and Engagement program ("HOPE") in the Office of the San Francisco Mayor. I spent that academic year working under Bevin Dufty—who was known as the "homeless Czar" of San Francisco at the time. Through this work, I learned how the City interacts with the unhoused community. I also observed how the City could effectively implement better ways to address issues related to homelessness, such as working closely with community partners.

4.      This experience prompted me to seek out a volunteering opportunity with the Coalition on Homelessness in 2012. I volunteered with the Coalition consistently until I was formally hired by the Coalition in February 2016. I got my start at the Coalition as an outreach

worker doing case management and providing direct services to unhoused people. I later transitioned onto the Human Rights Workgroup, where I served as a human rights organizer focusing on proactive policy and systemic work in addition to street outreach and community organizing. I remained employed at the Coalition until May 2022—and expect to remain an active volunteer and collaborator in the future.

5.        I presently sit on the Local Homeless Coordinating Board ("LHCB") of San Francisco, which is a board that helps to advise the City's Department of Homelessness and Supportive Housing. In my ongoing work on homelessness, I have also regularly attended meetings of the San Francisco Board of Supervisors (as well as subcommittee meetings), the Police Commission, and the San Francisco Municipal Transportation Agency. During the COVID-19 pandemic, I also attended the daily coordination calls of the Healthy Streets Operations Center ("HSOC") whenever possible to monitor their sweep activity.

6.        In my work at the Coalition over years, I spoke directly to and engage with unhoused individuals living on the street. On a regular basis, the Coalition and I received reports from unhoused individuals that the City was discarding their property and belongings.  People who observed sweeps or who lived in encampments would reach out to us informally by phone or social media to notify us about property destruction and harassment. As a result of the City's behavior, I spent a significant portion of the last several years documenting and investigating both destruction of homeless people's property by City agencies and the treatment of homeless people by the San Francisco Police Department ("SFPD").

7.        During my time at the Coalition, I observed numerous sweeps conducted by the City of San Francisco. Most of these sweeps were pre-planned encampment sweeps conducted by the HSOC task force. I have personally seen the life of an HSOC sweep from start to finish many times. These sweeps follow a decided pattern. However, I also observed dozens of informal sweeps that occurred while I was on street outreach work or just walking around the City on my personal time. These informal sweeps were usually conducted by the Department of Public Works ("DPW") or SFPD acting alone. In total, over years, I have witnessed well over a hundred sweep operations carried out in San Francisco.

**Timeline of a Healthy Streets Operations Center ("HSOC") Sweep**

8.        In a HSOC sweep, City employees typically gather near the site of the planned sweep around 7AM. If we had prior information that an HSOC sweep was going to occur, I would usually arrive at around 6:50AM or 7:00AM to begin observing the City's conduct.

9.      Large numbers of staff members from DPW, SFPD, San Francisco's Fire Department's ("SFFD") EMS-6, and a few workers from the Department of Public Health ("DPH") and the Homeless Outreach Team ("HOT") team have typically been present at the major HSOC sweeps I have observed.

10.     A large number of DPW workers typically arrive with various trucks, including a power washer, a flatbed truck, or a crusher truck. The precise number of SFPD officers always varies. I have sometimes observed sweeps where over 10 SFPD police officers are present. There are usually two to four HOT team workers and two DPH workers onsite for some portion of the sweep operation. The Director of HSOC, currently Sam Dodge and formerly Jeff Kositsky, is usually in charge of the overall sweep.

11.     By 7:30 AM, City workers begin entering the encampment. The HOT team collects names and will sometimes, though not always, tell residents how much time they have to pack. The HOT team will sometimes ask individuals whether they would like a shelter bed. However, when HOT team begin conducting this intake, they do not actually appear to know whether shelter beds are available or not. It will be hours before the HOT team actually learns whether any shelter beds are available. I know this from listening to HSOC's coordinating calls over months. This information usually does not become available until hours later, when the sweep operation is usually already over and unhoused people have already been forcibly removed from the area. At this time in the morning, in other words, the HOT team has not offered a single shelter bed.

12.     At 7:30AM, many unhoused people will tell the HOT team that they want shelter. Many others want to wait to confirm what shelter options are actually available and to make sure the shelter is appropriate for them before they begin packing up all their belongings. Based on my conversations with unhoused people and City workers onsite, HOT team workers will often report that these individuals have declined shelter—even though HOT team does not know what shelter will be available, has not made a shelter offer to anyone at this time, and cannot answer their questions. HOT team then leaves the area and often does not come back for hours.

13.     Shortly thereafter—around 7:45AM or 8:00AM—the sweep begins. Unhoused individuals are told that they need to take all of their belongings and leave the area immediately. Without further notice, DPW typically begins power washing the street. The power washing is very loud. This noise creates an intense environment. In my experience and based on my observations, the noise increases the stress and anxiety for unhoused individuals that are in an already stressful situation. The noise also makes it difficult for unhoused individuals to communicate with City workers while the power washing is going on. This often appears to be a

1 - 15

cover for DPW workers to begin seizing and destroying the belongings of unhoused people over their objections—creating a deafening sound so they cannot hear unhoused people beg to have their property saved. This effectively forces unhoused people to leave the area with whatever they can carry.

14.      I have also observed DPW pour unidentified chemicals around individuals at the encampments in connection with the cleaning of encampments. This has resulted in unhoused individuals reporting that they felt pressured to leave the area without their belongings and before being able to receive information about services.

15.      Meanwhile, the sweep continues. Whatever homeless individuals do not have physically in their hands usually gets picked up and put in the back of a DPW crusher truck— meaning that it is going straight to the dump. In other instances, I have witnessed City employees take unhoused people's belongings away on a flatbed truck without giving the property owners' information or notice about how they can retrieve their belongings.

16.      If anyone present at the encampment asks for more time, asks the DPW crews to stop throwing away their belongings, or resists orders to leave, SFPD moves in to tell people that they will be cited or arrested if they do not leave the area. By 9:30AM or 10:00AM, usually the City has succeeded in displacing most of the unhoused and has finished its "cleaning" of the area to remove tents and other signs of visible homelessness.

17.      The HOT team does not determine whether services are available until after DPW and SFPD complete their actions as described above. But at that point, most unhoused individuals have already been forced to leave the area. Around 9:30AM or 10:00AM is when the HOT team usually returns with whatever shelter offers they have for that day. But on several days, I spoke with HOT team workers who confirmed that they did not have shelter to offer anyone. From my experience observing sweeps, this was not uncommon.

18.      Even when services are available, I have seen that the City will typically offer only one-night or seven-day shelter beds. Individuals are not eligible to receive a 90-day shelter bed. The City only offers 90-day shelter beds to unhoused people who are on the HOT team's waitlist. However, homeless individuals have not been able to join the HOT team's waitlist since the start of the COVID-19 pandemic—now over two years ago. Furthermore, even where shelter beds are available, they often do not match the needs of the homeless individuals onsite. I know this because when the HOT team returns, I have often advocated for unhoused individuals to be connected with the services that are appropriate for them. For instance, at a sweep I attended on Willow Street, the only shelter beds available were five women's beds—even though there were

men present at the sweep. Likewise, at many sweeps, the City will only offer men's beds, even though individuals of all genders are in need of shelter.

19.      The result is that many homeless people have had their property taken, have not been offered shelter, and are simply forced to move a couple blocks away—only to have the City sweep them again a few days later.

**The City Ignores its Own Policies**

20.      I know that the City has policies about properly notifying unhoused people days and hours before a sweep operation is to take place so they have time to prepare. But I have spoken to hundreds of homeless individuals at the City's HSOC sweeps operations, and the vast majority of them could not recall having received advance notice that a sweep was about to occur.

21.      In my experience and observation, the City typically does not provide any notice to smaller encampments containing six or fewer tents. I have seen that the City sometimes puts up a posted notice for larger encampments, but in these cases, the notice will usually only be posted in one place that is not well-positioned for residents to actually see.

22.      I am also aware that the City has policies about storing the property of homeless individuals. But based on my observations, those policies are rarely followed. For example, I have almost never seen DPW bag and tag any individuals' property. Rather than bag and tag, I have far more regularly seen City employees confiscate individual's belongings and either throw those belongings out or throw them into DPW crusher trucks—over the objections of unhoused people who are asking to keep their property. I myself have intervened on many occasions to assist unhoused people in recovering their survival belongings when DPW has taken them away.

23.      I understand that the City also has policies about offering shelter before conducting a sweep or threatening individuals with citation or arrest. But based on the timeline of an HSOC sweep alone, where no services are offered until hours after the sweep begins—if they are offered at all—I do not believe that the City is complying with its own requirements.

**The City Also Conducts Non-HSOC Sweeps and Enforcement Actions Daily.**

24.      Beyond formally planned HSOC operations, SFPD and DPW employees are present on the streets every day directing unhoused individuals to leave their encampments and destroying any property that is left behind. I have witnessed dozens of informal sweeps on a monthly basis during my outreach work over years, and I have never seen an SFPD or DPW employee bag and tag an individual's property during these informal sweep operations.

25.      SFPD also employs "homeless outreach" officers that are specifically focused on encampments. When the homeless outreach officers return to an encampment that has been

previously swept, they do not have the full HSOC team with them. However, in these instances, officers inform unhoused individuals that they must move along or face arrest—even though there is not even an attempt to connect those individuals to services. I know from HSOC meetings and my experience attending City meetings that this type of enforcement is referred to as "re-encampment prevention." During re-encampment prevention, officers do not provide individuals advance notice of a sweep, nor do they offer any resources or shelter beds.

**Documenting the City's Sweep Operations and Interactions with Unhoused Individuals**

26.     Below, I have memorialized specific information I can recall about some of the formal and informal sweeps I have witnessed over the past two years. I attended many of these sweeps with Christin Evans, who was a volunteer who worked with me while I was employed at the Coalition.

| Date | Location | Agencies | Description of the Sweep |
|------|----------|----------|--------------------------|
| 5/6/20 | San Francisco Public Library | Police officers, library security guards | SFPD officers engaged in conversation with an unhoused man in a tent on the steps of the San Francisco Public Library. Officers and library security guards returned several moments later with orders for the individual to move his tent and belongings and leave the area. |
| 6/15/20 | Fulton Safe Sleeping Village | HSOC, DPW, SFPD | During this HSOC operation, City employees confiscated a  wheelchair, a walker, and several tents that belonged to homeless individuals without bagging and tagging and without providing the individuals information on how to re-claim those items at a later date. I did not see written notice posted at the site. |
| 6/18/20 | Castro | SFPD | I witnessed a police officer threaten an unhoused man with a misdemeanor if he did not move his belongings. This unhoused individual was not offered an SIP hotel room and it was the beginning of the pandemic. I recorded this interaction. |
| 3/26/21 | Bayview, across from food bank | SFPD | SFPD threatened a woman and her partner with a citation or arrest if they refused to leave the area where they were staying. |
| 4/15/21 | Russ & Howard | SFPD, DPW, HOT, SFFD | During this sweep, City employees destroyed a homeless individual's tent via a crusher truck. I recorded this interaction. I did not see written notice posted at the site. |
| 4/20/21 | Jones (from Ellis to Golden Gate) | DPW, HOT | During this sweep, HOT offered one woman an SIP hotel room. However, while she was waiting for the hotel room to become available, DPW attempted to remove her tent without providing a "tag" for the collected property. When she refused to leave, despite waiting for services, DPW accused her of being service resistant. At this same sweep, HOT |

1 - 18

|  |  |  | did not initially offer a shelter hotel room to two other individuals that were present, Jamel and their partner. While I connected them with HOT who did eventually offer to take them to a shelter hotel, the transport to take them never arrived. |
|---|---|---|---|
| 5/13/21 | Willow St | City employees | I witnessed City employees remove an unhoused man's unattended tent, which contained his personal belongings, into a crusher truck. City employees did not leave behind a notice for the man on how to collect his belongings. |
| 6/8/21-6/11/21 | Willow St (near Project Open Hand) | DPW, SFPD, HOT, SFFD | City employees conducted a three-day sweep to clear the street in preparation for a fundraiser the Mayor would be attending. Homeless individuals were asked to leave a two-block radius, and SFPD officers threatened individuals with citations or arrests if they refused to comply. The sweep resulted in most folks moving to the neighboring alley. I did not see written notice posted at the site. |
| June or July 21 | Olive | SFPD, DPW | No HOT team workers were present at this sweep. We observed one individual, Marquis, telling officers and DPW workers that he had spent the day moving his belongings and had not been offered any services. He confirmed this later in an interview that we filmed. |
| 7/19/21 | Olive | SFPD, DPW | During this sweep, no HOT outreach workers were present. Instead, Northern Station's "homeless outreach" police officer told residents to "move along." No notice had been provided. |
| 7/21/21 | Florida between 19th & 20th | HSOC agencies | During this sweep, HSOC did not offer services to four men. Instead, HSOC asked them to surrender their belongings, and HSOC dragged one man's tent into the street to continue with sidewalk cleaning. I did not see written notice posted at the site. |
| 8/20/21 | 15th & San Bruno |  | During this sweep, the incident commander on the scene cut up an individual's tent. I recorded a video documenting this incident. |
| Jun 2022 | Embarcadero[1] | DPW, SFPD | I spoke with unhoused individuals at the site the day the City conducted the sweep. People reported that they were not provided resources and I could see that their tents had been forcibly disbanded. Individuals report that their property had been destroyed and that the sweep began earlier than had been displayed on the posted notice. |

---

[1] A news report regarding this incident is available at the following address: https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps

**Reflections on the City's Conduct**

27.     I started working with the unhoused community in San Francisco because I recognized how critical it was for service providers to make meaningful, lasting connections with unhoused people to help connect them to the resources they need to break the cycles of homelessness. And I have also seen the ways in which the City can do this right by genuinely leading with a services-first approach.

28.     But the City's property destruction and law enforcement response is actively undermining all of the hard work our social services providers are putting in to actually help unhoused people get back on their feet. The City needs to be investing in real solutions to homelessness—not terrorizing people and taking their survival gear.  I have been doing this work for decades now. We need the City to finally listen to us so we are not still doing this work in the decades to come.

I have reviewed the information contained in this declaration. I declare under the pains and penalties of perjury that the contents are true and correct to the best of my knowledge.

Executed on: August 5, 2022

Kelley Cutler

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

Case No. 3:22-cv-05502

**DECLARATION OF CHRISTIN EVANS**

I, Christin Evans, hereby declare pursuant to 28 U.S.C. § 1746:

1.      My name is Christin Evans, and I am 48 years old. All facts set forth in this declaration are based upon my personal knowledge, and, if called upon to testify as to the truth of these facts, I could and would competently do so.

2.      I am a long-standing resident and business owner in the San Francisco Bay Area. I graduated from Vassar College in 1995 with a Bachelor's Degree in Political Science and a minor in International Economics. I received my M.B.A. from the Ross School of Business at the University of Michigan in 2001.

3.      My husband and I realized our dream of becoming small business owners in Haight-Ashbury in 2007. We purchased *The Booksmith*—a small independent bookstore known for its events, steady stream of lectures, and engagement with the broader community. In 2018, I purchased and now run a cocktail bar in Haight-Ashbury called *The Alembic*, which featured on the *San Francisco Chronicle*'s list of top cocktail bars in the City.

4.      I am a founding member of the Haight-Ashbury Merchants' Association (HAMA). I also serve on the Haight-Ashbury Neighborhood Council and represent our neighborhood at San Francisco's Council of District Merchant Associations. I use these positions to help ensure that our local businesses are engaged in the surrounding community and supported by local government.

**Confronting San Francisco's Homelessness Crisis**

5.      Haight-Ashbury is a primary neighborhood for San Francisco tourism. That makes it an exciting place to be a small business owner. But the neighborhood has also taken center stage in the political battle over homelessness. That started a journey for me to understand San Francisco's homelessness crisis—and to interrogate the City's role in perpetuating that crisis.

6.      I got more directly involved in addressing San Francisco's homelessness crisis in 2010. The City passed a Sit/Lie law making it illegal for unhoused people to be on public sidewalks during the daytime. *See* S.F. Police Code § 168. It was the perverse parallel to an already existing law making it illegal for homeless people to sleep in public parks at night. *See* S.F. Park Code § 3.13. In other words, literally hundreds of people were shuffling between our streets and public parks with everything they owned—every single day. That chaos was not a solution to homelessness, and it hurt us business owners too. I often heard even from loyal customers that they chose to shop online or go to other locations because they did not want to see the visible homelessness. I felt I had to do more—to look for real solutions.

**Advocacy with the Coalition on Homelessness; Monitoring the City's "Healthy Streets" Operation**

7.      For the past several years, I have been a volunteer with the Coalition on Homelessness (COH). I conduct street outreach to understand the needs of our unhoused community members. I learn people's stories and connect them to resources that meet their needs.

8.      The pandemic was a challenging time for my businesses. Both our bookstore and our bar in Haight-Ashbury were temporarily shut down. Instead, I used my time to help the expanding population of San Franciscans who could no longer make ends meet. There were no safe, non-congregate shelter options for homeless people in the early pandemic. So I raised money to purchase tents in coordination with COH. The City's Homeless Outreach Team (HOT) helped me distribute them.

9.      The City launched its Healthy Streets Operation Center (HSOC) in 2018 while I was a COH volunteer. This interagency program promised a services-first approach to resolving homelessness. Although I knew about HSOC since its inception, I started monitoring it more closely in the beginning of the pandemic. With my businesses shut, I had the time to volunteer with COH on a more regular basis. I also became increasingly concerned about peoples' belongings being taken.

10.     I have personally witnessed over 50 large-scale homelessness sweeps conducted by the City since March 2020. I understand that the CDC told local governments not to disrupt homeless encampments during the pandemic to protect the health of our entire community. That call was unheeded by the City.

11.     COH would often learn that a sweep was going to happen from HSOC meetings or other reported statements. Other times, unhoused people would have our contact information and would call us as a sweep was beginning to come assist them. As a result, I have seen the life of an HSOC sweep from start to finish many times. The sweeps follow a decided pattern.

**Timeline of a "Healthy Streets" Sweep**

12.     I usually arrive at an HSOC sweep around 6:50AM or 7:00AM. SFPD and DPW are often just arriving around that time. The Homeless Outreach Team (HOT) arrives around 7:30AM. SFPD and DPW are often the teams to make first contact—letting homeless people know there is a sweep that day and that they needed to clear out their belongings and go.

13.     At this point, homeless people have rarely received notice. In about 50 sweeps, I have never seen written notice posted at the site where an HSOC sweep is taking place. Some individuals report receiving verbal notice from officers driving by in their vehicles, but that is generally unhelpful. By the time crews arrive on the day of a sweep, most individuals who received a verbal warning are gone. I have seen most people learn about a sweep for the first time when DPW or SFPD starts shaking them out of their tents at 7AM. The lack of notice only increases the stress and anxiety of the experience. Individuals do not know to pack their belongings—and then are in a frenzy to do so.

14.      Somewhere around 7:30AM, the HOT team usually makes contact. They approach homeless people and ask them their names and if they *might* be interested in receiving services that day. But there is never any offer of shelter at that time. In fact, I learned that the HOT team usually has no idea what services or shelter might be available that day until at least 9:30AM. Often times, if the HOT team thinks they have spoken to someone on a previous occasion, they will not approach them at all.  Then the HOT team leaves for several hours.

15.     By 8:00AM, DPW has already started to take people's belongings. My fellow volunteers and I call it the "swarm." DPW comes with a crusher truck and a flatbed truck, splashes chemicals all along the sidewalk and people's belongings, and starts blasting a very large power washer. They start grabbing everything they can see, as fast as possible. People

1 - 23

dance around the power washer to collect their belongings—now wet. They have to yell to be heard. Whatever homeless individuals do not have physically in their hands gets picked up and put in the back of a DPW crusher truck. If someone protests, the DPW workers usually say: "Sorry, I thought it was trash." But no one is allowed to recover their property once it is in the back of a truck. This only ramps up the pressure for people to leave the area immediately with whatever they can carry. Those who cannot move fast enough lose everything.

16.     During this time, SFPD is standing watch. They intervene whenever someone protests the destruction of their property. Often, they take a more active role. If they perceive individuals are not leaving the area fast enough, they threaten them with arrest. Sometimes, DPW and SFPD have collectively forced every single person out of an area before the HOT team even returns. They do not tell people where they can go, they just tell them they cannot be there. At this point, no one has been offered any services and many have had their property destroyed. The sweep is, in effect, already over.

17.     The HOT team usually returns around 9:30AM or 10:00AM at the earliest. Often times, they have very little to offer. If they are lucky, they have shelter beds to offer *some* of the homeless people still onsite—in a congregate shelter in the middle of the pandemic. Sometimes they do not even have that to offer. Meanwhile, homeless people are standing on the street corner having had their belongings taken and now desperate for assistance.

18.     The few that remain often do not get that assistance. I have seen the HOT team return with only men's shelter beds when there are women who need shelter. I have seen them return with only women's shelter beds when there are men present. And yes, I have seen them return with no resources at all. And yet all homeless people are expected to pick up and move along—no matter what.

19.     Under these circumstances, I find that some of the HOT team workers have become like ghosts. This is a demoralizing assignment for them. It is not what they were meant to do. So instead, they focus on their personal needs like getting coffee. They are not meticulous about approaching everyone who is left at the site, because if they were they would have to confront each person to explain why they have nothing appropriate to offer them.

20.     The entire HSOC operation wraps up by about 11:30AM. For the most part, everyone has been displaced to just a couple blocks away. Those who have been swept have lost everything and must start over—until the City sweeps again.

**The City Ignores its Own Policies**

21.      I know the City has policies about storing the property of homeless individuals and offering them shelter before conducting a sweep. But based on my observations, those policies are rarely followed. When they are, it is usually because an advocate from COH or another community group is present to demand them.

22.      I have never seen the City initiate a bag and tag of someone's property. I understand that to happen extremely rarely. If I am present, I will approach SFPD and DPW and demand that individuals have their property bagged and tagged before it is destroyed. In many cases, officers refuse. They usually do not give a reason. Other times, they claim that belongings are soiled or trash when they clearly are not. Occasionally, we succeed in helping people have their belongings stored. But that is backwards. We should not have to tell the City to follow its own rules, and certainly the City should not refuse to follow its own rules.

23.      DPW indiscriminately throws away the property of homeless people who are not present at a sweep—no matter how neatly packaged or clear it is that a person wanted to keep their property. All unattended property, not just abandoned property, is destroyed. The same goes for so-called "bulky items." Mattresses, wheelchairs, bicycles, and other property essential for shelter and mobility are summarily seized and destroyed because the City does not want to store them.

24.      The City violates its own policies around shelter as well. Because the HOT team often does not approach people directly to offer services, I go ask the HOT team what options are available myself. I then go talk to the individuals at the site, and try to advocate for the appropriate shelter placement. This is work that the HOT team should be doing. My advocacy has resulted in people being placed in shelter or receiving services when they otherwise would have been left on the street with nothing. Regardless of whether I am successful in connecting people to placements, however, everyone is still forced to leave. I understand this to violate the City's own policies about when sweeps are authorized.

25.      I have also seen informal sweeps without the presence of the HOT team. On those occasions, DPW and SFPD will disturb people in their sleep, force them to move, or seize their property without even the guise of offering services—contrary to the City's promise to carry out a service-driven response to homelessness.

**Documenting the City's Destructive Sweep Operations**

26.     Below, I have memorialized specific information I can recall about many of the sweeps I have witnessed over the past two years.

| Date | Location | Agencies | Description of the Sweep |
|------|----------|----------|--------------------------|
| 3/24/20 | ~1745 Folsom | SFPD, DPW | No advance notice posted at the site. I was driving near Rainbow Grocery when I witnessed SFPD and DPW stopped by a tent. I circled around to observe the agencies onsite. DPW had taken the person's tent and belongings and thrown them into a garbage truck simply because the person was not present at the site. I discussed this matter with SFPD Officer J. Sylvester. He suggested there was nothing of "extreme" value in the property destroyed as an excuse for their behavior. |
| 6/15/20 | Turk & Hyde | SFPD, DPW HOT, SFFD | No advance notice posted at the site. A wheelchair, a walker, and several tents were placed in a dump truck while the property owners watched. |
| 7/23/20 | 1377 Fell | SFPD, DPW HOT, SFFD | No advance notice posted at the site. Individuals were told to remove their tents for a cleaning operation. Mischa, a homeless woman who was not present at the scene at the time, had her tent thrown away. |
| 8/11/20 | Noe & 14th | SFPD, DPW HOT, SFFD | No advance notice posted at the site. Some individuals offered hotels; some a safe outdoor sleeping site; but others offered only a congregate shelter during the pandemic—prior to anyone in the U.S. being vaccinated. One person at the site who did not receive a viable shelter offer was given his neighbor's tent. The DPW supervisor was angry. He slashed the tent with a box cutter to render it unusable. Michael Mason from EMS6 sent the DPW supervisor away to de-escalate the situation. |
| 8/21/20 | Market & 16th | SFPD, DPW HOT, SFFD | No advance notice posted at the site. I was not provided information about whether service offers were made and to whom. Most individuals present were preparing to relocate elsewhere in the neighborhood and were gathering their belongings when they were forced to leave. Toro Castaño asked repeatedly for DPW and SFPD to retrieve his Macbook Pro laptop and his tent before they destroyed the site. That request was not heeded. His property was destroyed. Toro was arrested for illegal camping. |
| 9/18/20 | Julien & 16th | SFPD, DPW HOT, SFFD | No advance notice posted at the site. One individual lost bicycles that were seized and never returned or bagged and tagged. Another individual storing items in their tent reported that their tent and belongings were taken during the sweep. I provided them with an administrative claim form to file a claim against the City. |
| 10/5/20 | Ashbury & Grove | SFPD, DPW HOT, SFFD | I arrived after the sweep had concluded. No notice posted at the site. One woman named Ria/Rita reported losing everything because she left to go to the bathroom. |
| 11/1/20 | Willow & Broderick | SFPD, DPW | No advance notice posted at the site. HOT team was not present and no services offered onsite. I spoke to SFPD Officers Brady (#4258) and Burkhart and asked about their rationale for ordering a "move-along." It appears they made |

1 - 26

| | | | that decision without consulting anyone else. They acknowledged that many people were forced to leave their tents behind because of the order to leave the area. People lost tents and other survival belongings. |
|---|---|---|---|
| 4/15/21 | Howard & Russ | SPFD, DPW HOT, SFFD | No advance notice posted at the site. I witnessed a woman who appeared to have a disability as she was swarmed by DPW workers who began indiscriminately grabbing her personal belongings and throwing them in the trash under protest. |
| 5/12/21 | Larkin & Turk | SFPD | No advance notice posted at the site. I observed SFPD as they approached a man sleeping in his tent. The SFPD officers told me they were responding to a call for services and were sent to remove the man from the location. There was no service offer made. No other agencies were present. |
| 5/12/21 | Olive | SFPD, DPH | No advance notice posted at the site. I came upon SFPD and DPH disposing of the tent of someone who had left the area momentarily to go to the bathroom. |
| 6/9/21 | Willow | SPFD, DPW HOT, SFFD | I witnessed this sweep in advance of a fundraising event hosted by Project Open Hand. The mayor & other VIPs were attending. The City was intent on clearing the area of visible homelessness. No advance notice posted at the site. There were ~30 homeless individuals living on that street and the HOT team did not have nearly enough services to offer everyone. Homeless people were told to "just move" under threat of arrest. SFPD led the sweep with no pretense that this was anything other than displacement. |
| 7/21/21 | Florida & 19th | SFPD, DPW HOT, SFFD DPH | No advance notice posted at the site. Four men were not offered services at all. They were asked to surrender their belongings nonetheless. One man's tent was dragged into the street. |
| 8/25/21 | Willow & Olive | SFPD, DPW HOT, SFFD DPH, DEM | No advance notice posted at the site. Jeff Kositsky from HSOC was leading the sweep. He personally spoke to one homeless woman, Dawn, four times urging her to leave the area. He promised a shelter in the Mission, transportation, and packing assistance. But he withdrew the offer later in the day after she had already prepared to leave. |
| 9/16/21 | Haight & Clayton | SFPD, DPW | No advance notice posted at the site. DPW power washed the street aggressively four times to try to force the homeless people on the block to depart. Belongings were soaked and destroyed. I provided one homeless woman, Lisa, with a replacement blanket and gloves. |

**Putting the City on Notice**

27.     As a former management consultant, I wanted to educate the City about how its policies were being disregarded and suggest how to make improvements. I was sure they would recognize that property destruction and failing to provide services are counterintuitive, destructive responses to the homelessness crisis. After all, the City's recent rhetoric about their "Healthy Streets" program explicitly rejects a law enforcement approach to homelessness.

28.     I contacted the City early in the pandemic to alert them to the realities on the ground. I met with Jeff Kositsky, who at the time was the head of HSOC, to inform him about

the City's violations of its own policies that I had seen. I also drafted a handout that I thought could be shared at sweeps to provide information about the appropriate protocols. Kositksy did not respond to me and we did not meet. I have tried to have the same conversation with DPW and SFPD supervisors on several occasions. They have said no.

29.     I filed a civilian complaint against the SFPD in August 2020 for their repeated harassment of a homeless man. That man was targeted by police and told to move by at least 4 different officers in a 12-hour period—despite following every City policy. When I called SFPD Captain Pedrini on the phone before lodging my complaint, he dismissed my concerns out of hand. He informed me that SFPD would continue to respond to all calls and complaints made about homeless individuals who were living in tents, whether or not they were violating the law and regardless of the proper protocols for conducting a sweep operation. This kind of law enforcement harassment is common, and reflects another way that SFPD gets around the City's policies to push homeless people out. A copy of my civilian complaint is attached as **Exhibit A** to this declaration. To my knowledge, no action was taken in response to my complaint.

30.     There is an accountability gap with HSOC. It is an amorphous City program without clearly defined leadership. At a sweep, it is seldom clear which City agency is in charge and who is calling the shots. Different agencies will tell homeless people and advocates different things. SFPD might tell people they have one hour to move, but DPW will tell them they have 10 minutes. The HOT team may tell someone to wait for a shelter placement, but SFPD will demand they move immediately. Without clear authority, no one knows who to listen to. That confusion achieves the goal. Homeless people are displaced one way or another, and each agency can point the finger at the other when they inevitably violate City policy.

**Reflections on the City's Conduct**

31.     San Francisco is one of the richest cities in the richest country in the world. We innovate technological solutions that drive change on a global scale. It is unfathomable to me that our response to homelessness—a response we pay for at astronomical rates as tax payers— involves law enforcement displacing people from one alley to the next every day and stealing their belongings. That response is as cruel as it is senseless. What a waste of our precious resources.

32.     San Francisco knows how to do this right. There was a flicker of hope during the pandemic where it seemed the City might actually get there. When the City opened thousands of hotel beds for homeless individuals, an unprecedented number of homeless people entered

stable housing. Contrary to the dominant narrative that homeless individuals prefer to be on the street, almost everyone offered a hotel room eagerly accepted. That program is now ending. Those people will be back on the street. But this example only goes to show that the solution to San Francisco's homelessness problem is housing itself.

33.     We need our taxpayer dollars to be put towards affordable housing that combats San Francisco's homeless crisis at its roots. Not to punish people who have already been priced out of the place they call home. That is not just kinder. It is also better for business.

I have reviewed the information contained in this declaration by telephone. I declare under the penalties of perjury that the contents are true and correct to the best of my knowledge.

Executed on: November 5, 2021

Christin Evans

# EXHIBIT A

My name is Christin Evans.  I was present during an HSOC operation which took place on Noe at Duboce on Tuesday, August 11.  I was present from approximately 8:30am to 7:30pm with the exception of three short breaks in that time to pick up food & use the restroom. None of the breaks exceeded 30 minutes and I was present for a large portion of that time observing SF Hot, DPW and SFPD contact with campers from 16 tents located along the fence of the Davies Medical Center.  As a volunteer for the Coalition on Homelessness and a proponent of Prop C, a gross receipts tax to fund real housing solutions for homeless individuals, I had been interested in observing the city's response to people experiencing homelessness and had been present at approximately 30 similar HSOC operations since the March shelter in place order took effect.

What was different about the HSOC operation on August 11th was that there were primarily only offers of congregant shelter made to campers.  I witnessed SF Hot and EMS6 staff make offers of SIP hotel rooms to 2 campers only.  But the large number of individuals (over 14 campers) who had slept in tents in this location did not receive an offer of a hotel room or safe camping site instead I witnessed offers of congregant shelter beds.  There were a number of people who declined the offer of congregant shelter citing concerns about safety including from theft, violence they'd previously experienced in similar congregant shelters.  Additionally, some campers mentioned the Covid shetler outbreaks as another reason why congregant shelters were not a safe choice they could accept.

One camper who introduced himself to me as "Jim" had a very tidy tent.  There was no garbage or debris.  In compliance with the city's safe sleeping guidelines, Jim's tent had more than 48 inches on all sides.  He had hung a little "home" ornament at the doorway of his tent and lined his tent with a little wooden fence.  It was clear that Jim took great pride in keeping his home clean and welcoming.

He communicated to SF Hot team members that he would accept a hotel room but not congregant shelter citing prior issues at shelters he'd experienced and a concern that they were not safe.  The SF Hot team did not make him an offer of a hotel room.  As a result of their interaction, he relocated his tent temporarily around the corner to Duboce street next to the church, approximately 50 feet from his tent's original location.

Around 6pm, Jim saw that the HSOC operation was nearly complete so he started relocating his belongings to his prior tent site on Noe street.  An officer approached him and asked him to remove his tent until the HSOC operation was complete.  Jim complied.  At around 7pm, the officer communicated to Jim & myself that the HSOC operation had been completed.

After the officer Jim relocated his tent to his prior location on Noe.  At approximately 8:25pm, I received a message that Jim was contacted by officers threatening him with arrest if he didn't relocate his tent.  Based on information I received from Park Station Sergeant K.Holder, I have learned those officers who were Officer Yessin and Officer Villanueva of Park Station.

1 - 31

On the morning of August 12th, I arrived at Jim's location at approximately 7:45am.  I saw Officer J Walker (badge 1590) from Park Station.  Officer Walker had a police vehicle with the lights on her vehicle tuned on.  Jim was agitated and in the process of packing up his belongings and I asked him what was taking place.  He reported that he was again being told that he couldn't have his tent where he was located at the moment.  There were no offers of a hotel room or a shelter being made to him.  He said a police vehicle or officer had been posted nearly continuously from the night before outside of his tent.  That he was unable to get a good night's rest.  And he was exhausted and was going to ask another camper to help him once again relocate his tent and belongings off of Noe street.

I requested Officer Walker to call her Sergeant to clarify the city's policy on why Jim was being asked to relocate since the HSOC operation was completed and his tent was in compliance with the safe sleeping guidelines.  While I was waiting for the Sergeant to arrive, another Officer C Dagit (badge 703) also interacted with Jim and nearby campers.

At approximately 8:05am, Sergeant K. Holder arrived & introduced herself.   She identified that she was currently acting Lieutenant.  I spoke with her about the situation and she said that Park Station Captain Pedrini had issued a "passing call" for the area the prior evening.  She explained that officers were told to "check to see how it was looking" and to ensure compliance with sleeping guidelines to ensure no furniture was accumulating or sidewalks were being blocked.  I asked if she believed Jim was in violation of guidelines and she said she was unaware if he was.   I asked her why officers had essentially established a fixed post outside of Jim's tent all night and she said that it was as a result of the Captain's orders.   Together we confirmed that Jim had been contacted by 4 different police officers between the hours of 8pm and 8am even though there was no unlawful or criminal behavior taking place.

Later that day, Captain Pedrini himself arrived at Duboce & Noe.   I spoke with him for about 30 minutes informing him what had taken place.  I communicated my concern that campers who are compliant with safe sleeping guidelines should be allowed to shelter in place and not be asked to move their location.  He expressed that campers had been offered hotel rooms and could be removed from the area if they did not accept.  I clarified to him that Jim did not receive an offer of a hotel room but that he had stated he would accept one if one was offered to him.

On Thursday August 13, Jim contacted me to say that he had been asked to relocate his tent an additional two times by SFPD officers.  He was no longer pitching his tent within the park station boundaries but instead inside the Mission station boundaries.  I sent this message to Captain Pedrini by email:

"Captain Pedrini,

Jim, the man who I mentioned to you who is a model camper (he knows the rules and keeps his tent tidy, and isn't a noise nuisance) called me today and he just broke down in tears.

He said that he had moved into an area near the Citibank on Sharon street and Mission officers told him to pack up and move again.

This is one of the campers who was forced to relocate multiple times off of Noe at Duboce. Four of your officers kept a fixed post and contacted him multiple times in a twelve hour period. He finally had a friend help him relocate to the Castro library area and he had multiple encounters with officers there as well.

He said he is sleep deprived, has lost more belongings and is now really struggling.

I need you to understand that this is SFPD directly traumatizing this man who already struggles with depression again and again.

I would like to find a location where Jim can set up his tent either in Mission or Park SFPD areas where police will not make frequent contact with him.

Please call me so we can identify that location.  My cell is 510-459-5451.

Thank you,
Christin Evans"

On the afternoon of August 13, I received a phone call from Captain Pedrini.  I believe we spoke for 10 minutes.  He said that he didn't believe SFPD officers were doing any harm by making multiple contacts with Jim because the officers were acting professionally.   He said that he could not identify a place for Jim to safely pitch his tent where he would be left alone by officers. He said that <u>SFPD officers would continue to respond to calls & complaints made to SFPD in regards to homeless individuals who have pitched their tent within the district, regardless if the tent was compliant with the city's safe sleeping guidelines</u>.

I believe that this statement made to me by Captain Pedrini indicates that he is directing his officers to make contact with homeless individuals, often repeatedly regardless of their tent compliance with city's safe sleeping guidelines.  I believe that Captain Pedrini and officers under his command are in violation of city policy and CDC recommendations to allow homeless individuals to safely take shelter in a tent at this time during the Covid health crisis.  I believe that Captain Pedrini's actions put his officers, homeless individuals and our broader community at greater risk for spreading the Covid virus.  Homeless individuals require sleep and rest to remain healthy.  Homeless individuals should be allowed to safely take shelter within their tent without disturbance.  Our community is safer when housing and hotels are provided however that is not taking place in sufficient numbers in spite of unanimous support of the Board of Supervisors to open 8000 hotel rooms.  I believe that the Mayor has put our whole community at greater risk by opening fewer than 3000 hotel rooms, shelter beds and safe campsites for the estimated 6000+ unsheltered people experiencing homelessness in our city before the Shelter In Place order took effect in March 2020.

I ask that SFPD take immediate action to refrain from contact unless there is actual criminal activity taking place.  This is necessary to ensure campers like Jim can get a good night's sleep. He needs his sleep so he can remain healthy and successfully shelter in place. Our whole community will be safer if Jim and others like him can get a good night's sleep.

Signed,
Christin Evans
632 Ashbury Street
Cell 510-459-5451
christin@booksmith.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

Case No. 3:22-cv-05502

**DECLARATION OF IAN JAMES**

I, Ian James, hereby declare pursuant to 28 U.S.C. § 1746:

1.     My name is Ian James, and I am 26 years old. All facts set forth in this declaration are based upon my personal knowledge, and, if called upon to testify as to the truth of these facts, I could and would competently do so.

2.     I was born and raised in San Francisco. Currently, I work as the Organizing Director at the Coalition on Homelessness ("COH" or "the Coalition"). I joined the Coalition in March 2021. Prior to working at the Coalition, I worked for the Western Regional Advocacy Project—a think tank for grassroots organizing—and on various campaigns and statewide ballot measures. All of my work has focused on ending the forced displacement of low-income tenants and unhoused people.

3.     As the Organizing Director at the Coalition, it is my job to provide the Coalition's organizers with the support they need as they organize in the field. I also ensure that our campaigns are connected and cohesive. Along with this work, I also do my own field outreach to unhoused people whenever my schedule allows. This includes attending homelessness sweeps and assisting unhoused individuals in filing administrative claims for property taken by the City.

**Advocacy with the Coalition on Homelessness: The Impact of Sweeps**

4.     In my role at the Coalition, I have directly observed the toll that sweeps take both on our organization's members and on other unhoused community members. I have also seen firsthand how much the City's endless sweeps limit the kind of work we are able to do at the Coalition. It is an intense responsibility to be out in the field protecting unhoused community

members' property and their human rights from the City's practices. Our organization's networks are not large enough to respond to all the sweeps, property confiscation, and destruction that happen on a daily basis. This creates a terrible feeling—organizers are out there as often as they can be, often every day, and this is still not enough to stop the City's constant violations from happening.

5.      Not only do sweeps drain our members emotionally, but responding to sweeps also saps resources from the Coalition's other work that seeks to proactively address the root causes of homelessness. We would like to work with the City on reforming broken systems like the coordinated entry system, which would actually start to aid individuals in exiting homelessness. But the Coalition cannot work to address these reforms when our time and resources are being spent responding to sweeps. The constant displacement of people also makes it more difficult for the Coalition to organize, find new members, and build up a community.

6.      In addition to directly observing sweeps, I also help unhoused individuals file administrative claims against the City when their property has been confiscated and destroyed. Since May 1, 2022, I have helped file 23 administrative claims for destroyed belongings. My role includes helping to draft a person's claim, taking it to the City Attorney's office, and—if the claim is denied—preparing individuals to represent themselves in small claims court. Though valuable work, these efforts take away from the time that I should be spending organizing around the Coalition's proactive housing initiatives.

**Timeline of a "Healthy Streets" Sweep**

7.      I have personally witnessed several sweep operations conducted by the City since beginning my work for the Coalition. Since July 2022, I have also personally observed three full-scale Healthy Streets Operations Center ("HSOC") sweeps.

8.      At two of the HSOC sweeps I have attended since July 2022, I did not see any notice posted at the site prior to the sweep. At the third, there was a posted notice, but the City did not come on the day identified on the notice. The sweep occurred on a different day instead. I have spoken to people who have experienced sweeps and to other Coalition volunteers who have observed sweeps, and therefore I have knowledge that this pattern of notice—either verbal notice only or posted notice for the wrong day—is common practice for HSOC sweeps.

9.      Based on the HSOC sweeps I have recently experienced, City workers will start to gather between 7:00 AM and 8:00 AM. This includes workers from the Department of Public Works ("DPW") and the San Francisco Police Department ("SFPD"), along with the Homeless Outreach Team ("HOT"). Recently, the San Francisco Fire Department ("SFFD") has usually been present as well.

10.     Usually, HOT will start out by doing an "assessment." This consists of HOT workers asking individuals present at the site if they would be interested in shelter. They do not actually make any shelter offers at this time, however, because shelter availability will not come online until closer to 9:00 AM—or later.

11.     While HOT is doing their initial assessment or directly after, around 7:00 or 7:30 AM, DPW is already beginning to push people to move out of the area. Sometimes, DPW will say that individuals can move a few blocks away. Other times, DPW will just tell unhoused people to leave and that there is nowhere for them to go.

12.     After HOT does their initial assessment, they will typically leave the area. They usually do not return unless and until they know they have shelter to offer some people onsite—which is around 9:00 AM or 9:30 AM. That is if there is any shelter available.

13.     In the meantime, people are being told to clear out by DPW and SFPD. There is confusion and chaos as people try to gather their survival belongings and protect them from being confiscated by the City.

14.     This means that, by the time HOT returns, many people have already been forced out of the area. Those few who remain are so stressed by the experience that they are not in a position to advocate to receive the shelter that would work for them. Usually, HOT will only have congregate shelter beds available to offer, if they have any offers at all. And, as I have learned from speaking with individuals at these sweeps, congregate shelter is not accessible to many people. For example, this type of shelter often does not have physical and mental disability accommodations for those who are in wheelchairs or who have PTSD or other trauma-related diagnoses.

**The City Ignores Its Own Policies: The Coalition's Response**

15.     I understand that the City is supposed to "bag and tag" any property that is confiscated during a sweep, labelling the property and providing its owner with information on where and how to retrieve it later. Despite this stated policy, I have never observed the City bag and tag anyone's property. The City confiscating people's property with no way for the individual to retrieve it has led the Coalition to help many people file administrative claims against the City for their destroyed property. I personally have assisted in the filing of 23 of these claims since May 1, 2022, alone.

16.     I have personally observed a dispute where DPW continually tried to call one woman's belongings trash to justify throwing them away, despite the woman clarifying again and again that her belongings were not trash. During this interaction, DPW also tried to throw her belongings away while she was not looking. This is not the only instance in which I have

observed City workers destroy unhoused individuals' belongings.

17.       I have also seen the City force people to choose between keeping their property and accessing shelter. During one sweep I observed, a woman was interested in a congregate shelter space. However, she wished to safeguard her belongings and place them in a storage unit while she was in the shelter. She was told that, if she left to arrange for a storage unit, the City could not guarantee that her belongings would be there when she returned. She ended up not taking the shelter spot because there was no way to protect her personal property. The City falsely calls this a refusal of shelter. But the City created a false and impossible choice that made shelter unavailable to this individual.

18.       I have also personally experienced the City's enforcement efforts and intimidation tactics. During one sweep where I was present, a woman asked me how long she would have to move from the site. DPW had begun cleaning on one end of the block and they were slowly working their way to the other end. I went to ask the SFFD employee who was in charge of the operation that day how much time he estimated the woman had to move. The SFFD employee responded aggressively. He said that I was interfering with the operation and trespassing—even though I was standing on a public street—and that if I did not leave, he would call the police and have me arrested. Though I was not arrested on this occasion, this fear tactic is common for the City during HSOC sweeps.

## Documenting the City's Destructive Sweep Operations

19.       Below, I have memorialized specific information I can recall about the sweeps I have witnessed since July 2022.

| Date | Location | Agencies | Description of the Sweep |
|---|---|---|---|
| 7/14/22 | 12th Street & Market Street | DPW, SFPD, HOT, SFFD | I arrived at this sweep around 8:30 AM. DPW was cleaning one side of the street and having people move across the street. There was one woman at the end of the block who was being targeted in particular by the DPW workers and the SFFD employee who was overseeing the sweep. They were repeatedly calling her belongings trash and trying to throw away her things when she was not looking. At this sweep, the same SFFD employee threatened to have the police arrest me for trespassing. At the time, I was standing on 12th Street. |
| 7/22/22 | 16th Street & Market Street | DPW, SFPD, HOT, DEM | I arrived at this sweep at 6:15 AM. Meter operators arrived at 6:50 AM. DEM arrived at 7 AM; SFPD arrived at 7:05 AM. They all stood around and watched. HOT began its assessment at 7:10 AM, but they said that they would not know the shelter options until 8 AM or 9 AM. HOT left at 8:30 AM. |

| | | | All City employees returned at 9:45 AM. Individuals at the site were told to move for power-washing at 10:10 AM and were allowed to move back afterwards. Later that afternoon, when only one COH observer was still present, SFPD returned to the site by themselves and forced everyone to move from the area. I learned of this in speaking with the COH observer who was present when this occurred. |
|---|---|---|---|
| 9/6/22 | Treat Avenue, behind Best Buy | DPW, SFPD | Another COH member, Laketha, and I arrived at this sweep around 3:45 PM. By that time, it was starting to wrap up, but we learned what had happened by talking to several people who had moved around the corner and were sitting in a small parking lot, including a woman named Ann. She told us that DPW had arrived at 7:30 AM. When this group of people had tried to move across the street, they were told that they needed to move further away. They asked about several other places to move and were told each time that they could not move there either. This was in the middle of a heat wave and much of the Bay Area was under a heat advisory. No services were offered. |
| 9/14/22 | 12th Street & Market Street | DPW, SFPD | I received text updates from Couper, a member of the Coalition. People at 12th Street and Market were told to throw away their belongings. Only after they had done so did the City employees tell them that they had no services to offer. City employees also ran people's names and threatened them with arrest during this sweep. |

## Reflections on the City's Conduct

20.     In my work assisting unhoused folks with filing administrative claims, people often ask something to the effect of: "Isn't the City supposed to help me? How am I supposed to trust the City to place me in shelter and connect me with housing if my experience with them is having my things stolen and being forcibly displaced?" This has stayed with me, and it is something I think about regularly. The City is breaking people's trust, when it is the City who should be helping to end the cycle of homelessness rather than perpetuating it.


I have reviewed the information contained in this declaration by telephone. I declare under the penalties of perjury that the contents are true and correct to the best of my knowledge.

Executed on September 16, 2022

_____

Ian James

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

Case No. 3:22-cv-05502

### DECLARATION OF CARLOS WADKINS

I, Carlos Wadkins, hereby declare pursuant to 28 U.S.C. § 1746:

1.     My name is Carlos Wadkins, and I am 21 years old. All facts set forth in this declaration are based upon my personal knowledge, and, if called upon to testify as to the truth of these facts, I could and would competently do so.

2.     I have lived in San Francisco since 2018. I moved here to attend college at San Francisco State University (SFSU), where I studied Political Science until December 2020.

3.     From January 2021 to May 2022, I worked at the Coalition on Homelessness ("the Coalition") as a human rights organizer. Over the last year and a half, I have helped lead the Coalition's outreach work to unhoused people living in San Francisco. I also helped direct the Coalition's writing and research work on homelessness and helped plan our approach to the issues that impact unhoused people.

**Organizing with the Coalition on Homelessness; Diverting Time to Stop Homeless Sweeps.**

4.     My organizing work with the Coalition took the form of daily street outreach to understand the needs of our unhoused community members and to hear about their experiences. In this role, I regularly spoke to people living in homeless encampments, in their vehicles, or in shelters. During these conversations, I gave unhoused people referrals and spoke with them about resources I could connect them to. Each week, I coordinated a group meeting for Coalition staff and volunteers where we shared what we learned during outreach. We brainstormed together how to connect the unhoused people we met to housed allies, nonprofit service

provider, harm reduction shelters, and other programming.

5.        My goal as an organizer at the Coalition was to build networks of support for unhoused people, connect them to public and social service programs, and help provide for their basic survival needs. Ordinarily, this work should be about helping unhoused people improve their general quality of life while also advocating for dignified shelter, hygiene, and permanent housing solutions in San Francisco. We call this *proactive* work: building a base of support and political power for unhoused people.

6.        Instead, my outreach work had to focus almost entirely on a rapid response campaign to fight against the City's displacement and criminalization of unhoused people— which took the form of daily sweeps of homeless people and their belongings. This was *reactive* work. Sweeps destabilize and disempower unhoused people, placing them in constant distress and activating their survival instincts. As long as the City was conducting its sweeps, my work to build community and resource networks for unhoused people became extremely difficult. So I was forced to shift gears.

**Coordinating the Coalition's Rapid Response to the City's Homeless Sweeps.**

7.        Over the past year and a half, I became responsible for training the Coalition's volunteer network on how to observe and monitor the City's homeless sweeps—and helped coordinate our rapid response to send volunteers out to protect unhoused people when their belongings were being taken or they were being threatened with citation or arrest.

8.        Usually, the Coalition received tips about sweeps from unhoused people who knew to call us. Other times, the Healthy Streets Operation Center (HSOC) hosted meetings or published schedules identifying the City's planned sweeps. On a few occasions, City workers called us to give us anonymous tips about upcoming homeless sweeps that were not on the schedule.

9.        When we heard that the City was conducting a sweep, we tried to arrive as soon as possible to monitor the situation. Monitoring included documenting what the City was doing and advocating on behalf of unhoused people who were onsite. This advocacy usually involved helping individuals ask for shelter beds—if there were any—or helping to ensure that their belongings were not destroyed.

10.       Whenever the Coalition sent staff or volunteers out to observe a sweep, I was often the one in charge of coordinating which volunteers and staff members would attend the sweep.

1 - 42

There was a set of volunteers I trained to go out regularly on behalf of the Coalition to monitor sweeps. Ordinarily, we tried to send at least one staff member and one volunteer to each sweep.

11.     Staff members and volunteers were told to ask the City how many services or shelter beds they had to offer that day. They were also told to record information about any unhoused person who was threatened, harassed, or had their property destroyed. Our volunteers were instructed to pay particular attention to whether or not there were enough shelter offers for everyone present. They also inquired about whether the shelter offerings were actually appropriate and accessible for the individuals they are offered to.

12.     Because I coordinated the Coalition's sweep response work, I ordinarily could not be physically present at the sweeps the City was conducting on an almost daily basis. Instead, I received and relayed reports and information to our other staff and volunteers. This involved me responding to calls about sweeps several times each week for the entire year and a half that I worked with the Coalition. In addition to the dozens of homeless sweeps that I have helped coordinate the Coalition's response to, I have also personally witnessed at least a dozen large-scale homeless sweeps.

**Timeline of a "Healthy Streets" Sweep**

13.     Many of the sweeps that I have observed have been conducted by the Healthy Streets Operation Center (HSOC)—which is an interagency program in San Francisco that promises a services-first approach to homelessness. Sweeps are ordinarily handled by the Department of Public Works (DPW) and the San Francisco Police Department (SFPD) acting alone. What makes HSOC operations different is the extent of coordination across City departments. The participating City agencies usually include a combination of DPW, SFPD, the Homeless Outreach Team (HOT), the EMS-6 team of the San Francisco Fire Department (SFFD), and the Department of Public Health (DPH). It is a massive operation.

14.     But after conducting interviews with unhoused people during my daily outreach and hearing their complaints, I began collecting public records about HSOC. I gathered HSOC sweep schedules, shelter availability reports, and property logs for unhoused people—and compared them. It became clear to me that HSOC had been destroying people's property and forcing people to move without offering them services.

15.     My interviewing and research work over months led me to author the Coalition's recent report about HSOC sweep operations, which is entitled: *Behind the Healthy Street*

*Operation Curtain: The True Story of San Francisco's Abusive Encampment Response.*[1] The report details months of sweep operations by HSOC. I have also personally attended about a dozen large-scale sweep operations led by HSOC and witnessed these operations first-hand.

16.     HSOC sweeps follow a clear pattern. They usually begin between 7:00AM and 7:30AM. Workers from the various City agencies begin to gather at the site just before 7:00AM. This usually includes workers from DPW, the HOT team, SFPD, DPH, and EMS-6. The EMS-6 Commander runs point on the day's operations, but DPW still leads the sweep effort and is supported by SFPD.

17.     I have heard countless reports from unhoused people that they never received advanced written or verbal notice that an HSOC sweep was happening—or that the notice they did receive told them that the sweep was going to happen on a different day. Often, I hear people say they were verbally informed by the HOT team that HSOC "might" be coming to clear the area soon, without being given an actual date or time.  At more than a dozen of the HSOC sweeps I have personally witnessed, I have not seen written notice posted at the site.

18.     The sweeps usually begin between 7:00 and 7:30 AM. DPW and SFPD will walk through the street, waking people up by shouting or shaking their tents. The officers tell them to leave. Sometimes, the HOT team will walk by and ask if individuals are looking for services and shelter. If they are, HOT team will take their name and date of birth. But the HOT team does not actually offer anyone shelter that early in the morning. I know from HSOC calls I have listened to that the HOT team does not even know if it will have shelter to offer until hours later in the day.

19.     Meanwhile, for approximately two hours from 7:30AM to 9:30AM, DPW and SFPD will be clearing the area. SFPD will often shut down the street and bring in both police officers and parking enforcement officers into the area. After a first round of cleaning the area, DPW then goes person by person, and tells people to clear out. They inform homeless people that everything they leave behind will be thrown out. This appears to be done in an attempt to get people to rush. During this time, the HOT team and DPH workers leave and walk away from the area.

20.     If someone is not moving quickly enough for DPW, they will call SFPD over and start to grab things that are clearly of value just to pressure people to take what they can and

---

[1] A copy of the Coalition's report is available at https://www.cohsf.org/wp-content/uploads/2021/10/HSOC-Report-Draft-10.6.pdf.

leave. SFPD will instruct unhoused people that they have 15 minutes to move or officers will seize their tents as evidence of a crime. I have also seen SFPD threaten to give people a citation if they did not move.

21.      I have seen SFPD threaten to seize people's property and cite them for refusing to move despite the fact that they have not been offered any services that day. In fact, I know from my conversations with unhoused people that many of these individuals are actually on waitlists for shelter or housing but do not have access to them.

22.      Meanwhile, DPW begins to get more aggressive. It pushes people's belongings into the street and leaves them in piles of debris. Often, DPW has brought its crusher truck to throw all of these belongings away. There is no sorting, and no attempt to safeguard any property of value—from tents to medications to expensive technology and family heirlooms. People leave the area with what they can and the rest is lost.

23.      At around 9:30AM, the HOT team usually returns. But by 9:30AM, most homeless people have already been forced out of the area. HOT team workers have admitted this to me, and I have also personally witnessed it. If HOT does come back with services, those who wait in line to receive them run the risk of their belongings being seized by DPW in the meantime for being left unattended.

24.      In the end, most unhoused people are left to move across the street or a few blocks away, without much of anything changing for them—a far cry from the services-first approach to homelessness that HSOC promises to be.

**The City Ignores its Own Policies; the Coalition Steps In.**

25.      I know the City has policies about storing the property of homeless individuals and offering them shelter before conducting a sweep. But based on my observations, those policies are rarely followed. When they are, it is usually because an advocate from the Coalition is present to demand them.[2]

26.      Often during sweeps, there will be a conflict because DPW claims that someone has abandoned their survival gear and valuable personal property just because it is momentarily unattended. DPW will attempt to put an unattended tent or other unattended property in the middle of the street to be swept into the garbage. I have even seen this occur even when someone

---

[2] For a comparison of what HSOC claims its sweeps protocol is, and what its standard operating procedures actually are based on my experience and the experience of many of our volunteers, see the Coalition's report, *supra* note 1, at 8-9.

1 - 45

is present with their belongings. If an individual is speaking with someone else, helping other people at the site, or even talking with the HOT team, they have to make sure that DPW does not try to take their belongings away just because it is unattended.

27.     I have almost never seen DPW bag and tag any of the property it does seize from people. Nor have I ever seen DPW actually hand someone a tag informing them of where or how they could collect their property. Instead, I usually get calls at the Coalition about once a week from someone who has had their property seized or destroyed by DPW during a sweep. The Coalition now runs a clinic to file administrative claims against the City as a result of these property losses.

28.     The City violates its own policies around shelter as well. In my experience witnessing sweeps, there have always been fewer beds available than people present at the site in need of services. I have seen HSOC workers say they will have enough beds and then not have enough. On several occasions, they have had no beds to offer at all.  If there are not enough beds for people, HOT will just stop talking to anyone onsite and let the sweep continue. If people approach them, HOT will ask them to come back the next day.

29.     I know from my work at the Coalition that shelter is not readily available to people in San Francisco. There is no operating shelter waitlist in the City—and when it was operating it had more than one thousand people waiting for shelter. The current 311 signs posted around the City do not even have shelter recommendations listed. Instead, the City recommends that you call the HOT team to help you find a shelter. But they take 72 hours to get back to you and even then may not have a shelter bed to offer.

**Documenting the City's Destructive Sweep Operations**

30.     Below, I have memorialized specific information I can recall about many of the large-scale sweeps I have witnessed in the past year—most of which were HSOC operations. But every week there have been countless smaller sweeps carried about by DPW and SFPD all over the City. I got calls about many of these smaller sweeps and it would be dizzying to attempt to document them. Walking through the Tenderloin in the morning, it is difficult not to catch DPW or SFPD approaching someone's tent and ordering them to move despite having nowhere else to go. The sweeps memorialized below are some of the larger ones I was present at during my time with the Coalition.

| Date | Location | Agencies | Description of the Sweep |
|---|---|---|---|
| 3/26/21 | Bayview, across from food bank | SFPD | A woman and her partner were told by SFPD to leave the area by that afternoon and were threatened with citation or arrest. There was no one there to offer them services of any kind. |
| 4/13/21 | Turk & Hyde | DPW, HOT, DPH, SFFD | I arrived toward the end of this sweep. I spoke with an individual named Alex, who said that DPW had cut his tent while he was talking to the HOT team. I walked over to confirm that his tent had been cut. Another individual said that he had his tent and all his belongings thrown away. I spoke to an individual named Lamont, a Black man in his 60s, who used a wheelchair. I watched as DPH and HOT workers assessed him and first told him he was not eligible for services. Later, they told him they only had beds for couples available. Lamont never got any services that day. I confirmed with City workers that about half of the residents of the encampment had already left by the time that services were made available that morning. |
| 4/15/21 | Russ & Howard | SFPD, DPW, HOT, SFFD | I watched as someone's tent was thrown into a crusher truck by DPW. One of the individuals present, named Artemis, was deaf, and the City did not communicate properly with her. She lost several of her belongings that day. |
| 4/20/21 | Jones (from Ellis to Golden Gate) | DPW, HOT, SFPD, SFFD | I observed service delivery in particular during this sweep operation. The HOT team never approached several of the individuals onsite, including Jamel and their partner. So I brought them to the HOT team to make sure they had the opportunity to receive services. They were offered a hotel room while I was present, but I later learned that the City never followed through and never took them to the hotel room they were promised. Meanwhile, another woman had been offered a hotel room as well. But while she was waiting for her hotel room to become available, DPW tried to seize and throw away her tent. She was accused of being services resistant/refusing services. |
| 4/23/21 | Under the freeway at S. Van Ness | HOT, SFFD, SFPD, DPW | I watched as HOT workers left the scene while the sweep was still occurring. They returned later, briefly, but did not offer any services that day. This resulted in homeless individuals being left waiting for shelter bed offers that never came despite packing all their belongings. |

1 - 47

| 5/13/21 | Willow St | DPW, SFPD, HOT | I watched as one man's tent with all his belongings in it was taken by DPW while he was not present and thrown in a crusher truck. |
|---|---|---|---|
| 5/24/21 | Jones (from Ellis to Golden Gate) | DPW, SFPD, HOT, SFFD | I watched as the HOT team offered services to many more people than they ultimately had beds for once the numbers came in. This resulted in the HOT team being forced to tell people, "Not today." But DPW and SFPD swept the area anyways. |
| 6/1/21 | Showplace Square | DPW, HOT, SFPD | Individuals reported to me that their belongings had been thrown away by DPW and I attempted to advocate for them to have their belongings returned—unsuccessfully. |
| 6/8/21-6/11/21 | Willow St (near Project Open Hand) | DPW, SFPD, HOT, SFFD | This was a three-day sweep conducted to clear the street in preparation for a fundraiser the Mayor was attending. Individuals were asked to leave a two-block radius and I watched as they were threatened with citation and arrest by SFPD. One individual, Brett, stated that he was upset that he was going to be moved because of the event. Brett has a back injury, but nonetheless was asked to move all of his belongings. He set all of his belongings neatly on the corner. But when he stepped away for a moment, his belongings were gone. He told us that he had asked others what happened and was informed that DPW had come back and thrown his belongings away. |
| 8/3/21 | Willow St | HOT, SFFD, SFPD, DPW | One individual, Jackie, was dragged in their tent by a DPW worker towards the DPW truck. We prevented the attempted taking and trashing of several people's belongings on this day. |
| 9/3/21 | 16th & Dolores | SFPD, DPW, HOT, SFFD | We heard that residents were told they were being "cleared" from the block because the nearby temple wanted them gone. We saw as police threatened homeless people with citations. But the police left when we began filming them. |
| 1/7/22 | 16th & Market | SFPD, HOT, DPW, SFFD | This was a standard HSOC operation. HOT talked to people in the morning but did not have shelter to offer anyone at that time. DPW harassed folks earlier in the morning, saying that if they left their tents to go to the bathroom, it would be considered abandoned and would be thrown away. One person's tent was thrown away because the person was not present at the time of the sweep. When HOT finally returned with some shelter offers, there were only congregate shelter spaces—and not that many available. |

1 - 48

**Reflections on the City's Conduct**

31.     I have spent more than a year of my life watching the pain that the City inflicts on its unhoused residents. It is unfathomable to me that in a City of such wealth and privilege, we are so focused on protecting an image of a utopic city rather than living our values. Destroying people's belongings, punishing them for sleeping outside through no fault of their own, offering them no real alternatives—and then lying about it—is unacceptable.

32.     This community needs to focus on building housing, instead of trying to remove all signs of the homelessness problem it helps to create by traumatizing unhoused people and seizing their belongings when they are at their most vulnerable.


I have reviewed the information contained in this declaration by telephone. I declare under the pains and penalties of perjury that the contents are true and correct to the best of my knowledge.

Executed on: May 25, 2022

Carlos Wadkins