1  LAWYERS' COMMITTEE FOR CIVIL
   RIGHTS OF THE SAN FRANCISCO BAY AREA
2  Zal K. Shroff, MJP 804620*
   Elisa Della-Piana, SBN 226462
3  131 Steuart Street, Ste. 400
   San Francisco, CA 94105
4  Telephone: (415) 543-9444
   edellapiana@lccrsf.org
5  zshroff@lccrsf.org
6
   *application pro hac vice pending
7
   Attorneys for Plaintiffs
8
   Additional Counsel below
9

10                 UNITED STATES DISTRICT COURT
11               NORTHERN DISTRICT OF CALIFORNIA
12

13  COALITION ON HOMELESSNESS; TORO          CASE NO. 3:22-cv-05502
    CASTAÑO; SARAH CRONK; JOSHUA
14  DONOHOE; MOLIQUE FRANK; DAVID            **EXHIBITS—PART 1 OF 3**
    MARTINEZ; TERESA SANDOVAL;               **PUBLIC DOCUMENTS (EXHIBITS 5**
15  NATHANIEL VAUGHN,                        **TO 25) IN SUPPORT OF PLAINTIFFS'**
                                             **MOTION FOR PRELIMINARY**
16                       Plaintiffs.         **INJUNCTION**
             v.
17
18  CITY AND COUNTY OF SAN FRANCISCO;
    SAN FRANCISCO POLICE DEPARTMENT;
19  SAN FRANCISCO DEPARTMENT OF
    PUBLIC WORKS; SAN FRANCISCO
20  DEPARTMENT OF HOMELESSNESS AND
    SUPPORTIVE HOUSING; SAN FRANCISCO
21  FIRE DEPARTMENT; SAN FRANCISCO
    DEPARTMENT OF EMERGENCY
22  MANAGEMENT; LONDON BREED, in her
    official capacity as Mayor; and SAM DODGE,
23  in his official capacity as Director of the Healthy
    Streets Operation Center (HSOC),
24
                         Defendants.
25

26

27

28

1
ACLU FOUNDATION OF
NORTHERN CALIFORNIA
2
John Thomas H. Do, SBN 285075
Brandon L. Greene, SBN 293783
3
39 Drumm Street
San Francisco, CA 94111
4
Telephone: (415) 293-6333
5
jdo@aclunc.org
bgreene@aclunc.org
6

LATHAM & WATKINS LLP
7
Alfred C. Pfeiffer, Jr., SBN 120965
8
Wesley Tiu, SBN 336580
505 Montgomery Street, Ste 2000
9
San Francisco, CA 94111
Telephone: (415) 391-0600
10
al.pfeiffer@lw.com
wesley.tiu@lw.com
11

12
LATHAM & WATKINS LLP
Joseph H. Lee, SBN 248046
13
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
14
Telephone: (714) 540-1235
joseph.lee@lw.com
15

16
LATHAM & WATKINS LLP
Regina Wang, SBN 326262
17
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
18
Telephone: (424) 653-5500
regina.wang@lw.com
19

20

21

22

23

24

25

26

27

28

# Exhibit 5

# San Francisco

## HOMELESS COUNT & SURVEY

### COMPREHENSIVE REPORT

# 2019

REPORT PRODUCED BY ASR

## ABOUT THE RESEARCHER

Applied Survey Research (ASR) is a social research firm dedicated to helping people build better communities by collecting meaningful data, facilitating information-based planning, and developing custom strategies. The firm was founded on the principle that community improvement, initiative sustainability, and program success are closely tied to assessment needs, evaluation of community goals, and development of appropriate responses.

### HOUSING INSTABILITY RESEARCH DEPARTMENT (HIRD)

Project Manager: Laura Petry, MSW

Senior Data Analyst: Yoonyoung Kwak, PhD

Graphic Design and Layout: Jenna Gallant, Katherine Lee, MPH

Department Vice President: Peter Connery

Department Director: Samantha Green, MSc

Department Coordinator: Jenna Gallant

### LOCATIONS

**Central Coast:**
55 Penny Lane, Suite 101
Watsonville, CA 95076
tel 831-728-1356

**Bay Area:**
1871 The Alameda, Suite 180
San Jose, CA 95126
tel 408-247-8319

www.appliedsurveyresearch.org



# Table of Contents

**TABLE OF CONTENTS** ....................................................................................................3

**ACKNOWLEDGEMENTS** ..................................................................................................4

**INTRODUCTION** ..............................................................................................................6

**POINT-IN-TIME COUNT** ..................................................................................................9

Number and Characteristics of Persons Experiencing Homelessness in San Francisco ..................10

Total Number of Unsheltered and Sheltered Homeless Persons by District .........................11

**HOMELESS SURVEY FINDINGS** ....................................................................................13

Survey Demographics ..............................................................................................14

Living Accommodations ...........................................................................................18

Duration and Recurrence of Homelessness ...............................................................21

Primary Cause of Homelessness ...............................................................................22

Services and Assistance ...........................................................................................24

Employment and Income ..........................................................................................26

Health ....................................................................................................................28

Domestic Violence and Partner Abuse .......................................................................30

Criminal Justice System ...........................................................................................31

**HOMELESS SUBPOPULATIONS** ....................................................................................32

Chronic Homelessness ............................................................................................33

Homelessness Among Veterans ................................................................................39

Homelessness Among Families with Children .............................................................42

Unaccompanied Homeless Children and Transitional-Age Youth ..................................46

**LOCAL CONTEXT** ........................................................................................................54

Department of Homelessness and Supportive Housing ...............................................54

**APPENDIX A: METHODOLOGY** .....................................................................................59

Street Count Methodology .......................................................................................60

Youth Street Count Methodology ..............................................................................62

Shelter Count Methodology ......................................................................................62

Survey Methodology ................................................................................................64

**APPENDIX B: SUPPLEMENTAL POINT-IN-TIME COUNT DATA** .......................................66

Supplemental Shelter Count .....................................................................................66

Supplemental Shelter Count Methodology .................................................................67

San Francisco Unified School District Data .................................................................68

**APPENDIX C: GENERAL SURVEY DEMOGRAPHIC COMPARISON** .....................................69

**APPENDIX D: DEFINITIONS AND ABBREVIATIONS** ........................................................72

**APPENDIX E: TABLE OF FIGURES** .................................................................................74

**APPENDIX F: FIGURE SOURCES** ...................................................................................76



# Point-in-Time Count

The 2019 San Francisco Homeless Point-in-Time Count & Survey included a complete enumeration of all unsheltered and publicly or privately sheltered homeless persons. The general street count was conducted on January 24, 2019 from approximately 8 p.m. to midnight and covered all 47 square miles of San Francisco.[1] The shelter count was conducted on the same evening and included all individuals staying in emergency shelters, transitional housing facilities, and domestic violence shelters. The general street count and shelter count methodologies were similar to those implemented in 2015 and 2017.

The methodology used for the 2019 San Francisco Homeless Point-in-Time Count & Survey is commonly described as a "blitz count" since it is conducted by a large team over a very short period of time. As this method was implemented in San Francisco, the result is an observation-based count of individuals and families who appear to be homeless. The count is then followed by a survey of a sampling of the total homeless population in order to better understand the characteristics of the local homeless population. Information collected from the survey is used to fulfill HUD reporting requirements and to inform local service delivery and strategic planning efforts.

In 2013, San Francisco adopted a best practice for the Point-in-Time Count: the supplemental youth count. The dedicated youth count occurs during the same time as the general street count and is conducted by young people with current or recent experience of homelessness. As this population can be especially difficult for volunteers to identify, the youth count methodology is intended to improve the quality of data on homeless youth. For more information regarding the dedicated youth count methodology, please see *Appendix A: Methodology*.

---

[1] For safety reasons, Golden Gate Park and Ocean Beach were counted on the subsequent morning of January 25th. See Appendix A: Methodology for details.

## NUMBER AND CHARACTERISTICS OF PERSONS EXPERIENCING HOMELESSNESS IN SAN FRANCISCO

On January 24, 2019, there were 8,035 people experiencing homelessness in San Francisco, a 17% increase over the 2017 Point-in-Time Count. A six-year trend of comparable Point-in-Time Count data identified a 15% increase in the number of persons experiencing homelessness in San Francisco between 2013 and 2019.

The total number of unsheltered persons counted was 5,180. Of the 2,855 individuals included in the shelter count, 84% (2,412 people) were in emergency shelter programs while 16% (443 persons) were residing in transitional housing and safe haven programs on the night of the count.

Persons in families with children, including the minor children, represented eight percent (8%) of the total population counted in the Point-in-Time Count, while 92% were individuals without children. In total, 5% of those counted on January 24, 2019 were under the age of 18, 14% were between the ages of 18-24, and 81% were over the age of 25.

Figure 1.    TOTAL NUMBER OF PERSONS EXPERIENCING HOMELESSNESS, 2013-2019



Figure 2.    TOTAL NUMBER OF PERSONS EXPERIENCING HOMELESSNESS BY SHELTER STATUS, 2013-2019



# Exhibit 6



DEPARTMENT OF
HOMELESSNESS AND
SUPPORTIVE HOUSING

# San Francisco 2021 Sheltered Point-in-Time Count

## Table of Contents

Background: The Point-in-Time Count................................................................................................1

   COVID-19 Challenges in 2021 ...........................................................................................................1

Overview: 2021 Sheltered Count Data .............................................................................................2

   Temporary Shelter Resources...........................................................................................................3

2021 Demographic Information: Sheltered Count ............................................................................5

Additional 2021 Data: Supplemental Count .....................................................................................8

Methodology.....................................................................................................................................8

   HUD Data .........................................................................................................................................8

   Additional Data ................................................................................................................................9

Conclusion.........................................................................................................................................9

## Background: The Point-in-Time Count

Every two years during the last ten days of January, communities across the country conduct comprehensive counts of the local population experiencing homelessness. Point-in-Time (PIT) Counts measure the prevalence of homelessness in each community and collect information on individuals and families residing in emergency shelters and transitional housing, as well as people sleeping on the streets, in cars, abandoned properties, or other places not meant for human habitation. The PIT Count is the only source of nationwide data on sheltered and unsheltered homelessness and is required by the U.S. Department of Housing and Urban Development (HUD) for all jurisdictions receiving federal funding for homelessness-related services. The count also helps inform strategic planning and capacity building at the federal, regional, and local levels.

***COVID-19 Challenges in 2021*** - In January 2021, due to the impact of COVID-19, the San Francisco Local Homelessness Coordinating Board unanimously voted to apply for an exception waiver for the unsheltered component of the 2021 PIT Count, which HUD approved. In the absence of a full 2021 PIT Count, the San Francisco Department of Homelessness and Supportive Housing (HSH) conducted the sheltered component of the 2021 PIT Count in line with HUD requirements. HSH and the Local Homelessness Coordinating Board decided that HSH would conduct a full PIT Count in 2022 (as well as the regularly scheduled count in 2023) to make up for the absence of the unsheltered count in 2021.

This report contains results from the sheltered component of the 2021 PIT Count, adding a useful data point to our information about the populations residing in temporary shelter. The 2022 count will provide extensive information about both sheltered and unsheltered individuals experiencing



homelessness. To get a sense for the scope of the information that will be included in the 2022 report, please see the 2019 San Francisco PIT Count.

## Overview: 2021 Sheltered Count Data

In the months leading up to the 2021 PIT Count, San Francisco's shelter system expanded rapidly due to the Mayor's 1,000 New Shelter Beds Initiative and the expansion of non-congregate shelter opened in response to the COVID-19 pandemic. Simultaneously, the City's congregate shelter system capacity decreased by over 70% due to social distancing requirements during the COVID-19 pandemic.

**Figure 1: Number of Sheltered People, 2019-2021**



The sheltered population of people experiencing homelessness jumped by 1,145 people – over a 40% increase - between the January 2019 and January 2021 Sheltered PIT Counts.

The population of individuals experiencing homelessness in this report is identified based on the federal HUD definition of homelessness and is broken into three household categories: adults only, children only, and families with children.

These categories follow HUD's reporting and are defined below:

(1) Adults only – this category includes individuals from all households with individuals only over the age of 18, including Transitional Age Youth.[1]
(2) Families with children – this category counts all individuals in families with at least one parent over the age of 18 and at least one child under the age of 18.[2]
(3) Children only – this category encompasses individuals from households with only people under the age of 18, including unaccompanied minors or families with minor parents.[3]

---

[1] *In HUD reporting, this category is defined as "households without children."*
[2] *In HUD reporting, this category is defined as "households with at least one adult (over 18) & one child (under 18)."*
[3] *In HUD reporting, this category is defined as "households with only children."*



*San Francisco 2021 Sheltered PIT Count*

*Table 1: Number of Sheltered People by Household Type*

| Population | 2019 | 2020 | 2021 |
|---|---|---|---|
| **Adults Only** | **2,237** | **2,423** | **3,400** |
| Transitional Aged Youth (18-24) | *188* | *203* | *179* |
| Over age 24 | *2,049* | *2,220* | *3,221* |
| **Families with Children** | **605** | **489** | **589** |
| Under age 18 | *53* | *38* | *43* |
| Transitional Aged Youth (18-24) | *235* | *172* | *221* |
| Over age 18 | *317* | *279* | *325* |
| **Children Only** | **13** | **32** | **11** |
| *Total* | *2,855* | *2,944* | *4,000* |

The adults-only sheltered population, which constituted 85% of individuals sheltered in 2021, accounted for the increase of the sheltered population in the years between 2019 and 2021. This 51% increase in the number of sheltered adults is likely due to the intentional targeting of older and medically vulnerable people experiencing homelessness for placement in COVID-19 Shelter-in-Place hotels. Although the number of sheltered adults over the age of 24 increased significantly, the number of sheltered Transitional Aged Youth from adult-only households remained relatively steady.

The number of sheltered people in families with children, who accounted for 15% of the sheltered population in 2021, decreased by 3% between 2019 and 2021.

The number of individuals in children-only households has remained very low since 2019 and constituted just 0.3% of the sheltered population in 2021.

***Temporary Shelter Resources -*** San Francisco significantly expanded the City's temporary shelter capacity between January 2019 and January 2021, increasing available beds from 3,493 beds to 5,080 beds. The Department offers two main kinds of shelter: emergency shelter and transitional housing.

- Emergency shelters include congregate shelters and other temporary lodging and services. Certain non-congregate shelters (i.e., Shelter-in-Place hotels) were considered emergency shelter in this count.
- Transitional housing provides people who have significant barriers to housing stability with a place to live and intensive social services for up to two years while they work towards housing stability.

*San Francisco 2021 Sheltered PIT Count*

**Figure 2: Total Temporary Shelter Beds**



*Source: 2019, 2020 and 2021 Housing Inventory Counts (HIC). These totals include a small number of beds that are not funded or managed by HSH, since the HIC includes all resources dedicated to individuals experiencing homelessness regardless of funding source. The HIC Count is conducted the same night as the PIT Count.*

*\*Please note: the 2019 count includes 20 Safe Haven beds, which served hard-to-reach people experiencing homelessness with severe mental illness. There were no Safe Haven beds in 2020 and 2021 since HUD is not funding new projects under the Continuum of Care Program.*

Two key initiatives drove this increase: Mayor London Breed's 1,000 Shelter Beds Initiative and the City's COVID-19 response. The 1,000 Shelter Beds initiative, announced in October 2018, significantly increased the number of beds in operation by January 2021. As part of this shelter expansion initiative, the City opened beds at a variety of types of shelter, including Navigation Centers and family shelters.

The COVID-19 response prompted the City to open alternative shelter resources to increase available shelter and make up for reduced capacity at existing congregate shelters.  Shelter-in-Place (SIP) hotels were the largest category of beds, accounting for 2,263 of the beds the night of the 2021 count. These beds will be phased out in FY21-22. San Francisco also opened a 200-bed congregate shelter at Moscone West and a non-congregate RV/Trailer program with 120 units during the pandemic.

Additionally, the City opened Safe Sleeping sites that had capacity for approximately 260 tents at full operation. These sites were not included in the Housing Inventory Count since they do not meet HUD's definitions for temporary shelter. Safe Sleep guests were not included in the Sheltered PIT Count.



# Exhibit 7



# SAN FRANCISCO HOMELESS COUNT AND SURVEY

2022 COMPREHENSIVE REPORT



# TABLE OF CONTENTS

FOREWARD BY HSH ........................................................................................................... 4

ACKNOWLEDGEMENTS ................................................................................................. 12

EXECUTIVE SUMMARY ................................................................................................... 14

INTRODUCTION ............................................................................................................. 16

POINT-IN-TIME COUNT ................................................................................................. 18

    Number and Characteristics of Persons Experiencing Homelessness in San Francisco ............... 19

    Total Number of Unsheltered and Sheltered Homeless Persons by District .................................... 20

HOMELESS SURVEY FINDINGS ..................................................................................... 24

    Survey Demographics ................................................................................................... 25

    Living Accommodations ................................................................................................ 30

    Duration and Recurrence of Homelessness ................................................................ 33

    Primary Cause of Homelessness .................................................................................. 35

    Services and assistance ............................................................................................... 37

    Employment and Income ............................................................................................ 39

    Health ........................................................................................................................... 41

    Domestic Violence and Partner Abuse ...................................................................... 42

    Criminal Justice System ............................................................................................... 43

SELECT POPULATIONS ................................................................................................... 44

CONCLUSION ................................................................................................................ 53

APPENDIX A: METHODOLOGY ..................................................................................... 54

    Overview ...................................................................................................................... 54

    Street Count Methodology .......................................................................................... 56

    Youth Street Count Methodology ............................................................................... 58

    Shelter Count Methodology ........................................................................................ 59

    Survey Methodology ................................................................................................... 60

APPENDIX B: SUPPLEMENTAL POINT-IN-TIME COUNT DATA .................................... 63

    Supplemental Shelter Count ....................................................................................... 63

    Supplemental Shelter Count Methodology ............................................................... 63

    San Francisco Unified School District Data ................................................................. 65

    Families in SRO Units or Doubled Up .......................................................................... 66

APPENDIX C: GENERAL SURVEY DEMOGRAPHIC COMPARISON ......................... 67



# NUMBER AND CHARACTERISTICS OF PERSONS EXPERIENCING HOMELESSNESS IN SAN FRANCISCO

On February 23, 2022, there were 7,754 people experiencing homelessness in San Francisco, a 3% decrease over the 2019 Point-in-Time Count. The total number of unsheltered persons counted was 4,397. Of the 3,357 individuals included in the shelter count, 87% (2,933 people) were in emergency shelter programs while 13% (424 persons) were residing in transitional housing programs on the night of the count.

Persons in families with children, including the minor children, represented eight percent (8%) of the total population counted in the Point-in-Time Count, while 91% were individuals without children. In total, 5% of those counted on February 23, 2022, were under the age of 18, 13% were between the ages of 18-24, and 81% were over the age of 25.

Figure 1.    TOTAL NUMBER OF PERSONS EXPERIENCING HOMELESSNESS, 2017-2022



Figure 2.    TOTAL NUMBER OF PERSONS EXPERIENCING HOMELESSNESS BY SHELTER STATUS, 2017-2022





# Exhibit 8

Skip to Main Content

DataSF 

# HSH 90 day emergency shelter waitlist  Health And Social Services

View Data  Visualize

Export

API

## Access this Dataset via OData

Use OData to open the dataset in tools like Excel or Tableau. This provides a direct connection to the data that can be refreshed on-demand within the connected application.

Tableau users should select the OData v2 endpoint option.

Socrata OData Documentation

**OData Endpoint**

https://data.sfgov.org/api/odata/v4/w4sk-nq57    OData V4 ⌄    Copy

Done

Provides the seniority list for entry into HSH 90 day emergency shelter waitlist. The list began on 2/24/14 and is updated at least daily. During the COVID19 response, clients are not being added to the list. For more information, see https://sf311.org/information/waitlist and http://hsh.sfgov.org/services/emergencyshelter/

Updated August 23, 2021

### About this Dataset

Mute Dataset

Mute this asset to stop receiving notifications. To resume notifications, you can unmute the asset at any time.

Updated
## August 23, 2021

**Data Last Updated** August 23, 2021
**Metadata Last Updated** December 14, 2020
**Date Created** January 7, 2014

Views          Downloads
## 91.7K        70.4K

**Data Provided by** *(none)*
**Dataset Owner** AndyM

Contact Dataset Owner

## Department Metrics

| Publishing Department | 311 |

**Detailed Descriptive**

| Geographic unit | Not applicable |

**Publishing Details**

| Publishing frequency | Daily |
| Data change frequency | Daily |

**Topics**

| Category | Health and Social Services |
| Tags | *This dataset does not have any tags* |

| Show More |

# What's in this Dataset?

Rows
      1,339
Columns
      6

# Columns in this Dataset

| Column Name | Description | Type |
|---|---|---|
| Position | The client's position on the wait list at the time the report was published. | Number |

Data Type
      [Number](#)
API Field Name
      position_number

| Seniority Number | The Client's seniority number for this waitlist request, based the date placed on the wait list (the day after the request was initiated.). The number is comprised of two digits for the year, three digits for the day of the year, and three digits for the random rank on the day added. | Number |

Data Type
      [Number](#)
API Field Name
      reservation_seniority

| DOB | Date of Birth | Plain Text |

| Column Name | Description | Type |
|---|---|---|
| | | |

Data Type
Text
API Field Name
    dob

| | | |
|---|---|---|
| CHANGES ID | Client ID in the Human Services Agency application (Coordinated Homeless Assessment of Needs and Guidance through Effective Services) | Number |

Data Type
Number
API Field Name
    txtchangesid

| | | |
|---|---|---|
| SR # | The Service Request Number in the SF311 system | Number |

Data Type
Number
API Field Name
    caseid

| | | |
|---|---|---|
| Instructions | Any specific instructions for the client. | Plain Text |

Data Type
Text
API Field Name
    message

# Table Preview

View Data | Create Visualization

| Position | Seniority Number | DOB | CHANGES ID | SR # | Instructions |
|---|---|---|---|---|---|
| 1 | 20045025 | 08-01-1958 | 310310 | 12080617 | |
| 2 | 20046026 | 09-13-1982 | 318535 | 12084460 | |
| 3 | 20046031 | 05-18-1988 | 421157 | 12086415 | |
| 4 | 20046032 | 12-08-1971 | 417050 | 12086022 | |
| 5 | 20046033 | 10-15-1976 | 408483 | 12085973 | |
| 6 | 20046034 | 08-05-1991 | 326983 | 12083493 | |
| 7 | 20046036 | 01-25-1966 | 273930 | 12086362 | |
| 8 | 20046037 | 06-30-1971 | 313461 | 12083663 | |
| 9 | 20046039 | 02-28-1978 | 421385 | 12085424 | |
| 10 | 20046040 | 11-10-1949 | 13237 | 12085819 | |
| 11 | 20047001 | 03-18-2020 | 424503 | 12087663 | |
| 12 | 20047004 | 02-01-1957 | 331236 | 12088803 | |

| Position | Seniority Number | DOB | CHANGES ID | SR # | Instructions |
|---|---|---|---|---|---|
| 13 | 20047006 | 08-01-1985 | 380362 | 12087683 | |

Previous Next Showing Rows 1 to 13 out of 1,339

Click and drag to pan the chart

View Source Data➜

## Open this dataset in Carto?

Your browser will be redirected to Carto, would you like to proceed?

Note that Carto has a file size limit of 150MB or 500,000 rows.

Learn about more external integrations at

https://support.socrata.com/hc/en-us/articles/115010730868

Close Open

## Open this dataset in Plot.ly?

Your browser will be redirected to Plot.ly, would you like to proceed?

Note that Plot.ly has a file size limit of 5MB.

Learn about more external integrations at

https://support.socrata.com/hc/en-us/articles/115010730868

Close Open

## Send a Message to the Owner of this Dataset

Send a short message to the dataset owner to ask a question, make a comment, or point out something about the data.

Subject

Message

Your Email (Your email address will be shared with the dataset owner so they can get back to you)

I'm not a robot

reCAPTCHA
Privacy - Terms

Cancel Send

# Manage Featured Content

# Featured Content

What would you like people to see when they first view this dataset? Promote up to 3 Socrata assets that use this data, or choose to feature any relevant external resources. Think of this section as the face of your data.

Add...

Add...

Add...

Done

  

- [Open Data](#)
- [Showcase](#)
- [Publishing](#)
- [Academy](#)
- [Resources](#)
- [Blog](#)

- [Terms of Use](#)
- [Socrata Privacy Policy](#)

DataSF's mission is to empower use of data. We seek to transform the way the City works through the use of data. We believe use of data and evidence can improve our operations and the services we provide. This ultimately leads to increased quality of life and work for San Francisco residents, employers, employees and visitors. [Learn more about our work.](#)

Made with ♥ in San Francisco

20046031

# Exhibit 9

# Shelter Reservation Wait-list

Due to the impact of COVID-19, the Shelter Reservation Waitlist is no longer available. HSH made the difficult decision to stop the waitlist based on guidance from DPH on best practices for preventing the spread of COVID-19 among the homeless population.

Adults, Families and Youth can still request temporary shelter. **Click here to learn more**.

Information on housing opportunities and problem solving assistance are available. Visit **https://hsh.sfgov.org/services/how-to-get-services/referrals-and-housing-assistance/** to see the available resources.

# Exhibit 10



العربية    简体中文    繁體中文    English    Filipino    Español

HOME     ABOUT HSH     SERVICES     PARTNER RESOURCES     PROJECTS AND PUBLIC POSTINGS     CALENDAR

COVID-19

You are here: Home / Services / How to Get Services / Accessing Temporary Shelter / Adult Temporary Shelter

# Adult Temporary Shelter

Ask for outreach and services from the SF Homeless Outreach Team (SFHOT) by calling SFHOT's public line at **415-355-7401.** Please leave a voicemail with:

- your name
- your location and the hours we can find you there
- your physical description
- your phone number if you have one
- your preferred language.

Also, please let us know if you're already working with the HOT team. During this public health emergency, we will not be answering this phone line live, so it's important that you provide all this information in your voicemail.

This voicemail is checked twice a day, and teams respond as quickly as possible to requests with the information above. The team usually responds in person or with a phone call within 24-72 hours. Please note that shelter space is limited. While we might not be able to immediately place you in a shelter, we look forward to meeting you and connecting you to available resources.

*Transgender, gender non-conforming, or intersex people experiencing homelessness can call SJI for a referral to the Taimon Booton Navigation Center: 415-323-5941*

*The Dolores Shelter Program (DSP) is located at 1050 South Van Ness Avenue in the Mission. DSP is an overnight-only shelter that will operate from 6:00PM to 8:00AM each night. DSP accepts walk-up guests on a first-come, first-serve basis. Shelter doors open at 6:00PM and guests can begin lining up no sooner than 30 minutes before the shelter doors open at 5:30PM.*

Automatic Translation Disclaimer

440 Turk Street
San Francisco, CA 94102
Contact Us

SEARCH

Adult Temporary Shelter

Search this website

© 2020-2022 San Francisco Department of Homelessness and Supportive Housing. All Rights Reserved.

# Exhibit 11

# Review of the Healthy Streets Operations Center

A case study on coordinating San Francisco's response to encampments and street behaviors





CITY PERFORMANCE

**March 20, 2019**

City & County Of San Francisco
Office of the Controller
City Performance

2 | Review of the Healthy Streets Operations Center

## About City Performance

The City Services Auditor (CSA) was created in the Office of the Controller through an amendment to the San Francisco City Charter that was approved by voters in November 2003. Within CSA, City Performance ensures the City's financial integrity and promotes efficient, effective, and accountable government.

City Performance Goals:

- City departments make transparent, data-driven decisions in policy development and operational management.
- City departments align programming with resources for greater efficiency and impact.
- City departments have the tools they need to innovate, test, and learn.

**City Performance Team (2018):**
Peg Stevenson, *Director*
Laura Marshall, *Project Manager*
Emily Lisker, *Project Manager*
Cody Reneau, *Senior Performance Analyst*



For more information, please contact:

Laura Marshall
Office of the Controller
City and County of San Francisco
(415) 554-7511 | laura.marshall@sfgov.org

Or visit:

http://www.sfcontroller.org

@sfcontroller

# Executive Summary

## WHAT IS HSOC?

The City and County of San Francisco (City) launched the Healthy Streets Operations Center (HSOC) on January 16, 2018 to coordinate the City's response both to homeless encampments and to behaviors that impact quality of life, such as public drug use and sales. As public concern about these issues increased, by January 2018, the City grappled with responding to over 2,500 calls per week related to both encampments and unsafe street behaviors and conditions through various reporting mechanisms, including SF311 and the City's emergency (911) and non-emergency[1] phone numbers.

Given the complexity of these issues, many City departments play a role in a comprehensive response. HSOC co-locates the following City departments in the City's Emergency Operations Center at the Department of Emergency Management. On a daily basis, they deliver a coordinated response to both encampments and unhealthy street conditions in real-time, with twelve more departments providing additional support to HSOC and its operations.[2]

- San Francisco Police Department (SFPD)
- San Francisco Public Works
- Department of Homelessness and Supportive Housing (HSH)
- Department of Emergency Management (DEM)
- Department of Public Health (DPH)

Departments engaged in HSOC established a charter and strategic framework to clarify roles and document the vision, mission, values, and goals of the initiative. Departments may revisit and revise the strategic framework in the coming year as they consider the scope and purpose of HSOC and craft measurable objectives to show its impact.

As written, the strategic framework illustrates the dual focus of HSOC: developing a

**Vision**
San Francisco's streets will be healthy for everyone and those living on the streets will have convenient access to available City services.

**Mission**
Provide a coordinated City response to unsheltered persons experiencing homelessness, individuals struggling with behavioral health issues, street cleanliness, and related public safety issues to ensure San Francisco's streets are healthy for everyone.

**Values**
Lead with compassion and respect, empathize with the whole community, and believe that everyone can change and that safe and clean streets can be maintained.

**Goals**

Ensure San Francisco's streets are safe and clean.

Meet the housing, shelter, and service referral needs of individuals on the street.

Improve the medical and behavioral health of individuals on the street.

Deliver coordinated City services to effectively address encampments.

---

[1] The non-emergency phone number is (415) 554-0123, but is referred to simply as "non-emergency" in this report.
[2] Additional departments include SF311, Controller's Office, Recreation and Parks Department, and more.

# A GROWING EMPHASIS ON COLLABORATIVE AND PROACTIVE EFFORTS

At its inception, HSOC prioritized response to calls for service via 911, the non-emergency line, SF311, and other channels to address the community's mounting concerns around encampments as well as street safety and cleanliness issues. However, HSOC representatives acknowledged the need to add greater emphasis on proactive, planned and collaborative efforts to address encampments, resolve sites, and connect individuals with the homeless response system. As noted in Figure 1, the City had a model for planned, collaborative response to large encampments using the Encampment Working Group and ERT which had already been effective in addressing 23 large encampments prior to HSOC's launch. HSOC now needed to test how to leverage its new partnerships to expand and enhance planned efforts.

## Joint Response to Service Requests

As one initiative, HSOC began testing proactive efforts in April 2018 in response to growing numbers of encampments and calls for service in the Mission district. HSOC deployed a team of Public Works staff and SFPD officers using a geographic approach to addressing known locations of encampments, closing other service requests in that vicinity at the same time. While it led to a backlog and spike in calls and tents, this was largely due to under-resourcing of the pilot (i.e., each site took more time than planned to resolve, and the two teams had difficulty making progress on their task list). Departments are continuing to test this model in new settings as resources are added.

Subsequently, and following ten months of HSH outreach efforts and building on this collaborative approach, SFPD officers and Public Works crews conducted multiple large-scale operations in the Mission. These teams jointly deployed and resolved encampments in a targeted area in collaboration with HSH outreach team members stationed at a nearby location for engagement and referrals. In one-such planned engagement, the number of tents in the Mission had spiked to 108 (on April 24, 2018). The operation brought the count of tents in that neighborhood down to 25 (on April 27, 2018).

### *What is Encampment Resolution?*

**HSH leads with services:** Outreach workers visit the site for one or more days in advance of the day chosen for resolution. HSH requests support from DPH and other departments if needed. Individuals receive referrals to shelter, Navigation Centers, and other services and are informed that the encampment will be removed on a specific date.

**Public Works cleans the area:** Crews collect belongings for storage or transportation to Navigation Centers, clean the area and remove debris left after individuals depart.

**SFPD maintains safety:** Officers ensure individuals safely leave the area on the day of the resolution, and enforce the law if there is criminal activity, such as violence.

## Tent Counts Inform a Planned Response

Though HSOC eventually designated SF311 as the primary tool for public reporting of encampments, HSOC developed a more proactive mechanism to plan outreach, engagement, and

# Exhibit 12



# Healthy Streets Operation Center

## Homeless Outreach

Commander David Lazar

# Overview

- The Healthy Street Operations Center(HSOC) has been developed to better coordinate the many city agencies involved in addressing homelessness and unhealthy street behaviors

- HSOC is structured as a unified command with representatives of City departments all in one room which direct, plan, and coordinate responses to street behaviors and homelessness

- HSOC was activated on Tuesday, January 16th, 2018.

- HSOC is an expansion of coordinated efforts that began in San Francisco's Mission District.

# HSOC Mission & Values



- HSOC's Mission is to provide unified and coordinated city services and responses to unsheltered persons experiencing homelessness

- HSOC Core Values
  - Lead with compassion and respect
  - Empathize with the whole community
  - Believe that everyone can change ad that safe and clean streets can be maintained.

# AGENCY ROLES AND RESPONSIBILITIES

- **SF Department of HSH**- Outreach, engagement, and placement of homeless individuals

- **SFDPH**- Outreach, harm reduction strategies, syringe cleanup and engagement, and health treatment homeless and housed individuals requiring care in street settings.

- **SFPD**- Engagement and enforcement (as a last resort) to respond to criminal issues.

- **SF Public Works**- Cleaning and implementation of environmental design changes.

- **SF Controller's Office-** Provides performance tracking of the Healthy Streets Operation center.

- **SF 3-1-1-** Provides non-emergency intake of homeless-related issues from the public

- **SF DEM-** Provides operational and logistical support for HSOC.









# ICS Roles at HSOC

- Incident Commander- leads efforts in all involved agencies.

- Operations Section Chief- Develops and implements strategies and tactics to carry out the HSOC mission and objectives.

- Section Chief for Admin- Conducts data tracking and dash boarding for HSOC operations including collection of operational data from primary responding HSOC departments to report HSOC actions and impact.

- Planning Section Chief- Responsible for the collection, evaluation and distribution of HSOC information for the IC/Unified Commander. (Breakout meetings at 0930 and 1430 hours)

- Operations Support as Public Safety-File arrest reports from homeless units, track tents seized as evidence and run the day to day operations at HSOC.

- Public Health Rep- Develop understanding and common operating picture of services offered by DPH for homeless individuals including creating/updating summary of these services.

- HSOC Liaison officer- Liaison officer interacts with the city and external partners as well as elected officials and the HSOC Policy Group.

## Goals & Objectives/

## Strategies & Activities

- Goal 1: SF's Streets are safe and clean
  - Objectives- reduced incidents leading to service requests, reduce drug-related and criminal activity in priority areas, eliminate tents and prevent re-encampment, and reduce environmental hazards.
- Goal 2: Meet the shelter and service needs of individuals on the streets
  - Objectives- connect homeless individuals in priority areas with shelter, supportive services, and increase non-emergency service acceptance by high utilizer of multiple systems within priority areas.

- Strategy 1:
  - Develop zone-based plans to identify key issues impacting each zone, tactics to address the issues, and performance measures to monitor effectiveness.
  - Use proactive team-based approaches and continue to respond to calls or issues based on standard protocols.

  - Strategy 2:
  - Focus on addressing needs of the "Top 20" individuals with high needs.
  - Train officers on issues associated with homelessness and substance abuse
  - Continue to outreach, engage and offer treatment or housing.

# Goals & Objectives/ | Strategies & Activities

- Goal 3: Establish a unified city response to homelessness and street behavior.
  - Objectives: Develop efficient means to manage calls for service and prioritize resources. Effectively share information and coordinate resources across participating City Departments.

- Strategy/Activity 3:
  - Co-located and coordinated dispatch functions to share information and coordinate resources and deployment across departments. (DEM, DPW)
  - Enhance public communication about the City's response to homelessness and street behaviors.
  - Use data to inform operation and policy-level decisions of HSOC.
  - Departments coordinate daily to solve operational challenges associated with HSOC management.
  - streamlined response by utilizing 311 vs. calling the police

# Organizational response flow to calls for service



## Started with

- Hours 07-1500, Mon-Fri
- 1 Lt, 1 Inspector, 2 Officers, 1 non-sworn, 1 cadet, 1 intern.
- Team 1/6 Mon-Thu, 06-1600 supplemented by district 70 units.
- Focused on encampment resolution
- Meeting with officers every Wednesday at 1100
- Triage 3-1-1 calls in the Mission
- Specialized radio channel

## Today

- Hours 07-2300, 7 days a week
- 1 Lt, 1 Inspector, 2 Officers, 1 non-sworn, 1 cadet, 1 intern
- Team 4/24 06-1600 or 1400-2400
- Focused on encampment resolution
- Meeting with officers every Wednesday at 1100
- Beginning on 8/8 all 3-1-1 encampment calls triaged and assigned.
- Schedule/calendar 1 large operation per week.
- Specialized radio channel

# Homeless Outreach Officers

- Participate in weekly Wednesday training meetings
  - Past topics have included: Training on Shigella, Narcan, Syringe Disposal, Homeward Bound Program, Mental Illness, LEADS presentation, Chronic substance abuse, referrals for navigation center, and street medicine.

- Trained in force de-escalation tactics and Crisis Intervention (CIT).

- Multidisciplinary team concept.

- Calendar for planned operations.

- Maintenance of statistics.

- Conduct customer service call backs.

# Why Resolve Large encampments?

## PROBLEM

1. Higher levels of substance abuse and communicable disease in large encampments.

2. Increase in public health and public safety concerns in and around the encampment.

3. Public outrage impacts City's ability to address homelessness.

4. Previous attempts to address encampments failed and let to lawsuits, reducing confidence in the city.

## GOAL

1. Assist as many people as possible by connecting them to shelter, services and housing.

2. Address quality of life issues for housed and unhoused individuals.

3. Change culture on streets to permanently eliminate large, long term encampments

4. Focus on effectiveness, legality and compassion while not redirecting entire service delivery system.

# Preventing Re-Encampment

- Walk through with Public Works to assess safety and access

- Coordinate with neighbors on prevention (fencing, lighting, security)

- Providing neighbors contact information for key city staff

- Ongoing re-encampment prevention team (outreach workers, police and public works)

- Healthy Streets email

- SFPD Department Bulletin 18-137, "Legal Enforcement Options for Addressing Illegal Encampments".



# Current Status: as of June 30, 2018

- No encampments with more than 15 people remain in San Francisco

- Currently 568 tents/structures city wide (50% reduction citywide)

- 18 large (over 5 tents) encampments remain (50% reduction)

- No encampments of greater than 20 tents/structures (100% reduction)

- 3 encampments 6-19 tents/structures (90% reduction

QUESTIONS?

# Thank you!



Commander David Lazar

Community Engagement Division

David.Lazar@sfgov.org

# Exhibit 13



Select Language

Search...

About Us (/about)    Get Involved (/get_involved)    Projects (/projects)
(/)    Services (/services)    TV (https://www.sfpublicworkstv.org/)

# Bag and Tag Policy

## Services (../services)

Report a Problem (/services/report-problem)

Cleaning Programs (/services/cleaning-programs)

Contractor Resources (/services/contractor-resources)

Garbage & Waste (/services/garbage-and-waste)

Graffiti (/graffiti)

Permits (/services/permits)

Potholes (/services/potholes)

Public Records Requests (/services/public-records-requests)

Public Toilets (/services/public-toilets)

Recycling & Refuse Collection (/services/recycling-and-refuse-collection)

Storm Preparation (/services/storm-preparation)

Street Sweeping (/services/mechanical-street-sweeping-and-street-cleaning-schedule)

Sidewalks (/streets)

Street Resurfacing (/street-resurfacing)

Street Trees and Plants (/trees)

Subdivisions and Mapping (/services/subdivisions-and-mapping-office-city-and-county-surveyor)

Other Services A-Z (/services/other-services-z)

Acceptance (/services/acceptance)

**Bag and Tag Policy (/services/bag-and-tag-policy)**

Gifts to Public Works (/services/gifts-public-works)

Establishing Street Names (/services/establishing-street-names)

News Rack Program (/services/news-rack-program)

Missing Sewer Vent Covers (/services/missing-sewer-vent-covers)

Monument Preservation (/services/monument-preservation)

Pigeons (/services/pigeons)

Posting Signs (/services/posting-signs)

Street Dedication and Acceptance (/services/street-dedication-and-acceptance)

Unwanted Handbills and Newspapers (/services/unwanted-handbills-and-newspapers)

Utility Undergrounding Information (/services/utility-undergrounding-information)

# 1. Circumstances in which personal items may be collected and stored

↑

a. Unattended items

Upon inspection by street cleaning staff, unattended personal items – such as medication, tents, luggage, backpacks, personal papers, and operational wheelchairs – will be collected and stored for up to 90 days for retrieval. Only items listed below under "Items that will be discarded" will be discarded immediately. All other items will be removed and stored. Staff will place a post-removal notice in the area from which the items were removed stating how, where and when the items may be retrieved. (See Section D below regarding notices).

Under no circumstances may staff take or keep for themselves unattended personal items for their own use or allow non-City personnel to take unattended property for their own use.

Distinguishing between unattended and abandoned property: Temporarily unattended property is different from abandoned property, which may be immediately discarded. In determining if property is abandoned, staff should evaluate the facts and circumstances surrounding the items. Unattended property is not abandoned if it is accompanied by signs of ownership, for example, an unattended tent that is filled with personal belongings or items that are being stored in an orderly manner (i.e., packed up, wrapped or covered). In addition, if there is a third party present who states s/he has been designated to watch or secure the items during the owner's temporary absence, the items are not considered abandoned.

By contrast, abandoned items are unaccompanied by objective indications of ownership, for example, an empty or broken tent sitting by itself on a sidewalk with no other belongings, a bag of clothes open and strewn across a sidewalk, or items that are broken, disheveled, surrounded by trash or showing other signs of neglect. This policy does not apply to abandoned property.

**b. Attended items**

In the case of routine cleaning operations (i.e., where individuals are allowed to return to a location following cleaning and there is no permanent removal), staff will provide the owner sufficient time to collect and move their belongings out of the public right of way, taking into account any special needs that individuals may have and the volume of belongings.

If the owner is unwilling to collect and move his/her belongings, staff may either: clean around the belongings, or call the Police Department for assistance. If police are called, under the direction of the San Francisco Police Department, staff will give oral notice that the items will be collected if they are not moved by the owner, and then bag and tag unremoved belongings in accordance with this policy.

If the owner is unable to collect and move his/her belongings, staff may either clean around the belongings, or bag and tag personal items in accordance with this policy.

If attended items are bagged and tagged, staff shall provide the owner with information on how and where the items may be retrieved from Public Works' storage facility.

In the case of pre-planned special cleanup events, such as encampment removals, or when responding to 311 service requests, staff should  provide the owner with sufficient time to collect and move their belongings, taking into account any special needs that

individuals may have and the volume of belongings; bag and tag those personal items that the owner cannot or does not remove themselves; and provide information on how and where the items may be retrieved from Public Works' storage facility.

San Francisco police officers encountering individuals who are, for example, being connected with social services, being asked to clear the public right of way, or are subject to arrest, may call on Public Works to collect and store personal belongings. Public Works employees should treat those individuals' belongings as attended items and comply with the rules for attended items above. Officers also may collect personal items themselves and deliver to Public Works for storage.

Note: Staff may discard any attended items the owner affirmatively states that he or she does not want.

## 2. Items that will be discarded and not stored

a. Items that present an immediate health or safety risk, such as:

- toxic sharps: needles, scissors, knives
- chemicals: bleach, paint, oils, etc.
- items (including bedding and clothing) soiled by infectious materials: human waste, body fluids, moldy, mildewed items
- Items infested by rodents and insects: rats, mice, fleas, lice, bed bugs

Note: If personal belongings are co-mingled or littered with needles, human waste, or other health risks. staff may dispose of the entire pile of belongings and are not required to sort through and attempt to remove the health or safety risks.

b. Furniture, mattresses, sheds, rolling structures and bulky items. A "bulky item" is any single item that does not fit in a 60-gallon container with the lid closed, except for a tent, or: an operational walker, operational wheelchair, operational crutches or operational bicycle. Personal belongings located inside a bulky item bin shall be stored even if the bulky item itself is discarded.

c. Perishable items, perishable food.

d. Contraband, illegal items; refer to San Francisco Police Department.

↑

e. Trash, garbage, and/or debris. This includes property that appears to have been discarded by its owner and broken appliances or broken furniture. If staff has a reasonable doubt as to whether an item constitutes trash, it should be collected and stored.

f. Abandoned property (see definition above).

Note: Shopping carts are governed by Public Works Procedure 16-05-05 and are not subject to this policy. However, personal property inside a shopping cart shall be bagged and tagged in accordance with this policy. There is no limit to the number or volume of personal items that Public Works will bag and tag for a particular individual so long as they are not bulky items, as defined above, or do not otherwise constitute "Items that will be discarded" under this section. However, the director of public works may, after determining that the storage facility at the Public Works Operations Yard is at or near full capacity and after clearing out property that is older than 90 days, issue a written directive imposing a temporary reasonable per-person limit on the volume of property to be stored that will remain in effect until additional capacity is identified and funded.

## 3. Notices

a. Pre-removal notice

- For pre-planned special cleanup events conducted with or without other City departments, for example permanent removals of encampments, the City will provide 72 hours advance written notice, so long as the site does not present any imminent health or safety hazards requiring immediate removal.

- A pre-removal notice shall be provided in writing to individuals who are present and posted conspicuously on or near the personal property that will be removed. The notice shall be in a form substantially similar to the "Pre-Removal Notice" attached to this policy.
- For routine cleaning operations (i.e., where individuals are allowed to return to the location following cleaning and there is no permanent removal), or when responding to 311 service requests, advance written notice is not required; however, staff shall give persons sufficient time to collect and move their items, taking into account that individuals may have special needs and the volume of belongings.

b. Post-removal notice

After any removal of unattended property – whether during a pre-planned special cleanup event or a routine cleaning operation – Public Works staff shall place a post-removal notice in the area from which the items were removed. See attached sample "Post-Removal Notice."

## 4. Procedure for collecting personal items

Public Works staff is required to wear necessary safety gear and personal protective equipment and follow the department's code of safe practices for field and yard operations.

a. Public Works staff are required to follow these procedures when collecting personal items:

- Items are assessed for safety under the criteria for collection or for discarding.
- If items are found to be hazardous or unfit for collection, they are to be discarded.
- If items are deemed personal property, then they are to be collected following these procedures.

b. If the owner of the items is present, under the direction of the San Francisco Police Department, staff will give oral notice that the items will be collected if they are not moved by the owner. Staff will comply with the rules set forth above for Attended Items.

↑

c. Public Works staff collects the personal items and while in the field documents the collection with a "Personal Property Collection Bag and Tag Intake Form." Forms are kept with Public Works cleaning staff and zone supervisors. Information collected includes:

- Pick-up date
- Pick-up time
- Intake date
- Number of items
- Description of items
- Indicate Police Department pick-up or field pick-up
- Indicate evidence or "bag and tag"
- SFPD Star number
- Location of police station and zone
- Street address
- Cross street
- What corner of intersection (if applicable)
- Public Works staff name
- Public Works staff radio number
- Tag number
- Tag color (corresponds to month)
- Service request number (if applicable)

d. If the owner of the items is present but is unable or unwilling to remove the belongings themselves, Public Works staff will provide written and oral information on how, where and when the items may be retrieved. If the owner is not present (i.e., the items are unattended), staff will place a post-removal notice in the area from which the items are removed. The notice will be posted for 24 ↑ hours.

e. Public Works staff deliver the items and the intake form to the Public Works Operations Yard at 2323 Cesar Chavez Street. Items are delivered to the lower yard at the locked "First 72 Hours" storage container.

- During working hours, Public Works "bag and tag" staff will intake the items for storage, place the items in the "First 72 Hours" storage container, fill out a colored "tag" for the items with the corresponding information from the intake form and place the tagged items in the 72-hour holding area.
- After working hours, Public Works cleaning staff delivering the items will place the items outside the "First 72 Hours" storage container, fill out a colored "tag" for the items with the corresponding information from the intake form and place the tagged items outside the 72-hour holding area.

f. When items are dropped off by anyone other than Public Works staff (by the San Francisco Police Department, for example), they must be logged following the same procedure with a completed form and corresponding colored tag.

## 5. Temporary storage

Personal items are stored at the Public Works Operations Yard at 2323 Cesar Chavez Street for 90 days. After 90 days, unclaimed items are discarded.

For the first 72 hours after items are collected and stored, they can be claimed by their owners 24 hours a day.

Starting from the date and time of the collection of items for three days (72 hours), owners can come to the Public Works Operations Yard at 2323 Cesar Chavez Street any time of the day and retrieve their items.

Personal items will be stored in the 72-hour holding area.                                    ↑

After the first 72 hours and up to 90 days from the item collection, owners can come to the Public Works Operations Yard 2323 Cesar Chavez Street, Monday through Friday, 9 a.m. to 3 p.m. to retrieve their items.

## 6. Procedure for retrieval of personal items

a. Owners of collected personal property may retrieve their items at the Public Works Operations Yard at 2323 Cesar Chavez Street.

- If collected within the previous 72 hours, owners can retrieve items anytime, day or night. If the items were collected more than 72 hours prior, the owner may retrieve items Monday through Friday, 9 a.m. to 3 p.m.
- Owners must provide satisfactory proof of ownership; i.e. describing the location of where the items were and when collected or describing the specific items that were collected.
- No government or photo identification is required.
- There is no fee charged for temporary storage of items.

b. Owners of the items should arrive at the Kansas Street entrance at Marin Street.

- Call for Public Works staff on radio or call the Radio Room at 415-695-2134.
- Owners of the items will wait at the gate for items to be delivered by Public Works staff and will not enter the Operations Yard.
- Public Works staff will meet with the prospective owners at the gate to coordinate the property retrieval.
- Owners must sign and date the intake form to designate that the items have been picked up.

b. If it is Monday through Friday, 9 a.m. to 3 p.m., the Radio Room will notify the Public Works "bag and tag" staff member to perform the procedures for the retrieval and documentation.

↑

c. If during the first 72 hours and at a time not on a Monday through Friday, 9 a.m. to 3 p.m., the Radio Room will notify the Public Works supervisor on duty to perform the procedures for the retrieval and documentation.

d. Prospective owners must describe the items to be retrieved. Public Works staff will then do the following:
- Attempt to find the items in storage and the corresponding tag and intake form.
- Deliver the items to the owner at the Kansas Street/Marin Street gate upon confirmation that the items do belong to the owner.
- Compare the tag on the items to the intake form to confirm that all the items are accounted for.
- Request that the owner sign and date the intake form to designate that the items have been collected.
- File the intake form for documentation in triplicate: white page to logbook, yellow page to Radio Room, pink page given to the owner along with the property.

e. At no time are members of the public allowed to visit storage area to look for items in the storage area.

f. Public Works "bag and tag" staff will regularly itemize and organize the stored items.

g. After 90 days, unclaimed items are discarded. Staff will record the date of disposal and update the intake form to note that the items went unclaimed.

San Francisco Public Works

49 South Van Ness Ave.

San Francisco, CA 94103

↑

**CONNECT WITH US**



**ADDITIONAL RESOURCES**



(http://sfgov.org/sf311.org/)

GIVE FEEDBACK ON OUR WEBSITE → (mailto:webmaster@sfdpw.org)

# Exhibit 14

CITY AND COUNTY OF SAN FRANCISCO
BOARD OF SUPERVISORS

**BUDGET AND LEGISLATIVE ANALYST**
**1390 Market Street, Suite 1150, San Francisco, CA 94102**
**PHONE (415) 552-9292 FAX (415) 252-0461**

## Policy Analysis Report

To:        Supervisor Hillary Ronen
From:      Budget and Legislative Analyst's Office
Re:        Police Department Role in Street Teams
Date:      April 19, 2022

## Summary of Requested Action

Your office requested that our office conduct an analysis on the extent to which the San Francisco Police Department is still responding to mental health street crises after the City created numerous teams composed of mental health professionals, paramedics, and peer advocates to, without law enforcement involvement, address street conditions and homelessness and to assist people with mental illness and/or addiction that are having crises in the streets.

This report addresses the extent to which San Francisco Police Department personnel are involved in responses to calls for services intended for the Street Crisis Response Team, created in November 2020, and in Healthy Streets Operations Center (HSOC) interventions.

***For further information about this report, contact Fred Brousseau, Director of Policy Analysis, at the Budget and Legislative Analyst's Office.***

## Executive Summary

- Of the numerous street outreach and crisis teams created by the City and County of San Francisco in recent years, two have been particularly designed to respond to street crises and situations in lieu of the San Francisco Police Department: the Street Crisis Response Team (SCRT), and the Healthy Streets Operations Center.

**Street Crisis Response Team**

- The Street Crisis Response Team, established in November 2020, was designed to replace law enforcement responses to individuals having acute non-criminal mental health crises on the streets with a multi-disciplinary team composed of paramedics, mental health professionals, and community peers. Staffing for the Street Crisis Response Team is provided by the Department of Public Health, the San Francisco Fire Department, and a contract community-based organization. Street mental

*Budget and Legislative Analyst*

Report to Supervisor Ronen
April 19, 2022

From inception, HSOC activities were the subject of considerable controversy.[3] There were reportedly difficulties in integrating these approaches and some community members and homeless advocates were critical of the encampment "sweeps", which involved SFPD and DPW staff. Criticisms included that the City's approach to clearing encampments gave little advance warning to encampment residents that they would need to leave and that they could not always take their possessions with them so they were taken by City employees to a location where the residents had to retrieve them subsequently. The encampment residents would be provided with referrals to City services such as shelters and behavioral health services at the time of these encampment clearings but many residents did not accept or receive services.

As noted in a 2019 Controller's report, the early objectives of HSOC included a multi-department approach to clearing encampments with 6 or more tents and insuring that no tents were present in certain Mission district corridors in order to reduce the visibility of the homeless in that neighborhood and the number of homeless related complaints.[4] The approach taken in the Mission District was subsequently expanded to the rest of the City by HSOC.

Over the first several years of HSOC operations, police officers were a highly visible and active presence when encampments were cleared and residents relocated. Over time HSOC began to respond less to calls received through 311 and to instead take a more pro-active approach to identifying encampments with the greatest needs for assistance. Higher needs were identified through regular counts of tents and inhabited vehicles by HSOC and identification of individuals residing in encampments who were frequent users of emergency medical and behavioral health services. HSOC also sought to increase the time encampment residents were given to relocate before encampments were cleared. While SFPD officers have continued to be present when residents are mandated to disperse, efforts have been made to de-emphasize the law enforcement nature of City policy towards homeless encampments, and to enhance service referrals and mental health and substance abuse outreach.

According to the Director of HSOC, Sam Dodge, while HSOC teams are still composed of staff from the various departments listed above, the emphasis has shifted away from responding to 311 calls for service in favor of using HSOC surveillance to identify locations where 6 or more tents and/or inhabited vehicles are present, and where there is evidence of problematic activities such as drug dealing or reports/incidents of violence. While HSOC still maintains on-site staff at DEM's building, calls for service receive lower priority than HSOC's own determination of

---

[3] For example, see: https://hsh.sfgov.org/wp-content/uploads/2019/10/August-HSOC-Quarterly-Meeting-Minutes-1.pdf, https://www.streetsheet.org/sfpd-dpw-grilled-on-response-to-homelessness/, San Francisco's broken promise to resolve homeless encampments - The San Francisco Examiner, https://hsh.sfgov.org/wp-content/uploads/2021/11/LHCB-HSOC.pdf

[4] *Review of the Healthy Streets Operations Center,* SF Controller, March 20, 2019

# Exhibit 15



Coalition on Homelessness

COALITION ON HOMELESSNESS  /  BEHIND THE HEALTHY STREET OPERATION CURTAIN

## BEHIND THE HEALTHY STREET OPERATION CURTAIN



Behind the Healthy Street Operation Curtain:

The True Story of San Francisco's Abusive Encampment Response

Download a PDF of this report here.

Donate

## TABLE OF CONTENTS

INTRODUCTION

BACKGROUND

- National Standards
- Adequate and Appropriate Services
- Homeless People's Legal Right to Survive
- Examples of San Francisco Encampment Response

FAILURES OF HSOC MODEL

- Poor Structure Leads to Low Placement Rates
- Not Enough Beds for Encampment Residents
- Inappropriate Service Offers
- Leading with Cleaning
- Left Without Shelter
- Zero Compliance with Bag & Tag Policy
- Sidewalk Shuffle is Trauma-Inducing and Ineffective

RECOMMENDATIONS

- Recommendations to Fix a Failing Street Response
- Recommendations for Informal Settlement Relocations

CONCLUSION

Appendix: Dissecting the Data

# INTRODUCTION

> *"'Wanda' is a young woman in her 20's who is currently pregnant and residing on the streets in the South of Market area. She is desperately trying to get a place to stay that is safe for her and her unborn child in the middle of the delta surge. She has been forcibly displaced from her camping spot on more than two occasions by the city and remains on the streets today, as no appropriate placement was offered to her. These operations have made her less safe, separating her from her support system, and causing undue stress during her pregnancy. Wanda is just one example of literally thousands of people who have been hurt by HSOC operations. Wanda matters. Her future child's life matters."*

> *– Kelley Cutler, Human Rights Organizer with the Coalition on Homelessness*

On Monday, August 2, 2021 the San Francisco Department of Emergency Management's (DEM) executive director, Mary Ellen Carroll, gave a quarterly presentation to the Local Homeless Coordinating Board regarding the impact of the city's Healthy Streets Operating Center (HSOC) on the unhoused population within the city. The presentation highlights the role of the public health-centric team in using a service-led model to connect people in need with available resources in an efficient and compassionate manner. Through a regimented assessment and resolution process, the HSOC staff evaluates what resources are needed to "resolve" an encampment, to bring adequate shelter resources to meet the need present, and to lead with offers of shelter to every encampment resident, before conducting street cleaning in a humane and respectful manner. Carroll's stated approach aims to prioritize upholding public health, where the primary objective is connecting unhoused people with long-term solutions.

To achieve this objective, the City would have to adopt equitable distribution of scarce shelter resources based on need, rather than complaint or nuisance. The City would also have to recognize that every individual has a right to self-determination: that different people

Case 4:22-cv-05502-DMR   Document 9-7   Filed 09/27/22   Page 70 of 175

require different types of resources, and that connecting the right people with the right resources requires time, care and intensive outreach. According to Director Carroll, the service-led model is the key to success in addressing the city's homelessness population.

Carroll insists on the resilience of the model even when the  statistics revealed during the presentation that the recent service connection rate was merely 30%. Carroll interjects that this was the responsibility of unhoused San Franciscans, implying that HSOC provided sufficient resources for every client they served and that the low rate of connection is due to unhoused individuals' negligence. In addition to these "service resistance" individuals, Carroll asserts that advocates who document actions taken by the city, inhibits HSOC's ability to expand on their efforts.

On Tuesday, August 3, the morning after Director Carroll's presentation, an  advocate witnessed a Department of Public Works (DPW) employee, who was working  with the HSOC resolution team, unceremoniously drag a tent about 5 yards along the sidewalk. Inside the tent was an unsuspecting woman, who after being dragged across the ground, continued to be harassed by the entirety of HSOC staff until the advocate helped her move her tent to the next available sidewalk. The next day, that sidewalk too was "resolved," and she was yet again displaced.

This incident, as opposed to the idyllic resolution process described in Director Carroll's presentation, is  a better representation of what advocates from the Coalition on Homelessness have been witnessing over the course of the pandemic. It reflects the perpetual displacement, lack of meaningful efforts to offer adequate and appropriate services, and the unjust treatment that unhoused San Franciscans often describe when asked about their interactions with HSOC. **It also reflects what the city's own documentation demonstrates – that HSOC almost never has an adequate number of beds to offer those who are being forcibly displaced as required by law, that they are failing to make appropriate and lasting placements, and that they are illegally discarding the property of those in encampments.**

This report is spurred by the recently acquired access to publicly released data that reinforces our experience monitoring HSOC operations.  This is an effort by the Coalition on Homelessness to expose the reality of HSOC's operations, how greatly they differ from public presentations by HSOC, and to outline how HSOC is ineffective and harms public health.



*"We don't do sweeps."*

*– Mayor London Breed, speaking to Nathan Heller of The New Yorker in May of 2020*

*"Man sleeping on bench on Hayes st near Gough. Can someone come ASAP. I'm in the area having lunch"*

8/4/22, 12:03 PM
Case 4:22-cv-05502-DMR   Document 9-7   Filed 09/27/22   Page 71 of 175
Behind the Healthy Street Operation Curtain / Coalition on Homelessness

*– Mayor London Breed, in a August 2019 text message to, among others, SFPD Chief Scott, released by public records request in May of 2020*

During the past four decades, San Francisco relied on using enforcement in an attempt to curb the presence of unhoused people, including the issuance of hundreds of thousands of citations and making countless arrests.  If individuals could not pay their citations or if they failed to appear in court, a warrant would be issued.  Eventually, after numerous tickets, the individual would typically be taken into jail, with time served "paying off the debt".  In October, 2015, the Superior Courts halted the practice of issuing warrants, and the police department decreased by almost half the number of citations given out annually.  According to San Francisco Police Department (SFPD) Lt. Lazar, the founder of HSOC, "the police don't feel it is worth it anymore, so many have stopped issuing homeless citations".  On October 12, 2016, the DOJ/COPS released its initial assessment of SFPD civil rights practices and provided 272 recommendations for improvement within the department. The areas of review included, Use of Force, Bias, Community Policing, Accountability, and Hiring and Personnel Practices. Many of the recommendations criticized the SFPD response to homelessness.  A homeless advisory body was formed to address these recommendations under then Lt. Lazar, but most of these meetings were cancelled or rescheduled, and rarely was there any review of the DOJ/COPS recommendations within those meetings.  Contrary to the DOJ/COPS recommendations that essentially called for SFPD to back off of homelessness, the city decided to take a markedly different route and doubled down on unhoused people – in particular those in encampments.  On January 16, 2018,  HSOC was started within the Mission Police station by Lt. Lazar, with the very intentional goal of eliminating large tent encampments in that same district.  HSOC consolidated the city's encampment response by establishing a coordinated multi department effort to respond to 911 calls regarding encampments with 6 or more tents.  These calls were rerouted to 311, HSOC was dispatched with police in the lead, with departments such as Public Works, Public Health and Homelessness and Supportive Housing close behind.

concept of HSOC as a police-led, complaint-driven coordination of city departments and resources designed to lower tent counts and k up large encampments appeared in all the early materials including the Controller's report which states that it aims to "[e]nsure [that e are] no tents within the geographic boundaries of the Mission District." Specifically, HSOC's metric of using tents as a measurement valuate the "success" invites detrimental policies that dehumanizes unhoused individuals. Indeed, while the San Francisco's Office of the Controller emphasizes HSOC's mission to "[l]ead with compassion and respect" and to coordinate response "to unsheltered persons experiencing homelessness," the main action items for various working groups detailed in the report prioritize reducing the number of tents within an area, rather than meaningfully decreasing homelessness.

Donate

In early 2019, HSOC moved out of the police department and into the Department of Emergency Management (DEM), the department that oversees the 911 system, emergency dispatch, and (more recently) the city's COVID response.  Along with that move, they replaced former HSOC lead in SFPD with Jeff Kositsky, who previously led the city's homeless department (who himself has since been replaced following his recent resignation). Over the course of the COVID-19 pandemic, Kositsky's HSOC has made use of the city's rapidly changing shelter system to greatly reduce the number of tents on San Francisco's streets.

## National Standards

Despite HSOC's purported claims on prioritizing public health, the HSOC process to control the unhoused population is through the police department.  Specifically, once HSOC receives a 311 phone complaint regarding homelessness, police officers are included in the response and are sent to the area to remove the individuals. This approach fails to address the underlying problem of the housing crisis, and is an ineffective use of government resources.

In fact, communities and governments across the country are re-examining a police response to homelessness. The federal government now penalizes municipalities in their McKinney Act funding applications for failing to address criminalization, including the elimination of enforcing misdemeanors for status crimes such as lodging.  The U.S. Interagency Council on Homelessness (USIACH) has also put out guidelines for addressing encampments which include recommendations to work collaboratively over a couple weeks with communities to

relocate individuals into permanent housing.  If permanent housing is unavailable, the USIACH suggests moving folks into temporary shelter until permanent housing is available.  The 2009 Congressional HEARTH Act delegated the United States Interagency Council on Homelessness (USICH) with the task of "develop[ing] alternatives to laws and policies that prohibit sleeping, eating, sitting, resting, or lying in public spaces when there are no suitable alternatives, result in the destruction of property belonging to people experiencing homelessness without due process, or are selectively enforced against people experiencing homelessness."  As we outline later in this report, the national standards established by these policies shows how HSOC's process to address homelessness is subpar.

The transition away from policing in homelessness  exemplifies a growing recognition in the failure of criminalization to combat homelessness and of the need for a different strategy to address the growing crisis. Despite this, many who are forced to stay on the streets of San Francisco are consistently denied fundamental human rights such as the right to accessible water, sanitation and hygiene (WASH) facilities. Meanwhile,  extensive resources are spent on enforcement-led responses to complaints about the presence of homeless people that at best push them from block to block. This approach creates high economic costs for the City to funnel resources into this growing problem, with little progress to show for it.

During the COVID-19 pandemic, there were guidelines established by the Centers for Disease Control and Prevention (CDC). The COVID-19 virus and now the Delta variant puts even more risk on municipalities' practice of displacing and criminalizing unhoused community members.  Congregate settings are currently not considered by many medical professionals as a viable option due to individual medical risks and public health risks of COVID-19 Delta variant.  In addition, the CDC recognized that displacement of encampments and removal of tents created several health hazards, including an inability to shelter in place when no adequate alternatives are available and a difficulty in contract tracing if outbreaks occur.  According to the CDC's Interim Guidance on Unsheltered Homelessness and Coronavirus Disease 2019 (COVID-19) for Homeless Service Providers and Local Officials:

Donate

*If individual housing options are not available, allow people who are living unsheltered or in encampments to remain where they are. Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for infectious disease spread.*

*– the CDC's Interim Guidance on Unsheltered Homelessness and Coronavirus Disease 2019 (COVID-19) for Homeless Service Providers and Local Officials*

## Adequate and Appropriate Services

Unhoused community members are diverse in terms of need.  Most are simply poor, cannot afford rent, and do not have accumulated wealth to fall back on when times get tough.  Approximately a third have mental health and/or substance use issues, more than a quarter are working, many suffer from chronic health conditions, many experienced adverse childhood trauma, while others suffer from Post Traumatic Stress Disorder.  In order to ensure that individuals are connected with appropriate services, trust must be developed, and a variety of services secured.  Critical to a successful relocation process is the embracing of self determination on the part of the unhoused neighbor, and detailed information on what options are available.  There may be barriers, such as PTSD which for some people prevents

them from being able to sleep in congregate settings, or domestic violence that prevents them from staying at a particular site where a former abuser is present.  Many options can be inappropriate for a myriad of reasons, and follow up work must be done to secure more appropriate options.  This is a process that can take time.  If there are not appropriate options, the individual may have to stay put, and in those cases garbage, clear passage and hygiene needs can be addressed until appropriate placements are available.  If the person is displaced, it will often be impossible to connect with that individual once appropriate placements are available. HSOC operations as we will later outline, include the offering of congregate shelter for a portion of the encampment residents.  Rarely do they include the offering of a wide variety of services appropriate to meet an individual's need.

## Homeless People's Legal Right to Survive

*"We're getting cops called on us all the time. We're in other people's space. They don't understand that we don't want to be in their way, we're just looking for a space to exist. We're just looking for a place to be. We try and find these spots that are out of the way, try and find areas that people don't frequent."*

*– Tony, unhoused San Franciscan speaking after an HSOC operation on June 23rd, 2021*

Donate

In addition to the ineffectiveness of temporarily displacing unhoused individuals in public areas, federal law clarifies that the City cannot criminalize homeless people for loitering and sleeping in public property. In Martin vs. Boise, six currently and formerly homeless Boise, Idaho residents, alleged that laws prohibiting them from sleeping outdoors within city limits amounted to cruel and unusual punishment and violated their rights under the Eighth Amendment. This was supported by the Obama administration's Department of Justice, which submitted a statement of interest, arguing that making it a crime for people who are homeless to sleep in public places, when there is insufficient shelter space in a city, unconstitutionally punishes them for being homeless.  This case received a ruling in favor of the plaintiffs in the 9th Circuit Court of Appeals after the decision was appealed by the City of Boise.

In Martin vs Boise,  Judge Marsha S. Berzon states: "Turning to the merits, the panel held that the Cruel and Unusual Punishments Clause of the Eighth Amendment precluded the enforcement of a statute prohibiting sleeping outside against homeless individuals with no access to alternative shelter.  The panel held that, as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter."

## Examples of San Francisco Encampment Response

The process as advocated by the court, is not only more humane, but it is also more effective. In 2012, California Highway Patrol called for the displacement of  a large encampment on King Street.  Spearheaded by Bevan Dufty, the Mayor's former homeless director, the initiative led to a successful permanent relocation of this settlement.  Duffy had reached out for counsel from community members of the camp, homeless advocates at the Coalition on Homelessness and secured a church where the residents could relocate en masse.  They rented a storage container where belongings could be stored intact and, most importantly, created an exit plan for the church.  After a stay

in the church, residents were relocated to housing, with careful considerations for keeping the very human support systems that formed and developed after living together in adversity. One hundred percent of camp residents were successfully connected with permanent housing.

The King Street resolution is a far cry from HSOC, where currently only 30% of individuals are connected with shelter, and none to permanent housing. HSOC's primary function has been to extend the power of the San Francisco Police Department (SFPD) and DPW, coordinating a massive amount of city resources towards the foundational goal of removing tents from the streets of San Francisco. The focus on the reduction of tents creates two problems: First, it creates problematic policies that exacerbate the housing crisis; second, it leads to questions on how successful the operations are and the validity of their results report. This is an inherently flawed approach. For unhoused community members, this only continues the cycle of being shuffled around by the city and having their belongings trashed or destroyed. These operations make it harder for people to find places that are well lit, or places where they can stay with others whom they know and, by turn, ensure their personal safety. For people with no other options, tents offer a modicum of shelter and privacy, and take the edge off the indignity of living in public spaces.

While HSOC sometimes offers services before clearing encampments, it often has very little to offer, and at other times relies on the police or public works departments to simply clear an area. At the August LHCB meeting, Director Carroll stated that "Police address enforcement issues" during operations. Once an area is cleared, HSOC employs strategies like bathroom removal and constructing barriers to prevent people from returning, further limiting safe sleeping areas for individuals who have no choice but to stay on the streets. They have a "re-encampment prevention" strategy that focuses on ensuring people don't set up tents in that area again. This strategy is not about helping individuals who present as unhoused in that area, but focused on preventing people from sleeping in that area via police enforcement. At the very same meeting, Director Carroll stated that after an operation, "district police stations are notified and asked to patrol the area." This action leads to increased criminalization and does not lead to an exit out of homelessness.

Donate

# FAILURES OF HSOC MODEL

*"They didn't offer me any services. I was busting my ass moving shit all day…I wasn't offered anything. I never got a time to stop from moving my stuff to say hey, I need a room, I need a shower, I need food.I don't know what else to do when 3 days in a row we are told to pack up and move. This is discrimination, harrassment. And with these people standing here waiting for you to move, its harassment. They don't want the homeless here. They want us dead. It's how the mayor feels about us."*

*– Marquis A, recorded speaking to DPW workers during an HSOC operation on 7/15/2021*



Donate

A Dia de Los Muertos ceremony where Mary Kate from Compass Family Services spoke about premature death in homeless adults and families. Pictured: three adults, including Mary Kate, and a toddler stand around an altar with marigolds and pan de muertos.

HSOC pursues its goal of eliminating large encampments through three main types of operation: resolutions, re-encampment prevention, and cleaning. Encampment resolutions are the largest operation, in which the full HSOC team "resolves" an encampment by offering limited services, demanding that residents leave the area and having DPW conduct a full cleaning. Once an area is "resolved," regardless of whether the people who lived there have moved into a shelter or just around the corner, it is subject to tactics aimed at preventing the re-emergence of the original encampment.

As the most significant and publicly observable operation, if not the most frequently used, encampment resolutions and their outcomes were the primary focus of Director Carroll's presentation to the Local Homeless Coordinating Board. In her presentation, Carroll went over in detail the step-by-step timeline of the HSOC team's activities during these resolutions. However, as several members of the board mentioned after the presentation, this timeline varies considerably from what unhoused San Franciscans and advocates have witnessed at resolutions over the past several months. Below is a comparison of timelines, based on the 28 HSOC operations that Coalition on Homelessness staff and volunteers have observed from during 2021 thus far, between the stated HSOC resolution process and the operations that have been observed in practice.

| HSOC publicly stated operating procedure | Observed operating procedure |
|---|---|
| Steps 1 – 3: At 7 a.m., | At 7 a.m., or sometimes as late as 8, outreach workers notify encampment residents of the coming resolution, and |

| outreach workers gather names and offer "sheltering alternatives" | gather. At this time, there is no specific offer of any shelter resources, but often a general inquiry as to whether individuals would accept a congregate shelter placement. Residents are also told to pack their belongings and leave the area. |
|---|---|
| Step 4-5: Outreach workers identify clients needing additional support and inform a clinician, office staff look up clients in system | Immediately following outreach workers' initial engagement, DPW workers begin their cleaning operation on the streets and sidewalks being resolved. At this time, they are mostly picking up loose debris throughout the encampment, but they also often pressure residents to pack their belongings more quickly and search for "abandoned" belongings to throw away. None of these belongings are "bag and tagged" in accordance with DPW policy. As they are typically not able to provide specific shelter offers until after 9:30 a.m., outreach workers are mostly taskless during this time, often taking the opportunity to make a trip to buy coffee. |
| Step 6: Client Transportation begins | After about 9:30 a.m., outreach workers gain access to the day's shelter bed allocations, and begin to make offers to residents. By this time, over two hours after the initial engagement, it's common for most residents to have already left the area, or else be occupied by packing and moving their belongings to their next destination. For those who are still in the area, there is no guarantee that there will be any appropriate resources available. |
| Step 7: Client given time they need to leave | Often, when there are not enough or appropriate resources, those who waited hours for a place to stay are told that there may be sufficient resources for them the following day, and that outreach workers will return to the area. This despite the fact that the area is being resolved, and residents have been told they are not allowed to stay there any longer. The workers pressuring people to leave at this time are often DPW or SFPD, who are not privy to which residents are working with outreach workers to access shelter. There is no clear process for assessing disability needs or providing reasonable accommodations, and rarely a clear time by which people must move. |
| Step 8: Public works begins cleaning and will bag and tag property as appropriate" | By the time shelter offers are being made, most encampment residents have already been forced to move their belongings out of the area. At this time, DPW begins a more thorough cleaning of the area, including more disposing of unaccompanied property, none of which is bag and tagged. |
| Step 9: Police ensures everyone's safety and addresses enforcement issues | People who have not packed and moved quickly enough for DPW workers to conduct their street cleaning are repeatedly harassed by DPW workers. Sometimes, this escalates to HSOC police threatening residents with citations if they don't move quickly enough. Police and other HSOC staff also often threaten residents with citation and/or arrest if they return to the encampment after the resolution. |
| Step 10: Operation ends between 11 a.m. and noon | Advocates have been told by several members of the HSOC team that DPW workers' morning shift ends at 11 a.m., causing workers to rush for the resolution to be finished by then. The entire resolution, a process which at one time spanned several weeks in order to effectively match people with services, usually takes no longer than 4 hours under the current model. Most of that time consists of DPW street cleaning, and very little time dedicated solely to intensive outreach without the stressor of DPW and police activity. |

Donate



Housekeys Not Handcuffs protest at City Hall for ending homelessness.

## Poor Structure Leads to Low Placement Rates

8/4/22, 12:03 PM
Case 4:22-cv-05502-DMR Document 9-7 Filed 09/27/22 Page 77 of 175
Behind the Healthy Street Operation Curtain | Coalition on Homelessness

Among the many discrepancies between Director Carroll's account of the HSOC resolution timeline and the one observed by advocates, lies in how HSOC approaches connecting people in need with the city's available shelter resources. Based on what advocates have witnessed, HSOC uses a poorly structured resolution process that prioritizes street cleaning over service connection, providing little time for outreach workers to work with residents and creating an atmosphere of stress and panic that makes it difficult for residents to advocate for their needs. What both advocates and the director agree on is that HSOC's rate of service connection is less than satisfactory. In the three periods of 2021 presented on by Director Carroll, HSOC never surpassed a "service acceptance" rate higher than 35% (with the higher rates of the previous year largely attributable to the availability of SIP hotel beds).

Director Carroll implies while reporting high rates of "service declines" that these low success rates can be attributed to "service resistance."  When asked about the low rates of successful relocations of encampment residents she stated "there are many reasons people decline services —addiction and mental health are high on that list," indicating services are not appropriate for these populations. "Service resistance" is the commonly used term that implies people on the streets have been offered alternatives, but have remained where they are by choice. According to Joe Wilson, director of Hospitality House, a San Francisco organization that operates along with other services, a shelter and two drop-in centers: "When individuals do not 'accept' services, likely the offer itself is not meeting their individual needs. The concept that people would rather be homeless or are homeless by choice fails to acknowledge both the severe misery homelessness presents and the systemic inequities such as racism, homophobia and the massive income rent disparities that lead to homelessness. It is our job to adapt the services to meeting the individual's needs — not the other way around."   According to a leading scholar on homelessness, Deborah K. Padgett of New York University's Silver School of Social Work, "there is no evidence to support this notion that homeless persons are 'service resistant. People on the street often reject the option of crowded, unsafe shelters—not housing in general."  In her study, she identified barriers to bureaucratic barriers to housing, and a lack of safe, pet-friendly shelter.

On the other hand, those of us who have been observing HSOC's resolutions would argue that **the greatest factors contributing to the success rate are the structure of the resolutions, which as previously stated prioritize cleaning over meaningful service connections, and the lack of availability of adequate and appropriate resources.** During the over two dozen sweeps witnessed by ...lition on Homelessness staff and advocates this year, rarely, if ever, did HSOC outreach workers have access to enough shelter beds for ...ry resident at an encampment. On the contrary, advocates have been told by outreach workers and other HSOC staff repeatedly that they typically only had access to 10 or fewer beds each day, despite the presence of many more people than that at most resolutions.

Donate

# Placement Rates

| End of the Period | Operating Days in the Period | Tents from HSOC Count* | Reduction in Tents | Percent Reduction in Tents | Client Placements | Placements /Day | Acceptance Rate | Placements /Tents Reduced** |
|---|---|---|---|---|---|---|---|---|
| 4/22/2020 | | 1108 | | | | | | |
| 6/9/2020 | | 1400 | | | | | | |
| 7/28/2020 | 34 | 1003 | -397 | -28.36% | 677 | 19.91 | 83% | 1.71 |
| 10/7/2020 | 51 | 703 | -300 | -29.91% | 441 | 8.65 | 60% | 1.47 |
| 12/14/2020 | 43 | 565 | -138 | -19.63% | 265 | 6.16 | 31% | 1.92 |
| 2/15/2021 | 40 | 501 | -64 | -11.33% | 197 | 4.93 | 35% | 3.08 |
| 4/26/2021 | 53 | 383 | -118 | -23.55% | 277 | 5.23 | 30% | 2.35 |
| 6/21/2021 | 38 | 387 | 4 | 1.04% | 179 | 4.71 | 29% | 0.00 |
| Summary | 259 | | -1013 | -72.36% | 2036 | 7.86 | 45% | 2.23 |

*Number of tents on 6/9 is an estimate, other data is from the regular count conducted by HSOC.

**The number of placements needed to reduce one tent

*"Accepting help is alright when the help comes that's really helping and not just trying to shove me out of the way. Any type of services I've had to debate whether or not I'd take it or not because the people who are coming to see us, they're asking us to leave, they're coming with the police, they're coming with garbage trucks, telling us we got to go, tents aren't going to be allowed up, and then they said but we'll send you to tent city. Ok, I can't sleep on the streets in a tent but you're going to put me somewhere where I can be in the street, in a tent."*

*– Paul R, unhoused San Franciscan interviewed by Coalition on Homlessness volunteer Christin Evans*

In the past few months, release and analysis of several public records requests (Appendix) have revealed this routine under-availability of shelter resources to be a pattern. Across a 37-day period from January to February of this year, HSOC had enough shelter beds to offer a bed to everyone at that day's operations only twice. On average, they had access to only 52% of the beds they would need to do so.

This consistent lack of shelter beds call into question how widespread the issue of "service resistance" really is. In the statistics presented by Director Carroll, the outcome of each individual at an HSOC operation is categorized as one of three options: Placed, Already Sheltered, or Declining Services. In other words, according to HSOC's statistics, any individuals who are not transported to shelter after an operation, or were already sheltered, are considered to have declined (or resisted) service. However, it remains in question how this can be true if there were not enough beds available for everyone who is said to have declined them. In other words, it's not clear how HSOC can consider people for whom there were not enough beds to offer to have refused shelter. In fact, by cross-referencing the service connection data provided by HSOC (from the same 37-day period previously mentioned) with the shelter beds that were available to HSOC during those same days, it becomes clear that people accept the shelter beds available at quite high rates. **In those 37 days, despite a 29% overall service acceptance rate, 75% of the beds HSOC had available were filled.**

## Shelter Beds Available vs Clients Engaged at HSOC Resolutions, Jan-Feb 2021



01/05/21: Clients Engaged – 18, Shelter Beds Available – 7
01/06/21: Clients Engaged – 22, Shelter Beds Available – 6
01/07/21: Clients Engaged – 12, Shelter Beds Available – 6

01/08/2021: Clients Engaged – 8, Shelter Beds Available – 5

01/11/2021: Clients Engaged – 15, Shelter Beds Available – 11

01/12/2021: Clients Engaged – 16, Shelter Beds Available – 8

01/13/2021: Clients Engaged – 26, Shelter Beds Available – 10

01/14/21: Clients Engaged – 37, Shelter Beds Available – 10

01/15/2021: Clients Engaged – 7, Shelter Beds Available – 10

01/19/2021: Clients Engaged – 28, Shelter Beds Available – 10

01/20/2021: Clients Engaged – 59, Shelter Beds Available – 10

01/21/2021: Clients Engaged – 10, Shelter Beds Available – 8

01/22/2021: Clients Engaged – 10, Shelter Beds Available – 5

01/25/2021: Clients Engaged – 26, Shelter Beds Available – 5

01/26/2021: Clients Engaged – 25, Shelter Beds Available – 8

01/27/2021: Clients Engaged – 14, Shelter Beds Available – 8

01/28/2021: Clients Engaged – 12, Shelter Beds Available – 8

01/29/2021: Clients Engaged – 16, Shelter Beds Available – 2

02/01/2021: Clients Engaged – 22, Shelter Beds Available – 6

02/02/2021: Clients Engaged – 22, Shelter Beds Available – 2

02/03/2021: Clients Engaged – 13, Shelter Beds Available – 7

02/04/2021: Clients Engaged – 19, Shelter Beds Available – 7

02/05/2021: Clients Engaged – 48, Shelter Beds Available – 7

02/08/2021: Clients Engaged – 19, Shelter Beds Available – 6

02/09/2021: Clients Engaged – 30, Shelter Beds Available – 10

02/10/2021: Clients Engaged – 18, Shelter Beds Available – 7

02/11/2021: Clients Engaged – 14, Shelter Beds Available – 8

02/12/2021: Clients Engaged – 23, Shelter Beds Available – 10

02/16/2021: Clients Engaged – 3, Shelter Beds Available – 8

02/17/2021: Clients Engaged – 18, Shelter Beds Available – 8

02/18/2021: Clients Engaged – 14, Shelter Beds Available – 8

02/19/2021: Clients Engaged – 11, Shelter Beds Available – 9

02/22/2021: Clients Engaged – 18, Shelter Beds Available – 7

2/23/2021: Clients Engaged – 13, Shelter Beds Available – 7

2/24/2021: Clients Engaged – 17, Shelter Beds Available – 7

2/25/2021: Clients Engaged – 13, Shelter Beds Available – 8

2/26/2021: Clients Engaged – 14, Shelter Beds Available – 8

Donate

## Not Enough Beds for Encampment Residents

*"DPW took my stuff. All my clothes, my phone, my money, and I can't replace it so I don't know where to go now. I don't know where to go from here."*

*"Did they offer you any services?"*

*"No services, no nothing…I'm mad as fuck."*

*Interview between Carlos Wadkins (Human Rights Organizer with the Coalition on Homelessness) and L (Unhoused, disabled San Franciscan) at an HSOC operation on April 13, 2021*

Together, these statistics imply that the main problem leading to low service connection rates by HSOC lies in service availability, not service resistance. Addressing this, Director Carroll stated to the LHCB that tent removal operations did not occur, or would be paused, if there were not enough available beds in shelters. However, as previously established, encampment resolutions are close to completion, with most residents having already been displaced, by the time that outreach workers know the exact number and types of beds that they will receive. In the experience of Coalition on Homelessness advocates, when there are not enough resources or the appropriate type of resource, outreach workers are often left to tell people in need that they must wait for the next day in order to be offered a bed. Additionally, there is no section of the outcome data presented by Director Carroll, nor the internal data released through public records request, to account for instances in which operations were paused due to lack of resources. In the event that this had occurred, individuals for whom there were not enough beds would presumably still be categorized under "declining services" for lack of other classifications, lending false evidence to the theory that service resistance is the key factor.

Donate

appropriate Service Offers

*"The HOT team does not have a 'housing solution' for us due to the schizophrenia. Charlie has been homeless and living on the streets since 1976. None of us drinks or does drugs.  I have bipolar, Charlie and Gael have schizophrenia and Tommy has PTSD. We want to stay together, we've been on the street together for years and look out for one another."*

*– Marlon, speaking about an HSOC operation on 7/29/2021*

# HSOC Outcomes – Detailed data

| Week of Year | First Sweep | Tents Removed | Vehicles Removed | Total "Clients" | "Clients" Served | "Declined Services" | Percent Served | Available Shelter Beds | Percent of available Shelter Beds Filled |
|---|---|---|---|---|---|---|---|---|---|
| 2 | 1/5/2021 | 53 | 1 | 60 | 25 | 31 | 42% | 24 | 104% |
| 3 | 1/11/2021 | 106 | 4 | 101 | 32 | 59 | 32% | 49 | 65% |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 4 | 1/19/2021 | 84 | 0 | 107 | 34 | 61 | 32% | 33 | 103% |
| 5 | 1/25/2021 | 80 | 8 | 93 | 22 | 52 | 24% | 31 | 71% |
| 6 | 2/1/2021 | 82 | 0 | 126 | 29 | 84 | 23% | 29 | 100% |
| 7 | 2/8/2021 | 86 | 3 | 104 | 33 | 53 | 32% | 41 | 80% |
| 8 | 2/16/2021 | 39 | 1 | 46 | 12 | 30 | 26% | 33 | 36% |
| 9 | 2/22/2021 | 63 | 7 | 75 | 23 | 44 | 31% | 37 | 62% |
| | Total: | 593 | 24 | 712 | 210 | 414 | Average: 29% | Total: 277 | Average: 76% |

# HSOC Outcomes – Summary



PowerPoint presentation slide: HSOC Outcomes. June 10, 2020 to June 30, 2021. Total operations: 679. Clients Encountered: 4,648. Clients Placed: 2,077 (45%). Already Sheltered: 542 (12%). Declining Services: 2,029 (43%).

While these numbers can speak to the numerical lack of shelter resources, they cannot speak to how appropriate those resources are for the people HSOC engages with. As we move through sites, one of the questions our outreach team asks is if the individuals were offered any services and if so, which service. The most common response was that no they were not offered services. At other times, the individual was offered congregate shelter. While this number is highly suspicious, obviously people don't take what does not serve them. Congregate shelter is advised against by the CDC during the pandemic, and is even more dangerous today than it was at the beginning of the pandemic given high infection and fatality rates of the delta variant. One former HSOC staff person told us, "They offer shelter, but everyone at HSOC knew that staying at MSC-South would be more harmful physically and mentally than staying in the tent, and they did it anyway. There are no ethical guidelines there." However, even in "normal" times, congregate shelter is often an inapproppriate placement for many individuals for a variety of reasons including disability accommodations. Individuals with post-traumatic stress disorder, for example, often are unable to sleep near strangers. Others with severe mental illnesses may shout out during the night, keeping others awake. During the time period that hotel rooms were made available, the acceptance rates of SIP hotels was about 95%. Hotels offered bathrooms, privacy and dignity. This acceptance rate further demonstrates that when the system is responsive to need, it is able to easily move people off the streets.

While these numbers can speak to the numerical lack of shelter resources, they cannot speak to how appropriate those resources are for the people HSOC engages with. As we move through sites, one of the questions our outreach team asks is if the individuals were offered any services and if so, which service. The most common response was that no they were not offered services. At other times, the individual was offered congregate shelter. While this number is highly suspicious, obviously people don't take what does not serve them. Congregate shelter is advised against by the CDC during the pandemic, and is even more dangerous today than it was at the beginning of the pandemic given high infection and fatality rates of the delta variant. One former HSOC staff person told us, "They offer shelter, but everyone at HSOC knew that staying at MSC-South would be more harmful physically and mentally than staying in the tent, and they did it anyway. There are no ethical guidelines there." However, even in "normal" times, congregate shelter is often an inapproppriate placement for many individuals for a variety of reasons including disability accommodations. Individuals with post-traumatic stress disorder, for example, often are unable to sleep near strangers. Others with severe mental illnesses may shout out during the night, keeping others awake. During the time period that hotel rooms were made available, the acceptance rates of SIP hotels was about 95%. Hotels offered bathrooms, privacy and dignity. This acceptance rate further demonstrates that when the system is responsive to need, it is able to easily move people off the streets.

Case 4:22-cv-05502-DMR   Document 9-7   Filed 09/27/22   Page 82 of 175

Leading with Cleaning

*"I'm close to 40 years of age and i can't keep up with the demands of the sweeps personnel. i shouldn't be rushed to move my belonging anywhere without checking ahead of time for services to be dished out. Like why are they still displacing people when COVID is still running rampant in the community. We have a shelter-in-place order in effect so that the transmission of the virus can be limited and through contact tracing, we can overcome this dilemma of fear and fragile feelings."*

*– Dawn P, unhoused San Franciscan interviewed by Coalition on Homelessness Intern Marquis A*

Donate

other key discrepancy between the two timelines lies in the actions of DPW workers during resolutions. According to Director Carroll's esentation, DPW workers do not begin their cleaning operation until after all encampment residents have been offered shelter, when sportation has already begun and people have had time to move their belongings. As previously stated, our experience witnessing olutions has found that DPW workers in fact begin cleaning immediately after the initial engagement by outreach workers, well before residents have begun to receive specific offers of shelter. Furthermore, it is often DPW, rather than outreach workers, that is pressuring encampment residents to leave the area throughout the resolution. This often leads to high tensions between DPW workers and encampment residents, in which case police are present to threaten citation and property confiscation.

## Left Without Shelter

Following the presentation regarding HSOC from the Department of Public Works and Department of Homelessness, Supervisor Matt Haney's doubts of HSOC points to a larger problem in the HSOC policies created to optimize their data. In his speech, Supervisor Haney suggests that HSOC's mission would encourage officers to discard tents instead of providing services for unhoused individuals, which would leave these unhoused individuals in a more desperate situation. While HSOC frequently boasts its success in reducing the number of tents in San Francisco, **this success is not reflected in anywhere near an equal number of exits from homelessness**. Tents are not people, and removing tents while doing nothing to change the housing status of the individual does nothing but leave people on the street with even less protection from the harsh conditions under which they live.

Beyond this, HSOC has also significantly changed the way that the City's resources are allocated. In order to facilitate HSOC's many operations, many available beds or housing are reserved for use at encampment sweeps. This means that the thousands of unhoused San Franciscans not subject to an operation, who are perhaps in greater need of shelter, are left without a way to access those beds. These resources are often directed to the most politically important areas, such as gentrifying neighborhoods, rather than those most in need. This is often done at the behest of "VIP" individuals and groups, such as San Francisco's many Community Benefit Districts.

## Zero compliance with Bag & Tag Policy

*"I won't give you a bag.  I'll call the police if you don't give me your stuff."*

*DPW worker overheard by Coalition on Homelessness Volunteer Flo Kelley on Jan.13, 2021 during an HSOC operation*

Director Carroll also claimed that workers "bag and tag" property "where appropriate", a process where personal belongings are confiscated and stored at the DPW lot, where people can go to get them back. According to DPW policy, abandoned belongings such as tents and other survival gear is to be bagged and tagged, rather than thrown away.

"Unattended property is not abandoned if it is accompanied by signs of ownership – for example, an unattended tent that is filled with personal belongings, or items that are being stored in an orderly manner (i.e. packed up, wrapped, or covered). In addition, if there is a third party present who states s/he has been designated to watch or secure the items during the owner's temporary absence, the items are not considered abandoned. By contrast, abandoned items are unaccompanied by objective indications of ownership, for example, an empty or broken tent sitting by itself on a sidewalk with no other belongings."

However, in all of the resolutions monitored by the Coalition on Homelessness this year, only one bag and tag was observed after an advocate demanded it be done. Advocates have witnessed, on the other hand, several tents and other personal belongings be thrown away, thrown into DPW's trash compacting truck. This experience is reflected in DPW's own bag and tag logs for the months of January and February, released in response to a public records request. **Of the 38 Bag and Tags recorded between January 4, 2021, and February 28, 2021, not a single one was recorded at the same location as the HSOC operations of the corresponding day.** In fact, many of the recorded bag and tags were not done by DPW workers at all, but by SFPD officers. In short: across 87 HSOC operations, in which their data claims 593 tents and structures were "removed," not a single belonging was bagged and tagged.

Donate

## Sidewalk Shuffle is Trauma-Inducing and Ineffective

*"This morning an officer came by and rudely woke me up asking us 'Who said we could be here?' 'How long had I been here?' Telling me it was totally unacceptable what my tent looked like and said we had to get packed up and get out and he was just really rude about it. I said, 'Sir, you don't have to be rude.' and he continued to be rude. C'mon, we are all just human beings, you don't have to talk to us like that. I'm not a piece of shit or piece of trash.' But that is how he made me feel. He didn't offer anything but as he left he turned around he said, 'Ma'am I'll be back!'"*

*– Dawn, during a July 19 HSOC operation*

Overall, neither HSOC's own data nor the experience of advocates depict HSOC operations as being centered on public health and permanent solutions for unhoused people. Rather, they depict a DPW-led model that prioritizes displacing people and tents as quickly and efficiently as possible, not leaving sufficient time to notice unhoused residents nor effectively connect residents with adequate and appropriate services. As a result, service connection rates are very low (less than 30% for the January to February period), while the rate of tents cleared remains very high, at 88% for the same period. While this may seem discordant with the presentation given by Mary Ellen Carroll in August, it perfectly aligns with the foundational purpose of HSOC to reduce the number of tents on the streets of San Francisco. In order to achieve higher success in the metrics that actually matter, connecting unhoused people with permanent solutions that keep them from needing to sleep on the street, there must be changes made not only to the model of this city's street response but to the foundational principles which HSOC was created to pursue.



Donate

weep in progress. A man and woman hold bags full of belongings, while three Department of Public Works employees in safety vests ep the sidewalk and put things in garbage bags.

# RECOMMENDATIONS

Recommendations to Fix a Failing Street Response

*"The current state of homelessness in the City and County of San Francisco is truly replusing. I believe that the Mayor and the current board of Supervisors are to blame for this mess. Homelessnes is not a "one solution – fix all" issue. It touches on many different issues like mental health, substance abuse and treatment, self esteem and self image issues, but would also include evolving discussion around housing justice, financial responsibilities, and community engagement."*

Case 4:22-cv-05502-DMR   Document 9-7   Filed 09/27/22   Page 85 of 175

*– Marquis A, unhoused San Franciscan and intern with the Coalition on Homelessness*

The following are system recommendations to ensure successful approaches to street homelessness.

1. Halt the policy and practice of focusing on tents – instead have street teams identify, assess, and place humans in need.
2. Eliminate barriers to services to existing homeless programs. This includes ensuring shelter options are barrier- free, such as ensuring pets, partners and property are allowed, and minimize rules.
3. Invest in permanent solutions to homelessness including housing, living- wage jobs, on-going treatment and medical care over bandaid solutions.
4. Ensure shelters during the surge are safe, such as fully utilizing SIP hotels rooms and pausing the shut down of these hotels.
5. Have regular cleanings and trash pick-up at set times in areas where unhoused people tend to sleep or park.
6. Halt practices that criminalize individuals for their economic and housing status, such as police responses to homelessness. Fully implement CART —- Compassionate Alternative Response to Homelessness —- by having a deeply trained, well- paid peer- based street team respond and solve "C" level 911 calls connected to homelessness.
7. Once CART is fully implemented, ensure the Homeless Outreach Team can fully focus on case management and connecting individuals to care, as opposed to responding to complaints.
8. Halt the enforcement of anti- homeless laws, including the enforcement against individuals residing in areas that have already been swept. These "re-encampment prevention" activities do not address the needs of unhoused people nor assist them off the streets, and instead rely on failed enforcement measures. Instead, connect individuals to care.
9. Ensure full transparency and reporting of all street responses, including numbers of people who are connected with care, as is occurring with Street Crisis Response Team and Street Overdose Response Team

Donate

structure and intent of HSOC fails to provide a sufficient long-term solution to the housing crisis. A focus on tent removal as a metric evaluate the severity of the homeless population is not only an inaccurate way of measuring data, but it also creates harmful policies that cerbate the crisis. We believe HSOC should be abolished because it's inherently aimed at the wrong goals of removing tents as opposed to addressing homelessness.

## Recommendations for Informal Settlement Relocations

Federal guidelines outlining how localities should address encampments also provide a good starting point on how to address the housing crisis, and they encourage municipalities to have clear and transparent communication with campers, timelines and relocation plans. In the past we have successfully resolved encampments, and not just at King Street. There have been other examples of encampment relocations where elements were effective. Islais Creek, which was an area that was being redeveloped, was done under the auspices of the Department of Homelessness and Supportive Housing via the Encampment Resolution Team led by Jason Albertson. This two-week effort entailed deep assessments and lining up resources, resulting in 70% of encampment residents having long-term accommodations. Earlier in the pandemic, when hotel rooms were available, HSOC collaborated with community-based organizations to place people in hotel rooms. Of those offered hotel rooms, 95% of them were successfully relocated. It is not only cruel, but a waste of resources to simply punish and push people who are already in crisis from place to place.

# Comparison of Informal Settlement Relocation Efforts

| Recommendations to Ensure Proper Relocation | King Street Example | Current Operations |
|---|---|---|
| 14-day written and verbal notice, with 7-day reminder | More than 14 days notice was given | No more than 3 days and rarely given |
| Assessments of need take place during noticing period | Every camp resident received clinical assessment | No real assessments, just asking for name and if they want congregate |

8/4/22, 12:03 PM
Case 4:22-cv-05502-DMR  Document 9-7  Filed 09/27/22  Page 86 of 175
Behind the Healthy Street Operation Curtain – Coalition on Homelessness

| | | shelter |
|---|---|---|
| Offering of services appropriate to need during noticing time period | New services were garnered for camp residents | Only congregate shelter offered |
| Permanent housing should be offered, and when not available, temporary accommodations until permanent placements are available | Temporary shelter was offered in a church until permanent housing was available. | No permanent housing currently offered |
| Cleaning occurs post placement | Cleaning did not occur until after residents moved into shelter | Cleaning occurs at start of operation |
| Operations conducted in collaboration with culturally competent community-based organizations | Community-based organizations such as Coalition on Homelessness were intentionally pulled in to help | Organizations actively discouraged from participating |
| All operations done in presence of human rights observer | Coalition on Homelessness served as observers | Human rights observers discouraged from being present |
| All operations publicly posted | Community including housed and unhoused neighbors informed ahead of time | Operations set up to avoid public scrutiny |
| Police are not present | Police are not present | Police are present |
| City entities are appropriate and have experience with unhoused communities and trauma-informed practices. Other entities brought in only on an "as needed" basis (for example, paramedics brought in when there is a medical emergency.) | Only skilled staff present | Untrained personnel present lacking experience with trauma informed operations. |
| unclaimed property is bagged and tagged. Individuals offered ans to keep and transport claimed property | City provided large containers for property. Containers transported to shelter. | No unclaimed property is bagged and tagged. Owners of claimed property struggle to transport, and often give up in order to enter shelter. |
| If there are not adequate services for unhoused residents, they should not be moved until such resources are garnered. Meanwhile, garbage, sanitation, clear passage and other mitigations should be addressed until relocation can be achieved via placements. | Operations happened with services already obtained. | Operations consistently happen without adequate and appropriate services. |
| Homeless people's legal rights, dignity, agency and self determination should be respected throughout. | Operation was done legally and individuals had agency in housing choice. Outcome: 100% of camp residents ended up in permanent housing. | Legal rights rarely observed, city actively skirting law. Outcome: post offering of hotel rooms, only 30% of encampment residents successfully relocated to temporary shelter. |
| These fundamental elements should form policy and procedures for the resolution team along with clear ethical guidelines the team is held accountable to. | Operations guided by community input. | No policies and procedures for operations shared with staff. No ethical guidelines. |



# CONCLUSION

**Conclusion**

8/4/22, 12:03 PM
Behind the Healthy Street Operation Curtain - Coalition on Homelessness
Case 4:22-cv-05502-DMR   Document 8-7   Filed 09/27/22   Page 87 of 175

The current HSOC operations fail to permanently address homelessness, increase economic costs and violate human rights. Only 30% of residents are being relocated, and they are only being relocated to temporary shelter. The remainder are still on the streets. From the unhoused person's perspective, they are cruel and trauma-inducing. From the housed person's perspective, they are only pushing people into more residential areas. As a city, we can and should do better by our housed and unhoused neighbors. Political battles during the epidemic also revealed how profoundly broken the "revolving door" approach the City takes to homelessness is, and the lack of structural investments in long-term solutions has increased systemic inequalities. As UCSF's Dr. Margot Kushel said in response on how to combat homelessness, "There is no medicine as powerful as housing."



Donate

Protesters stand in the street with signs and lie on the street holding red flowers to their chest.

# APPENDIX: DISSECTING THE DATA

While much of the information presented in this report draws on the experiences and firsthand knowledge of unhoused San Franciscans and advocates, a significant amount of it comes from the city's internal data and records. This data was made public, and brought to the attention of the Coalition on Homelessness, through an extensive series of public records requests made by Twitter user @dizz_h. These requests have resulted in a rather large and nebulous cache of information about HSOC and its operations, much of which has been made available in this public Google Drive folder.

In order to compile this information into a manageable set of data that gives a full picture of HSOC's operations and their outcomes, this report narrowly analyzes the period of time between January 5, 2021 and February 26, 2021. This analysis primarily takes into account three key areas: HSOC's operation reports, DPW's Bag and Tag Logs, and the city's daily shelter allocation summary. Through comparison and cross-reference of these three, a much clearer picture of HSOC is created than any one source could provide; a picture which largely verifies the experiences reported by those with firsthand experience of HSOC's day-to-day operations. What exact information came from each source, and how they were used in conjunction with one another in order to reach better analysis, is the subject of this appendix.

HSOC Encampment Reports

# HSOC Encampment Report: Week of January 25, 2021

| Location | Police District | Neighborhood | Supervisor | Date | Mission | Starting Tents & Structures | Tents & Structures Removed | Tents & Structures Remaining | Starting Vehicles | Vehicles Removed | Vehicles Remaining | To Cl |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Multiple Locations | | CATHEDRAL HILL | | 1/25/2021 | Re-Encampment Prevention | 15 | 15 | 0 | 0 | 0 | 0 | 17 |
| Multiple Locations | | TENDERLOIN | | 1/25/2021 | Re-Encampment Prevention | 7 | 3 | 4 | 0 | 0 | 0 | 9 |
| 220 San Bruno | | MISSION | | 1/26/2021 | Re-Encampment Prevention | 17 | 17 | 0 | 0 | 0 | 0 | 17 |
| 220 San Bruno | | SHOWPLACE SQUARE | | 1/26/2021 | Re-Encampment Prevention | 10 | 6 | 4 | 0 | 0 | 0 | 8 |
| Division between South Van Ness/ Potrero | | MISSION | | 1/27/2021 | Outreach & Cleaning | 16 | 10 | 6 | 0 | 0 | 0 | 14 |
| San no | | SHOWPLACE SQUARE | | 1/28/2021 | Re-Encampment Prevention | 10 | 10 | 0 | 0 | 0 | 0 | 11 |
| ondanga | | CAYUGA | | 1/28/2021 | Resolution | 3 | 3 | 0 | 0 | 0 | 0 | 1 |
| 901 Rankin | | BAYVIEW | | 1/29/2021 | Resolution | 16 | 16 | 0 | 8 | 8 | 0 | 16 |
| | | | | | Totals | 94 | 80 | 14 | 8 | 8 | 0 | 93 Ra |

*Weekly HSOC Report for the week of January 25, 2021, released via public records request*

The weekly encampment reports recorded by HSOC provide a foundational understanding of the day-to-day activities of their teams, as well as some information about their outcomes. More specifically, these reports provide the date and location of every HSOC operation, as well as the number of tents removed and the placement outcome of each "client" engaged. This data, which is very similar to the compiled data presented at the Local Homeless Coordinating Board, and doesn't provide much insight besides the fact that HSOC has very high success rates in terms of tents cleared, but comparatively low success rates in terms of service connection. These reports become much more informational, however, when contextualized by both the first-hand experience detailed in this report and the other two public records sources.

DPW Bag and Tags



*DPW Bag and Tag Log for the month of January 2021, released via public records request*

1/20/21, Howard St., S/O # 2485487, intake 1, bikes 0, tag # 285 291, tag color red, tent clothes sleeping bag

1/20/21, Ingleside and San Jose Ave, S/O # 56419, intake 3, bikes 0, tag # 289, tag color red, 2 blk duffle bags/skate board

1/21/21, 359 Jones, S/O # 2486126, intake 1, bikes 0, tag # 270, tag color red, 2 suitcases, 1 blue cart sleeping bag 3 purse bags

1/21/21, TL Station and Jones, S/O # 2485659, intake 2, bikes 0, tag # 299 298, red, 1 clear plastic bag w/ 1 bike

1/23/21, Mission Station PD 630 Valencia Street and 17th, S/O # 2483893, intake 2, bikes 1, tag # 272, tag color white, 1 blk bike 1 plastic bag tied to handlebars

1/24/21, Fillmore/Northern PD and Turk, S/O # 2488107, intake 1, bikes 1, tag # 279, tag color red, Blue bicycle/Sims, Rusty

1/24/21, 630 Valencia St. Mission police station and 17th, S/O # 2486918, intake 2, bikes 0, tag # 254, tag color red, two backpacks

1/26/21, 1125 Fillmore/PD and Turk, S/O # 2488799, intake 2, bikes 0, tag # 260, tag color red, 1 guitar 1 bag

1/27/21, 1192 Market and 7th St., S/O # 2488390, intake 2, bikes 0, tag # 255 256, tag color red, clear plastic bags w/ items [redacted]

1/29/21, 331 Eddy St. and Jones, S/O # 2490172, intake 1, bikes 0, tag # 257, tag color red, 1 small plastic bag

While the encampment reports reveal that HSOC's operations result in a large number of tents and structures being "removed," they do not detail whether those belongings were disposed of, bagged and tagged according to DPW policy, or taken by "clients" to other locations. Partially helping to clarify this omission, DPW's monthly Bag and Tag Logs detail every item brought to their lot throughout the month as a part of the bag and tag process. Further complicating the issue, not every DPW bag and tag is conducted as part of an HSOC operation, as many are belongings that have been confiscated by SFPD police officers for various reasons and picked up by DPW workers at the police station. In order to determine how many bag and tags were collected as a part of HSOC operations, the addresses from the logs for January and February were cross-referenced with the HSOC operation locations from the encampment reports. Through this process, it was determined that there was not a single logged bag and tag whose location correlated with that day's HSOC operations.

Daily Shelter Allocation Summary



*(Screenshot) Daily Shelter Allocation Summary for Site 10 on January 4th, 2021 released via public records request.* The original documents are on the Coalition on Homelessness Google Drive.

The city's shelter system, its capacity, and how its beds are distributed are topics that are essential to understanding how HSOC operates, but are not understood widely outside of city insiders and the advocates who work regularly on these issues. To give a brief overview that will help understand this information: As a result of the pandemic, public access points for shelter, including the former 311 shelter waitlist, were done away with as a part of the city's work to depopulate congregate shelters. Since then, access to all shelter beds, including SIP hotels and Safe Sleep Sites, has been centrally distributed from the COVID Command Center (CCC). Every day (based on the information found on the emails and conversations with frontline HSOC staff, this happens at or after about 9:30 a.m. daily), the CCC sends an email stating how many shelter beds will be made available for that day, and which city teams they will be allocated to. This is not an accounting of all available shelter beds in the system, but a determination based on unknown criteria of how many of those beds can be given out that day. After this email has been sent, outreach workers on the HSOC team can begin offering them to encampment residents. Upon running out of shelter beds, HSOC is occasionally able to borrow allocations from other teams, or tells clients that they will return the next day with additional resources.

The public records analyzed in this report include the daily allocation summary emails for every site, every day in the 37-day period discussed throughout. While there are several useful pieces of information in these records —including the time that these emails are sent daily, the total number and types of shelter beds made available every day, and the percentage of available beds that are allocated to HSOC as opposed to other teams —this report primarily focuses on the number of shelter beds allocated to HSOC each day. This number provides much more context to the service connection data provided in HSOC's encampment reports. For example, on January 25, HSOC reported engaging with 26 total clients across two operations. Of those clients, five were connected with services, three were "already housed/sheltered," and 18 reportedly declined services. On the same day, the shelter allocation summary shows that HSOC had access to [ ] total beds across all shelter sites, indicating that the 18 remaining encampment residents could hardly be considered to have declined [ser]vices. As argued in the report, conducting this analysis across the entire 37-day period greatly supported two of the main claims often [ma]de by observers and subjects of HSOC operations: that HSOC regularly displaces more people than it has shelter resources for —not to [men]tion the adequacy or appropriateness of those resources —and that the reported rates of declined services are greatly inflated.



| WHO WE ARE | WHAT WE DO | GET INVOLVED |
|---|---|---|
| ACCOMPLISHMENTS | WORKGROUPS | ACTION ALERTS |
| OUR TEAM | HOUSING JUSTICE | JOBS AND INTERNSHIPS |
| | HUMAN RIGHTS | BE A HOUSED ALLY |
| | RESEARCH & REPORTS | GIVE CREATIVELY |
| | STOLEN BELONGING | STREET SHEET |
| | LEARN MORE! | DONATE |
| | | COH STORE! |

COALITION ON HOMELESSNESS
280 TURK ST.
SAN FRANCISCO, CA 94102

T: (415) 346-3740

  

8/4/22, 12:03 PM
Case 4:22-cv-05502-DMR   Document 9-7   Filed 09/27/22   Page 91 of 175
Behind the Healthy Street Operation Curtain / Coalition on Homelessness

© Copyright 2019 Coalition on Homelessness, San Francisco. All rights reserved.

Website Designed & Developed by Crystal Cross

Donate

# Exhibit 16



*Affordable Housing/ Vivienda Asequible, Western Regional Advocacy Project (WRAP) &
Print Collective, Clarion Alley Mural Project, San Francisco, 2016*

# 2022
## Street Needs Assessment
## +
## El Proyecto Dignidad














**LATINO TASK FORCE**

# Latino Task Force Mission District Street Needs Assessment Report

+

# El Proyecto Dignidad:  Plan For Transitioning The Unhoused Into Housing In The Mission District

## June 16, 2022

# Table of contents

**Introduction**   3

**Executive Summary of Findings**   4

**The Latino Task Force**   7

**What Is The Street Needs Assessment Committee?**   7

**Goals Of The 2022 Second Street Needs Assessment**   8

**Methodology**   9

**Demographics**   10

**Findings: Learning More About Our Unhoused Neighbors**   14

**Findings: Access to Services**   19

**Findings: Human Rights and Displacement**   23

**El Proyecto Dignidad - Preparing to Begin the Four-Week Program**   31

**El Proyecto Dignidad - Operations**   32

**Additional Recommendations**   34

**Endnotes**   36

## Loss Of Personal Items

One of the many hardships experienced by our unhoused neighbors is the loss of personal belongings. Unhoused people are usually clinging to what little they have left – they carry around their identification; important documents; and survival gear such as warm clothing, shelter, and tarps. The loss of these critical belongings is often understandably devastating.

For this reason, the city has policies in place to protect the personal property of the unhoused from loss, commonly referred to as the "bag and tag" policy. This policy dictates that if items taken from homeless individuals and camps are clearly not trash or severely soiled, that city workers must bag the items up, label them, and store them so that the unhoused residents may later claim them. This policy, outlined in a 2018 SFPD bulletin,[13] also applies to other departments such as the Department of Public Works.

In administering our 2022 survey, the committee attempted to measure whether the city was following their own "bag and tag" policy with regard to the treatment of personal items and survival gear. **With nearly a full three quarters of respondents reporting that they recently had property confiscated by the city without the appropriate practices of retaining and labeling it for a later return, there appears to be a clear practice and pattern by the city of violating its own policy, despite the legal implications of doing so.**



**Have you lost personal items, such as survival gear, in a sweep because they were taken and not tagged?**

25.3%

74.7%

● Yes  ● No

Originally developed via negotiations with the ACLU and Lawyers Committee on Civil Rights, the city's "bag and tag" policy was recently updated as an outgrowth of the UC Hastings lawsuit regarding city actions in the Tenderloin neighborhood.  Three community organizations joined the original suit in an attempt to protect unhoused Tenderloin residents from what was seen as abusive practices employed by the city.



# Exhibit 17

| From: | Kositsky, Jeff (DEM) |
|---|---|
| To: | Lippi, Joseph (HOM); McCormick, Shawn (MTA); Candler, Robin (DPH); Marshall, Laura (CON); Horky, Allison (DPH); Peoples, Samuel (DPW); Christ, Samuel (POL); Tullock, Cristel (ADP); Maimoni, Andy (ADM); Okelo, Bryan (CON); Fong, Daryl (POL); Pang, Simon (FIR); Mazza, Mark (HOM); Wong, Bryan (ADM); Follin, Maja (REC); Cannariato, Umecke (HOM); O"Malley, Sara (SHF); Sawyer, Amy (MYR); Brown, Shaquita (REC); Cruz, Raymond (POL); Carroll, Maryellen (DEM); Lau, Peter (DPW); Hogan, Kristin (DEM); Marin, Angelique (POL); Walker, Joann (POL); Borne, Deborah (DPH); Meskan, Brenda (HOM); CCC - Planning; Lee, Kin Yau (POL); Sawyer, Jason (POL); Mason, Michael (FIR); Linares, Ernesto (POL); Holbrook, Bryson (DPW); Barone, Doris (HSA); Lee, Kin Yau (POL); Sawyer, Jason (POL); Chin, Albert (MTA); Sloan, April (FIR); Meehan, Andrew (POL); Newbeck, Gerald (POL); Tiffe, Liza (POL); Lee, Kevin (POL); Acosta, Jason (POL); Cortez, Miguel (POL); Cathey, John (POL); Clendenen, Robert (POL); Gonzales, Derrick (POL); Banks, Chris (DPW); Chin, Albert (MTA); Grives, Heather (DEM); Tran, Helen (LIB); Jones, Nicole (POL); Daneluz, David (POL); Schwartz, Emily (HOM); Escobar, Jessie (DPH); Young, Wayman (POL); Carr, Paul (POL); Bruce, Kenny (DPW); Leonardo, Abelardo (DPW); Torio, Dario (DPW); Dilworth, Darryl (DPW); Banks, Chris (DPW); Finetti, Roderick (HSA); Tillan, Luis (POL); Ferguson, Shannon (CPC); Hiralez, Christopher (REC); Renshaw, Patrick (FIR); Anderson, Christopher (POL); Dilworth, Darryl (DPW); O"Bannon, Christina (POL); Levy, Janice (CON); Reilly, John (DPW); Conley, William (POL); Lozada, Aaron (POL); Walsh, Peter; FireSCRT; Mohan, Anitha (DPH); Milton, Robert (DPW); Sices, Bernard (DPW); Zamora, Francis (DEM); Lim, Victor (DPH); Riddell, Joel (REC); Hodge, Mark (POL); Ross, Michael (POL); Bartley, Tommie (POL); Wright, Deshawn (POL) |
| Cc: | Caltagirone, Gaetano (POL); Falvey, Timothy (POL); Pedrini, Christopher (POL); Yep, Paul (POL); Ng, Julian (POL); Maron, David (POL); Moran, Rachel (POL); Jones, Nicole (POL); Canning, Chris (POL); Rainsford, Nicholas (POL) |
| Subject: | RE: HSOC Daily Operations Call Notes |
| Date: | Tuesday, March 30, 2021 2:52:06 PM |
| Attachments: | HSOC Notes.210330.docx |

Revised notes with updated instructions for tomorrow, meet at Redwood and Franklin at 7am:

1. Clear Redwood on both sides of Franklin (2-3 tents)
2. Drive up Franklin and check Larch (should be clear)
3. Clear 800 block of Eddy (4 tents)
4. Clear Willow from Franklin to Van Ness (4 tents)
5. Clear Austin  (between Franklin and Van Ness (1 tent)
6. Turn right on California and right on Polk
7. Clear Fern from Van Ness to Larkin (4 tents)
8. Clear Willow from Van Ness to Larkin (10 tents)

Give everyone 45 minutes to clear and area if not cooperating consider enforcement.

Thanks.

Jeff

---

**From:** Kositsky, Jeff (DEM)
**Sent:** Tuesday, March 30, 2021 10:39 AM
**To:** Lippi, Joseph (HOM) <joseph.lippi@sfgov.org>; McCormick, Shawn (MTA) <Shawn.McCormick@sfmta.com>; Candler, Robin (DPH) <Robin.Candler@sfdph.org>; Marshall, Laura (CON) <laura.marshall@sfgov.org>; Horky, Allison (DPH) <allison.horky@sfdph.org>; Peoples, Samuel (DPW) <Samuel.Peoples@sfdpw.org>; Christ, Samuel (POL) <samuel.christ@sfgov.org>; Tullock, Cristel (ADP) <cristel.tullock@sfgov.org>; Maimoni, Andy (ADM) <andy.maimoni@sfgov.org>; Okelo, Bryan (CON) <bryan.okelo@sfgov.org>; Fong, Daryl (POL) <daryl.fong@sfgov.org>; Pang, Simon (FIR) <simon.pang@sfgov.org>; Mazza, Mark (HOM) <Mark.Mazza@sfgov.org>; Wong, Bryan (ADM) <bryan.v.wong@sfgov.org>; Follin, Maja (REC)

<maja.follin@sfgov.org>; Cannariato, Umecke (HOM) <umecke.cannariato@sfgov.org>; O'Malley, Sara (SHF) <sara.omalley@sfgov.org>; Sawyer, Amy (MYR) <amy.sawyer@sfgov.org>; Brown, Shaquita (REC) <shaquita.brown@sfgov.org>; Cruz, Raymond (POL) <raymond.cruz@sfgov.org>; Carroll, Maryellen (DEM) <maryellen.carroll@sfgov.org>; Lau, Peter (DPW) <peter.l.lau@sfdpw.org>; Hogan, Kristin (DEM) <kristin.hogan@sfgov.org>; Marin, Angelique (POL) <angelique.s.marin@sfgov.org>; Walker, Joann (POL) <joann.walker@sfgov.org>; Borne, Deborah (DPH) <deborah.borne@sfdph.org>; Meskan, Brenda (HOM) <brenda.meskan@sfgov.org>; CCC - Planning <ccc.planning@sfgov.org>; Lee, Kin Yau (POL) <kinyau.lee@sfgov.org>; Sawyer, Jason (POL) <jason.sawyer@sfgov.org>; Mason, Michael (FIR) <michael.mason@sfgov.org>; Linares, Ernesto (POL) <ernesto.a.linares@sfgov.org>; Holbrook, Bryson (POL) <bryson.holbrook@sfgov.org>; Barone, Doris (HSA) <doris.barone@sfgov.org>; Lee, Kin Yau (POL) <kinyau.lee@sfgov.org>; Sawyer, Jason (POL) <jason.sawyer@sfgov.org>; Chin, Albert (MTA) <Albert.Chin@sfmta.com>; Sloan, April (FIR) <april.l.sloan@sfgov.org>; Meehan, Andrew (POL) <andrew.meehan@sfgov.org>; Newbeck, Gerald (POL) <gerald.newbeck@sfgov.org>; Tiffe, Liza (POL) <liza.tiffe@sfgov.org>; Lee, Kevin (POL) <kevin.lee1@sfgov.org>; Acosta, Jason (POL) <jason.m.acosta@sfgov.org>; Cortez, Miguel (POL) <miguel.cortez@sfgov.org>; Cathey, John (POL) <john.cathey@sfgov.org>; Clendenen, Robert (POL) <Robert.Clendenen@sfgov.org>; Gonzales, Derrick (POL) <derrick.gonzales@sfgov.org>; Banks, Chris (DPW) <Chris.Banks@sfdpw.org>; Chin, Albert (MTA) <Albert.Chin@sfmta.com>; Grives, Heather (DEM) <heather.grives@sfgov.org>; Tran, Helen (LIB) <helen.tran@sfpl.org>; Jones, Nicole (POL) <nicole.h.jones@sfgov.org>; Daneluz, David (POL) <david.daneluz@sfgov.org>; Schwartz, Emily (HOM) <emily.s.schwartz@sfgov.org>; Escobar, Jessie (DPH) <jessie.escobar@sfdph.org>; Young, Wayman (POL) <wayman.w.young@sfgov.org>; Carr, Paul (POL) <paul.carr@sfgov.org>; Bruce, Kenny (DPW) <kenny.bruce@sfdpw.org>; Leonardo, Abelardo (DPW) <abelardo.leonardo@sfdpw.org>; Torio, Dario (DPW) <dario.torio@sfdpw.org>; Dilworth, Darryl (DPW) <darryl.dilworth@sfdpw.org>; Banks, Chris (DPW) <Chris.Banks@sfdpw.org>; Finetti, Roderick (HSA) <roderick.finetti@sfgov.org>; Tillan, Luis (POL) <luis.tillan@sfgov.org>; Ferguson, Shannon (CPC) <Shannon.Ferguson@sfgov.org>; Hiralez, Christopher (REC) <christopher.hiralez@sfgov.org>; Renshaw, Patrick (FIR) <patrick.renshaw@sfgov.org>; Anderson, Christopher (POL) <christopher.j.anderson@sfgov.org>; Dilworth, Darryl (DPW) <darryl.dilworth@sfdpw.org>; O'Bannon, Christina (POL) <christina.obannon@sfgov.org>; Levy, Janice (CON) <janice.levy@sfgov.org>; Reilly, John (DPW) <john.reilly@sfdpw.org>; Conley, William (POL) <william.conley@sfgov.org>; Lozada, Aaron (POL) <aaron.lozada@sfgov.org>; Walsh, Peter <peter.walsh@sfgov.org>; FireSCRT <firescrt@sfgov.org>; Mohan, Anitha (DPH) <anitha.mohan@sfdph.org>; Milton, Robert (DPW) <robert.milton@sfdpw.org>; Sices, Bernard (DPW) <bernard.sices@sfdpw.org>; Zamora, Francis (DEM) <francis.zamora@sfgov.org>; Lim, Victor (DEM) <victor.lim@sfgov.org>; Riddell, Joel (REC) <joel.riddell@sfgov.org>; Hodge, Mark (POL) <mark.d.hodge@sfgov.org>; Ross, Michael (POL) <michael.y.ross@sfgov.org>; Bartley, Tommie (POL) <tommie.bartley@sfgov.org>; Wright, Deshawn (POL) <deshawn.wright@sfgov.org>

**Cc:** Caltagirone, Gaetano (POL) <gaetano.caltagirone@sfgov.org>; Falvey, Timothy (POL) <timothy.falvey@sfgov.org>; Pedrini, Christopher (POL) <christopher.pedrini@sfgov.org>; Yep, Paul (POL) <paul.yep@sfgov.org>; Ng, Julian (POL) <julian.ng@sfgov.org>; Maron, David (POL) <david.s.maron@sfgov.org>; Moran, Rachel (POL) <rachel.moran@sfgov.org>; Jones, Nicole (POL) <nicole.h.jones@sfgov.org>; Canning, Chris (POL) <chris.canning@sfgov.org>; Rainsford, Nicholas (POL) <nicholas.rainsford@sfgov.org>

**Subject:** RE: HSOC Daily Operations Call Notes

Notes from today's call, please review highlighted meeting locations.

jeff

# HSOC Daily Operations Call
## <u>Tuesday March 30, 2021</u>

**FOLLOW-UP**
<u>Resolution</u>
- Only a few people in downtown area, mostly at Embarcadero; probably not worth repeating a downtown operation

<u>Re-encampment/Hotspots</u>
- Mission
  - o 16th and Shotwell – in progress
  - o Bryant and Alameda – will address
  - o 26th and Shotwell – FEST to address on Thursday
- Tenderloin
  - o None
- Southern
  - o None
- Central
  - o None
- Northern
  - o None

<u>Other</u>
- None

<u>Noticing and Assessment</u>
- Noticing done on 6th and C. Chavez/101
- Will discuss next week noticing tomorrow afternoon

**ACTIVE OPERATIONS**

**Tuesday March 30, 2021**
<u>Both</u>
*Meeting Location*:
- AM: Golden Gate and Hyde
- 1PM: Golden Gate and Jones (HOT, SFPD, SFFD, DPW)
- 1PM: 1 HOT and 1 SFPD Unit to address 2501 Folsom

*Site Information*
- Location: Tenderloin
  - o AM: Golden Gate from Hyde to Market
  - o PM: 100 Jones

*Operation Details*
- Mission: Outreach and Cleaning
- Incident Commander:  Pat
- HSH Lead: Emily
- DPH Lead: Jessie

- Field Team: SFFD, SFPD, DPH, DPW (1 flat rack), MTA, UA
- DPH Assessment: NA
- HOT Notice: NA
- Street Closure: Yes
- Barricades/A-Frames: No
- Chop Shop: No
- Pit Stop Removal: No
- Estimated Tents/Structures: 5
- Estimated Vehicles: 0
- Shelter Available: Yes
- Notes:  DPH will be in the field, UA will be supporting. Most folks not in tents
  - Jeff alerted SCRT
  - Pat to ask for transport coordinator
  - Will address 2501 Folsom in the PM (SFHOT) (1pm)

**PLANNED OPERATIONS**
**Wednesday March 31, 2021**
<u>Both</u>
*Meeting Location*:
  AM: Franklin and Redwood
  PM: TBD


*Site Information*
- <mark>Location: Alleys from Franklin to Polk (status as of Tuesday)</mark>
  1. Clear Redwood on both sides of Franklin (2-3 tents)
  2. Drive up Franklin and check Larch (should be clear)
  3. Clear 800 block of Eddy (4 tents)
  4. Clear Willow from Franklin to Van Ness (4 tents)
  5. Clear Austin  (between Franklin and Van Ness (1 tent)
  6. Turn right on California and right on Polk
  7. Clear Fern from Van Ness to Larkin (4 tents)
  8. Clear Willow from Van Ness to Larkin (10 tents)
  Give everyone 45 minutes to clear an area if not cooperating consider enforcement.
- Neighborhood: Cathedral Hill
- Police District: Northern
- Supervisor: 6


*Operation Details*
- Mission: Re-encampment prevention
- Incident Commander:  Pat
- HSH Lead: Emily
- DPH Lead: Jessie
- Field Team: SFFD, SFPD, DPW, SFHOT, MTA
- DPH Assessment: NA
- HOT Notice: NA
- Street Closure:  Yes
- Barricades/A-Frames: Yes
- Chop Shop: No

- Pit Stop Removal: No
- Estimated Tents/Structures: 20
- Estimated Vehicles: 0
- Shelter Available:  Yes
- Notes: be sure to clear 311 calls from the area (SFPD)

**OPERATIONAL ISSUES**

<u>Look Ahead</u>
- Week of 3/29
  - Thursday – 6th and Minna/Natoma – 5th and Jessie, 6th and Mission
  - Friday – Cesar Chavez/101
- Week of 4/5
  - Monday - Castro
  - Tuesday – Tenderloin
  - Wednesday – SFUSD Site
  - Thursday – SFUSD Sites
  - Friday – GG Park

<u>Emerging Hot Spots (not scheduled)</u>
- 24th and Michigan (currently on hold per DPH)
- Caltrans parking lots off Harrison (on hold per DPH)
- Barneveld and Loomis (area behind burger king)
- Bayview and Paul
- 8th and Mission

<u>Healthy Streets Email Issues</u>
- None

<u>Areas to Avoid</u>
- 24th from Illinois to Michigan

<u>Staffing Issues</u>
- None

<u>Pending Items</u>
- None

<u>New Items</u>
- Clearing 311 calls (discuss next time)

**<u>TEMPLATES</u>**

**PLANNED OPERATIONS**
**Day, Date, Year**
<u>Shift</u>

*Meeting Location*:

*Site Information*
- Location:
- Location ID:
- Neighborhood:
- Police District:
- Supervisor:

*Operation Details*
- Mission:
- Incident Commander:
- HSH Lead:
- DPH Lead:
- Field Team:
- DPH Assessment:
- HOT Notice:
- Street Closure:
- Barricades/A-Frames:
- Chop Shop:
- Pit Stop Removal:
- Estimated Tents/Structures:
- Estimated Vehicles:
- Shelter Available:
  - Shelter:
  - Safe Sleeping:
  - Safe Parking:
  - Hotels:
  - DPH Programs:
- Notes:

**HSOC DAILY OPERATIONS AGENDA**

**FOLLOW-UP ITEMS**
Resolution
- Follow-up on any pending actions needed from resolutions

Re-encampment
- Follow-up on any pending actions needed for re-encampment prevention

Other
- As needed

**ACTIVE OPERATIONS**
Discussion of current day's operations
- Update from field and set meeting location for afternoon

**PLANNED OPERATIONS**
Discussion of operations the following day
- Plans for the next day and set meeting location

**RE-ENCAMPMENT PREVENTION/AREAS OF CONCERN**
Northern Station
Southern
Bayview Station
Mission Station
TL Station
Richmond Station
Central
Park Station
Taraval Station
Ingleside

**OPERATIONAL ISSUES**
Look Ahead
Healthy Streets Email Issues
Emerging Hot Spots
Areas to Avoid
Staffing Issues
Client Issues
New Items
Pending Items

MISSON DESCRIPTIONS

- The goal of **encampment resolution** is to fully clear an area of tents, structures and occupied vehicles; the team will have <u>adequate sheltering options for all clients</u> to address the situation and will set up barricades and signs to prevent re-encampment.
- The goal of **outreach/cleaning** is to ensure that: 1.  all tents not following safe sleeping guidelines are relocated; 2. <u>clients classified as high-risk for COVID-19 may transported to shelter/hotel/safe sleeping if available</u>; 3. area is cleaned; 4. outreach is conducted to clients with a focus on mitigating COVID-19.
- The goal of **re-encampment prevention** is to re-secure and clean areas where there have been encampment resolutions and to ensure no tents, structures and vehicles remain. <u>In general, sheltering options will not be offered unless there is an urgent situation</u>
-

# Exhibit 18



# Exhibit 19

https://www.sfexaminer.com/our_sections/forum/street-sweeps-endanger-the-health-of-the-homeless/article_4d84f64f-9887-5055-a602-610c3a773375.html

# *Street sweeps endanger the health of the homeless*

*By Community Contributor*
*Jul 3, 2020*



*A lawsuit settlement with UC Hastings calls for the city to remove 70 percent of the tents in the Tenderloin....*

### By Diane Qi, Rani Mukherjee, Kamran Abri

As demands for justice in response to the recent murders of Breonna Taylor, George Floyd and too many others reverberate nationwide, city governments are being pressured to take meaningful action against police violence. In San Francisco, Mayor London Breed responded on June 12 with a roadmap to change policing in The City, including reducing police engagement with homelessness. Yet, The City, in an agreement to a lawsuit filed by University of California, Hastings College of Law, announced plans on the very same day that may contradict London Breed's stated aim to combat police violence.

The agreement includes a plan to move unhoused people from tents to temporary hotel rooms or sanctioned sleeping sites — a welcome step that may provide long overdue respite for those who have been demanding appropriate shelter during this pandemic. However, the plan also includes a threat to "employ enforcement measures" for those that remain on the streets. The UC Hastings lawsuit, filed on the basis of addressing crowded, unhygienic streets in the Tenderloin, has reignited the question: Is our motive for addressing homelessness to promote the image of clean streets free of unhoused people, even if it means forcibly displacing people? Or do we care for the underlying needs of those on the streets? Indeed, while The City has provided temporary shelter (with no long-term plan) for a few hundred of the at least 1,990 people experiencing unsheltered homelessness in District 6, there is serious concern that the remaining 80% of individuals will be subjected to large-scale street sweeps.

Sweeps are actions carried out by the San Francisco Department of Public Works with the San Francisco Police Department to forcibly move unhoused individuals while often confiscating their tents and belongings. San Francisco utilizes street sweeps to conceal the prevalence of homelessness, largely as a response to fear and stigma towards unhoused people held by businesses and local housed people. Contrary to public messaging, sweeps rarely provide people with mental health services or housing, but instead use city resources to repeatedly move unhoused people between public spaces. In the last two years, near daily use of sweeps has been San Francisco's most potent tool for masking a documented 17% increase in homelessness in the city from 2017-19. Despite being conducted in the name of "health and safety," the primary intent of sweeps is not to help, but to hide.

We cannot ignore the role that street sweeps play in perpetuating racist state violence. The unhoused population in San Francisco is disproportionately Black due to racism and racist capitalist structures that, by design, create unequal economic opportunity for Black people. In San Francisco, 5.6% of the general population is Black, yet 37% of the unhoused population is Black; the same racial

disparities in homelessness are evident throughout California and nationally, illustrating that homelessness is a manifestation of systemic racism.

Our team at University of California, San Francisco conducted a study surveying health providers about the impact of street sweeps on their unhoused patients. Providers reported that sweeps negatively impact the health of unhoused communities: by creating an environment of instability due to being constantly displaced, by preventing people from establishing stable living routines, and by disrupting community networks that provide social support and safety. Instability caused by sweeps disrupts follow-through with treatment plans and connection with services. Medications and Narcan are confiscated and often never returned, a phenomenon that has also been documented by other groups.

We documented that sweeps exacerbate chronic conditions such as diabetes, prevent management and increase transmission of infectious diseases like HIV, increase unsafe substance use and relapses, and decrease physical mobility through the loss of walkers and wheelchairs. Providers stated that sweeps constitute recurring traumatic experiences that increase mental health crises and destroy trust between unhoused communities and the institutions charged to serve them. These negative impacts lead to frequent, costly emergency room visits and hospitalizations. In sum, sweeps are a form of state violence that increase the burden on health care systems by directly creating suffering and sickness.

Mayor London Breed and The City of San Francisco must honor their verbal commitment to reducing state violence against Black and unhoused communities. This will not happen unless we permanently end street sweeps of all forms. The funds wasted by The City on street sweeps through SFPD and the DPW should be diverted towards sustainable social services and permanent supportive housing — and in the absence of permanent supportive housing, people must be allowed to remain stable on the streets or in sanctioned and serviced encampments, free of police and state harassment. In addition, The City should invest in non-police mental health crisis response programs such as Eugene's Crisis Assistance Helping Out On The Streets or Sacramento's Mental Health First.

San Francisco is at a crucial crossroads: Do we keep chasing a false utopian vision of a San Francisco absolved of the burden of witnessing the suffering on its streets — a San Francisco that exists only through continued systemic racist violence against our unhoused neighbors? Or instead, will we commit to a vision of a city that invests in Black lives and radically restructures our

Case 4:22-cv-05502-DMR Document 9-7 Filed 09/27/22 Page 113 of 175

priorities to compassionately embrace and care for everyone in our community?

Diane Qi, Rani Mukherjee and Kamran Abri are medical students at UCSF and members of a research team that evaluated the health impacts of homeless sweeps. All opinions are their own.

# Exhibit 20

San Francisco (https://sfstandard.com/)

## Police Clear Homeless Encampment Days After Mayor's Tweet, Prompting Questions About Legality of Such Sweeps



Written by David Sjostedt (https://sfstandard.com/author/david-sjostedt/)
Published Jun. 6, 2022 at 6:54pm



Clinton Thompson packs up and throws away his items under the supervision of SFPD and Public Works the morning of Friday, June 3, 2022, outside the San Francisco Ferry Building in San Francisco, Calif. | Camille Cohen/The Standard

T he sound of a trash truck chewing up tents and other items that belonged to unhoused people camping along The Embarcadero nearly drowned out the explanation of an SFPD (https://sfstandard.com/glossary/san-francisco-police-department/) officer who told The Standard on Friday that they were acting in accordance with the city law.

Stephen Collins, a veteran cop, said he was able to determine the property was abandoned thanks to cross referencing past footage from his body camera, which allowed him and members of the Department of Public Works (https://sfstandard.com/glossary/san-francisco-department-of-public-works/) to destroy the items.

"This stuff hasn't moved in four days," said one of Cohen's Davis twins. Cohen said a sleeping bag that had been occupied by an unhoused woman an hour earlier.

The "sweep" occurred just 72 hours after San Francisco Mayor London Breed responded to a pseudonymous Twitter user asking her to "do something" about people in tents outside the ferry building.



Department of Public Works employees, who wished not to be identified, throw away items from the tent encampment outside the San Francisco Ferry Building in San Francisco, Calif., Friday, June 3, 2022. | Camille Cohen/The Standard

## From Tweet to Sweep

This wasn't the first time a passing request from the mayor led to police routing unhoused people from their camp site.

Text messages unearthed by a records request in 2020 (https://www.sfexaminer.com/archives/texts-show-mayor-breed-ordering-police-chief-to-clear-out-homeless/article_e9f76050-ac77-5661-923a-f2fc85b3d936.html) showed that Breed—despite denying that the city "sweeps" homeless encampments (https://twitter.com/DSA_SF/status/1156412787880419329?ref_src=twsrc%5Etfw%7Ctwcamp%5Etweetembed%7Ctwterm%5E1156412787880419329%7Ctwgr%5E%7Ctwcon%5Es1_c10&ref_url=https%3A%2F%2Fwww.sfexaminer.com%2Fthe_fs%2Fforum%2Fwhat-public-works-employees-say-about-taking-homeless-people-s-stuff%2Farticle_58609bc5-fa8b-5e36-b1ce-aec1ec1fff5a.html)—routinely asked SFPD to disband groups of unhoused people throughout the city.

What surprised advocates and homeless people alike was Breed's willingness to discuss it on a public platform, after getting into hot water over the issue just two years ago. Breed's informal directive prompted questions about the legality of evicting a camp in a city with a more-than-maxed-out shelter capacity.

And it drew plenty of ire from advocates for the homeless.

"When it comes to responsibility it all lands back on the mayor. She's the boss," said Kelley Cutler, a human rights organizer for the Coalition on Homelessness. "Everyone was aware that the city was starting to engage, so there was no excuse for SFPD and DPW to be there [Friday] morning."

### 'Do Something'

It started with a May 31 tweet (https://mobile.twitter.com/LondonBreed/status/1531694825677856768?s=20&t=f1rGTkmX14bsD7v_jBhAqw) in which Breed touted her five-year plan to "create real long-term change" by ending transgender homelessness in the city. A Twitter user with fewer than 300 followers replied to ask the mayor to "do something" about "all the tents on The Embarcadero in front of the Ferry Building."

"Many new tents were set up this weekend," @wasnakedborn tweeted.

Breed promptly responded, tagging the city's public complaint hotline: "@SF311 can we send someone out there this week."

Not 72 hours later, two SFPD officers joined staff from the Department of Public Works at the Embarcadero to disband the encampment. A reporter and photographer from The Standard happened to show up in time to witness the sweep.

Of the people who showed up in time to retrieve their belongings, many said they planned to just move to a sideway a few blocks away. Jesse Beasley, who said she's been in and out of housing in San Francisco for the past 28 years, said she wasn't living outside by choice.

"They're out their damn mind if they think we're not trying to do something about our situation," she said. "You either die, get put in a shelter or put in jail."

When reached for comment, Breed's spokesperson said the area was "first reported by other city agencies" as part of "routine field outreach operations."

Jesse Beasley talks to her neighbors at their tent encampment outside the San Francisco Ferry Building in San Francisco, Calif., the morning of Friday, June 3, 2022. | Camille Cohen/The Standard

## But Is It Legal?

Advocates say that on the face of it, Friday's sweep appeared to violate the city's own policies—and legal precedent restricting such enforcement by local governments.

Case law set in Martin V. Boise prohibits cities and counties from enforcing anti-camping ordinances unless there are shelter beds available to accommodate anyone upended by such actions. According to a public dashboard (https://sf.gov/data/homeless-shelter-system-recovery-and-expansion), the city's emergency shelter system is currently 170 people over its capacity.

Regardless, no members of the city's Homeless Outreach Team or other outreach groups were on site when city officials began dismantling the encampment early Friday. Stephen Collins, an SFPD officer at the scene, told The Standard that he was enforcing an ordinance that prevents people from sitting or lying down for extended periods of time in public spaces.

## What Else is Being Done About Encampments?

Homeless advocates have been raising alarm about encampment sweeps or "resolutions," as the city calls them, for years.

**SEE ALSO**



(https://sfst
andard.com
/public-
health/hom
elessness/as
-nonprofit-
workers-
strike-
tenderloin-
housing-
clinic-and-
city-point-
fingers/)

**As Nonprofit Workers Strike, Tenderloin Housing Clinic and City Point Fingers (https://sfstandard.com/public-health/homelessness/as-nonprofit-workers-strike-tenderloin-housing-clinic-and-city-point-fingers/)**

"It's a complaint-driven system," Cutler said. "Oftentimes, they're taking their belongings and people have to start completely over when they're already just barely hanging on."

The tent encampment outside the San Francisco Ferry Building in San Francisco, Calif., was cleared by SFPD and Public Works the morning of Friday, June 3, 2022. | Camille Cohen/The Standard

During a December press conference declaring a state of emergency in the Tenderloin neighborhood, Breed said the city would begin using every law on the books to get people off the streets. Since then, the number of encampments in the Tenderloin has decreased while the number of tents citywide has grown. (https://sf.gov/data/reducing-homelessness-and-street-sleeping-tenderloin)

Supervisor Rafael Mandelman has been pushing legislation (https://sfstandard.com/public-health/supes-spar-over-how-to-get-every-homeless-san-franciscan-into-a-shelter-the-streets-cannot-be-a-waiting-room/) to force the city to provide shelter for all of its unhoused residents stating that the streets can "no longer be the waiting room" for permanent housing. Mandelman told The Standard, after being informed of Friday's sweep, that the situation provided grounds for his legislation.

"I think it's totally unacceptable that camping tent so Dude man said, adding he urged to have more options to offer people."

The mayor's proposed budget for homelessness in the 2023 fiscal year (https://sfstandard.com/glossary/fiscal-year/) allocates $32 million in new investments (https://hsh.sfgov.org/wp-content/uploads/2022/05/Directors-Report-June-2022-FULL.pdf) toward 480 non-congregate shelter beds. City supervisors will begin negotiating the budget proposal in a committee on June 16.

Though many homeless advocates say that Mandelman's legislation and investments into shelter units, while important as a temporary emergency solution, are inadequate for many unhoused people. They argue that placing unhoused people in shelter is a workaround to Martin V. Boise that simply places low-income people out of sight.

"It feels like you're in prison," Beasley said. "Everyone that I know wouldn't stay in a shelter."

Clinton Thompson, an unhoused man who said that he would just move down the waterfront after Friday's sweep, said he understands why the city doesn't want him camping in front of the Ferry Building. But he said he couldn't understand where he should go.

Thompson said he's constantly migrating around the city as soon as someone complains about his tent. "They move us from one side of the street to the other," he lamented, "and then come on another day to move us from that side of the street back to the other."

*David Sjostedt can be reached at david@sfstandard.com (mailto:david@sfstandard.com).*

## Stay on top of what's happening in your city.

SF's most important stories, delivered straight to your inbox.

> Your email address

☑ **Daily Newsletter**
Know Your City! A comprehensive rundown of SF politics and culture.

☑ **Lunchbreak Newsletter**
Because a city this offbeat deserves a newsletter with some bite—a dose of arts, culture and more.

☑ **Weekly Newsletter**
Curating the best of The Standard's top-notch reporting, every Friday.

**Subscribe**

TAGS    HOMELESS (HTTPS://SFSTANDARD.COM/TAG/HOMELESS/)    TENDERLOIN (HTTPS://SFSTANDARD.COM/TAG/TENDERLOIN/)

(Https://Www.Facebook.Com/Sharer.Php?U=Https://Sfstandard.Com/Public-
Health/Homelessness/Police-Clear-Homeless-Encampment-Days-After-Mayors-
Tweet-Prompting-Questions-About-Legality-Of-Such-Sweeps/)
Share

(Https://Twitter.Com/In
TweetText=Police%20Clear%20Homeless%20Encampment%20Days%20After%20Mayor's%20Tweet,%20Prompting%20Quest
Health/Homelessness/Police-Clear-Homeless-Encampment-Days-After-Mayo

(Https://Www.Linkedin.Com/Cws/Share?Url=Https://Sfstandard.Com/Public-
Health/Homelessness/Police-Clear-Homeless-Encampment-Days-After-Mayors-
Tweet-Prompting-Questions-About-Legality-Of-Such-Sweeps/)
Share

(Mailto:?
ShareSubject=Police%20Clear%20Homeless%20Encampment%20Days%20After%20Mayor's%20Tweet,%20Prompting%20Questions%20About%20Legality%20of%20Such%20Sweeps&Body=Police%20Clear%20Homeless%20En
Health/Homelessness/Police-Clear-Homeless-Encampment-Days-After-Mayors-Tweet-Prompting-C

## Willy Naaktgeboren

- June 6, 2022 at 8:24 pm (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56407)

David, why didn't you reach out to me about my request? I've communicated with your chief editor and CEO before, so I'm really surprised that you would write an article without trying to communicate with me.

→ REPLY

## Beryl

- June 7, 2022 at 6:17 am (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56418)

Is it legal? I don't know. I'm not a lawyer. But I think any self-respecting and sensible city is within its right to sweep homeless encampments. What happened to common sense?

→ REPLY

## BigFrisco

- June 7, 2022 at 6:20 am (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56419)

You might say something he didn't want to hear.

→ REPLY

## Michael Adams

- June 7, 2022 at 7:18 am (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56469)

If we need more shelter beds, in order to store homeless, let's build more shelter beds. Let's provide essential medical services, psyche evaluation, drug treatment, toilets & a hot meal.
But you can't sleep & (use) on the street!

→ REPLY

Michael Mason or

- June 7, 2022 at 8:12 am (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56471)

From what it sounds like, there was an abandoned amount of items left on what I assume is Port of San Francisco property and it was removed since no one claimed it for some time. As for the other people who were there, it sounds like none of their personal property was taken and they were just told to obey the voter enacted "sit-lie" law. Doesn't seem like a real big story, but more like fishing for something that is not there, doesn't it?

→ REPLY

---

### Reede Kullervo

- June 7, 2022 at 8:28 am (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56473)

Good. Stop letting the Homeless Industrial Complex make decisions that affect the whole city.

Working people can't afford to live on the Embarcadero. Why do non-working people claim that privilege?

There is plenty of affordable housing in Texas. Jobs too. Speaking of which, there are help-wanted signs all over this city.

We don't have to support every homeless person who hasn't done anything to support themselves.

→ REPLY

---

### Reede Kullervo

- June 7, 2022 at 8:31 am (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56474)

Whoa, who are you to make such a demand? Journalists write what they and their editors decide, not what you decide.

→ REPLY

---

### Guest

- June 7, 2022 at 8:45 am (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56475)

Not sure it's the press's responsibility to figure out that you sometimes make up English translations of the name you usually use to rant, and then to contact you as if you are a meaningful source of "information" or "opinion."

→ REPLY

---

### JimmyGLookAlike

- June 7, 2022 at 9:16 am (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56477)

Abandoned trash was cleared from our streets. What make it seem like it seem like something that it wasn't? More of this should be done citywide. We need to respect this city with the respect that it deserves and not treat it like a dump.

→ REPLY

### unlivablecity

- June 7, 2022 at 10:37 am (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56483)

Let's talk about the "homeless, inc people
for a minute. I've experienced it. We had a criminal bike chop shop operating 24/7 for a year. Screaming fights, a stabbing, loud music all night so nobody could sleep. Video after video of illegal activity. Just wild. Even wilder? The roadblocks these rich kid "observers" put up against clearing these dregs from our neighborhood. The homeless lobby in this city should be defunded. Under their watch everything has gotten exponentially worse. Their lingo is fraudulent. Everything about them is a fraudulent pose. And every day their obstructionism continues to be funded, the situation gets worse. Go away.

→ REPLY

### Jon Goldberg

- June 7, 2022 at 11:27 am (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56528)

It is nice that the Ferry Building was able to be cleared. The Ferry Building is of course a major shopping destination and businesses are affected by the presence of tents etc. Unfortunately, those of us in residential areas do not get that level of attention when we ask for an encampment clearing. In the meantime, we are forced to deal with blocked sidewalks, human feces, garbage and the sight of adults shooting up or smoking their drugs.

I hope that the SF BOS will support the Mayor's effort to create shelter, current conditions are not acceptable.

→ REPLY

### keenplanner

- June 7, 2022 at 1:53 pm (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56530)

Since The Standard is fun by a major recall funder, I tend to view the articles as propaganda for something that San Franciscans normally wouldn't want to do. Condemning clearing or moving peoples tents and belongings normally isn't the beginning of the conversation with the tent dwellers.
The mayor needs to maintain order in our public spaces. Sidewalks must remain ADA accessible. People who don't want to move into housing don't automatically have the right to set up a tent anywhere they want. I hope the mayor is using the tough love approach that has been missing for a couple decades.
I really hope the Standard owner and his republican friends aren't going after the mayor. These fearmongering campaigns are exhausting and create more feelings of danger than actually exists.

→ REPLY

### Sarah

- June 7, 2022 at 2:42 pm (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56532)

Thank you Mayor Breed for helping to protect all of us from the Homeless Industrial Complex and the homeless criminals migrating here and destroying our City. NO homeless criminal has a right to commit crimes such as murder, violation of our sit-lie laws, rape, illegal camping, stealing, littering, polluting our environment, or blocking public property. We need a zero

guarantee you 22 to who do business with some law enforcement I destroy you will see and hope to find that not even 1% of these homeless criminals are from San Francisco and not even 10% have any connection or ties to California.

→ REPLY

---

### Scott D

- June 7, 2022 at 3:44 pm (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56535)

Thank you. As a native, I feel our city has become an embarrassment. As recently as 10 years ago when I'd travel people would say "wow, San Francisco, you're lucky–what a beautiful place to live." Now, they're "OMG why do you live there?" Time to take back the city from these vagrants and send them on their way.

→ REPLY

---

### Ian Black

- June 7, 2022 at 9:50 pm (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56818)

Every weekend my wife and I spend hours cleaning up piles of garbage on our neighborhood's streets. And within 24-hours our local homeless population has generated another mountain of litter, human waste, and cast-offs from what appears to be a roving chop shop from dismantled scooters and city bikes. I'm at my wit's end and hope that after today's election results Mayor Breed and other supes (https://sfstandard.com/glossary/san-francisco-board-of-supervisors/) will read the room and accelerate the cleanup of our city.

→ REPLY

---

### Elizabeth Stromer

- June 8, 2022 at 8:50 am (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-56835)

Whoop,. Most of you and your comment need to be checked!
First…what makes anyone believe that homeless people don't have jobs? A lot of the homeless population in SF do have jobs. Just not ones that allow them to ..pay rent, gas, electric, phone, health insurance, daycare, diapers, food, clothing and hope that maybe they'll have a little left over for a stick of bubble gum!
I've been on that homeless side of SF . 8 long years living in a tent , on the cold asess streets.
Many times DPW and SFPD would come every morning and make us load up and move again.
The moving from across the street to to across the other street is because that what the cops would tell us to do. That way we're not in their jurisdiction anymore ,meaning not their problem. Until we move back . DPWs idea of abandoned property is 5 MINUTES! That's what they them selfs have told many of us.
It's a complete joke…! SF is the only place in the USA, besides Honolulu Hawaii that gives general assistance ( cash money plus Food stamps) to people without dependent children.
I thank God I'm not on the streets anymore, but I'm just a paycheck away from it happening again..just like you.
I'm pretty sure that Purgatory is just around the corner for most of our government employees.
That puts my mind at ease, because I know I'm bound for heaven cause I've done my time in hell.

→ REPLY

JohnO.

- June 10, 2022 at 5:40 pm (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-57952)

To clarify a few points:

Pre COVID G.A. workfare requirements were 3 hours x 2 x number of weeks in the month. This ment working 48 hours per month for 59.00 cash plus the Muni bus pass which amounted to 2.49 per hour. Who except those who needed the cash would work for less than minimum wage?

The screening (interview) for GA which is been ( in my experience) condescending, judgemental, and highly insulting.

SNAP food stamps benefit does not have to be worked for and varies in amount depending upon your income. There is a penalty for selling the benefit for cash.

→ REPLY

---

JohnO.

- June 12, 2022 at 7:16 am (https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/#comment-58119)

Addendum:

As those who are "tent dwellers" are squatters who do not pay rent and as such do not have a legal right to live what is an alternative style; why not pass laws regulating their presence on public streets?

Using the models of motor vehicle regulations :

1.No person or persons shall block public access walkways.
1a. 1st and 2nd times a warning shall be given . 3nd time offense- a citation shall be issued.

2. Tent occupation on the sidewalks shall be limited to a maximum of 48 hours after which the occupants will be obligated to remove 1 mile from their current location.
2a. 1st and 2nd times a warning shall be given . 3nd time offense- a citation shall be issued.

1a and 2a. Citations which have been let to warrant shall be placed upon public record which may render the violator ineligible for public assistance including housing , and cash assistance .

3. Where the "owner" has left their belongings unattended for 4 hours which items shall be considered abandoned.
3a. Abandoned property shall be subject to removal and storage at the owners expense. If the storage fees are not paid within 7 days, the owner shall relinquish the items for public disposal.

While some people would argue that people should not be subject to societal rules and regulations. Being part of society obligates one to do so.

→ REPLY

---

## LEAVE A REPLY

Your email address will not be published.

YOUR COMMENT

NAME

Name

E-MAIL

E-mail

Submit Comment

About(https://sfstandard.com/about/)        Archive(https://sfstandard.com/archive/)

Careers(https://sfstandard.com/careers/)        Contact(https://sfstandard.com/contact/)

Privacy(https://sfstandard.com/privacy-policy/)        Staff(https://sfstandard.com/staff/)

Subscribe(https://sfstandard.com/subscribe/)

© 2022 The San Francisco Standard. All Rights Reserved.

# Exhibit 21

8/3/22, 6:38 PM
How many people are homeless in San Francisco? Here's what the data shows
Case 4:22-cv-05502-DMR  Document 9-7  Filed 09/27/22  Page 130 of 175

e-Edition

# How many people are homeless in San Francisco?



Lea Suzuki/The Chronicle 2021

YOOHYUN JUNG, MALLORY MOENCH
Updated: May 16, 2022 12:49 p.m.



*Update: New data shows fewer people are homeless in San Francisco. Here's why*

How many people are experiencing homelessness in San Francisco? That's an extremely tough question to answer.

As the coronavirus pandemic and its related impacts continue to ripple through San Francisco, experts say this number is critical to getting people the housing and other

Case 4:22-cv-05502-DMR   Document 9-7   Filed 09/27/22   Page 131 of 175

help they need, but also difficult to get as the virus halted some data gathering efforts.

There are a variety of metrics collected by local, state and federal agencies that attempt to quantify homelessness. While each of those measurements help in piecing together the state of homelessness in the city, they are all estimating a different part of the problem, and have drawbacks.

Based on all the different pieces, the latest best estimates of homelessness range from almost 8,000 to more than 19,000.

"We all desperately need to have a much better way of systematically assessing whether people are experiencing homelessness," said Dr. Margot Kushel, director of

8/3/22, 6:38 PM                    How many people are homeless in San Francisco? Here's what the data shows

Case 4:22-cv-05502-DMR   Document 9-7   Filed 09/27/22   Page 132 of 175

the UCSF Benioff Homelessness and Housing Initiative. "Right now everything we do has its own inaccuracies."

Many signs, including from the bits and pieces of data, point to a growing problem, worsened by the pandemic, which experts say makes getting an accurate count an especially urgent and important task.

Below, we review the three key sources of data on people experiencing homelessness in San Francisco and efforts to solve the issue, as well as the strengths and weaknesses of those metrics.

8/3/22, 6:38 PM
Case 4:22-cv-05502-DMR  Document 9-7  Filed 09/27/22  Page 133 of 175
How many people are homeless in San Francisco? Here's what data shows



Top: Allen "AJ" Alexander ties a blanket to a cart as he packs up his belongings in August before relocating from a homeless encampment on 19th Street in San Francisco.

Above: Joel Yates (center), a resident of Kelly Cullen Community housing in the Tenderloin, takes part in the Point-in-Time one-night homeless count in in February.

Scott Strazzante/The Chronicle

The PIT count: The most "official" data related to homelessness is the federally mandated Point-in-Time, or PIT count — an every-other-year tally of people experiencing homelessness in the streets or in shelters.

The PIT count, which the U.S. Department of Housing and Urban Development requires for federal funding, is considered the "primary source of nationwide data on homelessness," according to the city's department of homelessness and supportive housing.

A new PIT count was due in 2021, but COVID-19 postponed the process until this February. Preliminary data for the 2022 count was released in May, which showed that

8/3/22, 6:38 PM
Case 4:22-cv-05502-DMR   Document 9-7   Filed 09/27/22   Page 134 of 175
How many people are homeless in San Francisco? Here's what the data shows

about 7,750 were homeless in San Francisco. This is a 3.5% decline from 2019. The number of unsheltered homeless dropped by 15%, while the number of sheltered rose by 18%, largely due to an increase in the number of shelter beds available in the city.

Previous years' data had showed that the homeless population was on an upward trajectory in San Francisco. In 2019, before the pandemic's worst impacts swept through, PIT count data showed an increase in San Francisco's homeless population at just over 8,000 people — about a 17% increase from nearly 6,800 people in 2017.

The PIT count, which the U.S. Department of Housing and Urban Development requires for federal funding, is considered the "primary source of nationwide data on homelessness," according to the city's department of homelessness and supportive housing.

But the count is likely an underestimate, according to advocates and experts, who argue it captures only a fraction of people experiencing homelessness because it misses people couch-surfing with friends or staying in hotels who may drift in and out of homelessness. "The problem with the PIT count is that it's looking for people who are visible, and we know not everyone is outside, in their car or in a shelter all the time," Kushel said.

The PIT count is not a good barometer of people who are marginally housed or at risk of becoming homeless, said Emily Cohen, a spokesperson for the city's Department of Homelessness and Supportive Housing.

It also only offers a snapshot of one night, but "of course we know many more people will be homeless throughout the course of the year," Cohen said. She couldn't provide an exact number, but estimated it could be two or three times more.

Yet the PIT count information is the best data to help analyze trends because it uses the same methodology every two years. PIT count data is available for San Francisco

8/3/22, 6:38 PM
How many people are homeless in San Francisco? PIT count data shows
Case 4:22-cv-05502-DMR Document 9-7 Filed 09/27/22 Page 135 of 175

going back to 2005.

PIT counts have used volunteers along with nonprofit and city workers in the past to collect the data, which some advocates criticized as potentially less accurate. "Soccer moms from Noe Valley" don't know where to find people who are experiencing homeless or always get honest answers if they asked someone if they are unhoused, said Del Seymour, co-chair of the city's local homeless coordinating board.

This year was the first time the Homelessness and Supportive Housing Department used no volunteers. Cohen said the reason was to limit the number of people involved because of COVID and use people who already work on the streets and know the population and the landscape. She said "it worked incredibly well" and "we think that will give us a robust count."



City workers install signage outside the Tenderloin Linkage Center at United Nations Plaza before its opening in San Francisco in January. The center provides people on the streets with treatment, housing and resources.

8/3/22, 6:38 PM   Case 4:22-cv-05502-DMR   Document 9-7   Filed 09/27/22   Page 136 of 175

How many people are homeless in San Francisco? Here's what data shows

Stephen Lam/The Chronicle

Public health case management data: Another method of counting how many people are homeless is to see how many access services throughout the course of the year. That's what the city's public health department does by cross-checking data from its case management system with people observed or reported to be homeless by the Homelessness and Supportive Housing Department.

The Chronicle's previous analysis of that case management data showed an estimated population of more than 19,000 people experiencing homelessness in fiscal year 2020. This number is much larger than the PIT count because it is not a one-night snapshot, but captures people that may be in a precarious housing situation, and moving in and out of homelessness.

The public health department collects and maintains this data to inform their public health policies affecting that population, including figuring out how many people it needs to reach for COVID vaccination efforts, a department spokesperson said in an email.

Seymour of the city's local homeless coordinating board wants this method — using how many people who are experiencing homelessness access services to measure the population — to include people accessing services from other departments as well. This may happen in the near future, as the city is working on implementing a system that brings together data across departments, but the database isn't fully adopted yet, Cohen said.

Because of year-to-year variations in the types and breadth of services provided, this data may not be as useful for comparing trends over time, especially as the department changes to a new case management system.

8/3/22, 6:38 PM How many people are homeless in San Francisco? Here's what the data shows

Case 4:22-cv-05502-DMR Document 9-7 Filed 09/27/22 Page 137 of 175



A vehicle drives past a tent encampment on Willow Street in San Francisco's Tenderloin in October. Estimates of the number of homeless people in the city range from 8,000 to 19,000.

Stephen Lam/The Chronicle 2021

Mayor's Health Streets Operation Center: The mayor's Healthy Streets Operation Center also collects a variety of data related to the city's efforts to reduce homelessness, including the number of tents, vehicles, structures and encampments observed around the city. Those data sets, publicly available in a city dashboard page, offer insight on where help is needed most, Streets Operation's director Sam Dodge previously told The Chronicle.

"This is a practice that we developed long ago to have an ongoing surveillance of what we were working with to make sure there was equity where we are bringing resources," he said.

8/3/22, 6:38 PM
Case 4:22-cv-05502-DMR Document 9-7 Filed 09/27/22 Page 138 of 175
How many people are homeless in San Francisco? Here's what the data shows

The counts involve canvasing the city and estimating based on human observations. But unlike the PIT count, there are no follow-up surveys conducted, which means the data quality may not be as good. The survey also does not estimate the number of people in those tents and structures.

One strength of the data is that it is collected and published more frequently than other sources — counts of tents, structures, vehicles and encampments are conducted on a quarterly basis, Streets Operation says.

The most recent data is from March 2022. The data show more people are homeless in San Francisco in recent years. Streets Operation counted 537 tents and structures in March 2022 — 41% more than the count in April 2019.

But these figures are also based on what can be observed through the eyes of the counters, and don't account for all types of living situations related to homelessness, Dodge said. They're not meant to represent the comprehensive picture of homelessness in San Francisco and should be used with caution in talking about the general issue of homelessness.

Many of these data — the PIT count, city data and others — are often mere snapshots of the whole picture, or require people to reach out for services, UCSF's Kushel said. That means a lot of people are left unseen. People drift in and out of homelessness; a person who was homeless at some point throughout the year may not be any more.

Everyone — from hospitals to schools to government agencies providing benefits or health insurance — needs to develop better ways of proactively but sensitively asking people if they are homeless, tracking and sharing that information, she said.

More on Homelessness Crisis

New data shows fewer people are homeless in San Francisco. Here's why

8/3/22, 6:38 PM                    How many people are homeless in San Francisco? Here's what the data shows

Case 4:22-cv-05502-DMR   Document 9-7   Filed 09/27/22   Page 139 of 175

Alameda County sees 22% jump in homelessness in long-awaited count

Homeless populations surge 11% in San Jose and 8% in Marin County during COVID

Oakland saw a 24% surge in its homeless population despite efforts to tackle the crisis

Yoohyun Jung and Mallory Moench are San Francisco Chronicle staff writers.
Email: yoohyun.jung@sfchronicle.com, mallory.moench@sfchronicle.com

# Exhibit 22

**SAN FRANCISCO PUBLIC PRESS**

**San Francisco Public Press** │ (https://www.sfpublicpress.org/report-calls-sfs-homeless-sweeps-practices-illegal/)

NEWS ▼     SPECIAL REPORTS ▼     NEWSPAPER ▼     'CIVIC' PODCAST     KSFP RADIO     NEWSLETTER     ABOUT ▼     DONATE    MENU

# Report Calls SF's Homeless Sweeps Practices Illegal



Courtesy Coalition on Homelessness

*San Francisco's Healthy Streets Operations Center regularly clears homeless encampments such as the one pictured without having adequate shelter beds to offer residents, a new report charges.*

10.07.2021 | by **NUALA BISHARI**

    

On Jan. 8, 2020, Jayson Hill awoke in his tent near Jerrold Avenue and Rankin Street in the Bayview to the voices of police officers informing him he had to leave his camp.

"Imagine you are at home with your family when there is a knock at the door," Hill recalled to Judge Michelle Tong in an August small claims hearing. "It is the police and they do not look happy to see you. You are taken to the end of the road and told to wait; and for the next hour while the officers wait for the bulldozers to come, they threaten you any time you ask to be allowed to retrieve your medication or food for your animals, or at least warmer clothing."

That morning Hill lost everything. The Department of Public Works deployed a bulldozer and cleaning crew that decimated his camp. It was one of hundreds of cleanup operations the city has conducted since launching its Healthy Streets Operation Center — a multi-departmental agency tasked with relocating large homeless camps — in 2018.

On Thursday, a damning report dropped (https://www.cohsf.org/behind-the-healthy-street-operation-curtain/) , offering new data on San Francisco's practice of sweeping encampments. Authored by the Coalition on Homelessness, the report alleges the Healthy Streets Operation Center regularly fails to offer an adequate number of shelter beds to people on the streets during its cleanup operations and is illegally discarding people's belongings.

The practices create serious legal risk for San Francisco. After connecting with the Lawyers Committee for Civil Rights of the San Francisco Bay Area, Hill and nine of his neighbors successfully sued the San Francisco Department of Public Works over a lack of notice ahead of the cleanup. In August, Tong awarded each defendant $10,000. The city appealed on Oct. 1.

"They are taking enforcement action without sufficient shelter to offer people," said Elisa Della-Piana, the Committee's legal director. "They are not following their own policies and are destroying belongings instead of saving them for people to reclaim. We're hearing that people aren't getting proper notice of the sweeps, that they're finding out the morning of that crews are arriving, and not having sufficient time to move their things."

According to Della-Piana, those actions violate Martin v. Boise, which requires cities to have adequate shelter beds available before conducting anti-camping measures, as well as being unconstitutional. The Fourth Amendment prohibits seizures of belongings, and the Fourteenth Amendment requires due process, such as a notice before a cleanup begins.

## Shelter Beds in Short Supply

The Healthy Streets Operation Center is made up of staff from the Department of Emergency Management, the Police Department, the Department of Public Works, the Department of Public Health, and the Department of Homelessness and Supportive Housing. The task it faces is gargantuan: clearing hundreds of homeless camps from public spaces.

In the year ending in June 2021, the Center cleared 79 homeless camps where 4,648 people lived. About 45% of those people accepted offers of shelter, according to a presentation from the Department of Emergency Management.

The Coalition's report offers a closer look at that number and shows the acceptance rate has fluctuated enormously. In July 2020, when shelter-in-place hotel rooms were still available to people experiencing homelessness, 83% of the 816 people encountered during sweeps chose to move indoors, the report showed. By mid-December, when the shelter-in-place hotels had stopped accepting new intakes and group shelter was being offered, only 30% of the 854 people swept took those placements.

But even if everyone at the homeless camps agreed to congregate shelter, where multiple people share a room full of beds, the city simply doesn't have enough spaces to offer people.

"We can't do Healthy Streets Operations Center work without having shelter resources," Department of Emergency Management Director Mary Ellen Carroll said during an Aug. 2 meeting of the Local Homeless Coordinating Board. "It is the most important tool that we have, and it is necessary for us to have adequate resources for us to do that work."

Carroll notes that the Center uses a formula to determine how many shelter beds are needed during each operation and that if there aren't enough, the sweep won't move forward. "We use the formula that we use based on our experience to know how much resources we do need when we go to do a resolution," she said during the August meeting.

That formula appears to result in offering shelter beds to only 30-40% of an encampment's population. In the seven weeks ending Feb. 22, 2021, only four shelter beds were available for every 10 people the Healthy Streets Operation Center interacted with. In that period, 712 people were swept from their camps, but only 277 beds were offered.



Courtesy Coalition on Homelessness / Courtesy Coalition on Homelessness

Sam Dodge, the newly appointed director of the Healthy Streets Operation Center, told the San Francisco Public Press that the formula changes each week, and at the moment teams head out with enough shelter beds available for around 40% of any encampment. "That's the minimum, that's what you start with," he explained. "If the team happens to be in a place where there's a lot of acceptance and not a lot of shelter beds, they stop and come back the next day."

## Lost Belongings

In addition to providing homeless people with shelter, the city cannot seize belongings unless they're unattended, and under its own policies (https://sfpublicworks.org/services/bag-and-tag-policy) , must store any items for 90 days to give residents a chance to reclaim them.

But data from the Coalition's report shows a serious discrepancy between the "bag and tag" log from the Department of Public Works, which stores the unattended belongings, and the dates that the Healthy Streets Operation Center conducted its encampment cleanups.

When cross-referencing the addresses where cleanups happened in January and February with the bag and tag logs from Public Works, there were zero overlaps. Not a single item from the 712 people the Center interacted with in those two months was taken to the Public Works' yard for storage, according to the data.

It's this seizure of belongings that ultimately secured Hill and his nine neighbors $100,000 in their settlement against Public Works. Hill and his partner, Nichelle Solis, another plaintiff in the claim against Public Works, lost work clothes, books, artwork and sentimental heirlooms — a scarf Hill's grandmother crocheted for him, and his family Bible.

"When you're out on the street people look at you differently and treat you differently," he told the San Francisco Public Press over the phone on Wednesday. "When you're out there, in a tent or a box, some of the things that you used to have in your old life make you feel a little bit grounded, more human. If there's a tidal wave coming you might grab something you don't need for survival, but that will remind you that once you were once someone other than a vagrant. Those are the things we were stripped of."

Della-Piana, the lawyer who helped Hill file his suit, said there are many more small claims like this that could be filed — but it's not easy keeping track of plaintiffs when they have no fixed address.

"One of the biggest barriers to filing these claims is repeated sweeps," she said. "The very action people are harmed by is preventing them from being able to correct the injustice. If you're constantly moved around, you can't get your footing."

After their tent and belongings were bulldozed, Hill and Solis spent much of 2020 — in the heat of the pandemic —bouncing around between congregate shelters. They finally got into permanent supportive housing, but the rest of the camp at Jerrold Avenue and Rankin Street weren't so lucky. Many are still outdoors, and one fellow plaintiff, Edward Richardson, died on the streets a couple of months ago, after the judge's ruling.

Hill says he wishes there was more focus on services during sweeps and believes the city is to blame for Richardson's death. "Every death that happens outdoors due to pneumonia, or drug overdose, or exposure, or hunger, or thirst, anyone who dies outside like that, their blood is on the hands of the people who could have helped them," he said.

> Be the first to know about our latest journalism and events:
> **Sign up for our newsletter** (https://sfpr.es/3mRy56C) !

The San Francisco Public Press publishes investigative reporting online and in print, and produces audio journalism through podcasts and on KSFP, 102.5 FM. As a 501(c)3 nonprofit organization, we have received funding from national and local foundations and thousands of individuals. Donations are tax deductible to the extent allowed by law.

We depend on your support. A generous gift in any amount helps us continue to bring you this service.

**DONATE NOW**











**MORE SUPPORTERS**

# Exhibit 23



MISSION LOCAL
local news for a global city

HOUSING

# Records indicate dozens of homeless people's tents swept off the street prior to appearance by mayor, supe


by **ANNIKA HOM**
JUNE 17, 2021



Police approach a homeless denizen of Willow Street during a June 10 sweep of the vicinity. From a video shot by Kelley Cutler

At least 75 people gathered on Polk Street on June 10 to watch a new neon sign flick on. The lighting capped off a ceremony that celebrated Project Open Hand, a longstanding nonprofit dedicated to feeding the elderly and hungry. But hours before the spectacle occurred, dozens of unhoused people were ordered out of the vicinity.

A two-day homeless encampment "sweep" undertaken by police and the city's Homeless Outreach Team cleared at least 28 tents on nearby Willow Street. Emails obtained through a **public records request**, originally **posted on Twitter** and verified by Mission Local, state this clearance was in anticipation of the event — and, specifically, due to the scheduled attendance of Mayor London Breed and Supervisor Matt Haney.

"Hey Ronnie, just met with Peter and he assured me that 40+ tents will be cleared and that the area is intended to be clean this afternoon," Ian Schneider, a Department of Public Works employee, wrote on the morning of June 10.



Homeless advocates criticized this, and further complained about how, despite the deliberate clearing, inadequate shelter services were offered. City officials expected more than 40 tents on Willow Street needed removal, but were offering "at least 18 HSH shelter beds + whatever safe sleep is available" — a fraction of what would be required to accommodate everyone removed.

"It's insulting if the city is coming through when there aren't the resources to back it up," said Kelley Cutler, a Coalition on Homelessness advocate who personally **documented** the clearings.

A **meeting document** also confirmed "extra" police were summoned to patrol the scene and keep the public out until after the event.

Apparently, this to-do was for the mayor. Ronald Rodriguez, an employee with the Department of Public Works, **sent an email** to his colleague Schneider, asking if he knew the "history of encampments, drugs, and debris in the area." He continued, "should Public Works be aware so the area is cleared?"

Once Schneider assured it would be, Rodriguez followed up again. "When I staff the mayor I am always there earlier to check things out If [sic] I see anything, encampments, debris, etc. The mayor will be there from 7:30 p.m. to 8:00 p.m. Thank you, Ronnie."



Coalition on Homelessness advocate Carlos Wadkins, who was at the June 10 clearing, said these "sweeps" are a tactic the city uses to decrease the "visibility" of the homeless without sufficiently addressing their needs. He pointed to the lopsided proposal of 18 beds for a 40-plus tent encampment.

"That's an explicitly fucked-up example, where the city knows it will be a big event and a photo opp [sic] for the Mayor and Haney, so they clear the tents to make it look good for the event." Wadkins said. "It's transparent and disgusting, and not uniquely so."

The mayor's office did not respond to requests for comment.

Mission Local requested comment from the Department of Public Works employees and the Healthy Streets Operations Center, linking the emails published between Rodriguez and Schneider. The Covid Command Center responded in an email: "Willow is one of the areas visited regularly. The visits which occurred from June 9 to June 11 were not associated with events occurring in the area."

They said 28 tents and five structures were observed the first day, and reduced to nine tents and one structure. The next day, it fell to eight tents and no structures.

At least six police officers and a Homeless Outreach Team worker appeared at Willow on the mornings of June 9 and 10, when the Project Open Hand lighting was to begin. In **one video** recorded by Cutler, five cops approached a single tent.

"It's such overkill," Cutler told Mission Local, adding that the police weren't violent. Some unhoused individuals accepted services. But many simply picked up and moved over to Olive Street on the next alley over, Cutler said.

Covid Command said that "teams" visit Willow regularly; in June, 45 people were offered shelter; 19 accepted, two were housed. In 2021 "teams" visited 17 times and found 302 people who were offered shelter. Ninety-four people accepted, 21 were housed, and the remainder declined.

In a text message to Mission Local, Haney said he wasn't aware that the street was slated to be cleared in advance.

"I've asked my staff to follow up about the support and services that were offered to the people who were in Willow. I believe strongly and have fought hard for more placements and services for people living on the streets and an approach that is not led by law enforcement," Haney said.

A spokesman for Project Open Hand said it didn't request the sweep, but ordered permits for the lighting events. "All procedures were followed to ensure safety for all the guests including the Mayor, and Supervisor Haney. It was a special occasion and celebration for us."

Sweeps aren't new. Moving unhoused people at any time is considered "traumatic," Wadkins said, but stressed that in doing so when shelter-in-place hotels are no longer available to residents, and shelters still aren't accepting pre-covid numbers for safety reasons, the June 10 sweep was in especially poor taste.

Cutler agreed, and said that, in recent days, when she speaks with the Healthy Streets Operations Center, many times only one shelter bed is available for the day. "Instead of what we're hearing from the city and the mayor of this narrative that people are 'service resistant,'" Cutler said. "It's a myth, and it's also insulting."

When there are not adequate services, Cutler argued, people move back "because they didn't get people connected to their resources. Today, Willow Street looks exactly the same."

| | Monthly | Yearly |
|---|---|---|

**Make a one-time donation**

Choose an amount

| $5.00 | $15.00 | $100.00 |
|---|---|---|

Or enter a custom amount

| $  50.00 |
|---|

Your contribution is appreciated.

Donate



## ANNIKA HOM

Annika Hom is our inequality reporter through our partnership with Report for America. Annika was born and raised in the Bay Area. She previously interned at SF Weekly and the Boston Globe where she focused... **More by Annika Hom**

### Booradley

June 17, 2021 at 11:33 pm

The mayor should have to put up with the crackheads, vagrants, and 'unhoused' just like the rest of us do day and day out.

### Tai Mamoe

September 1, 2021 at 5:22 pm

Exactly

### Willy Naaktgeboren

June 18, 2021 at 7:54 am

Now that we have vaccines there is no excuse for allowing such tent camps. It's time to reopen shelters and get people off the streets.

### Howl

June 18, 2021 at 7:54 am

I wouldn't call them a 'Homeless Outreach Team' they are more along the lines of hired thugs. Last time I saw them they were beating a lady across the head for trying to take their things back that were being forcibly thrown out. I was called a faggot for telling them not to hit her and that I should 'mind my business' or they would attack me as well. I reported the incident to the city and nothing came of it. Basically London Breed has hired goons to attack the homeless under police supervision. It's a disgusting way to treat your fellow human being.

### h. brown

June 20, 2021 at 6:27 pm

To Howl,

Great observation, will save.

Go Giants!

h.

### JW

June 18, 2021 at 8:09 am

I know of five people camping within two blocks of where I live who have turned down repeated offers of housing. Perhaps they had an idea of how many people would reject it and the number of spots they had to offer was sufficient.

### RJ Sloan

June 18, 2021 at 1:22 pm

Princess Breed is at it Again – A Photo Op. Was She Holding Kamala Harris' Biography Upside Down?

### Sean

June 18, 2021 at 1:31 pm

Not to be a prick, but the streets these tents are located on do not belong to the homeless, they belong to all of us, homeless too. If you are using public space as your home you can be moved. How many times do whole streets get commandeered, with pedestrians and parked cars evicted when a film crew comes to town for a few days? The mayor wants to hold an event the space needs to be secured.

### Clay

June 18, 2021 at 2:22 pm

Aaannnndddd……

### David Elliott Lewis

June 19, 2021 at 2:24 am

Pushing the unhoused from for one block to another without providing shelter or housing doesn't solve homeless. It just redistributes it and just makes unhoused people more traumatized, poorer and more desperate.

## Patrick Monk.RN

June 19, 2021 at 8:27 am

The late Ruth Brinker was my mother-in-law. She would have been appalled. Shame on all involved, either by acts of commission or omission.
Patrick Monk.RN. Noe Valley.

© 2021 LOCAL NEWS FOR A GLOBAL CITY.

PROUDLY POWERED BY NEWSPACK BY AUTOMATTIC

# Exhibit 24

# Bay Area homelessness:
# 97 answers to your questions

By Kevin Fagan | July 28, 2019 | Updated: July 11, 2020

Homelessness was already a confounding crisis, but the coronavirus pandemic and the economic ruin it wreaked have amplified the existing challenges and created new ones.

While housed residents hunker down indoors as much as they can, many of them struggling with unemployment, thousands of people on the street have nowhere to go and little hope of climbing out of their predicament. Even those in shelters and government-rented hotel rooms face an uncertain, frightening future, realizing that there's more exposure to the virus in congregate settings and that someday, those safe hotel rooms will no longer all be available.

Ask any dozen people in the Bay Area what they think of homelessness, and you'll get a dozen different answers. For the past two years, we asked Chronicle readers to submit questions about this most vexing, heartbreaking, seemingly insoluble problem in the Bay Area, and received more than 700 submissions.

Most of them raised issues in a handful of key areas. We've pared them down to these topics, and highlighted this year's questions.

For the fifth year, The San Francisco Chronicle is leading the SF Homeless Project, a consortium of media organizations focusing on the seemingly intractable problem of homelessness. The Chronicle's ongoing coverage, including stories, videos and interactive graphics, can be found at SFChronicle.com/homelessness.

Supported by

**Chan Zuckerberg Initiative ⚕**

## New answers for 2020

**— Toggle all**    *Click a question to see the answer.*

**1**   **Are there regional efforts to solve homelessness?**

The mayors and homeless policy leaders of the biggest cities in the Bay Area, including San Jose, Oakland and San Francisco, regularly consult each other about funding, shelter and housing plans and other key issues, but there is no one governmental agency that coordinates the efforts for the region.

**2**   **Who are the people experiencing homelessness?**

More than 35,000 homeless people were counted across all nine Bay Area counties in the federally mandated one-night tally taken in January 2019, and about 30,000 of them — 86% — were unsheltered. That means they were living on the street or in vehicles and not in homeless shelters. That bracingly high percentage of unsheltered people is reflected statewide, where the one-night count found an overall population of 151,000 with 108,000 unsheltered. Most experts say that because these counts are so hard to do, the actual numbers are probably at least double what's reported.

**3**   **What is being done to help homeless people during the pandemic?**

To help the homeless avoid contracting the coronavirus, officials have decreased the shelter populations to create social distancing and rented emergency hotel rooms for the vulnerable (those over age 60 or with underlying health conditions) or COVID-19-infected homeless people.

**4**   **What will happen when temporary hotel rooms and safe sleeping sites close as the pandemic subsides?**

Several plans are being prepared statewide to try to house homeless people now in emergency hotel rooms or safe sleeping tent sites, and most involve trying to buy or lease some of those hotels and financially strapped properties to use as housing. San Francisco homeless policy leaders hope to obtain at least two hotels, and nonprofits, including the Tipping Point Community, are identifying what they expect will be hundreds of vacant apartments in the city that can be rented using philanthropic donations. The argument for hotel owners will be that, with the economy still expected to be awful for months to come, leasing or selling to governmental agencies will guarantee income at a time when they'll be hurting for customers.

**5**   **Is San Francisco really a homeless magnet, particularly during the pandemic?**

Several San Francisco leaders, most notably Mayor London Breed, think the famously compassionate city is attracting new street people looking for help in the pandemic. Typically about 70% of San Francisco's homeless people were housed here before they lost their roofs — it's more like 80% in other cities — but as early as April, Breed said she believed there was a worrisome influx throwing that figure off. No solid data to date document such an influx, and some homelessness experts say the influx may be more anecdotal than significant.

**6**   **Can cities and counties force people into treatment and shelters?**

It's incredibly hard under state and local laws to force anyone into treatment for substance abuse or mental illness, and also difficult to force someone to accept a shelter bed. New York many years ago passed a law basically forcing street people to choose between jail and shelters if pressed, but the chances of trying that approach in the Bay Area have been considered slim to none.

**7** How much have tent camps proliferated during the pandemic, and what's being done about it?

The explosion of tent camps, up by more than 70% citywide, has left its mark in every major district of the city, most visibly in the Tenderloin. The number of tents there shot up 285% between January and early May, when the mayor launched a program to address the problem in response to a lawsuit by residents and UC Hastings School of Law. A settlement reached in early June says 300 of the more than 400 tents in the Tenderloin must be gone by July 20, and hundreds of campers have already been moved into hotels and sanctioned encampment sites.

**8** How have the state and local budget crises affected homelessness?

The full effect has yet to hit. Gov. Newsom and his homelessness policy advisers are sticking to their pre-pandemic plan of spending $750 million statewide on the issue, but because of the virus crisis they are now focusing that money on converting hotels being used for emergency rooms for the homeless into permanent housing.

## Read answers from 2019

**All questions**    Population    Housing and shelter    Encampment issues    Solutions

Funding    Politics    Causes of homelessness    Public behavior issues

**– Toggle all**   *Click a question to see the answer.*

**1**   How many homeless people live in the Bay Area?

An estimated 35,005 homeless people were counted across all nine Bay Area counties during a one-night count made in January 2019 — a 24% increase over 2017. That number comes from a volunteer-driven, one-night survey that happens every two years under federal requirements. Many who work with homeless people believe this methodology understates the true numbers. However, because the counting methods are consistent, the numbers are useful for determining overall trends in the homeless population over time.

**2**   How many homeless are in San Francisco and how are they counted?

The latest one-night count in San Francisco found 8,011 homeless people in the city, 17% more than in 2017. Hundreds of volunteers participate in this one-night count, which attempts to cover streets, shelters and other programs in every sector of the city. That number does not include people in prisons, hospitals and rehabilitation centers who are counted in a supplemental tally that still gets done but is no longer included in the final number because those categories are not used in other communities. Adding those numbers would put the city's homeless population closer to 10,000, 30% higher than in 2017, but that rise was also partly attributable to changes in methodology.

**3**   It seems that most, if not nearly all of the homeless people in the Bay Area come here from other states due to the region's progressive politics and generous benefits. Is that true?

Not as much as people might think. Up to 80% of homeless people became homeless in the communities they are in. Some do travel to the Bay Area because, like others migrating here, they like the weather and the liberal environment. But virtually every major city in America also claims to be a magnet for homeless people.

**4**   California has the largest homeless population in the nation, about 130,000. Why?

California has 12% of the overall U.S. population, but about 25% of the nation's homeless population. The cost and dearth of housing is the No. 1 reason. If people lose their housing, it is much harder to find another place to live in California, which is short millions of housing units. California's overall population is the largest in the United States as well.

**5**   Why has there been an increase in homelessness?

There are many reasons.Two of the main ones: Wages have not kept up with the rising cost of housing for lower-income people, and the epidemic of opioids, fentanyl and methamphetamine use. People living in RVs and cars — a population that probably at one point had stable housing but lost it for various reasons — make up one of the biggest parts of the recent increase. San Francisco's programs lifted more than 2,000 people out of homelessness in 2018, but for every person who got housed, there were three newly homeless people.

**6**   How many homeless people are on drugs? Alcohol? How many are mentally ill?

An estimated 42% of homeless people struggle with drug or alcohol abuse in San Francisco; 39% have psychiatric or emotional conditions.

**7**   How many homeless people are military veterans?

The 2019 one-night homeless count in San Francisco found 608 veterans, 11% fewer than in 2017. This means 8% of the total homeless population consists of veterans.

**8**   How many families are homeless, and what's being done to help them?

The 2019 one-night homeless count found 612 people in 201 families, similar to the 2017 one-night count of 601 persons in 190 families. That means 8% of the total homeless population is made up of families. The Coalition on Homelessness says the count is actually much higher, pointing out that the school district — using its own definition of homelessness — lists more than 2,000 students as being homeless. And the subcategory of chronically homeless people in families grew from 26 in 2017 to 175 in 2019. However, the city has a robust network of programs specifically for homeless families, including Compass Family Services and Hamilton Families, and it is rare to see families living

8/4/22, 1:11 PM
Bay Area homeless crisis: 36 answers to your questions
Case 4:22-cv-05502-DMR   Document 9-7   Filed 09/27/22   Page 162 of 175

outside. San Francisco offers 800 family shelter beds, a range of rent subsidies for families, and 2,388 permanent supportive housing beds for families.

**9**   Do homeless people often relocate — move to a particular city because of better services, sense of community, weather, etc.?

A vast majority stay in the community they are most familiar with. That said, a small percentage may select cities where they think they will get more assistance. In San Francisco, the city found in 2019 that 55% of homeless people reported living in San Francisco for 10 or more years, and just 6% said they'd lived in San Francisco for less than one year.

**10**   Reports say tens of millions of Americans nearing old age don't have financial resources or a plan to fund a secure old age. That seems to indicate a coming large increase in homelessness. What are the numbers of those people, and what's being done to deter those in other areas from coming to the Bay Area?

UCSF researchers recently found that 44% of homeless people over 50 became homeless after their 50th birthday, and the researchers believe the numbers will grow. The trouble is that too many older, low-income Americans are unable to save or plan for retirement, so when they become physically unable to work they run into financial trouble. UCSF statistics show that in 1990, only 11% of the homeless population nationwide was 50 or older. Today it's 50%. The UCSF study, based in Oakland, also found that the overwhelming majority of older homeless people remained in their own communities after losing housing.

**11**   What percentage of the homeless are employed?

Of those identified in the city's 2019 count, 11% reported being employed full time or part time. Nationally, that figure is closer to 25%, according to the Urban Institute.

**12**   Why are there fewer homeless people in the North Bay?

There generally aren't as many poor people in North Bay communities. Most homeless people like to be in urban centers where there are more services, housing and — if they are acutely troubled — easily available drugs to feed their habits.

**13**   Do longtime homeless individuals think homelessness is a problem? Do they think they have a right to live on the streets of San Francisco?

Nobody likes living outside for years at a time. Most homeless people will say yes, it's a problem they would like to see solved humanely. Most homeless people will argue that they have a right to sleep outside if they have no choice, and federal court rulings support that right.

**14**   Since there is a housing shortage, does a person moving off the street mean someone else is becoming homeless?

Homeless people generally don't displace residents when they move inside because they almost always go into units specifically tailored for them, but for every 1 person who is housed in San Francisco, 3 more people become homeless. The rate of people becoming homeless is much higher than those who are housed at current rates. Because of the region's lack of housing, there is a problem moving people into an emergency shelter, then into supportive housing and eventually into low-income housing.

**15**   Is there an expectation that homeless people placed into housing will be able to support themselves at some point? I'm concerned that, if not, over time the program will grow to consume the entire budget for help.

You have to talk about different kinds of housing. Chronically homeless people, or 38% of the city's homeless total population, need intensive help. Once placed into housing, most are unlikely to find work and support themselves. The rest of those housed generally do move on to self-sufficiency. One thing to keep in mind: A chronically homeless person on the street costs the city about $85,000 a year in police, medical and other costs. The city spends about $25,000 per person to maintain them in supportive housing.

**16**   If the new Navigation Center (on the Embarcadero) is built, what are the demographics of the homeless population to be served? Will this be an older cohort?

The city aims to take only the most acutely needy homeless people into its Navigation Centers, since they have far more counseling services and flexibility (you can come and go 24-7, bring in partners, and more) than a typical shelter. There's no specific age target, but counselors concentrate on people who have been on the streets for more than a decade. About half of the homeless people along the Embarcadero say they'd like to move into the nav center, and the center will be focused on taking in those who are in the immediate area.

**17**   I am worried about the lack of affordable, accessible housing for older adults and people with disabilities. What are regional governments doing to ensure that people with chronic illness and in wheelchairs are not living and dying on the streets?

All service providers say they give higher priority to homeless people with disabilities and chronic illnesses, but there is never enough housing to instantly place them inside. In San Francisco, 27% of homeless people report having physical disabilities and 31% report chronic health problems.

**18**   Can Navigation Centers be expected to successfully support people suffering from a variety of issues (addiction, mental illness, poverty, lack of education) or will

Navigation Centers "specialize" in areas of support?

Navigation Centers are geared toward the most troubled people by having intensive counseling on-site, which is why they cost about $100 per bed per night, or about double the typical shelter bed cost. Conceived in San Francisco, they have generally been shown to be successful enough to be emulated in other parts of the nation.

**19**    What are governments doing to push back on opposition to Navigation Centers?

Elected leaders and homeless-program directors reach out to neighborhoods where nav centers are proposed, and this typically garners support. The centers usually get built because they are planned to be at some distance from residences. And once a nav center gets built and some of the area's homeless people are taken in off the streets, much of the opposition fades. Recent proposals encountered fiercer opposition than usual in Fremont and along San Francisco's Embarcadero. In the Embarcadero case, city leaders are going ahead with construction despite a lawsuit by residents to block the new center.

**20**    What reasons do individuals give for declining shelter and/or services?

About 30% of homeless people say they don't want government assistance, but street counselors have found that many say they don't want to go into shelters because they are wary of having their belongings stolen, or having to leave some of their belongings outside. Fear and an entrenched survival routine make it hard for chronically homeless people to make big changes like taking a shelter bed. It can take up to two years of engagement by street counselors to persuade such a person to trust the system enough to accept help. Navigation Centers, with their more open rules, help overcome the reluctance, and UCSF and the city are expanding techniques to help those who are resistant to services.

**21**    What is the status of the Tuff Shed housing initiative in Oakland? Is it still going on? What are the costs and outcomes? Is any other city doing this?

The city just opened a new "cabin" settlement (it doesn't use only Tuff Sheds) this month, meaning it now has four such sites in operation housing more than 100 people. In the year and a half since the city's experiment began, nearly 200 people have been moved into shelter or housing. Each unit costs about half of what a typical shelter bed would cost. Other cities have been slow to emulate the program, however, waiting to see what the long-term results are.

**22**    I would like to know how zoning is being streamlined to increase new home development.

Rezoning is notoriously tough in San Francisco — as in most big cities in Northern California — and high construction costs and city fees make it difficult to get new projects going. Efforts are now being made at City Hall to streamline the process. And a flurry of state legislation has been put forth in recent years to speed up development, but little has been passed. The highest-profile proposal, SB50 by state Sen. Scott Wiener, D-San Francisco, was shelved in June. Gov. Gavin Newsom has said he wants to spur the construction of millions of new homes in the next six years.

**23**    How is the potential for disease due to feces in public areas being dealt with?

Street cleaning crews try to keep up with the mess in camps and on sidewalks, but the problem is tough to combat because so much of it accumulates in the streets throughout the day.

**24**    Why are we not trying to establish mini-home areas, where the homeless can live?

There is movement on this front. Many homeless-policy experts think tiny homes — both standalone and stacking modulars — are a cost-effective way to create housing quickly and cheaply. But getting community approval and finding areas to locate them is tough. About a dozen tiny standalone homes for veterans opened in Santa Rosa this year. San Jose is trying to get a small village of them going, several hundred stackable modulars are planned in the next few years in San Francisco, and Berkeley has complexes in the works.

**25**    Why do so many city supervisors spend years "looking for appropriate sites" for Navigation Centers in their districts? How can we tell if the delay is a legitimate lack of sites and not endless bad-faith stalling?

Supervisors generally come under enormous pressure from residents to keep homeless shelters of any kind out of their neighborhoods, though there are also residents who welcome them, so it requires balancing interests. Some, like Hillary Ronen, have actively and successfully pushed for the centers in the past, and recently there's been a surge of support on the Board of Supervisors for building more centers. But such things rarely move fast at City Hall.

**26**    If you're evicted, are there programs to help you obtain a new apartment so that you're not homeless on the streets of San Francisco?

There are many programs that help people deal not just with eviction, but fight to prevent being evicted. One foremost resource is the Eviction Defense Collaborative, also the Coalition on Homelessness advises those in distress. The city's outreach counselors and aid centers help house homeless people with Rapid Rehousing funds, housing vouchers, supportive housing programs and more.

**27**    Are enough shelter beds available to match the number of people who are homeless?

No. There is always a waiting list of at least 1,000 people wanting a shelter bed. A year ago, Mayor London Breed set a goal of creating 1,000 new shelter beds by the end of 2020; so far she's added 286. An additional 126 new beds opened after she became mayor, but before she set her goal.

**28**    Yesterday, I saw several empty buildings along auto row in the Serramonte shopping area in San Mateo County. They used to house Toys R Us, car dealers, etc. — large

empty buildings that could serve as new Navigation Centers. Why can't San Francisco partner up and convert these buildings into much-needed housing for our homeless?

Converting unused buildings requires zoning changes, lengthy governmental approvals, community support, funding and construction contracts. There is a growing desire throughout the Bay Area — and the state — to cooperate regionally on homeless issues, including housing, but it is in an early stage. No city really wants to take in big numbers of homeless people from other areas, but governments are realizing they need to cooperate more, because problems just over the city line can easily spill over.

**29**   Why do so many homeless encampments include huge amounts of junk?

These are people living in desperate situations, and anything they can own is considered precious. Homeless people generally have nothing but what they can carry with them or pile up at a camp; just like anyone else, they become attached to their possessions. Mental illness is another reason people hold on to items that may seem like junk to others.

**30**   Why are homeless people allowed to build camps when it's clearly unsafe, a fire hazard and a sanitation problem, to name a few issues. Why are they allowed to live in unsafe conditions?

The city has stepped up its enforcement against tent camping so much over the past couple of years that large encampments are now rare, though camping persists. The city has laws and policies against sweeping away camps if there is no shelter space available, but it also has laws against blocking sidewalks that are enforced when housed residents complain. Street counselors are most interested in moving people away from the streets and into healthier situations, but they don't have enough resources for everyone. Homeless people often prefer to stay where they are, fearing they may lose their independence and few belongings if they move. It's a continuous balancing act that is always controversial.

**31**   Why do homeless people choose to lie down and sleep and set up camp in heavily trafficked places like Valencia Street doorways and on Market Street?

Those who sleep and camp in heavily trafficked places often do so for safety. They can be around their friends for protection and company. It also helps to be near crowds for panhandling, and being near welfare, soup kitchens or other organizations they need. Not every homeless person wants to camp and hang out in the thick of things, though. Some pitch their sleeping bags in hidden, out-of-the-way places for privacy.

**32**   Why do many people remain unsheltered for years? Do they avoid shelters because of safety concerns, restrictions on family/pets/storage, paranoia, laziness, or something else? What would convince them to enter a shelter or permanent housing?

People with disabling conditions who remain unsheltered for more than a year, or are on the street four or more times in the past three years, are categorized by homeless experts as being chronically homeless — the hardest people to shelter and house. Most struggle with substance abuse, mental illness or both, and find it very difficult to accept help because of fear, confusion, a desire for independence and more. It can take outreach counselors up to two years of repeated engagement with hard-core homeless people to persuade them to move inside.

**33**   What steps are being taken to temporarily provide camps for homeless? Why not provide long-term, clean and orderly tent cities?

San Francisco is planning to open a pilot-project parking place for people living in vehicles soon. San Jose already has one, and Oakland has been establishing small "cabin" communities as temporary shelters for more than a year. Most governments move gingerly toward temporary camps, however, because maintaining order at them is difficult — as indicated by a camp allowed to grow in Santa Rosa until it became so unruly it was dismantled last year. Program managers prefer to use actual buildings to house people because it's considered safer for everyone involved.

**34**   Why doesn't the government build apartments on barges and put the homeless half a mile out in the ocean? Or let them camp on Alcatraz?

Shipping homeless people onto isolated islands or boats would make them more like prisoners than people being helped into healthy lives. Every once in a while, someone sincere, such as former Mayor Art Agnos, proposes using retired Navy vessels or similar craft docked in the harbor as temporary homeless housing, but that is considered costly, unwieldy, and politically dicey.

**35**   Why does it cost $700,000 to create a unit of permanent affordable housing?

Construction costs in San Francisco are among the highest in the nation, and there are many layers of costly governmental approval required for building. Land is expensive, city fees for construction are high, unions have resisted cheap modular housing proposals and have extensive requirements for projects. Also, mandates that all large multifamily construction projects set aside units for affordable housing can stall market-rate building projects.

**36**   There's tons of space beneath all of the freeway overpasses coursing through S.F. Can the city work with Caltrans to develop all of that empty land into homeless communities?

The city has indeed used Caltrans property for creating shelter, such as at Fifth and Bryant streets, and city planners are in continual talks for using more of that type of land. However, Caltrans won't allow the construction of housing or shelters directly below freeways.

**37**   Why is city government not fighting for and utilizing enhanced conservatorship for the mentally ill?

The city actually passed legislation recently to expand conservatorship authority, but it's not enough to sweep in all the ill people who need it. The debate is the same that has raged in the city, state and nation since the closure of mental facilities began in the 1970s and '80s — the right of the mentally ill to determine their own fate versus governmental power to force people into treatment.

**38**   Why doesn't the city help a homeless person connect with their family and send them home? If they have no home and they are drug addicts, we should be offering them rehabilitation instead of phones and money.

The city does exactly that through the Homeward Bound program, which since 2005 has sent more than 10,000 people home with the goal of reconnecting and finding housing with loved ones or close friends.

**39**   Do experts in this area feel that some degree of homelessness is unavoidable? Or, using a variety of programs, can everyone be housed in one program or another?

Most experts think the problem can be solved, at least temporarily, in some communities with a big infusion of effort and funding. That happened in Salt Lake City a few years ago, though its chronic homelessness problem inched back up again after attention to it lapsed. And in Houston, homelessness dropped 54% in the past eight years as the city stepped up tracking its housing and programs and more efficiently routed people into services. But many also think the problem can't be fully solved until the federal and state governments devote more resources to make up for severe cuts in poverty housing and other support programs over the past four decades.

**40**   Why don't we pay homeless people to clean up the streets? Vouchers or cash per bag of trash?

There are several governmental and nonprofit programs, such as Downtown Streets Team, that do exactly that. But there aren't enough such programs to employ all the homeless people who could participate. Also, minimum wage is not enough to get someone out of subsidized housing.

**41**   What restrictions are placed on homeless people who want help finding a place to live?

Generally, they have to cooperate with the counselors trying to help them, and show good faith in wanting to get inside. They also need to cooperate with finance managers arranging the housing, and usually they need to accept a shelter spot while their situation is being worked on. Permanent supportive housing complexes — housing with counseling on-site — don't require residents to be free of their drug or alcohol addictions, with the idea that they can work on those problems much better when they move inside.

**42**   What percentage of homeless people would accept housing if it meant no drugs or alcohol?

That would be very hard to determine, but experts and counselors have found over decades of experience that it's much more effective to house people first, and then work on reducing their addictions while inside. Hence the terms "housing first" and "harm reduction." Depending on the addiction, somewhere between 40% and 60% of people in the general population relapse, which means those people would be back on the streets after every relapse, making it harder for them to get clean.

**43**   What do homeless individuals say is needed for them to come off the streets? Are there homeless individuals who truly do not want to be housed? Why do they feel this way?

Most homeless people want housing and a job. The most severely dysfunctional at times say they just want to be left alone, but nobody likes sleeping face-down in the dirt.

**44**   Are any government agencies working on a program that would exchange regular work done by homeless individuals for benefits like housing or food vouchers? Are any "workfare" programs in place?

There absolutely are, in San Francisco as well as other communities including San Jose. You get a little more welfare money if you agree to work in a job program. And some nonprofits, such as the Downtown Streets Team, give vouchers for food or retail to homeless people who participate in their homeless-aid programs.

**45**   Thinking about homeless individuals who are unwilling or unable to follow the rules required under various programs, are there ways to overcome these specific situations?

Extensive, professional case managers and counselors are the most effective. Simply throwing someone out of a program is not a desired option.

**46**   How can I help combat homelessness? Where is the best and most effective place to donate money or resources?

Scores of Bay Area nonprofits work with the homeless, providing help with housing, shelter, food, clothing and more. The Chronicle's "SF Homeless Project How You Can Help" guide is a good place to start looking for opportunities.

**47**   Are there examples in other countries of successful methods/processes that have been used to decrease homelessness? Can some of those be applied to the Bay Area?

Other Western countries don't have the same kind of homelessness problem we have here because they have national health systems, living-wage laws, unemployment payments that pay basic bills and national social low-income

housing programs, many with laws providing a legal right to a roof.

**48**    What are the three main reasons for homelessness and what are the top three solutions?

The top three reasons for homelessness are loss of job, loss of housing, and drug or alcohol abuse. The top three solutions are housing aid — counseling-intense supportive housing for the most troubled — employment programs and substance abuse rehab.

**49**    What are all the different ways San Francisco as a city has tried to solve homelessness, and which has been most effective?

Initially, as homelessness grew in the 1980s, San Francisco did what every other big city did, which is erect shelters and mostly expect people to pull themselves back into stability. As the severity of the crisis deepened, it developed housing and counseling programs, and then, as compassion fatigue set in, it tried get-tough law enforcement in the 1990s. During this millennium, the emphasis has been on housing people with counseling on-site if they need it, doing intensive street outreach to pull people into programs — and in the past couple of years, creating a strong data system of tracking homeless people through services to help them more effectively and to reduce wasted efforts. As hard as it is to see the distress in the streets, the latest era has the best grip on what are now considered best practices toward solving homelessness. Bringing programs to effective scale in the face of inadequate support from the federal government is difficult, however. Cuts in federal social and housing programs in the 1980s are what began the modern era of homelessness, and those cuts have never been restored fully.

**50**    Why do West Coast cities like San Francisco have so many fewer shelter beds per capita than the East Coast cities like New York? Has there ever been discussion of a California right-to-shelter law similar to New York's?

New York City is indeed the big example. In the 1980s, it passed a series of laws mandating a right to shelter for every homeless person, and then forcing most homeless people to either take the shelter bed offered to them or face penalties. It cleared up the visual problem in Manhattan to a large extent, but much of the city's 61,000-person homeless population now lives in teeming shelters away from downtown, with inadequate aid programs to get them into permanent housing. West Coast cities decided in the early 2000s to focus on creating housing opportunities instead of shelter, with the idea that it's a more permanent solution. The right-to-shelter idea does surface in California from time to time — and it is currently being considered by Gov. Gavin Newsom's new homelessness council — but hasn't found substantial support. .

**51**    What are local churches doing to help combat the crisis?

Most churches do have homeless-aid efforts, and probably the best known in San Francisco are Glide Memorial, which runs extensive counseling, job and food programs, and St. Boniface Catholic Church, where the Gubbio Project allows large numbers of homeless people to sleep in the pews during the day. Catholic Charities of the East Bay, in Oakland, is another religious organization that aids the poor and homeless. The Chronicle's "SF Homeless Project How You Can Help" guide lists several of these organizations.

**52**    Why doesn't the city put more portable toilets out so people have a place to go to the bathroom?

The city already spends more than $3 million a year on dozens of portable toilets, and proposals in next year's budget would add millions more dollars for them.

**53**    Where can I take someone who doesn't want to stay in a shelter but wants a shower?

The easiest solution would be connecting with a community program such as Lava Mae, the nonprofit that provides portable showers around town, drop-in centers such as at Glide Church, or city pools.

**54**    San Francisco spends more than $300 million a year on homelessness and yet the number of homeless people went up last year. Where does all that money go?

It goes to several city departments, mainly the Department of Homelessness and Supportive Housing, which then either runs directly or contracts with nonprofits to provide a wide range of services, including street counseling, medical aid, housing, substance abuse rehabilitation and mental health help. About 20% goes to providing shelter, and half or more of the money is for supportive housing that keeps roofs over more than 9,500 formerly homeless people.

**55**    How much does San Francisco spend per capita on homeless and/or housing-insecure persons? Is it more than comparable cities?"

That is no simple calculation, and you can't just divide any city's homelessness budget by the number of street people there because a lot of the money goes toward preventing people from becoming homeless, capital spending, administrative costs and more. And each city and county reports its figures differently.

**56**    How much does San Francisco spend to combat homelessness? How much money was spent five years ago? And 20 years ago.

Twenty years ago, the city spent $60 million a year on homeless programs. Five years ago, the city was spending $165 million annually on homeless programs, with about half going toward keeping formerly homeless people in supportive housing. Today, the homelessness department budget is $285 million, also with about half going toward supportive housing. Millions more are spent on law enforcement and other costs not included in the Department of Homelessness and Supportive Housing budget, but there's no central accounting of that.

**57**   What makes us believe that the money we are spending addresses the root causes and makes the situation better?

It can be tough to be optimistic if you see the distress on our streets every day, but in shelters and housing programs throughout the region, a lot of work is being done. Most big cities, where the main homeless populations are concentrated, follow best practices learned nationally over decades — housing people and providing counseling on-site, rapidly rehousing people who get evicted before they become entrenched into hard-core homelessness, tracking people as they use services to avoid duplication, and more. There is always wisdom in assessing spending to ensure efficient use of public money, but if homeless programs were not being funded to the degree they are, the populations on the street would grow astronomically.

**58**   Are there cost-control reports or audits of the city's spending on homelessness?

San Francisco's homeless program funding is required to be assessed annually for efficiency to qualify for federal funding. Those assessments are conducted by several authorities, including the Local Homeless Coordinating Board and the city Department of Homelessness and Supportive Housing. The city controller's office, grand jury, and the Board of Supervisors and its budget analyst also look at homeless funding, with supervisors often weighing in on money issues. Still, there is always a desire for tighter assessment and more evaluation.

**59**   What are we actually doing to address the issue? Our city officials seem to be just talking and not doing anything, while the problem only gets worse each day.

San Francisco spends more than $300 million a year on outreach, counseling and housing programs and it regularly comes up with new plans. If it didn't, the number of homeless people would be much higher than the 8,000 to 10,000 found daily in the city's streets and programs. Low-income housing aid limitations by the federal government, which began making huge cuts in the 1980s, is often blamed as a major cause of homelessness that makes it nearly impossible for local communities to solve the problem. Nationally, an inadequate health care system, income inequality and institutional racism are also to blame. There are two parts of the homeless epidemic: the visible, chronic population and the largely unseen population, people who may be living on friends' couches or in shelters. City leaders generally have been loath to crack down hard on the visible, chronic population in part because there are not enough shelter beds and not enough substance abuse and mental health programs to serve them all.

**60**   Why can't San Francisco make an arrangement with another county that has lower land values to build affordable units, and use lower-cost manufactured housing?

There is a Bay Area-wide and statewide push on right now for communities to work collaboratively to create affordable housing, but construction and land use is still up to each city and county, each with its own challenges. However, no city wants to take on other cities' problems. Nevertheless, this was a proposal raised by candidates in last November's election, and the issue seems to be gathering support among some politicians.

**61**   San Francisco owns a lot of land outside its borders. Why not build a new community outside the city where things could be cheaper — modest accommodations (like earthquake shacks) with communal bathrooms and kitchen facilities?

That idea has come up over the years, but shipping people away is often seen as impractical. Homeless people, like housed people, want to be near the things they need and depend on — in their case, soup kitchens, counseling services, friends, family and more. Forcing them elsewhere can be seen as insensitive and counterproductive to getting them to move toward healthy and stable life choices.

**62**   Has our leadership focused on a housing shortage when the predominant factors require treatment and care?

Homeless-aid leaders say they're equally focused on both, and, indeed, about half of San Francisco's homelessness budget pays for supportive housing, which is housing combined with counseling services. That same ratio is roughly true for the rest of the Bay Area, though it's difficult to determine exactly because each county uses different accounting methods.

**63**   Our lawmakers show intense interest in the safe and sanitary conditions of children at the border (and rightly so). However, our local streets at times are neither safe nor sanitary for the homeless or residents. Why haven't we demonstrated the same level of care or interest in solving that?

The city tries to be compassionate rather than punitive about bad behavior, and the people elected to solve such problems appear to anguish over the best approaches. Law enforcement officials say cracking down on drug use is ineffective and makes criminals of people with severe addictions. Most jails or prisons have some treatment behind bars — San Francisco provides mental health and substance abuse care in its jails, paid for the general fund — but they are not as intensive as full rehab programs outside, and prisoners often relapse after they are released. Experience over decades has shown that forcing people to be clean before they are housed is ineffective. The current practice is to house addicted homeless people, then work with them to get clean once they're inside. (Note: This answer has been updated to clarify the level of treatment offered in San Francisco jails.)

**64**   How does the federal decrease in low-income housing affect the current crisis in San Francisco?

It vastly reduces the number of new housing units the city can offer to poor and homeless people.

**65**   Why is the city beholden to the Coalition on Homelessness? What is the history of the relationship between the two? Why does the coalition wield so much power?

City officials' relationship with the coalition has varied depending on who has been elected to City Hall and who is in charge of the coalition, and that intersection, with nonprofits added in, can be politically touchy. The coalition's role is to vigorously advocate, but at times it has been all but ignored. It is considered an important part of the conversation on homelessness, and it does some important research, but it doesn't seem to have outsize influence compared with other organizations involved in policy discussions.

**66**   What do homeless people think the problem is, and what are their solutions?

They generally think it's a problem not just for themselves, but for society, and the solutions they propose vary wildly. Some think a better job and housing market would fix things, others want more governmental help for the poor.

**67**   Why do local leaders refuse to acknowledge that this is a drug crisis first and a homeless issue second? It's incredibly frustrating to see open-air drug use and dealing without consequences.

The two issues are related, but have separate elements. As acute and frustrating as the drug abuse is, the overarching bottom line is that addicts can't get clean while they're on the streets. And local officials generally do not think that arresting people for drug use is the best use of resources. Additionally, most people in unstable situations have a significantly low rate of rehab success.

**68**   San Francisco relies on a network of nonprofits to deliver services to the homeless. To what extent have these groups become powerful lobbyists for their own funding, making it impossible to develop streamlined and more effective policies and programs?

The services provided by all those nonprofits — numbering more than 60 in San Francisco — are evaluated each year by a range of committees and the Department of Homelessness and Supportive Housing, and if found to be coming up short, funding is reduced or cut. The leaders of those nonprofits advocate for their programs, but then so do the leaders of all programs that get government money. Nonprofits are often much cheaper administrators of homeless programs than city-staffed programs, but contracting for services can limit the ability for all shelters to operate in the same manner, for example. However, the city's homeless department is working on one software system to better track the effectiveness of any help being provided. The possibility of nonprofits protesting on the steps of City Hall over government cuts is a powerful image, and one most politicians would like to avoid. Homeless activists, meanwhile, are a much smaller source of campaign contributions than corporations and other political expenditure funds.

**69**   I have seen estimates of close to 3 million homeless Americans. Can we get support and attention that this is a serious national crisis that demands more funding from the federal government? Isn't this problem too big for local governments to solve individually?

Most homelessness and poverty experts say that until the federal government restores the social safety net and housing funding that was decimated beginning in the 1980s, it will be extremely difficult if not impossible to solve homelessness. Nearly one third of Americans live near or below the poverty line, and while the nation has had that kind of economic distress with inadequate support from the federal government, there is a constant pool of newly homeless people hitting the streets. The current federal climate favors cutting poverty funding, not restoring it. That 3 million estimate, by the way, is for the national homeless population throughout the year — nightly, the federal government estimates it to be about 600,000.

**70**   Why aren't tech companies and the people profiting from the tech boom held accountable for the deteriorating quality of life for people with fewer resources?

This has been a roaring debate since the tech boom gentrified San Francisco in this millennium. Ushered in by the "Twitter tax break" for tech companies in 2011 and other enticements, tech companies have made many in the city wealthy, and critics say they aren't doing their part for the underclass. This debate will not be resolved soon. However, some companies and individuals have stepped up to help the city's most impoverished people, such as Zendesk with its robust program of encouraging employees to volunteer at homeless programs, and Salesforce co-CEO Marc Benioff, who has donated tens of millions of dollars toward homeless causes.

**71**   What are the primary causes of homelessness?

In San Francisco, the top causes reported by homeless people are: job loss (26%); substance abuse (18%); eviction (13%); being kicked out of a home after an argument with a friend or relative (12%); mental illness (8%); and divorce or breakup (5%).

**72**   Why don't homeless people want to work?

A lot of them do go back to work, but many others cannot hold stable jobs for a variety of reasons, including physical disabilities, mental illness and substance abuse. The entry-level jobs that they might qualify for are unlikely to pay enough to live in an expensive city like San Francisco, which has a dearth of very low-income housing.

**73**   San Francisco has had a homeless problem since the days of Mayor Art Agnos. What factors have made it so much more visible? Has the incidence of mental illness and substance abuse increased?

The common belief is that the mental illness and substance abuse problems have worsened since the 1980s. Also, thousands of formerly homeless people have been housed since then but continue to panhandle or just hang out during the day, making the homeless population seem bigger than it is. San Francisco also used to have more spaces

for homeless people to gather, such as China Basin or Mission Bay — neighborhoods that have been highly developed since then.

**74**  Didn't homelessness greatly increase after President Ronald Reagan's cuts to mental health in the 1980s?

It did, but those drastic cuts were not solely responsible for the rise in homelessness. Mentally ill people constitute about one-third of the homeless population nationally, and in San Francisco 39% of homeless people were reported as dealing with "psychiatric or emotional conditions" in the 2019 one-night count.

**75**  Shouldn't addiction treatment combined with housing be a key component of the solution?

About 40% of the overall homeless population has substance abuse issues, but among the most acutely homeless — the chronically homeless people who have been on the streets for more than a year — the percentage is higher. Permanent supportive housing programs address this by taking in chronically homeless people off the street and then counseling them, and San Francisco has more of such housing per capita than any other city.

**76**  Do we really understand what's causing homelessness and the numbers behind who's on the street and why?

Homeless policy leaders and counselors do understand the causes — job loss, housing, addiction, mental illness, rising hardship on the economic underclass and more — but bringing programs and funding to full scale in the face of inadequate federal support over the years has been very hard.

**77**  Does homelessness provide a sense of freedom? I've known guys for whom it gives a sense of freedom from such things as the pressure to make rent/mortgage payments, dealing with unpleasant neighbors, and the seemingly simple task of maintaining a place.

Only for a while, if at all. Some people, particularly young wanderers or people in RVs, like the freedom of going wherever and whenever they want, but before too long a life of hunger, instability, frequent danger and continuous instability wears them down. The vast majority of homeless people say they want to be inside — but they have various conditions under which they would agree to do so.

**78**  What are the reasons homeless people say why they don't or won't accept help?

Some don't like the rules imposed in shelters — particularly those where they cannot bring a partner or pet. Others say they are afraid shelter environments are dangerous. Some don't want to be away from their drug suppliers; some are scared of a change in their survival routines. And others are mentally ill and unable to decide.

**79**  Have we inadvertently created a drug ecosystem, in which addicted homeless people remain clustered in San Francisco to remain close to dealers and to sources of income such as panhandling of tourists and petty theft?

Some would say yes. Homeless addicts do tend to group in areas where addicts to similar substances hang out and sleep — parts of the Mission District for heroin, and parts of the Tenderloin for crack or methamphetamine, for example. For many years, city law enforcement and courts have preferred to steer drug offenders toward rehabilitation rather than prison, with the understanding that hard time behind bars is often ineffective. The fact is, however, that rehabbing from drugs or alcohol usually takes several tries. For a homeless person, each failure puts that person right back on the streets.

**80**  How do the unsheltered homeless get medical treatment?

The city-run health care system and public health facilities take care of that for free for the most impoverished. Chronically homeless people lean heavily on Zuckerberg San Francisco General Hospital and Trauma Center and the Tom Waddell Urban Health Clinic near City Hall, both of which have specialists in homeless care.

**81**  What has led to a rise in behavior like public defecation?

Many businesses don't let noncustomers use their restrooms, and public toilets often are not easily accessible. Sometimes, more troubled homeless people are simply angry or frustrated with their plight and feel they can't go through the hassle of finding a restroom at that moment. Mental illness also certainly plays a role; up to 40% or more of the city's homeless population is considered mentally ill.

**82**  Are there people who pretend to be homeless while panhandling?

Some police and other officials estimate as many as half of the panhandlers in San Francisco live in subsidized housing. Panhandling gives them something to do during the day and also gets them quick cash that can be used on things like food or drugs.

**83**  Are the stories about panhandlers getting into fancy cars at the end of their workdays true, or are they urban legends?

Urban legend only.

**84**  How much money and other donations do various panhandlers collect on a daily basis?

It can be anything from $2 to $100. The higher amounts go to people who are disabled or otherwise unusually sympathetic in a way that touches people's hearts.

**85**   Do panhandlers on the street work cooperatively, and do they claim territories?

It is loosely territorial. Some have regular spots, but even if they don't, the general rule is not to panhandle too close to the next person.

**86**   Does giving money to homeless panhandlers make the homeless problem worse or better or have no effect?

On one hand, much of the money given to hard-core panhandlers goes straight into drugs or liquor. On the other hand, giving someone some respite with cash for a cheap meal or something at a store can help enliven their otherwise bleak lives. Some say all you're doing is feeding addiction by giving money, some say kind acts can't hurt. In the end, giving a panhandler money doesn't solve the problem. Aid programs do.

**87**   What legal and financial liability do cities and counties have to enforce laws that prevent disruptive homeless activities such as peeing/pooping in the street, sleeping in a public place, being drunk in public, using and possessing drugs in the open?

Every city and county has different "quality of life" laws on the books, and they enforce them variously. It's left up to each community. It is illegal to openly defecate in the street and to use illegal drugs, but police in Santa Cruz, for instance, are more stringent about enforcing such laws than in San Francisco, where tolerance is politically balanced with community pressure to clean up the streets. Homeless advocates often push back on quality-of-life enforcement, saying it is simply harassing people who have nowhere to go, while other residents often argue for more enforcement to get disruptive behavior off their blocks. Federal law also protects people's right to sleep outside if they have no choice.

**88**   What is being done to support law enforcement to get the homeless and their garbage, body waste and dirty needles off the street?

San Francisco has a police unit specially assigned to dealing with homeless people, and its main emphasis is getting them into services rather than citing them. Homeless advocates say police can be too heavy-handed at times, but city leaders say they want officers to balance compassionately helping people into housing and counseling with stopping bad behavior like urinating in public and clogging up sidewalks. The city also has a fairly new unit called the Healthy Streets Operations Center that is a collection of agencies, including Public Works and the Police Department, that dispatches teams to trouble spots such as growing tent camps. Polls reflecting public dismay over homelessness, however, indicate there is much room for improvement.

**89**   Why are those with psychiatric illness not screened and hospitalized for treatment instead of left on the streets to scream at the sky and be disruptive?

Street outreach counselors, and often police, make intensive efforts to get obviously mentally ill homeless people into treatment, but state law meant to protect the rights of the mentally ill makes it difficult. Officials generally cannot arrest someone or haul them off to treatment facilities if they are simply acting strange. They have to be demonstrably a danger to themselves or others for legal action to be taken. Or they have to consent to treatment — which is difficult permission to obtain from someone who is unable to make rational decisions.

---

**Fifth & Mission**

SF Homeless Project Takes on COVID-19

July 6, 2020



00:00                                                                                                 26:58

Will coronavirus worsen homelessness or provide an opportunity to get people housed? Reporter Kevin Fagan and host Demian Bulwa kick off the SF Homeless Project, a weeklong Chronicle special report that digs deep into the crisis in an effort to find solutions. | Get full Chronicle access: sfchronicle.com/pod Learn more about your ad choices. Visit megaphone.fm/adchoices

**MORE PODCASTS**

---



How you can help



SF Homeless Project



Homelessness surging in Bay Area suburbs

---

Credits

Reporter

Kevin Fagan · kfagan@sfchronicle.com · @kevinchron

Newsroom Developers

Erica Yee · erica.yee@sfchronicle.com · @ericayee_

8/4/22, 1:11 PM
Case 4:22-cv-05502-DMR   Document 9-7   Filed 09/27/22   Page 171 of 175
Bay Area homelessness crisis: 8 answers to your questions

Audrey DeBruine · audrey.debruine@gmail.com · @acdebruine

Evan Wagstaff · evan.wagstaff@sfchronicle.com · @evanwagstaff

Executive Producer

Brittany Schell · bschell@sfchronicle.com · @brittlynns

Managing Editors

Tim O'Rourke · torourke@sfchronicle.com · @TimothyORourke

Michael Gray · mgray@sfchronicle.com · @GrayMikeG

Demian Bulwa · dbulwa@sfchronicle.com · @demianbulwa

RETURN TO TOP

**ABOUT**

Our Company

Ad Choices

Careers

Terms of Use

Advertising

Privacy Policy

Your Privacy Rights

Your California Privacy Rights

**CONTACT**

Customer Service

FAQ

Newsroom Contacts

News Tips

Homepage Redesign Feedback

**SERVICES**

Profile

Subscriber Services

e-edition

App

Archives

Membership

Store

Subscription Offers

sfgate.com

HEARST newspapers
©2020 Hearst

# Exhibit 25

**THE HEALTH DIVIDE**

## Homeless sweeps in SF: How do you report on an issue city leaders deny is happening?

**By Nuala Sawyer**

June 25, 2020



*(Photo by Giuseppe Milo via Flickr)*

"The San Francisco Police Department does not conduct 'sweeps'," the email read. It was written by a spokesperson of the department, in response to my request for comment on the shuffling of unhoused people and their belongings from one street corner to another -— a practice largely conducted by police. Instead, the spokesperson continued, I should be requesting comment on "encampment resolutions," a phrase that implies the sweeps result in housing or a bed for the night, something that my research proved to be very rare.

The terms journalists use in their articles to describe public health crises should not be taken lightly. News reports have the potential to impact everything from colloquial speech to the drafting of legislative policies, and I kept this in mind as I chose to use the phrase "homeless sweeps" in a series of articles I wrote for the USC Annenberg California Health Fellowship.

My reporting project was fairly wide in scope: How does the constant displacement of unhoused people from alleys, neighborhoods, and entire cities affect their health? What are the impacts of having one's belongings regularly seized and lost by the city of San Francisco — and how are frontline medical workers adapting in their treatment of this vulnerable population as they lose medication, warm clothes, and other survival supplies?

There were a lot of logistical hurdles to overcome with this reporting. Could I find any data to quantify the many health impacts of homeless sweeps? Would anyone who had their stuff taken want to talk to me?

However, the biggest obstacle I ended up facing was not in the population I was writing about, but instead from the people at the top tiers of city departments. Despite hundreds of photos and videos showing city employees tossing tents, backpacks, and walkers into the back of dump trucks — plus countless testimonies from homeless people and their neighbors — city leaders repeatedly denied to me over and over again that homeless sweeps were even happening. From the police to the city's Department of Public Health, any request for information on "homeless sweeps" was sidestepped and dismissed.

It would have been easier to navigate if there was an equivalent official term, but there wasn't. My project occurred smack in the middle of a massive city-wide rebranding of their response to the more than 8,000 homeless people living on San Francisco streets.

The crisis of homelessness in this city is staggering. The nightly waitlist for a shelter bed hasn't dropped below 1,000 in more than a year, with many seniors and people with disabilities vying for a mat in a shelter, a reprieve from the streets. According to an April 2019 ruling in Martin v. City of Boise, cities can't cite or criminalize people for sleeping on the streets if there are no beds available, making San Francisco's behavior — of issuing 647e citations for illegal lodging, seizing people's belongings, and threatening them with jail time if they don't move from the street where they're camped — all against the law.

The workaround was fairly simple for city authorities. Offer an unhoused person a bed in a police station, and if they deny it (which many do) you're free to cite and seize as you see fit.

There are innumerable articles that can be produced from this situation. And while my fellowship project lay in the health impacts of these sweeps, it quickly became obvious that I would have to prove they were happening first, in order to lend of any of my reporting on health any credibility. So, I took a step back and dug up some numbers.

In my article Lost, Stolen, Sold: S.F. Violates Homeless Property Policy I focused on the seizure of unhoused people's belongings. When a person experiencing homelessness has their belongings — which can include life-saving medication, crutches, tents, and warm clothes — seized by the city in an attempt to clean up the street, they're often issued a "bag and tag" form, which they can use to reclaim their items at the Department of Public Works Yard in an industrial area of town, little-served by public transit.

In an effort to prove the scope of these sweeps, I obtained every bag and tag form issued by the city between October 2016 and March 2019. In their loosely-organized pages was ample evidence that the city was seizing every item homeless people owned — from photo albums to suitcases full of clothes. And, the city's own data proved that less than 20 percent of people who were issued bag and tag forms were able to reclaim their belongings, due to badly-organized and leaky storage containers in the Public Works Yard, and alleged theft and resale of items of value by Public Works employees.

The article blew up. It got thousands of shares on Facebook and Twitter, and shone a light on a broken situation that was negatively impacting the most-vulnerable of San Francisco's residents.

But it also helped me set the stage for a deep dive into some of the health impacts of these sweeps — such as the challenges unhoused people who use drugs face in holding on to the overdose-reversal medication Narcan, and how clinicians, researchers, and frontline workers are adapting hepatitis C treatment plans for unhoused people who are frequently losing their belongings. And while interviewing anyone who works for the city — who have all been instructed not to use the phrase "sweeps" — meant dancing around different phrases, for my readers the evidence that such incidents were taking place was made clear.

When you're ready to dive into a big reporting project it's not always easy to go back to the basics — particularly if it means proving something is happening that is easily witnessed by a stroll through the Tenderloin. But when you're challenging policy decisions created, for example, by a mayor, I learned it's best to back up and provide a foundation of evidence before diving into the nitty gritty of an issue.

---

## Related Posts



**How we pay doctors and hospitals is an overlooked driver of health disparities in this country**



**The team behind STAT's 'Color Code' podcast shares how they approach stories of racism in health care**



**Reporters are waking up to the Medicare story, but more digging is needed**

**Subscribe to our newsletter**

Stay in the loop