1  DAVID CHIU, State Bar #189542
   City Attorney
2  YVONNE R. MERÉ, State Bar #173594
   Chief Deputy City Attorney
3  WAYNE SNODGRASS, State Bar #148137
   Deputy City Attorney
4  MEREDITH B. OSBORN, State Bar # 250467
   Chief Trial Deputy
5  JAMES M. EMERY, State Bar #153630
   EDMUND T. WANG, State Bar #278755
6  Deputy City Attorneys
   City Hall, Room 234
7  1 Dr. Carlton B. Goodlett Place
   San Francisco, California 94102-4682
8  Telephone:    (415) 554-4628 (Emery)
                 (415) 554-3857 (Wang)
9  Facsimile:    (415) 554-4699
   E-mail:       jim.emery@sfcityatty.org
10               edmund.wang@sfcityatty.org

11 Attorneys for Defendants
   CITY AND COUNTY OF SAN FRANCISCO, et al.

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14

15 COALITION ON HOMELESSNESS; TORO          Case No. 4:22-cv-05502-DMR
   CASTAÑO; SARAH CRONK; JOSHUA
16 DONOHOE; MOLIQUE FRANK; DAVID            **SAN FRANCISCO'S MEMORANDUM OF
   MARTINEZ; TERESA SANDOVAL;               POINTS AND AUTHORITIES IN
17 NATHANIEL VAUGHN,                        OPPOSITION TO PLAINTIFFS' MOTION
                                            FOR PRELIMINARY INJUNCTION**
18           Plaintiffs,
                                            Hearing Date:   December 22, 2022
19      vs.                                 Time:           1:00 p.m.
                                            Place:          Courtroom 4 – 3rd Floor
20 CITY AND COUNTY OF SAN
   FRANCISCO; SAN FRANCISCO POLICE          Trial Date:     None set.
21 DEPARTMENT; SAN FRANCISCO
   DEPARTMENT OF PUBLIC WORKS; SAN
22 FRANCISCO DEPARTMENT OF
   HOMELESSNESS AND SUPPORTIVE
23 HOUSING; SAN FRANCISCO FIRE
   DEPARTMENT; SAN FRANCISCO
24 DEPARTMENT OF EMERGENCY
   MANAGEMENT; LONDON BREED, in her
25 official capacity as Mayor; and SAM DODGE,
   in his official capacity as Director of the
26 Healthy Streets Operation Center (HSOC),

27           Defendants.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

    I.      Overview of San Francisco's Homelessness Response System ............................ 2

    II.     HSOC Encampment Resolutions. ......................................................................... 4

    III.    Beyond HSOC Engagements. ............................................................................... 8

ARGUMENT ....................................................................................................................... 9

    I.      Legal Standard ........................................................................................................ 9

    II.     Plaintiffs Are Unlikely To Succeed On The Merits............................................... 9

          A.      San Francisco Offers Shelter Before Requiring an Unhoused Person to Vacate Public Property (Eighth Amendment). ............................................ 9

          B.      San Francisco Reasonably Preserves the Possessions of Unhoused Persons (Fourth Amendment). .................................................................... 12

          C.      Plaintiffs Rely On Stale and Inadmissible Evidence That Cannot Support A Preliminary Injunction. .......................................................................... 15

    III.    Plaintiffs Have Not Shown Irreparable Harm; the Public Interest and Balance of Harms Weigh Against an Injunction.................................................................. 18

CONCLUSION.................................................................................................................... 18

# TABLE OF AUTHORITIES

**Federal Cases**

*1075 Market Street Owners' Ass'n v. U.S. Dept. of Health & Human Servs.*
  Case No. 20-15517 2021 WL 2229175 (9th Cir. June 2, 2021) ...................................................1

*Dusenbery v. United States*
  534 U.S. 161 (2002)..........................................................................................................................13

*Garcia v. City of Los Angeles*
  11 F.4th 1113 (9th Cir. 2021) ......................................................................................................12

*Hastings College of the Law v. City & County of San Francisco*
  Case No. 3:20-cv-03033-JST (N.D. Cal. May 4, 2020) .............................................................1

*Johnson v. City of Grants Pass*
  50 F.4th 787 (9th Cir. 2019) ...........................................................................................10, 17, 18

*Lavan v. City of Los Angeles*
  693 F.3d 1022 (9th Cir. 2012) ......................................................................................................12

*Lavan v. City of Los Angeles*
  No. CV 11-2874, 2014 WL 12693524 (C.D. Cal. July 24, 2014) ...........................................13

*Martin v. City of Boise*
  920 F.3d 584 (9th Cir. 2019) ............................................................................................... *passim*

*Miralle v. City of Oakland*
  No. 18-cv-068234-HSG, 2018 WL 6199929 (N.D. Cal. Nov. 28, 2018)..........10, 11, 13, 14, 18

*Monell v. Dept. of Soc. Services of City of New York*
  436 U.S. 658 (1978)..........................................................................................................................15

*Shipp v. Schaaf*
  379 F. Supp. 3d 1033 (N.D. Cal. 2019) ........................................................10, 11, 13, 14, 18

*Sullivan v. City of Berkeley*
  383 F.Supp.3d 976 (N.D. Cal. 2019) ...................................................................12, 13, 14, 15

*Winter v. Nat. Resources Def. Council, Inc.*
  555 U.S. 7 (2008)................................................................................................................................9

**State Cases**

*City & County of San Francisco v. All Persons Interested in Matter of Proposition C*
   51 Cal. App. 5th 703 (2020) .........................................................................................................1

*Evergood Sausage Co., v. Pankowski*
  Case No. CGC-21-594280 (S.F. Super. Ct. Aug. 4, 2021)........................................................1

*Safe Embarcadero for All v. State of California*
  Case No. CPF 19-516841 (S.F. Super. Ct. Sept. 5, 2019) .......................................................1

**Constitutional Provisions**

U.S. Const., Amend. IV ................................................................................................12, 13, 18

U.S. Const., Amend. VIII .......................................................................................9, 11, 17, 18

U.S. Const., Amend. XIV ..........................................................................................12, 13, 18

## INTRODUCTION

San Francisco has developed sophisticated, multipronged, robust, and compassionate policies to address homelessness. San Francisco's dedicated and highly-trained professionals implement San Francisco's homelessness policies, supported by an annual budget this year of $672 million. Plaintiffs vigorously disagree with San Francisco's homelessness policies. But plaintiffs have not demonstrated San Francisco's policies are unconstitutional.

Within the economic and practical constraints it faces, San Francisco engages individuals experiencing homelessness with a progressive, services-first, harm reduction approach to providing services and support. San Francisco shares with plaintiffs the goal of providing permanent, secure housing to all who need it. The executive director of plaintiff Coalition on Homelessness serves on the oversight committee for San Francisco's Our City Our Home Fund, which dispenses more than $200 million each year for homeless services and housing.[1]

San Francisco's homelessness policies balance the needs of all San Franciscans for safe and clean streets and public spaces. Growing encampments on public property create public health risks, strain our communities, and create safety risks for San Franciscans with mobility impairments using the public right of way. See *Hastings College of the Law v. City & County of San Francisco*, Case No. 3:20-cv-03033-JST (N.D. Cal., filed May 4, 2020). To open new housing and shelters, San Francisco must overcome sometimes strident community opposition. E.g. *1075 Market Street Owners' Ass'n v. U.S. Dept. of Health & Human Servs.*, Case No. 20-15517 2021 WL 2229175 (9th Cir. June 2, 2021) (legal challenge to 256-unit supportive housing project at 1064 Mission Street); *Safe Embarcadero for All v. State of California*, Case No. CPF 19-516841 (S.F. Super. Ct., filed Sept. 5, 2019) (legal challenge to Embarcadero Navigation Center); *Evergood Sausage Co., v. Pankowski*, Case No. CGC-21-594280 (S.F. Super. Ct., filed Aug. 4, 2021) (legal challenge to Jennings Street Safe Sleep Site).

This lawsuit challenges one aspect of San Francisco's holistic response to homelessness. Plaintiffs allege San Francisco requires people who are experiencing homelessness to leave their

---

[1] See https://sf.gov/public-body/our-city-our-home-oversight-committee. San Francisco prevailed in a legal challenge to 2018's Proposition C, the voter initiative that created the Our City Our Home Fund.  See *City & County of San Francisco v. All Persons Interested in Matter of Proposition C*, 51 Cal. App. 5th 703 (2020), review denied (Sept. 9, 2020).

1   encampments without having offered a shelter bed to the person, and that San Francisco confiscates

2   and destroys their property without providing an opportunity for them to retrieve it. These allegations

3   directly contravene San Francisco's homelessness policies. San Francisco's policies ensure a person

4   experiencing homelessness is asked to leave an encampment only after the person has received an

5   offer of shelter and declined it. And San Francisco's policies specify that it disposes of an item only

6   upon determining it is trash, garbage, debris, broken furniture, a discarded appliance, or presents an

7   immediate health or safety risk such as hazardous sharps, chemicals, items soiled by infectious or

8   hazardous materials, and items infested by rodents or insects, or is intermingled with refuse. Other

9   items are bagged and tagged and stored 90 days at a central warehouse. San Francisco trains its

10  employees on these policies and through effective oversight ensures these policies are followed.

11       In the absence of systemic training failures, plaintiffs have offered no basis for imposing

12  municipal liability on San Francisco. For these reasons, set forth more fully below, the Court should

13  deny plaintiffs' motion for preliminary injunction.

**BACKGROUND**

**I.    Overview of San Francisco's Homelessness Response System**

16       San Francisco's Department of Homelessness and Supportive Housing (HSH) manages San

17  Francisco's homelessness response system. Cohen Decl. ¶8. HSH's budget for the current fiscal year is

18  $672 million. This budget amount does not include the value of other departments' contributions to

19  homeless-serving programs, including the Department of Public Health (DPH), the Department of

20  Public Works (DPW), the Department of Emergency Management (DEM), the Police Department

21  (SFPD), and the Fire Department (SFFD). All of these departments partner with HSH to provide

22  homeless services. *Id*. ¶4. Between 2019 and 2022, San Francisco has reduced the number of

23  unsheltered homeless by 15 percent and increased its shelter bed capacity. *Id*. ¶¶5-6.

24       The core components of San Francisco's homelessness response system are: (1) street

25  outreach; (2) temporary shelter and crisis intervention; (3) coordinated entry; (4) problem solving; (5)

26  homelessness prevention; (6) supportive housing; and (7) the housing ladder. Cohen Decl. ¶8.

27  Coordinated Entry is the "front door" for connecting households experiencing homelessness to the

28

resources needed to resolve their housing crisis. Last year, HSH's Coordinated Entry program conducted 8,743 assessments. *Id*. ¶13.

San Francisco's Homeless Outreach Team (SFHOT) provides citywide outreach seven days a week, connecting individuals living outside with available and appropriate resources, through outreach, engagement, and case management. SFHOT works collaboratively with DPH's Street Medicine team to address medical and behavioral health needs. During the 2021 fiscal year, SFHOT made 1,652 shelter placements through this citywide outreach work. In addition, SFHOT made approximately 1,000 placements in coordination with HSOC encampment resolutions. Cohen Decl. ¶9. Specialized outreach teams also provide services-first alternatives to law enforcement for 911 calls or 311 calls from the public. *Id*. ¶10.

HSH's temporary shelter inventory includes navigation centers, transitional housing, cabins, trailers, Shelter-in-Place hotels, other forms of congregate, non-congregate, and semi-congregate shelters, stabilization beds, and safe sleep sites. By the end of 2022 HSH plans to open approximately 1,000 shelter beds through a combination of new programs and reopening or expanding programs that had been closed or curtailed during Covid-19. Cohen Decl. ¶¶11-12.

HSH's Problem Solving Program focuses on clients who do not require ongoing support, but who can resolve their homelessness with a timely intervention, such as a one-time flexible grant to help resolve their homelessness or to reconnect with a support network outside San Francisco. Cohen Decl. ¶14. Last year, HSH's Homelessness Prevention Program disbursed $4.7 million to households needing assistance with back rent, future rent, and/or move-in costs. *Id*. ¶15.

HSH devotes more than half of its annual budget to supportive housing, offering permanent solutions to homelessness. Last year, HSH moved 2,057 households into supportive housing and maintained approximately 11,000 households in existing permanent supportive housing. And HSH acquired six sites for permanent supportive housing, which will provide 625 additional units with over 1,100 bedrooms. HSH's newest supportive housing project at 1064 Mission Street offers 256 units of supportive housing, with on-site services and a culinary job training and education program. Cohen Decl. ¶16. HSH's Housing Ladder Program offers opportunities for tenants in supportive housing, when appropriate, to move up the "ladder" to subsidized housing using lower levels of support

services. Last year, HSH opened the Abigail Hotel on McAllister Street as a new Housing Ladder site. *Id.* ¶ 17.

The Covid-19 pandemic prompted significant changes in San Francisco's response to homelessness. To comply with Covid-19 health guidelines, HSH reconfigured its congregate shelters, reducing their capacity by 70%, and opened a new congregate shelter site. The first Shelter-in-Place (SIP) hotel sites opened in April 2020 to provide temporary non-congregate shelter for people experiencing homelessness who were most vulnerable to Covid-19. At its highest capacity, San Francisco's SIP Hotel Program provided 2,288 rooms across 25 sites. HSH opened an SIP trailer site at Pier 94 with a capacity of 116 trailers. Isolation and Quarantine (IQ) sites provided safe places for people with Covid-19 to recover. The City managed as many as 538 IQ hotel rooms and shelter beds. The Safe Sleep Program created tent sites where people could sleep a safe distance apart from each other, off the public sidewalks, with services available. At its peak, the Safe Sleep Program offered 5 tent sites. Cohen Decl. ¶18.

As the city emerges from Covid-19, HSH is winding down the Shelter-in-Place Hotel program. HSH now maintains 2 SIP hotel sites accommodating approximately 400 guests. HSH will add one of those sites to its permanent supportive housing inventory. HSH will continue to operate the trailer site at Pier 94 as a long-term program. HSH has closed three of the Safe Sleep Sites and plans to maintain two Safe Sleep sites with a combined capacity for approximately 60 guests. Cohen Decl. ¶19.

## II.   HSOC Encampment Resolutions.

San Francisco's Healthy Streets Operation Center (HSOC) conducts several homeless encampment resolutions ("HSOC engagements") each week. The goals of an HSOC engagement are to conduct outreach to clients, offer services and housing to clients, remove hazardous or abandoned tents, structures, and vehicles, and clean and secure the site after campers have relocated. Dodge Decl. ¶7.

Each week the HSOC Director circulates to the participating departments a proposed schedule of times and locations for the next week's engagements, including projected shelter needs for each engagement. After consultation with the participating departments, the Director finalizes the next week's HSOC engagement schedule on Wednesday. Dodge Decl. ¶9. HSH's guest placement services

team receives these projected shelter needs on Wednesday or Thursday, and this projection of anticipated shelter needs informs HSH's shelter allocations during the following week. *Id.* ¶10.

Each weekend, typically on Saturdays, SFHOT outreach workers conduct outreach at each of the encampments that is scheduled for an HSOC resolution during the following week. Nakanishi Decl. ¶ 5; Piastunovich Decl. ¶¶ 4, 5. The SFHOT weekend staff provide the occupants of the encampment verbal notice of the upcoming HSOC resolution, assess them for housing and interest in shelter or other services, explain the process for accessing shelter, explain what to expect on the day of the resolution, and post written notices of the upcoming HSOC resolution in and around the encampment. Nakanishi Decl. ¶ 5; Piastunovich Decl. ¶ 5; *see also* Piastunovich Decl. Exs. A, B.

The written notice includes the date and location of the upcoming resolution. Piastunovich Decl. Ex. A. The written notice informs encampment occupants that "During the encampment resolution, we will provide access to shelter, safe sleeping villages, and/or hotels based on eligibility." *Id.* The written notice informed encampment occupants that "Outreach workers from the Department of Homelessness and Supportive Housing and/or the Department of Public Health may also offer" other services. *Id.* The written notice includes additional "Information on some of the services available for people experiencing homelessness . . . ." *Id.* The written notice further informs encampment occupants:

> Please also note that during the resolution, the Department of Public Works will clean the sidewalks and street**. Any personal property that is left at the encampment will be removed and taken to the Public Works Operations Yard at 2323 Cesar Chavez Street**.

*Id.* (original emphasis). The written notice also informs encampment occupants what types of items will *not* be stored but may be discarded:

> Please be advised that the following types of items will not be stored and may be discarded: (1) items that present an immediate threat to public health or safety (i.e., items that are soiled or infested with vermin, and needles), (2) items that are evidence of a crime, (3) trash, (4) perishable food, and (5) bulky items (i.e., furniture, mattresses, sheds, structures, and pallets), except for tents and operational bicycles, walkers, crutches, wheelchairs.

*Id.* The written notice also explains how to retrieve property that has been collected and stored. *See id.*

Also in advance of each HSOC engagement, outreach specialists from the Felton Institute visit the encampment, engage everyone on-site to assess their health and interest in any treatment or other

services, and again remind people of the upcoming HSOC engagement. They then report to DPH in advance of each HSOC encampment resolution about behavioral needs they have identified among people at the encampment. This advance report ensures DPH is equipped to provide behavioral health resources matching the needs of the clients at the site. Dodge Decl. ¶¶13-14; Horky Decl. ¶¶10-12.

During HSOC resolutions, San Francisco offers encampment occupants shelter and provides them additional time to pack up and move their belongings. On the morning of HSOC resolutions, SFHOT outreach workers again conduct outreach at the encampment. *See* Nakanishi Decl. ¶6; Piastunovich Decl. ¶6. The Encampment Resolution Team ("ERT") – SFHOT outreach workers assigned to staff HSOC resolutions – arrive at the encampment at 7:00 a.m. and begin engaging encampment occupants by 7:30 a.m. Nakanishi Decl. ¶6; Piastunovich Decl. ¶6; Dodge Decl. ¶15; *see also* Dilworth Decl. ¶5. ERT reminds encampment occupants of the timeframe and process of the HSOC resolution, and – as discussed with encampment occupants the weekend prior – offer to connect them to various services, including shelter. Nakanishi Decl. ¶6; Piastunovich Decl. ¶6. The DPH street medicine team provides a range of services at HSOC encampment resolutions, including: (a) assisting with de-escalation, crisis management, 5150 assessments; (b) engaging all clients with reported or observed behavioral health symptoms; (c) assessing clients for interest in services and determining appropriate referrals; and (d) completing referrals and linkage.  Horky Decl. ¶7.

While ERT has not yet confirmed during this initial engagement the specific shelters that are available, ERT informs encampment occupants that shelter is available; and if an individual is interested, ERT takes their information, including their preference for any specific shelter or type of shelter. Piastunovich Decl. ¶6. By around 8:30 a.m., HSH communicates to HSOC what shelter space has been allocated to HSOC that day. Dodge Decl. ¶17; Piastunovich Decl. ¶6; Nakanishi Decl. ¶7.

ERT then reengages with encampment occupants to match those interested in shelter with an appropriate placement. Dodge Decl. ¶17; Piastunovich Decl. ¶6; Nakanishi Decl. ¶7. At 9:30 a.m., HSH confirms shelter availability. Dodge Decl. ¶17; Piastunovich Decl. ¶8; Nakanishi Decl. ¶7. Throughout the HSOC resolution, field staff, including ERT, are in regular communication with HSH about who is interested in shelter and any specific shelter needs or preferences. Dodge Decl. ¶17; Piastunovich Decl. ¶7; Nakanishi Decl. ¶8. If an encampment occupant is interested in shelter, HSH

confirms they are not already housed or sheltered in a San Francisco-supported program. Dodge Decl. ¶17; Piastunovich Decl. ¶7.[2] Throughout the HSOC resolution – including before the 8:30 a.m. allocation and continuing after the 9:30 a.m. confirmation – HSOC-affiliated staff advocate for encampment occupants to try to obtain from HSH the specific and/or additional shelter allocations requested by encampment occupants. Dodge Decl. ¶17; Piastunovich Decl. ¶¶7-8; Nakanishi Decl. ¶8. Beginning around 9:30 a.m., HSOC arranges transportation for those individuals who accepted a shelter placement. Dodge Decl. ¶17; Piastunovich Decl. ¶8; Nakanishi Decl. ¶9.[3]

DPW typically does not arrive at the encampment until 8:00 a.m. or later. Dilworth Decl. ¶5; Dodge Decl. ¶20; Nakanishi Decl. ¶10. And DPW will not begin cleaning up an encampment until after ERT has conducted outreach, typically around 9:30 or 10:00 a.m. *See* Dilworth Decl. ¶5; Dodge Decl. ¶20; Nakanishi Decl. ¶10. While DPW waits for ERT to conduct its outreach so that it may begin cleaning up the encampment, DPW crews perform a variety of other street cleaning duties around the encampment's perimeter. Dilworth Decl. ¶5.

DPW is in regular communication with ERT and the HSOC Incident Commander about ERT's outreach, including who has left the encampment and who needs more time to pack up their belongings. Dilworth Decl. ¶7; Hardiman Decl. ¶4; Nakanishi Decl. ¶10. DPW stores and discards items left behind pursuant to its policy and procedure for the removal and temporary storage of personal items collected from public property, known as its "bag and tag" policy. *See* Dilworth Decl. ¶6. Plaintiffs attach a copy of Procedure No. 16-05-08, entitled 'Removal and Temporary Storage of Personal Items Collected From Public Property" to their motion. That policy provides:

> Upon inspection by street cleaning staff, underlined <u>unattended</u> personal items - such as medication, tents, luggage, bedding, backpacks, personal papers, and operational wheelchairs- will be collected and stored for up to 90 days for retrieval. Only items listed below under "Items That Will Be Discarded" will be discarded immediately. All other items will be removed and stored.

---

[2] It is not uncommon for someone who is already sheltered to nevertheless be residing in an encampment rather than in their shelter. Piastunovich Decl. ¶7.

[3] Plaintiffs mischaracterize San Francisco's Policy Analyst Report, Della-Piana Decl. Exh. 14, when they assert police inject a "highly visible and active presence" at HSOC resolutions. Plaintiffs' MPA at 10. To the contrary, Exhibit 14, dated April 2022, explains "efforts have been made to de-emphasize the law enforcement nature of City policy towards homeless encampments, and to enhance service referrals and mental health and substance abuse outreach."

Della-Piana Decl. Exh. 26 at §B(1). The policy authorizes DPW to discard: "Items that present an immediate health or safety risk"; "Furniture, mattresses, sheds, rolling structures, and bulky items"; "Perishable items, perishable food"; "Contraband, illegal items"; "Trash, garbage, and/or debris"; and "Abandoned property." *Id.* at §C. The policy advises DPW staff that:

> Temporarily unattended property is different from <u>abandoned</u> property, which may be immediately discarded. In determining if property is abandoned, staff should evaluate the facts and circumstances surrounding the items. Unattended property is not abandoned if it is accompanied by signs of ownership -for example, an unattended tent that is filled with personal belongings, or items that are being stored in an orderly manner (i.e., packed up, wrapped, or covered). In addition, if there is a third party present who states s/he has been designated to watch or secure the items during the owner's temporary absence, the items are not considered abandoned.

> By contrast, abandoned items are unaccompanied by objective indications of ownership, for example, an empty or broken tent sitting by itself on a sidewalk with no other belongings, a bag of clothes open and strewn across a sidewalk, or items that are broken, disheveled, surrounded by trash, or show other signs of neglect. This policy does not apply to abandoned property.

*Id.* at §B(1) (Distinguishing Between Unattended vs. Abandoned Property).

When any items are bag-and-tagged, DPW staff provide information about when and where to retrieve the items to their owner. Dilworth Decl. ¶8. If no one is present, a written notice including the date, time, and location of removal, a description of items removed, the removing DPW staff member's name and vehicle number, and instruction for retrieval, is posted in the immediate vicinity of the removal. *Id.* San Francisco stores items that have been bag-and-tagged at the Public Works Operations Yard at 2323 Cesar Chavez Street for 90 days. Dilworth Decl. ¶8.

## III.   Beyond HSOC Engagements.

There are occasions when San Francisco employees engage with individuals experiencing homelessness outside of HSOC encampment resolutions. DPW staff will encounter individuals experiencing homelessness during routine maintenance operations. *See* Dilworth Decl. ¶9. DPW staff, however, generally clean around belongings during routine maintenance; they generally do not move or remove people or property unless there are health or safety issues or the public right of way is inaccessible. Dilworth Decl. ¶9. When individuals are asked to move temporarily, DPW staff provide them time to move their belongings and inform them that unremoved items will be bag-and-tagged or discarded in accordance with DPW policy. Dilworth Decl. ¶9.

SFPD officers will also engage individuals experiencing homelessness outside of HSOC encampment resolutions. *See* Christ Decl. ¶4. SFPD officers are trained to adhere to SFPD Bulletin 19-080, which provides, *inter alia*, that S.F. Municipal Police Code § 168 ("Sit/Lie" law) may be enforced only between 0700 hours and 2300 hours; and that "Officers must secure appropriate shelter before taking enforcement action" under Penal Code § 647(e) (illegal lodging). Christ Decl. ¶ 4; *see also* Della-Piana Ex. 27.[4]

SFHOT outreach workers also conduct outreach to individuals experiencing homelessness outside of HSOC encampment resolutions. Mazza Decl. ¶8; Nakanishi Decl. ¶9; Cohen Decl. ¶9. This outreach, however, is specifically to offer services, connections, and/or referrals, and do not involve law enforcement, DPW, or any request to move (unless the clients are going to a shelter placement). Mazza Decl. ¶8; Nakanishi Decl. ¶9.

## ARGUMENT

### I.  Legal Standard

"Injunctive relief is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id*. Here, the Coalition has not satisfied its burden on any of the *Winter* factors.

### II.  Plaintiffs Are Unlikely To Succeed On The Merits.

#### A.  San Francisco Offers Shelter Before Requiring an Unhoused Person to Vacate Public Property (Eighth Amendment).

San Francisco's policy of offering shelter before requiring any unhouse person to vacate public property meets the requirements of the Eighth Amendment. In *Martin v. City of Boise*, the Ninth Circuit held "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter."

---

[4] Plaintiffs' incomplete quotation of SFPD Bulletin 19-080 and ellipses are misleading. See Plaintiffs' MPA at 10. Plaintiffs omit the explicit requirement in the Bulletin that an individual be offered housing before any enforcement may proceed.

*Martin v. City of Boise*, 920 F.3d 584, 616 (9th Cir. 2019). In *Johnson v. City of Grants Pass*, the Ninth Circuit "reache[d] beyond *Martini* slightly" – holding "that 'sleeping' in the context of *Martin* includes sleeping with rudimentary forms of protection from the elements, and that *Martin* applies to civil citations where ... the civil and criminal punishments are closely intertwined." *Johnson v. City of Grants Pass,* 50 F.4th 787, 813 (9th Cir. 2019).

The Ninth Circuit's holdings in *Martin* and *Johnson*, however, were "narrow." *Martin*, 920 F.3d at 617 ("Our holding is a narrow one."); *Johnson*, 50 F.4th at 813 ("We are careful to note that, as in *Martin*, our decision is narrow."). Neither *Martin* nor *Johnson* "dictate to the City that it must provide sufficient shelter for the homeless." *Martin*, 920 F.3d at 617. Nor do *Martin* and *Johnson* "allow anyone who wishes to sit, lie, or sleep on the street ... at any time and at any place." *Id.*

"*Martin* does not establish a constitutional right to occupy public property indefinitely at Plaintiffs' option." *Miralle v. City of Oakland*, No. 18-cv-068234-HSG, 2018 WL 6199929, at *2 (N.D. Cal. Nov. 28, 2018) (footnote omitted). "[R]emaining at a particular encampment on public property is not conduct protected by *Martin*, especially where the closure is temporary in nature." *Shipp v. Schaaf*, 379 F. Supp. 3d 1033, 1037 (N.D. Cal. 2019). Rather, the Ninth Circuit has "h[e]ld simply that it is 'unconstitutional to [punish] simply sleeping *somewhere* in public if one has nowhere else to do so." *Johnson*, 50 F.4th at 813 (original emphasis) (citing *Martin*, 920 F.3d at 590 (Berzon, J., concurring in denial of rehearing en banc)).

The Ninth Circuit was clear that its "holding does not cover individuals who *do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it." *Martin*, 920 F.3d at 617 n.8 (original emphasis); *see also Johnson*, 50 F.4th at 813 (directing district court to "narrow its injunction to ... enjoin enforcement ... only against involuntarily homeless person for engaging in conduct necessary to protect themselves from the elements when there is no shelter space available"). The Ninth Circuit also limited its holding to the criminalization of "conduct that is an unavoidable consequence of being homeless." *Martin*, 920 F.3d at 617 (citation omitted). Laws and ordinances "may be enforced against [homeless persons] who engage in prohibited activity unrelated to their status as homeless persons." *Johnson,* 50 F.4th at 812 n.36. And "citation or arrest for failing to vacate

the encampment" where "homeless plaintiffs" have a "'place where they can lawfully be' within the City" does not "punish[] for acts inherent to their unhoused status that they cannot control." *Shipp*, 379 F. Supp. 3d at 1037(citations omitted).

San Francisco's policy of offering shelter to anyone before they are asked to vacate an encampment complies fully with Ninth Circuit precedent. "This is not a case where 'homeless plaintiffs do not have a single place where they can lawfully be' within the City." *Shipp*, 379 F. Supp. 3d at 1037 (quoting *Martin*, 920 F.3d at 617) (finding no "serious questions as to their Eighth Amendment claim" because "even assuming" the City will "enforce[] temporary closures via citations or arrests, remaining at a particular encampment on public property is not conduct protected by *Martin*"). Encampment occupants in San Francisco asked to vacate public property "have access to adequate temporary shelter," even if many "choose not to use it." *Martin*, 920 F.3d at 617 n.8; *see also Miralle*, 2018 WL 6199929, at *2 (finding no "serious questions as to the merits of their Eighth Amendment claim" because "Plaintiffs are not faced with punishment for acts inherent to their unhoused status that they cannot control" where the "encampment closure ... includes an offer of shelter"). The Coalition's admissible evidence confirms their Eighth Amendment claim lacks merit. Three declarants acknowledge receiving and/or accepting shelter offers at HSOC resolutions in 2022. Cronk Decl. ¶¶8-11; Donohoe Decl. ¶¶8-11; Sandoval Decl. ¶8.

Patrick Dubose states HSOC arrived one day in advance of the posted resolution date in February 2022. Dubose Decl. ¶9. Dubose states HOT made no service offers, and with the helpful advocacy of a volunteer from plaintiff Coalition, he was not required to move. *Id*. That is exactly what is supposed to happen if in fact shelter resources are insufficient at an HSOC resolution. Dodge Decl. ¶18. And Molique Frank states at a January 26, 2022 HSOC resolution, "HOT said that there was no shelter available that day." Frank Decl. ¶12. In fact, HSOC had extra shelter resources available at the conclusion of the January 26, 2022 resolution that Molique Frank describes.  Dodge Decl. ¶11.

1

### B.   San Francisco Reasonably Preserves the Possessions of Unhoused Persons (Fourth Amendment).

The Fourth and Fourteenth Amendments apply to homeless persons' "unabandoned, but momentarily unattended, personal property." *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1027 (9th Cir. 2012). The Fourth Amendment protects against unreasonable seizures of property. *See id.* at 1030. "A 'seizure' of property under the Fourth Amendment occurs when there is 'some meaningful interference with an individual's possessory interests in that property.'" *Sullivan v. City of Berkeley*, 383 F.Supp.3d 976, 981 (N.D. Cal. 2019) (quoting *Lavan*, 693 F.3d at 1027). The Fourth Amendment, however, is not a guarantee against all seizures, only unreasonable seizures. And a seizure is unreasonable only "if the government's legitimate interest in the seizure does not outweigh the individual's interest in the property seized." *Id.* (citing *Lavan*, 693 F.3d at 1030). The Fourteenth Amendment protects against the deprivation of property without due process of law. "Under the Fourteenth Amendment, homeless individuals are entitled to meaningful notice and an opportunity to be heard before their unabandoned property is seized and destroyed." *Id.* (citing *Lavan*, 693 F.3d at 1032). Under the Fourth and Fourteenth Amendments, "the government may not *summarily* destroy the unabandoned personal property of homeless individuals that is kept in public areas." *Garcia v. City of Los Angeles*, 11 F.4th 1113, 1124 (9th Cir. 2021) (emphasis added).

The Constitution, however, "does not prohibit the City from removing items stored on its property where a homeless resident, if given an indefinite amount of time, would eventually return to collect them." *Sullivan*, 383 F. Supp. 3d at 986. "[T]he City has a legitimate interest in enforcing its penal and municipal statutes and in removing unsafe or hazardous conditions from its public spaces." *Id.* And this government interest outweighs the invasion of an individual's possessory interests in items left behind at an encampment where the government provides prior notice that belongings would need to be moved from public. *See id.* (finding "seizure and destruction of" items left behind "was reasonable as a matter of law" where the "all had prior notice that they needed to move their belongings from public roads and sidewalks" yet "[s]till, they did not timely move the items they wished to keep.")

Similarly, the government satisfies due process where it provides prior notice – warning encampment occupants to remove their belongings and informing them which items left behind would be stored versus discarded – as well as a post-seizure opportunity to retrieve any stored property. *See Sullivan*, 383 F. Supp. 3d at 981-83 (finding Berkeley's policy constitutional where notice was "generally" provided "72 hours prior," the notice explained "how individuals may reclaim any property collected," and unattended property collected was stored for 14 or 90 days while "refuse or garbage" was disposed of); *see also Shipp*, 379 F. Supp. 3d at 1037-38 (finding Oakland's policy "on its face, provides adequate notice and opportunity for Plaintiffs to be heard before property is seized" where it provided 72-hour notice, storage of property not deemed unsafe or hazardous for 90 days, and post-seizure notice of how to retrieve belongings); *Miralle*, 2018 WL 6199929, at *3 (same).

Due process does not require "actual receipt of notice" – it "requires only that the Government's effort be 'reasonably calculated' to apprise a party of the pendency of the action." *Dusenbery v. United States*, 534 U.S. 161, 169-170 (2002). And no specific amount of notice is required. While courts have found 72-hours' notice is sufficient to satisfy due process, it is not necessary – even less than 24-hours' notice can satisfy due process. *See, e.g.*, *Sullivan*, 383 F. Supp. 3d at 984 ("even if less than 24-hours' notice to leave a public space was provided on certain occasions, plaintiffs have failed to raise a triable issue as to whether this would violate due process when the encampment did, in fact, receive notice and a reasonable opportunity to pack up their belongings before the City collected any remaining unattended property.")

Further, neither the Fourth nor Fourteenth Amendment preclude the disposal of property reasonably believed to be abandoned under the totality of the circumstances. *See Sullivan*, 383 F. Supp. 3d at 984-85; *see also Lavan v. City of Los Angeles*, No. CV 11-2874, 2014 WL 12693524, at *8 (C.D. Cal. July 24, 2014) ("The abandonment inquiry focuses on whether, 'through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure.' [Citation.] Such a determination is 'to be made in light of the totality of the circumstances, and two important factors are denial of ownership and physical relinquishment of the property.' [Citations.]"). In *Sullivan*, the Court found that homeless plaintiffs "fail[ed] to raise a triable issue as to whether [Berkeley] has a practice of summarily destroying

unabandoned property in violation of the Fourth and Fourteenth Amendments" because Berkeley had an "objectively reasonable basis to believe that the property left behind by [plaintiffs] was wholly abandoned rather than temporarily unattended" where they had "prior notice" and been "informed that they should take what they wanted to keep and could leave behind any trash for disposal." *Id.* at 985.

This Court has upheld other Bay Area cities' policies regarding their responses to homeless encampment, which policies are similar to San Francisco's. *See Sullivan*, 383 F. Supp. 3d at 981-83; *Shipp*, 379 F. Supp. 3d at 1037-38; *Miralle*, 2018 WL 6199929, at *3.

Three of plaintiffs' declarants describe their property being confiscated and destroyed at an HSOC resolution in 2022. Frank Decl. ¶¶9-12; Sandoval Decl. ¶8; Solomon Decl. ¶9. Seven of plaintiffs' declarants describe being disturbed by DPW street cleaning operations and their belongings, including tents, damaged or destroyed in 2022. Cronk Decl. ¶¶3-7; Donohoe Decl. ¶¶3-7; Martinez Decl. ¶¶5-7; Sandoval Decl. ¶¶5-7; Howard Decl. ¶¶4-15; Murdock Decl. ¶¶2-3; Solomon Decl. ¶¶3-9. Due to overlap, a total of eight declarants have complained that DPW has damaged or destroyed their property.

These eight witnesses, even if credited, do not establish a policy or practice to violate plaintiffs' constitutional rights in contravention of San Francisco's official policies, which fully protect plaintiffs' constitutional rights. Plaintiffs have not demonstrated the items they assert were confiscated and destroyed, should have been preserved under DPW's bag/tag policy, or whether DPW properly disposed of them as trash, garbage, debris, broken furniture, discarded appliances, or items presenting an immediate health or safety risk such as hazardous sharps, chemicals, items soiled by infectious or hazardous materials, and items infested by rodents or insects.

One of plaintiffs' declarants describes unsuccessful efforts to recover property from the DPW storage facility in 2022. Martinez Decl. ¶10. Martinez's declaration, however, does not describe the property he was unable to recover. The declaration fails to establish whether his property had been bagged and tagged, or whether it should have been under DPW's policy. *Id.*

Plaintiffs' declarations "are too general" to show that San Francisco has repeatedly violated its own policies. *Shipp*, 379 F. Supp. 3d at 1038. "It is not sufficient to state, as Plaintiffs and their declarants do, that the City sometimes removed and destroyed encampment members' property.

Sometimes the City has the right to do this." *Id.* "Therefore, when the City confiscates and destroys property, it is not possible to conclude that there has been a policy violation without knowing more," and "Plaintiffs' declarations do not provide the 'more.'" *Id.* Plaintiffs' declarations "do not provide any specific details from which the Court can infer that the discarded items should have been stored instead." *Id.* Moreover, to the extent any one individual – or even eight individuals – had their property improperly discarded, that "would, at most, constitute an individual incident of unconstitutional action by a non-policymaking employee that is insufficient to establish *Monell* liability." *Sullivan*, 383 F. Supp. 3d at 987.

### C. Plaintiffs Rely On Stale and Inadmissible Evidence That Cannot Support A Preliminary Injunction.

Much of plaintiffs' percipient testimony is stale, describing events more than a year old. Especially in light of the shifting impact of Covid-19 on San Francisco's delivery of homeless services, events prior to 2022 are not probative of current conditions and therefore cannot support plaintiffs' preliminary injunction motion. Accordingly, the following declarations are inadmissible, in whole or in part: Ackerman (describes events June 2020-March 2022); Cutler (May 2020-June 2022); Evans (March 2020-Sept 2021); Wadkins (March 2021-Jan 2022); Castano (May 2020, Aug 2020); Frank (Jan 2022); Vaughn (Jan 2020); Bennett (Apr 2021-June 2021)[5]; Bryant (through Dec 2021); Brown (March 2017); Connick (winter 2020); Delamora (July 2019 and Jan 2020); Dubose ("summer of 2021" and Feb 2022); Freehoffer (April 2019 and Sept 2020); Harrison (Nov 2019 and Jan 2020); Hill (summer 2019 and Jan 2020); Howard (March-April 2022); Hurd (2018); Jones (Aug-Dec 2020); Solis (summer 2019 and Jan 2020);Orona (2017-2021); Partee (summer 2020); Sparks (Winter 2019 and May 2020); Vetter (summer 2018 and spring 2019). It is no surprise much of the percipient testimony comes from years ago. According to their own declarations, eleven of plaintiffs' percipient witnesses are now housed. Vaughn Decl. ¶2; Bryant Decl. ¶3; Dubose Decl. ¶3 (transitional housing); Freehoffer Decl. ¶2; Hill Decl. ¶3; Hurd Decl. ¶3; Jones Decl. ¶2; Orona Decl. ¶4 (lives in RV); Partee Decl. ¶2; Solis Decl. ¶2; Vetter Decl. ¶2. The following exhibits are likewise irrelevant, in whole or in

---

[5]   The Bennett declaration, in addition to being a year and a half old, lacks credibility because Mr. Bennett is a disgruntled former employee who threatened HSH staff and behaved violently against them when he was terminated. See Mazza Decl. ¶9 & Exh. A.

part, because they relate to conditions that existed prior to 2022. Della-Piana Decl. Exh. 12 (June 22, 2018); Exh. 31 (Jan-June 2021); Exh. 32 (Jan 2021-Aug 2022); Exh. 36 (July 2018-Oct 2021); Exh. 40 (Jan-Feb 2021).

The Coalition Declarations are riddled with inadmissible hearsay. E.g. Ackerman Decl. ¶10 ("One individual … told us"); Cutler Decl. ¶¶14, 26 ("unhoused individuals reporting"; "I have spoken to"; "People reported"); James Decl. ¶¶8, 19 ("I have spoken to people"; "I learned of this in speaking with"; "We learned what had happened by talking to"; "I received text updates"); Wadkins Decl. ¶¶12, 17, 21, 30 ("I ordinarily could not be physically present"; "I have heard countless reports"; "Often, I hear people say"; "I know from my conversations"; "I arrived toward the end of this sweep. I spoke with…"; "I later learned"; "Individuals reported to me"; "He told us"; "We heard that residents were told")  The following exhibits also constitute inadmissible hearsay, and should therefore be excluded: Exhs. 15-16, 19-25.

In addition to its hearsay problem, the characterizations of San Francisco's conduct beginning at paragraph 11 of the Friedenbach Declaration are improper opinion and fail to demonstrate a foundation based on personal knowledge. The declarations from Coalition staff and volunteers are vague and conclusory, in addition to the relevance and hearsay deficiencies specified above.

Dr. Herring presents five opinions in his expert declaration. His opinions lack a factual basis, and he applies the wrong standard to evaluate San Francisco's policies. The Court should therefore disregard Herring's opinions.

**Opinion 1**: Herring conflates aggregate shelter capacity with the offer of a bed for a specific individual at an encampment resolution. Herring Decl. ¶28. Herring acknowledges an encampment resolution is the "clear way to access shelter" in San Francisco. *Id.* ¶33. Herring next argues shelter space is "effectively" unavailable to those who are offered it at an encampment resolution, because the shelter beds San Francisco offers to campers may fall short of federal regulatory guidelines. *Id.* ¶¶34, ¶¶37-38. These federal guidelines, however, do not embody constitutional standards, which require a municipality to offer an alternative place to sleep. *Martin*, 920 F.3d at 616. The Constitution does not require San Francisco in each case to accommodate clients' preferences for pets, bulky item storage space, particular house rules, etc., see Herring Decl. ¶34, though San Francisco does try to

accommodate clients' preferences. Dodge Decl. ¶17. During Covid-19, San Francisco reduced its congregate shelter capacity by 70%, to allow social distancing and make the shelters safe. Cohen Decl. ¶18.

**Opinion 2**: Using stale data from Jan-June 2021, Herring calculates that on many days, an encampment resolution proceeded without a shelter allocation that matched the total number of clients at the site. Herring Decl. ¶¶48-51. But HSOC has learned that 40% of clients at an encampment resolution accept offers of shelter, and has made the rational decision to proceed accordingly. *Id*. ¶56n28. If HSOC's projection of shelter needs turns out to be insufficient on a particular day, the encampment resolution team shifts gears, continues to offer resources, and does not require clients to leave. Dodge Decl. ¶18. Further, Herring fails to recognize that HSOC and HSH continue to adjust shelter availability after the formal 9:30AM allocation, responding to any mismatch that may arise between the allocation and actual client needs. Dodge Decl. ¶17; Piastunovich Decl. ¶¶7-8.

**Opinion 3**: Herring relies on stale data, all of it more than a year old, Herring Decl. ¶¶60-78, stretching back as far as 2014. *Id*. ¶¶67, 72. Herring has not attempted to correlate police activity to HSOC encampment resolutions, though he acknowledges it is possible to do so. *Id*. ¶59. Herring relies on the erroneous premise of his Opinions 1 and 2, above, that HSOC lacks available shelter resources to offer clients at encampment resolutions. Since HSOC indeed offers shelter to campers, any police engagement at an encampment resolution complies fully with *Martin* and *Johnson*.

**Opinion 4**: Herring again relies on stale data, all of it more than a year old, Herring Decl. ¶¶83-88, stretching back as far as 2016. *Id*. ¶88. Herring acknowledges DPW policy requiring DPW to collect and store a person's belongings. *Id*. ¶81. Herring suggests no criticism of DPW policy. *Id*. Herring has no valid basis nor competence to resolve the disputed factual question whether DPW follows its policy and preserves unabandoned personal items while discarding only trash, garbage, debris, broken furniture, discarded appliances, and items presenting an immediate health or safety risk such as hazardous sharps, chemicals, items soiled by infectious or hazardous materials, and items infested by rodents or insects.

**Opinion 5**: Herring articulates his sharp policy disagreement with San Francisco. Herring's criticisms, though, are untethered to any constitutional standard. The Eighth Amendment does not

require San Francisco to allow *any* tent on its sidewalks, regardless of shelter availability. Compare Herring Decl. ¶93 and *Johnson*, 50 F.4th at 812 n.34. Enforcing restrictions on occupying public property is constitutional, so long as the individual has somewhere to sleep. Compare Herring Decl. ¶91 and *Martin*, 920 F.3d at 616.

### III. Plaintiffs Have Not Shown Irreparable Harm; the Public Interest and Balance of Harms Weigh Against an Injunction.

San Francisco agrees a constitutional violation establishes irreparable harm. See Plaintiffs' MPA, at p. 25. As explained above, however, plaintiffs have not shown San Francisco violates their Fourth Amendment or Eighth Amendment Rights. See Part II, *supra*. For the same reasons, this Court has denied preliminary injunction motions in similar cases challenging municipal homeless encampment policies under the Fourth, Eighth, and Fourteenth Amendments. *Shipp*, 379 F.Supp.3d at 1039; *Miralle*, 2018 WL 6199929 at *4.

Asserting their entitlement to an injunction, plaintiffs' ignore the public interest in promoting public health and safety. The public interest does not "weigh[ ] conclusively in favor of enjoining the City from exercising its considered judgment as to how to best maintain public health and safety." *Miralle*, 2018 WL 6199929 at *4.

Encampment resolutions are a key element in San Francisco's $672 million Homeless Response System. Encampment resolutions are essential to keep public spaces clean and sanitary, and to allow safe access to the public right of way. San Francisco has made "difficult decisions it judges to be in the best interests of all its residents by implementing a policy it believes appropriately balances the important individual and community rights implicated by encampments on public land."  See *Miralle*, 2018 WL 6199929 at *4. This Court should not lightly upend San Francisco's balanced and compassionate policy determinations.

### CONCLUSION

For the foregoing reasons, this Court should deny plaintiffs' motion for preliminary injunction.

Dated:  November 15, 2022

DAVID CHIU
City Attorney
YVONNE R. MERÉ
WAYNE SNODGRASS
MEREDITH B. OSBORN
JAMES M. EMERY
EDMUND T. WANG
Deputy City Attorneys


By: _s//James M. Emery_____
        JAMES M. EMERY

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO; SAN
FRANCISCO POLICE DEPARTMENT; SAN
FRANCISCO DEPARTMENT OF PUBLIC WORKS;
SAN FRANCISCO DEPARTMENT OF
HOMELESSNESS AND SUPPORTIVE HOUSING;
SAN FRANCISCO FIRE DEPARTMENT; SAN
FRANCISCO DEPARTMENT OF EMERGENCY
MANAGEMENT; MAYOR LONDON BREED; SAM
DODGE