LATHAM & WATKINS LLP
Alfred C. Pfeiffer, Jr., SBN 120965
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
al.pfeiffer@lw.com

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY AREA
Zal K. Shroff, MJP 804620, *pro hac vice*
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
zshroff@lccrsf.org

ACLU FOUNDATION OF NORTHERN
CALIFORNIA
John Thomas H. Do, SBN 285075
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
jdo@aclunc.org

*Attorneys for Plaintiffs*

*Additional Counsel Below*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| COALITION ON HOMELESSNESS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, et. al., <br><br> Defendants. | CASE NO. 4:22-cv-05502-DMR <br><br> **SUPPLEMENTAL EXPERT DECLARATION OF CHRISTOPHER JOHN HERRING, PH.D. IN SUPPORT OF THE REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> **Judge:** The Hon. Donna M. Ryu <br><br> **Hearing Date:** December 22, 2022 <br> **Time:** 1:00 p.m. <br> **Place:** Courtroom 4 – 3rd Floor <br> 1301 Clay Street <br> Oakland, CA 94612 |

LATHAM & WATKINS LLP
Wesley Tiu, SBN 336580
Kevin Wu, SBN 337101
Tulin Gurer, SBN 303077
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
wesley.tiu@lw.com
kevin.wu@lw.com
tulin.gurer@lw.com

LATHAM & WATKINS LLP
Joseph H. Lee, SBN 248046
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
joseph.lee@lw.com

LATHAM & WATKINS LLP
Rachel Mitchell, SBN 344204
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
rachel.mitchell@lw.com

LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA
Elisa Della-Piana, SBN 226462
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
edellapiana@lccrsf.org

ACLU FOUNDATION OF NORTHERN CALIFORNIA
Brandon L. Greene, SBN 293783
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
bgreene@aclunc.org

I, Christopher John Herring, hereby declare pursuant to 28 U.S.C. § 1746:

1. I am an Assistant Professor of Sociology at the University of California Los Angeles (UCLA) where my research and teaching centers on homelessness, affordable housing, and the impact of local government policies on homelessness and housing in the United States. Prior to my appointment at UCLA, I was appointed as a postdoctoral fellow at Harvard University's Faculty of Arts and Sciences. I received my Ph.D. in Sociology from the University of California, Berkeley. I also hold a Master's Degree in Social Anthropology from Central European University and a B.A. in Economics from Bard College.

2. I previously submitted an Expert Declaration in Support of Plaintiffs' Motion for Preliminary Injunction (the "PI Motion") on September 27, 2022 (the "Initial Expert Declaration"). I have had the opportunity to review Defendants' Opposition to the PI Motion (Dkt. No. 45), and I submit this Supplemental Expert Declaration in support of Plaintiffs' Reply. My qualifications and expertise are laid out in the Initial Expert Declaration.

3. My expert opinions contained in my Initial Expert Declaration rely on my expertise regarding San Francisco's response to homelessness and my extensive writing on San Francisco's homelessness crisis in particular. In my Initial Expert Declaration, I also relied in part on Public Records Request data from a variety of San Francisco city agencies dating generally from January 2018 through December 2021 to reach my expert opinions. This public records data had been provided to me by Plaintiffs' counsel—and I understood that it was the extent of the data that San Francisco had made available to Plaintiffs' counsel in time to be analyzed.

4. I understand that San Francisco has challenged the expert opinions contained in my Initial Expert Declaration by asserting that the years of data I analyzed (~2018-2021) does not include corresponding data from 2022. However, I understand that San Francisco did not produce the vast majority of relevant 2022 data to Plaintiffs' counsel until after the PI Motion was filed.

5. I have prepared this Supplemental Expert Declaration to address the new data from 2022 that has been provided to me since the preparation of my Initial Expert Declaration. I find that the trends I analyzed and the conclusions I reached in the Initial Expert Declaration are

confirmed by this data. I therefore re-iterate my initial findings in full based on the 2022 data, as I describe in the paragraphs below.

**Additional Data Reviewed Since the Initial Expert Declaration**

6.  The public data records that was provided to me and that I have further reviewed to prepare this Supplemental Expert Declaration include the following categories of data spanning the indicated periods.

- **Encampment Resolution Schedules and Reports (August 30, 2021 – November 8, 2022):** San Francisco's encampment resolution reports include information about when and where the City has conducted formal Healthy Streets Operation Center (HSOC) encampment resolutions of homeless individuals. These schedules and reports include information about the total number of unhoused people at the site, as well as other information about the encampment itself.

- **Bag and Tag Logs (January 2022 – October 2022):** Per City policy, San Francisco's Department of Public Works ("DPW") is required to keep a log of all property of unhoused people taken and stored following a sweep. I reviewed summary logs of DPW's bag and tag records between January – September 2022. These summary logs include general information about the amount of property logged and stored by the City each month. For October 2022, I reviewed individual logs that indicated where the property was located when it was removed, what the property was, and information about who it belonged to.

- **Citation and Arrest Logs (January 2022 – October 2022).** SFPD keeps logs of citations and arrests pursuant to Cal. Penal Code § 647(e) (no lodging on public property without permission) and Cal. Penal Code § 148(a) (willfully resisting city staff, including refusal to comply with a 'move along' order to vacate the premises)—the main quality of life offenses San Francisco regulatory enforces against homeless individuals.

- **Shelter Bed Availability Data (January 2022 to October 2022):** The

Department of Homelessness and Supportive Housing (HSH) records the daily shelter bed availability in all shelters and shelter placements throughout the City. This data includes the number of shelter beds expected to be available on a given day, the location of those beds, and the entity to which the shelter beds are assigned.

7. Each of the above-mentioned document categories are documents that I had already received, reviewed, and analyzed for the period from 2018-2021 in reaching the conclusions in the Initial Expert Declaration. I now confirm that those conclusions are not contradicted, and are in fact supported by, the same data sets from 2022.

**Supplement to Expert Opinions in Light of 2022 Data**

8. My expert opinions are supplemented *only* to address and incorporate the 2022 data I recently reviewed. I otherwise stand by my analysis and opinions in the Initial Expert Declaration in all respects. I divide my supplemental analysis of the 2022 data below on an opinion-by-opinion basis for the Court's convenience.

    **A.** **Regarding Opinion #1: Voluntary access to shelter has been functionally inaccessible to unhoused people in San Francisco since the onset of the pandemic in April 2020 and has long been systematically inadequate for a large portion of the population.**

9. As San Francisco's 2022 Homeless Count and Survey shows, there are at least 7,754 homeless individuals residing in the City on any single given night—and at least 2,500-4,000 of those individuals are forced to remain unsheltered because San Francisco does not have enough shelter beds to house its unhoused population and its shelter waitlists are closed so that no one can access shelter voluntarily. *See* Initial Expert Declaration, ¶¶ 24-31. I therefore describe that San Francisco operates in a context of extreme shelter scarcity.

10. The shelter bed availability reports provided by HSH for January to October 2022 confirm the reality of shelter scarcity. HSH daily reports during this period reflect that generally anywhere from 10 to 50 beds were theoretically available on a given day across the entirety of San Francisco. That is without even addressing whether those shelter placements are in fact available

to unhoused individuals based on their gender, social, and medical circumstances. Regardless, these numbers confirm San Francisco's shelter scarcity. On nights when 3,000+ San Franciscans were unsheltered and sleeping outside in 2022, San Francisco's entire shelter system had only approximately 10 to 50 beds theoretically available for use by that entire population. Meanwhile, voluntary access to even these few shelter beds remains functionally inaccessible to unhoused people. *See* Initial Expert Declaration ¶ 31.

**B.    Regarding Opinion #2: HSOC[1] Clears Encampments and Displaces Homeless Individuals Despite the Clear Lack of Available Shelter on a Daily Basis.**

11.    In my Initial Expert Declaration, I conclude that despite a general context of shelter scarcity across San Francisco and the lack of voluntary access to shelter, the City appears to justify its Healthy Streets Operation Center (HSOC) sweep operations by purporting to hold specific shelter beds open for law enforcement to offer when they threaten unhoused individuals with citation and arrest for sleeping in public. However, I concluded that the City's shelter shortage is so severe that it lacks the capacity to provide sufficient shelter to all homeless individuals it targets with enforcement—and therefore that the City fails to meet even its own more relaxed pre-enforcement standards. This conclusion was based in large part on a detailed analysis of 2021 data. *See* Initial Expert Declaration ¶¶ 42-43, 57.

12.    An analysis of the same public records from 2022 shows the same trend. Between January 3, 2022 and November 8, 2022, HSOC Encampment Reports indicate that HSOC conducted formal encampment resolutions on 197 days. Of those 197 days, I received reports of the City's HSOC shelter bed availability allocation for 165 of those days. Of those 165 days, shelter was only available for all unsheltered camp residents evicted by HSOC on 29 days (17.6%). In

---

[1] In both the Initial Expert Declaration and Supplemental Expert Declaration, I refer to HSOC as the entity that conducts encampment resolutions. My references to HSOC did not mean to exclude sweep operations conducted by other City agencies, such as DPW, SFPD, or HSH. I use the term interchangeably to refer as a whole to the agencies that are conducting both formal encampment resolutions and non-HSOC sweep operations.

4

other words, on 136 out of the 165 days with available data, HSOC did not appear to have a sufficient number of shelter beds to offer all those removed during its removal operations.

13.     That means that San Francisco failed to meet its own pre-enforcement standard 82.4% (136/165) of the time during HSOC encampment resolutions in 2022. *See* S.F. Police Code § 169 (the City is required to "offer Housing or Shelter *to all residents of the Encampment who are present*" and "shall not enforce the prohibition […] unless there is available Housing or Shelter for the person or persons in the Encampment.") (emphasis added).

14.     In the table below, I set out each of the dates where encampment resolutions took place, the number of total unsheltered clients who were reportedly present at each encampment when HSOC conducted its sweep operations, and the number of shelter beds available in congregate and non-congregate settings assigned to HSOC for each day an HSOC encampment resolution occurred.[2]

15.     Like before, if there was more than one HSOC resolution on a given day, the number of total clients listed in the table below represents the total clients across all resolutions that took place that day. For purposes of analysis, I also again exclude the number of "clients already housed/sheltered" as reported by the HSOC reports from the total number of unsheltered clients at each encampment resolution.

*Shelter Bed Shortfall for HSOC Encampment Resolutions, January – October 2022*

| DATE OF ENCAMPMENT RESOLUTION | TOTAL UNSHELTERED CLIENTS ENGAGED | TOTAL AVAILABLE SHELTER BEDS | % OF REQUIRED SHELTER AVAILABLE |
|---|---|---|---|
| 1/5/2022 | 29 | 6 | 21% |
| 1/10/2022 | 16 | 8 | 50% |
| 1/11/2022 | 14 | 6 | 43% |
| 1/18/2022 | 20 | 10 | 50% |
| 1/19/2022 | 8 | 5 | 63% |
| 1/20/2022 | 7 | 0 | 0% |
| 1/21/2022 | 6 | 0 | 0% |
| 1/26/2022 | 14 | 8 | 57% |
| 1/28/2022 | 11 | 5 | 45% |
| 1/31/2022 | 11 | 8 | 73% |

---

[2] Excluded from this table are the 32 days where the City's shelter bed availability was not reported.

| Date | | | |
|---|---|---|---|
| 2/2/2022 | 13 | 12 | 92% |
| 2/7/2022 | 18 | 7 | 39% |
| 2/8/2022 | 23 | 6 | 26% |
| 2/9/2022 | 16 | 5 | 31% |
| 2/10/2022 | 11 | 8 | 73% |
| 2/11/2022 | 16 | 1 | 6% |
| **2/15/2022** | **8** | **8** | **100%** |
| 2/16/2022 | 13 | 7 | 54% |
| **2/17/2022** | **7** | **7** | **100%** |
| **2/18/2022** | **5** | **6** | **120%** |
| 2/22/2022 | 10 | 9 | 90% |
| 2/23/2022 | 12 | 6 | 50% |
| 2/24/2022 | 10 | 4 | 40% |
| 2/25/2022 | 10 | 0 | 0% |
| 2/28/2022 | 7 | 6 | 86% |
| 3/1/2022 | 12 | 7 | 58% |
| 3/3/2022 | 14 | 6 | 43% |
| 3/4/2022 | 10 | 5 | 50% |
| 3/7/2022 | 12 | 8 | 67% |
| 3/8/2022 | 15 | 5 | 33% |
| 3/9/2022 | 25 | 7 | 28% |
| 3/10/2022 | 10 | 6 | 60% |
| 3/11/2022 | 13 | 9 | 69% |
| 3/14/2022 | 14 | 8 | 57% |
| 3/15/2022 | 14 | 10 | 71% |
| 3/16/2022 | 9 | 6 | 67% |
| 3/17/2022 | 13 | 5 | 38% |
| 3/18/2022 | 10 | 6 | 60% |
| 3/21/2022 | 17 | 5 | 29% |
| 3/22/2022 | 14 | 8 | 57% |
| 3/23/2022 | 12 | 5 | 42% |
| 3/24/2022 | 14 | 6 | 43% |
| 3/28/2022 | 18 | 7 | 39% |
| 3/29/2022 | 10 | 9 | 90% |
| 4/4/2022 | 8 | 7 | 88% |
| 4/5/2022 | 12 | 11 | 92% |
| **4/6/2022** | **5** | **5** | **100%** |
| 4/7/2022 | 12 | 7 | 58% |
| 4/8/2022 | 10 | 6 | 60% |
| 4/11/2022 | 13 | 12 | 92% |
| 4/12/2022 | 15 | 6 | 40% |
| 4/13/2022 | 7 | 5 | 71% |
| 4/14/2022 | 15 | 7 | 47% |
| 4/15/2022 | 7 | 4 | 57% |

| | Date | | | |
|---|---|---|---|---|
| 1 | 4/18/2022 | 15 | 8 | 53% |
| 2 | 4/19/2022 | 17 | 8 | 47% |
|   | 4/21/2022 | 14 | 9 | 64% |
| 3 | **4/22/2022** | **6** | **8** | **133%** |
|   | 4/25/2022 | 12 | 6 | 50% |
| 4 | 4/26/2022 | 12 | 4 | 33% |
| 5 | **4/27/2022** | **9** | **10** | **111%** |
|   | 4/28/2022 | 11 | 5 | 45% |
| 6 | 4/29/2022 | 12 | 5 | 42% |
|   | 5/2/2022 | 11 | 6 | 55% |
| 7 | 5/3/2022 | 9 | 8 | 89% |
| 8 | 5/4/2022 | 9 | 4 | 44% |
|   | 5/6/2022 | 5 | 5 | 100% |
| 9 | 5/9/2022 | 15 | 6 | 40% |
| 10 | 5/11/2022 | 9 | 4 | 44% |
|   | 5/12/2022 | 9 | 4 | 44% |
| 11 | 5/13/2022 | 11 | 7 | 64% |
| 12 | **5/16/2022** | **5** | **6** | **120%** |
|   | 5/17/2022 | 14 | 8 | 57% |
| 13 | 5/18/2022 | 22 | 9 | 41% |
| 14 | **5/19/2022** | **7** | **8** | **114%** |
|   | 5/20/2022 | 22 | 6 | 27% |
| 15 | 5/23/2022 | 14 | 7 | 50% |
|   | 5/24/2022 | 9 | 8 | 89% |
| 16 | 5/26/2022 | 12 | 8 | 67% |
| 17 | 5/27/2022 | 17 | 9 | 53% |
|   | 5/31/2022 | 18 | 9 | 50% |
| 18 | **6/2/2022** | **8** | **8** | **100%** |
|   | 6/3/2022 | 12 | 8 | 67% |
| 19 | 6/6/2022 | 13 | 8 | 62% |
| 20 | 6/7/2022 | 10 | 9 | 90% |
|   | 6/8/2022 | 12 | 9 | 75% |
| 21 | 6/9/2022 | 11 | 9 | 82% |
| 22 | 6/10/2022 | 14 | 8 | 57% |
|   | 6/13/2022 | 14 | 13 | 93% |
| 23 | **6/14/2022** | **8** | **14** | **175%** |
|   | 6/15/2022 | 16 | 14 | 88% |
| 24 | 6/16/2022 | 14 | 12 | 86% |
| 25 | **6/17/2022** | **6** | **14** | **233%** |
|   | **6/21/2022** | **7** | **14** | **200%** |
| 26 | 6/22/2022 | 15 | 14 | 93% |
| 27 | 6/23/2022 | 16 | 11 | 69% |
|   | 6/24/2022 | 20 | 11 | 55% |
| 28 | 6/27/2022 | 12 | 10 | 83% |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SUPP. DECL. OF CHRIS HERRING
CASE NO. 4:22-CV-05502-DMR

| | | | |
|---|---|---|---|
| 6/28/2022 | 12 | 4 | 33% |
| 6/29/2022 | 21 | 3 | 14% |
| 6/30/2022 | 16 | 5 | 31% |
| 7/1/2022 | 16 | 8 | 50% |
| **7/6/2022** | **7** | **10** | **143%** |
| 7/7/2022 | 23 | 12 | 52% |
| 7/8/2022 | 10 | 9 | 90% |
| **7/11/2022** | **7** | **13** | **186%** |
| 7/12/2022 | 24 | 13 | 54% |
| **7/13/2022** | **14** | **14** | **100%** |
| 7/14/2022 | 18 | 12 | 67% |
| **7/15/2022** | **7** | **14** | **200%** |
| **7/18/2022** | **11** | **11** | **100%** |
| 7/19/2022 | 8 | 4 | 50% |
| 7/20/2022 | 14 | 11 | 79% |
| **7/21/2022** | **5** | **6** | **120%** |
| 7/25/2022 | 18 | 6 | 33% |
| **7/26/2022** | **13** | **15** | **115%** |
| **7/27/2022** | **9** | **15** | **167%** |
| 7/28/2022 | 12 | 9 | 75% |
| **7/29/2022** | **10** | **10** | **100%** |
| **8/1/2022** | **11** | **12** | **109%** |
| 8/2/2022 | 14 | 9 | 64% |
| 8/3/2022 | 24 | 10 | 42% |
| 8/4/2022 | 16 | 10 | 63% |
| 8/5/2022 | 12 | 7 | 58% |
| **8/8/2022** | **10** | **11** | **110%** |
| 8/9/2022 | 21 | 11 | 52% |
| **8/10/2022** | **8** | **10** | **125%** |
| 8/11/2022 | 20 | 13 | 65% |
| **8/12/2022** | **12** | **12** | **100%** |
| **8/15/2022** | **5** | **8** | **160%** |
| 8/17/2022 | 12 | 9 | 75% |
| 8/18/2022 | 20 | 10 | 50% |
| 8/19/2022 | 19 | 10 | 53% |
| 8/22/2022 | 27 | 9 | 33% |
| 8/23/2022 | 22 | 7 | 32% |
| 8/24/2022 | 20 | 12 | 60% |
| 8/25/2022 | 20 | 11 | 55% |
| 8/26/2022 | 24 | 11 | 46% |
| 8/29/2022 | 30 | 11 | 37% |
| 8/30/2022 | 14 | 9 | 64% |
| 8/31/2022 | 26 | 11 | 42% |
| 9/1/2022 | 22 | 10 | 45% |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

SUPP. DECL. OF CHRIS HERRING
CASE NO. 4:22-CV-05502-DMR

| Date | Total Unsheltered Clients Engaged | Shelter Offers | % |
|---|---|---|---|
| 9/2/2022 | 8 | 6 | 75% |
| 9/7/2022 | 6 | 4 | 67% |
| 9/8/2022 | 15 | 10 | 67% |
| 9/9/2022 | 12 | 8 | 67% |
| 9/12/2022 | 22 | 7 | 32% |
| 9/13/2022 | 16 | 7 | 44% |
| 9/14/2022 | 44 | 11 | 25% |
| **9/15/2022** | **6** | **11** | **183%** |
| 9/16/2022 | 16 | 11 | 69% |
| 9/19/2022 | 12 | 9 | 75% |
| 9/20/2022 | 21 | 10 | 48% |
| 9/21/2022 | 12 | 11 | 92% |
| 9/22/2022 | 10 | 5 | 50% |
| 9/23/2022 | 26 | 8 | 31% |
| 9/26/2022 | 34 | 7 | 21% |
| 9/27/2022 | 11 | 10 | 91% |
| 9/28/2022 | 8 | 7 | 88% |
| 9/29/2022 | 13 | 11 | 85% |
| 9/30/2022 | 12 | 10 | 83% |
| 10/3/2022 | 12 | 9 | 75% |
| **10/4/2022** | **6** | **8** | **133%** |
| 10/5/2022 | 13 | 9 | 69% |
| 10/6/2022 | 11 | 7 | 64% |

16. Collectively, the chart above identifies that at least 2,239 unhoused people (sum of "total unsheltered clients engaged" for each of the dates identified above) were displaced by HSOC when San Francisco had insufficient shelter to offer the unhoused individuals onsite during the vast majority of sweep operations. It is therefore clear from the above analysis that HSOC continued to displace hundreds of unhoused people without having sufficient shelter assigned to the unit throughout 2022—precisely in line with San Francisco's practice in 2021 as identified in the Initial Expert Declaration.

17. I am aware that San Francisco appears to have admitted that it is justified in only arriving at HSOC sweep operations with 40% of the shelter beds necessary to house all unhoused individuals onsite. In my professional opinion as an academic studying local government responses to homelessness, such resource constraints can often pressure front-line workers to restrict and/or set aside shelter offers based on personal discretions and bias or to engage in other "workarounds" to accomplish supervisors' goals and meet performance metrics, which in the case of HSOC is

primarily the removal of tents, property, and persons as well as preventing re-encampment. *See* Initial Expert Declaration ¶ 52.

### C. Regarding Opinion # 3: HSOC Conducts Police Enforcement Against Homeless Individuals Despite the Lack of Available Shelter, Including Citing and Arresting Individuals During Camp Clearances Even When Adequate Shelter Was Not Available or Offered.

18. In my Initial Expert Declaration, I conclude that SFPD police enforcement occurred even when there was no adequate shelter available in San Francisco—relying in part on an analysis of detailed SFPD dispatch, citation, and arrest data from 2021. *See* Initial Expert Declaration ¶¶ 60-77.

19. An analysis of the same public records from 2022 shows the same trend. For example, between January 1, 2022 and October 6, 2022—a period in which the City lacked daily shelter availability for thousands of unhoused residents across the city and unhoused individuals had no voluntary option to seek shelter because all waitlists were closed—SFPD continued to enforce criminal penalties against unhoused individuals for sleeping and lodging outdoors. Collectively, SFPD cited or arrested individuals for illegal lodging under Cal. Penal Code § 647(e), public nuisance under Cal. Penal Code § 372, and for failure to obey a law enforcement order to vacate or "move along" at least 517 times in 2022—with the vast majority of citations and arrests falling under Cal. Penal Code §148(a).[3]

20. The chart below reflects SFPD's own report of the number of citations issued and arrests made against unhoused individuals during the relevant period. The month of October included only partial data from October 1, 2022 – October 6, 2022.

**SFPD Citation & Arrest Data January – October 2022**

| 2022 | SFPD Citations or Arrests |
|---|---|
| January | 33 |
| February | 23 |

---

[3] This is unsurprising given that SFPD has issued explicit guidance that police officers should issue citations for violations of Cal. Penal Code § 148(a) when the individual refuses to vacate an encampment following a "move along" order. *See* SFPD Bulletin 19-080 ("officers may cite an individual for violating Penal Code § 148(a), where [...] the individual refuses to vacate an encampment").

| | |
|---|---|
| March | 45 |
| April | 51 |
| May | 63 |
| June | 63 |
| July | 88 |
| August | 63 |
| September | 75 |
| October | 13* |
| **Total** | **517** |

21. As noted in my Initial Expert Declaration, these reports of citations and arrests are almost certainly a massive undercount of enforcement and do not reflect the likely thousands of "move along" orders SFPD issues against unhoused individuals across San Francisco that force them to leave a given area under threat of citation or arrest. *See* Initial Expert Declaration ¶¶ 71-73.

22. This data is consistent with recent reporting that San Francisco's new District Attorney has increased "public order" enforcement—including enforcement of San Francisco's "sit-lie" ordinance that criminalizes unhoused residents for sitting or sleeping in public—by about 20%.[4]

23. I have also performed the same specific snapshot across different data sets from 2022 that I performed in the Initial Expert Declaration with data from 2021. *See* Initial Expert Declaration ¶¶ 74-77. By comparing the dates on which the City conducted an HSOC enforcement resolution between January and October 2022 with the dates where the City lacked sufficient shelter bed availability for an HSOC encampment resolution (see *supra* Opinion #2), I determined that SFPD officers issued citations and arrests against unhoused individuals for lodging without permission, maintaining a public nuisance, or failure to obey a police officer on at least 109 of those 136 days (80.14%) *even though* there were not enough shelter beds available.

---

[4] Susie Nielsen, *Are S.F. police behaving differently under Brooke Jenkins than under Chesa Boudin? Study finds immediate shift*, San Francisco Chronicle (Nov. 2, 2022), www.sfchronicle.com%2Fcrime%2Farticle%2Fbrooke-jenkins-sf-policing-17550839.php ("Also in the 45 days after Jenkins was sworn in, officers made 10 additional "public order" stops per day, a 20% increase, according to the analysis conducted by an economist from New York University's Public Safety Lab in partnership with The Chronicle. Public order stops include those related to vandalism, illegal dumping, soliciting sex, trespassing **and sit-lie ordinances, which prohibit individuals from sitting or lying on city sidewalks between 7 a.m. and 11 p.m.**") (emphasis added).

24. I have reviewed San Francisco's challenge that I did not expressly "correlate police activity to HSOC encampment resolutions" in my Initial Expert Declaration although I noted that it may be possible to do so. *See* Dkt. No. 45 at 17; *see also* Initial Expert Declaration ¶¶ 59, 75. First, I will note that the SFPD citation and arrest records from 2021 note location by approximate street and cross street in a way that does not neatly line up with the address information in HSOC's encampment resolution reports. As such, an individualized comparison was not readily feasible and would be extremely time consuming to perform. Second, no such analysis is possible at all for the period between January to October 2022 as the SFPD data provided to me does not contain any information related to the location of each citation and arrest.

25. Furthermore, it would likely be difficult to *confirm* that a citation or arrest was associated with a particular HSOC encampment resolution without reviewing the individual SFPD citation or arrest incident reports, which I understand have not been provided by the City.

26. Additionally as I discuss in my initial declaration, during my own fieldwork, I regularly observed that officers did not offer specific individuals shelter prior to enforcement. In other cases when shelter was offered it was absurdly inadequate (such as offers for single-day stays requiring the forfeiture of nearly all personal property).

27. However, even a cursory review of the HSOC encampment reports and SFPD citation and arrest records for January to June 2021, do appear to show a relationship between several citation and arrest records with an HSOC encampment resolution on that day. For example, on April 26, 2021, SFPD issued a Lodging without Permission citation at Dore Street and Bryant Street. That same day, HSOC conducted an encampment resolution near "Showplace Square including Dore/Bryant." It also appears that citations for violations of Cal. Penal Code § 148(a) issued on January 28, 2021 and January 6, 2021 relate to HSOC encampment resolutions conducted on those days based on the stated locations of the citation and encampment resolution— with reported locations for both HSOC resolutions and arrests near San Bruno Avenue and Eddy Street, respectively. Indeed, this comparison is hampered by the fact that SFPD citation and arrest records generally only provide information on the *intersection* where a resolution takes place, while HSOC encampment resolution report the numbered address of the incident.

28. Regardless, SFPD's citation and arrest data records related to enforcement against unhoused individuals need not be tied to a formal HSOC encampment resolution to reflect that San Francisco is enforcing against unhoused individuals without shelter. For example, and as identified in my Initial Expert Declaration, SFPD regularly issues "move-along" orders to unhoused individuals under threat of citation or arrest in response to 311 dispatch calls whether or not any other agency is present to make a shelter offer in the first place. Initial Expert Declaration ¶¶ 59, 60-62, 64. These non-HSOC sweep operations are commonplace and would take place at different locations across the City regardless of where any formal HSOC sweep operations are occurring. *See id.*

**D. Regarding Opinion # 4: HSOC Engages in Widespread Property Destruction Instead of Appropriately Safeguarding and Storing the Property of Unhoused Individuals in Accordance with Federal Guidelines.**

29. In my Initial Expert Declaration, I stated that the City is failing to record the collection and storage of unhoused individuals' property following encampment resolutions and engages in widespread property destruction when it interacts with unhoused individuals. I reach this conclusion based on my extensive field research, direct observations, field surveys, a review of the various individual declarations in this case, and academic literature I have authored regarding San Francisco's responses to the property of unhoused people. Initial Expert Declaration ¶¶ 87-89. My conclusions are also reached in part based on a more detailed review of DPW Bag and Tag logs from 2016-2021. *Id.* ¶¶ 83-86.

30. An analysis of DPW bag and tag logs dated between January to October 2022 demonstrate the same pattern. Below, I have identified the number of bag and tags logged by DPW between January to October 2022. These totals are based on the number of tags recorded on DPW's monthly summary sheets. For October 2022, the number of DPW bag and tag logs is based on the actual number of bag and tag sheets submitted by DPW and provided to Plaintiffs' counsel. But there is a significant disparity between the number of bag and tags and the number of clients affected monthly HSOC encampment resolution. For example, In October 2022, City public records indicate that HSOC conducted at least 32 formal encampment resolutions affecting 335

unhoused individuals who were ordered to move away from the encampment. Yet, in October 2022, DPW only recorded 47 bag and tag forms.

31. The below table compares the number of bag and tags logged by DPW with the total number of clients at HSOC encampment operations per month. The month of September included only partial data from September 3 to September 13, 2022.

**DPW Bag and Tag Logs: January – October 2022**

| 2022 | DPW Logged Bag and Tags |
|---|---|
| January | 27 |
| February | 35 |
| March | 50 |
| April | 36 |
| May | 28 |
| June | 42 |
| July | 37 |
| August | 71 |
| September | 12* |
| October | 47 |
| **Total** | **237** |

32. The disparity between the sheer number of people subjected to encampment resolutions and the number of logged bag and tags by DPW suggests that San Francisco continues to fail to comply with its bag and tag policies during interactions with individuals experiencing homelessness. This analysis also does not take into account non-HSOC sweep activity conducted by DPW and SFPD on a daily basis that is not captured in HSOC encampment resolution data. *See* Initial Expert Declaration ¶ 86. This is fully consistent with the findings in my Initial Expert Declaration. *Id.* ¶¶ 80-89.

33. I am aware that San Francisco has suggested I do not have a "valid basis nor competence" to address whether the City has complied with its own Bag and Tag policies. Dkt. No. 45 at 17. Respectfully, my opinion is based not only on the City's own publicly available data but also based on my extensive experience researching, conducting field work, conducting surveys with unhoused San Franciscans, and publishing in academic journals regarding San Francisco's treatment of the property of unhoused individuals. My extensive academic work on precisely this

issue directly informs the basis for my opinions on these matters. *See* Initial Expert Declaration. *Id.* ¶¶ 9-18, 87-89.

I declare under penalty of perjury that the contents of this declaration are true and correct to the best of my knowledge, and that I executed this declaration on November 30, 2022 in Los Angeles, California.

Christopher John Herring, Ph.D.