# EXHIBIT 3

1
2
3
4

LATHAM & WATKINS LLP
Alfred C. Pfeiffer, Jr., SBN 120965
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
al.pfeiffer@lw.com

5
6
7
8

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY AREA
Zal K. Shroff, MJP 804620, *pro hac vice*
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
zshroff@lccrsf.org

9
10
11
12
13

ACLU FOUNDATION OF NORTHERN
CALIFORNIA
John Thomas H. Do, SBN 285075
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
jdo@aclunc.org

14

*Attorneys for Plaintiffs*

15

*Additional Counsel Below*

16
17
18

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

19
20
21
22
23
24
25
26
27
28

COALITION ON HOMELESSNESS, et al.,

   Plaintiffs.

  v.

CITY AND COUNTY OF SAN FRANCISCO,
et. al.,

   Defendants.

CASE NO. 4:22-cv-05502-DMR

**DECLARATION OF DYLAN VERNER-CRIST IN SUPPORT OF THE REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**Judge:**  The Hon. Donna M. Ryu

**Hearing Date:** December 22, 2022
**Time:**  1:00 p.m.
**Place:**  Courtroom 4 – 3rd Floor
    1301 Clay Street
    Oakland, CA 94612

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

VERNER-CRIST DECL. ISO REPLY ISO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 4:22-CV-05502-DMR

1  LATHAM & WATKINS LLP
   Wesley Tiu, SBN 336580
2  Kevin Wu, SBN 337101
   Tulin Gurer, SBN 303077
3  505 Montgomery Street, Ste 2000
   San Francisco, CA 94111
4  Telephone: (415) 391-0600
5  wesley.tiu@lw.com
   kevin.wu@lw.com
6  tulin.gurer@lw.com

7  LATHAM & WATKINS LLP
   Joseph H. Lee, SBN 248046
8  650 Town Center Drive, 20th Floor
   Costa Mesa, CA 92626
9  Telephone: (714) 540-1235
10 joseph.lee@lw.com

11 LATHAM & WATKINS LLP
   Rachel Mitchell, SBN 344204
12 12670 High Bluff Drive
   San Diego, CA 92130
13 Telephone: (858) 523-5400
14 rachel.mitchell@lw.com

15 LAWYERS' COMMITTEE FOR CIVIL
   RIGHTS OF THE SAN FRANCISCO BAY AREA
16 Elisa Della-Piana, SBN 226462
   131 Steuart Street, Ste. 400
17 San Francisco, CA 94105
   Telephone: (415) 543-9444
18 edellapiana@lccrsf.org

19
   ACLU FOUNDATION OF NORTHERN CALIFORNIA
20 Brandon L. Greene, SBN 293783
   39 Drumm Street
21 San Francisco, CA 94111
   Telephone: (415) 293-6333
22 bgreene@aclunc.org

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

VERNER-CRIST DECL. ISO REPLY ISO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 4:22-CV-05502-DMR

### DECLARATION OF DYLAN VERNER-CRIST

I, Dylan Verner-Crist, hereby declare pursuant to 28 U.S.C. § 1746:

1.      My name is Dylan Verner-Crist. All facts set forth in this declaration are based upon my personal knowledge, and, if called upon to testify as to the truth of these facts, I could and would competently do so.

2.       I am the lead investigator at the ACLU of Northern California. In my role, I conduct factual investigations of civil rights violations, often in support of impact litigation cases. As part of my investigatory work, I regularly find and interview prospective clients and witnesses, review public records and other documents, conduct fieldwork, and author investigative reports and declarations summarizing my findings.

3.      At the ACLU of Northern California, I have been part of numerous litigation and policy teams regarding the treatment of unhoused people. This has included the public right to view and videotape homeless encampment sweeps, the right of unhoused people to be free from the criminalization of homelessness, and the right of unhoused people to possess and safeguard their personal property.

4.      As part of my work, I have observed encampment sweeps in multiple municipalities, interviewed over one hundred unhoused people regarding their experiences during encampment sweeps, and analyzed numerous documents regarding encampment sweep policies and practices in municipalities across Northern California.

5.      Beginning the week of October 24, 2022, pursuant to a court order, Plaintiffs' Counsel and the Coalition on Homelessness received notification for all large-scale Healthy Streets Operation Center ("HSOC") encampment resolutions, enabling Coalition members and Plaintiffs' counsel to more consistently observe these preplanned sweeps.

6.      In response to this reporting by the City of San Francisco ("City"), I began acting as a monitor of the City's conduct. I attended the City's sweeps of encampments on October 26, 2022; October 31, 2022; and November 14, 2022. Below are my observations of the sweeps that I attended.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**A.  October 26, 2022 HSOC Resolution: Barneveld Avenue and Jerrold Avenue**

7.     The first sweep I attended, on October 26, 2022, was described by the City as planned for "Barneveld Avenue and Jerrold Avenue, and the surrounding areas" at 1 PM that day. I arrived at Barneveld and Jerrold at approximately 1:05 PM.

8.     At approximately 2 PM, Department of Public Works ("DPW") workers began going through the encampment and throwing away unhoused peoples' property. From what I observed, unhoused people in the encampment were continuing to pack up their belongings as DPW workers picked up materials without asking the unhoused people present what items they wanted to keep and what items should be discarded. The workers loaded a large number of obviously personal items into their dump trucks, including numerous bikes, peoples' clothing, food, sleeping items, and suitcases—all of which appeared to be individuals' survival belongings. A true and correct copy of a photo of a DPW truck containing furniture and other property is attached hereto as **Exhibit A.**

9.     After City workers had loaded a number of bikes into the back of a DPW work truck with no apparent attempt to bag and tag them, one of the unhoused people approached the DPW workers and told them that she wanted to take one of the bikes, as it belonged to a friend of hers and she wanted to save it for them. A true and correct copy of a photo of the truck with the bikes in the back is attached hereto as **Exhibit B.** The City workers at first told the woman that she could not take the bike, but after she pressed – with me looking on – the workers agreed to let her take the bike. Had it not been for her pleading and/or my presence, I believe DPW would have confiscated or destroyed this bike along with other unhoused peoples' other belongings.

10.     I saw another man in the encampment standing near a large grouping of belongings. I asked him whether they belonged to him. He told me no and said that they belonged to his friend, who was not there. He did not know where his friend had gone or whether his friend knew about the sweep. Shortly thereafter, the DPW workers approached to dispose of the absent man's belongings. A true and correct copy of a photo showing a DPW worker standing next to these belongings is attached hereto as **Exhibit C.** As shown in the photo, the items are arranged in a cart suggesting they were not abandoned.

2

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

11.     The workers then began taking the absent man's belongings and throwing them into their trucks. I asked the workers whether they were going to throw out all the man's belongings. After my question, the DPW workers agreed to leave a small portion of the man's belongings there for him to collect. A true and correct copy of a photo showing the property the DPW workers agreed to leave is attached hereto as **Exhibit D.** As the photo shows, the belongings that the workers agreed to leave are only a small fraction of the man's belongings. Without my presence at the sweep, I doubt that the City would have preserved these belongings.

12.     I did not witness the City bag and tag or preserve *any* belongings for storage at this sweep, nor did I observe any City workers offer unhoused people the option of bagging and tagging their property for later pickup.

**B. <u>October 31, 2022: Ellis Street from Larkin to Jones</u>**

13.     The next sweep I attended, on October 31, 2022, was described by the City as planned for "Ellis St. from Larkin St. to Jones St" at 7 AM that day. I arrived at the described location a few minutes before 7 AM.

14.     I immediately went to see whether the City had correctly provided notice of the sweep. Though notice was posted in some areas, there were several clusters of tents where no notice was posted, but they were nonetheless subject to the sweep that day. At 7 AM, I counted five groups of tents. From my count, there were a total of fourteen tents in these groups; these tents were occupied by approximately 27 unhoused people.

15.     One group consisted of two tents on the northern side of Ellis just east of Hyde Street. I did not see any notice posted on or near these tents. There were two occupants of these tents. I asked them whether they had received notice of the sweep. They told me that a San Francisco Police Department ("SFPD") officer had come by their tent the previous Friday and told them that they would have to move on Monday. The occupants said that they had informed the SFPD officer that the apartment residents abutting their tent allowed them to stay at the location as long as they kept their area clean. Per the occupants, the officer then told them that they could stay in their current location on Monday and would not have to move.

16.     Later that morning, at approximately 9 AM, I returned to talk to these two

3

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

VERNER-CRIST DECL. ISO REPLY ISO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 4:22-CV-05502-DMR

individuals when I saw them packing up their belongings. They told me that City workers had come by and told them that they would need to move—notwithstanding what the previous SFPD officer had told them. As I watched, they hurriedly packed up their belongings and left the area in search of a new place to sleep.

17.     The last group of tents was outside the described noticed area. This group consisted of three tents on the 700-800 block of Ellis Street between Larkin Street and Polk Street. There was no notice posted on this block. I watched as San Francisco Fire Department ("SFFD"), SFPD, and Homeless Outreach Team ("HOT") workers told the occupants of these tents that they would have to move from their current location.

18.     *Obvious Lack of Shelter*: During this sweep, I observed serious problems with the City's shelter offerings. While HOT workers began talking to unsheltered occupants at approximately 7:30 AM, these occupants all reported to me afterwards that the HOT workers did not know whether they had any shelter beds to offer them and, furthermore, that the HOT workers would not know whether there were any shelter beds available until at least 9 AM. At the same time, I observed HOT workers telling the unhoused people that they would have to move. A number of unhoused people began packing up their belongings following this directive.

19.     At approximately 9 AM, I observed HOT staff begin going around to talk to the remaining encampment occupants again. After these conversations, I approached the unhoused individuals to ask them what HOT staff had told them. The occupants told me that the HOT workers had received their shelter allocation, which was for only 11 spots, even though 27 unhoused individuals had been present at the encampment that day.

20.     At approximately 9:30 AM, a City worker who saw that I was observing the City's conduct told me that their shelter allocation had been increased to 17 spots due to the number of people asking for shelter. Despite this, the City's shelter allocation was still well short of the approximately 27 people who were being swept.

21.     By the time I left the sweep at approximately 11AM, a number of occupants of the encampment who thought they were going to get shelter had still not received a concrete shelter offer. For instance, one couple living in a tent on the 700-800 block of Ellis Street had still not

4

LATHAM&WATKINS<sub>LLP</sub>
ATTORNEYS AT LAW
SAN FRANCISCO

VERNER-CRIST DECL. ISO REPLY ISO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 4:22-CV-05502-DMR

1  been told what actual shelter beds the City could offer them, even though the City had already

2  told them that they would have to move. Despite these limitations, at approximately 10:30 AM I

3  observed the SFFD incident commander tell people that the encampment resolution had

4  concluded and that they would have to move "now."

5  **C.  November 14, 2022: 400-500 Block of Jessie**

6  22.     The next sweep I attended, on November 14, 2022, was described by the City as

7  planned for the "400-500 block of Jessie" at 7 AM that day. I arrived at this sweep location shortly

8  after 7 AM.

9  23.     *Inadequate Notice*: I walked down the 400 block of Jessie Street where notice had

10  been posted at a group of approximately ten tents. I then walked to the north end of the block,

11  near the intersection with Mint Street, where one solitary tent was erected. There was no notice

12  posted near this solitary tent, even though this tent was approximately 100 feet away from the

13  other tents. The posted notice was similarly spotty on the 500 block of Jessie Street, where five

14  tents had been erected in two separate groups. While notice was posted on a light pole next to two

15  of the tents, I did not see any posted notice at the other group of three tents.

16  24.     *Failure to Properly Offer Shelter*: As with the previous sweep, the City's shelter

17  offerings were chaotic. From approximately 7:30 AM to 8:30 AM, I observed HOT staff talk with

18  occupants of the encampment. After these conversations finished, I talked with the occupants.

19  The unhoused residents told me that HOT staff had informed them that they had not yet received

20  their shelter allocations and would not know if they had shelter to provide to anyone at the

21  encampment until 9AM.

22  25.     From my observation, the City's offer of shelter to some people was also

23  superficial. I observed the SFFD incident commander walk by one man who had just come out

24  of his tent and say, "You don't want shelter do you?" without stopping to wait for his answer.

25  That was the only offer of shelter that I saw the City make to this man. I never saw HOT staff

26  talk to him. The SFFD incident commander likewise asked other individuals, "Do you want to go

27  inside?" without providing any more context about what the offered shelter consisted of, where

28  it would be, and what services would be offered there.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

VERNER-CRIST DECL. ISO REPLY ISO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 4:22-CV-05502-DMR

26.     Moreover, the City began directing people to move along at approximately 8:30 AM, well before their shelter allocations had come in. At this time, the SFFD incident commander started approaching unhoused people who were not yet packing up their belongings, telling them that they would have to move that morning.

27.     There were also encampment occupants who had not been asked about shelter at all because they were asleep when HOT staff had been conducting their early morning outreach work. I spoke to one encampment occupant at approximately 9:45 AM. He had only recently woken up and was hurriedly packing up his belongings, as City staff had recently told him that he had to leave. He told me that HOT had never approached him and that he did not know that he could be offered shelter. I urged him to talk to HOT staff. It was only after my conversation with him that he approached HOT staff and was screened for a shelter offering.

28.     *Property Destruction:* The City also began disposing of peoples' property before they had received their shelter allocations. At approximately 8:30 AM, DPW staff began going down the two blocks and disposing of peoples' belongings. A true and correct copy of a photo of a DPW truck with blankets and luggage—that ostensibly was not trash—is attached hereto as **Exhibit E.** I took this photo at 8:29 AM. Another photo that I took at 9:01 AM, a true and correct copy of which is attached hereto as **Exhibit F**, shows the same truck now laden high with peoples' belongings.

/     /     /     /

/     /     /     /

/     /     /     /

/     /     /     /

/     /     /     /

6

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

VERNER-CRIST DECL. ISO REPLY ISO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 4:22-CV-05502-DMR

29.     At approximately 9:45 AM that morning, I talked to one encampment occupant who had downsized his belongings to a backpack and a suitcase. I asked him if he had managed to pack up all of his belongings. He told me he had only grabbed what he could carry. I asked him if he had asked DPW staff to bag and tag his property so that he could pick up what he could not carry at a later date. He told me no, but he then went up to two DPW staff to ask them to bag and tag some of his property so that he could pick it up in the next few days. As I listened, they refused to store his property, telling him that they only stored personal property if people were absent from the encampment at the time of the sweep. DPW staff then took the man's remaining property and threw it into their dump truck.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 30, 2022 at Berkeley, California.


_____

Dylan Verner-Crist

# EXHIBIT A

TO

DECLARATION OF DYLAN VERNER-CRIST
IN SUPPORT OF THE REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION



# EXHIBIT B

TO

DECLARATION OF DYLAN VERNER-CRIST
IN SUPPORT OF THE REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION



# EXHIBIT C

TO

DECLARATION OF DYLAN VERNER-CRIST
IN SUPPORT OF THE REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION



# EXHIBIT D

TO

DECLARATION OF DYLAN VERNER-CRIST
IN SUPPORT OF THE REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION



# EXHIBIT E

TO

DECLARATION OF DYLAN VERNER-CRIST
IN SUPPORT OF THE REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION



# EXHIBIT F

TO

DECLARATION OF DYLAN VERNER-CRIST
IN SUPPORT OF THE REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION

