# EXHIBIT 9

LATHAM & WATKINS LLP
Alfred C. Pfeiffer, Jr., SBN 120965
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
al.pfeiffer@lw.com

LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA
Zal K. Shroff, MJP 804620, *pro hac vice*
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
zshroff@lccrsf.org

ACLU FOUNDATION OF NORTHERN CALIFORNIA
John Thomas H. Do, SBN 285075
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
jdo@aclunc.org

*Attorneys for Plaintiffs*

*Additional Counsel Below*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

COALITION ON HOMELESSNESS, et al.,

Plaintiffs.

v.

CITY AND COUNTY OF SAN FRANCISCO, et. al.,

Defendants.

CASE NO. 4:22-cv-05502-DMR

**DECLARATION OF ANDRINNA MALONE IN SUPPORT OF THE REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**Judge:** The Hon. Donna M. Ryu

**Hearing Date:** December 22, 2022
**Time:** 1:00 p.m.
**Place:** Courtroom 4 – 3rd Floor
1301 Clay Street
Oakland, CA 94612

LATHAM & WATKINS LLP
Wesley Tiu, SBN 336580
Kevin Wu, SBN 337101
Tulin Gurer, SBN 303077
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
wesley.tiu@lw.com
kevin.wu@lw.com
tulin.gurer@lw.com

LATHAM & WATKINS LLP
Joseph H. Lee, SBN 248046
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
joseph.lee@lw.com

LATHAM & WATKINS LLP
Rachel Mitchell, SBN 344204
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
rachel.mitchell@lw.com

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY AREA
Elisa Della-Piana, SBN 226462
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
edellapiana@lccrsf.org

ACLU FOUNDATION OF NORTHERN CALIFORNIA
Brandon L. Greene, SBN 293783
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
bgreene@aclunc.org

**DECLARATION OF ANDRINNA MALONE**

I, Andrinna Malone, hereby declare pursuant to 28 U.S.C. § 1746:

1. All facts set forth in this declaration are based upon my personal knowledge, and, if called upon to testify as to the truth of these facts, I could and would competently do so.

2. I worked for the City of San Francisco in their Department of Public Works ("DPW") for eighteen years from 2003 to 2021—my entire professional career. I retired from DPW in 2021. Throughout my career at DPW, my job was as a "laborer." In this position, I supervised street cleaning crews that interacted with unhoused individuals and were responsible for cleaning in and around encampments.

3. What I saw while working on encampment resolution crews—from the time I started at DPW until I was moved off of encampment cleaning duties around late 2018 or early 2019—followed a regular pattern. It has stuck with me, and I am still working through the trauma these observations caused me. I always tried to interact with unhoused individuals with compassion and care. Eventually, I was moved to different tasks like graffiti cleanup and watering trees because my way of dealing with unhoused individuals was different than my coworkers and supervisors. Even after this, though, I was patently aware of the conduct DPW workers engaged in and saw it day-to-day as I worked.

4. I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction.

**DPW Regularly Destroys Unhoused People's Survival Belongings Without Notice**

5. Throughout my entire career at DPW—and especially in recent years—I personally witnesses many incidents where DPW conducted sweeps without posting a written notice in advance of a homelessness sweep. If there was a lot going on—like media coverage or other political pressure—then DPW would post a notice before going to a site. Additionally, if unhoused people at the location were political, meaning they knew their rights, we would try to post a notice. On a daily basis, though, there was usually no warning that we would be coming.

6. Although DPW employees are required to bag and tag items that they take from unhoused individuals, this rule is rarely followed. I have seen many instances where DPW

personnel made no effort at all to bag and tag property and would take unhoused people's belongings straight to the dump.

7. If DPW workers are sent to collect homeless peoples' belongings from a police station, they are more likely to be kept, because they have already been logged by SFPD. But if the unhoused person's belongings are picked up off the street by DPW workers, they are usually trashed regardless of what they are. That was true during my entire career up until I retired from DPW in 2021.

8. In the rare instance when I observed a DPW employee take and store homeless peoples' belongings by bagging and tagging them rather than immediately trashing them, it was not the normal practice at DPW to leave written notice onsite after the property had been bagged and tagged to inform the unhoused individual how to recover their property.

9. Even when unhoused individuals' belongings are taken to the DPW yard—which is where they are supposed to be stored—I observed that the property was not often kept. DPW street crews dump homeless people's property into a cage at the yard without separating the property out by individual—leaving it to the employees at the yard to sort through all of these belongings and decide what was worthy of being kept. On multiple occasions where I was present, even though an item looked to me like it should be stored, the DPW employees at the yard would refuse to bag and tag the item.  I witnessed this multiple times.

10. I have seen DPW workers throw away entire tents, oftentimes because there was not enough have time to go through people's belongings to determine what was trash and what was not. DPW workers sometimes received more than 50 service requests that needed to get done in one day. Under that kind of time pressure, if people did not pack their belongings quickly enough, DPW workers would consider everything trash because they did not have time to sort through what should be bagged and tagged and what was actually trash.

11. In order to speed up the process to clear encampments or conduct sweeps, and under threat of not meeting all of their scheduled cleanings or removals for the day, DPW employees would ask police officers to force people to move faster.

12. In my experience and observation over the years, the vast majority of homeless

peoples' belongings that were discarded by DPW were personal, clean, and usable. I was trusted in the unhoused community because I tried to treat people with respect to the greatest extent possible. As a result, people would often come up to me and ask whether their property had been bagged and tagged. I would go and check, but almost every single time, their property had not been bagged and tagged. I would have to go back to them and inform them that their property had not been bagged and tagged. There was no one to verify whether items were bagged and tagged, and no one to hold our DPW employees accountable to follow the policy.

13. During the years that I was responding directly to DPW requests for services at homeless encampments, I would always try to bag and tag medications—but could really only do so if they were readily visible. If a cart was neatly packed—with belongings nice and neat and folded up—I would try and bag and tag that as well. But I was often in the minority.

14. If I heard on the radio that there was a conflict between DPW workers and unhoused people and I knew that area and the people staying there, I would often try to go to deescalate the situation. Most of the time, I would get there and realize it was an instance of the DPW employee destroying an unhoused person's belongings while the unhoused person tried to stand up for their rights.

15. Sometimes, unhoused people would come to me before DPW crews even left the area saying that their belongings were missing. For instance, one man had an electronic cart with a large battery so that he could move his belongings quickly if DPW was coming. As we were finishing cleaning, he told me, "I know my battery was just here. They stole my battery." I went over to the DPW truck and found a pile of batteries. I asked if the man saw his battery, and he did, so I let him take it back.

**The City Enforces Against People Without Sufficient Shelter.**

16. In my direct observation over the last several years before I retired in 2021, the City often did not have shelter or resources to provide to individuals whose property DPW took during our cleaning operations. Often, we would be the only department present—or us and SFPD—so there was no one there to offer homeless people services. Nonetheless, I and other DPW workers would be tasked with forcing people to move and taking their belongings.

17. I knew that there were City teams that were tasked with going out and talking with unhoused people to connect them with services. But at the end of the day, these City workers would usually end up saying that they did not have shelter beds available for them. Oftentimes, by the time there was something to offer—if there was something to offer— these individuals had already been moved along and could not be found because they had been forced to move.

**Attitudes of DPW Management**

18. The DPW management called the work we did a war. They pitted *us* against *them*—them being the unhoused individuals we interacted with daily. This really bothered me. I never understood why department leadership would call it a war, when we were not supposed to be fighting unhoused people but rather helping them.

19. Toward the end of my employment at DPW, one manager told me, "You're a little too compassionate. We're at war with the homeless right now, so we want you to find some other duties that you can do, other than street cleaning because we don't want you out there right now, because we're at war."

20. It seemed like DPW's leadership preferred if you did not care about the people you were interacting with. I know that I was not promoted and was eventually moved off of street cleaning duty because I spoke out too much. I would not be put in charge of supervising teams because upper-level management knew that I would not take unhoused people's possessions without bagging and tagging them.

**Reflections on the City's Conduct**

21. I was deeply traumatized by my work at DPW. Often, while I was working there, I would wonder where the individuals whose belongings DPW had taken earlier that day were sleeping now. Often, DPW would leave them without even a blanket. Sometimes, management would ask you to do wrong by someone, then send you back to the same area the next day to face the person you had just taken everything from.

I have reviewed the information contained in this declaration. I declare under the penalties of perjury that the contents are true and correct to the best of my knowledge.

Executed on: November 29, 2022

Andrinna Malone