# EXHIBIT 10

LATHAM & WATKINS LLP
Alfred C. Pfeiffer, Jr., SBN 120965
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
al.pfeiffer@lw.com

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY
AREA
Zal K. Shroff, MJP 804620, *pro hac vice*
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
zshroff@lccrsf.org

ACLU FOUNDATION OF NORTHERN
CALIFORNIA
John Thomas H. Do, SBN 285075
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
jdo@aclunc.org

*Attorneys for Plaintiffs*

*Additional Counsel Below*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

COALITION ON HOMELESSNESS, et al.,

Plaintiffs.

v.

CITY AND COUNTY OF SAN FRANCISCO,
et. al.,

Defendants.

CASE NO. 4:22-cv-05502-DMR

**DECLARATION OF KAKI MARSHALL
IN SUPPORT OF THE REPLY IN
SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION**

**Judge:**        The Hon. Donna M. Ryu

**Hearing Date:** December 22, 2022
**Time:**         1:00 p.m.
**Place:**        Courtroom 4 – 3rd Floor
                  1301 Clay Street
                  Oakland, CA 94612

1   LATHAM & WATKINS LLP
    Wesley Tiu, SBN 336580
2   Kevin Wu, SBN 337101
    Tulin Gurer, SBN 303077
3   505 Montgomery Street, Ste 2000
4   San Francisco, CA 94111
    Telephone: (415) 391-0600
5   wesley.tiu@lw.com
    kevin.wu@lw.com
6   tulin.gurer@lw.com

7
    LATHAM & WATKINS LLP
8   Joseph H. Lee, SBN 248046
    650 Town Center Drive, 20th Floor
9   Costa Mesa, CA 92626
    Telephone: (714) 540-1235
10  joseph.lee@lw.com

11
    LATHAM & WATKINS LLP
12  Rachel Mitchell, SBN 344204
    12670 High Bluff Drive
13  San Diego, CA 92130
    Telephone: (858) 523-5400
14  rachel.mitchell@lw.com

15
    LAWYERS' COMMITTEE FOR CIVIL
16  RIGHTS OF THE SAN FRANCISCO BAY AREA
    Elisa Della-Piana, SBN 226462
17  131 Steuart Street, Ste. 400
    San Francisco, CA 94105
18  Telephone: (415) 543-9444
19  edellapiana@lccrsf.org

20  ACLU FOUNDATION OF NORTHERN CALIFORNIA
    Brandon L. Greene, SBN 293783
21  39 Drumm Street
    San Francisco, CA 94111
22  Telephone: (415) 293-6333
23  bgreene@aclunc.org

24

25

26

27

28

## DECLARATION OF KAKI MARSHALL

I, Kaki Marshall, hereby declare pursuant to 28 U.S.C. § 1746:

1.      My name is Kaki Marshall, and I am above eighteen years of age. I served as the Director of Outreach and Temporary Shelter at the San Francisco Department of Homelessness from October 2018 to August 2019. I learned about the above-captioned lawsuit from reading the news and felt compelled to share my observations about San Francisco's response to homelessness from the perspective of someone who worked on these issues for the City.

2.      All facts set forth in this declaration are based upon my personal knowledge, and, if called upon to testify as to the truth of these facts, I could and would competently do so.

**Background and Professional Experience**

3.      I have dedicated my career to working for government institutions and nonprofit organizations striving to improve outcomes for disadvantaged populations, including the homeless. I currently work for the Department of Education of the State of Oregon as a fiscal analyst where I support the Office of Diversity Equity and Inclusion with tracking and analysis of their Grant In Aid funding for all statewide equity initiatives. I previously held positions at Building Opportunities for Self Sufficiency (BOSS)—an organization in Alameda County that helps connect unhoused individuals to permanent housing—and served as a Senior Associate at PolicyLink, a national research and advocacy think tank focused on advancing social and racial equity.

4.      I received a Master's Degree in Public Policy from Portland State University in 2017. I also have a Bachelor's Degree in Psychology from Portland State University.

5.      Shortly after receiving my Master's Degree, I was recruited by the City of San Francisco to serve in a senior position as Director of Outreach and Temporary Shelter. I have extensive experience working with unhoused individuals in a trauma-informed way, which emphasizes providing services and shelter that is appropriate and accessible to individuals who have a history of trauma. I myself am a formerly homeless youth who ended my homeless experience in 1997. Since then, I have been passionate about working with unhoused individuals and doing my part to help people access resources and housing.

1

**Working for San Francisco and the Healthy Streets Operation Center (HSOC).**

6.      I began my tenure as San Francisco's Director of Outreach and Temporary Shelter excited about the prospect of working in government. Although I was apprehensive that working for San Francisco on its homelessness response could be contentious, I also saw it as an opportunity to impact decisions affecting homelessness. I understood that my position would be focused on developing systems and partnerships to deliver on the goals of the newly adopted strategic plan of the Department. The part of the strategic plan that I would manage included clearing all long-term encampments, setting up the coordinated entry system, building new navigation centers and shelter beds, and using the new navigation center beds to move priority status people off of the streets and into housing.

7.      I quickly learned that my job was going to look very different than what I had hoped. Before I was hired I had a phone conversation with Jeff  Kositsky the then Director of San Francisco's Department of Homelessness, who told me he was aware of my previous activism regarding street sweeps (when working at BOSS I lead the organization's work with our community organizing team that drafted the homeless person's bill of rights with Tom Amiano). During that call he asked me if I would have a problem being responsible to the part of the Department that managed all operations related to clearing encampments. I referenced my knowledge of the *Boise* decision and told him that I would accept the job on the condition that I would not be asked to break the law. He promised me on that call that we would not ever clear an encampment without providing at least two weeks of outreach and engagement to ensure everyone in the encampment was assessed and offered shelter.

8.      Once I was hired as the City's Director of Outreach and Temporary Shelter, Mr. Kositsky informed me that a big part of my new job was actually to act as the lead of a multi-agency team that operated out of the City of San Francisco's Department of Emergency Management. This team operated in an Incident Command Structure to respond to street homelessness. The team was called The Healthy Streets Operation Center (HSOC).

9.      From October 2018 through August 2019 while I was Director of Outreach and Temporary Shelter, I was regularly directed by Jeff Kositsky to collaborate at HSOC with SFPD

2

1   to plan and execute the forcible removal of people and destruction of their property without

2   providing time or resources to determine their housing needs before they were forcibly displaced.

3   I was also frequently put in untenable situations of conflict with SFPD and DPW staff with regard

4   to daily mandates handed down from the Mayor to HSOC, as described in further detail below.

5           10.     I worked and communicated on a daily basis with Jeff Kositsky, Sam Dodge (then

6   the HSOC representative for DPW), Commander David Lazar (then SFPD's HSOC

7   representative), and other City department heads with a part to play in responding to the street

8   impact of homelessness. My experience of David Lazar and Sam Dodge was that they were under

9   tremendous pressure to use any enforcement tactic available to clear the city streets. Both Mr.

10  Dodge and Commander Lazar  pressured me on a weekly basis for access to any empty shelter

11  beds in the system in order to justify a planned sweep.  The team seemed to believe that my whole

12  job was to provide shelter and outreach services to this enforcement mechanism. I learned that my

13  colleagues at HSOC were uninformed about the Department of Homelessness's strategic plan, and

14  that there was a coordinated entry system that was set up to assess and prioritize people for housing

15  by need in order to access to the navigation center beds. It became clear to me that HSOC's

16  leadership did not prioritize following the City's strategic plan to address homelessness.

17  **San Francisco Orders Camp Clearances Absent Any Available Shelter.**

18          11.     At the beginning of my tenure, HSOC only involved a small part of the HOT team.

19  There were perhaps 8 specialized HOT team members that made up the Encampment Resolution

20  Team (ERT). All sweeps that involved HOT were only conducted by the ERT. The ERT met

21  weekly to discuss and plan outreach and engagement with all encampments in the City and County

22  of San Francisco that had more than 5 tents in the same place for more than 5 days.  Sometime in

23  early 2019 we announced that we had cleared all long term encampments and at that point Mr.

24  Kositsky began to direct me to dedicate ERT team resources to "HSOC operations." These

25  operations appeared to me to be dictated by complaints from the Mayor and or a specific City

26  supervisor that felt their constituents 311 complaints were being ignored. Mr. Dodge and SFPD

27  representatives believed this change gave them access to the rest of the HOT team and all of the

28  shelter beds that HOT had access to. I would note the number of shelter beds that were actually

3

available, and I would request more time for HOT workers to conduct outreach before enforcement personnel arrived. HSOC leadership generally insisted that HOT accompany the SFPD at sweeps. As much as I could, I would resist having HOT walk with SFPD at sweeps—and instead pressed for the HOT team to walk ahead of SFPD to lead our response to unhoused people with shelter offers and social services.

12.     But since there was not ever enough shelter to offer individuals at these HSOC operations, the HOT team was typically only able to warn unhoused individuals that the police were coming to force them to move— or the HOT team would advise unhoused people to leave themselves. I fought against this operational tactic. I told Commander Lazar, Mr. Dodge, and Mr. Kositsky that it was putting HOT workers in an unsafe position and also eroded unhoused people's trust in them by using them in this way.  I believe this created a hostile work environment for HOT workers and I said so.

13.     When I raised these issues to Mr. Kositsky, he would often take my side in private. But he would insist that I tone down my objections when confronting SFPD or other HSOC employees who I felt were not following the law or our own policies.

14.     One particular HSOC operation was demanding access to close to 60 shelter beds over the course of a several day operation focused on a specific neighborhood. This became an agenda item at the weekly HSOC meeting that was held across from the Mayor's office facilitated by her chief of staff Sean Elsbernd. At that meeting, Captain Jason Cherniss reported that the SFPD had counted the number of individuals that SFPD felt they would need shelter beds to move. Before the meeting, I told Mr. Kositsky we had around 9 beds available in the entire system, and that those beds were needed by the other 90% of our department that was focused on getting the most vulnerable people in the houseless population housed.  I told Mr. Kositsky that, at the very most, we could spare two beds a day for this operation, which would likely run for two weeks. However, that morning when Captain Cherniss said that we would need close to 60 beds for the operation, Mr. Kositsky said we would have the beds. Mr. Kositsky then directed me to work with the team back at HSOC to develop a plan for the operation that I would present at the next meeting.

15.     I, along with the HSOC representative from the Department of Public Health,

4

assembled a group of outreach workers from HOT and city-funded local nonprofits. The reported plan created at HSOC and presented at the above-referenced weekly HSOC meeting, was as I had fought for: the "outreach workers would walk specific streets identified on maps for 3-4 hour chunks of time. Then one of the HOT workers would pass along the map of the area covered to SFPD and then SFPD would sweep the area. These workers were also supposed to offer and provide help with shelter, transportation, or storage of individuals' property if they were interested." But there were obviously not enough beds available and there was not enough time to assess and offer services to the amount of people being forcibly removed.

16.    I knew from driving to work every morning that DPW regularly swept people at hours that HOT was not in operation. I also understood that 80% of what HSOC did was to have SFPD respond to 311 complaints that rarely involved HOT or DPH. I had heard from consumers, advocates, and nonprofit contractors and had seen first-hand several occasions that DPW workers threw property that was either unattended or that someone was unable to carry away into a dump truck. But that was not within my control. What was in my control was what the outreach workers understood their task was and how we documented it.

17.    However, Sam Dodge, who at the time was at the Department of Public Works, created a tracking tool for the HOT and DPH outreach workers to turn into HSOC along with their maps that reported the number of people they engaged and the outcomes. The way Mr. Dodge designed the tool was to make a binary outcome for each person an outreach worker said they engaged. The options were either "accepted" or "refused" shelter.

18.    We gathered at HSOC the week after the first operation to prepare our report for the weekly HSOC meeting. This is when I discovered that Mr. Dodge intended to report to HSOC leadership that, of the 20 individuals we had encountered, practically all of them had refused shelter. But the HOT team would often only be able to tell unhoused individuals that the police were coming without conducting any coordinated entry assessment that would constitute a shelter offer. Mr. Dodge's tracker logged all of these interactions as shelter refusals, but this was plainly inaccurate and a blatant attempt to work around the City's stated requirements for enforcement.

19.    I pointed out that we could not characterize someone who did not speak to a service

5

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

provider as being given a viable shelter offer and refusing it. We discussed the same data issues with an outside auditor, who assisted me in fixing the tracking tool to more accurately reflect the number of shelter offers made and accepted, which confirmed that few individuals refused shelter when offered. The episode confirmed for me that HSOC's approach was to remove individuals from the streets whether or not we could offer them any shelter or services.

20.     Sam Dodge would constantly request that I deliver a sheet to him every morning with the complete shelter bed availability across San Francisco for the day. This was to allow HSOC to determine how those shelter beds would be used. Again, this directly contradicted what my role required—which was to allocate our limited shelter beds so that they were accessible to the unhoused individuals who were most in need.

21.     For example, even when we did have some shelter beds available, these were often navigation center beds, not general shelter beds, for which there was a separate wait list. Navigation center placements were the most expensive intervention available to us for unhoused San Franciscans most in need of supportive services. Individuals would go through the coordinated entry system, and if they were eligible for permanent supportive housing, they would qualify for a navigation center placement and, from there, the City would help connect them to the housing they needed. I oversaw this program directly.

22.     I would inform HSOC leadership regarding the limited number of navigation center beds available every day for encampment resolutions, noting that the remainder were for the individuals who qualified to receive those services because they were the most vulnerable and most in need of being connected to permanent housing resources.

23.     Because of the pressures from HSOC, instead, the vast majority of navigation center beds were used to clear people. This meant that most of the individuals who received a navigation center bed at a sweep operation were not among the most vulnerable population that we would prioritize for these resources. Instead, these people were forced to give up their property and move to the navigation center for a few days to justify removing them from public property under threat of criminal enforcement. But then they had to returned back to the streets without the property they had before—meaning without their blankets or tents. This enforcement-first model

6

1   meant that dozens of unhoused people desperately waiting for San Francisco's limited shelter and

2   housing resources could not access the resources they were qualified for.

3   **Driving Forces: Mayor Breed and Supervisors Specifically Order Camp Clearances.**

4          24.    Even our planned sweep operations through HSOC were often upended when

5   Mayor London Breed sent text messages directly to staff. Specifically, Mayor Breed would text

6   Jeff Kositsky, Sam Dodge, or the chief of police directing them to immediately remove certain

7   individuals from specific areas. The clear mandate from the Mayor was that the unhoused should

8   not be visible in public, even if they had nowhere else to go. HSOC would race to respond, putting

9   other planned and organized sweeps on hold. We would hold a special HSOC meeting to redirect

10  resources to the areas Mayor Breed had identified for that day. In other words, rather than allocate

11  services by need, political theater would dictate the services.

12         25.    I have personally reviewed many of the text messages Mayor Breed sent to staff to

13  remove unhoused people from sight. She would order us to displace unhoused people by a certain

14  date and time just because they were in the vicinity of her planned schedule for the day. Mayor

15  Breed ordered us to carry out sweeps because she did not want to be seen near unhoused people

16  while she was at lunch, at the gym, at fundraisers, or at meetings on public business.

17         26.    Although I was San Francisco's Director of Outreach and Temporary Shelter and

18  field work was not in my job description, I would often go out personally to locate the unhoused

19  individuals Mayor Breed wanted addressed. I would know that we did not have shelter to offer

20  them and that I could not constitutionally ask them to move without offering shelter. So I did what

21  I could to temporarily keep them out of the Mayor's way. Many times, I would ask the unhoused

22  individual if I could buy them lunch, just so they would be away from the site long enough to

23  satisfy Mayor Breed and the HSOC department heads. If I left this task to someone else, I was

24  confident they would break our own policies and the law to move people, especially given pressure

25  from the Mayor and other HSOC leaders to clear people away regardless of whether we could

26  feasibly provide them with any services.

27         27.    The HSOC advisory committee was where Mayor Breed exerted the most

28  influence. Sean Elsbernd, the mayor's Chief of Staff, would facilitate these advisory meetings, and

7

the agenda would tell us which districts to prioritize and where our resources were to be spent.

28.     HSOC would also prioritize areas to sweep based on which City supervisor or commissioner had reached out to HSOC, Jeff Kositsky, or other San Francisco department heads. These ad hoc sweeps drew resources directly away from matching the most in-need individuals on our waiting lists with shelters that worked for them. Mr. Kositsky would say that we had to make the supervisors happy.

29.     For instance, if a new navigation center opened in a commissioner's district, all the beds in the navigation center would be held for an HSOC operation—using SFPD and DPW to plan sweep in sweeps in that district. This approach was driven by a political calculus to help particular commissioners look like they were solving homelessness in their district—even when we knew we were not actually helping people exit homelessness. This allocation of resources based on geography and politics was directly contradictory to my understanding of how navigation centers were supposed to be used—which was supposed to be based on problem-solving needs and on our coordinated entry assessments.

**Unsanctioned Enforcement: DPW and SFPD Operations Without HOT Involvement**

30.     During my tenure as Director of Temporary Shelter, DPW crews would move throughout the City every night and pressure wash the streets. I was not informed in advance about any of these actions, and so there were no HOT workers present and available to offer shelter to individuals encountered in these nightly sweeps. I have witnessed DPW waking people up and forcing them to move under threat of being sprayed with steaming water and other chemicals— and compel them to leave the area.

31.     I knew DPW would engage in these informal sweeps daily. They would show up with a dump truck, a street sweeper, and other vehicles, rattling tents and waking individuals up. There was no notice for these sweeps, and the HOT team would not be present. This type of informal enforcement without services occurs on a daily basis.

32.     Without anyone from the HOT team to witness and oversee these operations, I became aware that DPW workers threw away unhoused people's survival belongings in large numbers instead of following City policy to safeguard, bag and tag, and store unhoused individuals'

personal property if it was removed during street cleaning. SFPD would also be onsite during some of these off-the-record sweep operations—and yet HOT team was never informed.

33.     I confronted Sam Dodge, the former head of DPW and current director of HSOC, about DPW's nightly operations without HOT involvement. DPW insisted, however, that these informal operations were not considered homeless sweeps and that they are simply regular DPW operations. And so these nightly sweeps still continued to be carried out by DPW and SFPD without the presence of the HOT team.

**HSOC Takes Additional Steps to Clear Tents at All Costs**

34.     In approximately January 2019, San Francisco announced that it had cleared every long-term encampment of more than five tents set up for more than five days. After that, HSOC's encampment resolutions became less planned and more like whack-a-mole. At that time, HSOC began focusing on clearing tents wherever they were being set up.

35.     Sweeping areas over and over again meant that we were encountering the same individuals repeatedly. These individuals had already been assessed through the coordinated entry system before and did not qualify for permanent supportive housing. This meant that HOT had no viable shelter to offer them, and yet they were still being forced to move from place to place by threat of criminal enforcement, fines, arrests, and other intimidation. That reality was untenable for me.

36.     Late in my tenure as Director of Outreach and Temporary Shelter, Mr. Kositsky and the other HSOC department heads began asking me to share the list I maintained of unhoused individuals who were the highest priority for a shelter or housing placement. These were individuals who had previously been assessed by my department but who had not yet secured permanent shelter or housing that was appropriate for them. HSOC wished to use this list to identify people who had previously been "offered shelter" and could therefore be enforced against freely. I was asked to share this list directly with police to aid in their enforcement efforts.

37.     I refused to do so on several grounds. First, claiming that individuals who are waiting for appropriate housing have been "offered shelter" is twisted and flatly incorrect. Unhoused individuals whom we assessed and who scored high enough on our priority status

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

assessment tool often took months to move from where they were staying into shelter and then housing. These people are extremely vulnerable, and as such, once identified, outreach teams are engaging with them on a daily basis to build the relationships needed to move them into shelter. Police interference has been known to exacerbate symptomology and slow down the process of building trust with any institution that would allow for the housing situation to be resolved. Second, I was concerned that disclosure of this list would violate various HIPAA provisions. Third, I understood it was not legal to punish an unhoused individual simply because they had been offered an inadequate shelter placement at some point. This felt like a blatant workaround that still amounted to illegal action.

**Direct Observations of Individual Sweep Operations I Witnessed on the Ground**

38.     Because I was in leadership, most of my direct observations regarding San Francisco's sweep operations were at the decisionmaker level during regular HSOC meetings. However, I also vividly recall specific instances where I was on the ground and observed City employees taking steps that directly contradicted the City's written policies and the law as I understand it.

39.     One such instance occurred when six individuals were staying on the corner of Mason, near Turk, in front of a building that had recently been given to the City. Sam Dodge and David Lazar told me that I had until 6 PM to clear the area, and then DPW and SFPD would force the individuals staying there to move so that the area would be clear for a press conference the next morning.

40.     I got on the phone with HOT immediately and began trying to find two navigation center beds and some HOT team members who could meet me at the site to assist the individuals that were there. I rushed to the site and waited for HOT. DPW workers were already there and had begun cleaning the street. I stepped between the City workers and the homeless people to begin talking with them about the possible opportunity of going to a navigation center. As I spoke to the men and continued making phone calls attempting to locate a shelter bed, the City workers were moving closer and closer with their steam hoses to myself and the two individuals I was engaging with. I identified myself as the Director of Outreach and Temporary Shelter and asked them to

10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   give us more time. They continued to pressure us to leave until the homeless people that I was

2   attempting to assist finally abandoned a portion of their property to DPW for them to throw into

3   the back of their truck. We walked to the other side of the street with whatever property they were

4   able to carry and waited for the HOT team to pick them up.

5          41.     I was present at the site until about 7 PM trying to find a placement for the people

6   there that day. Eventually, HOT arrived and offered the individuals a navigation center. By the

7   time HOT got there, however, DPW had already begun sifting through people's belongings and

8   pressuring them to throw things away.

9   **Reflections on the City's Conduct**

10         42.     There were many times when I was working for San Francisco that I believed I was

11  being asked to break the law. I did not know how to get help or where to turn. This chapter was

12  one of the darkest of my life, and I am still dealing with the mental health consequences of

13  spending more than a year of my life doing work that I believe fundamentally harmed people and

14  actually exacerbated San Francisco's homelessness crisis.

15

16

17  I have reviewed the information contained in this declaration. I declare under the penalties of

18  perjury that the contents are true and correct to the best of my knowledge.

19

20  Executed on: November 30, 2022

21

22

23                                                 Kaki Marshall

24

25

26

27

28

11