**Pages 1 - 46**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Donna M. Ryu, Magistrate Judge

COALITION ON HOMELESSNESS, et al.,

Plaintiffs,

VS.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

Defendants.

**NO. C 22-05502 DMR**

San Francisco, California
Thursday, December 22, 2022

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING**

**OF REMOTE ZOOM VIDEO CONFERENCE PROCEEDINGS**

**TIME: 1:25 P.M. - 2:31 P.M. = 1 HOUR, 3 MINUTES**

**APPEARANCES VIA ZOOM:**

For Plaintiffs:

LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111

**BY: ALFRED C. PFEIFFER, JR., ATTORNEY AT LAW**
**WESLEY D. TIU, ATTORNEY AT LAW**
**KEVIN WU, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

TRANSCRIBED BY: Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official U.S. Reporter

**APPEARANCES VIA ZOOM:** (CONTINUED)

For Plaintiffs:

LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY
131 Steuart Street, Suite 400
San Francisco, California 94105
**BY: ZAL KOTVAL SHROFF, ATTORNEY AT LAW**
**HADLEY ROOD, ATTORNEY AT LAW**

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, California 94111
**BY: JOHN THOMAS H. DO, ATTORNEY AT LAW**

For Defendants:

OFFICE OF THE CITY ATTORNEY
1 Dr. Carlton B. Goodlett Place
City Hall, Room 234
San Francisco, California 94102
**BY: JAMES M. EMERY, DEPUTY CITY ATTORNEY**

OFFICE OF THE CITY ATTORNEY
Sixth Floor, Fox Plaza
1390 Market Street
San Francisco, California 94102
**BY: EDMUND T. WANG, DEPUTY CITY ATTORNEY**

**Thursday - December 22, 2022 1:25 p.m.**

**P R O C E E D I N G S**

---o0o---

**THE CLERK:** Calling Civil Case C 22-5502 DMR, Coalition on Homelessness, et al. vs. City and County of San Francisco, et al.

This, again, is a gentle reminder. Since there's a lot of attorneys on the platform, please identify yourself each time you speak for the integrity of the record.

If plaintiff can start identifying themselves for the record

**MR. SHROFF:** Yes. Good afternoon, Your Honor. This is Zal Shroff from the Lawyers' Committee for Civil Rights of the San Francisco Bay Area for the plaintiffs.

We're also joined by the newest member of our team, who was sworn in last week, Ms. Hadley Rood, who is in our offices with one of our individual plaintiffs, Mr. Molique Frank.

**THE COURT:** Good afternoon, Mr. Shroff, Ms. Rood, Mr. Frank.

**MR. PFEIFFER:** Good afternoon, Your Honor, Al Pfeiffer of Latham & Watkins on behalf of the plaintiffs.

**THE COURT:** Good afternoon, Mr. Pfeiffer.

**MR. TIU:** Good afternoon, Your Honor. Wesley Tiu from Latham & Watkins as well for the plaintiffs.

**THE COURT:** Good afternoon, Mr. Tiu.

**MR. WU:** Good afternoon, Your Honor. This is Kevin Wu with Latham & Watkins on behalf of the plaintiffs.

**THE COURT:** Good afternoon, Mr. Wu.

**MR. DO:** Good afternoon, Your Honor. John Do with the ACLU. And I also have with us, if it's all right with you, members of the Coalition on Homelessness, who are the plaintiffs in this case as well.

**THE COURT:** All right. Good afternoon to all of you.

**MR. EMERY:** Good afternoon, Your Honor. Deputy City Attorney Jim Emery for the City and County of San Francisco.

**THE COURT:** Good afternoon, Mr. Emery.

**MR. WANG:** Good afternoon, Your Honor. Edmund Wang, Deputy City Attorney, on behalf of the City and County of San Francisco.

**THE COURT:** Good afternoon, Mr. Wang.

All right. We're here on the plaintiffs' motion for a preliminary injunction.

I want to start with some questions. Who will be arguing on behalf of plaintiffs, please?

**MR. SHROFF:** Yes, Your Honor. I'll take the lead from plaintiffs. And pursuant to the Court's standing order regarding professional development, we propose to divide the argument. I can answer questions as to the Eighth Amendment, and Mr. Tiu is prepared to address the Fourth Amendment, and Mr. Wu can address the parties' disputes as to evidentiary

admissibility, if the Court wishes to hear argument as to that.

**THE COURT:** Okay. Great. Thank you.

Mr. Emery, how is the defense going to handle the argument?

**MR. EMERY:** I will be arguing today, Your Honor.

**THE COURT:** Okay. So let me -- I want to -- I want to talk about the two policies that are at issue here. I want to confirm with the plaintiffs that I believe the plaintiffs believe these policies are constitutional, but they're complaining about how these policies are violated in a widespread and systematic way.

Mr. Shroff, is that a fair statement?

**MR. SHROFF:** Your Honor, I think that's a fair statement with respect to the Fourth Amendment issue, and not with respect to the Eighth Amendment issue.

**THE COURT:** Okay.

**MR. SHROFF:** Yes. The City doesn't have a coherent policy that addresses whether or not it actually offers shelter prior to encampment operations.

As to the Fourth Amendment issue, I think we are in general agreement that the policy -- and admittedly, there are a few iterations of it in the mix -- are generally constitutionally compliant. It's just a question of which is the policy that's currently at issue.

**THE COURT:** So let's start there.

I asked you all to submit what you thought were the more -- the most recent -- or the operative policy. This is the Bag and Tag DPW Procedure 16-05-18. Each of you submitted versions this morning, but they were different versions.

So, Mr. Emery, I -- I'm going to assume that the City gave me the operative version, which is Version 3. And I think your submission said that City employees are getting trained as of November 2022. Is that correct?

**MR. EMERY:** Yes. The rollout operationally is still underway for that. So what I learned just an hour or so ago is they have actually scheduled another training for next week.

**THE COURT:** All right. What are -- Mr. Emery, what are the differences between Version 3 and Version 2, which is what I think I received from plaintiffs this morning? They got that from the City in February 2022.

**MR. EMERY:** I actually think that the content of both is the same. And the difference is that the draft version that the plaintiffs had had not yet been published, which is what they -- how they described it in their brief.

And what happened in September was it was published, and then the actual operational rollout is still ongoing.

**THE COURT:** So --

**MR. EMERY:** And we --

**THE COURT:** -- is it the City's representation today that Version 3 is identical, substantively, to Version 2? It's just

that Version 3 is now public?

**MR. EMERY:** Version 2, which is -- was attached to the plaintiffs' moving papers, is several years old.

**THE COURT:** It was not --

**MR. EMERY:** What they --

**THE COURT:** It was not attached to -- that's why I asked for it.

**MR. EMERY:** Right.

**THE COURT:** And what I got this morning was something called Version 2. That came from the plaintiffs. They said they received it in February 2022.

**MR. EMERY:** Yeah. Yes, that is -- that is identical.

And how it's different from what was attached to plaintiffs' moving papers, which is an earlier version, the earlier version does not preserve bulky items.

**THE COURT:** Right.

**MR. EMERY:** The 2022 versions, from both the plaintiffs and the slightly tidier, cleaner version that I submitted this morning, that does provide for bulky items --

**THE COURT:** Okay.

**MR. EMERY:** -- also.

**THE COURT:** So again, for the record, I got two filings today. Right? One from plaintiffs, one from the defense.

**MR. EMERY:** Mm-hmm.

**THE COURT:** Mr. Emery, as a representative of the City who

created the document, can you say on the record that the version -- that both versions are identical by way of substance?

**MR. EMERY:** Yes.

**THE COURT:** It's just that the one submitted by the City has now been published. Is that a correct statement?

**MR. EMERY:** Yes. I'm saying that with a little wince because I have not gone word for word. I've looked at everything that is substantively important, and they look the same.

**THE COURT:** Mr. Shroff, have you had a chance to take a look at the version submitted by the City today?

**MR. SHROFF:** We have, Your Honor. And with the same caveat, that we have not looked in exact detail word for word, it looks to be substantially the same policy.

**THE COURT:** Does -- do plaintiffs concede that the policy itself, so Version 3, the one submitted by the City today that's public, that that policy is constitutional if followed?

**MR. SHROFF:** Yes, Your Honor, we would submit that that policy is constitutional.

**THE COURT:** Okay. Now, let's go back to, I guess I'm calling it a policy. It has to do with enforcement of the laws. Right?

So both sides have talked about the Enforcement Bulletin, also called the Department Bulletin, dated April 16th, 2019,

entitled "Legal Enforcement Options for Addressing Lodging and Illegal Encampments." Okay?

Now, that Enforcement Bulletin, in general, lays out various criminal and non-criminal statutes and ordinances that govern lodging and encampments on the streets or sidewalks of San Francisco.

The bulletin also sets forth restrictions on how to enforce Penal Code 647(e), which prohibits unauthorized lodging. And one of those restrictions specifically says that officers must secure appropriate shelter before taking enforcement action under Penal Code Section 647(e).

The bulletin also sets forth a restriction on enforcing Proposition Q, which is San Francisco Municipal Police Code 169, a non-criminal prohibition on encampments. And the bulletin specifically notes that when enforcing Proposition Q, the agency workers must provide a written offer of shelter or housing at least 24 hours before ordering the removal of a tent or encampment.

This bulletin also explains that officers can use Penal Code 148(a), which prohibits resisting, delaying, or obstructing a police officer, to enforce any of the laws that are mentioned in the bulletin. And there's a number of them.

So that's what I took from this bulletin. It's a statement -- it's a -- it's a, I guess, guidance for law enforcement officers in San Francisco about how -- what

they can do -- what their legal enforcement options are for addressing lodging and illegal encampments.

Mr. Emery, is that a fair summary of that document?

**MR. EMERY:** Yes, Your Honor.

**THE COURT:** Mr. Shroff, is it a fair summary of the document?

**MR. SHROFF:** Yes, Your Honor.

**THE COURT:** Okay. Now, if I'm -- calling that document a policy for the moment, Mr. Shroff, do plaintiffs agree that the policy itself, as written, is constitutional?

**MR. SHROFF:** Your Honor, the policy, as written, would be constitutional if San Francisco's shelter system was open, which it is not. So currently, unhoused individuals cannot access shelter on their own. The wait list is closed. There is no same-day line. You can't access shelter by calling.

If that were different, if the shelter system were, in fact, open such that people had practical access to shelter, then that policy would be constitutional with two caveats, Your Honor.

**THE COURT:** Okay.

**MR. SHROFF:** It doesn't address SFPD's stated policy via e-mail. And we do put this in the record. I believe it's Exhibit 17 with the opening brief. There's a stated SFPD policy by an incident commander that says that as long as an area of the City has been offered shelter in the past, it is

SFPD policy never to offer shelter in that area again. That happens in large swathes of the City. So that seems to be a separate policy at work beyond SFPD policy that the Court has mentioned.

And then there's the practice of move-along orders, which I don't think are covered under the policy that the Court has mentioned but is the standard operating procedure for SFPD, as we've put in the record.

**THE COURT:** Okay. Putting aside what the incident commander said in an e-mail, I'm really just talking about this one policy, which is the Enforcement Bulletin itself.

If -- is it fair to say that the plaintiffs' position, as long as there's adequate housing and as long as the Enforcement Bulletin were followed, that the policy itself is constitutional?

**MR. SHROFF:** That would be right, Your Honor, yes.

**THE COURT:** Okay. Okay. So let's get into the specifics.

And I -- Mr. Emery, I now have some questions for you about the underlying data.

In looking at the defense opposition, my takeaway is that the City does not dispute a number of key facts. So, for example, the City does not dispute or challenge that there is a shortfall that numbers in the thousands when comparing the number of homeless individuals in San Francisco and the number of available shelter beds in the period of time of roughly 2019

through 2022, and that that shortfall is calculated a number of ways but has been somewhere in the range of 2,700 to 4,200 beds short of the need during that time frame.

Mr. Emery, I didn't see any dispute of that in the defense papers.

**MR. EMERY:** The number of unsheltered people experiencing homelessness exceeds the number of shelter beds that San Francisco has.

**THE COURT:** By thousands?

**MR. EMERY:** Yes.

**THE COURT:** Okay. I also didn't see any dispute by the City on Dr. Herring's analysis about the minimum number of citations that were issued to homeless individuals for illegal lodging.

So for the period July 2018 to October 2021, Dr. Herring found that there were at least 360 citations issued to homeless individuals for illegal lodging and at least 2,652 citations during that same period pursuant to Penal Code 148(a), for refusal of a homeless individual to obey an order to vacate or move along.

Those were not challenged; so I assume --

**MR. EMERY:** That's correct.

**THE COURT:** -- the City agrees that that's correct information.

**MR. EMERY:** I don't have a basis to challenge that.

**THE COURT:** Okay. I also think that the City did not dispute that during encampment closures, when a member -- when members of the SFHOT team arrive to do their initial assessment or engagement, they do not have firm and immediate offers of beds for residents who are being displaced when they first get there. Is that -- I didn't -- the evidence on both sides seemed to confirm that.

**MR. EMERY:** They don't have specific beds available. They are confident that they can provide beds for everyone who expresses interest.

**THE COURT:** Okay. They -- I don't -- I don't think I saw that in the record. I don't think I saw an expression that they're confident, when they arrive, that they can provide bed space for everyone who wants it. Is that somewhere in the record?

**MR. EMERY:** What I remember in the record right now in response to that is Mr. Dodge explaining that on the occasions when he -- availability of beds falls short, which is very, very rare, that the encampment resolution change- -- switches gears. That's the phrase he used.

**THE COURT:** Okay.

**MR. EMERY:** And based on practice, they know that -- they expect that 40 percent of the people at the encampment will accept shelter. And based on those numbers, when they -- they are confident they will have that allocation that day to cover

the number of people they need. And that is borne out in the statistics.

**THE COURT:** Okay. Let me -- let me take that apart a little bit.

So your first -- the first question I had was: Where in the record does it show that SFHOT workers, even though they don't come with a firm and immediate offer of bed space, they are confident that they can meet the needs of everyone who wants a bed?

I don't -- if you're pointing to Mr. Dodge, I'm not sure that he said that. I don't think that he did.

Now, the other interesting thing about Mr. Dodge is that he is the source of this 40 percent notion; but the source of that is in an article in which he cited -- he is quoted. Mr. Dodge himself, who submitted a declaration in this case, did not talk at all about where this 40 percent rule comes from, what the formula is, how he derived it, how he -- so there's no -- there's nothing from the -- from the apparent maker of the percentage himself, even though he had an opportunity to put it in there. So that's -- that's a little problematic.

And finally, although Mr. Dodge says in his declaration that when there aren't enough shelter beds available, the enforcement does not go forward, there is certainly a lot of evidence submitted by Dr. Herring on the data that he crunched

as well as, you know, a lot of affidavits with anecdotal evidence that bring those numbers to life where, for example, Dr. Herring says in the period of June 1st -- sorry -- January 1st to June 30th, 2021, there's sweep operations on 83 days and that during that period there was only shelter available for all camp residents on 73 of those days; and yet enforcements went forward and citations occurred on at least 51 of the 73 days when there wasn't, as a documented matter, enough shelter space for all residents.

So there's a -- that's -- that's really just one piece of the evidence submitted by plaintiffs on this -- this question. And I didn't see anything in any of the defense submissions about any particular enforcement where, you know, there weren't enough beds and so they stopped.

There's a general statement about that, but all of the defense submissions were generalities. None of it was about -- you know, was based in statistical data, all of which was available to plaintiff -- sorry -- the defense, or more granular anecdotal data, which, quite frankly, the plaintiffs submitted, you know, a very significant amount of that material.

So I -- I am -- my initial question was, there doesn't appear to be a dispute that the SFHOT workers, when they come to the encampment closures, to start the day off, they do not have firm and immediate offers. Do you -- does the City

concede that that's true?

**MR. EMERY:** I -- I quibble with the phrase "firm and immediate." It's not a specific bed, but -- but the -- but the experience demonstrates that, day after day, we have -- we make the placements that -- for people -- we match placements with people who accept the offers.

**THE COURT:** Mr. Emery, besides pointing to Mr. Dodge's declaration, is there any other declaration or evidence that supports what you just said?

**MR. EMERY:** Well, attached to Ms. Piastunovich's declaration is her log of HSOC, the encampment outreach engagements for 2022. And it shows -- it's very hard to read, but it's there. And it shows day after day who was -- who was placed, who was matched with shelter.

And that's -- Piastunovich is P-i-a-s-t-u-n-o-v-i-c-h.

**THE COURT:** Is there any other evidence you want me to review?

**MR. EMERY:** No, Your Honor.

**THE COURT:** Okay. Let me turn briefly to Mr. Shroff.

Is there anything that Mr. Emery has said that you want to address or clarify with respect to the evidentiary record?

**MR. SHROFF:** Thank you, Your Honor.

Oh, I note that my Internet is unstable. Apologies.

Okay. I think we're back.

With respect to the Piastunovich evidence, that indicates

some degree of shelter acceptance or rejection. It doesn't connect that with enforcement operations.

So, as I think the Court noted, the plaintiffs have put in evidence of the substantial citations and arrests and move-along orders. The City has not attempted to suggest that only individuals who have actually been given a shelter offer were subject to those citations and arrests. That was something the City had the opportunity to do when this Court heard the discovery dispute between the parties regarding the record, and the City chose not to introduce evidence to suggest that.

And, yes, as Your Honor pointed out, there are 30 percipient witnesses who have identified situations in which individuals did not have shelter offered to them prior to being enforced against.

I do think it's important to note, Your Honor, for the Court as well that the HSOC sweep operations that we're talking about, the formalized encampment resolutions are but a small fraction of the City's interactions with unhoused individuals. As the Herring report points out, SFPD is dispatched thousands of times every month to respond to complaints about homelessness. I believe it's in the record in the Herring report that about 80 percent of those interactions result in a move-along order. That's where the HOT team isn't even present and there isn't even the guise of shelter.

And there are also DPW cleaning operations happening every day, again, without the presence of the HOT team.

In fact, the vast majority of the City's unconstitutional practices here are with respect to those informal sweep operations that are discussed by the Herring report.

What we have the most data on are the HSOC formal sweeps, and even there we see there isn't even enough shelter just to cover those formal operations under the City's HSOC program. But the problem really is far larger than just HSOC.

**THE COURT:** Okay. Thank you.

Mr. Emery, anything to respond to those points?

**MR. EMERY:** What plaintiffs haven't shown is that there are insufficient beds offered at HSOC encampment resolutions for the people who accept shelter. Everyone is offered, and we have enough beds for those who accept.

Plaintiffs think that that's an improper approach, but there isn't a factual dispute, I don't think.

Regarding the --

**THE COURT:** Hold on. Let me make sure I understand the argument.

**MR. EMERY:** Yeah.

**THE COURT:** So the City concedes that there is a shortfall in the thousands between available shelter beds and people who are involuntarily unhoused, involuntarily homeless individuals.

**MR. EMERY:** That's right.

**THE COURT:** But the City says: We are not engaging in unconstitutional behavior because when we perform a displacement, we offer, and anybody who says they want space, we can guarantee that they get it, and the record shows that.

And the record you'd point to is the Piastunovich log?

**MR. EMERY:** Yes.

**THE COURT:** Okay. So there is a -- you know, a veritable mountain of evidence if you look at the data by Dr. Herring, plus the observations of coalition declarants which, between them, I think there were close to -- well, at least well over a hundred encampment closure events that they observed, plus we have the individual plaintiffs, plus other individuals.

And there's a fair amount of evidence where people are saying or observing that there were no beds to be offered; that the HOT team didn't have anything to offer. And the numbers bear that out.

So I'm not sure -- I will -- you know, I'll go back and take a look at Dodge and the Piastunovich log; but I don't think it really rebuts anything close to the evidence -- the qualitative and quantitative evidence produced by the plaintiffs in their motion on this point.

**MR. EMERY:** When I read the plaintiffs' declarations about whether there were offers of shelter, I understand the assertion that there was no offer of shelter to be the absence of an offer of a particular bed. I think that the plaintiff

declarations don't consider the outreach and the offer of -- of a non-specific shelter bed at 7:30 in the morning to be an offer of shelter.

And so I think that's a legal question. I don't think that's a factual dispute.

**THE COURT:** Well, let me ask you a different question, then, Mr. Emery. I'm looking at *Martin* and *Johnson*. Okay? So first we had the *Martin* case, Ninth Circuit.

**MR. EMERY:** Yes.

**THE COURT:** Their holding (as read):

> "We hold only that 'so long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters,' the jurisdiction cannot prosecute homeless individuals for 'involuntarily sitting, lying, and sleeping in public.'"
>
> "That is, as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter."

That's followed very recently by *Johnson*, Ninth Circuit, September 2022 --

**MR. EMERY:** Mm-hmm.

**THE COURT:** -- which says (as read):

"The formula established in *Martin* is that the government cannot prosecute homeless people for sleeping in public if there 'is a greater number of homeless individuals in a jurisdiction than the number of available' shelter spaces."

It goes on to tell us that we can't count shelters if there's a mandatory religious focus -- right? -- that that should not be included in the formula.

So the Ninth Circuit is telling me that I need to follow a formula approach, and so I'm not -- what do I do with that, given the defense -- I think the defense is arguing for a different approach. You can spell that out for me.

**MR. EMERY:** Okay. I've been thinking about this a little bit.

I read *Martin* and *Johnson*, and they say two different things. They talk about the formula, and they also say as long as there's no option of sleeping indoors, the government cannot criminalize sleeping outdoors. That's -- that's *Martin*. And *Johnson* says it's unconstitutional to punish sleeping somewhere in public if one has nowhere else to do so.

The formula -- the context of the Ninth Circuit's articulation of that formula is in the absence of what San Francisco does, which neither *Grants Pass* nor *Boise* did, which was, before enforcing against an individual, offering shelter to that individual.

**THE COURT:** Okay. I understand the argument.

**MR. EMERY:** Yeah.

**THE COURT:** I will -- I don't know that I fully agree with it, but I understand the argument and will consider it.

But I also have to consider the bodies of evidence. So on the defense side, we've got Dodge and Piastunovich; right? That's what you've pointed me to consider --

**MR. EMERY:** Yeah.

**THE COURT:** -- for that.

Okay. Let me move on for a moment to the bag and tag. Mr. Emery, I didn't --

**MR. EMERY:** I did have some more on that. Can we --

**THE COURT:** I'm sorry. Go ahead.

**MR. EMERY:** Okay. When I looked through plaintiffs' evidence, I was focusing on -- on eyewitness, firsthand events that occurred in 2022. I was zeroing in on that because of the volume, and I explained why I don't think the rest is very probative.

And I only found one assertion that SFHOT at an encampment resolution did not have any beds to offer, and that was January 26th of 2022. And Mr. Dodge specifically rebuts that particular firsthand assertion because at the end of the day on January 26, 2022, HSOC had enough beds for everyone who wanted one that day.

**THE COURT:** I'm not sure -- I'm not understanding why you

would focus solely on 2022. I mean, there's a body of evidence here that --

**MR. EMERY:** Yeah.

**THE COURT:** -- dates back that Dr. Herring went through.

He -- the defense opposition objects to the opening brief, saying: It only went through 2021; that's stale.

But the reason it's stale is because the City didn't update their documents, didn't provide additional data until after the plaintiffs filed their opening brief, at which point plaintiffs had the additional data.

Dr. Herring has submitted a supplemental declaration saying the data that continues through 2022 is completely in line, nothing has changed. So I don't know that it's appropriate to focus on the January -- one specific incident when, actually, the data and the anecdotal evidence covers far more than that.

**MR. EMERY:** Well, they -- the Herring data does not distinguish between what happened at resolutions and what happens outside resolutions. We know that --

**THE COURT:** Why does that matter?

**MR. EMERY:** Well, because at resolutions, so long as there are enough shelter beds to provide for everyone who accepts shelter, every citation is proper.

Then if you look at the citations that are recorded outside resolutions, we know that the San Francisco Police

policy is to offer shelter, to call up on the phone the housing -- supportive housing services to see if there's a shelter bed available before enforcing, unless there -- the person is blocking the sidewalk so that a wheelchair can't go through or unless the person is blocking a -- access to a public area. Under those circumstances, you don't have to offer shelter. You're asking a person to move from a specific place. You're not saying a person has no place to sleep legally.

**THE COURT:** Mr. Emery, let me just stop you because I think this goes back to where we started.

I think the plaintiffs have conceded that the Enforcement Bulletin, as written, if --

**MR. EMERY:** Yeah.

**THE COURT:** -- there were enough shelter beds available, it's constitutional.

They are not challenging the policy itself.

**MR. EMERY:** Yes.

**THE COURT:** Their argument is that policy is violated on a widespread systematic basis, and they present evidence by Dr. Herring, as well as all of the declarations, to show that.

So I -- I didn't see -- what you're talking about now, what you're saying about practice, you know, there's not -- there was no quantitative analysis by the defense. There's -- there's -- there was nothing that was offered by the defense to

challenge Dr. Herring's analyses in any sort of quantitative way or to present an alternate analysis. So I can't -- you know, I'm stuck with what the record is on this motion.

How this plays out down the road, I don't know. We're very early in the case.

**MR. EMERY:** Mm-hmm.

**THE COURT:** But for purposes of considering the likelihood of success on the merits, both sides had -- had an opportunity --

**MR. EMERY:** That's right.

**THE COURT:** -- to give me a record.

The City is in possession of all of the information. So I -- I'm -- you know, you pointed out a few things that are in the record that I can look at, and I will. I'll go back to look at them. But I'm not hearing sort of a full-throated analysis or sort of evidentiary record --

**MR. EMERY:** Mm-hmm.

**THE COURT:** -- that addresses the record put forward by the plaintiffs on this.

**MR. EMERY:** What I'm --

**THE COURT:** Is there anything further?

**MR. EMERY:** What I'm suggesting is that the City does not challenge the police data that it provided to the plaintiffs through Public Records Act requests.

The inferences are unwarranted, given that San Francisco

has a policy that accommodates and explains all of the numbers of citations.

**THE COURT:** But there's ample evidence, anecdotal evidence that that policy is not being followed. We have very different descriptions of how encampment closures occur; and the plaintiffs' descriptions, which are, you know, fairly detailed, talk about many instances, many, many, many instances in which the policy was not followed.

So that's, I guess, what I'm pointing to. The policy isn't the problem. The question is: How is that policy being executed?

**MR. SHROFF:** Your Honor, if I may.

**THE COURT:** Mr. Shroff, go ahead.

**MR. SHROFF:** I was just hoping to address the legal question regarding what really is the test in *Martin* relative to the City's argument here --

**THE COURT:** Okay.

**MR. SHROFF:** -- because *Martin* does articulate a numerical test, and I think we provided the Court the recent authority from the District of Arizona that applies that test.

**THE COURT:** Yes.

**MR. SHROFF:** There are several other courts in this district that have done so. *Warren vs. City of Chico* also takes that mathematical test into account.

I think *Grants Pass* really addresses the question that the

defendants are seeking to assert, which is they're purporting that people are choosing to be unhoused. Where does that fit into the mathematical equation?

And *Grants Pass* at Footnote 32 makes very clear, if there's not enough shelter in the jurisdiction, it is not the burden of the plaintiffs to demonstrate that the hundreds of unhoused people outside are involuntarily homeless. That is not a burden that is put on the plaintiffs under *Martin*.

What Footnote 33 of *Grants Pass* articulates is actually that where there isn't anything in the record from the government to suggest that people are choosing homelessness, then the default mathematical equation in *Martin* is what applies.

And the District of Arizona decision just from last week interpreting *Grants Pass* goes even further and says it is the Government's burden, in the massive absence of shelter, to demonstrate that people are authentically choosing homelessness.

And we put in the record, not just from the individual plaintiffs who have been searching for shelters for months to even up to a year while being policed and yet not having access to it, but also the observations of 30 percipient witnesses, including other directly impacted people who clearly have not had access to shelter. And that's because, again, the shelter wait list with 1,000 people on it is closed and not moving.

You can no longer wait in a same-day line for shelter.

And before the pandemic, we know how this played out. There were 1,000 people waiting for shelter who couldn't get access to it for six to eight weeks. There were hundreds of people waiting in a same-day line every day, falling asleep outside while waiting for shelter.

So the idea that people aren't choosing shelter is an illusion. It's not borne out by the record. And if anything, it is the Government's burden, in light of the sheer lack of shelter access by thousands, to make that showing. They haven't made the showing.

**THE COURT:** Mr. Emery?

**MR. EMERY:** I'm glad Mr. Shroff brought up the Phoenix case because after plaintiffs submitted it to the Court the other night, I did read it. I hadn't been aware of that.

And Phoenix, like San Francisco, has more unhoused people than it has shelter beds. And I -- I noticed how the Court in the Phoenix case addressed that in its injunction against the City of Phoenix.

First of all --

**THE COURT:** Hold on one second, Mr. Emery. Before I let you go down this road -- I will allow it, but I just want to say, it was extraordinary to me that the City did not challenge the proposed three-part preliminary injunctive relief. Not a single word of the City's opposition brief was devoted to that

topic; and therefore, the City has waived its right to say how the Court should exercise its discretion if I decide that plaintiffs are entitled to preliminary injunctive relief. We don't get to start arguing that now. That's not how the rules work. There's an opposition -- there's opening, opposition, and reply for a reason.

But I will allow you to talk about the new case, which is Arizona, because that came in after the fact. So your remarks on injunctive relief should be limited to that.

**MR. EMERY:** Okay. Well, this also goes to how to apply the formula. That's -- that's where I was going first.

**THE COURT:** Okay. Go ahead.

**MR. EMERY:** So like San Francisco, Phoenix is faced with more people experiencing homelessness than the shelter beds that are available.

The Court in Phoenix was faced with two different things going on: a planned large-scale operation at what is called the Zone and ongoing small-scale operations outside the Zone. The Court in Phoenix addressed the formula, what we were discussing as a formula, by saying in the first point of the injunctive relief that as long as there are more unsheltered individuals in Phoenix than the shelter beds available, Phoenix can't enforce the camping and sleeping bans against individuals who practically cannot obtain shelter.

And so there's a -- the Court in Phoenix is recognizing a

second level to this formula. The formula's not the end of the story. As long as the formula applies against Phoenix, then enforcement is proper only against people who can practically obtain shelter.

That demonstrates that this Court, within the Ninth Circuit, is looking at the *Martin* and *Johnson* case and understanding that the formula is not the end of the story; that an individual's Eighth Amendment rights depend on whether that individual has access to shelter.

**THE COURT:** Again, I point out that none of this is in the opposition brief. So -- and certainly, *Martin* and *Johnson* were on the books when the brief was submitted.

**MR. EMERY:** Right.

**THE COURT:** So, okay. Let me turn to Mr. Shroff.

What do you think of that reading?

**MR. SHROFF:** Your Honor, we do describe this in our briefing in the opening brief with respect to an enforcement-first approach, which has been the City's approach in San Francisco at this time.

The basic precept of *Martin* is the Eighth Amendment doctrine that says that you cannot punish someone for something that is involuntary.

Right now in San Francisco, because of the closure of the shelter system, no one can access shelter in San Francisco unless they are subject to an enforcement operation by the City

under threat of citation or arrest. Until SFPD comes to tell you you are violating the law, you have no access to shelter.

That's in the record both from our individual plaintiffs, from the dozens of unhoused people who submitted declarations, from the five observers from the Coalition on Homelessness, and even from the former City workers who acknowledge that since the pandemic, the City has shut the shelter wait list so there's a thousand people still waiting there; you can't get in the line; you can't even call the City. So that's not "practically accessible shelter" under *Martin*.

In fact, what the City is doing to try to inflate the idea that it has beds -- and we know just last Friday, thanks to the Court's order giving us the shelter bed availability, there are reportedly 34 beds in San Francisco as of last Friday for 4,000 individuals. It's an illusion that people can access those beds. They literally cannot if they sought them today. Until the police comes to them to enforce against them, there is no shelter for them to be had. That's exactly backwards under *Martin*. It is punishing someone, first, for something over which they had no control when shelter was not practically accessible.

So I think when we talk about the SFPD policy being lawful, it is lawful to the extent that there is an open shelter system where anyone can access it and it is practically accessible to someone prior to being enforced against. That's

just not the reality in San Francisco.

Even in Phoenix, frankly, it's an open shelter system. They are missing a thousand beds, but if there's a bed, someone can access it in the order that's appropriate because they all can seek it.

Right now we have people waiting in the wings, thousands of people waiting in the wings for shelter in San Francisco who aren't being given that access. The City is suggesting it has a 20- to 30-bed opening, and yet you only get that if SFPD enforces against you. And even then, the record shows you may not be getting access to a bed. That's not "practically available shelter" under *Martin*.

**THE COURT:** Mr. Emery, does the City concede -- I think the City concedes this and, in fact, relied on this; that at this point -- well, since April 2020, I think, that there's no voluntary avenue to accessing a bed, that the only way to access a bed is if there's an enforcement process where one is offered, if available. Does the City concede that?

**MR. EMERY:** No.

And what Mr. Shroff described is not the way encampment resolutions work.

**THE COURT:** Point me to the evidence in the record that shows that there's availability or that there's ways that homeless individuals can access a bed without having to go through an encampment closure or other kind of enforcement

procedure.

**MR. EMERY:** No. What I meant was that the encampment resolution procedure is -- is not an enforcement procedure. The enforcement only occurs at the back end of the day. The weekend before, it's outreach; it's -- it's social workers.

**THE COURT:** Okay. I need you to answer my question first.

**MR. EMERY:** Yeah.

**THE COURT:** Okay.

**MR. EMERY:** Now --

**THE COURT:** Does the City concede that there is no avenue for a homeless individual to, as an in- -- just voluntarily access a shelter bed at this juncture?

**MR. EMERY:** That is correct.

I was disagreeing with the characterization of an encampment resolution as an enforcement procedure.

**THE COURT:** Okay. That's okay. I've got the record on that. We've talked about what the record says and what the evidence is, and I can sort through that.

I understand that there are discrepancies -- that the City has a very different view than the plaintiffs do about how those events take place.

**MR. EMERY:** Well, nobody disagrees about what happens on the weekend before; that that outreach occurs, the posting occurs.

**THE COURT:** I think that there's a significant amount of

evidence submitted by the plaintiffs that a lot of times people have no notice, there's no outreach. Sometimes there's notice that's given of a different day and things of that nature. So I don't think that's undisputed at all. I think it's hotly disputed.

Okay. Before we move on to the Fourth Amendment, Mr. Emery, is there any other point that the City wants to make on the Eighth Amendment?

**MR. EMERY:** I quickly said that -- that enforcement is proper, even absent an offer of shelter, when the person is blocking public areas, public space, and creating an unsafe situation. And plaintiffs have provided no way to -- to rebut that we're following our policy and doing that; that the inference that the plaintiffs are suggesting of violations of City enforcement policy, just based on the numbers, is not warranted.

**THE COURT:** Before I hear from Mr. Shroff on that, is there any evidence in the record, Mr. Emery, that the City has presented to show that Dr. Herring's numbers somehow include -- improperly include enforcement actions where, you know, they're being taken because somebody -- you know, that they don't -- they shouldn't be counted for one reason or another? Maybe they're a true health and safety citation or someone's breaking the law or something like that.

**MR. EMERY:** No. He counted them, but those buckets that

he counted include -- have to include all -- by his own definition, include those circumstances.

**THE COURT:** Well, the City didn't break that down for me. The City has the numbers.

**MR. EMERY:** Correct.

**THE COURT:** The City didn't say: Gosh, those numbers are false. In fact, half an hour ago you conceded that the number -- Dr. Herring's underlying data is accurate.

And I think that Dr. Herring's data was based on, you know, a pool of documents that were described a certain way.

**MR. EMERY:** Right.

**THE COURT:** So the City had the opportunity to say this is pulling in displacements that shouldn't fall in those buckets, but I didn't see that in the record.

**MR. EMERY:** Well, the bucket, based on Mr. Herring -- Dr. Herring's original description, includes, you know -- every nuisance citation, by definition, according to the policy, is someone who's blocking or someone who's been offered shelter.

**THE COURT:** But what I don't know -- what the City is saying is: Gosh, you shouldn't assume that all of those are about --

**MR. EMERY:** Right.

**THE COURT:** -- criminalizing lodge -- you know, the failure to lodge under a roof where no inside option is

available; right?

But the City -- you're saying that generally; but I don't have anything in the record to show whether that's, you know, two extra incidents or if it's most of it or -- you know, the City had the opportunity to do that --

**MR. EMERY:** Right.

**THE COURT:** -- but didn't.

**MR. EMERY:** You have Lieutenant Christ's declaration, saying how he trains everyone and how he's available to take phone calls from every officer who is encountering an issue and has a question. And he trains everyone who is encountering homeless -- all the police department people who are encountering homeless.

**THE COURT:** Okay.

**MR. SHROFF:** Your Honor, may I respond to that briefly?

**THE COURT:** Go ahead, Mr. Shroff.

**MR. SHROFF:** We do craft the proposed order and describe the evidence very carefully to only limit ourself to ordinances that are exclusively punishing people for sleeping or lodging outside or being asked to leave an area for sleeping outside.

In the SFPD policy that the Court cites, there are other lawfully permissible offenses to enforce. Penal Code 647(c), the San Francisco Police Code at Section 2022, those talk about obstructing sidewalks and pedestrian access. Those are not at issue in the Herring analysis. Those are excluded from the

analysis. They also are excluded from the proposed injunction in this order precisely because that is permissible conduct and not should be punishing unhoused people for being unhoused.

By the same token, the Municipal Health Code, again, part of the SFPD policy, when there's a genuine health and safety hazard, again, not part of the injunction, not part of the analysis, we only isolated and Dr. Herring's report only isolates those statutes that are ostensibly for sitting and sleeping outside, for lodging outside, or for failure to obey a move-along order. All of those are exclusively the natural consequence of simply being homeless without any further misconduct.

Presumably, if other ordinances were being violated, the City would prosecute under those ordinances. No one is precluding enforcement of a sidewalk safety ordinance. It's not relevant and it's not part of the proposed injunction.

**THE COURT:** Well, let me -- since we're there -- I'll get to the Fourth Amendment in a second, but I did have some questions about the plaintiffs' proposed injunction because the plaintiffs have a laundry list of statutes and ordinances. A number of them do not -- I think at least four of them do not appear in the Department Bulletin and are not, to my knowledge, discussed in Dr. Herring's reports. So let me just back into this.

Mr. Shroff, in looking at the Department Bulletin, it

names a number of laws that the City contends can be used to address lodging and encampments on streets and sidewalks. I think that all of these that are in the Enforcement Bulletin are included in plaintiffs' proposal. Is that correct?

**MR. SHROFF:** Your Honor, I believe if the -- I believe that the SFPD policy talks about the Municipal Health Code and the Police Code with respect to pedestrian access, in which case those are excluded from the proposed order.

**THE COURT:** Okay.

**MR. SHROFF:** And Your Honor is right. I just observed that what is not in the SFPD policy but what is in the San Francisco Charter are the Park and Port Codes --

**THE COURT:** Yes.

**MR. SHROFF:** -- that preclude lodging and sleeping.

So it appears that SFPD does not have a policy regarding those, and yet, they are ordinances on the books that, on their face, punish people for lodging or sleeping outside.

There wasn't available data to the plaintiffs regarding those ordinances. We are not aware of the extent of the enforcement practices there. That doesn't mean that they aren't occurring. And so we just don't have information about that at this time.

**THE COURT:** Okay. I mean, there's not data available, but there's also no anecdotal evidence that they've been used that way; right? So I don't have a record that those have been

enforced in a way that would potentially violate the Constitution.

But as to the others, I think what you're saying, Mr. Shroff, is that for -- well, why don't you go through this with me.

In the Department Bulletin, there are certain laws that are listed here that Dr. Herring did not include in his analysis because they might be for things like what Mr. Emery said, you know, blocking a sidewalk, and that that's not about sort of illegal lodging.

So what is in the bulletin that's not in your proposed injunction?

**MR. SHROFF:** Your Honor, I believe -- and I admittedly do not have that bulletin in front of me. I believe it's the Municipal Health Code sections and the Police Code Sections 22 to 24 that are with respect to obstructing pedestrian access.

And I will just note for the Court, we did request data on the violations of the Park Codes and the Port Codes in terms of lodging and sleeping ordinances. The City did not have that data to provide us because they represented that it was in paper files, not in electronic files.

So there very well may be a substantial amount of enforcement under those provisions. Dr. Herring's report does describe enforcement under these ordinances as it was last reported in publicly available data, and it was in the

thousands. And, again, those are ordinances for lodging and sleeping outside exclusively. So we would request that those be included in the proposed injunction.

**THE COURT:** I -- I don't recall seeing any -- any reference to the Park or Port Codes. Port Code is definitely not in Dr. Herring's report. Maybe the Park Codes are in -- but not -- not in a substantial way.

**MR. SHROFF:** That's correct, Your Honor.

**THE COURT:** Okay.

**MR. SHROFF:** That's correct.

**THE COURT:** All right.

**MR. SHROFF:** We had requested that information from the City, and I believe that's the -- the public records request is before the Court --

**THE COURT:** Okay.

**MR. SHROFF:** -- in the records, but no records were produced.

**THE COURT:** Okay.

Let's turn to the Fourth Amendment. Mr. Emery, does the City concede -- or I'll say that San Francisco did not challenge Dr. Herring's data, which is that from January 1 through June 1, 2022, he looked at the number of bag and tag records and he said there were 195. But during that same period of time, he found that there were 1,282 displaced homeless individuals from encampment closures and that that

is -- that's a very large disparity.

That's one -- so I don't -- I didn't see that that particular figure or figures were challenged by the City. Is that correct?

**MR. EMERY:** The numbers are not challenged by the City.

**THE COURT:** Okay.

**MR. EMERY:** The inference is challenged by the City, just as Judge Alsup rejected that equivalent inference in the *Sullivan* case, that there weren't enough bag and tag receipts compared to the number of citations during a particular period.

And as Judge Alsup explained, that's because the notices are doing their job and because a lot of stuff that's left behind is either abandoned or is within the categories of items that are properly disposed of because of health and safety but for other reasons.

**THE COURT:** But here, we have significant anecdotal evidence talking about how items that were -- that were clearly personal property, that were neatly stored were thrown into the back of trash trucks; that there was -- some people reported there was no bag and tag effort. There were things lost like laptops, cell phones, prosthetics, a wheelchair, a bicycle -- I mean, things that are clearly personal property, survival gear, not garbage.

So there are, you know, details in the record that the City's opposition kind of glosses over as, well, things

were debris or garbage. We have some specifics. And it's not just one person. It's a lot of anecdotes, along with the observations of the Coalition declarants, who have logs in their declarations describing some of what -- the incidents that they saw with respect to the failure to bag and tag or to offer to bag and tag. So I don't think this is like *Sullivan*.

But is there anything further on this one, Mr. Emery?

**MR. EMERY:** What the plaintiffs don't do is make any explanation that the items that they describe as having been lost were not intermingled with stuff that justifies throwing them away.

**THE COURT:** You're saying that if a laptop is intermingled with --

**MR. EMERY:** With hypodermic needles, with -- with stuff that is a health and safety risk, yes.

**THE COURT:** And you're suggesting that I'm to make the inference that it is intermingled with debris and garbage and hypodermic needles?

**MR. EMERY:** That --

**THE COURT:** Is there anything in the record that supports your inference?

**MR. EMERY:** Our policies.

And if there -- and if there are individual events that -- that depart from those policies, that there has -- there has to be a certain level of consistency before they become

NL violations.

**MR. TIU:** Your Honor, may I respond to that?

**THE COURT:** Yes, Mr. Tiu.

**MR. TIU:** The evidence in the declarations, in many of the declarations, show that the individuals who had their property destroyed took care to separate their personal property and the -- versus the trash or the stuff that they wanted DPW to throw out. It's not the case that individuals simply left their property commingled with any potential health and safety hazards. There's no evidence of that in the record. Rather, the record shows that individuals specifically distinguished between property they would like to keep versus property that they would like to throw out, but DPW ignores those distinguishing factors.

**THE COURT:** Okay. I have -- I have gone over the questions that I have for the parties, and I appreciate your answers.

I'll give each side, if you want five minutes to hit on any points that we haven't talked about that's not a rehash of your briefs but that you think's really important, I'll give you that opportunity.

Mr. Emery, let me start with the City.

**MR. EMERY:** If the Court's inclined to issue an injunction, I do urge the Court to look at the Phoenix case because that does demonstrate a way of handling the formula.

**THE COURT:** I don't necessarily read it the way you do.

**MR. EMERY:** Mm-hmm.

**THE COURT:** But I -- I see the spin you're putting on it. I'm not sure I read it the way you do.

**MR. EMERY:** Mm-hmm.

**THE COURT:** Especially given, you know, sort of "practically available," as Mr. Shroff pointed out and as the City's conceded, there's no way for a person to voluntarily try to access a bed at this point in San Francisco. That's been foreclosed, and that's an undisputed fact.

**MR. EMERY:** Except when offered through the outreach in advance of an encampment resolution, yes.

**THE COURT:** Okay. Anything else, Mr. Emery?

**MR. EMERY:** Plaintiffs have not shown any reason to have a special master as part of a preliminary injunction.

**THE COURT:** Mr. Emery, I'm sorry. I'm not going to entertain the City's argument on this. You had -- I was a little bit shocked. You had 25 pages to do an opposition. It was 17 pages long. There was not one word devoted to challenging the request for preliminary injunctive relief, which included the request for a special master. So that ship has sailed.

Now, whether or not I, you know, decide to issue a preliminary injunction and what it includes is in my discretion. But the City gave up its right to weigh in on

that. I don't know why it happened that way, but it did. So I'm -- I don't think it's fair, given that the defense, you know -- there's a reply mechanism that they'd be deprived of. So I'm not going to allow it in oral argument.

**MR. EMERY:** Well, then I rely on the arguments we did make in the brief about the contours and the scope of the substantive obligations and hope that the -- any injunction would -- would take into account those substantive obligations and the arguments we made there.

**THE COURT:** Okay. Thank you.

**MR. EMERY:** Thank you.

**THE COURT:** On the plaintiffs' team, is there anything you want to bring --

**MR. SHROFF:** Your Honor --

**THE COURT:** -- to my attention?

**MR. SHROFF:** -- just briefly, with respect to the scope of the injunction, we have the three more recent injunctions that have been issued in the Ninth Circuit.

I think we provided them to the Court in briefing. *Cobine vs. City of Eureka* is a helpful one, in addition to the District of Arizona order.

Many of those do keep open that any statute that criminalizes homelessness in the absence of shelter is to be enjoined. And we would ask that the injunction be that broad, given the sheer number of statutes and ordinances San Francisco

does have that criminalize ostensibly just sleeping or sitting outside or lodging, in the scope of the injunction.

But that would be it from us, Your Honor.

**THE COURT:** It's a little tricky because every case is different, and in some of the cases, they are challenging particular -- either particular closures or particular ordinances. And this is a little different. So I, you know, will have to consider what the record shows.

**MR. SHROFF:** Thank you, Your Honor.

**THE COURT:** All right. Submitted by both sides?

**MR. EMERY:** Submitted, Your Honor.

**MR. SHROFF:** Yes, Your Honor.

**THE COURT:** Okay. Thank you very much. I'll be issuing a written order.

**MR. EMERY:** Thank you, Your Honor.

**MR. SHROFF:** Thank you, Your Honor.

**THE COURT:** Take care.

**THE CLERK:** This Court is now adjourned.

(Proceedings adjourned at 2:31 p.m.)

---o0o---

**CERTIFICATE OF TRANSCRIBER**

I, ANA DUB, CSR NO. 7445, RDR, RMR, CRR, CCRR, CRG, CCG, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

DATE: Friday, December 30, 2022

Ana Dub

Ana Dub, Transcriber