**EXHIBIT A**

**TO**

**NOTICE OF APPEAL**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COALITION ON HOMELESSNESS, et al.,

             Plaintiffs,

      v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

             Defendants.

Case No. 22-cv-05502-DMR

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

Re: Dkt. No. 9

Plaintiffs are Toro Castaño, Sarah Cronk, Joshua Donohoe, Molique Frank, David Martinez, Teresa Sandoval, and Nathaniel Vaughn, all current or formerly homeless residents of the City and County of San Francisco, along with the Coalition on Homelessness, a non-profit advocacy organization. Defendants are the City and County of San Francisco ("San Francisco" or "the City"); San Francisco Police Department ("SFPD"); San Francisco Department of Public Works ("DPW"); San Francisco Department of Homelessness and Supportive Housing ("HSH"); San Francisco Fire Department ("SFFD"); San Francisco Department of Emergency Management ("DEM"); San Francisco Mayor London Breed; and Sam Dodge, Director of San Francisco Healthy Streets Operation Center ("HSOC"). Plaintiffs move for a preliminary injunction to enjoin Defendants from enforcing San Francisco ordinances that punish sleeping, lodging, or camping on public property and related California Penal Code provisions, and to prohibit Defendants from seizing and destroying the unabandoned personal property of homeless individuals. The court held a hearing on December 22, 2022. For the following reasons, the motion is granted.

**I.        INTRODUCTION**

Plaintiffs' lawsuit challenges certain aspects of San Francisco's official response to

United States District Court
Northern District of California

homelessness, including its coordinated effort among different agencies beginning in 2018 to respond to and close homeless encampments, informally called "sweeps."[1]  Plaintiffs seek a preliminary injunction for two of their claims: (1) that Defendants violate the Eighth Amendment to the U.S. Constitution by imposing civil and criminal penalties on homeless persons "for the involuntary act of sleeping outside" without offering shelter, and (2) that Defendants violate the Fourth Amendment by confiscating and destroying homeless persons' property without providing notice or an adequate means to retrieve such property.  *See* Mot. 2.

Plaintiff Coalition on Homelessness ("the Coalition") has spent the last three years documenting HSOC's alleged unconstitutional practices.[2]  *See id.* at 1.  Plaintiffs submitted a substantial body of evidence with their motion: six declarations by Coalition staff members and volunteers, five of whom describe their personal observations of well over 125 planned HSOC encampment closures and other informal "sweep" interactions between San Francisco and its homeless residents; declarations by Plaintiffs Castaño, Cronk, Donohoe, Frank, Martinez, Sandoval, and Vaughn regarding their experiences with encampment closures, interactions with SFPD, and the seizure and destruction of their property by DPW; declarations by an additional 18 current or formerly homeless residents of San Francisco; a declaration by a former HSH employee who participated in closures; a 106-paragraph declaration by Plaintiffs' expert Christopher John Herring, Ph.D.; and documentary evidence, including documents obtained via public records

---

[1] Plaintiffs use the term "sweeps."  Defendants refer to these events as "homeless encampment resolutions" or "HSOC engagements."  *See* Opp'n 4.  The court will use "encampment closures."

Plaintiffs use the terms homeless, unhoused, and unsheltered when referring to individuals experiencing homelessness.  The complaint states that it "uses the term 'homeless' to encompass persons who are both 'unhoused,' that is, without a fixed residence, and 'unsheltered,' that is both unhoused and without physical shelter."  Compl. 1 n.1.  For simplicity, the court uses "homeless persons" or "homeless individuals" throughout this opinion unless directly quoting material that uses a different term.

[2] The Coalition is an advocacy organization of, by, and for "unhoused people in San Francisco." [Docket No. 9-3 (Friedenbach Decl., June 28, 2022) ¶ 6.]  According to its executive director, the Coalition was established to "research, plan, and monitor long-term strategies to alleviate homelessness in" San Francisco and seeks "to find permanent solutions to homelessness while recognizing the dignity and human rights of unhoused people."  *Id.* at ¶ 2.  There are currently 50-60 active members of the Coalition, at least 70% of whom are presently experiencing homelessness.  *Id.* at ¶ 8.

2

requests.[3]  [Docket No. 9-2 (Della-Piana Decl., Sept. 26, 2022).]  Plaintiffs submitted additional

evidence, including declarations, with their reply.[4]  [Docket No. 50 (Shroff Decl., Dec. 1, 2022).]

In opposition, Defendants submitted nine declarations by employees of the relevant San

---

[3] Defendants made various objections to Plaintiffs' evidence. They argue that declarations by the Coalition's staff and volunteers "are riddled with inadmissible hearsay" and are "vague and conclusory." Opp'n 16. These objections are overruled. As to the hearsay objection, "it is well established that district courts may 'consider hearsay in deciding whether to issue a preliminary injunction.'" *Garcia v. City of Los Angeles*, 481 F. Supp. 3d 1031, 1035 n.2 (C.D. Cal. 2020) (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009)); *see also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("[t]he urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."). The court has considered all of the evidence submitted by both sides and assigns the appropriate weight to evidence that would otherwise be inadmissible under the Federal Rules of Evidence. As to the "vague and conclusory" objection, it is so unspecific as to be meaningless. In any event, as set forth in this order, the court does not rely on any vague and conclusory statements in ruling on this motion.

Defendants also argue that "[m]uch of plaintiffs' percipient testimony is stale, describing events more than a year old," as are documents that "relate to conditions that existed prior to 2022." *Id*. at 15-16. According to Defendants, "in light of the shifting impact of Covid-19 on San Francisco's delivery of homeless services, events prior to 2022 are not probative of current conditions and therefore cannot support" the motion. Opp'n 15. This is the extent of Defendants' "staleness" argument. They do not argue that they have changed any of their relevant policies or practices with respect to encampment closures or any other challenged conduct. They do not provide any detail as to why evidence of conduct prior to 2022 lacks probative value or submit any evidence demonstrating the same. Defendants' failure to explain the basis for their objection is particularly notable in light of the fact that they had plenty of room to explain themselves. Their opposition brief was only 18 pages long, seven pages less than the applicable page limit. *See* Civ. L.R. 7-3(a). Moreover, Plaintiffs submitted a supplemental declaration by Dr. Herring with the reply in which he addresses new data from 2022 (which Defendants produced after Plaintiffs filed the motion) and states that the trends he analyzed and the conclusions he reached in his initial declaration "are confirmed" by the 2022 data. He "re-iterate[s] [his] initial findings in full based on the 2022 data," thus putting to rest Defendants' staleness argument. [Docket No. 49 (Supp. Herring Decl., Nov. 30, 2022) ¶¶ 4, 5.] The objection is overruled.

Defendants also object to each of the five opinions offered by Dr. Herring, although they do not object to his qualifications or the accuracy of the data underlying his opinions. Opp'n 16-18. The court addresses these objections below in its discussion of Dr. Herring's declaration.

[4] Defendants filed objections to Plaintiffs' reply evidence on December 13, 2022, 12 days after Plaintiffs filed their reply. [Docket No. 51.] The court declines to consider Defendants' objections, which were filed five days late. *See* Civ. L.R. 7-3(d)(1) ("[i]f new evidence has been submitted in the reply, the opposing party may file and serve an Objection to Reply Evidence . . . no more than 7 days after the reply was filed."). The court also notes that Defendants' objections are not limited to the evidence submitted with Plaintiffs' reply; the filing improperly includes expanded argument supporting the objections to evidence Defendants initially raised in their opposition. *See id*. ("an Objection to Reply Evidence . . . may not include further argument on the motion.").

3

United States District Court
Northern District of California

Francisco agencies, as well as a declaration by counsel.  On reply, Plaintiffs submitted a supplemental declaration by their expert, Dr. Herring, along with four declarations by Coalition staff members and volunteers and an associated investigator, four declarations by homeless individuals, and two declarations by former San Francisco employees.

## II.  FACTUAL BACKGROUND

### A.  San Francisco's Shelter Bed Shortage and the Lack of Avenues to Access Shelter Beds

It is undisputed that San Francisco does not have enough available shelter beds for all homeless San Franciscans.  The United States Department of Housing and Urban Development ("HUD") requires all communities that receive federal funding for homeless services to regularly conduct a Point-in-Time ("PIT") Count of "people experiencing homelessness."  *See* San Francisco Homeless Count and Survey 2022 Comprehensive Report at 4, available at https://hsh.sfgov.org/about/research-and-reports/pit-hic/ (last visited Dec. 22, 2022).  On February 23, 2022 (the date of the 2022 PIT Count) there were 7,754 homeless individuals residing in San Francisco.  Della-Piana Decl. ¶ 10, Ex. 7 at 19.  [*See also* Docket No. 45-2 (Cohen Decl., Nov. 10, 2022) ¶ 5.]  However, San Francisco reported having 5,080 shelter beds in 2021, the last year that it reported on its total shelter bed availability, which amounts to a shortage of 2,674 beds.  Della-Piana Decl. ¶ 9, Ex. 6 at 3.[5]

Plaintiffs' expert Dr. Herring states that the 2,674 figure for San Francisco's 2022 shelter bed shortage is likely higher.  According to Dr. Herring, there is a consensus among academics and policymakers that PIT Counts of homeless individuals are "always an undercount and conservative number" due to difficulties counting homeless individuals.  [Docket No. 9-1 (Herring Decl., Sept. 24, 2022) ¶ 24.]  He also states that the 5,080 available shelter beds reported by San Francisco for 2021 "is not a meaningful indication of currently available shelter beds," because

---

[5] Emily Cohen, HSH's Deputy Director for Communications & Legislative Affairs, states that a 2022 HUD Housing Inventory count identified 4,322 shelter beds.  Cohen Decl. ¶ 6.  She also states that "[b]y the end of 2022 HSH plans to open approximately 1,000 shelter beds through a combination of new programs and reopening or expanding programs that had been closed or curtailed during Covid" but does not provide any details about the status of the new shelter beds. *See id*. at ¶ 12.

United States District Court
Northern District of California

2,263 of the 5,080 available shelter beds are part of the City's Shelter-in-Place hotel programs and are being phased out in fiscal year 2021-2022. According to Dr. Herring, a more accurate count of shelter beds that are available to homeless people in San Francisco is reflected in the 2019 pre-pandemic count of 3,493 shelter beds. Herring Decl. ¶¶ 26, 27; *see also* Cohen Decl. ¶ 19 (confirming that "HSH is winding down the Shelter-in-Place Hotel program."). He states that "[b]y that metric, shelter beds are effectively at capacity because there are approximately 3,357 individuals presently in shelter on any given night in 2022." Herring Decl. ¶ 27; *see* Della-Piana Ex. 7 at 19. Dr. Herring opines that San Francisco's current "shelter bed shortage is likely to be closer to approximately 4,261 beds (7,754 reported unhoused individuals – 3,493 permanent shelter beds)," and could be higher if the 2022 PIT Count underreported the number of homeless individuals. Herring Decl. ¶ 28. In fact, the City itself counted 4,397 homeless individuals who were "unsheltered" in 2022.[6] Della-Piana Decl. Ex. 7 at 19; Cohen Decl. ¶ 5.

This substantial shortfall of shelter beds is not a new phenomenon. On January 24, 2019, the date of the last full PIT Count, there were 8,035 homeless individuals in San Francisco, while the City had only 3,493 shelter beds available that year. Approximately 5,180 homeless individuals were unsheltered in 2019. *See* Della-Piana Decl. ¶¶ 8, 9, Ex. 5 at 10; Ex. 6 at 1 (explaining that San Francisco did not perform a full PIT Count in 2021 due to the impact of COVID-19); Ex. 6 at 4.

Dr. Herring states that at the present time, "unhoused people seeking shelter in San Francisco no longer have any immediate shelter options available to them because the traditional avenues to seek shelter are closed." Herring Decl. ¶ 32. Prior to the start of the COVID-19 pandemic, homeless individuals could access shelters via "the 311 waitlist and same-day lines," even though supply never met demand. Between January 2015 and March 2020, the 311 waitlist for a 90-day bed was "nearly always over 1,000 people." *Id.* at ¶ 29. Based on Dr. Herring's

---

[6] The 4,397 figure is from the San Francisco Homeless Count and Survey 2022 Comprehensive Report. The report sets forth 7,754 as the total number of "persons experiencing homelessness" in San Francisco as of February 23, 2022 and states that 4,397 of these individuals are "unsheltered," although it does not define that term. Della-Piana Decl. Ex. 7 at 19. In any event, San Francisco appears to admit in this report that it currently lacks shelter space for at least 4,000 individuals.

experience, this means the wait time to receive a shelter bed was usually between three to eight weeks and beds for one-night stays were "functionally full." Herring Decl. ¶ 29. Homeless individuals could also wait in a same-day line, but "most waits involved standing in line or sitting in chairs for two to eight hours before receiving a bed, without any guarantee" of a bed, and "[o]n most nights anywhere from fifty to over one-hundred people would be left in line or sleeping in chairs waiting for a bed." *Id*.

After the start of the pandemic, San Francisco closed the 311 waitlist and individuals can "no longer access same-day shelter beds at point of access as they could at least try to do prior to April 2020." *Id*.

**B.    Encampment Closures**

San Francisco's HSH manages the City's "homelessness response system." Cohen Decl. ¶ 8. HSH partners with other agencies, including the Department of Public Health ("DPH"), DPW, DEM, SFPD, and SFFD, to provide homeless services. *Id*. at ¶ 4. San Francisco's Homeless Outreach Team ("SFHOT" aka "HOT team") "provides citywide outreach seven days a week, connecting individuals living outside with available and appropriate resources, through outreach, engagement, and case management," including shelter placements in coordination with encampment closures. *Id*. at ¶ 9.

San Francisco established HSOC in 2018 "to coordinate the City's response to both homeless encampments and to behaviors that impact quality of life, such as public drug use and sales." Della-Piana Decl. ¶ 14, Ex. 11 at 3. "HSOC's primary activity is conducting large encampment field operations." [Docket No. 45-4 (Dodge Decl., Nov. 14, 2022) ¶ 2.] HSOC "is structured as a unified command with representatives of City departments all in one room," including HSH, DPH, SFPD, DPW, and DEM. Della-Piana Decl. Ex. 11 at 3; Ex. 12 at 4. HSOC conducts several encampment closures each week. According to HSOC Director Sam Dodge, "[t]he goals of an HSOC engagement are to conduct outreach to clients, offer services and housing to clients, remove hazardous or abandoned tents, structures, and vehicles, and clean and secure the site after campers have relocated." Dodge Decl. ¶ 7.

Two key policies govern San Francisco's actions with respect to encampment closures and

other agency interactions with homeless individuals: 1) an SFPD Department Bulletin that specifies the "legal enforcement options for addressing lodging and illegal encampments" in San Francisco and 2) DPW's Bag and Tag Policy governing personal items collected from public property.

### 1. SFPD Enforcement Bulletin

SFPD Bulletin 19-080, dated April 16, 2019, describes "four categories of laws that various City personnel may enforce to address lodging or encampments," including "criminal laws prohibiting sitting, lying, and lodging." Della-Piana Decl. ¶ 31, Ex. 27 ("SFPD Enforcement Bulletin"); *see* Opp'n 9 (discussing the bulletin). Altogether, the bulletin discusses 15 laws and ordinances. These include California Penal Code section 647(e), which provides that "every person . . . [w]ho lodges in any building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it" is "guilty of disorderly conduct, a misdemeanor[.]" SFPD Enforcement Bulletin 2. The bulletin explains restrictions on SFPD's enforcement of section 647(e) and emphasizes that "[**o**]**fficers must secure appropriate shelter before taking enforcement action under Penal Code Section 647(e)**." *Id*. at 2 (emphasis in original); *see also id*. ("[o]fficers shall notify [HSOC] and secure shelter or a navigation center bed."). It instructs that "[i]f there is no shelter or navigation center bed available, officers may not issue a citation or seize the encampment/tent." *Id*. at 3.

The bulletin also describes "Prop Q," which is codified in San Francisco Police Code section 169 as "a non-criminal prohibition on encampments on City sidewalks that DPW, DPH, or DHSH may enforce." *Id*. at 3. Section 169 provides that "[i]n the City and County of San Francisco, it is unlawful to place an Encampment upon a public sidewalk." S.F., Cal., Police Code § 169(c). The bulletin specifies that "officers may cite an individual for violating [California] Penal Code § 148(a)"[7] when an "individual refuses to vacate an encampment so that DPW may

---

[7] California Penal Code section 148(a) provides that "[e]very person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment . . . shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."

remove it" if "the City has complied with the requirements for enforcing Prop Q[.]"  Pursuant to the bulletin, "DPW, DPH, and DHSH must provide a written offer of shelter or housing at least 24 hours before ordering the removal of a tent or encampment," and "must provide at least 24-hour written notice to vacate."  SFPD Enforcement Bulletin 3.

The bulletin advises that Penal Code § 148(a) "prohibits any person from willfully resisting, delaying, or obstructing DPW, DPH, and … DHSH personnel or any other public officer or peace officer who is discharging or attempting to discharge an official duty, including the enforcement of any of the [15] above mentioned laws."  *Id*.

### 2.    Bag and Tag Policy

DPW's Procedure No. 16-05-08 REV 03 governs "Removal and Temporary Storage of Personal Items Collected From Public Property . . . commonly known as 'bag and tag.'"  [Docket No. 62-1 (Bag and Tag Policy, effective Nov. 2022).][8]  The policy sets forth the circumstances in which personal items may be "remov[ed] . . . from public property for temporary storage and retrieval."  It provides that "all unattended personal property that is collected for storage will be bagged and tagged upon collection and taken to the Public Works Operations Yard for storage."  Bag and Tag Policy 1.  DPW staff must collect the personal items and "while in the field document[ ] the collection with a personal property collection bag and tag intake form," which specifies the date and time the items were collected, the number of items or bags, a description of the items, the location at which the items were collected, the owner's name, and the names of DPW workers and SFPD officers, if applicable, among other information.  *Id*. at 2, 3.  The policy provides that DPW stores personal items for 90 days and describes the process for retrieval.  *Id*. at

---

[8] Plaintiffs submitted a version of the bag and tag policy dated December 2016 with their motion (Della-Piana Decl. Ex. 26) but also referred to an "apparently revised, but unpublished" version of the policy that "purport[ed] to include even more expansive protections" for individuals' personal property.  Mot. 13 n.3; Della-Piana Decl. ¶ 16.  The court ordered the parties to submit the revised version of the policy before the hearing.  [Docket No. 60.]  In response, Plaintiffs submitted a version of the bag and tag policy labeled Procedure No. 16-05-09 REV02.  [Docket No. 61.]  Defendants submitted a third version of the policy, labeled Procedure No. 16-05-08 REV 03, and represented at the hearing that San Francisco published the third version in September 2022 and is currently training employees on that version.  [Docket No. 62.]  Defense counsel also represented to the court that the second and third versions of the bag and tag policy are substantively the same.  The court's discussion of Plaintiffs' Fourth Amendment claim will use the latest version of the bag and tag policy.

United States District Court
Northern District of California

4.

According to the policy, "[t]here is no limit to the number or volume of personal items that Public Works will bag and tag for a particular individual" as long as they do not constitute items that may be discarded. Bag and Tag Policy 2. The policy authorizes DPW to discard "[i]tems that present an immediate health or safety risk"; "[p]erishable items, perishable food"; and "[a]bandoned property," as defined in the policy, among other categories. *Id*. at 2. It also states that "[t]rash, garbage, and/or debris" will be discarded and that "[i]f staff has a reasonable doubt as to whether an item constitutes trash, it should be collected and stored." *Id*.

The policy distinguishes between unattended and abandoned property:

> Temporarily unattended property is different from abandoned property, which may be immediately discarded. In determining if property is abandoned, staff should evaluate the facts and circumstances surrounding the items. Unattended property is not abandoned if it is accompanied by signs of ownership—for example, an unattended tent that is filled with personal belongings or items that are being stored in an orderly manner (i.e., packed up, wrapped or covered).
>
> In addition, if there is a third party present who states they have been designated to watch or secure the items during the owner's temporary absence, the items are not abandoned and are attended property . . .

*Id*. at 1. In contrast, abandoned property is that which is "unaccompanied by objective indications of ownership." The bag and tag policy does not apply to abandoned property.

The bag and tag policy also provides guidance for the process to be followed in "encampment resolutions." In such cases, the policy states

> Staff should (a) provide the owner or person who is watching the owner's property with a reasonable time (approximately 30 minutes) to collect and move his/her belongings, taking into account any special needs that individuals may have and the volume of belongings, (b) bag and tag those personal items that the owner or owner's designee cannot or does not remove him/herself, and (c) provide information on how and where the items may be retrieved. HSOC staff must provide the advisement concerning medications, medical devices, and personal identification and documents discussed . . . in subsection b.

*Id*. at 1-2. Subsection b, in turn, states that "[p]rior to bagging and tagging," HSOC staff "must advise the owner or owner's designee to separate any medications, medical devices, personal

9

identification and legal documents." Bag and Tag Policy 1.

### 3. The Timeline of Encampment Closures

Both parties submitted evidence explaining how encampment closures occur. Their accounts deviate in critical ways. The court now summarizes each parties' description.

### a. Defendants' Evidence

Defendants describe typical encampment closures as follows: HSOC conducts five to ten closures per week, Monday through Friday. They take place twice per day, from 7:00 am-11:00 am in the morning and from 1:00 pm-3:00 pm in the afternoon. [Docket Nos. 45-11 (Nakanishi Decl., Nov. 14, 2022) ¶ 4; 45-12 (Piastunovich Decl., Nov. 15, 2022) ¶ 4.] HSOC Director Dodge states that he circulates a proposed schedule of times and locations for encampment closures on a weekly basis to the participating departments, including projected shelter needs for each closure. The schedule is finalized on Wednesdays after consultation with participating departments. Dodge Decl. ¶ 9. According to Dodge, the "HSH guest placement services team" receives projected shelter needs on Wednesday or Thursday of each week, and uses the projection to "inform[ ] HSH's shelter allocations during the following week." *Id.*

According to San Francisco's witnesses, SFHOT workers perform outreach at the encampments the weekend before the scheduled closure. They post notices of upcoming closures on tents, utility posts, trees, and/or walls, provide verbal notice of the planned closures, and explain what to expect on the day of the closure. Nakanishi Decl. ¶ 5; Piastunovich Decl. ¶ 5, Exs. A (template for written notice), B (photos of posted notices in 2022); Dodge Decl. ¶ 12. SFHOT workers also "assess clients for housing and interest in shelter or other services and explain the process for accessing shelter." Piastunovich Decl. ¶ 5.

HSH's template for written notice includes the date and location of the upcoming closure and states, "[d]uring the encampment resolution, we will provide access to shelter, safe sleeping villages, and/or hotels based on eligibility," as well as other services. The written notice states that "during the resolution, [DPW] will clean the sidewalks and street. **Any personal property that is left at the encampment will be removed and taken to the Public Works Operations Yard at 2323 Cesar Chavez Street**" and provides instructions for how to retrieve property that

1    has been removed.  Piastunovich Decl. Ex. A (emphasis in original).  The notice also lists the

2    types of items that will not be stored and that may be discarded, including "(1) items that present

3    an immediate threat to public health or safety . . . , (2) items that are evidence of a crime, (3) trash,

4    (4) perishable food, and (5) bulky items (i.e., furniture, mattresses, sheds, structures, and pallets),

5    except for tents and operational bicycles, walkers, crutches, wheelchairs."  *Id*.

6          Additionally, Defendants state that 24-72 hours before each encampment closure, outreach

7    workers from the Felton Engagement Specialist Team ("FEST") visit the location, "engage

8    everyone on-site to assess their health and interest in any treatment or other services, and remind[ ]

9    people of the upcoming" closure.  [Docket No. 45-8 (Horky Decl., Nov. 9, 2022) ¶ 11.]  FEST

10   workers then report to DPH in advance of the closure "about behavioral needs . . . among people

11   at the encampment" so that DPH can "provide behavioral health resources matching the needs of

12   the clients at the site."  *Id*.; Dodge Decl. ¶ 13.[9]

13         To conduct encampment closures, HSOC assembles "field teams" which consist of an

14   SFFD paramedic who serves as the "incident commander," two to four SFHOT workers, one DPH

15   clinician, zero to six police officers, four to eight DPW street cleaners, and two parking control

16   officers.  Dodge Decl. ¶ 8.[10]  [*See also* Docket No. 45-7 (Hardiman Decl., Nov. 14, 2022) ¶¶ 2, 3

17   (describing role of "HSOC Incident Commander").]  On the morning of an encampment closure,

18   the field team meets at 7:00 am at the site.  Dodge Decl. ¶ 15; Nakanishi Decl. ¶ 6.  HSH's

19   Encampment Resolution Team ("ERT"), which consists of four SFHOT workers, "begins

20   engaging with clients and assessing what services they may be interested in being connected to,

21   including shelter" by 7:30 am.  Nakanishi Decl. ¶ 6; Dodge Decl. ¶ 15; Piastunovich Decl. ¶ 6.

22   According to Defendants, DPW workers typically do not arrive at the encampment until 8:00 am

23   or later, after ERT has begun its outreach.  Nakanishi Decl. ¶ 10.  [*See also* Docket No. 45-3

24

25   _____

     [9] DPH contracts with the Felton Institute to provide services via FEST.  "FEST is comprised of
26   Engagement Specialists who . . . provide outreach and service linkage to support clients by
     addressing any combination of substance use, mental health, and physical health needs."  Horky
27   Decl. ¶ 10; Dodge Decl. ¶ 14.

28   [10] Field teams for closures that take place in the afternoon are smaller.  They do not include a DPH
     clinician and include only one DPW street cleaner.  Dodge Decl. ¶ 8.

United States District Court
Northern District of California

(Dilworth Decl., Nov. 15, 2022) ¶ 5.]

During this initial contact between the residents and ERT, ERT "has not yet confirmed . . . the specific shelters that are available." Opp'n 6. "The expectation is at 8:30 a.m., HSH notifies HSOC of the available shelter allocated to HSOC. While there can be a delay in notification due to the HSH placement team's process of obtaining shelter availability, HSOC is generally notified by 9:00 a.m. at the latest." Nakanishi Decl. ¶ 7. There is a daily meeting at 9:30 am "where HSOC can confirm its allocations with HSH placement and request additional or specific allocations." *Id*.; Dodge Decl. ¶ 17. If an individual is interested in shelter, "ERT takes their information, including any preference for any specific shelter or type of shelter." Piastunovich Decl. ¶ 6. Once HSH notifies HSOC "of the specific available shelter resources allocated to HSOC . . . ERT then circles back around to clients to discuss with them the specific shelter resources available that day, which shelter they want, and confirm their placement." *Id*. After ERT confirms an individual is accepting a shelter placement, HSOC confirms the referral and ERT coordinates transportation to the shelter. Nakanishi Decl. ¶ 9. Since most shelter sites do not open for intake until 10:00 am, transportation does not begin until 9:45 am. *Id*.

Defendants assert that "DPW does not begin its responsibilities until ERT has conducted its outreach" and that "DPW relies on ERT to engage the clients to determine how much time the clients need to gather the [sic] move their belongings." Nakanishi Decl. ¶ 10. According to Dodge, "DPW staff begin cleaning the area, disposing of abandoned property, bagging and tagging, and cleaning the streets" between 9:30 am and 10:00 am, Dodge Decl. ¶ 20, "only after [DPW] is given the go-ahead by HSOC." Dilworth Decl. ¶ 5. While DPW waits for the go-ahead from the Incident Commander, its crews perform other street cleaning duties around the encampment's perimeter, including disinfecting and steam cleaning sidewalks. Dilworth Decl. ¶ 5; Hardiman Decl. ¶ 4.

Darryl Dilworth, a DPW operations supervisor, states that "[w]hen cleaning an encampment, [DPW] only removes garbage and discarded debris," and onsite supervisors decide which items must be removed and stored pursuant to the bag and tag policy. Dilworth Decl. ¶ 6. Additionally, Dilworth states that DPW "does not set time limits on removals . . . [and] [a]ny

requests for more time to pack personal belongings are offered strictly by HSOC team members . . .” Dilworth Decl. ¶ 7. According to Dilworth, “[w]hen items are bag and tagged . . . a homeless property information slip is filled out completely; [and] the items are bagged, tagged and brought back to a secured encampment items storage container.” DPW then provides the owner with information about how to retrieve the items, and if no one is present during the bag and tag, DPW tapes a Public Works Notice of Removal of Property slip to a pole, wall, or safety cone in the immediate vicinity. *Id.* at ¶ 8.

Finally, SFPD Lieutenant Sam Christ, the SFPD liaison to HSOC, states that he “assign[s] police support to” planned encampment closures “to provide safety and security for city employees, for the individuals at the encampment, and for any bystanders.” [Docket No. 45-1 (Christ Decl., Nov. 7, 2022) ¶ 3.] At closures, “SFPD officers respond to questions from the public, deescalate any conflicts that may arise, and enforce the law consistent with [the SFPD Enforcement Bulletin], when requested to do so.” *Id.*

### b. Plaintiffs’ Evidence

#### i. Coalition Employees and Volunteers

Plaintiffs’ evidence regarding the conduct of encampment closures is strikingly different from Defendants’. Plaintiffs rely on declarations from Coalition staff members and volunteers who have observed significant numbers of planned HSOC encampment closures. *See* Della-Piana Decl. Ex. 1 (Coalition Declarations).[11] Kelly Cutler, who worked for the Coalition from 2016

---

[11] Plaintiffs also submit a declaration by Damon Bennett, a former San Francisco employee who led SFHOT during encampment closures for two months in 2021. [Docket No. 9-5 (Bennett Decl., Nov. 15, 2021).] Defendants object that Bennett “lacks credibility because [he] is a disgruntled former employee who threatened HSH staff and behaved violently . . . when he was terminated.” Opp’n 15 n.5 (citing Mazza Decl., Nov. 14, 2022). The court has given the declaration appropriate weight given the circumstances of Bennett’s termination. However, Defendants do not address the substance of Bennett’s declaration, which corroborates those submitted by the Coalition’s witnesses. For example, Bennett states that he “never once saw” written notices posted at an encampment closure; that SFHOT members “had no idea whether there were shelter beds available to accommodate the homeless people onsite” when they told individuals to vacate the area; that he “almost never saw DPW bag and tag property,” which was in violation of protocol; and that SFPD threatened to cite individuals if they did not leave the area. Bennett Decl. ¶¶ 6, 8, 9, 12. Bennett also states that “[o]ften a couple days each week, there would be absolutely nothing to offer homeless individuals who had been swept—not even a congregate shelter bed.” *Id.* at ¶ 17.

United States District Court
Northern District of California

through May 2022, states that she has "witnessed well over a hundred" encampment closures in San Francisco.  Cutler Decl., Aug. 5, 2022, ¶¶ 4, 6, 7.  Christin Evans, a small business owner and Coalition volunteer, has "witnessed over 50 large-scale homelessness" encampment closures since March 2020.  Evans Decl., Nov. 5, 2021, ¶¶ 3, 7, 10.  Carlos Wadkins, a former Coalition organizer, trained Coalition volunteers on how to observe and monitor encampment closures.  He "personally witnessed at least a dozen large-scale homeless" encampment closures.  Wadkins Decl., May 25, 2022, ¶¶ 3, 7, 12.  Larry Ackerman has been a Coalition volunteer since 2019.  He has "personally witnessed . . . at least ten sweeps of unhoused people and their belongings."  Ackerman Decl., Apr. 4, 2022, ¶ 6.  Finally, Ian James is the Coalition's Organizing Director.  He has "personally witnessed several sweep operations" since 2021, and "three full-scale [HSOC] sweeps" since July 2022.  James Decl., Sept. 16, 2022, ¶¶ 2, 7.

Evans states that encampment closures begin early, around 6:50 am or 7:00 am., and that SFPD and DPW are often arriving around that time.  "SFPD and DPW are often the teams to make first contact—letting homeless people know there is a sweep that day and that they need[ ] to clear out their belongings and go."  Evans Decl. ¶ 12; Wadkins Decl. ¶ 18.  According to Wadkins, "DPW and SFPD will walk through the street, waking people up by shouting or shaking their tents" and telling them to leave.  Wadkins Decl. ¶ 18; Evans Decl. ¶ 13 ("I have seen most people learn about a sweep for the first time when DPW or SFPD starts shaking them out of their tents at 7AM.").  Wadkins states that he has "heard countless reports from unhoused people that they never received advanced written or verbal notice that an HSOC sweep was happening," or that the notice they received specified a different day.  Wadkins Decl. ¶ 17.  Similarly, Evans states that "homeless people have rarely received notice" of the encampment closure prior to that date; according to Evans, she has "never seen written notice posted at the site where an HSOC sweep is taking place" in about 50 sweeps she has observed.  Evans Decl. ¶ 13.  Ackerman has seen written notice posted at a site only once in ten encampment closures that he has witnessed.  Evans states that "[t]he lack of notice only increases the stress and anxiety of the experience.  Individuals do not know to pack their belongings—and then are in a frenzy to do so."  Evans Decl. ¶ 13.

According to the Coalition's witnesses, SFHOT workers arrive around 7:30 am, after the

14

Case 4:22-cv-05502-DMR   Document 365   Filed 01/23/23   Page 16 of 51

United States District Court
Northern District of California

1    DPW and SFPD representatives are already on site.  Their job is to approach homeless individuals

2    and ask if they are interested in shelter.  However, SFHOT has no idea if it can offer shelter to any

3    individuals onsite at that time, or if any shelter will become available that day at all.  Wadkins

4    Decl. ¶ 18; Cutler Decl. ¶ 11; Evans Decl. ¶ 14; James Decl. ¶ 10.  According to Cutler, "many

5    unhoused people will tell the HOT team that they want shelter" at 7:30 am, while others wait to

6    confirm what shelter options are actually available for them before they begin packing up their

7    belongings.  However, based on Cutler's conversations with homeless people and City workers

8    onsite, SFHOT "will often report that these individuals have declined shelter—even though HOT

9    team does not know what shelter will be available, has not made a shelter offer to anyone at this

10   time, and cannot answer their questions."  Cutler Decl. ¶ 12.  James explains that he has seen San

11   Francisco "force people to choose between keeping their property and accessing shelter."  For

12   example, on one occasion, he observed that a homeless woman was interested in a congregate

13   shelter space but asked if she could place her belongings in a storage unit while she was in the

14   shelter.  According to James, "[s]he was told that, if she left to arrange for a storage unit, the City

15   could not guarantee that her belongings would be there when she returned."  The woman declined

16   the shelter bed "because there was no way to protect her personal property."  James Decl. ¶ 17.

17           After speaking with residents, SFHOT then leaves for "several hours."  Cutler Decl. ¶ 12;

18   Evans Decl. ¶ 14; Wadkins Decl. ¶ 19; James Decl. ¶ 12.  By 8:00 am, "the sweep begins."  Cutler

19   Decl. ¶ 13; Evans Decl. ¶ 15; Wadkins Decl. ¶ 19.  Residents of the encampment "are told that

20   they need to take all of their belongings and leave the area immediately" while SFPD stands

21   watch.  Cutler Decl. ¶ 13.  DPW typically begins power washing the street, which is very loud.

22   According to Cutler, "the noise creates an intense environment" and makes it difficult for residents

23   to communicate with City workers, including asking to keep their belongings.  *Id*.  After a first

24   round of cleaning, "DPW then goes person by person, and tells people to clear out.  They inform

25   homeless people that everything they leave behind will be thrown out," which causes people to

26   rush.  Wadkins Decl. ¶ 19.  "Whatever homeless individuals do not have physically in their hands

27   usually gets picked up and put in the back of a DPW crusher truck—meaning that it is going

28   straight to the dump."  Cutler Decl. ¶ 15; Evans Decl. ¶ 15 (same).  No one is allowed to recover

15

property once it has been placed in the back of a truck.  Evans Decl. ¶ 15; Ackerman Decl. ¶ 8 ("Once DPW touches something or puts it in their truck, they claim it as theirs and there is no way to retrieve it—even if an individual is present and makes it clear that the items taken were not trash.").  According to Evans, "[a]ll unattended property, not just abandoned property, is destroyed," regardless of "how neatly packed or clear it is that a person wanted to keep their property."  Evans Decl. ¶ 23.  James states that "[t]here is confusion and chaos as people try to gather their survival belongings and protect them from being confiscated by the City."  James Decl. ¶ 13.

Ackerman, Wadkins, and James state that they have never seen DPW bag and tag individuals' property or hand someone a tag informing them how they could collect their property. Ackerman Decl. ¶ 8; Wadkins Decl. ¶ 27; James Decl. ¶ 15; *see also* Cutler Decl. ¶ 22 ("I have almost never seen DPT bag and tag any individuals' property").  Instead, Cutler states that she has "far more regularly seen City employees confiscate individual's [sic] belongings and either throw those belongings out or throw them into DPW crusher trucks—over the objections of unhoused people who are asking to keep their property."  Cutler Decl. ¶ 22.  Wadkins states "[t]here is no sorting [by DPW], and no attempt to safeguard any property of value . . . [p]eople leave the area with what they can and the rest is lost."  Wadkins Decl. ¶ 22.  Evans states she has never seen DPW initiate a bag and tag of someone's property on its own; rather, she has approached SFPD and DPW and demanded that they bag and tag individuals' property and has occasionally succeeded in having them do so.  Evans Decl. ¶ 22.

If an individual asks for more time, asks DPW to stop throwing away their belongings, or resists orders to leave, SFPD threatens them with citation or arrest if they do not leave the area. Cutler Decl. ¶ 16; Evans Decl. ¶ 16; Wadkins Decl. ¶ 20.  Wadkins states that "SFPD will instruct unhoused people that they have 15 minutes to move or officers will seize their tents as evidence of a crime."  Wadkins Decl. ¶ 20.  He has also seen SFPD threaten homeless people with citation or seizure of their property "despite the fact that they have not been offered any services that day." *Id*. at ¶ 21.

DPW finishes clearing a site around 9:30 or 10:00 am.  Cutler Decl. ¶ 16; Wadkins Decl. ¶

United States District Court
Northern District of California

19.  SFHOT usually returns around that time.  Evans Decl. ¶ 17; Wadkins Decl. ¶ 23.  However, by that point, most of the residents of the encampment have left the area.  Cutler Decl. ¶ 16; Wadkins Decl. ¶ 23; James Decl. ¶ 14.  Those that remain may or may not receive offers of shelter beds.  Evans, Cutler, and Wadkins state that they have witnessed SFHOT return to the site with no shelter beds to offer.  Evans Decl. ¶ 17; Cutler Decl. ¶ 17; Wadkins Decl. ¶ 28.  According to Wadkins, if there are no shelter beds available for residents of a particular encampment, SFHOT "will just stop talking to anyone onsite and let the sweep continue."  Wadkins Decl. ¶ 28.  James states that "[u]sually, HOT will only have congregate shelter beds available to offer, if they have any offers at all," and that he has learned that congregate shelter is not accessible to certain individuals, including people who are in wheelchairs or who have PTSD or other trauma-related diagnoses.  James Decl. ¶ 14.  Further, individuals who wait in line to receive SFHOT services "run the risk of their belongings being seized by DPW in the meantime for being left unattended."  Wadkins Decl. ¶ 23.  The encampment removal is over by around 11:30 am.  Evans Decl. ¶ 20.

The declarations by Cutler, Evans, Ackerman, and Wadkins also include charts in which they "memorialize[ ] specific information" that they can recall about some of the formal and informal encampment closures that they have observed.  The charts include dates, locations, and agencies involved.  They also include brief descriptions of the particular closures listed, including observations about San Francisco's failure to post written notice of encampment closures; seizures of homeless individuals' belongings without bagging and tagging and removal of unattended tents and other property without leaving notice; and threats of citation or arrest by SFPD officers even when the individual was not offered shelter.  *See* Cutler Decl. ¶ 26; Ackerman Decl. ¶ 10; Evans Decl. ¶ 26; Wadkins Decl. ¶ 30; James Decl. ¶ 19.

### ii.  Individual Plaintiffs' Experiences

The seven individual Plaintiffs submitted declarations that are largely consistent with the observations by the Coalition's employees and volunteers.  They are summarized below.

### Toro Castaño

Toro Castaño was homeless in San Francisco from 2019 to March 2021, when he secured housing through a private organization.  [Docket No. 9-4 (Castaño Decl., Sept. 27, 2022) ¶ 4.]

United States District Court
Northern District of California

Castaño states that for the majority of the time he was homeless, he stayed with six or seven other individuals near 16th Street and Market Street. He states that "[n]early every morning, public works crews would come wake us up and tell us we had to move," and if they did not, he and the others were threatened with arrest. He states that he "never recall[s] anyone offering [them] services or shelter." *Id.* at ¶ 5. Castaño also states that they "almost never got any notice from public works crews or the police before these daily sweeps," which involved public works crews spraying "large volumes of water and chemicals on [them] or near [them] that would damage their property." *Id.* at ¶ 6. According to Castaño, police officers regularly told him that they would arrest him if he did not move his tent or threatened to seize his tent "as evidence of a crime." He did not receive citations following these interactions and states that "[a]t no time did they offer [him] any services." *Id.* at ¶ 9.

Castaño states that he can recall only "about three times" in which San Francisco claimed that it would "bag and tag" his property for him to retrieve. Each time, when he attempted to recover his property "it was nowhere to be found and there was no record of the property logged in any system." *Id.* at ¶ 10. He personally witnessed his property destroyed by public works crews at least four times in two years during sweeps. According to Castaño, there was no posted written notice at any site before crews seized property and put it in their trucks, and the crews did not give him and other individuals "enough time to collect [their] belongings before they started to throw" their belongings away. *Id.* at ¶ 11.

For example, on August 21, 2020, SFPD and DPW gave Castaño two hours to pack all of his belongings. He spent the entire two hours packing, and at the end of the two hours, crews placed his belongings in a garbage truck after "the incident commander in charge declared that all the property would be deemed a fire hazard." *Id.* at ¶¶ 12-14. Castaño states that he lost over $9,000 worth of property that day, including a tent, laptop computer, and items of sentimental value. *Id.* at ¶ 15. According to Castaño, he received no prior notice of the sweep. *Id.* at ¶ 12. Castaño was eventually cited and detained by police for illegal camping after protesting the destruction of the encampment and his property. Castaño recalls that the HOT team offered him a congregate shelter bed on that date. He apparently declined the offer due to health concerns in

18

light of the pandemic. *Id*. at ¶¶ 17, 18. Castaño states that during the two years that he was homeless, he only saw one other homeless person ever offered services or shelter. *Id*. at ¶ 19.

### Sarah Cronk and Joshua Donohoe

Sarah Cronk and her partner Joshua Donohoe are currently homeless and unsheltered in San Francisco. They have been living together in a tent near 13th Street and Folsom Street since May 2022. [Docket No. 9-4 (Cronk Decl., Sept. 13, 2022) ¶ 2, (Donohoe Decl., Sept. 13, 2022) ¶ 2.]

Cronk and Donohoe state that DPW has "disturb[ed]" them "early in the morning at least 5 days every week." They state that sometimes DPW "want[s] to throw away everything [they] have," while other days DPW "will quietly grab anything they can while [Cronk and Donohoe] are waking up." They state that DPW has thrown away their "neatly packed dishware, sponges, and brooms" while ignoring "obvious pile[s] of trash." Cronk Decl. ¶¶ 3, 4; Donohoe Decl. ¶¶ 3, 4. For example, on September 12, 2022, four DPW employees arrived at the couple's tent early in the morning. The workers took Cronk and Donohoe's clothes and food, which were "neatly packed outside of" the tent, without telling Cronk and Donohoe where they were taking their property or how they could recover it. After Donohoe protested and asked a worker to leave them alone, the worker threatened Donohoe with violence. Cronk Decl. ¶¶ 6, 7; Donohoe Decl. ¶¶ 6, 7.

According to Cronk and Donohoe, the HOT team is "almost never at the daily sweep operations" they have experienced. On one occasion in June 2022, the HOT team was present at a sweep and evaluated them for housing. The HOT team informed the couple that Donohoe was "Priority 1" for housing and that they would attempt to find shelter for the couple. During the intake process, however, they state that "DPW was already seizing [their] belongings and attempting to throw them away into dumpsters." The HOT team ultimately told Cronk and Donohoe that it "might have a tiny home" for them, but that they needed to "decide right away if [they] would accept shelter and that, if [they] said yes, [they] would have to leave behind many of [their] survival belongings." Cronk Decl. ¶¶ 8-10; Donohoe Decl. ¶¶ 8-10. Cronk and Donohoe were concerned about accepting the offer without confirmation that shelter was actually available and asked for more time to find someone to watch their property. The HOT team then left the site.

United States District Court
Northern District of California

1    When they returned hours later, Cronk and Donohoe expressed their concern about losing their

2    "survival belongings with no guarantee of shelter," and an SFPD captain told them, "[y]ou don't

3    deserve housing." Cronk Decl. ¶ 11; Donohoe Decl. ¶ 11. Neither has interacted with the HOT

4    team since that date. *Id.*

5        Cronk states that she has interacted with the HOT team on one other occasion in the past

6    year and a half. The HOT team informed her that she was a priority for housing and offered her

7    shelter. Thirty minutes later, they informed her that she was not eligible for shelter without

8    explanation. Cronk Decl. ¶ 12.

9                      **Molique Frank**

10    Molique Frank is 46 years old. Frank "ha[s] been experiencing homelessness" since he

11    was 20 years old. [Docket No. 9-4 (Frank Decl., Mar. 10, 2022) ¶ 2.] Frank states that San

12    Francisco agencies such as DPW and SFPD have "harassed" him "repeatedly over the years. They

13    come to sweep and take [his] belongings away on a regular basis." According to Frank, San

14    Francisco "almost never" gives advance notice before a sweep, and that during the "few times

15    where the City has put up signs that say they are coming," he makes sure to be present onsite as

16    "that is the only way to save [his] belongings from being thrown away." *Id.* at ¶¶ 3-5.

17    Frank describes the most recent time the City destroyed his property at an encampment on

18    January 26, 2022 on 12th Street. Although San Francisco had posted a notice, "they did not come

19    on the day the notice said that they would" so he "did not receive prior notice that they were

20    coming on this day." *Id.* at ¶¶ 8, 9. SFPD, DPW, SFFD, and the HOT team were present at the

21    sweep. Over Frank's objections, DPT threw his belongings away, including clothes, an X-Box, a

22    bike frame, and "backpacks with essential survival gear inside." Frank states that he did not

23    receive any information about bagging and tagging and did not see DPW workers "sort or arrange

24    any of [his] belongings for safekeeping." *Id.* at ¶¶ 9, 10. Frank explains that even though the

25    HOT team was present, "they did nothing"; specifically, the HOT team did not offer or provide

26    services to Frank that day. After Frank asked an SFPD officer "if [he] would be able to be housed

27    that day," the officer referred him to the HOT team leader, but "HOT said there was no shelter

28    available that day." As a result, he and the other homeless persons "were simply forced to move

around the corner from where [they] were swept." *Id*. at ¶¶ 12, 13.

### David Martinez

David Martinez has been homeless in San Francisco for years. [Docket No. 9-4 (Martinez Decl., Sept. 12, 2022) ¶ 2.] He states that DPW or SFPD "come to tell [him] to move along at least once every week" and that his belongings have been taken "many times." DPW is usually the agency that tells him he has to move from where he is sleeping, and "SFPD officers sometimes stand behind them and threaten me with citation and arrest" for failure to comply. *Id*. at ¶ 3.

Martinez estimates that he has had his "belongings seized and destroyed by the City on at least 4 occasions" from September 2021 until September 2022 and describes two such incidents. *Id*. First, on June 23, 2022, DPW approached Martinez where he was sleeping on Folsom Street and 13th Street. The night before, Martinez had "carefully cleaned [his] area and neatly packed up" his belongings. Martinez, who has "right side congestive heart failure," informed DPW that he had to leave for a doctor's appointment. *Id*. at ¶ 4. "DPW workers assured [him] that [his] belongings would not be disturbed," and Martinez asked a friend to watch his belongings while he was gone. *Id*.

While Martinez was at his appointment, he learned that DPW had taken all of his belongings and placed them in a dumpster truck. His friend "jumped into the dumpster truck in an attempt to safeguard [his] belongings" and SFPD threatened her with arrest. Martinez states he lost a brand new tent that he had been living in, clothes, a laptop and two cell phones, nonperishable food, congestive heart failure medication, and his government-issued ID on that day. *Id*. at ¶ 5.

DPW again approached Martinez while he was sleeping in early September 2022. Martinez had found another tent and had started to collect clothing. He states that he pleaded with DPW not to take his tent and belongings but they took them anyway and threatened him with citation or arrest "if [he] resisted them as they took them away." According to Martinez, the HOT team was not present and he was not offered any shelter. *Id*. at ¶ 7.

Martinez states that "[t]he City almost never posts a written notice or provides us with verbal notice that a sweep is going to be happening" in the area. He last saw a posted notice "a

21

few months ago" and has not seen one since. Additionally, he states "[t]he HOT team usually has not been present for the sweeps" he has experienced. *Id.* at ¶ 9. Finally, Martinez states that he has attempted to retrieve property from DPW at least twice but has never gotten anything back. *Id.* at ¶ 10.

### Teresa Sandoval

Teresa Sandoval is currently unhoused. She is a double amputee and normally uses a wheelchair or prosthetics. [Docket No. 9-4 (Sandoval Decl., Sept. 12, 2022) ¶ 2.] The longest she has ever been allowed to stay in a shelter is about three months, and she states, "shelter is hard to find." *Id.* at ¶ 4. Sandoval states that she has been "harassed . . . on a regular basis" by SFPD and DPW during the years that she has been homeless and that SFPD has threatened to detain her if she does not move. *Id.* at ¶ 3.

Sandoval states that San Francisco "sometimes" comes by an encampment before a sweep to give individuals notice but that she has only ever seen one paper notice. *Id.* at ¶ 3. The HOT team is sometimes present at sweeps, but "[u]sually when [she] [is] approached by the City and told to move," she has not been offered shelter. *Id.* at ¶ 4.

Sandoval states that she has had her property taken by San Francisco at least three or four times from March 2022 through August 2022. She describes one sweep in June 2022. The entire HSOC team arrived without having posted a notice at the site and workers woke her up in her tent upon arrival. She and others were ordered to clear the area. Sandoval, who was in her wheelchair, was moving slowly to collect her belongings. As she did so, DPW workers seized her purse and placed her tent in a dumpster truck, and "refused to stop" when she told them she needed her belongings. They also took her prosthetics and she has been unable to obtain new ones since that date. *Id.* at ¶ 6.

On another occasion in August 2022, DPW approached her where she was staying at 13th and Mission. Sandoval asked DPW if she could leave her property there while she went to her doctor's appointment and "[t]hey said that if [she] left [her] property, they would take it," and they threw away her property that day. *Id.* at ¶ 7.

Sandoval was "swept yet again" in early September 2022. She received an offer of shelter

that day, which she accepted. However, she was unable to take all of her belongings to the shelter and "was forced to leave the majority of [her] survival belongings behind," including her tent, clothing, storage bags, and personal diaries." *Id.* at ¶ 8. The shelter was only temporary and she is again unhoused. She has been unable to retrieve from DPW any of the possessions she left behind when she accepted the shelter offer. *Id.*

### Nathaniel Vaughn

Nathaniel Vaughn became homeless in 2019. He secured temporary supportive housing on January 21, 2020 and now has "a permanent place to live." [Docket No. 9-4 (Vaughn Decl., Nov. 10, 2021) ¶ 2.]

Vaughn states that from January 2019 to January 2020, SFPD and DPW forced him to move from where he was sleeping and threatened to take his belongings at least once per month. During those months, Vaughn "never once saw the City bag and tag anyone's property," and he states the HOT team was "rarely present at these sweeps." *Id.* at ¶ 4.

Vaughn states his property was destroyed by law enforcement on January 8, 2020. He was not present at the time DPW and SFPD arrived as he was visiting his mother, but "had left [his] tent clean and had [his] belongings neatly packed inside." When he returned to the site, "nothing was left. SFPD and DPW had destroyed everything" and there was no bag and tag. According to Vaughn, the HOT team was present that day and he "begged for them to help [him] secure housing" since he had lost all of his possessions. He estimates the value of the destroyed property was $1,300, including a tent, sleeping bag, stove, clothing, food, toiletries, and bike parts, as well as various items he describes as priceless. *Id.* at ¶ 5.

### 4. Interactions Between Homeless Individuals and San Francisco Employees Outside of HSOC Encampment Closures

Defendants assert that DPW and SFPD comply with the bag and tag policy and SFPD Enforcement Bulletin during encounters with homeless persons outside of the context of HSOC encampment closures. *See* Opp'n 8-9. For example, DPW's Dilworth states that cleaning crews encounter tents and homeless persons during routine maintenance operations and refer encampments of two or more tents to HSOC. He states that cleaning crews "generally do not

United States District Court
Northern District of California

1    remove or move people or tents during routine cleaning unless there are health and safety issues or

2    the public right of way is inaccessible." In those circumstances, crews provide "sufficient time"

3    for individuals to collect and move their belongings and then bag and tag unremoved belongings

4    in accordance with the bag and tag policy. Dilworth Decl. ¶ 9.

5         SFPD Officer Christ states he conducts regular training for SFPD officers on the applicable

6    rules for "engag[ing] with individuals who are sleeping, sitting, or lying in public areas," including

7    "all aspects of" the SFPD Enforcement Bulletin. Christ Decl. ¶ 4. He also states that SFPD

8    officers have his phone number and call him "to identify available shelter beds they may offer to a

9    person experiencing homelessness" and to "arrange support from [DPW] to bag and tag a person's

10   belongings." *Id*. at ¶ 6.

11        In contrast, notwithstanding San Francisco's bag and tag policy and SFPD Enforcement

12   Bulletin, Plaintiffs assert that "DPW and SFPD personnel have a daily practice of summarily

13   destroying the property of homeless people without proper bag and tag, and of imposing or

14   threatening civil and criminal penalties on homeless people simply for being homeless." Mot. 8.

15   Cutler states she has "witnessed dozens of informal sweeps on a monthly basis . . . over years,"

16   and has never "seen an SFPD or DPW employee bag and tag an individual's property during these

17   informal sweep operations." Cutler Decl. ¶ 24. Evans has seen "informal sweeps without the

18   presence of the HOT team," where "DPW and SFPD will disturb people in their sleep, force them

19   to move, or seize their property without even the guise of offering services." Evans Decl. ¶ 25.

20   *See also* Wadkins Decl. ¶ 30 (describing "smaller sweeps carried about [sic] by DPW and SFPD

21   all over the City").

22        Additionally, Cutler states that SFPD employs "homeless outreach" officers who are

23   specifically focused on encampments. When these officers return to an encampment that has been

24   previously removed via HSOC action, they do not bring the HSOC field team with them. The

25   officers inform homeless individuals "that they must move along or face arrest—even though

26   there is not even an attempt to connect those individuals to services." Cutler Decl. ¶ 25. She

27   states that "this type of enforcement is referred to as 're-encampment prevention,'" and officers do

28   not provide advance notice or offer shelter. *Id*. This does not appear to be in dispute; Plaintiffs

cite a document produced by SFPD in response to a public records request that states, "[t]he goal of **re-encampment prevention** is to re-secure and clean areas where there have been encampment resolutions and to ensure no tents, structures and vehicles remain.  <u>In general, sheltering options will not be offered unless there is an urgent situation</u>."  Della-Piana Decl. ¶ 20, Ex. 17 (emphases in original).

### 5.  Dr. Herring's Opinions

Dr. Herring offers five opinions in his declaration.

#### a.  Opinion 1

Dr. Herring opines that "[v]oluntary access to shelter has been functionally inaccessible to unhoused people in San Francisco since the onset of the pandemic in April 2020 and has long been systematically inadequate for a large portion of the population."  Herring Decl. 10 (Opinion 1). He states that "the only clear way to access shelter is via an encampment resolution while under threat from law enforcement," which "means that individuals are being threatened with criminal punishment when they genuinely had no voluntary means to access shelter on their own."  *Id*. at ¶ 33.  Defendants do not dispute any of the data or analysis underlying this opinion.  At the hearing, they conceded that since April 2020, homeless individuals have not been able to access shelter.

Defendants "object"[12] to Opinion 1 on the ground that "Herring conflates aggregate shelter capacity with the offer of a bed for a specific individual at an encampment resolution."  *Id*. (citing Herring Decl. ¶ 28).  Dr. Herring sets forth the aggregate shelter capacity and explains that San Francisco has a clear shelter bed shortage based on the number of homeless individuals in the City.  Given the undisputed fact that homeless individuals "no longer have any immediate shelter options available to them," he concludes that "the typical unhoused person lacks access to shelter altogether" unless they are "under threat from law enforcement" via an encampment closure.  *See* Herring Decl. ¶¶ 24, 28, 32, 33.  This opinion is significant in light of *Martin v. City of Boise*, 920 F.3d 584, 618 (9th Cir. 2019), discussed further below, in which the Ninth Circuit held that "so

---

[12] Defendants state a number of "objections" to Dr. Herring's opinions but many are not objections in the formal sense.  Defendants do not cite rules of evidence or other legal authority. They amount to disagreements with Dr. Herring's conclusions.  Notably, Defendants did not submit any evidence to counter his opinions.

United States District Court
Northern District of California

long as there is a greater number of homeless individuals in [a jurisdiction] than the number of

available beds [in shelters], the jurisdiction cannot prosecute homeless individuals for

"involuntarily sitting, lying, and sleeping in public." (cleaned up). The "objection" is overruled.

### b.     Opinion 2

Dr. Herring's second opinion is that "HSOC clears encampments and displaces homeless

individuals despite the clear lack of available shelter on a daily basis." Herring Decl. 15 (Opinion

2). Dr. Herring analyzed HSOC data about encampment closures between January 1, 2021 and

June 30, 2021 and compared the dates of those closures with data about HSH's shelter bed

availability for the same period. *Id.* at ¶¶ 45-49. Shelter was available for all encampment

residents on only 10 days out of the 83 days on which HSOC conducted closures and evicted

residents. *Id.* at ¶ 45.

Defendants do not challenge the underlying data or Dr. Herring's analysis of the same in

formulating Opinion 2. Importantly, they do not challenge the conclusion that HSOC executed

encampment closures on days when there were documented deficiencies in shelter availability,

thereby conceding this important fact. Instead, they argue that Herring's analysis is based on

"stale data" from 2021. Opp'n 17. This objection is not well taken. On reply, Plaintiffs explain

that they were not able to provide a more up-to-date analysis in their opening brief because

Defendants did not produce HSOC encampment reports for the period August 30, 2021 to

November 8, 2022 until November 17, 2022, which was well after Plaintiffs filed the motion for a

preliminary injunction. Shroff Decl. ¶ 23. Herring submitted a supplemental declaration that

addresses the new data from 2022 in which he states that the conclusions he reached in his initial

declaration "are confirmed" by the 2022 data, discusses the new data, and "re-iterate[s] [his] initial

findings in full based on the 2022 data." Supp. Herring Decl. ¶¶ 4, 5.

Defendants also "object" to Opinion 2 on the ground that "HSOC has learned that 40% of

clients at an encampment resolution accept offers of shelter, and has made the rational decision to

proceed accordingly." Opp'n 17 (citing Herring Decl. ¶ 56 n.28). According to Defendants, "[i]f

HSOC's projection of shelter needs turns out to be insufficient on a particular day, the

encampment resolution team shifts gears, continues to offer resources, and does not require clients

26

1   to leave." Opp'n 17 (citing Dodge Decl. ¶ 18). Dodge states, "[i]f adequate sheltering alternatives

2   are not available, clients are not asked to relocate unless an immediate health or safety issue

3   requires relocation." Dodge Decl. ¶ 18.[13]

4        Again, this "objection" is more accurately described as a disagreement on the merits. As

5   to the purported 40% rate of acceptance of shelter offers, the sole evidence of this is an October

6   2021 article in the *San Francisco Public Press* in which Dodge is quoted as saying "the formula

7   [to know how many shelter beds are needed during an encampment closure] changes each week,

8   and at the moment teams head out with enough shelter beds available for around 40% of any

9   encampment, but "[i]f the team happens to be in a place where there's a lot of acceptance and not

10  a lot of shelter beds, they stop and come back the next day." Della-Piana Decl. ¶ 25, Ex. 22.

11  Curiously, even though Dodge submitted a declaration in support of Defendants' opposition, he

12  does not explain or even verify the existence of this 40% "formula" or any evidence supporting it.

13  As to Defendants' general contention that San Francisco does not go forward with an encampment

14  closure if bedspace is inadequate, Defendants do not offer any particularized proof of this alleged

15  practice, either in the form of data analysis or anecdotal evidence. Moreover, Defendants'

16  position is contradicted by Plaintiffs' evidence, set forth above, that homeless individuals have

17  been displaced even when there are no available shelter beds. Defendants' objections to Opinion 2

18  are overruled.

19              c.      **Opinion 3**

20       According to Dr. Herring, "HSOC conducts police enforcement against homeless

21  individuals despite the lack of available shelter, including citing and arresting individuals during

22  camp clearances even when adequate shelter was not available or offered." Herring Decl. 22

23  (Opinion 3). From July 2018 through October 2021, SFPD cited or arrested homeless people for

24  illegal lodging under California Penal Code section 647(e) at least 360 times. Herring Decl. ¶ 70;

25

26  _____

27  [13] Defendants' admission that it proceeds with encampment closures without having shelter
    available for 100% of affected residents appears to violate the SFPD Enforcement Bulletin, which
    provides that "DPW, DPH, and DHSH must provide a written offer of shelter or housing at least
28  24 hours before ordering the removal of a tent or encampment" for violation of San Francisco
    Police Code section 169. SFPD Enforcement Bulletin 3.

United States District Court
Northern District of California

Della-Piana Decl. ¶¶ 39, 40, Exs. 35, 36. During the same three-year period, SFPD cited or arrested homeless people under California Penal Code section 148(a) "for refusal to obey a law enforcement order to vacate or 'move along'" at least 2,652 times. Herring Decl. ¶ 70.

Dr. Herring opines that "these numbers are likely a massive undercount of actual citations and arrests," since "SFPD data has consistently vastly under-recorded its citations against unhoused individuals in the past." *Id*. at ¶ 71. However, at a minimum, he contends that the data shows that "SFPD has cited or arrested at least 3,000 individuals for sleeping or residing in public over the last three years," while at the same time, San Francisco "had insufficient and inadequate shelter to provide to its unhoused residents." *Id*. at ¶ 73. Dr. Herring compared SFPD citation data with HSOC encampment closure and shelter records for the period January 1, 2021 and June 30, 2021, which was a period in which San Francisco lacked daily shelter bed availability. Herring Decl. ¶¶ 45, 74. He concluded that "SFPD officers issued citations and arrests against unhoused individuals for lodging without permission, maintaining a public nuisance, or failure to obey a police officer on at least 51 of those 73 days (69.9%) even though there were not enough shelter beds available." *Id*. at ¶ 75 (emphasis removed).

Defendants do not challenge the factual content of Dr. Herring's analysis, nor do they offer any competing analysis. Defendants instead object that this opinion is based on "stale data." However, as previously discussed, the record establishes that Defendants did not provide Plaintiffs' counsel with citation and arrest data for 2022 until after the preliminary injunction motion was filed. *See* Shroff Decl. ¶ 19, Ex. 14. In his supplemental declaration, Dr. Herring states that an analysis of the 2022 records "shows the same trend." Supp. Herring Decl. ¶ 19.

Defendants also argue that "Herring has not attempted to correlate police activity to HSOC encampment resolutions, though he acknowledges it is possible to do so."[14] Opp'n 17 (citing Herring Decl. ¶ 59 ("The SFPD data I have been provided is location-specific and can be cross-referenced with HSOC Encampment Reports for a more robust analysis of SFPD activity at HSOC sweeps in particular.")). This is not grounds to disregard Dr. Herring's analysis. Plaintiffs need

---

[14] Defendants also had the ability to correlate the data but did not offer that analysis.

1    not correlate police activity to specific encampment closures in order to make a factual record that

2    SFPD cites and arrests homeless individuals for sleeping in public even though San Francisco

3    does not have enough shelter beds to offer them.  Defendants' objections to Opinion 3 are

4    overruled.

                    d.      Opinion 4

5

6           Dr. Herring also opines that "HSOC engages in widespread property destruction instead of

7    appropriately safeguarding and storing the property of unhoused individuals in accordance with

8    federal guidelines."  Herring Decl. 29 (Opinion 4).  Plaintiffs obtained DPW bag and tag records

9    dated from 2016 to August 2022.  Della-Piana Decl. ¶¶ 35, 36, Exs. 31, 32.  Dr. Herring analyzed

10   the period between January 2021 and June 2021.  In that timeframe, the total number of bag and

11   tag records was 195.  During that same period, San Francisco "displac[ed] at least 1,282 people

12   experiencing unsheltered homelessness from across sites they were inhabiting in 83 formally

13   scheduled HSOC encampment resolutions alone."  Herring Decl. ¶¶ 83, 84.  Dr. Herring further

14   observes that the addresses on the bag and tag records do not match those of HSOC encampment

15   closures.  *Id.* at ¶ 85.  According to Dr. Herring, the disparity between the number of homeless

16   individuals displaced due to encampment closures and the number of recorded bag and tags

17   "suggest that San Francisco fails to comply with its bag and tag policies during interactions with

18   individuals experiencing homelessness."  *Id.* at ¶ 86.

19          Defendants object to Opinion 4 on the ground that it is based on "stale data."  Opp'n 17.

20   In Dr. Herring's supplemental declaration, he explains that an analysis of DPW bag and tag

21   records from January 2022 to October 2022 "demonstrate the same pattern"; i.e., a disparity in the

22   number of bag and tag records and the total number of homeless individuals subjected to

23   encampment closures.  Supp. Herring Decl. ¶¶ 30-32.  The staleness objection is overruled.

24   Defendants also argue that "Herring has no valid basis nor competence to resolve the disputed

25   factual question whether DPW follows" its bag and tag policy.  Opp'n 17.  Defendants do not

26   challenge the factual disparity observed by Dr. Herring; rather, they object on the ground that

27   Opinion 4 goes to an ultimate issue in the case.  To the extent Plaintiffs offer Opinion 4 as an

28   opinion about HSOC's compliance with federal guidelines, including Fourth Amendment

United States District Court
Northern District of California

restrictions, Defendants' objection is sustained because the opinion encompasses an ultimate legal issue. *See United States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015) ("an expert cannot testify to a matter of law amounting to a legal conclusion."). However, the court will consider the facts underlying Opinion 4 (to which Defendants do not object).

### e.     Opinion 5

Finally, Dr. Herring offers an opinion about the harm caused by encampment closures without accompanying offers of shelter and property confiscation. He discusses federal guidance that "camp clearances that do not provide offers of adequate shelter or housing can 'result in adverse health outcomes, exacerbate racial disparities, and create traumatic stress, loss of identification and belongings, and disconnection from much-needed services.'" Herring Decl. ¶ 90. He concludes that move-along orders and property confiscation against unhoused people results in serious and irreparable harm." Herring Decl. 31 (Opinion 5).

Defendants object to Opinion 5 that it is an "articulat[ion]" of Dr. Herring's "sharp policy disagreement with San Francisco" and that his "criticisms . . . are untethered to any constitutional standard." According to Defendants, it is constitutionally permissible to "[e]nforc[e] restrictions on occupying public property . . . so long as the individual has somewhere to sleep." Opp'n 17-18. Defendants' objection is not directed to the subject of Opinion 5, which discusses the impacts of San Francisco's challenged practices on its homeless residents. These impacts do not themselves establish constitutional violations, nor does Dr. Herring attempt to make such a connection. Rather, the opinion is relevant to whether Plaintiffs have demonstrated that they are entitled to preliminary injunctive relief. The "objection" is overruled. Although Defendants did not object on this basis, the court will not consider Opinion 5 to the extent it opines on an ultimate legal conclusion – namely, that the challenged conduct "results in serious and irreparable harm."

### C.     The Proposed Preliminary Injunctive Relief

Plaintiffs request three forms of preliminary injunctive relief. First, Plaintiffs ask the court to prohibit Defendants "from citing, arresting, stopping, searching, questioning, or otherwise investigating or enforcing—or threatening to investigate or enforce—any ordinance that punishes sleeping, lodging, or camping on public property," citing a series of statutes and ordinances set

forth below. Mot. i. Plaintiffs' proposal also includes "a prohibition on the issuance of 'move along' orders or other police orders under threat of citation and arrest." *Id*. Plaintiffs request that the proposed preliminary injunction remain in effect "unless and until Defendants can confirm that San Francisco's unhoused residents have immediately available, appropriate, accessible, and voluntary shelter such that they are not being punished for the involuntary status of homelessness." *Id*.

The relevant portions of the cited statutes and ordinances are:

- **California Penal Code section 647(e):** "every person . . . [w]ho lodges in any building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it" is "guilty of disorderly conduct, a misdemeanor[.]"

- **California Penal Code section 148(a):** "[e]very person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment."

- **California Penal Code section 370:** "[a]nything which is injurious to health, or is indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property by an entire community or neighborhood, or by any considerable number of persons, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a public nuisance."

- **California Penal Code section 372:** "[e]very person who maintains or commits any public nuisance, the punishment for which is not otherwise prescribed, or who willfully omits to perform any legal duty relating to the removal of a public nuisance, is guilty of a misdemeanor."

- **San Francisco Police Code section 97(b):** "[n]o person shall use or occupy or permit the use or occupancy of any motor vehicle for human habitation, either single or in groups, on any street, park, beach, square, avenue, alley or public way, within a residential neighborhood of the City and County of San Francisco between the hours of 10:00 p.m. and 6:00 a.m. . . ."

- **San Francisco Police Code section 168:** "[i]n the City and County of San Francisco, during the hours between seven (7:00) a.m. and eleven (11:00) p.m., it is unlawful to sit or lie down upon a public sidewalk, or any object placed upon a public sidewalk," punishable "by a fine of not less than $50 or more than $100 and/or community service" for the first offense.[15]  S.F., Cal., Police Code § 168(b), (f)(1).

- **San Francisco Police Code section 169:** "[i]n the City and County of San Francisco, it is unlawful to place an Encampment upon a public sidewalk.  This prohibition shall not apply to the placement of an Encampment on a public sidewalk pursuant to and in compliance with a street use permit or other applicable permit."  S.F., Cal., Police Code § 169(c).

- **San Francisco Park Code section 3.12:** "[n]o person shall construct or maintain or inhabit any structure, tent or any other thing in any park that may be used for housing accommodations or camping, nor shall any person construct or maintain any device that can be used for cooking, except by permission from the Recreation and Park Department or Commission.  No person shall modify the landscape in any way in order to create a shelter, or accumulate household furniture or appliances or construction debris in any park."

---

[15] San Francisco Police Code section 168(f)(2) authorizes different penalties for "Subsequent Offenses," as follows: "[a]ny person violating any provision of this Section within 24 hours after violating and being cited for a violation of this Section shall be guilty of a misdemeanor and shall be punished by a fine of not less than $300 and not more than $500, and/or community service, for each provision violated, or by imprisonment in the County Jail for a period of not more than ten (10) days, or by both such fine and imprisonment. Any person violating any provision of this Section within 120 days after the date of conviction of a violation this Section shall be guilty of a misdemeanor, and shall be punished by a fine of not less than $400 and not more than $500, and/or community service, for each provision violated, or by imprisonment in the County Jail for a period of not more than thirty (30) days, or by both such fine and imprisonment."

United States District Court
Northern District of California

- **San Francisco Park Code section 3.13:** "[n]o person shall remain in any park for the purpose of sleeping between the hours of 8:00 p.m. and 8:00 a.m., except that special permission may be granted by the Recreation and Park Department to persons providing security services between said hours in any park or for other unusual events.

- **San Francisco Port Code section 2.9:** "[n]o person shall construct or maintain any building, structure, tent or any other thing in any park that may be used for housing accommodations or camping, except by written permission from the Executive Director."

- **San Francisco Port Code section 2.10:** "[n]o person shall remain in any park for the purpose of sleeping between the hours of 10:00 p.m. and 6:00 a.m., except that special permission may be granted by the Executive Director to persons providing security services between said hours in any park or for other unusual events."

Second, Plaintiffs ask the court to prohibit Defendants from "summarily seizing and destroying the personal property of homeless individuals, including momentarily unattended property, and to prohibit the confiscation of unhoused individuals' personal property except when bagged and tagged in accordance" with Defendants' written policies. Mot. i-ii.

Third, Plaintiffs ask the court to appoint a Special Master at Defendants' expense to help implement the preliminary injunction, monitor compliance with its terms, and resolve disputes among the parties or other interested persons. Mot. ii.

### D. Procedural History

Plaintiffs filed the complaint and the motion for a preliminary injunction on September 27, 2022. On October 4, 2022 the court set a briefing schedule for a November 18, 2022 hearing. [Docket Nos. 19, 21, 22.] Defendants filed a motion to extend the briefing schedule and for additional time to respond to the complaint. Plaintiffs opposed the motion in part. They asked that if the court granted the extension that it also impose certain notice and reporting conditions and require Defendants to conduct a "prompt" Rule 26(f) conference. [Docket No. 27, 30.] The court notified the parties that it was inclined to grant an extension of the briefing schedule and ordered them to meet and confer on Plaintiffs' proposed conditions to reach agreement or to file a

33

United States District Court
Northern District of California

1   joint letter setting forth their positions, including "their best compromise on the proposed

2   conditions." [Docket No. 31.]  The parties timely filed a joint letter.  [Docket No. 33.]

3          On October 18, 2022, the court granted Defendants' motion for an extended briefing

4   schedule in part and continued the hearing to December 22, 2022.  [Docket No. 34.]  The court

5   ordered the parties to conduct the Rule 26(f) conference by the usual deadline set forth in the

6   Order Setting Initial Case Management conference and ADR Deadline (December 14, 2022) and

7   to meet and confer to determine whether any discovery was necessary to complete the briefing on

8   the motion for a preliminary injunction.  The court ordered the parties to file a joint letter by

9   October 21, 2022 regarding any agreements and/or disputes about the discovery.  *Id.*

10  Additionally, the court ordered Defendants to provide 72-hour advance notice to Plaintiffs of any

11  planned homeless encampment resolutions scheduled by any San Francisco agency, and to

12  produce weekly logs maintained by DPW regarding interactions with unhoused individuals.  *Id*.

13  Finally, the court ordered the parties to meet and confer on Plaintiffs' request for production of

14  SFPD incident reports and dispatches and the use of search terms related to the same, and to file a

15  joint letter by October 21, 2022 regarding any agreements and/or disputes about search terms.  *Id*.

16  The parties timely filed two joint letters regarding discovery for the preliminary injunction motion

17  and weekly reporting of SFPD information.  [Docket Nos. 36, 37.]

18         On October 31, 2022, the court ordered Defendants to provide weekly reports of

19  misdemeanor citations for three penal code provisions and a report of dispatches for "homeless

20  calls for service," adopting Defendants' proposal for the same.  [Docket No. 38.]  The court held a

21  hearing on November 3, 2022 regarding the discovery disputes at which it adopted Plaintiffs'

22  proposal that Defendant disclose certain records to Plaintiffs two days after it filed its opposition

23  to the motion for a preliminary injunction, but only to the extent that "Defendants rely in part on

24  individual records" in certain document categories in their opposition.  [Docket Nos. 42, 44.]

## III.    LEGAL STANDARD

26         "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

27  *v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary

28  injunction must establish that he is likely to succeed on the merits, that he is likely to suffer

irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. "The first factor is the 'most important.'" *Garcia v. City of Los Angeles*, 11 F.4th 1113, 1118 (9th Cir. 2021) (quoting *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc)). "To establish a likelihood of success, plaintiffs need not conclusively prove their case or show that they are 'more likely than not' to prevail." *Stewart v. City & Cnty. of San Francisco, California*, No. 4:22-CV-1108-YGR, ---F. Supp. 3d---, 2022 WL 2720734, at *4 (N.D. Cal. June 22, 2022) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). "Rather, a 'fair chance' of success is the standard for granting preliminary injunctive relief." *Id.* (quoting *Benda v. Grand Lodge of IAM*, 584 F.2d 308, 315 (9th Cir. 1978)).

The Ninth Circuit uses a sliding scale approach to preliminary injunctions, such that "a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). In addition, courts may issue a preliminary injunction if the plaintiff raises "serious questions going to the merits . . . and the balance of hardships tips sharply in [the plaintiff's] favor." *Id.*

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

#### 1. Eighth Amendment Claim

Plaintiffs assert that San Francisco criminalizes involuntary homelessness in violation of homeless individuals' Eighth Amendment rights under *Martin*, 920 F.3d at 616. *See* Mot. 17.

The Eighth Amendment states, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. The amendment's bar against cruel and unusual punishments "circumscribes the criminal process in three ways." *Ingraham v. Wright*, 430 U.S. 651, 667 (1977). In relevant part, "it places substantive limits on what the government may criminalize." *Martin*, 920 F.3d at 615 (citing *Ingraham*, 430 U.S. at 667).

In *Martin*, the Ninth Circuit considered two ordinances that "criminalize[d] the simple act of sleeping outside on public property, whether bare or with a blanket or other basic bedding"

United States District Court
Northern District of California

United States District Court
Northern District of California

anywhere in the city of Boise, Idaho, and held that "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter." 920 F.3d at 616, 617.  The court based its holding on "the principle 'that the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being.'" *Id.* at 616 (quoting *Jones v. City of Los Angeles*, 444 F.3d 1118, 1135 (9th Cir. 2006), *vacated*, 505 F.3d 1006 (9th Cir. 2007)).  "[J]ust as the state may not criminalize the state of being 'homeless in public places,' the state may not 'criminalize conduct that is an unavoidable consequence of being homeless—namely, sitting, lying, or sleeping on the streets." *Id.* at 617 (quoting *Jones*, 444 F.3d at 1137).

The Ninth Circuit made clear that a city is not required to "provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place." *Id.* (quoting Jones, 444 F.3d at 1138).  Rather, it asserted that its holding was "a narrow one" regarding when a city may prosecute homeless individuals for sitting, sleeping, or lying on public property:

> We hold only that so long as there is a greater number of homeless individuals in [a jurisdiction] than the number of available beds [in shelters], the jurisdiction cannot prosecute homeless individuals for involuntarily sitting, lying, and sleeping in public.  That is, as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter.

*Id.* (alterations in original; internal quotation marks and citation omitted).  The Ninth Circuit also explained that its holding "does not cover individuals who *do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it . . ." *Id.* at 617 n.8 (emphasis in original).

In *Johnson v. City of Grants Pass*, 50 F.4th 787, 813 (9th Cir. 2022), the Ninth Circuit recently held that "'sleeping' in the context of *Martin* includes sleeping with rudimentary forms of protection from the elements, and that *Martin* applies to civil citations where . . . civil and criminal punishments are closely intertwined."

Plaintiffs assert, and Defendants concede, that San Francisco does not have adequate

available shelter for its homeless residents, falling short by thousands of beds. *See, e.g.*, Della-Piana Decl. Exs. 7 at 19 (reporting 7,754 homeless residents in 2022); 6 at 3 (reporting 5,080 shelter beds in 2021, the date of the last count); Herring Decl. ¶ 28 (current shelter bed shortage "is likely to be closer to approximately 4,261 beds" based on the total number of unhoused individuals in San Francisco (7,754) and the City's last count of the number of available shelter beds (3,493)). Despite San Francisco's indisputably insufficient stock of shelter beds, SFPD continues to cite, arrest, and force homeless individuals to vacate encampments and "move along" under threat of enforcement. Mot. 18; *see* Herring ¶¶ 70, 73-75, Opinion 3. Plaintiffs argue that these facts amount to a violation of the Eighth Amendment because they demonstrate that San Francisco "is criminalizing the status of homelessness in clear violation of *Martin*'s express holding." Mot. 18.

In response, Defendants argue that Plaintiffs are unlikely to succeed on the merits of their Eighth Amendment claim because San Francisco's "policy of offering shelter before requiring any unhouse[d] person to vacate public property meets the requirements of the Eighth Amendment." Opp'n 9. Defendants do not specifically identify this policy but appear to rely on the SFPD Enforcement Bulletin that requires SFPD officers to "secure appropriate shelter before taking enforcement action" under certain statutes and ordinances. According to Defendants, "[e]ncampment occupants in San Francisco asked to vacate public property 'have access to adequate temporary shelter,' even if many 'choose not to use it.'" *Id*. at 11 (quoting *Martin*, 920 F.3d at 617 n.8).

Defendants' position is wholly unconvincing. They rely on declarations of San Francisco employees, two of whom restate the policies embodied in the Enforcement Bulletin and the "Bag and Tag" policy and assert that SFPD and DPW workers comply with these policies. *See* Christ Decl. ¶¶ 4, 5; Dilworth Decl. ¶¶ 6-9. The declarants generally walk through how the City typically conducts encampment closures, without discussing any specific closures or providing supporting data or analysis of the same.[16] *See*, e.g., Nakanishi Decl. ¶¶ 5-11; Piastunovich Decl.

---

[16] The only reference to a particular encampment closure in Defendants' declarations is a statement by Dodge that "[a]t the January 26, 2022 HSOC resolution on 12th Street, HSOC had

United States District Court
Northern District of California

¶¶ 5-8; Mazza Decl. ¶¶ 4-7; Hardiman Decl. ¶¶ 4, 5; Dilworth Decl. ¶¶ 5, 6, 8; Dodge Decl. ¶¶ 12-13, 15-20. They ignore Plaintiffs' considerable and direct observations of violations of those policies, and do not provide a competing factual record from evidence within their control. For example, they do not offer declarations from SFHOT members testifying from personal experience that they offered an available shelter bed to every homeless individual affected by an encampment closure who wanted to sleep indoors.

Defendants' policy is not at issue. At the hearing, Plaintiffs confirmed that the substance of the Enforcement Bulletin is constitutional. What is at issue is the body of detailed evidence demonstrating significant failures to comply with the policy. Plaintiffs' key evidence is largely unchallenged. Defendants concede the existence of long-standing shelter bed shortfalls, as well as the fact that homeless San Franciscans have not been able to voluntarily access shelter beds since April 2020. *See* Herring Opinion 1. Defendants do not counter Plaintiffs' evidence that SFPD has cited and arrested individuals for sleeping or lodging in public thousands of times from 2018 to October 2022 despite the lack of available shelter. *See* Herring Opinion 3; Supp. Herring Decl. ¶¶ 19-23. Defendants do not meaningfully rebut evidence that San Francisco initiates encampment closures without actually knowing whether any shelter beds will be available to encampment residents, and that the closure proceeds anyway, with many residents having already been displaced by the time HSOC confirms whether it has shelter available or not. In fact, Defendants' own witnesses confirm that HSOC does not know shelter availability when SFHOT workers begin "outreach" at the start of an encampment closure. *See* Nakanishi Decl. ¶ 7; Piastunovich Decl. ¶ 6; Mazza Decl. ¶¶ 5, 6.

Plaintiffs submit ample evidence that encampment closures have been carried out even

---

sufficient shelter resources for everyone who accepted shelter space that morning." Dodge Decl. ¶ 11. This is in response to Frank's statements about a sweep on January 26, 2022 at 12th Street. Frank states that "[a]lthough the HOT team was present, they did nothing. The HOT team did not offer or provide any services to me that day. I specifically asked an SFPD officer if I would be able to be housed that day. SFPD directed me to the HOT team leader. HOT said that there was no shelter available that day." Frank Decl. ¶¶ 8, 12; *see* Opp'n 11. At best, this evidence establishes a dispute of fact as to whether the residents of that encampment were offered shelter on that date. It does little to rebut Plaintiffs' body of evidence that the City regularly does not comply with the SFPD Enforcement Bulletin.

when HOT representatives said there was no available bed space. *See* Cutler Decl. ¶ 17; Ackerman Decl. ¶ 9; Evans Decl. ¶¶ 17, 24, 25; James Decl. ¶ 14; Frank Decl. ¶ 12. Defendants' rebuttal evidence is thin on this point. Dodge denies that San Francisco asks homeless individuals to vacate an encampment "[i]f adequate sheltering alternatives are not available" but provides no specific examples. Dodge Decl. ¶ 18. The only other evidence Defendants cite to show that HSOC has ceased relocating encampment residents once it determines that "adequate sheltering alternatives are not available" is the declaration of Patrick Dubose submitted by Plaintiffs. *See* Opp'n 11. Dubose is a formerly unhoused resident of San Francisco who describes an encampment closure that took place in February 2022. Dubose states "DPW came a day earlier than" a posted notice informing him and other encampment residents of an upcoming closure. [Docket No. 9-6 (Dubose Decl., Mar. 11, 2022, ¶ 9).] According to Dubose, "[t]he HOT team was also present, but they did not make us any service offers," and "[a]ll [he] heard from DPW and the HOT team was just, 'You've got to go.'" *Id.* at ¶ 9. Dubose states that the Coalition intervened on his behalf and "City workers left the area without forcing [him] to move." *Id.* Defendants assert "[t]hat is exactly what is supposed to happen if in fact shelter resources are insufficient at an HSOC resolution," but fail to acknowledge that DPW and SFHOT were attempting to force Dubose to leave even though they had not offered him shelter and would likely have succeeded had the Coalition not advocated on his behalf.

Plaintiffs also offer evidence that closures took place without offers of bed space, either because SFHOT members did not make the offer or because SFHOT members were not even present. *See* Dubose Decl. ¶ 9; Castaño Decl. ¶¶ 13, 19; Frank Decl. ¶ 12; Cronk Decl. ¶ 8; Donohoe Decl. ¶ 8; Martinez Decl. ¶ 7; Sandoval Decl. ¶ 4; Vaughn Decl. ¶ 4; Cutler Decl. ¶¶ 17, 26; Ackerman Decl. ¶¶ 9, 10; Evans Decl. ¶¶ 17, 18, 25, 26; James Decl. ¶ 19; Wadkins Decl. ¶¶ 28, 30.

Defendants' rebuttal evidence is once again unconvincing. In their opposition brief, Defendants point to three individual Plaintiffs who acknowledge receiving and/or accepting shelter offers at HSOC encampment closures in 2022. Opp'n 11 (citing Cronk Decl. ¶¶ 8-11; Donohoe Decl. ¶¶ 8-11; Sandoval Decl. ¶ 8). Cronk and Donohoe explain that San Francisco's

shelter offer came with the threat that their survival belongings would be destroyed. Similarly, Sandoval was forced to leave the majority of her survival belongings behind when she accepted an offer of shelter. All three remain unsheltered, and all three also describe encampment closures that they have experienced without receiving shelter or offers of shelter from HSOC. In any event, the fact that three people once received offers of shelter does little to cut into the large body of evidence demonstrating that shelter offers are often not made.

At the hearing, Defendants cited additional evidence that purportedly supports San Francisco's claim that it always offers shelter beds to individuals facing closure of their encampments. First, they cited Dodge's declaration for the proposition that Dodge is "confident" that encampment closures proceed with an adequate allocation of shelter beds. Dodge's declaration makes no such statement or assertion. Defendants also cited a spreadsheet attached to the declaration of Arielle Piastunovich, who has been the liaison between HSH and HSOC since January 2022. She explains that the spreadsheet is a "client log for 2022 that [she] maintain[s] to track client engagement during resolutions and facilitate shelter placement." Piastunovich Decl. ¶¶ 2, 8, Ex. C. This exhibit offers little support for Defendants. It is not apparent from the document that it reflects actual offers of shelter connected to encampment closures or SFPD orders to "move along" or vacate, and Piastunovich's declaration does not provide any explanation or detail about the data captured therein.

Defendants' evidentiary record is notable for what it could have included but did not. For example, Defendants submitted a declaration by David Nakanishi, who is the clinical supervisor of the Encampment Resolution Team, which consists of SFHOT workers. Even though Nakanishi is generally "present for the morning resolutions, and the majority of afternoon resolutions," he does not actually state that SFHOT offers shelter to every homeless individual facing closure of their encampment. *See* Nakanishi Decl. ¶¶ 4, 8-11. In fact, in discussing his team's "effort to follow up [with clients] between scheduled resolutions," he admits that "resources or shelter options" may not be "available at the time of a resolution." *Id*. at ¶ 11. Similarly, Mark Mazza managed the work of SFHOT from August 2020 until October 2022. Mazza Decl. ¶ 2. Mazza does not state that SFHOT offers shelter to every encampment resident facing displacement.

United States District Court
Northern District of California

At the hearing, Defendants argued for the first time that the formula announced in *Martin* and *Johnson* for demonstrating an 8th Amendment violation should be interpreted differently when applied to this case. "The formula established in *Martin* is that the government cannot prosecute homeless people for sleeping in public if there 'is a greater number of homeless individuals in [a jurisdiction] than the number of available' shelter spaces." *Johnson*, 50 F.4th at 795 (alteration in original) (citing *Martin*, 920 F.3d at 617). Defendants concede that there are thousands more homeless individuals living in San Francisco than there are available shelter beds. They nevertheless assert that *Martin* and *Johnson* permit an inquiry beyond that basic equation.

Defendants point to language in *Martin* that immediately follows the passage cited in *Johnson*: ". . . [A]s long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter." 920 F.3d at 617. Defendants contend that even though San Francisco has a large shortfall of shelter beds, it does not violate the 8th Amendment. This is because it is the City's practice to provide homeless individuals with an option for sleeping indoors, as all are offered shelter beds before they are displaced.

Defendants claim support for this position in the preliminary injunction recently entered in *Fund for Empowerment, et al. v. City of Phoenix, et al*., 22-2041-PHX-GMS (D. Ariz. Dec. 16, 2022), slip op. at 19. The injunction includes a prohibition on "enforcing the Camping and Sleeping Bans against individuals who practically cannot obtain shelter as long as there are more unsheltered individuals in Phoenix than there are shelter beds available." According to Defendants, this wording supports their interpretation of *Martin* and *Johnson*, and shows that San Francisco is not violating the 8th Amendment notwithstanding the large shelter bed shortfall, because homeless individuals who experience encampment closures practically can obtain shelter since it is always offered to them.

The court need not decide whether Defendants' reading of *Martin* and *Johnson* is correct, because their position lacks factual support. It is beyond dispute that homeless San Franciscans have no voluntary "option of sleeping indoors," and as a practical matter "cannot obtain shelter." As previously noted, Defendants conceded at the hearing that "[v]oluntary access to shelter has

been functionally inaccessible to unhoused people in San Francisco since the onset of the pandemic in April 2020." Herring Decl. 10 (Opinion 1). Put another way, the parties agree that at this time, a homeless San Franciscan who wants a shelter bed has no avenue to ask for one, much less get one. Defendants nevertheless assert that every homeless person is offered shelter before being displaced by the City. As discussed above, the evidence supporting this broad assertion is thin; the City could have submitted a more convincing record (if it exists) because it controls the relevant evidence. On the other hand, Plaintiffs submitted ample evidence that homeless individuals routinely are displaced without a firm offer (or in many instances, any offer) of a shelter bed.

Having carefully considered the evidence submitted by both sides, the court concludes that Plaintiffs are likely to succeed on the merits of their claim that Defendants violate the Eighth Amendment by imposing or threatening to impose criminal penalties against homeless individuals for "sitting, sleeping, or lying outside on public property" without giving them the option of sleeping indoors. *See Martin*, 920 F.3d at 617; *see also Johnson*, 50 F.4th at 795 ("[t]he formula established in *Martin* is that the government cannot prosecute homeless people for sleeping in public if there 'is a greater number of homeless individuals in [a jurisdiction] than the number of available' shelter spaces." (citing *Martin*, 920 F.3d at 617)).

### 2. Fourth Amendment Claim

"The Fourth Amendment protects individuals from unreasonable government seizures of their property, even when that property is stored in public areas." *Garcia*, 11 F.4th at 1118 (citation omitted); *see also Lavan v. City of Los Angeles*, 693 F.3d 1022, 1030 (9th Cir. 2012) (affirming district court's conclusion that the Fourth Amendment protects homeless individuals from seizure and summary destruction of their unabandoned, but temporarily unattended, personal property).

Plaintiffs assert that San Francisco's bag and tag policy clearly requires City employees to store unabandoned personal property, whether attended or unattended, so that homeless individuals may reclaim it. Plaintiffs acknowledge that the policy itself if constitutional but claim that the City violates the policy by regularly and indiscriminately destroying homeless individuals'

42

United States District Court
Northern District of California

personal property.  Plaintiffs' evidence shows that the City produced a total of 195 bag and tag records for a six-month period in 2021, even though San Francisco "displac[ed] at least 1,282 people experiencing unsheltered homelessness from across sites they were inhabiting in 83 formally scheduled HSOC encampment resolutions alone" during that same period.  Herring Decl. ¶¶ 83, 84.  Plaintiffs assert that this large disparity demonstrates that DPW does not consistently comply with the bag and tag policy.  This data point is brought to life by the individual Plaintiffs' declarations recounting the seizure and destruction of their unabandoned personal property, as well as the eyewitness accounts of Coalition employees and volunteers regarding dozens of encampment closures.

At oral argument, Defendants relied on *Sullivan v. City of Berkeley*, 383 F. Supp. 3d 976, 987 (N.D. Cal. 2019), to argue that the large disparity does not support an inference that the City routinely violates the bag and tag policy but instead demonstrates that encampment residents receive proper notice of closures, are given plenty of time to pack their belongings, and therefore have no need to use the bag and tag system.  *Sullivan* is readily distinguishable because, unlike the evidentiary record in that case, Plaintiffs in this case submit significant evidence[17] that written notice of encampment closures is rarely provided, Evans Decl. ¶¶ 13, 26; Ackerman Decl. ¶¶ 7, 10; James Decl. ¶ 8; Wadkins Decl. ¶ 17, and that when homeless individuals ask for more time to pack their belongings, "SFPD moves in to tell people that they will be cited or arrested if they do not leave the area" or threatens to "seize their tents as evidence of a crime" if they are not leaving the area fast enough.  Cutler Decl. ¶ 16; Evans Decl. ¶¶ 15, 16; Wadkins Decl. ¶¶ 19, 20.  Plaintiffs also submit evidence that DPW "tells people to clear out" and that "everything they leave behind will be thrown out."  Wadkins Decl. ¶ 19; James Decl. ¶ 13.  Declarants state that whatever property homeless individuals "do not have physically in their hands usually gets picked up and put in the back of a DPW crusher truck" and taken "straight to the dump."  Cutler Decl. ¶

---

[17] These are not one-off observations.  The Coalition-affiliated declarants observed many encampment closures.  *See, e.g.,* Cutler Decl. ¶ 7 (witnessed "well over a hundred" sweep operations); Ackerman Decl. ¶ 6 (witnessed "at least ten sweeps"); Evans Decl. ¶ 10 (witnessed "over 50 large-scale homelessness sweeps"); James Decl. ¶ 7 (witnessed three "full-scale HSOC sweeps"); Wadkins Decl. ¶ 12 (witnessed "at least a dozen large-scale homeless sweeps").

15; Evans Decl. ¶ 15.  According to one declarant, "[t]here is no sorting [by DPW], and no attempt to safeguard any property of value . . . [p]eople leave the area with what they can and the rest is lost."  Wadkins Decl. ¶ 22.

Defendants do not rebut Plaintiffs' evidence of widespread seizure and destruction of homeless individuals' unabandoned personal property.  Instead, they argue that "Plaintiffs have not demonstrated that the items they assert were confiscated and destroyed should have been preserved under DPW's bag/tag policy, or whether DPW properly disposed of them" because they were trash, garbage, debris, or other materials subject to immediate disposal under the policy.  Opp'n 14.[18]  In a similar vein, at the hearing Defendants argued that Plaintiffs had not shown that any unabandoned property that had been discarded by DPW, including items such as laptops, had not been "intermingled" with items that pose an immediate health or safety risk, such as hypodermic needles, and thus were appropriate to discard.  Defendants contend that Plaintiffs' declarations "are too general" to show that San Francisco has repeatedly violated its own policies. *Id*. (citing *Shipp v. Schaaf*, 379 F. Supp. 3d 1033, 1038 (N.D. Cal. 2019) ("[i]t is not sufficient to state, as Plaintiffs and their declarants do, that the City has sometimes removed and destroyed encampment members' property.  Sometimes the City has the right to do this.").

The evidence shows otherwise.  The individual Plaintiffs' declarations clearly describe specific incidents in which DPW has seized and/or destroyed personal property that was not abandoned, such as tents, laptops, dishware, cleaning supplies, clothing, "essential survival gear," cell phones, medication, identification, and even prosthetics.  *See* Castaño Decl. ¶¶ 14, 15; Cronk Decl. ¶¶ 4, 5; Donohoe Decl. ¶¶ 4, 5; Frank Decl. ¶¶ 9, 10; Martinez Decl. ¶¶ 5, 7; Sandoval Decl. ¶ 6; Vaughn Decl. ¶ 5.  They also describe instances in which DPW had discarded property that had been neatly stored or organized, refuting Defendants' claim about DPW discarding personal property that was intermingled with hazardous objects such as needles.  *See* Castaño Decl. ¶¶ 14, 15; Cronk Decl. ¶¶ 4, 6; Donohoe Decl. ¶¶ 4, 6; Vaughn Decl. ¶ 5.  Coalition witnesses similarly

---

[18] Defendants also discuss the requirements of the Fourteenth Amendment's due process clause and contend that San Francisco's policies and practices with respect to providing notice of encampment closures satisfies due process.  *See* Opp'n 12-14.  The question of adequate notice under the Fourteenth Amendment is not before the court at this time.  *See* Reply 14 n.11.

describe DPW's summary seizure and destruction of homeless individuals' unabandoned personal property, including tents, a motorcycle, a wheelchair, and a walker. Cutler Decl. ¶ 26; Ackerman Decl. ¶ 10; Evans Decl. ¶¶ 23, 26, Ex. A; Wadkins Decl. ¶ 30. Plaintiffs have also submitted evidence that DPW indiscriminately seizes and destroys homeless individuals' personal property without sorting, collecting, and storing anything that can be salvaged. *See* Evans Decl. ¶ 23; Wadkins Decl. ¶ 22; Ackerman Decl. ¶ 8.

The court concludes that Plaintiffs have shown a likelihood of success on their Fourth Amendment claim based on San Francisco's "seizing and destroying" homeless individuals unabandoned property and the resulting "meaningful[ ] interfer[ence] with [their] possessory interests in that property." *See Lavan*, 693 F.3d at 1030.

## B. Irreparable Harm

The Ninth Circuit does "not require a strong showing of irreparable harm for constitutional injuries." *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019). The court has "stated that an alleged constitutional infringement will often alone constitute irreparable harm." *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (quoting *Associated General Contractors v. Coalition For Economic Equity,* 950 F.2d, 1401, 1412 (9th Cir. 1991)). Defendants agree that "a constitutional violation establishes irreparable harm." Opp'n 18. As set forth above, Plaintiffs have demonstrated a likelihood of success on their claims that their Fourth and Eighth Amendment rights have been violated.

In addition, Plaintiffs have submitted evidence that encampment closures without offers of shelter and seizures of unabandoned property harm homeless individuals in myriad ways, including negatively impacting their physical and mental health. *See* Herring Decl. ¶¶ 90-105. The individual Plaintiffs explain these impacts in their declarations, describing the encampment closures as "dehumanizing" and "traumatizing." *See, e.g.*, Castaño Decl. ¶ 20; Frank Decl. ¶ 15. Plaintiffs have demonstrated that they will likely suffer irreparable harm in the absence of preliminary relief.

## C. Balance of Hardships and the Public Interest

"A Court considering an application for a preliminary injunction must identify the harm

45

United States District Court
Northern District of California

that an injunction might cause a defendant and weigh it against the injury to a plaintiff." *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005, 1019 (C.D. Cal. 2011) (citations omitted). Plaintiffs argue that the deprivation of homeless individuals' constitutional rights and this population's "particular vulnerability" tips the balance of hardships sharply in Plaintiffs' favor as a matter of law. Mot. 25 (citations omitted).

In response, Defendants dispute whether Plaintiffs have shown violations of their Eighth and Fourth Amendment rights. They also raise "the public interest in promoting public health and safety," arguing that this interest does not weigh in favor of enjoining San Francisco "from exercising its considered judgment as to how to best maintain public health and safety." Opp'n 18 (quoting *Miralle v. City of Oakland*, No. 18-CV-06823-HSG, 2018 WL 6199929, at *4 (N.D. Cal. Nov. 28, 2018) (where homeless plaintiffs had not shown a likelihood of success on their Eighth and Fourteenth Amendment claims related to the closure of their encampment, the court concluded that the balance of the equities did not tip in plaintiffs' favor since the city had committed to provide temporary shelter and storage services to plaintiffs)). According to Defendants, "[e]ncampment resolutions are essential to keep public spaces clean and sanitary, and to allow safe access to the public right of way," and the court "should not lightly upend San Francisco's balanced and compassionate policy determinations." Opp'n 18.

The court concludes that the balance of hardships tips in favor of Plaintiffs, as does the public interest. Homeless individuals "risk losing not only their homes . . . but their community and their possessions" if San Francisco conducts encampment closures and seizes and destroys their personal property in violation of their constitutional rights. *Le Van Hung v. Schaaf*, No. 19-cv-01436-CRB, 2019 WL 1779584, at *7 (N.D. Cal. Apr. 23, 2019). *See also Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) ("by establishing a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction."). As one court in this district has observed, homeless residents of the City "are members of the community, and their interests, too, must be included in assessing the public interest." *See Le Van Hung*, 2019 WL 1779584, at *7.

United States District Court
Northern District of California

The relief sought by Plaintiffs will not bar Defendants' efforts to "keep public spaces clean and sanitary" or "allow safe access" to sidewalks and rights-of-way since Plaintiffs do not ask the court to enjoin any ordinances targeting public health nuisances or willfully obstructing streets, sidewalks, or other passageways, as discussed below.  Rather, Plaintiffs ask that Defendants be enjoined from enforcing ordinances that punish individuals for "involuntarily sitting, lying, and sleeping in public" and from "seizing and destroying" homeless individuals' unabandoned property in violation of their constitutional rights.  *See Martin*, 920 F.3d at 616; *Lavan*, 693 F.3d at 1030.

Defendants have policies in place governing encampment closures and treatment of homeless individuals' personal property that Plaintiffs agree are constitutional, but Plaintiffs have submitted substantial evidence that San Francisco routinely violates its own policies.  This weighs in Plaintiffs' favor when balancing the equities and considering the public interest.  *Le Van Hung*, 2019 WL 1779584, at *7 (granting preliminary injunction to enjoin municipality from clearing encampment in public park "in a manner that violates its stated policies").

### D.      Preliminary Injunctive Relief Granted

"Crafting a preliminary injunction is 'an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents.'" *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) (quoting *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017)).  In awarding a preliminary injunction a court must consider "the overall public interest," and in doing so, "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Trump*, 137 S. Ct. at 2087 (cleaned up).

Plaintiffs request three forms of injunctive relief: 1) a prohibition on Defendants' taking certain actions with respect to "any ordinance that punishes sleeping, lodging, or camping on public property," including barring Defendants' enforcement of 11 separate ordinances and statutes; 2) a prohibition on summarily seizing and destroying homeless individuals' personal property, including momentarily unattended property; and 3) appointment of a Special Master at Defendants' expense to implement the preliminary injunction.

In their opposition brief, Defendants wholly fail to object to or even address the substance or scope of the proposed preliminary injunction, thereby conceding these issues.

Plaintiffs present uncontradicted evidence that from July 2018 to October 2021, SFPD cited or arrested homeless individuals at least 2952 times for lodging without permission or for refusing to obey a law enforcement order to vacate or "move along." Herring Decl. ¶ 70. In a supplemental declaration, Dr. Herring states that his analysis of "the same public records from 2022 shows the same trend." Supp. Herring Decl. ¶ 19. It is also undisputed that for years San Francisco has had a shortfall of shelter beds that numbers in the thousands, and that homeless San Franciscans have not been able to voluntarily access shelter beds since April 2020.

In *Martin*, the Ninth Circuit held that "so long as there is a greater number of homeless individuals in [a jurisdiction] than the number of available beds [in shelters], the jurisdiction cannot prosecute homeless individuals for involuntarily sitting, lying, and sleeping in public." 920 F.3d at 617 (quotation marks omitted, alterations in original) (quoting *Jones*, 444 F.3d at 1138); *see also Johnson*, 50 F.4th at 795 ("[t]he formula established in *Martin* is that the government cannot prosecute homeless people for sleeping in public if there 'is a greater number of homeless individuals in [a jurisdiction] than the number of available' shelter spaces." (citation omitted)). In light of the record presented by Plaintiffs in support of their Eighth Amendment claim as well as governing Ninth Circuit law, Defendants are preliminarily enjoined from enforcing or threatening to enforce, or using California Penal Code section 148(a) to enforce or threaten to enforce, the following laws and ordinances to prohibit involuntarily homeless individuals from sitting, lying, or sleeping on public property:[19]

- California Penal Code section 647(e)
- California Penal Code section 370

---

[19] These laws and ordinances are all identified in the Enforcement Bulletin as "laws governing lodging and encampments on streets or sidewalks." Enforcement Bulletin at 1-3. The Enforcement Bulletin identifies several laws and ordinances that the court does not include in the injunction because Plaintiffs correctly did not seek their inclusion since they are directed at conduct beyond sitting, lying or sleeping outside. These are California Penal Code section 647(c), San Francisco Municipal Health Code sections 581 and 596; San Francisco Police Code sections 22-24; and San Francisco Police Code sections 25-27.

48

United States District Court
Northern District of California

1          • California Penal Code section 372

2          • San Francisco Police Code section 168

3          • San Francisco Police Code section 169

4          Plaintiffs' request for a preliminary injunction enjoining enforcement of San Francisco

5   Police Code section 97(b), San Francisco Park Code section 3.12, San Francisco Park Code

6   section 3.13, San Francisco Port Code section 2.9, and San Francisco Port Code section 2.10 is

7   denied without prejudice, as Plaintiffs have not established a record of enforcement of these

8   ordinances against homeless individuals who cannot obtain shelter in San Francisco.

9          As to Plaintiffs' Fourth Amendment claim, Plaintiffs have presented significant evidence

10  of a practice of seizing and destroying of homeless individuals' unabandoned personal property in

11  violation of the Fourth Amendment, *see Lavan*, 693 F.3d at 1030, and San Francisco's own bag

12  and tag policy, which clearly requires the City to store personal property so that homeless

13  individuals may retrieve it.  Plaintiffs acknowledge that the substance of the bag and tag policy is

14  constitutional.  Accordingly, Defendants are preliminarily enjoined from violating San Francisco's

15  bag and tag policy.

16         Plaintiffs' request for appointment of a Special Master is denied without prejudice.

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28

United States District Court
Northern District of California

## V.     CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is granted as follows:

I.      Defendants are preliminary enjoined from enforcing or threatening to enforce, or using California Penal Code section 148(a) to enforce or threaten to enforce, the following laws and ordinances to prohibit involuntarily homeless individuals from sitting, lying, or sleeping on public property:

- California Penal Code section 647(e)
- California Penal Code section 370
- California Penal Code section 372
- San Francisco Police Code section 168
- San Francisco Police Code section 169

This preliminary injunction shall remain effective as long as there are more homeless individuals in San Francisco than there are shelter beds available.

II.     Defendants are preliminarily enjoined from violating San Francisco's bag and tag policy as embodied in DPW Procedure No. 16-05-08 (REV 03).

**IT IS SO ORDERED.**

Dated: December 23, 2022



Donna M. Ryu
United States Magistrate Judge