**LATHAM&WATKINS** LLP

505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Tel: +1.415.391.0600  Fax: +1.415.395.8095
www.lw.com

April 18, 2023

**VIA ECF**

Hon. Donna M. Ryu, Chief United States Magistrate Judge
United States District Court, Northern District of California
Oakland Courthouse, Courtroom 4 – 3rd Floor
1301 Clay Street
Oakland, CA 94612

> Re:   Coalition on Homelessness, et. al. v. City and County of San Francisco, et. al.,
>        No. 4:22-cv-05502-DMR (N.D. Cal.)

Dear Judge Ryu,

The parties submit this letter regarding a discovery dispute concerning Plaintiffs' request for recurring disclosures of certain records to allow Plaintiffs to assess Defendants' compliance with the Preliminary Injunction. Dkt. No. 65. After meeting in-person pursuant to the Court's order (Dkt. No. 122), the Parties reached agreement on all issues save for a single item: to what extent Defendants will provide certain call and dispatch records (also known as computer-aided dispatch records, computer-assisted dispatch records, or "CADs") on a periodic basis. A proposed order detailing the parties' agreement and their respective positions on the CAD production, which are elaborated below, is contemporaneously filed.

Upcoming case management deadlines are the case management conference (May 17, 2023), close of fact and expert discovery (July 28, 2023 and October 6, 2023, respectively), final day to hear dispositive motions (January 25, 2024), pretrial conference (April 3, 2024), and start of trial (April 15, 2024). The parties will next appear before the Court on April 27 for a hearing on Defendants' partial motion to dismiss.

## I.   NUMBER OF CAD RECORDS PER DISCLOSURE PERIOD

**Plaintiffs' Position:** Plaintiffs have consistently maintained that Defendants routinely threaten or enforce anti-homeless laws and summarily destroy people's belongings when responding to daily dispatch calls. These regular police and DPW dispatches occurring on a daily basis formed a large body of the evidence presented to the Court in Plaintiffs' preliminary injunction motion. These practices likely far outnumber formal HSOC operations, yet Plaintiffs have been given no insight into these operations since the preliminary injunction issued almost 4 months ago. Given Plaintiffs' previously reported concerns about compliance at formal HSOC operations planned in advance, the potential for noncompliance at other same-day dispatch operations is even more grave. Without notice in advance of these same-day operations, prompt after the fact records are vital to monitoring compliance.

Previously, Plaintiffs had contemplated receiving notice of all preplanned homeless encampment operations involving two or more specific agencies. However, Plaintiffs are willing to forego notice of any preplanned operations planned less than 24 hours in advance, to accommodate Defendants' concern as to the burden of notifying Plaintiffs of these operations in advance, in exchange for an increase in post-hoc notification of Defendants' operations. Defendants had previously agreed to provide a randomized sampling of 10 individual CAD records for the dispatch Code 915 (homeless complaints) and Code 919 (person sitting/lying on a sidewalk) every three weeks. While Plaintiffs would prefer the City provide all such records, Plaintiffs' final

compromise position is for Defendants to provide an additional 90 individual CADs (so 100 total) per disclosure period.

While not a substitute for advance notice of operations for monitoring compliance, this additional sampling will provide a greater representative sample of same-day operations. The CADs may contain information including the basis of the call, what action law enforcement officers are dispatched to take in response, and what the end result was according to the City. This information is necessary for Plaintiffs to be able to assess Defendants' conduct at operations carried out in the same day, which likely represents the majority of the City's operations and therefore the most potential for noncompliance. With this information, Plaintiffs can direct their limited resources, see whether a violation is present on the face of the record, select which body cam footage to request, investigate, and find witnesses, among other follow up to confirm the City's practices.

Defendants represent that there have been about 4,000 CADs of the type Plaintiffs seek generated over the past three to four months, or 800-1,000 records per three-week period. That means that the City is dispatching to address unhoused individuals and their property 800-1,000 times every three weeks. If the City will not produce all of these records at this time, Plaintiffs seek only a small fraction of these records—less than 10%—for each three-week disclosure period. This is a reasonable sample that would address Defendants' burden concerns regarding advance notice of all same-day operations while also providing a representative picture of Defendants' same-day operations. The City's compromise offer, on the other hand, does not provide any additional records beyond the 10 it has already agreed to, despite Plaintiffs' concession to forgo advance notice of same-day operations. Providing *less than 1%* of the records generated for each period would not provide the meaningful sampling of the City's interactions with unhoused individuals Plaintiffs require now that they will not be receiving advance notice of operations planned in 24 hours or less.

Defendants concede that these records are relevant and raise only two concerns, neither of which supports denying Plaintiffs' request. First, Defendants assert that Plaintiffs have only monitored 10% of noticed operations. While Plaintiffs dispute the accuracy of that number, it simply does not matter. First, how Plaintiffs use their limited resources for live monitoring of operations for which Defendants provide notice does not justify denying Plaintiffs access to information regarding unnoticed same-day operations as reflected in the CAD records and for which other monitoring is impossible. Second, even if Defendants are correct that Plaintiffs attend only 10% of operations, this is consistent with and only supports Plaintiffs' request that Defendants provide information on approximately 10% of same-day operations as reflected in the CADs, as currently Plaintiffs are receiving no notice or information regarding such operations.

The only other basis Defendants provide is that even providing 100 CADs in lieu of same-day notification would be too burdensome. But Defendants' own representations undermine that position. Defendants assert that it takes approximately three minutes to produce each CAD. While the two sample CAD records Defendants have provided were produced and time-stamped only a minute apart, suggesting that three minutes may be conservative, even using Defendants' calculation, generating 100 of these records in a three-week period would only take about an hour and forty minutes of staff time per week. If the CADs can in fact be pulled faster, this requirement could take as little as about half an hour of staff time per week, if not less. Given the importance for Plaintiffs to be able to obtain an accurate picture of Defendants' same-day operations (for which Plaintiffs will not be receiving notice and will therefore be unable to otherwise monitor), 30

to 90 minutes of staff time per week does not seem like a "burden or expense" that is likely to outweigh the benefit of the records. *See* Fed. R. Civ. Proc. 26(b)(1). CADs are self-described computerized records, which can be readily produced. Courts routinely do not credit such claims of burden. *See, e.g., Doe v. Cty. of Sacramento*, No. 2:21-cv-01438-MCE-CKD, 2023 WL 2466294 at *3 (E.D. Cal., March 10, 2023) (rejecting argument CAD production would be too time-consuming); *Sartor v. Cty. of Riverside*, No. EDCV221410JGBSPX, 2022 WL 18278597, at *7 (C.D. Cal. Nov. 30, 2022) ("Defendants may be able to *immediately* turn over routine items of discovery such as the recorded interviews of officers and witnesses, police reports, crime scene photos, audio records from dispatch, radio broadcasts, 911 logs, computer-aided dispatch (CAD) logs, etc.") (emphasis added); *Dalton v. Town of Silver City*, No. 17-1143 WJ/GBW, 2021 WL 4307149, at *8 (D.N.M. Sept. 22, 2021) (compelling production of specific CADs from a ten year period and noting "[i]f Defendant does not wish to undertake the burden of screening the reports for this [criteria], it may of course produce all reports with the classification change.").

Although Defendants contend that producing CADs could cause 911 response times to deteriorate, there appears to be no reason why a 911 dispatcher is the only person who can pull the CADs for specific codes. Surely, other staff can learn. And even if it must be dispatchers, it is unclear why 30-90 minutes a week would take away from emergency duties to such an extent that public safety would be in jeopardy. Plaintiffs do not ask for, and do not require, that DEM certify the authenticity of the CADs before producing them under the proposed order. And DEM will not need to review the CADs for PII or CLETS, as Defendants' Counsel will do that review anyway. Crediting Defendants' burden argument here would also set a concerning precedent for public accountability of emergency response related agencies which have large budgets and wield considerable power. Given that Plaintiffs have sought all Code 915 (homeless complaints) and Code 919 (person sitting/lying on a sidewalk) CADs in discovery and that Defendants have acknowledged such CADs are relevant, it may even be more efficient to produce them now on a periodic basis.

In the end, Plaintiffs have already made a major concession by forgoing same-day notice. All they ask in return is that Defendants provide a modest amount of reporting on same-day dispatch operations in a timely fashion. The Court should not allow Defendants' desire to save less than two hours of time a week to trump Plaintiffs' need for prompt disclosures.

**San Francisco's Position:** Soon after the December 23, 2022 injunction, the parties began meeting and conferring over plaintiffs' demand for periodic expedited discovery for the purpose of monitoring San Francisco's compliance with the injunction. Meet-and-confer negotiations have continued nearly 4 months, and the parties agree on all elements of expedited periodic productions, save one, i.e, the volume of CADs from the Department of Emergency Management . The parties had been in accord on production of CADs for over nine weeks, until the April 14 in-person meet-and-confer session, when plaintiffs suddenly inflated their demand ten-fold.

Throughout the course of this extended meet-and-confer process, San Francisco has continued voluntarily to provide 72-hour notice of all HSOC operations. In addition, last month, San Francisco began providing plaintiffs the monthly schedule for Joint Field Operations ("JFO"). JFO is a homeless outreach program focused on the Tenderloin Neighborhood, offering shelter and services.

As a result of the meet-and-confer process, San Francisco has agreed to provide comprehensive information to plaintiffs. The agreed disclosures go well beyond the pre-injunction

disclosures in this case. This expedited periodic production is on top of San Francisco's ordinary discovery obligations.

San Francisco has agreed to provide plaintiffs:

- 72-hour advance notice of: (1) any interagency homeless outreach operation that is planned at least 72 hours in advance, including without limitation HSOC and JFO operations; and (2) Public Works' planned removal of property as described in Section 4 of Public Works' bag/tag policy;
- 24-hour advance notice of regular encampment cleanings conducted by Hot Spot crews, as described in Section 4 of the bag/tag policy; and
- Notice as promptly as practical for interagency homeless encampment operations that are planned 24-72 hours in advance.

In addition, every three weeks, San Francisco has agreed to produce to plaintiffs:

- Summary citation and arrest data and individual incident reports pertaining to enforcement of the enjoined statutes and ordinances against unhoused individuals;
- A summary list of SFPD incident reports for incident descriptions satisfying agreed search terms relating to homelessness, and a sample of 40 incident reports from the summary list;
- Bodycam footage from 5 of those incident reports selected by plaintiffs (not exceeding 5 hours of aggregate footage);
- Public Works' bag/tag logs;
- HSH's daily shelter bed availability records;
- HSOC post-encampment resolution reports, and pre-encampment resolution schedules;
- Department bulletins, training materials, and similar documents regarding compliance with the injunction; and
- A retrospective production of all these categories of documents, from Dec. 23, 2023 to the present.

But one issue still divides the parties. Plaintiffs now demand, every three weeks, 100 CADs, upending the parties' previous agreement. On February 7, 2023, plaintiffs first added CADs to their demands for this expedited periodic production. Plaintiffs sought 10 CADs for each 3-week production interval. San Francisco promptly agreed. For the subsequent 9 1/2 weeks, as the meet-and-confer process continued, the periodic production of 10 CADs remained a point of agreement.

At the April 14 in-person meet-and-confer session, plaintiffs proposed an exponential increase in the number of CADs. Plaintiffs justified this increase as necessary to address the absence of advance notice for interagency homeless operations that are planned fewer than 24 hours in advance. San Francisco explained to plaintiffs that notice of same-day operations was not only impractical, it would have no utility to plaintiffs, since plaintiffs were monitoring fewer than 10% of the HSOC operations for which plaintiffs were already receiving advance notice. Though plaintiffs asserted in their March 30 letter to the Court that they "dispute" San Francisco's 10% estimate, plaintiffs have refused San Francisco's repeated request for plaintiffs' alternative tally. Since plaintiffs have made minimal use of their existing monitoring opportunities, plaintiffs cannot demonstrate a pressing need for notice of yet additional categories of operations.

The agreed periodic production of 40 police reports and 10 CADs, along with ordinary discovery, provides plaintiffs adequate means to monitor any same-day operations. Plaintiffs have

not identified any particular type of same-day operation that raises concerns. Plaintiffs have not articulated how periodic production of additional CADs, beyond the 10 CADs the parties have agreed on, helps plaintiffs monitor same-day operations. The parties' agreement on police incident reports and bodycam footage fully addresses plaintiffs' desire to monitor police action, which was the focus of plaintiffs' preliminary injunction evidence outside HSOC. Moreover, the CADs do not correlate to interagency homeless outreach operations. Each of plaintiffs' two exemplar reports involved only a single city agency. When Public Works teams up with SFPD, Plaintiffs are already receiving advance notice of those operations through the bag/tag Section 4 notices. Plaintiffs' new demand for additional CADs is entirely untethered to their asserted desire to monitor same-day interagency operations. San Francisco has offered to meet and confer later if plaintiffs determine the periodic production of 10 CADs, in conjunction with all the other information and documents San Francisco will be providing, materially hampers their ability to monitor San Francisco's compliance with the injunction.

Weighed against the questionable utility to plaintiffs of receiving 90 additional CADs every three weeks, is the cumulative burden on San Francisco. This expedited discovery already requires San Francisco to collect and process multiple categories of documents from multiple sources, including review of police reports, bodycam footage, and CADs for redaction of PII and CLETS information.

After the April 14 meet-and-confer session, counsel for San Francisco ascertained the burden of plaintiffs' new demand. Counsel was informed DEM has assigned two FTEs to generate CADs to *all* requestors, including public record requests, other city departments, and law enforcement. These two employees are fully occupied with existing requests. It takes an average of 3 minutes to generate each CAD report, not including DEM's normal protocol of reviewing each report for PII and CLETS, and certifying each report's authenticity. There is no increase in efficiency with additional volume.

DEM is confident it can manage plaintiffs' demand for 10 CADs every three weeks with its current staffing level. Generating 100 CADs, however, would require additional personnel. The available personnel with the requisite skills are public safety dispatchers, who handle 911 calls. Reassigning 911 dispatchers to generate additional CADs for plaintiffs would attenuate San Francisco's 911 response times, creating potential risks to public safety. Moreover, in addition to its other interim discovery tasks, the City Attorney's Office would have to review the 90 additional reports every three weeks to redact PII and CLETS information.

Plaintiffs' skepticism of the time it takes to generate CADs is purely speculative. If this issue advanced to motion practice, San Francisco would provide supporting declarations establishing the burden of plaintiffs' demand and the potential impact on public safety. The cases plaintiffs rely on do not involve expedited production; and San Francisco's 3-minute-per-report time estimate is a consequence of San Francisco's own computer systems and interfaces.

For these reasons, San Francisco urges the Court to require periodic production of 10 CADs, and direct the parties to meet and confer in the event plaintiffs determine the volume of CADs materially hampers their ability to monitor San Francisco's compliance with the injunction.

LATHAM & WATKINS LLP

Respectfully submitted,

By: */s/ Alfred C. Pfeiffer, Jr.*

LATHAM & WATKINS LLP
Alfred C. Pfeiffer, Jr., SBN 120965
Wesley Tiu, SBN 336580
Kevin Wu, SBN 337101
Tulin Gurer, SBN 303077
505 Montgomery Street, Ste. 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
al.pfeiffer@lw.com
wesley.tiu@lw.com
kevin.wu@lw.com
tulin.gurer@lw.com

LATHAM & WATKINS LLP
Joseph H. Lee, SBN 248046
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
joseph.lee@lw.com

LATHAM & WATKINS LLP
Rachel Mitchell, SBN 344204
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
rachel.mitchell@lw.com

LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA
Zal K. Shroff, MJP 804620, *pro hac vice*
Elisa Della-Piana, SBN 226462
Hadley Rood, SBN 348168
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
zshroff@lccrsf.org
edellapiana@lccrsf.org
hrood@lccrsf.org

ACLU FOUNDATION OF NORTHERN CALIFORNIA
John Thomas H. Do, SBN 285075

**LATHAM & WATKINS**LLP

Brandon L. Greene, SBN 293783
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
jdo@aclunc.org
bgreene@aclunc.org

*Attorneys for Plaintiffs Coalition on Homelessness, Toro Castaño, Sarah Cronk, Joshua Donohoe, Molique Frank, David Martinez, Teresa Sandoval, Nathaniel Vaughn*

By: /s/ *James M. Emery*
James M. Emery

David Chiu
Yvonne R. Meré
Wayne Snodgrass
Meredith B. Osborn
James M. Emery
Edmund T. Wang
Ryan C. Stevens
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 92102-4682
Telephone: (415)-554-4675 (Snodgrass)
(415)-554-4628 (Emery)
(415)-554-3857 (Wang)
(415)-554-3975 (Stevens)
Facsimile: (415)-554-4699
E-mail: wayne.snodgrass@sfcityatty.org
jim.emergy@sfcityatty.org
edmund.wang@sfcityatty.org
ryan.stevens@sfcityatty.org
*Attorneys for Defendants*
City and County of San Francisco, et. al.

**LATHAM&WATKINS**LLP

## **ATTESTATION**

I, Alfred C. Pfeiffer, Jr., am the ECF user whose user ID and password authorized the filing of this document. Under Civil L.R. 5-1(h)(3), I attest that all signatories to this document have concurred in this filing.

Dated: April 18, 2023　　　　　　　　*/s/ Alfred C. Pfeiffer, Jr.*

　　　　　　　　　　　　　　　　　　Alfred C. Pfeiffer, Jr.