LATHAM & WATKINS LLP
Alfred C. Pfeiffer, Jr., SBN 120965
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
al.pfeiffer@lw.com

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY AREA
Zal K. Shroff, MJP 804620, *pro hac vice*
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
zshroff@lccrsf.org

ACLU FOUNDATION OF NORTHERN
CALIFORNIA
John Thomas H. Do, SBN 285075
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
jdo@aclunc.org

*Attorneys for Plaintiffs*

*Additional Counsel Below*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| COALITION ON HOMELESSNESS, et al., <br><br>  Plaintiffs. <br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, et. al., <br><br> Defendants. | CASE NO. 4:22-cv-05502-DMR <br><br> **DECLARATION OF PLAINTIFF COALITION ON HOMELESSNESS IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUNCTION** <br><br> **Judge:**   The Hon. Donna M. Ryu |

1  LATHAM & WATKINS LLP
   Wesley Tiu, SBN 336580
2  Kevin Wu, SBN 337101
   Tulin Gurer, SBN 303077
3  505 Montgomery Street, Ste 2000
   San Francisco, CA 94111
4  Telephone: (415) 391-0600
5  wesley.tiu@lw.com
   kevin.wu@lw.com
6  tulin.gurer@lw.com

7
   LATHAM & WATKINS LLP
8  Joseph H. Lee, SBN 248046
   650 Town Center Drive, 20th Floor
9  Costa Mesa, CA 92626
   Telephone: (714) 540-1235
10 joseph.lee@lw.com

11
   LATHAM & WATKINS LLP
12 Rachel Mitchell, SBN 344204
   12670 High Bluff Drive
13 San Diego, CA 92130
   Telephone: (858) 523-5400
14 rachel.mitchell@lw.com

15
   LAWYERS' COMMITTEE FOR CIVIL
16 RIGHTS OF THE SAN FRANCISCO BAY AREA
   Elisa Della-Piana, SBN 226462
17 131 Steuart Street, Ste. 400
   San Francisco, CA 94105
18 Telephone: (415) 543-9444
19 edellapiana@lccrsf.org

20 ACLU FOUNDATION OF NORTHERN CALIFORNIA
   Brandon L. Greene, SBN 293783
21 39 Drumm Street
   San Francisco, CA 94111
22 Telephone: (415) 293-6333
23 bgreene@aclunc.org

24

25

26

27

28

# DECLARATION OF PLAINTIFF COALITION ON HOMELESSNESS

I, Jennifer Friedenbach, hereby declare pursuant to 28 U.S.C. § 1746:

1. My name is Jennifer Friedenbach and I am the Executive Director of the Coalition on Homelessness (the "Coalition"). I have personal knowledge of the facts contained in this declaration including the organization's mission, programmatic work, finances, and staffing. If called upon to testify, I could and would testify competently as to the truth of the facts in this declaration. I previously provided declarations in this matter. See e.g., Dkt. Nos.9-3, 50-4, and 76.

2. I submit this declaration regarding the Coalition on Homeless' monitoring of the City of San Francisco's compliance with this Court's preliminary injunction over the past five months. For the reasons explained below, this process is an unsustainable diversion of limited resources and can be an exercise in futility.

**Diversion of Resources to Monitor the City's Enforcement Operations is Unsustainable**

3. The Coalition has previously reported to this Court the tremendous burden that monitoring the City's enforcement operations has in diverting the Coalition's resources away from its true mission—which is to help achieve true affordable housing reform that will end the City's street homelessness crisis. That diversion of resources has meant that critical staff and volunteer resources have been taken away from mission-activities to focus on monitoring unlawful enforcement. The fiscal and programmatic impact of this diversion of resources on our small non-profit has been documented in a prior declaration. *See* Dkt. 9-3, ¶¶ 17-22.

4. After the issuance of the Court's preliminary injunction, the Coalition has assumed that it would no longer need to closely monitor the City's conduct. Unfortunately, the Coalition quickly learned that Healthy Streets Operation Center (HSOC) displacement operations would be proceeding as scheduled, and that San Francisco Police Department (SFPD) would still be dispatched in response to complaints about homeless individuals sleeping in public. The Coalition received calls immediately from unhoused residents and concerned neighbors to report instances of criminalization and property destruction in the lead-up to the Court's hearing in this case on January 12, 2022—and for which the Coalition helped to gather evidence. Dkt. Nos. 75-80. Those

reports have now continued on a regular basis for the five months since the injunction has issued.

5. In response, the Coalition has attempted to continue monitoring the City's enforcement conduct. This has been a demoralizing and under-resourced undertaking (given our size and budget). The Coalition had expected the City to provide clear information about how it was complying with the Court's injunction and had expected conditions on the ground to change quickly. We barely had the resources to conduct the monitoring we were doing in the weeks leading up to the Court's preliminary injunction.

6. Out of necessity, the Coalition has re-arranged staffing so that the Coalition can have a presence at approximately two to three of the ten scheduled HSOC operations happening every week. The Coalition typically sends two people to each operation—one staff member and one volunteer. Because each operation is about three and a half hours long, effectively twenty-one hours of our staff and volunteer time each week are spent at HSOC operations. As previously described, this once again means that the vast majority of the Coalition's volunteer hours are being used to monitor the City's malfeasance rather than focusing on mission-related activities. *See* Dkt. 9-3, ¶ 21 ("Unfortunately, this reflects about 75% of the Coalition's total [human rights] volunteer hours").

7. The burden on the Coalition's staff has also been increasingly significant. In order to ensure a presence at HSOC operations, two of our housing justice organizers must spend several hours of their time each week training and connecting with volunteers, setting the schedule of observations for the week, doing debrief sessions and speaking to impacted unhoused people, and arranging their own and volunteer arrival at the relevant HSOC operations. About 10 of volunteers have assisted. These activities have required supervision and coordination from the Coalition's Director of Organizing. Unfortunately, our Director of Organizing has recently left the organization in part due to the stressors associated with assisting unhoused individuals during an active enforcement operation over the past several months.

8. Even with our significant investment of resources in ongoing monitoring, the Coalition is only able to monitor HSOC operations—as Plaintiffs' counsel has been receiving advance notice of these operations with sufficient time to advise the Coalition. But the Coalition

has no way to monitor any other SFPD, DPW, or other planned sweep operations because the City is only providing advance notice of these planned operations. Nor does the Coalition have any ability to monitor the hundreds of police dispatches each month that the City sends to address unhoused individuals and to get them to leave public space, or the regular DPW operations at which rampant property destruction has historically been an issue. In other words, the Coalition's efforts cannot protect unhoused individuals from the City's criminalization and property destruction.

9. Our budget and our resources are extremely limited. This ad-hoc, reactive monitoring work is not sustainable for the Coalition and its mission. Dkt. 9-3, ¶ 20 ("The total cost to the Coalition of sweep monitoring during this year skyrocketed to approximately $134,246.56—which is greater than the compensation for the time of two full-time employees"). Our staff and volunteers instead need to turn their attention more fully towards our important ongoing campaigns—including advocating for better shelter access, fighting to closing of four shelter sites and for the relocation of the unhoused individuals impacted, working with the City to support safe parking sites for those temporarily forced to shelter in their vehicles. Coalition's staff, and—most critically—connecting unhoused individuals to housing resources and advocating for the City to fulfill its commitments to provide affordable housing within the City.

**Monitoring at the City's Operations Demonstrates Significant Compliance Concerns.**

10. The Coalition has received calls and heard from unhoused individuals on outreach repeatedly that they are still being ordered to move along from public places simply because they are unhoused and without officers articulating the reasons why they are being told to move. The Coalition also continues to hear from impacted individuals whose property has been seized in violation of the City's Bag and Tag protocols. But the Coalition is generally unable to fully respond to these concerns in real-time—and often hears from unhoused individuals after the fact. In this sense, monitoring the bulk of City's conduct can be futile.

11. Collectively, the Coalition staff have observed approximately 60 HSOC operations. I have personally observed several of these HSOC operations. I share the following observations from both myself and my staff regarding the City's general conduct at those

3

operations that have occurred after the preliminary injunction.

12. *"Move-Along" Orders are Not Voluntary*: From our direct observations, it appears that city employees do not communicate to unhoused individuals that they can come back to the area once the encampment resolution is over. The unhoused individuals we speak to often state that they are left frightened, unsure, and confused about whether they can come back to that specific location. There is usually no indication that the request to move is temporary or voluntary. On certain occasions, our staff have heard city workers mention to unhoused individuals that they will return in a couple days. Signs posted indicate a "resolution" is taking place, and do not state that individuals may return. This only adds to confusion about whether unhoused people are permitted to return to the area.

13. *Lack of Shelter Offers*: Following the preliminary injunction, the City still does not come with enough shelter for the unhoused individuals present at an HSOC resolution. During the morning HSOC operations—which begin around 8:00AM—very few individuals receive a concrete shelter offer. HOT workers may approach individuals and may ask if they are generally interested in shelter, while at the same time telling them to pack up and move their belongings. HOT workers are very quick to dismiss any individuals who have questions about what shelter is in fact available, wrongly determining that those individuals must be disinterested in shelter. HOT workers do not re-approach people once shelter availability is determined if they are not satisfied with this first interaction. Many of these interactions are empty, leaving people without any concrete shelter offer.

14. Even when some concrete shelter offers are made, individuals are sometimes never successfully connected with that shelter placement. For example, the City is supposed to provide transportation and to facilitate the person's admission into shelter because the shelter system is closed and inaccessible to self-referral. But often, unhoused individuals are left waiting for hours for the City to transport them to the shelter. Some are left waiting so long that they suspect the City workers are not coming back, rendering the shelter offers they received meaningless.

15. *Property Confiscation*: At the HSOC operations where the Coalition is

monitoring, and particularly because the City knows we are present and our staff and volunteers engage with the unhoused individuals onsite and with City workers, the City has been much more responsive to individuals' requests that their personal property be bagged and tagged. There are still ongoing issues with the City seizing personal property that is obviously of value, but our staff and volunteers are often able to intercede and resolve the situation. But the Coalition continues to receive reports that City staff repeatedly seize and destroy their belongings during HSOC operations, and at other police operations during which the Coalition is unable to be present, and during the daily DPW operations occurring across the City several times every day. These are the very same reports that the Coalition heard before this Court entered its preliminary injunction. The Coalition has no ability to monitor or directly observe all these interactions.

16. *Changing the Course of the Operation*: The Coalition is abundantly aware that its presence fundamentally transforms the way that City employees treat unhoused individuals—gives a much rosier impression of the City's conduct at HSOC resolutions and at dozens of other enforcement interactions happening each week without monitoring or even the guise of shelter offers. Usually when we arrive on the scene, the unhoused individuals onsite tell us that the City was asking them to move away and so they have begun to pack up their belongings. But when the City notices that we have arrived, the workers often whisper to themselves and there is a shift in attitude. The City may then offer whatever limited services or shelter they have available for a couple people onsite, and then they leave without asking anyone else to move. The unhoused people onsite tell us they are glad that we are there because the City does not harass them to the same degree when we are watching. Unfortunately, it would be impossible for us to be present for all of the City's enforcement operations to monitor their conduct.

17. The experience of monitoring has left the Coalition staff and volunteers exasperated. The reports we hear every day from impacted unhoused individuals is that the City's behavior has largely not changed for them since the Court's preliminary injunction went into effect—particularly when we are not present.

5

1  I declare under penalty of perjury that the contents of this declaration are true and correct to the
2  best of my knowledge, and that I executed this declaration on May 23, 2023 in San Francisco,
3  California.

*Jennifer Friedenbach*
Executive Director
Coalition on Homelessness