LATHAM & WATKINS LLP
Alfred C. Pfeiffer, Jr., SBN 120965
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
al.pfeiffer@lw.com

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY AREA
Zal K. Shroff, MJP 804620, *pro hac vice*
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
zshroff@lccrsf.org

ACLU FOUNDATION OF NORTHERN
CALIFORNIA
John Thomas H. Do, SBN 285075
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
jdo@aclunc.org

*Attorneys for Plaintiffs*

*Additional Counsel Below*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| COALITION ON HOMELESSNESS, et al., <br><br> Plaintiffs. <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, et. al., <br><br> Defendants. | CASE NO. 4:22-cv-05502-DMR <br><br> **SUPPLEMENTAL DECLARATION OF DYLAN VERNER-CRIST** <br><br> **Judge:**   The Hon. Donna M. Ryu |

LATHAM & WATKINS LLP
Wesley Tiu, SBN 336580
Kevin Wu, SBN 337101
Tulin Gurer, SBN 303077
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
wesley.tiu@lw.com
kevin.wu@lw.com
tulin.gurer@lw.com

LATHAM & WATKINS LLP
Joseph H. Lee, SBN 248046
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
joseph.lee@lw.com

LATHAM & WATKINS LLP
Rachel Mitchell, SBN 344204
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
rachel.mitchell@lw.com

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY AREA
Elisa Della-Piana, SBN 226462
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
edellapiana@lccrsf.org

ACLU FOUNDATION OF NORTHERN CALIFORNIA
Brandon L. Greene, SBN 293783
John Do, SBN 285075
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
bgreene@aclunc.org
jdo@aclunc.org

## DECLARATION OF DYLAN VERNER-CRIST

I, Dylan Verner-Crist, hereby declare pursuant to 28 U.S.C. § 1746:

1.      All facts set forth in this declaration are based upon my personal knowledge, and, if called upon to testify as to the truth of these facts, I could and would competently do so.

**Background**

2.       I am the lead investigator at the ACLU of Northern California. In my role, I conduct factual investigations of potential civil rights violations. As part of my investigatory work, I regularly find and interview prospective clients and witnesses, review public records and other documents, conduct fieldwork, and author investigative reports and declarations summarizing my findings. I previously authored a declaration in this case. *See* Verner-Crist Decl., Dkt. # 50-3.

3.      I have experience observing encampment sweeps and interviewing unhoused people regarding their experiences during sweeps throughout Northern California. I have conducted such investigative fieldwork in the cities of San Francisco (hereafter "City"), Santa Cruz, Chico, Oakland, Pacifica, Siskiyou County, and Fresno, among others.

4.      Following the issuance of the preliminary injunction on December 24, 2022, I began monitoring the City's compliance with the injunction. From January 27, 2023 through May 18, 2023, I observed the City's actions at eleven different sweeps, attending an average of one sweep every ten days. I observed sweeps on January 27, February 2, February 9, February 14, February 15, March 1, March 3, March 23, March 30, April 6, and May 18, 2023.

5.      When the sweeps were noticed, I would arrive at the time that the City was set to start its operation. I spent approximately four hours at each sweep operation that I attended, for a total of approximately forty-four hours of direct fieldwork. Including travel time and time spent reviewing field notes and records, I spent approximately seventy-five hours conducting sweep monitoring for this case.

6.      During my sweep monitoring, I would frequently obtain declarations from unhoused people attesting to their experiences during the City's operations. In my experience, obtaining declarations from unhoused people is difficult due to the circumstances. This is

1

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

particularly true after unhoused people have just gone through a traumatic event like having their home and belongings taken. Declarations I obtained are referenced in observations below.

**Summary of Observations**

7.       Over the course of the eleven encampment sweeps that I monitored, I observed numerous violations of the preliminary injunction.

8.       _Orders to Move and Lack of Shelter Offering:_ I observed City workers fail to adequately offer unhoused people shelter during their sweep operations. On many occasions, the City's offer of shelter consisted of their Homeless Outreach Team ("HOT") workers asking an unhoused person a cursory question, such as "You're not interested in shelter, are you?" or "Are you interested in going inside?" before walking on. Unhoused people present at encampment sweeps who I interviewed about these shelter offers reported that these interactions do not provide them with enough information to know whether the City actually has a real shelter bed to offer them and, if so, what type of bed they are being offered and if the bed accommodates the needs of their family (such as being grouped together) or their disability (such as an accessible space). People were ordered to move despite this. I never heard the City workers indicate that any request to move was temporary or voluntary. Instead, I witnessed the City workers informing unhoused people that the Court order did not matter.

9.       At the encampment sweeps I attended, numerous unhoused reported that the City had either failed to offer them shelter or had offered them shelter that did not meet their needs and that, as a result, they could not accept. For instance, some encampment residents reported that the HOT workers had never spoken to them. Others reported the HOT workers had only offered them shelter in congregate housing, adding that they had previously been sexually assaulted or had severe psychiatric symptoms in such restrictive or unsafe settings.

10.       _Lack of Notice:_ I observed numerous sweeps that were not noticed. At such sweeps, despite thorough searching, I could not find any posted notice. Interviews with unhoused people at the locations revealed that the City had neither posted notice or provided oral notice of their planned operation. At times, the City abandoned their unnoticed sweep operations when I showed up to monitor their activities.

2

11.     At other times, the City's posting of notice consisted of one notice posted on a multiple block area, even though the encampments in question were often far-flung. When interviewed, many unhoused people in the vicinity of these sweeps had no knowledge that notice had been posted, likely because the only notice was far from their living space.

12.     _Property Destruction:_ I frequently witnessed City workers destroy unhoused peoples' property. At the sweep operations I attended, I watched City workers throw out usable sleeping bags, mattresses, clothes, furniture, tents, food, backpacks, suitcases, and other belongings, even when the belongings were evidently neither trash nor abandoned.

13.     I also observed unhoused people frequently attempt – only sometimes with success– to convince City workers to return their belongings to them or to not destroy their basic necessities, such as sleeping articles or clothing.

14.     I never observed City workers offer to help unhoused people pack up their belongings or meaningful additional time to pack up their belongings, even when the unhoused people had a visible disability.

15.     I never observed City workers store any property for later retrieval by unhoused people. Property was always either brought with unhoused people when they moved, left on the curb, or thrown into a dump truck. Likewise, I never witnessed City workers bring any property storage truck with them to an encampment sweep so that they could bring property that should be retained.

16.     I observed at least one apparent violation of the Court order and/or City policy occurring each time. Below I describe my observations at each individual sweep that I attended.

**January 27, 2023 Sweep**

17.     On January 27, 2023, I observed an encampment sweep by City workers of an approximately 15-to-20-person encampment located on both sides of Leavenworth Street just north of its intersection with Ellis Street.

18.     I arrived at the area at approximately 9:00 AM that morning. I observed approximately seven tents on the western side of Leavenworth Street and two tents on the eastern side of the street. True and correct copies of photos of these tents, taken at

3

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

approximately 9:30 AM that morning, are attached hereto as **Exhibits A** and **B**, respectively.

19.    I then walked up and down the block, looking for posted notice of an encampment sweep, but I did not see any such notice.

20.    At approximately 9:17 AM that morning, two HOT workers showed up. A few minutes later, another HOT worker showed up. As I stood approximately ten feet away, the new arrival told the other two HOT workers that the San Francisco Police Department ("SFPD") had recently released a bulletin regarding encampment sweeps. He said that the bulletin required unhoused people to completely move their tents, adding, "They will actually have to move today." He said that SFPD would tell the unhoused people to move and then HOT could go in to do their work. He said that they would all wait for the Incident Commander to arrive before beginning their work.

21.    After he told the other two HOT workers this information, this third HOT worker came over to me. He asked me what City department I worked for. I told him that I did not work for a City department. He then went away. Shortly afterwards, the HOT workers began going up to unhoused people in the encampment and talking with them.

22.    At approximately 9:30 AM, I heard one of the HOT workers ask one of the encampment residents if he was interested in shelter. The encampment resident asked if there were private rooms or hotels available. The HOT worker replied that he did not know, that he was getting names "in case," and then added, "They'll give us what they give us."

23.    At approximately that time, other City workers began showing up. I observed two San Francisco Municipal Transportation Authority ("SFMTA") workers, one SFPD vehicle with two officers, a Department of Public Works ("DPW") dump truck manned by two DPW workers, a San Francisco Fire Department ("SFFD") Incident Commander, two Felton outreach workers, and a vehicle emblazoned with "Street Crisis Response Team," all clustered around this one encampment.

24.    I then noticed a volunteer with the Coalition on Homelessness ("COH"). As we stood talking, the third HOT worker came up to us. He told me that he now recognized me and asked if I was with COH. I told him that I was not and that I worked for the ACLU. I introduced

4

1   myself. He then walked away again.

2       25.     I then went to talk to residents of the encampment to further understand the City

3   workers' actions that morning. As I did so, the HOT workers also talked to encampment

4   residents and the DPW workers began to collect scattered belongings and trash around the

5   encampment. The encampment residents I spoke with reported that the City had told them that

6   they would have to move that morning. *See* Harding Decl. ¶ 9; Melendez Decl. ¶¶ 5-8; Adams

7   Decl. ¶ 9. Some reported that the City workers had told them that the preliminary injunction had

8   been lifted, so they would have to move. *See* Melendez Decl., ¶ 6. Others reported that the City

9   workers threatened them with arrest if they did not move. Adams Decl., ¶ 9.

10      26.     At approximately 10:00 AM, as I was talking to one encampment resident, the

11  City workers all suddenly left. I looked up and all the City vehicles and workers were gone. The

12  unhoused people I talked with reported that they had never seen this happen before and told me

13  that they believed it was due to my presence at the sweep. *See* Melendez Decl., ¶ 10; Adams

14  Decl., ¶¶ 13-14. This matched my own experience and impression of the sequencing of events

15  as well.

16      27.     I stayed at the encampment until approximately 12:30 PM that day. The City

17  workers did not return before I left.

18  **February 2, 2023 Sweep**

19      28.     On February 2, 2023, I observed a City sweep of an encampment located on

20  Mission Street between 8th and 9th Street.

21      29.     I arrived at the area at approximately 9:00 AM that morning. I saw an

22  encampment of approximately three to five tents located on Laskie Street, a small alley off of

23  Mission Street just south of 8th Street.

24      30.     At approximately 9:15 AM, I observed City workers with the Department of

25  Emergency Management ("DEM"), SFPD, DPW, and HOT show up at the encampment site.

26      31.     I did not see any notices of planned encampment sweep operations at or near the

27  encampment at Laskie Street.

28      32.     From approximately 9:40 AM to 10:30 AM, I watched as the City workers

5

VERNER-CRIST DECL. ISO PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE
CASE NO. 4:22-CV-05502-DMR

approached the unhoused people in the encampment. Then, at 10:30 AM, the City workers left.

33.   After the City workers left, I approached the people in the encampment. They reported that the City workers had collected trash but had not told them to move nor offered shelter.

34.   I stayed in the area for another hour to see if the City workers would return. I left the area at 11:30 AM.

**February 9, 2023 Sweep**

35.   On February 9, 2023, I observed a City sweep of an encampment located on Leavenworth Street between Eddy Street and O'Farrell Street. This area included the block of Leavenworth Street on which I had observed the aborted sweep operation thirteen days earlier on January 27, 2023.

36.   I arrived at the sweep area at approximately 7:13 AM. I observed SFFD Healthy Streets Operation Center ("HSOC") Incident Commander Charles Patrick Hardiman (hereafter "Patrick"), two SFMTA workers, an SFPD vehicle with two police officers inside, a HOT vehicle, three DPW trucks, and four HOT workers stationed around the two blocks scheduled for sweeping.

37.   I counted five tents on the west side of Leavenworth Street between Ellis Street and Eddy Street. There were nine more tents on the west side of Leavenworth Street on the next block, between Ellis Street and O'Farrell Street. There was only one tent on the east side of the two blocks. It was located on the northern block (between Ellis Street and O'Farrell Street).

38.   From approximately 7:15 AM to 8:15 AM, I observed the HOT workers go around to people in the encampment. During that time, I spoke to one man in the encampment, who reported that City workers had told him that it would be in his "best interest" to move. He reported that he did not know what would happen if he did not move.

39.   After the City workers stopped talking to unhoused people in the encampment at approximately 8:15 AM, I went around to talk to encampment occupants. They reported that the HOT workers had told them that they would have to move out of the area. One man who had been told to move, Andrew Berger, reported that the HOT workers did not know if they actually

6

had shelter beds available. *See* Berger Decl. ¶¶ 8-9. Another occupant, Helen Hoffman, reported the same complaint: that City workers had told her to move, had threatened to take her property if she did not, and that the City workers did not know if they had available shelter or not. *See* Hoffman Decl. ¶¶ 7-8. Another encampment occupant, Katelin Bagley-Adams, reported that she had been told to move and threatened with property confiscation if she did not move. *See* Hoffman Decl. ¶ 7

40.     By approximately 9:00 AM, the lower block (between Eddy Street and Ellis Street) was completely clear. All of the unhoused people on that block, included Helen Hoffman, had moved away following their interactions with the HOT workers.

41.     At approximately 10:00 AM, the City workers began to get more aggressive. SFFD Incident Commander Patrick Hardiman approached one man in the encampment, Donovan Harding, and told him that he had been there all morning. Patrick then told Mr. Harding that he would have to start to move his belongings or "we're going to start throwing [them] into that machine," and pointed at a DPW dump truck stationed nearby. Mr. Harding appeared confused and tired. He was pale and did not respond.

42.     Patrick then approached two people inside of a tent near Mr. Harding. As I stood by, he told them that they had been there all morning and would have to move their stuff "now" or "I'll get [the police department] to come over here."

43.     At approximately 10:15 AM, Patrick returned to Mr. Harding and again told him to move "right now." Patrick did not offer to assist Mr. Harding gather his belongings or move down the block.

44.     At approximately 10:20 AM, Patrick returned to talk to the couple inside the tent. I overheard him ask them if the HOT workers had talked to them. When the couple said no, Patrick told them that they should find the HOT workers quickly because he was not sure that they still had shelter available that morning.

45.     I then approached the couple inside the tent. I spoke with them and confirmed what I had overheard. I told them about the preliminary injunction and how it constrains the City's actions. With my assistance, one of the two people (an unhoused woman) wrote and

7

signed a declaration attesting to what had just occurred. I took the declaration to photocopy.

46.     At approximately 10:45 AM, Patrick Hardiman returned to Mr. Harding. The incident commander told Mr. Harding that he had not moved and then proceeded to grab his mattress and other belongings and throw them into the DPW dump truck. Attached hereto as **Exhibit C** is a true and correct copy of a photo I took at 10:47 that morning, showing Mr. Harding's mattress in the dump truck. Mr. Harding then stumbled down the block without any of his belongings. *See* Supp. Harding Decl. ¶¶ 3-4.

47.     At approximately 10:50 AM, Patrick Hardiman reapproached the couple inside the tent. I witnessed him ordering the couple to leave. One of them replied, "What about the ACLU?" Patrick replied that she could talk to the ACLU all she wanted and that the ACLU could not do anything. He added, "You have to go now, no matter what ACLU says."

48.     After this interaction, the unhoused woman came up to me and demanded her declaration back. She told me that she no longer wanted to be a witness in a lawsuit because it clearly did not matter or have any effect on the City's actions.

49.     At approximately 11:15 AM, the DPW workers began throwing out property that remained on the block. I watched as two DPW workers dragged a fully intact tent and threw it into a dump truck. Attached hereto as **Exhibit D** is a true and correct copy of a photo I took at 11:18 AM showing DPW workers dragging the tent towards their truck.

50.     At approximately the same time, I talked to an unhoused man at the encampment who reported that he had been offered shelter. He further reported that the HOT workers had informed him that he had to leave for the shelter imminently, so he packed up his belongings for retrieval later. As soon as he left, the DPW workers put his recently packed belongings – consisting of a blanket atop two neat suitcases – and threw them into their dump truck. Attached hereto as **Exhibits E, F,** and **G** are true and correct copies of photos showing the suitcases, DPW workers dragging the suitcases towards the dump truck, and the suitcases inside the dump truck. I took these photos at 11:18 that morning.

51.     By 11:30 AM, the encampment was almost gone. All the occupants had left. I stayed around until the sweep had concluded at 12:00 PM and then left.

8

**February 14, 2023 Sweep**

52.     On February 14, 2023, I observed a City sweep of an encampment located on Russ Street between Howard Street and Folsom Street and of another encampment located across the street on Sherman Street adjoining Victoria Manalo Draves Park.

53.     I arrived at the noticed location shortly after 7:00 AM. I observed six tents on Russ Street, four on the northern side of the block and two on the southern side.

54.     At approximately 7:15 AM, I saw two SFPD officers, one SFPD vehicle, SFFD Incident Commander Charles Patrick Hardiman, six HOT outreach workers, two SFMTA workers, and one DPW truck stationed on Russ Street.

55.     At approximately 8:00 AM, I talked to one unhoused woman in a tent on Russ Street. She reported that the City had been coming to that location weekly for the past month, telling her and her partner to move, and threatening to throw out their belongings if they did not move. She reported that the only shelter that she had been offered was for single women, which would have entailed separation from her partner.

56.     Later that morning, an unhoused person went to talk to the City workers about whether he would have to move. The City workers told him that he would have to move that morning, so he and his neighbor began to pack up their belongings.

57.     From 8:30 AM to approximately 11:45 AM, I watched as unhoused people hurriedly packed up their belonging as the City workers stood on watching. Then, without warning, the City workers left shortly before noon, with many unhoused people still only half-packed up.

58.     I interviewed some of the encampment occupants and asked whether the City had told them that they would have to move that day or not. Some reported that the City had not said anything to them at all. One man, Henry Jones, reported that Patrick Hardiman had informed him that the City would be returning at 3:30 PM that day and that any property remaining on the block would be thrown away. Mr. Jones reported that he was tired of the City giving him constant, contradictory orders of where he had to go and when. *See* Jones Decl. ¶¶ 10-11.

9

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

59.     I left the encampment area at approximately 12 PM.

**February 15, 2023 Sweep**

60.     On February 15, 2023, I observed a City sweep of two locations: Crisp Road between Palou Avenue and Revere Avenue, and Palou Avenue southeast of Griffith Street. Both locations are in the Hunters Point neighborhood.

61.     I arrived at the noticed location at approximately 7:05 AM. I counted approximately three recreational vehicles ("RVs"), five trailers, and three vans parked in the area described on the City's sweep notice, which was posted to a tree on Crisp Road between Palou Avenue and Revere Avenue. A true and correct copy of the posted sweep notice is attached hereto as **Exhibit H**.

62.     The sweep notice further describes that the City would be sweeping an area described as "Griffith/Palou/Thomas/Ingalls Grid – including Shafter and Revere" later that day at 1:00 PM. This described zone is an area occupying eight square blocks, or almost a square mile in size. After reading the posted notice, I drove around this area. I counted approximately five to ten RVs and vans parked on adjoining blocks but no tents. I did not see any notices posted at or near any of these RVs or vans. The only notice I observed for the entire eight block area was the one posted on Crisp Road between Palou Avenue and Revere Avenue.

63.     At approximately 7:15 AM, I observed approximately ten City workers stationed on Crisp Road. I observed staff from DEM, SFPD, SFMTA, HOT, and DPW arriving for their operation.

64.     At approximately 7:40 AM, the HOT workers began going around to the encampment occupants. Shortly afterwards, the encampment occupants began to hurriedly pack up their belongings.

65.     Over the next three hours, I watched as the unhoused people hurriedly packed up their belongings and attempted to move their vehicles. At one point, at approximately 8:45 AM, one of the unhoused people asked an SFPD officer how much time they had to pack up. The officer replied that he did not know and that the unhoused person should talk to someone else.

66.     None of the City workers helped or even offered to help any of the unhoused

10

1   people pack up their belongings. Attached hereto as **Exhibit I**, for example, is a true and correct

2   copy of a photo that I took at 10:54 that day. It shows DPW workers standing around, lying

3   down, and looking at their phones as unhoused people hurriedly pack up their belongings.

4          67.    Instead of assisting the unhoused people, the City's workers criticized and

5   mocked them. At approximately 11:05 AM, I heard a DPW worker complaining to his

6   colleagues about outreach organizations that provided aid items to unhoused people, adding, "If

7   we stopped giving them [belongings], we wouldn't have to pick [them] up." Approximately five

8   minutes later, SFFD Incident Commander Charles Patrick Hardiman walked directly by one

9   woman who was hurriedly packing up her belongings, remarking as he passed, "Welcome to the

10  sh*t show."

11         68.    The unhoused people finished packing up their belongings at approximately

12  11:30 AM. Then, the DPW workers disposed of everything else. I did not see any of the DPW

13  workers store any of the belongings for safekeeping.

14         69.    I left the site at approximately 11:30 AM.

15  **March 1, 2023 Sweep**

16         70.    On March 1, 2023, I observed a City sweep of an encampment located on

17  O'Farrell Street between Jones Street and Taylor Street.

18         71.    I arrived at the site of the City's planned sweep at approximately 10:15 AM. I

19  saw two SFPD officers, one SFPD vehicle, four HOT workers, some DPW workers with two

20  DPW dump trucks, SFMTA workers, and an SFFD incident commander. I also saw an

21  encampment of approximately six tents, with three on each side of the block.

22         72.    I did not see any posted notice at or near any of the tents on either side of the

23  street.

24         73.    I then went to talk to the residents of the encampment. They reported they had

25  been told to move and that if they did not move then the City would take their belongings. *See*

26  Myers Decl. ¶¶ 14-15, Donohoe Decl. ¶¶ 5-6. One of the unhoused people living on the north

27  side of the block, Abimbola Myers, told me that he was told to move but that the HOT workers

28  had not offered him shelter. Myers Decl., ¶¶ 15-16.

74.     At approximately 10:15 AM, the SFFD incident commander approached one of the plaintiffs in this action, Joshua Donohoe, who was at the encampment. I heard the incident commander tell Mr. Donohoe that the City had not properly posted notice of the encampment sweep and so now the individuals would no longer have to move. I did not see the incident commander go to the other encampment occupants in a similar fashion.

75.     The unhoused people on the other side of the street continued to pack up their belongings and move down the block. After these unhoused people had packed up their belongings, the DPW workers began pressure-washing that part of the sidewalk.

76.     The City workers left at approximately 11 AM after finishing the operation on only the north side of the block. The workers did not appear to provide any notice that they had finished before leaving. I left the encampment shortly afterwards.

77.     While on my way from the site of the sweep, I passed a notice posted at or around 350 Jones Street. The notice, a true and correct copy of which is attached hereto as **Exhibit J**, was dated February 25, 2023, but takes a different form from the City's typical notices. It does not describe any shelter offerings connected with a potential sweep and states that the City will dispose of any bulky property items, which I understand to be unconstitutional. *See* Ex. J.

**March 3, 2023 Sweep**

78.     On March 3, 2023, I observed a City sweep of an encampment located on Mission Street near its intersection with 7th Street.

79.     I arrived at the area at approximately 9:00 AM. I observed two SFPD officers, two SFPD vehicles, two DEM vehicles, two SFMTA officers, and two SFMTA vehicles. I also saw a cluster of four tents on Mission Street just south of its intersection with 7th Street and one tent on 7th Street just east of the intersection. There was another cluster of approximately nine tents a block away on Minna Street just south of 7th Street.

80.     I did not observe any posted notice at or near any of the five tents clustered around the 7th Street and Mission Street intersection. I also did not see any notices posted at or near any of the nine tents on Minna Street.

VERNER-CRIST DECL. ISO PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE
CASE NO. 4:22-CV-05502-DMR

81.     At approximately 9:20 AM, four HOT workers with purple lanyards showed up. They began talking to unhoused people inside the five tents. They then went to Minna Street.

82.     At approximately 9:30 AM, I witnessed an unhoused man leave the encampment with his belongings. He was yelling and appeared upset. As he walked away, I asked him what the City workers had told him. He reported that the HOT workers had said to him three times, "You don't want shelter?" but had not actually offered him shelter nor explained to him what sort of shelter was available. He told me that he had packed up his belongings and left in frustration.

83.     At approximately 9:50 AM, I talked with another encampment occupant, Ronald Wilson, near one of the Minna tents. Mr. Wilson reported that he heard the City workers talking about the Minna Street encampment, saying that they were getting a headcount that day and would return the next day to force the residents to move. *See* Wilson Decl. ¶¶ 5-6. Mr. Wilson told me that he also did not see any notice posted at the encampment. *Id.*

84.     At approximately 10:00 AM, approximately four DPW workers showed up at the Mission Street and 7th Street intersection in three different DPW trucks.

85.     At approximately 10:10 AM, an SFFD incident commander looked inside one of the four tents stationed on Mission Street and then told one of the unhoused people standing nearby that the tent was abandoned. The unhoused man, Maurice Moran, began to argue with the incident commander, telling him that the tent belonged to his neighbor, who was at the dentist. He told the incident commander that the tent was not abandoned.

86.     I then spoke with Mr. Moran. He reported that he did not know that the City workers were going to come for a sweep and that he had not seen any notices. *See* Moran Decl., ¶ 10. He told me that the City's HOT workers had only offered him a congregate shelter, which he could not accept due to previous traumatic and triggering experiences in such shelters. *Id*, ¶ 6. He then told me that the HOT workers had not offered him any non-congregate shelters after he informed them that he could not accept a congregate shelter. *Id.*

87.     At approximately 10:15 AM, I watched as the DPW workers took one of the four tents on Mission Street and started to put it into their dump truck. I watched as Mr. Moran

argued with the workers, telling them that the tent belonged to his friend. He asked the workers if he could take some backpacks and other belongings out of the tent before they trashed it. With me standing on, the workers agreed to let Mr. Moran take some belongings out of the tent, but the tent was destroyed.

88.     Approximately five minutes later, a woman showed up. She went up to the tent that the workers were disassembling and grabbed some belongings out of it. She appeared distraught. She told the workers that the tent belonged to her. The workers continued to dismantle and dispose of the tent.

89.     At approximately 10:25 AM, the DPW workers began washing the area where the tent had been on Mission Street. Attached hereto as **Exhibit K** is a true and correct copy of a photo of a DPW worker power-washing the area where the tent had been.

90.     At approximately 10:35 AM, the City workers all suddenly left after taking the one tent and cleaning the area around it. The workers did not appear to give any reason for their sudden departure.

91.     At approximately 11:45 AM, the same DPW workers drove by again. They appeared to see me and then drove off again.

92.     I left the area at approximately 12:00 PM.

**March 23, 2023 Sweep**

93.     On March 23, 2023, I observed a City sweep of a number of tents located on Masonic Avenue from Euclid Avenue to Geary Boulevard and on Geary Street from Masonic Avenue to Presidio Avenue.

94.     I arrived at the noticed area at approximately 1:30 PM that day. When I arrived, I observed one tent on the east side of Masonic Avenue between Euclid Avenue and Geary Street. There was no notice of the sweep posted on or near the tent.

95.     At approximately 1:40 PM, I observed approximately ten City workers standing on or around Geary Boulevard near Masonic Avenue and Presidio Avenue. I counted approximately five SFPD officers, three HOT workers, one DEM supervisor, and some SFMTA personnel. I also observed an encampment of approximately four tents along Geary Boulevard

14

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

1    just north of Masonic Avenue.

2         96.    One of the tents was on a median on Geary Boulevard just west of the

3    intersection with Presidio Avenue. At approximately 1:45 PM, I observed an SFPD officer

4    talking to the unhoused people inside the tent. I overheard him ask them, "Do you want to go

5    inside?" He did not say more than that or explain what he meant by the question.

6         97.    At approximately 1:55 PM, I talked to one of the individuals inside the tent on

7    the Geary Boulevard median. She told me that the officer had asked if she was interested in

8    going inside, but that the officer did not have specifics on what sort of shelter was available.

9    She further reported that the officer had told her that she would have to move that day.

10        98.    I did not observe any posted notice at or near this tent.

11        99.    At approximately 2 PM, the City workers began talking to unhoused people on

12   the east side of Masonic Avenue close to the intersection with Geary Boulevard. I did not

13   observe any posted notices at or near these peoples' tents.

14        100.   At approximately 2:30 PM, I talked to one of the unhoused people camping on

15   the east side of Masonic Avenue near Geary Boulevard. He reported the City had offered him

16   shelter in an outdoor tent city-type sanctioned encampment.

17        101.   I then spoke to another unhoused man who was camping in the same location.

18   He reported that the City workers had come up to him and told him to move because his tent

19   was blocking the sidewalk. He said that he had asked them if he could move his tent to open up

20   the sidewalk. He then said that the City had responded by telling him that he needed to move

21   entirely off the sidewalk so that they could clean the street. He said that the City workers had

22   not raised street cleaning until he had asked if he could stay in the same area. He told me that he

23   had not received any notice of the sweep. I did not see any notice posted on or near his tent.

24        102.   At approximately 4 PM, I observed DPW workers loading the tent that had been

25   erected on the median along Geary Boulevard into a dump truck. From my observations, the

26   City workers did not appear to be storing any of the property. All the contents of the tent were

27   being loaded into a dump truck.

28        103.   Approximately half an hour later, at 4:30 PM, one of the occupants of the tent

15

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

that had been on the Geary median returned. He was yelling and appeared distraught. He told me that the City had offered him a hotel shelter room and that he had left for that room without gathering his property because the HOT workers had told him that he needed to go. He said that when he returned to the area where his tent had been, he saw that all his property, including his clothes and shoes, was gone.

104.    At approximately 4:45 PM, I talked with another unhoused person at the encampment, Corey Barkley. Mr. Barkley reported that the DPW workers had just thrown his belongings into their dump truck without asking him. *See* Barkley Decl. ¶ 18. He said that when he attempted to get his property, including his sleeping bag and food, from the dump truck, an SFPD officer had stopped him. Mr. Barkley was yelling and appeared distraught over the City's actions.

105.    Attached hereto as **Exhibit L** is a true and correct copy of a photo of Mr. Barkley's property that I took approximately two hours before this, at 2:19 PM that day. The photo shows that Mr. Barkley's property included a mattress, sleeping bags, a suitcase, and clothing. At 4:45 PM, I did not see any of this property in the vicinity of the sweep.

106.    I left the sweep location at approximately 4:50 PM. At this point, I did not observe any other City workers left at the site.

107.    I did not observe the City conduct any street cleaning or washing of the area before I left. The City workers had left the remnants of Mr. Barkley's property on the curb and the street when they left. The street appeared more littered than it had been when I had arrived at the beginning of the cleaning operation.

**March 30, 2023 Sweep**

108.    On March 30, 2023, I observed a City sweep of two encampments, one located on Fern Street between Polk Street and Larkin Street and the other located on Hemlock Street between Polk Street and Larkin Street.

109.    I arrived at the Hemlock Street encampment at approximately 8 AM. I observed approximately two tents on the street, inhabited by approximately two people. I also observed approximately six DPW workers overseeing an unhoused woman move her property from

16

Hemlock Street to Larkin Street. I did not see any notices posted on or near the tents stationed on Hemlock Street.

110. At approximately 8:08 AM, a DPW worker walked up to one of the older women in the encampment and said to her, in Spanish, "What are we going to do with you?"

111. At approximately 8:10 AM, some SFPD officers arrived at Hemlock. They were soon joined by DEM workers. These City personnel stood by as the encampment occupants moved. I did not observe any of the City workers inform the unhoused people why they had to move, when they could return to their previous location, or offer them shelter.

112. I then walked up Larkin Street two blocks to get to the Fern Street encampment. I arrived at the Fern Street encampment at approximately 8:15 AM. I observed four HOT workers and two HOT vehicles stationed outside a small encampment of approximately six tents, stationed neatly on one side of the Fern Street alley.

113. As I watched, the HOT workers went around to each tent, asking the occupants loudly, "Do you want to go inside today?" I did not hear the HOT workers explain what they meant by this question or tell the occupants what types of shelter, if any, they had available.

114. After the HOT workers talked with the encampment residents, the City waited around for the next approximate two to three hours. During this time, the HOT workers approached some of the encampment occupants. According to one these occupants, Thomas Draper, the HOT workers told him that they would have to move from the area but did not offer him shelter. *See* Draper Decl. ¶¶ 6-7. The HOT workers left at approximately 11:00 AM.

115. At approximately 11:25 AM, DPW workers began removing property from the encampment, including bedding/mattress from one tent. I did not observe DPW workers store or offer to store any personal property during their operation.

116. At approximately 11:30 AM, an unhoused woman in the encampment came up to me. She told me that she was looking for the HOT workers, who had told her that they would take her to a shelter. She seemed upset. I told her that I had not seen the HOT workers. She then went to pack up her belongings.

117. At approximately 12:00 PM, the City workers all left. I went to talk to some of

17

the encampment occupants who were still camped on Fern Street. They told me that the City

workers had said that the encampment occupants would still have to move, but that they were

unsure when that would be. The encampment occupants reported that they did not know if they

would have to move that day, the next day, or not at all.

118.    I left the sweep location shortly after 12:00 PM.

**April 6, 2023 Sweep**

119.    On April 6, 2023, I observed a City sweep of an encampment located next to a

highway around Berry Street and King Street in the Mission Bay neighborhood of the City.

120.    I arrived at the noticed location at approximately 8:20 AM. I observed three

SFFD personnel, a few DEM employees, four SFPD officers, two SFMTA workers in their

vehicles, three DPW workers and trucks, and a few HOT workers.

121.    The City entered the encampment area at approximately 8:30 AM. I observed

that there were approximately six tents in the encampment. I counted approximately ten people

in or around the tents.

122.    Over the course of the next hour, the HOT workers approached the encampment

occupants to talk to them. After the HOT workers had finished talking with each occupant, I

went up to each occupant and asked them what the HOT workers had told them. One occupant,

Troy Hawthorne, reported that he was living on the street with his adolescent son. *See*

Hawthorne Decl. ¶ 7. He reported that the HOT workers offered him a hotel shelter but told him

that his son could not accompany him. *Id*, ¶ 8.

123.    At approximately 10 AM that morning, SFFD Incident Commander Charles

Patrick Hardiman approached Mr. Hawthorne, who has severe disabilities and uses a wheelchair

to ambulate. *Id*, ¶¶ 3-4. Patrick told Mr. Hawthorne that I could help Mr. Hawthorne pack up his

belongings and move. *Id,* ¶ 9. Neither Patrick nor any other City worker assisted or offered to

assist Mr. Hawthorne move his belongings, despite his evident disability.

124.    After I had finished assisting Mr. Hawthorne move his belongings, I returned to

the encampment. By this time, it was approximately 10:30 AM. All of the encampment

occupants had now left. I stayed to observe DPW's clean-up operation and then left at

18

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  approximately 10:45 AM.

2  **May 18, 2023 Sweep**

3      125.    On May 18, 2023, I observed a City sweep of an encampment located around the

4  intersection of San Bruno Avenue and Alameda Street. The encampment stretched a few blocks

5  in either direction along San Bruno Avenue, from Division Street to the north to 16th Street to

6  the south.

7      126.    I arrived at the noticed location at approximately 8:00 AM. I observed a total of

8  approximately eighteen tents, seven RVs, and three vans stationed in the described area.

9      127.    At approximately 8:10 AM, I observed an SFFD incident commander, three

10 HOT workers, four SFPD officers, and one DPW worker in a DPW truck. Over the course of

11 the next half hour, approximately four more DPW workers in a total of three truck arrived at the

12 location of the sweep operation.

13     128.    At the intersection of San Bruno Avenue and Alameda Street, I observed that the

14 City had posted a notice describing the area as a "NO LODGING ZONE" and threatening

15 enforcement of Penal Code § 647(e) to anyone lodging in the area. A true and correct copy of a

16 photo of this notice is attached hereto as **Exhibit M**. I took this photo at approximately 11:42

17 AM that day.

18     129.    The City's sweep operation concluded at approximately 11:30 AM. I left the area

19 at approximately 11:45 AM.

20     I declare under penalty of perjury that the foregoing is true and correct.

21     Executed on May 24, 2023 at San Francisco, California.

22

23

24     _____

25     Dylan Verner-Crist

26

27

28

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
SAN FRANCISCO

VERNER-CRIST DECL. ISO PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE
CASE NO. 4:22-CV-05502-DMR