## REDACTED

DAVID CHIU, State Bar #189542
City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief Deputy City Attorney
WAYNE SNODGRASS, State Bar #148137
Deputy City Attorney
MEREDITH B. OSBORN, State Bar # 250467
Chief Trial Deputy
JAMES M. EMERY, State Bar #153630
EDMUND T. WANG, State Bar #278755
RYAN C. STEVENS, State Bar #306409
KAITLYN MURPHY, State Bar #293309
MIGUEL A. GRADILLA, State Bar #304125
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:      (415) 554-4675 (Snodgrass)
                (415) 554-4628 (Emery)
                (415) 554-3857 (Wang)
                (415) 554-3975 (Stevens)
                (415) 554-6762 (Murphy)
                (415) 554-3870 (Gradilla)
Facsimile:      (415) 554-4699
E-mail:         wayne.snodgrass@sfcityatty.org
                jim.emery@sfcityatty.org
                edmund.wang@sfcityatty.org
                ryan.stevens@sfcityatty.org
                kaitlyn.murphy@sfcityatty.org
                miguel.gradilla@sfcityatty.org

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO, et al.

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COALITION ON HOMELESSNESS; TORO CASTAÑO; SARAH CRONK; JOSHUA DONOHOE; MOLIQUE FRANK; DAVID MARTINEZ; TERESA SANDOVAL; NATHANIEL VAUGHN,<br><br>        Plaintiffs,<br><br>    vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>        Defendants. | Case No. 4:22-cv-05502-DMR<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUNCTION**<br><br>Date:       August 10, 2023<br>Time:       1:00 PM<br>Judge:      Hon. Donna M. Ryu<br>Place:      Courtroom 4 – 3rd Floor<br>            1301 Clay Street<br>            Oakland, CA 94612<br><br>Trial Date:   April 15, 2024 |

1

**TABLE OF CONTENTS**

2

TABLE OF AUTHORITIES ................................................................................. iii

3

I. INTRODUCTION ...........................................................................................1

II. RELEVANT BACKGROUND AND PROCEDURAL HISTORY .........................2

4

    I.    The Discovery Process Could Have Resolved Plaintiffs' Concerns. ....................2

5

        A.    Plaintiffs Declined To Raise Their Concerns Through Meet And Confer. .2

6

        B.    Plaintiffs Mischaracterize The Discovery Process Thus Far. .....................3

7

III. LEGAL STANDARD.....................................................................................4

IV. ARGUMENT ................................................................................................5

8

    I.    Problems With Plaintiffs' Evidence................................................................5

9

        A.    Plaintiffs' Evidence Is Inadmissible. ...............................................5

10

        B.    Plaintiffs' Evidence Provides Inadequate Detail For San Francisco To

11

              Respond...........................................................................................6

12

    II.    San Francisco Is Complying With The Preliminary Injunction...........................7

13

        A.    Plaintiffs' Eighth Amendment Claims.........................................7

             1.    Enforcement of Sit/Lie Laws is Not Increasing And Dispatch

14

                 Data Is Not Evidence of Enforcement. .........................................7

15

             2.    HSOC Resolutions.........................................................9

16

             3.    SFPD Presence At HSOC Resolutions Serves A Legitimate
                 Purpose.......................................................................10

17

             4.    San Francisco May Request Individuals Move During Street
                 Cleaning. ....................................................................12

18

             5.    San Francisco Voluntarily Makes Offers Of Shelter. ....................13

19

             6.    Requiring A 48" Opening On Sidewalks Complies With The
                 Injunction. ..................................................................17

20

        B.    Plaintiffs' Fourth Amendment Claims.......................................17

21

             1.    San Francisco's Bag and Tag Policy. ..........................................18

22

                 a.    The Amount of Time Provided........................................18

23

                 b.    Discardable Items.........................................................19

                 c.    Bagging and Tagging.....................................................21

24

             2.    Removing Items From DPW Trucks. ..........................................22

25

             3.    San Francisco Posts Adequate Notice Of Its Resolutions. ............22

26

        C.    Plaintiffs' Claims Are Untethered From The Injunction. .........................23

27

    III.    A Special Master Is Not Warranted, There Is No Basis To Require San
           Francisco To Pay For One Against Its Wishes, And Periodic Reports Are

28

           Unwarranted.................................................................................24

A.     Appointment Of A Special Master Is Not Appropriate. ...........................25

B.     It Is Inequitable For Plaintiffs To Seek A Special Master Over San Francisco's Objection And Ask The City To Pay All Associated Costs...27

C.     Periodic Compliance Reports. ...................................................29

V. CONCLUSION.........................................................................................30

## **TABLE OF AUTHORITIES**

**Federal Cases**

*A&M Records, Inc. v. Napster, Inc.*
    284 F.3d 1091 (9th Cir. 2002) ...................................................................................4

*Adventures in Good Eating, Inc. v. Best Places to Eat, Inc.*
    131 F.2d 809 (7th Cir. 1942) ...................................................................................25

*Al Otro Lado, Inc. v. Mayorkas*
    No. 17-cv-02366-BAS-KSC, 2022 WL 3142610 (S.D. Cal. Aug. 5, 2022) ...........................26

*Anti Police-Terror Project v. City of Oakland*
    No. 20-cv-03866-JCS, 2020 WL 6381358 (N.D. Cal. Oct. 31, 2020) .....................4, 9, 23, 30

*Arredondo v. Delano Farms Co.*
    No. CV F 09-01247-LJO-DLB, 2012 WL 2358594 (E.D. Cal. June 20, 2012).......................26

*AtPac, Inc. v. Aptitude Sols., Inc.*
    No. CIV. 2:10-294 WBS JFM, 2011 WL 13242817 (E.D. Cal. Apr. 13, 2011) .....................27

*Burlington N. R.R. Co. v. Dep't of Revenue of State of Wash.*
    934 F.2d 1064 (9th Cir. 1991) .................................................................................25

*Ceslik v. Miller Ford, Inc.*
    No. 3:04CV2045 (AWT), 2006 WL 1582215 (D. Conn. June 5, 2006) ...............................5

*Crump v. Ahern*
    No. C-12-4357 EMC (pr), 2013 WL 5487365 (N.D. Cal. Oct. 2, 2013)...............................7

*Faulkner v. Wausau Bus. Ins. Co.*
    571 F. App'x 566 (9th Cir. 2014) .............................................................................6

*Glover v. Wells Fargo Home Mortg.*
    629 F. App'x 331 (3d Cir. 2015)..............................................................................29

*In re Anthem, Inc. Data Breach Litig.*
    No. 15-MD-02617-LHK, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018)...........................28, 29

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*
    10 F.3d 693 (9th Cir. 1993) .....................................................................................4

*Keenan v. Allan*
    91 F.3d 1275 (9th Cir. 1996) ...................................................................................6

*La Buy v. Howes Leather Co.*
    352 U.S. 249 (1957)...............................................................................................26

*Mardiros v. City of Hope*
    No. 2:19-cv-02196-CJC-MAA, 2020 WL 6106820 (C.D. Cal. July 9, 2020) .....................5, 28

*Newmark Realty Capital, Inc. v. BGC Partners, Inc.*
  No. 16-cv-01702-BLF, 2018 WL 2416242 (N.D. Cal. May 29, 2018) ................................... 29

*Nkop v. City & Cnty. of San Francisco*
  956 F.2d 1167 (9th Cir. 1992) ............................................................................................. 25

*Philips Elecs. N.V. v. KXD Tech., Inc.*
  No. 05-cv-01532, 2008 WL 2699701 (D. Nev. July 2, 2008) ................................................ 29

*Richardson v. Trump*
  496 F. Supp. 3d 165 (D.D.C. 2020) ..................................................................................... 27

*Rodriguez v. Google LLC*
  No. 20-cv-04688-RS, 2022 WL 17905108 (N.D. Cal. Dec. 22, 2022) .................................. 27

*Saint Alphonsus Health All., Inc. v. Corizon, LLC*
  No. 1:18-cv-00183-DCN, 2021 WL 2381794 (D. Idaho June 10, 2021) .............................. 26

*Seggos v. Datre*
  No. 17-cv-2684 (SJF)(ARL), 2017 WL 11681160 (E.D.N.Y. Dec. 19, 2017). ...................... 29

*Shillitani v. United States*
  384 U.S. 364 (1966) .............................................................................................................. 4

*Shipp v. Schaaf*
  379 F. Supp. 3d 1033 (N.D. Cal. 2019) ................................................................................ 20

*Spallone v. United States*
  493 U.S. 265 (1990) .............................................................................................................. 4

*Sullivan v. City of Berkeley*
  383 F. Supp. 3d 976 (N.D. Cal. 2019) ............................................................................ 20, 21

*SunEarth, Inc. v. Sun Earth Solar Power Co.*
  No. 11-04991 CW, 2012 WL 2344081 (N.D. Cal. June 20, 2012) ....................................... 29

*Sys. Fed'n No. 91, Ry. Emps. Dept., AFL-CIO v. Wright*
  364 U.S. 642 (1961) .............................................................................................................. 4

*Thakur v. Cofiroute USA, LLC*
  No. 8:19-cv-02233-ODW (JDEx), 2020 WL 10731939 (C.D. Cal. Aug. 5, 2020) ................. 26

*Torrisi v. Tucson Elec. Power Co.*
  8 F.3d 1370 (9th Cir. 1993) ................................................................................................. 27

*United Farm Workers v. U.S. Dept. of Labor*
  No. 1:20-cv-01690-DAD-JLT, 2021 WL 1946696 (E.D. Cal. May 14, 2021) ........................ 4

*United States ex rel. Wilson, v. Maxxam, Inc.*
  No. C 06-7497 CW, 2009 WL 322934 (N.D. Cal. Feb. 9, 2009) .................................. 6, 7, 13

*United States v. Drayton*
536 U.S. 194 (2002) ..................................................................................................13

*United States v. Kelley*
594 F.3d 1010 (8th Cir. 2010) ..................................................................................10

*United States v. Rodriguez-Preciado*
399 F.3d 1118 (9th Cir. 2005) ..................................................................................11

*United States v. Suquamish Indian Tribe*
901 F.2d 772 (9th Cir. 1990) ....................................................................................25

*United States v. Vongxay*
594 F.3d 1111 (9th Cir. 2010) ..................................................................................13

*Wood v. Yordy*
No. CV07-350-S-EJL, 2009 WL 10706017 (D. Idaho June 2, 2009),
aff'd, 357 F. App'x 872 (9th Cir. 2009) ...................................................................28

*Xcentric Ventures, LLC v. Arden*
No. C 10-80058 SI, 2011 WL 806629 (N.D. Cal. Mar. 2, 2011) ...............................4

*Yeseta v. Baima*
837 F.2d 380 (9th Cir. 1988) ....................................................................................25

**Constitutional Provisions**
U.S. Const., amend. I ...................................................................................................7

**Federal Statutes**
Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. .................................12, 17

**Rules**
Fed. R. Civ. P.
Rule 53 ...............................................................................................................5, 25
53(g)(3) ...................................................................................................................27

**Regulations**
28 C.F.R. § 35.133(a) (2011) .....................................................................................17

Cal. Code Regs. tit. 24, § 1113A.1.1 (2022) ...............................................................17

**State Statutes & Codes**
Cal. Health § Safety Code § 11364(a) ..........................................................................8

Cal. Penal Code
§148(a) ......................................................................................................................7
§ 647c ......................................................................................................................17

**San Francisco Statutes, Codes & Ordinances**

S.F. Police Code

§ 22 ...........................................................................................................................8, 17

§ 25 ...............................................................................................................................17

§ 27 ...............................................................................................................................17

**Other References**

ACLU.org., *Susan Mizner, Director, Disability Rights Program Bio.*, available at
https://www.aclu.org/bio/susan-mizner (last visited June 27, 2023)...........................17

ALM/Law.com, Latham & Watkins LLP, available at https://www.law.com/law-firm-
profile/?id=178&name=Latham-&-Watkins (last visted July 6, 2023)....................................28

U.S. Access-Board.gov, *(Proposed) Public Rights-of-Way Accessibility Guidelines*,
available at https://www.access-board.gov/prowag/chapter-r3-technical-requirements/ ..........17

Wright & Miller, Federal Practice and Procedure, *Considerations Relating to the
Use of Masters,* 9C Fed. Prac. & Proc. Civ. § 2603 (3d ed.)......................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.INTRODUCTION

Plaintiffs seek to impose extraordinary and unjustified burdens on Defendants ("San Francisco" or "the City")—the appointment of a special master and burdensome periodic compliance reports. They do so based on unfounded claims that the City has not provided enough discovery fast enough, and based on claims of widespread violations of the Court's injunction. But on closer examination, Plaintiffs' assertions—which are spread over nearly 400 pages, and which were not provided to the City to try to resolve before burdening this Court—fall apart. Plaintiffs have not met their substantial burden, and they provide no grounds for the relief sought.

Plaintiffs' cavalcade of allegations—many inadmissible and irrelevant—does not show that the City has enforced or threatened to enforce the enjoined laws or has violated its bag and tag policy. Based on a misunderstanding that would have been easily resolved by informal discussions, Plaintiffs claim that the City is enforcing the enjoined laws. In fact, the data shows the opposite: fewer than 1% of the calls resulted in an arrest or citation, and there is no evidence that those scant events were based on the enjoined laws. Plaintiffs cite a video to incorrectly claim City employees forced a man from UN Plaza in violation of the injunction, but in reality, City employees were ensuring that individual, who was in and out of consciousness and refused their assistance, was responsive, and caught him as he fell backwards toward the curb. Plaintiffs claim the City took a dog from a declarant, but a time-consuming search by the City and Animal Care and Control proves Plaintiffs wrong. Plaintiffs also claim the City refused to shelter a declarant with his "son," but the minor was not related to the declarant. Rather, the minor was a recent runaway from out of state and a ward of that state. The rest of Plaintiffs' evidence fares no better. It merely advances an incomplete and misleading narrative that reflects Plaintiffs' unwillingness to engage in anything but motion practice to resolve disputes.

San Francisco is complying with the injunction while addressing the vexing homelessness crisis impacting it and many other cities. The City is doing all it can with available resources to find ways to house and shelter people and proceed with a services-first approach. It is conducting resolutions with notice, and with extensive offers of and placements in shelters for those who want them. And it is working to preserve safe, accessible, and clean streets—including by removing garbage that Plaintiffs' declarants say they want removed—while following its bag and tag policy. Because

San Francisco has not violated the injunction, a special master and submission of compliance reports are unwarranted. The Court should deny Plaintiffs' motion in its entirety.

## II. RELEVANT BACKGROUND AND PROCEDURAL HISTORY

### I. The Discovery Process Could Have Resolved Plaintiffs' Concerns.

Plaintiffs assert that they have not received the discovery they seek at the speed at which they seek it. Dkt. 130 ("MPA") at 14-18. Their characterization is neither complete nor accurate. But even if it was, Plaintiffs' motion is entirely inappropriate for resolving their asserted dispute. Plaintiffs did not raise their concerns through the meet and confer process, and San Francisco has already produced the categories of documents Plaintiffs seek.

### A. Plaintiffs Declined To Raise Their Concerns Through Meet And Confer.

Even though Plaintiffs assert violations stretching back to December 27, 2022, they waited until May 25, 2023 to file this motion. *See* MPA at 5, citing Dkt. 76, 77. Between January 6, 2023 (when Plaintiffs filed an administrative motion asserting noncompliance, Dkts. 75-80), and May 25, 2023 (when they filed this motion), Plaintiffs never engaged with San Francisco to resolve *any* incidents of alleged non-compliance, including those identified in their motion. Indeed, Plaintiffs actively *refused* to reveal any such claimed problems.[1]

Such gamesmanship has continued into the present, and has affected San Francisco's efforts to house the City's unsheltered residents.  San Francisco very recently made Plaintiff ███████ a concrete offer of shelter, in an individual "tiny home" cabin, but ██████ stated that he needed to talk to his lawyers, and then rejected the offer. Piastunovich Decl. ¶¶ 85-92.

Plaintiffs' strategic delay in presenting their concerns to San Francisco made it exponentially harder for the City to respond to Plaintiffs' claims. If Plaintiffs had raised their concerns at the time they arose, San Francisco could have addressed them at that time, or else collected real-time rebuttal evidence while memories were fresh. For example, Plaintiffs' delay has made it impossible for San Francisco to address claims concerning SFFD Captain Hardiman, who is now on leave and is therefore

---

[1] Defendants affirmatively sought evidence of such problems through a document request that sought declarations concerning alleged non-compliance. Plaintiffs objected to the request and produced no responsive documents. Gradilla Decl., Ex. A [Pls. Resp. and Obj. to RFP 3].

1   unavailable to prepare a rebuttal declaration. Bushong Decl. ¶ 3. Prompt notice of Plaintiffs' concerns

2   would also have provided SFPD Officer Govindbhai a fair opportunity to defend his alleged actions on

3   April 21, 2023 against the criticisms leveled by Plaintiffs' declarant Calloway. Govindbhai Decl. ¶¶ 5-

4   6. But rather than addressing issues as they arose, Plaintiffs' counsel instead chose to sandbag San

5   Francisco by filing an unwieldy motion, based on months-old allegations.

6   **B.      Plaintiffs Mischaracterize The Discovery Process Thus Far.**

7          During the five months the injunction has been in effect, the parties have met and conferred

8   over the scope of periodic expedited productions of compliance documents. These meet-and-confer

9   efforts were largely successful: the parties required the Court's assistance to resolve only a single

10  dispute over the volume of CAD reports to be produced every 3 weeks. Dkts. 123, 129. Plaintiffs

11  accuse San Francisco of "consistently obstruct[ing] progress," MPA at 16, but the City's good faith

12  throughout the meet-and-confer is shown by the fact that it voluntarily agreed to many one-sided

13  discovery requests going well beyond what the Federal Rules require. *See* Emery Decl., Exs. A, B.[2]

14         Next, Plaintiffs complain San Francisco did not provide "necessary documents in discovery,"

15  MPA at 1, 3, claiming Plaintiffs "have received none of these [compliance] documents." MPA at 4.

16  This is false. While the parties met and conferred, San Francisco voluntarily provided advance notice

17  of Healthy Street Operations Center (HSOC) operations, Tenderloin Joint Field Operation (JFO)

18  operations, and several categories of the documents that were ultimately the subject of the Court's

19  May 25 discovery order. Dkt. 129. As of the date Plaintiffs filed their motion, the City had already

20  produced CAD reports, SFPD incident reports, HSH's daily shelter bed availability records, HSOC

21  pre-encampment resolution schedules and post-encampment resolution reports, department bulletins,

22  training materials, and similar documents regarding compliance with the injunction—the very types of

23  documents Plaintiffs claim they did not receive. Garcia Decl., Exs. A – BB. Plaintiffs themselves

24  acknowledge that prior to filing their motion, the City provided them with 71 SFPD incident reports

25  and 53 CAD reports. MPA at 13. And on June 15, the City produced retroactive compliance

26

27         [2] James Emery recently retired from the San Francisco City Attorney's Office, but he
    completed work on this brief, including his declaration, before retiring. The City will file a notice of
28  withdrawal of counsel for Mr. Emery forthwith.

documentation, including 44 additional SFPD incident police reports and 381 additional CAD reports from DEM. Garcia Decl. ¶ 27. Plaintiffs filed their motion before that production was even served, declaring that they had not received sufficient information through the expedited recurring discovery process. Plaintiffs' procedural complaints are baseless, and are not grounds to appoint a special master or impose further burdensome reporting obligations.

### III. LEGAL STANDARD

 "[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966) (cleaned up); *see also Spallone v. United States*, 493 U.S. 265, 276 (1990). "The party alleging civil contempt must demonstrate that the alleged contemnor violated the court's order by 'clear and convincing evidence,' not merely a preponderance of the evidence." *United Farm Workers v. U.S. Dept. of Labor*, No. 1:20-cv-01690-DAD-JLT, 2021 WL 1946696, at *2 n.2 (E.D. Cal. May 14, 2021) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993). Modification of a preliminary injunction is warranted when significant legal or factual circumstances have changed. *Sys. Fed'n No. 91, Ry. Emps. Dept., AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961); *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1098 (9th Cir. 2002) (quoting *System Federation*). "Substantial compliance with the court order is a defense to civil contempt, and is not vitiated by a few technical violations where every reasonable effort has been made to comply." *Anti Police-Terror Project v. City of Oakland*, No. 20-cv-03866-JCS, 2020 WL 6381358, at *20 (N.D. Cal. Oct. 31, 2020) (cleaned up).

Although styled as a motion to enforce the preliminary injunction, Plaintiffs' motion is effectively a motion to find the City in contempt for violating the injunction, with the requested remedy being modification of the injunction to impose additional reporting requirements on San Francisco and appointment of a special master at San Francisco's expense. MPA at 15 n.2; *see Xcentric Ventures, LLC v. Arden*, No. C 10-80058 SI, 2011 WL 806629, at *3 (N.D. Cal. Mar. 2, 2011 ("plaintiff's motion [to enforce the permanent injunction] is really a motion to find that defendants are

in contempt"). This is Plaintiffs' third request that the Court appoint a special master, and their second request to impose additional reporting obligations on San Francisco.[3]

## IV. ARGUMENT

### I.     Problems With Plaintiffs' Evidence

#### A.     Plaintiffs' Evidence Is Inadmissible.

The traditional rules of evidence apply to a Rule 53 motion to appoint a special master, and the moving party must support their request with admissible evidence, not mere hearsay or speculation. *See, e.g.*, *Mardiros v. City of Hope*, No. 2:19-cv-02196-CJC-MAA, 2020 WL 6106820 (C.D. Cal. July 9, 2020) (sustaining hearsay objections to submissions regarding appointment of special master); accord *Ceslik v. Miller Ford, Inc.,* No. 3:04CV2045 (AWT), 2006 WL 1582215, at *1 (D. Conn. June 5, 2006) ("Evidence that would not be admissible under established federal rules regarding the competency of evidence at trial may not be considered on a motion for contempt.") Plaintiffs have not presented the Court with competent evidence. Their declarations are replete with hearsay (Dkts. 130-1, 130-8, 130-9, 130-27, 130-35, 130-49, 130-52), speculate without adequate foundation (Dkts. 130-1, 130-8, 130-9, 130-24, 130-26, 130-27, 130-49, 130-51, 130-53, 130-54), assert improper legal conclusions (Dkts. 130-9, 130-23, 130-24, 130-25, 130-26, 130-28, 130-29, 130-31, 130-33, 130-34, 130-36, 130-37, 130-38, 130-39, 130-40, 130-41, 130-42, 130-43, 130-48, 130-51, 130-52), and posit unsupported opinions and arguments (Dkts. 130-1, 130-49, 130-54).[4] They are therefore inadmissible.

Plaintiffs also fail to describe the majority of the evidence on which they rely in the body of their motion. Instead, they breezily string cite to hundreds of pages of declarations and exhibits submitted with this motion and their previously filed January 6, 2023 Administrative Motion, MPA at 4-6, 7-11, suggesting that their contentions are voluminously supported, and forcing San Francisco to scour the record to rebut factual assertions from declarations absent from their motion. As just one example, declarant Henry Jones stated someone told him a City employee had taken his dog. Dkt. 130-34 ¶¶ 6-7. To rebut this incorrect (and hearsay) claim—which, if true, would not have violated the

---

[3] Plaintiffs made the same arguments in their September 27, 2022 Motion for a Preliminary Injunction and their January 6, 2023 Administrative Motion For a Status Conference. Dkts. 9, 75.

[4] San Francisco's itemized objections to Plaintiffs' evidence are at Exhibit B to the Gradilla Declaration.

preliminary injunction—San Francisco's Shelter Office Supervisor for Animal Care and Control confirms that no dogs were brought in from Jones' location on or near the date he alleged. Choy Decl. ¶¶ 5-8. Such make-work obviously pulls San Francisco away from collecting, reviewing, and producing the type of relevant discovery Plaintiffs claim they want. The Court should strike or refuse to consider any facts Plaintiffs submitted with their accompanying declarations that they did not directly present in their motion, or that are otherwise inadmissible. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (holding it is not the Court's duty "to scour the record"); *Faulkner v. Wausau Bus. Ins. Co.*, 571 F. App'x 566, 569 (9th Cir. 2014) (citation omitted) ("Judges are not like pigs, hunting for truffles buried in briefs").

**B.    Plaintiffs' Evidence Provides Inadequate Detail For San Francisco To Respond.**

Many of Plaintiffs' declarations lack sufficient information about the date or location of the alleged events for San Francisco to investigate and respond.[5] In other places, the conduct about which Plaintiffs complain is untethered to the Court's injunction.[6] Plaintiffs also significantly oversell the declarations' statements. For example, Plaintiffs' motion cites to the Calloway Declaration for the argument that "an SFPD officer ordered unhoused individuals to move along, explicitly citing sit/lie laws." MPA at 7:4-6. Yet Calloway's declaration does not state that the officer referenced the sit/lie laws in the presence of the individuals he asked to disperse. Dkt. 130-44 ¶¶ 5-7. It was only *after* those individuals had left and in response to Calloway's questions that, according to Calloway, the officer referenced sit/lie laws—negating Plaintiffs' inference that SFPD threatened enforcement of the sit/lie laws. *Id.*; Govindbhai Decl. ¶ 6. Similarly, Plaintiffs argue that an interaction at UN Plaza is evidence the City threatened unhoused individuals with enforcement of sit/lie laws, stating the officers "stomp on the ground by an individual's head to wake him up as three others assist in forcibly removing the

---

[5] *See e.g.,* Dkts. 130-42 (Myers Decl.) ¶ 7 (describing a resolution "in or around January 2023, near the beginning of the month"); 130-43 (Wise Decl.) ¶¶ 3, 6 (encounters "[a]t the beginning of February" and "in late February"); 130-53 (Moran Decl.) ¶ 3 (interaction "in late September 2022").

[6] *See* Dkts. 130-29 (Bagley-Adams Decl.) ¶ 4 (admitting City posted prior notice of resolution and not indicating any lost items); 130-31 (Hoffman Decl.) ¶¶ 6-10 (complaining City said it would hold her tent if she did not move it, that SFPD was "looking at us threateningly," and not identifying any lost property); 130-51 (Garrett Decl.) ¶¶ 4-5 (complaining a community member told him HSOC was coming and HSOC ultimately never came); 130-54 (Wilson Decl.) ¶¶ 4-5 (individual not an encampment resident said City workers said they would be performing a resolution in the future).

unhoused person from the area." MPA at 7:6-8. But the cited declaration does not show that the

officers made any threat to enforce the sit/lie laws during this interaction. Dkt. 130-1 ¶ 26. Instead, the

Park Ranger involved declared that he encountered the man passed out in a place where he knew drug

use was common, and when he attempted to wake that person to perform a welfare check, the man

responded that he was fine and was getting up, but kept losing consciousness and falling backwards.

Farkash Decl. ¶¶ 2-4. Park Rangers stomped on the ground near the individual and raised their voices

in an attempt to stop him from losing consciousness again, while helping to steady him. *Id*. at ¶¶ 4-7.

At no point was that individual cited, arrested, or threatened under any Penal Code section. *Id*. at ¶ 9.

## II.     San Francisco Is Complying With The Preliminary Injunction.

This Court has enjoined the City "from enforcing or threatening to enforce, or using California

Penal Code Section 148(a) to enforce or threaten to enforce" five laws and ordinances "to prohibit

involuntarily homeless individuals from sitting, lying, or sleeping on public property." Dkt. 65 at 48-

49. It also has enjoined the City from violating its bag and tag policy. *Id*. at 49. The City is complying

with both of these provisions. Peralta Decl. ¶¶ 11-12.[7]

### A.     Plaintiffs' Eighth Amendment Claims

#### 1.     Enforcement of Sit/Lie Laws is Not Increasing And Dispatch Data Is Not Evidence of Enforcement.

Since the Court issued its injunction, Plaintiffs have not identified a single instance of San

Francisco citing or arresting someone under any of the enjoined laws. Instead, Plaintiffs cite

aggregated police call data, incorrectly insisting that the number of calls for service indicates the

police have made prohibited arrests or citations. But regardless of their number, calls for service are

not a proxy for law enforcement action, the number of calls is in decline when more than just a few

months of data are examined, and data shows enforcement of sit/lie laws has decreased over time.

Plaintiffs argue that "[d]espite a modest decline immediately after the injunction was issued, police

---

[7] Notwithstanding Plaintiffs' baseless claims (MPA at 2-3), the City has not attempted to "evade" the injunction through its appeal or motion for clarification—both of which are protected activities that cannot be used to find the City liable of anything. *Crump v. Ahern*, No. C-12-4357 EMC (pr), 2013 WL 5487365, at *2 (N.D. Cal. Oct. 2, 2013) ("filing an appeal to a higher court . . . is protected conduct" under the First Amendment); *U.S. ex rel. Wilson, v. Maxxam*, Inc., No. C 06-7497 CW, 2009 WL 322934, at *6 (N.D. Cal. Feb. 9, 2009) ("liability generally cannot be imposed on the basis that one has exercised his or her right to petition the government").

dispatches for sit/lie enforcement are on the rise again over the last several months." MPA at 18. In so doing, Plaintiffs ignore that dispatch calls are not equivalent to increased enforcement. They also ignore the long-term decline in dispatch calls and the fact that fewer than 1% of dispatched calls result in an enforcement action. The fact that law enforcement responds to a call does not mean that they take *any* enforcement action, let alone action under any enjoined law.

Plaintiffs focus on two types of dispatch calls: 915: Homeless Related Call for Service; and 919: Person sitting/lying on a public sidewalk. Dkt. 130-1, Schroff Decl. ¶¶ 15-16. The vast majority of such calls originate with the public. Baird Decl. ¶ 10. The frequency of both types of calls has significantly declined over the past four years. Baird Decl. at Exs. A and B (919 calls down from well over 1000 to 210; 915 dropping from about 2000 to 461). Further, over the past four and a half years, there has been a large amount of month-to-month variability in both types of dispatch calls, making Plaintiffs' attempts to focus on a small slice of data inaccurate. Baird Decl. ¶ 10.

In fact, fewer than two dozen police incident reports were generated from these 915 and 919 dispatched calls between December 24, 2022 and May 22, 2023. This is because the vast majority of such calls—70%—result in the call ending with a contact, but no enforcement action being taken. Baird Decl. ¶ 10; Young Decl. ¶ 3. Another 25% resulted in officers not finding anyone when they arrived on the scene. Baird Decl. ¶ 10. Only 30 of the 915 and 919 calls analyzed by San Francisco – less than 1% of such calls – resulted in an arrest (4) or citation (26). Of these 30 calls, San Francisco was able to pull 11 incident reports, which revealed that:

- two of the four arrests, and six of the 26 citations, were for possession of drug paraphernalia in violation of Health and Safety Code Section 11364(a);
- one arrest was for outstanding warrants following a response to obstruction of the sidewalk, in violation of S.F. Police Code Section 22; and
- two citations were for obstructing the sidewalk.

Gradilla Decl. ¶¶ 6-7. This is consistent with the incidents cited by Plaintiffs, Dkts. 130-1 (Shroff Decl.) ¶ 23 and 130-4 (Ex. C), where 10 of the 11 citations were for obstructing the sidewalk, and the eleventh citation was for lodging without permission was issued by University of California Police, not San Francisco. Gradilla Decl. ¶¶ 5, 7. This small number of enforcement actions for violations of

laws *not* enjoined by the Court is not "clear and convincing evidence" that San Francisco has violated the injunction, particularly because the City has made substantial efforts to comply with the injunction. *Anti Police-Terror Project*, 2020 WL 6381358, at *20, *29 ("Although the Court finds that Defendants have committed some violations of the Injunction, these violations do not warrant a contempt order because the record indicates that Defendants have made all reasonable efforts to substantially comply.")

SFPD revised its Enforcement Bulletin consistent with the preliminary injunction and has provided all officers with the revised policy and offered further training to officers who work at HSOC resolutions. Young Decl. ¶ 4. The data shows the revised policy and training are working.

**2.      HSOC Resolutions.**

HSOC conducts resolutions primarily to connect persons in encampments with the wide array of City supportive services, including offers of shelter. HSOC resolutions typically begin about a half hour to forty-five minutes before outreach workers receive the daily shelter allocation, giving them time to find out who at the encampment is interested in shelter.[8] Berger Decl. ¶ 17. The resolution team begins their outreach work at about 8:00 am, but incident commanders typically arrive around 7:30 am to survey and photograph the site, to flag any potential dangers or issues for the rest of the team. Berger Decl. ¶ 6; Delise Decl. ¶ 5. The first goal of outreach workers is to find out who at the encampment is interested in shelter, so that they can efficiently make placements once they receive the day's shelter allocations. Berger Decl. ¶¶ 14-17; Delise Decl. ¶¶ 7, 16. This enables the HOT team to triage appropriate placements based on people's interest. Although some encampment residents are interested in shelter, others already have shelter beds, or are not interested in shelter. Berger Decl. ¶ 16; Delise Decl. ¶¶ 7, 11.

---

[8] JFO resolutions are conducted in a similar fashion to HSOC resolutions, with the biggest difference being that JFO resolutions are geographically limited to the Tenderloin and immediately adjoining areas. *See generally* O'Donnell Decl. JFO resolutions are therefore not discussed separately.

In addition to offering to connect people to shelter, encampment residents are asked to move temporarily for cleaning because of the health hazards that encampments create. Berger Decl. ¶ 21; Delise Decl. ¶¶ 7, 12. Common health hazards at an encampment include uncovered buckets of feces and urine, rotting food and drink, used needles, and blood. Berger Decl. ¶ 18, 23; Delise Decl. ¶¶ 14-15. Beyond these obvious health hazards, encampments create a large amount of garbage, which HSOC attempts to gather and dispose of. Dilworth Decl. ¶¶ 14-16. In addition to these public health problems, there are also frequently a number of other safety concerns at encampments, such as open flames or live electrical wires spliced into light poles. Berger Decl. ¶ 18.

Finally, HSOC sometimes requires people to move so that paths of travel are not unlawfully blocked to people experiencing disabilities. Berger Decl. ¶ 21; It is important that the City have a minimum of four feet of unobstructed space. Encampment residents do not always cooperate with this directive, and sometimes HSOC's SFPD officers need to participate to ensure the City's rights of way are accessible to those with disabilities. Berger Decl. ¶ 26;

### 3. SFPD Presence At HSOC Resolutions Serves A Legitimate Purpose.

Plaintiffs suggest that the mere presence of SFPD officers at resolutions is threatening and violates the injunction. This is wrong for three reasons. First, SFPD officers are present not to threaten, but to protect the safety of everyone involved and de-escalate tensions that might arise. Delise Decl. ¶ 20; Berger Decl. ¶ 28; Young Decl. ¶ 5. Second, the "threats" the injunction prohibits are narrow. SFPD officers cannot threaten to enforce three sections of the California Penal Code and two sections of the SF Police Code. Dkt. 65 at 50. Plaintiffs would expand the injunction to forbid any conduct *perceived* as threatening, without tying the alleged threats to the specific statutory provisions in the Court's order. Third, law enforcement is sometimes needed for reasons unrelated to the enjoined laws. Additionally, the mere presence of police does not constitute a threat. *See, e.g.*, *United States v. Kelley*, 594 F.3d 1010, 1013 (8th Cir. 2010) ("the mere presence of several police cars and four officers" insufficient to negate voluntariness of consent to search home); *United States v. Rodriguez-Preciado*,

399 F.3d 1118, 1128 (9th Cir. 2005) (rejecting argument that "mere presence of officers" rendered *Miranda* waiver involuntary).

SFPD must be present at resolutions primarily to protect the safety of San Francisco's outreach workers, who have no law enforcement training and carry no weapons. Dilworth Decl. ¶ 25; Shehadeh Decl. ¶ 23; Dodge Decl. ¶¶ 9-10; Young Decl. ¶ 5. SFPD officers have observed people in crisis who have been aggressive towards outreach workers. Young Decl. ¶ 5. Outreach workers have been physically threatened, and on at least one occasion physically battered, by encampment residents. Young Decl. ¶ 5. During resolutions, SFPD has encountered hand guns, air powered guns, machetes, samurai swords, kitchen knives, brass knuckles, dirks, daggers, foldable pocket knives, metal pipes, and axes. Young Decl. ¶ 5. These weapons, combined with a vulnerable population of people often experiencing drug addiction and mental crisis, can pose a severe threat to the safety of civilian outreach workers. Dilworth Decl. ¶ 28, Ex. D; Dodge Decl., ¶¶ 9-10. Without a police presence, City workers have been assaulted by unhoused persons. Dilworth Decl. ¶ 27, Ex. C.

In addition to protecting City workers, SFPD officers sometimes perform a more traditional law enforcement role. Individuals with open felony warrants are sometimes present at resolutions, and SFPD is required to book individuals who have an outstanding warrant. Young Decl. ¶ 5. This Court's injunction did not impact that obligation. The majority of laws are not impacted by the injunction, and SFPD must still act to protect the community when encampment residents violate the law. Individuals at encampments regularly violate laws such as the prohibition against blocking the sidewalk to pedestrian access. Young Decl. ¶ 5. Although SFPD tries to gain voluntarily compliance, people who refuse to cooperate sometimes may need to be cited or arrested. Young Decl. ¶ 5.

Sensitive circumstances at an encampment involving minors may also require SFPD intervention. As just one example, on April 6, 2023, SFPD encountered an unhoused individual named Troy Hawthorne, who had a minor living with him who he claimed was his son. Peralta Decl. ¶ 4. Hawthorne asked that he be sheltered with this minor, but SFPD officers determined that the minor was not related to Hawthorne and was a ward of a state who had run away from a group home. Peralta Decl. ¶¶ 6, 8. SFPD was able to coordinate with Child Protective Services, and authorities in the

relevant state, to get the minor off the street and back to his group home. Peralta Decl. ¶ 9. Had SFPD

not been present to interview the minor, he would likely still be on San Francisco's streets.[9]

### 4.   San Francisco May Request Individuals Move During Street Cleaning.

The City continues to serve its residents by cleaning in and around encampments to address

health and safety issues and ensure an ADA-compliant path of travel in the public right of way. Dodge

Decl. ¶ 4. This is done not only through HSOC resolutions but through JFO operations, which are

interagency efforts to offer wellness checks, referrals to substance use programs and medical and

mental health care resources to unhoused individuals, as well as perform street cleaning, in the

Tenderloin. *See* Mazza Decl. ¶¶ 3, 4. Encampment residents are not told they cannot return. *See*

Morales Decl. ¶ 6; Rincon Decl. ¶ 6; Mazza Decl. ¶ 6; Berger Decl. ¶ 21. Plaintiffs claim that

"Defendants show no indication that their requests to move are temporary or voluntary," MPA at 7:28-

8:1, but tents frequently remain in areas of the operations at issue. Lei Ex. A.  Plaintiffs' own

declarations support this. See Dkts. 130-41 (Garcia Decl.) ¶ 4 ("The police say move . . . Then we

move back after they leave."); 130-36 (Barkley Decl.) ¶¶ 2-3 (stating City performed resolutions 20

times in the past two and a half years while he was lived at the same location); 130-42 (Myers Decl.)

¶¶ 3-4 (live "around O'Farrell Street and Jones Street" and have been subject to resolutions

"approximately 50 times in the last year. The City comes by every week to tell me to move.").

Plaintiffs' declarations are conspicuously silent on whether they could return to the area subject to

cleaning, because they could.[10] For example, Donovan Harding complains that he was asked to move

---

[9] This is not the only time SFPD has found Hawthorne in the company of a minor male. At a recent HSOC resolution SFPD again found a minor, who appeared to be under the influence of opiates, living with Hawthorne in his tent. Peralta Decl. ¶ 10.

[10] Many declarants admit that they were told to move, not that they were told they could never return under threat of the enjoined code sections. *See* Dkts. 130-23 (Supp. Murdock Decl.) ¶ 6 ("When the City arrived, they told me I would have to move . . . . There was no indication that this was a temporary or voluntary request."); 130-24 (Adams Decl.) ¶ 4 ("the City showed up and told us that we would have to move from Leavenworth Street" without any indication it was permanent); 130-25 (Harding Decl.) ¶ 3 ("City workers came by the area where I camp—along with around 20 other people—and told me that I would have to move" without any indication it was permanent); 130-26 (Melendez Decl.) ¶ 8 (stating they were told "I would have to move," without any indication it was permanent); 130-28 (Berger Decl.) ¶¶ 5-6 (stating they were told to move, but no indication that it was permanent); 130-29 (Bagley-Adams Decl.) ¶¶ 4-5 ("I asked the City workers why they could force us to move. I told them that I thought they could not force us to move because there was an active court case. The City worker I told this to just shrugged and said that we would have to move so that they

on January 23, 2023. Dkt. 130-25 ¶¶ 3-6. He does not contend the move was anything but temporary. *See id*. This is because it was in fact temporary—the people at the encampment re-erected their tents shortly after street cleaning. *See* Mazza Decl. ¶¶ 8, 9 & Ex. D (photograph showing tents remaining on sidewalk).[11] The evidence, including the declarants' awareness of the preliminary injunction, shows that people living in encampments understand that they are being asked to move so DPW can clean the area, and that once the cleaning is over, they are free to return.

The injunction does not prevent San Francisco from asking people to move. Nor does it require the City to affirmatively state that people can refuse the request to temporarily move for cleaning—a requirement that would exceed what police must say in other encounters with the public. *See United States v. Drayton*, 536 U.S. 194, 206 (2002) (collecting Supreme Court cases holding officers are not required to tell a defendant he has the right to refuse consent to search); *United States v. Vongxay*, 594 F.3d 1111, 1120 n.6 (9th Cir. 2010) ("An officer is not required to inform the person being searched that he has a right to refuse. . . ."). Plaintiffs' complaints about being told to relocate show no violation of the injunction.

**5.      San Francisco Voluntarily Makes Offers Of Shelter.**

Plaintiffs' complaints about how San Francisco makes offers of shelter to persons experiencing homelessness are also irrelevant. The injunction does not require San Francisco to make offers of shelter to *anyone*, unless or until San Francisco threatens to enforce its sit/lie laws against them. As explained above, San Francisco has complied.

---

could clean the street."); 130-31 (Hoffman Decl.) ¶ 4 (stating City employees "came by my tent and told me that I would have to move in two days so that they could clean the sidewalk. They did not say what would happen if I did not move."); 130-35 (Second Supp. Donohoe Decl.) ¶ 5 ("He told us that we would have to move and leave the area" with no indication that it was permanent); 130-37 (Draper Decl.) ¶ 6 ("They told me that I would have to move off the block for street cleaning and a big event" without any indication the request was permanent); 130-39 (Erickson Decl.) ¶ 11 ("Approximately one week ago, someone came by and told me verbally that the City would be coming in a few days and that we would have to move," without any indication the request was permanent); 130-54 (Wilson Decl.) ¶ 5 (stating he overheard City employees telling people to move, with no indication the request was permanent).

[11] Rather than identify any violation of the injunction, Harding instead complains that a porta-potty was tipped over and leaked urine and feces onto other people's property. But that allegation too is specious. *See* Mazza Decl. ¶¶ 8, 9 & Ex. D (photograph showing porta-potty upright next to re-erected tents).

That said, San Francisco does voluntarily make offers of shelter as part of its compassionate and comprehensive homelessness outreach efforts. Shelter is routinely offered. Delise Decl. ¶¶ 7, 11; Berger Decl. ¶ 17; Morales Decl. ¶¶ 3-6; Rincon Decl. ¶¶ 3-6. Since the injunction was entered in December, HSOC placed 957 formerly unhoused persons into shelters, hotels, and other forms of housing. It did so through 233 operations – meaning that on average, each operation resulted in more than four persons being offered and accepting housing. Dodge Decl. ¶ 5.

Plaintiffs' declarants' assertions that there were individuals who were not "offered shelter" at a resolution are misleading. HSOC assesses everyone it engages at a resolution for interest in shelter. *See* Morales Decl. ¶¶ 3-6, 11, 13, 15, 17, 20, 22, 24, 26, 31, 33, 35, 39; Rincon Decl. ¶¶ 3-6, 8, 10, 13, 14, 16-23. Everyone who is not already sheltered and is interested in shelter is offered a specific shelter placement. *See id.* HSOC makes every effort to offer shelter that meets clients' needs. *See, e.g.*, Rincon Decl. ¶ 11 (offering lower bunk on ground floor to address unspecified "medical condition"). Some individuals, however, leave the encampment before HSOC can engage them to even ask if they are interested in shelter. Morales Decl. ¶ 4; Rincon Decl. ¶ 4. Many others refuse to provide their name or information to HSOC, preventing the City from placing them in shelter. *Id*. Many clients who express interest in shelter are only willing to accept certain preferred shelters, and decline shelter when their preferred option is not available. *See* Morales Decl. ¶ 5; Rincon Decl. ¶ 5. And many individuals are simply not interested in any shelter at all, rejecting the City's initial assessment of interest. *See* Morales Decl. ¶¶ 3-6; Rincon Decl. ¶¶ 3-6. Others are already sheltered. *See id.* While these individuals may not have received a literal offer of shelter, that is only because they said they were not interested in shelter. It would be unreasonable to force San Francisco to offer shelter to someone who has just minutes before told the City they were not interested in it. Finally, in other circumstances individuals who receive concrete specific offers of shelter reject them, as Plaintiff ███████ did, responding that he would first need to talk to his lawyers, before returning to reject the offer. Piastunovich Decl. ¶¶ 85-92.

The HSOC resolutions referenced in Plaintiffs' declarations bear this out. *See* Piastunovich Decl. ¶¶ 5-83 & Exs. A-K, M, O-T (showing numbers of clients engaged, refused to provide information, were already sheltered, were not interested in shelter or rejected an offer of shelter, or

were referred and transported to shelter at HSOC resolutions identified by Plaintiffs' declarants). For example, Maurice Moran complains about a resolution on January 10, 2023 at Mission and 7th Streets. *See* Dkt. 130-53. ██████ was one of two clients engaged at that resolution, and was already sheltered at MSC South. Piastunovich Decl. ¶¶ 7, 8 & Ex. A; Rincon Decl. ¶ 9. The other client engaged was referred and transported to a navigation center. *Id.* Similarly, at the January 17, 2023 resolution at 15th and 16th and Mission Streets referenced by Jezzeille Murdock (Dkt. 130-23), HSOC engaged nine clients, including ██████, and as a result, was able to place six clients in shelter. Piastunovich Decl. ¶¶ 11, 12; Rincon Decl. ¶ 11. One client refused to provide their information to HSOC, while two others, including ██████, were not interested in shelter or rejected available shelter offered to them. Piastunovich Decl. ¶¶ 11, 12. Ms. Murdock admits she was offered shelter. Dkt. 130-23 ¶ 10. HSOC offered ████████████████████████████████████████ ███████████████████████████████████████████ Rincon Decl. ¶ 11.

Plaintiffs' declarations thus tell a partial and misleading story, and ask the Court to draw unwarranted conclusions based on the declarants' limited perspective, knowledge, and recollection of what occurred. For example, Joshua Donohoe contends that he only saw two people transported to shelter at the January 31, 2023 resolution at Willow Street between Polk Street and Van Ness Avenue. Dkt. 130-27 ¶¶ 7-9. But 12 clients were referred and transported to shelter that day. Piastunovich Decl. ¶ 15 & Ex. C. And in any event, the number of clients who accept an offer of shelter says little about whether HSOC assessed everyone for interest in shelter and made offers to those interested (which it did), given data showing how many people refuse offers of shelter. On the day Mr. Donohoe mentions, six clients refused to provide their information to HSOC, 14 disclaimed any interest in shelter or rejected an offer of shelter, three were referred to shelter but changed their mind before they could be transported, and two were already sheltered. Piastunovich Decl. ¶ 15 & Ex. C. Coalition volunteer Waltier asserts that two people were not offered shelter at the March 30, 2023 resolution around Fern Street, Polk Street, and Larkin Street. Dkt. 130-49 ¶ 10. But those two people were not "offered shelter" because one of them refused to provide their information to HSOC, thereby disclaiming any interest in shelter, and the other person was already sheltered at 711 Post. Piastunovich Decl. ¶¶ 61, 62 & Ex. O.

Plaintiffs also appear to suggest that SFHOT was not present at the February 16, 2023 resolution at or near 14th Street and Stevenson Street and Woodward Street, and did not engage declarant Noah Van Harin. Dkt. 130-40 ¶ 5. But SFHOT was present (Morales Decl. ¶ 24; Rincon Decl. ¶ 16; *see also* Piastunovich Decl. ¶¶ 39, 40 & Ex. H), and engaged ███████, who either disclaimed any interest in shelter or rejected the shelter offered. Piastunovich Decl. ¶ 40 & Ex. H. Corey Barkeley similarly alleges that on an unspecified date in February 2023, SFPD and DPW showed up at his tent at Masonic Street and Geary Boulevard, without SFHOT, and asked him to move. Dkt. 130-36 ¶¶ 8-9. But there was an HSOC resolution at that location on February 21, 2023. Piastunovich Decl. ¶¶ 43, 44 & Ex. I. And SFHOT was there. *See* Morales Decl. ¶ 26.

Even Plaintiffs' declarations supposedly showing that the City does not offer shelter are disingenuous. For example, declarant Barkley admits that the City asked him he if "wanted to go inside," on March 23, 2023, claiming this was not an offer of shelter because he "did not know what [that] meant," Dkt. 130-36 ¶ 12, yet in the very next paragraph he admits that the City previously used the same language to make him what he understood was an offer of shelter—asking him "do you want to go inside," which was an offer he accepted, leading him to be taken to a navigation center. *Id*. at ¶ 13. The ACLU's own investigator tries to make the same argument—admitting the City has asked people "Do you want to go inside," but faulting the City employees "for not say[ing] more than that or explain[ing] what [they] meant by the question." Dkt. 130-9 (Verner Crist Decl.) ¶¶ 96, 113. This kind of stretch shows the unreasonableness of Plaintiffs' complaints. Indeed, some declarants admit they were given offers of shelter, but declined them or never followed through on them. Dkts. 130-42 (Myers Decl.) ¶ 11 (acknowledging HOT team offered shelter for single individuals, but declined because they wanted to be housed with girlfriend); 130-53 (Moran Decl.) ¶ 6 (declined offer of congregate shelter); 130-26 (Melendez Decl.) ¶ 9 (admitting they have "a housing referral for a place on Howard Street"). HSH data shows that ███████████ have been offered shelter, most of them on multiple occasions, since December 2022, and many of them have been or are sheltered or housed by the City. Locher Decl. ¶¶ 5-6.

6.      **Requiring A 48" Opening On Sidewalks Complies With The Injunction.**

Surprisingly, Plaintiffs assert that San Francisco has invented "non-existent" disability access laws to enforce at encampments. MPA at 11-12.[12] To the contrary, San Francisco is obligated under federal and state law to ensure access.  State law establishes the City's obligation to maintain a 48-inch-wide path of travel on public sidewalks. Cal. Code Regs. tit. 24, § 1113A.1.1 (2022). The federal Proposed Right of Way Accessibility Guidelines mirror California's 48-inch width requirement. *See* PROWAG R302.3.[13] And the ADA requires San Francisco to maintain the accessible features of public facilities. 28 CFR § 35.133(a) (2011).  In addition to its affirmative obligation to maintain an accessible path on its public sidewalks, the City has the discretionary authority to enforce existing laws prohibiting obstruction of public sidewalks. *See, e.g.*, Cal. Penal Code § 647c (prohibiting willful obstruction of free movement on streets and sidewalks)[14]; S.F. Police Code §§ 22-24 (prohibiting willful and substantial obstruction of free passage on streets and sidewalks).[15]

San Francisco's policy and actions to maintain a 48-inch-wide clear path of travel on its public sidewalks promote public welfare, fulfill San Francisco's obligations under state and federal disability laws, and are consistent with its obligations under the injunction.

B.      **Plaintiffs' Fourth Amendment Claims**

DPW's role at an HSOC resolution is primarily to remove debris and clean sidewalks and roadways. Dilworth Decl. ¶ 9. They do this after other agencies offer services and temporary shelter. *Id*. DPW does not begin cleaning inside the encampment until HSOC gives the go-ahead. Dilworth

---

[12] Had the ACLU's Northern California Chapter, who signed on to Plaintiffs' brief, consulted with the National Director of the ACLU's Disability Rights Program, counsel would have learned that municipalities in California indeed have a duty to maintain a 48-inch-wide path of travel in the public right of way, and the ACLU's National Disability Rights Director played a key role in establishing San Francisco's policies to ensure disability access. See https://www.aclu.org/bio/susan-mizner (last visited June 27, 2023) ("Prior to joining the ACLU, [ACLU Director] served for nine years as Director of the San Francisco Mayor's Office on Disability, directing the City's ADA Self-Evaluation and Transition Plan and working with the Mayor, Board of Supervisors, community organizations, and local citizens on disability rights issues.")

[13] https://www.access-board.gov/prowag/chapter-r3-technical-requirements/

[14] The injunction did not restrict San Francisco's authority to enforce § 647c, because it is "directed at conduct beyond sitting, lying or sleeping outside." Dkt. 65 at 48 n.19.

[15] Police Code §§ 25-27 prohibit "enter[ing] upon" or "wilfully remain[ing] upon" "private property or business premises" after being notified to "leave," "keep off," or "keep away."

Decl. ¶ 14. However, while waiting for outreach efforts at the beginning of the resolution, DPW workers may clean around the perimeter of the encampment. Dilworth Decl. ¶ 15. The evidence shows DPW performs its role at encampment resolutions consistent with policy.

Plaintiffs' complaints about DPW's work are based on a misreading of the bag and tag policy as well as allegations about DPW's conduct that are inconsistent with what the injunction prohibits.

### 1.   San Francisco's Bag and Tag Policy.

San Francisco's bag and tag policy is lawful. Dkt. 65 at 42; Dilworth Decl. ¶ 17, Ex. A. Many of Plaintiffs' property complaints simply misunderstand what the policy does and does not require, centering around three topics: (1) how much time should be provided for individuals to move their items; (2) what items are discardable; and (3) whether DPW has an obligation to bag and tag property.

DPW employees are familiar with the policy, take the Court's injunction seriously, and work hard to ensure they understand and comply with the policy. Dilworth Decl. ¶¶ 36, 39; Shehadeh Decl. ¶ 26. Staff received training on the bag and tag policy and supervisors regularly bring up the policy during "tailgate" meetings at the beginning of shifts. Dilworth Decl. ¶ 17, Ex. A; Shehadeh Decl. ¶¶ 21-22. Supervisors encourage their team to ask questions if they are unsure how to apply the policy in a specific situation and supervisors provide guidance on compliance. Dilworth Decl. ¶ 39.

### a.   The Amount of Time Provided.

Many declarants complain about being asked to move, MPA at 5-6, but San Francisco can ask people to move consistent with the injunction. All the injunction prohibits is using or threatening to use the five enjoined code sections as a method to coerce people into moving. Others complain about the amount of time they had to move their belongings at a resolution, MPA at 10, but do not actually show a violation of the policy. The policy provides that "[i]n the case of regular encampment cleaning" or "routine cleaning operations (i.e, where individuals are allowed to return to a location following cleaning and there is no permanent removal)," the City is only required to provide "a reasonable amount of time (approximately 30 minutes")" for individuals "to collect their belongings out of the public right of way, taking into account any special needs that individuals may have and the volume of belongings." Dilworth Decl. ¶ 17, Ex. A.

In practice, individuals typically receive much longer to move their belongings. Dilworth Decl. ¶ 12. City workers and individuals moving their belongings discuss how much time is needed to pack and move under the circumstances. Berger Decl. ¶ 22; Delise Decl. ¶ 13. The City posted advanced notice of HSOC resolutions 72-hours before they occurred.[16] Delise Decl. ¶ 10. Those living at the encampments had days to move their property. While some declarants state they personally did not see the notices, that does not mean the notices were not there. San Francisco has no obligation to ensure every encampment resident pays attention to the notices the City posts.

Even declarants who stated they did not see a posted notice admit they received the required 30 minutes to move their items. Dkts. 130-26 (Melendez Decl.) ¶¶ 3-7 (learned of resolution at 9 am, at 9:30 received shelter offer, and DPW began to arrive in the next 30 minutes);130-29 (Bagley-Adams Decl.) ¶¶ 6-7 (City arrived at 7 am and told people to move at 8 am); 130-31 (Hoffman Decl.) ¶¶ 7-10 (City arrived at 7 am and declarant still moving her items at 9 am); 130-36 (Barkley Decl.) ¶ 8 (DPW told him he would have to move within the next hour); 130-40 (Van Harin Decl.) ¶¶ 4-6 (SFPD told him about engagement one hour before it started and then DPW gave an additional 30 minutes to move); 130-42 (Myers Decl.) ¶¶ 12-13 (notified of resolution at 8 am and DPW returned at 10 am).

### b.    Discardable Items.

San Francisco does not intentionally destroy items that are not discardable under the bag and tag policy. Berger Decl. ¶ 23. The policy permits DPW to discard five categories of items: (1) items that present an immediate health risk, such as needles, scissors, knives, chemicals, items soiled by infectious materials such as human waste, mold, or mildew, and items infested by rodents or insects; (2) perishable items including food; (3) contraband or illegal items; (4) trash, garbage, and debris, including broken appliances and furniture; and (5) abandoned property, which includes "property that does not have any signs of ownership or does not appear to have any value or use," including "a

---

[16] Plaintiffs' Motion includes two photographs of signs attached to fence area describing the area as a "NO LODGING ZONE." Dkts. 130-22, 130-50. Such signs were commonly used prior to 2021, when they were put up by property owners or put up by City workers at the property owner's request. Dodge Decl. ¶ 7. These signs are not commonly used now, and the signs Plaintiffs cite were likely put up before Covid-19 because they state "If you need shelter . . . please contact 311," and the City ceased using the 311 system as a means for unhoused persons to obtain shelter very early in the pandemic. *Id.*

broken tent sitting by itself on a sidewalk with no other belongings, clothes that are strewn across a sidewalk or other area, broken items and trash." Dilworth Decl. ¶ 17, Ex. A [Section 3]. DPW workers do find these kinds of discardable items while on the job. Shehadeh Decl. ¶ 12. When DPW encounters items "co-mingled or littered with needles, human waste or other health risks," they "are not required to sort through and attempt to remove the health or safety risks," and may instead "dispose of the entire pile of belongings" without bagging and tagging any items from the pile. *Id.*

Many of Plaintiffs' declarants complain about DPW discarding their property. But such complaints do not establish that the items seized were free of mold or mildew, were not soiled with human fluids or waste, were not co-mingled with items that DPW properly discarded, or were otherwise salvageable. Without this information, declarants have not shown that the items about which they complain were not properly discarded. *See Shipp v. Schaaf*, 379 F. Supp. 3d 1033, 1038 (N.D. Cal. 2019) (holding "[i]t is not sufficient to state . . . that the City sometimes removed and destroyed encampment members' property" because "[s]ometimes the City has the right to do this" and finding declarations failed to establish improper destruction of property where they "do not provide any specific details from which the Court can infer that the discarded items should have been stored instead."); *see also Sullivan v. City of Berkeley*, 383 F. Supp. 3d 976, 984-85 (N.D. Cal. 2019) (finding an "objectively reasonable basis to believe that the property left behind . . . was wholly abandoned rather than temporarily unattended" where there was "prior notice" that "informed that they should take what they wanted to keep and could leave behind any trash for disposal").

The reality is that many items at encampment resolutions are discardable under the bag and tag policy. Dilworth Decl. ¶ 23; Berger Decl. ¶¶ 18, 23 & Exs. A-D, F. That can include entire tents, either because the tent smells of urine or because the inside of the tent contains visible human waste or dangerous or hazardous items such as fentanyl. *Id.* For example, Maurice Moran and investigator Verner-Crist take issue with the City's disposal of an abandoned tent on March 3, 2023. Dkts. 130-9 (Verner-Crist Decl.) ¶¶ 84-88; 130-53 (Moran Decl.) ¶¶ 6-8. But that tent was soiled with feces and contained hypodermic needles. Berger Decl. ¶¶ 40, 41 & Ex. F. DPW employees are not expected to sift item by item through the contents of a tent containing dangerous or hazardous materials. Dilworth Decl. ¶ 23. Where a tent is itself discardable, DPW employees have sought to save whatever items

they could by bagging and tagging. Exhibit B to Darryl Dilworth's declaration, for example, shows photographs of a scene he encountered shortly after the injunction, where a tent smelled of feces and was filled with debris and open, perishable food. Dilworth Decl. ¶ 24, Ex. B. While the tent itself needed to be discarded, he was able to remove and bag and tag three suitcases to bring to the DPW Yard, after filling out the appropriate paperwork and posting a notice. *Id*.

DPW also proactively hands out large black trash bags for encampment residents to use to discard whatever trash or debris they want DPW to remove, which often equals more than a dozen bags from a single resolution. Dilworth Decl. ¶ 16. Unhoused individuals have requested DPW discard tents as part of this process, typically when the owner has obtained a newer tent. Shehadeh Decl. ¶ 12.

### c.      Bagging and Tagging.

Unsoiled tents are bagged and tagged if the owner is not present. Dilworth Decl. ¶ 23. Bagging and tagging at HSOC resolutions occurs a few times a month. Berger Decl. ¶ 23; Delise Decl. ¶ 14. There is no requirement that it occur more frequently. It is not surprising that there is no need to bag and tag many items at an encampment because, as described above, individuals have sufficient time to move their belongings before the resolution begins. *Cf. Sullivan,* 383 F. Supp. 3d at 987 (finding the absence of corresponding property storage forms for each noticed encampment removal "could very well demonstrate the effectiveness of the notices rather than the City's failure to store property" because "[t]he whole point of providing homeless residents with notice is to give them an opportunity to remove their belongings and avoid its collection and storage by the City"). After individuals have moved their property from a resolution, DPW can either bag and tag or clean around non-discardable items that remain. Dilworth Decl. ¶ 21; Shehadeh Decl. ¶ 19. Although Plaintiffs complain about the frequency with which DPW bags and tags items, there is no requirement that they do so, unless the items are not discardable and DPW chooses to remove them in order to complete a cleaning. Dilworth Decl. ¶ 17, Ex. A. Plaintiffs have not shown that the City's bag and tag logs evidence any violation of the injunction. And Plaintiffs raise no complaints about circumstances where DPW does bag and tag property, because DPW does so in accordance with the policy's notice requirements. Dilworth Decl. ¶ 22; Shehadeh Decl. ¶ 20.

### 2.      Removing Items From DPW Trucks.

Items DPW collects at a resolution are put into a City vehicle for transport—typically either a flatbed truck or a crusher. Dilworth Decl. ¶ 30. Several declarants complain that after their items were put into the truck or crusher, DPW employees refused to let them get into the truck to pull out items, but that is not a violation of the bag and tag policy. Once items are placed into a DPW flatbed truck or crusher DPW cannot allow someone living at the encampment to jump in or reach into the vehicle, due to safety and liability concerns. Dilworth Decl. ¶ 31; Shehadeh Decl. ¶ 14.

Where the items themselves are easily accessible, DPW workers have taken items off the truck and given them back to the individual. Berger Decl. ¶ 30; Delise Decl. ¶ 15. But because the trucks carry away things that are discardable under the bag and tag policy, such as items soiled with human waste, perishable food, or other hazardous materials, sometimes the item in question is buried under other items that are clear health hazards, such that the item requested is itself soiled. *Id*. It would be a health hazard to take such items off the truck or out of the crusher. *Id*. There are also safety concerns with asking DPW employees to go into the back of the truck themselves to dig through items that were discarded because they pose a health or safety concern. Berger Decl. ¶ 30.

### 3.      San Francisco Posts Adequate Notice Of Its Resolutions.

Encampments receive advance notice of HSOC resolutions. Each weekend, typically on Saturdays, SFHOT outreach workers conduct outreach at the encampments scheduled for a resolution during the following week. *See e.g.,* Morales Decl. ¶ 8; Berger Decl. 13. SFHOT outreach workers give the encampment verbal notice of the upcoming HSOC resolution, assess them for housing and interest in shelter or other services, explain what to expect on the day of the resolution, and post written notices of the upcoming resolutions in and around the encampment. *See, e.g.*, Morales Decl. ¶ 8; *see also* Piastunovich Ex. U. In addition, the City has been providing Plaintiffs' counsel with notice of HSOC resolutions since October 2022. Garcia Decl. ¶ 9. Plaintiffs' declarants' assertions that they personally did not see the written notices are beside the point. Plaintiffs' declarations generally confirm HSOC provides advance written notice of HSOC resolutions. *See, e.g*., Dkts. 130-9 (Verner-Crist Decl.) ¶ 61; 130-17 (Verner-Crist Ex. H); 130-33 (Harding Supp. Decl.) ¶ 3 (admitting he "saw" a notice on February 7 for a resolution on February 9). The City has no control over what happens to

the written notices after they are posted. *See, e.g.*, Delise Decl. ¶ 10; Berger Decl. 13. That a declarant

did not see a notice posted does not show that no notice was, in fact, posted. *Compare* Dkt. 130-49

(Waltier Decl.) ¶ 8 (alleging she "did not observe any posted notice" for the February 28, 2023

resolution), *with* Piastunovich Ex. U at 14 (photograph of notice for February 28, 2023 resolution).

After the injunction was issued, HSOC re-wrote its written notices to expressly state that

"After the area is cleaned you may return to the area so long as you do not block the public right of

way." Morales Decl. ¶ 8 & Ex. A; *see also* Piastunovich Ex. U at 16 (posted notice for March 30, 2023

HSOC resolution). Following Plaintiffs' complaints that an old version of the written notice was used,

SFHOT looked into the issue and confirmed that the wrong notice was unintentionally used in certain

instances by mistake. Morales Decl. ¶ 8. SFHOT has since addressed the issue to ensure that the

revised notice is used going forward. *Id.; Anti Police Terror Project*, 2020 WL 6381358, at *20, *29

("Although the Court finds that Defendants have committed some violations of the Injunction, these

violations do not warrant a contempt order because the record indicates that Defendants have made all

reasonable efforts to substantially comply.").[17] Jezzeille Murdock also alleges HSOC conducted a

resolution on January 17, 2023 even though she was given written notice that the resolution would not

occur until Friday, January 20, 2023. Dkt. 130-23 ¶¶ 4-6. The allegation is without merit. The written

notice for the resolution at Mission Street between 15th Street and 16th Street, however, clearly

indicated it would occur on January 17, 2023. Piastunovich Ex. U at 3.

### C.    Plaintiffs' Claims Are Untethered From The Injunction.

Plaintiffs wrongly suggest that multiple HSOC resolutions at or around the same locations

constitute harassment. Resolution sites are not randomly chosen. DEM, along with other partners

across the City, take a data-driven approach to target the City's finite resources to connect clients to

services in the most needed areas. Dodge Decl. ¶ 6; Wong Decl. ¶ 4. They develop the resolution

schedule using information from a Citywide census of homeless encampments that HSOC performs

---

[17] The old notices do not violate the injunction. They request that "Once the encampment has
been resolved, please do not return to this area," but do not threaten to enforce any of the enjoined
code sections. Rather, they "note that [SFPD] may be present during the resolution. They will focus on
ensuring safety during the operation. They may enforce San Francisco and California laws as needed."
Plaintiffs have not identified any citation or arrest under any of the enjoined laws post-injunction.

every three months, based on the size and density of particular encampments; the volume and nature of public complaints; and information gathered from repeated visits to particular encampments. Dodge Decl. ¶ 6; Wong Decl. ¶ 4. That some locations have had multiple resolutions shows that encampment residents understand they can and do and return after DPW finishes cleaning the right of way.

Plaintiffs speculate the City acts differently when observers from the ACLU or the Coalition are present, but City employees have repeatedly confirmed that they do not act differently when, as is often the case, there are observers present; that supervisors do not instruct their employees to act differently when observers are present; and that supervisors have never observed their staff acting differently when observers are present. Dilworth Decl. ¶¶ 32-34; Shehadeh Decl. ¶¶ 24-25; Mazza Decl. ¶ 6; Morales Decl. ¶ 7; Rincon Decl. ¶ 7; Berger Decl. ¶ 33; Delise Decl. ¶ 19; Peralta Decl. ¶ 13.; Young Decl. ¶ 7. And Plaintiffs' spurious allegation that DPW workers leave HSOC resolutions when observers are present likely has a simple explanation. The Hot Spots Team, the DPW crew that works at HSOC resolutions, works on shifts that start at 4:00 am and typically end at noon. Dilworth Decl. ¶ 35. HSOC resolutions are not the Hot Spots Team's only responsibility. Dilworth Decl. ¶ 8. When the pace of a resolution suggests that workers may not be able to complete their work at the resolution before the end of their shift, a Hot Spots Team supervisor instructs the team to leave the resolution, and instead an afternoon DPW crew comes by a few hours later on the next shift to complete the clean-up. *Id.* As DPW Supervisor Darryl Dilworth explained, this has nothing to do with the presence or absence of observers at the resolution. *Id.*

### III. A Special Master Is Not Warranted, There Is No Basis To Require San Francisco To Pay For One Against Its Wishes, And Periodic Reports Are Unwarranted.

This is Plaintiffs' third request for the Court to appoint a special master. Plaintiffs made unsuccessful requests as part of their motion for a preliminary injunction, and raised the issue again unsuccessfully in their January Administrative Motion. Dkts. 65, 75. Their request remains inappropriate, because this case is not sufficiently complex to justify such an extraordinary approach. Moreover, Plaintiffs' further request that a special master be appointed at San Francisco's sole expense with no contribution from Plaintiffs is both inequitable and unwarranted. The same is true of their request for periodic compliance reports.

**A.      Appointment Of A Special Master Is Not Appropriate.**

Reference to a special master is "the exception and not the rule." *Burlington N. R.R. Co. v. Dep't of Revenue of State of Wash.*, 934 F.2d 1064, 1071 (9th Cir. 1991) (citation omitted). Special masters should "only be appointed when the need is clear," and there is reason for additional caution when appointing a special master in cases like this regarding "important public issues" where "[d]irect judicial performance of judicial functions may be particularly important." Fed. R. Civ. Proc. 53 advisory committee's note to 2003 amendment. Although Rule 53 does not define what qualifies as an "exceptional circumstance," courts read the rule "narrowly, closely circumscribing the range of circumstances in which reference to a special master is appropriate." *Burlington*, 934 F.2d at 1071-72 (citation omitted).

The strong skepticism around appointing special masters is because of the heavy—and often one-sided—burdens they impose on defendants. "It is a matter of common knowledge that references greatly increase the cost of litigation and delay and postpone the end of litigation." 9C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2603 (3d ed. 2023) (citing *Adventures in Good Eating, Inc. v. Best Places to Eat, Inc.*, 131 F.2d 809, 815 (7th Cir. 1942)).

References to a special master are "reserved for extremely complex cases." *Nkop v. City & Cnty. of San Francisco*, 956 F.2d 1167 (9th Cir. 1992) (holding district court did not abuse its discretion in declining to appoint special master); *Yeseta v. Baima*, 837 F.2d 380, 387 (9th Cir. 1988) (same). Plaintiffs did not show this case is sufficiently complex to warrant a special master. Plaintiffs forfeited any argument that something about the complexity of this case is so exceptional that an attorney with specific qualifications or background justifies appointing a special master since they did not propose a specific individual as a special master with their motion, stating instead that if the Court authorized a special master in the abstract Plaintiffs would submit a list of names for the Court to consider. This is not sufficient. For example, in *United States v. Suquamish Indian Tribe*, 901 F.2d 772 (9th Cir. 1990), which Plaintiffs cite, the Court found the case sufficiently complex to warrant a special master only after finding it could not "think of a more. . . complex case," the litigation was one of 14 "sub-proceedings" which had collectively resulted in more than 11,000 filings and the special master had extensive experience in the tribal law issues the complaint raised. *Id.* at 775. There is

nothing comparable here. Plaintiffs have made no effort to identify a special master with specific subject matter expertise that the Court lacks, and they should not be permitted to do so on reply.

Instead, Plaintiffs' arguments about complexity are really about court congestion and judicial resources, but the Supreme Court has held court congestion and the weight of a judge's calendar do not constitute exceptional conditions. *La Buy v. Howes Leather Co.*, 352 U.S. 249, 258 (1957) ("congestion in itself is not such an exceptional circumstance as to warrant a reference to a special master. If such were the test, present congestion would make references the rule rather than the exception"); *see also Arredondo v. Delano Farms Co.*, No. CV F 09-01247-LJO-DLB, 2012 WL 2358594, at *12 (E.D. Cal. June 20, 2012) (declining to appoint special master even though "[t]he Eastern District of California has the highest weighted caseload per judge in the country. To say this Court's trial calendar is congested is an understatement. The conditions under which this Court operates is beyond exceptional," because "[b]ound by this precedent, this Court cannot appoint a special master, even under these extreme and exceptional circumstances."); *Thakur v. Cofiroute USA, LLC*, No. 8:19-cv-02233-ODW (JDEx), 2020 WL 10731939, at *4 (C.D. Cal. Aug. 5, 2020) ("[T]he Supreme Court has clearly refused to treat workload concerns . . . as exceptional conditions"). "While this is a somewhat large case, it is not so complex or technical that the addition of a discovery master is necessary." *Saint Alphonsus Health All., Inc. v. Corizon, LLC*, No. 1:18-cv-00183-DCN, 2021 WL 2381794, at *11–12 (D. Idaho June 10, 2021).

Nor can Plaintiffs' claims about San Francisco's conduct support their request because, despite Plaintiffs' complaint about "continued intransigence," "the record does not support Plaintiffs' bold claim." *Al Otro Lado, Inc. v. Mayorkas*, No. 17-cv-02366-BAS-KSC, 2022 WL 3142610, at *24 (S.D. Cal. Aug. 5, 2022), judgment entered, No. 17-cv-02366-BAS-KSC, 2022 WL 3970755 (S.D. Cal. Aug. 23, 2022). As explained above, Plaintiffs' declarations largely contain hearsay and speculation, which, even if true, would not show any violation of the preliminary injunction. And to the extent Plaintiffs complain about the narrow categories of conduct that the order did enjoin, their declarations mislead the Court by omitting critical information, or are rebutted by declarations the City presents. To the extent there are any allegations left unanswered, it is because of Plaintiffs' strategic choice to stockpile their declarations for this motion rather than raising them with San Francisco in real-time,

which prevented the City from collecting rebuttal testimony while the facts and events were still fresh in the participants' minds.

Plaintiffs' motion is also premature. Plaintiffs filed their motion based on a lack of sufficient information about Defendants' compliance with the injunction, just hours after the Court heard a motion designed to provide Plaintiffs recurring document productions of just such information. *AtPac, Inc. v. Aptitude Sols., Inc.*, No. CIV. 2:10-294 WBS JFM, 2011 WL 13242817, at *5 (E.D. Cal. Apr. 13, 2011) (declining to refer case to special master because "[s]ince the filing of the instant motion, the parties have apparently begun the process of [engaging in the requested discovery]. This demonstrates to the court that extraordinary interference in the form of appointing a special master is unnecessary.").

The parties' filings to date have shown no evidence that Plaintiffs' "issues cannot be effectively and timely addressed by the Court." *Rodriguez v. Google LLC*, No. 20-cv-04688-RS, 2022 WL 17905108, at *2 (N.D. Cal. Dec. 22, 2022) (denying request for special master); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1377 (9th Cir. 1993) (holding no need for special master where "[t]he court was in a position to judge the merits of the settlement based upon its familiarity with the case and the evidence presented to it"); *Richardson v. Trump*, 496 F. Supp. 3d 165, 190 (D.D.C. 2020) (declining to appoint special master to ensure compliance with preliminary injunction regarding USPS during COVID-19 because "implementation of [the Injunction Order] is not so complex as to constitute such exceptional circumstances" to warrant appointment of a special master).

**B.      It Is Inequitable For Plaintiffs To Seek A Special Master Over San Francisco's Objection And Ask The City To Pay All Associated Costs.**

Not only do Plaintiffs seek to impose the burden of a special master on San Francisco, they also seek an order absolving them of any responsibility for financially contributing to the special master's time—placing 100% of the cost on the taxpayers. Every dollar the City spends on a special master is a dollar they cannot spend on funding for shelters and supportive services. Fees for a special master should be allocated "considering the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master." Fed. R. Civ. Proc. Rule 53(g)(3). Plaintiffs have not shown any justification for placing all of the burden on San Francisco and its taxpayers.

Courts in the Ninth Circuit have declined to appoint a special master at all when the plaintiff asserts they have no money to contribute because of the inequitable financial imposition on defendants. *Wood v. Yordy*, No. CV07-350-S-EJL, 2009 WL 10706017, at \*11 (D. Idaho June 2, 2009), aff'd, 357 F. App'x 872 (9th Cir. 2009) ("Appointment of a special master would delay resolution of this case and greatly increase the cost of the litigation for Defendants, because Plaintiff has no ability to share in payment of such a cost."). The risks of the structure Plaintiffs advocate are clear. If Plaintiffs have no financial risk in bringing discovery disputes to the special master, they are more likely to run to the special master rather than trying in good faith to meet and confer, reducing efficiency and increasing costs on Defendants. Given Plaintiffs' conduct to date, the risk Plaintiffs will use the special master to further shift the one-sided financial and time burden of discovery is significant. If the Court finds Plaintiffs are unable to financially contribute to the cost of a special master, that is one more reason the Court should not appoint one here.

In other circumstances, courts have assigned fees to the party's attorney rather than the party itself when costs were an issue. *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 WL 3960068, at \*32 (N.D. Cal. Aug. 17, 2018) (cleaned up) ("The Special Master recommends that his charges be borne by Class Counsel, not the Class. The Court agrees. Class Counsel have the ability to pay and are more responsible . . . for the reference to a special master"). Whatever the resources of the Coalition on Homelessness, Plaintiffs are represented pro bono by a white shoe law firm with at least 12 offices in the United States and another 18 abroad, staffed by thousands of attorneys, that holds itself out as the second most profitable law firm in the word.[18] There is no credible argument they cannot contribute to the cost of the special master they seek.

To the extent the Court is inclined to appoint a special master, it should consider reserving ruling on the issue of fee splitting for now and assigning that responsibility to the special master, since they will be in the best position to determine an equitable division of costs based on any hypothetical discovery disputes that are actually presented to them. *Mardiros*, 2020 WL 6106820, at \*4 (permitting special master to consider allocation of fees for "each motion or issue(s) presented to the Special

---

[18] https://www.law.com/law-firm-profile/?id=178&name=Latham-&-Watkins (last visited on July 6, 2023).

Master"); *In re Anthem*, 2018 WL 3960068, at *32 ("The Court requested that the Special Master make a recommendation about who should pay these fees."). Many special masters recommend apportioning the cost of discovery disputes based on which side is the prevailing party. In other circumstances, where it is not obvious any party bears a greater responsibility for the appointment of a Special Master, courts often divide the fees evenly or pro rata among all parties. *Glover v. Wells Fargo Home Mortg.*, 629 F. App'x 331, 339 (3d Cir. 2015) (cleaned up) (holding the 50/50 fee allocation "reflected a thoughtful consideration of the equities, balanced against the need to protect against unreasonable expense or delay"); *Seggos v. Datre*, No. 17-cv-2684 (SJF)(ARL), 2017 WL 11681160, at *6 (E.D.N.Y. Dec. 19, 2017).

### C.   Periodic Compliance Reports.

Plaintiffs also ask the Court to issue a new discovery order, requiring San Francisco to produce periodic reports regarding their compliance with the injunction. The five cases Plaintiffs cite concerning periodic reports are unavailing. Most are not actually about *periodic* compliance reports—they concern trademark actions where the court made a one-time request of the infringing parties to file reports explaining the steps they took to ensure they stopped using the infringing marks. *Newmark Realty Capital, Inc. v. BGC Partners, Inc.,* No. 16-cv-01702-BLF, 2018 WL 2416242, at *17 (N.D. Cal. May 29, 2018); *SunEarth, Inc. v. Sun Earth Solar Power Co.*, No. 11-04991 CW, 2012 WL 2344081, at *8 (N.D. Cal. June 20, 2012); *Koninklijke Philips Elecs. N.V. v. KXD Tech., Inc.*, No. 05-cv-01532, 2008 WL 2699701, at *3 (D. Nev. July 2, 2008). The burden imposed by one-time reports is not comparable to the recurring burden Plaintiffs seek to impose here, with their requested periodic reports regarding Defendants' compliance with the injunction at "all dispatch, enforcement, displacement, property removal/destruction, or other operations involving interfacing with unhoused individuals and their property." Dkt. 130-55.[19] This is especially so because Plaintiffs can seek all of the information they request as part of the requested periodic disclosures through the normal course of

---

[19] The Court should deny Plaintiffs' request for periodic reports for the independent reason that Plaintiffs did not state how frequently they request such "periodic" reports should be made, depriving Defendants of the opportunity to respond on this point, and Plaintiffs' reference to requiring Defendants to affirm compliance at "other operations involving interacting with unhoused individuals and their property," is so vague and ambiguous that it does nothing but invite further discovery disputes regarding the interpretation of Plaintiffs' proposed order.

discovery. The parties have agreed to increase the traditional number of interrogatories available in this case from 35 to 50. Periodic disclosures on top of this would effectively be a one-sided expansion of the discovery limits. Plaintiffs already have an available avenue to obtain all of the information they seek. Periodic compliance reports are unnecessary.

Further, none of the cases Plaintiffs cite include any discussion of why the court required a compliance report under the circumstances, making them of little utility here. Instead of showing why a compliance report is appropriate, Plaintiffs' citations stand for the uninteresting proposition that compliance reports in general are within the Court's authority to order. In this case, Plaintiffs' request has the effect, if not the purpose, of making busy work for Defendants, creating additional paperwork for the Court to review, and pulling Defendants' resources away from its best efforts to complete fact discovery on a timely basis.  Rather than allowing Plaintiffs to unnecessarily impose such burdens on the City, the Court should deny Plaintiffs' request.

## V. CONCLUSION

Plaintiffs have failed to carry their considerable burden of showing that the injunction has been violated; have failed to justify the appointment of a special master; and have failed to justify the compliance reports they seek. The Court should decline Plaintiffs' invitation to place unnecessary burdens on San Francisco as it continues to work tirelessly to address the enormous challenges the homelessness crisis presents, while obeying the preliminary injunction issued in this case. Because San Francisco has substantially complied with the preliminary injunction, *see Anti Police-Terror Project*, 2020 WL 6381358, at *20, and for the reasons set forth above, the Court should deny Plaintiffs' motion in its entirety.

1 | Dated:  July 6, 2023

2 | DAVID CHIU
City Attorney
3 | YVONNE R. MERÉ
WAYNE SNODGRASS
4 | MEREDITH B. OSBORN
JAMES M. EMERY
5 | EDMUND T. WANG
RYAN C. STEVENS
6 | KAITLYN MURPHY
MIGUEL A. GRADILLA
7 | Deputy City Attorneys

8 |

9 | By:  s/Miguel A. Gradilla
Miguel A. Gradilla

10 |

    Attorneys for Defendants
11 | CITY AND COUNTY OF SAN FRANCISCO; SAN
FRANCISCO POLICE DEPARTMENT; SAN
12 | FRANCISCO DEPARTMENT OF PUBLIC WORKS;
SAN FRANCISCO DEPARTMENT OF
13 | HOMELESSNESS AND SUPPORTIVE HOUSING;
SAN FRANCISCO FIRE DEPARTMENT; SAN
14 | FRANCISCO DEPARTMENT OF EMERGENCY
MANAGEMENT

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |