1  DAVID CHIU, State Bar #189542
   City Attorney
2  YVONNE R. MERÉ, State Bar #173594
   Chief Deputy City Attorney
3  WAYNE SNODGRASS, State Bar #148137
   Deputy City Attorney
4  MEREDITH B. OSBORN, State Bar # 250467
   Chief Trial Deputy
5  JAMES M. EMERY, State Bar #153630
   EDMUND T. WANG, State Bar #278755
6  RYAN C. STEVENS, State Bar #306409
   KAITLYN MURPHY, State Bar #293309
7  MIGUEL A. GRADILLA, State Bar #304125
   Deputy City Attorneys
8  City Hall, Room 234
   1 Dr. Carlton B. Goodlett Place
9  San Francisco, California 94102-4682
   Telephone:    (415) 554-4675 (Snodgrass)
10                (415) 554-4628 (Emery)
                  (415) 554-3857 (Wang)
11                (415) 554-3975 (Stevens)
                  (415) 554-6762 (Murphy)
12                (415) 554-3870 (Gradilla)
   Facsimile:    (415) 554-4699
13 E-mail:       wayne.snodgrass@sfcityatty.org
                 jim.emery@sfcityatty.org
14               edmund.wang@sfcityatty.org
                 ryan.stevens@sfcityatty.org
15               kaitlyn.murphy@sfcityatty.org
                 miguel.gradilla@sfcityatty.org
16
   Attorneys for Defendants
17 CITY AND COUNTY OF SAN FRANCISCO, et al.

18                          UNITED STATES DISTRICT COURT

19                         NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 20  COALITION ON HOMELESSNESS; TORO CASTAÑO; SARAH CRONK; JOSHUA DONOHOE; MOLIQUE FRANK; DAVID MARTINEZ; TERESA SANDOVAL; NATHANIEL VAUGHN,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>Defendants. | Case No. 4:22-cv-05502-DMR<br><br>**DECLARATION OF CARL BERGER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUNCTION**<br><br>Date:   August 10, 2023<br>Time:   1:00 PM<br>Judge:  Hon. Donna M. Ryu<br>Place:  Courtroom 4 – 3rd Floor<br>        1301 Clay Street<br>        Oakland, CA 94612<br><br>Trial Date: April 15, 2024 |

DECL. BERGER ISO OPP. TO MOT. ENFORCE PI
CASE NO. 4:22-cv-05502-DMR

I, Carl Berger, declare as follows:

1. I am an Acting Paramedic Captain with the San Francisco Fire Department (SFFD). I have personal knowledge of the matters stated herein, and if called and sworn as a witness could and would competently testify thereto.

2. Currently, I am assigned to the Department of Emergency Management (DEM)'s Healthy Street Operations Center (HSOC) as an incident commander. In that role, while I am an SFFD employee, DEM supervises the work I do for HSOC.

3. As an HSOC incident commander I coordinate outreach and cleaning on Mondays, Tuesdays, and every other Wednesday. Before transitioning to being the HSOC incident commander, in about April 2023, I was assigned as incident commander to the Tenderloin Joint Field Operation (JFO). I started with JFO in February 2023. I continue to coordinate JFO operations as incident commander on Sundays. In addition, although I am technically employed by SFFD, as HSOC and JFO incident commander, I report to Sam Dodge through DEM.

4. Before working on JFO, I was a community paramedic on the SFFD's Street Crisis Response Team (SCRT). I started working with SCRT in or about February 2022. Prior to that, I worked first as an emergency medical technician (EMT) and then paramedic for SFFD at Station 49 starting in January 2017.

5. Prior to joining the SFFD, I was a paramedic with King-American Ambulance Company from about June 2015 to January 2017. Before that, I was an EMT with Falck from about January 2014 to June 2015 while attending City College of San Francisco's paramedic training program. I graduated from City College in 2015. I also earned an EMT certificate from the San Francisco Paramedics Association in 2011.

**Typical HSOC Resolution**

6. My typical day starts with reviewing an email with the scheduled resolutions for the day—usually a morning and afternoon resolution. I will then show up around thirty minutes before the resolution starts, which is usually 8 a.m., take pictures of the area, and get a sense for the encampment.

DECL. BERGER ISO OPP. TO MOT. ENFORCE PI    1
CASE NO. 4:22-cv-05502-DMR

I pay particular attention for anything that might pose a safety concern for HSOC team members or the public, including encampment occupants.

7. After surveying the scene, I greet the team members who are there, SFMTA and Homeless Outreach Team (HOT). I usually first make contact with SFMTA parking control officers who block traffic lanes to ensure that the resolution area is safe from oncoming traffic. Then, usually the Encampment Resolution Team (ERT) arrive, and I will check with them. (ERT is a group within the HOT team). These team members tend to be familiar with the areas we work in and know many of the encampment inhabitants we engage around the City.

8. The team from the Department of Public Works usually arrives around 8:15 a.m. They tend to bring different vehicles, including a steamer (which is a pickup truck with a water tank and hose that are used to power wash the sidewalk with a high-pressure hose), a flat rack truck with a hydraulic gate to load heavy objects into it, and a pickup truck usually driven by a DPW supervisor.

9. Also, at 8:15 a.m., I have a short Community Paramedic meeting via Zoom that I take from the field where I give updates on our operations. I stay on this meeting for usually no more than 5 minutes.

10. Sometime between 8:00 a.m. and 8:30 am, the SFPD's dedicated HSOC unit arrives.

11. Outreach workers from the Felton Institute (FEST) also work on the HSOC team to connect individuals with social services. It is my understanding that there have been and will be changes to the composition of social services outreach workers, although I am not sure of any coming changes, but the HSOC team comprises social services outreach workers.

12. Often, the Department of Homelessness and Supportive Housing (HSH) will send a transport van closer to 9 a.m. to help with transporting people to shelter. If a vehicle is not available, the HOT team has taxi vouchers to transport people to shelter.

13. As to the posting of advanced notices of encampment resolutions, I see them at the resolutions I have worked. They are usually on a wall, a pole, or somewhere very visible on the site. The FEST and HOT teams sometimes go ahead of a resolution to let individuals at a site know that a resolution will be happening. Although notices are posted, I have also seen notices of upcoming

resolutions burned, torn down, and otherwise vandalized. I have also seen notices crumpled up in tents on at least two occasions.

14. When we begin to engage with individuals during a resolution, our first task is to ensure that we talk with everyone living in an encampment, assuming there are no safety issues to address at the outset. Usually starting around 8:00 am, I walk around with the HOT team to make sure individuals living in the encampment at issue know we are there. Although, to my knowledge, advanced notice of an upcoming resolution has been posted ahead of time, I make sure to announce our presence at the beginning of the resolution. To make sure the HOT team and I talk to everyone, I create a route of the order in which I and the HOT team will talk to everyone at the site. While I cannot ensure that I have talked to every single person in every encampment resolution I have worked, I make it a point to be thorough.

15. My first action when engaging a person at a site is to announce ourselves outside a person's tent or structure. If no one answers, I do a wellness check. I ensure that there are no immediate medical issues to address. What specific thing I do to try and get a person's attention inside a tent from which I received no verbal response depends, but could be lifting a corner of the tent, for example, gently tapping someone's foot, or some other manner of eliciting a response if there is someone inside the structure or tent. I try to be cognizant that I am engaging with someone in their sleeping area and try to be the least intrusive as I can. My goal is to make sure no one is unconscious or unresponsive. It is a similar approach to doing a medical call—attempt a verbal stimulus first, then gentle tapping, and then, if need, a firmer touch to elicit a response.

16. Once I elicit a response, I ask individuals what their needs are. One of the first questions either I or the HOT team ask is whether a person is interested in obtaining shelter. We also offer other services. But, what I and the HOT team asks depends on the individual and their circumstances. Many of the people we engage are people we have worked with before. So, often, I and/or the HOT team will start a conversation by asking a person what happened with the housing placement that individual previously obtained. In any case, I want to assess that person's level of

interest in being placed into shelter and what issues I may have to help them with. For example, if the person has mobility issues then I will work with the HOT team to try and find a solution.

17. I ask about a person's interest in obtaining shelter so that the HOT team will be ready to offer that day's available beds once they are known. The HOT team learns what the shelter bed allocations will be for the day usually sometime between 8:30 a.m. or 8:45 a.m.

18. While I am talking to individuals at the beginning of an encampment resolution, I am also checking for safety and health hazards. Sometimes, individuals living on the street will tap into electricity from light poles or other sources on the street, or there might be an open flame in a tent from a candle. These are safety hazards. Common health hazards are uncovered buckets of feces and urine, exposed feces and urine, rotting food and drink, used needles, blood, and others. I am also attentive to the health needs of the people I am talking to, which commonly include open wounds. The process of talking to everyone and gaging their interest in shelter and assessing safety and health risks can take 30-45 minutes.

19. Once the HOT team receives the shelter allocations for the day, they talk to each other and triage where persons at the encampment can be placed based on the person's interest. I let the HOT team work on this themselves.

20. As the HOT team works on shelter allocations, I will check in with FEST to see if any of the people we spoke to has specific needs, such as medical complaints that need to be addressed, including injuries or wounds. I usually double check to make sure that we have not missed speaking to and assessing an individual's needs in an encampment.

21. I then also check in with a DPW supervisor to come up with a plan for cleaning the street. I am always cognizant that the cleaning must be done pursuant to the court's injunction. I talk to the DPW supervisors about the injunction every day I am out on an HSOC operation. I notify the individuals living in the encampment that they are required to move to allow us to clean the streets. I also make it a point to let them know that they can return so long as they leave four feet of space on the sidewalk for wheelchairs access. I make an effort to let people know they can return to the space.

22. Once the DPW supervisor and I make a plan for cleaning the sidewalk, I let people know that they have to move to allow us to clean. I give people a reasonable amount of time to move, and usually come to an agreement with people on what a reasonable time is, since every situation will be different.

23. At this time, I also help DPW assess items to leave in place if they are not soiled, health hazards, or abandoned, as well as what items to remove. Often times, items are soiled with feces or urine, rotting food, used needles, or other things that make an item, such as a tent, unsalvageable. True and correct copies of photographs showing examples of such items are attached as Exhibit A (a photograph I took with the HSOC incident commander's phone of a bucket with rotting food taken on June 21, 2023); Ex. B (a photograph in the HSOC incident commander's phone of a tent with perishable food taken on May 23, 2023); Ex. C (a photograph in the HSOC incident commander's phone of a towel with feces taken on May 21, 2023; Ex. D (a photograph I took with the HSOC incident commander's phone of a tent with needles inside it taken on April 17, 2023). In other words, if an item is a health hazard it is thrown out. However, if an item is not a health hazard and salvageable, it will not be thrown away. Often times, I have discussions with people about what to throw out and what to keep. I do not want to throw out people's belonging and I will either work with DPW to bag and tag it or leave items. I would estimate that of the items that are abandoned or unattended, these items are clean enough for bagging and tagging a few times a month.

24. While I am helping DPW decide what to throw out and what not to throw out as DPW is cleaning the sidewalk, the HOT team is making allocations and the transportation team is starting to transport people who have accepted shelter.

25. During encampment resolutions some people will tell me that they do not have to move because the Coalition on Homelessness told them that they do not have to move. If a person refuses to move temporarily, I address the situation on a case-by-case basis. Generally, I remind a person who is refusing to move that they can return to the location once it has been cleaned but that they do have to move temporarily. If I am unsuccessful at convincing the person to move, I will ask other HSOC members to help me try to convince that person to move. I will ask HOT team members to help or

others for help if I am unsuccessful after a few tries. I often ask HOT team members for help because they often have relationships with many people we see on the streets. I often see the same people again and again during these resolutions. Additionally, I will also sometimes ask SFPD for help in convincing people who refuse to move, to move if I cannot convince them myself. I know that SFPD cannot enforce or threaten to enforce any of the laws the injunction prohibits the City from enforcing, and in my experience SFPD's HSOC officers working with me are not enforcing or threatening to enforce any of the laws. The vast majority of time, I do not ask them to become involved in the operation in any way. HSOC police officers typically stand around the site and observe, and are cognizant of everyone's safety. I only ask for their help to convince someone to temporarily move if that person has not listened to anyone else. And often a person who at that point refuses to move does not move even after an office speaks with them. It is rare that someone is adamant about not moving.

26. The only times I have heard an officer seeking to enforce a law at a resolution has been when an officer is trying to ensure that a four feet of sidewalk space remains. When this has happened, I have noticed that SFPD officers will turn their body worn cameras on. In the past couple of months, this issue has come up in my experience no more than three (3) times. I have not seen anyone cited for this blocking a sidewalk.

27. As HSOC incident commander, I view the SFPD HSOC team's role as ensuring the safety of the HSOC team and the public, including the individuals living in the encampments. I have discussed my view of the HSOC officers' role during operations with the HSOC officers. By far most of what the officers are doing in standing by, observing the scene and evaluating safety concerns.

28. I believe the SFPD HSOC's officers' presence is critical to ensuring the success of resolutions because they ensure that my team and the public is safe. For example, I frequently see weapons or items that could be used as a weapon, including long knives, switch blade knives, and other tools. I have also regularly witnessed individuals yelling, getting aggressive, and escalating tensions in an already sometimes tense environment. I have witnessed several aggressive and unleashed dogs in front of a single tent as well as active drug selling activity. Having police present is critical for everyone's safety.

29. By 10 a.m., people are packing and moving their stuff. Usually it is not until 10:30 a.m. or 10:45 a.m. that DPW is able to clean the sidewalk. Many people discard large amounts of collected items to be removed by DPW. Depending on how much material needs to be taken out, I may suggest to DPW supervisor that more vehicles be brought to the site if available.

30. Regarding items placed onto DPW trucks, there have been times that people ask for items that have been put into a truck. In those cases, if an item is easily accessible, I have witnessed DPW workers take an item off a truck and give it back. However, I have also seen items buried in a truck under other items that were clear health hazards such that the item requested is soiled. In those instances, it would have been a health hazard to take it off the truck so the item was not taken off the truck. There are also safety risks to consider in getting back on DPW trucks to retrieve an item. If it is unsafe to retrieve an item, I will not direct an HSOC team member to retrieve an item from a truck nor would I allow any other person to do so. However, I tend to defer to DPW workers on whether to retrieve items from their trucks so as long as an item is not a health hazard.

31. Once DPW is cleaning the sidewalk, that is approaching the end of the resolution.

32. We repeat this same general sequence in afternoon resolutions. The biggest difference is that a different DPW crew works the afternoon resolution.

33. Whether or not observers from the Coalition on Homelessness, the ACLU, any other organization or the public has no bearing on how I conduct an HSOC resolution. I conduct them the same way regardless of observers.

34. I sometimes also try to follow up with people I engaged at a resolution. This is completely separate from an HSOC resolution. For example, I have connected people to the DPH's Street Medicine team to try and address their medical needs, for example.

**Specific JFO Resolutions**

35. I understand that Plaintiffs' declarants take issue with certain interactions with City personnel within the Tenderloin. The following events that Plaintiffs' declarants take issue with were JFO operations for which I was the JFO incident commander: March 1, 2023 JFO at or near O'Farrell Street and Jones Street; and March 3, 2023 at or near Mission Street and 7th Street.

36. The presence of third-party observers never influenced my JFO operations in any way. We never forced anyone to move permanently. We required people at the encampment to move temporarily to allow for street cleaning and to allow four feet of space on the sidewalk. People needed only to move into the street or up the block to allow for cleaning. We did not cite, arrest, or threaten to cite or arrest anyone for any of the laws the injunction prohibits the City from enforcing. We only discarded items that individuals identified was trash, garbage, debris, or abandoned, or that presented a health hazard, such as items soiled by feces or urine and used needles. People were allowed to keep their belongings, including on the sidewalk, so long as they did not present a health hazard and permitted four feet of space on the sidewalk. We told people that they could return to the area after cleaning so long as they left four feet of sidewalk space. This was how JFO operated whether third party observers were present or not.

37. I was personally present at the **March 1, 2023 JFO at or near O'Farrell Street and Jones Street**. I do not recall telling anyone that the JFO operation was not going forward that day. There have been times that the cleaning portion of the operation has been put on hold due to inclement weather and rain. I do not recall if the operation was put on hold due to inclement weather on this day. I told the people in the encampment that they are required to move to allow for street cleaning. I told the people in the encampment they could return to the area so long as they left four feet of space on the sidewalk. The people at the encampment were allowed to keep their belongings so long as they were not a health hazard. We only discarded items that people indicated was trash, garbage, or debris, or that posed a health hazard. No one was cited, arrested, or threatened with citation or arrest for any of the laws the injunction prohibits the City from enforcing.

38. Abimbola Myers was present at the March 1, 2023 JFO operation. Mr. Myers had numerous bicycles, and a large amount of bicycle parts. My understanding is that such items fall under Article 20 of the San Francisco Public Works Code concerning bicycle "chop shops." I am familiar with Mr. Myers as I have interacted with him on several occasions during JFO operations. I asked Mr. Myers to move temporarily to allow for street cleaning. I worked with Mr. Myers to determine which bicycle parts Mr. Myers would keep and which would be discarded pursuant to Article 20 of the San

Francisco Public Works Code. I told Mr. Myers that he could return to the area so long as he left four feet of sidewalk space. This particular area of sidewalk is next to a chain link fence in front of a church, and approximately 6 feet of sidewalk space total is available for use by the community. Mr. Myers was not cited, arrested, or threatened with citation or arrest for any of the laws the injunction prohibits the City from enforcing. Mr. Myers was provided ample time to move his belongings. I do not recall telling Mr. Myers he only had a certain amount of time to move his belongings. I do not recall telling Mr. Myers that we would discard his belongings if he did not move them within a certain amount of time. We did not discard any of Mr. Myer's items without Mr. Myers consent.

39. DPW took photographs of the March 1, 2023 JFO operation. I took photographs of DPW's photographs. True and correct copies of my photographs of the DPW tablet depicting DPW's photographs of the March 1, 2023 JFO operation, taken on March 1, 2023, are attached hereto as Exhibit E.

40. I was present at the **March 3, 2023 JFO at or near Mission Street and 7th Street**. I told the people at the encampment that they were required to move to allow for street cleaning. I told the people at the encampment that they are required to move to allow for street cleaning. I told the people at the encampment they could return to the area so long as they left four feet of space on the sidewalk. The people at the encampment were allowed to keep their belongings so long as they were not a health hazard. JFO only discarded items that people indicated was trash, garbage, debris, or abandoned, or that posed a health hazard. No one was cited, arrested, or threatened with citation or arrest for any of the laws the injunction prohibits the City from enforcing.

41. I recall that during the March 3, 2023 JFO operation, an abandoned tent was discarded because it was a health hazard, including being soiled with feces and littered with needles. I took photographs of the JFO operation that day, including of the abandoned tent that was discarded. True and correct copies of my photographs are attached hereto as Exhibit F. The photographs show the feces on and next to the tent, as well as the needles inside it.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this sixth day of July, 2023, at San Francisco, California.

_s/_ _____
Carl Berger

DECL. BERGER ISO OPP. TO MOT. ENFORCE PI    10
CASE NO. 4:22-cv-05502-DMR