1  DAVID CHIU, State Bar #189542
   City Attorney
2  YVONNE R. MERÉ, State Bar #173594
   Chief Deputy City Attorney
3  WAYNE SNODGRASS, State Bar #148137
   Deputy City Attorney
4  MEREDITH B. OSBORN, State Bar # 250467
   Chief Trial Deputy
5  JAMES M. EMERY, State Bar #153630
   EDMUND T. WANG, State Bar #278755
6  RYAN C. STEVENS, State Bar #306409
   KAITLYN MURPHY, State Bar #293309
7  MIGUEL A. GRADILLA, State Bar #304125
   Deputy City Attorneys
8  City Hall, Room 234
   1 Dr. Carlton B. Goodlett Place
9  San Francisco, California 94102-4682
   Telephone:    (415) 554-4675 (Snodgrass)
10               (415) 554-4628 (Emery)
                 (415) 554-3857 (Wang)
11               (415) 554-3975 (Stevens)
                 (415) 554-6762 (Murphy)
12               (415) 554-3870 (Gradilla)
   Facsimile:    (415) 554-4699
13 E-mail:       wayne.snodgrass@sfcityatty.org
                 jim.emery@sfcityatty.org
14               edmund.wang@sfcityatty.org
                 ryan.stevens@sfcityatty.org
15               kaitlyn.murphy@sfcityatty.org
                 miguel.gradilla@sfcityatty.org

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO, et al.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COALITION ON HOMELESSNESS; TORO CASTAÑO; SARAH CRONK; JOSHUA DONOHOE; MOLIQUE FRANK; DAVID MARTINEZ; TERESA SANDOVAL; NATHANIEL VAUGHN,<br><br>   Plaintiffs,<br><br>   vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>   Defendants. | Case No. 4:22-cv-05502-DMR<br><br>**DECLARATION OF SEAN DELISE IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE PRELIMINARY INJUNCTION**<br><br>Date:     August 10, 2023<br>Time:    1:00 PM<br>Judge:   Hon. Donna M. Ryu<br>Place:    Courtroom 4 – 3rd Floor<br>             1301 Clay Street<br>             Oakland, CA 94612<br><br>Trial Date:  April 15, 2024 |

I, Sean Delise, declare as follows:

1. I have personal knowledge of the matters stated herein, and if called and sworn as a witness could and would competently testify thereto.

2. I work for the San Francisco Fire Department (SFFD). I currently serve as an incident commander for the Healthy Streets Operation Center (HSOC). I have been in this position since March 2023. In this position, I direct HSOC encampment resolutions in San Francisco Thursdays, Fridays, and every other Wednesday. I also coordinate the Tenderloin Joint Field Operation (JFO) as incident commander on Saturdays. In addition, although I am technically employed by SFFD, as HSOC and JFO incident commander I currently report to Sam Dodge through the San Francisco Department of Emergency Management (DEM).

3. I earned my Emergency Medical Technician (EMT) certification in 2009 from College of Marin and my paramedic certification in 2011 from City College of San Francisco.

4. Before my current role, I worked in various paramedic and EMT roles for over a decade, including: as a paramedic for SFFD from about 2014 to early 2023; an EMT for SFFD from 2013 to 2014; as a paramedic with Medic Ambulance in Solano County from 2012 to 2013; and as an EMT with St. Joseph's Ambulance Company in Marin County from 2011 to 2012.

**Typical HSOC Resolution**

5. The morning of an HSOC resolution, I begin my day by reviewing an email that goes out showing that day's morning and afternoon operations' locations. I usually arrive at the morning site sometime between 7 and 7:30 a.m. and survey the area. I conduct a tent and vehicle count, take pictures of the site, and send that information to representatives from the departments involved in the operation.

6. The HSOC team includes outreach workers from the Homeless Outreach Team (HOT), employees from the San Francisco Police Department (SFPD), the Department of Public Works (DPW), the Municipal Transportation Agency (MTA), the Department of Homelessness and Supportive Housing (HSH), the Felton Institute (FEST), the Department of Emergency Management (DEM), and sometimes the Department of Public Health (DPH).

7. I start a resolution, usually around 8 a.m., by going from one end of the encampment, tent-to-tent or structure-to-structure, to the other end of the encampment with members of the HOT team to engage with all occupants. Either a HOT team member or I will explain that we are offering shelter and other social services, and cleaning up the street. My approach is to let HOT team members assess residents' interest in shelter, or determine whether they already have shelter, and to generally do housing assessments as needed. I will then confirm with residents whether they understand that we are there to clean the sidewalk and I ask them to move so that we may do so. I also usually ask whether they want to discard any items.

8. I will often start by loudly announcing my presence as I walk toward a tent or structure where I think someone is staying and say something to the effect of, "Good morning, SFFD, HOT team." If there is no response to my greeting, I will assess how best to get the attention of whoever may be in the area I am approaching. That might mean I shake a portion of the tent or structure. I may also open the tent or structure. Other times that might mean that I have to tap or grab someone's foot or other body part. Once I get a person's attention, then I can talk with them to assess their needs alongside the HOT team member or members I am working with. It is sometimes difficult to determine if someone is inside a tent or structure as tents are sometimes locked from the inside, or placed in a way that makes it hard to see if someone is inside, and it is sometimes the case a tent or structure is empty. But as a safety officer, it is my duty to ensure that people are safe. Before joining HSOC, when I was a paramedic, I encountered several overdoses and cardiac arrests in and around encampments, so I am mindful of ensuring that people are responsive to me when I work to assess residents' needs at the beginning of an HSOC operation. I have also had to administer Narcan to someone on a sidewalk, not in a tent or structure, who was exhibiting symptoms of opioid overdosing so, while conducting this work, I remain vigilant about the conditions around me.

9. Beyond ensuring that the people I encounter are responsive, I also check for obvious medical concerns. I routinely see abscesses, swollen hands and feet, and different types of injuries and wounds that are often concerning. These types of medical concerns arise about once or twice a week. I have called ambulances on a number of occasions so that people I encounter can have their various issues assessed by a doctor.

10. By the time I start engaging encampment residents, 72-hour notices have been posted. I have seen the notices, however, on the ground, torn, or otherwise not where they were originally posted.

11. Many of the encampment occupants we encounter are people that we have encountered several times before. We offer shelter but it is often declined. Further, many people we encounter are already in some type of shelter. I learn this from conversations I or HOT team members have with encampment occupants and also from experience helping to place people into shelter.

12. As I am moving from person-to-person in an encampment with the HOT team, encampment occupants pack their belongings and begin to move. If a person does not begin to move, I will remind them that we are there to clean the street or otherwise engage with them to understand why they are not moving and try to convince them to move.

13. Around this time in a resolution, I am also assessing what items can be discarded and what is not. To do this, I talk with residents to try to identify what needs to be thrown out but it is my practice to not touch their belongings. I also try to resolve whether any potentially abandoned items are actually abandoned or belong to someone. Some people will also ask for trash bags to put items in so I help secure those trash bags. Since different people need more or less time to pack and move their belongings, I am mindful of working with encampment occupants to allow them as much time as possible to pack and move. While people are packing and moving their belongings, DPW workers help them by placing items to be discarded in DPW trucks.

14. As to the bagging and tagging of individuals' belongings, in my experience bagging and tagging tends to happen when a tent or other item appears in good enough condition to be kept and there is no one present to claim it. Unfortunately, many items, though certainly not all items, in an encampment are often soiled with rotting food, urine, feces, blood, other bodily fluids, needles, drug paraphernalia, or other things that make the items unsalvageable. At HSOC resolutions that I have worked, bagging and tagging is done perhaps once or twice a month.

15. I have encountered encampment occupants who have asked for their items back after DPW workers have placed some item of theirs on DPW trucks to be discarded. In most instances, getting an item off a truck is a safety concern because of the debris and hazardous materials on the

truck, like feces, urine, discarded needles or other health hazards, so in many instances DPW workers do not take items off a truck. However, I have seen DPW workers take items off a truck where possible when encampment occupants have asked for an item. For example, about a month ago at a resolution I worked in the SOMA district, DPW discarded several bags and backpacks with cans and bottles inside them that were inside a tent blocking a sidewalk that was covered in material that was a health hazard, including urine (I could tell because there was an odor resembling urine), spoiled liquid foods, and flies. After the bags were discarded, a man came back and was adamant that he wanted his bags. I saw DPW workers engage with the man and ultimately gave him back the backpacks he requested.

16. While packing and moving of belongings is taking place, the HOT team receives notice of the shelter bed allocations that are available that day. After the HOT team receives the shelter allocations, I go with the HOT team to discuss shelter options with the people who expressed an interest in going to shelter. If a person expresses an interest in shelter, the HSH transport team will often provide that person transportation to a shelter. And I have personally assisted HSH with transporting people to shelter or personally driven people to shelter myself about 10 times. Sometimes, a person will go to their assigned shelter bed on their own.

17. Once a sidewalk area is cleared, DPW workers will go in and clean an area with high-pressured hoses. DPW conducts this cleaning close to the end of a resolution, usually between 11:30 a.m. and 12 p.m. But sometimes there is not enough time at the end of a resolution, before the DPW workers' shift is over, to pressure wash the sidewalk, or we do not have a pressure washer. So sometimes, a sidewalk is not pressure washed, but we do sweep up and try to clean it the best we can.

18. The afternoon operation mirrors the same steps as the morning operation. The biggest difference is that a different DPW crew works the afternoon resolution following a shift change.

19. It is my understanding that sometimes members of the public, including persons affiliated with the Coalition on Homelessness and the ACLU, observe HSOC and JFO operations. I do not change my practices or direct the operation any differently when these observers are present. I also do not seek to engage them while they are present.

20. Working HSOC and JFO operations comes with safety concerns for my team as well. For example, my colleagues and I have been verbally threatened, yelled at, and had things thrown at us, though I have not been struck yet. I have, however, been spit at and toward. I have found the SFPD officers' presence during HSOC and JFO resolutions reassuring in ensuring my safety, that of my colleagues, and the public's, including encampment occupants, because SFPD officers are around and observing my and the rest of the HSOC and JFO team's work. For the most part, SFPD officers are often standing away from the encampment occupants we are engaging or are sitting in their cars.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 6th day of July, 2023, at San Francisco, California.



Sean Delise