1  LATHAM & WATKINS LLP
   Alfred C. Pfeiffer, Jr., SBN 120965
2  505 Montgomery Street, Ste 2000
   San Francisco, CA 94111
3  Telephone: (415) 391-0600
   al.pfeiffer@lw.com
4

5  LAWYERS' COMMITTEE FOR CIVIL
   RIGHTS OF THE SAN FRANCISCO BAY AREA
6  Zal K. Shroff, MJP 804620, *pro hac vice*
   131 Steuart Street, Ste. 400
7  San Francisco, CA 94105
   Telephone: (415) 543-9444
8  zshroff@lccrsf.org

9
   ACLU FOUNDATION OF NORTHERN
10 CALIFORNIA
   John Thomas H. Do, SBN 285075
11 39 Drumm Street
   San Francisco, CA 94111
12 Telephone: (415) 293-6333
   jdo@aclunc.org
13

14 *Attorneys for Plaintiffs*

15 *Additional Counsel Below*

16
                    **UNITED STATES DISTRICT COURT**
17                 **NORTHERN DISTRICT OF CALIFORNIA**
                          **OAKLAND DIVISION**
18

19 COALITION ON HOMELESSNESS, et al.,          Case No. 4:22-cv-05502-DMR

20                          Plaintiffs,         **PLAINTIFFS' REPLY IN SUPPORT OF**
                   v.                           **PLAINTIFFS' MOTION TO ENFORCE**
21
   CITY AND COUNTY OF SAN FRANCISCO,           **Judge:**        The Hon. Donna M. Ryu
22 et al.,

23                          Defendants.         **Hearing Date:** August 10, 2023
                                                **Time:**         1:00 p.m.
24                                              **Place:**        via Videoconference
                                                                 Courtroom 4 – 3rd Floor
25                                                               1301 Clay Street
                                                                 Oakland, CA 94612
26

27

28

1  LATHAM & WATKINS LLP
   Wesley Tiu, SBN 336580
2  Kevin Wu, SBN 337101
   Tulin Gurer, SBN 303077
3  505 Montgomery Street, Ste 2000
   San Francisco, CA 94111
4  Telephone: (415) 391-0600
   wesley.tiu@lw.com
5  kevin.wu@lw.com
   tulin.gurer@lw.com
6
7  LATHAM & WATKINS LLP
8  Joseph H. Lee, SBN 248046
   650 Town Center Drive, 20th Floor
9  Costa Mesa, CA 92626
   Telephone: (714) 540-1235
10 joseph.lee@lw.com
11
   LATHAM & WATKINS LLP
12 Rachel Mitchell, SBN 344204
   12670 High Bluff Drive
13 San Diego, CA 92130
   Telephone: (858) 523-5400
14 rachel.mitchell@lw.com
15
   ACLU FOUNDATION OF NORTHERN CALIFORNIA
16 Brandon L. Greene, SBN 293783
   William S. Freeman SBN 82002
17 39 Drumm Street
   San Francisco, CA 94111
18 Telephone: (415) 293-6333
   bgreene@aclunc.org
19 wfreeman@aclunc.org
20
21
22
23
24
25
26
27
28

1

# TABLE OF CONTENTS

2
**Page**

3  I.       INTRODUCTION ...........................................................................................1

4  II.      STATEMENT OF UNDISPUTED FACTS .............................................1

5        A.   The City Concedes Hundreds of Sit/Lie Enforcement Interactions
             Continue...........................................................................................1

6
7        B.   The City Concedes HSOC Sweeps Continue Without Sufficient
             Shelter. ............................................................................................2

8        C.   The City Concedes That It Does Not Bag and Tag Most Property. .......3

9        D.   The City Does Not Rebut the Vast Majority of the Evidence on
             Violations. .......................................................................................4

10
11            1.   Continued Displacement of Unhoused Individuals Without
                  Shelter. ..................................................................................4

12            2.   Ongoing Property Destruction and Disregard of Bag and
                  Tag Policy. .............................................................................7

13       E.   The City's Noncompliance Continues to Evade This Court's
14            Review. .............................................................................................8

15  III.     ARGUMENT ...............................................................................................9

16       A.   Plaintiffs Move to Enforce the Injunction, Not for Contempt. ............9

17       B.   The City's Evidentiary Objections are Irrelevant and Improper. .......11

18       C.   The City's Continued Enforcement Threats and Nonexistent
             Record at Thousands of Enforcement Interactions Necessitate a
19            Special Master. ................................................................................12

20       D.   The City's Failure to Bag & Tag and Document Destroyed
             Property at Removal Operations Necessitates a Special Master. .........16

21       E.   The City Conflates the Requirements for Trial Masters and Special
22            Masters Appointed to Ensure Compliance with a Court Order. ..........17

23       F.   The City Alone Should Bear the Cost of a Special Master After
             Years of Violating the Constitution In Contravention of Its Own
24            Policies. ............................................................................................19

25       G.   Regular Compliance Reports Are Warranted, Routine Measures. .......20

26  IV.      CONCLUSION...........................................................................................20

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*A&M Records Inc. v. Napster, Inc.*,
   284 F.3d 1091 (9th Cir. 2002) ................................................................................15

*In re Anthem, Inc. Data Breach Litig.*,
   No. 15-MD-02617, 2018 WL 3960068 (N.D. Cal., Aug. 17, 2018) ................................18, 19

*Benson v. City of San Jose*,
   583 Fed. App'x 604 (9th Cir. 2014) ........................................................................14

*Burlington N. R.R. Co. v. Dep't of Revenue of Sate of Wash.*,
   934 F.2d 1064 (9th Circ. 1991) ........................................................................17, 18

*Calvillo Manriquez v. Devos*,
   411 F. Supp. 3d 535 (N.D. Cal. 2019) ......................................................................20

*Ceslik v. Miller Ford*,
   2006 WL 1582215 (C.D. Cal. July 9, 2020) .................................................................11

*Elliot v. Spherion Pac. Work, LLC*,
   368 Fed. App'x 761 (9th Cir. 2010) .......................................................................12

*F.T.C. v. John Beck Amazing Profits, LLC*,
   No. 09-cv-04719, 2009 WL 7844076 (C.D. Cal. Nov. 17, 2009) ...........................................14

*Faulkner v. Wausau Bus. Ins. Co.*,
   571 F. App'x 566 (9th Cir. 2014) ........................................................................12

*Flores v. Sessions*,
   No. 85-cv-04544, 2018 WL 6133665 (C.D. Cal. Nov. 11, 2018) ......................................9, 10

*Florida v. Bostick*,
   501 U.S. 429 (1991)....................................................................................14, 15

*Flynt Distrib. Co. v. Harvey*,
   734 F.2d 1389 (9th Cir. 1984) ...........................................................................11

*Gateway City Church v. Newsom*,
   516 F. Supp. 3d 1004 (N.D. Cal. 2021) ...................................................................11

*Hernandez v. Barr*,
   No. 16-cv-00620, 2019 WL 13019923 (C.D. Cal. March 25, 2019).......................................20

*Hook v. Ariz.*,
   120 F.3d 921 (9th Cir. 1997) ............................................................................12

*Keenan v. Allan*,
   91 F.3d 1275 (9th Cir. 1996) ............................................................................12

ii

*Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C*,
  478 U.S. ...............................................................................................................17

*Mardiros v. City of Hope*,
  2020 WL 6106820 (C.D. Cal. July 9, 2020).....................................................11

*Michigan v. Chesternut*,
  486 U.S. 567 (1988)..........................................................................................15

*Morgan Hill Concerned Parents Ass'n v. Cal. Dep't of Educ.*,
  No. 11-cv-03471, 2015 WL 10939711 (E.D. Cal. July 2, 2015).......................20

*Nat'l Org. For the Reform of Marijuana Laws v. Mullen*,
  828 F.2d 536 (9th Cir. 1987) ..................................................................10, 11, 14

*Newmark Realty Capital, Inc. v. BGC Partners, Inc.*,
  No. 16-cv-01702, 2018 WL 2416242 (N.D. Cal. May 29, 2018) .........................20

*Nkop v. City & Cnty. of San Francisco*,
  956 F.2d 1167 (9th Cir. 1992) ...........................................................................18

*Ohio v. Robinette*,
  519 U.S. 33 (1996).............................................................................................15

*People v. Butler*,
  85 Cal. App. 4th 745 (2000) ..............................................................................14

*People v. Culbert*,
  218 Cal. App. 4th 184 (2013) ............................................................................14

*Petroleum Expl. v. Pub. Serv. Comm'n of Kentucksy*,
  304 U.S. 209 (1938)...........................................................................................13

*Petrosyan v. Ali*,
  2013 WL 5466572 (E.D. Cal. Sept. 30, 2013) ..................................................11

*Pleasant Grove City, Utah v. Summum*,
  555 U.S. 460 (2009)...........................................................................................15

*Regis Metro Assocs., Inc. v. NBR Co., LLC*,
  2022 WL 267443 (N.D. Cal. Jan. 28, 2022).......................................................11

*Richardson v. Trump*,
  496 F. Supp. 3d 165 (D.D.C. 2020)....................................................................19

*Roman v. Wolf*,
  No. 20-cv-00768, 2020 WL 1952656 (C.D. Cal. Apr. 13, 2020), ECF No. 726....................10

*Shenzhenshi Haitiecheng Sci. and Tech. Co., LTD. v. Rearden LCC*,
  No. 15-cv-00797, 2019 WL 1560449 (N.D. Cal. Apr. 10, 2019)............................10

*SunEarth, Inc. v. Earth Solar Power Co.*,
  No. 11-cv-04991, 2012 WL 2344081 (N.D. Cal. June 20, 2012) .........................20

iii

*Thakur v. Cofiroute USA, LLC*,
   No. 19-cv-02233, 2020 WL 10731939 (C.D. Cal. Aug. 5, 2020) ....................................18, 19

*United States v. Suquamish Indian Tribe*,
   901 F.2d 772 (9th Cir. 1990) ..........................................................................................*passim*

*United States v. Drayton*,
   536 U.S. 194 (2002)..................................................................................................................14

*United States v. Faulkner*,
   450 F.3d 466 (9th Cir. 2006) ...................................................................................................15

*United States v. Vongxay*,
   594 F.3d 1111 (9th Cir. 2010) .................................................................................................14

*Wood v. Yordy*,
   No. 07-cv-00350, 2009 WL 10706017 (D. Idaho, June 2, 2009) .............................................19

*Xcentric Ventures, LLC v. Arden*,
   No. 10-cv-80058, 2011 WL 806629 (N.D. Cal. Mar. 2, 2011) ...............................................10

*Yeseta v. Baima*,
   837 F.2d 380 (9th Cir. 1988) ...................................................................................................18

**STATUTES**

28 U.S.C. § 1651(a) ............................................................................................................................9

California Penal Code § 422 ..............................................................................................................14

San Francisco Police Code § 169(d)....................................................................................................3

**RULES**

Fed. R. Civ. P. 53 ........................................................................................................................17, 18

Fed. R. Civ. P.  53(a)(1)(B)(ii) ........................................................................................................17

Fed. R. Civ. P.  53(b)(1) ..................................................................................................................18

Fed. R. Civ. P. 53(g)(3) ...................................................................................................................19

Fed. R. Evid. 801(d)(2) ....................................................................................................................11

L. R. 7-3(a) .......................................................................................................................................11

**TREATISES**

9C Wright & Miller, Fed. Prac. & Proc. Civ. § 2603 (3d ed. 2023) .............................................18

**OTHER AUTHORITIES**

David Sjostedt, *What San Francisco Politicians Won't See at Today's Hearing in UN Plaza*, San
   Francisco Standard (May 23, 2023), https://sfstandard.com/2023/05/23/un-plaza-heres-what-
   san-francisco-politicians-wont-see-at-rare-public-hearing/....................................................13

iv

1

London Breed, *City and County of San Francisco, California, Proposed Budget, Fiscal Years 2023-2024 and 2024-25*, 11, https://sf.gov/sites/default/files/2023-05/CSF_Proposed_Budget_Book_June_2023_Master_Web.pdf............................................19

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

v

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

I.     INTRODUCTION

Ensuring that San Francisco complies with the Court's preliminary injunction is of the utmost public importance.  The injunction protects the civil rights of thousands of San Francisco's most vulnerable residents, sparing them from further harm from their own City.  It also requires the City to fulfill its commitments to operationalize existing policies designed to actually mitigate the City's street homelessness crisis, as opposed to unconstitutionally punishing individuals simply for being homeless.  But Plaintiffs do not have the sufficient tools or information to systematically monitor the City's non-compliance at hundreds of unobserved and unrecorded enforcement interactions with unhoused individuals every month.

Despite the injunction, the City confesses that it has changed effectively nothing about its brutal and ineffective homelessness response operations.  The City has dispatched police hundreds of times to enforce sit/lie laws and endorses the use of police move-along orders.  The City concedes that it lacks sufficient shelter for the unhoused but continues to engage in formal HSOC encampment clearances anyway.  In an attempt to justify scant bag and tag records, the City explains that employees simply discard personal belongings without sorting, storing, or documenting any property destruction.  These admissions reflect brazen attempts to evade restrictions clearly set out in the injunction.  The City's unabashed conduct necessitates the appointment of a special master to ensure the City complies with the preliminary injunction.

The City's opposition targets three unhoused individuals while largely ignoring the vast majority of Plaintiffs' eyewitness evidence and the hundreds of unhoused residents the City has admitted it continues to subject to enforcement actions while shelters remain at capacity.  In response, the City maintains Plaintiffs are premature in seeking relief even though the Court issued the injunction seven months ago.  But the Court's intervention is needed imminently to ensure that the City does not further delay taking the steps necessary to comply with the injunction.  Given the City's dubious record of compliance, the Court should grant Plaintiffs' request for additional monitoring as necessary to provide timely assurance that the Court's orders are being followed.

II.    STATEMENT OF UNDISPUTED FACTS

A.     **The City Concedes Hundreds of Sit/Lie Enforcement Interactions Continue.**

1

The City concedes that it continues to dispatch police—instead of outreach workers who can offer services—more than 1,000 times to respond to calls for "919 Sit/Lie Enforcement" despite the preliminary injunction. Opp'n at 7-8. Seventy percent of those deployments resulted in police making contact with an unhoused person—meaning that in more than 700 instances, police began a law enforcement interaction with an unhoused person as a result of a call for prohibited sit/lie enforcement. Opp'n at 8:14-15. These numbers do not even include generic police dispatches in response to homelessness complaints, which the City concedes has resulted in thousands more interactions with unhoused individuals during the period of the injunction. Opp'n at 6-12.

The City has also indicated that the officers dispatched to respond to these calls have received no training specifically regarding enforcement of sit/lie laws or the Court's injunction. Young Decl. ¶ 4 (noting only officers assigned to *HSOC* operations have received any training); Shroff Supp. Decl. ¶ 4. Contrary to the City's policy on the use of body cameras, Young Decl., Ex. F, the City has represented that it will not record these interactions because it does not consider them enforcement. May 25, 2023 Hearing Tr. 7:25-8:1-19. As a result, the City provides no way to review hundreds of ongoing police interactions with unhoused individuals directly implicated by the injunction. The City claims that its enforcement actions at police dispatches are limited to only 30 citations or arrests that have been issued against unhoused individuals, ignoring that the injunction and the City's own updated Enforcement Bulletin also prohibit implicit and explicit threats of enforcement and move along orders. Opp'n at 8:8; Dkt. No. 97-2 at 1. Meanwhile, the City acknowledges that police officers direct unhoused people to move without clarifying that those requests are temporary or voluntary—notwithstanding the Court's stated concerns. Opp'n at 13:7-8; Dkt. No. 91 at 30:15-23, 31:14-15. The City also admits it is criminally enforcing a contrived 4-foot rule—which is not a criminal law—at many of these police-led enforcement interactions. Opp'n at 10:10-11, 10:17 (failing to cite authority setting out bright line rule).

## B.     The City Concedes HSOC Sweeps Continue Without Sufficient Shelter.

The City does not contest that it lacks sufficient shelter to offer unhoused individuals even at ongoing HSOC encampment resolutions. Dkt. No. 138 ¶ 133. The City admits that it does not

2

make a "literal offer of shelter" to most unhoused individuals, because the City does not know what limited amount of shelter may be available to offer when it engages unhoused residents—in violation of the City's own ordinances.  Opp'n at 14:20; *compare* O'Donnell Decl. ¶ 11 *with* San Francisco Police Code § 169(d).  The City also lists individuals as having "refused" shelter before any offer has been made, even including individuals who need a specific kind of shelter that is unavailable.  Opp'n at 14; Dkt. No. 138 ¶ 126.  The result is an over-inflated account of shelter refusals to justify continuing HSOC operations before shelter availability is even known or communicated to unhoused individuals.[1]  Such undisciplined reporting is consistent with Dr. Herring's uncontested observation that resource constraints "pressure front-line workers to restrict and/or set aside shelter offers based on personal discretions and bias or to engage in other workarounds to accomplish supervisors' goals and meet performance metrics."  Dkt. No. 9-1 ¶ 52.  Meanwhile, the parties agree that voluntary, on-demand access to shelter is essentially nonexistent in San Francisco.  Dkt. No. 138 ¶ 87.

## C.     The City Concedes That It Does Not Bag and Tag Most Property.

Despite the thousands of interactions with unhoused individuals both at formal HSOC operations and at informal DPW street cleanings, the City concedes that bagging and tagging of personal property occurs only "a few times a month."  Opp'n at 21:11-12.  The City claims there is "no requirement that it occur more frequently."  Opp'n at 21:13.  But this assertion ignores Dr. Herring's uncontested inference from the dearth of bag and tag logs that the City is engaging in widespread property destruction.  Dkt. No. 65 at 29-30.  The City avers that most items are destroyed because they present an immediate health or safety risk, Opp'n at 7, but again fails to submit evidence to satisfy its burden to demonstrate that this is the case, Dkt. No. 65 at 44.  In fact, no such health hazards were at issue in any of the Plaintiffs' declarations which describe usable,

---

[1] Many client log reports marked as "refusal" by the City actually indicate that individuals *were* interested in shelter, but that Defendants simply had no adequate shelter available. *See, e.g.* Piastunovich Decl., Ex. C. (listing entry 325 and 329 as "refused shelter offer" despite entry 325 requesting a "couples bed," and entry 329 requesting a "navigation bed"); Ex. E (listing lines 466 and 468 as "refused shelter offer" despite Entry 466 requesting a "couples bed" and Entry 468 requesting a "shelter bed"); Ex. G (listing Entry 564 and 566 as "refused shelter offer" despite both individuals requesting a "couples bed"); Ex. O (listing Entry 1065, 1068-1069, and 1074 as "refused shelter offer" despite record indicating all individuals expressed interest in shelter offer).

3

cherished belongings. *See* Mot. at 9-10 (listing items). The City's bag and tag policy also contemplates a photographic record of disputed property, Dkt. No. 62-1 at Section 2(d), but it is unclear whether those records are comprehensively maintained to allow Plaintiffs to review the City's decisions to discard personal property. Shroff Supp. Decl. ¶ 8.

### D.     The City Does Not Rebut the Vast Majority of the Evidence on Violations.

The City largely relies on conclusory recitations of their own policies and aspirational statements from City officials that do not rebut Plaintiffs' substantial eyewitness evidence of non-compliance. Opp'n at 12:9-10-24:5-11; Peralta Decl. ¶¶ 11-12 (SFPD Officer has "never seen" violations); Dilworth Decl. ¶¶ 17, 36, 39 (DPW worker describing *intent* to ensure compliance with DPW policy and the injunction during HSOC resolutions); Shehadeh Decl. ¶¶ 15, 26 (describing *intent* to ensure HOT team complies with the bag and tag policy at JFO resolutions); C. Berger Decl. ¶ 21 (explaining how he "make[s] an *effort* to let people know they can return to the space" after an HSOC resolution); C. Berger Decl. ¶ 26 (SFFD Paramedic describing that he *knows* "SFPD cannot enforce or threaten to enforce any of the laws the injunction prohibits"). Plaintiffs do not challenge the City's ability to recount its own policies or its declarants' intent to adhere to the preliminary injunction. But the City's generic assertions of compliance do not contradict an extensive evidentiary record of specific instances of non-compliance.

#### 1.     Continued Displacement of Unhoused Individuals Without Shelter.

The City has not contested many of Plaintiffs' specific examples of unhoused people being displaced since the injunction was entered. *See, e.g.,* Adams Decl. ¶ 9; Donohoe Supp. ¶¶ 4, 6; 2nd Donohoe Supp. Decl. ¶ 4; Myers Decl. ¶¶ 7-8; Verner Crist Supp. Decl. ¶¶ 23, 30, 36, 54, 63, 71, 79, 120, 127-128. The City does not dispute that specific declarants were never told commands to move were voluntary or temporary. A. Berger Decl. ¶ 8; Coalition Decl. ¶ 12; 2nd Donohoe Supp. Decl. ¶ 8 ; Melendez Decl. ¶ 5; Myers Decl. ¶ 15; Meyers Supp. Decl. ¶ 3; Erickson Decl. at ¶ 6; Harding Decl. ¶ 5; Hoffman Decl. ¶ 7; Dkt. No. 76-5; Dkt. No. 77 ¶¶ 5-6. Instead, the City claims it may force unhoused people to move as long as it does not explicitly reference the magic words "sit/lie" or say that removal is "permanent." Opp'n at 6:14-20; 12; 13:17-19. This position defies the SFPD's own bulletin in response to the injunction, which precludes "any conduct that

could be reasonably seen as forcing a particular action without an explicit threat. The circumstances of any such request must make it clear there is no possibility of enforcement of the enumerated laws if the individual declines to move." Dkt. No. 97-2 at 1. The City now concedes it does the opposite.[2] Opp'n at 13:7-9; *see also, e.g.,* Murdock Decl. ¶ 6 (told "it's time to go" by HOT employee); Harding Decl. ¶ 5 (told by SFPD to "get the hell out of there"); Jones Decl. ¶ 3; Martin Decl. ¶ 8; Melendez Decl. ¶ 5; Myers Decl. ¶¶ 7, 15-16 (told "if I did not move I would suffer the consequences"); Verner-Crist Decl. ¶¶ 9, 38, 41-43.[3]

Meanwhile, the City does not contest that it has posted signs across the City that continue to threaten enforcement for sitting or sleeping outside. Dkt. No. 138-9 ¶ 128; Dkt. No. 138-22; Verner-Crist 2nd Supp. Decl. ¶ 15. The City also concedes that some date-specific notices have been posted at HSOC operations that instruct unhoused individuals "not to return to this area." The City has acknowledged that it has used these notices as recently as the past few weeks. Opp'n at 23:8-10.[4] The City's argument that these notices "do not threaten to enforce any of the enjoined code sections" directly contradicts the Court's express concern that these notices violate the injunction. *Compare* Opp'n at 23:14 n. 17, *with* Dkt. No. 91 at 30:1-8 ("the same notice that's being used now as was used before the preliminary injunction order . . . . That's completely contrary to the order").

The City also does not challenge Plaintiffs' submissions providing detailed accounts of forced displacement where firm offers of shelter never materialized. *See* Mot. at 8:20-22, 26-28; *see, e.g.*, Barkley Decl. ¶¶ 4, 6, 15; A. Berger Decl. ¶ 9; Coalition Decl. ¶¶ 13-14; Draper Decl. ¶¶

---

[2] The City argues that because Officer Govindbhai did not "reference[] the sit/lie laws in the presence of the individuals he asked to disperse there was no threat and therefore no violation." Opp'n at 6:16-20. But the City does not dispute Mr. Calloway's account that Officer Govindbhai was flashing his police car lights at unhoused people and commanding them to move, or that he expressly told Mr. Calloway the sit/lie laws provided the basis for his actions. *Compare* Govindbhai Decl. with Calloway Decl.

[3] Additionally, the City does not challenge evidence establishing that it uses direct threats of property destruction and warrant checks to force declarants to move along. Jones Decl. ¶ 3; Verner Crist Supp. Decl. ¶ 41; Wise. Decl. ¶ 3; Myers Decl. ¶¶ 3, 8; Dkt. No. 79 ¶ 9. Other times, the City told unhoused individuals that the Court's order was gone or they do not care. Verner Crist Decl. ¶ 47-48; Jones Decl. ¶ 4; Melendez Decl. ¶ 6; Bagley-Adams Decl. ¶ 5.

[4] Plaintiffs have asked Defendants how many times the notices were "inadvertently" used and whether they have fully investigated the use but Defendants have declined to answer that question. Shroff Supp. Decl. ¶ 12.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3, 4, 5, 7; Erickson Decl. ¶ 8; Martin Decl. ¶ 6; Myers Decl. ¶¶ 10,16; Verner Crist Supp. Decl. ¶¶ 8, 22, 39, 44-45, 96-98; Dkt. No. 78 ¶ 8;  Dkt. No. 76 ¶¶ 7-8; Dkt. No. 77 ¶¶ 6-9; Dkt. No. 79 ¶¶ 7, 9; *compare* Myers Decl. ¶¶ 7-8, 14-15, 17 (detailing enforcement threats) *with* C. Berger Decl. ¶ 38 ("I do not recall" giving threats).  Instead, the City admits to not making firm shelter offers before directing unhoused individuals to leave the area and erroneously characterizing individuals as having refused shelter without actually offering shelter.  Opp'n at 14:14-25.[5]

The City's declarations from two HSOC commanders and two HOT team outreach specialists do not demonstrate that firm and adequate shelter offers precede enforcement.  These declarations describe the City ordering individuals to move along before they know the day's shelter bed allocation.  *See, e.g.* Delise Decl. ¶¶ 7, 16 (announcing at the beginning of an encampment resolution that individuals need to move and only "while packing and moving of belongings is taking place [does] the HOT team receive[] notice of the shelter bed allocations that are available that day"); Morales Decl. ¶¶ 3-5 (acknowledging that he assesses individuals for shelter prior to knowing what specific shelters are available).  This improper sequence of enforcement before identifying available shelter has not changed since the injunction.  Dkt. No. 65 at 12.

The City does not rebut the overall lack of shelter at HSOC resolutions or the specific violations Plaintiffs recount.  *See generally* Morales Decl., Rincon Decl. Regardless, the City does not contest that it has ordered individuals to move *without* the presence of the HOT team who can, in theory, offer shelter.  *See* Mot. at 16; Myers Decl. ¶¶ 7-10; Martin Decl. ¶¶ 7-8; Barkley Decl.

---

[5] The City suggests that a plaintiff rejected a shelter offer and is otherwise adverse to services. That is misleading.  Castaño 2nd Supp. Decl. (explaining desire for shelter, past use of shelter, and the obstacles the City has put in place to securing shelter).  Similarly, declarant A. Berger was never offered a specific offer of shelter.  A. Berger Decl. ¶¶ 8-9. Yet the City marked him as a refusal.  Rincon Decl. ¶ 15.  The City implies that particular declarants were not at an HSOC operations or refused to engage.  *See* Piastunovich Decl. ¶¶ 49, 63.  But declarant Draper makes clear that he was not at his tent until later in the day and that no one offered him shelter.  Draper Decl. ¶¶ 3, 4, 7.  Similarly, declarant Martin makes clear he hurried out of the area after an early threat from "an SFPD officer [who] came by and told me that I had to move or he would arrest me . . . I hurriedly packed up, hurting my back, so that I would not get arrested.  No one offered me shelter that day."  Martin Decl. ¶ 8.  Finally, the City suggests that declarant Moran "declined offer of congregate shelter" (Opp'n at 6), but Moran's concern was property destruction.  In any event, Moran explained his reason to be wary of for his safety at congregate shelter.  Moran Decl, ¶ 6 (noting an assault).

¶ 8; Hawthorne Decl. ¶ 7; van Harin Decl. ¶ 5; Calloway Decl. ¶¶ 5-7; *see also* O'Donnell at ¶¶ 11, 13 (shelter allocations are unknown at the start and "the second operation . . . and sometimes the third operation, is conducted without the HOT team"). The City also does not refute that SFPD has directed people to move without any other City officials present who could make a shelter referral. Calloway Decl. ¶¶ 3, 5-6; Martin Decl. ¶¶ 7, 8.

For the first time, the City has produced nineteen "client log" reports allegedly pertaining to shelter information for HSOC encampment resolutions since the preliminary injunction was issued. *See* Piastunovich Decl., Exs. A-K, M, O-T. While these logs show that *some* individuals received shelter, the reports are riddled with inconsistencies that undermine the reliability of the City's record-keeping.[6] By the City's logic, any individual who has accessibility or family needs is categorized as refusing shelter.[7]

### 2. Ongoing Property Destruction and Disregard of Bag and Tag Policy.

As described above, the City justifies its blatant failure to adhere to bag and tag protocols by broadly asserting that all destroyed property must be hazardous or soiled, reciting DPW procedures, and expressing employees' generalized intent to comply. *See supra* Section II.C; Opp'n at 17-18.[8] But the City barely attempts to justify the specific instances of property

---

[6] For example, at a February 21, 2023 HSOC resolution, Defendants claim that three individuals "refused to provide information," but the client log notes for those individuals indicated that they "must be placed in the same location." *See* Piastunovich Decl., Exs. B, I. Likewise, at a January 17, 2023 HSOC resolution, Defendants claim an individual refused to provide information, but the client log notes that individual indicated that they were "interested in a couples bed." *See* Piastunovich Decl., Ex A. As described above, these recorded shelter "refusals" obscure the reality that appropriate shelter is not made available to many unhoused individuals who seek it. *See supra* note 1 (detailing several other obviously erroneous shelter "refusals" in the City's newly produced records); *see also* Dkt. No. 138 ¶¶ 108, 126 (admitting that shelter offers may "not align with an individual's needs").

[7] Declarants Murdock and Hawthorne cannot stay in a group shelter for medical reasons but would be marked as having refused shelter. *See* Murdock Decl. ¶ 10; Hawthorne Decl. ¶ 8. The City claims that it "makes every effort to offer shelter that meets clients' needs" but cites only one instance where a HOT worker attempted to offer shelter that accommodated an individual's disabilities. Opp'n at 14:11-12, citing Rincon Decl. ¶ 11; Dkt. No. 138 ¶ 126 (shelters may "not align with an individual's needs"). This one example does not absolve the City of its numerous violations and obviously mislabeled shelter "refusals." *See* Mot. 8:17-28-9:1-13.

[8] For instance, an SFFD paramedic provides that the City "does not intentionally destroy items," and that he does "not want to throw out people's belongings." C. Berger Decl. ¶ 23. An aspirational desire to comply does not refute the numerous, specific instances where non-hazardous, recoverable personal items were thrown out. *See* Mot. at 9:15-28-10:1-12. Defendants' single reference to bagging and tagging salvageable items does not controvert the

---

destruction raised in Plaintiffs' declarations.  Opp'n at 20-21; Verner-Crist 2nd Supp. ¶¶ 21-23 (questioning the accuracy of the City's sole specific rebuttal).  In particular, the City does not rebut Plaintiffs' submitted testimony that the City has engaged in specific instances of unlawful property destruction even when items were valuable, attended, and expressly meant to be kept.  *See* Mot. at 9-11; *see, e.g.,* Barkley Decl. ¶ 18; Erickson Decl. ¶ 9; Garcia Decl. ¶ 5, Garrett Decl. ¶¶ 8-9; Harding Supp. Decl. ¶¶ 3-4 Jones Decl. ¶ 5; Martin Decl. ¶ 9; Moran Decl. ¶¶ 3-4; Murdock Supp. Decl. ¶¶ 8-9; Van Harin Decl. ¶ 6; Waltier Decl. ¶¶ 8-9; Wise Decl. ¶¶ 3-5; Verner Crist Supp. Decl. ¶¶ 46, 49, 50, 115; Dkt. No. 78 ¶¶ 10-11; *see also* Luz Decl.

Rather than bagging and tagging property, the City has repeatedly instructed declarants to either take their belongings or lose them.  Barkley Decl. ¶ 17; Coalition Decl. ¶ 10; A. Berger Decl. ¶ 10; Van Harin Decl. ¶¶ 8, 12.  Even when asked to bag and tag, the City declines to store property. Marin Decl. ¶ 9.  In violation of its own policy, the City limits the amount of property any individual can take with them and throws away the rest.  *Compare* Myers Decl. ¶ 9 *with* Dkt. No. 62-1 at 2.  Nor do Defendants disclaim that they failed to accommodate declarants who needed additional time or assistance to collect belongings.  Hawthorne Decl. ¶ 9; Martin Decl. ¶ 3; Verner Crist Supp. Decl. ¶¶ 67, 123; *contra* Dkt. No. 62-1 at 2.  The City also claims that it does not allow personal belongings to be retrieved from DPW trucks, even where the City cannot justify destroying the property.  Opp'n at 22:1-15; *see, e.g.,* Barkley Decl. ¶ 18; Garrett Decl. ¶¶ 6-7; Harding Supp. Decl. ¶ 4; Van Harin Decl. ¶ 7; Verner Crist Supp. Decl. ¶ 105.

## E.   The City's Noncompliance Continues to Evade This Court's Review.

The City has been unable to give Plaintiffs any assurance that it is complying with the Court's injunction via the discovery process.  The City has produced effectively no enforcement or shelter records in ordinary discovery for seven months, and its initial productions under the Court's stipulated preliminary injunction disclosure order provided far fewer incident reports and less compliance-related information than ordered, as well as incomplete notice of all enforcement

---

overwhelming number of other accounts of violation of the Bag and Tag Policy and injunction. Opp'n at 20:28-21:1-5.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

operations.  Shroff Decl. ¶¶ 3-10.[9]  For example, the City maintains that it is not conducting *any* DPW planned property removals that require advance notice to Plaintiffs, announcing that it is not providing advance notice of "JFO Operations" to unhoused individuals who are subject to these operations almost daily, and has obstructed Plaintiffs' monitoring efforts.  Shroff Supp. Decl. ¶¶ 5-6;  Verner-Crist Supp. Decl. ¶¶ 47-48 (City discouraging retaining of declaration of noncompliance); Verner-Crist 2nd Supp. Decl. ¶¶ 7-10 (threatening to deprive people shelter if monitor present).  Had the City produced a more complete sampling of information as they were ordered, Plaintiffs would have had at least some basis to evaluate the City's response to the injunction.  But no amount of discovery can correct the City's failure to take the requisite meaningful steps to comply with the injunction, its refusal to record hundreds of police interactions with unhoused individuals, its tolerance of officers making enforcement threats and issuing move along orders, its failure to create bag and tag records or to document property destruction, or its arbitrary determination that unhoused individuals have "refused" shelter before the City has even made a legitimate offer of appropriate shelter.  These circumstances make it impossible for Plaintiffs or this Court to assess the extent of the City's actual compliance with the preliminary injunction—discovery notwithstanding.

## III.   ARGUMENT

### A.   Plaintiffs Move to Enforce the Injunction, Not for Contempt.

Plaintiffs only seek additional compliance measures and monitoring under the All Writs Act to make sure that the City is abiding by the Court's preliminary injunction—not to hold the City in contempt.  Mot. at 13:23-14:11, 15:21-28.  The distinction is clear as a matter of law.  *See Flores v. Sessions*, No. 85-cv-04544, 2018 WL 6133665, at *2 (C.D. Cal. Nov. 11, 2018) ("Defendants entirely misapprehend the purpose of the Monitor's appointment and the scope of the Court's authority for doing so.  Federal Rule of Civil Procedure 53 and the All Writs Act (*i.e.*,

---

[9] At the time Plaintiffs filed the Motion to Enforce, the City had produced a total of approximately 71 SFPD Incident Reports.  Shroff Decl. ¶ 7.  Since then, the City produced an additional 45 SFPD Incident Reports, only three of which post-dated the Preliminary Injunction.  Shroff Supp. Decl. ¶ 9.

28 U.S.C. § 1651(a)) authorize the appointment of a special master to *monitor* compliance with a court's orders, and not to *coerce* that compliance or *punish* a defendant for non-compliance").

Nonetheless, the City incorrectly contends that this Court cannot subject it to additional monitoring or a special master without a specific finding of contempt by clear and convincing evidence. Opp'n at 4:20-5:1. Although a history of non-compliance favors appointment of a special master, it is not a requirement. Mot. at 20:1-12; *Shenzhenshi Haitiecheng Sci. and Tech. Co., LTD. v. Rearden LCC*, No. 15-cv-00797, 2019 WL 1560449, at *6-7 (N.D. Cal. Apr. 10, 2019) ("Though a history of noncompliance weighs in favor of reference to a special master, the Ninth Circuit has rejected a requirement that a court must find 'intentional disregard of court orders before a special master may be appointed.'").

The Central District of California recently rejected the City's precise argument here. *See Flores*, 2018 WL 6133665, at *2 (rejecting defendants' argument "that the Court may not . . . subject[] it to independent monitoring unless the Court finds by clear and convincing evidence that the agency breached the *Flores* Agreement . . ."). The City's sole authority to the contrary is inapposite. *Xcentric Ventures, LLC v. Arden*, No. 10-cv-80058, 2011 WL 806629, at *3 (N.D. Cal. Mar. 2, 2011) (summary order noting that the appropriate place to enforce an Arizona court order is Arizona).

Consistent with Ninth Circuit law, this Court can exercise its inherent authority to enforce and monitor compliance with its orders even without making a finding of contempt based on clear and convincing evidence. *See, e.g.*, *Nat'l Org. For the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 543 (9th Cir. 1987) ("There are no judicial decisions requiring a final determination of constitutional violation before an 'exceptional condition' justifying reference to a master can arise under Rule 53(b)."); Order Appointing Special Master, *Roman v. Wolf*, No. 20-cv-00768, 2020 WL 1952656 (C.D. Cal. Apr. 13, 2020), ECF No. 726 (court appointing a special master to oversee a preliminary injunction *sua sponte* given "the Government's inability to provide the Court with timely and accurate information").[10]

---

[10] The City's argument that it has undertaken "substantial efforts" to comply is inapplicable because this is not a contempt motion. Opp'n at 16:3-6.

**B.** **The City's Evidentiary Objections are Irrelevant and Improper.**

In the context of Plaintiffs' enforcement motion, the City's arguments about the sufficiency and admissibility of Plaintiffs' evidence are irrelevant. *See* Opp'n at 12:7-12 (citing *Ceslik v. Miller Ford*, 2006 WL 1582215, at *1 (C.D. Cal. July 9, 2020) (noting that the rules of evidence apply in "contempt proceeding[s]") and *Mardiros v. City of Hope*, 2020 WL 6106820, at * 1 (C.D. Cal. July 9, 2020) (regarding unsworn statements, attorney hearsay, and hearsay about costs, not underlying noncompliance). Plaintiffs need not make any evidentiary showing of non-compliance to prevail on their motion. *Mullen*, 828 F.2d at 543.

Plaintiffs have nonetheless provided numerous sworn declarations from percipient witnesses and non-hearsay evidence to support their motion to enforce. The witnesses provided accounts of their own personal observations about the City's conduct toward themselves or others, which is not hearsay. *See, e.g.*, Dkt. Nos. 130-33 ¶¶ 3-4; 130-34 ¶¶ 3-5; 130-26 ¶¶ 4-8; 130-23 ¶¶ 6-10; 130-36 ¶¶ 5-7; 130-24 ¶¶ 8-9; *see also* Fed. R. Evid. 801(d)(2) (party-opponent statements are not hearsay).[11] The City does not explain why any particular declaration lacks "foundation" or how any declaration contains "improper legal conclusions." Opp'n at 5:14-16; *see also Petrosyan v. Ali*, 2013 WL 5466572, at *5 (E.D. Cal. Sept. 30, 2013) (objection improper where "fail[ure] to explain the rationale behind [the] objections"). In any event, at this pre-trial stage, such evidentiary issues, at most, go to weight, not admissibility. *See Gateway City Church v. Newsom*, 516 F. Supp. 3d 1004, 1009 n.3 (N.D. Cal. 2021); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.").

The City has also violated the Court's rules by submitting "Objections to Evidence" as an exhibit to a declaration, plainly an attempt to bypass page limits. Gradilla Decl., Ex. B; L. R. 7-3(a) ("Any evidentiary and procedural objections to the motion must be contained within the brief or memorandum."); *Regis Metro Assocs., Inc. v. NBR Co., LLC*, 2022 WL 267443, at *9, n. 11 (N.D. Cal. Jan. 28, 2022) ("RMA's fourteen-page statement of objections is procedurally improper

---

[11] Harding Supp. Decl. ¶¶ 3-4, Jones Decl. ¶¶ 3-5, Melendez Decl. ¶¶ 4-8, Murdock Decl. ¶¶ 6-10, Barkley Decl. ¶¶ 5-7, and Adams Supp. Decl. ¶¶ 8-9 address specific actions and statements by the City itself.

because the objections are not contained within the opposition brief.").  The Court should therefore decline to consider these improper objections.[12]

The City's miscellaneous objections also include a baseless assertion that the City should not have to "scour the record" to rebut Plaintiffs' declaration evidence.  Opp'n at 5:19-6:9. But the City's own cited authority identifies that it is the non-moving party's *duty* to identify and rebut relevant evidence. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) ("[The nonmoving party's] burden to respond is really an opportunity to assist the court in understanding the facts.  But if the nonmoving party fails to discharge that burden—for example, by remaining silent—its opportunity is waived and its case wagered." (internal quotations and citations omitted)); *see also Faulkner v. Wausau Bus. Ins. Co.,* 571 F. App'x 566, 569 (9th Cir. 2014) (noting that parties must cite to relevant evidence in the record for it to be considered).

**C.      The City's Continued Enforcement Threats and Nonexistent Record at Thousands of Enforcement Interactions Necessitate a Special Master.**

It is binding Ninth Circuit law that a Special Master is appropriate where there are serious problems associated with compliance, a past history of non-compliance, or the inherent complexity of the litigation renders compliance difficult to monitor.  *See* Opp'n at 19:14-28; *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990) ("Masters may also be appointed because of the complexity of litigation and problems associated with compliance with the district court order"); *Hook v. Ariz.*, 120 F.3d 921, 926 (9th Cir. 1997) (finding district court did not abuse its discretion in appointing of special master where there was noncompliance and the court "lacked the resources to constantly monitor compliance").  The scope and nature of the City's conduct establishes each of these requirements.

The Court expressly enjoined the City from actions short of citation and arrest, like *threatened* enforcement of ordinances that criminalize involuntary homelessness, recognizing that threatening to enforce proscribed laws and ordinances also results in irreparable injury. *See*

---

[12] Dkt. No. 65 at 3:24-28.  *See, e.g., Elliot v. Spherion Pac. Work, LLC*, 368 Fed. App'x 761, 763 (9th Cir. 2010) ("The court did not abuse its discretion in following the local rules and refusing to consider the evidentiary objections. . . .").  Should the Court determine it will consider the exhibit, Plaintiffs respectfully ask that the Court provide an opportunity for Plaintiffs to separately respond to the arguments improperly contained therein.

*Petroleum Expl. v. Pub. Serv. Comm'n of Kentucksy*, 304 U.S. 209, 218-19 (1938) (describing how the injury that flows from threatened unconstitutional enforcement of laws is irreparable and sufficient to justify an injunction).  These thousands of unlawful "move along" orders formed the basis on which Plaintiffs' sought a preliminary injunction against enforcement.  Yet the City's homelessness removal practices remain unchanged.[13]  The City does not deny that its officers regularly instruct unhoused individuals to move without telling them the move is voluntary or temporary.  Opp'n at 13:7-9.  Instead, the City posits, implausibly, that if unhoused individuals decide to move, they are doing so of their own accord.  But unhoused individuals do not understand these requests to move as voluntary.[14]

These coercive interactions violate the City's own enforcement bulletin on the injunction— a policy that dispatch officers have not been trained on.  The City's only response is to assert that no enforcement has taken place because citations and arrests have not been issued or particular code provisions expressly invoked—which is irrelevant to the injunction's prohibition on threats of enforcement and a clear end run.  Opp'n 13:17-19.  Meanwhile, the City does not dispute that *hundreds* of law enforcement interactions with unhoused people are occurring without *any way* for Plaintiffs to meaningfully review and ensure compliance with injunction's prohibition on

---

[13] In a spate of separate instances, the City has ordered and forced individuals to move at formal HSOC resolutions, ad-hoc police dispatches, and single-department sweeps.  *See* Mot. at 4-6.  The City only contests a select few episodes described in Plaintiffs' submitted declarations, leaving the rest unanswered.  Even the City's response to these few incidents raises serious questions.  For example, the City purports that it displaced a man from U.N. plaza supposedly for his own benefit because he was "non-responsive," when it is abundantly clear that police were ordered to clear the entire plaza of unhoused individuals in advance of a public appearance by the Mayor.  *See* David Sjostedt, *What San Francisco Politicians Won't See at Today's Hearing in UN Plaza*, San Francisco Standard (May 23, 2023), https://sfstandard.com/2023/05/23/un-plaza-heres-what-san-francisco-politicians-wont-see-at-rare-public-hearing/; *see also* Dkt. No. 138 ¶ 223 ("San Francisco admits that Mayor Breed has expressly called for law enforcement to remove unhoused individuals from public property and that …the City does not have enough affordable housing or shelter to meet its needs").

[14] Rather than suggesting that the City's orders to move are optional or temporary, the evidence shows these orders are accompanied by threats of arrest, warrant checks, jailing, and property destruction.  *See* Mot. at 6-7; *see, e.g.,* Murdock Supp. Decl. ¶ 8 (property destruction); Wise Decl. ¶ 3 (city using knife to shred tents); Jones Decl. ¶¶ 3, 5 (property search and seizure); Hoffman Decl. ¶ 6 (same); Martin Decl. ¶ 8 (explicit threat by SFPD to arrest); Adams Decl. ¶ 7 (threat by City worker to call SFPD); Harding Decl. ¶¶ 4-5 (threat by City worker to call SFPD); Myers Decl. ¶ 8 (threat of warrant check by SFPD); Calloway Decl. ¶ 5 (show of authority by SFPD intended to make unhoused people move); Dkt. No. 79 ¶ 9.  This is contrary to the City's representation that police "keep their distance" and do not ask people to move.  Dkt. No. 83 at 1:8-18.

1    enforcement threats.[15]  These circumstances warrant the appointment of a special master to verify

2    compliance. *See Suquamish Indian Tribe*, 901 F.2d at 775; *Mullen*, 828 F.2d at 543; *F.T.C. v. John*

3    *Beck Amazing Profits, LLC*, No. 09-cv-04719, 2009 WL 7844076, at *16 (C.D. Cal. Nov. 17,

4    2009).

5         The City's primary argument against Plaintiffs' request for additional compliance

6    measures is that vague enforcement threats are lawful as long as they do not specifically invoke a

7    proscribed statute, and so the City's conduct does not need to be monitored.  Opp'n at 20:10-14.

8    But courts generally agree with this Court's determination that even a question or request from a

9    government official can constitute a coercive show of authority, and that compliance is not

10   voluntary simply on the government's say-so after the fact.  *See* Dkt. No. 91 at 30:15-17, 31:14-

11   15; *Florida v. Bostick*, 501 U.S. 429, 438 (1991) ("Citizens do not forfeit their constitutional rights

12   when they are coerced to comply with a request they would prefer to refuse."); *Benson v. City of*

13   *San Jose*, 583 Fed. App'x 604, 605-606 (9th Cir. 2014) (describing how a government official's

14   telling an individual to stay put or get on a bus can constitute a non-consensual seizure when

15   evaluated in context).

16        The City's cited legal authority does not indicate otherwise.  *See United States v. Drayton*,

17   536 U.S. 194, 207 (2002) (noting that whether a law enforcement encounter was "voluntary" is

18   governed by a "totality of the circumstances" test); *United States v. Vongxay*, 594 F.3d 1111, 1120

19   n.6 (9th Cir. 2010) (noting that "inform[ing] the person being searched that he has a right to refuse

20   consent . . . weighs in favor of finding consent"). [16]  In fact, courts reject "bright-line rule[s]" for

---

21   [15] The City's report that dispatches for sit/lie enforcement have moderately decreased in recent

22   years has no bearing on the question at hand: why these dispatches specifically to enforce sit/lie ordinances continue and whether enforcement threats persisted at hundreds of interactions after the injunction was issued.  Opp'n at 7:20-22.

23   [16] No such advisement on voluntariness or temporariness occurs.  Focusing on the "totality of

24   circumstances" is a similar inquiry for California Penal Code Sec. 422, which the SFPD Bulletin on the Court's injunction uses to illustrate what constitutes a threat.  *See* Dkt. No. 97-2 at 1 (""any

25   *conduct* that could be *reasonably seen as forcing a particular action without an explicit threat*")

     (emphasis added).  Penal Code Sec. 422 is California's criminal threat statute and "even an

26   ambiguous statement may be a basis for a violation of section 422."  *See People v. Culbert*, 218 Cal. App. 4th 184, 190 (2013).  Further, threats under section 422 are evaluated by "the

27   circumstances under which the threat is made that give meaning to the actual words used."  *People v. Butler*, 85 Cal. App. 4th 745, 753 (2000).  Thus, even the law that the City uses to show police

28   officers what constitutes a threat under the Injunction employs a "totality of the circumstances" standard.

14

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    evaluating whether an individual has been threatened with enforcement, as the City proposes.  *See,*

2    *e.g. Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *Bostick*, 501 U.S. at 437.

3          Instead, courts have found government conduct coercive if a reasonable person would not

4    feel free to "ignore the [government] and go about [their] business."  *Bostick*, 501 U.S. at 437

5    (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)); *see also United States v. Faulkner*,

6    450 F.3d 466, 469-70 (9th Cir. 2006) (describing how a reasonable person would not have felt free

7    to leave given the presence of a uniformed, armed law enforcement officer standing next to their

8    official government vehicle).  The Court previously raised the same concern with how the presence

9    and number of police may be threatening to unhoused individuals being ordered to move.  Dkt.

10   No. 91 at 30:15-23, 31:14-15 (questioning outsized police presence and whether "individuals

11   understand that moving is voluntary").  The City's own statements and the overwhelming record

12   of unrecorded police dispatches to response to calls for "Sit/Lie" enforcement—still prevalent

13   since the Court's injunction—plainly suggest that these conveniently ambiguous "requests" are in

14   fact enforcement threats the Court has proscribed.  Opp'n at 7:17-23, 8: 1-28, 9:1-9.  The Court

15   should decline the City's invitation to simply assume that the enjoined laws are not being enforced

16   at thousands of recurring and unrecorded law enforcement interactions with the unhoused.[17]

17   Alternatively, the City claims it is enforcing an arbitrary 4-foot rule, which does not come from

18   any criminal law and that SFPD specifically noted as a way around the Court's injunction.  Mot.

19   at 11:29, 12:1-20.[18]  At least dozens of unhoused individuals are being subjected to enforcement

20

21

22

---

23   [17] The City's opposition distracts by suggesting that there may be some legitimate law enforcement
     intervention in response to unhoused individuals at a given encampment. Opp'n at 18:22-28.
24   Plaintiffs agree.  That is irrelevant to the question of whether officers understand the limits of their
     authority and whether their compliance with the injunction at these interactions is able to be
25   ascertained either by Plaintiffs or this Court.
     [18] The City justifies its intransigence as protected First Amendment activity, but the Free Speech
26   Clause applies to individuals, not governments.  *Pleasant Grove City, Utah v. Summum*, 555 U.S.
     460, 467 (2009).  In any event, that does not preclude this Court from issuing an order to enforce
27   its injunction based on evidence that the City may not be complying as it pursues its appeal of the
     injunction in the Ninth Circuit.  *See A&M Records Inc. v. Napster, Inc.*, 284 F.3d 1091, 1099 (9th
28   Cir. 2002).

actions based on this arbitrary rule, and potentially many more at the City's unrecorded and undocumented ad hoc police interactions.[19]

It is undisputed that the police engage in thousands of these enforcement interactions without even purporting to offer shelter because outreach workers are not present and the City's shelters are full.  These enforcement operations, for which police dispatch officers have received no training specific to compliance with the injunction, require additional monitoring.  Even at formal HSOC operations, where HOT team outreach workers are nominally presented, there is insufficient shelter and the City's records reveal inconsistencies and the use of misleading labels making it difficult to assess whether individuals have access to shelter.  That is precisely why a special master is appropriate in this case.  *Suquamish Indian Tribe*, 901 F.2d at 775.

**D.    The City's Failure to Bag & Tag and Document Destroyed Property at Removal Operations Necessitates a Special Master.**

The City admits that it continues to seize and destroy property at dozens of monthly encampment resolutions and daily street cleanings without bagging and tagging specific property under the City's bag and tag policy—as required by the Court's injunction.  Without adequate logs or documentation identifying disputed property, the City's response to unhoused individuals' personal property is entirely unascertainable.  The bag and tag logs that do exist reveal that little property has been stored by the City since the injunction, while the City broadly purports that any valuable belongings it destroys are mixed with hazardous materials and refuse.  Opp'n at 20-21.  These bare assertions do nothing to undermine Dr. Herring's findings regarding the City's failure to maintain bag and tag records, individual accounts of the City's destruction of apparently

---

[19] Plaintiffs and declarants have consistently maintained that the City can and should keep the sidewalks clean and accessible without criminalizing unhoused people's existence. That does not excuse the City creating non-existent laws or artificial blockages to forcibly displace unhoused individuals. A rule that contractors building a sidewalk in San Francisco must make sure that the sidewalk has 4 feet of usable space does not make it a crime for the public to "obstruct" that space. See Mot. at 12.  Such an interpretation would be an end run the injunction and make huge swaths of the City off limits.  Castaño 2nd Supp. Decl ¶¶ 17-19.  Similarly, the City cannot claim a desire for ADA compliance while also purposefully obstructing sidewalk space to strategically block unhoused people from having enough public usable space to avoid enforcement.  Verner-Crist 2nd Supp. Decl. ¶¶ 5, 11 (setting up barricades); Meyers Supp. Decl. ¶ 5 (same).

16

1  valuable personal property included with this motion, and this Court's determination the City's

2  must demonstrate that any personal property it summarily destroys is not salvageable.[20]

3       Because the City has failed to create any property logs that would meaningfully catalog

4  any discarded property, there are no records to substantiate the City's compliance with its bag and

5  tag policy.   Additionally, to the extent DPW chooses not to post property removal notices in

6  advance, Plaintiffs are unable to identify instances of non-compliance at DPW's almost daily

7  operations where they remove the belongings of unhoused individuals across the City.   These

8  circumstances justify a special master—particularly as discovery would not allow Plaintiffs to

9  identify whether and how the City is complying with the injunction.  *See also Local 28 of Sheet*

10 *Metal Workers' Int'l Ass'n v. E.E.O.C*, 478 U.S. at 482 (noting "the difficulties inherent in

11 monitoring compliance with the court's orders" as a basis for the appointment of a special master).

12     **E.     The City Conflates the Requirements for Trial Masters and Special Masters**

13          **Appointed to Ensure Compliance with a Court Order.**

14      The City's principal argument in opposition to appointment of a special master is based on

15 outdated language from Fed. R. Civ. P. 53 and entirely inapposite rules that apply only to trial

16 masters.  Opp'n at 25:1-26:18.  It is true that prior to 2003, Rule 53(b) stated that reference "shall

17 be the exception and not the rule," and, with limited exceptions, "shall be made only upon a

18 showing that some exceptional condition requires it."  *See Burlington N. R.R. Co. v. Dep't of*

19 *Revenue of Sate of Wash.*, 934 F.2d 1064, 1071 (9th Circ. 1991).  But in 2003 the rule was "revised

20 extensively to reflect changing practices in using masters."  Fed. R. Civ. P. 53 advisory committee

21 notes.  The provisions of former Rule 53(b), including the "exceptional condition" language, are

22 now included in current Rule 53(a)(1)(B)(ii), which pertains solely to "trial masters"—masters

23 who exercise the "core functions of trial" such as fact-finding.  *Id.*  At the same time, subsection

24 (a)(1)(C) was added to "authorize[ ] appointment of a master to address pretrial and post-trial

25 matters . . . that cannot be addressed effectively and in a timely fashion by an available district

26 judge or magistrate judge of the district."  *Id.*  The 2003 Committee Notes clarify that this broader

27 ────────────────
[20] The City's own policy also demonstrates the opposite presumption.  In fact, all belongings are
28 to be assumed valuable, wanted, and subject to storage as a default matter.  Dkt. No. 62-1 at Section
3(d).

1   role is no longer limited to "exceptional condition[s]", and "may include matters that could be

2   addressed by a judge." *Id.*

3        As Plaintiffs have established, even before 2003, appointment of a special master was

4   always appropriate when necessary "to aid a district court in the enforcement of its decree."

5   *Suquamish Indian Tribe*, 901 F.2d at 774 (listing numerous references to masters during the course

6   of the litigation).  Contrary to the City's assertion (Opp. at 25:24-26), the complexity of the case

7   was only the *second* basis cited by the Ninth Circuit for the appointment of a master in *Suquamish*

8   *Indian Tribe*.  *Id.* at 774-75.  The City also does not address the many cases Plaintiffs cite

9   upholding references to special masters in like circumstances.  *See* Mot. at 19:14-20:25.  Rather,

10   the City relies on pre-1993 cases discussing "trial masters" and other inapposite cases.  *See*

11   *Burlington N. R.R. Co.*, 934 F.2d at 1071; *Nkop v. City & Cnty. of San Francisco*, 956 F.2d 1167

12   (9th Cir. 1992); *Yeseta v. Baima*, 837 F.2d 380, 387 (9th Cir. 1988).[21]  The City even cites authority

13   affirming this distinction.  *Thakur v. Cofiroute USA, LLC*, No. 19-cv-02233, 2020 WL 10731939,

14   at *4 (C.D. Cal. Aug. 5, 2020) (disapproving of a Rule 53(a)(1)(B) trial master while expressly

15   appointing a Rule 53(a)(1)(C) special pre-trial master on the same facts, and noting that

16   "Defendants are incorrect that the Court may only appoint a special master under Rule 53(a)(1)(C)

17   if exceptional circumstances exist").

18        Nor does the City cite any authority for its assertion that appointment of a master must be

19   based on "specific subject matter expertise that the Court lacks."  Opp. at 26:1-2.  Rule 53 does

20   not require that the party nominate a specific person for special master.  Rule 53(b)(1) states that

21   *any* party *may* suggest candidates for appointment" (emphasis added), and Courts often make

22   nominations *sua sponte*.  *See, e.g., In re Anthem, Inc. Data Breach Litig.,* No. 15-MD-02617, 2018

23   WL 3960068, at *1 (N.D. Cal., Aug. 17, 2018).[22]  The City's even cites authority that contradicts

---

24   [21]  The City's assertion that there is "strong skepticism around appointing special masters" is

25   wrong.  Opp'n at 25:11.  Defendants even rely on a treatise that also states that "reference to a
      master under Federal Rule 53 may be a useful device to assist the district court in many situations."

26   9C Wright & Miller, Fed. Prac. & Proc. Civ. § 2603 (3d ed. 2023).  The 2003 Committee Notes
      also state that "appointment of masters to participate in pretrial proceedings has developed

27   extensively over the last two decades . . . ."
   [22]  Defendants' argument, based on the 2003 Committee Notes, that additional caution is necessary

28   in a case involving "important public issues" (Opp'n at 25:3-7) is inapplicable because Plaintiffs

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

this position.  *Thakur*, 2020 WL 10731939, at *5 ("Rule 53(a)(1)(C) does not require that the proposed special master have expertise in the specific subject matter of the action in question.").

The City paradoxically argues that Plaintiffs' request is "premature" (Opp. at 27:3-9) even though Plaintiffs have amassed abundant evidence of repeated violations without receiving the information in the City's possession necessary to monitor compliance.  Despite months of sustained negotiations between the parties, the City has made it impossible to obtain discovery on entirely unrecorded interactions implicated by the Court's injunction.  Unlike in *Richardson v. Trump,* there is also ample evidence of the City's failures to comply with Court orders.  496 F. Supp. 3d 165, 190 (D.D.C. 2020).

### F.    The City Alone Should Bear the Cost of a Special Master After Years of Violating the Constitution In Contravention of Its Own Policies.

The parties agree that allocation of the master's costs must be based on the criteria set forth in Fed. R. Civ. P. 53(g)(3). These factors each require allocating 100% of the costs to the City. Regarding the "nature of the controversy" and "which party is more responsible … for the reference to a master," the *only* basis for the reference is the City's improper and insufficient conduct with respect to the injunction and years of failing to comply with its own policies.  Mot. at 4-13.  Comparing "the parties' means," between a small non-profit and destitute plaintiffs versus the City with its $14 billion annual budget,[23] there is no question the City should pay.[24] Defendants' extraordinary argument that costs should be borne by Plaintiffs' *pro bono* counsel is unsupported by case law.  The only case cited by Defendants, *In re Anthem, supra,* is entirely distinguishable: (1) the master was appointed due to the court's concerns regarding *plaintiffs' counsels' fee request* in a consumer class action; (2) payment could be made from a "fund . . .

---

seek a master only to monitor adherence to the injunction, not to exercise the "judicial function" of determining whether an injunction is warranted. Contrary to Defendants' straw man argument, the basis for Plaintiffs' request for a master is not "court congestion," but rather the need to monitor Defendants' compliance with the Court's injunction.

[23] London Breed, *City and County of San Francisco, California, Proposed Budget, Fiscal Years 2023-2024 and 2024-25*, 11, https://sf.gov/sites/default/files/2023-05/CSF_Proposed_Budget_Book_June_2023_Master_Web.pdf

[24] Defendants are incorrect about the holding in *Wood v. Yordy*, No. 07-cv-00350, 2009 WL 10706017 (D. Idaho, June 2, 2009).  There, the court's declined to appoint *not* because of the plaintiff's inability to pay, but because the plaintiff had not shown "circumstances to justify such an appointment." *Id.* at *11.

19

1   within the court's control," the ultimate $31 million fee award; and (3) plaintiffs' counsel did not

2   object to making such payment out of that fund; none of which remotely resemble the

3   circumstances in this case.  WL 3960068, at *32; *Morgan Hill Concerned Parents Ass'n v. Cal.*

4   *Dep't of Educ.*, No. 11-cv-03471, 2015 WL 10939711, at *2 (E.D. Cal. July 2, 2015) ("the court

5   finds defendant should bear the responsibility for special master's fees" when "plaintiffs' counsel

6   . . . are presently receiving no compensation for their time or reimbursement of costs").

### G.   Regular Compliance Reports Are Warranted, Routine Measures.

8   The City concedes that this Court has broad discretion to require compliance reports.

9   Opp'n at 30:5-8. Contrary to the City's argument, the cases cited by Plaintiffs also establish that

10   courts regularly exercise their power to order *multiple* compliance reports in light of compliance

11   concerns.  Opp'n at 30:5-6.[25]  As explained above, the City is wrong that the discovery process

12   would satisfy Plaintiffs' need for information, as the City has determined to avoid recording any

13   of its enforcement or property removal interactions with unhoused individuals, which is central to

14   understanding compliance with the Court's injunction.  Shroff Supp. Decl. ¶ 10.

## IV.   CONCLUSION

16   For the foregoing reasons, Plaintiffs respectfully request the Court to grant Plaintiffs'

17   Motion to Enforce the Preliminary Injunction by issuing an Order appointing a special master and

18   requiring the City to submit regular compliance reports.

---

[25] *See Calvillo Manriquez v. Devos*, 411 F. Supp. 3d 535, 538 (N.D. Cal. 2019) (ordering defendants to file a status report regarding compliance with the injunction after the plaintiffs "notified the court that Defendants were in substantial noncompliance with the preliminary injunction"); *Hernandez v. Barr*, No. 16-cv-00620, 2019 WL 13019923, at *2 (C.D. Cal. March 25, 2019) (requiring defendants to file a detailed status report describing the steps taken to identify each class member and the outcomes of any bond redeterminations); *SunEarth, Inc. v. Earth Solar Power Co.*, No. 11-cv-04991, 2012 WL 2344081, at *3 (N.D. Cal. June 20, 2012) (ordering defendant to file a detailed compliance report in a trademark dispute); *Newmark Realty Capital, Inc. v. BGC Partners, Inc.*, No. 16-cv-01702, 2018 WL 2416242, at *13 (N.D. Cal. May 29, 2018) (ordering defendants in a trademark case to file a compliance report "outlining … corrections" to their marketing materials after expressing concern that certain of defendants' activities might "constitute a violation of the preliminary injunction order that warrants a finding of contempt.").

20

1

2    Dated:  July 25, 2023                              Respectfully submitted,

3                                                       By: /s/ Alfred C. Pfeiffer, Jr.

4
                                                        LATHAM & WATKINS LLP
5                                                       Alfred C. Pfeiffer, Jr., SBN 120965
                                                        Wesley Tiu, SBN 336580
6                                                       Kevin Wu, SBN 337101
                                                        Tulin Gurer, SBN 303077
7                                                       505 Montgomery Street, Ste 2000
                                                        San Francisco, CA 94111
8                                                       Telephone: (415) 391-0600
                                                        al.pfeiffer@lw.com
9                                                       wesley.tiu@lw.com
                                                        kevin.wu@lw.com
10                                                      tulin.gurer@lw.com

11
                                                        LATHAM & WATKINS LLP
12                                                      Joseph H. Lee, SBN 248046
                                                        650 Town Center Drive, 20th Floor
13                                                      Costa Mesa, CA 92626
                                                        Telephone: (714) 540-1235
14                                                      joseph.lee@lw.com

15
                                                        LATHAM & WATKINS LLP
16                                                      Rachel Mitchell, SBN 344204
                                                        12670 High Bluff Drive
17                                                      San Diego, CA 92130
                                                        Telephone: (858) 523-5400
18                                                      rachel.mitchell@lw.com

19
                                                        By: /s/ Zal K. Shroff
20

21                                                      LAWYERS' COMMITTEE FOR CIVIL
                                                        RIGHTS OF THE SAN FRANCISCO BAY
22                                                      AREA
                                                        Zal K. Shroff, MJP 804620, pro hac vice
23                                                      131 Steuart Street, Ste. 400
                                                        San Francisco, CA 94105
24                                                      Telephone: (415) 543-9444
                                                        zshroff@lccrsf.org
25                                                      edellapiana@lccrsf.org

26
                                                        By: /s/ John Thomas H. Do
27

28

1

2

3

4

5

6

7

8

9

ACLU FOUNDATION OF NORTHERN
CALIFORNIA
John Thomas H. Do, SBN 285075
Brandon L. Greene, SBN 293783
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
jdo@aclunc.org
bgreene@aclunc.org

*Attorneys for Plaintiffs*
*Coalition on Homelessness, Toro Castaño, Sarah*
*Cronk, Joshua Donohoe, Molique Frank, David*
*Martinez, Teresa Sandoval, Nathaniel Vaughn*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

## **ATTESTATION**

2          I, Alfred C. Pfeiffer, Jr., am the ECF user whose user ID and password authorized the

3 filing of this document.  Under Civil L.R. 5-1(h)(3), I attest that all signatories to this document

4 have concurred in this filing.

5

6 Dated:  July 25, 2023                              */s/ Alfred C. Pfeiffer, Jr.*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLFS.' REPLY ISO MOT. TO ENFORCE PRELMINARY INJUNCTION
CASE NO. 4:22-cv-05502-DMR