LATHAM & WATKINS LLP
Alfred C. Pfeiffer, Jr., SBN 120965
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
al.pfeiffer@lw.com

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY AREA
Zal K. Shroff, MJP 804620, *pro hac vice*
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
zshroff@lccrsf.org

ACLU FOUNDATION OF NORTHERN
CALIFORNIA
John Thomas H. Do, SBN 285075
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
jdo@aclunc.org

*Attorneys for Plaintiffs*

*Additional Counsel Below*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| COALITION ON HOMELESSNESS, et al.,<br><br>　　　　　　　Plaintiffs,<br>　　v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>　　　　　　　Defendants. | Case No. 4:22-cv-05502-DMR<br><br>**SUPPLEMENTAL DECLARATION OF TORO CASTAÑO IN SUPPORT OF MOTION TO ENFORCE PRELIMINARY INJUNCTION**<br><br>**Judge:**　　　The Hon. Donna M. Ryu<br><br>**Hearing Date:**　August 10, 2023<br>**Time:**　　　1:00 p.m.<br>**Place:**　　　Courtroom 4 – 3rd Floor<br>　　　　　　1301 Clay Street<br>　　　　　　Oakland, CA 94612 |

LATHAM & WATKINS LLP
Wesley Tiu, SBN 336580
Kevin Wu, SBN 337101
Tulin Gurer, SBN 303077
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
wesley.tiu@lw.com
kevin.wu@lw.com
tulin.gurer@lw.com

LATHAM & WATKINS LLP
Joseph H. Lee, SBN 248046
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
joseph.lee@lw.com

LATHAM & WATKINS LLP
Rachel Mitchell, SBN 344204
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
rachel.mitchell@lw.com

ACLU FOUNDATION OF NORTHERN CALIFORNIA
William S. Freeman, SBN 82002
Brandon L. Greene, SBN 293783
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
wfreeman@aclunc.org
bgreene@aclunc.org

# SUPPLEMENTAL DECLARATION OF TORO CASTAÑO

I, Toro Castaño hereby declare pursuant to 28 U.S.C. § 1746:

1. I am an individual plaintiff in the above-titled case. I previously submitted declarations in this case describing my direct experiences with San Francisco's police displacement operations and property destruction while homeless. (Castaño Decl., Dkt. Nos. 9-4 and 50-5).

2. I submit this further supplemental declaration regarding my recent direct observations and experiences. I have also reviewed the Piastunovich declaration submitted by Defendants in this action that directly addresses a recent interaction I had with the City of San Francisco (City). *See* Dkt. 143-70.

3. All facts set forth in this declaration are based upon my personal knowledge, and, if called upon to testify as to the truth of these facts, I could and would competently do so.

**Interest in Shelter and Previous Shelter Stay**

4. I am involuntarily homeless and do not want to live outside. I want appropriate shelter and housing. When given the chance, I have taken advantage of both housing and shelter opportunities. At the time this litigation was filed, for example, I was staying in a cooperative housing arrangement and paid rent until I could no longer afford to do so. Thereafter, I was forced back out onto the streets because I could not find affordable housing.

5. Living outside is very difficult. It can be cold, unsafe, and lacks a sense of security. That is why I intentionally sought out emergency shelter from the City any way that I could. That worked for me. Not only have I expressed interest in shelter, I recently spent over four months–from early December to the end of April–in a City-operated shelter at 711 Post Street. I have and will continue to accept appropriate shelter or housing that is accessible to me.

6. I was happy that I was able to stay at the shelter at 711 Post Street. The shelter was helping me get my life on track and save up enough money to be able to finally afford rent again. Unfortunately, I had several roommate changes in the four months I was living there. The final

roommate that I had was struggling with dementia and an unaddressed lice problem. I tried to get help for him multiple times from City employees, including going to a clinic with him, trying to contact a care coordinator, and asking shelter staff for help. This was unsuccessful. Shelter staff refused to compel my roommate to take showers or otherwise address the issue. I told the shelter staff that I did not want to leave the shelter, but that I could not bear living in these conditions. Staff accepted this without remedying the situation or providing a real alternative, and so I had no choice but to leave my emergency shelter just a few weeks ago.

**Recent "Offers" of Shelter from the City**

7. I understand that the City has said that I declined an offer for shelter around the end of May. This is not true, and I believe this was a misunderstanding. Around that time, SFPD approached me, asked me if I was interested in shelter, and said that I should leave the area to seek shelter out because some shelter has become available. I expressed my interest in shelter, but said that I wanted to speak with the Homeless Outreach Team (HOT) to confirm whether shelter was available and what the shelter was. This was important to me because I have often been told that there is shelter available, packing up and surrendering some of my survival belongings, only to find that no shelter is actually available because of the extent of the City's shelter shortage. When I asked to speak with the HOT team, SFPD told me I was declining shelter, even though I communicated that I was interested in shelter.

8. Around the week of June 19, 2023, City workers offered me a tiny home. I expressed my excitement and scheduled an appointment to view the tiny home. But at the scheduled time, the City workers I was supposed to meet with did not appear. Later, I was told that they do not in fact offer tours. These mixed messages are confusing and frustrating as I try to find a safe shelter to get off the streets.

9. On or around June 29, 2023, the HOT team approached me again with an offer to stay in a similar tiny home. At the time, I was residing on Mission Street near the Pink Triangle Park. The HOT team told me that if I accepted, I could only bring one or two bags with me,

1   meaning the remainder of my belongings would be lost or destroyed. As I have detailed before, the City has often taken and destroyed my personal belongings. Each time, I have to start over to collect the baseline items I need to get back on my feet.

10. Given this history of recent shelter offers not leading to actual shelter, and that I would have had to surrender my belongings to get shelter, I did not know whether to immediately accept HOT's offer on or around June 29. I wanted to talk to my attorneys to help with this decision, which I communicated to HOT. I know that this case is not about money and does not include damages. It is instead about shelter and property. I did not think it was right that the City was asking me to abandon my belongings without knowing that the City had shelter for me. I was particularly concerned because it felt like City employees were trying to get rid of me. For example, HOT specifically declined to make a shelter offer for the five other individuals I was staying with on that block.

11. The HOT workers present called Arielle Piastunovich. After the call, the City workers replied that they needed to know by around 2:00 or 2:30 PM that day if I would surrender my belongings and leave with them. While I was trying to get in touch with my attorney, and before the 2:30 PM deadline they gave me, HOT left.

12. At no time did I say I was not interested in shelter. I wish I had been given a real opportunity to make an informed choice and accept appropriate housing and shelter. Instead, I have been frustrated with being given conflicting, confusing information. And especially given the past negative history with the City, I cannot make a decision while being threatened with enforcement and the risk of losing my belongings. However, I do want shelter, I have been asking for shelter, and I will accept appropriate shelter or housing that is accessible to me. The four months I just spent in shelter demonstrate this.

13. I was recently notified that I reached number 182 on the waitlist for affordable housing from an organization called DAHLIA. I tried to go to an open house to look at an available housing option on or around July 1, 2023. However, when I was supposed to leave, an

Urban Alchemy team came to tell me and the people I was residing near to move our belongings or the police would come later to make us. This interaction took so long that I missed the open house.

**Intimidating and Confusing City Interactions Prevent Me From Securing Shelter and Housing.**

14. From the beginning of this summer, I have repeatedly asked SFPD officers to get me into contact with HOT and social workers to secure housing. Instead of assisting me or connecting me with the HOT team, some officers, including Officer Oropeza, pressure me to make a decision immediately under the threat of labeling me as service resistant. The City's harassment is a barrier for me to secure shelter and housing.

15. Officer Oropeza in particular has been regularly taunting and harassing me, driving by me with loud sirens and horns and taunting me over his loudspeaker, and speaking to me in dismissive and demeaning ways. Another unhoused person told me that Officer Oropeza said that he did not like me. I also heard Officer Oropeza tell another officer to underline in his notes that I had refused services when I asked that a HOT worker speak with me rather than the police.

16. I am afraid of Officer Oropeza with his history of taunts. I feel that I cannot get fair treatment from my local beat officer, with whom I am forced to interact every day in the Castro neighborhood where I regularly sleep because I feel safer there as a gay man. Even when I tried to ask him for assistance after being assaulted in or around early June, he was not willing to assist me in any way.

17. I have also been getting mixed messages from different SFPD officers regarding where I am allowed to reside. Starting recently, about the beginning of June, SFPD officers will measure the sidewalk near me to make sure there is 48 inches of space, which they say is to comply with the Americans with Disabilities Act. But recently, an SFPD Captain from Park Station examined the sidewalk where I was staying and said that the space was adequate and that

I could stay there. A couple days later, a different SFPD Captain from Mission Station told me I could not stay in the same exact location.

18. When SFPD officers order me to move along, they do not tell me where I can reside, only where I cannot. This is no different than my experience before becoming a plaintiff in this lawsuit. Officers never tell me that their orders to move are voluntary nor temporary. In fact, they have said that they are not allowed to tell me where I can reside so I don't know where I can be.

19. I try hard to make sure there is plenty of space for pedestrians to pass by on the sidewalks where I reside. I try to find wide sidewalks away from homes and businesses, and I look for spaces under trees or near lampposts, so I am not the only obstruction on the sidewalk. I am also always willing to move if I do see I am obstructing someone's path. But insisting on 48 inches of open space on the sidewalk—which is essentially the entire sidewalk in most locations—means there is nowhere I can lawfully be.

20. Ultimately, I want appropriate shelter and housing, but the City's poor treatment of me—including daily SFPD harassment and orders for me to move from block to block—has prevented me from securing it.

I have reviewed the information contained in this declaration. I declare under the penalties of perjury that the contents are true and correct to the best of my knowledge.

Executed on July 23, 2023 at San Francisco, California.

_____
Toro Castaño