LATHAM & WATKINS LLP
Alfred C. Pfeiffer, Jr., SBN 120965
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
al.pfeiffer@lw.com

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY AREA
Zal K. Shroff, MJP 804620, *pro hac vice*
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
zshroff@lccrsf.org

ACLU FOUNDATION OF NORTHERN
CALIFORNIA
John Thomas H. Do, SBN 285075
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
jdo@aclunc.org

*Attorneys for Plaintiffs*

*Additional Counsel Below*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| COALITION ON HOMELESSNESS, et al.,<br><br>　　　　　　　Plaintiffs.<br><br>　　v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et. al.,<br><br>　　　　　　　Defendants. | CASE NO. 4:22-cv-05502-DMR<br><br>**SUPPLEMENTAL DECLARATION OF DYLAN VERNER-CRIST**<br><br>**Judge:**　　The Hon. Donna M. Ryu |

LATHAM & WATKINS LLP
Wesley Tiu, SBN 336580
Kevin Wu, SBN 337101
Tulin Gurer, SBN 303077
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
wesley.tiu@lw.com
kevin.wu@lw.com
tulin.gurer@lw.com

LATHAM & WATKINS LLP
Joseph H. Lee, SBN 248046
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: (714) 540-1235
joseph.lee@lw.com

LATHAM & WATKINS LLP
Rachel Mitchell, SBN 344204
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
rachel.mitchell@lw.com

ACLU FOUNDATION OF NORTHERN CALIFORNIA
William S. Freeman, SBN 82002
Brandon L. Greene, SBN 293783
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
wfreeman@aclunc.org
bgreene@aclunc.org

# DECLARATION OF DYLAN VERNER-CRIST

I, Dylan Verner-Crist, hereby declare pursuant to 28 U.S.C. § 1746:

1. All facts set forth in this declaration are based upon my personal knowledge, and, if called upon to testify as to the truth of these facts, I could and would competently do so.

**Background**

2. I am the lead investigator at the ACLU of Northern California. In my role, I conduct factual investigations of potential civil rights violations. As part of my investigatory work, I regularly find and interview prospective clients and witnesses, review public records and other documents, conduct fieldwork, and author investigative reports and declarations summarizing my findings. I have previously authored two declaration in this case. *See* Verner-Crist Decl., Dkt. # 50-3, Supp. Verner-Crist Decl., Dkt. # 130-9.

**Observations of July 6, 2023 HSOC Sweep Operation**

3. On July 6, 2023, I observed a City sweep of an encampment located on Taylor Street between Ellis Street and Eddy Street.

4. I arrived at the noticed area at approximately 8:05 AM.

5. At approximately 8:47 AM, I observed as a San Francisco Fire Department ("SFFD") officer walked up to one unhoused man. As I looked on, the SFFD officer told the man that he would have to move for street cleaning and that, after the street was cleaned, "the barricades are going in." The SFFD officer then walked up to another unhoused person and repeated the same directive.

6. At approximately 9:15 AM, the same SFFD officer approached two unhoused people near the corner of Taylor Street and Ellis Street. The two people appeared to be elderly and a couple. The woman was in a wheelchair. He told them that it was very unlikely that they would be offered a shelter together, adding that couple shelters existed and were offered occasionally, but that he had never seen anyone be offered a couple shelter. He encouraged them to split up and go to separate shelters.

7. At approximately 9:20 AM, I spoke with an elderly woman in a wheelchair who was sitting near Taylor Street and Ellis Street. I asked her if she had been offered shelter or

assessed by City workers yet. She said that she had not. I asked whether she would give me permission to observe and listen in during her conversation with City workers. I explained that the City workers would likely want to do a careful assessment to see what services she would qualify for, including by asking her personal questions. She said that I had her permission to listen into her conversation with the City workers.

8. At approximately 9:49 AM, three City workers with the Homeless Outreach Team ("HOT") approached the elderly woman. I followed to observe their conversation as part of my investigation into the City's shelter offerings. Immediately, one of the HOT workers turned to me. She appeared angry. She told me that I could not be there. I told her that I had obtained permission from the unhoused woman to listen into the conversation. The worker then told me that I was violating her rights. I asked the workers whether they would do an assessment if I was there. They replied that the elderly woman needed an assessment. The HOT workers then walked away and began to talk together in a huddle.

9. Approximately twenty minutes later, I still had not seen the HOT workers assess the elderly woman. I asked the HOT workers whether they were not assessing the elderly woman because I was there. They said yes and said that they would not assess her with me present, even if she had given me permission to be there. They confirmed that they would not assess her if I was there. After hearing this, I walked down the block so that the HOT workers would agree to assess the elderly woman.

10. At approximately 10:45 AM, one of the HOT workers informed me that they had been unable to place the elderly woman into a shelter bed because her needs were too severe. He told me that the elderly woman needed a skilled nursing facility and that she would be turned away from the City's shelters.

11. On or around that time in the morning, the Department of Public Works ("DPW") workers began putting up barricades along the block of Taylor Street. By approximately 11 AM, the barricades were completely put up. Attached hereto as **Exhibit A** are photos of these barricades.

12. I left the area at approximately 11:50 AM after the City's operation had concluded.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

VERNER-CRIST DECL. ISO PLAINTIFFS' MOTION FOR ORDER TO SHOW CAUSE
CASE NO. 4:22-CV-05502-DMR

**Observations of July 11, 2023 HSOC Sweep Operation**

13. On July 11, 2023, I observed a City sweep of an encampment located behind the Best Buy in the South of Market neighborhood of the City, centered around Alameda Street near Harrison Street and Treat Avenue.

14. I arrived at the posted area at approximately 8:30 AM.

15. While observing the encampment sweep, I saw that the City had posted a "NO LODGING ZONE" sign on the fence along Treat Avenue. Attached hereto as **Exhibit B** is a true and correct copy of this sign.

**Lack of Notice of JFO Sweep Operations**

16. On July 11, 2023, at approximately 1 PM, I was in the Tenderloin neighborhood of San Francisco ("City") speaking with some unhoused individuals living on Taylor Street near Eddy Street. While we were talking, a SFFD officer approached us. He told the unhoused people that I was standing with that the City would be coming by the next day for a JFO operation. While I stood nearby, he told the unhoused individuals and myself that the City did not have to post notice for their JFO operations, as it was not required.

17. On July 13, 2023, I attended the City's JFO operation, covering a roughly rectangular area stretching from 5th Street to the northeast to Van Ness Avenue to the southwest, and bordered on each side by Market Street and Mission Street. This area is approximately 72 acres in size.

18. I arrived to the area shortly before 9 AM. Upon arriving at Jessie Street, an alley located within the area, I observed SFFD, HOT, San Francisco Police Department ("SFPD"), San Francisco Municipal Transportation Authority ("SFMTA"), and DPW workers in the alley. Approximately ten minutes later, I witnessed the same City departments at work in the nearby Stevenson alley.

19. That morning, I observed as unhoused people moved their tents out of the two alleys. I also observed that the DPW trucks on-site were nearly full of items that had been in the encampments in each alley.

20. I did not observe any notice in either alley or in any other part of the designated

area that day.

**Destruction of Tent on March 3, 2023**

21. In my previous declaration, I wrote that I had watched City workers destroy a tent on Mission Street near 7th Street during a sweep operation on March 3, 2023; shortly after they had thrown the tent in a truck, a woman showed up and told the workers that the tent belonged to her. *See* Supp. Verner-Crist Decl., Dkt. # 130-9, ¶¶ 87-88. It is my understanding that SFFD Acting Paramedic Captain Carl Berger disputes this, claiming that the City discarded an abandoned tent during the sweep operation "because it was a health hazard, including being soiled with feces and littered with needles." *See* Berger Decl., Dkt. # 143-4, ¶ 41. To substantiate his point, Mr. Berger provides three photos: one showing a City block with multiple tents, one of which is taken to be the tent in question; the second showing the presumed inside of the tent in question; and the third showing feces outside what is presumed to be the tent in question. *Id,* ¶ 41, Ex. F.

22. Mr. Berger's first photo is erroneous. It does not show the southeastern sidewalk of Mission Street just south of 7th Street, where the tent was located. This sidewalk is wide and borders a green building, alongside a wide, double-laned road. *See* Supp. Verner-Crist Decl., Ex. K (photo showing the area where the tent had been). Mr. Berger's photo, rather, shows a narrow alley with a Salvation Army building. This alley appears to be Jessie Street, a narrow alley approximately two blocks away from the former site of the tent in question. *See* **Exhibit C** (Google Street View image of Jessie Street, showing the Salvation Army building). Due to this key difference, I cannot discern whether Mr. Berger's other photos do or do not show the tent in question.

23. I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 25, 2023 at Oakland, California.

Dylan Verner-Crist

# EXHIBIT A





# EXHIBIT B



# EXHIBIT C

