Pages 1-19

            IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF CALIFORNIA

              Before The Honorable Donna M. Ryu,
         United States Chief Magistrate Court Judge

COALITION ON HOMELESSNESS,    )
*et al.*,                     )
                              )
         Plaintiffs,          )
                              )
    vs.                       )    **Case No. 4:22-CV-05502-DMR**
                              )
CITY AND COUNTY OF            )
SAN FRANCISCO, *et al.*,      )
                              )
         Defendants.          )
_____)

                                        Oakland, California
                                        Thursday, May 25, 2023

**TRANSCRIPT OF REMOTE PROCEEDINGS**
**FURTHER CASE MANAGEMENT CONFERENCE**

**APPEARANCES ON THE NEXT PAGE.**

TRANSCRIPTION SERVICE BY:

                    Dipti Patel, CET-997
                    Liberty Transcripts
                    7306 Danwood Drive
                    Austin, Texas 78759
                    (847) 848-4907

**APPEARANCES:**

For the Plaintiffs:

        OFFICE OF THE ATTORNEY GENERAL
        California Department of Justice
        455 Golden Gate, Suite 11000
        San Francisco, California 94102
**BY: JOSEPH LEE, ATTORNEY AT LAW**

        ACLU of Northern California
        39 Drumm Street
        San Francisco, California 94111
**BY: JOHN DO, ATTORNEY AT LAW**

For the Defendants:

        OFFICE OF THE CITY ATTORNEY
        City of San Francisco
        1390 Market Street, 7th Floor
        San Francisco, CA 94102
**BY: JAMES EMERY, ATTORNEY AT LAW**
    **KAITLYN MURPHY, ATTORNEY AT LAW**
    **RYAN STEVENS, ATTORNEY AT LAW**
    **EDMUND WANG, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | **Thursday - May 25, 2023**　　　　　　　　　　　　　**1:02 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |

4　　**THE CLERK:** This Court is now in session; the Honorable
5　Chief Magistrate Judge Donna M. Ryu presiding.
6　　　Calling Civil Case C-22-4402-DMR, Coalition on
7　Homelessness, *et al.*, versus City and County of San Francisco,
8　*et al.*
9　　　Counsel, please state your appearances starting with the
10　plaintiffs' attorneys first.
11　　**MR. LEE:** Good afternoon, Your Honor. My apologies. My
12　voice is a little strained. This is Joseph Lee for
13　plaintiffs. Also, shortly joining the hearing will be John Do
14　from the ACLU who will be speaking today.
15　　**THE COURT:** Okay. Good afternoon, Mr. Lee. Mr. Do is
16　not here, so.
17　　**MR. LEE:** Let me check and confirm he's still joining.
18　　**MR. EMERY:** Good afternoon, Your Honor. Deputy City
19　Attorney Jim Emery representing City and County of San
20　Francisco. And with me are Kaitlyn Murphy, Ryan Stevens, and
21　Ed Wang.
22　　**THE COURT:** Good afternoon to the defense team.
23　　**MR. EMERY:** Thank you.
24　　(Pause)
25　　**MR. LEE:** Mr. Do says he's still waiting to be let in.

1  **THE COURT:** We don't -- I don't know if he's maybe in the
2  wrong Zoom room. I don't see anyone --
3  **THE CLERK:** He probably went to the non-probably Zoom
4  webinar. He needs to get out and go into the regular webinar
5  of Judge Ryu.
6  **THE COURT:** So I have a separate address for settlement
7  conferences that's non-public. So maybe that's where he is.
8  **MR. LEE:** I just resent him the link.
9  **THE COURT:** Okay.
10 **MR. LEE:** My apologies, Your Honor.
11 **THE CLERK:** I see him now, Your Honor.
12 **THE COURT:** Okay.
13     (Pause)
14 **THE CLERK:** Mr. Do, can you please state your appearance
15 for the record?
16 **MR. DO:** John Do for plaintiffs. And my apologies. I
17 probably not the first but clicked the wrong link.
18 **THE COURT:** Okay. Good afternoon, Mr. Do.
19     So we're here on two separate matters. One is a
20 discovery dispute, and the other is the case management
21 conference. So I'm going to start with the discovery dispute.
22 I read the papers. I think I understand the basic arguments.
23 But I have a couple of questions.
24     The plaintiffs' side says that they need the higher level
25 of number of CAD reports because they are -- they don't have

1   adequate understanding of engagements with homeless people
2   where there's been -- where it's happening on the same day,
3   where there's a dispatch call or certain kinds of codes and
4   it's not something that's planned in advance.
5       So I know that the parties worked really hard to come to
6   some agreements and there's a lot of material that is being
7   provided every three weeks as agreed upon.  So what I don't
8   understand is what the CAD reports add to what has already
9   been agreed upon.  So, Mr. Do, I don't know if you are -- are
10  you arguing this or Mr. Lee?
11      **MR. DO:**  I am.  And as you can perhaps tell from Mr. Lee
12  lost his voice last night so I'll be pinch-hitting and I'll be
13  covering this, Your Honor.
14      **THE COURT:**  Okay.
15      **MR. DO:**  And I'd be happy to answer your question now.
16      **THE COURT:**  Am I making sense that my takeaway from your
17  side of the letter was we need information about same-day
18  engagements.  And I totally understand the defense position
19  that they can't give notice of those, that that's very
20  burdensome.  But the plaintiffs are looking for some kind of
21  insight into what's happening in those same-day engagements.
22  And there's a lot of material that you've agreed on that's
23  sort of after the fact material.
24      And so I want to know what the CAD reports add to what
25  you're already getting.

1   **MR. DO:** Of course, Your Honor.

2   The information that the parties have agreed to have the
3   City provide primarily covers formal sweeps. And as we
4   previously have mentioned, we believe the vast majority of
5   potential violations of the preliminary injunction stem from
6   the more frequently day-to-day interactions that occur from
7   these dispatches.

8   And so the CAD information is --

9   **THE COURT:** Hold on. I guess let me ask more -- maybe
10  I'm just not understanding. I know there's a lot of material
11  you're getting ahead of time for those where there's planned
12  engagements, right. But for same day, you're not getting
13  advance materials because they're happening that same day and
14  it seems to me they would be very burdensome to try to give
15  notice to provide materials for something happening that day.

16  So there are things that I think the City is agreeing to
17  provide for after the fact on those, and that includes summary
18  citation and arrest data, individual incident reports related
19  to enforcement of enjoined statutes, a summary list of SFPD
20  incident reports, a sample of 40 incident reports, bodycam
21  footage from five of those.

22  I guess that sounds like material for after the fact for
23  engagements, but am I misunderstanding?

24  **MR. DO:** Some of that, yes, does involve after the fact
25  information. But our understanding --

1     **THE COURT:** About same-day engagements?

2     **MR. DO:** If it is created. So the issue here, Your

3 Honor, is that our understanding of how these interactions

4 occur is there are these hundreds of thousands of dispatches

5 that may not result in, for example, the officer turning on

6 his bodycam or his or her, their bodycam or may not result in

7 an incident report but may nonetheless include move-along

8 orders and the like.

9     So we don't have any insight into these interactions

10 which were largely unmonitored.

11    **THE COURT:** Okay. So you're saying it's not cumulative

12 or not necessarily cumulative of what the City has already

13 given you because what they're giving you is material where

14 there's a record that's created. But plaintiffs believe there

15 are many dispatches where there's an engagement but there's

16 not any paper record other than the CAD report itself.

17    **MR. DO:** That's correct, yes.

18    **THE COURT:** And what is that based on? How do you know

19 that that's how that works?

20    **MR. DO:** Sure. As part of, for example, our preliminary

21 injunction with regards to the reports from many of our

22 declarants about these informal interactions which comprise

23 the likely majority of the interactions that we think may be

24 unlawful.

25    So -- and I think even with regards to the City has

1  conceded that, for example, an officer may not turn on the
2  bodycam footage if they do not believe there is enforcement,
3  but that doesn't necessarily mean that there was not
4  enforcement in terms of for, again, example of a move-along
5  order and the like.
6  So these more informal interactions are quite common and
7  routine and are not captured by any of the -- are not captured
8  by some of the post-event documentation such as bodycam
9  footage.
10  **THE COURT:** Okay. Thank you.
11  Mr. Emergy, is Mr. Do's understanding of the process
12  correct? In other words, I know from the letter both sides
13  agree there's about 800 to 1,000 CADs generated for the
14  relevant codes every three weeks. So that's a lot
15  engagements. And Mr. Do has just told me those engagements
16  don't necessarily result in bodycam footage or post-event
17  documentation other than the generated CAD report.
18  Is that correct?
19  **MR. EMERY:** That is correct.
20  **THE COURT:** Okay. So it doesn't seem cumulative of the
21  information that's already being provided. And everybody
22  agrees that it's relevant. The question then is really about
23  burden. And what the City has indicated is it's a lot of work
24  to turn over 100 every three weeks instead of the ten and that
25  you were concerned that it's taking away time from people who

1     are working dispatch.
2          Can someone other than a dispatcher do this work, Mr.
3     Emery?
4          **MR. EMERY:**  The dispatchers are the people who have the
5     skills because they know the system.  And as it was explained
6     to me, the available human resources to do the job would be
7     dispatchers.  And I would have declarations if this went to
8     motion practice to fill that in.  But, yes, I did my due
9     diligence, I inquired of the right people, and that is the
10    information that I have.
11         **THE COURT:**  Okay.  I read your papers.  I don't think I
12    need additional argument because you both have answered the
13    questions that I had.  If there's any -- before I announce
14    what my ruling is, does anyone have any new information they
15    need to bring to my attention?
16         **MR. EMERY:**  I would like to speak briefly, Your Honor.
17         **THE COURT:**  Okay.
18         **MR. EMERY:**  We had an agreement for nine and a half
19    weeks.  Plaintiffs' new demand to enhance the number of CADs
20    is totally unconnected to what they say they're not getting in
21    the same-day interagency announcements because these CAD
22    reports do not reflect the same kind of interagency
23    interactions that the plaintiffs say they're giving up.
24         So there's no connection between --
25         **THE COURT:**  Mr. Emery, I'm sorry.

1      **MR. EMERY:** -- (indiscernible),

2      **THE COURT:** I'm going to ask, I, not understanding.  What
3  do you mean by interagency?  I'm not understanding your
4  argument, so you need to (indiscernible).

5      **MR. EMERY:** We were negotiating prior notice of
6  interagency engagements with homeless people.  And in our
7  in-person meet and confer in the attorney lounge, plaintiffs
8  and I agreed that they would not require notice of interagency
9  interactions with the homeless that were planned fewer than 24
10 hours in advance of the interaction.

11     And at that moment in the in-person meet and confer, the
12 plaintiffs suggested in the alternative of getting notice in
13 advance of same-day interagency interactions that the City
14 should increase from the agreed 10 CADS per period to provide
15 100 CADs per period.

16     My point today is that plaintiffs suggested exchange of
17 the 100 CADs instead of the advance notice of same-day
18 interagency interactions are untethered to each other, that
19 one does not compensate and give light on the same kind of
20 information that they're not getting with the impossible, in
21 my view, advance notice of same-day interagency interactions.

22     The CADs do not reflect interagency interactions.  It's
23 when a police officer goes -- there's a 911 call and in
24 response to 911 call, a police officer responds that a CAD
25 report documents that interaction.  Before our in-person meet

1  and confer in the attorney lounge, plaintiffs were satisfied
2  getting ten of those CAD reports every three weeks.
3         The resolution of our advance notice obligations did not
4  detract from what information plaintiffs get from the CADs.
5  Therefore, there's no justification at this point to increase
6  the agreed-up on number of CADs.  That's the point I'm trying
7  to make.  I hope I made it clear.
8         **THE COURT:**  I think I understand it, but it seems your
9  argument seems very tethered to sort of a policing of the meet
10 and confer.  Here's what they agreed to, but then they changed
11 their mind.  And I hear that at some level, but I also -- and
12 I know you all worked very hard on this.  I could see in what
13 you created that good discussions were had.  And that part of
14 the case is moving forward, which is excellent.
15        But we're down to this one issue, and I think if I
16 understood it, Mr. Emery, you're saying you can't -- they were
17 wrong to trade off interagency information for individual
18 officer information.  Is that the point?
19        **MR. EMERY:**  Not that they were wrong so much as the
20 agreement we had over nine and a half weeks, it was their
21 initial proposal nine and a half weeks earlier that the City
22 provide ten CADs every period and I said fine.  Not that it's
23 wrong to change, but that their nine and a half weeks of
24 agreement reflected that that level of information is
25 sufficient for the purpose.

1     **THE COURT:** Except that what the -- again, I'm not sure
2     that -- I don't think I should decide discovery based on a
3     refereeing of the meet and confer, although I certainly expect
4     everyone to work in good faith on that.  It's not appropriate
5     for me to decide under a Rule 26 what is discoverable.
6         But what I heard was also that in the negotiations, part
7     of the tradeoff was they wanted same-day notification of
8     things that were happening without notice.  So this is one
9     way, the CAD reports are one way to get at least some
10    information about same-day interactions.  It's after the fact.
11        So I don't see them as completely untethered.  So I know
12    they're not one-for-one, but if what the plaintiffs are trying
13    to get is some insight into the same-day engagements and
14    they're not going to be able to get it through advance notice
15    of the same-day interagency engagements, then this is one way
16    to do that instead.
17    **MR. EMERY:** But it's not a way to get an interagency
18    engagement.  It's just what the tradeoff is supposedly about.
19    **THE COURT:** Well, I think that's a pretty -- sometimes
20    there's a proxy, right.  It doesn't have to be a one-for-one.
21    If what they're trying to understand is what is happening on
22    when somebody -- when a representative of the City, in this
23    case for the CADs law enforcement representative, is engaging
24    with someone on the same day, versus interagency engagement on
25    the same day.

1   I get it's not one-for-one. But it's sort of
2   representative of the same kinds of things that are happening
3   without notice. So I don't view that as some kind of bad-
4   faith negotiation or underhanded move. I think that in a
5   perfect world, there would be a one-for-one. There's just not
6   there. I mean I'm not hearing that, oh well, they could get
7   interagency CADs after the fact. I don't know that that's
8   done. So this is kind of the next best thing.
9       Go ahead, Mr. Emery.
10      **MR. EMERY:** Well, what they're giving up is something
11  very hypothetical. I'm not aware that there are interagency
12  interactions that are not planned in advanced.
13  Hypothetically, I can imagine either a DPW personnel who's
14  asked to go to a situation calling up the police to say, hey,
15  I'd be more comfortable if you were there or vice versa. I
16  can imagine a police officer being called to do a first-
17  responder situation and knowing just based on the call that it
18  would be helpful to have someone from DPW.
19      But that's all hypothetical. The idea of burdening the
20  City with providing 90 new reports in response to the
21  plaintiffs giving up something that may not even and we have
22  no reason to believe actually exists, that's an unjustified
23  burden on the City.
24      **THE COURT:** Well, again, you're tying it back to all
25  kinds of things about the meet and confer and not about Rule

1   26, which is what I ultimately have to deal with here.  And I
2   don't know if they know if it's hypothetical or not, but I get
3   that -- because what they've told me is they're trying to get
4   some level of insight into same-day engagements.
5       And I guess they didn't say this, but by giving -- they
6   gave up an earlier request to get some notice the same day of
7   things.  That's something I probably would have denied anyway
8   because that sounds really really burdensome.  But it doesn't
9   strike me as a bad proxy to say, well, okay, let's get a
10  randomly generated sample of these same-day interactions.  We
11  do have some available information.  I think it's appropriate
12  for them to ask that.  And so do you at some level because the
13  City agreed to ten.  Now it's a question of burden.
14      And I am not sure that you need 100 every three weeks.
15  But I would -- well, let me tell you -- let me ask you if
16  there's any more argument from anybody before I announce the
17  ruling just so we have a clear record.
18      **MR. DO:**  Yes, Your Honor.  If I could just highlight, you
19  asked about any new information.  I'd like to, one, just
20  confirm your understanding of the negotiations that you just
21  laid out.  At the end of the day, we've always been concerned
22  about interactions with unhoused people, whether it's
23  interagency or on an individual officer basis.  And the  CAD
24  data has unique information with regards to that.
25      Just very briefly on burden, as we said in our papers,

1  even assuming the burden of the City is laid out, we don't
2  think that it's overly burdensome.  But we have received very
3  few CADs sent just in the course of regular discovery, and
4  those have been able to be produced based on their time stance
5  on every 30 -- it takes about 30 seconds according to what
6  we've seen on the very limited amount that we have seen so
7  far.
8      And then, lastly, I just want to highlight for the Court
9  that we were able to reach a significant amount of agreement
10 in the last meet and confer.  And we believe that was a
11 stipulation and our awaiting the Court's order on those, as
12 well.  We have not received so far the material that we are in
13 agreement about.  The City has taken the position that it is
14 waiting for your order before producing any of that.
15     So I just want to ensure that we do receive an order that
16 encompasses all that we've already agreed to.
17     **THE COURT:**  You gave me a nice fill-in-the-blank one.
18 Both sides stipulated to that, and I won't hold you up.
19     So, first of all, there's no argument that the
20 information is relevant.  The plaintiffs have explained to my
21 satisfaction that it's not cumulative of other information
22 that they're giving.  I understand that there is some -- I
23 appreciate the back and forth.  I want the parties to continue
24 to negotiate in good faith on discovery and other things.
25     But while the defense may have been unhappy with how that

1  last piece of negotiation went that a number increased,
2  although something was taken off the board and the defense
3  thinks they're untethered, I don't see them as completely
4  untethered.  I see one as being kind of a proxy for something
5  that wasn't going to be given.
6      But I think you don't need 100.  What I'm going to order
7  is 45 every three weeks.  That is 15 a week, which even at
8  three minutes is 45 minutes a week.  And there is some
9  evidence that it's going to take less time than that once
10 people start rolling in it.
11     I assume you have talked about how to do a randomized
12 approach.  It seems like you've figure about randomization on
13 other fronts, so, Mr. Do, is that right?  I see Mr. Emery
14 shaking his head yes.
15     **MR. DO:**  To the extent we have it, I think we have full
16 faith in our ability to some up with that --
17     **THE COURT:**  Okay.
18     **MR. DO:**  -- randomization through meet and confers.
19     **THE COURT:**  Great.  So you'll randomize it.  You'll do 45
20 -- this is without prejudice to if the plaintiffs start seeing
21 these 45 and see that there's a really big problem, then maybe
22 they come back in and say, well, we need more.  So I'm not
23 closing the door on that, but I'm also not encouraging it.
24     I think 45 sounds about right, but as with most things,
25 if there's adjustments because of a strong showing of good

1   cause, then maybe I'd take another look at that.  Okay?

2       So that's the discovery dispute.  Let's turn to the CMC.

3   Not much here.  I think my takeaway from your case management

4   conference statement is that the parties -- it's taking a

5   little longer than you all expected to get through discovery

6   and so the projections that you used when we originally set

7   the case schedule may now be off.

8       And what you told me jointly is you want to wait a little

9   while before you propose a new schedule so that you have a

10  better understanding of exactly what you need instead of

11  coming back seriatim.  And I appreciate that.

12      So your first deadline is going to be July 28th.  So I

13  assume I'm going to get some kind of stipulation from you on

14  changing the dates sometime before July 28th, right.  But I'll

15  have you back for a CMC on September 20th, which is about 120

16  days out because I think in the meantime you've got plenty to

17  do and so I don't need to bring it back in for management

18  before then.

19      Your joint -- so that's going to be at 1:30 by Zoom.

20  Then your joint updated papers will be due September 13th,

21  okay.  Does that sound acceptable to everyone?  Mr. Do and Mr.

22  Lee, September 20th at 1:30 for the next CMC?

23      **MR. DO:**  I believe so, Your Honor.  Thank you.

24      **THE COURT:**  Okay.  Mr. Emery and defense team, is that

25  going to work for you all?

1    **MR. EMERY:**  Yes.  That will work for us, Your Honor.
2    **THE COURT:**  Okay.  Is there anything else we need to
3 cover today?
4    **MR. EMERY:**  Not that I'm aware of, Your Honor.
5    **MR. DO:**  No, Your Honor.
6    **THE COURT:**  Okay.  Thank you all very much.  I will
7 modify the proposed order and get that turned around right
8 away, okay.
9    **MR. EMERY:**  Thank you, Your Honor.
10    **THE COURT:**  All right.  Thank you.
11    **MR. DO:**  Thank you, Your Honor.
12    (Proceedings adjourned at 1:27 p.m.)
13                          ---oOo---

**CERTIFICATE OF TRANSCRIBER**

I, DIPTI PATEL, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court for the Northern District of California of the proceedings take on the date and time previously stated in the above-entitled matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken.

I further certify that I am not financially nor otherwise interested in the outcome of the action.

*Dipti Patel*

DIPTI PATEL, CET-997

LIBERTY TRANSCRIPTS                              Date: July 22, 2023