1    DAVID CHIU, State Bar #189542
     City Attorney
2    YVONNE R. MERÉ, State Bar #173594
     Chief Deputy City Attorney
3    WAYNE SNODGRASS, State Bar #148137
     Deputy City Attorney
4    EDMUND T. WANG, State Bar #278755
     KAITLYN M. MURPHY, State Bar #293309
5    MIGUEL A. GRADILLA, State Bar #304125
     JOHN H. GEORGE, State Bar #292332
6    ZUZANA S. IKELS, State Bar #208671
     Deputy City Attorneys
7    City Hall, Room 234
     1 Dr. Carlton B. Goodlett Place
8    San Francisco, California 94102-4682
     Telephone:      (415) 554-4675 (Snodgrass)
9                    (415) 554-3857 (Wang)
                     (415) 554-6762 (Murphy)
10                   (415) 554-3870 (Gradilla)
                     (415) 554-4223 (George)
11                   (415) 355-3307 (Ikels)
     Facsimile:      (415) 554-4699
12   E-mail:         wayne.snodgrass@sfcityatty.org
                     edmund.wang@sfcityatty.org
13                   kaitlyn.murphy@sfcityatty.org
                     miguel.gradilla@sfcityatty.org
14                   john.george@sfcityatty.org
                     zuzana.ikels@sfcityatty.org
15
     Attorneys for Defendants
16   CITY AND COUNTY OF SAN FRANCISCO, et al.

17                          UNITED STATES DISTRICT COURT

18                        NORTHERN DISTRICT OF CALIFORNIA

19
     COALITION ON HOMELESSNESS; TORO          Case No. 4:22-cv-05502-DMR
20   CASTAÑO; SARAH CRONK; JOSHUA
     DONOHOE; MOLIQUE FRANK; DAVID            **REQUEST FOR JUDICIAL NOTICE AND
21   MARTINEZ; TERESA SANDOVAL;               NOTICE OF FILING OR LODGING OF
     NATHANIEL VAUGHN,                        TRANSCRIPT OF THE AUGUST 23, 2023
22                                            HEARING OF ORAL ARGUMENT BEFORE
                                              THE UNITED STATES COURT OF APPEALS
23           Plaintiffs,                      FOR THE NINTH CIRCUIT**

24           vs.

25   CITY AND COUNTY OF SAN                    Trial Date:         April 15, 2024
     FRANCISCO, et al.,
26                                             Attachments:  Exhibit A
             Defendants.
27

28

     RJN AND/OR LODGING OF TRANSCRIPT                                    n:\govlit\li2022\230239\01700568.docx
     CASE NO. 4:22-cv-05502-DMR

Pursuant to Rule 201 of the Federal Rules of Civil Procedure, and the Northern District Court's General Order No 59, Defendants City and County of San Francisco files and/or lodges the transcript of the oral argument of the August 23, 2023 hearing before the United States Court of Appeals for the Ninth Circuit in the matter *Coalition on Homelessness v. City and County of San Francisco, United States Court of Appeals, 9th Circuit,* Case No. 23-15087, a true and correct copy of which is attached as **Exhibit A**. The hearing was transcribed overnight from the official recording of the proceedings, which took place at approximately 9:30 to 10:30 a.m. yesterday. The official recording is located here: https://www.ca9.uscourts.gov/media/video/?20230823/23-15087/.

Federal courts may take judicial notice of orders and proceedings in other courts, including transcripts of hearings. *See Trigueros v. Adams*, 658 F.3d 983, 987 (9th Cir. 2011); *Engine Mfrs. Ass'n v. South Coast Quality Maint. Dist.*, 498 F.3d 1031, 1039 n.2 (9th Cir. 2007) (taking judicial notice of inter alia a transcript of an oral argument before the California Supreme Court); *Dawson v. Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006). Alternatively, if the August 24, 2023 hearing is not otherwise continued, Defendants lodge the transcript for purposes of oral argument.

Dated:  August 24, 2023

DAVID CHIU
City Attorney
YVONNE R. MERÉ
WAYNE SNODGRASS
EDMUND T. WANG
KAITLYN MURPHY
MIGUEL A. GRADILLA
JOHN H. GEORGE
ZUZANA S. IKELS
Deputy City Attorneys


By:   s/Zuzana S. Ikels
ZUZANA S. IKELS

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO POLICE DEPARTMENT; SAN FRANCISCO DEPARTMENT OF PUBLIC WORKS; SAN FRANCISCO DEPARTMENT OF HOMELESSNESS AND SUPPORTIVE HOUSING; SAN FRANCISCO FIRE DEPARTMENT; SAN FRANCISCO DEPARTMENT OF EMERGENCY MANAGEMENT

**EXHIBIT A**

**TO**

**REQUEST FOR JUDICIAL NOTICE AND NOTICE OF FILING OR LODGING OF TRANSCRIPT OF THE AUGUST 23, 2023 HEARING OF ORAL ARGUMENT BEFORE THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**Coalition on Homelessness v. City and County of San Francisco**
**23-15087**





203 Columbus Avenue · San Francisco  94133
toll-free 877-TIGERFISH

**www.tigerfish.com**

**23-15087**

[Start of recorded material]

Judge Bumatay:      Good morning. Judge Koh, Jude Desai, and I all welcome you to the Ninth Circuit. We have three cases for argument today. But before we get to the argued cases, we have a number of cases that will be submitted on the briefs, and I will do that now.

Uh, United States v. [Ermin]; United States v. Galloway; Madera Group v. Mitsui [Sumitomo] Insurance, USA; Best Auto Repair v. Travelers Casualty Insurance Company will all be submitted as of this day.

The first case for argument is Coalition, uh, on Homelessness v. the City and County of San Francisco. Just so the parties are aware: After we hear argument of this case, we plan on taking a very short recess. Counsel, whenever you're ready.

Wayne Snodgrass:      Good morning, Your Honors. And May it please The Court, uh, Deputy City Attorney Wayne Snodgrass on behalf of Appellants. And with me are the City Attorney David Chiu; Chief Deputy Yvonne Mere; and Deputy City Attorney Tara Steeley.

We need only look out the windows of this courthouse to see up close the dismal conditions that are now present on many of San Francisco's sidewalks as tents and encampments have sprung up and multiplied. This is a crisis, and it's one that San Francisco

expends enormous r-resources to address. The city's Department of Housing and S-- Homelessness and Supportive Housing in the most recent fiscal year had a budget of $672 million.

Each year, San Francisco engages, shelters, and houses thousands of persons experiencing homelessness. And San Francisco voters have enacted special taxes, to the tune of hundreds of millions of dollars per year, to help fund the services that the city provides to persons experiencing homelessness.

And the city has made significant strides in tackling the problem. From 2019 to '22, uh, San Francisco increased the number of shelter beds by almost 1,000 and the number of supportive housing beds by more than 1,500. But --

Judge Koh:          Is the District Court's hearing on a motion to enforce still set for tomorrow?

Wayne Snodgrass:    That is correct --

Judge Koh:          And do you . . .

Wayne Snodgrass:    Uh, yes. It is, Your Honor.

Judge Koh:          And did-did you request a continuance so this Court could weigh in, or not, on the issues?

Wayne Snodgrass:    We have not requested a continuance. The, uh, hearing had earlier been scheduled for -- I believe it was the 10th of August. But it was the District Court, uh, *sua sponte* that continued it to the day out to tomorrow.

As -- uh, excuse me. Um, as part of its efforts to get people off the streets and into shelters and supportive housing, San Francisco needs to be able to use all of the tools that state and local legislators, and the voters acting by initiative, have enacted, including laws that restrict the use of public rights of way for camping, lying, or sleeping.

These laws are necessary to encourage persons who receive offers of shelter to accept them and to help ensure that when an individual experiencing homelessness accepts a shelter offer, they actually use it rather than continuing to live in an encampment.

Judge Bumatay:    So let's address your-your-your motion to modify the injunction pending appeal. So my understanding is y-you're unclear on the definition of what "involuntary homelessness" means in the injunction.

Wayne Snodgrass:    That's one of the issues that we have with the injunction, absolutely.

Judge Bumatay:    So what's the unclarity? I mean, none of our cases have said that involuntary homelessness includes those that are offered shelter. So what -- wh-why is that an issue?

Wayne Snodgrass:     Well, the District Court, um, the District Court did not define the term despite our request[s] that the District Court do so. Uh, and the District Court spoke of a formula which it drew from this Court's decisions in Martin and Grants Pass -- *i.e.,* the diff-- the numerical difference between the number of individuals experiencing homelessness and beds.

Judge Bumatay:     Right, but-but those two cases did define involuntary homelessness. And so why wouldn't the District Court apol-- uh, follow those definitions?

Wayne Snodgrass:     It wasn't clear to us -- uh, it-it wasn't clear whether the District Court follows that definition or not. And in fact, at the, uh, hearing on the preliminary injunction motion, The Court said that-that -- something to the effect that "The Ninth Circuit is telling me I have to follow the formula." And w-- the city had raised the fact that --

Judge Bumatay:     Th-That formula language was stricken from Grants Pass, so . . .

Wayne Snodgrass:     That is correct. And that -- the fact that it has been stricken, um, in our view is, um, a strong *indicia* that there is legal error underlying the preliminary injunction.

Judge Bumatay:     Well, I just don't know if the formula has anything to do with the definition of, uh, "involuntary homelessness." We've said very clearly if you have access to housing or temporary shelter, you're not involuntarily homeless. So I don't see anything that would preclude San Francisco from enforcing its-its-its laws as written.

Wayne Snodgrass:     We-We agree that that is the definition that should apply. But again, the District Court, um, declined our efforts to have that term addressed. Um --

Judge Desai:     And notwithstanding the District Court's, um, declination of your request for clarification, I'm-I'm looking at the language in the injunction. So this is at ER49, and what I read is . . . Uh, this is the last full sentence before the delineation of the specific ordinances, and there's no mention of the formula that you're talking about.

     And to Judge Bumatay's point, um, the term that's used is "involuntary homeless." Th-That is the language that's used in the District Court injunction, and that term is defined by our Court's cases in Martin and in Johnson.

Wayne Snodgrass:     The District Court, uh, used only the formula, and did not address the question of how-how-how an individual experiencing homelessness is regarded with-with --

Judge Desai:     Can you point me to where, in this language here on ER49, which is the inj-- is-is the language of the actual injunction, um, there is any inclusion or reliance on the formula language?

Wayne Snodgrass:     Well, in that, in that section of the, uh, of the injunction, the formula comes in in terms of the endpoint that the District Court put on the injunction. Uh, and so the District Court stated that until that endpoint is reached, we may, uh, not enforce the enumerated laws

against the involuntarily homeless without -- again, without any, without any definition as to what that term encompassed. Uh --

Judge Bumatay:    But if we all agree --

Judge Koh:    Wasn't there evidence in the record that even if you adopt your, uh, interpretation of "involuntarily homeless" that the record showed there were still individuals who were involuntarily homeless? And so why should we vacate this preliminary injunction?

Wayne Snodgrass:    Because the uncertainty . . . Well, there are a number of reasons that, we believe, the in-injunction be -- should be vacated. But on this point, the problem is that the uncertainty about what the injunction means with regard to involuntarily homelessness has hampered the city and prevented the city from moving forward with enforcement of the laws in any situ-- of the enumerated laws in any situation because we don't, we don't want to be in violation of a federal court injunction. Um, and I'll just note that the Appellees, in their briefing, uh --

Judge Koh:    What part of the injunction prohibits you, for example, from following your pre-injunction enforcement bulletin? Is there any specific language that prohibits you to do that?

Wayne Snodgrass:    I don't think there's -- there is specific language saying the city may not follow that bulletin. But the-the injunctive language, the prohibition against enforcement of the enumerated laws except

against the involuntarily homelessness -- homeless again begs that question: Who are those individuals?

If they are, if they are, as the District Court seemed to believe from its remarks, and as the Appellees have sometimes urged both in this Court and in the District Court, sometimes not -- if involuntarily homeless individuals means all homeless individuals in San Francisco during such time as the number of shelter beds is less than the number of -- uh, is-is less than the number of individuals experiencing homelessness, then the city is not able to enforce those-those laws, the enumerated laws against [crosstalk].

Judge Bumatay:    But Counsel, if-if the District Court followed that definition, that would be in violation of Ninth Circuit precedent, which clearly says involuntary homeless incl-- doesn't include those that are offered temporary shelter.

Wayne Snodgrass:    And, uh, we're asking this Court to clarify that, in this case, the-the injunction must be -- its term "involuntarily homeless" must be read -- must be defined consistent with the definitions in Martin and in Grants Pass.

Judge Bumatay:    Okay.

Judge Koh:    Do you agree that, in an enforcement action, the city would bear the burden of showing that a shelter offer was made?

Wayne Snodgrass:    If there were an enforcement action, um . . . Well, if-if the city, for example, were to cite, uh, were to cite a -- an individual, and the city believes that if -- that a-a shelter offer had been made, and that -- and there was some dispute about that? Um, I think the -- I-I think it would depend where the, where the issue was raised. If-If there was a criminal proceeding in state court, um, then I don't believe the city would face that burden. Um, uh, I think it would depend on the particulars.

Judge Koh:    So a-a-a-at a minimum, Penal Code -- or, I'm sorry, I guess it's Police Code Section 169 requires that a shelter offer be made. So at a minimum in that instance, you would have to bear the burden. Correct?

Wayne Snodgrass:    Under . . . If we, if we were to cite, uh, an individual experiencing homelessness under Police Code 169, that is correct.

Judge Bumatay:    Would that be an affirmative defense in an individual prosecution? How would that happen? How would that play out?

Wayne Snodgrass:    Well, there's nothing in the record on this, but I do believe that that would be -- that could be raised as an affirmative defense in, uh, in an individual prosecution.

So the Mar-- the confusion in the District Court as to what "involuntarily homelessness" means is just one of the legal errors which we believe, um, under-undermines and requires vacation of the injunction. Um, another one is that the District Court

erroneously treated San Francisco as if it were the same as Boise and Grants Pass, which fundamentally it is not. In those --

Judge Koh:                Go back one second to involuntary, um, homeless individuals. Um, is an offer that requires someone to be separated from their family or to give up their pets or their belongings -- is that an adequate-shelter offer?

Wayne Snodgrass:    In our view, an -- a . . . First off, that is, that is not a question that is addressed at all by the record, uh, in this case. It has not been developed below, and there have not -- you know, th-there's -- that issue is not really present in this record. Our view is that an adequate-shelter, uh, offer is shelter that, um, does not -- for example, as in, as in, uh, Martin -- infringe upon the individual's First Amendment rights. Uh, but I . . .

For example, I do believe that a-an offer . . . I don't believe that shelters are required to accept all of the pets that belong to the individuals who live there. Uh, but again, these are issues that, right now, the injunction didn't address in the parties' briefings, uh, in the District Court and in this Court have not addressed. So that's --

Judge Koh:                And you're n-- you're not asking this Court to try to give some guidance on that, as to how you would assess whether somebody was involuntarily homeless, are you?

Wayne Snodgrass:    With --

Judge Koh:          It seems like there would be a lot of questions, uh, subsumed within
                    that ultimate question.

Wayne Snodgrass:    Correct. We are not asking this Court at this time to address the
                    issue of what specifically constitutes an ad-- an offer of adequate
                    shelter and what does not because the record before this Court
                    simply doesn't address that.

Judge Bumatay:      Can I ask . . . ? So you asked for the total vacation of the, uh, inj--
                    preliminary injunction. But, you know, there is -- Martin and Grants
                    Pass is -- you know, that is the law. So would an injunction that
                    required San Francisco to follow its policies as written, would that
                    solve all the problems?

Wayne Snodgrass:    I don't believe it would, Your Honor. And so that-that gets me to
                    another problem with the injunction, which is that this-this case
                    [and] San Francisco's laws are fundamentally unlike those in, uh,
                    the city of Boise and in Grants Pass.

                    In those jurisdictions . . . Each-Each one of those jurisdictions had a
                    flat 24/7 prohibition on sleeping in public on public property. Uh, in
                    Martin, there -- the ordinance prohibited sleeping in any public
                    place. And in Grants Pass, the ordinance said no person may sleep
                    on public sidewalks, streets, or alleys at any time.

                    And the Court held that it was a violation of the, uh, Eighth
                    Amendment, obviously, to criminally p-prosecute homeless

individuals for sleeping in public because, as a result of those 24/7
measures, they had nowhere else to go. San Francisco is different.

In San Francisco, uh, an individual experiencing homelessness is
legally allowed to sleep on the sidewalk or in a park within 20 out
of the 24 hours making up the day. Um, between 11:00 PM and
7:00 AM, Section -- Police Code Section, uh, 168 allows sleeping
on sidewalks. The prohibition contained in Section 168 only applies
from 7:00 AM to 11:00 PM.

Judge Bumatay:          So-So the real problem is just [crosstalk] --

Judge Koh:              You're-You're-You're making a, um, "geographic limitation"
                        argument. But those geographic limitations, they're not in the
                        ordinances that have been enjoined, are they?

Wayne Snodgrass:        Uh, Police Code 168 is one of the enjoined ordinances. So Police
                        Code --

Judge Koh:              But look at the others. Uh, uh, I mean, let-- okay, let's look at 168.
                        Uh, that says from 7:00 to 11:00 PM you can't sit or lie on the
                        sidewalk. Then the city argues, "Well, then go to a park." But the
                        park, it's illegal to sleep in a park from 8:00 PM to 8:00 AM. So
                        there's still four hours in the day when people don't have anywhere
                        to go. So how do you then address those four hours?

Wayne Snodgrass:        Well, Your Honor, we respectfully submit that it is not cruel and
                        unusual punishment to forbid sleeping on public property within

four out of the 24 hours making up the day. In more than 80 percent of the time of a day, there are places where individuals may lawfully sleep. Uh, one of . . .

Uh, Penal Code 647e, another of the enjoined ordinances, does not prohibit public sleeping; it prohibits lodging. And as the San Francisco, uh, pre-injunction enforcement bulletin states, um, the city only enforces that if the individual has a tent or some other similar structure.

Judge Bumatay:    So I guess th-that's my problem: I don't understand why, then, we couldn't say San Francisco should enforce its police bulletin as written. Because the -- it accounts for all -- everything you're saying now.

Wayne Snodgrass:    Correct. Um . . .

Judge Bumatay:    The only thing that wouldn't do: It would prevent San Francisco from enforcing 647e without offering shelter first.

Wayne Snodgrass:    That still leaves other issues as to the injunction. I'm-I'm happy to turn to those if the Court would like to hear those.

Judge Bumatay:    But, I mean, I'm just saying you would be happy -- would you be satisfied if we said that the injunction should be that y-- San Francisco should follow its laws as written?

Wayne Snodgrass:   Well, that-that is simply a follow-the-law injunction, which, um, legally is . . . There's -- obviously, there's --

Judge Bumatay:   But there's a record showing that it hasn't been, so . . .

Wayne Snodgrass:   We-We think that the, that the . . . We are asking The Court to vacate the injunction because of various fundamental legal flaws underlying it. Should The Court not do that, then we do ask that the, um . . . We ask for . . .

What we're seeking, then, is an order that -- uh, an opinion -- excuse me -- that-that clarifies a number of the issues that we have raised: involuntarily homelessness; um, the, uh -- there should be no injunction against 168 and 169. Uh, another issue is the, uh, prohibition against "threats to enforce," and --

Judge Koh:   And so when you talk about the threats to enforce, um, I understand, uh, that the District Court's comments at that January hearing certainly, uh, did raise your concern. But if you look at the language of the injunction itself, it says, uh, "enjoin from threatening to enforce" these specific five penal code and police code sections. So why isn't that specific enough?

Wayne Snodgrass:   Well --

Judge Koh:   That-That certainly doesn't say just standing around in your mere presence is enjoined. It says you threaten to enforce these five sections.

Wayne Snodgrass:   The District Court suggested at the, uh -- i-in The Court's remarks at the -- in the January hearing that the mere presence of police without s-- you know, silent presence of police could reasonably constr-- be construed as a threat to enforce. And it was those remarks that have created this -- again, another aspect of uncertainty that the city faces as to what it may or may not do under the injunction. Um, I agree with you that the --

Judge Koh:   Thanks.

Wayne Snodgrass:   -- a verbal or written threat is-is what is needed, not-not simply a presence. But the District Court, for example, talked about, at a certain enforcement action, the ratio, uh, between the number of officers present and the number of residents at the encampment, uh, suggesting that there was some permissible numerical level that, if it's exceeded, that constitutes a threat. Um, we need to know, we need to . . . W-We're asking The Court for clarification that a threat is a written or verbal, uh, communication, not simply a silent police presence.

Judge Bumatay:   Yeah, the District Court didn't do any balancing of the interests when considering -- making that statement. Right? So it didn't consider the safety issues that would be attendant if police were not around. So i-it seemed not to be appropriate to-to enforce that type of definition of "threaten."

Wayne Snodgrass:    It's hard to say what the District Court was considering at that moment.

Judge Bumatay:    Right.

Wayne Snodgrass:    It was faced with competing, uh, administrative motions from-from the respective sides. Um . . .

Judge Koh:    I have one last, uh, question. Your argument, uh, up until the appeal seems to have been consistently that your pre-injunction written policies required you to make a shelter offer before enforcement of any sit/sleep/lie laws during encampment resolutions. Um, but now you seem to be arguing, "Oh, we don't have to give a shelter offer, anyway, because people can move to another part of the city. They can move outside the city." Um, why shouldn't we find that that new argument is waived?

Wayne Snodgrass:    That argument, Your Honor, is a, is a pure issue of law, which The Court is free to-to address even if it was not addressed below. Um, with --

Judge Koh:    Uh, but don't we need a factual record to know whether other public spaces are, in fact, available?

Wayne Snodgrass:    No, Your Honor, you don't because the -- all you need is the text of the laws, the text specifically of 168 and the [park crew] provision, which together allow public sleeping within 20 of the 24 hours

making up the day. Um, unless there are further questions right now, I'd like to reserve some [crosstalk].

Judge Bumatay:   I do have two . . . I'll give you some [crosstalk]. I do have two questions. Um, one of the issues you raised is that we shouldn't, uh, en-en-enforce injunction while -- uh, during, uh, resolutions -- encampment resolutions where you're cleaning up and remediating the area. Is that . . . Are you asking for -- uh, that-that-that injunc-- uh, that you should be allowed to enforce these laws forever after, uh, a resolution, or is that limited in time?

Wayne Snodgrass:   The resolutions are not a, um . . . The resolutions don't create a permanent, uh, no-sleeping zone. They are, uh, they are, uh, an enforcement approach, an enforcement mechanism to deal with a particular problem focused in scope that the city perceives at that location.

Judge Bumatay:   So then after . . . 'Cause I think your briefing said that the District Court would allow you to cl-- to rem-- uh, to enforce the laws while y-you're actually cleaning the resolution area. But you're asking for, uh, the ability to enforce that after cleaning is done. Is that, is that right?

Wayne Snodgrass:   That is correct.

Judge Bumatay:   But how much time are you asking for after resolution is done?

Wayne Snodgrass:    Well, the-the . . . There-There isn't, there isn't a-a set time. Um, the .
                    . . What we're asking for is the ability to use these tools, which are
                    the enumerated laws --

Judge Bumatay:      Yeah.

Wayne Snodgrass:    -- uh, when presented with the, with the problems that we are facing
                    out on the streets.

Judge Bumatay:      In the resolution?

Wayne Snodgrass:    In the resolution.

Judge Bumatay:      Correct. And then m-my second question in -- um, is, you know,
                    you reference that the District Court's injunction, uh, referenced the
                    f-- uh, formula from Grants Pass, which was stricken. But what
                    timing . . . Assuming that we don't vacate the injunction totally,
                    what timing would be appropriate, then, for the end of the
                    injunction?

Wayne Snodgrass:    We-We think that in terms of the endpoint --

Judge Bumatay:      Yeah.

Wayne Snodgrass:    -- the injunction should have been like a standard preliminary
                    injunction, which is dur-- while the litigation is pending in the
                    District Court, unless the injunction is modified or vacated. That's

the way most preliminary injunctions read, and we think that that is the approach that should have been followed here.

Judge Bumatay:    Okay, yeah. We'll give you a couple minutes for rebuttal.

Joseph Lee:    Good morning. And may it please The Court, my name is Joseph Lee. I'm here on behalf of Plaintiff Appellees. So let me start off by, uh, pointing out two, I think, important things. One is that with respect to the legal standards that the District Court applied, the District Court faithfully, uh, applied the holdings in Martin and Johnson. In fact, uh, the District Court's injunction is a very straightforward application of those holdings.

Judge Desai:    But . . . So do you agree that the city can still enforce the enjoined laws against individuals who refuse an offer of actual available shelter?

Joseph Lee:    Absolutely, Your Honor. If an individual is no longer involuntarily homeless because they have access to practically available shelter, then -- again, consistent with Martin and Grants Pass -- that individual can have -- uh, is no longer involuntarily homeless and, therefore, is subject -- is outside the scope of the injunction, which on its face --

Judge Koh:    If you look, if you look at Page 41 of the injunction, the District Court treats the Defendant's argument regarding involuntarily homeless as sort of a novel issue and says The Court need not

decide whether Defendant's reading of Martin and Johnson is correct because their position lacks factual support.

Joseph Lee:        That's right.

Judge Koh:         So this does make it seem as if The Court is relying heavily on the formula. This whole language relies on the formula. The injunction only ends when the formula no longer applies. So there does seem to be a lot of confusion as to whether someone who declines a shelter offer is, in fact, involuntarily homeless.

Joseph Lee:        Your Honor, I would not characterize that as confusion, certainly not confusion on the part of the District Court. And if you look, for example, at The Court's opinion on Page 36 -- uh, that's the ER37 -- um, you can see that the District Court delineates between discussion of the formula versus discussion of what it means to be involuntarily homeless.

                   If you look at that p-page starting at Line 11, the District Court -- again relying upon Ninth Circuit precedent -- says: "The Ninth Circuit made clear, um, that-that its h-holding is a narrow one regarding when a city may prosecute homeless individuals." Again, here the District Court does not use the term "individual" -- er, "involuntarily homeless" for sitting, sleeping, or lying in public policy. And it-it recites, essentially, the formula.

                   But then it goes on to say that the Ninth Circuit also explained that its holding does not cover individuals who do have access to

adequate temporary shelter, whether because they have the means to pay for it or because it is [crosstalk] available --

Judge Koh:          I understand that-that those quotations of Martin and Johnson are there on 36. But on 41, the District Court clearly seems to think if the formula is not satisfied, I don't have to address the question of whether anyone is involuntarily homeless. And Rule 65d requires that injunctions be specific in terms, describe in reasonable detail the acts to be restrained, prevent uncertainty, prevent confusion. So how does it meet that [high bar] of precisely and fairly drawing notice of what the injunction actually prohibits?

Joseph Lee:         I-I think the injunction itself solves that. And I disagree with the ambiguity. But nevertheless, I think the language in the injunction itself solves that issue because the injunction separately states that the Defendants are enjoined from enforcing, uh, the laws to prohibit involuntarily homeless individuals from sitting, lying, or sleeping on public pr-property, and then it enumerates those laws -- and then separately says, "This preliminary injunction shall remain effective as long as there are more homeless individuals in San Francisco than there are shelter beds available." A-And as --

Judge Desai:        So what you're saying is that the-the language at the end of the injunction . . . And I think your friend on the other side ac-actually said the same thing, which is the language at the end of the injunction talks about how long the injunction shall remain in place. And what you're saying, and I think that's what the city is also, um, wanting us to hold, is that the actual scope of the injunction only

relates to involuntary homelessness without any connection to the formula.

Joseph Lee:         That's correct. And-And I think that's, in some ways, the best evidence that there's no confusion here because everybody agrees that that's how the injunction should be read: that the, uh, provision regarding the "formula" is merely intended to be a sunset provision, and the real -- uh, the-the actual limitation in terms of who -- whom the injunction can -- uh, it protects is limited to involuntarily homeless individuals.

And as this Court pointed out, that definition, that term, "involuntarily homeless individual," comes straight from the Ninth Circuit's case language and is well defined and, in fact, has been used by this Court to define not just a scope of injunction but other things, such as a class of persons.

Judge Bumatay:      So can I ask, just to be clear: Your-Your-Your-Your side believes that the -- San Francisco could enforce those policies as written?

Joseph Lee:         Uh, Your Honor, there is an important caveat here. For one thing, there are multiple policies at this point that the city has --

Judge Bumatay:      The pre-injunction enforcement bulletin.

Joseph Lee:         Right. Well, the problem with the pre-injunction enforcement bulletin is it doesn't go f-far enough. We certainly agree with the-the general principle behind the policy --

Judge Bumatay:          But there is disagreement about what the meaning of "involuntary homeless" is?

Joseph Lee:             No, the disagreement isn't with respect to "involuntary homelessness." The-The disagreement is that the policy -- uh, the pre-injunction policy doesn't fully -- uh, doesn't apply to, uh, three of the five enumerated laws. It applies to 647c, and it applies to 168 with respect to requiring offers of shelter be given before enforcement. It does not apply to 370, 372, or 169. And so --

Judge Koh:               But let's look at Police Code Section 169. It specifically, um, requires that a shelter offer be made before enforcement. So why should that code section be enjoined?

Joseph Lee:             I-I-I apologize, Your Honor. I misspoke. What I s-- what I meant to say is that the policy only applies to 169 and 647 -- um, [648].

Judge Koh:               But-But why, but why should the enforcement of Section 169 be enjoined? It specifically requires that prior to ordering a person to be removed from an encampment an offer for housing or shelter has to be made.

Joseph Lee:             And I think that's where we go to the crux of the issue, which is you have to look at the factual record to fully understand why it was entirely appropriate and certainly was an abuse of discretion for the District Court to issue the injunction in the fashion that it did.

Because what the record clearly shows -- and again, the record is largely undisputed: that the city used these laws not in the way that they were intended or, in fact, in the way that their policy describes they should be used, but used them as a pretext to criminalize homeless individuals s-simply because --

Judge Bumatay:      Yeah, [crosstalk] . . . I mean, that's very clear from the record.

Joseph Lee:      Sure. Sure.

Judge Bumatay:      But what we're trying to pin down is whether or not you believe San Francisco can enforce those laws as written in this policy.

Joseph Lee:      Sh -- certainly. If San Francisco were to make bona-fide, realistic offers of shelter, then they could -- they could enforce those o -- because those individuals --

Judge Bumatay:      [crosstalk] Just-just to be clear, y-yes, they can enforce the pre-injunction police bulletin as written?

Joseph Lee:      Yes. B -- yes, because, as written, what it requires is that only individuals who are not involuntarily homeless can be enforced against because th-th-th --

Judge Bumatay:      Right.

Joseph Lee:      -- the law by its very language requires that individuals be given offers of shelter.

Judge Bumatay:     And b-being given an offer of shelter makes you not involuntary homeless. Correct?

Joseph Lee:     That's correct. But of course, the offer of shelter has to be a-a real-realistic offer for shelter, a specific offer of shelter that provides them with access.

Judge Bumatay:     [crosstalk] Yeah.

Joseph Lee:     Well, so what the record is clear --

Judge Koh:     But --

Joseph Lee:     -- is that --

Judge Koh:     Could you def -- y -- throughout your brief, you keep saying it has to be a real voluntary offer. So how do you define a voluntary offer?

Joseph Lee:     So I-I think maybe -- [crosstalk]

Judge Koh:     [-- it have] to be of someone's choosing? Does it have to -- what-what-what criteria would the court use in determining whether that was a voluntary offer of appropriate shelter, given a real, voluntary offer of appropriate shelter is what you say on page 33 of your brief.

Joseph Lee:        I-I-I think maybe the -- maybe, uh, a-a clearer way to frame it is to simply say that, if an individual is offered a specific offer of shelter that's practically available to that individual, then-then that would provide that individual with access to shelter.

What the record does show though, the factual record, is that the city does not do that. Instead, what the city does is things like, uh, you know, "Hey, you know, are you interested in shelter?" without having a-a-an actual shelter offer in hand and then using that as a pretext to then enforce against that individual.

And so the problem here is that the city has shown that, despite the law requiring, uh, an offer for shelter that's-that's real, that's firm, the city doesn't do that but then says, uh, you know, we've done our duty and satisfied the law when that's clearly not the case.

Judge Koh:        B -- I-I understand what you're saying about the record. But in your brief, you repeated to say individuals who have practical -- which I understand you're now saying is like readily available -- and voluntary access to shelter. So are you now no longer requiring that voluntary condition?

Joseph Lee:        So individuals are not compelled to use shelter. Right. But, uh, certainly, if they do have access to shelter and they decide not to use it, that doesn't make them involuntarily homeless.

So-so with respect to the voluntary, I guess the way that I would put it is that, for example, if I was outside in the street and, you know, I

was asked to move along, I would not count as an involuntarily
homeless person because, uh, I do have a place that I can go to.

And so simply because I voluntarily choose not to make use of that
doesn't turn me into an involuntarily homeless individual. However,
there are -- c-certainly, it's undisputed that there are plenty of
people out on the street who are involuntarily homeless because
they have no place else to go.

And the city can't convert those individuals into, uh, people who are
not involuntarily homeless unless they provide those individuals
with access to, uh, practically available shelter, which d -- a-again,
the record shows the city has not done as a practice.

Judge Bumatay:       Well, the-the pre-enforcement -- pre-injunction enforcement
                     bulletin says, "If there is no shelter or Navigation Center bed
                     available, officers may not issue a citation or seize
                     encampment/tent." That-that satisfies the condition you're talking
                     about.

Joseph Lee:          It-it does. But again, keep in mind that that policy doesn't fully
                     cover the-the laws that the c -- that the city has used as tools to
                     criminalize homelessness. So the-the other point, some of which
                     I've already addressed, Your Honors, is that, uh, the city keeps
                     talking about legal error.

                     But-but the problem w -- that the city faces in challenging the
                     injunction is that it isn't a question of legal error. What the district

court did was it looked at what the factual record was to see how the city use these specific laws in an unconstitutional manner in violation of the standards set forth in Martin and Johnson.

And then, the city -- or the district court -- excuse me -- issued an injunction that essentially told the city, you are prohibited from continuing that conduct. That certainly was not an abuse of the district court's discretion.

The district court carefully targeted the specific laws that she enjoined the city against enforcing. In fact, we had asked during the-the preliminary injunction motion for additional laws that the city should be prohibited from enforcing.

But the district court, after a thorough and careful consideration of the factual record, determined that there is not enough factual support for enjoining against enforcement of those additional laws.

Judge Bumatay:      Can-can I ask you to address your-your friend's argument that this --- you know, San Francisco is not Boise. It's not, uh, Grants Pass. And there are -- and-and the homeless have a right to sleep somewhere in the city. And so therefore, none of these laws should apply. None of the precedents should apply.

Joseph Lee:         I think, again, you've got to turn to the factual record because what the factual record shows is, despite the language of the laws, the city freely enforces, uh, their laws against individuals at any time of day or night.

Uh, there's recor -- cites to the record, uh, in our, uh, answering brief on pages, I believe, uh, 49 and 50 where the city, uh -- we have declarations of individuals saying that the city enforces its laws against individuals as late as, uh, 1:00 a.m. and as early as 4:00-4:00 a.m.

And so these laws are used by the city as a tool to, uh, criminalize homelessness and keep involuntarily homeless individuals from sitting, sleeping or lying anywhere at any time of day or night.

Judge Bumatay: They might be volu -- violating. But if -- as written, what's wrong with the argument that homeless have a right to sleep somewhere in the city? Uh, they might not have, I guess, four hours in the day not -- a right to sleep somewhere in the city. But they have a right to be somewhere in the city. Then, that takes us out of the Grants Pass, Martin [World] and -- you know, none of this should exist.

Joseph Lee: I mean, uh, none of this was presented in the first instance by the city during the preliminary injunction motion. If-if the city, uh, thinks that it has a basis to argue that there is some sort of, uh, time, place, manner limitation, then the city is certainly free to go back to the district court and ask for a modification to the injunction.

I think that's the appropriate, uh, venue for this because then the district court can fully consider whatever factual information both sides, uh, might present to argue that there is or is not a-a-a-a-a safe harbor so to speak.

But based on the factual record that has been developed to date -- and that was before the district court for a preliminary injunction, the-the factual record shows there -- that, in fact, there is nowhere in the city that's safe from [the city].

Judge Bumatay:      I-I-I get -- I get it. The factual record is different. But I'm just t-talking, uh -- talking about the laws. In-in Grants Pass and Martins, they --

Joseph Lee:      Sure.

Judge Bumatay:      -- we looked at the laws of-of the cities. And it said that no one can sleep anywhere in the city boundaries at any time -- uh, you know, but San Francisco's laws are different than those two cities. And so --

Joseph Lee:      But-but th -- but the injunction isn't targeted toward simply addressing the-the law as it's written. The injunction is targeted towards addressing San Francisco's actual application of those laws, which isn't congruent with the laws as written.

And in fact, that's part of the reason why there is a problem with simply, uh, having San Francisco say, "Hey, follow your laws," because they've already demonstrated that they have a different interpretation of what those laws are compared to the actual letter of the law itself.

Judge Bumatay:      Well, if-if that's -- [crosstalk]

Judge Koh:          But to your -- uh, go ahead.

Judge Bumatay:      I was just wondering, if-if they're fall -- if they're violating the law,
                    like why isn't that just a-a defense to those individual prosecutions?

Joseph Lee:         Well, Your Honor, I think that, uh, in addition to them not
                    following the law, the-the problem is that, uh, you know, on an
                    individual basis, you're asking, uh, folks who, you know, frankly
                    have no resources to try and defend themselves against, uh, their
                    constitutional violations. There is no, uh, basis to require --

Judge Bumatay:      They're not entitled to counsel?

Joseph Lee:         They are entitled to counsel, Your Honor, at-at least in certain
                    circumstances. Uh, but-but the point here is that, uh, you know,
                    these constitutional harms can be addressed p-prof -- uh, [laughs] in
                    the first instance, uh, because we've established a factual record that
                    San Francisco does engage in constitutional harms.

                    And so it's entirely appropriate certainly during [dependency] of
                    this litigation to prohibit the city from continuing its practices
                    which, again, I don't think there's any dispute. In fact, the city
                    doesn't even really dispute that the factual record shows that the city
                    has engaged in widespread, uh, uh, constitutional misconduct to
                    telling the city, hey, hold off on that until this case gets resolved.

And that's all the preliminary injunction is intended to do. Uh, and we think that the district court did not abuse its discretion in-in issuing such an injunction. In fact, it-it's frankly very consistent with injunctions that have been issued in other cases including in Grants Pass.

Judge Koh:        Do you agree with your opposing counsel that any threat to enforce has to include a written or verbal threat to cite or arrest? Uh, or do you think mere police presence is in and of itself what conveys a threat to enforce an ordinance?

Joseph Lee:       Uh, Your Honor, I-I-I don't think that there is a bright-line rule that it has to be a written or a verbal threat. I do think though that the --

Judge Desai:      [crosstalk] -- you cited includes written and verbal threats.

Joseph Lee:       That's right. And so certainly, written and verbal threats would suffice to constitute a threat. But-but the point that I wanted to make, Your Honor, is simply that, uh, whether or not a threat exists is based upon a totality of the circumstances.

And-and so, for example, whether or not mere police presence might be enough or it might not be enough, that again depends on the facts. Right. Uh, one officer, uh, standing there with, you know, 100 people, that's probably not a threat. You know, 100 officers surrounding a single person --

Judge Koh:          [crosstalk] -- cited any authority. You haven't cited any authority
                    for that. Your case law that you cited in support of your position on
                    this issue, they all include written and verbal threats. So what would
                    be the author -- and actually, let me just back up. Do you believe
                    that this injunction enjoins mere, uh, police presence?

Joseph Lee:         Uh, uh, not-not as a bright-line rule. It-it could, again, depending
                    upon the totality of the circumstances. Uh, I would refer, Your
                    Honor, to the amici brief by, uh, the Law Enforcement, uh, Action
                    Partnership, I believe it's called, uh, where they do lay out case law
                    that-that describes the many circumstances in which, uh, police
                    presence has or has not been, uh, determined to be a threat.

                    And-and what I would also point out is that the city's post-
                    injunction bulletin articulates a standard for what constitutes a
                    threat that we're perfectly comfortable with. And so there is no issue
                    in our minds at least with respect to how the city itself understands
                    a threat to-to mean and what constitutes a threat.

Judge Desai:        I-I want to go back to, uh, uh, an issue that we were talking about
                    just a few minutes ago in terms of the -- what constitutes
                    appropriate, realistic, available shelter because there seems to be,
                    uh, a gap that's created between Martin and Johnson on this issue of
                    whether another location in the city that is a public space would be
                    sufficient for somebody to go to, converts them from being
                    involuntarily homeless to m -- v --

-- I-I actually would prefer to use a voluntary homeless because there's so many double negatives when we're talking about the involuntary homeless.

But, uh, if-if the city were to designate a part of the city or a park or something that was outdoor, was not a shelter and, much like I think they say in a different maybe encampment, that they're not going to be enforcing, uh, these ordinances and -- uh, wouldn't it be okay under our precedent, under Martin and Johnson to be able to say, if we tell people that's a place you can go and we're not enforcing, uh, the ordinances there, you are now, uh -- you are subject to enforcement here because you essentially become voluntarily homeless?

Joseph Lee:     That-that might be okay, Your Honor. And again, that's not the factual record here. I will note that, for example, in the case, uh, Warren v. City of Chico, uh, the use of, uh, an airport tarmac, for example, was not deemed an adequate alternative location for shelter because it was exposed to the elements.

You know, uh, being on a hot tarmac is-is not really adequate. Uh, but you know -- so it-it really is a fact inquiry in terms of what is that alternative. And again, that's not before this court. The city has never pointed to a specific location where, uh, it has said this is a safe harbor.

And the factual record supports that the exact opposite happens. The city enforced its laws against involuntarily homeless

individuals all across the city without regard to limiting them to any particular area.

In fact, the record also shows that the city will, in fact, uh -- after telling individuals to move under threat of enforcement, will then follow the individuals and again tell them to move. And so there is no factual record that supports a suggestion that there is any safe harbor anywhere in the city.

And again, if the -- if the city does create some sort of safe harbor location, then they can go back to the district court and ask for a modification. And we can debate the facts and have the district court decide that then.

Judge Desai:          On --

Joseph Lee:           But that's not the issue here.

Judge Desai:          -- on that point -- on that point, uh, can you clarify for me that the -- and maybe I can just ask the city this. But they-they will be filing an amended answer in September. So in terms of the litigation that is ensuing in the district court, there's still a timeline for obviously , uh, an amended answer, uh, and then, whatever happens through a permanent injunction phase. Right.

So m-maybe talk to me a little bit about what the opportunities are for the city to raise the kinds of issues and defenses and develop a record much like what you're saying is required.

| | |
|---|---|
| Joseph Lee: | Uh, sure, Your Honor. So, uh, you're correct, Your Honor, that there is amended answers. That's-that's to come. Uh, that's based on an agreement between the parties regarding, uh, the [affirmed defenses] that the city has pled and so -- that they're going to amend to that. |
| | Uh, I will say that the parties are all dis -- also [discussion e-extension] to the discovery schedule. It'll likely be at least six months. It could potentially be up to a year. Uh, and of course, uh, during the course of this litigation, uh, there will be opportunities for additional discovery to be done, as I just described. |
| | And the city can, based upon whatever discovery or other changes to their policy, for example, that they promulgate, uh, they can ask the district court to modify the injunction given the change in circumstances. |
| | And so there is s -- frankly ample opportunity during the course of this litigation for the district court to-to do that. Uh, I-I see my time is up. I-I did have one or t -- |
| Judge Koh: | One -- I have one last question. I have one last question. Separate from the waiver issue, do you agree that the district court should have conducted a Monell analysis? |
| Joseph Lee: | I think the district court, uh, uh, did what it needed to do with respect to Monell analysis because, again, the factual record is clear |

that the city engaged in a widespread practice of violating

individuals' constitutional rights.

And this wasn't simply a one-off situation. In fact, we have, uh,

declarations from ex-city employees that-that describe how this was

a practice of the city to do so and, in the city's own declarations,

also described how they would routinely go to encampments

without, uh, knowing whether or not any beds were available.

Judge Koh:        Uh, so is it your position that the district court did conduct a Monell

analysis? [That's your position]?

Joseph Lee:       Yes. Yes. I think that -- [crosstalk] I think to the ex -- in a -- in a

situation like this where the factual record is absolutely clear with

respect to the city's practices, I think the-the district court did what

it needed to do to show, uh, Monell liabil -- or certainly the-the

likelihood that we would succeed on the merits of the Monell

liability claim, which is all that's required.

Judge Bumatay:    Uh, I have one more question too. And we'll give you plenty of time

to finish --

Joseph Lee:       Okay.

Judge Bumatay:    -- w -- th-the points that you wanted. Uh, you-you-you keep talking

about a factual safe harbor. But you know, in Grants Pass and

Martin, it's not about factual safe harbor. It was legal safe harbor.

Here, in San Francisco, there seems to be a legal safe harbor that the laws, as enforced, allow the homeless to sleep somewhere.

Joseph Lee:          Well --

Judge Bumatay:    So we-we should not even be doing an Eighth Amendment analysis here.

Joseph Lee:          Well, Your Honor, I-I-I-I disagree with that because, again, we-we're-we're not dealing with just that single, uh, daytime sidewalk law. There are other laws including other laws that the preliminary injunction enjoins.

And what San Francisco does is they use this net of laws to capture in-involuntarily homeless individuals and criminalize them simply because they have no choice but to sleep on the streets. And so the preliminary injunction was entirely appropriately issued to address these interlocking laws that San Francisco uses to criminalize homelessness.

And th -- it wasn't an abuse of the district court's discretion to simply say, San Francisco, you are no longer allowed to use these laws to proceed as you've done so. And in -- uh, and in fact, the-the district court took a very measured view of that by not accepting all of the laws that we had asked to enjoin. Uh --

Judge Bumatay:    And you wanted to make one last point. Go ahead.

Joseph Lee:          Yes. Thank you, Your Honor. So, uh, o-one additional point I do want to bring up is with respect to the workability argument, which, uh, the city didn't spend a lot of time on. But we just want to make clear to the court what our position is on that, which is, again, the-there is no workability issue.

And the city's own words confirm that. The city submitted for judicial notice, which we are not opposing, a police bulletin that came out after the preliminary injunction that set forth what the city could still do with respect to keeping the streets safe, keeping the streets clean.

It-it details a-a number of things that can be done including asking people to temporarily move to allow for street cleaning, allowing the c -- uh, telling, uh, city employees you c -- we can still enforce these other laws that require people, for example, to move when they're obstructing a sidewalk.

And we don't contest any of that. We, frankly, don't really have an issue if the city follows the-the police bulletin that-that has issued post-injunction. The problem is, you know, the city has already shown that, uh, they're not following the new policy just like they didn't follow the old policy.

Judge Bumatay:      Y -- sorry. That raises one last question I have. The -- uh, they-they raise the timing of the end of the injunction, which seems to track w -- the formula from, uh, Grants Pass which was, uh, stricken. So do

you have a view on what the timing of the end of the f -- uh, of the injunction should be?

Joseph Lee:        Sure. I mean, as of --

Judge Bumatay:     The sunset provision, I guess, [if] --

Joseph Lee:        Sure. As with any other preliminary injunction, the-the injunction can end, uh, when the case ends. Uh, what that additional provision does is it does give an escape hatch, uh, if -- uh, if the city -- and again, this seems very unlikely, to be honest -- but if the city does engage on a -- on a-a process of building out thousands of additional beds that are needed and t -- and then goes back to the district court and says, "Look, you know, we've -- we -- there's housing for everybody now. We think that the injunction no longer applies." I think that provision sort of addresses that.

Judge Bumatay:     [I see].

Joseph Lee:        But what we know is that, in reality, it's not like we're five beds short or 10 beds short, we're thousands of beds short. And so --

Judge Bumatay:     [And 0.5 billion d-dollars] short apparently.

Joseph Lee:        Well-well, I-I-I'm not sure that that number is correct. But leaving that aside, we're certainly thousands of beds short. And so it seems unlikely that, as a factual matter, that provision is going to have any relevance prior to the end of the litigation.

Judge Bumatay:        Thank you. Thank you, Counsel. I think he went five minutes over.
                      We'll give him five minutes.

Wayne Snodgrass:      Thank you, Your Honors. I'd just like to make a few quick points.
                      Uh, the court was asking before where, within its injunction, does
                      the, uh, district court take the view that the formula is all that
                      matters. And I would point the court to, first off, on page 41 of the
                      injunction order, uh, where the -- at lines 25 through 27, 28 where
                      the court says --

Female Voice:         Look at -- but s -- look at page 36. The court very much quotes all
                      of the relevant sections of Martin and Johnson about involuntary
                      homeless.

Wayne Snodgrass:      But it goes on to say that it need not address the issue of whether
                      under Martin and Johnson, uh, a person is voluntarily homeless if
                      they have been offered shelter [as] -- while we're within this period
                      wh-when --

Female Voice:         But-but-but --

Wayne Snodgrass:      -- according to the formula --

Judge Desai:          Yeah. But the other side, uh, concedes this point. Th-they agree
                      with you that the formula is not what dictates -- the formula
                      language is not what defines involuntary homeless. In-instead, they
                      agree with you [clears throat] that what defines what is involuntary

homeless is a person who doesn't have an option -- any other option of available shelter.

So, uh, this-this argument about the fact that the formula language is what is -- you know, there's lack of clarity about what involuntary homeless means because of this formula language seems, you know, to be really manufactured because, uh, it sounds like everybody agrees on this point.

Wayne Snodgrass:    We welcome that concession today. We did not have that concession before. We believe that, in their briefs both in the district court and in -- and in this court, the other side has not been anywhere near as-as forthcoming as thankfully they were today. Uh, there is a second --

Judge Bumatay:    So if this all gets hashed out tomorrow, we -- y -- w -- you could withdraw the motion for, uh, uh -- to modify the injunction pending appeal?

Wayne Snodgrass:    I'm sorry. If what gets hashed out tomorrow?

Judge Bumatay:    If-if-if-if this-this agreement that's happening today happens tomorrow before the district court, then we wouldn't have to address your motion to modify the, uh, preliminary injunction pending appeal.

Wayne Snodgrass:    Well, uh, if the -- if the district court tomorrow --

Judge Bumatay:        [Yeah.]

Wayne Snodgrass:   -- were to -- I mean, what's before the court is not, uh, a -- is not a
motion to modify the injunction. Uh, it's a motion to enforce. It's
brought by the -- brought by the coalition and the individual
plaintiffs. Uh, so if -- [crosstalk]

Judge Koh:            But what if -- what if you reached a-a-a-a stipulation because it
sounds like your opposing counsel is in agreement that someone
who is offered a practically available shelter bed is not -- and
declines it is not involuntarily homeless? Doesn't that then --

Wayne Snodgrass:   W --

Judge Koh:            -- resolve your motion?

Wayne Snodgrass:   I think that that stipulation would h -- if there were such a
stipulation, it would have to be accepted by the district court and,
in-in effect, a-adopted as a modification of the inju -- a modification
or clarification of the injunction much like what we sought back in
January. Uh --

Judge Bumatay:        So, uh, if you don't mind --

Wayne Snodgrass:   B --

Judge Bumatay:        -- I think -- because we would -- rather than the district court deal
with it then us have to deal with that motion, so maybe after

tomorrow's hearing, you could file a supplemental notice of what's happened and whether or not we still need to rule on that motion to, uh, modify the injunction pending appeal.

Wayne Snodgrass:    We'd be happy to do so, Your Honor. A second point, which is related, uh -- and there was questioning about this, I think, from-from you, Judge Koh -- this question of, uh, voluntariness. Uh, the other side has repeatedly said that an in -- an individual, in order to be taken outside of the box of involuntarily homeless, they have to have voluntary access to a shelter and that access to a shelter has to happen before there is an encampment resolution.

So there are two concepts here that, uh, the other side is arguing for and the district court appeared to have accepted and embraced because again, at page 41, the district court says of the injunction order, it is beyond dispute that homeless San Franciscans have no voluntary option of sleeping outdoors and, as a practical matter, cannot obtain shelter.

That actually is factually incorrect. But again, it shows that the district court seems to have adopted this nebulous concept of voluntariness, which is not found in Martin. It's not found in Grants Pass. And part of the clarification that we ask this court to provide is that the offer of shelter can take place within the context of an encampment resolution. And it need not be, uh, voluntary because it n -- simply needs to be made. Uh --

Judge Bumatay:                Uh, can I ask one -- uh, can you respond to the -- so I-I take your
                             opening argument to be that-that Martin and Grants Pass shouldn't
                             even apply to San Francisco because the laws are different here and
                             that homeless do have a place somewhere to sleep, lie and sit.

                             Uh, but h -- uh, y -- opposing counsel said that, as a factual matter,
                             that's not true because the way San Francisco enforces those laws
                             that, uh, there is no such safe harbor. Do you have a response to
                             that?

Wayne Snodgrass:             Yes, several things. First off, I agree with, uh -- I agree with Your
                             Honor's question from earlier that, if the -- if San Francisco
                             enforced any of the laws in a manner which was contrary to the text
                             of that law, that would be a defense, uh, in an ind -- in an individual
                             enforcement action against a citation or prosecution.

                             But secondly, the record, uh, I believe, doesn't demonstrate that San
                             Francisco enforces the laws in -- it doesn't-doesn't contain the, uh,
                             supposed clear, uh, evidence that the other side alleges that it does.

                             For example, the record doesn't distinguish between enforcement of
                             -- enforcement against somebody who is sleeping versus
                             enforcement against somebody who has a tent on the public right of
                             way, maybe a series of tents, a large en -- a large encampment.

                             Uh, the latter would be prohibited by Penal Code 647(e) whereas
                             sleeping alone, based on the clear text of these laws just on their
                             face, is not. So --

Judge Desai:        So I presume that m-m-much of this will be asserted in the city's amended answer that is going to be filed here in less than a month and in the t -- work that happens between now and the-the permanent injunction or the-the trial.

Wayne Snodgrass:    It may be. But in-in our view, Your Honor, this is an appropriate issue for this court to address at this juncture because it's just a matter of what do the laws say.

On their face, the laws provide places that individuals experiencing homelessness can sleep lawfully in San Francisco for 20 out of the 24 hours in the day. We don't need -- we don't need a factual record as to what those laws say and what they mean.

Judge Bumatay:      And you're over time if you want to wrap up, please.

Wayne Snodgrass:    Sure. Uh, just as one final point, I think that counsel's rema -- counsel's, uh, remarks on the question of what may con -- what may or may not constitute a threat to enforce -- in other words, it all develops -- it depends on the circumstances. We really can't tell.

That just drives home the point that, on that issue, the preliminary injunction is excessively vague. And it has the effect of, in essence, chilling the city from doing what it needs to do to promote and protect public health and safety.

Uh, if there is some unspoken ratio, uh, of the number of officers that may go out to an encampment resolution as compared to the number of residents of the resolution, we don't know what that is. There's no law saying that such a ratio exists. And we ask this court to clarify that it doesn't.

Uh, lastly, just, uh, in summary, we believe that the preliminary injunction should be vacated in order to ensure that San Francisco can promote and protect public health and safety. And we ask this court to do so. Thank you.

Judge Bumatay:     Thank you. Thank you, Counsel. Thank you, both.

Judge Koh:         Judge Bumatay, could I ask -- I'm sorry --

Judge Bumatay:     Uh, go ahead.

Judge Koh:         Can I ask one question of plaintiff's counsel, not-not the city --

Judge Bumatay:     Sure. Go ahead.

Judge Koh:         -- of the coalition's counsel?

Judge Bumatay:     Sure. Go ahead. Mr. [Lee]?

Judge Koh:         And this-this is an issue that was, uh, raised in the city's rebuttal. And that is, why does a shelter have to be practically available outside of an enforcement action in order for an individual who

declines an offer of shelter in the context of an enforcement action
to be voluntarily homeless?

Joseph Lee:        Uh, uh, uh, Your Honor, if I understand your question correctly, I
guess I-I don't think that that's the position that we're taking. Uh, uh,
it's frankly irrelevant how the shelter -- how that access to shelter,
uh, was provided to the individual.

Uh, if that individual does have access to shelter, then they're not
involuntarily homeless. Uh, the-the issue is with the city's, uh, uh,
"offers" in the context enforcement, which are not -- does not
actually, uh, provide individuals with access to practically available
shelter.

Instead, as the factual record shows, the city, uh, essentially hand
waves a shelter by, you know, uh, canvassing individuals, uh,
asking for their needs. But what it doesn't do, uh, prior to initiating
enforcement action is to actually provide any [individual with]
shelter.

In fact, the city's own employees admit that, prior to, uh,
encampment operations, they don't even know if shelter is
available. So how could the city possibly take the --

Judge Koh:         So -- okay. I -- uh, can I ask you -- I'm-I'm not asking a-a factual
question. I'm asking a legal question to understand your position.

Joseph Lee:        Sure.

Judge Koh:            So it sounds like, currently, your definition of practically available shelter bed includes outside of an enforcement action because you believe the city cannot otherwise give you a bona-fide shelter offer in an enforcement action.

Joseph Lee:           What --

Judge Koh:            Is that your position?

Joseph Lee:           Yes. W --

Judge Koh:            I'm just trying --

Joseph Lee:           Sure.

Judge Koh:            -- if we get to a stipulation here, I want to -- I don't want it to blow up because there are all these additional nuances or contingencies that were not stated. Earlier, you said practically available access to shelter was sufficient. But, uh, now, I'm hearing no practically available has to be outside of an enforcement action.

Joseph Lee:           Well, and the reason that w --

Judge Koh:            -- [crosstalk] [can't see it] any other way.

Joseph Lee:           Right. And-and -- [crosstalk] and the r -- y -- uh, the reason why we say that is because what-what-what happens is -- or let me put it a

different way. If an individual is to be -- is not involuntarily homeless because they have access to shelter, the city can't then take that away -- access away from that individual, uh, outside the context of enforcement because then it's-it's-it's meaningless.

Effectively, what the city is doing is saying, hey, uh, you know, as long as you -- as long as you, uh, are-are -- obey our laws including the law against sleeping on the streets, we'll make you an offer of shelter.

But then, as soon as the person moved, they-they-they do, you know, what Lucy does to Charlie Brown and-and pull the football away. That's just not right. And that's what we're saying is -- the city shouldn't be allowed to do.

Judge Bumatay:      Sorry. If-if-if I could -- [crosstalk]

Judge Koh:          Okay. But-but -- go ahead.

Judge Bumatay:      I j -- just a follow-up on that, I-I was troubled by footnote five in your answer. It'll be on page 40 where you said -- suggested that the city can't manage its shelters in a way to allow, uh, you know, empty space to then, uh, uh, uh, do an enforcement action. Wh-why n -- there's n -- there's nothing I could see in the Eighth Amendment that requires us to manage their shelter -- how the city manages its shelter.

Joseph Lee:        That's correct. The-the Eighth Amendment and Martin and Grants Pass doesn't dictate to any city how they should manage their shelter system.

Judge Bumatay:     Okay.

Joseph Lee:        But what the factual record shows is that the city, uh, sets aside, uh, these beds or at least claims to set aside beds not in a genuine desire to provide shelter to individuals but as a pretext to then initiate enforcement against everybody.

                   And in fact, those beds don't actually exist for the most part as the record shows because they often go to encampments without even knowing if any shelter is available. And-and if you just look at the logic of it all, let's say they set aside 10 beds.

                   Once those beds are filled, then the city seems to think let's kick those 10 people out, and let's start the enforcement process all over again. And-and that just doesn't seem right.

Judge Koh:         Let me just -- [crosstalk] ask you one last question. So you're saying, as long as there's a genuine offer of a shelter bed, uh, uh, made in the context of an enforcement action, a person who declines it can still be involuntarily homeless. Is that right?

Joseph Lee:        That's right. If-if-if --

Judge Koh:         Okay.

Joseph Lee:          -- the offer for shelter is one that's -- uh, does provide them with access to, you know, practically available shelter, then they are no longer involuntarily homeless.

Judge Koh:           And it doesn't matter that it was in the context of an enforcement action.

Joseph Lee:          Right. As long as it's -- it genuinely provides them access to shelter.

Judge Bumatay:       You g -- thank you, counsel, for a well-argued case on both sides. Uh, this case is submitted. And we will take a short recess.

Bailiff:             All rise.

[End of recorded material]