DAVID CHIU, State Bar #189542
City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief Deputy City Attorney
WAYNE SNODGRASS, State Bar #148137
Deputy City Attorney
EDMUND T. WANG, State Bar #278755
KAITLYN M. MURPHY, State Bar #293309
MIGUEL A. GRADILLA, State Bar #304125
JOHN H. GEORGE, State Bar #292332
ZUZANA S. IKELS, State Bar #208671
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:    (415) 554-4675 (Snodgrass)
              (415) 554-3857 (Wang)
              (415) 554-6762 (Murphy)
              (415) 554-3870 (Gradilla)
              (415) 554-4223 (George)
              (415) 355-3307 (Ikels)
Facsimile:    (415) 554-4699
E-mail:       wayne.snodgrass@sfcityatty.org
              edmund.wang@sfcityatty.org
              kaitlyn.murphy@sfcityatty.org
              miguel.gradilla@sfcityatty.org
              john.george@sfcityatty.org
              zuzana.ikels@sfcityatty.org

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO, et al.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COALITION ON HOMELESSNESS; TORO CASTAÑO; SARAH CRONK; JOSHUA DONOHOE; MOLIQUE FRANK; DAVID MARTINEZ; TERESA SANDOVAL; NATHANIEL VAUGHN,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>Defendants. | Case No. 4:22-cv-05502-DMR<br><br>**SAN FRANCISCO'S RESPONSE TO COURT'S AUGUST 24, 2023 CIVIL LAW AND MOTION MINUTE ORDER (ECF NO. 180)**<br><br>Trial Date:    April 15, 2024 |

Defendants ("San Francisco" or "City") provide the following response to the Court's order requiring additional information with respect to training. (Dkt. No. 180.) On August 24, 2023, the Court held oral argument on Plaintiffs' Motion to Enforce the Preliminary Injunction. The motion included arguments based on the Fourth and Eighth Amendment. The Court denied Plaintiffs' motion as to the Eighth Amendment and reserved ruling on Plaintiffs' motion as to the Fourth Amendment.

The Court also ordered San Francisco to submit additional information regarding training provided by the Department of Public Works ("DPW") and the San Francisco Police Department ("SFPD"). In response, San Francisco submits the following information, without argument.

**I.     Response To Questions Regarding The Department Of Public Works**

With respect to DPW, the Court ordered San Francisco to submit declarations describing: "[1] how many DPW employees interact with homeless individuals with respect to cleaning; [2] the context in which they interact with homeless individuals with respect to cleaning; and [3] the training they receive on the bag and tag policy, including the frequency, length and format of the training and any details of any training materials." (Dkt. No. 180.) In response, San Francisco submits declarations from DPW Interim Director Carla Short and Jonathan Vaing, who is the Assistant Superintendent for the Bureau of Street and Environmental Services ("BSES").

In general, of the 1,800 budgeted positions at DPW, approximately 100 current active employees have work responsibilities that require them to interact with homeless individuals with respect to cleaning. (Short Decl. ¶¶ 6-7; Vaing Decl. ¶ 5.) Those employees work on three teams: Zone, Hot Spot, and Special Projects. (Vaing Decl. ¶ 5.) These teams are part of the Bureau of Street and Environmental Services ("BSES"), which is under DPW's Operations Division.

Zone employees work in one of six geographic "zones" in the City (labeled A-F), and respond to complaints—such as those submitted through 311—about cleaning the City's streets and sidewalks in their zone. (Vaing Decl. ¶ 12.) Zone has 84 current active employees. (*Id.*) The DPW employees who support the Joint Field Operations ("JFO") are part of Zone B. (*Id.*) The Hot Spot team is the DPW arm of Healthy Streets Operation Center ("HSOC") resolutions. (Vaing Decl. ¶ 14.) The Hot Spot Team has 6 current active employees. (*Id.*) The Special Projects team at DPW manages the DPW

Yard where DPW stores property that it collects and stores under the City's bag and tag policy. (Vaing Decl. ¶ 16.) Special Projects has 10 current active employees. (*Id.*)

DPW trains these employees on the bag and tag policy in no fewer than three ways: (1) PowerPoint presentations; (2) weekly refreshers and reminders; and (3) on-the-job correction from supervisors. (Vaing Decl. ¶ 19.) A copy of the current PowerPoint presentation is attached as Exhibit B to the Declaration of Jonathan Vaing. (Vaing Decl. ¶ 21.) This 30-minute presentation covers:

  a. Circumstances in which personal items may be collected and stored (Slide 1);

  b. Pre-Removal Notices (Slide 2);

  c. Procedures for Retrieval of Personal Items (Slide 3);

  d. Flowchart of the bag and tag process as it relates to unattended items (Slide 4);

  e. Flowchart of scheduled encampment outreach and clean up (Slide 5);

  f. Explanation of items that will be discarded and not stored (Slide 6);

  g. Notice used in advance of HSOC resolution (Slide 7);

  h. Paperwork to fill out for bagged and tagged property (Slides 8-9);

  i. Photographs documenting the bag and tag policy (Slides 10-13); and

  j. Log of items bagged and tagged (Slide 14).

Assistant Superintendent Vaing created these materials, and has given the presentation at least three times since January 2023. (Vaing Decl. ¶ 22.)

DPW also trains its employees on its bag and tag policy at weekly staff meetings. (Vaing Decl. ¶ 23.) Supervisors attend a weekly "Sup II" meeting and bring back the information they learn at the Sup II meeting to weekly meetings with their own teams, which are known as "Tailgate Meetings." (Vaing Decl. ¶¶ 24, 28.) Sup II meetings typically last 30 minutes, while Tailgate Meetings typically last 30-60 minutes. (Vaing Decl. ¶¶ 25, 28.) The Sup II meeting minutes show that the City's bag and tag policy was addressed during Sup II meetings on at least the following 14 occasions between April 18, 2023 and September 5, 2023: April 18, 2023; April 24, 2023; May 2, 2023; May 16, 2023; May 23, 2023; May 30, 2023; June 6, 6023; June 13, 2023; June 20, 2023; July 5, 2023; July 11, 2023; August 6, 2023; August 22, 2023; and September 5, 2023. (Vaing Decl. ¶ 27, Ex. C.) Supervisors bring the same refresher information reflected in the Sup II meeting minutes back to their Tailgate

Meetings with their staff. (Vaing Decl. ¶ 29, Ex. D.) Therefore, every week there was a discussion of the bag and tag policy at the Sup II meeting there would also be a corresponding conversation about the bag and tag policy at the Tailgate Meetings.

Some BSES teams also have had specific "bag and tag" trainings. These meetings have occurred routinely over the last year on at least the following occasions:

   a. Zone A: On October 25, 2022 eight Zone A crew members received training on the bag and tag policy and on January 12, 2023, 11 Zone A crew members received training on the bag and tag policy;

   b. Zone B and Graffiti Abatement: On December 1, 2022, 13 Zone B and Graffiti Abatement crew members received training on the bag and tag policy and on August 30, 2023 15 Graffiti Unit crew members received training on the bag and tag policy;

   c. Zone C: On January 12, 2023, eight Zone C crew members received training on the bag and tag policy;

   d. Zone D: On August 29, 2023, nine Zone D crew members received training on the bag and tag policy;

   e. Zone E: On January 10, 2023, nine Zone E crew members received training on the bag and tag policy;

   f. Zone F: On November 9, 2022, five Zone F crew members received training on the bag and tag policy and on December 29, 2022, five Zone F crew members received training on the bag and tag policy; and

   g. Hot Spots: On November 5, 2022, six Hot Spot crew members received training on the bag and tag policy.

(Vaing Decl. ¶ 30, Ex. E.)

Finally, BSES employees receive on-the-ground training related to the bag and tag policy. Supervisors are often available to offer guidance in real time if an employee has questions about how the policy applies in a given situation. (Vaing Decl. ¶¶ 31-33.) DPW also has a process by which

supervisors review bag and tag paperwork from their team and offer corrective feedback and training to employees after-the-fact if they are not complying with the policy. (*Id.*)

## II.     Response To Questions Regarding The San Francisco Police Department

With respect to SFPD, the Court ordered San Francisco to "file a detailed declaration specifying the number of SFPD officers who have interacted with homeless individuals in response to 919 and 915 calls for service since the issuance of the preliminary injunction, including specifying how many of those officers are not part of the group of SFPD officers providing support to HSOC or JFO." (Dkt. No. 180.) The Court also ordered San Francisco to "file a statement on whether San Francisco is willing to provide training on SFPD Bulletin 23-007 to non-HSOC/JFO SFPD officers who are reasonably likely to interact with homeless individuals, and if so, what that training would be." (Dkt. No. 180.) In response, San Francisco submits declarations from SFPD Lieutenant Wayman Young and Program Manager Jason Cunningham.

SFPD has been and continues to be willing to provide training on SFPD Department Notice (DN) 23-007. As detailed in Lieutenant Young's Supplemental Declaration, the SFPD has already sent DN 23-007 to every SFPD Officer. (Young Supp. Decl. ¶ 3.) And all HSOC officers have electronically signed off on it. (Young Supp. Decl. ¶ 3.) Officers who have any questions about DN 23-007 can ask their supervisors in "roll call" trainings. (Young Supp. Decl. ¶ 4.) "Roll-call" takes place at the beginning of each shift, and allows individual supervisors to review materials, reinforce skills already learned, and answer any questions officers may have about any specific subject. (Young Supp. Decl. ¶ 4.) SFPD is currently developing additional training on DN 23-007 that will be delivered to all officers assigned to patrol throughout the Department via "roll-call" training. (Young Supp. Decl. ¶ 5.) The training may include clarifying language and potentially address common scenarios that officers might encounter. (Young Supp. Decl. ¶ 5.) If DN 23-007 is superseded, the "roll-call" training procedure described above will take place to train officers on the superseding notice. (Young Supp. Decl. ¶ 5.)

SFPD also queried its systems to determine the number of its officers who interacted with individuals experiencing homelessness in response to 915 and 919 calls during the period the Court's Preliminary Injunction has been in place. SFPD was able to determine that it is likely that somewhere

between 964 and 1,170 SFPD officers interacted with individuals experiencing homelessness in response to these calls during the time period the Preliminary Injunction has been in place. (Cunningham Decl. ¶ 8.) Further, within that group, it is likely that about somewhere between 899 and 1,083 SFPD officers outside of those assigned to work on HSOC and JFO likely interacted with individuals experiencing homelessness. (Cunningham Decl. ¶¶ 5, 7.)

Dated:  September 22, 2023

                         DAVID CHIU
                         City Attorney
                         YVONNE R. MERÉ
                         WAYNE SNODGRASS
                         EDMUND T. WANG
                         KAITLYN MURPHY
                         MIGUEL A. GRADILLA
                         JOHN H. GEORGE
                         ZUZANA S. IKELS
                         Deputy City Attorneys

By:    /s/*Kaitlyn Murphy*
      KAITLYN MURPHY

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO POLICE DEPARTMENT; SAN FRANCISCO DEPARTMENT OF PUBLIC WORKS; SAN FRANCISCO DEPARTMENT OF HOMELESSNESS AND SUPPORTIVE HOUSING; SAN FRANCISCO FIRE DEPARTMENT; SAN FRANCISCO DEPARTMENT OF EMERGENCY MANAGEMENT