LATHAM & WATKINS LLP
Alfred C. Pfeiffer, Jr., SBN 120965
505 Montgomery Street, Ste 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
al.pfeiffer@lw.com

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY AREA
Zal K. Shroff, MJP 804620, *pro hac vice*
Andrew Ntim, SBN 347084
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
zshroff@lccrsf.org
antim@lccrsf.org

ACLU FOUNDATION OF NORTHERN
CALIFORNIA
John Thomas H. Do, SBN 285075
William S. Freeman SBN 82002
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
jdo@aclunc.org
wfreeman@aclunc.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| COALITION ON HOMELESSNESS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, et al., <br><br> Defendants. | Case No. 4:22-cv-05502-DMR <br><br> **PLAINTIFFS' RESPONSE TO DEFENDANT SAN FRANCISCO'S SUPPLEMENTAL EVIDENCE RE FOURTH AMENDMENT ISSUES (DKT. NO. 193)** <br><br> **Judge:**     The Hon. Donna M. Ryu |

San Francisco's Response to the Court's August 24, 2023 Order regarding the training of DPW personnel and their interactions with unhoused residents ("Supplemental Evidence") confirms that the City has not come close to sufficiently training its DPW workforce. *See* Dkt. No. 193. Since the Court issued its preliminary injunction, the City's training efforts have been woefully inadequate and have continued to result in property destruction in violation of the Fourth Amendment and the Court's injunction without any proper documentation or accountability. *See*, *e.g.*, Dkt. No. 181 at 42:4-21, 44:21-45:1, 49:24-50:16.

**I. The Supplemental Evidence Demonstrates that the City's Deficient Training Regimen Has Remained Unchanged Despite the Court's Preliminary Injunction.**

The City was required to disclose all training documents to Plaintiffs starting in May as part of the Court's Recurring Disclosure Order. Dkt. No. 129 ¶ 13. Plaintiffs also sought this material in ordinary discovery, but the City never previously provided any such materials other than the PowerPoint slides now submitted as Vaing Declaration, Exhibit B—raising concerns about whether the City has taken necessary steps to comply with the Court's injunction. The City's Supplemental Evidence related to DPW training leaves many critical questions unanswered, and further suggests a failure to meaningfully train City workers on the Court's injunction and the City's own policies. We address each in turn.

<u>PowerPoint Presentation (Dkt. No. 193-5)</u>. The City's flagship training on its bag and tag policy is a PowerPoint that merely restates the City's bag and tag policy without any additional guidance. The City does not state when this presentation was created or if it was ever modified after the injunction was ordered. The presentation contains no reference to the Court's finding that the City had "a practice of seizing and destroying [ ] homeless individuals' unabandoned personal property in violation of the Fourth Amendment . . . and San Francisco's own bag and tag policy." Dkt. No. 65 at 49. Despite this finding, the presentation does not mention the importance of strict compliance with the policy. Only three 30-minute trainings using this presentation took place since January 2023. Dkt. No. 193-3 ¶ 22. The City does not describe how many DPW employees attended these trainings, whether attendance was mandatory, or what proportion of DPW personnel who routinely deal with unhoused persons were at the trainings. *See* Dkt. No. 193-3 ¶¶ 21-22.

Sup II Meetings (Dkt. No. 193-6). Although the City purports to conduct a "weekly refresher" on bag and tag compliance, Dkt. No. 193-3 ¶¶ 23-26, the underlying notes suggest the only discussion concerning any aspect of the bag and tag policy is a boilerplate reminder to "take multiple before and after pictures." *See*, *e.g.*, Dkt. No. 193-6 at 13. There is no evidence of any training at Sup II Meetings concerning any other subjects covered in the PowerPoint or the City's bag and tag policy, such as how to give notice before and after a removal of property, circumstances in which personal items should be collected, what items must be collected and stored, what items can be discarded, distinguishing between unattended and abandoned property, or procedures for retrieval of property. To the extent there is any "training" in these meetings, it is directed to ensuring that the City can report that it cleared physical evidence of homelessness, not protecting the constitutional interests of the unhoused.

Tailgate Meetings (Dkt. Nos. 193-7, 193-8). The City does not provide any details, notes, or documents to substantiate the training given at "tailgate meetings," but it is clear that these meetings do not cover more than the basic admonition from the Sup II Meetings to "take pictures." Dkt. No. 193-3 ¶ 29 ("At these Tailgate Meetings, the team supervisor would have relayed the same information"). Four of the ten reported Tailgate Meetings happened before the Court's injunction even took effect. *Id.* ¶ 30(a)-(g). The City represents that at least 100 DPW employees interact with unhoused individuals during street cleanings. *Id.* ¶¶ 5, 7. But since the injunction, only 42 relevant DPW staff attended even a *single* tailgate meeting relating to "bag and tag" issues. *Id.* ¶ 30(a)-(g). Further, the City claims that only these 100 out of 1,800 DPW employees should be trained on the bag and tag policy. Dkt. No. 193 at 1:17-2:5; Dkt. No. 193-1 ¶¶ 6-7; Dkt. No. 193-3 ¶¶ 7, 20. But other frontline DPW employees engage in ordinary street cleanings and handle unattended property belonging to unhoused individuals during those regular operations. Accordingly, all such employees should be trained on the bag and tag policy, including what to do with property collected from the street and how to identify whether unattended property is abandoned and discardable.

Opportunity to Ask Questions (Dkt. No. 193-3). The remainder of the City's training consists of individuals being given "opportunities" to "ask questions" or "address issues"

concerning bag and tag policies, *id.* ¶¶ 32, 34; but these statements do not reflect that any training actually took place or that any questions were ever asked or answered.

Although the Court requested concrete details on the extent of the City's training programs, the City has not described conducting *any* trainings specifically to address issues of non-compliance with the preliminary injunction. The City does not even indicate whether it has changed anything about DPW's training regimen in light of the injunction. Additionally, the City presents no measures undertaken to monitor compliance with its trainings, incentivize adherence to the bag and tag policy, or sanction mishandling of unhoused individuals' property. The City's meager response regarding training further confirms Plaintiffs' misgivings regarding the City's compliance efforts—and warrants this Court's intervention as requested in Plaintiffs' Motion to Enforce. *See* Dkt No. 130 at v-vi. This is particularly appropriate given the City's history of non-compliance. Dkt. No. 181 at 42:4-21, 44:21-45:1, 49:24-50:16; Dkt. No. 91 at 31:18-32:5.

**II. The City's Trainings Have Not Prevented the City's Property Destruction in Violation of the Court's Injunction.**

Unsurprisingly, the City's inadequate training has resulted in DPW employees failing to abide by the City's bag and tag policy and the Court's injunction. For example, despite instructions apparently given at Sup II Meetings to take photographs to document property removal at cleaning operations, no photo records exist for the vast majority of property removals taking place since the preliminary injunction—proof that these "trainings" are not heeded. The City has never surfaced comprehensive records of disputed property as contemplated by the City's bag and tag policy. *See* Dkt. No. 193-4 at 2, ¶ 2. Plaintiffs have only received a handful of photographs without metadata or logs tying these records to particular incidents, dates, times, or locations. Dkt No. 157-1 ¶ 8.

Plaintiffs are also concerned about the City's apparent failure to comply with the notice requirements of the City's bag and tag policy. The Court's prior discovery orders require the City to regularly disclose to Plaintiffs all DPW 72-hour notices of property removal and 24-hour notices of cleaning, but the City has produced none—purporting that no such notices have been issued since the injunction despite the bag and tag policy's requirements. Dkt. No. 157-1 ¶ 6. Nor has the City identified a single post-removal notice issued to unhoused people to identify how they

can recover their property—again a requirement of the City's own bag and tag policy. *Id.*; Dkt. No. 193-4 at 2, ¶ 4.b. This reflects that the City's training is not resulting in compliance with the notice and documentation requirements built into the City's bag and tag policy.

More fundamentally, the training the City claims to conduct has not had any impact on the City's unlawful property destruction practices since the Court's preliminary injunction took effect. Dr. Herring's unrebutted analysis supporting the injunction concluded that the City engages in widespread property destruction, violating its own policies, based on records reflecting only a handful of bag and tags took place each month despite *hundreds* of DPW cleaning operations across the city, alongside witness declarations and academic surveys demonstrating instances non-compliance. Dkt. No. 65 at 29; Dkt. No. 9-1 ¶¶ 82-88 (from January 1, 2021 to June 30, 2021, 195 bag and tag forms logged compared to 1,282 people displaced in 83 encampment resolutions for the same time period). The City now admits that it is only conducting bag and tag at HSOC resolutions "a few times a month" since the injunction has been in place. Dkt. No. 142-3 at 21:11-12. Thus, the City is apparently safeguarding and storing even less property than it did before the injunction. Meanwhile, the Court has noted examples of continuing unlawful property destruction. Dkt. No. 181 at 42:4-21, 44:21-45:1, 49:24-50:16. Thus, the City's failure to appropriately train its staff defeats the central purpose of the Court's injunction—to protect Plaintiffs and thousands of unsheltered residents from irreparable harm. *See* Dkt. No. 65 at 45:11-26.

**III. Further Compliance Training, Documentation, and Reporting Are Necessary.**

For the reasons noted above, additional training is required to ensure the City follows the Court's preliminary injunction on the Fourth Amendment. An essential component of effective training is establishing a system to verify that the City's bag and tag policy is being followed and that violations are actively monitored and corrected. Even if trainings are held more regularly with more detailed presentations, Plaintiffs cannot assess what the City refuses to document. *See* Dkt. No. 157 at 17:3-7. Because the City only documents the few instances it stores property, and not the large swaths of property it destroys or the basis for doing so, Plaintiffs and this Court will be unable to assess whether any trainings are working. This is particularly concerning because Plaintiffs have no advance notice or ability to monitor the vast majority of unscheduled DPW

cleaning operations that occur across San Francisco hundreds of times each month. *See* Dkt. No. 130-8 ¶ 8; Dkt. No. 9 at 9:18-23.

This is precisely why Plaintiffs' Motion to Enforce seeks additional documentation and compliance reporting as part of the City's adjusted training regime. *See* Dkt. No. 130 at vi:9-12 ("To require Defendants to produce periodic reports under oath regarding Defendants' compliance with the Court's preliminary injunction at all . . . property removal/destruction, or other operations involving interfacing with unhoused individuals and their property"). If the Court sees fit to grant relief on Plaintiffs' Motion as to the City's compliance with the injunction regarding the Fourth Amendment—without reference to a Special Master to identify appropriate training elements and compliance documentation—Plaintiffs respectfully renew their request that the parties be given an opportunity to submit a specific proposal regarding the appropriate contents of any future trainings and how the City should document adherence to those trainings and its policy. *Id.* at vi (request "[t]o require the parties to submit a joint letter brief, no more than 10 pages, otherwise pursuant to the Court's standing order, within seven days, setting forth the parties' positions regarding . . . the scope and frequency of compliance reports, and any underlying data necessary and sworn certifications to be included in those reports").

At a minimum, Plaintiffs would request that the City be ordered to demonstrate compliance with the City's bag and tag policy by training staff to create, maintain, and disclose logs that describe when and where the property of unhoused people is seized and summarily discarded or destroyed, why the property was deemed discardable under the bag and tag policy, what property sorting took place if any, individuals who made the decision to remove the property, and photographs with time and location stamps corresponding to instances of property destruction and disputed items. Paragraph 5(c) of the City's bag and tag policy requires City employees to assess and record this same information and create logs, but only if they decide to safeguard and store property. *See* Dkt. No. 193-4 at 2-3; Dkt. No. 193-5 at 5, 6, 9, 15; Dkt. No. 193-10; Dkt. No. 50-12. This creates a perverse incentive for City workers *not* to store the property of unhoused people to avoid filling out the necessary paperwork, rendering the City's property logs incomplete and useless to assess compliance and the effectiveness of the City's trainings on the bag and tag policy.

|   |   |
|---|---|
| Dated:  October 6, 2023 | Respectfully submitted, |
|   | By: */s/ Alfred C. Pfeiffer, Jr.* |
|   | LATHAM & WATKINS LLP |

## ATTESTATION

I, Alfred C. Pfeiffer, Jr., am the ECF user whose user ID and password authorized the filing of this document. Under Civil L.R. 5-1(h)(3), I attest that all signatories to this document have concurred in this filing.

Dated: October 6, 2023                                            /s/ Alfred C. Pfeiffer, Jr.