**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| COALITION ON HOMELESSNESS; TORO CASTANO; SARAH CRONK; JOSHUA DONOHOE; MOLIQUE FRANK; DAVID MARTINEZ; TERESA SANDOVAL; NATHANIEL VAUGHN, *Plaintiffs-Appellees*, | No. 23-15087 D.C. No. 4:22-cv-05502-DMR |
| v. | OPINION |
| CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO POLICE DEPARTMENT; SAN FRANCISCO DEPARTMENT OF PUBLIC WORKS; SAN FRANCISCO DEPARTMENT OF HOMELESSNESS AND SUPPORTIVE HOUSING; SAN FRANCISCO FIRE DEPARTMENT; SAN FRANCISCO DEPARTMENT OF EMERGENCY MANAGEMENT; LONDON BREED, in her Official Capacity as Mayor; SAM DODGE, in his Official Capacity as Director of the Healthy Streets Operation Center (HSOC), *Defendants-Appellants*. | |

Appeal from the United States District Court
for the Northern District of California
Donna M. Ryu, Magistrate Judge, Presiding

Argued and Submitted August 23, 2023
San Francisco, California

Filed January 11, 2024

Before:  Patrick J. Bumatay, Lucy H. Koh, and Roopali H.
Desai, Circuit Judges.

Opinion by Judge Koh;
Dissent by Judge Bumatay

## SUMMARY[*]

### Homelessness

In an action seeking to prevent the City and County of San Francisco ("City") from enforcing any ordinance that punishes sleeping, lodging, or camping on public property, the panel affirmed the district court's grant of a preliminary injunction in favor of plaintiffs on their Eighth Amendment claim as to the City's new arguments regarding the geographic and time limitations of some of the enjoined ordinances, and in a concurrently filed memorandum disposition affirmed in part and vacated and remanded in

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

part for the district court to clarify the preliminary injunction as to the remaining issues.

The panel published its opinion to address the City's contention—raised for the first time in this appeal—that the limited geographic scope of the encampment resolutions and the time-limited nature of one of the enjoined ordinances distinguishes this case from *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019), and *Johnson v. City of Grants Pass*, 72 F.4th 868 (9th Cir. 2023). The City argued before the district court that plaintiffs were unlikely to succeed on the merits of their Eighth Amendment claim because the City offers shelters before requiring any unhoused person to vacate public property. On appeal, the City argued for the first time that the shelter offers were irrelevant because, unlike in *Martin* and *Johnson*, the challenged enforcement actions do not leave unhoused individuals with nowhere else to go— instead, they require individuals to relocate from specific encampment sites and only at certain times.

The panel determined that the City's limited geographic scope argument was waived because the City conceded that it did not raise the argument before the district court. Even if the panel had discretion to review the argument, it declined to do so in the first instance, noting that the record was undeveloped, and the City had no excuse for failing to raise it below despite having ample opportunity to do so.

The panel next held that the City's new argument did not establish a basis to reverse the district court. The enjoined laws were no narrower in scope than the laws at issue in *Martin* and *Johnson*, and the City's assertion that it conducted encampment resolutions in a geographically limited way was a factual point that was contradicted by plaintiffs' evidence. The panel concluded that at this stage,

the City had not shown that the preliminary injunction was improper based on the arguments and evidentiary record before the district court.

Finally, the panel declined to consider the City's argument—again raised for the first time on appeal—that enjoining enforcement of San Francisco Police Code § 168 was improper because that provision is time restricted. Section 168 prohibits sitting or lying on a public sidewalk only "during the hours between seven (7:00) a.m. and eleven (11:00) p.m." The panel held that evaluating the City's new argument on appeal required factual developments that the panel currently lacked. Because the City's attempts to distinguish this case from *Martin* and *Johnson* ultimately turned on factual questions, the panel was not inclined to reach these questions in the first instance.

Dissenting, Judge Bumatay stated that nothing in the text, history, and tradition of the Eighth Amendment's Cruel and Unusual Punishments Clause comes close to prohibiting enforcement of commonplace anti-vagrancy laws, like laws against sleeping on sidewalks and in parks. The district court's broad injunction falls starkly outside the original meaning of the Cruel and Unusual Punishments Clause, disregards the long history of anti-vagrancy laws, and broadly expands *Martin* and *Grants Pass*. It should be vacated immediately.

## COUNSEL

Wayne K. Snodgrass (argued) and Kaitlyn M. Murphy, Deputy Attorneys, San Francisco City Attorney's Office, San Francisco, California; James M. Emery, Edmund T. Wang, Ryan C. Stevens, and Miguel A. Gradilla, Deputy City Attorneys; Yvonne R. Meré, Chief Deputy City Attorney; David Chiu, City Attorney, San Francisco City Attorney's Office, San Francisco, California; for Defendants-Appellants.

Joseph H. Lee (argued), Latham & Watkins LLP, Costa Mesa, California; Alfred C. Pfeiffer Jr., Latham & Watkins LLP, San Francisco, California; John Thomas H. Do, ACLU Foundation of Northern California, San Francisco, California; Elisa Della-Piana, Hadley Rood, and Zal K. Shroff, Lawyer's Committee for Civil Rights, San Francisco, California; for Plaintiffs-Appellees.

Alexander C. Werner, Munger Tolles & Olson LLP, San Francisco, California, for Amici Curiae Healthcare Providers, Doctors Sharad Jain, Harrison Alter, Nicholas Iverson, Hemal Kanzaria, Elaine Khoong, Margot Kushel, John Landefeld, Katherine Lupton, Lisa Ochoa-Frongia, Naomi Schoenfeld, Sara Teasdale, and Melody Tran-Reina.

Deborah E. Arbabi, Crowell & Moring LLP, Irvine, California, for Amici Curiae National Homelessness Law Center, National Low Income Housing Coalition, National Coalition for the Homeless, and National Alliance to End Homelessness.

Ruth M. Bond, Atkinson Andelson Loya Ruud & Romo, Sausalito, California, for Amici Curiae California Association of Counties, International Municipal Lawyers Association, and League of California Cities.

Shanin Specter, Kline & Specter, Philadelphia, Pennsylvania, for Amici Curiae College of the Law, San Francisco.

Marissa A. Roy, O'Melveny & Meyers LLP, Los Angeles, California, for Amici Curiae Current and Former Local Elected Officials and Local Progress Impact Lab.

Y. Monica Chan, Fenwick & West LLP, Seattle, Washington; Shayla R. Myers, Legal Aid Foundation of Los Angeles, Los Angeles, California; for Amici Curiae Disability Rights Advocates.

Eliana Machefsky, National Police Accountability Project, New Orleans, Louisiana, for Amici Curiae Law Enforcement Action Partnership and National Police Accountability Project.

---

## OPINION

KOH, Circuit Judge:

Appellant City and County of San Francisco ("the City") appeals the grant of a preliminary injunction in this action brought by the Coalition on Homelessness and seven current or formerly homeless residents of San Francisco ("Plaintiffs"). We publish this opinion to address the City's contention—raised for the first time in this appeal—that the limited geographic scope of the encampment resolutions at issue in this case and the time-limited nature of one of the enjoined ordinances distinguish this case from *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019), and *Johnson v. City*

*of Grants Pass*, 72 F.4th 868 (9th Cir. 2023).  We affirm the district court on this issue.[1]

In September 2022, Plaintiffs sought a preliminary injunction preventing the City from enforcing "any ordinance that punishes sleeping, lodging, or camping on public property," including Cal. Penal Code § 647(e), Cal. Penal Code §§ 370, 372, and S.F. Police Code §§ 168–69, under the Eighth Amendment.[2]  Plaintiffs challenged the City's use of these laws to effect "sweep operations,"[3] which Plaintiffs contended—citing declarations from individuals who had experienced and observed such encampment closures—occurred across San Francisco on a daily basis, without notice and with "no safe harbor at any location within the City."   The City opposed the preliminary injunction, arguing that Plaintiffs are unlikely to succeed on the merits of their Eighth Amendment claim because the City offers shelter before requiring any unhoused person to vacate public property.  The parties offered starkly different accounts of the way encampment closures are carried out. The district court found the Plaintiffs' evidence more convincing and entered a preliminary injunction.  The City

---

[1] We address the remainder of the City's challenges in a concurrently filed memorandum disposition, in which we remand for the district court to clarify the preliminary injunction as to some issues.

[2] Plaintiffs also sought preliminary injunctive relief to remedy purported Fourth Amendment violations surrounding property seizure. The aspects of the preliminary injunction addressing the Fourth Amendment claims are not at issue in this opinion.

[3] As the district court noted, the parties use different terminology for these events.  Plaintiffs use the term "sweeps," while the City describes them as "encampment resolutions."  We follow the district court's usage of "encampment closures" unless specifically referring to a party's argument.

then moved for clarification and for a stay of the Eighth Amendment aspects of the preliminary injunction, again on the ground that individuals who decline offers of shelter are not involuntarily homeless under *Martin* and *Johnson*.

For the first time on appeal, the City argues that the shelter offers were irrelevant all along.  The City now contends that unlike in *Martin* and *Johnson*, the challenged enforcement actions do not leave unhoused individuals with nowhere else to go—instead, they require individuals to relocate from specific encampment sites.  In *Johnson*, the court declined to decide a somewhat similar question about "alternate outdoor space." *See* 72 F.4th at 894 n.33.  This appeal is not a proper vehicle to address this unsettled question, either.

The City concedes that it did not raise this argument about the limited geographic scope of encampment resolutions to the district court.  The City thus waived this argument. *See Armstrong v. Brown*, 768 F.3d 975, 981 (9th Cir. 2014).  Although we may exercise our discretion to consider a waived issue "when the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed," *id.* (quoting *Ruiz v. Affinity Logistics Corp.*, 667 F.3d 1318, 1322 (9th Cir. 2012)), we disagree with the City that these circumstances are present here, as we explain below.  In any event, "even if we have discretion to review these arguments notwithstanding the [City's] waiver, we decline to do so." *Id.* at 982.  "The [City] has no excuse for its failure to raise these arguments below.  Unlike cases in which we have exercised our discretion to consider arguments that were not raised below, the [City] had ample opportunity to craft its response to the district court." *Id.*

The dissent would nevertheless wade into the deeply complex and significant constitutional issues implicated in the City's new geographic scope argument without the benefit of consideration or key factual findings by the district court.   "Our judicial system generally assumes that consideration of an issue at both the trial court and appellate court level is more likely to yield the correct result, because the issue will be more fully aired and analyzed by the parties, because more judges will consider it, and because trial judges often bring a perspective to an issue different from that of appellate judges." *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1154 (9th Cir. 2000).   These principles are the foundation of our waiver doctrine and present sound reasons for us to decline to consider these issues at this juncture.[4]

Even aside from the waiver problem, however, the City's new arguments do not establish a basis to reverse the district court.   Review of the City's arguments further shows how factually intensive the resolution of the geographic scope is in this case—all the more reason not to reach the issue without factual findings from the district court on this heavily disputed factual record.

**I.**

As a threshold matter, most of the enjoined laws are no narrower in scope than the laws at issue in *Martin* and *Johnson*.   California Penal Code § 647(e) is virtually identical to the law that was enjoined in *Martin*. *Compare* Cal. Penal Code § 647(e) (prohibiting as "disorderly

---

[4] This is particularly so given that we are remanding the case in any event, eliminating any "efficiency interest" in resolving newly raised arguments. *Stout v. FreeScore, LLC*, 743 F.3d 680, 688 (9th Cir. 2014) (quoting *Ecological Rts. Found.*, 230 F.3d at 1154).

conduct" "lodg[ing] in any building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it"), *with Martin*, 920 F.3d at 604 (challenge to Boise City Code § 6-01-05, which banned "[o]ccupying, lodging, or sleeping in any building, structure, or public place, whether public or private . . . without the permission of the owner or person entitled to possession or in control thereof").[5]  The City also does not argue that the enjoined public nuisance provisions are meaningfully limited such that they would leave involuntarily homeless individuals with somewhere else to go.  *See* Cal. Penal Code § 370 (defining "public nuisance" to include "[a]nything which is injurious to health, or is indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property by an entire community or neighborhood, or by any considerable number of persons, or unlawfully obstructs the free passage or use, in the customary manner, of any . . . public park, square, street, or highway"); *id.* § 372 (criminalizing maintenance or commission of a public nuisance as a misdemeanor). Although the dissent endeavors to distinguish these laws, it is not our role to make the parties' arguments for them, particularly given the preliminary posture of this case.  "In our adversarial system of adjudication, we follow the principle of party presentation," because "our system is designed around the premise that parties represented by

---

[5] The dissent parses the distinction between "lodging" and "mere sleeping," but Boise's law barred "occupying" and "lodging" as well as "sleeping" (which the dissent omits when quoting that law), and the *Martin* court did not distinguish among the Boise ordinance's prohibitions when enjoining the ordinance in its entirety.  920 F.3d at 606, 618.

competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (cleaned up).

For the most part, then, the City has not argued that the enjoined laws themselves are geographically limited. Instead, the City argues that its enforcement of these laws during encampment closures is consistent with the Eighth Amendment because, per City policies, these resolutions "clear only a few City blocks" and notice is provided before a location is cleared.

However, the district court considered the City's evidence—or lack thereof—about the way the City conducts encampment closures and found it "wholly unconvincing" in light of Plaintiffs' "detailed evidence demonstrating significant failures to comply with the polic[ies]." The City's argument that it conducted encampment resolutions in a geographically limited way is a factual point that is contradicted by Plaintiffs' evidence. For example, the district court found that "Plaintiffs . . . submit[ted] significant evidence that written notice of encampment closures is rarely provided." Plaintiffs also included declarations describing individuals having to move multiple times in a day from different locations and being told they could not move to various alternative locations. Thus, at best, the City's geographic scope arguments rest on disputed factual premises.

To the extent the district court did not make clearer findings about whether the encampment closures leave involuntarily homeless individuals with nowhere else to go, that is because the City did not put that issue before the court despite multiple opportunities to do so. As litigation in this

case proceeds, the district court should consider whether the City's encampment closures leave involuntarily homeless individuals with a realistically available place to go. At this stage, however, the City has not shown that the preliminary injunction was improper based on the arguments and evidentiary record before the district court.

Accordingly, the bulk of the dissent is dedicated to arguing that *Martin* and *Johnson* themselves are inconsistent with the original meaning of the Eighth Amendment and, as such, were wrongly decided.   As a three-judge panel, however, we "are bound by the law of our circuit, and only an en banc court or the U.S. Supreme Court can overrule a prior panel decision." *Balla v. Idaho*, 29 F.4th 1019, 1028 (9th Cir. 2022).   As the dissent observes, the city of Grants Pass has filed a petition for certiorari with the U.S. Supreme Court, in which it argues that both *Martin*[6] and *Johnson* were wrongly decided.   No. 23-175 (U.S. Aug. 22, 2023).   In the meantime, we remain bound by *Martin* and *Johnson*, as does the district court.

## II.

The City further argues—again for the first time on appeal—that enjoining enforcement of San Francisco Police Code § 168 was improper because that provision is time restricted.   Section 168 prohibits sitting or lying on a public sidewalk only "during the hours between seven (7:00) a.m. and eleven (11:00) p.m."   S.F. Police Code § 168(b).   The City relies on language in *Martin* suggesting that "an ordinance prohibiting sitting, lying, or sleeping outside *at particular times or in particular locations* might well be

---

[6] The Supreme Court previously declined to review *Martin*.   140 S. Ct. 674 (2019).

constitutionally permissible." 920 F.3d at 617 n.8 (emphasis added).**[7]** However, the *Martin* court did not resolve this question because such a law was not before it.

Whether such a law is in fact constitutionally permissible is not a question that is properly before us in this case, either. Here, the record includes declarations describing homeless individuals being forced to move multiple times in a day, from multiple locations, while also being told that they could not move to various alternative locations. Accordingly, the district court found that Plaintiffs demonstrated the requisite likelihood of success on their as-applied constitutional claims that the City used a set of laws and practices, including S.F. Police Code § 168, to criminalize sitting, sleeping, or lying in public—in other words, that the City used these laws to do precisely what *Martin* and *Johnson* prohibit.

Whether the scope of S.F. Police Code § 168 changes the constitutional analysis thus turns on factual questions involving the practical impact of the City's enforcement. Our dissenting colleague simply assumes that, because the S.F. Police Code § 168's text describes only certain hours and certain locations, the City's enforcement of it and other laws *must* be constitutional. The record, however, paints a more complicated picture. For one thing, the parties dispute whether encampment closures are in fact limited to the hours during which S.F. Police Code § 168 is in effect. The record

---

[7] The City raises a somewhat similar argument about S.F. Police Code § 169, which applies only to sidewalks. Because we have directed the district court to reevaluate the preliminary injunction as to that law on other grounds in the concurrently filed memorandum disposition, we do not address the argument here.

is underdeveloped on this point, and we should not decide the question in the first instance.

The City, for its part, appears to accept that its argument additionally depends on there being somewhere else for involuntarily homeless individuals to go during the hours during which S.F. Police Code § 168 is in effect, and it argues that parks are available during those hours. Here too, however, the record is unclear as to whether San Francisco's parks are in fact realistically available during the hours in question. S.F. Police Code § 168 prohibits sitting, sleeping, and lying on sidewalks from 7:00 a.m. to 11:00 p.m., while S.F. Park Code § 3.13 makes it unlawful to "remain in any park for the purpose of sleeping" from 8:00 p.m. to 8:00 a.m. As a result, there are four hours in which neither sidewalks nor parks are available for sleeping: 7:00 a.m. to 8:00 a.m., and 8:00 p.m. to 11:00 p.m.

The dissent contends that the combined impact of S.F. Police Code § 168 (barring sleeping on sidewalks) and S.F. Park Code § 3.13 (barring sleeping in parks) is not so draconian. Again, however, this difficult issue deserves the benefit of full factual development at the trial court level, which our court lacks as a direct result of the City's decision not to raise this argument below. Conversely, in wading into this issue in the first instance, the dissent again assumes away unanswered factual questions.

First, although the dissent suggests that S.F. Park Code § 3.13 is irrelevant because the district court did not enjoin its enforcement, the key issue is the practical impact of the City's enforcement of all the challenged laws in tandem. As we observed above, Plaintiffs submitted a number of declarations describing individuals being required to move from location to location (including parks), multiple times in

a day, and being told they could not move to various alternative locations without any hints as to what would be a permissible location.  Because the City did not raise an argument about the limited scope of S.F. Police Code § 168 below, the district court has not yet considered Plaintiffs' declarations in the context of the question whether parks are a realistically available alternative to sidewalks during the hours in which sleeping on sidewalks is prohibited.

Second, the dissent contends that other public areas such as beaches and plazas can fill the gap during the hours in which neither sidewalks nor parks are available, but the City has not shown that these spaces are realistically available during the hours in question, as *Johnson* requires. 72 F.4th at 894 n.33.  Indeed, the City did not even raise either contention until its *reply* brief on appeal, and so these arguments are "not properly before the panel." *Kaffaga v. Estate of Steinbeck*, 938 F.3d 1006, 1018 n.8 (9th Cir. 2019). In short, the record is unclear as to whether, in fact, parks or other public areas are realistically available, further demonstrating why it is inappropriate for this court to reach waived issues on an undeveloped factual record.  Even if the record were clear, as we previously stated, "consideration of an issue at both the trial court and appellate court level is more likely to yield the correct result." *Ecological Rts. Found.*, 230 F.3d at 1154.

All these unsettled questions demonstrate that our dissenting colleague is mistaken: evaluating the City's new arguments on appeal requires factual development that we currently lack.**[8]**  As a result, it is inappropriate to review the

---

[8] The dissent also briefly alludes to the City's perfunctory statement (in asking the district court to disregard one of Plaintiffs' declarations) that homeless individuals still had "somewhere to sleep."  This "cryptic

City's arguments: although application of *Martin* and *Johnson* is "ultimately a legal question," its resolution turns on "underlying factual disputes. Here, the record is undeveloped." *Greisen*, 925 F.3d at 1115 (internal quotation marks and citation omitted); *see also A-1 Ambulance Serv., Inc. v. County of Monterey*, 90 F.3d 333, 339 (9th Cir. 1996) (concluding that the court lacked the power to consider a waived argument that was not "purely one of law" and that, even if the court had discretion to review the argument, the court "would decline to do so here"). Again, as the ongoing litigation proceeds, the district court should consider whether the City's use of S.F. Police Code § 168 "to prohibit involuntarily homeless individuals from sitting, lying, or sleeping on public property" leaves those individuals with somewhere else to go. Because the district court has made no such finding, which is understandable given that the City raised no argument to this effect to the district court, it is premature for this court to consider how such factual circumstances would play out under *Martin* and *Johnson*. *See Johnson*, 72 F.4th at 894 n.33 ("Because the City has not established any realistically available place within the jurisdiction for involuntarily homeless individuals to sleep we need not decide whether alternate outdoor space would be sufficient under *Martin*.").

\* \* \*

We acknowledge that this litigation raises difficult and important legal questions with real stakes for San Francisco and the thousands of unhoused individuals who call San

---

allusion" did not amount to raising the issue below. *Greisen v. Hanken*, 925 F.3d 1097, 1115 n.6 (9th Cir. 2019). Moreover, in context the statement was advanced in support of the City's actual argument before the district court: that the City's offers of shelter resolved this case.

Francisco home.  This only counsels in favor of resolving these questions with the benefit of two-level consideration and a developed factual record on key issues that would affect the constitutional analysis.  *Ecological Rts. Found.*, 230 F.3d at 1154 ("two-level consideration" is more likely to yield the correct result, both because "more judges will consider" the issue and because "trial judges often bring a perspective to an issue different from that of appellate judges").  As our dissenting colleague admirably states, our goal is to get the law right.  Allowing the district court to develop the record and consider the City's new arguments in the first instance makes it more likely that we will. Particularly because the City's attempts to distinguish this case from *Martin* and *Johnson* ultimately turn on factual questions, we are not inclined to reach these questions in the first instance.

**AFFIRMED.**

---

BUMATAY, Circuit Judge, dissenting:

Today, we let stand an injunction permitting homeless persons to sleep *anywhere*, *anytime* in public in the City of San Francisco unless adequate shelter is provided.  The district court's sweeping injunction represents yet another expansion of our court's cruel and unusual Eighth Amendment jurisprudence.  Our decision is cruel because it leaves the citizens of San Francisco powerless to enforce their own health and safety laws without the permission of a federal judge.  And it's unusual because no other court in the country has interpreted the Constitution in this way.

Based on a misreading of the Eighth Amendment's Cruel and Unusual Punishments Clause, the district court now

dictates to San Francisco how it may manage its sidewalks, streets, and parks. The result of the district court's far-reaching injunction is that homeless persons now have a *choice* to sleep, lie, or sit anywhere they want in public at any time until San Francisco can provide them shelter. That ruling is far removed from the original meaning of the Cruel and Unusual Punishments Clause and disregards the long history of anti-vagrancy laws in this country. And the district court goes beyond even our circuit's extraordinary reading of the Clause.

Five years ago, this court began its campaign to increase the power of the federal judiciary over States' and localities' management of the homelessness crisis. In *Martin v. City of Boise*, 902 F.3d 1031 (9th Cir. 2018), *opinion amended and superseded on denial of reh'g*, 920 F.3d 584 (9th Cir. 2019), this circuit transformed the Eighth Amendment's prohibition on cruel and unusual punishments into a tool to constitutionalize anti-vagrancy laws—barring local governments from penalizing "homeless people for sleeping outdoors, on public property," unless given an "option of sleeping indoors." *Martin*, 920 F.3d at 617. But there's nothing in the text, history, and tradition of the Clause that comes close to prohibiting enforcement of commonplace anti-vagrancy laws, like laws against sleeping on sidewalks and in parks.

Last year, we went even further in aggrandizing our role over State and local governments' homeless policies. In *Johnson v. City of Grants Pass*, 50 F.4th 787 (9th Cir. 2022), *opinion amended and superseded on denial of reh'g*, 72 F.4th 868 (9th Cir. 2023), we expanded *Martin* beyond merely sleeping in public. We forbade governments from enforcing criminal and *civil* bars against sleeping in public, made our ruling enforceable through class actions, and

invented a right to "rudimentary forms of protection from the elements" while sleeping outside. *Grants Pass*, 72 F.4th at 896. Nearly half of the active judges on this court have asked for *Grants Pass* to be overturned. *See id.* at 924 (O'Scannlain, J., respecting the denial of rehearing en banc). And for good reason. As Judge O'Scannlain explained, "[o]ur jurisprudence . . . is egregiously flawed and deeply damaging—at war with constitutional text, history, and tradition, and Supreme Court precedent." *Id*. at 925.

That brings us to this case. The Coalition on Homelessness sued San Francisco seeking to enjoin enforcement of State and local laws barring sleeping on sidewalks at certain times, public lodging and camping, and obstructing streets and parks. *See* Cal. Penal Code §§ 148(a), 370, 372, 647(e); S.F. Police Code §§ 168, 169. Based on an underdeveloped factual record, and apparently without even considering how these individual laws fit within our *Martin*/*Grants Pass* framework, the district court agreed to enjoin enforcement of the laws against "involuntarily homeless individuals." Worse yet, the district court didn't even define what it means to be "involuntarily homeless" and gave conflicting signals on the point—an issue we address in our concurrently filed memorandum disposition. To top it off, the district court then set a novel end date for the injunction. It continues "as long as there are more homeless individuals in San Francisco than there are shelter beds available." Never mind that injunctions usually terminate at the end of litigation, or that the relief here is merely meant to be *preliminary*. This sweeping injunction has no basis in the Constitution or our precedent. San Francisco should not be treated as an experiment for judicial tinkering.

While *Martin* and *Grants Pass* conflict with the text and historical understanding of the Eighth Amendment, those cases at least limited themselves to jurisdiction-wide, all-day ordinances barring sleeping in public.   When homeless individuals can "sleep[] *somewhere* in public," *Grants Pass*, 72 F.4th at 896 (simplified), *Martin* and *Grants Pass* have no relevance.  That's because even our court recognized that homeless persons have no right to "sleep on the streets . . . at any time and at any place."   *Martin*, 920 F.3d at 617 (simplified).  But the district court ignored these limitations and enjoined laws that go far beyond what *Martin* and *Grants Pass* protect.  It enjoined laws that apply to only certain areas of the City at certain times.  It also enjoined laws prohibiting more than mere sleeping, lying, or sitting— but those prohibiting tents and encampments.  It was a clear abuse of discretion to fashion such a broad injunction.

Unfortunately, the majority acquiesces to the district court's ill-conceived injunction.  Thankfully, however, the majority does not endorse the district court's misadventure in judicial overreach.  The majority simply concludes that San Francisco's arguments on appeal were waived.  That means that the district court's legal rulings are not the law of our court and they should be disregarded by other judges in this circuit.  The district court should also take the hint and reconsider its radical rulings on remand.

Because the majority permits most of the district court's injunction to stand, I respectfully dissent.

# I.

## Original Meaning of the Cruel and Unusual Punishments Clause

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. We must interpret the Amendment's scope in accordance with its "original and historical understanding." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (looking to "[t]he history of the constitutional prohibition of 'cruel and unusual punishments'").

As a matter of text and original meaning, this Clause bars punishments both *cruel*, meaning "inhumane" and "barbarous," and *unusual*, meaning "contrary to longstanding usage or custom" or "fallen out of use." *Edmo v. Corizon, Inc*., 949 F.3d 489, 507 (9th Cir. 2020) (Bumatay, J., dissenting from the denial of rehearing en banc). And nothing supports the Ninth Circuit's expansion of the Clause to bar the enforcement of anti-vagrancy laws— whether shelter is offered or not—which have a long and unbroken pedigree in our historical tradition.

## A.

### The Cruel and Unusual Punishments Clause

#### *Pre-Ratification*

When our Founding generation banned "cruel and unusual punishments" through the Bill of Rights, they did not pluck the term out of thin air. Far from it. Indeed, the whole of the Eighth Amendment was largely taken from the English Declaration of Rights of 1689. *See Harmelin v.*

*Michigan*, 501 U.S. 957, 966 (1991) (opinion of Scalia, J.) ("There is no doubt that th[is] Declaration of Rights is the antecedent of our constitutional text."). This English precursor provided that "excessive Baile ought not to be required nor excessive Fines imposed nor cruell and unusall Punishments inflicted." 1 Wm. & Mary, Sess. 2, ch. 2 (1689).

It is generally accepted that this provision of the English Declaration of Rights arose in response to "the arbitrary sentencing power" of the "infamous" Lord Chief Justice Jeffreys of the King's Bench. *Harmelin*, 501 U.S. at 967–68 (opinion of Scalia, J.). "Jeffreys was widely accused of 'inventing' special penalties for the King's enemies, penalties that were not authorized by common-law precedent or statute." *Id*. at 968. Take the sentence of one perjurer, Titus Oates—a Protestant cleric whose false accusations caused the death of several Catholics. *Id*. at 969. Oates was sentenced to "a fine of 1000 marks upon each Indictment," "stript of his Canonical Habits," "pillor[ied] annually," "whipped by the common hangman," and "imprisoned for life." *Id.* at 970 (citing *Second Trial of Titus Oates*, 10 How. St. Tr. 1227, 1316 (K.B. 1685)).

Those punishments shocked many in Parliament and, after Oates's sentence, the Declaration of Rights was enacted. *Id.* While a petition to set aside Oates's punishment proved unsuccessful, a minority of the House of Lords dissented, concluding that the punishment was "barbarous, inhuman, and unchristian" without "Precedent" and "contrary to the Declaration [of Rights]." *Id*. at 971 (quoting *Second Trial of Titus Oates*, 10 How. St. Tr. at 1325). They decried that "there [were] no precedents to warrant the punishments of whipping and committing to prison for life, for the crime of perjury." *Second Trial of Titus Oates*, 10

How. St. Tr. at 1325. Thus, the penalties "were contrary to law and ancient practice" and the sentence would "be an encouragement and allowance for giving the like cruel, barbarous, and illegal judgments hereafter." *Id.* The House of Commons joined in condemnation of Oates's punishment, calling it an "ill Example, and illegal" to impose a life sentence "where there is no express Law to warrant it" and "unusual" that "an Englishman should be exposed upon a Pillory, so many times a Year, during his Life." *Harmelin*, 501 U.S. at 972–73 (opinion of Scalia, J.) (quoting 10 Journal of the House of Commons 247 (Aug. 2, 1689)).

In sum, those contemporary authorities believed that a punishment violated the "cruell and unusall" right because they were: "out of [the Judges'] Power," "contrary to Law and ancient practice," without "Precedents" or "express Law to warrant," "unusual," "illegal," or imposed by "Pretence to a discretionary Power." *Id*.

These protests, centered on the novelty of Oates's punishment, contrasted with practices in long usage and aligned with the common law. Under the common law, courts "identif[ied] longstanding customary rules and appl[ied] them to particular cases." John F. Stinneford, *The Original Meaning of "Unusual": The Eighth Amendment as a Bar to Cruel Innovation*, 102 Nw. U. L. Rev. 1739, 1768–69 (2008). In the words of Sir Edward Coke, perhaps the most important common-law jurist in English history, "customary practices that enjoyed 'long' or 'immemorial usage'" were considered "inherently just and reasonable." *Id.* at 1772. "If a given customary law was used over a long period of time, throughout the entire kingdom, Coke held that this process confirmed the law's goodness and eliminated from the law anything that was bad or unreasonable." *Id*. at 1774. Indeed, in Coke's view, such

long usage would be "fined and refined by an infinite number of grave and learned men, and by long experience growne to such a perfection." *Id*. (quoting 1 Edward Coke, Institutes of the Lawes of England § 138 (1608), *as reprinted in* 2 The Selected Writings and Speeches of Sir Edward Coke § 138, at 701 (Steve Sheppard ed., 2003)).

### *Ratification*

At the Founding, fear that the federal government might enact punishments contrary to common usage was widespread.  George Mason led the charge:

> There is no Declaration of Rights, and the laws of the general government being paramount to the laws and constitution of the several States, the Declarations of Rights in the separate States are no security. Nor are the people secured even in the enjoyment of the benefit of the common law (which stands here upon no other foundation than its having been adopted by the respective acts forming the constitutions of the several States).

2 Kate Mason Rowland, Life of George Mason, 1725–1792, Including His Speeches, Public Papers, and Correspondence, at 385–86 (1892), *reprinted in* 2 The Records of the Federal Convention of 1787, at 637 (Max Farrand ed., 1911).  When Mason made this statement, many States had adopted bans on "cruel and unusual" or "cruel or unusual" punishments in their constitutions.  *See, e.g.,* Va. Declaration of Rights § 9 (1776); Del. Declaration of Rights § 16 (1776); Md. Declaration of Rights art. XXII (1776); N.C. Declaration of Rights art. X (1776); Mass. Const. pt. I, art. XXVI (1780); N.H. Bill of Rights art. XXXIII (1783).

In Massachusetts, Abraham Holmes, a legislator and attorney allied with the Anti-Federalists, warned against leaving Congress with the power to define novel punishments without limit.  He decried that the federal government was "nowhere restrained from inventing the most cruel and unheard-of punishments, and annexing them to crimes." 2 J. Elliott, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 111 (2d ed. 1891).  Holmes, then, feared that the new federal government would resurrect long out-of-use punishments so that "*racks* and *gibbets* may be amongst the most mild instruments of their discipline." *Id.*

In Virginia, Patrick Henry echoed Holmes's concern that "members of Congress will loose the restriction of not imposing excessive fines, demanding excessive bail, and inflicting cruel and unusual punishments" and bemoaned that "[w]hat has distinguished our ancestors [is t]hat they would not admit of tortures, or cruel and barbarous punishment." 3 J. Elliott, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 447 (2d ed. 1891).  Henry explained that Congress should have full latitude "[i]n the definition of crimes;" yet, he cautioned that the Constitution must limit the scope of penalties. *Id.*  "[W]hen we come to punishments," he said, "no latitude ought to be left, nor dependence put on the virtue of representatives." *Id*.  In particular, he advocated for the common-law tradition to set this limit, otherwise "Congress may introduce the practice of the civil law, in preference to that of the common law." *Id.*  At that time, the civil law was understood to allow "cruel new practices" while the common law required long usage and thus constrained such inventions.  Stinneford, *supra*, at 1776.

This point is underscored by the kinds of punishments considered *usual* and thus permissible under the Clause.  As James Wilson, a key contributor to the Constitution explained, it is "long customs, approved by the consent of those who use them, [that] acquire the qualities of a law."  2 James Wilson, *Collected Works of James Wilson* 759 (Kermit L. Hall & Mark David Hall eds., Indianapolis, Liberty Fund 2007).  Thus, customs enjoying a long history of usage were described as "usual" practices.  Stinneford, *supra*, at 1770.  Those contrasted with the unusual practices that Mason, Holmes, Henry, and other proponents of the Eighth Amendment worked to prevent.

So those who advocated for the Cruel and Unusual Punishments Clause sought to ban innovative punishments without longstanding acceptance in the legal tradition.

### *Post-Ratification*

Post-ratification understanding of the Clause confirms its prohibition of punishments contrary to longstanding usage or custom.  As Justice Story explained, the Clause bars "violent proceedings," such as those under the "arbitrary reigns of some of the Stuarts" during which "[e]normous fines and amercements were . . . sometimes imposed, and cruel and vindictive punishments inflicted."  3 J. Story, Commentaries on the Constitution of the United States 750–51 (1833).  For that reason, post-ratification legal commentators observed that the Clause would prohibit the revival of long discarded penalties.  *See, e.g.*, J. Bayard, A Brief Exposition of the Constitution of the United States 154 (2d ed. 1834) (barring "the use of the rack or the stake, or any of those horrid modes of torture, devised by human ingenuity"); B. Oliver, The Rights of An American Citizen 186 (1832) (prohibiting "various barbarous and cruel

punishments inflicted under the laws of some other countries, . . . [like b]reaking on the wheel, flaying alive, rending asunder with horses, various species of horrible tortures inflicted in the inquisition, maiming, mutilating and scourging to death").

Likewise, early American courts, construing the term "cruel and unusual" (typically as used in State constitutions), upheld punishments that were not "unusual" in light of common-law usage. *See* Stinneford, *supra*, at 1810–11 (citing *Barker v. People*, 20 Johns. 457, 459 (N.Y. Sup. Ct. 1823); *Commonwealth v. Wyatt*, 27 Va. (6 Rand.) 694, 701 (Va. Gen. Ct. 1828); *People v. Potter*, 1 Edm. Sel. Cas. 235, 245 (N.Y. Sup. Ct. 1846)).

\* \* \*

All in all, as a historical matter, the Cruel and Unusual Punishments Clause has two dimensions. The first prevents "cruel" punishments—those in which "terror, pain, or disgrace [were] superadded," *Bucklew*, 139 S. Ct. at 1123 (quoting 4 W. Blackstone, Commentaries on the Laws of England 370 (1769)), or which were "[p]leased with hurting others; inhuman; hard-hearted; void of pity; wanting compassion; savage; barbarous; unrelenting," *id*. (quoting 1 S. Johnson, A Dictionary of the English Language (4th ed. 1773)). The second dimension prohibits "unusual" punishments, meaning those that "had long fallen out of use." *Id*. Thus, we must look to both components when considering the contours of the Clause.

## B.

### Tradition of Anti-Vagrancy Laws

With this background, we review the history of anti-vagrancy laws. It should come as no surprise that it's

longstanding.   And the punishments for violating anti-vagrancy laws were far more severe than the misdemeanors and civil infractions involved here.

"Laws prohibiting loitering and vagrancy have been a fixture of Anglo–American law at least since the time of the Norman Conquest." *City of Chicago v. Morales*, 527 U.S. 41, 103 (1999) (Thomas, J., dissenting).   While the original reason for these prohibitions is archaic—"[t]he break-up of feudal estates in England" in the 14th century—their longstanding character is without question.   *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 161 (1972).   By the 17th century, English "laws vested in local governments responsibility for the poor and an almost unfettered control over their daily lives."   Harry Simon, *Towns Without Pity: A Constitutional and Historical Analysis of Official Efforts to Drive Homeless Persons from American Cities*, 66 Tul. L. Rev. 631, 637 (1992).

Even after the English Declaration of Rights in 1689, anti-vagrancy enforcement was regular and the permissible punishments severe.   *See* C. J. Ribton-Turner, A History of Vagrants and Vagrancy and Beggars and Begging 173–203 (1887).   The examples are many—

In 1713, Parliament passed an Act allowing certain "idle Persons" to be "taken up sent and conducted and conveyed unto Her Majestie's Service at Sea."   *Id.* at 180 (quoting 13 Anne c. 26 (Gr. Brit.)).   Others were "ordered to be sent to their place of settlement or birth, and if that could not be known, then to the place where they were last found begging or misordering themselves and passed unapprehended."   *Id.* at 181 (quoting 13 Anne c. 26).   "Vagrants without a legal place of settlement" could "be committed to the custody and power of the person apprehending them" who could

apprentice or keep the vagrant as a servant for a term of seven years. *Id.* at 182 (quoting 13 Anne c. 26). Others still could be sentenced to hard labor, incarceration, and public whipping. *Id.* at 180–82.

In the city of Bath—a particularly attractive destination to "poor persons so afflicted with [diseases]" given its "Medicinal and Mineral Waters"—under a 1739 law, those found "loitering, wandering, or begging" after discharge could be punished with three months' hard labor. *Id.* at 197 (quoting 12 Geo. II. c. 31 (Gr. Brit.)). And "loose, idle, and disorderly persons" if found "wandering or begging" faced up to twelve months' hard labor. *Id.* (quoting 12 Geo. II. c. 31).

In 1740, Parliament further targeted idle persons, including those wandering the streets, and authorized as a penalty one month's hard labor. *Id.* at 199 (citing 13 Geo. II. c. 24 (Gr. Brit.)). It punished "all persons wandering abroad, and lodging in barns and other outhouses, not giving a good account of themselves, and all persons wandering abroad and begging" more severely. *Id.* at 200 (quoting 13 Geo. II. c. 24). Those individuals would be sent back to their last legal place of settlement and punished with hard labor and up to six months' imprisonment, with the possibility of being pressed into service. *Id.* at 200–02.

These kinds of laws were also ubiquitous in early American history. "[A]t the time of the founding, state and local governments customarily criminalized loitering and other forms of vagrancy." *Morales*, 527 U.S. at 103 (Thomas, J., dissenting). This "[v]agrancy legislation in America started in colonial times and closely followed English models." Simon, *supra*, at 638. For example, South Carolina criminalized as vagrancy "all persons wandering

from place to place without any known residence." An Act for the promotion of Industry, and for the suppression of Vagrants and other Idle and Disorderly Persons (1787), *reprinted in* 5 The Statutes at Large of South Carolina, 41–44 (Thomas Cooper ed., 1939). If the court did "not think fit to discharge the offender," it could sell the vagrant's services as a servant for up to one year. *Id.* at 42. Alternatively, the vagrant could be punished with between ten and thirty-nine lashes and banished from the area. *Id.* at 43.

At least ten of the original colonies implemented such laws by the end of the 1700s. *Morales*, 527 U.S. at 103 n.2 (Thomas, J., dissenting) (collecting laws). This included places like Massachusetts, which had a constitutional prohibition on "cruel or unusual punishments." *Compare* Mass. Const. pt. I, art. XXVI (1780), *with* Act for suppressing and punishing of rogues, vagabonds, common beggars and other idle, disorderly and lewd persons, ch. 54, 1787 Mass. Laws 623 (1788) (permitting punishment through forced labor in a house of corrections). No rulings suggested that these "cruel and unusual" bars interfered with anti-vagrancy prohibitions or the punishments associated with them.

Furthermore, criminalizing vagrancy was not an early outlier. To the contrary, these laws lasted well through the ratification of the Fourteenth Amendment. *Morales*, 527 U.S. at 103–04 & n.3 (Thomas, J., dissenting). They then "remained on the books" into the middle of the 20th century. *Id.* at 104. It was only during the late 20th century that the Supreme Court began to question such laws—and even then, only on due process grounds. *See, e.g.*, *Papachristou*, 405 U.S. at 161–62.

From that perspective, it is notable that anti-vagrancy legislation, and the associated punishments, have coexisted with English, colonial, State, and federal prohibitions on "cruel and unusual punishments" for centuries. And anti-vagrancy laws with incarceration as a possible punishment have continued well into our modern era. Our historical tradition thus magnifies the disconnect between our court's jurisprudence and the proper scope of the Clause.

\* \* \*

Nothing in the text or historical understanding of the Clause supports barring States from enforcing the anti-vagrancy laws here. Such a reading is completely outside the bounds of the original understanding of the Eighth Amendment and the long tradition of penalties for anti-vagrancy laws. Thus, "[u]nder our federal system," the Clause generally leaves to "the States . . . primary authority for defining and enforcing the criminal law." *United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995) (simplified).

## II.

### Our Precedent Contradicts the Original Meaning

Given this history, *Martin* and *Grants Pass* unquestionably contradict the original meaning of the Eighth Amendment. With punishments for anti-vagrancy laws longstanding in our tradition, the Cruel and Unusual Punishments Clause places no substantive limits on laws criminalizing sleeping, lying, and sitting on public streets and sidewalks. Simply put, there's nothing barbarous or contrary to common usage about enforcing such laws with misdemeanor penalties or civil violations. Instead of following this straightforward reading, our court improperly federalized the health and safety regulations of every State

and locality within this circuit. By doing so, we impermissibly usurp powers left to the States and crown ourselves czars over homeless policy.

### *Martin v. City of Boise*

It began with *Martin v. City of Boise*. In *Martin*, several homeless or previously homeless residents of Boise, Idaho challenged the City's two criminal ordinances against sleeping outside on public property. 920 F.3d at 603. The first ordinance barred the use of "any of the streets, sidewalks, parks, or public places as a camping place at any time." *Id*. (quoting Boise City Code § 9-10-02 (repealed)). "Camping" was defined as "the use of public property as a temporary or permanent place of dwelling, lodging, or residence." *Id*. at 603–04. The other ordinance forbade "[o]ccupying, lodging, or sleeping in any building, structure, or public place, whether public or private . . . without the permission of the owner or person entitled to possession or in control thereof." *Id.* at 604 (quoting Boise City Code § 6-01-05 (repealed)). Both ordinances were misdemeanors. By their plain language, they operated throughout the City of Boise without geographic or temporal limitation. The *Martin* plaintiffs argued that the anti-camping and disorderly conduct ordinances violated the Cruel and Unusual Punishments Clause because no shelter had been made available to them.

Our court sided with the plaintiffs. We sweepingly ruled that enforcement of the two ordinances "violates the Eighth Amendment insofar as it imposes criminal sanctions against homeless individuals for sleeping outdoors, on public property, when no alternative shelter is available to them." *Id.* To get there, our court misread multiple Supreme Court cases. Despite its original meaning, our court insisted that

the Cruel and Unusual Punishments Clause "places substantive limits on what the government may criminalize." *Id*. at 615. But our court was wrong to stretch Supreme Court jurisprudence to reach this unprecedented holding.

To be fair, the Supreme Court has *once* applied the Cruel and Unusual Punishments Clause to overturn a substantive criminal ordinance. *See Robinson v. California*, 370 U.S. 660 (1962). In that case, the Court reversed a California conviction for "be[ing] addicted to the use of narcotics." *Id*. at 660 (simplified). According to the Court, a person could violate the law without ever "touch[ing] any narcotic drug within the State or be[ing] guilty of any irregular behavior there." *Id.* at 667. The law thus violated the Clause because the punishment was based on the "status" of being a narcotic addict—"an illness which may be contracted innocently or involuntarily." *Id.* At the same time, the Court emphasized that States were free to imprison those found guilty of "behavior[s]" such as using, purchasing, or possessing narcotics. *Id.* at 666.

Of course, *Robinson* didn't go far enough to support *Martin*'s ruling against enforcing the Boise ordinances. That's because the Boise laws prohibited "behavior" (like camping or sleeping), not "status" (like being a drug addict). So Boise's laws fell beyond the limits prescribed by *Robinson*.

Rather than acknowledge that *Robinson* couldn't support its novel holding, *Martin* employed some judicial sleight of hand, pulling out a concurrence and dissent from a case declining to extend *Robinson*—*Powell v. Texas*, 392 U.S. 514 (1968). In *Powell*, the Supreme Court reviewed a Texas conviction for "get[ting] drunk or be[ing] found in a state of intoxication in any public place." *Id.* at 517 (plurality

opinion) (simplified).   Under *Robinson*, the defendant claimed that being punished for "being a chronic alcoholic" was cruel and unusual. *Id.* at 532.   The Court fractured 4-1-4 to *deny* the constitutional challenge.

Writing for four members, Justice Thurgood Marshall explained that the Cruel and Unusual Punishments Clause had no relevance for laws proscribing conduct.   Justice Marshall reiterated that the Clause's "primary purpose" has "always been considered . . . to be directed at the method or kind of punishment imposed for the violation of criminal statutes." *Id*. at 531–32.   It thus had little to do with the substantive area of criminal law.   And *Robinson* wasn't controlling, he said, because the Texas defendant was convicted for being drunk in public—"public behavior which may create substantial health and safety hazards"— not "mere status" as in the California case. *Id*. at 532. Justice Marshall then warned against reading *Robinson* too broadly.   He said that case had no application to *conduct*, even if that conduct were "in some sense, involuntary or occasioned by a compulsion." *Id.* at 533 (simplified). Rather, *Robinson* merely held "that criminal penalties may be inflicted only if the accused has committed some act." *Id.* Expanding *Robinson* would make federal courts "the ultimate arbiter of the standards of criminal responsibility" and flout "[t]raditional common-law concepts of personal accountability and essential considerations of federalism." *Id.* at 533, 535.   The plurality rejected that sweeping federalization of criminal law.

Justice White agreed to affirm the conviction.   Speaking for himself, he concluded that the defendant had "showed nothing more than that he was to some degree compelled to drink and that he was drunk at the time of his arrest." *Id.* at 553–54 (White, J., concurring in the judgment).   Because

the defendant could not establish that his being drunk in public was "involuntary," Justice White explained that he "did not show that his conviction offended the Constitution." *Id.* at 554.   True, Justice White opined in dicta, citing *Robinson*, that "the chronic alcoholic with an irresistible urge to consume alcohol should not be punishable for drinking or for being drunk." *Id.* at 549.   Even so, Justice White believed that "the chronic alcoholic" cannot be "shielded from conviction when he has knowingly failed to take feasible precautions against committing a criminal act." *Id*. at 550.

The dissent, written by Justice Fortas and joined by three others, read *Robinson* broadly to conclude that "[c]riminal penalties may not be inflicted upon a person for being in a condition he is powerless to change." *Id.* at 567 (Fortas, J., dissenting).   He opined that being a "chronic alcoholic" was a "condition" which the defendant "had no capacity to change or avoid." *Id*. at 568.   Thus, the conviction for being drunk in public resulted from "an uncontrollable compulsion to drink." *Id*.   The dissenters would have reversed the conviction under the Eighth Amendment. *Id.* at 570.

Cobbling together the dissent and concurrence, *Martin* built a constitutional house of cards—constructing the *broadest* reading of the Clause in its long history.   Reading *Powell*'s three opinions, *Martin* somehow "gleaned" that Justice White's vote to affirm the conviction really constituted a vast holding that entirely agreed with the *dissenters*.   *See Martin*, 920 F.3d at 616.   Thus, *Martin* concluded that the narrowest grounds for the five Justices was the sweeping proposition that "the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being." *Id.* (simplified).

Based on this innovative reading of the Clause, our court thought it was "compel[led]" to prohibit enforcement of Boise's anti-camping and disorderly conduct ordinances whenever shelter is not offered. *Id. Martin* reasoned that sitting, lying, and sleeping are "universal and unavoidable consequences of being human" so that the "conduct . . . is involuntary and inseparable from status." *Id*. at 617 (simplified).   So *Martin* felt that governments cannot criminalize the "state of being homeless in public places" if "there is no option of sleeping indoors." *Id*. (simplified). By criminalizing "the simple act of sleeping outside on public property" when no sleeping space was "practically available in any shelter," *Martin* concluded that Boise's two ordinances violated the Clause. *Id.* at 617–18. Thus, *Martin* held that "so long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters, the jurisdiction cannot prosecute homeless individuals for involuntarily sitting, lying, and sleeping in public." *Id*. at 617 (simplified).

*Martin*'s invented meaning for the Cruel and Unusual Punishments Clause is wrong for several reasons—

Most important, it is untethered from the text or historical understanding of the Clause. *Martin* refuses to acknowledge that the constitutional guarantee proscribes only barbarous and out-of-use punishments.   And it disregards the Clause's focus on *punishments* rather than substantive criminal law. *Martin* doesn't even grapple with the long history of anti-vagrancy laws and their peaceful co-existence with the Cruel and Unusual Punishments Clause for more than two centuries.

Next, *Martin* violates how we must read fractured Supreme Court decisions. *See Marks v. United States*, 430

U.S. 188, 193 (1977) (requiring lower courts to follow the "position taken by those Members who concurred in the judgments on the narrowest grounds").   In interpreting *Powell*, *Martin* pretended that the boldest, most disruptive ground—one that has vast implications for substantive criminal law across the Ninth Circuit—is really the narrowest one.   This ignores the obvious: the narrowest ground of *Powell*—combining Justice White's concurrence and Justice Marshall's plurality—is simply that criminalizing acts of volitional conduct does not offend the Eighth Amendment.   It is absurd to conclude that the narrowest ground of *Powell* fundamentally reshapes substantive criminal law.

And finally, it overlooks the Supreme Court's later rulings.   When the Court looks to *Powell*, it does so with reference to Justice Marshall's plurality—and especially its conclusion that "doctrines of criminal responsibility must remain the province of the States." *Kahler v. Kansas*, 140 S. Ct. 1021, 1028 (2020) (quoting *Powell*, 392 U.S. at 534, 536) (simplified); *see also Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 289 (4th Cir. 2019) (Wilkinson, J., dissenting) (collecting cases).   Indeed, the Supreme Court has never endorsed a view of the Clause as broad as the Ninth Circuit's—one that protects anti-social conduct long penalized by communities throughout the Nation.

### *Johnson v. City of Grants Pass*

But we didn't stop there.   Only a few years later, we pushed our interpretation further with *Johnson v. City of Grants Pass*.   In *Grants Pass*, a group of homeless persons filed a class action to bar enforcement of various ordinances forbidding unauthorized sleeping or camping in public. 72 F.4th at 875, 880.   This time the ordinances were civil in

nature, with fines up to several hundred dollars and exclusions from city property.  *Id.* at 875.

Beyond expanding *Martin* to civil penalties and class actions, the *Grants Pass* majority supercharged its substantive reach.  The City of Grants Pass argued that *Martin* wasn't applicable because its anti-camping ordinances barred the use of bedding, sleeping bags, or other materials for bedding purposes—not merely sleeping in public.  *Id*. at 890.  The City had a good point.  As Judge Collins pointed out in dissent, *Martin* only barred enforcement of laws against sitting, lying, and sleeping in public, it said nothing about forbidding the use of ancillary items for sleep.  *Id*. at 912 n.15 (Collins, J., dissenting); *see also Martin*, 920 F.3d at 617 & n.8.

The *Grants Pass* majority rejected this distinction.  It extended the Cruel and Unusual Punishments Clause to allow a homeless person to "tak[e] necessary minimal measures to keep themselves warm and dry while sleeping." *Grants Pass*, 72 F.4th at 891 (simplified).  Claiming it a "life-preserving imperative," the *Grants Pass* majority ruled that governments cannot prohibit "articles necessary to facilitate sleep" or the "most rudimentary precautions . . . against the elements" when shelter is unavailable.  *Id*. at 891 & n.28.  For the same reason, the *Grants Pass* majority also barred enforcement of laws against sleeping in cars at night. *Id*. at 896.

Originally, the *Grants Pass* majority also created one additional wrinkle—the introduction of a "formula" to assess when the Cruel and Unusual Punishments Clause kicks in.  The initial majority opinion established a "formula" that "the government cannot prosecute homeless people for sleeping in public if there 'is a greater number of

homeless individuals in [a jurisdiction] than the number of available' shelter spaces." *Grants Pass*, 50 F.4th at 795 (vacated opinion) (quoting *Martin*, 920 F.3d at 617). Such a "formula" has led to confusion in the district courts, including the one here, because the language suggested that any enforcement of anti-sleeping or camping laws is barred until States and localities build enough shelters for every homeless person in their jurisdictions. The *Grants Pass* majority wisely excised that novel "formula" calculation from its amended opinion. *Grants Pass*, 72 F.4th at 874; *id.* at 916 (joint statement on denial of rehearing en banc).

*Grants Pass* has not fared well. Seventeen judges of our circuit have called for *Grants Pass* to be reheard en banc. *Id.* at 924 (O'Scannlain, J., respecting the denial of rehearing en banc); *id.* at 933 (Graber, J., respecting the denial of rehearing en banc); *id*. at 935 (M. Smith, J., dissenting from the denial of rehearing en banc); *id.* at 943 (Collins, J., dissenting from the denial of rehearing en banc); *id.* at 944 (Bress, J., dissenting from the denial of rehearing en banc). A petition for certiorari remains pending at the Supreme Court. States, cities, and community organizations from across our Nation have joined the call to have *Grants Pass* overturned by the Supreme Court. We should be reluctant to turn a blind eye to its further expansion.

\* \* \*

As a result of *Martin* and *Grants Pass*, we have moved far from the "original and historical understanding of the Eighth Amendment." *See Bucklew*, 139 S. Ct. at 1122. A prohibition against barbarous and out-of-use penalties now paralyzes the States and localities of this circuit. We prohibit them from effectively addressing homelessness, a pressing public issue closely tied to core State interests like health,

safety, and crime—despite centuries of enforcement of anti-vagrancy laws.  We are gravely wrong with this line of precedent.  Our ill-conceived rulings endanger the public, including those struggling on our streets.  The district court's expansion of our precedent makes matters even worse.

## III.

## The District Court's Expansion of *Martin* and *Grants Pass* is Egregiously Wrong

Given everything just explained—the original meaning of the Cruel and Unusual Punishments Clause, the tradition of anti-vagrancy punishments, and the shaky foundation of *Martin* and *Grants Pass*—the district court's expansion of this jurisprudence is egregiously wrong.  Our precedent has never required that homeless persons be allowed to sit, lie, or sleep in *any* public place at *any* time.  To the contrary, even as sweeping as our rulings have been, they've expressly limited themselves to situations involving *all-day*, *citywide* bars on sleeping, sitting, or lying.  Thus, *Martin* and *Grants Pass* do not compel the injunction imposed by the district court here.  And we should not have ignored this undue expansion and further unleashed our indefensible precedent on the people of San Francisco.

## A.

## *Martin* and *Grants Pass* Did Not License Sleeping *Anywhere Anytime*

Let's turn back to the two cases.  Despite their extraordinary nature and perhaps realizing their astonishing scope, the two panels *at least* limited these rulings in several important respects.  Indeed, both cases emphasized the narrowness of their holdings.  *Martin*, 920 F.3d at 617 (stating that its "holding is a narrow one"); *Grants Pass*, 72

F.4th at 896 (confirming its "decision is narrow").   We should have taken those cases at their word and not allowed the district court to expand them without serious thought.

### *Geographic and Temporal Limitations*

First, *Martin* and *Grants Pass* do not allow homeless persons to sleep anywhere, anytime.  Those cases apply only to universal *all-day*, *citywide* ordinances.  So the Cruel and Unusual Punishments Clause doesn't come into play when States and localities provide *some place* for homeless persons to sleep, lie, and sit in public at *some time*.

Take *Martin.*   It expressly rejected the idea that governments must "allow anyone . . . to sit, lie, or sleep on the streets . . . at *any time* and at *any place*."  920 F.3d at 617 (emphases added).  Even when shelter is unavailable, it said that laws criminalizing "sitting, lying, or sleeping outside *at particular times or in particular locations* might well be constitutionally permissible."   *Id*. at 617 n.8 (emphasis added).  Indeed, the author of *Martin* expressly stated that the case "holds only that municipal ordinances that criminalize sleeping, sitting, or lying *in all public spaces*, when no alternative sleeping space is available, violate the Eighth Amendment."  *Id*. at 589 (Berzon, J., concurring in the denial of rehearing en banc) (emphasis added).  Thus, *Martin* has nothing to say about anti-vagrancy laws that are limited in geographic or temporal scope.

*Grants Pass* had similar limitations.  It confirmed that its line of reasoning only applies to all-day, jurisdiction-wide laws.  According to *Grants Pass*, the Eighth Amendment is violated only "if there are no other public areas or appropriate shelters where those individuals can sleep."  72 F.4th at 877 (simplified). In fact, it reduced its holding to one "simpl[e]" rule—"it is unconstitutional to punish simply

sleeping *somewhere* in public if one has nowhere else to do so." *Id*. at 896 (simplified).  Thus, anti-vagrancy ordinances are unconstitutional "unless there is some place, such as shelter, [homeless persons] can lawfully sleep." *Id.* at 894.

The judges of the *Grants Pass* majority characterized this as an "exceptionally limited protection." *Id.* at 924 (joint statement on denial of rehearing en banc).  They did "not establish an unrestrained right for involuntarily homeless persons to sleep *anywhere* they choose." *Id*. at 914 (emphasis added).  So even "[w]hen there is no shelter space, jurisdictions may still enforce limitations on sleeping at certain locations." *Id*. at 915.

Thus, if governments offer "alternate outdoor space" for homeless persons to sleep, *id.* at 894 n.33, the Cruel and Unusual Punishments Clause isn't applicable.

### *Tents and Other Obstructions*

Next, *Martin* and *Grants Pass* do not prevent bans on using tents and other obstructive items in public.  Its holding doesn't affect laws barring tents, encampments, lodgings, and the like.

*Martin* expressly told us that it doesn't reach laws that bar "the obstruction of public rights of way or the erection of certain structures." 920 F.3d at 617 n.8.  Indeed, *Martin* only targeted criminalization of "the simple act of sleeping outside on public property, whether bare or with a blanket or other basic bedding." *Id*. at 617.

*Grants Pass* went even further in limiting its scope.  It only barred enforcement of laws against homeless persons possessing the "most rudimentary" bedding material, like blankets and sleeping bags—leaving other obstructive materials favored by homeless persons unprotected by the

Eighth Amendment. *Grants Pass*, 72 F.4th at 891, 895. *Grants Pass*, for example, does not apply to prohibitions on stoves, fires, or other structures. *See id.* at 895. Indeed, it expressly upheld bans on the use of tents in public parks. *Id.* at 895 n.34. So our precedent lets governments ban nuisance items.

### *Involuntarily Homeless*

Third, *Martin* and *Grants Pass* apply only to those who are truly "involuntarily" homeless.

Our court has defined what it means to be "involuntarily" homeless. *See Grants Pass*, 72 F.4th at 888 n.24 ("A person with access to temporary shelter is not involuntarily homeless[.]"); *Martin*, 920 F.3d at 618 (explaining that a person is involuntarily homeless "when no sleeping space is practically available in any shelter"). And that definition "does not cover individuals who *do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it." *Martin*, 920 F.3d at 617 n.8. The judges of *Grants Pass* stated "emphatically" that "when an involuntarily homeless person refuses a specific offer of shelter elsewhere, that individual may be punished for sleeping in public." *Grants Pass*, 72 F.4th at 915 (joint statement on denial of rehearing en banc). So governments may continue to enforce their anti-vagrancy laws against homeless persons who have received an offer of shelter.

### *No Control over Shelters*

Finally, our court has said that the Cruel and Unusual Punishments Clause does not control how governments may run their shelters. *Martin* said its ruling in "no way dictate[s]" that governments "must provide sufficient shelter

for the homeless."   920 F.3d at 617 (simplified).   As Coalition conceded at oral argument, the "Eighth Amendment and *Martin* and *Grants Pass* doesn't dictate to any city how they should manage their shelter system." So States and localities may manage their shelters in any way they see fit, including setting aside shelter space for enforcement activities.

## B.

## San Francisco's Laws Don't Implicate *Martin* and *Grants Pass*

Our precedent is clear: the homeless have no right to sleep *anywhere* at *any time* in *any* arrangement.  Because San Francisco allows homeless persons to sleep in public parks, beaches, and plazas at certain times and its streets at other times, the district court should not have enjoined enforcement of the City's ordinances under *Martin* and *Grants Pass*.

Let's look at the laws enjoined by the district court here—

- **California Penal Code § 647(e):** "every person . . . [w]ho lodges in any building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it" is "guilty of disorderly conduct, a misdemeanor[.]"

- **California Penal Code § 370:** "[a]nything which is injurious to health, or is indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property by an entire community or neighborhood, or by any considerable number of persons, or unlawfully

obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a public nuisance."

- **California Penal Code § 372:** "[e]very person who maintains or commits any public nuisance, the punishment for which is not otherwise prescribed, or who willfully omits to perform any legal duty relating to the removal of a public nuisance, is guilty of a misdemeanor."

- **San Francisco Police Code § 168:** "[i]n the City and County of San Francisco, during the hours between seven (7:00) a.m. and eleven (11:00) p.m., it is unlawful to sit or lie down upon a public sidewalk, or any object placed upon a public sidewalk," punishable "by a fine of not less than $50 or more than $100 and/or community service" for the first offense.

- **San Francisco Police Code § 169:** "[i]n the City and County of San Francisco, it is unlawful to place an Encampment upon a public sidewalk. This prohibition shall not apply to the placement of an Encampment on a public sidewalk pursuant to and in compliance with a street use permit or other applicable permit."

The district court also enjoined use of California Penal Code § 148(a) to enforce or threaten to enforce these laws. Section 148(a) makes it unlawful when a person "willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, . . . in the discharge or attempt to discharge any duty of his or her office or employment."

Notice that these laws are limited in temporal or geographic scope or prohibit conduct beyond what *Martin* and *Grants Pass* protect. For ease of understanding the scope of the injunction, here's a summary of the laws at issue:

| CODE SECTION | SUBSTANTIVE BAR | GEOGRAPHIC SCOPE | TEMPORAL SCOPE |
|---|---|---|---|
| CAL. PENAL CODE § 647(E) | Unauthorized lodging | Any public place | Any time |
| CAL. PENAL CODE §§ 370, 372 | Obstructing free passage | Public parks, squares, streets, and highways | Any time |
| S.F. POLICE CODE § 168 | Lying or sitting | Public sidewalks | Between 7:00 a.m. and 11:00 p.m. |
| S.F. POLICE CODE § 169 | Encampments | Public sidewalks | Any time |

**California Penal Code § 647(e**). Start with § 647(e). This section allows San Francisco police officers to arrest a person for unauthorized "lodging," meaning the use of a "tent, tarp or other structure or shelter." S.F. Police Dep't Bull. A-19-080 (Apr. 16, 2019). Thus, this law bans conduct beyond "the simple act of sleeping outside on public property, whether bare or with a blanket or other basic bedding." *Martin*, 920 F.3d at 617. As *Grants Pass* said unequivocally, there is no "right to use . . . a tent" for sleeping outdoors. 72 F.4th at 895 n.34.

By its plain text, § 647(e) requires more than mere sleeping in public; it penalizes "lodg[ing]" in public. Cal. Penal Code § 647(e). Lodging connotes the use of items or structures associated with sleeping quarters. *See* Webster's New International Dictionary 1451–52 (2d ed. 1941) (defining to "lodge" as "to encamp," "provide quarters for," "establish or settle (oneself) in a place," and "have lodging or sleeping quarters"). Court decisions have confirmed that § 647(e) requires more than mere sleeping. *See People v. Ellis,* 2017 WL 2463092, at \*7 (Cal. Ct. App. June 7, 2017) (unpublished) (holding the mere act of temporarily sitting on a curb is not lodging under § 647(e)); *Stone v. Agnos*, 960 F.2d 893, 895 (9th Cir. 1992) (approving an arrest of a homeless defendant for sleeping in a public plaza who had previously erected a tent and describing the State's interest as the prevention of "unpermitted camping"); *Joyce v. City and Cnty. of San Francisco*, 846 F. Supp. 843, 862–63 (N.D. Cal. 1994) (holding predecessor of § 647(e) was not unconstitutionally vague because San Francisco police officers had been advised not to enforce the prohibition against "the mere lying or sleeping on or in a bedroll," but to apply it only to persons who "set up living accommodations").[1]

Because § 647(e) targets conduct beyond sleeping with the "most rudimentary" bedding, *Grants Pass*, 72 F.4th at 891 (simplified), the law does not trigger our precedent. We should have dissolved the injunction as it pertains to § 647(e).

---

[1] Contrary to the majority's view, § 647(e) is very different than the law enjoined in *Martin*. Boise's law in *Martin* barred merely "sleeping in any . . . public place." 920 F.3d at 604. Section 647(e) requires much more—lodging.

**California Penal Code §§ 370, 372**.  Because California Penal Code §§ 370 and 372 target obstruction of streets or public health nuisances, they also go beyond what *Martin* and *Grants Pass* protect.

Bans on the obstruction of streets and other public areas fall outside the scope of *Martin* and *Grants Pass*.  Sections 370 and 372 permit San Francisco police officers to make an arrest when a person or the person's belongings "obstruct[ a] passageway such that a person using a wheelchair would be unable to pass."  S.F. Police Dep't Bull. A-19-080 (Apr. 16, 2019).  The provision does not bar mere sleeping.  Examples of obstruction require much more.  *See, e.g.*, *Hayman v. Block*, 222 Cal. Rptr. 293, 298 (Cal. Ct. App. 1986) (prostitutes stopping roadway traffic to solicit); *People v. Horton*, 87 Cal. Rptr. 818, 823 (Cal. App. Dep't Super. Ct. 1970) (protestors blocking a roadway and stopping vehicles); *Curtis v. Kastner*, 30 P.2d 26, 28 (Cal. 1934) (rafter protruding at eye level and injuring jogger).  As the author of *Martin* emphasized, that opinion "clearly states that it is not outlawing ordinances 'barring the obstruction of public rights of way.'"  *Martin*, 920 F.3d at 589 (Berzon, J., concurring in the denial of rehearing en banc) (quoting *Martin*, 902 F.3d at 1048 n.8).

And *Martin* and *Grants Pass* have nothing to say about laws against public health nuisances.  Sections 370 and 372 also cover "anything which . . . is injurious to health or is indecent, or offensive to the senses."  *People ex rel. Gallo v. Acuna,* 929 P.2d 596, 604 (Cal. 1997) (simplified).  This means, at the very least, that the action must endanger "the safety and health of the public at large," be "grossly unseemly or offensive to manners or morals," or involve "nauseating and offensive" conduct.  *People v. McDonald*, 40 Cal. Rptr. 3d 422, 434–35 (Cal. Ct. App. 2006)

(simplified).  Nothing in our Eighth Amendment precedent questions laws that protect the public from health and safety dangers or indecency.

So obstructive actions or public nuisances that contravene §§ 370 and 372 do not violate our precedent and the district court was wrong to include these laws in the injunction.

**S.F. Police Code § 168**.  This leads us to Police Code § 168.  It is the *only* ordinance here that prohibits sleeping, lying, and sitting.  At first blush, this is the only law that could fall under *Martin* and *Grants Pass*.  But it does not. That's because of two important limitations.  First, it is geographically limited.  Its "prohibition applies only to public sidewalks."  S.F. Police Code § 168(a).  So it has no effect in San Francisco's "beaches, plazas, public parks, public benches, and other common areas open to the public." *Id*.  Homeless persons thus can choose to sleep outside at these other locations.[2]

Second, it is temporally limited.  It prevents sitting and lying only in the morning until late evening from 7:00 a.m. to 11:00 p.m.  *Id*. § 168(b).  Section 168 targets this period

---

[2] The Coalition argues that San Francisco Park Code § 3.13 forbids sleeping in the park from 8:00 p.m. to 8:00 a.m., and so homeless persons could not sit or sleep in the City for at least four hours of the day (because both parks and sidewalks would be closed to them).  The Coalition is wrong for several reasons.  First, other public places, like beaches, benches, and plazas, are available by law to sleep and sit during those hours.  Second, the district court found that there was no "record of enforcement" of § 3.13 against homeless individuals who cannot obtain shelter in San Francisco.  That's why the district court refused to enjoin enforcement of that ordinance.  Third, *Martin* and *Grants Pass* do not establish a right to sleep in public at *all hours* of the day.  *See Martin*, 920 F.3d at 617.

because "[p]ersons who sit or lie down on public sidewalks during business hours threaten the safety of pedestrians, especially the elderly, disabled, vision-impaired, and children." *Id*. § 168(a). Thus, § 168 leaves available nighttime hours for homeless persons to sleep on public sidewalks. This part-time prohibition is no universal bar and does not implicate our Cruel and Unusual Punishments Clause jurisprudence. That's because the homeless have no right to sleep in public "at any time." *Martin*, 920 F.3d at 617.

The district court abused its discretion to expand *Grants Pass* and *Martin* to enjoin § 168.

**S.F. Police Code § 169**. This leaves Police Code § 169. It is a civil law banning the placement of an "[e]ncampment" on a "public sidewalk." S.F. Police Code § 169(c). "Encampment" means "a tent or any structure consisting of any material with a top or roof or any other upper covering or that is otherwise enclosed by sides that is of sufficient size for a person to fit underneath or inside while sitting or lying down." *Id*. § 169(b)(1). The law also requires City officials to offer housing or shelter before removing a person from an Encampment. *Id*. § 169(d).

So § 169 falls entirely out of the *Martin*/*Grants Pass* analysis for two reasons. First, it doesn't apply to the involuntarily homeless. *See Martin*, 920 F.3d at 617 & n.8 (holding does not cover those "who choose not to use" offered shelter). Second, it forbids only tents and other structures. *See id*. at 617 n.8. (holding does not apply to "the erection of certain structures"); *Grants Pass*, 72 F.4th at 895 n.34 (bars on tents are permissible).

As this panel instructs in an accompanying memorandum disposition, the district court must consider vacating the injunction as it pertains to § 169.

\* \* \*

The district court abused its discretion by improperly expanding our cruel and unusual punishments jurisprudence and fashioning a sweeping and unjustified preliminary injunction. *See Quinn v. Anvil Corp.*, 620 F.3d 1005, 1010 (9th Cir. 2010) (explaining that it is an abuse of discretion to base an injunction on an erroneous legal standard). On that basis alone, we should have vacated and remanded. No preliminary injunction should have been issued. San Francisco should have remained free to enforce its laws promoting health and safety on its streets, sidewalks, and public spaces.

## C.

### The District Court's Sweeping Expansion Is Not the Law of the Circuit

It is important to note—the district court's sweeping expansion of *Martin* and *Grants Pass* is *not* the law of our circuit. Because the majority doesn't reach the merits of any of the district court's rulings—instead holding that the City waived its arguments—the district court's decision should be considered a one-off, non-binding anomaly. Indeed, I agree with the majority that the district court here needs to reconsider its rulings *entirely* based on San Francisco's arguments.

Even so, the majority is wrong about waiver. "As the Supreme Court has made clear, it is claims that are deemed waived or forfeited, not arguments." *United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004) (citing

*Yee v. City of Escondido*, 503 U.S. 519, 534 (1992)).  San Francisco can make any argument in support of its claims on appeal—it is "not limited to the precise arguments [it] made below."  *Allen v. Santa Clara Cnty. Corr. Peace Officers Ass'n*, 38 F.4th 68, 71 (9th Cir. 2022) (simplified).

At the district court, San Francisco explained that "[e]nforcing restrictions on occupying public property is constitutional, so long as the individual has somewhere to sleep."  They proceeded to litigate that concern on appeal— that the district court was ignoring the express limitations of *Martin* and *Grants Pass*.  In its opening brief, San Francisco emphasized that its laws do not violate our precedent because they are geographically or temporally limited or because they proscribe conduct beyond mere sleeping in public.  And contrary to the majority's contention, none of San Francisco's arguments require factual development.  We must only read the State and local laws—something the district court apparently failed to do.

Finally, even if San Francisco somehow waived its arguments, "the rule of waiver is a discretionary one."  *Ruiz v. Affinity Logistics Corp*., 667 F.3d 1318, 1322 (9th Cir. 2012) (simplified).  Given the importance of addressing the homelessness crisis, we should not have ignored the district court's erroneous application of our precedents.  "[A]s judges, our duty is to get the law right."  *Ctr. for Investigative Reporting v. DOJ*, 14 F.4th 916, 943–44 (9th Cir. 2021) (Bumatay, J., dissenting).  As Justice Thurgood Marshall once instructed, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."  *Kamen v. Kemper Fin. Sevs., Inc*., 500 U.S. 90, 99 (1991).  So we should have

reached these critical questions and vacated the district court's injunction.

## III.

The district court improperly enjoined prohibitions on more than just sitting, lying, and sleeping in public with rudimentary bedding—the *only* conduct protected by *Martin* and *Grants Pass*. Instead, the preliminary injunction here covers laws forbidding lying on the sidewalk at certain hours, preventing camping or erecting structures, and banning the obstruction of parks, squares, streets, and highways. The laws enjoined are not blanket bars on the simple act of sleeping—they restrict activities in certain ways, at certain times, and in certain places.

But it cannot be cruel and unusual to prohibit homeless persons from sleeping, camping, and lodging wherever they want, whenever they want. While they are entitled to the utmost respect and compassion, homeless persons are not immune from our laws. And San Francisco should be free to address this pressing concern without judicial interference premised on the most radical interpretation of our Constitution. The district court's injunction falls starkly outside the original meaning of the Cruel and Unusual Punishments Clause, disregards the long history of anti-vagrancy laws, and violates even our own precedent. It should be vacated immediately.

The majority rightfully doesn't endorse the district court's power grab. But because the majority doesn't go far enough to vacate the injunction, I respectfully dissent.