**EXHIBIT A**

**TO**

**DECLARATION OF JOHN H. GEORGE IN SUPPORT OF MOTION TO STAY ALL
PROCEEDINGS PENDING THE SUPREME COURT'S DECISION IN**
***GRANTS PASS V JOHNSON***

No.

In The

## Supreme Court of the United States

———————

City of Grants Pass,

*Petitioner*,

v.

Gloria Johnson and John Logan, on Behalf of
Themselves and All Others Similarly Situated,

*Respondents*.

———————

**On Petition For A Writ Of Certiorari
To The United States Court Of Appeals
For The Ninth Circuit**

———————

**PETITION FOR A WRIT OF CERTIORARI**

———————

Jonathan C. Bond
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave., N.W.
Washington, D.C.  20036

Aaron P. Hisel
Capitol Legal Services
901 Capitol Street NE
Salem, OR  97301

Theane D. Evangelis
  *Counsel of Record*
Bradley J. Hamburger
Samuel Eckman
Daniel R. Adler
Patrick J. Fuster
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000
tevangelis@gibsondunn.com

*Counsel for Petitioner*

## QUESTION PRESENTED

In *Martin* v. *City of Boise*, 920 F.3d 584 (9th Cir. 2019), the Ninth Circuit held that the Cruel and Unusual Punishments Clause prevents cities from enforcing criminal restrictions on public camping unless the person has "access to adequate temporary shelter." *Id.* at 617 & n.8.  In this case, the Ninth Circuit extended *Martin* to a classwide injunction prohibiting the City of Grants Pass from enforcing its public-camping ordinance even through civil citations.  That decision cemented a conflict with the California Supreme Court and the Eleventh Circuit, which have upheld similar ordinances, and entrenched a broader split on the application of the Eighth Amendment to purportedly involuntary conduct.  The Ninth Circuit nevertheless denied rehearing en banc by a 14-to-13 vote.

The question presented is:

Does the enforcement of generally applicable laws regulating camping on public property constitute "cruel and unusual punishment" prohibited by the Eighth Amendment?

ii

## RELATED PROCEEDINGS

United States District Court (D. Or.)

*Blake* v. *City of Grants Pass*
No. 18-cv-1823 (Aug. 26, 2020)
(judgment entered)

United States Court of Appeals (9th Cir.)

*Johnson* v. *City of Grants Pass*
Nos. 20-35752, 20-35881 (July 5, 2023)
(amended opinion upon denial of rehearing)

iii

## TABLE OF CONTENTS

**Page**

OPINIONS BELOW .................................................. 1

JURISDICTION ....................................................... 2

CONSTITUTIONAL PROVISIONS INVOLVED ..... 2

INTRODUCTION ..................................................... 2

STATEMENT ........................................................... 6

REASONS FOR GRANTING THE PETITION ...... 15

I.   THE NINTH CIRCUIT'S DECISION ENTRENCHES A CONFLICT AMONG THE LOWER COURTS .......... 16

II.  THE NINTH CIRCUIT'S DECISION CONFLICTS WITH THIS COURT'S DECISIONS. ........................ 24

III. THE QUESTION PRESENTED IS EXCEPTIONALLY IMPORTANT .......................................................... 30

CONCLUSION ......................................................... 35

iv

## TABLE OF APPENDICES

**Page**

APPENDIX A:
Amended Opinion and Order of the
United States Court of Appeals for the
Ninth Circuit Denying Petition for
Panel Rehearing and Rehearing En Banc
(July 5, 2023) ......................................................1a

APPENDIX B:
Order of the United States District Court
for the District of Oregon Granting in Part
and Denying in Part Plaintiffs' Motion for
Summary Judgment; Denying Defendants'
Motion for Summary Judgment
(July 22, 2020) ................................................163a

APPENDIX C:
Order of the United States District Court
for the District of Oregon Granting
Plaintiffs' Motion for Class Certification
(June 5, 2020) ................................................206a

APPENDIX D:
Constitutional and Statutory
Provisions Involved ......................................221a

v

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen* v. *City of Sacramento*,
234 Cal. App. 4th 41 (2015) .................................17

*Bucklew* v. *Precythe*,
139 S. Ct. 1112 (2019)..........................................25

*City of Seattle* v. *Hill*,
435 P.2d 692 (Wash. 1967) ...................................22

*Coalition on Homelessness* v. *City & County of San Francisco*,
2022 WL 17905114 (N.D. Cal. Dec. 23, 2022).....31

*Driver* v. *Hinnant*,
356 F.2d 761 (4th Cir. 1966).........................22, 23

*Fund for Empowerment* v. *City of Phoenix*,
2022 WL 18213522 (D. Ariz. Dec. 16, 2022)...31, 32

*Georgia* v. *Public.Resource.Org, Inc.*,
140 S. Ct. 1498 (2020)..........................................29

*Harmelin* v. *Michigan*,
501 U.S. 957 (1991).............................................25

*Ingraham* v. *Wright*,
430 U.S. 651 (1977).......................3, 18, 25, 27, 28

*Joel* v. *City of Orlando*,
232 F.3d 1353 (11th Cir. 2000).....................17, 20

*Johnson* v. *City of Dallas*,
61 F.3d 442 (5th Cir. 1995)...........................17, 18

*Jones* v. *City of Los Angeles*,
444 F.3d 1118 (9th Cir. 2006)...................6, 23, 26

vi

*Jones* v. *City of Los Angeles*,
    505 F.3d 1006 (9th Cir. 2007)................................7

*In re Jones*,
    246 A.2d 356 (Pa. 1968) .......................................23

*Kahler* v. *Kansas*,
    140 S. Ct. 1021 (2020).........................................28

*In re Kemmler*,
    136 U.S. 436 (1890).............................................25

*Loveday* v. *State*,
    247 N.W.2d 116 (Wis. 1976) ...............................22

*Mahoney* v. *City of Sacramento*,
    2020 WL 616302 (E.D. Cal. Feb. 10, 2020).........32

*Manning* v. *Caldwell*,
    930 F.3d 264 (4th Cir. 2019).........................23, 28

*Marks* v. *United States*,
    430 U.S. 188 (1977)...............................................4

*Martin* v. *City of Boise*,
    902 F.3d 1031 (9th Cir. 2018)...............................2

*Martin* v. *City of Boise*,
    920 F.3d 584 (9th Cir. 2019).........2, 3, 7, 8, 18, 22,
                          25, 26, 29, 30, 32

*United States ex rel. Mudry* v. *Rundle*,
    429 F.2d 1316 (3d Cir. 1970) ...............................21

*People* v. *Hoy*,
    158 N.W.2d 436 (Mich. 1968) ..............................22

*People* v. *Jones*,
    251 N.E.2d 195 (Ill. 1969)....................................22

*Pottinger* v. *City of Miami*,
    810 F. Supp. 1551 (S.D. Fla. 1992).....................26

vii

*Powell* v. *Texas*,
　392 U.S. 514 (1968)...........4, 19, 20, 23, 27, 28, 29

*Railroad Retirement Bd.* v. *Fritz*,
　449 U.S. 166 (1980)..............................................29

*Rangel* v. *State*,
　444 S.W.2d 924 (Tex. Crim. App. 1969)..............22

*Robinson* v. *California*,
　370 U.S. 660 (1962)...........4, 18, 19, 23, 24, 26, 27

*Rosser* v. *Housewright*,
　664 P.2d 961 (Nev. 1983).....................................22

*Shelburne* v. *State*,
　446 P.2d 58 (Okla. Crim. App. 1968) .................22

*Smith* v. *Follette*,
　445 F.2d 955 (2d Cir. 1971) ................................21

*Solem* v. *Helm*,
　463 U.S. 277 (1983)..............................................27

*State* v. *Adams*,
　91 So. 3d 724 (Ala. Crim. App. 2010) .................23

*State* v. *Little*,
　261 N.W.2d 847 (Neb. 1978)................................22

*State* v. *Margo*,
　191 A.2d 43 (N.J. 1963).......................................22

*State* v. *Mendoza*,
　454 P.2d 140 (Ariz. 1969)....................................22

*State* v. *Robinson*,
　254 P.3d 183 (Utah 2011) ....................................22

*State* v. *Smith*,
　219 N.W.2d 655 (Iowa 1974)................................22

viii

*State* v. *Smith*,
355 A.2d 257 (Conn. 1974).................................22

*Steeves* v. *State*,
178 N.W.2d 723 (Minn. 1970).............................22

*Tobe* v. *City of Santa Ana*,
892 P.2d 1145 (Cal. 1995).............................17, 22

*United States* v. *Black*,
116 F.3d 198 (7th Cir. 1997).........................20, 21

*United States* v. *Moore*,
486 F.2d 1139 (D.C. Cir. 1973).....................21, 24

*United States* v. *Sirois*,
898 F.3d 134 (1st Cir. 2018) ...............................20

*Vick* v. *State*,
453 P.2d 342 (Alaska 1969) ................................22

*Warren* v. *City of Chico*,
2021 WL 2894648 (E.D. Cal. July 8, 2021)...30, 31

*Washington* v. *Glucksberg*,
521 U.S. 702 (1997).............................................26

*Wheeler* v. *United States*,
276 A.2d 722 (D.C. 1971) ....................................22

*Yanez* v. *Romero*,
619 F.2d 851 (10th Cir. 1980)..............................21

**Constitutional Provisions**

U.S. Const. amend. VIII........................................2, 25

**Statutes**

28 U.S.C. § 1254 ....................................................2

Grants Pass Municipal Code § 5.61.010....................9

Grants Pass Municipal Code § 5.61.020....................9

ix

Grants Pass Municipal Code § 5.61.030 .................... 9

Grants Pass Municipal Code § 6.46.090 .................... 9

Grants Pass Municipal Code § 6.46.350 .................... 9

**Other Authorities**

Anna Gorman & Kaiser Health News,
    *Medieval Diseases Are Infecting*
    *California's Homeless*, The Atlantic
    (Mar. 8, 2019) ........................................................ 33

Christal Hayes, *'The World Doesn't Care':*
    *Homeless Deaths Spiked During*
    *Pandemic, Not from COVID. From Drugs.*,
    USA Today (May 28, 2022) ................................. 33

Editorial Board, *Why San Francisco Is a*
    *Homeless Mecca*, Wall St. J. (Aug. 6, 2023) ........ 31

Eli Saslow, *A Sandwich Shop, a Tent City*
    *and an American Crisis*, N.Y. Times
    (Mar. 31, 2023) ................................................... 32

Eric Leonard, *LAPD Concerned About Increase*
    *in Sexual Violence Against Women*
    *Experiencing Homelessness* (Feb. 27, 2020) ........ 33

Jennifer Medina, *Los Angeles Fire Started*
    *in Homeless Encampment, Officials*
    *Say*, N.Y. Times (Dec. 12, 2017) .......................... 34

Michael Corkery, *Fighting for Anthony:*
    *The Struggle to Save Portland,*
    *Oregon*, N.Y. Times (July 29, 2023) .................... 33

Natalie O'Neill, *Blazes That Begin in*
    *Homeless Camps Now Account for*
    *Nearly Half the Fires in Portland*,
    Willamette Week (Nov. 2, 2022) .......................... 34

x

*Recent Killings in Los Angeles and New York Spark Anger, Raise Risk for Homeless People*, KTLA (Jan. 28, 2022) ..............................33

Sam Quinones, *Skid Row Nation: How L.A.'s Homelessness Crisis Response Spread Across the Country*, L.A. Mag. 108 (Oct. 6, 2022) .................................................33, 34

Thomas Fuller, *Death on the Streets*, N.Y. Times (Apr. 25, 2022) ..................................33

IN THE

# Supreme Court of the United States

No.

CITY OF GRANTS PASS,

*Petitioner*,

v.

GLORIA JOHNSON AND JOHN LOGAN, ON BEHALF OF
THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

*Respondents*.

**On Petition For A Writ Of Certiorari
To The United States Court Of Appeals
For The Ninth Circuit**

**PETITION FOR A WRIT OF CERTIORARI**

The City of Grants Pass, Oregon, respectfully petitions for a writ of certiorari to review the judgment of the United States Court of Appeals for the Ninth Circuit in this case.

## OPINIONS BELOW

The Ninth Circuit's amended opinion, together with its order denying the City's petition for panel rehearing or rehearing en banc (App., *infra*, 1a-162a), is reported at 72 F.4th 868. The district court's order on the parties' cross-motions for summary judgment (App., *infra*, 163a-205a) is not reported but is available at 2020 WL 4209227. An earlier order of the district court on class certification (App., *infra*, 206a-

2

220a) is not reported but is available at 2019 WL 3717800.

## JURISDICTION

The Ninth Circuit issued its original opinion on September 28, 2022, and issued an amended opinion and order denying rehearing on July 5, 2023. The jurisdiction of this Court is invoked under 28 U.S.C. § 1254(1).

## CONSTITUTIONAL PROVISIONS INVOLVED

The Eighth Amendment to the Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

Relevant ordinances are reproduced in the appendix to the petition. App., *infra*, 221a-224a.

## INTRODUCTION

The Ninth Circuit has decided that enforcement of commonplace restrictions on public camping constitutes "cruel and unusual punishment" within the meaning of the Eighth Amendment. When the Ninth Circuit first announced this rule in *Martin* v. *City of Boise*, 902 F.3d 1031 (9th Cir. 2018), amended on denial of reh'g, 920 F.3d 584 (9th Cir. 2019), six judges criticized the decision as a constitutional aberration that deviated from this Court's decisions and split from the lower courts. They also predicted that *Martin* would paralyze cities across the West in addressing urgent safety and public-health risks created by an ever-growing sprawl of tents and makeshift structures. The panel in *Martin* responded that its ruling was "narrow" and would leave ample leeway to cities on the frontlines of the homelessness crisis. 920 F.3d

3

at 617.  Five years under *Martin* has proved the dissenters right—and then some.

This case offered the Ninth Circuit an opportunity to correct course.  Instead, it doubled down on *Martin*, extending that ruling to civil citations and affirming a classwide injunction against the City of Grants Pass's enforcement of its ordinance prohibiting camping on public property.  The full Ninth Circuit then denied rehearing en banc by the slimmest of margins— 14 to 13—over the objections of 17 active and senior judges, who explained that the Ninth Circuit should have reconsidered this ill-conceived judicial experiment.

The Ninth Circuit's decisions have no foundation in the Constitution's original meaning or our Nation's history and traditions.  The Cruel and Unusual Punishments Clause (as its name suggests) prohibits "'*methods* of punishment'" that inflict unnecessary pain and have fallen out of use.  *Martin*, 920 F.3d at 601 (Bennett, J., dissenting from denial of rehearing en banc).  As Judge O'Scannlain explained, that provision does not have "anything to do with the jurisprudence" the Ninth Circuit has created for public-camping ordinances.  App., *infra*, 122a (statement respecting denial of rehearing en banc).  There is nothing cruel or unusual about a civil fine for violating commonplace restrictions on public camping.

Consistent with that original meaning, this Court has recognized that the "'primary purpose'" of the Cruel and Unusual Punishments Clause "'has always been considered, and properly so, to be directed at the method or kind of punishment imposed for the violation of criminal statutes.'"  *Ingraham* v. *Wright*, 430 U.S. 651, 667 (1977).  Only once has this Court held that the Eighth Amendment imposes a substantive

4

limit on *what* can be made a crime as opposed to *how* a crime could be punished. In *Robinson* v. *California*, 370 U.S. 660 (1962), this Court decided that the Eighth Amendment forbids punishing the *status* of being a drug addict, even if it permits prosecutions for the *act* of using drugs.

The Ninth Circuit concluded that the Cruel and Unusual Punishments Clause protects the conduct of camping on public property through a misreading of *Robinson* and the splintered decision in *Powell* v. *Texas*, 392 U.S. 514 (1968). In *Powell*, Justice Marshall, writing for a four-Justice plurality, rejected an Eighth Amendment defense because the defendant was punished for the act of being drunk in public, not the status of being an alcoholic. Justice Fortas's dissent (also for four Justices) advanced a diametrically opposed view: that *Robinson* prohibits punishing behavior that a defendant has no power to change. Concurring in the judgment, Justice White opined that the Eighth Amendment might prohibit enforcement of the challenged law if the defendant had no place else to go, but explained that it was unnecessary to decide that issue because the defendant had not proved he had no choice but to be drunk in public on the night in question.

In *Martin* and this case, the Ninth Circuit read the *Powell* dissent together with Justice White's dicta to create the rule that the Eighth Amendment prohibits punishment for conduct that purportedly flows from a status. That dissent-plus-concurrence-dicta approach is impossible to square with *Marks* v. *United States*, 430 U.S. 188 (1977), which directs lower courts interpreting fractured decisions to examine only the views of Justices *concurring* in the judgment. And regardless of which opinion is controlling on lower

5

courts under *Marks*, the Ninth Circuit's understanding of *Powell* is at odds with both the Eighth Amendment's focus on methods of punishment and this Court's consistent recognition that Justice Marshall's plurality opinion—not Justice White's concurrence or the dissent—embodies the true statement of constitutional principles.

In deciding that the enforcement of public-camping ordinances constitutes cruel and unusual punishment, the Ninth Circuit has parted ways with the California Supreme Court and the Eleventh Circuit, both of which have upheld virtually identical ordinances against similar challenges. The Ninth Circuit's holding that the Eighth Amendment protects conduct related to status also deepened a longstanding divide among the lower courts. On one side, seven circuits and 17 state courts of last resort have held that the government may punish *acts* (like drug use and sex with minors) even if they cannot punish mere *status* (like being a drug addict or pedophile). On the other side, the Ninth and Fourth Circuits, as well as two state courts, have extended the Eighth Amendment to conduct that purportedly follows from a status.

Time is of the essence for this exceptionally important question. The Ninth Circuit, though nearly evenly split, has made clear that it will not clean up its outlier decisions on its own. But these decisions have erected a judicial roadblock preventing a comprehensive response to the growth of public encampments in the West. The consequences of inaction are dire for those living both in and near encampments: crime, fires, the reemergence of medieval diseases, environmental harm, and record levels of drug overdoses and deaths on public streets. The decision below,

6

which reaffirms and extends *Martin*, will further hamstring cities at the worst possible time.

The Ninth Circuit's arrogation of quintessential policymaking authority over public health and safety has struck a blow not only to the principle of democratic governance, but also to the practical ability of cities to address the growth of public encampments. Only this Court can end this misguided project of federal courts dictating homelessness policy under the banner of the Eighth Amendment.

## STATEMENT

A.  The Ninth Circuit's creation of a right to public camping under the Cruel and Unusual Punishments Clause began two decades ago in Los Angeles.  In *Jones* v. *City of Los Angeles*, 444 F.3d 1118 (9th Cir. 2006), people living on Skid Row brought an Eighth Amendment claim against an ordinance that prohibited sitting, lying, or sleeping on streets, sidewalks, and other public ways.  *Id.* at 1123-1125.  The district court upheld the ordinance "because it penalizes conduct, not status." *Id.* at 1125.  A divided panel of the Ninth Circuit reversed, holding that the Eighth Amendment protects "involuntary conduct" (such as sleeping on public property) that is "inseparable from [the] status" of homelessness. *Id.* at 1136.  The majority arrived at this rule by combining two separate *Powell* opinions—Justice White's concurrence and Justice Fortas's dissent. *Id.* at 1134-1136.  Dissenting, Judge Rymer objected that this "extension of the Eighth Amendment to conduct that is derivative of status takes the substantive limits on criminality further than *Robinson* or its progeny support." *Id.* at 1143.  After Los Angeles sought rehearing en banc, the parties settled the case, and the Ninth Circuit

7

vacated its opinion. *Jones* v. *City of Los Angeles*, 505 F.3d 1006 (9th Cir. 2007).

The Ninth Circuit resurrected the *Jones* rationale soon enough. In *Martin* v. *City of Boise*, 920 F.3d 584 (9th Cir. 2019), people living on the streets of Boise claimed that punishing public camping with fines or short jail stints violates the Eighth Amendment. *Id.* at 606. The Ninth Circuit held that any punishment for public camping, no matter how small, would be cruel and unusual if the plaintiffs had "no access to alternative shelter," repeating "essentially the same reasons articulated in the now-vacated *Jones* opinion." *Id.* at 615.

The Ninth Circuit again read Justice White's concurrence and Justice Fortas's dissent in *Powell* together to establish that "'the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being.'" 920 F.3d at 616. That rule meant that Boise could not enforce its public-camping ordinance "'so long as there is a greater number of homeless individuals in a jurisdiction than the number of available beds in shelters.'" *Id.* at 617 (brackets omitted). The court also disregarded open beds in religiously affiliated shelters out of perceived Establishment Clause concerns. *Id.* at 609-610. The Ninth Circuit stated, however, that its decision left open the possibility of enforcement against "individuals who *do* have access to adequate temporary shelter" but "choose not to use it." *Id.* at 617 n.8.

The Ninth Circuit denied rehearing en banc over two separate dissents. Judge Milan Smith explained that *Martin* misapplied *Powell* and invalidated the ordinances of "countless, if not all, cities within" the Ninth Circuit. 920 F.3d at 590-594, 599. He also

8

predicted that the "overwhelming financial responsibility to provide housing for or count the number of homeless individuals within their jurisdiction every night" would force cities to "abandon enforcement of a host of laws regulating public health and safety." *Id.* at 594. Judge Bennett separately canvassed the "text, tradition, and original public meaning" of the Cruel and Unusual Punishments Clause and found no authority for courts to impose "substantive limits on what conduct a state may criminalize." *Id.* at 599-602. In his view, *Martin* "stretche[d] the Eighth Amendment past its breaking point." *Id.* at 603.

Boise petitioned this Court for a writ of certiorari. No. 19-247. Expressing concern about the widespread impact of *Martin*, dozens of amici argued in favor of review, including seven States and 45 counties, cities, and local homeless service providers. After the plaintiffs claimed that *Martin* would "leave[] cities with a powerful toolbox to address encampments" and urged this Court "to await the contours of [*Martin's*] rule to be elucidated in subsequent cases," Br. in Opp. 29-30, this Court denied the petition, *City of Boise* v. *Martin*, 140 S. Ct. 674 (2019).

B. The effects of *Martin* immediately reverberated throughout the Ninth Circuit, as the dissenting judges and amici had predicted. Three days after the Ninth Circuit's initial September 2018 ruling, a plaintiff filed a follow-on suit against Portland. Compl., *O'Callaghan* v. *City of Portland*, No. 3:18-cv-1641-YY (D. Or. Sept. 7, 2018). Over the ensuing months, more plaintiffs pursued *Martin* theories. *E.g.*, Compl., *Miralle* v. *City of Oakland*, No. 4:18-cv-6823 (N.D. Cal. Nov. 9, 2018).

1. This wave affected cities big and small. Just six weeks after the Ninth Circuit handed down

9

*Martin*, three people brought *Martin* claims against Grants Pass, a city of 38,000 in southern Oregon. App., *infra*, 13a.

Like many cities and towns across the country, Grants Pass protects public health and safety by regulating the public's ability to camp or sleep overnight in its outdoor spaces, including parks, trails, and sidewalks.  App., *infra*, 221a-224a.  Grants Pass has adopted three ordinances related to public sleeping and camping.  The first prohibits sleeping "on public sidewalks, streets, or alleyways at any time as a matter of individual and public safety."  Grants Pass Municipal Code § 5.61.020(A).  The second prohibits "[c]amping" on "any sidewalk, street, alley, lane, public right of way, park, bench, or any other publicly-owned property or under any bridge or viaduct," with a "[c]ampsite" defined as "any place where bedding, sleeping bag, or other material used for bedding purposes, or any stove or fire is placed." §§ 5.61.010(B), 5.61.030.  And the third prohibits camping specifically in the City's parks.  § 6.46.090.

Grants Pass enforces these ordinances through civil citations, not through criminal fines or jail terms. App., *infra*, 44a, 175a.  If a person has twice been cited for violating park regulations, city officers also have authority to issue an exclusion order barring that person from a City park for 30 days.  Grants Pass Municipal Code § 6.46.350.

As relevant here, the plaintiffs claimed that the City's public-sleeping, public-camping, and park-exclusion ordinances violate the Cruel and Unusual Punishments Clause.  App., *infra*, 19a.  They also promptly moved to certify a class of "[a]ll involuntarily homeless individuals living in Grants Pass."  *Id.* at 20a.

10

2. The district court certified the proposed class. App., *infra*, 206a-220a. According to the court, the Eighth Amendment claim concerned "city-wide practice[s]" in enforcing the public-sleeping and public-camping ordinances. *Id.* at 214a-215a. The court also believed that all class members could prove that they were "involuntarily" homeless under *Martin* solely because "[t]here are more homeless individuals than shelter beds in the City of Grants Pass." *Id.* at 216a.

On cross-motions for summary judgment, the district court ruled for the plaintiffs on their claim that enforcement of the City's ordinances constitutes cruel and unusual punishment. App., *infra*, 163a-205a. The court understood *Martin* to establish a "mathematical ratio" that prevents the City from enforcing its ordinances unless a shelter bed within the City's borders is available for every homeless person. *Id.* at 179a. After finding that 602 class members qualified as homeless, the court concluded that *zero* shelter alternatives satisfied *Martin*, discounting 138 beds at Gospel Rescue Mission due to "substantial religious requirements," nearby campgrounds on federal land, a warming shelter, and a sobering center. *Id.* at 179a-183a.

The district court also extended *Martin* in two ways. First, the court held that *Martin* protects not only sleeping on public property, but also camping with "bedding." App., *infra*, 177a-179a. Second, the court (citing decisions applying the Excessive Fines Clause) concluded that the Cruel and Unusual Punishments Clause prohibits even *civil* enforcement of the City's ordinances. *Id.* at 183a-187a.

The district court subsequently entered a judgment enjoining Grants Pass from enforcing its public-camping ordinances during daytime hours without

11

first giving a 24-hour warning, and at nighttime hours entirely.  App., *infra*, 24a-25a.

3. A divided panel of the Ninth Circuit affirmed the district court's rulings in large part and remanded for further proceedings.    App., *infra*, 13a-58a (amended opinion issued upon denial of rehearing).

a. In an opinion authored by Judge Silver (D. Ariz.) and joined by Judge Gould, the majority affirmed the district court's determination that the Cruel and Unusual Punishments Clause invalidates Grants Pass's public-camping ordinances. App., *infra*, 42a-55a.  The majority reasoned that "the number of homeless persons outnumber the available shelter beds" in "secular shelter space." *Id.* at 13a, 53a. The majority also held that this Eighth Amendment claim could be decided on a classwide basis even though Grants Pass had argued that the class lacked commonality "because some class members might have alternative options for housing, or might have the means to acquire their own shelter." *Id.* at 39a. According to the majority, the class definition eliminated such individualized issues because "the class includes only *involuntarily* homeless persons," meaning that people with access to alternative shelter "simply are never class members." *Id.* at 39a-41a.  The majority also approved the district court's extension of *Martin* to civil citations and to camping with bedding. *Id.* at 44a-47a.

The majority remanded with instructions for the district court to consider whether to narrow the injunction to allow Grants Pass to enforce its public-camping ordinances against the use of stoves and fires.  App., *infra*, 55a.  The majority also vacated summary judgment as to only the public-sleeping ordinance and remanded for the district court to

12

consider whether to substitute a new class representative for a plaintiff who passed away while the case was on appeal—the only one of the three who had standing to challenge the public-sleeping regulation. *Id.* at 25a n.12, 30a-32a.

b. Dissenting, Judge Collins criticized *Martin* for "combining *dicta* in a concurring opinion with a *dissent*" to mint a new constitutional rule—that the Eighth Amendment forbids punishment for any act that "is, in some sense, involuntary or occasioned by a compulsion"—in conflict with this Court's precedents. App., *infra*, 93a-95a (quotation marks omitted). That decision has had "'dire practical consequences'" for hundreds of cities and millions of people over the past five years. *Id.* at 95a.

Judge Collins further explained that the majority had manipulated the class definition to reduce *Martin* "to a simplistic formula": "whether the number of homeless persons . . . exceeds the number of available shelter beds." App., *infra*, 84a-86a. The majority's "egregiously flawed reconceptualization and extension of *Martin*'s holding," he feared, would mean that other cities could come under classwide injunctions "effectively requiring" them to "allow the use of [their] public parks as homeless encampments." *Id.* at 95a. Judge Collins called for the Ninth Circuit or this Court to overrule *Martin* and the present decision "at the earliest opportunity." *Ibid.*

4. The Ninth Circuit denied Grants Pass's petition for rehearing en banc over the dissent of 13 active judges (one short of a majority). App., *infra*, 12a.

a. All 13 dissenting active judges and four senior judges joined five separate opinions calling for en banc review. App., *infra*, 117a-162a.

13

Judge O'Scannlain, joined by 14 judges, explained that the Ninth Circuit has departed from the Constitution's original meaning, this Court's precedents, and decisions of other appellate courts, none of which has been "bold enough to embrace an Eighth Amendment doctrine that effectively requires local communities to surrender their sidewalks and other public places to homeless encampments." App., *infra*, 122a-131a (O'Scannlain, J., respecting denial of rehearing en banc). He also blamed *Martin* for both "paralyzing local communities from addressing the pressing issue of homelessness, and seizing policymaking authority that our federal system of government leaves to the democratic process"—twin problems that "will be greatly worsened by the doctrinal innovations introduced" in this case. *Id.* at 117a, 131a-133a.

Judge Milan Smith, joined by eight judges, denounced the "status quo" under *Martin* that "fails both those in the homeless encampments and those near them," as crime, drug use, and disease proliferate. App., *infra*, 138a-139a (M. Smith, J., dissenting from denial of rehearing en banc). He pointed out that this decision "doubles down on *Martin*—crystallizing *Martin* into a crude population-level inquiry, greenlighting what should be (at most) an individualized inquiry for class-wide litigation, and leaving local governments without a clue of how to regulate homeless encampments without risking legal liability." *Id.* at 142a; see *id.* at 146a-151a. And after reviewing litigation against cities such as San Francisco and Phoenix, he observed that *Martin* has "require[d] unelected federal judges" to act "like homelessness policy czars" instead of "Article III judges applying a discernible rule of law." *Id.* at 151a-156a.

14

Judge Collins reiterated his critiques of *Martin* and stated that Judges O'Scannlain and Smith had "further cogently explain[ed] the multiple serious errors in the panel majority's opinion." App., *infra*, 157a.

Judge Bress, joined by 11 judges, wrote that the Constitution grants "local leaders—and the people who elect them—the latitude to address on the ground the distinctly local features of the present crisis of homelessness and lack of affordable housing," and that the Ninth Circuit's "expanding constitutional common law" of the Eighth Amendment "adds enormous and unjustified complication to an already extremely complicated set of circumstances." App., *infra*, 161a-162a (Bress, J., dissenting from denial of rehearing en banc).

Judge Graber criticized the panel for extending "*Martin* to *classwide* relief" and "enjoining *civil* statutes." App., *infra*, 135a (Graber, J., respecting denial of rehearing en banc). Although she largely agreed with *Martin*, she also said that, "given the widespread nature of the homelessness crisis in our jurisdiction," it was "crucial" for the Ninth Circuit to rehear this case to "get it right." *Id.* at 136a-137a.

b. The panel majority filed a joint statement responding to Judges O'Scannlain and Smith and defending their decision as "modest" and "exceptionally limited." App., *infra*, 96a-116a. In his dissent from denial of rehearing, Judge Collins disputed those characterizations and explained that "the panel majority's statement confirms and illustrates the layers of self-contradiction that underlie its opinion in this case." *Id.* at 158a.

15

**REASONS FOR GRANTING THE PETITION**

The Ninth Circuit has now repeatedly held that enforcement of restrictions on public camping constitutes "cruel and unusual punishment" under the Eighth Amendment. By contrast, the California Supreme Court and the Eleventh Circuit have upheld public-camping ordinances against similar constitutional challenges. The Fifth Circuit, too, has rejected such a challenge on the ground that the Eighth Amendment does not apply at all to citations for public camping but only to punishment following a conviction.

This dispute over restrictions on public camping is part of a larger conflict over the Eighth Amendment's scope. A few courts, including the Ninth and Fourth Circuits, have interpreted this Court's decisions in *Robinson* and *Powell* as holding that the government cannot punish conduct that necessarily follows from a status. In contrast, seven federal courts of appeals and 17 state courts of last resort have rejected that approach, drawing a bright line between conduct (which can be punished) and status (which cannot).

The minority view has no foundation in the Eighth Amendment's text, history, and tradition. As this Court has long held, the Cruel and Unusual Punishments Clause prohibits certain *types* of punishments. With the lone exception of *Robinson*, the Court has never held that the Eighth Amendment sets substantive limits on what can be a crime in the first place. That one-off holding should be limited to punishment for mere status, not expanded to conduct that arguably follows from a status.

16

To extend *Robinson* to purportedly involuntary conduct related to a status, the Ninth Circuit relied on dicta in Justice White's *Powell* concurrence as a basis to adopt the rule advocated by Justice Fortas in dissent. But that approach takes the wrong path through *Powell* and so arrives at the wrong destination. In *Marks*, this Court held that lower courts should rely on the opinions of the Justices *concurring* in the judgment. And since *Powell*, this Court has repeatedly applied Justice Marshall's plurality opinion and never even hinted that the correct interpretation of the Eighth Amendment lay hidden in Justice White's dicta and Justice Fortas's dissent.

The question presented in this case is indisputably important. Across the West, cities face a growing humanitarian tragedy. Hundreds of thousands of people camp in public, their tents and belongings overtaking sidewalks, parks, and trails. Cities want to help those in encampments get the services they need while ensuring that our communities remain safe, but they find themselves hamstrung in responding to public encampments and the drug overdoses, murders, sexual assaults, diseases, and fires that inevitably accompany them. Even when coupled with offers of shelter and other services, efforts to enforce commonsense camping regulations have been met with injunctions. Restoring to local governments their rightful authority to address this pressing and complex crisis and get people the help they desperately need is a critical step to solving this crisis.

## I. THE NINTH CIRCUIT'S DECISION ENTRENCHES A CONFLICT AMONG THE LOWER COURTS

A. The Ninth Circuit alone recognizes a "constitutional 'right' to encamp on public property." App., *infra*, 128a (opinion of O'Scannlain, J.). The

17

California Supreme Court, Eleventh Circuit, and Fifth Circuit have rejected similar challenges under the Eighth Amendment.

1. The federal and state courts in California—home to half of the Nation's unsheltered homeless population—are divided on the question presented. In *Tobe* v. *City of Santa Ana*, 892 P.2d 1145 (Cal. 1995), plaintiffs challenged an ordinance prohibiting "'any person to camp, occupy camp facilities or use camp paraphernalia in . . . any street [or] any public parking lot or public area.'" *Id.* at 1150. The California Court of Appeal invalidated the ordinance under *Robinson* as "punishment for the 'involuntary status of being homeless.'" *Id.* at 1166. But the California Supreme Court reversed, explaining that "[t]he ordinance permits punishment for proscribed conduct, not punishment for status." *Ibid.* California courts have continued to uphold public-camping ordinances under the act/status distinction. *E.g.*, *Allen* v. *City of Sacramento*, 234 Cal. App. 4th 41, 59-60 (2015).

The Eleventh Circuit reached a similar result in *Joel* v. *City of Orlando*, 232 F.3d 1353 (11th Cir. 2000). There, homeless plaintiffs challenged an ordinance prohibiting unauthorized camping "on all public property." *Id.* at 1356. The Eleventh Circuit upheld the ordinance because it "target[ed] conduct, and d[id] not provide criminal punishment based on a person's status." *Id.* at 1362. The Eleventh Circuit also suggested that "homelessness is not a 'status' within the meaning of the Eighth Amendment" in any event. *Ibid.*

The Fifth Circuit rejected another challenge at an earlier step of the analysis. In *Johnson* v. *City of Dallas*, 61 F.3d 442 (5th Cir. 1995), a district court enjoined the enforcement of a public-sleeping ordinance against homeless people who had been ticketed for

18

violations. *Id.* at 443. The Fifth Circuit reversed on the ground that the Eighth Amendment applies only to punishment following a conviction. *Id.* at 445. Although the Fifth Circuit labeled the defect as a lack of Article III standing, its analysis focused on the Eighth Amendment's scope. *Id.* at 444-445 (relying on *Ingraham* v. *Wright*, 430 U.S. 651 (1977)).

2. The Ninth Circuit's precedents conflict with these decisions. In contrast to the California Supreme Court's and Eleventh Circuit's adoption of the act/status distinction, the Ninth Circuit has now twice invalidated public-camping ordinances under "the principle that 'the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being.'" App., *infra*, 50a (quoting *Martin*, 920 F.3d at 616). The Ninth Circuit also held that such Eighth Amendment challenges may be raised *before* conviction, breaking with the Fifth Circuit's decision in *Johnson*. *Martin*, 920 F.3d at 613-614.

B. More broadly, the Ninth Circuit is "locked in a deep and varied intercircuit split over how to read the Eighth Amendment in light of *Robinson* and *Powell*." App., *infra*, 130a (opinion of O'Scannlain, J.). That split is even deeper when one considers state courts of last resort. In total, 24 courts have held the line at the act/status distinction, and only four subscribe to the view that the Eighth Amendment protects involuntary conduct linked to a supposed status.

1. In *Robinson*, this Court confronted an unusual California statute providing that "'[n]o person shall . . . be addicted to the use of narcotics.'" 370 U.S. at 660 n.1. This statute "ma[de] the 'status' of narcotic addiction a criminal offense" even absent "proof of the actual use of narcotics within the State's

19

jurisdiction." *Id.* at 665-666.  Although this Court
held that the defendant's 90-day sentence for addic-
tion was cruel and unusual punishment, this Court
explained that California *could* prohibit "manufac-
ture, prescription, sale, purchase, or possession of nar-
cotics within its borders"—even by drug addicts—so
long as the law didn't penalize "the 'status' of narcotic
addiction." *Id.* at 664-667.

This Court revisited the act/status distinction in
*Powell*, where an alcoholic sought to extend *Robinson*
to purportedly involuntary conduct: his public drunk-
enness.  Justice Marshall, writing for a four-Justice
plurality, explained that *Robinson* stands for the
proposition that "criminal penalties may be inflicted
only if the accused has committed some act" that "so-
ciety has an interest in preventing"—or put in "histor-
ical common law terms, has committed some *actus
reus*." 392 U.S. at 533.  To forestall "this Court from
becoming, under the aegis of the Cruel and Unusual
Punishment Clause, the ultimate arbiter of the stand-
ards of criminal responsibility," the plurality rejected
the defendant's proposed extension of *Robinson* from
status to conduct that "is, in some sense, 'involuntary'
or 'occasioned by a compulsion.'" *Ibid.*

Justice Black concurred to underscore the "sound"
distinction between "pure status crimes" and "crimes
that require the State to prove that the defendant ac-
tually committed some proscribed act." *Powell,* 392
U.S. at 542-544.

Justice White, who concurred only in the result,
ventured that the Eighth Amendment might protect
public drunkenness when alcoholics "have no place
else to go and no place else to be when they are drink-
ing," but found this admittedly "novel construction" of
the Amendment "unnecessary to pursue at this point"

20

because the defendant hadn't proved his alcoholism made him "unable to stay off the streets on the night in question." *Powell*, 392 U.S. at 551-554 & n.4.

Finally, Justice Fortas penned a four-Justice dissent advancing the theory that *Robinson* immunizes a person from punishment for "being in a condition he is powerless to change." *Powell*, 392 U.S. at 567.

2. Seven circuits have followed the *Powell* plurality in holding that *Robinson* applies only to status crimes and does not immunize conduct supposedly associated with a status:

- In this precise context of a public-camping ordinance, the Eleventh Circuit agreed with the *Powell* plurality that "[a] distinction exists between applying criminal laws to punish conduct, which is constitutionally permissible, and applying them to punish status, which is not." *Joel*, 232 F.3d at 1361-1362.

- In *United States* v. *Sirois*, 898 F.3d 134 (1st Cir. 2018), the First Circuit rejected a defendant's argument that a district court committed plain error under the Eighth Amendment when revoking supervised release for drug use that was "compelled by his addiction." *Id.* at 137-138.

- In *United States* v. *Black*, 116 F.3d 198 (7th Cir. 1997), the Seventh Circuit rejected an Eighth Amendment defense by a defendant with a compulsive desire to collect child pornography. *Id.* at 201. The court reasoned that "*Robinson* is simply inapposite on its face because the statutes involved here do not criminalize the statuses of pedophile or ephebophile," but rather the "conduct of

21

receiving, possessing and distributing child pornography," and that Justice White's concurrence "need not be discussed further" because "no other Justice joined in that opinion." *Id.* at 201 & n.2.

- In *Yanez* v. *Romero*, 619 F.2d 851 (10th Cir. 1980), the Tenth Circuit held that "[a] reading of the decision in *Robinson* and that in *Powell* makes clear" that States can prohibit drug possession even by addicts. *Id.* at 852.

- In *United States* v. *Moore*, 486 F.2d 1139 (D.C. Cir. 1973) (en banc), a majority of a fractured D.C. Circuit endorsed the *Powell* plurality in rejecting an "Eighth Amendment defense for the addict-possessor" of drugs. *Id.* at 1153-1154 (plurality opinion); *id.* at 1197-1198 (Leventhal, J., concurring).

- In *Smith* v. *Follette*, 445 F.2d 955 (2d Cir. 1971), the Second Circuit agreed with the *Powell* plurality that *Robinson* "was in no way intended to stand for the proposition that those who affirmatively commit crimes because of their condition may not be punished"—there, for drug possession that "was the result in some degree of a socially developed compulsion." *Id.* at 961.

- In *United States ex rel. Mudry* v. *Rundle*, 429 F.2d 1316 (3d Cir. 1970) (per curiam), the Third Circuit held that *Robinson* and *Powell* allow States to forbid drug possession by addicts. *Id.* at 1316.

In addition to those seven circuits, 17 state courts of last resort have limited *Robinson* to status crimes. They, like the *Powell* plurality, have rejected claims

22

that the Eighth Amendment protects conduct associated with homelessness,[1] alcoholism,[2] drug addiction,[3] and sexual compulsions.[4]

3. The Ninth Circuit sees *Robinson* and *Powell* in a very different light. According to the Ninth Circuit, those decisions overrode the act/status distinction and compelled the conclusion that "a person may not be prosecuted for conduct that is involuntary or the product of a 'status.'" App., *infra*, 47a (citing *Martin*, 920 F.3d at 617); *id.* at 109a (statement of Gould and Silver, JJ.).

Among the federal courts of appeals, only the Fourth Circuit has joined the Ninth Circuit in extending *Robinson* to conduct that flows from a status. Its initial foray was *Driver* v. *Hinnant*, 356 F.2d 761 (4th Cir. 1966), where the Fourth Circuit reasoned that if *Robinson* forbids punishment for the status of being an alcoholic, then the Eighth Amendment should also forbid punishment for "an involuntary symptom of a

---

[1] *Tobe*, 892 P.2d at 1166.

[2] *Rosser* v. *Housewright*, 664 P.2d 961, 962-963 (Nev. 1983) (per curiam); *Loveday* v. *State*, 247 N.W.2d 116, 121 (Wis. 1976); *Vick* v. *State*, 453 P.2d 342, 343-344 (Alaska 1969); *Shelburne* v. *State*, 446 P.2d 58, 59 (Okla. Crim. App. 1968); *People* v. *Hoy*, 158 N.W.2d 436, 445 (Mich. 1968); *City of Seattle* v. *Hill*, 435 P.2d 692, 698-699 (Wash. 1967).

[3] *State* v. *Robinson*, 254 P.3d 183, 191 & n.41 (Utah 2011); *State* v. *Smith*, 355 A.2d 257, 259-260 (Conn. 1974); *State* v. *Smith*, 219 N.W.2d 655, 657 (Iowa 1974); *Wheeler* v. *United States*, 276 A.2d 722, 726 (D.C. 1971); *Steeves* v. *State*, 178 N.W.2d 723, 726 (Minn. 1970); *Rangel* v. *State*, 444 S.W.2d 924, 925-926 (Tex. Crim. App. 1969); *State* v. *Mendoza*, 454 P.2d 140, 141 (Ariz. 1969); *State* v. *Margo*, 191 A.2d 43, 44 (N.J. 1963) (per curiam).

[4] *State* v. *Little*, 261 N.W.2d 847, 851-852 (Neb. 1978); *People* v. *Jones*, 251 N.E.2d 195, 198 (Ill. 1969).

23

status—public intoxication." *Id.* at 764-765. Justice
Fortas cited *Driver* with approval in his dissent in
*Powell*, 392 U.S. at 569 n.33, but the plurality rejected
*Driver*'s holding, drawing a clear line between status
and conduct, *id.* at 533-534. Nevertheless, the Fourth
Circuit recently reaffirmed *Driver* on the theory that
the controlling *Powell* opinion under *Marks* is Justice
White's concurrence, including his dictum that the
Eighth Amendment might protect truly involuntary
conduct. *Manning* v. *Caldwell*, 930 F.3d 264, 280-283
& n.13 (4th Cir. 2019) (en banc); see *id.* at 282 n.17
(agreeing with *Martin*).

Like the Ninth and Fourth Circuits, the Pennsyl-
vania Supreme Court has "combine[d]" Justice
White's concurrence and Justice Fortas's dissent "to
produce an amplification of *Robinson*"—namely, that
the Eighth Amendment immunizes "anti-social *acts*
flowing from an uncontrollable 'status.'" *In re Jones*,
246 A.2d 356, 362 (Pa. 1968).

A state intermediate appellate court has also ex-
pressly aligned itself with the Ninth Circuit's ap-
proach for conduct that follows from status. In
*State* v. *Adams*, 91 So. 3d 724 (Ala. Crim. App. 2010),
a sex offender argued that he could not be punished
for failing to provide an address upon his release be-
cause he could not afford rent and had nowhere else
to stay. *Id.* at 729-730. The Alabama Court of Crimi-
nal Appeals, in analyzing this claim, incorporated
wholesale pages of *Jones*, the Ninth Circuit's vacated
predecessor to *Martin*. *Id.* at 745-753 (quoting *Jones*,
444 F.3d at 1131-1138). *Robinson* and *Powell*, on this
reading, "forbid[] punishing criminally not only a per-
son's pure status, but also a person's involuntary con-
duct that is inseparable from that person's status." *Id.*
at 753. And that understanding of the Eighth

24

Amendment invalidated the reporting requirement because the defendant's failure to provide an address was "involuntary conduct that was inseparable from his status of homelessness" given the lack of space in shelters that housed sex offenders. *Id.* at 754.

\*       \*       \*

The Ninth Circuit alone has upheld Eighth Amendment challenges to generally applicable public-camping ordinances. Even though a chorus of judges across eight separate opinions in *Martin* and this case has criticized this interpretation from every possible angle, the Ninth Circuit has refused to change course and instead has further entrenched a long-recognized and "sharp split of opinion throughout the legal profession concerning the meaning of *Powell*" for the act/status distinction this Court adopted in *Robinson*. *Moore*, 486 F.2d at 1239 n.178 (Wright, J., dissenting). That split stands little chance of resolving itself after the Ninth Circuit denied rehearing en banc over 17 judges' objections and the en banc Fourth Circuit adhered to its outlier position in *Manning*. This Court should grant certiorari to restore uniformity to the interpretation of the Cruel and Unusual Punishments Clause.

## II. THE NINTH CIRCUIT'S DECISION CONFLICTS WITH THIS COURT'S DECISIONS.

As Judges O'Scannlain, Smith, and Collins explained below, the Ninth Circuit has departed from this Court's precedents and the Eighth Amendment's original meaning.

A. *Martin* and the decision below find no support—and indeed never claim the pretense of support—in the "text, history, or tradition of the Eighth Amendment." App., *infra*, 119a (opinion of

25

O'Scannlain, J.).  Under this Court's decisions, how-
ever, original meaning and history are critical to the
Cruel and Unusual Punishments Clause.  *E.g.*, *Buck-
lew* v. *Precythe*, 139 S. Ct. 1112, 1123-1124 (2019); *In-
graham*, 430 U.S. at 664-666.

The Eighth Amendment provides that "cruel and
unusual punishments" shall not be "inflicted."
U.S. Const. amend. VIII.  The Framers borrowed this
language verbatim from the English Declaration of
Rights of 1689.  *Martin*, 920 F.3d at 599-600 (Bennett,
J., dissenting from denial of rehearing en banc).  And
the text and its common-law backdrop show that the
Cruel and Unusual Punishments Clause is "directed
to *modes of punishment*."  App., *infra*, 122a (opinion of
O'Scannlain, J.).  As this Court has explained, the
"original and historical understanding" is that the
Eighth Amendment outlaws only "methods" of pun-
ishment that unnecessarily "'superadd[]'" pain
(cruel) and have "long fallen out of use" (unusual).
*Bucklew*, 139 S. Ct. at 1122-1123; accord *Harmelin* v.
*Michigan*, 501 U.S. 957, 976 (1991) (opinion of Scalia,
J.).  Such cruel and unusual punishments include, for
example, "burning at the stake, crucifixion, [and]
breaking on the wheel."  *In re Kemmler*, 136 U.S. 436,
446 (1890).

Under *Bucklew*, there is nothing cruel or unusual
about the modes of punishment in *Martin* (one-day
jail sentences and criminal fines) and this case (civil
citations).  920 F.3d at 606; App., *infra*, 44a.  These
low-level penalties are not "marked by savagery and
barbarity" and have not fallen out of "common use."
App., *infra*, 123a (opinion of O'Scannlain, J.).  To the
contrary, countless jurisdictions across the Nation
have adopted such routine measures to protect public

26

health and safety. *Martin*, 920 F.3d at 599 (M. Smith, J., dissenting from denial of rehearing en banc).

Nor does text or history suggest that the Cruel and Unusual Punishments Clause "arrogate[s] the substantive authority of legislatures to prohibit 'acts' like those at issue here." App., *infra*, 122a (opinion of O'Scannlain, J.) (quoting *Martin*, 920 F.3d at 602 (Bennett, J., dissenting from denial of rehearing en banc)). Even Justice White, whose dictum in *Powell* about involuntary conduct now governs jurisdictions throughout the Ninth and Fourth Circuits, stated that *Robinson* itself involved an "application of 'cruel and unusual punishment' so novel that I suspect the Court was hard put to find a way to ascribe to the Framers of the Constitution the result reached today rather than to its own notions of ordered liberty." *Robinson*, 370 U.S. at 689 (dissenting opinion). Whatever the merits of *Robinson*, there is no basis to extend the Cruel and Unusual Punishments Clause yet further to prevent even issuing a citation for conduct that supposedly flows from a status. In fact, no court suggested that the Eighth Amendment or a state equivalent could invalidate public-camping restrictions until the early 1990s—two centuries after the Founding. *Pottinger* v. *City of Miami*, 810 F. Supp. 1551, 1565 (S.D. Fla. 1992).

Plaintiffs in the Ninth Circuit appear to have pursued their inventive theory under the Eighth Amendment because "a Fourteenth Amendment claim" would have "prove[d] unavailing." *Jones*, 444 F.3d at 1147 (Rymer, J., dissenting) (emphasis omitted). There is no serious argument that a right to camp on public property is "'deeply rooted in this Nation's history and tradition.'" *Washington* v. *Glucksberg*, 521 U.S. 702, 720-721 (1997). But this Court's decisions

27

have consistently made clear that the original meaning of the Eighth Amendment matters, too. Under that approach, *Martin* and the decision below have no footing in the Cruel and Unusual Punishments Clause.

B. In keeping with text and history, this Court has long recognized that the Cruel and Unusual Punishments Clause is primarily "'directed at the *method or kind of punishment* imposed for the violation of criminal statutes'" and does not apply to "impositions outside the criminal process." *Ingraham*, 430 U.S. at 667-668 (emphasis added) (quoting *Powell*, 392 U.S. at 531-532 (plurality opinion)). This Court has also held that certain punishments can become cruel and unusual if they are excessively disproportionate to the crime committed. *Solem* v. *Helm*, 463 U.S. 277, 288-289 (1983). Even so, this Court's focus has always remained on the mode of punishment with the lone exception of *Robinson*, where this Court held that the Eighth Amendment prohibited States from criminalizing status irrespective of the method of criminal punishment. 370 U.S. at 667. This Court has cautioned this limitation is "to be applied sparingly" and has never again invalidated a crime on this basis. *Ingraham*, 430 U.S. at 667.

As Judge O'Scannlain explained, the Ninth Circuit misread *Robinson* and *Powell* in holding that the Eighth Amendment prohibits the enforcement of public-camping ordinances. App., *infra*, 126a-127a. *Robinson* distinguished between status and conduct for Eighth Amendment purposes. 370 U.S. at 664-665. The *Powell* plurality reaffirmed this act/status distinction in rejecting the extension of *Robinson* to conduct that "is, in some sense, 'involuntary.'" 392 U.S. at 533. And in the half century since *Powell*, this

28

Court has relied on only Justice Marshall's plurality opinion and Justice Black's concurrence, and has never endorsed the views expressed in Justice White's concurrence in the result, let alone Justice Fortas's dissent. *E.g.*, *Ingraham*, 430 U.S. at 659; see *Manning*, 930 F.3d at 289 (Wilkinson, J., dissenting) (collecting cases).

An illustrative example is *Kahler* v. *Kansas*, 140 S. Ct. 1021 (2020), which presented the question whether the Due Process Clause guaranteed a defendant's right to claim insanity based on his inability to tell right from wrong. In rejecting that contention, this Court understood Justice Marshall's analysis of the Eighth Amendment to set forth the proper framework for constitutional challenges to the "paramount role of the States in setting 'standards of criminal responsibility.'" *Id.* at 1028 (quoting *Powell*, 392 U.S. at 533). Respect for that role means that the people's representatives, rather than the courts, get to decide "when a person should be held criminally accountable for 'his antisocial deeds.'" *Ibid.* (quoting *Powell*, 392 U.S. at 535-536). Judges simply aren't equipped to dictate "rigid" constitutional rules in this context, *ibid.* (citing *Powell*, 392 U.S. at 536-537), or to "balanc[e] and rebalanc[e] over time complex and oft-competing ideas about 'social policy' and 'moral culpability,'" *ibid.* (quoting *Powell*, 392 U.S. at 538 (Black, J., concurring)). *Powell* thus stands for the principle that "'doctrine[s] of criminal responsibility' must remain 'the province of the States.'" *Ibid.* (quoting *Powell*, 392 U.S. at 534, 536 (plurality opinion)).

The Ninth Circuit has read *Powell* the polar opposite way from *Kahler*. Rather than follow the *Powell* plurality's properly cabined approach, the Ninth Circuit has developed its own constitutional doctrine of

29

criminal responsibility for involuntary conduct related to status—all "by stitching together *dicta* in a lone concurrence with a *dissent*." App., *infra*, 119a (opinion of O'Scannlain, J.). Judges Smith and Collins explained that this dissent-plus-concurrence-dicta approach conflicts with this Court's decision in *Marks*, which instructs courts to consider "[o]nly the views of the Justices *concurring* in the judgment." *Martin*, 920 F.3d at 592-593 (M. Smith, J., dissenting from denial of rehearing en banc) (emphasis added); accord App., *infra*, 93a-94a (Collins, J., dissenting).   Typically, "'comments in a dissenting opinion' about legal principles and precedents 'are just that: comments in a dissenting opinion.'" *Georgia* v. *Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1511 (2020) (brackets omitted) (quoting *Railroad Retirement Bd.* v. *Fritz*, 449 U.S. 166, 177 n.10 (1980)).  But the Ninth Circuit's upside-down *Marks* analysis of *Powell* means that one Justice's dictum has transformed Justice Fortas's dissenting comments into the law of the land for the western United States.

In short, the Ninth Circuit's rule that the Eighth Amendment prohibits punishing "'a person for being in a condition he is powerless to change'" turns a constitutional provision that is ostensibly directed to the kinds of *criminal punishments* into a sweeping doctrine of *criminal responsibility*.  *Martin*, 920 F.3d at 616 (quoting *Powell*, 392 U.S. at 567 (Fortas, J., dissenting)).  This interpretation, as Justice Marshall explained, discards "[t]raditional common-law concepts of personal accountability and essential considerations of federalism." *Powell*, 392 U.S. at 534-536.  But in the absence of a majority decision settling the issue, parties have sought to extend the radical logic of the *Powell* dissent to all sorts of harmful conduct (such as public camping, drug use, and sexual assaults) that

30

could be characterized as involuntary or compulsive. *Supra*, at 20-22. This Court should reject the *Powell* dissent once and for all.

### III. THE QUESTION PRESENTED IS EXCEPTIONALLY IMPORTANT.

When the Ninth Circuit declined to rehear *Martin* en banc, six judges warned of "dire practical consequences for the hundreds of local governments within our jurisdiction, and for the millions of people" living there. 920 F.3d at 594 (M. Smith, J., dissenting from denial of rehearing en banc). The past five years under *Martin* have been, if anything, more disastrous than even its fiercest critics predicted.

*Martin* has "paralyz[ed] local communities from addressing the pressing issue of homelessness." App., *infra*, 117a (opinion of O'Scannlain, J.). As a formal matter, cities purportedly retain the authority to enforce public-camping laws against people who "'have access to adequate temporary shelter'" or the "financial means to obtain shelter." *Id.* at 14a n.2 (majority opinion). But those standards are unworkable in practice. There is no reliable way for an officer in the field to determine whether a person is "involuntarily" homeless, let alone assess how many people need shelter in total and how much shelter is currently available at that exact moment. Nor has the Ninth Circuit offered any guideposts for what qualifies as "'*adequate* temporary shelter'" (other than that religiously affiliated shelters don't qualify). *Id.* at 19a (emphasis added). That ambiguity has empowered courts to ignore available shelter for a growing list of reasons— for example, because a shelter lacks beds (which sidewalks and parks also lack), *id.* at 22a, or is outdoors (like sidewalks and parks), *Warren* v. *City of Chico*, 2021 WL 2894648, at *3-4 (E.D. Cal. July 8, 2021).

31

Some district judges have observed that "the practical ramifications for the community are much more complex" than the Ninth Circuit's singular focus on "practically-available shelter." *Warren*, 2021 WL 2894648, at *4 & n.4. Still, given the difficulties of administering a shelter-based approach, district courts applying *Martin* have hamstrung cities in enforcing public-camping laws against *anyone* unless and until they have enough "secular shelter space" for *everyone*—a near-impossible task, especially because the number of homeless people surpasses the shelter available in every major western city and continues to climb. App., *infra*, 53a.

For example, San Francisco has attempted to clean up public encampments under threat of law enforcement only after offering "'appropriate shelter'" to the encampment's residents. *Coalition on Homelessness* v. *City & County of San Francisco*, 2022 WL 17905114, at *4-7 (N.D. Cal. Dec. 23, 2022). Given the high resistance to social services, "55% of homeless individuals rejected shelter when offered it."[5] Yet a district court still enjoined San Francisco from enforcing its public-camping ordinance "as long as there are more homeless individuals in San Francisco than there are shelter beds available." *Id.* at *28.

The story is much the same for Phoenix, which has instructed its police officers to "make individualized assessments before citing individuals" for sleeping on sidewalks and other public ways. *Fund for Empowerment* v. *City of Phoenix*, 2022 WL 18213522, at *2-3 (D. Ariz. Dec. 16, 2022). After one encampment in 2022 alone witnessed "1,097 calls for emergency

---

[5] Editorial Board, *Why San Francisco Is a Homeless Mecca*, Wall St. J. (Aug. 6, 2023), https://tinyurl.com/5cx5cr7v.

32

medical help, 573 fights or assaults, 236 incidents of trespassing, 185 fires, 140 thefts, 125 armed robberies, 13 sexual assaults and four homicides," as well as 16 other deaths "from overdoses, suicides, hypothermia or excessive heat," Phoenix tried to clean up the encampment.[6] Again, however, a district court enjoined Phoenix from enforcing its public-camping ordinance "as long as there are more unsheltered individuals in Phoenix than there are shelter beds available." *Id.* at \*9.

The logic of *Martin*—that governments cannot regulate "'universal and unavoidable consequences of being human,'" 920 F.3d at 617—also hasn't stopped at public camping, but has "inevitably" extended to "public defecation and urination." *Id.* at 596 (M. Smith, J., dissenting from denial of rehearing en banc). A district court has held that the Eighth Amendment right under *Martin* "to be free from punishment for involuntary conduct" includes "eliminating" (a euphemism for defecating) "in public if there is no alternative to doing so." *Mahoney* v. *City of Sacramento*, 2020 WL 616302, at \*3 (E.D. Cal. Feb. 10, 2020); see App., *infra*, 155a (opinion of M. Smith, J.).

The status quo under *Martin* has harmed local governments, surrounding residents, and—most of all—the homeless themselves by contributing to the growth of encampments across the West. See App., *infra*, 139a (opinion of M. Smith, J.). These lawsuits, though brought "in the name of compassion and decriminalizing homelessness[,] had the effect of surrounding the homeless in criminality and predation, not to mention fires, filth, disease, and fentanyl and

---

[6] Eli Saslow, *A Sandwich Shop, a Tent City and an American Crisis*, N.Y. Times (Mar. 31, 2023), https://tinyurl.com/yh42zzrh.

33

meth."[7]  The results have been tragic, if predictable: skyrocketing rates of fatal drug overdoses;[8] "increasingly volatile behavior on the streets" for those who live near encampments;[9] a shocking rise in homicides and sexual assaults committed against the homeless;[10] a resurgence of "medieval" diseases (such as typhus and tuberculosis) in encampments;[11] a series of fires in major cities, some of which burned out of

---

[7] Sam Quinones, *Skid Row Nation: How L.A.'s Homelessness Crisis Response Spread Across the Country*, L.A. Mag. 131 (Oct. 6, 2022).

[8] Thomas Fuller, *Death on the Streets*, N.Y. Times (Apr. 25, 2022), https://nyti.ms/3DpJsKs (deaths among the homeless are up 200% in Los Angeles County); Christal Hayes, *'The World Doesn't Care': Homeless Deaths Spiked During Pandemic, Not from COVID. From Drugs.*, USA Today (May 28, 2022), https://tinyurl.com/523wex3p (Seattle and Portland experienced a record number of deaths in 2021 among the homeless).

[9] Michael Corkery, *Fighting for Anthony: The Struggle to Save Portland, Oregon*, N.Y. Times (July 29, 2023), https://tinyurl.com/3zvxpss3.

[10] *Recent Killings in Los Angeles and New York Spark Anger, Raise Risk for Homeless People*, KTLA (Jan. 28, 2022), https://tinyurl.com/y97jbayw; Eric Leonard, *LAPD Concerned About Increase in Sexual Violence Against Women Experiencing Homelessness*, NBC4 (Feb. 27, 2020), https://tinyurl.com/4ccfrb6v.

[11] Anna Gorman & Kaiser Health News, *Medieval Diseases Are Infecting California's Homeless*, The Atlantic (Mar. 8, 2019), https://tinyurl.com/53k3h44z.

34

control for days;[12] and massive amounts of debris, such as needles and excrement, polluting the environment.[13]

The Ninth Circuit's decision in this case exacerbates all of these problems. If "*Martin* handcuffed local jurisdictions as they tried to respond to the homelessness crisis," this decision "now places them in a straitjacket." App., *infra*, 143a (opinion of M. Smith, J.). Cities can't issue even *civil* citations for public camping if there are any potential downstream criminal consequences. *Id.* at 44a-46a (majority opinion). And having collapsed the individualized voluntariness inquiry under *Martin* from the merits into the class definition, the Ninth Circuit has charted a path for the routine issuance of classwide injunctions under which cities must assess on a case-by-case basis (facing the threat of contempt) whether public camping is sufficiently "involuntary" for Eighth Amendment protection. *Id.* at 39a-41a & n.23. As the Ninth Circuit's judge-made rules become more and more elaborate, and as the costs of both complying and litigating continue to rise, more cities will be forced "to surrender the use of many of their public spaces (including

---

[12] Natalie O'Neill, *Blazes That Begin in Homeless Camps Now Account for Nearly Half the Fires in Portland*, Willamette Week (Nov. 2, 2022), https://tinyurl.com/ykw69dtf (Portland firefighters extinguish six fires a day that start in encampments); Jennifer Medina, *Los Angeles Fire Started in Homeless Encampment, Officials Say*, N.Y. Times (Dec. 12, 2017), https://nyti.ms/3sPyXLv.

[13] Quinones, *supra*, *Skid Row Nation* at 112 (noting that the cleanup of the Echo Park Lake encampment in Los Angeles generated "35 tons of debris, 723 pounds of biological waste, and 300 pounds of needles and other drug paraphernalia").

35

sidewalks) to homeless encampments." *Id.* at 133a
(opinion of O'Scannlain, J.).

The homelessness crisis is an exceptionally diffi-
cult public-policy challenge. No one argues that *Mar-
tin* is "an on/off-switch entirely responsible for" this
crisis, which stems from "a complex mix of economic,
mental-health, and substance-abuse factors, and ap-
pears to resist any easy solution." App., *infra*, 140a-
141a, 143a (opinion of M. Smith, J.). But if the past
five years have proved nothing else, it is that courts
not only lack the legal authority, but also the practical
competence, to serve as "homelessness policy czars"
superintending every major city in the Ninth Circuit
on today's paramount policy issue. *Id.* at 157a.

Public-camping laws are a critical (and constitu-
tional) backstop as cities attempt to stop the growth
of encampments and start to make progress on the un-
derlying causes of homelessness. Cities on the front-
lines of this crisis should be allowed "to make tough
policy choices unobstructed by court-created man-
dates that lack any sound basis in law" and have
"add[ed] enormous and unjustified complication to an
already extremely complicated set of circumstances."
App., *infra*, 163a (opinion of Bress, J.). Only this
Court's intervention can return this issue to the peo-
ple's representatives—where it has belonged all
along.

## CONCLUSION

The petition for a writ of certiorari should be
granted.

36

Respectfully submitted.

JONATHAN C. BOND
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C.  20036

AARON P. HISEL
CAPITOL LEGAL SERVICES
901 Capitol Street NE
Salem, OR  97301

THEANE D. EVANGELIS
    *Counsel of Record*
BRADLEY J. HAMBURGER
SAMUEL ECKMAN
DANIEL R. ADLER
PATRICK J. FUSTER
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000
tevangelis@gibsondunn.com

August 22, 2023