1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3     Before The Honorable Donna M. Ryu, Magistrate Judge

4

5  COALITION OF HOMELESSNESS,      )
   et al.,                         )
6                                  )
                                   )
7          Plaintiffs,             )
                                   )
   vs.                             )   No. C 22-05502-DMR
8                                  )
   CITY AND COUNTY OF SAN          )
9  FRANCISCO, et al.,              )
                                   )
10         Defendants.             )
   _____)

11

12                           Oakland, California
                             Thursday, February 8, 2024
13

14   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
              RECORDING 1:04 - 1:51 = 47 MINUTES
15

   APPEARANCES:
16

   For Plaintiffs:
17                           ACLU Foundation of Northern
                               California
18                           39 Drumm Street
                             San Francisco, California
19                             94111
                        BY:  JOHN THOMAS H. DO, ESQ.
20                           WILLIAM S. FREEMAN, ESQ.

21                           Lawyers' Committee for Civil
                               Rights for San Francisco
22                             Bay Area
                             131 Steuart Street, Suite 400
23                           San Francisco, California
                               94105
24                      BY:  NISHA KASHYAP, ESQ.

25          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

*Echo Reporting, Inc.*

2

```
 1  APPEARANCES:  (Cont'd.)

 2  For Defendants:
                              San Francisco City Attorney's
 3                                Office
                              Fox Plaza
 4                            1390 Market Street
                              Sixth Floor
 5                            San Francisco, California
                                94102
 6                        BY:  JOHN H. GEORGE, ESQ.

 7  Transcribed by:          Echo Reporting, Inc.
                              Contracted Court Reporter/
 8                            Transcriber
                              echoreporting@yahoo.com
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

<u>Thursday, February 8, 2024</u>                                    <u>1:04 p.m.</u>

                       P-R-O-C-E-E-D-I-N-G-S

                              --oOo--

              THE CLERK:  Calling Civil Case C-22-5502-DMR,

Coalition on Homelessness, et al. versus City and County of

San Francisco, et al.

          Counsel, please state your appearances, starting with

the Plaintiffs' attorneys first.

              MS. KASHYAP (via Zoom):  Good afternoon, your

Honor.  Nisha Kashyap for Plaintiffs.

              THE COURT:  Good afternoon.

          Mr. Do, we can't hear you.

              MR. DO (via Zoom):  My apologies, your Honor.  Can

you hear me now?

              THE COURT:  Yes.

              MR. DO:  Thank you.

              THE COURT:  Please make your appearance, because

it was mute when you were talking.

              MR. DO:  Of course.  John Do for Plaintiffs'

counsel.

              THE COURT:  Good afternoon.

              MR. GEORGE (via Zoom):  Good afternoon, your

Honor.  John George from the San Francisco City Attorney's

Office, on behalf of Defendants.

              THE COURT:  Good afternoon.

4

1        MR. GEORGE:  Good to see you.

2        THE COURT:  All right.  Good to see you too.

3    So, we're here on the motion to stay.  I've got --

4 thank you for your papers.  I read them with great interest.

5 I have two areas of questions I need your help on.  The

6 first area is a question from Mr. George, and it has to do

7 with timing.

8        The Defendants seek a stay in front of me until 30 days

9 after the Supreme Court issues its decision in the Johnson

10 case, and I think everybody here agrees that our -- our best

11 projection is that that decision will be made this term.

12 So, let's say by June 30th.  So, if we add 30 days, that

13 puts us at roughly July 30.  That's what the City is asking

14 for.

15        My understanding, though, is that the Defendants asked

16 for and received a -- a request -- a grant to have the Ninth

17 Circuit stay issuance of its mandate in this case until 28

18 days after the Johnson decision comes out.  So, that puts us

19 at roughly July 28th before the mandate issues from the

20 Ninth Circuit, and you received an extension to file your

21 petition for rehearing en banc 21 days after Johnson comes

22 out.  So, that's July 21st.

23        So, Mr. George, what happens in roughly July 21st.  Is

24 the -- is the City going to come back and ask for another

25 stay while its petition for rehearing is under submission?

5

1          MR. GEORGE:  I don't believe that we would, your

2    Honor.  I believe that what we would do is, you know, we

3    would have -- by the time that we came back to you to notify

4    you of what was happening in the case, meaning when the stay

5    would lift in the District Court, we would at that point

6    know what the briefing was looking like and whether or not

7    we had moved -- you know, whether or not we had actually

8    filed a petition and what the schedule would look like

9    there, and I think that the -- the Ninth Circuit briefing

10   would impact the injunction, the application of an

11   injunction, but it wouldn't impact the -- you know, the rest

12   of the case in terms of discovery and other deadlines and

13   things of that nature.

14        So, I don't -- in the same way that we were on appeal

15   up at the Ninth Circuit previously and continued to litigate

16   the case, I believe that we could proceed under the same

17   grounds here in -- in late July.  I think that the -- the

18   timing is such that when the stay lifts here, assuming that

19   it's granted, then we would have some clarity as to what is

20   going on in the -- on the -- the Circuit as well.

21          THE COURT:  Can the City make an unequivocal

22   commitment that it won't be seeking a further stay in the

23   case beyond the 30 days past Supreme Court issuing its

24   decision in Johnson?

25          MR. GEORGE:  I can't -- I cannot make an absolute

6

1 unequivocal because I don't know what will occur. However,

2 I can say that it's -- it's highly unlikely. I just can't

3 say one way or the other. I haven't been able to map out

4 with our clients every permutation of what could happen, in

5 part because we don't know what the Supreme Court will do.

6 And, so, it's difficult to know exactly how we would react

7 under those circumstances.

8     I can -- the greatest commitment I can give you today

9 is that it is unlikely and we have every interest in moving

10 the case forward, only so long as we actually know what is

11 going to be happening.

12         THE COURT: Okay. I think you said highly

13 unlikely. Can I take your word on that?

14         MR. GEORGE: We don't have to parse the -- the

15 strength of any adjectives. But, yes, I will -- I will

16 commit to highly unlikely at this point.

17         THE COURT: Well, listen, I know you've looked at

18 this very carefully. I know you've looked at -- I'm -- I'm

19 sure you've looked at many different permutations, and I

20 understand that you can't predict everything with perfect

21 accuracy. But City Attorney's Office, very sophisticated

22 folks, as I've noted before. So, I know you've looked at it

23 thoroughly, and -- and I just need to know for my purposes

24 that based on that, you can represent to me it's highly

25 unlikely that you'd be asking for a stay beyond what you're

1  asking for in the current motion unless something, you know,

2  really unexpected happens.

3           MR. GEORGE:  That's correct, your Honor.  There

4  may be some impact on -- on a -- a further schedule.  You

5  know, I wouldn't know exactly what -- depending on what the

6  Ninth Circuit does or what the Supreme Court does, that may

7  impact -- if this case greatly narrows, then I think that

8  the schedule would be more impacted than if we have the

9  exact same case.  So, it's -- there's also a lot that

10 depends on what the scope of discovery and what the case

11 looks like going forward.  I see that much more as impacting

12 the schedule as opposed to needing, you know, all

13 proceedings to stop in order to determine what will be the

14 next step.

15          THE COURT:  Okay.  So, that's one area just on the

16 question of timing.

17     And, Ms. Kashyap or Mr. Do, do you have any comment on

18 what Mr. George just presented?

19          MS. KASHYAP:  Two comments, your Honor.  The first

20 is that it's cold comfort to Plaintiffs that, although there

21 might not be any further request for a stay, that the City

22 can't make any commitments to what the case schedule would

23 look like after July.

24          THE COURT:  Well, that's okay because I run the

25 case schedule.  So --

1          MS. KASHYAP:  I understand that, your Honor.  And,

2  of course -- of course, you do.  But I think when -- and

3  we're -- I'm happy to get into this another moment, but when

4  we think about the harms to Plaintiffs resulting from

5  bringing this case to a grinding halt until at least July

6  and then possibility of delaying further the resolution of

7  the issues in this case, past that, it is significant, and

8  it's a significant concern.

9          THE COURT:  I understand that, and I promise you I

10  read the papers.  I just didn't understand the impact of

11  footnote two of the reply, which is -- which talks about

12  what happened before the Ninth Circuit after the initial

13  motion was filed and the impact of the petition -- potential

14  petition for rehearing and whether we could expect that

15  another stay would -- request would be forthcoming, and I

16  would need to build that into the Landis factors, right?

17      So, on that particular issue, Ms Kashyap, does the

18  Plaintiff -- Plaintiffs want to be heard?

19          MS. KASHYAP:  I think the only other point we'd

20  make, your Honor, is the -- we disagree with Defendants'

21  characterization that any ruling from the Supreme Court will

22  potentially greatly narrow the issues in this case.  As --

23  as we've noted in our papers -- and I -- I won't belabor the

24  point -- the -- it's our position that we will be entitled

25  to discovery on the same set of facts because those facts

9

1  animate other claims.

2          THE COURT:  Okay.

3          MS. KASHYAP:  And, so, we disagree with that

4  characterization.

5          THE COURT:  And that leads me to my next bucket of

6  questions, and this is a question for you, Ms. Kashyap.

7      So, we have two completely opposite views in the

8  papers.  The City says that "Lots of discovery could be

9  rendered obsolete."  That's a quote.  "It would be

10 completely irrelevant."  That's another quote -- depending

11 on what happens in Johnson.  So, I'm looking particularly at

12 the Defense opening brief at page 13.  So, it points to

13 specifically discovery around shelter offers, shelter

14 capacity, enforcement policies, incident reports, CAD

15 reports, SFPD training, and in quote "and many other

16 categories of information."  That would be irrelevant if

17 Johnson comes down in a way that -- that basically makes the

18 Eighth Amendment claim not viable.  Okay.

19     Now, on the other side, the Plaintiffs say not so.

20 They say the opposite, and they say the Eighth Amendment

21 claim is one of 13 claims.  And, actually, the discovery for

22 all 13 claims overlaps such that whatever happens in -- in

23 the Eight Amendment claim before the Supreme Court isn't

24 really going to affect the scope of discovery.

25     Is that a fair summary, Ms. Kashyap, of the Plaintiffs'

1   position?

2          MS. KASHYAP:  Yes, your Honor.

3          THE COURT:  Okay.  So, both sides spoke in broad

4   terms, but I really would like you to engage more directly

5   with that question.

6      So, let's take a hypothetical.  Okay.  Let's assume for

7   the moment that <u>Johnson</u> comes out in a way that does render

8   the Eight Amendment claim pretty much unviable, okay.  So,

9   you've got 12 other claims.  Will you need to do

10  substantially the same discovery on those 12 claims that you

11  would have done if the 13th were in there -- sorry -- if the

12  Eighth Amendment claim were still in there?

13         MS. KASHYAP:  Yes, your Honor.  And I can give the

14  Court --

15         THE COURT:  Walk me through -- walk me through.

16  How is it -- how is it the same?  I'm not -- I'm not clear

17  on that.

18         MS. KASHYAP:  Sure, your Honor.  And I'll start

19  with an example and then can give the Court additional ones

20  if that would be helpful.

21     So, taking just for example, our state-created danger

22  claim.  That claim is predicated on not only the City's

23  practice of destroying the property and the survival

24  belongings of unhoused individuals and how that creates --

25  places people in danger, but also the City's practice of

11

1 displacing individuals who are unhoused in public space,

2 from public space without first making shelter available and

3 how that places people in danger.

4     And, so, the evidence that the Defendants identified of

5 shelter offer, shelter availability, the use of law

6 enforcement and threatened enforcement to displace

7 individuals, all of those facts remain relevant to that

8 claim.  And, so, we would seek the same discovery.  And,

9 thus, Defendants' proposal only delays our ability to -- to

10 seek the discovery that is going to be relevant to these

11 other claims.

12         THE COURT:  Well, let's use a different example.

13 How about the California Constitution?

14         MS. KASHYAP:  Certainly, your Honor.  So, we

15 disagree with Defendants' characterization of our California

16 Constitution claim.  The case, Tobe, that Defendants

17 reference in their briefing was a facial challenge.  The

18 California Supreme Court has never considered as as-applied

19 challenge under these facts.  And, so, again, we are free to

20 proceed with our contention that the California Constitution

21 has a broader scope than the federal Constitution, even if

22 we were to assume the Supreme Court makes the Eighth

23 Amendment claim under the federal Constitution unavailable.

24 And, so, our -- the same discovery would animate that claim,

25 and we would seek that discovery in support of that claim.

12

1        THE COURT:  Do we have any other guidance from the
2  California Supreme Court on cruel or unusual language in the
3  context of enforcing a law that -- or applying a law
4  affecting homeless individuals, other than Tobe?
5        MS. KASHYAP:  I'm unaware of any guidance that
6  would be dispositive to that question or even kind of highly
7  relevant to that question.  And, so, again, it's really an
8  untested question for the California Supreme Court.  But the
9  question of whether the Defendants' observations about what
10 they consider the merits of that claim are not -- is not the
11 relevant question.  The relevant question is what would be
12 the scope of permissible discovery, and our position is that
13 the scope of permissible discovery would remain the same.
14       THE COURT:  Okay.  Well, you know, we haven't
15 spent a lot of time on the state-created danger or
16 disability claim so far because Plaintiffs chose to move for
17 preliminary injunction just on the Eighth and Fourth
18 Amendment.  That's your right, and it's not unusual to try
19 to, you know, have a narrow scope of a preliminary
20 injunction.  So, I'm not going to second guess the strategy,
21 but I -- you know, the other claims haven't been tested on
22 how viable they are as theories.  So, I guess if you can
23 give me whatever information you want to provide now on the
24 claims you just mentioned or other ones and why I should
25 keep those claims going at this point with -- with full

13

1   discovery rather than granting a stay pending Johnson --

2           MS. KASHYAP:  Sure, your Honor.

3           THE COURT:  -- flesh that out the best you can.

4           THE COURT:  Absolutely, your Honor.  So, I'll

5   start by directing the Court's attention to the case that we

6   mentioned at the last case management conference, Tyson v.

7   City of San Bernardino.  There the Court issued a

8   preliminary injunction enjoining the practice of encampment

9   resolutions or sweeps based on Fourth Amendment and ADA

10  claims.  There wasn't an Eighth Amendment claim that was the

11  basis for that injunction.

12      And, so, even if we assume a world where the Supreme

13  Court does away with an Eighth Amendment claim, there is a

14  path forward to the types of relief that Plaintiffs seek in

15  this case.

16      And, second, I think it's important to note that the --

17  the respective strength -- potential strength of the claims

18  is slightly different than the question before the Court,

19  which is what is the scope of relevant discovery were the

20  Eight Amendment claim to fall.

21      The question of whether the claims have been tested or

22  not would be something that eventually would -- would be

23  before this Court, but prior to that, Plaintiffs would be

24  entitled to discovery on those claims, and that scope of

25  discovery is the same.  And, as we've noted, the information

14

1  about the way the City addresses the property of unhoused

2  people is very much intermeshed with and interwoven with the

3  way the City handles the actual presence of unhoused people

4  themselves.  The City has chosen to run its operations on

5  both of these -- in both of these ways, property and people

6  through HSOC, the factual discovery on those two issues are

7  -- are going to be interwoven.

8      And, so, not only is the -- the facts -- are the facts

9  themselves relevant to multiple claims, but the facts

10 themselves on these two issues are very interwoven, such

11 that parsing discovery only as to property destruction or

12 only as to the displacement of unhoused folks is, frankly,

13 impossible.  Those facts are all bound up within the way the

14 City has engaged in these encampment resolutions.

15         THE COURT:  What is the citation to <u>Tyson</u>, just so

16 I have that handy?  I don't think it was in your opposition.

17         MS. KASHYAP:  Yes, your Honor.  I can provide

18 that.  Just -- well, maybe I'll ask my colleague, John, to

19 pull that up while we're speaking, your Honor.

20         THE COURT:  Okay.

21         MS. KASHYAP:  Actually, I have it here before me.

22 It's 523 C.D. 01539, and the preliminary injunction is

23 Docket Number 63, the preliminary injunction order where the

24 Court ruled on Fourth Amendment and ADA claims and enjoined

25 the City from engaging in encampment resolutions.

1          THE COURT:  What's the date of that order, please?

2          MS. KASHYAP:  Sure.  It's January 12th, 2024.

3          THE COURT:  January 12th?

4          MS. KASHYAP:  2024, yes.

5          THE COURT:  2024.  Okay.  Just happened.

6          MS. KASHYAP:  And this -- this is the subject of

7  the request for leave to file a statement of recent decision

8  is this case.

9          THE COURT:  Okay.  Got it.

10      All right.  Mr. George, I want to hear your response.

11  I -- having read <u>Tobe</u> or <u>Tobey</u> (phonetic) -- I don't know

12  how to pronounce it -- it is very much a facial challenge,

13  and Justice Baxter in the majority makes really clear that

14  any as-applied challenge was just not perfected, and this

15  is, I think everybody would agree, in this case an as-

16  applied challenge.  It's not a challenge to the statutes

17  themselves.  Plaintiffs have agreed, in fact, that the

18  policies of the City are constitutional.  It's how they are

19  being enforced.

20      So, it raises a pretty different set of questions in

21  what happened in that California Supreme Court case from

22  1995.  So, what response do you have to Ms. Kashyap's

23  presentation that all the discovery on the remaining 12

24  claims or at least even one or two of them -- we don't need

25  all 12, right.  If there are other claims that would call

16

1  for the same discovery, then it would have to go forward

2  anyway, right?  That's their position.  So, what is your

3  response?

4          MR. GEORGE:  Yeah.  It's -- it's several fold, and

5  I'll walk through.  First I'll start with the California

6  Constitution because I think that that's the one that's the

7  most on point with respect to its overlap.

8      So, the -- it's -- it's important for us to note that

9  in 2015 -- and this case is cited in our reply at page 11.

10  It's ECF page 16 -- there's the Allen v. City of Sacramento

11  case --

12          THE COURT:  Yeah, I -- I understand.  It's a Court

13  of Appeal case.  It's -- it is -- so -- so, I -- it's not

14  precedential.  I mean, but I get that there's --

15          MR. GEORGE:  Right.

16          THE COURT:  -- one other -- you know, there's an

17  appellate case in California that reads Tobe a certain way.

18  I'm not sure that that would change the scope of discovery,

19  honestly.

20          MR. GEORGE:  So, in Tobe, your Honor, they look

21  entirely to the same cases that Johnson relies on, and they

22  come out to the opposite conclusion.  So, in -- in Tobe, the

23  Court walks through purely U.S. Supreme Court cases.  They

24  walk through Robinson, and they walk through Powell, and

25  they also look at Ingram.

17

1    And, so, the Court doesn't actually look to any
2  California Constitutional basis.  What they say is our law
3  is consistent with the Eight Amendment, and so we are going
4  to look to the U.S. Supreme Court cases that have delineated
5  the scope of the Eight Amendment.
6    I think that what is -- the reason that that is very
7  important is because if Johnson comes down, you know, in
8  whatever way that it comes down, that will provide the exact
9  analysis that the California Supreme Court would do.  And,
10  so, the novel interpretation of state law that the
11  Plaintiffs are pushing, which they don't have any case to
12  actually show that shelter offers are required or that, you
13  know, anything that is like Johnson in California State
14  Court --
15        THE COURT:  Well, actually, they do have a case
16  that they -- that they provided to me and to you that talks
17  about the difference between the California and federal
18  constitutions on this question, right.  California, for --
19  for distinct and, you know, cognizable reasons chose to say
20  cruel or unusual.  It's a different standard, and there's a
21  Court of Appeal case that -- that recognizes that that's,
22  you know, purposeful.
23    So, I -- I understand that the Baxter majority, right,
24  so the majority opinion in Tobe, in the facial attack does
25  talk a lot about the Eight Amendment cases.  But I don't

18

1  think that that means that the California constitutional

2  claim brought by the Plaintiffs would be not viable.  And --

3          MR. GEORGE:  Your Honor, I think that what -- we

4  want to separate out two different things.  One is a

5  complete lack of viability, and one is the scope of

6  discovery underneath that claim because right here we're

7  talking about scope of discovery.  And, so, whether or not

8  we would prevail on a motion to dismiss that claim, I think

9  that we can set that aside.  We're not talking about that

10  argument.

11      What we're talking about is what is the scope of

12  discovery for the Eighth Amendment.  Right now we're basing

13  all of our scope of discovery off of Johnson, and Johnson

14  talks about shelter offers.  It talks about involuntary

15  homelessness as the linchpin, the absolute distinguishing

16  characteristic.  And, so, all of our discovery is drawn from

17  that concept of involuntary homelessness, which comes from

18  Johnson.

19      The California courts have not done -- they've not gone

20  that route.  And, so, we haven't actually seen from -- from

21  them what it is that would be that type of -- you know, what

22  the analysis would actually look like in terms of pulling in

23  the full breadth of everything that we're doing here.  And,

24  so --

25          THE COURT:  Just because you don't have a

19

1  California Supreme Court or a substantial body of law

2  interpreting this and mapping it onto these circumstances

3  doesn't mean that I -- you know, therefore, we can't

4  conceive of a case that could go forward.  I mean, I -- I'm

5  not totally following your argument.

6          MR. GEORGE:  It's -- it's really -- it really --

7  if this case were -- let's just wind back the clock and say

8  that this case were filed and it was purely a state law

9  claim, it was a state law constitutional claim.  You would

10  be exercising your jurisdiction in a pendent fashion over a

11  novel state law claim.  And if the parties asked for or if

12  the Plaintiffs, rather, asked for all of the discovery that

13  they asked for, including every shelter offer, all of the

14  HSH documents, every single enforcement report, all of the

15  body-worn camera footage, we would have challenged that to

16  say California law does not allow that breadth.  The

17  proportionality here is  not tied to the actual claims that

18  you have, because there isn't really any guidance about what

19  it is that the Eighth Amendment prohibits in this context

20  and this -- and this novel situation under pendent

21  jurisdiction.

22      I think that it would be quite amazing to have the full

23  breadth of discovery that we currently have.  I think it's

24  also noteworthy that --

25

1      THE COURT:  Well, but you didn't -- you didn't

2 make that argument here.  I mean, you've said it in a more

3 conclusory fashion that -- and you -- you really didn't

4 address this other than to say, Well, <u>Tobe</u> took care of

5 this, and it clearly didn't.  So, I --

6      MR. GEORGE:  Well, the --

7      THE COURT:  I'm stuck with trying to figure out

8 what are the parties saying here.  They've take extreme

9 positions without explaining or really engaging with, you

10 know, what does this mean for the case.

11      MR. GEORGE:  Your Honor, I do believe that this is

12 what we have been addressing in the reply and what we

13 addressed in -- in our briefing.  I'm not sure -- I mean,

14 one -- it --

15      THE COURT:  Well, for example --

16      MR. GEORGE:  I --

17      THE COURT:  Hold on, Mr. George.

18      MR. GEORGE:  Yes.

19      THE COURT:  So, you were just saying -- I just

20 want to make sure I'm understanding.  You said, you know,

21 what you'd need to do, Court, is -- is take a look at the

22 California constitutional claim and the scope of discovery

23 that would be allowed by that, and it's just not the same as

24 what would be allowed under the Eighth Amendment.  And, of

25 course, that's not really mapped out for me in your reply.

21

1  I mean, you didn't -- you didn't make that argument, at

2  least in a way that I understood, because --

3           MR. GEORGE:  Well --

4           THE COURT:  -- I'm expecting that you would go

5  through and say why that's such an extraordinary thing.  You

6  know, I --

7           MR. GEORGE:  Your Honor, I -- I apologize if we

8  didn't provide it with the absolute clarity that -- that you

9  -- that maybe we should have.  However, I mean, we have an

10  entire section saying that the scope of discovery will

11  completely change if Johnson comes out.  I mean, this is --

12  this is the heart of our argument.

13           THE COURT:  I -- I -- I understand.  Both sides

14  said the exact opposite on that point, and they said enough

15  to sort of look like it's something slightly more than

16  conclusory, but neither side actually engaged with it, which

17  is --

18           MR. GEORGE:  Well, I --

19           THE COURT:  -- hard.  It's leaving me with these

20  questions marks about, well, do they -- does it overlap like

21  the Plaintiffs say or is it completely nonsense, like -- and

22  irrelevant and could be rendered obsolete like the Defense

23  says.

24           MR. GEORGE:  I also -- I want to pull back a

25  little bit, your Honor, to what we are talking about here

22

1  too because what we're talking about is harm, to the

2  Plaintiffs.  So, let's say that we pause this case for the

3  next --

4        THE COURT:  Mr. George, I really want -- this is

5  -- I'll let you briefly argue that point.  I really wanted

6  to make sure I got both sides' best argument on this

7  question about the scope of discovery because I think that's

8  at the heart of the stay.

9     So, I -- I -- is there anything more you want to say on

10 that point?

11       MR. GEORGE:  I do want to mention -- on the scope

12 of discovery, your Honor, I do -- I want to -- want to

13 discuss Tyson because Tyson wasn't in their opposition at

14 all.  It was published before their opposition was due, and

15 it's not in there at all.  And, so, to the extent that

16 there's novel issues that are being raised, I mean, I think

17 that Tyson is.  And, so, I -- I did want to say that this

18 case it's -- it's not addressing a motion to stay.  It's --

19 I don't see really how it's germane to the -- to the -- the

20 analysis on what discovery will be relevant if the case goes

21 forward with an Eighth Amendment claim or without.

22    And I did have on the -- you asked me about -- we just

23 discussed California Constitution.  I'm happy to discuss the

24 other claims as well, the state-created danger.

25       THE COURT:  Sure.

23

1          MR. GEORGE:  So, on state-created danger, again,

2   this is something where the scope of discovery is just going

3   to be completely different.  We address this on page 12 of

4   our -- of our opposition, and this is really limited to

5   property destruction.  It is not -- it really doesn't

6   involve moving a person from one place to another.  Those

7   are not -- the cases that are --

8          THE COURT:  It could.  I mean, again, the cases

9   that have happened in this District had to -- were

10  specifically in the context of COVID, right?

11         MR. GEORGE:  Correct.

12         THE COURT:  And they weren't just property cases.

13  I know the Fresno case is a property case, but I think -- I

14  believe the Santa Cruz case and Sausalito case and -- and

15  the Emeryville case all have some aspect of, you know,

16  dissembling -- or disassembling an -- an encampment and what

17  that would mean for the individuals that were living there,

18  not just their stuff.

19         MR. GEORGE:  That's --

20         THE COURT:  So, but it's -- it was very much tied

21  to COVID.

22         MR. GEORGE:  Correct.

23         THE COURT:  We have -- we don't have a case where

24  somebody so far has argued like these Plaintiffs are, that

25  -- that a displacement of a closure of an encampment if

24

1  there aren't -- if there isn't sufficient shelter elsewhere

2  could potentially support a claim for state-created danger.

3  I don't know.  Don't know.  It's untested.

4          MR. GEORGE:  So -- and I want to point to those

5  other cases that you raised with Santa Cruz, Marin, and

6  Emeryville.  In each one of those, shortly after the -- the

7  danger of COVID abated, then those -- the -- the, you know,

8  disposition as it were was allowed to go forward, certainly

9  in Santa Cruz.

10     And, so, this is -- it's an important point because it

11  shows that without an acute danger and an actual injury,

12  then you -- you don't look to -- it's -- and, again --

13          THE COURT:  It means those --

14          MR. GEORGE:  -- I would point to the --

15          THE COURT:  It means those cases were brought with

16  certain arguments.  And then when those arguments -- when

17  the danger dissipated, then the consequence happened in

18  those cases.  I don't exactly know what the Plaintiffs are

19  arguing here.  I mean, the claim hasn't been fleshed out.  I

20  don't know really if it would -- it hasn't been challenged

21  on the pleadings.  So, whether or not it goes forward is --

22  is still a -- a question mark.

23          MR. GEORGE:  What's important to note, though, is,

24  as I noted before, the scope of discovery completely changes

25  because it is not going to allow for all of the -- you know

25

1 all -- and I won't run through the list of -- of points

2 again, but all of the pieces of discovery that are at issue

3 with the Eighth Amendment.

4     We've been proceeding under, you know, really what is

5 an assumption that is lots of the discovery that has been

6 asked for is relevant to the Eighth Amendment.  And, so, we

7 haven't needed to test whether or not it is relevant to

8 every other claim because, as Defendants readily concede,

9 it's relevant to the Eight Amendment claim.  And, so, we

10 have been moving forward and reviewing it and producing it.

11 We haven't had to tie it specifically to one claim.

12     And, so, at this point, where we are now trying to

13 break these things apart, it is -- it's -- it is clear that

14 these -- the full breadth of what has been asked for is not

15 going to bear directly on -- on this untested, as you

16 acknowledge, very limited argument about people being moved

17 in the context of COVID.

18     We don't know -- as you said, they -- it really hasn't

19 been fleshed out in either direction, and we also know that

20 Plaintiffs are going to amend their complaint.  So, I don't

21 know if that's -- if this is one of the claims that it's

22 going to change and modify and then, therefore, we'll be in

23 a slightly different situation come say July or August when

24 we have an amended complaint.

25     You know, it wouldn't be wise to move forward on the

26

discovery under this claim encompassing everything only to have this become modified about some particular danger which then, you know, has wasted a lot of effort to produce other documents.

THE COURT:  Ms. Kashyap, which one -- which claim or claims of Plaintiffs maps on the most closely with the discovery on the Eight Amendment claim?

MS. KASHYAP:  I think there are three claims or three sets of buckets of claims, your Honor.  The first is the second -- no, excuse me -- the California Constitution claim, the second claim, and the parties have discussed that at length with your Honor.  So, I won't belabor that point.

I think the second is that -- is the ADA claim, and the information about shelter offers and the types of shelter available and shelter availability all speak to our ADA claim which concerns not only the -- the opportunity to have additional time to move belongings during an enforcement operation but also the types of shelter made available to individuals with disabilities.

THE COURT:  Let me ask, Mr. George's brief points out that Ms. Sandoval is the only one with an ADA claim, and it's not a class action.  So, that's a pretty -- you know, is that true?

MS. KASHYAP:  Well, your Honor, in addition to Ms. Sandoval, the Coalition is standing in the shoes of -- or

27

1  representing members who are unhoused, some of whom are
2  people with disabilities.  And, again, coming back to <u>Tyson</u>,
3  <u>Tyson</u> -- in the preliminary injunction order in <u>Tyson</u>, the
4  Court found there that the association that was one of the
5  Plaintiffs in that matter had standing to bring the ADA
6  claim.  And, so, we don't believe that there are any
7  standing issues with respect to the ADA claim.
8       In addition, if Defendants were to raise standing
9  issues, this is not the appropriate vehicle to do that.
10      THE COURT:  Okay.  Yeah, I -- I don't think I'm
11 going -- I -- I don't think it's appropriate to -- for me to
12 rule on the standing issue in the -- in the stay.  So, I'm
13 not going to be taking that up, but I -- I wanted to at
14 least understand what your position was with respect to Ms.
15 Sandoval.
16      Okay.  So, that's -- you think the -- the one that maps
17 on the closest to the Eight Amendment is the California
18 Constitution.  The next closest would be the ADA and then
19 what?
20      MS. KASHYAP:  And then, in addition to the state-
21 created danger claim, which we've talked about, I also want
22 to flag for the Court that our claims related to property
23 destruction, while the legal claim itself is based on facts
24 related to property destruction, in practice, the discovery
25 is going to be bound up in these issues of law enforcement

28

dispatch to encampment resolutions because we know that SFPD
calls upon DPW to respond to encampments, and DPW calls upon
SFPD.  And I think this speaks to the interwoven nature of
the fact discovery.  So, it's -- the question isn't just
what is the scope of relevant discovery but will this
discovery be -- can we draw clear lines between discovery
related to property destruction.

THE COURT:  Well, my -- my understanding of the
Fourth Amendment issues -- property issues are that they
come up not just in the encampment enclosure situation but
in other situations, right.  So -- so, shelter availability
and capacity and offers I don't think would have anything to
do with the property claims.

MS. KASHYAP:  We respectfully disagree just in two
ways, your Honor.  The first is that there are certainly
situations where individuals are made shelter offers but are
not able to take their property with them to that shelter.
And, so, the City's practices of handling that property or
destroying that property, as it may be, are absolutely
relevant and bound up with the question of the shelter and
what shelter offers are made available.

And the second is the reason I -- I raised the property
destruction claims is that those claims, although they
concern primarily the conduct of DWP, also are bound up in
law enforcement dispatch and the use of law enforcement to

1  respond to encampments because your Honor's correct that

2  these claims do not just arise in the context of encampment

3  resolutions but also in just the kind of everyday

4  interactions that law enforcement may have with unhoused

5  individuals.

6          THE COURT:  Mr. George, any response to what Ms.

7  Kashyap has offered so far?

8          MR. GEORGE:  Yes, several points, your Honor.  So,

9  on the -- on the point about, you know, people who are --

10  you know, potential folks who are disabled who may be

11  members of the -- of the Coalition, we don't know who those

12  people are.  They haven't produced any documents to show who

13  those individuals are.  We've asked for information about

14  that, and, so we --

15          THE COURT:  Well, that's a discovery dispute.

16  It's not before me.  So --

17          MR. GEORGE:  So, when it is --

18          THE COURT:  You raised it, but, you know, I'm not

19  going to decide standing on a motion to stay, and I'm not

20  going to decide a discovery issue on a motion to stay.  If

21  you had a problem with it, like you pointed out in your

22  motion, you know how to raise that with me.

23          MR. GEORGE:  Correct, your Honor.  However, it is

24  relevant to the scope of discovery again.  So, what we have

25  been -- what -- Ms. Sandoval is the -- is the only person,

30

1 and the claim is only on behalf of her and the Coalition

2 when you go to the complaint and you look at who it's on

3 behalf of.

4      And, so, again, the scope of discovery is not going to

5 be every single offer, every single event that the City has

6 participated in.  That's just not the proper scope of

7 discovery on a limited ADA claim on behalf of a single

8 person and potentially a -- the Coalition on behalf of some

9 of its members.

10      So, the other point that I want to raise is that this

11 interlocking that Ms. Kashyap has identified of claims being

12 overlapped, that is actually a -- a reason for a stay

13 because it's very difficult for us to know who it is that we

14 should depose and what questions and how we should split

15 time in depositions focused on the various issues because we

16 view them as -- as quite disparate.  And if the Eighth

17 Amendment drops out of this case, I can tell you that I'm

18 not going to be spending a lot of time asking people about

19 whether or not they are involuntarily homeless.  It just

20 won't be a particularly salient issue with respect to the

21 other claims.

22           THE COURT:  Well, I guess that's the -- that's the

23 question before me, right?  Because the Plaintiffs have

24 taken the position that if the Eighth Amendment claim drops

25 out, the scope of discovery is going to be exactly the same.

1  So, you know, if you choose not to ask people that, that's

2  at your peril is apparently their view and what I'm trying

3  to sort out, right, because --

4           MR. GEORGE:  Right.

5           THE COURT:  -- they would say that those questions

6  are totally relevant to the California constitutional claim

7  to -- to name the closest fit.

8           MR. GEORGE:  And what -- what I'm saying is that

9  what we should do is wait until we have certainty on that so

10 that you don't have to rule in a vacuum about whether or not

11 these things are going to be relevant absent some type of

12 change.  We don't know what the Supreme Court will do.

13      And, so, what I'm -- what I'm saying is we are much

14 better off to pause, wait until we have clarity and

15 certainty and not require a bunch of interstitial rulings

16 about the scope of discovery, so that we can figure out what

17 to do over the next four months.  It's -- it's a -- the --

18 the -- the more -- the more cautious path would be to pause,

19 wait, and then once we have that certainty, then we can

20 actually approach you with a more informed argument about

21 what is relevant at that point because then we will have --

22 we will have the benefit of potentially their amended

23 complaint, which will clarify their claims.  We'll have the

24 benefit of the Supreme Court's decision.  We may have the

25 benefit of the Ninth Circuit's, you know, whatever happens

32

1  there with their decision on -- on their orders on the

2  preliminary injunction.  And then we can fully flesh out

3  these issues.  We also have the proportionality analysis

4  able to be nailed down at that point.

5       And, so, this is -- because I'll readily concede that

6  there will be an incident report that says I, SFPD officer,

7  called DPW in order to deal with this property that was left

8  after I arrested the -- the person on the street because we

9  don't leave the property on the street.  DPW comes in and

10 addresses that under the bag and tag policy.  However, it

11 won't sweep in, assuming that the Eight Amendment goes away,

12 every single incident report that addresses every

13 interaction with officers.  The same is true of CADS and

14 body-worn camera footage, which adds up very quickly because

15 often there's more than one officer at a scene, and when

16 there is more than one officer, each one has their video

17 camera on.  And, so, you can end up with, you know, in a

18 one-hour encounter, five or six or seven or even ten hours

19 of footage, which needs to then be reviewed and produced.

20 We're in a much better situation if we know whether or not

21 it has to be produced, and then we can review it, as opposed

22 to wondering now whether or not we should continue to

23 collect and review all of that at, you know, remarkable cost

24 and also a lot of cost to the time of people at the agencies

25 who have to collect it and review it and get it over to us.

1    And, so, this is really -- it would be a really

2    unfortunate use of public resources and quitting the

3    resources of those who are providing these services to have

4    to continue to deal with these issues while this is all

5    quite uncertain about what t he scope of discovery will be.

6            THE COURT:  Okay.  Ms. Kashyap, you have the last

7    word.  Anything in response to what Mr. George just said?

8            MS. KASHYAP:  Thank you, your Honor.  Two points

9    briefly.  The first is because Defendants raised this point

10   really the first time in reply, the proportionality analysis

11   argument is based on the flawed premise that the

12   proportionality analysis will change as the result of the

13   Supreme Court ruling in <u>Grant's Pass</u>.  When we look at the

14   proportionality factors in Rule 26, for example, the

15   parties' relative access to information, the parties'

16   resources, those factors are not going to change, regardless

17   of what the Supreme Court does.  And, so, we disagree with

18   Defendants' contention that the proportionality analysis

19   will be meaningfully different.

20   And, second, to the overarching point that the scope of

21   discovery will be different, Defendants conflate their

22   opinion about the relative merits of Plaintiffs' other

23   claims with the scope of discovery.  Plaintiffs have very

24   clearly pled in the existing complaint where their claims

25   are based not only on the issues of property destruction but

34

1  also on the issues of displacement of unhoused individuals

2  without giving them access to shelter.  And, so, those facts

3  will remain relevant to the case.  Plaintiffs will be

4  entitled to seek discovery on those facts, and we will do

5  so.  All Defendants' proposal does is result -- prevent us

6  from doing that until at least the end of July, if not

7  later.

8      And then, finally, your Honor, if I may be heard just

9  briefly on the preliminary injunction discovery, which I

10  don't think the Court or the parties have discussed yet, I'm

11  happy to address that point as well, but I don't want to go

12  ahead if the Court's not ready for that.

13          THE COURT:  Well, I don't know that I need to hear

14  -- I mean, I asked you for a report.  You couldn't make a --

15  you couldn't agree.  So, I -- I get that the Plaintiffs want

16  to get those continuing reports.  The Defense doesn't think

17  that's appropriate unless -- but perhaps if -- would have

18  stipulated to it if the Plaintiffs stipulated to a stay.

19  That's my understanding.

20      Is that a fair statement?

21          MS. KASHYAP:  I think that's a fair

22  characterization, your Honor, with one clarification.

23  Plaintiffs' position is that we are entitled to not only the

24  ongoing disclosures in the ongoing discovery order but also

25  any other discovery that would be necessary to monitor

35

1 preliminary injunction compliance.  And that goes beyond

2 just the ongoing disclosure order.

3     And, so, were the Court to be inclined to grant the

4 stay, with the exception of preliminary -- excuse me --

5 preliminary injunction compliance discovery, we would want

6 to make clear that we believe we're entitled not only to

7 what's covered by the ongoing disclosure order but any other

8 discovery necessary to monitor compliance with the

9 injunction.

10          THE COURT:  What does that mean?

11          MS. KASHYAP:  Certainly, your Honor.  I can give

12 the Court a couple of examples.  First is the Plaintiffs

13 have already served discovery related to the City's conduct

14 during APEC.  That -- we served that discovery after

15 attempting to resolve some of our concerns about the City's

16 conduct during APEC with different Defendants informally.

17 We served discovery.  Defendants have responded that they

18 do, in fact, have responsive documents, but we've yet to

19 receive those responsive documents.  So, that would be the

20 -- an example of the type of discovery that's beyond the

21 ongoing disclosure order but is, nevertheless, necessary to

22 ensure that we are able to monitor compliance.

23     I think another example --

24          THE COURT:  I don't want just examples.  I want

25 the -- what's your wish list in case that's the way I go?  I

1  don't know yet when I'll be ruling on this.  I'm going to

2  take it under submission and give it some thought.  But if

3  you're saying, Well, if the Court issues a stay, we think we

4  should get not just the discovery that -- that was the

5  subject of the earlier order but the following things, so

6  APEC discovery.  What else?

7      MS. KASHYAP:  Well, your Honor, I think I might

8  struggle to come up with a conclusive list here and now.

9      THE COURT:  Well, that's a problem.  You should

10  know.

11      MS. KASHYAP:  Well, your Honor, here -- here's

12  what I can say.  I think the ongoing disclosure order was

13  entered into by the parties at a time when full discovery

14  was available, was open.  It was never intended to be the

15  only vehicle for us to monitor compliance with the

16  injunction.  And, so, any documents, communications,

17  information related to Defendants' practices during the

18  pendency of the injunction but also potentially training and

19  policy that predated the injunction to the extent that those

20  things have not changed since the injunction was put into

21  place would all be relevant to whether and how Defendants

22  are complying with the injunction.

23      And, so, I -- I gave APEC as an example, and we've

24  sought documents and communications related to the City's

25  preparation for APEC, its law enforcement response during

37

APEC, its coordination with other -- with other law

enforcement agencies outside of SFPD with respect to APEC.

And, so, those would be the types of things that we'd need

to be able to continue to have discovery into is what are

the City's practices, communications in realtime about how

it is complying with the injunction.

THE COURT:  Okay.  Mr. George, anything on that

last point, which is --

MR. GEORGE:  Yes.

THE COURT:  -- if I were to grant the stay, what

discovery should be allowed with respect to monitoring --

continuing to monitor compliance with the preliminary

injunction, which --

MR. GEORGE:  Your --

THE COURT:  -- should remain in place?

MR. GEORGE:  Your Honor, it's very -- it's really

unfortunate.  I -- we had the meet and confer on Monday

morning per your order, and I asked the exact questions that

you asked, which is what specifically is it that Plaintiffs

would like to see in terms of -- of documents, specific

documents that we can then consider about providing in order

to have ongoing discovery -- or, sorry -- ongoing compliance

monitoring, and I -- we didn't get an answer.  And, so, this

is the very first time that we're hearing about any

particular documents, which is very frustrating because we

1 were prepared on Monday morning to quickly turn around and

2 determine whether or not those were particular items that we

3 could -- that we could actually produce.

4      And, so, the City is willing to produce the -- the

5 continued categories that we identified from the ongoing

6 discovery order, and I'm happy to walk through those if

7 you'd like.  We did it by paragraph so that those are -- are

8 readily identifiable.  But I -- we do not view those other

9 categories pre -- pre-injunction training, APEC-related

10 discovery, and others as necessary to monitor ongoing

11 compliance.  I mean, the documents that we have been

12 producing have been more than sufficient.  In fact, they're

13 over-inclusive.  Lots of the incident reports when they're

14 producing under the sampling provision that's identified

15 through search terms, those identify arsons and assaults and

16 stolen vehicles and things that really just don't have

17 anything to do with -- with this case at all.

18      And, so, our position is is that we were more than

19 willing to continue to provide the particular paragraphs

20 that we identified, and if there's others from ECF 129 that

21 we want to talk about in specifics, I'm -- I'm happy to

22 discuss those.

23          THE COURT:  Okay.  Submitted?

24          MR. GEORGE:  Can I make a brief point about harm?

25 You mentioned that we could discuss harm, your Honor.

39

1            THE COURT:  Well, you -- you made your -- you made
2  your argument in your papers on harm, which is essentially
3  you think the Plaintiffs were not harmed because they had
4  agreed to move the trial into April, and they say, Well,
5  that's not the same thing as like having a stay and not
6  having anything move forward.
7       So, I -- I read your brief.  Was there anything in
8  addition to that?
9            MR. GEORGE:  I'll -- I'll rest on the papers, your
10  Honor, on that.
11            THE COURT:  Okay.
12            MR. GEORGE:  We'll save ourself some time.
13            THE COURT:  All right.  Anything further that
14  either side wants to -- to present that's not in your
15  briefs, that we haven't already talked about?
16            MS. KASHYAP:  No, your Honor.  Thank you.
17            THE COURT:  Okay.  Thanks very much.  That was
18  very helpful.
19            MR. GEORGE:  Thank you, your Honor.
20            MS. KASHYAP:  Thank you, your Honor.
21            MR. DO:  Thank you, your Honor.
22            THE COURT:  Thank you.
23       (Proceedings adjourned at 1:51 p.m.)
24
25

40

1                          CERTIFICATE OF TRANSCRIBER

2

3        I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9        I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16

17            Echo Reporting, Inc., Transcriber

18                Monday, February 12, 2024

19

20

21

22

23

24

25