UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COALITION ON HOMELESSNESS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, et al., <br><br> Defendants. | Case No. 22-cv-05502-DMR <br><br> **ORDER ON MOTION TO ENFORCE THE PRELIMINARY INJUNCTION RE: FOURTH AMENDMENT CLAIM** <br><br> Re: Dkt. No. 130 |

Plaintiffs filed this lawsuit in September 2022 against the City and County of San Francisco ("San Francisco" or "the City") and five San Francisco agencies, challenging the City's official response to homelessness, including its effort to address homeless encampments. The court partially granted Plaintiffs' motion for a preliminary injunction on their Eighth and Fourth Amendment claims. *Coal. on Homelessness v. City & Cnty. of San Francisco*, 647 F. Supp. 3d 806, 841-42 (N.D. Cal. 2022), *aff'd in part, vacated in part, remanded*, No. 23-15087, 2024 WL 3325655 (9th Cir. July 8, 2024). Defendants appealed. During the pendency of the appeal, Plaintiffs moved to enforce the preliminary injunction, arguing that Defendants are not complying with its terms at formal encampment operations. [Docket No. 130.] The court held a hearing on August 24, 2023 at which it denied without prejudice the portion of the motion to enforce as it pertains to Plaintiffs' Eighth Amendment claim and ordered Defendants to submit supplemental evidence relevant to the portion of the motion to enforce directed to the Fourth Amendment claim. [*See* Docket No. 180 (Minute Order).] Defendants timely submitted the supplemental evidence, to which Plaintiffs responded. [Docket Nos. 193 (Defs.' Supp. Evid.), 196 (Pls.' Resp. to Supp. Evid.).]

On June 28, 2024, the United States Supreme Court issued *City of Grants Pass, Oregon v.*

*Johnson*, 144 S. Ct. 22022224 (2024), in which it held that the Eighth Amendment's prohibition on cruel and unusual punishments does not prohibit "the enforcement of public-camping laws," abrogating *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019). The Ninth Circuit subsequently vacated the portion of the preliminary injunction related to Plaintiffs' claims of cruel and unusual punishment under the Eighth Amendment. *Coal. on Homelessness v. City & Cnty. of San Francisco*, No. 23-15087, 2024 WL 3325655, at *1 (9th Cir. July 8, 2024). The Ninth Circuit also affirmed the preliminary injunction directed to the Fourth Amendment claims, holding that this court did not abuse its discretion "by requiring the City to comply with its 'bag and tag' policy" as written. *Id*. As discussed below, the bag and tag policy governs the circumstances in which San Francisco's Department of Public Works may remove personal items "from public property for temporary storage and retrieval."

For the following reasons, Plaintiffs' motion to enforce the preliminary injunction with respect to the Fourth Amendment claim is granted in part and denied in part.[1]

## I. BACKGROUND[2]

Plaintiffs are a group of current and formerly homeless residents of the City and County of San Francisco and the Coalition on Homelessness, a non-profit advocacy organization.[3] In relevant part, they challenge San Francisco's alleged summary seizure and destruction of homeless individuals' personal property and survival belongings without notice or opportunities to recover their property as violating the Fourth Amendment. [Docket No. 135 (Second Amended Compl., "SAC") ¶ 8.] At issue in this motion is Defendants' compliance with the Department of Public

---

[1] Plaintiffs' unopposed administrative motion for leave to file a statement of recent decision is granted. [Docket No. 212.]

[2] The court has set out a detailed history of this litigation in previous orders and does not repeat that history here.

[3] Plaintiffs are Toro Castaño, Sarah Cronk, Joshua Donohoe, Molique Frank, David Martinez, Teresa Sandoval, and Nathaniel Vaughn, all current or formerly homeless residents of San Francisco, and the Coalition on Homelessness ("Coalition"), a non-profit advocacy organization. Defendants are San Francisco; San Francisco Police Department; San Francisco Department of Public Works ("DPW"); San Francisco Department of Homelessness and Supportive Housing; San Francisco Fire Department; and San Francisco Department of Emergency Management. [*See* Docket No. 135 (Second Am. Compl., "SAC").]

2

Works's ("DPW") Procedure No. 16-05-08, commonly known as the "bag and tag policy."

## A.     The Bag and Tag Policy

As described in the preliminary injunction order, the bag and tag policy sets forth the circumstances in which personal items may be "remov[ed] . . . from public property for temporary storage and retrieval" and provides that "all unattended personal property that is collected for storage will be bagged and tagged upon collection and taken to the Public Works Operations Yard for storage." *Coalition*, 647 F. Supp. 3d at 813-14.

The preliminary injunction order described the relevant terms of the bag and tag policy as follows:

> DPW staff must collect the personal items and "while in the field document[ ] the collection with a personal property collection bag and tag intake form," which specifies the date and time the items were collected, the number of items or bags, a description of the items, the location at which the items were collected, the owner's name, and the names of DPW workers and SFPD officers, if applicable, among other information.  The policy provides that DPW stores personal items for 90 days and describes the process for retrieval.
>
> According to the policy, "[t]here is no limit to the number or volume of personal items that Public Works will bag and tag for a particular individual" as long as they do not constitute items that may be discarded. Bag and Tag Policy 2. The policy authorizes DPW to discard "[i]tems that present an immediate health or safety risk"; "[p]erishable items, perishable food"; and "[a]bandoned property," as defined in the policy, among other categories. *Id.* at 2. It also states that "[t]rash, garbage, and/or debris" will be discarded and that "[i]f staff has a reasonable doubt as to whether an item constitutes trash, it should be collected and stored." *Id.*
>
> The policy distinguishes between unattended and abandoned property:
>
>> Temporarily unattended property is different from abandoned property, which may be immediately discarded. In determining if property is abandoned, staff should evaluate the facts and circumstances surrounding the items. Unattended property is not abandoned if it is accompanied by signs of ownership—for example, an unattended tent that is filled with personal belongings or items that are being stored in an orderly manner (i.e., packed up, wrapped or covered).
>>
>> In addition, if there is a third party present who states they have been designated to watch or secure the items during the owner's temporary absence, the items are not abandoned and are attended property . . .

3

> *Id.* at 1. In contrast, abandoned property is that which is "unaccompanied by objective indications of ownership." The bag and tag policy does not apply to abandoned property.
>
> The bag and tag policy also provides guidance for the process to be followed in "encampment resolutions." In such cases, the policy states
>
>> Staff should (a) provide the owner or person who is watching the owner's property with a reasonable time (approximately 30 minutes) to collect and move his/her belongings, taking into account any special needs that individuals may have and the volume of belongings, (b) bag and tag those personal items that the owner or owner's designee cannot or does not remove him/herself, and (c) provide information on how and where the items may be retrieved. HSOC staff must provide the advisement concerning medications, medical devices, and personal identification and documents discussed . . . in subsection b.
>
> *Id.* at 1-2. Subsection b, in turn, states that "[p]rior to bagging and tagging," HSOC staff "must advise the owner or owner's designee to separate any medications, medical devices, personal identification and legal documents." Bag and Tag Policy 1.

*Coalition*, 647 F. Supp. 3d at 813-14.

As noted in the preliminary injunction order, "Plaintiffs acknowledge that the [bag and tag] policy itself is constitutional." *Id*. at 837. Nonetheless, Plaintiffs submitted unrebutted "evidence of widespread seizure and destruction of homeless individuals' unabandoned personal property." *Id*. at 838. The court concluded that Plaintiffs had "shown a likelihood of success on their Fourth Amendment claim based on San Francisco's 'seizing and destroying' homeless individuals unabandoned property and the resulting 'meaningful[ ] interfer[ence] with [their] possessory interests in that property'" in violation of the Fourth Amendment and San Francisco's own bag and tag policy. *Id*. at 839, 841 (quoting *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1030 (9th Cir. 2012)).

Finding that Plaintiffs had established the remaining preliminary injunction factors, *id*. at 839-40, the court preliminarily enjoined Defendants from violating San Francisco's bag and tag policy and denied Plaintiffs' request for appointment of a special master without prejudice. *Id*. at 841-42.

### B. Plaintiffs' Motion for Enforcement

Plaintiffs move to enforce the preliminary injunction, arguing that City employees have

4

taken and destroyed their personal property during encampment operations even though their belongings are not abandoned, not trash, and not hazardous materials, in violation of the bag and tag policy. Plaintiffs submitted over two dozen declarations from percipient witnesses, including homeless individuals and Coalition observers, describing encampment operations and other interactions with DPW and other City workers since the date of the preliminary injunction order, December 23, 2022, through the filing of this motion.[4] They ask the court to order Defendants to conduct additional training on the bag and tag policy. *See* Pls.' Resp. to Supp. Evid. 4. They also ask that the court order Defendants "to produce periodic reports under oath regarding Defendants' compliance with the Court's preliminary injunction at all . . . property removal/destruction, or other operations involving interfacing with unhoused individuals and their property" and appoint a Special Master at Defendants' expense to assist with implementation of the preliminary injunction and monitoring compliance. Mot. vi.

---

[4] Defendants made various general objections to Plaintiffs' evidence, including that their declarations are "replete with hearsay, speculate without adequate foundation, assert improper legal conclusions, and posit unsupported opinions and arguments." Opp'n 5 (internal citations omitted). They do not identify any particular portions of the declarations to which they object, instead listing entire declarations. *See id.* They submitted "itemized objections" to Plaintiffs' evidence via a four-page chart attached to a declaration by counsel. [Docket No. 143-56 (Gradilla Decl. Jul. 6, 2023) ¶ 4, Ex. B.] Defendants' objections violate Local Rule 7-3(a), which provides that "[a]ny evidentiary . . . objections to the motion must be contained within the brief or memorandum." The court will not consider them.

Defendants also filed timely objections to Plaintiffs' reply evidence pursuant to Local Rule 7-3(d)(1). [Docket No. 161.] Plaintiffs filed a response to the objections without leave of court, to which Defendants responded via a letter to the court. [Docket Nos. 164, 165.] Defendants then filed a motion for administrative relief in which it asks the court to disregard the new evidence submitted with Plaintiffs' reply or permit them to file a surreply, to which Plaintiffs filed an opposition. [Docket Nos. 168, 170.] Other than Defendants' objections to Plaintiffs' reply evidence, which are authorized by the local rules, these unauthorized filings waste judicial resources and unnecessarily multiply the proceedings. The court declines to consider Plaintiffs' responses to the objections and denies Defendants' administrative motion to disregard the new evidence or for permission to file a surreply. The administrative motion to seal documents submitted with Defendants' administrative motion to disregard the new evidence or for permission to file a surreply is denied as moot. [Docket No. 167.]

As to the substance of Defendants' objections to reply evidence, the court denies the objections to the Luz declaration, Myers' supplemental declaration, portions of Verner-Crist's supplemental declaration, and portions of Castano's supplemental declaration as moot as it does not rely on the objected-to materials in this order. The court overrules the objections to Shroff's Supplemental Declaration, as the statements in that declaration respond to the contentions in Defendants' opposition about their document productions to date and were properly submitted with Plaintiffs' reply.

1  Defendants respond that DPW properly discards items in compliance with the bag and tag
2  policy because these items are either subject to immediate disposal under the policy or are
3  commingled with items that are subject to immediate disposal. They argue that Plaintiffs'
4  evidence does not establish "that the items seized were free of mold or mildew, were not soiled
5  with human fluids or waste, were not co-mingled with items that DPW properly discarded, or were
6  otherwise salvageable." Opp'n 20. They submit declarations from various City employees,
7  including DPW supervisors Darryl Dilworth and Khaled Shehadeh, in opposition to Plaintiffs'
8  motion.

9  At the hearing, the court noted that Plaintiffs had submitted "evidence . . . that bag and tag
10 is not being followed in every instance, and there's certainly reason to believe the training [on the
11 bag and tag policy] has not been very robust in either its breadth or its depth." [Docket No. 181
12 (Hr'g Tr.) 48.] For example, the lead investigator from ACLU of Northern California, one of the
13 organizations representing Plaintiffs in this case, describes seeing DPW workers throwing "a
14 blanket atop two neat suitcases" into a dump truck. Verner-Crist Decl. ¶ 50, Exs. E-G (photos of
15 same). Krystle Erickson states that DPW took her belongings that had been "set neatly to the side
16 of [her] tent and covered with a tarp," including a brand new grill, dishes, camp gear, and suitcases
17 with her clothing. Erickson Decl. ¶ 7. Pauline Wise states she saw a worker put her jewelry "into
18 his pocket and get in the truck" and tell her that the items "belong to the City now," indicating that
19 those items were not commingled with soiled or hazardous materials. *See* Wise Decl. ¶ 5.

20 The evidence submitted by Defendants with their opposition brief regarding training on the
21 bag and tag policy was thin and conclusory. Dilworth explains that he manages the "Hot Spots
22 Team," which is a group within DPW's Bureau of Street Environmental Services that works with
23 Healthy Streets Operation Center ("HSOC") resolution operations. Shehadeh is a supervisor
24 responsible for "Zone" work, which "is the complaint-driven part of" the Bureau of Street
25 Environmental Services, in the Tenderloin and surrounding neighborhoods where Tenderloin Joint
26 Field Operations works. [Docket Nos. 143-14 (Dilworth Decl. June 29, 2023) ¶¶ 3-7; 143-93
27 (Shehadeh Decl. June 28, 2023) ¶¶ 2-5, 7, 10.] Dilworth states generally that he is aware of the
28 preliminary injunction that requires DPW to comply with the bag and tag policy and that the Hot

6

1  Spots Team "only removes items consistent with" the policy. Dilworth Decl. ¶ 17. Dilworth and
2  Shehadeh state that the Hot Spots Team and Zone laborers are "trained on" the bag and tag policy
3  but offer few details of such training. Dilworth Decl. ¶¶ 36, 37; Shehadeh Decl. ¶¶ 21, 22, Ex. A
4  (sign-in sheet for training dated Dec. 1, 2022).

5  Given the shortcomings in the City's evidence regarding its training of DPW employees on
6  the bag and tag policy, the court ordered Defendants to submit "a detailed declaration describing
7  how many DPW employees interact with homeless individuals with respect to cleaning; the
8  context in which they interact with homeless individuals with respect to cleaning; and the training
9  they receive on the bag and tag policy, including the frequency, length and format of the training
10 and details of any training materials." It gave Plaintiffs the opportunity to file a five-page
11 response to Defendants' evidence. Minute Order. The parties timely filed the requested materials.

## II. DISCUSSION

In response to the court's order to provide detailed evidence, San Francisco submitted
declarations from DPW Interim Director Carla Short[5] and Jonathan Vaing, who is the Assistant
Superintendent for the Bureau of Street and Environmental Services ("BSES"). According to
Short and Vaing, out of the 1,800 budgeted positions at DPW, approximately 100 employees have
work responsibilities that require them to interact with homeless individuals with respect to
cleaning. Short Decl. ¶¶ 6, 7; Vaing Decl. ¶ 5. Those employees work on three teams that are part
of DPW's Bureau of Street and Environmental Services ("BSES"): the Zone, Hot Spot, and
Special Projects Teams. Vaing Decl. ¶ 5; Short Decl. ¶ 13.

Zone employees work in one of six geographic "zones" in the City and respond to
complaints about cleaning the City's streets and sidewalks in their zone. Vaing Decl. ¶ 12. The
Zone team has 84 current active employees. *Id*. Additionally, Zone employees assigned to Zone
B, which includes the Tenderloin, support Joint Field Operations. *Id*. The Hot Spot team is
responsible for supporting HSOC resolution operations. *Id*. at ¶ 14. There are currently six

---

[5] Defendants filed a version of Short's declaration that is missing page iii, which presumably includes all of paragraphs 8 through 11 and portions of paragraphs 7 and 12. [*See* Docket No. 193-1.]

1 employees on the Hot Spot Team. *Id*. The Special Projects team manages and stores property that
2 DPW collects under the bag and tag policy and staff the property storage area at the DPW Yard.
3 *Id*. at ¶ 16. Special Projects has 10 current active employees. *Id*.

4 Vaing states that DPW trains employees in the Zone, Hot Spot, and Special Projects teams
5 on the bag and tag policy in three ways: (1) PowerPoint presentations; (2) weekly refreshers and
6 reminders; and (3) on-the-job training from supervisors. Vaing Decl. ¶¶ 19, 20.

### A. PowerPoint Presentation

San Francisco submitted a copy of DPW's PowerPoint presentation. Vaing Decl. ¶ 21, Ex. B (PowerPoint). The 14-page PowerPoint presentation is undated and Vaing does not state when it was created. *See id*. According to Vaing, he has led trainings using the PowerPoint presentation "to BSES employees at least three times since January 2023." The training takes approximately 30 minutes. Vaing Decl. ¶ 22. The slides include language from the bag and tag policy, flow charts, and sample notices and forms to fill out for bagged and tagged property.

The presentation does not include a section on frequently asked questions or address challenges in following the bag and tag policy. It also contains no instruction on the importance of strict compliance with the policy or refer to the preliminary injunction order, and Vaing does not describe how he communicates the importance of strict compliance to DPW employees. Additionally, although Vaing states that he has given the presentation at least three times since January 2023, he does not state how many DPW employees attended the trainings or whether attendance was mandatory. Other than Vaing's statement about the number of times he has given the PowerPoint presentation, Defendants did not submit documentation of the presentations or information about attendees.

### B. Weekly Staff Meetings

Vaing states that DPW "regularly reminds employees of their obligations under the bag and tag policy at weekly meetings." Vaing Decl. ¶ 23. Individuals at the Supervisor II rank attend weekly "Sup II" meetings and disseminate information from the Sup II meetings to their teams in "Tailgate Meetings." *Id*. at ¶¶ 23, 28. Sup II meetings typically last 30 minutes. Tailgate Meetings last 30-60 minutes. *Id*. at ¶¶ 25, 28.

8

Vaing states that Sup II meetings "address current issues relevant to BSES's work, ongoing issues, and upcoming events" and that he "frequently review[s] the same content from the PowerPoint presentation orally during the Sup II meetings." Sup II meetings are documented in meeting minutes. *Id*. at ¶¶ 25, 26. Vaing submits Sup II meeting minutes from 14 meetings between April 18, 2023 and September 5, 2023. *Id*. at ¶ 27, Ex. C. For nearly every set of meeting minutes, the references to the bag and tag policy have to do with taking photos to "document everything," and are not about the substance of the policy. *See* Vaing Ex. C. For example, there are no references in the meeting minutes to subjects such the circumstances in which DPW should collect and store personal items, what items must be collected and stored, how to distinguish between unattended and abandoned property, or giving individuals "a reasonable time" to collect and move their belongings.

With respect to Tailgate meetings, Vaing states "the team supervisor would have relayed the same information he or she learned during the previous Sup II meetings, including reminders and training regarding DPW's bag and tag policy." Vaing Decl. ¶ 29. Some Tailgate meetings require a sign-in sheet. *Id*. at ¶ 29, Ex. D (sign-in sheets). Vaing submits copies of sign-in sheets for 13 Tailgate meetings at which "bag and tag issues were raised," nine of which took place after the preliminary injunction order. Vaing Decl. ¶ 30, Ex. E. The sign-in sheets do not list or describe which "bag and tag issues" were addressed. *See id*.

### C.   On-the-Ground Training

Vaing states that BSES employees also receive on-the-ground training related to the bag and tag policy. Vaing Decl. ¶ 31. For example, supervisors are "typically on-scene" during HSOC resolutions or JFO engagements to "help crew members determine whether materials should be bagged and tagged or whether they are discardable under the policy." *Id*. at ¶ 32. When Zone workers respond to 311 calls for service, they can reach supervisors for questions via "the radio room." Vaing states that "[t]hese interactions provide opportunities for BSES crew members to ask questions of their supervisors in real time and get guidance on how to apply the bag and tag policy." *Id*. Vaing does not state that any training on the bag and tag policy actually takes place during these interactions or that DPW crew members ask questions about

9

1   implementing the policy.

2   Vaing also states that supervisors review bag and tag forms completed by their teams, and
3   that "[t]o the extent a supervisor notices anything missing from the paperwork, they have an
4   opportunity to address the issue with the employee and provide guidance on the bag and tag
5   policy." *Id*. at ¶¶ 33, 34.  He does not describe any instances of supervisors providing such
6   guidance.

\* \* \*

8   The court has carefully considered the Vaing and Short declarations.  They fall short of
9   demonstrating meaningful training of City workers on the bag and tag policy as of September
10  2023, the date that Defendants submitted the declarations.  First, Vaing's declaration regarding
11  DPW training gives few details about the substance of the information communicated to DPW
12  workers about the policy.  The PowerPoint presentation largely repeats portions of the bag and tag
13  policy verbatim.  Vaing does not state whether he and other supervisors educate workers on the
14  detailed requirements of the policy or train workers on particular challenges in implementing the
15  policy.  Such challenges include distinguishing between unattended personal property vs.
16  abandoned property and determining whether personal property is co-mingled with items that
17  present an immediate health or safety risk.  These aspects of the bag and tag policy require
18  workers to exercise some level of judgment and appear to give rise to the most disputes, as shown
19  by Plaintiffs' evidence in support of this motion.  There is no indication in Vaing's declaration that
20  the training recognizes or addresses these challenges in applying the bag and tag policy.  Vaing
21  also does not state which or how many DPW employees have received the PowerPoint training.

22  Second, it does not appear that supervisors have communicated to DPW workers the
23  substance of the court's preliminary injunction or the importance of following the bag and tag
24  policy.  This is troubling given that Plaintiffs presented "evidence of widespread seizure and
25  destruction of homeless individuals' unabandoned personal property" in violation of the policy in
26  the preliminary injunction order, *see Coalition*, 647 F. Supp. 3d at 838, and the evidence
27  submitted in connection with this motion that suggests ongoing violations of the policy.

28  With respect to the Sup II meetings, the meeting minutes offer little information about the

1  subjects discussed, including guidance regarding compliance with the policy.  As to the "on-the-
2  ground training," Vaing provides no concrete examples of such training in action or common
3  questions that arise.  Other than reviewing bag and tag forms to ensure completion, Vaing
4  provides no information about how supervisors ensure compliance by DPW workers, how
5  supervisors incentivize adherence to the policy, or how supervisors address instances of
6  mishandling homeless individuals' property and violations of the policy.

7         In sum, Defendants' evidence regarding training on the bag and tag policy raises more
8  questions than answers.  The court concludes that additional training of DPW employees is
9  required to ensure Defendants follow the preliminary injunction with respect to the bag and tag
10  policy.  Plaintiffs' motion to enforce is granted in part, as follows: the parties shall immediately
11  meet and confer on a joint proposal regarding the appropriate contents of future training for DPW
12  employees on the bag and tag policy, attendance, and frequency of such training.  Additionally,
13  the parties shall meet and confer on how to document DPW's training on the bag and tag policy
14  going forward, including the periodic submission of sworn declaration(s) describing training on
15  the bag and tag policy to the court.  By no later than two weeks from the date of this order, the
16  parties shall submit a joint letter brief that does not exceed five pages, exclusive of exhibits,
17  setting forward a joint training proposal and documentation of the same.  If the parties are unable
18  to agree, the joint letter shall set forth separate proposals.

19         In addition, to bring the pertinent information up to date, Defendants shall supplement the
20  record regarding training on the bag and tag policy.  By August 26, 2024, Defendants shall file
21  updated declarations describing in detail all training on the bag and tag policy that has taken place
22  since the dates of the Short and Vaing declarations.

23         The court denies Plaintiffs' request to appoint a special master without prejudice.  It also
24  denies without prejudice Plaintiffs' request for regular compliance reports, only detailed for the
25  first time in their response to Defendants' supplemental evidence.  Plaintiffs request that
26  Defendants be ordered to demonstrate compliance with the bag and tag policy by requiring DPW
27  to "create, maintain, and disclose logs that describe when and where the property of unhoused
28  people is seized and summarily discarded or destroyed, why the property was deemed discardable

under the bag and tag policy, what property sorting took place if any, individuals who made the decision to remove the property, and photographs with time and location stamps corresponding to instances of property destruction and disputed items." *See* Pls.' Resp. to Supp. Evid. 5. Requiring this level of detailed documentation would create burdens on Defendants' operations that are not currently justified.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs' motion to enforce the preliminary injunction with respect to the Fourth Amendment claim is granted in part and denied in part. The parties' training proposal(s) are due by August 19, 2024. Defendants' updated declarations regarding training that has taken place since the submission of their supplemental evidence is due by August 26, 2024.

**IT IS SO ORDERED.**

Dated: August 5, 2024



Donna M. Ryu
Chief Magistrate Judge