# EXHIBIT A

2024 WL 4475248
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Strong Communities Foundation of
Arizona Incorporated, et al., Plaintiffs,
v.
Stephen Richer, et al., Defendants.

No. CV-24-02030-PHX-KML
|
10/11/2024

**ORDER**

*1 Fifty-one days before the general election, Plaintiffs Strong Communities Foundation of Arizona (which refers to itself as "EZAZ.org") and Yvonne Cahill lodged a motion seeking to require every county recorder in Arizona to perform "voter list maintenance" by submitting a list of certain registered voters to the U.S. Department of Homeland Security ("DHS") "to verify the[ir] citizenship and immigration status[.]"[1] By plaintiffs' own admission, the recorders—many of whom had not been served when EZAZ.org lodged its oversized emergency motion— would be required to submit tens of thousands of voter names. Plaintiffs' mandatory injunction would also require defendants to provide certain information to the Arizona Attorney General.

Plaintiffs are not entitled to a preliminary injunction because they have not made a sufficiently clear showing they have standing. Plaintiffs' request raises no more than a "generalized grievance" shared by every Arizona voter that elected officials must follow the law. Cahill has not established an individualized injury in fact and EZAZ.org therefore lacks representational standing. The Ninth Circuit's recent opinion in *Arizona Alliance for Retired Americans v. Mayes* ("*Arizona Alliance*"), --- F.4th ----, 2024 WL 4246721 (9th Cir. 2024), applying the Supreme Court's decision in *FDA v. All. for Hippocratic Medicine* ("*Hippocratic Medicine*"), 602 U.S. 367 (2024), compels the rejection of EZAZ.org's organizational standing arguments. And even if plaintiffs had shown an injury in fact, the mismatch between their shifting requests for emergency relief and stated goals would prevent a federal court from redressing their injury.

Alternatively, plaintiffs are not entitled to emergency relief because the election is too close to require the action they request. The court declines to order Arizona's county recorders to divert resources from preparing for the general election to instead submitting thousands of requests to DHS when plaintiffs have not shown clearcut injury, particularly when the relief they originally requested—"ensur[ing] that 'voters...who are not eligible to vote [in federal elections] are removed' " from voter rolls (Doc. 12 at 2 (citing 52 U.S.C. § 21083(a)(2)(B)(ii))[2]—is currently precluded by the National Voter Registration Act ("NVRA") quiet period.

**I. Factual Background**

No party has requested an evidentiary hearing, presumably because none believe one is necessary. *Compare Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 555 (9th Cir. 1986) (hearing may be merited when there are "sharply disputed...facts"), *with Charlton v. Est. of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988) (hearing need not be held when "facts are not in dispute") (quoting *Pro. Plan Examiners of New Jersey, Inc. v. Lefante*, 750 F.2d 282, 288 (3d Cir. 1984)). For purposes of resolving plaintiffs' motion, the court accepts as true the facts alleged in the complaint and set forth in the exhibits to plaintiffs' motion except as otherwise noted. (Docs. 12, 57 at 36–165.)

*2 Federal and Arizona law prohibit non-citizens from voting. (Doc. 12 at 3 (citing 18 U.S.C. § 611(a); Ariz Const. Art. VII § 2(A); Ariz. Rev. Stat. § 16-101(A)(1)).) Despite those prohibitions, plaintiffs allege non-citizens appear on voter lists and have voted. (Doc. 12 at 17.) The focus of the present suit is on ensuring the accuracy of the lists of registered voters maintained by each county recorder. The parties refer to the efforts at maintaining accuracy as "voter list maintenance." Plaintiffs' complaint defines "voter list maintenance" as "ensur[ing] that 'voters...who are not eligible to vote [in federal elections] are removed" from voter registration lists. (Doc. 12 at 17 (quoting 52 U.S.C. § 21083(a)(2)(B)(ii)).)

Federal law requires States to perform voter list maintenance in certain prescribed ways. *See* 52 U.S.C. § 21083(a)(2) (voter list maintenance); 52 U.S.C. § 20507(b)(1) (requiring voter list maintenance to be "uniform," "nondiscriminatory," and to comply with the Voting Rights Act of 1965). Arizona law also requires county recorders to perform various acts of voter list maintenance. In 2022, Arizona adopted additional voter list maintenance requirements. *See* 2022 Ariz. Legis.

Serv. Ch. 370 (H.B. 2243); 2022 Ariz. Legis. Serv. Ch. 99 (H.B. 2492); Ariz. Rev. Stat. §§ 16-121.01, 16-143, 16-165. Plaintiffs allege the county recorders have not complied with their obligations under the 2022 Arizona laws and are discriminating against certain voters by only submitting citizenship checks to DHS when a voter has provided an alien number or other DHS numeric identifier. (Doc. 12 at 31–32.)

**A. Arizona's Voter Registration System**
Arizona's system of voter registration is bifurcated such that some voters are only eligible to vote in federal elections and not state or local ones. (Doc. 12 at 14.) This system developed due to the interplay between federal and state election laws.

A federal statute, the NVRA, requires all states to "accept and use" the voter registration form authorized by a federal body. 52 U.S.C. § 20505(a)(1). The federal form is designed to "guarantee[ ] that a simple means of registering to vote in *federal* elections will be available." *Arizona v. Inter Tribal Council of Arizona, Inc. ("ITCA")*, 570 U.S. 1, 12 (2013) (emphasis added). The federal form requires applicants to certify under penalty of perjury that they are United States citizens but does not require them to submit documentary proof of that citizenship. (*See* Doc. 57 at 52.) And the NVRA prohibits states from imposing a proof-of-citizenship requirement on registrants who use the federal voter registration form. *ITCA*, 570 U.S. at 15.

Although Arizona is required to accept the federal form, it is also permitted to use its own state registration form that "may require information the Federal Form does not." *Id.* at 12. Voters who use the Arizona form and submit documentary proof of citizenship ("DPOC") are registered to vote in federal, state, and local elections. (Doc. 12 at 13–14.) Individuals who register using the federal form *and* provide DPOC are likewise registered to vote in federal, state, and local elections. *Mi Familia Vota v. Fontes*, --- F. Supp. 3d ----, 2024 WL 862406, at *2 (D. Ariz. 2024). But individuals who register using the federal form without providing DPOC are only allowed to vote in primary and general elections for candidates running in federal races. (Doc. 12 at 14.) These voters are referred to as "Federal-Only Voters."

The NVRA does not preclude states from "deny[ing] registration based on information in [their] possession" which establishes an applicant's ineligibility. *ITCA*, 570 U.S. at 15 (citation omitted). In effect, the interplay between *ITCA* and the NVRA requires Arizona to allow individuals to apply to register to vote in federal elections using the federal form but, after receiving the application, it may investigate the applicant's eligibility and deny registration to any person who it finds ineligible to vote.

**\*3** In 2022, Arizona amended its election statutes "to impose stricter voter list maintenance requirements for Federal-Only Voters." (Doc. 12 at 12.) These relatively-new voter list maintenance requirements serve as the basis for the present suit.

**B. Arizona's 2022 Changes**
Under the 2022 laws, county recorders must take specific actions after receiving a new voter registration application on the federal form when that form is not accompanied by "satisfactory evidence of citizenship." Ariz. Rev. Stat. § 16-121.01(D). "Within ten days after receiving" an application on the federal form, a county recorder "shall use all available resources to verify the citizenship status of the applicant." Ariz. Rev. Stat. § 16-121.01(D). At a minimum, a country recorder "shall compare the information" on the federal form "with the following, provided the county has access":

  1. The department of transportation databases of Arizona driver licenses or nonoperating identification licenses.

  2. The social security administration (SSA) databases.

  3. The United States citizenship and immigration services systematic alien verification for entitlements program (SAVE), if practicable.

  4. A national association for public health statistics and information systems electronic verification of vital events system (EVVE).

  5. Any other state, city, town, county or federal database and any other database relating to voter registration to which the county recorder or officer in charge of elections has access, including an electronic registration information center database.

Ariz. Rev. Stat. § 16-121.01(D)(1)-(5).
Some new voter list maintenance provisions require county recorders to perform certain monthly checks "[t]o the extent practicable," such as comparing the voter list against specified databases maintained by the Social Security Administration and U.S. Citizenship and Immigration Services. Ariz. Rev. Stat. §§ 16-165(G), (H), (I). But the new provision plaintiffs

invoke in this suit does not require monthly action. (See Doc. 12 at 16–17 (quoting Ariz. Rev. Stat. § 16-165(K).) Instead, it requires: "[t]o the extent practicable, the county recorder shall review relevant city, town, county, state and federal databases to which the county recorder has access to confirm information obtained that requires cancellation of registrations pursuant to this section." Ariz. Rev. Stat. § 16-165(K).

Finally, the 2022 changes imposed a new requirement regarding sharing information with the Arizona Attorney General. That statute reads "[t]he secretary of state and each county recorder shall make available to the attorney general a list of all [Federal-Only Voters] and shall provide, on or before October 31, 2022, the applications of individuals who are [Federal-Only Voters]." Ariz. Rev. Stat. § 16-143(A).

**C. Parties**

There are two named plaintiffs: EZAZ.org and Yvonne Cahill. EZAZ.org is a nonprofit organization headquartered in Arizona whose mission "is to make civic participation easy and accessible for all Americans." (Docs. 12 at 4, 57 at 38.) "An essential part" of EZAZ.org's mission "is ensuring that Arizona's elections are free, fair, and lawfully administered, which includes proper voter list maintenance." (Docs. 12 at 5, 57 at 38.) It allegedly has over 59,000 mailing list subscribers, has received donations from over 4,000 people, conducts 90 or more public events a year, and has 3,001 volunteers. (Doc. 57 at 38.) EZAZ.org purportedly has 573 members who are Arizona citizens and are registered in each of Arizona's fifteen counties. (Doc. 57 at 39.)

*4 EZAZ.org's volunteers conduct "door-knocking campaigns to educate voters." (Doc. 57 at 39.) During those campaigns, volunteers have allegedly "been encountering an increasing number of voters (of all political persuasions) who state that they do not believe that their votes matter because they believe that their votes will be cancelled out by illegal votes." (Doc. 57 at 39.) Because of this, EZAZ.org alleges they have had to "expend significant amounts of time and money responding to...voter concerns and...conducting voter education about this issue." (Doc. 57 at 40.)

The other plaintiff is Yvonne Cahill. She is a naturalized citizen of the United States and an Arizona resident. (Doc. 12 at 5.) She regularly votes in Arizona's primary and general elections and "plans to vote in Arizona's upcoming federal and state elections." (Doc. 12 at 5.) Because Cahill plans to vote in "state elections," she is not a Federal-Only Voter.

But based on Cahill's plan to vote, she allegedly "has a clear interest in supporting the enforcement of Arizona's election laws, including list maintenance requirements." (Doc. 12 at 5.)

Defendants are comprised of all fifteen Arizona counties[3] and each of their county recorders. (Doc. 12 at 1–2.) Twelve counties joined Maricopa County's opposition (Doc. 48), while Mohave County filed its own opposition (Doc. 82). Only Greenlee County "cannot...find a reasonable reason for opposing" a preliminary injunction because for it, compliance would only "result in a few county man-hours" compared to how long it will take to answer the lawsuit. (Doc. 77 at 2.) Greenlee County has five active Federal-Only Voters and four inactive ones. (Doc. 77 at 2.)

**D. Plaintiffs' Allegations**

Plaintiffs allege defendants have failed to comply with the 2022 statutory changes. Plaintiffs argue one obstacle the county recorders have faced in performing voter list maintenance is that "Secretary of State Adrian Fontes has neglected to obtain access...to the three databases that the statutes specifically require be consulted to verify citizenship:" the SAVE, SSA, and EVVE databases.[4] (Doc. 12 at 16.) But they do not name Fontes as a defendant, and even universal use of these three databases would not satisfy plaintiffs because these databases are "insufficient to definitively verify the citizenship of all Federal-Only Voters." (Doc. 12 at 18.) Thus, plaintiffs allege consulting these databases would be "insufficient to fulfill a County Recorder's list maintenance duties under State and federal law." (Doc. 12 at 18.)

Instead, plaintiffs allege Ariz. Rev. Stat. §§ 16-121.01(D) (which applies during the first ten days after a Federal-Only Voter registers) and 16-165(K) (governing cancellation after the first ten days) require county recorders to make specific requests to DHS asking to verify individuals' citizenship status. (Doc. 12 at 15–16, 24–25.) Plaintiffs reach this conclusion by reference to 8 U.S.C. § 1373(c), which requires DHS to respond to government agencies requesting to verify an individual's citizenship status "for any purpose authorized by law." (Doc. 12 at 22.) These requests to DHS are referred to as "1373 requests." Plaintiffs believe DHS's responses to 1373 requests would provide accurate results regarding voters' citizenship. They further allege a 1373 request qualifies as an "available resource[ ]" under Ariz. Rev. Stat. § 16-121.01(D) and a "federal database[ ] to which the county

Case 4:22-cv-05502-DMR   Document 253-1   Filed 10/17/24   Page 5 of 12
Strong Communities Foundation of Arizona Incorporated, et al.,..., Slip Copy (2024)
2024 WL 4475248

recorder has access" under Ariz. Rev. Stat. § 16-165(K) such that county recorders "have a mandatory obligation" to submit 1373 requests even later than ten days after a Federal-Only Voter registers. (Doc. 12 at 24.) In plaintiffs' view, federal law also requires county recorders to submit 1373 requests to fulfill their obligations to make " 'reasonable effort[s]' to remove potentially ineligible voters." (Doc. 12 at 24 (citing 52 U.S.C. § 21003(a)(2)(A), (a)(4)(A), (a)(2)(B)(ii).)

**\*5** Plaintiffs allege defendants have not been submitting 1373 requests. Their evidence is "the number of Federal-Only Voters increasing in recent months by unprecedented amounts." (Doc. 57 at 27, 40.) In other words, plaintiffs believe there has been an unprecedented surge of individuals registering to vote and if the county recorders were to submit 1373 requests, they would discover some of those new registrants are ineligible. Plaintiffs do not provide any plausible factual allegations supporting this belief.[5] Despite this, EZAZ.org claims it has been forced "to expend significant resources and money to monitor data about the registration of Federal-Only Voters." (Doc. 57 at 27, 40.) And it claims it has had to "expend more resources on educating State Legislators" about the alleged issues and possible solutions to them. (Doc. 57 at 27, 40.)

Plaintiffs fault the county recorders for not submitting 1373 requests, but they also complain the county recorders have refused to provide the Arizona Attorney General with the lists required by Ariz. Rev. Stat. § 16-143(A). That statute states "each county recorder shall make available to the attorney general a list of all [Federal-Only Voters] and shall provide, on or before October 31, 2022, the applications of individuals who are [Federal-Only Voters]." Ariz. Rev. Stat. § 16-143(A). Plaintiffs' complaint does not differentiate between the requirement to "make available" a list of all Federal-Only Voters and the requirements to "provide" a list of all Federal-Only Voters no later than October 31, 2022.

### E. Procedural History

On August 5, 2024, plaintiffs filed this suit in state court. (Doc. 1-1 at 14.) One week later, Maricopa County and its recorder removed the case to federal court. (Doc. 1). On August 16, Voto Latino and One Arizona moved to intervene.[6] (Doc. 9.) On August 30, plaintiffs filed their opposition to the motion to intervene. (Doc. 11.)

On September 3, plaintiffs filed an amended complaint which remains the operative complaint. (Doc. 12.) The amended complaint asserts four claims under Arizona law and one under the NVRA. (Doc. 12 at 28–31.) The four state claims are different ways of alleging the counties and their recorders are violating the 2022 voter list maintenance requirements by failing to make 1373 requests or by failing to provide information to the Arizona Attorney General. The federal claim is that defendants' handling of a subset of registration forms submitted by Federal-Only Voters violates the NVRA. The complaint's stated goal is "to restore public trust in [Arizona's] electoral system by holding the Defendants accountable for their failures and to ensure that the list maintenance required by the law—and common sense —is performed[,]" with "voter list maintenance" defined as including the removal of ineligible voters. (Doc. 12 at 3–4.) The amended complaint requests declaratory and injunctive relief establishing Arizona's county recorders must make 1373 requests for all Federal-Only Voters and provide information to the Arizona Attorney General. (Doc 12. at 32–33.)

**\*6** On September 15, plaintiffs filed a motion to exceed the page limits and lodged a motion for a temporary restraining order and preliminary injunction.[7] (Docs. 15, 16.) That motion seeks to require defendants "to conduct uniform and nondiscriminatory voter list maintenance by submitting a list of [Arizona's] Federal-Only Voters to [DHS] to verify the citizenship and immigration status of these registrants." (Doc. 57 at 10.) Plaintiffs again define "voter list maintenance" as encompassing removing ineligible voters from the rolls (Doc. 57 at 9) and explain that the urgency justifying injunctive relief is "the proximity of the general election in November[.]" (Doc. 57 at 33–34.) Plaintiffs claim they "will suffer even greater harm" due to "disenfranchisement and vote dilution" if defendants do not submit the 1373 requests and thus perform the allegedly necessary list maintenance "before the election." (Doc. 57 at 34.) However, after defendants pointed out that the NVRA prohibits systematic voter-list purges within 90 days of a federal election (Doc. 48 at 15), plaintiffs' reply clarified their motion "merely" seeks "the sending of a letter to DHS and not the removal of *any* voters." (Doc. 86 at 16.)

The motion's September 15 lodging date means plaintiffs waited 41 days after filing their complaint to request emergency injunctive relief. The lodging date also means plaintiffs sought to compel every county recorder in Arizona to submit 1373 requests for tens of thousands of Federal-Only

Case 4:22-cv-05502-DMR   Document 253-1   Filed 10/17/24   Page 6 of 12
Strong Communities Foundation of Arizona Incorporated, et al.,..., Slip Copy (2024)
2024 WL 4475248

Voters to DHS—in addition to their regular voter registration and election-planning duties—51 days before the general election. Arizona allows for early voting beginning October 9, so plaintiffs' motion was lodged 24 days before voting began.

Plaintiffs had not served most defendants when they lodged their motion. Between September 15 and September 26, plaintiffs were able to serve the unserved defendants. On September 26, the Democratic National Committee filed a motion to intervene. (Doc. 46.) On September 27, Maricopa County and its recorder filed an opposition to the lodged motion for injunctive relief. (Doc. 48.) The court granted plaintiffs' request to exceed page limits and the case was transferred to a different judge late on September 30. (Doc. 61.) The court issued a briefing order the following day. (Doc. 64.) That order notified plaintiffs it would treat the proposed intervenors as amici for purposes of resolving the motion. (Doc. 64.)

**II. For Purposes of this Motion, Plaintiffs Lack Standing**
Plaintiffs' motion seeks to alter the current status quo by requiring county recorders to submit 1373 requests before the general election. Requests to alter the status quo on an emergency basis—*i.e.*, mandatory injunctions—are "particularly disfavored." *Am. Freedom Def. Initiative v. King Cnty.*, 796 F.3d 1165, 1173 (9th Cir. 2015) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009)). District courts should not grant these requests in "doubtful cases." *Id*.

Here, the court need not reach the merits of plaintiffs' preliminary injunction request for two reasons. First, plaintiffs have not made a clear showing that they have standing. Second, even if they had, the court would decline to compel Arizona's county recorders to divert their resources to submitting tens of thousands of 1373 requests a mere 25 days before the general election.

Defendants argue plaintiffs lack standing to sue. (Doc. 48 at 8–13.) "Standing is a threshold matter central to [a federal court's] subject matter jurisdiction." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007). The standing requirement flows from the principle that federal courts do not "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business.' " *Hippocratic Medicine*, 602 U.S. at 379 (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)). Standing ensures that federal courts exercise power that is "judicial in nature" by tailoring remedies to concrete injuries rather than "engag[ing] in policymaking properly left to elected representatives." *Lance v. Coffman*, 549 U.S. 437, 441 (2007) (per curiam); *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013).

**\*7** A plaintiff seeking a preliminary injunction "must make a clear showing of each element of standing[.]" *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020). These elements are: (1) "that she has suffered or likely will suffer an injury in fact"; (2) "that the injury likely was caused or will be caused by the defendant"; and (3) "that the injury likely would be redressed by the requested judicial relief." *Hippocratic Medicine*, 602 U.S. at 380. Here, plaintiffs have not shown an injury in fact, nor (independently) that the injury they claim is likely to be redressed by granting their motion.

**A. Lack of Injury in Fact**
The injury in fact requirement applies whether a plaintiff asserts individual standing (like Cahill), representational standing (like EZAZ.org, on behalf of its members), or organizational standing (like EZAZ.org, as its own entity). "An injury in fact must be 'concrete,' meaning that it must be real and not abstract." *Hippocratic Medicine*, 602 U.S. at 381. It must be "particularized," meaning that it affects the plaintiff "in a personal and individual way" rather than being a "generalized grievance." *Id*. (simplified). And the injury "must be actual or imminent, not speculative[.]" *Id*.

The injury in fact requirement exists to "screen[ ] out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* Plaintiffs may not sue "based only on an 'asserted right to have the Government act in accordance with law' " no matter how sincere or committed they are to that principle because that general interest is common to all members of the public and not individualized. *Id*. (quoting *Allen*, 468 U.S. at 754); *Carney v. Adams*, 592 U.S. 53, 58 (2020). To show injury in fact, a plaintiff must therefore raise a claim more particular to that specific person or organization than "harm to his and every citizen's interest in proper application of the...laws" and "seek[ ] relief that...more directly and tangibly benefits him than it does the public at large[.]" *Hollingsworth*, 570 U.S. at 706 (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 573-74 (1992)).

**1. Cahill Has Not Established Injury in Fact**

Plaintiffs argue Cahill has been injured in two ways. First, as a naturalized citizen with an alien number, she is subject to "greater scrutiny than natural-born citizens and unlawfully present foreigners who lack an alien number" (including through citizenship verifications conducted via the SAVE database). (Doc. 57 at 24.) Second, "every vote cast by a foreign citizen dilutes the votes of eligible voters" like Cahill. (Doc. 57 at 24.) Plaintiffs' scrutiny and voter-dilution arguments both fail under existing law.

Plaintiffs' scrutiny argument appears to depend on two demonstrably-false premises. Cahill alleges "she is subject[ed] to citizenship verifications through SAVE" while other registered voters are not subject to such verifications. (Doc. 57 at 24.) To demonstrate ongoing or future injury, plaintiffs necessarily must believe that Cahill is being or will be subjected to repetitive checks of her citizenship status through defendants' use of SAVE. That is wrong. As explained by another judge in the District of Arizona, defendants have access to "SAVE pursuant to a memorandum of agreement between the Secretary of State and USCIS[.]" *Mi Familia Vota*, 2024 WL 862406, at *6. That memorandum of agreement "permits county recorders to verify citizenship information of naturalized and derived U.S. citizens only 'when they register to vote' " and "Arizona currently may not use SAVE for any other purpose." *Id.* Plaintiffs allege no personalized facts supporting their theory that Cahill is subject to repeated SAVE checks, and such checks appear to be precluded by the memorandum of agreement. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988, *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001) ("The court need not...accept as true allegations that contradict matters properly subject to judicial notice[.]"); *DiRuzza v. Cnty. of Tehama*, 206 F.3d 1304, 1310 n.3 (9th Cir. 2000) (court may take judicial notice of a memorandum of understanding). To the extent Cahill's asserted injury depends on ongoing citizenship verifications through SAVE, it fails.

*8 Plaintiffs also attempt to show Cahill has suffered a sufficient injury by arguing the general practice of using SAVE to verify citizenship "subjects naturalized citizens, including Ms. Cahill, to greater scrutiny than natural-born citizens and unlawfully present foreigners who lack an alien number." (Doc. 57 at 24.) Again, it is not entirely clear what theory of harm plaintiffs invoke. Cahill is not currently subject to any SAVE checks, so she is not being subjected to "greater scrutiny." Even if she was, that "greater scrutiny" does not require any action on her part, *Mi Familia*, 2024 WL 862406, at *20, and has not impaired her plans to vote in federal or state elections (Doc. 12 at 5). More generally, Cahill has not shown that "alleged under-regulation of other[ ]" foreign-born voters injures her at all. *Hippocratic Medicine*, 602 U.S. at 392–93; *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1089 (9th Cir. 2024) ("[T]he inadvertent counting of some invalid ballots, without more, does not limit, prevent, or otherwise burden the ability of any voter to cast a lawful ballot consistent with their voting preference, or to have their ballot counted equally in determining the final tally.") (simplified). Put simply, without personalized injury, Cahill's scrutiny argument amounts to nothing more than one that the law has not been followed, which is "precisely the kind of undifferentiated, generalized grievance about the conduct of government" that is insufficient to confer standing. *Lance*, 549 U.S. at 442; *see also Bowyer v. Ducey*, 506 F. Supp. 3d 699, 711 (D. Ariz. 2020).

Finally, Plaintiffs argue Cahill has suffered an injury because greater numbers of potentially-ineligible registrants dilute her vote. (Doc. 57 at 24.) But Ninth Circuit precedent is clear: "[W]hether evaluated in the context of [standing] or on the merits,...the mere fact that some invalid ballots have been inadvertently counted, without more, does not suffice to show a distinct harm to any group of voters over any other." *Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1089 n.13 (9th Cir. 2024); *see also Bowyer*, 506 F. Supp. 3d at 711 ("As courts have routinely explained, vote dilution is a very specific claim...and cannot be used generally to allege voter fraud."). Instead, "[a] vote dilution claim requires a showing of *disproportionate* voting power for some voters over others[.]" *Election Integrity Project Cal.*, 113 F.4th at 1082. Because vote dilution "in an absolute sense[ ] occurs any time the total number of votes increases in an election[,]" the crux of a cognizable vote dilution claim is "*inequality* of voting power— not diminishment of voting power *per se*." *Id.* at 1087. Accordingly, even if Cahill's vote was "diluted" in the colloquial sense plaintiffs allege, that type of "dilution" does not give Cahill particularized injury in fact because it is also suffered by every other voter. Cahill's voter dilution theory is therefore insufficient to establish her standing.

**2. EZAZ.org Has Not Established Injury in Fact Under a Representational Standing Theory**

EZAZ.org also asserted "representational standing on behalf of its members on the same essential grounds as Ms. Cahill." (Doc. 57 at 25.) An association will have representational standing only when its members "otherwise

have standing to sue in their own right." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

EZAZ.org's acknowledgment that its members share the standing arguments of Cahill—who the court has determined lacks standing for purposes of this motion—is fatal to its representational standing argument. *See LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 960 (9th Cir. 2021) (holding organization lacked associational standing when it failed to show its members would otherwise have standing). EZAZ.org therefore lacks representational standing on behalf of its members.

### 3. EZAZ.org Has Not Established Injury in Fact to Itself

EZAZ.org also argues it has suffered a direct injury itself and therefore asserts organizational standing. (Doc. 57 at 26 (claiming organizational standing because EZAZ.org "faces concrete harm from the Defendants' wrongful conduct").) Plaintiffs' argument is based on the theory that an organization has standing when it can show "a drain on its resources from both a diversion of its resources and frustration of its mission." (Doc. 57 at 26 (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (simplified)). To the extent that argument was once sufficient for standing, it is not today. *Hippocratic Medicine* and *Arizona Alliance*, both decided this year, compel the rejection of EZAZ.org's organizational standing theory on the present record. [8]

 ***9** Under *Arizona Alliance*, "neither the frustration of a mission nor the diversion of resources confers [an organization with] standing[.]" *Arizona Alliance*, 2024 WL 4246721, at *2 (citing generally *Hippocratic Medicine*, 602 U.S. 367). Instead, organizations must "show that a challenged governmental action directly injures the organization's pre-existing core activities and does so *apart* from the plaintiffs' response to that governmental action." *Id.* (citing *Hippocratic Medicine*, 602 U.S. at 395–36). An organization cannot establish injury in fact by "expending money to gather information and advocate against" a defendant's (in)action, by making "vague claims that a policy hampers their mission," by "spending money voluntarily" on "public advocacy" or "public education" functions "in response to a governmental policy," or by "divert[ing] resources in response to a governmental policy that frustrates its mission." *Id*. at 2–10; *Hippocratic Medicine*, 602 U.S. at 394. In other words, when a defendant's action or inaction does not directly require or prohibit an organizational plaintiff from doing anything, courts must examine the organization's core mission and pre-existing activities to determine whether there is injury in fact for standing.

EZAZ.org describes its core mission as "teach[ing] people how to become active in the political process in their local communities and to help voters get engaged in a positive way." (Doc. 57 at 38.) Other components of EZAZ.org's mission are "mak[ing] civic participation easy and accessible for all Arizonans[,]" "train[ing] Arizonans about becoming more civically involved[,]" and "increas[ing] civic engagement [by] ensuring that Arizona's elections are free, fair, and lawfully administered, which includes proper voter list maintenance." (Doc. 57 at 38.) It identifies six pre-existing activities in service of that mission it claims are affected by defendants' actions: (1) door-knocking campaigns to educate voters which sometimes identify ineligible voters that EZAZ.org volunteers report to county officials; (2) encounters with voters who "do not believe that their votes matter" because of ineligible foreign-citizen voters on Arizona's rolls; (3) recruiting new volunteers, who are "extremely discourage[d]" because of the recorders' list maintenance failures; (4) educating state legislators, which costs more money due to list maintenance failures; (5) monitoring data about Federal-Only Voters; and (6) encouraging legal voters to cast their ballots despite concerns about ineligible voters diluting their vote. (Docs. 57 at 26–27, 86 at 7–9.)

Neither EZAZ.org's core mission nor its pre-existing activities meaningfully differ from those found insufficient for standing in *Hippocratic Medicine* and *Arizona Alliance*. *See Hippocratic Medicine*, 602 U.S. at 384 (noting that "in 'many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases.' ") (quoting *Allen*, 468 U.S. at 751–52).

To start, the only components of EZAZ.org's core mission that defendants' alleged inaction affects are "public education" and "public advocacy" functions. *See Arizona Alliance*, 2024 WL 4246721, at *8. Making civic participation easy, training Arizonans to become more civically involved, and increasing civic engagement by ensuring free and fair elections are all "broadly stated mission[s] or goal[s]" on which organizational standing may no longer be premised. *Id*.; *see also id*. ("No matter how much a defendant's conduct can be said to frustrate an organization's abstract mission, alleged injuries to an organization's 'general legal, moral,

Case 4:22-cv-05502-DMR   Document 253-1   Filed 10/17/24   Page 9 of 12
Strong Communities Foundation of Arizona Incorporated, et al.,..., Slip Copy (2024)
2024 WL 4475248

ideological, and policy concerns do not suffice on their own' to confer...standing[.]' ") (citing *Hippocratic Medicine*, 602 U.S. at 386).

Nor does the defendants' alleged (in)action "directly affect[ ] and interfere[ ] with" EZAZ.org's claimed core pre-existing activities as *Hippocratic Medicine* requires. 602 U.S. at 395; *see also Arizona Alliance*, 2024 WL 4246721, at *8. Defendants' actions do not prevent EZAZ.org volunteers from encouraging voters or educating legislators or making efforts to recruit new volunteers; those functions would continue unaffected but for EZAZ.org's own decision to devote more time during these pre-existing activities to voter list maintenance topics. As in *Arizona Alliance*, plaintiffs' decision "to shift some resources from one set of pre-existing activities in support of their overall mission to another, new set of such activities" in response to defendants' actions is insufficient to confer organizational standing. 2024 WL 4246721, at *8, *10.

**\*10** More generally, EZAZ.org has failed to show it is doing anything more than choosing to alter the emphasis of its pre-existing activities "in response to . . . government[al] [in]action." *Id*. at *8. For example, EZAZ.org's decision to report ineligible voters it encounters during door-knocking campaigns, and the time the resulting reporting takes, is no more than a "diversion of resources *in response* to a policy[.]" *Id*. So too its decision to "expend more resources on educating State Legislators" and eligible voters about voter list maintenance instead of other topics. (Doc. 57 at 27.) EZAZ.org admits as much. (Doc. 86 at 7 ("because of increasing concerns among voters about foreign citizens voting, a considerable amount of resources for voter education is now being diverted to responding to these issues").) To allow standing based on this type of organizational resource-prioritization would violate *Hippocratic Medicine*'s command that "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." 602 U.S. at 394; *see also Arizona Alliance*, 2024 WL 4246721, at *8 ("[W]e must not allow the diversion of resources *in response* to a policy to confer standing—instead, the organization must show that the new policy directly harms its *already-existing* core activities.").

For all these reasons, EZAZ.org has not clearly shown that defendants' alleged conduct has harmed its core activities sufficient to establish an injury in fact.

### B. Lack of Redressability

Setting aside *Arizona Alliance*, plaintiffs' standing argument suffers from an independently-fatal flaw in the context of their request for emergency relief: they fail to show that the relief they now request—"merely the sending of a letter to DHS and not the removal of *any* voters" (Doc. 86 at 16)—will redress their claimed imminent harm of "disenfranchisement and vote dilution" in the November 5 general election (Doc. 57 at 34).

Plaintiffs' motion sought to compel defendants to send 1373 requests on an emergency basis as a part of "perform[ing] the necessary list maintenance before the election." (Doc. 57 at 34.) They repeatedly cite a definition of "voter list maintenance" that includes removing ineligible voters from the rolls, both before this court and in letters demanding the county recorders take action. (Docs. 12 at 3, 57 at 9, 10, 13, 20, 26,

51, 53, 61, 64, 68, 71, 75, 78, 82, 85, 89, 92,
96, 99, 103, 106, 110, 113, 117, 120, 124,

127, 131, 134, 138, 141, 145, 148, 152, 155.) But after defendants and amici pointed out that the NVRA precludes states from conducting "any program the purpose of which is to systematically remove the names of ineligible voters from the officials lists of eligible voters" within 90 days of an election (Docs. 48 at 15 (citing 52 U.S.C. § 20507(c)(2)(A)), 46-3 at 11–12 (same), 62 at 13–15 (same)), plaintiffs honed their request. They now claim to seek nothing more than to have the recorders send 1373 requests to "begin[ ] the investigation process." (Doc. 86 at 19.)

This evolution poses a new problem for plaintiffs. At the preliminary injunction stage, in addition to injury in fact, plaintiffs must clearly show both causation and "that the injury likely would be redressed by the requested judicial relief." *Yazzie*, 977 F.3d at 966; *Hippocratic Medicine*, 602 U.S. at 380. Causation and redressability "are often flip sides of the same coin" in that "enjoining the [defendant's] action...will typically redress [an] injury" the defendant has caused. *Hippocratic Medicine*, 602 U.S. at 380–81 (simplified). To satisfy these standards, plaintiffs' showings of causation and redressability must not be speculative, attenuated, or rely on "the unfettered choices made by independent actors not before the courts" or "distant (even if predictable) ripple effects[.]" *Id*. at 383 (simplified). "Instead, plaintiffs must show a sufficiently close and predictable link

Case 4:22-cv-05502-DMR   Document 253-1   Filed 10/17/24   Page 10 of 12
Strong Communities Foundation of Arizona Incorporated, et al.,..., Slip Copy (2024)
2024 WL 4475248

between the challenged action and their injury-in-fact" and that enjoining the defendants "will cure their injury." *Arizona Alliance*, 2024 WL 4246721, at *5-*6 (quoting *Hippocratic Medicine*, 602 U.S. at 383). And they must show it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (simplified).

***11** Plaintiffs' narrowed request that defendants "begin[ ] the investigation process" (Doc. 86 at 19) does not meet this standard. Redressing their claimed harm of "disenfranchisement and vote dilution" before the general election (Doc. 57 at 34) requires more than *starting* an investigation: it requires *removing* ineligible voters from the rolls at the *end* of the investigation. That result in turn relies on choices by independent actors and factual showings of the likely timing of those choices and results of the investigation that plaintiffs simply have not made. For example, plaintiffs argue DHS can respond to 1373 requests containing only a name and birthdate—a fact defendants dispute, but which the court takes as true for purposes of resolving the motion—and that DHS officials are mandated to respond to these requests (*i.e.*, their choices are not "unfettered"). (Docs. 57 at 14, 18–20, 22, 86 at 11–12.) But they provide no evidence, nor do they even allege, that DHS will be able to respond to tens of thousands of requests before the general election. Moreover, their claims about the likely results of the investigation rely on a public opinion poll, *see supra* at 8 n.5, and evidence adduced for the first time in their reply. Even if the court were to exercise its discretion to consider all of that evidence —which it should not without giving defendants a chance to respond to the new facts in the reply, *see Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1188–89 (9th Cir. 2024)—it is speculative and attenuated. In short, plaintiffs have not shown their request that the defendants be required to begin an investigation by sending 1373 requests will likely redress the harm they claim.

Because plaintiffs have not clearly shown they have standing, the court must deny their motion for injunctive relief.

### III. Even if Plaintiffs Had Standing, Their Emergency Relief Request Comes Too Soon Before the Election

Even if plaintiffs had standing, their injunction request would be denied because they waited too long before seeking relief. The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (citing cases); *see also Short v. Brown*, 893 F.3d 671, 676 (9th Cir. 2018) ("[T]he Supreme Court has warned us many times to tread carefully where preliminary relief would disrupt a state voting system on the eve of an election."). Importantly, "[w]hen the preliminary relief sought would interfere with state voting procedures shortly before an election, a court considering such relief must weigh, 'in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures.' " *Id.* at 675-76 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4, (2006) (per curiam)).

One purpose of the *Purcell* principle is to prevent voter confusion, but another is to prevent eleventh-hour "administrative burdens for elected officials." *Lake v. Hobbs*, 623 F. Supp. 3d 1015, 1031 (D. Ariz. 2022) (simplified); *see also Arizona Democratic Party v. Hobbs*, 976 F.3d 1081, 1086 (9th Cir. 2020) (noting the public interest is best served by preserving existing laws "rather than by sending the State scrambling to implement and to administer a new procedure...at the eleventh hour."). This is because running state-wide elections is "extraordinarily complicated and difficult," poses "significant logistical challenges[,]" and requires "enormous advance preparations by state and local officials[.]" *Merrill v. Milligan*, 142 S.Ct. 879, 880 (2022) (Kavanaugh, J., concurring). As a result, plaintiffs seeking an injunction close in time to an election should show the merits are "entirely clearcut" in their favor and "the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Id.* at 881.

Plaintiffs have not made those showings here, despite their arguments to the contrary. (Doc. 86 at 16–18.) They pooh-pooh the possibility that the 1373 requests will take any additional time, ignoring amici's assertion that plaintiffs' requested injunction would require the recorders to undertake a new system of citizenship checks for 42,301 registered voters (Doc. 46-3 at 16). Plaintiffs reference the Arizona Supreme Court's recent descriptions of the steps county recorders must take to provide due process before cancelling a voter's registration, but that decision—issued nearly three weeks ago before early voting had begun—does not speak to the additional time required to submit 1373 requests and in any event declined to change the election rules with "so little time remaining before the beginning of the 2024 General Election." *Richer v. Fontes*, No. CV-24-0221-SA, 2024 WL 4299099, at *3 (Ariz. Sept. 20, 2024).

**\*12**  Plaintiffs waited until shortly before the election to file this lawsuit despite allegedly suffering irreparable harm since Arizona's 2022 voter list maintenance laws went into effect. They have not made a clearcut showing of harm, nor that the action they request is feasible in the midst of a general election. The court must tread carefully as the Ninth Circuit and Supreme Court have instructed, and would decline to grant a mandatory injunction here for that reason even if plaintiffs had established standing for emergency relief.

### IV. Conclusion

Plaintiffs lack standing to seek injunctive relief. Cahill has not shown an injury in fact and EZAZ.org's argument for organizational standing is precluded by *Arizona Alliance*. But even if *Arizona Alliance* was not presently binding precedent, plaintiffs would lack standing because the relief they seek—an order "merely" compelling every Arizona county recorder to begin an investigation into the citizenship of tens of thousands of Federal-Only Voters—would not redress their asserted harm. And in any event, the court would decline to issue such an order three-and-a-half weeks before the general election with early voting underway.

Accordingly,

**IT IS ORDERED** granting plaintiffs' motion for leave to file excess pages for their reply in support of their temporary restraining order and preliminary injunction (Doc. 85).

**IT IS FURTHER ORDERED** denying plaintiffs' motion for a temporary restraining order and preliminary injunction (Doc. 57).

Dated this 11th day of October, 2024.

### All Citations

Slip Copy, 2024 WL 4475248

---

### Footnotes

1   Plaintiffs filed their motion as a request for a temporary restraining order and preliminary injunction. Because "[t]he legal standard for a [temporary restraining order] is substantially identical to the standard for a preliminary injunction," the court will treat the motion as one for a preliminary injunction. *Facebook, Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720, 732 (N.D. Cal. 2020) (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)).

2   Pincites in this order refer to the page number in the ECF header of the document.

3   As Mohave County points out, plaintiffs "do not allege illegal activity on the part of the Counties," but rather by their recorders. (Doc. 82 at 6.) Naming the counties may have been unnecessary but there is no need to resolve that issue at this time.

4   The statutory text is not as demanding as plaintiffs claim. It does not "specifically require" these three databases be consulted (Doc. 12 at 16): the SAVE and SSA databases must be consulted "[t]o the extent practicable" and the EVVE database must be consulted "if accessible." Ariz. Rev. Stat. § 16-165(H), (I), (J).

5   Plaintiffs' motion cites an August 2024 opinion poll in which 1.9 percent of "likely [Arizona] voters" (as classified by Rasmussen and NumberUSA, who conducted the poll) reported they are not U.S. citizens. (Doc. 57 at 9.) Plaintiffs' reply tries to remedy this deficiency, citing "definitive evidence" that emerged while their motion was pending "that foreign citizens *are* registered to vote in Arizona[.]" (Doc. 86 at 9.) That evidence, however, does not establish that 1373 requests would have a meaningful impact in deterring alleged noncitizens from registering to vote.

6   "Voto Latino is a nonprofit, nonpartisan 501(c)(4) corporation dedicated to growing political engagement in historically underrepresented communities, specifically young and Latinx voters." (Doc. 5 at 7.) "One Arizona

is a nonprofit, nonpartisan 501(c)(3) corporation with a mission of building a culture of civic engagement and democratic participation among historically underrepresented communities in Arizona." (Doc. 5 at 7.)

7  Plaintiffs argue they did not wait to seek injunctive relief because the same day they filed their complaint in state court, they also filed what they describe as a "procedurally proper" request for injunctive relief. (Doc. 89.) That is correct but it does not explain plaintiffs' behavior after the case was removed to federal court on August 12, 2024. If plaintiffs believed their request filed in state court was still pending, they should have filed a notice of pending motion pursuant to Local Rule 3.6(d). Alternatively, plaintiffs could have immediately filed a new motion seeking injunctive relief. Instead, plaintiffs waited 34 days after the case was removed to lodge their request for injunctive relief.

8  Arizona Alliance for Retired Americans has petitioned the Ninth Circuit for rehearing en banc and the defendants have been ordered to respond by October 25, 2024. *See Arizona Alliance*, Ninth Cir. No. 22-16490, ECF Nos. 89, 90. The panel opinion binds this court unless and until rehearing is granted. *See generally In re Zermeno-Gomez*, 868 F.3d 1048 (9th Cir. 2017).

---

**End of Document**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.