# EXHIBIT A

2024 WL 4542260
Only the Westlaw citation is currently available.
United States District Court, D. Montana,
Missoula Division.

FREE SPEECH COALITION, et al., Plaintiffs,

v.

Austen KNUDSEN, in his official capacity as the
Attorney General of the State of Montana, Defendant.

CV 24-67-M-DWM
|
Filed October 22, 2024

**Attorneys and Law Firms**

Natasha Prinzing Jones, Thomas J. Leonard, Boone Karlberg, P.C., Missoula, MT, D. Gill Sperlein, Pro Hac Vice, The Law Office of D. Gill Sperlein, San Francisco, CA, Jeffrey Sandman, Pro Hac Vice, New Orleans, LA, for Plaintiffs.

Christian B. Corrigan, Peter Martin Torstensen Jr., Montana Department of Justice, Office of the Attorney General, Helena, MT, for Defendant.

OPINION and ORDER

Donald W. Molloy, United States District Judge

 *1  In 2023, Montana enacted a law that requires "[a] commercial entity that knowingly and intentionally publishes or distributes material harmful to minors on the internet" to "perform reasonable age verification methods to verify the age of individuals attempting to access the material." SB. 544 (2023) (codified at Mont. Code Ann. § 30–14–159). If an entity fails to do so, it is liable for civil "damages resulting from a minor accessing the material, including court costs and reasonable attorney fees." *Id.* Plaintiffs—a coalition of private companies, individuals, and a nonprofit trade association—challenge this law both facially and as-applied on constitutional grounds, arguing it violates the First and Fourteenth Amendments and the Commerce Clause. (*See* Doc. 1.) They also allege it is preempted by federal statute, *see* 47 U.S.C. § 230. (*See id.*) Defendant, the Attorney General of the State of Montana (the "State"), seeks to dismiss Plaintiffs' complaint for lack of standing and failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 17.) The States's motion is granted as to Plaintiffs' Commerce Clause claim and denied in all other respects.

BACKGROUND

At this stage of the proceeding, the allegations in Plaintiffs' Complaint are assumed to be true and construed in their favor. *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1114 (9th Cir. 2021).

**I. The Age Verification Act**

In May 2023, the Montana legislature enacted, and Governor Greg Gianforte signed into law, Senate Bill 544. *See* § 30–14–159. With an effective date of January 1, 2024, Montana's Age Verification Act ("Act") provides:

(1) A commercial entity that knowingly and intentionally publishes or distributes material harmful to minors on the internet from a website that contains a substantial portion of the material must be held liable if the entity fails to perform reasonable age verification methods to verify the age of individuals attempting to access the material.

(2) A commercial entity or third party that performs the required age verification may not retain any identifying information of the individual after access has been granted to the material.

(3)(a) A commercial entity that is found to have violated this section is liable to an individual for damages resulting from a minor accessing the material, including court costs and reasonable attorney fees as ordered by the court.

(b) A commercial entity that is found to have knowingly retained identifying information of the individual after access has been granted to the individual must be liable to the individual for damages resulting from retaining the identifying information, including court costs and reasonable attorney fees as ordered by the court.

(4) This section does not apply to any bona fide news or public interest broadcast, website video, report, or event and may not be construed to affect the rights of any news-gathering organizations.

(5) An internet service provider or its affiliates or subsidiaries, a search engine, or a cloud service provider may not be held to have violated the provisions of this section solely for providing access or connection to or from

a website or other information or content on the internet or a facility, system, or network not under that provider's control, including transmission, downloading, intermediate storage, access software, or other forms of access or storage to the extent the provider is not responsible for the creation of the content of the communication that constitutes material harmful to minors.

***2** (6) The department shall provide an annual report of enforcement actions taken under this section. The department shall provide an internet version of the report free of charge to the public and shall charge a fee for paper copies that is commensurate with the cost of printing the report.

*Id.* The statute defines "minor" as someone under 18 years of age and "material harmful to minors" as:

(i) any material that the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;

(ii) any of the following material that exploits, is devoted to, or principally consists of descriptions of actual, simulated, or animated display or depiction of any of the following, in a manner patently offensive with respect to minors:

(A) pubic hair, anus, vulva, genitals, or nipple of the female breast;

(B) touching, caressing, or fondling of nipples, breasts, buttocks, anuses, or genitals; or

(C) sexual intercourse, masturbation, sodomy, bestiality, oral copulation, flagellation, excretory functions, exhibitions, or any other sexual act; and

(iii) the material taken as a whole lacks serious literary, artistic, political, or scientific value for minors.

§ 30–14–159(7)(d), (e). The statute defines "substantial portion" as "more than 33 1/3 % of total material on a website." § 30–14–159(7)(i). The Act also includes several additional definitions, *see generally* § 30–14–159(7), which are discussed in more detail in the analysis below.

## II. Plaintiffs

As indicated above, Plaintiffs are a coalition of businesses, individuals, and a trade association that are involved directly or indirectly with providing online content to Montana residents.

### A. Businesses

#### 1. Deep Connection Technologies, Inc.

Deep Connection Technologies, Inc. ("Deep") is a Delaware corporation that operates "O.school," "a judgment-free online educational platform focused on sexual wellness." (Doc. 1 at ¶ 14.) "O.school's mission is to help people worldwide improve their sexual health, power, and confidence" and, as part of that mission, "provides critical sex education" to minors. (*Id.* ¶¶ 14, 15.) Deep "opposes any age-verification measure that would preclude ... teens from accessing O.school's content" and "is confused as to what constitutes 'reasonable age verification methods' under the Act[ ] and concerned about the prohibitive cost of providing complying age verification protocols." (*Id.* ¶ 15.)

#### 2. JFF Publications, LLC

JFF Publications, LLC ("JFF") is a Delaware limited liability company that "operates an internet-based platform at the domain <JusfFor.Fans> that allows independent producers/performers of erotic audiovisual works to publish their content and provide access to fans on a subscription basis." (*Id.* ¶ 20.) Functionally, "[e]ach producer/performer operates and maintains an individual JustFor.Fans channel, which may contain photographs or videos and permits the exchange of messages between producers/performers and fans." (*Id.*) "JFF is confused about what constitutes a 'website' (whether each performer channel, the JustFor.Fans platform, or even *other* platforms operated by JFF), confused as to what constitutes 'reasonable age verification methods' under the Act and how a 'substantial portion' of a 'website's' content is to be measured, and concerned about the prohibitive cost of providing complying age verification protocols." (*Id.* ¶ 21.)

#### 3. PHE, Inc.

**\*3** PHE, Inc. ("PHE") is a North Carolina corporation doing business as "Adam and Eve," "an award-winning

sexual wellness retailer that owns and operates various online stores and franchises brick and mortar stores bearing its well-respected trademark." (*Id.* ¶ 29.) "Through its online store at adameve.com, PHE markets, processes payments for, and fulfills orders for adult toys, lingerie, soaps, lubricants, candles, bath items, novelty items, and adult games. PHE also publishes education articles related to sexual health and wellness on adameve.com, sells adult videos from a second web domain devoted exclusively to DVD sales ..., streams erotic movies on a third [website] ..., and promotes its brick-and-mortar franchise stores via a fourth site ... that provides a separate subdomain for each of its franchised stores to offer store-specific information." (*Id.*) "Each of the[se] websites ... contains some material that might qualify as 'material harmful to minors' under the Act, but PHE cannot determine which (if any) are out of compliance because it does not know, for example, what constitutes 'the material as a whole' or how it should measure the 33 1/3% threshold under which its 'harmful to minors' offerings must remain vis-à-vis its other offerings." (*Id.* ¶ 30.)

### 4. Convergence Holdings, Inc.

Convergence Holdings, Inc. ("Convergence") is a Montana corporation doing business as Adam and Eve Montana. (*Id.* ¶ 32.) Convergence owns and operates five franchise stores located in Three Forks, Helena, Great Falls, Missoula, and Billings. (*Id.*) These stores use the subdomains operated by PHE to provide store and sales information. (*Id.*) Although Convergence recognizes that it would not be subject to an enforcement action as it does not own or operate the subdomains for its franchise stores, it maintains that a pre-enforcement challenge is the only means by which it can vindicate its constitutional rights. (*See id.* ¶ 33.)

### B. Individuals

### 1. Charyn Pfeuffer

Charyn Pfeuffer lives in Seattle, Washington, and writes professionally about sex and relationships. (*Id.* ¶ 17.) "She archives her written work in an online portfolio and shares it via her social medica platforms." (*Id.*) Pfeuffer is unsure whether her portfolio or her webcam channel "would be considered a 'website,' whether she would qualify as a 'commercial entity' responsible for performing her own age-verification checks, and how she is to determine whether a 'substantial portion' of her writing constitutes 'material harmful [to] minors.' " (*Id.* ¶ 18.)

### 2. Anna Louise Peterson

Anna Louise Peterson, Ed. D., LCPC is a psychotherapist who lives and operates a private practice in Missoula, Montana. (*Id.* ¶ 23.) She has served as an adjunct professor in the Counselor Education program at the University of Montana and in the Department of Social Work at Walla Walla College. (*Id.*) "In connection with her professional work, Dr. Peterson relies on internet research on transgender issues and sexuality." (*Id.* ¶ 24.) "She fears that, as websites block access to internet users in Montana to avoid running afoul of the Act, she will see a substantial reduction in the availability of online materials that she depends on." (*Id.*) Peterson "is also concerned about her own privacy and objects to providing her identity to access websites that have instituted age verification protocols to comply with the Act." (*Id.*)

### 3. Lynsey Griswold

Lynsey Griswold, known professionally as "Lynsey G," "is a writer, editor, and publisher who concentrates on the intersection of pornography, feminism, and sexuality." (*Id.* ¶ 26.) She is the cofounder of Oneshi Press, which is "an independent publishing company based in Missoula, Montana[,] that produces richly illustrated fantasy and sci-fi graphic novels, comics, and art books—including her own graphic novel, *Tracy Queen*, about an adult film star." (*Id.*) "As a consumer of adult content, Griswold cannot now access numerous adult websites that no longer grant access to Montana consumers to avoid running afoul of the Act." She is also fearful of the impact the Act will have on her privacy and "her ability to sell her graphic novel online." (*Id.* ¶ 27.)

### C. Trade Association – Free Speech Coalition, Inc.

Free Speech Coalition, Inc. ("Free Speech") is a California trade association that was founded in 1991. (*Id.* ¶ 12.) It "assists film makers, producers, distributors, wholesalers, retailers, internet providers, performers, and other creative artists located throughout North America in the exercise of their First Amendment rights and in the vigorous defense of those rights against censorship." (*Id.*) It "currently represents hundreds of businesses and individuals involved in the production, distribution, sale, and presentation of

constitutionally-protected and non-obscene materials that are disseminated to consenting adults via the internet." (*Id.*) "Most of that material would fit within Montana's statutory definition of 'material harmful to minors.' " (*Id.*) Free Speech "sues on its own behalf and on behalf of its members to vindicate its own constitutional rights, its members' constitutional rights, and those of the members' respective owners, officers, employees, and current and prospective readers, viewers, and customers." (*Id.* ¶ 13.)

### III. The Present Case

**\*4** On May 14, 2024, Plaintiffs sued the State, alleging that Montana's Age Verification Act violates their free speech rights under the First and Fourteenth Amendments (Count 1), their rights to due process and equal protection under the Fourteenth Amendment (Count 2), the Commerce Clause (Count 3), and the Supremacy Clause (Count 4). (Doc. 1.) Plaintiffs seek declaratory judgment (Count 5). (*Id.*) Instead of answering, the State filed the present motion to dismiss. (Doc. 17.)

### LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Dismissal is appropriate "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017) (internal quotation marks omitted).

A plaintiff raising a facial challenge on First Amendment or overbreadth grounds must show a significant number of "realistic" unconstitutional applications of the statute that are "substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, 599 U.S. 762, 770, 143 S.Ct. 1932, 216 L.Ed.2d 692 (2023); *Moody v. NetChoice, LLC*, ––– U.S. ––––, 144 S. Ct. 2383, 2397–98, 219 L.Ed.2d 1075 (2024) (explaining that this analysis requires a court to assess "the full range of activities the laws cover, and measure the constitutional against the unconstitutional applications"). For all other facial challenges, a plaintiff must show that "no *set of circumstances* exists under which the [statute] would be valid." *Hansen*, 599 U.S. at 769, 143 S.Ct. 1932 (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). Nonetheless, "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case." *Citizens United v. Fed. Election Com'n*, 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). Rather, "it goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Id.*

### ANALYSIS

The State seeks to dismiss Plaintiffs' claims largely on the basis that they lack substantive merit, not because they are inadequately pled. Accordingly, the State's motion to dismiss is primarily denied. However, Plaintiffs attempt to overreach in pleading a claim under the dormant Commerce Clause, and the State's motion is granted as to that single claim.

### I. First Amendment

The State argues that Plaintiffs have failed to state a plausible First Amendment claim because obscene materials are not protected speech and, even if they are, the Act passes constitutional muster under any level of scrutiny, primarily because "it doesn't prohibit *any* speech." (Doc. 18 at 21.) Plaintiffs, on the other hand, argue that Montana's Age Verification Act burdens constitutionally protected speech and is subject to strict scrutiny, the standard governing content-based speech restrictions. Plaintiffs are correct on both counts. Whether the Act survives such scrutiny is a question for a later date.

#### A. Protected Speech

The State first argues that Plaintiffs cannot state a plausible First Amendment claim because "[t]he First Amendment doesn't protect content that is obscene for minors." (Doc. 18 at 14.) In response, Plaintiffs insist that "[i]nvoking the innocence of children is not, and cannot be, a magic incantation sufficient for legislatures to run roughshod over the First Amendment rights of adults." (Doc. 19 at 9.) Plaintiffs have the better argument. Because the Act burdens protected speech in several ways, it "triggers review under the

First Amendment." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1117 (9th Cir. 2024).

**\*5** First, the Act impacts adults' access to protected expression. To be sure, "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. Jacksonville*, 422 U.S. 205, 212–13, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (internal citation omitted). One of those narrow areas is the State's ability to restrict the dissemination of materials that would be obscene from the perspective of minors. *Ginsberg v. St. of N.Y.*, 390 U.S. 629, 638–39, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) ("The well-being of its children is of course a subject within the State's constitutional power to regulate[.]"). But even those regulations cannot impede an adult's ability to see the same material without triggering heightened scrutiny so long as the material retains some First Amendment protection. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 73–74, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) ("[T]he government may not reduce the adult population ... to reading only what is fit for children." (Internal quotation marks omitted.)). Where the government crafts a regulation that burdens a significant amount of speech beyond the core purpose of the statute— for example, limiting adults' ability to view speech to protect minors—the statute becomes vulnerable to a facial attack because overbroad regulations "have the potential to chill, or deter, speech outside their boundaries." *Counterman v. Colorado*, 600 U.S. 66, 75, 143 S.Ct. 2106, 216 L.Ed.2d 775 (2023). "This facial challenge transforms this case from one about limiting a minor's ability to view harmful content, to a case about whether the burdens placed upon adult's access to protected speech are constitutionally acceptable." *Free Speech Coal., Inc. v. Rokita*, ––– F. Supp. 3d ––––, ––––, 2024 WL 3228197, at \*9 (S.D. Ind. June 28, 2024).

Here, because what is inappropriate for minors is not the same as it is for adults, the Act "places burdens on speech that is constitutionally protected but not appropriate for children." *Id.* at ––––, 2024 WL 3228197, at \*10; *see Reno v. American Civil Liberties Union*, 521 U.S. 844, 874, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("In evaluating the free speech rights of adults, we have made it perfectly clear that sexual expression which is indecent but not obscene is protected by the First Amendment." (Internal quotation marks and alteration omitted.)). Additionally, because the Act requires that age verification be used if one-third of the material on the website is "harmful to minors," § 30–14–15(1), (7)

(i), it "imposes burdens on adults accessing constitutionally protected speech even when the *majority* of a website contains entirely acceptable, and constitutionally protected, material," *Free Speech*, ––– F. Supp. 3d at ––––, 2024 WL 3228197, at \*10.

Second, the Act "deputizes covered businesses into serving as censors for the State." *NetChoice, LLC*, 113 F.4th at 1118. As argued by Plaintiffs, the Act requires that commercial entities "brand themselves inappropriate for minors" insofar as they must each determine whether their content is subject to the Act and therefore mandates they use an age-verification method. (Doc. 19 at 12.) "It is ... well-established that the forced disclosure of information, even purely commercial information, triggers First Amendment scrutiny." *NetChoice, LLC*, 113 F.4th at 1117.

Based on the foregoing, the First Amendment is triggered here.

**B. Assessing the Appropriate Level of Scrutiny**

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). The State argues that the rational basis test applies here because the regulated conduct is "material harmful to minors," citing *Ginsberg v. State of N.Y.*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), and *Free Speech Coalition v. Paxton*, 95 F.4th 263, 267 (5th Cir. 2024). Plaintiffs, on the other hand, insist that because the Act is a content-based restriction, it is subject to strict scrutiny. Because the Act imposes burdens based on the content of speech, "the answer should be clear: [t]he standard is strict scrutiny." *Playboy*, 529 U.S. at 814, 120 S.Ct. 1878. Setting aside the anomalous decision in *Paxton*, this inquiry is rather straightforward.

"Once it becomes clear a statute chills constitutionally protected speech, the First Amendment demands either intermediate or strict scrutiny depending on whether the regulation is content-neutral or content-based." *Free Speech*, ––– F. Supp. 3d at ––––, 2024 WL 3228197, at \*12. A content-neutral statute is subject to intermediate scrutiny. *See Clark v. Comm. for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). Regulations that regulate based on the content of speech, however, face strict scrutiny. *Playboy*, 529 U.S. at 812, 120 S.Ct. 1878. Montana's Age Verification Act is a content-based regulation. It imposes age verification requirements if at least one third "of total material

on a website ... meets the definition of 'material harmful to minors.' " § 30–14–159(7)(i). This is a direct reference to the content of the speech to be burdened. Moreover, the State justifies the law through reference to the speech's impact on the listener or viewer, requiring consideration of what "contemporary community standards" would find "designed to appeal to ... or pander to ... prurient interest" or depictions that are "patently offensive with respect to minors." § 30–14–159(7)(d). (*See also* Doc. 18 at 22 ("SB544 is aimed ... at websites whose business model is driven by the publication and distribution of ... material [harmful to minors].").) Thus, the Act is subject to strict scrutiny.

**\*6** This conclusion is consistent with other courts that have applied strict scrutiny in analyzing laws "seeking to protect minors from indecent wire communications." *Free Speech*, ––– F. Supp. 3d at ––––, 2024 WL 3228197, at \*13 (collecting cases). For example, in *Reno v. American Civil Liberties Union*, the Supreme Court applied strict scrutiny in assessing the Communications Decency Act, which sought to protect minors from harmful material on the internet by criminalizing the knowing online transmission of obscene, indecent, or patently offensive content to anyone under 18 years of age. 521 U.S. 844, 885, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). Ultimately, the Court held that the law "lack[ed] the precision that the First Amendment requires when a statute regulates the content of speech." *Id.* at 874, 117 S.Ct. 2329. It did so because "[i]n order to deny minors access to potentially harmful speech, the [Act] effectively suppresse[d] a large amount of speech that adults have a constitutional right to receive and to address to one another[,] ... [and t]hat burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve." *Id.*

Similarly, in *Playboy*, the Supreme Court considered a First Amendment challenge to a law that "require[d] cable television operators who provide channels 'primarily dedicated to sexually-oriented programming' either to 'fully scramble or otherwise fully block' those channels or to limit their transmission to hours when children are unlikely to be viewing." 529 U.S. at 806, 120 S.Ct. 1878 (quoting 47 U.S.C. § 561(a)). Although the Court reaffirmed the idea that there are legitimate reasons to limit the availability of such materials to minors, *id.* at 811, 120 S.Ct. 1878, the law imposed a content-based restriction on constitutionally-protected material for adults and was therefore subject to strict scrutiny, *id.* at 812–13, 120 S.Ct. 1878. The Court ultimately concluded that the law failed to pass this test as the government failed to show that less restrictive alternatives—specifically independent user requests to block undesired channels—would be ineffective to achieves its goals. *Id.* at 816, 120 S.Ct. 1878. Likewise, in *Ashcroft v. American Civil Liberties Union*, the Supreme Court upheld a preliminary injunction of the Child Online Protection Act, which criminalized the posting of content "harmful to minors" on the internet for "commercial purposes." 542 U.S. 656, 661, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004). Relying on *Playboy*, the Court determined that the case "involved a content-based restriction designed to protect minors from viewing harmful materials" and was therefore subject to strict scrutiny. *Id.* at 670, 124 S.Ct. 2783 (citing *Playboy*, 529 U.S. at 825, 120 S.Ct. 1878). And, as in *Playboy*, the Court held that the government failed to meet its burden of showing that a less restrictive alternative—i.e., filtering software—would be less effective. *Id.*; *see also Sable Comms. of Cal. v. Fed. Comms. Cmm'n*, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) (rejecting a restriction on indecent telephone communications).

Despite the Supreme Court's unwavering application of strict scrutiny in this context, the State argues that either rational basis or an intermediate level of scrutiny should be applied here. Neither position is tenable.

In arguing that the rational basis test should apply, the State relies primarily on *Ginsberg*, a 1968 Supreme Court decision that rejected a First Amendment challenge to a New York statute prohibiting the sale of "girlie magazines" to minors. 390 U.S. at 631, 88 S.Ct. 1274. Therein the Supreme Court held that "[t]he well-being of its children is of course a subject within the State's constitutional power to regulate, and ... it was rational for the legislature to find that the minors' exposure to such material might be harmful." *Id.* at 639, 88 S.Ct. 1274. *Ginsberg* is inapposite here. "[T]he New York statute at issue in *Ginsberg* did not burden the free speech interests of adults," meaning "*Ginsberg*'s justification for rational basis review ... has no purchase here, as we are dealing with a challenge to an adult's ability to access constitutionally protected materials ...." *Paxton*, 95 F.4th at 293 (Higginbotham, J., concurring in part and dissenting in part). To be sure, the State's reliance on *Ginsberg* finds a toe-hold in a recent Fifth Circuit case, *Paxton*, where the court held that a Texas age-verification law almost identical to the one at issue here survived rational basis review under *Ginsberg. Paxton*, 95 F.4th at 270. That decision, however, is inconsistent with the First Amendment jurisprudence outlined above. The Fifth Circuit's analysis has also been rejected by

at least one court, *see Free Speech*, ––– F. Supp. 3d at ––––, 2024 WL 3228197, at *8, and is going before the Supreme Court, *Free Speech Coalition v. Paxton*, ––– U.S. ––––, 144 S. Ct. 2714, ––– L.Ed.2d ––– (2024) (accepting certiorari).

***7** Alternatively, the State argues that an intermediate level of scrutiny should apply under the "secondary effects" doctrine. This doctrine permits a content-based speech regulation to be treated as if it were content-neutral so long as the purpose of the statute is "to combat the undesirable secondary effect[s]" of a business, such as an adult entertainment business, not to prevent "the dissemination of 'offensive' speech." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 49, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (quoting *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 71 n.34, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976)). However, this argument was squarely rejected in *Reno*, wherein the Supreme Court held that the purpose of the statute at issue was "to protect children from the primary effects of 'indecent' and 'patently offensive' speech[,]" not to protect them from the "secondary" effect of such speech. 521 U.S. at 868, 117 S.Ct. 2329. The same holds true here. The State argues that Montana's Age Verification Act "imposes no liability based on the content's offensiveness or effect on its listener—it regulates the secondary effects on minors' health and well-being by imposing liability on covered entities for failure to employ reasonable age-verification methods." (Doc. 20 at 7.) But that conclusion is nonsensical. The stated goal of the statute is to protect minors' mental and emotional well-being from the "corroding influence" of online pornography. *See* SB544 Preamble, https://perma.cc/N8R6-HZF5. Thus, as in *Reno*, the Montana Age Verification Act "is a content-based blanket restriction on speech, and, as such, cannot be properly analyzed as a form of time, place, and manner regulation." 521 U.S. at 868, 117 S.Ct. 2329 (internal quotation marks omitted).

Based on the foregoing, strict scrutiny applies here.

### C. Strict Scrutiny
To satisfy strict scrutiny, a statute "must be narrowly tailored to promote a compelling [State] interest." *Playboy*, 529 U.S. at 813, 120 S.Ct. 1878. The Supreme Court has "recognized that there is a compelling interest in protecting the physical and psychological well-being of minors." *Sable Comms.*, 492 U.S. at 126, 109 S.Ct. 2829. "This interest extends to shielding minors from the influence of literature that is not obscene by adult standards." *Id.* (citing *Ginsberg*, 390 U.S. at 639–40, 88 S.Ct. 1274). While the State may serve this legitimate interest, "it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms." *Id.* "It is not enough to show that the [State]'s ends are compelling; the means must be carefully tailored to achieve those ends." *Id.* "If a less restrictive alternative would serve the [State]'s purpose, the legislature must use that alternative." *Playboy*, 529 U.S. at 813, 120 S.Ct. 1878.

Here, the State argues that Montana's Age Verification Act is narrowly tailored because "it doesn't prohibit *any* speech," and there is no "less-restrictive regulation that will adequately advance Montana's interest." (Doc. 18 at 21–22.) But, as indicated above, the State carries the burden to show both that the means employed by the statute are the least-restrictive available and that the statute actually serves the interest identified. *See Ashcroft*, 542 U.S. at 670, 124 S.Ct. 2783. It has done neither. On the other hand, Plaintiffs have stated plausible facial and as applied First Amendment claims. *See Moody*, 144 S. Ct. at 2393 (explaining that to pursue a facial challenge, a plaintiff must show that "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep" (internal quotation marks and alteration omitted)). Plaintiffs allege that filtering programs or device-level restrictions may provide a viable, less-restrictive alternative. (*See* Doc. 1 at ¶ 51.) They further allege that the Act is underinclusive insofar as it does not cover search engines or social media platforms, both of which Plaintiffs allege are "places children are *most* likely to encounter pornography in the first place." (Doc. 19 at 18; Doc. 1 at ¶ 48.) Plaintiffs also allege that the Act fails to consider the use of VPN programs that can easily be used to evade state-level restrictions or the use of the dark web. (*See* Doc. 1 at ¶¶ 44, 49.)

Accordingly, the State's motion to dismiss Plaintiffs' First Amendment claim is denied.

### II. Substantive Due Process
"Substantive due process refers to certain actions that the government may not engage in, no matter how many procedural safeguards it employs." *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1154 (9th Cir. 2016) (internal quotation marks omitted). "Generally speaking, substantive due process protects an individual's fundamental rights to liberty and bodily autonomy." *Id.* Here, Plaintiffs allege that Montana's Age Verification Act violates their substantive due process rights under the Fourteenth Amendment "because it intrudes into the private sexual conduct and proclivities of adults,

thus impairing a fundamental right in a manner that is not the least restrictive means of accomplishing any compelling governmental purpose." (Doc. 1 at ¶ 93.) The State argues that this claim fails because Plaintiffs lack standing and do not allege a fundamental liberty interest. Neither argument is entirely compelling.

### A. Standing

**\*8** Standing in a federal civil action has two components: "Article III standing, which enforces the Constitution's case-or-controversy requirement, and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11–12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (internal quotation marks and citations omitted). To have Article III standing, a plaintiff must allege: (1) an injury-in-fact (2) that is "fairly traceable to the challenged action of the defendant" and (3) "likely" to be redressable by a favorable decision. *Fellowship of Christian Athletes v. San Jose Uni. Sch. Dist. Bd. of Edu.*, 82 F.4th 664, 680 (9th Cir. 2023) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). In the case of a pre-enforcement action, a plaintiff must "allege an intention to engage in a course of conduct arguably affected with a constitutional interest[,] [t]he intended future conduct must be arguably proscribed by the challenged statute, [a]nd ... the threat of future enforcement must be substantial." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024) (internal quotation marks, alterations, and citations omitted). Prudential standing, on the other hand, is a separate inquiry that focuses on whether "a person in the litigant's position will have a right of action on the claim."[1] *Dep't of Labor v. Triplett*, 494 U.S. 715, 721 n.\*\*, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990) (internal quotation marks omitted).

#### 1. Individual Plaintiffs

The State first argues that the Individual Plaintiffs lack standing because they are not "commercial entities" and are therefore not regulated by the Act. This position is unpersuasive for two reasons.

First, Montana's Age Verification Act defines "commercial entity" to include "corporations, limited liability companies, partnerships, limited partnerships, sole proprietorships, or other legally recognized entities." § 30–14–159(7)(a). The Individual Plaintiffs may qualify as "sole proprietors" insofar as Montana law makes no distinction between a sole proprietorship and the "actual, physical p[erson]." *See Alexander v. Bozeman Motors, Inc.*, 367 Mont. 401, 291 P.3d 1120, 1125 (2012) ("[S]ole proprietorships ... can be held directly liable for intentional actions because the[y] ... are actual, physical people."). The State argues, however, that none of the Individual Plaintiffs "allege that they engage in any business activities that could make them sole proprietors." (Doc. 20 at 10.) Contrary to this characterization, all three Individual Plaintiffs allege commercial activity, specifically the sale of their written work, (*see* Doc. 1 at ¶¶ 17–18 (Pfeuffer), 26 (Griswold)), and the operation of a private psychotherapist practice, (*id.* ¶ 23 (Peterson)). Thus, the Individual Plaintiffs have alleged sufficient facts to show they may qualify as "commercial entities" under the Act.

Second, Peterson and Griswold have also alleged harm "by virtue of the restrictions placed upon ... other regulated entities that will result in a loss of privacy for the Individual whose professional obligations require access to those materials." (Doc. 19 at 25.) More specifically, Peterson alleges that she "relies on internet research on transgender issues and sexuality" and "objects to providing her identity to access websites that have instituted age verification protocols to comply with the Act." (Doc. 1 at ¶ 24.) That same objection is voiced by Griswold. (*See id.* ¶ 27.) This argument is not addressed by the State in its reply. But there is no question that Montana residents, such as Peterson and Griswold, must provide personal, identifying information if they seek to access adult content online. *See FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 384–85, 144 S.Ct. 1540, 219 L.Ed.2d 121 (2024) (recognizing that government regulations may cause upstream or downstream injuries). Thus, they have standing on this ground.

#### 2. Free Speech Coalition

**\*9** The State further argues that the Free Speech Coalition lacks standing. Plaintiffs insist that it has both organization and associational standing. Because Plaintiffs are correct that Free Speech Coalition has associational standing, it may pursue its due process claim.

#### i. Organizational Standing

"[O]rganizations may have standing 'to sue on their own behalf for injuries they have sustained.' " *Hippocratic Medicine*, 602 U.S. at 393, 144 S.Ct. 1540 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)). To do so, an organization must satisfy the usual standards for injury in fact, causation, and redressability. *Id.* at 393–94, 144 S.Ct. 1540. But it is not enough for an organization to merely have expended resources advocating against the defendant's actions; rather, the injury to the organization must "directly affect[ ] and interfere[ ] with [the organizational plaintiff's] core business activities." *Id.* at 395, 144 S.Ct. 1540; *see Ariz. All. for Retired Ams. v. Mayes*, ––– F.4th ––––, ––––, 2024 WL 4246721, at *5 (9th Cir. Sept. 20, 2024) ("Organizations can no longer spend their way to standing based on vague claims that a policy hampers their mission."). The State argues that the Free Speech Coalition has failed to plead such existential injury here. In light of the Supreme Court's decision in *Hippocratic Medicine* and the Ninth Circuit's decision in *Arizona Alliance*, the State is correct.

Plaintiffs allege that the Free Speech Coalition "assists film makers, producers, distributors, wholesalers, retailers, internet providers, performers and other creative artists ... in the exercise of their First Amendment rights and in the vigorous defense of those rights against censorship." (Doc. 1 at ¶ 12.) The Act would therefore interfere with this "mission" insofar as Free Speech Coalition would have to "in response to the provision, ... shift some resources from one set of pre-existing activities in support of [its] overall mission to another, new set of such activities." *Ariz. All.*, 2024 WL 4246721, at *10. Indeed, "there is no sense in which [the Act] can be said to directly injure the organization['s] pre-existing core activities, apart from the plaintiffs' response to that provision." *Id.* Under *Hippocratic Medicine* and *Arizona Alliance*, that is simply not enough to confer organizational standing.

### ii. Associational Standing

Nevertheless, organizations may also have "associational standing" to sue on behalf of their members. *Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* Here, the State challenges the first element of Free Speech Coalition's associational standing: whether its individual members would each have standing. That argument is premised on the State's belief that commercial entities that provide adult content on the internet do not have a fundamental liberty interest impacted by Montana's Age Verification Act. Because that argument is unpersuasive as discussed below, Free Speech Coalition has standing under this theory.

### 3. Business Plaintiffs

**\*10** The State further argues that the Business Plaintiffs lack standing because they improperly seek to vindicate the constitutional rights of third parties, i.e., their patrons. The question of third-party standing is a prudential one. *See Craig v. Boren*, 429 U.S. 190, 192, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). While disfavored, the Supreme Court has recognized third-party standing where the "enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski v. Tesmer*, 543 U.S. 125, 131, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (internal quotation marks omitted). More specifically, the Court has held that a beer vendor had standing to raise an equal protection challenge to a state law on behalf of a specific age-subset of males disparately treated under a gender-based liquor law. *See Craig*, 429 U.S. at 196–97, 97 S.Ct. 451. The Court explained that because the law at issue precluded sale of beer to a specific subset of the population, the vendor stood to "incur[ ] a direct economic injury through the constriction of her buyers' market" and potential sanctions if she violated the law. *Id.* at 194, 97 S.Ct. 451. The Court concluded that this "inflicted injury in fact upon [the vendor] sufficient to guarantee her concrete adverseness." *Id.* (internal quotation marks omitted). Thus, "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Id.* at 195, 97 S.Ct. 451. That is the case here.

The Business Plaintiffs have alleged that the Montana Age Verification Act has a direct economic impact on them insofar as they will lose business if they require patrons to provide identifying information or face sanctions if they fail to do so. (*See* Doc. 1 at ¶ 58.) Concomitantly, patrons who seek to access the Business Plaintiffs' websites are forced to reveal personal, identifying information before accessing "some of

the most sensitive, personal, and private contents a human being might search for." (*Id.* ¶ 57.) The Business Plaintiffs therefore have standing to raise a substantive due process challenge.

### B. Fundamental Liberty Interest

Although intertwined with its standing argument, the State separately argues that Plaintiffs have failed to allege the existence of a fundamental liberty interest. Specifically, the State rejects the idea that Plaintiffs have a protected liberty interest in private sexual conduct generally. In response, Plaintiffs maintain that the Constitution secures a broad right to personal autonomy. Both sides appear to agree that the contours of such a right, to the extent it exists, turn on *Lawrence v. Texas*, 539 U.S. 558, 578, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). The crux of the State's argument is that while *Lawrence* contains broad language about personal autonomy, it did not secure a liberty interest in private sexual conduct and did not involve minors. Neither argument diminishes its application here.

First, *Lawrence* recognizes a broader concept of personal autonomy than the consensual sexual relationship of same-sex individuals. *See* 539 U.S. at 567, 123 S.Ct. 2472 (explaining that the Court has previously "misapprehended the claim of liberty" in *Bowers v. Hardwick*, 478 U.S. 186, 190, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), when it assessed "whether there is a fundamental right to engage in consensual sodomy"). Rather, as the Court explained, "liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex." *Id.* at 572, 123 S.Ct. 2472. Indeed, "[l]iberty protects the person from unwarranted government intrusions into a dwelling or other private places." *Id.* at 562, 123 S.Ct. 2472. "Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct." *Id.* Such conduct has been pled here. (*See* Doc. 1 at ¶ 77 ("It's a striking invasion of privacy at a time and place when a person legitimately expects it most.").) Moreover, the State appears to conflate the existence of a liberty interest with the consideration of whether state conduct burdens that interest. (*See* Doc. 18 at 28 ("[The law] doesn't prevent adults from accessing these age-restricted materials; it just requires commercial entities to verify that the customers who wish to access these age-restricted materials are of age.").)

Second, the State is indeed correct that *Lawrence* specifically states that it "does not involve minors." 539 U.S. at 578, 123 S.Ct. 2472. That assertion is beside the point, however, because of the liberty interest pursued here. As stated above, Plaintiffs have identified the private sexual conduct of consenting adults as the interest at issue. Such conduct is protected under *Lawrence.* Contrary to the State's attempt to muddle the issue, Plaintiffs have not asserted that minors have this same liberty interest or that adults have an interest in gaining access to such materials for minors. As argued by Plaintiffs, the State's "argument betrays the deeply mistaken belief that any regulation 'concerned with minors' is somehow immune from judicial scrutiny for the burden it places on adults." (Doc. 19 at 26.) Not so.

**\*11** Accordingly, the State's motion to dismiss Plaintiffs' substantive due process claim is denied.

### III. Procedural Due Process

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, 132 S.Ct. 2307, 183 L.Ed.2d 234 (2012). A regulation violates due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or if it "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* (internal quotation marks omitted). The State argues that Plaintiffs have failed to plausibly allege that Montana's Age Verification Act is impermissibly vague because, in the State's estimation, the terms identified by Plaintiffs are not vague. Plaintiffs disagree. Yet both parties fail to appreciate the operative question at this stage of the proceeding, which is not whether Plaintiffs are indeed correct as to their assertion of vagueness, but rather whether they have alleged a plausible claim to that effect. They have.

Here, Plaintiffs have alleged that many of the terms used in Montana's Age Verification Act fail to give a person of ordinary intelligence fair notice as to their meaning; specifically, "taken as a whole," (Doc. 1 at ¶ 60); "substantial portion," (*id.* ¶ 61); "minor," (*id.* ¶ 62); "commercial entity," (*id.* ¶ 63); "website," (*id.*); "any commercially reasonable method that relies on public or private transactional data," (*id.* ¶ 64); "contemporary community standards," (*id.* ¶ 65); "know," (*id.* ¶ 66); and "intend," (*id.*). In so pleading, Plaintiffs have identified why they believe each individual term lacks certainty. For example, Plaintiffs challenge the term "taken as a whole" on the ground that is unclear whether it means the internet as a whole, a website as a whole, or a single webpage as a whole and/or whether it includes linked material. (*See id.* ¶

60.) While the State may disagree with Plaintiffs' assessment of the term, Plaintiffs have adequately pled a procedural due process claim.

This claim therefore survives the State's Rule 12(b)(6) challenge. The merit of Plaintiffs' position remains a question for a later date. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("Rule 8(a) establishes a pleading standard without regard to whether a claim will succeed on the merits.").

**IV. Equal Protection**
The State unpersuasively argues that Plaintiffs lack standing to pursue their equal protection claim, largely repeating the standing arguments made in the context of Plaintiffs' substantive due process claim.

The State once again argues that because the Individual Plaintiffs are not commercial entities, they are not subject to the Act's penalties and therefore lack standing to challenge it. This argument fails for the same reasons identified above. Likewise, the State's argument as to the Free Speech Coalition's lack of standing is unpersuasive because, as discussed above, the Free Speech Coalition has associational standing. The State does not challenge Business Plaintiffs' standing in this context other than to argue, substantively, that they fail to allege that they are similarly situated to entities that are treated differently under the Act. That argument is also unpersuasive because the State confuses Plaintiffs' ability to plead an injury-in-fact with Plaintiffs' ability to prove the merits of their equal protection claim. The Supreme Court recognizes a viable equal protection claim "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). Here, Plaintiffs have alleged that by creating an exception for "news-gathering" organizations, Montana's Age Verification Act has created an "impermissible distinction[ ] among media providers—exempting any employee of chosen media while offering no such protection to independent (non-employee) 'news gatherers,' or to bloggers, vloggers (video bloggers), or podcasters whose platforms do not fit within the definition of 'news-gathering organizations.' " (Doc. 1 at ¶ 74.) In so doing, Plaintiffs have adequately alleged an injury-in-fact under the Equal Protection Clause. Whether these groups are, in fact, similarly situated is a merits issue.

**\*12** Based on the foregoing, the State's motion to dismiss Plaintiffs' equal protection claim is denied.

**V. Commerce Clause**
The Commerce Clause grants Congress the "Power ... To regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. "[T]he Commerce Clause not only vests Congress with the power to regulate interstate trade; the Clause also contains a further, negative command, one effectively forbidding the enforcement of certain state economic regulations even when Congress has failed to legislate on the subject." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368, 143 S.Ct. 1142, 215 L.Ed.2d 336 (2023) (internal quotation marks and alterations omitted). "This negative aspect of the Commerce Clause is generally known as the dormant Commerce Clause." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514, 139 S.Ct. 2449, 204 L.Ed.2d 801 (2019) (internal quotation marks omitted). A state law violates the dormant Commerce Clause if it discriminates against interstate commerce, *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 138 S. Ct. 2080, 2091, 201 L.Ed.2d 403 (2018), or is neutral yet nonetheless imposes a burden on such commerce that "is clearly excessive in relation to the putative local benefits," *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The Supreme Court recently cautioned, however, that courts should be careful when reading *Pike* and its progeny to not "depart from the antidiscrimination rule that lies at the core of [the Court's] dormant Commerce Clause jurisprudence." *Nat'l Pork Producers*, 598 U.S. at 377, 380, 143 S.Ct. 1142 (holding that nondiscriminatory laws that merely regulate the in-state sale of ordinary consumer goods do not implicate the dormant Commerce Clause).

*National Pork Producers* poses a challenge for Plaintiffs. More specifically, Montana's Age Verification Act neither directly nor indirectly discriminates against interstate commerce insofar as it treats both in-state and out-of-state commercial entities the same and there is no allegation that it will have the practical effect of burdening out-of-state entities more than in-state entities. Thus, the discriminatory concern of the dormant Commerce Clause identified in *National Pork Producers* is simply not implicated.

That is not the end of the inquiry, however, as Plaintiffs' have alleged a burden on an *instrumentality* of commerce, (*see* Doc. 1 at ¶ 97), the regulation of which has caused the Supreme Court to "express[ ] special concern," *National Pork Producers*, 598 U.S. at 380, 143 S.Ct. 1142. However,

the Supreme Court "has only rarely held that the Commerce Clause itself pre-empts an entire field from state regulation, and then only when a lack of national uniformity would impede *the flow* of interstate goods." *Id.* at 379, 143 S.Ct. 1142 n.2 (quoting *Exxon Corp. v. Gov. of Md.*, 437 U.S. 117, 128, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978)). Plaintiffs' suggestion that any regulation of the internet is effectively a regulation governing commerce across the entire nation is "not tenable." See *Defense Distributed v. Platkin*, 697 F. Supp. 3d 241, 268 (D.N.J. 2023). Indeed,

> [w]eb-content providers ... frequently control content flows from state to state and can do so by conditioning access to certain content on the presentation of payment information or by geographic filtering. As such, just because a state regulates certain behavior on the Internet within its borders does not necessarily establish that the state directly regulates interstate commerce by creating extraterritorial effects.

**\*13** *Id.* Just because an internet content-provider must alter their content for Montana does not mean that the state is attempting to regulate out-of-state conduct. See *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 433 (9th Cir. 2014) (indicating that CNN could create a California-specific site to accommodate a California closed-captioning law). As the Supreme Court recently explained, "[i]n our interconnected national marketplace, many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior." *Nat'l Pork Producers*, 598 U.S. at 374, 143 S.Ct. 1142. Accordingly, this impact alone is insufficient to trigger the dormant Commerce Clause.

Accordingly, the State's motion to dismiss Plaintiffs' Commerce Clause claim (Count 3) is granted.

**VI. Section 230**
Under the Supremacy Clause of the United States Constitution, courts are required to treat "the Laws of the United States" as "the supreme Law of the Land." U.S. Const. Art. VI, cl. 2; see *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25, 135 S.Ct. 1378, 191 L.Ed.2d 471 (2015). In light of the "rapidly developing array of Internet and other interactive computer services available to individual Americans," Congress passed the Communications Decency Act of 1996, which sought to prevent interactive computer services, i.e., websites and platform hosts, from being liable for harmful or offensive conduct posted by third parties on their sites. 47 U.S.C. § 230(a)(1). To wit, Section 230, as the statute is known, states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). Section 230 further states that while "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section[, n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3).

Here, Plaintiffs allege that Plaintiff JFF is a "provider or user of an interactive computer service" under this statute because it provides a platform upon which others post. (Doc. 1 at ¶¶ 82, 100); *see* 47 U.S.C. § 230(f)(2) (defining "interactive computer service"). Plaintiffs allege that Montana's Age Verification Act directly conflicts with § 230 because it "seek[s] to render JFF and other providers and users of 'interactive computer services' liable on account of the actions of 'content providers.'" (Doc. 1 at ¶ 83.) In the State's view, there is no tension between § 230 and Montana's law as (1) § 230 only immunizes actions that restrict content and (2) Montana's Age Verification Act does not treat Plaintiffs as a "publisher or speaker" of the underlying content. The State's arguments are copied almost verbatim from the Fifth Circuit's decision in *Paxton*. *See* 95 F.4th at 284–86. Neither one is persuasive.

First, the State's understanding of the scope of immunity under § 230(c) misses the forest for the trees. The State argues that "Congress enacted § 230(c) to shield against liability for removal, but not publication or distribution, of 'offensive material.'" (Doc. 18 at 39.) In so arguing, the State implies that immunity under § 230(c) is only for harms resulting from Plaintiffs' restricting content on their sites. However, the fundamental purpose of § 230 is to immunize interactive computer services, like JFF, from liability associated with content *they failed to censor*. Indeed, Section 230 was enacted to "to promote the free exchange of information and ideas over the Internet and to *encourage voluntary monitoring for offensive or obscene material.*" *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099–100 (9th Cir. 2009) (internal quotation

marks omitted) (emphasis added). Section 230 therefore allows interactive computer service providers "to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete." *Fair Housing Council v. Roommates.com, LLC*, where 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc). Thus, § 230 provides immunity for content that remains on the site, which is what is at issue here.

**\*14** Second, the State argues that Plaintiffs would not be considered "publisher[s] or speaker[s]" in this context. It is unclear, however, why the State believes this is the case. To the contrary, the State specifically states that "[i]f IFF doesn't create content and serves only as a passive conduit, [§ 230](c)(1) protects it from liability for third-party content." (Doc. 18 at 41.) That is precisely Plaintiffs' argument. Confusingly, however, the States goes on to argue that Montana's Age Verification Act "only imposes liability on JFF based on whether it complies with [the Act]'s age-verification procedure." (*Id.*) The disconnect in the State's argument is likely the result of an attempt to summarize *Paxton*'s discussion of this issue without grappling with its substance. Regardless, *Paxton*'s analysis on this point is unpersuasive.

In *Paxton*, the Fifth Circuit held that the immunity provision of § 230 did not apply to Texas's age-verification law because any harm arising from noncompliance with the law was based on the interactive computer service provider's failure to comply with its legal obligations, not the content posted by a third party. *See* 95 F.4th at 285–86. According to the Fifth Circuit, liability under Texas's law "[wa]s not reliant on the harm done by third-party content." *Id.* at 285. But that is exactly the harm at issue. Montana's law provides that "[a] commercial entity that knowingly and intentionally *publishes or distributes material harmful to minors on the internet*" must "perform reasonable age verification methods to verify the age of individuals *attempting to access the material.*" § 30–14–159(1) (emphasis added). It in fact defines "publish" as "to communicate or make information available to another person or entity on a publicly available internet website." § 30–14–159(7)(g). The Fifth Circuit's attempt to dissociate the alleged harm caused by the platform from the alleged harm caused by the content ignores the plain language and fundamental purpose of the statute. Montana's Age Verification Act holds interactive computer service providers liable for "publishing" material harmful to minors on their websites. Section 230 says that interactive computer services providers are not publishers of third-party content. It is difficult to see how these laws could be read in harmony with one another.

Ultimately, Section 230(c)(1) protects from liability "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes*, 570 F.3d at 1100–01. Plaintiffs have adequately pled a claim based on the Act's impact on JLL as an interactive computer service provider. Thus, the State's motion to dismiss Plaintiffs' preemption claim is denied.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that the State's motion to dismiss (Doc. 17) is GRANTED as to Plaintiffs' Commerce Clause claim (Count 3) and DENIED in all other respects.

**All Citations**

--- F.Supp.3d ----, 2024 WL 4542260

---

**Footnotes**

1      The Supreme Court has expressed doubt about whether the two concepts are truly distinct insofar as many prudential concerns also implicate Article III standing. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.3, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014). That uncertainty is especially pronounced where, as here, a plaintiff seeks to vindicate the rights of a third party, i.e., third-party standing. *See id.* (determining that the consideration of third-party standing's "proper place in the standing firmament

can await another day"); *but see* Kowalski v. Tesmer, 543 U.S. 125, 131, 125 S.Ct. 564, 160 L.Ed.2d 519 (2004) (suggesting it is a matter of "prudential standing").

---

**End of Document**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.