1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Donna M. Ryu, Magistrate Judge

4

5   COALITION ON HOMELESSNESS,    )
    et al.,                       )
6                                 )
                                  )
7            Plaintiffs,          )
                                  )
    vs.                           )   No. C 22-05502-DMR
8                                 )
    CITY AND COUNTY OF SAN        )
9   FRANCISCO, et al.,            )
                                  )
10           Defendants.          )
    _____)

11

12                               Oakland, California
                                 Thursday, October 24, 2024
13

14   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
             RECORDING 1:08 - 2:27 = 79 MINUTES
15

16  APPEARANCES:

17  For Plaintiffs:
                         ACLU Foundation of Northern
18                         California
                         39 Drumm Street
19                       San Francisco, California
                           94111
20                  BY:  JOHN THOMAS H. DO, ESQ.

21

22

23

24        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

25

2

1  For Defendants:
2                              San Francisco City Attorney's
                                 Office
                              Fox Plaza
3                             1390 Market Street
                              Sixth Floor
4                             San Francisco, California
                                94102
5                        BY:  STEVEN A. MILLS, ESQ.
                         BY:  JOHN H. GEORGE, ESQ.
6

7  Transcribed by:              Echo Reporting, Inc.
                               Contracted Court Reporter/
8                              Transcriber
                               echoreporting@yahoo.com
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1    <u>Thursday, October 24, 2024</u>                                    <u>1:08 p.m.</u>

2                          P-R-O-C-E-E-D-I-N-G-S

3                              --oOo--

4          THE CLERK:  Calling Civil Case C-22-5502-DMR,

5    Coalition on Homelessness, et al. versus City and County of

6    San Francisco, et al.

7          THE CLERK:  Okay.  The first matter we're calling

8    is 22CV5502, Coalition on Homelessness, et al. versus The

9    City and County of San Francisco.

10     Counsel, please state your appearances, starting with

11   the Plaintiffs' attorneys first.

12         MR. DO (via Zoom):  John Do for Plaintiffs, your

13   Honor.

14         THE COURT:  Mr. Do.

15         MR. MILLS (via Zoom):  Good morning, your Honor.

16   Steven Mills on behalf of the Defendants, from the San

17   Francisco City Attorney's Office.

18         THE COURT:  Mr. Mills.

19         MR. GEORGE (via Zoom):  And John George as well,

20   from the San Francisco City Attorney's Office, on behalf of

21   Defendants.  Good afternoon.

22         THE COURT:  Mr. George.  Good afternoon to you as

23   well.

24     Okay.  We're here on the defense motions, and I want

25   to -- I have a number of questions that I really need your

4

1  help on, so what I want to do -- the way I'm going to

2  structure this hearing is to ask you questions.  We're going

3  to jump around a little from issue to issue, and I promise

4  you I've reviewed things very carefully.  So I'll give you

5  some brief opportunity at the end if there's highlights you

6  want to hit from other points that we don't get to.  Okay?

7      So I want to start, Mr. Do, with just a confirmation on

8  the relief sought by Plaintiffs.  My understanding is that

9  Plaintiffs are not seeking any damages, correct?

10      MR. DO:  That's correct, your Honor.

11      THE COURT:  But I couldn't tell whether the

12  equitable relief, so, injunctive relief and declaratory

13  relief, were really meant for just -- are you seeking broad

14  injunctive relief and declaratory relief?  Are you seeking

15  any form of individual injunctive or declaratory relief for

16  the named Plaintiffs?

17      MR. DO:  I don't believe there will be any relief

18  that would necessarily be tailored toward a particular

19  individual.  I imagine this is an instance where there is --

20  the scope of relief would be applicable to everyone equally.

21      THE COURT:  Okay.  So I'm going to take that as a

22  representation that you will not be seeking individualized

23  relief.  Correct?

24      MR. DO:  Yes, your Honor.

25      THE COURT:  Okay.  I want to talk about

5

1  organizational standing.  So, of course, we've had fairly

2  recent change in the law with Hippocratic Medicine, which

3  really -- followed by Arizona Alliance in the Ninth

4  Circuit -- that really narrows Havens-style organizational

5  standing.

6      So, Mr. Do, I'd like you to give me the Plaintiffs'

7  best argument for organizational standing in light of those

8  cases, which, first of all, they reject the theory of

9  organizational standing based on frustration of mission and

10  diversion of resources, right?  And they narrow Havens.  So

11  I'm going to cite from Arizona Alliance.  It says that:

12          "Organizations must show that a

13          challenged governmental action directly

14          injures the organization's preexisting

15          core activities, and does so apart from

16          the Plaintiffs' response to that

17          governmental action."

18      So that's the standard we now have.  What is the

19  Plaintiffs' best argument, and with appropriate citations to

20  cases and also to the allegations in the second amended

21  complaint?

22          MR. DO:  Sure, your Honor.  I would highly -- to

23  start with, what are the coalition's core activities?  Those

24  are listed in the complaint at paragraphs, I believe, 19 to

25  22.  I would put them more or less in two buckets.  The

6

1   first bucket is that the Coalition on Homelessness is a

2   membership-based community-organizing organization that does

3   significant amount of outreach to unhoused individuals.

4   That is all part of their mission to advocate for and push

5   for solutions to homelessness.

6        Another component, significant component, of their

7   work, in addition to that -- or in cooperation with that, I

8   should say -- is the fact that the coalition -- again, I

9   think I'd go to paragraph 21 -- builds a network of support

10  for unhoused people through peer outreach campaigns, and

11  connects unhoused folks to social services and resources.

12  It also engages unhoused people and provides basic

13  necessities they need to survive while living unsheltered.

14       So those are the -- some core activities that are

15  directly impacted by the city's encampment policies.  What

16  we have here is the city having a scheme, a pattern of

17  practice, specifically targeting the coalition's base,

18  whether it be coalition members, potential members, who they

19  do outreach to, causing great degree of instability,

20  destruction of belongings, including things from -- like,

21  communication devices, like phones, laptops, and the like,

22  and, again, the destruction and lack of providing

23  appropriate shelter leads to increased instability, and

24  prevents the coalition from building its membership, and

25  needing significant more resources to just locate its base.

7

1      So that's one kind of bucket that I mentioned earlier.
2 The other core one is that the coalition has had to replace
3 survival gear that is routinely destroyed by the city, and
4 other things like tents and the like.  That happened
5 routinely, and they have expended the resources to do that
6 as a direct result of that, and, again, this -- as I
7 mentioned earlier, they provide a wide variety of connection
8 to services, which I would say is very much akin to Havens,
9 which, of course, remains good law, and it is based on
10 whether or not there is an injury, in fact.
11      There, in Havens, there was whether or not there was an
12 impact on, for example, the counseling services that the
13 particular entity in there provided.  Here, certainly, if we
14 have the city, again, interfering with the ability of the
15 coalition to connect with their base by, again, not
16 providing notice of their sweep operations, and, therefore,
17 leading to significant displacement of the individuals.
18      So this is a pretty -- it goes to the heart of what the
19 coalition does, which would be the results which would lead
20 to a cognizable injury, injury in fact, under both Havens,
21 Hippocratic Oath and the most recent Arizona case.
22          THE COURT:  On the -- so part of what you argued
23 was this diversion of resources on buying survival gear
24 for -- gear that gets thrown away that belong to members.
25 In Arizona Alliance, there is this line that says it

8

1  directly injures the organization's preexisting core

2  activities, and does so apart from the Plaintiffs' response

3  to the governmental action, and so I am going to guess that

4  the city would argue that buying tents to replace tents is a

5  response that's not apart from the response to the

6  government's action.  So what do you think?

7          MR. DO:  I think that line would more akin to, for

8  example, if the coalition's basis of standing was purely,

9  for example, to observe the sweep -- observe the encampment

10 resolutions, you know, so that they could, for example,

11 combat that.  While that is certainly something the

12 coalition has done, one of the preexisting activities that

13 they have done is to provide support to their members, and

14 the city's (sic) is a direct disruption of that.

15     Again, paragraph 21 states how they engage volunteers

16 and donors to provide those basic necessities, and it now

17 makes -- the city's practices now make that significantly

18 much more difficult and onerous, and increases the amount of

19 work that the coalition needs to do, and that is, of course,

20 on top of the direct attack on the membership base that I

21 mentioned earlier.

22         THE COURT:  Okay.  Who is arguing this for the

23 city?

24         MR. MILLS:  Your Honor, I am addressing standing,

25 and most of the merits questions.  My colleague, Mr. George,

9

 1    will address any state-created danger or ADA questions, to

 2    the extent they don't bear on standing.

 3            THE COURT:  Okay.  Great.  Mr. Mills, what's your

 4    response on organizational standing?

 5            MR. MILLS:  So your Honor's skepticism of

 6    organizational standing in light of FDA and Arizona

 7    Alliance's exact --

 8            THE COURT:  It's not skepticism.  I'm just trying

 9    to figure out how the law flies here, and I wanted to make

10    sure I understood.

11            MR. MILLS:  So those cases are clear that

12    organizational standing based off of any diversion of

13    resources is no longer good law, and it hasn't been

14    recognize by the courts, the Supreme Court's traditional

15    practice with respect to standing, in order to allow these

16    organizations to have standing on that basis.

17       So I want to respond to the points that have been

18    raised by Mr. Do.  The second amended complaint doesn't say

19    anything, doesn't include any facts about the number of

20    members that have been lost, how Coalition is making members

21    based off of encampment allegations.  None of those are

22    theories identified in the complaint.

23       They don't have any allegations in the complaint for

24    how they're able to use cell phones to connect with members,

25    how they actually correspond, interact with members, and a

1  comment that you said raises questions for standing overall

2  about Coalition's ability to raise claims on behalf of

3  people.  He claims that unhoused people on the street could

4  be Coalition members, or potentially may become Coalition

5  members, and it's raising questions for, well, who are they

6  trying to seek to represent in this case?  Because it's not

7  a class action.  They haven't identified specific members.

8      The survival gear -- your comment about the Arizona

9  Alliance saying that this needs to be apart from the

10 entity's conduct that's at issue is spot-on because, within

11 this case, they have alleged that they are providing tents

12 to try to combat the city's policies, and they also don't

13 establish that there is any right for these things to exist

14 on the street.

15      I'd also like to flag that their kind of theory of

16 people being displaced is no longer good law, following

17 Grants Pass.  Individuals are not allowed to keep

18 encampments on the streets, given that the city does have

19 time, place, and manner restrictions for where people are

20 able to sit, sleep, and lie.  So all of that falls apart at

21 the seams, given that the Supreme Court has been very clear

22 that diversion of resources is not appropriate, and to the

23 extent they try to rely upon Havens, the Supreme Court went

24 to great lengths to kind of distance itself even from Havens

25 by noting these preexisting core activities, and the --

1          THE COURT:  So _Havens_ is not -- is still good law.

2   It was narrowed, and I think the allegations in the second

3   amended complaint make clear that these are preexisting core

4   activities.  I think there's a fair inference of that piece

5   of it.  So take it from there.

6          MR. MILLS:  Yes.  And so, your Honor, there are

7   kind of two points to respond to why _Havens_ is

8   distinguishable from this case, and why the Court should be

9   reluctant to extend it, given the Supreme Court's admonition

10  that that's an unusual case that they have been reluctant to

11  expand themselves.

12      The first point is that, within _Havens_ -- or within

13  _FDA_, they kind of characterize _Havens_ as a case where a

14  retailer is obtaining essentially false information -- or

15  products, defective products, from a manufacturer.  That's

16  the analogy that they drew, and within the context of that

17  case, where a housing organization was, in essence, being

18  deprived of truthful information to go out and connect

19  people to the services that that organization provided, is

20  completely different here than any type of core activity

21  that Coalition is trying to identify to have standing for

22  constitutional claims.

23      Kind of the second distinction that Plaintiffs don't

24  really grapple with in the briefs with respect to _Havens_ is

25  that the Fair Housing Act expressly provided a remedy to

1   that organization in order to obtain damages for its own

2   discrimination that is experienced under the Fair Housing

3   Act, and the Supreme Court had previously determined as a

4   matter of law that those organizations could bring those

5   claims.

6        So, if you think about Transunion, which is another

7   case where the Supreme Court has tried to clarify what types

8   of harms can be redressable, they say, "Identify at common

9   law the analog," and when you look at Havens, the analog

10  would be some kind of misrepresentation or tortious

11  interference with their actual business directly

12  attributable to the Defendants' conduct.  Coalition is not

13  able to allege, and does not allege, that this loss of

14  membership, or that not being able to communicate to people,

15  or their expenditures of tents, putting tents out on the

16  street, is directly attributable to the city.

17       So Havens is plainly distinguishable under these

18  circumstances, and Coalition doesn't -- there's no dispute

19  here that Coalition doesn't have a constitutional claim, in

20  and of itself.  It's seeking to redress its monetary harm

21  that is not cognizable under any of the constitutional

22  claims that have been invoked, and they also don't include

23  any type of diversion of resources with their ADA claim at

24  all, which is important to note, because they do make

25  specific concrete allegations with respect to all of the

13

1  constitutional claims, but the second amended complaint is

2  silent as to the ADA on that point.

3         THE COURT:  Let me ask you about just, again,

4  organizational standing.  If I were to allow amendment, and

5  if Mr. Do's clients were able to amend it to say things like

6  what you pointed out, you know, "Because of the city's

7  actions in destroying" -- you know, "unconstitutionally

8  destroying property and tents and other things of unhoused

9  people without giving proper notice, et cetera, in violation

10 of the city's own policy, that has resulted in the coalition

11 losing, you know, some quantifiable number of members, or,

12 you know, some identifiable impact that way, or inability to

13 contact people by cell phone because cell phones were" --

14 along the lines of what you started with -- if they were

15 able to allege those things, would they be alleging

16 organizational standing, in other words, that their

17 preexisting core activities were injured by the city's

18 actions?

19         MR. MILLS:  No, your Honor, and, as our papers

20 point out, there are specific standards applicable to each

21 of the types of constitutional claims that exist in this

22 case, where courts have traditionally recognize that, in

23 order to have standing, for instance, with a Fourth

24 Amendment claim, you have to have a possessory interest in

25 the property searched or seized.  That is a very clear and

14

1   well established standard that has been articulated by the

2   Supreme Court, has been echoed by the Ninth Circuit, and

3   applied by District Courts.

4        So, if you look at cases like U.S. v. Texas or Spokeo

5   from the Supreme Court, those recognize that you have to

6   look at tradition to see how claims have played out in

7   federal courts in order for Plaintiffs to claim that they

8   have an injury in fact, and tradition shows that this

9   organizational theory that they want to claim is simply not

10  applicable, and it turns redressability on its head as well

11  because, if an organization comes in and tries to claim that

12  it has diverted its resources, and should be able to

13  challenge constitutional rights that apply to specific

14  individuals, without having one --

15            THE COURT:  I'm sorry.  Is this in your brief?

16            MR. MILLS:  It is, your Honor.

17            THE COURT:  Okay.

18            MR. MILLS:  So it's throughout our brief, on

19  pages -- excuse me.  It's in the moving papers, and we

20  start -- on page six, we identify the Supreme Court cases.

21  We flag that, in Transunion, they say that:

22            "A concrete harm is traditionally

23            recognized at common law as providing a

24            basis for redress in federal courts."

25            THE COURT:  Okay.  Got it.  Thanks.  Continue.

1        MR. MILLS:  Yes.  So all of that is to say that
2 this injury is simply not redressable in -- for any of the
3 claims that they seek to address, and <u>Havens</u> was unique, and
4 that there was a statutory cause of action for Havens to
5 come in and seek redress from the federal court.
6        What's important here, too, is <u>Havens</u> was based off of
7 damages.  This is a case for injunctive relief, and they
8 have no authority that extends <u>Havens</u> for being able to --
9 or to extrapolate <u>Havens</u> and apply it to the type of broad
10 systematic injunctive relief that Mr. Do has already
11 indicated they are trying to seek in this case.
12        Federal courts are supposed to have limited
13 jurisdiction with respect to standing because of the injury
14 in fact requirements, redressabilities, in order to protect
15 separations of powers, and allowing an organization to come
16 in where it has no harm that has been recognized as
17 providing a basis for redress in a federal court would turn
18 standing on its head.
19        THE COURT:  Okay.  Mr. Do, let me hear your
20 response.  Again, we're still on just organizational
21 standing.
22        MR. DO:  Yes, your Honor.  I think there has been
23 some conflating of some issues with regards to associational
24 standing or organizational standing of these other issues.
25 At the end of the day, this goes to <u>Havens</u> and Article 3

16

1 standing, whether or not there is a concrete injury. The

2 injuries that the coalition is alleging do match traditional

3 ones. For example, it could be akin to, for example,

4 something like tortious interference.

5    What we have here, again, is the city very much

6 targeting the exact base of the coalition, and we have

7 allegations with regards to, for example, the -- of how the

8 coalition struggles to maintain their relationships with

9 their members. Those are at paragraphs 22, 177, 184, 200,

10 and 204. It describes how individuals, including coalition

11 members, have lost their communications devices, and I think

12 it's paragraph 247 where an individual names that.

13    The coalition also lists all the -- many of the

14 instances where they have seen the destruction of unhoused

15 people's communication devices, like phones and the like,

16 but, on top of that, it does go to this larger displacement,

17 not merely just the destruction of, say, a cell phone,

18 again, the idea of not providing services, and instead

19 having a police response or a response where individuals'

20 belongings are taken, and, essentially, they're forced to

21 move out.

22    So that is very much akin. I would actually say it's

23 existential to the organization, its ability to be able to

24 reach its members and the like, and I think it's very akin

25 to, again, the harms named in Havens, which was, again, an

17

1  organization that was providing counseling, and just the

2  mere receiving bad information there was enough to confer

3  standing.

4      Here we have an instance where the coalition has named

5  that it does its best to provide a certain degree of

6  stability to individuals by, for example, providing the

7  basic necessities and connecting people to services, which I

8  think is very akin to counseling, and, again, the -- and

9  what we have here is the city not providing information, for

10  example, not providing notice of sweep operations and the

11  like, which, again, leads to individuals losing their

12  belongings, leads to individuals being displaced, being

13  harassed, and being pushed out.

14      THE COURT:  Anything more, Mr. Do, on

15  redressability?  So you mentioned tortious interference.

16  Any other points on whether the dispute is traditionally

17  thought to be capable of resolution through the judicial

18  process and is traditionally redressable in federal court?

19      MR. DO:  Well, I'll just try -- this is a -- there

20  is a direct connection here between the city's activities

21  here.  If the city were to, for example, provide reasonable

22  accommodations, if the city was, for example, to abide by

23  the Fourth Amendment, its "bag and tag" policy, the amount

24  of displacement of individuals, the state-created danger or

25  harm would be readily addressable.

1     And so those claims still stand.  We can certainly get
2 into more details about each one individually, but I do
3 believe the remedy potentially offered here with regards to
4 limiting the city's unconstitutional violations would
5 redress the injury to the organization, and, again, I'm
6 speaking specifically about the coalition.  It would not
7 have to -- it would be able to better establish its
8 membership, be able to reach people at outreaches, without
9 having to spend more resources, time to try to find
10 individuals because they've moved constantly, and the like.
11          THE COURT:  Okay.  Well, let's walk through,
12 then -- I mean, I think I understand your argument on sort
13 of the constitutional claims, but for the -- sorry, the --
14 and the basic, you know, destruction of property without
15 notice.  So talk about organizational standing with respect
16 to state-created danger and ADA.
17          MR. DO:  Sure, your Honor.  With regard to
18 state-created danger, it is similar in the sense that the
19 harms here concern -- is displacement and destruction of
20 people's belongings.
21     So, again, the coalition would be able to retain its
22 members, build its members, be able to do more efficient
23 outreach if the city was not putting individuals' lives at
24 risk, and they do so, as laid out in the complaint, by
25 destroying people's survival gear, everything from

19

medication to prosthetics to tents, which increase the

city's -- excuse me -- increases Plaintiffs' and unhoused

folks' exposure to the elements, which will lead to a

variety of very real health impacts.

      And so, again, if not for -- but for the city's actions

there, individuals would be -- have a larger degree of

stability.  The coalition would be able to better reach

their membership and build that base.

      Again, similarly, with regard to disability, again, if

individuals were actually able, for example, to be given the

appropriate amount of time to be able to move their

belongings, if their medical devices were not destroyed,

that would, again, further lead to greater stability for

individuals, so that they could actually reach the

coalition.

      They could be better provided services, connected

services, for the same, because, again, at the end of the

day, one of the coalition's main activities, I think at

paragraph 20, is that it's to support exits from

homelessness, and, again, the city's actions make it

significantly more difficult to do that by, again,

preventing -- by harming the coalition's ability to build

that base, to do outreach, and also having to instead

continue to replace, continuously, the belongings of

individuals.  And so that goes to the ADA as well.

1          THE COURT:  Okay.  Mr. George, I think you were

2    tapped for arguing standing with respect to state-created

3    danger and ADA.  Is that right?

4          MR. GEORGE:  Your Honor, I was going to argue the

5    merits of those ones.  We'll defer to my colleague.  If you

6    have questions specific for me, though, at this time, I'm

7    happy to answer them.  I just was to handle the merits on

8    those issues.

9          THE COURT:  I misunderstood your assignment.

10         MR. GEORGE:  No problem.

11         THE COURT:  Mr. Mills, I'm going to allow the city

12   an opportunity to respond to standing, organizational

13   standing, with respect to ADA and state-created danger

14   claims.

15         MR. MILLS:  Yes, your Honor.  And so I just want

16   to state my objection that all of Mr. Do's arguments that

17   he's raising for the first time here at the hearing are

18   outside of this brief and outside of the second amended

19   complaint as it's alleged.

20       The allegations in the complaint, in, for instance,

21   paragraph 20, say that Coalition's primary purpose, or one

22   of its main focuses, is providing housing solutions.  There

23   is nothing alleged in the complaint that the city's conduct

24   here with respect to displacement of individuals on the

25   street, with respect to any disability access issues, with

21

1  respect to any state-created danger, is preventing them from
2  being able to go out and provide housing solutions, advocate
3  for things like Prop C that are identified in the
4  allegations in the complaint as well, and still connect
5  people to the services through the means that they have been
6  doing so.  With respect --
7         THE COURT:  Well, they talk about Prop C, but they
8  also do specifically talk about creating networks and
9  connecting people with social services.  So that is alleged,
10 and, again, we are at the pleading stage, which is very
11 different from the merits stage, but, as a pleading matter,
12 is there enough here to get organizational standing?  And
13 there are things that talk about those activities.  I'm not
14 sure there are things in here about interfering, how the
15 city interferes with those activities, that I'll
16 double-check.  Maybe that's not spelled out so well, but
17 there's also, you know, leave to amend as a possibility.  So
18 all of those things are out there.
19     So, Mr. Mills, go ahead.
20         MR. MILLS:  Yes.  And, your Honor, with regard to
21 issues, with instance (sic), for notice, I'm hearing
22 argument that Coalition is relying upon notices to go out
23 and be able to identify its members, and that the city's
24 failure to provide notice somehow prevents them from getting
25 access to members.

22

1    Under the "bag and tag" policy, the notice does not go

2  to the Coalition on Homelessness, so I really don't even

3  understand, within the policy that they're identifying, how

4  that's at all traceable to the city and county of San

5  Francisco.  It's that they've decided to go out, monitor

6  these sweeps, and try to identify people, and then -- now,

7  on a claim -- and kind of distance themselves from that

8  expenditure that they made that Havens and the Arizona

9  Alliance cases specifically foreclose.

10    So that's what I'm struggling to grapple with, because

11  there's no redressability, no traceability here, and those

12  are the things that the Supreme Court has admonished are

13  problems with respect to this theory that is divorced from

14  tradition.

15    And with respect to the ADA, there is specific law

16  within the Ninth Circuit that requires ADA claims to allege

17  that a person has experienced discrimination with respect to

18  a disability and intends to go forward and be subject to

19  that barrier again.  That's the Kirola case.  Again, we cite

20  that on page nine of our brief -- sorry.  That's on page --

21  that is on page seven and eight of our brief.

22    So there is a test that applies, and this is not the

23  test that Coalition is raising.  Because this is an

24  organization, it has no claim, and we raised in our papers

25  as well, with respect to the ADA claim, that Congress sets

23

1   forth the "zone of interest" test through the Lexmark

2   decision, which requires Coalition to be able to identify an

3   injury that falls within the ADA that is cognizable.

4        We made an argument that the ADA only applies to

5   qualified individuals with a disability, and creates a cause

6   of action for people that have alleged discrimination on the

7   basis of a disability, and that Coalition is not a qualified

8   person with a disability, and does not allege any injury

9   derivative of discrimination to itself, let alone anybody

10   that is disabled, and that that simply does not work, as a

11   matter of law, under that test, and still it goes back to

12   the questions of redressability here.  Coalition has no

13   legal right, which Spokeo, Transunion recognizes as a basis

14   to have access to federal court, and those simply do not

15   exist.

16        And there's really no distinction with respect to the

17   state-created danger claim and the property claim, with one

18   important caveat.  The state-created danger claim applies to

19   harms that are caused by third parties, and here Coalition

20   does not have a harm that is cognizable of resulting from

21   any conduct of that nature.  So, again, it's not

22   redressable, and courts requires that there be an actual

23   particularized and imminent harm to Coalition in a

24   state-created danger claim, and that just does not exist.

25               THE COURT:  Okay.  Thank you.

24

1    Let's turn to the merits of the state-created danger

2  claims, and, Mr. Do, I have a couple questions.  One, is

3  there anything in the second amended complaint, and, if not,

4  can the Plaintiffs allege a state-created danger beyond

5  generalized dangers of living on the street?

6         MR. DO:  We can absolutely -- it is -- living on

7  the street -- the part of the state-created danger claim is

8  exposure to the elements, which courts have routinely

9  recognized.

10         THE COURT:  Well, courts have not really routinely

11  recognized -- I mean, the ones that have let state-created

12  danger claims go forward typically have been in the context

13  of very extreme weather conditions, or COVID, or things like

14  that, so not just general exposure to the elements, and the

15  things that, unfortunately, people face if they are

16  unhoused.

17    So that -- let me give, also, the other little cluster

18  of questions, because I think your answer may go to all of

19  this, but the other -- I didn't see anything in the

20  complaint that talked about Plaintiffs suffering any

21  injuries that resulted from the city's actions, so, for

22  example, no claimed injuries about exposure to the elements,

23  or extreme elements, or -- you know, there just weren't many

24  causation injury-related allegations that I could find.

25  Now, maybe you can point me to them.  Maybe you'll tell me

25

1  you can amend.  I don't know, but those are the kinds of

2  problems I saw with the state-created danger claims.

3          MR. DO:  Yes, your Honor.  So I think the focus is

4  on whether or not there is a risk of harm, not necessarily

5  in terms of pleading what the actual danger is, and what we

6  have here is, for example, we have the client, David

7  Martinez, who highlights in the declaration, after the city

8  has -- he was subject to sweeps.  He was essentially

9  relegated to sleeping on a cardboard box.  And so those --

10 and I do disagree, your Honor, with the idea that the courts

11 that have looked at state-created danger have spoken to --

12 about, specifically, exposure to the elements.

13     I would highlight, maybe, the Prado v. Berkeley case,

14 which we actually cite in our brief, which is the most

15 recent explanation from a District Court in terms of the

16 scope of the state-created danger, which, again, does focus

17 on exposure to the elements, whether that would be, you

18 know, cold, wind, rain, which leads to very concrete health

19 impacts, whether that be lack of sleep, you know, increased

20 morbidity, and the like, and, of course, our complaint does

21 highlight the growing body of evidence which we will

22 certainly show if this case were to proceed along those

23 lines.

24         So even the case -- like, I think it was Langley.  That

25 is where the county -- excuse me, the city and county --

26

1  suggest that that was merely a COVID case, but no, again,

2  that one actually did emphasize a state-created danger that

3  essentially mirrors ours, which is, again, concerning, lived

4  exposure to the elements without protections from the cold,

5  wind, rain, et cetera, and including both jeopardizing their

6  both physical and mental health.

7           THE COURT:  Okay.  Mr. Mills -- or Mr. George.

8  Sorry.

9           MR. GEORGE:  This one is mine, your Honor, just to

10 respond to a couple points.  So I did -- I wanted to, you

11 know, just sort of pull back a little bit and highlight

12 that, you know, you've been here before, and I don't want to

13 restate entirely, but you started off your opinion back in

14 the -- at the motion to stay that Plaintiffs made no attempt

15 to explain how their claims fit into the relatively narrow

16 boundaries of the state-created danger doctrine if there's

17 also no clear road map for those claims based on existing

18 case law.  That's exactly where we are now.

19      Unfortunately, they have just given you cases that are

20 precisely COVID cases or weather cases.  The Langley case

21 that's identified, again, that was one where they were

22 identifying COVID specifically, as well as the onset of

23 predictably bad weather.

24      I think the only Plaintiff who I heard Mr. Do

25 specifically single out was Mr. Martinez.  First, I do want

27

1  to highlight that amendment for him at this point would be

2  futile, because he is in permanent housing.  He's

3  permanently housed.  He has been since January of 2023,

4  which I'm very pleased to report that he is, because he now

5  won't be exposed to, you know, any conditions on the street.

6  So that's the only specific Plaintiff that we've heard of.

7      I think that you were very correct to point out the

8  lack of injuries here.  Mr. Martinez doesn't allege that he

9  was actually injured by any exposure that the city

10  deliberately exposed him to.  In addition to the failure to

11  plead a particularized danger, as well as a failure to plead

12  any serious injury, which is all that the Ninth Circuit has

13  recognized at this point, there is no claimed deliberate

14  indifference specifically to him or anyone else.

15      The deliberate indifference that was highlighted in the

16  cases that Plaintiffs highlight, it was very specific to the

17  weather, the extreme weather context in, say, the Sacramento

18  Union case, where it was triple-digit heat, and it was

19  obvious that by taking away people's -- whether it was an

20  overhang or a tent or something, and relocating them to a

21  parking lot where there was measured temperatures in excess

22  of 110 degrees.  That was -- that's how the Court was able

23  to find deliberate indifference there.

24      In the COVID cases, it was very specific to the CDC's

25  guidance, which said, by displacing people in an encampment

1  during the height of COVID, whether that's the Omicron surge

2  for the cases that they highlight, the later cases like the

3  Where Do We Go Berkeley? case, or sort of earlier cases like

4  the Sausalito case -- the CDC had put out guidance saying,

5  "You really shouldn't break these up, because you're going

6  to be exposing specifically the inhabitants of the

7  encampment, as well as the greater community, to the spread

8  of COVID."

9      We just don't have anything like that here to say that

10  the city is knowledgeable about the harm that will befall

11  someone, and yet it acts regardless of that harm.  That's

12  just not anywhere in the complaint with respect to Mr.

13  Martinez, or any other specific plaintiff that's identified,

14  or a member of the coalition, which are really the only

15  people whose situation is at issue.

16      I did want to draw the Court's attention just to one

17  footnote, because I think that this is important.  On page

18  68 and footnote 128, this is in one of the studies that

19  they -- that the Plaintiffs highlight, and I think it's

20  actually the expert who they put forward, and the quote that

21  they pull out for that allegation is, quote, "Simply being

22  without a home is a dangerous health condition," and that

23  is -- I think that that actually encapsulates it quite well.

24  Without further allegations that a particular city action

25  exposed someone to home, and then they suffered an injury

1 because of that, and it was done with deliberate

2 indifference, we just don't have a state-created danger

3 claim.

4      So those are -- without belaboring this point further,

5 those are really the main responses that I have to Mr. Do,

6 and if the Court has further questions on this, I'm

7 obviously happy to get more into the case law or the

8 particular issues in each one.

9           THE COURT:  I guess there's a little bit of a

10 twist on this claim, right, which is about property, which

11 is that Plaintiffs are saying, "We had tents.  We had some

12 protection.  But, because of the city's actions as alleged,

13 those tents were taken away, and, you know, our clothing or

14 whatever it might be, the things that we rely on for some

15 protection, and that left us in a worse -- you know, a more

16 precarious situation, where it was more dangerous, because

17 of the elements."  So it's a little bit different than the

18 "clearing an encampment" scenario of some of the other

19 cases.

20           MR. GEORGE:  Respectfully, your Honor, I disagree

21 it is, and so I want to highlight a few things.  First, it

22 is important to note that what Plaintiffs are challenging --

23 I don't think that they're just challenging the removal of a

24 tent.  The claims that are left in the case now --

25 Plaintiffs haven't disputed that the post-Grants Pass

30

1  displacement, HSCO resolutions -- that is now gone.  They

2  don't take those --

3          THE COURT:  Right.  Understood.

4          MR. GEORGE:  Right.  So now we are down to the

5  city following its "bag and tag" policy, and I want to be

6  very clear on this, that they don't dispute that we could

7  bag and tag a tent, which will leave a person without a

8  tent, and so, by our perfectly legal and recognized activity

9  that they don't dispute, they're -- so it's -- their claim

10 is "By destroying the tent, by taking the tent, you have

11 violated the Fourth Amendment, and you've exposed me to a

12 state-created danger," but, because they've really only

13 highlighted the unconstitutional act as the destruction of

14 the tent, we can still constitutionally take the tent.

15     In fact, that's what they're asking us to do, and

16 that's what they've really highlighted in, you know,

17 enforcing training and things of our DWP teams, is to "Hey.

18 If it's a tent, bag and tag it, because that's important for

19 someone to get back."  Now, they could go back a few days

20 later or something like that, but it's up to 90 days, and so

21 the chances of them being overnight in the immediate without

22 their tent or without their clothing -- I mean, if we come

23 across a bag of clothing, we can certainly bag and tag it.

24 Again, it may deprive a person in the immediate of the use

25 of that clothing on, you know, a chilly evening in San

1 Francisco, but we acted fully lawfully.  And so what I'm

2 having trouble with here is, that's not what happened in

3 those cases.

4         THE COURT:  Well, but part of the allegation is

5 not the bag and tag itself, but the failure to follow bag

6 and tag, right?  So the allegation is, even though there's a

7 policy, and even though the Plaintiffs agree, that policy is

8 constitutional, that the city or county, or the various

9 Defendants, are systemically ignoring the policy, violating

10 the policy by trashing stuff without following the bag and

11 tag, which -- that's what I understand their case to be.

12         MR. GEORGE:  I understand --

13         THE COURT:  Am I wrong about that?

14         MR. GEORGE:  I don't think that -- I don't

15 think --

16         THE COURT:  Hold on.  I just want to make sure

17 I --

18         MR. GEORGE:  Okay.

19         THE COURT:  Maybe I'm misstating it.

20         Mr. Do?

21         MR. DO:  No, your Honor.  I think that is

22 certainly part of our case, is the connection with property

23 destruction.  For example, one of the things that wasn't

24 raised is the alleged -- routinely, the destruction of

25 medical devices, prosthetics, medicines, both for named

32

1 individual Plaintiffs -- that is in the complaint.

2        THE COURT:  Okay.  Good.  But I just want to

3 get --

4        MR. DO:  The --

5        THE COURT:  Plaintiffs' case is that there is this

6 policy, but, systemically and across the city services that

7 are charged here, that policy is being violated, and things

8 are being thrown away, without notice and indiscriminately,

9 and they include tents and clothing and medical devices and

10 medicine, and the kinds of things outlined in the second

11 amended complaint.  Right?

12        MR. DO:  That's correct.  And one of the main

13 components of their bag and bag (sic) policy is notice.  So,

14 if they're -- the city is actually following their notice

15 provisions, that would decrease the likelihood that

16 individuals' belongings would be lost.  An individual,

17 rather than having a tent confiscated, could move it.

18    Rather than having their medicine or wheelchairs taken,

19 they could move it and take it with them, so they could

20 use -- to continue to be able to survive on the streets,

21 which they're forced to do.  And so, while it is true that,

22 under certain circumstances, the city can confiscate items,

23 they can only do so with appropriate due process, and that

24 is not occurring, as part of our theory of the case, your

25 Honor.

33

1          THE COURT:  Okay.  Mr. George, I interrupted you

2   to --

3          MR. GEORGE:  Yes.  No, that's --

4          THE COURT:  -- information from Mr. Do.

5          MR. GEORGE:  That's all right.  I appreciate it,

6   your Honor.  So I want to point out that the -- what I'm

7   trying to separate here is the -- I understand that their

8   allegations are that we don't follow policy, but what I'm

9   saying is that, even if we acted to the absolute perfect

10  constitutional requirement of the Fourth Amendment, and we

11  bagged and tagged everything, then it would still separate a

12  person from their property for a period of time, and so they

13  would still -- it is still the reality that they are now

14  separated from their tent or from their clothing for a

15  period of time, and that's what divorces this from the other

16  cases, where the actions --

17         THE COURT:  Well, Mr. Do just explained that

18  that's not necessarily true.  If notice was being given,

19  they can move.  They wouldn't be separated.

20         MR. GEORGE:  Well, I would point your Honor to the

21  cases that the -- there is not an independent requirement

22  for pre-deprivation notice where there's post-deprivation

23  process to get the item back.  You know, that's the Sullivan

24  case that separates this out and says you don't necessarily

25  need to give notice.  If we were to show up -- and by "we,"

34

1 I mean the city -- and bag and tag everything, then

2 pre-notice is not constitutionally required, because people

3 have post-deprivation notice to get everything back.

4     I mean, this is -- it's important to really finely

5 distinguish these points, because not every single thing

6 that is being alleged is unconstitutional, and so we really

7 need to parse this out and then work through, "Okay.  Well,

8 what happens if we follow the law?"  And if we follow the

9 law, a person is still separated from their items for a

10 period of time.

11     THE COURT:  But the problem here is the

12 allegations are systemic failure to follow the policies,

13 right?  So this gets into the due process -- procedural due

14 process arguments made, maybe, by Mr. Mills, but this is the

15 Hudson case that talks about post-deprivation remedies.  But

16 Hudson doesn't apply, specifically does not apply, when

17 there's a challenge to -- let's see what their wording is --

18 "established state procedure."

19     I mean, in essence, that's what Plaintiffs are arguing,

20 that there's a systemic violation where the policy just is

21 not being followed, period, and so post-deprivation remedies

22 don't -- or shouldn't be required, because, really, it's

23 state action -- in a broad-based state action that's

24 creating these deprivations.

25     MR. GEORGE:  I will defer to Steve on the response

35

1 to that, although I just wanted to finish my point on

2 state-created danger, if I may, that even with -- even

3 accepting the premise that these cases are -- that our case

4 is different from the others -- and I disagree with that,

5 but, even accepting that, we still here don't have an

6 injury, and one that was immediately foreseeable, as well as

7 deliberate indifference.  Those allegations are completely

8 lacking, and I really want to highlight that they're very

9 specifically lacking for a Plaintiff, for a particular

10 Plaintiff.

11     In the kind of theoretical pull back and say, "Could a

12 person be harmed by the deprivation of their tent?," I'm not

13 going to take the position that a person having their tent

14 taken in a -- you know, in a very hypothetical situation,

15 with weather or something like that, could not suffer an

16 injury, but what I'm saying is that this complaint does not

17 have that allegation for a particular Plaintiff where it

18 results in a serious injury, and Mr. Do has not cited cases

19 from the Ninth Circuit that have recognized or that are

20 binding on this Court that a risk of future harm is

21 something that creates a state-created danger claim, as

22 opposed to an actual harm, which is what the -- an actual

23 serious harm, is what I would add there from the Ninth

24 Circuit.  With that, I'll defer over to my colleague,

25 Steven, on your question about remedies.

36

1      MR. MILLS:  Yes, your Honor.  I'd like to bring
2  your attention to paragraph 144 for one point that kind of
3  permeates across all of these claims.

4      THE COURT:  Okay.  Well, let me stop you, Mr.
5  Mills.  I'm not opening this up for grabs.  I really -- you
6  know, you -- so, specifically on the due process, the
7  challenge to the due process, procedural due process claim,
8  the city says those are not cognizable, because there's a
9  meaningful post-deprivation remedy, which is smalls claims
10  or the kinds of ways that unhoused folks have been getting
11  compensation so far when their things are inappropriately
12  thrown away.

13      You cite Hudson, but Hudson has a caveat, and that
14  caveat is followed through also in the Newman case, which
15  you didn't cite.  So I want to give you a brief opportunity
16  to address that part of the case which you did not cite.

17      MR. MILLS:  So we do cite to Judson v. Newman,
18  where failure to comply with the state's procedure can
19  create, under the Ninth Circuit -- you know, trigger the
20  requirement that a post-deprivation remedy be followed.  And
21  part of the distinction here is that the policy, to some
22  extent, while it does exist, gives discretion to individuals
23  to go out and to make these very difficult determinations.
24  There is no ability to provide a pre-deprivation remedy on
25  the ground.

1   DPW workers may make either a negligent or intentional

2   deprivation that goes outside of what the city has

3   authorized, and the whole point of the state-established

4   procedure exception is that the state has more or less

5   endorsed the particular deprivation that exists here.

6         THE COURT:  But that's kind of their case.  Their

7   case, as I understand it, is that this is -- you know,

8   there's a policy, but there's sort of a systemic practice of

9   not following the policy.

10        MR. MILLS:  So this does, to some extent, overlap

11  with our argument on Monell, that they do not identify any

12  policymaker that has acquiesced in any of this policy to

13  essentially deprive the city of the ability to invoke this

14  post-deprivation --

15        THE COURT:  Okay.  Let's not jump to Monell, and,

16  of course, there's a number of ways to get to Monell.

17        MR. MILLS:  And in the Ninth Circuit case, the

18  Stones (phonetic) case that we do cite, an unhoused person's

19  property was destroyed in violation of city policy, and the

20  Ninth Circuit held that there was no due process violation

21  under those circumstances.  It didn't address --

22        THE COURT:  Mr. Mills, please.  I feel like the

23  city is not recognizing that -- as I understand it, and Mr.

24  Do just confirmed, the basic thrust of the Plaintiffs' case

25  is that, on the property-related claims, the remaining

38

1  claims, is that sure, there's this policy, and the policy

2  itself is constitutional, if it were followed, but there is

3  a widespread practice of not following the policy, which is

4  creating a number of -- you know, the basis for a number of

5  various claims.  So that's different from sort of random

6  failures to follow an existing -- violation of a policy.

7  That's not what's going on here.  That's not what's been

8  alleged.

9          MR. MILLS:  So the difference is --

10          THE COURT:  I think it's a meaningful difference.

11          MR. MILLS:  So the difference is -- well, one, I

12  want to point your Honor to Lavan, and it's the District

13  Court proceedings in Lavan, where L.A. tried to bring the

14  argument that a post-deprivation remedy existed, and the

15  District Court ended up rejecting it, because there it was

16  completely conceded that the city's policy, on its face, was

17  to never provide notice, and to always summarily destroy

18  individuals' property.  So the state's established procedure

19  was to always deprive individuals of their property rights.

20      This case is different because what Plaintiffs want to

21  say is that DPW workers, on sporadic, isolated instances,

22  are going out and violating the city's policy.  Sometimes

23  it's followed, sometimes it's not.  But the whole point of

24  the post-deprivation remedy kind of exception for this, to

25  bar this claim, is to allow the state to then correct what

39

1 its employees either did intentionally or negligently wrong,

2 underneath the law, and even in Hudson, which is --

3           THE COURT:  I don't think there's any case that

4 says that it has to be -- you know, if it's followed once in

5 a while, then that sort of changes the nature of a basic

6 systemic, you know, claim.  Sure, it could be followed once

7 in a while, but -- and we're at the pleading stage, Mr.

8 Mills.  So, as they've pleaded it, this is about an

9 unwritten policy or practice of doing things in violation of

10 existing practice, number one, and, number two, a failure to

11 train such that those things are happening.

12      But let me just confirm with Mr. Do.  Mr. Do, I didn't

13 see a Monell claim based on ratification or violation of an

14 express policy.  Do you concede that there's no Monell claim

15 on those two theories?

16           MR. DO:  No, your Honor, we don't.

17           THE COURT:  I didn't see -- well, then you didn't

18 plead ratification, and you didn't plead violation of an

19 express policy.  I think you -- the allegations seem to go

20 toward, you know, the policy and practice of not following

21 the policy, number one, and, number two, failure to train,

22 but you can point me to the allegations in the second

23 amended complaint that you think support ratification or

24 violation of an express policy.

25           MR. DO:  I would, I think -- I believe, in our

40

1 brief, we cite all the examples in which we list high-level

2 employees, ranging from the mayor to department heads, being

3 aware of -- and this actually goes a little bit to

4 deliberate indifference, the knowing that San Francisco

5 routinely does not have shelters to provide individuals,

6 knowing that there is a "bag and tag" policy that in place

7 to, in theory, provide protections, yet there are,

8 nonetheless, a series of violations about it, and, of

9 course, just also knowledge that there is, for example, an

10 inclement weather.  You know, those are dangers that are

11 obvious.

12      This is -- like, again, I'm connecting both the -- our

13 response to deliberate indifference, and also the fact that

14 all these high-level policymakers are aware of this, because

15 it is so systematic, which, therefore, would be,

16 nonetheless, ratification by continuing to have those

17 activities continue, notwithstanding that knowledge.

18           THE COURT:  What about --

19           MR. DO:  I'm conflating the two, but it's relevant

20 to both.

21           THE COURT:  What about express policy, violation

22 of express policy?

23           MR. DO:  We certainly allege that there's a

24 violation of the "bag and tag" policy, if that's what you're

25 referring to, your Honor.

41

1          THE COURT:  No.  Sorry.  An express

2   unconstitutional policy, right?  So what you have is, I

3   think, a practice, a widespread practice, of violating the

4   "bag and tag" policy.  That's what I -- how I understand

5   your allegations --

6          MR. DO:  Yes.

7          THE COURT:  -- right, not that there is an

8   unconstitutional policy.

9          MR. DO:  My apologies.  I misunderstood your

10  question, your Honor.  So, generally speaking, yes, we agree

11  that the written policy, for example, the bag and tag, is

12  generally constitutional.  There may be some questions about

13  how it's applied that may be unconstitutional.  So, to that

14  regard, then yes, we're not alleging that there is a city

15  policy that, as written, is unconstitutional.

16      And I do want to just highlight paragraphs 231 and 241,

17  just as examples of those high-level employees ratifying the

18  violations that we've been naming here.

19          THE COURT:  Okay.  Let me turn to conspiracy just

20  for a moment, Mr. Do.  I'm looking at paragraph 333.  It's

21  very conclusory.  That's the only allegation that I saw on

22  conspiracy.  Are Plaintiffs able to plead anything more on

23  this?  You didn't respond to the argument, so I'm thinking

24  maybe not, but --

25          MR. DO:  We understood the city's argument that

42

1   the conspiracy only exists to the extent there are

2   violations of underlying constitutional rights, and to the

3   extent that the city is successful in presenting that

4   there's no -- that we haven't pled violation of

5   unconstitutional rights (sic), then, therefore, any

6   conspiracy claim would not survive.

7           THE COURT:  I actually don't -- I think they made

8   more of an argument than that, but my question is, are you

9   able to amend this, or is it futile?

10          MR. DO:  No, it absolutely wouldn't be futile, but

11  I would highlight, again, the entire complaint concerns the

12  interactions between all these different agencies under the

13  umbrella, for example, of HSOC.  That is a conspiracy, where

14  you have all these groups of people or agencies acting in

15  cooperation with each other.  There's no disagreement that

16  all these entities are acting in cooperation with each other

17  to implement San Francisco's encampment resolution policies,

18  which, of course, what we find those are the ones that are

19  violating individuals' constitutional rights.

20      So, while we certainly could amend, it would not be

21  futile.  I do believe the allegations are there with regards

22  to the coordination and cooperation of all these different

23  departments, whether it be ranging from DPW to the police to

24  the mayor's office, with regards to the -- whether it be the

25  "bag and tag" policy or, again, San Francisco's encampment

43

1  policies -- or practices, I should say.

2          THE COURT:  Okay.  Let's turn to the disability

3  claim, and here this was somewhat unclear on both sides.

4  So, Mr. Do, under Ninth Circuit law, where do we go?

5  Berkeley is one example, from 2022:

6                  "To state a prima facie case for

7                  violation of Title 2, Plaintiffs must

8                  show, one, they are qualified

9                  individuals with disabilities, two, they

10                 were either excluded from participation

11                 in or denied the benefits of a public

12                 entity's services, programs, or

13                 activities, or were otherwise

14                 discriminated against by the public

15                 entity."

16      So two types of discrimination, and:

17                 "Three, such exclusion, denial of

18                 benefits, or discrimination was by

19                 reason of their disabilities."

20      So Plaintiffs didn't really explain what their theory

21  is.  I'm guessing the theory is under the second -- the

22  first type of discrimination in prong two.  In other words,

23  Plaintiffs are saying they were excluded from participation

24  in or denied the benefits of a public entity's services,

25  programs, or activities by reason of the disabilities

44

 1  because they -- because of the disability, and they didn't

 2  get accommodations, they didn't have the benefit of the "bag

 3  and tag" policy.  Is that what the claim is?  I don't know.

 4            MR. DO:  That certainly is part of the claim, your

 5  Honor, yes.

 6            THE COURT:  Well, what is the whole claim, then?

 7            MR. DO:  Yes, your Honor.  Sure.

 8            THE COURT:  I don't understand it.

 9            MR. DO:  Sure.  So San Francisco has a practice in

10  terms of their offers of -- their services must not

11  discriminate against individuals with disabilities.

12            THE COURT:  Which services?  Tell me exactly what

13  services.

14            MR. DO:  Sure.  Their services here, although it's

15  called -- I'm labeling it "services" -- is the practice of

16  their encampment resolutions, which include poor

17  communication of the actual encampment resolution itself.

18  It includes a failure to provide necessary time for

19  individuals with disabilities, for example, to collect their

20  belongings and the like.

21      It is -- although it's again labeled a service, it is

22  the process of going through the DPW process, in which

23  things like medical necessities and medicines are destroyed,

24  and it is, finally, not actually being provided shelter that

25  actually meets their needs.  So all those are under the

1  umbrella of a service that the city provides.  Obviously, we
2  don't believe these are actual services that actually lead
3  to positive results all the time for individuals.
4      So, under that umbrella, there is certainly a disparate
5  impact on individuals, which it is cognizable for a
6  disability-based claim, and doesn't necessarily require a
7  specific request for a reasonable accommodation, but when
8  you -- when the city has practices that I just outlined,
9  those discriminate against individuals with disability,
10 including named Plaintiffs such as Ms. Teresa Sandoval
11 (phonetic), who had her belongings, for example, or medical
12 devices destroyed, and, of course, members of the coalition
13 who have a large number of individuals with disabilities.
14     They are discriminated against because of these
15 practices, leading to, again, those destruction of
16 belongings, particularly medical devices and the like, is
17 one example.  There is another --
18         THE COURT:  Go ahead.
19         MR. DO:  Just the full -- the larger one is -- the
20 other component of it is, if an individual, you know, for
21 example, does expressly ask for a reasonable accommodation,
22 and that is not given, that would be a violation, in and of
23 itself.
24         THE COURT:  This much broader, the way you stated
25 it, than I understood it, but here's -- let me parrot it

46

back to you, to make sure I understand the theories, one,

that there was failure to provide notice in the encampment

resolutions to give appropriate time for people with

disabilities to collect their belongings.  So I don't

know -- I guess maybe that's a -- are you saying they might

need more time, or what is it that's about -- what's the

disability part of it?

MR. DO:  Sure.  So I actually would separate those

out, in that -- for two things.  One is, governments must

provide -- must communicate with individuals with

disabilities on equal footing as everyone else.  So I think,

for example, we have an -- the city -- in our complaint, we

speak of how the city doesn't communicate with an individual

who is deaf, and, therefore, they lost their belongings,

because the city wasn't communicating with them in an

appropriate manner.

I would say, for example, lack of notice, which is

replete throughout our complaint, is not actually -- or poor

notice, if any notice at all, therefore does not allow

individuals with disabilities, in particular, to necessarily

understand what is happening.  So that's one component.

The other component that you also named, your Honor, is

what is also throughout the complaint, and is examples of

how individuals are not given sufficient time to actually

get their belongings.  So certainly you have -- whether it

47

be a mental or physical disability, just being told to "Take

your belongings immediately."  Individual disabilities,

particularly whether it be physical or mental health, would

have a more difficult time doing that, but for that

disability.  So, of what you just named, that's how I would

break it down.

THE COURT:  Okay.  I didn't see -- one issue is a

lack of allegations about either people requesting

accommodation or more time, or it being obvious, or anything

like that.  So that's one problem, but -- so, sorry.  Going

back to what your claim is, you just outlined a bunch of

claims that have to do with communication and lack of

notice --

MR. DO:  And lack of time.

THE COURT:  -- and lack of time, where people

say -- you know, need more time -- that the bag and tag is

being violated such that people are losing their medicine or

prosthetic devices that would affect people with

disabilities, right?  I think that was one thing you

mentioned.

MR. DO:  Yes.  And I just want to clarify the time

one relates to, if you are going to have individuals move

their belongings, they may need some sort of accommodation

like additional time.  It may be they may need help to move

a particular item.  But then moving to the next one, as your

48

Honor just mentioned, is destruction of things from mobility
devices to medication and the like.

THE COURT:  Okay.  And then the last one you said
was actually shelter, that people were not being -- people
with disabilities were not being provided accommodation in
the form of shelter.  So I didn't realize there was a
shelter claim still involved in the case, but are you saying
there is with respect to the ADA?

MR. DO:  I think the city would certainly agree
that there is a need for any shelter accommodations to
accommodate individuals with disability, and here what we
are alleging is that the city has a practice of not
providing shelter to individuals, which does relate to, your
Honor, the state-created danger claim.  I will highlight
that as well.  So there is a shelter component still part of
this case, because, as part of state-created danger, they
are displacing people without providing any real
alternative.

So, for example, if the city were to take a tent, but
provide shelter, then I think the state-created danger claim
would be lessened there, because they are not putting an --
they are not necessarily putting an individual at any
increased risk.  So that is why the shelter component still
very much remains alive in this case, notwithstanding <u>Grants</u>
<u>Pass</u> and the Eighth Amendment claim.

1          THE COURT:  Okay.  I'm also not sure that there's

2   any allegations about, well, not just requests for

3   accommodation or, you know, putting city workers somehow on

4   notice in particular instances, but also particular

5   injuries.  Like, I get maybe Sandoval said something about

6   her injuries, but she didn't say anything about requests,

7   requesting accommodation or need for additional help.

8          MR. DO:  So there are certainly -- there are

9   allegations with regards to the city failing to provide

10  reasonable accommodations.  I think they're around paragraph

11  200, 201, I believe.  To the extent that that is not

12  specific enough, certainly more elaboration could be done

13  there, but that is in the complaint, your Honor, with

14  regards to failing to provide reasonable accommodations.

15         THE COURT:  Okay.

16         MR. DO:  And, of course, Ms. Sandoval is an

17  individual, I believe, who is an entity who relies, of

18  course, on her wheelchair and prosthetics, who has mobility

19  issues, and on top of mobility issues, the destruction or

20  confiscation of her prosthetics would certainly be very

21  obvious, and I don't think an individual would need to ask a

22  reasonable accommodation to not have their prosthetics be

23  destroyed.

24         THE COURT:  Well, there's not even an allegation

25  about that.  There is nothing in there to say this is why

50

1  this -- you know, so there isn't even one on obviousness.

2  So, you know, you're probably getting from my questions that

3  I didn't understand -- the pleadings, as such, are confusing

4  with respect to the disability claims.

5            MR. DO:  Well, I do --

6            THE COURT:  So --

7            MR. DO:  If I may, your Honor.  I do want to make

8  clear that a request for a reasonable accommodation isn't a

9  prerequisite for every theory of a disability claim.  Again,

10 it sounds from -- the city has a practice of destroying

11 people's belongings that is specifically going to -- and

12 they do not, for example, distinguish between medication and

13 trash, prosthetics and trash.  That practice is the

14 discriminatory action that we are challenging.  It does not

15 require the individual --

16           THE COURT:  If that's the case, then maybe you

17 ought to say it more clearly in your complaint.  I mean, I

18 really don't understand your theories, and they're all over

19 the place, and that ties back to some standing problems.

20 So, you know, it's a very scattershot disability theory,

21 same with state-created danger.

22      There isn't sort of a unified theory in the way there

23 might be on just destruction of property, and that makes it

24 very hard to analyze with respect to standing and just, you

25 know, whether a claim has been stated, and whether there's,

1  you know, causation of injury, and just some of the basic

2  stuff.  It's incredibly broad, and every time you speak, Mr.

3  Do, it gets broader.  So I think there are some problems

4  here in wrapping, you know, the nuggets of those claims, and

5  then, also, thinking about how they're affected by standing.

6      Now, we're just at the pleading stage on these, in this

7  particular set of motions, but, you know, at some point, if

8  it gets past the pleadings, all these things are going to

9  have to be proven up, too, or its allegations won't be

10  enough, but I'm concerned that this is just so sort of

11  broadly stated that it's very hard to know what Plaintiffs'

12  theories are in those areas, as opposed to the basic

13  theories on destruction of property.

14           MR. DO:  Well, your Honor --

15           THE COURT:  Mr. Do.

16           MR. DO:  I would just say, although we think our

17  allegations are sufficient, certainly, if there is a desire

18  for additional clarity, we can certainly amend, and I wanted

19  to explain the legal premises of it to show why it would not

20  be futile, if we have the opportunity to do so.

21           THE COURT:  Okay.  All right.  Well, we've been

22  going for an hour and 15 minutes.  I don't -- you know, I

23  don't need more argument, but I'll give you, you know, a

24  couple minutes, if either side wants to hit on some point,

25  but really I mean a couple minutes.

52

1      So, Mr. Mills, this is your motion -- or I don't know,

2  Mr. George.  One of you, not both of you, gets two minutes,

3  if there's anything more you want to add.

4           MR. GEORGE:  Your Honor, I will -- I'm sure I

5  could say a lot about the ADA pieces.  I think that your

6  Honor understood our arguments from the papers, and so I'll

7  rest on that.  I will defer over to my colleague to handle

8  anything, because I think standing is probably more

9  complicated than my issue.

10           MR. MILLS:  So, yes, your Honor.  I wanted to echo

11  back to a point that was raised about, potentially, leave to

12  amend to add this organizational diversion of resources-like

13  theory, and I wanted to point to allegation 144 in

14  Plaintiffs' complaint, where it cites to a case called <u>Rios</u>

15  <u>v. City of Sacramento</u>.  It's also cited in the parties'

16  briefing.

17      There the Court did not find that there was injunctive

18  relief to challenge Fourth Amendment issues or due process

19  issues by an organization, and then, with respect to

20  damages, it did get through the gate, and then gave a Rule

21  11 obligation, that Plaintiffs' claim was going to be denied

22  because they had -- they could not demonstrate that they had

23  a constitutional claim.  That just goes back to the issues

24  with respect to redressability, and I wanted to flag that

25  for your attention, because it is in the complaint and it is

1  in the briefing as well.

2      We haven't talked about associational standing.  For

3  all of the reasons that we've gone through in this -- in the

4  argument so far, there are so many individualized issues at

5  play that Coalition cannot be a plaintiff in this case,

6  raising associational standing issues.  The ADA is --

7            THE COURT:  You're talking about the third prong?

8            MR. MILLS:  The third prong, the prudential prong.

9            THE COURT:  The prudential prong, right?  So we're

10  just talking there about efficiency, and I don't know

11  that every individual needs to be involved, depending on the

12  claim, in particular.  So that's going to tie back to

13  whatever the theory is by the Plaintiffs on the ADA, if

14  particularly individualized, maybe state-created danger as

15  well, but, on some of these, they're pretty broad claims

16  that I don't know that they really need to be brought by

17  every individual member.

18            MR. MILLS:  Well, for purposes -- even with the

19  Fourth Amendment claim, those are personal rights that

20  cannot be vicariously asserted as a matter of law, and one

21  of the issues we raised in our papers is that it lacks --

22            THE COURT:  I disagree.  I disagree with that,

23  but, okay.

24            MR. MILLS:  Well, we also raised that <u>Lexmark</u>

25  flags, you know, a unanimous opinion from the Supreme Court

54

1 that third-party standing, which has been characterized as

2 prudential, is questioned, in a footnote by all of the

3 judges, that it's not really prudential, it's more

4 constitutional.

5      Plaintiff cites to two cases for the ADA issues.

6 They're both disability rights cases.  I believe one is out

7 of Pennsylvania.  One is out of Alameda, where Congress

8 created a very specific statutory mechanism for an

9 organization to come in and bring claims on behalf of

10 disabled individuals.  Our whole point in our opposition is

11 that Congress can create causes of action.  The Court

12 cannot.  And because Section 1983 of the ADA -- all of these

13 claims apply specifically to individuals -- Coalition can't

14 bring that.

15      We're going to be entitled to probe standing.  We're

16 going to be able to challenge the veracity of the claims,

17 what property was owned, and to the extent they want to say

18 there's a systemic pattern and practice of violating the

19 "bag and tag" policy, we're going to also have to

20 demonstrate that there are underlying constitutional

21 violations, which necessarily brings those Plaintiffs in to

22 demonstrate what property they had, what degree of notice

23 they had.

24          THE COURT:  Okay.  Mr. Mills, your two minutes is

25 up.  Thank you.

1      Mr. Do?

2           MR. DO:  Sure.  While I appreciate the city

3  offering a variety of legal theories, the type of claims

4  that the coalition is -- and the Plaintiffs here are

5  bringing have been recognized and are quite routine.  While

6  we can --

7           THE COURT:  They're not routine, at least --

8           MR. DO:  With respect to the Fourth Amendment

9  issues, to the extent there is any -- and also the

10 procedural mechanism in order to bring so (sic).  So there

11 are a variety of cases where, of course, Section 1983 claims

12 are brought by organizations all the time, including for the

13 Fourth Amendment.

14     Again, I would highlight, probably, the <u>Prado</u> case as

15 the most recent one.  There is a Ninth Circuit case,

16 <u>Columbia v. City of Pasco</u>, where, again, the Ninth Circuit

17 has routinely recognized Section 1983 claims, Fourth

18 Amendment claims, and the like.  We listed a number of cases

19 where ADA claims can be brought by organizations.

20     The other component that I would respond to is with

21 regard to associational standing.  As your Honor questioned

22 at the very beginning, this case is -- it's a pattern and

23 practice case in which the ultimate remedy is essentially

24 going to be the same for everybody.  An individual, whether

25 it be an individual plaintiff or an individual instance of a

56

1 particular property destruction or a particular violation,

2 is equally relevant.

3     It doesn't -- bringing this claim doesn't necessarily

4 mean why we have to have a particular plaintiff raising

5 those issues.  Here it actually makes a lot of sense, where

6 we have a coalition who is an organization that works

7 directly with individuals in very precarious situations, to

8 also be able to bring those directly on behalf of their

9 members.

10     And so I think, lastly, I would just ask, to the extent

11 the Court is interested in amendment, we're happy to talk

12 about any time where the Court would like that to be

13 received.

14         THE COURT:  Okay.

15         MR. DO:  And we -- and I --

16         THE COURT:  Well, I'll issue an order, and if

17 there's leave to amend, then you'll get leave to amend, and,

18 if not, then not.

19         MR. MILLS:  Your Honor, can I just add one point

20 on the leave to amend?

21         THE COURT:  No.

22         MR. MILLS:  Okay.

23         THE COURT:  Okay.  I got it.  I mean, you all

24 wrote out what you -- I've read everything.  I just wanted

25 to give you a quick moment to highlight things, but we've

57

1  now been going for an hour and 20 minutes.  I think that's

2  enough.

3          MR. DO:  I have a housekeeping matter, your Honor,

4  if I may raise.

5          THE COURT:  Okay.  Mr. Do.

6          MR. DO:  So, when we last left you, in terms of

7  our negotiations with regards to the coming schedule and

8  discovery limits, we informed the Court that we would work

9  to negotiate modifications, and that Defendants wanted to

10 increase the number of depositions.

11     I just wanted to report back that we've reached an

12 agreement in principle with regards to changes to the

13 deposition limits, which will also entail a corresponding

14 extension, likely, of the case schedule.  We are

15 anticipating three, four months.  We are going to finalize

16 that and propose something to your Honor for your

17 consideration.

18          THE COURT:  Okay.  While I appreciate you being

19 able to meet and confer and come to some compromises, I'm

20 not crazy about moving the case schedule, but I'll take a

21 look, of course.  I don't mean to scare you off.  If you

22 reached an agreement that -- and it sort of rests on needing

23 a little more time, I will take that into account, and, you

24 know, I may not give you everything you want, but I'll take

25 a look and see what makes sense.  Okay?  When will I be

58

1  seeing that?

2          MR. DO:  This week, I hope, your Honor -- well,

3  this week or early next week.

4          THE COURT:  Okay.  Fair enough.

5      All right.  Well, thank you.  That was very helpful.

6  I'll get a written order out.

7          MR. DO:  Thank you, your Honor.

8          THE COURT:  All right.  Take care.

9          THE CLERK:  This court is now adjourned.

10      (Proceedings adjourned at 2:27 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

59

CERTIFICATE OF TRANSCRIBER

1

2

3          I certify that the foregoing is a true and correct

4    transcript, to the best of my ability, of the above pages of

5    the official electronic sound recording provided to me by

6    the U.S. District Court, Northern District of California, of

7    the proceedings taken on the date and time previously stated

8    in the above matter.

9          I further certify that I am neither counsel for,

10   related to, nor employed by any of the parties to the action

11   in which this hearing was taken; and, further, that I am not

12   financially nor otherwise interested in the outcome of the

13   action.

14

15

16

17          Echo Reporting, Inc., Transcriber

18               Monday, October 28, 2024

19

20

21

22

23

24

25