UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COALITION ON HOMELESSNESS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, et al., <br><br> Defendants. | Case No.  22-cv-05502-DMR <br><br> **ORDER ON MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND MOTION FOR JUDGMENT ON THE PLEADINGS** <br><br> Re: Dkt. No. 242 |

Defendants City and County of San Francisco; San Francisco Police Department ("SFPD"); San Francisco Department of Public Works ("DPW"); San Francisco Department of Homelessness and Supportive Housing ("HSH"); San Francisco Fire Department ("SFFD"); and San Francisco Department of Emergency Management ("DEM") (collectively, "San Francisco" or "the City"), move pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(c) to dismiss the second amended complaint ("SAC") for lack of subject matter jurisdiction based on standing and for judgment on the pleadings.  [Docket No. 242.]  Plaintiffs oppose.  [Docket No. 247.][1]  The court held a hearing on October 24, 2024.  For the following reasons, the motion to dismiss is granted in part and denied in part.  The motion for judgment on the pleadings is granted in part and denied in part.

## I.    BACKGROUND

Plaintiffs are Toro Castaño, Sarah Cronk, Joshua Donohoe, Molique Frank, David Martinez, Teresa Sandoval, and Nathaniel Vaughn, all current or formerly homeless residents of San Francisco, and the Coalition on Homelessness ("Coalition"), a non-profit advocacy

---

[1] Prior to oral argument, San Francisco filed three Statements of Recent Decision pursuant to Civil Local Rule 7-3(d)(2).  [Docket Nos. 253, 256, 258.]

organization.  They filed this lawsuit in September 2022 alleging that San Francisco has a "custom and practice of violating the constitutional rights of unhoused people."  [Docket No. 135 (SAC) ¶ 2).]  The challenged conduct included Defendants' "enforce[ment of] a series of laws that prevent unhoused residents from sheltering in the City's open spaces when there is no other shelter available" and "campaign to seize and destroy the property of unhoused people with the express purpose of removing visible signs of homelessness from San Francisco's streets."  *Id.* Specifically, Plaintiffs challenged San Francisco's alleged "custom and practice of citing, fining, and arresting—as well as threatening to cite, fine, and arrest—unsheltered persons to force them to 'move along' from public sidewalks and parks" even though it lacks adequate shelter to offer these individuals, thus "punishing residents who have nowhere to go."  *Id.* at ¶¶ 5, 6.  They alleged that these enforcement policies violate the Eighth Amendment and the California Constitution's prohibition on cruel and unusual punishment, citing *Martin v. City of Boise*, 920 F.3d 584, 618 (9th Cir. 2019).  *Id.* at ¶ 6.  Plaintiffs also challenge San Francisco's alleged summary seizure and destruction of homeless individuals' personal property and survival belongings without notice or opportunities to recover their property as violating the Fourth and Fourteenth Amendments and corollary provisions of the California Constitution, among other claims.  *Id.* at ¶ 8.

The SAC, which is the operative complaint, asserts the following claims: 1) violation of the Eighth Amendment's prohibition against cruel and unusual punishment, by all Plaintiffs; 2) violation of the California Constitution's prohibition against cruel or unusual punishment (Article I, § 17), by all Plaintiffs; 3) violation of the Fourth Amendment's prohibition against unreasonable searches and seizures without probable cause, by all Plaintiffs; 4) violation of the California Constitution's prohibition against unreasonable searches and seizures without probable cause (Article I, § 13), by all Plaintiffs; 5) violation of the Fourth Amendment's prohibition against unreasonable searches and seizures based on destruction of property, by all Plaintiffs; 6) violation of the California Constitution's prohibition against unreasonable searches and seizures based on destruction of property (Article I, § 13), by all Plaintiffs; 7) violation of the Fourteenth Amendment's guarantee of procedural due process, by all Plaintiffs; 8) violation of the California Constitution's guarantee of procedural due process (Article I, §§ 7(a), 15), by all Plaintiffs; 9)

exposure to state-created danger in violation of the Fourteenth Amendment, by all Plaintiffs; 10) exposure to state-created danger in violation of the California Constitution (Article I, § 7(a)), by all Plaintiffs; 11) disability discrimination in violation of the Americans With Disabilities Act ("ADA"), by Coalition and Sandoval; 12) disability discrimination in violation of California Government Code section 11135, by Coalition and Sandoval; and 13) conspiracy to deprive Plaintiffs of their federal and state constitutional rights, by all Plaintiffs.  Plaintiffs seek declaratory relief, injunctive relief, mandate relief, and attorneys' fees and costs.  SAC 97-99, Prayer for Relief.

In December 2022, the court partially granted Plaintiffs' motion for a preliminary injunction on their Eighth and Fourth Amendment claims.  *Coal. on Homelessness v. City & Cnty. of San Francisco*, 647 F. Supp. 3d 806, 841-42 (N.D. Cal. 2022), *aff'd in part, vacated in part, remanded*, No. 23-15087, 2024 WL 3325655 (9th Cir. July 8, 2024).  San Francisco appealed.[2] On June 28, 2024, the United States Supreme Court issued *City of Grants Pass, Oregon v. Johnson*, 144 S. Ct. 2202, 2224 (2024), in which it held that the Eighth Amendment's prohibition on cruel and unusual punishments does not prohibit "the enforcement of public-camping laws," abrogating *Martin*.  The Ninth Circuit subsequently vacated the portion of the preliminary injunction related to Plaintiffs' claims of cruel and unusual punishment under the Eighth Amendment.  *Coal. on Homelessness v. City & Cnty. of San Francisco*, No. 23-15087, 2024 WL 3325655, at *1 (9th Cir. July 8, 2024). The Ninth Circuit affirmed the preliminary injunction directed to the Fourth Amendment claims, holding that this court did not abuse its discretion "by

---

[2] During the pendency of San Francisco's appeal, Plaintiffs filed the first amended complaint ("FAC"). [Docket No. 111.]  San Francisco subsequently moved pursuant to Rule 12(b)(1) to dismiss the individual Plaintiffs based on lack of Article III standing to pursue injunctive relief but did not challenge Coalition's standing to bring any of the claims in the action.  [Docket No. 112.] As Defendants did not assert that Coalition lacks standing, the court held "[t]he Coalition on Homelessness unquestionably has standing to pursue all forms of relief sought through this lawsuit."  It then denied the motion to dismiss the individual Plaintiffs for lack of standing, citing *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993), in which the Ninth Circuit held that "[t]he general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." *Coal. on Homelessness v. City & Cnty. of San Francisco*, No. 22-CV-05502-DMR, 2023 WL 3637032, at *3 (N.D. Cal. May 23, 2023).  Thus, the court has not previously analyzed the merits of San Francisco's arguments challenging the standing of any Plaintiff.

United States District Court
Northern District of California

1    requiring the City to comply with its 'bag and tag' policy" as written.[3]  *Id.*

2       The court scheduled a case management conference upon remand.  The parties filed a joint

3    CMC statement in which they stated their agreement that Claims 1-4 in the SAC "should be

4    dismissed in light of *City of Grants Pass*" and that Claims 5-8 "should remain," but noted their

5    disagreement about "the scope of *Grants Pass*' impact on Claims 9-13."  [Docket No. 230 (Jt.

6    CMC Statement) 2.]  Plaintiffs represented in the joint statement that they planned to move to

7    amend the complaint to remove Claims 1-4 and to add additional claims and Defendants stated

8    their intention to move for judgment on the pleadings.  *Id.* at 2-3, 5-6.  At the August 7, 2024 case

9    management conference, Plaintiffs stated they would dismiss Claims 1-4, preferably by

10    stipulation, and that they would not seek leave to amend the complaint at this time.  [Docket No.

11    246 (Aug. 7, 2024 Hr'g Tr.) 6-8.]  The court ordered Defendants to file their motion for judgment

12    on the pleadings by September 9, 2024.  [Docket No. 236 (Minute Order).]

13       The parties did not file a stipulation regarding the dismissal of Claims 1-4.  Defendants

14    timely filed this motion seeking to dismiss the SAC for lack of subject matter jurisdiction based on

15    the absence of Article III standing.  They also move for judgment on the pleadings.[4]

16   **II.**      **LEGAL STANDARDS**

17       **A.**      **Motion to Dismiss**

18       A motion to dismiss filed pursuant to Rule 12(b)(1) is a challenge to the court's subject

19    matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  A court will dismiss a party's claim for lack of

20    subject matter jurisdiction "only when the claim is so insubstantial, implausible, foreclosed by

21    prior decisions of th[e Supreme] Court, or otherwise completely devoid of merit as not to involve

22    a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (citation

23

24    ───────────────

25    [3] On August 5, 2024, the court granted in part and denied in part Plaintiffs' motion to enforce the
preliminary injunction with respect to the Fourth Amendment claim and subsequently ordered

26    Defendants to provide Department of Public Works employees with additional training on the bag
and tag policy.  [Docket Nos. 231, 241.]

27    [4] San Francisco filed an unopposed request for judicial notice in support of the motions in which it
asks the court to take judicial notice of the existence of court records pertaining to Plaintiffs

28    Castaño, Vaughn, and Frank.  [Docket No. 242-7.]  The request is denied as moot as the court
does not rely on the court records in ruling on these motions.

and quotation marks omitted); *see* Fed. R. Civ. P. 12(b)(1).  The challenging party may make a facial or factual attack challenging subject matter jurisdiction.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  A facial challenge asserts that "the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  In contrast, a factual attack disputes "the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Id*. at 1039.  A factual challenge permits the court to look beyond the complaint, without "presum[ing] the truthfulness of the plaintiff's allegations."  *White*, 227 F.3d at 1242 (citation omitted).  Even the presence of disputed material facts "will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."  *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (citations omitted).

In this case, San Francisco makes a facial attack on subject matter jurisdiction as to Coalition's standing.  It makes a factual attack on subject matter jurisdiction as to the individual Plaintiffs' standing, relying on extrinsic evidence outside the pleadings.

### B.    Motion for Judgment on the Pleadings

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  "Judgment on the pleadings is properly granted when, accepting all factual allegations in the complaint as true, there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law."  *Chavez* 683 F.3d at 1108.  The court must construe all factual allegations "in the light most favorable to the non-moving party."  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).

"Rule 12(c) is functionally identical to Rule 12(b)(6) and . . . the same standard of review applies to motions brought under either rule."  *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011).  Accordingly, the court "court must assess whether the complaint 'contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Mere conclusory statements in a complaint and 'formulaic recitations of the elements of a cause of action' are not sufficient."  *Id.* (quoting *Bell*

5

1  *Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "When considering a motion for judgment on

2  the pleadings, th[e] court may consider facts that 'are contained in materials of which the court

3  may take judicial notice.'"  *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th

4  Cir. 1999) (quoting *Barron v. Reich*, 13 F.3d 1370, 1377 (9th Cir. 1994)).

5  **III.    CLAIMS NO LONGER AT ISSUE**

6        San Francisco moves to dismiss Claims 1-4 in their entirety and with prejudice, and Claims

7  9-13 to the extent they rely on "a theory of liability predicated on the removal, arrest, citation, or

8  fining of individuals" without providing adequate shelter.  Mot. 17.

9        Plaintiffs do not dispute that Claims 1-4 should be dismissed but argue "the dismissal

10  should not be a ruling on the merits that would prejudice Plaintiffs' ability to bring them in state

11  court or in federal court if the law changes."  Opp'n 16.  Plaintiffs argue that "although unlikely in

12  the near future, the law on the Eighth Amendment (claim 1) and derivative Fourth Amendment

13  claim (claim 3) could change," and "[t]he state law claims remain viable (claims 2 and 4)[.]"  *Id.*

14  at 16 n.12.  They do not address San Francisco's request to dismiss Claims 9-13.  *See id.* at 16-17.

15        While *City of Grants Pass* put the federal questions beyond debate, it did not address

16  similar claims based on the California Constitution or state law.  Accordingly, Claims 1 and 3,

17  which are based on federal law, are dismissed with prejudice.  Claims 2 and 4, which are based on

18  state law, are dismissed without prejudice.

19        Plaintiffs do not clarify the extent to which Claims 9-13 are impacted by *City of Grants*

20  *Pass*, but the SAC includes the following allegations under these claims: "Plaintiffs re-allege and

21  incorporate by reference all the above allegations as though fully set forth herein."  This leaves

22  open the possibility that they rely in part on theories foreclosed by *City of Grants Pass*.  *See* SAC

23  ¶¶ 306, 314, 318, 327, 331.  Claims 9, 11, and 13, which are based on federal law, are dismissed

24  with prejudice to the extent they rely on a theory of liability foreclosed by *City of Grants Pass*.

25  Claims 10 and 12 are based on state law; to the extent that Claims 10 and 12 are based in part on a

26  theory of liability foreclosed by *City of Grants Pass*, such claims are dismissed without prejudice.

27        What remains are Claims 5-8 as well as the portions of Claims 9-13 that are not impacted

28  by *City of Grants Pass*.  Claims 5-8 are based on San Francisco's alleged improper seizure and

United States District Court
Northern District of California

6

1    destruction of homeless individuals' personal property.  Claims 9 and 10 assert exposure to state-

2    created danger based on San Francisco's alleged improper seizure of and destruction of homeless

3    individuals' personal property, including "survival belongings."  Claims 11 and 12 allege

4    disability discrimination based on San Francisco's treatment of homeless individuals with

5    disabilities, including failure to provide additional time or accommodations when demanding that

6    they remove themselves and their belongings from public spaces and the alleged wrongful seizure

7    of their possessions.  Claim 13 asserts a conspiracy to deprive Plaintiffs of their constitutional

8    rights by destroying their property, exposing them to state-created danger, and discriminating

9    against them on the basis of their disabilities.

10   **IV.    MOTION TO DISMISS**

11           San Francisco moves to dismiss the SAC for lack of subject matter jurisdiction, arguing

12   that the organizational and individual Plaintiffs lack Article III standing.

13           **A.    Article III Standing**

14           Article III standing "is a necessary component of subject matter jurisdiction."  *In re*

15   *Palmdale Hills Prop., LLC*, 654 F.3d 868, 873 (9th Cir. 2011).  The party invoking federal

16   jurisdiction bears the burden of demonstrating standing.  *TransUnion LLC v. Ramirez*, 594 U.S.

17   413, 430-31 (2021).  "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate

18   standing for each claim that they press and for each form of relief that they seek (for example,

19   injunctive relief and damages)."  *Id*. at 431.

20           To satisfy Article III's standing requirements, "[t]he plaintiff must have (1) suffered an

21   injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is

22   likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338

23   (2016).  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a

24   legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not

25   conjectural or hypothetical.'"  *Id*. (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

26   (1992)).  "For an injury to be 'particularized,' it must affect the plaintiff in a personal and

27   individual way," and must also be "concrete."  *Id*. at 339 (cleaned up).

28           A plaintiff seeking injunctive relief must demonstrate a "likelihood of substantial and

United States District Court
Northern District of California

immediate irreparable injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1982) (quoting

*O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)).  "[T]he injury or threat of injury must be both 'real

and immediate,' not 'conjectural' or 'hypothetical.'"  *Id.* at 102 (citations omitted).  "A plaintiff

threatened with future injury has standing to sue 'if the threatened injury is certainly impending, or

there is a substantial risk the harm will occur.'"  *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th

Cir. 2018) (quotation marks omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149,

158 (2014) (quoting *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013))).

"The existence of standing turns on the facts as they existed at the time the plaintiff filed

the complaint."  *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007).

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing

courts must accept as true all material allegations of the complaint and must construe the

complaint in favor of the complaining party."  *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th

Cir. 2011) (quotation and citation omitted).

### B.    Discussion

#### 1.    Coalition's Standing

San Francisco argues that Coalition lacks standing for any claim because it "has no

cognizable injury that is redressable."  Mot. 7.  It makes a facial challenge; that is, the City's

argument does not rely on materials outside the operative complaint.  Plaintiffs respond that

Coalition has both associational and organizational standing.  Opp'n 4.  At the hearing, Plaintiffs

clarified that they do not seek damages in this action.  They request injunctive and declaratory

relief that "would be applicable to everyone equally" and do not seek any individualized relief.

[Docket No. 274 (Oct. 24, 2024 Hr'g Tr.) 4.]

Plaintiffs "must demonstrate standing for each claim that they press and for each form of

relief that they seek." *TransUnion*, 594 U.S. at 431.  The court will address Coalition's

associational and organizational standing for Claims 5-8 and the portion of Claim 13 that is based

on San Francisco's alleged improper seizure of and destruction of homeless individuals' personal

property; Claims 9, 10, and the portion of Claim 13 that is based on exposure to state-created

danger; and Claims 11, 12, and the portion of Claim 13 that is based on disability discrimination.

United States District Court
Northern District of California

### a.    Associational Standing

"The doctrine of associational standing permits an organization to 'sue to redress its members' injuries, even without a showing of injury to the association itself.'" *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003) (quoting *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996)). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). "If an association can satisfy these requirements, [courts] allow the association to pursue its members' claims, without joining those members as parties to the suit." *Id.*

The second prong is not at issue; San Francisco does not dispute that Coalition seeks to protect interests that are germane to its purpose in this action. *See* Mot. 10. The parties dispute the first and third prongs.

### i.    Claims 5-8 and 13

Claims 5-8 challenge San Francisco's seizure and destruction of homeless individuals' personal property under the U.S. and California Constitutions. Part of Claim 13 alleges a conspiracy to deprive Plaintiffs of their constitutional rights under the U.S. and California Constitutions with respect to San Francisco's property destruction.

To meet the first prong of associational standing, Coalition "must show that a member suffers an injury-in-fact that is traceable to the defendant and likely to be redressed by a favorable decision." *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013). An organization must make "specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.* (emphasis removed) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)). This does not necessarily require the operative complaint to identify an injured member by name. The Ninth Circuit noted it is "not convinced that *Summers*, an environmental case brought under the National Environmental Policy Act, stands for the proposition that an injured member of an organization

must always be specifically identified in order to establish Article III standing for the organization." *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015), *overruled on other grounds as recognized in Ariz. All. for Retired Ams. v. Mayes*, No. 22-16490, 2024 WL 4246721, at *8 (9th Cir. Sept. 20, 2024). Instead, "[w]here it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, [the Ninth Circuit] see[s] no purpose to be served by requiring an organization to identify by name the member or members injured." *Id.*

The SAC contains the following allegations about Coalition and its members:

> The Coalition is an advocacy organization of, by, and for unhoused people in San Francisco. Its members are comprised almost entirely of unhoused people or people with lived experience of homelessness who supervise, direct, and lead the Coalition's work. The Coalition has dozens of active members at any given time and has had thousands of active members over the years. Many of the Coalition's active members have been personally impacted by citations, arrests, law enforcement threats, and property destruction while living unsheltered in San Francisco. . . .

> Many of the Coalition's individual members have been directly impacted by the City's criminalization and sweep policies. The Coalition's staff and volunteers engage with several members each week who have been victimized by Defendants' harmful criminalization and sweep policies. The Coalition has drafted administrative claims for property destruction against the City on behalf of several of these members—and has filed at least 23 administrative claims since September of 2021.

SAC ¶¶ 22, 185. The SAC also alleges that "[a]ll Individual Plaintiffs have lived through threats of arrest and have lost their valuable personal property as a result of Defendants' sweeps over the last several years," and that "[s]everal [of the Individual Plaintiffs] are active members with the Coalition on Homelessness." *Id.* at ¶ 243.

Accepting as true the allegations of the SAC and construing the SAC in favor of Plaintiffs, *see Maya*, 658 F.3d at 1068, the court concludes it is "relatively clear, rather than merely speculative," that one or more of Coalition's members have been and will be adversely affected by San Francisco's alleged unlawful seizure and destruction of homeless individuals' personal

property.  The City does not need (nor does it argue it needs) to know the identity of the allegedly harmed Coalition members to understand and respond to the SAC.  *See, e.g., Garcia v. City of Los Angeles*, 611 F. Supp. 3d 941, 947, 951 (C.D. Cal. 2020) (holding that local organization that advocates for housing, shelters, and connections between housed and unhoused residents "need not specifically name" members allegedly harmed by city ordinance regarding storage of personal property in public areas at the pleading stage, where organization alleged that "its unhoused members 'have been subjected to the City's enforcement of [challenged ordinance] and have suffered harm as a result of that enforcement'").[5]  To be sure, Plaintiffs may not rest on mere allegations to establish standing at later stages of this case.  *See Lujan*, 504 U.S. at 561 (each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.").  At the pleading stage, the allegations in the SAC are sufficient to satisfy the first prong of associational standing for Claims 5-8 and 13.

The third prong requires Coalition to show that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt*, 432 U.S. at 343.  This requirement is prudential rather than constitutional.  *Mink*, 322 F.3d at 1109 (citing *United Food*, 517 U.S. at 555-57).  "Hence the third prong of the associational standing test is best seen as focusing on . . . matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution."  *United Food*, 517 U.S. at 557.  The Supreme Court noted that "'individual participation' [in a lawsuit] is not normally necessary when an association seeks prospective or injunctive relief for its members" but may be "required in an

---

[5] In any event, Coalition has in fact identified particular members who have been impacted by San Francisco's practices, including losing their personal property:

> Some of the Coalition's most active members have been particularly impacted. For example, Couper Orona, Shyhyene Brown, and Toro Castaño are unhoused people who have been active members in the Coalition and help lead the Coalition's human rights working group. But each of these individuals has also lived through threats of arrest and have lost their valuable personal property in Defendants' sweeps over the last several years.

SAC ¶ 186.

1    action for damages to an association's members . . ." *Id*. at 546.  *See also Columbia Basin*

2    *Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001) (finding third prong of *Hunt*

3    test satisfied where plaintiff "sought only injunctive and declaratory relief," which "do not require

4    individualized proof"); *Associated Gen. Contractors v. Metro. Water Dist. of S. Cal.,* 159 F.3d

5    1178, 1181 (9th Cir. 1998) ("Individualized proof from the members is not needed where, as here,

6    declaratory and injunctive relief is sought rather than monetary damages.").  In this case, Plaintiffs

7    seek only declaratory and injunctive relief, rather than monetary relief requiring individual proof

8    of damages.

9        Citing *Tanner-Brown v. Haaland*, 105 F.4th 437, 447 (D.C. Cir. 2024), San Francisco

10   contends that "allowing Coalition to proceed as an associational Plaintiff does not add

11   "'administrative convenience and efficiency' to permit the association to litigate on behalf of its

12   members 'when those members are already parties to the lawsuit in their own right.'"  Mot. 12

13   This argument is disingenuous.  In *Tanner-Brown*, the organization identified the co-plaintiff as its

14   "sole named member and its standing rest[ed] wholly on her claim."  105 F.4th at 447.

15   Accordingly, the court concluded that the organization's "participation in the suit would be

16   redundant with" the co-plaintiff's.  *Id*.  Not so here, where the Coalition alleges it has "dozens of

17   active members at any given time and has had thousands of active members over the years."  SAC

18   ¶ 22.  In other words, *Tanner-Brown* is obviously distinguishable.[6]

19       Relying solely on out-of-circuit authority, San Francisco next argues that an "organization

20   does not have standing to assert the rights of its members in a case brought under 42 U.S.C. §

21   1983" because they are personal rights.  Mot. 13 (citations omitted).  For example, it cites *Nnebe*

22   *v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011), in which the Second Circuit affirmed the district

23   court's determination that an alliance of taxi drivers lacked associational standing to assert section

24

25   ─────────────────────────

     [6] San Francisco also argues, unpersuasively and without support, that allowing Coalition to
26   proceed "unnecessarily prolongs the litigation, disproportionally increases the burdens of
     discovery, and detracts from the core issues impacting Individual Plaintiffs."  In fact, Coalition's
27   participation likely increases litigation efficiency due to its ability to assist in organizing discovery
     and facilitating participation of witnesses, many of whom are unhoused or marginally housed and
28   may be more difficult to contact.  Mot. 12.

1983 claims on behalf of its members, noting "[i]t is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983, as we have "interpret[ed] the rights [§ 1983] secures to be personal to those purportedly injured." (citing *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984) (citing *Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1973))). Neither the Supreme Court nor the Ninth Circuit have adopted such a rule, and other circuits that have considered the issue have reached a different conclusion.  *See, e.g., Am. Fed'n of State, Cty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 861 n.1 (11th Cir. 2013) (noting that although the defendant "has not appealed the district court's determination that the Union had standing to challenge" an executive order mandating suspicionless drug testing of state employees on the basis that it violates their Fourth Amendment rights, "we are satisfied that the Union has standing to mount this challenge"); *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 532 (8th Cir. 2005) ("The Supreme Court has never held (and neither have we) that associational standing is not available to § 1983 plaintiffs alleging Fourth Amendment violations.").

At least one court in the Ninth Circuit concluded that an organization has associational standing under *Hunt* to pursue section 1983 claims asserting violations of its members' Fourth Amendment rights.  In *Garcia v. City of Los Angeles*, No. CV 19-6182 DSF (PLAx), 2020 WL 6586303, at *2-3 (C.D. Cal. Sept. 15, 2020), the court noted there are exceptions to the general rule that Fourth Amendment rights are personal and cannot be vicariously asserted.  *Garcia* drew an analogy between a successor-in-interest who brings a survival action on behalf of a decedent who suffered a constitutional violation and an organization that seeks to vindicate its members' constitutional injuries.  *See also Watson v. Weeks*, 436 F.3d 1152, 1154, 1162 (9th Cir. 2006) (holding that individuals and an organization that advocated on their behalf "have established a section 1983 right" under the Medicaid Act without differentiating between the organization and the individuals).  The court agrees with the reasoning of *Garcia* and declines to adopt the Second Circuit rule.[7]

---

[7] San Francisco contends that "[e]ach claim also requires participation of individual members in the lawsuit to prove underlying constitutional or statutory violations because the Fourth

United States District Court
Northern District of California

1    Finally, San Francisco argues that "Coalition must allege a redressable concrete harm to

2   itself in order to have associational standing," citing *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 543

3   (2020).  Mot. 14-15.  *Thole* is inapposite.  In *Thole*, the Supreme Court held that two retired

4   participants in a bank's retirement plan lacked standing to bring a putative class action suit against

5   the bank for alleged mismanagement of the plan because they had not suffered an injury in fact;

6   both plaintiffs had been paid all of their monthly pension benefits and were "legally and

7   contractually entitled to receive those same monthly payments for the rest of their lives."  590 U.S.

8   at 540.  The plaintiffs "assert[ed] standing as representatives of the plan itself," and the Court held

9   that "in order to claim 'the interests of others, the litigants themselves still must have suffered an

10   injury in fact, thus giving' them 'a sufficiently concrete interest in the outcome of the issue in

11   dispute.'"  *Id.* at 543 (quoting Hollingsworth v. Perry, 570 U.S. 693, 708 (2013)).  The City fails

12   to acknowledge that the plaintiffs in *Thole* did not claim associational standing, and the Supreme

13   Court did not address that doctrine, "under which an organization may sue to redress its members'

14   injuries, even without a showing of injury to the association itself[.]"  *United Food*, 517 U.S. at

15   552.

16    The court concludes that Coalition has adequately pleaded associational standing for

17   Claims 5-8 and the corresponding portion of Claim 13.

18                        **ii.  Claims 9, 10, and 13**

19    Claims 9 and 10 allege exposure to state-created danger in violation of the U.S. and

20   California Constitutions.  Part of Claim 13 alleges a conspiracy to deprive Plaintiffs of their

21   constitutional rights under the U.S. and California Constitutions with respect to exposure to state-

22   created danger.  These claims are based on the allegations that "Defendants have a policy, custom,

23   _____

24   Amendment [and] Due Process . . . claims require inquiries into the facts and circumstances
     particular to each allegedly affected individual."  Mot. 13-14.  According to San Francisco,
25   "individual involvement is required to determine . . . personal rights" under the Fourth
     Amendment and Due Process Clause."  *Id.* at 14.  The City does not cite any cases discussing this
26   issue in the context of associational standing.  Frankly, the court does not understand the argument
     and therefore cannot analyze it.  To the extent it is related to the "section 1983 rights are personal
27   rights" argument, it is rejected for the reasons already provided.  If the City is arguing that every
     individual member of an organization must participate in litigation in order to have associational
28   standing to pursue Fourth and Fourteenth Amendment claims for declaratory and injunctive relief,
     it offers no authority for such a broad-sweeping proposition.

1    and practice of removing unhoused people from public spaces and of seizing and destroying their

2    personal property, such as tents and other survival gear, that is necessary for their protection," and

3    do so "without ensuring that shelter and/or housing options are available to unhoused individuals."

4    The SAC alleges that as a result of Defendants' actions, "homeless individuals are forced to live

5    exposed to the elements, without protection from cold, wind, and rain," which "severely

6    jeopardizes their physical and mental health."  SAC ¶¶ 309, 310, 316.

7         For associational standing, Coalition must "show that a member suffers an injury-in-fact

8    that is traceable to the defendant and likely to be redressed by a favorable decision." *Associated

9    Gen.*, 713 F.3d at 1194.  The Fourteenth Amendment, which prohibits "any state [from]

10   depriv[ing] any person of life, liberty, or property, without due process of law," U.S. Const.

11   amend XIV, "generally does not confer any affirmative right to governmental aid, even where

12   such aid may be necessary to secure life, liberty, or property interests." *Patel v. Kent Sch. Dist.*,

13   648 F.3d 965, 971 (9th Cir. 2011); *see also Murguia v. Langdon*, 61 F.4th 1096, 1106 (9th Cir.

14   2023) ("The Due Process Clause is a *limitation* on state action rather than a *guarantee of minimum

15   levels* of state protections, so the state's failure to prevent acts of private parties is typically

16   insufficient to establish liability under the Due Process Clause." (emphasis in original)).  The

17   state-created danger exception is one of two recognized exceptions to this general rule.  *Murguia*,

18   61 F.4th at 1108.

19        To hold a state actor liable under the "danger creation" exception, "a plaintiff must first

20   show that 'the state action affirmatively place[s] the plaintiff in a position of danger, that is, where

21   state action creates or exposes an individual to a danger which he or she would not have otherwise

22   faced." *Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007) (quoting *Kennedy v. City of

23   Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006)).  Courts "examine whether the officers left the

24   person in a situation that was more dangerous than the one in which they found him." *Murguia*,

25   61 F.4th at 1111 (citing *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir.

26   2000)).  "The affirmative act must have exposed the plaintiff to 'an actual, particularized danger,'

27   and the resulting harm must have been foreseeable." *Pauluk v. Savage*, 836 F.3d 1117, 1125 (9th

28   Cir. 2016) (internal citations omitted).  "This does not mean that the exact injury must be

United States District Court
Northern District of California

15

foreseeable. Rather, the state actor is liable for creating the foreseeable danger of injury given the particular circumstances." *Murguia*, 61 F.4th at 1111 (quoting *Martinez v. City of Clovis*, 943 F.3d 1260, 1273-74 (9th Cir. 2019)). "Second, the state actor must have acted with deliberate indifference to a known or obvious danger." *Pauluk*, 836 F.3d at 1125 (cleaned up). Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Patel*, 648 F.3d at 974 (quoting *Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)).

Under Ninth Circuit law, a plaintiff must establish the following three elements to prevail on a state-created danger claim: 1) "the [state actors'] affirmative actions created or exposed [plaintiff] to an actual, particularized danger that [they] would not otherwise have faced"; 2) "the injury [they] suffered was foreseeable"; and 3) "the [state actors] were deliberately indifferent to the known danger." *Martinez*, 943 F.3d at 1271. Here, the SAC does not allege that a Coalition member (or individual Plaintiff) suffered injuries resulting from the City's challenged conduct that created or exposed them to an actual, particularized danger they would not otherwise have faced. Although the City raises this deficiency in its opening brief, *see* Mot. 19, Plaintiffs do not respond to the argument and thus concede it. As the SAC fails to allege that a Coalition member experienced a foreseeable injury due to a state-created danger, Coalition has failed to show that "its members would otherwise have standing to [bring a state-created danger claim] in their own right." *See Hunt*, 432 U.S. at 343. It thus lacks associational standing to bring Claims 9, 10, and the corresponding portion of Claim 13.

### iii. Claims 11, 12, and 13

Claims 11 and 12 are for disability discrimination in violation of the ADA and California law. Part of Claim 13 alleges a conspiracy to deprive Plaintiffs of their rights under federal and state law with respect to disability discrimination. The SAC alleges that "Ms. Sandoval, and a significant number of unhoused individuals served by [Coalition], have physical or mental disabilities and have been injured by Defendants' discriminatory response to unhoused residents with disabilities." SAC ¶¶ 326, 330. The disability discrimination claims are based on the following forms of alleged discrimination:

- "failing to provide adequate notice, time, and assistance to unhoused people with disabilities who are forced to move themselves or their belongings from public space in response to Defendants' homeless sweeps"; and

- "arresting, citing, fining, and seizing the property of unhoused people for sleeping or lodging in public without first identifying their individualized needs and whether Defendants' shelter options, if any exist, can actually meet those needs."

SAC ¶¶ 323, 324.

Coalition must "show that a member suffers an injury-in-fact that is traceable to the defendant and likely to be redressed by a favorable decision" to demonstrate associational standing for Claims 11 and 12 and the relevant portion of Claim 13. *Associated Gen.*, 713 F.3d at 1194. The SAC fails to do so because it does not allege that Coalition has members with disabilities who have been injured by the foregoing actions. It alleges only that "[t]housands of unhoused individuals in San Francisco are living with a physical or mental disability," *id*. at ¶ 200, that "a significant number of unhoused individuals served by" Coalition "have physical or mental disabilities," *id*. at ¶¶ 326, 330, and that Coalition's membership is made up of primarily unhoused individuals. *Id*. at ¶ 22. While these allegations support the general proposition that Coalition members include homeless individuals with disabilities, they are insufficient to plead that Coalition members have been injured by San Francisco's alleged failure to provide homeless individuals with disabilities adequate notice, time, and assistance with moving from public spaces and to identify the "individualized needs" of such individuals in connection with arresting, citing, and fining them and seizing their property.

Plaintiffs respond that "Ms. Sandoval, an individual plaintiff, has alleged her 'prosthetics were taken' resulting in her 'mobility [becoming] substantially impaired'" and that "Mr. Martinez alleges the City has taken his survival gear, his heart medication for congestive heart failure, and interfered with his ability to go to doctor appointments." Opp'n 6 (citing SAC ¶¶ 34, 250, 252). The issue for associational standing is whether a Coalition *member* suffered an injury in fact, and the SAC does not allege that Sandoval or Martinez is a Coalition member. Moreover, the disability discrimination claims are brought on behalf of Coalition and Sandoval only; the SAC

1    does not allege a disability discrimination claim on behalf of Martinez.  Accordingly, Coalition

2    does not satisfy the first prong of associational standing to bring Claims 11 and 12 and the

3    corresponding portion of Claim 13.

### b.    Organizational Standing

5        "An organization asserting that it has standing based on its own alleged injuries must meet

6    the traditional Article III standing requirements—meaning, it must show (1) that it has been

7    injured or will imminently be injured, (2) that the injury was caused or will be caused by the

8    defendant's conduct, and (3) that the injury is redressable."  *Ariz. All.*, 2024 WL 4246721, at *4

9    (citing *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395-96 (2024), and

10    *Havens Realty v. Coleman*, 455 U.S. 363, 378-79 (1982)).

### i.    Claims 5-8 and 13

12        Plaintiffs argue that Coalition has alleged an injury-in-fact because it suffered "both a

13    diversion of its resources and a frustration of its mission" caused by San Francisco's sweeps and

14    seizure of homeless individuals' property, citing *La Asociacion de Trabajadores de Lake Forest v.*

15    *City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010), and *Rodriguez v. City of San Jose*, 930

16    F.3d 1123, 1134 (9th Cir. 2019).  Opp'n 8-9.  This type of injury is no longer sufficient to

17    establish organizational standing because the Supreme Court recently rejected the "frustration-of-

18    mission and diversion-of-resources theories" in *Hippocratic Medicine*.  *See Ariz. All.*, 2024 WL

19    4246721, at *8 (noting that Ninth Circuit precedents "allow[ing] plaintiffs to satisfy Article III

20    using the sort of frustration-of-mission and diversion-of-resources theories the Supreme Court

21    rejected in *Hippocratic Medicine*" are "irreconcilable with *Hippocratic Medicine*—and thus

22    overruled.").  "[A]n organization that has not suffered a concrete injury caused by a defendant's

23    action cannot spend its way into standing simply by expending money to gather information and

24    advocate against the defendant's action.  An organization cannot manufacture its own standing in

25    that way."  *Hippocratic Medicine*, 602 U.S. at 394.  Instead, organizations must "show that a

26    challenged governmental action directly injures the organization's pre-existing core activities and

27    does so *apart* from the plaintiffs' response to that governmental action."  *Ariz. All.*, 2024 WL

28    4246721, at *2 (emphasis in original) (citing *Hippocratic Medicine*, 602 U.S. at 395-36).

United States District Court
Northern District of California

1    At the hearing, Plaintiffs' counsel identified two "buckets" of Coalition's "core activities":

2    first, through "community organizing and advocacy," Coalition "fights to prevent people from

3    becoming homeless, presses for affordable housing in San Francisco, and advocates to expand

4    resources available to unhoused people." SAC ¶ 19. Second, Coalition "seeks to build networks

5    of support for unhoused people through organizer and peer-led outreach campaigns and to connect

6    unhoused people to social services and resources." *Id*. at ¶ 21. *See* Tr. 5-6. Coalition alleges that

7    these core activities have been injured by San Francisco's challenged practices, which have

8    resulted in the Coalition's "difficult choice to depart from its mission-related activities—proactive

9    housing and homelessness prevention and support work—to focus on the dire need to protect

10    unhoused people," including using "limited donor dollars to replace survival gear for unhoused

11    people" that has been destroyed. SAC ¶ 22; Tr. 7. The SAC specifically alleges that in 2020,

12    Coalition spent $28,000 on tents and survival belongings "to replace what the City took from

13    unhoused people." SAC ¶ 181.

14    Coalition's proffered injury amounts to a frustration-of-mission and diversion-of-resources

15    theory that is no longer viable. As to the allegations regarding a specific expenditure of funds,

16    Coalition would have to "show that a challenged governmental action directly injures the

17    organization's pre-existing core activities and does so *apart* from the plaintiffs' response to that

18    governmental action." *See Ariz. All*., 2024 WL 4246721, at *2 (emphasis in original) (citation

19    omitted). Here, the allegations fall short of establishing organizational standing because Coalition

20    does not dispute that its expenditure of funds to replace tents and survival belongings is a direct

21    response to the City's actions.

22    Plaintiffs' counsel also argued at the hearing that San Francisco's practices with respect to

23    sweeps and the alleged seizure and destruction of homeless individuals' property, including

24    "communication devices, like phones, laptops, and the like," "leads to increased instability, and

25    prevents the Coalition from building its membership, and needing significant[ly] more resources

26    to just locate its base." Tr. 6. In other words, the City's practices purportedly injure Coalition's

27    ability to build networks of support and "connect unhoused people to social services and

28    resources." This theory is not alleged in the SAC. The SAC alleges only that "[t]he displacement

19

of unhoused people and the City's constant sweeps make it much more difficult for the Coalition to stay in contact with or to maintain and secure new active members." SAC ¶ 22. It also alleges that "Defendants' sweeps have resulted in the Coalition losing touch with countless members over the past several years, and have presented significant obstacles that have prevented the Coalition from being able to secure new membership," *id*. at ¶ 177, but it does not include any specific factual allegations supporting these claims. In other words, the SAC alleges that the City's practices have made it "more difficult" for Coalition to maintain or expand its membership, but does not include specific, non-conclusory allegations about Coalition's purported injury. The court finds that the SAC fails to adequately plead injury in fact for purposes of organizational standing with respect to Claims 5-8 and 13.

#### ii. Claims 9-12 and 13

Coalition offers no specific argument regarding organizational standing for Claims 9 and 10 (exposure to state-created danger), 11 and 12 (disability discrimination), and the corresponding aspects of Claim 13, including whether Coalition itself suffered an injury in fact caused by San Francisco's affirmative actions creating or exposing homeless individuals to an actual, particularized danger that they would not otherwise have faced and San Francisco's allegedly discriminatory actions. *See* Opp'n 9-11. The court concludes that the SAC does not plead injury in fact for purposes of organizational standing with respect to Claims 9-12 and the relevant portions of Claim 13.

### 2. Individual Plaintiffs' Standing

San Francisco brings a factual challenge to the standing of the individual Plaintiffs. As the SAC adequately alleges Coalition's associational standing to bring Claims 5-8 and 13, the court only addresses the individual Plaintiffs' standing with respect to Claims 9-12. *See Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) ("The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." (citing *Carey v. Population Services Int'l*, 431 U.S. 678, 682 (1977)); *accord Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) ("As a general rule, in an injunctive case this court need not address

standing of each plaintiff if it concludes that one plaintiff has standing."). Additionally, because San Francisco moves for judgment on the pleadings on all of Castaño and Vaughn's claims, the court will analyze standing for those two individual Plaintiffs.

### a.   Claims 9 and 10

As noted above, the SAC does not allege that any individual Plaintiff suffered an injury resulting from the City's sweeps and alleged property seizures based on a state-created danger theory. At the hearing, Plaintiffs' counsel asserted that the focus for these claims "is on whether or not there is a – a risk of harm," and noted the allegation in the SAC that Plaintiff Martinez "has been sleeping in a cardboard box because he feels that it is no longer worthwhile for him to replace the tents and clothes the City continually takes from him." Tr. 25 (citing SAC ¶ 34). According to Plaintiffs, this demonstrates Martinez's exposure to the elements: "cold, wind, rain, which leads to very concrete health impacts." Tr. 26. Plaintiffs offer no authority recognizing that a state-created danger claim may be based on the *risk* of future harm, as opposed to an actual injury caused by a defendant's actions. *See, e.g., Nieves v. Cnty. of Trinity*, No. 2:21-CV-02248-KJM-AC, 2022 WL 17994367, at *3-4 (E.D. Cal. Dec. 29, 2022) (dismissing state-created danger claim for failure to plead any cognizable injury, noting that although Plaintiff "allegedly was at risk of bodily harm, that alone is not enough . . ."); *Sanchez v. City of Fresno*, No. 1:12-CV-00428-LJO, 2014 WL 2042058, at *12 (E.D. Cal. May 16, 2014) (granting summary judgment on state-created danger claims because plaintiffs "failed to submit evidence of 'serious harm' caused by the defendants' conduct; and did not submit "competent evidence connecting any claimed injury to" exposure to the elements).

Accordingly, the SAC does not allege that any individual Plaintiff has standing to bring Claims 9 and 10 for exposure to state-created danger.

### b.       Claims 11 and 12

The City challenges Sandoval's standing to seek injunctive relief on the disability discrimination claims. Specifically, it argues that "Sandoval was sheltered when the lawsuit was commenced and is presently sheltered" and is not "subject to any length of stay requirements." Accordingly, the City argues, "it is pure conjecture" that she is at immediate risk of unlawful

1    conduct and thus lacks standing to seek injunctive relief.  Mot. 15-16.  The City mounts a factual

2    standing challenge and cites evidence that Sandoval "has been in Emergency Shelter between

3    September 1, 2022 and September 28, 2022, December 12, 2023 and January 3, 2024, March 20,

4    2024 and April 1, 2024, and June 11, 2024 through the present," and that "a person placed in City-

5    provided shelter," including emergency shelters, "may generally stay there as long as they like

6    subject to compliance with shelter rules and requirements."  [Docket Nos. 242-5 (Locher Decl.,

7    Sept. 4, 2024) ¶ 6(g); 242-6 (Rachowicz Decl., Sept. 4, 2024) ¶¶ 4, 5.]

8         "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief

9    to prevent the harm from occurring," *TransUnion*, 594 U.S. at 435 (citing *Clapper v. Amnesty*

10   *Int'l*, 568 U.S. 398, 414 n.5 (2013)), but "allegations of *possible* future injury" or an "objectively

11   reasonable likelihood" of future injury are insufficient to confer standing for injunctive relief.

12   *Clapper*, 568 U.S. at 409-10 (emphasis in original).  Instead, there must be a "substantial" risk of

13   harm or a "threatened injury must be *certainly impending* to constitute injury in fact."  *Id.* at 409,

14   414 n.5 (emphasis in original) (cleaned up).

15        Plaintiffs do not dispute San Francisco's evidence that Sandoval is currently sheltered[8] but

16   argue that Sandoval is "only one step away from being on the streets and subject to Defendants'"

17   unlawful practices.  Opp'n 13-14.  Plaintiffs did not submit a declaration by Sandoval regarding

18   her housing status, including whether she plans to leave emergency shelter for any reason.

19   Instead, they contend that evidence about Sandoval's four stays in emergency shelters in the past

20   two years shows that she has "been routinely in and out of shelter throughout this litigation."

21   They argue this demonstrates she is "housing insecure" and thus likely to be unhoused again and

22   subject to the City's unlawful discrimination.  *Id.* at 12, 14-15 and n.11.  Plaintiffs' argument

23   primarily focuses on the precarity of Sandoval's housing status, but her standing for the disability

24   discrimination claims depends on future injuries that go beyond the possibility of her becoming

25   homeless again.  As the City points out, her future injuries are contingent on numerous events,

26

27   ────────────────

28   [8] At the time the SAC was filed, it alleged that Sandoval "is currently unsheltered and living on
     the streets in San Francisco," and that she "fears that because she is unsheltered, she will once
     again be subject to the City's regular criminalization threats and property destruction."  SAC ¶ 32.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    including her leaving her current shelter; moving to the public right of way in violation of anti-

2    camping laws such that the City forces her to move; and being forced to move without the City

3    giving her "adequate notice, time, and assistance" and/or being arrested, cited, fined, and having

4    her property seized by the City without it "first identifying [her] individualized needs and whether

5    Defendants' shelter options, if any exist, can actually meet those needs." *See* SAC ¶¶ 323, 324;

6    Defs.' Mot. 11; Reply 6.

7        While the Supreme Court's standard for standing for injunctive relief does not require

8    "literal certainty" that a harm will occur, it does require more than a possibility of future harm.

9    *Munns v. Kerry*, 782 F.3d 402, 409 (9th Cir. 2015).  Here, the SAC does not allege any facts

10   suggesting that the City's discrimination against Sandoval because of her disabilities is "certainly

11   impending" or that there is a "substantial risk" that the harm will occur.  *See TransUnion*, 594

12   U.S. at 435 ("a person exposed to a risk of future harm may pursue forward-looking, injunctive

13   relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently

14   imminent and substantial." (citing *Clapper*, 568 U.S. at 414 n.5)).  Instead, Sandoval's theory of

15   standing for injunctive relief is based on a "speculative chain of possibilities."  *See Clapper*, 568

16   U.S. at 414 & n.5 (noting that respondents fell short of even the "substantial risk" standard for

17   future injury "in light of the attenuated chain of inferences necessary to find harm").  Accordingly,

18   the court concludes that Sandoval lacks standing to seek injunctive relief in connection with

19   Claims 11 and 12.[9]

20           c.    **Castaño's Standing**

21       At the time the SAC was filed, it alleged that Castaño was housed and that he "recently

22   settled a claim" against the City for $9,000 for the destruction of his property while he was

23   homeless.  SAC ¶¶ 25, 26.[10]  [*See* Docket No. 242-1 (Mills Decl. Sept. 5, 2024) ¶ 2, Ex. A (Jan. 6,

24

25   ─────────────────────────
     [9] As the court does not rely on any challenged evidence in ruling on the individual Plaintiffs'
26   standing, it denies the objections to that evidence as moot.

27   [10] San Francisco submits evidence that Castaño "has been in Emergency Shelter between
     December 1, 2022 and April 29, 2023, August 22, 2023 and January 3, 2024, and January 26,
28   2024 through the present."  Locher Decl. ¶ 6(a).

United States District Court
Northern District of California

2021 Property Damage Only Release).]  San Francisco argues that Castaño lacks standing to pursue his claims because his injury was fully redressed in that settlement.  Mot. 10-11.  As discussed above, the SAC fails to allege that any individual Plaintiff has standing to bring claims for exposure to state-created danger.  Accordingly, the remaining challenge to Castaño's standing is with respect to the property-related claims.

With respect to Castaño's settlement with the City for property destruction, the Supreme Court observed in *Summers* that it "know[s] of no precedent for the proposition that when a plaintiff has sued to challenge the lawfulness of certain action or threatened action but has settled that suit, he retains standing to challenge the basis for that action . . ."  555 U.S. at 494.  "Such a holding would fly in the fact of Article III's injury-in-fact requirement."  *Id*.  Plaintiffs do not dispute that Castaño settled a claim against the City for property destruction, *see* Opp'n 19, and do not address San Francisco's argument that under *Summers*, Castaño no longer has standing to challenge the events underlying the settled claim.  As Castaño's "injury in fact . . . has been remedied," he lacks standing to bring property-related Claims 5-8 and 13.  *See Summers*, 555 U.S. at 494.

### d.    Vaughn's Standing

The SAC alleges that after periods of homelessness from 2019 to 2020, Vaughn "secure[d] placement in an affordable SRO."  SAC ¶¶ 23, 24.[11]  It alleges that Vaughn "recently settled a claim against [the City] for $7,000" for destruction of his personal property while he was homeless."  *Id*. at ¶ 23; Mills Decl. ¶ 3, Ex. B (Apr. 14, 2022 Full and Final Release).

The remaining challenge to Vaughn's standing is with respect to the property-related claims.  As with Castaño, San Francisco argues that Vaughn lacks standing to pursue his property-related claims because he settled them with the City.  *See* Mot. 15 & n.7; Reply 5.  Plaintiffs do not dispute Vaughn's settlement and do not address the merits of San Francisco's argument that his injury has been redressed.  *See* Opp'n 19.  Accordingly, Vaughn lacks standing to bring Claims

---

[11] San Francisco submits evidence that Vaughn "has been in Permanent Housing since August 20, 2020."  Locher Decl. ¶ 6(c).

1    5-8 and 13.

2              **3.      Summary Regarding Standing**

3          In sum, the SAC adequately alleges Coalition's associational standing to bring Claims 5-8

4    and the portion of Claim 13 based on property seizures and destruction but does not sufficiently

5    plead organizational standing to pursue those claims.  Coalition has not sufficiently pleaded

6    associational or organizational standing to bring Claims 9-12 and the corresponding portions of

7    Claim 13 and no individual Plaintiff has pleaded standing to assert those same claims.[12]  Further,

8    Castaño and Vaughn lack standing to bring Claims 5-8 and the portion of Claim 13 based on

9    property seizures and destruction.  Accordingly, the following claims are dismissed for lack of

10   standing: Claims 9 and 10 (exposure to state-created danger in violation of the U.S. and California

11   Constitutions), Claims 11 and 12 (disability discrimination in violation of federal and state law),

12   the portions of Claim 13 based on exposure to state-created danger and disability discrimination,

13   and all claims by Castaño and Vaughn.

14   **V.     MOTION FOR JUDGMENT ON THE PLEADINGS**

15         San Francisco moves for judgment on the pleadings.  The court addresses the issues in the

16   order in which the parties discuss them in their briefs.  The motion is denied as moot with respect

17   to Claims 9-12 because the SAC does not adequately plead standing to pursue them.  It is also

18   denied as moot as to Castaño and Vaughn's claims because the SAC does not adequately support

19   their Article III standing.

20            **A.  Due Process (Claims 7 and 8)**

21         Claim 7 is a section 1983 claim for violation of procedural due process under the

22   Fourteenth Amendment.  It challenges the City's "unwritten policy, custom, and practice of

23   seizing and destroying" homeless individuals' personal property without notice, an opportunity to

24   be heard, or a "meaningful way to collect their property."  SAC ¶ 299.  Claim 8 is for violation of

25   procedural due process under the California Constitution based on the same conduct.  *Id*. at ¶ 305.

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [12] As noted, the court does not reach the parties' arguments regarding the individual Plaintiffs'
28   standing to bring claims 5-8 and 13, other than Castaño and Vaughn, because it finds that
     Coalition has adequately alleged associational standing to bring those claims.

United States District Court
Northern District of California

"[A] claim under § 1983 for an unconstitutional deprivation of property must show (1) a deprivation (2) of property (3) under color of state law." *Newman v. Sathyavaglswaran*, 287 F.3d 786, 789 (9th Cir. 2002). "If these elements are met, the question becomes whether the state afforded constitutionally adequate process for the deprivation." *Id*.

The Supreme Court has held that "the Due Process Clause of the Fourteenth Amendment is not violated when a state employee negligently deprives an individual of property, provided that the state makes available a meaningful postdeprivation remedy." *Hudson v. Palmer*, 468 U.S. 517, 531 (1984). Citing *Hudson*, the City argues that Plaintiffs have not stated due process claims because the SAC does not allege "the absence of an adequate post-deprivation remedy" and in fact concedes that Plaintiffs filed small claims actions and government actions challenging the City's destruction of their property. Mot. 20 (citing SAC ¶¶ 25, 28, 182). Accordingly, the City argues, the due process claims are barred due to the existence of adequate post-deprivation remedies. *Id*. The court disagrees. "[P]ostdeprivation remedies do not satisfy due process where a deprivation of property is caused by conduct pursuant to established state procedure, rather than random and unauthorized action." *Hudson*, 468 U.S. at 532. Moreover, "absent 'extraordinary situations,' . . . such as 'the necessity of quick action by the State or the impracticality of providing any predeprivation process,' the deprivation of property resulting from an established state procedure does not meet due process requirements without a predeprivation hearing." *Newman*, 287 F.3d at 799.

Here, Plaintiffs' claims rest on allegations of systemic practices. The SAC alleges that Plaintiffs were deprived of their property pursuant to "an unwritten policy, custom, and practice," despite the existence of written policies to the contrary, including the bag and tag policy. *See* SAC ¶ 299. The motion for judgment on the pleadings as to Claims 7 and 8 is denied.

### B.    Unreasonable Search and Seizure (Claims 5 and 6)

Claim 5 is a section 1983 claim for unreasonable search and seizure in violation of the Fourth Amendment. Claim 6 is for unreasonable search and seizure in violation of the California Constitution.

The City argues that the court should dismiss Plaintiffs' claims for injunctive relief

because Plaintiffs have adequate remedies at law in the form of damages. Mot. 21. It asserts that "[d]amages are a normal, and adequate, response to an improper search or seizure, which as a constitutional tort often is analogized to (other) personal-injury litigation," *id.* (quoting *Campbell v. Miller*, 373 F.3d 834, 835 (7th Cir. 2004)). Once again, the City misconstrues the gravamen of Plaintiffs' claims, which allege a "policy, custom, and practice of seizing and destroying unhoused people's personal belongings" in violation of San Francisco's "written policies to the contrary." *See* SAC ¶ 288. San Francisco offers no authority for application of *Campbell* to a case like this one that alleges systemic constitutional violations. The motion for judgment on the pleadings as to Claims 5 and 6 is denied.

### C.    *Monell* Liability (Claims 5 and 7)

San Francisco next moves for judgment on the section 1983 claims for municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), which correspond to Claims 5, 7, and 9.[13] Claim 5 is for violation of the Fourth Amendment's prohibition against unreasonable searches and seizures based on destruction of property and Claim 7 alleges a violation of the Fourteenth Amendment's guarantee of procedural due process, including the deprivation of property without notice or an opportunity to be heard.

#### 1.   Legal Standards for *Monell* Liability

A municipality may face section 1983 liability if it "'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 692). However, the municipality may be held liable "only for '[its] *own* illegal acts.'" *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). It cannot be held vicariously liable for its employees' actions. *Id.* (citations omitted). To establish municipal liability, plaintiffs "must prove that 'action pursuant to official municipal policy' caused their injury." *Id.* (quoting *Monell*, 436 U.S. at 691). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is

---

[13] As noted above, Claim 9 is dismissed and therefore is not discussed in this section.

United States District Court
Northern District of California

actually responsible." *Pembaur*, 475 U.S. at 479-80 (emphasis in original). Official municipal policy includes "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61 (citations omitted). Such policy or practice must be a "moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694). An official municipal policy may be either formal or informal. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988) (acknowledging that a plaintiff could show that "a municipality's actual policies were different from the ones that had been announced.").

In the Ninth Circuit, a municipality may be liable under section 1983 under three possible theories. *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018). The first is where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury." *Id.* (quoting *Monell*, 436 U.S. at 694). "A policy or custom may be found either in an affirmative proclamation of policy or in the failure of an official 'to take any remedial steps after [constitutional] violations.'" *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991) (holding that a jury could find a policy or custom of using excessive force from the police chief's failure to discipline officers for such conduct)); *see also Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1234-35 (9th Cir. 2011) (holding that "evidence of a recurring failure to investigate and discipline municipal officers for constitutional violations can help establish the existence of an unconstitutional practice or custom" of using excessive force).

Second, "a local government can fail to train employees in a manner that amounts to 'deliberate indifference' to a constitutional right, such that 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Rodriguez*, 891 F.3d at 802 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

Finally, a municipality may be liable under section 1983 if "the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified

a subordinate's unconstitutional decision or action and the basis for it." *Rodriguez*, 891 F.3d at 802-03 (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097 (9th Cir. 2013) (internal quotation marks and citation omitted)).

### 2.    Analysis

The SAC alleges two theories of *Monell* liability: 1) a "custom and practice" of "destroying the property of unhoused people notwithstanding any of the City's clear written policies that preclude" this practice, SAC ¶¶ 40, 215; and 2) failure to train City employees regarding constitutional requirements related to property destruction, SAC ¶¶ 41, 45, 47, 49, 51, 53, 55, 224, 231, 242.  At the hearing, Plaintiffs' counsel asserted that the SAC also alleges a ratification theory of *Monell* liability.  Plaintiffs acknowledged they do not assert a *Monell* theory based on the existence of an express policy.  *See* Tr. 40-42.

### a.    Custom and Practice

In order to prove a claim for municipal liability based on a policy, custom, or practice, a plaintiff must "demonstrate that an 'official policy, custom, or pattern' on the part of [the defendant] was 'the actionable cause of the claimed injury.'"  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022, 1026 (9th Cir. 2008)).  "[A] plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'"  *City of St. Louis*, 485 U.S. at 127 (quoting *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 167-68 (1970)).

Municipalities can be held liable under *Monell* for policies of inaction or omission as well as policies of action or commission.  *Jackson v. Barnes*, 749 F.3d 755, 763 (9th Cir. 2014) (citing *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1185-86 (9th Cir. 2002), *overruled on other grounds in Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016)).  "A policy of action is one in which the government body itself violates someone's constitutional rights, or instructs its employees to do so; a policy of inaction is based on a government body's 'failure to implement procedural safeguards to prevent constitutional violations.'"  *Jackson*, 749 F.3d at 763 (quoting *Tsao*, 698 F.3d at 1143).  In cases alleging a policy of inaction, a municipality may be responsible

United States District Court
Northern District of California

through its omissions for "a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation." *Gibson*, 290 F.3d at 1185-86.  In such cases, the plaintiff must establish that the policy "amounts to deliberate indifference to the plaintiff's constitutional right," which requires showing that the government body "was on actual or constructive notice that its omission would likely result in a constitutional violation." *Tsao*, 698 F.3d at 1143, 1145 (citations and quotation marks omitted).

The Ninth Circuit has used a two-part rule to evaluate whether factual allegations supporting a *Monell* claim are adequately pled:

> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*A.E. ex rel. Hernandez v. Cty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).  *See, e.g., Mateos-Sandoval v. Cty. of Sonoma*, 942 F. Supp. 2d 890, 899-900 (N.D. Cal. 2013) (applying *Starr* rule to evaluate *Monell* allegations); *Perryman v. City of Pittsburg*, 545 F. Supp. 3d 796, 800-02 (N.D. Cal. 2021) (same).

As to the first part of the *Starr* rule, the court finds that the SAC "contain[s] sufficient allegations of underlying facts to give [Defendants] fair notice" of the claim.  *See Starr*, 652 F.3d at 1216.  The SAC alleges that the City "has a demonstrated custom and practice of . . . destroying the property of unhoused people notwithstanding any of the City's clear written policies that preclude" this practice, and that the City "regularly engages in this conduct through formal HSOC sweep operations" and "informal sweep operations that City agencies carry out independently across the City."  SAC ¶ 215.  It further alleges that DPW and SFPD "have a custom and practice of seizing and destroying the property of unhoused people," and that they are assisted in doing so by HSH and DEM through their coordination of HSOC sweep operations.  *Id.* at ¶¶ 218-21.  It

30

describes specific incidents of property seizures and destruction, SAC ¶¶ 244, 246-47, 248-49, 250, 252, 254, and alleges that "[n]o written policy changed has stopped the regular, on-the-ground constitutional violations," including property destruction.  *Id*. at ¶ 225.

The SAC also alleges that the City has repeatedly been put on notice regarding its failure to comply with constitutional requirements and its own policies, and that in response to complaints about tent and property destruction, HSOC's director stated, "it is just taking some time for everyone to get onboard."  The SAC alleges that the same HSOC director had previously acknowledged DPW's "'long time practice' of destroying unhoused people's tents," and that "property destruction has continued in full force."  *Id*. at ¶ 231.  The SAC further alleges that in 2021 and 2022, the San Francisco City Attorney's Office "conducted ongoing negotiations" with Coalition and other advocacy groups regarding "repeated property destruction practices," and that "[t]he result was to be an update to DPW's written bag and tag policies to better safeguard the property of unhoused individuals—including additional notice prior to property seizure, explicit protections for larger bulky items such as tents and other survival belongings, and photographing of disputed property prior to destruction."  *Id*. at ¶ 242.  However, DPW's "published policy on its website had remained unchanged from 2016, there are no reports that staff have been trained on the new policies, and the unlawful custom and practice of unnoticed destruction and enforcement continues."  *Id*.  These allegations support Plaintiffs' allegation that the City was aware of the unlawful conduct, and that City employees acted consistent with the alleged custom and practice.  *See Mateos–Sandoval v. Cty. of Sonoma*, 942 F. Supp. 2d at 899 (holding that detailed allegations "specify[ing] the content of the policies, customs, or practices . . . are sufficient to 'give fair notice and to enable the opposing party to defend itself effectively,' particularly since information relating to the policies, customs, and practices of County Defendants ... is likely to be easily available to them"); *Robertson v. Bruckert*, 568 F. Supp. 3d 1044, 1048-49 (N.D. Cal. Oct. 27, 2021) (allegations in proposed amended complaint that "detail[ed] [the defendant officer's] conduct with specificity" and "present[ed] sufficient details on ... five prior exemplary incidents of excessive force" were sufficient "to enable the City to defend itself" for purposes of proposed *Monell* claim based on custom or policy).

1        As to the second part of the *Starr* rule, taking the allegations as true, the court concludes

2    that at this stage, it is plausible that Plaintiffs' alleged constitutional injuries under the Fourth and

3    Fourteenth Amendments arose as a result of the City's custom and practice of seizing and

4    destroying the property of homeless individuals notwithstanding the City's written policies that

5    preclude this practice. *See Perryman*, 545 F. Supp. 3d at 801-02 (discussing that there is no

6    probability requirement at the pleading stage). Accordingly, the City's motion for judgment on the

7    pleadings is denied as to the *Monell* claims based on custom and practice.

**b.      Failure to Train**

9        Under limited circumstances, "a local government's decision not to train certain employees

10    about their legal duty to avoid violating citizens' rights may rise to the level of an official

11    government policy for purposes of § 1983." *Connick*, 563 U.S. at 61. However, "[a]

12    municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a

13    failure to train." *Id.* In order to establish liability under this theory, the "municipality's failure to

14    train its employees in a relevant respect must amount to 'deliberate indifference to the rights of

15    persons with whom the [untrained employees] come into contact.'" *Id.* (citing *Canton v. Harris*,

16    489 U.S. 378, 388 (1989)). This "stringent standard of fault" requires proof that "policymakers

17    are on actual or constructive notice that a particular omission in their training program causes city

18    employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 61; *see also Canton*,

19    489 U.S. at 389 ("[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a

20    municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure

21    under § 1983."). The training deficiency must be the "functional equivalent of a decision by the

22    city itself to violate the Constitution." *Id.* "The issue is whether the training program is adequate

23    and, if it is not, whether such inadequate training can justifiably be said to represent municipal

24    policy." *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (citing *Canton*, 489

25    U.S. at 39).

26        In order to establish section 1983 municipal liability based on a failure to train, a plaintiff

27    must show: 1) deprivation of a constitutional right; 2) a training policy that "amounts to deliberate

28    indifference to the [constitutional] rights of the persons with whom [the police] are likely to come

32

1    into contact"; and 3) that his constitutional injury would have been avoided had the municipality

2    properly trained the officers. *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007)

3    (quoting *Canton*, 489 U.S. at 388-89) (first alteration in original).

4        Here, the SAC alleges that Plaintiffs were deprived of their Fourth Amendment and

5    Fourteenth Amendment procedural due process rights. It further alleges that the City failed to

6    train its employees regarding the constitutional requirements related to property destruction. SAC

7    ¶¶ 41, 45, 47, 49, 51, 53, 55, 224, 231, 242. This includes the allegation that "the sheer extent" of

8    the custom and practice of property seizure and destruction "establishes that the City and its

9    various agencies know or should know that it has failed to appropriately train City staff regarding

10   their interactions with unhoused communities." *Id.* at ¶ 224. The SAC alleges that "[t]he City's

11   unconstitutional conduct is not a secret. Advocates and attorneys have been working with the City

12   *for years* to change their clearly unlawful practices," and that "[n]o written policy change has

13   stopped the regular, on-the-ground constitutional violations." *Id.* at ¶ 225 (emphasis in original).

14   The SAC cites HSOC meeting notes about "PD/DPW working to clarify and train the bag/tag

15   transfer of policy property" but alleges that "property destruction has continued in full force." *Id.*

16   at ¶ 231. These allegations support a reasonable inference that the City's failure to properly train

17   its employees regarding homeless individuals' personal property amounts to deliberate

18   indifference to their constitutional rights, and that the injuries alleged in the SAC would have been

19   avoided had the municipality properly trained its officers. The allegations about the alleged

20   failure to train satisfy both parts of the *Starr* rule because they "contain[s] sufficient allegations of

21   underlying facts to give [Defendants] fair notice" of the claim and taken as true, "plausibly suggest

22   an entitlement to relief. *See Starr*, 652 F.3d at 1216.

23       The City's motion for judgment on the pleadings is denied as to the *Monell* claims based

24   on failure to train.

25                        **c.    Ratification**

26       A municipality may be liable under section 1983 if "an official with final policy-making

27   authority . . . ratified a subordinate's unconstitutional decision or action and the basis for it."

28   *Rodriguez*, 891 F.3d at 802-03 (quotation marks and citation omitted). "To show ratification, a

plaintiff must prove that the 'authorized policymakers approved a subordinate's decision and the basis for it,'" which accordingly requires, "among other things, knowledge of the alleged constitutional violation." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting *City of St. Louis v. Paprotnik*, 485 U.S. 112, 127 (1988)). "A policymaker's knowledge of an unconstitutional act does not, by itself, constitute ratification. Instead, a plaintiff must prove that the policymaker approved of the subordinate's act." *Id.*

The SAC does not expressly allege that any San Francisco official "ratified" an unconstitutional decision or action; in fact, the SAC does not include any version of the word "ratified." At the hearing, Plaintiffs' counsel argued that the SAC alleges that "high level employees" are aware of the bag and tag policy and that there are "nonetheless a series of violations" of the same. Tr. 40-41. He identified paragraphs 231 and 241 as "examples of . . . high level employees ratifying the . . . violations that we've been naming here." *Id.* at 42.

Paragraph 231 alleges:

> After the Coalition on Homelessness formally complained to HSOC's Director about tent and property destruction during the COVID-19 pandemic, Director Jeff Kositsky demurred: "it is just taking some time for everyone to get onboard." In fact, however, Kositsky had directly asserted that DPW had a "long time practice" of destroying unhoused people's tents in separate correspondence. HSOC's own meeting notes from June 2019 acknowledge the same problems: "PD/DPW working to clarify and train the bag/tag transfer of property policy." Meanwhile, property destruction has continued in full force.

These allegations are sufficient to allege that HSOC Director Kositsky was aware of the City's ongoing unconstitutional practices with respect to "tent and property destruction," and that the practices continued despite his knowledge. However, the SAC does not allege that Kositsky had "final policymaking authority." *See City of St. Louis*, 485 U.S. at 123 ("[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability.").

Paragraph 241 alleges:

> This conduct extends to the very highest of City officials. For example, the Mission Local reported on a sweep operation at the behest of the Mayor's Office in June 2021 because Mayor Breed was to attend a fundraiser event near to where unhoused people were residing. The reporting described emails from City department heads

United States District Court
Northern District of California

> requesting "at least 18 HSH shelter beds" when officials knew that "40+ tents [would] be cleared." Mayor Breed also directly instigated a sweep operation in June 2022 that resulted in the displacement of unhoused people located near the Ferry Building and the destruction of their property.

These allegations do not adequately allege a ratification theory of *Monell* liability with respect to Breed because the SAC does not allege that she had knowledge of alleged constitutional violations and approved them. Instead, it alleges only that she "instigated" two sweep operations in June 2021 and June 2022 that resulted in property destruction.

The City's motion for judgment on the pleadings is granted as to the *Monell* claims based on a ratification theory.

### D.  Conspiracy (Claim 13)

Conspiracy requires a showing of "(1) the existence of an express or implied agreement among the defendant[s] to deprive [the Plaintiffs] of [their] constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement." *Avalos v. Baca*, 596 F.3d 583, 592 (9th Cir. 2010) (cleaned up). "[T]he plaintiff must state specific facts to support the existence of the claimed conspiracy." *Olsen v. Idaho State Bd. of Med.,* 363 F.3d 916, 929 (9th Cir. 2004) (quotation and citation omitted).

The City moves for judgment on the conspiracy claim on the ground that "Plaintiffs have failed to state an actual deprivation of rights." Mot. 25. Not so. As discussed above, Plaintiffs have stated claims for violation of procedural due process and unreasonable search and seizure.

The City also argues that the SAC fails to allege "facts from which an agreement to unlawfully destroy Plaintiffs' property can plausibly be inferred." *Id.* Plaintiffs do not respond to this argument, see Opp'n 23 n.15, and thus concede it. In fact, the sole allegation supporting an agreement to violate Plaintiffs' constitutional rights is as follows:

> Defendants have entered into both explicit and implicit agreements with one another to violate the constitutional rights of unhoused people by arresting, citing, fining, and destroying the property of unhoused people without providing adequate notice or adequate shelter in violation of the U.S. and California Constitutions—under the banner of the interagency operation known at the Healthy Streets Operation Center (HSOC).

SAC ¶ 333. This allegation is entirely conclusory and thus insufficient. Accordingly, the City's

1   motion for judgment on the pleadings on the conspiracy claim is granted.

2   **VI.    LEAVE TO AMEND**

3   Plaintiffs request leave to amend in the event that any portion of Defendants' motions are

4   granted.  Opp'n 25.

5   Under Federal Rule of Civil Procedure 15(a), leave to amend should be granted as a matter

6   of course, at least until the defendant files a responsive pleading.  Fed. R. Civ. P. 15(a)(1).  After

7   that point, Rule 15(a) provides generally that leave to amend the pleadings before trial should be

8   given "freely . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2); *see also In re Dynamic*

9   *Random Access Memory Antitrust Litig.*, 516 F. Supp. 2d 1072, 1084 (N.D. Cal. 2007) ("courts

10  generally have discretion in granting 12(c) motions with leave to amend").  "This policy is to be

11  applied with extreme liberality."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051

12  (9th Cir. 2003) (quotation omitted).  In the absence of an "apparent" reason, such as undue delay,

13  bad faith or dilatory motive, prejudice to the opposing party, futility of the amendments, or

14  repeated failure to cure deficiencies in the complaint by prior amendment, it is an abuse of

15  discretion for a district court to refuse to grant leave to amend a complaint.  *Foman v. Davis*, 371

16  U.S. 178, 182 (1962); *Lockheed Martin Corp. v. Network Sols., Inc.*, 194 F.3d 980, 986 (9th Cir.

17  1999).  "[D]elay alone no matter how lengthy is an insufficient ground for denial of leave to

18  amend."  *United States v. Webb*, 655 F.2d 977, 980 (9th Cir. 1981).  The factors do not "merit

19  equal weight," and "it is the consideration of prejudice to the opposing party that carries the

20  greatest weight."  *Eminence Capital*, 316 F.3d at 1052.

21  Defendants argue that Plaintiffs should be denied leave to amend because the court

22  previously "invited" them to amend the merits of their complaint and Plaintiffs declined, citing the

23  transcript of the August 7, 2024 case management conference.  Reply 9, 15.  This is not an entirely

24  accurate characterization of the prior proceedings.  Plaintiffs had stated in a joint CMC statement

25  their desire to move for leave to amend to add new claims and/or new parties.  At the case

26  management conference, the court instructed Plaintiffs to file a motion to amend, and Plaintiffs

27  updated the court that they did not seek to proceed with new claims and/or new parties.  [*See*

28  Docket No. 246 (Hr'g Tr. Aug. 7, 2024) 5-6.]  Plaintiffs now seek leave to amend the complaint

United States District Court
Northern District of California

to address deficiencies in standing and in their previously pleaded claims; consistent with their representation to the court, they are not seeking leave to add new claims or parties.

To the extent Defendants argue that leave to amend should be denied based on Plaintiffs' delay, "delay, by itself, is insufficient to justify denial of leave to amend." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). Defendants do not argue they will be prejudiced by further amendment or that Plaintiffs have acted in bad faith. Finally, with respect to futility, the court cannot say that "no set of facts can be proved under [an] amendment that would constitute a valid claim." *See Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). Accordingly, the court grants Plaintiffs one final opportunity to amend.

## VII.  CONCLUSION

For the foregoing reasons, San Francisco's motion to dismiss is granted in part and denied in part, as follows:

- Claims 1 and 3, which are based on federal law, are dismissed with prejudice. Claims 2 and 4, which are based on state law, are dismissed without prejudice.
- Claims 9, 11, and 13, which are based on federal law, are dismissed with prejudice to the extent they rely on a theory of liability foreclosed by *City of Grants Pass*. Claims 10 and 12, which are based on state law, are dismissed without prejudice to the extent that they rely on a theory of liability foreclosed by *City of Grants Pass*.
- The SAC fails to adequately allege facts supporting Coalition's associational standing to bring Claims 9, 10, 11, 12, and the portions of Claim 13 based on exposure to state-created danger and disability discrimination, and fails to adequately allege facts supporting Coalition's organizational standing to bring any claims. The SAC also fails to adequately allege facts supporting any individual Plaintiff's standing to bring Claims 9-12 and the portions of Claim 13 based on exposure to state-created danger and disability discrimination. Accordingly, Claims 9, 10, 11, 12, and the portions of Claims 13 based on exposure to state-created danger and disability discrimination are dismissed with leave to amend.
- The court does not reach the individual Plaintiffs' standing to bring Claims 5-8 and

Claim 13 based on property seizures and destruction (other than Castaño and Vaughn) because Coalition adequately pleads associational standing to pursue those claims.

- The SAC fails to adequately allege facts supporting Castaño and Vaughn's standing to bring Claims 5-8 and 13. Castaño and Vaughn's claims are dismissed with leave to amend.

- The motion is denied with respect to Claims 5-8 and the relevant portion of Claim 13 because Coalition has adequately pleaded associational standing.

The motion for judgment on the pleadings is denied in part and granted in part as follows:

- The motion is denied as moot as to Claims 9-12 and as to Claims 5-8 and 13 to the extent they are brought by Castaño and Vaughn.

- The motion is granted as to the *Monell* claims based on theories of ratification and the existence of an express unconstitutional policy. Those claims are dismissed with leave to amend. The motion challenging the *Monell* claims is otherwise denied.

- The motion is granted as to Claim 13 for conspiracy. The conspiracy claim is dismissed with leave to amend.

- The motion is denied with respect to Claims 5-8.

Any amended complaint is due by no later than December 18, 2024. **Plaintiffs shall plead their best case.**

      **IT IS SO ORDERED.**

Dated: December 4, 2024



Donna M. Ryu
Chief Magistrate Judge