1   LAWYERS' COMMITTEE FOR CIVIL
    RIGHTS OF THE SAN FRANCISCO BAY AREA
2   ~~Zal K. Shroff, MJP 804620, *pro hac vice*~~
    Nisha Kashyap SBN 301934
3   Andrew Ntim SBN 347084
    131 Steuart Street, Ste. 400
4   San Francisco, CA 94105
    Telephone: (415) 543-9444
5   ~~zshroff~~nkashyap@lccrsf.org
    antim@lccrsf.org
6

7   *Attorneys for Plaintiffs Coalition on Homelessness,*
    *~~Toro Castaño,~~ Sarah Cronk, Joshua Donohoe,*
8   *Molique Frank, David Martinez, Teresa Sandoval~~,~~*
    *~~Nathaniel Vaughn~~*
9

10  *Additional Counsel Appear on Signature Page*

11

12                  **UNITED STATES DISTRICT COURT**

13                 **NORTHERN DISTRICT OF CALIFORNIA**

14                         **OAKLAND DIVISION**

15

16  COALITION ON HOMELESSNESS; ~~TORO~~          CASE NO. 4:22-cv-05502-DMR
    ~~CASTAÑO;~~ SARAH CRONK; JOSHUA
17  DONOHOE; MOLIQUE FRANK; DAVID
    MARTINEZ; TERESA SANDOVAL;                   ~~SECOND~~THIRD **AMENDED**
18  ~~NATHANIEL VAUGHN,~~                        **COMPLAINT FOR DECLARATORY**
                                                 **AND INJUNCTIVE RELIEF**
19                        Plaintiffs.
20              v.

21  CITY AND COUNTY OF SAN FRANCISCO;
22  SAN FRANCISCO POLICE DEPARTMENT;
    SAN FRANCISCO DEPARTMENT OF
23  PUBLIC WORKS; SAN FRANCISCO
    DEPARTMENT OF HOMELESSNESS AND
24  SUPPORTIVE HOUSING; SAN FRANCISCO
    FIRE DEPARTMENT; SAN FRANCISCO
25  DEPARTMENT OF EMERGENCY
    MANAGEMENT,
26
27                       Defendants.

28

# Table of Contents

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 6

PARTIES ............................................................................................................................ 7

    A.    Plaintiffs ................................................................................................................ 7

    B.    Defendants .......................................................................................................... 14

HISTORICAL AND FACTUAL BACKGROUND ......................................................... 18

    A.    San Francisco's Homelessness Crisis is Rooted in Decades of Racial Redlining and Exclusionary Zoning Practices Designed to Kick Low-Income Black and Brown Families Out. ........................................................................................... 18

    B.    The City's Refusal to Supply Affordable Housing Opportunities Has Perpetuated the Current Homelessness Crisis, Forcing Unprecedented Numbers of Low-Income Residents onto the Streets in One of the Wealthiest Cities in the World. ........... 22

    C.    The City Blames Unhoused People for the Crisis it Caused, Subjecting Residents to a Renewed Era of Failed Mass Incarceration Policies, Criminalization, and Racist Policing as a Punishment for Being Poor. ............................................... 25

    D.    Affordable Housing is the Only Permanent Solution to Homelessness, Makes Communities Far Safer, and Costs Substantially Less than the City's Useless Punishment Schemes. ....................................................................................... 27

FACTUAL ALLEGATIONS ............................................................................................ 31

    A.    San Francisco Does Not Have Enough Shelter Beds to House Thousands of its Unhoused Residents, Forcing Unhoused People to Sleep on the Streets. ......... 31

    B.    San Francisco Has Enacted and Continues to Enforce a Litany of Anti-Homelessness Ordinances and Statutes. ............................................................. 34

    C.    The U.S. Constitution Protects Unhoused People from Criminalization in the Absence of Available Shelter and From Summary Destruction of Property Without Due Process of Law. ............................................................................. 36

    D.    HSOC Operations Hide the Extent of the City's Homelessness Crisis By Destroying Signs of Visible Homelessness. ....................................................... 37

    E.    Anatomy and Timeline of an HSOC Sweep Operation: Law Enforcement Threats, Intimidation, and Property Destruction Absent Any Viable Shelter. ................. 41

    F.    HSOC's Customs and Practices Criminalize Homelessness Even Though Unhoused Individuals Have No Genuine, Voluntary Access to Shelter—Contrary to the City's Own Stated Policies. ................................................................... 45

    G.    HSOC's Customs and Practices Completely Disregard the City's Prior Notice and Bag and Tag Policies—to Intentionally Engage in Mass Property Destruction. ........... 47

    H.    DPW and SFPD Also Conduct Their Own Daily, Independent, and Unlawful Sweep Operations in Violation of City Policy. ................................................. 49

I.    The City's Own Public Records Reveal Rampant Criminalization and Property
      Destruction and Widespread, Massive Non-Compliance with Constitutional
      Requirements and the City's Own Written Policies Prohibiting these Practices.............51

      1.    The City Regularly Conducts Sweep Operations on Days it Knows it Has
            Insufficient Shelter..............................................................................................51

      2.    SFPD Continues to Cite or Arrest Thousands of Unhoused People for
            Sleeping in Public Despite a Lack of Shelter......................................................52

      3.    City Logs Document Essentially No Storage or Safeguarding of Property
            Despite Sweeping Hundreds of Unhoused People Each Week. .........................53

J.    The Coalition on Homelessness Diverts Its Limited Resources to Document the
      City's Constitutional Violations and to Protect its Members from Ongoing Rights
      Violations....................................................................................................................55

      1.    The Coalition Diverts its Resources to Monitor the City's HSOC Sweeps..........55

      2.    The Coalition's Active Members Have Experienced Defendants'
            Criminalization and Property Destruction First-Hand.........................................57

K.    The Coalition Has Documented Dozens of the City's Repeated Constitutional
      Violations Against its Unhoused Residents. ................................................................58

L.    The City's HSOC Sweeps and Other Criminalization and Property Destruction
      Programs Fail to Accommodate Unhoused Individuals' Disabilities..............................66

M.    Criminalization of Homelessness and Property Destruction Sweeps Have
      Profound and Deeply Harmful Health Impacts—and Actively Expose Unhoused
      People to Further Harm................................................................................................68

N.    Monell Allegations: The City and its Agencies Have a Demonstrated Custom and
      Practice of Criminalizing Homelessness and Destroying Homeless Individuals'
      Property—Often in Violation of the City's Own Policies Meant to Preclude this
      Conduct.......................................................................................................................71

O.    The City Has Repeatedly Been Put On Notice Regarding Its Failure to Comply
      with Constitutional Requirements and Its Own Policies—And Has Flatly Ignored
      Calls to Correct its Conduct. ......................................................................................74

P.    Individual Plaintiffs Have Been Subject To, And Are At Ongoing Risk of Being
      Subject to, the City's Unconstitutional Criminalization and Property Destruction..........78

Q.    The Coalition and Individual Plaintiffs Need Judicial Intervention. ...............................81

CLAIMS ................................................................................................................................82

PRAYER FOR RELIEF ...........................................................................................................97

INTRODUCTION .................................................................................................................1

JURISDICTION AND VENUE .........................................................................................7

PARTIES ..............................................................................................................................8

A.    Plaintiffs .................................................................................................................8

B.    Defendants ...........................................................................................................19

HISTORICAL AND FACTUAL BACKGROUND .......................................................23

A.    San Francisco's Homelessness Crisis is Rooted in Decades of Racial Redlining
and Exclusionary Zoning Practices Designed to Kick Low-Income Black and
Brown Families Out..............................................................................................23

B.    The City's Refusal to Supply Affordable Housing Opportunities Has Perpetuated
the Current Homelessness Crisis, Forcing Unprecedented Numbers of Low-
Income Residents onto the Streets in One of the Wealthiest Cities in the World. ...........27

C.    The City Blames Unhoused People for the Crisis it Caused, Subjecting Residents
to a Renewed Era of Failed Mass Incarceration Policies, Criminalization, and
Racist Policing as a Punishment for Being Poor. ...............................................30

D.    Affordable Housing is the Only Permanent Solution to Homelessness, Makes
Communities Far Safer, and Costs Substantially Less than the City's Useless
Punishment Schemes. ..........................................................................................33

FACTUAL ALLEGATIONS ............................................................................................37

A.    San Francisco Does Not Have Enough Shelter Beds to House Thousands of its
Unhoused Residents, Forcing Unhoused People to Sleep on the Streets. ........37

B.    San Francisco Has Enacted and Continues to Enforce a Litany of Anti-
Homelessness Ordinances and Statutes. ............................................................39

C.    The U.S. Constitution Protects Unhoused People from Summary Destruction of
Property Without Due Process of Law. ..............................................................41

D.    HSOC Operations Hide the Extent of the City's Homelessness Crisis By
Destroying Signs of Visible Homelessness. .......................................................42

E.    Anatomy and Timeline of an HSOC Sweep Operation: Law Enforcement Threats,
Intimidation, and Property Destruction Absent Any Viable Shelter. ...............46

F.    HSOC's Customs and Practices Criminalize Homelessness Even Though
Unhoused Individuals Have No Genuine, Voluntary Access to Shelter—Contrary
to the City's Own Stated Policies. ......................................................................51

G.    HSOC's Customs and Practices Completely Disregard the City's Prior Notice and
Bag and Tag Policies—to Intentionally Engage in Mass Property Destruction...............53

H.    DPW and SFPD Also Conduct Their Own Daily, Independent, and Unlawful
Sweep Operations in Violation of City Policy....................................................55

I.    The City's Own Public Records Reveal Rampant Criminalization and Property
Destruction and Widespread, Massive Non-Compliance with Constitutional
Requirements and the City's Own Written Policies Prohibiting these Practices..............56

1        1.      The City Regularly Conducts Sweep Operations on Days it Knows it Has

2               Insufficient Shelter........................................................................................57

3        2.      SFPD Continues to Cite or Arrest Thousands of Unhoused People for
               Sleeping in Public Despite a Lack of Shelter.................................................58

4        3.      City Logs Document Essentially No Storage or Safeguarding of Property
               Despite Sweeping Hundreds of Unhoused People Each Week. ........................59

5  J.     The Coalition on Homelessness Diverts Its Limited Resources to Document the
      City's Constitutional Violations and to Protect its Members from Ongoing Rights

6      Violations.......................................................................................................60

7        1.      The Coalition Diverts its Resources to Monitor the City's HSOC Sweeps...........60

8        2.      The Coalition's Active Members Have Experienced Defendants'
               Criminalization and Property Destruction First-Hand.....................................63

9

10  K.    The Coalition Has Documented Dozens of the City's Repeated Constitutional
      Violations Against its Unhoused Residents.........................................................63

11  L.    The City's HSOC Sweeps and Other Criminalization and Property Destruction
      Programs Fail to Accommodate Unhoused Individuals' Disabilities................................72

12  M.   Criminalization of Homelessness and Property Destruction Sweeps Have

13      Profound and Deeply Harmful Health Impacts—and Actively Expose Unhoused
      People to Further Harm...................................................................................74

14  N.    Monell Allegations: The City and its Agencies Have a Demonstrated Custom and

15      Practice of Criminalizing Homelessness and Destroying Homeless Individuals'
      Property—Often in Violation of the City's Own Policies Meant to Preclude this

16      Conduct.........................................................................................................77

17  O.    The City Has Repeatedly Been Put On Notice Regarding Its Failure to Comply
      with Constitutional Requirements and Its Own Policies—And Has Flatly Ignored

18      Calls to Correct its Conduct............................................................................80

19  P.    Individual Plaintiffs Have Been Subject To, And Are At Ongoing Risk of Being
      Subject to, the City's Unconstitutional Criminalization and Property Destruction.........84

20  Q.    The Coalition and Individual Plaintiffs Need Judicial Intervention. ...................88

21  CLAIMS ..............................................................................................................88

22  PRAYER FOR RELIEF .......................................................................................103

23

24

25

26

27

28

1

**INTRODUCTION**

2      1.      San Francisco presents the image of a caring municipality with a concrete plan to

3   address the root causes of homelessness. But in reality, the City's decades-long failure to

4   adequately invest in affordable housing and shelter has left many thousands of its residents

5   unhoused,[1] forcing them to use tents and vehicles as shelter. In the face of this mounting crisis, the

6   City has marshalled significant resources toward unlawful and ineffective punishment rather than

7   affordable housing and shelter.

8      2.      This action seeks to enjoin San Francisco's custom and practice of violating the

9   constitutional rights of unhoused people. In violation of the U.S. and California Constitutions, San

10  Francisco ~~enforces a series of laws that prevent unhoused residents from sheltering in the City's~~

11  ~~open spaces when there is no other shelter available. The City has also~~has embarked on a campaign

12  to seize and destroy the property of unhoused people with the express purpose of removing visible

13  signs of homelessness from San Francisco's streets. These "solutions" are as misguided as they

14  are unconstitutional, as they actually perpetuate San Francisco's homelessness crisis.

15     3.      Many of San Francisco's approximately 8,000 unhoused residents lack not only a

16  physical home but also access to any alternative shelter.[2] The City's categorical refusal to provide

17  sufficient affordable housing and shelter is a well-documented bureaucratic failure.[3] Because of

18

---

19  [1] This Complaint uses the term "homeless" to encompass persons who are both "unhoused," that
20  is without a fixed residence, and "unsheltered," that is both unhoused and without physical shelter.
    The Department of Housing and Urban Development (HUD) defines "literally homeless" as
21  lacking a fixed, regular, and adequate nighttime residence; people who are homeless include
    people living in public and private places not meant for human habitation, people living in shelters
22  and similar temporary arrangements, and people exiting institutions who were homeless prior to
    entering the institution.
23

24  [2] *2022 Point-in-Time Count: Preliminary Results*, S.F. DEP'T OF HOMELESSNESS & SUPPORTIVE
    HOUSING (2022), https://hsh.sfgov.org/get-involved/2022-pit-count/.

25  [3] *See, e.g.*, Nuala Bishari, *In San Francisco, Hundreds of Homes for the Homeless Sit Vacant*,
26  PROPUBLICA (Feb. 24, 2022), https://www.propublica.org/article/in-san-francisco-hundreds-of-
    homes-for-the-homeless-sit-vacant; Nicole Karlis, *How bureaucracy kept the Bay Area from
27  housing the houseless*, USC ANNENBERG CTR. FOR HEALTH JOURNALISM (June 21, 2020),
    https://centerforhealthjournalism.org/fellowships/projects/how-bureaucracy-kept-bay-area-
28  housing-houseless.

~~FIRST~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

this severe lack of affordable housing across San Francisco, shelter designed for temporary stays in emergency situations has become a place of permanent habitation, but unavailable for thousands of San Franciscans in urgent need.[4] With shelters at functional capacity across the City, when the City was able to conduct a count of its unsheltered population in 2022, 4,397 individuals—or 57 percent of the City's reported homeless population—were unsheltered.[5]

4.      Instead of making affordable housing available, the City established an interagency task force misleadingly called the Healthy Streets Operation Center ("HSOC"). HSOC consists of the following major San Francisco city agencies, among others: San Francisco Police Department ("SFPD"), Department of Public Works ("DPW"), Department of Emergency Management ("DEM"), and Department of Homelessness and Supportive Housing ("HSH"). HSOC operates under the guise of a services-first response to the City's homelessness crisis. But in fact, the City uses this interagency operation to pour money into law enforcement operations so that the City can clear evidence of homelessness from City streets.[6] For years, Mayor London Breed has celebrated the HSOC program, praised its supposed success, and sought additional funding for it.[7]

---

[4] For example, the United States Interagency Council on Homelessness lists questions to consider to help emergency shelter serve as a platform for housing access and considerations to determine the right scale for emergency shelter, but these factors do not appear to drive the City's shelter availability. *See* Interagency Council on Homelessness, *Key Considerations for Implementing Emergency Shelter Within an Effective Crisis Response System* 8-9 (2017), https://www.usich.gov/resources/uploads/asset_library/emergency-shelter-key-considerations.pdf (discussing the proper "scale" of emergency shelter as needing to take into account "the inflow at which people enter the system, and the permanent housing (both targeted and mainstream affordable) units available for creating paths out of homelessness").

[5] 2022 Point-in-Time Count, *supra* note 2.

[6] *Behind the Healthy Streets Operation Curtain: The True Story of San Francisco's Abusive Encampment Response* 3-4, COAL. ON HOMELESSNESS (2021), https://www.cohsf.org/wp-content/uploads/2021/10/HSOC-Report-Draft-10.6.pdf ("[This report] reflects the perpetual displacement, lack of meaningful efforts to offer adequate and appropriate services, and the unjust treatment that unhoused San Franciscans often describe when asked about their interactions with HSOC.")

[7] *See, e.g.*, Press Release, Off. Of the Mayor, Mayor London Breed Announces a 34% Reduction in Tents Since Taking Office, (Nov. 12, 2018), https://sfmayor.org/article/mayor-london-breed-announces-34-reduction-tents-taking-office (noting that the Mayor has "Mayor London N. Breed announced a 34% reduction in tents on the streets of San Francisco since she took office in July, a

SECOND̶THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

5.      Through HSOC, the City has embarked on a campaign of driving its unsheltered residents out of town—or at least out of sight—~~in violation of their constitutional rights.~~. Specifically, the City has a custom and practice of citing, fining, and arresting—as well as threatening to cite, fine, and arrest—unsheltered persons to force them to "move along" from public sidewalks and parks. The City targets unhoused people throughout the City at the request of select City employees and more privileged members of the public.

6.      Because San Francisco does not have—and has never had—enough shelter to offer to *thousands* of its unhoused residents, the City is punishing residents who have nowhere to go. ~~These enforcement policies violate the Eighth Amendment and the California Constitution's prohibition on Cruel and Unusual Punishment. *See* U.S. Const. amend. VIII; Cal. Const., art. I, § 17; *Martin v. City of Boise*, 920 F.3d 584, 616-17 (9th Cir. 2019) ("the [S]tate may not criminalize conduct that is an unavoidable consequence of being homeless"), *cert. denied*, 140 S. Ct. 674 (2019).~~

7.      Although San Francisco purports to stockpile enough shelter beds to offer each of the individuals it targets through its perverse practice of criminal enforcement, the City openly admits that it deliberately targets homeless people knowing that it only has shelter for about 40% of them.[8] When shelter is possibly available, the City only offers it, if at all, as an afterthought to

---

reduction of approximately 193 tents in less than four months [...] she has expanded the resources for Healthy Streets Operations Center (HSOC)"); Mallory Moench, *Mayor Breed's push to make San Francisco 'tent-free' has gone as far as removing toilets for the homeless*, S. F. CHRONICLE (June 7, 2021), https://www.sfchronicle.com/local-politics/article/San-Francisco-s-latest-feud-What-to-do-about-16231736.php ("With the city getting people off the streets, the city's emergency response team [the Healthy Streets Operation Center] put pressure on Public Works to remove toilets, as revealed by emails first released by an anonymous account on Twitter and available via public records request"); Mayor's Proposed Budget FY 2019-20 and 2020-21, at 19, MAYOR'S    OFF.    OF    PUB.    POL'Y    &    FIN.    (2019), https://sfmayor.org/sites/default/files/CSF_Budget_Book_June_2019_Final_Web_REV2.pdf ("To continue the positive work of HSOC and to ensure that HSOC continues to be a service-first approach to addressing unsheltered homelessness and unhealthy street behavior, the two-year budget includes over $4.0 million to sustain existing services in participating departments").

[8] Laura Wenus, *SF Encampment Clearings Mostly Fail to Connect Residents to Services, Report Alleges*, S. F. PUBLIC PRESS (Nov. 4, 2021), https://www.sfpublicpress.org/sf-encampment-clearings-mostly-fail-to-connect-residents-to-services-report-alleges/ ("Workers with the city's

the few unhoused residents who remain hours after the City has forced all other unhoused residents to move under threat of citation or arrest. For the small minority who are offered the prospect of shelter, the City's scarce shelter offerings are often not actually available to them based on their gender, life and family circumstances, or disability status. ~~Such conditions violate the Eighth Amendment, the California Constitution, and the Americans with Disabilities Act (ADA). *See* U.S. Const. amend. VIII;. Cal. Const., art. I, § 17; 42 U.S.C. § 12131.~~

8.      Meanwhile, the City deploys DPW and SFPD to search out and dispose of tents and other property of unhoused people across San Francisco. To reach that goal, the City summarily seizes and destroys the valuable personal property and survival belongings of unhoused people without adequate prior notice or opportunities to recover their property. The City's destructive conduct is in clear violation of its own written policies, the Fourth Amendment's protection against unreasonable searches and seizures, the Fourteenth Amendment's requirement of due process and fair notice, and the corollary protections of the California Constitution. *See* U.S. Const. amends. IV, XIV; Cal. Const., art. I, §§ 7(a), 13, 15.

9.      The City's custom and practice of removing unhoused people from public space and seizing and destroying their personal property, such as tents and other survival gear, also deprives unhoused residents of the very belongings they need to rebuild their lives and break the cycle of homelessness, and often puts their physical and mental health at risk. ~~The City is exposing unhoused residents to imminent and grave harms in violation of the Fourteenth Amendment and California Constitution's protection against state-created dangers. U.S. Const. amend. XIV; Cal. Const., art. I, §§ 7(a), 15.~~

10.     San Francisco's punitive approach to homelessness is a renewed relic of failed mass incarceration era criminalization policies and reflects a fundamentally misguided approach to

---

Healthy Streets Operations Center clear encampments when there are enough open beds in the city's shelter system to accommodate about 40% of that encampment's residents in shelters. According to the center's director, Sam Dodge, the formula is adjusted each week").

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1  community safety.[9] It is also inextricably linked to San Francisco's history of systemic racism in

2  housing. It is no coincidence that in 2019, the last year the City released comprehensive data, 37%

3  of all unhoused people were Black in a City whose population of Black people is just 6%.[10] For

4  decades, the City and its residents engaged in racial redlining and took advantage of zoning laws

5  to intentionally force communities of color out of its neighborhoods.[11]

6      11.    The current homelessness crisis in San Francisco is the result of decades of failed

7  economic policies that led to dramatic wealth inequality, an unprecedented housing shortage fueled

8  by racism, and the defunding of social services programs—leaving many San Franciscans in

---

[9] *See*, *e.g.*, Chris Herring & Dilara Yarbrough, *Punishing the Poorest: How the Criminalization of Homelessness Perpetuates Poverty in San Francisco* 1 (June 18, 2015), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2620426 ("This report documents and analyzes the impacts of the rising tide of anti-homeless laws in our era of mass incarceration on those experiencing homelessness in San Francisco. […]The study makes evident how criminalization not only fails to reduce homelessness in public space, but also perpetuates homelessness, racial and gender inequality, and poverty even once one has exited homelessness").

[10] *San Francisco Homeless County & Survey Comprehensive Report 2019*, S.F. DEP'T OF HOMELESSNESS & SUPPORTIVE HOUSING (2020), at 16, https://hsh.sfgov.org/wp-content/uploads/2020/01/2019HIRDReport_SanFrancisco_FinalDraft-1.pdf.

[11] *See*, *e.g.*, Lexi Pandell, *The Racist Origins of San Francisco's Housing Crisis*, TNR (May 31, 2019), https://newrepublic.com/article/154028/racist-origins-san-franciscos-housing-crisis ("Poor neighborhoods and areas dominated by non-white residents were also redlined, meaning that developers and banks avoided investing in those areas or loaning to those who lived there"); *see also* Centennial Report 9, S. F. PLAN. COMM'N (2017), https://default.sfplanning.org/publications_reports/SF_Planning_Centennial_Brochure.pdf ("The implications were that 'blight' stood in the way of progress, that it could spread, and that it needed to be removed before it killed the City. It was a deeply political term firmly rooted in structural racism, which relied on fears of white flight and urban disinvestment to justify the wholesale removal of communities of color").

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1    crisis.[12] Despite awareness of these root causes,[13] the City is using unhoused residents as the

2    scapegoats for a crisis of economic and racial justice that it helped to create. San Francisco should

3    fight to end homelessness. But the only real solution to San Francisco's homelessness crisis is

4    housing.[14]

5        12.    In fact, evicting the unhoused and destroying their belongings exacerbates

6    homelessness. The City's actions increase "survival- and crisis-driven decision making" that

7    further distances unhoused individuals from "the ability to envision and work toward long-term

8    wellbeing and stability."[15] ~~Plaintiff~~ Nathaniel Vaughn, a life-long San Franciscan who recently

9    became unhoused, reflects: "We do not deserve to be treated like criminals and to have our

10   belongings thrown in the trash when we are at our most vulnerable." ~~Plaintiff~~ Toro Castaño notes

11   the impact this has on unhoused people: "The City's sweeps [are] a dehumanizing disruption to

12   the small ounce of stability that I was trying to build for myself during one of the hardest times of

13   my life." Plaintiff Sarah Cronk says the same: "We are just trying to scrape by and build as much

14

---

15   [12] *See, e.g.*, Greg Rosalsky, *How California Homelessness Became a Crisis*, NPR (June 8, 2021),
16   https://www.npr.org/sections/money/2021/06/08/1003982733/squalor-behind-the-golden-gate-
     confronting-californias-homelessness-crisis ("By the 1980s, homelessness emerged as a chronic
17   issue. There were many factors, including the federal government deciding to slash the budget for
     affordable housing. By then the California state government had significantly cut taxes and gutted
18   social programs, including for state-funded mental institutions, resulting in thousands of people
     with mental illnesses and other difficulties struggling to make it on their own. Yet the core reason
19   for the crisis boils down to supply and demand for housing. As regions like the San Francisco Bay
20   Area became magnets for highly paid professionals in the computer-driven economy, they failed
     to build enough new units to keep up with demand.")

21   [13] *See* Jeff Kositsky & Marc Dones, *For Too Many, Homelessness Begins with Racism*, S. F.
22   CHRONICLE (Oct. 11, 2016) (noting that "The situation in San Francisco is similar […] There is a
     deep and abiding problem within the reality of American homelessness that points unequivocally
23   to racial injustice").

24   [14] *See* Sara K. Rankin, *Punishing Homelessness*, 22 NEW CRIM. L. REV. 99, 104, 109, 130-34
25   (2019) ("[C]riminalization, along with other traditional approaches that manage homelessness, are
     the most expensive and least effective ways to address it […] Studies consistently show that
26   solving chronic homelessness is achievable through the evidence-based solutions of Housing First
     and permanent supportive housing").

27   [15] Diane Qi et al., *Health Impact of Street Sweeps from the Perspective of Healthcare Providers*,
28   J. Gen. Internal Med. (Mar. 16, 2022).

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

of a life for ourselves as possible—with both dignity and safety. The City makes that impossible for us." In short, the City is making the homelessness crisis worse.

13.    Plaintiffs in this action are the Coalition on Homelessness—a nonprofit membership and advocacy organization of, by, and for unhoused San Franciscans—and ~~seven~~five unhoused individuals who have and will continue to be directly impacted by the City's destructive conduct. Collectively, Plaintiffs seek an end to the City's unconstitutional attack on its unhoused communities.

### JURISDICTION AND VENUE

14.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), ~~42 U.S.C. § 12132,~~ and 42 U.S.C. § 1983 because Plaintiffs' claims arise under the laws and Constitution of the United States.

15.    The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Federal Rules of Civil Procedure 57 and 65 authorize this Court to grant Plaintiffs the declaratory and injunctive relief prayed for herein. An award of attorneys' fees is authorized pursuant to 42 U.S.C. § 1988(b).

16.    This Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiffs' state law claims share all common operative facts with their federal law claims, and the parties are identical. Resolving Plaintiffs' federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

17.    Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because at least one of the Defendants resides in this district and a substantial part of the events and/or omissions were committed in this district.

18.    Because the events and omissions giving rise to Plaintiffs' claims occurred in San Francisco County, this case should be assigned to the Northern District's San Francisco Division or its Oakland Division. N.D. Cal. L.R. 3-2(d).

**PARTIES**

A.    **PLAINTIFFS**

    1.    **Coalition on Homelessness**

19.    The Coalition on Homelessness (the "Coalition") is a 501(c)(3) non-profit with the mission to find permanent solutions to homelessness while recognizing the dignity and human rights of unhoused people. Through community organizing and advocacy, and by providing services and resources to unhoused people, the Coalition fights to prevent people from becoming homeless, presses for affordable housing in San Francisco, and advocates to expand resources available to unhoused people including mental health treatment, emergency shelter, and basic necessities.

20.    The Coalition envisions a San Francisco in which every human being can have and maintain decent, habitable, safe, and secure housing. This means that economic justice, housing advocacy, and supports to exit homelessness are the main focus of the Coalition's work. The Coalition's housing-related work has included getting the City to fund an emergency hotel voucher program for families and securing housing subsidies for unhoused individuals. In 2018, for example, the Coalition was the author of Proposition C, which was a ballot measure calling for a gross receipts tax on all businesses receiving more than $50 million in revenues annually. The tax was to help fund the City's affordable housing projects. With the Coalition's sustained advocacy, Proposition C passed. It has already brought more than $492 million to fund affordable housing programs that will help end homelessness in San Francisco—if used correctly. Mayor London Breed actively opposed the measure.[16]

21.    The Coalition also seeks to build networks of support for unhoused people through organizer and peer-led outreach campaigns and to connect unhoused people to social services and resources. This proactive work requires daily engagement with unhoused communities across San

---

[16] *See* Dominic Fracassa, *Three SF elected leaders announce opposition to Prop. C—raising business taxes for homeless services*, S. F. CHRONICLE (Oct. 5, 2018), https://www.sfchronicle.com/bayarea/article/Three-SF-elected-leaders-announce-opposition-to-13285614.php.

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1   Francisco. ~~It also engages~~ and engaging  members, volunteers, and donors to provide unhoused

2   people with the basic necessities they need to survive while living unsheltered.

3       22.    Over the past several years, the ~~Coalition made~~City's displacement and property

4   destruction practices have hindered  the ~~difficult choice to depart from its~~Coalition's mission-

5   related activities—proactive housing and homelessness prevention ~~and support work   to focus on~~

6   ~~the dire need to protect unhoused people from the City's ongoing criminalization and property~~

7   ~~destruction practices~~, coalition building, and supporting its members. The Coalition has also spent

8   some of its limited donor dollars to replace survival gear for unhoused people that the City of San

9   Francisco has destroyed. The Coalition is an advocacy organization of, by, and for unhoused

10  people in San Francisco. ~~Its~~In addition to front line service providers, staff, and other advocates

11  and volunteers, its members are comprised almost entirely of unhoused people or people with lived

12  experience of homelessness who supervise, direct, and lead the Coalition's work. The Coalition

13  has dozens of active members at any given time ~~and has had thousands of active members over~~

14  ~~the years.~~, particularly involved in the work group meetings and campaigns ,and has had thousands

15  of members over the years including those who participate in trainings, hearings, rallies, vending

16  or contributing to the Street Sheet newspaper, acting as informants on homeless services systems,

17  lobbying and press events. The Coalition communicates with its members through regular

18  outreach to streets, shelters, drop in centers, and soup kitchens, texts, phone calls, e-mail, social

19  media, and through other members and service providers.

20      23.    Since before Defendants adopted the customs and practices that are the subject of

21  this litigation, the Coalition has long engaged in core activities supporting unhoused people.  These

22  activities include:

23          (a) Assisting unhoused people navigate the homeless services system by

24          connecting unhoused people to governmental, private, and nonprofit services like

25          shelter, medical and behavioral health care, housing, basic needs, and other

26          services.

27          (b) Collecting donations for, purchasing, and distributing basic necessities such as

28          tents, sleeping bags, blankets, socks, and food for unhoused people.

(c) Providing public education services and researching and writing reports on the needs of unhoused people, like reports on the shelter/housing systems and access to water/hygiene facilities, based on data gathered from focus groups, outreach, and interviews of unhoused people.

(d) Publishing "Know Your Rights" material, resource guides, and the "Street Sheet" newspaper, which includes submissions by those with lived experience of homelessness, provides income support for and is distributed by Coalition members through a vendor program on City streets, and aims to provide information to unhoused people and education and advocacy for the public at large.

(e) Building coalitions of unhoused people and their allies to engage in lobbying for legislation, budget advocacy, electoral change, and public policy changes, including by participating in hearings, media, voter outreach, press conferences, meetings with public officials, review of legislation, and rallies.

(f) Providing leadership and advocacy training services to unhoused people so they can effectively participate in coalition-building and advocacy.

22.24. Many of the Coalition's active members have been personally impacted by citations, arrests, law enforcement threats, and property destruction while living unsheltered in San Francisco. Defendants have illegally seized members' phones, medication, identification, medical devices/mobility aids, tools, tents/shelters, clothing, vital records, Coalition provided literature, and many other personal property items. The displacement of unhoused people and the City's constant sweeps[17] including the taking of property without adequate notice, make it much more difficult for the Coalition to stay in contact with or to maintain and secure new active members. The City's custom and practice of destroying and dispersing encampments and illegally taking

---

[17] A "sweep"—which the City calls an "encampment resolution"—is a City-led operation to clear homeless people and their property off of public property. Such sweeps usually start around 7 a.m. and include representatives from DPW and the SFPD, among others. *See* Michelle Robertson, *An interview with the controversial San Francisco agency responsible for conducting homeless sweeps*, SF GATE (Aug. 25, 2021), https://www.sfgate.com/bay-area-politics/article/sf-homeless-sweeps-encampment-resolution-hsoc-16400951.php.

1  property, including their communications devices such as phones, laptops, and other electronic

2  devices and accessories like chargers, without adequate notice or procedural protections, directly

3  injures the Coalition's long established principal activities, including by:

4          a) **Preventing the Coalition from helping unhoused people and members**

5          **navigate the homeless services system**. Providing this support often requires the

6          Coalition to follow up with unhoused people to complete an application process or

7          submit additional information to obtain the services. For example, the Coalition

8          assists individuals to access Coordinated Entry to be assessed for housing.  Even

9          when the Coalition succeeds in getting an individual initially assessed, additional

10         documentation is often required to complete the process.  For people who have had

11         their personal or shared phones or laptops unlawfully seized and destroyed by the

12         City, it is also more difficult, if not impossible, for the Coalition to follow up to

13         complete these and other applications. The City's practice of unlawfully seizing

14         and destroying property, including tents and other survival structures, also displaces

15         people.  The City often sweeps the same locations repeatedly to prevent the re-

16         establishment of encampments. So, after an encampment is destroyed by the City,

17         people stop living in groups or leave previously swept areas out of fear of losing

18         their belongings again, making re-establishing contact that much more difficult for

19         the Coalition.  With those communal social ties disrupted, the Coalition therefore

20         cannot locate past contacts through others who lived in the same encampment. The

21         Coalition must spend more time, staffing, and resources to locate its members and

22         other unhoused people so that it may continue its core activities. The Coalition also

23         assists individuals with Homeless Verification forms which confirm their eligibility

24         for other benefits. When those forms are illegally seized by the City, the Coalition

25         must spend additional time and resources to re-verify those individuals.

26         (b) **Depleting the Coalition's supply of basic necessities more quickly**. The

27         City's custom and practice of illegally seizing and destroying the property of

28         homeless people has resulted in those people losing all, or many, of their basic

~~SECOND~~THIRD AMENDED COMPLAINT FOR
                                               DECLARATORY AND INJUNCTIVE RELIEF
                                               CASE NO. 4:22-CV-05502-DMR

living necessities. The Coalition has to help its members and unhoused people replace more of these items on a more frequent basis, as a result. Due to the increased demand for these necessities caused by the City, the Coalition is more frequently unable to meet the needs of unhoused people (during outreach or when they drop in the office) for basic necessities. Other members are similarly limited in their ability to provide mutual aid to each other. Among other harms, this makes it more difficult for the Coalition to fulfill its core activity of providing these necessities and also hampers its outreach work which relies on using these necessities to build trust and relationships with the homeless people the Coalition aims to serve and take on as members.

(c) **Making it harder for the Coalition to do its public education work.** For example, the Coalition is more limited in its ability to conduct focus groups and conduct surveys and interviews of homeless people that are necessary for the Coalition to write reports. Because of the City's custom and practice of illegal property destruction, many unhoused people are now fearful of losing their property if they leave it unattended in order to participate in a Coalition focus group or interview. As a result, and due to the traumatic loss of property, the Coalition has seen a decline in participation and its ability to follow up and locate participants which directly harms its ability to produce these reports and fulfill its core activity of providing public education services. Not only do individuals have communication devices taken, but they no longer reside at known encampments due to the City repeatedly destroying encampments in the same locations. Similarly, the Coalition's publication and distribution of its "Street Sheet" newspaper are affected. The "Street Sheet" includes submissions of news articles, poetry, and art created by unhoused people. The City has taken people's artworks, writings, tools they use to create new art and writings, and communication devices, which limits submissions to the Coalition and in turn limits the Coalition's fundraising and income support. In addition, the Coalition distributes its "Street

Sheet" through member vendors who are often themselves unhoused individuals and distribute the papers across San Francisco streets, promoting awareness of the Coalition's work. The City's custom and practice of displacement and illegal property seizure and destruction put them and their property, like the Street Sheets, at risk. Elsewhere, "Know Your Rights" material, information on the City's Bag and Tag policies that are distributed to combat the misinformation on people's rights, and Coalition business cards with staff contact information, have been destroyed by the City, further preventing the Coalition from engaging its base. And when entire encampments, including people's belongings like communication devices, are destroyed and the people living in them are dispersed as a result, the Coalition must exhaust more resources to cultivate and sustain its membership and educate the public.

(d) **Harming the Coalition's core activities of building coalitions of unhoused people and their allies to advocate and lobby for legislation, budget advocacy, electoral change, and public policy changes by causing a reduction in participation of homeless people in Coalition sponsored events**. Unhoused people who have illegally subject to devastating property loss of basic needs, are focused on reacquiring basic needs and survival and are less likely to participate in Coalition-led advocacy. That creates barriers to participating in coalition building and forces the Coalition staff to address those basic needs first. Because of the City's custom and practice of illegal property destruction, many unhoused people also are now fearful of losing their property if they leave it unattended to participate in a Coalition organizing, mobilizing, or lobbying activities like attending Coalition work group meetings in the office, providing public comment, protests, and meeting with policymakers. As a result, the Coalition has seen less participation in these activities which directly harms its ability to center unhoused people's voices, mobilize, organize, and fight for new legislation and public policy changes. It is also more difficult for the Coalition to build these coalitions because they cannot

call, email, text, or reach out via social media with unhoused people who have had their personal or shared phones or laptops unlawfully seized and destroyed by the City, pushing them away from established communities. Coalition staff, particularly organizers, must instead resort to traveling across the City and engaging other members, unhoused people, or service providers to locate people.

**(e) Undermining the Coalition's ability to provide leadership and advocacy training services to unhoused people so they can effectively participate in coalition-building and advocacy.** Because of the City's custom and practice of illegal property destruction, many unhoused people are now fearful of losing their property if they leave it unattended to participate in Coalition leadership and advocacy training services. This includes training on media, meeting facilitation, service navigation, legal rights, community organizing, outreach, and more. Key to this effort is keeping in contact with potential participants, notifying them of dates and access to zoom through electronic devices, which are being illegally destroyed by the City.  As a result, the Coalition has seen a decline in participation in these activities which directly harms its ability to train and empower new leaders for its advocacy efforts and gain new members.

2.    Nathaniel Vaughn

23.    Nathaniel Vaughn is a Black man who was born and raised in San Francisco. Unfortunately, Mr. Vaughn's family lost the home they were renting in 2019 due to financial constraints and unaffordable rents in San Francisco. Although Mr. Vaughn's mother successfully secured a Single Room Occupancy unit (SRO) due to her medical conditions, Mr. Vaughn was left with nowhere to go. From 2019 to 2020, Mr. Vaughn experienced regular harassment by San Francisco Police Department ("SFPD") and Department of Public Works ("DPW"). This included being forced to move under threat of citation and arrest at least once a month. Mr. Vaughn recently settled a claim against the City and County of San Francisco for $7,000 after a judge found that the City had destroyed his personal property while he was homeless, including his tent, survival gear, a suitcase full of sports collector cards, and his godmother's ashes—among other items.

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1    24.    Mr. Vaughn was finally able to secure placement in an affordable SRO after these

2    harrowing experiences. But Mr. Vaughn now faces the potential threat of eviction at a time when

3    the City is carrying out massive SRO evictions.[18] Mr. Vaughn would have no way of finding

4    housing in San Francisco if he is evicted from his SRO. Mr. Vaughn fears that if he is evicted, he

5    will become unsheltered again and will once again be subject to the City's regular criminalization

6    threats and property destruction. *See Blake v. City of Grants Pass*, No. 1:18-CV-01823-CL, 2019

7    WL 3717800, at *5 (D. Or. Aug. 7, 2019).

8    3.    Toro Castaño

9    25.    Toro Castaño is a Latino man who resides in San Francisco. He is a visual artist

10    with a Master of Arts Degree in Art and Curatorial Practices from the University of Southern

11    California. For two years during the pandemic, Mr. Castaño was unable to find work and was

12    unhoused. During that time, Mr. Castaño experienced weekly harassment and threats from the

13    City, SFPD, and DPW—including threats of citation and arrest and threats to have his belongings

14    seized and destroyed for sleeping in public. Mr. Castaño was cited by SFPD for illegal camping in

15    August 2020. He has had his property seized and destroyed by the City at least four times in recent

16    years. Mr. Castaño recently settled a claim against the City and County of San Francisco for $9,000

17    after the City destroyed his personal property while he was homeless—including his tent, survival

18    gear, and his MacBook Pro, among other items.

19    Mr. Castaño is still at imminent risk of homelessness. Although he has secured

20    housing at a cooperative in San Francisco, he does not know how he will afford to

21    pay his rent from month to month. He therefore meets the U.S. Department of

22    Housing and Urban Development (HUD) definition of being at risk of

23

24    [18] *See* Joaquin Palomino & Trisha Thadani, *The Breed administration offered them homes. Then it

25    spent millions to kick them out*, S. F. CHRONICLE (Aug. 25, 2022), https://www.sfchronicle.com/projects/2022/sf-sro-evictions/; Joaquin Palomino & Trisha

26    Thadani, *S.F. is evicting its most vulnerable tenants closer to pre-pandemic levels. But official

27    numbers don't show scope of the crisis*, S. F. CHRONICLE (Sept. 6, 2022), https://www.sfchronicle.com/sf/article/S-F-is-evicting-its-most-vulnerable-tenants-

28    17423437.php.

SECOND THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CASE NO. 4:22-CV-05502-DMR

1    ~~homelessness, as he is one paycheck away from becoming homeless again. *See* 24~~

2    ~~C.F.R § 91.5. Mr. Castaño fears that if he is unable to secure permanent housing he~~

3    ~~can afford, he will become unsheltered again and will once again be subject to the~~

4    ~~City's regular criminalization threats and property destruction. *See Blake*, 2019 WL~~

5    ~~3717800, at *5.(~~

6         **~~4.~~2.    Molique Frank**

7         ~~26.~~25.  Molique Frank is a Black man who was born and raised in San Francisco.

8    Unfortunately, Mr. Frank's family could no longer afford to live in San Francisco by the time he

9    was a teenager. They left, and he chose to stay. At first, he tried to get back on his feet by staying

10   in hotels and motels while searching for permanent housing. When that failed— without his family

11   and without a place he could afford—he became homeless by the age of 20. Mr. Frank became a

12   recreational  drug  user  once  ~~we  has~~he  was  forced  onto  the  streets.  Thus  began  a  cycle  of

13   incarceration for various offenses spurred by the conditions of his poverty. Mr. Frank finally broke

14   that vicious cycle and his addiction in 2018. But he has never been able to find affordable housing

15   in the City where he grew up.

16        ~~27.~~26.  Over the past several years, Mr. Frank was repeatedly harassed by the City—

17   including  SFPD  and  DPW—just  for  being  homeless  and  sleeping  outside.  Mr.  Frank  was

18   physically assaulted by both an SFPD officer and a DPW worker while pleading with them not to

19   destroy his belongings. Mr. Frank recently settled a claim against the City and County of San

20   Francisco for $5,000 after the City destroyed his personal property while he was homeless,

21   including backpacks containing essential survival gear, his X-Box One, and sentimental photos—

22   among other items.

23        ~~28.~~27.  After years of struggling to make ends meet, being forced out onto the street due to

24   unaffordable rents as a youth, experiencing incarceration, and battling ongoing homelessness, Mr.

25   Frank had finally been able to secure safe and stable temporary housing through the City's Shelter-

26   in-Place ("SIP") program that began during COVID-19. This was a victory after a lifetime of

27   housing instability in San Francisco. As of August 2022, however, Mr. Frank was informed that

28   every unhoused person living in his building is to be evicted by the end of September 2022.

29.28. Mr. Frank was subsequently approved to transfer to another shelter after being notified that his current SIP hotel would be closing down. However, this is still a temporary placement. Mr. Frank meets the U.S. Department of Housing and Urban Development ("HUD") definition of homelessness, as he is currently residing in temporary shelter. *See* 24 CFR 91.5. Mr. Frank fears that if he loses this temporary placement, he will become unsheltered again and be subject to the City's regular criminalization threats and property destruction.

### 5.3.    Teresa Sandoval

30.29. Teresa Sandoval is a Hispanic and Native woman living in San Francisco. She is a double amputee who uses either a wheelchair or prosthetics for mobility. Over the past several years, Ms. Sandoval has been repeatedly harassed by the City—including by SFPD and DPW. Ms. Sandoval has been threatened with detention by SFPD if she did not move quickly enough during a sweep. She has also had her property taken by DPW, often without notice. In June 2022, DPW took and disposed of her prosthetics during a sweep—which she has been unable to replace since they were taken. On other occasions, Ms. Sandoval has been forced to leave the majority of her survival belongings behind to be destroyed by DPW in exchange for a temporary shelter placement.

31.30. Ms. Sandoval meets the HUD definition of homelessness, as she is currently unsheltered and living on the streets in San Francisco. *See* 24 C.F.R § 91.5. Ms. Sandoval fears that because she is unsheltered, she will once again be subject to the City's regular criminalization threats and property destruction.

### 6.4.    David Martinez

32.31.        David Martinez is a Latino man living in San Francisco. After many years working in construction and living in a high rise in the South of Market neighborhood, Mr. Martinez's construction work dried up and he could no longer afford his rising rent payments. Mr. Martinez became homeless after that—now more than a decade ago.

33.32. Over the past several years, Mr. Martinez has been harassed repeatedly by the City—specifically SFPD and DPW. This has included being threatened with arrest or citation by SFPD after DPW tells him he must move from the area where he is sleeping. Between September

2021 and September 2022, Mr. Martinez has had his property taken by the City approximately four times, including his tent and other vital survival belongings. Mr. Martinez has right side congestive heart failure, and the City took his medication during a recent sweep. He has been unable to replace his medication since. Mr. Martinez has been sleeping in a cardboard box because he feels that it is no longer worthwhile for him to replace the tents and clothes the City continually takes from him.

34.33. Mr. Martinez meets the HUD definition of homelessness, as he is currently unsheltered and living on the streets in San Francisco. *See* 24 C.F.R. § 91.5. He has been told by the City that they hope to place him in permanent housing in short order—after more than a decade—but the details are not yet finalized. Mr. Martinez fears that because he is unsheltered, he will once again be subject to the City's regular criminalization threats and property destruction, which he experienced most recently just weeks ago.

7.5.    **Sarah Cronk**

35.34. Sarah Cronk is a white woman living in San Francisco. She is homeless and has been sleeping in a tent with her partner, Joshua Donohoe, in the South of Market neighborhood for approximately the past four months. Ms. Cronk faces regular harassment by the City, including SFPD and DPW. DPW has disturbed her early in the morning at least five days a week over the past four months. Ms. Cronk has had her property taken repeatedly during this time, including vital survival belongings. This has happened as recently as September 2022, when DPW seized some of Ms. Cronk's clothes and nonperishable food that she had recently purchased and packed to feed herself.

36.35. Ms. Cronk meets the HUD definition of homelessness, as she is currently unsheltered and living on the streets in San Francisco. *See* 24 CFR 91.5. Ms. Cronk fears that because she is unsheltered, she will once again be subject to the City's regular criminalization threats and property destruction.

8.6.    **Joshua Donohoe**

37.36. Joshua Donohoe is a white man living in San Francisco. He is homeless and has been staying in a tent with his partner, Sarah Cronk, in the South of Market neighborhood for

1   approximately the past four months. Although Mr. Donohoe was told by the City that he is "Priority
2   1" for an affordable housing placement, he is yet to be placed in affordable housing. Mr. Donohoe
3   has faced regular harassment by the City while homeless—including from SFPD and DPW. DPW
4   has disturbed Mr. Donohoe early in the morning at least five days a week over the past four months.
5   Mr. Donohoe has had his property taken repeatedly during this time, including vital survival
6   belongings. Mr. Donohoe was also physically threatened by a DPW worker in September 2022
7   when he asked the DPW worker to leave his property alone.

8   38.37.  Mr. Donohoe meets the HUD definition of homelessness, as he is currently
9   unsheltered and living on the streets in San Francisco. *See* 24 CFR 91.5. Mr. Donohoe fears that
10  because he is unsheltered, he will once again be subject to the City's regular criminalization threats
11  and property destruction.

12      **B.**      **DEFENDANTS**

13          **1.**      **City and County of San Francisco**

14      39.38.  Defendant City and County of San Francisco ("San Francisco" or the "City") is a
15  municipal corporation organized under the laws of the State of California. The City and County of
16  San Francisco, through its various agencies and employees, has a custom and practice of: (1)
17  arresting and citing unhoused people—or threatening the same—even though they have no choice
18  but to live in public space; and (2) destroying the property of hundreds of unhoused people each
19  year.

20      40.39.  The City established the Healthy Streets Operations Center ("HSOC") in 2018.
21  HSOC is the interagency program that the City often uses to conduct its unconstitutional sweep
22  practices. Upon information and belief, the City intentionally coordinates its homelessness
23  criminalization and property destruction campaign across city agencies through the HSOC
24  program. Separately, the City's various agencies are directed to conduct their own sweep
25  operations throughout the City. San Francisco has also failed to properly train its staff regarding
26  the constitutional and legal requirements prior to conducting sweep operations against unhoused
27  people.

28      41.40.  Mayor London Breed is the chief executive officer and official representative of

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

the City and County of San Francisco. *See* San Francisco Charter § 3.100.

42.41.  Mayor Breed has taken an active role in directing the City's response to homelessness. Mayor Breed has celebrated the City's practices, including the indiscriminate seizure and removal of tents, and has recently called for increased criminalization of unhoused individuals.[19] Mayor Breed has also continued to invest heavily in HSOC, has praised the steps it has taken, and has sought additional funding for its unlawful sweep operations.[20]

43.42.  Mayor Breed's office has had knowledge of and has participated in planning at least two large-scale sweep operations that unlawfully displaced unhoused individuals.[21]

44.43.  Sam Dodge, in his role as HSOC director, is responsible for leading the City's homelessness sweeps, including directing City agencies to seize the property of unhoused people and threaten them with citation and arrest despite not having sufficient shelter to offer these

---

[19] Mallory Moench, *S.F. Mayor Breed Responds to Castro Merchants' Protest Over Drugs, Homelessness by Pledging Police Help*, S.F. Chronicle (Sept. 13, 2022), https://www.sfchronicle.com/sf/article/S-F-Mayor-Breed-responds-to-Castro-merchants-17439866.php#:~:text=Mayor%20London%20Breed%20pledged%20during,officials%20didn't%20take%20action. (quoting Mayor Breed as stating, "the police will not allow individuals to continue to disrupt the neighborhood").

[20] *See, e.g.*, Press Release, Off. of the Mayor, *supra* note 7 (noting that the Mayor has "Mayor London N. Breed announced a 34% reduction in tents on the streets of San Francisco since she took office in July, a reduction of approximately 193 tents in less than four months [...] she has expanded the resources for Healthy Streets Operations Center (HSOC)"); Mallory Moench, *supra* note 7 ("With the city getting people off the streets, the city's emergency response team [the Healthy Streets Operation Center] put pressure on Public Works to remove toilets, as revealed by emails first released by an anonymous account on Twitter and available via public records request"); Mayor's Proposed Budget FY 2019-20 and 2020-21, *supra* note 7, at 19, ("To continue the positive work of HSOC and to ensure that HSOC continues to be a service-first approach to addressing unsheltered homelessness and unhealthy street behavior, the two-year budget includes over $4.0 million to sustain existing services in participating departments").

[21] Amy Sawyer of the Mayor's Office was copied on and referenced in an email from June 4, 2021 discussing a sweep on Willow Street prior to a large event Mayor Breed would be attending, in which Jeff Kositsky requested 18 shelter beds for 41 tents; *see also See* David Sjostedt, *Police Clear Homeless Encampment Days After Mayor's Tweet, Prompting Questions About Legality of Such Sweeps*, THE S. F. STANDARD (Jun. 6, 2022), https://sfstandard.com/public-health/homelessness/police-clear-homeless-encampment-days-after-mayors-tweet-prompting-questions-about-legality-of-such-sweeps/ (noting June 2022 sweep of visibly homeless people near the Ferry Building).

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

individuals. Mr. Dodge has also failed to train staff regarding the constitutional and legal requirements prior to conducting sweep operations against unhoused people.

### 2.    San Francisco Police Department

~~45.~~44.  The San Francisco Police Department ("SFPD") is an agency of the City and County of San Francisco. SFPD and its officers have a custom and practice of citing, fining, and arresting—as well as threatening to cite, fine, and arrest—unhoused people who have no choice but to shelter in public because San Francisco has not provided sufficient or adequate shelter to accommodate them. SFPD also coordinates with other agencies on a daily basis to respond to encampments.[22] Since 2018, SFPD officers have made thousands of arrests and citations to enforce anti-lodging laws against unhoused people in San Francisco.

~~46.~~45.  San Francisco's Chief of Police, William Scott, is the final decisionmaker for SFPD. *See* Cal. Gov. Code § 38630. Upon information and belief, Chief Scott oversees, has knowledge of, and acquiesces in SFPD's unconstitutional and unlawful homelessness criminalization practices. SFPD and Chief Scott have failed to properly train officers regarding the constitutional and legal requirements prior to citing or arresting unhoused people for sleeping or lodging in public space—or threatening citation or arrest. SFPD and Chief Scott have likewise failed to train officers regarding the constitutional and legal requirements prior to seizing property and conducting sweep operations against unhoused people.

### 3.    Department of Public Works

~~47.~~46.  The San Francisco Department of Public Works ("DPW") is an agency of the City and County of San Francisco. DPW and its work crews have a custom and practice of seizing and destroying the survival belongings and personal property of unhoused people without adequate warning or opportunity to safeguard or collect those belongings prior to destruction. DPW conducts its unconstitutional homeless sweeps across San Francisco on an almost daily basis—

---

[22] Review of the Healthy Streets Operation Center 12, CITY & COUNTY OF THE S. F. OFF. OF THE CONTROLLER (Mar. 20, 2019),
https://sfcontroller.org/sites/default/files/Documents/Auditing/Review%20of%20the%20Healthy%20Streets%20Operations%20Center.pdf.

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1  which results in hundreds of unhoused individuals losing their survival belongings each year.

2  48.47.  The Director of DPW, Carla Short, is the final decisionmaker for DPW. Upon

3  information and belief, she has direct knowledge of, and has acquiesced in, DPW's custom and

4  practice of property destruction. DPW and Director Short have also failed to properly train staff

5  regarding the constitutional and legal requirements prior to conducting sweep operations against

6  unhoused people.

7  **4.    Department of Homelessness and Supportive Housing**

8  49.48.  The San Francisco Department of Homelessness and Supportive Housing ("HSH")

9  is an agency of the City and County of San Francisco. HSH has never had enough affordable

10  housing or shelter capacity to offer shelter to all unhoused residents across San Francisco. HSH

11  and its outreach team, known as the Homeless Outreach Team ("HOT"), assists other City agencies

12  in carrying out sweep operations despite regularly not having enough shelter to offer the homeless

13  individuals being threatened with citation and arrest for sleeping or lodging in public on any given

14  day. Knowing there are not enough beds for everyone, HSH waits to offer possible shelter to just

15  a few of the unhoused people who remain at a sweep after they have already been subject to law

16  enforcement threats and property destruction. These limited shelter offers are often not appropriate

17  for or accessible to many unhoused individuals based on gender, life and family circumstances, or

18  disability status.

19  50.49.  Mark Mazza, the Outreach Manager for HSH, is the final decisionmaker for HSH

20  with respect to the HOT team's outreach work and provision of shelter to unhoused people in San

21  Francisco. Upon information and belief, Mr. Mazza oversees, has knowledge of, and acquiesces

22  in HSH's failure to provide adequate shelter offerings at homeless sweeps across San Francisco.

23  HSH and Mr. Mazza have failed to properly train staff regarding the constitutional and legal

24  requirements prior to conducting sweep operations against unhoused people.

25  **5.    San Francisco Fire Department**

26  51.50.  The San Francisco Fire Department ("SFFD") is an agency of the City and County

27  of San Francisco. SFFD's EMS-6 team is responsible for managing the City's Healthy Street

28  Operation Center sweep operations and responsible for coordinating the work of each agency at

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1    scheduled HSOC sweeps.

2      ~~52.~~51.  SFFD actively participates in HSOC sweeps and has a custom and practice of

3 destroying the property of unhoused people with DPW work crews and threatening unhoused

4 people with citation and arrest in collaboration with SFPD officers. SFFD has also failed to

5 properly train staff regarding the constitutional and legal requirements prior to conducting sweep

6 operations against unhoused people.

7             **6.     Department of Emergency Management**

8      ~~53.~~52.  The San Francisco Department of Emergency Management ("DEM") is an agency

9 of the City and County of San Francisco. DEM houses the HSOC interagency program, which

10 coordinates the City's homelessness criminalization and property destruction activities. DEM

11 directly hires and employs the HSOC Director, Sam Dodge. DEM hosts weekly meetings of city

12 agencies to schedule, plan, discuss, and review the City's homeless sweep operations. DEM also

13 coordinates with other City departments on a daily basis to respond to complaints about homeless

14 encampments.[23]

15      ~~54.~~53.  The Director of the Department of Emergency Management, Mary Ellen Carol, is

16 the final decisionmaker for DEM. *See* San Francisco Admin. Code § 2A.200(a). She has regularly

17 reported on the City's sweep and tent clearance programs in public presentations. Director Carol

18 also directly supervises the Director of HSOC—and, upon information and belief—oversees and

19 has knowledge of the City's interagency homeless sweep operations. DEM and Director Carol

20 have failed to properly train staff regarding the constitutional and legal requirements prior to

21 conducting sweep operations against unhoused people.

22                       **HISTORICAL AND FACTUAL BACKGROUND**

23      A.      <u>San Francisco's Homelessness Crisis is Rooted in Decades of Racial Redlining and</u>

24               <u>Exclusionary Zoning Practices Designed to Kick Low-Income Black and Brown</u>

25               <u>Families Out.</u>

26      ~~55.~~54.  San Francisco is in the midst of a homelessness crisis decades in the making. On

27

28   [23] *Id.*

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

any given night, thousands of residents are unhoused and without shelter.[24] The crisis has distinctly racial dimensions—Black people comprise 6% of San Francisco's general population but make up 37% of the City's unhoused population.[25] That is because San Francisco has systematically displaced Black and Brown people for years.[26]

~~56.~~55.  San Francisco has a long history of operationalizing the law to ensure that the City remains as white as possible. In the late 1800s, San Francisco was among the first cities in the United States to use explicitly racist zoning laws to exclude communities of color.[27] The Supreme Court finally put an end to this kind of blatant racial exclusion in 1917 in *Buchanan v. Warley*.[28]

~~57.~~56.  Thus began San Francisco's longstanding practice of using single-family zoning laws as a pretext to keep people of color out—a nakedly exclusionary practice that originated in

---

[24] 2022 Point-in-Time Count, *supra* note 2.

[25] *Id.*; U.S. Census Bureau, *QuickFacts: San Francisco, California*, https://www.census.gov/quickfacts/fact/table/US/PST045221.

[26] *See, e.g.*, Lexi Pandell, *The Racist Origins of San Francisco's Housing Crisis*, TNR (May 31, 2019), https://newrepublic.com/article/154028/racist-origins-san-franciscos-housing-crisis ("Poor neighborhoods and areas dominated by non-white residents were also redlined, meaning that developers and banks avoided investing in those areas or loaning to those who lived there"); *see also* Centennial Report, at 9, S. F. PLAN. COMM'N (2017), https://default.sfplanning.org/publications_reports/SF_Planning_Centennial_Brochure.pdf ("The implications were that "blight" stood in the way of progress, that it could spread, and that it needed to be removed before it killed the City. It was a deeply political term firmly rooted in structural racism, which relied on fears of white flight and urban disinvestment to justify the wholesale removal of communities of color").

[27] Nicole Montojo et al., *Roots, Race, & Place: A History of Racially Exclusionary Housing in the San Francisco Bay Area* 15, HAAS INSTITUTE FOR A FAIR AND INCLUSIVE SOCIETY (2019), https://belonging.berkeley.edu/rootsraceplace ("Many exclusionary housing policies now common across the United States originated in the Bay Area. San Francisco was among the first to use zoning to exclude specific racial groups").

[28] *Buchanan v. Warley*, 245 U.S. 60, 82 (1917) (striking down a racially exclusionary ordinance because "[w]e think this attempt to prevent the alienation of the property in question to a person of color was not a legitimate exercise of the police power of the state, and is in direct violation of the fundamental law enacted in the Fourteenth Amendment of the Constitution").

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

the Bay Area and was later adopted widely across the country.[29] In the 1920s, *California Real Estate* openly praised the Bay Area's aggressive use of single-family zoning ordinances as "protection against invasion of Negroes and Asiatics."[30]

~~58.~~57.  Racial redlining in the 1930s reflected a collaboration between San Francisco and the federal government to encourage financial institutions and businesses to actively discriminate against Black and Asian families.[31] San Francisco's redlining map from 1937 labeled the few neighborhoods where Black and Asian families still lived as "hazardous" for investment expressly because of the "threat of infiltration of foreign-born, Negro, or lower grade population."[32] These pronouncements made it impossible for Black and immigrant families to secure the same mortgages and loans in San Francisco that were available to white families—which decimated Black home ownership and rental opportunities.[33]

---

[29] *See* Nicole Montojo, *supra* note 32, at 15 (noting that pre-textual zoning ordinances originating in the Bay Area "became a standard in cities throughout the United States"); *see also* Marc Weiss, *"Urban Land Developers and the Origins of Zoning Laws: The Case of Berkeley,"* BERKELEY PLAN. J. (1986), https://escholarship.org/uc/item/26b8d8zh; Sonia Hirt, *Zoned in the USA: The Origins and Implications of American Land-Use Regulation*, 165 (Ithaca, NY: Cornell University Press, 2014); Erin Baldassari, *The Racist History of Single-Family Home Zoning*, KQED (Oct. 5, 2020), https://www.kqed.org/news/11840548/the-racist-history-of-single-family-home-zoning.

[30] Nicole Montojo, *supra* note 32, at 15.

[31] John Kimble, *Insuring Inequality: The Role of the Federal Housing Administration in the Urban Ghettoization of African Americans* 405, L. & Soc. Inquiry, Spring 2007; Terry Gross, *A 'Forgotten History' of How the U.S. Government Segregated America*, NPR, (May 3, 2017), https://www.npr.org/2017/05/03/526655831/a-forgotten-history-of-how-the-u-s-governmentsegregated-america.

[32] *See e.g.*, *Mapping Inequality: Redlining in New Deal America*, *San Francisco, CA: D1*, UNIV. OF RICHMOND, https://dsl.richmond.edu/panorama/redlining/#loc=12/37.758/-122.514&city=san-francisco-ca&area=D1 ("More than half the Negro population of San Francisco are located here, and it is considered a highly hazardous area"); Matthew Green, *How Government Redlining Maps Pushed Segregation in California Cities*, KQED (Apr. 27, 2016), https://www.kqed.org/lowdown/18486/redlining (publishing San Francisco's 1937 redlining map, and identifying the racist criteria the government used to determine which areas lenders should divest from).

[33] *See, e.g.*, David Reiss, *The Federal Housing Administration and African-American Homeownership*, 26. J. AFFORDABLE HOUS. & CMTY. DEV. L., No. 1 (2017), at 123-25 (identifying that "redlined" neighborhoods were not eligible for federally-insured mortgages, and outlining the

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

59.58.  In the 1940s, San Francisco's housing authorities took direct aim at Black neighborhoods for "redevelopment." In 1947, the San Francisco Planning and Housing Association published a report calling for the demolition of the Fillmore District—a neighborhood it called "an indeterminate shade of dirty black."[34] From the 1950s-1970s, San Francisco used authorizing legislation to bulldoze the Fillmore District—ejecting thousands of Black families in one of the country's largest racialized urban displacement projects.[35]

60.59.  These practices persist to this day. Recent studies show that Black renters in San Francisco still face some of the worst discrimination in the country.[36] San Francisco is set to

---

dire consequences for Black home ownership as white homeownership was supported and actively subsidized by the government).

[34] *See* Clement Lai, *The Racial Triangulation of Space: The Case of Urban Renewal in San Francisco's Fillmore District*, ANNALS OF THE ASS'N OF AM. GEOGRAPHERS (2012), https://www.jstor.org/stable/41412759 (identifying an influential San Francisco housing report entitled "Blight and Taxes").

[35] *See, e.g.*, Christina Jackson & Nikki Jones, *Remembering the Fillmore: the Lingering History of Urban Renewal in Black San Francisco*, at 62-63, CENTER FOR BLACK STUDIES RESEARCH (2012), https://cupola.gettysburg.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1000&context=afsfac (documenting lived experiences of "Urban Renewal and Negro Removal in San Francisco" following two major "redevelopment" schemes in 1953 and 1963); Bianca Taylor, *How 'Urban Renewal' Decimated the Fillmore District, and Took Jazz With It*, KQED (Jun. 25, 2020), https://www.kqed.org/news/11825401/how-urban-renewal-decimated-the-fillmore-district-and-took-jazz-with-it ("The redevelopment of the Fillmore was one of the largest projects of urban renewal on the West Coast. It impacted nearly 20,000 people […] According to the U.S. census, in the 1970s 10% of San Francisco's population identified as Black. Today, that number is half"); *see also* Rachel Brahinsky, *Hush Puppies, Communalist Politics, and Demolition Governance: The Rise and Fall of the Black Fillmore*, in *Ten Years That Shook the City: San Francisco 1968-1978* (2011 ed., Carlsson et al.).

[36] *See* Peter Christensen et al., *Racial Discrimination and Housing Outcomes in the United States Rental Market*, NAT'L BUREAU OF ECON. RSCH. (2021), https://www.nber.org/papers/w29516; Julian Glover, *Black renters in San Francisco more likely to face discrimination, new research finds*, ABC NEWS (Dec. 21, 2021), https://abc7news.com/black-renters-discrimination-renter-problems-sf-rental-racism-study/11368115/ ("According to the study, Black renters in San Francisco faced the sixth worst response rate in the country in the experiment conducted over the course of nine months in 2021").

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

become the whitest county in the Bay Area—when it was the most diverse just fifty years ago.[37]

Its Black population has halved in that time as a result of San Francisco's targeted exclusion.[38]

61.60.  As City officials have readily admitted, this targeted exclusion of Black communities from access to housing is a root cause of the City's outsized, persistent, and racialized homelessness crisis.[39]

B.    The City's Refusal to Supply Affordable Housing Opportunities Has Perpetuated the Current Homelessness Crisis, Forcing Unprecedented Numbers of Low-Income Residents onto the Streets in One of the Wealthiest Cities in the World.

62.61.  Given San Francisco's history of racial exclusion, the City's failure to support enough housing for its low-income Black and Brown families is particularly troubling.[40] It is no secret that San Francisco desperately lacks affordable housing.[41] In 2016, 73% of San Francisco households spent more than 30% of their income on rent.[42] This standard metric of housing

---

[37] *See, e.g.*, *An Equity Profile of the San Francisco Bay Area Region*, POLICYLINK (2015), https://www.policylink.org/sites/default/files/documents/bay-area-profile/BayAreaProfile_21April2015_Final.pdf; Tamara Palmer, *San Francisco Poised to be "Whitest County" in Bay Area By 2040: Study*, NBC BAY AREA (Apr. 23, 2015), https://www.nbcbayarea.com/news/local/san-francisco-diversity-study/134333/.

[38] *See* Bianca Taylor, *supra* note 40, ("According to the U.S. census, in the 1970s 10% of San Francisco's population identified as Black. Today, that number is half").

[39] *See* Jeff Kositsky & Marc Dones, *supra*, note 14. (noting that "[t]he situation in San Francisco is similar […] [t]here is a deep and abiding problem within the reality of American homelessness that points unequivocally to racial injustice"); George R. Carter III, *From Exclusion to Destitution: Race, Affordable Housing, and Homelessness*, 13 Cityscape, No. 1, at 33, 62.

[40] *See e.g.*, Herring & Yarbrough, *supra*, note 10.

[41] Rosalsky, *supra*, note 13.

[42] McKinsey Global Inst., *A tool kit to close California's housing gap: 3.5 million homes by 2025* at 4, 7, MCKINSEY & CO. https://www.mckinsey.com/~/media/mckinsey/industries/public%20and%20social%20sector/our%20insights/closing%20californias%20housing%20gap/closing-californias-housing-gap-full-report.pdf.

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

affordability—and direct predictor of homelessness—betrayed a grim outlook for the City.[43] The City's dearth of affordable housing is a direct cause of the homelessness crisis.[44] Scholars have likened the situation to a game of musical chairs—as a City fails to build enough new units, existing affordable housing becomes increasingly scarce.[45] When the music stops, there are more low-income people than affordable units, forcing many people out onto the streets.[46]

63.62. San Francisco's dire lack of affordable housing is no accident or stroke of bad luck—it is the result of the City's consistent choice to ignore to the needs of its residents. The City's Planning Department has acknowledged that a lack of affordable housing is driving displacement and homelessness in the City.[47] Nonetheless, San Francisco failed to meet state targets for affordable housing production between 1999 and 2014—ultimately constructing 61,000

---

[43] *See* Bay Area Equity Atlas, *Place Indicators*, https://bayareaequityatlas.org/about/methods/place#housing-burden (defining housing burden); Chris Glynn et al., *Inflection points in community-level homeless rates*, 15 ANNALS APPLIED STAT. 1037, 1037-1053 (2021) (finding homelessness increases quickly once median rental costs exceed 30% of median income). Black and Latinx renters are more likely to be cost-burdened. *See* Bay Area Equity Atlas, *Housing burden: All residents should have access to quality, affordable homes*, https://bayareaequityatlas.org/indicators/housing-burden#/?breakdown=2&geo=0400000000006075 (breaking down data by race).

[44] *See* Rosalsky, *supra* note 13 ("The primary cause of the crisis is simple: Housing has gotten way too scarce and expensive."); Jeffrey Olivet et al., *Racial Inequity and Homelessness: Findings from the SPARC Study*, 693 ANNALS AM. ACAD. POL. & SOC. SCI., no. 1, 2021, at 90 ("The interviews indicated that lack of access to safe, decent, and truly affordable housing was a major factor contributing to homelessness."); Cushing N. Dolbeare, *Homelessness and the Low Income Housing Crisis*, 19 J. SOC. & SOC. WELFARE 151, 151 (1992) (identifying gap in housing affordability as the underlying cause of homelessness); Carter, *From Exclusion to Destitution: Race, Affordable Housing, and Homelessness*, 13 CITYSCAPE, No. 1, at 37 (discussing literature on positive relationship between lack of affordable housing and homelessness).

[45] *See* Marybeth Shinn & Colleen Gillespie, *The Roles of Housing and Poverty in the Origins of Homelessness*, 37 AM. BEHAVI. SCIENTIST, No. 4 at 505, 505-07 (explaining how a lack of affordable housing causes homelessness).

[46] *Id.*

[47] *See* S. F. PLAN. DEPT., *Context: Dismantling San Francisco's Housing Inequities*, (Apr. 6, 2021), https://storymaps.arcgis.com/stories/26bc500b5aee4f0281a860a2144a5998 ("When housing is a scarce resource, prices rise based on what the highest earners can afford. Lower income households are left paying unsustainably high shares of their income to stay in the city – if they can secure housing at all.").

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1    fewer very low-income units than needed.[48] The City also lost affordable housing at an alarming

2    rate: "for every two affordable housing units created, the city lost more than one from its existing

3    inventory because of units being permanently withdrawn from the protection of rent control."[49]

4    ~~64.~~63.  In recent years, the City has continued to underproduce affordable housing and

5    overproduce housing for the wealthy. From 2015 to 2022, the City only built 33% of the deeply

6    affordable housing units it promised and only 25% of actual housing production went to affordable

7    housing, while the City easily exceeded 100% of its building target for unaffordable housing.[50]

8    ~~65.~~64.  The City's decision to underproduce affordable housing has forced unprecedented

9    numbers of its low-income residents onto the streets.[51] Meanwhile, the technology boom has

10    drawn tens of thousands of new residents to San Francisco, and exacerbated the housing crisis.[52]

11    For every seven new jobs created between 2010 and 2015, the Bay Area added only one home,

12

13

14    [48] Kate Anthony et al., *Homelessness in the San Francisco Bay Area: The crisis and a path forward*
4, MCKINSEY & CO., (2019), https://resources.ecww.org/sites/default/files/Homelessness-in-the-
15    San-Francisco-Bay-Area-The-crisis-and-a-path-forward.pdf.

16    [49] *Id.*

17    [50]  S. F. PLAN. DEPT., *2020 San Francisco Housing Inventory* 15 (2021),
https://sfplanning.org/sites/default/files/documents/reports/2020_Housing_Inventory.pdf.
18

19    [51] *See id.* As a result of housing unaffordability, San Francisco's low-income renters and renters
of face evictions, housing instability, fewer housing options, and displacement pressure. *See* S. F.
20    PLAN. DEPT., *Housing Affordability Strategies* 10 (Mar. 2020),
https://default.sfplanning.org/publications_reports/Housing_Affordability_Strategies_Report.pdf
21    ; *Context: Dismantling San Francisco's Housing Inequities*, *supra* note 52; Bhargavi Ganesh, *The
Bay Area's housing crisis, in four charts*, URBAN INST. (May 2018), https://www.urban.org/urban-
22    wire/bay-areas-housing-crisis-four-charts. It is therefore no surprise that 70% of unhoused people
in San Francisco were living in the City when they were driven into homelessness. *See 2017 Point-
23    in-Time Count*, S.F. DEP'T OF HOMELESSNESS & SUPPORTIVE HOUSING (2017),
http://hsh.sfgov.org/wp-content/uploads/        2017/06/2017-SF-Point-in-Time-Count-General-
24    FINAL-6.21.17.pdf.

25    [52] Rosalsky, *supra* note 13, ("As regions like the San Francisco Bay Area became magnets for
highly paid professionals in the computer-driven economy, they failed to build enough new units
26    to keep up with demand."); *Housing Affordability Strategies*, *supra* note 56, at 9 ("Higher income
households have occupied a growing share of the city's rental and ownership housing in all housing
27    types including a growing portion of the city's rent-controlled housing").

28

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1  while rents increased more than 40% during the same period. [53] The San Francisco metropolitan

2  area has the fourth largest economy in the U.S., the highest concentration of billionaires in the

3  world, and one of the highest rates of income inequality in the U.S.[54] As the City has become one

4  of the wealthiest places in the world, it has stood by and allowed its low-income residents to be

5  displaced and thrust into homelessness.[55]

6         C.    The City Blames Unhoused People for the Crisis it Caused, Subjecting Residents

7               to a Renewed Era of Failed Mass Incarceration Policies, Criminalization, and Racist

8               Policing as a Punishment for Being Poor.

9       66.65.  Instead of taking responsibility for its role in creating the homelessness crisis, San

10  Francisco cracks down with criminal penalties on the low-income residents it has driven into

11  homelessness. [56] The City "has more anti-homeless ordinances on its book than any other

12

13

---

14  [53] Jenny Scheutz, *Dysfunctional policies have broken America's housing supply chain*,
15  BROOKINGS    INST.    (Feb.    22,    2022),    https://www.brookings.edu/blog/the-
    avenue/2022/02/22/dysfunctional-policies-have-broken-americas-housing-supply-chain/.

16  [54] *See* Iman Ghosh, *This 3D map shows the U.S. cities with the highest economic output*, WORLD
17  ECONOMIC FORUM (Sept. 24, 2020), https://www.weforum.org/agenda/2020/09/united-states-
    america-economic-output-new-york-la/; Willy Staley, *How Many Billionaires Are There,*
18  *Anyway?*,      N.      Y.      TIMES      (Apr.      7,      2022),
    https://www.nytimes.com/2022/04/07/magazine/billionaires.html ("San Francisco is now home to
19  81 billionaires, at least according to Wealth-X. That's almost two per square mile, or about one
20  for every 10,000 residents — the highest concentration in the world"); Alan Berube, *City and
    metropolitan income inequality data reveal ups and downs through 2016*, BROOKINGS
21  INSTITUTION (Feb. 5, 2018) https://www.brookings.edu/research/city-and-metropolitan-income-
    inequality-data-reveal-ups-and-downs-through-2016/ (identifying San Francisco as one of the
22  cities with the highest income inequality in the United States).

23  [55] Georgina McNee & Dorina Pojani, *NIMBYism as a barrier to housing and social mix in San
24  Francisco,* J. HOUS. & THE BUILT ENVIRON. 37, 553–573 (2022). https://doi.org/10.1007/s10901-
    021-09857-6 ("Planning meetings appear to be dominated by older, white, and financially stable
25  residents, and this is a major (though not sole) barrier to the city's social mix").

26  [56] *See* Mallory Moench, *Mayor Breed Promised to Bring Tough Love to the Troubled Tenderloin.
27  Did She Deliver?*, SF Chronicle (Apr. 15, 2022), https://www.sfchronicle.com/sf/article/san-
    francisco-mayor-tenderloin-17082180.php (quoting Mayor Breed's pledge to be "more aggressive
28  with law enforcement" in the Tenderloin).

SECONDTHIRD AMENDED COMPLAINT FOR
                                         DECLARATORY AND INJUNCTIVE RELIEF
                                         CASE NO. 4:22-CV-05502-DMR

California and possibly U.S. city."[57] It seeks to erase any trace of unhoused people from public space, reflecting a deep "disdain for visible poverty."[58] In her remarks and actions, Mayor London Breed has also raised the specter that unhoused people are a blight to be removed from sight.[59]

~~67.~~66.  The City criminalizes the status of homelessness through ordinances prohibiting people from sleeping or lodging on public property, effectively punishing unhoused people for their predicament.[60] But as the City well knows, unhoused people have little choice in the matter. Unhoused individuals regularly identify that their primary obstacle to obtaining permanent housing is being unable to afford rent. [61] This is not a problem that can be solved by punishment.

~~68.~~67.  Criminal enforcement dispossesses unhoused people of their property, drives them further into poverty, creates barriers to employment, housing, and financial stability, subjects unhoused people to further trauma, increases their vulnerability to violence, and makes them more

---

[57] Chris Herring, *Complaint-Oriented Policing: Regulating Homelessness in Public Space*, 84 Am. Soc. Rev., No. 5, Oct. 2019, at 769, 790, 794.

[58] *See* Sara K. Rankin, *supra* note 15 at 102-104 (2019).

[59] *See* David Marks, *SF Mayor Breed Declares State of Emergency in Tenderloin*, KQED (Dec. 17, 2021), https://www.kqed.org/news/11899726/sf-mayor-breed-declares-state-of-emergency-in-tenderloin (quoting S.F. Mayor London Breed as saying, "too many people are sprawled over our streets" . . . "There are a number of things that this city is going to do to address public safety, and part of that is a police response."); David Sjostedt, *supra* note 26 (discussing city response to presence of visibly homeless people near the Ferry Building); Press Release, Off. of the Mayor, *supra* note 7 (celebrating a reduction in the presence of unhoused people's tents throughout the city).

[60] *See, e.g.*, S.F. Police Code § 168 (prohibiting sitting, lying down, or lodging on the sidewalk between 7:00 a.m. through 11:00 p.m.); S. F. Port Code §§ 2.9-2.10 (no sleeping or lodging in the Port areas between 10:00 p.m. and 6:00 p.m.); S. F. Park Code §§ 3.12-3.13 (no sleeping or lodging in any park between the hours of 8:00 p.m. and 8:00 a.m.); *see also* Rankin, *Punishing Homelessness*, *supra* note 15, at 107 ("Chronically homeless people are frequently burdened with civil infractions and criminal charges related to their homelessness."). By definition, criminalization laws "restrict one's ability to engage in necessary life-sustaining activities in public, *even when that person has no reasonable alternative. Id.* (emphasis added).

[61] *See* San Francisco Homeless County & Survey Comprehensive Report 2019, *supra* note 11, at 23 ("Respondents were asked what prevented them from obtaining housing. The majority (63%) reported that they could not afford rent").

1    likely to remain homeless—ultimately making our communities less safe.[62] The impact on Black

2    and Brown communities is even more severe. Not only are such community members

3    overrepresented in San Francisco's homeless population, but they are also approached, cited,

4    arrested, and incarcerated by police at the highest rates."[63] San Francisco's criminalization of

5    unhoused people's status perpetuates failed mass incarceration era policies.[64]

6         69.68.  In short, San Francisco's criminal punishment for being poor and unhoused is a

7    cruel and ineffective approach that betrays a deep, willful misunderstanding of the solutions to

8    homelessness.[65]

9

10

11

---

[62] *See* Herring, *supra* note 62, at 790 (documenting the consequences of criminalizing homeless people through move-along orders, citations, and threats and the ways in which that drives individuals further into poverty); Katrina Ballard & Samantha Batko, *Three Ways Communities Can Promote Inclusive Public Space and Better Support People Forced to Live Outside*, URBAN INST. (Aug. 7, 2020),  https://www.urban.org/urban-wire/three-ways-communities-can-promote-inclusive-public-space-and-better-support-people-forced-live-outside ("When police respond to homelessness, they frequently issue move-along orders or arrests and citations for sleeping or camping. This criminalization of living outside leads to a homelessness-jail cycle, which does nothing to improve the lives of people without homes or the broader community. Encampment sweeps can also traumatize people living there and interrupt their efforts to build stability").

[63] *See* Herring & Yarbrough, *supra* note 10, at 55 ("Not only are Blacks and Latinos disproportionately represented in the homeless population, they also experienced police interactions, citation, arrest, and incarceration at the highest rates of all our homeless respondents").

[64] *See* Herring & Yarbrough, *supra* note 10, at 1 ("This report documents and analyzes the impacts of the rising tide of anti-homeless laws in our era of mass incarceration on those experiencing homelessness in San Francisco."); *id.* at 8-9 ("the criminal justice system produces homelessness through detaining poor people who are housed prior to arrest and in the course of a few months or years graduates them into homelessness with a certified criminal record and no viable housing option upon release").

[65] Mary K. Cunningham, *The Homelessness Blame Game*, URBAN INST. (September 23, 2019) https://www.urban.org/urban-wire/homelessness-blame-game ("But criminalizing homelessness to force people into shelters is a bad idea. Research shows that criminalizing homelessness increases costs and strain on police, jails, and prisons—placing a heavy toll on state and local budgets").

D.    Affordable Housing is the Only Permanent Solution to Homelessness, Makes Communities Far Safer, and Costs Substantially Less than the City's Useless Punishment Schemes.

~~70.~~69.  The City's criminal enforcement most often removes unhoused people from one street and forces them onto another. But this is a costly cycle.[66] Research has consistently found that the criminalization of unhoused people is both expensive and ineffective—and that it is far more efficient to expend resources on non-punitive alternatives like permanent housing.[67]

~~71.~~70.  In 2015, for example, San Francisco spent at least $20 million to enforce quality-of-life ordinances against homeless individuals.[68] This is quite likely a massive undercount of San Francisco's direct spend on annual criminalization efforts that do not work.[69] Meanwhile, San Francisco's choice not to make affordable housing available for its unhoused residents imposes hundreds of millions of dollars in downstream costs every year by straining the City's healthcare,

---

[66] Rankin, *supra* note 15, at 115 ("[S]weeps also punish the broader community because they do nothing to solve homelessness; instead, they are a costly, rotating door that wastes taxpayer dollars."); *see* Cunningham, *supra* note 70, ("Criminalizing homelessness won't work . . . These actions traumatize people living in encampments and have negative implications for public health. They also don't work; people experiencing homelessness may simply relocate to avoid them, or expensive jails or hospitals become de facto affordable housing.").

[67] *See e.g.*, Rankin, *Punishing Homelessness*, *supra* note 15, at 104, 109 ([C]riminalization, along with other traditional approaches that manage homelessness, are the most expensive and least effective ways to address it"); Joshua Howard et al., *At What Cost: The Minimum Cost of Criminalizing Homelessness in Seattle and Spokane*, HOMELESS RIGHTS ADVOC. PROJECT, (May 8, 2015) https://digitalcommons.law.seattleu.edu/hrap/10 (finding that over a five year period, Seattle spent a minimum of $2.3 million enforcing just 16% of its criminalization ordinances and Spokane spent a minimum of $1.3 million enforcing 75% of its criminalization ordinances and concluding that non-punitive alternatives, such as building housing are more effective "in terms of cost and in terms of addressing the underlying problems of homelessness").

[68] Policy Analysis Report: *Homelessness and the Cost of Quality of Life Laws*, S.F. BUDGET AND LEGIS. ANALYST OFFICE (2016) http://2zwmzkbocl625qdrf2qqqfok-wpengine.netdna-ssl.com/wp-content/uploads/2016/06/Budget-and-Legislative-Analyst-Report.Quality-of-Life-Infactions-and-Homelessness.052616-1.pdf

[69] *See, e.g.*, Herring & Yarbrough, *supra* note 10, at 66-68 (discussing difficulty of determining exact costs and noting that it is a political decision to intentionally overlook and ignore reporting on the costs of enforcing these laws).

1    social service, and legal systems.[70]

2        ~~72.~~71.  In Santa Clara County—a county with a comparable population of unhoused people

3    to San Francisco—a comprehensive study found that the county indirectly spent over $520 million

4    annually on its healthcare, criminal, and social services systems as a result of leaving people

5    unhoused and not directly addressing homelessness. Even a preliminary tally of some of San

6    Francisco's direct expenditures on homelessness-related services indicates the annual cost of

7    homelessness—a cost ultimately borne by taxpayers—is at least similar to that of Santa Clara[71], if

8    not significantly higher.[72]

9
10   [70] *See, e.g.*, Ballard & Batko, *supra* note 67 (discussing costliness of homelessness-jail, whereby
     unhoused people cycle in and out of jail, shelters, rehabilitation centers, and emergency care);
11   Cunningham, *supra* note 70; Gregory A. Shinn, *Rethink Homelessness & Impact Homelessness,
     The Cost Of Long-Term Homelessness In Central Florida: The Current Crisis and the Economic
12   Impact of Providing Sustainable Housing Solutions* 15-17, 20 (2014), CENT. FLA. COMM'N ON
     HOMELESNESS https://shnny.org/uploads/Florida-Homelessness-Report-2014.pdf (discussing how
13   long-term homelessness is expensive to the community and that the cost of doing nothing is
     substantial).

14
15   [71] *See* SANTA CLARA CNTY. OFF. OF SUPPORTIVE HOUS., *Santa Clara County Homeless Census
     and Survey Reports*, https://osh.sccgov.org/continuum-care/reports-and-publications/santa-clara-
16   county-homeless-census-and-survey-reports (documenting trends in Santa Clara's unhoused
     population); Santa Clara County Continuum of Care, *How does Santa Clara County compare to
17   other                                                                          jurisdictions?*,
     https://osh.sccgov.org/sites/g/files/exjcpb671/files/2017%20PIT%20CoC_Comparisons.pdf
18   (comparing Santa Clara to San Francisco); Molly Turner, *Homelessness in the Bay Area*, SPUR
     (Oct. 23, 2017), https://www.spur.org/publications/urbanist-article/2017-10-23/homelessness-
19   bay-area ("San Francisco and Santa Clara counties have some of the nation's highest percentages
     of homelessness.").
20
21   [72] *See e.g.*, DEP'T OF HOMELESSNESS & STRATEGIC HOUS., Five Year Strategic Framework, (Oct.
     2017),    https://hsh.sfgov.org/wp-content/uploads/2017/10/HSH-Strategic-Framework-Full.pdf
22   (noting the city spent $256.7 million on homelessness services through HSH in 2017); S.F. DEP'T
     OF      PUB.      HEALTH,,      Annual      Report      FY      2020-2021,
23   https://www.sfdph.org/dph/files/reports/PolicyProcOfc/FINAL-Annual_Report_FY2021.pdf
     (noting city spent $28 million on a mental health initiative for unhoused people in 2020); S.F.
24   DEP'T OF PUB. HEALTH, Mental Health San Francisco Implementation Plan,
     https://www.sfdph.org/dph/files/IWG/MHSF_Implementation_Report_Feb.2022.pdf (noting city
25   is poised to spend another $60 million for mental health services serving unhoused people); BAY
     AREA COUNCIL ECON. INST., Bay Area Homelessness: A Regional View of a Regional Crisis17
26   (noting city spent $54 million on street cleaning in 2018). None of these sources include the cost
     of physical health services—health services were the largest source of spending in the Santa Clara
27   study.

28

                                        ~~SECOND~~THIRD AMENDED COMPLAINT FOR
                                        DECLARATORY AND INJUNCTIVE RELIEF
                                        CASE NO. 4:22-CV-05502-DMR

73.72.  In this context, making affordable housing available would be a far more prudent investment than the City's destructive and costly practice of forcing unhoused people to cycle through different streets, jails, hospitals, and temporary shelters. To meet its housing goals for low-income and very low-income units, San Francisco would need to build 6,624 new affordable units, which would cost about $4.8 billion.[73] That would be enough to house every currently unsheltered San Franciscan. Assuming San Francisco indirectly spends about the same annually on homelessness as Santa Clara does—$520 million—and it instead chose to invest that sum in affordable housing, the City would be able to build 742 of those new units per year and could actually stem, and even end, the homelessness crisis.[74]

74.73.  This necessary investment in affordable housing pales in comparison to the hundreds of millions of taxpayer dollars San Francisco hemorrhages each year as a consequence of keeping its residents unhoused and forced to sleep on the City's streets or in temporary shelter.

75.74.  In addition to being unjustifiably costly, criminalization harms unhoused people and puts our communities at further safety risk.[75] Criminalization does not reduce the presence of unhoused people in public space, it only makes unhoused people less likely to seek or to receive social services and supports (of which there is already an unmet need). The criminal eviction of unhoused people from public areas also has no discernible impact on economic activity at

---

[73] *See* 2020 Housing Inventory, *supra* note 55 at 15 (noting deficit of 6,624 units); BAY AREA COUNCIL ECON. INST., *How Much Does it Cost to Construct One Unit of Below Market Housing in the Bay Area?,* http://www.bayareaeconomy.org/how-much-does-it-cost-to-produce-one-unit-of-below-market-housing-in-the-bay-area/#:~:text=In%202019%2C%20the%20average%20construction,of%20below%20market%20rate%20housing (identifying that producing a single unit of affordable housing costs around $700,000 in San Francisco).

[74] *See id.*

[75] *See* Rankin, *supra* note 15, at 108, 113-14 (discussing consequences of ordinances and concluding that they emotional and psychological tolls on encampment residents, exacerbate existing physical and mental health problems, and "render chronically homeless people more resistant to recovery and more likely to remain homeless, to become sick, to self-medicate, to be incarcerated, and even to die.").

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1  storefront businesses.[76]

2      ~~76.~~75.  Solving homelessness is possible.[77] Studies have consistently shown that housing

3  is the answer.[78] Affordable housing is cost-effective and makes communities safer by investing in

4  long-term stability and community growth. The City need not continue expending vast resources

5  criminalizing its unhoused population when it could invest in the only permanent, cost-effective

6  solution to its homelessness crisis—affordable housing.[79]

7      ~~77.~~76.  Nonetheless, San Francisco has repeatedly failed to approve measures that would

8  rapidly expand the building of affordable housing.[80] The City has also failed to appropriately and

9  promptly spend hundreds of millions of annual Proposition C tax dollars that are specifically

10  allocated to address permanent solutions to the City's homelessness crisis.[81]

11

12  [76] Herring & Yarbrough *supra* note 10, at 61, 67; Berkeley Law Policy Advocacy Clinic, Does Sit-
13  Lie Work: Will Berkeley's "Measure S" Increase Economic Activity And Improve Services To
    Homeless People, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2165490
14  (finding no meaningful evidence to support claims that sit-lie ordinances increase economic
    activity).

15  [77] Rankin, *supra* note 15, at 130-34. ("Studies consistently show that solving chronic homelessness
16  is achievable through the evidence-based solutions of Housing First and permanent supportive
    housing").

17  [78] *Id.*
18

19  [79] *See e.g.*, *id.* at 104 ("[N]on-punitive alternatives, such as permanent supportive housing, are the
    most cost-effective ways to solve chronic homelessness."); Samantha Batko, *We Can End
20  Homelessness through Housing First Interventions*, Urban Inst. (Feb. 12, 2020)
    https://www.urban.org/urban-wire/we-can-end-homelessness-through-housing-first-
21  interventions.

22  [80] For example, the City has chosen not to use federal and state funds to immediately create
    affordable housing options for the unhoused. *See, e.g.,* Streetsheet, *An Unprecedented Golden
23  Opportunity* (May 20, 2021), https://streetsheet.medium.com/an-unprecedented-golden-
    opportunity-a28150b601b9 (noting that the City could, but has not, invest in a series of building
24  purchase programs that would immediately create affordable housing options for the unhoused).

25  [81] *See* J.D. Morris, *Here's how much San Francisco has spent of $600 million in Prop. C money
26  slated for homeless services*, S. F. Chronicle (May 27, 2022),
    https://www.sfchronicle.com/sf/article/Here-s-how-much-San-Francisco-spent-prop-C-tax-
27  17202036.php ("San Francisco has only spent about a quarter of the funds it has available from a
    2018 business tax that voters approved to make massive investments in homeless services").

28

~~SECOND~~THIRD AMENDED COMPLAINT FOR
                DECLARATORY AND INJUNCTIVE RELIEF
                CASE NO. 4:22-CV-05502-DMR

1

# **FACTUAL ALLEGATIONS**

2      A.      San Francisco Does Not Have Enough Shelter Beds to House Thousands of its

3              Unhoused Residents, Forcing Unhoused People to Sleep on the Streets.

4      ~~78.~~77.  San Francisco does not have sufficient and adequate shelter to accommodate those

5 currently experiencing homelessness in the City. This is true on any given day, yet the City

6 nonetheless conducts regular sweeps across the City.

7      ~~79.~~78.  According to San Francisco's 2019 Homeless Count and Survey, there were 8,035

8 homeless individuals residing in the City.[82] On the night the City conducted a count of its homeless

9 population, the City counted 5,180 individuals—or 64% percent of the City's homeless

10 population—as unsheltered.[83] The City counted 2,855 individuals in the shelter count.[84] Although

11 San Francisco had 3,493 shelter beds available in 2019, the number of beds was far insufficient to

12 shelter San Francisco's entire population.[85] In 2021, because of a *temporary* COVID-19 program,

13 the City modestly increased its shelter capacity to provide 5,080 shelter beds.[86] This was still

14 approximately 3,000 beds short of what would have been necessary to shelter every unhoused San

15 Franciscan.

16      ~~80.~~79.  According to San Francisco's 2022 Homeless Count and Survey, there were 7,754

17 unhoused people in San Francisco on a given day and as many as 20,000 individuals may

18 experience homelessness in San Francisco over the course of a full year.[87] The City's total shelter

19

20 _____

[82] San Francisco Homeless County & Survey Comprehensive Report 2019, *supra* note 11, at 10.

21 [83] *Id.*

22 [84] *Id.*

23 [85] San Francisco 2021 Sheltered Point-in-Time Count 4, S.F. DEP'T OF HOMELESSNESS &
24 SUPPORTIVE HOUSING (2021), https://hsh.sfgov.org/wp-content/uploads/2021/09/2021-Sheltered-
PIT-Count.pdf.

25 [86] *Id.* at 4 (identifying that 2,263 temporary shelter beds added due to COVID-19 "will be phased
26 out in FY21-22").

27 [87] San Francisco Homeless County & Survey Comprehensive Report 2022, at 2, S.F. DEP'T OF
HOMELESSNESS    &    SUPPORTIVE    HOUSING    (2022),    https://hsh.sfgov.org/wp-
28 content/uploads/2022/08/2022-PIT-Count-Report-San-Francisco-Updated-8.19.22.pdf.

~~SECOND~~THIRD AMENDED COMPLAINT FOR
                                    DECLARATORY AND INJUNCTIVE RELIEF
                                    CASE NO. 4:22-CV-05502-DMR

1   bed availability during the same time period remained at only 5,080 beds.[88] The City is thus, by

2   its own count, thousands of shelter beds short.

3          ~~81.~~ 80.  The shortage is getting worse. The present shelter inventory includes 2,263

4   temporary Shelter-in-Place hotel rooms for COVID-19 that will be phased out entirely by the end

5   of FY21-22.[89] San Francisco is already keeping the majority of these temporary COVID beds

6   vacant in anticipation of an end to supplemental federal funding for the temporary Shelter-in-Place

7   program. Without the COVID beds, the 2019 count is most accurate: only 3,493 beds are actually

8   available, meaning a shortage of at least 4,400 beds.[90]

9          ~~82.~~ 81.  The shelter shortage corresponds to San Francisco's unsheltered homeless

10  population. When the City was able to conduct a count of its unsheltered population on one night

11  in 2022, 4,397 unhoused individuals—or 57 percent of the City's homeless population—were

12  unsheltered.[91]

13         ~~83.~~ 82.  The City's extreme shortage of shelter beds means that unhoused people

14  functionally lack access to shelter when they seek it. Prior to the start of the COVID-19 pandemic,

15  City shelters could be accessed through the Department of Homelessness and Supportive

16  Housing's 311 Waitlist. But shelter supply never met shelter demand.

17         ~~84.~~ 83.  From approximately 2015 to March 2020, the 311 Waitlist for a 90-day shelter bed

18  hovered around over 1,000 people.[92] This meant that it was often impossible for an unhoused

19  person seeking shelter to receive a timely shelter placement even if they had actively requested

20  and sought out shelter. The usual wait time to get a shelter bed through this process was between

21

22  [88] San Francisco 2021 Sheltered Point-in-Time Count, *supra* note 90, at 4.

23  [89] *Id.* at 4 (identifying that 2,263 temporary shelter beds added due to COVID-19 "will be phased out in FY21-22").

24  [90] *Id.* at 3 (noting 3,493 available shelter beds as of January 2019).

25  [91] 2022 Point-in-Time Count, *supra* note 2, at 10.

26  [92] *HSH 90 Day Emergency Shelter Waitlist*, DATASF (last updated Aug. 23, 2021),
27  https://data.sfgov.org/Health-and-Social-Services/HSH-90-day-emergency-shelter-waitlist/w4sk-nq57 (identifying that there were 1,339 individuals waiting for shelter in San Francisco before the
28  waitlist was put on hold due to COVID-19).

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

three to eight weeks.

85.84.  Beds for one-night stays were functionally full as well. Securing a one-night shelter bed required an unhoused person to stand or sit in line between two to eight hours a day just to secure a bed for that night. On most nights, between fifty and one-hundred unhoused people would be left in line or forced to sleep outside because no beds were available for them.

86.85.  After the start of the COVID-19 pandemic, San Francisco closed the 311 waitlist and it remains closed. Individuals can also no longer access same-day shelter beds at a point of access as they could at least try to do prior to April 2020. Since April 2020, the ability to access shelters voluntarily has been almost completely shut-off. Unhoused individuals seeking shelter in San Francisco do not have any immediate shelter options available to them because the traditional avenues to seek shelter are closed.

87.86.  In other words, San Francisco has never come close to providing enough shelter for thousands of its unhoused residents—which has resulted in the *majority* of the City's unhoused residents being forced to sleep on the streets. Due to the shelter scarcity, unhoused individuals also do not have voluntary access to shelter if they try to seek it out.

B.    San Francisco Has Enacted and Continues to Enforce a Litany of Anti-Homelessness Ordinances and Statutes.

88.87.  The City's systematic enforcement of a constellation of state statutes and local ordinances against homeless individuals punishes them solely for being homelessness.

89.88.  Since the 1980s, San Francisco has enacted a slew of ordinances that expressly seek to punish unhoused individuals for sleeping, lying down, or storing their belongings on public property within the City.

90.89.  For example, San Francisco passed its Sit/Lie ordinance in 2010 making it illegal to stay on public sidewalks during the day time. *See* S.F. Police Code § 168. This was the perverse parallel to the already existing City ordinance making it illegal for homeless people to sleep in public parks at night. *See* S.F. Park Code § 3.13. In other words, to avoid prosecution under these ordinances, literally thousands of unhoused people would have to shuffle continuously between San Francisco's streets and the public parks with everything they owned—every single day.

SECONDTHIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CASE NO. 4:22-CV-05502-DMR

1      ~~91.~~90.  San Francisco Police Department Bulletins specifically instruct the City's police

2  officers to enforce local ordinances and multiple California state laws, including:

3                      Local Ordinances

4              a.      SF Health Code §§ 581 and 596 (criminalizing public nuisance including

5                      "[a]ny buildings, structures, or portion thereof found to be unsanitary")

6              b.      S.F. Police Code §§ 22-24 (criminalizing "wilfully and substantially

7                      obstruct[ing] the free passage of any person or persons on any street,

8                      sidewalk, passageway or other public place")

9              c.      S.F. Police Code §§ 25-27 (criminalizing "wilfully remain[ing] upon any

10                     private property or business premises after being notified by the owner,

11                     lessee, or other person in charge thereof to leave")

12             d.      S.F. Police Code § 168 (making it "unlawful to sit or lie down upon a

13                     public sidewalk, or any object placed upon a public sidewalk" between

14                     7:00 a.m. and 11:00 p.m.),

15                     State Statutes

16             a.      Cal. Penal Code § 647(e) (criminalizing "lodg[ing] in any building,

17                     structure, vehicle, or place, whether public or private, without the

18                     permission of the owner or person entitled to the possession or in control

19                     of it"), and

20             b.      Cal. Penal Code § 148(a) (prohibiting willfully resisting, delaying or

21                     obstruction agency or law enforcement personnel, which San Francisco

22                     Police Bulletins explain allows officers to issue citations when an

23                     "individual refuses to vacate an encampment" after s/he is provided notice

24                     to vacate). s

25             c.      Cal. Penal Code § 372 (criminalizing public nuisance as defined in Section

26                     370, including "unlawfully obstruct[ing] the free passage or use, in the

27                     customary manner, of any . . . public park, square, street, or highway")

28

1            d.      Cal. Penal Code § 647c (criminalizing "willfully and maliciously

2                  obstruct[ing] the free movement of any person on any street, sidewalk, or

3                  other public place or on or in any place open to the public").

4      ~~92.~~91.   SFPD Department Bulletins dating to May 2018 (A18-088) and July 2018 (A18-

5 137) described the above civil and criminal penalties as available for law enforcement to address

6 encampments on City streets or sidewalks. In 2020, the City issued another Bulletin, SFPD's

7 Department Notice, 20-100 (June 12, 2020), which continued to allow officers to "issue an

8 admonishment, followed by citation, or arrest when appropriate" in connection with the

9 aforementioned civil or criminal penalties.

10      C.       The U.S. Constitution Protects Unhoused People from ~~Criminalization in the~~

11              ~~Absence of Available Shelter and From~~ Summary Destruction of Property Without

12              Due Process of Law.

13      ~~93.~~92.   The Fourth, ~~Eighth,~~ and Fourteenth Amendments to the U.S. Constitution and their

14 corollaries in the California Constitution limit whether and how a City may disturb unhoused

15 people and their personal property. *See* U.S. Const. amends. ~~VIII,~~ IV, XIV; Cal. Const., art. I, §§

16 7(a), 13~~, 15~~.

17      ~~94.      The Eighth Amendment prohibits cities from criminalizing the involuntary~~

18 ~~condition or status of homelessness—and from enforcing ordinances that do so. *See Martin*, 920~~

19 ~~F.3d at 615-18 (holding that an anti-camping ordinance violated the Eighth Amendment because~~

20 ~~it "criminalize[d] conduct that [was] an unavoidable consequence of being homeless"); *Jones v.*~~

21 ~~*City of L.A.*, 444 F.3d 1118, 1138 (9th Cir. 2006), *vacated by settlement*, 505 F.3d 1006 (9th Cir.~~

22 ~~2007) (same).~~

23      ~~95.      *Martin v. Boise* conclusively declared that arresting or citing homeless people for~~

24 ~~sleeping in public in the absence of viable shelter violates the Eighth Amendment. For instance,~~

25 ~~"so long as there is a greater number of homeless individuals in [a jurisdiction] than the number~~

26 ~~of available beds [in shelters], the jurisdiction cannot prosecute homeless individuals for~~

27 ~~involuntarily sitting, lying, and sleeping in public . . . on the false premise they had a choice in~~

28 ~~the matter." *Id.* (internal quotations omitted).~~

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1    96.93.  The Fourth and Fourteenth Amendments ~~also~~ protect homeless individuals from

2    having their property summarily seized and destroyed by law enforcement without significant due

3    process safeguards—including advance notice, reasonable time to move property, and "bagging

4    and tagging" of all non-hazardous property for later recovery at a suitable location. *Lavan v. City*

5    *of Los Angeles*, 693 F.3d 1022, 1028-29 (9th Cir. 2012) (declaring that Fourteenth Amendment

6    due process "protect[s] homeless persons from government seizure and summary destruction of

7    their unabandoned, but momentarily unattended, personal property"); *O'Callaghan v. City of*

8    *Portland*, No. 3:12-CV-00201-BR, 2013 WL 5819097, at *4 (D. Or. Oct. 29, 2013) (finding that

9    sufficient due process was provided where plaintiff was given notice 24 hours prior to the removal

10   of his personal property from the public land on which he was illegally camping, the city stored

11   the property for 30 days, and a process existed for plaintiff to reclaim his removed property).

12   ~~97.    Local governments also violate the substantive due process rights of unhoused~~

13   ~~people under the Fourteenth Amendment when they place unhoused individuals in vulnerable~~

14   ~~situations by confiscating the survival belongings that they use for shelter, warmth, and protection~~

15   ~~from the elements. *See Santa Cruz Homeless Union v. Bernal*, 514 F. Supp. 3d 1136, 1145 (N.D.~~

16   ~~Cal. 2021); *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1102 (E.D. Cal. 2012).~~

17   98.94.  In apparent awareness of what the Constitution requires, the City has promulgated

18   several policies that pay lip service to the appropriate constitutional requirements.[93] Regardless,

19   the City and its employees have substantially failed to comply with its own written policies and its

20   customs and practices are actually contrary to those written policies.  As identified below, the City

21   has instead embarked on a campaign to seek out and summarily destroy the survival belongings of

22   unhoused San Franciscans.

23       D.    HSOC Operations Hide the Extent of the City's Homelessness Crisis By

24             Destroying Signs of Visible Homelessness.

25   99.95.  HSOC began "as a police-led, complaint-driven coordination of city departments

26

27   _____

28   [93] *See*, *e.g.*, SFPD Department Bulletin A19-080; DPW Proc. 16.05.08.

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

and resources designed to lower tent counts and break up large encampments."[94] Since its inception in 2018, HSOC has relied primarily on police to clear the streets of San Francisco and displace unhoused individuals in the process.[95]

~~100.~~96.But, the City immediately received criticism for HSOC's heavy-handed law enforcement approach to homelessness.[96] The City itself acknowledged in 2018 that HSOC's policies were not only ineffective, but also confusing for the City employees seeking to enforce them.[97] In 2020, the City announced a shift in strategy to respond to street encampments in the face of criticism that HSOC was operating without community engagement and was responding to unhoused people with policing rather than needed services.[98]

~~101.~~97.HSOC now characterizes itself as "a collaborative effort of multiple City departments" that aims "to coordinate the City's response both to homeless encampments and to

---

[94] Behind the Healthy Streets Operation Curtain: The True Story of San Francisco's Abusive Encampment Response, *supra* note 6, at 4.

[95] Joshua Sabatini, *SF's new homeless unit accused of heavyhanded police response*, S. F. EXAMINER (Oct. 2, 2018), https://www.sfexaminer.com/news/sf-s-new-homeless-unit-accused-of-heavyhanded-police-response/article_f74eefa5-7acc-52aa-a068-c94cce94a652.html.

[96] *Id.*

[97] A memorandum from June 9, 2018, written by Jeff Kositsky, HSOC's manager, communicated an ongoing list of issues and concerns that the Department of Homelessness and Supportive Housing had been amassing about HSOC since February of 2018. Included in this list was that "[a]ll participating agencies should be communicating action through HSOC; there are SFPD/DPW actions taking place earlier that create a great deal of confusion with field staff."

[98] *See* Joshua Sabatini, *SF to make major changes to homeless response operations*, S. F. EXAMINER (Mar. 2, 2020), https://www.sfexaminer.com/archives/sf-to-make-major-changes-to-homeless-response-operations/article_f9f9d928-c70a-50a0-b5a4-bae0b1784b93.html; OFF. OF BUDGET & LEGIS. ANALYST, Policy Analysis Report: Police Department Role in Street Teams, CITY & CNTY. OF S. F. BD. OF SUPERVISORS (Apr. 19, 2022), https://sfbos.org/sites/default/files/BLA.SCRT_.HSOC_.041922.pdf (noting that after HSOC began "efforts have been made to de-emphasize the law enforcement nature of City policy towards homeless encampments, and to enhance service referrals and mental health and substance abuse outreach").

1    behaviors that impact quality of life in San Francisco's public spaces."[99]

2    ~~102.~~98. As an interdepartmental taskforce, HSOC consists of the following five primary

3    agencies:   the San Francisco Police Department ("SFPD"), the Department of Public Works

4    ("DPW"), the Department of Homelessness and Supportive Housing ("HSH"), the Department of

5    Public Health ("DPH"), and the Department of Emergency Management ("DEM").[100]

6    ~~103.~~99. HSOC is governed by the directors of each of these five departments as well as

7    representatives from the Mayor's office.[101] But HSOC's daily operations and practices are

8    spearheaded by HSOC's Director—who is a City employee based in the DEM.

9    ~~104.~~100.      HSOC coordinates with several additional City departments and agencies—

10   especially the San Francisco Fire Department ("SFFD")—whose incident commanders often take

11   the lead in coordination during HSOC sweeps if HSOC's Director is not present. HSOC also

12   coordinates directly with the following City agencies: SF311, the Adult Probation Department, the

13   General Services Agency, the Municipal Transportation Authority, the Port of San Francisco, the

14   Public Utilities Commission, the Recreation and Parks Department, and the Sheriff's

15   Department.[102]

16   ~~105.~~101.      Today, HSOC purports to be a compassionate, service-based response to

17   homelessness. HSOC's stated mission is to coordinate the City's response to homeless

18   encampments, provide services to "meet the housing, shelter, and service referral needs of

19   individuals on the street," reduce the number of vulnerable people living on the street, reduce the

20   number of tents in the City, and increase safety and cleanliness.[103]

21   ~~106.~~102.      But the data and experience of advocates and unhoused people tell a

22

23   [99] Healthy Streets Data and Information, CITY & CNTY. OF SAN FRANCISCO,
     https://sfgov.org/scorecards/hsoc (last visited July 29, 2022).

24   [100] Review of the Healthy Streets Operation Center, *supra* note 27, at 12.

25   [101] *Id.* at 13.

26   [102] *Id.* at 12.

27   [103] *Id.* at 3, 15.

28

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1   different, more callous story.[104] Behind HSOC's façade lies a harsh reality: HSOC has carried

2   forward its original policing-heavy approach, focused on clearing unhoused people from sight.

3        ~~107.~~103.        Although HSOC claims to focus on connecting unhoused people with

4   services,[105] by this metric, it has failed miserably.[106] The City's own data reveals that HSOC

5   connects only 30% of unhoused individuals it encounters with shelter and connects none to

6   permanent housing.[107]

7        ~~108.~~104.        HSOC does not just fail to connect unhoused people with services—it

8   actively harms them through sweeps that prioritize tent removal over their well-being.[108] For

9   HSOC, tent removal has been a foundational goal and metric of success since its inception.[109]

10

---

11   [104]   *Compare* Healthy Streets Data and Information, CITY & CNTY. OF S. F.,
12   https://sf.gov/data/healthy-streets-data-and-information (last visited July 29, 2022) (discussing
     HSOC's mission of service provision); Behind the Healthy Streets Operation Curtain: The True
13   Story of San Francisco's Abusive Encampment Response, *supra* note 6 (discussing displacement
14   and lack of service provision).

15   [105] Behind the Healthy Streets Operation Curtain: The True Story of San Francisco's Abusive
     Encampment Response, *supra* note 6, at 1 (discussing City's presentation on "the role of the public
16   health-centric team in using a service-led model to connect people in need with available
     resources").

17   [106] *See* Carly Graf, *San Francisco's broken promise to resolve homeless encampments*, S. F.
18   EXAMINER (Oct. 26, 2021), https://www.sfexaminer.com/archives/san-francisco-s-broken-
     promise-to-resolve-homeless-encampments/article_e4d47445-cec3-50c8-be0d-
19   0720012c3d39.html ("Nearly half of the people encountered by The City during encampment
20   cleanups over a 16-month period were not connected with services. They were asked to move.").

21   [107] Behind the Healthy Streets Operation Curtain: The True Story of San Francisco's Abusive
     Encampment Response, *supra* note 6, at 6.
22

23   [108] Behind the Healthy Streets Operation Curtain: The True Story of San Francisco's Abusive
     Encampment Response, *supra* note 6, at 10.

24   [109] *See e.g.*, Healthy Streets Data and Information, supra note 104, (providing tent count and
25   referencing removal as part of an operation); Review of the Healthy Streets Operations Center,
     *supra* note 27, at 5-6, 15, 21-22 (identifying tent reduction as a key goal, metric, and result of
26   HSOC operations); Press Release, Off. of the Mayor, *supra* note 7. (noting that "Mayor London
     N. Breed announced a 34% reduction in tents on the streets of San Francisco since she took office
27   in July, a reduction of approximately 193 tents in less than four months [...] she has expanded the
     resources for Healthy Streets Operations Center (HSOC)").
28

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1    Unsurprisingly, this misguided metric "invites detrimental policies."[110] "Tents are not people, and

2    removing tents while doing nothing to change the housing status of the individual does nothing

3    but leave people on the street with even less protection from the harsh conditions under which they

4    live."[111]

5        ~~109.~~105.        In an effort to keep the city "tent-free," former HSOC Director Jeff Kositsky

6    even sought to prevent unhoused people from accessing bathrooms.[112]

7        E.    Anatomy and Timeline of an HSOC Sweep Operation: Law Enforcement Threats,

8            Intimidation, and Property Destruction Absent Any Viable Shelter.

9        ~~110.~~106.        An HSOC sweep is a multi-hour operation that involves various City

10    agencies. First, HSOC identifies an area to sweep—usually through complaints about an

11    encampment that result in the encampment being placed on HSOC's schedule for "resolution."

12    HSOC's participating agencies—including SFPD, DPW, HSH, DEM and others—have a daily

13    coordinating call where they discuss and plan for the sweep operations they will carry out over the

14    coming days.

15        ~~111.~~107.        Sweeps are generally conducted in the morning. SFPD and DPW arrive

---

16    [110] *See* Carly Graf, *supra* note 111 ("Tents may be cleared, but that doesn't mean the people who
17    live in them end up housed."); Behind the Healthy Streets Operation Curtain: The True Story of
    San Francisco's Abusive Encampment Response, *supra* note 6, at 4, 13 ("While HSOC frequently
18    boasts its success in reducing the number of tents in San Francisco, this success is not
    reflected in anywhere near an equal number of exits from homelessness."); *see also* Pub.
19    Safety  &  Neighborhood  Servs.  Comm.  Mtg.  Tr.  Feb.  28,  2019
    https://sanfrancisco.granicus.com/TranscriptViewer.php?view_id=178&clip_id=32541  (SF
20    Supervisor Matt Haney interrogating use of tent reduction as a metric: "Can you take someone's
21    tent and say we've reduced a tent? . . . I'm wondering why we're looking at tents as opposed to
    placing human beings in shelter or services as a sign of our success.").

22
23    [111] Behind the Healthy Streets Operation Curtain: The True Story of San Francisco's Abusive
    Encampment Response, *supra* note 6, at 13.

24    [112] See Mallory Moench, *supra* note 7  ("Jeff Kositsky, head of the Healthy Streets Operation
25    Center — a multi-department effort tasked with responding to homelessness — emailed Alaric
    Degrafinried, acting director of Public Works, on Jan. 28 about four toilets he was "concerned"
26    about  and  asked  for  their  removal."); Matt  Haney,  Twitter,
    https://twitter.com/MattHaneySF/status/1399949814511534081 (discussing HSOC's requests to
27    remove public bathrooms and former HSOC Director Jeff Kositsky noting that "some of the porta
    potties do lead to re-encampment").

28

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

around 7:00 a.m. SFPD and DPW are often the teams to make first contact and inform unhoused individuals that a sweep is about to occur. They do so by shaking people's tents, waking them up, and telling them that they need to clear out immediately. This gives unhoused residents around thirty minutes to attempt to pack up their belongings and move them from the street—a process that usually takes several hours. Most individuals do not receive even those thirty minutes. Instead, SFPD and DPW order them to leave their tents and belongings behind and "move along." In addition to SFPD and DPW, members of EMS-6—which is part of SFFD—are often present at sweeps, and the EMS-6 Commander may run point on the day's operations. Often, the City does not post written notice at the site prior to a sweep. In other words, unhoused individuals are made aware of a sweep for the first time when SFPD or DPW are waking them from their sleep. In addition to being unlawful, this is deeply traumatic.

112.108.    The Homeless Outreach Team ("HOT")—which is a part of HSH—usually arrives around 7:30 a.m., as SFPD and DPW have already begun the sweep. HOT's job is to approach unhoused individuals and ask if they would be interested in receiving services—i.e., shelter. But HOT cannot make any concrete services offers because HOT does not yet know whether shelter will be available for that day until at least 9:30 a.m. HOT approaches some unhoused individuals and asks if they would generally be interested in shelter. If unhoused individuals ask about what shelter options are actually available so they can make an informed decision, HOT team workers often identify them as having refused shelter.

113.109.    If the HOT team thinks they have spoken to an unhoused individual on any previous occasion, they will not approach them at all and will simply assume that they have declined shelter. This is because, in reality, the HOT team knows that it almost never has enough appropriate shelter to offer to every unhoused individual present onsite.

114.110.    After inquiring generally about interest in services, HOT will often leave the sweep site for several hours. They often do not return until the entire sweep operation is over. No one has been offered shelter at this time. Meanwhile, DPW, SFPD and SFFD become more aggressive.

115.111.    DPW often begins its massive property removal operation by 8:00 a.m. as

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1    unhoused people rush to collect their belongings.[113] DPW does not wait. Cleaning crews race to

2    take any belongings that unhoused people have not already managed to pack up and move. DPW

3    workers may also begin power-washing the street—soaking unhoused people and their belongings.

4        ~~116.~~112.        Although there are times when DPW purports to differentiate between trash

5    and people's belongings, DPW more often indiscriminately throws unhoused individuals' essential

6    items, survival gear, and precious personal property into their crusher trucks. These trucks are

7    specifically designed to handle and destroy trash, brought in anticipation of mass disposal and

8    destruction of personal items. DPW does not "bag and tag" this valuable and essential property for

9    safekeeping, and it is often immediately destroyed rather than stored.

10       ~~117.~~113.        DPW workers take belongings that they know are not trash in an effort to

11   get unhoused people to leave the area faster.

12       ~~118.~~114.        If unhoused people are not present at the time of the sweep to vouch for

13   their property—even when it is obviously the property of an unhoused individual and arranged in

14   a way that suggests the owner was relying on it and wanted it—DPW will immediately throw away

15   their belongings. Unhoused individuals leave their tents temporarily unattended to use the

16   restroom, or to seek employment or housing opportunities or services in the community—only to

17   find that DPW destroyed their belongings in their absence.

18       ~~119.~~115.        Even if unhoused people are present at the time of a sweep, DPW crews

19   often throw their valuable personal property and survival gear into crusher or dumpster trucks over

20   their direct objections and pleas that they both need and want their property.[114]

21

22

23

24

25

---

26   [113] Recently, DPW has begun its property destruction slightly later in the sweep operation.
27   Regardless, its conduct otherwise remains unchanged.

28   [114] *See*, *e.g.*, David Sjostedt, *supra* note 26.

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR



*Department of Public Works employees, who wished not to be identified, throw away items from the tent encampment outside the*

*San Francisco Ferry Building in San Francisco, Calif., Friday, June 3, 2022. | Camille Cohen/The Standard*

~~120.~~116.     DPW finishes its clearing of the area—including removing and destroying tents and other property—around 9:30 a.m. During this time, SFPD and SFFD officers typically stand back and watch. If an unhoused person is not packing up and leaving quickly enough, SFPD often intervenes and threatens them with arrest or citation for refusing to "move along." SFPD also intervenes when an unhoused person protests the destruction of their property, ordering them to leave the area or risk citation or arrest. SFPD officers threaten these consequences even though the individuals have been given no access to shelter. If they are present, SFFD staff will assist DPW staff in seizing and destroying unhoused people's property.

~~121.~~117.     During HSOC sweeps, SFPD officers routinely threaten unhoused individuals with arrest or citation specifically under Cal. Penal Code § 647(e) for lodging without permission or Cal. Penal Code § 148(a) for willfully resisting law enforcement if they fail to leave the encampment after being told to move along—among the litany of other statutes and ordinances

that punish sleeping, lying, or lodging in public.[115] Again, this is before they have received any actual offer of shelter.

122.118.        If unhoused individuals do not leave quickly or are unable to leave, SFPD officers will often arrest or cite those individuals for violations of a "move along" order (Cal. Penal Code § 148(a)) or will arrest of cite them for lodging without permission (Cal. Penal Code § 647(e))—or some other statute or ordinance.

123.119.        The HOT team usually returns at 9:30 a.m. or 10:00 a.m. at the earliest— two hours after the sweep has begun. This is the earliest that the HOT team knows whether any shelter has become available that day. By this point, many unhoused individuals have already left the area after being told to "move along" by DPW, SFPD or SFFD or after being cited or arrested.

124.120.        When the HOT team returns, if they have learned that there are any shelter beds available for that day, they begin to re-engage with any unhoused people still present at the site to make shelter offers.  But even after the forced dispersal of most unhoused people, HOT staff often does not have enough shelter beds or shelter beds that are appropriate for the few individuals remaining.

125.121.        Sometimes, HOT has the wrong types of beds available— such as only women's beds when men need services, only couples spaces when single individuals need services, beds that do not accommodate an individual's physical or mental disabilities, or similar scenarios—meaning these unhoused people will not have access to shelter that night, even though DPW has likely already taken their belongings, including tents and other survival gear, during the sweep.

126.122.        Other times, when HOT has no shelter beds to offer, the HOT team does not make contact with unhoused people at all and they will simply leave the site. For example, a former HOT worker confirmed that his team would often leave unhoused people stranded on the side of the road after a sweep because the City had no shelter available to offer them.

---

[115] *See supra* ¶ 93 (recounting every statute and ordinance that criminalizes homelessness and is enforced in San Francisco).

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1      ~~127.~~123.        The HSOC operation concludes after every unhoused individual originally

2   present at the site has been forced to leave the area—which often happens as early as 9:30 a.m.

3   For larger encampment resolutions, the operation may last until 11:30 a.m.

4      ~~128.~~124.        Often, an HSOC sweep results in unhoused people moving just a couple

5   blocks away. Having lost everything, and without shelter, they must start over—until another

6   sweep comes along and they are again threatened with citation and arrest for the unavoidable

7   consequence of sleeping outside.

8      F.        HSOC's Customs and Practices Criminalize Homelessness Even Though

9               Unhoused Individuals Have No Genuine, Voluntary Access to Shelter—Contrary

10              to the City's Own Stated Policies.

11     ~~129.~~125.        As described above, San Francisco does not have sufficient and adequate

12   shelter to accommodate those currently experiencing homelessness in the City. As a result, the

13   City and HSOC should not be conducting sweep operations at all. ~~Cf. Martin, 920 F.3d at 617~~

14   ~~("[S]o long as there is a greater number of homeless individuals in [a jurisdiction] than the number~~

15   ~~of available beds [in shelters], the jurisdiction cannot prosecute homeless individuals for~~

16   ~~involuntarily sitting, lying, and sleeping in public . . . on the false premise they had a choice in the~~

17   ~~matter") (internal quotations omitted). Nor does the City routinely have sufficient and adequate~~

18   ~~shelter even for individuals at any particular daily sweep.~~

19     ~~130.~~126.        And there is no voluntary access to shelter that unhoused people are able to

20   take advantage of in San Francisco—because there are no immediate shelter options available to

21   unhoused people even if they seek them. ~~Cf. id. at 584 (the Eighth Amendment "prohibits the~~

22   ~~imposition of criminal penalties for sitting, sleeping, or lying outside on public property for~~

23   ~~homeless individuals who cannot obtain shelter"); see also Powell v. Texas, 392 U.S. 514, 533~~

24   ~~(1968) (White, J. concurring in the result) (noting that the Eighth Amendment punishes only~~

25   ~~voluntary acts, and not involuntary acts).~~

26     ~~131.~~127.        HSOC justifies its sweep operations by purporting to hold specific shelter

27   beds open for law enforcement to offer when they threaten unhoused individuals with citation and

28   arrest for sleeping in public. As explained above, such offers are illusory or not reasonably

1  available.  The City and HSOC have been using this tactic for years—weaponizing shelter as a
2  means to carry out criminal enforcement and removal operations despite the fact that in reality,
3  San Francisco has never had enough shelter and individuals have no voluntary access to shelter.

4       ~~132.~~128.    The City's shelter shortage is so extreme, however, that HSOC lacks
5  sufficient shelter to provide even to the specific homeless individuals it targets for enforcement.
6  HSOC openly admits, for example, that it deliberately displaces homeless people despite knowing
7  that it usually only has shelter for about 40% of them.[116]

8       ~~133.~~129.    In other words, HSOC fails to meet the City's own stated pre-enforcement
9  standards for criminalization. *See* S.F. Police Code § 169 (the City is required to "offer Housing
10 or Shelter to all residents of the Encampment who are present" and "shall not enforce the
11 prohibition […] unless there is available Housing or Shelter for the person or persons in the
12 Encampment").

13      ~~134.~~130.    Even if HSOC does eventually identify enough shelter beds to
14 accommodate each unhoused person onsite—which is exceedingly rare—DPW and SFPD have
15 already begun clearing out unhoused people and their belongings and threatening them with
16 citation and arrest *hours before* the HOT team knows if shelter beds will become available later
17 that day. This, too, violates the City's own written policies. *See* SFPD Bulletin No. 19-080 (before
18 an order to vacate can be criminally enforced for non-compliance, SFPD is required to confirm
19 that there has been a "written offer of shelter or housing at least 24 hours before ordering removal
20 of a tent or encampment").

21      ~~135.~~131.    As such, HSOC's custom and practice is to criminalize homelessness even
22 though unhoused individuals have no genuine, voluntary access to shelter in San Francisco. This
23 belies HSOC's claim that it is leading a services-first approach to homelessness. These sweeps
24 occur, and, absent relief, will continue to occur, on at least a bi-weekly basis and impact hundreds

---

[116] Laura Wenus, *supra* note 8  ("Workers with the city's Healthy Streets Operations Center clear
encampments when there are enough open beds in the city's shelter system to accommodate about
40% of that encampment's residents in shelters. According to the center's director, Sam Dodge,
the formula is adjusted each week.").

1    of unhoused people each year.

2    ~~136.~~132.        Meanwhile, HSOC's participating agencies—including SFPD, DPW, HSH,

3    DEM and SFFD—continue to have daily coordinating calls where they review their past sweep

4    operations, discuss and plan for the sweep operations they will carry out in the future, and report

5    on their successes in "tent clearance"—despite being fully aware of the City's lack of available

6    shelter.

7        G.    HSOC's Customs and Practices Completely Disregard the City's Prior Notice and

8              Bag and Tag Policies—to Intentionally Engage in Mass Property Destruction.

9    ~~137.~~133.        Despite HSOC's stated mission of service connection, the City's real-world

10   treatment of unhoused people's personal property during HSOC operations also differs greatly,

11   and systematically, from the City's written Bag and Tag Policies, which require prior notice before

12   removal and that property be bagged, tagged, and stored, such that unhoused people have an

13   opportunity to recover their property at a later date.[117]

14   ~~138.~~134.        Although City policies require City employees to provide at least 72 hours

15   written notice in advance of any HSOC operation,[118] HSOC regularly fails to provide the

16   appropriate written notice or to provide verbal notice. Indeed, unhoused individuals report that

17   they never received notice prior to an HSOC sweep—and community advocates attending sweep

18   operations confirm the same.[119] HSOC itself appears to be fully aware of these issues. At a

19   February 4, 2021, HSOC meeting, HSOC representatives noted: "City Attorney working with

20   HSOC on noticing issues." But HSOC regularly continues to improperly notify unhoused people

21   prior to a sweep, despite being aware that its practices were in violation of the stated policies.

22

23   [117] *See* DPW's "Bag & Tag" Pol'y, Proc. No. 16-05-08 ("For pre-planned encampment resolutions, the HSOC or the San Francisco Homeless Outreach Team (SFHOT-ERT) will provide 72 hours
24   advance written notice . . . [A]ll unattended personal property that is collected for storage will be bagged and tagged upon collection and taken to the Public Works Operations Yard for storage. . .
25   Public Works staff will provide written and oral information on how, where and when the items may be retrieved. . . the department will store personal items for 90 days").

26
     [118] *See id.*
27
     [119] *See infra* at Section J-K, for these detailed accounts.
28

                                          ~~SECOND~~THIRD AMENDED COMPLAINT FOR
                                          DECLARATORY AND INJUNCTIVE RELIEF
                                          CASE NO. 4:22-CV-05502-DMR

1    139.135.    During HSOC operations, City workers also have a custom and practice of

2    destroying property instead of bagging and tagging it. Specifically, DPW arrives with crusher

3    trucks when they conduct HSOC sweeps to facilitate the mass destruction of unhoused people's

4    personal property. Rather than collect unattended personal property and record the property's

5    location and owner for later retrieval, City workers instead choose to classify that personal property

6    as abandoned. This is contrary to City policy. *Cf.* DPW Procedure No. 16-05-08 ("[u]nattended

7    property is not abandoned if it is accompanied by signs of ownership, for example, an unattended

8    tent that is filled with personal belongings or items that are being stored in an orderly manner (i.e.,

9    packed up, wrapped or covered)").

10    140.136.    DPW also destroys the personal property of unhoused individuals

11    regardless of whether or not it actually poses an immediate health risk, contrary to its stated

12    policies. *Cf.* DPW Procedure No. 16-05-08 (property only to be immediately destroyed if it an

13    immediate health or safety risk, such as "needles, scissors, knives," "human waste, body fluids,

14    moldy, mildewed items," or "items infested by rodents and insects").

15    141.137.    Instead, DPW indiscriminately seizes the belongings of unhoused

16    individuals and disposes of them as if they are trash, which goes against the City's stated policy.

17    *Cf. id.* ("If staff has a reasonable doubt as to whether an item constitutes trash, it should be collected

18    and stored"). This is so even when unhoused individuals plead for their property to be preserved.

19    142.138.    Much of the property DPW destroys during an HSOC sweep has obvious

20    value. On many occasions, DPW has destroyed laptops, medicine, clothing, tents, and personal

21    effects, in violation of the stated DPW Bag and Tag Policy. *Cf. id.* ("personal items – such as

22    medication, tents, luggage, backpacks, personal papers, and operational wheelchairs – will be

23    collected and stored for up to 90 days for retrieval").

24    143.139.    The indiscriminate destruction of unhoused people's valuable personal

25    property belies any claim that HSOC's conduct is defensible as protecting the public from genuine

26    safety-hazards. *See*, *e.g.*, *Mitchell v. City of L.A.*, No. CV 16-01750 SJO (GJSx), 2016 U.S. Dist.

27    LEXIS 197949, at *9 (C.D. Cal. Apr. 13, 2016) (finding the government's interest in cleaning

28    inadequate when the city "summarily dispose[d] of essential medications and medical equipment,

1   without distinguishing contaminated property from other property and without separating each

2   individual's property"); *Rios v. Cnty. of Sacramento*, 562 F. Supp. 3d. 9999, 1016 (E.D. Cal. 2021)

3   (where the "[c]ounty's only professed interest was in removing the [plaintiffs] and their

4   belongings," "[i]t could have accomplished that goal without taking the plaintiffs' belongings

5   indiscriminately into garbage trucks and driving them away").

6           ~~144.~~140.      Even in the few instances where the City does bag and tag property,

7   unhoused individuals are rarely able to recover their property. When they visit the location where

8   their property is allegedly stored by DPW, DPW workers consistently tell them they cannot find

9   their property or that it has been lost or disposed of, again contrary to their stated policies. *Cf.*

10  DPW Proc. No. 16-05-08 ("the department will store personal items for 90 days").

11          ~~145.~~141.      In other words, HSOC's actual custom and practice is not to inventory and

12  store the personal property of homeless individuals. Nor does HSOC provide unhoused individuals

13  with an opportunity to recover their personal property. This is a wholesale rejection of the City's

14  stated policies.

15          H.      DPW and SFPD Also Conduct Their Own Daily, Independent, and Unlawful

16                  Sweep Operations in Violation of City Policy.

17          ~~146.~~142.      Planned HSOC sweeps involving the full task force of SPFD, DPW, HSH,

18  DEM, DPH, SFFD, and other staff are the City's most conspicuous response to homelessness. But

19  the City also conducts more informal sweep operations on a daily basis.

20          ~~147.~~143.      Specifically, SFPD dispatches officers in response to calls about

21  homelessness on a daily basis. When SFPD arrives onsite, officers often order unhoused people to

22  "move along" under threat of citation or arrest, though there is not even the guise of an offer of

23  services because SFPD officers often have no information about or ability to offer shelter beds

24  without other City agencies that are not dispatched. *Cf.* SFPD Bulletin No. 19-080 (before an order

25  to vacate can be criminally enforced for non-compliance, SFPD is required to confirm that there

26  has been a "written offer of shelter or housing at least 24 hours before ordering removal of a tent

27  or encampment").

28          ~~148.~~144.      SFPD conducts these regular enforcement activities despite knowing that

1    the City lacks sufficient shelter to house its unhoused population and knowing that unhoused

2    people have no voluntary access to shelter in the City. These SFPD enforcement operations happen

3    everywhere across the city and at all hours, including the middle of the night.

4          ~~149.~~145.         SFPD has an explicit custom and practice of authorizing its officers to cite

5    and arrest unhoused people for failing to "move along" without any attempt to offer shelter, as

6    long as the officers are policing in area where an HSOC sweep has already taken place. SFPD's

7    "mission descriptions" lists the "goal of re-encampment prevention is to re-secure and clean areas

8    where there have been encampment resolutions and to ensure no tents, structures and vehicles

9    remain. <u>In general, sheltering options will not be offered unless there is an urgent situation[.]</u>"

10   (emphasis in original).[120] SFPD uses this practice to threaten individuals with citation or arrest

11   whether or not there is present shelter availability, and regardless of whether they ever received an

12   offer of services at a prior sweep operation. SFPD also has its own pick-up truck out of its

13   Tenderloin station that it uses to remove property illegally as well.

14         ~~150.~~146.         Similarly, DPW dispatches to perform street cleaning in different

15   neighborhoods across San Francisco on a daily basis and conducts informal sweep operations to

16   displace unhoused people as a part of that process. DPW interacts with hundreds of unhoused

17   individuals each month. Yet, contrary to its stated policies, DPW consistently seizes and disposes

18   of homeless individuals' valuable personal property and survival gear without following the City's

19   Bag and Tag policies.

20        I.    <u>The City's Own Public Records Reveal Rampant Criminalization and Property</u>

21              <u>Destruction and Widespread, Massive Non-Compliance with Constitutional</u>

22              <u>Requirements and the City's Own Written Policies Prohibiting these Practices.</u>

23         ~~151.~~147.         Extensive public records work demonstrates the extent of the City's custom

24   and practice of criminalizing unhoused individuals and destroying their property—which is a

25   process that impacts thousands of unhoused individuals each year.

26

27   _____

28   [120] HSOC Daily Operations Call, Mar. 30, 2021, Mission Descriptions.

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1        **1.     The City Regularly Conducts Sweep Operations on Days it Knows it**

2              **Has Insufficient Shelter.**

3        ~~152.~~148.         Although the City does not keep appropriate records of the daily informal

4   sweep operations carried out by SFPD and DPW, formal HSOC sweeps are scheduled and fairly

5   well-documented. Through public records, it is therefore possible to identify whether—on any

6   given day where an HSOC sweep took place—the City had enough available shelter beds to offer

7   the unhoused people it targeted for enforcement.

8        ~~153.~~149.         For example, between January 1, 2021 and June 30, 2021, HSOC conducted

9   sweep operations on 83 days—which corresponds to two major sweep operations involving all

10  participating HSOC agencies every week. On 73 out of the 83 days (88.0%) where HSOC

11  conducted camp resolutions, HSH shelter availability records prove that the City did not have an

12  adequate or sufficient number of shelter beds to house even the people HSOC forcibly displaced

13  on that day—let alone the thousands of San Franciscans with no voluntary access to shelter across

14  the City. The daily median of available beds during this period was 50%—or one bed available for

15  every two persons displaced.

16       ~~154.~~150.         As a result, HSOC displaced at least 1,282 people experiencing unsheltered

17  homelessness from sites they were inhabiting, over the course of 6 months, without nearly enough

18  shelter to house these individuals. *Cf.* S.F. Police Code § 169 (the City is required to "offer

19  Housing or Shelter to all residents of the Encampment who are present" and "shall not enforce the

20  prohibition […] unless there is available Housing or Shelter for the person or persons in the

21  Encampment").

22       ~~155.~~151.         A 2022 report by the Latino Task Force found that 64.8% of survey

23  participants had been asked to move without an accompanying offer of a place to move. Nearly

24  60% of survey respondents said that they had been displaced by the City at least one time in just

25  the past four weeks, and nearly 20% of all respondents had been forced to move by the City five

26

27

28

                                        ~~SECOND~~THIRD AMENDED COMPLAINT FOR
                                        DECLARATORY AND INJUNCTIVE RELIEF
                                        CASE NO. 4:22-CV-05502-DMR

1   or more times during this same short period.[121]

2       156.152.    Far from the services first approach HSOC promises, in January and

3   February 2021, HSOC connected only 30% of unhoused individuals it encountered with shelter

4   and connected none to permanent housing.[122]

5       157.153.    These numbers pale in comparison to the daily SFPD and DPW sweep

6   operations that are conducted without documentation and without even the guise of offering

7   services to unhoused individuals.

8       **2.    SFPD Continues to Cite or Arrest Thousands of Unhoused People for**

9       **Sleeping in Public Despite a Lack of Shelter.**

10      158.154.    Public records also make it clear that SFPD is engaging in widespread

11  enforcement of quality-of-life offenses that criminalize homelessness despite a complete lack of

12  daily shelter availability and the fact that unhoused individuals have had no voluntary option to

13  seek shelter from the City since April 2020. A Policy Analysis Report from the Budget and

14  Legislative Analyst's Office to the Board of Supervisors notes that police officers have been a

15  highly visible and active presence when encampments are cleared by the City.[123]

16      159.155.    For example, between July and September 2021, police were dispatched in

17  response to "homeless complaints" (also known as 915 calls) at least 3,606 times. This data

18  indicates that a law enforcement officer was dispatched to respond to a "homeless complaint"

19  between 744 and 965 times each month, as opposed to a HOT team worker who is theoretically

20  trained to provide support and services to unhoused individuals if available.

21      160.156.    Meanwhile, SFPD citation and arrest data indicates that over the three-year

22  period from July 2018 to October 2021, SFPD cited or arrested unhoused people for illegal lodging

---

[121] 2022 Street Needs Assessment 25, LATINO TASK FORCE (June 16, 2022), https://www.ltfrespuestalatina.com/_files/ugd/bbc25b_99f10a84713449bd9e24e1ec89bb1c0c.pdf.

[122] Behind the Healthy Streets Operation Curtain: The True Story of San Francisco's Abusive Encampment Response, *supra* note 6, at 6.

[123] Policy Analysis Report, *supra* note 103, at 16.

SECONDTHIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF CASE NO. 4:22-CV-05502-DMR

1    under California Penal Code § 647(e) at least 360 times.

2        161.157.    During the same three-year period, SFPD cited or arrested unhoused people

3    under California Penal Code § 148(a) for refusal to obey a law enforcement order to vacate or

4    "move along" at least 2,652 times.

5        162.158.    These numbers do not begin to include SFPD citations and arrests for a

6    variety of other quality-of-life offenses targeting unhoused individuals, including: San Francisco

7    Park Code §§ 3.12-3.13 (no lodging or sleeping); California. Penal Code §§ 370, 372, and San

8    Francisco Health Code §§ 581, 596 (public nuisance, including obstructing streets or sidewalks).

9        163.159.    SFPD has cited or arrested at least 3,000 unhoused individuals for sleeping

10   or residing in public over the last three years during a time when San Francisco had insufficient

11   and inadequate shelter to provide to its unhoused residents.  It has threatened to enforce these laws

12   against thousands more.

13        **3.    City Logs Document Essentially No Storage or Safeguarding of**

14            **Property Despite Sweeping Hundreds of Unhoused People Each**

15            **Week.**

16        164.160.    Public records also demonstrate the City's widespread property destruction

17   and failure to bag and tag the personal property of unhoused individuals.

18        165.161.    DPW's Bag and Tag logs—which are meant to reflect the extent of property

19   safely collected and stored for unhoused individuals—reflect a profound lack of documentation,

20   accountability, and oversight in property removal and storage and instead suggest that there is

21   property destruction occurring at encampment sweeps and street cleanings in San Francisco in

22   direct violation of federal guidelines and City policies.

23        166.162.    For the entire 6-month period between January 1, 2021 and June 30, 2021,

24   DPW only logged 195 items or bags of belongings—during a time when HSOC reported removing

25   1,282 unhoused individuals through encampment resolutions.

26        167.163.    The disparity between the sheer *number* of people subjected to encampment

27   resolutions and the number of logged bag and tags by DPW suggests that San Francisco fails to

28   comply with its bag and tag policies during the vast majority of interactions with individuals

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1  experiencing homelessness.

2  ~~168.~~164.    The 2022 survey by the Latino Task Force found that 74.7% of respondents

3  reported they had recently had personal items such as survival gear lost in a sweep because they

4  were not bagged and tagged.[124]

5  ~~169.~~165.    The City Attorney's office reports receiving over 30 administrative claims

6  from unhoused people complaining of property destruction since 2019. This number is remarkable

7  given the barriers unhoused people experience when attempting to access the legal system. The

8  City has already paid out well over $100,000 to settle these recent claims and the small claims

9  lawsuits that have followed.

10  ~~170.~~166.    In August 2021, the Honorable Judge Michelle Tong of the San Francisco

11  Superior Court determined that the City had destroyed the property of 10 unhoused individuals

12  during an HSOC sweep operation—and noted in the decision that "DPW notices for bagging and

13  tagging […] were not provided to the Court by any of the Defense witnesses." These matters were

14  later settled on appeal for a monetary settlement award.

15  ~~171.~~167.    These public records are consistent with social science research showing

16  that between 38% and 46% of unhoused individuals in San Francisco have reported having their

17  belongings confiscated and destroyed by City employees while experiencing homelessness—in

18  violation of City policy.[125]

19  J.    The Coalition on Homelessness Diverts Its Limited Resources to Document the

20        City's Constitutional Violations and to Protect its Members from Ongoing Rights

21        Violations.

22        1.    The Coalition Diverts its Resources to Monitor the City's HSOC

23              Sweeps.

24  ~~172.~~168.    Over the past twenty years, Coalition staff heard about Defendants'

25  homeless sweeps sporadically during outreach to unhoused people. In the last several years, the

26  _____

27  [124] 2022 Street Needs Assessment, *supra* note 126, at 26.

28  [125] Herring & Yarbrough, *supra* note 10, at 2, 32.

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1    reports have become much more severe. Since 2018—after Defendants began running their

2    Healthy Streets Operation Center ("HSOC")—the Coalition has heard about significantly more

3    property destruction and threats of arrest as the result of methodical, cruel, and repetitive sweeps

4    in San Francisco neighborhoods almost every day of the year.

5        173.169.    As a result, the Coalition made the difficult choice to depart from its

6    mission-related activities—proactive housing and homelessness prevention and support work—to

7    respond to the dire need to protect unhoused people from Defendants' ongoing criminalization and

8    property destruction practices.

9        174.170.    This shift was necessary because the criminalization of homelessness and

10    destruction of survival property fundamentally disrupt the ability of unhoused people to rebuild

11    their lives and must be immediately addressed before the Coalition can focus on its ultimate goal

12    of securing proactive solutions to San Francisco's homelessness crisis.

13        175.171.    These circumstances impose a tremendous burden on the Coalition, and

14    directly interfere with its ability to help unhoused people exit homelessness or to help organize the

15    unhoused community to advocate for housing reform. The Coalition has diverted its staff and

16    volunteer time away from advocating for affordable housing and improved shelter to minimizing

17    the harm from Defendants' sweeps by: sending staff and volunteers to monitor daily large-scale

18    sweep operations, training staff and volunteers to approach City workers and stop them from

19    violating their own policies and the law, and deploying staff and volunteers to advocate on behalf

20    of unhoused people who are having their survival belongings seized, are being threatened with

21    arrest, or who are not being offered appropriate shelter.

22        176.172.    Sweeps also cause unhoused people to be displaced in large numbers. This

23    displacement—which occurs almost on a daily basis—makes it much more difficult for the

24    Coalition to stay in contact with its members or to maintain and secure new active members.

25    Defendants' sweeps have resulted in the Coalition losing touch with countless members over the

26    past several years, and have presented significant obstacles that have prevented the Coalition from

27    being able to secure new membership.

28        177.173.    The Coalition's unplanned, reactive work to monitor and protect unhoused

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

people from Defendants' sweeps has had a measurable fiscal impact on the organization. In 2018 when HSOC's sweeps began, the Coalition had to divert one staff member to work half of their time on monitoring homeless sweeps—with the rest of the organization's staff efforts focused on its proactive work to advocate for housing and shelter. With the total compensation to one full-time employee of $58,244.69 (including benefits), the approximate cost to the Coalition of sweeps monitoring at that time was $29,122.34.

178.174.    In 2019, however, recognizing the need for more direct monitoring, the Coalition began dedicating one full-time and one part-time employee to sweep monitoring and response work, with each employee spending at least half of their time monitoring sweeps. With the total compensation to 1.5 full-time employees of $90,080.66, the approximate cost to the Coalition of sweeps monitoring that year increased to $45,040.33.

179.175.    In 2020, with the increased frequency and destructiveness of HSOC sweeps—even with HSOC halting some regular sweep activity for four months because of the COVID-19 pandemic—the Coalition was again forced to increase its sweeps monitoring work to include two full-time employees—each spending at least two-thirds of their time on this reactive monitoring work. With the total compensation to 2 full-time employees of $130,947.86 that year, the approximate cost to the Coalition of sweeps monitoring jumped to $86,425.58.

180.176.    In 2020, the Coalition also spent $28,000 on tents and survival belongings in the face of HSOC's sweeps to replace what the City took from unhoused people. The money the Coalition used to purchase tents was from cash donations that otherwise could have been spent on emergency support, payment to unhoused people for conducting and participating in surveys, and meeting staffing needs. The staff time conducting this fundraiser likewise could have been spent on fundraising or other projects for the Coalition's core mission activities.

181.177.    In 2021, the Coalition was forced to engage staff from all program areas to help monitor and stop Defendants' sweeps—including producing a report on sweeps, monitoring police activities at sweeps, setting up a volunteer network, and setting up administrative clinics to file claims related to property confiscated at sweeps. This required the Coalition to dedicate three full-time employees to this effort. The total cost to the Coalition of sweep monitoring during this

1    year skyrocketed to $134,246.56.

2    ~~182.~~178.    The Coalition is a small organization with a limited and fixed budget, and

3    these expenditures substantially limit the amounts that the Coalition can spend on its proactive

4    work to end homelessness or its campaigns to build affordable housing and shelter.

5                    **2.    The Coalition's Active Members Have Experienced Defendants'**

6                         **Criminalization and Property Destruction First-Hand.**

7    ~~183.~~179.    The Coalition is an advocacy organization of, by, and for unhoused people

8    in San Francisco. Its members are comprised almost entirely of unhoused people or people with

9    lived experience who supervise, direct, and lead the Coalition's work. The Coalition has dozens

10   of active members at any given time and has had hundreds of active members over the years.

11   ~~184.~~180.    Many of the Coalition's individual members have been directly impacted

12   by the City's criminalization and sweep policies. The Coalition's staff and volunteers engage with

13   several members each week who have been victimized by Defendants' harmful criminalization

14   and sweep policies. The Coalition has drafted administrative claims for property destruction

15   against the City on behalf of several of these members—and has filed at least 23 administrative

16   claims since September of 2021.

17   ~~185.~~181.    Some of the Coalition's most active members have been particularly

18   impacted. For example, Couper Orona, Shyhyene Brown, and Toro Castaño are unhoused people

19   who have been active members in the Coalition and help lead the Coalition's human rights working

20   group. But each of these individuals has also lived through threats of arrest and have lost their

21   valuable personal property in Defendants' sweeps over the last several years.

22        K.    The Coalition Has Documented Dozens of the City's Repeated Constitutional

23              Violations Against its Unhoused Residents.

24   ~~186.~~182.    In response to the City's sweeps, the Coalition on Homelessness has been

25   forced to dispatch its staff and volunteers to regularly monitor the City's conduct and to intervene

26   to assist unhoused individuals when they are being targeted for citation or arrest, are having their

27   belongings seized, or are being displaced without being offered an appropriate shelter placement.

28   ~~187.~~183.    The Coalition staff and volunteers have attended and observed both large-

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

scale HSOC encampment operations and more informal SFPD and DPW sweep operations when

unhoused individuals call to report that a sweep is underway.

188.184.    The Coalition has documented a large number of these sweep operations. It

has also assisted unhoused individuals at countless other sweep operations that were never

documented or recorded. The table below summarizes dozens of specific sweeps over the last two

to three years where the Coalition, its staff, volunteers, and members directly observed: (1)

unhoused individuals subject to arrest or other consequences during a sweep operation—often

where there was clearly no proper shelter offer made; (2) instances of inadequate notice prior to a

sweep; and (3) instances of property destruction without following the City's Bag and Tag

protocols.

***Enforcement and Property Destruction Actions Observed by the Coalition on Homelessness***

| Date | Location | Description of the Sweep |
|------|----------|--------------------------|
| June 18, 2020 | Castro | SFPD officer threatened an unhoused man with a misdemeanor if he did not move his belongings. The unhoused individual was not offered a hotel room. |
| January 3, 2019 | Division & 13th St. | An unhoused individual had all of his belongings confiscated without notice and later received a citation for illegal camping. |
| March 24, 2020 | Near the Rainbow Grocery | SFPD and DPW conducted a sweep without providing advance notice at the site. DPW seized an unhoused individual's tent and belongings and threw them into a garbage truck because the person was not present at the site. SFPD Officer J. Sylvester suggested the property was destroyed because there was nothing of "extreme" value in the property. |
| May 6, 2020 | San Francisco Public Library | SFPD officers engaged in conversation with an unhoused man in a tent near the San Francisco Public Library. Officers and library security guards returned several moments later with orders for the individual to move his tent and belongings. |
| June 15, 2020 | Turk & Hyde | DPW, SFPD, SFFD and HOT workers conducted a sweep without advance notice. A wheelchair, a walker, and several tents were placed in a dump truck while the property owners watched. |
| July 23, 2020 | 1377 Fell St. | Individuals were told to remove their tents for a cleaning operation. A homeless woman who was not present at the scene at the time had her tent thrown away. No advance notice was posted at the site. |
| August 11, 2020 | Noe & 14th | During a sweep, some individuals were offered hotels and some were offered a safe outdoor sleeping site, but others were offered only a congregate shelter during the pandemic—prior to |

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

| | | anyone in the U.S. being vaccinated. One person at the site who did not receive a viable shelter offer was given his neighbor's tent. A DPW supervisor slashed an unhoused individual's tent with a box cutter to render it unusable. No advance notice of the sweep was posted at the site. |
|---|---|---|
| August 21, 2020 | Market & 16th | During a sweep, unhoused individuals were preparing to relocate elsewhere in the neighborhood and were gathering their belongings when they were forced to leave. An unhoused individual asked repeatedly for DPW and SFPD to retrieve his Macbook Pro laptop and his tent before they destroyed the site. That request was not heeded. His property was destroyed, and he was arrested for illegal camping. No advance notice was posted at the site. |
| September 18, 2020 | Julien & 16th | City workers seized bicycles without bagging and tagging. The bicycles were never returned. Another individual storing items in their tent reported that their tent and belongings were taken during the sweep. No advance notice was posted at the site. |
| October 5, 2020 | Ashbury & Grove | The City seized and trashed all of the personal belongings of an unhoused woman who had left to use the bathroom. No notice of the sweep was posted at the site. |
| November 1, 2020 | Willow & Broderick | SFPD Officers Brady (#4258) and Burkhart ordered a "move-along" and acknowledged that many people were forced to leave their tents behind because of the order to leave the area. People lost tents and other survival belongings. No shelter was offered to the approximately 14 homeless people on site. No advance notice was provided. |
| March 26, 2021 | Bayview (across from food bank) | SFPD threatened an unhoused woman and her partner with citation or arrest if they did not leave the area by afternoon. There was no one there to offer them shelter. |
| April 13, 2021 | Turk & Hyde | DPW cut the tent of an unhoused man while he was talking to HOT. DPW also confiscated and trashed the tent and all personal belongings of another unhoused individual without bagging and tagging. A Black man in his sixties who uses a wheelchair was told that he was not eligible for shelter. Later, the City told him they only had beds for couples available. About half of the residents of the encampment had already left by the time that shelter was made available that morning. |
| April 15, 2021 | Russ & Howard | City employees destroyed a homeless individual's tent via a crusher truck. Additionally, another individual, who is deaf, had her belongings confiscated by City workers, who did not account for her disability when communicating with her. As a result of the City not bagging and tagging, she lost several of her belongings that day. |

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

| April 20, 2021 | Jones (from Ellis to Golden Gate) | During this sweep, HOT offered one woman a hotel room. However, while she was waiting for the hotel room to become available, DPW attempted to seize and discard her tent. When she refused to leave, DPW accused her of being service resistant even though she was waiting for services. At this same sweep, HOT did not initially offer a hotel room to two other individuals that were present. Although HOT eventually offered to take them to a hotel, the transport to the hotel never arrived. |
|---|---|---|
| April 23, 2021 | Under the freeway at S. Van Ness | HOT workers left the scene while the sweep was still occurring. They returned later, briefly, but did not offer any shelter that day. Homeless individuals were left waiting for shelter bed offers that never came. |
| May 12, 2021 | Larkin & Turk | SFPD woke a man sleeping in his tent to remove the man from the location. No shelter was offered. |
| May 12, 2021 | Olive | SFPD and DPH disposed of the tent of an unhoused individual who had left the area momentarily to go to the restroom. |
| May 13, 2021 | Willow St. | DPW threw an unhoused man's unattended tent, which contained his personal belongings, into a crusher truck. |
| May 24, 2021 | Jones St. (from Ellis to Golden Gate) | HOT team personnel offered shelter to more unhoused individuals than they had beds available for. Despite the lack of shelter available, DPW and SFPD swept the area. |
| June 1, 2021 | Showplace Square | DPW trashed unhoused individuals' belongings without bagging and tagging. |
| June 8, 2021 – June 11, 2021 | Willow St. (near Project Open Hand) | City employees conducted a three-day sweep in which unhoused people were told to "just move" under threat of arrest or citation if they did not comply. One individual with a back injury was told to move his belongings. When he did, the City trashed them anyway. |
| [June/July] 15, 2021 | Olive | An unhoused individual told officers and DPW workers that he had spent the day moving his belongings and had not been offered any shelter. |
| July 19, 2021 | Olive | During this sweep, no HOT outreach workers were present. Instead, Northern Station's "homeless outreach" police officer told residents to "move along." |
| July 21, 2021 | Florida between 19th & 20th | A sweep was conducted without advance notice. HSOC did not offer shelter to four unhoused men. Instead, HSOC asked them to surrender their belongings, and HSOC dragged one man's tent into the St. to continue with sidewalk cleaning. No bagging and tagging occurred. |
| August 3, 2021 | Willow St. | A DPW worker dragged an individual still in their tent towards the DPW truck. |
| August 15, 2021 | Willow & Olive | Jeff Kositsky led a sweep and spoke to an unhoused woman, urging her to leave the area. He promised shelter in the Mission, transportation, and packing assistance, but withdrew the offer later in the day, |

SECOND THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

| | | after she had already prepared to leave. No advance notice of the sweep was posted at the site. |
|---|---|---|
| August 20, 2021 | 15th & San Bruno | During a sweep, the incident commander on the scene, named Nate, cut up a homeless person's tent. |
| September 3, 2021 | 16th & Dolores | SFPD threatened unhoused people with citations if they didn't clear the area. Residents were told they were being "cleared" from the block because the nearby temple wanted them gone. The police left when the Coalition on Homelessness began filming them. |
| September 16, 2021 | Haight & Clayton | No advance notice was posted at the site. DPW power washed the Street aggressively four times to try to force the homeless people on the block to depart. Belongings were soaked and destroyed. |
| December 2021 | Division St. | The City confiscated and trashed all of the belongings of an unhoused individual while he had temporarily left his items unattended. He attempted to retrieve his belongings from DPW but was told they could not be retrieved. |
| January 7, 2022 | 16th & Market | During an HSOC operation, DPW told unhoused individuals that if they left their tents to go to the restroom, their property would be considered abandoned and would be thrown away. One person's tent was thrown away because the person was not present at the time of the sweep. HOT personnel told unhoused individuals that shelter was not available for anyone. Later in the day after the conclusion of the sweep, HOT returned with some shelter offers, but there were only congregate shelter spaces and not enough available for everyone. |
| March 8, 2022 | 26th St. | The City seized the personal belongings of an unhoused individual without notice, without offering shelter, and without bagging and tagging. |
| April 6, 2022 | 26th & Shotwell St. | The City seized the personal belongings of an unhoused individual without notice, without offering shelter, and without bagging and tagging. |
| April 26, 2022 | 26th & Shotwell St. | The City seized the personal belongings of an unhoused individual without notice, without offering shelter, and without bagging and tagging. |
| April 2022 | 16th & Pond St. | DPW seized and trashed the tent, bedding, dog food and other personal necessities of an individual who had been assisting another individual to move their belongings. No notice had been provided and the individual was not able to retrieve those items. |
| May 10, 2022 | 16th & Dolores | DPW seized the bedding, electronics, clothes, and dog food of an individual who had momentarily left them unattended. No notice had been provided and the individual was not able to retrieve those items. |
| June 2022 | 13th & Mission St. | DPW workers seized the purse, tent, and prosthetics of an unhoused individual in a wheelchair and put them into a dumpster truck. |
| June 3, 2022 | Embarcadero | DPW and SFPD seized and trashed unhoused individuals' belongings in a sweep. Unhoused individuals reported that the sweep began earlier |

67

| | | than had been displayed on the notice. Additionally, no shelter was offered and the city's emergency shelter system was 170 people over capacity. |
|---|---|---|
| June 23, 2022 | 13th & Fulsome St. | An unhoused individual was reassured by DPW workers that his belongings would be safe while he went to a doctor's appointment, but DPW workers seized and trashed his new tent, clothes, a laptop and two cells phones, nonperishable food, congestive heart failure medication, and a government issued ID. |
| July 14, 2022 | 12th & Market St. | DPW and SFFD employees repeatedly called a woman's belongings trash and tried to throw them away when she was not looking. |
| July 22, 2022 | 16th & Market St. | HOT workers required seized and trashed belongings and then power-washed the area without offering services. No notice of the sweep was provided. |
| August 2022 | 13th & Mission St. | DPW seized and trashed the belongings of an individual while she went to a doctor's appointment without offering shelter and without bagging and tagging. |
| August 2022 | 16th & Pond St. | DPW seized and trashed the tent, electronics, clothes, sentimental items, jewelry and dog food of an individual who was gone for less than an hour. No notice had been provided and the individual was not able to retrieve those items. |
| September 2022 | 13th & Fulsome St. | DPW workers woke an unhoused individual and took his tent and belongings, threatening him with arrest and citation if he resisted them. He never received notice and could not find any of his property at the DPW tow yard. |
| September 2022 | 13th & Mission St. | An unhoused individual was offered shelter, but she could only take a small number of belongings and was forced to leave her tent, sets of clothes, storage bags, and personal diaries behind, and has not been able to retrieve those items. |
| September 2022 | Mission near 16th St. | DPW threw away a single-man tent, a blanket, an emergency phone, a windup flashlight, and a care package of items needed to stay clam while living outside. |
| September 6, 2022 | Treat Avenue | DPW workers seized and trashed belongings without providing notice or offering services. |
| September 12, 2022 | Near 13th & Fulsome St. | DPW seized clothes and nonperishable food. |
| September 14, 2022 | 12th & Market St. | The City seized and trashed belongings and threatened individuals with arrest. No services were offered. Although a notice was posted in the area, the sweep occurred on a different date than the date identified in the notice. |

189.185.    Robert Gumpert is a San Francisco-based photographer who has devoted

his life to documenting social issues with his camera. He now volunteers with the Coalition on Homelessness and has spent countless hours meeting with unhoused people, hearing their stories, and photographing them. Gumpert's work captures the unhoused people he has met and connected with—including many who have been affected by the City's recent sweeps and property destruction.

190.186.    Below are just some of the many photos Gumpert has taken of unhoused people shortly after they experienced property destruction. Gumpert identifies these individuals as "sweep victims" and has documented and recorded their stories as a volunteer and collaborator with the Coalition.



191.187.    The photograph above was taken on Division Street and Florida Street in October 2021. Mia, who is 31 years old, is sitting in her tent with her boyfriend and another friend. Mia told Gumpert: "With the COVID thing people you would never imagine would be homeless, and they are. It could happen to anybody. It's messed up to dehumanize somebody because they don't have a house."

192.188.    Mia commented directly on DPW's conduct in her interview with Gumpert: "With the DPW everybody knows that if you're not home you lost everything, it doesn't matter what's in your tent. Me personally, I have my mom's ashes, I have my dog's ashes. People have personal objects and it's thrown away. It's never "bagged and tagged". If you're not home, they

throw it away. I've seen a girl dumped out of her tent. She was screaming 'Not again!' It's like [DPW is] their own street gang, and they just do whatever they want and nobody can do anything about it."

193.189.    Mia continued: "DPW, they're feared in a way. When they move you, it's kind of cruel. People will have their pile of personal belongs and then their pile of trash and I've seen them [DPW] go behind people's back and take stuff in their personal belongings pile and throw it away. I would imagine a lot of people on the street would have PTSD."



194.190.    The photograph above was taken in a parking lot under the freeway on Merlin Street in April 2021. Lakrisha, who is 38 years old, reflected on the City's property destruction. She told Gumpert: "They leave us here to fend for ourselves with no resources at all. The only time we do get resources is when we raise hell and cause problems for them."



195.191.    The photograph above was taken on King Street in January 2020. Addie, who is 51 years old, is seen sitting with her tent and other survival belongings. She reflected: "[With the DPW] you can't claim someone else's things no matter whether you're watching it for them while they run an errand or what. They don't allow you to do that. You cannot take someone else's stuff down for them and move it, that's their rules. It's not fair because each of us watches each other's things to where we don't have the problem of losing all of our stuff. It breaks [the community] apart when one can't take care of their friends' or neighbor's stuff, when DPW comes out. That person gets angry and upset, 'well where's my stuff, why did you let them take it?'"

196.192.    Gumpert also conducted an interview with Jesse, a 43-year-old staying at the corner of Alameda Street and Utah Street on January 28, 2021. Jesse told Gumpert: "[The hardest thing about being out here is] DPW and the police messing with you every day.  Forcing you to move and they got no "resolution", they got no solution, they say get out of here. Move down the street and they power wash everything and throw all your stuff away and then leave you sitting out there in the rain."

197.193.    Jesse continued: "It happens every day.  It happened just now again today. No notice, they just came this morning, without a solution – no shelter, not Nav Center, no nothing. They just said you're gone, threw a bunch of stuff away. You can't have this, you can't have that, now move along, now move along."

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

198.194.    The Coalition, its staff, and volunteers, continue to monitor the City's criminalization of homelessness and property destruction on an ongoing basis.

L.    The City's HSOC Sweeps and Other Criminalization and Property Destruction Programs Fail to Accommodate Unhoused Individuals' Disabilities.

199.195.    Thousands of unhoused individuals in San Francisco are living with a physical or mental disability.[126]  Being forced to live outside, without shelter, without the safety and security of a home or a door you can lock, dramatically increases the likelihood that someone will develop a disability while they are homeless.[127]

200.196.    Despite the large number of unhoused individuals living with a disability in San Francisco, the City regularly fails to provide reasonable accommodations to its unhoused residents. Specifically, the City does not provide enough time for unhoused people with disabilities to move their belongings during sweeps and the City fails to provide adequate, accessible shelter to unhoused people with disabilities.

201.197.    It is common, for example, for DPW and SFPD to confiscate medication and medical devices, including mobility aids, that unhoused disabled people rely on for daily life. The City has also summarily thrown away the belongings of disabled individuals with back and spinal injuries, among other disabilities, before these individuals have had sufficient time to remove their belongings—even when individuals have clearly stated that they needed more time because of their disabilities.

---

[126] Laura Waxmann, *City struggles to meet housing needs of growing number of homeless with disabilities*, S. F. EXAMINER (Oct. 26, 2019), https://www.sfexaminer.com/archives/city-struggles-to-meet-housing-needs-of-growing-number-of-homeless-with-disabilities/article_24ca38db-827b-5689-9aa3-0bb8de62a9a6.html ("Most of the estimated 8,011 people who are homeless in the City on any given night have some type of disability, whether mental or physical."); San Francisco Homeless Count &. Survey Comprehensive Report 2019, at 28, S.F. DEP'T OF HOMELESSNESS & SUPPORTIVE HOUS. (2020), https://hsh.sfgov.org/wp-content/uploads/2020/01/2019HIRDReport_SanFrancisco_FinalDraft-1.pdf (finding that 27% of San Francisco's unhoused population self-reported having a physical disability).

[127] *See Homelessness & Health: What's the Connection?*, NAT'L HEALTH CARE FOR THE HOMELESS COUNCIL (Feb. 2019) https://nhchc.org/wp-content/uploads/2019/08/homelessness-and-health.pdf.

202.198.     Because shelter is so scarce in San Francisco, it is much more difficult for disabled unhoused people to find shelter that will accommodate their needs. Nonetheless, DPW and SFPD subject disabled unhoused people to sweeps without taking any steps to provide for their particular shelter needs in coordination with the HOT team—if shelter is offered at all. This is so despite the City's written policies that tell City employees that they must take into account individuals with "special needs."

203.199.     The Coalition on Homelessness—which is comprised of and regularly works with many disabled unhoused people—has regularly observed and documented these failures. Volunteers from the Coalition on Homelessness who monitor sweeps have routinely observed the City both fail to provide sufficient time to allow disabled people to move and fail to offer adequate, appropriate, accessible shelter. The table below includes just a few of these examples:

| Sweep Date | Location | Description of ADA Violation |
| --- | --- | --- |
| June 2020 6/15/20 | Turk Street & Hyde Street | HSOC provided no advance notice before placing dump truck destroying a wheelchair, a walker, and several tents without bagging and tagging the items. |
| April 13, 2021 | Turk Street & Hyde Street | DPH and HOT told an older man who used a wheelchair that he was not eligible for shelter. They later told him that there were only beds for couples available. He did not receive any shelter. |
| April 15, 2021 | Russ & Howard | During a sweep, the City failed to communicate properly with a deaf unhoused person. DPW workers indiscriminately grabbed and destroyed her personal belongings without bagging or tagging them. |
| June 8-11, 2021 | Willow St. (near Project Open Hand) | An individual with a back injury was ordered to move all of his belongings. After he moved them, DPW threw his belongings away without bagging and tagging them. He was not offered any shelter. |
| February 2022 | Masonic & Geary | Although the City had posted notice of the sweep, it came a day earlier than the notice said. DPW told an unhoused person with two broken feet that he had ten minutes to pack up and leave. He was not offered any shelter. COH had to intervene to make sure he did not have to end up moving. |
| June 2022 | 13th & Mission St. | DPW workers seized the purse, tent, and prosthetics of an unhoused individual in a wheelchair and put them into a dumpster truck. |

SECONDTHIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1    ~~204.~~200.         In short, the City's custom and practice is not to accommodate the needs of

2    disabled unhoused individuals.

3         M.    <u>Criminalization of Homelessness and Property Destruction Sweeps Have Profound</u>

4               <u>and Deeply Harmful Health Impacts—and Actively Expose Unhoused People to</u>

5               <u>Further Harm.</u>

6    ~~205.~~201.         Social science literature demonstrates that sweep operations harm both the

7    physical and mental health of unhoused individuals—when unhoused individuals are already at

8    greater health risk by virtue of being forced to sleep in public without shelter.[128]

9    ~~206.~~202.         The City's sweeps endanger the health of unhoused people by confiscating

10   and destroying unhoused individuals' survival gear, including tents, clothing, blankets, and food.

11   When unhoused people lose their tents or other forms of shelter, they lose protection from the

12   elements, a space to store their belongings, privacy, and security—all of which are critical for

13   health and survival outdoors.

14   ~~207.~~203.         Unhoused individuals also use survival gear to keep warm, cook their food,

15   filter their water, and perform basic first aid, among other purposes. When the City takes and

16   destroys the survival gear of unhoused people, it subjects them to additional dangers—including

17   exposure to the elements, dehydration, and malnutrition.

18   ~~208.~~204.         A study on the public health impact of criminalizing homelessness in

19   Denver found that when police increased enforcement of camping or shelter bans—including

20   confiscating survival belongings—unhoused people were 45% more likely to suffer from weather-

21   related health issues such as frostbite, heatstroke, and dehydration.[129] Even if it can be treated,

22

---

23   [128] *See, e.g.*, Marisa Westbrook & Tony Robinson, *Unhealthy by design: health and safety*

24   *consequences of the criminalization of homelessness*, 30 J. SOC. DISTRESS & HOMELESSNESS 107,
     107-08, 112-13 (2020) (finding that the criminalization of homelessness harms the health and

25   safety of unhoused people and "the health and wellbeing of people experiencing homelessness is
     worsened through 'quality of life' policing"); Herring & Yarbrough, *supra* note 10, at 24;

26   *Homelessness & Health: What's the Connection?*, *supra* note 132 ("Simply being without a home
     is a dangerous health condition.").

27
     [129] Westbrook & Robinson, *supra* note 133, at 111-12.

28

~~SECOND~~<u>THIRD</u> AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1    extended weather exposure is dangerous and harmful to unhoused people's long-term health.[130]

2        209.205.        Because survival gear is expensive and difficult to replace, unhoused people

3    in San Francisco spend days or weeks attempting to replace the survival belongings that the City

4    destroys during its tent clearance and sweep operations—at great risk to their physical wellbeing.

5    This is especially the case when the City throws out belongings indiscriminately, resulting in

6    unhoused individuals losing medications that are vital to their healthcare and losing government

7    IDs and other valuable paperwork that is critical for unhoused people to receive medical care and

8    other social services.[131]

9        210.206.        The loss of property for unhoused people that have so little is also mentally

10   devastating and causes severe psychological stress, emotional trauma, depression, hyper-vigilance,

11   anxiety, fear, insomnia, loss of trust and security, hopelessness, and loss of motivation for self-

12   care.[132] Sweeps cause recurring trauma by subjecting unhoused individuals to humiliating and

13   dehumanizing displacement and property destruction, fostering deep mistrust of the very

14   institutions that claim to help them.[133] These serious mental health conditions—brought on by the

---

16   [130] *See* Health Care for the Homeless Clinicians' Network, *Exposure-Related Conditions: Symptoms and Prevention Strategies* at 1-2, 11 Healing Hands, No. 6 (Dec. 2007), https://nhchc.org/wp-content/uploads/2019/08/Dec2007HealingHands.pdf (discussing exposure-related conditions, including prevalence of hypothermia among unhoused San Franciscans and noting that "exposure to the environment is often a contributing factor to morbidity and mortality from other causes").

20   [131] *See Homelessness & Health: What's the Connection?, supra*, note 132 (discussing how health conditions for unhoused individuals worsen when "there is no safe place to store medications properly"); Jennifer Darrah-Okike et al., *"It Was Like I Lost Everything": The Harmful Impacts of Homeless-Targeted Policies*, Housing Policy Debate, 28:4, 635-651, (2018) (discussing loss of important government documents and the impacts on access to important services).

23   [132] *See* Jennifer Darrah-Okike et al., *supra*, note 136 (documenting how sweeps in Honolulu caused feelings of alienation, dehumanization, anxiety, and fear and noting that these can exacerbate existing mental health issues); Marisa Westbrook & Tony Robinson, *supra* note 128 at 107, 110-11 ("Frequently being woken by police, and stress over possible police contact, is significantly correlated with short periods of uninterrupted sleep, inadequate total hours of sleep, and a variety of sleep-related health disorders").

27   [133] *See* Jennifer Darrah-Okike et al., *supra*, note 131*, Westbrook & Robinson, *supra* note 128 at 107, 110-12.

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

City's sweeps—prevent unhoused people from rebuilding stability in their lives and prevent them from exiting homelessness.

211.207.    Police interactions at sweeps also result in lasting, clinical anxiety for unhoused individuals—particularly because unhoused individuals are petrified that their belongings may be taken in the future and that they will have to start over yet again with no protection from the elements.[134] These well-founded fears prevent unhoused people from leaving their belongings even for brief periods of time—with the result that they are unable to leave to access shelter, search for employment, secure housing, or attend to their healthcare needs.

212.208.    In addition to the serious physical and mental health risks the City visits upon unhoused individuals by displacing them and sweeping their belongings, sweeps also expose unhoused individuals to a serious risk of violent crime. Unhoused individuals develop stability and safety in the shelter they build for themselves. Policing and forced removal disrupts that cycle and forces unhoused individuals to move to areas and settings where they are far less likely to be safe.[135] For example, Denver's public health and homelessness study showed that those who felt compelled to move to avoid citation and arrest experience significantly higher rates of physical assault, robbery, and violent threats.[136] Specifically, those compelled to move to avoid law enforcement consequences were twice as likely to be physically assaulted and 39% more likely to be robbed than those who did not have to move.[137]

213.209.    These realities establish that the City's criminalization of homelessness, sweeps, and property destruction actively endangers unhoused individuals and exposes them to

---

[134] See Westbrook & Robinson, *supra* note 128 at 133 ("[T]he already poor mental health of homeless individuals is exacerbated by frequent contact with police. A majority of our survey respondents (56.7%) noted that they were stressed by thinking about police contact multiple times every day. There is also a significant correlation between actual police contact and a deterioration in how homeless respondents feel about their own mental health.").

[135] See Westbrook & Robinson, *supra* note 133 at 111; *see also* Herring & Yarbrough, *supra,* note 10, at 58.

[136] See Westbrook & Robinson, *supra* note 133, at 111.

[137] *Id.*

1    serious health risks and bodily harm.

2        N.    Monell Allegations: The City and its Agencies Have a Demonstrated Custom and

3              Practice of Criminalizing Homelessness and Destroying Homeless Individuals'

4              Property—Often in Violation of the City's Own Policies Meant to Preclude this

5              Conduct.

6        214.210.    The City of San Francisco has a demonstrated custom and practice of

7    criminalizing homelessness in the absence of available shelter and of destroying the property of

8    unhoused people notwithstanding any of the City's clear written policies that preclude many of

9    these practices. *See Daskalea v. District of Columbia*, 227 F.3d 433, 442 (D.C. Cir. 2000) (holding

10   that "a 'paper' policy cannot insulate a municipality from liability where there is evidence . . . that

11   the municipality was deliberately indifferent to the policy's violation."); *see also C.B. v. Sonora*

12   *Sch. Dist.*, 691 F. Supp. 2d 1170, 1185-86 (E.D. Cal. 2010) (holding that an allegation that "the

13   Chief of Police maintained a practice and custom of ignoring the written policy" was sufficient to

14   state a claim for *Monell* liability). The City regularly engages in this conduct through formal HSOC

15   sweep operations and through countless informal sweep operations that City agencies carry out

16   independently across the City. As a result of these sweep operations, the City has a custom and

17   practice of exposing unhoused individuals to serious dangers that impact their health. The City

18   carries out these activities without appropriately addressing or accommodating the needs of

19   unhoused individuals who are disabled.

20       215.211.    SFPD, DPW, HSH, DEM, and SFFD each have a custom and practice of

21   criminalizing homelessness and destroying the property of unhoused individuals through their

22   active management and direction of the HSOC taskforce and their regular conduct and

23   participation in HSOC sweeps—again notwithstanding each agency's written policies precluding

24   this conduct. As a result, SFPD, DPW, HSH, DEM, and SFFD each expose unhoused individuals

25   to serious dangers that impact their health. SFPD, DPW, HSH, and SFFD carry out their HSOC

26   activities without appropriately addressing or accommodating the needs of unhoused individuals

27   who are disabled. Each agency also participates in daily and weekly coordinating calls to plan

28   further HSOC sweep operations.

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

216.212.    SFPD and its officers have a custom and practice of citing, fining, and arresting—as well as threatening to cite, fine, and arrest—unhoused people who have no choice but to shelter in public because San Francisco has not provided sufficient or adequate shelter to accommodate them. Many of these actions violate SFPD's written policies. SFPD carries out these activities as part of formal HSOC sweep operations and also independently whenever responding to complaints about homelessness. SFPD's actions expose unhoused individuals to serious dangers that impact their health. SFPD carries out these activities without appropriately addressing or accommodating the needs of unhoused individuals who are disabled.

217.213.    DPW and its work crews have a custom and practice of seizing and destroying the survival belongings and personal property of unhoused people without adequate warning or opportunity to safeguard or collect those belongings prior to destruction. Many of these actions violate DPW's written policies. DPW carries out these activities as part of formal HSOC sweep operations and also independently whenever it is dispatched to perform street cleaning services. DPW's actions expose unhoused individuals to serious dangers that impact their health. DPW carries out these activities without appropriately addressing or accommodating the needs of unhoused individuals who are disabled.

218.214.    HSH and its outreach team, known as the Homeless Outreach Team ("HOT"), has a custom and practice of assisting other City agencies in carrying out sweep operations despite regularly not having enough shelter to offer the homeless individuals who are being threatened with citation and arrest for sleeping or lodging in public. HSH makes belated offers of shelter to just a few of the unhoused people who remain at a sweep after they have already been subject to law enforcement threats and property destruction. HSH's limited shelter offers are not appropriate for or accessible to many unhoused individuals based on gender, life and family circumstances, or disability status.

219.215.    SFFD has a custom and practice of destroying the property of unhoused people in collaboration with DPW work crews and threatening unhoused people with citation and arrest in collaboration with SFPD officers while presiding at and attending full HSOC sweep operations. SFFD's actions expose unhoused individuals to serious dangers that impact their

1  health. SFFD carries out these activities at HSOC sweeps without appropriately addressing or

2  accommodating the needs of unhoused individuals who are disabled.

3      220.216.      DEM has a custom and practice of coordinating HSOC sweep operations

4  that result in the criminalization of unhoused people without appropriate shelter and in the mass

5  destruction of unhoused individuals' property. DEM also hosts weekly HSOC meetings with

6  SFPD, DPW, HSH, and SFFD to plan future HSOC operations.

7      221.217.      As the current Director of HSOC, Samuel Dodge takes an active role in

8  coordinating and directing HSOC sweeps—including explicitly encouraging participating HSOC

9  agencies to criminalize homelessness in the absence of available shelter and to destroy the property

10  of unhoused people notwithstanding any of the City's clear written policies that preclude many of

11  these practices.

12      222.218.      Mayor London Breed has continued to permit the City and its various

13  agencies to carry out their criminalization and property destruction agenda—and she has

14  celebrated the HSOC program, praised its supposed success, and sought additional funding for

15  it.[138] Mayor Breed has also expressly called for law enforcement to remove unhoused individuals

16  from public property[139] despite making public statements that plainly demonstrate the Mayor's

17  awareness that the City does not have enough affordable housing or shelter to care for thousands

18  

19  [138] *See, e.g.*, Press Release, Off. of the Mayor "Mayor London Breed Announces a 34% Reduction
    in Tents Since Taking Office," (Nov. 12, 2018), https://sfmayor.org/article/mayor-london-breed-

20  announces-34-reduction-tents-taking-office (noting that "Mayor London N. Breed announced a
    34% reduction in tents on the streets of San Francisco since she took office in July, a reduction of

21  approximately 193 tents in less than four months [...] and has expanded the resources for Healthy
    Streets Operations Center (HSOC)"); Mallory Moench, , *supra* note 7 ("With the city getting

22  people off the streets, the city's emergency response team [the Healthy Streets Operation Center]
    put pressure on Public Works to remove toilets, as revealed by emails first released by an

23  anonymous account on Twitter and available via public records request"); Mayor's Proposed
    Budget FY 2019-20 and 2020-21, MAYOR'S OFFICE OF PUBLIC POLICY AND FINANCE (2019), at

24  19, https://sfmayor.org/sites/default/files/CSF_Budget_Book_June_2019_Final_Web_REV2.pdf

25  ("To continue the positive work of HSOC and to ensure that HSOC continues to be a service-first
    approach to addressing unsheltered homelessness and unhealthy street behavior, the two-year

26  budget includes over $4.0 million to sustain existing services in participating departments").

27  [139] Mark, *supra* note 9; *see also* David Sjostedt, *supra* note 26 (noting June 2022 sweep of visibly
    homeless people near the Ferry Building).

28  

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

of the City's unhoused residents. [140]

223.219.    Collectively, the sheer extent of the City's custom and practice of criminalizing homelessness in the absence of available shelter and of destroying the property of unhoused people—notwithstanding any of the City's clear written policies—establishes that the City and its various agencies know or should know that that it has failed to appropriately train City staff regarding their interactions with unhoused communities. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("Policymakers' 'continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action'").

O.    The City Has Repeatedly Been Put On Notice Regarding Its Failure to Comply with Constitutional Requirements and Its Own Policies—And Has Flatly Ignored Calls to Correct its Conduct.

224.220.    The City's unconstitutional conduct is not a secret. Advocates and attorneys have been working with the City *for years* to change their clearly unlawful practices. No written policy change has stopped the regular, on-the-ground constitutional violations: staff continue to admit that they are engaging in criminalization and property destruction activity that is plainly unconstitutional.

225.221.    In 2018, Jeff Kositsky, as the head of HSH—an agency purportedly tasked with providing unhoused individuals shelter access—boldly asserted that "Public Works and SFPD can clear areas rapidly when there is not a designated resolution in progress"—effectively encouraging informal sweep operations without proper notice, bag and tag, and other procedures. DPW worker Peter Lau was similarly direct about the City's goals: "We need to stay very diligent and proactive in addressing tents. […] Take them down as you see them." These directives from high-level City employees have built a culture of non-compliance.

---

[140] See Matt Charnock, *Mayor Breed Announces She's Added 1,065 New Shelter Beds Since 2018*, (Jan. 19, 2020), https://sfist.com/2020/01/19/mayor-breed-announces-shes-added-1-065-new-shelter-beds-since-2018/ (discussing addition of new shelter beds and conceding that there are upwards of 5,000 unhoused people).

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1    226.222.        In fact, in response to a TRO in 2020 filed by an unhoused person who had

2    their belongings seized and destroyed without advance written or verbal notice, the City

3    erroneously retorted that advance notice was not required: "The City is not required to comply

4    with the notice provisions of Proposition Q when enforcing laws other than Proposition Q, and the

5    encampment resolution at issue here was not an enforcement action under Proposition Q."

6    227.223.        The City has had full knowledge of its misconduct. As recently as 2021,

7    HSOC admitted that it needed to "develop and implement a process for noticing encampments in

8    advance of a resolution" and reported that the "City Attorney working with HSOC on noticing

9    issues." As recounted above, these efforts have not changed the experience of unhoused

10    individuals—who continue to be targeted for sweep operations without receiving appropriate

11    advance notice.

12    228.224.        Indeed, on March 30, 2021, while discussing a planned sweep, then-HSOC

13    Director Kositsky instructed City workers to "[g]ive everyone 45 minutes to clear and area [*sic*] if

14    not cooperating consider enforcement." Kositsky did not indicate that any prior notice of the sweep

15    had been given.

16    229.225.        The City is likewise aware of its categorical failure to appropriately bag and

17    tag the property of unhoused individuals. In 2019, when a City employee asked DPW if their

18    unhoused neighbor's belongings had been bagged and tagged, DPW responded: "Looks like it

19    went to the dump. You can try Recology to see if there is any chance of getting to it at the transfer

20    station at tunnel road in Brisbane before it is hauled to the landfill, but I doubt it. It is likely very

21    much destroyed and inaccessible at this point. Sorry about this."

22    230.226.        After the Coalition on Homelessness formally complained to HSOC's

23    Director about tent and property destruction during the COVID-19 pandemic, Director Jeff

24    Kositsky demurred: "it is just taking some time for everyone to get onboard." In fact, however,

25    Kositsky had directly asserted that DPW had a "long time practice" of destroying unhoused

26    people's tents in separate correspondence.  HSOC's own meeting notes from June 2019

27    acknowledge the same problems: "PD/DPW working to clarify and train the bag/tag transfer of

28    property policy." Meanwhile, property destruction has continued in full force.

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

231.227.        The City is likewise patently aware of its scheme to criminalize homelessness and displace unhoused people from public property within the City without first offering shelter. In 2018, for example, SFPD stated its enforcement plan as follows: "PD will be citing all individuals with tents, and DPW will take control of tents /bag and tag. HSH will be staged at Olive between Vanness and Polk at 0730 for individuals who wish to explore options to HSH." In other words, SFPD has directly identified a practice of citing individuals first, before any clear shelter options exist, and contemplates DPW summarily seizing the belongings of unhoused individuals. Meanwhile in August 2021, the San Francisco Port authorized staff to "send roving patrol [to a reported encampment] to disperse as needed." There was no mention of services.

232.228.        Indeed, department heads sometimes specifically request enforcement instead of and without services offers. For instance, then-HSOC Director Kositsky stated clearly in an email on May 14, 2021, that "we believe enforcement is the only tool remaining" and that there was "little reason for outreach workers to return to [the area in question]." This was a blatant direction from the City for SFPD to enforce without offering services.

233.229.        This custom and practice is so pervasive that it is even contained in the "mission descriptions" section of HSOC's Daily Operations Agendas. In the meeting notes from one such meeting on April 14, 2021, "re-encampment prevention" includes the notice that, "[i]n general, sheltering options will not be offered unless there is an urgent situation."

234.230.        This is because the City is fully aware that it has no services to offer. An email from Jeff Kositsky identified the extent of the shelter shortage: "It turns out that the resource center at MSC south [the City's largest shelter] is almost always full. People line up out front all the time waiting for the next seat to open up." Meanwhile, in June 2019 HSH accurately reported that "shelters are full at all times now." The City admitted in its HSOC reports that no women at homeless sweeps were offered shelter at that time: "these mats are for men only facilities and therefore could not be offered to female contacts."

235.231.        In 2020, Kositsky advocated for a policy that would explicitly warn unhoused individuals that there were no services to offer. In the notes from an HSOC principals meeting on June 11, 2020, Kositsky noted that they would need "to include message about not

1    coming to TL [the Tenderloin district] for services and that we are taking back the streets." Like

2    much of the communication described above, this direction from the head of HSOC places the

3    focus on enforcement rather than services.

4    ~~236.~~232.    In emails from April and May 2021, HSOC's Director Jeff Kositsky

5    explicitly advocated for SFPD to police unhoused individuals without regard to shelter: "want to

6    see if SFPD can commit to preventing [an encampment] from reforming for a few weeks." Alaric

7    Degranfinried of DPW made a similar admission in an email on June 16, 2020, in which he

8    requested that DPW coordinate with SFPD to have an area "extra cleaned…even if they'll likely

9    move right back when we're done." Degranfinried recognized that the individuals being swept had

10   nowhere else to go.

11   ~~237.~~233.    A former HOT worker confirmed that whenever he was deployed to a sweep

12   in 2021, sweeps proceeded before any City agency knew how many and what kind of shelter beds

13   would be available on a given day—if at all. He confirmed that he raised these issues with his

14   supervisor, Mark Mazza, the director of HSH's HOT team, who refused to do anything.

15   ~~238.~~234.    Indeed, there were sometimes planned operations even when City officials

16   knew that no shelter was available. For instance, on October 30, 2020, Kositsky sent out a schedule

17   that included "remov[ing] all unauthorized tents" in several locations, even though shelter

18   availability for the planned day of the operation was "none."

19   ~~239.~~235.    Sam Dodge, the director of HSOC, openly admits that the City does not

20   have enough shelter to accommodate all of the unhoused individuals it enforces against on a given

21   day.[141] Nonetheless, Mr. Dodge continues to direct HSOC to conduct unconstitutional sweep

22   operations.

23   ~~240.~~236.    This conduct extends to the very highest of City officials. For example, the

24   Mission Local reported on a sweep operation at the behest of the Mayor's Office in June 2021

25

26   [141] Laura Wenus, *supra* note 8. ("Workers with the city's Healthy Streets Operations Center clear
27   encampments when there are enough open beds in the city's shelter system to accommodate about
     40% of that encampment's residents in shelters. According to the center's director, Sam Dodge,
28   the formula is adjusted each week.").

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1    because Mayor Breed was to attend a fundraiser event near to where unhoused people were

2    residing. The reporting described emails from City department heads requesting "at least 18 HSH

3    shelter beds" when officials knew that "40+ tents [would] be cleared."  Mayor Breed also directly

4    instigated a sweep operation in June 2022 that resulted in the displacement of unhoused people

5    located near the Ferry Building and the destruction of their property.[142]

6    241.237.    Throughout 2021 and ending in February 2022, the City Attorney's Office

7    conducted ongoing negotiations with the Coalition on Homelessness and various other advocacy

8    groups regarding the City's repeated property destruction practices. The result was to be an update

9    to DPW's written bag and tag policies to better safeguard the property of unhoused individuals—

10    including additional notice prior to property seizure, explicit protections for larger bulky items

11    such as tents and other survival belongings, and photographing of disputed property prior to

12    destruction. But DPW's published policy on its website had remained unchanged from 2016, there

13    are no reports that staff have been trained on the new policies, and the unlawful custom and practice

14    of unnoticed destruction and enforcement continues.

15    P.    Individual Plaintiffs Have Been Subject To, And Are At Ongoing Risk of Being

16    Subject to, the City's Unconstitutional Criminalization and Property Destruction.

17    242.238.    Individual Plaintiffs Nathaniel Vaughn, Toro Castaño, Molique Frank,

18    Teresa Sandoval, David Martinez, Sarah Cronk, and Joshua Donohoe ("Individual Plaintiffs")

19    have been directly impacted by Defendants' criminalization and sweep policies. Individual

20    Plaintiffs are all people who are currently unhoused or who are at imminent risk of becoming

21    unhoused again. Several are active members with the Coalition on Homelessness. All Individual

22    Plaintiffs have lived through threats of arrest and have lost their valuable personal property as a

23    result of Defendants' sweeps over the last several years. They fear the same will recur without

24    intervention to stop the City's unconstitutional practices.

25    243.239.    **Nathaniel Vaughn.** Nathaniel Vaughn's property was destroyed by the

26    City on January 8, 2020, while he was homeless and staying near Jerrald Avenue and Evans

27

28    [142] David Sjostedt, *supra* note 26.

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

Avenue on Rankin Street. Though he had gone to visit his mother at her SRO and so was not present when the sweep began, he had left his tent clean and his belongings neatly packed inside. Nonetheless, SFPD and DPW destroyed everything. This included vital survival items like Mr. Vaughn's tent and clothes, as well as priceless sentimental items like his godmother's ashes. Mr. Vaughn recently settled a claim against the City and County of San Francisco for $7,000 after a judge found that the City had destroyed his personal property during that sweep.

244.240.    From January 2019 to January 2020, Mr. Vaughn was regularly threatened by SFPD throughout the time he was unsheltered if he did not move from where he was sleeping. Mr. Vaughn fears the same will recur if he is evicted from his SRO through no fault of his own.

245.241.    **Toro Castaño.** Toro Castaño witnessed the City destroy his property four times during the time he was unsheltered during COVID-19. The first three of these sweeps occurred when Mr. Castaño was staying at Noe and Market, Collingwood and Market, and Sanchez and Market, respectively. Each time, the City would arrive and tell Mr. Castaño and the people he was staying with that they had too many things and that they needed to throw their property away. City workers would take whatever they could grab and throw it directly into their trash trucks. The fourth time Mr. Castaño witnessed his property being destroyed was on August 21, 2020, while he was staying on 16th Street and Market Street. He saw no written notice and received no verbal notice prior to the sweep. Mr. Castaño watched as the property he had spent two hours carefully packing was thrown in a garbage truck. The items he lost that day included vital survival belongings like his tent, clothes, and a heater, as well as irreplaceable items like his mother's kimono. Mr. Castaño was cited for illegal camping that day—despite only being offered a congregate shelter bed during the middle of the pandemic months before vaccines were available.

246.242.    Mr. Castaño settled a claim against the City and County of San Francisco for $9,000 after the City destroyed his personal property—including his tent, survival gear, and his MacBook Pro, among other items.  Mr. Castaño fears the same harms will recur if he becomes homeless again because cannot afford to pay rent at his cooperative this month.

247.243.    **Molique Frank**. Molique Frank's property was destroyed by the City on January 26, 2022, while he was staying on 12th Street. SFPD, SFFD, DPW, and HOT were all

present. The City did post a paper notice, but the sweep occurred on a different day than was listed on the notice. Mr. Frank pleaded with the City not to have his belongings taken, but all of his property was thrown away nonetheless. This included everything from his clothes and his Xbox One to sentimental photos and important documents. Mr. Frank was also physically assaulted by an SFPD officer and a DPW worker while asking that they not destroy his property.

248.244.    Mr. Frank recently settled a claim against the City and County of San Francisco for $5,000 after the City destroyed his personal property. Mr. Frank fears the same harms will recur because his shelter hotel is about to close down and he has only been offered another temporary shelter placement in its place.

249.245.    **Teresa Sandoval.** Teresa Sandoval has had her belongings taken by the City at least three or four times between March 2022 and August 2022. In June 2022, while Ms. Sandoval was staying at 13th Street and Mission, the City woke Ms. Sandoval up and ordered her to move. She did not see any notice posted at the site before the sweep. Ms. Sandoval was in her wheelchair and was moving slowly to collect her belongings when DPW workers seized her purse from her, took her tent, and placed both items into a dumpster truck. Ms. Sandoval's prosthetics were also taken during this sweep, which she has not been able to replace since that time. As such, her mobility is substantially impaired and she must rely exclusively on her wheelchair.

250.246.    Ms. Sandoval has been harassed and threatened by SFPD regularly over the past several years, with SFPD saying things like, "I'm going to detain you if you don't move." These threats often take the form of move-along orders, with no offer of shelter or services. Ms. Sandoval fears that the same harms will recur because she is still homeless and living unsheltered, and therefore constantly at risk of suffering the City's harassment.

251.247.    **David Martinez.** David Martinez has had his belongings taken by the City at least four times between September 2021 and September 2022. One instance occurred on approximately June 23, 2022, when Mr. Martinez was staying at Folsom Street and 13th Street. Mr. Martinez was given no advance notice that a sweep would occur that day. Mr. Martinez informed the DPW workers onsite that he had to attend a doctor's appointment and could not stay to safeguard his belongings. DPW assured Mr. Martinez that they would not throw away his

belongings. However, he was informed by a friend that DPW did in fact throw away his property—despite the fact that his friend had jumped into the DPW truck in an effort to save his property. On this day, Mr. Martinez lost everything, including his tent, a laptop he used to connect with family and for work, his government-issued ID, and his heart medication.

252.248.    Mr. Martinez has been threatened by SFPD repeatedly over the past several years. SFPD will threaten to cite or arrest him if he does not comply with orders to move from where he is sleeping. These threats often take the form of move-along orders, with no offer of shelter or services. In early September 2022, DPW threatened Mr. Martinez with citation or arrest if he did not back away from his belongings as City workers moved to throw them away. The HOT team was not present on that day and Mr. Martinez did not receive any offer of services. Mr. Martinez fears that the same harms will recur because she is still homeless and living unsheltered, and, though he has been promised housing by the City, the details are yet to be secured. Therefore, he is still constantly at risk of suffering the City's harassment, which he most recently experienced just weeks ago.

253.249.    **Sarah Cronk & Joshua Donohoe**. Sarah Cronk and Joshua Donohoe have had their belongings taken by the City repeatedly over the past four months. In August and September 2022 alone, they have had their tent, their phones, important cooking tools and nonperishable food items, and other survival items taken by DPW. On September 12, 2022, Ms. Cronk and Mr. Donohoe were awoken by DPW rustling the belongings neatly packed on the side of their tent—which was located at 13th Street and Folsom Street. They had received no notice that DPW would be conducting a sweep that day. Mr. Donohoe exited the tent and asked the DPW worker to leave them alone. The DPW worker, who drove truck #431454, responded by threatening to break Mr. Donohoe's jaw. The DPW worker proceeded to take Ms. Cronk's clothes and her and Mr. Donohoe's food.

254.250.    Ms. Cronk and Mr. Donohoe fear that the same harms will recur because they are still homeless and living unsheltered, and therefore constantly at risk of suffering the City's harassment.

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

Q.   The Coalition and Individual Plaintiffs Need Judicial Intervention.

~~255.~~251.   Without judicial intervention to cause Defendants to cease their unlawful practices at sweeps, where they fail to provide adequate notice, destroy property instead of appropriately bagging, tagging and storing it, threaten and inflict criminal penalties on unhoused individuals without appropriate offers of shelters, and fail to accommodate individuals' disabilities—the Coalition will be unable to return full focus to its real work: finding permanent solutions to end homelessness in the City of San Francisco.

~~256.~~252.   Without judicial intervention to cause Defendants to cease their unlawful practices, Individual Plaintiffs will continue to live their lives in constant fear of the destruction of their property or that they will face arrest or citation simply for living in the City's public space when no shelter is available.

~~257.~~253.   The Coalition, the Coalition's members, and Individual Defendants will face ongoing harm unless and until Defendants' policy, custom, and practice of unlawful conduct is permanently enjoined.

~~258.~~254.   The presence of mass homelessness in San Francisco is driven by deep systemic inequities based on race, economic standing, and disability. Although some of these systemic challenges are complicated to dismantle, some solutions are simple. The City has refused to build the affordable housing that could end San Francisco's homelessness crisis. Regardless, the City certainly must stop responding to its homelessness crisis with harmful and illegal practices that actually exacerbate homelessness.

## CLAIMS

### First Cause of Action

~~Violation of Prohibition Against Cruel and Unusual Punishment~~

~~Under the Eighth Amendment to the U.S. Constitution~~

~~*Pursuant to 42 U.S.C. § 1983*~~

~~(All Plaintiffs Against All Defendants)~~

~~259.   Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.~~

260.    The Eighth Amendment to the U.S. Constitution protects individuals from being subject to cruel and unusual punishment. *See* U.S. Const. amend. VIII. The prohibition against cruel and unusual punishment prohibits state and municipal governments from enforcing criminal and infraction offenses that punish individuals—not for their voluntary conduct—but based on their involuntary condition or status. *See*; *Robinson v. California*, 370 U.S. 660, 666 (1962); *see also Ingraham v. Wright*, 430 U.S. 651, 667-68 (1977) (the Eighth Amendment places "substantive limits on what can be made criminal").

261.    The Eighth Amendment therefore "prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter." *Martin* 920 F.3d 584 at 616-17. "[S]o long as there is a greater number of homeless individuals in [a jurisdiction] than the number of available beds [in shelters], the jurisdiction cannot prosecute homeless individuals for involuntarily sitting, lying, and sleeping in public […] on the false premise they had a choice in the matter.". *Id.* at 617 (internal quotations omitted).

262.    The Eighth Amendment also precludes the criminal enforcement of any law that prohibits unhoused people from camping, lodging, or storing survival belongings in public space when they do not have access to shelter—as these laws are synonymous with punishing homelessness. *Id.* at 618 (finding violation of the Eighth Amendment where camping ordinance is enforced against unhoused people "who take even the most rudimentary precautions to protect themselves from the elements").

263.    Defendants do not have, and have never had, enough shelter to accommodate all of the unhoused residents of San Francisco. Every day, thousands of unhoused residents have no choice but to sleep and live outdoors in the City's parks, streets, and open spaces.

264.    Nonetheless, Defendants continue to enforce the following laws and ordinances against unhoused people: Cal. Penal Code § 647(e) (no lodging without permission), Cal. Penal Code § 148(a) (resisting, delaying, or obstructing an officer), Cal. Penal Code §§ 370, 372 (public nuisance), S.F. Police Code §§ 97(b), 168-169 (anti-camping and "sit/lie" ordinances, prohibition on living in passenger vehicles), S.F. Park Code §§ 3.12-3.13 (no lodging or sleeping); and S.F. Port Code §§ 2.9-2.10 (no lodging or sleeping).

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

265.    By criminalizing lodging, sitting, or sleeping in public—and by criminalizing refusal to comply with orders to cease those activities—Defendants are preventing homeless residents from carrying out the most basic functions of survival without breaking the law. As such, Defendants' enforcement of these laws punishes unhoused people for the involuntary status of being homeless.

266.    Notwithstanding a complete lack of adequate shelter capacity, Defendants have arrested, cited, and fined hundreds of unhoused residents for lodging, sitting, or sleeping in public over the past several years—and have arrested, cited, and fined thousands more for refusal to cease those activities in response to a "move along" order. Defendants have also destroyed the personal property of unhoused people as part of their enforcement efforts. This custom and practice of criminalization and enforcement violates the Eighth Amendment.

267.    Defendants' belated offers of shelter to some unhoused people hours after enforcing these laws against them through citation and arrest—or threats of the same—does not change the fact that unhoused residents have no option to enter shelter before they are subject to the criminal process. Further, Defendants' limited number of available shelter beds are not appropriate for or accessible to certain individuals based on gender, life and family circumstances, or disability status—thereby making shelter functionally unavailable to them.

268.    Individual Plaintiffs and others living unsheltered in San Francisco, including many unhoused people served by Plaintiff Coalition on Homelessness, have been subject to citation, fine, arrest, and property destruction in the past—or have had these consequences threatened against them—simply because they are homeless. They live under constant and imminent threat of citation, arrest, fines, and property destruction for living outside in public places as unhoused people.

269.    The unconstitutional criminalization of homelessness in San Francisco has also caused diversion of Plaintiff Coalition on Homelessness' resources and frustrated its mission. Defendants' conduct has resulted in the Coalition moving staff and volunteer resources to monitor Defendants' law enforcement conduct and intercede on behalf of unhoused people whenever necessary.

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1

**Second Cause of Action**

2

**Violation of Prohibition Against Cruel and Unusual Punishment**

3

**Under Article I, § 17 of the California Constitution**

4

**(All Plaintiffs Against All Defendants)**

5       270.    Plaintiffs re-allege and incorporate by reference all the above allegations as though

6   fully set forth herein.

7       271.    While the Eighth Amendment protects against cruel *and* unusual punishments, the

8   California Constitution protects against cruel *or* unusual punishments. *See* Cal. Const., art. I, § 17.

9       272.    The California Constitution protects against all punishments proscribed by the

10  Eighth Amendment—but also proscribes additional punishments that would not violate the Eighth

11  Amendment. *See California v. Carmony*, 127 Cal. App. 4th 1066, 1085 (2005) (recognizing this

12  distinction is "purposeful and substantive rather than merely semantic"); *In re Alva*, 33 Cal. 4th

13  254, 291 n. 20 (2004) (collecting cases). Critical to the difference in analysis is whether the

14  government is "treat[ing] its [residents] with respect for their intrinsic worth as human beings."

15  *Carmony*, 127 Cal. App. 4th at 1085 (citations omitted).

16      273.    Defendants' custom and practice of arresting, citing, fining, and destroying the

17  property of hundreds of unhoused people—and threatening the same—when they have no choice

18  but to live in public space, constitutes inhumane punishment that does not respect the intrinsic

19  worth of unhoused individuals as human beings in violation of California's prohibition against

20  cruel or unusual punishment.

21      274.    The provisions of the California Constitution are self-executing and create a private

22  right of action for declaratory or injunctive relief. *Katzberg v. Regents of the Univ. of Cal.*, 29 Cal.

23  4th 300, 307 (2002).

24

**Third Cause of Action**

25

**No Probable Cause: Unreasonable Search and Seizure**

26

**Under the Fourth Amendment to the U.S. Constitution**

27

***Pursuant to 42 U.S.C. § 1983***

28

**(All Plaintiffs Against Defendants City of San Francisco, SFPD, and DPW)**

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

275.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

276.    The Fourth Amendment to the U.S. Constitution protects against all unreasonable searches and seizures. U.S. Const. amend. IV. The Fourth Amendment also specifically protects individuals from being arrested or having their property searched and seized by law enforcement without probable cause that a crime has been committed. *See, e.g., Kincaid v. City of Fresno*, 2006 WL 3542732, at *35-37 (E.D. Cal. Dec. 8, 2006) ("The City's seizure of homeless people's personal property without probable cause […] violates the Fourth Amendment to the United States Constitution").

277.    Similarly, government officials can only detain or make an investigatory stop if they are aware of "specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that the particular person detained is engaged in criminal activity." *U.S. v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989).

278.    Where enforcement of a law has already been determined to be patently unconstitutional, however, there can be no reasonable suspicion or probable cause to investigate a violation of the law. *See Cuadra v. City of South San Francisco*, 2010 WL 55875, at *9 (N.D. Cal. Jan. 4, 2010) ("there was no probable cause to arrest [plaintiff] for breaking a law that had already been held unconstitutional"); *Warner v. Village of Ruidoso*, 2013 WL 12329081, at *12 (D. N.M. Sept. 30, 2013) ("state courts have already held that the Village Ordinance was patently unconstitutional, which supports his contention that no probable cause existed for issuing the citation").

279.    For years, it has been clearly unconstitutional to impose criminal penalties on unhoused individuals for sleeping or lodging in public space when they have no choice but to do so because of a lack of adequate shelter space in the jurisdiction. *See Martin*, 920 F.3d at 616-17. Under these circumstances, there can be no probable cause or reasonable suspicion to investigate violations of these laws.

280.    Defendants have a custom and practice of conducting investigatory stops, searches, property seizures, arrests, "move along" orders and warnings pursuant to anti-lodging and sleeping

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1   laws that are unconstitutional as applied to unhoused individuals because Defendants do not

2   provide adequate shelter resources. These law enforcement activities are therefore conducted

3   without reasonable suspicion or probable cause in violation of the Fourth Amendment.

4          281.   Individual Plaintiffs and others living unsheltered in San Francisco, including many

5   unhoused people served by Plaintiff Coalition on Homelessness, have been subject to investigatory

6   stops, searches, property seizures, arrests, "move along" orders and warnings pursuant to anti-

7   lodging and sleeping laws without probable cause or reasonable suspicion. They live under

8   constant and imminent threat of being subject to these unconstitutional searches and seizures.

9                              **Fourth Cause of Action**

10                 **No Probable Cause: Unreasonable Search and Seizure**

11                 **Under Article I, § 13 of the California Constitution**

12          **(All Plaintiffs Against Defendants City of San Francisco, SFPD, and DPW)**

13          282.   Plaintiffs re-allege and incorporate by reference all the above allegations as though

14   fully set forth herein.

15          283.   The California Constitution involves even greater protections than the Fourth

16   Amendment with respect to arrest, search, and seizure. *See* Cal. Const., art. I, § 13; *In re Lance*

17   *W.*, 37 Cal. 3d 873, 879 (1985) (Article I, Section 13 imposes "independent and more exacting

18   standards" than the U.S. Constitution).

19          284.   Defendants have a custom and practice of conducting investigatory stops, searches,

20   property seizures, arrests, "move along" orders and warnings pursuant to anti-lodging and sleeping

21   laws that are unconstitutional as applied to unhoused individuals because Defendants do not

22   provide adequate shelter resources. These law enforcement activities are therefore conducted

23   without reasonable suspicion or probable cause in clear violation of the more expansive protections

24   under Article I, Section 13 of the California Constitution.

25                              **Fifth Cause of Action**

26              **Property Destruction: Unreasonable Search and Seizure**

27              **Under the Fourth Amendment to the U.S. Constitution**

28

1    ***Pursuant to 42 U.S.C. § 1983***

2    **(All Plaintiffs Against Defendants City of San Francisco, SFPD, and DPW)**

3    ~~285.~~255.    Plaintiffs re-allege and incorporate by reference all the above allegations as

4    though fully set forth herein.

5    ~~286.~~256.    The Fourth Amendment prohibits local governments from summarily

6    seizing and destroying the personal property of unhoused individuals. *See Lavan v. City of L.A.*,

7    797 F. Supp. 2d at 1012  (declaring that the Fourth Amendment protects homeless persons from

8    government seizure and summary destruction of their unabandoned, but momentarily unattended,

9    personal property), *aff'd, Lavan*, 693 F.3d 1022; *see also Lavan*, 693 F.3d at 1030 ("[E]ven if the

10   seizure of the property would have been deemed reasonable had the City held it for return to its

11   owner instead of immediately destroying it, the City's destruction of the property rendered the

12   seizure unreasonable."); *Garcia v. City of L.A.*, 11 F.4th 1113, 1124 (9th Cir. 2021) ("our prior

13   caselaw states clearly that the government may not summarily destroy the unabandoned personal

14   property of homeless individuals that is kept in public areas").

15   ~~287.~~257.    Despite Defendants' written policies to the contrary, Defendants have an

16   unwritten policy, custom, and practice of seizing and destroying unhoused people's personal

17   belongings. Defendants destroy such property even if that property poses no threat to public health

18   and does not constitute evidence of a crime.

19   ~~288.~~258.    Defendants' policy, custom, and practice is to indiscriminately amass all

20   personal property from unhoused individuals and to dispose of it *en masse* without sorting it or

21   saving any belongings for later retrieval—often over the objection of unhoused people crying out

22   to have their survival belongings preserved. This widespread destruction belies any suggestion that

23   Defendants' practice is to remove only clearly abandoned or hazardous property. *See*, *e.g.*,

24   *Mitchell*, 2016 WL 11519288, at *3-4 (C.D. Cal. Apr. 13, 2016); *Rios v. County of Sacramento*,

25   562 F. Supp. 3d 999, 1017 (E.D. Cal. 2021); *see also Pottinger v. City of Miami*, 810 F. Supp.

26   1551, 1559 (S.D. Fla. 1992).

27   ~~289.~~259.    Defendants' unconstitutional policies and practices continue, subjecting

28   Individual Plaintiffs, and a significant number of unhoused individuals served by Plaintiff

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

Coalition on Homelessness, to persistent and imminent threat of having their personal property seized and destroyed in violation of the Fourth Amendment.

~~290.~~260.    The unconstitutional seizure and destruction of unhoused people's personal property has ~~caused diversion of Plaintiff Coalition on Homelessness' resources and frustrated its~~ hindered the Coalition's mission. ~~This destruction has caused the Coalition on Homelessness to expend more of its limited resources to obtain~~ related activities—proactive housing and homelessness prevention, coalition building, and ~~provide replacement tents and other supplies to individuals who have lost their necessary survival gear and other belongings due to Defendants' actions, and has resulted in the Coalition moving staff and volunteer resources to monitor Defendants' conduct and intercede on behalf of unhoused people.~~ supporting its members..

**~~Sixth~~Second Cause of Action**

**Property Destruction: Unreasonable Search and Seizure**

**Under Article I, § 13 of the California Constitution**

**(All Plaintiffs Against Defendants City of San Francisco, SFPD, and DPW)**

~~291.~~261.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

~~292.~~262.    The California Constitution involves even greater protections than the Fourth Amendment with respect to property seizures. *See* Cal. Const., art. I, § 13; *In re Lance W.*, 37 Cal. 3d at 879.

~~293.~~263.    Despite Defendants' written policies to the contrary, Defendants have an unwritten policy, custom, and practice of seizing and destroying unhoused people's personal belongings. Defendants destroy such property even if that property poses no threat to public health and does not constitute evidence of a crime.

~~294.~~264.    Defendants' unconstitutional policies and practices continue, subjecting Individual Plaintiffs, and a significant number of unhoused individuals served by Plaintiff Coalition on Homelessness, to persistent and imminent threat of having their personal property seized and destroyed in clear violation of the more expansive protections under Article I, Section 13 of the California Constitution. It further hinders the Coalition's mission-related activities—

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1  proactive housing and homelessness prevention, coalition building, and supporting its members.

2  **~~Seventh~~Third Cause of Action**

3  **Violation of Procedural Due Process**

4  **Under the Fourteenth Amendment to the U.S. Constitution**

5  ***Pursuant to 42 U.S.C. § 1983***

6  **(All Plaintiffs Against All Defendants)**

7  ~~295.~~265.       Plaintiffs re-allege and incorporate by reference all the above allegations as

8  though fully set forth herein.

9  ~~296.~~266.       The Fourteenth Amendment to the U.S. Constitution prohibits the

10  government from depriving any person of their property without due process of law. *See* U.S.

11  Const. amend. XIV. Due process protections squarely apply to the property of unhoused people.

12  *See Lavan v. City of Los Angeles*, 693 F.3d 1022, 1033 (9th Cir. 2012).

13  ~~297.~~267.       The fundamentals of due process are notice and an opportunity to be heard

14  prior to a permanent deprivation of property. "In the context of the collection or destruction of the

15  possessions of people experiencing homelessness that are left unattended in a public space, courts

16  have found that minimally, the municipality must provide advance notice and a meaningful way

17  to collect the property." *Phillips v. City of Cincinnati*, 479 F. Supp. 3d 611, 645 (S.D. Ohio 2020),

18  *citing Cobine v. City of Eureka*, 2016 WL 1730084, at *4 (N.D. Cal. May 2, 2016) (due process

19  likely adequate with advance notice and ability to reclaim property within 90 days of removal).

20  Any procedures short of these requirements violates the Fourteenth Amendment. *See Lavan*, 693

21  F.3d at 1032 (holding that due process required government to take "reasonable steps to give notice

22  that the property has been taken so the owner can pursue available remedies for its return").

23  ~~298.~~268.       Despite Defendants' written policies to the contrary, Defendants have an

24  unwritten policy, custom, and practice of seizing and destroying unhoused people's personal

25  belongings without any notice or an opportunity to be heard, and without any meaningful way to

26  collect their property in violation of the Fourteenth Amendment.

27  ~~299.~~269.       Defendants' unconstitutional policies and practices continue, subjecting

28  Individual Plaintiffs, and a significant number of unhoused individuals served by Plaintiff

1   Coalition on Homelessness, to persistent and imminent threat of having their personal property

2   seized and destroyed without due process of law.

3       300.270.        The seizure and destruction of unhoused people's personal property without

4   due process of law has caused diversion of Plaintiff Coalition on Homelessness' resources and

5   frustrated its hindered the Coalition's mission. These property seizures without due process cause

6   the Coalition on Homelessness to expend more of its limited resources to obtain related

7   activities—proactive housing and homelessness prevention, coalition building, and provide

8   replacement tents and other supplies to individuals who have lost their necessary survival gear and

9   other belongings due to Defendants' actions, and has resulted in the Coalition moving staff and

10  volunteer resources to monitor Defendants' conduct and intercede on behalf of unhoused

11  peoplesupporting its members.

12                      **EighthFourth Cause of Action**

13              **Violation of Procedural Due Process**

14      **Under Article I, §§ 7(a), 15 of the California Constitution**

15                  **(All Plaintiffs Against All Defendants)**

16      301.271.        Plaintiffs re-allege and incorporate by reference all the above allegations as

17  though fully set forth herein.

18      302.272.        The due process protections under the California Constitution are more

19  expansive than those under the U.S. Constitution. *See* Cal. Const., art. I, §§ 7(a), 15; *Ryan v. Cal.*

20  *Interscholastic Federation-San Diego Section*, 94 Cal. App. 4th 1048, 1070 (2001) ("procedural

21  due process under the California Constitution is much more inclusive and protects a broader range

22  of interests than under the federal Constitution") (citations omitted).

23      303.273.        Specifically, the California Constitution requires that "even in cases in

24  which the decision-making procedure will not alter the outcome of governmental action, due

25  process may nevertheless require that certain procedural protections be granted the individual in

26  order to protect important dignitary values." *People v. Ramirez*, 25 Cal. 3d 260, 268 (1976). The

27  purpose of these safeguards is "to ensure that the method of interaction itself is fair in terms of

28  what are perceived as minimum standards of political accountability—of modes of interaction

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1   which express a collective judgment that human beings are important in their own right, and that

2   they must be treated with understanding, respect, and even compassion." *Id.* Furthermore, in

3   California, "due process safeguards . . . must be analyzed in the context of the principle that

4   freedom from arbitrary adjudicative procedures is a substantive element of one's liberty." *Id*. at

5   268.

6          304.274.          Defendants' unwritten policy, custom, and practice of seizing and

7   destroying unhoused people's personal belongings without any notice or an opportunity to be

8   heard, and without any meaningful way collect their property, violates the basic tenets of

9   procedural due process—and fails to confer the dignity, respect, and compassion required by the

10  California Constitution. That Defendants' actual policy, custom, and practice flies in the face of

11  Defendants' articulated written policies further evidences the kind of "arbitrary" procedures that

12  the California Constitution is designed to protect against. It further hinders the Coalition's mission-

13  related activities—proactive housing and homelessness prevention, coalition building, and

14  supporting its members.

15                              **Ninth Cause of Action**

16                      **Exposure to a State-Created Danger**

17              **Under the Fourteenth Amendment to the U.S. Constitution**

18                      ***Pursuant to 42 U.S.C. § 1983***

19                   **(All Plaintiffs Against All Defendants)**

20          305.   Plaintiffs re-allege and incorporate by reference all of the above allegations as

21  though fully set forth herein.

22          306.   Governmental action that affirmatively places a person in a position of danger

23  deprives that person of substantive due process rights guaranteed by the Fourteenth Amendment

24  to the United States Constitution. *See* U.S. Const. amend. XIV.

25          307.   Local governments violate the substantive due process rights of unhoused people

26  when they place unhoused individuals in more vulnerable situations by confiscating the survival

27  belongings that they use for shelter, warmth, and protection from the elements. *See Santa Cruz*

28  *Homeless Union*, 514 F. Supp. 3d 1136 at 1144-1145; *Sanchez*, 914 F. Supp. 2d at 1101-02.

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

308.    Defendants have a policy, custom, and practice of removing unhoused people from public spaces and of seizing and destroying their personal property, such as tents and other survival gear, that is necessary for their protection. Defendants engage in these practices without ensuring that shelter and/or housing options are available to unhoused individuals.

309.    Without any other available option for shelter and without their tents and survival gear—now destroyed—homeless individuals are forced to live exposed to the elements, without protection from cold, wind, and rain. This severely jeopardizes their physical and mental health. Defendants' conduct is particularly cruel when unhoused individuals who are actively seeking shelter from Defendants are unable to access it—only to have their only survival belongings destroyed.

310.    Defendants know or should know that their actions endanger the health and safety of unhoused individuals. This conduct is shocking to the conscience and only further imperils the health and safety of unhoused people.

311.    Defendants' policies and practices have and will continue to put Individual Plaintiffs, and a substantial number of unhoused individuals served by Plaintiff Coalition on Homelessness, in immediate danger—in violation of their substantive due process rights.

312.    Defendants' continuing unlawful conduct has also frustrated the Coalition on Homelessness' mission and has caused it to dramatically increase the resources and time it expends to assist and serve homeless individuals who have lost their survival belongings.

**Tenth Cause of Action**

**Exposure to a State-Created Danger**

**Under Article I, § 7(a) of the California Constitution**

**(All Plaintiffs Against All Defendants)**

313.    Plaintiffs re-allege and incorporate by reference all the above allegations as though fully set forth herein.

314.    Governmental action that affirmatively places a person in a position of danger deprives that person of substantive due process rights guaranteed by the California Constitution. Cal. Const., art. I, § 7(a). The substantive due process protections under the California Constitution

1   are at least as expansive as those under the U.S. Constitution.

2        315.   Defendants' policy, custom, and practice of removing unhoused people from public

3   spaces and of seizing and destroying their personal property, such as tents and other survival gear,

4   endangers the health and safety of unhoused people in a way that shocks the conscience.

5   Defendants know or should know that their actions endanger the health and safety of unhoused

6   individuals.

7        316.   Defendants' policies and practices have and will continue to put Individual

8   Plaintiffs, and a substantial number of unhoused individuals served by Plaintiff Coalition on

9   Homelessness, in immediate danger in violation of their substantive due process rights under the

10  California Constitution.

11                          **Eleventh Cause of Action**

12                 **Discrimination Against Persons With Disabilities**

13      **Under the Americans With Disabilities Act (ADA), 42 U.S.C. § 12131 *et seq.***

14   **(Plaintiffs Coalition on Homelessness and Teresa Sandoval Against Defendant City of San**

15                             **Francisco)**

16       317.   Plaintiffs re-allege and incorporate by reference all the above allegations as though

17  fully set forth herein.

18       318.   Title II of the Americans with Disabilities Act (ADA) provides that "no qualified

19  individual with a disability shall, by reason of such disability, be excluded from participation in or

20  be denied the benefits of the services, programs, or activities of a public entity, or be subjected to

21  discrimination by any such entity." 42 U.S.C. § 12132. Discrimination under Title II of the ADA

22  includes administration of programs in a way that has a discriminatory effect on people with

23  disabilities, or that has the "effect of defeating or substantially impairing the accomplishment of

24  the objectives of the service, program, or activity with respect to individuals with disabilities." 28

25  C.F.R. § 35.130 (b)(3)(ii).

26       319.   A local government's removal of homeless individuals and their possessions from

27  public property—as well as the provision of services or shelter to unhoused individuals—are

28  programs, services, and/or activities covered by Title II of the ADA.

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

320. Failure to provide proper assistance, additional time, or other supports to disabled individuals when demanding that unhoused people remove themselves or their belongings from public space is a violation of the ADA. *See Cooley v. City of Los Angeles*, 2019 WL 3766554, at *6 (C.D. Cal. Aug. 5, 2019) ("Cooley […] told LAPD officers that she needed help to carry her property because of her disability and that she lost most of her essential property because her needs were not accommodated […] the City's practices, even if it facially neutral, violate the ADA by unduly burdening people with disabilities such as Cooley").

321. Failing to provide shelter options to unhoused people that meet their disability needs is also a violation of the ADA—as it means that shelter is functionally unavailable to them because of their disability. *See Bloom v. City of San Diego*, 2018 WL 9539238, at *3 (S.D. Cal. June 8, 2018) ("[B]ecause of plaintiffs' disabilities, they cannot seek housing in a homeless shelter because the shelters cannot accommodate their disabilities; . . . the shelters are 'functionally unavailable' to them").

322. Defendants discriminate against unhoused individuals by failing to provide adequate notice, time, and assistance to unhoused people with disabilities who are forced to move themselves or their belongings from public space in response to Defendants' homeless sweeps.

323. Defendants further discriminate against unhoused individuals with disabilities by arresting, citing, fining, and seizing the property of unhoused people for sleeping or lodging in public without first identifying their individualized needs and whether Defendants' shelter options, if any exist, can actually meet those needs.

324. Forcibly removing unhoused residents without first identifying and offering alternative shelter or services that meet the individualized needs of people with disabilities does not serve any sufficiently compelling or bona fide and legitimate interest of Defendants, and less discriminatory options are available to Defendants to achieve any interests they claim they are trying to advance.

325. Ms. Sandoval, and a significant number of unhoused individuals served by Plaintiff Coalition on Homelessness, have physical or mental disabilities and have been injured by Defendants' discriminatory response to unhoused residents.

SECOND<u>THIRD</u> AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1    Twelfth Cause of Action

2    Discrimination Against Persons With Disabilities

3    Under Cal. Gov. Code § 11135

4    (Plaintiffs Coalition on Homelessness and Teresa Sandoval Against Defendant City of San

5    Francisco)

6    326.    Plaintiffs re-allege and incorporate by reference all the above allegations as though

7    fully set forth herein.

8    327.    Cal. Gov. Code § 11135 is intended to prohibit all forms of discrimination

9    prohibited under Title II of the Americans with Disabilities Act and, where possible, to be more

10    protective of people with disabilities. *See* Cal. Gov. Code § 11135(b).

11    328.    By administering its programs for unhoused people and response to homelessness

12    in a manner that has a discriminatory effect on people with disabilities, Defendants have violated,

13    and continue to violate, Section 11135.

14    329.    Ms. Sandoval, and a significant number of unhoused individuals served by Plaintiff

15    Coalition on Homelessness, have physical or mental disabilities and have been injured by

16    Defendants' discriminatory response to unhoused residents with disabilities.

17    Thirteenth Cause of Action

18    Conspiracy to Deprive Plaintiffs of Their Constitutional Rights

19    *Pursuant to 42 U.S.C. § 1983*

20    (All Plaintiffs Against All Defendants)

21    330.    Plaintiffs re-allege and incorporate by reference all the above allegations as though

22    fully set forth herein.

23    331.    When government actors collectively agree to violate individuals' constitutional

24    rights—and take any steps in furtherance of that agreement—all relevant public agencies and

25    employees are liable for constitutional conspiracy pursuant to Section 1983. *See Mendocino Envtl.*

26    *Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1301 (9th Cir. 1999).

27    332.    Defendants have entered into both explicit and implicit agreements with one

28    another to violate the constitutional rights of unhoused people by arresting, citing, fining, and

SECONDTHIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

1  ~~destroying the property of unhoused people without providing adequate notice or adequate shelter~~
2  ~~in violation of the U.S. and California Constitutions — under the banner of the interagency~~
3  ~~operation known at the Healthy Streets Operation Center (HSOC).~~

4  ~~333.  Defendants have each taken concrete steps in furtherance of these agreements as~~
5  ~~evidenced by Defendants' ongoing policy, custom, and practice of coordinating with one another~~
6  ~~to target unhoused people for enforcement and property destruction in violation of their~~
7  ~~constitutional rights.~~

8  ~~334.  Individual Plaintiffs, and a substantial number of unhoused individuals served by~~
9  ~~Plaintiff Coalition on Homelessness, have and will continue to be harmed as a direct and proximate~~
10 ~~result of Defendants' ongoing conspiracy.~~

11                                 **PRAYER FOR RELIEF**

12      WHEREFORE, Plaintiffs respectfully request that the Court:

13 **Declaratory Relief:**

14      ~~a.  Declare that Defendants' ongoing investigation and enforcement of criminal~~
15 ~~statutes against unhoused people for sleeping, lying, sheltering, or lodging on public property~~
16 ~~violates the Fourth and Eighth Amendments to the U.S. Constitution; Article I, §§ 13 and 17 of~~
17 ~~the California Constitution;~~

18      ~~b.~~a.  Declare that Defendants' ongoing seizure and destruction of the personal property
19 of unhoused people violates the Fourth and Fourteenth Amendments to the U.S. Constitution;
20 Article I, §§ 7(a) and 13 of the California Constitution;

21      ~~c.  Declare that Defendants' removal of unhoused people from public property and~~
22 ~~seizure of their necessary survival gear, in the absence of adequate housing or shelter, violates~~
23 ~~their right to be free from state-created dangers under the Fourteenth Amendment to the U.S.~~
24 ~~Constitution and Article I, § 7(a) of the California Constitution;~~

25      ~~d.~~b.  Declare that Defendants have failed to appropriately train staff ~~to enforce~~
26 ~~ordinances against unhoused people or~~ to seize property from unhoused people only in
27 conformance with the Fourth~~, Eighth,~~ and Fourteenth Amendments to the U.S. Constitution;
28 Article I, §§ 7(a), ~~13,~~ and 17 of the California Constitution;

1    ~~e.      Declare that Defendants' ongoing enforcement and seizure practices are~~
2    ~~government programs that discriminate against unhoused people with disabilities in violation of~~
3    ~~42 U.S.C. § 12131 and Cal. Gov. Code § 11135;~~
4    ~~f.      Declare that Defendants have conspired to deprive unhoused people of their civil~~
5    ~~rights in violation of 42 U.S.C. § 1983.~~

6    **Injunctive Relief:**

7    ~~a.      Grant a preliminary and permanent injunction enjoining and restraining Defendants~~
8    ~~from investigating, citing, arresting, prosecuting, or otherwise enforcing alleged violations of any~~
9    ~~ordinance that punishes sleeping, lodging, or camping on public property—or threatening the~~
10   ~~same—against unhoused individuals in a manner that violates the Fourth and Eighth Amendments~~
11   ~~to the U.S. Constitution and Article I, §§ 13 and 17 of the California Constitution. This includes a~~
12   ~~prohibition on the issuance of "move along" orders or other police orders under threat of citation~~
13   ~~and arrest. The prohibition shall last unless and until Defendants can confirm that all of San~~
14   ~~Francisco's unhoused residents have immediately available, appropriate, accessible, and voluntary~~
15   ~~shelter such that they are not being punished for the involuntary status of homelessness.  At a~~
16   ~~minimum, enforcement of the following ordinances is to be enjoined:~~

17        ~~i.      Cal. Penal Code § 647(e) (no lodging without permission);~~
18        ~~ii.      Cal. Penal Code § 148(a) (resisting, delaying, or obstructing an officer);~~
19        ~~iii.      Cal. Penal Code §§ 370, 372 (public nuisance);~~
20        ~~iv.      S.F. Police Code §§ 97(b), 168-169 (anti-camping, "sit/lie" ordinances,~~
21             ~~prohibition on living in passenger vehicles);~~
22        ~~v.      S.F. Park Code §§ 3.12-3.13 (no lodging or sleeping); and~~
23        ~~vi.      S.F. Port Code §§ 2.9-2.10 (no lodging or sleeping).~~

24   ~~b.~~a.    ~~Grant a preliminary and~~Grant a permanent injunction enjoining and restraining
25   Defendants from seizing and disposing of homeless individuals' property in a manner that violates
26   the Fourth and Fourteenth Amendments to the U.S. Constitution and Article I, §§ 7(a) and 13 of
27   the California Constitution;

28

~~SECOND~~THIRD AMENDED COMPLAINT FOR
                                                              DECLARATORY AND INJUNCTIVE RELIEF
                                                              CASE NO. 4:22-CV-05502-DMR

1    ~~c.    Grant a permanent injunction enjoining and restraining Defendants from removing~~

2    ~~unhoused people from public property and seizing their property, in the absence of adequate~~

3    ~~housing or shelter, in violation of the Fourteenth Amendment to the U.S. Constitution and Article~~

4    ~~I, § 7(a) of the California Constitution;~~

5    ~~d.    Grant a permanent injunction enjoining and restraining Defendants from actions~~

6    ~~that discriminate against people with disabilities in the administration of their programs in~~

7    ~~violation of 42 U.S.C. § 12131 and Cal. Gov. Code § 11135;~~

8    **~~Mandate Relief:~~**

9    ~~a.~~    Issue a mandatory order compelling Defendants to <u>take protective measures,</u>

10   <u>including</u> adequately ~~train~~<u>training</u> staff, to ~~stop enforcing ordinances against unhoused people and~~

11   ~~stop~~<u>ensure any</u> seizing ~~their~~<u>of</u> property ~~except in conformance~~<u>conform</u> with the Fourth ~~, Eighth,~~

12   and Fourteenth Amendments to the U.S. Constitution; Article I, §§ 7(a), 13, and 17 of the

13   California Constitution;

14   b.    ~~Issue a mandatory order requiring Defendants to reasonably modify their programs~~

15   ~~to avoid any continued discrimination against unhoused people, pursuant to 42 U.S.C. § 12131~~

16   ~~and Cal. Gov. Code § 11135;~~

17   c.    Issue a mandatory order requiring Defendants to submit to regular monitoring and

18   compliance checks by the Court at Defendant's expense;

19   **Other Relief:**

20   a.    Order Defendants to pay for Plaintiffs' attorneys' fees and costs; and

21   b.    Grant Plaintiffs such further relief as the Court deems just and proper.

22

23   Dated: ~~June 6, 2023~~ <u>December 18, 2024</u>                    Respectfully submitted,

24

25                                                    By: */s/ ~~Zal K. Shroff~~* <u>*Nisha*</u>
                                                     <u>*Kashyap*</u>

26

27                                                    LAWYERS' COMMITTEE FOR CIVIL
                                                     RIGHTS OF THE SAN FRANCISCO BAY
28                                                   AREA

~~SECOND~~<u>THIRD</u> AMENDED COMPLAINT FOR
                                                           DECLARATORY AND INJUNCTIVE RELIEF
                                                           CASE NO. 4:22-CV-05502-DMR

~~Zal K. Shroff, MJP 804620,~~ *pro hac vice*
~~Elisa Della-Piana,~~Nisha Kashyap SBN
~~226462~~301934
~~Hadley Rood,~~Andrew Ntim SBN ~~348168~~347084
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
~~zshroff~~nkashyap@lccrsf.org
~~edellapiana~~antim@lccrsf.org
~~hrood@lccrsf.org~~

By: */s/ John Thomas H. Do*

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
John Thomas H. Do, SBN 285075
~~Brandon L. Greene,~~William S. Freeman SBN
~~293783~~82002
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
jdo@aclunc.org
~~bgreene~~wfreeman@aclunc.org

By: */s/ ~~Alfred C. Pfeiffer, Jr.~~            Scout*
*Katovich*

~~LATHAM & WATKINS LLP~~
~~Alfred C. Pfeiffer, Jr., SBN 120965~~
~~Wesley Tiu, SBN 336580~~
~~Kevin Wu, SBN 337101~~
~~Tulin Gurer, SBN 303077~~
~~505 Montgomery~~AMERICAN CIVIL
LIBERTIES UNION
Scout Katovich, *pro hac vice*
425 California Street,~~ Ste 2000~~
Suite 700
San Francisco, CA ~~94111~~94104
212-549-2500
skatovich@aclu.org

By: */s/ Zoe Salzman*

ECBAWM LLP
Zoe Salzman, *pro hac vice*
Vasudha Talla, SBN 316219
Vivake Prasad, *pro hac vice*

106

Bianca Herlitz-Ferguson, *pro hac vice*
600 Fifth Avenue, 10th Floor
New York, NY 10020
Telephone: (~~415) 391-0600~~212) 763-5000
~~al.pfeiffer@lw~~zsalzman@ecbawm.com
~~wesley.tiu@lw~~vtalla@ecbawm.com
~~kevin.wu@lw~~vprasad@ecbawm.com
~~tulin.gurer@lw.com~~

~~LATHAM & WATKINS LLP~~
~~Joseph H. Lee, SBN 248046~~
~~650 Town Center Drive, 20th Floor~~
~~Costa Mesa, CA 92626~~
~~Telephone: (714) 540-1235~~
~~joseph.lee@lw.com~~

~~LATHAM & WATKINS LLP~~
~~Rachel Mitchell, SBN 344204~~
~~12670 High Bluff Drive~~
~~San Diego, CA 92130~~
~~Telephone: (858) 523-5400~~
~~rachel.mitchell@lw~~bherlitz-ferguson@ecbawm.com

*Attorneys for Plaintiffs*
*Coalition on Homelessness, ~~Toro Castaño,~~ Sarah*
*Cronk, Joshua Donohoe, Molique Frank, David*
*Martinez, Teresa Sandoval,~~Nathaniel Vaughn~~*

~~SECOND~~THIRD AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF
CASE NO. 4:22-CV-05502-DMR

## **ATTESTATION**

I, ~~Alfred C. Pfeiffer, Jr.,~~Zoe Salzman, am the ECF user whose user ID and password authorized the

filing of this document. Under Civil L.R. 5-1(h)(3), I attest that all signatories to this document

have concurred in this filing.


Dated:  ~~June 6, 2023~~December 18, 2024        */s/ Alfred C. Pfeiffer*            *Zoe Salzman*
                                                            ~~Alfred C. Pfeiffer, Jr.~~