**EXHIBIT E**

**TO**

**DECLARATION OF STEVEN A. MILLS IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

# In The Matter Of:

*Coalition on Homelessness, et al. v.*
*City and County of San Francisco, et al.*

---

*Sarah A. Cronk*
*September 23, 2024*

---

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California 94104*
*(415) 597-5600*

Original File 43357Cronk_nl.txt
**Min-U-Script®**

1

1           UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3   - - - - - - - - - - - - - - - - -

4   COALITION ON HOMELESSNESS; TORO  )

5   CASTANO; SARAH CRONK; JOSHUA     )

6   DONOHOE; MOLIQUE FRANK; DAVID    )

7   MARTINEZ; TERESA SANDOVAL;       )

8   NATHANIEL VAUGHN,                )

9           Plaintiffs,          ) CASE NO.

10  v.                              ) 4:22-cv-05502-DMR(LJC)

11  CITY AND COUNTY OF              )

12  SAN FRANCISCO, et al.,          )

13          Defendants.          )

14  - - - - - - - - - - - - - - - - -

15

16      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

17            PURSUANT TO PROTECTIVE ORDER

18       VIDEOTAPED DEPOSITION OF SARAH A. CRONK

19            MONDAY, SEPTEMBER 23, 2024

20

21      BEHMKE REPORTING AND VIDEO SERVICES, INC.

22          BY:  MARY J. GOFF, CSR NO. 13427

23          550 CALIFORNIA STREET, SUITE 820

24          SAN FRANCISCO, CALIFORNIA  94104

25                          (415) 597-5600

2

1

2

3

4

5

6

7

8              Videotaped deposition of SARAH A. CRONK,

9    taken on behalf of Defendants, at Lawyers'

10   Committee for Civil Rights of the San Francisco Bay

11   Area, 131 Steuart Street, Suite 400, San Francisco,

12   California, commencing at 10:09 A.M., MONDAY,

13   SEPTEMBER 23, 2024, before Mary J. Goff, California

14   Certified Shorthand Reporter No. 13427 and WA CSR

15   No. 21030779, pursuant to Notice.

16

17

18

19

20

21

22

23

24

25

3

 1  APPEARANCES OF COUNSEL:

 2  FOR PLAINTIFFS:

 3       LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE

 4       SAN FRANCISCO BAY AREA, CCRSF

 5       BY:  ANDREW NTIM, ATTORNEY AT LAW

 6       131 Steuart Street

 7       Suite 4000

 8       San Francisco, California  94105

 9       Telephone:  (415) 543-9444

10       Email:  antim@lccrsf.org

11

12  - AND -

13       ACLU FOUNDATION OF NORTHERN CALIFORNIA

14       BY:  WILLIAM S. FREEMAN, ATTORNEY AT LAW

15       39 Drumm Street

16       San Francisco, California  94111

17       Telephone:  (415)-621-2493

18       Email:  wfreeman@aclunc.org

19

20

21

22

23

24

25

4

1    APPEARANCES OF COUNSEL (CONTINUED):

2    FOR DEFENDANTS:

3          OFFICE OF THE CITY ATTORNEY

4          BY:  STEVEN MILLS, ATTORNEY AT LAW

5              KAITLYN MURPHY, ATTORNEY AT LAW

6          1390 Market Street

7          Sixth Floor

8          San Francisco, California  94102

9          Telephone:  (415) 355-3304

10         Email:  steven.mills@sfcityattry.org

11              kaitlyn.murphy@sfcityattry.org

12

13   ALSO PRESENT:

14         VINNY BEZERRA, VIDEOGRAPHER

15

16

17

18

19

20

21

22

23

24

25

93

1        A    I found out about them in 2011 through an

2    outreach team that was offering me services when I

3    was on the street at the time.

4        Q    And was it a Coalition on Homelessness

5    outreach team?

6        A    No.  It was a different outreach team.

7        Q    What is your understanding of what

8    Coalition on Homelessness does?

9        A    Okay.  Coalition on Homelessness fights to

10   advocate for the rights of homeless people, tries to

11   offer them services and connect them with services

12   related to getting on their feet, securing stable

13   housing, and not having their rights violated.

14       Q    And has that been your understanding of

15   what Coalition has done since you first learned

16   about them in around 2011?

17       A    Yes.

18       Q    Anything changed about your perception of

19   Coalition on Homelessness since 2011?

20       A    No.

21       Q    What are your impressions of the Coalition

22   on Homelessness?

23            ATTORNEY FREEMAN:  Objection, ambiguous.

24       Q    (BY ATTORNEY MILLS) And you can answer, to

25   the extent you understand.

94

```
 1        A    Can you repeat the question?  I'm sorry.
 2        Q    Yeah.
 3             So what are your views of the -- personal
 4   views of the Coalition on Homelessness?
 5        A    I think they're amazing.  I think they're
 6   a very important organization.
 7             I have -- I'm very grateful to them for
 8   the work that they do to help people that have been
 9   in the situations that I have been in.  And I think
10   they're great.
11        Q    And are you aware that the Coalition on
12   Homelessness includes individuals that are housed in
13   their leadership?
14        A    Yes.
15        Q    Has the Coalition on Homelessness ever
16   offered you services personally?
17        A    No.
18        Q    Have you ever been to the Coalition on
19   Homelessness' office?
20        A    Yes.
21        Q    And what would you do when you would go to
22   the Coalition on Homelessness' office?
23        A    Just speak to people.
24        Q    And when do you think you first went to
25   their office?
```

96

1    from Coalition about knowing your rights?

2         A    Probably around the same time I found out

3    about them.

4         Q    So fair to say sometime around 2011?

5         A    Yeah.

6         Q    And how often do you think you would see

7    documents like that reminding you of what your

8    rights were from Coalition on Homelessness?

9         A    Pretty frequently.  Maybe every few months

10   or so.  But of course while I was in the City.

11        Q    Okay.  Have you ever asked for services

12   from Coalition on Homelessness that were declined?

13        A    No.

14        Q    Have you ever worked for the Coalition on

15   Homelessness as either an employee or an independent

16   contractor?

17        A    No.

18        Q    Have you ever been a volunteer with the

19   Coalition on Homelessness?

20        A    Not officially.

21        Q    Okay.  Well, what about unofficially?

22   Have you been a volunteer with the Coalition on

23   Homelessness?

24        A    Sure.

25        Q    And when was that?

97

1        A       I would say that was around the pandemic,
2    2 -- after 2020.
3        Q       And what did your volunteer activities
4    with the Coalition on Homelessness involve?
5        A       I would -- I have given out food,
6    distributed socks, spare sleeping bags, just had
7    conversations with people about what services are
8    available to them and tried to help my fellow person
9    who was outside.
10       Q       Have you ever gotten a sleeping bag from
11   Coalition on Homelessness?
12       A       Um-hum.
13       Q       How many sleeping bags have you gotten
14   from the Coalition on Homelessness?
15       A       I believe two.
16       Q       Okay.  And how many hours would you say
17   you have spent volunteering with the Coalition on
18   Homelessness?
19               ATTORNEY NTIM:  Objection.  Vague as to
20   time.
21               ATTORNEY MILLS:  And I just want to
22   clarify, because we have had two objecting
23   attorneys.
24               Which attorney is the speaking attorney
25   for the record?

98

1          ATTORNEY NTIM:  I'm the primary speaking

2    attorney.

3          ATTORNEY MILLS:  Okay.  Thank you.

4          ATTORNEY FREEMAN:  But I also think that

5    as a matter of record, that any attorney can make an

6    objection.

7      A    Yeah, can you -- can you tell me, like,

8    what timeline you're talking about?

9      Q    (BY ATTORNEY MILLS) So in total, how many

10   hours do you think you have spent volunteering for

11   the Coalition on Homelessness?

12     A    In total?  Probably 200 hours.

13     Q    And when do you think those service hours

14   with Coalition on Homelessness started?

15     A    Around 2015-2016.

16     Q    Did you ever receive any type of training

17   from the Coalition on Homelessness?

18     A    No.

19     Q    Are there other organizations that you

20   volunteered with in the past five years other than

21   Coalition on Homelessness as far as, like,

22   homelessness issues are concerned?

23     A    No.

24     Q    Have you ever been a member of the

25   Coalition on Homelessness?

99

1          A      Yes.

2          Q      And what is your understanding of what the

3     requirements are to be a member of the Coalition on

4     Homelessness?

5          A      I think the requirements are pretty loose.

6     I think it's that you are -- you stand up for the

7     rights of homelessness, try to advocate for the laws

8     in the City to change as far as how they treat

9     people on the street and with regard to treating

10    them with compassion and dignity.  Things of that

11    nature.  And also, just trying to help out whenever

12    possible.

13         Q      And do you have to pay any dues or

14    anything to be a member of the Coalition on

15    Homelessness?

16         A      No.

17         Q      Do you have to sign up formally to be a

18    member of the Coalition on Homelessness?

19         A      No.

20         Q      Did you do anything to sign up to become a

21    member of the Coalition on Homelessness?

22         A      No.

23         Q      Do you know if membership is limited to

24    being unhoused in San Francisco?

25         A      No, it's not.

100

1        Q    So does the Coalition on Homelessness

2   include members of other communities outside of

3   San Francisco?

4        A    Not that I know of.

5        Q    Does the Coalition on Homelessness include

6   members that are housed?

7        A    Yes.

8        Q    Are you aware of any documents that may

9   track the Coalition on Homelessness' members?

10        A    No.

11        Q    And when do you think, based off of your

12   own experience, you first became a member of the

13   Coalition on Homelessness?

14        A    2021.

15        Q    And do you know when in 2021?

16        A    No, I don't know exactly when.

17        Q    Okay.  And what made you think that you

18   were finally or officially a member of the Coalition

19   on Homelessness in 2021?

20        A    Doing specific volunteer work with the

21   people that I knew that were official members as

22   well.

23        Q    And who were those official members that

24   you were volunteering with?

25        A    I don't recall the names of -- I don't

101

1   recall the -- their exact names.

2        Q    Do they have nicknames that you can

3   recall?

4        A    One person, yes.

5        Q    And what's that name?

6        A    Cooper.

7        Q    Do you know if Cooper is still a member of

8   the Coalition on Homelessness?

9        A    Yes.

10       Q    Are you still in contact with Cooper?

11       A    Yes.

12       Q    Do you have Cooper's phone number?

13       A    Yes.

14       Q    Would you be able to provide Cooper's

15   phone number?

16       A    Yes.

17       Q    And do you have -- do you know if Cooper

18   has an email address?

19       A    I don't know it.

20       Q    How do you often communicate with Cooper?

21       A    Via text.

22       Q    Are there any other official members that

23   you know of?

24       A    I -- I can't give you any names.

25       Q    Do you know what rights you have as a

102

```
 1   member of the Coalition on Homelessness?
 2        A    As a member of the Coalition?
 3        Q    Um-hum.  Correct.
 4        A    Like as opposed to, like...
 5        Q    As a self-identified member of the
 6   Coalition on Homelessness, do you have any rights in
 7   the organization?
 8        A    I -- I don't really understand what...
 9        Q    Do you get to vote on any Coalition
10   projects?
11        A    Oh, no.
12        Q    Do you get to decide where money gets
13   spent by Coalition?
14        A    No.
15        Q    Do you get to have a say in the causes
16   that Coalition wants to advance or proceed on?
17        A    Yes.
18        Q    And how do you end up getting to have a
19   voice in those projects?
20        A    By speaking to individuals, going to
21   committee meetings.  Things like that.
22        Q    Have you gone to any committee meetings?
23        A    I have not.
24        Q    Are you familiar with the Human Rights
25   Work Group?
```

103

1      A      I have heard of them.

2      Q      Have you been to that group?

3      A      No.

4      Q      What about the Housing Justice Work Group?

5      Have you been to that group?

6      A      No.

7      Q      Do you know if the Human Rights Work Group

8      is open to the public?

9      A      I believe so, yes.

10     Q      Do you know if attorneys are present at

11     those meetings?

12     A      I do not know.

13     Q      Based off of what you have heard about the

14     Human Rights Work Group meetings, do you know if

15     they're intended to be confidential?

16     A      I believe they are.

17     Q      Have you ever heard of anybody saying that

18     they had to sign an agreement with Coalition on

19     Homelessness to be a member or a participant?

20     A      No.

21     Q      Do you know when Coalition on Homelessness

22     started monitoring the City's destruction of

23     homeless people's property?

24     A      I'm not sure when it started.

25     Q      Do you have a rough idea of when it could

104

1    have started based off of your knowledge of the

2    Coalition on Homelessness?

3         A    I'm not sure when the organization formed,

4    but I'm sure it was pretty recently after the

5    formation.

6         Q    Okay.  So if I told you that the Coalition

7    on Homelessness knew that the City had been

8    destroying homeless people's property since at least

9    2016 and never brought a lawsuit, how does that make

10   you feel?

11             ATTORNEY NTIM:  Objection, calls for

12   speculation.

13        Q    (BY ATTORNEY MILLS) But you can answer.

14        A    Considering that I understand the

15   difficulties in putting together a lawsuit and

16   basically being ready to come at something that will

17   actually make a difference, I can understand why

18   they would have waited, so it doesn't -- it doesn't

19   make me feel anything in particular.

20        Q    Would you think that the homeless -- that

21   the Coalition on Homelessness was a good

22   representative of the homeless community in

23   San Francisco if they failed to bring a lawsuit,

24   knowing that the City was systematically destroying

25   property in violation of the Constitution?

1      A      No.

2      Q      Do you know Teresa Sandoval?

3      A      No.

4      Q      Do you know Nathan Vaughn?

5      A      No.

6      Q      Okay.  So earlier you mentioned Cooper.

7             Do you know Cooper's full name?

8      A      No, I can't remember.

9      Q      Do you know if Cooper was married at some

10     point in time?

11     A      I don't know.

12     Q      Is Cooper -- do you know where Cooper is

13     living now?

14     A      No.

15     Q      When is the last time you communicated

16     with Cooper?

17     A      I saw her a couple of months ago.

18     Q      Is Ms. Cooper presently housed?

19     A      Yes.

20     Q      So how do you know Ms. Cooper is housed?

21     A      Well, as far as at the time that I saw her

22     last, she was.

23     Q      And is that in San Francisco?

24     A      Yes.

25     Q      Do you know if Ms. Cooper was housed in

158

```
1    your health because of City conduct?
2         A    No.
3         Q    Do you intend to be homelessness in
4    San Francisco again in the near future?
5         A    No.
6         Q    Where -- if you were homelessness in
7    San Francisco, would you pack your property and move
8    if you received notice of an encampment resolution?
9         A    Yes.
10        Q    And where would you move?
11        A    I don't know.
12        Q    And if your property was taken, would you
13   go to the DPW yard to try to pick that property back
14   up?
15        A    Yes.
16        Q    Do you think that you could avoid or
17   mitigate any risk of future injury by losing your
18   property if you tried to avoid encampment
19   resolutions in the first place?
20        A    I'm sorry.  Can you -- can you please
21   restate that?
22        Q    Yeah.
23             Do you agree that you would be able to
24   mitigate any risk of future injury that your
25   property would be stolen by trying to avoid
```

159

1    encampment resolutions in the first place?

2              ATTORNEY FREEMAN:    Objection, calls for a

3    legal conclusion.

4         Q    (BY ATTORNEY MILLS) You can answer to the

5    extent...

6         A    Yes.

7         Q    And are you aware that your current

8    lawsuit against the City is not requesting monetary

9    compensation for your injuries?

10        A    One more time.  I'm sorry.

11        Q    Are you aware that your current lawsuit

12   against the City is not requesting monetary

13   compensation for your injuries?

14        A    No.

15        Q    And why are you not seeking monetary

16   compensation for your injuries?

17        A    Because that's not my motivation for doing

18   this.

19        Q    And what's your motivation?

20        A    My motivation is for policies to change

21   and for the City to treat us homeless residents with

22   more respect and dignity and also treat their

23   belongings with respect and not take them from them

24   anymore.

25        Q    And do you agree that you have never tried

221

1    4:05 p.m.)

2              THE VIDEOGRAPHER:  This is the beginning

3    of Media Number 6.  Sorry.  Something just shut off.

4    Sorry.  Second time today.  Sorry about.  I'm going

5    to restart.

6              This is the beginning of Media Number 6 of

7    the deposition of Sarah Cronk.  The time now is

8    4:05 p.m., and we are back on the record.

9        Q    (BY ATTORNEY MILLS) All right.  Thank you.

10   Ms. Cronk, I am going to move to mark just the next

11   exhibit, which is going to be Exhibit 6.  So I will

12   give you a copy of that.

13              (Exhibit 6 was marked for identification

14   and is attached to the transcript.)

15       Q    (BY ATTORNEY MILLS) Ms. Cronk, are you

16   familiar with Google Street View?

17       A    Yes.

18       Q    And have you ever looked at Google Street

19   View to see if you were captured on it with any of

20   your encampments or campsites?

21       A    No, I haven't.

22       Q    Okay.  So I'll represent that Exhibit 6 is

23   a copy of a street image from August 2022 next to

24   the Target on 13th and Folsom Street.

25              So if you want to you take a moment to

222

1    flip through the three pages.  And let me know when

2    you're done.

3            A    Yes, I'm done.

4            Q    So, Ms. Cronk, is this the area where you

5    were generally staying at when you would stay next

6    to the Target location?

7            A    Yes.

8            Q    And earlier when you testified about kind

9    of a divider where tents could be placed that may or

10   may not be a sidewalk, is the divider reflected on

11   page 1?

12           A    Yes.

13           Q    Okay.  And is that where the tents are

14   placed?

15           A    Yes.

16           Q    And, Ms. Cronk, when you looked at the

17   photos, did this refresh your recollection of any of

18   the conditions of a campsite that you may have been

19   staying in at some point in August of 2022?

20           A    Yes.

21           Q    And do you know roughly when this would

22   have been in August of 2022?

23           A    Probably the whole month of August.

24           Q    And, Ms. Cronk, have -- having flipped

25   through the three pages, did you see your campsite

223

1    anywhere in the photographs?

2          A    Yes.

3          Q    Sorry.  What was the answer?

4          A    Yes.

5          Q    And, Ms. Cronk, which page are you looking

6    at where you see your -- your encampment?

7          A    I am looking at the second page.

8          Q    So, Ms. Cronk, I'm going to hand you a red

9    pen.  And if you could mark on the exhibit with the

10   pen where the encampment is.

11         A    (Complied.)

12         Q    And then can you please hold up the

13   photograph for the video?

14         A    (Complied.)

15         Q    And did you circle the tent with a green

16   top?

17         A    Yes.

18         Q    Okay.  And, Ms. Cronk, how do you know

19   that that's your tent?

20         A    I remember.

21         Q    And do you know how long you had this

22   tent?

23         A    I had that tent for a couple of months.

24         Q    And do you know who the tent is

25   immediately next to you on the right side?

1    up with what looks like some kind of white sheep --

2    or sorry -- white sheep or tarp hanging out, do you

3    know what this structure is?

4         A    No.

5         Q    Would this reflect the shower that you

6    were referring to earlier?

7         A    No.

8         Q    And, Ms. Cronk, in the tent that you

9    circled, is -- were you staying with Mr. Donohoe in

10   that tent?

11        A    Yes.

12        Q    And, Ms. Cronk, do you know what items are

13   in the gutter below your tent?

14        A    It looks to be some -- some cans, maybe

15   paper towels.  I'm not sure exactly.

16        Q    And are those your cans and paper towels?

17        A    No, sir.

18        Q    And did you always stay next to this

19   pillar when you were living behind the Target on

20   13th and Folsom?

21        A    No.

22        Q    So would you move up and down the street

23   on that -- in that -- that location?

24        A    Yes.

25        Q    Do you know how long the tent existed that

226

1    you circled in that location?

2        A    A few months.

3        Q    Is this what your tent looked like in

4    September of 2022?

5        A    No.

6        Q    And what was different?

7        A    It -- in September of 2022, if I remember

8    correctly, I think we had a different tent with the

9    same tarp over it and it was a little bit smaller.

10       Q    Is it common to change tents as a person

11   experiencing homelessness on the streets of

12   San Francisco?

13       A    Yes.

14       Q    Like how often would you typically change

15   out your tent?

16       A    Every couple of weeks to every couple of

17   months.

18       Q    And would you have to buy them yourself or

19   are you able to access tents for free through

20   various organizations that may provide them?

21       A    There were a few organizations that would

22   provide tents sometimes, if they had them, but most

23   of the time we would have to buy them.

24       Q    And do you know what organizations

25   provided tents in 2022?

230

```
1        Q    Okay.  And in front of -- immediately in

2   front of that in between what looks like a little

3   red car and that item on the ground, is there a cart

4   with items?

5        A    Yes.

6        Q    And was that your cart with items?

7        A    No.

8        Q    And did the street look like this from --

9   in June of 2022 as well?

10       A    Yes.

11       Q    Thank you, Ms. Cronk.

12            ATTORNEY NTIM:  Before we move on from

13  this item, can I ask if it was produced in the

14  litigation so far?

15            ATTORNEY MILLS:  It has not been yet.

16            ATTORNEY MURPHY:  Well, it's publicly

17  available.

18            ATTORNEY MILLS:  It's publicly available?

19            ATTORNEY MURPHY:  Yeah.

20            ATTORNEY NTIM:  Okay.

21       Q    (BY ATTORNEY MILLS) All right.  All right.

22  Ms. Cronk, I'm going to mark the next exhibit, which

23  is going to be Exhibit 7.

24            (Exhibit 7 was marked for identification

25  and is attached to the transcript.)
```

239

1        A     Oh, I don't think so, no.

2        Q     Do you know if other people were placed

3   into shelter on that rainy day in January?

4        A     I don't know.

5        Q     Do you know if there was any kind of

6   emergency shelter available to individuals because

7   of the rain?

8        A     Not that I know of.

9        Q     And now that you have your transitional

10  housing, do you continue to store property on the

11  street at all in San Francisco?

12       A     No.

13       Q     Do you have any intent to do so?

14       A     No.

15       Q     So, Ms. Cronk, I'm going to mark the next

16  exhibit, which is going to be Exhibit 9.

17             (Exhibit 9 was marked for identification

18  and is attached to the transcript.)

19       Q     (BY ATTORNEY MILLS) And I will represent

20  that this is a photo pulled from a 311 complaint

21  from September 11, 2022.

22             ATTORNEY MILLS:  And all of the 311

23  complaints are being produced in the course of

24  discovery.

25             ATTORNEY FREEMAN:  Are being -- have been

1    tanks there were in that area in September of 2022?

2        A    I would only be able to guess.

3        Q    Do you have a best estimate based off of

4    how many propane tanks you may have personally seen

5    in that area?

6        A    Maybe three or four.

7        Q    Do you happen to know who owned these

8    propane tanks in this photo?

9        A    No.

10        Q    Do you happen to know whose campsite that

11    is in the photograph?

12        A    No.

13        Q    And you didn't have any propane tanks --

14        A    No, I didn't.

15        Q    -- in September of 2022?

16        A    No, I did not.

17        Q    So, Ms. Cronk, I'm going to mark the next

18    exhibit, which is going to be Exhibit 10.

19            (Exhibit 10 was marked for identification

20    and is attached to the transcript.)

21        Q    (BY ATTORNEY MILLS) And I will represent

22    that this is another 311 photograph associated with

23    the complaint from September 14, 2022.  The same

24    issue.  The same file.

25            And, Ms. Cronk, if you could go ahead and

1      take a look at the photograph.  And let me know when

2      you're done?

3          A    Yes, I'm done.

4          Q    Ms. Cronk, do you see your campsite in

5      this photograph?

6          A    Yes.

7          Q    And, Ms. Cronk, do you still have the red

8      pen?

9          A    Yes.

10          Q    Can you circle for me where you see your

11      campsite in the photograph?

12          A    Oh, it's not working.

13          Q    Here.  Let's try this orange highlighter.

14      Here.  Sorry.  I'll keep it closed.

15          A    (Complied.)

16          Q    And then, Ms. Cronk, would you mind

17      holding up the photograph so we can see where you

18      circled.

19          A    (Complied.)

20          Q    And, Ms. Cronk, where did you apply the

21      circle in Exhibit 10?

22          A    The very first tent pictured, the green

23      tent.

24          Q    Okay.  And, Ms. Cronk, how do you know

25      that that's your tent in the bottom left-hand

243

1    corner?

2        A    I recognize it.

3        Q    Is there anything distinctive about the

4    tent that refreshes your recollection?

5        A    Yes.  The green rain fly.

6        Q    And, Ms. Cronk, it looks like immediately

7    adjacent there may be a black kind of storage

8    container on the ground.

9             Is that your black storage container?

10       A    No.

11       Q    Do you know whose storage container that

12   is?

13       A    No.

14       Q    And, Ms. Cronk, do you know whose items

15   those are in front of the tent in the roadway

16   between the tent and Target?

17       A    Where are you talking about?  Like,

18   directly in front of the tent?

19       Q    Yeah.  It looks like there may be

20   something black next to a white item.

21       A    I'm not sure.

22       Q    Ms. Cronk, do you happen to see yourself

23   in this photograph?

24       A    No.

25       Q    Okay.  Ms. Cronk, do you happen to know

244

1    who the person is that's holding the palette?

2         A    No.

3         Q    Do you happen to know if that was an

4    encampment that was set up next to Target's door?

5         A    There were no encampments by the Target

6    door.

7         Q    And, Ms. Cronk, how long did you have this

8    tent in September?

9         A    A few months.

10        Q    And then do you know how much longer into

11   September you had the tent?

12        A    Probably until December.

13        Q    And, Ms. Cronk, do you see any 2-foot

14   clearance in front of the tent between that roadway

15   where cars would park?

16             ATTORNEY FREEMAN:  Object to the form of

17   the question.

18        Q    (BY ATTORNEY MILLS) You can answer.

19        A    I don't understand.  Can you --

20        Q    Yeah, we'll strike that.

21             Ms. Cronk, when I'm looking at the

22   photograph of the tent, in the bottom left-hand

23   corner, is that the front door of the tent that's

24   pictured?

25        A    No --

276

1    STATE OF CALIFORNIA          )

2    COUNTY OF SAN FRANCISCO     ) ss.

3        I hereby certify that the witness in the

4    foregoing deposition, SARAH A. CRONK, was by me duly

5    sworn to testify to the truth, the whole truth, and

6    nothing but the truth, in the within-entitled cause;

7    that said deposition was taken at the time and place

8    herein named; and that the deposition is a true

9    record of the witness's testimony as reported by me,

10   a duly certified shorthand reporter and a

11   disinterested person, and was thereafter transcribed

12   into typewriting by computer.

13       I further certify that I am not interested in

14   the outcome of the said action, nor connected with,

15   nor related to any of the parties in said action,

16   nor to their respective counsel.

17       IN WITNESS WHEREOF, I have hereunto set my hand

18   this 1st day of October, 2024.

19   Reading and Signing was:

20   _x_ requested  ___waived  ___ not requested

21

22                        *Mary J. Goff*

23

24              MARY J. GOFF, CSR NO. 13427

25              STATE OF CALIFORNIA