## REDACTED

## EXHIBIT H

## TO

## DDECLARATION OF STEVEN A. MILLS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

## PROVISIONALLY FILED UNDER SEAL PURSUANT TO ADMINISTRATIVE MOTION TO CONSIDER WHETHER ANOTHER PARTY'S MATERIAL SHOULD BE SEALED

1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3

4      - - - - - - - - - - - - - - - - -

5      COALITION ON HOMELESSNESS,         )

6      et al.,                            )

7                      Plaintiffs,        ) CASE NO.

8      v.                                 ) 4:22-cv-05502-DMR

9      CITY AND COUNTY OF SAN             )

10     FRANCISCO, et al.,                 )

11                     Defendants.        )

12     - - - - - - - - - - - - - - - - -

13

14         TRANSCRIPT AND/OR ITS EXHIBITS MAY CONTAIN

15         INFORMATION SUBJECT TO A PROTECTIVE ORDER

16

17       VIDEOTAPED DEPOSITION OF JOSHUA DONOHOE

18            TUESDAY, NOVEMBER 12, 2024

19

20

21         BEHMKE REPORTING AND VIDEO SERVICES, INC.

22              BY:  CYNTHIA TURI, CSR NO. 11812

23              550 CALIFORNIA STREET, SUITE 820

24              SAN FRANCISCO, CALIFORNIA  94104

25                           (415) 597-5600

1

2

3

4

5

6

7

8            Videotaped deposition of JOSHUA DONOHOE,

9   taken on behalf of Defendants, at Lawyers Committee

10   for Civil Rights of the San Francisco Bay Area at 131

11   Steuart Street, Suite 400, San Francisco, California,

12   commencing at 10:14 A.M., TUESDAY, NOVEMBER 12, 2024,

13   before Cynthia Turi, Certified Shorthand Reporter

14   No. 11812, pursuant to Notice.

15

16

17

18

19

20

21

22

23

24

25

```
1   APPEARANCES OF COUNSEL:

2   FOR THE PLAINTIFFS:

3      LAWYERS COMMITTEE FOR CIVIL RIGHTS OF THE SAN

4      FRANCISCO BAY AREA

5      BY:  ANDREW NTIM, ATTORNEY AT LAW

6      131 Steuart Street, Suite 400

7      San Francisco, California  94105

8      Telephone:  (415) 543-9444

9      Email:  antim@lccrsf.org

10

11  FOR THE DEFENDANTS:

12     OFFICE OF THE CITY ATTORNEY

13     BY:  STEVEN MILLS, DEPUTY CITY ATTORNEY

14          KAITLYN MURPHY, DEPUTY CITY ATTORNEY

15     1390 Market Street, Sixth Floor

16     San Francisco, California  94102

17     Telephone:  (415) 355-3304

18     Email:  steven.mills@sfcityatty.org

19          kaitlyn.murphy@sfcityatty.org

20

21  ALSO PRESENT:

22      KYLE FRIEND, VIDEOGRAPHER

23

24

25
```

1        A.   Not that I'm aware of.

2        Q.   So do you have any recollection of Shanna Couper

3   using, like, a microphone to document what you were

4   telling her about property destruction?

5        A.   No.

6        Q.   Do you have any recollection of Shanna Couper

7   using a camera to record you having conversations about

8   property destruction?

9        A.   No.

10        Q.   Did Shanna Couper ever help you prepare a

11   declaration about property destruction?

12        A.   Clarification, help?  Like, what do you mean by

13   help?

14        Q.   Did you ever work with Shanna Couper to prepare

15   a declaration relating to property destruction?

16        A.   Yes.

17        Q.   Do you know when you worked with Shanna Couper

18   to prepare a declaration?

19        A.   It would have been the first one in September.

20   I don't know the exact date.  September 2022 -- 2022.

21        Q.   And did Shanna Couper come to you, or did you go

22   to Shanna Couper about preparing a declaration?

23        A.   She came to me.

24        Q.   And when did Shanna Couper go to you?

25        A.   Multiple times.  Multiple times.  I'm not sure

1    when the first one was.

2        Q.  Do you have a recollection of writing more than

3    one declaration with Shanna Couper?

4        A.  No.

5        Q.  So is the first one September 2022?

6        A.  Correct.

7        Q.  Can you explain what that process of writing the

8    declaration was like?

9        A.  Yeah.  She was -- she more had the connection to

10   the attorneys and the Coalition and the Coalition's

11   lawsuit.  So she -- she helped me get in touch with the

12   correct people to write it.

13           She was also, you know, there to make sure we

14   made -- we made the appointment with the attorneys on

15   time.  And once we actually met with the attorneys, to

16   make sure that, you know, that I -- I was, you know,

17   pretty much taken care of and make sure that I was, you

18   know, okay to stay there for the entire process with

19   talking to the attorneys and -- you know, kind of, like,

20   just moral support really.

21       Q.  And where did you write the declaration with

22   Shanna Couper?

23       A.  In front of -- well, to clarify, I wrote it with

24   the attorneys -- and Shanna Couper was present -- in

25   front of Rainbow Grocery off of 13th and Harrison or

1   Folsom.   I can't remember which one.

2       Q.  Do you know what attorneys those were?

3       A.  I don't remember the names of those attorneys,

4   no.

5       Q.  Do you know if it's any of the attorneys in this

6   case?

7       A.  I don't -- I don't remember.  I...

8       Q.  Do you remember the names?

9       A.  I don't.

10      Q.  And so when the declaration was getting

11  prepared, was there anybody else other than

12  Shanna Couper and the attorneys present?

13      A.  Other plaintiffs writing their own declarations.

14  It was -- we met outside of a -- outside of a grocery

15  store, so, you know.

16      Q.  What do you mean by "other plaintiffs"?

17      A.  Some other people who were declaring that they

18  had also lost things and, you know, giving the testimony

19  on the damage that they had experienced recently.

20      Q.  Do you know the names of those individuals?

21      A.  That were with -- that were present while I was

22  there?

23      Q.  Correct.

24      A.  I just know him as Toro.  And I can't remember

25  the other ones who were there.

 1      A.  Yes.

 2          MR. MILLS:  So we've been going for about an

 3  hour.  Does a ten-minute break work for people?

 4          So we'll go off the record at 11:15.

 5          THE VIDEOGRAPHER:  Going off the record.  The

 6  time is 11:15 a.m.

 7          (Recess taken from 11:15 to 11:27 a.m.)

 8          THE VIDEOGRAPHER:  This marks the beginning of

 9  Media No. 2.  We are back on the record.  The time is

10  11:27 a.m.

11          MR. MILLS:  Just a quick housekeeping, I'd like

12  to mark Exhibit 68.  This is a signed protective order

13  that Mr. Donohoe signed before the start of the

14  deposition.

15          (Deposition Exhibit 68 marked for

16          identification.)

17  BY MR. MILLS:

18      Q.  And, Mr. Donohoe, during the break, did you talk

19  to anybody other than your lawyer about the deposition?

20      A.  No.

21      Q.  Thank you.  And so just to circle back, do you

22  currently live in San Francisco?

23      A.  Yes.

24      Q.  And where is that?

25      A.  Parkmerced.

1      Q.   How long have you been at Parkmerced?

2      A.   For roughly a month.

3      Q.   Can you describe for me what that living

4  situation is at Parkmerced?

5      A.   Yeah.  We -- we obtained housing through a

6  voucher called Flex Pool.

7      Q.   And do you have a lease at Parkmerced?

8      A.   Yes.

9      Q.   Does the lease have an end date?

10     A.   No.

11     Q.   So are you allowed to stay at Parkmerced as long

12  as you want?

13     A.   Yes.

14     Q.   Are there any program rules or requirements that

15  you have to satisfy in order to live at Parkmerced?

16     A.   Through Flex Pool, yes.

17     Q.   What are those requirements?

18     A.   Steady source of income.  And I think that's

19  pretty much it.

20     Q.   And do you have to pay monthly rent at

21  Parkmerced?

22     A.   Yes.

23     Q.   What's that?

24     A.   At the moment, I do not know.

25     Q.   Do you know if it's, like, a percentage of how

1    much you make?

2         A.  Yeah.  It's supposed to be 30 percent of our

3    monthly income.

4         Q.  And does that amount vary from month to month?

5         A.  Only if they do a reevaluation of our income.

6         Q.  So every month, do you have to submit paperwork

7    for what your income looks like?

8         A.  Not that I know of.

9         Q.  Do you know when you do the reevaluations?

10         A.  I -- I'm not quite sure.

11         Q.  Has anybody told you that you'd have to be out

12    of Parkmerced by a certain date?

13         A.  No.

14         Q.  At Parkmerced, can you describe, like, what type

15    of unit you have?

16         A.  Yeah.  It's a two-bedroom, two-bath loft on the

17    11th floor.

18         Q.  And do you live in that unit with just Ms. Cronk

19    and your daughter?

20         A.  Yes.

21         Q.  Do you have any shared spaces at Parkmerced with

22    other tenants?

23         A.  Laundry room.

24         Q.  And where were you living before Parkmerced?

25         A.  Hamilton -- Hamilton Houses Family -- Hamilton

1            THE WITNESS:  It was on a -- like, violation

2    based.

3    BY MR. MILLS:

4        Q.  The entire time that you lived at

5    Hamilton House, did you ever have to do drug testing?

6        A.  No.

7        Q.  Thank you.  And did you have to pay rent at

8    Hamilton?

9        A.  Yes.

10        Q.  And what was that situation?

11        A.  It was a total of 50 percent of our monthly

12    income or adjusted income.

13        Q.  And was that the entire time that you were

14    staying at Hamilton House?

15        A.  Yes.

16        Q.  Is it fair to say for roughly ten months, you

17    had to spend roughly 50 percent of your monthly --

18    adjusted monthly income?

19        A.  Yes.

20        Q.  Were there ever any instances where you were

21    unable to pay that 50 percent?

22        A.  No.

23        Q.  Did you have to pay into a savings as a term of

24    living at Hamilton?

25        A.  Yes.

1      Q.   How much did you pay into the savings in the
2   ten months that you were living at Hamilton?
3      A.   It was calculated in the 50 percent, so...
4      Q.   So just to make sure I understand, is it some
5   fraction or percentage of the 50 percent that you were
6   paying would go into a savings account?
7      A.   Correct.
8      Q.   Do you happen to know how much money went into
9   the savings account?
10      A.   Almost 2,000.
11      Q.   And is that money that you have access to any
12   time you want?
13      A.   Only after we move.
14      Q.   And do you know -- does a bank hold that money
15   or some other entity?
16      A.   I'm assuming a bank.
17      Q.   Do you have a bank?
18      A.   I do.
19      Q.   And what institution do you have a bank at?
20      A.   Through SF Fire Credit Union, as well as
21   SMW 104 Federal Credit Union.
22      Q.   Can you say that, SM?
23      A.   SMW Local 104 Federal Credit Union.
24      Q.   Are those both in San Francisco?
25      A.   The San Francisco one is.  The Fire Credit Union

1       Q.   Who is that?

2       A.   Kathleen Zerzan.

3       Q.   Can you spell that for us?

4       A.   Yeah.  K-a-t-h-l-e-e-n, Z-e-r-z-a-n.

5       Q.   And when have you last had contact with

6    Kathleen?

7       A.   2013.

8       Q.   Do you know where Kathleen is currently located?

9       A.   At this moment, I do not know.

10       Q.   Do you know where Kathleen was last located,

11    based off of your personal knowledge?

12       A.   My personal knowledge, Rhode Island.

13       Q.   Any reason why you don't have contact with your

14    son?

15       A.   I lost custody and rights to, you know, even

16    communicate back in 2013 in Portland, Oregon.

17       Q.   Thank you.  So when did you start living in

18    San Francisco?

19       A.   2014.

20       Q.   And when you started living in San Francisco in

21    2014, did you start -- were you homeless?

22       A.   Yes.

23       Q.   Were there ever any periods after 2017 and when

24    you secured housing around January of 2023 where you

25    were no longer homeless?

1        A.   No.

2        Q.   So is it fair to say during that entire period,

3   you identified as being homeless?

4        A.   Yes.

5        Q.   And where were you before San Francisco?

6        A.   Portland.

7        Q.   And you have family in Alamo, correct?

8        A.   Yes.

9        Q.   Have you ever lived with your family in Alamo?

10       A.   Yes.

11       Q.   And when have you lived with your family in

12   Alamo?

13       A.   Between October of 2023 -- well, the -- for the

14   whole month of November 2023.

15       Q.   Why was that?

16       A.   When I got finished with treatment, the options

17   that were available to me did not -- I had -- we had

18   already had an application for getting into

19   Hamilton House, Sarah and I.

20            And so the period of time between when I got out

21   of treatment and when the application was going to be

22   processed and, you know, we would be able to move into

23   Hamilton was indeterminate.

24            So I wanted to start work.  And the options that

25   were available to me, aside from living with my parents

1    in Alamo, would not have allowed me to secure -- secure

2    that.

3         Q.  So how long were you living in Alamo?

4         A.  For 30 days.

5         Q.  And is that a place that you could live if

6    anything happened and you were to lose your housing at

7    Parkmerced?

8         A.  I don't know.

9         Q.  Have you talked to your mom about whether you

10   could live with her in Alamo if you were to lose housing

11   at Parkmerced?

12        A.  I have not.

13        Q.  Would you ask your mom if you could live with

14   her in Alamo if you lost housing at Parkmerced?

15             MR. NTIM:  Objection.  Calls for speculation.

16             THE WITNESS:  I don't know.

17   BY MR. MILLS:

18        Q.  Do you have anybody else that you would ask to

19   live with if you were to lose housing at Parkmerced?

20             MR. NTIM:  Objection.  Calls for speculation.

21             THE WITNESS:  I -- no.

22   BY MR. MILLS:

23        Q.  If you were to lose your housing at Parkmerced,

24   would you return to the streets?

25             MR. NTIM:  Objection.  Calls for speculation.

1                THE WITNESS:   I would try my best not to.

2  BY MR. MILLS:

3      Q.  In the period that you've been housed or in

4  treatment since January of 2023, have you ever put any

5  property -- left any property on the streets of

6  San Francisco at encampments?

7            MR. NTIM:  Objection.  Ambiguous as to "left any

8  property on the ground."

9            THE WITNESS:  Yeah.  Can you --

10  BY MR. MILLS:

11      Q.  In the time --

12      A.  -- go back?

13      Q.  Let me provide some context.  Some people, we

14  understand, will still keep property at encampments even

15  though they're living somewhere else.

16            Between the period of -- from January 2023

17  onwards, have you left property in any encampments even

18  though you were physically living inside somewhere else?

19      A.  Yes.

20      Q.  And when were you doing that?

21      A.  During the short period of time I was living at

22  the SIP hotel.

23      Q.  And what -- when was that?

24      A.  January and beginning of February of 2023.

25      Q.  Where were you leaving your property outside of

1    was already, like, pretty full.

2            So without digging through there, which is, you

3    know, which was -- I was told, was illegal to do, I

4    wouldn't be able to find out.

5            But -- yeah.  After -- after a while, after,

6    like, a couple of people stood their ground, they ended

7    up leaving.  Everybody ended up -- pretty much almost

8    everybody left that day.

9        Q.  So you didn't see DPW take your stuff?

10        A.  My specific stuff, no.

11        Q.  And you don't know one way or the other if the

12    friend that you left your stuff with took your stuff?

13        A.  Correct.

14        Q.  Is it possible that the friend could have taken

15    your stuff?

16        A.  I never ran into him again, so I don't know.

17        Q.  You can't say one way or the other if the friend

18    didn't take your stuff?

19        A.  Correct.

20        Q.  And what items did you lose that day?

21        A.  Coffee maker.  That was the coffee maker

22    getting -- I lost a coffee maker that day.  I lost

23    clothing.  It wasn't a whole bunch.  I can't remember if

24    that was when the bike was stolen or taken.  Yeah.

25            I think it was just -- I mean, it was -- it was

1        A.  I think that's -- yeah.

2        Q.  Is it your understanding that anything -- sorry.

3            Is it your experience that anything less than

4    72 hours' notice when law enforcement is present is not

5    enough time for you to move your stuff?

6        A.  In an efficient and, like, safe and thorough

7    manner, no.

8        Q.  So you only relied upon the Coalition and Couper

9    for your understanding of this kind of tiered system

10   that you've outlined?

11       A.  No.  I -- my tiered system comes from my own

12   experiences.  These are the -- my own experiences fuel

13   the pieces that I've categorized.

14       Q.  Have you ever gone online to read the policies

15   around this?

16       A.  No.

17       Q.  So when you were telling people that they were

18   entitled to a written notice, that was just based off of

19   your own personal experience and not any policy that you

20   read on January 31st, 2023?

21       A.  Not that I have read, no.

22       Q.  Are you aware that under DPW's bag and tag

23   policy, items that are commingled with health hazards

24   can be discarded?

25       A.  No.

1      Q.   Were you aware that if there were needles

2   present in a tent, that DPW could just discard the items

3   underneath a bag and tag policy?

4      A.   No.

5      Q.   So no one communicated that to you ever?

6      A.   That particular -- that -- those things in

7   particular, no.  It was my understanding that, you

8   know -- yeah.  Yeah -- keep it clean, and it should be

9   fine.

10      Q.   So your understanding is a person that was

11   experiencing homelessness in San Francisco, that as long

12   as you kept your tent clean, your items should be bagged

13   and tagged?

14      A.   Yes.

15      Q.   And you didn't know of any exceptions?

16      A.   No.

17      Q.   Have you ever heard of the people on the street

18   being told about exceptions?

19      A.   The exceptions being the health hazards and all

20   that?

21      Q.   Uh-huh.

22      A.   Yes.

23      Q.   When have you heard those?

24      A.   I couldn't give you a specific date.  I mean, it

25   would be the aftermath of certain sweeps or just talking

1  somebody's tent, if it was somebody's things or if it

2  was trash.

3        But I have asked before.  I have sat there and

4  asked specifically to assist in making sure people's

5  things do not get destroyed, and also, to help clean up

6  the area I'm in.

7      Q.  Have you ever wanted DPW to come by and remove

8  garbage that you had at your encampment?

9      A.  Yes.

10     Q.  What type of garbage do you typically want DPW

11 to take away?

12     A.  Specifically, things that I have bagged as

13 garbage, set off to the side in a garbage area.  Health

14 hazards, if there are any, refuge -- refuse, like, you

15 know, food discard -- you know, discarded food, scraps

16 of any kind, you know, empty containers, clothing that

17 is no longer functional.

18        Sharps, I actually was very, very poignant on

19 making sure it made it back to the various, you know,

20 exchange sites so that they could get, you know,

21 accounted for and I can get new ones.  So that, I never

22 threw away -- I never threw those away in a trash can.

23        I don't want somebody to accidentally, you know,

24 get stabbed or poked or anything like that.  I was very,

25 very aware of that.

1      Q.  Is it fair to say that that would apply to a DPW

2  employee that is going through a tent where a sharps bin

3  is located, and that that employee should not be

4  accidentally stabbed with a needle?

5      A.  I -- yes.  I also think that DPW person- --

6  employees shouldn't be going through somebody's tent.

7      Q.  Are you aware that this lawsuit initially sought

8  to enjoin various laws relating to sitting, sleeping, or

9  camping in San Francisco?

10      A.  Enjoined meaning?

11      Q.  To stop them.

12      A.  Yes.

13      Q.  What was your understanding of those laws?

14      A.  That they are designed to criminalize

15  homelessness without criminalizing homelessness, if that

16  makes sense.  Without actually saying being a vagrant is

17  illegal, I can't sit or lie down for more than        20

18  minutes.  It's a problem.

19          That's -- what else am I supposed to do as a

20  human being if I don't have a home to go to?

21      Q.  So are you aware that in the City and County of

22  San Francisco, during the hours between 7 a.m. and

23  11 p.m., it's unlawful to sit or lie down upon a public

24  sidewalk or any object placed upon a public sidewalk,

25  subject to certain exceptions?

1    sleep on the sidewalk at 7 a.m.?

2        A.  Without an alarm or a way to tell time, until

3    they're there, yeah.

4        Q.  Are you aware that in the City and County of

5    San Francisco, it's unlawful to place an encampment upon

6    a public sidewalk?

7            MR. NTIM:  Objection.  Calls for legal

8    conclusion.

9            THE WITNESS:  That is my understanding.

10   BY MR. MILLS:

11       Q.  Did you do anything to try to conform your

12   conduct to that law?

13           MR. NTIM:  Same objection.

14           THE WITNESS:  Aside from trying to clean up and

15   make it seem as if we weren't ever there, yes.

16   BY MR. MILLS:

17       Q.  Were there ever any instances where you kept an

18   encampment out all day, 24 hours throughout the day, for

19   more than a single day?

20       A.  Yes.

21       Q.  How many times do you think you've done that?

22       A.  Several.

23       Q.  What's the longest you think you've kept an

24   encampment in a single place?

25       A.  During what period of time?

1      Q.   I'm just asking, based off --

2      A.   Just in general?

3      Q.   Yes.

4      A.   I mean, the longest I've been at a place for --

5   you know, undisturbed, for about a month, yeah.

6      Q.   If you were to become homeless again in the

7   future, would you try to conform your conduct to these

8   laws?

9           MR. NTIM:   Objection.   Calls for speculation.

10   Incomplete hypothetical.

11           THE WITNESS:   Yeah.   I don't like thinking about

12   the possibility of becoming homeless, even though I'm

13   very -- I'm not -- I'm definitely not that far away from

14   it.

15           So I mean, I would do -- I would do my best to

16   do what -- what I could.   I mean, I'm human.   I need a

17   place to sleep, so...

18   BY MR. MILLS:

19      Q.   So I want to go back to the incidents in

20   January 2023 because we had a little moment to pivot

21   about your understanding of some of the City's policies.

22           What was the third incident in January --

23   sorry -- in just 2023 where you believe your property

24   was destroyed?

25      A.   That would have been, I think -- yeah, in April.

1          A.  No.

2          Q.  Have you obtained any physical injuries in

3   connection with a City sweep?

4          A.  No.

5          Q.  To the extent that you're presently housed, do

6   you fear that you're going to be exposed to extreme

7   weather out on the street?

8          A.  Where I'm currently housed?

9          Q.  Correct.

10         A.  No.

11         Q.  And you mentioned the Coalition on Homelessness

12  a couple of times.  What is the Coalition's mission,

13  from your perspective?

14         A.  To find out solutions to end chronic

15  homelessness and to have more of, like, a political and

16  outreach front to address the issues and hopefully find

17  some, like I said, solutions.

18         Q.  When did you first learn about the Coalition on

19  Homelessness?

20         A.  Probably, like, 2017 or 2018.

21         Q.  And do you know if the Coalition on Homelessness

22  was monitoring the City's sweeps in 2017?

23         A.  I do not know.

24         Q.  Are you familiar with the idea of, like, joining

25  organizations to be a member?

1       A.   Yes.

2       Q.   Are you a member of the Coalition on

3   Homelessness?

4       A.   I consider myself to be.

5       Q.   And why do you consider yourself to be a member

6   of the Coalition on Homelessness?

7       A.   Because I have done many outreach things for

8   them.  I stand by a lot of the things that they stand

9   by.

10           I've also been -- I've had also close contact

11  with a few of the actual active members.  I -- yeah.

12  I've even claimed -- you know, claimed being part of

13  the -- I've gone to their, you know, headquarters where

14  they meet, and I've met some of the higher-up people.

15           I have never gone to an actual meeting.  But

16  like I said, I've done a lot of outreach for them.

17       Q.   And when, based off of your experience, do you

18  think that you first became a member of the Coalition?

19       A.   Probably 2020.

20       Q.   And have you been a member since 2020?

21       A.   Off and on, yeah.

22       Q.   Were you a member on September 27th, 2022?

23       A.   Yes.

24       Q.   Were you a member when you were preparing the

25  declaration with Couper?

1      A.  Yes.

2          Q.  Did you do anything -- did you tell Coalition

3   that you were a member?

4          A.  I didn't.  I mean, I guess, clarification on

5   that one.

6          Q.  Did you ever sign anything with Coalition saying

7   that you wanted to be a member of the Coalition?

8          A.  No.

9          Q.  Did you ever sign, like, a contract that you

10  could represent me in court for my constitutional

11  rights?

12         A.  I don't know.

13              MR. NTIM:  Objection.  Calls for legal

14  conclusion.

15  BY MR. MILLS:

16         Q.  Have you ever told the leadership at the

17  Coalition on Homelessness that you can represent me for

18  issues that impact homeless people in San Francisco?

19         A.  Yes.

20         Q.  And when did you tell them that?

21         A.  In -- somewhere between 2022 -- like, the

22  beginning of 2022 or 2021.

23         Q.  And who did you tell?

24         A.  The -- I can't remember their exact names, but

25  my -- specifically, you know, the person that Couper got

1    me in contact with to, you know, start calling if there

2    was ever any issues or if there was a sweep going on

3    that wasn't documented, Brian Edwards.  He was still --

4    I don't know his last name.  I'm sorry.  I'm

5    speculating.

6            But Brian, while he was still alive, yeah.

7        Q.  Did you ever go to any meetings at the Coalition

8    on Homelessness to vote on issues?

9        A.  No.

10       Q.  Did you ever sign up to participate in the human

11   rights working group?

12       A.  No.

13       Q.  Did you ever sign up to work for the housing

14   justice group?

15       A.  No.

16       Q.  What type of outreach did you do for the

17   Coalition?

18       A.  Like I said, if I witnessed a sweep in my

19   travels that -- you know, that there was no

20   representation that I could see, I was supposed to

21   contact one of the -- contact either Couper or this

22   other person -- I forgot his name -- and let them

23   know -- there were a couple of people I'd contact -- let

24   them know what's going on.

25           And they instructed me to kind of, like, stay

1  put and start videotaping or just, like, being an

2  observer to -- not to approach anybody specifically,

3  especially not aggressively, but just to show that I am

4  somebody watching, to make sure that things were, you

5  know -- that people were acting right, basically.

6       Q.  And were you doing that outreach before the

7  lawsuit was filed in this case?

8       A.  No.

9       Q.  So after the lawsuit, you started doing

10  outreach, monitoring sweeps, and responding to -- with

11  what you saw?

12       A.  Yes.

13       Q.  I'm going to go through a couple of names, and

14  ask them if you know that individual.

15          Do you know Jennifer Friendenbach?

16       A.  Yes.

17       Q.  And how do you know Jennifer Friendenbach?

18       A.  I'm not sure.  I just very much recognize that

19  name.

20       Q.  Kelley Cutler?

21       A.  Yes.

22       Q.  Ian James?

23       A.  Rings a bell, but not sure.

24       Q.  Carlos Watkins?

25       A.  No.





```
1    STATE OF CALIFORNIA      )

2    COUNTY OF SAN FRANCISCO ) ss.

3         I hereby certify that the witness in the

4    foregoing deposition, JOSHUA DONOHOE, was by me duly

5    sworn to testify to the truth, the whole truth, and

6    nothing but the truth in the within-entitled cause; that

7    said deposition was taken at the time and place herein

8    named; and that the deposition is a true record of the

9    witness's testimony as reported by me, a duly certified

10   shorthand reporter and a disinterested person, and was

11   thereafter transcribed into typewriting by computer.

12        I further certify that I am not interested in

13   the outcome of the said action, nor connected with nor

14   related to any of the parties in said action, nor to

15   their respective counsel.

16        IN WITNESS WHEREOF, I have hereunto set my hand

17   this November 25, 2024.

18   Reading and signing was:

19   _x_ requested __ waived __ not requested

20

21

22

23            CYNTHIA TURI, CSR NO. 11812

24            STATE OF CALIFORNIA

25
```