# EXHIBIT I

## TO

## DECLARATION OF STEVEN A. MILLS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

# In The Matter Of:

*Coalition on Homelessness, et al. v.*
*City and County of San Francisco, et al.*

---

*Toro Castano*
*October 9, 2024*

---

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 43437Castano_nl.txt
**Min-U-Script®**

1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4   - - - - - - - - - - - - - - - - - -

5   COALITION ON HOMELESSNESS,          )

6   et al.,                             )

7                   Plaintiffs,    )   CASE NO.

8   vs.                            )   4:22-cv-05502-DMR

9   CITY AND COUNTY OF SAN              )

10  FRANCISCO, et al.,                  )

11                  Defendants.    )

12  - - - - - - - - - - - - - - - - - -

13

14

15        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16             PURSUANT TO PROTECTIVE ORDER

17        VIDEOTAPED DEPOSITION OF TORO D. CASTAÑO

18             WEDNESDAY, OCTOBER 9, 2024

19

20

21        BEHMKE REPORTING AND VIDEO SERVICES, INC.

22          BY:  SUZANNE I. ANDRADE, CSR NO. 10682

23             550 CALIFORNIA STREET, SUITE 820

24             SAN FRANCISCO, CALIFORNIA  94104

25                  (415) 597-5600

2

1

2

3

4

5

6

7

8

9

10              Videotaped deposition of TORO D. CASTAÑO,

11      taken on behalf of Defendants, at 39 Drumm Street, Third

12      Floor, San Francisco, California, commencing at

13      10:07 A.M., WEDNESDAY, OCTOBER 9, 2024, before Suzanne

14      I. Andrade, Certified Shorthand Reporter No. 10682,

15      pursuant to Notice.

16

17

18

19

20

21

22

23

24

25

3

1  APPEARANCES OF COUNSEL:

2  FOR PLAINTIFFS:

3       LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE

4       SAN FRANCISCO BAY AREA

5       BY:  ANDREW NTIM, ATTORNEY AT LAW

6       131 Steuart Street, Suite 400

7       San Francisco, California  94105

8       Telephone:  (415) 543-9444

9       Email:  antim@lccrsf.org

10  - AND -

11       AMERICAN CIVIL LIBERTIES UNION FOUNDATION NORTHERN

12       CALIFORNIA

13       BY:  WILLIAM S. FREEMAN, ATTORNEY AT LAW

14       39 Drumm Street

15       San Francisco, California  94111

16       Telephone:  (415) 621-2493

17       Email:  wfreeman@aclunc.org

18

19

20

21

22

23

24

25

4

1   APPEARANCES OF COUNSEL (CONTINUED):

2   FOR DEFENDANTS:

3        CITY AND COUNTY OF SAN FRANCISCO

4        OFFICE OF THE CITY ATTORNEY

5        BY:  STEVEN A. MILLS, DEPUTY CITY ATTORNEY

6             JOHN H. GEORGE, DEPUTY CITY ATTORNEY

7        1390 Market Street, Sixth Floor

8        San Francisco, California  94102

9        Telephone:  (415) 355-3304

10       Email:  steven.mills@sfcityatty.org

11               john.george@sfcityatty.org

12

13  ALSO PRESENT:

14       KYLE FRIEND, BEHMKE VIDEOGRAPHER

15

16

17

18

19

20

21

22

23

24

25

1    V-a-f-i-a-d-e-s.  And I don't remember his roommate's

2    name.

3        Q.    And do you know if there was a cross street

4    that you lived next to at 864 Rolf Street that can be

5    identified?

6        A.    There -- I'm sure there was.  I couldn't

7    identify it.

8        Q.    Was the unit at 864 Rolf Street next to any

9    landmarks?

10        A.    Yes.  There was a large park across the highway

11    from there.

12        Q.    And what was the name of that park?

13        A.    I don't recall.

14        Q.    Any other stores or business names that pop out

15    as being in close proximity to the location at 864 Rolf

16    Street?

17        A.    There was a Little Caesars Pizza.  What else

18    was there?  I can't remember what else.

19        Q.    Are you currently housed?

20        A.    Yes, I'm in a shelter.

21        Q.    And what shelter are you staying at?

22        A.    33 Gough.

23        Q.    And how long have you been at the shelter at

24    33 Gough?

25        A.    About six months.

39

1    Q.   Were you in a shelter before that location at
2  33 Gough?
3    A.   Yeah.
4    Q.   And what shelter were you at?
5    A.   Before that, Monarch Hotel, the International
6  Hostel, and Next Door, Polk and Geary.
7    Q.   Do you know roughly how long you stayed at the
8  Monarch?
9    A.   Very briefly.
10   Q.   Do you know when that was?
11   A.   When was it?  No, I don't remember when.
12   Q.   And was that more than six months?
13   A.   It was very brief.
14   Q.   Less than a month?
15   A.   Yes.
16   Q.   Less than a week?
17   A.   I don't recall.
18   Q.   And then I believe you said the International
19  Hostel?
20   A.   Mm-hmm.
21   Q.   And do you know when you were staying at the
22  International Hostel?
23   A.   After the Monarch?  I'm not sure exactly when.
24   Q.   Do you know how long you were staying there?
25   A.   That was brief also.  That was maybe a week or

40

1    two.

2        Q.    And then I believe the last one was Next Door;

3    is that correct?

4        A.    Yes.

5        Q.    And do you know when you were living at Next

6    Door?

7        A.    I believe it was around December twenty

8    twenty -- let's see -- December twenty -- 2023?  Is that

9    right?  Or maybe it's 2022.

10             It's December, but I don't remember the year.

11       Q.    And do you know when you stopped staying at

12   Next Door?

13       A.    It was when my CAAP benefits ran out.  You

14   could look that up.

15       Q.    Do you know how many months you were staying at

16   Next Door?

17       A.    At least two months.  I don't recall exactly.

18       Q.    Is 33 Gough city housing?

19       A.    Yes.

20       Q.    Did the City help you get into that housing?

21       A.    I don't -- maybe peripherally.  It was Arial

22   she's the social worker with HSH.

23       Q.    But Arial connected you to 33 Gough?

24       A.    Yes.

25       Q.    Are there any program rules that you have to

1      Q.    How long have you had your current cell phone?

2      A.    I would have to look it up.  It coincides with

3  a certain date, but I don't know it off the top of my

4  head.

5      Q.    Roughly, when was that date?

6      A.    Under two years but more than a year.

7      Q.    And what phone carrier is that?

8      A.    T-Mobile.

9      Q.    And what -- what's the phone number?

10     A.    (415) 595-0159.

11     Q.    Have you ever used any other phone numbers?

12     A.    Yes.

13     Q.    Have you used any other phone numbers in the

14  last five years?

15     A.    Yes.

16     Q.    And what phone numbers have you had in the last

17  five years?

18     A.    What are they?  I'm not totally sure.  (562),

19  maybe, 999-4820 and (628) 946-2230 and (415) 312-4187

20  and 5 -- (650) 270- -- I can't remember.  I can't

21  remember it.

22     Q.    That's okay.

23           In the last five years -- well, strike that.

24           Since 2019, how many cell phones do you think

25  that you've had?

126

1     A.   Less than ten, more than three.

2     Q.   So somewhere between three and ten phones?

3     A.   Yeah.  They break.

4     Q.   Were any -- are you familiar with the concept

5 Obama Phone?

6     A.   Yes.

7     Q.   Were any of those Obama Phones?

8     A.   Yes.

9     Q.   How many of them?

10    A.   At least two.

11    Q.   And what is an Obama phone?

12    MR. NTIM:  Objection; calls for speculation.

13 BY MR. MILLS:

14    Q.   You can answer.

15    A.   It's a colloquialism referring to a phone

16 that's provided by the government, services provided by

17 the government.  I'm not sure if it's Lifeline service

18 or it's something separate.

19    Q.   And is that a City-provided phone?

20    A.   No.  It's State, I believe.  Maybe it's

21 national.  I don't know.

22    Q.   Have you ever had a City-provided phone?

23    A.   I don't know what that is.

24    Q.   Did anybody from a City agency in San Francisco

25 ever provide you with a cell phone?

127

```
 1        A.    I didn't know they did that.

 2        Q.    In 2020, how many phones did you have?

 3        A.    I'd have to research it.  More than one.

 4        Q.    Did they all have the same phone carrier?

 5        A.    Did they have the same car- -- no.

 6        Q.    So what phone carriers have you had?

 7        A.    I can't recall some of them.

 8        Q.    What ones can you recall other than T-Mobile?

 9        A.    That's it.  Assurance maybe was one of them.

10   I'm not certain.

11        Q.    Is that Assurance Wireless?

12        A.    I think so, yeah.

13        Q.    And is that the Obama Phone provider?

14        A.    One of them, yeah.

15        Q.    Would you use your phones to take photographs?

16        A.    Yes.

17        Q.    And would you upload those photographs to your

18   laptop?

19        A.    Maybe.

20        Q.    Would they get uploaded to another cloud?

21        A.    It's pretty likely they were backed up, yeah.

22        Q.    So what was your typical process for getting

23   your photographs backed up on either a laptop or a

24   cloud?

25        A.    Wherever I had room on.
```

162

1             Did you mean James?

2        A.    I did, yes.

3        Q.    Okay.  So it's Ian James?

4        A.    Yes.

5        Q.    So was Ian James the officer manager the entire

6    time you were a volunteer?

7        A.    Yes, I believe so.

8        Q.    And was Ian James the office manager the entire

9    time you were an intern?

10       A.    Yes, I believe so.

11       Q.    And then the same question as an employee.

12       A.    Murky, but I think maybe, yeah.  We butted

13   heads about it.

14       Q.    And how were you paid by the Coalition on

15   Homelessness?

16       A.    By paycheck.

17       Q.    Would that paycheck get direct-deposited into

18   an account, or would you receive a physical check?

19       A.    I don't recall what I did.

20       Q.    Do you know roughly how much you made as an

21   intern with the Coalition on Homelessness?

22       A.    No more than 20 hours a week.

23       Q.    Do you have a rough estimate of the total

24   amount of --

25       A.    No idea.

1    A.   No.  I didn't have that expectation.

2    Q.   And do you know what your salary was as an

3    employee as opposed to an intern?

4    A.   They're all the same.  It's something like

5    54,000, something around there except for the people

6    with kids.

7         It would be on their -- their non -- their --

8    oh, God.  What is it? -- nonprofit tax return thing.

9    Q.   Did you get any subsidies from the Coalition on

10   Homelessness in addition to the hourly rate that you

11   were paid?

12   A.   No.  No.  There's no such thing.

13   Q.   Did the Coalition on Homelessness give you any

14   stipends when you were a volunteer?

15   A.   No, definitely not.

16   Q.   Did they give you any money as a volunteer?

17   A.   I don't recall.  It seems unusual.  I don't

18   believe they did.

19   Q.   Are there any other internships that you had

20   since the time you graduated from grad school and this

21   internship with the Coalition on Homelessness?

22   A.   No.  I can absolutely say with certainty I did

23   not have any other internships, even though I forgot

24   about this one.  Because it was -- as I said, I

25   wasn't -- it was more about helping me out than, you

1    Q.    Do you know who was invited to the sweeps

2    training?

3    A.    I don't.

4    Q.    And then I want to point out and read the first

5    sentence of your e-mail to Ian James.

6    A.    Mm-hmm.

7    Q.    It says:  "I'm sorry I missed this!  I was deep

8    into my sunshine request research in preparation for my

9    suit against the city."

10    A.    Mm-hmm.

11    Q.    What suit against the City are you referring

12    to?

13    A.    Small claims.  I never actually initiated it; I

14    threatened to.  We settled before.

15    Q.    So is it your testimony that prior to

16    September 16th, 2021, you had not settled your small

17    claims case?

18    A.    No.  The City was dragging their feet, not

19    responding to me.  I think it was almost a year before

20    they responded or something.

21    Q.    And were you representing yourself with respect

22    to that matter?

23    A.    Yeah, because it was small claims.  I couldn't

24    have a lawyer represent me.

25    Q.    What Sunshine request research were you doing?

187

1    BY MR. MILLS:

2        Q.    And, Mr. Castaño, I will represent that this is

3    a declaration of Toro Castaño that was filed in this

4    litigation on September 27th, 2022.  So if you want to

5    go ahead and take a moment to flip through the document

6    and let me know when you're done.

7        A.    (Examines document.)

8              Okay.  Done.

9        Q.    Mr. Castaño, if you could turn to page 5.  It's

10   5 at the bottom of the document -- of the declaration,

11   and let me know when you're there.

12       A.    Um...

13       Q.    It's 7 on the blue number at the top of the

14   page, if that helps.

15       A.    Okay.  Got it.

16       Q.    So, Mr. Castaño, do you see a signature?

17       A.    Yes, I do.

18       Q.    Is that your signature?

19       A.    Yes.

20       Q.    And having flipped through this declaration, do

21   you recall preparing the document?

22       A.    No.

23       Q.    Mr. Castaño, do you see the date on the

24   document, September 27th, 2021?

25       A.    I'm not sure where you're seeing that.

188

1       Q.    Next to the signature.

2       A.    Oh, yeah.

3       Q.    And do you see -- is that the date, September

4    27th, 2021?

5       A.    Yeah, because I said I was 50 at the beginning.

6    So, yeah.

7       Q.    So was this document signed on September 27th

8    of 2021?

9       A.    I'm not sure if that means it was or not.  I'm

10   not sure what that means.

11      Q.    Do you have any recollection of when you signed

12   this document?

13      A.    I don't.

14      Q.    And, Mr. Castaño, I would like to refer you

15   back to Exhibit No. 27, where the document is dated

16   September 16, 2021, and it refers to "my suit against

17   the city."

18      A.    Mm-hmm.

19      Q.    So was this declaration prepared in

20   anticipation of a lawsuit with the City?

21      A.    No.  Was it?  No, I don't think so.  I'm not

22   sure what it was for.  Or maybe it was.

23      Q.    Do you know who you -- if you prepared this

24   document with anybody else?

25      A.    Well, I didn't prepare it myself.  So I'm not

189

1    sure who did.  I don't remember.

2        Q.    In September of -- September 27th of 2021, do

3    you have any memory of who could have prepared the

4    declaration?

5        A.    It might have been Larissa.

6        Q.    And who is Larissa?

7        A.    She used to work for LCCR; is that correct?

8        Q.    And is Larissa -- or is LCCR the Lawyer's

9    Committee for Civil Rights?

10       A.    Yeah.

11       Q.    At some point in September of 2021, were you

12   working with a Larissa of the Lawyers Committee on Civil

13   Rights?

14       A.    I think so, yeah.

15       Q.    And was Larissa an attorney?

16       A.    Yes.

17       Q.    Do you remember discussing this declaration at

18   all with Larissa?

19       A.    Yes.

20       Q.    And do you know what it was being prepared in

21   anticipation for?

22       A.    I think for my suit, but I'm not sure.

23       Q.    So is it fair to say that if this document was

24   filed on September 27th of 2022, you hadn't seen -- or

25   you did not prepare the document for at least one year

190

1   before that filing?

2        A.    Yeah, because they didn't respond for almost a

3   year -- the City didn't respond.

4            I remember asking Larissa about that.  And she

5   said, "Well, you can take that as a no."  They didn't

6   respond at all, denying my claim, basically.

7        Q.    Okay.  So your understanding is that this --

8   sorry -- this declaration of Toro Castaño may have been

9   prepared in anticipation of a small claims action?

10       A.    I -- I believe so, yes.

11       Q.    So I'm going to go ahead and set that aside.

12       MR. NTIM:  A point of clarification.  I think there

13  may have been an error in the date that was written on

14  here.  You see it was filed on 9/27/2022, but it says

15  executed on -- in 2021.

16       MR. MILLS:  Are you going to testify as to the

17  authenticity of when the document was signed?

18       MR. NTIM:  I would ask Mr. Castaño to testify on

19  that authenticity.

20       MR. MILLS:  Because he just testified that it would

21  have been one year difference between the date that the

22  declaration was prepared and when it was filed with the

23  court.

24       THE WITNESS:  September -- that would have been the

25  next month after the sweep.

191

1        MR. FREEMAN:    The reason we raise the question --

2        THE WITNESS:    It's wrong.    The date's wrong.

3        MR. FREEMAN:    It could be a discrepancy in the date.

4        THE WITNESS:    Yeah.    The date's wrong.

5        MR. FREEMAN:    That's for the witness to say.

6    BY MR. MILLS:

7        Q.    If you look at Exhibit No. 27, again, it refers

8    to a lawsuit.    And that was September 16th, 2021.    And

9    the declaration is dated September 27th, 2021.

10              So I'm trying to understand, Mr. Castaño, is if

11   this declaration was prepared in anticipation of the

12   small claims lawsuit that you said this e-mail

13   concerned.

14       A.    Yes, it was.    It was prepared by Larissa.

15       Q.    Thanks.

16             Mr. Castaño, are you familiar with the concept

17   of bagging and tagging?

18       A.    Yes.

19       Q.    And what does that mean to you?

20       A.    They identify where something was taken from

21   and who it belongs to, and then you can go to the DPW

22   yard later and claim it, in theory.    I think you have

23   three days or something.

24       Q.    Okay.    And when we say "DPW," is that the

25   Department of Public Works?

204

1       A.    No, I don't.

2       Q.    Could it have been more than two?

3       A.    Yes, possibly.

4       Q.    And in addition to tents, did you have any

5    structures --

6       A.    Yes.

7       Q.    -- set up?

8             And what kind of structures did you have set up

9    leading into the August 21st, 2020, incident?

10      A.    I have pictures you could look at, but I'm not

11   really sure how to describe them.

12            You were given pictures, actually, I think.

13   Were you?  Maybe you weren't.  I'm not sure.

14      Q.    Do you have pictures of the structures?

15      A.    I do, yeah.

16      Q.    And to the extent those have not been produced,

17   going to ask that they be produced.

18      A.    Sure.

19      Q.    Thank you.

20      A.    People are astonished when they see them.  They

21   looked really nice.

22      Q.    The tents?

23      A.    Mm-hmm.

24      Q.    And the structures?

25      A.    Oh, yeah.  They were beautiful.

1    Q.    Did you build any of them yourself?

2    A.    No.

3    Q.    And just to clarify, so it was two individuals
4    that were living with you in that camp on August 21st,
5    2020?

6    A.    Yeah.  One of them had their own tent, a very
7    large tent also.

8    Q.    And the way that the encampment group was set
9    up, did you leave space in between each other's tents,
10   or were they kind of stacked side by side?

11   A.    We had a share -- we had a shared yard where we
12   had all the resources that we'd give out to people
13   organized.

14   Q.    And what resources were you giving out?

15   A.    We had a shoe -- we had a shelf of shoes on it.
16   We had jackets.  We had blankets.  We had various,
17   sundry other clothing items, first-aid, needle exchange,
18   food.

19   Q.    So was your expectation that individuals could
20   come into the encampment and take those belongings that
21   were left out, like shoes?

22   A.    We would apportion them.  They weren't -- they
23   weren't left out.

24   Q.    So what do you mean by "apportion them"?

25   A.    Literally what it means.

1    Q.    I'm not understanding your meaning of the

2    words.  So if you have any other way you could describe

3    that for me.

4    A.    We would give people resources based on their

5    needs.

6    Q.    So did people come to you and -- and act as if

7    you were like a store for belongings?

8    A.    Not a store.  But we -- we were like a hub

9    during the pandemic.  All the health workers came to my

10   tent because they knew they could monitor everyone in my

11   area by talking to me.  And they would ask me to keep an

12   eye out for certain people, and I would for them.

13   Q.    And where would you get these items that were

14   kept to be apportioned?

15   A.    People would donate them.

16   Q.    How did you distinguish between items that were

17   going to exist for apportionment and the items that you

18   had and kind of held out as being your own personal?

19   A.    We tried to give according to needs, the

20   greatest need, you know, with the most...

21   Q.    And did you document these, like, requests that

22   people made in any way, like an inventory log?

23   A.    No.

24   Q.    Okay.  Did you ever have any disputes leading

25   up to August 21st, 2020, where somebody was trying to

1   take an item out of the camp that you did not want them

2   to take?

3       A.   It sounds plausible.  People stole stuff all

4   the time.

5       Q.   How often would things be stolen?

6       A.   Often.

7       Q.   Almost daily?

8       A.   Yes.

9       Q.   And did you take any steps to try to prevent

10  items from being stolen?

11      A.   No.  I took steps afterwards, but no -- I mean,

12  other than the normal precautions.

13      Q.   What are the normal precautions you're

14  referring to?

15      A.   Locking things up, not leaving things out.

16      Q.   Did you have, like, dresser drawers or cabinets

17  that you were able to leave things locked in at that

18  encampment?

19      A.   I had a crate that everything fit into that had

20  two sections that locked.  There's a video of it.  I

21  think you were -- you were given the video.

22      Q.   And then you meant -- I heard you testify about

23  needle exchange.

24           So would people get to come and just place

25  needles in the encampment?

208

1    A.    They put them in Sharps boxes.

2    Q.    How many Sharps boxes did you have?

3    A.    I had a large one and a medium size one.

4    Q.    So two?

5    A.    Yes.

6    Q.    And can you describe roughly the size or

7    dimensions of the large needle box?

8    A.    I couldn't, but it's standard.

9    Q.    And what's standard to you?

10    A.    I'm not sure what the measurements are.

11    Q.    With your hands, can you kind of give me a best

12    estimate of how wide that box was?

13    A.    Maybe this wide (indicating).

14    Q.    And how tall?

15    A.    Maybe that tall (indicating).

16    Q.    And what about the smaller one; can you do the

17    same activity?

18    A.    Probably about like this size (indicating).

19    Q.    And how would those get, like, replaced or

20    emptied?

21    A.    I would dispose of them according to whatever

22    the protocols were.  It was difficult during the

23    pandemic; not everything was open.  But I didn't just

24    throw them away.

25    Q.    Did you seek those Sharps bins from City

1    next to the desk?

2         A.    Yep.

3               (Writes on document.)

4         Q.    Do you see other items that belong to you?

5         A.    Yeah.  There's a chest on top of that.

6         Q.    And can you circle the chest that belongs to

7    you --

8         A.    Mm-hmm.

9               (Writes on document.)

10        Q.    -- and put a "2" next to it?

11        A.    To the right of that, there's a white banquet

12   or caf- -- what would you call it?  Buffet.

13        Q.    Is that like a freezer buffet, something to

14   keep food cold?

15        A.    No.  It's like something you would store dishes

16   in.

17        Q.    And can you circle that for me and put a "3"

18   next to it?

19        A.    Yeah.

20               (Writes on document.)

21               And then beyond -- in front of that, there's

22   some artificial plants.  And not sure what that is above

23   there.  Oh, I have a red velvet curtain in the doorway.

24        Q.    And do you know what that doorway leads to?

25        A.    The photo lab.

245

1    covered that belong to you?

2        A.    No, I don't think so.

3            (Writes on document.)

4        Q.    And if you turn to page 2, just to confirm

5    there's nothing there.

6        A.    Don't see anything.  Not sure what I'm looking

7    at.

8        Q.    I just wanted to make sure that there's no

9    property there that belongs to you on page 2.

10        A.    It's just a street, I believe.

11        MR. MILLS:    Okay.    I'm going to mark next

12    Exhibit No. 32.

13            (Deposition Exhibit 32 was marked for

14            identification.)

15        THE WITNESS:    Who's that?    Oh, that's Courtenay?

16    Oh, my God.    Wow.

17    BY MR. MILLS:

18        Q.    So, Mr. Castaño, I will represent that this is

19    a photograph again taken from the 311 complaint on

20    August 2nd, 2020, at Pond and 16th.

21            Looking at the photograph, does this represent

22    your camp?

23        A.    Yes.    We painted that sheet with a tree on it.

24        Q.    And is that the painted tree on the picket

25    fence?

1      A.    Yeah, yeah.    That's an example of anesthetics

2  we used.    The red velvet curtain.

3      Q.    Do you happen to know who the individual is

4  sitting kind of towards the center that appears to be

5  writing in a notebook?

6      A.    I think it's Courtenay.

7      Q.    And is that the one with schizophrenia that

8  would throw items?

9      A.    Yeah.    I think that's her tent there.

10      Q.    Courtenay in the tent with the orange top?

11      A.    Yeah.    It looks like her stuff is all piled up.

12      Q.    And do you see next to that tent a barbecue

13  pit?

14      A.    I do.

15      Q.    Is that a barbecue pit that you would use at

16  the camp to cook?

17      A.    It's possible.

18      Q.    And do you see the -- if you keep looking to

19  the right next to that silver chair --

20      A.    Mm-hmm.

21      Q.    -- there's a smaller barbecue.

22      A.    That's my silver chair.

23      Q.    Is that your small barbecue as well?

24      A.    I think so.

25      Q.    And would you use that to cook at the camp?

247

1    A.    Yes.

2    Q.    Do you happen to know -- it appears there may

3    be a body inside of that orange tent.

4         Do you know whose body --

5    A.    There is?  I don't see one.

6    MR. NTIM:  Objection; assumes facts not in evidence.

7    BY MR. MILLS:

8    Q.    And, Mr. Castaño, I'm going to take you back to

9    that picket --

10   A.    There's a red Sharps container in there, by the

11   way.

12   Q.    You predicted where I was going.

13        So, Mr. Castaño, next to that red -- or sorry.

14   Next to that picket fence --

15   A.    Mm-hmm.

16   Q.    -- is there a Sharps container?

17   A.    Yes.  There's one in front of Courtenay's tent

18   too.

19   Q.    And can you circle both of those for me?

20   A.    Yeah.

21        (Writes on document.)

22   Q.    And are those the Sharps containers that you

23   were testifying to earlier in the day?

24   A.    Yes.

25   Q.    And, Mr. Castaño, next to that Sharps container

248

1   by the picket fence, there appears to be some green

2   buckets and, like, a mop bucket.

3       A.   Mm-hmm.

4       Q.   Do you know what those are?

5       A.   For cleaning, yeah.

6       Q.   Did they have chemicals in them?

7       A.   Soap probably, Simple Green.

8       Q.   And, Mr. Castaño, looking at this, are you able

9   to identify any other property that belonged to you?

10      A.   Yes.  There's a clear Philippe Starck stool to

11  the left of the painted sheet.

12      Q.   Okay.  And can you circle that for me, please.

13      A.   (Writes on document.)

14           Yeah.

15           That pallet is mine.  And on the left side of

16  the image, there's some Tyvek stretched out for privacy.

17  And the ladder I guess I still had.  I borrowed it from

18  Cafe Flore.

19      Q.   And, Mr. Castaño, do you know if there's a tent

20  behind that painted tree banner that we were talking

21  about?

22      A.   I think there might be.

23      Q.   Do you not know one way or the other, though?

24      A.   It looks like there is.

25      Q.   And do you know what kind of tent that was?

1    Q.    Would you use glitter?

2    A.    Oh, yeah, definitely.

3    Q.    Are you a heavy glitter user?

4    A.    Not heavy.

5          But I used American cheese slices once.

6    Someone donated, like, 300 of them.

7    Q.    And that was perishable cheese?

8    A.    Yeah.

9    Q.    And what did you do with that cheese?

10    A.    I spelled out an obscene word.

11    Q.    And did you do that in this camp?

12    A.    Yeah, I think so.

13    Q.    What was the obscene word?

14    A.    I think it said "fuck you" or something like

15    that.

16    Q.    And what did you do with the cheese after it

17    was left out?

18    A.    I swept it up and put it in the dumpster.

19    Q.    Do you know how long you kept the cheese out?

20    A.    About a week.

21    Q.    Were you trying to telegraph that message to

22    anyone in particular?

23    A.    No.    It was a message of resistance.

24    Q.    And who were you sending a message of

25    resistance to?

1    A.    Neighbors.

2    Q.    Your neighbors in the Castro?

3    A.    The people directly across the street.

4    Q.    Is that a library across the street?

5    A.    Yeah.

6    Q.    Do you know if the library was open during this

7    time?

8    A.    Depends on what day it was.

9    Q.    Is there a daycare there?

10    A.    No.  Not in the library, no.

11    Q.    Do you see any other items that we haven't gone

12    over on Exhibit 30 --

13    A.    No.

14    Q.    -- 32?

15         Sorry.  Chicken scratch.  Okay.

16         Mr. Castaño, I'm going to mark our next

17    exhibit, which is going to be Exhibit 33.

18    A.    Okay.

19         (Deposition Exhibit 33 was marked for

20         identification.)

21    THE WITNESS:  Whoa.  When was this?

22    BY MR. MILLS:

23    Q.    So, Mr. Castaño, I've just handed you

24    Exhibit 33.  I will represent that, again, this is

25    another photo taken from a 311 complaint.  This one is

1    dated August 14, 2020, at Pond and 16th Street.

2            Looking at the photograph, are you able to

3    identify yourself in it?

4        A.   Yes.

5        Q.   And can you circle where you are on the

6    photograph?

7        A.   Yep.  Really dark.

8            (Writes on document.)

9            There's the shoe rack on the right side.

10       Q.   And can you circle the shoe rack for me?

11       A.   Mm-hmm.

12           (Writes on document.)

13       Q.   And can you put a "1" next to it?

14       A.   Yes.

15           (Writes on document.)

16       Q.   And is that shoe rack that we marked with

17   number 1 the shoe rack that was open to the public to be

18   able to get items?

19       A.   It wasn't open, but people could point, and we

20   could retrieve them for them.

21       Q.   So were the items in front of that shoe rack

22   items that were available for the public to potentially

23   claim or take?

24       A.   It's possible.  It seems likely.

25       Q.   And, Mr. Castaño, I want to pull your eyes down

281

1    2020, incident?

2        MR. NTIM:  Objection; calls for a legal conclusion.

3        MR. MILLS:  It's asking for his knowledge.

4    BY MR. MILLS:

5        Q.    You can answer to the extent you know.

6        A.    I believe so.

7        Q.    And, Mr. Castaño, have you sued the City and

8    County of San Francisco again for that August 21st,

9    2020, incident?

10       A.    No.

11       MR. FREEMAN:  Same objection.

12       THE WITNESS:  I never sued them.

13   BY MR. MILLS:

14       Q.    So you haven't sued the City and County of

15   San Francisco?

16       A.    I've never sued the City.

17       Q.    Do you know that the City and County of

18   San Francisco is a defendant in the lawsuit that brings

19   us here for deposition today?

20       A.    Yeah, I think so.

21       Q.    And are you a named plaintiff in that lawsuit?

22       A.    Yes.

23       Q.    And did you know that that lawsuit references

24   the August 21st, 2020, incident?

25       A.    I wasn't clear on that.

1   but somewhere.

2       Q.   Do you know if this chat transcript is

3   depicting boots that were built in a cart but not

4   purchased yet?

5       A.   No.   They were purchased.   There's later

6   transcripts that -- that say that.

7       Q.   And if you could turn -- keep turning where it

8   says "Pictures showing MacBook Pro" --

9       A.   This has nothing to do with my claim, and I'm

10  not sure why this is included.

11      Q.   So are you representing that it had nothing to

12  do with your claim that was submitted to seek $10,000

13  from the City and County of San Francisco?

14      A.   No.   I bought those boots for Karl years

15  before, when I lived in Southern California.   It had

16  nothing to do with San Francisco.

17      Q.   Did you review that claim before it was

18  submitted?

19      A.   Review what claim?

20      Q.   The government claim that was settled for

21  10,000 -- for $9,000.

22      A.   Review it for what?

23      Q.   Accuracy.

24      A.   I believe so.

25      Q.   But your testimony today is that those

292

1    receipt -- or those chats for the boots had nothing to

2    do with your claim?

3        MR. FREEMAN:    Objection; misstates testimony.

4    BY MR. MILLS:

5        Q.    You can answer.

6        A.    No.    They were just -- they're just an example

7    of the cost.    They have nothing to do with -- they're

8    not the same boots.

9        Q.    And if you could keep flipping through where it

10   says "Pictures showing MacBook Pro thrown away."

11       A.    Where at?

12       Q.    So if you could go back -- forward in the

13   document a couple more pages, and then we'll be on the

14   same -- same page.

15           I'm looking at this one here.    It says:

16   "Pictures showing MacBook Pro."

17       A.    Okay.

18       Q.    And then if you could turn --

19       A.    I can't --

20       Q.    -- two more pages?

21       A.    -- see it.

22           Mm-hmm.

23       Q.    Do you know who took this photograph?

24       A.    Christin Evans.

25       Q.    And do you know who highlighted what appears to

1    BY MR. MILLS:

2        Q.    Do you know what a jury trial is?

3        A.    I think so, yeah.

4        Q.    Is it your understanding that this case will be

5    presented to a jury?

6        A.    No, I don't believe so.  I was told otherwise.

7        Q.    Do you think that the City should be entitled

8    to a jury?

9        MR. NTIM:  Objection --

10       THE WITNESS:  I'm not a lawyer --

11       MR. NTIM:  -- calls for --

12       THE WITNESS:  -- yeah.

13       MR. NTIM:  -- legal opinion.

14   BY MR. MILLS:

15       Q.    Do you intend to be homeless in San Francisco

16   in the near future?

17       A.    That's a weird question.

18       Q.    Do you intend to be homeless in San Francisco

19   in the near future?

20       A.    I don't understand that question.  That's

21   bizarre to me.

22       Q.    Do you have any plans to be unsheltered on the

23   streets of San Francisco?

24       A.    That's crazy.  Why would I make plans for that?

25       Q.    To the extent you lose your current shelter,

316

1   would you return to the streets to camp?

2       A.   I -- I don't know.   I would go wherever I

3   could.

4       Q.   Would you try to conform your conduct to the

5   anti-camping laws?

6       MR. NTIM:   Objection; calls for speculation.

7       THE WITNESS:   I don't know.

8   BY MR. MILLS:

9       Q.   Would you try to avoid interactions with DPW by

10  not keeping a camp in a condition where they will try to

11  resolve it?

12      MR. NTIM:   Same objection; incomplete hypothetical.

13  BY MR. MILLS:

14      Q.   You can answer.

15      A.   I can't imagine that I would, but it's a

16  bizarre question.   I don't really understand it.

17      Q.   To the extent you lose your current housing

18  shelter, would you try to get another one?

19      A.   Of course.   I don't want to be out on the

20  street.

21      Q.   If you were told that you had 72 hours to break

22  up an encampment, would you listen to that notice and

23  move?

24      MR. NTIM:   Objection; calls for speculation,

25  incomplete hypothetical.

317

1   BY MR. MILLS:

2       Q.   You can answer the question.

3       A.   I don't -- I don't know.  I have no idea.

4       Q.   If you received notice that an HSOC resolution

5   was going to take place within 72 hours --

6       A.   I don't know all the context.  I don't know

7   all -- you know, I don't know.

8       Q.   Just --

9       A.   It depends --

10      Q.   -- assuming you received a notice 72 --

11           (Reporter clarification.)

12  BY MR. MILLS:

13      Q.   We have to ask the question, and then you can

14  answer.  And I get you might predict where I'm going,

15  but we've got to let that happen, and we will get out

16  sooner.

17      A.   Okay.

18      Q.   To the extent you receive a 72-hour notice that

19  an HSOC resolution is going to be coming within the next

20  72 hours, would you move your belongings or -- would you

21  move your belongings?

22      MR. NTIM:   Same objections.

23      THE WITNESS:   I don't know.  I -- I'm very

24  principled, and I am motivated by my conscience.

25  BY MR. MILLS:

331

1    invoking our right to review the deposition transcript

2    and make corrections.

3         MR. MILLS:  All right.  Thank you.

4              So we'll go off the record at 6:19.

5         THE VIDEO OPERATOR:  This concludes the deposition

6    of Toro Castaño.  The number of media files used was

7    five.  The original media will be retained at Behmke

8    Reporting and Video Services, Inc.

9              We are going off the record.  The time is

10   6:20 p.m.

11             (At 6:20 p.m. the deposition proceedings

12              adjourned.)

13

14

15        _____

16                  TORO D. CASTAÑO

17

18

19

20

21

22

23

24

25

332

```
 1   STATE OF CALIFORNIA          )

 2                                ) ss.

 3   COUNTY OF SAN FRANCISCO       )

 4           I hereby certify that the witness in the

 5   foregoing deposition, TORO D. CASTAÑO, was by me duly

 6   sworn to testify to the truth, the whole truth and

 7   nothing but the truth, in the within-entitled cause;

 8   that said deposition was taken at the time and place

 9   herein named; and that the deposition is a true record

10   of the witness's testimony as reported by me, a duly

11   certified shorthand reporter and a disinterested person,

12   and was thereafter transcribed into typewriting by

13   computer.

14           I further certify that I am not interested in

15   the outcome of the said action, nor connected with nor

16   related to any of the parties in said action, nor to

17   their respective counsel.

18           IN WITNESS WHEREOF, I have hereunto set my

19   hand this 21st day of October, 2024.

20   Reading and Signing was:

21   _x_ requested   ___ waived   ___ not requested

22

23

24

25           SUZANNE I. ANDRADE, CSR NO. 10682
```