**EXHIBIT V**

**TO**

**DECLARATION OF STEVEN A. MILLS IN SUPPORT OF
DEFENDANTS' PARTIAL MOTION TO DISMISS THE THIRD
AMENDED COMPLAINT**

# In The Matter Of:

*Coalition on Homelessness, et al. v.*
*City and County of San Francisco, et al.*

---

*Toro Castano*
*October 9, 2024*

---

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 43437Castano_nl.txt
**Min-U-Script®**

1

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4    - - - - - - - - - - - - - - - - - -

5    COALITION ON HOMELESSNESS,        )

6    et al.,                          )

7                  Plaintiffs,        )   CASE NO.

8    vs.                              )   4:22-cv-05502-DMR

9    CITY AND COUNTY OF SAN           )

10   FRANCISCO, et al.,               )

11                  Defendants.       )

12   - - - - - - - - - - - - - - - - - -

13

14

15       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16             PURSUANT TO PROTECTIVE ORDER

17        VIDEOTAPED DEPOSITION OF TORO D. CASTAÑO

18             WEDNESDAY, OCTOBER 9, 2024

19

20

21        BEHMKE REPORTING AND VIDEO SERVICES, INC.

22            BY:  SUZANNE I. ANDRADE, CSR NO. 10682

23               550 CALIFORNIA STREET, SUITE 820

24               SAN FRANCISCO, CALIFORNIA  94104

25                                (415) 597-5600

2

1

2

3

4

5

6

7

8

9

10          Videotaped deposition of TORO D. CASTAÑO,

11   taken on behalf of Defendants, at 39 Drumm Street, Third

12   Floor, San Francisco, California, commencing at

13   10:07 A.M., WEDNESDAY, OCTOBER 9, 2024, before Suzanne

14   I. Andrade, Certified Shorthand Reporter No. 10682,

15   pursuant to Notice.

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES OF COUNSEL:

2    FOR PLAINTIFFS:

3         LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE

4         SAN FRANCISCO BAY AREA

5         BY:  ANDREW NTIM, ATTORNEY AT LAW

6         131 Steuart Street, Suite 400

7         San Francisco, California  94105

8         Telephone:  (415) 543-9444

9         Email:  antim@lccrsf.org

10   - AND -

11        AMERICAN CIVIL LIBERTIES UNION FOUNDATION NORTHERN

12        CALIFORNIA

13        BY:  WILLIAM S. FREEMAN, ATTORNEY AT LAW

14        39 Drumm Street

15        San Francisco, California  94111

16        Telephone:  (415) 621-2493

17        Email:  wfreeman@aclunc.org

18

19

20

21

22

23

24

25

4

1    APPEARANCES OF COUNSEL (CONTINUED):

2    FOR DEFENDANTS:

3         CITY AND COUNTY OF SAN FRANCISCO

4         OFFICE OF THE CITY ATTORNEY

5         BY:   STEVEN A. MILLS, DEPUTY CITY ATTORNEY

6              JOHN H. GEORGE, DEPUTY CITY ATTORNEY

7         1390 Market Street, Sixth Floor

8         San Francisco, California  94102

9         Telephone:  (415) 355-3304

10        Email:  steven.mills@sfcityatty.org

11              john.george@sfcityatty.org

12

13   ALSO PRESENT:

14        KYLE FRIEND, BEHMKE VIDEOGRAPHER

15

16

17

18

19

20

21

22

23

24

25

1   V-a-f-i-a-d-e-s.  And I don't remember his roommate's

2   name.

3       Q.   And do you know if there was a cross street

4   that you lived next to at 864 Rolf Street that can be

5   identified?

6       A.   There -- I'm sure there was.  I couldn't

7   identify it.

8       Q.   Was the unit at 864 Rolf Street next to any

9   landmarks?

10      A.   Yes.  There was a large park across the highway

11  from there.

12      Q.   And what was the name of that park?

13      A.   I don't recall.

14      Q.   Any other stores or business names that pop out

15  as being in close proximity to the location at 864 Rolf

16  Street?

17      A.   There was a Little Caesars Pizza.  What else

18  was there?  I can't remember what else.

19      Q.   Are you currently housed?

20      A.   Yes, I'm in a shelter.

21      Q.   And what shelter are you staying at?

22      A.   33 Gough.

23      Q.   And how long have you been at the shelter at

24  33 Gough?

25      A.   About six months.

39

1      Q.    Were you in a shelter before that location at
2   33 Gough?
3      A.    Yeah.
4      Q.    And what shelter were you at?
5      A.    Before that, Monarch Hotel, the International
6   Hostel, and Next Door, Polk and Geary.
7      Q.    Do you know roughly how long you stayed at the
8   Monarch?
9      A.    Very briefly.
10     Q.    Do you know when that was?
11     A.    When was it?  No, I don't remember when.
12     Q.    And was that more than six months?
13     A.    It was very brief.
14     Q.    Less than a month?
15     A.    Yes.
16     Q.    Less than a week?
17     A.    I don't recall.
18     Q.    And then I believe you said the International
19   Hostel?
20     A.    Mm-hmm.
21     Q.    And do you know when you were staying at the
22   International Hostel?
23     A.    After the Monarch?  I'm not sure exactly when.
24     Q.    Do you know how long you were staying there?
25     A.    That was brief also.  That was maybe a week or

40

1   two.

2        Q.    And then I believe the last one was Next Door;

3   is that correct?

4        A.    Yes.

5        Q.    And do you know when you were living at Next

6   Door?

7        A.    I believe it was around December twenty

8   twenty -- let's see -- December twenty -- 2023?  Is that

9   right?  Or maybe it's 2022.

10             It's December, but I don't remember the year.

11       Q.    And do you know when you stopped staying at

12  Next Door?

13       A.    It was when my CAAP benefits ran out.  You

14  could look that up.

15       Q.    Do you know how many months you were staying at

16  Next Door?

17       A.    At least two months.  I don't recall exactly.

18       Q.    Is 33 Gough city housing?

19       A.    Yes.

20       Q.    Did the City help you get into that housing?

21       A.    I don't -- maybe peripherally.  It was Arial

22  she's the social worker with HSH.

23       Q.    But Arial connected you to 33 Gough?

24       A.    Yes.

25       Q.    Are there any program rules that you have to

1      Q.   How long have you had your current cell phone?

2      A.   I would have to look it up.  It coincides with

3  a certain date, but I don't know it off the top of my

4  head.

5      Q.   Roughly, when was that date?

6      A.   Under two years but more than a year.

7      Q.   And what phone carrier is that?

8      A.   T-Mobile.

9      Q.   And what -- what's the phone number?

10     A.   (415) 595-0159.

11     Q.   Have you ever used any other phone numbers?

12     A.   Yes.

13     Q.   Have you used any other phone numbers in the

14  last five years?

15     A.   Yes.

16     Q.   And what phone numbers have you had in the last

17  five years?

18     A.   What are they?  I'm not totally sure.  (562),

19  maybe, 999-4820 and (628) 946-2230 and (415) 312-4187

20  and 5 -- (650) 270- -- I can't remember.  I can't

21  remember it.

22     Q.   That's okay.

23       In the last five years -- well, strike that.

24       Since 2019, how many cell phones do you think

25  that you've had?

1    A.    Less than ten, more than three.

2    Q.    So somewhere between three and ten phones?

3    A.    Yeah.  They break.

4    Q.    Were any -- are you familiar with the concept

5    Obama Phone?

6    A.    Yes.

7    Q.    Were any of those Obama Phones?

8    A.    Yes.

9    Q.    How many of them?

10    A.    At least two.

11    Q.    And what is an Obama phone?

12    MR. NTIM:  Objection; calls for speculation.

13    BY MR. MILLS:

14    Q.    You can answer.

15    A.    It's a colloquialism referring to a phone

16    that's provided by the government, services provided by

17    the government.  I'm not sure if it's Lifeline service

18    or it's something separate.

19    Q.    And is that a City-provided phone?

20    A.    No.  It's State, I believe.  Maybe it's

21    national.  I don't know.

22    Q.    Have you ever had a City-provided phone?

23    A.    I don't know what that is.

24    Q.    Did anybody from a City agency in San Francisco

25    ever provide you with a cell phone?

1       A.    I didn't know they did that.

2       Q.    In 2020, how many phones did you have?

3       A.    I'd have to research it.  More than one.

4       Q.    Did they all have the same phone carrier?

5       A.    Did they have the same car- -- no.

6       Q.    So what phone carriers have you had?

7       A.    I can't recall some of them.

8       Q.    What ones can you recall other than T-Mobile?

9       A.    That's it.  Assurance maybe was one of them.

10   I'm not certain.

11      Q.    Is that Assurance Wireless?

12      A.    I think so, yeah.

13      Q.    And is that the Obama Phone provider?

14      A.    One of them, yeah.

15      Q.    Would you use your phones to take photographs?

16      A.    Yes.

17      Q.    And would you upload those photographs to your

18   laptop?

19      A.    Maybe.

20      Q.    Would they get uploaded to another cloud?

21      A.    It's pretty likely they were backed up, yeah.

22      Q.    So what was your typical process for getting

23   your photographs backed up on either a laptop or a

24   cloud?

25      A.    Wherever I had room on.

```
 1        A.    No, I don't.

 2        Q.    Could it have been more than two?

 3        A.    Yes, possibly.

 4        Q.    And in addition to tents, did you have any

 5   structures --

 6        A.    Yes.

 7        Q.    -- set up?

 8              And what kind of structures did you have set up

 9   leading into the August 21st, 2020, incident?

10        A.    I have pictures you could look at, but I'm not

11   really sure how to describe them.

12              You were given pictures, actually, I think.

13   Were you?  Maybe you weren't.  I'm not sure.

14        Q.    Do you have pictures of the structures?

15        A.    I do, yeah.

16        Q.    And to the extent those have not been produced,

17   going to ask that they be produced.

18        A.    Sure.

19        Q.    Thank you.

20        A.    People are astonished when they see them.  They

21   looked really nice.

22        Q.    The tents?

23        A.    Mm-hmm.

24        Q.    And the structures?

25        A.    Oh, yeah.  They were beautiful.
```

1    Q.    Did you build any of them yourself?

2    A.    No.

3    Q.    And just to clarify, so it was two individuals

4    that were living with you in that camp on August 21st,

5    2020?

6    A.    Yeah.  One of them had their own tent, a very

7    large tent also.

8    Q.    And the way that the encampment group was set

9    up, did you leave space in between each other's tents,

10    or were they kind of stacked side by side?

11    A.    We had a share -- we had a shared yard where we

12    had all the resources that we'd give out to people

13    organized.

14    Q.    And what resources were you giving out?

15    A.    We had a shoe -- we had a shelf of shoes on it.

16    We had jackets.  We had blankets.  We had various,

17    sundry other clothing items, first-aid, needle exchange,

18    food.

19    Q.    So was your expectation that individuals could

20    come into the encampment and take those belongings that

21    were left out, like shoes?

22    A.    We would apportion them.  They weren't -- they

23    weren't left out.

24    Q.    So what do you mean by "apportion them"?

25    A.    Literally what it means.

1    Q.    I'm not understanding your meaning of the

2    words.   So if you have any other way you could describe

3    that for me.

4    A.    We would give people resources based on their

5    needs.

6    Q.    So did people come to you and -- and act as if

7    you were like a store for belongings?

8    A.    Not a store.   But we -- we were like a hub

9    during the pandemic.   All the health workers came to my

10   tent because they knew they could monitor everyone in my

11   area by talking to me.   And they would ask me to keep an

12   eye out for certain people, and I would for them.

13   Q.    And where would you get these items that were

14   kept to be apportioned?

15   A.    People would donate them.

16   Q.    How did you distinguish between items that were

17   going to exist for apportionment and the items that you

18   had and kind of held out as being your own personal?

19   A.    We tried to give according to needs, the

20   greatest need, you know, with the most...

21   Q.    And did you document these, like, requests that

22   people made in any way, like an inventory log?

23   A.    No.

24   Q.    Okay.   Did you ever have any disputes leading

25   up to August 21st, 2020, where somebody was trying to

1    take an item out of the camp that you did not want them
2    to take?

3        A.    It sounds plausible.  People stole stuff all
4    the time.

5        Q.    How often would things be stolen?

6        A.    Often.

7        Q.    Almost daily?

8        A.    Yes.

9        Q.    And did you take any steps to try to prevent
10   items from being stolen?

11       A.    No.  I took steps afterwards, but no -- I mean,
12   other than the normal precautions.

13       Q.    What are the normal precautions you're
14   referring to?

15       A.    Locking things up, not leaving things out.

16       Q.    Did you have, like, dresser drawers or cabinets
17   that you were able to leave things locked in at that
18   encampment?

19       A.    I had a crate that everything fit into that had
20   two sections that locked.  There's a video of it.  I
21   think you were -- you were given the video.

22       Q.    And then you meant -- I heard you testify about
23   needle exchange.

24              So would people get to come and just place
25   needles in the encampment?

1    A.    They put them in Sharps boxes.

2    Q.    How many Sharps boxes did you have?

3    A.    I had a large one and a medium size one.

4    Q.    So two?

5    A.    Yes.

6    Q.    And can you describe roughly the size or

7    dimensions of the large needle box?

8    A.    I couldn't, but it's standard.

9    Q.    And what's standard to you?

10    A.    I'm not sure what the measurements are.

11    Q.    With your hands, can you kind of give me a best

12    estimate of how wide that box was?

13    A.    Maybe this wide (indicating).

14    Q.    And how tall?

15    A.    Maybe that tall (indicating).

16    Q.    And what about the smaller one; can you do the

17    same activity?

18    A.    Probably about like this size (indicating).

19    Q.    And how would those get, like, replaced or

20    emptied?

21    A.    I would dispose of them according to whatever

22    the protocols were.  It was difficult during the

23    pandemic; not everything was open.  But I didn't just

24    throw them away.

25    Q.    Did you seek those Sharps bins from City

1    covered that belong to you?

2        A.    No, I don't think so.

3              (Writes on document.)

4        Q.    And if you turn to page 2, just to confirm

5    there's nothing there.

6        A.    Don't see anything.  Not sure what I'm looking

7    at.

8        Q.    I just wanted to make sure that there's no

9    property there that belongs to you on page 2.

10       A.    It's just a street, I believe.

11          MR. MILLS:   Okay.   I'm going to mark next

12   Exhibit No. 32.

13             (Deposition Exhibit 32 was marked for

14             identification.)

15          THE WITNESS:   Who's that?   Oh, that's Courtenay?

16   Oh, my God.   Wow.

17   BY MR. MILLS:

18       Q.    So, Mr. Castaño, I will represent that this is

19   a photograph again taken from the 311 complaint on

20   August 2nd, 2020, at Pond and 16th.

21             Looking at the photograph, does this represent

22   your camp?

23       A.    Yes.   We painted that sheet with a tree on it.

24       Q.    And is that the painted tree on the picket

25   fence?

1      A.    Yeah, yeah.   That's an example of anesthetics

2  we used.   The red velvet curtain.

3      Q.    Do you happen to know who the individual is

4  sitting kind of towards the center that appears to be

5  writing in a notebook?

6      A.    I think it's Courtenay.

7      Q.    And is that the one with schizophrenia that

8  would throw items?

9      A.    Yeah.   I think that's her tent there.

10      Q.    Courtenay in the tent with the orange top?

11      A.    Yeah.   It looks like her stuff is all piled up.

12      Q.    And do you see next to that tent a barbecue

13  pit?

14      A.    I do.

15      Q.    Is that a barbecue pit that you would use at

16  the camp to cook?

17      A.    It's possible.

18      Q.    And do you see the -- if you keep looking to

19  the right next to that silver chair --

20      A.    Mm-hmm.

21      Q.    -- there's a smaller barbecue.

22      A.    That's my silver chair.

23      Q.    Is that your small barbecue as well?

24      A.    I think so.

25      Q.    And would you use that to cook at the camp?

1      A.   Yes.

2      Q.   Do you happen to know -- it appears there may

3   be a body inside of that orange tent.

4           Do you know whose body --

5      A.   There is?  I don't see one.

6      MR. NTIM:  Objection; assumes facts not in evidence.

7   BY MR. MILLS:

8      Q.   And, Mr. Castaño, I'm going to take you back to

9   that picket --

10     A.   There's a red Sharps container in there, by the

11  way.

12     Q.   You predicted where I was going.

13          So, Mr. Castaño, next to that red -- or sorry.

14  Next to that picket fence --

15     A.   Mm-hmm.

16     Q.   -- is there a Sharps container?

17     A.   Yes.  There's one in front of Courtenay's tent

18  too.

19     Q.   And can you circle both of those for me?

20     A.   Yeah.

21          (Writes on document.)

22     Q.   And are those the Sharps containers that you

23  were testifying to earlier in the day?

24     A.   Yes.

25     Q.   And, Mr. Castaño, next to that Sharps container

1   by the picket fence, there appears to be some green

2   buckets and, like, a mop bucket.

3        A.   Mm-hmm.

4        Q.   Do you know what those are?

5        A.   For cleaning, yeah.

6        Q.   Did they have chemicals in them?

7        A.   Soap probably, Simple Green.

8        Q.   And, Mr. Castaño, looking at this, are you able

9   to identify any other property that belonged to you?

10       A.   Yes.  There's a clear Philippe Starck stool to

11  the left of the painted sheet.

12       Q.   Okay.  And can you circle that for me, please.

13       A.   (Writes on document.)

14            Yeah.

15            That pallet is mine.  And on the left side of

16  the image, there's some Tyvek stretched out for privacy.

17  And the ladder I guess I still had.  I borrowed it from

18  Cafe Flore.

19       Q.   And, Mr. Castaño, do you know if there's a tent

20  behind that painted tree banner that we were talking

21  about?

22       A.   I think there might be.

23       Q.   Do you not know one way or the other, though?

24       A.   It looks like there is.

25       Q.   And do you know what kind of tent that was?

252

1    Q.    Would you use glitter?

2    A.    Oh, yeah, definitely.

3    Q.    Are you a heavy glitter user?

4    A.    Not heavy.

5          But I used American cheese slices once.

6    Someone donated, like, 300 of them.

7    Q.    And that was perishable cheese?

8    A.    Yeah.

9    Q.    And what did you do with that cheese?

10    A.    I spelled out an obscene word.

11    Q.    And did you do that in this camp?

12    A.    Yeah, I think so.

13    Q.    What was the obscene word?

14    A.    I think it said "fuck you" or something like

15    that.

16    Q.    And what did you do with the cheese after it

17    was left out?

18    A.    I swept it up and put it in the dumpster.

19    Q.    Do you know how long you kept the cheese out?

20    A.    About a week.

21    Q.    Were you trying to telegraph that message to

22    anyone in particular?

23    A.    No.    It was a message of resistance.

24    Q.    And who were you sending a message of

25    resistance to?

1     A.    Neighbors.

2     Q.    Your neighbors in the Castro?

3     A.    The people directly across the street.

4     Q.    Is that a library across the street?

5     A.    Yeah.

6     Q.    Do you know if the library was open during this

7     time?

8     A.    Depends on what day it was.

9     Q.    Is there a daycare there?

10     A.    No.  Not in the library, no.

11     Q.    Do you see any other items that we haven't gone

12     over on Exhibit 30 --

13     A.    No.

14     Q.    -- 32?

15           Sorry.  Chicken scratch.  Okay.

16           Mr. Castaño, I'm going to mark our next

17     exhibit, which is going to be Exhibit 33.

18     A.    Okay.

19           (Deposition Exhibit 33 was marked for

20           identification.)

21     THE WITNESS:  Whoa.  When was this?

22     BY MR. MILLS:

23     Q.    So, Mr. Castaño, I've just handed you

24     Exhibit 33.  I will represent that, again, this is

25     another photo taken from a 311 complaint.  This one is

1    dated August 14, 2020, at Pond and 16th Street.

2         Looking at the photograph, are you able to

3    identify yourself in it?

4    A.    Yes.

5    Q.    And can you circle where you are on the

6    photograph?

7    A.    Yep.  Really dark.

8         (Writes on document.)

9         There's the shoe rack on the right side.

10   Q.    And can you circle the shoe rack for me?

11   A.    Mm-hmm.

12        (Writes on document.)

13   Q.    And can you put a "1" next to it?

14   A.    Yes.

15        (Writes on document.)

16   Q.    And is that shoe rack that we marked with

17   number 1 the shoe rack that was open to the public to be

18   able to get items?

19   A.    It wasn't open, but people could point, and we

20   could retrieve them for them.

21   Q.    So were the items in front of that shoe rack

22   items that were available for the public to potentially

23   claim or take?

24   A.    It's possible.  It seems likely.

25   Q.    And, Mr. Castaño, I want to pull your eyes down

1   BY MR. MILLS:

2       Q.    Do you know what a jury trial is?

3       A.    I think so, yeah.

4       Q.    Is it your understanding that this case will be

5   presented to a jury?

6       A.    No, I don't believe so.  I was told otherwise.

7       Q.    Do you think that the City should be entitled

8   to a jury?

9       MR. NTIM:  Objection --

10      THE WITNESS:  I'm not a lawyer --

11      MR. NTIM:  -- calls for --

12      THE WITNESS:  -- yeah.

13      MR. NTIM:  -- legal opinion.

14  BY MR. MILLS:

15      Q.    Do you intend to be homeless in San Francisco

16  in the near future?

17      A.    That's a weird question.

18      Q.    Do you intend to be homeless in San Francisco

19  in the near future?

20      A.    I don't understand that question.  That's

21  bizarre to me.

22      Q.    Do you have any plans to be unsheltered on the

23  streets of San Francisco?

24      A.    That's crazy.  Why would I make plans for that?

25      Q.    To the extent you lose your current shelter,

1  would you return to the streets to camp?

2       A.   I -- I don't know.   I would go wherever I

3  could.

4       Q.   Would you try to conform your conduct to the

5  anti-camping laws?

6       MR. NTIM:   Objection; calls for speculation.

7       THE WITNESS:   I don't know.

8  BY MR. MILLS:

9       Q.   Would you try to avoid interactions with DPW by

10  not keeping a camp in a condition where they will try to

11  resolve it?

12       MR. NTIM:   Same objection; incomplete hypothetical.

13  BY MR. MILLS:

14       Q.   You can answer.

15       A.   I can't imagine that I would, but it's a

16  bizarre question.   I don't really understand it.

17       Q.   To the extent you lose your current housing

18  shelter, would you try to get another one?

19       A.   Of course.   I don't want to be out on the

20  street.

21       Q.   If you were told that you had 72 hours to break

22  up an encampment, would you listen to that notice and

23  move?

24       MR. NTIM:   Objection; calls for speculation,

25  incomplete hypothetical.

1    BY MR. MILLS:

2         Q.    You can answer the question.

3         A.    I don't -- I don't know.  I have no idea.

4         Q.    If you received notice that an HSOC resolution

5    was going to take place within 72 hours --

6         A.    I don't know all the context.  I don't know

7    all -- you know, I don't know.

8         Q.    Just --

9         A.    It depends --

10        Q.    -- assuming you received a notice 72 --

11             (Reporter clarification.)

12   BY MR. MILLS:

13        Q.    We have to ask the question, and then you can

14   answer.  And I get you might predict where I'm going,

15   but we've got to let that happen, and we will get out

16   sooner.

17        A.    Okay.

18        Q.    To the extent you receive a 72-hour notice that

19   an HSOC resolution is going to be coming within the next

20   72 hours, would you move your belongings or -- would you

21   move your belongings?

22        MR. NTIM:  Same objections.

23        THE WITNESS:  I don't know.  I -- I'm very

24   principled, and I am motivated by my conscience.

25   BY MR. MILLS:

331

1    invoking our right to review the deposition transcript

2    and make corrections.

3        MR. MILLS:  All right.  Thank you.

4            So we'll go off the record at 6:19.

5        THE VIDEO OPERATOR:  This concludes the deposition

6    of Toro Castaño.  The number of media files used was

7    five.  The original media will be retained at Behmke

8    Reporting and Video Services, Inc.

9            We are going off the record.  The time is

10   6:20 p.m.

11           (At 6:20 p.m. the deposition proceedings

12            adjourned.)

13

14

15   _____

16               TORO D. CASTAÑO

17

18

19

20

21

22

23

24

25

332

```
 1   STATE OF CALIFORNIA           )
 2                                 ) ss.
 3   COUNTY OF SAN FRANCISCO        )
```

4        I hereby certify that the witness in the

5  foregoing deposition, TORO D. CASTAÑO, was by me duly

6  sworn to testify to the truth, the whole truth and

7  nothing but the truth, in the within-entitled cause;

8  that said deposition was taken at the time and place

9  herein named; and that the deposition is a true record

10  of the witness's testimony as reported by me, a duly

11  certified shorthand reporter and a disinterested person,

12  and was thereafter transcribed into typewriting by

13  computer.

14        I further certify that I am not interested in

15  the outcome of the said action, nor connected with nor

16  related to any of the parties in said action, nor to

17  their respective counsel.

18        IN WITNESS WHEREOF, I have hereunto set my

19  hand this 21st day of October, 2024.

20  Reading and Signing was:

21  _x_ requested   ___ waived   ___ not requested

22

23

24

25        SUZANNE I. ANDRADE, CSR NO. 10682