# EXHIBIT AA

## TO

## DECLARATION OF STEVEN A. MILLS IN SUPPORT OF DEFENDANTS' PARTIAL MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3
 4   - - - - - - - - - - - - - - - - - -
 5   COALITION ON HOMELESSNESS,       )
 6   et al.,                          )
 7                  Plaintiffs,       ) CASE NO.
 8   v.                               ) 4:22-cv-05502-DMR
 9   CITY AND COUNTY OF SAN           )
10   FRANCISCO, et al.,               )
11                  Defendants.       )
12   - - - - - - - - - - - - - - - - - -
13
14       TRANSCRIPT AND/OR ITS EXHIBITS MAY CONTAIN
15         INFORMATION SUBJECT TO A PROTECTIVE ORDER
16
17        VIDEOTAPED DEPOSITION OF JOSHUA DONOHOE
18               TUESDAY, NOVEMBER 12, 2024
19
20
21           BEHMKE REPORTING AND VIDEO SERVICES, INC.
22                   BY:  CYNTHIA TURI, CSR NO. 11812
23                   550 CALIFORNIA STREET, SUITE 820
24                   SAN FRANCISCO, CALIFORNIA  94104
25                                    (415) 597-5600
```

```
 1
 2
 3
 4
 5
 6
 7
 8          Videotaped deposition of JOSHUA DONOHOE,
 9   taken on behalf of Defendants, at Lawyers Committee
10   for Civil Rights of the San Francisco Bay Area at 131
11   Steuart Street, Suite 400, San Francisco, California,
12   commencing at 10:14 A.M., TUESDAY, NOVEMBER 12, 2024,
13   before Cynthia Turi, Certified Shorthand Reporter
14   No. 11812, pursuant to Notice.
15
16
17
18
19
20
21
22
23
24
25
```

```
 1   APPEARANCES OF COUNSEL:
 2   FOR THE PLAINTIFFS:
 3      LAWYERS COMMITTEE FOR CIVIL RIGHTS OF THE SAN
 4      FRANCISCO BAY AREA
 5      BY:  ANDREW NTIM, ATTORNEY AT LAW
 6      131 Steuart Street, Suite 400
 7      San Francisco, California  94105
 8      Telephone:  (415) 543-9444
 9      Email:  antim@lccrsf.org
10
11   FOR THE DEFENDANTS:
12      OFFICE OF THE CITY ATTORNEY
13      BY:  STEVEN MILLS, DEPUTY CITY ATTORNEY
14           KAITLYN MURPHY, DEPUTY CITY ATTORNEY
15      1390 Market Street, Sixth Floor
16      San Francisco, California  94102
17      Telephone:  (415) 355-3304
18      Email:  steven.mills@sfcityatty.org
19              kaitlyn.murphy@sfcityatty.org
20
21   ALSO PRESENT:
22       KYLE FRIEND, VIDEOGRAPHER
23
24
25
```

```
 1        A.   Not that I'm aware of.
 2        Q.   So do you have any recollection of Shanna Couper
 3   using, like, a microphone to document what you were
 4   telling her about property destruction?
 5        A.   No.
 6        Q.   Do you have any recollection of Shanna Couper
 7   using a camera to record you having conversations about
 8   property destruction?
 9        A.   No.
10        Q.   Did Shanna Couper ever help you prepare a
11   declaration about property destruction?
12        A.   Clarification, help?  Like, what do you mean by
13   help?
14        Q.   Did you ever work with Shanna Couper to prepare
15   a declaration relating to property destruction?
16        A.   Yes.
17        Q.   Do you know when you worked with Shanna Couper
18   to prepare a declaration?
19        A.   It would have been the first one in September.
20   I don't know the exact date.  September 2022 -- 2022.
21        Q.   And did Shanna Couper come to you, or did you go
22   to Shanna Couper about preparing a declaration?
23        A.   She came to me.
24        Q.   And when did Shanna Couper go to you?
25        A.   Multiple times.  Multiple times.  I'm not sure
```

```
 1  when the first one was.
 2       Q.  Do you have a recollection of writing more than
 3  one declaration with Shanna Couper?
 4       A.  No.
 5       Q.  So is the first one September 2022?
 6       A.  Correct.
 7       Q.  Can you explain what that process of writing the
 8  declaration was like?
 9       A.  Yeah.  She was -- she more had the connection to
10  the attorneys and the Coalition and the Coalition's
11  lawsuit.  So she -- she helped me get in touch with the
12  correct people to write it.
13           She was also, you know, there to make sure we
14  made -- we made the appointment with the attorneys on
15  time.  And once we actually met with the attorneys, to
16  make sure that, you know, that I -- I was, you know,
17  pretty much taken care of and make sure that I was, you
18  know, okay to stay there for the entire process with
19  talking to the attorneys and -- you know, kind of, like,
20  just moral support really.
21       Q.  And where did you write the declaration with
22  Shanna Couper?
23       A.  In front of -- well, to clarify, I wrote it with
24  the attorneys -- and Shanna Couper was present -- in
25  front of Rainbow Grocery off of 13th and Harrison or
```

```
 1   Folsom.  I can't remember which one.
 2        Q.  Do you know what attorneys those were?
 3        A.  I don't remember the names of those attorneys,
 4   no.
 5        Q.  Do you know if it's any of the attorneys in this
 6   case?
 7        A.  I don't -- I don't remember.  I...
 8        Q.  Do you remember the names?
 9        A.  I don't.
10        Q.  And so when the declaration was getting
11   prepared, was there anybody else other than
12   Shanna Couper and the attorneys present?
13        A.  Other plaintiffs writing their own declarations.
14   It was -- we met outside of a -- outside of a grocery
15   store, so, you know.
16        Q.  What do you mean by "other plaintiffs"?
17        A.  Some other people who were declaring that they
18   had also lost things and, you know, giving the testimony
19   on the damage that they had experienced recently.
20        Q.  Do you know the names of those individuals?
21        A.  That were with -- that were present while I was
22   there?
23        Q.  Correct.
24        A.  I just know him as Toro.  And I can't remember
25   the other ones who were there.
```

```
 1        A.   Yes.
 2             MR. MILLS:  So we've been going for about an
 3   hour.  Does a ten-minute break work for people?
 4             So we'll go off the record at 11:15.
 5             THE VIDEOGRAPHER:  Going off the record.  The
 6   time is 11:15 a.m.
 7             (Recess taken from 11:15 to 11:27 a.m.)
 8             THE VIDEOGRAPHER:  This marks the beginning of
 9   Media No. 2.  We are back on the record.  The time is
10   11:27 a.m.
11             MR. MILLS:  Just a quick housekeeping, I'd like
12   to mark Exhibit 68.  This is a signed protective order
13   that Mr. Donohoe signed before the start of the
14   deposition.
15             (Deposition Exhibit 68 marked for
16             identification.)
17   BY MR. MILLS:
18        Q.   And, Mr. Donohoe, during the break, did you talk
19   to anybody other than your lawyer about the deposition?
20        A.   No.
21        Q.   Thank you.  And so just to circle back, do you
22   currently live in San Francisco?
23        A.   Yes.
24        Q.   And where is that?
25        A.   Parkmerced.
```

```
 1        Q.   How long have you been at Parkmerced?
 2        A.   For roughly a month.
 3        Q.   Can you describe for me what that living
 4   situation is at Parkmerced?
 5        A.   Yeah.  We -- we obtained housing through a
 6   voucher called Flex Pool.
 7        Q.   And do you have a lease at Parkmerced?
 8        A.   Yes.
 9        Q.   Does the lease have an end date?
10        A.   No.
11        Q.   So are you allowed to stay at Parkmerced as long
12   as you want?
13        A.   Yes.
14        Q.   Are there any program rules or requirements that
15   you have to satisfy in order to live at Parkmerced?
16        A.   Through Flex Pool, yes.
17        Q.   What are those requirements?
18        A.   Steady source of income.  And I think that's
19   pretty much it.
20        Q.   And do you have to pay monthly rent at
21   Parkmerced?
22        A.   Yes.
23        Q.   What's that?
24        A.   At the moment, I do not know.
25        Q.   Do you know if it's, like, a percentage of how
```

```
 1  much you make?
 2       A.  Yeah.  It's supposed to be 30 percent of our
 3  monthly income.
 4       Q.  And does that amount vary from month to month?
 5       A.  Only if they do a reevaluation of our income.
 6       Q.  So every month, do you have to submit paperwork
 7  for what your income looks like?
 8       A.  Not that I know of.
 9       Q.  Do you know when you do the reevaluations?
10       A.  I -- I'm not quite sure.
11       Q.  Has anybody told you that you'd have to be out
12  of Parkmerced by a certain date?
13       A.  No.
14       Q.  At Parkmerced, can you describe, like, what type
15  of unit you have?
16       A.  Yeah.  It's a two-bedroom, two-bath loft on the
17  11th floor.
18       Q.  And do you live in that unit with just Ms. Cronk
19  and your daughter?
20       A.  Yes.
21       Q.  Do you have any shared spaces at Parkmerced with
22  other tenants?
23       A.  Laundry room.
24       Q.  And where were you living before Parkmerced?
25       A.  Hamilton -- Hamilton Houses Family -- Hamilton
```

```
 1            THE WITNESS:  It was on a -- like, violation
 2   based.
 3   BY MR. MILLS:
 4       Q.   The entire time that you lived at
 5   Hamilton House, did you ever have to do drug testing?
 6       A.   No.
 7       Q.   Thank you.  And did you have to pay rent at
 8   Hamilton?
 9       A.   Yes.
10       Q.   And what was that situation?
11       A.   It was a total of 50 percent of our monthly
12   income or adjusted income.
13       Q.   And was that the entire time that you were
14   staying at Hamilton House?
15       A.   Yes.
16       Q.   Is it fair to say for roughly ten months, you
17   had to spend roughly 50 percent of your monthly --
18   adjusted monthly income?
19       A.   Yes.
20       Q.   Were there ever any instances where you were
21   unable to pay that 50 percent?
22       A.   No.
23       Q.   Did you have to pay into a savings as a term of
24   living at Hamilton?
25       A.   Yes.
```

```
 1         Q.   How much did you pay into the savings in the
 2    ten months that you were living at Hamilton?
 3         A.   It was calculated in the 50 percent, so...
 4         Q.   So just to make sure I understand, is it some
 5    fraction or percentage of the 50 percent that you were
 6    paying would go into a savings account?
 7         A.   Correct.
 8         Q.   Do you happen to know how much money went into
 9    the savings account?
10         A.   Almost 2,000.
11         Q.   And is that money that you have access to any
12    time you want?
13         A.   Only after we move.
14         Q.   And do you know -- does a bank hold that money
15    or some other entity?
16         A.   I'm assuming a bank.
17         Q.   Do you have a bank?
18         A.   I do.
19         Q.   And what institution do you have a bank at?
20         A.   Through SF Fire Credit Union, as well as
21    SMW 104 Federal Credit Union.
22         Q.   Can you say that, SM?
23         A.   SMW Local 104 Federal Credit Union.
24         Q.   Are those both in San Francisco?
25         A.   The San Francisco one is.  The Fire Credit Union
```

```
1        Q.   Who is that?
2        A.   Kathleen Zerzan.
3        Q.   Can you spell that for us?
4        A.   Yeah.  K-a-t-h-l-e-e-n, Z-e-r-z-a-n.
5        Q.   And when have you last had contact with
6   Kathleen?
7        A.   2013.
8        Q.   Do you know where Kathleen is currently located?
9        A.   At this moment, I do not know.
10       Q.   Do you know where Kathleen was last located,
11  based off of your personal knowledge?
12       A.   My personal knowledge, Rhode Island.
13       Q.   Any reason why you don't have contact with your
14  son?
15       A.   I lost custody and rights to, you know, even
16  communicate back in 2013 in Portland, Oregon.
17       Q.   Thank you.  So when did you start living in
18  San Francisco?
19       A.   2014.
20       Q.   And when you started living in San Francisco in
21  2014, did you start -- were you homeless?
22       A.   Yes.
23       Q.   Were there ever any periods after 2017 and when
24  you secured housing around January of 2023 where you
25  were no longer homeless?
```

1      A.   No.
2      Q.   So is it fair to say during that entire period,
3 you identified as being homeless?
4      A.   Yes.
5      Q.   And where were you before San Francisco?
6      A.   Portland.
7      Q.   And you have family in Alamo, correct?
8      A.   Yes.
9      Q.   Have you ever lived with your family in Alamo?
10     A.   Yes.
11     Q.   And when have you lived with your family in
12 Alamo?
13     A.   Between October of 2023 -- well, the -- for the
14 whole month of November 2023.
15     Q.   Why was that?
16     A.   When I got finished with treatment, the options
17 that were available to me did not -- I had -- we had
18 already had an application for getting into
19 Hamilton House, Sarah and I.
20          And so the period of time between when I got out
21 of treatment and when the application was going to be
22 processed and, you know, we would be able to move into
23 Hamilton was indeterminate.
24          So I wanted to start work.  And the options that
25 were available to me, aside from living with my parents

```
 1   in Alamo, would not have allowed me to secure -- secure
 2   that.
 3       Q.  So how long were you living in Alamo?
 4       A.  For 30 days.
 5       Q.  And is that a place that you could live if
 6   anything happened and you were to lose your housing at
 7   Parkmerced?
 8       A.  I don't know.
 9       Q.  Have you talked to your mom about whether you
10   could live with her in Alamo if you were to lose housing
11   at Parkmerced?
12       A.  I have not.
13       Q.  Would you ask your mom if you could live with
14   her in Alamo if you lost housing at Parkmerced?
15           MR. NTIM:  Objection.  Calls for speculation.
16           THE WITNESS:  I don't know.
17   BY MR. MILLS:
18       Q.  Do you have anybody else that you would ask to
19   live with if you were to lose housing at Parkmerced?
20           MR. NTIM:  Objection.  Calls for speculation.
21           THE WITNESS:  I -- no.
22   BY MR. MILLS:
23       Q.  If you were to lose your housing at Parkmerced,
24   would you return to the streets?
25           MR. NTIM:  Objection.  Calls for speculation.
```

```
 1              THE WITNESS:  I would try my best not to.
 2   BY MR. MILLS:
 3       Q.  In the period that you've been housed or in
 4   treatment since January of 2023, have you ever put any
 5   property -- left any property on the streets of
 6   San Francisco at encampments?
 7           MR. NTIM:  Objection.  Ambiguous as to "left any
 8   property on the ground."
 9           THE WITNESS:  Yeah.  Can you --
10   BY MR. MILLS:
11       Q.  In the time --
12       A.  -- go back?
13       Q.  Let me provide some context.  Some people, we
14   understand, will still keep property at encampments even
15   though they're living somewhere else.
16           Between the period of -- from January 2023
17   onwards, have you left property in any encampments even
18   though you were physically living inside somewhere else?
19       A.  Yes.
20       Q.  And when were you doing that?
21       A.  During the short period of time I was living at
22   the SIP hotel.
23       Q.  And what -- when was that?
24       A.  January and beginning of February of 2023.
25       Q.  Where were you leaving your property outside of
```

```
 1  was already, like, pretty full.
 2          So without digging through there, which is, you
 3  know, which was -- I was told, was illegal to do, I
 4  wouldn't be able to find out.
 5          But -- yeah.  After -- after a while, after,
 6  like, a couple of people stood their ground, they ended
 7  up leaving.  Everybody ended up -- pretty much almost
 8  everybody left that day.
 9      Q.  So you didn't see DPW take your stuff?
10      A.  My specific stuff, no.
11      Q.  And you don't know one way or the other if the
12  friend that you left your stuff with took your stuff?
13      A.  Correct.
14      Q.  Is it possible that the friend could have taken
15  your stuff?
16      A.  I never ran into him again, so I don't know.
17      Q.  You can't say one way or the other if the friend
18  didn't take your stuff?
19      A.  Correct.
20      Q.  And what items did you lose that day?
21      A.  Coffee maker.  That was the coffee maker
22  getting -- I lost a coffee maker that day.  I lost
23  clothing.  It wasn't a whole bunch.  I can't remember if
24  that was when the bike was stolen or taken.  Yeah.
25          I think it was just -- I mean, it was -- it was
```

```
 1  sleep on the sidewalk at 7 a.m.?
 2       A.   Without an alarm or a way to tell time, until
 3  they're there, yeah.
 4       Q.   Are you aware that in the City and County of
 5  San Francisco, it's unlawful to place an encampment upon
 6  a public sidewalk?
 7            MR. NTIM:  Objection.  Calls for legal
 8  conclusion.
 9            THE WITNESS:  That is my understanding.
10  BY MR. MILLS:
11       Q.   Did you do anything to try to conform your
12  conduct to that law?
13            MR. NTIM:  Same objection.
14            THE WITNESS:  Aside from trying to clean up and
15  make it seem as if we weren't ever there, yes.
16  BY MR. MILLS:
17       Q.   Were there ever any instances where you kept an
18  encampment out all day, 24 hours throughout the day, for
19  more than a single day?
20       A.   Yes.
21       Q.   How many times do you think you've done that?
22       A.   Several.
23       Q.   What's the longest you think you've kept an
24  encampment in a single place?
25       A.   During what period of time?
```

```
 1       Q.   I'm just asking, based off --
 2       A.   Just in general?
 3       Q.   Yes.
 4       A.   I mean, the longest I've been at a place for --
 5  you know, undisturbed, for about a month, yeah.
 6       Q.   If you were to become homeless again in the
 7  future, would you try to conform your conduct to these
 8  laws?
 9            MR. NTIM:  Objection.  Calls for speculation.
10  Incomplete hypothetical.
11            THE WITNESS:  Yeah.  I don't like thinking about
12  the possibility of becoming homeless, even though I'm
13  very -- I'm not -- I'm definitely not that far away from
14  it.
15            So I mean, I would do -- I would do my best to
16  do what -- what I could.  I mean, I'm human.  I need a
17  place to sleep, so...
18  BY MR. MILLS:
19       Q.   So I want to go back to the incidents in
20  January 2023 because we had a little moment to pivot
21  about your understanding of some of the City's policies.
22            What was the third incident in January --
23  sorry -- in just 2023 where you believe your property
24  was destroyed?
25       A.   That would have been, I think -- yeah, in April.
```

```
 1   STATE OF CALIFORNIA     )
 2   COUNTY OF SAN FRANCISCO ) ss.
 3           I hereby certify that the witness in the
 4   foregoing deposition, JOSHUA DONOHOE, was by me duly
 5   sworn to testify to the truth, the whole truth, and
 6   nothing but the truth in the within-entitled cause; that
 7   said deposition was taken at the time and place herein
 8   named; and that the deposition is a true record of the
 9   witness's testimony as reported by me, a duly certified
10   shorthand reporter and a disinterested person, and was
11   thereafter transcribed into typewriting by computer.
12           I further certify that I am not interested in
13   the outcome of the said action, nor connected with nor
14   related to any of the parties in said action, nor to
15   their respective counsel.
16           IN WITNESS WHEREOF, I have hereunto set my hand
17   this November 25, 2024.
18   Reading and signing was:
19   _x_ requested __ waived __ not requested
20
21                              [signature]
22
23                              CYNTHIA TURI, CSR NO. 11812
24                              STATE OF CALIFORNIA
25
```