EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
Vasudha Talla, SBN 316219
Zoe Salzman, *admitted pro hac vice*
Vivake Prasad, *admitted pro hac vice*
Bianca Herlitz-Ferguson, *admitted pro hac vice*
600 Fifth Avenue
New York, New York
Telephone: (212) 763-5000
zsalzman@ecbawm.com

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
JOHN THOMAS H. DO, SBN 285075
jdo@aclunc.org
WILLIAM S. FREEMAN, SBN 82002
wfreeman@aclunc.org
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333

LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA
Nisha Kashyap, SBN 301934
Andrew Ntim, SBN 347084
131 Steuart Street, Suite. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
nkashyap@lccrsf.organtim@lccrsf.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| COALITION ON HOMELESSNESS, et al., | Case No. 4:22-cv-05502-DMR |
| Plaintiffs, | |
| v. | **PLAINTIFFS' OPPOSTION TO DEFENDANTS' FIFTH MOTION TO DISMISS** |
| CITY AND COUNTY OF SAN FRANCISCO, et al., | |
| Defendants. | **Judge:** The Hon. Donna M. Ryu |

TABLE OF CONTENTS

PAGE NO.

TABLE OF AUTHORITIES.................................................................................iii-iv

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ...........................................................................................................1

    I.    The City's Motion is Procedurally Improper...........................................1

           A.    The Court Has Already Held the Plaintiffs Have Standing ........................2

           B.    Factual Disputes Cannot be Resolved on a Rule 12(b)(1) Motion .............2

    II.    The Coalition Has Properly Established Organizational Standing .........................3

           A.    The Coalition Has Organizational Standing Under *Havens Realty* and *Hippocratic Medicine*...........................................................................3

               i.    *Havens* and *Hippocratic Medicine* Set the Standard for Injury-in-Fact ...................................................................................4

           B.    The Coalition Has Been Injured by the City's Interference with Its Preexisting Core Activities ...................................................................8

                i.    The City's Policy Impedes the Coalition's Ability to Assist Unhoused People Navigate the Homeless Services System ...........8

               ii.    The City's Policy Directly Impairs the Coalition's Ability to Provide Basic Necessities to Unhoused People ........................13

               iii.    The City's Policy Interferes with the Coalition's Ability to Educate Unhoused People About Their Rights .............................15

               iv.    The City's Policy Impacts the Coalition's Work to Provide Education and Training Services to Homeless People .................17

               v.    Public Advocacy on Other Issues Is Also Relevant to Standing ...19

           C.    The Coalition Is Not Required to Allege an Informational Injury.............21

    III.    The City's Policy Has Directly Caused the Coalition's Injuries ...........................21

           A.    The City's Efforts to Deflect Responsibility All Fail ................................22

           B.    The Coalition's Injuries Can Be Redressed by Compliance with the Constitution......................................................................................23

IV.     Defendants' Prohibited Renewed Attack on Associational Standing Fails ...........24

CONCLUSION ....................................................................................................................25

TABLE OF AUTHORITIES

**Cases**

*Al Otro Lado, Inc. v. Mayorkas*,
    No. 23 Civ. 1367, 2024 WL 4370577 (S.D. Cal. Sept. 30, 2024) .................................... 17

*Arizona Alliance for Retired Americans v. Mayes*,
    117 F.4th 1165 (9th Cir. 2024) ............................................................... 5, 12, 22

*Barnum Timber Co. v. U.S. E.P.A.*,
    633 F.3d 894 (9th Cir. 2011) ......................................................................... 23

*Bowen v. Energizer Holdings, Inc.*,
    118 F.4th 1134 (9th Cir. 2024) ....................................................................... 3

*California v. Texas*,
    593 U.S. 659 (2021) .................................................................................. 22

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) .......................................................................... 2

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024).............................................................................. passim

*Freedom Foundation v. Int'l Bhd. of Teamsters Loc. 117*,
    No. 23-3946, 2024 WL 5252228 (9th Cir. Dec. 31, 2024)............................................ 6, 8

*Get Loud Ark. v. Thurston*,
    No. 24 Civ. 5121, 2024 WL 4142754 (W.D. Ark. Sept. 9, 2024).............................. 6, 11

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)............................................................................. passim

*La Union Del Pueblo Entero v. Abbott*,
    No. 21 Civ. 0844, 2024 WL 4488082 (W.D. Tex. Oct. 11, 2024) ................................. 11

*Leonard v. Clark*,
    12 F.3d 885 (9th Cir. 1993) ........................................................................... 2

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).................................................................................. 25

*Mar. for Our Lives Idaho v. McGrane*,
    No. 23 Civ. 00107, 2024 WL 4226912 (D. Idaho Sept. 17, 2024)................................. 19

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*,
    567 F.3d 521 (9th Cir. 2009) .......................................................................... 2

*Ocean Advocates v. U.S. Army Corps of Engineers*,
    402 F.3d 846 (9th Cir. 2005) ......................................................................... 23

*Or. Advoc. Ctr. v. Mink*,
    322 F.3d 1101 (9th Cir. 2003) ....................................................................... 25

*Pitts v. Terrible Herbst, Inc.*,
    653 F.3d 1081 (9th Cir. 2011) ....................................................................... 25

*Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*,
    120 F.4th 390 (4th Cir. 2024) ........................................................................ 12

*Rios v. County of Sacramento*,
    562 F. Supp. 3d 999 (E.D. Cal. 2021)............................................................. 7

*S.C. State Conf. of NAACP v. S.C. Dep't of Juv. Justice*,
    No. 22 Civ. 1338, 2024 WL 5153170 (D.S.C. Dec. 18, 2024)................... 6, 14

*Skaff v. Meridien N. Am. Beverly Hills, LLC*,
    506 F.3d 832 (9th Cir. 2007) ......................................................................... 25

*Torres v. United States Dep't of Homeland Sec.*,
    411 F. Supp. 3d 1036 (C.D. Cal. 2019) ......................................................... 25

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)......................................................................................... 7

*United States v. Texas*,
    599 U.S. 670 (2023)......................................................................................... 7

*WildEarth Guardians v. U.S. Dep't of Agric.*,
    795 F.3d 1148 (9th Cir. 2015) ....................................................................... 23

*Yesue v. City of Sebastopol*,
    No. 22 Civ. 06474, 2024 WL 4876953 (N.D. Cal. Nov. 22, 2024)..... 12, 15, 23


**Rules**

Federal Rule of Civil Procedure 12 ........................................................................ 1, 2

**PRELIMINARY STATEMENT**

Defendants' fifth motion to dismiss this case should be denied just like the rest. Limited by the Court to address only organizational standing, Defendants' motion cannot defeat the Coalition on Homelessness's associational standing, let alone dismiss the case. The Court also cannot resolve these disputed issues of fact on a Rule 12(b)(1) motion to dismiss, because they are intertwined with the merits of the claims. The Court should deny this motion and revisit the issue only after trial.

If considered now, the motion is also meritless. The Coalition has properly established organizational standing under the standard set forth by the Supreme Court last year in *Hippocratic Medicine*. That is because the Coalition provides services and essential living supplies to homeless people and advocates on issues beyond property destruction. The City's practice of systematically destroying homeless people's property directly impacts the Coalition's provision of services and other advocacy efforts, making it more difficult or impossible for the Coalition to communicate with homeless people who have lost their phones and laptops, burdening the Coalition with replacing the essential living supplies and Know Your Rights materials destroyed in the sweeps, and discouraging homeless people from attending the Coalition's trainings and programs because they fear the City will destroy their property while they do so. Defendants' motion should be denied in its entirety.

**ARGUMENT**

**I.    The City's Motion is Procedurally Improper**

The City's motion is procedurally improper, because this Court has already held the Coalition and individual plaintiffs have standing, and because the Court cannot resolve disputed issues of fact intertwined with the merits on a motion to dismiss under Rule 12(b)(1).

**A.      The Court Has Already Held the Plaintiffs Have Standing**

The Court has already held that the Coalition adequately pled associational standing. Dkt. 281 at 9-14. The Court has since rejected any further attempts by Defendants to attack the Coalition's associational standing, challenge the individual plaintiffs' standing, or dismiss the complaint at this time. Dkt. 298.

In light of the Court's ruling that the individual plaintiffs and the Coalition have standing sufficient to "ma[k]e it past the pleading stage," Defendants' new motion only "wastes the court resources." *Id.* at 2. It is well-settled that in a "federal court suit with multiple plaintiffs . . . once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others." *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993); *accord Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) ("As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing."); *see also* Dkt. 298 at 1 (same); Dkt. 128 at 5 (same). An organizational plaintiff "can assert standing on behalf of their own members *or* in their own right." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 662 (9th Cir. 2021) (internal citations omitted) (emphasis added). The Coalition already has standing; another motion to dismiss is improper. Defendants' motion should be denied on this basis alone.

**B.      Factual Disputes Cannot be Resolved on a Rule 12(b)(1) Motion**

Defendants' motion is also improper because their factual attack on the Coalition's standing rests on disputed facts which are intertwined with the merits of the case, and therefore impossible to resolve on a Rule 12(b)(1) motion.

"As with a motion for summary judgment, when a court is faced with a factual attack on standing pursuant to Rule 12(b)(1), the court must leave the resolution of material factual disputes to the trier of fact when the issue of standing is intertwined with an element of

the merits of the plaintiff's claim." *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1144 (9th Cir. 2024) (cleaned up). In *Bowen*, the Ninth Circuit reversed a 12(b)(1) dismissal, holding "there is a clear overlap between" the defendants' attack on whether the plaintiff had suffered an injury-in-fact sufficient for Article III standing and the damages she alleged as an element of her claim. *Id.* at 1145. As a result, the plaintiff's "allegations relating to standing are not separable from the merits of the case, such that the district court was free to resolve factual disputes" on a motion to dismiss. *Id.* at 1145 (cleaned up). The same is true here, particularly because the claims alleged are constitutional violations. *Id.* at 1143 ("Jurisdiction and substance might also be intertwined when the claim at issue arises under the Constitution."). As set forth *infra*, the Coalition has submitted evidence showing it has suffered injury, which is required both for standing and to prevail on the constitutional claims in this case. Defendants' attempts to dispute that evidence must be deferred until trial. This is another independent basis to deny the motion.

## II.    The Coalition Has Properly Established Organizational Standing

Defendants' motion also fails on the merits. The Third Amended Complaint (Dkt. 289, hereinafter "TAC") properly pleads organizational standing for the Coalition.

### A.    The Coalition Has Organizational Standing Under *Havens Realty* and *Hippocratic Medicine*

To establish standing based on its own alleged injuries, an organization must satisfy the traditional requirements under Article III and demonstrate (i) that it has been injured or will imminently be injured, (ii) that the injury was caused or will be caused by the defendant's conduct, and (iii) that the injury is redressable. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (hereinafter "*Hippocratic Medicine*").

i.   ***Havens*** and ***Hippocratic Medicine*** **Set the Standard for Injury-in-Fact**

The Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) sets forth the standard to assess an organizational injury. In *Havens*, HOME, an organization providing home-counseling and referral services to low-income homeseekers, sued the owner of an apartment complex for alleged racial steering practices in violation of the Fair Housing Act. 455 U.S. at 368-69. The Court held that HOME adequately alleged an organizational injury because defendant's steering practices "perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers." *Id.* at 379. The Court explained that "such concrete and demonstrable injury to the organization's activities— with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests" and is sufficient to support standing. *Id.*

The Court's decision last year in *Hippocratic Medicine* relied on and affirmed the *Havens* standard. In *Hippocratic Medicine,* four lobbying groups—dedicated exclusively to advocating against abortion—sued to challenge the Food and Drug Administration's relaxed regulations regarding the prescription of mifepristone. 602 U.S. at 386. The groups alleged that the FDA's regulations had forced them to "incur[]costs to oppose FDA's actions," such as "conduct[ing] their own studies on mifepristone," drafting "citizen petitions to FDA," and engaging in additional forms of "public advocacy and public education." *Id.* at 394. The Supreme Court unanimously rejected this sort of advocacy as a basis for an organizational injury, reasoning that an organization "cannot spend its way into standing simply by expending money to gather information and advocate against a defendant's action." *Id.* Put differently, an organization is not injured "simply because [it] object[s] to [defendant's] actions" and incurs costs to voice those objections. *Id.*

Instead, the Court reiterated that an organization can establish a viable injury when a defendant's actions "directly affect[] and interfere[] with" an organization's "core business activities." *Id.* at 395. The Supreme Court relied on its decision in *Havens* to emphasize this distinction. The Court explained that while HOME, the housing organization in *Havens*, "operated a housing counseling service" and was "not only [] an issue-advocacy organization," the groups in *Hippocratic Medicine* had no purpose or function beyond their anti-abortion advocacy. *Id.* Accordingly, while the defendant's actions in *Havens* directly affected and interfered with HOME's "core business activities" of providing counseling services, the FDA's conduct in *Hippocratic Medicine* did nothing to prevent the lobbying groups from continuing their advocacy work against the FDA. *Id.* Absent any interference with, or impairment of, their core activities, the groups therefore failed to establish an organizational injury. *Id.*

The Ninth Circuit has applied *Havens Realty* and *Hippocratic Medicine* to assess organizational standing in two recent cases. In *Arizona Alliance for Retired Americans v. Mayes*, three organizations challenged the Cancellation Provision of an election law amendment that allowed county recorders to cancel a voter's registration in certain circumstances. 117 F.4th 1165, 1169 (9th Cir. 2024). The Court held that the organizations lacked standing because they failed to show that defendant's conduct "directly harmed [their] already-existing activities." *Id.* at 1172. The Court distinguished the case from *Havens,* noting that HOME's alleged injury not only affected its advocacy work, but also directly impeded the organization's ability to provide counseling services. *Id.* at 1177. By contrast, because the nonprofits in *Arizona Alliance* could "continue their core activities that they have always engaged in"—registering and educating voters—"with or without the Cancellation Provision," they failed to show an injury. *Id.* at 1178.

Applying this standard to another advocacy organization, the Ninth Circuit reached the opposite conclusion in *Freedom Foundation v. Int'l Bhd. of Teamsters Loc. 117*, No. 23-3946,

2024 WL 5252228 (9th Cir. Dec. 31, 2024). In *Freedom Foundation,* a nonprofit organization

advocating for public employees to stop paying union dues challenged various unions' rejection

of the organization's dues revocation forms. The Court held that the Freedom Foundation

adequately alleged that the defendants' conduct directly interfered with its "core activity" of

"helping public employees revoke their dues authorizations"—an activity it had engaged in

"before any of the alleged conduct by the unions"—and it therefore had standing to sue. 2024

WL 5252228, at *1.

In sum, the Supreme Court and Ninth Circuit have made clear that an organization may

establish an injury sufficient to confer standing when a defendant's conduct directly affects or

interferes with the organization's ability to carry out its core activities, so long as those core

activities include something beyond advocacy about the very issues challenged in the lawsuit.

That is exactly what the Coalition has alleged here. *See infra* section II(B).

Contrary to Defendants' contention, the Coalition's claim for injunctive relief rather

than statutory damages does not render the "'pre-existing core activities' standard derived from

*Havens* inapplicable." Defs.' Br. at 9. No case has limited *Havens* in such a way. Indeed, in

*Hippocratic Medicine*, the Supreme Court relied on *Havens* to assess whether the plaintiff

medical groups—who sought an injunction against the FDA—had organizational standing. The

Court's conclusion that the medical groups lacked standing under *Havens* was based on the

insufficiency of the plaintiffs' purported injuries, not the type of relief they sought. *Hippocratic*

*Med.,* 602 U.S. at 395. *See also, e.g.*, *S.C. State Conf. of NAACP v. S.C. Dep't of Juv. Justice*,

No. 22 Civ. 1338, 2024 WL 5153170 (D.S.C. Dec. 18, 2024) (finding organization had standing

under *Havens Realty* and *Hippocratic Medicine* to seek injunctive relief); *Get Loud Ark. v.*

*Thurston*, No. 24 Civ. 5121, 2024 WL 4142754, at *4 (W.D. Ark. Sept. 9, 2024) (same).

Defendants' argument that the Coalition has not lost its own property is similarly irrelevant to the assessment of organizational standing. *See* Defs.' Br. at 6-8. Defendants' cited cases did *not* involve organizational standing and are therefore irrelevant here. *Id.* (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 414 (2021) & *United States v. Texas*, 599 U.S. 670, 676 (2023)). In *Havens*, the fair housing organization had standing, even though it did not allege the organization itself was denied housing; so too here, the Coalition has standing, even though it does not allege that the organization itself suffered unconstitutional property destruction. The Supreme Court made clear just last year that *Havens* is good law and organizations have standing when defendants' unconstitutional practices interfere with their core activities, which, as explained in detail *infra*, the Coalition has shown here. *See Havens,* 455 U.S. at 369; *Hippocratic Med.*, 602 U.S. at 394.

The City's reliance on *Rios v. County of Sacramento*, 562 F. Supp. 3d 999 (E.D. Cal. 2021), is similarly misplaced. Nothing in *Rios* (a district court decision) could or does abrogate *Havens*; on the contrary, the Supreme Court made clear in 2024 that *Havens* is still good law. *Hippocratic Med.*, 602 U.S. at 395. In *Rios,* plaintiffs challenged the "clean up" of a piece of vacant land that homeless people lived on. The court found a lack of standing to seek injunctive relief because the complaint did "not include factual allegations about another impending clean-up" that might cause future harm. 562 F. Supp. 3d at 1013. Here, by contrast, the Coalition has alleged that the City's practice of destroying unhoused people's property—and the resulting impact on the Coalition's core activities—is ongoing and will continue to occur absent injunctive relief, *e.g.* TAC ¶ 259, and the Court has already granted a preliminary injunction enjoining Defendants "from violating San Francisco's bag and tag policy." Dkt. No. 65 at 49.

**B.    The Coalition Has Been Injured by the City's Interference with Its Preexisting Core Activities**

Like HOME and the Freedom Foundation, the Coalition is not purely an advocacy organization. Since its formation, the Coalition has always provided services and essential supplies to homeless people, in addition to the advocacy it engages in on their behalf. The Coalition also advocates about many problems unrelated to the property destruction at issue in this case. Because the City's systematic violation of the 4th and 14th Amendments directly interferes with the Coalition's core activities of providing these services and supplies, and advocating about these other issues, the Coalition has suffered an injury-in-fact and has organizational standing to challenge the City's misconduct.

**i.    The City's Policy Impedes the Coalition's Ability to Assist Unhoused People Navigate the Homeless Services System**

Since its inception, the Coalition has been dedicated to assisting unhoused people navigate the homeless services system by providing services to connect them to governmental, private, and nonprofit resources that provide shelter, health care, housing, and other assistance. *See* Friedenbach Decl. ¶¶ 3, 6; Cutler Decl., Dkt. 9-3, ¶ 4 (former Coalition employee explaining "I got my start at the Coalition as an outreach worker doing case management and providing direct services to unhoused people."); Salzman Decl., Ex. 3 (Martinez Dep.) at 113:16-114:13 (testifying the Coalition provided services to access housing, explaining "They always come around, you know, let us know how close we were to getting housing or -- or where to be"); Salzman Decl., Ex. 5 (Castano Dep.) at 142:14-143:3 (testifying Coalition staff "helped me try to resolve some of my financial issues and some citation stuff. Just practical things, I guess"); Salzman Decl., Ex. 6 (Wadkins Dep.) at 25:22-26:5 (prior Coalition employee testifying that Coalition does "proactive work includ[ing] connecting people to resources" and "helping people navigate the homeless services system").

For example, the Coalition helps homeless people access the Coordinated Entry system to be assessed for housing and helps homeless people complete Homeless Verification forms to establish their eligibility for benefits. Friedenbach Decl. ¶¶ 20-22 & Ex. 7; Salzman Decl., Ex. 6 (Wadkins Dep.) at 127:16-128:1 (former Coalition employee testifying that helping complete the Homeless Verification form is the "service we provide [to unhoused people]"); *id.* at 130:1-4 (testifying Coalition helped fill out Homeless Verification forms "A lot. Frequently close to one a day maybe even. Maybe three-ish – three to five a week"); Wadkins Decl. ¶¶ 2-5 (listing services he provided to homeless people when he worked at the Coalition).

In order to effectively provide these services to unhoused people, the Coalition must communicate with them—either by phone, text, email, or in person—to provide and collect information, complete applications, submit forms and other documentation, and coordinate visits to resource centers. Friedenbach Decl. ¶ 19. Indeed, even when the Coalition succeeds in getting an individual initially assessed for a particular service, additional documentation or follow-up visits are often required to complete the process and, if the person is initially denied, the Coalition helps them gather additional documentation in order to apply again. *Id.* ¶ 22; Wadkins Decl. ¶¶ 5, 7-9.

The City's practice of unlawfully seizing and destroying unhoused people's phones, laptops, electronics, and chargers directly impairs the Coalition's ability to provide these services because the Coalition then has no way to contact unhoused people by phone or email, leaving in-person contact as the only form of communication available. Friedenbach Decl. ¶ 23; Wadkins Decl. ¶ 7; *see also* Salzman Decl., Ex. 1 (Cronk Dep.) at 109:7-111:6 (testifying that City workers "trashed" the laptop she and Mr. Donohoe used in a sweep in April 2022); *id.* at 116:14-117:6 (testifying she saw all of Mr. Martinez's property get "destroyed" in a sweep in June 2022, including "a tent, a – all his clothes, a sleeping bag, a phone, laptop, his documents,

his medication."); *id.* at 217:9-218:23 (testifying she lost "our laptop – my partner's laptops" in a sweep in September 2022); *id.* at 265:10-17 (testifying the City has destroyed two cell phones and one laptop that belonged to her); Salzman Decl., Ex. 2 (Donohoe Dep.) at 99:16-100:8 (testifying he lost his laptop in a sweep in August 2022); Salzman Decl., Ex. 5 (Castano Dep.) at 114:11-20 (testifying his laptop was "destroyed" in a sweep in 2021).

The City's conduct makes in-person contact more difficult or impossible as well. Seizing and destroying property, including tents and other survival structures, causes unhoused people to flee out of fear of losing their belongings again. This displacement prevents or makes it more difficult for the Coalition to locate or re-establish contact in person with those members or others who lived in the same encampment. Friedenbach Decl. ¶ 24; Wadkins Decl. ¶ 7. Absent any ability to contact them, the Coalition cannot provide unhoused people with the assistance they need to access benefits and resources. Friedenbach Decl. ¶ 25.

The City's destruction of property also often results in the permanent loss of identification and documentation required to establish unhoused people's eligibility for benefits. Friedenbach Decl. ¶ 26; Wadkins Decl. ¶ 9; Salzman Decl., Ex. 1 (Cronk Dep.) at 183:9-185:6 (testifying City destroyed her property including "my paperwork" in a sweep in 2019); *id.* at 186:3-15 (testifying she lost "all of my – my documents . . . my California ID, one of my wallets, cards, and phone numbers" in a sweep in 2019); *id.* at 217:9-218:23 (testifying she lost her "paperwork" in a sweep in September 2022); *id.* at 266:9-15 (testifying that between 2018 and 2024, the City took two of her identification cards, four or five other government benefits cards, and her Social Security card during sweeps); Salzman Decl. Ex. 6 (Wadkins Dep.) at 128:23-129:5 (former Coalition employee testifying that "I have seen of lot of paperwork thrown away and people tell me that paperwork was thrown away" by City workers during sweeps). Without this required paperwork, the Coalition's work to assist unhoused people

submit the forms necessary to obtain essential services is more difficult or impossible, because they first need to obtain new identification. Friedenbach Decl. ¶ 26.

Similarly, when the City destroys a homeless person's medications, it has a negative impact on that person's health, makes it more difficult for that person to function, and therefore more difficult for the Coalition to communicate with that person and work with them to help them access services and benefits. Friedenbach Decl. ¶ 27; *see e.g.* Salzman Decl., Ex. 1 (Cronk Dep.) at 116:14-117:6 (testifying she saw all of Mr. Martinez's property get "destroyed" in a sweep in June 2022, including "his medication."); *see also* Wadkins Decl. ¶ 10 (explaining "The City's property destruction, particularly of basic necessities, is also traumatizing and inhibits our ability to engage someone in crisis to connect them in services or engage in larger campaigns.").

The City's direct interference with the Coalition's ability to provide services to unhoused people and connect them to benefits and resources constitutes an injury sufficient to establish standing. *See Havens*, 455 U.S. at 379 (holding that impairment of organization's "ability to provide counseling and referral services" constituted sufficient injury to support standing); *Hippocratic Med.*, 602 U.S. at 395 (holding that an organization may establish injury by showing that defendant's actions "directly affected and interfered with [its] core business activities"); *Get Loud Ark.*, 2024 WL 4142754, at *4 (holding that nonprofit organization that developed a tool to allow people to digitally sign voter registration applications was injured by a state rule prohibiting digital signatures because the rule "perceptibly impaired GLA's ability to provide voter registration services"); *La Union Del Pueblo Entero v. Abbott*, No. 21 Civ. 0844, 2024 WL 4488082, at *36 (W.D. Tex. Oct. 11, 2024) (finding that civil rights organizations were injured by provisions of Texas' Election Protection and Integrity Act that imposed new restrictions on voter assistance activities because the provisions "perceptibl[y] impair[ed] the

groups' "core services" by making it more difficult to provide voter assistance). In a similar recent case, another court in this District held there was standing for "a non-profit organization whose volunteers serve individuals experiencing homelessness, providing supplies such as meals, clothing, tents, and sleeping bags." *Yesue v. City of Sebastopol*, No. 22 Civ. 06474, 2024 WL 4876953, at *4 (N.D. Cal. Nov. 22, 2024). Because the challenged city practice made "it increasingly difficult to locate people to get them meals, increasing the time spent looking for them" and thereby reducing the organization's reach, the court held "Plaintiff AoK has standing, as the [challenged ordinance] allegedly affected Plaintiff AoK's ability to find unhoused individuals to distribute meals to, draining its resources." *Id.*

The City's reliance on *Arizona Alliance* is misplaced. *See* Defs.' Br. at 10-11. As noted above, the organization in *Arizona Alliance* lacked standing to advocate against an election law amendment because, "with or without" the amendment, it could *still* "continue their core activities that they have always engaged in" unaffected. *Ariz. All.*, 117 F. 4th at 1178. Here, by contrast, the City's destruction of unhoused people's property directly limits and often wholly prevents the Coalition from contacting and counseling its members and unhoused people on obtaining social services in the first instance. As the Court in *Arizona Alliance* made clear, such a "direct[] harm[]" to a "core activity" is sufficient to establish an injury. *Id.* at 1177 (reiterating that the organization in *Havens* had standing because defendant's conduct "directly harmed HOME's core activity—counseling its clients on housing availability").[1]

---

[1]     A petition for en banc review has been made in *Arizona Alliance* and that decision should be overturned, among other reasons because it improperly narrows frustration of mission as a separate basis for organizational standing, even though the Supreme Court has not overruled that doctrine and other circuits continue to recognize it. *See Havens*, 455 U.S. at 368, 378; *see also Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 396–97 (4th Cir. 2024) (plaintiffs adequately alleged injury under *Havens* and *Hippocratic Medicine* on the grounds that their "core organizational mission of election security and providing services aimed at promoting Republican voter engagement and electing Republican candidates for office" was directly "affected and interfered with" by defendant's conduct because plaintiffs were unable to ascertain who would be able to vote in the upcoming election). If the decision is overturned, the Coalition has also alleged and will prove the City's conduct

1
2

      **ii.**    **The City's Policy Directly Impairs the Coalition's Ability to Provide Basic Necessities to Unhoused People**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

      The City's policy of unlawfully seizing and destroying property similarly interferes with the Coalition's core activity of providing basic necessities to unhoused people. As part of its work, the Coalition routinely distributes tents, sleeping bags, blankets, socks, and food to unhoused people on the streets and to those who visit a Coalition office. Friedenbach Decl. ¶¶ 7, 28 & Ex. 8 (invoices for tents purchased by Coalition) & Ex. 10 at COH01502353 (describing donations raised from "Tent Together GoFundMe" to fund purchase of tents); Def. Ex. P at COH00742825 (describing how Coalition provides "monthly meals"); Salzman Decl., Ex. 1 (Cronk Dep.) at 97:3-15 (testifying the Coalition gave her two sleeping bags and, as a Coalition volunteer herself, "I have given out food, distributed socks, spare sleeping bags, just had conversations with people about what services are available to them"); *id.* at 226:24-227:3 (testifying "I think the Coalition did provide some tents" in 2022); Salzman Decl., Ex. 5 (Castano Dep.) at 142:14-143:3 (testifying the Coalition provided him with a tent); Salzman Decl., Ex. 6 (Wadkins Dep.) at 26:3-5 (prior Coalition employee testifying that the Coalition "provid[es] supplies to people experiencing homelessness"); Wadkins Decl. ¶ 4 ("I would distribute supplies like tents, harm reduction kits, sleeping bags, hand sanitizer, socks, gloves, and water.").

21
22
23
24
25

      The City's destruction of property causes unhoused people to permanently lose many or all of these essential living necessities. Friedenbach Decl. ¶ 28; Salzman Decl., Ex. 1 (Cronk Dep.) at 109:7-111:6 (testifying that City workers "trashed" the tents she and Mr. Donohoe used); *id.* at 116:14-117:6 (testifying she saw all of Mr. Martinez's property get "destroyed"

26
27
28

---

frustrates the Coalition's mission to help unhoused people by impeding its ability to provide them with services and resources, an additional and independent basis for standing. *See* TAC ¶¶ 22, 260, 264, 270, 274.

including his tent, clothes, and sleeping bag); *id.* at 183:9-185:6 (testifying City destroyed "[a]ll my clothing, blankets, my paperwork, art supplies, some food" in a sweep in 2019); *id.* at 186:3-15 (testifying she lost "my tents" and "all of my clothing" in a different sweep in 2019); *id.* at 211:17-213:22 (testifying City workers "picked up and they put on their truck, including our tent, our tarp, our blankets, clothing" in a sweep in May 2022); *id.* at 217:9-218:23 (testifying "[p]retty much everything we had" was destroyed in a sweep in September 2022, including "our tent, our cleaning supplies, our backpacks, our laptop – my partner's laptops, art, art supplies, shoes, food, toiletries, paperwork, notebooks."); Salzman Decl., Ex. 2 (Donohoe Dep.) at 102:1-25 (testifying Department of Public Works took "two tents, laptop, art supplies, a cell phone, tools, clothes, food" during an August 2022 sweep); Salzman Decl., Ex. 3 (Martinez Dep.) at 143:3-144:15 ("When I was coming back from the appointment, they were – they were taking my tent and everything else and throwing it in the back of a garbage truck."); Salzman Decl., Ex. 4 (Frank Dep.) at 173:2-12 (testifying the City took "My whole tent. Everything was in the tent, like my clothes and stuff" during January 2022 sweep).

As a result of the City's rampant property destruction, the Coalition must more frequently replace these items, which in turn depletes the Coalition's supply and leaves the Coalition unable to address the needs of unhoused people for these supplies. Friedenbach Decl. ¶ 29-30 & Ex. 8 (tent purchase invoices); Wadkins Decl. ¶ 10 ("Due to the City's repeated property destruction, there was a growing unmet need for basic supplies that the Coalition would provide.").

Courts routinely find this kind of direct impairment of an organization's core activity sufficient to constitute an organizational injury. *See e.g., Havens,* 455 U.S. at 379; *S.C. State Conf. of NAACP*, 2024 WL 5153170. In *South Carolina State Conference of NAACP,* for example, various civil rights organizations, including Justice 360, challenged the unlawful

conditions of confinement at juvenile detention facilities on the grounds that the conditions impaired their ability to serve their clients. Specifically, Justice 360 alleged that the conditions caused its juvenile clients to "show up to attorney visits sleep-deprived, exhausted, and anxious" such that they "struggle to focus when Justice 360's attorneys attempt to meet with them about their cases." 2024 WL 5153170, at *6. The court found that Justice 360 plausibly demonstrated an organizational injury because the challenged conditions, and their resulting impact on the juvenile detainees, "impede[d] Justice 360's efforts to help their clients" and "reduc[ed] the number of children" it could represent. *Id.* Here too, the City's practice of seizing and destroying property impairs the Coalition's ability to provide basic necessities to its members and limits the number of unhoused people it can assist. *See also Yesue*, 2024 WL 4876953, at *4. And, just as Justice 360 struggled to help its "sleep-deprived clients," so here too, the Coalition struggles to communicate with and help its homeless members when the City has destroyed their shelters and medications because it makes it more difficult for the Coalition to work with and communicate with those people. Friedenbach Decl. ¶ 27; Wadkins Decl. ¶ 10; *see e.g.* Salzman Decl., Ex. 1 (Cronk Dep.) at 116:14-117:6 (testifying she saw all of Mr. Martinez's property get "destroyed" in a sweep in June 2022, including "his medication").

### iii. The City's Policy Interferes with the Coalition's Ability to Educate Unhoused People About Their Rights

As part of the services it provides to unhoused people, the Coalition publishes and distributes "Know Your Rights" pamphlets, resource guides, and the Street Sheet newspaper. These educational materials are aimed specifically at unhoused people and are distinct from the Coalition's broader efforts to educate the public about homelessness through its advocacy reports. Friedenbach Decl. ¶¶ 8-12 & Exs. 1-3; Ex. 11 at COH01525957 (Coalition's activities include "Develop[ing] and provid[ing] educational material such as zines, know your rights,

wheatpasting to increase the knowledge base of unhoused community members"); Def. Ex. P at

COH00742834 (same, in 2022-2023); Friedenbach Decl., Ex. 12 at COH01058081 (same, in

2023-24); Salzman Decl., Ex. 1 (Cronk Dep.) at 95:14-96:10 (testifying Coalition has provided

her with Know Your Rights flyers since approximately 2011 "[p]retty frequently. Maybe every

few months or so."); Salzman Decl., Ex. 6 (Wadkins Dep.) at 26:1-25 (prior Coalition employee

testifying that Coalition does public education work, including "distributing literature to people

. . . There would be pamphlets that we called know your rights pamphlets that described

people's rights as unhoused people," and explaining "If they needed support with anything, I

would give them my business card"); Wadkins Decl. ¶ 3 ("During my time at the Coalition, I

distributed Know Your Rights material. . ."). The Coalition's Know Your Rights materials,

resource guides, and some editions of the Street Sheet contain critical information for

navigating the homeless services system, including details on the City's Bag & Tag policy,

shelter eligibility, searching for an apartment, voting rights, and updates on other issues

affecting unhoused people. Friedenbach Decl. ¶ 9.

       The City's destruction of all property belonging to many of the homeless people

impacted by the sweeps results in the frequent and widespread destruction of *all* those people's

property, including their Know Your Rights materials, their basic living essentials, their

electronic devices, their identification, and their paperwork. Friedenbach Decl. ¶ 32. The City's

seizure and destruction of property results in the permanent loss of these materials and prevents

the Coalition from educating its members about available services, informing them of their

rights, and engaging its base. Friedenbach Decl. ¶ 36. Similarly, when the City destroys all of a

homeless person's property, it also destroys their artworks, writings, tools they use to create

new art and writings, and communication devices, which limits their ability to create new art,

including submissions to the Coalition's Street Sheet. Friedenbach Decl. ¶ 33[2]; Wadkins Decl. ¶ 9; Salzman Decl., Ex. 1 (Cronk Dep.) at 183:9-185:6 (testifying she lost her "art supplies" in a 2019 sweep); *id.* at 186:3-15 (testifying she lost "the artwork I was making" in another 2019 sweep); *id.* at 217:9-218:23 (testifying she lost "art, art supplies" in a sweep in September 2022); Salzman Decl., Ex. 2 (Donohoe Dep.) at 102:1-25 (testifying he lost his art supplies in an August 2022 sweep, including "Painting supplies, markers, canvases, actual paint, and, you know, fabric that both Sarah and I had made, yeah"). Moreover, as already noted, because the City's policy impedes communication with unhoused people, the Coalition struggles to, and often cannot, contact or locate its members to redistribute these materials. Friedenbach Decl. ¶¶ 23-24.

The City's interference with the Coalition's efforts to educate unhoused people and its members about their legal rights and the availability of services constitutes an injury sufficient to support standing. *Havens*, 455 U.S. at 379; *see also Al Otro Lado, Inc. v. Mayorkas*, No. 23 Civ. 1367, 2024 WL 4370577, at *1 (S.D. Cal. Sept. 30, 2024) (organization had standing to challenge the U.S. Customs and Border Protection policy of turning away asylum applicants without a CBP One mobile app appointment on the grounds that the policy "perceptibly impaired their ability to provide mission-essential services" including "legal orientations and Know Your Rights trainings" to recently-arrived migrants).

### iv.    The City's Policy Impacts the Coalition's Work to Provide Education and Training Services to Homeless People

Similarly, the City's interference with the Coalition's efforts to train unhoused people on their legal rights, service navigation, community organizing, and outreach, including through

---

[2]       Contrary to the City's suggestion (Defs.' Br. at 13 n.6), the circulation figures of the Street Sheet have in fact declined in recent years. Friedenbach Decl. ¶ 34 & Ex. 9.

the Coalition's Free School, also supports an organizational injury. Friedenbach Decl. ¶¶ 13, 28-31 & Exs. 4-5; Ex. 10 at COH01502337 (discussing Coalition's "workshops for job training, skill building, and employment"); *id.* at COH01502367 (describing how the Coalition is engaged in "Design[ing] new Free School" and "quarterly trainings"); *id.* at Ex. 11 at COH01525910 ("Held virtual Free School"); *id.* at COH01525943 ("Put on Free School"); *id.* at COH01525967 ("Host another Journalism 101 course for unhoused journalists"); Def. Ex. P at COH00742828-29 ("Put on Free School" in 2022-23) & at COH00742812 ("Journalism 101 course for unhoused journalists"); Friedenbach Decl. Ex. 12 at COH01058082 ("Design new Free School" and "Develop a speakers bureau that trains [homeless] people" in 2023-24).

As a result of the City's rampant property destruction, unhoused people often refrain from attending Coalition training and educational sessions for fear that their property will be destroyed while they are gone. Friedenbach Decl. ¶ 38. Without members to train, the Coalition is unable to educate unhoused people, empower new leaders, and sustain and grow its membership base. *Id.* at ¶¶ 39-40; Wadkins Decl. ¶ 9 ("Due to rampant property destruction including phones and laptops and constant displacement, we were limited to what training offerings we could make as people needed to stay with their belongings rather than attend a training."). It is also more difficult for the Coalition to contact homeless people to attend its trainings and events when their phones and laptops have been destroyed by the City. Friedenbach Decl. at ¶ 41 & Ex. 10 at COH01502341 (explaining how Coalition staff "make calls before every meeting, and send out agendas via email" and have started "sending texts"); *id.* at COH01502367 (explaining how Coalition adds "homeless people's information" to an email listserv on "monkey mailer" to distribute information); Friedenbach Decl., Ex. 12 at COH01058083 (same, and explaining the need for "in-person outreach for those who don't have phone/email access").

1

2

The City's interference with the Coalition's provision of training and education services

3

for homeless people, as well as the Coalition's efforts to sustain and grow its membership, are

4

an additional, independent injury that is sufficient basis for organizational standing. *See Mar.*

5

*for Our Lives Idaho v. McGrane*, No. 23 Civ. 00107, 2024 WL 4226912, at *6 (D. Idaho Sept.

6

17, 2024) (nonprofit organization had standing to challenge the constitutionality of an Idaho

7

voting law limiting the acceptable forms of identification required to register to vote because the

8

law interfered with the organization's core "business" of "educating and registering voters—not

9

merely gathering information and advocating against the law").

10

### v.   Public Advocacy on Other Issues Is Also Relevant to Standing

11

12

Even if the Coalition's advocacy work is disregarded, the Coalition has established the

13

City's interference with four other core activities, each of which independently suffices to

14

confer standing. *Supra*. The Court need look no further to find standing.

15

The fact that the Coalition *also* does public advocacy and public education work does

16

not defeat its organizational standing. *Contra* Defs.' Br. at 10. As the Supreme Court recently

17

explained, the HOME organization in *Havens* had standing because it was "*not only* [] an issue-

18

advocacy organization," but *also* alleged interference with its core activity of providing

19

counseling services, unlike the lobbying group in *Hippocratic Medicine* that was trying to

20

"spend its way into standing simply by expending money to gather information and advocate

21

*against the defendant's action*." 602 U.S. at 394-95 (emphasis added). No court has held that

22

engaging in *any* public advocacy in conjunction with the provision of services defeats

23

organizational standing.

24

In addition, because the Coalition engages in advocacy on "many issues beyond the

25

property destruction being litigated in this case," Friedenbach Decl. ¶ 42, this case is also

26

different than the public advocacy at issue in *Hippocratic Medicine*. There, the lobbying groups

27

28

engaged in public advocacy solely on the very same FDA regulations they sought to sue over, leading the Supreme Court to conclude "that theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike." 602 U.S. at 395. Here, by contrast, the Coalition is not relying on its advocacy against the City's illegal property destruction practices to establish standing.

The Coalition advocates on a broad range of issues; it "uses community organizing and advocacy to fight to prevent people from becoming homeless . . . presses for affordable housing in San Francisco to solve homelessness, and advocates to expand resources available to unhoused people including mental health treatment, emergency shelter, and basic necessities." Friedenbach Decl. ¶ 4. This advocacy is directed at private entities in addition to the City. For example, the Coalition's housing-related work has included getting the City to fund an emergency hotel voucher program for families and winning housing subsidies for unhoused individuals. *Id.* ¶ 16. In 2018, for example, the Coalition was the author of Proposition C—a ballot measure for a gross receipts tax on all businesses receiving more than $50 million in revenues annually, to be used to help fund the City's affordable housing projects. *Id.* And in 2021, the Coalition conducted a survey and wrote a long report documenting homeless people's lack of access to clean water and the need for public policy changes, including the construction of clean water stations to address this problem, which the Coalition later advocated for and helped install. *Id.* & Ex. 6.

The City's destruction of homeless people's communication devices makes it harder for the Coalition to engage them in this advocacy work, and homeless people's fear that the City will destroy all unattended property makes them less likely to attend the Coalition's advocacy efforts, whether those are press conferences, rallies, or hearings. Friedenbach Decl. ¶ 42. This in turn undermines the Coalition's efforts to build networks of homeless people to advocate on

these issues and to sustain and grow its membership base, which relies on engaging homeless

people in these public advocacy efforts. *Id.* ¶¶ 43-44.

Defendants' focus on the Coalition's pre-litigation work is similarly irrelevant to this

Court's standing analysis. *See* Defs.' Br. at 12. The Coalition, like all organizations, is entitled

to use or explore litigation as a tool to protect itself. That the Coalition has been "monitoring the

City's alleged property destruction" for years or has considered taking "legal action" has no

impact on the Coalition's organizational standing. Defs.' Br. at 12. The Coalition does not rely

on its pre-litigation costs or "diversion of resources"—for litigation purposes or otherwise—as a

basis for standing in this case. *See id.* Moreover, Defendants' suggestion that any work an

organization might do to prepare for potential litigation automatically precludes standing is

nonsensical. All organizations seeking legal recourse—and therefore asserting standing—will

necessarily have performed at least *some* legal work prior to filing a lawsuit.

### C.    The Coalition Is Not Required to Allege an Informational Injury

The Coalition is also not required to allege an informational injury as a basis for

organizational standing. *Contra* Defs.' Br. at 9. While informational injury remains one of the

various ways an organization may satisfy Article III's injury requirement, neither *Havens* nor

*Hippocratic Medicine* has held, or even implied, that it is the *only* kind of injury sufficient to

confer organizational standing. Indeed, as the Court in *Hippocratic Medicine* made clear, an

organization may also establish injury if a defendant's actions "directly affected and interfered

with [its] core business activities." 602 U.S. at 395. Just so here.

### III.    The City's Policy Has Directly Caused the Coalition's Injuries

The second and third requirements of Article III standing—causation and

redressability—are "often flip sides of the same coin." *Hippocratic Med.*, 602 U.S. at 380. Put

differently, if a defendant's action "causes an injury, enjoining the action or awarding damages

21

1    for the action will typically redress that injury." *Id.* at 381. Accordingly, the "two key questions

2    in most standing disputes are injury in fact and causation." *Id.*

3         To establish causation, a plaintiff must show "a predictable chain of events leading from

4    the [defendant's] action to the asserted injury—in other words, that the [defendant's] action has

5    caused or likely will cause injury in fact to the plaintiff." *Hippocratic Med.*, 602 U.S. at 385. To

6    establish redressability, a plaintiff must show that a favorable ruling will cure their injury. When

7    evaluating redressability, courts "consider the relationship between 'the judicial relief

8    requested' and the 'injury' suffered." *Ariz. All.*, 117 F.4th at 1174 (quoting *California v. Texas*,

9    593 U.S. 659, 671 (2021)).

10        The City's illegal seizure and destruction of property directly impacts the Coalition's

11   ability to carry out its core activities and build its membership base, which is necessary to

12   enable it to continue its core activities. Specifically, the failure to follow the Bag & Tag policy

13   results in the permanent loss of unhoused people's communication devices, basic living

14   necessities, and educational materials. Without these items, the Coalition cannot connect

15   unhoused people to social services, provide essential living supplies, or inform unhoused people

16   of their rights and resources. Moreover, the City's conduct affects the Coalition's ability to

17   build its membership base by hindering outreach efforts and discouraging members and

18   potential members from attending the Coalition's meetings or trainings. *See supra* section II(B).

19        **A.    The City's Efforts to Deflect Responsibility All Fail**

20        In an effort to deflect responsibility, Defendants insist that other obstacles, rather than

21   their own conduct, have caused the Coalition's injuries. Defs.' Br. at 13-14. Defendants even go

22   so far as to insinuate that the Coalition's own "decision-making" caused its harm. *Id.* These

23   arguments are unpersuasive. That the Coalition has *also* faced other challenges in conducting its

24   work, including the impact of the COVID-19 pandemic and the difficulties inherent in working

with unhoused people, in no way disproves the significant impact of the City's conduct. The

"mere existence of multiple causes" of the Coalition's injuries does not defeat

standing. *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1157 (9th Cir. 2015)

("So long as a defendant is at least partially causing the alleged injury, a plaintiff may sue that

defendant, even if the defendant is just one of multiple causes of the plaintiff's injury.");

*Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 901 (9th Cir. 2011) (the plaintiff "need not

eliminate any other contributing causes to establish its standing"); *Ocean Advocates v. U.S.

Army Corps of Engineers*, 402 F.3d 846, 860 (9th Cir. 2005) (finding the injury fairly traceable

to the defendant, even though "other factors may also cause" the injury, because "the link

between the [challenged action] and [the alleged injury] is not tenuous or abstract"). Another

court in this District rejected a similar argument in *Yesue*, holding that the mere fact that the

organizational plaintiff's "representative testified that its ability to serve the unhoused was

limited by financial and volunteer constraints" did not defeat standing because the

"representative made clear that its inability to find the unhoused did impact its distribution of

meals." 2024 WL 4876953, at *4. Regardless of the independent impact of other factors, if any,

the Coalition has adequately shown that the City's unlawful conduct has interfered with its

ability to carry out its core activities and serve its members.

**B.     The Coalition's Injuries Can Be Redressed by Compliance with the
          Constitution**

Defendants' contention that compliance with the Bag & Tag policy will not redress the

Coalition's alleged injuries because members would still not have access to their property

"while [it was] bagged and tagged" is misleading and incorrect. Defs.' Br. at 11. The Bag &

Tag policy does not allow for the summary destruction of belongings. Rather, it requires that the

City carefully bag unhoused people's property, tag it for identification, and store it such that

people can retrieve their property immediately, as the policy requires it to be available for pick-up 24 hours/day for the first 72 hours. Salzman Decl., Ex. 7 (Dkt. No. 193-4) at p. 3, § 6(a). Accordingly, if the City adhered to its own policy, unhoused people would be able to promptly retrieve undamaged phones, laptops, chargers, documentation, verification forms, medications, tents, sleeping bags, clothing, and other items, thereby only temporarily interfering with the Coalition's work. Moreover, if City complied with the policy and provided adequate notice of the sweeps in advance, *e.g., id.* § 4, and the necessary time for homeless people to collect their belongings, *e.g., id.* § 2(b)-(c), loss of property would be entirely avoided and people would be less fearful to remain following a sweep. Instead, the City's failure to comply with the Bag & Tag policy results in the permanent destruction of property and the Coalition's resulting inability to communicate with members, provide services, and distribute basic necessities. *See supra* section II(B).

## IV.   Defendants' Prohibited Renewed Attack on Associational Standing Fails

Less than a month ago, the Court struck Defendants' fourth motion to dismiss and reprimanded Defendants for "[i]nexplicably" and improperly "tak[ing] another swing at associational and individual standing." Dkt. 298 at 1-2. The Court explicitly forbade Defendants from challenging associational standing again prior to summary judgment. *Id.*

In violation of the Court's clear order, Defendants have yet again inexplicably and improperly attacked associational standing in this new motion, arguing the Coalition cannot establish standing because "all but one" of the "ten individual members" that the Coalition identified to support standing are no longer homeless. Defs.' Br. at 15. This is the identical attack on associational standing Defendants made in their fourth motion that was struck by the Court. Dkt. No. 295 at 16-18. The housing status of individual Coalition members is wholly irrelevant to whether the Coalition has organizational standing, the *only* issue on which

1  Defendants have permission to move at this time. The Coalition's organizational standing is

2  based on the City's direct interference with the Coalition's *own* ability to carry out its core

3  activities, not the housing status of its members. *See Havens*, 455 U.S. at 369.

4  The Court should reject Defendants' improper back-door attempt to relitigate the

5  Coalition's associational standing after the Court explicitly forbade it from doing so. Dkt. 298 at

6  2. The argument is also meritless, as Plaintiffs will fully demonstrate if the City attacks

7  associational standing again on summary judgment or at trial.[3]

8

9  **CONCLUSION**

10  For the foregoing reasons, the Coalition has organizational standing. Defendants'

11  Motion to Dismiss the Third Amended Complaint should be denied.

12

13

14

15

16

17

18

---

19  [3]        Because standing is assessed at the time of filing, the current housing status of individual Coalition members is irrelevant even as to the Coalition's associational standing. *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) ("The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint.") (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992)); *Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1051 (C.D. Cal. 2019) ("A plaintiff's standing is assessed as of the time an action was initiated and is unaffected by subsequent developments."). To the extent Defendants are actually hinting at a mootness argument, the Ninth Circuit has found that an associational standing case is not moot when the organization's members generally may face the same harm again in the future. *See e.g.*, *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003). Thus, in *Oregon Advocacy Center,* the plaintiff organization sued on behalf of seven mentally incapacitated criminal defendants, on the grounds that the Oregon State Hospital and Oregon Department of Human Services unreasonably delayed the inmates' transfer from county jails to state mental hospitals for treatment. Despite the fact that all seven inmates had been admitted to the hospital by the time trial began, the Court held that the case was *not* moot, because, *inter alia,* "the detention of incapacitated criminal defendants for weeks or months in Oregon county jails is an ongoing, pervasive and systemic problem" that "continues to occur" and defendants did not offer any evidence to suggest "that this problem has ceased." *Id* at 1117; *see also Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011) (explaining that an action is not moot if it meets either the "capable of repetition, yet evading review" or "inherently transitory" exceptions to the mootness doctrine); *Torres*, 411 F. Supp. 3d at 1056 (explaining "the Ninth Circuit permits plaintiffs with mooted individual claims to maintain those individual claims for injunctive relief where they challenge an ongoing government policy") (cleaned up). So too here.

Dated: February 6, 2025

By:    /s/ Zoe Salzman

EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL LLP
Vasudha Talla, SBN 316219
Zoe Salzman, NY Reg. No. 4663308*
Vivake Prasad, NY Reg. No. 5669569*
Bianca Herlitz-Ferguson, NY Reg. No. 6164214*
600 Fifth Avenue, 10th Floor
New York, NY 10020
Telephone: (212) 763-5000
vtalla@ecbawm.com
zsalzman@ecbawm.com
vprasad@ecbawm.com
bherlitz-ferguson@ecbawm.com

ACLU FOUNDATION OF NORTHERN
CALIFORNIA
John Thomas H. Do, SBN 285075
William S. Freeman, SBN 82002
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
jdo@aclunc.org
wfreeman@aclunc.org

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY
AREA
Nisha Kashyap, SBN 301934
Andrew Ntim, SBN 347084
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
nkashyap@lccrsf.org
antim@lccrsf.org

*Attorneys for Plaintiffs*
*\* admitted pro hac vice*