**<u>REDACTED</u>**

**EXHIBIT 3**

**TO**

**DECLARATION OF STEVEN MILLS IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**PROVISIONALLY FILED UNDER SEAL PURSUANT TO INTERIM
ADMINISTRATIVE MOTION TO SEAL**

1

1                  UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3        - - - - - - - - - - - - - - - - - -

4    COALITION ON HOMELESSNESS; TORO   )

5    CASTANO; SARAH CRONK; JOSHUA      )

6    DONOHOE; MOLIQUE FRANK; DAVID     )

7    MARTINEZ; TERESA SANDOVAL;        )

8    NATHANIEL VAUGHN,                 )

9              Plaintiffs,             ) CASE NO.

10   v.                                ) 4:22-cv-05502-DMR(LJC)

11   CITY AND COUNTY OF                )

12   SAN FRANCISCO, et al.,            )

13              Defendants.            )

14       - - - - - - - - - - - - - - - - - -

15

16         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

17                PURSUANT TO PROTECTIVE ORDER

18         VIDEOTAPED DEPOSITION OF SARAH A. CRONK

19                MONDAY, SEPTEMBER 23, 2024

20

21          BEHMKE REPORTING AND VIDEO SERVICES, INC.

22              BY:  MARY J. GOFF, CSR NO. 13427

23              550 CALIFORNIA STREET, SUITE 820

24              SAN FRANCISCO, CALIFORNIA  94104

25                            (415) 597-5600

2

1

2

3

4

5

6

7

8          Videotaped deposition of SARAH A. CRONK,

9   taken on behalf of Defendants, at Lawyers'

10  Committee for Civil Rights of the San Francisco Bay

11  Area, 131 Steuart Street, Suite 400, San Francisco,

12  California, commencing at 10:09 A.M., MONDAY,

13  SEPTEMBER 23, 2024, before Mary J. Goff, California

14  Certified Shorthand Reporter No. 13427 and WA CSR

15  No. 21030779, pursuant to Notice.

16

17

18

19

20

21

22

23

24

25

3

1    APPEARANCES OF COUNSEL:

2    FOR PLAINTIFFS:

3        LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE

4        SAN FRANCISCO BAY AREA, CCRSF

5        BY:  ANDREW NTIM, ATTORNEY AT LAW

6        131 Steuart Street

7        Suite 4000

8        San Francisco, California  94105

9        Telephone:  (415) 543-9444

10        Email:  antim@lccrsf.org

11

12    - AND -

13        ACLU FOUNDATION OF NORTHERN CALIFORNIA

14        BY:  WILLIAM S. FREEMAN, ATTORNEY AT LAW

15        39 Drumm Street

16        San Francisco, California  94111

17        Telephone:  (415)-621-2493

18        Email:  wfreeman@aclunc.org

19

20

21

22

23

24

25

4

1    APPEARANCES OF COUNSEL (CONTINUED):

2    FOR DEFENDANTS:

3        OFFICE OF THE CITY ATTORNEY

4        BY:  STEVEN MILLS, ATTORNEY AT LAW

5             KAITLYN MURPHY, ATTORNEY AT LAW

6        1390 Market Street

7        Sixth Floor

8        San Francisco, California  94102

9        Telephone:  (415) 355-3304

10        Email:  steven.mills@sfcityattry.org

11                kaitlyn.murphy@sfcityattry.org

12

13    ALSO PRESENT:

14        VINNY BEZERRA, VIDEOGRAPHER

15

16

17

18

19

20

21

22

23

24

25

54

1   The time now is 11:21 a.m.  We are back on the

2   record.

3              ATTORNEY MILLS:  All right.  We're back on

4   the record.  I just wanted to clarify that off the

5   record we discussed that the company's name for --

6   was "Assurance Wireless" and not "Insurance

7   Wireless."

8              So, Ms. Cronk, to the extent that I was

9   inadvertently referring to it as "Insurance

10  Wireless," did you understand that we were talking

11  about the same business?

12      A    Yes, I did.

13      Q    Thank you so much for the clarification.

14              So, Ms. Cronk, what's your current housing

15  status?

16      A    I am in transitional housing.

17      Q    Okay.  And where are you in transitional

18  housing?

19      A    At Hamilton House.

20      Q    And is there a length of stay requirement

21  that you're subjected to at Hamilton House?

22      A    Yes.  You only get two years.

23      Q    And how long have you been at Hamilton

24  House?

25      A    Since December of last year.

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

55

```
1        Q      And in transitional housing, is the
2   understanding that you look for permanent housing
3   solutions?
4        A      Yes.
5        Q      And are you actively looking for permanent
6   housing solutions?
7        A      I have found permanent housing.
8        Q      Okay.   And where have you found permanent
9   housing?
10        A      At Parkmerced Apartments.
11        Q      When do you expect to move into the
12   Parkmerced Apartments?
13        A      At the beginning of October.
14        Q      And will that be subsidized by the City?
15        A      Yes.
16        Q      And do you know how much of the rent at
17   Parkmerced will be subsidized by the City?
18        A      Whatever is left over after I pay the
19   30 percent portion of my income.
20        Q      And do you have a job lined up for when
21   you move into Parkmerced?
22        A      I do not.
23        Q      And are you actively looking for
24   employment?
25        A      No.
```

57

1      Q      And where is he working?

2      A      He is working -- he is a full-time sheet

3   metal worker.

4      Q      And do you know what company he is a sheet

5   metal worker for?

6      A      Fertado Heating and Air.

7      Q      And do you happen to know how to spell

8   Fertado?

9      A      I believe it's F-E-R-T-A-D-O.

10     Q      And do you know how long Mr. Donohoe has

11  been there?

12     A      About three months.

13     Q      Do you know how much Mr. Donohoe makes a

14  month?

15     A      About 2,800.

16     Q      With Mr. Donohoe's income, will you be

17  able to afford the 30 percent that you have to pay

18  at Parkmerced?

19     A      Yes.

20     Q      And is your expectation that you'll still

21  obtain employment in addition to Mr. Donohoe's

22  source of income with Fertado Heating?

23     A      Hopefully.

24     Q      Are you getting any other type of

25  assistance at the moment?

1       A      No.

2       Q      -- also CAAP?

3       A      No.

4       Q      Okay.  Are you still getting any SSI?

5       A      No.

6       Q      What about, like, Medicare?  Is anybody

7   providing you benefits for Medicare?

8       A      No.

9       Q      Medi-Cal?

10      A      Yes.

11      Q      Do you have any -- outside of kind of a

12  formal employer, do you do anything to kind of

13  generate revenue -- revenue for yourself?  Any type

14  of money to spend on, you know, food and things of

15  that nature?

16      A      No.

17      Q      So is it fair to say that for finances,

18  you primarily rely upon Mr. Donohoe and, like, the

19  benefits that you are receiving right --

20      A      Yes.

21      Q      -- now?

22             Do you consider yourself to be homeless?

23      A      No.

24      Q      When did you stop considering yourself

25  being homeless?

1       A       In December of last year.

2       Q       And why did you stop considering yourself

3  homeless in December of last year?

4       A       Because my family was accepted into

5  transitional housing.

6       Q       So have you been in transitional housing

7  since December of 2022 through -- through the

8  present?

9               ATTORNEY FREEMAN:    Excuse me.    You said

10  "2022."

11              ATTORNEY MILLS:    Sorry.

12              ATTORNEY FREEMAN:    Last year was 2023.

13      Q       (BY ATTORNEY MILLS) Yeah.    Correct that.

14  2023.   Sorry.

15      A       Yes.

16      Q       Have there been any lapses in the

17  transitional housing since you enrolled?

18      A       No.

19      Q       Have you ever intentionally lived on the

20  street in San Francisco even though you could have

21  stayed somewhere else like with a friend or a family

22  member?

23      A       No.

24      Q       And do you speak any other languages in

25  addition to English?

61

1         A     No.

2         Q     Do you have any difficulties reading,

3    writing, or understanding English?

4         A     No.

5         Q     Are you familiar with what a government

6    claim is?

7         A     I can infer.

8         Q     So if -- what would you infer to be the

9    meaning of "government claim"?

10        A     Well, actually, if you could just tell me,

11   that would be better.

12        Q     So the City has a process where you can

13   submit a Government Claim Form for injuries that you

14   may have experienced caused by the City or any of

15   the City's employees.

16              Have you ever filed a claim for that to

17   seek compensation from the City --

18        A     No.

19        Q     -- for any type of injury?

20              Are you familiar with -- prior to my

21   explanation of what a government claim is, did you

22   have any kind of independent understanding that that

23   was a process?

24        A     Yes.

25        Q     And when did you learn about kind of the

1   government claims process?

2        A     I don't know.

3        Q     Do you know if you filed a government

4   claim in connection with any of your property being

5   taken with encampment resolutions?

6        A     Yes.

7        Q     Is it -- did you file a government claim?

8        A     Oh, is that -- that's not the same as

9   this -- no.   No.

10        Q     No government claim?

11        A     Hum-um.

12        Q     Okay.   Yeah.   So separate from the lawsuit

13   --

14        A     Yeah, okay --

15        Q     -- what --

16        A     -- yeah.

17        Q     -- did you file any type of --

18        A     No.

19        Q     -- okay.

20              And like I said, if there's any question

21   that's confusing, we don't want speculation.   And if

22   I can clarify, that's my job, so let me --

23        A     Right.

24        Q     -- let me know.   So I don't want to

25   confuse anybody.

78

1        Q    So is it your testimony that despite this
2    document, you weren't getting any CAAP benefits in
3    2022?
4        A    Yes.
5        Q    All right.  We can go ahead and set that
6    document aside.  Thank you.
7             Ms. Cronk, did you ever apply for a PPP
8    loan, also known as a Paycheck Protection Program
9    loan?
10        A    No.
11        Q    Are you aware that there are certain
12    nonprofit organizations in San Francisco that
13    San Francisco partners with that provide city
14    storage for items such as clothes or legal documents
15    for --
16        A    I --
17        Q    -- homeless individuals?
18        A    -- I have heard of it recently, but just
19    word of mouth.
20        Q    And when did you recently hear about that?
21        A    Maybe a couple of months ago.
22        Q    So prior to a few months ago, did you know
23    that there was homeless storage available for
24    individuals in San Francisco?
25        A    I did not.

1      Q     So is it fair to say you never used

2    homeless storage that was partnered -- or provided

3    by the City and San Francisco?

4      A     Yes.

5      Q     As far as storage goes of belongings, did

6    you ever pool resources with any other unhoused

7    individuals to have a storage unit?

8      A     No.

9      Q     Did you ever seek out opportunities to

10   have items stored with any family or friends in

11   San Francisco?

12     A     I don't have any family in San Francisco.

13   I -- no.

14     Q     In San Francisco, where would you

15   typically leave your belongings?

16     A     Typically I would -- I would carry them on

17   my back depending on how many items I had.  If not,

18   I would try to put them in a location where they

19   would be out of the way.

20     Q     And what items would you typically carry

21   on your back with you?

22     A     Sometimes a tent to sleep in it -- to

23   sleep with at night, clothes food, bathing supplies.

24   Things of that nature.  A sleeping bag.

25     Q     What about legal documents like benefit

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

1   "Plaintiffs' Supplemental response to Defendants'

2   First Set of Interrogatories."

3           Again, is that your name at the top?

4   A     Yes.

5   Q     And is that your signature at the bottom?

6   A     Yes.

7   Q     And was it executed on September 5, 2024?

8   A     Yes.

9   Q     Have you seen this document before?

10  A     Yes.

11  Q     And did you sign this document in

12  connection with the responses that you just reviewed

13  at Exhibit 4?

14  A     Yes.

15  Q     Okay.  Thank you.

16          So, Ms. Cronk, was it your understanding

17  that you were verifying those responses under oath

18  when you signed the verification pages?

19  A     Yes.

20  Q     And that's the same oath that you took to

21  tell today?

22  A     Yes.

23  Q     And when you were signing that document,

24  did you understand that it was important to give

25  accurate information when you submitted those

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

85

1    discovery responses?

2        A    Yes.

3        Q    And did you get -- do your best to give

4    accurate answers when you verified those discovery

5    responses?

6        A    Yes.

7        Q    And did you know that you needed to be

8    complete in your discovery responses?

9        A    Yes.

10        Q    And did you do your best to be complete in

11    providing your discovery responses?

12        A    Yes.

13        Q    Thank you.

14            And, Ms. Cronk, what types of personal

15    devices do you have?

16        A    I have a phone and a tablet.

17        Q    And how long have you had that phone?

18        A    About a year.

19        Q    And what kind of phone do you have?

20        A    I don't know what kind of phone I have.

21    A -- something "1."  An Android phone.

22        Q    And did you purchase that phone for

23    yourself or were you able to obtain it using

24    benefits?

25        A    Actually, it was a -- it was a gift.

1       A     Can you repeat the question?  I'm sorry.

2       Q     Yeah.

3             So what are your views of the -- personal

4    views of the Coalition on Homelessness?

5       A     I think they're amazing.  I think they're

6    a very important organization.

7             I have -- I'm very grateful to them for

8    the work that they do to help people that have been

9    in the situations that I have been in.  And I think

10   they're great.

11      Q     And are you aware that the Coalition on

12   Homelessness includes individuals that are housed in

13   their leadership?

14      A     Yes.

15      Q     Has the Coalition on Homelessness ever

16   offered you services personally?

17      A     No.

18      Q     Have you ever been to the Coalition on

19   Homelessness' office?

20      A     Yes.

21      Q     And what would you do when you would go to

22   the Coalition on Homelessness' office?

23      A     Just speak to people.

24      Q     And when do you think you first went to

25   their office?

1      A     Probably around 2015 or so.

2      Q     And with what frequency do you think you

3  would go to Coalition on Homelessness' office in a

4  given year?

5      A     Probably once.

6      Q     Has Coalition ever given you a tent?

7      A     I don't remember.

8      Q     Have they ever given you like a cart to

9  push or move your belongings?

10     A     No.

11     Q     Have they ever offered you storage for

12  your personal belongings?

13     A     No.

14     Q     Have you ever gotten, like, Know Your

15  Rights info from Coalition on Homelessness?

16     A     Yes.

17     Q     And what can you tell me about that

18  information that you have gotten with respect to

19  Know Your Rights?

20     A     I don't know if I understand the question.

21     Q     So would Coalition on Homelessness give

22  you, like, a flyer that would say:  Know Your

23  Rights?

24     A     Yes.

25     Q     When do you think you first saw a flyer

96

1    from Coalition about knowing your rights?

2        A    Probably around the same time I found out

3    about them.

4        Q    So fair to say sometime around 2011?

5        A    Yeah.

6        Q    And how often do you think you would see

7    documents like that reminding you of what your

8    rights were from Coalition on Homelessness?

9        A    Pretty frequently.  Maybe every few months

10   or so.  But of course while I was in the City.

11       Q    Okay.  Have you ever asked for services

12   from Coalition on Homelessness that were declined?

13       A    No.

14       Q    Have you ever worked for the Coalition on

15   Homelessness as either an employee or an independent

16   contractor?

17       A    No.

18       Q    Have you ever been a volunteer with the

19   Coalition on Homelessness?

20       A    Not officially.

21       Q    Okay.  Well, what about unofficially?

22   Have you been a volunteer with the Coalition on

23   Homelessness?

24       A    Sure.

25       Q    And when was that?

1      A    I would say that was around the pandemic,

2  2 -- after 2020.

3      Q    And what did your volunteer activities

4  with the Coalition on Homelessness involve?

5      A    I would -- I have given out food,

6  distributed socks, spare sleeping bags, just had

7  conversations with people about what services are

8  available to them and tried to help my fellow person

9  who was outside.

10     Q    Have you ever gotten a sleeping bag from

11 Coalition on Homelessness?

12     A    Um-hum.

13     Q    How many sleeping bags have you gotten

14 from the Coalition on Homelessness?

15     A    I believe two.

16     Q    Okay.  And how many hours would you say

17 you have spent volunteering with the Coalition on

18 Homelessness?

19          ATTORNEY NTIM:  Objection.  Vague as to

20 time.

21          ATTORNEY MILLS:  And I just want to

22 clarify, because we have had two objecting

23 attorneys.

24          Which attorney is the speaking attorney

25 for the record?

98

```
 1              ATTORNEY NTIM:   I'm the primary speaking
 2    attorney.
 3              ATTORNEY MILLS:   Okay.   Thank you.
 4              ATTORNEY FREEMAN:   But I also think that
 5    as a matter of record, that any attorney can make an
 6    objection.
 7         A     Yeah, can you -- can you tell me, like,
 8    what timeline you're talking about?
 9         Q     (BY ATTORNEY MILLS) So in total, how many
10    hours do you think you have spent volunteering for
11    the Coalition on Homelessness?
12         A     In total?   Probably 200 hours.
13         Q     And when do you think those service hours
14    with Coalition on Homelessness started?
15         A     Around 2015-2016.
16         Q     Did you ever receive any type of training
17    from the Coalition on Homelessness?
18         A     No.
19         Q     Are there other organizations that you
20    volunteered with in the past five years other than
21    Coalition on Homelessness as far as, like,
22    homelessness issues are concerned?
23         A     No.
24         Q     Have you ever been a member of the
25    Coalition on Homelessness?
```

1       A       Yes.

2       Q       And what is your understanding of what the

3  requirements are to be a member of the Coalition on

4  Homelessness?

5       A       I think the requirements are pretty loose.

6  I think it's that you are -- you stand up for the

7  rights of homelessness, try to advocate for the laws

8  in the City to change as far as how they treat

9  people on the street and with regard to treating

10  them with compassion and dignity.  Things of that

11  nature.  And also, just trying to help out whenever

12  possible.

13      Q       And do you have to pay any dues or

14  anything to be a member of the Coalition on

15  Homelessness?

16      A       No.

17      Q       Do you have to sign up formally to be a

18  member of the Coalition on Homelessness?

19      A       No.

20      Q       Did you do anything to sign up to become a

21  member of the Coalition on Homelessness?

22      A       No.

23      Q       Do you know if membership is limited to

24  being unhoused in San Francisco?

25      A       No, it's not.

1      Q    So does the Coalition on Homelessness

2  include members of other communities outside of

3  San Francisco?

4      A    Not that I know of.

5      Q    Does the Coalition on Homelessness include

6  members that are housed?

7      A    Yes.

8      Q    Are you aware of any documents that may

9  track the Coalition on Homelessness' members?

10      A    No.

11      Q    And when do you think, based off of your

12  own experience, you first became a member of the

13  Coalition on Homelessness?

14      A    2021.

15      Q    And do you know when in 2021?

16      A    No, I don't know exactly when.

17      Q    Okay.  And what made you think that you

18  were finally or officially a member of the Coalition

19  on Homelessness in 2021?

20      A    Doing specific volunteer work with the

21  people that I knew that were official members as

22  well.

23      Q    And who were those official members that

24  you were volunteering with?

25      A    I don't recall the names of -- I don't

1  recall the -- their exact names.

2      Q    Do they have nicknames that you can

3  recall?

4      A    One person, yes.

5      Q    And what's that name?

6      A    Cooper.

7      Q    Do you know if Cooper is still a member of

8  the Coalition on Homelessness?

9      A    Yes.

10     Q    Are you still in contact with Cooper?

11     A    Yes.

12     Q    Do you have Cooper's phone number?

13     A    Yes.

14     Q    Would you be able to provide Cooper's

15 phone number?

16     A    Yes.

17     Q    And do you have -- do you know if Cooper

18 has an email address?

19     A    I don't know it.

20     Q    How do you often communicate with Cooper?

21     A    Via text.

22     Q    Are there any other official members that

23 you know of?

24     A    I -- I can't give you any names.

25     Q    Do you know what rights you have as a

1    member of the Coalition on Homelessness?

2         A    As a member of the Coalition?

3         Q    Um-hum.   Correct.

4         A    Like as opposed to, like...

5         Q    As a self-identified member of the

6    Coalition on Homelessness, do you have any rights in

7    the organization?

8         A    I -- I don't really understand what...

9         Q    Do you get to vote on any Coalition

10   projects?

11        A    Oh, no.

12        Q    Do you get to decide where money gets

13   spent by Coalition?

14        A    No.

15        Q    Do you get to have a say in the causes

16   that Coalition wants to advance or proceed on?

17        A    Yes.

18        Q    And how do you end up getting to have a

19   voice in those projects?

20        A    By speaking to individuals, going to

21   committee meetings.   Things like that.

22        Q    Have you gone to any committee meetings?

23        A    I have not.

24        Q    Are you familiar with the Human Rights

25   Work Group?

1    A    I have heard of them.

2    Q    Have you been to that group?

3    A    No.

4    Q    What about the Housing Justice Work Group?

5    Have you been to that group?

6    A    No.

7    Q    Do you know if the Human Rights Work Group

8    is open to the public?

9    A    I believe so, yes.

10    Q    Do you know if attorneys are present at

11    those meetings?

12    A    I do not know.

13    Q    Based off of what you have heard about the

14    Human Rights Work Group meetings, do you know if

15    they're intended to be confidential?

16    A    I believe they are.

17    Q    Have you ever heard of anybody saying that

18    they had to sign an agreement with Coalition on

19    Homelessness to be a member or a participant?

20    A    No.

21    Q    Do you know when Coalition on Homelessness

22    started monitoring the City's destruction of

23    homeless people's property?

24    A    I'm not sure when it started.

25    Q    Do you have a rough idea of when it could

104

1   have started based off of your knowledge of the

2   Coalition on Homelessness?

3        A    I'm not sure when the organization formed,

4   but I'm sure it was pretty recently after the

5   formation.

6        Q    Okay.  So if I told you that the Coalition

7   on Homelessness knew that the City had been

8   destroying homeless people's property since at least

9   2016 and never brought a lawsuit, how does that make

10  you feel?

11            ATTORNEY NTIM:  Objection, calls for

12  speculation.

13       Q    (BY ATTORNEY MILLS) But you can answer.

14       A    Considering that I understand the

15  difficulties in putting together a lawsuit and

16  basically being ready to come at something that will

17  actually make a difference, I can understand why

18  they would have waited, so it doesn't -- it doesn't

19  make me feel anything in particular.

20       Q    Would you think that the homeless -- that

21  the Coalition on Homelessness was a good

22  representative of the homeless community in

23  San Francisco if they failed to bring a lawsuit,

24  knowing that the City was systematically destroying

25  property in violation of the Constitution?

133

134

135

136

137

1   very personal.  And the fact that you're sharing is

2   helpful for the client to understand, too, so thank

3   you for that.

4        A   No problem.

5        Q   I don't want that to get lost.

6         Do you think it would be difficult for a

7   worker from the Department of Public Works to go

8   into one of your tents and navigate around the red

9   hazard bin that was kept in there?

10       A   No.

11       ATTORNEY FREEMAN:  Objection, calls for

12   speculation.

13       Q   (BY ATTORNEY MILLS) With respect to kind

14   of homeless sweeps or encampment resolutions -- I

15   know that those terms can be used sometimes

16   interchangeably -- do you consider yourself an

17   abolitionist of those?

18       A   Yes.

19       Q   So do you ever think that there's an

20   instance where an encampment resolution is

21   appropriate?

22       A   I -- no.

23       Q   Have you ever seen a -- an encampment

24   resolution benefit somebody's life?

25       A   No.

1  to "lodge in any building, structure, vehicle, or

2  place, whether public or private, without the

3  permission of the owner or person entitled to the

4  possession or in control of it" prior to the lawsuit

5  being filed in September of 2022?

6        A    Yes.

7        Q    And what type of steps would you take to

8  conform your -- your conduct to that requirement?

9        A    I would not sleep in other people's cars

10  or go inside of spaces that were privately owned.

11             I would basically try to remain hidden

12  and -- on property that was -- that was basically

13  uninhabited.

14        Q    Do you know what the phrase "bag and tag"

15  means?

16        A    Yes.

17        Q    And what does that mean to you?

18        A    I believe that means that if a City worker

19  is going to confiscate people's belongings off of

20  the street, that they need to put them in bags, tag

21  them so that they can find -- find the exact

22  property and bring it to a designated location where

23  the person is able to retrieve their property.

24        Q    Okay.  And setting aside any conversations

25  that you may have had with counsel, when did you

1    become -- first become familiar with that concept of

2    bagging and tagging, as you described it?

3        A    When I first -- the first time I heard

4    about it was through this lawsuit, actually.

5        Q    Okay.  So have you ever read the City's

6    Bag and Tag policy?

7        A    No.

8        Q    Has anyone ever told you about -- aside

9    from any conversations with your counsel, has

10   anybody on the street ever told you about the

11   contents of the City's Bag and Tag policy?

12       A    I was -- I was told by a friend that they

13   were supposedly supposed to be bagging and tagging.

14       Q    But has anybody ever instructed you on how

15   to comply with the Bag and Tag policy requirements

16   if you were to be leaving any property on the

17   street?

18            And again, that's outside of any

19   conversations that you had with counsel.

20       A    No.

21       Q    Okay.  Did anybody from Coalition on

22   Homelessness ever tell you how to bag -- or how to

23   store your property on public sidewalks to avoid it

24   being bagged and tagged?

25       A    To avoid it being?

154

1       Q    To avoid it being bagged and tagged.

2       A    Can you -- I'm sorry.   Can you rephrase

3    that or --

4       Q    Yeah.

5       A    -- restate it?

6       Q    We'll take a step back.

7            Have you had any conversations with

8    Coalition on Homelessness about the Bag and Tag

9    requirements?

10      A    No.

11      Q    Do you have any recollection of, like,

12   nonprofit organizations coming out to the streets

13   and telling unhoused individuals how to pack their

14   belongings to avoid it potentially being bagged and

15   tagged?

16      A    No.

17      Q    So outside of the context of this

18   litigation, is it fair to say that you had no

19   understanding of what the City's Bag and Tag policy

20   was?

21      A    Yes.

22      Q    And have you ever read that Bag and Tag

23   policy?

24      A    I have not.

25           Is it possible we could take a short

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

1          So before we went on the break we were

2    talking about the City's Bag and Tag policy.

3          Do you have any knowledge of the

4    Department of Public Works' policies with respect to

5    storing property at the yard?

6      A    No.

7      Q    Have you ever tried to go to the DPW yard

8    to see if they had property of yours that may have

9    been collected on a street?

10     A    No.

11     Q    Have you ever spoken with anybody else

12   about filing government claims against the City for

13   property destruction allegations?

14     A    No.

15     Q    Are you familiar with the small claims

16   process of bringing a small claims action against

17   the City in a court -- in a state court?

18     A    Vaguely.

19     Q    And have you spoken with anybody about

20   bringing a small claims action against the City in a

21   state court?

22     A    No.

23     Q    What is your vague kind of recollection --

24   or understanding of what the small claims process

25   is?

1      A    I might be totally wrong on this, but I

2  think it's -- it's definitely under a certain limit.

3  It's -- if I remember correctly, it's like anything

4  under $5,000 you can claim in small claims.  And

5  that's -- that's pretty much it.

6      Q    And did you ever try to bring a small

7  claims action against the City for property that may

8  have been destroyed since you have experienced

9  homelessness in San Francisco?

10     A    I have not.

11     Q    Did you ever think about filing a small

12 claims action against the City for property

13 destruction that you may have experienced in the

14 times that you have been homelessness?

15     A    I thought about it.

16     Q    And why didn't you end up filing any small

17 claims action?

18     A    I didn't believe it would go anywhere.

19     Q    To the extent that you are presently

20 housed, do you fear that your property is going to

21 be destroyed by the City?

22     A    No.

23     Q    To the extent that you are presently

24 housed, do you feel fear that you are going to be

25 exposed to extreme whether that would jeopardize

1   your health because of City conduct?

2        A    No.

3        Q    Do you intend to be homelessness in

4   San Francisco again in the near future?

5        A    No.

6        Q    Where -- if you were homelessness in

7   San Francisco, would you pack your property and move

8   if you received notice of an encampment resolution?

9        A    Yes.

10        Q    And where would you move?

11        A    I don't know.

12        Q    And if your property was taken, would you

13   go to the DPW yard to try to pick that property back

14   up?

15        A    Yes.

16        Q    Do you think that you could avoid or

17   mitigate any risk of future injury by losing your

18   property if you tried to avoid encampment

19   resolutions in the first place?

20        A    I'm sorry.  Can you -- can you please

21   restate that?

22        Q    Yeah.

23             Do you agree that you would be able to

24   mitigate any risk of future injury that your

25   property would be stolen by trying to avoid

1   encampment resolutions in the first place?

2           ATTORNEY FREEMAN:   Objection, calls for a

3   legal conclusion.

4       Q    (BY ATTORNEY MILLS) You can answer to the

5   extent...

6       A    Yes.

7       Q    And are you aware that your current

8   lawsuit against the City is not requesting monetary

9   compensation for your injuries?

10      A    One more time.  I'm sorry.

11      Q    Are you aware that your current lawsuit

12  against the City is not requesting monetary

13  compensation for your injuries?

14      A    No.

15      Q    And why are you not seeking monetary

16  compensation for your injuries?

17      A    Because that's not my motivation for doing

18  this.

19      Q    And what's your motivation?

20      A    My motivation is for policies to change

21  and for the City to treat us homeless residents with

22  more respect and dignity and also treat their

23  belongings with respect and not take them from them

24  anymore.

25      Q    And do you agree that you have never tried

160

1    to seek monetary compensation against the City for

2    any property destruction that you may have

3    experienced in the past?

4        A    Yes.

5        Q    In your experience being homelessness in

6    San Francisco, do unhoused have conversations about

7    how to avoid their property being thrown away --

8             ATTORNEY NTIM:  Objection --

9        Q    (BY ATTORNEY MILLS) -- by the City?

10            ATTORNEY NTIM:  -- objection, calls for

11   speculation.

12       A    Yes.

13       Q    (BY ATTORNEY MILLS) And what have those

14   conversations been like?

15       A    Kind of hopeless.  Basically we kind of

16   talk about the fact that there's not really a way to

17   avoid it happen -- from happening very easily.

18       Q    Have you talked about practices to avoid

19   the property destruction in the first place?

20       A    Yes.

21       Q    And what type of practices have been

22   discussed that would allow individuals to avoid

23   property destruction?

24       A    It doesn't necessarily work.  We talk

25   about the fact that it helps to keep your property

1    clean and tidy and out of -- and just out of the way

2    of people who are walking and moving.

3         Q    And to the best of your recollection, when

4    do you think you first kind of heard that guidance

5    about trying to keep property clean and tidy up?

6         A    Are you looking for, like, a year?

7         Q    Yeah.  Just your best estimate.

8         A    Let's say like 2013.

9         Q    Based on your experience, do you think

10   that property destruction has been an issue since

11   2013?

12        A    Yes.

13        Q    Since 2013, have you taken any personal

14   steps to kind of create the policy changes that you

15   were talking about earlier with respect to the

16   City's destruction of unhoused people's belongings?

17        A    No.

18        Q    Have you ever gone to a city hall

19   meeting -- town hall meeting?

20        A    No.

21        Q    Have you ever submitted a complaint or a

22   letter to the City saying that property destruction

23   violates people's rights?

24        A    I have not.

25        Q    So is it fair to say that this lawsuit is

1    your first stance against the City with trying to

2    effect the policy changes that we discussed?

3        A    Yes.

4        Q    So in addition to keeping property clean

5    and tidy, are there any other kind of tips that are

6    circulated amongst the unhoused population about how

7    to avoid their property being destroyed in the first

8    place?

9        A    Just being respectful of the neighborhood

10   and the people in the community that live nearby,

11   not making a lot of noise.  Just basically trying to

12   stay on notice and as out of the way as possible.

13            ATTORNEY MILLS:  Do we need to go off the

14   record?

15            THE COURT STENOGRAPHER:  No.

16            ATTORNEY MILLS:  Okay.  Sorry.

17       Q    (BY ATTORNEY MILLS) Does the unhoused

18   community have conversations about areas that are

19   hotspots for City property destruction and that

20   those areas should be avoided?

21            ATTORNEY NTIM:  Objection, calls for

22   speculation.

23       A    Yes.

24       Q    (BY ATTORNEY MILLS) And what are those

25   conversations?  What do they typically entail?

219

1      Q    Any camping -- cooking equipment?

2      A    No.

3      Q    Had you spilled any art supplies in the

4   tent leading up to the incident in September of

5   2022?

6      A    No.

7      Q    How would you describe the condition of

8   your tent?

9      A    Kind of old.

10     Q    How old?

11     A    It -- it was -- a friend had given it to

12  us because we -- because our other one -- we didn't

13  have -- we had to get rid of the one before that.

14          So it -- it was previously used, so it may

15  have been a little bit dingy, but it did not have

16  any holes.  It -- the zipper worked.  Everything

17  worked properly.

18     Q    Did you report this incident to anybody?

19     A    No.

20     Q    Did you receive notice prior to the

21  resolution?

22     A    No.

23     Q    Were you given time on the day of to move

24  certain belongings?

25     A    Yes.

1     Q    How much time were you given?

2     A    A few hours.

3     Q    And did you use the few hours to move

4 belongings?

5     A    We were -- we were actually attempting to

6 see if they would offer us shelter, so we were -- we

7 were waiting before we -- we did any moving.

8     Q    So is the answer that -- no, you didn't

9 try to actually pack or move any of the belongings?

10    A    No.

11    Q    Did you get shelter that day?

12    A    No.

13    Q    Did you document anything around that

14 incident?

15    A    No.

16    Q    Any other instances in 2022?

17    A    No.

18    Q    Okay.  So I'm going to mark -- well, does

19 anybody want a break?  Do you need a little break?

20    A    Sure.  Yeah.

21         ATTORNEY MILLS:  We'll go off the record

22 at 3:52 p.m.

23         THE VIDEOGRAPHER:  This is the end of

24 Media Number 5.  We are off the record at 3:52 p.m.

25         (A break was taken from 3:52 p.m. to

221

1   4:05 p.m.)

2          THE VIDEOGRAPHER:  This is the beginning

3   of Media Number 6.  Sorry.  Something just shut off.

4   Sorry.  Second time today.  Sorry about.  I'm going

5   to restart.

6          This is the beginning of Media Number 6 of

7   the deposition of Sarah Cronk.  The time now is

8   4:05 p.m., and we are back on the record.

9      Q    (BY ATTORNEY MILLS) All right.  Thank you.

10  Ms. Cronk, I am going to move to mark just the next

11  exhibit, which is going to be Exhibit 6.  So I will

12  give you a copy of that.

13          (Exhibit 6 was marked for identification

14  and is attached to the transcript.)

15      Q    (BY ATTORNEY MILLS) Ms. Cronk, are you

16  familiar with Google Street View?

17      A    Yes.

18      Q    And have you ever looked at Google Street

19  View to see if you were captured on it with any of

20  your encampments or campsites?

21      A    No, I haven't.

22      Q    Okay.  So I'll represent that Exhibit 6 is

23  a copy of a street image from August 2022 next to

24  the Target on 13th and Folsom Street.

25          So if you want to you take a moment to

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

1    flip through the three pages.  And let me know when

2    you're done.

3         A    Yes, I'm done.

4         Q    So, Ms. Cronk, is this the area where you

5    were generally staying at when you would stay next

6    to the Target location?

7         A    Yes.

8         Q    And earlier when you testified about kind

9    of a divider where tents could be placed that may or

10   may not be a sidewalk, is the divider reflected on

11   page 1?

12        A    Yes.

13        Q    Okay.  And is that where the tents are

14   placed?

15        A    Yes.

16        Q    And, Ms. Cronk, when you looked at the

17   photos, did this refresh your recollection of any of

18   the conditions of a campsite that you may have been

19   staying in at some point in August of 2022?

20        A    Yes.

21        Q    And do you know roughly when this would

22   have been in August of 2022?

23        A    Probably the whole month of August.

24        Q    And, Ms. Cronk, have -- having flipped

25   through the three pages, did you see your campsite

223

1    anywhere in the photographs?

2        A    Yes.

3        Q    Sorry.  What was the answer?

4        A    Yes.

5        Q    And, Ms. Cronk, which page are you looking

6    at where you see your -- your encampment?

7        A    I am looking at the second page.

8        Q    So, Ms. Cronk, I'm going to hand you a red

9    pen.  And if you could mark on the exhibit with the

10   pen where the encampment is.

11       A    (Complied.)

12       Q    And then can you please hold up the

13   photograph for the video?

14       A    (Complied.)

15       Q    And did you circle the tent with a green

16   top?

17       A    Yes.

18       Q    Okay.  And, Ms. Cronk, how do you know

19   that that's your tent?

20       A    I remember.

21       Q    And do you know how long you had this

22   tent?

23       A    I had that tent for a couple of months.

24       Q    And do you know who the tent is

25   immediately next to you on the right side?

1    up with what looks like some kind of white sheep --

2    or sorry -- white sheep or tarp hanging out, do you

3    know what this structure is?

4         A    No.

5         Q    Would this reflect the shower that you

6    were referring to earlier?

7         A    No.

8         Q    And, Ms. Cronk, in the tent that you

9    circled, is -- were you staying with Mr. Donohoe in

10   that tent?

11        A    Yes.

12        Q    And, Ms. Cronk, do you know what items are

13   in the gutter below your tent?

14        A    It looks to be some -- some cans, maybe

15   paper towels.  I'm not sure exactly.

16        Q    And are those your cans and paper towels?

17        A    No, sir.

18        Q    And did you always stay next to this

19   pillar when you were living behind the Target on

20   13th and Folsom?

21        A    No.

22        Q    So would you move up and down the street

23   on that -- in that -- that location?

24        A    Yes.

25        Q    Do you know how long the tent existed that

1    you circled in that location?

2         A    A few months.

3         Q    Is this what your tent looked like in

4    September of 2022?

5         A    No.

6         Q    And what was different?

7         A    It -- in September of 2022, if I remember

8    correctly, I think we had a different tent with the

9    same tarp over it and it was a little bit smaller.

10        Q    Is it common to change tents as a person

11   experiencing homelessness on the streets of

12   San Francisco?

13        A    Yes.

14        Q    Like how often would you typically change

15   out your tent?

16        A    Every couple of weeks to every couple of

17   months.

18        Q    And would you have to buy them yourself or

19   are you able to access tents for free through

20   various organizations that may provide them?

21        A    There were a few organizations that would

22   provide tents sometimes, if they had them, but most

23   of the time we would have to buy them.

24        Q    And do you know what organizations

25   provided tents in 2022?

1     A     Maybe about 2 feet of space.

2     Q     And was there a roadway in front of that

3  2 feet of space?

4     A     It was sort of a road -- I -- I don't

5  really -- it was kind of like a parking lot area

6  that people would put cars behind sometimes.  It

7  wasn't a road.

8     Q     And was that kind of roadway used by the

9  community here for additional storage space?

10    A     No.

11    Q     And, Ms. Cronk, if we turn to page 3,

12 is -- the green tent in the right-hand corner, is

13 that your tent as well?

14    A     Yes.

15    Q     And it looks like to the left side of that

16 tent there may be some clear plastic containers.

17           Do you know what that item is?

18    A     Clear plastic containers?

19    Q     Yeah.

20           Do you know what the object is that's on

21 the left side of the tent in between the tent and

22 the pillar?

23    A     There was a leather bag -- two leather

24 bags.  And I'm not sure what the -- the black item

25 right there is.

1      Q    Okay.  And in front of -- immediately in

2    front of that in between what looks like a little

3    red car and that item on the ground, is there a cart

4    with items?

5      A    Yes.

6      Q    And was that your cart with items?

7      A    No.

8      Q    And did the street look like this from --

9    in June of 2022 as well?

10     A    Yes.

11     Q    Thank you, Ms. Cronk.

12          ATTORNEY NTIM:  Before we move on from

13    this item, can I ask if it was produced in the

14    litigation so far?

15          ATTORNEY MILLS:  It has not been yet.

16          ATTORNEY MURPHY:  Well, it's publicly

17    available.

18          ATTORNEY MILLS:  It's publicly available?

19          ATTORNEY MURPHY:  Yeah.

20          ATTORNEY NTIM:  Okay.

21     Q    (BY ATTORNEY MILLS) All right.  All right.

22    Ms. Cronk, I'm going to mark the next exhibit, which

23    is going to be Exhibit 7.

24          (Exhibit 7 was marked for identification

25    and is attached to the transcript.)

239

1       A    Oh, I don't think so, no.

2       Q    Do you know if other people were placed

3   into shelter on that rainy day in January?

4       A    I don't know.

5       Q    Do you know if there was any kind of

6   emergency shelter available to individuals because

7   of the rain?

8       A    Not that I know of.

9       Q    And now that you have your transitional

10  housing, do you continue to store property on the

11  street at all in San Francisco?

12      A    No.

13      Q    Do you have any intent to do so?

14      A    No.

15      Q    So, Ms. Cronk, I'm going to mark the next

16  exhibit, which is going to be Exhibit 9.

17           (Exhibit 9 was marked for identification

18  and is attached to the transcript.)

19      Q    (BY ATTORNEY MILLS) And I will represent

20  that this is a photo pulled from a 311 complaint

21  from September 11, 2022.

22           ATTORNEY MILLS:  And all of the 311

23  complaints are being produced in the course of

24  discovery.

25           ATTORNEY FREEMAN:  Are being -- have been

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

1  tanks there were in that area in September of 2022?

2      A    I would only be able to guess.

3      Q    Do you have a best estimate based off of

4  how many propane tanks you may have personally seen

5  in that area?

6      A    Maybe three or four.

7      Q    Do you happen to know who owned these

8  propane tanks in this photo?

9      A    No.

10     Q    Do you happen to know whose campsite that

11 is in the photograph?

12     A    No.

13     Q    And you didn't have any propane tanks --

14     A    No, I didn't.

15     Q    -- in September of 2022?

16     A    No, I did not.

17     Q    So, Ms. Cronk, I'm going to mark the next

18 exhibit, which is going to be Exhibit 10.

19          (Exhibit 10 was marked for identification

20 and is attached to the transcript.)

21     Q    (BY ATTORNEY MILLS) And I will represent

22 that this is another 311 photograph associated with

23 the complaint from September 14, 2022.  The same

24 issue.  The same file.

25          And, Ms. Cronk, if you could go ahead and

242

```
1    take a look at the photograph.  And let me know when

2    you're done?

3         A    Yes, I'm done.

4         Q    Ms. Cronk, do you see your campsite in

5    this photograph?

6         A    Yes.

7         Q    And, Ms. Cronk, do you still have the red

8    pen?

9         A    Yes.

10        Q    Can you circle for me where you see your

11   campsite in the photograph?

12        A    Oh, it's not working.

13        Q    Here.  Let's try this orange highlighter.

14   Here.  Sorry.  I'll keep it closed.

15        A    (Complied.)

16        Q    And then, Ms. Cronk, would you mind

17   holding up the photograph so we can see where you

18   circled.

19        A    (Complied.)

20        Q    And, Ms. Cronk, where did you apply the

21   circle in Exhibit 10?

22        A    The very first tent pictured, the green

23   tent.

24        Q    Okay.  And, Ms. Cronk, how do you know

25   that that's your tent in the bottom left-hand
```

243

1    corner?

2        A    I recognize it.

3        Q    Is there anything distinctive about the

4    tent that refreshes your recollection?

5        A    Yes.  The green rain fly.

6        Q    And, Ms. Cronk, it looks like immediately

7    adjacent there may be a black kind of storage

8    container on the ground.

9             Is that your black storage container?

10       A    No.

11       Q    Do you know whose storage container that

12   is?

13       A    No.

14       Q    And, Ms. Cronk, do you know whose items

15   those are in front of the tent in the roadway

16   between the tent and Target?

17       A    Where are you talking about?  Like,

18   directly in front of the tent?

19       Q    Yeah.  It looks like there may be

20   something black next to a white item.

21       A    I'm not sure.

22       Q    Ms. Cronk, do you happen to see yourself

23   in this photograph?

24       A    No.

25       Q    Okay.  Ms. Cronk, do you happen to know

1    who the person is that's holding the palette?

2         A    No.

3         Q    Do you happen to know if that was an

4    encampment that was set up next to Target's door?

5         A    There were no encampments by the Target

6    door.

7         Q    And, Ms. Cronk, how long did you have this

8    tent in September?

9         A    A few months.

10        Q    And then do you know how much longer into

11   September you had the tent?

12        A    Probably until December.

13        Q    And, Ms. Cronk, do you see any 2-foot

14   clearance in front of the tent between that roadway

15   where cars would park?

16             ATTORNEY FREEMAN:  Object to the form of

17   the question.

18        Q    (BY ATTORNEY MILLS) You can answer.

19        A    I don't understand.  Can you --

20        Q    Yeah, we'll strike that.

21             Ms. Cronk, when I'm looking at the

22   photograph of the tent, in the bottom left-hand

23   corner, is that the front door of the tent that's

24   pictured?

25        A    No --

1      Q    Did it smell like feces?

2      A    No.

3      Q    Did it smell like urine?

4      A    It had a couple times.

5      Q    And did you ever see, like, rodents such

6  as rats or mice in this area?

7      A    Yes, I saw a few mice.

8      Q    And was that the case in September of

9  2022?

10      A    No.

11      Q    So when did you see the mice in -- in that

12  area?

13      A    I don't recall.

14      Q    How often do you think you saw mice?

15      A    Just once.

16      Q    Would you see ants or bugs?

17      A    No.

18      Q    Do you know if there was ever a bedbug

19  outbreak in this area?

20      A    I don't think so.

21      Q    Ms. Cronk, looking at the tent and seeing

22  the photograph, is there anything else about the

23  campsite that we haven't covered that you would like

24  to testify to or clarify?

25            ATTORNEY FREEMAN:  Object to the form of

1    the question.

2         A    No, other than the fact that oftentimes

3    the areas would be a little bit soiled, but it was

4    definitely difficult to keep the environment around

5    us clean.

6              It was just -- it was definitely

7    difficult.  We had -- we had no place to shower, to

8    regularly clean ourselves, things like that.

9              But we did the best we could.  And I feel

10   this photograph only reflects one instance and

11   doesn't reflect the times that we have tried to do

12   our best to -- to keep it tidy.  And there were

13   many -- many times that I was much tidier than that.

14        Q    (BY ATTORNEY MILLS) Do you think people in

15   the encampment area put as much effort into keeping

16   things tidy and clean as you did?

17             ATTORNEY NTIM:  Objection, calls for

18   speculation.

19        Q    (BY ATTORNEY MILLS) You can answer.

20        A    Yes.

21        Q    Do you think that anybody was particularly

22   difficult in trying to keep the area clean?

23        A    Nobody that -- no.

24        Q    Did you ever kind of create rules with the

25   neighbors that people would try to follow to keep

1    them to pick up.

2        Q    Do you agree that solving homelessness is

3    a complex problem?

4        A    Yes.

5        Q    And do you agree that you have personally

6    benefited from housing services offered by the City

7    and County of San Francisco?

8        A    Yes.

9        Q    Do you agree that San Francisco offers

10   more services for people experiencing homelessness

11   than other cities or counties?

12            ATTORNEY NTIM:   Objection, calls for

13   speculation.

14       A    I don't know.

15       Q    (BY ATTORNEY MILLS) Do you agree that a

16   significant number of people that experience

17   homelessness in San Francisco reject services

18   offered by the City?

19            ATTORNEY NTIM:   Objection, calls for

20   speculation.

21            ATTORNEY FREEMAN:   It's also ambiguous.

22       A    No.

23       Q    (BY ATTORNEY MILLS) Do you agree that

24   people who make claims against the City should have

25   to produce evidence to support their claims?

1    STATE OF CALIFORNIA          )

2    COUNTY OF SAN FRANCISCO      ) ss.

3        I hereby certify that the witness in the

4    foregoing deposition, SARAH A. CRONK, was by me duly

5    sworn to testify to the truth, the whole truth, and

6    nothing but the truth, in the within-entitled cause;

7    that said deposition was taken at the time and place

8    herein named; and that the deposition is a true

9    record of the witness's testimony as reported by me,

10   a duly certified shorthand reporter and a

11   disinterested person, and was thereafter transcribed

12   into typewriting by computer.

13       I further certify that I am not interested in

14   the outcome of the said action, nor connected with,

15   nor related to any of the parties in said action,

16   nor to their respective counsel.

17       IN WITNESS WHEREOF, I have hereunto set my hand

18   this 1st day of October, 2024.

19   Reading and Signing was:

20   _x_ requested  ___waived  ___ not requested

21

22                          *Mary J. Goff*

23

24           MARY J. GOFF, CSR NO. 13427

25              STATE OF CALIFORNIA

        BEHMKE REPORTING AND VIDEO SERVICES, INC.
                    (415) 597-5600