**REDACTED**

# EXHIBIT 2

# TO

# DECLARATION OF STEVEN MILLS IN SUPPORT OF DEFENDANTS' MOTION TO VACATE OR DISSOLVE THE PRELIMINARY INJUNCTION

**PROVISIONALLY FILED UNDER SEAL PURSUANT TO INTERIM ADMINISTRATIVE MOTION TO SEAL**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - - - -

COALITION ON HOMELESSNESS, et al., Plaintiffs,

v.

CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants.

CASE NO. 4:22-cv-05502-DMR

- - - - - - - - - - - - - - - - -

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF JOSHUA DONOHOE

TUESDAY, NOVEMBER 12, 2024

BEHMKE REPORTING AND VIDEO SERVICES, INC.

BY: CYNTHIA TURI, CSR NO. 11812

550 CALIFORNIA STREET, SUITE 820

SAN FRANCISCO, CALIFORNIA 94104

(415) 597-5600

Videotaped deposition of JOSHUA DONOHOE, taken on behalf of Defendants, at Lawyers Committee for Civil Rights of the San Francisco Bay Area at 131 Steuart Street, Suite 400, San Francisco, California, commencing at 10:14 A.M., TUESDAY, NOVEMBER 12, 2024, before Cynthia Turi, Certified Shorthand Reporter No. 11812, pursuant to Notice.

Q. And what did you do to prepare for your deposition today?
A. I reviewed the declarations that I submitted.
Q. Do you know how many declarations you reviewed?
A. Three. Three or four.
Q. And do you know when you reviewed those declarations?
A. Probably for the last five days.
Q. How many times do you think you reviewed those declarations in the last five days?
A. Once every day.
Q. Did you review any documents other than those declarations?
A. No.
Q. And did you speak with anybody about your deposition today?
A. Yes.
Q. Who did you speak with?
A. My partner, Sarah Cronk.
Q. When did you talk to Sarah Cronk about your deposition?
A. Probably three out of the five days.
Q. Did you talk about Ms. Cronk's deposition?
A. Yes.
Q. And did you talk about what questions Ms. Cronk

was asked in her deposition?

A. No.

Q. Did you talk about what Ms. Cronk testified to in her deposition?

A. Yes.

Q. What did you talk about?

A. The emotional impact on her. And also, just kind of, you know, trying to figure out timelines and making sure that, you know, we could recollect correctly what happened to both of us.

Q. Did you happen to review the transcript of Ms. Cronk's deposition?

A. No.

Q. I want to go back. There's one more instruction that I meant to give. You'll be getting a copy today -- after your deposition of everything that was written down, and you'll be provided an opportunity to review that. And if you make any corrections, the City is allowed to point that out at trial, if it's something that goes to the substance.

So for instance, if the sky was rainy that day and it gets changed to a sunny day, that's the type of thing we may be able to comment on. But that will be an opportunity that you do have.

So I want to circle back since we were on the

topic of the transcript.

Did Ms. Cronk tell you about any specific questions that she was asked in her deposition?

A. No.

Q. Did she tell you about any exhibits that she was shown in her deposition?

A. Yes.

Q. What exhibits did Ms. Cronk tell you that she was shown?

A. They weren't specific. It was just more, like, kind of -- like, it was under the umbrella of what to expect and kind of preparing myself for this.

Q. Did you talk about Google photographs?

A. We did.

Q. What did you talk about about those photographs?

A. Mentioning of our encampments and places we stayed at before.

Q. And did you look at those photographs?

A. No.

Q. Did you talk about photographs from places other than Google?

A. No.

you know, where they got it, what time, what date, you know, all the things that help someone locate it.

And put for storage or safekeeping for someone to pick up. Or the owner to pick up, I should say.

Q. And when do you think you learned about that kind of perception of what the bag -- what bag and tag is?

A. I've known about bag and tagging since pre-COVID, so 2017 or '18.

Q. Have you ever read the Department of Public Works, or DPW's, bag and tag policy?

A. No.

Q. Have you ever spoken with anybody about DPW's bag and tag policy?

A. Yes.

Q. And who did you speak to about DPW's bag and tag policy?

A. Aside from, you know, the general DPW workers and police officers and City officials, Shanna Couper or -- I don't know her last name. I know her as Couper.

Q. Did Shanna Couper ever show you the bag and tag policy?

A. No.

Q. Did Ms. -- did Shanna Couper hold herself out as being familiar with the bag and tag policy?

A. Yes. And her -- her definition matched -- matched what I was hearing from DPW.

Q. Do you know who from DPW you heard about it from?

A. No one specifically.

Q. So if I understood your testimony, you knew about bag and tagging sometime in 2017 or 2018.

Is that -- when did you hear about bag and tagging from Shanna Couper?

A. Probably roughly around that time.

Q. Are you familiar with the stolen belongings project?

A. Not -- no.

Q. Did you ever hear Shanna Couper talk about working on a documentary concerning DPW's bag and tag policy?

A. Yes.

Q. When did you learn about that?

A. Probably 2018 or 2019.

Q. And what did Shanna Couper tell you about that project?

A. That she was going to be basically part of a documentary, and that there were going to be certain people, you know, questioned and interviewed for that documentary, and was very excited about it.

street that's down there.

There's a lot of the railroads -- not railroads -- freeway intersections and bridges in that area.

Q. Did you stay with Ms. Cronk at the Navigation Center?

A. No.

Q. At some point in time, did you start staying with Ms. Cronk on the streets of San Francisco?

A. Yes.

Q. And when was that?

A. Shortly after.

Q. Do you have a best estimate of the month that you first started living on the streets of San Francisco with Ms. Cronk?

A. Probably end of April.

Q. And where did you start living with Ms. Cronk in roughly the end of April? That's 2022?

A. Correct.

Q. So roughly -- where did you start living with Ms. Cronk on the streets of San Francisco in roughly April of 2022?

A. It was really all over. We never really stayed in one spot for more than three or four days.

Q. After April of 2022 and before -- strike that.

When you started living with Ms. Cronk on the streets of San Francisco in April of 2022, were there ever any periods where you began living inside with Ms. Cronk after that?

A. Yes.

Q. When was that?

A. January of 2023.

Q. And where was that?

A. That was in a shelter-in-place hotel. I don't know the name of it. But it was located on Larkin and Ellis.

Q. Between April of 2022 and January of 2023, were there ever any periods where you did not live with Ms. Cronk?

A. No.

Q. Were there any days during that period where you were not living with Ms. Cronk?

A. No.

Q. When you started living with Ms. Cronk in April of 2022, were you living in the -- like, at the same shared camp spot, or did you both maintain separate camps?

A. We were in the same tent.

Q. Did that continue to be kind of your habit until January of 2023?

A. Yes.

MR. MILLS: So we've been going for about an hour. Does a ten-minute break work for people?

So we'll go off the record at 11:15.

THE VIDEOGRAPHER: Going off the record. The time is 11:15 a.m.

(Recess taken from 11:15 to 11:27 a.m.)

THE VIDEOGRAPHER: This marks the beginning of Media No. 2. We are back on the record. The time is 11:27 a.m.

MR. MILLS: Just a quick housekeeping, I'd like to mark Exhibit 68. This is a signed protective order that Mr. Donohoe signed before the start of the deposition.

(Deposition Exhibit 68 marked for identification.)

BY MR. MILLS:

Q. And, Mr. Donohoe, during the break, did you talk to anybody other than your lawyer about the deposition?

A. No.

Q. Thank you. And so just to circle back, do you currently live in San Francisco?

A. Yes.

Q. And where is that?

A. Parkmerced.

Q. How long have you been at Parkmerced?
A. For roughly a month.
Q. Can you describe for me what that living situation is at Parkmerced?
A. Yeah. We -- we obtained housing through a voucher called Flex Pool.
Q. And do you have a lease at Parkmerced?
A. Yes.
Q. Does the lease have an end date?
A. No.
Q. So are you allowed to stay at Parkmerced as long as you want?
A. Yes.
Q. Are there any program rules or requirements that you have to satisfy in order to live at Parkmerced?
A. Through Flex Pool, yes.
Q. What are those requirements?
A. Steady source of income. And I think that's pretty much it.
Q. And do you have to pay monthly rent at Parkmerced?
A. Yes.
Q. What's that?
A. At the moment, I do not know.
Q. Do you know if it's, like, a percentage of how

much you make?

A. Yeah. It's supposed to be 30 percent of our monthly income.

Q. And does that amount vary from month to month?

A. Only if they do a reevaluation of our income.

Q. So every month, do you have to submit paperwork for what your income looks like?

A. Not that I know of.

Q. Do you know when you do the reevaluations?

A. I -- I'm not quite sure.

Q. Has anybody told you that you'd have to be out of Parkmerced by a certain date?

A. No.

Q. At Parkmerced, can you describe, like, what type of unit you have?

A. Yeah. It's a two-bedroom, two-bath loft on the 11th floor.

Q. And do you live in that unit with just Ms. Cronk and your daughter?

A. Yes.

Q. Do you have any shared spaces at Parkmerced with other tenants?

A. Laundry room.

Q. And where were you living before Parkmerced?

A. Hamilton -- Hamilton Houses Family -- Hamilton

Transitional Families.

Q. How long were you at Hamilton Transitional Families?

A. For ten months.

Q. Did any individuals at Hamilton help connect you to your current housing at Parkmerced?

A. No.

Q. Did you have any program rules at Hamilton that you had to follow?

A. Yes.

Q. What were those?

A. Curfew; signing in and out; no -- you know, no illicit drug use. You know, other than the basic respect other people's area and all that stuff.

Q. Thank you. And did they do any type of drug testing at Hamilton?

A. Yes.

Q. How regularly did you have to do drug testing at Hamilton?

A. I did not have to do drug testing specifically.

Q. Did Ms. Cronk have to do drug testing?

A. No.

Q. Who typically does drug testing then at Hamilton House?

MR. NTIM: Objection. Calls for speculation.

in Alamo, would not have allowed me to secure -- secure that.

Q. So how long were you living in Alamo?

A. For 30 days.

Q. And is that a place that you could live if anything happened and you were to lose your housing at Parkmerced?

A. I don't know.

Q. Have you talked to your mom about whether you could live with her in Alamo if you were to lose housing at Parkmerced?

A. I have not.

Q. Would you ask your mom if you could live with her in Alamo if you lost housing at Parkmerced?

MR. NTIM: Objection. Calls for speculation.

THE WITNESS: I don't know.

BY MR. MILLS:

Q. Do you have anybody else that you would ask to live with if you were to lose housing at Parkmerced?

MR. NTIM: Objection. Calls for speculation.

THE WITNESS: I -- no.

BY MR. MILLS:

Q. If you were to lose your housing at Parkmerced, would you return to the streets?

MR. NTIM: Objection. Calls for speculation.

THE WITNESS: I would try my best not to.

BY MR. MILLS:

Q. In the period that you've been housed or in treatment since January of 2023, have you ever put any property -- left any property on the streets of San Francisco at encampments?

MR. NTIM: Objection. Ambiguous as to "left any property on the ground."

THE WITNESS: Yeah. Can you --

BY MR. MILLS:

Q. In the time --

A. -- go back?

Q. Let me provide some context. Some people, we understand, will still keep property at encampments even though they're living somewhere else.

Between the period of -- from January 2023 onwards, have you left property in any encampments even though you were physically living inside somewhere else?

A. Yes.

Q. And when were you doing that?

A. During the short period of time I was living at the SIP hotel.

Q. And what -- when was that?

A. January and beginning of February of 2023.

Q. Where were you leaving your property outside of

Q. That was Five Keys?
A. Yeah, Five Keys.
Q. Thank you. And in January and February of 2023, what type of property were you leaving outside?
A. A bicycle. You know, stuff that we thought that we could bring in, like a coffee maker. Any clothes that didn't fit in the two-bag minimum. You know, our tent, yeah.
Q. And were you living with Ms. Cronk at the SIP hotel in January of 2023?
A. Yes.
Q. And do you know when that started?
A. Yeah. It was the day or two after my birthday, so January 4th or 5th.
Q. And were you living with Ms. Cronk the entire time at the SIP hotel?
A. Yes.
Q. Was there ever any period where you and Ms. Cronk were separated while having access to the SIP hotel?
A. Define "separated."
Q. Not physically living in the same location as one another.
A. No.
Q. Do you know when Ms. Cronk started obtaining

A. No.
Q. When was the last time you had employment before Fertado Heating and Air?
A. Portland. 2013, I think.
Q. And what type of work were you doing in Portland?
A. I was a cashier and stocker for Dollar Tree.
Q. So is it fair to say that between 2014 and when you started working at Fertado Heating and Air, you didn't have any employment in San Francisco?
A. Yes.
Q. And what would you do for earning any type of money or income?

I also helped people -- I traded services for certain things.
Q. What kind of services are you talking about when you say traded services?
A. I helped people inject their drugs, yeah. Also, watching people's stuff, you know, just giving them a hand moving.
Q. So aside from stealing for trade, the trade services, watching people's stuff, did you do any other

type of work that would allow you to obtain money to survive?

A. No.

Q. Were you getting any type of government benefits during that time?

A. Food stamps every once in a while. I think I had food stamps twice in the entire time.

Q. Are you familiar with the County Adult Assistance Program --

A. Yes.

Q. -- CAAP?

Have you ever obtained CAAP benefits?

A. No.

Q. Have you ever applied for CAAP benefits?

A. I have applied, yes.

Q. Did you ever get benefits because of those applications?

A. No.

Q. Do you know why?

A. I -- I don't know why.

Q. Did anybody tell you that you weren't eligible for CAAP benefits?

A. No. Well, correction. The interviews that were scheduled were most of the time phone interviews, and my -- I couldn't hold on to a phone number for long

Q. And it's talking about your aspirations going forward. Is it fair to say that you believe you're turning your life around after experiencing treatment?

A. Yes.

Q. And what do you hope to get out of your life going forward as far as your professional growth is concerned?

A. A career where I don't have to worry about a paycheck to paycheck, the ability to invest and make sure that my daughter has a life that I can be proud of.

Yeah. I just want to be able to take care of my family, and make sure that, you know, I don't have to worry about ever being homeless again.

Q. Based off of your personal experience, do you think you're taking all of the steps necessary, based off of your experience, to stay on that track?

A. I hope I am.

Q. And when did you get enrolled into the apprentice program?

A. I was indentured in June of this year.

Q. June of 2024?

A. Yes.

MR. NTIM: This would be a good time for a break.

MR. MILLS: We'll go off the record. It's

Q. Thank you. Have you heard -- are you familiar with the concept of a government claim?

A. In regards to?

Q. So some context, people can get injured or lose property and submit something called a government claim and try to get money back from the City and County of San Francisco through that process.

With that description, have you heard of the government claims process before?

A. No.

Q. So is it fair to say you've never filed a government claim?

A. Correct.

Q. Have you ever been a party to any other lawsuit?

A. No.

Q. So I'm going to mark our next exhibit, which will be Exhibit No. 70 and Exhibit No. 71. So Exhibit No. 70 is plaintiff's response to defendants' first set of interrogatories. And 71 will be a verification.

(Deposition Exhibits 70 and 71 marked for identification.)

BY MR. MILLS:

Q. So, Mr. Donohoe, if you could take a moment to flip through the document that I have handed you that's

were both living together unhoused in San Francisco?

A. Just the one that got stolen -- that got taken in August.

Q. So I'll represent that Ms. Cronk testified that you would sometimes have a red sharps bin in your tent.

Do you know if you had one in your tent on August -- in the August 2022 incident?

A. Yes. And also, for the fourth laptop, I just remembered when that one was taken.

Q. Okay. Mr. Donohoe, on the break, did you talk to anybody about the laptop?

A. No.

Q. And, Mr. Donohoe, when was the last laptop taken?

A. January of 2023.

Q. And where were you staying when the laptop was taken in January of 2023?

A. That was when I moved into the SIP hotel.

Q. And where was it taken from?

A. The rest of my belongings that I could not take to the SIP hotel when they were on 13th and Folsom.

Q. And who took the laptop?

A. It was told to me that DPW had taken our stuff.

Q. Who told you that DPW took your stuff?

A. A couple of the other people on the block.

Q. You didn't see DPW take your stuff?
A. No.
Q. Is it possible that somebody else other than DPW could have taken your laptop?
A. I don't know.
Q. Are you speculating that DPW took your laptop?
A. No.
Q. What day was that?
A. Like, January 5th or 6th.
Q. What's your birthday?
A. January 3rd.
Q. You testified earlier that there was an incident prior to your birthday or that you got into the SIP hotel before your birthday?
A. No. It was a couple of days after. The day -- the day or the day -- like, two days after my birthday.
Q. So two to three days after your birthday, you went into a SIP hotel?
A. No. One or two days after my birthday.
Q. So when you believe that the laptop was taken from [sic] DPW, where did you leave it?
A. It was inside my tent, inside of a backpack.
Q. And where exactly were you on the street?
A. Very close to Folsom, on 13th.
Q. Do you know if you were by any specific

buildings that can serve as a landmark for where you were at?

A. Like, right behind Target.

Q. Is that before -- is that close to Total Wine?

A. It's close, yeah.

Q. How close to Total Wine were you?

A. Total Wine would be, like, a block away and across the street.

Q. Did you ever stay in front of Total Wine?

A. Yes.

Q. When did you stay in front of Total Wine?

A. Middle of December, yeah, of 2022.

Q. Do you know how many people were -- you were camping with around January 5th or January 6th, 2023?

A. Yeah. There were, like, three other tents that were nearby. And then farther down the block, there was a whole -- I don't know how many people were staying there.

Q. And to make sure I understand, did you leave the items behind because you accepted a placement in the SIP?

A. Yes.

Q. Did you ask anybody specifically to watch your stuff?

A. Yes.

Q. Who was that?
A. I don't remember his name.
Q. Do you know --
A. I'm sorry. His name was Manny.
Q. Is that a nickname, or is that Manny's actual name?
A. I just knew him as Manny. I'm not sure.
Q. Do you know -- can you describe Manny's physical appearance?
A. Yeah. He's a little shorter than I am, kind of stout, maybe mid 40s, white, male. Not -- he had kind of, like, dirty blond, gray hair, but short, and -- yeah.
Q. Do you have any contact information for Manny?
A. I don't.
Q. Did you take any videos of the property that you were leaving behind?
A. No.
Q. Did you take any photos of the property you were leaving behind?
A. No.
Q. Did you write in a journal anywhere, that property that you were leaving behind?
A. No.
Q. Do you know if Sarah Cronk took any photos of

the property that was being left behind?

A. I don't.

Q. Do you know if Sarah took any videos?

A. I don't.

Q. Do you know if Sarah journaled of anything that was left behind?

A. Not specifically, no.

Q. So from the time that you -- what was the time in between when you accepted your shelter at the SIP and learned that the laptop had been stolen?

A. About a day. We had moved in, and we went to go check on our stuff because we were planning on moving it closer to the SIP hotel.

And by the time we got there, it was gone. And Manny, along with, like -- like, a couple of the other guys were gone too. Like, our neighbors were gone as well.

Q. So did you talk to Manny at all after you had gone to the SIP hotel and returned to see if your property was still there?

A. Yes. Can you rephrase that again? Not rephrase it, but repeat it.

Q. Yeah. Did you talk to Manny at all after you left for the SIP hotel and then returned to see if your property was still there?

A. After all that, yes.

Q. And where was that?

A. I think we ran into him downtown near Civic Center.

Q. Do you know how many days after you accepted the SIP hotel that was?

A. Probably a couple of days. Like, I'd say, about four or five.

Q. And what did you learn from Manny about your property?

A. That DPW had come and -- you know, he doesn't deal with -- he doesn't like dealing with cops and everything. And so he tried to start packing our stuff up for us.

And they got -- they kind of pushed on him to -- you know, if it's not yours, you can't take it. So he took what he could, but then he had lost it between that day and when we ran into him.

Q. Do you know if Manny had warrants?

A. I don't.

Q. Do you know if Manny was afraid of interactions with law enforcement?

A. I just know he doesn't like dealing with them.

Q. Was it your understanding that Manny left your stuff behind so that he didn't have to interact with law

enforcement?

A. I mean, I believed what he had said about trying to grab as much as he could without, you know, causing too much of a disturbance. And probably left a lot of stuff behind, yeah.

Q. So is the answer, yes, Manny did have to leave stuff behind because he wanted to avoid interacting with law enforcement?

A. Yes.

Q. And Manny didn't take your laptop when he left the items behind?

A. I don't believe so.

Q. And you have no contact information for Manny?

A. Correct.

Q. Do you know if Manny is still on the streets unhoused?

A. I believe so.

Q. Do you know where Manny is living unhoused?

A. No.

Q. Is it -- based off of your experience living on the streets in San Francisco, do unhoused individuals typically try to avoid interactions with law enforcement officers?

A. Yes.

Q. And with what frequency do you believe that

individuals, based off of your personal perceptions, have tried to avoid interactions with law enforcement?

A. You're asking how --

Q. Uh-huh.

A. -- do they do that?

Q. What percentage of the time do you think you've seen that?

A. Probably, like, 80 to 90 percent.

Q. And when law enforcement comes in these 80 -- strike that.

When law enforcement officers come, do unhoused individuals typically just leave their belongings and walk away?

A. No.

Q. What do they do?

A. They frantically pack up what they can, and then leave before any -- to kind of lessen the amount of interaction that they have to have.

Q. So is it fair to say that law enforcement would see individuals packing up certain items and then intentionally leaving items behind when they walk away?

A. Yes.

Q. Do you think DPW's seen that as well?

A. Yes.

Q. Do you think, given those circumstances, it's

really difficult for officers to distinguish between what property people want versus what property they're just abandoning altogether?

MR. NTIM: Objection. Calls for speculation.

THE WITNESS: Yes. I feel -- I mean, my own personal experience with it, though, is that they're not leaving with everything that they want to grab. They're leaving with everything that they could possibly need in order to not get harassed more. Yeah.

BY MR. MILLS:

Q. Have you ever seen instances where unhoused individuals were approached by law enforcement, asked more time -- for more time to move their belongings, and was provided the time?

A. Yes.

Q. How many times do you think you've seen that?

A. Probably about maybe, like, 50 percent of the time.

Q. Based off of your own personal situation living on the streets of San Francisco, was it your practice to always leave your items when you knew that law enforcement was coming?

A. No.

Q. What percentage of the time do you think you would stay behind and interact with law enforcement when

Mr. Donohoe, when we took the break, did you have any conversations with anybody about that?

A. Aside from my attorney, no.

Q. And, Mr. Donohoe, have you ever read the bag and tag policy that outlines some of the tiers?

A. No.

Q. So is your only knowledge the knowledge from your attorney?

A. From my own experience and...

Q. Prior to the break, did you have that understanding?

A. Yes.

Q. So as a person that's experienced homelessness on the streets of San Francisco, you're aware that there are instances where the City can ask individuals to move along without 72 hours' notice?

A. Yes.

Q. So in January of -- January 31st, 2023, why did you default to looking for posted notices?

A. Because at that point, my interaction with the Coalition and -- and Couper and a couple of the other people who were advocates for civil rights, it was just common practice to make sure that, you know, posts were there.

I also am in the understanding that the 72-hour

A. I think that's -- yeah.

Q. Is it your understanding that anything -- sorry.

Is it your experience that anything less than 72 hours' notice when law enforcement is present is not enough time for you to move your stuff?

A. In an efficient and, like, safe and thorough manner, no.

Q. So you only relied upon the Coalition and Couper for your understanding of this kind of tiered system that you've outlined?

A. No. I -- my tiered system comes from my own experiences. These are the -- my own experiences fuel the pieces that I've categorized.

Q. Have you ever gone online to read the policies around this?

A. No.

Q. So when you were telling people that they were entitled to a written notice, that was just based off of your own personal experience and not any policy that you read on January 31st, 2023?

A. Not that I have read, no.

Q. Are you aware that under DPW's bag and tag policy, items that are commingled with health hazards can be discarded?

A. No.

Q. Were you aware that if there were needles present in a tent, that DPW could just discard the items underneath a bag and tag policy?

A. No.

Q. So no one communicated that to you ever?

A. That particular -- that -- those things in particular, no. It was my understanding that, you know -- yeah. Yeah -- keep it clean, and it should be fine.

Q. So your understanding is a person that was experiencing homelessness in San Francisco, that as long as you kept your tent clean, your items should be bagged and tagged?

A. Yes.

Q. And you didn't know of any exceptions?

A. No.

Q. Have you ever heard of the people on the street being told about exceptions?

A. The exceptions being the health hazards and all that?

Q. Uh-huh.

A. Yes.

Q. When have you heard those?

A. I couldn't give you a specific date. I mean, it would be the aftermath of certain sweeps or just talking

formal, you got to get out and you got to move.

Those ones, I, for the most part, was able to get out with everything. So the destruction, I'm not quite sure about.

But for routine cleanings on a regular basis, like, five times a day [sic], where trash was only supposed to be picked up, other items were also disturbed and taken that were not trash, that I perceive as pretty obvious not being trash.

Q. So is it your testimony that in 2022, your property was destroyed in instances where there was routine cleaning in an encampment?

A. Yes.

Q. Were there any other instances where property was destroyed outside of routine cleanings?

A. Yes.

Q. And what types of incidents were those?

A. One in particular was in June -- this is 2022, correct?

Q. Correct, still 2022.

A. And -- yeah. More than a routine cleaning, yeah. That -- just the June.

Q. Do you know what day in June it was?

A. Late June. I think June 23rd, yeah.

Q. And was it in the morning or the night?

A. It was all day.
Q. So all day, DPW was doing a cleaning at --
A. Yes.
Q. And where was this encampment located?
A. 13th and Folsom.
Q. And how close were you to Target?
A. Right behind it.
Q. Were you next to the pillar again?
A. I believe so, yes.
Q. Do you know how many campers were there on June 23rd, 2022?
A. I don't. I mean, more than 20.
Q. Do you know how many tents there were?
A. Definitely more than 10.
Q. And what property do you think that the City destroyed of yours that day?
A. That day, they took -- let's see. I'm not really -- I didn't do an itemized, like, breakdown of everything that was missing, only because there was a lot going on that day. Yeah.
It was -- that was, like, their HOT team. That was a day that HOT team and everyone else came in and -- there was just a lot going on. I just know that while I was talking to different officials and trying to get, like, certain things happening with HOT team, I kept on

having to swat -- almost, like, push DPW off our stuff, saying, you can't tell us to talk to these guys and then turn around and take our stuff while we're talking to them.

We were busy.

Q. So were you offered shelter that day by the HOT team?

A. I -- I was. I was offered the idea of shelter.

Q. What type of shelter were you being offered?

A. A tiny home that was located off of Gough Street. I think that's Gough, yeah.

Q. As you sit here today, can you think of any actual item of yours that the City destroyed that day?

A. Clothing. Yeah. I'm not 100 percent sure. I know clothing went missing, but --

Q. What type of clothing went missing?

A. Like, what do you mean by "what type"?

Q. What type of clothing items did you lose that day in June of 2022?

A. I lost -- we lost jackets. I know a hat specifically that I really liked. And everything else was, like, T-shirts, underwear. I think socks. I think a lot of our socks went -- got taken that day.

And it was -- like I said, there was more stuff. There was a lot going on that day.

Q. Just to clarify, are you speculating about the items that you lost that day, because there was some hesitation in your answer?

A. No. I vividly remember thinking, I'm going -- we have to get new socks. Also, the jackets and everything. My favorite jacket got missing.

Q. And what was that favorite jacket?

A. It was just a hoodie that fit me and kept me warm. I can't remember the make.

Q. And were these items inside of your tent or outside of your tent?

A. Well, at the time that they were taken, they were outside of the tent because we were asked to move.

Q. Were they organized in a pile, or were they kind of strewn all across the street?

A. They were in trash bags, separated other things in our belongings still.

Q. So the clothing items that you claim that you lost on June of 2022 were clothing items that were in a trash bag?

A. That were not sealed up and in front of our tent, yes.

Q. Did DPW give you the trash bag?

A. No.

Q. How did you get the trash bag?

A. That's how we kind of kept our clothing inside of our tent sometimes.

Q. Did you see DPW physically take the bag that had your clothing in it in June of 2022?

A. Physically, no -- well, I saw them taking things away from our -- away from our area before I had separated the stuff that I wanted to go in the trash while I was talking to the HOT team, and I was unable to -- you know, I was -- they told us to move. We started moving.

They started pulling things out. And then I got distracted by HOT team. And DPW came in and started throwing stuff away. Whenever I told them not to, they continued to do it.

So I broke away from HOT team to pull all my stuff back into my tent and actually move my whole tent away and face the wall so they could not take anything else from my tent.

I did not see what they -- like, which bags they had taken. I did not realize what was gone until later on that night.

Q. How many feet away from your camp were you with the HOT workers?

A. 10 feet.

Q. And were both you and Sarah Cronk talking to the

HOT workers together?

A. Yes.

Q. Did you ask if one of you can stay behind as the other spoke with the HOT team about the tiny home?

A. We did eventually once we realized that one of us was going to have to safeguard our stuff and continue packing.

Q. Did one of you go back to watch the rest of your stuff?

A. Yes.

Q. Did you end up moving the rest of your belongings?

A. We ended up dragging our tent across the street.

Q. So nothing else other than the clothing was destroyed in June of 2022?

A. That I remember, yes.

Q. Did you have notice that that resolution was going to be taking place?

A. I don't remember.

Q. Is it possible you had notice?

MR. NTIM: Objection. Calls for speculation.

THE WITNESS: Yeah. I don't -- I don't recall.

BY MR. MILLS:

Q. Do you know how much time you were given to move your belongings on the day of?

A. Initially, it was a few hours. Once we got contact with the HOT team, they gave us, like, maybe another hour. But we had to make a decision that day, so it had shifted from us moving our stuff to making a very quick decision on whether or not we wanted to move to the tiny home.

Q. So what was different between this day where you were offered a shelter, a tiny home, and the incident in January of 2023 where you accepted a SIP and left your property behind?

A. First and foremost, the SIP hotel was actually, like, orchestrated and, like, put in the works by a friend of mine, who I -- I am not sure. She worked for some part of the City or some kind of outreach program. But I'm not sure what -- which one it is.

I ran into her at Target, and I told her about Apple being pregnant.

And she said, oh, my God. We need to get that taken care of. And she pulled some strings, like, within a week or two. They came specifically for us. It was not a sweep. It was not a -- it was them coming out to us and saying, we have a place for you.

Q. Do you know the name of that employee?

A. Yeah. Nikia Hanes or Heinz. I'm not quite sure how to spell her last name.

Q. That's okay.

A. Whereas -- yeah. To continue answering that other question, whereas, the one in June was a full-blown sweep that was -- it was focused on making people move.

Only us and one other person got offered a shelter, and we only got offered the tiny home or shelter because we were quickly assessed for priority on getting housing.

And they were, like, you're priority one. You get to go today. Almost like it was all, you won this.

Q. And did you expressly decline the offer to move into a tiny home?

A. Not initially.

Q. But you did?

A. Eventually, yes.

Q. So you told somebody, no, I don't want to move into the tiny home?

A. After it was told to us that we don't deserve one.

Q. Who told you you don't deserve a tiny home?

A. The fire department chief of command, Patrick -- I don't know his last name.

Q. And when did you hear that?

A. During the whole ruckus before DPW left, before

HOT team had left. It was while we were trying to find a -- somebody to watch our things, while we went -- because same stipulation, we had -- we could only bring two bags each. Obviously, it's not enough for everything we needed or we wanted to bring or wanted to make sure it didn't get destroyed.

So we needed to find somebody else to watch our stuff. And as we were doing that, that is when Patrick had said, you guys don't even deserve it.

Q. Are tiny homes -- and based off of your experience being unhoused in San Francisco, are tiny homes a preferred shelter option that people get communicated to them?

MR. NTIM: Objection. Ambiguous as to "preferred."

THE WITNESS: I also don't know what other people might want.

BY MR. MILLS:

Q. Based off of your experience living on the streets in San Francisco, did you hear unhoused individuals saying that they would like to get into a tiny home?

A. Yes.

Q. And did you hear those individuals say they would like to get into a tiny home because tiny homes

are a better place to live than on the street of San Francisco?

A. Yes.

Q. And did you hear any other reasons why people like tiny homes?

A. Yes.

Q. And what are those reasons?

A. Food. They offer food. They also offer, like, a shower, if you need one, a place to use the restroom. Also, I know another use for them was to store items and continue, like, just checking in, and living -- having an encampment outside of it.

Q. Were you told that you could bring more items into the tiny home after you moved?

A. Yes.

Q. So you could have brought the items that you left behind with you back to the tiny home?

A. As long as they were still there, yeah.

Q. You could ask DPW to bag and tag the items for you to pick up and then take to the tiny home?

A. I did not know I could do that, nor do I trust them to do that.

Q. But you didn't do that?

A. No.

Q. Did you talk to the HOT team about doing that?

A. No.

Q. Did you talk to the HOT team about trying to bag and tag anything that day so you could go to the tiny home?

A. No. It was not offered as an option.

Q. But you didn't ask about it?

A. Correct.

Q. You are familiar with the bag and tag policy because of your conversations and experience living on the streets of San Francisco?

MR. NTIM: Objection. Misstates prior testimony. He did not state that he was familiar with the specifics of the bag and tag policy.

THE WITNESS: My experience with bag and tag is that it's just another -- I know what the theory -- or I have an idea of what the theory behind what the policy might be.

But I know in action, it's just another word for, I'm trashing your things.

MR. MILLS: So how about we go off the record and take a quick break.

THE VIDEOGRAPHER: This marks the end of Media No. 5. We are going off the record. The time is 5 o'clock.

(Recess taken from 5:00 to 5:27 p.m.)

THE VIDEOGRAPHER: This is the beginning of Media No. 6. We are back on the record. The time is 5:27 p.m.

BY MR. MILLS:

Q. Mr. Donohoe, just a couple of questions to try to streamline the process for us a little bit.

Have you ever heard of programs where people that are experiencing homelessness can go store certain items?

A. No.

Q. Have you ever sought any of those types of programs out?

A. No.

Q. And, Mr. Donohoe, have you ever pooled resources with anybody else to try to afford storage?

A. No.

Q. Have you heard of that happening?

A. Yes.

Q. And how does that typically happen?

A. Like, the process for that? Like, normally, two or three people will get together and take on, you know, half or a third of the rent, whatever portion, equal rent -- part of the payment for it.

It goes for a little bit, and then somebody ends up not paying. And, you know, you don't pay, everybody

A. No.

Q. Have you obtained any physical injuries in connection with a City sweep?

A. No.

Q. To the extent that you're presently housed, do you fear that you're going to be exposed to extreme weather out on the street?

A. Where I'm currently housed?

Q. Correct.

A. No.

Q. And you mentioned the Coalition on Homelessness a couple of times. What is the Coalition's mission, from your perspective?

A. To find out solutions to end chronic homelessness and to have more of, like, a political and outreach front to address the issues and hopefully find some, like I said, solutions.

Q. When did you first learn about the Coalition on Homelessness?

A. Probably, like, 2017 or 2018.

Q. And do you know if the Coalition on Homelessness was monitoring the City's sweeps in 2017?

A. I do not know.

Q. Are you familiar with the idea of, like, joining organizations to be a member?

A. Yes.

Q. Are you a member of the Coalition on Homelessness?

A. I consider myself to be.

Q. And why do you consider yourself to be a member of the Coalition on Homelessness?

A. Because I have done many outreach things for them. I stand by a lot of the things that they stand by.

I've also been -- I've had also close contact with a few of the actual active members. I -- yeah. I've even claimed -- you know, claimed being part of the -- I've gone to their, you know, headquarters where they meet, and I've met some of the higher-up people.

I have never gone to an actual meeting. But like I said, I've done a lot of outreach for them.

Q. And when, based off of your experience, do you think that you first became a member of the Coalition?

A. Probably 2020.

Q. And have you been a member since 2020?

A. Off and on, yeah.

Q. Were you a member on September 27th, 2022?

A. Yes.

Q. Were you a member when you were preparing the declaration with Couper?

A. Yes.

Q. Did you do anything -- did you tell Coalition that you were a member?

A. I didn't. I mean, I guess, clarification on that one.

Q. Did you ever sign anything with Coalition saying that you wanted to be a member of the Coalition?

A. No.

Q. Did you ever sign, like, a contract that you could represent me in court for my constitutional rights?

A. I don't know.

MR. NTIM: Objection. Calls for legal conclusion.

BY MR. MILLS:

Q. Have you ever told the leadership at the Coalition on Homelessness that you can represent me for issues that impact homeless people in San Francisco?

A. Yes.

Q. And when did you tell them that?

A. In -- somewhere between 2022 -- like, the beginning of 2022 or 2021.

Q. And who did you tell?

A. The -- I can't remember their exact names, but my -- specifically, you know, the person that Couper got

me in contact with to, you know, start calling if there was ever any issues or if there was a sweep going on that wasn't documented, Brian Edwards. He was still -- I don't know his last name. I'm sorry. I'm speculating.

But Brian, while he was still alive, yeah.

Q. Did you ever go to any meetings at the Coalition on Homelessness to vote on issues?

A. No.

Q. Did you ever sign up to participate in the human rights working group?

A. No.

Q. Did you ever sign up to work for the housing justice group?

A. No.

Q. What type of outreach did you do for the Coalition?

A. Like I said, if I witnessed a sweep in my travels that -- you know, that there was no representation that I could see, I was supposed to contact one of the -- contact either Couper or this other person -- I forgot his name -- and let them know -- there were a couple of people I'd contact -- let them know what's going on.

And they instructed me to kind of, like, stay

put and start videotaping or just, like, being an observer to -- not to approach anybody specifically, especially not aggressively, but just to show that I am somebody watching, to make sure that things were, you know -- that people were acting right, basically.

Q. And were you doing that outreach before the lawsuit was filed in this case?

A. No.

Q. So after the lawsuit, you started doing outreach, monitoring sweeps, and responding to -- with what you saw?

A. Yes.

Q. I'm going to go through a couple of names, and ask them if you know that individual.

Do you know Jennifer Friendenbach?

A. Yes.

Q. And how do you know Jennifer Friendenbach?

A. I'm not sure. I just very much recognize that name.

Q. Kelley Cutler?

A. Yes.

Q. Ian James?

A. Rings a bell, but not sure.

Q. Carlos Watkins?

A. No.

Q. Did you ever fill out any online polls about the issues that Coalition should focus on?

A. I'm not sure.

Q. Did you ever vote on issues for the Coalition on Homelessness to focus on?

A. Not that I -- not that I can remember.

Q. I'm going to go back to some of the instances of property destruction that we were talking about.

In this case, do you intend to testify about any experiences of property destruction that you haven't disclosed in written discovery or declarations?

A. No.

Q. So with that in mind, you submitted a declaration in this case. I'll represent that it was submitted on September 13th -- dated September 13th, 2022. And in that declaration, you refer to an incident on September 12th, 2022.

As you sit here today, can you recall an incident in September -- on September 12th of 2022?

A. Yes.

Q. What can you recall about that incident?

A. So early morning, like, maybe -- you know, sun was not up and it wasn't going to be up for a little while -- I'd say maybe 5:00, DPW came by and started pretty much harassing us. It was part of those routine

okay. Didn't think it was going to be necessary to hand over.

Q. Did you throw that piece of paper -- sorry.

Did you throw that piece of paper away when you were done with it?

A. No. We put it back in the journal.

Q. Do you still have that journal?

A. No.

Q. When did that journal go missing?

A. I do not know.

Q. Do you know how it went missing?

A. No.

Q. Did you look for it?

A. Many times. I mean, I don't really recall exactly when we couldn't find it anymore.

Q. And after you had the vehicle number of the DPW vehicle, did you report that to DPW?

A. No.

Q. Did you report it to any City agency?

A. No.

Q. So I believe you testified that you lost clothes. What type of clothing items did you lose?

A. Jackets, a lot of Sarah's clothes, and -- yeah. Some boots that she was working on.

So I think blankets might have been part of

that. It was -- it was, like, bags that went missing were, like, our warm stuff, like -- yeah, just to stay warm at night, so...

Q. And do you know what the weather was like in San Francisco around September 12th, 2022?

A. Yeah. Warm during the day and cold at night.

Q. What type of food did you lose?

A. Non-perishables.

Q. And, yeah, what were those?

A. I can't remember exactly. Yeah.

Q. How do you know they were non-perishable items then?

A. Because we didn't really get regular perishable -- not regular -- we don't have access to a fridge.

Every once in a while, we would have a cooler, but, like, you know, we ate the things that would go bad quickly -- as quick as possible, so I guess -- you know.

Q. Were all of these items that were taken outside of your tent?

A. Yes.

Q. And so the food was outside of the tent?

A. Yes.

Q. Do you know if you had any open food containers?

A. If they were, it was all inside of a closed,

like, container, so...

Q. So the food was in some kind of a container?

A. Like, a bin or something.

Q. And did the entire bin get taken?

A. Yes.

Q. And can you describe what the bin looked like?

A. I want to say it was, like, a large Tupperware kind of box. Not Tupperware.

Like, a Rubbermaid box with a lid, closes.

Q. And as a person that had been living in that area, had you seen rodents, such as mice?

A. No.

Q. Had you seen rats?

A. Not where we were living.

Q. Did you ever hear of rats existing at 13th and Folsom?

A. No.

Q. And no mice?

A. No mice.

Q. Ants?

A. No ants.

Q. Would you want to keep food stored so rodents don't come to the camp?

A. Yes.

Q. And I heard you say that Sarah Cronk was in a

Q. In 2022, yeah.

A. That weren't part of, like, the routine cleanups and stuff like that? Any one that stands out aside from the June -- the one in June? No.

Q. And to clarify, the idea of a routine cleaning -- so I understood that you testified earlier that it's your understanding or expectation that you be provided 72 hours' notice when there's law enforcement present.

How much time do you think you need when it's just DPW?

A. It depends on if we were being asked to move and not come back or vacate specifically or if it's just a routine cleaning.

Q. So if you're being asked just to move, how much time do you think you need?

A. I think at least one day.

Q. So if it's just DPW and DPW is asking you to move so they can clean, it's your expectation that you be given at least one day to move your belongings?

A. Right. At least, moving -- move the belongings or be prepared to move when they come so that we can move back.

The idea is it's informal, and we don't have to vacate.

Q. Are you going to try to resolve the warrant before a trial in this matter?
MR. NTIM: Objection. Calls for speculation.
THE WITNESS: I'm going to definitely reach out and figure out if this is still active. This puts a very big damper in a lot of things that I'm working for.
BY MR. MILLS:
Q. Did you do anything in Marin County around September 7th, 2023, that could have resulted in a warrant being issued?
A. No.
MR. NTIM: Same objection. Relevance.
BY MR. MILLS:
Q. Are you on probation in Marin County?
A. No. Not that I'm aware of.
Q. Are you on any diversion programs in Marin County?
A. Not that I'm aware of or know.















Q. Do you know Teresa Sandoval?
A. Yes.
Q. And is Teresa Sandoval a double amputee?
A. If it's the -- I don't know her last name, but if it was the Teresa I'm thinking of. I know a Teresa who is a double amputee.
Q. Did that Teresa live on 13th Street?
A. Yes, farther up the street than us.
Q. Do you know if Teresa Sandoval uses drugs?
A. I do not know.
Q. Do you know Nathaniel Vaughn?
A. No.

BY MR. MILLS:
Q. Have you ever stolen from an encampment?
A. No.

for substance abuse?

A. I don't know if the -- if the route that I took was through really City programming.

Q. Okay. Do you agree that you've benefitted from housing services that the City provides?

A. Yes.

Q. Do you agree that homelessness is a complex problem?

A. Yes.

Q. Do you think homelessness is a complex problem that defies a ready and easy solution?

A. Yes.

MR. NTIM: Objection. Calls for speculation.

BY MR. MILLS:

Q. That was a yes?

A. Yes.

Q. Do you agree that people who make claims against the City should have to produce evidence to support their claims?

MR. NTIM: Same objection. And calls for legal conclusion.

The WITNESS: Repeat that one more time.

BY MR. MILLS:

Q. Do you agree that people who make claims against the City should have to produce evidence to support

STATE OF CALIFORNIA )
COUNTY OF SAN FRANCISCO ) ss.

I hereby certify that the witness in the foregoing deposition, JOSHUA DONOHOE, was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place herein named; and that the deposition is a true record of the witness's testimony as reported by me, a duly certified shorthand reporter and a disinterested person, and was thereafter transcribed into typewriting by computer.

I further certify that I am not interested in the outcome of the said action, nor connected with nor related to any of the parties in said action, nor to their respective counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this November 25, 2024.

Reading and signing was:

_x_ requested __ waived __ not requested

CYNTHIA TURI, CSR NO. 11812
STATE OF CALIFORNIA