**EXHIBIT 6**

**TO**

**DECLARATION OF STEVEN MILLS IN SUPPORT OF
DEFENDANTS' MOTION TO VACATE OR DISSOLVE THE
PRELIMINARY INJUNCTION**

DAVID CHIU, State Bar #189542
City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief Deputy City Attorney
EDMUND T. WANG, State Bar #278755
KAITLYN M. MURPHY, State Bar #293309
MIGUEL A. GRADILLA, State Bar #304125
JOHN H. GEORGE, State Bar #292332
STEVEN A. MILLS, State Bar #328016
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:       (415) 554-3857 (Wang)
                 (415) 554-6762 (Murphy)
                 (415) 554-3870 (Gradilla)
                 (415) 554-4223 (George)
                 (415) 355-3304 (Mills)
Facsimile:       (415) 554-4699
E-mail:          edmund.wang@sfcityatty.org
                 kaitlyn.murphy@sfcityatty.org
                 miguel.gradilla@sfcityatty.org
                 john.george@sfcityatty.org
                 steven.mills@sfcityatty.org

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO, et al.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COALITION ON HOMELESSNESS; SARAH CRONK; JOSHUA DONOHOE; MOLIQUE FRANK; DAVID MARTINEZ; TERESA SANDOVAL, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY AND COUNTY OF SAN FRANCISCO, et al., <br><br> Defendants. | Case No. 4:22-cv-05502-DMR (LJC) <br><br> **DEFENDANTS' SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** <br><br><br> Trial Date:       July 28, 2025 |

PROPOUNDING PARTY:   Plaintiffs COALITION ON HOMELESSNESS, ET AL.

RESPONDING PARTY:   Defendants CITY AND COUNTY OF SAN FRANCISCO, ET AL.

SET NUMBER:   ONE

Pursuant to Federal Rules of Civil Procedure, Rules 26 and 33, Defendants CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO POLICE DEPARTMENT, SAN FRANCISCO DEPARTMENT OF PUBLIC WORKS, SAN FRANCISCO DEPARTMENT OF HOMELESSNESS AND SUPPORTIVE HOUSING, SAN FRANCISCO FIRE DEPARTMENT, and SAN FRANCISCO DEPARTMENT OF EMERGENCY MANAGEMENT (collectively "Defendants" or "San Francisco"), hereby provide this second supplemental response to Plaintiffs COALITION ON HOMELESSNESS,, SARAH CRONK, JOSHUA DONOHOE, MOLIQUE FRANK, DAVID MARTINEZ, and TERESA SANDOVAL (collectively "Plaintiffs") First Set of Interrogatories as follows:

## **PRELIMINARY STATEMENT**

Defendants' responses to the following Interrogatories are made to the best of their present knowledge, information, and belief. The responses are at all times subject to such additional or different information as discovery or further investigation may disclose and, while based on Defendants' present state of recollection, are subject to such refreshing of recollection, and such additional knowledge of facts, as may result from discovery or further investigation. Therefore, the following responses and objections are given without prejudice to Defendants' right to rely on subsequently discovered or recalled information and evidence. Defendants specifically reserve the right to make use of, or to introduce at any hearing and at trial, information and/or documents responsive to the following Interrogatories discovered or recalled subsequent to the date of these responses, including, without limitation, any information or documents obtained in discovery or by further investigation of this matter.

## **GENERAL OBJECTIONS**

1.     Defendants object to each Interrogatory to the extent it may be construed as calling for information subject to any claims of privilege, including, without limitation, the attorney-client

privilege and the attorney work product doctrine. In responding to these Interrogatories, Defendants in no way waive any such privilege or protection.

2.     Defendants reserve all objections to the competency relevancy, materiality, and/or admissibility as evidence of the following responses, and any document or thing identified in response to the following Interrogatories at any subsequent proceeding in, or trial of, this and any other matter for any purpose whatsoever.

3.     Defendants object to and do not admit, accept or acknowledge as true any of the facts, quotes, attributions, characterizations or contentions made and/or assumed by these Interrogatories. Defendants reserve all rights to challenge any such assumed facts, quotes, attributions, characterizations or contentions.

4.     Defendants object to the term "Database" as defined in these Interrogatories as overbroad to the extent it is defined to include, but not be limited to "any source or compilation" of sources.

5.     Defendants object to the term "Identify" as defined in these Interrogatories to the extent it seeks to have Defendants provide the present or last known address, primary contact information, and last known place of employment for any person. To the extent Plaintiffs believe they have a good faith non-frivolous need for such information on an individualized basis, Defendants are willing to meet and confer regarding this issue.

6.     Defendants object to the terms "YOU" and "YOUR" in so far as they include attorneys and anyone acting on behalf of legal counsel and therefore call for attorney work product or attorney-client communications.

7.     Defendants object to Instruction No. 1 to the extent it purports to impose on Defendants obligations in excess of those imposed by the Federal Rules of Civil Procedure.

8.     Defendants object to Instruction No. 4 regarding overbroad discovery requests to the extent Plaintiffs seek to preserve any ability to meet and confer regarding the narrowed scope of an overbroad request. Plaintiffs have chosen to place the burden of narrowing an overbroad discovery request on Defendants rather than having Defendants object to an overbroad term and then meeting and conferring with Plaintiffs to jointly propose a narrowed definition. Defendants reserve the right to

object to an overbroad term or phrase and not take up the burden of narrowing it. However, once Defendants have defined an overbroad term and responded to the narrowed request, Plaintiffs will need to serve an additional interrogatory to the extent they require additional information.

9.    Defendants object to Instruction No. 6 regarding ambiguous discovery requests to the extent Plaintiffs seek to preserve any ability to meet and confer regarding a new definition of the ambiguous terms. Plaintiffs have chosen to place the burden of narrowing an defining an ambiguous term on Defendants rather than having Defendants object to an ambiguous term and then meeting and conferring with Plaintiffs to jointly propose a clearer definition. Defendants reserve the right to object to an ambiguous term or phrase and not take up the burden of re-interpreting it. However, once Defendants have undertaken the burden to clarify and define an ambiguous term, Plaintiffs will need to serve an additional interrogatory to the extent they wish to request Defendants employ a different definition.

10.    Defendants object to Instruction No. 8 to the extent it exceeds the requirements of FRCP 33(d).

11.    Defendants object to Instruction No. 12 on the ground that the department defendants are not separate legal entities.  Defendants will answer with information available to them after a reasonable inquiry.

12.    Subject to and without waiving the above general objections and privileges, Defendants responds to the specific interrogatories as follows:

## SUPPLEMENTAL RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1**:

Identify all applicable federal, state, and City laws, ordinances, and statutes You rely upon, have relied upon, recited, or cited as the basis for issuing or threatening arrest, citation, or fines to order Homeless Persons to move or to vacate Homeless Encampments during Sweep Operations or at any other interaction or engagement with Homeless Persons, and describe all facts, Databases, and information on which You rely to identify these laws and the factual circumstances under which each law is to be applied.

/ / /

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object to this Interrogatory as compound because it contains two or more subparts that are not logically or factually subsumed within and necessarily related to the primary question. Specifically, this Interrogatory contains two requests: one seeking to have Defendants "identify" certain laws, ordinances, and statutes and a second seeking to have Defendants "describe all facts, Databases, and information" on which they rely in identifying those laws, ordinances, and statutes, including "the factual circumstances under which each [law, ordinance, and statute] is to be applied. "[A] demand for information about a certain event and for the documents about it should be counted as two separate interrogatories." *Withers v. eHarmony*, Inc., No. CV 09-2266-GHK(RCX), 2010 WL 11520197, at *3 (C.D. Cal. Apr. 1, 2010) (quoting *Banks v. Office of the Senate Sergeant–At–Arms*, 222 F.R.D. 7, 10 (D. D.C. 2004).) An interrogatory seeking both information and the factual basis for that information is a compound interrogatory. *U.S. ex rel. O'Connell v. Chapman Univ.*, 245 F.R.D. 646, 649 (C.D. Cal. 2007). An interrogatory seeking information, knowledgeable people, and supporting evidence is a compound interrogatory counting as 3 separate interrogatories. *In re Ameranth Cases*, No. 11-CV-1810-DMS(WVG), 2018 WL 1744497, at *2 (S.D. Cal. Apr. 11, 2018); Accord *Paananen v. Celico Partnership*, No. C08–1042 RSM, 2009 WL 3327227, at *3 (W.D.Wash. Oct.8, 2009) ("[A] demand for information about a certain event and for the documents about it should be counted as two separate interrogatories' because 'knowing that an event occurred is entirely different from learning about the documents that evidence it occurred"); *Johnson v. Cate*, No. 1:10-CV-0803-AWI-MJS, 2014 WL 6978324, at *5 (E.D. Cal. Dec. 9, 2014) ("Interrogatory No. 4 contains at least 48 discrete subparts."); *Erhart v. BofI Holding, Inc.*, No. 15-CV-2353-BAS-NLS, 2018 WL 4204928, at *8 (S.D. Cal. Sept. 4, 2018) (interrogatory seeking information regarding each person identified in a previous interrogatory is compound). Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as two Interrogatories toward the agreed total of 50 Interrogatories per side. Defendants

object that the phrase "Sweep Operations or at any other interaction or engagement with Homeless Persons" is vague, overbroad, pejorative, and disparaging. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to the SFPD. This Interrogatory is further overbroad because it seeks "all" laws, ordinances, and statutes related to a broad topic. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants further object this Interrogatory is overbroad as to time and not calculated to lead to the discovery of admissible evidence; San Francisco will respond for the time period beginning January 1, 2020.

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows: SFPD does not have a special set of laws that apply only to homeless persons during encampment resolutions. Homeless individuals can be cited, fined, or arrested in the same manner as any other person, which is dependent on the unique facts and circumstances of their situation. SFPD officers followed Department Notice 24-126 and Department Notice 24.140, and the prior versions thereto at all times relevant to this litigation. The City also has an obligation to maintain a 48-inch wide path of travel on public sidewalks. Cal. Code Civ. Regs. tit.24, s 1113A.1.1 (2022); *see also* 28 C.F.R. 35.133(a)(2011).

***

Defendants' answered Interrogatory No. 1 prior to the Supreme Court's decision in *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024) and the dismissal of Plaintiffs' related claims. Accordingly, responding to Interrogatory No. 1 is no longer relevant or proportional to the needs of the case.

**INTERROGATORY NO. 2**:

Describe in detail and identify all Your policies that apply to Your interactions with Homeless Persons and their property during Sweep Operations or at a Homeless Encampment, including but not limited to the S.F. Police Code § 169, SFPD Police Department Bulletin, and DPW Procedures.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object that the term "policies" is vague and ambiguous. Defendants will interpret the term to mean written procedures for a San Francisco department or agency. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to: SPFD, DPW, HSH, DEM, and SFFD. This Interrogatory is further overbroad because it seeks "all" policies related to a broad topic, and "policies" is vague and ambiguous. Defendants object that the term "Sweep Operation" is vague, overbroad, pejorative, and disparaging. Defendants further object that this Interrogatory is overbroad as to time and not calculated to lead to the discovery of admissible evidence; San Francisco will respond for the time period beginning January 1, 2020.

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows: The policies set forth in the City and County of San Francisco Employee Handbook apply to employees across all departments, which includes a Policy Regarding the Treatment of Co-Workers and Members of the Public to treat individuals with courtesy and respect.

**SFPD**: The laws apply equally to all. Nearly every policy regarding interaction with the public is responsive to this request, and accordingly the request is overbroad. The following SFPD Department General Orders are potentially responsive to this request as phrased and interpreted: 2.01, 5.01, 5.03, 5.06, 5.07, 5.17, 5.18, 5.21, 5.22, 5.23, 6.07, 6.08,6.11,6.14,6.15, and 7.02.  SFPD officers also follow all Department Notices that are applicable to their work, including Department Notice 24-126 and Department Notice 24.140, and the prior versions thereto.

**DPW**: DPW's bag and tag policy applies in all circumstances. DPW Bureau of Street and Environmental Services ("BSES") crew are responsible for a number of cleaning and/or maintenance duties that may bring them into contact with persons experiencing homelessness. These duties include

cleaning garbage and waste from public spaces, street sweeping, monitoring the City's litter receptacles, responding to graffiti, responding to potholes on City streets and sidewalks, and managing abandoned property. In these interactions, BSES crew treat all individuals including those who are experiencing homelessness with courtesy and respect.

In the context of an HSOC resolution, BSES crew typically do not arrive at the encampment for an AM resolution until 8:00 a.m. or later and will not begin cleaning up the encampment until after the Encampment Resolution Team ("ERT") has conducted outreach, typically around 9:30 or 10:00 a.m. While DPW waits for ERT to conduct its outreach, DPW crews perform a variety of other street cleaning duties around the encampment perimeter, in regular communication with ERT and the HSOC Incident Commander. DPW stores and discards items left behind pursuant to its policy for the removal and temporary storage of personal items, known as its "bag and tag" policy, set forth in Procedure No. 16-05-08 Removal and Temporary Storage of Personal Items Collected From Public Property. The current revision of this policy is REV 3. DPW incorporates its policy into this response. DPW is the lead City department responsible for handling of the property of encampment residents, pursuant to its bag and tag policy.

BSES crew facilitate the HSOC resolutions by cleaning and sanitizing public spaces, as well as bagging and tagging and/or removing property consistent DPW policy. When any items are bagged and tagged, DPW crew members provide information about when and where to retrieve the items to the owner. If no owner is present or comes forward, a written notice including the date, time, and location of removal, a description of the items removed, and instructions for retrieval, is posed in the vicinity of the removal. (*See e.g.*, CCSF-COH_000249-CCSF-COH_000250.) BSES crew may also hand out free garbage bags to persons experiencing homelessness and permit them to put any unwanted items in the bags for collection and removal by DPW. DPW follows the same approach for PM HSOC resolutions.

Outside the context of a resolutions, a BSES crew's regular work assignments, for example, responding to complaints through 311, may require them to respond to a location where a person experiencing homelessness is present although that fact is not always clear from the request for service itself. Crew members generally try to clean around the individual and/or his or her belongings. If the

situation requires, BSES crew may ask the individual to temporarily relocate for the purpose of cleaning the public property. In doing so, BSES crew do not invoke the threat of a citation against a person experiencing homelessness for a failure to comply. BSES crew members are not law enforcement officers. BSES crew generally do not request people move unless there are health or safety issues or the public right of way is inaccessible. When individuals are asked to move temporarily, BSES crew provide them time to move their belongings and inform them that unremoved items will be bagged and tagged or discarded in accordance with DPW's written policies.  BSES crew perform similar work in the context of Joint Field Operation outreach in the Tenderloin area of San Francisco.

**HSH:** The HS Participant Grievance Policy (available at https://hsh.sfgov.org/about/contact/) establishes a process by which program participants who believe they received unsatisfactory services or poor treatment, or who believe discrimination occurred, and/or who believe the assessment procedure was unfair, may file a written grievance that will be reviewed and responded to.

During resolutions, ERT/HSH is not responsible for monitoring the belongings of individuals. However, ERT does assist clients in paring down items into two large bags if they are being placed in shelter as this is the maximum allowed. ERT/HSH may assist clients in finding storage if the clients have belongings on the streets that they want to keep, but that do not fit in the allowable size limits for shelter. ERT will also make accommodations for clients as appropriate i.e.:  let the client leave belongings in place being watched by a friend, bring them to shelter to check in, and/or let the client return to collect or store the items they want.

**DEM**: DEM has no such "policies," as it understands that term. DEM coordinates operations with different departments that are responsible for executing those departments' policies and procedures.

**SFFD**: Although SFFD personnel are involved in HSOC and JFO operations, SFFD does not direct these operations. SFFD assigns personnel to work on HSOC and JFO operations. Once assigned to these groups, SFFD personnel working on these operations report to supervisors outside of SFFD. While SFFD still, for example, approves their personnel's' time off requests and similar work-related issues, the substance of the work performed on HSOC and JFO is not under SFFD's purview. In other

words, SFFD does not direct or supervise its assigned, or "loaned", personnel while they are working on HSOC or JFO operations. Nor does SFFD have any policies specifically related to HSOC and JFO operations.

**INTERROGATORY NO. 3:**

Describe in detail how You monitor, assess, ensure, and enforce compliance with Your own policies regarding interactions with Homeless Persons and their property, including how You train personnel to follow Your policies, reporting and oversight protocols, and any internal responses and consequences You have established for personnel that do not follow Your policies, and identify all facts, Databases, and information on which You rely.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object to this Interrogatory as compound because it contains two or more subparts that are not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains two requests: one demanding that Defendants "describe in detail" how they perform certain actions, and a second demanding that Defendants identify "all facts, Databases, and information" on which they relied. Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as two Interrogatories toward the agreed total of 50 Interrogatories per side. Defendants object that the term "policies" is vague and ambiguous. Defendants will interpret the term to mean written procedures for a San Francisco department or agency. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to: SFPD, DPW, HSH, DEM, and SFFD. This Interrogatory is further overbroad because it seeks "all" facts related to a broad topic. This Interrogatory also seeks

information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants face additional prejudice from this overbroad Interrogatory is because Plaintiffs seek information for a time frame in excess of five years. San Francisco will respond for the time period beginning January 1, 2020.

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows: The policies set forth in the City and County of San Francisco Employee Handbook apply to employees across all departments, which includes a Policy Regarding the Treatment of Co-Workers and Members of the Public to treat individuals with courtesy and respect.

**SFPD**: SFPD officers undergo a robust training process that complies with standards set by the state of California. Prior to joining SFPD, candidate undergo a 30-32 week POST certified police academy. Following successful completion of the academy, there is a 16 week POST certified field training program. After the initial training, officers have biannual refresher training requirements. Officers who are promoted must undergo new POST officer trainings at each new rank. The Department also issues periodic "roll call training" on a as needed basis as issues arise.

If SFPD changes policy, a Department Notice is issued electronically to all officers. Officers are required to sign an attestation that they received and reviewed the Department Notice and are expected to know and comply with department policy. Officers who fail to comply with applicable rules may be disciplined pursuant to Department General Order 2.07.

In addition, SFPD officers also discuss policies and procedures applicable to their work with their supervisors during daily lineups. Supervisors are often on scene with their subordinates observing the work being performed. SFPD also uses documentation to ensure that officers follow applicable policies and procedures; all incident reports are reviewed by a supervisor.

**DPW**: DPW objects to the term "property" to the extent Plaintiffs seek to include abandoned items DPW will interpret the term "property" to refer to temporarily unattended items that are bagged and tagged, not abandoned items that are discarded.

DPW employees act consistent with their obligations under the bag and tag policy and continue to instruct DPW personnel to perform their job duties consistent with departmental policy. DPW has

produced its bag and tag policy to Plaintiffs (*see e.g.*, CCSF-COH_000001), and hereby incorporates that policy into this response by reference.

The employees at DPW whose work touches on the bag and tag policy are a part of DPW Bureau of Street and Environmental Services (BSES). BSES monitors, assesses, and ensures compliance with the bag and tag policy through training, reinforcing that compliance with the policy is a department priority, documentation, and the potential for positive and negative consequences for compliance or non-compliance, respectively. All new BSES employees whose work involves implementing the bag and policy are trained on the policy through a robust powerpoint training, which includes an opportunity for employees to ask questions. (S*ee e.g.*, CCSF-COH_000418-CCSF-COH_000432; CCSF-COH_437437- CCSF-COH_437489. ) DPW has revised its powerpoint training over time. The current version of the bag and tag powerpoint also includes slides specifically targeted at hypothetical situations in which a laborer would need to apply the bag and tag policy.

BSES holds full and refresher trainings on the bag and tag policy for these same employees quarterly. Full trainings are accompanied by the current version of the powerpoint and walk through the bag and tag process in detail, including using a flow chart. There are opportunities for employees to ask questions and receive answers at each full training. (See e.g., CCSF-COH_356886- CCSF-COH_356949; CCSF-COH_660191.) DPW previously submitted declarations regarding its training (see ECF Nos. 238, 292), and incorporates those documents into this response by reference.

In between full trainings BSES holds refresher or informal trainings for employees, which occur as part of weekly meetings. The weekly meetings for supervisors is the Sup II meeting. The weekly meeting for general laborers is a Tailgate. At these refresher meetings, a presenter may cover the full bag and tag policy or drill down on specific aspects of the policy for additional training. Meeting minutes reflect when bag and tag topics are covered at the Sup II meeting. The Tailgate meetings are designed to trickle down the same information covered at the Sup II meetings. Tailgate meetings do not have meeting minutes, but are often accompanied by sign-in sheets documenting attendance. When there are more in-depth trainings on the bag and tag policy at Tailgate meetings, the sign-in sheets may reflect "bag and tag" as the topic discussed. (*See e.g.*, CCSF-COH_000399, CCSF-COH_000417.) Like full trainings, employees have the opportunity to ask questions about

implementing the bag and tag policy during these refresher trainings. Whether a supervisor or general laborer, DPW expects that employees attend Sup II or Tailgate meetings for these teams as applicable.

Outside of full and refresher trainings employees also receive on-the-job training around the bag and tag policy. Supervisors are available to Zone employees by radio or phone and are often on scene at HSOC encampment resolutions or Joint Field Operations along with the Hot Spot and/or Reactionary crews. Employees are encouraged to, and do, ask questions of their supervisors in the field. Where a supervisor has a question, they can also elevate the issue to a manager or to an assistant superintendent.

DPW also uses documentation to ensure that employees follow the bag and tag policy. When employees respond to service orders coded as "Encampment" or "Bag and Tag," they enter information about the encounter into CMMS, which is a centralized DPW database for tracking service orders. Those service orders often include the date, time, and location where DPW responded to the service request. It may also include photographs of the location and notes about DPW's response at the location. Any photographs are viewable in CMMS by clicking on the hyperlink under the "Documents" heading. DPW employees receive training on how to appropriately used the CMMS database. (See e.g., CCSF-COH_ 573434- CCSF-COH_ 573453.) Since CMMS is a way to track compliance with the bag and tag policy, training on CMMS is training in furtherance of ensuring compliance with the bag and tag policy.  The City will produce the CMMS entries coded as "Encampment" or "Bag and Tag" for the time period beginning January 2020.

CMMS records are not the only documentation DPW uses with respect to the bag and tag policy. DPW continues to fill out bag and tag logs when property from public spaces is collected and stored pursuant to the policy. The bag and tag records DPW creates when it collects items are produced as part of the City's ongoing three week-productions pursuant to Dkt. No. 129, *see e.g.*, CCSF_COH_PI_DPW_000001-000035; CCSF_COH_PI_DPW_000037-000048; CCSF_COH_PI_DPW_000050-000062; CCSF_COH_PI_DPW_000065-000082; CCSF_COH_PI_DPW_000084-000090; CCSF_COH_PI_DPW_000092-000100; CCSF_COH_PI_DPW_000102-000108; CCSF_COH_PI_DPW_000110-000118; CCSF_COH_PI_DPW_000120-000127; CCSF_COH_PI_DPW_000129-000141; CCSF-

COH_000241; CCSF-COH_000251-000263; CCSF-COH_000267- 000302; CCSF-COH_000305- 000315; CCSF-COH_000317-000349; CCSF-COH_000354; CCSF-COH_003135- 003151; CCSF-COH_003153- 003165; CCSF-COH_003169-003186; CCSF-COH_003188- 003227; CCSF-COH_003233- 003314; CCSF-COH_003322- 003330; CCSF-COH_048490- 048497; CCSF-COH_048682; CCSF-COH_049186- 049194; CCSF-COH_049196- 049206; CCSF-COH_051816- 051828; CCSF-COH_052646; CCSF-COH_053223- 053236; CCSF-COH_053263- 053282; CCSF-COH_053442- 053458; CCSF-COH_053490- 053502; CCSF-COH_053534- 053542; CCSF-COH_198464; CCSF-COH_198511- 198528; CCSF-COH_198571- 198581; CCSF-COH_198872- 198881; CCSF-COH_198921- 198930; CCSF-COH_198976- 198983; CCSF-COH_199116- 199120; CCSF-COH_199372- 199380; CCSF-COH_199382- 199393; CCSF-COH_199517- 1995025; CCSF-COH_199615- 199619; CCSF-COH_199623- 199630; CCSF-COH_260725- 260732; CCSF-COH_260795- 260804; CCSF-COH_260869- 260871; CCSF-COH_260873- 260881; CCSF-COH_261154- 261165; CCSF-COH_261531- 261539; CCSF-COH_261541- 261555; CCSF-COH_261628- 261639; CCSF-COH_261938- 261956; CCSF-COH_262002- 262021; CCSF-COH_262057- 262063; CCSF-COH_262423- 262439; CCSF-COH_262515- CCSF-COH_262518; CCSF-COH_262537- CCSF-COH_262547; CCSF-COH_262705- CCSF-COH_262727; CCSF-COH_262786- CCSF-COH_262802; and CCSF-COH_262976- CCSF-COH_262987; CCSF-COH_308721-308774; CCSF-COH_309475-CCSF-COH_309513; CCSF-COH_309519-CCSF-COH_309542; CCSF-COH_351573-CCSF-COH_351606; CCSF-COH_351614- CCSF-COH_351626; CCSF-COH_352050- CCSF-COH_352082; CCSF-COH_354983- CCSF-COH_355001; CCSF-COH_355004- CCSF-COH_355015; CCSF-COH_355019- CCSF-COH_355038; CCSF-COH_356128- CCSF-COH_356139; CCSF-COH_356142- CCSF-COH_356155; CCSF-COH_356159- CCSF-COH_356177; CCSF-COH_356849- CCSF-COH_356869; CCSF-COH_356874- CCSF-COH_356884; CCSF-COH_356952- CCSF-COH_356969; CCSF-COH_411220- CCSF-COH_4112903; CCSF-COH_436648-436670; CCSF-COH_436679- CCSF-COH_436687; CCSF-COH_436689- CCSF-COH_436710; CCSF-COH_492762- CCSF-COH_492779; CCSF-COH_492782- CCSF-COH_492807; CCSF-COH_492812- CCSF-COH_492834; CCSF-COH_660192- CCSF-COH_660213; CCSF-

1  COH_660215- CCSF-COH_660239; CCSF-COH_660249- CCSF-COH_660321, and Defendants

2  incorporate them by reference into this response.

3          DPW then logs those bag and tag records into a central excel spreadsheet. At different times

4  during the relevant period, DPW may have used color-coded tags or separate storage containers to

5  track items bagged and tagged each month.DPW has produced those records in real-time every three

6  weeks to Plaintiffs and incorporates both the past and future productions of these records into its

7  response by reference (*see e.g.*, CCSF_COH_PI_DPW_000036; CCSF_COH_PI_DPW_000049;

8  CCSF_COH_PI_DPW_000063-000064; CCSF_COH_PI_DPW_000083;

9  CCSF_COH_PI_DPW_000091; CCSF_COH_PI_DPW_000101; CCSF_COH_PI_DPW_000109;

10  CCSF_COH_PI_DPW_000119; CCSF_COH_PI_DPW_000128; CCSF_COH_PI_DPW_000142;

11  CCSF-COH_000264;CCSF-COH_000265; CCSF-COH_000266- 198474; CCSF-COH_000303-

12  000304; CCSF-COH_000350-000353; CCSF-COH_003134; CCSF-COH_003152; CCSF-

13  COH_003166-003168; CCSF-COH_003187; CCSF-COH_003228-003232; CCSF-COH_003315;

14  CCSF-COH_003321; CCSF-COH_048498; CCSF-COH_048693; CCSF-COH_049195; CCSF-

15  COH_049207- 049208; CCSF-COH_051829; CCSF-COH_053237; CCSF-COH_053283; CCSF-

16  COH_053459; CCSF-COH_053503- 053504; CCSF-COH_053543; CCSF-COH_198475; CCSF-

17  COH_198529; CCSF-COH_198582- 198583; CCSF-COH_198882; CCSF-COH_198931; CCSF-

18  COH_198984; CCSF-COH_199121; CCSF-COH_199381; CCSF-COH_199394; CCSF-

19  COH_199526; CCSF-COH_199620; CCSF-COH_199631; CCSF-COH_199739; CCSF-

20  COH_260733; CCSF-COH_260805; CCSF-COH_260872; CCSF-COH_260882; CCSF-

21  COH_261166; CCSF-COH_261540; CCSF-COH_261556; CCSF-COH_261640; CCSF-

22  COH_261957; CCSF-COH_262022; CCSF-COH_262064; CCSF-COH_262440-262441; CCSF-

23  COH_262519; CCSF-COH_262536; CCSF-COH_262728; CCSF-COH_262803; and CCSF-

24  COH_262988; CCSF-COH_308775; CCSF-COH_309474; CCSF-COH_309514-CCSF-

25  COH_309518; CCSF-COH_351607- CCSF-COH_351613; CCSF-COH_352049; CCSF-

26  COH_352083; CCSF-COH_355002; CCSF-COH_355016- CCSF-COH_355018; CCSF-

27  COH_356127; CCSF-COH_356141; CCSF-COH_356158; CCSF-COH_356870; CCSF-

28  COH_356885; CCSF-COH_356970; CCSF-COH_411218- CCSF-COH_411219; CCSF-

COH_411294; CCSF-COH_436671- CCSF-COH_436672; CCSF-COH_436688; CCSF-COH_492780; CCSF-COH_492808; CCSF-COH_492835; CCSF-COH_660214; CCSF-COH_660240;  CCSF-COH_660246- CCSF-COH_660248).

Items that are bagged and tagged receive a physical tag. At certain points the color of the tag changed each month so that DPW can determine which bags have been in their custody long enough that they can properly be discarded consistent with policy. At other points DPW secured enough storage containers that items collected in the same month were all placed into the same container. If the employees responsible for managing the bag and tag storage facility notices that required information is missing from the bag and tag logs they can correct the behavior by either speaking with the supervisor for that crew or the crew member directly. Bag and tag issues along with issues concerning discardable items are regularly discussed at the Sup II meetings and follow-on crew tailgate meetings.

In addition to the paperwork DPW keeps when it bags and tags items in the public right of way, DPW also leaves a notice either the with the individual whose property was taken or posts the notice at the location where the items were taken in the event that the owner is not present. When the owner is present DPW gives this information orally. When the owner is not present DPW leaves the notice in writing. Examples of the notice of removal forms DPW leaves behind are: CCSF-COH_000249; and CCSF-COH_000366- 000367.

DPW Supervisor II's also prepare weekly reports for their own management covering the work their team accomplished that week. *See e.g*., CCSF-COH_077850; CCSF-COH_075183; CCSF-COH_075376; CCSF-COH_074501. In order to prepare these reports supervisors also review their employees work performance, which provides another opportunity to review compliance with the bag and tag policy and provide education on the policy as necessary.

Although DPW does not have the funds to provide bonuses to incentivize employees who comply with the bag and tag policy, it does praise those employees who go above and beyond as an incentive to comply with the policy. Where necessary, employees who fail to comply with a city policy are subject to progressive discipline beginning and a verbal and/or written warning all the way through termination for cause. DPW has provided corrective action around the bag and tag policy from

informal instruction through termination and/or separation. See e.g., CCSF-COH_437220-CCSF-COH_437436.

In combination all of these methods demonstrate to employees that compliance with the bag and tag policy is important to the department, which further incentivizes compliance with the policy.

In addition to the response included above, DPW filed declarations describing its training on the bag and tag policy as well as copies of the meeting minutes from the Sup II meetings and sign-in sheets from the relevant Tailgate meetings in response to Dkt. No. 193. Defendants incorporate those documents by reference here. Additionally, on August 16, 2024 in response to Dkt. No. 231 DPW agreed to include certain requirements as part of its full bag and tag training and its refresher trainings and incorporates by reference those provisions and any further updates to the bag and tag policy in response to Court orders.

**HSH:**  The HSH grant agreement with Heluna Health requires that outreach workers be trained in a variety of specified topics. Every outreach worker is required to participate in a comprehensive six week training and initial orientation period. In addition, the team is required to attend various refresher trainings throughout the year. Defendants will produce an overview of Heluna Health's training curriculum as well as a recent learning and development needs assessment plan developed for the HOT team.

In the field, there is a clinical supervisor as well an incident commander (who is in charge of operations) who oversees the entirety of the encampment resolution and will instruct members of the Encampment Resolution Team ("ERT" - part of SF HOT and staffed by Heluna Health) if they have done something inappropriate. ERT staff also have an administrative supervisor who goes over policies and expectations during resolutions.

**DEM**: See response to Interrogatory No. 2. Because DEM has no such "policies," as it understands that term, DEM does not and cannot "monitor, assess, ensure, and enforce compliance" with them. DEM coordinates operations with different departments that are responsible for executing those departments' policies and procedures.

**SFFD**: SFFD monitors, assesses, and ensures compliance with its policies related to interactions with unhoused persons through a continuous quality improvement team led by an SFFD

Captain in the Community Paramedicine Division. The Captain reviews various sources of information (e.g., encounter logs, patient charts, and other documents) to monitor and ensure compliance with SFFD policies. There are weekly meetings with the medical director to review events, including specific cases flagged for review. This is also how SFFD reviews and monitors members' performance. If this process leads to the conclusion that SFFD personnel need to be re-trained, appropriate re-training occurs. And if performance improvement plans are needed, a performance plan is implemented. If needed, this iterative review process can also lead to internal investigations, if appropriate.

**INTERROGATORY NO. 4**:

Describe in detail how You determine, track, monitor, and assess how many citations, arrests, fines, and move-along orders have been issued or threatened against Homeless Persons by Defendants, including all facts, Databases, and information on which You rely.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object to the phrase "threatened against" as vague and ambiguous. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to: SFPD, HSH, and DEM. Defendants object to this Interrogatory as compound because it contains two or more subparts that are not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains two requests: one seeking to have Defendants "describe in detail how" they perform certain actions and a second seeking to have Defendants identify "all facts, Databases, and information" on which they relied. Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as two

Interrogatories toward the agreed total of 50 Interrogatories per side. This Interrogatory is further overbroad because it seeks "all" facts related to a broad topic. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants face additional prejudice from this overbroad Interrogatory is because Plaintiffs seek information for a time frame in excess of five years. San Francisco will respond for the time period beginning January 1, 2020. Defendants object that the term "threatened" is undefined, overly broad and vague because it fails to "describe with reasonable particularity each item or category of items to be inspected." Rule 34(b)(1)(A). Defendants further object this Interrogatory is overbroad as to time and not calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows:

**SFPD**:  SFPD does not specifically track citations, arrests, fines, and move-along orders against persons experiencing homelessness. The databases used to track general citations and arrests that have been issued are: Crime Data Warehouse (incident reports that include some arrest information) and eCitations (digitally issued citations system). Neither system has a datapoint that indicates housing status. SFPD does not have a fine tracking system, nor does it track move-along orders. SFPD does not have a system that tracks threats of enforcement.

**HSH**: HSH does not track citations, arrests, fines, and move-along orders.

**DEM**:  DEM receives a daily report from the HSOC Incident Commander that may contain information concerning the number of arrests made or citations issued at a particular encampment resolution. Additionally, it is conceivable that Computer Aided Dispatch ("CAD") information sent by radio to DEM may contain references to arrests. However, DEM does not "determine, track, monitor, and assess" the information this Interrogatory references.

*** 

Defendants' answered Interrogatory No. 4 prior to the Supreme Court's decision in *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024) and the dismissal of Plaintiffs' related claims. Accordingly, responding to Interrogatory No. 4 is no longer relevant or proportional to the needs of the case.

**INTERROGATORY NO. 5**:

Describe in detail how You determine, track, monitor, and assess shelter bed availability and offers to Homeless Persons, including how you track, monitor and assess: how many shelter beds are available on a daily basis to be offered to Homeless Persons; what types of shelter are available on a daily basis, including congregate and non-congregate options; whether shelter is offered to Homeless Persons; whether shelter offers are accepted by Homeless Persons; which of Your personnel receive this information; and all communications between Your personnel regarding shelter availability before and during Sweep Operations or in interacting with a Homeless Encampment, and identify all facts, Databases, and information on which You rely.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object to this Interrogatory as compound because it contains two or more subparts that are not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains four requests: one seeking to have defendants "describe in detail" how they perform certain actions, a second seeking "all communications" between Defendants and their personnel, a third seeking to have Defendants identify "all facts, Databases, and information" on which they rely in part one and a fourth seeking to have Defendants identify "all facts, Databases, and information" on which they rely in part two. Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as four Interrogatories toward the agreed total of 50 Interrogatories per side. Defendants object that the phrase "Sweep Operations or in interacting with a Homeless Encampment" is vague, overbroad, pejorative, and disparaging. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response

is limited to: HSH and DEM. This Interrogatory is further overbroad because it seeks "all" facts related to a broad topic. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants face additional prejudice from this overbroad Interrogatory is because Plaintiffs seek information for a time frame in excess of five years. San Francisco will respond for the time period beginning January 1, 2020.

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows:

**HSH**: Temporary shelter programs maintain their bed occupancy and vacancy data in either the ONE System or RTZ databases. This data informs HSH what adult temporary shelter placements are available for placement each day. In addition, some adult temporary shelter sites confirm this data via text each morning to their assigned HSH Program Manager. For adult programs where HSOC is the only referent (SVN Safe Sleep and Gough Cabins), the HSH Program Manager reports all vacancies daily in the morning to the HSOC team and the centralized HSH Guest Placement team. For programs with multiple referring entities, the HSH Guest Placement team tracks and reports vacancies in shelter. The Guest Placement team utilizes a PowerBI dashboard which reports daily shelter vacancy data populated from the ONE System and RTZ.

Based on these vacancies, the HSH Guest Placement team allocates beds to each referral entity based on projected needs and the referral prioritization framework (which is described in the response to Interrogatory No. 14). For HSOC, the number of placements allocated is based on a weekly shelter bed request sent out to Guest Placement by the HSH / HSOC liaison the week prior. The shelter bed request calculation is determined by the Director of HSOC / DEM. This projection informs the Guest Placement team of location of resolutions both in the morning and afternoon and approximately how many beds may be needed on a particular day. Defendants will produce an example of this email correspondence informing Guest Placement of HSOC weekly shelter beds. Temporary shelter programs for which HSOC may be allocated beds include emergency shelters (Sanctuary, Hospitality House, MSC-S, Next Door), Navigation Centers (Central Waterfront, Division Circle, Embarcadero SAFE, Bayshore, Bayview SAFE, Taimon Booten), and Semi- and Non-congregate shelters (Adante, Cova, 711 Post, Ellis, Monarch, and Baldwin).

Once all shelter bed vacancies are allocated each morning, the Guest Placement team sends out an email with bed allocation projections to each referring entity. The Guest Placement team holds a 9:30 am weekday meeting attended by each referring entity where allocations are adjusted and finalized based on individual referring entity needs. After this meeting, the Guest Placement team sends out an email with the final daily allocations for each referring entity. The Guest Placement team also sends out an email each morning with a summary of the number of referrals made into the allocated shelter beds from the day prior.

Throughout the day, the HSH HSOC liaison and data analyst are in communication with the Guest Placement team regarding additional beds or types of beds needed to place encampment residents. The Guest Placement team may call shelters to identify beds vacated since the morning allocation was made, or call direct community referral partners who have an allotment of beds to see if one of them can be made available to accommodate an encampment resident. If an available bed is identified, the Guest Placement team will allocate additional needed spaces to HSOC. HSH requests these beds based on the needs of the individuals on site at the encampment.

Since February 2023, the HSH Guest Placement team identifies any shelter bed allocations where an individual was not referred by the end of the day. These unused shelter bed allocations are then reported to the HSH HSOC liaison in the evening to be used by HSOC the next day. The Guest Placement team will account for these allocations the next morning in the HSOC total allocation. Typically, HSOC will receive additional bed allocations in the morning, once the Guest Placement team knows the full number of total vacancies in the shelter system through the PowerBI dashboard.

**DEM**:  DEM staff including Sam Dodge and David Nakanishi have access to communications among City personnel at the site of an encampment resolution, including the HSOC Incident Commander, ERT workers, and DPH Behavioral Health specialists, who engage individuals at the encampment site and record client identifying information and information needed for shelter placement. That information is communicated by text exchanges throughout the resolution, as well as by a Microsoft tool that populates an Excel spreadsheet known as a Client Log. The Client Log records, for each person experiencing homelessness engaged by HSOC: (1) the date of the engagement; (2) the shift (e.g., morning or afternoon); (3) the location of the engagement; (4) the

initials of the HSOC staff member entering the information; (5) the client's first name; (6) the client's last name; (7) any nickname used by the client; (8) the client's date of birth; (9) the last four digits of the client's Social Security number; (10) the client's desired destination (shelter, Safe Sleeping, Safe Parking, DPH Program, Homeward Bound, or other referral), or refusing service; (11) the client's reason(s) for refusing service; (12) whether the client is with a partner; (13) the initials of any partner; (14) the client's gender identity; (15) presence of any physical disability; (16) information as to the type of any physical disability; (17) the number of pets the client possesses; (18) the number of bikes the client possesses; (19) the number of bags the client possesses; (20) whether follow up is required; (21) if so, what kind of follow up is required; (22) whether the client is willing to provide their name; (23) whether the client has a Social Security number; (24) what kind of vehicle or vehicles the client has; and (25) the names of people sharing those vehicles. HSH staff are able to access the Client Log and use the information it contains to secure appropriate shelter placements for clients seeking such placements. Information from the Client Log is also entered into the Online Navigation and Entry ("ONE") System, also known as the HSH BitFocus Clarity Social Services system, which is used as a tracking system for unhoused individuals and is used by the City's shelter and housing programs to identify clients in the system.

***

Defendants' answered Interrogatory No. 5 prior to the Supreme Court's decision in *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024) and the dismissal of Plaintiffs' related claims. Accordingly, responding to Interrogatory No. 5 is no longer relevant or proportional to the needs of the case.

**INTERROGATORY NO. 6**:

Describe in detail the basis for Your contention that only approximately 40% of Homeless Persons at HSOC Encampment Resolutions accept offers of shelter (Dkt. No. 45 at 17), and identify all facts, Databases, and information on which You rely.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege

and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object to this Interrogatory as compound because it contains two or more subparts that are not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains two requests: one seeking to have Defendant "Describe in detail" that basis for a contention included with their Opposition to Plaintiffs' Motion for a Preliminary Injunction and a second seeking to have Defendants "identify all facts, Databases, and information" on which Defendants relied in part one. Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as two Interrogatories toward the agreed total of 50 Interrogatories per side. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to: HSH and DEM. This Interrogatory is further overbroad because it seeks "all" facts related to a broad topic. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants face additional prejudice from this overbroad Interrogatory is because Plaintiffs seek information for a time frame in excess of five years. San Francisco will respond for the time period beginning January 1, 2020. Defendants object to this Interrogatory to the extent it prematurely seeks the disclosure of expert witness information.

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows:

**HSH**:  HSH and DEM maintain a grid (i.e., a Microsoft form that is transferred from mobile device input to an excel spreadsheet that HSH and DEM jointly manage) that tracks all people engaged in an encampment resolution and the outcome of that engagement. The link to the grid is provided in a comment at the top of this document. Recently, the forms have been updated to track more closely the numbers of people engaged who were referred to shelter, were engaged and refused shelter, who provided no information, and who were already sheltered. This is relatively new tracking

information from the last 6-7 months (as of March 2023), but it provides clear data on who, of those engaged, is accepting and refusing shelter. This data is not in a format that is easily aggregated or manipulated, but the data show that on average, around 40 percent accept shelter; however there are days that no one will accept the offer of shelter placement.

**DEM**: In the latter part of 2021, Sam Dodge, likely in conjunction with other department managers, reviewed available information concerning the number of HSOC encampment resolutions occurring from approximately June 2020 onward; the number of persons present in such encampments who were unwilling to engage with HSOC staff during those resolutions; the number of persons present in such encampments who were willing to, and did, engage with HSOC staff during those resolutions; and the number of client placements made as a result of those resolutions. That information was located the Client Log, described above, as well as in weekly reports (which are no longer prepared). From that information DEM calculated that the rate at which encampment residents accepted offers of shelter was approximately 40%. The calculation was repeated on at least a quarterly basis in late 2021 and/or early 2022.

***

Defendants' answered Interrogatory No. 6 prior to the Supreme Court's decision in *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024) and the dismissal of Plaintiffs' related claims. Accordingly, responding to Interrogatory No. 6 is no longer relevant or proportional to the needs of the case.

**INTERROGATORY NO. 7**:

Describe in detail all steps each of Your personnel, including San Francisco Police Department ("SFPD"), San Francisco Department of Public Works ("DPW"), San Francisco Fire Department ("SFFD"), San Francisco Department of Homelessness and Supportive Housing ("HSH"), and the Homeless Outreach Team ("HOT") members, take during the course of Sweep Operations when there is not sufficient available shelter to offer, including whether Your personnel remove Homeless Persons from Homeless Encampments in those instances, how these circumstances are documented, what documents record these circumstances and Your response to them, and identify all facts, Databases, and information on which You rely in making these determinations.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object to this Interrogatory as compound because it contains two or more subparts that are not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains four requests: one seeking to have Defendants "describe in detail" the steps certain employees took when there were insufficient available shelter beds, a second seeking to have Defendants identify "what documents record" the circumstances in part one, a third seeking to have Defendants "identify all facts, Databases, and information" on which they relied to answer part one, and a fourth seeking to have Defendants "identify all facts, databases, and information" on which they relied to answer part two. Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as four Interrogatories toward the agreed total of 50 Interrogatories per side. Defendants object to the phrase "not sufficient available shelter to offer" as vague and ambiguous. Defendants will interpret this phrase to mean when there are fewer shelter beds available in the City as compared to the number of individuals who express an interest in shelter when an offer is made by San Francisco employees and who remain when transportation is available to take someone to an offer of shelter. Defendants object that the phrase "Sweep Operations" is vague, overbroad, pejorative, and disparaging. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to: SFPD, DPW, HS, DEM, and SFFD. This Interrogatory is further overbroad because it seeks "all" steps related to a broad topic. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants face additional prejudice from this overbroad Interrogatory is because Plaintiffs seek information for a time frame in excess of five years.

San Francisco will respond for the time period beginning January 1, 2020. Defendants object that the term "not sufficient available shelter to offer" is undefined, overly broad and vague because it fails to "describe with reasonable particularity each item or category of items to be inspected." Rule 34(b)(1)(A).

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows: The policies set forth in the City and County of San Francisco Employee Handbook apply to employees across all departments, which includes a Policy Regarding the Treatment of Co-Workers and Members of the Public to treat individuals with courtesy and respect.

**SFPD**: Prior to the Supreme Court's ruling in Grants Pass, if there is no shelter available, SFPD does not take any enforcement actions against people experiencing homelessness unless the subject/encampments are blocking doorways, garage doorways, any fire exits/emergency escape routes (spaces on sidewalk under the drop-down ladders on apartment buildings), fire hydrants, blocking entire sidewalks, or if the encampments are in the streets. In these exceptions, SFPD will ask the subject/s to voluntarily comply and abate the violations and will use enforcement as last resort if they refuse.

SFPD sometimes encounters other unlawful activity while present an encampment including, but not limited to, domestic violence, assault, animal abuse, illegally tapping electricity from utility poles, vandalism, damaging buildings with unlawful bonfires, and loud noise or music creating a nuisance. If SFPD observes a subject that is a danger to themselves or to others, that individual may be subject to a mental evaluation detention subject to Section 5150 of the Welfare and Institutions Code.

If SFPD takes any enforcement action (make an arrest for misdemeanor/felony/warrant), the officer must first obtain approval from a police Sergeant or Lieutenant unless it is an infraction citation. A police report with a case number will be generated if it is a misdemeanor/felony/warrant arrest, documenting the arrest, and documented on the citation. Dispatch is also advised an arrest/citation has been made and documented in Computer Aided Dispatch ("CAD"). If the incident is an enforcement action, SFPD officers activate their body worn camera ("BWC") which records the interaction.

SFPD officers are guided by Department General Order ("DGO") Nos. 5.06 "Citation Release," 5.04 "Investigative Detention," 5.04 "Arrest by Private Persons," 6.09 "Domestic Violence," 6.14 "Psychological Evaluation of Adults," 6.18 "Warrant Arrests," and 5.18 "Prisoner Handling and Transportation."

SFPD officers are also guided by DGO. 6.11 "Obstruction of Streets and Sidewalks," Department Bulletin (DB 19-080) "Legal Enforcement Options for Addressing Lodging and Illegal Encampments issued on 04/16/2019, (DB 20-100) "Legal Enforcement Options for Addressing Lodging and Illegal Tents, Living Structures, and Encampments during Covid-19" issued on June 12, 2020, and DB 23-007 "Enforcement of Laws and Ordinances for Homeless individuals Sitting, Lying, or Sleeping on Public Property" issued on January 25, 2023.

**DPW**: DPW BSES crew treat individuals including those who are experiencing homelessness with courtesy and respect. In the context of an HSOC resolution, BSES crew members typically do not arrive at the encampment until 8:00 a.m. or later and will not begin cleaning up an encampment until after ERT has conducted outreach, typically around 9:30 or 10:00 a.m. While crew members wait for ERT to conduct its outreach, BSES crew members perform a variety of other street cleaning duties around the encampment perimeter, in regular communication with ERT and the HSOC Incident Commander.

DPW stores and discards items left behind pursuant to its policy for the removal and temporary storage of personal items collected from public property, known as its "bag and tag" policy, set forth in Procedure No. 16-05-08 Removal and Temporary Storage of Personal Items Collected From Public Property. The current revision of this policy is REV 3. DPW incorporates that policy into this response. BSES crew facilitate the HSOC resolutions by cleaning and sanitizing public spaces, as well as bagging and tagging and/or removing property consistent with policy.

When any items are bagged and tagged, DPW staff provide information about when and where to retrieve the items to the owner. If no owner is present or comes forward a written notice is posed in the immediate vicinity of the removal. Where the owner is present, DPW typically provides the same information orally. Those bag and tag logs are collected in a centralized excel spreadsheet. BSES crew may also hand out free garbage bags to persons experiencing homelessness and permit them to put any

unwanted items in the bags for collection and removal by DPW. BSES crew may take photographs of items that are removed from a City sidewalk or street. (*See e.g.*, CCSF-COH_000243-CCSF-COH_000248.) BSES crew perform similar work in the context of JFO outreach in the Tenderloin area. They offer these services regardless of the number of available shelter beds.

DPW employees do not invoke the threat of a criminal citations at an HSOC resolution or when they encounter a person experiencing homelessness, regardless of whether there are sufficient available shelter beds to offer everyone at the encampment. BSES crew members are not law enforcement officers.

**HSH**:  It is rare that HSH/HSOC uses all allocated beds on a given day. However, if this unusual circumstance did occur prior to *Grants Pass*, HSOC stopped the resolution (i.e., HSH/HSOC stops asking people to move, and stops entering data into the grid (i.e., a Microsoft form that is transferred from mobile device input to an excel spreadsheet that HSH and DEM jointly manage described above) since there are no more shelter resources to be offered) and HSOC switches to informing people that cleaning needs to take place and cleaning around people if they do not voluntarily move. ERT will inform campers who might have agreed to shelter placement had a bed been available of where they will be the next day so that campers can follow up to attain placement the next day. Again, this seldom happens as it is most often the case that the bed supply is adequate, but persons at an encampment refuse the offer of shelter when it is made.

**DEM**: Other than having access to communications among and from City personnel at the site of an encampment resolution, including the HSOC Incident Commander, ERT workers, and DPH Behavioral Health specialists, at the time of the resolution, as described in the Response to Interrogatory No. 5, DEM has no involvement or participation in activities described in this Interrogatory.

**SFFD**: Although SFFD personnel are involved in HSOC resolutions, SFFD does not direct these operations. SFFD assigns personnel to work on HSOC resolutions and thereafter SFFD working on these operations report to supervisors outside of SFFD. While SFFD still, for example, approves their personnel time off requests and similar work-related issues, the substance of the work performed on HSOC is not under SFFD's purview. In other words, SFFD does not direct or supervise its

assigned, or "loaned", personnel while they are working on HSOC resolutions. Accordingly, SFFD cannot details all the steps its personnel take during HSOC resolutions. Further, the only SFFD personnel involved in HSOC and JFO operations are HSOC incident commanders. SFFD refers Plaintiffs to the deposition transcripts of Leslie Fong and Brandon Cunningham for information relevant to this interrogatory.

***

Defendants' answered Interrogatory No. 7 prior to the Supreme Court's decision in *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024) and the dismissal of Plaintiffs' related claims. Accordingly, responding to Interrogatory No. 7 is no longer relevant or proportional to the needs of the case.

**INTERROGATORY NO. 8:**

Describe in detail all steps Your personnel, including SFPD, DPW, SFFD, and HOT team members, take during the course of Sweep Operations or at Homeless Encampments when Homeless Persons refuse to leave the site, including all facts, Databases, and information on which You rely.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object to this Interrogatory as compound because it contains two or more subparts that are not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains two requests: one seeking to have Defendants "describe in detail all steps" they took at a homeless encampment when an individual refuses to leave and a second seeking to have Defendants identify "all facts, Databases, and information" on which they relied to answer part one. Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as two Interrogatories toward the agreed total of 50 Interrogatories per side. Defendants object that the phrase "Sweep Operations or at Homeless Encampments" is vague, overbroad, pejorative, and disparaging. Defendants object to this

Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to: SFPD, DPW, HSH, and SFFD. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. This Interrogatory is further overbroad because it seeks "all" steps related to a broad topic. Defendants face additional prejudice from this overbroad Interrogatory is because Plaintiffs seek information for a time frame in excess of five years. San Francisco will respond for the time period beginning January 1, 2020.

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows: The policies set forth in the City and County of San Francisco Employee Handbook apply to employees across all departments, which includes a Policy Regarding the Treatment of Co-Workers and Members of the Public to treat individuals with courtesy and respect.

**SFPD**: During the Court's injunction, and prior to the Supreme Court's decision in *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024), people were offered shelter and if they refused shelter but were willing to leave, they were free to leave, and SFPD would take no further police actions. If people accepted shelter, transportation would be arranged to take them to the shelter location. In the context of an encampment resolution, those who refused to accept shelter and refused to relocate were either left in place or requested to move temporarily for cleaning. In the context of responses to calls for service, those who refused to accept shelter and refused to relocate were left in place. SFPD officers would still enforce laws and ordinances that were not enjoined by the Court's injunction when appropriate. SFPD officers followed Department Notice 23-202, 23-166, or 23-007, during their applicable time periods.

Prior to the Court's injunction, and after the Supreme Court's decision in *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024), if people refused shelter and refused to leave, SFPD would explain to them that they would be in violation of Penal Code 647(e) "Unauthorized Lodging" and could be subject to misdemeanor arrest. SFPD and HOT team members would attempt numerous times to engage and talk to the subject to persuade them to voluntarily comply or accept shelter, and only as a

last resort will take enforcement actions (arrest, cite for 647e PC, and release on scene). SFPD officers followed Department Notice 24-126, or 20-100, during their applicable time periods.

**DPW**: The DPW Bag and Tag policy applies regardless of whether person refuses to leave the site. In the context of an HSOC resolution, BSES crew members typically do not arrive at an AM encampment until 8:00 a.m. or later and will not begin cleaning up an encampment until after ERT has conducted outreach, typically around 9:30 or 10:00 a.m. While crew members wait for ERT to conduct its outreach, BSES crew members perform a variety of other street cleaning duties around the encampment perimeter, in regular communication with ERT and the HSOC Incident Commander.

DPW stores and discards items left behind pursuant to its policy for the removal and temporary storage of personal items collected from public property, known as its "bag and tag" policy, set forth in Procedure No. 16-05-08 Removal and Temporary Storage of Personal Items Collected From Public Property. The current revision of this policy is REV 3. DPW incorporates that policy by reference into its response to this Interrogatory. BSES crew facilitate the HSOC resolutions by cleaning and sanitizing public spaces, as well as bagging and tagging and/or removing property consistent with policy. When any items are bagged and tagged, DPW crew provide information about when and where to retrieve the items to the owner. If no owner is present or comes forward, a written notice is posed in the immediate vicinity of the removal. (*See e.g.*, CCSF-COH_000249-CCSF-COH_000250.) Where the owner is present, the information is provided orally. Those bag and tag logs are collected in a centralized excel spreadsheet. BSES crew may also hand out free garbage bags to persons experiencing homelessness and permit them to put any unwanted items in the bags for collection and removal by DPW. They offer these services regardless of whether in individual refuses to leave. BSES employees may take photographs of items that are removed from a City sidewalk or street. (See e.g., CCSF-COH_000243-CCSF-COH_000248.)

Outside the context of an HSOC resolution, a DPW BSES employee's regular work assignments, for example, responding to complaints through 311, may require them to respond to a location where a person experiencing homelessness is present although that fact is not always clear from the request for service itself. DPW generally try to clean around the individual and/or his or her belongings. If the situation requires, BSES crew may ask the individual to temporarily relocate for the

purpose of cleaning the public property. In doing so, they do not invoke the threat of a criminal citation for a failure to comply and they do not ask an individual to leave permanently, only while cleaning is underway. DPW staff also seek to provide an individual sufficient time to remove their property when such a request is made, based on the circumstances of the interaction. DPW generally does not ask someone to move unless there are health or safety issues or the public right of way is inaccessible. When individuals are asked to move temporarily, DPW staff provide them time to move their belongings and inform them that unremoved items will be bagged and tagged or discarded in accordance with DPW policy. BSES crew perform similar work in the context of JFO outreach in the Tenderloin area.

DPW employees do not invoke the threat of a criminal citations when they encounter a person experiencing homelessness, regardless of whether that individual refuses to leave. BSES crew members are not law enforcement officers.

**HSH**: Neither HSH or its ERT provider, Heluna Health, has an enforcement role. ERT takes minimal steps when a person experiencing homelessness refuse to leave the site. ERT may try to encourage people verbally and talk about the need for street cleaning etc, but they are not empowered to compel anyone leave a site and ERT staff are well aware of such conduct occurring.

**SFFD**: See SFFD's response to Interrogatory Nos. 2 and 7.

**INTERROGATORY NO. 9**:

Describe in detail all steps Your personnel, including SFPD, DPW, SFFD, and HOT team members, take during the course of Sweep Operations when interacting with Homeless Persons who have disabilities and/or special needs, including all steps personnel take to determine whether Homeless Persons with whom they interact have one or more disabilities or special needs, and how personnel record, report or memorialize the existence of such disabilities or special needs, including all facts, Databases, and information on which You rely.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions.

Defendants object to this Interrogatory as compound because it contains two or more subparts that are not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains two requests: one seeking to have Defendants "describe in detail" all steps their employees take when they encounter a person with disabilities and a second seeking to have Defendants identify "all facts, Databases, and information" on which they relied to answer part one. Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as two Interrogatories toward the agreed total of 50 Interrogatories per side. Defendants object to the phrase "disabilities and/or special needs" as vague and ambiguous. Defendants will interpret this phrase to mean when an individual has expressly informed a San Francisco employee at the encampment resolution that they have a legal disability cognizable under the ADA that requires an accommodation and directly requests a specific accommodation. Defendants object that the phrase "Sweep Operations when interacting with Homeless Persons" is vague, overbroad, pejorative, and disparaging. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to: SFPD, DPW, HSH, and SFFD. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. This Interrogatory is further overbroad because it seeks "all" steps related to a broad topic. Defendants face additional prejudice from this overbroad Interrogatory is because Plaintiffs seek information for a time frame in excess of five years. San Francisco will respond for the time period beginning January 1, 2020.

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows: The policies set forth in the City and County of San Francisco Employee Handbook apply to employees across all departments, which includes a Policy Regarding the Treatment of Co-Workers and Members of the Public to treat individuals with courtesy and respect.

**SFPD**: SFPD complies with all obligations under the General Orders and any applicable Department Notices and/or Bulletins including but not limited to: Department General Order 5.23, Department Bulletin 21-063, and Department Notice 22-085.

**DPW**: DPW stores and discards items left behind pursuant to its policy for the removal and temporary storage of personal items collected from public property, known as its "bag and tag" policy, set forth in Procedure No. 16-05-08 Removal and Temporary Storage of Personal Items Collected From Public Property. The current revision of this policy is REV 3. DPW incorporates its bag and tag policy into this response by reference. The bag and tag policy applies at all times. Employees are trained to comply with all aspects of the policy, including the provisions around providing sufficient time for persons with special needs to move their items.

In the context of an HSOC resolution, by the time DPW starts their work, individuals at the resolution location have already had 72 hours to move their belongings. If an individual requests additional time to move, DPW provides. it. Outside the context of an HSOC resolution, when DPW employees arrive to a work location the staff will provide the owner or the owner's designee with a reasonable amount of time, approximately 30 minutes, to collect and move their belongings out of the public right of way, taking into account any special needs that individuals may have. "Special needs" in this context includes any disabilities that would prevent a person from moving their items in the time provided and about which the person has alerted DPW. DPW employees implementing the bag and tag policy have no obligation to ask whether a person they encounter had a disability and/or requires an accommodation, however employees use any information a person voluntarily provides about whether they have a disability or need an accommodation in assessing how to interpret a "reasonable amount of time" as the phrase is used in the bag and tag policy. Where an individual requests additional time on the basis of a disability, DPW provides it. Because the number of variations of what could fall within the ambit of "special needs" is so large, it is not possible for DPW to describe each such circumstance here.

DPW may also offer to assist the individual by handing out garbage bags or offering to discard any items the individual no longer wants. In that circumstances DPW will tell the person that they can leave behind anything they no longer want and DPW will take care of discarding it for them.

When any items are bagged and tagged, DPW staff provide information about when and where to retrieve the items to the owner. If no owner is present or comes forward, a written notice is posed in the immediate vicinity of the removal. (See e.g., CCSF-COH_000249-CCSF-COH_000250.) When an owner or their designee is present DPW may provide the same information orally. DPW has stored bagged and tagged items in the same location for years and individuals generally know where to come to claim bagged and tagged property even without notice. Those bag and tag logs are collected in a centralized excel spreadsheet maintained by the Special Projects team.

Outside the context of an HSOC resolution, a BSES crew member's regular work assignments, for example, responding to complaints through 311, may require them to respond to a location where a person with a disability is present although that fact is not always clear from the request for service itself. DPW generally try to clean around the individual and/or his or her belongings. If the situation requires, DPW may ask the individual to temporarily relocate for the purpose of cleaning the public property.  If the person requests an accommodation, for example, additional time to move their property because of a disability, DPW staff will make reasonable efforts to honor the request where public health and safety permit. DPW staff seek to provide an individual sufficient time to remove their property when such a request is made, based on the unique circumstances of the interaction. When individuals are asked to move temporarily, DPW staff provide them time to move their belongings and inform them that unremoved items will be bagged and tagged or discarded in accordance with DPW policy as set forth in No. 16-05-08 Removal and Temporary Storage of Personal Items Collected From Public Property.

DPW tracks its service orders in the CMMS database. The City will produce to Plaintiffs CMMS entries coded as "Encampment" or "Bag and Tag" for the period of January 2020 through February 14, 2025 and incorporates those documents by reference into this response. DPW employees are not required to create any paperwork unique to their interactions with a person who has disabilities separate and apart from the paperwork they create in response to any other kind of service order. To the extent any of DPW employees notes or photographs indicate a person they encountered had a disability, that information would be accessible through the CMMS database.

By cleaning and greening the City sidewalks and public rights of way DPW employees are serving the members of the City community with disabilities and/or special needs, especially those with mobility-based concerns to ensure that public rights of way are equally accessible to them. The City has received complaints about encampments blocking the right of way through the Mayor's Office on Disability, which are tracked in a spreadsheet. The City will produce the spreadsheet tracking complaints from January 2020 through July 2024.

**HSH**: On the day of the resolution, the incident commander and ERT assess and ask each person engaged (if possible) whether they present with disabilities or mobility issues. Information is recorded in our grid (i.e., a Microsoft form that is transferred from mobile device input to an excel spreadsheet that HSH and DEM jointly manage described above) in response to the prompt: "does this person present with disabilities?" This is a yes/no data field plus a space for notes to be entered. This data is mainly used for the purposes of ensuring that individuals are appropriately matched to shelter (e.g., a client in a wheelchair would not be placed in an upper bunk bed) and to provide linkage to appropriate services as necessary.

When a person is seen or known to have mental health issues, HSOC team members from DPH who are present at the resolutions will step in and try to engage the individual. The ERT supervisor, who is often in the field, is also a licensed clinician and can intervene and assess client needs as needed.

**SFFD**: See SFFD's response to Interrogatory Nos. 2 and 7.

\*\*\*

Defendants' answered Interrogatory No. 9 prior to the dismissal of disability related claims in this case. Accordingly, responding to Interrogatory No. 9 is no longer relevant or proportional to the needs of the case.

**INTERROGATORY NO. 10**:

List and describe in detail every Sweep Operation You have conducted, including for each Sweep Operation the date, time, and location; the identity of all Your enforcement personnel participating in the Sweep Operation; the amount and timing of any prior notice given; the identity of any persons allegedly offered specific and available shelter, and which if any persons so offered

1  shelter declined; and whether any property was destroyed or stored pursuant to Your Bag and Tag

2  policy during the Sweep Operation, including but not limited to any information You have regarding

3  each of the Sweep Operations specifically enumerated in the declarations and materials supporting

4  Plaintiffs' Motion for Preliminary Injunction (*see* Dkt. Nos. 9-3 through 9-6).

5  <u>**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10**</u>:

6  Defendants incorporate into this response the preliminary statement and general objections set

7  forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege

8  and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions.

9  Defendants object to this Interrogatory as compound because it contains two or more subparts that are

10  not logically or factually subsumed within and necessarily related to the primary question. (See

11  caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically,

12  this Interrogatory contains five requests: one seeking to have Defendants "list and describe in detail

13  every sweep operation" they have conducted, one seeking to have Defendants identify "all your

14  enforcement personnel participating in the sweep operations," a third seeking to have Defendants

15  provide "the amount and timing of any prior notice given" as part of a sweep operation, a fourth

16  asking Defendants to identify "any persons allegedly offered specific and available shelter, and which

17  if any persons so offered shelter declined" at every sweep operation, and a fifth seeking to have

18  Defendants state for each sweep operation "whether any property was destroyed or stored pursuant" to

19  the City's bag and tag policy. Having given Plaintiffs an opportunity to withdraw and redraft this

20  Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as five Interrogatories

21  toward the agreed total of 50 Interrogatories per side. Defendants object that the phrase "Sweep

22  Operations" is vague, overbroad, pejorative, and disparaging. This Interrogatory also seeks

23  information not relevant to any claim or defense at issue or proportional to the needs of the case.

24  Defendant objects to the term "enforcement personnel" as vague and ambiguous. Defendants will

25  interpret this term to refer to sworn peace officers whose responsibilities are to enforce San Francisco

26  laws. San Francisco has more than 150 divisions, departments, and agencies. Defendants object to this

27  Interrogatory as overbroad because it seeks information from San Francisco without exhaustive

28  reference to any division, department, or office. Defendants have made a good faith effort to determine

the divisions, departments, or offices likely to have responsive information and its response is limited to: DPW, and HSH. This Interrogatory is further overbroad because it seeks information about "every" Sweep Operation in a more than five-year period. This Interrogatory is especially burdensome given that the motions to date suggest there may be multiple Sweep Operations per week and Plaintiffs defined Sweep Operation to include nearly every interaction with a person experiencing homelessness in San Francisco.

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows:

**DPW**: DPW does not "conduct" "sweep operations." The City has provided Plaintiffs' counsel with advance notice of every HSOC resolution and the starting location of every Joint Field Operation for years, and incorporates those notices into this response. The City has also produced to Plaintiffs CMMS records for every service request coded as "Encampment" or "Bag and Tag" and hereby incorporates those records into this response. The City has also produced Weekly Reports that DPW Supervisor II's prepare for their own management and hereby incorporates those notices into this response.

DPW participates in encampment resolutions planned by other City departments and provides a supporting role keeping streets, sidewalks, and other public spaces clean through a combination of mechanical street sweepers, manual cleaning work crews, graffiti abatement, and powerwashing as needed. The teams at DPW whose work involves implementing the bag and tag policy primarily include the Hot Spots Team, Reactionary Team, Zone Team, and Special Projects.

In general, the Hot Spots Team staffs HSOC resolutions. The Reactionary team staffs HSOC resolutions and Joint Field Operations. The Zone team responds to requests for service, for example those that are directed from 311. Special Projects manages the DPW storage yard where DPW keeps bagged and tagged items. DPW has produced documents and deposition testimony including the names of employees who work on these teams, as well as the names of the supervisors and managers who oversee these teams. DPW has produced witnesses from each of these teams to sit for deposition and provide details regarding their operations and hereby incorporates those depositions into this response.

DPW does not have "enforcement personnel." BSES crew members are not law enforcement officers, and do not threaten persons experiencing homelessness with arrest or citation.

DPW has written policies and procedures regarding when it bags and tags items which are set forth in Procedure No. 16-05-08 Removal and Temporary Storage of Personal Items Collected From Public Property. The current revision of this policy is REV 3. Crew members are expected to know and comply with this written policy and manage trash, abandoned property, and unattended property consistent with DPW policy. The bag and tag policy applies at all times and DPW incorporates that policy in this response.

The property that DPW has in its possession pursuant to the department's bag and tag policy is tracked in bag and tag logs, which are themselves logged in an excel spreadsheet. The property collected pursuant to the bag and tag policy is kept in a secure location. At certain times DPW used with a color-coded tag on each bag such that all property brought in during the same month receives the same color-coded tag. In that way, by looking at the color-coded tag on property, crew members can determine how long the property has been in DPW storage and can discard items after the timeframe for storage has elapsed. During the course of litigation DPW acquired additional storage containers such that it now has sufficient storage containers to store all items bagged and tagged each month in a single storage container and generally does need to mix items collected across multiple months in the same container. Bulky items may be stored and separately. However, for non-bulky items, once per month DPW moves items from one storage container to the next to track how long the items have been in storage. Only after all items in the container have been stored for at least 90 days are the items from the container discarded. For example, items brought in during January would be stored through the end of April; items brought in during February would be stored through the end of May, etc.

DPW keeps records of the full weight of items its compactors bring to Recology when they make a drop-off, but these records will not parse out what portion of that total volume was removed from an encampment resolution as compared to other work responsibilities around the City. DPW employees may also take photographs as part of their work responsibilities, which would reflect the type, volume, and condition of the items DPW employees encounter on the job, including when

working at an encampment resolution. Those photos are taken on work issued tablets connected to a software ("CMMS") that tracks service requests including those related to Encampments and Bag and Tag. DPW employees whose work involves using CMMS to track its response to homeless encampments are trained on the policy.

**HSH**:  At least 48 hours and up to 5 days' notice is provided before every encampment resolution (notices are posted on Saturday). There is also outreach prior to noticing, conducted by DPH FEST team.

While in the field, ERT uses a Microsoft form on a mobile device to track the name of each person engaged in an encampment, the date they were engaged, whether they were offered shelter and whether or not they accepted the offer. Data captured in the Microsoft form is exported to an Excel spreadsheet where the ability to manipulate and report data is limited, and HSH's official administrative data system (ONE) does not have the ability to tie individual client records to particular encampment resolutions by date, time or location.

**DEM:** DEM does not "conduct" "sweep operations" as it understands those terms. DEM coordinates operations with different departments that are responsible for executing those departments' policies and procedures. HSOC coordinates several encampment resolutions each week to provide outreach to clients, offer services and housing to clients, make placements, conduct well-being, checks, provide transportation, clean, address ADA violations or other immediate health and safety concerns, and secure the site after campers have relocated. DEM has produced draft memoranda that generally reflect changes to HSOC operations over time. The resolutions occur Monday through Friday (excluding holidays). Generally, there is a morning operation and an afternoon operation. The morning operation begins at approximately 8:00 a.m. at a predetermined location and the afternoon operation begins at approximately 1:00 p.m. at a predetermined location. Depending on the size of an encampment, a morning and afternoon operation may address the same predetermined location. Moreover, depending on progress made during a morning operation or other operational considerations, a predetermined afternoon location may not be reached.

The full team of members from various City departments can vary at different resolutions and has varied over time.  Generally, the team includes an Incident Commander from SFFD, personnel

from HSH, ERT and SFHOT, DPW, MTA, SFPD, SFFD, and DPH. Depending on the resolution, partners from SF Recreation and Park, Port, CHP, and CalTrans may be present.

Various forms of notice are provided to individuals at encampments leading up to a given planned resolution by departments that DEM coordinates operations with. SFHOT/ERT staff provide written and verbal notices that have been identified for a resolution, and begin conducting housing assessments, gauging interest in shelter, explain the process for accessing shelter, and explain what to expect on the day of the resolution. These occur at least 72 hours in advance of the scheduled resolution. In addition, personnel from DPH may visit sites usually 24 to 48 hours in advance of a planned resolution to notify those present of the scheduled resolution and what to expect, and offer various DPH related services, including but not limited to behavioral health and medical/health services.  On the day of an operation, the Incident Commander and SFHOT provide additional outreach and inform individuals at the encampment of the timeframe and process of the HSOC encampment resolution.

In addition to planned operations, and contingent upon the availability of resources on any given day, HSOC may return to areas that have previously been outreached to offer shelter, make placements, conduct well-being checks, provide transportation, clean, and address ADA violations or other immediate health and safety concerns. Departments again follow their own policies and procedures in these instances. Depending on the availability of resources, the Incident Commander or outreach workers go ahead of the other HSOC personnel to provide verbal notice. The expectation and practice is that clients are given no less than 30 minutes to move belongings and departments are encouraged to be flexible with these engagements.

HSOC's coordination, operations, and interactions with people that experience homelessness from the relevant time period are not captured in a single document. From the relevant time period, DEM has produced templates, notices, HSOC schedules, Daily Operations Call Notes, HSOC Encampment Reports, HSOC Encampment Assessments, HSOC Client Logs, ArcGIS data, and text messages from DEM staff that reflect operations and hereby incorporates those fully into this response.

In addition to HSOC, DEM coordinates the Joint Field Operation ("JFO"). JFO is distinct from HSOC. JFO is a multi-departmental effort that operates seven days per week in set geographic zones generally within the tenderloin to improve street conditions in the Tenderloin by offering wellness checks and referrals to substance use programs and medical and mental health care resources to unhoused individual, as well as street cleaning. JFO is also staffed with personnel from varying City departments. Generally, each JFO operation is staffed with an Incident Commander, SFHOT outreach workers, SFPD officers, SFMTA parking control officers, and DPW personnel. Personnel from the various partner departments has varied over time.

JFO provides a monthly schedule indicating the geographic zones that JFO will address each day of the month, including where JFO will meet and begin operations each day. From the relevant period, DEM has produced these JFO monthly schedules, ArcGIS data tracking JFO operations, as well as text messages concerning JFO operations and incorporates those fully into this response. Every morning, JFO personnel meet at the designated meeting point for the quadrant scheduled for that day. JFO does not cover the entire quadrant when it does work and may have to respond to other immediate health and safety hazards such as open air drug use, wellness checks, ADA obstructions, and blocked sidewalks and building entrances. JFO generally estimates the location of the operation by 5:00 p.m. the day before and then finalizes the location in the morning once developments over the evening can be considered. JFO used to provide individuals verbal notice that an operation was going to occur the day prior to an operation. Because clients indicated that notice was more helpful the day of, the expectation is that the Incident Commander will begin providing verbal notice concerning outreach and cleaning the morning of the operation.

**SFPD**: SFPD does not "conduct" "sweep operations" as it understands those terms. When SFPD takes an action for which an incident report is required, *e.g*., an arrest, the incident report will include individuals, including SFPD personnel involved, and the relevant facts. SFPD has produced potentially responsive records in real-time every three weeks to Plaintiffs and incorporates both the past and future productions of these records into its response by reference.

/ / /

/ / /

**INTERROGATORY NO. 11**:

Describe in detail all complaints You have received about Your personnel's conduct at Sweep Operations, including all facts, Databases and information on which You rely.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. This Interrogatory improperly calls for private and/or personnel information that is protected by the right to privacy. Further, the parties do not yet have a protective order in this case. Defendants object to this Interrogatory as compound because it contains two or more subparts that are not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains two requests: one seeking to have Defendants "describe in detail all complaints" received about personnel at sweep operations and a second seeking to have Defendants identify "all facts, Databases, and information" on which they relied in responding to part one. Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as two Interrogatories toward the agreed total of 50 Interrogatories per side. Defendants object that the phrase "Sweep Operations" is vague, overbroad, pejorative, and disparaging. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. Defendants object to the term "complaints" as vague and ambiguous. Defendants will interpret the phrase to mean written formal complaints. San Francisco has more than 150 divisions, departments, and agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to: SFPD, DPW, HSH, DEM, and SFFD. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. This Interrogatory is further overbroad because it seeks information about "every" complaint related to Sweep Operation in a more than five-year period. This is especially burdensome given that the motions to date suggest there may be multiple Sweep Operations per week and given

that Plaintiffs defined "Sweep Operation" to include nearly every interaction with a person experiencing homelessness. San Francisco will respond for the time period beginning January 1, 2020.

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows:

**SFPD**: Complaints about SFPD officers are received and investigated by the Department of Police Accountability ("DPA"). Complaints are not tracked based upon whether or not they are associated with "Sweep Operations" as defined by this request.

**DPW**: Residents or visitors can make a complaint about a DPW employee's conduct through 311. When someone contacts 311 about a DPW-related issue, the complaint or request for service is logged and assigned a number and then forwarded to DPW through the CMMS database and/or the radio room. A complaint about a DPW employee in CMMS would be assigned to a manager as an action item or request for service. CMMS does not have a category code unique to complaints about employees or one that is specific to "Sweep Operations," as this Interrogatory defines the term. DPW will produce CMMS records for all service requests coded as "Encampment" or "Bag and Tag" through February 14, 2025 and herby incorporates those records by reference into this response. DPW objects that responding to this request in any further detail would require review and analysis of a significant number of 311 or CMMS entries without a guarantee that the review would provide sufficient information to determine whether the complaint concerns the category requested in this Interrogatory. Defendants are willing to provide Plaintiffs information from the CMMS database related to "complaints." DPW produced the 311 entries coded as "Complaint" for the time frame January 1, 2020 through March 29, 2023; at CCSF-COH_021576-CCSF-COH_022006, and incorporates those documents by reference.

**HSH**: All those at an encampment are given 48 hours' notice of when a resolution will take place and, prior to Grants Pass, on day of the resolution, those individuals are asked to move for purposes of sheltering individuals, if they accept placement, and cleaning. Those at the encampment are asked to pack up their belongings and told that they are able to return once the streets are cleaned. This is often what happens. HSH does not track property so this is not recorded.

/ / /

The majority of complaints that HSH receives about encampments are from the public asking HSH to intervene with an encampment (i.e., remove it and/or outreach to the encampment residents). HSH has, however, received some claims against the City for property lost during an encampment resolution. There was a claim filed by a person experiencing homelessness related to encampment resolution on January 8, 2020. HSH will produce documentation of this case.

In May 2021, HSH received 10 claims numbered #21-01810 – 21-01820 related to the work of the Homeless Outreach Team ("HOT") in relation to an encampment resolution. An investigation was conducted for Claims #21-01810 – 21-01820 by appropriate HSH staff including HSH Outreach Manager Mark Mazza and HSOC Liaison Joseph Lippi. Defendants will produce HSH's response to these complaints. In March 2021, HSH received Claim #21-01419 and #21-01418 which were related to the Homeless Outreach Team's role in an encampment resolution. Defendants will produce HSH's response.  HSH reviewed all Whistleblower reports referred to the Department since 2020 and had none related to encampment resolution activities. Additionally, we have received some email complaints from people living in their vehicles when their vehicle was towed for violation of parking regulations. Defendants will produce these complaints.

**DEM**: DEM has received no such complaints concerning its personnel.

**SFFD**: SFFD has received no such complaints concerning its personnel.

**INTERROGATORY NO. 12**:

Describe in detail how You record, track, monitor, and assess Sweep Operations and Your interactions with Homeless Persons at Homeless Encampments outside of HSOC Encampment Resolutions, where Your personnel interact with or seek to move Homeless Persons in the following instances: police dispatches in response to complaints about Homeless Persons, regular police patrols, DPW dispatches to perform street cleaning, or any other informal interaction with Homeless Persons not planned in advance by HSOC, including all Databases You use to store this information.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions.

Defendants object to this Interrogatory as compound because it contains two or more subparts that are not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains two requests: one seeking to have Defendants "describe in detail" how they "record, track, monitor, and assess" interactions with persons experiencing homelessness and a second seeking to have Defendants identify "all Databases" they use to store this information. Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as two Interrogatories toward the agreed total of 50 Interrogatories per side. Defendants object that the phrase "Sweep Operations" is vague, overbroad, pejorative, and disparaging. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to: SFPD, DPW, HSH, DEM, and SFFD. This Interrogatory is further overbroad because it seeks "all" databases related to a broad topic. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants face additional prejudice from this overbroad Interrogatory is because Plaintiffs seek information for a time frame in excess of five years. San Francisco will respond for the time period beginning January 1, 2020.

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows: The policies set forth in the City and County of San Francisco Employee Handbook apply to employees across all departments, which includes a Policy Regarding the Treatment of Co-Workers and Members of the Public to treat individuals with courtesy and respect.

**SFPD**:  SFPD does not track, monitor, or assess "Sweep Operations" as defined by this request. When SFPD takes an action for which an incident report is required, e.g., an arrest, the incident report will include individuals, including SFPD personnel involved, and the relevant facts. SFPD has produced potentially responsive records in real-time every three weeks to Plaintiffs and incorporates both the past and future productions of these records into its response by reference.

"Beginning in April 2024, SFPD HSOC officers began documenting certain aspects of their work in a "Response Form," which data is being produced. Defendants incorporate said data into this response.

**DPW**: Outside of HSOC resolutions, BSES crew members keep San Francisco's public spaces including its sidewalks clean through a number of strategies. For example, crews can be assigned to respond to specific requests for service or can be assigned to clean in a general zone of the City. DPW also implements routine cleanings for certain high traffic areas of the City, such as through the CleanCorridor SF program, which deploys a large contingent of DPW street cleaners to a different neighborhood commercial district every Thursday to power wash and sweep the sidewalks, flush down the roadway and wipe out graffiti. The schedule for CleanCooridor SF cleanings is available on the DPW website.

When BSES crew members respond to service requests, their work can bring them into contact with a person experiencing homelessness and/or homeless encampments. Requests for service may include issues such as cleaning garbage and waste from public spaces, street sweeping, monitoring the City's litter receptacles, responding to graffiti, responding to potholes on City streets and sidewalks, and managing abandoned property. In reviewing a request for service, it is not always obvious from the face of the request whether the BSES crew member will encounter anyone when responding to the request, regardless of what that person is experiencing homelessness.

DPW's responses to requests for service are tracked internally by the initial 311 service request number through the radio room CMMS database. Requests for service are generally routed through DPW's radio room, which assigns the request to a team member. BSES crew may also be required to create daily field reports showing the work they performed while on patrol in a particular zone or may take photographs of certain items they encounter while at work. Those photographs are taken on a City-issued tablet that is connected to CMMS, so photographs are also uploaded into that database. Outside the context of 311 requests, a crew member's work is tracked through daily field reports. When crew members bag and tag property consistent with DPW policy, they create a bag and tag log, which itself is then logged into an excel spreadsheet. DPW supervisors also create weekly reports for their own managers, which track the work that their team performed for the week, which may also

include any work the team performed that brought them into contact with persons experiencing homelessness.

When DPW bags and tags items they are stored at the DPW Yard and managed by the Special Projects team, which the property in its possession through a spreadsheet.

**HSH**:  HSH does not ask people to move; its role is to offer shelter and/or services. The HSH Grievance Policy (available at: https://hsh.sfgov.org/about/contact/) establishes a process by which program participants who believe they received unsatisfactory services or poor treatment, who believe discrimination occurred, and/or who believe the assessment procedure was unfair, may file a written grievance that will be reviewed and responded to.

HSH also requires its contracted providers to file a Critical Incident Report ("CIR," found at links below) any time a critical incident such as a death, overdose or act of violence occurs onsite. Heluna Health's grant agreement also requires outreach workers to report critical incidents. Although Heluna Health has not yet converted to using the new online reporting form that was recently rolled out to shelter and housing providers, HSH intends to migrate Heluna to this new reporting format in future:

> https://forms.office.com/pages/responsepage.aspx?id=z8LVIj7OPUSaf9_MAjH3P-ykwoioEAVJiWm7XGC4YWNUNFRYMEUxWkRSQzU3N1RKNUpFMkswTTVZMSQlQCN0PWcu

> https://forms.office.com/pages/responsepage.aspx?id=z8LVIj7OPUSaf9_MAjH3P-ykwoioEAVJiWm7XGC4YWNURDJSREhDUThJOVFSNTNPNUkxRzlYWFNETyQlQCN0PWcu

The new online automated CIRs are used by HSH funded CBOs working in temporary shelter, outreach, housing, coordinated entry (access points), problem solving, and prevention. CIRs are auto-routed to HSH Program Managers as soon as they are submitted online. Program Managers follow up with providers when more clarification is needed, to offer support as needed, and escalate issues to HSH leadership where appropriate. Providers contact HSH by phone if the incident requires a more immediate response or support from HSH, in addition to submitting the online CIR form. This ensures the most critical incidents are addressed quickly through timely provider/HSH communication and collaboration.

/ / /

All CIRs are stored in the HSH data warehouse. CIR data feeds into an HSH data dashboard every 24 hours where it can be visualized and displayed to pull meaningful information and used to track and report CIR data in a variety of ways. CIR data from the dashboard is reviewed at division management meetings monthly or bi-monthly to look at trends across programs and determine if follow up or intervention is needed (e.g., development of response protocols/policies/procedures to support the providers and identifying potential training needs for providers).

**DEM**: DEM does not engage or participate in the activities described in this Interrogatory as it understands them. DEM coordinates operations with different departments that are responsible for executing those departments' policies and procedures to respond to homelessness or issues impacting the homeless community. For instance, as described in Response to Interrogatory No. 10, DEM coordinates JFO, which is distinct from HSOC. DEM's response to Interrogatory No. 10 concerning HSOC and JFO operations is incorporated fully in this response.

**SFFD**: See SFFD's response to Interrogatories Nos. 2 and 7. SFFD further responds that it does not record, track, monitor, or assess HSOC or JFO operations. As to unplanned interactions with persons experiencing homelessness, SFFD maintains a Community Paramedicine Division to serve the needs to San Franciscans, including its unhoused population. This Division operates several teams: EMS6, Street Wellness, and Street Overdose Response. Through these teams, SFFD seeks to connect individuals to appropriate care, treatment, and services, including connecting them to shelter as appropriate. SFFD records these interactions in the community paramedicine encounter log. If, however, someone has a medical emergency, then SFFD will record in the ESO database as well.

**INTERROGATORY NO. 13**:

Describe in detail how Homeless Persons seeking shelter can obtain access to shelter outside of the context of HSOC Encampment Resolutions, including all steps needed to do so, and how long it takes to obtain a shelter bed by each different available means, and identify all facts, Databases, and information on which You rely.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege

and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object to this Interrogatory as compound because it contains two or more subparts that are not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains two requests: one seeking to have Defendants "describe in detail how homeless persons seeking shelter can obtain access to shelter" including all steps needed to do so and how long it takes to do so, and a second seeking to have Defendants "identify all facts, Databases, and information" on which it relied in responding to part one. Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as two Interrogatories toward the agreed total of 50 Interrogatories per side. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to HSH. This Interrogatory is further overbroad because it seeks "all" facts related to a broad topic. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants face additional prejudice from this overbroad Interrogatory is because Plaintiffs seek information for a time frame in excess of five years. San Francisco will respond for the time period beginning January 1, 2020.

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows: There are a variety of paths to shelter outside of HSOC resolutions as described here and on the HSH website at this link https://hsh.sfgov.org/services/how-to-get-services/accessing-temporary-shelter/.

Adults:

Most adult shelter beds available each day are allocated by the HSH Guest Placement team across multiple referring entities on business days, for same day placement. Any beds that are not utilized that day get reallocated the following business day. HSH does not keep a waitlist for these beds. Adults experiencing homelessness engaged with the following referral sources may be referred

to shelter based on availability of beds and assessment by the referral source: SFHOT, San Francisco hospital and medical respite facilities, DPH Isolation and Quarantine hotel, Episcopal Community Services Adult Coordinated Entry Housing Navigation team, and the Street Crisis Response Team ("SCRT"). Adults experiencing homelessness may call the SFHOT phone message line (628-652-8000) and request access to shelter. SFHOT checks this phone message line multiple times per day and returns calls from individuals experiencing homelessness. Shelter placements made by SFHOT are from their daily allocation of beds.

The County Adult Assistance Program ("CAAP") administered by the SF Human Services Agency is also able to refer individuals experiencing homelessness who are enrolled in CAAP to shelter beds daily. CAAP recipients who call or walk-in to the CAAP office may request same day shelter placement from CAAP. Anyone CAAP refers must report on the same day to the shelter to claim their bed.

Several shelter programs accept referrals from community referents working with their target population. Community referral sources include, A Woman's Place Drop-In, St. James Infirmary, TGI Justice Project, LGBTQ Center, Ella Terra Trans Latinas, and Felton Institute/United Council of Human Services. Persons experiencing homelessness engaged with these referring entities may request shelter and must follow their internal referral process. Some referring entities may keep a waitlist when beds are filled.

Shelter programs that accept same day walk-in self-referrals for placement are Dolores Adult Shelter, Interfaith Winter Shelter, and, during weather activations, pop-up inclement weather placements at Next Door, MSC-South, and Sanctuary.

Transitional Aged Youth:

Transitional Age Youth ("TAY") experiencing homelessness may be referred to shelter same day based on shelter bed availability via the TAY Access Points, DPH Behavioral Health Services, SFHOT, and TAY Outreach teams (Larkin, At the Crossroads, Homeless Youth Alliance). In addition, when a child ages out of HSH's minor shelters, Huckleberry and Diamond minor shelters may reach out directly to their HSH Program Manager for a TAY shelter bed placement.

Families:

Families experiencing homelessness access shelter placements primarily through the Family Access Points. For congregate emergency shelter beds, Access Points will offer any available beds for same day placement. For placement in single room shelter, families are placed on a waitlist queue after completing a shelter assessment and being verified as experiencing homelessness through a Family Access Point outreach team or, in some cases, a community agency. Families will wait on the queue typically for 2-6 weeks, depending on room availability and family size. Once a family is offered a shelter placement from the queue, they must report to the shelter for intake at the designated day/time, typically within a few business days.

Families with minor children in SFUSD may access Buena Vista Horace Mann shelter via self-referral by phone or walk-in. If space is available, they will be able to enter shelter the same day. If space is not available immediately, they will be placed on a waiting list managed by the CBO operator.

Pregnant individuals and couples without minor children may access dedicated pregnant person congregate shelter via phone self-referral at Hamilton Family Emergency Shelter. If beds are available, the individual or couple will be able to access the placement same day or the next business day. If beds are not available, families must call again the next day. Pregnant individuals and couples without minor children may also access shelter through the adult shelter pathways if they prefer.

Families seeking 14-day emergency single room placements may access shelter via phone self-referral for the Providence Family Services Center at the Oasis Hotel. Intakes for 14-day emergency placements will occur same day or the next business day pending availability. If beds are not available, families must call again the next day. Oasis shelter temporarily ceased operations as a family shelter in January 2023 and will resume intakes on March 13, 2023.

***

Defendants' answered Interrogatory No. 13 prior to the Supreme Court's decision in *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024) and the dismissal of Plaintiffs' related claims. Accordingly, responding to Interrogatory No. 13 is no longer relevant or proportional to the needs of the case.

/ / /

/ / /

**INTERROGATORY NO. 14**:

Describe in detail how You allocate available shelter beds, including all criteria governing shelter eligibility for different kinds of shelter inventory (*e.g.*, navigation centers, transitional housing, congregate, non-congregate, semi-congregate), how You determine if Homeless Persons are eligible for shelter beds, how You determine a Homeless Person's level of need, and how You prioritize which Homeless Persons are provided available shelter beds, and identify all facts, Databases, and information on which You rely.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object to this Interrogatory as compound because it contains two or more subparts that are not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains eight requests: one seeking to have Defendants "describe in detail" how they allocate shelter beds, a second seeking to have Defendants "describe in detail" how they "determine if homeless persons are eligible for shelter beds," a third seeking to have Defendants "describe in detail how they "determine a homeless person's level of need," a fourth seeking to have Defendants "describe in detail" how they "prioritize which homeless persons are provided available shelter beds," a fifth seeking to have Defendants "identify all facts, Databases, and information" on which they rely in responding to part one, a sixth seeking to have Defendants "identify all facts, Databases, and information" on which they rely in responding to part two, a seventh seeking to have Defendants "identify all facts, Databases, and information" on which they rely in responding to part three, and an eighth seeking to have Defendants "identify all facts, Databases, and information" on which they rely in responding to part four. Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as eight Interrogatories toward the agreed total of 50 Interrogatories per side. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive

reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to HSH. This Interrogatory is further overbroad because it seeks "all" facts related to a broad topic. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants face additional prejudice from this overbroad Interrogatory is because Plaintiffs seek information for a time frame in excess of five years. San Francisco will respond for the time period beginning January 1, 2020.

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows: HSH allocates all available adult shelter beds every business day through a centralized HSH Guest Placement Team. The HSH Guest Placement Team uses a prioritization framework to assign beds each morning to each referring entity and attempts to meet the placement needs of each referring entity when possible. The prioritization of allocations in order of priority is as follows: Internal Safety Transfers, Site Demobilization, Safe Sleep/VTC referral to shelter, Hospital discharge (max 4 beds), Isolation and Quarantine discharge, Jail, ECS Adult Coordinated Entry Navigation team (2-4 beds), SCRT (2 beds), HSOC, SFHOT, and A Woman's Place Drop-In. There are also allocations given daily to hospital discharge, ECS ACE, SCRT, HSOC, and SFHOT. The other allocation priorities are on an as needed basis by request.

Eligibility criteria for shelter is listed in Temporary Shelter Policy Manual on pages 4 - 9. Defendants will produce the Temporary Shelter Policy Manual. The various referring entities make their own assessment and determination on an individual person meeting the shelter eligibility criteria, level of need, and prioritization for placement within available beds.

\*\*\*

Defendants' answered Interrogatory No. 14 prior to the Supreme Court's decision in *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024) and the dismissal of Plaintiffs' related claims. Accordingly, responding to Interrogatory No. 14 is no longer relevant or proportional to the needs of the case.

/ / /

**INTERROGATORY NO. 15**:

Describe in detail all facts, Databases, and information on which You rely for Your contention that, while conducting Sweep Operations, Your personnel identify, distinguish between, and sort out personal belongings Homeless Persons need for survival—personal belongings that should be bagged, tagged, and stored—from abandoned property, trash, and dangers to public health that should be destroyed (Dkt. No. 45-3, ¶ 6).

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object that the phrase "Sweep Operations" is vague, overbroad, pejorative, and disparaging. San Francisco objects to the phrases "need for survival" and "abandoned property" as vague and ambiguous. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to: SFPD, DPW, and SFFD. Defendants object to this Interrogatory to the extent it prematurely seeks the disclosure of expert witness information. This Interrogatory is further overbroad because it seeks "all" facts related to a broad topic. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants face additional prejudice from this overbroad Interrogatory is because Plaintiffs seek information for a time frame in excess of five years. San Francisco will respond for the time period beginning January 1, 2020. Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows:

**SFPD**:  SFPD follows Department General Order 6.15, which sets forth the general rules on how to handle property. Department Bulletin 21-063 and Department Notice 22-085 are potentially relevant depending on the circumstances. SFPD follows Department Notice 24-140 and followed the prior versions thereto during their applicable time periods.

**DPW**: Defendants note that this Interrogatory purports to restate a paragraph from the declaration of Darryl Dilworth, but paraphrases and excerpts rather than quotes the full paragraph, which states:

> "When cleaning an encampment, Public Works only removes garbage and discarded debris. Public Works onsite supervisors decide which items must be bag-and-tagged pursuant to Public Works policy. Abandoned garbage consists of trash, garbage, debris, broken furniture and appliances that have been discarded by its owner. Also removed are items that present an immediate health or safety risk: hazardous sharps, such as needles, scissors and knives; chemicals, such as bleach, paint and oils, items (including bedding and clothing) soiled by infectious or hazardous materials, including human waste, bodily fluids, mold and mildew, as well as items infested by rodents and insects, such as rats, mice, fleas, lice and bed bugs. If personal belongings are comingled or littered with needles, human waste or other health hazards, Public Works staff may dispose of the entire pile of belongings and are not required to sort through and attempt to remove the health or safety risk. Unsoiled tents are bagged and tagged if the owner is not present."

This declaration was executed by a competent witness drawing from his own experience as a Supervisor II and the current supervisor of the "Hot Spots" team within DPW's BSES Bureau, a position that he has held from 2018 to 2019 and again beginning May 28, 2022, and who served as the Acting Assistant Superintendent of BSES in the interim period from 2019 to May 2022.

Additionally, DPW has a written policy which all of its BSES crew are expected to know and follow regarding how to deal with property on the street, including when such property should be bagged and tagged, known as its "bag and tag" policy, set forth in Procedure No. 16-05-08 Removal and Temporary Storage of Personal Items Collected From Public Property. DPW incorporates that policy into this response. Evidence that DPW employees understand and are trained on the bag and tag policy support Mr. Dillworth's statements.

BSES monitors, assesses, and ensures compliance with the bag and tag policy through training, reinforcing that compliance with the policy is a department priority, documentation, and the potential for positive and negative consequences for compliance or non-compliance, respectively. All new BSES employees whose work involves implementing the bag and policy are trained on the policy through a robust powerpoint training, which includes an opportunity for employees to ask questions. (S*ee e.g.*, CCSF-COH_000418-CCSF-COH_000432; CCSF-COH_437437- CCSF-COH_437489.) DPW has revised its powerpoint training over time. The current version of the bag and tag powerpoint

also includes slides specifically targeted at hypothetical situations in which a laborer would need to apply the bag and tag policy.

BSES holds full and refresher trainings on the bag and tag policy for these same employees quarterly. Full trainings are accompanied by the current version of the powerpoint and walk through the bag and tag process in detail, including using a flow chart. There are opportunities for employees to ask questions and receive answers at each full training. (See e.g., CCSF-COH_356886- CCSF-COH_356949; CCSF-COH_660191.) DPW previously submitted declarations regarding its training (see ECF Nos. 238, 292), and incorporates those documents into this response by reference.

In between full trainings BSES holds refresher or informal trainings for employees, which occur as part of weekly meetings. The weekly meetings for supervisors is the Sup II meeting. The weekly meeting for general laborers is a Tailgate. At these refresher meetings, a presenter may cover the full bag and tag policy or drill down on specific aspects of the policy for additional training including the requirement to identify which documents to bag and tag and which items to discard. Meeting minutes reflect when bag and tag topics are covered at the Sup II meeting. The Tailgate meetings are designed to trickle down the same information covered at the Sup II meetings. Tailgate meetings do not have meeting minutes, but are often accompanied by sign-in sheets documenting attendance. When there are more in-depth trainings on the bag and tag policy at Tailgate meetings, the sign-in sheets may reflect "bag and tag" as the topic discussed. (*See e.g.*, CCSF-COH_000399, CCSF-COH_000417.) Like full trainings, employees have the opportunity to ask questions about implementing the bag and tag policy during these refresher trainings. Whether a supervisor or general laborer, DPW expects that employees attend Sup II or Tailgate meetings for these teams as applicable.

Outside of full and refresher trainings employees also receive on-the-job training around the bag and tag policy. Supervisors are available to Zone employees by radio or phone and are often on scene at HSOC encampment resolutions or Joint Field Operations along with the Hot Spot and/or Reactionary crews. Employees are encouraged to, and do, ask questions of their supervisors in the field. Where a supervisor has a question, they can also elevate the issue to a manager or to an assistant superintendent.

/ / /

DPW also uses documentation to ensure that employees follow the bag and tag policy, including information in CMMS, homeless property information forms, and spreadsheets tracking homeless property information forms.  DPW Supervisor II's also prepare weekly reports for their own management covering the work their team accomplished that week. *See e.g*., CCSF-COH_077850; CCSF-COH_075183; CCSF-COH_075376; CCSF-COH_074501. In order to prepare these reports supervisors also review their employees work performance, which provides another opportunity to review compliance with the bag and tag policy and provide education on the policy as necessary.

Although DPW does not have the funds to provide bonuses to incentivize employees who comply with the bag and tag policy, it does praise those employees who go above and beyond as an incentive to comply with the policy. Where necessary, employees who fail to comply with a city policy are subject to progressive discipline beginning and a verbal and/or written warning all the way through termination for cause. DPW has provided corrective action around the bag and tag policy from informal instruction through termination and/or separation.  (See e.g., CCSF-COH_437220-CCSF-COH_437436.)

In combination all of these methods demonstrate to employees that compliance with the bag and tag policy is important to the department, which further incentivizes compliance with the policy.

**SFFD**: See SFFD's response to Interrogatory Nos. 2 and 7.

**INTERROGATORY NO. 16**:

List all facilities where property belonging to Homeless Persons has been or is stored, including the dates during which each facility has operated, the square footage devoted to storage of belongings, the amount of property stored at those facilities at any given time, and the amount of property successfully collected by unhoused people from these facilities, including all facts, Databases, and information on which You rely.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object to this Interrogatory as compound because it contains two or more subparts that are

not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains eight requests: one seeking to have Defendants "list all facilities where property belonging to homeless persons has been or is stored, including the date for each location, a second seeking to have Defendants identify "the square footage devoted to storage" at each location, a third seeking to have Defendants identify "the amount of property stored at those facilities at any given time," a fourth seeking to have Defendants identify "the amount of property successfully collected by unhoused people from these facilities," a fifth seeking to have Defendants identify "all facts, Databases, and information" they relied on in responding to part one, a sixth seeking to have Defendants identify "all facts, Databases, and information" they relied on in responding to part two, a seventh seeking to have Defendants identify "all facts, Databases, and information" they relied on in responding to part three, and an eighth seeking to have Defendants identify "all facts, Databases, and information" they relied on in responding to part four. Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as eight Interrogatories toward the agreed total of 50 Interrogatories per side. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to DPW. This Interrogatory is further overbroad because it seeks "all" facts related to a broad topic. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants face additional prejudice from this overbroad Interrogatory is because Plaintiffs seek information for a time frame in excess of five years. San Francisco will respond for the time period beginning January 1, 2020. Defendants object that the term "amount of property" is undefined, overly broad and vague because it fails to "describe with reasonable particularity each item or category of items to be inspected." Rule 34(b)(1)(A).

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows: DPW BSES stores property it has bagged and tagged at its Public Work Operations

Yard at 2323 Cesar Chavez Street and has done so since at least January 1, 2020. The Public Work Operations yard has several storage cages and/or containers used to house bagged and tagged property. The number of storage containers have grown over time. Defendants will produce photographs of these storage areas and incorportes those photographs into this response. Plaintiffs' counsel and expert also performed a site inspection where they took photographs of this area and Defendants incorporate any photographs or notes Plaintiffs or their expert took as well. DPW's storage cage is approximately 12 feet by 12 feet by 30 feet. It also has three storage containers that measure approximately 8 feet by 8 feet by 30 feet, and recently purchased an additional two storage containers that measure approximately 8 feet by 8 feet by 20 feet. The dimensions of DPW's storage space is not a limiting factor on the department's ability to comply with its own bag and tag policy. In the event the volume of property bagged and tagged exceeded the currently available storage area, DPW would find additional storage area to house the property.

DPW will also return property to the owner if that individual comes to the storage area to claim it within the allotted timeframe and can provide a sufficiently specific description of the details related to his or her request. The bag and tag log contains information about the date, time, and location of where the property was taken, as well as a brief description of the property itself and, if it is available, the name of the individual who was identified as owning the property. A person who presents at the DPW storage area and is able to provide the matching information is able to retrieve the stored property. That collection may be located in the excel spreadsheet, but even if it is not, a person could determine whether the property had been collected by a person by looking at the property that remained in the Public Work Operations Yard within 90 days of the collection and comparing that property to a specific claim. CMMS records may also reflect when property is claimed from the bag and tag storage area.

In addition to the storage described above, Defendants are aware that pursuant to contracts with the City, there are storage locations available to anyone experiencing homelessness that allow a secure location to store certain items. The first is the Sixth Street Homeless Storage Facility located at 74 6th St., San Francisco, CA 94103 and it is available Monday to Friday from 8:30 am to 5:00 pm. The Sixth Street Homeless Storage Facility accepts clothes, shoes, and documents. The second is the

Bryant Homeless Storage Facility located at 680 Bryant St., San Francisco, CA 94107 and is available Monday to Friday from 9:00 a.m. to 4:00 p.m.  The Bryant Homeless Storage Facility accepts clothes, shoes, and documents. Information concerning the amount of property stored is in the possession, custody, and control of those providers. However, Defendants have produced documents related to these programs. (*See, e.g.*, CCSF-COH_349920.)

**INTERROGATORY NO. 17**:

Describe in detail all facts, Databases, and information on which You rely to determine, monitor, or assess the proportion of property belonging to Homeless Persons that Your personnel destroys or discards, that is stored for later retrieval, and that is ultimately recovered by Homeless Persons who own the property, including what notice is given to unhoused people regarding property storage and property collection.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object to this Interrogatory as compound because it contains two or more subparts that are not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains two requests: one seeking to have Defendants "describe in detail all facts, databases, and information" on which they rely "to determine, monitor, or assess the proportion of property belonging to homeless persons" that Defendants destroy or discard, that is stored for later retrieval, or that is ultimately recovered and a second seeking to have Defendants identify "what notice is given to unhoused people regarding property storage and property collection." Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as two Interrogatories toward the agreed total of 50 Interrogatories per side. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. This Interrogatory also seeks

information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to DPW. This Interrogatory is further overbroad because it seeks "all" facts related to a broad topic. Defendants face additional prejudice from this overbroad Interrogatory is because Plaintiffs seek information for a time frame in excess of five years. San Francisco will respond for the time period beginning January 1, 2020.

Subject to and without waiving the foregoing objections, and as so interpreted, Defendants state as follows: DPW has written policies and procedures regarding when it bags and tags items BSES crew members encounter, which are set forth in Procedure No. 16-05-08 Removal and Temporary Storage of Personal Items Collected From Public Property. The current revision of this policy is REV 3. DPW incorporates that policy into this response by reference. Employees are expected to know and comply with this written policy. It is not possible to answer this Interrogatory as it relates to "the proportion of property belonging to Homeless Persons," because is not always apparent to a DPW crew member performing his or her work whether the items they encounter belong to a person experiencing homelessness and therefore DPW cannot segregate out those encounters from all other encounters crew members have on the job as this Interrogatory requests.

DPW keeps records of the full weight of items its compactors bring to Recology when they make a drop-off, but these records will not parse out what portion of that total volume was removed from an encampment resolution and/or from a person experiencing homelessness as compared to other work responsibilities around the City. DPW employees may also take photographs as part of their work responsibilities, which would reflect the type, volume, and condition of the items DPW employees encounter on the job, including when working at an encampment resolution. These photographs are associated with service orders in the CMMS database.

The property that DPW has in its possession is tracked in bag and tag logs, which are themselves logged in an excel spreadsheet. DPW will also return property to the owner if that individual comes to the storage area to claim it within the allotted timeframe and can provide a sufficiently specific description of the details related to his or her request. The bag and tag logs contains information about the date, time, and location of where the property was taken, as well as a

brief description of the property itself and, if it is available, the name of the individual who was identified as owning the property.

When property is bagged and tagged pursuant to DPW policy, BSES crew members leave a notice either directly with the individual whose property was taken if they are on-site or post the notice in the event that individual is not present. (*See e.g.,* CCSF-COH_000249-CCSF-COH_000250.) The notice states: "Be advised that unattended personal property has been removed from this area because it was stored on City or State property in violation of California Penal Code Sections 372 and/or 647(e), and/or San Francisco Policy Code Section 22." The notice also states: "You may retrieve your belongings at the Public Works Operations Yard located at 2323 Cesar Chavez Street (use the Kansas Street entrance, at Marin Street), 415-695-2134. For the first 72 hours after items are collected then can be claimed 24 hours a day. Afterwards, owners may retrieve their items Monday through Friday, 9 a.m. to 3 p.m. There is no fee for storage or retrieval. Although you are not required to present official I.D., you must provide a reasonably specific and detailed description of the property in order to retrieve it. Property not claimed within 90 days of the date of removal will be deemed abandoned and will be destroyed." (*Id.*)

**INTERROGATORY NO. 18**:

List and describe in detail each instance in which Your personnel have treated property belonging to Homeless Persons in conformity with Your Bag and Tag policy, including the date, time, and location at which the property was taken; the identity of all Your enforcement personnel involved in the taking, bagging, and tagging of property; the location to which the property was taken; how Your enforcement personnel determined the owner(s) of the property; and whether You continue to maintain possession of the property, and, if not, when and how You ceased to maintain possession of the property.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 18**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object to this Interrogatory as compound because it contains two or more subparts that are

not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains two requests: one seeking to have Defendants "list and describe in detail each instance" in which Defendants' employees "have treated property belonging to homeless persons in conformity with your bag and tag policy," including the "date, time, and location" of each, the "identify of all your enforcement personnel involved, the location to which the property was taken, and how Defendants' "enforcement personnel determined the owners of the property" and a second seeking to have Defendants identify whether they "continue to maintain possession of the property, and, if not, when and how you ceased to maintain possession of the property." Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as two Interrogatories toward the agreed total of 50 Interrogatories per side. Plaintiffs' total Interrogatories at this point is in excess of 50 and Defendants refuse to provide a further response on that basis. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to DPW. This Interrogatory is further overbroad because it seeks every instance in which San Francisco employees have implemented the city's Bag and Tag policy over a more than five-year period. San Francisco will respond for the time period beginning January 1, 2020.

**DPW:** DPW also objects to the term "property" to the extent Plaintiffs seek to include abandoned items DPW will interpret the term "property" to refer to temporarily unattended items that are bagged and tagged, not abandoned items that are discarded. DPW treats property in conformance with its bag and tag policy every day. DPW has produced its bag and tag policy to Plaintiffs (*see e.g.*, CCSF-COH_000001), and hereby incorporates that policy into this response by reference.

The burden of listing the time and location of each such interaction is so high that Defendants object to responding to this portion of the Interrogatory, which would require DPW to identify every

BSES crew member it has had working in a period of several years and for each of those individuals to disclose every location where they removed any items in the City. This is especially true because is not always apparent to a DPW crew member performing his or her work whether the items they encounter belong to a person experiencing homelessness and therefore DPW cannot segregate out those encounters from all other encounters crew members have on the job as this Interrogatory requests. DPW BSES crew members are not "enforcement personnel," are not law enforcement officers, and do not threaten persons experiencing homelessness with arrest or citation.

DPW employees who respond to requests for service coded either as an Encampment or Bag and Tag enter information about the service they provided in the CMMS database. The CMMS entries include the date, time, and location from where the property was taken and the name of the DPW laborer who was responsible for responding to that service request. DPW will produce printouts of the CMMS database entries for service performed under the Encampment or Bag and Tag codes for the time frame beginning in 2020 to the present (August 2024) and hereby incorporates those productions into this response by reference. Items bagged and tagged under the policy are taken to the DPW storage yard at 2323 Cesar Chavez Street, San Francisco, CA.

The property that DPW has in its possession pursuant to the department's bag and tag policy is also tracked in bag and tag logs (*see e.g.*, CCSF_COH_PI_DPW_000001-000035; CCSF_COH_PI_DPW_000037-000048; CCSF_COH_PI_DPW_000050-000062; CCSF_COH_PI_DPW_000065-000082; CCSF_COH_PI_DPW_000084-000090; CCSF_COH_PI_DPW_000092-000100; CCSF_COH_PI_DPW_000102-000108; CCSF_COH_PI_DPW_000110-000118; CCSF_COH_PI_DPW_000120-000127; CCSF_COH_PI_DPW_000129-000141; CCSF-COH_000241; CCSF-COH_000251-000263; CCSF-COH_000267- 000302; CCSF-COH_000305-000315; CCSF-COH_000317-000349; CCSF-COH_000354; CCSF-COH_003135- 003151; CCSF-COH_003153- 003165; CCSF-COH_003169-003186; CCSF-COH_003188- 003227; CCSF-COH_003233- 003314; CCSF-COH_003322- 003330; CCSF-COH_048490- 048497; CCSF-COH_048682; CCSF-COH_049186- 049194; CCSF-COH_049196- 049206; CCSF-COH_051816- 051828; CCSF-COH_052646; CCSF-COH_053223-053236; CCSF-COH_053263- 053282; CCSF-COH_053442- 053458; CCSF-COH_053490- 053502;

CCSF-COH_053534- 053542; CCSF-COH_198464; CCSF-COH_198511- 198528; CCSF-
COH_198571- 198581; CCSF-COH_198872- 198881; CCSF-COH_198921- 198930; CCSF-
COH_198976- 198983; CCSF-COH_199116- 199120; CCSF-COH_199372- 199380; CCSF-
COH_199382- 199393; CCSF-COH_199517- 1995025; CCSF-COH_199615- 199619; CCSF-
COH_199623- 199630; CCSF-COH_260725- 260732; CCSF-COH_260795- 260804; CCSF-
COH_260869- 260871; CCSF-COH_260873- 260881; CCSF-COH_261154- 261165; CCSF-
COH_261531- 261539; CCSF-COH_261541- 261555; CCSF-COH_261628- 261639; CCSF-
COH_261938- 261956; CCSF-COH_262002- 262021; CCSF-COH_262057- 262063; CCSF-
COH_262423- 262439; CCSF-COH_262515- CCSF-COH_262518; CCSF-COH_262537- CCSF-
COH_262547; CCSF-COH_262705- CCSF-COH_262727; CCSF-COH_262786- CCSF-
COH_262802; and CCSF-COH_262976- CCSF-COH_262987; CCSF-COH_308721-308774; CCSF-
COH_309475-CCSF-COH_309513; CCSF-COH_309519-CCSF-COH_309542; CCSF-COH_351573-
CCSF-COH_351606; CCSF-COH_351614- CCSF-COH_351626; CCSF-COH_352050- CCSF-
COH_352082; CCSF-COH_354983- CCSF-COH_355001; CCSF-COH_355004- CCSF-
COH_355015; CCSF-COH_355019- CCSF-COH_355038; CCSF-COH_356128- CCSF-
COH_356139; CCSF-COH_356142- CCSF-COH_356155; CCSF-COH_356159- CCSF-
COH_356177; CCSF-COH_356849- CCSF-COH_356869; CCSF-COH_356874- CCSF-
COH_356884; CCSF-COH_356952- CCSF-COH_356969; CCSF-COH_411220- CCSF-
COH_4112903; CCSF-COH_436648-436670; CCSF-COH_436679- CCSF-COH_436687; CCSF-
COH_436689- CCSF-COH_436710; CCSF-COH_492762- CCSF-COH_492779; CCSF-
COH_492782- CCSF-COH_492807; CCSF-COH_492812- CCSF-COH_492834; CCSF-
COH_660192- CCSF-COH_660213; CCSF-COH_660215- CCSF-COH_660239; CCSF-
COH_660249- CCSF-COH_660321), which are themselves logged in an excel spreadsheet (see e.g.,
CCSF_COH_PI_DPW_000036; CCSF_COH_PI_DPW_000049; CCSF_COH_PI_DPW_000063-
000064; CCSF_COH_PI_DPW_000083; CCSF_COH_PI_DPW_000091;
CCSF_COH_PI_DPW_000101; CCSF_COH_PI_DPW_000109; CCSF_COH_PI_DPW_000119;
CCSF_COH_PI_DPW_000128; CCSF_COH_PI_DPW_000142; CCSF-COH_000264;CCSF-
COH_000265; CCSF-COH_000266- 198474; CCSF-COH_000303-000304; CCSF-COH_000350-

000353; CCSF-COH_003134; CCSF-COH_003152; CCSF-COH_003166-003168; CCSF-COH_003187; CCSF-COH_003228-003232; CCSF-COH_003315; CCSF-COH_003321; CCSF-COH_048498; CCSF-COH_048693; CCSF-COH_049195; CCSF-COH_049207- 049208; CCSF-COH_051829; CCSF-COH_053237; CCSF-COH_053283; CCSF-COH_053459; CCSF-COH_053503- 053504; CCSF-COH_053543; CCSF-COH_198475; CCSF-COH_198529; CCSF-COH_198582- 198583; CCSF-COH_198882; CCSF-COH_198931; CCSF-COH_198984; CCSF-COH_199121; CCSF-COH_199381; CCSF-COH_199394; CCSF-COH_199526; CCSF-COH_199620; CCSF-COH_199631; CCSF-COH_199739; CCSF-COH_260733; CCSF-COH_260805; CCSF-COH_260872; CCSF-COH_260882; CCSF-COH_261166; CCSF-COH_261540; CCSF-COH_261556; CCSF-COH_261640; CCSF-COH_261957; CCSF-COH_262022; CCSF-COH_262064; CCSF-COH_262440-262441; CCSF-COH_262519; CCSF-COH_262536; CCSF-COH_262728; CCSF-COH_262803; and CCSF-COH_262988; CCSF-COH_308775; CCSF-COH_309474; CCSF-COH_309514-CCSF-COH_309518; CCSF-COH_351607- CCSF-COH_351613; CCSF-COH_352049; CCSF-COH_352083; CCSF-COH_355002; CCSF-COH_355016- CCSF-COH_355018; CCSF-COH_356127; CCSF-COH_356141; CCSF-COH_356158; CCSF-COH_356870; CCSF-COH_356885; CCSF-COH_356970; CCSF-COH_411218- CCSF-COH_411219; CCSF-COH_411294; CCSF-COH_436671- CCSF-COH_436672; CCSF-COH_436688; CCSF-COH_492780; CCSF-COH_492808; CCSF-COH_492835; CCSF-COH_660214; CCSF-COH_660240;  CCSF-COH_660246- CCSF-COH_660248). DPW has produced these bag and tag records and corresponding spreadsheets and hereby incorporates those productions into this response by reference. DPW continues to produce new bag and tag logs and corresponding entries in the excel spreadsheet as part of its three-week productions pursuant to ECF Nos. 129 and 235, and also incorporates the bates numbers of any future three-week productions into this response.

DPW has also produced training logs that show the names of employees who work on teams that have responsibility for implementing the bag and tag policy, and incorporates those training logs into this response by reference. DPW objects and will not respond to Plaintiffs' request that it identify how the DPW employee determined the owner of the property for each instance in which DPW

bagged and tagged items under the policy as overbroad given the volume of entries included in DPW's CMMS database records.

**INTERROGATORY NO. 19**:

Describe in detail all facts, Databases, and information on which You rely to assess whether written notice is provided to Homeless Persons at a Homeless Encampment prior to conducting a Sweep Operation, including how you determine how often such notice is provided, and how you record, track and assess whether notice is given.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 19**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object that the phrase "Sweep Operations" is vague, overbroad, pejorative, and disparaging. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to DEM and DPW. This Interrogatory is further overbroad because it seeks "all" facts related to a broad topic. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants face additional prejudice from this overbroad Interrogatory is because Plaintiffs seek information for a time frame in excess of five years. San Francisco will respond for the time period beginning January 1, 2020. City employees or contractors post written notice on-site at the locations of HSOC resolutions 72 hours in advance. They photograph those notices, which are then stored in a database. Photographs of the posted notices are also shared with partner agencies including Samuel Peoples from DPW.

**INTERROGATORY NO. 20**:

Describe in detail how You determine how many and what percent of Homeless Persons have been connected to shelter or permanent housing on a daily basis, and how many have refused or have

/ / /

not been able to be placed in shelter or permanent housing—both at HSOC Encampment Resolutions and also generally—including all facts, Databases, and information on which You rely.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 20**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object to this Interrogatory as compound because it contains two or more subparts that are not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains two requests: one seeking to have Defendants 'describe in detail" how they "determine how many and what percent of homeless persons have been connected to" shelter and a second seeking to have Defendants identify "all facts, Databases, and information" on which they relied in responding to part one. Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as two Interrogatories toward the agreed total of 50 Interrogatories per side. Plaintiffs' total Interrogatories at this point is in excess of 50 and Defendants refuse to provide a further response on that basis. Defendants object to the phrases "what percent" and "have not been able to be placed in shelter" as vague and ambiguous. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to: HSH and DEM. Defendants object to this Interrogatory to the extent it prematurely seeks the disclosure of expert witness information. This Interrogatory is further overbroad because it seeks "all" facts related to a broad topic. Defendants face additional prejudice from this overbroad Interrogatory is because Plaintiffs seek information for a time frame in excess of five years. San Francisco will respond for the time period beginning January 1, 2022.

\*\*\*

Defendants' answered Interrogatory No. 20 prior to the Supreme Court's decision in *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024) and the dismissal of Plaintiffs' related claims. Accordingly, responding to Interrogatory No. 20 is no longer relevant or proportional to the needs of the case.

**INTERROGATORY NO. 21**:

Describe in detail all steps You have taken to comply with the Court's Order on Motion for Preliminary Injunction, Dkt. No. 65, including any post-injunction changes to the instructions and training You provide to Your personnel, how Your personnel have been instructed to conduct Sweep Operations post-injunction, how You are monitoring Your post-injunction interactions with Homeless Persons and their property, and how these circumstances are documented, and identify all facts, Databases, and information on which You rely to ensure compliance with the Court's Order.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 21**:

Defendants incorporate into this response the preliminary statement and general objections set forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions. Defendants object to this Interrogatory as compound because it contains two or more subparts that are not logically or factually subsumed within and necessarily related to the primary question. (See caselaw regarding compound Interrogatories cited in response to Interrogatory No. 1.) Specifically, this Interrogatory contains four requests: one seeking to have Defendants "describe in detail all steps" they have taken to comply with the injunction concerning Plaintiffs' Eight Amendment claims, a second seeking to have Defendants "describe in detail all steps" they have taken to comply with the injunction concerning Plaintiffs' Fourth Amendment claims, a third seeking to have Defendants "identify all facts, Databases, and information" on which they relied in responding to part one, and a fourth seeking to have Defendants "identify all facts, Databases, and information" on which they relied in responding to part two. Having given Plaintiffs an opportunity to withdraw and redraft this Interrogatory, which Plaintiffs declined, Defendants will treat this Interrogatory as four Interrogatories toward the agreed total of 50 Interrogatories per side. Plaintiffs' total Interrogatories at this point is in excess of 50 and Defendants refuse to provide a further response on that basis. Defendants object that

the phrase "Sweep Operations" is vague, overbroad, pejorative, and disparaging. Defendants object to this Interrogatory as overbroad because it seeks information from San Francisco without exhaustive reference to any division, department, or office. San Francisco has more than 150 divisions, departments, and agencies. This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional to the needs of the case. Defendants have made a good faith effort to determine the divisions, departments, or offices likely to have responsive information and its response is limited to: SFPD, DPW, HSH, DEM, and SFFD. This Interrogatory is further overbroad because it seeks "all" facts related to a broad topic. Defendants further object to this Interrogatory to the extent it refers to the portion of the Court's injunction based on the Eighth Amendment claims that are no longer at issue in the case.

**DPW:** DPW employees to not "conduct sweep operations," are not law enforcement officers, and do not threaten persons experiencing homelessness with arrest or citation. DPW also objects to the term "property" to the extent Plaintiffs seek to include abandoned items DPW will interpret the term "property" to refer to temporarily unattended items that are bagged and tagged, not abandoned items that are discarded. DPW further objects to this request as duplicative of Request No. 3, which sought information about how DPW monitors, assess, ensures, and enforces compliance with its own bag and tag policy. Because the preliminary injunction only required DPW to comply with its own policy, information about DPW compliance with the bag and tag policy is coextensive with information about its efforts to comply with the preliminary injunction.

DPW's bag and tag policy is consistent with Defendants' constitutional obligations. The Court did not require Defendants to modify their bag and tag policy and instead required Defendants to continue to enforce its current policy and then to modify its bag and tag training materials. Defendants continue to act consistently with their lawful policy, custom, and practice and continue to instruct DPW personnel to perform their job duties consistent with departmental policy. DPW has produced its bag and tag policy to Plaintiffs (*see e.g.*, CCSF-COH_000001), and hereby incorporates that policy into this response by reference.

*Training*

All new BSES employees whose work involves implementing the bag and policy are trained on the policy through a robust powerpoint training, which includes an opportunity for employees to ask questions.  (S*ee e.g.*, CCSF-COH_000418-CCSF-COH_000432; CCSF-COH_437437- CCSF-COH_437489. ) DPW has revised its powerpoint training over time including after the Court issue its preliminary injunction. On August 26 in response to Dkt. No. 231 DPW agreed to voluntarily make certain modifications to its bag and tag training described in Dkt. No. 237-1, and incorporates those documents, and any further updates to the Court in response to Dkt. No. 247-1, by reference. DPW has since revised its bag and tag training materials consistent with the Court's September 4, 2024 order regarding training. ECF No. 241. The City provided its revised training materials as well as sign-in sheets showing that the relevant employees had been trained on the bag and tag policy. ECF Nos. 292 through 202-6. These training materials provide further detail on how to apply the bag and tag policy, including hypothetical test questions. The current version of the bag and tag powerpoint also includes slides specifically targeted at hypothetical situations in which a laborer would need to apply the bag and tag policy.

After Plaintiffs filed their motion for a preliminary injunction, DPW reviewed the bag and tag policy at the recurring crew supervisor meetings ("Sup II meetings") and supervisors have in turn reviewed the bag and tag policy with their crew at tailgate meetings. BSES holds full and refresher trainings on the bag and tag policy for these same employees quarterly. Full trainings are accompanied by the current version of the powerpoint and walk through the bag and tag process in detail. There are opportunities for employees to ask questions and receive answers at each full training. (See e.g., CCSF-COH_356886- CCSF-COH_356949; CCSF-COH_660191.)

DPW's bag and tag trainings also make clear that it is important to DPW that employees comply with the bag and tag policy including because compliance with the policy is necessary in response to the Court's order.

*Documentation*

DPW provided declarations describing its trainings (ECF Nos. 193, 292), as well as copies of the meeting minutes from the Sup II meetings and sign-in sheets from the crew tailage meetings and incorporates those documents by reference as well.  DPW produced meeting minutes from the Sup II

meetings and sign-in records show attendance at those crew tailgate meetings. (*See e.g.*, CCSF-COH_000399, CCSF-COH_000417.) DPW hereby incorporates those documents by reference. Many of those Sup II and tailgate meetings used a powerpoint to facilitate discussion as well as a handout listing items that can properly be discarded pursuant to the bag and tag policy. (*See e.g.*, CCSF-COH_000418-CCSF-COH_000432.) DPW hereby incorporates those training materials by reference.

DPW also uses documentation to ensure that employees follow the bag and tag policy via CMMS. When employees respond to service orders coded as "Encampment" or "Bag and Tag," they enter information about the encounter into CMMS, which is a centralized DPW database for tracking service orders. Those service orders often include the date, time, and location where DPW responded to the service request. Subsequent to the Court's injunction DPW increased the number of employees who have tablets capable of taking photographs and required employees to submit photographs with certain categories of CMMS service requests. Any photographs are viewable in CMMS by clicking on the hyperlink under the "Documents" heading. DPW employees receive training on how to appropriately used the CMMS database. (See e.g., CCSF-COH_ 573434- CCSF-COH_ 573453.) Since CMMS is a way to track compliance with the bag and tag policy, training on CMMS is training in furtherance of ensuring compliance with the Court's order. Subsequent to the Court's preliminary injunction order DPW also added a field to CMMS for laborers to track the reason that items are discarded. Employees have also received additional training on CMMS itself following the Court's preliminary injunction order. Since CMMS is a way to track compliance with the bag and tag policy, training on CMMS is training in furtherance of ensuring compliance with the bag and tag policy.

CMMS records are not the only documentation DPW uses with respect to the bag and tag policy. DPW continues to fill out bag and tag logs when property from public spaces is collected and stored pursuant to the policy. It also collects and saves attestation forms when an individual at an HSOC resolution is given the opportunity to remove certain items from their belongings before DPW bags and tags them. DPW logs those bag and tag records into a central excel spreadsheet. The DPW employees who manage this spreadsheet also review the bag and tag forms when they come in and where necessary can offer re-instruction or constructive feedback on whether the general laborer is filling out the bag and tag paperwork completely and correctly.

DPW teams also produce weekly reports, which document their work, including work involving application of the bag and tag policy, which is another way to ensure compliance with the bag and tag policy and the Court's order.

*Opportunities To Ask Questions*

In Sup II and Tailgate meetings employees have the opportunity to ask questions and are also encouraged to ask questions of their supervisor if additional issues come up while they are working in the field. Employees can and do ask their supervisors questions about how to apply the bag and tag policy out in the field and in training meetings.

*Praise and Corrective Action*

Following the injunction DPW also continued its practice of praising employees who have performed above and beyond and initiating corrective action, ranging from informal counseling through separation against employees who violate the policy. Where necessary, employees who fail to comply with a city policy are subject to progressive discipline beginning and an informal verbal and/or written warning all the way through termination for cause. DPW has terminated employees for failure to comply with the bag and tag policy following the Court's preliminary injunction order.

*Storage Capacity*

The property that DPW has in its possession pursuant to the department's bag and tag policy is tracked in bag and tag logs, which are themselves logged in an excel spreadsheet. The property collected pursuant to the bag and tag policy is kept in a secure location. Following the Court's preliminary injunction order DPW increased its storage capacity at the Yard. Bulky items may be stored and separately. However, for non-bulky items all items collected in a calendar month are stored in a single container. Once per month DPW moves items from one storage container to the next to track how long the items have been in storage. Only after all items in the container have been stored for at least 90 days are the items from the container discarded. For example, items brought in during January would be stored through the end of April; items brought in during February would be stored through the end of May, etc. This ensures that materials are not discarded prematurely.

/ / /

/ / /

1  **INTERROGATORY NO. 22**:

2      Describe in detail how You searched for and identified documents responsive to Plaintiffs'

3  discovery requests, including Plaintiffs' First Set of Requests for Production, disclosures made during

4  the pendency of the motion for preliminary injunction, and disclosures to ensure compliance with the

5  preliminary injunction, including (but not limited to) the identity of any document custodian, the

6  sources and locations searched (e.g., e-mail accounts, computer drives, mobile devices, social media,

7  audio and video recordings, office locations, and other physical or electronic storage), the methods

8  used to search or filter for documents such as the use of search terms and temporal limits, and when

9  the searches were performed.

10      **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 22**:

11      Defendants incorporate into this response the preliminary statement and general objections set

12  forth above. Defendants object to this Interrogatory on the grounds of the attorney-client privilege

13  and/or work product doctrine, and the right to privacy under the U.S. and California Constitutions.

14  This Interrogatory seeks information protected by the attorney client privilege including

15  communications between counsel and their clients regarding Plaintiffs' discovery requests. This

16  Interrogatory also seeks information protected by the work product doctrine and for which Plaintiffs

17  have not made a showing of substantial need an absence of undue hardship on the part of Defendants.

18  This Interrogatory also seeks information not relevant to any claim or defense at issue or proportional

19  to the needs of the case. To the extent there is non-privileged non-confidential information to which

20  Plaintiffs could be entitled, the parties are already in engaging in a meet and confer process regarding

21  these issues. For example, the parties are in the process of mutually negotiating the parameters for

22  Defendants to respond to Plaintiffs' overbroad first set of document requests including the appropriate

23  date range and search terms. On this basis no further response to this Interrogatory is required.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

Dated:  March 10, 2025

1

2                                    DAVID CHIU
                                     City Attorney
3                                    YVONNE R. MERÉ
                                     EDMUND T. WANG
4                                    KAITLYN MURPHY
                                     MIGUEL A. GRADILLA
5                                    JOHN H. GEORGE
                                     STEVEN A. MILLS
6                                    Deputy City Attorneys

7

8                            By:____/s/*John H. George*_____
                                     JOHN H. GEORGE

9
                                     Attorneys for Defendants CITY AND COUNTY OF
10                                   SAN FRANCISCO; SAN FRANCISCO POLICE
                                     DEPARTMENT; SAN FRANCISCO DEPARTMENT
11                                   OF PUBLIC WORKS; SAN FRANCISCO
                                     DEPARTMENT OF HOMELESSNESS AND
12                                   SUPPORTIVE HOUSING; SAN FRANCISCO FIRE
                                     DEPARTMENT; SAN FRANCISCO DEPARTMENT
13                                   OF EMERGENCY MANAGEMENT

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

I, HOLLY CHIN, declare as follows:

I am a citizen of the United States, over the age of eighteen years and not a party to the above-entitled action. I am employed at the City Attorney's Office of San Francisco, City Hall, 1 Dr. Carlton B. Goodlett Place, San Francisco, CA 94102.

On March 10, 2025, I served the following document(s):

**DEFENDANTS' SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

on the following persons at the locations specified:

Andrew Ntim
Nisha Kashyap
LAWYERS COMMITTEE FOR CIVIL RIGHTS
OF THE SAN FRANCISCO BAY
131 Steuart Street, Suite 400
San Francisco, CA 94105
Telephone:    415-543-9444
Facsimile:    415-543-0296
Email:    antim@lccrsf.org
    nkashyap@lccrsf.org

Scout Katovich
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco
New York, CA 94104
Telephone:    212-549-2500
Email:    skatovich@aclu.org
[Pro Hac Vice Attorney]

John Thomas H. Do
William S. Freeman
ACLU FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone:    415-621-2493 [Do & Freeman]
Email:    jdo@aclunc.org
    wfreeman@aclunc.org

Zoe Salzman
Vivake Prasad
Bianca Herlitz-Ferguson
Vasudha Talla
EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL LLP
600 Fifth Avenue, Ste 10th Floor
New York, NY 10020
Telephone:    212-763-5000
Email:    zsalzman@ecbawm.com
    vprasad@ecbawm.com
    bherlitz-ferguson@ecbawm.com
    vtalla@ecbawm.com
[Pro Hac Vice Attorneys]

[Counsel For Plaintiffs COALITION ON
HOMELESSNESS; TORO CASTAÑO; SARAH
CRONK; JOSHUA DONOHOE; MOLIQUE
FRANK; DAVID MARTINEZ; TERESA
SANDOVAL; NATHANIEL VAUGHN]

in the manner indicated below:

☒    **BY ELECTRONIC MAIL:** Based on a court order or an agreement of the parties to accept electronic service, I caused the documents to be sent to the person(s) at the electronic service address(es) listed above. Such document(s) were transmitted *via* electronic mail from the electronic address: holly.chin@sfcityatty.org ☒ in portable document format ("PDF") Adobe Acrobat.

I declare under penalty of perjury pursuant to the laws of the State of California that the foregoing is true and correct. Executed March 10, 2025 at San Francisco, California.

/s/*Holly Chin*
HOLLY CHIN