## REDACTED


## EXHIBIT 14

## TO

## DECLARATION OF STEVEN MILLS IN SUPPORT OF DEFENDANTS' MOTION TO VACATE OR DISSOLVE THE PRELIMINARY INJUNCTION


**PROVISIONALLY FILED UNDER SEAL PURSUANT TO INTERIM ADMINISTRATIVE MOTION TO SEAL**

1                UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3

4       - - - - - - - - - - - - - - -

5       COALITION ON HOMELESSNESS,     )

6       et al.,                        )

7                   Plaintiffs,        )  CASE NO.

8       vs.                            )  4:22-cv-05502-DMR (LJC)

9       CITY AND COUNTY OF SAN         )

10      FRANCISCO, et al.,             )

11                  Defendants.        )

12      - - - - - - - - - - - - - - -

13

14

15           30(b)(6) VIDEOTAPED DEPOSITION OF

16                JENNIFER FRIEDENBACH

17           RE:  COALITION ON HOMELESSNESS

18             TUESDAY, FEBRUARY 25, 2025

19

20

21         BEHMKE REPORTING AND VIDEO SERVICES, INC.

22                 BY:  CYNTHIA TURI, CSR NO. 11812

23                 550 CALIFORNIA STREET, SUITE 820

24                 SAN FRANCISCO, CALIFORNIA 94104

25                      (415) 597-5600

1

2

3

4

5

6

7

8          30(b)(6) videotaped deposition of JENNIFER

9    FRIEDENBACH, RE:  COALITION ON HOMELESSNESS, taken

10   on behalf of Defendant, at 39 Drumm Street, San

11   Francisco, California, commencing at 9:03 A.M.,

12   TUESDAY, FEBRUARY 25, 2025, before CYNTHIA TURI,

13   Certified Shorthand Reporter No. 11812, pursuant

14   to Notice of Deposition.

15

16

17

18

19

20

21

22

23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2    FOR THE PLAINTIFFS:

 3         AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF

 4         NORTHERN CALIFORNIA

 5         BY:  JOHN THOMAS H. DO, ATTORNEY AT LAW

 6         39 Drumm Street

 7         San Francisco, California  94111

 8         Telephone:  (415) 621-2493

 9         Email:  jdo@aclunc.org

10    - AND -

11         EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP

12         BY:  ZOE SALZMAN, ATTORNEY AT LAW

13         600 Fifth Avenue, 10th Floor

14         New York, New York  10020

15         Telephone:  (212) 763-5000

16         Email:  zsalzman@ecbawm.com

17

18

19

20

21

22

23

24

25
```

```
 1   APPEARANCES OF COUNSEL (CONTINUED):
 2   FOR THE DEFENDANTS:
 3        CITY AND COUNTY OF SAN FRANCISCO
 4        OFFICE OF THE CITY ATTORNEY
 5        BY:  JOHN H. GEORGE, DEPUTY CITY ATTORNEY
 6             STEVEN A. MILLS, DEPUTY CITY ATTORNEY
 7        1390 Market Street, 7th Floor
 8        San Francisco, California  94102
 9        Telephone:  (415) 554-4223
10        Email:  john.george@sfcityatty.org
11                steven.mills@sfcityatty.org
12
13   ALSO PRESENT:
14        KYLE FRIEND, VIDEOGRAPHER
15
16
17
18
19
20
21
22
23
24
25
```

1      A.  Correct.

2      Q.  So can you identify which month, approximately,

3  the board would have approved this litigation?

4      A.  Well, I'm not totally sure, but I think probably

5  April or May.

6      Q.  How often does the board meet?

7      A.  Monthly, with some exception.

8      Q.  Would the board's approval of this litigation be

9  reflected in its minutes from the monthly meeting?

10      A.  It should be, yeah.

11      Q.  Will you please turn to page 2 of Exhibit 143.

12      A.  Uh-huh.

13      Q.  Do you see the section under Article 6 entitled,

14  membership?

15      A.  Yes.

16      Q.  Is it correct that the Coalition's bylaws do not

17  provide for membership?

18          MS. SALZMAN:  Objection to form.

19          THE WITNESS:  Yeah.  We have a -- this refers to

20  a formal membership, which is a particular legal thing

21  where you elect the board of directors.

22          And so we have a very deliberate structure where

23  we have an informal membership.

24  BY MR. GEORGE:

25      Q.  So the Coalition is not a formal membership

1  organization; is that correct?

2       A.  Correct.

3            MS. SALZMAN:  Objection.

4  BY MR. GEORGE:

5       Q.  How does the Coalition define membership?

6       A.  The Coalition defines membership as people who

7  are actively involved in our work.  So folks who are

8  coming to meetings, selling Street Sheets, submitting

9  the Street Sheet articles, poetry, artwork.  Folks who

10  are acting as informants out on the street, who are

11  distributing flyers and information for us, folks who

12  act as spokespersons in -- with members of the media and

13  in meetings with policymakers in public hearings.

14            So it's basically active participation in the

15  organization qualifies an individual as membership.

16       Q.  You can set those ones aside.

17            Does the Coalition have operating expenses?

18       A.  Yes.

19

20  Redacted

21

22

23

24

25

1 ▮Redacted▮

2     Q.  Where would the Coalition's annual operating

3 expenses be recorded?  What type of document would

4 record that?

5     A.  So we have a budget.  And then we have our

6 financials that are provided to the board of directors

7 each month.

8         And those have our profit and loss statement,

9 and that includes a budget, how much we spent that

10 month, our actuals versus our estimated budget and --

11 both to date and on a monthly basis.

12     Q.  Have those records that you just described

13 existed since 2019?

14     A.  Yes.

15     Q.  How does the Coalition fund itself, meaning, how

16 does it get money to pay those operating expenses?

17     A.  We are primarily funded through individual

18 donors, many of whom heard about us originally through

19 Street Sheet or through, you know, media and

20 word-of-mouth.

21         We also are funded through foundations.  We do

22 get a small amount of corporate support.  And we also

23 have contracts, primarily -- well, our only contracts

24 are with Chinatown Community Development Center.

25     Q.  And is that contract with Chinatown Community

```
 1            But typically, people at our weekly workgroup
 2   meeting, we set our outreaches, and people report back
 3   on the outreaches.
 4            And the idea is the information we're getting
 5   from homeless people is driving our agenda.  It's
 6   sometimes sweeps, but it could be a shelter outreach,
 7   et cetera.
 8        Q.  When did Coalition's employees first begin
 9   monitoring sweeps as part of their job responsibilities?
10        A.  As long as I've been at the Coalition.  And it
11   kind of changes because the City's policies and
12   practices change.
13            But we've had some form of going out on the
14   streets.  And that looks differently, depending on the
15   time.  But when, for example, I first started at the
16   Coalition in 1995 under Frank Jordan, there was the
17   matrix program, you know, so things have kind of
18   shifted.
19            But it wasn't -- yeah.  So we've had a
20   consistent presence.  Although, when -- because of the
21   sweeps getting more escalated and more intense in terms
22   of the negative impact on people that are living out
23   there, we've had to intensify our monitoring.
24        Q.  Does the Coalition have any interns at the
25   moment?
```

1   that is effective in moving the needle on homelessness.

2   BY MR. GEORGE:

3       Q.  I'm going to turn to the Coalition's members.

4   You can set this document aside.

5           The Coalition has members, correct?

6       A.  Correct.

7       Q.  How does the Coalition track its members?

8       A.  We do not have a formal database of members, but

9   we do have a number of different -- so we have a

10  workgroup list, we have an e-mail list, we have a --

11  notes that we're taking about different interactions and

12  reporting back.

13          So it's a -- more of an informal -- you know, of

14  course, our individual organizers have their contacts of

15  people they're in regular contact with and that

16  relationship building that occurs.

17      Q.  Is there any one single document that lists the

18  Coalition's members?

19      A.  No.

20      Q.  Is there any single database that lists the

21  Coalition's members?

22      A.  No.

23      Q.  Is there any single database that tracks the

24  Coalition's members?

25      A.  No.

1    sometimes we also have -- we'll have break-off lists for

2    those people who are interested in that particular

3    topic.

4        Q.  So in order to determine the members of the

5    Coalition, you would need to consult Human Rights

6    working group list, the Housing Justice working groups

7    list, the Street Sheet vendors, the chimp mail list, and

8    then the records for each of the various campaigns on

9    which members participated; is that correct?

10       A.  Correct.

11       Q.  Has the Coalition done that work to identify all

12   of its current members at any point in time?

13       A.  We do not have a comprehensive list of members

14   because we have an informal membership model and, you

15   know, just -- we didn't have the time to do that.

16       Q.  So the Coalition hasn't, then, created a single

17   database or single list of all of its members; is that

18   correct?

19           MS. SALZMAN:  Objection.  Asked and answered.

20           THE WITNESS:  Correct.

21   BY MR. GEORGE:

22       Q.  Earlier, you mentioned that a person becomes a

23   Coalition member by taking actions that are in

24   furtherance of the Coalition's mission; is that correct?

25       A.  Correct.

1         Q.  At what point in a person's involvement do they

2    become a member?

3              MS. SALZMAN:  Objection to form.

4              THE WITNESS:  Because our constituency -- it's

5    very different than different organizations -- are

6    unhoused, many of them, we have -- we deliberately have

7    created an informal membership structure.  And so we

8    define it as people being involved in our work.

9              So once they are involved in our work, they are

10   members in the various ways I described earlier.

11   BY MR. GEORGE:

12        Q.  Is there a moment at which the Coalition

13   recognizes them as a member, meaning, sends them

14   something to say, you are a member of the Coalition?

15        A.  No.  Because -- yeah.  Because of our informal

16   structure and we don't have dues, there's not really --

17   yeah.  So we don't do that, no.

18             But once they come to a meeting and they're part

19   of the workgroup, you know, they're clearly a member.

20   When they start engaging in the work, they're a member.

21        Q.  Does the Coalition track the reasons why a

22   person becomes a member?

23        A.  No.

24        Q.  Can a current member stop being a member of the

25   Coalition?

1      A.   Yeah.   Due to the nature of our membership,
2 people kind of fluctuate from active involvement to not
3 active.   And so I think that's a better differentiation
4 is thinking about, you know, active members.
5           We certainly have a lot of members who are
6 inactive.   I mean, certainly someone can communicate,
7 hey, I don't want anything to do with you all, or
8 someone moves away.   Then they would no longer be a
9 member.
10      Q.   Does the Coalition track members' inactivity,
11 such that it defines them as inactive members?
12      A.   We don't have -- do a formal tracking of that,
13 no.
14      Q.   Does the Coalition track its members' activity
15 at all?
16           MS. SALZMAN:   Objection to form.
17           THE WITNESS:   So we have -- if they come to
18 meetings, then they're -- then they're signing in that
19 way.
20           We sometimes track participation at -- you know,
21 in trainings and so forth.   We track -- it's often
22 reflected in our notes at the workgroup meetings.
23           So those are the variety of ways.   And probably
24 some other ways.
25 ///

```
 1    out of -- you know, it's not a trait, homelessness.
 2            It's a -- a status at a particular time.
 3        Q.  Does the Coalition have members who are
 4    permanently housed who haven't been formerly homeless or
 5    are not at immediate risk at becoming homeless?
 6        A.  Yes.
 7        Q.  Do you have an estimate on the percentage of the
 8    members who are housed with some level of permanence?
 9        A.  Probably between 30 and 50 percent.  Probably
10    more -- closer to the 30 side.
11        Q.  And what is that estimate based on?
12        A.  That's based on, kind of, a bird's-eye view of
13    the involvement in all the different areas.  So for
14    example, our vendors are primarily unhoused or lived
15    experience.  I would say probably 100 percent.  But
16    there may be some exceptions in there.
17            You know, so -- and then looking at each of the
18    categories that way, yeah.
19        Q.  I'm sorry.  I didn't mean to interrupt.
20            Those are Street Sheet vendors?  Is that what
21    you're discussing there as vendors?
22        A.  Yeah.  Yeah.  That was just an example of, kind
23    of, a bird's-eye view.
24        Q.  How many current Street Sheet vendors are there?
25        A.  So kind of lost a lot of vendors during the
```

1   pandemic.  Actually, a lot passed away.  I think we have

2   right now between, like, 40 and 70.

3       Q.  Does the Coalition ask its members about their

4   experience with homelessness in the past?

5       A.  Not in a formal way.  Occasionally -- I mean,

6   yeah.  Not in a formal way.

7       Q.  Do members have any particular rights in

8   directing the Coalition's activities?

9       A.  Yes.

10      Q.  And what are those rights that the members have

11  to direct the Coalition's activities?

12      A.  So our structure is bottom up.  And so in terms

13  of what we're working on really comes out of the

14  outreach that we're conducting to unhoused people.

15          So at the most fundamental level, homeless

16  people are directing our advocacy agenda.  They also --

17  our internal budget for the Coalition is a collective

18  conversation, and we have open meetings to discuss

19  those.  So members are welcome if they wanted to be

20  involved in that.

21          And then they're also -- yeah.  And then

22  outreach is sometimes -- that information is collected

23  in more formal ways, through surveys and whatnot, and

24  sometimes in more informal ways.

25      Q.  Do members vote for the members -- do Coalition

1  members vote for members of the board of directors?

2         MS. SALZMAN:  Objection.  Asked and answered.

3         THE WITNESS:  You mean, vote or have input?

4  BY MR. GEORGE:

5     Q.  I mean, vote for in order to put them on the

6  board.

7     A.  No, we do not.  Because of the nature of our

8  constituency, we have an informal structure that -- that

9  does not include a formal voting of the board of

10  directors.

11         But they have input.  And so we often have

12  from -- representation from the working group on the

13  board of directors.  And if a seat is open, then we'll

14  bring that to the workgroup, which is open to all

15  members, unhoused or housed alike.

16         And they can give input on nominating someone or

17  thinking about who they want.  If there was multiple

18  people, then there could be an instance where a vote

19  took place.  We haven't had multiple people come up in

20  recent history, that I can recall.

21     Q.  Are there any unhoused members currently on the

22  Coalition's board of directors?

23     A.  Currently unhoused?

24     Q.  Correct.

25     A.  No.  But half our board has lived experience

1    with homelessness.

2        Q.  What's the board member's most recent experience

3    of homelessness, meaning, how many years has it been

4    since a current board member was homeless?

5        A.  Probably -- probably more than five years.

6        Q.  When was the last time that the Coalition's

7    board had a presently unhoused member on it?

8        A.  Because people come in and out of homelessness,

9    just trying to line up, probably -- probably about

10   seven years ago.

11       Q.  Who was that person?

12       A.  Jesus Perez.

13       Q.  Was Jesus Perez on the Human Rights working

14   group before being a board member?

15       A.  Jesus was on the -- was Housing Justice.

16       Q.  Is Jesus Perez currently a board member?

17       A.  No.  He had a stroke and heart attack and tried

18   to hang on for a while, but...

19       Q.  Sorry to hear that.

20       A.  Yeah.

21       Q.  Do unhoused members make decisions about who is

22   employed at the Coalition?

23       A.  So we have -- we have hiring committees.  And

24   members and volunteers are welcome to join those when

25   there's an open position.

1          Q.  And do the hiring committees have input on who

2     is hired?

3          A.  The hiring committee decides who gets hired.

4          Q.  Who was the last person that was hired by a

5     hiring committee?

6          A.  I believe it was River Beck.

7          Q.  And were there unhoused members of the Coalition

8     who participated on that hiring committee that hired

9     River Beck?

10         A.  I believe that -- I believe no one -- no one

11    chose to be on that committee from the membership.  I

12    believe the committee was all staff.  I believe we did

13    have a -- I have to double-check, but I believe we had

14    an unhoused staff person that was on that committee.

15         Q.  When was the last committee that had an unhoused

16    member on it -- not a staff member, but an unhoused

17    Coalition member that hired a Coalition employee?

18         A.  I can't remember.  Yeah.

19         Q.  Did unhoused members of the Coalition vote on

20    whether the Coalition would pursue this litigation?

21         A.  So it -- it's a bottom-up process, so we were

22    doing a lot of outreach to unhoused people.  I mean,

23    this is a long -- a long story.

24              But we -- in outreach, it kept coming up that

25    people were having their property confiscated illegally,

```
 1    the lawyers.
 2             THE WITNESS:  Yes.  I believe a presentation was
 3    given.
 4    BY MR. GEORGE:
 5       Q.  Did unhoused members participate in that
 6    presentation?
 7       A.  Well, you have the board members with the lived
 8    experience.  And then the process that the lawsuit was
 9    developed would have been shared.  And that would have
10    included input from unhoused members.
11       Q.  Were there any -- were there any individual
12    unhoused members present for the presentation to the
13    board regarding this litigation before the board voted
14    on it?
15       A.  No.
16       Q.  Did any unhoused members enter into an agreement
17    with the Coalition to represent them in this litigation?
18             MS. SALZMAN:  Objection to form.
19             THE WITNESS:  I'm not exactly sure what you're
20    asking.  You mean, like -- I mean, because there was a
21    whole bunch of unhoused people that were plaintiffs.
22    And then the declarations, all of those are signed
23    documents.  Is that what you're referring to?
24    BY MR. GEORGE:
25       Q.  I mean, is there any contact between the
```

1    Coalition and any unhoused members for the Coalition to

2    represent them in this litigation, to act on their

3    behalf?

4              MS. SALZMAN:   Objection to form.

5              THE WITNESS:   No.  Not in the way you're

6    describing.

7    BY MR. GEORGE:

8        Q.  Is there an informal agreement for the Coalition

9    to represent any unhoused members in this litigation?

10       A.  Yeah.  I mean, we try to structure ourselves so

11   that we're representatives of unhoused community members

12   through doing a lot of outreach and having conversations

13   about what's happening for going in the wrong direction.

14             We look for those threads.  And so we can -- we

15   can represent our constituency as best as we can.

16       Q.  Is that a legal agreement with those members to

17   represent them?

18             MS. SALZMAN:   Objection.

19             THE WITNESS:  A legal -- not a legal agreement

20   with the Coalition, no.

21   BY MR. GEORGE:

22       Q.  So there's no legal agreement between the

23   Coalition and any of its unhoused members to represent

24   the unhoused members in this litigation?

25             MS. SALZMAN:   Objection.

1             THE WITNESS:  No.

2    BY MR. GEORGE:

3        Q.  Other than the ground-up process that you

4    described, do unhoused members choose which legal

5    matters the Coalition proceeds with?

6        A.  Well, when it -- you know, so the ground-up

7    part -- you said, other than, but we have the workgroup

8    where it's opened to unhoused members where decisions

9    are made.

10       Q.  Is the workgroup part of that ground-up process?

11       A.  Yeah.  The idea is that the workgroup members

12   conduct outreach themselves, and so they're informed

13   what they're hearing from unhoused people because

14   unhoused people, being in crisis, they can't necessarily

15   always go to meetings.

16           They're having to deal with where to sleep,

17   where to get food, et cetera.

18           So that's why we structure it that way.

19       Q.  I'm going to introduce Exhibit 146.

20           (Deposition Exhibit 146 marked for

21           identification.)

22   BY MR. GEORGE:

23       Q.  This is an excerpt from a longer document, which

24   is why it looks, sort of, like it starts in the middle.

25   But can you turn to the page that's marked one, which is

1    on this paragraph, and then we can go off.

2              MS. SALZMAN:   Sure.

3    BY MR. GEORGE:

4         Q.   This document -- this is again, in paragraph 7.

5    It refers to "these activities" in that next sentence

6    that follows the one we were just discussing.

7              Is there a document that identifies the

8    activities that people can engage in and then become a

9    member by engaging in them?

10        A.   Beyond this one?  I'm just kidding.

11             I believe some of this is described in the

12    volunteer manual.

13        Q.   Following "these activities" is a list of

14    activities, correct, on this -- in paragraph 7 here?

15        A.   Yes.

16        Q.   And it says, membership activities include --

17    and it lists the various set of activities; is that

18    right?

19        A.   Correct.  Likely not comprehensive.

20        Q.   What would you -- what document would you

21    consult in order to see the comprehensive list of

22    activities through which a person could become a member

23    by participating?

24             MS. SALZMAN:   Objection to form.

25             THE WITNESS:   I mentioned the one document.  I

1  a possibility they could get it back, and they were

2  doing other things, then yes.

3      Q.  Would that person that you just described who's

4  helping look for other people -- would that person know

5  that they are a member of the Coalition?

6          MS. SALZMAN:  Objection.

7          THE WITNESS:  They may or may not.  But I think

8  generally, yes.

9  BY MR. GEORGE:

10     Q.  And why -- why would it be that they may not

11 know that they were a member of the Coalition?

12         MS. SALZMAN:  Objection.

13         THE WITNESS:  Well, I can't really speak for

14 somebody else.  But I would imagine that they didn't --

15 they may think of member as, like, something you have to

16 sign a piece of paper, and may not realize that their

17 activity, that we consider them a member.

18 BY MR. GEORGE:

19     Q.  So there could be a situation where the

20 Coalition considers someone a member, but they don't

21 consider themselves a member because they think of

22 membership in a different way?

23     A.  That's possible for that happening, yeah.  But I

24 think that if they, you know, know what membership is,

25 they would say yes.

```
 1              MS. SALZMAN:  Objection to form.
 2              THE WITNESS:  Well, I -- like, I'm getting paid
 3    to sit here.  So, you know, there's some staff time
 4    involved.
 5    BY MR. GEORGE:
 6         Q.  Is the Coalition spending any money on lawyers
 7    for this litigation?
 8         A.  No.
 9         Q.  Is the Coalition paying any of the filing fees
10    that are associated with this litigation?
11         A.  No.
12         Q.  Is it paying any of the litigation costs, like,
13    for depositions or other types of litigation expenses?
14         A.  No.
15         Q.  Are the members contributing towards the funding
16    of this litigation in any way?
17         A.  Well, members are providing declarations, and so
18    they're -- I guess if time is money, then yes.  But
19    not -- they're not giving financially.
20         Q.  Other than time that they may provide or for
21    their own participation in the litigation, are they
22    providing any financial support for the litigation?
23         A.  No.
24         Q.  By "they," I mean Coalition members.  Did you
25    understand that when I said that?
```

```
1        A.  (Witness nods head up and down.)

2        Q.  That's a yes?  Sorry.

3        A.  Yes.

4        Q.  Thanks.  The head shaking is hard to read.

5        A.  Yeah.  Yeah.  Yeah.

6        Q.  Absolutely.  You're doing great on that.

7            This case is not being brought to pursue damages

8    or compensation; is that correct?

9        A.  Correct.

10       Q.  Did the members get to decide on why this case

11   was being pursued not to pursue damages or compensation?

12           MS. SALZMAN:  Objection to form.

13           THE WITNESS:  The members had input on, you

14   know, this -- bringing up this issue and whether to

15   pursue it.  I don't know if outside of the workgroup, if

16   we had a specific conversation with damages.

17           We didn't do a survey or anything like that on

18   it.

19   BY MR. GEORGE:

20       Q.  So the Coalition didn't survey its unhoused

21   members to determine whether or not they would want this

22   case to be brought for compensation?

23       A.  Correct.

24       Q.  The discussion of what to seek in the litigation

25   was limited to the Human Rights working group; is that
```

1    correct?

2        A.  Well, the what to seek in the litigation was

3    determined by the experiences of unhoused people that

4    was uncovered during outreach.

5            So, you know, the property confiscation, for

6    example, was so overwhelming and getting worse and

7    worse, and so we -- we were hearing from our members

8    that we needed to do something about it.  And many

9    brought up the idea of doing a lawsuit.  You know, can't

10   you sue the City?  Is this legal?  That was a frequent

11   thread.

12           And we said, well, we need to pursue other

13   things before that.  And we did.  And then we pursued

14   litigation as a last resort.

15       Q.  And did those members who asked about suing the

16   City, did they -- were they consulted about what the

17   Coalition should sue for, meaning, for damages or just

18   an injunction?

19       A.  Not -- not on those, kind of, technical topics,

20   but on, like, what the -- what is the issue that needs

21   to be addressed.

22       Q.  I want to turn back to -- this is Exhibit 146.

23   This is your declaration that we were looking at

24   before -- excuse me -- before the break.

25           Can you turn to paragraph 8, please?

1       A.   Uh-huh.

2       Q.   Towards the end of this paragraph -- this is on

3  page 5 of 51.   Towards the end of paragraph 8, it

4  discusses Coalition's connection with about 150 to

5  200 unhoused people every week.

6            How is that number calculated?

7       A.   Yeah.  So it's estimated.  And so between the

8  different areas of work, we're doing outreach and

9  shelters at drop-ins in street locations and other

10  areas, sometimes parks where unhoused people congregate.

11            And it's an estimate based on those collective

12  experiences.

13       Q.   Are these -- so this is outreach -- in-person

14  outreach to shelters; is that correct?

15       A.   Correct.

16       Q.   And outreach on the street; is that correct?

17       A.   Yeah.  And drop-in centers and churches and, you

18  know, so...

19       Q.   So this 150 to 200 is the in-person outreach

20  that's done by the Coalition on the streets; is that

21  right?

22       A.   Yes.

23       Q.   And then it next mentions an e-mail distribution

24  list, and it includes about 3,000 unhoused people and

25  volunteers.

1    And was she currently unhoused at the time she was an

2    active member of that group?

3        A.  I'm not sure when exactly she went into housing.

4    She may have been unhoused when she first joined.  She's

5    definitely housed now.

6            Yeah.  I believe she was in shelter when she

7    joined.

8        Q.  Are there -- how often are the Human Rights

9    working group meetings?

10       A.  Weekly.

11       Q.  And are there people who participate nearly

12   every week for a period of time -- for a long period of

13   time?

14       A.  Yes.

15       Q.  And are there any unhoused people who are

16   members of those kind of regular participating meetings?

17       A.  Well, Yolanda is one.  Through the period of the

18   lawsuit, I think we -- we had AJ.  We had this other guy

19   who was living at Hospitality House.  I can't remember

20   his name, who was regular for a while.

21           Toro was regular for a while.  Couper, yeah.

22       Q.  Couper is Couper Orona?

23       A.  Correct.

24       Q.  Is Toro Castano a member of the Coalition?

25       A.  Yes.

1      Q.  When did he become a member?

2      A.  Wouldn't be able to give you an exact date.  But

3  I believe prior to 2020.

4      Q.  What activities does he currently perform for

5  the Coalition?

6      A.  He's not a very active member at this point.

7  But in the past, he would distribute Know Your Rights

8  information to other members.  He spoke to public

9  officials.  He ended up, you know, coming on as an

10  intern.

11         He did -- gave a lot of input for different

12  policy positions, did monitoring of sweeps.

13      Q.  Would you consider him an inactive member at the

14  moment?

15      A.  Yeah.  Probably in the gray zone, but he's

16  somewhat active.  But not as -- he's not actively coming

17  to workgroup meetings or anything like that.

18      Q.  What activities is he currently doing that make

19  him somewhat active?

20      A.  He's contacting us about what -- what he's seen

21  basically as an informant.  If he's seen things, then

22  he'll let us know.

23      Q.  And him acting as an informant categorizes him

24  in the gray zone?  Was that your phrase?

25      A.  Yeah.  Yeah.  Yeah.  I mean, I think he's

1    somewhat active.  I wouldn't say he's, like, a super
2    active member, yeah.
3          Q.  And what do you mean by "gray zone"?
4          A.  Somewhat active.
5          Q.  And was Toro employed by the Coalition at a
6    certain point?
7          A.  Yes.  So he was -- he came on as an intern in a
8    20-hour position and then was hired as a Human Rights
9    organizer for a short period of time.
10          Q.  And when he was hired by the Coalition, was he
11    still a member of the Coalition at that time?
12          A.  Then he kind of shifted into staff.  But, yeah,
13    I think he had probably -- because he came out of being
14    a member, he would still be a member.
15          Q.  Does the Coalition consider its staff to be
16    members?
17          A.  Not necessarily.  But I think in Toro's case,
18    because he -- we hired him on as a member, I think, you
19    know, yeah, sort of continues somewhat with membership
20    status, yeah.
21
22    Redacted
23
24
25

**Redacted**

 Q.  Did the Coalition provide any direct services to Toro?

 A.  Well, we advocated for him to get placements multiple times.

 Q.  Did it provide him -- did it -- did the Coalition ever provide him a tent?

 A.  I don't remember.

 Q.  Did the Coalition ever provide him a sleeping bag?

 A.  I don't remember.

 Q.  Did the Coalition ever do a homeless verification for Toro?

 A.  I don't remember.

 Q.  Would the Coalition have a record of having done a homeless verification for Toro if it had done one?

 A.  Not if it was back in -- I mean, if it was over,

```
1         A.  No.

2         Q.  Has the Coalition provided Mr. Martinez any

3    tents?

4         A.  I'm not sure.  Again, you know, after a property

5    confiscation, it very well could have.

6         Q.  Is there any record of who receives a tent from

7    the Coalition?

8         A.  No.

9         Q.  If a person comes into the Coalition's offices

10   and gets a particular item given to them by the

11   Coalition, is there any record of that?

12        A.  No.  We're way too busy for that.

13        Q.  Has the Coalition done any homeless verification

14   forms for Mr. Martinez?

15        A.  I'm not sure.

16        Q.  Has the Coalition assisted Mr. Martinez in the

17   Coordinated Entry process?

18        A.  I'm not sure.

19        Q.  Does the Coalition keep records of who it

20   assists in the Coordinated Entry process?

21        A.  No, it doesn't.

22        Q.  Has the Coalition provided Mr. Martinez any

23   medical devices?

24        A.  I don't -- I don't know.

25        Q.  Does the Coalition provide people who live on
```

1    correct?

2        A.  Correct.  But I think that -- yeah.  So I might

3    be wrong.  It could have been Carlos Wadkins.  No.

4    Carlos would have been gone.

5            But, you know, we were doing the preliminary

6    work of lining everything up.  And so Kelley was very

7    involved in identifying folks, et cetera.

8            And then we hired Laketha Pierce and then Javier

9    Bremond.  So it could have been -- could have been them.

10           But I think it was probably more likely

11   Ms. Cutler.

12       Q.  Did the Coalition reach out to Ms. Brown to

13   notify her that it would be filing her declaration in

14   this case before it filed it?

15       A.  I believe that would have been an attorney doing

16   that.

17       Q.  The Coalition has indicated that Ms. Brown is

18   one of the members on whom the Coalition bases its

19   associational standing.

20           Are you aware of that?

21       A.  Yes.

22       Q.  And did the Coalition discuss that with

23   Ms. Brown before it put her in its answers to the

24   interrogatories regarding that issue?

25       A.  I'm not sure.

```
 1            (Discussion off the record.)

 2            THE VIDEOGRAPHER:  This marks the end of

 3    Media No. 3.  We are going off the record.  The time is

 4    12:56.

 5            (Lunch recess taken from 12:56 to 1:47 p.m. of

 6            the same day.)

 7            (Nothing omitted nor deleted.  See next page.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    some stuff around that.

2            And then other kinds of just, you know, keeping

3    us informed on what's happening.  And there may be other

4    things.  I'm not sure.  So maybe some comp work.

5        Q.  Is Mr. Bryant an active member of the Coalition

6    now?

7        A.  I would say that he's definitely a member.  I

8    don't think he's active at this particular moment.

9        Q.  Is he an inactive member of the Coalition?

10       A.  I guess he's kind of more gray area-ish too as

11   well where he's somewhat inactive.

12       Q.  I'm not sure if I asked this for Mr. Martinez.

13   I apologize if I'm repeating myself.

14           Is Mr. Martinez an active member of the

15   Coalition at this point in time?

16       A.  I would say, yeah, somewhat -- somewhat active,

17   not super active.

18       Q.  More like the gray area that you've described?

19       A.  Yeah.

20       Q.  When was the last time that Mr. Bryant

21   participated in a specific Coalition on Homelessness

22   activity?

23       A.  He's participated in the legal proceedings.  I

24   think aside from that, I can't remember.

25       Q.  Does the Coalition have any knowledge of

```
 1    two different -- three different sites for youth; and
 2    two sites for families.  And they're spread between
 3    Bayview, Mission, Tenderloin.
 4         Q.  So approximately once per week, a Coalition
 5    staff member is joining an unhoused person at one of
 6    those sites for the Coordinated Entry in-person
 7    interview; is that correct?
 8         A.  Correct.
 9         Q.  Okay.  How does Coalition document its
10    involvement in the Coordinated Entry process -- in the,
11    sort of, direct services Coordinated Entry process.
12              MS. SALZMAN:  Objection.
13              THE WITNESS:  We don't have any formal
14    documentation of that.
15    BY MR. GEORGE:
16         Q.  Is a person who is navigating that process or
17    applying for Coordinated Entry -- are they required to
18    provide documentation to complete that process?
19         A.  So on the initial screening, no.  If they want
20    to appeal the score, yes.
21              Eventually, if they get a placement offer, if
22    they're what they consider referral -- housing referral
23    status, there is an abundance of documentation that has
24    to be provided, including income verifications, and
25    identification, pretty extensive paperwork.
```

1          Depending on the housing program, they have a
2     variety of funding sources, and they each have their own
3     eligibility criteria that was quite difficult to
4     navigate.
5          Q.  Is that -- is that documentation required for
6     Coordinated Entry, or is it required based on what the
7     ultimate housing provider requires?
8          MS. SALZMAN:  Objection.
9          THE WITNESS:  It's based on what the ultimate
10    housing provider requires, with the exception of the
11    appeal.  That is a Coordinated Entry requirement.
12    BY MR. GEORGE:
13         Q.  What is the documentation that's needed to
14    appeal the housing score?
15         A.  Well, it's -- you know, so let's say, someone
16    gets a low score and they don't feel that their mental
17    health has been accurately assessed.
18         Then they would get a letter from a mental
19    health provider kind of explaining what the situation
20    is.
21         Same with the medical condition.  It could be
22    from a primary care doctor.  Those are kind of the
23    typical ones.
24         There's also scoring around domestic violence,
25    some documentation around that, police report,

1    et cetera.

2            So -- but more typically, it's going to be on

3    the medical side, on the mental health, or the primary.

4        Q.  Would a person be able to use their medical

5    records to substantiate their appeal?

6        A.  Correct.  And that's an HSH decision.

7        Q.  I believe that earlier, you mentioned that

8    Lukas Illa is one of the people at the Coalition who

9    assists in Coordinated Entry; is that correct?

10       A.  I believe he has assisted people with

11   Coordinated Entry.

12           I know River has, for sure -- I think I

13   mentioned before -- was homeless certifications.

14       Q.  Oh, okay.  I apologize.  So River and Lukas,

15   they do currently assist in the Coordinated Entry

16   process; is that correct?

17       A.  I know for sure River does.  I believe Lukas has

18   as well.

19       Q.  Other than --

20       A.  I'm not positive.

21       Q.  Other than River definitively, is there anyone

22   else at the Coalition who assists in that process,

23   helping people navigate the Coordinated Entry system?

24       A.  Mercedes Bullock, yeah.  Perhaps

25   Yessica Hernandez.

1    Q.  Do Coalition employees document the time that
2    they spend on particular tasks as part of their daily
3    obligations?
4    A.  No.  Yeah.  We're -- no.  We're in the fast
5    lane.
6    Q.  Is there any way for the Coalition to determine
7    how much of River's or Mercedes' or Yessica's time is
8    dedicated to assisting people with navigating the
9    Coordinated Entry system?
10    A.  They would have to estimate that.  I'm sure it
11    varies.
12    Q.  Does Coalition know how many people it has
13    assisted in the navigation of the Coordinated Entry
14    system since, say, 2020?
15    A.  No.  I mean, we could estimate based on my --
16    once a week, 52 weeks in a year, four years.  That would
17    be 208, I believe.
18        But that would be an estimation.
19    Q.  Does the Coalition submit the appeal to the
20    agency when a person is appealing their Coordinated
21    Entry score?
22    A.  No.  It's -- we connect them with the -- I'll
23    connect them with the medical and kind of advise them on
24    the process.
25    Q.  Does Coalition assist in -- I'm sorry.

1          A.  The medical provider needs to submit that.

2          Q.  So the Coalition -- if a person is appealing

3     their particular score and they need information to

4     just -- medical information to justify the appeal, the

5     Coalition will connect them with a medical provider; is

6     that correct?

7          A.  Yeah.  With a -- typically, what we would do is

8     ask them, are they in medical care, where are they

9     getting it?  Are they in psychiatric care?  Okay.  This

10    is what -- you know, and give them the help on what

11    needs to happen, and then point them in the direction of

12    how to do it.

13         Q.  So the Coalition is not aware of the number of

14    people that it has assisted in the Coordinated Entry

15    process; is that correct?

16              MS. SALZMAN:  Objection.  Asked and answered.

17              THE WITNESS:  We are -- we can estimate how

18    many, as I previously said.

19    BY MR. GEORGE:

20         Q.  Is the Coalition able to provide a number of

21    people that it has assisted with the Coordinated Entry

22    process who have been unable to complete Coordinated

23    Entry because the City unlawfully destroyed their

24    belongings?

25         A.  We don't have a track of that.

1            I mean, I know of, you know, an example,

2    Andy Howard, whose housing was significantly delayed as

3    a result of their paperwork getting destroyed after they

4    were promised they were able to leave their belongings

5    there by the City.

6            And we hear -- I mean, property destruction is

7    so widespread.  So it is an issue that comes up quite

8    frequently.

9            We don't have, like, a tracker keeping track of

10   all of that.

11       Q.   You mentioned Andy Howard?

12       A.   Uh-huh.

13       Q.   Is that person a member of the Coalition?

14       A.   He was.  He's deceased.

15       Q.   And when did he die?

16       A.   He died, I want to say, about a year ago.

17       Q.   And when was he trying to navigate the

18   Coordinated Entry system?

19       A.   He was a member when we filed the lawsuit in

20   2022, so I want to say -- I would have to look.  I have

21   a -- I believe it was already submitted, if I'm not

22   mistaken, as part of our discovery, a videotaped

23   interview that I personally videotaped of him talking

24   about what happened.

25            And it was posted on social media.  And that, of

1    course, has a date, so --

2        Q.   Other than -- other than Mr. Howard, are there

3    any other specific people that the Coalition can

4    identify whose Coordinated Entry process was delayed

5    because of the destruction of their property?

6        A.   There's many more.  I can't -- I can't put --

7    like, say, these are the names of people, because it is

8    pretty widespread.

9             But one of the issues I didn't mention is that

10   in -- in Andy Howard's case, you know, he was trying to

11   get housing through the Care.Cash program.  So part of

12   that paperwork was -- was basically qualifying for

13   welfare.

14            And so in that situation, the paperwork is more

15   up front than ahead of time of the housing offer.  That

16   is the easiest way for people to get housing, and pretty

17   commonplace where people get it through the welfare

18   program.

19            I believe it's about a -- probably about a third

20   of the City's units are Care.Cash units.

21       Q.   Which documentation was he unable to provide to

22   complete that process because it was destroyed?

23       A.   It was his -- all his income -- I think he had

24   to do bank statements and stuff like that for the

25   welfare process.  And he gathered that together, his

1    identification, yeah.

2         Q.  Did --

3         A.  I'm not positive.  I think it was a birth

4    certificate, but I'd have to go back and look at that

5    tape and see if he mentioned that.

6             But it was definitely the -- it definitely

7    slowed him down.

8         Q.  Did the Coalition or a Coalition affiliate, like

9    a member or a employee, observe the destruction of

10   Mr. Howard's property?

11            MS. SALZMAN:  Objection to form.

12            THE WITNESS:  Mr. Howard stated that his friend

13   was watching his stuff and saw that it was the City that

14   took his property.

15   BY MR. GEORGE:

16        Q.  And who was his friend?

17        A.  I don't remember.  He did do a small claims,

18   though.  It might have been on that.

19        Q.  Was he compensated through the small claims

20   process for the destruction of his property?

21        A.  I think he was.  But, you know, I mean, the

22   experience was so devastating.  You really can't

23   compensate that kind of loss when you're already

24   homeless and lost everything, and you're holding onto

25   your littlest but left -- is pretty overwhelming.

1    the relevant documents to this litigation; is that

2    correct?

3        A.  Correct.

4        Q.  Does Coalition have all of the homeless

5    verification forms going back to the date that it began

6    preserving documents?

7        A.  Well, when we were preserving documents, I don't

8    think we had the homeless -- it wasn't our understanding

9    that we needed to preserve the homeless verification

10   things.  I think that was kind of a newer development

11   later on, but yeah.

12       Q.  So Coalition destroyed homeless verification

13   forms that are dated after the date of preservation for

14   this lawsuit; is that correct?

15           MS. SALZMAN:  Objection.

16           THE WITNESS:  We may have.  You know, they may

17   still be sitting in the office.  I'm not sure, but I can

18   look.  I don't know -- what I can say is, I don't think

19   we thought of those as being part of documents that

20   needed to be preserved.

21   BY MR. GEORGE:

22       Q.  Does Coalition have all the verification forms

23   it created back to September of 2022?

24       A.  Not sure.

25           MS. SALZMAN:  Objection.  Asked and answered.

```
1         A.  No.  We just know through conversations and
2    whatnot.
3         Q.  How many verification forms has Coalition needed
4    to duplicate because the City illegally destroyed the
5    homeless person's copy of the form?
6         A.  I don't know.
7         Q.  Does the Coalition have that number anywhere in
8    its possession?
9         A.  We don't track that.
10        Q.  Is the Coalition able to distinguish between a
11   verification form that was destroyed illegally and one
12   that was not destroyed illegally?
13             MS. SALZMAN:  Objection to form.
14             THE WITNESS:  Well, that would -- you know, if
15   someone volunteered that information, then we would
16   know.  And if they didn't, we wouldn't.
17   BY MR. GEORGE:
18        Q.  The Coalition would need to rely on someone
19   telling them how the form was destroyed in order to know
20   whether it was destroyed illegally; is that correct?
21        A.  Correct.
22        Q.  Does the Coalition have any documentation that
23   records the illegal destruction of a homeless
24   verification form?
25             MS. SALZMAN:  Objection to form.  And asked and
```

 1   answered.

 2          THE WITNESS:  Yeah.  We don't have any kind of,

 3   like, tracking system for that.

 4   BY MR. GEORGE:

 5      Q.  Has HSA, the Human Services Agency for the City

 6   of San Francisco -- have they ever required verification

 7   forms from Coalition?

 8          MS. SALZMAN:  Objection to form.

 9          THE WITNESS:  Well, HSH was part of HSA.  And so

10   before that, we probably were doing homeless

11   verifications in there under their homeless department.

12          I'm not sure if currently, they send people to

13   us or not.  They do have a little bit of housing through

14   their CalWORKs program, and they built a housing program

15   that's, like, specific for people on disability.

16          They have a tiny bit of housing still.

17   BY MR. GEORGE:

18      Q.  Has HSA ever communicated to the Coalition that

19   it was unwilling to accept verification forms from the

20   Coalition?

21      A.  There was an issue with -- way back in the day

22   with residency letters.  So they asked us to do

23   residency letters, trained us on how to do it.  We did

24   it that way.

25          And then there was a bizarre expose of a news

1    provided to homeless people since 2019?

2         A.   I'm not sure exactly because we don't track.

3    But I know we are just giving out -- we had ten today.

4    It's kind of random.

5              I could roughly estimate, dozens, but I'm not

6    sure.  Certainly there was much more during the -- when

7    the -- when the shelters closed.  But we pretty

8    regularly give them out.

9              It just depends on, like, when people donate

10   them to us, we have them to give out.  When we don't, we

11   don't.

12        Q.   Does the Coalition purchase sleeping bags in

13   order to distribute to homeless people?

14        A.   We -- I believe we have purchased sleeping bags.

15        Q.   When was the last time that the Coalition

16   purchased sleeping bags to distribute to unhoused folks?

17        A.   Let's see, so we purchased some at St. John's in

18   the Mission.  And we distributed some that were

19   distributed at St. James infirmary.  I'm trying to

20   remember the dates on those.

21              Let's see, the St. James one was -- would have

22   been -- I think both of those would have been between

23   probably 2021 and 2023.  Yeah.  I'm not sure of an exact

24   date.  Sorry.

25        Q.   Does the Coalition have the receipts for the

1    sleeping bags that it purchased and distributed at

2    St. John's and St. James?

3         A.  I believe those were provided already, yes.

4         Q.  Provided already, you mean produced in this

5    litigation?

6         A.  Correct.

7         Q.  And where were those sleeping bags purchased?

8         A.  It was at a sporting goods store that Homeless

9    Youth Alliance had a discounted connection to.

10         And I think the other ones were purchased at --

11    I'm -- coming up with retail stores is even harder for

12    me.  The Canadian cheap camping store.  I can't remember

13    the name of it.

14         Q.  Was it Decathlon?

15         A.  Decathlon.  There you go.

16         Q.  Did you -- are the receipts for this submitted

17    with your most recent declaration?  Is that what you're

18    referring to?

19         A.  I believe so.

20         Q.  Other than those sleeping bags that were

21    purchased to distribute at St. John's and St. James

22    infirmary, has Coalition in the last five years

23    purchased any other sleeping bags to distribute?

24         A.  Not sure.  Those are the two I recall.  We've

25    gotten a lot donated, though, that we then redistribute.

1          And that's a much bigger than what we've

2    purchased.  And so people pretty consistently drop off

3    old, you know, blankets and sleeping bags and stuff like

4    that.

5          Q.  Has the Coalition purchased blankets to

6    distribute to people?

7          A.  I think blankets, it's more like -- way back in

8    the day, we used to do those emergency blankets.  I

9    don't think we have done those.

10          Typically, the blankets are donated blankets,

11    like, people getting rid of the blankets in their home.

12          Q.  So in the last five years -- let me limit this

13    to the time period since 2019 -- has the Coalition

14    purchased any blankets to distribute to people who live

15    on the street?

16          A.  I don't think so.

17          Q.  Does the Coalition track how many blankets it

18    distributes to people?

19          A.  No, it doesn't.

20          Q.  Does it currently distribute blankets to people

21    who come in in need of a blanket?

22          A.  Yes.

23          Q.  Is it dependent on blankets having been donated

24    to the Coalition and therefore, Coalition having some

25    blankets to distribute?

```
 1        A.  Typically, yes.
 2        Q.  Has the Coalition, in the last five years,
 3   purchased socks to distribute to unhoused folks?
 4        A.  Yes.
 5        Q.  And does it have -- sorry.
 6        A.  Sorry.  We -- we did not purchase socks.  But we
 7   solicited them from -- I wasn't involved in it, so I
 8   don't have the details.
 9             One of our interns got really nice socks
10   donated, a few hundred of them, and I'm not sure from
11   where.
12        Q.  And when did that -- when did that occur that
13   the intern got some socks donated to then distribute?
14        A.  That was a month ago.
15        Q.  Other than that particular event where an intern
16   got some socks donated, does the Coalition purchase
17   socks and then distribute to unhoused people in the last
18   five years?
19        A.  I -- I can't remember.
20        Q.  Do people donate socks for the Coalition to
21   distribute, other than this one event with the intern?
22        A.  Yes.
23        Q.  If a person comes in and needs socks but some
24   haven't been donated, is the Coalition able to provide
25   them socks?
```

1      A.  If we don't have them in stock, then we'll

2   usually try to figure out where they can get them.

3      Q.  Meaning, you might refer the person to another

4   entity that could provide socks for them?

5      A.  Yes.  They're not super easy to come by, though,

6   honestly.

7      Q.  Does the Coalition currently purchase tents to

8   provide to homeless people?

9      A.  We haven't purchased tents in a minute.  Tents

10  were included in those two, the Decathlon and then there

11  was the -- with the two organizations.

12          And then there was tents distributed during the

13  pandemic through mutual aid orgs.

14          We have gotten tents donated, though, that we've

15  given out.  And then sometimes there's, like, requests

16  that come in.

17          So there will be a request that the -- you know,

18  somebody says, you know, we need ten sleeping bags out

19  in the Bayview.

20          And then we'll, like, put the word out and try

21  to get them donated.  Sometimes it's that way.

22      Q.  So there are times where a specific request

23  comes in and Coalition solicits donations for the items

24  so people can get those items; is that correct?

25      A.  Correct.  With the property confiscations,

```
1          A.  Most of them we did directly.  But we were
2     getting calls where people were, like, can I get
3     ten tents?  You know, different groups.
4              And then we'd set those aside.  But then I think
5     the majority of them, we were distributing directly.
6     And we also had a lot of people who -- the word got out,
7     and they'd come to the office.  And we wanted to make
8     sure we had some there.
9          Q.  And these tents, the ones that are described in
10    this -- in these receipts were from the first few months
11    of the pandemic, correct?
12         A.  Correct.
13         Q.  During that time, were people seeking tents so
14    that they could live on their own apart from other
15    people and not be exposed to the Coronavirus?
16         A.  Yeah.  People wanted to try and shelter in
17    place.  And, of course, the shelters were closed, so
18    that was the idea.
19              In the first few months, you know, there was a
20    very brief moment of people's tents not getting taken
21    and they started -- the City started confiscating them
22    again.  The demands grew at that point.
23         Q.  When did the City start taking people's tents
24    again in 2020?
25         A.  It was within that year.  Probably -- probably
```

1    about six months in.  But it was -- well, maybe six to

2    nine months, somewhere around there.

3            Basically, we had a whole campaign to get the

4    City to do shelter-in-place hotels so that folks

5    wouldn't be forced to sleep in tents.  And it took a

6    minute for the City to get those going.

7            But when they did get them going, that's when

8    they started confiscating tents again.  I would have to

9    look back and see when the first SIP started opening up.

10           We kept that pressure on.

11       Q.   Does the Coalition track the reasons why a

12   person needed a replacement tent?

13       A.   We don't have a tracking, but the property

14   confiscation and the taking of tents is so commonplace.

15   I mean, it's all the time.

16       Q.   When a person comes in to get a tent, how does

17   the Coalition know that it was -- that the prior tent

18   was illegally destroyed versus destroyed for a valid

19   legal reason?

20       A.   Well, I mean, that's part of the conversation

21   that we're having with people, you know, what happened?

22   You know, what's going on?

23           And so we're usually talking through that stuff.

24   By a valid legal reason, you mean -- you mean what?

25   What would be a valid legal reason to destroy a tent?

1          Q.  Are you familiar with the DPW bag and tag
2   policy?
3          A.  Uh-huh.
4          Q.  And do you understand that provides certain
5   bases that allow for the disposal of property?
6          A.  Oh, you mean, if it's soiled?  So okay.  Yeah.
7   So yeah.  I mean, we -- yeah.  It comes up in the
8   conversation.
9              And I think there's frequently a disagreement
10  with what's soiled or not.  From our perspective,
11  there's a very broad interpretation of that word
12  "soiled" that's way beyond what it was intended.
13         Q.  So does the Coalition document its discussions
14  with people who come in to get a replacement tent,
15  meaning, do they document the reason why their last tent
16  was destroyed?
17         A.  We don't have a -- kind of a tracking system of
18  that.  But, you know, there's plenty of places that it
19  comes up in text and e-mails and declarations and all of
20  that.
21         Q.  So that would be the source of determining
22  whether or not a particular tent was destroyed
23  unlawfully or lawfully?
24         A.  It would be through conversation -- well, I
25  mean, we also could be out there at the site and

1   monitoring to see a sweep, and seeing for ourself that

2   it was illegally taken and destroyed, and then the

3   person is left without anything.

4           And then, you know, there's some efforts to try

5   to get them something to keep them warm.

6           And then there would be situations where people

7   would come into the office or people would call.  And so

8   in those cases, it would be conversations about what

9   happened when we would -- then that's how we would be

10  able to determine that.

11      Q.  For a particular person whose tent was destroyed

12  and the Coalition observed that destruction, how many of

13  those people has the Coalition provided a replacement

14  tent to?

15      A.  We don't track that.  A lot of times, that's,

16  like, you know, asking around, seeing if anybody has

17  anything for the person or that kind of thing.

18          But, yeah, we don't track that.  It might also

19  be clothing or a sleeping bag, pet food.  I mean,

20  there's a myriad of different things that the person --

21  I had a person come in that -- you know, this is pretty

22  common.  We weren't able to do a declaration.

23          They were in crisis and just were completely

24  freaked out because all their dog food had been taken

25  and they didn't --

1          Q.  Sorry.  I just want to ask about tents.  Let me
2     limit it because I want to be specific about particular
3     people and items.  Let me cut you off for a moment
4     there.
5               As far as tents, the Coalition doesn't track the
6     tents that it has provided to people as a replacement
7     for tents that the Coalition has observed destroyed; is
8     that correct?
9               MS. SALZMAN:  Objection to form.  And objection
10    to interrupting the witness's last answer.
11              THE WITNESS:  The -- we do not have a formal
12    database where we're writing all of that down.
13    BY MR. GEORGE:
14         Q.  You mentioned other items, pet food and those
15    things.  Does the Coalition have a database to track its
16    provision of those items to a person whose items were
17    destroyed and that the Coalition observed?
18         A.  No.  Honestly, a lot of that stuff happens
19    out-of-pocket.  I mean, our staff is constantly just
20    buying stuff for people out of their own money, so --
21    yeah.
22         Q.  And that's the personal funds of individual
23    staff members?
24         A.  Uh-huh.  Yeah.
25         Q.  Does Coalition track how much it has spent on

1    are.  But I believe you're still doing depositions.

2    There could be evidence that comes forward in those.

3    And there could be more declarations that have been

4    uncovered by folks doing monitoring that have not been

5    submitted yet.

6    BY MR. GEORGE:

7        Q.  Are those declarations already written?

8        A.  I'm not sure.

9        Q.  Can you -- do you recognize Exhibit No. 158?

10       A.  Yes.

11       Q.  And is this the Plaintiffs' Response --

12   Responses to Defendant's Second Set of Interrogatories?

13       A.  Yes.

14       Q.  Can you turn to the very last page?  Do you see

15   your verification?

16       A.  Yes.

17       Q.  And is that your signature on this page?

18       A.  Yes.

19       Q.  Did you verify these as true under the penalty

20   of perjury?

21       A.  Yes, to the -- yeah.

22       Q.  Do you agree that when a person's property is

23   destroyed by the City, that person is best situated to

24   testify about its condition and what property they had

25   that was destroyed?

1      A.   The person whose property was destroyed?

2   Typically, yes.

3      Q.   Okay.  I have no further questions.

4      A.   All right.  Thank you.

5           THE VIDEOGRAPHER:  This concludes the PMK

6   deposition of Jennifer Friedenbach.  We are going off

7   the record.  The time is 6:16.

8           THE REPORTER:  Would you like a copy of the

9   transcript?

10          MS. SALZMAN:  Yes.

11          (Deposition proceedings adjourned at 6:16 p.m.)

12                      ---oOo---

13

14

15

16

17

18          _____

19                   JENNIFER FRIEDENBACH

20

21

22

23

24

25

```
 1   STATE OF CALIFORNIA      ) ss.

 2   COUNTY OF SAN FRANCISCO )

 3        I hereby certify that the witness in the

 4   foregoing deposition, JENNIFER FRIEDENBACH, was by me

 5   duly sworn to testify to the truth, the whole truth, and

 6   nothing but the truth in the within-entitled cause; that

 7   said deposition was taken at the time and place herein

 8   named; and that the deposition is a true record of the

 9   witness's testimony as reported by me, a duly certified

10   shorthand reporter and a disinterested person, and was

11   thereafter transcribed into typewriting by computer.

12        I further certify that I am not interested in the

13   outcome of the said action, nor connected with nor

14   related to any of the parties in said action, nor to

15   their respective counsel.

16        IN WITNESS WHEREOF, I have hereunto set my hand

17   this March 7, 2025.

18        Reading and signing was:

19   ___ Requested ____ Waived __X__ Not Requested.

20

21

22

23

24             CYNTHIA TURI, CSR NO. 11812

25             STATE OF CALIFORNIA
```