**EXHIBIT 20**

**TO**

**DECLARATION OF STEVEN MILLS IN SUPPORT OF
DEFENDANTS' MOTION TO VACATE OR DISSOLVE THE
PRELIMINARY INJUNCTION**

```
 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3

 4    - - - - - - - - - - - - - - - -

 5    COALITION ON HOMELESSNESS,      )

 6    et al.,                         )

 7              Plaintiffs,           )

 8    v.                              )  CASE NO.

 9    CITY AND COUNTY OF SAN          )  4:22-CV-05502-DMR (LJC)

10    FRANCISCO, et al.,              )

11              Defendants.           )

12    - - - - - - - - - - - - - - - -

13        THIS TRANSCRIPT AND ITS EXHIBITS CONTAIN INFORMATION

14        SUBJECT TO A PROTECTIVE ORDER AND SHALL BE TREATED

15              AND USED ONLY IN ACCORDANCE THEREWITH

16

17          VIDEOTAPED DEPOSITION OF SHYHYENE BROWN

18                THURSDAY, FEBRUARY 6, 2025

19

20

21                  BEHMKE REPORTING AND VIDEO SERVICES, INC.

22              BY:  VALERIE DIANE MAFFEI, CSR NO. 12138

23                   550 CALIFORNIA STREET, SUITE 820

24                   SAN FRANCISCO, CALIFORNIA  94104

25                        (415) 597-5600
```

1

2

3

4

5

6

7

8          Videotaped deposition of SHYHYENE BROWN, taken on

9    behalf of Defendants, at the Office of the City Attorney,

10   1390 Market Street, Seventh Floor, San Francisco, California,

11   commencing at 9:39 A.M., THURSDAY, FEBRUARY 6, 2025, before

12   Valerie Diane Maffei, Certified Shorthand Reporter for the

13   State of California, License No. 12138, pursuant to Notice

14   of Deposition.

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFFS:

 3           LAWYERS COMMITTEE FOR CIVIL RIGHTS OF THE

 4           SAN FRANCISCO BAY AREA

 5           BY:  ANDREW NTIM, ATTORNEY AT LAW

 6           131 Steuart Street, Suite 400

 7           San Francisco, California  94105

 8           Telephone:  (415) 543-9444

 9           Email:  antim@lccrsf.org

10   - ALSO -

11           EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP

12           BY:  VASUDHA TALLA, ATTORNEY AT LAW

13           600 Fifth Avenue, 10th Floor

14           New York, New York  10020

15           Telephone:  (212) 763-5075

16           Email:  vtalla@ecbawm.com

17   FOR THE DEFENDANTS:

18           OFFICE OF THE CITY ATTORNEY

19           BY:  STEVEN MILLS, DEPUTY CITY ATTORNEY

20           1390 Market Street, Seventh Floor

21           San Francisco, California  94102

22           Telephone:  (415) 355-3304

23           Email:  steven.mills@sfcityatty.org

24   ALSO PRESENT:

25           JOSHUA HEADRICK, BEHMKE VIDEOGRAPHER
```

```
 1              Q.  I'm sorry to hear that.
 2              A.  So, no.
 3              Q.  Sorry to hear that.  And did you just have the
 4      one son?
 5              A.  Uh-huh.
 6              Q.  And so four years ago, was that 2021, your son
 7      passed away?
 8              A.  Yes.
 9              Q.  And what was the name of your son?
10              A.  Isaiah Samuel Goins.
11              Q.  And did you live with Isaiah in San Francisco?
12              A.  No.  He lived with his dad in San Ramon.
13              Q.  Appreciate it.
14                  And what's your date of birth?
15              A.  10-03-1981.
16              Q.  Do you currently live in San Francisco?
17              A.  Yes.  I do.
18              Q.  And are you currently living in a house?  A
19      shelter?
20              A.  No.  I'm living in an SRO right now.
21              Q.  And can you explain for me what an "SRO" is.
22              A.  Single-room occupancy.
23              Q.  Would you describe yourself as being housed
24      right now?
25              A.  Yes.
```

1          Q.  And how long have you been living at this SRO?

2          A.  Since November 19th of last year.

3          Q.  And that's November 19th of 2024?

4          A.  Yes, sir.

5          Q.  Appreciate it.

6              Do you know if you are limited in how long you

7   can stay at that SRO?

8          A.  No.

9          Q.  Is it "No," there's no limit or "No," you don't

10  know if there is a limit?

11         A.  No, I don't know if there is a limit.

12         Q.  Has anybody told you that you have to leave

13  within a certain amount of time?

14         A.  No.

15         Q.  Do you have any intention to leave the SRO?

16         A.  Yes.

17         Q.  Okay.  And can you explain for me what that

18  intention is.

19         A.  Uh . . . I like . . . to be on my own and not

20  have to report to nobody, 'cause the visiting policy

21  there, people have to have their IDs and everything

22  else.  And it makes people feel uncomfortable in that --

23  in coming there to visit me.  So, like, I want to be

24  able to, like, get an apartment eventually to,

25  basically, make it to where my company feels . . . safe

1    and not have to be . . . checking in to anybody when
2    they come to see me.  So, yeah.
3        Q.  Okay.  So is your goal to get another apartment
4    where you live on your own?
5        A.  Yes.
6        Q.  Do you have any plans to live on the street
7    again?
8        A.  No.
9        Q.  Do you intend to live on the street again?
10       A.  No.
11       Q.  If you were to be asked to leave the SRO, do
12   you have somewhere else that you'd be able to stay,
13   other than the street?
14       A.  Yes.
15       Q.  And where is that?
16       A.  My godmom's house.
17       Q.  And who is your godmom?
18       A.  She's an elderly lady named Rebecca.  She lives
19   in South City, South San Francisco.
20       Q.  And do you know Rebecca's last name?
21       A.  Johnson.
22       Q.  Now that you're living at the SRO, are you
23   keeping any belongings on the street?
24       A.  No.
25       Q.  Do you have any intention to do that?

```
 1          A.  No.
 2          Q.  And do you know what the name of the building
 3     is where you're staying at?
 4          A.  The Royan Hotel.
 5          Q.  And can you spell that.
 6          A.  R-O-Y-A-N.
 7          Q.  And do you know if that's City housing?
 8          A.  No.  I do not know that.
 9          Q.  Do you pay anything per month to stay at the
10     Royan?
11          A.  Yes.  I do.
12          Q.  Okay.  And what do you pay per month?
13          A.  $214.
14          Q.  And how do you pay the $214 a month?
15          A.  Elaborate on that.
16          Q.  Do you pay the $214 yourself or does somebody
17     else pay it for you?
18          A.  I pay it myself.
19          Q.  And is that the full $214 amount?
20          A.  Yes.
21          Q.  How do you get money to pay the $214?
22          A.  I'm on GA.
23          Q.  And what do you mean by GA?
24          A.  General Assistance.
25          Q.  Is that -- have you heard of CAAP?
```

1        A.   Yes.

2        Q.   Are you on CAAP?

3        A.   Yes.  I am.

4        Q.   Okay.  So do you use your CAAP benefits to pay

5    for --

6        A.   Yes.  I do.

7        Q.   -- your housing?

8             And again, just because this is a depo, we want

9    to be able to wait for each other.

10       A.   Sorry.

11       Q.   You're doing a great job overall.

12       A.   Sorry.

13       Q.   So I just want to flag it now.  So thanks.  I'm

14   going to try to do the same.

15             So . . . okay.  Do you know how much you get

16   from CAAP?

17       A.   $746.

18       Q.   Okay.  And do you know if the money -- do you

19   pay the money directly to the Royan Hotel or is somebody

20   paying that through your CAAP benefits?

21       A.   General and Housing pays -- like takes it out

22   of my check and pays, the, uh -- my bill -- my landlord.

23       Q.   Okay.  So every month, you don't have to, for

24   instance, write a check?

25       A.   Uhn-uhn.

1      Q.  Or get a Money Order?

2      A.  No.

3      Q.  Okay.  So the payments are kind of automatic?

4      A.  Yes.

5      Q.  And do you live with anybody in that room?

6      A.  No.  I don't.

7      Q.  Okay.  And do you have to follow certain rules

8   to stay at the Royan?

9      A.  Yes.  You do.

10      Q.  And what kind of rules do you have to follow?

11      A.  They are pretty basic.  Uh, check in with your

12   Case Manager on a weekly basis, uh, keep your room

13   orderly, nice and clean for an inspection.  You don't

14   have to be present for inspection when they go into it.

15   Uh . . . like -- like I said, make sure that your

16   visitors are respectful to the front desk people so you

17   can continue having your visitors come by.  It's pretty

18   basic . . . rules.

19      Q.  Have you been complying with the rules at the

20   Royan?

21      A.  Yes.  I have.

22      Q.  And do you intend to comply with the rules at

23   the Royan?

24      A.  Yes.  I do.

25      Q.  And do you have to do anything to continue to

**BEHMKE REPORTING AND VIDEO SERVICES, INC.**
**(415) 597-5600**

```
 1      BY MR. MILLS:
 2          Q.  Did you ever ask your partner to try to live in
 3      shelters?
 4          A.  Yes.  I have.
 5          Q.  And then what changed after 2017?
 6          A.  Elaborate, please.
 7          Q.  Yeah.  So did your living situation change
 8      after 2017?
 9          A.  Give or take, yes.  Yes.  Uh . . . in 2017, I
10      broke up with Devontaye and started pursuing housing for
11      myself, for myself, because I no longer wanted to stay
12      outside anymore, 'cause -- not only because of him, but
13      because of everything else that was going on around that
14      time.
15          Q.  Okay.  And so is it fair to say, after 2017,
16      you started increasing your frequency with how you were
17      trying to engage with the shelter system again?
18          A.  Yes.
19          Q.  Were there ever any years, after you broke up
20      with Devontaye, where you were completely living inside?
21          A.  Yes.
22          Q.  Okay.  And what years were those?
23          A.  Uh . . . 2018, I actually got my housing at the
24      Cambridge Hotel, and I lived there for four years.
25          Q.  So from 2018 to 2022, were you living at the
```

```
 1      Cambridge?
 2           A.   Yes.
 3           Q.   And where did you start living after the
 4      Cambridge?
 5           A.   Uh, back on the street.
 6           Q.   And why did you stop living at the Cambridge?
 7           A.   They kicked me out, 'cause they said, I
 8      abandoned my apartment, which I didn't.
 9           Q.   Do you know why they believed you abandoned the
10      apartment?
11                MR. NTIM:   Objection.  Calls for speculation.
12                THE WITNESS:   Can you repeat the question one
13      more time.
14      BY MR. MILLS:
15           Q.   Yeah.  Do you know why they thought you had
16      abandoned the apartment?
17           A.   That was around the time that my son passed
18      away, and I went on a little hiatus for, like, six
19      months.  But I actually let them know, uh, that I was
20      not gonna be in my apartment for that long, because I
21      was dealing with some personal issues.  And they still
22      kicked me out.
23           Q.   Okay.  And where did you go for your hiatus?
24           A.   I was still here in San Francisco, uh, just not
25      on -- that side where I -- where my housing was at.  I
```

1    was still here in San Francisco.  I just didn't go home,
2    pretty much, 'cause I didn't want to be by myself in the
3    house though, like -- yeah.
4          Q.  Were you living inside with anybody?
5          A.  No.  Just me.
6          Q.  Setting aside the Cambridge, did you go stay in
7    any other city shelter?
8          A.  No.  I was -- can you elaborate a little bit
9    more on that one, because . . . I -- I'm thinking . . .
10   I think, I answered that question too quickly on my
11   behalf.  My apologies.  Can you elaborate on that a
12   little bit, because . . . if you don't mind.
13         Q.  Yeah.  Let me break it up.  And again, my job
14   is to do the good questions.  So I appreciate you
15   pushing back on that.
16             Do you -- was the Cambridge City housing?
17         A.  Yes.  It was.
18         Q.  Okay.  So out -- when you were not living in
19   the Cambridge --
20         A.  Right.
21         Q.  -- did you enroll or try to enroll in any other
22   city accommodations, such as shelters or housing?
23         A.  Yes.
24         Q.  Okay.  And did you actually stay in any of
25   those?

1          A.  Yes.  I did.

2          Q.  And where did you stay?

3          A.  At the Good Hotel.

4          Q.  And do you know how long you were staying at

5    the Good Hotel?

6          A.  Uh . . . approximately, like six months.  Yeah,

7    six months before they basically closed down, and they

8    moved everybody to the Monarch at that time.

9          Q.  In 2022, was there ever a period of time where

10   you were exclusively living on the street, because you

11   had no access to a shelter or accommodation inside?

12         A.  Elaborate, please.

13         Q.  Yeah.  Was there any period, during the year of

14   2022, where you were living on the streets of

15   San Francisco because you didn't have access to an

16   inside accommodation, such as a shelter or house?

17         A.  No.  No.

18         Q.  What about in 2023?

19         A.  2023?  I was at the Monarch.

20         Q.  And did you live in the Monarch all of 2023?

21         A.  The end of 2022 to all of 2023.

22         Q.  Okay.  And then, at some point, in 2023, were

23   you unhoused living on the streets of San Francisco?

24         A.  Yes.

25         Q.  Do you know when that was?

1      A.  That was, uh . . . give or take, in June of
2  2023.  No.  Wait.  Wait.  Wait.  Wait.  Wait.  Wait.
3  Wait.  Hold on.  Hold on.  Hold on.  Take that back.  My
4  apologies.
5           All of -- June of 2024.  My apologies.  It was
6  June of 2024 that I got -- they kicked me out.  They
7  kicked me out June 2024, and I was only on the streets
8  for like six-and-a-half, maybe, seven months, before I
9  got into the Navigation Center in Bay View.
10     Q.  Okay.  So is it fair to say, between 2022 and
11  2024, you were only on the streets for the, roughly,
12  six-and-a-half months or so when you got kicked out of
13  the Monarch?
14     A.  Yes.
15     Q.  And when you were kicked out of the Monarch,
16  did you try to get into another housing accommodation?
17     A.  When I got kicked out, yes.  I tried to get
18  into another shelter -- like another shelter.  And
19  that's when they put me at the Navigation Center.
20     Q.  Okay.  Are you aware of CAAP recipients being
21  entitled to a shelter bed, if they get CAAP?
22     A.  Yes.
23     Q.  And did you get access to a shelter bed through
24  CAAP during those six months?
25     A.  No.  Uh, I went through the Hot Team to get my

1     bed in the Navigation Center.

2          Q.  Do you know if CAAP clients are offered the

3     Navigation Center?

4          A.  To my understanding, I don't know, 'cause I

5     never really asked about that.  That's why I went to the

6     Hot Team to get my bed.

7          Q.  So did you ever ask HSA to use your CAAP

8     shelter bed during those six months?

9          A.  No.

10         Q.  Do you know if you were getting CAAP benefits

11    during those of months?

12         A.  I was.

13         Q.  So if a CAAP -- if a bed was available to you

14    through the CAAP benefits program, did you decline that?

15         A.  Like I said before, I was unaware of it at the

16    time.

17         Q.  In the six months that you were living on the

18    street again, in San Francisco, where did you typically

19    stay?

20         A.  Uh, up on like . . . up by, like, Geary and --

21    and -- no, Polk and Cedar or Polk and Myrtle.

22         Q.  And is that the Tenderloin?

23         A.  Yeah.

24         Q.  And what was your typical practice when you

25    were living on the streets?  Would you stay in the same

1          A.  Not very long ago.  Like . . . let me elaborate
2     on that.  What I mean by "not very long ago," within the
3     last . . . give or take . . . what's this, February?
4     January, December . . .
5               Four months.
6          Q.  So I'll do the math.  Is that sometime in
7     October?
8          A.  November "-ish".
9          Q.  So November "-ish" is when the last time you
10    read the Bag and Tag Policy on that?
11         A.  Yes.  I have.
12         Q.  And have you read the Bag and Tag Policy before
13    that?
14         A.  No.
15         Q.  Are you aware that the Bag and Tag Policy has
16    certain situations enumerated in it where property can
17    be discarded?
18         A.  Yes.
19         Q.  And what are those?
20         A.  Uh, things that -- like mattresses, soil --
21    like blankets, pillows, uh, stuff that they cannot hold
22    for you.  You see what I'm saying?  That -- they're just
23    gonna throw it away.  Period.  Like how can I put it?
24    Like . . . things that you cannot save, pretty much,
25    that's been exposed to the elements, sort of, kind of

1     like that.  Yeah.  It's mostly elements where you can't

2     save it.  You have to discard it, you know?  So, yeah.

3          Q.  Okay.  And prior to reading the Bag and Tag

4     Policy in, roughly, November of 2024, did you know about

5     those exceptions for items that could be discarded?

6          A.  Yes.

7          Q.  Okay.  When do you think you first knew that

8     there were some items that DPW could discard?

9          A.  Uh, when . . . when, uh, I first encountered

10    DPW back in two thousand -- between 2015 and 2017.  And

11    they, basically, explained to me at that time what --

12    what they can discard and what they can bag and tag.

13    That's my first time experiencing any interaction with

14    DPW whatsoever and what they can and cannot discard.

15         Q.  Okay.  So sometime between 2015 and 2017, a DPW

16    employee informed you that there are certain items under

17    the policy that can be discarded?

18         A.  Yes.

19         Q.  Okay.  And is that the same understanding that

20    you have today, as well?

21         A.  Oh, yes.

22         Q.  Based off of your experience living on the

23    street in San Francisco, between 2015 and 2017, and your

24    perceptions of and interactions with other homeless

25    people, do you think that they knew that there are

```
 1      situations where DPW can discard items under the policy?

 2           A.  No.  They didn't.

 3           Q.  So is it fair to say that homeless people,

 4      between 2015 and 2017, might have believed that DPW

 5      should bag and tag everything?

 6               MR. NTIM:  Objection.  Calls for speculation.

 7               THE WITNESS:  Some people, yes.

 8      BY MR. MILLS:

 9           Q.  Okay.  Do you know if today, people living on

10      the streets at all have said that DPW is supposed to bag

11      and tag every item?

12           A.  Yeah.  I've ran into those a lot lately.

13           Q.  Is that more often that homeless people, based

14      off of your experience, is that more often than not,

15      that people think DPW workers are supposed to bag and

16      tag every single item?

17               MR. NTIM:  Calls for speculation.

18               THE WITNESS:  The one -- the . . . very

19      recently, yes.  They still believe that DPW, uh, should

20      be bagging and tagging everything that they have.

21      BY MR. MILLS:

22           Q.  Under the Bag and Tag Policy, as you understood

23      it --

24           A.  Uh-huh.

25           Q.  -- during 2015 and 2017, did you know if items,
```

1          A.  No.  Not this way.  No.  I just was taking

2     stuff out and . . . putting it in suitcases so I can

3     move it down to the shelter that day.  Because, uh . . .

4     what's the name of that place?  Uh, uh, uh, uh, Kelley

5     and the -- uh . . . Kelley and a couple of other people

6     that were with her were gonna drive me down to the Good

7     Hotel around that time.  That's the -- that's the

8     shelter that I was at, the Good Hotel.

9          Q.  Okay.  And you've been mentioning the Coalition

10    on Homelessness.  Are you familiar with that

11    organization?

12         A.  Yes.  I am.

13         Q.  And how did you become familiar with that

14    organization?

15         A.  Uh, the day that I wrote that letter was the

16    first day that I found out about the Coalition on

17    Homelessness.  And after that day, Kelley, uh, invited

18    me out with her to do outreach, uh, in that area with

19    her.

20         Q.  And what did the outreach involve?

21         A.  Uh, basically, offering services to people, uh,

22    uh, pretty much as, like, offer -- what I mean by

23    "services," like offering them, uh, shelter bed, like

24    getting them into shelters, uh, the homeward bound

25    program that we -- they offered for them, uh, doing harm

```
 1        reduction, like passing out harm reduction supplies for

 2        people who use needles and stuff like that, uh . . . and

 3        pretty much, like, reaching out to the community,

 4        letting them know that we're here, if you guys need us

 5        and . . . stuff like that.

 6            Q.  Do you still do that outreach work with the

 7        Coalition on Homelessness?

 8            A.  As needed.

 9            Q.  And what does that mean?

10            A.  Whenever they call me in, it'd be like, "We

11        need you, Shy."  I'll go.

12            Q.  Okay.  When is the last time they called you?

13            A.  Uh, during the pandemic.

14            Q.  So you haven't been called by the Coalition on

15        Homelessness to do outreach since the pandemic?

16            A.  Right.

17            Q.  Have you gone to any meetings on the

18        coalition -- sorry, strike that.

19                Have you gone to any meetings with the

20        Coalition on Homelessness since the pandemic?

21            A.  No.  I have not.

22            Q.  Have you voted on any projects that the

23        Coalition on Homelessness is participating in today?

24            A.  I have not.

25            Q.  Are you aware that the Coalition on
```

1    Homelessness is claiming to represent you in this

2    lawsuit?

3        A.  Yes.

4        Q.  Did you agree to that?

5        A.  Truth be told, I was not aware of it, until I

6    got that e-mail from you.

7        Q.  Okay.  So before the e-mail to me you, did not

8    know that the Coalition on Homelessness was claiming to

9    represent your rights in Federal Court?

10       A.  No.

11       Q.  Does that surprise you?

12       A.  Yes.

13       Q.  And why does that surprise you?

14       A.  Because, normally, they would call me and let

15   me know this ahead of time before . . . and I never got

16   that phone call.  I never got that e-mail.  And I never

17   got that text message from them stating that there's a

18   possibility, I can get subpoenaed because of this

19   lawsuit.  So, yeah.

20       Q.  And did you know that the Coalition on

21   Homelessness was gonna file a lawsuit?

22       A.  That I did, but I didn't know when, because

23   they were talking -- we -- they were talking about it

24   after the last rally -- the last rally during the

25   pandemic that they had, uh . . . what is that?  Hastings

```
 1    Law School.  There you go.
 2              Hastings Law School.  That was the last time I
 3    heard about them filing a lawsuit against the City.
 4         Q.  Okay.  So when you say that your outreach ended
 5    during the pandemic what month, roughly, was that?
 6         A.  Uh . . .
 7         Q.  Month and year.  Sorry.
 8         A.  Uh, the pandemic ended in 2023?  I'm not gonna
 9    even bullshit with you.  I don't remember the exact
10    date, but I know that it was back in 2023.
11         Q.  By the time of the Hastings lawsuit, were you
12    already done doing outreach?
13         A.  After that, after the rally and the protest
14    that happened for Hastings Law School, uh, after that,
15    that's when . . . I stopped.
16         Q.  So since then, you haven't done any outreach
17    for the Coalition on Homelessness?
18         A.  No.
19         Q.  You haven't gone to any Coalition on
20    Homelessness meetings?
21         A.  No.
22         Q.  The Coalition on Homelessness hasn't called
23    you?
24         A.  No.
25         Q.  Has the Coalition on Homelessness texted you?
```

1          A.   No.

2          Q.   Have they sent you any e-mails?

3          A.   None.

4          Q.   Does that surprise you?

5          A.   Yes.

6          Q.   And why does that surprise you?

7          A.   Because, normally, they -- they call me -- they

8     use me as a last resort.  Like when they can't find,

9     like somebody . . . to come out and represent them or to

10    like -- to join them in their rallies or whatever, they

11    use me as a last resort.  So it does surprise me a

12    little bit.

13         Q.   Okay.  After that protest for the Hastings

14    lawsuit, did you view yourself as being a member of the

15    Coalition on Homelessness?

16         A.   No.  I didn't.

17         Q.   Do you view yourself as being a member of the

18    Coalition on Homelessness today?

19         A.   No.  I view -- I view myself as a volunteer of

20    the Coalition on Homelessness, but not a member.  No.

21         Q.   Would it surprise you to hear that the

22    Coalition on Homelessness has referred to you as a

23    member?

24         A.   Yes.  It would be surprising.

25         Q.   And would you wish that they would not do that?

```
 1      gonna, uh . . . sweep -- they were trying to file a
 2      lawsuit against the City for uh . . . the destruction of
 3      the homeless peoples tents and everything else.  So,
 4      yeah.  I do know.
 5          Q.  Did you know that that Declaration was gonna be
 6      filed with the Court?
 7          A.  No.  Honestly, I didn't.  I just thought, they
 8      were gonna . . . I don't know what I was thinking when
 9      they did it, but they never informed me that they were
10      gonna submit it to the Federal Courts.
11          Q.  Would you wanted -- it have been submitted to
12      the Federal Court?
13          A.  Yes.
14          Q.  Do you remember reviewing that Declaration for
15      accuracy?
16          A.  Yes.  I did.
17          Q.  And how did that happen?
18          A.  With my lawyer.
19          Q.  And it was Andrew?
20          A.  Yes, sir.
21          Q.  So you reviewed a Declaration with Andrew?
22          A.  Yes.
23          Q.  And how do you know it was Andrew?
24          A.  'Cause he sent it to me through e-mail.
25          Q.  And this -- I'm -- I'm referring to when it was
```

```
 1        not for sure.
 2             Q.  And I don't want you to guess.  So we'll draw
 3        that distinction.
 4                  And?
 5             A.  Do you know if it was a lawyer from the Lawyers
 6        Committee on Civil Rights?
 7             A.  I don't . . . remember.
 8             Q.  Okay.  And then I'm gonna read the next
 9        sentence.  It says, "I declare under the pains and
10        penalties of perjury that the contents are true and
11        correct."
12                  Were you aware that this was being submitted
13        "under the pains and penalties of perjury"?
14             A.  No.  I did not.
15             Q.  So when you submitted this, you didn't know
16        that you were supposed to submit everything truthfully
17        and honestly?
18             A.  No.
19             Q.  Okay.  And looking at the second paragraph on
20        page one, it says, "In 2020 I graduated from UC Berkeley
21        with a Bachelor of Science degree in Criminal Justice
22        and Paralegal Studies."
23                  And that's no longer correct?
24             A.  Right.
25             Q.  Do you know why you put that this was --
```

1    A.  I don't remember if -- well --

2    Q.  Go --

3    A.  No.  I apologize.  Finish your question.  My

4  apologies.

5    Q.  I wanna let you add your clarification.

6    A.  If this was done in 2020 -- filed in 2022, I've

7  been here more than 11 years.  That's why I'm like . . .

8    Q.  So the document was dated in 2021.

9    A.  Right.

10    Q.  So --

11    A.  I see that, but I'm just -- I'm looking at

12  when -- when it was filed.

13    Q.  And I will represent that the filed date at the

14  top is when it was actually transmitted to the Court,

15  and the Court stamps at the top that that's when they

16  received it.  So that's where the September 27, 2022

17  date comes into play.

18        So at the time that you submitted -- signed

19  this Declaration around October 25th, 2021, were you

20  homeless in San Francisco for 11 years?  Or living in

21  San Francisco for 11 years?

22    A.  A little bit more.  A little bit longer than

23  that.

24    Q.  Do you know how much longer?

25    A.  I'm trying to do the math in my head.  Hold on.

```
 1              No.  I don't know how much longer.  But, I
 2        know, I've been here for more than 11 years.
 3              Q.  Okay.  But focusing on the language about you
 4        graduating from U.C. Berkeley with a Bachelor of Science
 5        degree in Criminal Justice and Paralegal Studies --
 6              A.  I don't remember saying that.  That's why I'm
 7        trying to realize like . . . I don't even remember
 8        telling this person . . . about that part right there.
 9        (INDICATING.)  I don't remember seeing -- I don't
10        remember ever telling this person about me -- about my
11        college, like me going to school or anything else like
12        that.  So I don't understand why they would put it in
13        here.
14              Q.  Do you know if you typed a version of this
15        document at some point --
16              A.  I did not.  I did not.
17              Q.  Do you know if you had, like, a handwritten
18        version of this document that somebody else may have
19        typed up?
20              A.  I don't . . . No, like . . .
21              Q.  As you read this sentence, that you "graduated
22        from UC Berkeley with a Bachelor of Science degree in
23        Criminal Justice and Paralegal Studdies," do you know if
24        it was submitted to convey that you had specialization
25        in the law?
```

```
1      STATE OF CALIFORNIA    )

2                             )   ss.

3      COUNTY OF SAN MATEO    )

4

5             I, VALERIE DIANE MAFFEI, Certified Shorthand

6      Reporter in and for the State of California, License

7      No. 12138, do hereby certify that the witness in the

8      foregoing deposition, was by me duly sworn to tell

9      the truth, the whole truth and nothing but the truth

10     in the within-entitled cause, and that the foregoing

11     is a full, true and correct transcript of the

12     proceedings had at the taking of said deposition,

13     reported to the best of my ability and transcribed

14     under my direction.

15     Reading and signing was:

16     _x__ requested  ___ waived  ___ not requested

17

18

19

20     VALERIE DIANE MAFFEI, CSR NO. 12138

21     STATE OF CALIFORNIA

22

23

24

25
```