EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP
Zoe Salzman, *pro hac vice*
Vasudha Talla, SBN 316219
Vivake Prasad, *pro hac vice*
Bianca Herlitz-Ferguson, *pro hac vice*
1 Rockefeller Plaza, 8th Floor
New York, NY 10020
Telephone: (212) 763-5000
zsalzman@ecbawm.com
vtalla@ecbawm.com
vprasad@ecbawm.com
bherlitz-ferguson@ecbawm.com

*Attorneys for Plaintiffs*


*Additional Counsel Appear on Signature Page*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| COALITION ON HOMELESSNESS; SARAH CRONK; JOSHUA DONOHOE; DAVID MARTINEZ; TERESA SANDOVAL; MOLIQUE FRANK,<br><br>Plaintiffs,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO POLICE DEPARTMENT; SAN FRANCISCO DEPARTMENT OF PUBLIC WORKS; SAN FRANCISCO DEPARTMENT OF HOMELESSNESS AND SUPPORTIVE HOUSING; SAN FRANCISCO FIRE DEPARTMENT; SAN FRANCISCO DEPARTMENT OF EMERGENCY MANAGEMENT,<br><br>Defendants. | CASE NO. 4:22-cv-05502-DMR<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 8, 2025<br>Time: 1:00 PM<br>Courtroom: Courtroom 4, 3rd Floor<br>Judge: Hon. Donna M. Ryu |

**TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................................1

FACTS ............................................................................................................................1

    I.       The City Frequently Clears Encampments Without Advance Notice ....................1

    II.      The City Routinely Destroys Homeless Individuals' Property.............................2

    III.    The City Fails to Provide a Meaningful Opportunity to Retrieve Property............6

    IV.    The City's Training and Supervision Are Inadequate ..............................7

LEGAL STANDARD........................................................................................................9

ARGUMENT .................................................................................................................10

    I.       Plaintiffs Have Standing on All Their Claims, Which Remain Live....................10

           A.     Coalition Has Organizational Standing ...................................11

                1.      The City Impairs Coalition's Preexisting Core Activities ............12

                2.      Coalition Has Established Causation and Redressability .............16

                3.      The City's Conduct Frustrates Coalition's Mission ....................16

           B.     Coalition Has Associational Standing .......................................17

                1.      Coalition Has Identified Multiple Members with Standing..........17

                2.      Coalition's Membership Structure Supports Associational Standing ...................................................19

                3.      Individual Participation of All Members Is Not Required............21

           C.     The Individual Plaintiffs Have Standing......................................22

    II.      The City Is Liable Under *Monell* on All Claims....................................25

           A.     Plaintiffs' Claims Are Timely................................................25

           B.     The City Has a Custom of Violating the Fourth Amendment .................25

           C.     The City Has a Custom of Violating the Fourteenth Amendment............28

           D.     The City Is Liable for Its Failure to Train..................................31

    III.    Equitable Relief Is Available on All Claims..........................................32

CONCLUSION..............................................................................................................33

1

## TABLE OF AUTHORITIES

2

**Cases**

3

*Al Otro Lado, Inc. v. Mayorkas,*
    No. 23-cv-1367, 2024 WL 4370577 (S.D. Cal. Sept. 30, 2024)...................................... 15

4

*Am. Unites for Kids v. Rousseau,*
    985 F.3d 1075 (9th Cir. 2021) ...................................................................................... 20

5

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)...................................................................................................... 10

6

7

*Anti Police-Terror Project v. City of Oakland,*
    477 F. Supp. 3d 1066 (N.D. Cal. 2020) ....................................................................... 26

8

*Arizona Alliance for Retired Americans v. Mayes,*
    117 F.4th 1165 (9th Cir. 2024) .............................................................................. 11, 16

9

10

*Armstrong v. Davis,*
    275 F.3d 849 (9th Cir. 2001) ....................................................................................... 23

11

*Ass'n of Christian Schs. Int'l v. Stearns,*
    678 F. Supp. 2d 980 (C.D. Cal. 2008), *aff'd*, 362 F. App'x 640 (9th Cir. 2010) ............ 22

12

13

*Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.,*
    159 F.3d 1178 (9th Cir. 1998) ..................................................................................... 22

14

15

*Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.,*
    713 F.3d 1187 (9th Cir. 2013) ..................................................................................... 17

16

17

*Banks v. Booth,*
    468 F. Supp. 3d 101 (D.D.C. 2020)............................................................................. 26

18

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,*
    520 U.S. 397 (1997).......................................................................................... 25, 31, 32

19

20

*Berry v. Hennepin Cnty.,*
    No. 20-cv-2189, 2024 WL 3495797 (D. Minn. July 22, 2024) ....................................... 23

21

22

*Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.,*
    149 F.3d 971 (9th Cir. 1998) ....................................................................................... 29

23

24

*Brewster v. Beck,*
    859 F.3d 1194 (9th Cir. 2017) ..................................................................................... 27

25

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)...................................................................................................... 10

26

27

*City of Grants Pass v. Johnson,*
    603 U.S. 520 (2024).......................................................................................... 11, 23, 28

28

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ............................................................................................. 23, 24

*Clear Connection Corp. v. Comcast Cable Commc'ns Mgmt., LLC,*
   501 F. Supp. 3d 886 (E.D. Cal. 2020) ...................................................................... 10

*Clement v. City of Glendale,*
   518 F.3d 1090 (9th Cir. 2008) .................................................................................. 29

*Compare Shipp v. Schaaf,*
   379 F. Supp. 3d 1033 (N.D. Cal. 2019) ................................................................... 30

*Denver Homeless Out Loud v. Denver,*
   514 F. Supp. 3d 1278 (D. Colo. 2021), *vacated on other grounds and remanded*, 32 F.4th
   1259 (10th Cir. 2022) ............................................................................................... 30

*Doe v. City of San Diego,*
   35 F. Supp. 3d 1233 (S.D. Cal. 2014) ...................................................................... 26

*Doe v. Cnty. of San Diego,*
   576 F. Supp. 3d 721 (S.D. Cal. 2021) ...................................................................... 32

*Donovan v. Crisostomo,*
   689 F.2d 869 (9th Cir. 1982) .................................................................................... 10

*Dunklin v. Mallinger,*
   No. 11-cv-1275, 2013 WL 1501446 (N.D. Cal. Apr. 10, 2013) ............................... 32

*Est. of Saunders v. Comm'r,*
   745 F.3d 953 (9th Cir. 2014) .................................................................................... 11

*Familia Vota v. Fontes,*
   129 F.4th 691 (9th Cir. 2025) .............................................................................. 17, 19

*Fleck & Assocs., Inc. v. City of Phoenix,*
   471 F.3d 1100 (9th Cir. 2006) .................................................................................. 11

*Floyd v. City of New York,*
   959 F. Supp. 2d 540, 573 (S.D.N.Y. 2013) .............................................................. 25

*Food & Drug Admin. v. All. for Hippocratic Med.,*
   602 U.S. 367 (2024) ............................................................................................ 11, 12

*Freedom Found. v. Int'l Bhd. of Teamsters Loc. 117,*
   No. 23-3946, 2024 WL 5252228 (9th Cir. Dec. 31, 2024) ....................................... 11

*Freedom From Religion Found., Inc. v. Weber,*
   951 F. Supp. 2d 1123 (D. Mont. 2013 ..................................................................... 17

*Friends for Am. Free Enter. Ass'n v. Wal-Mart Stores, Inc.*,
    284 F.3d 575 (5th Cir. 2002) ........................................................................ 22

*Garcia v. City of Los Angeles*,
    No. 19-cv-6182, 2023 WL 11056759 (C.D. Cal. May 23, 2023) .................................. 19

*Garcia v. City of Los Angeles,*
    No. 19-cv-6182, 2020 WL 6586303 (C.D. Cal. Sept. 15, 2020) .................. 22, 26, 27, 28

*Get Loud Arkansas v. Thurston*,
    748 F. Supp. 3d 630 (W.D. Ark. 2024) ........................................................... 13

*Gomez v. Vernon*,
    255 F.3d 1118 (9th Cir. 2001) ....................................................................... 26

*Gordon v. Cnty. of Orange*,
    6 F.4th 961 (9th Cir. 2021) ......................................................................... 25

*Guatay Christian Fellowship v. Cnty. of San Diego*,
    670 F.3d 957 (9th Cir. 2011) ....................................................................... 11

*Harper v. City of Los Angeles*,
    533 F.3d 1010 (9th Cir. 2008) ..................................................................... 32

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ........................................................................ 11, 12, 15, 16

*Henry v. Cnty. of Shasta*,
    132 F.3d 512 (9th Cir. 1997), *opinion amended on denial of reh'g,* 137 F.3d 1372 (9th
    Cir. 1998) ......................................................................................... 25, 26

*Hindu Am. Found., Inc. v. Kish*,
    No. 2:22-CV-01656, 2023 WL 5629296 (E.D. Cal. Aug. 31, 2023 ................................. 21

*Hodgers-Durgin v. de la Vina*,
    199 F.3d 1037 (9th Cir. 1999) ..................................................................... 23

*Hudson v. Palmer*,
    468 U.S. 517 (1984) ................................................................................ 31

*Hunt v. Washington State Apple Advertising Commission*,
    432 U.S. 343 (1977) .............................................................................. 19, 20

*In re Navy Chaplaincy*,
    697 F.3d 1171 (D.C. Cir. 2012) ..................................................................... 24

*In re Zappos.com, Inc.*,
    888 F.3d 1020 (9th Cir. 2018) ..................................................................... 24

*Index Newspapers LLC v. City of Portland*,
  474 F. Supp. 3d 1113 (D. Or. 2020) ............................................................. 24

*Jessen v. Cnty. of Fresno*,
  808 F. App'x 432 (9th Cir. 2020) ................................................................. 32

*Jones v. Flowers*,
  547 U.S. 220 (2006) ...................................................................................... 30

*K.J.P. v. Cnty. of San Diego*,
  621 F. Supp. 3d 1097 (S.D. Cal. 2022) ........................................................ 26

*Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*,
  958 F.2d 1018 (10th Cir. 1992) ..................................................................... 22

*Kincaid v. City of Fresno*,
  No. 06-cv-1445, 2006 WL 3542732 (E.D. Cal. Dec. 8, 2006) ...................... 29

*Kirkpatrick v. Cnty. of Washoe*,
  843 F.3d 784 (9th Cir. 2016) ......................................................................... 32

*Klein v. City of Beverly Hills*,
  865 F.3d 1276 (9th Cir. 2017) ....................................................................... 25

*La Asociacion De Trabajadores De Lake Forest v. City of Lake Forest ("ATLF")*,
  No. 07-cv-250, 2008 WL 11411732 (C.D. Cal. Aug. 18, 2008), *aff'd*,
  624 F.3d 1083 (9th Cir. 2010) .................................................................. 19, 21

*Larez v. Holcomb*,
  16 F.3d 1513 (9th Cir. 1994) ..................................................................... 22, 27

*Lavan v. City of Los Angeles*,
  693 F.3d 1022 (9th Cir. 2012) ............................................................... passim

*Le Van Hung v. Schaaf*,
  No. 19-cv-1436, 2019 WL 1779584 (N.D. Cal. Apr. 23, 2019) .................... 30

*Levine v. Johanns*,
  No. 05-cv-4764, 2006 WL 8441742 (N.D. Cal. Sept. 6, 2006) ..................... 11

*Long v. Cnty. of Los Angeles*,
  442 F.3d 1178 (9th Cir. 2006) ....................................................................... 32

*Lyons v. England*,
  307 F.3d 1092 (9th Cir. 2002) ....................................................................... 25

*March for Our Lives Idaho v. McGrane*,
  749 F. Supp. 3d 1128 (D. Idaho 2024) ....................................... 16, 19, 20, 21

*Massachusetts v. EPA,*
 549 U.S. 497 (2007) ................................................................................................. 11

*Mathews v. Eldridge,*
 424 U.S 319 (1976) ................................................................................................. 29

*McGinest v. GTE Serv. Corp.,*
 360 F.3d 1103 (9th Cir. 2004) ................................................................................ 18

*McRorie v. Shimoda,*
 795 F.2d 780 (9th Cir.1986) ................................................................................... 26

*Melendres v. Arpaio,*
 695 F.3d 990 (9th Cir. 2012) .................................................................................. 23

*Miranda v. City of Cornelius,*
 429 F.3d 858 (9th Cir. 2005) .................................................................................. 27

*Mitchell v. City of Los Angeles,*
 No. 16-cv-1750, 2016 WL 11519288 (C.D. Cal. Apr. 13, 2016) ............................ 29, 30

*Monell v. Dep't of Soc. Servs.,*
 436 U.S. 658 (1978) .......................................................................................... passim

*Morgan v. Komers,*
 151 F. App'x 546 (9th Cir. 2005) ............................................................................ 25

*Mueller v. Auker,*
 700 F.3d 1180 (9th Cir. 2012) ................................................................................ 22

*N.B. ex rel. Peacock v. D.C.,*
 682 F.3d 77 (D.C. Cir. 2012) .................................................................................. 24

*Nat. Res. Def. Council, Inc. v. U.S. E.P.A.,*
 507 F.2d 905 (9th Cir. 1974) .................................................................................. 21

*Nat'l Ass'n of Consumer Advocs. v. Gemini Tr. Co., LLC,*
 No. CV 24-2356 , 2024 WL 4817122 (D.D.C. Nov. 18, 2024) ................................ 21

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown,*
 567 F.3d 521 (9th Cir. 2009) .................................................................................. 22

*Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.,*
 176 F.R.D. 329 (C.D. Cal. 1997) ............................................................................ 21

*Nat'l Council of La Raza v. Cegavske,*
 800 F.3d 1032 (9th Cir. 2015) ................................................................................ 17

*Oregon Advoc. Center v. Mink,*
 322 F.3d 1101 (9th Cir. 2003) ........................................................................... 21, 25

*Pavao v. Pagay*,
    307 F.3d 915 (9th Cir. 2002) ........................................................................ 22

*People of City of Los Angeles Who Are Un-Housed v. Garcetti*,
    No. 21-cv-6003, 2023 WL 8166940 (C.D. Cal. Nov. 21, 2023) ..................................... 29

*Pitts v. Terrible Herbst, Inc.*,
    653 F.3d 1081 (9th Cir. 2011) ...................................................................... 24

*Pottinger v. Miami*,
    720 F. Supp. 955 (S.D. Fla. 1989) ................................................................. 24

*Price v. Sery*,
    513 F.3d 962 (9th Cir. 2008) ........................................................................ 32

*Proctor v. D.C.*,
    531 F. Supp. 3d 49 (D.D.C. 2021) ................................................................ 23

*Recchia v. City of L.A. Dep't of Animal Servs.*,
    889 F.3d 553 (9th Cir. 2018) ........................................................................ 27

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
    120 F.4th 390 (4th Cir. 2024) ...................................................................... 16

*Rios v. Cnty. of Sacramento*,
    562 F. Supp. 3d 999 (E.D. Cal. 2021) ........................................................... 23

*Roe v. City of New York*,
    151 F. Supp. 2d 495 (S.D.N.Y. 2001) ...................................................... 23, 24

*Soldal v. Cook County*,
    506 U.S. 56 (1992) ............................................................................. 27, 28

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) ........................................................................ 33

*South Carolina State Conference of NAACP*,
    22-cv-1338, 2024 WL 5153170 (D.S.C. Dec. 18, 2024) ........................................ 13

*Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*,
    770 F.3d 1282 (9th Cir. 2014) ...................................................................... 22

*Sullivan v. City of Berkeley*,
    383 F. Supp. 3d 976 (N.D. Cal. 2019) ........................................................... 30

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ......................................................................... 11, 23

*Torres v. United States Dep't of Homeland Sec.*,
    411 F. Supp. 3d 1036 (C.D. Cal. 2019) .......................................................... 25

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:22-cv-05502-DMR

*Trevino v. Gates,*
    99 F.3d 911 (9th Cir. 1996) ........................................................................ 26

*Tyson v. City of San Bernardino,*
    No. 23-cv-1539, 2024 WL 3468832 (C.D. Cal. Jan. 12, 2024)........................ 28

*United States v. Baker,*
    58 F.4th 1109 (9th Cir. 2023) ..................................................................... 11

*United States* v. *Jacobsen,*
    466 U.S. 109 (1984)..................................................................................... 28

*United States v. Nordling,*
    804 F.2d 1466 (9th Cir. 1986) ..................................................................... 28

*United States v. Sullivan,*
    797 F.3d 623 (9th Cir. 2015) ....................................................................... 27

*Vasquez v. City of Santa Paula,*
    No. 13-cv-7726, 2015 WL 12734071 (C.D. Cal. Mar. 11, 2015)................... 32

*Velazquez v. City of Long Beach,*
    793 F.3d 1010 (9th Cir. 2015) ..................................................................... 26

*WildEarth Guardians v. U.S. Dep't of Agric.,*
    795 F.3d 1148 (9th Cir. 2015) ..................................................................... 16

*Wright v. SEIU Local 503,*
    48 F.4th 1112 (9th Cir. 2022) ...................................................................... 12

*Yesue v. City of Sebastopol,*
    No. 22-cv-6474, 2024 WL 4876953 (N.D. Cal. Nov. 22, 2024) ............... 14, 16

*Zinermon v. Burch,*
    494 U.S. 113 (1990)..................................................................................... 31

**Other Authorities**

Wright & Miller, Federal Prac. & Proc. § 2181 (3d ed.) ...................................... 10

**Rules**

Fed. R. Civ. P. 56 ............................................................................................... 10

Fed. R. Evid. 803 ............................................................................................... 28

**INTRODUCTION**

"*My motivation [in bringing this case] is for policies to change and for the City to treat us homeless residents with more respect and dignity and also treat their belongings with respect and not take them from them anymore.*" Plaintiff Sarah Cronk, Ex. 2 (Cronk) 159:20-24.

This case challenges the rampant and unconstitutional destruction of homeless people's property in San Francisco by Defendants (the "City"). The City bags and tags a miniscule amount of property because its goal is to destroy tents without regard to basic constitutional rights enjoyed by all—including those without shelter. This is the sixth attempt by the City to challenge standing to avoid accountability after having tactically picked off several individual plaintiffs with monetary settlements. The evidence establishes that Plaintiffs have standing for their claims, and that the City is liable under *Monell* for its routine and unlawful property destruction, inadequate notice, and failure to train. At the very least, there are multiple contested issues of fact. Summary judgment should be denied; the case should proceed to trial.

**FACTS**

**I.     The City Frequently Clears Encampments Without Advance Notice**

City policy requires written notice be posted 72 hours in advance of formal "pre-planned" encampment resolutions. Ex. 56 § 4(a) (hereinafter "BTP").[1] In reality, 91% of homeless people reported inconsistent notice. Herring Decl., Ex. 1 ("Herring Rep.") at 35-45; *see also, e.g.*, Ex. 16 (Stephenson) 139:18-141:9 (1 notice for multi-block area); Ex. 12 (Orona) 67:22-25; Ex. 17 (Dubose) 76:25-78:10, 87:22-88:9; Declaration of Dylan Verner-Crist ("Verner-Crist Decl.") ¶¶ 20, 39, 58, 103, 134. There are instances where no notice was posted. *E.g.*, Ex. 85; Ex. 100; Ex. 86; Ex. 106. And in a large area, only one notice is posted. Herring Rep. at 39-40. HSOC has no guidelines on how many notices to post, and supervisors have conflicting understandings on where to post notice. Ex. 45 (Rincon) 51:2-16. *Compare id.* at 81:21-82:21 & Ex. 84 at CCSF-COH_350904 *with* Ex. 22 (Dodge 30(b)(6)) 84:22-88:14 & Ex. 99 at CCSF-COH_350904. There are also multiple notices posted in the same area for different days. Herring Rep. at 39-42.

---

[1]     All citations are "cleaned up." All exhibits are attached to the Declaration of Vasudha Talla ("Talla Decl.") unless otherwise noted. References to "D. Br." are to the City's motion, Dkt. 350.

The City also has a "common practice" of "roving" encampment clearing to discard property in other areas without *any advance notice*. Ex. 38 (Nakanishi) 156:13-159:6; Ex. 21 (Vaing 30(b)(6)) 63:11-68:19; ████████████████████████ Ex. 83; Ex. 87; Ex. 15 (Reem) 162:9-165:1; Verner-Crist Decl. ¶¶ 1, 37, 50, 61, 64, 86, 114, 122, 166. HSOC clears encampments up to "miles away" from a noticed location. Ex. 38 (Nakanishi) 158:4-160:15, 164:5-22; Ex. 143 (Cunningham) 131:23-132:13. *Compare* Ex. 33 (Graham) 127:2-130:16 & Exs. 65, 66 *with* Ex. 67; *compare* Ex. 68 *with* Ex. 69; *compare* Ex. 70 *with* Ex. 71. In October 2024, the City went outside the noticed location 23% of the time; in January 2025, *it did so 50% of the time*. Herring Rep. at 37, 38-39 & Herring Decl. ¶¶ 4-9.

II.    **The City Routinely Destroys Homeless Individuals' Property**

Pursuant to the BTP, DPW is required to store all unattended property and attended property that the owner does not remove, except if it poses an "immediate health or safety risk," or is perishable, contraband, trash, or abandoned. Ex. 56 § 1. In reality, the City routinely destroys homeless individuals' property without any actual basis to do so.

First, homeless people confirm that City workers destroy their property, both in front of their eyes and while they are away. *E.g.*, Ex. 2 (Cronk) 109:7-111:6 (laptop), 183:9-185:6 (art supplies) 186:3-15 (artwork), 217:9-218:23, 165:1-18 (lost property in at least half of 30 resolutions experienced), 200:14-204:3 (Feb. 2022), 209:2-212:17 (Feb. 2022 & May 2022), 116:14-125:7 (confirming D. Martinez property destruction), 217:9-218:23 (Sept. 2022), 265:10-17 (phones, laptop); Ex. 6 (Donohoe) 99:16-100:8 (laptop), 102:1-25 (art supplies), 187:13-189:18 (June 2022), 100:23-102:25 (late Aug. 2022), 206:22-214:5 (Sept. 12, 2022), 119:15-124:14 (Jan. 2023), 137:11-138:4, 141:20-24, 170:19-174:18 (Apr. 2023); Ex. 5 (D. Martinez) 176:17-19 & Ex. 51 at 22:1-8 (Sept. 2022); Ex. 121 (D. Martinez) ¶¶ 4-5 (June 2022); Ex. 118 (Bryant) ¶ 6; Ex. 13 (Bryant) 120:15-20, 147:9-153:13, 168:5-11; Ex. 20 (Barkley) 48:6-12, 103:21-105:11; Ex. 17 (Dubose) 72:15-74:18; Ex. 18 (Stromer) 120:2-18; Ex. 15 (Reem) 39:5-15, 77:24-78:1, 116:21-24; Ex. 4 (Castano) 114:11-20 (laptop); Ex. 16 (Stephenson) 126:3-9, 138:12-139:10.

The City frequently provides homeless people—who often receive little to no advance notice—only minutes to remove all their belongings, with DPW workers trashing property even

as people try to salvage what little they can, eventually forcing them to leave the rest behind. *E.g.*, Ex. 16 (Stephenson) 138:12-139:17, 149:5-149:16, 204:4-19 (DPW: "We are not here to let you pack anything.") & Ex. 52; Ex. 17 (Dubose) 138:1-23; Ex. 6 (Donohoe) 189:3-190:16; Ex. 19 (Erickson) 95:16-98:8, 129:24-132:23; Ex. 2 (Cronk) 111:16-112:16, 176:8-177:5, 181:8-182:9, 184:23-185:6, 217:3-8; Ex. 4 (Castano) 328:12-329:16; Ex. 13 (Bryant) 168:17-18; Ex. 18 (Stromer) 90:13-91:23, 107:22-108:11, 115:15-117:10; Ex. 15 (Reem) 146:15-150:5, 164:6-168:25 (DPW: "You're going to lose your stuff today."), 173:19-23 & Ex. 53; Ex. 92; Ex. 93; Verner-Crist Decl. ¶¶ 9, 52, 136. If they accept shelter, the City allows them only two bags of belongings and trashes the rest. Ex. 6 (Donohoe) 195:2-5; Ex. 20 (Barkley) 58:11-61:2. The discarded property does not pose health or safety risks or qualify for immediate disposal. Ex. 17 (Dubose) 68:6-70:14, 83:2-84:21, 110:2-111:14, 134:11-136:5; Ex. 19 (Erickson) 98:9-20; c; Ex. 18 (Stromer) 105:14-107:21, 118:25-120:1; Ex. 13 (Bryant) 120:25-121:4; Ex. 20 (Barkley) 68:21-70:5, 84:8-20, 102:7-103:15, 125:7-127:2; Ex. 16 (Stephenson) 139:8-10.

Second, observers confirm that City workers trash personal belongings. Ex. 7 (Friedenbach) 87:11-90:23; Verner-Crist Decl. ¶¶ 10, 16, 25-26, 32, 44, 57, 75-78, 84-85, 90, 95-96, 110, 118, 124, 167-170; Declaration of Lukas Illa ¶¶ 6, 10, 13-14 (4 incidents of property destruction, including by DPW Supervisor Graham); Ex. 122 (Wadkins); Ex. 139 (Evans) ¶ 26 (12 incidents); Ex. 140 (Evans) ¶¶ 6, 9-10, 15, 20 (5 incidents); Ex. 141 (Evans) ¶¶ 10-11 (advocacy stopped destruction); Ex. 10 (Evans) 141:25-142:18, 179:20-181:5, 182:16-21, 185:20-186:14 & Ex. 54, 213:10-214:16, 217:6-17, 233:6-234:21, 238:20-239:7, 241:1-18.

Third, Plaintiffs' expert, Dr. Christopher Herring, found that the City engages in "widespread property destruction" instead of complying with the BTP. Herring Rep. at 9. In a survey, 90% of people had belongings taken by the City. Only 8% of survey participants received notices about property retrieval. *Id.* at 12-14.

Fourth, the City itself confirms it discards homeless people's belongings, ███████ ███████████████████████████████████ ███████ Ex. 46 (Horky) 117:1-20, 121:24-122:12; Ex. 34 (Castro) 167:4-170:2 (referring to Ex. 94 at VERNER-CRIST_2002, 2006); Ex. 33 (Graham) 50:2-16 (discards anything he does not

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:22-cv-05502-DMR

1  consider valuable); Ex. 27 (Jackson) 43:2-5 (never bagged and tagged); Ex. 29 (Shehadeh) 174:6-

2  22 (DPW did not bag and tag items of homeless people accepting shelter) & Ex. 55; Ex. 26 (Bruce)

3  131:19-132:24 (bagging and tagging attended items is "a rarity"); Ex. 30 (Peoples) 144:6-15 ██

4  ███████████████████████████████████████; Ex. 36 (J. Martinez) 89:3-13 (only bags and tags

5  property at SFPD request); Ex. 39 (Mazza) 37:20-38:13; Ex. 130; Ex. 138.

6  ████████████████████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████████████████████

10 ████████████   In an unnoticed encampment clearing, a DPW supervisor working alongside

11 his crew threw away suitcases, a tent, and cart as the owner begged to keep her belongings. Ex. 33

12 (Graham) 140:4-145:18 & Ex. 72; Ex. 34 (Castro) 155:6-24 & Ex. 93; ██████████████████

13 ███████████████████████████   DPW throws away items people cannot take

14 themselves, such as mattresses, wheelchairs, and furniture. Ex. 34 (Castro) 106:12-18, 143:1-18;

15 ████████████████████████████████████; Ex. 31 (Dilworth) 58:24-25,

16 134:18-22; Ex. 33 (Graham) 73:17-19, 75:7-15: Ex. 43 (Cunningham) 81:16-20, 83:2-18; Ex. 42

17 (Fong) 64:9-16. Until September 2023, DPW instructed workers *not* to bag and tag "bulky items,"

18 contrary to the BTP. Ex. 21 (Vaing 30(b)(6)) 210:1-213:12 & Ex. 58 at 17, 117:5-7, 137:2-138:23

19 & Ex. 91; Ex. 24 (Vaing) 119:6-10; Ex. 28 (Garcia) 92:13-93:17. Ex. 57 at CCSF-COH_056565.

20    SFPD provides people with only minutes to move, regardless of whether a person needs

21 additional time for "special needs" or disabilities. Ex. 34 (Castro) 46:8-47:13, 48:11-17, 49:15-21

22 (unaware of "special needs" in BTP); Ex. 27 (Jackson) 135:13-136:5 (same); Ex. 36 (J. Martinez)

23 51:22-25; Ex. 41 (Hoang) 36:2-12, 38:4-14 (DPW begins cleaning before time provided by SFPD

24 has elapsed); Verner-Crist ¶ 34.[2] DPW exploits language in the BTP that allows it to discard

25 "personal belongings [that] are co-mingled or littered with needles, human waste or other health

26 risks" to trash everything, including items that do *not* fall within this category, claiming needles

27

28 ───────────────
   [2]    SFFD believes it can start clearing "immediately" upon arrival at a pre-noticed formal
   HSOC resolution location. Ex. 42 (Fong) 58:10-25; Ex. 43 (Cunningham) 35:25-36:23.

are present when they are not, Ex. 33 (Graham) 158:1-21 (referring to Ex. 73), or discarding an entire tent or item when it merely touches "food" or a "needle," Ex. 32 (Brandon) 206:11-207:13 (referring to Ex. 63); Ex. 34 (Castro) 118:9-12, 121:18-122:6, 176:13-25 (referring to Ex. 73). They have no special training on or uniform practice of identifying public health or safety risks. Ex. 32 (Brandon) 238:18-240:19, 242:13-245:15; Ex. 36 (Martinez) 63:4-17, 103:7-15; Ex. 29 (Shehadeh) 135:20-141:11; Ex. 33 (Graham) 69:14-72:23; Ex. 31 (Dilworth) 131:17-133:21; Ex. 28 (Garcia) 175:1-10; Ex. 27 (Jackson) 117:23-120:23. They also do not assess whether a tent or other property is abandoned or merely unattended. Ex. 33 (Graham) 63:19-23 (rarely bags and tags unattended items), 68:1-3 (did not recall last time gave post-removal notice for unattended property); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The majority of DPW's bag and tags are done at the request of SFPD. When SFPD issues a citation for illegal lodging under PC 647(e), it seizes tents, tarps, and even blankets as "evidence," even though such evidence also exists in the form of photographs and video. Ex. 41 (Hoang) 95:11-96:6, 97:10-98:7; Ex. 23 (Lazar 30(b)(6)) 64:22-24, 73:18-75:6; Ex. 62. The tent "evidence" is then either discarded immediately by DPW or bagged and tagged, sent to the DPW Yard, and discarded after 90 days if not retrieved by the owner. *E.g.*, Ex. 49 (Admis.) Nos. 30; Ex. 60; Ex. 61 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 23 (Lazar 30(b)(6)) 66:1-23; Ex. 21 (Vaing 30(b)(6)) 132:8-133:9. *No* other "evidence" collected and seized by SFPD is turned over to DPW or discarded like this. Ex. 23 (Lazar 30(b)(6)) 69:4-17; Ex. 40 (Young) 173:18-21; Ex. 41 (Hoang) 98:8-103:4; 60:4-10. The SFPD property receipts for seized tents do not contain the Yard address or ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 41 (Hoang) 79:6-21. Neither the District Attorney nor SFPD has *ever* retrieved such "evidence" for use in a criminal case. Ex. 21 (Vaing 30(b)(6)) 133:24-134:13; Ex. 28 (Garcia) 101:13-15; Ex. 40 (Young) 170:21-23, 228:3-11. In Dr. Herring's analysis of 2023 and 2024 DPW records, an average of 24 items were bagged and tagged each month, even though DPW encountered an average of 390 individuals and 284 structures at HSOC resolutions each month, and hundreds, if not thousands, more during other JFO operations, street cleanings, and 311 requests. Herring Rep. at 12, 18-21. The few instances of bagged and tagged property consisted of

1   tents purportedly seized as "evidence" or in an arrest, *not* because DPW applied the BTP on its

2   own to attended or unattended property. *Id.* at 12, 26-31. Once police-driven bag and tags are

3   excluded, the data reveal that DPW bags and tags a miniscule amount of property. *Id.* at 33.

4   **III.    The City Fails to Provide a Meaningful Opportunity to Retrieve Property**

5          The City almost never informs individuals how they can retrieve property. Herring Rep. at

6   16, 46 (only 8% were given such information). *First*, when the City bag and tags attended property,

7   it does not provide written information on the retrieval process. Herring Rep. at 47-48; Ex. 33

8   (Graham) 62:12-20; Ex. 32 (Brandon) 112:17-20, 115:15-116:3; Ex. 31 (Dilworth) 129:2-16.

9   *Compare* Ex. 56 § 5d (requiring written information on retrieval process) *with* Ex. 49 (Admis.)

10  Nos. 15, 16, 17 (practice is oral notice). That means individuals attempting to reclaim belongings

11  at the Yard lack written documentation and almost never get them back. Dr. Herring's survey

12  found that *99%* of people did not get all their property back, Herring Rep. at 50, and his fieldwork

13  confirmed it is very difficult to retrieve property from the Yard, *id.* at 50-56.[3] *Second*, when the

14  City bags and tags unattended property, it rarely posts a notice informing the owner how to retrieve

15  it. Ex. 33 (Graham) 68:1-3; ███████████████████; Herring Rep. at 55; Verner-Crist ¶¶ 75, 113.

16  *Third*, when DPW bags and tags tents seized as "evidence," neither it nor SFPD provides retrieval

17  information. Ex. 33 (Graham) 60:1-5; Ex. 36 (J. Martinez) 88:16-21; Ex. 41 (Hoang) 80:2-81:13.

18         To try to reclaim their property, homeless individuals must travel to the Yard—only to wait

19  for hours and be told that DPW does not have their property. Herring Rep. at 50-57; Ex. 18

20  (Stromer)  157:22-160:13; ████████████████████████████████

21  ███████████████████████████████████████████████████; Ex. 107; Ex. 108. Several

22  Coalition members have been unable to retrieve their property, even when they attempted to do so

23  within the time allotted by DPW. Ex. 13 (Bryant) 59:14-61:12, 55:5-24; Ex. 16 (Stephenson)

24  92:15-94:12, 124:3-6; Ex. 15 (Reem) 161:16-165:1.

25         The inability to retrieve property is a predictable result of DPW's practices. The City

26  concedes that its workers typically do not complete the required intake form—the basis for

27

28  [3]    It is unlikely any oral advisements included the needed CMMS service order number that
    DPW uses to search for property when a person arrives at the DPW yard.

tracking what and whose property the City seized—out in the field. *Compare* Ex. 56 § 5c *with* Ex. 21 (Vaing 30(b)(6)) 120:19-121:21. Instead, they pile unsorted property in trucks—without organizing, placing tags, or completing forms that identify where, when, and from whom the items were taken—to be tagged later at the Yard. *Id.* 183:1-185:7 & Ex. 137; ████████████████████ ████████████████████; Ex. 34 (Castro) 75:25-76:7. The City also allows its workers to list the property of multiple individuals picked up at the same location as a single entry on the bag and tag log with the same tag number and color. Ex. 24 (Vaing) 180:22-25; Ex. 31 (Dilworth) 146:6-21. The Yard has little organization and security, leading to ████████████████. Herring Rep. at 55-56; ████████████████████████; Ex. 26 (Bruce) 134:9-137:2 & Ex. 88; Ex. 13 (Bryant) 60:1-4, 63:14-64:15; Ex. 90; Ex. 75; Ex. 109; Ex. 110; Ex. 112; Ex. 113 at CCSF-COH_079504; Ex. 111; Ex. 137. The City relies solely on its disorganized record-keeping when searching for property. ████████████████████; Ex. 21 (Vaing 30(b)(6)) 125:17-130:6; Ex. 41 (Hoang) at 145:15-146:7 & Exs. 96, 97 (tent seized from individual for bag and tag was not listed in bag and tag log). ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████; Ex. 112. *Contra* Ex. 50 (Interrog.) No. 16. City records show that individuals regularly are unable to retrieve their property at the Yard. *E.g.*, Ex. 113. ████████████████████████████████████████

## IV.    The City's Training and Supervision Are Inadequate

City workers are not adequately trained and do not understand the BTP.[4] Until September

---

[4]    SFPD did not develop the additional training it told the Court it would do. Ex. 40 (Young) 255:22-256:14. Multiple City agencies make key decisions affecting unhoused people's property but are not trained on the BTP. Ex. 32 (Brandon) 73:10-74:4; ████████████████    An SFPD Incident Commander directs the HSOC resolution, while SFPD or DEM determines how much time people have to remove their items and instructs DPW to begin clearing encampments. Ex. 21 (Vaing 30(b)(6)) 98:7-99:22; Ex. 41 (Hoang) 35:11-16; Ex. 34 (Castro) 46:11-47:21; Ex. 43 (Cunningham) 66:18-67:4, 152:20-22. The Incident Commander and the DPW supervisor "joint[ly]" decide whether to discard an item and whether it poses an immediate health and safety risk. Ex. 21 (Vaing 30(b)(6)) 103:20-24. DPW will not remove an individual's property unless SFPD is present. *Id.* 34:18-25.

2023, the City's training was facially incorrect, *supra* Facts(II). And as the Court later found, the City fell "short of demonstrating meaningful training of City workers on the bag and tag policy." Dkt. 231 at 10. The training provided no guidance on "distinguishing between unattended personal property vs. abandoned property and determining whether personal property is co-mingled with items that present an immediate health or safety risk." *Id.*

DPW's revised training remains inadequate. DPW workers demonstrate little understanding of the trainings they attend, ask no questions, and do not know basic terms or how to handle unattended items, perishable items, bulky items, health or safety risks, medications, "special needs," or "contraband." Ex. 34 (Castro) 16:1-17, 17:23-25, 21:14-24, 29:9-22, 32:15-18, 33:1-34:7, 48:11-17, 49:2-21, 106:12-18; ███████████████████████████████████████████ ███████████████████████████████; Ex. 36 (J. Martinez) 33:16-34:5, 36:9-12, 64:4-17, 73:10-15; Ex. 31 (Dilworth) 35:1-4; Ex. 40 (Young) 259:7-14 (no change in practices after Aug. 2024); Ex. 50 (Interrog.) No. 9 ("special needs" includes disabilities). One worker testified he used his "discretion" to trash property. Ex. 34 (Castro) 40:4-11. Two DPW supervisors who oversee HSOC resolutions, train general laborers on the BTP, and direct general laborers on whether to bag or tag or discard did not know basic definitions ("soiled," "bulky items," "special needs"), what should be bagged and tagged, or that medication advisements are required. Ex. 33 (Graham) 50:2-16, 51:10-13, 55:21-24, 73:12-16, 75:22-23, 88:24-89:4, 90:18-21; Ex. 32 (Brandon) 253:7-16, 135:19-22, 233:4-7; Ex. 34 (Castro) 23:24-24:2, 35:3-37:3, 55:10-12; Ex. 24 (Vaing) 30:16-33:21. Other supervisors did not understand key terms either. Ex. 31 (Dilworth) 18:1-16, 132:21-133:2, 134:18-25, 167:8-11; Ex. 29 (Shehadeh) 110:5-112:9, 113:10-18, 123:17-24; Ex. 27 (Jackson) 135:13-136:5; Ex. 24 (Vaing) 34:1-35:25.

DPW supervisors also engaged in or observed improper property destruction, including just hours after attending a BTP training. Ex. 33 (Graham) 32:3-21 (Aug. 6, 2024 training), 140:4-145:18 & Ex. 72; ████████████████████████ DPW supervisors were long aware of property handling practices that resulted in inappropriate property destruction. Ex. 49 (Admis.) Nos. 19, 21 (medication advisement process did not occur); Ex. 34 (Castro) 143:1-18 (wheelchairs discarded until six months ago); Ex. 26 (Bruce)139:9-140:1 & Ex. 89 (items stored outside Yard

containers). DPW supervisors—fully aware of the training deficiencies identified by this Court—do not take steps to ensure their workers comply with the BTP. DPW's only policy for tracking compliance with the BTP is for supervisors to "spot check" DPW documentation. Ex. 21 (Vaing 30(b)(6)) 152:23-156:5; Ex. 24 (Vaing) 132:22-135:1. Yet no supervisor conducted "spot checks" of CMMS service orders and an Excel bag and tag tracking sheet was not "spot checked" after February 2024. Ex. 25 (Roumbanis) 22:7-14, 30:24-31:14, 38:18-21; Ex. 26 (Bruce) 54:6-25; Ex. 32 (Brandon) 33:4-9; Ex. 27 (Jackson) 58:5-59:20, 61:15-62:16, 76:11-77:2 (did not know whether crew followed BTP); Ex. 31 (Dilworth) 208:1-12; Ex. 33 (Graham) 45:14-16; Ex. 29 (Shehadeh) 91:24-92:9; Ex. 21 (Vaing 30(b)(6)) 117:17-119:18, 160:6-161:4. "Spot checking" *bagged and tagged* property also excludes the more critical review of what was *discarded*. Ex. 21 (Vaing 30(b)(6)) 158:11-161:4. Nor did supervisors monitor compliance in the field: the Superintendent of Operations overseeing street cleaning spent fifteen minutes per year at HSOC resolutions, while another supervisor never attended a JFO done by his crew. Ex. 24 (Vaing) 96:10-13; Ex. 27 (Jackson) 50:6-16, 53:4-9; ▮▮▮▮▮▮▮▮▮▮; Ex. 29 (Shehadeh) 103:24-104:18; Ex. 26 (Bruce) 54:6-25. DPW has not engaged in any serious analysis of its bag and tag practices. Ex. 21 (Vaing 30(b)(6)) 162:9-163:7; Ex. 24 (Vaing) 152:15-153:14, 154:3-6; ▮▮▮▮▮▮▮ ▮▮▮▮ Ex. 37 (Cervantes) 84:24-85:6.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

**LEGAL STANDARD**

Summary judgment must be denied when there are "genuine dispute[s] as to any material fact," Fed. R. Civ. P. 56(a). Evidence must be viewed in the light most favorable to the nonmoving

party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court must assume the truth of the nonmovant's evidence. *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014). Summary judgment evidence comprises all potentially admissible evidence, including documents and deposition testimony. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The City incorrectly contends that Plaintiffs cannot rely on deposition testimony, expert reports, and documents because they were not referenced in interrogatory responses. D. Br. at 20. But it was "aware of these additional facts during the discovery process," so Plaintiffs were not "required to supplement [their] interrogatory responses under Rule 26(e)," and the evidence may "not [be] excluded under Rule 37(c)(1)." *Clear Connection Corp. v. Comcast Cable Commc'ns Mgmt., LLC*, 501 F. Supp. 3d 886, 896 (E.D. Cal. 2020). Nor can interrogatory responses cut off Plaintiffs' proof, especially since depositions and document productions continued past the fact discovery cut-off. *Donovan v. Crisostomo*, 689 F.2d 869, 875 (9th Cir. 1982); Talla Decl. ¶¶ 7-8.[5]

Unlike the City's cases, D. Br. at 13 fn.10, Plaintiffs disclosed *during fact discovery and prior to summary judgment* hundreds of thousands of documents, declarations from unhoused witnesses and observers, photos, and videos that identified incidents of property destruction. The City deposed numerous witnesses about incidents of property destruction. The City also possesses internal records and photographs for each resolution, SFPD incident reports, bodycam footage, and other documents, enabling it to investigate and defend the property destruction claims.

## ARGUMENT

## I.    Plaintiffs Have Standing on All Their Claims, Which Remain Live

The City's latest attack on standing fails just like the rest. Dkt. 281 at 9-14; Dkt. 298. Standing requirements are not onerous. "Even a small probability of injury is sufficient" to create standing. *Massachusetts v. EPA*, 549 U.S. 497, 525 n.23 (2007). "Substantial risk," not "certainly impending" harm, is all that is needed. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Standing is established "if each step in the causal chain is *plausible*, even if the chain of events leading from defendant's conduct to plaintiff's injury is not immediate." *Levine v. Johanns*,

---

[5]    Wright & Miller, Federal Prac. & Proc. § 2181 (3d ed.) (Interrogatories are often "answered early in the case before a party has completed its investigation and before it has a full understanding of the case. Invariably holding parties to that early understanding would be quite wrong.").

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:22-cv-05502-DMR

No. 05-cv-4764, 2006 WL 8441742, at *8 (N.D. Cal. Sept. 6, 2006) (emphasis added).[6]

### A.    Coalition Has Organizational Standing

Only last year, the Supreme Court reaffirmed *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and identified the key question for organizational standing as whether the organization's activities—such as services, *other than* advocating against the challenged activity—are harmed. *Food & Drug Admin. v. All. for Hippocratic Med.,* 602 U.S. 367, 394 (2024). In *Havens*, HOME, a non-profit like Coalition, had standing because defendant's steering practices "perceptibly impaired" HOME's ability to provide counseling and referral services. 455 U.S. at 379. In *Hippocratic Medicine*, the Court reiterated that an organization has standing when a defendant's actions "directly affect[] and interfere[] with" an organization's "core business activities." 602 U.S. at 395. The Ninth Circuit has subsequently held that a nonprofit had standing to challenge defendants' conduct because it interfered with the organization's pre-existing "core activity" of "[h]elping public employees revoke their dues authorizations." *Freedom Found. v. Int'l Bhd. of Teamsters Loc. 117*, No. 23-3946, 2024 WL 5252228, at *1 (9th Cir. Dec. 31, 2024).[7]

Organizational standing does not require that Coalition lose its own property, and none of the City's cases involve organizational standing.[8] *Contra* D. Br. at 16. In *Havens*, the organization had standing, even though it was not denied housing; here, Coalition has standing, even if it did not lose property. Nor is Coalition required to allege an informational injury. *Id.* That is *one* way an organization can be injured, but not the *only* way. *Hippocratic Medicine*, 602 U.S. at 395.

---

[6]    Nothing in *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024), or any other case, holds homelessness is a "political question." *Contra* D. Br. at 5 n.3. "Arguments raised only in footnotes, or only on reply, are generally deemed waived." *Est. of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014). The Court should not entertain this argument if made more fully on reply.

[7]    The vacatur of *Arizona Alliance for Retired Americans v. Mayes*, 117 F.4th 1165 (9th Cir. 2024) does not undermine the "pre-existing core activity test," which comes from the Supreme Court in *Hippocratic Medicine*. *Contra* D. Br. at 17 n.13.

[8]    *United States v. Baker*, 58 F.4th 1109, 1116 (9th Cir. 2023) (applying the Exclusionary Rule in a criminal appeal); *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1104-06 (9th Cir. 2006) (corporation cannot assert right to engage in consensual homosexual sex because it is not a person and its customers were not "members" for associational standing); *Guatay Christian Fellowship v. Cnty. of San Diego*, 670 F.3d 957, 980 (9th Cir. 2011) (case not ripe because plaintiff had not applied for a Use Permit); *Wright v. SEIU Local 503*, 48 F.4th 1112, 1120-21 (9th Cir. 2022) (retired plaintiff lacked standing to seek prospective relief from future union dues).

1.    **The City Impairs Coalition's Preexisting Core Activities**

Since its formation, Coalition has provided counseling, referral services, and essential supplies to homeless people. Because the City's systematic constitutional violations impair these core activities, Coalition has organizational standing. *See Havens*, 455 U.S. at 379.[9]

Coalition's Volunteer Manual proves that Coalition's core activities include providing services. *Contra* D. Br. at 17-18. *First*, the unrebutted evidence is that the Manual's reference to "community organizing" *includes* direct services, including "individual support." Ex. 1 (Coalition 30(b)(6)) 67:19-71:1.[10] *Second*, the Manual states Coalition provides direct services, ███████ ████████████████████████████████████████████████████████████████ Whether these services are "limited" in number is irrelevant; they are a core part of Coalition's work. *Third*, the Manual does not even list all Coalition's services. Ex. 1 (Coalition 30(b)(6)) 61:2-62:5.

**The City impairs Coalition's provision of services.** Like HOME, Coalition provides "counseling and referral services," 455 U.S. at 379, to homeless people by connecting them to shelter, health care, and other resources. *See* Ex. 124 (Friedenbach) ¶¶ 3, 6; Ex. 123 (Cutler) at ¶ 4; Ex. 5 (D. Martinez) 113:16-114:13 (housing information); Ex. 4 (Castano) 142:14-143:3 (assistance with "financial issues" and "citation"); Ex. 9 (Wadkins) 25:22-26:5; Ex. 10 (Evans) 72:16-73:1; Ex. 8 (Illa) 39:21-40:25; Ex. 44 (Piastunovich) 115:24-117:8.

Coalition helps homeless people access the Coordinated Entry system for housing and complete Homeless Verification forms for benefits. *See* Ex. 124 (Friedenbach) ¶¶ 20-22 & Ex. 135. Coalition assists on average one person per week with the Coordinated Entry system. Ex. 1 (Coalition 30(b)(6)) 169:12-18. Coalition produced 1,438 pages of Homeless Verification forms

---

[9]    The standard is "perceptibly impaired," not "prevented from engaging in." *Contra* D. Br. at 17. Evidence of the City's property destruction is extensive, unrebutted, and based on non-hearsay eyewitness testimony, and easily meets that standard. Coalition has knowledge of the impact on its organization and that testimony is not hearsay. *Contra* D. Br. at 18. That a resource-strapped non-profit organization is "way too busy," Ex. 1 (Coalition 30(b)(6)) 127:9-12, to keep written records of everything does not carry the City's summary judgment burden.

[10]    That Coalition *also* advocates on a broad range of issues, Ex. 124 (Friedenbach) ¶¶ 4, 42-44 & Ex. 134, does not defeat organizational standing. *Contra* D. Br. at 17-18. The HOME organization had standing because it was "*not only* [] an issue-advocacy organization" but *also* provided counseling services. *Hippocratic Medicine*, 602 U.S. at 395 (emphasis added).

1   it completed from 2022 to the present. *See* Talla Decl. ¶ 6. *Contra* D. Br. at 18. *See also* Ex. 9

2   (Wadkins) 127:16-128:1, 130:1-4; Ex. 122 (Wadkins) ¶¶ 2-5; Ex. 1 (Coalition 30(b)(6)) 60:18-

3   62:5, 163:19-164:22, 166:4-8, 113:10-13, 155:19-25, 187:8-12.

4        The City's destruction of homeless people's devices impairs Coalition's ability to provide

5   these services because Coalition cannot contact those homeless people by phone or email, and in-

6   person contact is more difficult. *Supra* Facts(II); Ex. 124 (Friedenbach) ¶¶ 12, 22, 23-25; Ex. 122

7   (Wadkins) ¶¶ 5, 7-9; Ex. 1 (Coalition 30(b)(6)) 224:8-10, 220:23-221:25; *see Get Loud Arkansas*

8   *v. Thurston*, 748 F. Supp. 3d 630, 653 (W.D. Ark. 2024) (state rule prohibiting digital signatures

9   "perceptibly impaired [organization's] ability to provide voter registration services"); *La Union*

10  *Del Pueblo Entero v. Abbott*, 753 F. Supp. 3d 515, 562 (W.D. Tex. 2024) (voting restrictions

11  "perceptibl[y] impair[ed]" the groups' "core services" of voter assistance).

12       The City also destroys the identification and documentation required to get benefits. Ex.

13  124 (Friedenbach) ¶ 26; Ex. 122 (Wadkins) ¶ 9; Ex. 2 (Cronk) 183:9-185:6, 186:3-15, 217:9-

14  218:23, 266:9-15; Ex. 9 (Wadkins) 128:23-129:5; Ex. 101 at COH01527254 ███████

15  ████████████████████████████████████████████████████████

16  Paperwork destruction impairs Coalition's work assisting homeless people get benefits. Ex. 124

17  (Friedenbach) ¶ 26; Ex. 1 (Coalition 30(b)(6)) 187:8-12, 170:20-171:10 (Coalition member Andy

18  Howard's "housing was significantly delayed as a result of their paperwork getting destroyed.").

19       The City destroys medications, making it difficult for Coalition to help unmedicated people

20  and "to engage someone in crisis to connect them with services." Ex. 122 (Wadkins) ¶ 10; Ex. 124

21  (Friedenbach) ¶ 27; Ex. 2 (Cronk) 116:14-117:6 (Martinez's medication discarded); Ex. 34

22  (Castro) 101:18-102:11 (did not know how to handle medications); ████████████

23  *South Carolina State Conference of NAACP*, 22-cv-1338, 2024 WL 5153170, *6 (D.S.C. Dec. 18,

24  2024) (standing existed for organization when detention conditions created anxiety and exhaustion

25  for clients and impeded ability to provide services to those clients).

26       **The City impairs Coalition's provision of supplies,** including tents, sleeping bags,

27  blankets, socks, and food. Ex. 124 (Friedenbach) ¶ 7 & Exs. 128, 130 at COH01502353; Ex. 102

28  at COH00742825; Ex. 2 (Cronk) 97:3-15; Ex. 4 (Castano) 142:14-143:3; Ex. 9 (Wadkins) 26:3-5;

Ex 122 (Wadkins) ¶ 4; Ex. 1 (Coalition 30(b)(6)) 61:13-23, 64:16-19, 193:25-194:6, 196:20-22, 197:2-11, 68:23-69:1, 127:25-128:19; Ex. 8 (Illa) 42:14-18; Ex. 10 (Evans) 167:20-169:2, 171:16-172:3; Ex. 16 (Stephenson) 60:11-61:5, 79:18-80:2, 54:9-25, 75:17-76:5;   Ex. 14 (Melodie) 130:25-131:14. That the Coalition has not recently *purchased* socks, tents, or sleeping bags is irrelevant; it routinely distributes *donated* supplies. *Contra* D. Br. at 18; Ex. 1 (Coalition 30(b)(6)) 198:7-199:7, 195:20-196:4, 196:5-11, 197:6-11; Ex. 8 (Illa) 42:14-18.

The City's property destruction causes homeless people to permanently lose essential items. *Supra* Facts(II); Argument(I)(A); Ex. 124 (Friedenbach) ¶ 28. Regardless of who sourced the items initially, once they are destroyed, Coalition must replace these items, depleting its supply and leaving it unable to address the need. *Contra* D. Br. at 18; Ex. 124 (Friedenbach) ¶¶ 29-30; Ex. 122 (Wadkins) ¶ 10; Ex. 1 (Coalition 30(b)(6)) 206:13-22 (tent "demands grew" from City confiscation), 207:11-15, 118:6-15 (if members' property is confiscated, Coalition staff "try to secure those needs for them"), 198:7-199:7, 248:1-13; *Yesue v. City of Sebastopol*, No. 22-cv-6474, 2024 WL 4876953, at *4 (N.D. Cal. Nov. 22, 2024) (group that provided meals had standing because city's conduct increased time and difficulty to find people to "get them meals").

**The City impairs Coalition's education services**, including "Know Your Rights" pamphlets, resource guides, and the "Street Sheet" newspaper.[11] Ex. 124 (Friedenbach) ¶¶ 8-12 & Exs. 125-127; Ex. 103 at COH01525957 ███████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████; Ex. 131 at COH01058081; Ex. 1 (Coalition 30(b)(6)) 229:6-20 ("over 1,000" Know Your Rights trainings); Ex. 2 (Cronk) 95:14-96:10; Ex. 9 (Wadkins) 26:1-25; Ex. 122 (Wadkins) ¶ 3; Ex. 16 (Stephenson) 57:6-58:19, 63:1-63:23 (gave out Coalition business cards).

The City's sweeps result in the frequent and widespread destruction of *all* property, including Know Your Rights materials. Ex. 124 (Friedenbach) ¶ 32. The loss of these materials prevents Coalition from educating its members about its services, informing them of their rights, and engaging its base. *Id.* ¶ 36. When the City destroys art, supplies, writings, and communication

---

[11]     These are distinct from Coalition's advocacy reports. Ex. 124 (Friedenbach) ¶¶ 8-12.

1  devices, it limits homeless people's ability to make submissions to Coalition's Street Sheet. *Id.* ¶

2  33; Ex. 122 (Wadkins) ¶ 9; *see supra* Facts(II); Ex. 1 (Coalition 30(b)(6)) 228:4-17. When the City

3  destroys devices, Coalition struggles to locate its members to redistribute these materials, Ex. 124

4  (Friedenbach) ¶¶ 23-24, causing Street Sheet circulation figures to decline. *Id.* ¶ 34 & Ex. 129; Ex.

5  115 (2020 Street Sheet invoices); Ex. 116 (2021); Ex. 117 (2022); Ex. 129.

6        The City's interference with Coalition's efforts to educate its members about their legal

7  rights confers standing. *See Al Otro Lado, Inc. v. Mayorkas*, No. 23-cv-1367, 2024 WL 4370577,

8  at *2 (S.D. Cal. Sept. 30, 2024) (organizational standing to challenge policy of rejecting asylum

9  applicants without a mobile app appointment because policy "perceptibly impaired [] ability to

10 provide mission-essential services" including "legal orientations and Know Your Rights

11 trainings"); *see also Havens,* 455 U.S. at 379.

12       **The City impairs Coalition's training services** because its practice of property

13 destruction causes homeless people to refrain from attending Coalition activities, like trainings,

14 for fear that their property will be destroyed while they are gone. Ex. 124 (Friedenbach) ¶ 38.

15 These trainings include Coalition's Free School. Ex. 124 (Friedenbach) ¶¶ 13, 28-31 & Exs. 132-

16 133; Ex. 103 at COH01502337

17 *id*. at COH01502368 ("quarterly trainings"); *id*. at COH01525910; *id*. at COH01525943; *id*. at

18 COH01525967 ("Journalism 101 course for unhoused journalists"); Ex. 102 at COH00742828-29

19       & at COH00742812; Ex. 131 at COH01058082

20       It is also more difficult for Coalition to contact homeless people to attend its

21 trainings when their devices have been destroyed. Ex. 124 (Friedenbach) ¶ 41 & Ex. 104 at

22 COH01502341

23       Ex. 130 at COH01502368 (Coalition uses email listserv on "monkey

24 mailer" to distribute information); Ex. 131 at COH01058083

25       *See supra* Argument(I)(A).

26       Without members to train, Coalition is unable to educate homeless people and sustain and

27 grow its membership base. Ex. 124 (Friedenbach) ¶¶ 39-40; Ex. 122 (Wadkins) ¶ 9 (due to property

28 destruction, "we were limited to what training offerings we could make as people needed to stay

with their belongings rather than attend a training").

The City's interference with Coalition's training services and its efforts to sustain and grow its membership is an additional basis for Coalition's standing. *See March for Our Lives Idaho v. McGrane*, 749 F. Supp. 3d 1128, 1139 (D. Idaho 2024) (organization had standing to challenge voter ID law because it impaired the organization's core "business" of "educating and registering voters—not merely gathering information and advocating against the law").

### 2.    Coalition Has Established Causation and Redressability

It is irrelevant that Coalition may *also* face other challenges on top of the City's unconstitutional practices. *Contra* D. Br. at 18-19. The "mere existence of multiple causes" does not defeat standing "[s]o long as a defendant is at least *partially* causing the alleged injury." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1157 (9th Cir. 2015) (emphasis added); *Yesue*, 2024 WL 4876953, at *4 ("financial and volunteer constraints" did not defeat standing; the city still made group unable to find unhoused and distribute meals).

The City's compliance with the Constitution would redress Coalition harm. *Contra* D. Br. at 18-9. If the City provided adequate notice of sweeps and ceased unjustified property destruction, homeless people could avoid property destruction or promptly retrieve devices, IDs, paperwork, medications, tents, and other items, thereby limiting or ending interference with Coalition work.

### 3.    The City's Conduct Frustrates Coalition's Mission

An independent basis for organizational standing is the City's frustration of Coalition's mission by impeding its ability to provide homeless people with services and resources. Ex. 124 (Friedenbach) ¶¶ 2-3; Ex. 136 (Friedenbach) ¶¶ 5, 12. This basis for standing is again available now that *Arizona Alliance* has been vacated. *See Havens*, 455 U.S. at 368, 378; *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 396–97 (4th Cir. 2024) (plaintiffs had standing because their "core organizational mission of election security and providing services aimed at promoting Republican voter engagement and electing Republican candidates" was "affected and interfered with" by defendant making it hard to see who could vote in election).

**B.    Coalition Has Associational Standing**

This Court already found that Coalition satisfies associational standing: (1) its members have standing, (2) it seeks to protect interests germane to its purpose, and (3) the case does not require participation of all individual members. Dkt. 281 at 9-14. None of the City's arguments disturbs that finding, much less demonstrates the absence of a genuine dispute of material fact.

**1.    Coalition Has Identified Multiple Members with Standing**

Even at summary judgment, no "particular injured members [need be identified] by name," so long as "it is clear and not speculative that a member of a group will be adversely affected." *Mi Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025) (citing *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015)); *Freedom From Religion Found., Inc. v. Weber*, 951 F. Supp. 2d 1123, 1131 (D. Mont. 2013) (standing found based on member not named in complaint); Dkt. 281 at 9-10; *Contra* D. Br. at 12 n.8.

Evidence demonstrates that—both at the time of the lawsuit filing and now—at least one of Coalition's members will be adversely affected and possesses standing. *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013). Countless Coalition members have been  or will be injured by the City's practice of unlawful property destruction. Ex. 1 (Coalition 30(b)(6)) 207:11-15,171:6-7, 231:20-232:22.[12]

Sarah Cronk, Joshua Donohoe, and David Martinez have been Coalition members since before the lawsuit. Ex. 2 (Cronk) 100:11-15 (member since 2021), 98:9-12 (volunteered 200 hours for Coalition); Ex. 120 (Cronk) ¶ 12; Ex. 1 (Coalition 30(b)(6)) 114:7-12, 120:3-25; Ex. 6 (Donohoe) 199:17-19 (member since 2020), 199:2-9; Ex. 5 (Martinez) 118:2-16 (testifying he was

---

[12] Three City declarations purport to provide housing status to support the claim that those individuals are "housed" and future injury is "speculative." D. Br. 12-13. The only administrator to testify, however, refuted this proposition. Ex. 146 (Adamek) 108:2-23 ███████████████████████████████████████ ███████████████████████████ All three declarations also rely on inadmissible hearsay. None claim to have personal knowledge of any individual's housing status, and none explain how the records cited therein were created, who created them, and whether that person had personal knowledge of any individual's housing status. *See* Rachowicz Decl. ¶¶ 5-6 (no explanation of how or who provided her information); Adamek Decl. ¶ 7 (no explanation of how he "looked into" benefit histories); Locher ¶ 6 (basing conclusions on a database query).

one of "the main guys"); Dkt. 350-22 at 7:1-4. All were homeless at the time of the Complaint, and all suffered property destruction within two years of the Complaint. Ex. 2 (Cronk) 37:22-38:25; Ex. 120 (Cronk) ¶ 3; Ex. 6 (Donohoe) 56:17-22; Ex. 119 (Donohoe) ¶ 4; Ex. 5 (Martinez) 55:20-25; *see supra* Facts(II). They had standing at the time of the Complaint because it was likely that they would be subjected to the City's unlawful property destruction practices. *See infra* Argument(I)(C). Even though they are now housed, their claims are not moot because they may become homeless and subjected to the City's unlawful practices. *Id.* While David Martinez recently settled his claims, the Coalition was not party to that settlement and is not precluded from relying on evidence of his membership to support its standing. The City has no authority otherwise.

Todd Bryant has been a member since at least 2018, participating in a documentary and attending rallies. *See* Ex. 1 (Coalition 30(b)(6)) 148:14-20; Ex. 13 (Bryant) 47:9-24; 48:20-22. He was homeless at the time of the Complaint. *Id.* 52:6-7 & 71:2-3.[13] Bryant suffered numerous incidents of property destruction. *Supra* Facts(II). His claims are timely. *Infra* Argument(II)(A).

Melodie has been a member ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ she still lives outside with "property that she's trying to secure on the streets . . . at risk of property destruction." Ex. 1 (Coalition 30(b)(6)) at 17:11-16; ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[15]

Shyhyene Brown was a Coalition member before the lawsuit, volunteering and attending the Human Rights Working Group. Ex. 1 (Coalition 30(b)(6)) 138:16-19; Ex. 11 (Brown) 153:17-154:7, 170:22-24 ("honored" to be considered a member). Her activities meet the definition of membership for associational standing. *Infra* Argument(I)(B)(2); *see also March for Our Lives*

---

[13]    *See also* Ex. 13 (Bryant) 53:10-2 (wasn't living in tiny home at time of declaration), 70:15-18 ("I was told I was *going to be* put into a tiny home.") (emphasis added), 74:13-16 (same). To the extent there is a dispute between Bryant and a City witness declaring he was housed, *see* Locher Decl. ¶ 6g, material factual disputes and credibility determinations must be resolved at trial, not summary judgment. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113 n.5 (9th Cir. 2004).

[14]    The TAC concerns the "vehicularly unhoused." Dkt. 289 ¶¶ 1, 1 n.1; *contra* D. Br. at 13.

[15]    Even those who are sheltered are subject to the BTP and property destruction. *E.g.*, Ex. 46 (Horky) 170:6-8, 170:22-171:7, 172:10-19; ▓▓▓▓▓▓▓▓▓▓▓▓

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:22-cv-05502-DMR

*Idaho*, 697 F. Supp. 3d at 1042; *La Asociacion De Trabajadores De Lake Forest v. City of Lake Forest ("ATLF")*, No. 07-cv-250, 2008 WL 11411732, at \*4 (C.D. Cal. Aug. 18, 2008), *aff'd*, 624 F.3d 1083 (9th Cir. 2010). Her errata made clear that she misunderstood the City's questioning about membership. Brown was in and out of housing placements in 2022, and she was homeless for *more than six months between 2022 and 2024*. Ex. 11 (Brown) 56:23-57:2; 60:10-14; *see also* Ex. 146 (Adamek) 93:19-94:2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, 94:21-95:5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Her situation illustrates the cyclical nature of homelessness. Herring Rep. at 57-60; Ex. 48 (Adamek) 37:15-22, 38:6-9, 46:3-18, 76:6-12, 84:23-85:2, 87:6-18 (CAAP administrator says it is common to lose CAAP, lose shelter, and cycle on and off CAAP; CAAP benefits in one six-month period does not guarantee shelter in the next period; and insufficient beds for CAAP recipients).

The recent destruction of members Reem and Stephenson's property, along with Dr. Herring's expert analysis, show that "it is clear and not speculative" that a Coalition member will be "adversely affected" by the City's ongoing conduct. *Mi Familia Vota*, 129 F.4th at 708; Ex. 12 (Orona) 163:1-12, 164:4-11, 175:17-177:10; Ex. 15 (Reem) 77:24-78:3, 39:5-40:1, 162:9-164:12; Ex. 16 (Stephenson) 113:10-13, 138:12-139:17; Herring Rep. at 12-17. Others' membership can cure any "jurisdictional defect" caused by a "temporary loss in standing." *Garcia v. City of Los Angeles*, No. 19-cv-6182, 2023 WL 11056759, at \*3-\*5 (C.D. Cal. May 23, 2023).

### 2.   Coalition's Membership Structure Supports Associational Standing

*Hunt v. Washington State Apple Advertising Commission* refused to "exalt form over substance." 432 U.S. 343, 345 (1977). It is unnecessary to demonstrate *all* the *Hunt* indicia of membership for purposes of standing because Coalition "is sufficiently identified with and subject to the influence of those it seeks to represent as to have a personal stake in the outcome of the controversy." *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021).[16]

The evidence shows Coalition's strategy and actions are driven by the homeless members

---

[16]    It is irrelevant that Coalition is not a "formal membership organization" under California law. D. Br. at 9. *Hunt* rejected an analogously formalistic argument that "the Commission's status as a state agency, rather than a traditional voluntary membership organization, precludes it from" standing. 432 U.S. at 344; *March for Our Lives Idaho*, 697 F. Supp. 3d at 1042.

it represents, and that it has indicia of membership. *Contra* D. Br. at 9-11. The "Coalition defines membership" specifically "as people who are actively involved in our work." Ex. 1 (Coalition 30(b)(6)) 27:5-7. That includes "folks who are coming to meetings, selling Street Sheets, submitting the Street Sheet articles, poetry, artwork," and "acting as informants out on the street, who are distributing flyers and information for us, folks who act as spokespersons in -- with members of the media and in meetings with policymakers in public hearings." *Id.* 27:5-13, 50:6-22. The majority of members is homeless. *Id.* 78:7-10. Multiple members confirmed this definition of membership. Ex. 2 (Cronk) 99:2-12, 100:17-22; Ex. 6 (Donohoe) 199:2-9; Ex. 5 (D. Martinez) 118:13-21; Ex. 14 (Melodie) 121:17-19; Ex. 15 (Reem) 81:4-15; Ex. 16 (Stephenson) 52:23-53:3. *Contra* D. Br. at 10. Coalition's structure is "bottom up" and its agenda "really comes out of the outreach that we're conducting to homeless people" such that "at the most fundamental level, homeless people are directing our advocacy agenda." Ex. 1 (Coalition 30(b)(6)) 79:7-24, 44:4-5, 79:21-24. Half of Coalition's Board of Directors "has lived experience with homelessness," *id.* 80:21-81:1, and its members nominate Board candidates. *Id.* 80:5-20. Members participate in hiring Coalition's staff. *Id.* 81:21-25. And members decide the budget through "collective conversation" in "open meetings." *Id.* 79:15-20.

Current or formerly homeless members initiated the decision to bring this case because "the property confiscation [was] getting worse and worse, and so [] we were hearing from our members that we needed to do something about it. And many brought up the idea of doing a lawsuit." Ex. 1 (Coalition 30(b)(6)) 102:20-103:21, 83:5-8, 86:3-18, 102:24-103:14 (decision of "what to seek in the litigation was determined by the experience of unhoused people"). Members testified that they support and consent to the lawsuit. *E.g.*, ███████████████; Ex. 15 (Reem) 79:4-9; Ex. 13 (Bryant) 51:12-52:13. Because unhoused members petitioned Coalition to bring the suit, the City's reliance on *Nat. Res. Def. Council, Inc. v. U.S. E.P.A.* is misplaced. 507 F.2d 905, 910 (9th Cir. 1974) (in case challenging Arizona environmental plan, organization with over 16,000 members nationwide and only 107 members in Arizona failed to allege its *Arizona members* consented to representation). The City's remaining cases fare no better. *Nat'l Ass'n of Consumer Advocs. v. Gemini Tr. Co., LLC*, No. CV 24-2356 , 2024 WL 4817122, at *2 (D.D.C.

Nov. 18, 2024) (organization claiming consumers as members failed to show any consumers "can actually influence" it); *Hindu Am. Found., Inc. v. Kish*, No. 2:22-CV-01656, 2023 WL 5629296, at *6 (E.D. Cal. Aug. 31, 2023) (organization claiming to represent "all Hindu Americans" failed to allege it actually represented anyone allegedly injured); *Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc*., 176 F.R.D. 329, 344 (C.D. Cal. 1997) (organization was "simply not a suitable proxy" for members and failed *third* prong of associational standing test).

The Ninth Circuit has rejected the City's argument that unhoused members must fully control Coalition's activities and finances. Like the law office in *Oregon Advoc. Center v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003), the Coalition is "sufficiently identified with and subject to the influence of those it seeks to represent." Standing existed in *Mink* because, like here, OAC identified with and "serve[d] a specialized segment" of the community that was the primary beneficiaries of its activities, people with disabilities sat on OAC's board, and it was "overly formalistic" to demand that "individuals with mental illness actually control OAC's activities and finances." *Id.* at 1110-11. The Coalition's membership is deliberately informal, *see* Ex. 1 (Coalition 30(b)(6)) 74:1-20, because of the challenges homeless people face, analogous to those faced by the disabled constituents in *Mink. See also ATLF*, 2008 WL 11411732, at *4 (organization representing day laborers had standing despite "amorphous" membership structure because it demonstrated "activities and participation by members in working toward a common purpose"); *March for Our Lives Idaho*, 697 F. Supp. 3d at 1042 ("student-led organization" had standing "[d]espite not alleging a formal membership" because its "constituents" including "hundreds of supporters and volunteers" "who guide the organization's priorities and activities").

### 3.    Individual Participation of All Members Is Not Required

*First*, the Court correctly predicted that the "Coalition's participation likely increases litigation efficiency" in a case with many homeless witnesses "who may be difficult to contact." Dkt. 281 at 12 n.6. The City has no new arguments, and no evidence, to explain how it would benefit administrative convenience to dismiss Coalition. *See* D. Br. at 14. *Second*, the Court rejected the argument that Coalition does not have standing to assert members' Fourth Amendment rights vicariously, as well as several related theories. Dkt. 281 at 13-14 & n.7; D. Br. at 25-26

1    (Fourth Amendment rights are personal rights); D. Br. 20-21 (associations cannot bring Section

2    1983 claims on behalf of members). This Court correctly adopted *Garcia v. City of Los Angeles*,

3    holding that an organization with associational standing "may assert claims under section 1983 for

4    alleged violations of its members' Fourth Amendment rights." No. 19-cv-6182, 2020 WL

5    6586303, at *5 (C.D. Cal. Sept. 15, 2020). The City does not address *Garcia*.[17] *Third*, the Court

6    rejected the City's argument that individual involvement is required. Dkt. 281 at 11-12 (quoting

7    *Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*, 159 F.3d 1178, 1181 (9th Cir.

8    1998) (individualized proof unnecessary for injunctive relief).[18] Testimony from observers,

9    Plaintiffs' expert, City employees, and the City's own records can establish *Monell* liability for a

10   custom and a failure to train that causes constitutional violations. *See infra* Argument(II)(D).

11   **C.    The Individual Plaintiffs Have Standing**

12       The Court has already held it need not address the individual plaintiffs' standing because

13   Coalition has standing. Dkt. 128 at 5-6; Dkt. 281 at 21-22; *see Nat'l Ass'n of Optometrists &*

14   *Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).

15       Regardless, Cronk and Donohue have standing. They were unsheltered, and *not* voluntarily

16   homeless, when the Complaint was filed. Dkt. No. 242 at 15; Ex. 120 (Cronk) ¶ 3; Ex. 119

17   (Donohoe) at ¶ 3. *Contra* D. Br. at 7.[19] Sufficient facts exist to show they faced a "substantial risk"

18

19   [17]    None of the City's Fourth Amendment cases concern associational standing. *See Larez v.*
     *Holcomb*, 16 F.3d 1513 (9th Cir. 1994); *Pavao v. Pagay*, 307 F.3d 915 (9th Cir. 2002)*; Mueller v.*

20   *Auker*, 700 F.3d 1180 (9th Cir. 2012).
     [18]    The City's cited cases are irrelevant. *Spinedex Physical Therapy USA Inc. v. United*

21   *Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1293 (9th Cir. 2014) (did not involve "systematic policy
     violations that . . . make extensive individual participation unnecessary"); *Ass'n of Christian Schs.*

22   *Int'l v. Stearns*, 678 F. Supp. 2d 980, 985 (C.D. Cal. 2008), *aff'd*, 362 F. App'x 640 (9th Cir. 2010)
     (relief requested was individualized, varying depending on each member's circumstances);

23   *Friends for Am. Free Enter. Ass'n v. Wal-Mart Stores, Inc.*, 284 F.3d 575, 577 (5th Cir. 2002)
     (separate choice of law analysis for each member required individualized relief); *Kan. Health Care*

24   *Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 958 F.2d 1018, 1022-23 (10th Cir. 1992)

25   (Medicare reimbursement rate claims for 335 facilities and each required separate analysis).
     [19]    The voluntariness of homelessness is irrelevant outside the now-overturned *Grants Pass*

26   doctrine. Even if relevant, Cronk and Donohoe were not "voluntarily homeless." *See* Ex. 6
     (Donohoe) 192:12-23 (accepted an offer for tiny home, but while they attempted to pack their

27   belongings within the two-bag limit imposed on them, SFFD incident commander told them they
     "don't deserve [a tiny home]"); Ex. 2 (Cronk) 67:15-17 (shelter acceptance would have required

28

of future property destruction: the City destroyed their property many times, *supra* Facts(II),
including *after* the lawsuit. *Susan B. Anthony List*, 573 U.S. at 158; Ex. 6 (Donohoe) 65:18, 119:13-
15, 129:20-130:4, 141:20-24, 170:19-174:18. The City offers no *evidence* other than speculation
that items related to substance use were present, and Cronk and Donohoe dispute it. D. Br. at 6;
Ex. 2 (Cronk) 175:23-25; Ex. 6 (Donohoe) 129:14-130:4; Ex. 2 (Cronk) 253:19-22 (now sober
after treatment); ███████████████████████

That Cronk and Donohoe may be on the street in violation of law is irrelevant. *Lavan v.
City of Los Angeles*, 693 F.3d 1022, 1029 (9th Cir. 2012) ("Violation of a City ordinance does not
vitiate the Fourth Amendment's protection of one's property."); *Contra* D. Br. at 6 (citing
*Armstrong v. Davis*, 275 F.3d 849, 865 (9th Cir. 2001)). The limitation on standing in *Armstrong*,
derived from *Lyons*, does not apply here. *See Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1041
(9th Cir. 1999) (the denial of standing is based on "plaintiff's ability to avoid engaging in illegal
conduct"). *Lyons* is inapplicable when the injury is caused by official practice. *See, e.g.*, *Melendres
v. Arpaio*, 695 F.3d 990, 998 (9th Cir. 2012); *Roe v. City of New York*, 151 F. Supp. 2d 495, 506
(S.D.N.Y. 2001) (injection drug users had standing based on reasonable fear of future arrest
"grounded in both prior arrests and an allegedly ongoing NYPD practice [ . . . ] Such a claim is
not too attenuated to preclude standing").[20]

Nor do post-filing events render the claims moot; Cronk and Donohoe retain standing to
seek injunctive relief. The City continues to destroy property. *Supra* Facts(II), (III); Herring Rep.
at 6, 12 (survey participants' property destruction and inability to retrieve belongings); *City of Los
Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *In re Zappos.com, Inc.*, 888 F.3d 1020, 1024 (9th Cir.
2018); *In re Navy Chaplaincy*, 697 F.3d 1171, 1177 (D.C. Cir. 2012) (sufficient allegations of a

property destruction), 67:23. Cronk and Donohoe have sought shelter many times. Ex. 6
(Donohoe) 191:7-25. Cronk entered shelters in 2018 and 2019, but left because they were only
temporary, and again sought out shelter in 2021 but was turned away due to lack of beds. Ex. 2
(Cronk) 68:17-70:19. She left a shelter that did not accommodate her epilepsy. *Id.* 71:16-73:8.

[20] *See Rios v. Cnty. of Sacramento*, 562 F. Supp. 3d 999, 1013 (E.D. Cal. 2021) (unlike here,
no allegation "they are at imminent risk of harm from another 'clean up' action"); *Berry v.
Hennepin Cnty.*, No. 20-cv-2189, 2024 WL 3495797, at *6 (D. Minn. July 22, 2024) (unlike here,
"no allegation that regular encampment closures remain ongoing"); *Proctor v. D.C.*, 531 F. Supp.
3d 49, 61 (D.D.C. 2021) (unlike here, newer policy required 14-day notice and plaintiffs "admitted
to regularly seeing those signs," so no further property destruction was likely).

1    pattern and practice render future injury "sufficiently non-speculative" ); *Index Newspapers LLC*

2    *v. City of Portland*, 474 F. Supp. 3d 1113, 1122 (D. Or. 2020) (same).

3         Sufficient evidence exists to defeat summary judgment on whether Cronk and Donohoe

4    may become unhoused again.[21]  Cronk previously lost "permanent" subsidized housing. Ex. 2

5    (Cronk) 41:5-13; Ex. 6 (Donohoe) 170:11-14 ("I'm definitely not that far away from

6    [homelessness]."); Ex. 120 (Cronk) ¶¶ 3-4, 11; Ex. 119 (Donohoe) ¶¶ 3-4, 10. Cronk and Donohoe,

7    who live together, can lose their subsidy and housing if Donohoe is injured, loses his job, or has

8    his hours cut. Ex. 120 (Cronk) ¶¶ 2, 5, 7-10; Ex. 119 (Donohoe) ¶¶ 2, 5, 7-9. Donohoe was laid off

9    for several weeks late last year. Ex. 6 (Donohoe) 70:1-13. "Statistical evidence" and objective data

10   can support standing. *N.B. ex rel. Peacock v. D.C.*, 682 F.3d 77, 85 (D.C. Cir. 2012); *Roe*, 151 F.

11   Supp. 2d at 506 (evidence that fear of future harm is "reasonable"). "Research and the city's own

12   data [that] indicates . . . high percentages of those both in shelter and permanent supportive housing

13   exit and return to homelessness." Herring Rep. at 57, 60 (nearly one out of five homeless people

14   in San Francisco previously had permanent supportive housing); Ex. 146 (Adamek) 108:6-23,

15   98:25-99:5 ████████████████████████████████████████████████████

16   ████████████ Ex. 46 (Horky) 170:6-8; ████████████████████ Courts find standing

17   even when future harm rests on "contingencies." *Peacock*, 682 F.3d at 83. A more robust record

18   exists now compared to when the Court dismissed Sandoval's claims. Dkt. 281 at 23.

19        Mootness exceptions also apply because the claims are "capable of repetition, yet evading

20   review" and "inherently transitory." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir.

21   2011); *Pottinger v. Miami*, 720 F. Supp. 955, 959 (S.D. Fla. 1989) (newly housed plaintiffs had

22   standing because of "the transitory nature of homelessness").[22] In addition, "plaintiffs with mooted

23   individual claims [can] maintain those individual claims for injunctive relief where they challenge

24   an ongoing government policy," as Plaintiffs do here. *Torres v. United States Dep't of Homeland*

---

21    Neither the BTP nor the Fourth Amendment is limited to unhoused people. *See* Dkt. 62-1.
The City destroyed Donohoe's property while he was sheltered. Ex. 6 (Donohoe) 170:19-174:19.
22    The Court already rejected the City's argument claiming there are adequate legal remedies
at law, because this case is about an ongoing pattern and practice of destroying property in
violation of a City policy and the Constitution. Dkt. 281 at 26-27. *Contra* D. Br. at 8 n.4. The
inherently transitory exception is not limited to class actions. *See, e.g., Mink*, 322 F.3d at 1117-18.

1    *Sec.*, 411 F. Supp. 3d 1036, 1056 (C.D. Cal. 2019).

2    **II.    The City Is Liable Under *Monell* on All Claims**

3    Plaintiffs easily meet their burden to present material facts that *Monell v. Dep't of Soc.*

4    *Servs.*, 436 U.S. 658 (1978), liability exists for both a "custom" of widespread property destruction

5    and inadequate notice that is "so widespread as to have the force of law," and for a failure to train.

6    *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

7    **A.    Plaintiffs' Claims Are Timely**

8    Plaintiffs' claims are timely. Donohoe, Cronk, Martinez, and other Coalition members

9    suffered property destruction within two years of filing. D. Br. at 22; *supra* Facts(II). Property

10   destruction prior to September 27, 2020 is admissible evidence of custom and deliberate

11   indifference. *Lyons v. England*, 307 F.3d 1092, 1108 (9th Cir. 2002); *Henry v. Cnty. of Shasta*,

12   132 F.3d 512, 521 (9th Cir. 1997), *opinion amended on denial of reh'g,* 137 F.3d 1372 (9th Cir.

13   1998) (in *Monell* claim filed in 1993, considering evidence going back to 1986); *Floyd v. City of*

14   *New York*, 959 F. Supp. 2d 540, 573, 591 (S.D.N.Y. 2013) (in *Monell* case filed in 2008,

15   considering almost decade-old evidence in assessing deliberate indifference).[23]

16   **B.    The City Has a Custom of Violating the Fourth Amendment**

17   The City's violations of the Fourth Amendment are "so permanent and well settled as to

18   constitute a 'custom or usage' with the force of law." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 974

19   (9th Cir. 2021); *Monell*, 436 U.S. at 691 (unwritten policy or custom may be so "persistent and

20   widespread" that it constitutes a "permanent and well settled" practice). The Fourth Amendment

21   protects "individuals from unreasonable government seizures of their property, even when that

22   property is stored in public areas." *Garcia*, 11 F.4th at 1118; *Lavan*, 693 F.3d at 1032.

23   Testimony of multiple homeless individuals, observers, City workers, and the expert

24   analysis of Dr. Herring are evidence of repeated unconstitutional property destruction, by multiple

25   City agencies, across multiple years, including by supervisors. *Supra* Facts(II). Dr. Herring

---

27   [23]    The City's cases do not involve pattern or practice or seek injunctive relief. *Klein v. City*

28   *of Beverly Hills*, 865 F.3d 1276, 1278 (9th Cir. 2017) (unlawful search of home and computer); *Morgan v. Komers*, 151 F. App'x 546, 547 (9th Cir. 2005) (wrongful employment action).

considered the volume of interactions between City personnel and homeless individuals, *contra* D. Br. at 30, and concluded that property destruction occurred at many of those interactions given the minimal number of items bag and tagged. Herring Rep. at 31-35. This is conduct of "sufficient duration, frequency and consistency that [it] has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *K.J.P. v. Cnty. of San Diego*, 621 F. Supp. 3d 1097, 1126 (S.D. Cal. 2022) (*Monell* liability based on six officers' testimony and two previous similar incidents); *Doe v. City of San Diego*, 35 F. Supp. 3d 1233, 1239 (S.D. Cal. 2014) (three officers' testimony, two expert reports, and policies); *Banks v. Booth*, 468 F. Supp. 3d 101 (D.D.C. 2020) (22 prisoner declarations, facility-level data, and expert report); *Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066 (N.D. Cal. 2020) (12 declarations, 8 videos).

The City's failure to engage in any discipline or serious investigations, *supra* Facts(IV), is additional proof that lack of notice and property destruction are tolerated and have force of law. *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir.1986). The fact that "even after being sued to correct a blatantly unconstitutional course of treatment," the City made no serious attempt to comply with the BTP, *supra* Facts(IV), "is even more persuasive evidence of deliberate indifference or of a policy encouraging such official misconduct." *Henry*, 132 F.3d at 520. The City's "blind-eye approach," not observing workers in the field or assessing internal documentation, also condoned and created a custom. *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001); *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027 (9th Cir. 2015).[24]

The City cannot meet *its* burden to show that its seizures are reasonable. *Larez*, 16 F.3d at 1517 (defendant bears burden of demonstrating consent or warrant exceptions); *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005); *Recchia v. City of L.A. Dep't of Animal Servs.*, 889 F.3d 553, 558 (9th Cir. 2018). *Contra* D. Br. at 14. The City's cases confirm the Fourth

---

[24]    Plaintiffs do not raise "novel" claims for assessing deliberate indifference analysis. *Contra* D. Br. at 33. Factual disputes over whether the destroyed property is abandoned do not take this case beyond the reach of *Lavan*. Nor were the "settlement rights" of the *Lavan* plaintiffs a material factor in that holding. *All* the City's cases address state-created danger claims, in which deliberate indifference is an element of the claim itself; none address deliberate indifference in the context of *Monell*. D. Br. at 34 n.24. Shelter is often temporary, and both shelter and storage facilities limit the amount of that can stored, leaving the rest at risk of destruction. *Supra* Argument(III).

1    Amendment's warrant requirement and apply settled law that warrantless seizures must fall within

2    a recognized exception. D. Br. at 14, 25; *see also Garcia*, 11 F.4th at 1118. The City fails to identify

3    *any* applicable exception to the warrant requirement, instead suggesting a generic "reasonable"

4    standard that lacks support in the caselaw. *Contra* D. Br. at 23.[25]

5        *First*, even under the City's balancing test, the City's seizures are unreasonable because

6    homeless individuals' interests outweigh any purported City justification for the "devastating"

7    destruction of their property. *See Lavan*, 693 F.3d at 1032; *see* Facts(II); Argument(I). The City

8    offers no evidence or argument that any health or safety risk or other justification existed at the

9    time workers discarded people's property, and cannot cure this deficiency on reply. *Supra*

10   Facts(II); *Recchia*, 889 F.3d at 558-60. City workers confirm that they do not have training to

11   properly identify "immediate health or safety hazards" and that they subjectively apply the label

12   to justify discarding non-hazardous property *Supra* Facts(II).

13       *Second*, even if some legitimate exigency required the City to move items from a certain

14   area, it does not justify the City's destruction of those items. *Contra* D. Br. at 25. "[E]ven if the

15   seizure of the property would have been deemed reasonable had the City held it for return to its

16   owner instead of immediately destroying it, the City's destruction of the property rendered the

17   seizure unreasonable." *Lavan*, 693 F.3d at 1030; *see also Brewster v. Beck*, 859 F.3d 1194, 1197

18   (9th Cir. 2017) (while "vehicles that jeopardize public safety and the efficient movement of

19   vehicular traffic" could be seized, the "exigency that justified the seizure vanished once the vehicle

20   arrived in impound"); *United States* v. *Jacobsen*, 466 U.S. 109, 124-25 & n.25 (1984).[26]

21       *Third*, only seizure of "*voluntarily* abandon[ed] property" complies with the Fourth

22   Amendment. *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986) (emphasis added).

23   *Contra* D. Br. at 25. Where, as here, notice and time to move are insufficient, homeless people do

24   not relinquish their possessory interest or abandon the property. *Supra* Facts(II); *Tyson v. City of*

25   _____

26   [25]    *Soldal v. Cook County*, 506 U.S. 56, 62 (1992), addressed only what constitutes a seizure under the Fourth Amendment, not how reasonableness is determined. And in *United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015), the Court applied a balancing test to determine whether a delay between a seizure and *obtaining a warrant* rendered the seizure unreasonable.

27   

28   [26]    These cases also vitiate the City's contention that destruction of Cronk and Donohoe's property was justified because they were in violation of the law. *Supra* Argument(I)(C).

1  *San Bernardino,* No. 23-cv-1539, 2024 WL 3468832, at *4 (C.D. Cal. Jan. 12, 2024). When

2  individuals are threatened with or actually arrested, their relinquishment of property is not

3  voluntary. *E.g.,* ███████████████████████████████████████████████████████████

4  ██ ; Ex. 40 (Young) 202:18-203:22; Ex. 23 (Lazar 30(b)(6)) 143:3-16; Ex. 59.

5      *Fourth*, the Court cannot overrule *Lavan*, *contra* D. Br. 23 at n.17, and *Lavan* was not

6  limited to mobile shelters or carts, *Garcia*, 11 F.4th at 1119 n.6. Nor is *Lavan*—involving Fourth

7  and Fourteenth Amendment claims and predating the Ninth Circuit's *Martin*/*Grants Pass*

8  doctrine—"irreconcilable" with *Grants Pass*, which addressed only the Eighth Amendment.

9  *Grants Pass,* 603 U.S. at 557; *id.* at 591 (Sotomayor, J., dissenting) (*Lavan*'s holding was

10  unaffected by the majority's decision). And *Soldal* actually supports *Lavan*. *Soldal*, 506 U.S. at 68

11  ("[A]n officer who . . . come[s] across an individual's property in a public area could seize it only

12  if Fourth Amendment standards are satisfied," e.g., items are evidence of a crime or contraband.").

13      Sufficient evidence establishes a dispute of material fact on whether the City's destruction

14  of Cronk and Donohoe's property in June 2022, September 2022, and January 2023[27] violated the

15  Fourth Amendment. *Supra* Facts(II). None of the City's proffered facts suggests that the property

16  was voluntarily abandoned and could be trashed; indeed, under the BTP, clothes, boots, food, bags

17  and containers should have been considered unattended given that the City was aware they

18  belonged to people. D. Br. at 24-25. The City's claim that Cronk and Donohoe abandoned property

19  because they left it in the care of a friend directly contradicts the BTP, which recognizes property

20  left with a designee is attended. Ex. 56 § 2(a). Even if the friend subsequently left the area, DPW

21  should have considered the property unattended instead of assuming it was abandoned. Nor could

22  the City destroy belongings in the right of way under the guise of "abate[ment]." D. Br. at 24-25;

23  *supra* Argument(I)(C). Finally, "messy" appears nowhere in Fourth Amendment caselaw or the

24  BTP, and Cronk and Donohoe dispute that fact. Ex. 2 (Cronk) 175:23-25.

25      **C.**    **The City Has a Custom of Violating the Fourteenth Amendment**

26      "[T]he government may not take property like a thief in the night; rather it must announce

27

28  [27]    Hearsay exceptions permit consideration of other peoples' statements on the disposition of Cronk's property in January 2023. Fed. R. Evid. 803(2), 803(3).

its intentions and give the property owner a chance to argue against the taking." *Lavan*, 693 F.3d at 1032. To establish a due process claim, Plaintiffs must show a deprivation of a constitutionally protected property interest and a denial of adequate procedural protections. *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998).

*First*, Plaintiffs have presented sufficient evidence to create a material factual dispute concerning a pattern and practice of property deprivation. *Supra* Facts (II), (III); Argument(II)(A). Even the temporary deprivation of a significant property interest, such as a vehicle impound or the seizure of a homeless person's belongings, requires due process. *See Clement v. City of Glendale*, 518 F.3d 1090, 1094 (9th Cir. 2008) (due process violated by vehicle tows even though seizure was temporary and vehicle was retrievable); *Kincaid v. City of Fresno*, No. 06-cv-1445, 2006 WL 3542732, at *37 (E.D. Cal. Dec. 8, 2006). *Second*, there are inadequate procedural protections.

**The City's roving encampment removals without any advance notice** *alone* creates a triable issue. *Supra* Facts(I). Advance notice is the most fundamental requirement of procedural due process. *Mathews v. Eldridge*, 424 U.S 319, 348 (1976); *Clement*, 518 F.3d at 1094.

Providing oral notice upon the City's arrival is inadequate. *Mathews*, 424 U.S at 335, *Mitchell v. City of Los Angeles*, No. 16-cv-1750, 2016 WL 11519288, at *5 (C.D. Cal. Apr. 13, 2016); *Kincaid*, 2006 WL 3542732, at *37. It is meaningless for unattended property, and insufficient for those present, especially since the City routinely begins trashing even as people are packing. *People of City of Los Angeles Who Are Un-Housed v. Garcetti*, No. 21-cv-6003, 2023 WL 8166940, at *16 (C.D. Cal. Nov. 21, 2023); *Denver Homeless Out Loud v. Denver*, 514 F. Supp. 3d 1278, 1292 (D. Colo. 2021), *vacated on other grounds and remanded*, 32 F.4th 1259 (10th Cir. 2022) (morning-of notice "did not afford homeless individuals sufficient time to remove their property from designated areas" and individuals who were away "risk having all of their property seized"); *Mitchell*, 2016 WL 11519288, at *5 (significant risk of erroneous deprivation when City gave plaintiffs a moment's warning). In *Shipp*, the court granted a preliminary injunction after warning the City it needed to provide advance written notice. *Compare Shipp v. Schaaf*, 379 F. Supp. 3d 1033, 1038 (N.D. Cal. 2019), *with Le Van Hung v. Schaaf*, No. 19-cv-1436, 2019 WL 1779584, at *6 (N.D. Cal. Apr. 23, 2019). And as this Court found, *Sullivan v.*

*City of Berkeley*, 383 F. Supp. 3d 976 (N.D. Cal. 2019), is distinguishable because there is evidence that written notice is not adequately posted, people are not given sufficient time to pack and move, and the City routinely destroys property that people want to keep. *Supra* Facts(I); Dkt. 65 at 43.

Further, the cost to the City of additional procedures is minimal: its policy *already* provides for advance written notice, including HSOC resolutions that involve the *same processes and same City departments* as non-noticed encampment removals. *Supra* Facts(I). "[D]esire for an efficient street cleaning process" cannot trump constitutional rights. *Lavan*, 797 F. Supp. 2d at 1018.

**The City does not provide constitutionally adequate notice** that is "reasonably calculated, under all the circumstances, to apprise interested parties." *Jones v. Flowers*, 547 U.S. 220, 226 (2006). *First*, until at least November 2022, the form of written notice incorrectly stated the City would *not* bag and tag bulky items (and workers were trained to discard bulky items until at least September 2023). *Supra* Facts(II), (III). *Second*, testimony from homeless individuals, Mr. Verner-Crist, and Dr. Herring's expert opinion establish facts, contrary to Peter Rincon's testimony, that the City posts notice inconsistently and haphazardly, leaving large areas with no notice. *Supra* Facts(I). *Contra* D. Br. at 27-28. As a result, many homeless individuals and observers report seeing no notice. *Supra* Facts(I). *Third*, Dr. Herring reports that multiple notices are posted in same area for different days. *Id*. Finally, homeless people are given insufficient time to move their belongings. *Supra* Facts(II); *contra* D. Br. at 28.

Genuine issues of material fact exist as to notice provided to Cronk and Donohoe. On January 5, 2023, the City took Donohoe's belongings from the corner of 13th and Folsom Streets. Ex. 6 (Donohoe) 119:13-21. The City proffers evidence that notice was posted for Treat and Alameda Streets, over a quarter mile away. Dkt. 350-36. Similarly, on June 23, 2022, the City took Donohoe's clothes at the intersection of 13th and Folsom Streets, over a quarter mile away from the single posted notice of the encampment resolution offered by the City. Dkt. 350-32. The City claims to photograph all posted notices, Ex. 45 (Rincon) 56:21-57:20; thus, its inability to provide evidence of notice posted at or near Cronk and Donohoe's encampments illustrates a lack of notice (or at least a factual dispute). Cronk and Donohoe also testified a DPW worker arrived early in the morning and began seizing property almost immediately, without notice or time to move their

belongings. Ex. 6 (Donohoe) 205:21-208:12; Ex. 2 (Cronk) 214:23- 216:14. That Cronk on *one occasion* (different than January or June 2023) had some time to move her property is insufficient for summary judgment. *Contra* D. Br. at 28. Leaving aside whether Plaintiffs saw notice, a factual dispute exists over whether the City posts notice at all, let alone constitutionally adequate notice.

**Post-deprivation remedies are inadequate**, as this Court already recognized, where property deprivation occurs "pursuant to established state procedure, rather than random and unauthorized action." Dkt. 281 at 26 (citing *Hudson v. Palmer*, 468 U.S. 517, 532 (1984)); *see Zinermon v. Burch*, 494 U.S. 113, 139 (1990). The "established state procedure" is clear: Plaintiffs' claims are based on systematic practices, Dkt. 281 at 26, including the City's practices that foreclose any meaningful ability for people, including Coalition members, to recover their property even if it is bagged and tagged. *Supra* Facts(III). *Contra* D. Br. at 28-29. The City offers no evidence of circumstances justifying "quick action" that would foreclose pre-deprivation process or notice. D. Br. at 27. Moreover, Plaintiffs have proffered sufficient evidence to defeat summary judgment on the inadequacy of post-deprivation process: DPW does not post post-removal notice after bagging and tagging unattended property and does not provide written notice when bagging and tagging attended property or property seized pursuant to SFPD instructions. *See* Facts(III).

### D. The City Is Liable for Its Failure to Train

The City's failure to provide adequate training also gives rise to *Monell* liability. Not only was the City's prior training facially incorrect and deemed inadequate by the Court, but the City's new training has also failed to "prevent constitutional violations." *Bryan Cnty.*, 520 U.S. at 407. The City engages in widespread property destruction as a direct result of misunderstanding basic aspects of the BTP. *Supra* Facts(II). That "pattern of tortious conduct by inadequately trained employees" in itself demonstrates the "lack of proper training." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006). Deliberate indifference rising to the level set forth in *Price v. Sery*, 513 F.3d 962, 973 (9th Cir. 2008), exists here. *First*, supervisors have made the "conscious" choice not to train workers appropriately because they themselves destroy property (in one instance, immediately after attending a BTP training), direct others to do so, implement facially improper policies, and omit key City agencies from any training on the BTP. *Supra* Facts(II), (IV).

1    The training deficiencies permeate DPW, resulting in routine property destruction; they are not

2    isolated instances of an "unsatisfactorily trained" worker or occasional "injur[ies] or accidents."

3    *Contra* D. Br. at 32. *Second*, supervisors do not have meaningful procedures to assess compliance

4    with the BTP, and do not even implement the little process they have. *Supra* Facts(IV). "[T]he

5    need for more or different training is so obvious," and workers' misunderstandings and ignorance

6    "so likely to result" in constitutional violations, that the City is deliberately indifferent. *Kirkpatrick*

7    *v. Cnty. of Washoe*, 843 F.3d 784, 793–94 (9th Cir. 2016); *Bryan Cnty.*, 520 U.S. at 407.[28]

8           The failure to train City workers on providing notice, handling unattended and attended

9    property, determining what constitutes an immediate health and safety risk, and allowing people

10   to retrieve bagged and tagged property—all aspects of the BTP, *contra* D. Br. 31 at n.21—have

11   caused property destruction. Not only "closely related" to the injury, "they are cause and effect."

12   *Harper v. City of Los Angeles*, 533 F.3d 1010, 1027 (9th Cir. 2008). More than just incorrect

13   instructions on bulky items, D. Br. at 33, the failures embrace fundamental aspects of the BTP.

14   **III.    Equitable Relief Is Available on All Claims**

15          *First*, this Court has already recognized damages are *not* an adequate remedy. Dkt. 281.

16   *Contra* D. Br. at 19-20. The City continues to lack "authority for application of *Campbell* to a case

17   like this one that alleges systemic constitutional violations." Dkt. 281 at 27. None of the City's

18   cited cases does so. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (plaintiff

19   sought *money* in her equitable claim, equally available in the damages claim she voluntarily

20   dismissed to avoid a jury trial on the latter).

21          *Second*, Plaintiffs can demonstrate immediate and irreparable harm: there is sufficient

22   evidence of property destruction and individuals unable to retrieve their property from the Yard

23   within the last two years. *Supra* Facts(II), (III); *contra* D. Br. at 20.

24

25   [28]     The City's cases are distinguishable. *Doe v. Cnty. of San Diego*, 576 F. Supp. 3d 721, 741
26   (S.D. Cal. 2021) (no failure to train claim because underlying conduct was not a constitutional
     violation); *Vasquez v. City of Santa Paula*, No. 13-cv-7726, 2015 WL 12734071, at *3 (C.D. Cal.
27   Mar. 11, 2015) (only a "single incident of errant behavior"); *Dunklin v. Mallinger*, No. 11-cv-
     1275, 2013 WL 1501446, at *25 (N.D. Cal. Apr. 10, 2013) (no evidence of facially incorrect
28   training or that officers misunderstood standard); *Jessen v. Cnty. of Fresno*, 808 F. App'x 432, 435
     (9th Cir. 2020) (insufficient evidence of need for different training).

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:22-cv-05502-DMR

1

**CONCLUSION**

2

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

3

Dated: April 17, 2025

4

Respectfully submitted,

5

By: */s/ Vasudha Talla*

6

7

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

8

Zoe Salzman, *pro hac vice*
Vasudha Talla

9

Vivake Prasad, *pro hac vice*
Bianca Herlitz-Ferguson, *pro hac vice*

10

One Rockefeller Plaza, 8th Floor
New York, NY 10020

11

Telephone: (212) 763-5000

12

zsalzman@ecbawm.com
vtalla@ecbawm.com

13

vprasad@ecbawm.com
bherlitz-ferguson@ecbawm.com

14

15

By: */s/ Nisha Kashyap*

16

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS OF THE SAN FRANCISCO BAY

17

AREA

Nisha Kashyap SBN 301934

18

Andrew Ntim SBN 347084

Chloë Dominique Smith SBN 352170

19

131 Steuart Street, Ste. 400

20

San Francisco, CA 94105
Telephone: (415) 543-9444

21

nkashyap@lccrsf.org
antim@lccrsf.org

22

23

By: */s/ John Thomas H. Do*

24

AMERICAN    CIVIL    LIBERTIES    UNION
FOUNDATION OF NORTHERN CALIFORNIA

25

John Thomas H. Do, SBN 285075
William S. Freeman SBN 82002

26

Larissa Grijalva SBN 352930

27

39 Drumm Street
San Francisco, CA 94111

28

Telephone: (415) 293-6333

jdo@aclunc.org
wfreeman@aclunc.org

By: */s/ Scout Katovich*

AMERICAN CIVIL LIBERTIES UNION
Scout Katovich, *pro hac vice*
425 California Street
Suite 700
San Francisco, CA 94104
212-549-2500
skatovich@aclu.org

*Attorneys for Plaintiffs*
*Coalition on Homelessness, Sarah Cronk, Joshua*
*Donohoe*

1

## **ATTESTATION**

2          I, Vasudha Talla, am the ECF user whose user ID and password authorized the

3    filing of this document. Under Civil L.R. 5-1(h)(3), I attest that all signatories to this document

4    have concurred in this filing.

5

6    Dated: April 17, 2025                    By: */s/ Vasudha Talla*_____

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28