# EXHIBIT 1

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v.*
*City and County of San Francisco, et al.*

---

*Jennifer Friedenbach 30(b)(6)*
*February 25, 2025*

---

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 44154FriedenbachPMK_NL.txt
**Min-U-Script® with Word Index**

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 17

1    A. Yes.
2    Q. Other than discussions about Mr. Reem and
3  Ms. Stephenson, what else did you discuss with Mr. Illa?
4    A. That's all I could recall.
5    Q. And you mentioned that you had conversations
6  with River Beck; is that correct?
7    A. Uh-huh.
8    Q. What did you discuss with River?
9    A. We talked about another member named Melodie and
10  what her housing situation was.
11    Q. And what is Melodie's housing situation?
12    A. She is -- she currently has a shelter, but
13  they're not accommodating her disabilities. And
14  she's -- you know, basically still has property that
15  she's trying to secure on the streets and is at risk of
16  property destruction.
17    Q. Is River Beck knowledgeable about Melodie's
18  situation?
19    A. Yes.
20    Q. Other than River and Mr. Illa, did you discuss
21  this deposition with anyone else?
22    A. No.
23    Q. So didn't discuss it with any member of the
24  Coalition?
25    A. No.

Page 18

1    Q. How about any of the other plaintiffs in this
2  case?
3    A. I don't think so, no.
4    Q. You didn't discuss this deposition with
5  Sarah Cronk or Josh Donohoe?
6    A. No.
7    Q. You mentioned a number of documents that you
8  reviewed, including the filings and declarations,
9  discovery materials, texts, and e-mails, and then work
10  plans.
11       Are there any other documents that you reviewed
12  to prepare for this deposition?
13    A. Our volunteer manual. It was a lot, so I might
14  be missing stuff.
15    Q. Understood.
16    A. Yeah.
17    Q. I'll show you some exhibits today, and I may ask
18  you if you reviewed them as part of your preparation.
19    A. Okay.
20    Q. But I think we can move on from those.
21  Although, I do want to ask, was it the current volunteer
22  manual that you reviewed, the one that is currently
23  applicable at the Coalition?
24    A. Yes.
25    Q. And when was that adopted?

Page 19

1    A. I believe -- I'm not sure of the exact year, but
2  it's been around for a few years, so I would say
3  pre-pandemic, going back a ways. It may be more than
4  eight years old.
5    Q. And did reviewing that manual refresh your
6  recollection of what the manual provided?
7       MS. SALZMAN: Objection to form.
8       THE WITNESS: In this situation, I continue
9  answering, right?
10       MS. SALZMAN: (Nods head up and down.)
11  BY MR. GEORGE:
12    Q. Yeah.
13    A. I'm, like -- let's see, so can you repeat the
14  question, please?
15    Q. Sure. So were you familiar -- I'll ask it this
16  way, before you reviewed the volunteer manual, were you
17  familiar with all the contents of what the manual
18  provided?
19    A. Yes.
20    Q. Did reviewing the manual remind you of anything
21  that it did provide?
22       MS. SALZMAN: Objection.
23       THE WITNESS: So an objection, I don't answer?
24       MR. GEORGE: You can.
25       MS. SALZMAN: You can -- I'm sorry -- unless I

Page 20

1  say, I instruct you not to answer.
2       THE WITNESS: Okay.
3       MS. SALZMAN: Objection, I'm just preserving it
4  for the record. You can still answer.
5       THE WITNESS: So no. I mean, I'm pretty
6  familiar with the document because it is something we
7  specifically use to -- for people who are coming in and
8  volunteering on the front desk.
9       A lot of times, there are people who are just
10  working off hours, and so it needs to be updated because
11  it's got all the phone instructions on it and whatnot,
12  and -- yeah. So...
13  BY MR. GEORGE:
14    Q. You mentioned working off hours. What does that
15  phrase mean?
16    A. Well, like, if somebody is -- somebody has a
17  ticket, like a -- they have -- or some kind of criminal
18  thing where they get sent to do community service, they
19  have, like, community service hours. We're a site that
20  sometimes we get people sent to.
21    Q. Oh, okay. So people can, if -- as part of
22  their -- a criminal interaction, are assigned community
23  work hours, they can perform those hours at the
24  Coalition?
25    A. Yeah. And we have a welfare to work program

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 4 of 39
Coalition on Homelessness, et al. v.                    Jennifer Friedenbach 30(b)(6)
City and County of San Francisco, et al.                        February 25, 2025



Page 25

1    Q. Are these the current bylaws that are currently
2  in effect at the Coalition?
3    A. They are.
4    Q. Are you familiar with these bylaws from your
5  work with the Coalition?
6    A. Yes.
7    Q. Do these appear to be an accurate copy of the
8  Coalition's bylaws?
9    A. Yes.
10    Q. I'll just note for the record that the Bates on
11  this document is COH 01508325.
12       Were these bylaws in effect in September of
13  2022?
14    A. Yes.
15    Q. Is the Coalition's board required to approve
16  litigation that the Coalition brings?
17    A. Yes.
18    Q. Did the Coalition's board approve this
19  litigation?
20    A. Yes.
21    Q. And approximately when did that occur?
22    A. Well, I would say about six months before
23  filing.
24    Q. And the case was filed in September of 2022; is
25  that correct?

Page 26

1    A. Correct.
2    Q. So can you identify which month, approximately,
3  the board would have approved this litigation?
4    A. Well, I'm not totally sure, but I think probably
5  April or May.
6    Q. How often does the board meet?
7    A. Monthly, with some exception.
8    Q. Would the board's approval of this litigation be
9  reflected in its minutes from the monthly meeting?
10    A. It should be, yeah.
11    Q. Will you please turn to page 2 of Exhibit 143.
12    A. Uh-huh.
13    Q. Do you see the section under Article 6 entitled,
14  membership?
15    A. Yes.
16    Q. Is it correct that the Coalition's bylaws do not
17  provide for membership?
18       MS. SALZMAN: Objection to form.
19       THE WITNESS: Yeah. We have a -- this refers to
20  a formal membership, which is a particular legal thing
21  where you elect the board of directors.
22       And so we have a very deliberate structure where
23  we have an informal membership.
24  BY MR. GEORGE:
25    Q. So the Coalition is not a formal membership

Page 27

1  organization; is that correct?
2    A. Correct.
3       MS. SALZMAN: Objection.
4  BY MR. GEORGE:
5    Q. How does the Coalition define membership?
6    A. The Coalition defines membership as people who
7  are actively involved in our work. So folks who are
8  coming to meetings, selling Street Sheets, submitting
9  the Street Sheet articles, poetry, artwork. Folks who
10  are acting as informants out on the street, who are
11  distributing flyers and information for us, folks who
12  act as spokespersons in -- with members of the media and
13  in meetings with policymakers in public hearings.
14       So it's basically active participation in the
15  organization qualifies an individual as membership.
16    Q. You can set those ones aside.
17       Does the Coalition have operating expenses?
18    A. Yes.
19
20
21
22
23
24
25

Page 28

1
2    Q. Where would the Coalition's annual operating
3  expenses be recorded? What type of document would
4  record that?
5    A. So we have a budget. And then we have our
6  financials that are provided to the board of directors
7  each month.
8       And those have our profit and loss statement,
9  and that includes a budget, how much we spent that
10  month, our actuals versus our estimated budget and --
11  both to date and on a monthly basis.
12    Q. Have those records that you just described
13  existed since 2019?
14    A. Yes.
15    Q. How does the Coalition fund itself, meaning, how
16  does it get money to pay those operating expenses?
17    A. We are primarily funded through individual
18  donors, many of whom heard about us originally through
19  Street Sheet or through, you know, media and
20  word-of-mouth.
21       We also are funded through foundations. We do
22  get a small amount of corporate support. And we also
23  have contracts, primarily -- well, our only contracts
24  are with Chinatown Community Development Center.
25

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 5 of 39
Coalition on Homelessness, et al. v.                                    Jennifer Friedenbach 30(b)(6)
City and County of San Francisco, et al.                                        February 25, 2025

Page 41

1  Coalition?
2      A.  Less than a year.
3      Q.  How long has Yessica Hernandez been employed by
4  the Coalition?
5      A.  More than -- more than two years.
6      Q.  You mentioned that -- is it Ms. Hernandez?
7      A.  Yes.
8      Q.  You mentioned that Ms. Hernandez is focused on
9  RVs; is that correct?
10     A.  Correct.
11     Q.  Does Ms. Hernandez attend resolutions or sweeps
12  that are not related to RVs?
13     A.  No.
14     Q.  Does Lukas Illa have responsibilities other than
15  monitoring resolutions or sweeps?
16     A.  Yes.
17     Q.  What are those responsibilities?
18     A.  So probably too much.  But they -- the
19  organizers are responsible for staffing a variety of
20  campaigns that include human rights issues that people
21  focus.
22         So everything from addressing conditions on the
23  street, making sure people have access to water, hygiene
24  and showers, access to shelter.
25         So looking at, like, the shelter access process

Page 42

1  and trying to improve that, working on overseeing our
2  efforts to transform the City's street response into one
3  that is effective.
4         And that includes staffing the workgroup,
5  working with the media, developing position and policy
6  papers, meeting with public officials, developing new
7  programs to fill gaps.
8         So for example, Lukas is very involved in
9  working with the Stop Poverty Tows Coalition to get some
10  safe parking opened up in the City.
11     Q.  Have there been former Coalition employees who
12  were involved in monitoring the sweeps during their
13  employment?
14     A.  Yes.
15     Q.  And who are those employees -- those former
16  employees?
17     A.  Julian Highsmith, Javier Bremond, Lamario
18  (phonetic), Laketha Pierce.  Let's see, Toro Castenada
19  [sic].
20         How far back do you want me to go?
21     Q.  Do you recall any -- let me withdraw that.
22     A.  Carlos Wadkins, Kelley Cutler.  I wasn't sure
23  the time frame you were asking for.
24     Q.  No problem.  I'll be more specific.  I
25  apologize.

Page 43

1         So since approximately 2020, other than
2  Mr. Highsmith, Javier, Laketha, Toro, Carlos, and
3  Kelley, have there been other former employees who
4  observed or monitored the City's actions at sweeps?
5      A.  Yes.
6      Q.  And who are those people?
7      A.  Lamario, Julian Highsmith.  I can't remember if
8  you mentioned -- yeah.
9      Q.  Did Ian James --
10     A.  Oh, Ian James.  Thank you.  Tracy Nixon.
11     Q.  Does the Coalition have a particular document
12  that identifies all of its employees who were involved
13  in monitoring the City's actions at sweeps or
14  resolutions?
15     A.  To clarify, you mean, like, an internal document
16  that's just -- like, says, these are the list of people?
17     Q.  Yeah.  That is correct.
18     A.  No.
19     Q.  Where would -- let me first ask, does the
20  Coalition record in any way when its employees are
21  involved in monitoring the City's actions at sweeps?
22     A.  Well, primarily through our Human Rights
23  workgroup notes.  And over time, there's -- you know,
24  there was a form that people were filling out and
25  submitting during the lawsuit frame.

Page 44

1         But typically, people at our weekly workgroup
2  meeting, we set our outreaches, and people report back
3  on the outreaches.
4         And the idea is the information we're getting
5  from homeless people is driving our agenda.  It's
6  sometimes sweeps, but it could be a shelter outreach,
7  et cetera.
8      Q.  When did Coalition's employees first begin
9  monitoring sweeps as part of their job responsibilities?
10     A.  As long as I've been at the Coalition.  And it
11  kind of changes because the City's policies and
12  practices change.
13         But we've had some form of going out on the
14  streets.  And that looks differently, depending on the
15  time.  But when, for example, I first started at the
16  Coalition in 1995 under Frank Jordan, there was the
17  matrix program, you know, so things have kind of
18  shifted.
19         But it wasn't -- yeah.  So we've had a
20  consistent presence.  Although, when -- because of the
21  sweeps getting more escalated and more intense in terms
22  of the negative impact on people that are living out
23  there, we've had to intensify our monitoring.
24     Q.  Does the Coalition have any interns at the
25  moment?

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 49

1   and next minute, they're employed and can't do it
2   anymore.
3      Q.  Do volunteers have defined responsibilities?
4      A.  That depends.
5      Q.  And what does that depend on?
6      A.  What they're volunteering to do.
7      Q.  Do people specifically volunteer to observe the
8   City's actions at sweeps or resolutions?
9      A.  Yes.
10     Q.  Does the Coalition track those members who
11  volunteer specifically to do that work?
12     A.  We do not have a set database of that, no.
13     Q.  Does the Coalition track its volunteers
14  generally to keep track of how many it's had?
15     A.  No.
16     Q.  Is there any way to determine who has been a
17  volunteer of the Coalition since 2020?
18     A.  Comprehensively, no.  But calling the Human
19  Rights notes, you can get a pretty good idea.
20     Q.  We've been going about an hour.  Would you like
21  to take a brief break?
22     A.  Sure.
23     Q.  We can go off.
24         THE VIDEOGRAPHER:  We are going off the record.
25  This -- we are going off the record at 10:06 a.m.

Page 50

1          (Recess taken from 10:06 to 10:18 a.m.)
2          THE VIDEOGRAPHER:  This marks the beginning of
3   Media No. 2.  We are back on the record.  The time is
4   10:18 a.m.
5   BY MR. GEORGE:
6      Q.  How does the Coalition distinguish between
7   members and volunteers?
8      A.  There's many people who are both.  A member is
9   someone who is actively engaged in basically putting
10  forward our mission -- you know, working on our mission.
11         And so members would be supporting folks who are
12  unhoused to get their needs met, advocating for them,
13  engaged in meetings, meeting with public officials,
14  acting as spokespersons there, engaging in rallies and
15  public hearings, helping get input on policy papers.
16         Volunteers would -- people who are just strictly
17  volunteers who are not members, if you're looking at
18  concentric circles, would be people who are just either
19  helping in the office or volunteering at fundraising
20  events and that kind of thing and aren't active in
21  working towards fulfilling our mission of ending
22  homelessness in San Francisco.
23     Q.  So the volunteers who are not involved in
24  advancing the Coalition's mission are not members; is
25  that correct?

Page 51

1      A.  Correct.
2      Q.  And those volunteers are limited to people who
3   purely perform office work or are involved in organizing
4   the special events, like the art auction; is that
5   correct?
6      A.  Correct.
7      Q.  Are there any other volunteers who are not
8   members because they're not advancing the Coalition's
9   mission?
10     A.  Not that I can think of.
11     Q.  I'm going to introduce Exhibit 145.
12         (Deposition Exhibit 145 marked for
13         identification.)
14  BY MR. GEORGE:
15     Q.  This is Bates stamped COH 01471481.
16         Do you recognize this document?
17     A.  Yes, I do.
18     Q.  What is it?
19     A.  It is our volunteer manual.
20     Q.  This is titled, Coalition on Homelessness,
21  San Francisco Manual; is that correct?
22     A.  Correct.
23     Q.  And does this apply to people who are not
24  volunteers?
25     A.  This is primarily used for an audience of folks

Page 52

1   who are coming in to the office to volunteer.
2      Q.  Going to introduce a previously marked
3   Exhibit No. 92.
4          (Discussion off the record.)
5          (Deposition Exhibit 92 previously marked for
6          identification.)
7   BY MR. GEORGE:
8      Q.  And Exhibit 92 has the Bates COH 01481558.
9          Do you recognize what has been previously marked
10  as Exhibit No. 92?
11     A.  Yes.
12     Q.  What is this document?
13     A.  This is the older volunteer manual.
14     Q.  Okay.
15     A.  I'm not sure what year it's from.
16     Q.  At what point in time did the volunteer manual
17  that's marked as Exhibit 145 supersede the previously
18  marked Exhibit No. 92?
19     A.  It's really hard to say, honestly, because like
20  I said, I update it pretty regularly.  I think some of
21  this language in terms of the values and kind of the
22  background piece was added, I believe, maybe in 2020.
23  I'm not totally sure.
24         To -- one of the staff wanted to play around
25  with it a bit, yeah.

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 7 of 39
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.
Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 53

1  Q. Were you involved in creating the current
2  volunteer manual, Exhibit 145?
3  A. Yes.
4  Q. Who else was involved in creating this document
5  with you?
6  A. Armando Garcia. I believe the values was an
7  open meeting that happened either at a retreat or a
8  staff meeting or something.
9  So that was more collective.
10  Q. What would you consult to determine the time at
11  which this current policy was adopted?
12  MS. SALZMAN: Objection to form.
13  THE WITNESS: It's kind of more of a work in
14  progress.
15  BY MR. GEORGE:
16  Q. So there's no one point in time when a new
17  policy is adopted? It's just sort of small changes are
18  made as you go along?
19  A. Correct.
20  Q. Does the Coalition have a process for amending
21  its volunteer manual?
22  A. No.
23  Q. Looking at the current manual, Exhibit 145, is
24  this an accurate copy of the current manual that applies
25  today?

Page 54

1  A. I'm looking for the staff directory, kind of
2  indicates the newness of it or not.
3  Yeah. It's probably been updated. Some of the
4  staff has turned over.
5  Q. Which staff has turned over since this manual
6  was adopted?
7  A. So Ruth is still fiscal. Carlos left the
8  development director position to go to grad school in, I
9  believe, July or August of 2024.
10  Dajuan was -- that position, we no longer have.
11  Julian Highsmith left a couple of weeks ago, and that
12  position is vacant.
13  We no longer have the office volunteer
14  coordinator.
15  Quiver is -- still does the production. And TJ
16  does the editing.
17  And the rest of the staff, except for Human
18  Rights, Javier Bremond left, and he was replaced by
19  River Beck.
20  MS. SALZMAN: Maybe just for the record, if you
21  could read the Bates number at the bottom of the
22  page you're referring to.
23  MR. GEORGE: Thank you.
24  THE WITNESS: COH 01471495.
25  ///

Page 55

1  BY MR. GEORGE:
2  Q. Thank you. Appreciate that.
3  Other than these personnel changes, is the
4  remainder of the manual the same today as it was in this
5  particular version?
6  A. Most likely.
7  Q. Who at the Coalition would have a copy of the
8  current manual?
9  A. So we use the Google Docs suite, so it's -- you
10  know, an item that gets updated and all of the staff
11  have -- should have access to it.
12  Q. In order to obtain the current manual, would you
13  just log into Google Docs and download the current
14  manual?
15  A. Correct.
16  Q. Looking at this particular manual, it describes
17  the Coalition's organizing model. This is on the
18  page that ends 1483. It's the third page.
19  Does this accurately describe the Coalition's
20  organizing model?
21  A. Yes.
22  Q. On the page that ends 485, it describes how to
23  get involved as a volunteer, and then it has various
24  parts. There's part one, outreach; part two, workgroup.
25  Does this accurately describe how to get

Page 56

1  involved as a volunteer at the Coalition?
2  A. Yeah. I mean, I think it -- it is really
3  reflective of more membership activities. But again,
4  since this is an audience of new people coming in, we
5  kind of just lay out the different ways that they could
6  get involved as a recruitment strategy.
7  Q. At the bottom of the page that ends 490, there's
8  a section on part five, active solidarity, aka services.
9  Do you see that?
10  A. Uh-huh.
11  Q. Does that describe the services that the
12  Coalition provides -- the direct services, I should say?
13  A. Yeah. This one we kind of deliberately had it
14  more limited, because when we have front desk
15  volunteers, for example, if someone is calling in and
16  saying, I'm about to lose my apartment, which is a
17  pretty common call we get, we don't want that volunteer
18  to, like, do tenant counseling because they're not an
19  expert.
20  So we really try to -- I think, you know, the --
21  one of the core activities of our work on a day-to-day
22  basis is providing support to people as they're
23  approaching. And that is so endless. It can -- it can
24  really take over everything.
25  So it -- it isn't accurate in terms of the

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 8 of 39
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.
Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 57

1  expansiveness of the services that we do. But it is
2  accurate in terms of the instruction that we're giving
3  to somebody who's jumping on the desk for the first
4  time.
5      Q. The last sentence of this says -- sorry -- the
6  second to the last -- it begins at the bottom of page
7  490 and goes on.
8          It says, in that sense, we provide a very
9  limited number of services in-house and active referrals
10 to other agencies.
11         And then it goes on and says, for a list of
12 services we provide, refer to our front desk and
13 telephone guidelines.
14         Are those front desk and telephone guidelines
15 the ones that are within this document on this page and
16 the next?
17     A. Sorry. Yeah. I think that again, that's a --
18 for a front desk volunteer, that's what we want them to
19 be limited to. We really try to get them to involve
20 staff.
21         But I mean, you know, as people present and they
22 have different needs, we are going to try and meet those
23 needs. So when you have a mom walking in with a
24 domestic violence situation, we're going to really
25 support her through that situation on how to address it.

Page 58

1          But we don't want them to get, like, bad
2  information. So that's why it's structured the way it
3  is.
4          So it's not comprehensive. But in terms of a
5  front desk volunteer, it's accurate. We really want to
6  get them to refer, rather than try to take it on.
7  Sometimes people try to be helpful and it ends up not
8  being helpful if they don't know the best resources or
9  ways to navigate.
10     Q. This section under, services we provide, on the
11 bottom of page 493, it says, please stick to specific
12 times these services are offered. Inform folks of
13 times, and do not attempt to refer them to another staff
14 person if service needs -- if the service needed falls
15 outside of specific time we offer it.
16         Is this referring to providing a front desk
17 staff referral -- a front desk referral to staff to help
18 the person who's coming in for services?
19     MS. SALZMAN: Objection to form.
20     THE WITNESS: This is --
21     MS. SALZMAN: Go ahead.
22     THE WITNESS: This is specific -- like, we're
23 supposed to have hours for -- honestly, nobody follows
24 this, but we're supposed to have hours for homeless
25 verification, because it's so overwhelming.

Page 59

1          But people come in after the hours, and they end
2  up getting the homeless verification anyway. We were
3  attempting to try and have particular hours. And it
4  hasn't manifested in reality.
5  BY MR. GEORGE:
6      Q. Do front desk volunteers provide any of the
7  listed services that are on page 494 directly
8  themselves?
9      A. They hand out Street Sheets. One of them is
10 trained in homeless verification. None of the others.
11         The active referral, if it's something that
12 we -- you know, we have basic information on the board
13 about where to go for things. But the front desk
14 volunteers usually, like, ask staff on just about every
15 call.
16         So -- but theoretically, they could say, here's
17 the phone number for housing -- eviction defense
18 collaborative.
19     Q. So they can provide referrals, but they don't --
20 other than the person who is trained to provide homeless
21 verifications, they don't actually provide these direct
22 services; is that correct?
23     A. Correct. Well, except for distributing Street
24 Sheets.
25     Q. Other than distributing Street Sheets and the

Page 60

1  single person who is trained in homeless verification,
2  they don't actually provide direct services; is that
3  correct?
4      A. Correct.
5      Q. Who is trained in -- which volunteer who works
6  the front desk is trained in homeless verifications?
7      A. Chris Lloyd.
8      Q. How do you spell that name?
9      A. L-l-o-y-d.
10     Q. Chris Lloyd?
11     A. Uh-huh.
12     Q. Okay. Thank you. How long has Chris Lloyd been
13 providing homeless verification?
14     A. About six months. He's between jobs.
15     Q. When does Chris Lloyd volunteer?
16     A. Monday, Tuesday -- excuse me.
17         Monday, Thursday, and Friday afternoons.
18     Q. Does Mr. Lloyd provide those verifications any
19 time that he's working the front desk?
20     A. Correct.
21     Q. If someone comes in for a homeless verification
22 outside the hours Mr. Lloyd is working or outside of
23 Monday and Wednesdays from 10:00 to 12:00, are they
24 referred to a staff member to help them with the
25 homeless verification?

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 9 of 39
Coalition on Homelessness, et al. v.                    Jennifer Friedenbach 30(b)(6)
City and County of San Francisco, et al.                          February 25, 2025

---

Page 61

1    A.  Yes.
2    Q.  On page 493, towards the bottom, it says, here
3    are the only services we offer.  And then it says, what
4    we provide directly.  And then it has the five bullet
5    points that we were just going through.
6        Is it not accurate to say, only for these
7    services that are directly provided by the Coalition?
8        MS. SALZMAN:  Objection to form.
9        THE WITNESS:  Yeah.  I would say not accurate to
10   say "only."  You're just giving me all these ideas on
11   how I have to update the manual.
12   BY MR. GEORGE:
13   Q.  What are the other services that the Coalition
14   directly provides to homeless people?
15   A.  So we provide a number of, kind of, different
16   ways in material support in terms of survival gear,
17   toiletries, socks, you know, clothing, depending on what
18   we have.
19       We provide water and snacks, sometimes food.  We
20   provide -- I mean, it's kind of loosely put in here as
21   referral, but, you know, there's a lot of system
22   navigation that we assist people with in individual
23   advocacy.
24       So helping somebody get an appropriate placement
25   in shelter, substance use, mental health treatment,

---

Page 62

1    housing, advocating for people in the Coordinated Entry
2    process, providing people with help navigating the
3    domestic violence system and advocating for them within
4    that system.
5        It's -- it's a lot, yeah.
6    Q.  If a person comes in for Coordinated Entry help,
7    how would the volunteer know how to help them with that?
8        MS. SALZMAN:  Objection to form.
9        THE WITNESS:  You're talking about the front
10   desk volunteer, or --
11   BY MR. GEORGE:
12   Q.  Correct.  Let me withdraw that question, and
13   I'll start with a shorter series of them.
14       So this Coordinated Entry is not provided on --
15   in these five bullet points, correct?
16   A.  Correct.
17   Q.  How would a person who comes in -- well, let me
18   withdraw that.
19       Do the volunteers get trained on providing help
20   on Coordinated Entry?
21       MS. SALZMAN:  Objection to form.
22       THE WITNESS:  The volunteers at the front desk
23   do not.  It's a very complicated system, honestly.  That
24   would be more staff and more, kind of, experienced
25   members.

---

Page 63

1        And so they would -- we don't have, like, a
2    formal Coordinated Entry training, per se.  But we do
3    have, like, a resource training where we give people the
4    basics.
5        But Coordinated Entry, I would say, advocating
6    for someone in that system is a pretty sophisticated
7    activity that would more likely be done by staff and
8    maybe a few more experienced members.
9    BY MR. GEORGE:
10   Q.  If a person comes in for help with Coordinated
11   Entry, would they be referred by a front desk person to
12   staff members who are knowledgeable about that system?
13   A.  Correct.
14   Q.  How would a volunteer know who to refer a person
15   to if it's not listed in the training manual?
16   A.  We have a pretty small staff, and so, you know,
17   the volunteers kind of have their go-to people that
18   are -- it's really whoever is present.
19       The organizing staff are in the front of the
20   office.  And so they usually just pull one of the
21   organizers in.  And so Mercedes Bullock, for example,
22   and Yessica Hernandez are both very -- probably the most
23   sophisticated in Coordinated Entry.  Lukas Illa and
24   River Beck would help people as well.
25       But because Yessica sits on a -- she actually

---

Page 64

1    sits on the redesign oversight body for the City,
2    because Coordinated Entry is such a mess.  It's been
3    two years.  They're supposed to be making changes.
4        And Mercedes Bullock sits on the local homeless
5    coordinating board and shares the Coordinated Entry
6    subcommittee.
7        And so both of them have a little bit higher
8    level.  They're probably our biggest experts.  But
9    pretty much all the organizing staff or myself could
10   help somebody.
11   Q.  Would you or one of those organizing staff
12   always be there when the office is open?
13   A.  Someone would be there.  If for some reason
14   there was no organizers present, they would let them
15   know when the person could come back.
16   Q.  Are front desk staff involved in handing out the
17   various items that you mentioned, the survival gear or
18   clothing, water, or food?
19   A.  Yes.
20   Q.  Are those items just kept at the front desk?
21   A.  Depending.
22   Q.  What does that depend on?
23   A.  Depends on what we have and how -- and what the
24   purpose of it is for.  If it's supplies that we're going
25   to be giving out during the outreach, those are kept

---

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 10 of 39
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 65

1  inside the office.
2      If it's supplies that we're going to be giving
3  out to people that are walk-ins, that are heavier to
4  carry for outreach workers, like, clothing, we'll
5  typically have those in the front, and people can help
6  themselves to what they like.
7      Q.  There's a section on office heads-up after those
8  five bullet points.  This is on the bottom of page --
9  page 494.
10     It says, watch your belongings.  Things tend to
11 get stolen.
12     Have things been stolen from the Coalition's
13 offices?
14     A.  You know, these current offices, not as much.
15 But our last office on Turk Street was -- that we moved
16 out of there in 2018 was -- was a little wilder.
17     Q.  This directs the volunteers to not store
18 people's belongings for them; is that correct?
19     A.  Correct.  We had -- we're almost always storing
20 people's property.  We are right now, actually.  We're
21 not supposed to because it -- you know, it -- we don't
22 always have the space and that kind of thing.
23     But that was put in there because of a
24 particular incident where somebody stored property
25 without permission, and then some of that property

Page 66

1  disappeared.  And then they were very angry about it.
2      And so we just put this in here to prevent that
3  from happening.
4      Q.  Where does the Coalition store people's property
5  currently?
6      A.  Well, I -- again, we're not supposed to, but
7  I've noticed, for example, one of the staff is holding a
8  sleeping bag for somebody in their office, that the
9  person said, can I keep this here and come back?
10     We don't really have a means or a way to store
11 people's property.  So -- yeah, it's kind of a casual
12 decision that staff are making.
13     Q.  So it's up to staff whether or not they store a
14 particular person's property?
15     MS. SALZMAN:  Objection to form.
16     THE WITNESS:  Staff are not supposed to, but
17 they sometimes do.
18 BY MR. GEORGE:
19     Q.  How many items are currently stored right now at
20 the Coalition's offices?
21     A.  As far as I know, it's just that one sleeping
22 bag.
23     Q.  How does the Coalition track which items are
24 belonging to which person who stored them at the
25 Coalition?

Page 67

1      MS. SALZMAN:  Objection to form.
2      THE WITNESS:  We don't have a system for that.
3  BY MR. GEORGE:
4      Q.  Other than the one incident where you mentioned
5  someone's belongings were not there when they came to
6  get them, have there been other instances where someone
7  has stored their belongings at the Coalition and they
8  weren't able to get them back?
9      A.  Not that I know of.  And, yeah, just to add to
10 that, we don't have a locked place to put stuff.  That's
11 the issue.
12     Q.  So anything that would be stored at the
13 Coalition would be accessible to any person who's in the
14 Coalition's offices?
15     A.  Correct.
16     Q.  Will you please turn to page 1483.  This is the
17 third page of the document.
18     A.  Uh-huh.
19     Q.  This says, the Coalition -- this is the last
20 paragraph, the first sentence.
21     It says, the Coalition on Homelessness engages
22 in community organizing as its primary activity.
23     Is it accurate that that is the Coalition's
24 primary activity?
25     A.  It's one of our core activities, along with

Page 68

1  supporting unhoused people in individual advocacy
2  and drafting legislation and creating policy change and
3  so forth.
4      Q.  It's a -- you just described it as a core
5  activity.  Is it nonetheless also the primary activity
6  that the Coalition is engaged in?
7      MS. SALZMAN:  Objection.  Asked and answered.
8      THE WITNESS:  Do you want to expand on what you
9  think of as community organizing?
10 BY MR. GEORGE:
11     Q.  What is the definition of community organizing
12 that's meant by this document?
13     A.  So it's -- it's basically unifying people
14 together and getting information from folks about what
15 they would need to end their homelessness, and then
16 doing a number of different steps to make that happen.
17     And so that could be, you know, some of the core
18 support, individual support that we give individuals.
19 It could be giving input on the development of a policy
20 paper, working on trying to get that policy implemented,
21 identifying gaps in the system, and engaging in a number
22 of different tactics to effect change.
23     Q.  Does community organizing include distributing
24 resources?
25     A.  Yes.  That's an important part of engaging our

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 11 of 39

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 69

1  constituents so that they're able to participate.
2      Q.  Will you please look to the first paragraph on
3  this section under, what is community organizing?
4      A.  Uh-huh.
5      Q.  It says, community organizing is a process
6  through which people living in proximity to each other
7  are brought together into an organization that acts in
8  their shared self-interests.
9          It goes on to say, as opposed to direct service,
10 which is the charitable act of meeting needs by
11 distributing resources or advocacy, which is arguing for
12 a cause and is often one person helping someone else
13 directly by providing legal assistance.  Community
14 organizing attempts to address the root causes of the
15 problem.
16         Is it still your testimony that community
17 organizing includes distributing resources?
18         MS. SALZMAN:  Objection to form.
19         THE WITNESS:  Yes.  It's a core part because I
20 mean within that, you know, you're -- what we're trying
21 to do here is differentiate between the work of a
22 charity that, let's say, is distributing food, like
23 St. Anthony's.  And they are giving food on a day-to-day
24 basis, but they're not engaging at the same time on
25 trying to make sure that people don't have to line up to

Page 70

1  get free food.
2          And so we're really trying to differentiate here
3  so people understand that in community organizing, they
4  have much more of an equal seat at the table.
5          And as part of the community organizing process
6  and working with folks who are unhoused is our
7  constituency, providing support is a core activity.
8  BY MR. GEORGE:
9      Q.  So this describes community organizing as
10 opposed to direct service.  Are community organizing and
11 direct service two different types of activities?
12         MS. SALZMAN:  Objection.
13         THE WITNESS:  Looking again at those concentric
14 circles, you know, you would have -- basically,
15 there's -- there's direct service that's just direct
16 service and is not engaging in social change.
17         Community organizing crosses over into the
18 direct services.  And doing both is part of the process
19 of effecting change.
20         And that can be, you know, the individual
21 advocacy that happens on the street to make sure that
22 during an operation, someone doesn't have their property
23 confiscated or they get an appropriate shelter
24 placement, simultaneously working to change those
25 structures so that the City is doing a street response

Page 71

1  that is effective in moving the needle on homelessness.
2  BY MR. GEORGE:
3      Q.  I'm going to turn to the Coalition's members.
4  You can set this document aside.
5          The Coalition has members, correct?
6      A.  Correct.
7      Q.  How does the Coalition track its members?
8      A.  We do not have a formal database of members, but
9  we do have a number of different -- so we have a
10 workgroup list, we have an e-mail list, we have a --
11 notes that we're taking about different interactions and
12 reporting back.
13         So it's a -- more of an informal -- you know, of
14 course, our individual organizers have their contacts of
15 people they're in regular contact with and that
16 relationship building that occurs.
17     Q.  Is there any one single document that lists the
18 Coalition's members?
19     A.  No.
20     Q.  Is there any single database that lists the
21 Coalition's members?
22     A.  No.
23     Q.  Is there any single database that tracks the
24 Coalition's members?
25     A.  No.

Page 72

1      Q.  You mentioned a few different areas where -- a
2  few different documents, rather, where the Coalition's
3  members can be identified.
4          What is the e-mail list that you described?
5      A.  Well, we have the Human Rights workgroup list.
6  We have the Housing Justice workgroup list.  We have a
7  list of vendors that sell Street Sheets.  We have --
8  yeah.
9          So those -- we also have our -- sorry.  I call
10 it Monkey Mailer.  Our chimp mail list where we try to
11 make sure everybody goes on and then folks get the
12 Street Sheet regularly.
13         Yeah.  Those are some of them.  There may be
14 more.
15     Q.  What are the other ones, other than what you
16 just described, that would list the members of the
17 Coalition?
18     A.  Well, we have specific campaigns that we bring
19 in members on.  And so for example, we have the CART
20 campaign, which is the Compassionate Alternative
21 Response Team, where we developed a list of
22 recommendations instead -- as an alternative to sending
23 police in response to homeless complaints.  And that had
24 a number of folks that were involved.
25         And so depending on the issue we're working on,

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 12 of 39
Coalition on Homelessness, et al. v.                                Jennifer Friedenbach 30(b)(6)
City and County of San Francisco, et al.                                          February 25, 2025

Page 73

1 sometimes we also have -- we'll have break-off lists for
2 those people who are interested in that particular
3 topic.
4    Q. So in order to determine the members of the
5 Coalition, you would need to consult Human Rights
6 working group list, the Housing Justice working groups
7 list, the Street Sheet vendors, the chimp mail list, and
8 then the records for each of the various campaigns on
9 which members participated; is that correct?
10    A. Correct.
11    Q. Has the Coalition done that work to identify all
12 of its current members at any point in time?
13    A. We do not have a comprehensive list of members
14 because we have an informal membership model and, you
15 know, just -- we didn't have the time to do that.
16    Q. So the Coalition hasn't, then, created a single
17 database or single list of all of its members; is that
18 correct?
19       MS. SALZMAN: Objection. Asked and answered.
20       THE WITNESS: Correct.
21 BY MR. GEORGE:
22    Q. Earlier, you mentioned that a person becomes a
23 Coalition member by taking actions that are in
24 furtherance of the Coalition's mission; is that correct?
25    A. Correct.

Page 74

1    Q. At what point in a person's involvement do they
2 become a member?
3       MS. SALZMAN: Objection to form.
4       THE WITNESS: Because our constituency -- it's
5 very different than different organizations -- are
6 unhoused, many of them, we have -- we deliberately have
7 created an informal membership structure. And so we
8 define it as people being involved in our work.
9       So once they are involved in our work, they are
10 members in the various ways I described earlier.
11 BY MR. GEORGE:
12    Q. Is there a moment at which the Coalition
13 recognizes them as a member, meaning, sends them
14 something to say, you are a member of the Coalition?
15    A. No. Because -- yeah. Because of our informal
16 structure and we don't have dues, there's not really --
17 yeah. So we don't do that, no.
18       But once they come to a meeting and they're part
19 of the workgroup, you know, they're clearly a member.
20 When they start engaging in the work, they're a member.
21    Q. Does the Coalition track the reasons why a
22 person becomes a member?
23    A. No.
24    Q. Can a current member stop being a member of the
25 Coalition?

Page 75

1    A. Yeah. Due to the nature of our membership,
2 people kind of fluctuate from active involvement to not
3 active. And so I think that's a better differentiation
4 is thinking about, you know, active members.
5       We certainly have a lot of members who are
6 inactive. I mean, certainly someone can communicate,
7 hey, I don't want anything to do with you all, or
8 someone moves away. Then they would no longer be a
9 member.
10    Q. Does the Coalition track members' inactivity,
11 such that it defines them as inactive members?
12    A. We don't have -- do a formal tracking of that,
13 no.
14    Q. Does the Coalition track its members' activity
15 at all?
16       MS. SALZMAN: Objection to form.
17       THE WITNESS: So we have -- if they come to
18 meetings, then they're -- then they're signing in that
19 way.
20       We sometimes track participation at -- you know,
21 in trainings and so forth. We track -- it's often
22 reflected in our notes at the workgroup meetings.
23       So those are the variety of ways. And probably
24 some other ways.
25 ///

Page 76

1 BY MR. GEORGE:
2    Q. If you wanted to distinguish -- if you wanted to
3 determine whether or not a member was an inactive or
4 active member, are those the types of documents you
5 would consult to determine their level of activity?
6    A. We -- we don't -- since we're not keeping a
7 formal list, it's -- we're constantly reaching out to
8 people and trying to engage them in whatever activity is
9 happening. And they are either engaging or not.
10       And if they're engaging, they're active. If
11 they're not, then they're inactive at that particular
12 moment, as expected because of the, you know, the crisis
13 that unhoused people are in.
14    Q. Would responding to one of the Coalition's
15 e-mails to its -- say, the mail chimp list, count as
16 engaging?
17    A. Well, that would depend on what the response is.
18 So if they get something and they respond and they say,
19 hey, I want to -- can you give -- can I come by the
20 office and pick up flyers to distribute to folks and
21 help -- you know, and help turn people out for that
22 particular event, I would say yes.
23       If it's, thanks for your great work, I would say
24 no.
25    Q. Is -- does the Coalition actively track in a

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

---

Page 77

1  single database or document the level of activity that
2  its membership is engaged in?
3      A. No.
4      Q. Does the Coalition track people who have stopped
5  being members, meaning, a list of people who are no
6  longer members of the Coalition?
7      A. No, we don't. But people can unsubscribe to the
8  variety of lists that they're on. And we do not track
9  that. It happens automatically.
10     Q. Does the Coalition track why people who are not
11  yet members don't become members of the Coalition?
12     A. No.
13     Q. How many members does the Coalition currently
14  have?
15     A. Well, since we don't keep a specific list, I
16  would have to estimate. And it's a lot, between Street
17  Sheet vendors, Housing Justice, Human Rights, people are
18  involved in the other side campaigns.
19         But definitely would be in the hundreds, if not
20  much higher.
21     Q. Does the Coalition track the housing status of
22  its members?
23     A. Not in a single place. But because we're
24  working with them, we usually know their housing status,
25  but not always, because folks go so frequently in and

---

Page 78

1  out of -- you know, it's not a trait, homelessness.
2         It's a -- a status at a particular time.
3      Q. Does the Coalition have members who are
4  permanently housed who haven't been formerly homeless or
5  are not at immediate risk at becoming homeless?
6      A. Yes.
7      Q. Do you have an estimate on the percentage of the
8  members who are housed with some level of permanence?
9      A. Probably between 30 and 50 percent. Probably
10  more -- closer to the 30 side.
11     Q. And what is that estimate based on?
12     A. That's based on, kind of, a bird's-eye view of
13  the involvement in all the different areas. So for
14  example, our vendors are primarily unhoused or lived
15  experience. I would say probably 100 percent. But
16  there may be some exceptions in there.
17         You know, so -- and then looking at each of the
18  categories that way, yeah.
19     Q. I'm sorry. I didn't mean to interrupt.
20         Those are Street Sheet vendors? Is that what
21  you're discussing there as vendors?
22     A. Yeah. Yeah. That was just an example of, kind
23  of, a bird's-eye view.
24     Q. How many current Street Sheet vendors are there?
25     A. So kind of lost a lot of vendors during the

---

Page 79

1  pandemic. Actually, a lot passed away. I think we have
2  right now between, like, 40 and 70.
3      Q. Does the Coalition ask its members about their
4  experience with homelessness in the past?
5      A. Not in a formal way. Occasionally -- I mean,
6  yeah. Not in a formal way.
7      Q. Do members have any particular rights in
8  directing the Coalition's activities?
9      A. Yes.
10     Q. And what are those rights that the members have
11  to direct the Coalition's activities?
12     A. So our structure is bottom up. And so in terms
13  of what we're working on really comes out of the
14  outreach that we're conducting to unhoused people.
15         So at the most fundamental level, homeless
16  people are directing our advocacy agenda. They also --
17  our internal budget for the Coalition is a collective
18  conversation, and we have open meetings to discuss
19  those. So members are welcome if they wanted to be
20  involved in that.
21         And then they're also -- yeah. And then
22  outreach is sometimes -- that information is collected
23  in more formal ways, through surveys and whatnot, and
24  sometimes in more informal ways.
25     Q. Do members vote for the members -- do Coalition

---

Page 80

1  members vote for members of the board of directors?
2         MS. SALZMAN: Objection. Asked and answered.
3         THE WITNESS: You mean, vote or have input?
4  BY MR. GEORGE:
5      Q. I mean, vote for in order to put them on the
6  board.
7      A. No, we do not. Because of the nature of our
8  constituency, we have an informal structure that -- that
9  does not include a formal voting of the board of
10  directors.
11         But they have input. And so we often have
12  from -- representation from the working group on the
13  board of directors. And if a seat is open, then we'll
14  bring that to the workgroup, which is open to all
15  members, unhoused or housed alike.
16         And they can give input on nominating someone or
17  thinking about who they want. If there was multiple
18  people, then there could be an instance where a vote
19  took place. We haven't had multiple people come up in
20  recent history, that I can recall.
21     Q. Are there any unhoused members currently on the
22  Coalition's board of directors?
23     A. Currently unhoused?
24     Q. Correct.
25     A. No. But half our board has lived experience

---

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

---

Page 81

1  with homelessness.
2      Q.  What's the board member's most recent experience
3  of homelessness, meaning, how many years has it been
4  since a current board member was homeless?
5      A.  Probably -- probably more than five years.
6      Q.  When was the last time that the Coalition's
7  board had a presently unhoused member on it?
8      A.  Because people come in and out of homelessness,
9  just trying to line up, probably -- probably about
10  seven years ago.
11      Q.  Who was that person?
12      A.  Jesus Perez.
13      Q.  Was Jesus Perez on the Human Rights working
14  group before being a board member?
15      A.  Jesus was on the -- was Housing Justice.
16      Q.  Is Jesus Perez currently a board member?
17      A.  No.  He had a stroke and heart attack and tried
18  to hang on for a while, but...
19      Q.  Sorry to hear that.
20      A.  Yeah.
21      Q.  Do unhoused members make decisions about who is
22  employed at the Coalition?
23      A.  So we have -- we have hiring committees.  And
24  members and volunteers are welcome to join those when
25  there's an open position.

Page 82

1      Q.  And do the hiring committees have input on who
2  is hired?
3      A.  The hiring committee decides who gets hired.
4      Q.  Who was the last person that was hired by a
5  hiring committee?
6      A.  I believe it was River Beck.
7      Q.  And were there unhoused members of the Coalition
8  who participated on that hiring committee that hired
9  River Beck?
10      A.  I believe that -- I believe no one -- no one
11  chose to be on that committee from the membership.  I
12  believe the committee was all staff.  I believe we did
13  have a -- I have to double-check, but I believe we had
14  an unhoused staff person that was on that committee.
15      Q.  When was the last committee that had an unhoused
16  member on it -- not a staff member, but an unhoused
17  Coalition member that hired a Coalition employee?
18      A.  I can't remember.  Yeah.
19      Q.  Did unhoused members of the Coalition vote on
20  whether the Coalition would pursue this litigation?
21      A.  So it -- it's a bottom-up process, so we were
22  doing a lot of outreach to unhoused people.  I mean,
23  this is a long -- a long story.
24          But we -- in outreach, it kept coming up that
25  people were having their property confiscated illegally,

Page 83

1  as well as some of the other issues.  And so as it came
2  that there was a possibility of doing lawsuits, those
3  conversations did take place with unhoused people in
4  terms of their opinion.
5          And then it went to workgroup for a discussion
6  of whether we should do the lawsuit.  And then it went
7  to the board.
8          And so at all of those stages, people with lived
9  experiences of homelessness or who were actively
10  homeless could weigh in.
11      Q.  Was there a presentation to the board about this
12  litigation before the vote on the litigation?
13          MS. SALZMAN:  Objection to form.  You mean, the
14  board vote?
15          MR. GEORGE:  Yeah.  Correct.  Let me say it this
16  way.  Thank you.
17      Q.  Was there a presentation to the Coalition board
18  of directors about this litigation before they voted on
19  the litigation?
20          MS. SALZMAN:  I'm just going to instruct the
21  witness that to the extent lawyers made a presentation
22  to the board, the contents of that presentation and
23  discussions with the lawyers would be privileged.
24          You can answer whether such a presentation was
25  given, but don't discuss the contents if it was given by

Page 84

1  the lawyers.
2          THE WITNESS:  Yes.  I believe a presentation was
3  given.
4  BY MR. GEORGE:
5      Q.  Did unhoused members participate in that
6  presentation?
7      A.  Well, you have the board members with the lived
8  experience.  And then the process that the lawsuit was
9  developed would have been shared.  And that would have
10  included input from unhoused members.
11      Q.  Were there any -- were there any individual
12  unhoused members present for the presentation to the
13  board regarding this litigation before the board voted
14  on it?
15      A.  No.
16      Q.  Did any unhoused members enter into an agreement
17  with the Coalition to represent them in this litigation?
18          MS. SALZMAN:  Objection to form.
19          THE WITNESS:  I'm not exactly sure what you're
20  asking.  You mean, like -- I mean, because there was a
21  whole bunch of unhoused people that were plaintiffs.
22  And then the declarations, all of those are signed
23  documents.  Is that what you're referring to?
24  BY MR. GEORGE:
25      Q.  I mean, is there any contact between the

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 15 of 39

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 85

1 Coalition and any unhoused members for the Coalition to
2 represent them in this litigation, to act on their
3 behalf?
4         MS. SALZMAN: Objection to form.
5         THE WITNESS: No. Not in the way you're
6 describing.
7 BY MR. GEORGE:
8    Q. Is there an informal agreement for the Coalition
9 to represent any unhoused members in this litigation?
10   A. Yeah. I mean, we try to structure ourselves so
11 that we're representatives of unhoused community members
12 through doing a lot of outreach and having conversations
13 about what's happening for going in the wrong direction.
14        We look for those threads. And so we can -- we
15 can represent our constituency as best as we can.
16   Q. Is that a legal agreement with those members to
17 represent them?
18        MS. SALZMAN: Objection.
19        THE WITNESS: A legal -- not a legal agreement
20 with the Coalition, no.
21 BY MR. GEORGE:
22   Q. So there's no legal agreement between the
23 Coalition and any of its unhoused members to represent
24 the unhoused members in this litigation?
25        MS. SALZMAN: Objection.

Page 86

1         THE WITNESS: No.
2 BY MR. GEORGE:
3    Q. Other than the ground-up process that you
4 described, do unhoused members choose which legal
5 matters the Coalition proceeds with?
6    A. Well, when it -- you know, so the ground-up
7 part -- you said, other than, but we have the workgroup
8 where it's opened to unhoused members where decisions
9 are made.
10   Q. Is the workgroup part of that ground-up process?
11   A. Yeah. The idea is that the workgroup members
12 conduct outreach themselves, and so they're informed
13 what they're hearing from unhoused people because
14 unhoused people, being in crisis, they can't necessarily
15 always go to meetings.
16        They're having to deal with where to sleep,
17 where to get food, et cetera.
18        So that's why we structure it that way.
19   Q. I'm going to introduce Exhibit 146.
20        (Deposition Exhibit 146 marked for
21        identification.)
22 BY MR. GEORGE:
23   Q. This is an excerpt from a longer document, which
24 is why it looks, sort of, like it starts in the middle.
25 But can you turn to the page that's marked one, which is

Page 87

1 just the second page of the document, after you've had a
2 chance to look through it?
3    A. This one?
4    Q. Yeah. Do you recognize this document?
5    A. Yes.
6    Q. This is the declaration of the Coalition on
7 Homelessness that was submitted in this case on
8 September 27th, 2022; is that correct?
9    A. Yes.
10   Q. Do you see your signature on the last page of
11 this, the one that is marked 1-8?
12   A. I'm sorry. I got distracted for a second.
13   Q. No problem. Do you see your signature on the
14 last page of this document? It's the page marked 1-8.
15   A. Yeah.
16   Q. You're familiar with this document?
17   A. Yes.
18   Q. Did you draft this document?
19   A. I verbally gave information, and I think
20 somebody else typed it up, and then I reviewed it.
21   Q. Who typed it up?
22   A. It might have been Zal Schroff.
23   Q. Who was that? What was the name?
24   A. Zal Schroff, it might have been. Yeah. I don't
25 remember.

Page 88

1    Q. Zal was a lawyer for the Coalition, correct?
2    A. Yes. Lawyers' Committee.
3    Q. Do you know if this was typed up by anyone who
4 was not a lawyer on this case?
5    A. I -- I don't remember.
6    Q. Do you know if anyone other than Zal contributed
7 to this document?
8         MS. SALZMAN: Objection.
9         THE WITNESS: I'm not sure.
10 BY MR. GEORGE:
11   Q. At the end here on page 1-8, just above your
12 signature, it says, I have reviewed the information
13 contained in this declaration by telephone.
14        What does that mean?
15   A. I believe it was read to me. I don't know why I
16 didn't -- was I out of town maybe and didn't have a
17 computer and they had to read it to me? I'm not sure,
18 honestly.
19        But I did review the document, yeah.
20   Q. You reviewed it in a sense that someone read it
21 to you by telephone; is that correct?
22   A. I -- I don't -- I think so.
23   Q. Did you dictate this declaration to someone over
24 the phone?
25   A. I don't remember.

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 16 of 39
Coalition on Homelessness, et al. v.                    Jennifer Friedenbach 30(b)(6)
City and County of San Francisco, et al.                           February 25, 2025

Page 101

1     MS. SALZMAN: Objection to form.
2     THE WITNESS: Well, I -- like, I'm getting paid
3  to sit here. So, you know, there's some staff time
4  involved.
5  BY MR. GEORGE:
6     Q. Is the Coalition spending any money on lawyers
7  for this litigation?
8     A. No.
9     Q. Is the Coalition paying any of the filing fees
10 that are associated with this litigation?
11    A. No.
12    Q. Is it paying any of the litigation costs, like,
13 for depositions or other types of litigation expenses?
14    A. No.
15    Q. Are the members contributing towards the funding
16 of this litigation in any way?
17    A. Well, members are providing declarations, and so
18 they're -- I guess if time is money, then yes. But
19 not -- they're not giving financially.
20    Q. Other than time that they may provide or for
21 their own participation in the litigation, are they
22 providing any financial support for the litigation?
23    A. No.
24    Q. By "they," I mean Coalition members. Did you
25 understand that when I said that?

Page 102

1     A. (Witness nods head up and down.)
2     Q. That's a yes? Sorry.
3     A. Yes.
4     Q. Thanks. The head shaking is hard to read.
5     A. Yeah. Yeah. Yeah.
6     Q. Absolutely. You're doing great on that.
7        This case is not being brought to pursue damages
8  or compensation; is that correct?
9     A. Correct.
10    Q. Did the members get to decide on why this case
11 was being pursued not to pursue damages or compensation?
12       MS. SALZMAN: Objection to form.
13       THE WITNESS: The members had input on, you
14 know, this -- bringing up this issue and whether to
15 pursue it. I don't know if outside of the workgroup, if
16 we had a specific conversation with damages.
17       We didn't do a survey or anything like that on
18 it.
19 BY MR. GEORGE:
20    Q. So the Coalition didn't survey its unhoused
21 members to determine whether or not they would want this
22 case to be brought for compensation?
23    A. Correct.
24    Q. The discussion of what to seek in the litigation
25 was limited to the Human Rights working group; is that

Page 103

1  correct?
2     A. Well, the what to seek in the litigation was
3  determined by the experiences of unhoused people that
4  was uncovered during outreach.
5        So, you know, the property confiscation, for
6  example, was so overwhelming and getting worse and
7  worse, and so we -- we were hearing from our members
8  that we needed to do something about it. And many
9  brought up the idea of doing a lawsuit. You know, can't
10 you sue the City? Is this legal? That was a frequent
11 thread.
12       And we said, well, we need to pursue other
13 things before that. And we did. And then we pursued
14 litigation as a last resort.
15    Q. And did those members who asked about suing the
16 City, did they -- were they consulted about what the
17 Coalition should sue for, meaning, for damages or just
18 an injunction?
19    A. Not -- not on those, kind of, technical topics,
20 but on, like, what the -- what is the issue that needs
21 to be addressed.
22    Q. I want to turn back to -- this is Exhibit 146.
23 This is your declaration that we were looking at
24 before -- excuse me -- before the break.
25       Can you turn to paragraph 8, please?

Page 104

1     A. Uh-huh.
2     Q. Towards the end of this paragraph -- this is on
3  page 5 of 51. Towards the end of paragraph 8, it
4  discusses Coalition's connection with about 150 to
5  200 unhoused people every week.
6        How is that number calculated?
7     A. Yeah. So it's estimated. And so between the
8  different areas of work, we're doing outreach and
9  shelters at drop-ins in street locations and other
10 areas, sometimes parks where unhoused people congregate.
11       And it's an estimate based on those collective
12 experiences.
13    Q. Are these -- so this is outreach -- in-person
14 outreach to shelters; is that correct?
15    A. Correct.
16    Q. And outreach on the street; is that correct?
17    A. Yeah. And drop-in centers and churches and, you
18 know, so...
19    Q. So this 150 to 200 is the in-person outreach
20 that's done by the Coalition on the streets; is that
21 right?
22    A. Yes.
23    Q. And then it next mentions an e-mail distribution
24 list, and it includes about 3,000 unhoused people and
25 volunteers.

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 17 of 39

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 113



10    Q. Did the Coalition provide any direct services to
11 Toro?
12    A. Well, we advocated for him to get placements
13 multiple times.
14    Q. Did it provide him -- did it -- did the
15 Coalition ever provide him a tent?
16    A. I don't remember.
17    Q. Did the Coalition ever provide him a sleeping
18 bag?
19    A. I don't remember.
20    Q. Did the Coalition ever do a homeless
21 verification for Toro?
22    A. I don't remember.
23    Q. Would the Coalition have a record of having done
24 a homeless verification for Toro if it had done one?
25    A. Not if it was back in -- I mean, if it was over,

Page 114

1 like, the past year, yes. But we don't -- there's not a
2 reason for us to keep the homeless verifications beyond
3 that.
4    Q. Did the Coalition ever store Toro's property at
5 the Coalition's headquarters?
6    A. We may have. I'm not sure.
7    Q. Is Sarah Cronk a member of the Coalition?
8    A. Yes.
9    Q. When did she become a member?
10    A. I don't know the exact date, but I think she was
11 active with us in -- I'm just going to approximate --
12 2019.
13    Q. Is 2019 the time period when the Coalition first
14 considered her to be a member?
15    A. I don't know for sure.
16    Q. Would you be able to consult any document that
17 the Coalition has to determine when she became a member?
18    A. That would be difficult. I don't think so.
19    Q. Did the Coalition consider her a member before
20 this litigation was filed?
21    A. Yes.
22    Q. And why was that? Why did it consider her to be
23 a member before this case was filed?
24    A. She was active in -- well, as I recall, she was
25 active in speaking to the media and press conferences,

Page 115

1 informing us of stuff that was happening on the streets.
2    Q. In the media presentations that she was giving
3 or her discussions with the media, was she acting on
4 behalf of the Coalition in those?
5    A. Well, yeah. If it's a Coalition event, I would
6 say that yes. But we don't -- like, she's also talking
7 about her own personal experience.
8    Q. Which particular events was she involved in
9 where she was discussing --
10    A. I don't remember exactly, but we had some press
11 conferences down in the Mission area that -- or a press
12 conference that I believe she spoke at or was involved
13 in helping organize.
14    Q. When was that?
15    A. I think that was 2019, but I'm not totally sure.
16    Q. What was that press conference covering, or what
17 was the substance of it?
18    A. I believe it was about the -- some of the City's
19 actions.
20    MS. SALZMAN: Just a reminder to let him finish
21 asking the question before you start speaking.
22    THE WITNESS: Okay.
23    MS. SALZMAN: I know it's starting to go long.
24 We have to be careful with that or Cynthia will have a
25 hard time.

Page 116

1 BY MR. GEORGE:
2    Q. The goal is to have a very clear transcript, so
3 that will help out. Thank you. I appreciate that.
4    Does the Coalition have records of that press
5 conference that was held in 2019 that Sarah Cronk spoke
6 at?
7    A. I don't know.
8    Q. Would there have been at the time materials that
9 were created for that press conference?
10    A. Probably a press release. But this is -- this
11 is a very vague memory, so I'm kind of -- I would have
12 to go back and look, yeah.
13    And it may not have been a press conference. It
14 might have been a rally or something like that. But I
15 just remember her being involved in some kind of thing.
16    Q. Since that event in 2019, have there been other
17 instances where Sarah Cronk has spoken to the media on
18 behalf of the Coalition?
19    A. I'm not sure.
20    Q. Has she participated in any of the meetings
21 like, for example, the Human Rights working group
22 meeting?
23    A. No.
24    Q. Has she participated in any other meetings that
25 the Coalition coordinates?

Case 4:22-cv-05502-DMR   Document 366-7   Filed 04/17/25   Page 18 of 39
Coalition on Homelessness, et al. v.                                                    Jennifer Friedenbach 30(b)(6)
City and County of San Francisco, et al.                                                     February 25, 2025

Page 117

1    A. Probably some street-based meetings that we were
2  having, but I can't be sure of that.
3    Q. What do you mean by that, "street-based
4  meetings"?
5    A. Well, sometimes we'll have -- we'll kind of go
6  to areas where there's a lot of homeless people and then
7  have the meeting there to discuss what -- you know, what
8  we're working on, what they want us to work on, that
9  kind of thing.
10    Q. Is there any record of those meetings that the
11  Coalition has?
12    A. I'm not sure.
13    Q. Has Sarah Cronk contributed any content to the
14  Street Sheet?
15    A. I'm not sure.
16    Q. Has she participated in any Coalition activities
17  since this lawsuit was filed, other than her
18  participation in the lawsuit itself?
19    A. I'm not sure.
20    Q. Is there any member-specific record that the
21  Coalition has, meaning, where you could look up a
22  particular member and know what activities they are
23  participating in?
24    A. No.
25    Q. Has the Coalition provided any tents to

Page 118

1  Sarah Cronk?
2    A. I'm not sure.
3    Q. Has it provided her a homeless verification
4  form?
5    A. Not sure.
6    Q. Has it provided her any survival gear?
7    A. I'm not sure. Likely.
8    Q. Why is that likely?
9    A. Well, because with us having a relationship with
10  her, you know, usually people are like, I need
11  blah-blah-blah, you know. And so it's very common for
12  our members to have particular needs.
13        And if they're subject to the property
14  confiscation, it's pretty common for our staff to -- our
15  staff to, you know, try to secure those needs for them.
16    Q. Sarah Cronk is now permanently housed, correct?
17    A. That's what I heard. I don't have personal
18  knowledge of it.
19    Q. Would she have gone through the Coordinated
20  Entry system to get her current housing?
21    A. She likely would have, yeah.
22    Q. Did the Coalition assist her in the Coordinated
23  Entry process that she went through?
24    A. I'm not sure.
25    Q. Has Sarah Cronk ever voted on any of the

Page 119

1  Coalition's activities?
2    A. I don't think so.
3    Q. Does --
4    A. I'm not sure.
5    Q. Sorry. I didn't mean to cut you off.
6        Does the Coalition have any record of her
7  participation on any votes?
8    A. I'm not sure.
9    Q. Is the Coalition acting on Sarah Cronk's behalf
10  in this litigation?
11        MS. SALZMAN: Objection.
12        THE WITNESS: Well, in that she is a victim of
13  the City operations and was negatively hurt by that, and
14  our whole, you know, work is around trying to have a
15  decent street response, then I would say yes, if that's
16  what you mean.
17  BY MR. GEORGE:
18    Q. Has the Coalition discussed with Sarah Cronk
19  acting on her behalf in this litigation?
20    A. I'm sure that the -- there was conversations
21  that took place with her explaining what was happening
22  and how the lawsuit would proceed.
23        My understanding is it weren't -- you know,
24  organization Plaintiff and then there's individual
25  plaintiffs, et cetera.

Page 120

1    Q. Has Sarah Cronk, as a Coalition member, ever
2  provided her consent for the Coalition to act on her
3  behalf in this lawsuit?
4        MS. SALZMAN: Objection.
5        THE WITNESS: Well, I mean, she would have
6  consented -- you know, any involvement in the lawsuit,
7  she was consenting to in terms of -- it's very clear
8  that the Coalition on Homelessness is an organizational
9  Plaintiff.
10        In terms of a piece of paper to sign that says,
11  Coalition on Homelessness will act on your behalf, no.
12  BY MR. GEORGE:
13    Q. By -- you said participation in the lawsuit. Do
14  you mean her individual participation in the lawsuit as
15  a plaintiff? Is that the participation you're referring
16  to?
17    A. Yeah. Any information provided, yeah.
18    Q. Any information provided meaning, like, the
19  declarations that she provided?
20    A. Yeah.
21    Q. Is Joshua Donohoe a member of the Coalition?
22    A. Yes. I would say he is.
23    Q. And when did he become a member?
24    A. I -- I believe he was active in that same time
25  period, 2019. Yeah. But I don't have exact -- I don't

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 19 of 39
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.
Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 125

1    A. Yes.
2    Q. What activities is he currently engaged in that
3  make him a member?
4    A. I believe that he also acts as an informant to
5  the organization on what's happening. And -- yeah.
6  And -- yeah.
7    Q. Would his informing be recorded in the same
8  style as Mr. Donohoe's, meaning, potentially in the
9  Human Rights working group notes, but not necessarily?
10    A. Yes.
11    Q. When did Mr. Martinez first become a member?
12    A. I'm not sure.
13    Q. Was he a member at the time this lawsuit was
14  filed in September of 2022?
15    A. Yes.
16    Q. How do you know that?
17    A. Because -- I know that because he was involved
18  in our work at that point and was involved in a lot of
19  discussions around what was happening on the street, was
20  informing us about City operations.
21    Q. In addition to his discussions and his
22  informing, was there any other Coalition activities that
23  he was involved in at that time in September of '22?
24    A. I believe there was, but I'm not sure exactly
25  what.

Page 126

1    Q. Would his other involvement be recorded in any
2  documents that the Coalition has?
3    A. I don't -- I don't know.
4    Q. Did Mr. Martinez attend any of the Human Rights
5  working group meetings?
6    A. I'm not sure.
7    Q. Did he attend any of the other meetings that the
8  Coalition has?
9    A. Probably some street-based stuff that happened,
10  yeah.
11    Q. Does the Coalition have any record of those
12  street-based meetings with Mr. Martinez that may have
13  happened?
14    A. I don't know.
15    Q. Did Mr. Martinez contribute any content to the
16  Street Sheet?
17    A. I'm not sure.
18    Q. Is there a way to search for contributors to the
19  Street Sheet?
20    A. The Street Sheets are all online. And I don't
21  know if the way it's organized, it's searchable or not.
22  It may be.
23    Q. Does the Coalition have a database of all the
24  contributors who have contributed to the Street Sheet,
25  say, since 2019?

Page 127

1    A. No.
2    Q. Has the Coalition provided Mr. Martinez any
3  tents?
4    A. I'm not sure. Again, you know, after a property
5  confiscation, it very well could have.
6    Q. Is there any record of who receives a tent from
7  the Coalition?
8    A. No.
9    Q. If a person comes into the Coalition's offices
10  and gets a particular item given to them by the
11  Coalition, is there any record of that?
12    A. No. We're way too busy for that.
13    Q. Has the Coalition done any homeless verification
14  forms for Mr. Martinez?
15    A. I'm not sure.
16    Q. Has the Coalition assisted Mr. Martinez in the
17  Coordinated Entry process?
18    A. I'm not sure.
19    Q. Does the Coalition keep records of who it
20  assists in the Coordinated Entry process?
21    A. No, it doesn't.
22    Q. Has the Coalition provided Mr. Martinez any
23  medical devices?
24    A. I don't -- I don't know.
25    Q. Does the Coalition provide people who live on

Page 128

1  the street any medical devices?
2    A. Occasionally, you know, we'll connect people
3  with walkers, with somebody from DPH, Martinez or Tom
4  Waddell or somebody like that.
5        Medical devices, I'm not sure exactly. Narcan,
6  we certainly give that to folks. I'm not sure exactly
7  what you mean by "medical devices."
8    Q. So the Coalition distributes Narcan to unhoused
9  people and others?
10    A. Yes.
11    Q. If a person needed, say, a wheelchair, and it
12  came to the Coalition, would the Coalition provide them
13  a wheelchair directly or would it refer them to an
14  entity that provides wheelchairs?
15    A. Very unlikely we'd have a wheelchair, but we'll
16  call around and try to secure one for them.
17    Q. Is that the same with crutches?
18    A. Very unlikely we have crutches in the office.
19  Same way, we would call around.
20    Q. And a prosthetic -- I assume the Coalition
21  doesn't have any prosthetics to provide to people?
22    A. No. I think those are highly specialized.
23    Q. Does the Coalition provide any prescription
24  medicine to any unhoused people?
25    A. No. Just the Narcan.

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 20 of 39
Coalition on Homelessness, et al. v.                                    Jennifer Friedenbach 30(b)(6)
City and County of San Francisco, et al.                                          February 25, 2025

Page 129

1    Q.  Other than the Narcan, does the Coalition
2  provide any what I call over-the-counter medication to
3  individuals?
4    A.  Not typically.  But, like, if someone came up
5  and said, do you have aspirin, I've certainly given that
6  out.
7    Q.  Sure.
8    A.  And sometimes -- depending on how good our first
9  aid kit -- supplies go pretty quickly.  But people come
10  to the office, I need this.  If someone is on outreach
11  and they have it with them, they'll give it to them.
12    Q.  Is the Coalition regularly in the practice of
13  providing any type of medication or medical devices to
14  people?
15    A.  Beyond Narcan, that's not one -- that's not a
16  regular thing, no.
17    Q.  Okay.  Did Mr. Martinez ever attend any meetings
18  at the Coalition?
19    A.  I'm not sure.
20    Q.  When was the last time that he participated in a
21  Coalition activity?
22    A.  I'm not sure.
23    Q.  What was that activity that he last participated
24  in?
25    A.  I'm not sure.

Page 130

1    Q.  Did the Coalition obtain Mr. Martinez's consent
2  to act on his behalf in this litigation?
3        MS. SALZMAN: Objection to form.
4        THE WITNESS: Yeah.  I -- again, there was not,
5  like, a thing that says the Coalition on Homelessness is
6  going to represent me.
7  BY MR. GEORGE:
8    Q.  Is his -- is the engagement on consent with him
9  the same as it was for Sarah Cronk that we discussed?
10    A.  Yes.
11    Q.  And is that true for all of the individual
12  plaintiffs in this litigation?
13    A.  Yes.
14    Q.  If I say the name, Melodie, to you, do you know
15  who I'm referring to?
16    A.  Yes.
17    Q.  You don't have to disclose it, but do you know
18  Melodie's last name?
19    A.  I do not.  She's kind of like Prince, I think.
20    Q.  Prince being famous for his single name like
21  Madonna, correct?
22    A.  Right.
23    Q.  I don't have a deposition topic to refer to for
24  that question, but I hope it will be allowed.
25        The Melodie that I'm speaking about lived in the

Page 131

1  Bayview in an RV.  Is that the Melodie that you
2  understand to be the Melodie that we're talking about?
3    A.  Yes.
4    Q.  I just want to be sure that we're talking about
5  the same person since she uses her single name.
6        Is Melodie a member of the Coalition?
7    A.  Yes.
8    Q.  When did she become a member of the Coalition?
9    A.  It's been a long time.  I'd have to look back.
10  At least a decade or more.
11    Q.  So since approximately 2015, she's been a
12  member?
13    A.  I believe so.
14    Q.  How did she become a member of the Coalition?
15    A.  I believe Ms. Cutler met her on outreach.  And
16  she started coming to meetings and being involved in
17  giving feedback and so forth.
18    Q.  And Ms. Cutler is Kelley Cutler?
19    A.  Correct.
20    Q.  And would that have been in approximately 2015?
21    A.  Yes.  I believe it was when Ms. Cutler was still
22  volunteering.
23    Q.  Was Melodie a member of the Coalition in
24  September of '22?
25    A.  Yes.

Page 132

1    Q.  What actions was she taking at that time that
2  made her a member?
3    A.  She was coming to meetings.  She was going to
4  hearings, mostly at the SFMTA.  And she was -- I believe
5  she might have been meeting with some policymakers.
6    Q.  Has she, Melodie, attended the Human Rights
7  working group meetings?
8    A.  Yes.
9    Q.  And does she vote for any of the Coalition's
10  actions?
11    A.  If there's a vote that takes place in the
12  workgroup meeting, yes.
13    Q.  Would her participation in the workgroup
14  meetings be reflected in the meeting notes that we've
15  been discussing?
16    A.  It should be.
17    Q.  Has she contributed to the Street Sheet?
18    A.  She may have.
19    Q.  Do you know one way or the other whether she
20  has?
21    A.  I'm just trying to think if she put in a poem or
22  something.  I kind of have a vague memory, but I'm not
23  sure.
24    Q.  Has Melodie ever claimed to the Coalition or
25  anyone working on its behalf that she has dementia?

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 137

1    A.  No.  I mean, well, if someone has a substance
2  use disorder, then, you know -- and it's obvious to us,
3  then we'll engage in conversations about, you know, any
4  kind of support that they need to address that medical
5  condition.
6    Q.  Other than potentially connecting someone to
7  resources for a substance use disorder, does the
8  Coalition keep tabs on any of its members' drug use?
9    A.  You mean, like, keep a log on when they use
10  drugs?  I'm kind of confused by the question.  Sorry.
11    Q.  It's all right.  Does the Coalition have
12  knowledge about its members' drug use, other than when
13  they approach the Coalition for help with a substance
14  use disorder?
15    MS. SALZMAN:  Objection to form.
16    THE WITNESS:  Well, if someone is clearly
17  intoxicated, then we're not going to have a serious
18  conversation with them.
19    Same with if they were in a psychiatric crisis
20  or something like that.  It's just impossible to do.
21  BY MR. GEORGE:
22    Q.  If a Coalition member was using drugs privately
23  in their tent, would the Coalition know about that if
24  they weren't there?
25    MS. SALZMAN:  Objection.

Page 138

1    THE WITNESS:  Well, not unless they said
2  something.  Or -- yeah.  Like I said, if someone is
3  clearly intoxicated, then you pick a different time to
4  have a conversation.
5  BY MR. GEORGE:
6    Q.  Is -- let me ask you this first because I want
7  to pronounce this correctly.
8    Are you familiar with Shyhyene Brown?
9    A.  Uh-huh.
10    Q.  How do you pronounce -- say Shyhyene's first
11  name?
12    A.  Shyhyene Brown.
13    Q.  Thank you.  Is Ms. Brown currently a member of
14  the Coalition?
15    A.  Yes.
16    Q.  When did Ms. Brown become a member?
17    A.  She's been around for a long time.  I'm going to
18  safely say, 2018.  But it was probably earlier than
19  that.
20    Q.  What -- sorry.  I didn't mean to cut you off.
21    What participation did she engage in that made
22  her a member?
23    A.  She wrote for Street Sheet.  She would come to
24  meetings.  She participated in speaking to the media
25  and, like, being involved with different actions,

Page 139

1  distributing flyers, educating people on their rights.
2    Those are some things I recall.
3    Q.  Has Ms. Brown ever been a paid intern for the
4  Coalition?
5    A.  She was not part of our internship process.
6  She -- I don't remember if we were giving stipends when
7  she was writing.
8    Currently, we're giving stipends to
9  contributors.  And I'm not sure if she was doing that
10  before we started that.
11    And I can't remember if she was part of the
12  Stolen Belongings or not.  If she was, then she would
13  have been -- she would have received a stipend for that
14  participation.
15    Q.  What was the stipend for Stolen Belongings
16  participation?
17    A.  So we basically hired people on contract to go
18  out, and they were trained on videography and
19  interviewing skills.  And then they would go out and do
20  interviews of unhoused people.
21    Q.  And the people who are doing those interviews
22  for the Stolen Belongings project were compensated by
23  the Coalition; is that correct?
24    A.  Yes.
25    Q.  Do you recall how much they were paid or what

Page 140

1  they were paid?
2    A.  Whatever our hourly rate at that point was would
3  have been -- because we all earn the same.  And so when
4  we do contract positions, the same thing applies.
5    Probably, like, 29 bucks an hour back then.  I'm
6  not really sure.  Yeah.
7    Q.  Other than that involvement -- potential
8  involvement in the Stolen Belongings project, has
9  Ms. Brown been an employee or intern of the Coalition?
10    A.  No.
11    Q.  Has the Coalition provided Ms. Brown any tents
12  or other survival gear?
13    A.  I don't remember.
14    Q.  Has it done a homeless verification for
15  Ms. Brown?
16    A.  I don't remember.
17    Q.  Has it helped her navigate the Coordinated Entry
18  system?
19    A.  I'm not sure.  We may have advocated for her to
20  get housing -- a housing placement at one of the City's
21  operations.  And I believe she got a shelter-in-place
22  hotel.  But I can't remember exactly.
23    Q.  Has the Coalition been in contact with Ms. Brown
24  throughout this lawsuit?
25    A.  On and off.

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

---

Page 145

1    A.  Yeah.  It looks like I must have misspoke
2  earlier about not remembering her saying that she had
3  dementia.  I'm not sure -- yeah.  It's kind of an
4  unclear statement there.
5    Q.  It seems to indicate -- the e-mail dated
6  March 20th, 2023, at the top of the first page seems to
7  indicate that Melodie is communicating that she has
8  dementia; is that correct?
9        MS. SALZMAN:  Objection.
10       THE WITNESS:  Well, she says, dementia is a
11  Mobius strip that keeps getting shorter and shorter.
12       I'm not sure if she's referring to herself.  Or
13  she could be.
14  BY MR. GEORGE:
15    Q.  At the top of the e-mail, it starts with the
16  date, 3/20/23, and then it says, Hi Jennifer.
17       Do you see that?
18    A.  Uh-huh.
19    Q.  On the next sentence, it says, not doing well,
20  well spelled with three l's.
21       Don't have comprehension to understand issue for
22  parking.
23       Do you see that?
24    A.  Yes.
25    Q.  Did you have an understanding at this time of

---

Page 146

1  what that meant?
2    A.  I am not sure if we had a previous conversation
3  about what was happening there.  Yeah.  I think it would
4  just be engaging in guesswork.
5    Q.  Do you see the prior e-mails between you and
6  Melodie in this chain?
7    A.  Yeah.
8    Q.  On the first page, there's an e-mail from you on
9  March 17, 2023.  It says, Hi Melodie.  Checking with
10  Human Rights staff.  Anyone available on the 21st?
11       Is that referring to an MTA meeting that was
12  going to happen on the 21st?
13    A.  I believe it was.
14    Q.  And was Melodie responding about not being able
15  to participate in the MTA meeting?
16    A.  I thought I just saw somewhere where she said
17  she couldn't do Zoom.  I'm trying to find it again.
18    Q.  I'm sorry.  I didn't mean to cut you off.
19       I direct your attention to the top of the first
20  page after the --
21    A.  Oh, don't have the ability.  There it is.  Yeah.
22  Okay.
23    Q.  And let me just ask the question so it's clear.
24       So her e-mail states, don't have ability to Zoom
25  SFMTA meeting.

---

Page 147

1        Is that referring to the meeting you were asking
2  her to participate in?
3    A.  I think what I'm doing is, she was asking for
4  people to turn up to the SFMTA meeting because she
5  couldn't.
6        I was asking if any staff were available on the
7  21st.  So I might have forwarded that to her.  I'm not
8  really sure.  Yeah.
9    Q.  Do you know if she ultimately participated in
10  this -- that SFMTA Zoom meeting that she was referencing
11  in her e-mail?
12    A.  I -- I don't remember.  She has participated in
13  the SFMTA meetings in person.  I'm not sure if she has
14  participated in Zoom or not.
15    Q.  If you go to the very first e-mail in this
16  chain -- this is on the page that ends in Bates 803.
17    A.  Uh-huh.
18    Q.  It's a March 10, 2023, e-mail, from Melodie.
19        What did you understand this e-mail to mean?
20    A.  Well, the context for this is that her mom was
21  dying, and so she was going down to LA to visit her.
22  And then after her mom died, I think she was going down,
23  kind of, to deal with the post-death situation.
24        And I don't remember exactly what that was, you
25  know, like, a period of time.  You know, a few months

---

Page 148

1  that -- that situation was happening with her mother.
2    Q.  This --
3    A.  She -- yeah.  But so I think she was driving
4  down and visiting.  Yeah.
5    Q.  This first e-mail is dated March 10, 2023.
6        Do you know when she first started to head down
7  to LA to help out with her mother's situation?
8    A.  I don't remember.
9    Q.  And the e-mail that -- the e-mail address that
10  Melodie is using on here is Melodiesfriends@yahoo.com.
11        Do you recognize that as her e-mail?
12    A.  Yes.
13    Q.  You can set this one aside.
14        Is Todd Bryant a current member of the
15  Coalition?
16    A.  Yes.
17    Q.  When did he first become a member?
18    A.  I would say before Stolen Belongings.
19  Maybe 2018, 2019, something like that.  Maybe even
20  earlier.
21    Q.  And what activity participation led to his
22  becoming a member in that time period of 2018, 2019?
23    A.  I believe the impetus was when all his tools
24  were taken from him and thrown away, as I recall.  I
25  can't be exactly sure.

---

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 149

1  And he was involved with -- he was involved with
2  Stolen Belongings. I believe he was involved in some
3  media work, some work on that -- some actions related to
4  that, probably some other stuff. I don't remember.
5      Q. How was he involved in Stolen Belongings?
6      A. I don't know if he was one of the videographers
7  or not. I think actually, he was -- he was a
8  participant in getting videoed -- was what it was.
9      But he kind of -- I think -- like, after his
10  stuff got -- his belongings got taken, he was --
11  Leslie Dreyer, who was an artist -- it all kind of came
12  together around him because of that particular incident.
13  She witnessed it, and it sort of -- like, was
14  sort of the impetus for the -- going forward with that
15  project.
16      Q. Were -- was each person who provided testimony
17  or information about their belongings being taken to the
18  Stolen Belongings project a member of the Coalition
19  because of that provision of information?
20      A. A lot of them were. I wouldn't say all of them
21  just because of the provision of that information. No.
22      Q. Other than Mr. Bryant's provision of information
23  to Leslie and her being there for the event at issue,
24  what other activities did he have for the Stolen
25  Belongings project that then made him a member?

Page 150

1      MS. SALZMAN: Objection to form.
2      THE WITNESS: Well, definitely informant. He
3  had another incident that happened where his leg brace
4  was taken, I believe. And we did, like, media work
5  around that.
6      That was a pretty horrific situation where the
7  police came in the middle of the night. I think he did
8  a whistleblower complaint. And -- yeah.
9      So I think he did some, like, calm [sic] stuff.
10  I don't remember what all else.
11  BY MR. GEORGE:
12      Q. Was he compensated for his involvement in the
13  Stolen Belongings project?
14      A. I should know this. I know that the
15  videographers were -- were paid to do the videos. I
16  don't know if they gave -- they gave people stipends for
17  their time or not. I would have to check the budget or
18  ask Leslie.
19      Q. Does the Coalition have those records that
20  pertain to the Stolen Belongings project and who was
21  paid or whether they were paid?
22      A. I believe there's -- yes. I think they're in
23  the grant reports. But Leslie kept track of all that
24  stuff. She was the artist and -- the main artist
25  that -- the way that grant worked.

Page 151

1      Q. Did Coalition have the same documents that
2  Leslie had for the Stolen Belongings project?
3      A. Yes.
4      Q. Were people who participated in the Stolen
5  Belongings project provided a gift card for their
6  participation?
7      A. They might have -- if they were compensated any
8  way, they may have gotten a gift card. I can't remember
9  exactly. It's pretty common practice, you know, when we
10  do -- if we have the resources, to share those resources
11  with unhoused people, and to try to create economic
12  opportunities for people.
13      We don't always. And so, like, in surveys, for
14  example, sometimes we have the resources to, you know,
15  give people gift cards when they do surveys like UCSF
16  does and all these other places.
17      We don't always have it. I can't remember what
18  the budget ended up with on that particular situation.
19      Q. Does the Coalition still have those records that
20  would reflect --
21      A. Yeah. I'm sure we could, yeah, pull them out of
22  e-mails or whatnot, yeah.
23      Q. Did Mr. Bryant attend any of the Human Rights
24  working group meetings?
25      A. I'm not sure.

Page 152

1      Q. Did he attend any of the other -- any of the
2  other meetings that are held by the Coalition?
3      A. I believe he was involved in some street-based
4  meetings.
5      Q. And that's street-based meetings like you've
6  discussed about Mr. Martinez and some of the other
7  plaintiffs?
8      A. Yeah.
9      Q. Has Mr. Bryant contributed any content to the
10  Street Sheet?
11      A. I'm not sure. Might have written up some of the
12  incidents that he experienced, but I can't remember.
13      Q. Does the Coalition know why he maybe wouldn't
14  have submitted things to the Street Sheet?
15      MS. SALZMAN: Objection.
16      THE WITNESS: You know, it's kind of like people
17  have the writing bug or they don't. Right? So people
18  who feel like that's an artistic expression that they
19  want to have and other people don't go there.
20  BY MR. GEORGE:
21      Q. What activities has Mr. Bryant participated in
22  since the lawsuit was filed that continue him as an
23  active member of the Coalition?
24      A. So the -- the other incident that occurred with
25  the leg brace was post filing. And, you know, we did

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 24 of 39
Coalition on Homelessness, et al. v.                                   Jennifer Friedenbach 30(b)(6)
City and County of San Francisco, et al.                                        February 25, 2025

Page 153

1   some stuff around that.
2       And then other kinds of just, you know, keeping
3   us informed on what's happening. And there may be other
4   things. I'm not sure. So maybe some comp work.
5       Q. Is Mr. Bryant an active member of the Coalition
6   now?
7       A. I would say that he's definitely a member. I
8   don't think he's active at this particular moment.
9       Q. Is he an inactive member of the Coalition?
10      A. I guess he's kind of more gray area-ish too as
11  well where he's somewhat inactive.
12      Q. I'm not sure if I asked this for Mr. Martinez.
13  I apologize if I'm repeating myself.
14      Is Mr. Martinez an active member of the
15  Coalition at this point in time?
16      A. I would say, yeah, somewhat -- somewhat active,
17  not super active.
18      Q. More like the gray area that you've described?
19      A. Yeah.
20      Q. When was the last time that Mr. Bryant
21  participated in a specific Coalition on Homelessness
22  activity?
23      A. He's participated in the legal proceedings. I
24  think aside from that, I can't remember.
25      Q. Does the Coalition have any knowledge of

Page 154

1   Mr. Bryant's drug use while he was living on the street?
2       A. No.
3       Q. Is Couper Orona an active member of the
4   Coalition?
5       A. Yes.
6       Q. And is Couper a current active member?
7       A. Yes.
8       Q. When did Couper first become a member?
9       A. I want to guess 2018. It's been a while.
10      Q. What activities is Couper engaged in currently
11  at this point in time that make her a member?
12      A. Well, she occasionally attends the workgroup
13  meetings. She is in regular contact with us,
14  distributes information, gives us information on what's
15  happening because she does a lot of outreach, and
16  assists us with that.
17      Sometimes assists us in finding people and --
18  yeah. I mean, she's active on a lot of different
19  fronts.
20      She speaks in press conferences and rallies and
21  public hearings and that kind of thing.
22      Probably other stuff as well, media stuff.
23  Yeah, public speaking.
24      Q. I just want to return to Mr. Bryant just for a
25  brief moment. I forgot to ask.

Page 155

1       Did the Coalition ever create a homeless
2   verification form for him?
3       A. I'm not sure.
4       Q. Has the Coalition provided him any tents?
5       A. I'm not sure.
6       Q. Has the Coalition provided him any other
7   property or items?
8       A. I'm not sure.
9       Q. Would there be any way to find out from the
10  Coalition's records whether after his property was taken
11  by the City, the Coalition provided him with replacement
12  property?
13      A. No. We wouldn't keep track of that.
14      Q. Has Couper provided any contributions to the
15  Street Sheet?
16      A. I believe so, but I'm not sure.
17      Q. Is Couper currently housed?
18      A. Yes.
19      Q. Did the Coalition assist Couper in securing the
20  housing?
21      A. We assisted her in keeping that housing. That's
22  kind of a -- you know, Daniel Lurie paid her rent to
23  begin with. I believe she connected to Daniel Lurie.
24      I don't know if she connected to him through us.
25  She might have.

Page 156

1       Q. You say Daniel Lurie paid her rent. Do you mean
2   Daniel Lurie personally or his foundation --
3       A. No. He personally.
4       Q. Interesting.
5       A. So when those -- that building that she was
6   living in that he was paying the rent on was acquired
7   with Prop C dollars, which is our initiative, she got
8   moved to the other building that Patrick Kennedy owns,
9   that the City then acquired that.
10      And then we advocated that she be grandfathered
11  in so that she didn't lose the housing. And so she was
12  able to keep it, yeah.
13      Q. Is she currently in that same housing?
14      A. Uh-huh. 333 12th.
15      Q. Has the Coalition provided Couper a homeless
16  verification form?
17      A. I don't think so.
18      Q. Has the Coalition provided Couper a tent?
19      A. I don't know. I don't remember.
20      Q. Do you know if Couper has been involved in
21  distributing tents on her own?
22      A. Probably helped with that, especially during the
23  pandemic. There was a lot of mutual aid and different
24  stuff going on based on the recommendations from the CDC
25  that people shelter in place.

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

---

Page 161

1    Q. Was -- is Sarah Stephenson a current active
2  member of the Coalition?
3    A. Yes.
4    Q. What activity is she currently engaged in that
5  make her a member?
6    A. So she's -- she's been active in informing us of
7  what's been going on. She's been in pretty regular
8  communication with our Human Rights staff, documenting
9  things that have been happening.
10    I think she might have distributed flyers. I'm
11  not sure.
12    Q. When did Ms. Stephenson first become a member?
13    A. She's a newer one. Within the last year as
14  well.
15    Q. And would her membership be reflected in a
16  similar way to Mr. Reem, in a Human Rights working group
17  minutes, if at all?
18    A. Yes. It might be, yeah.
19    Q. And would her membership outside of that
20  particular document, that Human Rights working groups
21  notes -- I think I just called it the minutes, but the
22  note.
23    Other than that document, would her membership
24  be reflected in any other documents in the Coalition?
25    A. No.

---

Page 162

1    Q. And she was not a member in September of 2022;
2  is that correct?
3    A. Correct.
4    Q. And did the Coalition provide her a homeless
5  verification form?
6    A. I'm not sure.
7    Q. Has the Coalition assisted Ms. Stephenson in the
8  Coordinated Entry process?
9    A. Maybe. Not totally sure.
10    Q. Is there a particular person at the Coalition
11  who would know about whether or not they assisted
12  Ms. Stephenson?
13    A. Well, Lukas is the main person. So if it
14  happened, it would have been probably through Lukas.
15    Q. Has the Coalition provided Ms. Stephenson any
16  tents or other survival gear?
17    A. I'm not sure.
18    Q. Has the Coalition preserved documents relevant
19  to this litigation?
20    A. Yes.
21    Q. And when did it start doing that?
22    A. Well, I think that we got notified from Lawyers'
23  Committee and ACLU that we had to preserve documents
24  pretty early on. I don't remember exactly.
25    And then they reminded us again later during --

---

Page 163

1  I think as we got closer to the discovery period, or
2  maybe it was the second discovery, something like that.
3    Q. And pretty early on, do you mean pretty close to
4  when the lawsuit was filed in September 2022?
5    A. Yeah. It might have been right away. I'm not
6  really sure.
7    Q. Is it fair to say that in or around that time
8  period of late 2022, the Coalition was notified that it
9  needed to preserve documents?
10    A. Uh-huh.
11    MS. SALZMAN: Objection to form.
12  BY MR. GEORGE:
13    Q. Did -- were you involved in that process of
14  preserving documents at the Coalition?
15    A. Yes.
16    Q. Did you direct staff to save particular
17  documents so they wouldn't be destroyed?
18    A. Yes.
19    Q. Earlier, you used the phrase "core activity."
20  What do you mean by "core activity"?
21    A. Something that's fundamental, that happens on a
22  regular basis.
23    Q. Do you have a benchmark for how much of the
24  Coalition's time needs to be spent on a particular
25  activity before it becomes a core activity?

---

Page 164

1    A. No. I mean, I would say -- when I say something
2  is regular, it's -- it's typically a daily occurrence.
3  So I don't know that that's, like, a benchmark written
4  in stone, but that's what -- that's kind of my
5  description of "regular."
6    Q. Thank you. If the Coalition is engaging in an
7  activity, say, once per day, then you would recognize it
8  as a core activity; is that correct?
9    A. Yeah.
10    Q. If it's not done necessarily every day, would
11  you still recognize it as a core activity if it's done,
12  say, most days?
13    A. Perhaps. But the core activity I was referring
14  to was support services. That's done every day. Even
15  me as ED is doing it every day. Certainly pretty much
16  everybody is, so, yeah.
17    Q. You've mentioned the Coordinated Entry system.
18  When did Coalition first start assisting people in
19  navigating the Coordinated Entry system?
20    A. Probably since its inception when it started,
21  which I think is maybe in its fifth year, something like
22  that.
23    But at the beginning, they wouldn't allow people
24  to bring advocates with them for the first few years,
25  and so we had to kind of push for that because a lot of

---

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 26 of 39
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 165

1  folks have difficulty kind of articulating what their
2  situation is.  And if you have more personal knowledge,
3  you can kind of help them with the assessment, which
4  then delivers a score in determining whether or not they
5  get housing.
6        And so a couple of years in, they allowed it.
7  Before that, it was, like, explaining where to go, maybe
8  taking people over.  But we'd have to sit outside.
9        And now they let us go through the process,
10  typically -- they're supposed to let us go through the
11  process with them.
12    Q.  By "let us go through," you mean that in the
13  Coordinated Entry interview process, a Coalition
14  employee or volunteer is allowed to be in the room to
15  participate on behalf of the person who is navigating
16  that system?
17    A.  If the person wants that, yes.
18    Q.  How often are staff from the Coalition going and
19  joining a person in an interview that pertains to the
20  Coordinated Entry system?
21    A.  We didn't -- I'm going to estimate.
22  Conservatively, once a week.
23    Q.  Is that done at HSH's headquarters or its
24  offices?
25    A.  No.  There's three different sites for adults;

Page 166

1  two different -- three different sites for youth; and
2  two sites for families.  And they're spread between
3  Bayview, Mission, Tenderloin.
4    Q.  So approximately once per week, a Coalition
5  staff member is joining an unhoused person at one of
6  those sites for the Coordinated Entry in-person
7  interview; is that correct?
8    A.  Correct.
9    Q.  Okay.  How does Coalition document its
10  involvement in the Coordinated Entry process -- in the,
11  sort of, direct services Coordinated Entry process.
12      MS. SALZMAN: Objection.
13      THE WITNESS: We don't have any formal
14  documentation of that.
15  BY MR. GEORGE:
16    Q.  Is a person who is navigating that process or
17  applying for Coordinated Entry -- are they required to
18  provide documentation to complete that process?
19    A.  So on the initial screening, no.  If they want
20  to appeal the score, yes.
21      Eventually, if they get a placement offer, if
22  they're what they consider referral -- housing referral
23  status, there is an abundance of documentation that has
24  to be provided, including income verifications, and
25  identification, pretty extensive paperwork.

Page 167

1        Depending on the housing program, they have a
2  variety of funding sources, and they each have their own
3  eligibility criteria that was quite difficult to
4  navigate.
5    Q.  Is that -- is that documentation required for
6  Coordinated Entry, or is it required based on what the
7  ultimate housing provider requires?
8      MS. SALZMAN: Objection.
9      THE WITNESS: It's based on what the ultimate
10  housing provider requires, with the exception of the
11  appeal.  That is a Coordinated Entry requirement.
12  BY MR. GEORGE:
13    Q.  What is the documentation that's needed to
14  appeal the housing score?
15    A.  Well, it's -- you know, so let's say, someone
16  gets a low score and they don't feel that their mental
17  health has been accurately assessed.
18      Then they would get a letter from a mental
19  health provider kind of explaining what the situation
20  is.
21      Same with the medical condition.  It could be
22  from a primary care doctor.  Those are kind of the
23  typical ones.
24      There's also scoring around domestic violence,
25  some documentation around that, police report,

Page 168

1  et cetera.
2        So -- but more typically, it's going to be on
3  the medical side, on the mental health, or the primary.
4    Q.  Would a person be able to use their medical
5  records to substantiate their appeal?
6    A.  Correct.  And that's an HSH decision.
7    Q.  I believe that earlier, you mentioned that
8  Lukas Illa is one of the people at the Coalition who
9  assists in Coordinated Entry; is that correct?
10    A.  I believe he has assisted people with
11  Coordinated Entry.
12      I know River has, for sure -- I think I
13  mentioned before -- was homeless certifications.
14    Q.  Oh, okay.  I apologize.  So River and Lukas,
15  they do currently assist in the Coordinated Entry
16  process; is that correct?
17    A.  I know for sure River does.  I believe Lukas has
18  as well.
19    Q.  Other than --
20    A.  I'm not positive.
21    Q.  Other than River definitively, is there anyone
22  else at the Coalition who assists in that process,
23  helping people navigate the Coordinated Entry system?
24    A.  Mercedes Bullock, yeah.  Perhaps
25  Yessica Hernandez.

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 27 of 39
Coalition on Homelessness, et al. v.                                    Jennifer Friedenbach 30(b)(6)
City and County of San Francisco, et al.                                         February 25, 2025

Page 169

1    Q.  Do Coalition employees document the time that
2    they spend on particular tasks as part of their daily
3    obligations?
4    A.  No.  Yeah.  We're -- no.  We're in the fast
5    lane.
6    Q.  Is there any way for the Coalition to determine
7    how much of River's or Mercedes' or Yessica's time is
8    dedicated to assisting people with navigating the
9    Coordinated Entry system?
10   A.  They would have to estimate that.  I'm sure it
11   varies.
12   Q.  Does Coalition know how many people it has
13   assisted in the navigation of the Coordinated Entry
14   system since, say, 2020?
15   A.  No.  I mean, we could estimate based on my --
16   once a week, 52 weeks in a year, four years.  That would
17   be 208, I believe.
18        But that would be an estimation.
19   Q.  Does the Coalition submit the appeal to the
20   agency when a person is appealing their Coordinated
21   Entry score?
22   A.  No.  It's -- we connect them with the -- I'll
23   connect them with the medical and kind of advise them on
24   the process.
25   Q.  Does Coalition assist in -- I'm sorry.

Page 170

1    A.  The medical provider needs to submit that.
2    Q.  So the Coalition -- if a person is appealing
3    their particular score and they need information to
4    just -- medical information to justify the appeal, the
5    Coalition will connect them with a medical provider; is
6    that correct?
7    A.  Yeah.  With a -- typically, what we would do is
8    ask them, are they in medical care, where are they
9    getting it?  Are they in psychiatric care?  Okay.  This
10   is what -- you know, and give them the help on what
11   needs to happen, and then point them in the direction of
12   how to do it.
13   Q.  So the Coalition is not aware of the number of
14   people that it has assisted in the Coordinated Entry
15   process; is that correct?
16        MS. SALZMAN:  Objection.  Asked and answered.
17        THE WITNESS:  We are -- we can estimate how
18   many, as I previously said.
19   BY MR. GEORGE:
20   Q.  Is the Coalition able to provide a number of
21   people that it has assisted with the Coordinated Entry
22   process who have been unable to complete Coordinated
23   Entry because the City unlawfully destroyed their
24   belongings?
25   A.  We don't have a track of that.

Page 171

1         I mean, I know of, you know, an example,
2    Andy Howard, whose housing was significantly delayed as
3    a result of their paperwork getting destroyed after they
4    were promised they were able to leave their belongings
5    there by the City.
6         And we hear -- I mean, property destruction is
7    so widespread.  So it is an issue that comes up quite
8    frequently.
9         We don't have, like, a tracker keeping track of
10   all of that.
11   Q.  You mentioned Andy Howard?
12   A.  Uh-huh.
13   Q.  Is that person a member of the Coalition?
14   A.  He was.  He's deceased.
15   Q.  And when did he die?
16   A.  He died, I want to say, about a year ago.
17   Q.  And when was he trying to navigate the
18   Coordinated Entry system?
19   A.  He was a member when we filed the lawsuit in
20   2022, so I want to say -- I would have to look.  I have
21   a -- I believe it was already submitted, if I'm not
22   mistaken, as part of our discovery, a videotaped
23   interview that I personally videotaped of him talking
24   about what happened.
25        And it was posted on social media.  And that, of

Page 172

1    course, has a date, so --
2    Q.  Other than -- other than Mr. Howard, are there
3    any other specific people that the Coalition can
4    identify whose Coordinated Entry process was delayed
5    because of the destruction of their property?
6    A.  There's many more.  I can't -- I can't put --
7    like, say, these are the names of people, because it is
8    pretty widespread.
9         But one of the issues I didn't mention is that
10   in -- in Andy Howard's case, you know, he was trying to
11   get housing through the Care.Cash program.  So part of
12   that paperwork was -- was basically qualifying for
13   welfare.
14        And so in that situation, the paperwork is more
15   up front than ahead of time of the housing offer.  That
16   is the easiest way for people to get housing, and pretty
17   commonplace where people get it through the welfare
18   program.
19        I believe it's about a -- probably about a third
20   of the City's units are Care.Cash units.
21   Q.  Which documentation was he unable to provide to
22   complete that process because it was destroyed?
23   A.  It was his -- all his income -- I think he had
24   to do bank statements and stuff like that for the
25   welfare process.  And he gathered that together, his

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 177

1    Q. What do you mean by that, they tell you what to
2  do and you do it?
3    A. They tell us to give the person the form to
4  bring back to their provider, so they -- yeah. They're
5  the ones who, like I said, outreached us and trained us
6  on how to do it.
7    Q. How long has the Coalition been providing
8  homeless verification forms?
9    A. A long time. Could be as long as two decades.
10 I think they've looked different ways over the years,
11 but I think the last time it was updated was a couple of
12 years ago, their process.
13   Q. Have there been periods in the last five years
14 where agencies have not accepted verification forms from
15 the Coalition on Homelessness?
16   MS. SALZMAN: Objection to form.
17   THE WITNESS: Well, MOHCD did call us and asked
18 us not to do verifications for people who were needing
19 furniture in housing that they had just gotten or
20 something along those lines.
21   And we kind of figured out what was happening
22 there. And I think MOHCD ended up figuring out who was
23 sending those people to us, and kind of nipped it at
24 that end.
25   So that kind of fits into what you're saying --

Page 178

1  or what you're asking.
2  BY MR. GEORGE:
3    Q. What is Coalition's process for verifying that a
4  person is homeless?
5    MS. SALZMAN: Objection to form.
6    THE WITNESS: So it's -- it's self -- it follows
7  the HUD's self-declaration. And so we ask a series of
8  questions, and then the people answer, and then we check
9  it off as HSH asked us to do.
10 BY MR. GEORGE:
11   Q. Approximately how many questions is it?
12   A. It's pretty short. It's, like, four or five or
13 something. It's basically about where people are
14 living.
15   Q. Is there any investigation into whether or not
16 that person is telling the truth or anything like that?
17   A. No. They -- the reason HUD recommends doing a
18 self-declaration is that they don't want to create more
19 barriers for folks seeking housing. So it's done in
20 this way. And people sign it as being true.
21   In reality, if it's, like, in the Coordinated
22 Entry process, for example, they're going to look at --
23 one of the things they look at is length of homelessness
24 and they look at the HMIS system to see if people have
25 come in contact with the system.

Page 179

1    So I think they probably have other ways of
2  looking at it. But from our end, this is what we're
3  supposed to do.
4    Q. But Coalition doesn't do that type of
5  investigation into a person's prior housing history as
6  part of the homeless verification process; is that
7  correct?
8    A. We don't have access to --
9    (Reporter interrupts.)
10   THE WITNESS: We don't have access to HMIS.
11 That is an HSH decision. Sorry. A lot of letters in
12 there.
13 BY MR. GEORGE:
14   Q. It's a bit of an acronym salad.
15   A. Yeah.
16   Q. So you said it was approximately four to
17 five questions that are asked of a person, and that's
18 the process for verification?
19   A. Uh-huh.
20   Q. How long does that process usually take?
21   A. Well, that depends, because you have somebody
22 coming in who often is in a crisis situation and wants
23 more help beyond the homeless verification.
24   So the homeless verification maybe takes, you
25 know, 10, 15, 20 minutes, but it's pretty typical for

Page 180

1  staff to spend an hour with the person because, you
2  know, I'm a dad. I'm in a car. They're trying to take
3  my kids, and, you know, just -- it's -- you know, we're
4  not going to push people out the door.
5    So they often have stories to tell and they're
6  often in crisis, and need -- would like assistance with
7  a myriad of other things that we can advise them on.
8    Q. Those other things are not necessarily necessary
9  for doing the verification itself; is that correct?
10   A. Right. Right. I need diapers. I ran out of
11 formula, you know. The -- I'm getting targeted on the
12 street. I'm -- you know, et cetera, et cetera, yeah.
13   Q. If a person doesn't diverge into other topics
14 beyond what the questions are asking for the homeless
15 verification, that process takes about 10 to 20 minutes;
16 is that correct?
17   A. Yeah. Yeah.
18   Q. Earlier, we looked at the manual which noted
19 that the time to get verifications were Monday and
20 Wednesday from 10:00 to 12:00. We discussed how one
21 staff member provides them on Fridays as well; is that
22 correct?
23   MS. SALZMAN: Objection. Mischaracterizes
24 testimony.
25   THE WITNESS: I said there was a volunteer who

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 29 of 39
Coalition on Homelessness, et al. v.                                    Jennifer Friedenbach 30(b)(6)
City and County of San Francisco, et al.                                        February 25, 2025

Page 185

1   presumably, the person -- once the person is in housing,
2   they wouldn't need it.  But there's other programs that
3   operate differently.  There's a longer lag time.
4        I'm not sure on each of the programs, what the
5   time acceptance is.
6    Q.  And does the Coalition have a list of all the
7   programs that require a homeless verification form?
8    A.  No.  We just do them based on referral.  So
9   people refer -- send people to us to do the homeless
10  verification.
11   Q.  By "people send people," you mean the agencies
12  direct people to the Coalition to get a form?
13   A.  The contracted organizations -- yeah, send
14  people to us to do a form, unless it's Housing
15  Authority.  Then they would get sent directly from
16  Housing Authority.
17   Q.  And do you know the total list of organizations
18  that send people to the Coalition to get housing
19  verifications?
20   A.  No.
21   Q.  Do you know the purpose for which a person is
22  seeking a form when they come in to get one?
23   A.  Not always.
24   Q.  If the person doesn't tell you, would the
25  Coalition have any way of knowing?

Page 186

1    A.  No.
2    Q.  So is the Coalition ever aware of how -- how
3   close in time the verification that they're issuing for
4   any particular person needs to be for them to actually
5   have it be useful in that program they're applying to?
6    A.  Well, you know, it's not uncommon for someone to
7   say, it's an emergency.  I need one by today.  Could you
8   do it now?  I have an appointment at 3:00 or I need to
9   bring it with me.
10       So that's -- that can happen.  Aside from that,
11  I don't think so.
12   Q.  Is it common that people need one for, kind of,
13  immediate presentation to a program in order to
14  participate in that program?
15   A.  That does happen.
16   Q.  Is that kind of the normal course at -- in the
17  Coalition's experience?
18   A.  Not necessarily.  It's kind of all over the
19  place, honestly.
20   Q.  Do you know, when a person doesn't give the
21  reason for why they need a particular form, does the
22  Coalition know why they need the form?
23   A.  You asked that.  I'm not sure.  I don't think
24  that's one of the questions, but I actually might be
25  wrong.

Page 187

1    Q.  How many people has the Coalition verified the
2   homelessness of more than one time?
3        MS. SALZMAN:  Objection to form.
4        THE WITNESS:  I don't know.
5   BY MR. GEORGE:
6    Q.  Did you understand my question?
7    A.  Yes.
8    Q.  People can come in more than once and get a
9   further verification; is that correct?
10   A.  Yes.  And people's status changes frequently,
11  and people have their property confiscated, and lose
12  forms and have to come back, all of that.
13   Q.  For people who are coming back in to get another
14  form, does the Coalition ask what happened to their
15  previous form or why they need another form?
16   A.  Thank you.
17       You know, we may or may not recognize the
18  person.  So if they state they need another form and
19  they did one before, then we would know that.
20       But we wouldn't -- we don't track that in any
21  kind of database or anything like that.
22   Q.  The Coalition doesn't track the reason why a
23  person needs a duplicate form?
24   A.  Not in, like, a database, no.
25   Q.  Does it track it in any way?

Page 188

1    A.  No.  We just know through conversations and
2   whatnot.
3    Q.  How many verification forms has Coalition needed
4   to duplicate because the City illegally destroyed the
5   homeless person's copy of the form?
6    A.  I don't know.
7    Q.  Does the Coalition have that number anywhere in
8   its possession?
9    A.  We don't track that.
10   Q.  Is the Coalition able to distinguish between a
11  verification form that was destroyed illegally and one
12  that was not destroyed illegally?
13       MS. SALZMAN:  Objection to form.
14       THE WITNESS:  Well, that would -- you know, if
15  someone volunteered that information, then we would
16  know.  And if they didn't, we wouldn't.
17  BY MR. GEORGE:
18   Q.  The Coalition would need to rely on someone
19  telling them how the form was destroyed in order to know
20  whether it was destroyed illegally; is that correct?
21   A.  Correct.
22   Q.  Does the Coalition have any documentation that
23  records the illegal destruction of a homeless
24  verification form?
25       MS. SALZMAN:  Objection to form.  And asked and

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 30 of 39
Coalition on Homelessness, et al. v.                                              Jennifer Friedenbach 30(b)(6)
City and County of San Francisco, et al.                                                    February 25, 2025

Page 189

1  answered.
2      THE WITNESS: Yeah. We don't have any kind of,
3  like, tracking system for that.
4  BY MR. GEORGE:
5      Q. Has HSA, the Human Services Agency for the City
6  of San Francisco -- have they ever required verification
7  forms from Coalition?
8      MS. SALZMAN: Objection to form.
9      THE WITNESS: Well, HSH was part of HSA. And so
10  before that, we probably were doing homeless
11  verifications in there under their homeless department.
12      I'm not sure if currently, they send people to
13  us or not. They do have a little bit of housing through
14  their CalWORKs program, and they built a housing program
15  that's, like, specific for people on disability.
16      They have a tiny bit of housing still.
17  BY MR. GEORGE:
18      Q. Has HSA ever communicated to the Coalition that
19  it was unwilling to accept verification forms from the
20  Coalition?
21      A. There was an issue with -- way back in the day
22  with residency letters. So they asked us to do
23  residency letters, trained us on how to do it. We did
24  it that way.
25      And then there was a bizarre expose of a news

Page 190

1  anchor who posed as a person who was on public
2  assistance and said he -- you know, he wasn't a
3  resident.
4      So we were, like, somehow committing fraud even
5  though we were doing it the way HSA asked us to do that.
6  So HSA said, we don't want you to do the verifications
7  anymore.
8      We were cut off at that point.
9      Q. Do you know what time period that was?
10      A. It was prior to 2007. I was not the director.
11  I can't remember exactly what year.
12      Q. Since 2020, there hasn't been a similar
13  situation where Coalition has been directed not to
14  submit forms to HSA?
15      A. I don't think so. Yeah.
16      Q. I think now --
17      A. The only thing I'm remembering is that MOHCD
18  incident, but I don't think so.
19      Q. I think now is a good time for a break. Maybe
20  do ten minutes or so.
21      THE VIDEOGRAPHER: This marks the end of
22  Media No. 4. We are going off the record. The time is
23  2:56.
24      (Recess taken from 2:56 to 3:17 p.m.)
25      THE VIDEOGRAPHER: This is the beginning of

Page 191

1  Media No. 5. We're on the record. The time is 3:17.
2  BY MR. GEORGE:
3      Q. Welcome back. How many homeless verification
4  forms has the Coalition issued since 2019?
5      A. Hundreds and hundreds. I wouldn't know exactly
6  how many, but...
7      Q. Is there a way for the Coalition to determine
8  how many it has issued since 2019?
9      A. I don't think so, but I'm not sure. I don't
10  think -- yeah. I would have to check if we still had
11  all that stuff.
12      Q. Do you know how many it has done in 2024?
13      A. I did not count them, but based on reams of
14  paper, probably -- I mean, very conservatively at least
15  500. It's probably more like 1,000.
16      Q. How far back does Coalition have with certainty
17  the homeless verification forms?
18      A. I think we have all of 2024. And I think we
19  have another chunk electronically for, like, six months
20  or so.
21      And then I don't know on the other, beyond that,
22  if we have those or not.
23      Q. Would the Coalition be issuing homeless
24  verification forms if the City had not asked it to?
25      MS. SALZMAN: Objection to form.

Page 192

1      THE WITNESS: Well, if -- no. I don't know -- I
2  mean, we would -- I don't know why we would do them if
3  they weren't needed. So I don't think so.
4      But there might be a scenario where we would
5  because a nonprofit asked us to do it or there was
6  another -- another reason to do it.
7  BY MR. GEORGE:
8      Q. Other than the City, has any other entities or
9  agencies reached out to Coalition and trained the
10  Coalition on how to do these forms?
11      A. Well, I think -- the conversation that I
12  mentioned before with MOHCD, they were giving some
13  instruction.
14      But that -- like, the main training, my
15  understanding, is it's the HSH.
16      Q. If HSH didn't require the forms from the
17  Coalition, do you know approximately how many the
18  Coalition would be doing in a year?
19      MS. SALZMAN: Objection to form.
20      THE WITNESS: I don't have any way of
21  differentiating the housing funding source. But the
22  other ones that I had mentioned was, I believe, Housing
23  Authority and I believe MOHCD.
24  BY MR. GEORGE:
25      Q. This next question I'm going to limit to the

Case 4:22-cv-05502-DMR   Document 366-7   Filed 04/17/25   Page 31 of 39
Coalition on Homelessness, et al. v.                                    Jennifer Friedenbach 30(b)(6)
City and County of San Francisco, et al.                                        February 25, 2025

Page 193

1  time period for 2020 to 2025.  It is also going to be
2  limited to the people who Coalition was assisting with
3  Coordinated Entry.
4       Other than Mr. Howard, is there any specific
5  individual whose Coordinated Entry process was disrupted
6  because the City illegally destroyed their property?
7       A.  I'm sure that -- we hear it a lot, that this
8  comes up when we're on outreach, et cetera.
9       Q.  Can you identify a specific person who fits that
10  description?
11      A.  I can't think of anybody else off the top of my
12  head.  Yeah.
13      Q.  Is there anything in the complaint that
14  identifies -- "the complaint" being the complaint in
15  this litigation -- that identifies the person who meets
16  that criteria?
17      A.  There may be.  I'm not sure.  It's a lot of --
18  there's a lot of lost items to review there.  I'm not
19  sure.
20      Q.  Sitting here, you don't know of any particular
21  person who meets that criteria; is that correct?
22          MS. SALZMAN:  Objection to form.
23          THE WITNESS:  No one is coming to mind.
24  BY MR. GEORGE:
25      Q.  How many sleeping bags has the Coalition

Page 194

1  provided to homeless people since 2019?
2       A.  I'm not sure exactly because we don't track.
3  But I know we are just giving out -- we had ten today.
4  It's kind of random.
5       I could roughly estimate, dozens, but I'm not
6  sure.  Certainly there was much more during the -- when
7  the -- when the shelters closed.  But we pretty
8  regularly give them out.
9       It just depends on, like, when people donate
10  them to us, we have them to give out.  When we don't, we
11  don't.
12      Q.  Does the Coalition purchase sleeping bags in
13  order to distribute to homeless people?
14      A.  We -- I believe we have purchased sleeping bags.
15      Q.  When was the last time that the Coalition
16  purchased sleeping bags to distribute to unhoused folks?
17      A.  Let's see, so we purchased some at St. John's in
18  the Mission.  And we distributed some that were
19  distributed at St. James infirmary.  I'm trying to
20  remember the dates on those.
21      Let's see, the St. James one was -- would have
22  been -- I think both of those would have been between
23  probably 2021 and 2023.  Yeah.  I'm not sure of an exact
24  date.  Sorry.
25      Q.  Does the Coalition have the receipts for the

Page 195

1  sleeping bags that it purchased and distributed at
2  St. John's and St. James?
3       A.  I believe those were provided already, yes.
4       Q.  Provided already, you mean produced in this
5  litigation?
6       A.  Correct.
7       Q.  And where were those sleeping bags purchased?
8       A.  It was at a sporting goods store that Homeless
9  Youth Alliance had a discounted connection to.
10      And I think the other ones were purchased at --
11  I'm -- coming up with retail stores is even harder for
12  me.  The Canadian cheap camping store.  I can't remember
13  the name of it.
14      Q.  Was it Decathlon?
15      A.  Decathlon.  There you go.
16      Q.  Did you -- are the receipts for this submitted
17  with your most recent declaration?  Is that what you're
18  referring to?
19      A.  I believe so.
20      Q.  Other than those sleeping bags that were
21  purchased to distribute at St. John's and St. James
22  infirmary, has Coalition in the last five years
23  purchased any other sleeping bags to distribute?
24      A.  Not sure.  Those are the two I recall.  We've
25  gotten a lot donated, though, that we then redistribute.

Page 196

1       And that's a much bigger than what we've
2  purchased.  And so people pretty consistently drop off
3  old, you know, blankets and sleeping bags and stuff like
4  that.
5       Q.  Has the Coalition purchased blankets to
6  distribute to people?
7       A.  I think blankets, it's more like -- way back in
8  the day, we used to do those emergency blankets.  I
9  don't think we have done those.
10      Typically, the blankets are donated blankets,
11  like, people getting rid of the blankets in their home.
12      Q.  So in the last five years -- let me limit this
13  to the time period since 2019 -- has the Coalition
14  purchased any blankets to distribute to people who live
15  on the street?
16      A.  I don't think so.
17      Q.  Does the Coalition track how many blankets it
18  distributes to people?
19      A.  No, it doesn't.
20      Q.  Does it currently distribute blankets to people
21  who come in in need of a blanket?
22      A.  Yes.
23      Q.  Is it dependent on blankets having been donated
24  to the Coalition and therefore, Coalition having some
25  blankets to distribute?

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 32 of 39

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 197

1    A.  Typically, yes.
2    Q.  Has the Coalition, in the last five years,
3  purchased socks to distribute to unhoused folks?
4    A.  Yes.
5    Q.  And does it have -- sorry.
6    A.  Sorry.  We -- we did not purchase socks.  But we
7  solicited them from -- I wasn't involved in it, so I
8  don't have the details.
9        One of our interns got really nice socks
10  donated, a few hundred of them, and I'm not sure from
11  where.
12    Q.  And when did that -- when did that occur that
13  the intern got some socks donated to then distribute?
14    A.  That was a month ago.
15    Q.  Other than that particular event where an intern
16  got some socks donated, does the Coalition purchase
17  socks and then distribute to unhoused people in the last
18  five years?
19    A.  I -- I can't remember.
20    Q.  Do people donate socks for the Coalition to
21  distribute, other than this one event with the intern?
22    A.  Yes.
23    Q.  If a person comes in and needs socks but some
24  haven't been donated, is the Coalition able to provide
25  them socks?

Page 198

1    A.  If we don't have them in stock, then we'll
2  usually try to figure out where they can get them.
3    Q.  Meaning, you might refer the person to another
4  entity that could provide socks for them?
5    A.  Yes.  They're not super easy to come by, though,
6  honestly.
7    Q.  Does the Coalition currently purchase tents to
8  provide to homeless people?
9    A.  We haven't purchased tents in a minute.  Tents
10  were included in those two, the Decathlon and then there
11  was the -- with the two organizations.
12        And then there was tents distributed during the
13  pandemic through mutual aid orgs.
14        We have gotten tents donated, though, that we've
15  given out.  And then sometimes there's, like, requests
16  that come in.
17        So there will be a request that the -- you know,
18  somebody says, you know, we need ten sleeping bags out
19  in the Bayview.
20        And then we'll, like, put the word out and try
21  to get them donated.  Sometimes it's that way.
22    Q.  So there are times where a specific request
23  comes in and Coalition solicits donations for the items
24  so people can get those items; is that correct?
25    A.  Correct.  With the property confiscations,

Page 199

1  that's kind of the typical thing, you know, where the
2  person will be without anything, nothing to protect them
3  from the elements.
4        And so we'll try to, like, you know, contact
5  different people and just be, like, hey, do you -- like,
6  could you try to scrounge up some or donate some?  This
7  person is, you know, in need.
8    Q.  I'm going to introduce what is going to be
9  marked as Exhibit 148.
10        (Deposition Exhibit 148 marked for
11        identification.)
12  BY MR. GEORGE:
13    Q.  Take a look at this, and let me know when you've
14  had a chance to review it.
15    A.  Yeah.  I believe this one -- yeah.  This is the
16  Decathlon order for tents specifically.
17    Q.  Do you recognize this document?
18    A.  Yes.  This was a pandemic order that was
19  distributed through the -- through the mutual aid
20  groups.
21    Q.  Who were those mutual aid groups?
22    A.  You know, there was just -- they didn't have
23  names.  There was just a lot of people just kind of
24  mobilizing during the pandemic to -- you know, people
25  were so worried about the COVID spreading.

Page 200

1        And it was before the -- you know, the early
2  stages.  And so there was so much worry about people
3  spreading COVID, so a lot of people mobilized to -- to
4  distribute tents.
5        And we got somehow someway to get them at cost
6  so -- yeah.
7    Q.  So this document is dated April 21st of 2020.
8  That's specific to that pandemic time period that you're
9  referring to?
10    A.  Yeah.  Yeah.
11    Q.  Has the Coalition purchased any tents since this
12  purchase in April of 2020?
13    A.  I believe so.
14    Q.  When was the last purchase or the most recent
15  purchase of tents by the Coalition to distribute to
16  unhoused people?
17    A.  I -- I think it was -- let's see, I think it was
18  in 2022.
19    Q.  When in 2022?
20    A.  Well, I'm trying to line it up with who was on
21  staff at the time.  And so it was when Carlos was a
22  Human Rights organizer, so I think it was previous to
23  them moving over to development.
24        So I think they moved over to development in
25  the -- like, June is when they left the organizing job.

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 205

1  we were on a limited staffing schedule, so we had
2  two staff that were there, Emmett House and Olivia
3  Gawocki (phonetic). Neither of them are with the
4  organization anymore. They were kind of, like,
5  administrative staff.
6      And then other -- like, we kind of coordinated
7  stuff. Like, people would pick up and bring it over to
8  so-and-so's garage or something would get picked up from
9  so-and-so garage. There was a lot of -- yeah, that kind
10 of thing.
11 Q. So --
12 A. It wasn't a singular responsibility. It was
13 pretty diverse.
14     Christin Evans actually picked up some of these
15 from a warehouse, and she distributed some to different
16 groups -- I think some church groups in the Haight or
17 maybe Homeless Youth Alliance.
18     Yeah. So it was pretty dispersed.
19 Q. Were -- you mentioned that Christin Evans may
20 have distributed some to a church group. Were some of
21 these tents given to other people to do direct
22 distribution to people who needed a tent?
23 A. Yes.
24 Q. Do you have an idea of how many the Coalition
25 itself gave directly to a particular unhoused person?

Page 206

1  A. Most of them we did directly. But we were
2  getting calls where people were, like, can I get
3  ten tents? You know, different groups.
4      And then we'd set those aside. But then I think
5  the majority of them, we were distributing directly.
6  And we also had a lot of people who -- the word got out,
7  and they'd come to the office. And we wanted to make
8  sure we had some there.
9  Q. And these tents, the ones that are described in
10 this -- in these receipts were from the first few months
11 of the pandemic, correct?
12 A. Correct.
13 Q. During that time, were people seeking tents so
14 that they could live on their own apart from other
15 people and not be exposed to the Coronavirus?
16 A. Yeah. People wanted to try and shelter in
17 place. And, of course, the shelters were closed, so
18 that was the plan.
19     In the first few months, you know, there was a
20 very brief moment of people's tents not getting taken
21 and they started -- the City started confiscating them
22 again. The demands grew at that point.
23 Q. When did the City start taking people's tents
24 again in 2020?
25 A. It was within that year. Probably -- probably

Page 207

1  about six months in. But it was -- well, maybe six to
2  nine months, somewhere around there.
3      Basically, we had a whole campaign to get the
4  City to do shelter-in-place hotels so that folks
5  wouldn't be forced to sleep in tents. And it took a
6  minute for the City to get those going.
7      But when they did get them going, that's when
8  they started confiscating tents again. I would have to
9  look back and see when the first SIP started opening up.
10     We kept that pressure on.
11 Q. Does the Coalition track the reasons why a
12 person needed a replacement tent?
13 A. We don't have a tracking, but the property
14 confiscation and the taking of tents is so commonplace.
15 I mean, it's all the time.
16 Q. When a person comes in to get a tent, how does
17 the Coalition know that it was -- that the prior tent
18 was illegally destroyed versus destroyed for a valid
19 legal reason?
20 A. Well, I mean, that's part of the conversation
21 that we're having with people, you know, what happened?
22 You know, what's going on?
23     And so we're usually talking through that stuff.
24 By a valid legal reason, you mean -- you mean what?
25 What would be a valid legal reason to destroy a tent?

Page 208

1  Q. Are you familiar with the DPW bag and tag
2  policy?
3  A. Uh-huh.
4  Q. And do you understand that provides certain
5  bases that allow for the disposal of property?
6  A. Oh, you mean, if it's soiled? So okay. Yeah.
7  So yeah. I mean, we -- yeah. It comes up in the
8  conversation.
9      And I think there's frequently a disagreement
10 with what's soiled or not. From our perspective,
11 there's a very broad interpretation of that word
12 "soiled" that's way beyond what it was intended.
13 Q. So does the Coalition document its discussions
14 with people who come in to get a replacement tent,
15 meaning, do they document the reason why their last tent
16 was destroyed?
17 A. We don't have a -- kind of a tracking system of
18 that. But, you know, there's plenty of places that it
19 comes up in text and e-mails and declarations and all of
20 that.
21 Q. So that would be the source of determining
22 whether or not a particular tent was destroyed
23 unlawfully or lawfully?
24 A. It would be through conversation -- well, I
25 mean, we also could be out there at the site and

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 34 of 39
Coalition on Homelessness, et al. v.                                    Jennifer Friedenbach 30(b)(6)
City and County of San Francisco, et al.                                          February 25, 2025

Page 217

1    Q. Is the Latino Task Force 2022, Street Need
2  Assessment Report one of the public education reports
3  that the Coalition creates?
4    A. So that one we didn't create, but we -- it came
5  out of the Latino Task Force, as the name suggests. But
6  we put it on our website because we feel like it's a
7  really valuable report.
8    Q. Was the Coalition involved in the -- in the
9  creation of that report?
10    A. We -- that came out of the street needs
11  committee of the Latino Task Force, which we are members
12  of.
13    Q. Were Coalition volunteers or employees involved
14  in gathering information that was then used in that
15  report?
16    A. Yeah. I believe they had about 100 volunteers.
17  And of those 100 volunteers, I think there was three of
18  us from the Coalition.
19    Q. The next one I'm going to ask you about is the
20  Voices of the Unseen report. Is that also one of the
21  public education reports that the Coalition creates?
22    A. That is. That one was done in collaboration
23  with Compass Family and -- but we did design and help
24  write that report.
25    Q. Since 2020, has the Coalition published any

Page 218

1  other reports that are part of its public education
2  campaign?
3    A. Besides the ones listed?
4    Q. That's correct. Besides those ones that I just
5  went through.
6    A. No.
7    Q. Is the Coalition currently working on any
8  reports that are similar to or like those other ones
9  that I just discussed?
10    A. Oh, I'm sorry. I forgot one. The CART report,
11  the Compassionate Alternative Response Team, I believe,
12  was since 2020, which was done with a group of
13  50 people, including City officials from Department of
14  Emergency management, homeless department and
15  supervisors and SFPD, et cetera.
16        We are currently working on a report assessing
17  the park ranger program.
18    Q. Is the Coalition engaged in collecting surveys
19  for that report?
20    A. Yes.
21    Q. And how is it conducting those surveys, meaning,
22  is it doing them in the field, like, in person?
23    A. We are conducting them in the field. And
24  what -- but we also -- we -- pretty much all of our
25  reports also include focus groups that are done that are

Page 219

1  site based.
2    Q. Are the reports that you just discussed that we
3  just went through -- the Stop the Revolving Door, Water
4  For All, Healthy Streets Operation Curtain, Coordinated
5  Entry, Latino Task Force, Voices of the Unseen, and the
6  CART report -- are those available on the Coalition's
7  website?
8    A. Yes.
9    Q. Are the versions of those that are on the
10  Coalition's website accurate and, you know, truthful
11  versions of those particular reports?
12    A. Yes.
13    Q. Which Coalition employees are engaged in the
14  surveys for the reporting on the park ranger program
15  that you just discussed?
16    A. Myself and River Beck. And there's discussion
17  at the workgroup about it.
18    Q. How is the Coalition locating the survey
19  participants for that report, the one on the park
20  service?
21    A. We identified a number of parks where park
22  rangers are -- both park rangers and unhoused people
23  have some kind of presence. And then we go out and do
24  surveys there.
25        And then in some situations where there's, like,

Page 220

1  a service center that's near a park, we'll do -- we'll
2  do surveys there as well.
3    Q. Do you go out in person to engage with people in
4  the first instance?
5    A. Me personally?
6    Q. Let me ask it this way, do you and River and the
7  others who are participating in gathering surveys, do
8  they first encounter people in person when they go out
9  to see if they want to participate in the survey?
10    A. Yes.
11    Q. And is the survey completed in one visit with
12  that person who is participating in the survey?
13    A. Well, at the end of the survey, we ask if they'd
14  like to be contacted to be part of a focus group. And
15  so the survey part is done.
16        But then we like to kind of dig down deeper in a
17  focus group to really get a little bit more meat on the
18  bones.
19    Q. Have the focus groups for that particular
20  research paper that is involving the parks -- have those
21  happened yet?
22    A. They're not complete, but some of them have.
23    Q. And have the -- have the focus group
24  participants been those folks who you went and did the
25  initial surveys with?

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 35 of 39
Coalition on Homelessness, et al. v.                                    Jennifer Friedenbach 30(b)(6)
City and County of San Francisco, et al.                                         February 25, 2025

Page 221

1     MS. SALZMAN: Objection to form.
2     THE WITNESS: Those who indicated they wanted to
3  be part of the focus group, we reached back out to.
4  Kind of creates difficulties with the property
5  confiscation and the displacement to get in touch with
6  people.
7     And -- but, you know, we give it a try, and we
8  have the focus groups.
9  BY MR. GEORGE:
10     Q.  Are there specific people that you weren't able
11  to get in touch with for the follow-up for that focus
12  group?
13     A.  Yes, there were.  I personally was not in charge
14  of contacting people.  Our intern was.
15     But yes.  She -- she had difficulty getting in
16  touch with some people.
17     Q.  Does she know why she wasn't able to get in
18  contact with them?
19     A.  Well, I mean, the first -- people are providing
20  phone numbers, and then you're unable to get through on
21  the phone.  We're not going to know specifically if that
22  phone was confiscated necessarily, but we hear about
23  that.
24     So frequently, we can infer that that's likely
25  an issue.

Page 222

1     Q.  For people who have -- unhoused people who have
2  a phone, do they have trouble keeping those phones
3  charged?
4     MS. SALZMAN: Objection to form.
5     THE WITNESS: That -- that that -- that can be an
6  issue.  It was a much bigger issue during the pandemic.
7  Now that the libraries are opened back up and people can
8  charge them, that's less of an issue.
9     The -- the thing is that if they can't charge
10  it, you can leave a message.  And then when they do have
11  juice, they get the message.
12     And if we give them plenty of time, that's not
13  as much of an issue as if the phone was confiscated and
14  taken from them.
15  BY MR. GEORGE:
16     Q.  Are there other reasons other than confiscation
17  that homeless people lose a phone?
18     A.  Sure.
19     Q.  Do phones get stolen by other people who are out
20  on the street?
21     A.  Occasionally.  I mean, phones are not super
22  difficult to get at this point.  So it's not a huge
23  issue.  But occasionally, yes.
24     Q.  And do people lose phones?
25     A.  Of course.  Sometimes, yeah.

Page 223

1     Q.  When a -- when the intern who's been reaching
2  out to people isn't able to get in contact with a
3  person's phone number, does she know why, from among the
4  various reasons, that a phone is not with that person,
5  why it's not with them?
6     MS. SALZMAN: Objection.  Asked and answered.
7     THE WITNESS: She wouldn't know necessarily,
8  unless she ran back into the person, you know, if that
9  comes up in conversation and...
10  BY MR. GEORGE:
11     Q.  Have any of the people who the Coalition wasn't
12  able to get back in contact with for these focus groups
13  that we just discussed about the park paper, have they
14  specifically told the Coalition that they couldn't be
15  contacted because their phone had been confiscated by
16  the City?
17     A.  Well, generally speaking, we hear about people
18  not being able to participate and their -- because their
19  phone was taken by the City or they share a phone with
20  somebody and then that person had it taken by the City.
21     So it's an issue that comes up.  I can't say
22  specifically to this particular situation if that
23  specifically happened or not since I wasn't the one
24  contacting people.
25     Q.  Does the Coalition know the identities of any of

Page 224

1  these people who couldn't be contacted for the focus
2  group follow-up who specifically lost a phone because
3  the City illegally destroyed it?
4     MS. SALZMAN: Objection.  Asked and answered.
5     THE WITNESS: We -- we wouldn't know, you know,
6  unless like I said, the -- we came back across -- I
7  mean, that's part of the struggle.  Right?
8     So we do know it's very commonplace that -- that
9  people have their property taken, and it destroys their
10  ability to communicate.
11  BY MR. GEORGE:
12     Q.  Is the Street Sheet printed on newsprint?
13     A.  Yes.
14     Q.  Does the Coalition give Street Sheets to
15  homeless people in bundles of 100?
16     A.  Well, typically.  I mean, sometimes we have a
17  couple of vendors that for some reason only want 15 at a
18  time.  And then they come back more frequently.  But
19  yeah.
20     Q.  Once a Street Sheet vendor picks up the papers
21  from Coalition, does the Coalition have any control over
22  what happens with those papers after?
23     A.  I -- no.  It's there -- well, not totally sure
24  what you mean by "control," but the vendors can sell
25  them for $2 and they get to keep 100 percent of the

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 36 of 39
Coalition on Homelessness, et al. v.                                    Jennifer Friedenbach 30(b)(6)
City and County of San Francisco, et al.                                        February 25, 2025

Page 225

1  proceeds.
2      Q.  Could a vendor have given it away to somebody?
3      A.  There is secondary distribution that occurs.
4  Absolutely.  And we don't discourage that.  We want
5  people to have -- we want the paper to be as low
6  threshold as possible and that people are able to access
7  it.
8          So, yeah, there's definitely people who pick up
9  and do a secondary distribution to other folks.
10     Q.  Does the Coalition track what happens to Street
11  Sheet papers after they are provided to a vendor?
12     A.  No.  It's pretty difficult to do.
13     Q.  Does the Coalition essentially donate the papers
14  to the vendor, and the vendor is able to, you know,
15  economically benefit from those papers?
16     A.  I -- I don't think we think about it as a
17  donation.  We're providing the papers to the vendors
18  because they're doing us a service by distributing the
19  paper and getting it out there because it is our media
20  that -- you know, that basically, it's a place where you
21  can hear directly from unhoused people, and is a form of
22  media and where homeless people are humanized.
23          You don't see that in other media forms.  So the
24  paper in and of itself is important to us, that it
25  reaches its audience.

Page 226

1      Q.  Is the Street Sheet paper mostly distributed in
2  particular neighborhoods in the City?
3      A.  Well, the vendors get to choose their spots.
4  And the most successful vendors have a particular spot
5  that they sell where they can develop relationships with
6  customers.  And we don't track that either.
7          But I would say most neighborhoods have a Street
8  Sheet -- at least one Street Sheet vendor that's
9  present.
10     Q.  Are more of them grouped in the
11  Financial District or SoMa?
12     A.  I would say -- no.  I mean, we've got, like,
13  regular vendors in the Mission, Rainbow -- they're more
14  centered around, like, grocery stores and stuff like
15  that than -- I don't think SoMa -- well, I guess SoMa
16  has a Whole Foods at Fourth Street, and they probably
17  have a vendor there.
18          But it's kind of a food desert in the
19  Tenderloin.  There's not really a lot of good vending
20  spots there.
21     Q.  Earlier, you mentioned that the -- a number of
22  vendors had passed away in the pandemic; is that
23  correct?
24     A.  Uh-huh.
25     Q.  How did the pandemic affect the number of

Page 227

1  vendors who were distributing the Street Sheet?
2      A.  Well, the pandemic affected the Street Sheet
3  distribution in a number of ways.  I mean, we had a
4  pretty old, vulnerable population that was selling
5  Street Sheets that were particularly affected by the
6  pandemic.
7          And we know of a handful of people who passed
8  away.  We also know that people -- the exchange of cash
9  during the pandemic was not a winning proposition.  So
10  that affected.
11          We tried to do Venmo, but that still requires a
12  little bit of contact with the QR code and stuff.
13          And Venmo didn't allow for people to set up an
14  account without a bank account until recently, so that
15  was a barrier.
16          And then people stopped carrying cash.  And so
17  some of these things were pandemic related, but some of
18  them just kind of -- you know, did the stopping carrying
19  cash happen because of the pandemic or everything just
20  kind of went more virtual?  It's hard to say.
21          Those are the main factors that have affected
22  Street Sheet distribution.
23     Q.  Has the Coalition calculated what percentage of
24  the circulation decline is due to particular reasons?
25     A.  Well, not in a scientific way.  But based on our

Page 228

1  conversations with vendors, that's how we arrived at the
2  conclusions that we arrived at.  Some of it's kind of
3  common sense, but yeah...
4      Q.  Does the Coalition track why submissions are not
5  made to the Street Sheet?
6      A.  Not in a formal database.  Although, we've had a
7  couple of occasions that I can point to.  Actually,
8  Andy Howard, who I mentioned earlier, who was a person
9  who submitted to the Street Sheet who was impacted by
10  property confiscation and had some writings that were
11  lost in that process.
12          No books.  Artwork by Ronnie Goodman was
13  confiscated by the City, and he's a regular, did a lot
14  of our covers, and is kind of a -- signature style that
15  really defines the paper.
16          And his actual Linocuts were taken, which is the
17  original art.  Impossible to replicate really.  So,
18  like, the actual rubber Linocuts.  Yeah.
19          So not in a database, but we do know it happens.
20     Q.  Other than Mr. Goodman and Mr. Howard, are there
21  regular Street Sheet contributors whose property has
22  been unlawfully destroyed by the City?
23     A.  Those are the two I can think of.
24     Q.  And you mentioned Mr. Goodman's art being
25  destroyed.  When was that?

Case 4:22-cv-05502-DMR    Document 366-7    Filed 04/17/25    Page 37 of 39
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 229

1    A. That was prior to filing of the lawsuit. And
2    prior to his -- he also passed away. And I'm not
3    remembering the exact year. I was out with my son and
4    we saw him -- he died a couple of days later, I believe,
5    during the pandemic.
6    Q. Are the Know Your Rights documents that you have
7    discussed in your declaration, are those printed on
8    single sheets of paper?
9    A. The typical one we give out, I think it's single
10   sheets of paper. Yeah. They get folded into a much
11   smaller format, though.
12   Q. How many of those has the Coalition distributed
13   since 2020?
14   A. I would have to estimate. I mean, it's probably
15   over 1,000, if not -- yeah. Definitely over 1,000.
16   Q. It's -- how many are sent -- well, let me
17   withdraw that.
18      Are they distributed by Coalition members or
19   Coalition employees who are going to do outreach?
20   A. Both.
21   Q. And how many will a person take with them in
22   order to go and distribute them to people that they meet
23   on the street?
24   A. They usually bring -- well, you know, if they're
25   bringing it to someone to distribute to other folks,

Page 230

1    then it's going to be a larger amount. It could range
2    between 50 and a couple hundred.
3    Q. Are there times where a Coalition employee or
4    member will take a bunch of them and give them to an
5    unhoused person to then distribute among other folks
6    that they run into on the street?
7    A. Correct.
8    Q. Sort of a secondary distribution. Is that fair
9    to say?
10   A. Correct.
11   Q. Does the Coalition track which ones are what
12   I'll call direct distribution and which ones are
13   secondary distributions for the Know Your Rights
14   documents?
15   A. No.
16   Q. Does the Coalition track the reasons why any
17   particular Know Your Rights document was destroyed?
18   A. We don't have a database of it. But the
19   property confiscation is so commonplace. It comes up a
20   lot.
21   Q. Is there a particular person that the Coalition
22   knows about whose Know Your Rights documents or document
23   was destroyed by the City unlawfully?
24   A. No one's name I can come up with at this moment,
25   but I can say confidently that, yes, there's a lot of

Page 231

1    people that have had that experience.
2    Q. So I think now is probably a good time for a
3    break. Do about ten minutes or so. Does that work?
4    A. Yeah. Sounds good.
5      THE VIDEOGRAPHER: This marks the end of
6    Media No. 5. We are going off the record. The time is
7    4:19.
8      (Recess taken from 4:19 to 4:35 p.m.)
9      THE VIDEOGRAPHER: Here begins Media No. 6. We
10   are back on the record. The time is 4:35.
11   BY MR. GEORGE:
12   Q. Can you please turn back to the declaration? I
13   believe it's marked as Exhibit 146. This is your
14   declaration.
15   A. Uh-huh. Okay. I'm making a mess of things over
16   here.
17   Q. It's inevitable.
18      Will you please turn to paragraph 23?
19   A. Okay.
20   Q. This refers to administrative claims against the
21   City on behalf of individuals, correct?
22   A. Correct.
23   Q. And it says -- this is the last sentence. It
24   says, we have started drafting. Who is the "we" that
25   that refers to?

Page 232

1    A. So that is -- was primarily -- Ian James was
2    heading that project with advice from lawyers from and
3    staff from the Lawyers' Committee.
4    Q. Other than Mr. James, was anyone else who worked
5    for the Coalition involved in preparing administrative
6    claims for people who had lost property?
7    A. I believe Carlos Wadkins may have assisted.
8    There -- we did have a -- well, Andy Howard kind of on
9    his own was helping, did his own admin claim, and kind
10   of had that be -- that was where his passion project, to
11   help other people file who had suffered the same as him.
12      So we kind of kept those apart from the ones we
13   were specifically helping with.
14      Toro Castano may have helped. I'm not -- so
15   we -- there was a period of time where we were -- when
16   it was less formal and we were assisting people with
17   admin claims.
18      And then Ian tried to have it be a little more
19   formalized, created a tracker, got trained from -- and
20   advice from the attorneys on how to set it up.
21   Q. The paragraph 23 refers to 17 administrative
22   claims filed since September of 2021.
23      For those 17 claims, were those ones that were
24   done by Ian and his, sort of, revised process, or do
25   those also include the ones from Andy Howard and Toro's

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Jennifer Friedenbach 30(b)(6)
February 25, 2025

Page 245

1  recognize that as the same name on the first page of the
2  document in the claim form?
3     A. Yes.
4     Q. Is there any reason to doubt that this admin
5  claim questionnaire is for a person other than the
6  person who's listed on the claim?
7        MS. SALZMAN: Objection to form.
8        THE WITNESS: Well, the name is the same and the
9  address is used for the same.
10  BY MR. GEORGE:
11    Q. And the Coalition's address appears on the top
12  right of the claim form, correct?
13    A. Correct. Yeah.
14    Q. If you compare the handwriting on the claim form
15  on Exhibit 151, does it appear similar as to the
16  two prior claims we looked at, Exhibits 149 and 150?
17    A. Yes.
18        MS. SALZMAN: Objection.
19  BY MR. GEORGE:
20    Q. If you take a look on the second page of the
21  Exhibit 151 in the chart of items, do you see those?
22    A. In this -- the 3A part?
23    Q. 3C.
24    A. 3C part, I mean. Yeah.
25    Q. Do those correspond to the items that are on the

Page 246

1  last page of the admin claim form?
2     A. There's -- I see the comic book collection. I
3  do not see the sports cam -- oh, wait -- or collection
4  of 49er, sports memorabilia. It might be included in
5  the baseball.
6        I'm not seeing specifically the watches, but I
7  see -- oh, thank you. I'm not seeing the jewelry or the
8  watches, unless I'm missing it. And I'm not seeing
9  music recordings.
10    Q. For the items that appear in the chart on 3C,
11  are those included on that admin claim form?
12        MS. SALZMAN: Objection. Asked and answered.
13        MR. GEORGE: Okay. I'll --
14        THE WITNESS: Yeah. I mean, I would just say --
15  you know, they're -- you know, this process is kind of
16  open to folks. And I think the differentiation for us
17  is whether the Coalition actually worked on the form or
18  not.
19        I recognize that a photocopy that we give out
20  pretty broadly is used here. But anybody can submit
21  admin claims and go through this process, which the City
22  has laid out for these situations.
23  BY MR. GEORGE:
24    Q. This admin claim questionnaire, the one that has
25  the Coalition's logo on it, who does the Coalition

Page 247

1  distribute that to?
2     A. Pretty much anybody who -- who asks. We have
3  a -- like, a packet that we give to them. And I don't
4  know when Ian left, if it was updated or not. But
5  there's a lot floating out there.
6     Q. Would you be able to tell if this particular
7  claim, this Exhibit 151, was prepared by the Coalition
8  by consulting the tracker that Ian created?
9     A. I believe so, yeah.
10        Well, in particular, if it was one of the other
11  folks that were helping people with a lot of admin
12  claims, we could see that, which might be more helpful.
13  But yeah.
14    Q. And do you recognize the chart in Exhibit 151 as
15  containing the same items that are in the prior
16  two exhibits that we just looked at?
17    A. Yes.
18    Q. Does the Coalition have a position on whether or
19  not these claim forms are truthful or accurate?
20    A. Yeah. I mean, our -- I am not sure that we --
21  that this -- I'm pretty confident that this was not in
22  our wheelhouse of ones that we worked on.
23        And so we don't have responsibility to do that,
24  that's -- it's a process, and, you know, the court
25  ultimately decides that.

Page 248

1     Q. In this lawsuit, does the Coalition contend that
2  the City destroyed property that belonged to the
3  Coalition on Homelessness?
4     A. Yes. We believe that our -- well, belonged to.
5  Well, we distribute items to unhoused people that is
6  then their property.
7        If articles and stuff like that were destroyed
8  that were going to be submitted to the Street Sheet or
9  artwork, I guess it could be argued it was Coalition
10  property.
11        But it's items that -- you know, we have to
12  replace and put effort into when our members lose that
13  property during property confiscation.
14    Q. Once the -- excuse me.
15        Once the Coalition provides an item to someone,
16  like a tent or sleeping bag, does it continue to own
17  that item?
18    A. Well, we wouldn't be asking for it back, so I
19  guess, no. I mean, we're giving it to the person, and
20  so it's something that we expended resources on.
21        I don't know that we would claim ownership of
22  something we gave to somebody.
23    Q. Does the Coalition, once it provides, say, a
24  bundle of Street Sheets to a vendor, does it contend
25  that it continues to have an ownership interest in the

# ERRATA SHEET

NAME OF CASE: *Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*,
No. 4:22-cv-05502-DMR
DATE OF DEPOSITION: February 25, 2025
NAME OF DEPONENT: Jennifer Friedenbach, 30(b)(6)

| PAGE | LINE (S) | CHANGE | REASON |
|------|----------|--------|--------|
| 27-28 | 19-1 | | Designated confidential |
| 28-31 | 25-15 | | Designated confidential |
| 33-37 | 10-18 | | Designated confidential |
| 42 | 17-19 | "Lamario" to Vamario; "Castenada" to "Castano" | Errata |
| 43 | 7 | "Lamario" to Vamario | Errata |
| 64 | 5 | "shares" to "chairs" | Errata |
| 112-113 | 21-9 | | Designated confidential |
| 133 | 4 | "organic" to "traumatic" | Errata |
| 135-136 | 15-24 | | Designated confidential |
| 146-147 | | "MTA" and "SFMTA" to "HRG" | Errata |
| 150 | 9 | "calm" to comms | Errata |
| 212 | 6-7 | | Designated confidential |
| 213 | 4-9 | | Designated confidential |
| 214 | 7-9 | | Designated confidential |
| 252 | 53- I think line 25 | "2023" to "2022" | Witness mistake over dates |
| 256 | 15 | "2023" to "2022" | Witness mistake over dates |
| 273 | 20 | "Lisa Realitory" to "Lisa Marie Alatorre" | Errata |

_____
Jennifer Friedenbach

3.28.25 _____
Date