# EXHIBIT 2
## To
# Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

## In The Matter Of:

*Coalition on Homelessness, et al. v.*
*City and County of San Francisco, et al.*

*Sarah A. Cronk*
*September 23, 2024*

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California 94104*
*(415) 597-5600*

Original File 43357Cronk_nl.txt
Min-U-Script® with Word Index

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 37

1 and 9th and Folsom and 13th Streets.
2    Q    And is that typically by, like, the
3 freeway --
4    A    Yes.
5    Q    -- underpass?  Okay.
6         And were you camping in San Francisco in
7 2020?
8    A    Yes.
9    Q    And do you know where in San Francisco you
10 were camping in 2020?
11    A    A few different places.  I don't remember
12 exactly.
13    Q    Was it like 2022 where you typically
14 stayed in the same types of neighbors or was it
15 different than that?
16    A    2022, we mostly stayed in -- in the same
17 area besides the few other neighborhoods I mentioned
18 for short periods of time.
19    Q    Okay.  But in 2020, is it fair to say you
20 roamed more, to use that term?
21    A    I roamed a bit more, yes.
22    Q    When would you say you started
23 experiencing homelessness in San Francisco?
24    A    Shortly after I moved to San Francisco.
25 Do you want a year?

Page 38

1    Q    Yeah.  Do you have a rough year?
2    A    About 2008-2009.
3    Q    Okay.  And were you living on -- did you
4 start living on the street in around 2008-2009?
5    A    On and off before that, but like,
6 completely, yes, around that time.
7    Q    Do you attribute any, you know, reasons to
8 why you had to start living on the street around
9 that period in 2008-2009?
10    A    Being in the foster care system and being
11 put in different -- different group homes and
12 facilities that I felt uncomfortable in.
13    Q    Do you know what year you started foster
14 care -- like living in the foster care system?
15    A    I believe it was -- it should have been
16 2008.
17    Q    And did you leave the foster care system,
18 like run away from the foster care system?
19    A    Yes.
20    Q    And when did you run away from the foster
21 care system?
22    A    Almost immediately.
23    Q    And do you know how old you were when you
24 ran away from the foster care system?
25    A    I was 15.

Page 39

1    Q    And so when you left foster care, was
2 there anybody that you were kind of living with
3 out -- outside of the system?
4    A    No.
5    Q    Did you ever try to go back into the
6 foster care system after you left at around 15?
7    A    No.
8    Q    Did you have any family that you tried to
9 move in with after leaving the foster care system?
10    A    No.
11    Q    What about, like, friends?
12    A    I didn't stay with anybody.
13    Q    When you left the foster care system, did
14 you stay in any type of city shelter or housing?
15    A    Yes.
16    Q    And what kind of city shelter or housing
17 did you stay in after leaving the foster care
18 system?
19    A    I had been in transitional housing for a
20 period of time.
21    Q    And were you allowed to stay in that
22 transitional housing without any kind of
23 restrictions based off of time?
24    A    No.
25    Q    And did you leave the transitional housing

Page 40

1 at some point in time?
2    A    No.  I graduated.
3    Q    And when did you graduate from
4 transitional housing?
5    A    I can't honestly recall the date offhand.
6    Q    Would you have been, like, close to 18,
7 like a certain age?
8    A    Yes.
9    Q    What was your housing like after you
10 graduated from this transitional program?
11    A    I was mainly unhoused.
12    Q    Did you try to get back into any type of
13 city housing after leaving the transitional housing
14 program at roughly the age of 18?
15    A    Yes.
16    Q    And what type of housing did you try to
17 get into?
18    A    Subsidized.
19    Q    Were you ever living in subsidized City
20 housing after you were 18?
21    A    Yes.
22    Q    And when were you doing that?
23    A    I believe it was 2010 to 2012ish.
24    Q    And at some point did you stop living in
25 the tran -- in the subsidized housing?

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

---

Page 41

1    A    Yes.
2    Q    And why -- when was that?
3    A    I -- I might want to correct my former
4    answer.  It was about 2014, I think, that I left.
5    Q    Okay.  Any reason why you left the
6    subsidized housing in around 2014?
7    A    Yes.
8    Q    And what were the reasons for leaving
9    subsidized housing around 2014?
10   A    The program changed from permanent housing
11   to temporary housing, and people with leases were
12   basically told that they had to leave after a
13   certain period of time.
14   Q    And did you try to get into any other
15   types of programs around 2014-2015, when that
16   permanent housing was changing to temporary?
17   A    No.
18   Q    After you left that permanent housing
19   around 2014, did you pretty regularly start camping
20   in San Francisco?
21   A    For the most part.
22   Q    Roughly what percentage of the time would
23   you say that you were camping in San Francisco?
24   A    90 percent of the time.
25   Q    Are there any locations in San Francisco

---

Page 42

1    when you camped that you prefer to be at?
2    A    Can you restate that?
3    Q    Yeah.
4         So when you do camp in San Francisco, are
5    there any neighborhoods, areas specifically within
6    the City that you prefer to -- to live?
7    A    Not particularly.
8    Q    What is your highest education level?
9    A    I have done some college.
10   Q    And where did you do some -- some college?
11   A    At CCSF, City College.
12   Q    And did you study anything specifically
13   while you were there?
14   A    Biology, premed.
15   Q    How -- how long do you think you were
16   studying at the City College, the biology or premed?
17   A    Less than a year.
18   Q    Was there any reason why you stopped
19   studying at the City College?
20   A    Unstable housing, and I was just
21   overwhelmed by the coursework.
22   Q    Do you have any type of, like, special
23   vocational training?
24   A    No.
25   Q    Any type of special certifications that

---

Page 43

1    you may have?
2    A    No.
3    Q    Are you currently in school?
4    A    No.
5    Q    Has there ever been a period of time after
6    that one year -- roughly one year where you went
7    back to City College to try to take courses again?
8    A    No.
9    Q    Any other school --
10   A    Not yet.
11   Q    -- beside City -- sorry.
12        So what do you mean by "not yet"?
13        Is -- is it your plan to go to school?
14   A    Yes.
15   Q    And where would you -- where are you
16   hoping to go to school?
17   A    Well, I'm hoping to transfer to State when
18   I finish my coursework.
19   Q    And by "State, do you mean San Francisco
20   State --
21   A    Yes.
22   Q    -- University?
23   A    Yeah.
24   Q    Are you enrolled in classes now?
25   A    No.

---

Page 44

1    Q    Do you have a plan to enroll at any time
2    in the near future?
3    A    Yes.
4    Q    Okay.  And when are you hoping to enroll?
5    A    As soon as I can secure childcare for my
6    daughter.
7    Q    Have your educational interests changed or
8    would you like to still kind of pick up the biology
9    or premed that you were studying before again?
10   A    I want to stay on the same track.
11   Q    What's it about those areas that kind of
12   inspire you?
13   A    I'm interested in holistic health.  I want
14   to get a degree in naturopathy eventually.
15   Q    I'm sorry?  Can you -- what is
16   naturopathy?
17   A    Naturopathic medicine.  Like holistic
18   medicine.  It's -- it's kind of an umbrella term for
19   holistic and alternative practices.  So I'm more
20   interested in the nutritional side and the
21   preventative care.
22   Q    Okay.  Any personal motivations for why
23   you kind of like that holistic preventative care?
24   A    I felt that understanding how to keep my
25   body healthy definitely made a difference in my

---

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 65

1    Q   Okay.  And what do you -- what do you have
2    to pay to stay at the transitional housing?
3    A   We have to pay 30 percent of our current
4    income.
5    Q   And that's in the current housing in --
6    because I -- just to clarify --
7    A   Yes.
8    Q   -- in the current --
9    A   Yes.
10   Q   -- housing, you --
11   A   Yes.
12   Q   -- pay 30 percent?
13   A   Um-hum.  As well as savings.  They -- they
14   do a savings that you have to pay each month as
15   well.
16   Q   So is the rule that you have to pay some
17   money into, like, a saving account?  Is that -- is
18   that what you are trying to articulate?
19   A   Yes.  There's -- there's rent, and
20   there's -- there's savings as well that we have to
21   pay monthly.
22   Q   Okay.  Do you know how much you have paid
23   into the savings?
24   A   I don't know the number.
25   Q   Are you -- have you been worried at all

Page 66

1    that you wouldn't be able to pay the 30 percent
2    while you're in transitional housing?
3    A   No.
4    Q   Do you have any worries that you won't be
5    able to pay the 30 percent once you're in the
6    permanent Parkmerced housing?
7    A   Yes.
8    Q   And why are you concerned about that?
9    A   I'm concerned because I'm currently not
10   employed, and I'm relying on my partner's income.
11   Our -- our benefits from the City end in
12   October.  And if he loses his job, we will not have
13   income.
14   Q   So prior to the entering into the
15   transitional housing, how many times do you think
16   you have been offered a sheltered living situation
17   by the City?
18   A   I would say maybe three times.
19   Q   And do you know roughly when in time that
20   was?  Were they all in the same year?  Spread out
21   over time?
22   A   There was once in 2022 and -- and once or
23   twice in the couple of years previous to that.  So
24   around 2018 or 2019, maybe.
25   Q   And did you accept those offers of shelter

Page 67

1    or housing accommodations from the City?
2    A   No.
3    Q   And why didn't you accept them?
4    A   I'm sorry?  Which -- which offer?  Because
5    I --
6    Q   So let's --
7    A   -- I -- there's only -- yeah.
8    Q   -- so let's start with this instance in
9    2022.
10       Did you accept the shelter that the
11   City -- or the shelter, housing, and accommodations
12   that the City was offering you in 2022?
13   A   No.
14   Q   And why didn't you accept them?
15   A   Because we were -- they were threatening
16   to throw away all of our belongings if we were to
17   leave the area.
18       We were considering accepting the offer,
19   but we wanted to find somebody to watch our
20   belongings so that we could come back and retrieve
21   them after we signed in for the shelter.
22       And after a certain period of time, they
23   came back.  And we felt that we were being harassed,
24   so we decided we didn't -- we didn't want to bother.
25   Q   Did they offer to take your belongings

Page 68

1    with you?
2    A   We were only allowed to take -- they said
3    we were only allowed to take two bags with us.
4    Q   And was that two bags per person or two
5    bags for you and Mr. Donohoe collectively?
6    A   Collectively, two bags.
7    Q   And do you know where you were staying
8    when you were offered that shelter?  Like, where
9    were you camping at that time?
10   A   Yeah.  We were under the freeway behind
11   the Target that used to be on, I think, 9th and
12   Folsom.
13   Q   Do you know what time of the year that
14   was?
15   A   That was in -- yeah, that was in the
16   winter of 2022.
17   Q   Okay.  And then going backwards, I
18   understood that you said there may have been two
19   other instances sometime between 2018 and maybe
20   2019.  Let's take the first instance that comes to
21   mind.
22       When do you think you were offered
23   shelter?
24   A   Sometime in 2019, I was offered --
25   sometime in 2019.

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

---

Page 69

1  Q   Okay.  And what were you offered?
2  A   They said they had room at a navigation
3  center.
4  Q   And did you take the room?
5  A   Yes.
6  Q   And how long did you stay at the
7  navigation center?
8  A   A few days.
9  Q   And were you allowed to stay at the
10 navigation center as long as you wanted?
11 A   No.
12 Q   Do you know how many days you were limited
13 to staying at the navigation center?
14 A   I'm not sure.
15 Q   And then the second -- the second
16 instance, which would the last of the three that you
17 identified, do you know when that was?
18 A   That was -- that was the -- the one
19 furthest back.  And I -- I can only recall them just
20 offering me shelter at, I think it was -- I'm trying
21 to remember what it was called.
22     It was a shelter in South of Market on
23 5h Street.  I can't remember the name of it offhand,
24 but...
25 Q   And would that have been a temporary

Page 70

1  shelter?
2  A   Yes.
3  Q   And do you know if you would have been
4  limited to how long you could stay at that shelter?
5  A   I don't know how long.
6  Q   So apart from those three instances, have
7  you ever tried to obtain City shelter on your own?
8  A   What do you mean by "shelter"?
9  Q   So to the extent that the City has any
10 accommodations -- navigation centers, subsidized
11 housing -- did you ever go out on your own to seek
12 that type of accommodation from the City from, let's
13 say, 2018 onwards?
14 A   Yes.
15 Q   And can you explain what those efforts
16 involved?
17 A   In 2021, I tried to see if there was
18 shelter available through an outreach team.  They
19 said there were no beds at the time.
20 Q   And do you know where that request was
21 made?  Did you call some --
22 A   I -- I think it was in the Tenderloin, and
23 they were out -- I met them on the street.
24 Q   And can you think of any other instances?
25 A   No.

Page 71

1  Q   Did you ever go into a City office to
2  inquire about housing accommodations that could have
3  been available to you?
4  A   No.
5  Q   Any reason why you didn't go into a City
6  office to see about accommodations that could be
7  available to you?
8  A   Yes.  I had had a -- I had had previous
9  negative experiences and heard negative stories from
10 other people about the available shelter.
11     And I was concerned that they wouldn't be
12 able to accommodate -- accommodate me for my medical
13 needs, as well as allow me to bring my belongings
14 and be with the people that I was staying with at
15 the time.
16 Q   Okay.  I want to follow up on your
17 testimony that they wouldn't be able to accommodate
18 your medical needs.
19     What medical needs are you referring to?
20 A   I have epilepsy.  So if -- if I need to
21 take a shower, for instance, there needs to be a
22 railing or I need to have a place to sit down.
23     And if they have, like, rules such as,
24 like, time limits and things like that, that would
25 be difficult for me to follow.

Page 72

1  Q   Did you ever ask for any type of City
2  housing accommodation that could accommodate your
3  medical needs?
4  A   Can you restate that?  I'm sorry.
5  Q   Yeah.
6     Did you ever ask for -- did you ever ask
7  the City for any type of housing accommodation that
8  may accommodate the medical needs that you listed
9  such as epilepsy and needing to have a rail or being
10 able to sit down?  Did you --
11 A   Yes.
12 Q   And when did you raise that to the City?
13 A   When I moved into the housing that I was
14 staying at and -- on 5th and Harrison in 2012 and --
15 as well as now that I'm obtaining affordable
16 housing.
17 Q   So between 2012 and now, did you ever ask
18 for any accommodation?
19 A   No.
20 Q   And what about the rules make it difficult
21 for your medical needs?
22 A   I think the best way to explain it would
23 be to give you an example.  When I was at a
24 navigation center, they -- I was harassed while I
25 was in the shower for taking too long in the shower,

---

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 73

1  even though the showers were not -- nobody was
2  waiting for the shower.
3       And it takes me a long time sometimes
4  because I have to stabilize myself and I get dizzy.
5       So they -- that interaction ended up with
6  me being kicked out without notice of the navigation
7  center without being able to take my belongings with
8  me. So things like that.
9    Q   I'm sorry. When was that? Was that in
10 2012?
11   A   No. That was -- that was when -- I -- I
12 forgot when I -- when I took the navigation center
13 offer.
14   Q   Do you have a rough estimate of what year
15 that was?
16   A   I think that was in 2019.
17   Q   And was it an employee of the shelter that
18 harassed you or another resident?
19   A   An employee of the shelter.
20   Q   And how do you know it was an employee?
21   A   Because they -- they called themselves an
22 employee. And they had a nametag, and they were
23 referred to by everybody else there as an employee.
24   Q   Okay. And do you know the name of the
25 navigation center that that was?

Page 74

1    A   I do not remember the name.
2    Q   And do you know the name of the employee?
3    A   No.
4    Q   Do you know if it was a City employee or
5  like a contractor?
6    A   I have no idea.
7    Q   Are there any other examples that you have
8  of similar experiences where you weren't provided an
9  accommodation because of the rules?
10   A   No.
11   Q   Do you have any physical impairments aside
12 from the epilepsy that have not been accommodated in
13 a shelter?
14   A   No.
15   Q   And is -- your current transitional
16 housing environment, is that accommodating of your
17 epilepsy?
18   A   Yes.
19   Q   And what about the other rules of the
20 transitional housing that you are currently living
21 in? Does -- do those rules accommodate your medical
22 needs?
23   A   Yes.
24   Q   So I mentioned County Adult Assistance
25 Program Benefits earlier.

Page 75

1       Have you ever received those CAAP
2  benefits?
3    A   Yes.
4    Q   And do you know when you were a recipient
5  of CAAP benefits?
6    A   You don't remember exactly. It was -- it
7  was before the SSI. It was -- let me think about
8  this.
9       I would say somewhere around 2014.
10   Q   And do you know if, as a recipient of CAAP
11 benefits, you had guaranteed shelter or housing
12 accommodations available to you when you were on
13 those benefits?
14   A   No.
15   Q   Is it no -- the answer was no, that the
16 benefits weren't available to you or you don't know
17 if the benefits were available to you?
18   A   The -- the benefits were not guaranteed
19 was the concern.
20   Q   Okay. I'm going to mark the first
21 exhibit, which is going to be Exhibit 1.
22       (Exhibit 1 was marked for identification
23 and is attached to the transcript.)
24   Q   (BY ATTORNEY MILLS) So, Ms. Cronk, the
25 document that I am going to hand you is going to be

Page 76

1  called the "CAAP Homeless Client Agreement."
2       Let me see how I can put this on here.
3       THE COURT STENOGRAPHER: You can put it on
4  the top maybe.
5       ATTORNEY MILLS: Yeah, I'm just -- that
6  works.
7       THE COURT STENOGRAPHER: You'll want to
8  look at the one with the exhibit number on it.
9       THE DEPONENT: Oh, sorry. Do I need this
10 one?
11      ATTORNEY MILLS: I can take it back.
12      THE COURT STENOGRAPHER: I can take it.
13   Q   (BY ATTORNEY MILLS) Sorry. Yes. So,
14 Ms. Cronk, the document that I just handed you as
15 Exhibit 1 is a "CAAP Homeless Client Agreement."
16      Is that your name at the top of the
17 document?
18   A   Yes.
19   Q   And is that your signature at the bottom
20 of the document?
21   A   That is not my signature.
22   Q   Do you know if -- do you see where it says
23 "Docu" --
24   A   Oh, okay.
25   Q   -- "Signed?  "

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 93

1  A  I found out about them in 2011 through an
2  outreach team that was offering me services when I
3  was on the street at the time.
4  Q  And was it a Coalition on Homelessness
5  outreach team?
6  A  No. It was a different outreach team.
7  Q  What is your understanding of what
8  Coalition on Homelessness does?
9  A  Okay. Coalition on Homelessness fights to
10 advocate for the rights of homeless people, tries to
11 offer them services and connect them with services
12 related to getting on their feet, securing stable
13 housing, and not having their rights violated.
14 Q  And has that been your understanding of
15 what Coalition has done since you first learned
16 about them in around 2011?
17 A  Yes.
18 Q  Anything changed about your perception of
19 Coalition on Homelessness since 2011?
20 A  No.
21 Q  What are your impressions of the Coalition
22 on Homelessness?
23    ATTORNEY FREEMAN: Objection, ambiguous.
24 Q  (BY ATTORNEY MILLS) And you can answer, to
25 the extent you understand.

Page 94

1  A  Can you repeat the question? I'm sorry.
2  Q  Yeah.
3    So what are your views of the -- personal
4  views of the Coalition on Homelessness?
5  A  I think they're amazing. I think they're
6  a very important organization.
7    I have -- I'm very grateful to them for
8  the work that they do to help people that have been
9  in the situations that I have been in. And I think
10 they're great.
11 Q  And are you aware that the Coalition on
12 Homelessness includes individuals that are housed in
13 their leadership?
14 A  Yes.
15 Q  Has the Coalition on Homelessness ever
16 offered you services personally?
17 A  No.
18 Q  Have you ever been to the Coalition on
19 Homelessness' office?
20 A  Yes.
21 Q  And what would you do when you would go to
22 the Coalition on Homelessness' office?
23 A  Just speak to people.
24 Q  And when do you think you first went to
25 their office?

Page 95

1  A  Probably around 2015 or so.
2  Q  And with what frequency do you think you
3  would go to Coalition on Homelessness' office in a
4  given year?
5  A  Probably once.
6  Q  Has Coalition ever given you a tent?
7  A  I don't remember.
8  Q  Have they ever given you like a cart to
9  push or move your belongings?
10 A  No.
11 Q  Have they ever offered you storage for
12 your personal belongings?
13 A  No.
14 Q  Have you ever gotten, like, Know Your
15 Rights info from Coalition on Homelessness?
16 A  Yes.
17 Q  And what can you tell me about that
18 information that you have gotten with respect to
19 Know Your Rights?
20 A  I don't know if I understand the question.
21 Q  So would Coalition on Homelessness give
22 you, like, a flyer that would say: Know Your
23 Rights?
24 A  Yes.
25 Q  When do you think you first saw a flyer

Page 96

1  from Coalition about knowing your rights?
2  A  Probably around the same time I found out
3  about them.
4  Q  So fair to say sometime around 2011?
5  A  Yeah.
6  Q  And how often do you think you would see
7  documents like that reminding you of what your
8  rights were from Coalition on Homelessness?
9  A  Pretty frequently. Maybe every few months
10 or so. But of course while I was in the City.
11 Q  Okay. Have you ever asked for services
12 from Coalition on Homelessness that were declined?
13 A  No.
14 Q  Have you ever worked for the Coalition on
15 Homelessness as either an employee or an independent
16 contractor?
17 A  No.
18 Q  Have you ever been a volunteer with the
19 Coalition on Homelessness?
20 A  Not officially.
21 Q  Okay. Well, what about unofficially?
22 Have you been a volunteer with the Coalition on
23 Homelessness?
24 A  Sure.
25 Q  And when was that?

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 97

1  A   I would say that was around the pandemic,
2  2 -- after 2020.
3     Q   And what did your volunteer activities
4  with the Coalition on Homelessness involve?
5     A   I would -- I have given out food,
6  distributed socks, spare sleeping bags, just had
7  conversations with people about what services are
8  available to them and tried to help my fellow person
9  who was outside.
10    Q   Have you ever gotten a sleeping bag from
11  Coalition on Homelessness?
12    A   Um-hum.
13    Q   How many sleeping bags have you gotten
14  from the Coalition on Homelessness?
15    A   I believe two.
16    Q   Okay.  And how many hours would you say
17  you have spent volunteering with the Coalition on
18  Homelessness?
19        ATTORNEY NTIM: Objection.  Vague as to
20  time.
21        ATTORNEY MILLS: And I just want to
22  clarify, because we have had two objecting
23  attorneys.
24        Which attorney is the speaking attorney
25  for the record?

Page 98

1        ATTORNEY NTIM: I'm the primary speaking
2  attorney.
3        ATTORNEY MILLS: Okay.  Thank you.
4        ATTORNEY FREEMAN: But I also think that
5  as a matter of record, that any attorney can make an
6  objection.
7     A   Yeah, can you -- can you tell me, like,
8  what timeline you're talking about?
9     Q   (BY ATTORNEY MILLS) So in total, how many
10  hours do you think you have spent volunteering for
11  the Coalition on Homelessness?
12    A   In total?  Probably 200 hours.
13    Q   And when do you think those service hours
14  with Coalition on Homelessness started?
15    A   Around 2015-2016.
16    Q   Did you ever receive any type of training
17  from the Coalition on Homelessness?
18    A   No.
19    Q   Are there other organizations that you
20  volunteered with in the past five years other than
21  Coalition on Homelessness as far as, like,
22  homelessness issues are concerned?
23    A   No.
24    Q   Have you ever been a member of the
25  Coalition on Homelessness?

Page 99

1     A   Yes.
2     Q   And what is your understanding of what the
3  requirements are to be a member of the Coalition on
4  Homelessness?
5     A   I think the requirements are pretty loose.
6  I think it's that you are -- you stand up for the
7  rights of homelessness, try to advocate for the laws
8  in the City to change as far as how they treat
9  people on the street and with regard to treating
10  them with compassion and dignity.  Things of that
11  nature.  And also, just trying to help out whenever
12  possible.
13    Q   And do you have to pay any dues or
14  anything to be a member of the Coalition on
15  Homelessness?
16    A   No.
17    Q   Do you have to sign up formally to be a
18  member of the Coalition on Homelessness?
19    A   No.
20    Q   Did you do anything to sign up to become a
21  member of the Coalition on Homelessness?
22    A   No.
23    Q   Do you know if membership is limited to
24  being unhoused in San Francisco?
25    A   No, it's not.

Page 100

1     Q   So does the Coalition on Homelessness
2  include members of other communities outside of
3  San Francisco?
4     A   Not that I know of.
5     Q   Does the Coalition on Homelessness include
6  members that are housed?
7     A   Yes.
8     Q   Are you aware of any documents that may
9  track the Coalition on Homelessness' members?
10    A   No.
11    Q   And when do you think, based off of your
12  own experience, you first became a member of the
13  Coalition on Homelessness?
14    A   2021.
15    Q   And do you know when in 2021?
16    A   No, I don't know exactly when.
17    Q   Okay.  And what made you think that you
18  were finally or officially a member of the Coalition
19  on Homelessness in 2021?
20    A   Doing specific volunteer work with the
21  people that I knew that were official members as
22  well.
23    Q   And who were those official members that
24  you were volunteering with?
25    A   I don't recall the names of -- I don't

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 109

1    Q    And do you know if the camera was used for
2  photos and videos of the encampments?
3    A    It was not.
4    Q    Okay.  And then what was the second type
5  of laptop brand?
6    A    That was also Windows.
7    Q    And do you know when you started getting
8  access to that computer?
9    A    That was before -- it was actually right
10  before -- it got trashed right before I got the next
11  one, so at the end of 2021.
12    Q    So when you said that "it got trashed,"
13  can you elaborate what you mean by that?
14    A    Yeah.  During -- during the one of the
15  sweeps, it was thrown away when they took our tents.
16    Q    And this was Mr. Donohoe's laptop?
17    A    Yes.
18    Q    And just to clarify, this was the first
19  computer that you had access to --
20    A    Yes.
21    Q    -- of Mr. Donohoe's --
22    A    Yes.
23    Q    -- or Donohoe's?
24      Do you know the date that it was trashed?
25    A    I don't remember the specific date.

Page 110

1    Q    Do you have a rough idea of what month and
2  year the computer was trashed?
3    A    I would say in -- probably in April 2022.
4    Q    And do you know if the computer was left
5  unattended?
6    A    No.
7    Q    Do you know where you were staying when
8  the computer was trashed in San Francisco?
9    A    Yes.  I was -- yes.
10    Q    And where was that?
11    A    Folsom and 9th.
12    Q    And did you see -- was it trashed by City
13  employees?
14    A    Yes.
15    Q    And did you see City employees take the
16  computer?
17    A    I did.
18    Q    And how did you know it was City
19  employees?
20    A    Because they wore uniforms.
21    Q    And what did the uniforms look like?
22    A    They -- it basically looks like -- like
23  jumpsuits, basically, for -- DPW workers wear when
24  they clean up.
25    Q    Did you ask for them to not throw the

Page 111

1  computer away?
2    A    Yes.
3    Q    And what was the response?
4    A    They ignored me.
5    Q    Did Mr. Donohoe ask for the computer to
6  not be trashed as well?
7    A    Yes.
8    Q    Do you know if this was in the morning or
9  was it in the afternoon?
10    A    The morning.
11    Q    Do you have a rough idea of what time
12  of -- in the morning?
13    A    Probably around 6:00.
14    Q    6:00 a.m.?
15    A    Um-hum.
16    Q    On that day, were you given time to move
17  belongings?
18    A    Can you -- can you elaborate?  To -- A
19  given time?
20    Q    So how did you first come to interact with
21  City employees on that day in -- around April 2022?
22    A    They -- they pulled in front of our
23  encampments and immediately start picking things
24  up and putting them in their truck to dispose of.
25    Q    Did they ask you to gather any belongings

Page 112

1  that you wanted kept?
2    A    They did not.
3    Q    Did you know that the City employees were
4  coming on that day?
5    A    No.
6    Q    Do you know -- were you given any time to
7  move belongings before they started throwing
8  people's objects away?
9    A    No.
10    Q    So not even a second?
11    A    No.  They started doing it the moment they
12  got out of their trucks.
13    Q    Did any health workers come in the three
14  weeks before and tell you that individuals may be
15  coming by to throw away or move -- clean property?
16    A    No.
17    Q    And did -- the second laptop that you had
18  access to of Mr. Donohoe's was that trashed as well?
19    A    No.
20    Q    How did he come to get the second laptop?
21    A    I don't remember.
22    Q    Do you know if it was a gift or if he
23  bought it?
24    A    I believe he bought it.
25    Q    Do you know how much the laptop cost?

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 113

1    A    No.
2    Q    Did you have any information on the first
3  laptop that was thrown away?
4    A    What kind of information?  Like
5  information on the laptop itself?
6    Q    Yeah.
7    A    Possibly email addresses that were logged
8  in.  Things of that nature.  Pictures uploaded from
9  phones.
10    Q    Where do you typically upload photos from
11  phones?
12    A    What do you mean?
13    Q    Well, what phone were you using to take
14  photos that you would upload to a computer?
15    A    The phone that I had at the time.
16  Whatever phone that I had at the time.
17    Q    And would you upload your photos to like a
18  cloud storage system?
19    A    Yes.
20    Q    And do you know what cloud storage system
21  you would use?
22    A    Google.
23    Q    So there are photos on Google Drive?
24    A    Yes.
25    Q    And did you search Google Drive for any

Page 114

1  photos of the encampment or the property that you
2  allege may have been destroyed?
3    A    No.
4    Q    Do you still have access to Google Drive?
5    A    Yes.
6    Q    And what account is that Google Drive for?
7    A    The Apple Cronk account.
8    Q    Do you have Google Drives associated with
9  both Gmail accounts that we spoke about earlier?
10    A    I -- actually, I don't know.  No, I don't
11  think so.  I think I moved it all to the -- the
12  Apple Cronk.
13    Q    And how would you actually upload the
14  photographs from the phone to a cloud service like
15  Google?
16    A    A USB cord.
17    Q    And was that process the same for the
18  second laptop?
19    A    Yes.
20    Q    As you sit here today, do you think that
21  there could be photographs on a Google Drive of any
22  of the encampments that you stayed in?
23    A    No.
24    Q    But is it safe to say you haven't looked
25  at the drive to see if there are photographs of the

Page 115

1  encampments?
2    A    Yes.
3    Q    And is that all about the laptops that you
4  wanted to clarify for --
5    A    Yes.
6    Q    -- for the record?
7    A    Yes.
8    Q    Thank you.
9        Do you know who Toro Castano is?
10    A    No.
11    Q    What about Molique Frank?
12    A    No.
13    Q    David Martinez?
14    A    Yes.
15    Q    And what do you know about a David
16  Martinez?
17    A    I used to camp beside him at one point.
18    Q    And is that the David Martinez that is a
19  named Plaintiff in the lawsuit -- in this lawsuit?
20    A    Yes.
21    Q    And where would you camp with David
22  Martinez?
23    A    Behind the Target, 9th and Folsom area.
24    Q    Do you know roughly when in time you were
25  camping with David Martinez behind the Target?

Page 116

1    A    2022.
2    Q    And is that the only time you had camped
3  with Mr. Martinez?
4    A    Maybe the end of 2021.
5    Q    When is the first time you think you first
6  encountered Mr. Martinez?
7    A    Around the end of 2021.
8    Q    Did you ever stay in a -- in a tent with
9  Mr. Martinez?
10    A    No.
11    Q    Did you share belongings with
12  Mr. Martinez?
13    A    No.
14    Q    Have you ever witnessed Mr. Martinez's
15  property get destroyed?
16    A    Yes, I have.
17    Q    And what did you see of Mr. Martinez's
18  property get destroyed?
19    A    Everything.
20    Q    Do you know when that was?
21    A    It was June 2022.
22    Q    And that was behind the Target?
23    A    Yes.
24    Q    Do you know -- did he tell you what items
25  he lost that day?

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 117

1  A  Yes, I had some idea.
2  Q  And what were those items?
3  A  He had -- he had a tent, a -- all his
4  clothes, a sleeping bag, a phone, laptop, his
5  documents, his medication. I believe he had a bike
6  as well.
7  I don't know the extent of anything else.
8  Q  Do you know if Mr. Martinez was there on
9  June -- in -- sorry. Strike that.
10  Do you know if Mr. Martinez was there in
11  June of 2022 to witness his property being taken?
12  A  He was not.
13  Q  Do you know where Mr. Martinez was?
14  A  I believe he at a medical appointment.
15  Q  Do you know if Mr. Martinez had asked
16  somebody to keep his stuff safe?
17  A  Yes.
18  Q  Do you know who he asked?
19  A  I don't know her name.
20  Q  Can you describe her generally?
21  A  She was short, probably around 5 foot,
22  late 30s. I don't know. Blonde or brownish hair.
23  Q  And do you know if this woman stayed to
24  watch Mr. Martinez's stuff?
25  A  I think she did for a period of time and

Page 118

1  then left.
2  Q  So was there a point in time where
3  Mr. Martinez's belongings weren't being watched by
4  anybody?
5  A  No.
6  Q  Then who was watching Mr. Martinez's
7  belongings?
8  A  My partner and I.
9  Q  Did Mr. Martinez ask you to watch his
10  belongings?
11  A  He did not.
12  Q  How close in proximity was Mr. Martinez's
13  camp to yours?
14  A  Probably 10 feet away.
15  Q  And what did you tell -- did you tell any
16  City employees that that was Mr. Martinez's property
17  and that it wasn't abandon?
18  A  Yes, I did.
19  Q  And what specifically did you tell them?
20  A  I told them that it was -- it -- the
21  property belonged to a friend of mine and that he
22  was coming back.
23  And specifically they were asking me: Did
24  the property belong to anybody?
25  And I said: Yes.

Page 119

1  And I told them that I was watching --
2  watching it for him.
3  Q  Did Mr. Martinez have trash around --
4  A  No.
5  Q  -- his property?
6  Do you know if Mr. Martinez uses drugs?
7  A  I'm not aware.
8  Q  Do you know if Mr. Martinez's tent was
9  dirty?
10  A  How do you mean?
11  Q  Did Mr. Martinez's tent have any dirt on
12  it?
13  A  Not -- not really, no. It was actually
14  fairly new.
15  Q  But you caveated that a little bit with
16  "not really," so did Mr. Martinez's tent have some
17  dirt on it?
18  A  Well, there was a rainstorm, so yeah,
19  there was some stains on it.
20  Q  Do you know if the tent was wet?
21  A  It was not wet at the time.
22  Q  Do you know if the tent was moldy?
23  A  No, it was not.
24  Q  Do you know when the rainstorm was?
25  A  A week before that.

Page 120

1  Q  Was there mud in the area?
2  A  No.
3  Q  Do you know if Mr. Martinez had any
4  perishable foods around?
5  A  No.
6  Q  Is it no, you don't know; or no, he
7  didn't?
8  A  No, he did not.
9  Q  And what is your basis for understanding
10  that Mr. Martinez did not have any food --
11  perishable food?
12  A  Well, I guess you could say I was not
13  aware of any food. I did not see any food that -- I
14  suppose there could have been food inside of his
15  tent but...
16  Q  Did Mr. Martinez typically keep the
17  outside of his tent area tidy?
18  A  Yes.
19  Q  And what do you understand the word "tidy"
20  to mean?
21  A  I mean no trash laying around, no items in
22  the way of people to walk, if people walk through
23  that area. Swept. No, like -- I guess, like,
24  hazards to human health.
25  Q  Are you an expert in human health hazards?

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 121

1    A    What do you mean by that?
2    Q    You just described that there were no
3  health hazards."
4         Do you hold yourself out as being an
5  expert in human health hazards?
6    A    No.
7    Q    So then what is your experience,
8  understanding that Mr. Martinez's tent or area was
9  not -- didn't have any health hazards?
10   A    Because he kept his -- he kept his stuff
11 clean.  He kept things out of people's way.  He
12 would -- he would often disinfect items around him
13 because he was worried about getting sick.
14        He had immunity issues, so he was -- he
15 was definitely very careful about things like that.
16 And it just -- it just was clean.  It...
17   Q    And do you know where Mr. Martinez's tent
18 was located?  Was it on a sidewalk?  Underneath an
19 overpass?  Can you provide a little context for
20 where his -- physically his tent was?
21   A    Sure.  It -- it was on, like, a divide
22 between the space that they walked and the -- the
23 actual road underneath the overpass.
24   Q    Is that a sidewalk?
25   A    Yeah, it's kind of a sidewalk.  Well, it's

Page 122

1  kind of a sidewalk.  It's not -- it's not a sidewalk
2  that people walk on.  It's just a ledge, basically.
3    Q    Could people have walked there if there
4  weren't tents on that divide?
5    A    Yes.
6    Q    Do you know how Mr. Martinez would go to
7  the bathroom in the camp?
8    A    I'm not aware of all that.
9    Q    Did you see any, like, feces or urine
10 buckets?
11   A    No.
12   Q    But you didn't see inside of the tent to
13 know if there was a feces or urine bucket inside of
14 it?
15   A    I have seen inside of his tent, and there
16 was nothing like.
17   Q    But specifically in this June of 2022
18 instance, did you see inside of his tent to know
19 that there wasn't any human waste bucket?
20   A    No.
21   Q    What kind of items did Mr. Martinez
22 typically keep with him in his camp based off of
23 your understanding of -- and experience with
24 Mr. Martinez?
25   A    A sleeping bag, a tent, clothing, some

Page 123

1  electronics.  I can't really think of what else.
2         Shoes, a sleeping bag.  Various things to,
3  like, cook with and clean with.
4    Q    Would that include propane tanks?
5    A    I never saw one.
6    Q    So what would Mr. Martinez cook with in
7  his camps?
8    A    A pot and pan.  A pot and pan.
9    Q    Did Mr. Martinez have any type of camping
10 stove to cook with his pots and pans?
11   A    I'm not sure.
12   Q    Did you ever see Mr. Martinez using some
13 kind of camping stove to cook?
14   A    No.
15   Q    So what would you -- what type of food
16 would Mr. Martinez cook with his pots and pans?
17   A    I don't know.  I have seen him eat soup.
18 Like, canned soup.  Chili. things like that.
19   Q    Do you know if he was heating it up?
20   A    Yes.
21   Q    And how would he heat up the soup or chili
22 or food?
23   A    A torch lighter.
24   Q    And what do you mean by a "torch lighter"?
25   A    You would find a piece of wood, light it

Page 124

1  on fire with a torch in a, you know, kind of secured
2  little area and heat the food up above it.
3    Q    And do you know if that type of torch --
4  torched wood was in the area on June -- in June of
5  2022?
6    A    No.
7    Q    Is it:  No, it wasn't there; or no, you
8  don't know?
9    A    No, it was not.
10   Q    Did you see any other type of cooking or,
11 like, fire debris in the area on June of 2022?
12   A    No.
13   Q    Do you know if Mr. Martinez would have a
14 sign on his belongings saying:  Not abandoned?
15   A    Not that I know of.
16   Q    On this instance in June of 2022, do you
17 know if Mr. Martinez -- Mr. Martinez had a sign
18 saying like:  I will be right back; don't throw my
19 stuff away?
20   A    He did not.
21   Q    Did he have any type of sign with, like,
22 similar messaging?
23   A    Not that I saw.
24   Q    And when did Mr. Martinez first come back
25 after the City employees were there going through

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

---

Page 125

1 his property?
2    A    It was rather quickly.  It was about an
3 hour after -- after they left.  They left sometime
4 in the late afternoon.
5    Q    Do you know roughly how many hours
6 Mr. Martinez was gone?
7    A    Maybe -- maybe three or four.
8    Q    And then I believe you testified that you
9 knew that Mr. Martinez had some immunity issues.
10        Could you elaborate for me what that
11 meant?
12    A    As -- from what I'm aware, he has
13 congestive heart failure.
14    Q    And what do you know about Mr. Martinez's
15 congestive heart failure and how it impacts him?
16    A    I know that it makes it hard for him to
17 breathe and hard for him to exert himself.  I have
18 seen him kind of crouch in pain just at random
19 times.
20        He told me that he has to be careful of
21 getting sick because it -- it could make the -- make
22 the situation worse, basically.
23    Q    Do you know if Mr. Martinez would take
24 medication for his condition?
25    A    Yes.

---

Page 126

1    Q    How often would Mr. Martinez take his
2 medication?
3    A    I don't know.
4    Q    Did you ever see Mr. Martinez take his
5 medication?
6    A    No.
7    Q    And you never saw Mr. Martinez use any
8 other drugs aside from medication?
9    A    No.
10    Q    Have you been in touch with Mr. Martinez
11 since the lawsuit has been filed?
12    A    Yes.
13    Q    When have you been in touch with
14 Mr. Martinez?
15    A    I saw him one time.  I can't remember
16 exactly when it was.
17    Q    And did you talk about the lawsuit?
18    A    No.
19    Q    Do you text Mr. Martinez?
20    A    No.
21    Q    Did you text Mr. Martinez while you were
22 camping in the same proximity as him?
23    A    No.
24    Q    Have you spoken with Mr. Martinez about
25 your allegations of property destruction at all?

---

Page 127

1    A    No.
2    Q    Do you know Teresa Sandoval?
3    A    No.
4    Q    Do you know Nathan Vaughn?
5    A    No.
6    Q    Okay.  So earlier you mentioned Cooper.
7        Do you know Cooper's full name?
8    A    No, I can't remember.
9    Q    Do you know if Cooper was married at some
10 point in time?
11    A    I don't know.
12    Q    Is Cooper -- do you know where Cooper is
13 living now?
14    A    No.
15    Q    When is the last time you communicated
16 with Cooper?
17    A    I saw her a couple of months ago.
18    Q    Is Ms. Cooper presently housed?
19    A    Yes.
20    Q    So how do you know Ms. Cooper is housed?
21    A    Well, as far as at the time that I saw her
22 last, she was.
23    Q    And is that in San Francisco?
24    A    Yes.
25    Q    Do you know if Ms. Cooper was housed in

---

Page 128

1 September of 2022, when this lawsuit was filed?
2    A    I don't know.
3    Q    Do you know what the Stolen Belongings
4 Project is?
5    A    No.
6    Q    So you never spoke with Cooper about the
7 Stolen Belongings Project?
8    A    No.
9    Q    Do you know -- and might say the name
10 wrong, so correct me if I have it misplaced -- but
11 Cheyenne Brown?
12    A    No.
13    Q    Have you had any interactions with Kelly
14 Cutler?
15    A    No.
16    Q    Ian James?
17    A    No.
18    Q    Carlos Watkins?
19    A    No.
20    Q    So Javier Bremman?
21    A    No.
22    Q    LaKeitha Pearse?
23    A    No.
24    Q    T.J. Johnson?
25    A    No.

---

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 129

1  Q  And Lucas Illa or Illa (phonetic)?
2  A  No.
3  Q  Have you ever been employed by the City
4  and County of San Francisco?
5  A  No.
6  Q  Any other government agency?
7  A  No.
8  Q  Do you have -- do you resent the City and
9  County of San Francisco?
10  A  Yes.
11  Q  And why is that?
12  A  I feel that I have been grossly -- myself
13  and many people that I know have been grossly
14  mistreated by them.
15     I feel like the City has turned their
16  backs on us, treated us as if we were trash and
17  don't want us here, even though we are residents of
18  the City.
19  Q  And do you hold these feelings today, even
20  though you're in City transitional housing?
21  A  Yes.
22  Q  Do you think that the City helped you get
23  through your birth?
24  A  Yes.
25  Q  And how is that?

Page 130

1  A  Are you talking about my birth of my
2  daughter?
3  Q  Yes.
4  A  Yes.  I feel like the City actually has a
5  few very good programs for pregnant women.  And they
6  definitely -- they definitely helped me -- like, the
7  services that they provided while I was in treatment
8  and while I was in care at the hospital definitely
9  saved my daughter's life and helped me to get back
10  on my feet and stabilized, yes.
11  Q  Okay.  So you just -- thank you.
12     You just mentioned that they were helping
13  you with treatment.  Can you elaborate what you
14  meant by "treatment"?
15  A  Prior to being in the transitional housing
16  that I'm in, I was in a treatment program.
17  Q  Okay.  And what kind of treatment?
18  A  It was sober living.
19  Q  So prior to being in that treatment
20  program, were you having difficulties we sobriety?
21     ATTORNEY NTIM:  Objection, privacy.  I
22  instruct the client not to answer, unless you
23  demonstrate the relevance of the information sought.
24     ATTORNEY MILLS:  This is going to be
25  relevant because to the extent there's drug use that

Page 131

1  impacts perception or if there could be contraband
2  that was located in encampments, we have to set the
3  foundation for what type of drug use there was going
4  to be in the case.
5     So the question about if there was
6  difficulties with sobriety is directly relevant to
7  setting all of those foundational questions.
8     ATTORNEY NTIM:  Okay.  Then you may
9  continue.
10     ATTORNEY MILLS:  So is the witness not
11  being instructed to answer?
12     ATTORNEY NTIM:  So the witness is not
13  being instructed not to answer.  The witness may
14  answer.
15  Q  (BY ATTORNEY MILLS) Okay.  And would you
16  like me to repeat?
17  A  Sure.
18  Q  Yeah.
19     So prior to becoming enrolled in that
20  treatment program, were you having difficulties with
21  your sobriety?
22  A  Yes.
23  Q  And how long have you been having
24  difficulties with your sobriety?
25  A  On and off since I was 16 years old.

Page 132

1  Q  Okay.  And what type of drugs were you
2  using when you were at -- 16?
3  A  Opioids.
4  Q  And was that taken in the form of pills,
5  needles, or injections?  Can you explain a little
6  bit what type of opioids you were using?
7  A  Opioid pills.
8  Q  And were you using opioids prior to being
9  placed into the treatment program?
10  A  Yes.
11  Q  In 20 -- sorry.
12     And what year were you placed into the
13  treatment program?
14  A  June of 2023.
15  Q  So in June of 2023, what drugs were you
16  using?
17  A  I was not in June 2023.
18  Q  Okay.  Prior to enrolling in the treatment
19  program, what drugs were you using in, say, the last
20  year before entering that program?
21  A  Morphine and -- yeah, morphines.
22  Q  Is morphine the only drug that you would
23  use?
24  A  DILAUDIDs at times.
25  Q  And were you injecting morphine or were

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 157

1    A    I might be totally wrong on this, but I
2  think it's -- it's definitely under a certain limit.
3  It's -- if I remember correctly, it's like anything
4  under $5,000 you can claim in small claims.  And
5  that's -- that's pretty much it.
6    Q    And did you ever try to bring a small
7  claims action against the City for property that may
8  have been destroyed since you have experienced
9  homelessness in San Francisco?
10    A    I have not.
11    Q    Did you ever think about filing a small
12  claims action against the City for property
13  destruction that you may have experienced in the
14  times that you have been homelessness?
15    A    I thought about it.
16    Q    And why didn't you end up filing any small
17  claims action?
18    A    I didn't believe it would go anywhere.
19    Q    To the extent that you are presently
20  housed, do you fear that your property is going to
21  be destroyed by the City?
22    A    No.
23    Q    To the extent that you are presently
24  housed, do you feel fear that you are going to be
25  exposed to extreme whether that would jeopardize

Page 158

1  your health because of City conduct?
2    A    No.
3    Q    Do you intend to be homelessness in
4  San Francisco again in the near future?
5    A    No.
6    Q    Where -- if you were homelessness in
7  San Francisco, would you pack your property and move
8  if you received notice of an encampment resolution?
9    A    Yes.
10    Q    And where would you move?
11    A    I don't know.
12    Q    And if your property was taken, would you
13  go to the DPW yard to try to pick that property back
14  up?
15    A    Yes.
16    Q    Do you think that you could avoid or
17  mitigate any risk of future injury by losing your
18  property if you tried to avoid encampment
19  resolutions in the first place?
20    A    I'm sorry.  Can you -- can you please
21  restate that?
22    Q    Yeah.
23        Do you agree that you would be able to
24  mitigate any risk of future injury that your
25  property would be stolen by trying to avoid

Page 159

1  encampment resolutions in the first place?
2        ATTORNEY FREEMAN: Objection, calls for a
3  legal conclusion.
4    Q    (BY ATTORNEY MILLS) You can answer to the
5  extent...
6    A    Yes.
7    Q    And are you aware that your current
8  lawsuit against the City is not requesting monetary
9  compensation for your injuries?
10    A    One more time.  I'm sorry.
11    Q    Are you aware that your current lawsuit
12  against the City is not requesting monetary
13  compensation for your injuries?
14    A    No.
15    Q    And why are you not seeking monetary
16  compensation for your injuries?
17    A    Because that's not my motivation for doing
18  this.
19    Q    And what's your motivation?
20    A    My motivation is for policies to change
21  and for the City to treat us homeless residents with
22  more respect and dignity and also treat their
23  belongings with respect and not take them from them
24  anymore.
25    Q    And do you agree that you have never tried

Page 160

1  to seek monetary compensation against the City for
2  any property destruction that you may have
3  experienced in the past?
4    A    Yes.
5    Q    In your experience being homelessness in
6  San Francisco, do unhoused have conversations about
7  how to avoid their property being thrown away --
8        ATTORNEY NTIM: Objection --
9    Q    (BY ATTORNEY MILLS) -- by the City?
10        ATTORNEY NTIM: -- objection, calls for
11  speculation.
12    A    Yes.
13    Q    (BY ATTORNEY MILLS) And what have those
14  conversations been like?
15    A    Kind of hopeless.  Basically we kind of
16  talk about the fact that there's not really a way to
17  avoid it happen -- from happening very easily.
18    Q    Have you talked about practices to avoid
19  the property destruction in the first place?
20    A    Yes.
21    Q    And what type of practices have been
22  discussed that would allow individuals to avoid
23  property destruction?
24    A    It doesn't necessarily work.  We talk
25  about the fact that it helps to keep your property

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 165

1    Q    So setting aside just kind of the
2    geographical limits, how many encampment resolutions
3    do you think you have experienced in, say, the last
4    five years?
5    A    At least 30.
6    Q    And were the majority of those in a given
7    year?
8    A    No.  Spread out.
9    Q    And were they concentrated to a specific
10   neighborhood?
11   A    No.
12   Q    Of those 30 encampment resolutions that
13   you have experienced, in what percentage of them do
14   you believe that your property was wrongly
15   destroyed?
16        ATTORNEY NTIM: Objection, calls for a
17   legal conclusion.
18   A    At least half.
19   Q    (BY ATTORNEY MILLS) And do you do any type
20   of diary -- like create any type of diary or
21   journaling of the experiences that you have
22   experienced where you thought that your property was
23   wrongly destroyed?
24   A    I have in the past.
25   Q    And do you have those notes?

Page 166

1    A    No.
2    Q    Where did -- where would you typically
3    write those notes?
4    A    In a notebook.
5    Q    And do you have the notebooks still?
6    A    I do not.
7    Q    Would you ever send text messages about
8    the experiences with property destruction?
9    A    Not that I remember.
10   Q    Would you ever write notes on an -- on an
11   electronic device like a phone about the
12   experiences?
13   A    No.
14   Q    Did you ever think that you should take
15   photographs of your belongings in the event that
16   your property was wrongly destroyed by the City?
17   A    In retrospect, yes.
18   Q    How -- and when you say "retrospect," when
19   do you mean that retrospect materialized?
20   A    After the destruction occurred, I -- I
21   would be, like: I wish -- I wish I had photographed
22   my items.
23   Q    And when do you think you experienced your
24   first property destruction in San Francisco?
25   A    2014 or 2015.

Page 167

1    Q    And do you know where you were located
2    when your property was destroyed in 2014?
3    A    I believe I was on Fern Alley in Knob
4    Hill.
5    Q    And what property do you think was wrongly
6    destroyed?
7    A    Clothes, tents, art supplies, art,
8    sleeping bags, things to clean myself, photographs,
9    just memorabilia.  Things of that nature.
10   Q    And would you be able to recall a date in
11   2014 when that occurred?
12   A    No.
13   Q    Do you have a rough idea of the season?
14   A    I think the first time was probably in the
15   fall.
16   Q    So how many times in 2014 do you think
17   your property was wrongly destroyed?
18   A    One time.
19   Q    And what about in 2015?  Did you
20   experience any property destruction in 2015?
21   A    I don't think so.
22   Q    2016?
23   A    No.
24   Q    2017?
25   A    Yes.

Page 168

1    Q    And where in 2017 do you think that your
2    property was destroyed?
3    A    The -- the Mission area.  I don't
4    remember -- honestly, I don't remember exactly where
5    I was camping.
6    Q    Do you know what -- how many times in 2017
7    your property was wrongly destroyed?
8    A    Two times.
9    Q    And were these both in The Mission?
10   A    Yes.
11   Q    In the same neighborhood in The Mission?
12   A    Yes, the same neighborhood.
13   Q    Do you know if you were living with other
14   campers in 2017 when your property was destroyed?
15   A    No.  I was alone.
16   Q    And was your property destroyed in your
17   presence?
18   A    Yes.
19   Q    So let's focus on the first instance in
20   2017.
21        Do you have a rough idea of when in the
22   year that was?
23   A    Probably around November.
24   Q    And what property do you believe was
25   destroyed in November of 2017?

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 173

1  Q   Would you use spray paint?
2  A   Rarely.
3  Q   What percentage of the time do you think
4  you would use spray paint?
5  A   Probably like only four or five times
6  ever.
7  Q   And when we're talking about the art
8  supplies that you use, is that something that has
9  been pretty consistent since 2017 until the time you
10 were no longer sleeping on the streets?
11 A   Yes.
12 Q   Were there ever any periods in time where
13 you weren't doing art anymore?
14 A   How long of periods do you mean?  Like --
15 Q   So from 2017 until the time you entered
16 the transitional housing program that you're
17 currently in, did you ever stop doing art?
18 A   I did, yes.
19 Q   When did you stop?
20 A   When I had my daughter in 2023 -- April of
21 2023.
22 Q   But prior to that you did not have a lapse
23 in doing any artwork?
24 A   No.
25 Q   What percentage of the time do you think

Page 174

1  you had art supplies with you when you were camping?
2  A   Maybe 60 percent of the time.
3  Q   Do you have any notebooks that you have
4  drawn in over the years?
5  A   Yes.
6  Q   And do you still have those in your
7  possession?
8  A   A couple.
9  Q   Is it possible that the journals that
10 documented property destruction would be stored with
11 those art books?
12 A   The -- no.
13 Q   Do you have the art books in storage
14 somewhere?
15 A   No.
16 Q   So are they kept with you in your
17 apartment --
18 A   Yes.
19 Q   -- studio?
20     So what do you recall about first learning
21 in that instance in November of 2017 that your
22 property was stolen?
23 A   Can you say it one more time?  Sorry.
24 Q   Yeah.
25     So for this instance in November of 2017

Page 175

1  where you were staying somewhere in The Mission in,
2  I believe, November, when do you first recall
3  learning that your property had been stolen?
4  A   I remember waking up and unzipping my tent
5  and City workers were sweeping up front and taking a
6  few of my items and -- and tossing them into their
7  trash collector.
8  Q   And had you received any notice that City
9  workers were going to be coming that day?
10 A   No.
11 Q   Did anybody give you any notice that you
12 could move -- move along and pick up some belongings
13 to leave the area before your items started getting
14 thrown away?
15 A   No.
16 Q   Did you tell anybody that your property
17 was thrown away that day?
18 A   No.
19 Q   And do you know any of the City's
20 employees' names on --
21 A   I do not.
22 Q   -- that day?
23 Q   And do you know if your property was kept
24 tidy, as you described it earlier?
25 A   Yes.

Page 176

1  Q   Do you know if you were camped on the
2  public sidewalk?
3  A   It wasn't really a sidewalk.  It was -- it
4  was more just next to a building.
5  Q   Do you know what building you were next
6  to?
7  A   I don't remember.
8  Q   So let's shift to the second instance in
9  2017.
10     Do you know when that was in relation to
11 this November incident?
12 A   It was shortly after.  Probably --
13 probably -- either in November as well or in
14 mid-December.
15 Q   Okay.  And did you get any notice that
16 anybody was going to be coming?
17 A   No.
18 Q   Were you given any time to move your
19 belongings once the City employees were there?
20 A   No.
21 Q   Did you ask if you could move any of your
22 belongings?
23 A   Yes.
24 Q   And what did you ask?
25 A   I asked if you could -- if they could give

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 177

1  me a little bit of time to pack my things before
2  they threw them away.
3     Q    And were you given any time?
4     A    Well, what they ended up doing was they
5  just took a couple of items and then left.
6     Q    So they didn't throw everything away?
7     A    They didn't throw everything away.
8     Q    And what items did they take then?
9     A    They took a backpack.  Let me see if I can
10  remember everything that they took.
11         They took my broom.  They took my pillow.
12  Yeah, I don't recall the rest that...
13     Q    And were you cited at all in connection
14  with this incident?
15     A    No.
16     Q    And did you tell anybody about this
17  incident?
18     A    Yes.
19     Q    Who did you tell about this incident?
20     A    One of my friends.
21     Q    And what's the name of the friend?
22     A    It's somebody that I haven't spoken to in
23  a long time.  I don't -- I don't remember.  I don't
24  remember.  They were my friend at the time, but I
25  don't remember what their name was.

Page 178

1     Q    How close of a friend --
2     A    Just -- just --
3     Q    -- was it?
4     A    -- like a casual -- like just saw them
5  every once in a while.
6     Q    Did the friend have a nickname?
7     A    I don't remember.
8     Q    Did you write that incident down anywhere?
9     A    No.
10     Q    Did you have any text conversations with
11  the friend about this incident?
12     A    No.
13     Q    Was it just told in person?
14     A    Um-hum.
15         ATTORNEY FREEMAN: Make sure you say "Yes"
16  or "No."
17     A    Yes.
18     Q    (BY ATTORNEY MILLS) Okay.  Were there any
19  other instances in 2017?
20     A    No.
21     Q    So how many resolutions do you think you
22  experienced in 2018 where you lost property?
23     A    One.
24     Q    And do you know where you were camping at
25  that time?

Page 179

1     A    I don't remember.
2     Q    Do you have a best estimate?
3     A    The Tenderloin.
4     Q    Can you think of any landmarks that you
5  would stay near in 2018 in the Tenderloin?
6     A    There was a park -- a kids' park like a
7  couple of blocks away.
8     Q    Do you happen to know name of the park?
9     A    I -- I don't know the name of the park.
10  It was, I think, on Turk and -- yeah, I don't
11  recall.
12     Q    Sorry.  What was the last -- so you said
13  Turk, and I missed the --
14     A    I -- I was trying to remember.
15     Q    Oh.
16     A    I didn't say anything.
17     Q    Okay.  Do you know if you were by any
18  businesses or names of buildings that you can
19  recall?
20     A    I'm not sure.
21     Q    Do you know if you were on the sidewalk?
22     A    Yes.
23     Q    Were you obstructing any right-of-way?
24     A    No.
25     Q    And what's your basis for knowing that you

Page 180

1  weren't obstructing the right-of-way?
2         ATTORNEY NTIM: Objection, calls for a
3  legal conclusion.
4     Q    (BY ATTORNEY MILLS) You can answer.
5     A    Because there was plenty of room for
6  people to pass.
7     Q    Were you near any bus stops?
8     A    Yes.
9     Q    How close to the bus stop were you?
10     A    A few feet away.
11     Q    Were your belongings touching the bus
12  stop?
13     A    No.
14     Q    I want to go back to the incidences in
15  2017.
16         Do you have any recollection if you were
17  near a bus stop for either of those instances?
18     A    I was not.
19     Q    Do you know if you were in -- in the
20  cross -- like near a cross -- sorry.  Excuse me.
21         Do you know if you were near a crosswalk?
22     A    No, I don't believe so.
23     Q    And jumping back to the 2018 instance, do
24  you know if you were near a crosswalk next to a bus
25  stop?

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 181

```
 1    A   No.
 2    Q   Did you have any items stored outside of
 3  your -- your tent in this instance in 2018?
 4    A   Yes.
 5    Q   Do you know what items were stored outside
 6  of the tent?
 7    A   I had a pair of boots and a stool.
 8    Q   And what items did the City take from you
 9  in connection with the 2018 instance next to the bus
10  stop?
11    A   They took my entire tent that time.
12    Q   And do you know if you were given notice
13  to move?
14    A   There was no notice.
15    Q   Were you given notice once any City
16  workers came to try to move your belongings within
17  roughly 30 minutes?
18    A   No.
19    Q   Did you ask for any additional time to
20  move your belongings?
21    A   Yes.
22    Q   How much time did you ask for?
23    A   I -- I asked for as long as they could
24  give me.
25    Q   And were you given any -- any additional
```

Page 182

```
 1  time?
 2    A   They gave me 10 minutes.
 3    Q   Was 10 minutes enough to be able to pack
 4  your belongings?
 5    A   No.
 6    Q   Were you able to pack any belongings in
 7  the 10 minutes?
 8    A   Yes, I was able to get a backpack and a
 9  jacket and my sleeping bag.
10    Q   Did you tell anybody about this
11  instance -- incident?
12    A   I don't recall.
13    Q   Do you know if you wrote it down anywhere?
14    A   No.
15    Q   Did you ever try to go pick up property
16  from the DPW yard after this incident?
17    A   No.
18    Q   Did you call anybody at the City to try to
19  get property after the incident?
20    A   No.
21    Q   Did you go into any City agencies to try
22  to find out how you may be able to get property back
23  after that incident?
24    A   No.
25    Q   Were you cited for anticamping ordinance
```

Page 183

```
 1  violations in connection with that --
 2    A   No.
 3    Q   -- incident?
 4        Are there any other incidents in 2018 that
 5  you can recall where you experienced property
 6  destruction outside of this instance next to the bus
 7  stop in the Tenderloin?
 8    A   No.
 9    Q   And then in 2019, were there instances
10  where you experienced property destruction?
11    A   Yes.
12    Q   And how many instances in 2019 do you
13  think you experienced property destruction?
14    A   I would say three or four times.
15    Q   And let's start with the first one.
16        Do you recall when the first one took
17  place?
18    A   Yeah, it was a -- it was at the beginning
19  of the year, and I'm not sure.  January or February.
20    Q   And do you know where you were staying?
21    A   I was in Clara Alley.
22    Q   So that's Clara Alley?
23    A   Clara Alley, yes.
24    Q   And can you spell that, if you know?
25    A   C-L-A-R-A.
```

Page 184

```
 1    Q   And how long had -- had you been staying
 2  in Clara Alley?
 3    A   A night.
 4    Q   And what property do you claim was wrongly
 5  taken?
 6    A   My backpack.  Yeah, just -- just the bags
 7  that I had.
 8    Q   And what was in the backpack?
 9    A   All of my clothing, blankets, my
10  paperwork, art supplies, some food.
11    Q   What kind of food was taken?
12    A   I don't remember.  I think candy.
13    Q   Do you know if it was open, the candy, if
14  it was --
15    A   It --
16    Q   -- open?
17    A   -- might have been open.
18    Q   And do you know if your art supplies were
19  visible to the naked eye --
20    A   No --
21    Q   -- in plain sight?
22    A   -- they were not.
23    Q   Were you given notice that you were going
24  to have to move?
25    A   No.
```

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 185

1    Q    Were you given an opportunity to pack up
2    your belongings once the City employees arrived?
3    A    No.
4    Q    So you weren't given any time to try to
5    move your belongings whatsoever?
6    A    No.
7    Q    Did you report this incident to anybody?
8    A    I did not.
9    Q    Did you write it down anywhere?
10   A    No.
11   Q    What is the second instance in 2019 that
12   you can remember?
13   A    The second incidence was in Fern Alley.
14   Q    And do you know if there was a cross
15   street with Fern Alley?
16   A    Polk Street.
17   Q    Do you know if this is considered one of
18   the hotspot areas that we talked about earlier where
19   homeless individuals recommend to one another that
20   they should try to avoid, if they can?
21   A    Are you asking if I know now or I knew
22   then?
23   Q    Then.
24   A    I did not.
25   Q    Is that an area now that is known as being

Page 186

1    a hotspot that individuals should try to avoid?
2    A    Yes.
3    Q    And what items do you think you lost in
4    this second instance in 2019 at Fern Alley and Polk?
5    A    I lost my tents. I lost all of my -- my
6    documents. I lost all of my clothing. I lost some
7    of the -- the artwork that I was making. Shoes,
8    backpacks. That's -- that's all I can --
9    Q    That's all?
10   A    -- yeah.
11   Q    And when you say "documents," what do you
12   mean by "documents"?
13   A    Paperwork. Like, my -- my -- one of my --
14   my California ID, one of my wallets, cards, and
15   phone numbers.
16   Q    Was it your practice at that time to not
17   keep your ID and wallet on your person when you left
18   your tent?
19   A    I did most of the time. But at that
20   particular time, I didn't have it.
21   Q    And were you present -- physically present
22   when they were taking your property?
23   A    I was not.
24   Q    How long had you not been there?
25   A    About 10 minutes.

Page 187

1    Q    And what about the instance that we were
2    talking about before in Clara Alley? Were you
3    physically present for them to see -- for you to see
4    them taking your property?
5    A    Yes.
6    Q    So at the instance in Fern Alley and Polk,
7    did you have any signage on your belongings that it
8    wasn't abandoned?
9    A    No.
10   Q    Would you ever write signs and leave it on
11   your property that your property was not abandoned?
12   A    No.
13   Q    And when we talk about your artwork, what
14   type of, like, paintings or graphics are you making?
15   A    Just portraits of people usually. Yeah,
16   portraits or paintings of, like, creatures. Things
17   like that.
18   Q    And do you do anything that's like
19   abstract or modern art?
20   A    Not really. More like fantasy.
21   Q    Would anybody construe your art as
22   potentially, like, scribbles on a piece of paper?
23   A    I hope so.
24        ATTORNEY FREEMAN: That calls for
25   speculation.

Page 188

1    Q    (BY ATTORNEY MILLS) I'm just asking to try
2    to get an idea of what it is you're -- you're, like,
3    putting on the paper, so --
4    A    No.
5    Q    -- sorry about that. Okay.
6        So do you have any recollection of other
7    instances in 2019 where your property was destroyed?
8    A    No.
9    Q    In 2020, how many times do you think your
10   property was destroyed?
11   A    Twice.
12   Q    And when was the first instance?
13   A    March 2020. End of March.
14   Q    And where were you staying?
15   A    I was at -- I'm trying to remember the
16   name of the alleyway behind it.
17       Oh. It -- it was Clara as well. Clara.
18   Q    And were you living with Mr. Donohoe at
19   this point?
20   A    No.
21   Q    Were you living with anybody else?
22   A    No.
23   Q    And were you living in an encampment
24   community or were you camping alone?
25   A    I was alone.

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 197

1 other if it was a City employee or a community
2 ambassador?
3     A   I -- I don't know for sure.
4     Q   Okay.  Did you document this incident
5 anywhere?
6     A   No.
7     Q   Did you tell anyone about it?
8     A   No.
9     Q   And then when did the second incident
10 occur in 2021?
11    A   In July.
12    Q   And was that at the beginning of the month
13 or the end of the month?
14    A   Around the beginning.
15    Q   Do you know if it was in the morning or
16 the night or afternoon?  Sorry.
17    A   It was -- it was late morning.
18    Q   Do you have a rough idea of what time?
19    A   Around 7:00.
20    Q   And where were you staying?
21    A   I do not recall the name of this alley,
22 but it's in -- it's in the Knob Hill area.
23    Q   Is that an area that people experiencing
24 homelessness would consider a hotspot that they
25 should avoid?

Page 198

1     A   Yes.
2     Q   And did you know that in 2021?
3     A   No.
4     Q   Can you explain what happened that
5 morning?
6     A   I woke up, and they were like:  We need to
7 clean streets and we're going to -- we're going to
8 wash the area.  You have 10 minutes to pick up all
9 your stuff and go.
10    Q   And what belongings did you have with you?
11    A   I had a tent.  I had a tarp.  I had a
12 sleeping bag.  I had clothing.  I had a couple of
13 nonperishable cans of food.  I had art supplies.  I
14 had hats.  I had backpacks.
15    Q   And were you camping with Mr. Donohoe at
16 this point in time?
17    A   No.
18    Q   Were you camping with anybody?
19    A   No, I was not.
20    Q   So was this a group encampment or were you
21 camping alone?
22    A   I was alone.
23    Q   Were you by any landmarks?
24    A   No.
25    Q   Were you near a bus stop?

Page 199

1     A   No.
2     Q   A driveway?
3     A   No.
4     Q   Were you obstructing the sidewalk at all?
5     A   No, I was not.
6     Q   And how did you know that this was a City
7 employee?
8     A   Because they came with a -- a truck that
9 was the Department of Public Works.  And they had --
10 they had their hoses to clean the sidewalk with.
11    Q   Okay.  And can -- how much time did you
12 say you were given to -- to move your belongings
13 that day?
14    A   I said -- said like 10 or 15 minutes.
15    Q   And were you physically present when they
16 took your property?
17    A   Yes.
18    Q   Were there any HOT workers?
19    A   No.
20    Q   And did you report this incident to
21 anybody?
22    A   No.
23    Q   Did you write it down or document it
24 anywhere?
25    A   No.

Page 200

1     Q   Were there any witnesses other than the
2 City employees?
3     A   There might have been.
4     Q   Do you know who any of them are?
5     A   No.
6     Q   Is that the only other instance in 2021
7 where you experienced property destruction?
8     A   Yes.
9     Q   How many times in 2022 did you experience
10 property destruction?
11    A   Five or six times.
12    Q   When is the first instance that you
13 remember property destruction in 2022?
14    A   February of 2022.
15    Q   And where were you located?
16    A   I was at the 9th and Folsom area behind
17 Target.
18    Q   And were you living with Mr. Donohoe at
19 this point?
20    A   No.
21    Q   Would Mr. Donohoe have had his red hazard
22 bin in any encampment with you in February of 2022?
23    A   Yes.
24    Q   Can you describe what that day was like in
25 February of 2022?

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Sarah A. Cronk
September 23, 2024

Page 201

1  A  Yes.  The -- a couple of different trucks
2  drove up, and they instructed us to pick up all our
3  belongings because they said they would have to
4  clean the sidewalk area that we were -- that our
5  tents were on top of.
6      They started sweeping immediately and
7  picking up items and throwing them into the truck.
8  Just anything that was out of our reach and in their
9  reach, they would pick up and they would throw in
10  the truck.
11      They -- there were a couple of -- there
12  were a couple of trash bags that were left out
13  specifically because -- they had told us in the past
14  that:  If you leave a trash bag out and -- for us to
15  pick up, we'll pick that up and we'll take it.  And
16  it will be fine, and we won't take anything else.
17      But they -- that particular time they did
18  not pick up the trash bag that we had put out.  And
19  they picked up specific items that were ours that
20  were not trash.
21      And they told us if we didn't leave the
22  area, that they would have to call SFPD and cite us.
23  Q  Do you have any recollection of getting
24  notice that the City was going to be coming on that
25  day in February of 2022?

Page 202

1  A  No.
2  Q  Did any City or HOT team workers come and
3  inform you that individuals were going to be coming
4  on that day?
5  A  No.
6  Q  Did you hear from anybody else -- well,
7  let's take a step back.
8      Were you and Mr. Donohoe camping with
9  other individuals in that area?
10  A  In the area, yes.
11  Q  How many individuals do you think that you
12  were camping with in February of 2022 at roughly 9th
13  and Folsom?
14  A  Okay.  What do you mean, "camping with"?
15  Like in the same tent or what are you --
16  Q  Just in the area, how many tents or, like,
17  similar structures do you think that there were for
18  campers?
19  A  Maybe six.
20  Q  And do you know how many people?
21  A  Approximately eight people.
22  Q  Do you know how long that group of roughly
23  six camps or eight people had been living in that
24  area on 9th and Folsom in February of 2022?
25  A  No.

Page 203

1  Q  Do you know how long you had been camping
2  there?
3  A  Yes.
4  Q  And how long was that?
5  A  About a month.
6  Q  And was it more or less eight people for
7  that entire month?
8  A  No.
9  Q  And how close were you to the Target?
10  A  I was on the other side of the street kind
11  of kitty corner to it.  Not -- not in front of
12  the -- the entryway, but maybe like 30 -- 30 feet to
13  the side of it.
14  Q  And were you and Mr. Donohoe given time
15  that day to move certain belongings after you were
16  told that you could be cited?
17  A  Given time before?
18  Q  To move your belongings.
19      Were you and Mr. Donohoe given time, after
20  City employees came, to move belongings?
21  A  As in before they started throwing them
22  away?
23  Q  Correct.
24  A  No.
25  Q  And what property are you claiming you

Page 204

1  lost that day?
2  A  We lost ours pots and pans, our boots, our
3  tarp.  That's about it.
4  Q  Did you have a tent?
5  A  Yes.
6  Q  And how old was the tent?
7  A  Probably about a month old.
8  Q  Can you describe the condition of your
9  tent?
10  A  It was -- it was slightly -- it was
11  slightly weathered, but it was clean.  No holes or
12  anything like that.  It was dry.
13  Q  Had you been doing artwork inside of that
14  tent?
15  A  Yes.
16  Q  Do you know if there was any paint spilled
17  inside of that tent?
18  A  No.
19  Q  Any other art supplies spilled inside of
20  that tent?
21  A  No.
22  Q  How close was your tent to the other tents
23  that were located in that area?
24  A  Only a few feet from them.
25  Q  How would you typically go to the restroom