# EXHIBIT 4

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.*

*Toro Castano
October 9, 2024*

*Behmke Reporting and Video Services, Inc.
550 California Street, Suite 820
San Francisco, California 94104
(415) 597-5600*

Original File 43437Castano_nl.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR    Document 366-10    Filed 04/17/25    Page 3 of 6
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Toro Castano
October 9, 2024

Page 113

1  A. Of course, yes.
2  Q. And did you also understand that it was
3  important to provide complete responses?
4  A. I'm not clear on that question.
5  Q. When you were providing the responses, was your
6  intent to provide as much information as you could
7  recall about the -- the information that you were
8  providing?
9  A. I would imagine.
10 Q. Do you know if you did your best to be as
11 complete as possible when you were verifying the written
12 responses?
13 A. Yes.
14 Q. And we can go ahead and set those aside.
15    So, Mr. Castaño, between -- between 2017 and
16 2022, how many laptops did you have?
17 A. One.
18 Q. And did you have any laptops between 2022 and
19 the present day that are different than that laptop?
20 A. In the present day?
21 Q. Yes.
22 A. Yes. I have one.
23 Q. So you've had two laptops since 2017 through
24 the present day?
25 A. Yes.

Page 114

1  Q. And do you know when you needed to change
2  laptops?
3  A. When I needed to change?
4  Q. Yes.
5  A. I'm not sure what you mean.
6  Q. So did you -- was there ever anytime where you
7  had both laptops --
8  A. No.
9  Q. -- at once?
10 A. No.
11 Q. So why did you need to get a second laptop?
12 A. The first one was destroyed.
13 Q. Do you know when that was destroyed?
14 A. August 21st.
15 Q. Do you know what year?
16 A. 2021. Was that the pandemic? I think, yeah.
17 Q. And do you still have the same laptop today
18 that replaced the one that was stolen -- or sorry --
19 destroyed on August 21st, 2020?
20 A. No, definitely not. I wish I did.
21 Q. So right now is -- you don't have any laptop?
22 A. I do. Mine -- mine is a 2017 now, and that was
23 a 2006, I believe.
24 Q. So let's go back to the first one that might
25 have been a 2006.

Page 115

1  A. No, it was. I'm sure it was.
2  Q. So your testimony is that it was a 2006 Mac?
3  A. I bought it from Apple. Yes.
4  Q. Do you know when you bought it?
5  A. It was in two thousand -- it was after 2006 but
6  before 2010.
7  Q. So sometime before 2010, you bought a 2016
8  [sic] Mac?
9  A. Yeah. Um... Yeah.
10 Q. And did you buy that from an Apple store?
11 A. I bought it online from Apple.
12 Q. Do you have a receipt for that laptop?
13 A. No. I could probably find one, or they could
14 probably verify it, I would imagine.
15 Q. And then you had that laptop from roughly
16 before 2010 to August 21st, 2020?
17 A. Mm-hmm. A little over the twelve years.
18 Q. Did that laptop have any issues with its
19 functionality?
20 A. Yes. It began to start to physically break
21 down at the twelve-year mark.
22 Q. What do you mean, "began to break down"?
23 A. Well, they -- they -- they just -- DesignUp --
24 Ups lessons began to manifest. Little things.
25 Q. Was it still a functioning laptop in

Page 116

1  August 21st, 2020?
2  A. Yeah. I repaired each of the things. For
3  example, the Wi-Fi antenna became detached.
4  Q. Any other issues with the laptop heading into
5  August 21st, 2020?
6  A. Sure. Yeah.
7  Q. And what were those?
8  A. I don't remember specifically, but I have had
9  it repaired over the years.
10 Q. Where would you get it repaired?
11 A. The last place I had it repaired was in Orange
12 County.
13 Q. Do you know the name of the store?
14 A. No. I could tell you the streets it was on.
15 Q. That would help.
16 A. Heil, H-e-i-l, and -- let's see -- Edinger --
17 no. Is that Edinger? I'd have to look at a map. I'm
18 not sure of the streets. One past Golden West, which
19 was the main street in Huntington Beach.
20 Q. And do you know what year you got that repaired
21 in?
22 A. Two -- no. It was maybe five years ago. I'm
23 not sure.
24 Q. What about how -- how long in advance of August
25 21st, 2020, was the laptop repaired?

Case 4:22-cv-05502-DMR    Document 366-10    Filed 04/17/25    Page 4 of 6

Coalition on Homelessness, et al. v.　　　　　　　　　　　　　　　　Toro Castano
City and County of San Francisco, et al.　　　　　　　　　　　　　October 9, 2024

Page 141

1   Q.  Was there any type of charter or controlling
2   manual that outlined your rights as a volunteer in the
3   Coalition on Homelessness?
4   A.  Peripherally, yes.
5   Q.  What do you mean by "peripherally" --
6   A.  The --
7   Q.  -- with regards to a document?
8   A.  The officer manager had academic training, and
9   he like to use that as a model.  We were sent to -- to
10  have classes here and there and training.
11  Q.  Who was the office manager?
12  A.  I don't remember his name.  Josh, I think.
13  Q.  And what was the academic training that you
14  knew?
15  A.  I don't remember specifically.  It was
16  something -- something having to do with the Midwest.
17  Q.  But is it fair to say that there was no
18  document outlining what your rights as a volunteer in
19  the Coalition on Homelessness were?
20     MR. NTIM:  Objection; vague as to "rights."
21     THE WITNESS:  I think -- I would think of it more
22  like the way the Constitution is framed.  These are,
23  like -- it's like a living document.  So there's
24  nothing -- you know, no one typed something out, but we
25  certainly were free to exchange ideas and raise

Page 142

1   objections or affirmations or...
2   BY MR. MILLS:
3   Q.  So if I am understanding the testimony, there
4   is no document?
5   A.  Per se --
6      MR. FREEMAN:  Objection.
7      THE WITNESS:  -- I don't know.  I wouldn't know.
8      MR. NTIM:  Objection; misstates prior testimony.  He
9   said that he was not aware of it.
10  BY MR. MILLS:
11  Q.  Did you have to pay any dues to the Coalition
12  on Homelessness?
13  A.  No.
14  Q.  Did the Coalition on Homelessness ever offer
15  you, personally, any services as an unhoused individual?
16  A.  Yes.
17  Q.  And what kind of services were you offered by
18  the Coalition?
19  A.  I think I was given a tent one time.  And Brian
20  was the first person I worked with.  He helped me to try
21  to resolve some of my financial issues and some citation
22  stuff.  Just practical things, I guess.
23  Q.  Do you know how many tents you were provided by
24  the Coalition on Homelessness?
25  A.  One.  And I'm not sure if it was from the

Page 143

1   Coalition.  It was from someone who worked there.  I
2   think it was his personal tent.  So it might not have
3   been from the Coalition.
4   Q.  Do you know if the Coalition on Homelessness
5   offered storage services to individuals?
6   A.  I don't believe they did.  I think they were
7   point -- they pointed people towards resources.
8   Q.  And at any point while you've been unhoused,
9   were you aware that the City offers storage for homeless
10  property?
11  A.  Yes.  I believe that's where they would refer
12  people to.
13  Q.  And what do you know about that programming
14  that the City has available?
15  A.  I've never participated in it.  I understand
16  that it's south of Market near 6th Street.
17  Q.  Do you know when you first learned about it?
18  A.  Early on.
19  Q.  Is it fair to say in 2020, you knew about
20  programming?
21  A.  Probably.  I think people in the street share a
22  lot of resources.  I'm sure someone told me there.
23  Q.  Do you know if the Coalition on Homelessness
24  helped unhoused individuals pool resources to locate
25  storage?

Page 144

1   A.  I don't know.  I wouldn't have any idea.  It's
2   possible.
3   Q.  Do you know if the Coalition on Homelessness
4   provides wheelchairs or carts to individuals?
5   A.  No.  They would have referred them to an
6   organization near Dolores Park that does that.
7   Q.  And what's that organization's name?
8   A.  I don't know.  You'd -- you'd have to look for
9   wheelchairs.  They provide wheelchairs mostly.
10  Q.  Have you ever declined any services that were
11  being offered by the Coalition on Homelessness?
12  A.  I don't think so.  I don't think they offered
13  services, per se.  They were kind of like a -- they
14  would direct people to resources or instruct people on
15  what to do if their car was towed or something, you
16  know, something like that.
17  Q.  So what type of activities did you do as a
18  volunteer?
19  A.  All that I could, you know.  I tried to do
20  everything I could to help people that needed help that
21  asked me.
22  Q.  And what type of physical activities did you do
23  as a volunteer?
24  A.  I cleaned up litter.  I got people resources.
25  I got people clothing, food.  I helped people with

Case 4:22-cv-05502-DMR   Document 366-10   Filed 04/17/25   Page 5 of 6

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Toro Castano
October 9, 2024

Page 325

1  compel with the Court ordering that the name be
2  provided.
3     A.  Go for it.
4     Q.  We'll keep the deposition open as well for the
5  name to the extent --
6     A.  Not giving it up.  Not giving it up.  That's
7  not the point.  You should be concerned about the City
8  worker, not the person it was offered to.
9     Q.  I'm trying to identify the City worker.  So if
10 you provide the name, then we can --
11    A.  I can -- I can try and find out his name again.
12 I'd just have to do some research.
13    Q.  The DPW worker's name?
14    A.  Yeah.  He's really tall and dark-skinned.  And
15 he wore a police badge around his neck on a chain when
16 he was doing resolutions.
17    Q.  Was this in the Castro?
18    A.  It was among other places.  Yeah, the Castro.
19 No.  The incident happened in Twin Peaks.
20    Q.  Do you know the cross streets?
21    A.  It was Grandview, I think is the street, under
22 the overpass.  It turns into Portola.
23        They were ant- -- there was -- they were
24 antique guns.  There was something unique about both of
25 them.

Page 326

1     Q.  Do you know if that was in the summer, fall,
2  spring?
3     A.  I don't believe it was wintertime, but I'm not
4  sure.
5     Q.  Do you have any idea what season it was?
6     A.  No.  It wasn't very cold or rainy.  So...
7     Q.  And how did you know that this was a DPW
8  worker?
9     A.  I'd seen him many, many times.  He was wearing
10 a uniform.
11    Q.  Can you describe the uniform?
12    A.  Orange vest.  I don't remember what he had on
13 underneath that.
14    Q.  Are you familiar with community -- community
15 ambassadors?
16    A.  Yes.
17    Q.  Do community ambassadors wear orange vests?
18    A.  No.  They wear white usually.
19    Q.  Do you know if community ambassadors would
20 clean up encampments?
21    A.  No.  Usually they didn't do much other than
22 report and observe.
23    Q.  Do you have information written down about this
24 DPW worker?
25    A.  I did some research to figure out who he was.

Page 327

1  I think I did image searches, but I don't remember if I
2  took notes.
3     Q.  But you don't know when this search was done?
4     A.  I could find out.  But, no, I don't know off
5  the top of my head.
6     Q.  Anything else about your interactions with the
7  City and County of San Francisco that we haven't covered
8  that you would like to disclose?
9     A.  The use of chemicals is, like, excessive, like
10 shockingly so.
11    Q.  And is that chemicals to clean the sidewalks?
12    A.  Deodorant or soap, yes.
13    Q.  And why were they excessive?
14    A.  They did it so bad one time in Triangle Park,
15 that residents complained about it because it was -- it
16 was so bad, you couldn't even walk in the area.  It
17 burned your lungs and your eyes.
18    Q.  I'm sorry.  You said Triangle Park again?
19    A.  Yeah.
20        And there were times when we didn't move quick
21 enough, they threw the chemicals on us.  And it's very
22 hard to breathe.
23    Q.  Did you ever complain to anybody in writing
24 about the chemicals being sprayed on you?
25    A.  I talked -- I talked to Street Medicine a

Page 328

1  couple times.  Not in writing, just verbally.
2     Q.  Street Medicine?
3     A.  Yeah.  They were the nurses that offer care.
4     Q.  Do you know when you had that conversation?
5     A.  Not exactly, no.
6     Q.  Did you ever file a claim about that?
7     A.  I tried to, but no one was interested in going
8  against the City.
9     Q.  And you didn't file it self-represented?
10    A.  No.  I didn't -- I don't have enough expertise
11 to do that.
12    Q.  What time would these interactions begin?
13    A.  4:30 in the morning sometimes.
14    Q.  And how do you know it was the City workers?
15    A.  They were in City vehicles wearing City
16 uniforms.  And it was usually the same people.  The
17 steam truck people are usually the same people.
18    Q.  And were you asked to move?
19    A.  Yes.
20    Q.  And did you move?
21    A.  I tried to every time.  But sometimes we didn't
22 move fast enough.  So they just threw the chemicals on
23 us, or they got on us when they were...
24    Q.  How long would you typically take to move?
25    A.  20 minutes.

Case 4:22-cv-05502-DMR   Document 366-10   Filed 04/17/25   Page 6 of 6

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Toro Castano
October 9, 2024

Page 329

1  Q. So they'd give you about 20 minutes to move,
2  and you still --
3  A. They'd give us five minutes, maybe, and just
4  start spraying.
5  Q. Do you know the names of any of those
6  employees?
7  A. No. One of them had really bright
8  reddish-burgundy hair who regularly drove the steam
9  truck, a large heavyset woman.
10 Q. Was this all prior to twenty -- August 21st,
11 2020?
12 A. No. Some of it happened after.
13 Q. At some point, did it stop?
14 A. No. It's been intermittent. It happened at
15 Castro and Market recently, and it happened a lot at
16 16th Street.
17 Q. Have you ever seen the green truck in the
18 Castro?
19 A. The green truck?
20    MR. NTIM: Objection.
21 BY MR. MILLS:
22 Q. That drives around and cleans the streets.
23 A. I'm not sure what that is.
24 Q. Are you familiar with the Castro Community
25 Benefit District?

Page 330

1  A. Yeah.
2  Q. Have you ever seen them clean the streets?
3  A. No. I don't think they do.
4     Cody, the heavyset guy that used to do it, I
5  saw him slash a tent once.
6  Q. So how are you able to distinguish individuals
7  like Cody from the Castro Benefit District from DPW
8  workers?
9  A. Because it's very clear that he worked for the
10 business district.
11 Q. And what made it clear?
12 A. Everyone knew that.
13 Q. Do you know what Cody was wearing?
14 A. No. He was -- he usually had some kind of
15 utility belt on and vest. He was very, very large, very
16 obese.
17 Q. Anything else?
18 A. No. That's it.
19    MR. MILLS: All right. I have no further questions.
20    MR. NTIM: Okay. Just while we're on the record,
21 I'd like, under our protective order, to state that
22 we're invoking our right to have 21 days to identify
23 specific portions of the testimony we intend to
24 designate as Confidential or Attorneys' Eyes Only.
25    And additionally, under Rule 30(e), we are

Page 331

1  invoking our right to review the deposition transcript
2  and make corrections.
3     MR. MILLS: All right. Thank you.
4     So we'll go off the record at 6:19.
5     THE VIDEO OPERATOR: This concludes the deposition
6  of Toro Castaño. The number of media files used was
7  five. The original media will be retained at Behmke
8  Reporting and Video Services, Inc.
9     We are going off the record. The time is
10 6:20 p.m.
11    (At 6:20 p.m. the deposition proceedings
12     adjourned.)
13
14
15    _____
16    TORO D. CASTAÑO

Page 332

1  STATE OF CALIFORNIA        )
2                             ) ss.
3  COUNTY OF SAN FRANCISCO    )
4         I hereby certify that the witness in the
5  foregoing deposition, TORO D. CASTAÑO, was by me duly
6  sworn to testify to the truth, the whole truth and
7  nothing but the truth, in the within-entitled cause;
8  that said deposition was taken at the time and place
9  herein named; and that the deposition is a true record
10 of the witness's testimony as reported by me, a duly
11 certified shorthand reporter and a disinterested person,
12 and was thereafter transcribed into typewriting by
13 computer.
14        I further certify that I am not interested in
15 the outcome of the said action, nor connected with nor
16 related to any of the parties in said action, nor to
17 their respective counsel.
18        IN WITNESS WHEREOF, I have hereunto set my
19 hand this 21st day of October, 2024.
20 Reading and Signing was:
21 _x_ requested    ___ waived    ___ not requested
22
23        *[signature]*
24
25    SUZANNE I. ANDRADE, CSR NO. 10682