# EXHIBIT 5

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition On Homelessness, et al., v.*
*City and County of San Francisco, et al.,*

*David Martinez*
*October 15, 2024*

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California 94104*
*(415) 597-5600*

Original File 43461Martinez_nl.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR   Document 366-11   Filed 04/17/25   Page 3 of 7
Coalition On Homelessness, et al., v.
City and County of San Francisco, et al.,
David Martinez
October 15, 2024

Page 53

1  recognize Exhibit 44?
2  A.  I keep forgetting.
3      (Examines document.)
4      Yeah.  Yes.  Sorry.  Yes.
5  Q.  Is Exhibit 44 one of your declarations for this
6  case?
7  A.  Yes.  Right?
8  Q.  I didn't see a date on Exhibit 44.
9      Do you remember when you signed it?
10 A.  No.  No.
11 Q.  Do you have a best estimate of when you signed
12 Exhibit 44?
13 A.  No.  I'm sorry.
14 Q.  Okay.  That's fine.
15     I'll tell you at the very top it says "Filed
16 September 26th, 2024."
17     Do you -- does that help you remember in any
18 way when you might have signed it?
19 A.  Mm-mm.
20 Q.  Okay.  But you did sign the last page of
21 Exhibit 44, right?
22 A.  Yeah.  Yes, mm-hmm.
23 Q.  And when you signed Exhibit 44, you were
24 signing to indicate that everything in the declaration
25 was truthful; is that right?

Page 54

1  A.  Yes.
2  Q.  And I ask if you could take a look at the
3  second page of Exhibit 44.  There's a paragraph that
4  starts with the number 4, and let me know when you get
5  there.
6  A.  Okay.  Yes.
7  Q.  I'm going to read the first sentence and then
8  ask you if I read it correctly.
9      So the first sentence of paragraph 4 in
10 Exhibit 44 reads:  "When I got to my current placement,
11 I was told the placement would be temporary."
12     Did I read that correctly?
13 A.  Yes.
14 Q.  And when you're talking about "current
15 placement" here, that means 44 McAllister, right?
16 A.  Yes.
17 Q.  So were you mistaken when you wrote in
18 paragraph 4 of Exhibit 44 that somebody told you that
19 placement would be temporary?
20 A.  No, no, no.  It was -- it was told to me from
21 another tenant.
22 Q.  Okay.
23 A.  So they might have been wrong.
24 Q.  Okay.  Do you remember the name of that tenant?
25 A.  No.  No.  Sorry.

Page 55

1  Q.  Okay.  When you say "another tenant," to me
2  that means one person.
3      Do you remember how many people told you that
4  your placement at 44 McAllister would be temporary?
5  A.  Just that one.
6  Q.  Okay.  And when you said in the second sentence
7  of paragraph 4 in Exhibit 44:  "I believe that at some
8  point, I might have to move," did you mean move to
9  another building or move and become homeless again?
10 A.  To another building.
11 Q.  Okay.  I'm not going to ask you any more
12 questions about documents for a minute.
13     Is it fair to say that at some point in time
14 you were homeless?
15 A.  Yes.
16 Q.  What's your best estimate of the time period
17 when you were homeless?
18 A.  It was a long time.  I would say over -- over
19 20 years.
20 Q.  And is it fair to say that the point where you
21 stopped being homeless was in January 2023 when you
22 moved to 44 McAllister?
23 A.  Mm-hmm.
24 Q.  Is that a yes?
25 A.  Yes, yes.

Page 56

1  Q.  Do you have a best estimate of, like, how old
2  you were when you first became homeless?
3  A.  No.  Sorry.
4  Q.  That's fine.
5      But so you think something longer than 20 years
6  before January 2023; is that right?
7  A.  Yes.
8  Q.  Do you consider yourself homeless today?
9  A.  No.
10 Q.  Sometimes people might end up in like a
11 Navigation Center or a shelter where you can kind of
12 stay, but it's time-limited.
13     Do you understand that?
14 A.  Yeah.  Yes.
15 Q.  Were there ever times when you were homeless
16 where you were staying in -- inside a building even
17 though it wasn't like a permanent home?
18 A.  Navigation Center, 3rd and 24th, I think was
19 the street.  It's called The Waterfront.  I stayed there
20 for about a year and a half.
21 Q.  Do you recall when you stayed at The
22 Waterfront?
23 A.  No.  I mean...
24 Q.  Do you have, like, an estimate of what decade
25 of your life you were in?  30s?  40s?

Page 113

1  Q.  I see.
2     So you might have lived with Jezzeille Murdock
3  when you were in the Navigation Center on Mission?
4  A.  Yeah.  Yes.
5  Q.  Did she live with you in the encampment
6  community on -- oh, shoot.
7  A.  13th?
8  Q.  Thank you.
9  A.  Yes.  Yeah.
10 Q.  Okay.  You said maybe Darrah Reasor.
11    Anything, like, coming to mind?
12 A.  Mm-mm.
13 Q.  Okay.  And what about Garrett Washington?
14 A.  Mm-mm.
15 Q.  Still nothing?  Okay.
16    Are you familiar with the Coalition on
17 Homelessness?
18 A.  Yes.
19 Q.  Okay.  What do you know about it?
20 A.  Not much.  Just they help me out, you know, and
21 I offered to help, because I would volunteer my help
22 whenever I could.
23 Q.  How did the Coalition on Homelessness help you
24 out?
25 A.  They always come around, you know, let us know

Page 114

1  how close we were to getting housing or -- or where to
2  be.  Because there would be, like, certain -- certain
3  days where -- I don't know if it was the police or
4  somebody else would come, and they would pick a certain
5  amount of people from the group and they would house
6  them.  So they would tell us where to go for that.
7  Q.  So your recollection is that at some points the
8  City had some shelter capacity, and the people from the
9  Coalition on Homelessness were coming out letting you
10 know where to be to meet up with the City employees --
11 A.  Yeah.
12 Q.  -- if you wanted housing?
13 A.  Yeah.
14 Q.  Any other, like, services or ways they helped
15 you out?
16 A.  Not really.  I wasn't wanting to stick around
17 if it wasn't going to happen.  You know, I kind of knew
18 right up front, so just, like, walk away from it.
19 Q.  Yeah.
20    Have you ever seen people from the Coalition on
21 Homelessness as observers at resolutions?
22 A.  Sometimes.  Not very often, but, yeah, once or
23 twice.
24 Q.  Did you talk to them when that happened?
25 A.  No.  I was too busy packing up.

Page 115

1  Q.  Yeah.
2     I think I also heard you say that you
3  volunteered with the Coalition on Homelessness when you
4  could; is that right?
5  A.  Yeah.
6  Q.  Can you tell me about that?
7  A.  Oh, I offered -- I offered to volunteer for
8  them, but so far I always go -- like, I volunteer when
9  they would show up.  Like I would walk with them and
10 talk to other homeless people, show them where certain
11 people were, because they would come every once in a
12 while looking for specific people.
13 Q.  Mm-hmm.
14 A.  And, you know, I don't know, but I would know
15 where everybody's at more or less.
16 Q.  Yeah.
17    So to make sure I'm understanding, there are
18 times when members of the Coalition on Homelessness
19 would come out to your community.
20    They were looking for certain people, and you
21 would kind of help connect them; is that right?
22 A.  Yeah.
23 Q.  Any other types of volunteer work you did for
24 the Coalition on Homelessness?
25 A.  No.  Pretty much that was about it, yeah.

Page 116

1  Q.  And did the Coalition on Homelessness tell you
2  why they were looking for those people?
3  A.  I guess so, yeah.
4  Q.  What did they say?
5  A.  I can't remember.  But I know it was -- that
6  would definitely be a part of it.  I wouldn't -- I
7  wouldn't show anybody where anybody was at unless I knew
8  it was worth it, you know.
9  Q.  What do you mean when you say unless you knew
10 it was worth it?
11 A.  Like, if it meant their housing or something
12 important, you know, I would definitely show you.
13 Q.  Yeah.
14 A.  But if it was something -- they wouldn't tell
15 me, I wouldn't show you.
16 Q.  Yeah.
17 A.  Because I don't know -- you know, I don't want
18 to put nobody in a bad situation.
19 Q.  Yeah.
20    Did the Coalition on Homelessness ever ask you
21 where people were to help, like, get a declaration for
22 one of their cases?
23 A.  I don't think so.
24 Q.  When's the last time that you recall
25 volunteering to help connect the Coalition on

Page 117

1  Homelessness with other members of your community?
2  A. A few years ago.
3  Q. Okay. And we're in 2024. So a few years ago,
4  like...
5  A. Since I moved in.
6  Q. Okay.
7  A. So, uh-huh.
8  Q. And you moved in in January of 2023, right?
9  A. Yes.
10 Q. Okay. So your best recollection is that you
11 haven't had any volunteering with the Coalition on
12 Homelessness since at least January 2023?
13 A. At least, yeah. I'm still trying to get
14 situated.
15 Q. Yeah.
16 A. It's not an easy transition.
17 Q. Have you ever been to the -- like, the physical
18 building where the Coalition on Homelessness is?
19 A. I think so.
20 Q. How many times do you estimate you've been
21 there?
22 A. Maybe once or twice. Not very often.
23 Q. Have you ever participated in, like, a meeting
24 they were organizing somewhere in the community?
25 A. Not really, no. I was just waiting for them to

Page 118

1  show up, and I would help them if they needed it.
2  Q. Do you consider yourself at any point having
3  been a member of the Coalition on Homelessness?
4  A. I guess. I guess, yeah.
5  Q. When you say "I guess," what do you mean by
6  that?
7  A. Once I started helping, it was -- it was pretty
8  much, like, the people that would come, they knew me, I
9  knew them, you know, and it was just -- it was just that
10 simple. As soon as they asked me, you know, for the
11 help, I would give it to them.
12 Q. Yeah.
13    So, in other words, the reason you consider
14 yourself a member of the Coalition on Homelessness is
15 because you helped connect them with people?
16 A. Yeah. I was one of, like, the main guys, yeah.
17 Q. Anything else that kind of makes you feel like
18 you were a member of the Coalition on Homelessness?
19 A. No, not really. Just -- just the fact that
20 they -- they would come straight to me for certain
21 things.
22 Q. Yeah.
23 A. That was...
24 Q. Did you ever have to, like, sign up somewhere
25 to be a member?

Page 119

1  A. No, no.
2  Q. Did you ever get, like, a membership card?
3  A. No.
4  Q. Do you ever get, like, membership e-mails from
5  them?
6  A. No. I think we could, but I don't -- I don't
7  think I ever did.
8  Q. Yeah.
9  A. I never paid attention to my e-mails.
10 Q. Were you ever able to, like, vote on what they
11 were, you know, making decisions about?
12 A. I -- I guess if I wanted to, but I -- you know,
13 it depends on what I wanted.
14 Q. Yeah.
15    But did you actually ever vote on something?
16 A. No, no, I don't think so.
17 Q. Okay. Were you ever paid by the Coalition on
18 Homelessness?
19 A. Mm-mm.
20 Q. Is that a no?
21 A. No. Sorry. Yes. I probably wouldn't accept
22 it anyway.
23 Q. How come?
24 A. I don't know. It's just something you do
25 for -- for reasons. And you don't, you know...

Page 120

1  Q. When you considered yourself a volunteer with
2  the Coalition, did they ever provide you any training?
3  A. No, mm-mm.
4  Q. Any instruct- --
5  A. I -- what they needed, I knew more than they
6  did. So...
7  Q. That's fair.
8     So other than connecting members of the
9  Coalition with members of your encampment community, any
10 other types of volunteer work you did for them?
11 A. No. That was pretty much it.
12 Q. Okay.
13 A. Stuff like that, yeah.
14 Q. Do you have -- what, if any, understanding do
15 you have about the requirements to be a member of the
16 Coalition on Homelessness?
17 A. I don't -- I'm not sure of the question.
18 Q. Yeah. Thank you for letting me know.
19    So what I'm wondering is, for some
20 organizations there might be a membership requirement,
21 like, maybe you have to be over a certain age or, you
22 know --
23 A. Okay. Okay.
24 Q. Yeah, yeah.
25    So do you have any understanding of whether

Case 4:22-cv-05502-DMR   Document 366-11   Filed 04/17/25   Page 6 of 7
Coalition On Homelessness, et al., v.
City and County of San Francisco, et al.,
David Martinez
October 15, 2024

Page 141

1  just to agree with them and then, you know, work with it
2  that way than to, like, tell them the truth, you know.
3  Because if you didn't get high or nothing like that,
4  then you weren't on the list.
5      You know, you have to be doing certain things
6  to be even considered for any kind of housing.  So I --
7  people started agreeing with them, people started
8  admitting things that they didn't do.  So that was one
9  of them.
10 Q.  Okay.  So then to make sure I'm following, in
11 July of 2019, you really did tell a cop that you were
12 trying to stay clean; it just wasn't true when you said
13 it?
14 A.  Yeah, because I wasn't high at all.
15 Q.  Yeah.
16 A.  But -- but I -- to them it was easier to get
17 you housing, at least that's what it made it seem --
18 Q.  Okay.
19 A.  -- if you were getting high.  But I wasn't -- I
20 don't know.  Yeah.  That's basically it, yeah.
21 Q.  I'm going to ask you a couple more questions
22 about your tent.
23     So we talked about the art supplies that you
24 would keep inside.
25     What other kind of stuff would you keep inside

Page 142

1  your tent?
2  A.  That's usually about it.  There wasn't --
3  really not much room for anything else.  The bedding,
4  you know, to keep your bedding clean.  You keep clothes
5  clean.  You know, everybody had -- well, not everybody,
6  but some of us were organized when it came to that.
7  Q.  Yeah.
8      Okay.  So I heard you say the art supplies,
9  your bedding, and your clothing.
10     Other than those three things, other stuff that
11 you would typically keep inside your tent?
12 A.  Not really, no.  I don't think so.
13 Q.  Sometimes in a lawsuit there's people who
14 testify just based on their own experience.  There's
15 other people that come in and offer opinions and testify
16 as an expert.
17     I think that you're here kind of to give your
18 own experience, but I want to double-check.
19     Are there any topics that you're planning on
20 offering expert opinion on at trial?
21 A.  No.  I mean, I -- I don't think so.
22 Q.  I'm going to ask you a couple more questions
23 about the City's bag-and-tag policy.
24     Do you know one way or the other if the
25 bag-and-tag policy changed over time?

Page 143

1  A.  In my -- no.  In my opinion, no.  I don't think
2  it ever existed.  I've never seen it.
3  Q.  So is it your belief, as you sit here today,
4  that the City bag-and-tag policy doesn't actually exist?
5  A.  To my knowledge, yeah.  I remember -- I
6  remember the cops telling us if we had a note, tape
7  something to our tent if we weren't there for some
8  reason.
9      Like, I had to go to an appointment.  When I
10 was coming back from the appointment, they were -- they
11 were taking my tent and everything else and throwing it
12 in the back of a garbage truck, but I had a note taped
13 to it, you know, to the front of the tent.  So --
14 Q.  Yeah.
15 A.  -- they shouldn't have did that, but they did.
16 Q.  And so that's, for you, when you had to kind of
17 step away from your tent, something you would sometimes
18 do is leave a note.
19     What would the note say?
20 A.  Just that I had an appointment at so-and-so
21 place, and I'd be back by this time.
22 Q.  Okay.
23 A.  Basic, you know.
24 Q.  Why would you leave that note?
25 A.  Because we were told to.

Page 144

1  Q.  Okay.  Who told you to do that?
2  A.  The police.
3  Q.  And, like, just mechanically, how do you attach
4  it to your tent?  Is it tape?
5  A.  Oh, I would pin it.  I would pin it.  Because I
6  knew tape wouldn't hold a lot of times.  It's windy
7  under that bridge, so I would pin it, yeah.
8  Q.  Do you believe that you've ever seen a City
9  employee violate the bag-and-tag policy?
10 A.  Yeah.  When I was coming home that day and the
11 cop just told me just -- you know, if I didn't walk
12 away, that I was going to get arrested.  I don't know
13 why, but that's what he said to me, so I kept going.
14 But everything I had, everything I owned was gone.  They
15 threw it in the back of a garbage truck for no reason.
16 Q.  So other than the one occasion you're just
17 describing, do you ever recall observing a City employee
18 violate the bag-and-tag policy?
19 A.  I've never actually seen it done, so I don't
20 know.  I know that they were supposed to, but, like I
21 said, I don't know.  I've never seen it done.
22 Q.  Yeah.  This is helpful.
23     So when I'm talking about the City bag-and-tag
24 policy, what does that mean to you?
25 A.  That DPW is supposed to put your belongings in

Page 173

1  it. That's all I remember.
2  Q.  Their height?
3  A.  Maybe 5'8", lower, shorter.
4  Q.  For both of them?
5  A.  Yeah, yeah, yeah.
6  Q.  And they told you not to bring items with you
7  to your new housing?
8  A.  Yeah, they -- well, they -- they said it like,
9  you know, "Don't bring anything yet. Wait until you go
10 there and see what -- how much room you got." And then,
11 you know, then I can choose what I can bring and what I
12 want to bring.
13 Q.  And they told you that before you moved into
14 44 McAllister?
15 A.  Yeah, yeah.
16 Q.  So that would have happened in either the end
17 of 2022 or beginning of 2023?
18 A.  I guess. I don't know. I'm not sure.
19 Q.  Well, you moved into 44 --
20 A.  It was -- it was months before. They told me
21 that months before I even -- it was -- I thought --
22 before I even got chosen for a room.
23 Q.  They told you this months before you moved into
24 44 --
25 A.  Yeah.

Page 174

1  Q.  -- McAllister?
2  A.  Yeah. They were, like, "Once you got a room,"
3  they said, "make sure you go there first to see what
4  you -- what kind of room you have." And then -- so --
5  it was easy, honestly.
6  Q.  Why didn't you move your art equipment into
7  44 McAllister in the three months between when you moved
8  in in January and when you allege the City took this
9  property in April of 2023?
10 A.  Well, they -- they probably -- it was probably
11 mostly gone by then. It didn't last very long between
12 DPW sweeps, so I probably didn't have any. They took my
13 art equipment all the time. There was a few times
14 that's all they took, was the art equipment. I had
15 paintings and stuff, and that was the only thing they
16 would take, for some reason.
17 Q.  So there were some occasions you recall where
18 you believe DPW wrongly discarded your property, and the
19 specific stuff that they discarded was your art and your
20 art supplies?
21 A.  Yeah, yeah.
22 Q.  I want to go back to this incident in April of
23 2023.
24     So I think what I heard you say before was that
25 the items you had at that time but hadn't yet moved into

Page 175

1  your apartment were bedding, clothes, and art
2  equipment --
3  A.  Yeah, yeah.
4  Q.  -- is that correct?
5  A.  Yeah.
6  Q.  Any other items as of April 2023 that you owned
7  but had not yet moved into your apartment?
8  A.  Well, there was a lot of stuff. Like, I had
9  cooking equipment. I had stoves, you know, gas stoves
10 that me and this other guy would cook -- we would be the
11 cooks, you know, for the group, for the encampment,
12 whatever. So a lot of things, you know.
13 Q.  Yeah. I'm interested in figuring out the full
14 list.
15     So I heard you say bedding, clothes, art
16 equipment, cooking equipment, and stoves.
17     What, if any, other items did you own in April
18 of 2023 but had chosen not yet to move into your
19 apartment?
20 A.  Oh, my tent. That specifically was gone when I
21 left it, like, three days. But that's it, pretty much.
22 Clothes, tent. You know, stuff that I just couldn't
23 carry at the time.
24 Q.  Other than the tent, bedding, clothes, art
25 equipment, cooking equipment, and the stove, any other

Page 176

1  property that you owned in April of 2023 but had not yet
2  moved into your apartment?
3  A.  No, I don't think so. I mean, there wasn't
4  much that you could own out there.
5  Q.  So, for example, if you look at the last
6  sentence in this paragraph of Exhibit 42, the one that
7  starts on line 6 and goes through line 8: "Mr. Martinez
8  was unable to recover the following items: a cell
9  phone, medication for his right-side congestive heart
10 failure, a tent, a bed, a cot, clothing, a radio, food,
11 pots and pans, a portable stove, his personal drawings,
12 and paperwork."
13     Do you see that?
14 A.  Mm-hmm.
15 Q.  Do you still maintain that this statement is
16 correct?
17 A.  Yeah. From thinking about the right time, that
18 was probably one of the last times I was -- I was out
19 there.
20 Q.  Now, you said the City took a cell phone, but
21 just now when you listed all of the items in your
22 possession that you had not yet moved into your
23 apartment, you didn't list a cell phone.
24     Why is that?
25 A.  I don't know. Maybe I didn't think about it.