# EXHIBIT 7

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v.*
*City and County of San Francisco, et al.*

---

*Jennifer Friedenbach*
*February 27, 2025*

---

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 44168Friedenbach_nl.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR   Document 366-13   Filed 04/17/25   Page 3 of 4

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jennifer Friedenbach
February 27, 2025

Page 85

1  attorneys that are related to that particular event at
2  26th and Shotwell?
3  A. I do not recall.
4  Q. At the time that this event occurred at 26th
5  and Shotwell, was the Coalition reporting its
6  observations to its attorneys?
7  A. Correct.
8     MS. SALZMAN: Sorry. I'm just going to instruct on
9  privileged, the content of communications to attorneys
10  is privileged.
11     John, if you want to ask were they working with
12  attorneys at that time, I would not instruct on that,
13  privilege on that, on the date range; but on content
14  what they were communicating with attorneys, I will
15  instruct on privilege.
16     BY MR. GEORGE:
17  Q. Okay. Let me ask it this way.
18     So previously you testified that there was a
19  form that was submitted directly to the attorneys that
20  included observations of sweeps; is that correct?
21  A. Correct.
22  Q. At this particular point in time of the 26th
23  and Shotwell sweep that we have been discussing, were
24  you using that attorney form at that time?
25  A. I was using the attorney form. I cannot recall

Page 86

1  if I submitted a form or if Mr. Wadkins submitted a
2  form.
3  Q. Okay. If you are asked about the 26th and
4  Shotwell sweep that you observed, if you're asked about
5  it at trial, will you testify about this particular
6  sweep?
7     MS. SALZMAN: Objection.
8     THE WITNESS: I believe I would.
9     BY MR. GEORGE:
10  Q. Okay. I just have a few questions about the
11  13th and Division incident, and then I think that's
12  probably a good time for us to take a break. And I
13  apologize, I think it was 13th and Mission.
14     Earlier we were talking about the event at 13th
15  and Mission where the person -- the DPW had the badge;
16  correct?
17  A. Correct.
18  Q. Did you observe DPW employees dispose of
19  property in violation of the bag-and-tag policy at that
20  particular sweep at 13th and Mission?
21  A. I believe I did. Just -- I'm not sure that
22  what I'm talking about is the same reference on this
23  particular document. So I just want to clarify that,
24  because as I said, the incident that I was talking about
25  occurred down closer to San Bruno and 13th Division, you

Page 87

1  know, it changes names. And I'm not sure of the time
2  frame.
3  Q. Okay.
4  A. Just to -- yeah.
5  Q. Let me clarify that, then.
6     The incident with the DPW worker with the
7  badge, and the woman's whose partner had passed away,
8  that occurred in the area of San Bruno and 13th; is that
9  correct?
10  A. Correct.
11  Q. Did you observe DPW dispose of property in
12  violation of its bag-and-tag policy at that particular
13  resolution in around the area of San Bruno and 13th?
14  A. Yes, I did.
15  Q. What was the property that you saw DPW dispose
16  of?
17  A. So the woman had, I think it was love letters
18  and poetry from her deceased boyfriend and I -- that
19  was -- oftentimes these situations are very chaotic, so
20  there was a lot of kind of scrambling trying to get
21  stuff, and she tried to get as much as she could and
22  lost -- lost -- you know, while DPW was grabbing stuff,
23  she was grabbing stuff, and I think she got -- she got
24  away with a card. And then they got most of the other
25  stuff.

Page 88

1     I don't remember beyond that, because that's
2  what she was sobbing about, is the loss of love letters.
3  Q. Were the --
4  A. And I was really more consoling, trying to be
5  there -- yeah, she was in a lot of crises and I was
6  trying to console her and then deal with, you know,
7  getting DPW to back off. It was not a good situation.
8  Q. Were the love letters and poetry printed on
9  paper?
10  A. Yeah, but she was saying what it was that they
11  were throwing away that she wanted to keep, and they
12  were taking it anyway. But I think it was some artwork
13  that her boyfriend had made. But it was like his
14  creative product that was very sentimental to her. And
15  I think she said she lost jewelry. Yeah.
16  Q. Did you see DPW dispose of the jewelry that she
17  said she lost?
18  A. No, it was just all kind of like -- because her
19  stuff was contained in containers, I didn't see what was
20  inside of it. That's what she said.
21  Q. What kind of containers did you see DPW dispose
22  of?
23  A. I believe she had kind of a -- some kind of
24  chest-type situation, some kind of small piece of
25  furniture that was like something you put on top of your

Case 4:22-cv-05502-DMR    Document 366-13    Filed 04/17/25    Page 4 of 4

Coalition on Homelessness, et al. v                              Jennifer Friedenbach
City and County of San Francisco, et al.                          February 27, 2025

Page 89

1  dresser. And, yeah, I can't recall a lot of other
2  detail. I would have to, yeah, look back and see. It
3  was quite a while ago.
4  Q. Did you see DPW put that chest-type piece of
5  furniture that you just described into the DPW truck?
6  A. Yes. Yeah, I believe I did.
7  Q. Did you see the contents --
8  A. Like I said, it was a long time ago, so it's
9  kind of a little bit fuzzy, exactly, and it's -- you
10 know, these experiences are really also traumatizing to
11 be around so you kind of try to push a lot of stuff out
12 of your head.
13 Q. Other than the woman's description to you, did
14 you see the contents of the -- of the chest that was
15 disposed of by DPW?
16 A. I don't think so.
17 Q. And why was DPW's disposal of that particular
18 peace of property, the chest, a violation of their
19 bag-and-tag policy?
20    MS. SALZMAN: Objection.
21    THE WITNESS: Well, the bag-and-tag policy, you're
22 not supposed to take property out of people's hands.
23 They're supposed to be able to identify what's their
24 property and what's not. She was very clearly verbally
25 articulating, and apparently articulated to the DPW

Page 90

1  worker the night before, and as well as that morning,
2  that this was property that was hers, and she was trying
3  to scramble and get it away.
4     And because it was also her -- you know, she
5  had her boyfriend's property as well, it was hard for
6  her to move it all at once, when the workers were
7  laughing and taking it and throwing it away.
8  Q. Other than the chest that you have described,
9  did you see DPW dispose of any of her other property?
10 A. It was -- it was a lot of property. I don't
11 remember exactly what, yeah. She -- the only -- it was,
12 you know, like a -- not a huge amount of property, but a
13 fairly large amount of property and she like was trying
14 to put stuff -- she had stuff all like bound up in
15 several carts and she was able to get one of the carts
16 away. And then the rest, as well as that little -- that
17 chest thing, got tossed.
18 Q. Did you see -- sorry.
19 A. She wasn't, you know -- like it's -- one of the
20 things that happens, and this is -- you know, it's
21 really easily resolvable, is that the City doesn't give
22 people, you know -- she just wasn't given the time to
23 get everything out of the zone. So, yeah.
24 Q. And wasn't given the time on that particular
25 morning, is that what you're describing?

Page 91

1  A. Correct. It was either morning or afternoon.
2  I can't remember if it was a morning or afternoon
3  operation. But she had just been dealing with --
4  because of the death of boyfriend, she of course was
5  trying to deal with his family and communicating all the
6  arrangements, and it was just like a whole thing. And
7  she was trying to hold onto his property. She really
8  wanted to give like some of his special things to his
9  parents.
10    And so she was like -- yeah, yeah, very chaotic
11 time for her, so very difficult for her to be able to
12 deal with everything all at once. Yeah.
13 Q. Everything that you just described about her
14 situation with dealing with her deceased boyfriend's
15 family and her situation that day, were those all
16 details that you learned from your conversation with
17 her?
18 A. Yeah, with her and Ms. Brown.
19 Q. Okay. Do you have independent knowledge of her
20 dealing with her boyfriend's family and making
21 arrangements?
22    MS. SALZMAN: Objection.
23    THE WITNESS: I don't -- I don't know if I, like,
24 heard her talking on the phone or not. I don't think
25 so.

Page 92

1     BY MR. GEORGE:
2  Q. Okay.
3  A. I mean, like -- you know, it was a very chaotic
4  and crises-ridden situation.
5     MR. GEORGE: Okay. I think now is a good time to
6  take a break, if that works for you. Is that all right?
7     THE WITNESS: That is fantastic. I have to use the
8  rest room.
9     MR. GEORGE: Yeah, of course. You can also call for
10 a break, you don't have to wait for me, if you need one.
11 This doesn't have to be, you know, a physically
12 punishing experience.
13    THE WITNESS: Thank you.
14    THE VIDEOGRAPHER: All right. Going off the record.
15 The time is 10:44 a.m.
16    (Recess taken.)
17    THE VIDEOGRAPHER: We're back on the record. The
18 time is 10:58 a.m.
19    BY MR. GEORGE:
20 Q. Ms. Friedenbach, we were previously discussing
21 the incident that you observed with the woman who lost
22 her boyfriend on or around San Bruno. She was living
23 near there.
24    Do you know what I'm talking about?
25 A. Yes.