# EXHIBIT 8

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v.*
*City and County of San Francisco, et al.*

*Lukas Illa*
*February 20, 2025*

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 44130Illa_nl.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR   Document 366-14   Filed 04/17/25   Page 3 of 4
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.
Lukas Illa
February 20, 2025

Page 37

1  Q. Were you involved in sort of advocating for
2  homeless or unhoused individuals or involved in the
3  issues of homelessness when you were living in Seattle?
4    A. Yes.
5    Q. And how -- how so?
6    A. I worked on campus -- well, I advocated on
7  campus for more relaxed policies towards unhoused people
8  on a public university campus and libraries and public
9  spaces as well as being a part of a mutual-aid
10 organization called Stop the Sweeps Seattle.
11   Q. Has homelessness been an issue that you've
12 cared about for a while?
13   A. I would say homelessness has been an issue I've
14 cared about since 2019 -- 2018, 2019, yes.
15   Q. Was there some sort of instigating event or
16 incident or something you saw that sort of, you know,
17 brought it to the fore in your -- in your consciousness?
18      ATTORNEY KASHYAP: Objection; relevance.
19         You can answer.
20      THE WITNESS: It was -- the start of college, when
21 there was a, you know, convergence of a ton of different
22 folks from a ton of different backgrounds who expressed
23 certain, in my belief, classist sentiments about kind of
24 the urban life around them in a big city made me become
25 a bit more aware of certain issues and certain things

Page 38

1  plaguing unhoused communities.
2         And that is what got me initially involved in,
3  yeah, that relevant work.
4  BY ATTORNEY WANG:
5    Q. And when did you first hear about the Coalition
6  on Homelessness?
7    A. January of 2024.
8    Q. Okay. Did you come across them because you
9  were just looking for jobs?
10   A. No.
11   Q. Okay. How did you become aware of Coalition on
12 Homelessness?
13   A. The executive director, Jennifer Friedenbach,
14 was a regular customer at the coffee shop I worked at
15 and then revealed within that month, January 2024, that
16 she was an executive director of a homeless advocacy
17 nonprofit that was hiring.
18   Q. So did you apply to any other jobs?
19   A. No.
20   Q. And what is your understanding of the Coalition
21 on Homelessness's mission?
22   A. Yeah. The Coalition on Homelessness's mission
23 is to connect -- connect unhoused folks and frontline
24 service providers with organized advocacy efforts to
25 increase the betterment of the services provided by the

Page 39

1  City as well as addressing human rights concerns posed
2  both by the City and by the world around us towards
3  unhoused people.
4    Q. And since you've been the human rights
5  organizer at the Coalition, what would you consider the
6  core activities of the Coalition?
7       ATTORNEY KASHYAP: Objection; calls for a legal
8  conclusion.
9          Go ahead.
10      THE WITNESS: Can you say that again? Sorry.
11      ATTORNEY KASHYAP: Objection; calls for a legal
12 conclusion.
13         Go ahead.
14      THE WITNESS: Can you repeat the question? Sorry.
15 BY ATTORNEY WANG:
16   Q. Sure.
17         So since you've worked at the Coalition, what
18 is your understanding or what do you consider the core
19 activities of the Coalition?
20      ATTORNEY KASHYAP: Same objection.
21      THE WITNESS: The core activities, from what I
22 understand, are to do street-based outreach and --
23 excuse me -- to conduct advocacy efforts. That can mean
24 going to City Hall and doing lobbying efforts there,
25 providing public comment, meeting with supervisors, but

Page 40

1  connecting unhoused folks and unhoused community with
2  those lobbying efforts directly as well as advocating
3  for -- and -- and keeping an eye on shelter conditions,
4  conditions in SROs, public -- permanent supportive
5  housing units, as well as producing our street
6  newspaper, Street Sheet. Yeah. As well as there are
7  portions of our work that, particularly for myself, that
8  involve direct service that do involve case management
9  and -- yeah. And that includes providing supplies and
10 whatnot.
11 BY ATTORNEY WANG:
12   Q. When you say you do case management, can you
13 tell me a little bit more about what you mean?
14   A. I use that term pretty informally. I don't
15 classify myself as a case manager, of course. But there
16 are instances in which we come across folks who are, you
17 know -- and this includes longtime members -- who come
18 to the Coalition specifically or we meet them on the
19 street for help navigating certain systems, whether that
20 be a government agency, whether that be a shelter
21 provider, or their own, you know, outreach team member
22 or case manage themselves to provide, you know, guidance
23 as well as advocacy or pointing them in the, you know,
24 correct direction in the myriad of bureaucracy that
25 includes homeless services.

Case 4:22-cv-05502-DMR   Document 366-14   Filed 04/17/25   Page 4 of 4
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.
Lukas Illa
February 20, 2025

Page 41

1   Q.  And you had previously mentioned doing a
2   street-based outreach.
3       Can you tell me more about what you mean by --
4   mean by that term or what that entails?
5   A.  Yeah.  Street-based outreach, in my role,
6   includes going to spots where a lot of street-based
7   unhoused folks congregate, whether that be parks,
8   whether that be particular hot spots that often time
9   face encampment resolutions, and meeting with folks, you
10  know, discussing updates in, you know, policy or legal
11  precedent that, you know, might change how they are
12  treated in the city, how they are able to take up space
13  in public space.
14      But that also includes involving folks in
15  advocacy efforts, of course.  So if we are -- we have a
16  particular cause or we have a particular campaign that
17  we're working on, going out, eliciting feedback on those
18  campaigns, asking folks to get involved if they want to,
19  and trying to gain broader participation amongst a
20  pretty disparate class of folks.
21  Q.  And you've touched on some of them already, but
22  can you tell me what all your sort of job duties and
23  responsibilities are as, you know, the human rights
24  organizer?
25  A.  It varies.  It varies a lot.  Because it really

Page 42

1   depends on an individual and what they need or what
2   they're requesting from us and what we are able to
3   provide.
4       But it comes with, yeah, doing outreach efforts
5   to ensure that we're maintaining a presence in
6   community, hearing from what street conditions are like
7   from the folks on the street and hearing from -- and
8   also, again, as I said before, reiterating what, you
9   know, certain policies or legal precedent has changed
10  around unhoused issues.
11      It also includes, you know, promoting our
12  events, promoting or advocacy efforts, promoting our
13  campaigns.
14      ==This includes, yeah, distributing certain==
15  ==supplies, like socks, soap, razors, things like that==
16  ==that we have donated to us.  This could include sleeping==
17  ==bags, at times, tents, but that has been slightly==
18  ==de-emphasized in the year that I've worked here.==
19      And trying to think of what else.
20      And also -- how could I forget? -- the Human
21  Rights Working Group is the group that I staff, and that
22  is our working group that all of our campaigns run
23  through and, you know, the core bulk of our campaign
24  work goes through.
25  Q.  Okay.  You had mentioned distributing supplies,

Page 43

1   socks --
2   A.  Mm-hmm.
3   Q.  -- sometimes sleeping bags, et cetera.
4       Are all those supplies donated to the Coalition
5   that you then distribute out?
6   A.  From -- in my time of working there, yes.
7   Q.  And then the Human Rights Working Group, is
8   that what it was called?
9   A.  Mm-hmm.
10  Q.  Can you tell me more about what that is?
11  A.  Yeah.  The Human Rights Working Group is one of
12  two working groups at the Coalition.  It is a group of
13  members that are both unhoused and housed.
14      It's a primarily, you know, tight-knit regular
15  group that folks have been coming to for years and years
16  who are participating in.  But there, we discuss kind of
17  updates to our campaigns, campaign planning, advocacy
18  efforts, long-term strategic goals, things like that --
19  Q.  Okay.
20  A.  -- specific to human rights work.
21  Q.  Okay.  It sounds like there's regular
22  meetings --
23  A.  Yes.
24  Q.  -- for the working group.
25      When are those meetings?

Page 44

1   A.  They are Wednesdays at 12:30 p.m.
2   Q.  Are these in-person meetings, or are they
3   virtual now?
4   A.  They are hybrid.
5   Q.  And are these meetings sort of open to the
6   public?
7   A.  We welcome all folks, whoever wants to come
8   into a Human Rights Workgroup meeting.  But primarily
9   the folks that regularly come are -- are long-term
10  members.
11  Q.  Mm-hmm.
12      Are these meetings sort of advertised in any
13  way, or how do people -- how can they be informed about
14  when they are and what -- you know --
15  A.  Yeah.  We --
16  Q.  -- how they can attend?
17  A.  We have a brochure that advertises specifically
18  the Human Rights Workgroup -- what we do, what our scope
19  is, how you can get involved, when the meetings are that
20  we do pass around -- that we have available at our front
21  desk.
22      And I also, during outreach, am always
23  attempting to recruit folks to come to meetings.  Yeah.
24  Q.  Got it.
25      And you said there was, like, a tight-knit