# EXHIBIT 9

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al., v.*
*City and County of San Francisco, et al.*

---

*Carlos Wadkins*
*January 27, 2025*

---

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 43976Wadkins_NL.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR    Document 366-15    Filed 04/17/25    Page 3 of 5
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Carlos Wadkins
January 27, 2025

Page 25

1  number.
2  When I did RV outreach, there would be -- I could
3  speak to over a dozen, maybe several dozen people in a
4  day because they're all kind of lined up tightly, and in
5  the shelters it's hard to say.
6  Q.  Why did you do that outreach in person?
7  A.  Because that was the best way to meet new
8  people and to do my work effectively.
9  Q.  In your opinion was it the best way to be able
10  to communicate with the population that you were trying
11  to communicate with?
12  A.  Yes.
13  Q.  Would you take a moment to read Paragraph
14  Number 5 to yourself, and let me know when you're done?
15  A.  Yes.  Okay.
16  Q.  Do you see the reference to proactive work in
17  Paragraph 5?
18  A.  Yes.
19  Q.  Is that a yes?
20  A.  Yes.
21  Q.  Thank you.  Sorry.  I just didn't hear you.
22  Does proactive work include connecting people to
23  resources?
24  A.  Yes.
25  Q.  Does it include helping people navigate the

Page 26

1  homeless services system?
2  A.  Yes.
3  Q.  Does it include providing supplies to people
4  experiencing homelessness?
5  A.  Yes.
6  Q.  Does it include building coalitions of unhoused
7  people?
8  A.  Yes.
9  Q.  Does it include public education that the
10  Coalition was engaged in?
11  A.  Yes.
12  Q.  And what were the examples of public education
13  that were happening at the time that you were at
14  Coalition doing outreach?
15  A.  The one example is that we -- is distributing
16  literature to the people.
17  Q.  And what kind of literature was that?
18  A.  There would be pamphlets that we called know
19  your rights pamphlets that described people's rights as
20  unhoused people.  There would also be literature related
21  to various campaigns over issue we were working on that
22  we hand out or information, as I said earlier, about our
23  weekly meetings or about how to contact us.  If they
24  needed support with anything, I would give them my
25  business card.

Page 27

1  Q.  Does public education include the Street Sheet?
2  A.  Yes.
3  Q.  And what is the Street Sheet?
4  A.  The Street Sheet is a newspaper that the
5  Coalition on Homelessness has published for over
6  30 years.
7  Q.  Did proactive work at that time -- and by that
8  time I mean sort of the 2021 to 2022 time period that
9  you were doing outreach -- did that include leadership
10  and advocacy training?
11  A.  Can you ask the question again?
12  Q.  Yeah.  During time period from when you started
13  in 2021 until May of 2022, did the proactive work that
14  you discussed in your Declaration include leadership and
15  advocacy training?
16  A.  Yes.  So I want to clarify in case things are
17  confused.  That there is -- obviously one part of my
18  work is doing outreach and there is other work I'm still
19  doing when I'm not in outreach.  The reason I say this
20  is because this list of things that you are giving, it
21  is not as if I do each of them every time I meet someone
22  on outreach; right?  There is variations of how well we
23  know someone, building the relationship over time --
24  (Reporter clarification.)
25     THE WITNESS:  And so the leadership training is a

Page 28

1  longer process and involves building relationships over
2  time.  And so that is work that I did and -- but just to
3  say that it wasn't like every time I was in outreach and
4  met a new person I'm trying to develop them into a
5  leader.  It is more of a process that we have already
6  built the relationship and are continuing to work with.
7  Q.  Okay.  Thank you.  I think I understand that.
8  Regardless of that clarification, leadership and
9  advocacy draining are part of the proactive work that
10  you describe, though; correct?
11  A.  Yes.
12  Q.  Okay.  Thank you.  During that time period of
13  2021 and 2022, who else, other than you, was engaged in
14  what you would describe as proactive work?  And by that,
15  I mean what other employees of the Coalition?
16  A.  Proactive work related to human rights or
17  proactive work in general?
18  Q.  Related to human rights.
19  A.  That would be all of the members of the human
20  rights work group as well as other members of staff,
21  such as the executive director would support, members of
22  the Street Sheet would support.  Sometimes members of
23  housing justice would support.
24  Q.  And are there specific employees of the
25  Coalition that you recall being engaged in proactive

Case 4:22-cv-05502-DMR   Document 366-15   Filed 04/17/25   Page 4 of 5

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Carlos Wadkins
January 27, 2025

Page 125

1  station. They kind of bagged it and left it on the
2  sidewalk.
3  There was several, I would even say plenty, of
4  incidents where we were able to get them to not take a
5  tent either because the person was there or the person
6  maybe would coming there soon, something like this.
7  Q. In the total number of sweeps that you saw --
8  actually, let me withdraw that.
9  I believe that you said earlier that it was fewer
10 than 100 but maybe greater than 2 dozen, is that
11 correct, for the number of the sweeps that you observed?
12 A. Hard to say but somewhere in there I think.
13 Q. So somewhere between 25 and 90; is that fair?
14 A. Yeah.
15 Q. Is there any more specificity, or is that just
16 as good as you can recall?
17 A. It's very difficult.
18 Q. So for those resolutions that you have seen,
19 the more than 2 dozen, the fewer than 90 or
20 approximately 100, how many times did you see DPW
21 violate their bag and tag policy?
22 A. I would say not every single one. Not like
23 every single sweep did a violation in my opinion occur
24 but pretty often.
25 Q. Did you write about all of them in your

Page 126

1  Declaration, all of them being the violations of the
2  policy?
3  A. I don't believe I did.
4  Q. And which -- what are you leaving out of the
5  Declaration?
6  A. Ones that I didn't leave in would be ones that
7  I could not -- that I was not -- either were part of
8  kind of smaller operations or like rather than a full HR
9  operation being just a DPW interaction, or ones that I
10 had a difficult time getting track of all of the exact
11 day and location or something like this.
12 Q. Do you have any photos of any of the violations
13 that are not included in the Declaration that you
14 signed?
15 A. Every photo, every video I had relevant to
16 encampments or tents was submitted. I don't know off
17 the top of my head whether any of those fits that
18 description.
19 Q. Do you have any notes of any particular DPW
20 policy violations that are -- for resolutions that are
21 not referenced in your Declaration?
22 A. Same answer, everything I have was submitted.
23 There is likely descriptions of such incidents in human
24 rights work group meeting notes. If there are any, I
25 think they are very likely there. But there is nothing

Page 127

1  additionally that I have.
2  Q. Do you have any specific recollection of any of
3  those other violations that are not included in your
4  Declaration sitting here today?
5  A. You're asking for incidents where I remember
6  seeing property confiscated in a way that violates the
7  DPW's bag and tag policy?
8  Q. That's correct.
9  A. Okay. I would say it is difficult at this
10 moment. My memory of kind of that span of time now a
11 few years removed is seeing this on a semi-regular
12 basis. Again, not every sweep or every week but often
13 enough that I was familiar with it. It's hard for me to
14 sort the images in my head to specific dates or example,
15 whether they're included in this list or not.
16 Q. Okay. Do you know what a homeless verification
17 form is?
18 A. I do.
19 Q. What is that?
20 A. It is a form of documentation that we -- it is
21 a service we provide. When unhoused people come to our
22 office, they might be trying to access some kind of
23 services in which they need to confirm that they are
24 homeless, and they would ask us for specifically I want
25 a homeless verification, and we would begin to fill one

Page 128

1  out.
2  Q. And what format did it take? Like, for
3  example, was it a piece of paper that was provided to
4  the person?
5  A. Piece of paper we had a bunch of copies of. We
6  would fill it out. Make them however many copies they
7  need and keep a copy for ourselves.
8  Q. So the Coalition kept a copy of the homeless
9  verification form that it provided to the particular
10 homeless person?
11 A. Yes, they kept hardcopies for a certain amount
12 of time.
13 Q. Do you know how long that time was?
14 A. I don't. I wasn't in charge of this.
15 Q. Who at Coalition was in charge of that in the
16 time period that you were there, either the first half
17 or second half as I'll refer to it?
18 A. For most of the time I was there Emmitt House
19 was in charge of recordkeeping for homeless
20 verifications.
21 Q. You said Emmitt House?
22 A. Emmitt House.
23 Q. Okay. Thank you. I appreciate that. In the
24 sweeps that you observed did you ever see DPW or any
25 other city worker specifically throw away a homeless

Case 4:22-cv-05502-DMR    Document 366-15    Filed 04/17/25    Page 5 of 5
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Carlos Wadkins
January 27, 2025

Page 129

1  verification form?
2  A.  I have seen of lot of paperwork thrown away and
3  people tell me that paperwork was thrown away.  I would
4  never have been able to sort through the individual
5  papers.
6  Q.  Do you know what Coalition did to verify that a
7  person was homeless in order to issue them a homeless
8  verification form?
9  A.  More or less, yes.  I filled them out myself.
10 Q.  What was the process for verification on that?
11 A.  For my guidance the process was basically just
12 an interview.  Asking the person a series of questions,
13 including where have you been sleeping?  How long have
14 you been sleeping in this or similar conditions?  Do you
15 have children, those kind of questions?
16 Q.  How long was that process of verification?
17 A.  It was a single interview.
18 Q.  And roughly how much time do you recall?
19 A.  Between 5 and 30 minutes depending on the case.
20 Q.  Okay.  Thank you.  How many did you do in the
21 time that you were at Coalition?  How many -- by that I
22 mean homeless verifications.
23 A.  As an organizer, very few.  In my development
24 role, several.  I was never like the main person, but I
25 would do them every now and then.

Page 130

1  Q.  How many did Coalition do in the time that you
2  were there, do you know?
3  A.  A lot.  Frequently close to one a day maybe
4  even.  Maybe three-ish -- three to five a week.
5  Q.  Okay.  I'm going to introduce another -- before
6  I do that, let me turn to your Declaration again.  This
7  is Exhibit 88.  I just want to direct your attention to
8  Paragraph 7.  If you could take a look at that.
9  A.  I'm looking at it.
10 Q.  Does it accurately describe your role in
11 providing training?
12 A.  It does.
13 Q.  Sorry.  I didn't catch that.  It does?
14 A.  It does.
15 Q.  Okay.  Thank you.  When did you begin training
16 the volunteer network?
17 A.  Well, the first few months I wasn't doing any
18 training because I myself was being trained.  I'd say
19 the next few months was -- there was some kind of like
20 on the job or like informal trainings.  By I think
21 either late summer or the fall of 2021, maybe later, I
22 held a kind of at least one maybe another one, more
23 formal sweep response training.
24 Q.  Who trained you?
25 A.  Largely I was trained kind of on the job.  I

Page 131

1  had -- if I was with people who were more experienced
2  than me, I would try to ask them questions or learn from
3  them.  Or if I was by myself or with people less
4  experienced than me, then I would just do what I thought
5  was best.
6  Q.  And who were those more experienced people that
7  trained you?
8  A.  Kelley Cutler was more experienced, Christin
9  Evans.  Larry Ackerman was more experienced than me.
10 Q.  Did you ever do any training with Dillon Verner
11 Christ?
12    MS. SIKORA:  Objection to the extent that that calls
13 for work product or attorney-client privileged material.
14    BY MR. GEORGE:
15 Q.  And you can answer with your lawyer's caveat.
16 A.  I don't recognize that name.
17 Q.  So, no, is the answer?
18 A.  I could have forgotten, but not that I
19 remember.
20 Q.  Okay.  You don't recall any?
21 A.  Yeah.
22 Q.  Do you have an estimate of how many volunteers
23 you have trained?
24 A.  Are you asking kind of those more formal
25 trainings or those combined with kind of the informal,

Page 132

1  people I took along.
2  Q.  Let's do the formal ones first.
3  A.  Okay.  The one formal training I remember
4  clearly.  I think there was between a dozen and 20
5  people there.  That might be an over estimate, but I
6  think what I remember.  There may have been online
7  training.  I don't remember if it was specifically on
8  sweeps or something else.  But that one had maybe around
9  the same amount of people.  There could have been the
10 same people in both trainings.
11 Q.  Were the trainings recorded?
12 A.  The in person one, definitely not.  Sometimes
13 the online stuff would be recorded that we did, but I
14 don't recall that incident.
15 Q.  Do you know what a spot Declaration is?
16 A.  I have heard it referred to but not really.
17 Q.  Did you train anyone on how to obtain
18 Declarations from unhoused people at resolutions?
19 A.  I did not do that.
20 Q.  Were you trained to obtain Declarations from
21 people at resolutions?
22    MS. SIKORA:  Objection to the extent that calls for
23 attorney-work product.
24    THE WITNESS:  I remember kind of conversations with
25 this happening.  That might have been after I stopped