# EXHIBIT 10

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

*Christin Evans*
*March 10, 2025*

Behmke Reporting and Video Services, Inc.
550 California Street, Suite 820
San Francisco, California 94104
(415) 597-5600

Original File 44219Evans_NL.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR    Document 366-16    Filed 04/17/25    Page 3 of 16

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Christin Evans
March 10, 2025

Page 69

1  observing sweeps and encampment resolutions, attending
2  the Monday policy briefing and the Human Rights Work
3  Group meetings and sort of regular communication with
4  Coalition staff and members, how else have you been
5  involved with the Coalition since, let's say, January,
6  2020?
7  A.  I would say I have also given quite a lot of
8  interviews to the media.
9  Q.  And are these interviews on behalf of the
10 Coalition, or they in your personal capacity, just
11 about the Coalition?
12     Does that distinction make any sense?
13 A.  It does.  A lot of times the reporters don't
14 say can I interview you, as this hat.  Right?  They
15 know that I'm a person that has quite a lot of the
16 knowledge about these -- whatever they're writing about
17 related to homelessness.
18     And sometimes they will identify me in
19 newspaper articles as a member of the Coalition on
20 Homelessness, or a volunteer with the Coalition on
21 Homelessness.  Sometimes they will identify me as a
22 small business owner.
23     There's many different reporters out there
24 that I interact with pretty regularly.
25 Q.  And when you give these interviews, do you

Page 70

1  consider your giving of an interview to be sort of on
2  behalf of or in furtherance of the Coalition?
3  A.  So I would say that that depends on the
4  interview and the reporter.
5     Sometimes the reporters are coming through
6  the Coalition on Homelessness.  And they're -- you
7  know, they're connecting me, you know, to help identify
8  maybe somebody with lived experience to interview, and
9  I'm liaising with a reporter in that capacity.
10    Sometimes it's less obvious.  Like, I have
11 sat down with the current beat reporter for the
12 Chronicle that covers homelessness many times, and she
13 knows that I wear many hats.  So I can't tell you, you
14 know, when she's asking me a question, is she going to
15 identify me as the -- like, that I'm speaking on behalf
16 of the Coalition on Homelessness.
17    You know, sometimes I am, sometimes I'm not,
18 depending on the question and the article and the
19 interview and the context.
20 Q.  But it sounds like you have spoken on behalf
21 of the Coalition before, during at least some of these
22 interviews?
23 A.  Yes.  I have.  Particularly around the
24 campaign, because I was, you know, a legal proponent
25 for Proposition C, and I was giving quite a lot of

Page 71

1  interviews on behalf of the Coalition on Homelessness
2  related to that campaign in particular.
3  Q.  What about since the end of the campaign, so
4  since the end of the pandemic, March, 2020, have you
5  given interviews on behalf of --
6  A.  Believe it or not -- yes, I was going to say
7  believe it or not, even though the campaign is over and
8  the measure has passed, people still have an extreme
9  amount of the interest in the money.  So I continue to
10 provide interviews on some of the questions that you
11 asked me, like how has the money been spent, and, so
12 on.
13    I have also, as I said, primarily served as a
14 liaison where I'm connecting people that have contacted
15 the Coalition on Homelessness, they're looking for a
16 particular type of person.
17    So, like, this week, I think a reporter was
18 looking for somebody that had lived in permanent
19 supportive housing, but had exited permanent supportive
20 housing and had been, you know, able to go on to be,
21 you know, self-sufficient, without State intervention
22 and -- but they didn't want them to have worked for or
23 currently working for an organization affiliated with
24 homelessness.  So they wanted somebody that was like in
25 a private-sector job.  And I think they specifically

Page 72

1  said it -- like someone that works at a florist shop.
2     You know, a lot of times that's kind of the
3  thing that I get requests for, is like very specific
4  type of people that the media is looking to interview.
5  Q.  Got it.  So, like, the media reaches out to
6  the Coalition looking for a particular kind of person.
7  The Coalition then reaches out to you to help connect
8  the media person with the interviewee?
9  A.  A lot -- sorry.  I violated one of your
10 rules.  I will not interrupt you.
11    A lot of these reporters now have my
12 cellphone, and so they often are contacting me.  And I
13 couldn't tell you for sure in all the cases, are they
14 contacting me because they see me as a part of the
15 Coalition on Homelessness, or just a resource.
16 Q.  Got it.  So other than what we have already
17 discussed, the meetings, street outreach, observing
18 sweeps and, you know, the interviews that we just
19 discussed, how else have you been involved with the
20 Coalition since January, 2020?
21 A.  Um, yeah.  I mean there's a number of ways
22 that I have been involved.  So, I'm sure, you know, as
23 we -- as you keep asking that question I could come up
24 with more and more responses.  I have been involved in
25 campaigns, I have been involved in connecting

Case 4:22-cv-05502-DMR   Document 366-16   Filed 04/17/25   Page 4 of 16
Coalition on Homelessness, et al. v                                              Christin Evans
City and County of San Francisco, et al.                                       March 10, 2025

Page 73

1  individuals to services.
2  Q. Anything else you can think of right now?
3  A. I have been part of organizational meetings
4  about how to structure the organization. I think I
5  have been in a few conversations about fundraising.
6  Q. Anything else?
7  A. If you -- if you have any other, I'm happy to
8  say if there's -- if I am or not involved in that.
9  But, at this moment, that is to -- my best recollection
10 of the type of activities that I've been involved in.
11 Q. Thank you.
12 A. But it's been over a long period of time. So
13 there's been a lot of different things that I've done
14 related to the homeless -- Coalition on Homelessness.
15 Q. Um, let's say between March of 2020 and when
16 you became a commissioner on the Homeless Oversight
17 Commission, in May, 2023?
18 A. Uh-huh.
19 Q. Do you have an estimate of how much time
20 you've spent on activities sort of related to the
21 Coalition on Homelessness?
22    If you have an estimate of, like, hours per
23 week or hours per month, anything like that?
24 A. As I said, it tends to vary. So I could say
25 that there have been weeks that I have been involved as

Page 74

1  much as 30-plus hours in a week, and then there have
2  been other weeks where I did a more limited amount,
3  like five hours, or so.
4  Q. And what about since you became a
5  commissioner in May, 2023? So since that time to
6  present, has your -- like, the amount in terms of hours
7  of your involvement with the Coalition changed at all?
8  A. Yeah. So as I said, it fluctuates up and
9  down. So since May, 2023, there have been periods of
10 time where I have been more actively involved with the
11 Coalition than others.
12    And so there would be probably a few weeks in
13 there where it was, again, 30-plus hours, and then
14 there'll be some weeks that would be more like the five
15 hours, or less.
16 Q. Would you say, like, the general, like,
17 average amount of time you spent on activities related
18 to the Coalition on Homelessness have stayed the same
19 since March, 2020?
20 A. I feel like I answered that question already,
21 but as I said, it really does fluctuate quite a lot, up
22 and down.
23 Q. Do you feel like your involvement with the
24 Coalition has lessened at all since becoming
25 commissioner?

Page 75

1  A. I would say it's changed. The nature of the
2  work has changed.
3  Q. Okay. The sort of level of involvement you'd
4  say would be the same, even if the nature of your
5  involvement has changed.
6    Is that fair?
7  A. Uh, so, again, it's changed in -- since May,
8  2023, there have been weeks I've been more or less
9  involved in Coalition -- Coalition-related activity.
10 Some weeks have been busy, and others have been less
11 busy.
12    As, as a for-example, I remember in and
13 around July and August, 2024, when right, shortly after
14 Grants Pass had been decided by the Supreme Court,
15 there was some pretty significant changes in City
16 policy related to outreach. And I was doing an
17 intensive period of work for the Coalition, and also
18 wearing my hat as a commissioner for the Homeless
19 Oversight Commission, trying to understand what has
20 happening related to the change in the City's policies.
21 So I got very active again in that period of time.
22 Q. And what period of time was that?
23 A. July and August, 2024.
24 Q. And what did your intensive involvement with
25 the Coalition in July and August of 2024 look like?

Page 76

1  A. So there was, --
2     MS. SALZMAN: Objection.
3     THE WITNESS: -- um, a lot of reported change
4  in how the City was conducting operations. And there
5  were a couple of legal documents -- or City-written
6  documents, I should say, I guess. Is any document the
7  City produced a legal document? I'm not sure.
8     But, there were documents that were produced.
9  I think one of them was by the Chief of Police; one was
10 done by the Mayor's office. They were related to
11 changes in the City's policies around how they were
12 going to address encampment resolutions. And there
13 was, like, specific language around people no longer
14 necessarily receiving an offer of shelter.
15    There was also language about if the
16 encampment was a smaller encampment, not a large
17 encampment resolution, that they would potentially just
18 send out SFPD or DPW, and it was not going to
19 necessarily involve HSOC or the HOT Team.
20    And so I was doing a lot of conversations
21 with people with lived experience that were living on
22 the street, and I was working with the Coalition on
23 Homelessness to determine, like, what were we hearing
24 and seeing and observing as relates to those changes in
25 policies.

Case 4:22-cv-05502-DMR   Document 366-16   Filed 04/17/25   Page 5 of 16
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Christin Evans
March 10, 2025

Page 141

1  like: I'm going to move my stuff to the next block
2  because I've been asked to move, and so I can't carry
3  everything with me. So they'll say: I'm coming back
4  for this.
5     But sometimes there's a very explicit
6  statement that something is not abandoned. And then
7  they are, by leaving the area, making it unattended.
8     But sometimes it's also context.
9  Q. During your observations of sweeps, have you
10  come across property or items where you never saw it
11  being attended at any time?
12     MS. SALZMAN: Objection to form.
13     THE WITNESS: I didn't understand the
14  question.
15  BY MR. WANG
16  Q. Sure.
17     During your observations of sweeps, have you
18  come across property that didn't have anyone attending
19  it at any time during your observations?
20     MS. SALZMAN: Objection to form.
21     THE WITNESS: So I believe I've run across
22  both unattended and abandoned property in observation
23  of my sweeps.
24  BY MR. WANG
25  Q. I think my distinction was you had mentioned

Page 142

1  that sometimes an individual would set aside some
2  property and then leave the area, but meaning to come
3  back to collect the stuff that was left behind.
4     Correct?
5  A. Yes. And at some times I've pointed those
6  out to workers who look like they're about to throw
7  them in the back of a truck.
8  Q. Okay. Have you ever come across property
9  that you considered unattended, but that you never saw
10  anyone sort of interacting with it?
11     MS. SALZMAN: Objection to form.
12     THE WITNESS: Yes.
13  BY MR. WANG
14  Q. Okay.
15  A. Yes. I think in one of my declarations, I
16  referenced that the person wasn't present, but the
17  items looked like they were trying to be protected, and
18  they were clearly not abandoned.
19  Q. And when you are kind of determining whether
20  those items are unattended or abandoned, that
21  determination is kind of based on context, you said?
22     MS. SALZMAN: Objection to form, and asked
23  and answered.
24     THE WITNESS: So, yeah, I feel like I have
25  answered that question. Sometimes it's an explicit

Page 143

1  conversation I've had with people in the area. And
2  sometimes it's in context.
3  BY MR. WANG
4  Q. Do you think that there is any room for sort
5  of reasonable disagreement between two people about
6  whether a particular item you come across is unattended
7  or abandoned?
8     MS. SALZMAN: Objection.
9     THE WITNESS: So I know that I've had
10  conversations with City employees where we've had a
11  discussion, discussing whether something is attended or
12  abandoned, and we've had a disagreement.
13  BY MR. WANG
14  Q. Do you think that that disagreement is
15  reasonable? Or do you think that the issue of whether
16  something's unattended or abandoned is a black-or-white
17  issue?
18     MS. SALZMAN: Objection.
19     THE WITNESS: I -- I think that there is
20  sometimes a lens through which people making that
21  determination -- possibly, you know, influenced by
22  their motivation.
23  BY MR. WANG
24  Q. So do you think that if an item appears to
25  you to be unattended as opposed to abandoned, that it

Page 144

1  would be unreasonable for someone else to view that
2  item as abandoned?
3     MS. SALZMAN: Objection. Calls for
4  speculation.
5     THE WITNESS: I'd say that there are certain
6  individuals involved in City operations where I never
7  see them take any care in doing bagging and tagging,
8  and I think those individuals don't -- are not
9  particularly reasonable when it comes to those judgment
10  calls.
11     I --
12  BY MR. WANG
13  Q. There is a judgment -- sorry, go ahead.
14  A. But I was going to say, you know, like when
15  they're indiscriminately removing everything in the
16  area, with -- with no even time spent to examine the
17  items closely, I don't think that they're providing a
18  reasonable assessment of what is considered unattended.
19  Q. So, have you ever had a disagreement with a
20  City employee about whether an item was unattended or
21  abandoned, where you felt like the City employee was
22  being reasonable?
23  A. Um, so, I have recollection of many
24  conversations with many City employees, over many
25  sweeps and encampment resolutions. And I do have a

Case 4:22-cv-05502-DMR   Document 366-16   Filed 04/17/25   Page 6 of 16
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Christin Evans
March 10, 2025

Page 145

1  sense and a recollection that some of the people that I
2  interacted with were reasonable. I couldn't say for
3  sure whether we were in disagreement or agreement.
4    I do think that, you know, sometimes we --
5  you know, it was determined that maybe some additional
6  information could be obtained. Like, for example, who
7  did that tent belong to? And we could assess that by
8  asking questions by neighboring individuals, and then
9  with that new information, we could have come up with,
10 you know, a conclusion that we were in agreement or --
11 about.
12    I can't say for sure if I -- like, who I
13 disagreed with when, and how, I couldn't recall
14 specific examples of that.
15    I do think that I documented some of that in
16 my declaration.
17 Q. What about whether an item is soiled or not?
18    Have you had disagreements with City
19 employees about whether an item is soiled?
20 A. It was a pretty -- like, in my experience, it
21 was not an uncommon occurrence for DPW to just wave at
22 a general area of an encampment and say "It's soiled,"
23 like, dismissively.
24    And so, yeah. I would say that there are
25 definitely times where the assessment of what was

Page 146

1  considered soiled was -- I wouldn't agree with.
2  Q. During your observation of sweeps, have you
3  ever witnessed drug use at an encampment?
4  A. Yes.
5  Q. Have you ever witnessed, during your
6  observation of sweeps, sort of drug paraphernalia at an
7  encampment?
8  A. Yes.
9  Q. During your observations of sweeps, have you
10 ever witnessed sort of needles and syringes at an
11 encampment?
12 A. Yes.
13 Q. During your observation of sweeps, have you
14 ever witnessed, you know, feces sort of in and around
15 the encampment?
16 A. Yes.
17 Q. During your observations of sweeps, have you
18 ever witnessed tents with feces in or on it?
19 A. Could you repeat; did you say "tents"? The
20 word you used was "tents"?
21 Q. Yes.
22 A. I have observed tents that have been in
23 various states of condition, including those that
24 appeared to have feces on them.
25 Q. Then during your observations of sweeps, have

Page 147

1  you ever come across tents that smell like, you know,
2  human waste, whether feces or urine?
3    MS. SALZMAN: Objection to the form.
4    THE WITNESS: I -- I would say there are a
5  lot of smells at some of these encampment resolutions,
6  and I couldn't say exactly where they're originating
7  from. The sidewalks, themselves, are not always the
8  cleanest.
9  BY MR. WANG
10 Q. During your observations of sweeps, have you
11 ever witnessed, you know, rats or mice at an
12 encampment?
13 A. I have not, actually.
14 Q. During your observations of sweeps, have you
15 ever observed spoiled food at an encampment?
16 A. Did you say "spoiled" or "boiled"?
17 Q. "Spoiled."
18 A. I was like, I hear "boiled," and I was, like,
19 that's a weird question.
20    I have seen boxes of cereal that is open. I
21 wouldn't consider that spoiled. I've seen trash
22 wrappers or containers that have remnants of food. I
23 couldn't say if it was spoiled, for sure.
24    I don't recall, like, seeing, like, mold --
25 like the things that sometimes come out of my

Page 148

1  refrigerator, I don't recall seeing anything like that.
2  (Laughter)
3  Q. The problem living in the city, sometimes
4  it's just easier to buy food rather than eat what's in
5  the fridge. But, um...
6    During your observations of sweeps, have you
7  ever heard an individual, an encampment occupant, tell
8  a City employee that they no longer wanted an item?
9  A. Yes.
10 Q. During your observations of sweeps, have you
11 ever observed any violence directed at any City
12 employee?
13 A. Like, physical assault?
14 Q. Yeah, let's start with physical.
15 A. So there was one incident in 2020 where a
16 gentleman was experiencing homelessness was arrested.
17 And I believe there was an allegation of assault. I
18 don't recall witnessing the physical assault.
19    But I remember speaking to the individual,
20 individual who had made contact with the person in the
21 tent, and what they said occurred.
22 Q. Do you recall when in 2020 this incident was?
23 A. Yeah. 2020.
24 Q. Do you recall what month?
25 A. It was early on in the pandemic. It would be

Case 4:22-cv-05502-DMR    Document 366-16    Filed 04/17/25    Page 7 of 16
Coalition on Homelessness, et al. v                                    Christin Evans
City and County of San Francisco, et al.                              March 10, 2025

Page 165

1  since 2007.  The bookstore's going to celebrate 50
2  years.  Again, predates me, quite, quite substantially.
3  There was 30 years when I did not run it.  So there are
4  loyal customers that I met, even as early as 2007.
5     But I would say between 2007 and for sure up
6  until this declaration was made in 2021, there were
7  different points in time when I heard from people about
8  their concerns about visible homelessness in our
9  community.
10 Q.  And since you signed this declaration, so
11 since November, 2021, have you heard from more -- other
12 customers, that they've chosen to shop online or go to
13 other locations because they did not want to see the
14 visible homelessness?
15 A.  Yes.
16 Q.  Is that a complaint you still hear every once
17 in a while, today?
18 A.  I wouldn't say it's as frequent, actually.
19 Q.  And when you say "visible homelessness," you
20 said it was describing people who were living outdoors,
21 in tents?
22     Is that right?
23 A.  I -- I believe I answered that a little
24 longer than just "people in tents."  I think I said
25 could be people sleeping outdoors, sometimes in tents,

Page 166

1  sometimes in vehicles.
2  Q.  Uh-huh.
3  A.  There's -- in the Haight-Ashbury neighborhood
4  corridor, there is about five blocks of storefronts.
5  And it's pretty typical that you would see people
6  sleeping in doorways at night, and along buildings.
7  Sometimes, also during the daytime.
8  Q.  Have you heard from other members of the
9  Haight-Ashbury Merchants Association that, you know,
10 they've had customers who have chosen to go other
11 places or shop online because of the visible
12 homelessness?
13 A.  Yes.
14 Q.  Do you feel like visible homelessness has had
15 a negative impact on -- let's start with your -- the
16 Booksmith?
17 A.  I would say that the bookstore has been
18 impacted negatively as a result of visible
19 homelessness, yes.
20 Q.  And then, what about your other business, the
21 Alembic?
22    Do you think that its business has been
23 impacted negatively by visible homelessness?
24 A.  Yes.
25 Q.  If we go further down your declaration to now

Page 167

1  Paragraph 8 on Exhibit 304.
2     (Document displayed)
3  Q.  Please feel free to read the whole paragraph,
4  but I'm going to focus on the last three sentences of
5  this paragraph that begin (As read):
6     "There were no safe non-congregate shelter
7     options..."
8  Q.  Do you see that?
9  A.  I do.
10 Q.  And it continues.  So the sentence reads.
11 (As read):
12    "There were no safe non-congregate shelter
13    options for homeless people in the early
14    pandemic.  So I raised money to purchase
15    tents in coordination with COH, and then the
16    City's homeless outreach team (HOT) helped me
17    distribute them."
18    Do you see that?
19 A.  I do.
20 Q.  And so it sounds like from this paragraph
21 that you were involved with helping to purchase tents
22 in coordination with the Coalition on Homelessness
23 during the early pandemic.
24 A.  Yes.
25 Q.  And was the purpose of purchasing those tents

Page 168

1  in order to allow folks living outdoors to be able
2  to -- I think you mentioned before, like, have, I don't
3  know, a way to shelter in place outdoors?
4     MS. SALZMAN:  Objection to form.
5     THE WITNESS:  To have -- so, so, as I recall,
6  during that time, CDC actually had guidance that tents
7  were better than nothing.
8  BY MR. WANG
9  Q.  Okay.  And so that was the -- the reason you
10 were raising money to purchase tents was to allow those
11 folks to follow CDC guidance and have a tent outdoors
12 to help prevent the spread of COVID-19?
13    MS. SALZMAN:  Objection to form.
14    THE WITNESS:  That was part -- that was part
15 of the reason, yes.
16 BY MR. WANG
17 Q.  Okay.  What were the other reasons for it?
18 A.  I do think that shelter provide -- tents
19 provide a form of shelter that is not perfect, but it
20 does provide a form of shelter from, like, say the
21 elements, like the heat and sun, as well as from rain
22 and mist and fog, and can help keep belongings more
23 dry.
24    So there's a variety of reasons why tents can
25 be helpful to people experiencing homelessness, to try

Case 4:22-cv-05502-DMR    Document 366-16    Filed 04/17/25    Page 8 of 16
Coalition on Homelessness, et al. v                                    Christin Evans
City and County of San Francisco, et al.                             March 10, 2025

Page 169

1  to keep their health up, and their belongings safe and
2  protected.
3  Q.  And you had mentioned earlier in the
4  deposition that during at least the early pandemic,
5  that the congregate shelters had sort of reduced the
6  number of beds.
7     Correct?
8  A.  Yes.
9  Q.  And your understanding was that was in order
10 to allow for some social distancing within the
11 congregate shelters?
12 A.  That was the reasons that I recall the City
13 workers cited at the time.
14 Q.  And then, so was the effort to raise money to
15 purchase tents with Coalition on Homelessness partly to
16 also address the fact that folks who would have been in
17 congregate shelter were now needing to, you know, stay
18 outdoors?
19 A.  Yes.
20 Q.  And then the last sentence says (As read):
21    "The City's homeless outreach team (HOT)
22    helped me distribute them."
23    Do you see that?
24 A.  Yes.
25 Q.  Can you describe for me a little bit more

Page 170

1  about what that coordination was like with the City's
2  HOT team?
3  A.  Yes.  So I received individual cellphone
4  numbers and text messages connecting me to individuals
5  that worked for the City that wanted to distribute
6  tents to their clients.
7     So I was, again, one of the few people with a
8  car, so I was sometimes playing delivery driver.  Like,
9  literally transporting tents to individuals.
10 Q.  Do you know whether the Coalition was
11 distributing tents or purchasing tents prior to the
12 pandemic?
13 A.  As I said, mostly my involvement with the
14 Coalition in terms of the street outreach started in
15 March of 2020, so I wouldn't be in a good position to
16 say what the Coalition was doing prior.
17 Q.  Do you recall whose idea it was to purchase
18 tents, and distribute them, during the pandemic?
19 A.  I couldn't say for sure.  I know that I was
20 part of the group that was involved in very actively
21 trying to -- like, initially solicit them from
22 neighbors, um, just tents that people might have at
23 home.
24    And then later, um, beyond the donations,
25 raising funds to purchase tents from vendors.  Either

Page 171

1  online, or -- I think there was a few physical trips to
2  Oakland to pick up tents.
3  Q.  And did you begin soliciting tents -- well,
4  strike that.
5     I guess I'm trying to figure out whether the
6  idea to raise money to purchase tents or to solicit
7  tents during the pandemic was an idea you had that got
8  brought to the Coalition by you, or if it was something
9  generated out of a Coalition meeting or, you know,
10 endeavor.
11    MS. SALZMAN: Objection to form.
12    THE WITNESS: I don't recall that it was my
13 idea.  I was definitely involved, but I -- I don't
14 recall if it originated with me.
15 BY MR. WANG
16 Q.  And your understanding is that this sort of
17 push to raise money for tents was in response to the
18 situation caused by the pandemic, and having to shelter
19 in place, and the decrease in beds at congregate
20 shelters?
21    MS. SALZMAN: Objection to form.
22    THE WITNESS: I know that the Coalition still
23 distributes tents on occasion, today.  But I can't say
24 what they did prior to March, 2020.
25    But as I recall, in this context, at this

Page 172

1  moment, we were raising money maybe -- I can't say in
2  relation to prior, because I didn't really have
3  knowledge of prior.
4     Does that make sense?
5  BY MR. WANG
6  Q.  Yes.
7     But at the time in March when you were
8  involved in raising money to purchase tents, that was
9  in sort of direct response to circumstances and
10 situations caused by the pandemic at the time?
11    MS. SALZMAN: Objection to form.
12    THE WITNESS: I -- I would say that there was
13 definitely, um, urgency as a result of the pandemic.
14 BY MR. WANG
15 Q.  If we go to the next page, Page 3 of
16 **Exhibit 304**, your declaration, Paragraph 10, at
17 the top of the page?
18    (Document displayed)
19 Q.  Do you see Paragraph 10?
20 A.  Yes.
21 Q.  And just the first sentence reads (As read):
22    "I have personally witnessed over 50
23    large-scale homelessness sweeps conducted by
24    the City since March, 2020."
25    Do you see that?

Case 4:22-cv-05502-DMR   Document 366-16   Filed 04/17/25   Page 9 of 16

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Christin Evans  
March 10, 2025

Page 177

1  that (As read):
2      "I was driving near Rainbow Grocery when I
3      witnessed SFPD and DPW stopped by a tent."
4      Do you see that?
5  A.  I do.
6  Q.  Okay.  Do you recall what direction you were
7  driving?
8  A.  I recall, I was driving -- I think that would
9  be east, at -- it's in the direction where I would be
10 closest to Rainbow Grocery, in the road.
11 Q.  Okay.
12 A.  And I recall, I think, making a U-turn and
13 coming back, and parking.  And getting out of the
14 vehicle.
15 Q.  Do you recall what you witnessed before you
16 made that U-turn, as you were driving past Rainbow
17 Grocery?
18 A.  I recall seeing DPW and SFPD vehicles.  And I
19 believe they had flashing lights on.
20 Q.  Okay.  Could you see the tent from your car,
21 when you were driving by?
22 A.  Yes.
23 Q.  And then, you said you eventually made a
24 U-turn, to come back up the other direction.
25     Correct?

Page 178

1  A.  Correct.
2  Q.  And then, what did you do after making the
3  U-turn?
4  A.  I believe I pulled aside, and parked.  There
5  was a row of parking that's available there, usually.
6  Q.  Okay.  And then, what did you do after you
7  parked?
8  A.  I got out of my vehicle.
9  Q.  And then what?
10 A.  Sorry; was the question "And what?"
11 Q.  And then what?
12 A.  And then what?
13     And then I believe I spoke to an officer on
14 site.
15 Q.  Did you cross over to the median where you
16 had seen the tent?
17 A.  I don't believe I moved physically into the
18 roadway.  I -- I remember being mostly, uh, us on the
19 side of the street.
20 Q.  Okay.  And then the next sentence --
21 A.  With -- with a view to the median.  Uh-huh.
22 Q.  Okay.  And so the next sentence in your
23 description says (As read):
24     "DPW had taken the person's tent and
25     belongings and thrown them into a garbage

Page 179

1      truck..."
2      Do you see that?
3  A.  I do.
4  Q.  So does that mean that by the time you had
5  parked the car and gotten out of it, that the tent and
6  belongings had already been put into the garbage truck?
7  A.  I don't believe so.  I think I witnessed the
8  whole process.  So, I think I might have been parked at
9  that point.
10 Q.  Okay.
11 A.  There was parking in the area, and visibility
12 to it.
13 Q.  Okay.  And the tent and the belongings were
14 in the median.
15     Do you recall where the garbage truck was
16 stopped?
17 A.  I -- I believe the garbage truck was -- had
18 its flashing blinkers on, and was in the lane closest
19 to the median.
20 Q.  And so you recall seeing the DPW employee
21 take the items and put them into the garbage truck?
22 A.  I believe so, yes.
23 Q.  And that sentence that we were just reading
24 continues on that (As read):
25     "DPW had taken the person's tent and

Page 180

1      belongings and thrown them into a garbage
2      truck, simply because the person was not
3      present at the site."
4      Do you see that?
5  A.  I do.
6  Q.  And how do you know, or what's the basis for
7  your understanding that the reason the DPW employee was
8  throwing the belongings in the truck was because the
9  person was not present?
10 A.  I -- I -- I recall that there was no person
11 present.  And I recall having a conversation with the
12 SFPD officer.  I don't recall if I also spoke to the
13 DPW worker.
14     But through that -- those interactions and
15 those observations, I determined that they determined
16 the items to be abandoned.
17 Q.  Do you ever recall seeing what was inside the
18 tent, at all?
19 A.  Yes.
20 Q.  What was inside the tent, if you recall?
21 A.  It appeared to me to be neatly-packed
22 belongings.
23     This was a tent that was really carefully
24 placed and positioned where it was, with those barriers
25 that are like metal barriers, like, physically around

Case 4:22-cv-05502-DMR    Document 366-16    Filed 04/17/25    Page 10 of 16

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Christin Evans
March 10, 2025

Page 181

1  it.
2  And I remember seeing the items basically,
3  like the -- the, um, DPW workers dismantling the
4  barriers, and throwing everything into the back of a
5  truck. A DPW truck.
6  Q. So when you're talking about "barriers,"
7  those are the sort of metal City --
8  A. (Nods head)
9  Q. -- um, I don't know, like fence
10 barrier-looking things?
11 A. Yeah. I think they're sometimes used in
12 parades and things like that. And I couldn't say for
13 sure if they belonged to the City. A lot of them do
14 belong to the City.
15    But sometimes there are those kind of
16 barriers out and about, as well.
17 Q. Okay. And so you mentioned that the -- those
18 barriers had been set up as -- around the tent?
19 A. Yes. To provide protection to it.
20 Q. And you said you did -- you were able to see
21 inside the tent, as well?
22 A. Yeah. I -- I believe, you know, the metal
23 things, they have slots or -- you know. So my view was
24 maybe not 100 percent unobstructed, and it was from a
25 distance, but I do recall seeing property.

Page 182

1    I don't recall how much of the inside I saw,
2  versus what I saw being carried from the location and
3  placed in the truck. I couldn't say how much of it was
4  while it was in place, versus when it was being
5  deposited into the back of the truck.
6  Q. Okay. And when you watched the items being
7  deposited in the truck, you were observing from the --
8  across the street?
9  A. I believe so. I -- I don't recall. You
10 know, sometimes I would cross the street, if I felt
11 like it was safe. I -- I don't -- I don't have a
12 recollection that I did, that day.
13    But it was not uncommon, in my practice, to
14 try to get physically close to the site in order to do
15 a correct observation.
16 Q. Okay. Do you recall, sitting here today, how
17 close you got on March 24, 2020, to the --
18 A. I couldn't --
19 Q. -- tent?
20 A. I couldn't say for sure exactly how close,
21 but I do have a recollection that I had a good view.
22 Q. I'm going to mark a different exhibit now.
23    And if you've got Exhibit 304 open, I'd
24 probably leave it there; we're going to refer back to
25 it again. But do I want to mark another exhibit right

Page 183

1  now.
2  A. Yeah, no problem. Happy to do it.
3     MR. WANG: This will be Exhibit 305.
4     (Exhibit 305 was marked for
5     identification.)
6     (Document displayed)
7     THE WITNESS: Yep. That looks like a photo.
8  BY MR. WANG
9  Q. Yes. So my first question, as you look at
10 305, do you recognize this photograph?
11 A. I do not. I would be guessing that it might
12 have been one that I supplied. I couldn't say for
13 sure.
14 Q. Okay.
15    MR. WANG: I will -- just for the record,
16 Exhibit 305 is an image that was produced to us with
17 Bates stamp EVANS_00000254.
18    THE WITNESS: It looks like a photo I might
19 have supplied, yes.
20 BY MR. WANG
21 Q. Okay. And feel free to refer back to
22 Exhibit 304, but I believe, in your declaration, you
23 referenced speaking with an SFPD officer about the
24 sweep on March 24, 2020?
25    Is that correct?

Page 184

1  A. Yes. Uh-huh.
2  Q. Is this the officer you spoke to?
3  A. It's possible; I don't know. Do the names
4  match?
5  Q. So in your declaration, and feel free to
6  check it if you want, you say you discussed this matter
7  with SFPD officer J. Sylvester.
8  A. Then it doesn't look like the same person.
9  Q. Okay. So your understanding is you might
10 have talked to a different SFPD officer than the one
11 that's depicted in Exhibit 305?
12 A. Yes.
13 Q. That was -- next Exhibit, this will be 306.
14 It is another image. And I will pull it up on my
15 screen as well.
16    (Image displayed)
17 Q. Ms. Evans, do you see what has been marked as
18 Exhibit 306?
19 A. Yes.
20    (Exhibit 306 was marked for
21    identification.)
22    MR. WANG: And for the record, this was an
23 image that was produced to us, with Bates stamp
24 EVANS_00000257.
25

Case 4:22-cv-05502-DMR   Document 366-16   Filed 04/17/25   Page 11 of 16

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Christin Evans  
March 10, 2025

Page 185

1  BY MR. WANG
2  Q. Do you recognize this photograph, Ms. Evans?
3  A. Yes. It looks like a photo that I produced.
4  Q. And just, I will represent to you that the
5  metadata shows that this was taken on March 24th, 2020.
6     Do you recall taking this photograph?
7  A. I -- I believe I took this photograph.
8  Q. Okay. Is this the back of the garbage truck
9  that you reference in your declaration's description of
10 the March 24, 2020, sweep?
11 A. It appears to be at least one of the trucks
12 that I referenced.
13 Q. Okay. So is it your understanding that there
14 were two garbage trucks at the location on March 24,
15 2020?
16 A. I couldn't say for sure. I -- a lot of times
17 there are multiple vehicles traveling together. I
18 couldn't say on this particular date how many trucks
19 were involved.
20 Q. Okay. Does this photograph, Exhibit 306,
21 show the tent and belongings that are referenced in
22 your declaration, Exhibit 304?
23 A. It appears that it does include some
24 belongings. I -- I would suspect that the reason I
25 took the photo is because it was the belongings that I

Page 186

1  was concerned about. It was my --
2  Q. Do you recall -- sorry, go ahead.
3  A. It was my practice to take photos of items I
4  was concerned about being lost.
5  Q. Do you recall which items were the ones that
6  were taken by DPW on March 24, 2020, as referenced in
7  your declaration?
8     MS. SALZMAN: Objection to form.
9     THE WITNESS: I -- uh-huh. I can't say that
10 I recall exactly. It was, I think, five years ago.
11    But, I do see items in the photo that could
12 have been the items that I was concerned about,
13 including what appears to be a rolled bedroll, and a
14 tarp that would go over a tent.
15 BY MR. WANG
16 Q. And do you recall --
17 A. (Inaudible)
18 Q. Sorry. Do you recall whether those items are
19 the items that you were discussing in your declaration?
20 A. I believe they are. I -- you know, to the
21 best of my recollection, these were the items, or at
22 least a subset of the items. I couldn't say for sure
23 they were definitely the items.
24 Q. And did you get any closer to the items than
25 sort of what is shown in Exhibit 306, the photograph?

Page 187

1  A. I don't believe so, no.
2     Well, actually, now that I think about it, I
3  mean, my car was probably closer to the items than this
4  photo represents, --
5  Q. Do you know where this --
6  A. -- initially.
7  Q. Sorry. Do you know when this --
8  A. I just wanted to be precise in my answer, so,
9  I think when I was coming down and driving one way and
10 then came back the other, there was at one point my car
11 might have been close to the items.
12 Q. As, as you were passing by before you made
13 the U-turn?
14    Is that what you mean?
15 A. Right. Yes.
16    (Photograph taken off display)
17 Q. Next exhibit, this will be Exhibit 307. This
18 is going to be a video file, so I'm not sure if it will
19 transfer in the chat, but I will try.
20    But, either way, I will share my screen and
21 show it.
22    (Exhibit 307 was marked for
23    identification.)
24    (Reporter clarification)
25    MR. WANG: Understood. Thank you.

Page 188

1     THE WITNESS: So, sorry, did you want me to
2  download it and play it? What is --
3  BY MR. WANG
4  Q. You don't have to, if you don't want to. I
5  just want to make sure it's available to you, if that's
6  what you want to do.
7     I am going to share my screen and play the
8  video, so that we can watch it together.
9  A. Okay, sounds good. Does it have audio when
10 you play it?
11 Q. It does. It should.
12 A. Okay.
13 Q. Yeah.
14 A. Okay.
15 Q. So I'm going to start sharing what has been
16 marked as Exhibit 307.
17    Can you see the video, at least? It should
18 not be playing yet, but I just want to make sure you
19 can see it.
20 A. Yes. And I notice that this individual has a
21 different name.
22 Q. Yeah. So the individual shown in this still
23 frame at the beginning of Exhibit 307, is this the SFPD
24 officer that you spoke to on March 24, 2020?
25 A. I'm pretty sure it is. And I'm about to hear

Case 4:22-cv-05502-DMR   Document 366-16   Filed 04/17/25   Page 12 of 16

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Christin Evans
March 10, 2025

Page 213

1  A.  To him --
2  Q.  -- tell DPW that the tent had been left for
3  someone there?
4  A.  Exactly.  And I -- and I don't recall if I
5  was standing, like, right by the door and I could have
6  maybe heard him say it, but it was my understanding,
7  and it was generally all -- everyone in the -- everyone
8  present's understanding that the tent was being gifted
9  to this man who was not being offered a shelter bed.
10 Q.  Okay.  And do you recall seeing what was
11 inside that tent?
12 A.  I -- I was standing by that tent, and saw the
13 contents of it, yes.
14 Q.  Okay.  Did it have the original owner's stuff
15 in it?  Or what was in it?
16 A.  I believe it did have some items in it.  I
17 don't remember it being particularly full.  But...
18 Q.  Okay.
19 A.  I remember that the individual was moving
20 rapidly to dismantle it and make it -- to take -- to
21 pack it up.  To take it with him.
22 Q.  Okay.  So the person who was gifted the tent
23 was trying to pack it up, to -- to move for --
24 A.  Correct.
25 Q.  -- the sweep.  Okay.

Page 214

1  A.  Correct.
2  Q.  And you said that, in your description, that
3  a DPW supervisor slashed the tent with a box cutter?
4  Is that right?
5  A.  Yeah.  I believe it was a box cutter.  It was
6  a sharp item that was about the size of a box cutter,
7  so I described it as a box cutter.
8  Q.  And then you write that:
9     "Michael Mason from EMS6 sent the DPW
10    supervisor away to de-escalate the
11    situation."
12    Do you see that?
13 A.  I do.
14 Q.  Is Michael Mason, is that a Fire Department
15 employee?
16 A.  I believe so, yes.
17 Q.  And what happened after he sent the
18 particular DPW supervisor away?
19 A.  So this was an encampment resolution that
20 happened over a very long period of time.  So there was
21 many things that happened after that incident.
22 Q.  What about with respect to tent that was
23 slashed?
24    Do you recall what ended up happening?
25 A.  Thank you.  It was a long day.

Page 215

1     I believe, um, there was a negotiation and
2  some advocacy done by myself, and I think Larry was
3  present as well from the Coalition, and we tried to
4  advocate to allow the man to take the tent.
5     I can't recall the outcome.
6  Q.  Yeah, that was my next question.
7     Do you recall whether the man was allowed to
8  take the tent or not?
9  A.  I -- it's possible.  I -- I might have that
10 documented somewhere.
11 Q.  Okay.  And when you mentioned a "Larry," is
12 that Larry --
13 A.  I don't -- I don't recall in this moment what
14 happened at the end.
15 Q.  Okay.
16 A.  Obviously, what -- obviously, what was really
17 memorable was the slashing.  I mean, that was not a
18 usual thing.  So...
19 Q.  But it's possible that the man kept the tent
20 anyway?  Is that right?
21 A.  It's possible, yeah.
22 Q.  And you had mentioned "Larry"; is that Larry
23 Ackerman?
24 A.  Correct.
25 Q.  Okay.  Moving on to the next row, this is

Page 216

1  August 21st, 2020, at Market and 16th.
2     Do you see that row?
3  A.  Yes.
4  Q.  Okay.  It looks like that the sweep involved
5  Toro Castaño.  Is that right?
6  A.  Yes.
7  Q.  And you write -- and I'm going to skip toward
8  the second half of this description, but please feel
9  free to read the whole thing before answering.
10 A.  Uh-huh.
11 Q.  But, it looks like this sweep involved Toro
12 Castaño.  It reads (As read):
13    "...asked repeatedly for DPW and SFPD to
14    retrieve his Macbook Pro laptop and his tent
15    before they destroyed the site."
16    Do you see that?
17 A.  Yes.
18 Q.  Do you recall where that MacBook Pro was
19 located, when Toro was asking for it?
20 A.  Yes.  I believe I took a photo of where it
21 was located.  It was in a pile of belongings.
22 Q.  Okay.  And is the pile of belongings the
23 items that were involved in a fire earlier that day?
24 A.  I believe some of the belongings that were in
25 the pile might have been involved in the fire.  I think

Case 4:22-cv-05502-DMR    Document 366-16    Filed 04/17/25    Page 13 of 16

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Christin Evans  
March 10, 2025

Page 217

1 some of the items were not burned, but there were items
2 that were wet.
3 Q. Did you -- were you there present for when
4 the fire started?
5 A. I was not, no.
6 Q. By the time you were present, was the pile of
7 belongings that you are referencing, where Toro's
8 laptop was located, already kind of gathered up?
9 A. It's my recollection that when I arrived, the
10 -- the laptop was in this pile of belongings.
11 Q. Okay.
12 A. That he wasn't being allowed to access.
13 Q. Do you recall whether, when you were there,
14 present, did you watch any City employees, like, add to
15 the file at all?
16   Or had that pile already been, you know,
17 established and set aside?
18 A. I believe it -- the pile had been established
19 and set aside. But -- and I was present when there
20 was, like, a heavy vehicle -- machinery vehicle that
21 pushed those belongings into the garbage.
22 Q. Were you ever told, like, how the fire
23 started?
24 A. I had different reports from different
25 individuals about what had happened that day.

Page 218

1 Q. What was reported to you about how it
2 started?
3 A. I seem to recall one person indicated that
4 they thought that it was some electrical wiring that
5 had set it off.
6   And I heard another allegation that it might
7 have been a drug-involved situation, that might have
8 been related to drug -- to the production of drugs. Or
9 preparation of drugs.
10 Q. Do you have an understanding of where the
11 fire was, or where it started?
12 A. There was a building that was located in that
13 area, and I believe that was near the area. I don't
14 know if it was inside the building, or just outside the
15 building.
16 Q. Do you know where Toro's laptop and tent were
17 located when the fire started?
18 A. I believe I visited him at the site prior to
19 this encampment resolution, so I had a sense of where
20 his tent was, at least a -- a day or two before.
21   I don't know that, um, like, on that day,
22 exactly where it was located, in that moment.
23 Q. Who told you that the fire was started by,
24 like, an electrical wiring issue?
25 A. I don't recall who told me what. I remember

Page 219

1 having conversations with a number of people, including
2 City employees, and Toro.
3 Q. And then, what about the information that the
4 fire was started as a result of a drug-involved
5 situation?
6   Do you recall who told you that?
7 A. I think it was Jeff Kozinski [sic].
8 Q. And who is Jeff Kositsky?
9 A. I believe it was Jeff Kozinski.
10 Q. Okay. And who was Jeff Kositsky?
11 A. At the time, Jeff Kozinski -- well, let's
12 see. He was the head of Department of Homelessness and
13 Supportive Housing. At some point he shifted into
14 being the head of Healthy Street Operations Center and
15 team.
16   So, I believe he made that trip; I'm not
17 positive.
18 Q. I'm going to mark another exhibit, just to --
19 oh.
20   Did you -- do you recall whether Toro or
21 anyone in his encampment were drawing power from the
22 vacant building next to their encampment?
23 A. Did I personally have firsthand knowledge of
24 that? No.
25 Q. I just shared the next exhibit in the chat.

Page 220

1 It should be Exhibit 311.
2   (Exhibit 311 was marked for
3   identification.)
4 Q. And I will share it now on my screen. It's
5 got Bates stamp EVANS_0000048. It is an image that was
6 produced to us.
7   Ms. Evans, if you would take a look at what's
8 been marked as Exhibit 311, and tell me whether you
9 recognize what's shown in this exhibit.
10 A. There appears to be a photo that I took at
11 the site, on the day that we're talking about.
12 Q. So is what's shown in Exhibit 311 the sort of
13 pile of items where Toro Castaño's MacBook Pro laptop
14 was located?
15 A. Yes.
16 Q. And the laptop is within that pile of items?
17 A. I believe so, yes.
18 Q. Okay. And when you arrived on --
19 A. Uh, uh --
20 Q. Oh, sorry. Go ahead.
21 A. If you give me a moment -- if you give me a
22 moment, I'll take a look at the photo on a bigger
23 scale, and see if I can identify where the laptop is.
24 Q. Sure. And maybe we can short-cut that in one
25 second. Let me mark another exhibit.

Case 4:22-cv-05502-DMR   Document 366-16   Filed 04/17/25   Page 14 of 16

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Christin Evans
March 10, 2025

Page 233

1  Q.  Do you recall whether the woman that's
2  referenced in your declaration for the April 15th,
3  2021, sweep, used a -- any sort of device to assist
4  with her mobility that day?
5  A.  Um, I -- I -- I don't know if she did or not.
6  Q.  Do you recall what you observed that made you
7  think she appeared to have a disability?
8  A.  Her ability to respond to people that were
9  interacting with her; she was not as responsive as a
10 person without a disability might be.  So she was
11 non-verbal.
12     I think also she was having mobility issues.
13 She was, um, moving very carefully in the area.
14 Q.  And do you recall what items were being taken
15 by DPW when were you there, observing?
16 A.  That encampment resolution, I think there
17 were multiple tents taken in the area.  I don't
18 recall -- for this particular woman, I seem to recall
19 there was a lot of belongings around her.
20     And there was a DPW worker that was dumping
21 things out on the sidewalk, and she was trying to sort
22 through the items that had been dumped out on the
23 sidewalk, out of a container of some sort.
24 Q.  Okay.  And when you say "sort through," does
25 that mean sorting through for things she wanted to keep

Page 234

1  and things she wanted to throw away?
2  A.  Correct.
3  Q.  Okay.
4  A.  It was really concerning.
5  Q.  Do you recall whether any of the things she
6  indicated she wanted to keep, she was allowed to keep
7  that day?
8  A.  So, the -- this woman, as I said, was not
9  very verbal.  And, um, it was really a sad situation,
10 right?  And there were multiple DPW workers that were
11 around her.
12     And, I didn't think there was -- I don't
13 think any reasonable person would think that she was
14 given adequate notice to collect the belongings that
15 she needed.
16 Q.  So what ended up happening with -- was she
17 allowed to keep any of the belongings that you remember
18 seeing there with her?
19 A.  I seem to recall she was able to get a few
20 items.
21     That was a pretty bad one.
22 Q.  Next exhibit, I will mark Exhibit 315.  This
23 is a document with Bates stamp EVANS_00000331.
24     (Exhibit 315 was marked for
25     identification.)

Page 235

1     MR. WANG:  And I will also share it on my
2  screen.
3     (Document displayed)
4  BY MR. WANG
5  Q.  Ms. Evans, do you see what has been marked as
6  Exhibit 315?
7  A.  Yes.
8  Q.  And I'll try to scroll through it, more
9  slowly.
10    (Pages of document displayed)
11 Q.  Do you recognize what has been marked as
12 Exhibit 315?
13 A.  It appears to be a tweet.
14    (Pages of document displayed)
15 Q.  Okay.  And it looks like you have --
16 A.  Just to be clear, it looks like a text
17 message that I sent to Kelley, which is inclusive of a
18 tweet.
19 Q.  Right.  So it looks like you sent a tweet
20 that had been posted on Twitter to Kelley in this text
21 message.  Is that right?
22 A.  That's right.  That's correct.
23 Q.  Then, looking at the date --
24 A.  So, you're scrolling -- you're scrolling back
25 and forth too quickly.  Can you let me just read the

Page 236

1  tweet?
2  Q.  Sure.  So you want to look at the tweet.
3  Yes.
4  A.  Okay.  Thank you.  Can you pause there?
5     MS. SALZMAN:  Just remember, you can also
6  download it if you want, and look at it on your own
7  device.  If that's better for you.
8     THE WITNESS:  Okay.  Thank you.  I just want
9  to read it, thanks.
10    4/15 HSOC report.
11    (Witness examines document)
12    THE WITNESS:  Yeah.  Okay, thank you.
13 BY MR. WANG
14 Q.  So is this tweet that you also messaged to
15 Kelley, the April 15th, 2020, sweep that's at issue in
16 your declaration, Exhibit 304?
17 A.  Yes.  So, as I recall, there -- this, um,
18 operation spanned a couple blocks.  And this was one of
19 the photos and one of the things that I messaged out
20 about that day, in response to what I observed.
21 Q.  And as part of this tweet that you have also
22 messaged to Kelley, there is a photograph.
23    Correct?
24 A.  Yes.
25 Q.  And does this photograph that you tweeted out

Case 4:22-cv-05502-DMR   Document 366-16   Filed 04/17/25   Page 15 of 16

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Christin Evans  
March 10, 2025

Page 237

1  and that you've messaged to Kelley show the woman who
2  appeared to have a disability that you reference in
3  your description of the April 15, 2021, sweep in your
4  declaration?
5  A.  Yes.
6  Q.  Okay.  And is it the individual on the sort
7  of left side of the photograph?  Looks like they are
8  wrapped in a blanket, and they're wearing their hoodie
9  with the hood up, and kind of bending over?
10 A.  Yes.
11 Q.  Okay.  And is the property that is depicted
12 in the photograph the belongings that you're
13 referencing in your description of the April 15th,
14 2021, sweep?
15 A.  It appears to be some of the belongings that
16 I'm referencing, yes.
17 Q.  Okay.  Do you recall what the other
18 belongings that were at issue were?
19 A.  So I remember there was quite a lot of
20 belongings in the area.  And there were, like, multiple
21 workers, and they were, like, grabbing things, um,
22 around her.
23     And so -- and there were a number of bags, a
24 number of other items that were in container --
25 containerized.

Page 238

1  Q.  Okay.  And then, stepping back a bit, the
2  "Kelley" that you are texting this tweet to, is that
3  Kelley Cutler?
4  A.  It is, yes.
5  Q.  Okay.  And then, at the bottom of this
6  exhibit, Exhibit 315, it looks like this is Kelley
7  Cutler's message to you, in response to your tweet
8  message, that says:
9     "She got a hotel correct?" [as written]
10    Do you see that?
11 A.  Yes.
12 Q.  Is that right?  Is that Kelley Cutler texting
13 you?
14 A.  Yes.  That's right.
15 Q.  Do you recall whether the woman who appeared
16 to have a disability was, um, you know, transported to
17 a hotel that day?
18 A.  I believe she was.
19    (Document taken off display)
20 Q.  Do you know whether the items that were
21 ultimately taken by DPW from her that day were items
22 that, you know, she had told anyone that she was going
23 to give up to go to the hotel?
24 A.  That -- as I said, that one was a tough one.
25 That woman was not very verbal and not very

Page 239

1  communicative.
2     And I don't think a reasonable person would
3  have thought that she had adequate notice and/or time
4  to collect her belongings, given what I saw in terms of
5  the number of DPW workers working around her very
6  rapidly, grabbing things, throwing them into garbage
7  trucks.
8  Q.  And do you recall she was allowed to take
9  items with her to the hotel?
10 A.  I recall that she was very slowly picking
11 through some items to take with her.
12 Q.  Do you know whether she did have a
13 conversation with any City employee about what items
14 she was going to not take with her and leave, to go to
15 the hotel?
16 A.  Could you repeat the question?
17 Q.  Sure.  Do you know if the woman who appeared
18 to have a disability had had a conversation with any
19 City employee about what items she was going to leave
20 behind when she went to the hotel?
21 A.  I know that she did not have an in-depth
22 conversation with the people that were present when I
23 was there with her.
24 Q.  What about when you were not present?
25    Do you know whether she -- or did you hear

Page 240

1  whether she spoke to anyone about what she was going to
2  leave behind when she went to the hotel?
3  A.  At what point?
4  Q.  When you weren't around.  Did you hear that
5  she had a conversation with anyone?
6  A.  No.  How would I be able to hear something
7  that I -- if I wasn't around?
8  Q.  Do you recall what was happening at the time
9  that you arrived on scene where this woman who appeared
10 to have a disability was being swarmed by DPW workers?
11    MS. SALZMAN: Objection to form.
12    THE WITNESS: Can you repeat the question?
13 BY MR. WANG
14 Q.  Sure.  Do you know at what point during the
15 sweep you approached the woman who appeared to have a
16 disability?
17 A.  Um, I -- there might be a timestamp related
18 to the photo, so that that would give an indication of
19 time.
20 Q.  Were you present for every interaction that
21 this woman who appeared to have a disability had with a
22 DPW worker who was trying to collect her things?
23 A.  I -- I believe I was there from the time that
24 DPW started their work of gathering things around her,
25 yes.

Case 4:22-cv-05502-DMR   Document 366-16   Filed 04/17/25   Page 16 of 16

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Christin Evans
March 10, 2025

Page 241

1  Q.  Do you recall how long from the time DPW, as
2  you say, swarmed her, until she was actually
3  transported to a hotel?
4  A.  I, um, don't recall the exact length of time,
5  no.
6      Again, I just don't think anyone would
7  reasonably think that she was given time.  The
8  communication with the DPW workers was so poor, that --
9  that incident, in particular.  And that's why I tweeted
10 about it.
11     That's why I said it's not trauma-informed,
12 because, woman clearly was not given a fair opportunity
13 to get her belongings.
14 Q.  Trying to locate my next exhibit here.
15     MS. SALZMAN:  Are you okay, Ms. Evans?  Or do
16 you need to take a break?
17     THE WITNESS:  I just -- it -- it -- some of
18 this is awful.
19     MS. SALZMAN:  If you need a break at any
20 time, just say so.
21     THE WITNESS:  Okay.  Thanks.
22 BY MR. WANG
23 Q.  The next exhibit is Exhibit 316, I believe.
24     (Exhibit 316 was marked for
25     identification.)

Page 242

1  Q.  And I will also share it.
2      MS. SALZMAN:  Can we see it in the chat?
3      MR. WANG:  Maybe I didn't send.  Let me see.
4  Oh, yeah, I didn't hit "Send."  There we go.
5      THE WITNESS:  (Nods head)
6  BY MR. WANG
7  Q.  Sharing on my screen, Exhibit 316.
8      (Document displayed)
9  Q.  This looks like -- sorry.  Let me start over.
10     Exhibit 316 is a five-page document with
11 Bates stamp COH01154373 through 1154377.
12     And I will try to scroll through it slowly,
13 but also feel free to download it and take a look on
14 your own computer as well.
15     (Pages of document displayed)
16 A.  Uh-huh.  I see a typo.  But I see it, yes.
17 Q.  So just, I guess, some general questions.
18     If we look at the top of the first page of
19 Exhibit 316, this looks like it's an email from you to
20 an email address, organizing@cohsf.org.
21     Do you see that?
22 A.  I do.
23 Q.  Okay.  And this email is dated April 15,
24 2021.  Correct?
25 A.  Yes.

Page 243

1  Q.  And the subject is "April 15th outreach."  Do
2  you see that?
3  A.  Yes.
4  Q.  Okay.  Can you just tell me, I guess, what
5  this document is?
6  A.  It looks to me like it's a form being used to
7  collect information.
8  Q.  Is this one of the Googles forms you had
9  discussed previously, that some -- that at times you
10 would fill out after a sweep that you observed?
11 A.  Yes.
12 Q.  And in this instance, it looks like you were
13 emailing a copy of the form that you filled out to
14 organizing@cohsf.org.
15     Is that correct?
16 A.  I don't think this is me emailing it.  It
17 might be, when I completed the form, it generated an
18 email that was sent.
19     I don't rec- -- I don't remember seeing the
20 content of this, in this form.
21 Q.  I see.  To the best of your recollection, you
22 filled out an online form and clicked "Submit," and
23 that was it?
24 A.  That's vaguely my recollection, yes.
25 Q.  Okay.  And then, this looks like your notes

Page 244

1  from the April 15th, 2021, sweep that's also referenced
2  in your declaration.
3      Is that correct?
4  A.  Yes.
5  Q.  And then I just want to -- I'm going to go to
6  the -- sorry.  The second page of Exhibit 316.
7      And I'm going to, at the top of the screen,
8  sort of the -- looks like -- I guess it kind of looks
9  like it's the second paragraph that begins "Artemis
10 Powell."
11     Do you see that?
12 A.  I do.
13 Q.  And it says (As read):
14     "Artemis Powell is a 46-year-old dead woman."
15     I assume that's the typo you are referencing?
16 A.  Yes.
17 Q.  What is it supposed to read?
18 A.  "Deaf."
19 Q.  "Deaf."  Okay.  Is Artemis Powell the
20 individual with an apparent disability that's
21 referenced in your description of the April 15th, 2021,
22 sweep in your declaration?
23 A.  She is not.
24 Q.  Okay.  So Artemis Powell is a different
25 person than the one referenced in your declaration.