# EXHIBIT 11

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v.*
*City and County of San Francisco, et al.*

---

*Shyhyene Brown*
*February 6, 2025*

---

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 44058Brown_nl.txt
Min-U-Script® with Word Index

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Shyhevene Brown
February 6, 2025

---

Page 21

1    A. No. I didn't.

2    Q. Okay. Do you know -- so you don't know one way

3    or the other, as you sit here today, if you have any

4    documents that may be response to that subpoena?

5    A. Can you elaborate a little bit more on that

6    one.

7    MR. MILLS: Yeah. So let me do one thing. I'm

8    gonna mark our exhibit as "106," and I'm gonna pull out

9    the Subpoena.

10    (Defendant's Exhibit 106 was marked for

11    identification.)

12    BY MR. MILLS:

13    Q. So, Shy, I just marked 106, which is entitled,

14    "Subpoena to Produce Documents, Information, or Objects

15    or to Permit Inspection of Premises in a Civil Action."

16    If you could take a moment and just briefly

17    flip through it. And my first question is gonna be, did

18    you ever look through this document?

19    A. No.

20    Q. Great. So I'm gonna ask if, after this

21    deposition, would you be willing to look at that

22    document to see if you have any information that may

23    respond to it?

24    A. Yes.

25    Q. Perfect. I appreciate it.

---

Page 22

1    And, Counsel, given the representation, is that

2    something that you would be able to help facilitate?

3    MR. NTIM: Yes.

4    MR. MILLS: Perfect. I appreciate that.

5    Q. So, Miss Brown, you can go ahead and set that

6    aside.

7    So, Shy, have you ever testified at a trial

8    before?

9    A. No. I haven't.

10    Q. Do you go by any other names?

11    A. Elaborate.

12    Q. So today, at the start of the deposition, you

13    said that you go by "Shy."

14    A. Right.

15    Q. In addition to Shy, do you go by any other

16    names?

17    A. Besides my government name, no.

18    Q. Okay. So I know that, sometimes, there's the

19    distinction about a government name and a name that

20    individuals use when they've been living on the street.

21    Do you have any names that you've been using on the

22    street?

23    A. No.

24    Q. Do you have any nicknames that you go by?

25    A. Just "Shy."

---

Page 23

1    Q. Okay. Have you ever gone by "Mickey Rocha"?

2    A. No.

3    Q. Do other individuals that are unhoused on the

4    street refer to you as a nickname?

5    A. Elaborate on that a little bit more, because,

6    uh, I'm not understanding like exactly what you're

7    trying to say.

8    Q. Perfect. And I appreciate it. And my job is

9    to ask the good question.

10    So I understand that some individuals that are

11    homeless on the street are called a nickname by others,

12    rather than using what you termed the "government name."

13    A. Right.

14    Q. Do you know if people refer to you as a

15    nickname on the street?

16    A. They refer to me as "Shy" on the street. Yes.

17    They do. Some people know my government, but

18    mostly . . . people call me "Shy."

19    Q. Perfect. Are you married?

20    A. No.

21    Q. Have you ever been married?

22    A. No.

23    Q. Do you have any children?

24    A. My son passed away -- my son passed away four

25    years ago.

---

Page 24

1    Q. I'm sorry to hear that.

2    A. So, no.

3    Q. Sorry to hear that. And did you just have the

4    one son?

5    A. Uh-huh.

6    Q. And so four years ago, was that 2021, your son

7    passed away?

8    A. Yes.

9    Q. And what was the name of your son?

10    A. Isaiah Samuel Goins.

11    Q. And did you live with Isaiah in San Francisco?

12    A. No. He lived with his dad in San Ramon.

13    Q. Appreciate it.

14    And what's your date of birth?

15    A. 10-03-1981.

16    Q. Do you currently live in San Francisco?

17    A. Yes. I do.

18    Q. And are you currently living in a house? A

19    shelter?

20    A. No. I'm living in an SRO right now.

21    Q. And can you explain for me what an "SRO" is.

22    A. Single-room occupancy.

23    Q. Would you describe yourself as being housed

24    right now?

25    A. Yes.

---

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Shyhyene Brown
February 6, 2025

Page 25

1    Q. And how long have you been living at this SRO?
2    A. Since November 19th of last year.
3    Q. And that's November 19th of 2024?
4    A. Yes, sir.
5    Q. Appreciate it.
6       Do you know if you are limited in how long you
7    can stay at that SRO?
8    A. No.
9    Q. Is it "No," there's no limit or "No," you don't
10   know if there is a limit?
11   A. No, I don't know if there is a limit.
12   Q. Has anybody told you that you have to leave
13   within a certain amount of time?
14   A. No.
15   Q. Do you have any intention to leave the SRO?
16   A. Yes.
17   Q. Okay. And can you explain for me what that
18   intention is.
19   A. Uh . . . I like . . . to be on my own and not
20   have to report to nobody, 'cause the visiting policy
21   there, people have to have their IDs and everything
22   else. And it makes people feel uncomfortable in that --
23   in coming there to visit me. So, like, I want to be
24   able to, like, get an apartment eventually to,
25   basically, make it to where my company feels . . . safe

Page 26

1    and not have to be . . . checking in to anybody when
2    they come to see me. So, yeah.
3    Q. Okay. So is your goal to get another apartment
4    where you live on your own?
5    A. Yes.
6    Q. Do you have any plans to live on the street
7    again?
8    A. No.
9    Q. Do you intend to live on the street again?
10   A. No.
11   Q. If you were to be asked to leave the SRO, do
12   you have somewhere else that you'd be able to stay,
13   other than the street?
14   A. Yes.
15   Q. And where is that?
16   A. My godmom's house.
17   Q. And who is your godmom?
18   A. She's an elderly lady named Rebecca. She lives
19   in South City, South San Francisco.
20   Q. And do you know Rebecca's last name?
21   A. Johnson.
22   Q. Now that you're living at the SRO, are you
23   keeping any belongings on the street?
24   A. No.
25   Q. Do you have any intention to do that?

Page 27

1    A. No.
2    Q. And do you know what the name of the building
3    is where you're staying at?
4    A. The Royan Hotel.
5    Q. And can you spell that.
6    A. R-O-Y-A-N.
7    Q. And do you know if that's City housing?
8    A. No. I do not know that.
9    Q. Do you pay anything per month to stay at the
10   Royan?
11   A. Yes. I do.
12   Q. Okay. And what do you pay per month?
13   A. $214.
14   Q. And how do you pay the $214 a month?
15   A. Elaborate on that.
16   Q. Do you pay the $214 yourself or does somebody
17   else pay it for you?
18   A. I pay it myself.
19   Q. And is that the full $214 amount?
20   A. Yes.
21   Q. How do you get money to pay the $214?
22   A. I'm on GA.
23   Q. And what do you mean by GA?
24   A. General Assistance.
25   Q. Is that -- have you heard of CAAP?

Page 28

1    A. Yes.
2    Q. Are you on CAAP?
3    A. Yes. I am.
4    Q. Okay. So do you use your CAAP benefits to pay
5    for --
6    A. Yes. I do.
7    Q. -- your housing?
8       And again, just because this is a depo, we want
9    to be able to wait for each other.
10   A. Sorry.
11   Q. You're doing a great job overall.
12   A. Sorry.
13   Q. So I just want to flag it now. So thanks. I'm
14   going to try to do the same.
15      So . . . okay. Do you know how much you get
16   from CAAP?
17   A. $746.
18   Q. Okay. And do you know if the money -- do you
19   pay the money directly to the Royan Hotel or is somebody
20   paying that through your CAAP benefits?
21   A. General and Housing pays -- like takes it out
22   of my check and pays, the, uh -- my bill -- my landlord.
23   Q. Okay. So every month, you don't have to, for
24   instance, write a check?
25   A. Uhn-uhn.

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Shyhyene Brown
February 6, 2025

Page 29

1   Q.  Or get a Money Order?
2   A.  No.
3   Q.  Okay.  So the payments are kind of automatic?
4   A.  Yes.
5   Q.  And do you live with anybody in that room?
6   A.  No.  I don't.
7   Q.  Okay.  And do you have to follow certain rules
8   to stay at the Royan?
9   A.  Yes.  You do.
10  Q.  And what kind of rules do you have to follow?
11  A.  They are pretty basic.  Uh, check in with your
12  Case Manager on a weekly basis, uh, keep your room
13  orderly, nice and clean for an inspection.  You don't
14  have to be present for inspection when they go into it.
15  Uh . . . like -- like I said, make sure that your
16  visitors are respectful to the front desk people so you
17  can continue having your visitors come by.  It's pretty
18  basic . . . rules.
19  Q.  Have you been complying with the rules at the
20  Royan?
21  A.  Yes.  I have.
22  Q.  And do you intend to comply with the rules at
23  the Royan?
24  A.  Yes.  I do.
25  Q.  And do you have to do anything to continue to

Page 30

1   keep your CAAP benefits?
2   A.  Elaborate, please.
3   Q.  Yeah.  So in order to get the GA, the CAAP
4   benefits that you have, do you have to do anything on a
5   monthly basis to maintain those?
6   A.  Yes.  I do.
7   Q.  What do you have to do?
8   A.  I have light work duty where they, uh, link me
9   up with . . . these providers outside to, basically,
10  work light duty for, like, a certain amount of hours
11  every week.  And that's how I be -- I maintain getting
12  my GA through them.  And on top of that, they just
13  started drug testing everybody for, uh, GA.  So I had to
14  have -- come back with a clean test.
15  Q.  Okay.  How many hours a week do you have to
16  work?
17  A.  Well, since I'm only light-work duty, I only do
18  like four hours, maybe, four to six hours each week.
19  Q.  And what kind of work are you doing?
20  A.  Uh, right now, nothing, because they're -- the
21  people that, uh, they are contracted with, uh, they're
22  full.
23  But normally, what I would do would be like
24  front desk work or something very light duty because of
25  my back.  So I won't be like physically, like

Page 31

1   overexerting myself a lot more.  So, yeah.
2   But usually, they usually have me up at General
3   doing, like, front desk work with the nurses and stuff
4   like that.
5   Q.  And what do you mean by "General"?
6   A.  General Hospital.  My bad.
7   Q.  Okay.  And is that San Francisco General
8   Hospital?
9   A.  Yes, sir.
10  Q.  Have you ever done work as a nursing assistant?
11  A.  Uhn-uhn.
12  COURT REPORTER:  Sorry?
13  THE WITNESS:  Sorry.  No.  I haven't.
14  BY MR. MILLS:
15  Q.  Thank you.
16  And have you ever gotten a license to do
17  nursing assistance?
18  A.  No.
19  Q.  So your testimony is that you would have never
20  told anybody that you are a licensed Certified Nursing
21  Assistant?
22  A.  Elaborate on that, please.
23  Q.  Have you ever told anybody that you were a
24  Certified Nursing Assistant?
25  A.  Never.

Page 32

1   Q.  Have you ever told anybody that you're a
2   Certified Nursing Assistant through the Human Services
3   Agency?
4   A.  No.
5   Q.  Have you done any other work, outside of
6   General?
7   A.  Yes.
8   Q.  And what type of work have you done?
9   A.  Uh . . . I worked for Five Keys as a, uh . . .
10  what are they called?  Like an ambassador.
11  Q.  Okay.  Can you explain for me what kind of work
12  that is.
13  A.  Okay.  Uh . . . think about this.
14  I used to work at the, uh . . . the hostile
15  right there on Ellison and Larkin.  And what I would do
16  is I would come in . . . you know, I would open the
17  doors for the clients, usually feed them breakfast,
18  lunch, or dinner, whichever one they wanted to eat; do
19  wellness checks making sure that they're doing okay,
20  that they're not . . . gone.  And, uh . . . pretty much,
21  just do that throughout the whole day.
22  You know, uh . . . yeah, that's what they would
23  have us do for -- as an ambassador for Five Keys.
24  Q.  Okay.  Have you ever held a job full time?
25  A.  Yes.  Five Keys was the one I, uh . . . held

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Shyhyene Brown
February 6, 2025

Page 53

1    Q. Were there ever any periods between 2011 and,
2  let's say, 2017, where you spent like the entire year
3  living on the street in San Francisco?
4    A. Yes. Uh . . . between 2011 and 2017, there's
5  multiple times that -- that, uh, I lived outside for a
6  whole year.
7       But it was closer to like, give or take, 2015,
8  2016 -- between 2015 and 2017 that -- that period of
9  time right there was the longest I -- I ever stayed
10  outside without going to no shelters, without going
11  inside. None of that. It's just . . . yeah,
12  that's . . .
13    Q. Got it.
14    A. That's my longest time.
15    Q. And during that period, between, roughly, 2015
16  and 2017, were there any days when you would live
17  inside?
18    A. No.
19    Q. So for, roughly, three years, you lived
20  completely on the streets in San Francisco?
21    A. Yes, sir.
22    Q. And would you live in tents or structures?
23    A. Tents, pretty much.
24    Q. Did you ever live in an R.V.?
25    A. No.

Page 54

1    Q. And during that three years, did you try to go
2  back to Glide to ask if they could help you get a bed?
3    A. No.
4    Q. And why is that?
5    A. Relationships. The relationship that I was in,
6  uh . . . the person I was with at the time wouldn't
7  allow me to do that. They wanted me to be outside with
8  them all the time and everything else.
9    Q. Okay. So just to make sure I understand, did
10  you have a partner that wanted you to live outside --
11    A. Yes.
12    Q. -- on the street with them?
13    A. Yes.
14    Q. Okay. And what was the name of your partner?
15    A. His nickname was "Spaz," but his government
16  name is Devontaye Peevey.
17    Q. Devontaye Peevey?
18    A. Yes.
19    Q. Do you know how to spell that?
20    A. D-E-V-O-N-T-A-Y-E, P-E-E-V-E-Y.
21    Q. Okay. And so were you in a relationship with
22  Devontaye between 2015 and 2017?
23    A. Yes. I was.
24    Q. So for all, roughly, three years?
25    A. Yes.

Page 55

1    Q. Do you have contact information for Devontaye?
2    A. To be honest with you, oh, he goes to jail too
3  much for me.
4    Q. Do you know where he's at now?
5    A. No.
6    Q. So during that period of time, between 2015 and
7  2017, do you think you could have lived inside at a
8  shelter if your partner didn't want you to live on the
9  street?
10       MR. NTIM: Objection. Calls for speculation.
11       THE WITNESS: Yes.
12  BY MR. MILLS:
13    Q. Okay. Would you say that you were voluntarily
14  on the street, between 2015 and 2017, because your
15  partner wanted you to live with him?
16       MR. NTIM: Objection. Ambiguous as to the term
17  "voluntary," and it calls for speculation.
18       THE WITNESS: Elaborate, please.
19  BY MR. MILLS:
20    Q. Yeah. So between the period of 2015 and 2017,
21  were you voluntarily living on the street by your own
22  choosing in order to accommodate your partner's request
23  to live on the street?
24    A. Yes.
25       MR. NTIM: Same objections.

Page 56

1  BY MR. MILLS:
2    Q. Did you ever ask your partner to try to live in
3  shelters?
4    A. Yes. I have.
5    Q. And then what changed after 2017?
6    A. Elaborate, please.
7    Q. Yeah. So did your living situation change
8  after 2017?
9    A. Give or take, yes. Yes. Uh . . . in 2017, I
10  broke up with Devontaye and started pursuing housing for
11  myself, for myself, because I no longer wanted to stay
12  outside anymore, 'cause -- not only because of him, but
13  because of everything else that was going on around that
14  time.
15    Q. Okay. And so is it fair to say, after 2017,
16  you started increasing your frequency with how you were
17  trying to engage with the shelter system again?
18    A. Yes.
19    Q. Were there ever any years, after you broke up
20  with Devontaye, where you were completely living inside?
21    A. Yes.
22    Q. Okay. And what years were those?
23    A. Uh . . . 2018, I actually got my housing at the
24  Cambridge Hotel, and I lived there for four years.
25    Q. So from 2018 to 2022, were you living at the

Case 4:22-cv-05502-DMR    Document 366-17    Filed 04/17/25    Page 7 of 11
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Page 57

1  Cambridge?
2      A.  Yes.
3      Q.  And where did you start living after the
4  Cambridge?
5      A.  Uh, back on the street.
6      Q.  And why did you stop living at the Cambridge?
7      A.  They kicked me out, 'cause they said, I
8  abandoned my apartment, which I didn't.
9      Q.  Do you know why they believed you abandoned the
10  apartment?
11         MR. NTIM:  Objection.  Calls for speculation.
12         THE WITNESS:  Can you repeat the question one
13  more time.
14  BY MR. MILLS:
15      Q.  Yeah.  Do you know why they thought you had
16  abandoned the apartment?
17      A.  That was around the time that my son passed
18  away, and I went on a little hiatus for, like, six
19  months.  But I actually let them know, uh, that I was
20  not gonna be in my apartment for that long, because I
21  was dealing with some personal issues.  And they still
22  kicked me out.
23      Q.  Okay.  And where did you go for your hiatus?
24      A.  I was still here in San Francisco, uh, just not
25  on -- that side where I -- where my housing was at.  I

Page 58

1  was still here in San Francisco.  I just didn't go home,
2  pretty much, 'cause I didn't want to be by myself in the
3  house though, like -- yeah.
4      Q.  Were you living inside with anybody?
5      A.  No.  Just me.
6      Q.  Setting aside the Cambridge, did you go stay in
7  any other city shelter?
8      A.  No.  I was -- can you elaborate a little bit
9  more on that one, because . . . I -- I'm thinking . . .
10  I think, I answered that question too quickly on my
11  behalf.  My apologies.  Can you elaborate on that a
12  little bit, because . . . if you don't mind.
13      Q.  Yeah.  Let me break it up.  And again, my job
14  is to do the good questions.  So I appreciate you
15  pushing back on that.
16         Do you -- was the Cambridge City housing?
17      A.  Yes.  It was.
18      Q.  Okay.  So out -- when you were not living in
19  the Cambridge --
20      A.  Right.
21      Q.  -- did you enroll or try to enroll in any other
22  city accommodations, such as shelters or housing?
23      A.  Yes.
24      Q.  Okay.  And did you actually stay in any of
25  those?

Page 59

1      A.  Yes.  I did.
2      Q.  And where did you stay?
3      A.  At the Good Hotel.
4      Q.  And do you know how long you were staying at
5  the Good Hotel?
6      A.  Uh . . . approximately, like six months.  Yeah,
7  six months before they basically closed down, and they
8  moved everybody to the Monarch at that time.
9      Q.  In 2022, was there ever a period of time where
10  you were exclusively living on the street, because you
11  had no access to a shelter or accommodation inside?
12      A.  Elaborate, please.
13      Q.  Yeah.  Was there any period, during the year of
14  2022, where you were living on the streets of
15  San Francisco because you didn't have access to an
16  inside accommodation, such as a shelter or house?
17      A.  No.  No.
18      Q.  What about in 2023?
19      A.  2023?  I was at the Monarch.
20      Q.  And did you live in the Monarch all of 2023?
21      A.  The end of 2022 to all of 2023.
22      Q.  Okay.  And then, at some point, in 2023, were
23  you unhoused living on the streets of San Francisco?
24      A.  Yes.
25      Q.  Do you know when that was?

Page 60

1      A.  That was, uh . . . give or take, in June of
2  2023.  No.  Wait.  Wait.  Wait.  Wait.  Wait.  Wait.
3  Wait.  Hold on.  Hold on.  Hold on.  Take that back.  My
4  apologies.
5         All of -- June of 2024.  My apologies.  It was
6  June of 2024 that I got -- they kicked me out.  They
7  kicked me out June 2024, and I was only on the streets
8  for like six-and-a-half, maybe, seven months, before I
9  got into the Navigation Center in Bay View.
10      Q.  Okay.  So is it fair to say, between 2022 and
11  2024, you were only on the streets for the, roughly,
12  six-and-a-half months or so when you got kicked out of
13  the Monarch?
14      A.  Yes.
15      Q.  And when you were kicked out of the Monarch,
16  did you try to get into another housing accommodation?
17      A.  When I got kicked out, yes.  I tried to get
18  into another shelter -- like another shelter.  And
19  that's when they put me at the Navigation Center.
20      Q.  Okay.  Are you aware of CAAP recipients being
21  entitled to a shelter bed, if they get CAAP?
22      A.  Yes.
23      Q.  And did you get access to a shelter bed through
24  CAAP during those six months?
25      A.  No.  Uh, I went through the Hot Team to get my

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Shyhyene Brown
February 6, 2025

---

Page 61

1    bed in the Navigation Center.
2        Q.  Do you know if CAAP clients are offered the
3    Navigation Center?
4        A.  To my understanding, I don't know, 'cause I
5    never really asked about that.  That's why I went to the
6    Hot Team to get my bed.
7        Q.  So did you ever ask HSA to use your CAAP
8    shelter bed during those six months?
9        A.  No.
10       Q.  Do you know if you were getting CAAP benefits
11   during those of months?
12       A.  I was.
13       Q.  So if a CAAP -- if a bed was available to you
14   through the CAAP benefits program, did you decline that?
15       A.  Like I said before, I was unaware of it at the
16   time.
17       Q.  In the six months that you were living on the
18   street again, in San Francisco, where did you typically
19   stay?
20       A.  Uh, up on like . . . up by, like, Geary and --
21   and -- no, Polk and Cedar or Polk and Myrtle.
22       Q.  And is that the Tenderloin?
23       A.  Yeah.
24       Q.  And what was your typical practice when you
25   were living on the streets?  Would you stay in the same

---

Page 62

1    spot for a certain amount of time?
2        A.  Elaborate a little bit more on that, please.
3        Q.  Yeah.  So we understand that, sometimes, people
4    that are living on the street will stay in a given area
5    for a day.  Other people like to stay as long as they
6    can.
7        A.  Right.
8        Q.  What was your typical experience?
9        A.  Uh . . . I wouldn't stay for very long.  Like I
10   would stay for like two, maybe, three days, as in I
11   would leave, and then like transition to Myrtle Alley
12   and do the same thing down there, as well.
13       Q.  And would you typically living in alleys?
14       A.  Yes.
15       Q.  Did you typically live with other individuals?
16       A.  Elaborate, please.
17       Q.  Yeah.  So, sometimes, people camp by
18   themselves; sometimes, people camp with a community of,
19   you know, two or more people.
20           What did you typically do?
21       A.  Uh . . . at the time, I was transitioning in
22   between Cedar Alley and Myrtle.  I would always -- at
23   the time, me and my boyfriend would stay together.  And
24   we liked to stay by ourselves, not with a group of
25   people.

---

Page 63

1        Q.  Did you have the same boyfriend during the
2    entire six months --
3        A.  Yes.
4        Q.  -- that you were living -- I'm sorry.  Let me
5    ask a better question and clarify it, 'cause I want to
6    make sure we're on the same page.
7            Did you live with the same boyfriend during the
8    six months that you were unhoused in 2024?
9        A.  Yes.
10       Q.  And what was the name of that boyfriend?
11       A.  Romeo Vincent.
12       Q.  Can you spell that.
13       A.  "R" -- no, Marcus Venson.  My apologies.
14   Marcus Venson.  M-A-R-C-U-S, V-E-N-S-O-N.
15       Q.  And was that for the entire six months?
16       A.  Yes.
17       Q.  Were there ever any periods where you weren't
18   living with Marcus?
19       A.  No.
20       Q.  Did you and Marcus agree to live on the street,
21   rather than trying to go access shelter, as you did with
22   your prior relationship?
23       A.  Elaborate just a little bit.
24       Q.  Yeah.  So my understanding, from your testimony
25   earlier, is when you had the partner in 2015 through

---

Page 64

1    2017, you both preferred to stay on the street camping
2    outside.  Was that the same thing with your partner in
3    2024?
4        A.  No.
5        Q.  Did you ever try to access shelter?
6        A.  Yes.  Uh, yes.  We did.  And when . . . he
7    tried to, like -- when he tried to get a shelter bed at
8    the Navigation Center, uh . . . I never knew that they
9    ran your name when you go to try to get a shelter bed.
10   I never knew that.  But he ends up going to jail the day
11   that he tries to get into a shelter.
12       Q.  And do you know what he had to go to jail for?
13       A.  A warrant.
14       Q.  Do you know what the warrant was for?
15       A.  No.  I do not.
16       Q.  Do you know if he had any pending felonies?
17       A.  I don't know.
18       Q.  Did you live with dogs on the street?
19       A.  Yes.
20       Q.  In 2024?
21       A.  Yes.
22       Q.  And did the dogs live with you the entire six
23   months?
24       A.  Yes.
25       Q.  How many dogs did you live with?

---

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Shyhyene Brown
February 6, 2025

Page 137

1    A. Uh . . . almost a month.
2    Q. Okay.
3    A. A little under, like, give or take a month,
4  month-and-a-half, because that's how long he was in jail
5  for.
6    Q. And so when he got out, you went back to the
7  street?
8    A. Yes.
9    Q. Are there any other instances where DPW took
10  your property?
11    A. After that, that incident? Uhn-uhn. I mean,
12  "No." I apologize.
13    Q. Okay. So in 2017, it was just the two
14  incidents, the one where we just described with the rain
15  and you wrote a letter to the Mayor, and the second one
16  where your mother's jewelry was taken?
17    A. Yes.
18    Q. I want you to turn to page No. 1 of Exhibit
19  No. 109. And there are two photos on the front that
20  show a tent.
21       Do you know if that was your tent?
22    A. The one that's right here up under the tree --
23    Q. Yes.
24    A. (INDICATING) -- was mine.
25    Q. So that's your tent?

Page 138

1    A. Yes.
2    Q. And are you able to see there where you had the
3  clearance for ADA accessibility that we referred to
4  earlier?
5    A. Yes. 'Cause if you -- instead of them, I wish
6  they would have tooken it, like, this way, going like
7  this way. (INDICATING.) You would have seen that, uh,
8  behind my tent, people can walk around it, and a
9  wheelchair can get around it.
10       You would have been able to see that, if they
11  would have taken it from like -- vertical view of it,
12  like . . . you feel me? But since they took it on the
13  side, you can't actually see that part.
14    Q. Looking at the photo of the tent on the bottom,
15  do you know how much room there was between you and the
16  tree?
17    A. Without all my stuff being there, it would have
18  been enough space for somebody to walk through, but not
19  a wheelchair. But like I said, if they would have taken
20  the picture, like, vertically, like this -- you feel me?
21  You would have seen, in the back of my tent, a
22  wheelchair can go around my tent, and so people can walk
23  clearly around my tent.
24    Q. So in order for the wheelchair to get around
25  your tent, would they have to go into the street?

Page 139

1    A. No. No.
2    Q. So they would be able to get around the tree?
3    A. Yes.
4    Q. Do you know if this photo was taken at the
5  start of the resolution that day or at the end?
6    A. End. Towards the end.
7    Q. So you were able to reset this tent up?
8    A. Yes.
9    Q. And did this tent not have any belongings
10  inside of it?
11    A. It didn't have nothing in it, 'cause everything
12  that you see outside the front, they took.
13    Q. Do you know what time this photo was taken?
14    A. (NONVERBAL SOUND.) Truth be told, no. I do
15  not remember it.
16    Q. Do you know who took the photo?
17    A. Kelley. She took it off her phone.
18    Q. And do you see that DP -- is that a DPW truck?
19    A. Yes.
20    Q. And do you see any items in that DPW truck?
21    A. Yes. And I see the barricades too.
22    Q. And what kind of items do you see in the truck?
23    A. I see -- if you look very closely, besides the
24  barricades, if they were enlarging, they, you can see
25  people's belongings right here in the very, very front

Page 140

1  of the -- of the -- of the DPW truck.
2    Q. And do you know if this tent in the top most
3  photograph is in the same location as the bottom?
4    A. No.
5    Q. So this tent was in two different locations?
6    A. Right. And that tent, I don't know whose it
7  is. But, I know, the bottom one was mine.
8    Q. So the bottom one is yours. And the top one
9  next to the -- what appears to be a telephone pole is
10  not yours?
11    A. Right.
12    Q. Was that garbage can in the bottom photo near
13  your tent?
14    A. Yes. It was.
15    Q. And was it like that before DPW came?
16    A. No. It wasn't.
17    Q. So if DPW had already come, why is there trash
18  on the street?
19    A. Like I said, this stuff that was in front of my
20  tent, they took. (INDICATING.)
21    Q. So my question --
22    A. Because they -- they -- my apologies. Go
23  ahead.
24    Q. Yeah. I think, my question is a little
25  different. And if it's confusing, I want to clarify it.

Case 4:22-cv-05502-DMR    Document 366-17    Filed 04/17/25    Page 10 of 11
Coalition on Homelessness, et al. v.                                Shyhyene Brown
City and County of San Francisco, et al.                           February 6, 2025

Page 153

1    A. No.
2    Q. Have they sent you any e-mails?
3    A. None.
4    Q. Does that surprise you?
5    A. Yes.
6    Q. And why does that surprise you?
7    A. Because, normally, they -- they call me -- they
8    use me as a last resort. Like when they can't find,
9    like somebody . . . to come out and represent them or to
10   like -- to join them in their rallies or whatever, they
11   use me as a last resort. So it does surprise me a
12   little bit.
13   Q. Okay. After that protest for the Hastings
14   lawsuit, did you view yourself as being a member of the
15   Coalition on Homelessness?
16   A. No. I didn't.
17   Q. Do you view yourself as being a member of the
18   Coalition on Homelessness today?
19   A. No. I view -- I view myself as a volunteer of
20   the Coalition on Homelessness, but not a member. No.
21   Q. Would it surprise you to hear that the
22   Coalition on Homelessness has referred to you as a
23   member?
24   A. Yes. It would be surprising.
25   Q. And would you wish that they would not do that?

Page 154

1    Let me ask a better question.
2    A. Yeah. I was gonna say.
3    Q. If the Coalition on Homelessness has
4    represented that you're a member of the Coalition on
5    Homelessness, would you ask that they not do that?
6    A. No. Because if that's how they view me, then
7    I'm honored.
8    Q. But you --
9    A. But -- but during that time, that I was
10   volunteering with them, I never considered myself as a
11   member.
12   You understand -- does that make?
13   Q. I -- yes. I understand.
14   Are you aware that the Coalition on
15   Homelessness submitted a Declaration in the Federal
16   Court case on your behalf?
17   A. Elaborate a little bit on that, please.
18   Q. Yeah. At the start of the deposition, you said
19   that you reviewed a Declaration that you --
20   A. Yes.
21   Q. -- had helped prepare?
22   A. Yes.
23   Q. Do you know why that was prepared?
24   A. Yes. Because they were gonna, uh -- they
25   were -- like I said -- I testified before, they were

Page 155

1    gonna, uh . . . sweep -- they were trying to file a
2    lawsuit against the City for uh . . . the destruction of
3    the homeless peoples tents and everything else. So,
4    yeah. I do know.
5    Q. Did you know that that Declaration was gonna be
6    filed with the Court?
7    A. No. Honestly, I didn't. I just thought, they
8    were gonna . . . I don't know what I was thinking when
9    they did it, but they never informed me that they were
10   gonna submit it to the Federal Courts.
11   Q. Would you wanted -- it have been submitted to
12   the Federal Court?
13   A. Yes.
14   Q. Do you remember reviewing that Declaration for
15   accuracy?
16   A. Yes. I did.
17   Q. And how did that happen?
18   A. With my lawyer.
19   Q. And it was Andrew?
20   A. Yes, sir.
21   Q. So you reviewed a Declaration with Andrew?
22   A. Yes.
23   Q. And how do you know it was Andrew?
24   A. 'Cause he sent it to me through e-mail.
25   Q. And this -- I'm -- I'm referring to when it was

Page 156

1    written. Do you know --
2    A. Oh.
3    Q. -- who you reviewed it with when it was
4    written?
5    A. I apologize. I . . . at this time, I don't
6    remember that girl's name. What is her name? What is
7    her name?
8    COURT REPORTER: Please slow down.
9    THE WITNESS: Okay. I don't remember the
10   lady's name that took my -- my Declaration . . . at this
11   time.
12   MS. TALLA: Should we take a break? Would that
13   be best?
14   Okay. Let's take a quick break, if you don't
15   mind.
16   MR. MILLS: We'll go off the record.
17   THE VIDEOGRAPHER: We're going off the record.
18   The time is 2:18 p.m.
19   (A recess was taken at 2:18 P.M. until 2:32 P.M.)
20   THE VIDEOGRAPHER: Back on the record. This is
21   the beginning of Media 3. The time is 2:32 p.m.
22   BY MR. MILLS:
23   Q. All right. Shy, before the break, we were
24   talking about your Declaration. So I am going to mark
25   that as Exhibit 112.

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Shyhyene Brown
February 6, 2025

Page 169

1  expectation that they would get money on your behalf?
2     A. I was -- never thought there was gonna be any
3  money involved or a payout, to begin with. So my
4  expectations when -- be null and void to me, because I
5  didn't -- I would never -- they never brought it to my
6  attention that I was gonna get paid or have any
7  compensation coming my way at all. So . . .
8     Q. And you mentioned some services that you've
9  gotten from the Coalition on Homelessness. What are the
10  services that you would typically get?
11     A. Uh, they've helped me in so many ways. They
12  helped me get -- like, when I was homeless in 2017, and
13  I didn't have no identification, they helped me, uh, get
14  my ID, uh, with the ID vouchers and stuff like that.
15  They helped -- they would come and pick me up and take
16  me to, like, my GA appointments and stuff like that, to
17  make sure that I have income coming in and stuff like
18  that.
19        Uh, they . . . they've . . . during the
20  pandemic, they helped me out, 'cause I didn't have a
21  tent at that time. Give a -- get a tent to stay in
22  during the pandemic. Uh, considering the fact that my
23  building, my whole entire building was . . . infected --
24  had too many people infected with Covid. So I just went
25  outside behind that.

Page 170

1        Like, they've helped me so -- in so many ways.
2  Uh, I'm grateful for them, like . . . I'm really
3  grateful for them. They've done so much for me over
4  these last few years. If I go in there today or
5  tomorrow and ask for some help, I know for a fact,
6  they'll help -- they won't -- they won't deny me.
7  They'll actually help me.
8     Q. And have you ever been an employee or intern at
9  the Coalition on Homelessness?
10     A. No. I just volunteer.
11     Q. And did they ever pay you for any services that
12  you were providing?
13     A. No. I didn't -- I -- I -- I was -- I never
14  expected payment from them, because I love helping
15  people. That's who I am. I love helping people. I
16  like seeing people smile and, basically, achieve what
17  they want, you know? And that's why I volunteered.
18        I didn't expect no payment from them or
19  anything else in return, you know? Because . . . the
20  payment is seeing the next person happy, because they
21  achieved something that they wanted to do.
22     Q. Right. Have you ever participated in a Human
23  Rights Work Group meeting?
24     A. Yes. I have.
25     Q. And when did you participate in those?

Page 171

1     A. Uh, it was only for a short amount of time. It
2  wasn't for a long period, but, uh . . . it was . . . I
3  don't know exactly the date. But, I know, it was like
4  towards the end of the pandemic that I just went in
5  and -- and -- I sat in some of the -- excuse me. I sat
6  in some of the groups, like two or three other groups,
7  because after that, I didn't go again. So . . .
8     Q. Are you aware that Kelley Cutler has sued the
9  Coalition on Homelessness?
10     A. I was unaware of that.
11     Q. Do you know Toro Castaño?
12     A. No. I don't.
13     Q. Do you know Shanna Couper Orona?
14     A. Yes. I do.
15     Q. And how do you know her?
16     A. Uh, she's like a friend of mine. She's a good
17  friend of mine. Uh, we did Outreach together during the
18  pandemic to help people who needed tents and stuff like
19  that. Like, we would go out and do Outreach together
20  and stuff like that.
21     Q. Do you know if she was a firefighter?
22     A. I don't know none of that.
23     Q. Do you know if she was an E.M.T.?
24     A. I don't know that.
25     Q. Do you know if she's an honest person?

Page 172

1     A. To me, she was. I don't know about everybody
2  else. But to me, she was.
3     Q. Okay. When is the last time you spoke with
4  her?
5     A. Elaborate, please.
6     Q. Eleven or eight weeks?
7     A. No. I said, "elaborate, please."
8     Q. Oh, sorry. When is the last time you spoke
9  with Shanna Couper Orona?
10     A. It's been a while. Almost like two years;
11  maybe, three.
12     Q. Okay. Do you know Brian Edwards?
13     A. Yes. I do.
14     Q. Did you ever hear about the Human Rights Work
15  Group not appealing to homeless people in the work that
16  it was trying to do?
17     A. No, sir. I haven't.
18     Q. Do you know Dylan Verner-Crist?
19     A. No. I do not.
20     Q. Would you say that you've benefited from
21  services in the City and County of San Francisco?
22     A. Yes.
23     Q. And would you say that you're housed because of
24  the City and County of San Francisco?
25     A. Yes.