# EXHIBIT 12

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3
 4   - - - - - - - - - - - - - - -
 5   COALITION ON HOMELESSNESS,  )
 6   et al.,                     )
 7             Plaintiffs,       )
 8   vs.                         )  CASE NO.
 9   CITY AND COUNTY OF          )  4:22-cv-05502-DMR (LJC)
10   SAN FRANCISCO, et al.,      )
11             Defendants.       )
12   - - - - - - - - - - - - - - -
13
14
15              VIDEOTAPED DEPOSITION OF
16                 SHANNA COUPER ORONA
17              FRIDAY, FEBRUARY 28, 2025
18
19
20
21        BEHMKE REPORTING AND VIDEO SERVICES, INC.
22               BY:  CYNTHIA TURI, CSR NO. 11812
23               550 CALIFORNIA STREET, SUITE 820
24                 SAN FRANCISCO, CALIFORNIA 94104
25                             (415) 597-5600
```

```
 1        A.   I'm not sure who was in the top level.  But
 2   it -- I know it didn't -- it didn't last very long, the
 3   two-week time frame, which was -- it was very helpful,
 4   and then it just went away.  And they don't do that
 5   anymore.
 6        Q.   In your mind, do you know when it went away?
 7        A.   I -- I would say within, like, that first year
 8   of them doing it.  It seemed like things got a little
 9   more -- just got -- it was just different.  They didn't
10   do that.  They didn't give people that time frame.  They
11   didn't go and do outreach.
12             It wasn't, like, communicating with the people
13   to help them.  It was just gone.
14        Q.   And what period -- when you're saying they
15   stopped doing that, who stopped doing that?
16        A.   When the City and HSOC and, you know, those
17   involved within the encampment resolutions, everyone
18   that's involved with that, from parking, you know,
19   people to the top or Jeff Kositsky.
20             I would see him down there during the encampment
21   resolutions as well.  And that's what I'm referring to.
22        Q.   Do you know if at some point, HSOC was providing
23   72 hours' advance notice?
24        A.   Yeah.  But they never -- it was very rare that
25   they did.
```

```
 1        A.   That one I'm talking about, that's the last --
 2   the second incident.
 3             The first incident was, he was next to Josh and
 4   Apple, across the street, maybe about a week and a half,
 5   maybe two weeks prior to that.  And they came through
 6   and he wasn't there at that moment.
 7             But it was lived in.  He had a bed and
 8   everything there.  They took his tent and all his stuff.
 9             Josh tried to stop him and they took it anyway.
10   He's, like, I'm watching his stuff.
11             They were, like, oh, well, it's not your stuff.
12   So they took it.
13        Q.   You were physically there that day?
14        A.   Yeah.  Yeah, I was.
15        Q.   Did you take any videos?
16        A.   I didn't because my phone was dead.  And I was,
17   like, looking for an outlet so I could charge it a
18   little bit and get something.
19             They were in and out so quick, I wouldn't have
20   time to do that.
21        Q.   Do you know if that was a preplanned HSOC
22   resolution?
23             MS. GRIJALVA:  Objection.  Speculation.
24             THE WITNESS:  I don't know -- no.  It definitely
25   wasn't.  I don't believe so.  It was evening time, and
```

```
 1  it was just one truck.  So it was like a swoop in kind
 2  of thing, sneak attack.
 3  BY MR. MILLS:
 4      Q.  So David Martinez's tent was taken on a sneak
 5  attack by DPW?
 6      A.  Yeah, because that was only thing they took was
 7  just that, his stuff.
 8      Q.  Do you know what property he lost that day?
 9      A.  I'm not sure what he had in his -- in his tent
10  area, but I just know, his tent and his bike, and his
11  bike cart, because he recycled.
12          So he goes and gets cans in different areas of
13  the city.  And so he relied on that cart and that bike
14  to survive to get -- to make money.
15      Q.  Do you have any documents relating to that
16  second incident with David Martinez?
17      A.  No.  I assume, like, when Hadley talked to him,
18  that maybe she would -- I don't know -- document
19  something or I don't know.
20      Q.  When you were out there, were you looking for
21  plaintiffs to be named in a lawsuit?
22      A.  No.  No.
23      Q.  I'm going to mark the next exhibit, which will
24  be 221.
25  ///
```

```
 1   is probably Krystle Erickson.
 2        Q.   Is it fair to say, as you sit here today, you
 3   don't know what Krystle this is?
 4        A.   I would say I'm 50 percent sure.
 5        Q.   Is it fair to say you'd be guessing as to what
 6   kind of Krystle -- what Krystle this is referring to?
 7        A.   Yeah.  Maybe.  Yeah.  I think so.  Yeah.  Yeah.
 8   I would need more information to know.
 9        Q.   Is it fair to say you'd be speculating about the
10   incident because you don't know what Krystle it is?
11        A.   I know the incident, but the Krystle, I'm not
12   sure.
13             MS. GRIJALVA:  I'll object as misstating
14   previous testimony.
15   BY MR. MILLS:
16        Q.   Well, what do you know about the incident?
17        A.   When -- when DPW came when she was not at her
18   encampment, I was there.  So -- and I was there when --
19   I had a conversation with the DPW guy.  The DPW guy
20   always wore a badge.  I don't know what that meant.
21             But he -- there was -- his truck pulled up.  And
22   they started just grabbing stuff.  I said, like, hey,
23   wait.  Wait.  She's in the bathroom.  She was at
24   Trader Joe's.  She'll be right back.
25             He was very rude and kind of just jerky, and
```

```
 1    they didn't care that they were -- that's what -- that's
 2    why I said in one of the previous things that, like,
 3    they sit and wait till someone leaves.  They target
 4    people that they want to get rid of their stuff or
 5    whatever, because the second she walked away and crossed
 6    to Trader Joe's, they swooped in and just started
 7    grabbing stuff and throwing it.  Doors open and a bunch
 8    of stuff was gone.
 9              And I was, like, hey.
10              We're helping her get rid of all this stuff
11    because she's a hoarder.  She doesn't need this stuff.
12    It's all trash, just making comments like that.
13         Q.   Do you know where this was located?
14         A.   Yeah, Dore Alley, between Bryant and Division.
15    Bryant, Brannan, like that, Potrero, in between that
16    whole little --
17         Q.   Do you know the date of the incident?
18         A.   I do not.
19         Q.   Do you know the season?
20         A.   I don't.
21         Q.   Do you know what items she lost that day?
22         A.   She -- she lost -- she had a small tent that she
23    had that had her -- her, like, bags and stuff like that
24    and that she kept.
25              She had another little tent that she slept in.
```

1  They went for the stuff with the bags, and took all the
2  bags, and then threw the tent -- the small tent in the
3  truck.
4           She had random, just, things.  I think she had a
5  bike.  I don't know if it was working or not.  And just
6  some other bags that were right there.  They took, like,
7  two pickup trucks full of stuff that they took.  It was
8  her dirty clothes that she was -- laundry night was
9  coming up.  She -- it was half of the stuff that she had
10 there.
11      Q.  And if you could turn to page 2, paragraph 8
12 refers to the Stolen Belonging project.  When you were
13 working on the Stolen Belonging project, was your
14 intention to sue the City and County of San Francisco?
15      A.  No.  I wanted to educate my city on how to
16 better treat its citizens and make things better for all
17 of us.
18      Q.  Do you know if Leslie wanted to sue the City and
19 County of San Francisco?
20      A.  No way.
21      Q.  Do you know if the Coalition intended to sue the
22 City and County of San Francisco?
23      A.  No.  I mean, there was nothing, any
24 conversations or anything.  We're trying to do something
25 important to get people to understand what's happening