# EXHIBIT 13

To

Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

*Todd Dutch Bryant*
*March 4, 2025*

Behmke Reporting and Video Services, Inc.
550 California Street, Suite 820
San Francisco, California  94104
(415) 597-5600

Original File 44184Bryant_NL.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR   Document 366-19   Filed 04/17/25   Page 3 of 15
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Todd Dutch Bryant
March 4, 2025

Page 45

1  A.  I -- is that -- that one's supposed to --
2  requires me to have housing or something, you're
3  saying?
4  Q.  I'm just asking you if it does.
5  A.  Oh, okay.
6  Q.  Based off of your personal knowledge.
7  A.  I don't know.  I'm not sure.
8  Q.  Do you know if that case is resolved?
9  A.  Yeah, they downgraded it or some -- it was a
10  -- I think so, yeah.
11  Q.  Do you know if you have any pending warrants
12  for your arrest related to that case?
13     MS. YOUNG: Objection, asked and answered.
14  But, you can go ahead.
15     THE WITNESS: I don't know.  Do I?  Because
16  you keep on asking.
17  BY MR. MILLS
18  Q.  I'm just asking if you know.
19  A.  I don't think so.
20  Q.  Have you been told if all of your
21  requirements have been satisfied with respect to that
22  program?
23  A.  I'm not really sure.  That was a program that
24  was during COVID, that I went -- I was at that place.
25  I'm not -- I'm not 100 percent sure.

Page 46

1  Q.  Are you familiar with the government claim
2  process?
3  A.  No.  What's that?
4  Q.  Have you heard of the process where
5  individuals either have property destroyed or injured,
6  or obtained personal injuries, and then fill out a form
7  with the City and County of San Francisco, requesting
8  money?
9  A.  Oh, you're talking about, like, the one I was
10  doing in small claims, when you give me the subpoena in
11  the rain?  Right?
12  Q.  So that was a small claims court, I
13  understand.
14  A.  Yeah, yeah.
15  Q.  Are you familiar with the claims process that
16  predates the --
17  A.  The one you got to do before you go to small
18  claims?
19  Q.  Correct.
20  A.  Yes.
21  Q.  Okay.
22  A.  I am.  That's how I -- that's how I ended up
23  there.
24  Q.  So I understand you have that one
25  small-claims action and claim.

Page 47

1  A.  (Nods head)
2  Q.  Have you ever filed any other government
3  claims, like that?
4  A.  That's the only one.  That's the only one.
5  And I got -- they did not want to pay me on that.
6  Q.  Are you familiar with the Coalition on
7  Homelessness?
8  A.  Yes.
9  Q.  Are you a member of the Coalition on
10  Homelessness?
11  A.  Yeah, you can say that.
12  Q.  And what do you mean by "you can say that"?
13  A.  Yeah.  I mean, they're -- you know,
14  they've -- they've been there.  I mean, it's amazing.
15     They were there -- a lot of times, these
16  instances that I told you about, they were -- members
17  that worked there happened to be there at times when --
18  that's how these instances happened where they
19  documented it, you know?  They were there when this was
20  going down, and caught it all on film, or took pictures
21  and -- yeah.
22     It was in a documentary that was by one of
23  them.  And, yeah, you could say that.  I would say that
24  I'm a member, yes.
25  Q.  Is that documentary your only exposure to the

Page 48

1  Coalition on Homelessness?
2  A.  No.
3  Q.  So have there been other instances where the
4  Coalition on Homelessness has observed property
5  destruction on -- related to you?
6  A.  Yes.  I first met them on Florida Street.
7  They had a rally for -- to stop the sweeps.  And that's
8  how I first met all of them.
9     And then one of the -- a lady who worked
10  there, Kelley Cutler, the instance where I said I'm on
11  the freeway, they were taking all my stuff, and
12  arresting me, taking all my stuff.  And she -- she
13  happened to be walking by, and she took pictures of
14  everything, to help me with that.
15     It's -- I mean, didn't really help that much,
16  but that's how I first met her, I can remember.  And
17  then I seen them -- that's how I eventually got this
18  whole thing underway.  Meeting with them over the
19  years.
20     We had several rallies and stuff like that,
21  like, trying to get our stuff back from the place,
22  supposed to bag & tag.  We had a big thing there, too.
23  Q.  Do you know if that rally was in connection
24  with the Stolen Belonging Project?
25  A.  Which one?  The one trying to get the stuff

Case 4:22-cv-05502-DMR    Document 366-19    Filed 04/17/25    Page 4 of 15
Coalition on Homelessness, et al. v                                    Todd Dutch Bryant
City and County of San Francisco, et al.                                  March 4, 2025

Page 49

1  back?
2  Q. Yeah.
3  A. No, it wasn't in connection with it, I don't
4  think. They just wanted to see if anybody could get
5  their stuff back, because nobody was. And they invited
6  media there, too. And we tried to get stuff returned
7  to us, and I wasn't able to get anything back that they
8  had. And I don't believe anyone else was. Although,
9  we tried. We were there all day.
10 Q. Do you know what year the incident with
11 Kelley Cutler taking pictures was?
12 A. I'm not for certain, but I was arrested for
13 it, so you could find out that way. They brought me up
14 to the police station on, um, Valencia, I think.
15 Q. Are you aware that the Coalition on
16 Homelessness is claiming that you are at risk of having
17 your property destroyed in this case?
18 A. What's that? Say again?
19 Q. Are you aware that the Coalition on
20 Homelessness is claiming that you're at risk of having
21 your property destroyed in this case?
22 A. At risk of it?
23 Q. Yes.
24 A. I'm not sure. I mean, it was either
25 destroyed or, I mean it's not there now, so I mean

Page 50

1  either it was -- they claimed -- that last one with the
2  toolbox and everything? They claimed to me, the DPW
3  workers, that -- that they had the Fire Department
4  coming in with the jaws of life, trying to open the box
5  up, and then they ended up throwing it in the packer,
6  which is a big garbage truck that crushes everything.
7     So that -- that means -- they're trying to
8  claim they destroyed it, which is -- I don't believe
9  that -- they could not lift that box up, and throw it
10 into the back of the garbage truck. I don't -- that's
11 impossible.
12 Q. The question is a little bit different.
13    Are you aware that, in the future, the
14 Coalition on Homelessness is claiming that you will be
15 subject to property destruction?
16 A. That's what they're saying? I don't -- I
17 didn't know that, no.
18 Q. Does that make sense to you?
19 A. No, I'm inside. So unless I was put back on
20 the street, I don't see that as a possibility. Unless
21 they have stuff of mine still that they're destroying;
22 I don't know.
23 Q. Are you aware that the Coalition on
24 Homelessness is trying to invoke your personal
25 Constitutional rights in this case?

Page 51

1  A. What do you mean? You mean they're trying to
2  invoke my personal Constitutional rights?
3  Q. Correct.
4  A. Yeah, I guess so.
5  Q. And how are you aware of that?
6  A. Just, just me? Or are you talking about
7  every -- all, everybody who's homeless?
8  Q. You.
9  A. Just me, only? No, I didn't know that they
10 were invoking my -- I mean, I -- what does that mean,
11 exactly, to invoke my personal Constitutional rights?
12 Q. Do you know that the Coalition is claiming to
13 bring a lawsuit on your behalf, to invoke your
14 Constitutional rights in a Federal Court, for risk of
15 property destruction that you may experience?
16 A. Yeah. That I may experience?
17 Q. Correct. In the future?
18 A. Oh, I didn't know that, no. I mean, I
19 thought it was for what I had already experienced.
20 What I witnessed. And they -- you know, they did do
21 already.
22    Not the future because, I mean, I'm inside.
23 Q. Is it fair to say that you didn't consent to
24 Coalition bringing that claim on your behalf for
25 property destruction that you may experience in the

Page 52

1  future, because you're housed?
2     MS. YOUNG: Objection. Leading question.
3     But if you understand the question, you can
4  answer.
5     THE WITNESS: I mean, I think at the time,
6  when we filed this lawsuit, I was still homeless at the
7  time. Because I remember when they -- we talked about
8  it, I was still living in Dore Alley.
9     So they didn't know I was -- I was inside at
10 the time when I filed this. I was still -- I was still
11 on the street. I was living in Dore Alley.
12    So that's -- that's probably why they said
13 that. You know what I mean? I'm assuming.
14 BY MR. MILLS
15 Q. Are you aware that the declaration that was
16 submitted on your behalf in this case indicates that
17 you were already living in a tiny home when the lawsuit
18 was filed?
19 A. Oh, it was? I already was? I didn't know; I
20 mean, maybe it took a while to file it or something.
21    But I remember talking to them, and we were
22 giving the declaration that I gave, I was pretty sure
23 that I was on Dore Alley when I was talking to them
24 there. That's when we first decided to do that.
25 That's when they decided to...

Case 4:22-cv-05502-DMR   Document 366-19   Filed 04/17/25   Page 5 of 15
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Todd Dutch Bryant
March 4, 2025

Page 53

1  They said I was living in the tiny homes at
2  the time?
3  Q.  I'm just saying a declaration that was
4  submitted in this case --
5  A.  Yeah.
6  Q.  -- around the time the lawsuit was filed
7  indicates that you were already living in a tiny home.
8      Did you know that that was filed on your
9  behalf?
10 A.  No, they filed a declaration for this, but I
11 didn't -- at the time I gave the declaration, I don't
12 -- I wasn't living in the tiny homes at that time.
13    Maybe it took a while for them to file it or
14 something.  But, I was -- because I went from Dore
15 Alley to -- they made me go to the tent encampment at
16 the library.
17    That's -- that's where -- that's the last
18 time I was -- I was still kind of homeless, I guess,
19 you know, living in a tent near the library.  But it
20 was all -- it was a gated community.
21    And that was just, Urban Alchemy was taking
22 our stuff at that point.
23    MS. YOUNG:  It's been about an hour.
24    Do -- do you feel like you need a break?
25    MR. MILLS:  Yeah, we could take a break.

Page 54

1  We'll go off the record, at -- I have 11:05.
2     THE VIDEOGRAPHER:  This is at the end of
3  Media No. 1.  We are off the record at 11:04 a.m.
4     (Recess taken from 11:04 a.m. to 11:18 a.m.)
5     THE VIDEOGRAPHER:  This is the beginning of
6  Media No. 2.  We are back on the record at 11:18 a.m.
7  BY MR. MILLS
8  Q.  Mr. Brown, did you discuss the deposition
9  with anybody during the break?
10 A.  Uh, yes.
11 Q.  And who was that?
12 A.  My attorney (Indicating).  We just went over
13 the last question you asked, like the thing I was --
14    MS. YOUNG:  Um, objection, attorney/client
15 privilege.
16    THE WITNESS:  Oh.
17    MS. YOUNG:  Yes, I'm going to instruct you
18 not to answer.
19 BY MR. MILLS
20 Q.  And are you going to follow the advice of
21 counsel?
22 A.  Um, it wasn't advice, I was just reading --
23 Q.  We don't need to know the conversation you
24 had.
25 A.  Gotcha.

Page 55

1  Q.  But just, will you follow the advice of
2  counsel to not answer the question?
3  A.  Sure.  Whatever.  I don't know.  Yeah.  Of
4  course I will.
5  Q.  Mr. Bryant, are you familiar with the concept
6  of bag & tag?
7  A.  Yes.
8  Q.  And can you explain to me what that means to
9  you?
10 A.  Well, when they first were taking our things
11 they said that they were bagging and tagging them,
12 which meant -- which explains to me that they're --
13 that all the items that they take are going to be down
14 at the yard over there, next to TV20 over there, or
15 that area; I can't remember what that's called.  The
16 DPW yard.  So that we can retrieve them at a later
17 date.
18    Which I found untrue.  Every time I went over
19 there after they took my stuff, to retrieve it, there
20 was never anything there to retrieve.  It was a -- very
21 frustrating, every time.
22    So, yeah.  That's -- that's what I was told
23 was supposed to happen.  And it never did happen,
24 because I never got a single thing back from them.
25 Q.  Have you ever read DPW's bag & tag policy,

Page 56

1  yourself?
2  A.  I believe so.  I think there was something, I
3  saw something about it, but, yeah.  It just -- it just
4  -- most of them, most of the workers didn't even --
5  even know what bag & tag was.  They were just like:
6  What?  Bag & tag?
7  Q.  What makes you think that you've reviewed the
8  DPW policy before?
9  A.  I think it was -- because they -- because
10 they mentioned -- I mean, I have a lot -- a lot of
11 conversations with the workers.  And they were saying,
12 like, something -- because they said there was some
13 things they couldn't -- they don't keep.
14    Like, like basically, like when they took all
15 my stuff, my cooler, they couldn't keep that, so they
16 had to throw all that away.  I said:  I just bought all
17 that food.  You know what I mean?  It was like, I mean,
18 it's just very frustrating.
19    But that doesn't matter, because I didn't get
20 anything back.  You know what I mean?  Not just the
21 cooler or the things that they said, it was nothing.
22    And a lot of the workers didn't even know
23 about this policy.  They didn't even know it was a po-
24 -- they said -- I mean, I got to know a lot of these
25 guys that worked there.

Case 4:22-cv-05502-DMR   Document 366-19   Filed 04/17/25   Page 6 of 15
Coalition on Homelessness, et al. v                          Todd Dutch Bryant
City and County of San Francisco, et al.                     March 4, 2025

Page 57

1     Some of them were cool, but most of them were
2  just like -- just wanting to steal your stuff, you
3  know.
4  Q.  So my question is going to be a little bit
5  different.
6     Have you ever physically read a copy of DPW's
7  bag & tag policy, as opposed to hearing from --
8  A.  From a DPW handbook?  No, I don't think so.
9  Maybe not.
10 Q.  So is it fair to say you've never read a
11 written document from the City and County of
12 San Francisco, outlining what DPW's bag & tag policy
13 is?
14 A.  Yes, I guess I never -- I mean, that I can
15 recall.
16 Q.  So is your only understanding of DPW's bag &
17 tag policy things that you have heard from other
18 people?
19 A.  From the DPW workers, yeah.
20 Q.  Are you aware that DPW is allowed to discard
21 certain items in the bag & tag policy?
22 A.  Well, yeah.  Like I said, they couldn't --
23 they don't keep things that are, like, coolers, things
24 like food and stuff like that.  They said they couldn't
25 save that.

Page 58

1     And, like, I can't remember all the things
2  they said.  But, yeah.  They would say things like
3  that.  But sometimes they would just say they're
4  keeping everything.  You know, it depends on the
5  person.
6     It was just -- I really believe, just, you
7  know, the workers will tell you what you want to hear
8  to get your stuff, you know.  And then -- because I've
9  heard from some of the workers that they didn't even
10 have a bag & tag policy.  They just took what they
11 wanted, dumped the rest at the dumps, and then would
12 sell the shit that was worth money on the -- at the
13 flea market.
14 Q.  Are you aware that under DPW's policy, items
15 that are soiled can be discarded?
16 A.  Yeah, I think so.  That's what they said.
17 They said stuff like that, perishables and things like
18 that.
19 Q.  Are you aware that items that are commingled
20 with safety and health hazards could be discarded?
21 A.  Yes.  I think so.
22 Q.  Are you aware that items that are -- include
23 contraband could be discarded?
24 A.  I've heard that before, yeah.
25 Q.  Are you aware that DPW can discard items that

Page 59

1  are deemed abandoned?
2  A.  They would say that, yes.  That's why.
3  Q.  Did you ever receive training from anyone on
4  what DPW's bag & tag policy was?
5  A.  No training, no.  Just they -- what the
6  workers would say, as they're taking my stuff and...
7  Q.  As you sit here today, can you identify any
8  of those workers?
9  A.  Um, not by name.  But I -- I know.  If they
10 were here in this room, I could point them out to you,
11 for sure.  Absolutely.
12    It was a regular relationship with them.  I
13 mean, so many times.
14 Q.  Do you know how long DPW was required to keep
15 property at the DPW yard after it was bag & tagged?
16 A.  Yeah.  They say -- they said something
17 like -- they'd say different things.  They'd say you
18 have a month to pick it up, or something like that.
19    But, like I said, every time I went there to
20 pick my stuff up, not a single time did they ever
21 produce anything.  If they would even come -- most of
22 the time, they would just not even come back out.
23 They'd say:  Oh, we'll take a look.  And then they
24 wouldn't come back out.  They just close the gate, and
25 -- it's crazy.

Page 60

1     And they never, ever -- a lot of times they'd
2  say:  Oh, our cage got broken into, someone stole a
3  bunch of stuff, so it probably got stolen.  They'd use
4  that one a lot.
5  Q.  How many times do you think you physically
6  went to the DPW yard to try to retrieve property?
7  A.  Every time.  And how many times'd they take
8  my stuff?  Dozens.
9  Q.  So your testimony is that you've gone dozens
10 of times to the DPW yard, in connection with every
11 incident that you had property taken from you?
12 A.  Yeah.  I had hoped to get my stuff back, like
13 they said they were gonna -- it was there, man.  It
14 never was.  Every single time, I did not get anything.
15 Q.  Did you have a practice of going within a set
16 window of time from when your property was taken by
17 DPW?
18 A.  Yeah.  Usually as soon as possible, right the
19 same day.  Or, I tried -- I mean, over and over.  I
20 started camping down that way, to get my stuff.
21    It was just -- it -- just apparent there was
22 nothing there.  It was a big lie.
23    That's how the Homeless Coalition went there,
24 to ask, you know, what's up.  Because I was telling
25 them:  Hey, there's nothing there.  I -- how many times

Case 4:22-cv-05502-DMR   Document 366-19   Filed 04/17/25   Page 7 of 15
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Todd Dutch Bryant
March 4, 2025

Page 61

1  I've gone there.
2     And they went to go interview them and find
3  out what happened, you know? What's going on with this
4  whole thing here. That's how we got the whole thing
5  going, over there.
6  Q. Do you know if you went to the DPW yard
7  within 30 days of your property being discarded, every
8  time?
9     MS. YOUNG: Objection. Asked and answered.
10    You can --
11    THE WITNESS: Oh, before 30 days, for sure,
12 yeah.
13 BY MR. MILLS
14 Q. So is it fair to say that it was always
15 before 30 days that you would go to see if your
16 property was at the DPW yard, from the date that
17 property was taken by DPW?
18 A. Yeah. Except that one time we had the big
19 rally thing there, I just -- I went there -- went there
20 to see if they could recover anything. Anything, from
21 any of the times. And, not a single thing they had.
22    So --
23 Q. When you --
24 A. -- that's the one time I went there that
25 something wasn't taken -- just taken. You know what I

Page 62

1  mean? I just went there to see if they could come up
2  with anything. That this whole pressure would make
3  them, you know, produce something.
4     And I think at the end, they brought out a
5  couple suitcases and something like that, that was,
6  like, not mine. And I'm like: Man. Not a single
7  thing.
8     So, I don't know. It's so frustrating. It's
9  like very -- I thought that one time that we'd get
10 answers and I'd get my stuff, or something like that.
11 And it just didn't happen.
12 Q. When you went to that rally and hadn't had
13 anything taken, when was the last time your property
14 was taken by DPW?
15 A. Before that?
16 Q. Before that one.
17 A. I'm not sure, exactly.
18 Q. Was it more than 90 days?
19 A. I'm not 100 percent sure, to be honest. I
20 just -- I just -- I'm not sure. It's hard to put that
21 -- it's all a bunch of instances. It's hard to put
22 that into exact dates.
23 Q. Is it fair to say you'd be speculating about
24 the timeline?
25 A. What do you mean?

Page 63

1  Q. Is it fair to say that you have no personal
2  knowledge of the date your property was last taken from
3  DPW [sic] before you went to the rally to see if any
4  property was there?
5  A. Um, whatever date I told them, that day, that
6  was about -- that's when it was. I can't remember what
7  I told them that day. I did tell them a date, and
8  items, and where I lived.
9     There's a few things they go by, I guess, to
10 find it. Streets I lived on, and when it was and
11 stuff. I gave them as much information as I possibly
12 could, and they did not come up with anything. Know
13 what I mean.
14    One time they told me that -- I mean, I just
15 got my stuff was taken, and it was important stuff.
16 And I went right down there, and they said: Oh, we got
17 broken into last night. Your stuff got stolen.
18    I said: No, dude. They just took it, like,
19 an hour ago.
20    (Reporter clarification)
21    (A pause in the proceedings)
22 BY MR. MILLS
23 Q. So you were told by DPW that items got
24 stolen --
25 A. Yeah.

Page 64

1  Q. -- from the DPW yard?
2  A. I got into an argument with the guy. He
3  said: Your stuff got stolen last night.
4     And I'm like: Dude, they just took it like
5  an hour and a half ago. What are you talking about, it
6  got stolen last night?
7     You know what I mean? That's like -- it's
8  just a regular line they'd use, I think, saying it got
9  stolen last night. Because I heard it so many times,
10 them saying that.
11    And I'm like: How could it get stolen last
12 night, when they just took it an hour and a half ago?
13    And then it's like: Uh...
14    That's when I knew something was up with
15 that. I was like, you know, come on.
16 Q. Did you ever go to the DPW yard and get an
17 item back?
18 A. No, never. Not once.
19 Q. Did you ever report this to DPW, that you
20 were not getting your property back?
21 A. Yeah, they know. I mean, they're the ones
22 that are -- that are coming out there. I mean...
23 Q. Did you ever file a formal complaint with the
24 City and County of San Francisco, when you realized you
25 weren't getting your property back?

Case 4:22-cv-05502-DMR   Document 366-19   Filed 04/17/25   Page 8 of 15

Coalition on Homelessness, et al. v   Todd Dutch Bryant
City and County of San Francisco, et al.   March 4, 2025

Page 69

 1  I don't think I gave the declaration over the
 2  phone; did I?  Is this how this one does?  Hold on a
 3  second.
 4     (Witness examines document)
 5  Q.  So you don't know one way or the other if you
 6  had a telephone conversation or a conversation that was
 7  in person when you agreed to submit the contents under
 8  penalty of perjury?
 9  A.  Yeah.  I mean, if it says I -- that's my
10  signature.  It says I reviewed it.
11  Q.  Do you have any --
12  A.  I've seen this.  I mean, I think.
13  Q.  -- personal recollection in your mind of
14  reviewing this specific version of a typed-up document
15  before it was filed in Federal Court on your behalf?
16  A.  Yeah.
17  Q.  Okay.  Is it your understanding that
18  everything in this document is true and correct, to the
19  best of your knowledge?
20  A.  Yes.
21  Q.  Okay.  So Mr. Bryant, if I can turn you back
22  to the first page.  And we are going to look on
23  Paragraph 3.
24  A.  Okay.
25  Q.  And Paragraph 3 says (As read):

Page 70

 1     "Finally, very recently, I was able to secure
 2     placement in a tiny home on Gough Street.  I
 3     hope that I will be permitted to stay long
 4     term, although this is by no means a
 5     guarantee."
 6     So is it true that --
 7  A.  That's on Page 1?
 8  Q.  Page 1.  Paragraph 3.
 9     (Witness examines document).
10  A.  Okay, okay, yeah.  "Finally," okay.
11  Q.  So my question is:  After you've had a second
12  to read that paragraph, is it fair to say that you were
13  living in a tiny home when this document was signed on
14  April 26, 2022?
15  A.  No, I think I was in the tent camp between
16  the library and the Asian Art Museum.  Because it says
17  I was told I was going to be put into a tiny home.
18  Because in -- in reality, it wasn't a tiny home.  It
19  was a small room.  So, I wouldn't have said "tiny home"
20  if it was -- if I knew what it was already.
21     So, I was eventually placed in there.  But at
22  the time, I was probably still in the -- I'm sure I
23  was.  I wouldn't have said "tiny home," because it was
24  -- it's not a tiny home.  It's a -- it's a very small
25  room.  You know what I mean?

Page 71

 1  So that's how I probably would have -- so
 2  that's -- I was still probably -- I know I was.  I was
 3  still in the tent encampment, right there.
 4  Q.  Do you know how long --
 5  A.  Civic Center.
 6  Q.  -- after you learned that you were going to
 7  move into a tiny home from the tent encampment, you
 8  did, in fact, move to that tiny home?
 9  A.  I moved there the last -- the last day that
10  place closed down, there.  I'm not sure what date it
11  was.  But I was there.  I was one of the last people
12  there when they closed that place down, that parking
13  lot there.
14  Q.  Is it fair to say that Paragraph 3 does not
15  mention the tent encampment that were you living in?
16     (Witness examines document)
17  A.  It doesn't mention it, no.  Because it says
18  I've been trying to find...
19     "Finally, very recently, I was able to
20     secure..."
21     Yeah.  Because I was -- because they were
22  closing it down, and they told us they were going to --
23  you know, they were trying to place everybody
24  somewhere.
25     And some people there got placed into -- back

Page 72

 1  in the navigation centers, which, I did not want to go.
 2  Because that never worked out.  And I was able to get a
 3  place in this tiny home place, that they said "tiny
 4  homes" and I was like:  Yes.  That sound cool.
 5     But it's just basically a room with a bed.
 6  I'm not saying -- I'm not explaining about it; it was a
 7  great place.  It was better than living on the streets,
 8  for sure.
 9  Q.  So if you could turn to what is going to be
10  Page 4-4 on the bottom right-hand corner.  And
11  Paragraph 24 says (As read):
12     "Although I have finally been able to find a
13     temporary housing option in a tiny home
14     program, there is no guarantee that this
15     living situation will be long term.  As a
16     result, I live in constant fear that if I am
17     forced to live back on the streets, I will
18     then" -- "I will again be subject to the
19     City's cruel citation, arrest and property
20     destruction practices."
21     What did you mean by "I have finally been
22  able to find a temporary housing option in a tiny home
23  program"?
24  A.  Because that's what they were promising me,
25  was a tiny -- I thought they were like little tiny

Case 4:22-cv-05502-DMR    Document 366-19    Filed 04/17/25    Page 9 of 15
Coalition on Homelessness, et al. v                                    Todd Dutch Bryant
City and County of San Francisco, et al.                               March 4, 2025

Page 73

1  house, you were going to get a tiny house. That's what
2  they were promising me at that tent encampment place,
3  you know?
4     But, they also said, you know, it's not --
5  you know, you're not guaranteed to have this place
6  here. You know, there's rules.
7     It was all run by Urban Alchemy. And they
8  made it clear to us that you gotta follow their rules
9  or you'd be out on the street before you know it, and
10 this and that.
11    So, because even in that tent encampment
12 place, even though I was in that fence, in that
13 encampment, it was still not good. It was like --
14 because Urban Alchemy was just as bad, if maybe even
15 worse than the DPW. They would constantly take our
16 stuff. I mean, those guys would just like -- it was
17 horrible.
18    So, you know. Those guys were just like, you
19 know, it was just -- it was nothing -- it wasn't my own
20 place yet. It was -- you're living in a moldy tent for
21 -- I was there for a while. And it wasn't like your
22 own place.
23    So, looking to the future, I thought -- I
24 looked at the tiny home place as, you know, finally I
25 have my own place. You know, I'll be back into a place

Page 74

1  that's a tiny -- like a house. I thought. But in
2  reality, it was just a room. But still, it was a room.
3  It wasn't living on the street, you know.
4     And when I did go there, it finally was -- I
5  mean -- although, someone did break in my room and
6  steal my computer. But -- because they took the lock
7  off. They drilled the lock out of my door. Those
8  Urban Alchemy guys.
9     Um, but still, you didn't have to live in
10 fear, and push your stuff around, that -- and have it
11 all taken. It was still -- it was better than living
12 on the street, that's for sure.
13 **Q.  So at some point in time after this statement**
14 **in Paragraph 24, you did, in fact, move into a tiny**
15 **home?**
16 **A.  Yes.**
17 Q.  And then after you moved into the tiny home,
18 did you move straight into the Dudley House?
19 A.  Yeah. I went from there to the Dudley House,
20 yeah. And Dudley House, that was -- that was the real
21 -- that's where I am now, and that's -- yeah. There's
22 no fear there. There's nothing -- it's -- everything's
23 -- that's the first place I've been able to be where I
24 had -- didn't have to fear someone taking my stuff,
25 really.

Page 75

1  Q.  And I want to make sure that I just
2  understand the testimony.
3     So, is it fair to say you don't know how much
4  time lapsed from when you learned about being able to
5  move into a tiny home to when you actually physically
6  moved into that tiny home?
7  A.  I'm not sure exactly, but it ended up being
8  right when they closed that thing down. Because, like
9  I said, I was -- there was only one more person there.
10 When I -- when I left there, to the tiny homes, I was
11 -- there was one person, other than me, still there.
12 So, I was one of the last people to leave there.
13 Q.  And --
14 A.  I'm not sure of the date, though. I'm not
15 really sure of the date.
16 Q.  Sorry. And, just to clarify, are you
17 speculating that you weren't living in the tiny home
18 already when this declaration was signed on April 26,
19 2022?
20    Or, do you have personal knowledge in your
21 memory that you were in fact not yet living in the tiny
22 home on April 26th?
23 A.  No, I wasn't, because, like I said, now I
24 wouldn't call it a tiny home. It's a tiny room. I
25 only called it a tiny home before I actually moved

Page 76

1  there. You know what I mean? That's how I know.
2  Because I -- I just called it "tiny home"; that's what
3  they called it, a "tiny home." And in reality, it's a
4  room, smaller than a jail cell.
5  Q.  Using your kind of description of "tiny room"
6  how long were you living in that tiny room?
7  A.  Um, I'm not 100 percent sure, but until --
8  until I went -- until I got the place at the Dudley.
9  Q.  Do you remember ever submitting a lease to
10 the City and County of San Francisco for the Dudley
11 House?
12 A.  Um, I'm not sure. I don't -- I don't think
13 -- I know I filled one out when I went to the -- yeah,
14 they had me -- when it was available, they had me fill
15 out a lease, yeah.
16 Q.  So if you signed that lease, is it fair to
17 say that lease would indicate when you moved into the
18 Dudley House?
19 A.  Um, no, because it was still under
20 construction. Remember I told you, when I went to go
21 look at the Dudley, they showed it to me, but it was
22 all -- it was empty, and the whole bathroom was torn
23 out, and all the floor, and they were going to replace
24 all this stuff. That's why I didn't move in right
25 away, when I first saw that.

Case 4:22-cv-05502-DMR   Document 366-19   Filed 04/17/25   Page 10 of 15

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Todd Dutch Bryant
March 4, 2025

Page 117

 1    And then this lady's yelling like:  Hey,
 2  they're taking your stuff.
 3    You know, if you came back to get it -- you
 4  know, like, because it -- I can't -- I can't move all
 5  those things, at once.  So I had to move one, like, ten
 6  feet, and another one ten feet (Indicating), you know,
 7  like that.
 8  Q.  So Mr. Bryant, looking at Exhibit 226 again,
 9  that's the Google Map of the street view outside of the
10  women's shelter.
11  A.  Yeah.
12  Q.  How did you organize your six shopping carts
13  on the sidewalk?
14  A.  Like, like where the bushes are, like along
15  the back -- excuse me -- like two, two, and then like
16  one on each side (Indicating), to make like a wagon
17  train circle.  You know what I'm talking about?  Like,
18  like, but a square.
19  Q.  So you had your carts in a square on the
20  sidewalk?
21  A.  Yeah.
22  Q.  Do you know how much space individuals had on
23  the sidewalk, to pass you?
24  A.  It was enough, because I put two in the back,
25  and then just one of them -- you know, it just, on the

Page 118

 1  side, each side, and then two like this (Indicating).
 2    So, it was, it was -- people could pass.  It
 3  wasn't like I was blocking the sidewalk.
 4  Q.  And these were the size of Costco, like,
 5  shopping carts?
 6  A.  Yeah, you see the ones on there (Indicating).
 7  I think those were like, like Nabisco ones, or like the
 8  -- they're like, they're like, they're like maybe this
 9  wide (Indicating).
10    I don't -- if you watch the video, you could
11  probably see what's there better.  The things change
12  all of the time, that I had.  I just -- they'd always
13  confiscate that stuff, too.
14  Q.  So I understand your testimony earlier, that
15  you had approximately six carts.  Were there other
16  carts for other individuals there, in addition to the
17  six?
18  A.  Um, no.  Everyone else moved over there to
19  Plumb Street.  I -- I'm the only one that moved over
20  here.
21  Q.  And did you have bicycles?
22  A.  Yeah.
23  Q.  And where did you store the bicycles when you
24  were setting up your structure?
25  A.  Just chain them all to one side, like that.

Page 119

 1  Q.  Were they chained on a pole?
 2  A.  No.  To my stuff.  And we just moved there,
 3  so it wasn't like -- I hadn't had anything set up yet
 4  or anything, but...
 5  Q.  So the bikes weren't on the opposite side of
 6  the sidewalk from where you had your items stored in
 7  the cart?
 8  A.  I mean, if you want me to draw a picture, I
 9  could show you like that.  I mean, I don't -- I mean,
10  it's hard to say, like, say, like this is -- this is a
11  good example.
12    Say here's a cart here, cart here
13  (Indicating).  This is the women's shelter right here,
14  right?  One cart here, one cart here, and then two
15  carts here, two carts here, like that (Indicating).
16    And then on this one end, I put, like, the
17  bikes against each other.  Like, my girl was on one
18  bike, going to check, like, I'd -- stole my tools, and
19  then it was three bikes like that.  All chained
20  together on this one last one, like that (Indicating).
21    See what I'm saying?  How it goes?
22  Q.  Did any citizens tell you that you were
23  obstructing the sidewalk when you were camped?
24  A.  No.
25  Q.  Did any citizens have a hard time navigating

Page 120

 1  around you?
 2  A.  No.
 3  Q.  And you had a dog with you, correct?
 4  A.  At this point he was with Sarah, went over to
 5  Plumb Street.
 6  Q.  But when you first set up your structure,
 7  were you setting up the structure with Sarah?
 8  A.  She wasn't there.  Just me and that guy
 9  Sellers were there.  She went over to Plumb Street to
10  get the guy who was pushing, had my tools on a -- on a
11  hand truck, he went over there.
12    And so she wanted to go get that because --
13  you know.  He wasn't there, and I was like: Where's my
14  tools?  You know, like that.
15  Q.  As you sit here today, what items can you
16  specifically remember losing in connection with this
17  incident described in the declaration on January 3rd,
18  2019?
19  A.  They took the bikes.  And they took like, you
20  know, just --
21    (Witness examines document)
22  A.  Had some knives they took, and it was --
23    (Witness examines document)
24  A.  It's hard to remember exactly, specifically.
25  Q.  As you sit here today, can you recall the

Case 4:22-cv-05502-DMR   Document 366-19   Filed 04/17/25   Page 11 of 15
Coalition on Homelessness, et al. v                                         Todd Dutch Bryant
City and County of San Francisco, et al.                                    March 4, 2025

Page 121

1  condition of any of your property?
2  A. It was all good new stuff. I mean, I wasn't
3  always homeless; I didn't have a bunch of garbage. I
4  had good stuff, you know.
5  Q. Earlier, you testified that you'd sometimes
6  have to steal things when --
7  A. No, I said I would have to steal if -- if
8  someone -- how am I going to get my pills replaced, you
9  know what I mean?
10 Q. Were any of the items that you had in your
11 encampment on the day that items were taken, stolen?
12 A. No. I don't steal. No.
13 Q. How would you typically amass all of the
14 items that you had?
15 A. Well, I was getting $1,000 a month from SSI.
16 Q. And when you get that $1,000 from SSI, were
17 you putting it in a bank?
18 A. It was on a card, an ATM card, like.
19 Q. Do you have any receipts for the items that
20 were lost that day?
21 A. No, I don't, not on me, no.
22 Q. Would you know any of the stores where you
23 purchased items that day?
24 A. Yeah.
25 Q. Where would you have purchased items that

Page 122

1  were taken that day?
2  A. Discount Builders Supply. That's one of
3  them. Safeway, Food Co, REI. That day...
4     (Witness examines document)
5  A. I mean, there's a couple that I can think of.
6  Q. After this incident, did you write any notes
7  about items that were taken from you?
8  A. Yeah.
9  Q. And what did you do with those notes?
10 A. I kept them until DPW took them.
11 Q. Did you take any photographs of the notes?
12 A. No. I took photographs of all kind -- all my
13 stuff, and they always took that stuff, too.
14    (Reporter clarification)
15    THE WITNESS: I'm sorry. I tried to film
16 them as much as I could, taking my stuff, and the stuff
17 I had. But they'd always end up taking that, too. My
18 phone, with all that stuff on it.
19 BY MR. MILLS
20 Q. Were you taking the photos and videos on a
21 phone?
22 A. Yes. Tablet.
23 Q. And were -- was that --
24 A. Hm?
25 Q. Was it a phone? Or was it a tablet?

Page 123

1  A. Both.
2  Q. And were those items synched to any type of
3  electronic storage?
4  A. You'd hope. I don't know. I mean, hopefully
5  that stuff that that lady got off my phone, I mean,
6  you'd know if that was on there, right?
7     You got that already, right?
8  Q. But, do you know if you had any photos on the
9  storage?
10 A. I don't.
11 Q. And do you know if the storage was actually
12 searched?
13 A. Yeah. She searched it, right there. I mean,
14 didn't she? She told me that she was going -- that's
15 to where she was going to do with my phone. So, I
16 didn't have any reason not to trust her.
17 Q. Okay. So I'm going to turn you back to your
18 declaration, which was Exhibit 223. And I'm going to
19 turn you to Paragraph 21, on Page 4-4.
20 A. Okay.
21 Q. And Mr. Bryant, Paragraph 21 is referring to
22 an incident on December 2021. Would you know when in
23 December that incident took place?
24 A. No, I just know it was in December.
25 Q. And how do you know that the incident was in

Page 124

1  December?
2  A. Because it was around -- it was right around
3  Christmas, you know. It was before Christmas.
4  Somewhere around there.
5  Q. And then, do you see where Paragraph 21 says:
6     "Right before I was able to move to a safe
7     sleep site..."?
8  A. Uh-huh.
9  Q. Do you know how many months you were in that
10 safe sleep site?
11 A. Yeah, until I moved to the tiny cabins on
12 Gough Street. I'm not sure how long it was, but until
13 then.
14 Q. Do you know if it was less than six months?
15 A. It was more than six months. I think. It
16 was -- yeah, probably more.
17 Q. Can you tell me what happened during this
18 incident, on December, 2021?
19 A. Yeah, they -- they came in on Division Street
20 and took all -- everything that -- I was staying there
21 with a couple, couple friends. And they took
22 everything. And they wouldn't let anybody take
23 anything.
24 Q. Based on our earlier discussion about the
25 difference between Division and 13th Street, how do you

Case 4:22-cv-05502-DMR   Document 366-19   Filed 04/17/25   Page 12 of 15
Coalition on Homelessness, et al. v                                  Todd Dutch Bryant
City and County of San Francisco, et al.                              March 4, 2025

Page 145

1 anything I could to get off the street, you know, back
2 to a normal life.
3 Q. Have you done any jobs for anybody?
4 A. Um, yeah. I tried to do some stuff. I mean,
5 not back in the shop, like, you know, I wanted to.
6 But -- you know, I don't think, I don't think I could
7 ever do -- I could never do flat-rate. That's how most
8 shops are, flat-rate like that, I can never do that
9 again, I just can't. Unless I get my back fixed,
10 somehow. It's the only way it's possible.
11 Q. What do you mean by "flat-rate" work?
12 A. That's how shops do it. Flat-rate. Like,
13 say you came in, your car needs a tuneup, or needs
14 brakes, front and rear brakes. Well, flat rate is like
15 where, say you make $45 an hour, they give you two
16 hours to do rear brakes, pads and rotors. Well, if I
17 do it in 20 minutes, I still get paid two hours worth
18 of labor. See what I'm saying? That's how flat rate
19 works.
20    So if you're fast and you know what you're
21 doing, you can make a lot of money. Way more than your
22 hourly rate.
23    But if you're really slow and you can't work
24 like that because your back's messed up and you're in
25 pain all the time, then, then you lose. Then, then

Page 146

1 say, a two-hour job takes you four hours, well, then
2 you get even less. You know what I mean?
3    So it's -- it's great if you can do it, if
4 you can do it fast and you know what you're doing. But
5 if you're not -- you know, no one's going to hire me
6 injured, anyway, like that. So...
7    Trying to get that.
8 Q. So I'm going to mark the next exhibit, which
9 I believe is 227.
10    (Reporter clarification)
11    MR. MILLS: Okay, thanks.
12    (Exhibit 228 marked for identification.)
13 BY MR. MILLS
14 Q. So Mr. Bryant, Exhibit -- so we just
15 introduced, Mr. Bryant, Exhibit 228.
16    Can you take a moment to look through the
17 document and let me know if it looks familiar to you.
18    (Witness examines document)
19 A. Yeah, kind of. This is the one that -- small
20 claims that they kept on pushing me out.
21 Q. So Mr. Bryant, if you can look on the first
22 page in Box No. 1 of Exhibit No. 228, is that your
23 name?
24    (Witness examines document)
25 A. Yeah.

Page 147

1 Q. And is Box No. 3 your date of birth?
2 A. Yeah.
3 Q. And is Box No. 4 your Social Security number?
4 A. Yes, it is.
5 Q. And can you look at Box No. 5, where it says
6 "Date of incident"?
7 A. Yeah.
8 Q. Do you know if that date is correct?
9 A. It's -- I know it's December, 2021. I'm not
10 sure if it's the 20th, I know it was close to Christmas
11 because people were handing out stuff, like people
12 dropped off these sleeping bags and stuff to us because
13 it was close to Christmas and stuff, you know?
14    But --
15 Q. But you don't know, as you sit here today, if
16 the incident was on December 20, 2021?
17 A. No. I know it's in December, though. Or
18 somewhere around there.
19 Q. Box No. 6 says that the date of the incident
20 was 6:00 a.m. Do you know if that's true?
21 A. That's about right, yeah. They usually came
22 about 5:00 or 6:00 no the morning, yeah.
23 Q. So you were gone from the location at some
24 time between 5:00 and 6:00 a.m.
25 A. Yeah.

Page 148

1 Q. And do you know where you went?
2 A. Yeah.
3 Q. Where was that?
4 A. I went with Sarah to go see a friend, a
5 friend of ours who had cancer, who was dying.
6 Q. What was the name of the friend?
7 A. Michelle.
8 Q. Does Michelle have a last name?
9 A. Hm?
10 Q. Did Michelle have a last name?
11 A. Yeah.
12 Q. What's that?
13 A. I think Debruin, or something, or --
14 Q. That's Debruin?
15 A. I think, or -- yeah, something like that.
16 Q. Do you know how to spell that?
17 A. Um, D-E-B-R-U-I-N? I'm not surely exactly,
18 but --
19 Q. Was Michelle in the hospital?
20 A. Um, no, we saw her at her house. She had
21 brain cancer and they -- they found it, and they cut
22 her head open and did emergency, removed the tumor in
23 her brain, but it was like -- yeah.
24    Just, like, she went to the hospital because
25 she was having seizures, and all of a sudden, they did

Case 4:22-cv-05502-DMR   Document 366-19   Filed 04/17/25   Page 13 of 15
Coalition on Homelessness, et al. v                                    Todd Dutch Bryant
City and County of San Francisco, et al.                                March 4, 2025

Page 149

1  it on the spot there. So it was crazy. Yeah.
2  Q. Did you see her at her house?
3  A. Yeah.
4  Q. Where was that?
5  A. In the Avenues, 45th Avenue.
6  Q. Do you know the cross street?
7  A. Um, it's like, um, Ortega or Pacheco, one of
8  those; I'm not sure.
9  Q. Is Michelle still alive?
10 A. No.
11 Q. How did you get from Division Street to
12 45th Avenue and Ortega at somewhere between 5:00 a.m.
13 and 6:00 a.m.?
14 A. Sarah drove. She borrowed a car from her
15 dad.
16 Q. And so did you go to Sarah's dad's house
17 before?
18 A. No. She just came and got me because she was
19 dying, and she wanted to go see her.
20 Q. Do you know how long after you visited,
21 Michelle died?
22 A. I don't know.
23 Q. Okay. Looking on Page 1, Box 13 at the
24 bottom, it says that this document is being presented,
25 and that there's a criminal penalty for presenting a

Page 150

1  false or fraudulent claim.
2  A. Where's it at? Where's this?
3  Q. Right below Box 13.
4  A. Okay.
5  Q. It says:
6      "Criminal penalty for presenting a false or
7      fraudulent claim is imprisonment or fine or
8      both..."
9      Citing to Penal Code 72.
10     And then, Mr. Bryant, above that, there is a
11 signature. Is that your signature?
12 A. Yeah.
13 Q. And did you sign this, knowing that you were
14 submitting the document under penalty of perjury?
15 A. Well, yeah. It said it right there, yeah.
16 Q. And when you signed is this, was everything
17 in it true and false? Or -- sorry. Was everything
18 true?
19 A. Yeah.
20 Q. And was everything, to the best of your
21 knowledge, accurate?
22 A. Yeah.
23 Q. And was everything, to the best of your
24 knowledge, complete?
25 A. Complete? What do you mean?

Page 151

1  Q. That you provided complete information
2  about --
3  A. Oh, I guess so, yeah, yeah. I mean, I mean,
4  I -- the amount -- they said that you couldn't go over
5  a certain amount. They took more stuff than this. It
6  just said you can only -- the maximum was $10,000,
7  so...
8      It was way more stuff than that. It was just
9  that's the maximum, so they -- they told me to leave
10 out certain stuff. It was way more stuff than that.
11 Q. Okay. And then Box 2 says "Zal Shroff."
12     Did you work with Zal Shroff to prepare this
13 government claim?
14 A. Not in person. It must have been over the
15 phone. Because I don't remember meeting -- I would
16 remember that.
17     I think that's the guy I talked to on the
18 phone, I guess; huh? Maybe.
19 Q. So if you look on the next page under "Basis
20 of Claim," it says "In December of 2021."
21     Do you see that?
22 A. Yeah.
23 Q. And that doesn't say "On December 20th,
24 2021," correct?
25 A. Uh-huh.

Page 152

1  Q. If Box No. 5 said "December 20th, 2021," why
2  didn't you say "December 20th, 2021," in the basis of
3  claim?
4  A. Because I told you, I didn't know when in
5  December was the exact date. I just knew it was in
6  December. I couldn't remember the exact date. I just
7  know it was close to Christmas.
8  Q. And Box No. 5 where it says the date of the
9  incident was on December 20, 2021, doesn't say
10 "approximately," correct?
11     (Witness examines document)
12 A. There's a little asterisk next to it. I'm
13 not sure what that means, but...
14 Q. Do you see an asterisk in every box?
15 A. Yeah, I guess -- there's two asterisks.
16 Q. And do you see at the top above No. 1, it
17 says "Asterisk equals..."
18 A. Oh, "required," okay, okay. I get it.
19 Q. And that entry doesn't say "approximately"
20 with respect to the date of incident. Correct?
21 A. Yeah. Yeah. That's the date they put, I
22 guess. But --
23 Q. Okay.
24 A. But they know, they know it's -- I mean, I
25 already went to court on this thing, and they -- they

Case 4:22-cv-05502-DMR   Document 366-19   Filed 04/17/25   Page 14 of 15

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Todd Dutch Bryant  
March 4, 2025

Page 153

1  know it was just an approximate date.
2      And the lawyers I had proved that DPW, they
3  were saying they were never there in December, and we
4  found documents saying they were there twice.
5      So...
6  Q.  And that small claims case ended up getting
7  dismissed.  Correct?
8  A.  Yeah.  We were late; it was the fourth time.
9  We had to show up, like, four different times for that
10 thing.  And we were late because the freeway was
11 flooded, and...
12 Q.  Okay.
13 A.  So, yeah.
14 Q.  So Mr. Bryant, I'd like to go back to your
15 declaration which is Exhibit 223, to go over the first
16 instance that's described there, starting on
17 Paragraph 9 on Page 4-2.
18 A.  223, what?
19 Q.  It's 4-2, Paragraph 9.
20    (Witness examines document)
21 Q.  Below "Specific Episodes of Property
22 Destruction and Arrest While Homeless"?
23 A.  So it's No. 4?  Is that what --
24    MS. YOUNG:  Paragraph 9.
25

Page 154

1  BY MR. MILLS
2  Q.  Paragraph 9 on Page 4-2.
3  A.  Oh, okay.
4     (Witness examines document)
5  Q.  So if you want to take a moment to read
6  Paragraph 9, and then let me know when you're done.
7     (Witness examines document)
8  A.  Yeah.
9  Q.  Do you have any idea when this incident
10 occurred, as far as a date is concerned?
11 A.  No.  No, this is the one earlier when I was
12 trying to figure out when this was, if it was before or
13 after.  I'm not sure.
14    It was -- no, I don't know the exact date,
15 obviously.
16    (Reporter clarification)
17    THE WITNESS:  I don't know the exact date,
18 obviously.  I would have said it, if I knew it.
19 BY MR. MILLS
20 Q.  Do you have an estimate of what year this
21 was?
22 A.  No.  I mean, when we were trying to figure
23 that out.  It was after -- I can't -- I can't remember
24 if it was before or after because it was -- I was in
25 the same location where those little tiny houses are

Page 155

1  now.
2  Q.  Is it fair to say you would be speculating
3  about when this incident took place, as far as a date
4  is concerned?
5  A.  I don't -- I don't -- there isn't a date at
6  all on this, is there?  No.  So I don't -- I'm not sure
7  when.
8     I'm not even sure if it is the first one of
9  these incidents, in order.  You know.  In fact, I know
10 it's not the first incident.  It's not the last one.
11 Somewhere in between.
12 Q.  And can you describe for me what happened
13 that day?
14 A.  Yeah.  The DPW and the police showed up, said
15 we had to move.  It was raining, as it usually is
16 raining when they make us move.
17    And me and my girlfriend were kind of
18 fighting and stuff over -- you know, because we're --
19 they've got to move everything, and it's a stressful
20 situation.
21    I got my stuff in the cart, and I moved it
22 across the street.  And Sarah was still kind of getting
23 her stuff up.
24    I went up to Market Street to try to get
25 something for us to drink.  And the small store up

Page 156

1  there was closed, so I went down Walgreens that used to
2  be on Market and Van Ness.
3     And when I got there, before I could go in
4  the store, these police pulled up and said I fit the
5  description of someone wanted for an armed robbery or
6  something like that.
7     So they made me get down on the ground --
8  they pulled their guns on me and everything, told me to
9  get down on the ground.  Took all my stuff out of my
10 pockets, threw it in the water.  And called my name in,
11 whatever.
12    And then eventually a vehicle showed up with
13 dark windows, and I had to stand up and see if I'm the
14 person (Indicating).  And then that vehicle drove off.
15 They took -- and they said: Okay, you can go.
16    When I got back to finding my girlfriend
17 hysterical, crying, and said they -- that when she was
18 packing the stuff up, she had a hard time pushing this
19 one, the cart.  And they said: Just go find Todd, and
20 don't worry, your stuff will be fine; it will be safe
21 right here.  Just don't -- just go find Todd, and he'll
22 help you move it.
23    And she went looking for me.  And when she
24 came back, everything was gone -- already on the truck.
25 And the cop said, you know, they have a policy.  Once

Case 4:22-cv-05502-DMR    Document 366-19    Filed 04/17/25    Page 15 of 15

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Todd Dutch Bryant
March 4, 2025

Page 165

 1  Q.  So you lost one laundry cart of property that
 2  day?
 3  A.  That, yeah.  And there was other stuff that
 4  Sarah had, her personal stuff.  And we also had a cart
 5  that we both shared that had a generator on it and some
 6  other stuff that they took, too.
 7      That's -- she had a hard time pushing.  And
 8  they wouldn't -- they didn't help her; they said "Go
 9  find Todd."
10      So when she did, she came back, and
11  everything was on the truck.
12  Q.  Was the generator a gas generator?
13  A.  Yeah.
14  Q.  Did you have gas?
15  A.  For the generator?
16  Q.  With your belongings?
17  A.  It was gas in the generator; it was working.
18  Q.  Do you know if DPW is allowed to store gas?
19  A.  Um, if it's in the generator they want, yeah.
20  I'm sure they do.  They have gas in their -- back in
21  their compartment -- in their thing for all those
22  vehicles and stuff they have.  Crap.
23  Q.  Do you have an estimate of what time of day
24  this incident was?
25  A.  It was early in the morning, probably

Page 166

 1  five-ish, 5:00 in the morning, 6:00 in the morning,
 2  something like that.
 3  Q.  So at 5:00 or 6:00 in the morning, were you
 4  already at Walgreens?
 5  A.  They arrived at that time.  I mean, I went to
 6  Walgreens; that was the only thing open.  That's when I
 7  went there.
 8  Q.  Well, was the Walgreens open between 5:00 and
 9  6:00 a.m.?
10  A.  Yeah, it was like a 24-hour Walgreens or
11  something.  It's not there anymore; it used to be
12  there.
13      (Reporter clarification)
14      THE WITNESS:  Oh, sorry, sorry.
15  BY MR. MILLS
16  Q.  And where did you say that Walgreens was,
17  again?
18  A.  It was on the corner of Van Ness and Market
19  Street.
20  Q.  So right outside of this building?
21  A.  This one here (Indicating)?
22  Q.  No, right outside our office, currently.
23  A.  Um, yeah, that way (Indicating).  You know,
24  where, where you get on BART or Muni or whatever?
25  Q.  Yeah.

Page 167

 1  A.  Right there, that corner on this side of the
 2  street (Indicating), that used to be Walgreens, yeah.
 3  Q.  Do you know All Star Cafe?
 4  A.  Yeah.  That's across the street from it.
 5  Q.  So the Walgreens was across the street from
 6  the All Star Cafe?
 7  A.  Yeah.  The doughnut shop right there?  Yeah.
 8  Q.  Okay.
 9  A.  Exactly.  Now it's a construction site that's
10  all fenced off, like.  They tore the Walgreens down,
11  but it's just sitting there, an empty site or something
12  like that now.  They haven't built anything there, yet.
13  Q.  Okay.  Then I want to go over the next
14  incident that you refer to, starting in Paragraph 14.
15  We already went through this one, but you couldn't
16  remember, I believe, where it was located.
17      We'll ask the question again.  Take a moment
18  to read the start of Paragraph 14 and 15.
19      And then my first question to you is going to
20  be:  Do you know the date of this incident?
21      (Witness examines document)
22  A.  Um, no, I don't know the date.  But this is
23  the incident that, um, what's her name, Kelley -- she
24  had -- she took photos of it, of my stuff there, that
25  -- and also I was arrested for this, this one here.  So

Page 168

 1  there should be a record of that.
 2      And, brought to the station on Van -- what
 3  was it, Guerrero?  Or no; what's that?  What's above --
 4  below Guerrero, what's that street?  Valencia.
 5  Q.  So you were arrested on Valencia?
 6  A.  No.  Right here (Indicating), they put me in
 7  the car and then tore apart my whole tent, took
 8  everything.  And took me to the police station on
 9  Valencia, and kept me in a tank for a couple hours,
10  while they took all my stuff and let me go.  When I got
11  back there, everything was gone.
12      And they showed up -- the weird thing is they
13  showed up to do this at, like, 7:00 in the evening.  It
14  was d- -- you know, it was like sun was going down, and
15  it was like -- it was one cop with a whole crew of DPW
16  guys.
17      And he said I had 20 minutes to move my
18  stuff, or he's going arrest me, is what he said.
19  Q.  Do you have an estimate of what year this
20  was?
21  A.  I don't.
22  Q.  Do you know what time of year it was?  Like
23  summer, spring, fall, winter?
24  A.  Um, not 100 percent sure.  You know, summer
25  here is like fall other places or winter other places,