# EXHIBIT 15

## To

**Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment**

# In The Matter Of:

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

*James J. Reem, Jr.*
*February 27, 2025*

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 44164Reem_NL.txt
**Min-U-Script® with Word Index**

Case 4:22-cv-05502-DMR   Document 366-21   Filed 04/17/25   Page 3 of 12

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

James J. Reem, Jr.
February 27, 2025

Page 37

 1  that don't fit in your backpack but you keep with your
 2  art materials?
 3  A.  Not anymore, no.
 4  Q.  Between May of 2023 and today, any other things
 5  besides art supplies that you've stored on the street?
 6  A.  What do you mean?  Like --
 7  Q.  Yeah.  Let me ask a better question.
 8      So when I asked you about keepsakes, your
 9  answer was "not anymore."  So that makes me think that
10  maybe at some earlier time, you did have keepsakes
11  stored.
12  A.  Mm-hmm.
13  Q.  So now I'm trying to figure out what -- not
14  just what you have right now, but for the whole time
15  that you've been living on the street in San Francisco,
16  what type of stuff have you kept with you.
17      Does that make sense?
18  A.  Yeah.  I mean, there were -- there was a
19  keepsake box, which was -- which was confiscated.  And I
20  don't know where that -- that's -- that disappeared.
21      And any clothes I did have are gone.  Some art
22  supplies are also gone; I wasn't able to keep them all.
23  Q.  So I think I hear you saying that between 2023
24  and today, the things you've stored not in your backpack
25  but on the street would be your art materials, a

Page 38

 1  keepsake box, and clothes; is that right?
 2  A.  So -- yeah, pretty much.
 3  Q.  Any other categories of stuff we're missing?
 4  A.  My medications were missing twice.  They were
 5  taken.
 6  Q.  And were there times where you stored your meds
 7  not in your backpack but --
 8  A.  Yeah.
 9  Q.  Okay.  Why?
10  A.  It was -- at that time, it was -- there
11  wasn't -- I wasn't afraid of losing my things.  I was a
12  little more trusting, I guess.
13  Q.  Do you remember when you switched from carrying
14  your medications on the street to in your backpack?
15  A.  When DPW took all...
16  Q.  What -- best estimate of the time frame when
17  that happened?
18  A.  August of -- let's see -- July of this year --
19  of last year.
20  Q.  2024?
21  A.  Mm-hmm.
22  Q.  Is that a yes?
23  A.  Yes.
24  Q.  Okay.  This is helpful.
25      So, to make sure I'm tracking, up until July,

Page 39

 1  August 2024, you would keep your medications on the
 2  street with your art supplies.  After that, you started
 3  keeping them in your backpack; is that right?
 4  A.  Yeah.
 5  Q.  Okay.  And then what about the keepsake box
 6  that you said was confiscated; best estimate of when
 7  that happened?
 8  A.  It was in December, I think, of this last year.
 9  Q.  Of 2024?
10  A.  Yeah.  December, January, something like that.
11  Q.  So your best estimate is that your keepsake box
12  was confiscated in either December 2024 or January 2025?
13  A.  Mm-hmm.  Correct.
14  Q.  Is that a yes?
15  A.  Yes.
16  Q.  The keepsake box that you had, had you had that
17  the entire time that you were homeless?
18  A.  I managed to hold on to it until that point.
19  Q.  I guess what I'm wondering is:  Can you tell me
20  a little bit more about how your meds were confiscated
21  in the summer of 2024, but your keepsake box wasn't
22  confiscated at that time?
23  A.  I was allowed to take two carts away from
24  the -- and there was no -- nothing -- it was -- I was
25  allowed to take two things away from the scene as they

Page 40

 1  were discarding my things.
 2  Q.  When you say "two carts," what's the
 3  dimensions, best estimate?
 4  A.  Yeah.  They were the -- the wire carts with
 5  the -- with the wheels, you know.
 6  Q.  Like a shopping cart?
 7  A.  Like -- yeah, the shopping -- yeah, the wire
 8  ones.  They call them old-lady or granny carts.  They
 9  call them old-lady carts.  But, yeah, they're the ones
10  with the four wheels, and you can wheel them.
11  Q.  I see.
12      So not like the -- the kind that the grocery
13  store has, but the kind a person might bring to the
14  grocery store?
15  A.  Right, smaller.
16  Q.  Were those carts yours to begin with, or did
17  somebody give --
18  A.  Yeah.
19  Q.  -- them to you?
20  A.  They were mine.
21  Q.  I'm going to ask you some questions about kind
22  of how much stuff you've had while you were living on
23  the street.  So, like, the volume.
24      So when you first became homeless after you
25  left the FedEx truck in May of 2023, do you have a best

Case 4:22-cv-05502-DMR    Document 366-21    Filed 04/17/25    Page 4 of 12

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

James J. Reem, Jr.
February 27, 2025

Page 77

1  walk me through the initial post -- you know, the issues
2  that are -- you know, the DPW coming, when the police
3  are -- you know, just kind of letting me know what's
4  happening on the scene, which is important.
5  Q. And how many times have you seen or been a part
6  of one of those HSOC resolutions where the City
7  departments come through and clean and offer shelter?
8  A. Well, I mean -- there was a number we -- I gave
9  you. 15 to 20 I think was the times.
10 Q. Oh, 15 to 20. Okay.
11 A. Was the amount of -- how many post- -- how many
12 things I've been -- gone through. I think you mentioned
13 it. I don't know exactly the context of the question
14 that you had asked me.
15 Q. Yeah. That's fair. And I'll be honest. I
16 apologize. I don't remember if you gave me that answer
17 before.
18 A. I think I did.
19 Q. So, to make sure I'm tracking, your best
20 recollection is that from the time you've been on the
21 street, you've observed maybe 15 to 20 of these HSOC
22 resolutions; is that right?
23 A. Correct.
24 Q. How many of those 15 to 20 HSOC resolutions
25 was -- do you think your stuff was taken?

Page 78

1  A. Five.
2  Q. Okay.
3  A. Maybe about five.
4  Q. How many times have you seen Lukas at an HSOC
5  resolution?
6  A. Probably three -- three or four.
7  Q. Okay. And so is that, like, the total number
8  of times you've met him, is three or four times?
9  A. No. I met him at a homeless -- a pancake
10 gathering on Tuesday morning. He came through there.
11 And there's another member that -- to help serve the
12 pancakes. So he knows Lukas. And then we all talked.
13 Q. And same thing about Larry. How many times
14 have you met Larry?
15 A. Probably five times, six times, something like
16 that.
17 Q. When's the last time you saw Larry?
18 A. It was fairly recently too. Like, maybe a
19 couple weeks ago.
20 Q. The next person, Dylan Verner-Crist. When's
21 the first time you met him?
22 A. It was about the same time I met Larry for the
23 first time. It was maybe a posting before Larry --
24 Q. Okay.
25 A. -- you know.

Page 79

1  Q. Have you ever talked with Dylan about this
2  lawsuit?
3  A. Yeah. We've discussed it, yeah. Just --
4  Q. What have you and Dylan talked about related to
5  this lawsuit?
6  A. Just basically whether, you know, being a
7  member, just how he -- being -- being -- if I wanted to
8  be -- first of all, if I want to do this, if it's
9  something I want to do. And I told him yes, absolutely.
10    And -- and that's -- we -- that's where we're
11 at with it. I mean, it's a...
12 Q. Yeah. I think I heard you say being a member.
13    So did you talk with Dylan Verner-Crist about
14 whether or not you were going to be a member of the
15 Coalition on Homelessness?
16 A. I told him I was a member. And I was a member.
17 Q. When was that?
18 A. That is when -- it was probably -- boy. I
19 don't know why April and May keeps sticking in my head.
20 But it was when me, Lukas, and this guy named John met.
21 And it was on a Tuesday, and it was -- when was it? It
22 was -- it was just before the -- so it was April, May
23 of -- of twenty -- was it last year? I think it was
24 last year.
25 Q. Okay. Like, April, May 2024?

Page 80

1  A. Yeah.
2  Q. Was "John" John Do?
3  A. I don't know his last name.
4  Q. Could you -- just kind of real general
5  description?
6  A. It's a taller gentleman. He works with a
7  church group --
8  Q. Okay.
9  A. -- that serves pancakes in the park. But he --
10 he knows a lot of homeless people.
11 Q. Did Lukas or Dylan ask you if you wanted to be
12 a member of the Coalition?
13    How did -- like, how did the conversation about
14 membership happen?
15 A. Well, I became a member. I was told I was a
16 member.
17 Q. Who told you you were a member?
18 A. Well, it was kind of a consensus because of
19 that one meeting we had, and then it was strategizing
20 of -- around what was happening to me. And of course, I
21 wasn't going to get a home right away, so -- or a house.
22 So, you know...
23 Q. When was there kind of a consensus around you
24 being a member of the Coalition on Homelessness?
25 A. Probably -- that -- when that meeting in April

Case 4:22-cv-05502-DMR   Document 366-21   Filed 04/17/25   Page 5 of 12
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
James J. Reem, Jr.
February 27, 2025

Page 81

1  or May.
2  Q. 2024?
3  A. Yeah. Yeah, maybe.
4  Q. Did anybody ask you, like, "Hey, do you want to
5     be a member?"
6  A. No. I mean, it was just kind of like a -- it
7     was a -- it was -- it's kind of assumptive, you know,
8     being -- being involved in it by being -- I really felt
9     like I was -- I was taking a step forward by being
10    forthcoming with my infor- -- you know, I was -- I
11    became kind of like -- I would stand up for the other
12    people that were homeless in my group.
13       There was a group of us, you know, that -- who
14    were all together. And -- and so I felt like I was
15    taking on a role, and then it just made sense, you know.
16 Q. I think that that's helpful. Let me make sure
17    I'm understanding.
18       So sometime around, like, April or May of 2024,
19    you wanted to kind of take on a role of advocating for
20    people in your community who are homeless.
21       And so one of the things you did for that was
22    to work with the Coalition in their lawsuit against the
23    City and kind of be a member for them, you know, in
24    the -- related to the issues around homelessness?
25 A. I think --

Page 82

1       ATTORNEY TALLA: Objection; misstates prior
2  testimony.
3       BY ATTORNEY MURPHY:
4  Q. The question was whether or not I'm getting it
5     right.
6  A. I -- I felt like it was a matter of course
7     with -- with my understanding of what's happening to me
8     and those around me, that taking on that role was a --
9     was a -- you know...
10 Q. Was one of the things you intended to do when
11    you became a member of the Coalition on Homelessness to
12    help them with this lawsuit?
13 A. No, that wasn't the intent.
14 Q. Why not?
15 A. Well, I mean, I didn't even -- I didn't -- when
16    I became a member, I didn't know there was a lawsuit
17    really. I had no idea there was a lawsuit.
18 Q. So in April, May of 2024, at that point, you
19    weren't even aware there was a lawsuit, right?
20 A. No. I was -- no, uh-uh.
21 Q. Okay.
22 A. I don't -- I don't -- no, I don't think it
23    was -- no.
24 Q. Did you have to sign up anywhere to become,
25    like, a formal member?

Page 83

1  A. No.
2  Q. Okay. Did you have to do anything to kind of
3     switch from being a nonmember to a member?
4  A. Not really, other than, you know, my own
5     personal commitment.
6  Q. Okay.
7  A. Which was recognized, that's -- I guess is --
8     in a way.
9  Q. How was it recognized?
10 A. By -- by -- I was present, you know, just
11    present during those -- those times when the sweeps were
12    happening and I was -- you know, I would -- you know, I
13    was there.
14 Q. Do you have any understanding about the
15    membership requirements for the Coalition on
16    Homelessness?
17 A. For me, it was just being homeless, I guess. I
18    mean, I -- and taking a step -- you know, taking another
19    role on, which was, you know...
20 Q. Yeah.
21    Is it your understanding that Larry Ackerman is
22    a member of the Coalition on Homelessness?
23 A. I think so. I think he is.
24 Q. So -- I'm just trying to understand.
25 A. He introduced himself as such.

Page 84

1  Q. Yeah.
2     If you are saying that being a member means
3     you're homeless, but -- is Larry homeless?
4  A. I don't know. I don't know --
5  Q. Okay.
6  A. -- Larry's living situation.
7  Q. Okay. But your understanding is that the
8     membership requirements for being a member of the
9     Coalition on Homelessness is that you're homeless
10    yourself?
11 A. Well, for me, I'm saying it made sense, you
12    know, that, you know, wanting to take a proactive role
13    and being homeless and --
14 Q. Yeah.
15 A. -- I felt like it was right.
16 Q. My question is a little bit different.
17    So I understand you saying, like, here -- this
18    was your personal motivation for wanting to join the
19    Coalition on Homelessness.
20    My question is about whether or not there are
21    any formal requirements. So the Coalition says, like,
22    "Even if you want to be a member, if you don't meet this
23    requirement, you can't be"?
24 A. I mean, I might be missing something. I didn't
25    know there was a formal requirement.

Case 4:22-cv-05502-DMR   Document 366-21   Filed 04/17/25   Page 6 of 12
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
James J. Reem, Jr.
February 27, 2025

Page 113

1  A. Mm-hmm.
2  Q. -- you picked up your stuff, you moved it,
3  waited for the resolution to be over, and then you went
4  back?
5  A. Sure. Yeah.
6  Q. And --
7  A. I tried to. Sometimes I moved it, you know,
8  around -- a little bit around the area. But for the
9  most part, we hung together, all of us.
10    ATTORNEY MURPHY: We're at another hour. Do you
11 want to take a break?
12    ATTORNEY TALLA: I have lunch here.
13    THE WITNESS: Yeah.
14    ATTORNEY MURPHY: Yeah.
15    THE WITNESS: Take a break.
16    ATTORNEY MURPHY: Agree to go off.
17    THE VIDEO OPERATOR: This marks the end of Media
18 No. 2. We are going off the record. The time is 11:53.
19    (At 11:53 a.m. a lunch recess was taken until
20    12:29 p.m. of the same day.)
21    (Nothing omitted nor deleted. See next page.)
22
23
24
25

Page 114

1    THURSDAY, FEBRUARY 27, 2025, 12:29 P.M.
2    EXAMINATION RESUMED
3    THE VIDEO OPERATOR: Here begins Media No. 3. We
4  are going on the record. The time is 12:29.
5    BY ATTORNEY MURPHY:
6  Q. Mr. Reem, I'm going to go back to asking you
7  questions about the occasion in either December 2023 or
8  January 2024 where you think the City wrongly discarded
9  your property.
10    Is that okay?
11 A. Yeah.
12 Q. And this is, just to clarify, the same occasion
13 where you were arrested for 647(e)?
14 A. I believe so, yeah.
15 Q. To say it differently, this is the same
16 occasion you were arrested for unlawful lodging on the
17 street when you refused shelter?
18 A. Oh, no. At that time, they weren't asking if
19 we had -- if we wanted shelter.
20 Q. Okay. So were you arrested on the date that
21 we're talking about in either December 2023 or January
22 2024?
23 A. Yeah.
24 Q. Okay. And your memory is that on -- well, let
25 me back up.

Page 115

1    Have you been arrested for violating, like, a
2  sit/lie law or -- in San Francisco more than once?
3  A. No.
4  Q. Okay. And your recollection is that on the day
5  you were arrested for violating the sit/lie law, nobody
6  made any offer of shelter to you?
7  A. Not that day.
8  Q. Okay. So -- this is my fault for asking you a
9  double-negative question. Let me try a better question.
10    On the day you were arrested under the sit/lie
11 law, did anybody make you an offer of shelter?
12 A. No, not that I recall.
13 Q. Thank you.
14    And I think you said that day, there was an
15 HSOC notice posted, right?
16 A. Yeah, there was one.
17 Q. And that you were on Fell Street at the time,
18 right?
19 A. Mm-hmm.
20 Q. Is that a yes?
21 A. Yes.
22 Q. How long had you been camping in that location?
23 A. Let me think. Probably about a week, two
24 weeks. Two weeks maybe.
25 Q. Was there anybody else around you, or were you

Page 116

1  kind of camping solo?
2  A. No. There was -- there was other people on
3  that same street.
4  Q. Best estimate of the number of people on the
5  street with you?
6  A. Five, six.
7  Q. And at that time, were you staying in a tent?
8  A. No, uh-uh.
9  Q. Can you describe kind of the structure you had
10 created there?
11 A. I just had my -- my personal items from --
12 covered with a tarp, and then I just slipped under the
13 tarp to be, you know, from the elements if possible.
14 Q. Do you have a best estimate of -- I'm trying to
15 figure out, like, how much stuff you had, like the
16 dimensions of how big your structure was.
17 A. It was -- I think I gave you a number on that.
18 I'm trying to think now. It was probably 30 by 10 by
19 maybe 4 feet high. It was -- it was quite a bunch -- it
20 was all my worldly possessions.
21 Q. And what things did the City take from you that
22 day?
23 A. They took the tarp. And essentially, that was
24 all they said they could take at that time.
25 Q. Okay. So on the occasion in either December

Case 4:22-cv-05502-DMR    Document 366-21    Filed 04/17/25    Page 7 of 12
Coalition on Homelessness, et al. v                                            James J. Reem, Jr.
City and County of San Francisco, et al.                                       February 27, 2025

Page 145

1  took -- wrongly took your property. I think the second
2  time you mentioned, you said it was four to five months
3  after the move.
4      Do you remember that?
5  A. Possibly, yeah.
6  Q. Yeah. Let me try it differently.
7      So I think you mentioned a time in either of
8  December '23 or January '24 and then another time in
9  July or August 2024.
10     Was there something in between those two?
11 A. There was -- there -- yeah, there was -- there
12 was an incident.
13 Q. Okay. What's your best estimate of the time
14 frame for the incident?
15 A. It was all -- probably May -- May, June.
16 Q. So May or June of 2024?
17 A. Yeah.
18 Q. Okay. Do you remember where you were for the
19 incident?
20 A. It was -- I had moved my stuff from a posted
21 area. I was across the street from it where -- it
22 was actually in the Panhandle. So we needed -- that
23 agency couldn't do anything when we're there, so...
24 Yeah, that was it.
25 Q. So for this incident in either May or June

Page 146

1  2024, you saw a posted notice for an HSOC resolution, so
2  you moved a couple blocks away; is that right?
3  A. No. I moved across the street.
4  Q. Across the street. Okay.
5  A. Allowing them to clean.
6  Q. And you mentioned you were in the Panhandle.
7  Is it -- when you said they couldn't get there.
8      Do you mean like that Rec and Park handles the
9  Panhandle, and DPW does --
10 A. The rangers, yeah.
11 Q. Rangers.
12 A. It's different agencies.
13 Q. And what items did you lose that day?
14 A. I don't know exactly what was missing.
15 Q. Okay. Can you explain to me what happened?
16 A. The police left. I had moved my stuff across
17 the street. They did a cleaning, and then the police
18 left.
19     And then after the police left, the DPW workers
20 came over to my property and told me that I had to
21 uncover it because they wanted to know -- they wanted to
22 see what I was allowed to keep.
23 Q. Do you know anything about those DPW workers,
24 like identifying characteristics?
25     Did you know any of them?

Page 147

1  A. There was a heavyset Black woman. There was
2  a -- there was about -- there was about ten workers.
3  There was the firemen representative -- the Fire
4  Department's representative was there. He orchestrated
5  calling the police again. And they said, "We've been
6  already been out there; we're not coming back."
7      Then the DPW workers left but not without
8  perusing my things, taking the tarp back, going --
9  picking and pawing through my personal property.
10     And then that -- and then I -- then they
11 started playing a game with me and -- there was
12 observers -- where they would -- you know, one would go
13 towards the property. I'd go try to address that, and
14 then one would go behind me. Would you do -- they were
15 playing games with me. It was...
16 Q. Were there any items that DPW took that day?
17 A. I believe there were -- well, they walked away
18 with stuff, and it wasn't clear what it was. It was,
19 like, it was in a bag or it was in a box. They
20 just (descriptive sound).
21 Q. Can you identify any specific item that you
22 believe DPW took from you that day?
23 A. I believe they took a painting. They said
24 they -- the one woman said I couldn't keep that. Like,
25 why? Like, what...

Page 148

1      And there was -- you know, there was another
2  witness too. I mean, there's plenty of people that saw
3  what happened.
4      And I had -- I had to try to move my stuff away
5  from them at the same time I was trying to defend it.
6  It was very -- it was difficult. I can't really say
7  exactly what was missing. I know -- I mean, there's
8  things that ended up being missing, big paintings and --
9  you know, I don't know exactly what was missing.
10 Q. How many paintings would you estimate that you
11 had that day?
12 A. About ten.
13 Q. And any reason why only one of them DPW would
14 have said you can't have this one, but the other nine
15 are okay?
16 A. It was larger. It was too large.
17 Q. How big was it?
18 A. Oh, it was probably 3 by 4.
19 Q. So you believe you physically saw a DPW
20 employee take one of your paintings --
21 A. Yeah.
22 Q. -- at this incident in --
23 A. Yeah.
24 Q. -- June or May of 2024?
25 A. Yeah.

Case 4:22-cv-05502-DMR   Document 366-21   Filed 04/17/25   Page 8 of 12
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
James J. Reem, Jr.
February 27, 2025

Page 149

1  Q.  Any other specific items you believe you saw
2     DPW take that day?
3  A.  It could have been personal, like, clothing.
4  Q.  Yeah.
5  A.  Things came up missing.
6  Q.  So --
7  A.  I just -- it was -- we -- the moves themselves
8     are difficult.
9  Q.  My question --
10 A.  And then to organize things at the same time
11    you're trying to move them and then, you know, balance
12    everything.  And then -- then that confrontation, and
13    then things come up missing, and it's like --
14 Q.  Yeah.
15 A.  -- it's hard -- it's hard to keep track of
16    everything.
17 Q.  So it sounds like part of what you're saying is
18    that, in the process of moving, you might lose things
19    even if DPW doesn't take them, but you've still lost the
20    item?
21    Is that -- that's part of what you're saying?
22 A.  Yeah, but -- yeah.
23 Q.  Okay.  And I hear you saying that there are
24    other items you lost that day.
25    My question is a little different, which is:

Page 150

1     For things that you actually observed DPW take, I heard
2     you say there's one, a larger painting.
3     Anything else you saw the City take that day
4     from you?
5  A.  No.
6  Q.  Okay.  And did you ever attempt to get the
7     painting back?
8  A.  No.
9  Q.  I think you said on this occasion, there were
10    observers there; is that right?
11 A.  Yeah.
12 Q.  Who were those observers?
13 A.  This -- this woman, Melissa, took -- took on a
14    role, and she said -- she watched, and she said, "If
15    this ever happens again, you call me."  And she gave me
16    her phone number.
17    And she said her father was homeless and that
18    she has, you know, an interest in it for herself.  And
19    so she observed it.
20 Q.  Did you ever hear Melissa yell or -- yell at or
21    threaten the Public Works employees that day?
22 A.  Well, she told them what they were doing was
23    wrong and that they should leave the stuff alone.
24 Q.  And was the tone and the volume that she used
25    yelling when she did that?

Page 151

1  A.  Yelling or just -- well, there was a lot of
2     them, and they were spread out.  Yeah, I guess so.  I
3     mean...
4  Q.  Did you hear her use profanity?
5  A.  No.
6  Q.  You don't remember her using one --
7  A.  No, no.
8  Q.  -- swear word?
9  A.  I don't -- I don't remember it.  I mean --
10 Q.  Okay.
11 A.  -- I know what she told them was that they were
12    doing -- what they were doing was wrong.
13 Q.  Did she send you the video?
14 A.  We made it at Tim Redmond's 48 Hills thing, the
15    blog that was -- that was out there.
16 Q.  Do you have a copy of the video?
17 A.  It's on -- it's on the net.  I mean, that's
18    our -- I would go to 48 Hills.
19 Q.  Yeah.  So I understand that I could go to the
20    news site.
21 A.  That's the only thing -- I don't have -- I
22    didn't get a personal copy of it.
23 Q.  Got it.  Thank you.
24    Have you spoken with Melissa at any point since
25    then?

Page 152

1  A.  Well, since that incident, yeah.  Yeah, because
2     that was the one in August or July -- late July or early
3     August.  I think it was late July actually is what it
4     was.
5  Q.  So you met this woman Melissa at least twice,
6     once in May or June or 2024 and then again in late
7     August 2024?
8  A.  Yeah.  And then she -- she walks her daughter
9     to work -- I mean to school.  And so she would stop by
10    the encampments every once in a while and check on me.
11    She brought -- you know, she brought me a
12    sleeping bag, you know, food and stuff like that.
13 Q.  What's your best estimate of the time of day
14    this May, June 2024 incident happened?
15 A.  The morning.
16 Q.  Any more detail about time in the morning?
17    Like, close to lunch?
18 A.  Well, it was -- there were -- like, they
19    post -- we always had the A.M., for whatever reason.  I
20    don't know.  But 9:00 o'clock, they would show up and
21    then -- usually.
22 Q.  And then what happened when they showed up at
23    9:00?
24 A.  They would -- they would -- well, if you
25    weren't packed up and ready to go, then they would --

Case 4:22-cv-05502-DMR   Document 366-21   Filed 04/17/25   Page 9 of 12
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
James J. Reem, Jr.
February 27, 2025

Page 153

1  they would try and, you know, get people motivated to
2  get their stuff out of there, or they were going to just
3  start loading it up.
4      And that's when the cops would start -- you
5  know, put their coffee cup down and start arguing about
6  getting your stuff out of there so they could clean.
7  Q.  And when you say they showed up at 9:00 --
8  A.  I'm sorry.  That was when the DPW workers
9  started.
10 Q.  Okay.  And during the second incident in May or
11 June of 2024, did you have a tent?
12 A.  No.
13 Q.  Was it kind of a similar tarp structure that we
14 talked about before?
15 A.  No.  I was -- I was moved.  I was moved and
16 away from the posted area already.  And then they came
17 to the area I had moved to, which is just across the
18 street.
19     And so, yeah.  And I didn't have anything set
20 up.  I was just -- I was in the process of moving
21 everything away from the area they were going to clean
22 out of respect.  And so they came to me outside of it,
23 you know.
24 Q.  Were your items covered, like by a tarp or
25 anything?

Page 154

1  A.  Yeah.  They were totally covered.  Everything
2  was covered.  They told me I had to remove the tarp so
3  they could see what I was allowed to keep.
4  Q.  How many new tarps did you get between December
5  or January of 2024 in the first incident and May or June
6  of 2024 in the second incident?
7  A.  I would get these green ones.  I don't know how
8  many.  Numerous, you know.  But...
9  Q.  Where did you get them from?
10 A.  They give them out at HYA, which is the
11 Homeless Youth Alliance.  And a couple other agencies
12 just walk through and say, "Do you need a tarp?"  You
13 know, they hand out these -- they're kind of cheap.
14 They don't -- they really don't protect well, and they
15 rip easily.  But, you know...
16     We haven't even gotten to the big incident yet.
17 Q.  Yeah.  We've still got -- we've still got about
18 an hour and a half together.
19 A.  Yeah.
20 Q.  Let's -- why don't we kind of jump out of order
21 to get the easy ones out of the way first.
22     You mentioned there was some type of incident
23 after November or December of 2024 where they -- they
24 didn't take your property, but you're calling it an
25 incident.

Page 155

1  Do you remember that?
2  A.  That was one that -- that I -- that it was --
3  it was -- it was DPW worker -- let's see.
4      It was another camper that was in a
5  confrontation with a worker.  And I think it was the
6  only time I had seen one.  But it was -- it was -- there
7  was no hitting or anything like that.  There was no
8  con- -- like physical contact, but they had words.
9      And then I was in my camp, and I was listening
10 to what was going on.  And then there was...
11     And he -- he made threats, you know.  He was
12 making threats to both of us after -- because I had to
13 stick up for her, you know.  She's right there.
14     And then -- I mean, he was -- he went off
15 the -- just got out of character, just way out of
16 character.
17 Q.  When you say "way out of character," had you
18 seen that person before?
19 A.  No.  I'm referring to -- adding another
20 incident on top of that, which is I think the day he --
21 he's the guy who took my photograph another time.
22     So he was -- but he was just out of character.
23 I mean, that's a professional; that's someone who's
24 doing something that's, you know, just -- that's what I
25 mean by...

Page 156

1  Q.  Best estimate of when this happened?
2  A.  Probably in June, July -- June probably, maybe
3  mid June.
4  Q.  Of 2024?
5  A.  Yeah.
6  Q.  Was this part of, like, an HSOC resolution?
7  A.  No.
8  Q.  This was kind of a one-off thing?
9  A.  Mm-hmm.
10 Q.  Was there any other department there besides
11 Public Works?
12 A.  No.  He came solo, as a matter of fact.  I
13 think he was just doing prep for a posting the following
14 day.
15     So I was upset because they were -- you know,
16 look, you guys are going to be here at 9:00 o'clock
17 tomorrow morning.  You need to harass us now?  It's,
18 like, that was kind of my kind of arguing.
19 Q.  So your memory is this happened the day before
20 an HSOC resolution --
21 A.  Right.
22 Q.  -- is that right?
23     And your memory is that the person who was
24 coming through to give notice of the HSOC resolution was
25 a DPW employee?

Case 4:22-cv-05502-DMR    Document 366-21    Filed 04/17/25    Page 10 of 12

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

James J. Reem, Jr.
February 27, 2025

Page 161

1   took your stuff before that date, or was that the first
2   one?
3   A.  That was the first one.
4   Q.  Okay.  The second incident we talked about
5   was --
6   A.  That was the police, not DPW.
7   Q.  Thank you.
8       -- like five months later, in May or June of
9   2024.  And that's where you said someone from DPW took
10  one of your paintings.
11  A.  Paintings, right.  Okay.
12  Q.  Any other instances where you think the City
13  wrongly took your property between the arrest and then
14  when you lost the painting?
15  A.  No.
16  Q.  Okay.  And what's the next time that you
17  remember the City wrongly taking your property?
18  A.  Definitely on August.
19  Q.  Okay. So let's talk about that one.
20      Any more detail on the date of when that
21  happened?
22  A.  I think it was a Friday, the last Friday in
23  July.
24  Q.  What makes you kind of have that in your
25  memory?

Page 162

1   A.  Well, London Breed had come out with a
2   statement saying that she wasn't going to be doing any
3   more sweeps in July.  She would -- they would -- they
4   would be starting in August 1st.
5   Q.  Mm-hmm.
6   A.  And then -- and then she didn't stay to that.
7   They came in late July.  There was a posting -- a
8   posting for late July, and they just did it.
9   Q.  So this was a noticed HSOC resolution, and you
10  saw the notice?
11  A.  Yeah.  And they weren't -- yeah.
12  Q.  And what did you do once you saw the notice?
13  A.  I immediately made -- took the steps to get my
14  stuff, you know, taken care of.
15  Q.  Do you remember where -- I'm going to ask you
16  both -- where you were when the notice happened and then
17  where you moved to?
18  A.  I was in -- I was on Baker between Oak and Fell
19  right in back of the DMV.  And then I moved to Hayes and
20  Buchanan, I guess.  Is it Buchanan after Baker?  I think
21  it is Buchanan.
22      So it was down the street and then made a right
23  on Hayes.  And I was down there a little bit, and then
24  they... Yeah, that was it.
25  Q.  So before the resolution started, you were

Page 163

1   staying on Baker behind the DMV; is that right?
2   A.  Before the resolution started, I was staying on
3   Baker.  Yeah.
4   Q.  And then you moved, and you moved -- where did
5   you move to?
6   A.  I moved to Hayes, on Hayes Street down -- down
7   Hayes towards Buchanan.  I think -- is it Buchanan?  I
8   think it's Buchanan.  Or Broderick.  Is it Broderick?
9   Q.  Either -- one of those two --
10  A.  Yeah.
11  Q.  -- Buchanan or Broderick?
12  A.  Yeah.  I think it's Buchanan.
13  Q.  What time did DPW show up for the HSOC
14  resolution that day?  Or had you already moved by then?
15  A.  This is why I was relating to the other guy.
16  The same guy that got in the argument with that girl
17  showed up at, like, 7:30, way before the time they were
18  supposed to show up.
19  Q.  And it was the same person?
20  A.  I believe so, yeah.
21  Q.  So the same person was working mornings for the
22  HSOC resolution in July, August 2024 and then evening in
23  June or July?
24  A.  Same guy.
25  Q.  And was this the first time you -- or the

Page 164

1   second time you saw that employee?
2   A.  No.  I think I'd seen him at a lot of the
3   resolutions.  You know, a lot of the postings, he came.
4       He might have been management.  He might have
5   been a supervisor.  I don't know.  I don't know.
6   Q.  What items did DPW take from you that day?
7   A.  Everything I owned at that time.  I just had --
8   I was allowed the two carts with minimal -- I couldn't
9   go through anything.  I couldn't organize and get the
10  things I need, the essential essentials, like my
11  medication and my finished and completed art pieces and
12  my...
13      So, yeah, that was it.
14  Q.  I hear you saying they took everything you
15  owned --
16  A.  Except for those two things -- those two carts,
17  which were random at that point because I couldn't
18  really organize anything or --
19  Q.  Okay.
20  A.  -- you know, wasn't told that when I moved out
21  of the posted area, I was going to lose all my things.
22  It wouldn't have made no sense to post.
23  Q.  So you kept two carts of items after that
24  resolution?
25  A.  I gleaned two carts out of the stuff that they

Case 4:22-cv-05502-DMR   Document 366-21   Filed 04/17/25   Page 11 of 12

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

James J. Reem, Jr.
February 27, 2025

Page 165

1  were throwing into the truck at the same time.
2  Q. Yeah. I mean, I'm not --
3  A. I'm sorry.
4  Q. -- trying to be difficult with you.
5  A. I know. I know. I'm trying to explain the
6  situation.
7  Q. Yeah.
8  A. But it really -- it was really hard.
9     And as far as losing my things, I mean, there's
10 a cohesive group of things that I had. There was a
11 plan; there was a goal in mind. And then losing any one
12 of the things is like losing everything.
13    I mean, if -- if you've got a -- you nurse it
14 towards having a plan and a goal being met, and you
15 start losing things here and there, bits and pieces, and
16 then not being able to... It was just ridiculous.
17 Q. Yeah.
18    So the reason I'm following up on this is I --
19 I want to make sure that I understand what happened
20 because I wasn't there.
21    And sometimes, you know, if you say they took
22 everything but then you also say you got to keep two
23 carts, it's a little confusing for me.
24 A. Sure. I understand what you're saying.
25 Q. So that's why I'm spending so much time on it.

Page 166

1  I want to understand what items you got to keep or what
2  items you still had after that occasion in -- is this
3  June or July of 2024 or July, August?
4  A. This is July. Yeah, late July.
5  Q. Last week of July?
6  A. Yeah.
7  Q. Okay. So what items did you still have with
8  you after your encounter with DPW in the last week of
9  July 2024?
10 A. Okay. I -- I imagine -- I mean, I meant to
11 keep some paint, some brushes, some antiquities that
12 I've been holding on to for a long time. I was able to
13 get those out of there, but they were already packed in
14 those two carts; they were just ready to move.
15    So those are the things I was allowed to keep,
16 but it wasn't the essential things. You know, if I
17 could have done it over again, I would have been able to
18 keep more.
19    But they came with a random two-cart thing,
20 which I don't know where that came from, that rule. And
21 it was convenient at the time for them.
22    But anyway, so -- so paints, some -- it was --
23 it was some antiquities. Anyway, I -- I was able to
24 keep those. But I lost, I'd say, well, the bulk of my
25 property.

Page 167

1  Q. Other than paints, brushes, and antiquities,
2  anything else you recall still having after your
3  encounter with Public Works in the last week of July
4  2024?
5  A. I think they left my bike -- well, they were
6  going to load it in; and then one of the guys, I think
7  he felt bad and wheeled it over to my property, the two
8  carts I was allowed to keep.
9  Q. Other than paints, brushes, antiquities, and a
10 bike, any other items you recall still having after your
11 encounter with DPW --
12 A. No. That's pretty much it.
13 Q. -- in the last week of July 2024?
14 A. Sorry.
15 Q. It's okay.
16 A. No, I don't -- I don't recall anything else.
17 Q. What were the antiquities that you kept?
18 A. Oh, they were -- oh, what was it? Well, I
19 managed to keep the box, my -- my -- my personal box
20 that had my -- that had my crystals in it, my personal
21 jewelry, and my, you know...
22    And let's see. There was a lot of -- there was
23 sheet music I was allowed to keep, old -- old vintage
24 stuff I'd been protecting.
25    And I -- I don't remember exactly what it was.

Page 168

1  It was just collections of stuff, collection of things.
2  It was -- it was -- it wasn't what I would have kept.
3  Had I been given the opportunity to go through my things
4  or gather -- you know, if I told -- anyway, no, I
5  don't...
6  Q. What's your best estimate of how many blocks
7  away from the HSOC resolution area you were?
8  A. I was two blocks away from the resolution, out
9  of eyesight too. Definitely out of the posted area.
10 Q. In the bag-and-tag policy, do you know how long
11 DPW needs to wait before they can start interacting with
12 somebody's items outside of an HSOC resolution?
13 A. No, I don't.
14 Q. Okay. What's your best estimate of how long
15 DPW had been in the area before they encountered you?
16 A. Well, they had already -- see, before I was
17 able to wheel my stuff out, that individual who got
18 there early took photographs of me.
19    And I still -- I'm like, "What are you doing?
20 I'm going to be -- I'm going to be gone. You guys can
21 clean, no problem. I'm just getting out of the way."
22    And so then he followed me to where I went and
23 took pictures of me there. And then that was when he
24 threatened, you know, "You're going to lose your stuff
25 today," you know.

Case 4:22-cv-05502-DMR   Document 366-21   Filed 04/17/25   Page 12 of 12
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

James J. Reem, Jr.
February 27, 2025

Page 173

1  A.  Transparent what they're doing.
2  Q.  Your memory is that you've never seen Dylan
3    Verner-Crist take a photo at a resolution?
4  A.  No, I haven't.
5  Q.  You've never seen him take a video at a
6    resolution?
7  A.  No, I haven't.
8  Q.  And have you ever seen Lukas Illa take a photo
9    at a resolution?
10 A.  No.
11 Q.  Ever seen him take a video?
12 A.  No.
13 Q.  Have you ever seen Larry take a photo at a
14   resolution?
15 A.  No.  He has a notepad with him, but...
16 Q.  You've never seen Larry take a video?
17 A.  No, no.  I haven't seen it, not like that, not
18   documenting it like that.
19 Q.  What items do you believe the City took from
20   you in the last week of July 2024?
21 A.  All my personal effects, my clothing, bedding.
22   It was -- it was the artwork that was the most painful
23   probably.
24     THE REPORTER:  I'm sorry.  It was art --
25     THE WITNESS:  It was the artwork that was the most

Page 174

1  painful for me anyway.
2     Let's see.  What items?  I had completed
3  pieces.  I had sold pieces that were -- that were still
4  with me that got taken and a lot of pieces in process.
5     Yeah, mainly my art materials and the art was
6  the main ones.
7     BY ATTORNEY MURPHY:
8  Q.  I heard you say artwork and bedding.
9     Anything else?
10 A.  They took my clothing, my toiletries.
11 Q.  Anything else?
12 A.  Well, yeah.  The art materials mainly and some
13   other things.  Art materials.  It was hard watching.
14    THE REPORTER:  I'm sorry.  Say that --
15    THE WITNESS:  It was hard watching.
16    BY ATTORNEY MURPHY:
17 Q.  Do you have any records of the artwork that you
18   had sold that -- to show that you had actually sold it?
19 A.  I could -- I could definitely provide proof.
20 Q.  What kind of records would those be?
21 A.  Well, photographs of the completed pieces that
22   are no longer here.  And then I can ask the individual
23   that I sold it to to come forward.  He would do that, no
24   problem, for me.
25 Q.  Who's the person that you sold the art to?

Page 175

1  A.  His name is Rene.  And that's -- I don't know
2    his last name.
3  Q.  And is Rene homeless or --
4  A.  No, no, no.  He's -- no.
5  Q.  Okay.  Where does he live?
6  A.  He lives up in -- he's on Shrader and Cole --
7    no.  Shrader and 17th -- 17th.  Yeah, 17th and Shrader.
8  Q.  And have you sold pieces to anybody else
9    besides Rene, or is he --
10 A.  Well, I had a piece in process that was to be
11   sold.  And then the -- like I said, the one piece was
12   sold already.  I was doing a complementary piece to it.
13   I needed that one present to do -- finish the other one.
14 Q.  So I hear you say you had one piece that was
15   complete and already sold to Rene.
16 A.  Mm-hmm.
17 Q.  And then you had two complementary pieces that
18   were in process that had been sold?
19 A.  One complementary to the -- to the -- it was a
20   Steph Curry portrait, and then I had another one.  He
21   had wanted a Kobe Bryant portrait.  And I wanted them to
22   be looking at -- like, looking at the same spot in the
23   two pieces.
24     So I had -- I had one Curry piece present and
25   then -- yeah, yeah.

Page 176

1  Q.  Was this also a piece for Rene or somebody
2    else?
3  A.  The Kobe Bryant was a piece for Rene, yeah.
4  Q.  How much had you sold those two pieces for?
5  A.  Well, the one piece I sold to him for 250,
6    but -- and the other one was going to be the same price.
7  Q.  Okay.  What ultimately ended up happening with
8    Rene?
9     Did you remake the paintings?
10 A.  He -- no.  I'm sorry.  Yeah, he -- not yet.
11   But I am -- he wants me to do just the Kobe Bryant now,
12   which is okay.  Yeah.
13 Q.  And did he give you the money for it even
14   though they were lost?
15 A.  He gave me -- he had already given me the money
16   for the Steph Curry, which was -- which was -- you know,
17   it was a paid-for piece.  And it was -- it wasn't a
18   problem.  I thought I could protect it, but I couldn't.
19 Q.  Were there any observers present when this
20   happened?
21 A.  Where?  When I lost all my stuff?
22 Q.  Yeah.  Sorry.  Let me ask you a better
23   question.
24 A.  No.  I mean, what happened is I was --
25    ATTORNEY TALLA:  Wait, wait, wait.