# EXHIBIT 16

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

*Sarah J. Stephenson*
*January 22, 2025*

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 43953Stephenson_NL.txt
**Min-U-Script® with Word Index**

Case 4:22-cv-05502-DMR   Document 366-22   Filed 04/17/25   Page 3 of 18
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Sarah J. Stephenson
January 22, 2025

Page 49

1  documents, pictures, that sort of thing, up to Google
2  Drive?
3  A. Yes, if -- yes, but not always. Like, I'm --
4  yeah. I don't -- I don't know how to do it, so if
5  someone does it for me.
6  Q. I see.
7     So, generally, where you store your documents,
8  information, generally since 2020, has been Google Drive
9  only?
10    ATTORNEY KASHYAP: Objection; misstates prior
11 testimony.
12    BY ATTORNEY GRADILLA:
13 Q. Okay. Let me ask you a different question.
14    Since 2020, where have you stored your personal
15 documents?
16 A. Mostly -- I have the paper copies. I had. I
17 don't anymore. Or some are on Google.
18 Q. I see.
19    But you didn't -- you haven't used a different
20 service?
21 A. No.
22 Q. No? Okay.
23    And what's your e-mail address, Ms. Stephenson?
24 A. Sarahsmilezz, s-m-i-l-e-z-z, 1432@gmail.com.
25 Q. And do you use any social media accounts?

Page 50

1  A. Yes.
2  Q. Which ones?
3  A. Facebook.
4  Q. And what's your account name for Facebook?
5  A. Sarah Stephenson.
6  Q. And your phone numbers.
7     What's your phone number?
8  A. The number that I have right now, I don't know.
9  Q. Okay.
10 A. I can look at it, if you need me to, but my
11 number is that I -- that I use is coming back. It just
12 didn't get ported in correctly.
13 Q. Got it.
14 A. So it's (415) 646-1710.
15 Q. And how long have you used that number?
16 A. Two months.
17 Q. Oh. The one you just gave me, you've only used
18 it for two months?
19 A. Yes.
20 Q. And before that, do you remember your number
21 before then?
22 A. I don't recall.
23 Q. Did you have multiple numbers or just -- just
24 one --
25 A. Just --

Page 51

1  Q. -- before then, before this most recent number?
2  A. Multiple.
3  Q. Multiple.
4     Do you remember any of those phone numbers?
5  A. No.
6  Q. Okay. Shifting gears a little bit,
7  Ms. Stephenson.
8     What is it -- you're -- are you familiar with
9  the Coalition on Homeless?
10 A. Yes.
11 Q. How are you familiar with them?
12 A. I'm -- I'm a member. I met them in, I guess,
13 October of '23.
14 Q. And when you say you met them in October of
15 '23, who'd you meet?
16 A. Carlos.
17 Q. What's Carlos's last name?
18 A. I don't know.
19 Q. And how'd you meet Carlos?
20 A. I -- I went there. I asked -- I Googled. I
21 Googled them. Or help. And that's what I found, and I
22 went to their office.
23 Q. So you Googled help.
24    Just generally help, or what --
25 A. Help for the homeless.

Page 52

1  Q. I see.
2     And when did you Google that, about October of
3  '23?
4  A. Mm-hmm. Yes.
5  Q. And when you say you went "there," where is
6  "there"?
7  A. Turk Street.
8  Q. That's the Coalition on Homelessness' office?
9  A. Yes.
10 Q. What's your understanding of what the Coalition
11 does?
12 A. They stand up for the rights of people who are
13 unhoused.
14 Q. And a minute ago, you mentioned that you're a
15 member.
16 A. Yes.
17 Q. What's your understanding of how one becomes a
18 member of the Coalition?
19 A. I think that we all have to stick together,
20 being unhoused, and people who respect that and want to
21 help, and we work together to make that a better
22 situation.
23 Q. So what does someone have to do to become a
24 member of the Coalition?
25    What's your understanding of what someone needs

Case 4:22-cv-05502-DMR   Document 366-22   Filed 04/17/25   Page 4 of 18
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Sarah J. Stephenson
January 22, 2025

Page 53

1  to do to become a member of the Coalition?
2  **ATTORNEY KASHYAP:** Objection; lacks foundation.
3  **THE WITNESS:** Be accountable and present.
4  BY ATTORNEY GRADILLA:
5  Q. Ms. Stephenson, so you said you went to the
6  Coalition's office in October of 2023.
7  Who'd you speak to?
8  A. Carlos.
9  Q. Anyone else?
10 A. There was somebody else there, but I don't
11 recall his name.
12 Q. Anybody else there that you spoke to?
13 A. No.
14 Q. And what did you talk to them about?
15 A. My tent had been burned down by a company, and
16 the police would not take a police report.
17 Q. When you say your tent was "burned down by a
18 company," which company?
19 A. It was a -- like, a car -- a car mechanic place
20 on -- oh. I missed that one. Shotwell.
21 Q. And that was when your -- when did your tent --
22 A. It was on -- in October of '23.
23 Q. Okay. Did you see someone burn it down?
24 Like, was it intentional?
25 A. Mm-hmm. They told us.

Page 54

1  Q. I'm sorry to hear that.
2  When you say "they," who's "they"?
3  A. The two gentlemen, I think, who own it. I
4  don't know their names.
5  Q. Who owned the mechanic shop?
6  A. Mm-hmm.
7  Q. Did they tell you why?
8  A. Because they didn't want us living there.
9  Q. So you went to the Coalition. You told them
10 that this happened to you.
11 What did they tell you?
12 A. They provided support. They gave us a tent,
13 some information on where to get help with food and
14 whatnot. That there wasn't anything that they could do,
15 like -- for us, you know, to help us with that
16 situation, but they could put us in contact with people
17 who could, and gave us information.
18 Q. What information did they give you about people
19 who could help you?
20 A. It was a pro bono -- it was -- I think -- it
21 was some attorney. I don't really recall. It was some
22 pro bono thing, and then resources.
23 Q. And did you follow up with any of those
24 resources?
25 A. Yes.

Page 55

1  Q. Which ones?
2  A. Oh. We went to St. Anthony's. We went to --
3  they told -- they told us about 123 10th Street and how
4  to get -- oh, and they -- yeah, 123 10th Street and how
5  to get an assessment.
6  Q. An assessment for what?
7  A. Homelessness.
8  Q. You said, for -- for the incident, that the
9  police wouldn't take a police report.
10 Did you ask the police to take a police report?
11 A. Yes.
12 Q. And what --
13 A. I called three times.
14 Q. What number did you call?
15 A. 911.
16 Q. And who told you they wouldn't take a police
17 report?
18 A. They never came.
19 Q. So you called 911 in October of 2023 because of
20 this incident at the car mechanic --
21 A. A fire.
22 Q. The fire.
23 Did you reach 911?
24 A. Yes.
25 Q. What did the dispatcher say?

Page 56

1  A. That they would send somebody. And asked me if
2  the fire was out.
3  Q. Did a firefighter come?
4  A. No.
5  Q. Did any -- any responder come?
6  A. Four days later.
7  Q. Do you remember the date of the incident?
8  A. It was just October.
9  Q. And you said --
10 A. I don't know.
11 Q. -- it was on Shotwell?
12 A. Mm-hmm. Yes.
13 Q. Going back to the first -- your first meeting
14 at the Coalition, did you talk to Carlos about how one
15 becomes a member at -- of the Coalition?
16 A. No.
17 Q. Okay. How did you -- or when did you learn
18 that you could become a member of the Coalition?
19 A. I don't think I ever learned it. It was
20 something -- it just was. I started wanting to help,
21 like pass out flyers and -- like, DPW's policies, I
22 printed off to give to other people. And gave out their
23 cards so that -- because I didn't think a lot of
24 homeless -- the unhoused knew about them --
25 Q. When you say --

Case 4:22-cv-05502-DMR    Document 366-22    Filed 04/17/25    Page 5 of 18
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Sarah J. Stephenson
January 22, 2025

Page 57

1  A.  -- that there was people who could help.
2  Sorry.
3  Q.  When you said give out their cards, what do
4  you -- what do you mean by that?
5  A.  Their business cards.
6  Q.  The Coalition on Homelessness' business cards?
7  A.  Mm-hmm.
8  Q.  Okay.  So how did you know to do all those
9  things?
10     Like, did you speak to someone who told you to
11  do those things or -- can you just walk me through how
12  you went from your first -- your first interaction with
13  Carlos to, you know, handing out business cards for the
14  Coalition?
15  A.  Yes.  When we went there, they were the only
16  people who helped us.  A lot of places -- I was new
17  here, and I didn't know all the things that I know now.
18  And it's not easy to get information from people.  They
19  don't -- it's like what you're supposed to do when
20  you're homeless.  I -- or where you can get help and
21  assistance.
22     Everyone at the -- and when I asked people or,
23  you know, went to the police or -- or, you know, it --
24  no one really had any information for us.  And so when
25  they gave us, you know, all the pamphlets and the things

Page 58

1  and they helped us and they cared and they listened to
2  what we said, you know, and -- I felt like other people
3  should know that that's there, that, you know, there is
4  somebody who will help, you know, and -- and -- or --
5  or, you know, tell, you know, things you could do.
6     And then there was these newspapers that you
7  could sell and -- a way for people to make money.
8  Q.  So you said a lot there, so I just want to --
9  A.  Yeah.
10  Q.  -- understand what you were saying.
11     So if I -- if I understood you correctly,
12  you're basically saying that you wanted to tell other
13  folks.
14     It came from your own desire of telling other
15  homeless folks about the Coalition, correct?
16     ATTORNEY KASHYAP:  Objection; misstates prior
17  testimony.
18     THE WITNESS:  Yes and no.  I -- yes, I wanted to,
19  and the Coalition said that was okay.
20     BY ATTORNEY GRADILLA:
21  Q.  When you say "the Coalition said that was
22  okay," who said that?
23  A.  I think that was Lukas.
24  Q.  And what's Lukas's last name?
25  A.  Illa.

Page 59

1  Q.  What does he do for the Coalition?
2  A.  I don't know.  He -- well, I mean, he's an
3  advocate, I guess.
4  Q.  And I forgot to ask you that for Carlos.
5     Do you know what Carlos's role at the Coalition
6  is?
7  A.  An advocate, I guess.  I don't -- I'm...
8  Q.  Okay.  You also mentioned something about
9  newspapers.
10  A.  Mm-hmm.
11  Q.  Did someone talk to you about newspapers, or
12  what -- can you describe to me what -- what are these
13  newspapers?
14  A.  They're just information of what's happened in
15  homeless news, in -- like, the sweeps and things like
16  that.
17  Q.  And how did you become aware of these
18  newspapers?
19  A.  The first time I was there, somebody came to
20  pick some up, another unhoused person.  And I asked the
21  person at the front desk.
22  Q.  Have you ever sold the newspapers?
23  A.  No, I haven't.
24  Q.  But someone can sell them?
25  A.  Yes.

Page 60

1  Q.  How much do they cost?
2  A.  I think it's -- I think they're allowed to
3  charge whatever they want, but I think it's like a
4  dollar.
5  Q.  I see.
6     And who keeps that money?
7  A.  I don't know.  Oh, the -- the unhoused do.  I'm
8  sorry.
9  Q.  Um.
10  A.  The person who sells them.
11  Q.  Mm-hmm.
12     I think you mentioned that the first time you
13  went there, to the Coalition of Home- -- on
14  Homelessness' offices, they provided you a tent, yes?
15  A.  Yes.
16  Q.  Have they ever provided you with any other
17  services?
18  A.  Yes.
19  Q.  Can you tell me about those?
20  A.  They have -- let's see.  I've gotten the
21  verification of homelessness from them.  They've gotten
22  me:  groceries; laundry soap; dog food; tents, plural;
23  sleeping bags, plural; food, like lunches and dinners.
24  I think that's pretty much it.
25  Q.  And over what time period would you say that

Case 4:22-cv-05502-DMR   Document 366-22   Filed 04/17/25   Page 6 of 18
Coalition on Homelessness, et al. v                                    Sarah J. Stephenson
City and County of San Francisco, et al.                               January 22, 2025

Page 61

1  they provided those services to you?
2  A. From 2023 October until now.
3  Q. So they're still assisting you?
4  A. Well, no. They're not giving me anything now,
5     but I don't need it now.
6  Q. Have you ever worked for the Coalition as
7     either an employee or an independent contractor?
8  A. Like, on paper?
9  Q. Yes.
10 A. No. I -- they've never paid me any money.
11 Q. So have you volunteered for the Coalition?
12 A. Yes.
13 Q. And when did you volunteer for them?
14 A. Like, I went to -- well, when there were going
15    to be sweeps, I went and gave the people where they were
16    going to be copies of the policies for DPW and Lukas's
17    card.
18 Q. I'm sorry.
19    Did you do that once or more than once?
20 A. Whenever I could. So, like, three or four
21    times.
22 Q. Do you remember when?
23 A. When -- well, it was when I saw the -- like, if
24    I knew that there was going to be a sweep -- it was when
25    I saw some of the postings from DPW. I would just go to

Page 62

1  that area and give it to the people there, and then to
2  just encampments when we saw them, like if we were just
3  out and about. So I don't really recall.
4  Q. Got it.
5     And when you say when you saw "the postings,"
6     what are you referring to when you say "the postings"?
7  A. Like those papers that they put up sometimes.
8  Q. Like notices of upcoming resolutions?
9  A. Mm-hmm.
10 Q. Is that a "yes"?
11 A. Yes.
12 Q. So do I understand your volunteering with the
13    Coalition is not a regular thing, like --
14 A. No.
15 Q. -- you don't have, like, a certain set schedule
16    or...
17 A. No.
18 Q. Or certain hours a week?
19 A. No.
20 Q. Did you ever receive any training for the
21    volunteer work that you did?
22    ATTORNEY KASHYAP: Objection; vague.
23    THE WITNESS: No.
24    BY ATTORNEY GRADILLA:
25 Q. Any equipment?

Page 63

1  Q. Did you receive any equipment for the volunteer
2     work that you did?
3  A. Just business cards.
4  Q. And any guidance materials for the volunteer
5     work that you did?
6     ATTORNEY KASHYAP: Objection; vague.
7     THE WITNESS: Yes.
8     BY ATTORNEY GRADILLA:
9  Q. What -- what guidance materials did you
10    receive?
11 A. It was verbal from Lukas. Just...
12 Q. So he verbally gave you guidance --
13 A. Mm-hmm.
14 Q. -- on how to -- on to do what?
15 A. To let other unhoused people know what the
16    policies are and basically, you know, tell them, you
17    know, that they have rights.
18 Q. Do you remember when that verbal guidance was
19    given to you?
20 A. Probably June of '24.
21 Q. Did anyone else give you verbal guidance
22    besides Lukas?
23 A. No. No.
24 Q. And have you volunteered with any other
25    organization in the last five years?

Page 64

1     ATTORNEY KASHYAP: Objection; relevance.
2     THE WITNESS: Not in the last five years.
3     BY ATTORNEY GRADILLA:
4  Q. Okay.
5     ATTORNEY KASHYAP: Miguel, we've been going a little
6     over an hour. I'm wondering if this is a good spot --
7     ATTORNEY GRADILLA: I was --
8     ATTORNEY KASHYAP: -- we could --
9     ATTORNEY GRADILLA: -- about to say --
10    ATTORNEY KASHYAP: -- take a quick break.
11    ATTORNEY GRADILLA: Mm-hmm. We'll -- let's go off
12    the record.
13    THE VIDEO OPERATOR: We are going off the record.
14    This is the end of Media No. 1. The time is 11:13 a.m.
15    (Recess taken from 11:14 a.m. to 11:29 a.m.)
16    THE VIDEO OPERATOR: This marks the beginning of
17    Media No. 2. We are back on the record. The time is
18    11:28 a.m.
19    ATTORNEY GRADILLA: Thank you.
20    BY ATTORNEY GRADILLA:
21 Q. Ms. Stephenson, ready to start?
22 A. Yes.
23 Q. And you understand you're still under oath?
24 A. Yes.
25 Q. Before the break, we were talking about the

Case 4:22-cv-05502-DMR   Document 366-22   Filed 04/17/25   Page 7 of 18
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Sarah J. Stephenson
January 22, 2025

Page 73

1  itself, it has a header saying: "City and County of
2  San Francisco Human services Agency Homeless Residency
3  Verification."
4      Do you see that?
5  A. Yes.
6  Q. Have you seen this document before?
7  A. Yes.
8  Q. What is it?
9  A. It's my verification of homelessness.
10 Q. You see it says -- it's dated 9/25/24. It
11 says: "Name of Agency: Coalition on Homelessness."
12     And it says that: "This letter verify" -- or
13 "is to verify that Stephenson, Sarah," redacted your
14 Social Security number, "has been seen for services at
15 this agency on the following contact dates."
16     Do you see that?
17 A. Mm-hmm. Yes.
18 Q. And then it has a series of dates after that?
19 A. Yes.
20 Q. Could you -- could we go through each one of
21 those dates, and if you remember, tell me what your
22 contact was at the Coalition on those dates?
23     So let's start with the first one, June 25th,
24 2024.
25     Do you remember?

Page 74

1  A. I don't recall.
2  Q. But do you have reason to believe that you
3  weren't there on that date?
4  A. I've been there lots of times, more times than
5  that, but I don't -- I couldn't tell you what days they
6  are.
7  Q. Got it.
8      What about for the next one, July 9th?
9  A. I'm sorry. I don't remember.
10 Q. The next one, July 25th?
11 A. No.
12 Q. The following one, August 2nd?
13 A. No. I...
14 Q. And the next one, August 21st?
15 A. No.
16 Q. The next one, August 30th?
17 A. No. I -- I know what I went there for. I
18 know -- I can't tell you specifically what I went for
19 each time, but I know that -- I mean, on any one of
20 those, it could have been picking up a tent or when I
21 did the declaration. I just don't know what date --
22 what -- what dates they were.
23 Q. Got it.
24     So you just said when you "did the
25 declaration."

Page 75

1  Q. What are you referring to?
2  A. When I did a declaration.
3  Q. Um...
4  A. I picked up --
5  Q. Do --
6  A. Hmm?
7  Q. Do you recall around what date, if any, of
8  these, or no?
9      Was it earlier or later?
10 A. I --
11 Q. No?
12 A. I'm sorry. I can't -- my dates are...
13 Q. Got it.
14     And I will ask you more about that declaration
15 later.
16 A. Okay.
17 Q. So you said also, besides the declaration, you
18 got tents.
19     Anything else?
20     So this was around the -- the -- sorry. Answer
21 that question.
22     Anything else other than tents, getting tents?
23 A. These -- it wasn't always just at the office.
24 It was -- some of these dates, I think, are also times
25 when they came to me.

Page 76

1  Q. Who's "they"?
2  A. Lukas and -- I don't remember their names. I
3  don't know their names, but there was other people with
4  him. They came to drop off groceries a couple times or
5  brought sleeping bags, things like that.
6  Q. Is it safe to say that Lukas is your main point
7  of contact with the Coalition?
8  A. Yes.
9  Q. Okay. And just to close it out, you don't
10 remember what your interaction was with the Coalition on
11 September 13th, 2024?
12 A. No.
13 Q. And what about September 24th --
14 A. No.
15 Q. -- 2024?
16     Now I'm going to show you what has been
17 previously marked as Exhibit 13 [sic].
18     (Previously marked Deposition Exhibit 70 was
19     presented.)
20     BY ATTORNEY GRADILLA:
21 Q. You see how, at the front -- the first page
22 says "Plaintiffs' Second Amended Disclosures Pursuant to
23 Federal Rule of Civil Procedure 26(a)(1)"?
24 A. Mm-hmm.
25 Q. I'm going to represent to you that this is a

Case 4:22-cv-05502-DMR    Document 366-22    Filed 04/17/25    Page 8 of 18
Coalition on Homelessness, et al. v                                                         Sarah J. Stephenson
City and County of San Francisco, et al.                                                    January 22, 2025

Page 77

1  list of names that Plaintiffs' lawyers have given -- or
2  made known of people that might be witnesses in this
3  case.
4  A.  Mm-hmm.
5  Q.  We've redacted all the information, other than
6  the people's names.
7      Can you do me a favor and just look through all
8  the names from the second page of the document through
9  the second-to-last page of the document?
10     And take your time, and tell me if you
11  recognize any of those names.
12 A.  Okay.
13     (Examines document.)
14     Jennifer, Carlos, Lukas, London Breed.  That's
15  it.
16 Q.  Okay.  So I think you named four, but let me
17  confirm.
18     I think you said Jennifer Friedenbach.
19  Correct?
20 A.  Mm-hmm.  Yes.
21 Q.  Lukas Illa?
22 A.  Yes.
23 Q.  Carlos Wadkins?
24 A.  Yes.
25 Q.  And London Breed?

Page 78

1  A.  Yes.
2  Q.  Okay.  How are you familiar with Jennifer
3  Friedenbach?
4  A.  I think that's Jenny who was going to help
5  me get into Mission Cabins with Justin.
6  Q.  Have you ever communicated with
7  Ms. Friedenbach?
8  A.  Just verbally.
9  Q.  So you never texted?
10 A.  No.
11 Q.  Never gotten a -- or a phone call with her?
12 A.  No.
13 Q.  No e-mail, nothing like that?
14 A.  No.
15 Q.  How many times have you had verbal
16  communication with her?
17 A.  Once.
18 Q.  Do you remember around what time?
19 A.  It would have been in October of '24 or about.
20 Q.  So in the several times that you've been to the
21  Coalition on Homelessness' office, have you ever seen
22  Ms. Friedenbach there?
23 A.  Twice.
24 Q.  Twice.
25     Did you speak to her at either time?

Page 79

1  A.  Just the one time.
2  Q.  In October of 2024?
3  A.  Between September and October, yes.
4  Q.  Okay.  What did you-all talk about?
5  A.  The Mission Cabins and my experiences with
6  trying to get shelter.
7  Q.  Was anybody else at -- with you during that
8  conversation?
9  A.  I think Lukas was there.
10 Q.  If you remember, about how long was that
11  conversation?
12 A.  About 20 minutes.
13 Q.  And it was just about your experience in
14  getting into shelter and the Mission Cabins?
15 A.  And getting -- I was also -- that time, I was
16  there picking up one of those papers to go get an ID
17  from the DMV, the -- the voucher.
18 Q.  Sorry.
19     Just so I understand, so you were getting some
20  sort of document at the Coalition's offices to -- to --
21 A.  It's --
22 Q.  -- help you get an ID?
23 A.  Yes.  It's a voucher.
24 Q.  So you wouldn't have to pay for --
25 A.  Yes.

Page 80

1  Q.  -- the fee?
2  A.  Mm-hmm.
3  Q.  Okay.  Talk about anything else?
4  A.  No, that's it.
5  Q.  Okay.  Moving on to Lukas.
6      How are you familiar with Lukas?
7  A.  He works at the Coalition.
8  Q.  It sounds like he's your main point of contact.
9      So how many times, would you say -- can you
10  estimate of how many times you've communicated with
11  Lukas?
12 A.  Yeah.  Probab- -- a lot.  I don't know, like
13  40 times.  I...
14 Q.  And do you usually talk to him verbally?
15 A.  Verbally, yeah, and text.
16 Q.  Text?
17     So you've texted Lukas?
18 A.  Mm-hmm.  Yes.
19 Q.  E-mail?
20 A.  Yes.
21 Q.  Phone calls?
22 A.  Yes.
23 Q.  Did you produce any of the e-mails between you
24  and Lukas in response to our subpoena?
25 A.  No.

Case 4:22-cv-05502-DMR   Document 366-22   Filed 04/17/25   Page 9 of 18
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Sarah J. Stephenson
January 22, 2025

Page 89

1 there's -- you know, I didn't ever expect to be
2 homeless, and I was. And I feel like that you're
3 treated differently by everybody. I feel that you're
4 not given the same -- I came -- I -- I don't -- I hate
5 to say it like this, but it's -- normal, I was normal.
6 I went to work every day. I raised my kids. I -- you
7 know.
8     And if I -- when I became homeless, I made
9 it -- I tried very hard not to look like somebody who
10 was homeless. And most of the time, I accomplished
11 that. And so I was treated differently from day to day.
12 Very, very differently. I could use the restroom when I
13 had my hair done. I couldn't use the restroom if I had
14 just woken up and hadn't done my hair and makeup the
15 next day, by the same people.
16     So when -- a lot of the time, when I would go
17 into places like D -- you know, Department of -- you
18 know, like where you get food stamps and all of that, or
19 if I was going to a food pantry, people would ask if I
20 was there to volunteer or, you know, who I was there to
21 work with. No one ever thought I was homeless.
22     So my feelings on it are that just -- if you
23 can treat me two different ways just because of the way
24 that I look, and being in a government position or a
25 poli- -- you know, a place of authority, it's ridiculous

Page 90

1 that they're treated that way, that we're treated that
2 way. And I think that people need to open their eyes
3 and treat everybody the same a little bit. If we did,
4 then we wouldn't have all these problems.
5 Q. Thanks for sharing that.
6    Do you have any general feelings about DPW?
7 A. No.
8 Q. Would you consider yourself an advocate for
9 persons experiencing homelessness?
10 A. Yes.
11 Q. And do you have any positive things to say
12 about the City of San Francisco's policy with respect to
13 homelessness?
14    ATTORNEY KASHYAP: Objection; vague.
15    THE WITNESS: No.
16    BY ATTORNEY GRADILLA:
17 Q. Do you hold yourself out to be an expert on
18 topics related to this lawsuit, Ms. Stephenson?
19    ATTORNEY KASHYAP: Objection; vague.
20    THE WITNESS: No.
21    BY ATTORNEY GRADILLA:
22 Q. Do you have any educational and professional
23 background on issues related to the lawsuit?
24    ATTORNEY KASHYAP: Objection; vague.
25    THE WITNESS: No.

Page 91

1    BY ATTORNEY GRADILLA:
2 Q. Shifting gears a little bit.
3    Do you know what the phrase "bag and tag"
4 means?
5 A. Yes, I do.
6 Q. What is your understanding of what that means,
7 what "bag and tag" means?
8 A. That DPW should take the -- take an item that
9 is larger than is supposed to be on the street -- or any
10 item that they're going to take, they're supposed to put
11 them -- take them and put them at the yard and hold them
12 for the unhoused to come and get.
13 Q. So is -- what you just told me, your
14 understanding of what "bag and tag" means, is that your
15 understanding of what the City's bag-and-tag policy
16 requires?
17 A. Mm-hmm. It has --
18    (Reporter clarification.)
19    THE WITNESS: Oh, you -- yes. You want to know what
20 it requires? It requires it to be clean and no bugs.
21    BY ATTORNEY GRADILLA:
22 Q. Well, let me ask you a slightly better
23 question.
24    What is your understanding of what the City's
25 bag -- DPW's bag-and-tag policy is?

Page 92

1 A. It's their policy to take the things off the
2 street that can't be there when -- during the sweeps and
3 put them and hold them.
4 Q. Where did your understanding come from?
5 A. Online and from Lukas telling me.
6 Q. When you say "online," what websites did you
7 review?
8 A. When -- let's see. It was in, I guess,
9 November. They took -- they took -- the police officer
10 gave me the website, the City's website, and said that
11 that's who I needed to call.
12 Q. Sorry.
13    November of what year?
14 A. Of '23.
15 Q. Okay. So you had an interaction with a police
16 officer in November of 2023?
17 A. Mm-hmm. I asked him -- DPW took our things. I
18 didn't know that DPW had taken our things there. Our
19 things were just gone. Our entire tent.
20 Q. Do you remember where that was, what -- where
21 in the city that was?
22 A. Yeah, it was on 9th and Brannon.
23 Q. Do you remember the name of that officer?
24 A. No. He was just over at Trader Joe's.
25 Q. And so how did you get in touch with the --

Case 4:22-cv-05502-DMR    Document 366-22    Filed 04/17/25    Page 10 of 18

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Sarah J. Stephenson
January 22, 2025

Page 93

1  that officer?
2  A.  He was just there, and I walked up to him. And
3  I said that all of our things were gone, and he said,
4  "You're not allowed to have them on the street" -- or it
5  was unattended -- it was unattended.
6     And I said, "We left for a second, you know,
7  but, no, and we have every right to be here. We're --
8  HOT Team came out and measured. We're four feet.
9  Gave -- we have the clearance. And it wasn't unattended
10 and -- it was clearly not unattended."
11    And he said, "Well, you know, this is who you
12 call because they'll have your things there."
13    And I -- or, no, "This is where you can look,"
14 and he said to go on the website, the City's website.
15 And he gave us a pamphlet.
16    And I called the first number. I don't recall
17 which one. And they said -- I said -- I was still
18 unfamiliar with, like, the city, and I didn't really
19 know what street we were on at that point. And I said,
20 "By Trader Joe's," I said -- I -- I said, "You -- you
21 took our things, I think. The police officer said you
22 may have taken our things."
23    And I -- he -- he said -- I said, "Over by
24 Trader Joe's." And I said, "I'm sorry, hold on, I'm
25 going to get the street."

Page 94

1     And she said, "Oh, on Brannon and 9th."
2     And I said, "Yeah. Yeah, that's it."
3     And she said, "Oh, yeah. You can get your
4  things at the yard. You need to call this number."
5     And so then I wrote that number down, and I
6  called that number. And they said, "No, we didn't do
7  that."
8  Q.  I see.
9  A.  And then I said, "But your other lady said you
10 did."
11    And she said, "Well, she was wrong. We don't
12 have your things."
13 Q.  And just to be clear, when you said the "other
14 lady," do you mean the police officer?
15 A.  No. The lady that I called that the police
16 officer gave me the number.
17 Q.  Got it.
18    So it was a male police officer?
19 A.  Yes.
20 Q.  Who gave you a number you called.
21    And you spoke to a lady?
22 A.  Yes.
23 Q.  So you spoke to two people on the phone, sounds
24 like?
25 A.  Yes. Mm-hmm. I had to call the yard then. It

Page 95

1  was just where the things were being held, according to
2  the first lady.
3  Q.  I see.
4     And what items, if you remember, were taken?
5  A.  It was an entire tent. It was two rooms.
6  Q.  Two what? I'm sorry.
7  A.  Two-room tent. It was on Brannon and 9th,
8  right by -- right behind -- what is that -- the Airbnb
9  place with all the security guards that walk around
10 every 15 minutes. They -- oh, right across the street
11 from the car dealership.
12    And it was a two-room tent. It had a futon in
13 it. A dresser. It had table. All of my clothes. All
14 of Justin's clothes. All of our food. Our bedding.
15 Justin's tools for -- he owns a fencing business.
16    I -- I mean, just goes on. The list is huge.
17 They took everything. I mean, there wasn't even a trash
18 can left or a piece of gum. It was just all gone. And
19 that's why I knew something had happened, other than
20 we'd been robbed or something. But we didn't know about
21 DPW then.
22 Q.  And you said that was in November of 2023,
23 correct?
24 A.  Mm-hmm.
25 Q.  Do you remember, like, what date,

Page 96

1  approximately, or...
2  A.  I don't. It was towards the end of November, I
3  think.
4  Q.  I'll -- I'll come back to that later.
5     Are you -- going back to DPW's policy, are you
6  aware of whether or not the DPW's -- whether DPW's
7  bag-and-tag policy has changed over time?
8     ATTORNEY KASHYAP: Objection; calls for speculation.
9     THE WITNESS: Yeah, I don't -- I can't say. I don't
10 know.
11    BY ATTORNEY GRADILLA:
12 Q.  And have you read the DPW policy?
13 A.  Yes.
14 Q.  How many times?
15 A.  A couple, a few.
16 Q.  Do you know what versions of the DPW policy?
17 A.  It was the one that was printed over -- it was
18 in the summertime. So it would have been probably June,
19 July, and August.
20 Q.  Of what year?
21 A.  Of '24.
22 Q.  And did you get those online?
23 A.  Yes.
24 Q.  Have you ever received training on DPW's
25 bag-and-tag policy?

Case 4:22-cv-05502-DMR   Document 366-22   Filed 04/17/25   Page 11 of 18
Coalition on Homelessness, et al. v                                    Sarah J. Stephenson
City and County of San Francisco, et al.                               January 22, 2025

Page 113

1  had five minutes. You weren't even allowed to grab
2  anything. You just got told to get on a bus.
3  Q. So it's your understanding that encampment
4  resolutions are no longer happening?
5     ATTORNEY KASHYAP: Objection; misstates prior
6  testimony.
7     THE WITNESS: For me, I mean, at that -- but I don't
8  know.
9     BY ATTORNEY GRADILLA:
10 Q. So on that, how many camp -- HSOC resolutions
11 have you experienced?
12    ATTORNEY KASHYAP: Objection; vague.
13    THE WITNESS: I've been in, I think, about six.
14    BY ATTORNEY GRADILLA:
15 Q. Do you remember when those happened?
16 A. Some of them, yes. But the dates specifically,
17 no.
18 Q. Can you give me like a ballpark, like time of
19 year?
20 A. Yeah. So we had -- the first one, if that's
21 what you want to call it, the revel- -- the one that I
22 told you about on 9th and Brannon.
23    Oh. There was -- and then the second one was
24 over -- oh, by -- we were only there for a couple of
25 days. SPCA. By the SPCA.

Page 114

1  Q. Do you remember when that one was, roughly?
2  A. It was before December.
3  Q. Of '23?
4  A. Yeah. I know it was before December. And it
5  was before we were at UPS. Because it was just a couple
6  of days. But that wasn't DPW. That was just the police
7  and the SPCA, the security there.
8  Q. Okay. What about the rest?
9     You said there were about six.
10 A. Oh. Then there was the one -- there was one
11 right before -- let's see. There were two in July -- or
12 in June. And then there -- the last of them were all
13 within a one-month period, if not smaller, in -- or it
14 was June, July, and August. So there was -- yeah, they
15 were all in June, July, and August, on San Bruno and
16 Alameda, Division, yeah, and mo- -- yeah. The last one
17 was on Division.
18 Q. And so you say the last one's about how many?
19 Resolutions.
20 A. Say it again.
21 Q. You said the last ones were in June, July --
22 A. No, the --
23 Q. -- and August?
24 A. Yeah. The resolutions, yeah. There -- because
25 they all -- besides the two of them --

Page 115

1  Q. Mm-hmm.
2  A. -- all four -- the last four happened in -- on
3  San Bruno and Alameda and Division.
4  Q. Got it.
5     So there were four in the summer of 2024?
6  A. Mm-hmm.
7  Q. That happened pretty close in time?
8  A. Mm-hmm.
9  Q. Near around San Bruno, Alameda, and Division,
10 yes?
11 A. Yes. Three of them at San Bruno, Alameda --
12 San Bruno and Alameda, and one of them at Division.
13 Q. Okay. Have you ever received training on -- on
14 observing an HSOC resolution?
15    ATTORNEY KASHYAP: Objection; vague.
16    THE WITNESS: No.
17    BY ATTORNEY GRADILLA:
18 Q. So no one at the Coalition on Homelessness
19 talked to you about what to look for when DPW and other
20 City departments were engaged in an HSOC resolution?
21 A. Oh. Yeah. Well, Lukas came -- when I met him.
22 Q. Mm-hmm.
23 A. That's how I met him, is he came and told us
24 that they were coming.
25 Q. Do you remember when that was?

Page 116

1  A. It was that video, the date of the video. Is
2  that June? Sometime.
3  Q. Sorry. What video are you referring to?
4  A. The video that I gave to you guys.
5  Q. So you met Lukas during that --
6  A. Yeah.
7  Q. -- encounter?
8  A. Mm-hmm.
9  Q. A video that you say you produced to the City?
10 A. Mm-hmm. Yes.
11 Q. Do you remember when that was?
12 A. In June.
13 Q. Of '24?
14 A. Yeah, I think.
15 Q. And what did Lukas tell you?
16 A. That DPW and the police were coming to do a
17 sweep. And one -- to pack.
18 Q. Did he give you any instructions about how to
19 pack or anything else related to --
20 A. Just he gave us the policies.
21 Q. What policies?
22 A. From DPW. A copy of them.
23 Q. Did he stay there throughout the resolution?
24 A. For a short time. Not the whole time, no.
25 Q. And so what did you do when -- after Lukas gave

Case 4:22-cv-05502-DMR   Document 366-22   Filed 04/17/25   Page 12 of 18

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Sarah J. Stephenson  
January 22, 2025

Page 121

1  A. Mm-mm. No.
2  Q. Could you put a lock on it?
3  A. No.
4  Q. No.
5     And was there a sign-in sheet when you asked
6  for the bin?
7  A. No.
8  Q. Is there any other way that you noted that you
9  were there?
10 A. No. You just went and buzzed the door, and
11 they opened the door and said -- you just gave them your
12 name, and they went and got your bin -- your bin.
13 Q. And just to confirm, you were never allowed to
14 go back there --
15 A. Mm-mm.
16 Q. -- and get --
17 A. No.
18 Q. -- the -- okay.
19    And did you ever report -- earlier, you
20 testified that some items miss -- went missing from your
21 storage bin, correct?
22 A. Mm-hmm.
23 Q. Did you ever report the items missing to
24 anyone?
25 A. I asked if anyone was allowed -- like, if

Page 122

1  anybody touched them or -- you know -- and was around,
2  and he said no. He said just the people who worked
3  there. And I said that things were missing, and he said
4  that was impossible.
5  Q. Do you remember who this person was that you
6  told that to?
7  A. No.
8  Q. No.
9  A. Just the man who works in the front.
10 Q. Do you remember when -- about when that
11 conversation happened?
12 A. It was about a month before I left, I guess.
13 Because I took everything that I really, like, felt like
14 I needed, like, had to have with me.
15 Q. Okay.
16 A. Sorry.
17 Q. And when -- about when do you think that was?
18 A. I don't recall.
19 Q. Sometime towards the middle of 2024?
20 A. Mm-hmm.
21    ATTORNEY KASHYAP: Do you --
22    THE WITNESS: I'm sorry.
23    ATTORNEY KASHYAP: Do you need to take a break?
24 Why don't we go off the record for a minute.
25    THE WITNESS: She's not -- she's not going to sit.

Page 123

1     THE VIDEO OPERATOR: We are -- we are going off the
2  record. The time is 1:21.
3     (Recess taken from 1:21 p.m. to 1:23 p.m.)
4     THE VIDEO OPERATOR: We are back on the record. The
5  time is 1:22 p.m.
6     BY ATTORNEY GRADILLA:
7  Q. Okay. Ms. Stephenson, sorry, you just said
8  that you did not report any of your missing items other
9  than to one person about a month before you took all
10 your items, correct?
11 A. And I didn't really report it either. I kind
12 of asked him about it, and he said that was impossible,
13 and it was done at that. And I chalked it up to my
14 stuff is in somewhere that is, like -- I just didn't
15 really think anything. I just took it out, so...
16 Q. Got it.
17    So it was just a conversation you had with --
18 A. Mm-hmm.
19 Q. -- one another.
20    Did -- were you aware if you could report
21 missing items, whether there was a process for that?
22 A. I think that, in the beginning, you do sign
23 something. And I'm sure it probably said it in there.
24 Q. But you don't remember what that was?
25 A. No.

Page 124

1  Q. And did you take advantage of that?
2  A. No.
3  Q. Okay. Earlier today, I also asked you your
4  best estimate of the number of HSOC resolutions that you
5  observed.
6     Do you remember that?
7  A. Yes.
8  Q. And I think you said it was six, correct?
9  A. Mm-hmm. Yes.
10 Q. And, again, do you -- do you remember the last
11 one you observed, or around when that was?
12 A. It was like two days after the law was passed,
13 so I don't -- was that in August?
14 Q. And when you say "after the law was passed,"
15 what are you referring to?
16 A. The sit law, sleep -- well, not passed, but it
17 went into effect. Sit, sleep, lie law, whatever it is,
18 the one that you can be arrested for.
19    I think it was August. It was on Division.
20 Q. Of '24, August of '24?
21 A. Mm-hmm. Yes.
22 Q. "Yes"?
23    And, again, sitting here today, do you remember
24 when the first HSOC resolution was that you observed?
25    ATTORNEY KASHYAP: Objection; vague. Objection;

Case 4:22-cv-05502-DMR   Document 366-22   Filed 04/17/25   Page 13 of 18

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Sarah J. Stephenson
January 22, 2025

Page 125

1  asked and answered.
2      **THE WITNESS:** The first one that I was -- the one on
3  9th and Brannon, and -- and that was in November or
4  December, I guess.
5      **BY ATTORNEY GRADILLA:**
6  Q.  Of '23?
7  A.  Yes.
8  Q.  Okay.  Sitting here today, can you recall the
9  first time that you thought you saw a violation of the
10 bag-and-tag policy?
11     **ATTORNEY KASHYAP:** Objection; vague, calls for a
12 legal conclusion.
13     **THE WITNESS:** Yeah, I thought it was illegal when
14 they took the things at 9th and Brannon.  But I didn't
15 really know then, like, who DPW was or anything, and
16 that's when I started doing research and whatnot.
17     **BY ATTORNEY GRADILLA:**
18 Q.  And when was the first time that you thought
19 there were systematic -- systematic problems with DPW
20 following the ball -- the bag-and-tag policy?
21     **ATTORNEY KASHYAP:** Objection; assumes facts not in
22 evidence, vague.
23     **THE WITNESS:** When I had been involved in probably
24 two of them, just seeing that the same thing was
25 happening over and over again.

Page 126

1      **BY ATTORNEY GRADILLA:**
2  Q.  How many times do you think the -- do you
3  believe -- sorry.
4      How many times do you believe the City has
5  wrongfully discarded your property?
6  A.  Six times.
7  Q.  And the six times that you're referring to are
8  the ones we talked about earlier today?
9  A.  Yes.  Of my things, yes.
10 Q.  How many times do you believe you -- you've
11 observed the City wrongfully discard someone else's
12 property?
13     **ATTORNEY KASHYAP:** Objection; vague, calls for
14 speculation.
15     **THE WITNESS:** A lot.  Well, I'm going to say -- for,
16 like, each individual person at the encampments?  I
17 mean, I saw everyone's things being wrongfully taken,
18 but I can't speak on their experience.
19     **BY ATTORNEY GRADILLA:**
20 Q.  Do you have a best estimate of how many times,
21 though, you saw that?
22     **ATTORNEY KASHYAP:** Same objections.
23     **THE WITNESS:** Every time I saw it happen, and so
24 that would be about six times -- the times, amount I saw
25 it, so...  I mean, it was a lot.

Page 127

1      **BY ATTORNEY GRADILLA:**
2  Q.  But you can't give me a number?
3  A.  24.
4  Q.  Have you ever been to the DPW storage yard?
5  A.  No.  Just called them.  My things were never
6  stored there.
7  Q.  Outside of the time you allege -- or you think
8  that the City wrongfully discarded your things, have you
9  ever left something on the street, expecting it to be
10 there when you got back, and it was gone?
11 A.  Outside of the times I told you?
12 Q.  Mm-hmm.
13 A.  No.
14     **ATTORNEY GRADILLA:** I think we're at Exhibit 84?
15     **THE REPORTER:** Yes.
16     **ATTORNEY GRADILLA:** Show you what I'm going to put
17 as Exhibit 84.
18     (Deposition Exhibit 84 was marked for
19 identification.)
20     **BY ATTORNEY GRADILLA:**
21 Q.  Ms. Stephenson, do you see this document that I
22 just gave you says at the bottom right -- has an
23 alphanumerical number saying -- that says COH01525308?
24 A.  Mm-hmm.  Yes, I do.
25 Q.  And at the top, it has your name --

Page 128

1  A.  Yeah.
2  Q.  -- Sarah Stephenson?
3      Do you recognize this document?
4  A.  Yes.
5  Q.  What is it?
6  A.  My declaration.
7  Q.  Your declaration for what?
8  A.  Two of the times that I -- there was a sweep
9  done and they took my things.
10 Q.  Did you write this yourself?
11 A.  Yes.
12 Q.  Did you write it on a computer?
13 A.  Yes.
14 Q.  Did anyone help you put this together?
15 A.  Lukas was there and -- and helped me, yeah.
16 Q.  And when did you write it?
17 A.  Oh, what does it say?  I don't remember.  Let's
18 see.  It was on August 5th.
19 Q.  Did you write it all in one day?
20 A.  Yeah.  Well, kind of.  I had a notebook.  I
21 kept -- I have -- I had a notebook that I wrote down my
22 stuff in.
23 Q.  Do you still have that notebook?
24 A.  No.  I wish.
25 Q.  When did you lose that notebook?

Case 4:22-cv-05502-DMR   Document 366-22   Filed 04/17/25   Page 14 of 18

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Sarah J. Stephenson
January 22, 2025

Page 137

1  time, I'm sure.  I think I got a business card,
2  actually, but -- no.
3  Q.  Okay.  You also mention in paragraph 3 that a
4  firefighter approached you.
5      Do you --
6  A.  Warning us of the sweep.
7  Q.  The firefighter warned you of the sweep?
8  A.  Mm-hmm.
9  Q.  Do you remember that firefighter's name?
10 A.  No.
11 Q.  Can you describe him?
12 A.  He talked to Justin, actually.
13 Q.  He didn't -- he didn't talk to you at all?
14 A.  I was there in close proximity, but we were --
15 I was standing right there, but he was -- I don't -- I
16 don't think I looked at him.  I think it was, like,
17 there's a sweep, hurry, get your stuff, you have five
18 minutes, you know.
19 Q.  He said "hurry"?
20 A.  No, that's what I was thinking in my head.
21 Q.  I see.
22     Then you go on to say, in paragraph 3, that:
23 "He," the firefighter, "told us that the City would be
24 sweeping our area at 1:30 PM that day.  I asked him if
25 the City would bag and tag our property.  Without

Page 138

1  answering, he walked away and called someone."
2  A.  Mm-hmm.
3  Q.  How did you know to ask about bag and tagging?
4  A.  From Lukas.  Well -- yeah, I mean, from that
5  and looking on the -- on the website.  I mean,
6  everything.  I mean -- but...
7  Q.  So before July 22nd, you had reviewed the DPW
8  website that had the bag-and-tag policy?
9  A.  Yes.  There was -- that was two sweeps before
10 that, I think.  I'm sorry if, like, it gets jumbled.
11 I -- like I said, my dates are messed up.
12 Q.  So when you -- when you asked about the bag and
13 tagging, what property were you asking about bagging and
14 tagging?
15 A.  Specifically, it was the -- the items that
16 aren't allowed.  It was the -- I wanted the -- the
17 couch, the ottoman, our futon.
18 Q.  So furniture that you had with you?
19 A.  Mm-hmm.
20 Q.  Anything other than furniture?
21 A.  I wanted other things, but I didn't think that
22 it would be -- I didn't think that it -- I didn't think
23 that the stuff would be safe, like, where it was going,
24 so it was like I'll take what the important things, and
25 the rest, then, you can just throw away.  But we took

Page 139

1  everything we could take.  We wanted to take everything.
2  We would have taken everything, if we had had the time.
3      But they didn't give us -- I mean, that time
4  was the only time that someone came and asked us --
5  like, gave us warning besides Lukas the first time.  The
6  other times, they were just there out of nowhere.  Like,
7  that was the only time that we ever had warning to even
8  pack, and that was only 15 minutes.  And I -- and, yes,
9  I had a lot of things, but it was all clean and kept
10 nicely.
11 Q.  So at this -- on July 22nd, the -- what we're
12 talking about right now, the incident you're referring
13 to in your declaration --
14 A.  Mm-hmm.
15 Q.  -- you didn't have prior warning, is what
16 you're saying?
17 A.  No.
18 Q.  You didn't see a notice anywhere?
19 A.  No.  With the notices -- I do know what you're
20 talking about.  I've seen the notices.  They will put up
21 a notice, like, three blocks away, saying they're going
22 to do it for -- or they're going to -- they, you know --
23 you know how long Van Ness is or San Bruno.  They'll put
24 the notice down here (indicating), you know, and -- you
25 know, two, three, four, five blocks away, and then say,

Page 140

1  "Oh, yeah, notice is posted."
2      You don't get very far when you're walking a
3  whole lot of places, so it's -- it's -- it's difficult
4  to say that it was posted for there, like -- I don't
5  know.
6  Q.  So for this incident --
7  A.  No, none of them, did I ever see a post for
8  mine.
9  Q.  Did you --
10 A.  I've seen them, though, yes.
11 Q.  Did you look around July 22nd --
12 A.  Yes.
13 Q.  -- for the notices?
14 A.  Yes, I did, actually, because -- and that one,
15 there were no notices for that one.  But how I know that
16 they were posted so far away was a different one.  I was
17 like, "Well, here's the notice."  It was like two weeks
18 later.  I said, "Here's the notice we were supposed to
19 get."  And it was like six blocks from where we were
20 staying.
21 Q.  I'm sorry.  Just to be clear.
22     For a different resolution, not --
23 A.  Yeah.
24 Q.  Okay.  So this was in the future?
25 A.  Just -- yeah, it's just in regards to how I

Case 4:22-cv-05502-DMR    Document 366-22    Filed 04/17/25    Page 15 of 18
Coalition on Homelessness, et al. v                                            Sarah J. Stephenson
City and County of San Francisco, et al.                                       January 22, 2025

Page 141

1  know that the notices are posted so far away.  They were
2  not posted anywhere near our tent.
3  Q.  Got it.
4      And so for the July 22nd incident --
5  A.  There was nothing.
6  Q.  And you didn't go look?
7  A.  Did I look for them?
8  Q.  Mm-hmm.
9  A.  Yeah.
10 Q.  You did?  When?
11 A.  Specifically for the reason of taking a picture
12 of it and -- or -- or lack thereof, so that I could show
13 that -- when I tried to, you know, get my stuff back,
14 that there were no posts.  Because that's all everybody
15 wanted, was, like, proof.  And it was hard -- you know,
16 it's, like, I don't have any proof, you know.  I'm
17 going -- I'm telling you what I know, because I'm not
18 lying, and that's all I have.  And the police always
19 wanted proof of this, and DPW wanted proof of this.  And
20 I was, like, I'll go take a picture of it, and then it
21 wasn't there.
22 Q.  So my question is:  When did you do that?
23 A.  Right afterwards, I think.
24 Q.  Okay.
25 A.  Like --

Page 142

1  Q.  And where --
2  A.  -- like --
3  Q.  -- where did you go?
4  A.  All around San Bruno and -- and, like, up by --
5  what's that, the Public Storage and Safeway over there.
6  Q.  And about --
7  A.  The same places that I saw the other ones that
8  were posted that one time.
9  Q.  And about how long would you say you spent
10 trying to look for a notice?
11 A.  Not more than a half hour.  But, I mean, I
12 looked for them when we were out and about, so...
13 Q.  So paragraph 4, going back to your declaration,
14 you -- you say: "After the firefighter walked away, I
15 walked up to a Homeless Outreach Team worker and asked
16 if he could get us into a shelter.  He told me that I
17 had to wait until 1:30.  Another HOT worker then began
18 to talk to my partner.  After doing so, he told us that
19 they could not get us into shelter."
20     Are those the same HOT workers that you
21 referenced --
22 A.  Yeah.  It --
23 Q.  -- awhile ago?
24 A.  I think it's put backwards or I'm saying it
25 backwards.  But I would go with what's on here because

Page 143

1  that was -- it was fresh in my mind then.
2  Q.  Okay.  So, sorry, when you say it's
3  "backwards," what do you mean?
4  A.  It -- the -- the firefighter came first, and
5  then I talked to the HOT Team.
6  Q.  Okay.
7  A.  Yeah, that's what it says.  Yeah.
8  Q.  And then, paragraph 5, you say:  "The
9  firefighter walked -- then walked up to me and told me
10 the City would bag and tag our property.  He told me to
11 arrange my property into neat piles for them to
12 collect."
13     What property did -- were you putting into neat
14 piles?
15 A.  Okay.  So he -- there's a -- there's a -- a
16 pillar, like, where we were; like, we built off of a
17 pillar.
18 Q.  Mm-hmm.
19 A.  And on the other side of the pillar, he said to
20 put everything there.  Put it -- just put everything on
21 that side on this wall of the pillar that we wanted
22 bagged and tagged.  And I said, "Okay."
23     And so Justin and I went about putting things
24 over there that we wanted taken by the City and put and
25 stored.  And then we had a pile for what they could

Page 144

1  take, and then we had -- and then we had, like, a pile
2  of things, like, that were for us.
3  Q.  So I'm going to show you what I'm going to mark
4  as Exhibit 85, I believe.
5     (Deposition Exhibit 85 was marked for
6     identification.)
7     BY ATTORNEY GRADILLA:
8  Q.  And I'll just note that it's designated as
9  Highly Confidential, Attorneys' Eyes Only, which is part
10 of the reason why we had you sign a protective --
11 A.  This toward --
12 Q.  -- order.
13     ATTORNEY KASHYAP: Wait for the question.
14     BY ATTORNEY GRADILLA:
15 Q.  So you were just describing a pillar in what
16 was the situation on July 22nd.
17     Ms. Stephenson, can you describe the
18 Exhibit 85, the picture at Exhibit 85?
19     What -- what is -- what is this?
20 A.  That's where we're staying.  That was my
21 kitchen.  This is the pillar (indicating).
22 Q.  Do you see two people in this photograph?
23 A.  Yeah.  That's me and Justin.
24 Q.  I'm sorry?
25 A.  That's me and Justin.

Case 4:22-cv-05502-DMR    Document 366-22    Filed 04/17/25    Page 16 of 18
Coalition on Homelessness, et al. v                                    Sarah J. Stephenson
City and County of San Francisco, et al.                                January 22, 2025

Page 149

1  A.  I said -- he said -- he said, "Do it quickly."
2  He was -- he was -- he was, like, rushing us along.  And
3  I said, "If you want it done more quickly, come and
4  help."
5  Q.  Did you ask for a specific amount of time to be
6  done?
7  A.  I asked -- yes, I asked.  But I said, "This
8  isn't enough time.  Obviously, I have a lot of stuff."
9     And he said, "Well, obviously, you shouldn't
10 have a lot of stuff.  You're homeless.  How do you do,
11 da, da, da."
12    I said, "This is where I live.  I'm making it a
13 home.  I mean, it's my house."
14    I wanted to live, like, normal while we were
15 trying to do this.  We weren't getting any help from the
16 City.
17 Q.  So going back to the paragraph -- sorry.
18    Going back to the declaration, at paragraph 7,
19 you say that you had:  a chair, a long chest, a vanity,
20 a mirror, a table, two cots, three rugs, and a couch.
21    Do you see that?
22 A.  Mm-hmm.
23 Q.  Is that -- sitting here today, do you remember,
24 is that an accurate list of what you had?
25 A.  Oh, no.  I mean, when they -- when we

Page 150

1  condensed, I mean, that list went from an entire page of
2  things to that.  But it was --
3  Q.  When you say --
4  A.  -- irrelevant.
5  Q.  When you say "when we condensed," what are
6  you --
7  A.  Yeah, when they --
8  Q.  -- referring to?
9  A.  -- told me to condense.  I mean, Justin and I
10 kind of just, you know, said all right.  It was -- I'm
11 not here for the things back.  Like, you guys are making
12 this all about my things, my things, my things.  Screw
13 the things.  Like, you guys broke the laws and violated
14 me.  You took my stuff.  I don't care for the things
15 back.  I don't care for the money.  I want this to stop.
16 Q.  Ms. Stephenson --
17 A.  I'm sorry.
18 Q.  -- I --
19 A.  This isn't about stuff.
20 Q.  I understand it's difficult, but I'm going to
21 ask you to limit your responses to the questions I ask.
22    ATTORNEY KASHYAP:  Do you -- do you need a break?
23    THE WITNESS:  No.
24    ATTORNEY GRADILLA:  We can take a break.
25    ATTORNEY KASHYAP:  Why don't we take five minutes.

Page 151

1  Let's just take five minutes.  Thank you.
2     ATTORNEY GRADILLA:  Mm-hmm.
3     ATTORNEY KASHYAP:  Sarah, why don't you come with
4  me.
5     THE WITNESS:  Yeah, I'm sorry.
6     ATTORNEY KASHYAP:  No, it's okay.
7     THE VIDEO OPERATOR:  We are going off the record.
8  The time is 1:54.
9     (Recess taken from 1:54 p.m. to 2:04 p.m.)
10    THE VIDEO OPERATOR:  We are back on the record.  The
11 time is 2:04 p.m.
12    BY ATTORNEY GRADILLA:
13 Q.  Ms. Stephenson, before the break, we were
14 discussing your -- where you were living in July of
15 twenty -- July 2022, 2024.
16    Do you remember that?
17 A.  Mm-hmm.
18 Q.  And --
19 A.  Yes.
20 Q.  And we were looking at Exhibits 84 and 85, I
21 believe.
22 A.  Yes.
23 Q.  Which is your declaration and a picture of --
24 of your encampment, correct?
25 A.  Mm.  Yes.

Page 152

1  Q.  Can you describe the conditions of your
2  encampment at that time?
3  A.  There was a little front area that had a couch
4  and a rug and a little kitchen set up.  There was a
5  vanity, where I did my makeup and had my clothes.  And
6  then around the pillar, there was a tent with two cots
7  and a futon on top of it, a futon mattress, that we used
8  as a bedroom.
9  Q.  The cots and the mattress were a bedroom?
10 A.  Inside the tent, yes.
11 Q.  And in the picture at Exhibit 85, you see what
12 I think are tarps, or there's some sort of draping
13 material that's white and another one that's blue.
14    Do you see that, in the middle of the picture?
15 A.  Yeah.  The white thing is a shower curtain, and
16 the blue thing is a blanket.
17 Q.  Okay.  And you're using that to cover the area,
18 correct?
19 A.  Yes.
20 Q.  How long had you been staying -- staying at
21 this area?
22 A.  We had been there for quite some time.  That
23 was in June.  So February until June.
24 Q.  Of 2024?
25 A.  Yes.

Case 4:22-cv-05502-DMR   Document 366-22   Filed 04/17/25   Page 17 of 18

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Sarah J. Stephenson  
January 22, 2025

Page 169

1  A.  I know that -- I know for sure that they took
2  the -- the bed that time.
3  Q.  Sorry.  I think I misheard you.
4     You -- you kept the chest?
5  A.  Yeah.  That time.  They took the beds that
6  time.  I don't recall the rest.
7  Q.  The two cots?
8  A.  Mm-hmm.  And all the bedding.
9  Q.  Okay.  So starting with the chair, can you
10 describe the chair?
11    Is it the chair at Exhibit 85, the one with the
12 black and white?
13 A.  Yes.
14 Q.  That's the chair you referred to in your
15 declaration?
16 A.  Yes.
17 Q.  How would you describe the condition that it
18 was in at the time?
19 A.  The chair?
20 Q.  Yes.
21 A.  Clean.
22 Q.  And sitting here today, do you know what
23 happened to that chair?
24 A.  No.
25 Q.  Okay.  So it's possible that DPW did not take

Page 170

1  it?
2  A.  No.  I just don't know when they took it, or if
3  they took it that time or if they took it the next time
4  or if we left it there.
5  Q.  Did you see them take it?
6  A.  Not specifically that chair, no.
7  Q.  No.
8     So just to be clear, you did not see DPW take
9  the chair --
10 A.  No, I didn't.
11 Q.  Okay.  The long chest, you just told me that
12 you kept it this time, correct?
13 A.  Yep.  But I saw DPW take it the next time.
14 Q.  Sorry.
15    July 22nd, DPW did not take it that time?
16 A.  Oh, actually, no.  Yes, they did.  This is the
17 time that they came and got us a second time on the same
18 day.  And the same instance.  We moved over there, and
19 they came and took our stuff from us over there.  And
20 that's on video.
21 Q.  So you saw DPW take the long chest?
22 A.  Yep.  I did.
23 Q.  Can you describe the long chest?
24 A.  Yes.  It's like an ottoman, a large ottoman.
25 Q.  Was there anything distinctive about it?

Page 171

1  A.  It was white.  It was white, and it had buttons
2  on the top.
3  Q.  And when did you first get the long chest?
4  A.  Justin brought it home from somewhere.  I don't
5  remember where.
6  Q.  But you didn't get it yourself?
7  A.  No.
8  Q.  And how long had you had it before DPW took it?
9  A.  I don't recall.
10 Q.  Did you attempt to get it back?
11 A.  They threw it in the garbage.
12 Q.  You saw them throw it in the garbage?
13 A.  Yes.
14 Q.  Not a truck, but a garbage?
15 A.  They threw it inside of the truck.  They threw
16 it in there.  It was garbage.  They threw it with
17 garbage.
18 Q.  I guess what I'm trying -- what I'm trying to
19 understand is what you saw.
20    So you saw them throw it into a truck, yes?
21 A.  Yes.
22 Q.  And are you saying that there was garbage on
23 the truck?
24 A.  Yes.
25 Q.  Or in the truck?

Page 172

1  A.  Yeah.
2  Q.  How do you know it was garbage?
3  A.  Because they took it from us and said they were
4  throwing it away.
5  Q.  Did you ever attempt to replace the long chest?
6     ATTORNEY KASHYAP:  Objection; vague.
7     THE WITNESS:  I guess I attempt to replace it all
8  the time, like everything.  We just replaced it, chalked
9  it up.
10    BY ATTORNEY GRADILLA:
11 Q.  So -- but you didn't get another long chest --
12 A.  No, I didn't.  I'm sorry.
13 Q.  The vanity.
14    Did DPW take the vanity that day?
15 A.  Yes, they did.
16 Q.  You saw them take it?
17 A.  Yes.
18 Q.  Was there anything distinctive about the
19 vanity?
20 A.  No.  Justin built it.
21 Q.  He built it?
22 A.  Yes.
23 Q.  Using what?
24 A.  Old, like -- like, countertops.
25 Q.  Where'd he get the old countertops?

Case 4:22-cv-05502-DMR    Document 366-22    Filed 04/17/25    Page 18 of 18

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Sarah J. Stephenson
January 22, 2025

Page 201

1  Q.  And so this -- this bike that you reference
2  here that was related to the August 2nd incident, did
3  you see that bike being taken by anyone?
4  A.  Yes.
5  Q.  Who?
6  A.  Wait.  On August 2nd?
7  Q.  August 2nd.
8  A.  Yes.  I saw them take everything that day.
9  Q.  And by "them," you mean DPW?
10 A.  Yes.
11 Q.  Do you remember if it's the same bike as in
12 Exhibit 85?
13 A.  No, it wasn't.
14 Q.  It wasn't?
15    How did Justin get that bike that was taken on
16 August 2nd?
17 A.  He traded work for it.  He is a fencing
18 contractor.
19 Q.  Okay.  Do you remember when that happened?
20 A.  The work?
21 Q.  The trade, yes.
22 A.  No, I don't.
23 Q.  No.
24    And did he tell you that that's how he got it?
25    Is that how you know?

Page 202

1  A.  Yes.  He worked for a lady that we met when we
2  first got here on Guerrero.
3  Q.  What about the iPad; did -- did -- was that
4  your iPad?
5  A.  It was ours, yes.
6  Q.  When did you get that iPad?
7  A.  I don't recall.  That was one -- I don't
8  recall.
9  Q.  Did you have that on July 22nd?
10 A.  I think so, yes.
11 Q.  How did you -- where was it that you were able
12 to keep that?
13 A.  I don't know.
14 Q.  It was in the blue suitcase?
15 A.  I was arrested.  I don't know.
16 Q.  So you had the blue iPad.
17    Do you remember for how long?
18 A.  No.
19 Q.  No.
20    Did you see DPW take the iPad?
21 A.  I saw them take everything.
22 Q.  When you say you saw them take everything,
23 piece by piece, or was it in storage, or what do you
24 mean by that?
25 A.  They -- when they go in there, they kind of

Page 203

1  just start shoveling things and putting it in the trash
2  can.  And we were sitting on the sidewalk.
3  Q.  Do you remember where the iPad was on August --
4  August 2nd?
5  A.  It was inside of the 49ers thing.
6  Q.  The 49ers canopy?
7  A.  Yeah.
8  Q.  I'm sorry.  I guess I don't understand.
9     What's a -- what's a canopy?  Can you describe
10 that to me?
11 A.  Like -- like the little canopies with the four
12 legs --
13 Q.  Mm-hmm.
14 A.  -- that stands up, and it had a 49ers tarp-like
15 thing on it, like a -- you know, the co- -- the cover
16 that goes on top of it.
17 Q.  I see.
18    And so are you saying the iPad was underneath
19 that?
20    It wasn't --
21 A.  It was inside, but there was also the thing
22 that went around the outside.
23 Q.  Mm-hmm.
24    What else was underneath the canopy?
25 A.  His bike stuff.  We were -- the best I can tell

Page 204

1  you is what's in here, and that I was allowed to take,
2  like, a bag that I was allowed to pack for like two
3  minutes.
4  Q.  I'm sorry.
5     For how long?
6  A.  Two minutes, if -- I wasn't even allowed to
7  pack it.  Like, they told me I wasn't -- they
8  specifically said, "We are not here to let you pack
9  anything.  We don't have to do that anymore."
10 Q.  Who's "they"?
11 A.  The police.
12 Q.  The police, not DPW?
13 A.  No.
14 Q.  And so -- but DPW workers were the ones who
15 took your items?
16 A.  Yes.
17 Q.  How'd you know they were DPW workers?
18 A.  Because they had their DPW truck and DPW
19 outfits on.
20 Q.  You see, at the bottom of your declaration,
21 where you say that you "declare under penalty of perjury
22 that the foregoing is true"?
23 A.  Yes.
24 Q.  Do you still stand by that?
25 A.  Yes.