# EXHIBIT 17

To

Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v.*
*City and County of San Francisco, et al.*

*Patrick Dubose*
*February 3, 2025*

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 44026Dubose_nl.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR    Document 366-23    Filed 04/17/25    Page 3 of 12
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.
Patrick Dubose
February 3, 2025

Page 65

1  I don't -- I don't like the "look at me, look
2  at me." I wasn't out there trying to -- I was just
3  trying to -- to survive, you know, just get my feet back
4  on the ground, you know.
5  Q. I understand.
6  I'm trying to understand for right now, for the
7  incident that -- that you mentioned at the Marina behind
8  the Safeway, what -- to the extent you remember, what
9  your living situation was like, meaning the things that
10 you had with you.
11  So if we could focus on that, I'd -- I'd --
12  ATTORNEY FREEMAN: He's already given you a partial
13 list. Do you want --
14  THE WITNESS: I -- I mean, clothing --
15 BY ATTORNEY GRADILLA:
16  Q. Mm-hmm.
17  A. -- bedding, food --
18  Q. Mm-hmm.
19  A. -- and something to cook food on.
20  Q. And now kind of just, again, helping me
21 understand where this was, where were you? You
22 mentioned that it was behind a Safeway.
23  A. Behind a Safeway.
24  Q. And so was it, like, adjacent to the Safeway?
25 Was it in the parking lot?

Page 66

1  A. Behind Safeway. Like the Safeway and then
2  behind it. It would be -- yeah, a park -- a -- a
3  sidewalk --
4  Q. Mm-hmm.
5  A. -- you know, that would be big enough to have a
6  tent and then still walking path, you know.
7  I tried to stay out of people's way without --
8  you know, it's not -- the stares and the looks that you
9  get when you're living in that -- it's not something
10 that you want to -- you know, you don't want to be --
11 you're not -- I'm not trying to parade myself out there,
12 you know.
13  Q. I understand.
14  A. I go there in the morning. I sleep. I sleep
15 in the evening, and I leave during the day trying to
16 find work, something to eat.
17  Q. And how long had you been staying there at that
18 time when the -- from the day the resolution happened,
19 how long had you been there?
20  A. Which -- which -- which -- which one?
21  Q. At the Marina. Again, I just want to focus on
22 that one first.
23  A. I don't think it was probably two months. Just
24 seemed like just as you get comfortable, they come take
25 it.

Page 67

1  You know, the problem would be one person
2  attracts another person, will attract another person.
3  And then if it would get, you know, three or four tents,
4  then --
5  ATTORNEY FREEMAN: I think you've answered the
6  question.
7  BY ATTORNEY GRADILLA:
8  Q. So were there other tents with you at the
9  Marina?
10  A. Not my tents, no.
11  Q. No. I understand.
12  But were there other people camping near you?
13  A. There were individuals who had tents, yes.
14  Q. Do you remember about how many?
15  A. That's how it would be called an encampment.
16  Q. Do you remember about how many?
17  A. Not exactly.
18  Q. Do you remember if it was -- the day of the --
19 of the resolution at the Marina, do you remember what
20 the weather was like that day?
21  A. Like today.
22  Q. Gray, cloudy?
23  A. At the Marina, it's always a little bit windy,
24 but it wasn't bad.
25  Q. Was it raining?

Page 68

1  A. I don't believe it was raining, no.
2  Q. Was it wet outside? Because it's wet outside
3  today.
4  A. I -- I -- I couldn't -- I couldn't recall, to
5  tell you the truth.
6  Q. Okay. So I want to take you again back to that
7  day in the Marina behind the Safeway where you say you
8  experienced an encampment resolution.
9  So you don't remember exactly what the weather
10 was like, but do you remember if there was garbage near
11 your encampment?
12  A. I wouldn't know that. People have garbage
13 around me.
14  Q. Were there any --
15  A. I would be --
16  Q. -- rodents?
17  A. -- an enforcer of that.
18  Q. Were there any rodents or fleas or anything
19 like that?
20  A. No. I'm not an animal.
21  Q. Were there drug paraphernalia --
22  A. No.
23  Q. -- around the encampment?
24  A. I wouldn't put up with that.
25  Q. Any human waste?

Case 4:22-cv-05502-DMR   Document 366-23   Filed 04/17/25   Page 4 of 12
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Patrick Dubose
February 3, 2025

Page 69

   1   A.  No.
   2   Q.  What about food, like rotten food?
   3   A.  No.
   4   Q.  Cooking equipment?
   5   A.  Inside my tent.
   6   Q.  Do you know elsewhere in the encampment?
   7   A.  Excuse me?
   8   Q.  Elsewhere in the encampment, do you know if
   9  there was cooking equipment?
  10   A.  No, I don't.  I couldn't -- I couldn't tell
  11  you.
  12   Q.  And again, just all my questions right now are
  13  about the Marina encampment.
  14   A.  Mm-hmm.
  15   Q.  Was there, like, a setup for electricity?
  16   A.  No.
  17   Q.  Did you have a phone with you that -- that time
  18  around -- around that time?
  19   A.  I'm sure I did.
  20   Q.  How would you charge your phone?
  21   A.  At the park.
  22   Q.  There are outlets at the park?
  23   A.  Mm-hmm.
  24   Q.  What about heating equipment, like -- I don't
  25  know -- like space heater or anything like that?

Page 70

   1   A.  No.
   2   Q.  No.
   3       Do you think that there was anything that could
   4  be viewed as a health hazard?
   5       ATTORNEY FREEMAN: Object; calls for speculation, no
   6  foundation.
   7       THE WITNESS: No.
   8  BY ATTORNEY GRADILLA:
   9   Q.  Anything that could be viewed as soiled or
  10  moldy?
  11       ATTORNEY FREEMAN: Same objection.
  12          You may answer.
  13       THE WITNESS: I wouldn't live in that kind of
  14  environment.
  15  BY ATTORNEY GRADILLA:
  16   Q.  Is there anything else about the encampment or
  17  anything I should know about?
  18       ATTORNEY FREEMAN: Objection; calls for speculation,
  19  no foundation.
  20       THE WITNESS: I don't think you need to know.  I
  21  mean, I -- I don't know what you need to know, to tell
  22  you the truth.  I don't know.  I'm not -- I'm not...
  23  BY ATTORNEY GRADILLA:
  24   Q.  So, again, going back to that day where you're
  25  experiencing the resolution, were you there -- well,

Page 71

   1  just -- let me ask a different question.
   2       What happened that day?
   3   A.  I left in the morning.  And when I came back,
   4  my stuff was gone.
   5   Q.  When you say you left in the morning, what time
   6  was that?
   7   A.  Probably 10:00.
   8   Q.  10:00 a.m.?
   9   A.  Mm-hmm.
  10   Q.  And where did you go?
  11   A.  I would go out recycling.  I was recycling.  I
  12  was doing quite a bit of recycling back then.  I would
  13  go to the park, go through wherever they would have an
  14  event, and -- and collect cans.
  15   Q.  And were you living with anyone -- or, rather,
  16  was anyone else living with you in your tent at that
  17  time?
  18   A.  Shelly.
  19   Q.  And was she at the --
  20   A.  No.
  21   Q.  -- there that day?
  22   A.  She was with me.
  23   Q.  So you would both go recycling?
  24   A.  Mm-hmm.
  25   Q.  So you'd go out at 10:00 a.m. that morning.

Page 72

   1  You go out recycling.
   2       Do you remember where -- which park you went
   3  to?
   4       ATTORNEY FREEMAN: That particular day?
   5       ATTORNEY GRADILLA: Yes.
   6       THE WITNESS: Oh, I -- there was, like, a little
   7  route I would have that I would go to.  And then, you
   8  know, some of the residents -- some of the businesses, I
   9  would sweep their -- I would sweep their -- in front of
  10  the building or clean up their little trash area, and
  11  they would let me -- they would save their recyclables
  12  for me.  And then just a little -- you know, I don't --
  13  I don't -- recycle is recycle.
  14  BY ATTORNEY GRADILLA:
  15   Q.  So you were out there for some period of time.
  16       Do you remember about what time you returned to
  17  your encampment?
  18   A.  Probably just before dark.
  19   Q.  So evening --
  20   A.  I was gone most of the day.  I was gone all
  21  day.
  22   Q.  So you get back, and what did you see?
  23   A.  A few of the other folks who were living in the
  24  tents next to me were pretty upset because their stuff
  25  had been taken too.  And I saw the spot where my tent

Case 4:22-cv-05502-DMR   Document 366-23   Filed 04/17/25   Page 5 of 12

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Patrick Dubose
February 3, 2025

Page 73

1  used to be.
2  Q.  So in that morning, before you left, what was
3  there?  What of your stuff was there?
4  A.  Everything I owned.
5  Q.  So it was all in a tent?
6  A.  It was all in the tent.
7  Q.  Okay.  And you got back and --
8  A.  Everything was gone.
9  Q.  Nothing was left?
10  A.  Nothing was left.
11  Q.  Who do you think took your things?
12  A.  DPW.
13  Q.  And why do you think that?
14  A.  People who witnessed it and other -- I was told
15  by people who witnessed it, saw it happen, and -- it was
16  always DPW.  I mean, it was -- it was known.
17  Q.  But you didn't see it.  So you had a
18  conversation with someone.
19      What did they tell you?
20  A.  "They came through and took your stuff."
21  Q.  And who were these people?
22  A.  Who were what people?
23  Q.  Who told you that your -- your things were
24  gone.
25      Do you remember their names?

Page 74

1  A.  I don't know their names.  I -- I...
2  Q.  Nicknames or anything?
3  A.  I can't recall their names.  I stick to myself
4  mostly.
5  Q.  Can you give me a description of who --
6  A.  The only reason I would live next to anybody
7  would be just for safety reasons, not to get to know
8  them personally.
9  Q.  Understood.  But you said you spoke to someone.
10      So can you give me a description of who this
11  person was, or persons?
12  A.  Like what?  Five foot tall, brown hair?
13  Q.  Whatever you remember.
14  A.  There seemed to be a know-it-all kid there.  He
15  always knew what was going on.  His name was -- what's
16  his name? -- Jason.  He always seemed to know what was
17  going on.  He didn't live there, but he always knew what
18  was going on.  He's a nosy dude.
19  Q.  Did you ask Jason or anyone else to --
20  A.  No.  He --
21  Q.  -- watch your belongings while you were gone?
22  A.  No.
23  Q.  Did you ask anyone to watch your belongings
24  while you were gone?
25  A.  No.

Page 75

1  Q.  Was it your practice or your habit, I guess, to
2  just leave your -- your belongings and go without
3  telling anyone that you were going to be gone?
4  A.  It's nobody's business.
5  Q.  Okay.
6  A.  I would clean up my stuff, make everything nice
7  and tight, and then go what I had to do today -- during
8  the day to...
9  Q.  And was that the first time that you believe
10  the City wrongly took your belongings?
11  A.  Yeah.
12  Q.  So it hadn't happened anytime before?
13  A.  Not to me personally, no.
14  Q.  And you have no recollection of when in time
15  this was, like -- like the time of year, if it was
16  around any holidays or anything like that?
17  A.  I can picture, but I can't -- September.  I
18  couldn't say -- I couldn't tell you without being a
19  hundred percent sure.  So I can't help but speculate.
20  Q.  Your best guess, like -- I know you told me
21  that you -- the last car you had was a Nissan.
22      Do you have any recollection of, like, how much
23  time had passed since you had not -- as soon as you lost
24  the Nissan?  Like, how much time had passed --
25  A.  Oh.  I was -- I wasn't living in the Marina

Page 76

1  when I -- when I had the Nissan.
2  Q.  So just timelinewise, this incident in the
3  Marina happened after you no longer had the Nissan, yes?
4  A.  Yes -- no, no, no.
5  Q.  No?
6  A.  Yes.  I'm sorry.  Yes.  I'm sorry.
7  Q.  Okay.
8  A.  No, no.  I'm sorry.  I'm sorry.  I had gotten
9  the Toyota and then...  I didn't get none of my -- I
10  don't think any of my stuff -- any of the sweeps had
11  happened to me until I didn't have a vehicle.
12      When I had a vehicle, I wouldn't -- wouldn't
13  store nothing on the street; it would be stored in my
14  vehicle.  So that hadn't happened to me.
15  Q.  Okay.  So your best recollection right now --
16  understanding it was years ago, but your best
17  recollection right now is that this incident at the
18  Marina had to have happened after you lost the Nissan?
19  A.  I had lost my vehicles, yes.
20  Q.  All three vehicles?
21  A.  Yes.
22  Q.  But you don't remember when?
23  A.  No.  I don't -- I don't remember the date, the
24  exact date.
25  Q.  Okay.  All right.  So, again, staying with

Case 4:22-cv-05502-DMR   Document 366-23   Filed 04/17/25   Page 6 of 12
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Patrick Dubose
February 3, 2025

Page 77

1    this -- the Marina event, did you see any notices of --
2    A.  There was nothing --
3    Q.  -- the resolution?
4    A.  There was nothing posted, no.  The only time I
5    saw something posted was on the last time.
6    Q.  I'll ask you more about that in a bit.
7         But for this one, the Marina one --
8    A.  No.
9    Q.  -- you didn't see --
10   A.  There was nothing posted.
11   Q.  Did you look for a notice at any time that day?
12   A.  There wasn't a notice.  I didn't have to --
13   there was -- I -- I -- if they had posted it, there was
14   no posted anything where I would have seen it.  There
15   was nothing posted.
16   Q.  I guess --
17   A.  There was no -- there was no --
18   Q.  I guess I'm asking you if you looked for one to
19   kind of understand how you knew that there was no
20   notice.
21        So you went out and you looked to see if a
22   notice was posted?
23        ATTORNEY FREEMAN: Object to time.  Are you talking
24   about before or after the sweep?
25        ATTORNEY GRADILLA: I just said anytime that day.

Page 78

1         THE WITNESS: A notice is something that you would
2    put somewhere where somebody would see, or it wouldn't
3    be a notice.
4         So if it wasn't in my vicinity, my area, then
5    it wouldn't be a notice, and I wouldn't have seen it
6    anyway.
7    BY ATTORNEY GRADILLA:
8    Q.  Okay.  But I --
9    A.  In my vicinity, where I was at, there was no
10   notice.
11   Q.  What I'm asking is if you did anything to
12   search.
13        So is the answer to my question no?
14   A.  If you have to search for a notice, then it's
15   not a notice.
16   Q.  I understand that's your opinion, Mr. Dubose,
17   but I'm asking you a question about what you did.
18        Did -- did you look --
19   A.  Did I go out and look for notice?  No.
20   Q.  Yes, in, say, like a block or two of where you
21   were.
22   A.  No.
23   Q.  No.
24        Did you talk to any -- any of your fellow
25   people who were in the encampment near you about --

Page 79

1    before the resolution about HSOC resolutions?
2    A.  No.  We just heard -- I just heard a rumor
3    that -- and it hadn't happened to me before.  So, no.
4    Q.  Okay.  Okay.  So moving on to the second --
5    excuse me -- instance where you say that you experienced
6    an HSOC resolution.
7         Can you tell me a little bit about that.  Do
8    you remember when that happened?
9    A.  I think it was in the fall.
10   Q.  In the fall of what year?
11   A.  '21, '22.  I don't remember.
12   Q.  And I think you mentioned that that was on
13   Geary and Masonic.
14   A.  Mm-hmm.
15   Q.  Do you remember anything more specific about
16   the area in that -- where you were?
17   A.  Like, what do you -- I don't know what --
18   specify.  I don't know.
19   Q.  Were you, like, on a median?  Were you on a
20   sidewalk?  Were you on a specific street, like either --
21   on either Geary or Masonic?  Like any other description
22   of where you were?
23   A.  Across the street from Trader Joe's.
24   Q.  And can you describe the conditions of your
25   encampment then?  You know, if you had a tent...

Page 80

1    A.  Same as -- same as before.  It was always the
2    same thing, you know.
3    Q.  And by that, I'm going to ask you to spell it
4    out for me.
5    A.  I had my tent --
6    Q.  Mm-hmm.
7    A.  -- for shelter.  And then I would have my
8    clothing, my bedding, a cooler to store my food in, and
9    something to cook my food with.
10        Other than that, just bare -- just -- just bare
11   necessities, just what you needed to get by, you know.
12   Q.  And were you with Shelly here as well?
13   A.  Mm-hmm.
14        ATTORNEY FREEMAN: That's a yes?
15        THE WITNESS: Yes, sir.  Yes, sir.
16   BY ATTORNEY GRADILLA:
17   Q.  And how long had you been staying there the day
18   that the resolution happened?
19   A.  Two months probably, maybe three months.
20   Q.  And so --
21   A.  You usually weren't able to stay in any place
22   for long.
23   Q.  Got it.
24        So you -- you lost all your belongings at
25   Safeway; then you went over to Geary and Masonic.

Case 4:22-cv-05502-DMR   Document 366-23   Filed 04/17/25   Page 7 of 12
Coalition on Homelessness, et al. v.                                    Patrick Dubose
City and County of San Francisco, et al.                             February 3, 2025

Page 81

1   Do you remember about how much time elapsed
2 between the two events?
3   ATTORNEY FREEMAN: Between the two sweeps?
4   ATTORNEY GRADILLA: Between the two, yep.
5   THE WITNESS: Four months, maybe three months.
6 BY ATTORNEY GRADILLA:
7   Q.  And over that time, did you have to buy all
8 your things again or acquire somehow all the things that
9 you say you had?
10   A.  Yeah, mm-hmm.
11   Q.  Did you buy the tent that you had?
12   A.  I did.  I would sell -- sell stuff at the --
13 you know, on Market in the evening time or at my big
14 place I was going to -- what's the name of the place
15 where they buy clothing?  I can't remember the name of
16 the place now.
17       There's a few -- there's a few shops that will
18 buy clothing from you, decent clothing.  So that's how I
19 made my money, and recycling.
20   Q.  But if you lost all your clothing, where did
21 you get clothing from to sell?
22   A.  Have you seen the streets of San Francisco?
23 People put stuff out there on the curb all the time
24 everywhere.
25   Q.  So you got things from the street to sell?

Page 82

1   A.  From the street or go to thrift store,
2 purchase.
3   Q.  Okay.  So you bought a tent; you got more
4 clothing.
5       What other things did you have with you at
6 Geary and Marina -- or excuse me -- Masonic?
7   ATTORNEY FREEMAN: I think he's answered that
8 question.
9       You can answer it again.
10   THE WITNESS: Yeah.  I don't, I -- I -- I --
11 BY ATTORNEY GRADILLA:
12   Q.  I'm just trying to understand how you got the
13 things.
14   ATTORNEY FREEMAN: That's a different question.  Why
15 don't you -- why don't you ask a question.
16   THE WITNESS: I would acquire them through effort --
17 time, effort, work, you know.
18 BY ATTORNEY GRADILLA:
19   Q.  Okay.
20   A.  I don't -- I don't...
21   Q.  Did you have any furniture with you that time
22 at Geary and Masonic?
23   A.  I'm in a tent.
24   Q.  I understand.  Sometimes people do have
25 furniture with them.

Page 83

1   A.  No, no furniture.
2   Q.  Again, with the -- again, focusing on the
3 second event when you were at the -- Geary and Masonic,
4 was there any garbage in the encampment that you were
5 at?
6   A.  I'm a clean person.  No.
7   Q.  What about around you; were there other tents?
8   A.  I would -- I would -- my area, I would make
9 sure that anybody who was around me was clean.  I'm
10 not -- I'm not a slob, and I'm not going to hang around
11 slobs.
12   Q.  And same question as before:  Were there any
13 rodents, fleas, ants, any of that kind of thing?
14   A.  No.
15   Q.  What about drug paraphernalia?
16   A.  No.
17   Q.  Human waste?
18   A.  No.
19   Q.  Rotten food?
20   A.  No.
21   Q.  Any other human, like, fluids, like blood or
22 anything like that?
23   A.  No.
24   Q.  At that encampment, did you have any setup for
25 electricity?

Page 84

1   A.  I've never had electricity on any encampment.
2   Q.  Heating equipment?
3   A.  Camping stove.
4   Q.  Again, anything you think that could be viewed
5 as a health hazard?
6   ATTORNEY FREEMAN: Object; calls for speculation, no
7 foundation.
8       You may answer.
9   THE WITNESS: No.  I'm not -- I don't -- I don't --
10 I was living in a tent.  I was -- I'm still a human
11 being.
12 BY ATTORNEY GRADILLA:
13   Q.  What about anything that you think -- did you
14 have anything that you think could be viewed as a safety
15 hazard?
16   ATTORNEY FREEMAN: Same objections.
17       You may answer.
18   THE WITNESS: No.
19 BY ATTORNEY GRADILLA:
20   Q.  Anything that was either soiled or moldy?
21   A.  No.
22   Q.  Anything else about the encampment that you
23 think I should know about?
24   ATTORNEY FREEMAN: Object; calls for speculation, no
25 foundation.

Case 4:22-cv-05502-DMR    Document 366-23    Filed 04/17/25    Page 8 of 12
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.
Patrick Dubose
February 3, 2025

Page 85

1    THE WITNESS: No, I don't think so.
2    BY ATTORNEY GRADILLA:
3    Q.  Do you remember the weather the day of the
4    resolution, the second resolution?
5    A.  Just a day in San Francisco, you know.  Wait
6    ten minutes, it will change.
7    Q.  Do you remember anything, like, distinctive
8    about that day?
9    A.  Yeah.  My stuff was taken.
10   Q.  But I mean in terms of weather or anything that
11   might help you remember what time of year that was.
12   A.  No.  I don't remember.
13   Q.  Okay.  So taking you back to that day --
14   A.  Which day?  The first one?
15   Q.  The second -- the second resolution you
16   experienced --
17   A.  Okay.
18   Q.  -- at Geary and Masonic.  That's where we've
19   been talking.
20   A.  Mm-hmm.
21   Q.  You get up.  What do you do that morning?
22   A.  What was I doing then?  I think I was helping
23   somebody paint a house.  I was helping Kyle paint a
24   house.  So I would get up in the morning and go work
25   with him.  And Shelly -- and then Shelly would come with

Page 86

1    me.  She'd bring her dog.
2    Q.  Who's Kyle?
3    A.  She'd bring her little dog.  And the people
4    were very kind.
5    Q.  Who's Kyle?  Sorry.
6    A.  He was a -- construction.  He did -- he did --
7    it was like a handyman service, and I would help him
8    out.
9    Q.  Do you remember Kyle's last name?
10   A.  Kyle...  I do know his last name.  Kyle, Kyle,
11   Kyle...  He's Lebanese, so I can't -- I just remember he
12   was Lebanese.  I can't remember his last name.
13   Q.  Okay.  And so you were helping him paint a
14   house, you said?
15   A.  Mm-hmm.
16   Q.  I guess you get up; you go with him, I assume,
17   or...
18   A.  Mm-hmm.
19   Q.  What time did you leave?
20   A.  Yeah.  He -- he would come pick me up.
21   Q.  What time did you leave your area encampment?
22   A.  It was early.  It was -- it had to have been
23   early, because we get there about 9:00 o'clock.  So
24   probably about 8:30, 8:00 o'clock, and then not get home
25   until after 4:00.

Page 87

1    Q.  And you said that Shelly was with you and a dog
2    you had?
3    A.  She had a little -- she has a little dog, yeah.
4    It's a little Chihuahua.
5    Q.  Sorry.  Just -- did you have -- did you and
6    Kelly [sic] have that dog with you at your first
7    encampment, at --
8    A.  No.
9    Q.  When did you get that dog?
10   A.  In between the first and second encampment,
11   she -- she rescued it.  It was a bunch of puppies that
12   were going to get -- she -- she's an animal lover.  I
13   don't -- she'll take in anything.
14   Q.  But the dog lived with you in your tent?
15   A.  Yeah.
16   Q.  Okay.  So on the day of the resolution, you
17   leave in the morning; you don't get home until the
18   evening.
19       Did you tell anyone around you in the
20   encampment that you were leaving for the day?
21   A.  No.
22   Q.  Okay.  In the morning, that morning, did you
23   see any notices of a resolution?
24   A.  No.  No.
25   Q.  Did you look for any notices either that --

Page 88

1    that morning or days before?
2    A.  There wasn't anything posted where -- in -- in
3    the vicinity where I was staying, no.
4    Q.  When you say the vicinity you were staying,
5    what -- what are you thinking?
6         What are you referring to?
7    A.  If I was to get up out of my tent in my little
8    area where I -- there was -- there was nothing -- there
9    was nothing posted within 50 feet of either side of me.
10   Q.  So you didn't -- you didn't look past 50 feet
11   of either side of you for a notice?
12   A.  I walked past.  Yes, I walked past 50 feet, but
13   I wasn't -- just walking down the street, I'm not -- I
14   wasn't observing -- in my area, I would make sure -- I
15   would be -- I would be familiar with what was going on.
16       ATTORNEY FREEMAN: We've been going about an hour.
17   Could we take a break, please.
18       ATTORNEY GRADILLA: Sure.
19       ATTORNEY FREEMAN: Okay.
20       ATTORNEY GRADILLA: It's 12:01.
21       THE VIDEO OPERATOR: We are going off the record.
22   The time is 12:01.
23       (Recess taken from 12:01 p.m. to 12:18 p.m.)
24       THE VIDEO OPERATOR: Here begins Media No. 2.  We
25   are back on the record.  The time is 12:18.

Case 4:22-cv-05502-DMR   Document 366-23   Filed 04/17/25   Page 9 of 12

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Patrick Dubose
February 3, 2025

Page 109

1   Q.  And would you pick up things off the street to
2   barter with, or how would you obtain things?
3       ATTORNEY FREEMAN: Object; ambiguous.
4       THE WITNESS: When -- when -- when somebody moves in
5   this city, it seems like they take everything that they
6   have in their house and they put it out on the curb.
7       If I see something that I come by, when I see a
8   pile of stuff, I'm going to grab whatever I want or
9   whatever I can make use of, and I'm going to take it,
10  and I'm going to put use to it.
11  BY ATTORNEY GRADILLA:
12  Q.  Okay.  So after the second incident where you
13  say you -- you lost all your things, did you get things
14  off the street to barter or trade with?
15      ATTORNEY FREEMAN: Do you specifically recall
16  whether you did or not?
17      THE WITNESS: I --
18      ATTORNEY FREEMAN: If you don't, that's fine.
19      THE WITNESS: I don't -- I don't recall.  I mean, I
20  imagine some of the stuff came from -- you know, I
21  don't -- I don't know.  I don't -- I don't even know
22  where I got the pair of shoes I'm wearing right now.  I
23  don't know -- I don't recall how I got those.
24      ATTORNEY GRADILLA: Okay.
25      ATTORNEY FREEMAN: Fine.

Page 110

1   BY ATTORNEY GRADILLA:
2   Q.  So going back to the condition of your
3   encampment, was there any garbage around your
4   encampment?
5   A.  I'm a clean person.  No.
6   Q.  Was there -- were there any rodents,
7   cockroaches, ants, fleas, that sort of thing?
8   A.  No.
9   Q.  What about drug paraphernalia?
10  A.  No.
11  Q.  Human waste?
12  A.  No.
13      ATTORNEY FREEMAN: It's okay.
14  BY ATTORNEY GRADILLA:
15  Q.  Rotten food?
16      ATTORNEY FREEMAN: Go ahead.  He -- he has a right
17  to ask.  You can just answer the question.  That's
18  all --
19      THE WITNESS: No.
20      ATTORNEY FREEMAN: -- you need to do.
21  BY ATTORNEY GRADILLA:
22  Q.  What about other human fluids, like blood or
23  anything like that?
24  A.  No.
25  Q.  You said there was cooking equipment.

Page 111

1   Electricity setup?
2   A.  No.
3   Q.  Anything heating equipment?
4   A.  No.
5   Q.  Anything that you think could be viewed as a
6   health or safety hazard?
7       ATTORNEY FREEMAN: Object; ambiguous, calls for
8   speculation.
9       THE WITNESS: No.
10  BY ATTORNEY GRADILLA:
11  Q.  Anything that you think could be viewed as
12  soiled and moldy?
13      ATTORNEY FREEMAN: Same objections.
14      THE WITNESS: No.
15      ATTORNEY FREEMAN: That's fine.
16  BY ATTORNEY GRADILLA:
17  Q.  Anything else about your encampment you think I
18  should know?
19      ATTORNEY FREEMAN: Objection; calls for speculation.
20      THE WITNESS: No.
21  BY ATTORNEY GRADILLA:
22  Q.  And do you remember the weather that day,
23  Mr. Dubose?  Of the third event, I mean.
24  A.  No.
25  Q.  No?

Page 112

1       Again, I'm going to ask you to just kind of
2   walk me through what happened that day.
3   A.  Which event?
4   Q.  The third one, the third, where --
5       ATTORNEY FREEMAN: Where you were --
6       ATTORNEY GRADILLA: I guess at Geary at Masonic.
7       THE WITNESS: Okay.
8       ATTORNEY FREEMAN: Where you went for COVID testing.
9       Is that --
10      ATTORNEY GRADILLA: Yes.
11      ATTORNEY FREEMAN: -- what you're talking about?
12      THE WITNESS: Okay.  Go ahead.
13  BY ATTORNEY GRADILLA:
14  Q.  So walk me through what happened that day.  You
15  get up at some point in the morning.  What do you do?
16  A.  They had come by --
17  Q.  Who's "they"?
18  A.  I don't know who.  Some -- some -- I don't -- I
19  don't -- I don't know who it was, to tell you the truth.
20  They come by and they were just making sure -- they --
21  that's right.  They would come by and bring bottles of
22  water and just check on the safety of -- of people.
23  They would do that quite often.
24      And Shelly was sick.  And so they took her
25  temperature, and she had a fever.  So they -- they put

Case 4:22-cv-05502-DMR   Document 366-23   Filed 04/17/25   Page 10 of 12

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Patrick Dubose
February 3, 2025

Page 133

1  Q.  And the pot and pan, did you buy those?
2  A.  Yes -- no.  That was also I think from -- from
3  Shelly's mom.
4  Q.  Again, can you describe the -- just the
5  conditions of the -- that encampment, the one on Geary
6  and Masonic where you met Kelly?
7  A.  It was -- there were probably four tents in the
8  in the area and --
9  Q.  Is that one like a sidewalk on Geary?
10     Or when you say "area," what do you mean?
11  A.  Yeah.  It's just a -- it's part of a wide
12  sidewalk right there.  And I was -- pitched a tent up
13  against the back of the -- back of the sidewalk and made
14  sure that -- that people could get by.  And it was just
15  a spot to stay.
16  Q.  And was Shelly staying with you at that time?
17  A.  Yeah.
18  Q.  And the dog?
19  A.  When we got -- when we got up -- when we --
20  when we got the tent -- no, no.  The dog was with her
21  mom at that point.
22  Q.  I guess when you went into the hotel --
23  sorry -- the previous time during the COVID time, did
24  the dog go with you, or did you keep it somewhere else?
25     ATTORNEY FREEMAN: Objection; relevance.

Page 134

1     THE WITNESS: She didn't have a dog then.
2  BY ATTORNEY GRADILLA:
3  Q.  Okay.  Sorry.  I guess I'm a little confused.
4  A.  The dog was with her mother.
5  Q.  I see.
6  A.  Sorry.
7  Q.  So she had the dog, but the dog was just with
8  her mother?
9  A.  Yeah.  The dog spent a lot of time with her
10  mother.
11  Q.  So the incident -- just going back to the
12  incident where you met Kelly and talking about the
13  conditions of the encampment during that time.
14     Was there any garbage in the encampment?
15  A.  No.
16  Q.  Rodents, cockroaches?
17  A.  No.
18  Q.  Ants, fleas?
19  A.  No.
20  Q.  Any drug paraphernalia?
21  A.  No.
22  Q.  Any human waste?
23  A.  No.
24  Q.  Any other human fluids?
25  A.  No.

Page 135

1  Q.  Rotten food?
2  A.  No.
3  Q.  You mentioned cooking equipment, the stove I
4  think you mentioned.
5     Anything else?
6  A.  Cooking stove and a pot and a pan maybe.
7  Q.  Were you set up for electricity?
8  A.  No.
9  Q.  Any heating equipment?
10  A.  Any what?
11  Q.  Heating equipment.
12  A.  No.
13  Q.  Anything you think could be viewed as a health
14  or safety hazard?
15  A.  No.
16     ATTORNEY FREEMAN: Object; calls for speculation,
17  ambiguous.
18     You can answer.  Okay.
19  BY ATTORNEY GRADILLA:
20  Q.  Is that a no?
21  A.  No.
22  Q.  Anything you think could be viewed as
23  contraband?
24  A.  No.
25     ATTORNEY FREEMAN: Same objections.

Page 136

1  BY ATTORNEY GRADILLA:
2  Q.  Anything that you think could be viewed as
3  soiled or moldy?
4     ATTORNEY FREEMAN: Same objections.
5     THE WITNESS: No.
6  BY ATTORNEY GRADILLA:
7  Q.  Anything else about the encampment that you
8  think I should know about?
9  A.  No.
10     ATTORNEY FREEMAN: Object; calls for speculation.
11  BY ATTORNEY GRADILLA:
12  Q.  Do you remember the weather that day?
13  A.  No, I don't.
14  Q.  Okay.  So going back to that day, can you just
15  tell me what happened?
16     You wake up.  What do -- what do you do that
17  day?
18  A.  They woke us up.
19  Q.  Who's "they"?
20  A.  The -- the -- before -- before they come and --
21  before the DPW would come by, there would be somebody in
22  front of them saying, you know, you got -- you have so
23  much time, and we're going to come through and clean
24  house, what have you.
25  Q.  Were the people who came to tell you that, were

Case 4:22-cv-05502-DMR   Document 366-23   Filed 04/17/25   Page 11 of 12

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Patrick Dubose
February 3, 2025

Page 137

1  they wearing a uniform?
2     A.  I don't know.  I was inside the tent.  They
3  just spoke to me through the tent.
4     Q.  Did you respond to them?
5     A.  I told them I can't do nothing.  I said, "You
6  see that wheelchair out there.  That's what -- I'm in a
7  wheelchair."  I said, "I don't know what -- what you
8  want me to do."
9     Q.  So you spoke with them.
10        Did Shelly also speak with them?
11    A.  No.
12    Q.  So you were talking to them?
13    A.  Yes.
14    Q.  Was it -- was it a man or a woman who spoke to
15 you?
16    A.  It was a female.
17    Q.  Were there more than -- was there more than one
18 person?
19    A.  I don't know.
20    Q.  You -- you remember talking to a woman?
21    A.  I was inside the tent.
22    Q.  Excuse me.  But you were talking to a female
23 through the tent?
24    A.  There was one person that I talked to, and it
25 was a female voice, yeah.

Page 138

1     Q.  And she told you you had how much time to move?
2     A.  She said I had ten minutes.
3     Q.  Ten minutes?
4     A.  Mm-hmm.
5     Q.  How do you remember that it was ten minutes?
6        ATTORNEY FREEMAN:  Objection --
7        THE WITNESS:  Because --
8        ATTORNEY FREEMAN:  -- ambiguous.
9           Go ahead.  Go ahead.
10       THE WITNESS:  When someone tells you you have ten
11 minutes, it seems to stick in your mind.  You know, it's
12 not something that you're threatened with oft- -- not
13 often.
14 BY ATTORNEY GRADILLA:
15    Q.  You said "threatened."
16       You took that as a threat?
17    A.  Not against me as far as harming me, but I took
18 it as a threat, like, where am I going to go?  What am I
19 going to do?  It put me in a panic state.
20    Q.  So someone tells you you have ten minutes.  Ten
21 minutes to do what?  To pack your belongings?
22    A.  To pack up and get out.  Yeah, pack up and
23 move.
24    Q.  So what did you do at that point?
25    A.  I couldn't do nothing.  I was -- I was

Page 139

1  immobile.
2     Q.  Did Shelly begin to pack up your belongings?
3     A.  She was upset.  And so I told her to take
4  the -- no.  Because the dog was with her mother.  I
5  told -- I -- I remember she was upset, and I couldn't
6  deal with her and the whole -- and I -- I asked her to
7  go -- I asked her to go to -- I don't remember where --
8  where -- you know, go take a walk, go -- go to -- she
9  had a friend that she would go hang out with.  So I told
10 her to go over there.  You know, it was too much.
11    Q.  To go with a friend?  I'm sorry.
12    A.  Yeah.  She was very worried.  She was very
13 defensive for me, and I didn't want her to start no --
14 you know, she's like a mama bear.
15    Q.  So what did -- what did you do?
16       Were you sitting -- were you sitting in the
17 tent or --
18    A.  I was sitting in the tent.  And when they left,
19 I told her to go before they came back.
20    Q.  Then what happened?
21    A.  They came back, and they were hassling me
22 about -- I told them -- they were hassling me about
23 getting my stuffed moved.  I couldn't -- I couldn't -- I
24 couldn't move it.
25       And that's when Kelly and I can't remember the

Page 140

1  other lady -- gal's name who -- they said, "You don't
2  have to go anywhere.  Don't go -- you don't have to go
3  nowhere.  Stay where you're at."  So I did.
4     Q.  At this point, were you inside the tent, or had
5  you moved out or --
6     A.  No.  I was still -- I was with my head outside
7  the tent.
8     Q.  Do you remember what, if anything, prompted
9  Kelly to come to your -- to your tent, or did she just
10 show up or...
11    A.  She showed up because they -- she -- they were
12 doing a sweep.
13    Q.  And you just saw her come?
14    A.  She -- no.  She -- she -- she was not only just
15 talking to me; she was talking to other people who were
16 getting their -- their stuff either taken or had to be
17 moved, you know.
18    Q.  Did she introduce herself to you?  Or what
19 was -- what was the first interaction between you and
20 Kelly?
21    A.  "It's illegal.  They can't do that.  You don't
22 have to move.  You don't have to go anywhere."
23    Q.  She just said that to you?
24    A.  Not in -- not -- not that bluntly.  But, like,
25 she stated the fact that they can't -- they can't --

Case 4:22-cv-05502-DMR   Document 366-23   Filed 04/17/25   Page 12 of 12
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.
Patrick Dubose
February 3, 2025

Page 177

 1  A.  No.
 2  Q.  Okay.
 3  A.  They weren't there to fend for themselves, so I
 4  just took it upon myself and took their stuff and kept
 5  it until they showed back up.
 6  Q.  So I'm again just going to ask you some other
 7  questions about encampments.
 8     Have you ever seen a camper threaten a City
 9  employee at a resolution?
10  A.  No.
11  Q.  Have you ever seen a camper raise their voice
12  to a City employee at a resolution?
13  A.  No.
14  Q.  Have you ever seen a camper physically harm a
15  City employee at a resolution?
16  A.  No.
17  Q.  Have you ever seen a camper threaten another
18  camper at a resolution?
19     ATTORNEY FREEMAN: Objection; ambiguous --
20     THE WITNESS: No.
21     ATTORNEY FREEMAN: -- calls for speculation.
22     THE WITNESS: Not in a campsite.
23  BY ATTORNEY GRADILLA:
24  Q.  What about threaten another person?  Maybe not
25  who's in camp, but just any other person.

Page 178

 1     ATTORNEY FREEMAN: Objection --
 2     THE WITNESS: No.
 3     ATTORNEY FREEMAN: -- ambiguous, relevance.
 4     (Reporter clarification.)
 5     THE WITNESS: No.
 6  BY ATTORNEY GRADILLA:
 7  Q.  Have you ever seen minors, people under 18, at
 8  an encampment?
 9     ATTORNEY FREEMAN: Objection; relevance.
10     THE WITNESS: No.
11  BY ATTORNEY GRADILLA:
12  Q.  Have you ever heard of missing persons being
13  identified at encampments?
14     ATTORNEY FREEMAN: Objection; ambiguous, calls for
15  speculation, relevance.
16     THE WITNESS: I don't understand.
17  BY ATTORNEY GRADILLA:
18  Q.  Just -- again, if you -- if you don't know,
19  feel free to say -- say that.
20     But have you ever heard of someone who was
21  missing or people were looking for that was in an
22  encampment?
23     ATTORNEY FREEMAN: Same objections.
24     THE WITNESS: No.
25  BY ATTORNEY GRADILLA:

Page 179

 1  Q.  Have you ever heard of sex trafficking within
 2  an encampment?
 3     ATTORNEY FREEMAN: Same objections.
 4     THE WITNESS: No.
 5  BY ATTORNEY GRADILLA:
 6  Q.  Just -- I'll ask you some questions about DPW,
 7  Mr. Dubose.
 8     Have you ever seen DPW bag and tag items at an
 9  encampment resolution?
10  A.  I've never seen bag and tag.  I've just
11  witnessed them throw it in the back of the truck.  If
12  you call -- if you call garbage bag it --
13  Q.  Well -- -
14  A.  -- bag and tag, then I guess they put stuff in
15  a garbage bag and throw it in the back of a truck.
16  Q.  As it relates to -- have you ever observed DPW
17  offer to throw away items for a person who no longer
18  wanted them?
19  A.  No.  I've -- no.
20  Q.  Have you ever seen someone at an encampment ask
21  DPW --
22  A.  Yes.
23  Q.  -- to throw away items?
24  A.  Yes.
25  Q.  When -- when has that happened?

Page 180

 1     Have you seen it more than once?  Let's start
 2  there?
 3  A.  I am speaking for myself asking them if they --
 4  if I could get rid of some things in their -- in
 5  their --
 6  Q.  When was that?
 7  A.  I don't -- I don't recall.  I don't recall.  If
 8  there was -- if there was something that needed to be
 9  thrown away and there was a DPW person there, then I
10  would ask them if I could put it in their truck.
11  Q.  And was that -- did that only happen once or
12  multiple times?
13  A.  I did it just the other day, just two days ago.
14  Q.  I see.
15     What did you ask DPW to throw away for you?
16  A.  In front of the place where I stay, there's
17  been some garbage just been staying just there for
18  over -- I don't know how long, three or four days, five
19  days.  And they -- DPW was there.  I think they were
20  cleaning gutters.  I asked them if I could throw some
21  stuff away in the back of their truck.
22  Q.  Got it.
23     So it was garbage that was just on the street?
24  A.  Yeah.
25  Q.  Was it in garbage bags?