# EXHIBIT 21

To
Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al., v*
*City and County of San Francisco, et al.*

---

*Jonathan Vaing, 30(b)(6)*
*Vol. 1*
*March 5, 2025*

---

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 44195VaingV1_NL.txt
**Min-U-Script® with Word Index**

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vang, 30(b)(6) - Vol. 1
March 5, 2025

Page 21

1  MR. GEORGE: Same objection.
2  THE WITNESS: Yes.
3  MS. KASHYAP: You can put this exhibit down,
4  Mr. Headrick. Thank you.
5  BY MS. KASHYAP:
6  Q. And, Mr. Vaing, I believe you have been
7  employed at the Department of Public Works since 1996;
8  is that right?
9  A. Yes.
10  Q. And you have been acting superintendent of the
11  SCS for approximately six months now; is that correct?
12  A. Yes.
13  Q. And prior to that you were an assistant
14  superintendant with the SCS; is that right?
15  A. That's correct.
16  Q. And you were an assistant supervisor with the
17  SCS since approximately 2020; is that right?
18  A. I believe it's 2021.
19  Q. 2021, thank you.
20  Do you know the month in 2021 when you became
21  assistant supervisor with the SCS?
22  A. It was around March.
23  Q. Thank you. And on each of the topics that we
24  just covered today, Mr. Vaing, are you prepared to
25  testify about your knowledge of that topic going back to

Page 22

1  January 1st, 2020?
2  MR. GEORGE: Objection; the negotiations indicate a
3  different time period, so I'll just note that. Object
4  to form as well.
5  THE WITNESS: Yes.
6  MS. KASHYAP: Mr. Headrick, can you please put up
7  what has been marked as Tab 26.
8  And this was previously marked as Exhibit 1023.
9  (Clarification by the reporter.)
10  (Previsouly Marked Exhibit 1023 was referenced.)
11  MS. KASHYAP: No, I'll just refer to it, thank you.
12  BY MS. KASHYAP:
13  Q. Again, Mr. Vaing, take a moment to just scroll
14  through quickly to familiarize yourself with the
15  document, and I just have a couple questions about it.
16  A. Okay.
17  Q. Thank you.
18  Mr. Vaing, can you please confirm that this is the
19  current version of DPW's bag-and-tag policy that is in
20  effect?
21  A. Yes, it is.
22  Q. And since when has this version of the policy
23  been in effect?
24  A. I believe before I got here. I believe it's
25  2018.

Page 23

1  Q. And who issued final approval of this version
2  of the bag-and-tag policy?
3  A. It would be the director.
4  Q. The director of DPW?
5  A. Yes.
6  Q. Do you know who that person was?
7  A. Carla Short.
8  Q. Thank you. And throughout this deposition
9  today if I refer to this as the bag-and-tag policy, will
10  you understand what I mean?
11  A. Yes.
12  MS. KASHYAP: Thank you.
13  You can put that down, Mr. Headrick. Thank you.
14  BY MS. KASHYAP:
15  Q. Mr. Vaing, what is DPW's process for
16  dispatching DPW staff to scheduled HSOC resolutions?
17  A. Can you repeat that? Sorry.
18  Q. Sure. What is DPW's process for dispatching
19  DPW staff to scheduled HSOC resolutions?
20  MR. GEORGE: Objection; form.
21  THE WITNESS: Yeah, we have a representative at
22  Public Work attend a meeting with HSOC resolution team.
23  And they would send the information location with photo
24  that they would post to the managers and the supervisors
25  of the crew. And they would have that schedule ahead of

Page 24

1  time for the crew, so when the crew start in the
2  morning, they know where they are going to.
3  BY MS. KASHYAP:
4  Q. And what is DPW's process for dispatching DPW
5  staff to joint field operations or JFOs?
6  MR. GEORGE: Objection; form.
7  THE WITNESS: Very similar to a previous meeting,
8  and they would contact a supervisor with email to let
9  them know the meeting location and what are the areas of
10  -- would be cleaned today.
11  BY MS. KASHYAP:
12  Q. When you say they would contact the supervisor,
13  who would contact the supervisor?
14  A. It would be the JFO commander.
15  Q. Who is that?
16  A. It would be Mark Mazza. David also, I don't
17  know his last name.
18  Q. Is it possible that it's David Nakanishi?
19  A. Yes.
20  Q. How far in advance do Mr. Mazza or
21  Mr. Nakanishi the DPW supervisor with the
22  information about where to dispatch staff for a JFO?
23  A. I believe it's weeks in advance.
24  Q. Thank you. And what is DPW's process for
25  dispatching staff for re-encampment prevention?

Case 4:22-cv-05502-DMR    Document 366-27    Filed 04/17/25    Page 4 of 25

Coalition on Homelessness, et al. v                                    Jonathan Vang, 30(b)(6) - Vol. 1
City and County of San Francisco, et al.                                                March 5, 2025

Page 25

1    MR. GEORGE: Objection; form, assumes facts not in
2    evidence.
3    THE WITNESS: In this the dispatch supervisor is
4    coordinating with the JFO or the HSOC commander.
5    BY MS. KASHYAP:
6    Q.  So it's a similar process to what you described
7    for HSOC resolutions or JFOs?
8    MR. GEORGE: Objection; form.
9    THE WITNESS: Yes.
10   BY MS. KASHYAP:
11   Q.  Thank you.
12   What is DPW's process for dispatching staff to
13   address 311 complaints?
14   MR. GEORGE: Objection; form.
15   THE WITNESS: The 311 complaints come through our
16   database, CMMS database.  So the information, the
17   request or the complaint for 311 will populate into our
18   radio room dispatcher, which they would assign to the
19   area litter patrol or supervisor in that area.  So
20   basically it would pop up in the queue, in the tablet,
21   in the truck.  And in the queue when they would open it,
22   they would have the information such as location, photo,
23   what is the complaint and such.  And the process is the
24   staff would go to the location, access, take photos and
25   take action and document action taken.

Page 26

1    BY MS. KASHYAP:
2    Q.  Thank you.  And I think you referenced the
3    routine litter patrol in your last answer.
4    Can you tell me what the process is for dispatching
5    staff to conduct routine litter patrol?
6    A.  It goes to 311, from 311 to the radio room, and
7    a radio room dispatcher who dispatch that into the queue
8    within the table.  So that is how the assignment gets
9    assigned.  So we breakdown into six different districts
10   from A to F, and each districts are divided and mapped
11   out into section, and that's how the dispatcher would
12   assign those routes.
13   Q.  Okay.  And I want to make sure I understand.
14   It sounds like even for a routine litter patrol, that
15   also comes through the 311 system that you just
16   described?
17   A.  Yes.
18   Q.  And how about requests from the San Francisco
19   Police Department, how does DPW -- excuse me -- what is
20   DPW's process for dispatching staff in response to
21   requests from SFPD?
22   MR. GEORGE: Objection; form.
23   THE WITNESS: In most case PD would call our radio
24   room dispatcher to create a request, and the request
25   would triage it to the appropriate litter patrol

Page 27

1    supervisor area.
2    BY MS. KASHYAP:
3    Q.  You said that's in most cases.
4    Are there any other ways that SFPD might communicate
5    a request to DPW?
6    MR. GEORGE: Objection; form.
7    THE WITNESS: Yes.
8    BY MS. KASHYAP:
9    Q.  And what are those ways?
10   A.  Sometimes I believe they do call the area
11   supervisor directly.
12   Q.  Okay.  Anything else --
13   MR. GEORGE: Objection; form.
14   THE WITNESS: No, not that I can think of right now.
15   BY MS. KASHYAP:
16   Q.  Thank you.  And, Mr. Vaing, I think you know
17   this from last time, but as we go throughout the day if
18   anything comes to your memory, always feel free to let
19   me know.  I am always happy to take that information.
20   A.  Okay.
21   Q.  Mr. Vaing, does the bag-and-tag policy apply to
22   DPW's handling of unhoused people's property at
23   scheduled HSOC resolutions?
24   A.  Repeat that for me.
25   Q.  Does the bag-and-tag policy apply to DPW's

Page 28

1    handling of unhoused people's property at scheduled HSOC
2    resolutions?
3    A.  Yes.
4    Q.  Does the bag-and-tag policy apply to DPW's
5    handling of unhoused people's property at JFOs?
6    A.  Yes.
7    Q.  Does the bag-and-tag policy apply to DPW's
8    handling of unhoused people's property during
9    re-encampment prevention?
10   MR. GEORGE: Objection; form, assumes facts not in
11   evidence.
12   THE WITNESS: Yes.
13   BY MS. KASHYAP:
14   Q.  Does the bag-and-tag policy apply to DPW's
15   handling of unhoused people's property when DPW goes
16   outside the noticed area at an encampment resolution to
17   conduct encampment operations?
18   MR. GEORGE: Objection; form.
19   THE WITNESS: I'm not understanding the question.
20   BY MS. KASHYAP:
21   Q.  Sure.  Let me ask it in a better way.
22   So are there situations where DPW leaves the noticed
23   area for an HSOC resolutions and conducts encampment
24   operations outside of that noticed area?
25   MR. GEORGE: Objection; form.

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vang, 30(b)(6) - Vol. 1
March 5, 2025

---

Page 33

1  BY MS. KASHYAP:
2  Q.  Sure.
3      Is there a DPW policy that DPW workers cannot clean
4  an encampment unless there are SFPD officers present?
5      MR. GEORGE:  Objection; form.
6      THE WITNESS:  No, not that I'm aware of.
7      BY MS. KASHYAP:
8  Q.  So DPW workers are permitted to clean at an
9  encampment whether or not there are SFPD officers
10  present?
11  A.  Yes, if they feel safe.
12  Q.  And that includes attended encampments?
13      MR. GEORGE:  Objection; form.
14      THE WITNESS:  Correct.
15      BY MS. KASHYAP:
16  Q.  So do you know what this reference here is to
17  DPW policy?
18  A.  I'm not sure.  But I want to clarify cleaning.
19  When I said cleaning, I'm referring to miscellaneous
20  debris around the campsite, not remove the encampment
21  itself.
22  Q.  Thank you for that clarification.
23      Is there a DPW policy that DPW workers are not
24  allowed to remove property from an encampment that is
25  attended -- let's start there -- unless there are city

---

Page 34

1  -- unless there are SFPD officers present?
2      MR. GEORGE:  Objection; form.
3      THE WITNESS:  Yes.
4      BY MS. KASHYAP:
5  Q.  And is it DPW policy that DPW workers cannot
6  remove property from an unattended encampment unless
7  there are SFPD officers present?
8      MR. GEORGE:  Objection; form.
9      THE WITNESS:  Repeat that one more time, please.
10      BY MS. KASHYAP:
11  Q.  Sure.
12      Is there a DPW policy that DPW workers cannot remove
13  property from an encampment that is unattended unless
14  there are SFPD officers present?
15      MR. GEORGE:  Same objection.
16      THE WITNESS:  Cannot, no.
17      BY MS. KASHYAP:
18  Q.  So the policy is if there is an unattended
19  encampment, DPW workers are permitted to remove property
20  from that encampment.  But if it is an attended
21  encampment, DPW workers may clean around it, but are not
22  permitted to remove property from it unless there is
23  SFPD officers present?
24      MR. GEORGE:  Objection; form.
25      THE WITNESS:  Yes, that's correct.

---

Page 35

1  BY MS. KASHYAP:
2  Q.  Thank you.
3      MS. KASHYAP:  You can put this exhibit down,
4  Mr. Headrick.  Thank you.
5      BY MS. KASHYAP:
6  Q.  Mr. Vaing, does the bag-and-tag policy apply to
7  DPW's handling of unhoused people's property when
8  responding to SFPD requests to bag and tag property?
9  A.  That depends.
10  Q.  What does it depend on?
11  A.  Well, we have two ways of bag and tag how the
12  complaints or request come in.  One of them are we pick
13  up the item from the police station.  And others
14  can be from the public right-of-way or street, sidewalk.
15  Q.  And for the items that you pick up -- that DPW
16  picks up from the police station, does the bag-and-tag
17  policy apply?
18  A.  Yes.
19  Q.  And how about the items that you pick up from
20  the public right-of-way or streets or sidewalks?
21  A.  Yes.
22      MR. GEORGE:  Objection; form.
23      THE WITNESS:  Yes.
24      BY MS. KASHYAP:
25  Q.  So in either scenario the bag-and-tag policy

---

Page 36

1  does apply?
2  A.  Yes.
3  Q.  And for the second scenario, the items picked
4  up from streets or sidewalk, does the bag-and-tag policy
5  apply when SFPD makes -- issues a citation or makes an
6  arrest and needs DPW to bag and tag the tent as
7  evidence?
8  A.  Yes.
9  Q.  Does DPW dispatch staff to handle unhoused
10  people's property in response to requests from any other
11  sources other than what we have spoken about already?
12      MR. GEORGE:  Objection; form.
13      THE WITNESS:  Not that I can think of at the time.
14      BY MS. KASHYAP:
15  Q.  For example, does DPW dispatch staff to handle
16  unhoused people's belongings in response to requests
17  from elected officials or their staff?
18      MR. GEORGE:  Objection; form.
19      THE WITNESS:  I don't recall that.  Most of our
20  requests come to 311.
21      BY MS. KASHYAP:
22  Q.  Thank you.
23      Mr. Vaing, you referenced the CMMS database.
24  Does CMMS create service orders related to
25  encampments?

---

**BEHMKE REPORTING AND VIDEO SERVICES, INC.**
(415) 597-5600

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Jonathan Vaing, 30(b)(6) - Vol. 1
March 5, 2025

Page 61

1  question?
2  A.  It would be the supervisor with HSOC -- Sam
3  Peoples.
4  Q.  Sam peoples would know the answer to what this
5  description here means?
6  A.  Yes.
7      MS. KASHYAP: I'm going to show you one more.
8  This is Tab 3, Mr. Headrick.
9  And this will be Exhibit 1333.
10  (Plaintiffs' Exhibit 1333 was marked for
11  identification.)
12      MR. GEORGE: Nisha, can we do a little break after
13  this exhibit?
14      MS. KASHYAP: Sure.  That works perfectly.
15      BY MS. KASHYAP:
16  Q.  So, Mr. Vaing, what you're now seeing is
17  Exhibit 1333.  Go ahead and scroll through it and
18  familiarize yourself with it, and then I have a couple
19  of questions.
20  A.  Okay.
21  Q.  So again, Mr. Vaing, are you familiar with this
22  document?
23  A.  No.
24  Q.  I'm going to direct your attention to the
25  bottom of Page 1.  I'll give you a moment to get there.

Page 62

1  So, again, the sentence or section beginning with HSOC
2  PM.  So the first sentence there states, Polk Street
3  corridor for re-encampment prevention.  All alleys still
4  clear so shifted to 200 Taylor with two tents, lots of
5  debris and a chop shop.
6  So, Mr. Vaing, are you familiar with the term that
7  is used here, re-encampment prevention?
8  A.  No, not at this time, no.
9  Q.  Are there situations where HSOC will return to
10  an area where an encampment was previously removed from
11  the area?
12      MR. GEORGE: Objection; form, foundation, scope.
13      THE WITNESS: No, not that I know of.
14      BY MS. KASHYAP:
15  Q.  Are there situations where DPW will return to
16  an area where an encampment was previously removed?
17      THE WITNESS: It's possible.
18      BY MS. KASHYAP:
19  Q.  But to your knowledge, there is no policy
20  around returning to areas where encampments were
21  removed, no DPW policy -- excuse me -- about returning
22  to areas where encampments were removed?
23      MR. GEORGE: Objection; form.
24      THE WITNESS: That's correct as far as I know,
25  unless we get a complaint, 311.

Page 63

1      MS. KASHYAP:
2  Q.  And you're not otherwise familiar with the term
3  re-encampment prevention that's used here?
4  A.  No, I don't remember hearing that.
5  Q.  Do you know who might be familiar with this
6  term?
7      MR. GEORGE: Objection; form.
8      THE WITNESS: I would say HSOC.
9      BY MS. KASHYAP:
10  Q.  Thank you.
11  Are you familiar, Mr. Vaing, with the Polk Street
12  corridor?
13  A.  Yes.
14  Q.  Do you know what area of the city that's
15  referring to?
16  A.  Yes.
17  Q.  To your knowledge, is 200 Taylor Street within
18  the Polk Street corridor area?
19  A.  200 block of Taylor?
20  Q.  Yes.
21  A.  To my knowledge, no, that's pretty far away
22  from Polk Street.
23  Q.  Okay.  Does this sentence -- the first sentence
24  after HSOC PM that I read, does that describe a scenario
25  where the HSOC group or team moved to an area outside of

Page 64

1  the noticed area and continued encampment operations
2  there?
3      MR. GEORGE: Objection; form, foundation, scope.
4      THE WITNESS: No, I cannot tell from this.
5      BY MS. KASHYAP:
6  Q.  Okay.  Who might know the answer to that
7  question based on this notation here?
8  A.  HSOC team.
9  Q.  Thank you.
10      MS. KASHYAP: You can put this exhibit down.
11  Just a couple more questions, and then I think we're
12  at a good stopping point for a break.
13      BY MS. KASHYAP:
14  Q.  Mr. Vaing, to your knowledge is there any
15  policy about how far outside the noticed area DPW can go
16  to conduct encampment cleaning?
17      MR. GEORGE: Objection; form.
18      THE WITNESS: No, I don't.
19      BY MS. KASHYAP:
20  Q.  Is there any official practice, to your
21  knowledge, about how far they could go outside the
22  noticed location?
23      MR. GEORGE: Objection; form.
24      THE WITNESS: From practice it's usually that same
25  block itself, within that block.

Case 4:22-cv-05502-DMR    Document 366-27    Filed 04/17/25    Page 7 of 25

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vang, 30(b)(6) - Vol. 1
March 5, 2025

Page 65

      BY MS. KASHYAP:
 2 Q.  And is that an official practice, or is that
 3    just customarily what happens -- usually what happens?
 4      MR. GEORGE: Objection; form.
 5      THE WITNESS: That is usually what happen.
 6      BY MS. KASHYAP:
 7 Q.  Thank you.  And who decided whether the HSOC
 8    team should go outside the noticed area to conduct any
 9    encampment operations?
10      MR. GEORGE: Objection; scope, calls for
11    speculation.
12      THE WITNESS: I would think that would be HSOC team.
13      BY MS. KASHYAP:
14 Q.  So that is not a decision made by DPW?
15      MR. GEORGE: Objection; form.
16      THE WITNESS: Yes.
17      BY MS. KASHYAP:
18 Q.  So that would be a directive or instruction
19    that DPW receives from someone within HSOC?
20      MR. GEORGE: Objection; form, assumes facts not in
21    evidence.
22      THE WITNESS: Yes.
23      BY MS. KASHYAP:
24 Q.  And when DPW goes outside the noticed location,
25    can they take attended property to bag and tag it?

Page 66

 1      MR. GEORGE: Objection; form.
 2      THE WITNESS: Attended property you said?
 3      BY MS. KASHYAP:
 4 Q.  Yes, that's right.
 5 A.  No, if it's attended, no.
 6 Q.  Can they discard attended property if it meets
 7    one of the criteria under 3A of the bag-and-tag policy?
 8 A.  If it's attended and they're claiming it, no,
 9    they cannot do that.
10 Q.  Can they take any unattended property they find
11    outside the noticed encampment area to bag and tag it?
12      MR. GEORGE: Objection; form.
13      THE WITNESS: Can you repeat that question?
14      BY MS. KASHYAP:
15 Q.  Sure.
16    Can they take any unattended property they find
17    outside the noticed area to bag and tag it?
18 A.  Yes.
19 Q.  And can they discard any unattended property
20    they find outside the noticed area if it meets one of
21    the criteria of 3A?
22      MR. GEORGE: Objection; form.
23      THE WITNESS: Yes.
24      BY MS. KASHYAP:
25 Q.  So it is correct that there are circumstances

Page 67

 1    in which DPW will remove property outside a noticed
 2    encampment area?
 3      MR. GEORGE: Objection; form.
 4      THE WITNESS: Again, it depends.
 5      BY MS. KASHYAP:
 6 Q.  What does it depend on?
 7 A.  Abandoned, scattered, loose abandoned property.
 8 Q.  But they also can take unattended property if
 9    they're going to bag and tag it; is that correct?
10      MR. GEORGE: Objection; form.
11      THE WITNESS: Yes.
12      BY MS. KASHYAP:
13 Q.  And they can also discard unattended property
14    if it meets one of the criteria of 3A; is that right?
15 A.  Yes.
16 Q.  And is there any notice provided to individuals
17    whose property is outside the noticed encampment area?
18      MR. GEORGE: Objection; form, calls for speculation,
19    incomplete hypothetical.
20      THE WITNESS: That depends.
21      BY MS. KASHYAP:
22 Q.  What does that depend on?
23 A.  If it's unattended and the item belong with the
24    criteria for bag and tag, we would bag and tag through
25    the process and posted notice at the location with

Page 68

 1    information stating that where we picked up the item and
 2    take photos of those.
 3 Q.  Thank you.  And if the property is unattended
 4    and then discarded because DPW finds that it meets the
 5    criteria of 3A, is there any post-removal notice
 6    provided?
 7      MR. GEORGE: Objection; form.
 8      THE WITNESS: If all items is found to be -- to be
 9    discarded per our policy, we would just create the CMMS
10    document what we discarded.  And no, we don't post a
11    sign if all item is not bagged and tagged.
12      BY MS. KASHYAP:
13 Q.  And other than the post-removal notice that you
14    described when property is bagged and tagged, is there
15    any other type of notice provided to individuals who are
16    outside of the noticed area?
17      MR. GEORGE: Objection; form, calls for speculation,
18    incomplete hypothetical.
19      THE WITNESS: No.
20      MS. KASHYAP: Why don't we go ahead and go off the
21    record now.
22    Off the record.
23      MR. GEORGE: That works.  Let's come back at 11:50.
24    (A break was taken.)
25      MS. KASHYAP: Back on the record.

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Jonathan Vaing, 30(b)(6) - Vol. 1
March 5, 2025

---

Page 77

1 violation of DPW policy?
2      MR. GEORGE: Objection; form, incomplete
3 hypothetical.
4      THE WITNESS: I don't believe we have a policy not
5 to have anybody follow, so I'm not sure if that is a
6 violation of the policy.
7      BY MS. KASHYAP:
8 Q.  Would it be a violation of DPW's procedures?
9      MR. GEORGE: Objection; form.
10      THE WITNESS: Again, I don't believe in our
11 procedure that we're telling or advising our folks to
12 follow or not to follow.
13      BY MS. KASHYAP:
14 Q.  That's helpful, Mr. Vaing.
15      So there is no written guidance -- to your
16 knowledge, no written guidance one way or the other
17 whether DPW folks may follow someone outside an
18 encampment resolution area to take their property?
19      MR. GEORGE: Objection; form.
20      THE WITNESS: That's correct.
21      BY MS. KASHYAP:
22 Q.  And if a DPW staff member followed someone
23 leaving an encampment resolution in order to take their
24 property, would that be -- would that conduct be subject
25 to any type of corrective action or discipline?

---

Page 78

1      MR. GEORGE: Objection; form, incomplete
2 hypothetical.
3      THE WITNESS: Yes.
4      BY MS. KASHYAP:
5 Q.  And why?
6 A.  I believe our job is to clean the street, not
7 to chase anybody around and pick up the item.  It's
8 always been our standard practice if the owner take
9 their belongings, they can keep their belonging, and we
10 move on to the next job.  It's standard practice.
11 Q.  Thank you, Mr. Vaing.
12      I believe you previously testified that in the time
13 that you have been with BSES, DPW has not had any staff
14 conducting regular encampment cleanings; is that
15 correct?
16 A.  That's correct, not that I know of.
17 Q.  Just so you and I are speaking about the same
18 thing, when I use the phrase regular encampment
19 cleanings, I use that phrase as it is referred to in the
20 bag-and-tag policy.
21      Is that your understanding of what regular
22 encampment cleaning is?
23 A.  Yes, it is.
24 Q.  Thank you.
25 A.  Can I clarify something on the previous --

---

Page 79

1 before we took the break?  I remember that a question
2 was asked about the bag-and-tag policy, the time frame.
3 I realized that it was approved on 2022, and that
4 bag-and-tag policy was -- I mentioned was 2018.  So I
5 want to make the correction that it was 2022.
6 Q.  Thank you.  So the bag-and-tag policy that we
7 looked at earlier, which was previously marked as
8 Exhibit 1023, that went into effect in 2022; is that
9 correct?
10 A.  That's correct.
11 Q.  Do you know the date or month in which it went
12 into effect?
13 A.  No.
14 Q.  And prior to 2022, was there a different
15 version of the bag-and-tag policy in effect?
16 A.  I don't remember.
17 Q.  So you don't know if DPW had a bag-and-tag
18 policy prior to 2022?
19 A.  I don't recall at this moment.
20 Q.  Do you know who would know the answer to that
21 question?
22 A.  The previous assistant superintendent.
23 Q.  And who is that person?
24 A.  Linda Lee.
25 Q.  Is Ms. Lee still with DPW?

---

Page 80

1 A.  No.
2 Q.  Is there anyone who is currently within DPW who
3 would know whether or not DPW had a bag-and-tag policy
4 prior to 2022?
5 A.  No, not at this time.
6 Q.  And does DPW have any place, whether that be
7 hard copies or electronic copies, where it keeps
8 versions -- prior versions of policy?
9 A.  Yes.
10 Q.  Where is that?
11 A.  It should be in our share drive.
12 Q.  Would you expect that if there was a prior
13 version of the bag-and-tag policy prior to 2022, that it
14 would be in that shared drive?
15 A.  Yes, I would expect it.
16 Q.  Thank you for clarifying that.
17      I want to ask about routine cleaning operations.
18      How are routine cleaning operations different from
19 HSOC encampment resolutions?
20 A.  A routine cleaning is a route that a litter
21 patrol gets in their assigned area.  And they routinely
22 -- we call it litter patrol where they patrol their
23 assigned route where they do brush up, sweep up and pick
24 up miscellaneous debris.  That's a routine cleaning.
25 Q.  Thank you.

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vang, 30(b)(6) - Vol. 1
March 5, 2025

Page 97

1   already on hand.
2       BY MS. KASHYAP:
3   Q.  Sorry.  Maybe I'm not being clear.
4       How does the PD -- how does the police officer tell
5       the person -- the unhoused person where to get their
6       belongings?
7   A.  I'm not sure how PD notify them.  But I do
8       remember cases where they come to our yard to pick up
9       their belonging per PD telling them to come to the yard.
10  Q.  Do you know if PD provides anything in writing
11      to the person?
12  A.  I don't remember.
13  Q.  So let's -- setting aside what the police
14      department is doing.
15      Does DPW provide any notice to an unhoused person
16      when their attended property is bagged and tagged?
17  A.  I don't recall if they have ever done that, not
18      to my knowledge.
19  Q.  So there is no, you know, receipt that they're
20      given, no piece of paper they're given when attended
21      property is bagged and tagged?
22      MR. GEORGE: Objection; form.
23      THE WITNESS: Not that I know of, no.
24      MS. KASHYAP: Before I get to the next set of
25      questions, I can stop here and we can take an early

Page 98

1       break, or we can go another half hour or so.
2       Do you folks have a preference?
3       THE WITNESS: I'm fine.
4       MS. KASHYAP: Let me try and keep going then, maybe
5       try to get us out of here at a reasonable hour.
6       BY MS. KASHYAP:
7   Q.  Mr. Vaing, at an HSOC resolution who ultimately
8       decides how much time unhoused people have to move their
9       property before DPW begins clearing an area?
10  A.  You said outside of HSOC resolution?
11  Q.  No, no.  Inside an HSOC resolution, during an
12      HSOC resolution.
13      MR. GEORGE: Objection; scope.
14      THE WITNESS: It would be the commander, HSOC
15      commander, JFO commander who make that.
16      BY MS. KASHYAP:
17  Q.  And who decides whether or not someone can take
18      a piece of property with them during an HSOC resolution?
19      MR. GEORGE: Objection; form.
20      THE WITNESS: It would be commander also.
21      BY MS. KASHYAP:
22  Q.  And is that true of JFO as well, the JFO
23      commander?
24  A.  Yes.
25  Q.  And who decides when DPW can begin cleaning the

Page 99

1       area at an HSOC resolution?
2   A.  DPW supervisor.
3   Q.  And what do they make that decision based on?
4   A.  Sorry.  DPW supervisor and commander would
5       coordinate that process.
6   Q.  What does the -- the DPW supervisor making that
7       decision based on?
8   A.  Based on visual of area, where they already
9       cleared the area, now we can sweep and they would clean.
10  Q.  When you say visual, what are they looking for?
11  A.  They're looking for what is to be bagged and
12      tagged, items that can be discarded.
13  Q.  Thank you.  But my question is a little step
14      before that.
15      What are they looking for when they decide now we
16      can start -- DPW can start cleaning the area?  What kind
17      of clues or factors are they looking for?
18      MR. GEORGE: Objection; form.
19      THE WITNESS: We usually -- again, the coordination
20      between the commander and the supervisor would clearly
21      tell -- the commander say yeah, you clear, you guys
22      clear on this side.
23      BY MS. KASHYAP:
24  Q.  And when you say the commander says they're
25      clear, do you mean that the area is clear of people?

Page 100

1   A.  Yes.
2   Q.  Thank you.
3       Who decides whether or not for any particular item
4       whether DPW is going to bag and tag that item?
5   A.  DPW staff and the supervisor.
6   Q.  Who decides whether something is going be
7       bagged and tagged versus discarded?
8   A.  DPW staff and the supervisor.
9   Q.  Who decides the locations where HSOC teams will
10      deploy to clear encampments?
11      MR. GEORGE: Objection; scope.
12      THE WITNESS: HSOC team.
13      BY MS. KASHYAP:
14  Q.  Does DPW play a role in deciding the locations
15      where HSOC will clear encampments from?
16      MR. GEORGE: Objection; form.
17      THE WITNESS: I don't recall we're involved in that,
18      Public Work involved in that.
19      BY MS. KASHYAP:
20  Q.  Who decides whether an unhoused individual is
21      going to be cited for illegal lodging?
22      MR. GEORGE: Objection; scope.
23      THE WITNESS: It wouldn't be Public Works.  I
24      wouldn't know who.  I would be guessing PD.
25      /////

Case 4:22-cv-05502-DMR    Document 366-27    Filed 04/17/25    Page 10 of 25

Coalition on Homelessness, et al. v                                    Jonathan Vang, 30(b)(6) - Vol. 1
City and County of San Francisco, et al.                                              March 5, 2025

Page 101

1    BY MS. KASHYAP:
2 Q.  No, I don't want you to guess.  It sounds like
3    not Public Works.
4    And similarly, who decides whether or not to bag and
5    tag a tent or a tarp after someone has been cited for
6    illegal lodging?
7 A.  That's Public Work, and I think this is also
8    tricky where it is also a PD situation.
9 Q.  Help me understand what part of that is the PD
10   responsible for, and what part of it is Public Works
11   responsible for?
12      MR. GEORGE: Objection; form.
13      THE WITNESS: If PD stated that there is a certain
14   item there is for some type of evidence or whatever.
15      BY MS. KASHYAP:
16 Q.  Okay.  And so correct me if this is not
17   correct, but it sounds like the initial decision about
18   whether or not something should be treated as evidence
19   is made by the police department; is that correct?
20 A.  Yes.
21 Q.  And then what is the Public Works' role from
22   there?
23      MR. GEORGE: Objection; form.
24      THE WITNESS: We bag and tag per PD request.
25   /////

Page 102

1    BY MS. KASHYAP:
2 Q.  And does the bag-and-tag policy apply there?
3 A.  Yes.
4 Q.  And so if an item that the PD has directed DPW
5    to bag and tag falls within Section 3A of the policy,
6    meaning that it can be discarded, will Public Works
7    still bag and tag the item?
8 A.  Due to our team safety, no, we not bag and tag
9    anything that's a potential hazard to our team.
10 Q.  Even if it's -- even if the police has
11   determined that it is evidence?
12      MR. GEORGE: Objection; form.
13      THE WITNESS: That's correct.
14      BY MS. KASHYAP:
15 Q.  Thank you.  Who decides what amount of property
16   that a person at an HSOC resolution can take with them
17   if they have accepted shelter?
18      MR. GEORGE: Objection; form, scope.
19      THE WITNESS: I'm not sure.  But it is not Public
20   Work.
21      BY MS. KASHYAP:
22 Q.  Who decides what property that person must
23   leave behind?
24      MR. GEORGE: Objection; form, scope.
25      THE WITNESS: Repeat that, please.

Page 103

1    BY MS. KASHYAP:
2 Q.  Sure.
3    So we're talking about a person who is at an HSOC
4    resolution and has decided to accept a shelter offer.
5    Who decides what property that person must leave
6    behind, that they cannot take with them to shelter?
7      MR. GEORGE: Objection; form, scope.
8      THE WITNESS: Not Public Work.  I'm not sure who.
9      BY MS. KASHYAP:
10 Q.  And who decides whether to bag and tag or
11   discard any property that the person does leave behind?
12 A.  Public Work.
13 Q.  Thank you.
14   Who decides at an HSOC resolution whether an item of
15   property presents an immediate health or safety risk?
16      MR. GEORGE: Objection; form.
17      THE WITNESS: Can you repeat that?  I'm a little
18   confused on that.
19      BY MS. KASHYAP:
20 Q.  So at an HSOC resolution who decides whether
21   any particular item that is there presents an immediate
22   health or safety risk?
23 A.  It would be a joint decision between the
24   commander and Public Work supervisor.
25 Q.  Thank you.

Page 104

1    We have spoken a little bit about CMMS, and I
2    understand that may draw an objection.  Some of these
3    questions may be better directed to your colleague.  But
4    we talked about the encampment problem code.  I want to
5    understand what DPW operations used the encampment
6    problem code in CMMS.
7      MR. GEORGE: Objection; scope.
8      THE WITNESS: I'm not understanding your question.
9      BY MS. KASHYAP:
10 Q.  Sure.  Let me try again.
11   What type of DPW operations would the encampment
12   problem code be selected for in CMMS?
13      MR. GEORGE: Objection; scope and also form.
14      THE WITNESS: Mostly it would be used with HSOC and
15   JFO because those are the schedule encampment clean.
16      BY MS. KASHYAP:
17 Q.  Is it used for any other types of operations
18   other than the scheduled HSOC and JFO resolutions?
19      MR. GEORGE: Objection; scope.
20      THE WITNESS: No, not that I know of.  Like I said,
21   unless it was called in and listed as encampment.
22      BY MS. KASHYAP:
23 Q.  So it sounds like there are maybe three
24   scenarios in which it is used, HSOC resolution, JFO
25   operation or if the -- if DPW receives a call, and the

Case 4:22-cv-05502-DMR    Document 366-27    Filed 04/17/25    Page 11 of 25

Coalition on Homelessness, et al. v                    Jonathan Vang, 30(b)(6) - Vol. 1
City and County of San Francisco, et al.                              March 5, 2025

Page 117

1    BY MS. KASHYAP:
2    Q.  I want to turn back to the before-and-after
3    photos column in this tracker.
4    What is the purpose of this column?
5    A.  The purpose of it is to capture or catch any
6    mistake or -- so we can coach and teach them right away
7    to try to catch it as soon as possible so they won't
8    make further mistakes.  That is the main purpose of
9    that.
10   Q.  Is this different than the spot checks that we
11   had just spoken about, or is this part of same
12   spot-check process?
13   MR. GEORGE:  Objection; form.
14   THE WITNESS:  It's the same.
15   BY MS. KASHYAP:
16   Q.  So this is part of the spot check that is being
17   conducted by the crew at the yard?
18   A.  Yes.
19   Q.  And where there is no entry, where the -- for a
20   row where it's blank in the before-and-after photos
21   column, what does that mean?
22   A.  That means that individual case was not spot
23   checked.
24   Q.  And then I'm going to have you scroll down in
25   this document to -- I think starting at the middle of

Page 118

1    Page 1.  You should start to see some yeses in this
2    column.
3    What does it mean to you when there is a yes in this
4    column for a particular row?
5    A.  To me it means it's before-and-after photos in
6    that CMMS.
7    Q.  So the person -- this item passed the spot
8    check?
9    A.  Yes.
10   Q.  And I'm going to have you scroll down to I
11   think it's page -- let's see -- Page 4 -- excuse me --
12   Page 2 of the PDF, and you can go and ahead scroll all
13   the way through.
14   But I will represent to you that I don't see any
15   entries in the before-and-after photo column after
16   February 27, 2024?
17   A.  Yes, it appears that way, yes.
18   Q.  And so does that mean that there were no spot
19   checks conducted after February 27, 2024?
20   MR. GEORGE:  Objection; form.
21   THE WITNESS:  Yes, that's possible.
22   BY MS. KASHYAP:
23   Q.  Is there any other explanation for why there
24   are no entries in this column of the tracker after
25   February 27, 2024?

Page 119

1    A.  No, depending on the staff level that's why
2    it's a spot check when we can.  The crew are very busy
3    on things.  The spot check is an extra thing we put into
4    place trying to catch what we can.  So it's not a
5    guarantee that we're able to spot check everything.  In
6    February it is depending on the staff scheduling, so I'm
7    not sure during that time if the person who was in
8    charge of that was on vacation or the supervisor was
9    sick and so on.
10   Q.  Thank you.
11   And I just want to be clear that if you scroll down
12   to the remainder of this document, for the rest of 2024
13   I don't believe I see any entries in the before-or-after
14   column.  So it's not just the month of February.  It's
15   the rest of the document.  I just want to make sure that
16   your answer is the same having seen the full document.
17   A.  Yes.
18   Q.  Great.
19   MS. KASHYAP:  This might be a good stopping point
20   for lunch.  So if we could go off the record, please.
21   (At 1:00 P.M., a lunch recess was taken until 1:32
22   P.M. of the same day.)
23   (Nothing omitted nor deleted.  See next page.)
24
25

Page 120

1    WEDNESDAY, MARCH 5, 2025; P.M. SESSION
2    EXAMINATION RESUMED
3    BY MS. KASHYAP:
4    Q.  Good afternoon, Mr. Vaing.
5    MS. KASHYAP:  I want to ask Mr. Headrick to please
6    put up what was previously marked as Exhibit 1122.  This
7    is Tab 9.
8    (Previously Marked Exhibit 1122 was referenced.)
9    BY MS. KASHYAP:
10   Q.  Mr. Vaing, take a moment and go ahead and
11   scroll through, it is just a one-page document, and let
12   me know when you're ready.
13   A.  Okay.
14   Q.  Thank you.
15   Are you familiar with this form, Mr. Vaing?
16   A.  Yes.
17   Q.  What is it?
18   A.  It's our intake form.
19   Q.  Is it correct that this intake form is
20   completed by DPW staff at the yard?
21   A.  Yes.
22   Q.  So it is not completed at the site where the
23   property is bagged and tagged?
24   A.  That depends.  Sometimes they do it out in the
25   field.

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vang, 30(b)(6) - Vol. 1
March 5, 2025

Page 121

1  Q.  But typically is this form completed at the
2  yard?
3  A.  Yes.
4  Q.  And under what circumstances might they do it
5  in the field?
6  A.  When they have this form with them and -- yeah.
7  Q.  Is this form in the DPW trucks?
8  A.  In most trucks, yes, they should be.
9  Q.  And are there any written policies or
10  procedures about when this form must be completed?
11  A.  I don't believe there was a time frame of when,
12  no.
13  Q.  And how often would you say it's typically
14  completed at the yard instead of at the site of the bag
15  and tag?
16      MR. GEORGE: Objection; form.
17      THE WITNESS: I believe probably 70 to 80 percent of
18  the time.
19      BY MS. KASHYAP:
20  Q.  It's completed at the yard?
21  A.  Yes.
22  Q.  Thank you.
23  And what information does DPW staff use to complete
24  the intake form at the yard?
25  A.  What information?

Page 122

1  Q.  Yes.  What information do they use to fill out
2  the form?
3  A.  The information in the CMMS and the photos.
4  Q.  And the photos are also in CMMS?
5  A.  Correct.
6  Q.  And how do they identify which bag and tag the
7  property belongs to, which individual?
8      MR. GEORGE: Objection; form.
9      THE WITNESS: In most cases when we pick up item
10  from the street when there is nobody there, we wouldn't
11  know who is it.
12      BY MS. KASHYAP:
13  Q.  That's helpful.
14  I guess what I'm asking is if there were multiple
15  people whose items were bagged and tagged that day, how
16  do they figure out which item goes with which person or
17  which items go together as the same person's property?
18  A.  Okay.  Yeah, we note it as what property coming
19  from what tents, if there are several tents.  If it is
20  just one area, we just note it as we don't know if it is
21  multiple owner or not.  We looking at if it is one owner
22  for that one particular location.
23  Q.  When you say you note it or that the staff
24  noted it, is that noted in CMMS?
25  A.  Yes.

Page 123

1  Q.  And so the information used to complete this
2  intake form based on whatever information was put in by
3  staff into CMMS at the site of the bag and tag; is that
4  right?
5      MR. GEORGE: Objection; form.
6      THE WITNESS: Yes.
7      BY MS. KASHYAP:
8  Q.  And on this form what does it mean for
9  something to be PD pick up?
10  A.  Is being picked up from the police station.
11  Q.  How about the box for field pickup?
12  A.  That's picking up from the field.
13  Q.  And would it be a field pickup whether or not
14  it's an SFPD related bag and tag?
15  A.  Correct.
16  Q.  What does it mean for the evidence box to be
17  checked?
18  A.  That's when PD make an arrest, and they let us
19  know that it's evidence.
20  Q.  That the items being bagged and tagged are
21  considered evidence?
22  A.  Yes.
23  Q.  And then what does it mean for the bag-and-tag
24  box to be checked?
25  A.  This item -- this case has been bagged and

Page 124

1  tagged.
2  Q.  Thank you.
3  And is the information from the PD pick up, the
4  field pick up, evidence and bag-and-tag boxes, is that
5  electronically stored anywhere?
6  A.  Yes, it is scanned, saved on our share drive.
7  Q.  Thank you.
8  So this intake form, which I understand is a hard
9  copy, a paper copy form, is then scanned and saved into
10  DPW share drive?
11  A.  Yes.
12  Q.  Is the information in PD pick up, field pick
13  up, evidence or bag and tag extracted from this form and
14  stored in any other electronic format?
15  A.  Yes.
16  Q.  And how is that stored?
17  A.  Excel, we was looking at earlier today, where
18  we looked at the location where it come from and what is
19  the item, service request number, tracking and whether
20  it was disposed or claimed, the same Excel information
21  goes into that Excel file.
22  Q.  Thank you, Mr. Vaing.
23  And I can put the tracker back up in a second.  But
24  I don't see on the tracker any columns for PD pick up,
25  field pickup or evidence.

Case 4:22-cv-05502-DMR    Document 366-27    Filed 04/17/25    Page 13 of 25

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vang, 30(b)(6) - Vol. 1
March 5, 2025

Page 125

1  Is that information, PD pickup, field pickup and
2  evidence, is that captured anywhere electronically other
3  than this scan of this intake form?
4  A.  I have to take a look at that.  I would think
5  it would be captured on the CMMS.
6  Q.  In the corresponding CMMS entry?
7  A.  Yes.
8  Q.  Is there like a specific field for that, for
9  each of these PD pickup, field pickup or evidence, or is
10  it something that would be captured, for example, in the
11  comments section?
12      MR. GEORGE: Objection; form.
13      THE WITNESS: It would be in the comments section.
14      MS. KASHYAP: You can put exhibit down, Mr.
15  Headrick.
16      BY MS. KASHYAP:
17  Q.  Mr. Vaing, when someone arrives to the DPW
18  storage yard to pick up their property, what steps are
19  taken?
20  A.  We have signs around our building, at least two
21  that I know of, to let the unhoused person or the
22  claimant come into our gated area.  And within business
23  hours we always have a security guard there.  And the
24  guard is aware of that we do have folks that come in and
25  claim their belongings.  Once they arrive, a security

Page 126

1  guard will contact our radio room dispatcher, and our
2  radio room dispatcher will contact our special project
3  team.  Our special project team will go out to the gate
4  and meet them at the gate and get information --
5  information, location, date, range, item.  And then they
6  go to the cage or our container and our record to check
7  if there was any item that was picked up for that claim.
8  If we do find information, we will bring that item
9  to the individual outside the gate and ask the
10  individual to sign the document that they retrieved
11  their belonging, and we document that retrieval date and
12  by names on our CMMS.
13  Q.  Thank you, Mr. Vaing.
14  I want to kind of take that step by step just to
15  make sure I understand each step of the process.
16  As I understand it, the security guard lets the
17  radio room know.  The radio room sends out someone from
18  the special projects team to meet this person and gather
19  some information from the person about the item.
20  From there what does the special projects team
21  member do with that information once they've been told
22  this is what I'm looking for, or this was the date and
23  location where it was bagged and tagged from?
24  A.  They write down the notes of what information
25  what they need to look for.  So they go to the container

Page 127

1  and their office to search for that specific, and on the
2  record would let them know what color is the tag.
3  Either red, yellow, blue tag, and they know which
4  container to look for.
5  Q.  Thank you.
6  So are they -- once they get that information, they
7  write it down.
8  Are they running some type of search in a database
9  or some kind of recordkeeping system?
10  A.  Yes.
11  Q.  Which record system is that?
12  A.  The Excel file, the tracker that we have been
13  talking about.
14  Q.  So they will take a look at the tracker and see
15  if they can match the description that they have been
16  given with an item in the tracker?
17  A.  Yes, that's the first step.
18  Q.  Let's say there is a match.  They see a match
19  for the corresponding item.  Then what happens next?
20  A.  Then they would -- now they would know what
21  color the tag is, what container to go to.  And they go
22  retrieve that item and take it to the front yard -- the
23  front gate or the gate and provide the belonging to
24  them.
25  Q.  Thank you.  And what if there is not a match in

Page 128

1  the tracker?
2  A.  So there are two places that we usually check.
3  The first one would be the tracker, which is live.  Let
4  me rephrase that.  We update it on a daily basis.  So we
5  would have the most accurate information if we update --
6  any item coming today, tomorrow morning will get updated
7  on the tracker.
8  The second place we would check is our CMMS
9  database.  We'll do a search for a location, the time
10  frame and take a look at the notes of the CMMS, because
11  we maybe discarded the item for that specific case.  So
12  we need to look at the photo and notes if that's the
13  case.
14  Q.  And so you would expect that if an item was
15  bagged and tagged, that it would be on that Excel
16  tracker that we looked at previously.
17  And so typically you -- the staff would only look to
18  the CMMS if, for example, the item was, in fact,
19  discarded and it wasn't actually bagged and tagged; is
20  that right?
21  A.  Yeah.  In most cases we do both just to make
22  sure.
23  Q.  And am I right that the description of the item
24  on the Excel tracker comes from the intake form that you
25  and I looked at previously?

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vang, 30(b)(6) - Vol. 1
March 5, 2025

Page 129

1  A.  That's correct.

2  Q.  And that description in the intake form is

3  based on the notes made in CMMS at the time the item was

4  bagged and tagged?

5  A.  Yes.

6  Q.  And how -- when the individual is -- the DPW

7  staff member is searching in the tracker, are they

8  searching based on any particular type of information,

9  for example, the date or the location or the physical

10  description of the property?

11  A.  Yeah --

12       MR. GEORGE: Objection; form.

13  Go ahead.

14       THE WITNESS: It's based on location.  You know, if

15  it's Mission between 13 and 14 or 200 block of Mission,

16  we do a street segment and then a specific date.

17       BY MS. KASHYAP:

18  Q.  Thank you.

19  And so that location and date information in the

20  Excel tracker, that comes from the intake form as well;

21  is that correct?

22  A.  Yes.

23  Q.  And the information on that intake form comes

24  from CMMS; is that correct?

25  A.  Yes.

Page 130

1  Q.  What happens if there is nothing in the Excel

2  tracker and nothing in the CMMS database corresponding

3  to the information that the person at the entrance gave?

4       MR. GEORGE: Objection; form.

5       THE WITNESS: We would advise the individual that we

6  do not have record or item that they was claiming.

7       BY MS. KASHYAP:

8  Q.  Anything else that DPW staff would do in that

9  scenario?

10  A.  I believe the crew provide a claim form to the

11  individual if they wish to file a claim.

12  Q.  And then you had said -- when I first asked you

13  about these steps, you talked about how the return of

14  the property is documented.  So let's say they're able

15  to find the property as a match, and they retrieve the

16  item and return it to the person.

17  How is the return of that property documented?

18  A.  The CMMS, noted on the CMMS and also noted on

19  the tracker itself.  And there are -- the original

20  intake form at the bottom we need -- required the

21  signature of the owner who retrieved it.

22  Q.  So I want to take you to those.

23  So when it is noted on CMMS, by that do you mean

24  that the original CMMS record corresponding to that bag

25  and tag is updated to reflect the fact that the property

Page 131

1  was returned to the person?

2  A.  That is correct.

3  Q.  And where on the CMMS record is that update

4  documented?

5  A.  It's on the note section.

6  Q.  Notes I see is sometimes referred to as

7  comments.

8  Is that the same field that you're describing there?

9  A.  Yes.

10  Q.  And then you say that you noted in the tracker.

11  So is this -- you update the Excel tracker to list the

12  date on which it was picked up; is that correct?

13       MR. GEORGE: Objection; form.

14       THE WITNESS: Yes.

15       BY MS. KASHYAP:

16  Q.  And then you also said that they -- the person

17  signs the bottom of the intake form.

18  Where is the signed intake form stored once it has

19  been signed by somebody who got their property back?

20  A.  Special projects office.

21  Q.  And is it stored in electronic copy or hard

22  copy or both?

23  A.  It's a hard copy.

24  Q.  So the intake form that you and I looked at

25  previously, I think you previously testified that's that

Page 132

1  scanned after it's completed when an item is bagged and

2  tagged.

3  The version of that form that has the signature of

4  the person whose property was returned to them, the

5  second version of that form is not scanned and stored on

6  the shared drive; is that right?

7  A.  Not that I know of.

8  Q.  And at the yard is property bagged and tagged

9  at the request of the police department stored any

10  differently than other bagged and tagged property?

11  A.  No.

12  Q.  And someone who owns property that was bagged

13  and tagged at the request of the police department can

14  still come and pick up that property within 90 days like

15  any other bagged and tagged property; is that right?

16  A.  That's correct.

17  Q.  And is it also true that tents that are bagged

18  and tagged as evidence of anti-lodging are also stored

19  no differently than any other bagged and tagged property

20  at the yard?

21       MR. GEORGE: Objection; form.

22       THE WITNESS: Yes.

23       BY MS. KASHYAP:

24  Q.  And so similarly someone who owned that tent

25  that was stored as evidence of illegal lodging could

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Case 4:22-cv-05502-DMR    Document 366-27    Filed 04/17/25    Page 15 of 25

Coalition on Homelessness, et al. v                                                    Jonathan Vang, 30(b)(6) - Vol. 1
City and County of San Francisco, et al.                                                                March 5, 2025

Page 133

1    come pick that tent up within 90 days like any other
2    bagged and tagged property?
3        MR. GEORGE: Objection; form.
4        THE WITNESS: Yes.
5        BY MS. KASHYAP:
6    Q.   After 90 days that bagged and tagged tent that
7    was evidence of illegal lodging can be discarded like
8    any other bagged and tagged property; is that correct?
9    A.   Yes.
10   Q.   Has the San Francisco Police Department ever
11   asked DPW to retrieve a tent that was stored as evidence
12   of anti-lodging?
13       MR. GEORGE: Objection; form.
14       THE WITNESS: Repeat that, please.
15       BY MS. KASHYAP:
16   Q.   Sure.
17   Has the San Francisco Police Department ever asked
18   DPW to retrieve a tent that was stored as evidence of
19   anti-lodging?
20       MR. GEORGE: Same objection.
21       THE WITNESS: Retrieve as mean pick it up from the
22   police station?
23       BY MS. KASHYAP:
24   Q.   What I'm asking is has the San Francisco Police
25   Department ever asked DPW to give the police department

Page 134

1    back a tent that is being stored as evidence of
2    anti-lodging from the storage yard?
3        MR. GEORGE: Objection; form.
4        THE WITNESS: No, not that I'm aware of.
5        BY MS. KASHYAP:
6    Q.   And same question but for the San Francisco
7    District Attorney's Office, has the District Attorney's
8    Office ever asked DPW to give the District Attorney's
9    Office back a tent that is being stored as evidence of
10   anti-lodging at the DPW storage yard?
11       MR. GEORGE: Objection; form, assumes facts not in
12   evidence.
13       THE WITNESS: Not that I'm aware of.
14       BY MS. KASHYAP:
15   Q.   Mr. Vaing, is there a hazmat zone in the
16   storage yard?
17   A.   Yes.
18   Q.   And is there any policy on what goes in the
19   Hazmat zone?
20       MR. GEORGE: Objection; scope.
21       THE WITNESS: Yes.
22       BY MS. KASHYAP:
23   Q.   And what is that policy?
24   A.   We have area with signs and posted note where
25   the policy is if you pick up a car battery or oil,

Page 135

1    cooking oil and fluorescent light bulb, we have an area
2    where they supposed to be disposing that or placing that
3    there to properly dispose of.
4    Q.   And other than the signage that you -- well,
5    let me make sure I understand.
6    It sounds like you described there is signage posted
7    at the DPW storage yard at the entrance to the hazmat
8    area; is that correct?
9        MR. GEORGE: Objection; scope.
10       THE WITNESS: There is signage posted at the hazmat
11   area to help crew to identify what item to put on which
12   section.
13       BY MS. KASHYAP:
14   Q.   Thank you.  That's helpful.
15   Other than that signage, is there any other written
16   information provided to DPW staff about what to put in
17   the hazmat area?
18       MR. GEORGE: Objection.
19   What topic is this, Nisha?
20       MS. KASHYAP: Related to the storage yard, Topic 11.
21       MR. GEORGE: Yeah, I don't think this was covered at
22   all.  I mean, how is the hazmat area?  I mean, this is
23   not something that we envisioned being covered by that
24   topic in our discussions.
25       MS. KASHYAP: And that's fine.  And we can convene.

Page 136

1    I have two further questions about this, and that's
2    going to be --
3        MR. GEORGE: I'll just have my standing objection to
4    those, and if we go any further I'll be instructing him
5    not to answer.
6        MS. KASHYAP: That's fair.
7    Ms. Gilbert, can you read back my last question?
8    (The reporter read back.)
9        THE WITNESS: Do you want me to answer that?
10       MR. GEORGE: Yeah, I just objected to the scope, and
11   then you can answer.
12       THE WITNESS: Yes.  This is a part of our standard
13   tailgate meetings with all the supervisor that is doing
14   the tailgate -- regular tailgate meeting with their
15   crew.  It is in the supervisor handbook, how to handle
16   hazmat material and where to dispose them.
17       BY MS. KASHYAP:
18   Q.   Thank you, Mr. Vaing.
19   Mr. Vaing, who is responsible for determining
20   whether or not unhoused person's property is unattended,
21   attended or abandoned?
22   A.   The staff does on site.
23   Q.   And how does the staff make the determination
24   whether property is abandoned versus unattended?
25       MR. GEORGE: Objection; form.

Case 4:22-cv-05502-DMR   Document 366-27   Filed 04/17/25   Page 16 of 25
Coalition on Homelessness, et al. v                                    Jonathan Vang, 30(b)(6) - Vol. 1
City and County of San Francisco, et al.                                                March 5, 2025

Page 149

1   correctly.
2   Q.  Go ahead and scroll up for me in the thread,
3   please.  So I want to stop here.  December 27, 2022, an
4   email from Mr. Nakanishi back to Mr. Peoples and
5   Mr. Dodge and Ms. Carroll.  And it says -- the second
6   sentence is, I am assuming DPW staff will be briefed on
7   the expectations and how to address this when, slash, if
8   there is an instance where they need to bag and tag
9   large bulky belongings.
10  Does seeing this refresh your recollection as to
11  whether or not there was any change to DPW's practice
12  around bulky items in December of 2022?
13  A.  No.
14  Q.  To your knowledge was DPW staff briefed on
15  bulky items in or around December of 2022?
16  A.  I know that we brief our staff, but I don't
17  remember the specific time frame.
18  Q.  Go ahead and scroll to the top email in this.
19  This is an email from Mr. Peoples back to Mr. Nakanishi
20  and Mr. Dodge and Ms. Carroll.  And it says, yes, you
21  are correct.  Our staff will be trained on the new
22  policy.
23  Do you understand Mr. Peoples here to be referring
24  to a new policy as it relates to bulky items?
25      MR. GEORGE: Objection; foundation.

Page 150

1       THE WITNESS: No, I do not.  I understand what he is
2   saying here.  But I'm not -- just reading through the
3   email it sounds like he claimed there is a new policy.
4       BY MS. KASHYAP:
5   Q.  And is that correct?  Was there a new policy
6   around -- in December of 2022?
7       MR. GEORGE: Objection; asked and answered.
8       THE WITNESS: I don't recall we changing any policy.
9       BY MS. KASHYAP:
10  Q.  And who would know?
11      MR. GEORGE: Objection; asked and answered.
12      THE WITNESS: I said I would know.  I'm not sure who
13  else would know.  But for myself I have to dig into my
14  email during this time frame to see if I'm involved in
15  it or did any training or update any training related to
16  this.
17      BY MS. KASHYAP:
18  Q.  But as you sit here today having read this
19  email you don't know whether or not there was a new
20  policy as it relates to bulky items in December of 2022;
21  is that correct?
22  A.  That's correct.  I cannot confirm.
23  Q.  And you also don't know whether there was any
24  training provided to staff on any new policy related to
25  bulky items in December of 2022?

Page 151

1       MR. GEORGE: Objection; form.
2       THE WITNESS: Correct, not at this time.
3       BY MS. KASHYAP:
4   Q.  But if you had the opportunity to review your
5   emails, you would be prepared to speak to whether or not
6   there was a change in policy around bulky items in
7   December of 2022; is that correct?
8   A.  Yes.
9       MS. KASHYAP: We have Tab 28, which was previously
10  marked as Exhibit 1026.
11  (Previously Marked Exhibit 1026 was referenced.)
12      BY MS. KASHYAP:
13  Q.  Again, Mr. Vaing, take a moment to familiarize
14  yourself with this.
15  A.  Okay.
16  Q.  And I'll direct your attention to I think
17  Page 2 of the PDF to start, right there.
18  And this appears to be an email from you, sent
19  November 30, 2022, to Ms. De La Garza; is that correct?
20  A.  Yes, it appears that way, yes.
21  Q.  And I'll represent to you that the first page
22  of this PDF if you scroll up, that is a document that
23  was attached to your November 30, 2022, email.
24  A.  Okay.
25  Q.  And if you could scroll to Page 2, I believe

Page 152

1   your email says that the attached form -- the form that
2   is Page 1 of this PDF was reformatted so our crew can
3   fill in required information.
4   Is this form that's Page 1 of this PDF the 72-hour
5   notice that was in use by DPW in November of 2022?
6       MR. GEORGE: Objection; form.
7       THE WITNESS: I believe so, yes.
8       BY MS. KASHYAP:
9   Q.  And if you could scroll up for me and look at
10  the actual notice on Page 1.  Can you confirm for me
11  that this notice that was in use in November 2022 states
12  that bulky items will not be stored and may be
13  discarded; is that correct?
14  A.  That is correct.
15  Q.  Thank you.
16      MS. KASHYAP: We can put this one down.
17      BY MS. KASHYAP:
18  Q.  Does DPW have a policy for tracking compliance
19  with the bag-and-tag policy?
20  A.  Tracking compliance, as far as like
21  disciplinary?
22  Q.  We can talk about disciplinary in a second.
23  The question is, does DPW have any policy for
24  tracking or assessing whether or not there is compliance
25  with the bag-and-tag policy by its staff?

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vang, 30(b)(6) - Vol. 1
March 5, 2025

---

Page 153

1    MR. GEORGE: Objection; form.
2    THE WITNESS: I mean, the tracking right now is our
3    tracker, the spot checker to make sure everything is
4    followed.  We're going to extend to have the supervisor
5    respond to bag-and-tag situation.
6    BY MS. KASHYAP:
7    Q.  So the policy for tracking compliance currently
8    is use of the tracker, which I understand to be the
9    Excel tracker and then the spot checks that you and I
10   have discussed previously?
11   MR. GEORGE: Objection; misstates his testimony,
12   form.
13   THE WITNESS: Repeat one more time, please.
14   BY MS. KASHYAP:
15   Q.  Sure.
16   The policy for tracking compliance is the tracker,
17   which I understand to be the Excel tracker that you and
18   I have looked at previously, and the spot checks that
19   you and I have discussed previously; is that right?
20   MR. GEORGE: Objection; form, misstates his
21   testimony.
22   THE WITNESS: Yes.
23   BY MS. KASHYAP:
24   Q.  Is there anything else other than those two
25   processes for tracking compliance with the bag-and-tag

---

Page 154

1    policy?
2    A.  Not that I can recall at this time.
3    Q.  And are those processes written down anywhere?
4    MR. GEORGE: Objection; form.
5    THE WITNESS: I'm sorry.  Which processes?
6    BY MS. KASHYAP:
7    Q.  The process of the spot check and using the
8    tracker to track compliance with the bag-and-tag policy.
9    A.  I don't believe it's a written down
10   instruction.  Just the outcome is documented.
11   Q.  Thank you.
12   And is there any training provided to DPW staff in
13   order to track compliance with the bag-and-tag policy?
14   A.  Yes.
15   Q.  What training is that?
16   A.  It's within the supervisor to me.  I and the IT
17   folks provided hands-on training to the supervisor, how
18   to open the CMMS, how to review it and what to look for.
19   Q.  Is that training written down?
20   A.  It is documented as the topic we discussed in
21   the training, yes, in the Sup 2 minutes.
22   Q.  In the Sup 2 minutes you said?
23   A.  Yes.
24   Q.  Is there a PowerPoint training or any other
25   written materials associated with that training?

---

Page 155

1    MR. GEORGE: Objection; form.
2    THE WITNESS: I believe so, yes.
3    BY MS. KASHYAP:
4    Q.  Where are those stored?
5    A.  In our share drive with our IT team.
6    Q.  Do you know the name of that document, by any
7    chance?
8    A.  Not at this moment.
9    Q.  But it's stored with the IT team?
10   A.  Yes.  It's -- it's called how to operate a CMMS
11   and bag-and-tag process.
12   Q.  Is that training that you just referenced and
13   those materials, is that different from the training
14   that DPW labor would receive about how to just use CMMS?
15   A.  Yes, it is the same.
16   Q.  It's the same training.  So there is no
17   supervisor-specific materials to train them to do this
18   spot -- this type of spot checking?
19   A.  That's correct.  What I have done with the
20   Sup 2 is a refresher, hands on.
21   Q.  When you say hands on, what do you mean by
22   that?
23   A.  We show them on the screen as we go step by
24   step.
25   Q.  And you're showing them the CMMS system on the

---

Page 156

1    screen?
2    A.  Yes.
3    Q.  Does DPW have any other policies for ensuring
4    compliance with the bag-and-tag policy?
5    A.  Not that I know of right now.
6    Q.  Does DPW have a policy of requiring Sup 2's to
7    physically observe or personally observe HSOC
8    resolutions or JFOs?
9    MR. GEORGE: Objection; form.
10   THE WITNESS: It is our expectation, but not a
11   written requirement that I know of.
12   BY MS. KASHYAP:
13   Q.  And does DPW have a policy of requiring
14   assistant superintendents to personally observe HSOC
15   resolutions or JFOs?
16   A.  It's not a -- there is not a requirement I
17   don't believe.  But we do expect the managers and the
18   Sup 2 to make some site visits, yes.
19   Q.  And what is the expectation for Supervisor 2's
20   about how often they're supposed to be personally
21   observing HSOC resolutions or JFOs?
22   A.  It's not written how many times.  But I was --
23   I told the Sup 2 my expectation is at least two times a
24   week.
25   Q.  And how is that communicated to them, that

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vang, 30(b)(6) - Vol. 1
March 5, 2025

---

Page 157

1  expectation?

2  A.  During the Sup 2 meeting.

3  Q.  And would it be document in the Sup 2 notes if

4   that was communicated to them?

5  A.  I am expecting that to be documented, yes.

6  Q.  And how about for the assistant

7   superintendents, is there a frequency that they're

8   expected to observe HSOC resolutions?

9  A.  Yes.

10  Q.  And what is that frequency?

11  A.  We don't have a time or frequency how often.

12   It depends on the schedule we just -- I asked them to

13   make time.

14  Q.  Is that true for all of the folks at the

15   assistant superintendent level?

16  A.  Yes.

17  Q.  And how is that communicated, that expectation

18   communicated to them?

19  A.  During the Sup 2 meeting.

20  Q.  And similarly would you expect that to be in

21   the Sup 2 notes?

22  A.  Yes.

23  Q.  Does DPW have a policy of requiring Sup 2 level

24   staff to review CMMS reports for HSOC resolutions or

25   JFOs?

---

Page 159

1  A.  I didn't really give that date or time frame on

2   that.

3  Q.  How long has that been the expectation that

4   they should be doing these spot checks in the field?

5  A.  I would say around November 2024.

6  Q.  Was that communicated to them during the

7   Supervisor 2 meeting?

8  A.  Yes.

9  Q.  Would you expect it to be in the notes if it

10   was communicated to them?

11  A.  I do, yes.

12  Q.  So other than the field spot check and the

13   office spot check, is there any other policy requiring

14   Supervisor 2 level staff to review CMMS reports for HSOC

15   resolutions or JFOs?

16  A.  Not that I know of.

17  Q.  Does DPW monitor whether or not Supervisor 2's

18   are conducting those spot checks?

19  A.  Yes.

20  Q.  How?

21  A.  We're actually trying to -- well, not yet, but

22   I'm implementing a weekly report.

23  Q.  So if I understand correctly, this is not

24   something that is yet implemented, but it is something

25   that the department is planning to implement?

---

Page 158

1   MR. GEORGE: Objection; form.

2   THE WITNESS: Review -- I'm sorry, review HSOCs?

3   BY MS. KASHYAP:

4  Q.  The CMMS reports for HSOC resolutions or JFOs.

5   MR. GEORGE: Same objection.

6   THE WITNESS: Yes.

7   BY MS. KASHYAP:

8  Q.  Is that the spot check that you and I had

9   discussed previously?

10  A.  That is correct.

11  Q.  Is there any other policy besides the spot

12   check for Supervisor 2's to review CMMS reports from

13   HSOC resolutions or JFOs?

14  A.  Other expectation was to help the field crew

15   out in the field to spot check.

16  Q.  Sorry.  Go ahead?

17  A.  To spot check them on the field to see what

18   they are missing.

19  Q.  So this is a separate spot check than the spot

20   check that is being done --

21  A.  In the office.

22  Q.  -- in the office?

23  A.  Yes.

24  Q.  And how often should that field spot check be

25   done?

---

Page 160

1   MR. GEORGE: Objection; form.

2   THE WITNESS: The weekly report has always been

3   implemented.  There is a certain thing that we will

4   require to be on the weekly report.

5   BY MS. KASHYAP:

6  Q.  Related to this spot check conducted by the

7   Supervisor 2's?

8  A.  Bagged and tagged, yes.

9  Q.  But that has not yet been implemented?

10  A.  No.

11  Q.  Do you know when the department expects to

12   implement it?

13  A.  I'm looking to that now.  I can't give you a

14   date and time right now.

15  Q.  Does DPW have a policy requiring the assistant

16   superintendents to review CMMS reports for HSOC

17   resolutions or JFOs?

18  A.  I recommend that -- for the assistant

19   superintendent to have ability to access and know how to

20   maneuver or navigate the CMMS.

21  Q.  Thanks.

22   But do I understand that to mean that there is not a

23   policy, though, that says the assistant superintendents

24   have to review CMMS reports with a certain amount of

25   frequency; is that correct?

---

Case 4:22-cv-05502-DMR    Document 366-27    Filed 04/17/25    Page 19 of 25

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vang, 30(b)(6) - Vol. 1
March 5, 2025

Page 161

1  A.  That's correct.
2      MR. GEORGE: Objection; form.
3      THE WITNESS: That's correct.  No, no policy on
4  that.
5      BY MS. KASHYAP:
6  Q.  As part of the spot checks conducted by the
7  Supervisor 2's, the field spot checks and the office
8  spot checks, would you expect that they be reviewing for
9  before-and-after photos?
10 A.  That is my expectation for the spot check, yes.
11 Q.  And is that part of what -- what it is supposed
12 to be checked for during the spot checks?
13 A.  Yes.
14 Q.  Does DPW have a policy requiring Supervisor 2's
15 to review any SFPD body worn camera footage from an HSOC
16 resolution?
17 A.  A body camera from the PD?
18 Q.  Yes.
19 A.  And you're saying Public Work crew to review
20 the camera?
21 Q.  Yeah, is there a policy or an expectation that
22 Supervisor 2's would review body cam footage from HSOC
23 resolutions?
24 A.  Not that I'm aware of, no.
25 Q.  Same for assistant superintendents, any policy

Page 162

1  for assistant superintendents to be reviewing body worn
2  camera footage?
3  A.  Not that I recall.
4  Q.  Does DPW conduct any analysis of how often its
5  staff is bagging and tagging items?
6      MR. GEORGE: Objection; form.
7      THE WITNESS: Say that again please.
8      BY MS. KASHYAP:
9  Q.  Does DPW conduct any analysis of how often its
10 staff is bagging and tagging items?
11     MR. GEORGE: Same objection.
12     THE WITNESS: No, I don't recall that happening, no.
13     BY MS. KASHYAP:
14 Q.  Does DPW conduct any analysis of its compliance
15 with the bag-and-tag policy?
16     MR. GEORGE: Objection; form.
17     THE WITNESS: I don't recall that.
18     BY MS. KASHYAP:
19 Q.  You don't recall that that takes place.  To
20 your knowledge it does not, it sounds like.
21     MR. GEORGE: Objection; form, misstates testimony.
22     THE WITNESS: I just don't remember if we did or
23 not.  We may have.  I'm not sure.
24     BY MS. KASHYAP:
25 Q.  But as a kind of ongoing regular practice does

Page 163

1  DPW conduct any analysis with its compliance of the
2  bag-and-tag policy?
3      MR. GEORGE: Objection; form, asked and answered.
4      THE WITNESS: I don't remember that happening.
5      BY MS. KASHYAP:
6  Q.  You don't remember?
7  A.  I don't remember, no.
8  Q.  What is the process if DPW receives an
9  administrative claim filed by someone alleging that
10 their property was discarded by the City?
11     MR. GEORGE: I just want to caution you here to not
12 disclose any types of communications or interactions
13 with the City Attorney's Office regarding administrative
14 claims.
15     THE WITNESS: Okay.  When we get a claim, we do
16 research.
17     BY MS. KASHYAP:
18 Q.  What does that research entail?
19 A.  Location, date range, items, possible names.
20 Q.  And what would you do with that information
21 that you just listed?
22 A.  We will provide it to our attorney.
23 Q.  And again, as Mr. George mentioned, I don't
24 want to know anything about the communication between
25 you and counsel.

Page 164

1  The information that you just mentioned, date,
2  location, etcetera, where would you get that information
3  from?
4  A.  The request or claim.
5  Q.  Okay.  So let me make sure I understand.  An
6  administrative claim comes in.  Someone says that my
7  property was improperly discarded at Y, X Z location on
8  that day.
9  What would DPW do with that information, the date,
10 location, property information?
11     MR. GEORGE: Objection; form.
12     THE WITNESS: The process is -- the claim goes
13 through the City Attorney's Office.  It does not come
14 directly to Public Work.  The City Attorney's Office --
15     MR. GEORGE: Hang on one second.  I want to -- so it
16 may help if maybe we take a break here and discuss.  If
17 I can talk with the client about this.
18 Nisha, as I think you know, the claims, they come
19 straight to us.  And then it's no secret that then there
20 is communications with the client on that.  Is there --
21 I mean, I don't -- if you can reframe your questions to
22 focus on maybe outcomes of claims?  I just want to -- I
23 want to be cautious here.  I don't want to stop the depo
24 if we don't need to.  If you can avoid the process, if
25 that's not necessarily for your purposes, then maybe we

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vang, 30(b)(6) - Vol. 1
March 5, 2025

Page 165

1  can jump it.  Otherwise, we do need to take a break, and
2  I have got to talk to him.
3      MS. KASHYAP:  Sure.  I appreciate that.
4  I guess, Mr. Vaing, I'm not intending to ask nor do
5  I want to know about correspondence between you and the
6  State Attorney's Office.
7      MS. KASHYAP:
8  Q.  What I am trying to understand just within the
9  confines of DPW.  Once a claim -- once DPW has been made
10  aware of a claim, however they're made aware of it, what
11  other steps does DPW take once they're made aware of an
12  administrative claim alleging the wrongful destruction
13  of property by DPW?
14      MR. GEORGE:  I think we're going to have to go off
15  and chat.  There is obviously a fair amount of
16  sensitivity on this because it does involve our office.
17      MS. KASHYAP:  Sure.
18      MR. GEORGE:  Yeah, let's go off, and I can talk with
19  JV separately.
20      MS. KASHYAP:  That's fine.
21  (A break was taken.)
22      MS. KASHYAP:  Ms. Gilbert, can you read back the
23  last question to the witness, please?
24  (The reporter read back.)
25      THE WITNESS:  I can answer that?

Page 166

1      BY MS. KASHYAP:
2  Q.  Yes, please.
3  A.  Yeah, with the information I just mentioned,
4  basically Public Work do our -- we conduct our own
5  investigation, and we provide our findings to the City
6  Attorney's Office.
7  Q.  And what steps are typically taken in that
8  Public Works investigation?
9      MR. GEORGE:  I'm going to instruct him not to answer
10  on the basis of attorney-client privilege and attorney
11  work product.  And so I will instruct the witness not to
12  answer.
13      BY MS. KASHYAP:
14  Q.  Mr. Vaing, are you going to follow your
15  counsel's instructions?
16  A.  Yes.
17  Q.  And other than providing those findings to the
18  City Attorney's Office, is DPW's investigation into an
19  administrative claim documented in any other way?
20  A.  No, not that I know of.
21  Q.  If DPW receives a complaint outside of the
22  administrative claim process about the handling of an
23  unhoused person's belongings, what steps will DPW
24  typically take?
25  A.  We conduct an investigation, and depending on

Page 167

1  our finding, we will -- in some cases we would involve
2  our HR team.
3  Q.  And what is involved in that investigation?
4      MR. GEORGE:  Objection; form.
5      THE WITNESS:  What involved in the investigation is
6  again, location, time frame, who is involved, truck
7  numbers.
8      BY MS. KASHYAP:
9  Q.  And will DPW look at its own records and
10  compare those to the information provided in the
11  complaint?
12  A.  Yes.
13  Q.  And what records is DPW typically looking at?
14  A.  Looking at -- depending on the claim, but we're
15  looking at the CMMS record, location, time frame, and
16  then if anybody involved, GPS vehicle number, if any.
17  Q.  And how are the results of the investigation
18  typically documented?
19  A.  Usually email.
20  Q.  Who does that email go to?
21  A.  It goes to the immediate managers, from the
22  supervisor to the managers.
23  Q.  So that would be the supervisor and the
24  assistant superintendent over the relevant unit?
25  A.  Yes.

Page 168

1  Q.  Would that come to someone like yourself at the
2  acting superintendent level?
3  A.  In most cases, yes.
4  Q.  Would it go to anyone else in DPW management,
5  senior management?
6  A.  Again, depending on the situation.
7  Q.  Who might it go to, other than the folks you
8  have already spoken about?
9  A.  My boss, Deputy Director DiJaida Durden.
10  Q.  Anyone else?
11  A.  No, not that I know of.
12  Q.  And what -- what is the process if a DPW
13  supervisor observes or is otherwise made aware of
14  noncompliance with the bag-and-tag policy?
15      MR. GEORGE:  Objection; form.
16      THE WITNESS:  If the field supervisor notice, you
17  said?
18      BY MS. KASHYAP:
19  Q.  If any supervisor within DPW observes or is
20  otherwise made aware of noncompliance with the
21  bag-and-tag policy.
22      MR. GEORGE:  Same; objection.
23      THE WITNESS:  They would take immediate action as
24  far as coaching and counsel the individual.
25  /////

Case 4:22-cv-05502-DMR     Document 366-27     Filed 04/17/25     Page 21 of 25

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vang, 30(b)(6) - Vol. 1
March 5, 2025

Page 169

1      BY MS. KASHYAP:
2   Q.  Any other steps?
3   A.  No.
4   Q.  Is it true that supervisor coaching is to be
5      documented by the supervisor in their notes?
6   A.  Yes, that's the expectation.
7   Q.  And is there any other place that supervisor
8      coaching is supposed to be documented?
9   A.  Yes.
10  Q.  Where is that?
11  A.  Most recently I implemented a tracker.
12  Q.  When did you implement that tracker?
13  A.  February.
14  Q.  Last month?
15  A.  Yes.
16  Q.  Prior to that the only way that supervisor
17     coaching was documented was in the supervisor's notes?
18  A.  Yes.
19  Q.  Are there any entries in the tracker since
20     February?
21  A.  I'm not aware at this time.
22  Q.  Does anyone else have access to the tracker
23     other than you?
24  A.  Yes, the rest of the managers.
25  Q.  So these are the other assistant

Page 170

1      superintendents?
2   A.  Yes.
3   Q.  Why did you create this coaching tracker?
4   A.  To document any issue, concern, disciplinary
5      and also compliment.  This type of stuff can help us run
6      the operation a little smoother, see what we can --
7      especially during the performance evaluation.
8   Q.  And is this coaching tracker specific to
9      bag-and-tag related coaching or any other form of
10     coaching?
11  A.  All others also.
12  Q.  And did anyone ask you to create this tracker?
13  A.  No.
14  Q.  And sorry, I may have asked this before but
15     just to confirm.
16     To your recollection there are no entries in that
17     coaching tracker yet?
18  A.  That's correct, not that I'm aware of yet.
19     There might be, but I haven't looked at it recently.
20  Q.  Are complaints about bag and tag handled
21     differently than other any other type of complaint that
22     comes into DPW?
23     MR. GEORGE: Objection; form.
24     THE WITNESS: No, we handle as a complaint, and we
25     do take it serious like every other complaint.

Page 171

1      BY MS. KASHYAP:
2   Q.  Mr. Vaing, am I right that if there is verbal
3      counseling that is provided to a DPW staff member, that
4      is to be documented via email?
5   A.  Yes, that's what I'm expecting to see.
6   Q.  Is there any other way that that is documented,
7      that verbal counseling is documented?
8   A.  With a tracker.
9   Q.  And how about written counseling, is that
10     supposed to be documented via email?
11  A.  Yes.
12  Q.  And any other ways that that is to be
13     documented, other than email?
14  A.  Also tracker.
15  (The following pages, 172 through 174, were deemed
16  highly confidential and for attorneys' eyes only by
17  counsel and sealed under separate cover.  See
18  Volume 1A.)
19     (See next page.)
20
21
22
23
24
25

Page 172

1   (The following testimony, Pages 172 through 174, was
2   deemed highly confidential and for attorneys' eyes only
3   by counsel and sealed under separate cover.  See
4   Volume 1A.)
5      (See next page)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vang, 30(b)(6) - Vol. 1
March 5, 2025

---

Page 181

1  action taken as a result of the incident depicted in the
2  video?
3     MR. GEORGE: Objection; form, assumes facts not in
4  evidence.
5     THE WITNESS: I don't remember specific, no.
6  BY MS. KASHYAP:
7  Q.  Who would know if there was corrective action
8  taken?
9  A.  HR or the supervisor in charge.
10 Q.  How about any formal HR discipline resulting
11 from this incident?
12    MR. GEORGE: Objection; form.
13    THE WITNESS: I'm not aware of one for HR.
14 BY MS. KASHYAP:
15 Q.  Sorry.  You said you're not aware --
16 A.  Yeah.
17 Q.  You're not aware of any formal discipline
18 resulting from this incident?
19 A.  I don't recall, yeah.  I don't remember if
20 there is anyone.
21 Q.  Is it proper DPW procedure for DPW workers to
22 drag a tent away from an unhoused person who is still in
23 physical contact with a tent?
24 A.  Looking at the video we can't really see what
25 is happening before.  But it is no excuse.  You know, we

---

Page 182

1  run into cases where sometimes individuals say you can
2  take this, it's garbage, and then they change their mind
3  and they come back.  But to answer your question, no, we
4  should never do any pulling with the unhoused person or
5  anybody.
6  Q.  Do you know if that tent that's depicted in the
7  video was bagged and tagged?
8  A.  Not from the video, no.  I can't tell from that
9  video.
10    MS. KASHYAP: I'll go ahead and introduce -- let's
11 mark any that will be marked as Exhibit 1339.
12 This is Tab 29, Mr. Headrick.
13 (Plaintiffs' Exhibit 1339 was marked for
14 identification.)
15    MR. GEORGE: Are you going to the mark the videos?
16    MS. KASHYAP: Yes, they're marked as 1337 and 1338.
17 BY MS. KASHYAP:
18 Q.  So, Mr. Vaing, go ahead and familiarize
19 yourself with this exhibit, which is 1339, and then let
20 me know when you're ready.  I don't expect that you will
21 be able to read the whole thing.  But I just want to go
22 ahead and have you at least take a moment to skim it and
23 see what it is.
24 A.  Okay.
25 Q.  Thank you, Mr. Vaing.

---

Page 183

1     And if you could please go to Page 5 of the PDF.
2  I'll represent to you for the record that this is a PDF
3  of an article in the San Francisco Standard that was
4  published on July 30th of 2024 and then updated also on
5  July 30th, 2024.  And if you could go to Page 5 --
6  excuse me -- Page 6 of the PDF.  Yes, right there.
7  There is a photograph at the top of Page 6.
8  Do you recognize this to be a Department of Public
9  Works vehicle?
10 A.  Yes.
11 Q.  And can you tell from this photograph whether
12 the items in this vehicle are being discarded or have
13 been bagged and tagged for storage?
14    MR. GEORGE: Objection; foundation, calls for
15 speculation.
16    THE WITNESS: From looking at the photo it looks
17 like a bag and tag.
18 BY MS. KASHYAP:
19 Q.  That all of these items in the back of this
20 truck would have been bagged and tagged for storage?
21 A.  I'm not seeing all of it.  I'm just seeing
22 something that is covered with blue and a table and what
23 looks like a bike frame that is not really clear.
24 Q.  So I guess my question is, from the manner in
25 which these are in the back of the vehicle can you tell

---

Page 184

1  whether or not these are bagged and tagged item or
2  whether or not they're items set to be discarded?
3     MR. GEORGE: Same objection.
4     THE WITNESS: No, I cannot tell from this photo.
5  BY MS. KASHYAP:
6  Q.  Okay.  And is it DPW's practice to store items
7  that are being bagged and tagged for storage in the back
8  of a truck bed along with items that are going to be
9  discarded?
10 A.  No, we try to avoid that.  We try to avoid
11 mixing any debris and bag-and-tag item.
12 Q.  So you would expect that all of the items in
13 the back of this truck bed are going to be treated the
14 same way, whether that's to be discarded or bagged and
15 tagged?
16    MR. GEORGE: Objection; form.
17    THE WITNESS: Yes.
18 BY MS. KASHYAP:
19 Q.  And this may be a misnomer, but if these items
20 are to be stored, from what I can see in the photo none
21 of these items are actually in what I would consider
22 bags.
23 Is that a fair assessment of the photo?
24    MR. GEORGE: Objection; form.
25    THE WITNESS: Right.  But we don't bag it out in the

---

Case 4:22-cv-05502-DMR    Document 366-27    Filed 04/17/25    Page 23 of 25

Coalition on Homelessness, et al. v                                          Jonathan Vang, 30(b)(6) - Vol. 1
City and County of San Francisco, et al.                                                     March 5, 2025

Page 185

1    field.
2        BY MS. KASHYAP:
3    Q.   Okay.  So items if they are to be bagged and
4    tagged and stored, they'll be bagged at the storage
5    yard?
6    A.   Yes, organized and bagged.  Unless it is
7    scattered stuff where we need to bag it into one bag.
8    Q.   In the process of transporting it from the
9    encampment site to the storage yard there is no way to
10   tell by looking at the item whether or not it is
11   something that is going to be bagged and tagged and
12   stored versus something that is going to be discarded;
13   is that right?
14   A.   Yes, that's correct.
15       MS. KASHYAP: Thank you.  You can put this exhibit
16   down, Mr. Headrick.
17       BY MS. KASHYAP:
18   Q.   Mr. Vaing, does DPW policy require a DPW worker
19   to report a violation of the bag-and-tag policy that
20   they observe to a supervisor?
21   A.   I'm not sure it is a requirement.  But it's
22   just an expectation from the crew itself.
23   Q.   To your knowledge there is no written policy
24   that requires one member of a crew to report to the
25   supervisor if they see a fellow member of the crew

Page 186

1    violating the bag-and-tag policy?
2    A.   Not that I'm aware of, correct.
3    Q.   And if a DPW worker reported a violation of the
4    bag-and-tag policy to their supervisor, how would that
5    be documented?
6    A.   Documented in the incident report.
7    Q.   And is that a form that is used?
8    A.   Yes.
9    Q.   And where are those forms stored once they're
10   completed?
11   A.   A drop file in the office.
12   Q.   Sorry.  Did you say the drop file?
13   A.   Yes, in the office.
14   Q.   And what is the drop file?
15   A.   It's a document we keep in the administrative
16   office.
17   Q.   And is this a physical location, so a physical
18   document?
19   A.   Yes.
20   Q.   So if a DPW worker is going to report a
21   violation of the bag-and-tag policy, they would fill out
22   an incident report form and put that in the physical
23   drop file in the office; is that correct?
24   A.   Or the supervisor to investigate and take
25   corrective action.

Page 187

1    Q.   And is there -- is that incident report stored
2    electronically anywhere?
3    A.   No, not that I know of at this time.  It's just
4    hard copy.
5    Q.   And to your knowledge are the hard copies of
6    the incident report stored anywhere other than in the
7    drop file?
8    A.   No.
9    Q.   Do you know how many incident reports DPW has
10   received in the time that you have been with the SCS?
11   A.   Are you referring to just the bag and tag
12   itself?
13   Q.   Yes.  Thank you for clarifying.
14   Incident reports for violations of the bag-and-tag
15   policy.
16   A.   I'm estimating about four or five since I have
17   been there.
18   Q.   Are those hard copies of the four or five
19   forms, are those still in the drop file today?
20   A.   It should be, yes.
21   Q.   And once the supervisor receives an incident
22   report, what are they to do with it?
23   A.   They conduct their own investigation.
24   Q.   And if the result of their investigation showed
25   that there was in fact a violation of the bag-and-tag

Page 188

1    policy, what are they to do?
2    A.   They would counsel them or coach them.
3    Q.   Anything else?
4    A.   And if it was severe where it require a written
5    counseling, they would issue a written counseling.  And
6    if it is severe where it need to involve HR, we'll
7    provide the finding to HR for further action.
8    Q.   Thank you.
9    And the incident report form that you mentioned to
10   report violations, does anyone other than DPW staff use
11   that incident report form?
12   A.   Anybody else outside Public Work?
13   Q.   That's right.
14   A.   Not that I know of.
15   Q.   Thank you.
16   When DPW staff is conducting routine cleaning
17   operations, who decides how much time to give unhoused
18   people to move their belongings?
19       MR. GEORGE: Objection; form.
20       THE WITNESS: A routine cleaning for us is not
21   moving any unhoused person.  So we don't give them time
22   to move.  We're not asking them to move.
23       BY MS. KASHYAP:
24   Q.   Okay.  And in responding to 311 service
25   requests -- when DPW staff responds to 311 service

Case 4:22-cv-05502-DMR    Document 366-27    Filed 04/17/25    Page 24 of 25

Coalition on Homelessness, et al., v                              Jonathan Vaing, 30(b)(6) - Vol. 1
City and County of San Francisco, et al.                                         March 5, 2025

Page 209

1  Q.  Thank you, Mr. Vaing.
2      So I'll first direct your attention to -- it's going
3  to be Page 6 of the PDF.  So you can use the numbers at
4  the side of the document to tell you where you're at.
5      And this will be Paragraph 22.
6      First, do you recognize this document as a
7  Declaration that you submitted to the Court in this
8  litigation?
9  A.  Yes.
10 Q.  And in Paragraph 22 it says, I have led
11 training using these PowerPoint materials to BSES
12 employees at least three times since 2023.  The training
13 using my PowerPoint materials takes approximately 30
14 minutes.
15     Do you see that?
16 A.  Yes.
17 Q.  And is it your understanding that the
18 PowerPoint materials referenced in that paragraph are
19 the PowerPoint materials included with this Declaration?
20 A.  Yes, I believe so.
21 Q.  And if I could please direct your attention to
22 Page 17 of PDF.
23     Is this one of the slides in the PowerPoint that you
24 gave to staff at least three times after January 2023?
25 A.  Yes.

Page 210

1  Q.  And is it correct that this slide states that
2  furniture, mattresses, sheds, rolling structures and
3  bulky items will be discarded and will not be stored?
4  A.  Yes, according to this, yes.
5  Q.  But that was not DPW's policy as it relates to
6  bulky items that was in effect at the time this training
7  was given; is that correct?
8  A.  Yes, that's correct.
9  Q.  So DPW staff continued to be trained to discard
10 bulky items even after the policy required the storage
11 of bulky items; is that correct?
12 A.  I'm not sure that is accurate.  I understand
13 that the PowerPoint training information here appeared
14 to be incorrect.  But as far as the standard practice on
15 the field, the staff know we do bag and tag bulky item.
16 Q.  How do they know that?
17 A.  Because we stored them.  The crew does know
18 that we do store the bulky item.
19 Q.  So by seeing these bulky items in storage DPW
20 staff know that bulky items are to be stored?
21 A.  At least the special unit that is handling the
22 encampment cleaning.  Again, I can say, yes, the
23 information on this slide is not right.
24 Q.  Other than seeing the bulky items at the
25 storage yard, are there any other ways that staff would

Page 211

1  know that they were required to store bulky items under
2  the version of the DPW policy that was in effect at the
3  time?
4  A.  No, I think from 2021 to present we have made a
5  lot of changes as far as training document.  We have
6  improved our process and the training guides information
7  that need to be on there.  Those are the steps that we
8  take.  Every training that we provide we get feedback
9  from the crew, and we try to improve it from what we
10 learned from it.
11 Q.  My question is, other than seeing the items --
12 bulky items at the storage yard, in 2023 when this
13 training was being given, is there any other way that
14 staff know not to discard bulky items?
15     MR. GEORGE:  Objection; form.
16     THE WITNESS:  Beside new training and updated
17 training and clarifying what the requirement is, no.
18 There are no other besides our visual training.
19     BY MS. KASHYAP:
20 Q.  And if you scroll up just to the top of this
21 page, you'll see a date, filed September 22nd, 2023.
22 I'll represent to you that this is the date that this
23 Declaration was filed with the Court.
24 So between January of 2023 and September 22 of 2023
25 when this was filed, was this slide deck that we're

Page 212

1  looking at the version of the training that was in use
2  for DPW staff?
3  A.  I believe so, yes.
4  Q.  So any changes to the slide deck to correctly
5  state bulky item policy would have been made after
6  September 22 of 2023?
7  A.  Yes.
8  Q.  Mr. Vaing, does seeing this training slide,
9  does this refresh your recollection any further as to
10 whether there were changes to DPW policy or practice
11 around the storage of bulky items in or around December
12 of 2022?
13 A.  Yes.
14 Q.  What is now your recollection of whether there
15 were any changes to how DPW stored bulky items in or
16 around December of 2022?
17 A.  I believe this may be tied into the email you
18 showed me earlier today with Sam Peoples and the HSOC
19 team.
20 Q.  And what is your understanding now?
21 A.  My understanding is the correct information
22 should be on there, that the bulky items should be
23 bagged and tagged.
24 Q.  The correct information should be on where?
25 A.  On the new slide, on this training slide.

Case 4:22-cv-05502-DMR    Document 366-27    Filed 04/17/25    Page 25 of 25

Coalition on Homelessness, et al. v                                    Jonathan Vang, 30(b)(6) - Vol. 1
City and County of San Francisco, et al.                                              March 5, 2025

Page 213

1  Q.  But it's your understanding that at least until
2  September of 2023 this training slide was not updated to
3  state that bulky items should not be discarded?
4  A.  That's correct, as far as I know, yes.
5  Q.  And we can put the email back up if need be.
6  But I'll represent to you that that email was sent in
7  December of 2022.
8  So if it's between December of 2022 when Mr. Peoples
9  sent that email and September of 2023, DPW staff
10  continued to be trained using a PowerPoint that said
11  that bulky items could be discarded?
12  A.  Yes.
13  Q.  And was there any change in DPW's practice
14  around bulky items in December of 2022?
15  A.  I don't remember, no.
16  Q.  Sorry.  You cut out.  You said you don't
17  remember?
18  A.  Yes, I don't remember if there was in that
19  time.
20  Q.  Okay.  Thank you.
21      MS. KASHYAP:  We can put this exhibit down.
22  BY MS. KASHYAP:
23  Q.  Mr. Vaing, is it true that other than the
24  bag-and-tag policy, which we have been discussing and
25  have looked at, DPW has no further written policies on

Page 214

1  whether an unhoused person's belongings constitute an
2  immediate health risk?
3  A.  Repeat that one more time.
4  Q.  Sure.
5  Other than the bag-and-tag policy, is it -- does DPW
6  have any other written policies about whether unhoused
7  person's property is an immediate health risk?
8      MR. GEORGE:  Objection; form.
9      THE WITNESS:  That's correct, to my knowledge.
10  BY MS. KASHYAP:
11  Q.  It is correct that there is no other written
12  policy?
13  A.  Yes.
14  Q.  Same question about whether something poses an
15  immediate safety risk.  Other than the bag-and-tag
16  policy, are there any other DPW written policies about
17  whether something is an immediate safety risk?
18  A.  No, not that I know of.
19  Q.  And other than the bag-and-tag policy, are
20  there any other DPW written policies about whether
21  something is co-mingled with items that pose a health or
22  safety risk?
23      MR. GEORGE:  Objection; form.
24      THE WITNESS:  Besides the bag-and-tag training
25  policy, no.

Page 215

1  BY MS. KASHYAP:
2  Q.  Besides the bag-and-tag training and the
3  bag-and-tag policy; is that right?
4  A.  Correct.
5  Q.  And then finally, other than the bag-and-tag
6  policy, does DPW have any further written policies on
7  whether an unhoused person's property is contraband?
8  A.  Besides bag-and-tag training policy, no.
9  Q.  Thank you.
10  Are you aware in this case there was a court order
11  called a preliminary injunction issued in December of
12  2022?
13  A.  Yes.
14  Q.  And who at DPW is responsible for ensuring that
15  DPW complies with the preliminary injunction?
16      MR. GEORGE:  Objection; beyond the scope.
17  And I'll just caution you not to disclose any
18  communications with counsel.
19      THE WITNESS:  I'm not sure what your question as far
20  as responsible.
21  BY MS. KASHYAP:
22  Q.  Maybe I'll ask it a better way.  Again, I don't
23  want to know anything about your communications with the
24  City Attorney's Office.
25  Is there someone at DPW who is responsible for

Page 216

1  ensuring that DPW complies with the preliminary
2  injunction order?
3      MR. GEORGE:  Same objection; beyond the scope and
4  also form.
5      THE WITNESS:  It would be the bureau superintendent.
6  BY MS. KASHYAP:
7  Q.  Who is that individual?
8  A.  Chris McDaniels.
9  Q.  It's my understanding that Mr. McDaniels is no
10  longer with DPW.  I believe he retired.
11  Is there someone else other than Mr. McDaniels who
12  has that responsibility now?
13  A.  Yes.
14      MR. GEORGE:  Same objections.
15      THE WITNESS:  That would be me.
16  BY MS. KASHYAP:
17  Q.  Did Mr. McDanields read the preliminary
18  injunction after it was issued?
19      MR. GEORGE:  Objection; beyond scope and also form.
20      THE WITNESS:  I don't know that.
21  BY MS. KASHYAP:
22  Q.  Have you read the preliminary injunction?
23  A.  Yes.
24  Q.  And again, I want to set aside any discussions
25  you have had or anyone at DPW has had with City