# EXHIBIT 24

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

*Jonathan Vaing*
*January 15, 2025*

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 43920Vaing_nl.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR    Document 366-30    Filed 04/17/25    Page 3 of 12

Coalition on Homelessness, et al. v                                        Jonathan Vaing
City and County of San Francisco, et al.                                 January 15, 2025

Page 29

1  how did you supervise them?
2      Did you meet with them?
3  A. Yes.
4      ATTORNEY GEORGE: Objection; compound.
5      BY ATTORNEY KASHYAP:
6  Q. Yes, you met with them?
7  A. Yes, I did.
8  Q. How often did you meet with them?
9  A. Usually, daily.
10 Q. And what were those meetings about?
11 A. On the operation. So each unit has a different
12    operation part, what is a graffiti abatement issue
13    related to graffiti, or special events with Edgar, or
14    Corridor block sweeping with Mr. Corey Jackson.
15 Q. Did you discuss the bag-and-tag policy during
16    those meetings?
17 A. I don't remember discussing that with them.
18 Q. Did you discuss any problems or issues at the
19    storage yard with Mr. Garcia in those meetings?
20 A. I don't remember that.
21 Q. Did you e-mail with Mr. Shehadeh, Mr. Garcia,
22    and Mr. Jackson when you were supervising them?
23 A. Yes.
24 Q. Did you ever discuss the bag-and-tag policy in
25    those e-mails?

Page 30

1  A. I don't remember.
2  Q. Okay. And how about text messages; did you
3     communicate with Mr. Shehadeh, Mr. Garcia, and
4     Mr. Jackson by text?
5  A. Yes.
6  Q. How often would you say you communicated with
7     them by text?
8  A. Probably on a daily basis.
9  Q. And did you discuss the bag-and-tag policy with
10    them via text message?
11 A. I don't remember specific.
12 Q. Okay. Other than those three individuals,
13    while you were assistant superintendent, did anyone else
14    report directly to you?
15 A. No. Those are the three.
16 Q. Mr. Vaing, can you help me understand what is
17    the difference between the title Supe I and Supe II
18    within DPW?
19 A. Sure. Supe I is a supervisor level overseeing
20    a general laborer. A Supervisor II is overseeing the
21    whole section of that unit, where there's a general
22    laborer or the Supe I. And the Supe II is over that.
23 Q. And just so I understand, when you say the
24    Supervisor II oversaw -- oversees the whole section,
25    previously, we had talked about the fact that Mr. Reilly

Page 31

1  was currently -- well, excuse me. Let me back up.
2      As I understand it, Mr. Reilly was the -- was
3     overseeing the Hot Spot team.
4      Is he the Supe II of the Hot Spot team, or do I
5     have that wrong?
6  A. That's -- he's actually acting assistant
7     superintendent overseeing the Hot Spot team of the
8     Supe II. He oversee the Supe II.
9  Q. Okay. So who is the current Supe II of the Hot
10    Spot team?
11 A. Currently, it's Brittany Brandon.
12 Q. Okay. And how long has Ms. Brandon been in
13    that role?
14 A. I think couple weeks.
15 Q. And prior to Ms. Brandon, who was the Supe II
16    of the Hot Spot crew?
17 A. It was Mr. Darryl Dilworth.
18 Q. And do you know how long Mr. Dilworth was in
19    that role, Supe II of the Hot Spot crew?
20 A. I believe it was a year or two. Over a year.
21 Q. And who was the Supervisor II of the Hot Spot
22    crew prior to Mr. Dilworth?
23 A. I don't remember now who that is.
24 Q. And is the Supervisor II of the Hot Spot crew
25    physically present with the Hot Spot crew when they're

Page 32

1  conducting their operations?
2  A. Not all the time.
3  Q. How often is the Supervisor II physically
4     present with the Hot Spot crew?
5  A. I can't say. Depending on their schedule. I'm
6     not sure how often.
7  Q. Is it more than half the time that they're
8     physically present with the Hot Spot crew?
9      ATTORNEY GEORGE: Objection; asked and answered.
10     THE WITNESS: I'm guessing probably half.
11     BY ATTORNEY KASHYAP:
12 Q. Okay. I don't want you to guess, Mr. Vaing.
13    So if it truly is a guess -- you know, as we talked
14    about the difference between an estimate and a guess, I
15    don't want a guess.
16     But is that an -- is that your best estimate as
17    to how often they're out there?
18 A. I'm sorry. Yeah, it would be my best estimate.
19    Yes.
20 Q. Okay. Thank you.
21     And when the Supervisor II is not physically
22    present with the Hot Spot crew, is the Supervisor I
23    present?
24 A. Yes.
25 Q. Okay. So it's accurate to say that, at all

Case 4:22-cv-05502-DMR   Document 366-30   Filed 04/17/25   Page 4 of 12

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vaing
January 15, 2025

Page 33

1  times with the Hot Spot crew, there is either a
2  Supervisor II or a Supervisor I physically present as
3  they're conducting their work?
4  A.  Our standard operation, yes, we will.
5  Q.  Okay.  Are there times where DPW deviates from
6  that standard operation?
7  A.  That depends on days.
8  Q.  Okay.  Approximately how often would you say
9  that there is neither a Supervisor II nor a Supervisor I
10  physically present with the Hot Spot crew?
11  A.  My estimate is very unlikely.  Depend if people
12  call in sick and other issues, emergency, come up.
13  Q.  Okay.  But maybe it's fair to say 90 percent of
14  the time, there's either a Supervisor I or a
15  Supervisor II present with the Hot Spot crew?
16  A.  Yes.
17  Q.  Okay.  And who is the Supervisor I for the Hot
18  Spot crew currently?
19  A.  It is Mr. Israel Graham.
20  Q.  And how long has Mr. Graham been in that role?
21  A.  I think a little bit over a year.
22  Q.  Who was the Supervisor I of the Hot Spot crew
23  prior to Mr. Graham?
24  A.  I don't remember at this time who it was.
25  Q.  Thank you.

Page 34

1  So within DPW, which crews handle formal
2  encampment resolutions?
3     ATTORNEY GEORGE:  Objection; form.
4     THE WITNESS:  It would be our Hot Spot crew.
5     BY ATTORNEY KASHYAP:
6  Q.  Any other crews, other than the Hot Spot crew?
7  A.  Reactionary crew.
8  Q.  Okay.  Let me make sure I understand where the
9  Reactionary crew fits into the DPW's organization chart.
10     Previously, you had told me about the Zone, the
11  Swing Shift, Graffiti, Corridor, Special Projects.
12     What unit is the Reactionary crew within?
13  A.  The Reactionary crew fall under Special Project
14  operations.
15  Q.  Other than the Hot Spot crew and the
16  Reactionary crew, are there any other crews that handle
17  formal encampment resolutions for DPW?
18  A.  No.
19  Q.  Okay.  What is the role of the Reactionary crew
20  in formal encampment resolutions?
21  A.  The Reactionary crew responds to -- and
22  schedule resolution also with the -- we call it Joint
23  Operation, JFO.
24  Q.  Okay.  So the Reactionary crew is responsible
25  for scheduling the formal encampment resolutions and the

Page 35

1  JFOs?
2     ATTORNEY GEORGE:  Objection; misstates testimony.
3     THE WITNESS:  They respond to the schedule location.
4     BY ATTORNEY KASHYAP:
5  Q.  I see.  Thank you for clarifying, Mr. Vaing.
6     And how about the Hot Spot crew; what is their
7  role within formal encampment resolutions?
8  A.  Are the same.  They respond to the schedule
9  location.
10  Q.  Okay.  So is it accurate to say that the Hot
11  Spot crew and the Reactionary crew have the same role
12  when it comes to formal encampment resolutions?
13  A.  Yes.
14  Q.  And is that also true for JFOs?
15  A.  Yes.
16  Q.  Are there other -- any other crews, other than
17  those two, that respond to or participate in JFOs?
18  A.  No, I don't remember any others.
19  Q.  No, you don't remember, or no, there are no
20  other crews that respond?
21  A.  I don't remember who else, at this time, that
22  involve with the resolution.
23  Q.  Okay.  Which crews within DPW participate in
24  regular encampment cleanings?
25  A.  All the Zone.

Page 36

1  Q.  Any other crews?
2  A.  We mentioned the Hot Spot crew and the
3  Reactionary crew and the Zone.
4  Q.  Okay.  So the Zone crews participate in regular
5  encampment cleanings along with the Hot Spot and
6  Reactionary crews, but the Zone crews do not participate
7  in the formal encampment resolutions; is that accurate?
8  A.  Yes.
9  Q.  Okay.  And then which crews within DPW
10  participate in routine cleaning operations?
11  A.  That would be the Zone and Swing Shift
12  operations.
13  Q.  Any others?
14  A.  No, I don't believe so.
15  Q.  Okay.  And which crews within DPW participate
16  in reencampment clearings?
17  A.  Can you clarify "reencampment"?
18  Q.  Sure.  And maybe that's a good place to start.
19     Are you familiar with the term "reencampment
20  prevention"?
21  A.  Sorry, I don't.  I might be confused, but I
22  don't.
23  Q.  Okay.  Are there any situations in which DPW
24  crews will respond to an area where an encampment
25  resolution has previously taken place to clear the area

Case 4:22-cv-05502-DMR    Document 366-30    Filed 04/17/25    Page 5 of 12
Coalition on Homelessness, et al. v                                    Jonathan Vaing
City and County of San Francisco, et al.                               January 15, 2025

Page 93

1  unlikely.
2  Q. So in the past six months, it's very unlikely
3  that you've attended an entire encampment resolution
4  from beginning to end?
5  A. That's correct.
6  Q. Okay. Prior to your role as acting
7  superintendent, when you were assistant superintendent
8  of BSES operations, how often were you physically
9  personally present at an encampment resolution from
10 beginning to end?
11 A. Probably two or three time, my estimate, within
12 like two to three years.
13 Q. Two to three times in two to three years.
14    So approximately once a year, you would
15 personally observe an encampment resolution from
16 beginning to end?
17 A. I would think so, yes.
18 Q. Okay. And how often, while you were assistant
19 superintendent of BSES operations, were you present for
20 any portion of an encampment resolution?
21 A. Sorry. Say that again?
22 Q. Sure. Sorry.
23    Let me start with your -- we're talking about
24 your role as assistant superintendent.
25 A. Mm-hmm.

Page 94

1  Q. So it was your testimony that you -- you know,
2  maybe once a year were you at an entire encampment
3  resolution.
4     While you were assistant superintendent, how
5  often were you at any portion of an encampment
6  resolution?
7  A. I see.
8     The two to three time that -- between that two
9  or three years, that was as assistant superintendent.
10 Q. I understand. Right.
11    So as assistant superintendent, how often were
12 you at an encampment resolution for any portion of time,
13 even if you weren't there from beginning to end?
14 A. Oh, it was about two or three time during that
15 period, two or three years, too.
16 Q. Two or three times in two or three years.
17    And those are different instances than the
18 times that you stayed the whole time?
19    Or, if you were there, would you be there the
20 entire time?
21 A. I don't recall I'm staying there for the whole
22 time. I would just stop by.
23 Q. Okay. So just, again, so I'm clear, because I
24 know there's a lot of different time periods we've been
25 talking about here and different things.

Page 95

1  While you were assistant superintendent of BSES
2  operations, it's your recollection that you never stayed
3  for an entire encampment resolution, from the very
4  beginning all the way to the very end, but it's your
5  recollection that once a year, you would physically be
6  present for some portion of an encampment resolution; is
7  that fair?
8  A. Yes, it is fair.
9  Q. Okay. And then in this past six months, when
10 you've been acting superintendent, have you physically
11 gone out to any encampment resolutions?
12 A. Yes.
13 Q. How many, would you say?
14 A. Once.
15 Q. Okay. And how long did you stay at the
16 encampment resolution you observed in the past six
17 months?
18 A. Approximately about 15 minute.
19 Q. Okay. And were you out of your vehicle and
20 physically present at the encampment resolution, or were
21 you observing from a vehicle?
22 A. I was out the vehicle.
23 Q. Sorry. You were at the wheel? Is that what
24 you said?
25 A. No, I was out the vehicle.

Page 96

1  Q. Out of the vehicle.
2  A. Sorry.
3  Q. Got it.
4     And you said you were there for about
5  15 minutes.
6     When you were assistant superintendent and you
7  went to encampment resolutions for about once a year,
8  would you stay for about 15 minutes, similarly?
9  A. Yes. I would say so, yes.
10 Q. Okay. So it's fair to say that in the past two
11 and a half years, you've observed 15 minutes of an
12 encampment resolution every year; is that accurate?
13 A. That sounds accurate, yes.
14 Q. Okay. Great.
15    ATTORNEY KASHYAP: I know folks are probably eager
16 for a lunch break. I can do one of two things. I can
17 either -- we can either break now and come back maybe in
18 half an hour or so, or longer, if folks need longer,
19 especially, Madam Court Reporter, I'm looking to you.
20 Or I can do one more, you know, section for about 10,
21 15 minutes, and then we can come back.
22    What would folks prefer?
23    ATTORNEY GEORGE: Really up to the reporter and the
24 witness. I'm indifferent.
25    THE REPORTER: Whatever you decide is fine with me.

Case 4:22-cv-05502-DMR     Document 366-30     Filed 04/17/25     Page 6 of 12

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Jonathan Vaing  
January 15, 2025

Page 117

1  **ATTORNEY GEORGE:** Great. Thank you. I see them
2  now.
3  **ATTORNEY KASHYAP:** And, Mr. Friend, Tab 11 has a
4  Bates ending 25 and then a Bates ending 36, if we can --
5  we'll do, you know, each at a time. Because I think you
6  can only share screen one at a time.
7  **ZOOM TECHNICIAN:** This is Tab 11, ending in 36,
8  first.
9  **BY ATTORNEY KASHYAP:**
10 Q. Okay. Mr. Vaing, take your time and review
11 this, please.
12 A. (Examines document.)
13    Okay.
14 Q. Okay. Let's start here, and then we'll look at
15 the other document that's part of this exhibit.
16    So, Mr. Vaing, what is this document that we're
17 looking at?
18 A. It's a 72-hour notice planned removal.
19 Q. Okay. Is this the notice that is posted as
20 part of an encampment resolution?
21    **ATTORNEY GEORGE:** Objection; foundation.
22    **THE WITNESS:** To my knowledge, yes.
23    **BY ATTORNEY KASHYAP:**
24 Q. If you could scroll down to the bottom.
25    Would you agree that this notice misstates

Page 118

1  DPW's policy as to bulky items?
2  **ATTORNEY GEORGE:** Objection; form, foundation.
3  **THE WITNESS:** That depends.
4  **BY ATTORNEY KASHYAP:**
5  Q. Okay. What does it depend on?
6  A. I mean, it depend on the condition of the bulky
7  item. I -- yeah, it was all broken up and mixed with
8  certain things, that's consider safety concern for our
9  crew, we would all -- we would discard it.
10 Q. I understand that, I think.
11    So what your testimony is, is if it's a bulky
12 item but that it also presents an immediate threat to
13 public health or safety because it's intermingled with
14 items that present a threat to public health or safety,
15 that it would still be discarded?
16 A. Yes.
17 Q. Okay. Or if it's, as you said, broken up.
18    So essentially trash or unusable, then it would
19 be discarded?
20 A. Yes.
21 Q. But is it accurate to say that at the time --
22 let me take a step back.
23    Is it accurate to say that in the entirety of
24 the time that you have been with BSES, so 2021 onward,
25 it has not been DPW's policy to discard bulky items

Page 119

1  simply because they are bulky?
2  A. From my understanding, yes. From what I
3  remember, we always been tagged -- supposed to be
4  tagging the bulky item when it's in good condition and
5  not on that depends situation.
6  Q. Okay. And so since it is not DPW's policy to
7  discard bulky items simply because they are bulky, would
8  you agree that this notice that's on the screen
9  inaccurately states DPW's policy as to bulky items?
10 A. Looking at this, yes.
11    **ATTORNEY KASHYAP:** Mr. Friend, if we could please
12 see the part of the tab ending in 25.
13    **BY ATTORNEY KASHYAP:**
14 Q. Mr. Vaing, let me know when you're done.
15 A. (Examines document.)
16    Okay.
17 Q. Okay.
18    **ATTORNEY KASHYAP:** So first, just for clarity for
19 the court reporter, this document is also part of
20 Exhibit 1026.
21    **BY ATTORNEY KASHYAP:**
22 Q. Mr. Vaing, what is this document?
23 A. It's an e-mail chain.
24 Q. Okay. And the e-mail at the top of the chain,
25 that's an e-mail from you to Nicole De La Garza on

Page 120

1  November 30th, 2022; is that right?
2  A. Yes.
3  Q. I want to direct your attention to the sentence
4  starting with: "Below is the Official verbiage/language
5  on the 72 hour posting notice."
6     What did you mean by that?
7  A. During that time, looking at it, I believe I
8  meant whatever is written on the official 72-hour notice
9  that we had at that time.
10 Q. Okay. And so just so I understand, the notice
11 posted below in this e-mail, starting on page 2, this is
12 the official notice that was in use, according to you,
13 on November 30th, 2022?
14 A. That's correct.
15 Q. And if we could stay here on page 2.
16    Would you also agree that the -- this notice,
17 specifically the final paragraph, misstates DPW's policy
18 as to bulky items?
19    **ATTORNEY GEORGE:** Objection; form.
20    **THE WITNESS:** I agree.
21    **BY ATTORNEY KASHYAP:**
22 Q. Okay. Can you scroll up, please. Thank you.
23    Oh, no, sorry. Scroll up to the top.
24    To your knowledge, was the form that is in this
25 e-mail the version that was in use in -- as of

Case 4:22-cv-05502-DMR   Document 366-30   Filed 04/17/25   Page 7 of 12

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vaing
January 15, 2025

Page 129

1  included with the corresponding CMMS report?
2  A.  That's correct.
3  Q.  And just so we make sure we're using the same
4  terminology, when I say "CMMS report," is that also
5  referred to as a service order report?
6  A.  Yes.
7  Q.  Okay.  And would it be fair to say, then, that
8  if there is no photograph of a post-removal notice, that
9  no such notice was provided?
10     ATTORNEY GEORGE:  Objection; form.
11     THE WITNESS:  Repeat that one more time, please.
12     BY ATTORNEY KASHYAP:
13 Q.  Sure.
14     So just to make sure I understand,
15 department -- your expectation is that there is a
16 photograph included of any post-removal notice with the
17 CMMS report.
18     So if there is no photograph of any
19 post-removal notice, is it fair to understand that no
20 such notice was posted?
21     ATTORNEY GEORGE:  Same objection.
22     THE WITNESS:  That -- that depends.  Again, that can
23 be an error, but that doesn't mean that it wasn't post.
24     BY ATTORNEY KASHYAP:
25 Q.  Are you aware of any circumstances where DPW

Page 130

1  staff members posted the post-removal notice but did not
2  take a photo of it?
3  A.  No, not specific on this.  But there are cases
4  where we have Internet issue throughout the city.  Where
5  it's a certain black spot sometime, it doesn't take
6  photos.  And sometimes the supervisor or the worker
7  doesn't appear to know it right away, that the photo is
8  not in there.
9  Q.  I see.
10     Has it ever been brought to your attention that
11 there was an issue with posting -- let me back up.
12     Has it ever been brought to your attention
13 there was an issue with taking or posting a post-removal
14 notice due to technological issues?
15     ATTORNEY GEORGE:  Objection; form.
16     THE WITNESS:  No, not specific.
17     BY ATTORNEY KASHYAP:
18 Q.  Okay.  And setting aside technological issues,
19 is there any other reason that a photo of a post-removal
20 notice that was posted would not be included in a CMMS
21 report?
22 A.  No.
23     Let me -- can I rephrase that?
24 Q.  Of course.
25 A.  That also depend, right.  Not everything is

Page 131

1  need to be posted, unless it's we bag and tag it.
2  Q.  Thank you for clarifying.
3      So the post-removal notice is only posted when
4  there is a bag and tag of unattended property; is that
5  accurate?
6  A.  That's correct.
7  Q.  Okay.  And then once the post-removal notice is
8  posted, absent some technological issue, that photo --
9  that notice should be photographed and that photograph
10 should be included in the CMMS report?
11 A.  That's correct.
12 Q.  Who is responsible for ensuring that each crew
13 follows the bag-and-tag policy?
14 A.  Their immediate supervisor.
15 Q.  And what is the supervisor supposed to do to
16 ensure that a worker follows the policy?
17 A.  To do an ongoing tailgate meeting regarding the
18 policy and spot-check the CMMS.  And, of course, be on
19 the site to answer any question the crew may have on the
20 site.
21 Q.  Anything else that a supervisor is expected to
22 do to ensure that the worker follows the policy?
23 A.  No, not that I can remember anything else about
24 that.
25 Q.  Are you responsible for ensuring that the

Page 132

1  individuals that you supervise comply with the policy?
2  A.  Yes.
3  Q.  How do you ensure compliance with the policy
4  for the individuals that you supervise?
5  A.  By doing the training.  So the crew under my
6  supervision are managers and Supe II.  And my job is to
7  make sure they understand the policy and make it more
8  simplify for their field crew to understand.
9      And this is one of the things where we gather
10 information and get the notice -- or information on the
11 field crew, what helps them.  So we add a lot of photos
12 into the PowerPoint so they can see what's do and don't
13 and so on.
14     So, yeah, the Supervisor II, which is the next
15 level from me, is my responsibility.  I make sure they
16 understand the policy.  I work with them, get their
17 ideas, their input, what information we should put on
18 the training for the crew to understand the whole policy
19 itself.
20 Q.  Anything else, other than what you've
21 described?
22     ==Any other steps that you take to ensure==
23 ==compliance with the policy?==
24 A.  ==Yes.==
25 Q.  ==Can you please describe those.==

Case 4:22-cv-05502-DMR   Document 366-30   Filed 04/17/25   Page 8 of 12

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vaing
January 15, 2025

Page 133

1  A.  Yeah.  The other step I want the Supe II to do
2  is spot-check.  What I meant by spot-check is, our
3  schedule is so busy.  Everybody is so tied up and busy.
4  But I ask them to find time and spot-check every CMMS
5  that the crew bring in relating to bag and tag.
6     And the reason to spot-check is to make sure
7  that they comply and follow our policy.  And we try to
8  utilize that time to do additional training and coaching
9  to make sure they understand this is what you've done
10  wrong or miss a step, continue to do on, on that one.
11     So -- and we document these type of coaching
12  for any other future error may lead into additional
13  disciplinary.
14  Q.  Thank you, Mr. Vaing.
15     So I want to take you to those kind of items in
16  turn.  So starting with the spot-check, I believe you
17  said that you ask your supervisors to spot-check every
18  CMMS report that has a bag and tag.
19     Do I understand that correctly?
20  A.  Yes.  When I say "every," I meant when they
21  can, you know.  I know they don't have time to check
22  every one of them, but I ask them to check -- spot-check
23  their crew work.
24  Q.  And how often do you expect your supervisors to
25  conduct the spot-check?

Page 134

1  A.  I expect them to do it on a daily basis.
2  Q.  And how many reports would you expect them to
3  spot-check a day?
4  A.  At least three.  Two to three.
5  Q.  And do you know approximately how many CMMS
6  reports related to bag and tag that are created a day?
7  A.  I don't.
8  Q.  Could you give me an estimate?
9     More than 10?
10  A.  Citywide?
11  Q.  Yes.
12  A.  I would say, yes, more than 10.
13  Q.  More than 20?
14  A.  More than 10 a day.
15  Q.  So somewhere between 10 and 20?
16  A.  Yes.
17  Q.  Okay.  So out of that 10 to 20 reports per day
18  related to bag and tag, you expect supervisors to
19  spot-check at least three?
20  A.  Yes.
21  Q.  What are supervisors to do if they identify
22  errors during their spot-check?
23  A.  They are instructed to sit down with the
24  individual, to go through -- go over the policy, and
25  kind of coach them through what they -- they miss, any

Page 135

1  step they miss, or what they need to -- need help on.
2  Q.  And I believe you said earlier that that
3  coaching is documented.  Is that correct?
4     How is that coaching documented?
5  A.  I mean, the last year or so, the supervisor
6  usually have their own section book where they make
7  note -- a written note.  I'm not sure it's still -- not
8  sure they're still doing that, but, yeah, they usually
9  make notes of -- whether you have attendance problem or
10  any other issue, they would make note on this section,
11  spoke to such-and-such on this date regarding attendance
12  or misbehaving and so on.
13  Q.  Thank you, Mr. Vaing.
14     So you said something called a "section book"?
15  I'm not familiar with that.
16     Can you tell me what that is?
17  A.  Every operation, you have a structure where you
18  have a Supe II, Supervisor II, and a Supervisor I.
19  Within that section, they have -- we have a book, a
20  note, where a supervisor take their note.
21  Q.  Is this a physical book?
22  A.  Yes.
23  Q.  And where is this book kept?
24  A.  I'm not sure.  Every supervisor is keeping
25  their own notes.  Again, these note is based on the

Page 136

1  attendance or special events going on in calendar and
2  stuff like that.
3  Q.  Okay.  So we previously talked about
4  Mr. Dilworth as a Supe II, Mr. Graham as a Supe I.
5     You would expect that Mr. Dilworth and
6  Mr. Graham each have their own section book where
7  they're taking notes?
8  A.  Yes.
9  Q.  Including notes about coaching their laborers
10  about compliance with the bag-and-tag policy?
11  A.  I believe so, yes.
12  Q.  And is this a physical -- would you -- do you
13  know if this is a physical book that Mr. Dilworth and
14  Mr. Graham are using, or if there's an electronic
15  version of this?
16  A.  I mean, from my recollection, there's always
17  been a physical book.
18  Q.  Okay.  Do you know whether Mr. Dilworth has
19  engaged in any coaching of members of his team about the
20  bag-and-tag policy?
21  A.  I believe so, yes.
22  Q.  Approximately how many times has Mr. Dilworth
23  coached members of his team about the bag-and-tag
24  policy, let's say in the last year?
25  A.  I don't know how...

Case 4:22-cv-05502-DMR    Document 366-30    Filed 04/17/25    Page 9 of 12
Coalition on Homelessness, et al. v                                    Jonathan Vaing
City and County of San Francisco, et al.                           January 15, 2025

Page 149

1  ATTORNEY KASHYAP: Sure. Sure.
2  BY ATTORNEY KASHYAP:
3  Q. And I can clarify, Mr. Vaing, if you're not
4  sure what I mean.
5      Do you understand the question?
6  A. No. Please clarify.
7  Q. Sure.
8      So what I'm trying to understand is that you
9  said that since 2021, when you arrived, the requirement
10 was that there be photographs attached to a CMMS report.
11     So I'm just trying to clarify that since 2021,
12 the requirement is that -- was that DPW workers who
13 bagged and tagged property took a photo of what was
14 bagged and tagged and attached that photo to the
15 corresponding CMMS report.
16 A. Yes. As far as I remember, yes.
17 Q. Okay. Is there anything else that you would
18 look at in a CMMS report to determine whether or not
19 property was bagged and tagged?
20 A. I would look at the note and the photo as the
21 two most important factor. I'm not -- yeah, I think
22 that's it.
23 Q. Okay. Can you tell from a CMMS report whether
24 there is property that has been discarded?
25 A. Yes.

Page 150

1  Q. How can you tell?
2  A. That's the same information, at the comment
3  area and the photos.
4  Q. Okay. So just so I'm clear, the expectation is
5  that DPW workers are noting in the comment field when
6  they discard a property -- when they discard any
7  property and also taking a photograph of what they
8  discarded?
9  A. Yes.
10 Q. Okay. And are DPW workers required to specify
11 why they discarded property?
12 A. Yes.
13 Q. So, for example, if the property was soiled or
14 if it was broken, they would have to specify that?
15 A. That's correct.
16 Q. And where would they specify that?
17 A. At the comment area.
18 Q. Okay. And can you tell from a CMMS report
19 whether the unhoused person who was present at this
20 location when the DPW workers responded took any
21 personal property with them?
22     ATTORNEY GEORGE: Objection; form, foundation.
23     THE WITNESS: Yes.
24 BY ATTORNEY KASHYAP:
25 Q. How can you tell?

Page 151

1  A. Again, it's our expectation for the crew to
2  make appropriate notes at the comment. If they
3  encounter an individual taking all the belonging -- and
4  this happens a lot -- and they would say, "I only want
5  this stuff; the rest of it, you can toss it out," our
6  crew is expected to make that note in the comment and
7  photograph what is -- it was left. And the sample note
8  would be, "Individual took their belonging. All remain
9  are okay to discard." And then photos of the discarded
10 items.
11 Q. Okay. Thank you, Mr. Vaing.
12     And that expectation and requirement has been
13 in place since you arrived at BSES?
14 A. I believe it was. I was -- my job was to start
15 to implement it more frequently, training-wise.
16 Q. And today, now, you know, years into your time
17 at BSES, are there still problems with compliance of
18 these photography requirements?
19     ATTORNEY GEORGE: Objection; form.
20     THE WITNESS: I mean, nothing is perfect. I mean,
21 we always have challenges. Again, just -- I have over
22 300 staff throughout the operation of street cleaning.
23 Their safety is our goal. And the goal is to keep
24 San Francisco clean.
25     And the challenge with that is that majority of

Page 152

1  the general labor out in the field have no knowledge of
2  what computer is. The training to get them into this
3  tablet -- that's why we created this PowerPoint, to fit
4  the need what they can understand. So I can't say it's
5  a perfect thing going on.
6      But the challenge that we go through, the
7  improvement that we have, every other month or so, we --
8  we meet again with the managers, like, "Hey, what can we
9  do to get crew more..."
10     But to answer your question, I seen a lot
11 improvement from what we've done in the past, but it's
12 not yet perfect.
13 BY ATTORNEY KASHYAP:
14 Q. Okay. Thanks, Mr. Vaing.
15     ==And can you estimate for me how often CMMS==
16 ==reports are generated now without the required==
17 ==photographs?==
18 A. ==Generate now without -- without photo?==
19 Q. ==Without the photos that are required.==
20 A. ==I have not run that report yet, so I can't tell==
21 ==you right now how many.==
22 Q. ==Is that a report that you regularly run, to==
23 ==determine how many photos -- how many reports are being==
24 ==submitted without photographs?==
25 A. ==Yes, it's a part of my plan.==

Case 4:22-cv-05502-DMR   Document 366-30   Filed 04/17/25   Page 10 of 12

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Jonathan Vaing
January 15, 2025

Page 153

1  Q. When was the last time you ran that report; do
2     you recall?
3  A. Probably over a year.
4  Q. Do you recall how many CMMS reports were found
5     without photos when you last ran the report?
6  A. I don't recall, but it wasn't that good.
7  Q. Sorry. You broke up at the end there.
8     You don't recall, but what?
9  A. I don't recall the specific number or the rate,
10    but I do remember it wasn't great.
11 Q. And by "it wasn't great," you mean there were
12    still a lot of CMMS reports without the required
13    photographs?
14 A. Correct.
15 Q. Okay. Would you expect a Supervisor I to be
16    following the requirement to take photos?
17 A. Yes.
18 Q. And attach those photos to the service order
19    reports?
20 A. Yes. We hold them in a higher standard.
21 Q. So you would expect that any CMMS reports
22    prepared by your Supervisor I would have the required
23    photographs?
24 A. Yes.
25 Q. And the required comments that we've been

Page 154

1     discussing?
2  A. Yes.
3  Q. Have you run a report to determine whether or
4     not the Supervisor Is have been preparing compliant
5     reports?
6  A. I have not yet.
7  Q. And somebody who's in the position of
8     Supervisor II, like Mr. Dilworth, for example, should be
9     spot-checking the CMMS reports created by the
10    Supervisor Is; is that correct?
11 A. That's my expectation, yes.
12 Q. And is it Mr. Dilworth's responsibility to also
13    spot-check the reports created by individual laborers,
14    or is that a Supervisor I responsibility?
15 A. It's a -- responsible for both, the laborer and
16    the Supe I.
17 Q. And when there are both -- let me rephrase this
18    question.
19    When there's a Supervisor I in the field --
20 A. Mm-hmm.
21 Q. -- physically present, would you expect that
22    the Supervisor I would be the person to do the CMMS
23    report?
24 A. Yes, unless if the Supe I is trusting the
25    worker to do it properly. And this is where the

Page 155

1     hands-on trainings in the field come into play.
2  Q. And it's my understanding that 90 percent of
3     the time, there is at least -- there's either a
4     Supervisor I or a Supervisor II in the field with the
5     general laborers. Is that right?
6  A. Yes. That was my estimation, yes.
7  Q. So correct me if I have this wrong, but if
8     there is a supervisor in the field, would you expect the
9     supervisor be the one to complete the CMMS report?
10 A. No, not necessarily.
11 Q. Okay. And tell me why not.
12 A. Because we're all about cross-training to want
13    to make sure that we're consistent throughout the whole
14    bureau. So I always ask the supervisor to train the
15    individual laborer in the field so they can do it next
16    time. It doesn't have to be all the time the supervisor
17    have only -- shouldn't be the only supervisor know how
18    to do that. Everybody's on the field know how to do and
19    follow the policy and procedures.
20 Q. Okay. Would you expect the Supervisor I who's
21    in the field to be working with the laborer who is
22    submitting the CMMS report, to ensure it's done
23    correctly?
24 A. Yes.
25 Q. When you ran that report about a year ago --

Page 156

1     you said over a year ago, excuse me -- and found that
2     there were still many CMMS reports that did not have
3     photographs attached, what steps did you take?
4  A. I recall I did a tailgate meeting with all the
5     Supe II. And this is standard practice for me when I
6     run into this. I show, in the Supe II meeting -- we
7     have a weekly meeting. And the topic would come up, and
8     I would show them some sample on the slideshow what are
9     some of the step that we have issue with, to show them
10    so they can show their next level staff.
11 Q. And you did, in fact, do that process when you
12    identified the issues with the CMMS reports?
13 A. Yes.
14 Q. And since then, since doing that additional --
15    taking those additional steps, have you done anything
16    else to check whether or not there's been improvement in
17    compliance with the requirements for a CMMS report?
18 A. Not personally, no.
19 Q. Has anyone else within DPW taken any steps to
20    ensure compliance since that training?
21 A. The supervisors.
22 Q. And what steps have they taken?
23 A. By spot-checking.
24 Q. Do they report to you the result of their
25    spot-check?

Case 4:22-cv-05502-DMR   Document 366-30   Filed 04/17/25   Page 11 of 12

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Jonathan Vaing  
January 15, 2025

Page 177

1  A.  I believe so, yes.
2  Q.  What do you believe that address to be?
3  A.  PD station.
4  Q.  Okay. It's my understanding that that's the
5   SFMTA garage.
6     Does that sound accurate to you?
7  A.  I know it's next to it. It's a police station
8   next to that address.
9  Q.  Okay. So same thing.
10    If the address listed here is 766 Vallejo
11  Street, that tells you that this was a situation where
12  DPW was called to pick up items belonging to an arrestee
13  who was at that police station?
14  A.  Yes.
15    And I want to make clear that, also, when the
16  individuals, our staff, get these requests, they would
17  also have the name of the caller or the requester. And
18  it would say officer or sergeant or SFPD.
19  Q.  I see.
20    And that would be noted in the service order
21  report?
22  A.  Correct.
23  Q.  As the name of the person requesting it?
24  A.  Yes.
25  Q.  Okay. What does it mean -- so let's take those

Page 178

1   first two entries. I see there, for example, with
2   766 Vallejo Street, which you understand to be a police
3   station, there's still a cross street listed.
4     What do you understand that cross street to
5   mean in that second entry?
6  A.  It's mean it's Vallejo between Stockton and
7   Powell Street.
8  Q.  Okay. So that is still the cross street of the
9   address located in that column?
10  A.  Yes.
11  Q.  Okay. I want to turn to the next column,
12  "Request #."
13    What is that number?
14  A.  That is our internal service request number.
15  Q.  Okay. So that corresponds to the service order
16  request document that you and I looked at earlier?
17  A.  Correct.
18  Q.  And that number is different, though, from the
19  CMMS report number; is that right?
20  A.  That is correct.
21  Q.  Okay. What does the next column mean,
22  "Intake"?
23  A.  One intake form.
24  Q.  And what is the intake form?
25  A.  Meaning this is only one case. Because there

Page 179

1   are sometime PD will call us to one station, pick up two
2   different case. And we have to identify if it's the
3   same owner or it's different owner, so we have to
4   identify it's two different case.
5  Q.  I understand.
6  A.  From my understanding, yes.
7  Q.  Okay. So looking again at the second entry,
8   the second row on this spreadsheet there, it says the
9   intake number is two.
10    So it's your understanding that that is -- that
11  DPW there is picking up items for two different people?
12  A.  Yes.
13  Q.  Okay. Do you know why there is -- turning to
14  the next column, do you know why there is a separate
15  column for bikes?
16  A.  Oh, because bike, we consider that's a bulky
17  item. And we just need to count -- I mean, we -- we get
18  a lot of requests of how many bike we actually receive
19  or get from the street. So it's easier for us to
20  identify now that how many bike we got so far on a
21  monthly basis.
22  Q.  And when you say you get requests, do you mean,
23  for example, public records requests?
24  A.  Yes.
25  Q.  I see.

Page 180

1     And is there any limit to the number of bikes
2   that will be bagged and tagged?
3  A.  No.
4  Q.  What does the next column, "Tag," refer to?
5  A.  That's the color code tag I was mentioning
6   about by the monthly. But it's also listed by number
7   itself.
8  Q.  Okay. So let's go back to that second entry in
9   the spreadsheet that we've been talking about. So we've
10  established that's a pickup from a police station at
11  766 Vallejo Street and that the intake number is two, so
12  it's your understanding that these are the items of two
13  different people.
14  A.  Mm-hmm.
15  Q.  And they have the tag number 201.
16    So these two individuals' items have the same
17  tag number; is that your understanding?
18  A.  Yes.
19  Q.  Okay. And then the color is also in reference
20  to the tag; is that right?
21  A.  Yes.
22  Q.  So the two different people whose items were
23  picked up at 766 Vallejo Street have the same tag number
24  and the same tag color?
25  A.  Yes.

Jonathan Vaing Deposition Transcript Errata

*Coalition on Homelessness v. City and County of San Francisco*, No. 4:22-cv-05502-DMR

| Page | Line | Change | Reason |
|---|---|---|---|
| 35 | 8 | "Are the same." to "They are the same." | Error |
| 91 | 10 | "sewage" to "syringe" | Error |
| 91 | 13 | "sewage" to "syringe" | Error |
| 108 | 23 | "On the field" to "In the field" | Error |
| 129 | 23 | "post" to "posted" | Error |
| 145 | 24 | "Bluebike" to "blue bike" | Error |

_____    2/21/25
Jonathan Vaing              Date