# EXHIBIT 26

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

*Kenny Bruce*
*February 25, 2025*

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California 94104*
*(415) 597-5600*

Original File 44151Bruce_NL.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR   Document 366-32   Filed 04/17/25   Page 3 of 20
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Kenny Bruce
February 25, 2025

Page 53

1  THE WITNESS: Yes.
2  MR. WANG: That works.
3  THE REPORTER: Off the record at 11:16 a.m.
4  (Recess taken.)
5  THE REPORTER: The time is now 11:30 a.m., and we're
6  on the record.
7  MS. SMITH: Thank you.
8  Q. Mr. Bruce, before our brief break you mentioned
9  a system called CCMS.
10     Are you familiar with CCMS reports?
11 A. So it's CMMS. CMMS. And that's the computer
12 system that the crews use to receive the requests and
13 then go and actually complete the requests.
14    So they're supposed to take a before and after
15 picture of the work done and then close out the request
16 with the comments.
17 Q. Thank you.
18    And at this time, Ms. Headrick, I'd like to
19 request that we please pull up Tab 4.
20    Thank you. This is an exhibit previously
21 marked 1029.
22    (Previously marked Exhibit 1029 referenced.)
23 THE WITNESS: I can't see the small print. I can
24 just see where it says "Service Order Report."
25 ///

Page 54

1  BY MS. SMITH:
2  Q. Is it possible for you to move any closer, or
3  are we able to blow this up at all?
4  A. Oh, perfect.
5  Q. Great, thank you.
6     Mr. Bruce, are you familiar with a service
7  order report that looks like this?
8  A. I have seen them, yes.
9  Q. Do you regularly review these types of reports?
10 A. No.
11 Q. You do have access to these reports from CMMS?
12 A. I do not pull them up. I guess I could tell
13 you we probably do have access. I do not utilize that
14 access.
15    MR. WANG: Can I ask, is this something that's been
16 marked previously as an exhibit number? Or did I miss
17 the exhibit number? I'm sorry.
18    MS. SMITH: It is. It was previously marked 1029.
19    Excuse me. A bit of allergies this morning.
20 Q. You mentioned that this isn't something that
21 you regularly pull up in your activities; correct?
22 A. Yes, that's correct.
23 Q. Have you used the CMMS to pull up a report like
24 this before?
25 A. No.

Page 55

1  Q. Do you know if anyone on your team does use
2  CMMS to pull up reports like this?
3  A. I'm not sure.
4  Q. Do you know if your direct reports review CMMS
5  reports that look like this?
6  A. So I don't know if they review the reports, but
7  I do know that my direct reports use CMMS daily. That's
8  how they are able to monitor what their staff are
9  performing.
10    You start the day with a certain number of
11 requests in your zone, and then you have it divided by
12 the litter patrol grids, like LP1, LP2, LP3. And you're
13 able to monitor their productivity of what they have
14 done and closed out throughout the day.
15    So that's how they use the CMMS.
16 Q. And do you know how they're able to monitor
17 that?
18 A. Yeah. Again, so you go -- I do not use it. My
19 understanding is they have a total picture of the amount
20 of service requests they start each day. And, as their
21 staff are performing their work, they can see the
22 numbers going down, and then they can also see what new
23 is coming in.
24 Q. Okay. Do you know if they review the service
25 orders in Excel spreadsheets?

Page 56

1  A. No.
2  Q. Do you know the format that they review reports
3  in CMMS? Excuse me. Let me rephrase.
4     Do you know the format in which they review
5  requests in CMMS?
6  A. No.
7  Q. Are you familiar with -- excuse me. Let me
8  rephrase.
9     Do you know if your direct reports review
10 reports in CMMS for completeness?
11 A. So you're calling it "reports," and I don't
12 understand it as reports.
13    I do know that they check their service
14 requests to see that they were addressed properly. Like
15 if -- you know, you're checking on one of your staff's
16 work for the day, so you pull up a service request and
17 you see, did they take a before and after picture? And
18 did they close it out?
19    That's my understanding of how they monitor the
20 CMMS and the work being performed.
21 Q. Okay. So by "check service requests," do you
22 mean that they check for a photo attached to the
23 request? Is that correct?
24 A. Yes.
25 Q. Okay. And they check to see if the request was

Case 4:22-cv-05502-DMR   Document 366-32   Filed 04/17/25   Page 4 of 20
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Kenny Bruce
February 25, 2025

Page 57

1  closed out; is that correct?
2  A.  Yes.
3  Q.  Do you know if there's any other information
4  that they look for to see if a request was completed
5  correctly?
6     MR. WANG: Objection. Vague. Calls for
7  speculation.
8     Go ahead.
9     THE WITNESS: So there is the before and after
10 pictures. There's comments. And then there's another
11 thing called measures. So could be, you know, five bags
12 and three piles of cardboard. You know, those are
13 measures that are put in that request.
14    BY MS. SMITH:
15 Q.  And do you know what field in CMMS those
16 measures correlate to?
17    MR. WANG: Objection. Vague.
18    Go ahead.
19    THE WITNESS: Yeah. I just know that they have
20 drop-down boxes and options to choose from, and then
21 they add their own comments.
22    BY MS. SMITH:
23 Q.  Okay, thank you.
24    How often are your direct reports checking
25 CMMS?

Page 58

1     MR. WANG: Objection. Calls for speculation.
2     Go ahead.
3     THE WITNESS: Daily.
4     BY MS. SMITH:
5  Q.  Are -- do you expect your direct reports to
6  check CMMS daily to make sure that work is being
7  completed fully?
8  A.  Absolutely.
9  Q.  And do you expect them to check CMMS daily for
10 accuracy?
11 A.  Yes.
12 Q.  Do your staff have a specific number of times
13 they are expected to check work in CMMS to make sure it
14 is being performed correctly?
15 A.  No.
16 Q.  Is the expectation that your staff will check
17 CMMS at least once a day?
18 A.  Yes.
19 Q.  Does your staff provide results from the
20 reports that they were checking in CMMS to you?
21 A.  No.
22 Q.  Have you ever asked your staff for the results
23 of their checks in CMMS?
24 A.  So we've asked our staff to do random checks of
25 their staff on CMMS service requests to just see that

Page 59

1  their staff are following the process of just any
2  service requests, that they're doing them correctly.
3  Q.  How frequently have you asked your staff to
4  complete those checks?
5  A.  I -- I don't know how frequently I've asked.
6  Q.  How frequently -- excuse me one moment. My
7  apologies.
8     How frequently do you expect your staff to
9  conduct those random checks?
10 A.  At least weekly.
11 Q.  At least weekly?
12    And, if your staff notices that work is not
13 being completed correctly, is there an expectation that
14 they report that to you?
15 A.  They would report to me if it became egregious.
16 If it's just one of their litter patrols or steamer who
17 made an error, I leave that to them to educate and train
18 their staff.
19 Q.  So you don't expect your staff to tell you
20 every time they educate their staff on how to conduct
21 work correctly?
22 A.  No.
23 Q.  How often do they bring issues to your
24 attention that they identify in CMMS reports?
25 A.  Not very often.

Page 60

1  Q.  Would you think about once a month?
2  A.  Not even that.
3  Q.  Do you have an estimate of how frequently they
4  bring these issues to your attention?
5  A.  Honestly, I can't remember the last time.
6     So what I like to believe is that my
7  Supervisor 2s know what they're doing in running their
8  zone, and, if they have issues, they're going to deal
9  with it. It's -- and they're going to correct it.
10    So that's my explanation of why it's not coming
11 to me, because they are running a good operation and
12 they're holding their staff accountable. And I would
13 say that for the most part their staff are doing what
14 they're supposed to do from start to finish of a service
15 request.
16    (Discussion held off the record.)
17    BY MS. SMITH:
18 Q.  Mr. Bruce, are you familiar with the service
19 order report like the one that we have pulled up on the
20 screen here?
21 A.  So I have seen this, but I don't see this
22 often.
23 Q.  Okay. Do you know what the "Service Order"
24 field means?
25 A.  No.

Case 4:22-cv-05502-DMR    Document 366-32    Filed 04/17/25    Page 5 of 20
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Kenny Bruce
February 25, 2025

Page 65

1  You know, example would be, "Hey, Control, I'm
2  at Fifth and Market, and there's 20 bags of debris here.
3  Can you please create a service request for this."
4     Then they would send it to their tablet, and
5  then they would take a picture of it, the 20 bags, load
6  it onto the truck, take the picture of it now gone so
7  they could track their work.
8     BY MS. SMITH:
9  Q.  Okay, thank you.
10    Are you aware of any changes made to
11 encampment-related CMMS fields in 2023?
12 A.  No.
13 Q.  And when the Police Department calls BSES to
14 conduct a bag and tag, do they also call the radio room?
15 A.  So I know they have.  They have called the
16 radio room.  But I also believe that they have used 311
17 in the past too.
18 Q.  Are there any other methods that calls for bag
19 and tag from the Police Department reach your employees
20 other than 311 or the radio room?
21    MR. WANG: Objection.  Calls for speculation.
22    Go ahead.
23    THE WITNESS:  So I do know that there has been times
24 in the past where a district captain will call one of
25 the Supervisor 2s directly by phone.

Page 66

1     BY MS. SMITH:
2  Q.  Okay.  And when a call comes into the radio
3  room for a bag and tag, do you see that come?
4  A.  No, I don't see that.
5  Q.  When a call comes in to 311 for a bag and tag,
6  do you see that come in?
7  A.  No.
8  Q.  Are you involved in instructing staff on zone
9  shift or swing shift to conduct bag and tags on a daily
10 basis?
11 A.  So the instruction I have given our staff are
12 like the ones I described with you, giving them with
13 Jonathan Vaing, where we are giving those PowerPoint
14 trainings.  That's the extent of us conveying the
15 message that you are to follow the bag and tag process
16 completely.
17 Q.  And, if the Police Department were to call a
18 Supervisor 2 directly, is a service order created for
19 that bag and tag request?
20 A.  Yes.  That is a requirement.
21 Q.  If an action code or failure code in CMMS says
22 "Disposed," does that mean that everything at a
23 resolution was discarded?
24    MR. WANG: Objection.  Calls for speculation, lacks
25 foundation.

Page 67

1     THE WITNESS:  I do not know the answer to that
2  question.
3     BY MS. SMITH:
4  Q.  If something is bagged and tagged at a
5  resolution, should the action or failure code say "bag
6  and tag"?
7  A.  Action or --
8     MR. WANG: Objection.  Calls for speculation, lacks
9  foundation.
10    Go ahead.
11    THE WITNESS:  I do not know.
12    BY MS. SMITH:
13 Q.  Who would know?
14 A.  So I would say -- this is just my thoughts --
15 Arthur would know, the ones that oversee the database.
16 And the supervisor or employee who uses the tablet on a
17 daily basis would know the answer to that, as I do not
18 use the tablet.
19 Q.  Okay.  And, when a CMMS entry is "Encampment,"
20 do you know what that means?
21    MR. WANG: Objection.  Calls for speculation, lacks
22 foundation.
23    THE WITNESS:  So my understanding, if I get a
24 service request for an encampment, citizens have called
25 in requests for encampments to be removed, which we do

Page 68

1  not do.  So the litter patrol will go to see what
2  exactly is at this location.
3     Again, a citizen may ask for it to be gone.
4  That's not going to happen.  But if there's a mess,
5  trash, broken glass, paper spill, they will clean that
6  up because that's part of their job.
7     And that's what they should put in their
8  service request, is "Cleaned up the glass, cleaned up
9  the paper spill, refer encampment to SFPD," is what I
10 believe is usually what's put in the comments.
11    So that when the caller calls back and says,
12 "Well, you did half the job.  You removed the glass and
13 the paper, but the tent is still here."  So they can see
14 that we're not removing that tent.
15    And the pictures will show that we cleaned up
16 the mess.  We're not touching the tent.
17    BY MS. SMITH:
18 Q.  When a citizen calls for trash pickup as you've
19 described and the laborer bags and tags something, do
20 they create a service order?
21 A.  Yes.  So, again, if the litter patrol in the
22 process of cleaning up trash finds there are items to be
23 bagged and tagged, then they are to call the radio room
24 and have them create a new service request for bag and
25 tag.

Case 4:22-cv-05502-DMR   Document 366-32   Filed 04/17/25   Page 6 of 20
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Kenny Bruce
February 25, 2025

Page 69

1  Q.  And is that request that will be created coded
2  "bag and tag" in CMMS?
3       MR. WANG: Objection. Calls for speculation, lacks
4  foundation.
5       Go ahead.
6       THE WITNESS: That's my understanding.
7  BY MS. SMITH:
8  Q.  Would you expect --
9       (Reporter requests clarification.)
10 BY MS. SMITH:
11 Q.  Would you expect photos to be attached to the
12 service order created for bag and tag?
13 A.  Yes.
14 Q.  And, if the Police Department calls for a
15 general laborer to come bag and tag property, would a
16 service order be created?
17 A.  It's supposed to be.
18      And the other one I -- just came to mind is you
19 may get a service request for a bag and tag. When the
20 litter patrol gets there, there may be absolutely
21 nothing there. And then they would close out the
22 service request as "nothing found." So that's just
23 another piece to this.
24 Q.  And when you say, "They would close out the
25 service request as 'nothing found,'" are you referring

Page 70

1  to -- where would that be documented in CMMS?
2       MR. WANG: Objection. Calls for speculation, lacks
3  foundation.
4       Go ahead.
5       THE WITNESS: That request.
6       So let's say they received one as a bag and
7  tag. You go to the location and there's nothing there.
8  Then they would close it out with those comments,
9  "nothing found."
10      BY MS. SMITH:
11 Q.  Okay. And "nothing found" will be in the
12 comments field?
13 A.  It should be, yes.
14      The other variables is we've had staff arrive
15 and the same thing: You look, but nothing found. Where
16 campers nearby said, "Oh, I claimed it for my friend" or
17 "Someone came and took it."
18      So, again, they're not gonna put all those
19 comments there; they're just going to put "nothing
20 found."
21 Q.  Thank you.
22      And, if the Police Department calls for a
23 general laborer to pick up bag and tag items, would that
24 be coded as "bag and tag" in CMMS?
25 A.  My understanding is it's supposed to be.

Page 71

1  Q.  Okay. And would a service order be created if
2  the Police Department calls and requests a general
3  laborer to bag and tag items?
4       MR. WANG: Objection. Calls for speculation, lacks
5  foundation.
6       Go ahead.
7       THE WITNESS: So yes, there has to be a service
8  request for the employee to put their pictures and put
9  their comments. So it has to be a service request.
10      BY MS. SMITH:
11 Q.  So every bag and tag must have a corresponding
12 service request; is that correct?
13 A.  Yes.
14 Q.  Can you tell from CMMS whether property has
15 been discarded?
16      MR. WANG: Objection. Calls for speculation, lacks
17 foundation.
18      THE WITNESS: I do not know.
19      BY MS. SMITH:
20 Q.  When the service order is created for a bag and
21 tag, is a service order created for each item bag and
22 tagged at a location?
23      MR. WANG: Objection. Incomplete hypothetical,
24 calls for speculation, and lacks foundation.
25      THE WITNESS: And, if you don't mind, can you just

Page 72

1  repeat the question again, please?
2       BY MS. SMITH:
3  Q.  Yes.
4       When a service order is created for a bag and
5  tag, is one service order created for all items to be
6  bagged and tagged at that location?
7  A.  So the one service order at that location, my
8  understanding is there could be ten suitcases, red,
9  blue, black, yellow. So the photo documentation should
10 capture that, and they're also supposed to put in their
11 comments that they retrieved ten suitcases that were
12 bagged and tagged. This will all be under one service
13 order.
14      But, um, you'll find those comments, the photos
15 in the service request.
16      And, lastly, when the items are put away in the
17 storage container, there's paperwork that goes with
18 those ten suitcases that says the location, the date,
19 the time, and a description saying, you know, the
20 yellow, the blue, the black, the red suitcase.
21 Q.  Do you know what the name of that paperwork is
22 that is intended to accompany the items bagged and
23 tagged?
24 A.  So those are the bag and tag slips. One gets
25 put -- it's -- the form is, like, three sheets. One

Case 4:22-cv-05502-DMR   Document 366-32   Filed 04/17/25   Page 7 of 20

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Kenny Bruce
February 25, 2025

Page 81

1  shared drive. So, if all of us here were going to put a
2  document in the V: drive, then all of us here could view
3  that drive on the V: drive.
4  Q. Do you use the V: drive in your daily work?
5  A. Yes. We have -- yes.
6  Q. Do you have access to all documents within the
7  V: drive?
8  A. So I have access to the V: drive. But, when
9  you say "all documents," I don't know about that.
10 Q. Are there documents from the Hot Spot Crew in
11 the V: drive?
12 A. I can't answer that hundred percent certain. I
13 would assume there is but I don't know.
14 Q. Are there documents from zone teams in the V:
15 drive?
16 A. I haven't looked at the V: drive in a long
17 time. But I would imagine probably every part of our
18 operation in some form or fashion are on the V: drive.
19 Q. What documents do you store on the V: drive?
20 A. I'm not using anything on the V: drive.
21 Q. You don't use the V: drive?
22 A. I mean, I have. I can't tell you when. It's
23 not something I do frequently.
24 Q. Are there department policies on the V: drive?
25 A. There may be. I just don't know.

Page 82

1  Q. Okay, thank you.
2     What are your staff expected to do if they are
3  made aware of a violation of the bag and tag policy?
4  A. Please repeat.
5  Q. What are your staff expected to do if they
6  witness a violation of the bag and tag policy?
7  A. The staff should immediately report to their
8  supervisor if they see something happening at a bag and
9  tag that is improper.
10 Q. How many such reports have you received in the
11 past few years?
12 A. I have not seen none.
13 Q. Would those reports be directed to Sup. 1s?
14 A. So, if there's an employee who reports
15 something improper, that would go to their supervisor.
16 And then, whichever unit is handling the supervisor
17 would report that to their Sup. 2. And a Sup. 2 should
18 relay that to their assistant superintendent. And the
19 assistant would report that to the superintendent.
20 Q. And you've received no such reports in the last
21 about five years that you've been assistant
22 superintendent?
23 A. I have received no reports of improper bag and
24 tag incidents.
25 Q. Thank you.

Page 83

1  Q. Has anyone you've supervised ever been found to
2  have violated the bag and tag policy?
3  A. Yes.
4  Q. Who?
5  A. So earlier, when I mentioned the Supervisor 2
6  who is facing discipline but the discipline has not been
7  given out yet, he's a direct -- the Supervisor 2 reports
8  to me.
9  Q. And what stage is that disciplinary process in
10 at the moment?
11 A. So they had the Weingarten meeting and the
12 Skelly meeting. And so, after the Skelly meeting, they
13 review and advise the department on their
14 recommendation. And so that's where we're at right now.
15 Q. Okay.
16 A. It hasn't come to its final final.
17 Q. Would you be made aware of any internal
18 investigations of violations of the bag and tag policy
19 by employees within the units you supervise?
20 A. Would I be made aware of any violation?
21 Q. Of any investigations.
22 A. So the investigations are conducted by HR. So
23 I would be informed if the people being investigated
24 were under my supervision.
25 Q. Okay. Other than the incidents you mentioned

Page 84

1  at the beginning of our session together, are you aware
2  of any other DPW staff on your teams who have been
3  disciplined for violations of the bag and tag policy?
4  A. So in our manager meetings we have discussed
5  issues within other units. So I know there was one guy,
6  a laborer -- I'm not sure what happened. I believe he
7  was released. And he had taken some baseball cards,
8  something to that effect. So I don't have all the
9  details, but yes, I'm aware that somebody didn't do what
10 they were supposed to do and received a serious
11 discipline by being released.
12 Q. Aside from that incident are there any other
13 incidents of discipline related to the bag and tag
14 policy that you're aware of?
15 A. Yes. So I mentioned to you Bernard Sices, who
16 was terminated; Frederick Johnson, who was released; and
17 then the supervisor, Zapata, who's still pending.
18    Those are --
19 Q. Any others?
20 A. No, no others.
21 Q. Thank you.
22    And what steps are taken when a formal incident
23 requiring discipline is brought to your attention?
24 A. So the steps are, once we have the details of
25 what occurred, we forward that to our bosses and to HR.

Case 4:22-cv-05502-DMR    Document 366-32    Filed 04/17/25    Page 8 of 20
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Kenny Bruce
February 25, 2025

Page 85

1  Q. Okay. Would you be made aware of any internal
2  investigations for misconduct related to your staff's
3  work at an encampment resolution, regular encampment
4  cleaning, or routine cleaning?
5     MR. WANG: Objection. Vague, lacks foundation.
6     Go ahead.
7     THE WITNESS: So I really don't understand that
8  question. If you could either repeat it or rephrase it,
9  please.
10    BY MS. SMITH:
11 Q. Would you be made aware of internal
12 investigations into other types of misconduct aside from
13 bag and tag in behavior of staff on either zone or swing
14 shift?
15 A. Absolutely.
16 Q. Are you aware of internal investigations into
17 misconduct allegedly committed by your staff at this
18 time?
19    MR. WANG: Objection. I'm going to object and just
20 don't answer that. Irrelevant.
21    Unrelated to bag and tag is the question?
22    MS. SMITH: Generally.
23    MR. WANG: So, other than the bag and tag -- I'm
24 going to instruct you not to answer that.
25 ///

Page 86

1     BY MS. SMITH:
2  Q. Are you responsible for issuing any corrective
3  action if someone does not apply the bag and tag policy
4  correctly?
5  A. So, again, I can tell you this. With the
6  Frederick Johnson incident, after the video was reviewed
7  and HR had done their thorough investigation and the
8  paperwork, it was decided that he was going to be
9  released, that paperwork was issued to me.
10    And I had brought in his supervisor and himself
11 into my office and I actually had to hand him the
12 paperwork. This was right before Thanksgiving. It was
13 pretty bad timing. The guy was very emotionally upset
14 and crying in my office. But I had to deliver the bad
15 news and hand him the paperwork of release.
16    So yes, I have been a part of it. And anything
17 further anymore, I have to do the same thing.
18 Q. Have you engaged in verbal counseling related
19 to violations of the bag and tag policy?
20 A. No.
21 Q. Have you ever engaged in coaching of staff
22 related to violations of the bag and tag policy?
23 A. So, when I think of coaching, I think of, as
24 you know, that initial step of trying to correct
25 something that wasn't done right. So not that form of

Page 87

1  coaching. But the training, absolutely.
2  Q. Okay. So you have not engaged in that informal
3  coaching when there is a violation of the bag and tag
4  policy; is that correct?
5  A. That's correct.
6  Q. Have you ever received copies of written
7  complaints from people stating that their property has
8  been destroyed?
9  A. Have I received. No, I haven't. Not received.
10 Q. Are you involved in reviewing administrative
11 claims about property destruction?
12    MR. WANG: Objection. Vague.
13    THE WITNESS: No.
14    BY MS. SMITH:
15 Q. Have you ever received copies of administrative
16 claims that people have filed stating that the City
17 destroyed their property?
18    MR. WANG: Objection. Vague.
19    THE WITNESS: So I have seen -- as managers, we
20 discuss what happens in our operation. So we have had
21 discussion on some claims.
22    And I can give you an example where one person
23 was claiming that we took -- they're stating that at
24 their encampment we took their Rolex watches and all
25 these other valuables. That's a claim that was

Page 88

1  discussed.
2     I don't know whatever -- whatever the outcome
3  was. I just know the claim was made, and it was
4  discussed.
5     BY MS. SMITH:
6  Q. Are you involved in determining the outcome for
7  any administrative claims?
8  A. No.
9  Q. Are you involved in conducting any
10 investigation as a result of administrative claims?
11 A. No.
12 Q. Have you ever received written complaints about
13 DPW staff conduct at encampments?
14 A. Again, like the video with Bernard Sices. So
15 that video, I'm not even sure how this all generated,
16 but we were made aware. We viewed the video.
17    So there is a claim of misconduct. It -- it
18 was not professional, and the results resulted in this
19 Bernard losing his job.
20 Q. Other than the instances that we have discussed
21 already, have you received any written complaints about
22 DPW staff conduct at encampments?
23 A. No, I have not.
24    MS. SMITH: At this time I'd ask that Ms. Headrick
25 please queue up Tab 5 to display to Mr. Bruce.

Case 4:22-cv-05502-DMR    Document 366-32    Filed 04/17/25    Page 9 of 20
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Kenny Bruce
February 25, 2025

Page 89

1   MR. WANG: Can you tell us how many pages it is and
2   if there's an exhibit number and scroll up so that
3   Mr. Bruce can view it before Mr. Bruce answers any
4   questions?
5   MS. SMITH: Yes. This is two pages, and I'd request
6   to mark this as Exhibit 1270.
7   (Exhibit 1270 marked for identification.)
8   MS. SMITH: Ms. Headrick, can you please scroll down
9   just so Mr. Bruce can view the pages. I believe there's
10  no information on the second page.
11  MR. WANG: Can you see from there?
12  THE WITNESS: Yeah. It's saying the caller
13  "observed a Public Works employee in a city vehicle" --
14  this gives the number on the truck, the license plate,
15  Lombard and Laguna -- "spray his hose on homeless people
16  and into their tents. When the caller asked the
17  employee what he was doing, he threatened his life. He
18  was driving a blue city vehicle with the power wash
19  equipment and the city logo on the door."
20  Okay, go ahead.
21  BY MS. SMITH:
22  Q. Thank you. Just so you know, I may show you
23  some documents that could get quite lengthy, so no need
24  to read them aloud. I ask you to just briefly review
25  the document to familiarize yourself with it, and then I

Page 90

1   can direct you to the specific portions that we're going
2   to talk about.
3       Okay?
4   A. Okay.
5   Q. Thank you.
6       So do you recall this incident described in
7   this report?
8   A. So I don't know if I recall this particular
9   one, but I will tell you, if we get a complaint like
10  this, the first thing we're going to do is look at the
11  time, look at the zone, and give it to the Supervisor 2
12  to investigate.
13      And that would be -- I will tell the
14  supervisor -- so this says 3:30 p.m. So our last calls
15  on day are at 1:30, as they're off at 3:00.
16      So the first thing I would think is, the person
17  reporting this, it happened on swing shift. So I would
18  give this to the swing shift Supervisor 2, ask them to
19  run the GPS on that truck.
20      I would ask them to review the sign-in sheet
21  and team watcher report so they can see, okay, John Doe
22  signed out this truck. John Doe -- the GPS showed that
23  he was or was not at this location. We would
24  investigate to see if there was any validity. We would
25  have the Supervisor 2 call back the caller, Kevin, for

Page 91

1   more details.
2       Once we gathered all of our findings, we would
3   then forward that to our bosses and to HR.
4   Q. Do you recall who the employee was involved in
5   this incident?
6   A. No, I do not.
7       MR. WANG: Just belated objection. Calls for
8   speculation, lacks foundation.
9       Go ahead.
10      Oh, sorry. Is there a Bates number for this
11  document, just for my --
12      MS. SMITH: Ms. Headrick, if you wouldn't mind,
13  could you please drop a copy of this document in the
14  chat for opposing counsel.
15      And this is Bates Number CCSF-COH_070429 and
16  then to 070430, although there's no substantive
17  information on the second page.
18      MR. WANG: Thank you.
19      BY MS. SMITH:
20  Q. Do you recall what steps were taken -- or I'm
21  sorry. Let me back up.
22      Do you recall if an investigation was conducted
23  into this complaint?
24  A. I don't recall.
25  Q. Do you recall if any discipline resulted from

Page 92

1   this complaint?
2   A. No.
3   Q. Do you recall if any training resulted from
4   this complaint?
5   A. So another example I'm going to give you is,
6   even before we find our findings, if I get a complaint
7   like this, once a week we meet with all our supervisors.
8   It's the Supervisor 2 meeting. We will let everyone
9   know, all the supervisors, that we received a complaint
10  stating that one of our steamers sprayed into a tent,
11  which is totally unacceptable.
12      We wouldn't get into names and things like
13  that. We would just tell the story and ask our
14  supervisors -- 'cause they meet with their staff the
15  very next day -- well, they meet with them every day --
16  but they go over the Sup. 2 minutes.
17      And the thing would be, "Guys, we got a
18  complaint. This is what they're stating happened. In
19  no way, form, or fashion are we to ever engage. We are
20  to conduct ourselves professionally, and this type of
21  conduct is unacceptable and will not be tolerated."
22      That's how I would tell the story in regards to
23  this claim, whether it was true or false. If we get a
24  complaint, we're going to let our people know that
25  you're held to a high standard of professionalism, and

Case 4:22-cv-05502-DMR   Document 366-32   Filed 04/17/25   Page 10 of 20
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Kenny Bruce
February 25, 2025

Page 93

```
 1  in no way would this ever be tolerated.  So share it
 2  with your staff.
 3      That's how we would address this before it even
 4  ran its course.
 5  Q.  Thank you.
 6      Do you recall any specific training given
 7  specific to this incident?
 8  A.  No.
 9  Q.  And the conversation that you described, would
10  something like that be documented in the Supervisor 2
11  meeting minutes?
12  A.  It may or may not, but we ask them to take
13  notes.
14      So, you know, we share things with our staff.
15  We also get compliments that may not be in the Sup. 2
16  minutes, but we point out that, "Hey, this employee, we
17  got a great compliment on someone's beautiful work they
18  performed.  Please let your staff know that we
19  appreciate what they're doing and share this with all of
20  your folks."
21      So it isn't just the bad things.  There are a
22  lot of good things that we receive.  Like we just did
23  NBA All Star Week, and we got rave reviews for having
24  this city look so good.
25      So those are just the type of examples that we
```

Page 94

```
 1  share, stories -- good, bad, or ugly -- as training
 2  tools to teach our staff and to motivate our staff.
 3  Q.  In addition to the Supervisor 2 minutes that
 4  are circulated by email, are Supervisor 2s expected to
 5  take their own notes?
 6  A.  So, again, as I said, when we -- all the
 7  managers speak at these Sup. 2 meetings, they are to
 8  take their notes because they are to relay the message
 9  that we give in the Sup. 2 meetings.
10      And there's a safety chat.  Today we have back
11  safety training.  So there's all kinds of things,
12  important information that we need to get out to the
13  folks so that they are in compliance.
14  Q.  Thank you.
15      If there was discipline as a result of this
16  incident, would it be documented?
17  A.  Yes.  If there was a discipline, all the
18  findings would be with HR.  And, if it was found to be
19  true, the employee, whoever did this, would have been
20  dealt with.
21      So HR would have that information if it ever
22  went, you know, to be true and -- so yes.  If discipline
23  was administered, there would be a record of it.
24      MS. SMITH: Thank you.
25      I think this may be a good place for us to take
```

Page 95

```
 1  a break for lunch, if we could please go off the record.
 2      THE REPORTER: The time is now 12:33 p.m., and we
 3  are off the record.
 4      (Discussion held off the record.)
 5      (At 12:35 p.m., a lunch recess
 6      was taken until 1:20 p.m. of the
 7      same day.)
 8  (Nothing omitted nor deleted. See next page.)
```

Page 96

```
 1          TUESDAY, FEBRUARY 25, 2025; P.M. SESSION
 2
 3      THE REPORTER: The time is now 1:20 p.m. and we're
 4  on the record.
 5      MS. SMITH: Thank you.
 6
 7      EXAMINATION RESUMED
 8      BY MS. SMITH:
 9  Q.  Mr. Bruce, are you aware of any ongoing
10  investigations into potential violations of the bag and
11  tag policy other than the one you mentioned earlier
12  involving Mr. Zapata?
13  A.  No.
14  Q.  Thank you.
15      At this time I'd like to request that we pull
16  up Tab 8.  And if you wouldn't mind, Ms. Headrick, also
17  dropping a PDF of that in the chat for opposing counsel.
18      And, Mr. Bruce, I'll just direct you briefly to
19  overview the top of this document.
20      Does this appear to be an email sent to you,
21  along with some other recipients?
22  A.  Yes.  So I see it's addressed from Maria Espina
23  to me and other folks, yes.
24  Q.  Great.  And could you tell me briefly the
25  subject of this email?
```

Case 4:22-cv-05502-DMR    Document 366-32    Filed 04/17/25    Page 11 of 20

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Kenny Bruce
February 25, 2025

Page 101

1  subject.
2     And we just had one on Sunday, and we talked
3  about it again today.  Doesn't mean they're going to
4  stop, but it means that we need to reiterate, "Guys,
5  slow down, take your time.  We gotta drive safely."
6  Q.  Thank you.
7     Have staff had difficulty implementing the
8  photo requirement?
9     MR. WANG:  Objection.  Calls for speculation, lacks
10 foundation.
11    Go ahead.
12    Vague.
13    THE WITNESS:  So all I can say is back then they
14 probably had a lot more difficulty than they do now.
15    BY MS. SMITH:
16 Q.  Do you recall at the time that the capability
17 to add photos to CMMS was rolled out that staff had
18 difficulty?
19 A.  Yes.  I'm going to say yes.  Staff had
20 difficulty, as when the tablets came on and these were
21 new to everybody, so people had to learn.  People had to
22 get hands-on training.  So yes, I would say in the
23 beginning it was foreign to everyone.
24 Q.  Thank you.
25    If we can please scroll to page 3 of this

Page 102

1  document, Bates ending 77362.  And if you wouldn't mind
2  scrolling down just a little bit.  Thank you.
3     (Reporter requests clarification.)
4     MS. SMITH:  This is still Exhibit No. 1271.
5  Q.  Mr. Bruce, do you see the list of trainings in
6  this document?
7  A.  Yes, I do.
8  Q.  And bag and tag policy is not listed as one of
9  the trainings; is that correct?
10 A.  (Witness reviews exhibit.)
11    Yeah, I don't see it.
12 Q.  Was bag and tag a required training in 2021?
13 A.  I -- I don't recall.
14    MS. SMITH:  Okay.  And we're finished with this
15 exhibit.  Thank you, Ms. Headrick.
16    If we could please pull up Tab 9.  Thank you.
17 And I'd like to mark this as Exhibit 1272.
18    (Exhibit 1272 marked for identification.)
19    MS. SMITH:  If you wouldn't mind, when you get a
20 chance, to drop a copy of this in the chat for opposing
21 counsel.
22 Q.  And I'd like to direct -- I'm sorry, before we
23 head there, Mr. Bruce, do you see your name at the top
24 here?  It looks like you're one of the recipients listed
25 on this email; is that correct?

Page 103

1  A.  Yes.
2  Q.  Thank you.
3     And, again, this appears to be an email with
4  Supervisor 2 meeting minutes; is that correct?
5  A.  Yes.
6     MS. SMITH:  Ms. Headrick, can we please scroll to
7  page Number 2, Bates ending in 17053.  And there should
8  be a list of new employee trainings if we scroll down
9  just a bit.  Yes.
10    If we can scroll just a little lower.
11    Thank you.
12 Q.  Mr. Bruce, bag and tag training is not listed
13 as one of the new employee trainings here, is it?
14 A.  No.
15    MS. SMITH:  Ms. Headrick, could you please scroll to
16 the top of the next page to see if the trainings
17 continue there.  Thank you.
18 Q.  Again, bag and tag trainings is not listed as
19 one of the required trainings, is it?
20 A.  It's not in these minutes.
21 Q.  Is bag and tag policy training required for new
22 employees?
23    MR. WANG:  Objection.  Vague as to time.
24    THE WITNESS:  So I can't say with a hundred percent
25 certainty that it has been drawn into it, but I am

Page 104

1  assuming that it is.
2     BY MS. SMITH:
3  Q.  And, as of the time of this email -- and,
4  Ms. Headrick, if we could actually just scroll up to the
5  top once more, I believe this is 2022.  Yes.
6  January 25, 2022.
7     As of this time do you know if bag and tag was
8  a required training for new employees?
9  A.  No, I don't.
10    MS. SMITH:  And if we could please remove this
11 exhibit and queue up Tab 10.
12    And, while we do that, I'll just ask one final
13 question.
14 Q.  Mr. Bruce, as of right now you're not sure if
15 bag and tag is a required training for new employees; is
16 that correct?
17 A.  At least I'm not sure if it's on the printed
18 page of specific trainings.  But I do know that we are
19 giving that training now to everyone, new and old.
20 Q.  And do you know who would know if it is a
21 formal part of the new employee training process?
22 A.  Jonathan Vaing.
23 Q.  Okay, thank you.
24    And I see Tab 10 is queued up.  I'd like to
25 mark this as Exhibit 1273.

Case 4:22-cv-05502-DMR    Document 366-32    Filed 04/17/25    Page 12 of 20
Coalition on Homelessness, et al. v                                    Kenny Bruce
City and County of San Francisco, et al.                         February 25, 2025

Page 105

1    (Exhibit 1273 marked for identification.)
2    MS. SMITH: And if we could please drop the link in
3    the chat if there isn't one already.
4    Q. And, Mr. Bruce, again does this appear to be
5    Supervisor 2 meeting minutes emailed to you, among other
6    recipients?
7    A. (Witness reviews exhibit.)
8    Yes.
9    MS. SMITH: Could we please scroll to page 2, Bates
10   ending 17258.
11   I'm just going to pull up the corresponding
12   version on my computer. One moment, please.
13   Q. And under the bullet points under Jonathan
14   Vaing, the third bullet point there says (as read):
15       Please print out procedures for bag
16       and tag and put it in each truck.
17   Do you know if the bag and tag policy was not
18   printed and put in each truck prior to this email?
19   A. So I'm not sure if they were already required
20   to be. Were we reminding them? I'm not sure about
21   this. But printout procedures for bag and tag are put
22   in each truck.
23   Q. And do you know who would know the answer to
24   that question?
25   A. I'm not sure. We can try Jonathan Vaing.

Page 106

1    MS. SMITH: Ms. Headrick, can we please scroll up
2    again to the top of this email. It looks like it was
3    sent on January 10, 2023.
4    Q. Do you know if the bag and tag policy's being
5    printed and placed in each truck was in response to the
6    preliminary injunction order issued by the Court?
7    A. I have no knowledge of that.
8    Q. Thank you.
9    And you have no knowledge of the preliminary
10   injunction order; is that correct?
11   A. I -- I -- this is the first time I'm hearing
12   that.
13   Q. Thank you.
14   And I'm finished with this exhibit, if you
15   wouldn't mind removing it, please. Thank you.
16   Just to clarify, is this the first time you're
17   hearing about a preliminary injunction order in this
18   case?
19   A. It's the first time I've heard that verbiage,
20   yes.
21   Q. Okay. Have you heard of an order in a court
22   case described in another way?
23   MR. WANG: Objection. Vague.
24   THE WITNESS: So my only understanding is that
25   there's a lawsuit, and that's why we're being deposed.

Page 107

1    BY MS. SMITH:
2    Q. Okay. And, prior to your deposition, were you
3    aware of any court order that changed any of your
4    training processes internally?
5    MR. WANG: Objection. Vague, lacks foundation.
6    And then, to the extent any of your knowledge
7    about that is based on conversations with our office, I
8    instruct you not to answer. But otherwise, you know,
9    your own personal knowledge of stuff, go ahead.
10   THE WITNESS: That's it, yeah.
11   BY MS. SMITH:
12   Q. I'm sorry, did you answer the question?
13   A. Counsel said do not answer.
14   MR. WANG: If your knowledge is based on the
15   substance of something our office told you, then yeah, I
16   instruct you not to provide that.
17   THE WITNESS: So I'm a little confused here. I
18   don't even know what the question is, if you can start
19   over again.
20   BY MS. SMITH:
21   Q. No problem at all.
22   The question was if you're aware of any changes
23   to your internal practices as a result of a court order
24   in this case.
25   A. So all I can tell you is that we have updated

Page 108

1    the bag and tag policy over time. But I don't know
2    about a court order telling us to do that.
3    Q. Thank you.
4    And do you know how many times the bag and tag
5    policy has been updated?
6    A. No.
7    Q. Are you involved in updates to the bag and tag
8    policy?
9    A. No. Just conveying the message to our folks to
10   follow our policy and procedure.
11   Q. Thank you.
12   And are you involved in answering questions
13   about any changes to the policy and procedure if those
14   arise?
15   A. Again, if someone asks me a question about bag
16   and tag, like you are, I will answer to the best of my
17   ability.
18   Q. And, specifically as it relates to the people
19   you supervise, are you -- do you answer questions that
20   they may have about the bag and tag policy?
21   A. I could and I would. But no one's asking me
22   questions, really.
23   Q. Thank you.
24   ==You mentioned previously that members of the==
25   ==zone team and swing shift will conduct bag and tags at==

Case 4:22-cv-05502-DMR   Document 366-32   Filed 04/17/25   Page 13 of 20

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Kenny Bruce
February 25, 2025

Page 109

1  the request of the Police Department.
2  A.  Yes.
3  Q.  Does the bag and tag policy apply to those
4  requests?
5      MR. WANG: Objection. Vague.
6      THE WITNESS: To be honest, I don't even know right
7  now. I'm thinking about the updated policy. Is there a
8  page regarding the police? I -- I can't even answer
9  that.
10     I just know that, if the police call us for a
11 bag and tag, then we respond and we bag and tag as
12 required. And, if the items meet our criteria, then we
13 create a service request and bag and tag it.
14     BY MS. SMITH:
15 Q.  When the police request you to bag and tag
16 items, is that typically following an arrest or
17 citation?
18     MR. WANG: Objection. Calls for speculation, lacks
19 foundation.
20     Go ahead.
21     THE WITNESS: So, to my knowledge, the calls we
22 receive usually are based on an arrest. "We need a
23 litter patrol here at Fifth and Market because we're
24 arresting someone and we need a bag and tag. He has
25 items here."

Page 110

1      BY MS. SMITH:
2  Q.  Is there any difference in the way that
3  property is handled when DPW is called by the police for
4  assistance for a bag and tag versus when a bag and tag
5  is conducted as just a general part of litter patrol?
6      MR. WANG: Objection. Incomplete hypothetical.
7      Go ahead.
8      THE WITNESS: So you said the police call in one
9  case, and then the other case is the litter patrol just
10 receives a regular request to that same location, are
11 you saying?
12     BY MS. SMITH:
13 Q.  Yes. You mentioned earlier that litter patrol
14 sometimes comes across items that need to be bag and
15 tagged that are not a result of the Police Department
16 calling; is that correct?
17 A.  Yes, that is.
18 Q.  So are items that are bagged and tagged
19 subsequent to the police calling handled any differently
20 than items that are bagged and tagged in any other
21 circumstance?
22 A.  No. If there are items to be bagged and tagged
23 then we would handle them the same way as whether the
24 police called or not.
25 Q.  Thank you.

Page 111

1  And does FF -- do DPW workers pick up property
2  from police stations?
3  A.  Yes, we have.
4  Q.  Under what circumstances?
5      MR. WANG: Objection. Incomplete hypothetical.
6      Go ahead.
7      THE WITNESS: Yeah, same request. We received a bag
8  and tag to pick up at such-and-such police station.
9      BY MS. SMITH:
10 Q.  Are all of these calls related to encampments?
11     MR. WANG: Objection. Calls for speculation, lacks
12 foundation.
13     Go ahead.
14     THE WITNESS: So our policy is, if we're picking
15 something up from a police station for bag and tag, it
16 is supposed to be from a homeless individual that was
17 arrested. That's our understanding.
18     BY MS. SMITH:
19 Q.  When DPW workers pick up this property, are
20 they sometimes collecting tents?
21     MR. WANG: Objection. Vague.
22     Go ahead.
23     THE WITNESS: If part of the bag and tag includes a
24 tent, then yes, they would take that as well.
25 ///

Page 112

1      BY MS. SMITH:
2  Q.  If an arrest is made for illegal lodging and
3  the tent is bagged as evidence, would a DPW worker store
4  that in the storage yard?
5      MR. WANG: Objection. Incomplete hypothetical.
6      Go ahead.
7      THE WITNESS: Yeah. As I just said previously,
8  yeah. If the call was to come get these items at the
9  police station, it's a bag and tag from a homeless
10 arrest, if a tent is part of that, yes, it would go to
11 the storage container back in our yard.
12     BY MS. SMITH:
13 Q.  Are DPW workers notified by police whether
14 items are being bagged and tagged as personal property
15 or as evidence?
16     MR. WANG: Objection. Incomplete hypothetical,
17 vague.
18     Go ahead.
19     THE WITNESS: So I'm a little confused with the
20 question because we're only going to the police station
21 because they called us for a bag and tag items.
22     BY MS. SMITH:
23 Q.  Yes. Let me rephrase.
24     Is there a difference in the way property is
25 handled if it's personal property or if it's being

Case 4:22-cv-05502-DMR    Document 366-32    Filed 04/17/25    Page 14 of 20

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Kenny Bruce  
February 25, 2025

Page 113

1  stored as evidence?
2  A.  So, again, I -- the question is a little fuzzy
3  to me because, again, we're only going there because the
4  police called us to come pick up bag and tag items, but
5  you mentioned evidence.
6     So, if it's something to do with a crime, then
7  the police should be holding on to that evidence and not
8  asking us to store it.
9  Q.  Are you aware of any circumstances in which DPW
10 would be asked to store evidence of a crime?
11 A.  No.
12    MR. WANG: Objection.  Vague, incomplete
13 hypothetical.
14    Go ahead.
15    THE WITNESS: No.
16    BY MS. SMITH:
17 Q.  To your knowledge, is it against DPW policy to
18 store evidence of a crime in the bag and tag storage
19 area?
20    MR. WANG: Objection.  Incomplete hypothetical,
21 vague.
22    Go ahead.
23    THE WITNESS: My understanding is we will not deal
24 with crime scene evidence.
25 ///

Page 114

1     BY MS. SMITH:
2  Q.  Have there been circumstances in the past where
3  DPW workers have been asked to store evidence by the
4  police?
5     MR. WANG: Objection.  Vague.
6     Go ahead.
7     THE WITNESS: I do not know if the police have asked
8  us to ever store their crime evidence.  My knowledge is
9  no, but I don't know hundred percent if that ever was
10 asked.
11    BY MS. SMITH:
12 Q.  If you received information from one of your
13 direct reports that police were asking employees to
14 store property as evidence, what would you instruct your
15 supervisor to do?
16    MR. WANG: Objection.  Vague, best evidence.
17    Go ahead.
18    THE WITNESS: My supervisor would call me and say,
19 "Hey, this is not a regular bag and tag."  This is what
20 I expect them to do.
21    Then I would tell them, "Then you are not
22 picking it up."  And I would forward that to my boss, is
23 that, "Hey, so-and-so got a call.  They responded to the
24 police station, and they were informed this is not from
25 a arrested Homeless person; this is crime scene

Page 115

1  evidence.  And I instructed them, 'You are not picking
2  it up.'"
3     That's how the story would go on that.
4     BY MS. SMITH:
5  Q.  And is that true if evidence of the crime
6  included a tent?
7     MR. WANG: Objection.  Vague, incomplete
8  hypothetical.
9     Go ahead.
10    THE WITNESS: Again, our understanding is and our
11 position is, if that is a crime scene evidence,
12 including a tent, we're not touching it.
13    BY MS. SMITH:
14 Q.  Thank you.
15    Is it safe to assume that if a pickup location
16 is a police station that the bag and tag was initiated
17 by the Police Department?
18    MR. WANG: Objection.  Vague as to "bag and tag."
19    Go ahead.
20    THE WITNESS: My understanding is, of course,
21 anything at the police station is confiscated by them
22 and they asked us to come and store it because it was a
23 homeless arrest.
24    BY MS. SMITH:
25 Q.  Okay.  Does DPW store tents if homeless people

Page 116

1  are arrested for anti-lodging citations?
2     MR. WANG: Objection.  Vague.
3     Go ahead.
4     THE WITNESS: Again, the same call.  If they're
5  calling us, I don't know what they were arrested for,
6  but if the officer tells us this was an arrested
7  homeless individual, we will bag and tag it.
8     BY MS. SMITH:
9  Q.  If the tent is evidence of the anti-lodging
10 citation, would DPW still bag and tag the tent?
11    MR. WANG: Objection.  Vague.  Calls for
12 speculation, lacks foundation.  Incomplete hypothetical.
13    Go ahead.
14    THE WITNESS: So, again, if it's deemed bag and tag,
15 we bag and tag it.
16    You mentioned lodging something -- the way you
17 said "lodging," I'm not sure what you mean by that.  But
18 I -- all I can say is, if they're telling us it's bag
19 and tag, homeless arrest, then we bag and tag it.
20    BY MS. SMITH:
21 Q.  Are you familiar with the practice of arresting
22 and citing -- excuse me.  Let me rephrase.
23    Are you familiar with SFPD's practice of
24 arresting unhoused people for anti-lodging citations?
25    MR. WANG: Objection.  Vague.  Calls for

Case 4:22-cv-05502-DMR    Document 366-32    Filed 04/17/25    Page 15 of 20

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Kenny Bruce
February 25, 2025

**Page 117**

1  speculation, lacks foundation.
2      Go ahead.
3      THE WITNESS: No.
4      BY MS. SMITH:
5  Q.  Is it the Police Department's position about
6  whether something should be bagged and tagged?
7  A.  So my understanding, again, if they're going to
8  tell us that these items here are from an arrested
9  homeless individual, we -- we take their word at it.
10 And we'll still photo document it, create the CMMS, and
11 put it in our storage container.
12     (Reporter requests clarification.)
13     BY MS. SMITH:
14 Q.  Is that true whether the bag and tag takes
15 place on the street or at a police station?
16 A.  So, again, any bag and tag requires the steps
17 and procedures.  We have to have our service request.
18 We've got to take some pictures of what we're storing.
19     So yes, whether it's PD, at a police station,
20 or on the street, we should have a service request with
21 photo documentation.  That's our expectation.
22 Q.  And, if the DPW worker arrives at a police
23 station for a bag and tag, are they required to bag and
24 tag items that are otherwise soiled?
25     MR. WANG: Objection.  Vague, incomplete

**Page 118**

1  hypothetical.
2      THE WITNESS: So I don't know if they've ever had
3  some item that was sitting there for us to pick up that
4  was soiled.  I'm going to believe that they're not going
5  to hold on to that either.
6      Again, like I said, if there's something in a
7  bag -- let's say it's loaded with -- you could smell
8  it's human waste, or if you see there's roaches and
9  stuff in there, we'll take a picture of that and say
10 that's why we discarded it.
11     So that's the only thing I can -- you know, to
12 try to answer your question.
13     BY MS. SMITH:
14 Q.  Does that same practice hold true if the police
15 call a DPW worker to conduct a bag and tag on the
16 street?
17     MR. WANG: Objection.  Vague.
18     Go ahead.
19     THE WITNESS: So, on the street again, at one
20 location you could have a variety of things, where half
21 of it is soiled and trashed and is going to be
22 discarded, and the other half is not and it is of value
23 and it should be bagged and tagged.
24     So -- that's the best I can tell you on that
25 one.

**Page 119**

1      BY MS. SMITH:
2  Q.  So if police call for DPW workers to bag and
3  tag items, the DPW worker can still make the decision on
4  whether items are fit to be bagged and tagged; is that
5  correct?
6  A.  Yes.
7  Q.  And can still discard those items if they're
8  soiled; is that correct?
9  A.  Soiled items will be discarded.
10     MS. SMITH: Okay.  If we could please queue up
11 Tab 11.  And this was previously marked as Exhibit 1203.
12     (Previously marked Exhibit 1203 referenced.)
13     BY MS. SMITH:
14 Q.  Mr. Bruce, does this appear to be an email
15 chain on which you are cc'd?
16 A.  Looking for my name.
17     Can you blow it up a little?
18     Yes, I see -- I see my name, yes.
19 Q.  Great.  Thank you.
20     And if we could please scroll down to the
21 bottom of the first page here.
22     And I'd like to direct your attention to where
23 Ms. Durden's email says (as read):
24     We will no longer pick up inmates'
25 things.

**Page 120**

1  What does this statement mean to you?
2      MR. WANG: Objection.  Vague.
3      Go ahead.
4      THE WITNESS: So what it means to me is back to what
5  I told you again.  If it's crime scene related, we
6  should have never picked it up in the first place.
7      So maybe if she says -- who's saying it?  I
8  thought -- we no longer pick up inmates' things.  So
9  maybe someone did.  But I just know my understanding is
10 we do not pick up anything that's crime related; only
11 homeless related.
12     BY MS. SMITH:
13 Q.  Are you aware of any time where DPW's policy
14 was to pick up belongings regardless of whether the
15 person being arrested was homeless or not?
16 A.  No.
17 Q.  To your knowledge that policy has not changed?
18 A.  The policy is homeless related, not crime.
19     MS. SMITH: We can remove this exhibit, and if we
20 could please queue up Tab 12.  This was previously
21 marked as Exhibit 1204.
22     (Previously marked Exhibit 1204 referenced.)
23     BY MS. SMITH:
24 Q.  Mr. Bruce, does this appear to be an email that
25 you sent?

Case 4:22-cv-05502-DMR   Document 366-32   Filed 04/17/25   Page 16 of 20

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Kenny Bruce  
February 25, 2025

Page 121

1  A.  Yes.
2  Q.  Do you see the contents of the email there,
3  just below "Attachments," where it says (as read):
4     SFPD has been calling us frequently to
5     bag and tag items that are not encampment
6     related.
7  A.  Yes.
8  Q.  Do you recall this being a problem frequently?
9  A.  So we have -- we all communicate, and when a
10  litter patrol has went to the station as, you know,
11  called to do so, and they ask, "Is this homeless
12  related," there has been times in the past where an
13  officer has said, "No.  No, it's not."
14     And so that's why we have this discussion.  If
15  they're not saying that it is specifically homeless
16  related, we're not picking the stuff up.
17  Q.  Did you do anything in response to this email?
18  A.  I let my bosses know.  So our big boss, the
19  deputy director, who communicates with our director, who
20  meets with the chief of police, can reiterate to the
21  chief and back on down, "Don't call Public Works for
22  items that are not homeless related."
23  Q.  And do you know if anything was done in
24  response to this email?
25  A.  As far as I know, the conversation was ran up

Page 122

1  the chain.  So I'd like to think that we do pretty good
2  in communicating.
3     So I would believe that our director had
4  communicated that with the top of the chain for PD.
5  Q.  Thank you.
6     If we could please remove this exhibit and
7  queue up Tab 13.  And I'd like to mark this as
8  Exhibit 1274.
9     (Reporter requests clarification.)
10  MS. SMITH: Yeah.  I'd like to mark it as 1274.
11     (Exhibit 1274 marked for identification.)
12  BY MS. SMITH:
13  Q.  Mr. Bruce, do you see yourself listed here as
14  one of the recipients?  Looks like maybe on the third
15  line on the right-hand side?
16  A.  Yes.
17  Q.  Great.
18     Could we please scroll down to page 2.  Thank
19  you.  Right here is perfect.
20     Mr. Bruce, there's an email here sent by a
21  Darren Mayes, and it says (as read):
22     We never see a bag and tag on the
23     tablet marked as encampment.  As far as I
24     know, the process is this:  SFPD arrests
25     bad guy.  SFPD bags bad guy's belongings.

Page 123

1     SFPD calls radio room.  Radio room calls
2     supervisor to LP to go pickup bag and tag.
3     Do you agree with Mr. Mayes's email?
4  MR. WANG: Objection.  Calls for speculation, lacks
5  foundation.
6     Go ahead.
7  THE WITNESS: No, I do not.
8  BY MS. SMITH:
9  Q.  Why not?
10  A.  Well, the way he puts it, it says, "We never
11  see a bag and tag on the tablet marked as an
12  encampment."  Right there, that's a red flag.  It
13  doesn't make sense to me.
14     And then, as far as -- so Darren Mayes doesn't
15  even work with us no more.  But it says, as far as I
16  know -- so this is his interpretation -- that PD arrests
17  a bad guy, PD bags the bad guy's belongings, calls the
18  radio room, and calls supervisor to LP to pick up.
19     So yeah, no, I do not agree with Mr. Mayes's
20  comments.
21  Q.  What about the first sentence doesn't make
22  sense to you?
23  A.  To say that we never see a bag and tag on the
24  tablet marked as an encampment, I would have to ask all
25  my supervisors who actually use the tablet and receive

Page 124

1  the requests and ask them, "Is this accurate?  Have you
2  never seen a bag and tag request that was marked as an
3  encampment?"
4     I -- it just almost doesn't make sense to me,
5  but I'd have to ask all the staff that deal with CMMS
6  and tablet requests and see what they think to that
7  first line.
8  Q.  Which unit was Mr. Mayes a part of?
9  A.  He was in Zone B downtown.
10  Q.  Who was his supervisor?
11  A.  At the time Sup. 2 -- I can't remember at the
12  time who the Supervisor 2 was.  Oh, maybe Nicole de la
13  Garza.  Yeah, Nicole de la Garza.
14  Q.  And did you supervise Nicole de la Garza at
15  that time?
16  A.  Yes.
17  Q.  And would it be your understanding that zone
18  shift members should have been conducting bag and tags
19  outside of just when police called them?
20  A.  Say that again, please?
21  Q.  Would you expect that zone shift workers were
22  conducting bag and tag policies outside of when police
23  officers called them at that time?
24  A.  Yes.
25  Q.  Would you expect them to conduct bag and tags

Case 4:22-cv-05502-DMR    Document 366-32    Filed 04/17/25    Page 17 of 20

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Kenny Bruce
February 25, 2025

Page 125

1   on encampments at that time?
2   A.  Yes.
3   Q.  Do you have information on whether or not that
4   statement was true?
5   A.  About what Mr. Mayes wrote?
6   Q.  Yes.
7   A.  No.
8   Q.  Did you look into the statement?
9   A.  No.  I don't even remember this email.
10  Q.  Do you know if Ms. De la Garza looked into this
11  statement?
12  A.  I don't know.  We would have to ask Ms. De la
13  Garza.
14  Q.  If a Supervisor 2 that you supervise found out
15  that their employee was only conducting bag and tags
16  when requested to by police, would that concern you?
17      MR. WANG: Objection.  Incomplete hypothetical to
18  the extent you're misstating the document, and vague,
19  lacks foundation, calls for speculation.
20      Go ahead.
21      THE WITNESS: So, if there was something not done
22  accurately, I would expect the Supervisor 2 to correct
23  whatever action was done incorrectly.
24      BY MS. SMITH:
25  Q.  And here would you expect the Supervisor 2 to

Page 126

1   talk to Mr. Mayes about the statement?
2       MR. WANG: Objection.  Vague.
3       THE WITNESS: Again, I expect our Supervisor 2s to
4   deal with whatever situations come up.  So, if there was
5   something to be addressed, I would expect it to be
6   addressed.
7       BY MS. SMITH:
8   Q.  And, if a Supervisor 2 learned that an employee
9   they supervised was only conducting bag and tags when
10  requested to do so by police, would you expect them to
11  talk to that employee?
12      MR. WANG: Objection.  Vague as to what "bag and
13  tag" means.
14      But go ahead.
15      THE WITNESS: Yes.
16      BY MS. SMITH:
17  Q.  Did you instruct Ms. De la Garza to talk to
18  Mr. Mayes about this statement?
19  A.  No.
20  Q.  Do you have an estimate of the percentage of
21  bag and tags at this time that were being conducted
22  pursuant to arrest or citation out of the total number
23  of bag and tags that your teams do?
24  A.  No, not at all.  But I'm looking at that email
25  that says (as read):

Page 127

1   We're looking into data mapping, and
2   typically bagging and tagging service
3   orders are created in combination with an
4   encampment service order.
5   So -- and that's from Arthur.
6   Q.  Thank you.
7       Does SFPD still call the radio room to collect
8   bags and tags for people who have been arrested or
9   cited?
10      MR. WANG: Objection.  Calls for speculation, lacks
11  foundation, vague.
12      Go ahead.
13      THE WITNESS: I haven't heard it in a while, but as
14  far as I believe, that right now we still do receive
15  calls from the Police Department to come pick up a bag
16  and tag for a homeless person that was arrested.
17      BY MS. SMITH:
18  Q.  Are you aware of whether the Police Department
19  still calls to request bag and tags for items of people
20  arrested who are not homeless?
21      MR. WANG: Objection.  Calls for speculation, lacks
22  foundation.
23      Go ahead.
24      THE WITNESS: I haven't heard of anything recently
25  as far as receiving requests to come and pick up from --

Page 128

1   anything outside of it being homeless related.  So
2   crime, that has not come to my attention recently.  So
3   no.
4       MS. SMITH: Thank you.
5       We can go ahead and remove this exhibit at this
6   time.
7   Q.  Mr. Bruce, do you oversee the storage yard?
8   A.  I do not oversee the storage container.
9   Q.  Do you have -- do you oversee employees who
10  drop off items at the storage yard?
11  A.  Yes.  They're within the zone and swing shift.
12  Q.  Are there policies that those employees are
13  expected to follow when dropping off items that have
14  been bagged and tagged at the storage yard?
15  A.  Yeah.  The policy is that they're supposed to
16  do it completely and thoroughly.
17  Q.  And what does that mean?
18  A.  That means that they bag and tag accurately,
19  take the photo documentation, put the slips with the
20  items, close out the request.
21  Q.  And is there a specific way that they are
22  supposed to store items in the storage yard after
23  bagging and tagging them?
24      MR. WANG: Objection.  Vague.
25      THE WITNESS: So I'm not sure about a certain way.

Case 4:22-cv-05502-DMR   Document 366-32   Filed 04/17/25   Page 18 of 20

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Kenny Bruce
February 25, 2025

Page 129

1  I mean, I know there's shipping containers with
2  shelving, and, once they have put everything together,
3  they put it in there and lock it up.
4      BY MS. SMITH:
5  Q.  And, if they fail to lock up the items, would
6  that be an issue?
7  A.  Yes.
8  Q.  Do they complete a homeless property
9  information form when they complete a bag and tag?
10 A.  So homeless property information form?  I don't
11 specifically know that verbiage.  I just know there is
12 paperwork for bag and tags required with the items
13 stored.
14 Q.  Where does that paperwork go?  Who stores that?
15 A.  Yeah.  So I mentioned that earlier today.  It's
16 three sheets.  It's all one with three sheets.  One copy
17 goes to Special Projects for their book.  One goes to
18 the radio room.  And the other copy stays with the items
19 in the container.
20 Q.  Is there any paperwork that is to be given to
21 the unhoused person when their items are bagged and
22 tagged?
23 A.  Yeah.  So that one is the one back to the
24 training and the pictures in the PowerPoint and in their
25 books, where, if we're bagging and tagging someone's

Page 130

1  belongings at a location and they're not there, that's
2  when we put the notification on a cone or an A-frame
3  stating, "We have taken your suitcase.  It's at our
4  facility.  You can come claim that there."
5      The thing we're also requiring them to do now
6  is to take a picture of the paperwork that you left at
7  the scene on the cone or A-frame.  And the reason why
8  is, shortly after we leave, anybody can come by and tear
9  up that notice, throw it away, what have you.
10     At least we have proof that we did our due
11 diligence upon retrieving the item at the location.  We
12 tried to inform the person that, if they come back,
13 where's my stuff, at least they know.
14 Q.  Thank you.
15     When did you start requiring photos of the
16 post-removal notice?
17 A.  Again, I can't tell you when.  I just know
18 that, once the policy had evolved and we started taking
19 pictures and leaving notices -- I guess Arthur again
20 would know the date that we started putting these
21 notice -- taking pictures of these notices.
22 Q.  Do you have an estimate as to the year that
23 that happened?
24 A.  No, I don't.
25 Q.  Would you know if it was in the past year or

Page 131

1  further back?
2  A.  Oh, I believe it would be further back.
3  Q.  Do you believe it was in the past five years?
4  A.  Within.  Within.
5  Q.  Do you believe in the past two years?
6  A.  I would say yes, it should have been within the
7  last couple of years for sure.
8  Q.  Okay, thank you.
9      And is there any paperwork that you give a
10 person who was attending their property when it was
11 bagged and tagged?
12 A.  Is there paperwork we give them when it's -- I
13 don't know.  That's a different one.  I don't know why
14 we would be bag and tagging their stuff if they're there
15 and they're not arrested.
16     So that's a confusing question.  I don't -- I
17 don't know how to answer that one.
18 Q.  Is it your understanding that bag and tags are
19 primarily performed when the property is unattended?
20     MR. WANG:  Objection.  Incomplete hypothetical,
21 vague.
22     Go ahead.
23     THE WITNESS:  So unattended is one, and arrest are
24 the main ones that I know of why we would fill out
25 paperwork and leave a notice.

Page 132

1      BY MS. SMITH:
2  Q.  So DPW doesn't bag and tag property that's
3  attended unless there is an arrest?
4      MR. WANG:  Objection.  Calls for speculation, lacks
5  foundation, vague as to DPW.
6      Go ahead.
7      THE WITNESS:  Yeah.  I'm not sure on that one.
8  I'm sure that, of all the work we do, there may
9  have been times.  Maybe the person had a medical
10 situation and needed to be transported and said, "Can
11 you please store my suitcase?"
12     And we may have, you know, in that situation
13 where he was there, was sick, and we stored the items
14 because he was going to be transported.
15     I mean, I'm just trying to think, would there
16 ever be a time that we may do this.
17     BY MS. SMITH:
18 Q.  So it sounds like it would be a one-off or an
19 unusual circumstance; is that correct?
20     MR. WANG:  Objection.  Vague, lacks foundation,
21 calls for speculation.
22     Go ahead.
23     THE WITNESS:  My understanding is that would be more
24 on the -- a rarity.  That's my understanding.
25 ///

Case 4:22-cv-05502-DMR   Document 366-32   Filed 04/17/25   Page 19 of 20

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Kenny Bruce
February 25, 2025

Page 133

1  BY MS. SMITH:
2  Q.  Thank you.
3      Is there any paperwork that you give someone
4  when they are arrested and their property is bagged and
5  tagged to be stored by DPW?
6  A.  You know, I'm not sure.  That's something we
7  would have to ask the crews that do it the most.  Have
8  they ever been there while the police were arresting
9  someone, and we said, "Hey, we're going to take your
10 stuff to our yard.  We're going to hold your suitcase.
11 And, by the way, here's our address."
12     That's a possibility.  But that's something we
13 would have to ask all the crews who have ever done it
14 and see.  But I don't have a definitive answer for you.
15 Q.  When is the form that is completed in
16 triplicate that you referenced earlier completed?
17 A.  That form is the bag and tag information.  On
18 that it will have the date, time, location, who picked
19 it up, and a description of the items.  That's the
20 three-sheet item --
21 Q.  Yes.
22 A.  Yes.
23 Q.  When is that paperwork completed?
24 A.  It is completed when they bring the items to
25 the storage area.  That's -- you know, they fill out

Page 134

1  that paperwork completely.
2  Q.  Are you aware of any DPW policy regarding
3  providing paperwork to an unhoused person who's arrested
4  and has their property bagged and tagged?
5  A.  I'm not aware.
6      MS. SMITH:  Thank you.
7      I'd like to queue up Tab 15 at this time,
8  please.  And I request to mark it as 1275.
9      (Exhibit 1275 marked for identification.)
10     MS. SMITH:  And also we'll throw a copy in the
11 chat for opposing counsel, please, when you get a
12 chance.
13 Q.  Mr. Bruce, does this appear to be an email sent
14 to you on April 17 of 2022?
15 A.  Yes.
16 Q.  Great.
17     And if we could please scroll down to just the
18 second half of the first page.
19     And this appears to be an email from you noting
20 that bag and tag items were left outside of the storage
21 area in violation of proper procedure; correct?
22 A.  Yes.
23 Q.  Do you recall this incident?
24 A.  It's -- it's coming back to me.  I remember --
25 you know, I remember that there was someone who did not

Page 135

1  follow the proper procedure and left the items outside.
2  So that's why we asked IT to run the video footage.
3  Q.  Do you remember who the employee was involved
4  in this incident?
5  A.  No, but give me a sec.  I just want to read
6  through this.
7      (Witness reviews exhibit.)
8      If you can just blow it up a little.
9      MR. WANG:  Let me find it.
10     THE WITNESS:  But I already remember when it says
11 somebody walking from the Evans Bridge to come get the
12 items.  Let me see.
13     (Witness reviews exhibit.)
14     Okay.  So --
15     MR. WANG:  See the rest of the email.
16     THE WITNESS:  So I don't -- what I remember is I
17 think what happened here was an employee left the bags
18 outside of the storage container.  So that was improper.
19     And then I believe a homeless person broke into
20 our yard and came through and either rummaged through
21 the bags or took the bags.  They took off with the
22 stuff.
23     So that's my memory.
24     And then you would ask, do I know who the
25 employee was.

Page 136

1  BY MS. SMITH:
2  Q.  Yes.
3  A.  That I do not.  I don't remember.
4  Q.  Do you remember what steps were taken in
5  response to this incident?
6  A.  No.  I think it happened during the middle of
7  the night 'cause the video was dark.  So I think it
8  happened at night.
9      And normally what we would do is turn it over
10 to the night shift Supervisor 2 and ask them to
11 investigate this, and they would investigate who was the
12 employee who brought this in, who failed the policy, and
13 take appropriate action.
14     That's my understanding of what we would do
15 with this.
16 Q.  And what would "appropriate action" entail?
17 A.  Well, after the supervisor who conducted the
18 investigation -- so, if I knew that my litter patrol
19 John Doe went and brought those items in last night, I
20 could check his GPS and, you know, take the proper
21 disciplinary procedures with this guy.
22     Has this been his first time doing it, or has
23 he has a history of doing this?  I'm not over the night
24 shift operations, but, as managers, we kind of have our
25 hands in a little bit of everything.  So I can't tell

Case 4:22-cv-05502-DMR     Document 366-32     Filed 04/17/25     Page 20 of 20

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Kenny Bruce
February 25, 2025

Page 137

1  you specifically who it was or what type of discipline
2  they received.
3      MS. SMITH:  Okay.  Ms. Headrick, if we could please
4  remove this exhibit and queue up Tab 24.  And I'd like
5  to request that we mark Tab 24 as Exhibit 1276.
6      (Exhibit 1276 marked for identification.)
7      BY MS. SMITH:
8  Q.  Mr. Bruce, does this again appear to be an
9  email chain on which you are a part?
10 A.  Yes.  It's from me and to Jason Jimenez, who
11 was HR at the time.
12 Q.  Thank you.
13     And if you could please scroll to the second
14 page, Ms. Headrick.
15     Mr. Bruce, does this appear to be an email from
16 Mr. Jimenez to you, asking for the employee's schedule
17 so you can interview him?
18 A.  Yes, from Jason to me, yes.
19 Q.  What would this indicate to you in regards to
20 what steps were taken in relation to this incident?
21 A.  Yes.  So Jason wants to know this employee's
22 schedule so he can schedule a Weingarten notice.
23     And so, once he had that information -- let's
24 say he works Tuesday through Saturday; he would not
25 schedule the Weingarten for a Monday -- and then he

Page 138

1  would create the Weingarten notice of conference and
2  have that employee's supervisor serve them that notice.
3  Q.  The fact that you are being asked for his
4  schedule, does that indicate to you that you supervised
5  this employee?
6  A.  No.  Again, if we get a complaint, day, swing
7  or night, whatever manager first gets it is going to
8  jump on it.  So, when he's asking me this employee's
9  schedule, like I said, I believe it was at night.  I
10 didn't even know his schedule.
11     I'm -- we're communicating back and forth, and
12 we're trying to get this notice of conference in the
13 employee's hand.  That's what I think when I see this.
14 Q.  To your knowledge, do you remember whether or
15 not you supervised -- the employee you -- let me
16 rephrase.
17     Do you remember whether the employee who was
18 responsible for this incident was part of your either
19 zone or swing shift teams?
20 A.  So, again, I'm just going on my knowledge of --
21 so there's a potential that, let's say, you work for me
22 on day shift, but they called out for overtime on one of
23 your days off and you took it.  You could have worked
24 overtime on graveyard last night, not working for me,
25 but you work for me during the regular week.

Page 139

1      So there's a possibility that a person who
2  worked for me could have been on overtime and did this.
3  If that answers your question.
4  Q.  Thank you.  That's helpful.
5      And if we could please scroll up to the top of
6  the first page.  Sorry.  If we could scroll down just a
7  bit so that we can see that email below from Mr. Vaing.
8  Thank you.
9      Mr. Bruce, it looks like Mr. Vaing's email is
10 indicating that the bag and tag procedure did not at
11 that time require to store an item inside the storage
12 area; is that correct?
13     MR. WANG:  Objection.  Misstates the document.
14 Vague.
15     Go ahead.
16     THE WITNESS:  Yeah.  I mean, when I read that with
17 Jonathan, he's seeing something that's missing.
18     Now, you would think it would be common sense
19 that I would need to secure these items, but common
20 sense is not always common.  So maybe that's why he
21 asked for that to be put in there.
22     BY MS. SMITH:
23 Q.  And, if we look at this top email above, it
24 looks like the email, "We need to add this verbiage," is
25 from you; correct?

Page 140

1  A.  Yup.
2  Q.  Have you made other recommendations about
3  changes to the bag and tag policy?
4      MR. WANG:  Objection.  Vague as to time.
5      (Simultaneous speaking.)
6      (Reporter requests clarification.)
7      MR. WANG:  Just vague in general.
8      THE WITNESS:  So not that I can remember of making
9  any other changes, but I will tell you, as a manager, if
10 I review something and I see something's missing, I'm
11 going to climb in.
12     BY MS. SMITH:
13 Q.  Do you recall the name of the employee who was
14 involved in this incident?
15 A.  No, I do not.
16 Q.  Okay, thank you.
17     And we can go ahead and remove this exhibit.
18     If we could please queue up Tab 17.
19     Oh, I'm sorry, if we could actually queue up
20 Tab 16 first.  And I'd like to mark this as
21 Exhibit 1277.
22     (Exhibit 1277 marked for identification.)
23     BY MS. SMITH:
24 Q.  If we could just scroll down so the email from
25 Mr. Reilly is seen.