# EXHIBIT 27

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

*Corey Jackson*
*February 24, 2025*

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 44143Jackson_NL.txt
**Min-U-Script® with Word Index**

Case 4:22-cv-05502-DMR   Document 366-33   Filed 04/17/25   Page 3 of 16

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Corey Jackson
February 24, 2025

Page 41

1  Q.  (BY MR. PRASAD:) When you say respond, do you
2  mean -- are -- well, okay.  Let me rephrase that.
3     Are you ever assigned to preplanned encampment
4  resolutions?
5     MR. MILLS: Objection.  Vague and ambiguous.
6     THE WITNESS: Not in Zone B, no.
7  Q.  (BY MR. PRASAD:) Are you familiar with the term
8  JFO?
9  A.  Yes.
10 Q.  What does JFO refer to?
11 A.  Joint Field Operation.  So that is a combination
12 of work that we do with ASOC resolution and SFPD.
13 Q.  Can you elaborate on what you mean by a
14 combination of work with ASOC resolutions and SFPD?
15 A.  It is different departments working together
16 responding to encampments throughout the city.
17 Q.  And are these organized by ASOC?
18    MR. MILLS: Objection.  Vague and ambiguous.
19 Calls for speculation.
20    THE WITNESS: Yes, I believe so.
21 Q.  (BY MR. PRASAD:) What city agencies participate in
22 JFOs, to your knowledge?
23 A.  Public Works, SFPD, and I think -- does ASOC fall
24 under DM?  DM.
25 Q.  And what's DPW's role in JFOs?

Page 42

1  A.  DPW role is to clean the debris, the trash, clean
2  around the area, provide potential trans vests for people
3  to, you know, put their stuff in, if that's what it's going
4  to be, and potentially bag and tagging if that situation
5  calls for it.
6  Q.  You mentioned SFPD.  What's SFPD's role, to your
7  knowledge?
8  A.  SFPD I believe is just supposed to be make sure
9  that everybody is safe and that the locations are responded
10 to.  Mostly for safety, I would imagine.
11 Q.  Do you personally participate in JFOs?
12 A.  No.
13 Q.  Have you in the past?
14 A.  Yes, a long time ago.
15 Q.  Do you recall what your position was then?
16 A.  The only time I was a part of any JFOs I believe I
17 was working overtime as a supervisor I in Zone B.
18 Q.  And when was that, to your knowledge?
19 A.  Probably around the same time I was working in
20 Zone A, so a while ago.
21 Q.  And what was your role in that JFO?
22 A.  I think my role was to just assist the group,
23 assist the staff members that were actively working there --
24 and LPs alike.  And as a supervisor I, I may also clean and
25 help take litter if that's what's needed, and potentially

Page 43

1  bag and tagging if that's what's needed.
2  Q.  Do you recall if you participated in bagging and
3  tagging on that occasion?
4  A.  I don't remember bagging and tagging at any point
5  when I was working with the JFO.
6  Q.  Sorry.  Did you say how long ago that was?
7  A.  I said I believe that's prior to me being in a
8  Corridor program, so probably some time when I was working
9  with Zone A.
10 Q.  Meaning more than a year ago?
11 A.  Means before October of '23.
12 Q.  And is that the only time you attended a JFO?
13 A.  Yeah.
14 Q.  To your knowledge, do DPW workers remove tents at
15 JFOs?
16    MR. MILLS: Objection.  Vague and ambiguous.
17    THE WITNESS: Yeah, I'm not exactly sure by
18 remove.  If we're speaking of maybe a soiled or broken tent,
19 something that was considered not operable, that could
20 possibly go.  If it is a tent that isn't in good standing, I
21 imagine it's probably bagged and tagged.
22 Q.  (BY MR. PRASAD:) Did DPW workers remove other
23 personal property at JFOs?
24    MR. MILLS: Objection.  Vague and ambiguous.
25 Calls for speculation.

Page 44

1     THE WITNESS: I'm also not sure about that.  I
2  would think that they will follow the policy when they're at
3  the location as far as what they decide to tag and what is
4  considered something that's not going to be tagged.
5  Q.  (BY MR. PRASAD:) What's considered something
6  that's not going to be tagged?  What do you mean by that?
7  A.  I mean soiled or like trashed pieces or items.
8  Typically things that are like scattered clear debris or,
9  you know, something that is -- I'd say soiled by saying that
10 it may have potential human something.  I'm trying to find a
11 way to say it without saying feces and pee and poop or
12 whatever.  I'm trying to think of different ways to think
13 about why we would not.
14    So it's typically soiled items, things that
15 are clear trash, things that are scattered in disarray,
16 things that aren't together to be -- yeah.  Or anything with
17 any sort of needle, drug, or any sort of paraphernalia
18 connected to that as well.
19 Q.  We'll discuss that more in a minute.
20    Do you know if DPW workers are required to comply
21 with the bag and tag policy at JFOs?
22 A.  Yes, they are.
23 Q.  And do you know if public notices are posted in
24 advance of JFOs?
25    MR. MILLS: Objection.  Vague and ambiguous.

Case 4:22-cv-05502-DMR   Document 366-33   Filed 04/17/25   Page 4 of 16
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Corey Jackson
February 24, 2025

Page 49

1  you asking that?
2  Q. Is there a supervisor from your crew at these
3  Saturday and Sunday JFOs?
4  A. On Saturdays, Henry Ramirez tries to pop in when
5  he can. On Sundays, I typically don't have a supervisor
6  there. Mike Lonadairy, one of my staff members who is
7  effectively a lead, he's one of my lead men, he typically
8  works with the JFO all Sunday.
9  Q. Now, is there a specific crew of individuals who
10  work from your crew on these Saturdays and Sundays?
11  A. Yes.
12  Q. Who are those individuals?
13  A. Mike Lonadairy on Sunday. And on Saturday, I
14  would actually have to ask Henry. That's a day I don't
15  work. I know Henry always responds. But I believe it's
16  Milton Navarete, one of my staff members.
17  Q. And to your best understanding, what's the purpose
18  of these Saturday and Sunday JFO operations?
19  A. Essentially Zone B is just subbing for the hot
20  spot crew.
21  Q. What's the hot spot crew?
22  A. They are the crew that is solely responsible for
23  encampments and I will say sort of homeless-related
24  potential cleanups.
25  Q. So fair to say that these Saturday and Sunday JFO

Page 50

1  operations primarily involve cleanup of homeless
2  encampments; is that right?
3     MR. MILLS: Objection. Misstates testimony.
4     THE WITNESS: I guess. I'm not exactly sure, but,
5  yes, I would think somewhat, yeah, for the most part.
6  Q. (BY MR. PRASAD:) Have you ever attended a Saturday
7  or Sunday JFO?
8  A. I have not. If I have shown up, it hasn't been
9  for longer than 5 or 10 minutes.
10  Q. And the individuals from your crew who participate
11  in these JFOs, are they responsible for knowing the bag and
12  tag policy?
13  A. Yes.
14  Q. And are you responsible for ensuring that they
15  know the bag and tag policy for those JFOs?
16  A. Yes.
17  Q. And earlier we discussed notice of JFOs, but you
18  don't recall what the rule is for notice for JFOs; is that
19  right?
20  A. As it involves us. When it comes to JFO, I
21  imagine that the ASOC resolution team will be the ones
22  posting notice.
23  Q. But you don't know what the rule is; is that
24  right?
25  A. Not in regards to our operation, no.

Page 51

1  Q. Can you walk me through the tasks that your crew
2  performs at a JFO starting from when they arrive?
3  A. They are responsible for cleaning the area.
4  Pretty much they have to sort of wait to understand what
5  kind of resolution it's going to be. I think that that
6  depends on the outreach that's provided and what is
7  basically the scope of their job at that point.
8  Q. Who defines the scope of their job at a JFO?
9  A. We overall understand what our scope of the job
10  is, but we don't deal with people. We just are there to
11  clean up. So ultimately the -- whether that's DM staff or
12  ASOC staff, whomever is doing the outreach at these
13  encampment resolutions, when they're done with their job
14  we'll know whether or not we're cleaning this, we're tagging
15  this, et cetera.
16  Q. Who decides when DPW workers can start doing their
17  job at a JFO?
18  A. I believe that would probably work through the
19  people who are doing the outreach and SFPD saying that,
20  okay, it's safe to go in here and clean now.
21  Q. And do your crew members decide what items should
22  be thrown away versus what items should be bagged and
23  tagged, or are they told what to do in those circumstances?
24  A. I can't speak to what's said at these resolutions
25  that I'm not at. But they are to, you know, refer to our

Page 52

1  policy. So they are to be able to make the determining
2  factor themselves. Or whatever supervisor is there should
3  be able to make the determining factor on what should be
4  bagged and tagged and what is trash.
5  Q. When you say supervisors, you mean the
6  supervisors --
7  A. The supervisor Is that may be at the location.
8  Q. In your crew, the supervisors from your crew; is
9  that right?
10  A. No. I was speaking about the general people who
11  are at the location. If we're talking about Saturday and
12  Sunday, when my guys are there, Michael and Deret, who is
13  one of my leads, he is very much capable. I don't need to
14  have a supervisor I there when he's there. I know that on
15  Saturday Henry Ramirez does respond a good amount.
16  Q. So your crew members who are there, including
17  these individuals you just mentioned, is it their
18  responsibility to determine, you know, what items should be
19  thrown away versus what items should be bagged and tagged?
20  A. Yes.
21  Q. Who decides how much time an unhoused person at a
22  JFO has to move their belongings?
23  A. Who makes that decision as far as how much time
24  they have?
25  Q. Yeah.

Case 4:22-cv-05502-DMR   Document 366-33   Filed 04/17/25   Page 5 of 16
Coalition on Homelessness, et al. v                                      Corey Jackson
City and County of San Francisco, et al.                             February 24, 2025

Page 53

1  A. I'm not exactly sure who that is. I know it's not
2  us. I think that would fall more with DMS, SFPD, the people
3  doing the outreach and talking to the people.
4  Q. Do your crew members ever interact with unhoused
5  people at these JFOs?
6     MR. MILLS: Objection. Vague and ambiguous.
7     THE WITNESS: Yeah, I was going to say I don't
8  really know because I'm not there. But I imagine just in
9  proximity, maybe. People --
10 Q. (BY MR. PRASAD:) Have you ever -- sorry. Please
11 go ahead.
12 A. No. I was just saying people speak to you just
13 walking down the street, so I could imagine if you're there
14 someone might interact.
15 Q. Well, do you ever provide instructions to your
16 crew about how they are to interact with unhoused people at
17 JFOs?
18 A. Yes. I always tell our crews that we want to
19 interact respectfully with anybody in the public, unhoused
20 or not. I'll also try to minimize interaction.
21 Q. Why is that?
22 A. I just think that it's better. We're ultimately
23 here to do a job. We're not here to necessarily have a
24 bunch of interaction with people at the encampment or people
25 in the public in general. Ultimately we're focused on our

Page 54

1  work.
2  Q. Do your crew members ever provide instructions to
3  unhoused people at JFOs about what they should do with their
4  property?
5     MR. MILLS: Objection. Vague, ambiguous, calls
6  for speculation.
7     THE WITNESS: Not that I'm aware of.
8  Q. (BY MR. PRASAD:) Are they supposed to, to your
9  knowledge?
10 A. No.
11 Q. Are you aware of whether -- withdrawn.
12    Your crew members are responsible for the bag and
13 tags that occur at these Saturday and Sunday JFOs; is that
14 right?
15 A. Yes.
16 Q. Is any other crew responsible or is it your crew
17 alone?
18 A. On Saturday and Sunday?
19 Q. Yes.
20 A. Yes, just my crew.
21 Q. Okay. Can you kind of walk me through how bag and
22 tags are supposed to occur at JFOs?
23 A. Once you identify what is bag and tag worthy, if
24 there's not already a service request generated, you make
25 sure one is generated. Make sure you take photos of what is

Page 55

1  going to be bagged and tagged from the location. If someone
2  is not there when you're tagging their stuff, you make sure
3  to leave notice.
4     Ultimately, you take those items that have
5  been documented via the service request and the photos taken
6  back to the operations yard to the container where we keep
7  the tags. We finish the paperwork for that tag, make sure
8  that the tag is on the items, or tags for that matter. And
9  then you turn in the paperwork to the proper spaces.
10 Q. To break that down a little bit, once one of your
11 crew members encounters an item that should be bagged and
12 tagged at a Saturday/Sunday JFO, what do they do next?
13 A. If there's not a service request generated for it,
14 they generate one with the radio room.
15 Q. And that's to ensure that it's documented; is that
16 right?
17 A. Exactly.
18 Q. And then what do they do after that?
19 A. And then they want to take photos within that
20 service request to document what exactly is being tagged, or
21 for that matter what's not being tagged if there's a reason
22 as to why it's not. With that done, they eventually take
23 those items back to the bag and tag cage and follow the
24 policy from there.
25 Q. And do they have to note down why they've

Page 56

1  determined certain items should be bagged and tagged or not?
2     MR. MILLS: Objection. Incomplete hypothetical
3  and compound.
4     THE WITNESS: Yes. They should put at least in
5  the comments -- I always tell my staff members to add into
6  the comments all details in relation to the bagged and
7  tagged. So whatever those things are, even if that means
8  there's a reason as to why this was not tagged, to note that
9  in the comments.
10 Q. (BY MR. PRASAD:) So, for example, if an item is
11 soiled, would that be recorded in the comments?
12 A. It should be. And also in the photos.
13 Q. The photo is demonstrating that the item is
14 soiled?
15 A. Mm-hmm.
16 Q. Do DPW workers in your crew participate in
17 removing tents at JFOs?
18    MR. MILLS: Objection. Vague, ambiguous.
19    THE WITNESS: I guess that would depend on the
20 operation. It is a possibility.
21 Q. (BY MR. PRASAD:) When would they participate in
22 removing tents?
23    MR. MILLS: Objection. Vague, ambiguous,
24 incomplete hypothetical, calls for speculation.
25    THE WITNESS: If the tent is to be bagged and

Case 4:22-cv-05502-DMR    Document 366-33    Filed 04/17/25    Page 6 of 16
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Corey Jackson
February 24, 2025

Page 57

1  tagged or if the tent is broken, soiled, or something to
2  where it's not to be bagged and tagged, those would be the
3  reasons for removal.
4  Q. (BY MR. PRASAD:) Do you know what time your crew
5  members arrive on Saturdays and Sundays to JFOs?
6  A. 9:00 a.m.
7  Q. And what time do they leave?
8  A. The operation is to be from 9:00 a.m. to 1:00 p.m.
9  Q. So your crew members leave at 1:00 p.m.?
10 A. I guess that depends on the day. I'm not exactly
11 sure if it's exactly at 1:00 p.m. every time. But, yes,
12    9:00 a.m. to 1:00 p.m. is the listed time for a JFO on
13 Saturday and Sunday.
14 Q. Now, you mentioned service requests. What is a
15 service request?
16 A. A service request is something that our staff
17 members receive in order to go complete certain jobs.
18 Typically those requests are coming from 311. Or if someone
19 called, that's one of us on channel 1, like I mentioned
20 before. Service requests come in all forms, whether that's
21 a graffiti request, whether that's a human waste request,
22 whether that's picking up litter or a bag from a corner.
23 Q. Do you review the service requests that your crew
24 members create at JFOs?
25 A. Do I -- hold on. Do I review the service request

Page 58

1  they create at JFOs you said?
2  Q. Yes.
3  A. Not always. But I do review service requests from
4  time to time.
5  Q. Does anyone review the service requests that your
6  crew create at JFOs?
7  A. I'm not sure.
8  Q. Do you ever engage in any monitoring of whether
9  your crew is correctly implementing the bag and tag policy
10 at JFOs?
11    MR. MILLS: Objection. Vague and ambiguous.
12    THE WITNESS: Yeah. I'm not sure, because with a
13 JFO being only two days a week, I don't necessarily find
14 myself going to check those SRs as generated. But my turn
15 on going to monitor other service requests, or service
16 requests for that matter, is something that I do randomly,
17 yes.
18 Q. (BY MR. PRASAD:) But as a supe II, it's your
19 responsible to ensure that your crew is correctly using the
20 bag and tag policy at JFOs. Correct?
21 A. Correct.
22 Q. So what do you do to make sure that happens?
23 A. I make sure that the people who are in place are
24 very much so trained and capable and people that have
25 demonstrated that they very much so understand the policy.

Page 59

1  Q. But you don't review any documentation that's
2  created at the JFOs to determine if that's actually taking
3  place; is that right?
4  A. I have not reviewed any of the recent JFOs on
5  Saturday and Sunday.
6  Q. So do you know if your crew at JFOs are actually
7  correctly implementing the bag and tag policy?
8     MR. MILLS: Objection. Vague, ambiguous, calls
9  for speculation, assumes facts not evidence.
10    THE WITNESS: I guess the best way I could
11 describe that is that I know for a fact that Mike Lonadairy
12 is very well versed on the bag and tag policy. He's someone
13 that I go to to help other staff members when they have
14 questions.
15 Q. (BY MR. PRASAD:) Right. But you don't know for a
16 particular JFO if your crew has bagged and tagged any items;
17 is that right?
18 A. I'll know if they have bagged and tagged an item.
19 But will I know specifically via checking a service request
20 that they generated? Not recently.
21 Q. How will you know if they've bagged and tagged an
22 item?
23 A. There's a thing we have called a DSS report, and
24 we make a DSS report for any PD calls.
25 Q. And who makes that report at a JFO?

Page 60

1  A. Typically my supervisor Is have created the DSS
2  reports daily. This is for any time we get a PD call.
3  Q. And what's included in that report?
4  A. Who responded and the details of what went on in
5  that response; whether that's a bag and tag or not.
6  Q. So is there one created at every JFO?
7  A. There's not a DSS report created because JFO --
8  there's a DSS report created for any SFPD calls. But the
9  fact that JFO is basically an SFPD joint assignment, then
10 yes.
11 Q. So, for example, you said there's a JFO every
12 weekend; is that right?
13 A. Well, we're part of JFO during the weekend.
14 Q. Sorry. So when I say JFOs, I'm referring to JFO
15 operations related to homeless encampments. You understand
16 that. Correct?
17 A. Yes.
18 Q. And so those occur every Saturday and Sunday; is
19 that right?
20 A. A JFO is daily.
21 Q. Daily. No. I'm sorry.
22    Your crew participate in those every Saturday and
23 Sunday. Right?
24 A. Yes, that's correct.
25 Q. Okay. So is there a DSS report created when your

Case 4:22-cv-05502-DMR   Document 366-33   Filed 04/17/25   Page 7 of 16

Coalition on Homelessness, et al. v   Corey Jackson
City and County of San Francisco, et al.   February 24, 2025

Page 61

1  crew participates in those JFOs every Saturday and Sunday?
2  A.  There is a DSS report created for a PD call, so I
3  imagine that JFO should be attached to it.  I would have to
4  reference some of my DSS reports or my recent DSS reports
5  from Saturday or Sunday to be completely clear on that.
6  Q.  So you don't know if DSS reports are created for
7  every Saturday/Sunday JFO; is that right?
8  A.  Yeah, I actually don't, yes.
9  Q.  And you don't know, then, whether, for example,
10 your crew bagged and tagged an item last Saturday; is that
11 right?
12     MR. MILLS: Objection.  Misstates testimony.
13 Incomplete hypothetical.
14     THE WITNESS: Can you ask that question again?
15 Q.  (BY MR. PRASAD:) Yeah.  So did your crew respond
16 to a JFO involving an encampment resolution last Saturday?
17 A.  Yes.
18 Q.  And did they bag and tag any items last Saturday?
19 A.  I'm not sure.
20 Q.  Did your crew respond to a JFO involving a
21 homeless encampment last Sunday?
22 A.  Yes.
23 Q.  Do you know if they bagged and tagged any items
24 last Sunday?
25 A.  I do not.

Page 62

1  Q.  So it's fair to say that sitting here today you
2  don't know if your crew properly implemented the bag and tag
3  policy last Saturday?
4  A.  Yep.
5     MR. MILLS: Objection.  Vague and ambiguous.
6  Calls for speculation.
7  Q.  (BY MR. PRASAD:) And it's fair to say that sitting
8  here today you don't know if your crew properly implemented
9  the bag and tag policy last Sunday; is that right?
10 A.  I can't say for a fact that I know that.  Like I
11 said before, I have very much so faith in the individuals
12 that got put in place to do it.  But I haven't reviewed -- I
13 haven't reviewed everything that will be connected to that
14 to say for a fact that I know.  So yes.
15 Q.  In other words, you don't know?
16 A.  Yes, I don't know.
17 Q.  And you mentioned these DSS reports.  What details
18 about bag and tags are included in these reports?
19 A.  When it comes to DSS reports and if it was a bag
20 and tag, it would just be listed in the comments that it was
21 a bag and tag and the service request number connected to
22 that.
23 Q.  Are there photographs included in these reports?
24 A.  Within the service request.  Not in the DSS
25 report.

Page 63

1  Q.  And do you review those service requests, for
2  example, to look at the photographs and determine if your
3  crew properly implemented the policy?
4  A.  Yes.
5  Q.  Regularly?
6  A.  Yes.
7  Q.  How often would you say you review those reports?
8  A.  Generally, I hope to do that once in my week.
9  Q.  And did you review any reports for last weekend's
10 JFOs?
11 A.  I have not.
12 Q.  What about the weekend before that?
13 A.  I have not.
14 Q.  And the weekend before that?
15 A.  For the JFOs, no.
16 Q.  When was the last time you reviewed a service
17 report to determine whether your crew was properly
18 implementing the bag and tag policy?
19 A.  Within the last two weeks for sure, just not the
20 JFO.  The DSS report is for all PD calls, period, so . . .
21 Q.  Right.  But earlier you said you couldn't remember
22 whether your crew responded to any PD calls to bag and tag
23 items in recent memory; is that right?
24     MR. MILLS: Objection.  Misstates testimony.
25     THE WITNESS: Not exactly sure about that, but I

Page 64

1  will say that in reference to DSS reports being made or
2  people responding to PD calls, it doesn't necessarily mean
3  it was a bag and tag.  So that would be a bit different.
4  Q.  (BY MR. PRASAD:) When was the last time you
5  reviewed a service report involving a bag and tag conducted
6  by your crew?
7  A.  I would say within the last couple of weeks.
8  Q.  And so does that mean that your crew responded to
9  an encampment resolution in the last couple weeks?
10     MR. MILLS: Objection.  Vague, ambiguous.
11     THE WITNESS: Also not necessarily sure about
12 that.  I know that they had a PD call.  Let's say you have a
13 PD call and it's just backpack.  That doesn't necessarily
14 mean it was an encampment resolution.  But in the same
15 breath, you bag and tagged it.
16 Q.  (BY MR. PRASAD:) Right.  Do you know when was the
17 last time that your crew responded to -- let me rephrase
18 that.
19     Do you know when was the last time that your crew
20 conducted a bag and tag involving unhoused individuals'
21 property other than a JFO?
22 A.  I'm not sure specifically.
23 Q.  Do all the JFOs that your crew responds to on
24 Saturdays and Sundays involve unhoused individuals and their
25 property?

Case 4:22-cv-05502-DMR    Document 366-33    Filed 04/17/25    Page 8 of 16
Coalition on Homelessness, et al. v                                                Corey Jackson
City and County of San Francisco, et al.                                        February 24, 2025

Page 73

1  more now than when this policy was newer.  So probably, if I
2  was to try to estimate, every other week I'm checking
3  service requests.
4  Q.  And what percentage of service requests would you
5  say that you're randomly checking to determine compliance
6  with the bag and tag policy?
7       MR. MILLS: Objection.  Calls for speculation.
8       THE WITNESS: I don't know.
9  Q.  (BY MR. PRASAD:) Would you say it's less than
10 half?
11 A.  Are we speaking half of the bag and tag service
12 requests?
13 Q.  Yes.
14 A.  Yes, less than half.
15 Q.  When you review those service requests, have you
16 ever come across a time when you felt that one of your crew
17 members did not properly implement the bag and tag policy?
18      MR. MILLS: Objection.  Vague and ambiguous.
19      THE WITNESS: No, not necessarily.  But I have
20 thought that we could be even more detailed.  Those are
21 things that I've said to people, that I think we could be
22 even more detailed.
23 Q.  (BY MR. PRASAD:) So you've provided that feedback
24 to your workers?
25 A.  Yes, to my staff.

Page 74

1  Q.  What kinds of details are we talking about?
2  A.  Let's say if I have one photo that depicts an item
3  that I want to depict, whichever way is in my comments,
4  maybe I take more than one from different angles, different
5  spaces, just to get a better picture.
6  Q.  And speaking of photographs, just to go back to
7  the topic of JFOs, are your crew members required to take
8  photographs at JFOs?
9  A.  They should take -- be taking photos of all
10 service requests generated, yes.
11 Q.  And what specifically are they required to take
12 photographs of?
13 A.  Work that they are performing, the before, the
14 after; if there's a tag, what's being tagged, what's not
15 being tagged.
16 Q.  And do you ever submit these photographs -- let me
17 rephrase that.
18      And these photographs are included in the service
19 reports; is that right?
20 A.  Yes.  They should be a part of the service
21 request.
22 Q.  Okay.  Are these photographs and service requests
23 ever reviewed by your supervisor?
24      MR. MILLS: Objection.  Calls for speculation.
25      THE WITNESS: I believe so, but I'm not sure.

Page 75

1  Q.  (BY MR. PRASAD:) Have you -- you recently
2  testified that you sometimes provide feedback to your
3  employees upon reviewing their service reports; is that
4  right?
5  A.  Yes.
6  Q.  And have you ever disciplined an employee that you
7  supervise because of something you reviewed in the service
8  report?
9       MR. MILLS: Objection.  Vague and ambiguous.
10      THE WITNESS: No, I have not.
11      MR. PRASAD: This would be a good time for a few
12 minutes' break, if that makes sense.  I think we've been
13 going on for about an hour 40 minutes or so.
14      Would you all like to take a quick break?
15      MR. MILLS: Yep, that works.
16      MR. PRASAD: We come back -- it's 11:40.  Should
17 we come back in about 5 minutes?
18      MR. MILLS: Cool.  That works.
19      MR. PRASAD: Thank you.
20      (A break was taken from 11:39 a.m. to 11:46
21 a.m.)
22 Q.  (BY MR. PRASAD:) Okay.  I just want to clarify one
23 last thing about JFO, Mr. Jackson.
24      You mentioned earlier that you trust your
25 supervisors in the field to ensure that individuals are

Page 76

1  complying with the bag and tag policy at JFOs; is that
2  right?
3  A.  That's correct.
4  Q.  But is it fair to say that sitting here today you
5  personally do not know whether your Zone B workers are
6  complying with the bag and tag policy in the field?
7       MR. MILLS: Objection.  Misstates testimony.
8       THE WITNESS: I can say for a fact from looking at
9  everyone's service request that they handled every bag and
10 tag policy correct.
11 Q.  (BY MR. PRASAD:) What I mean to ask, Mr. Jackson,
12 is that you don't personally know, for example, whether your
13 crew members followed the bag and tag policy at last
14 weekend's JFOs?
15      MR. MILLS: Objection.  Calls for speculation.
16 Incomplete hypothetical.  Assumes facts not in evidence.
17      THE WITNESS: Correct.
18 Q.  (BY MR. PRASAD:) And that's generally the case
19 or -- let me rephrase that.
20      It's generally the case that you do not know
21 whether your Zone B crew members have followed the bag and
22 tag policy at previous JFOs as well; is that correct?
23      MR. MILLS: Objection.  Misstates testimony.
24 Assumes facts not in evidence.  Incomplete hypothetical.
25 Calls for speculation.

Case 4:22-cv-05502-DMR    Document 366-33    Filed 04/17/25    Page 9 of 16

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Corey Jackson
February 24, 2025

Page 77

1  THE WITNESS: Yeah, I guess, I have not reviewed
2  since I've been in Zone B, so yes.
3  Q. (BY MR. PRASAD:) Earlier you mentioned CMMS,
4  Mr. Jackson. What is CMMS?
5  A. CMMS would be the app in which we work through
6  that we receive and close out our service request orders.
7  Q. And do you know how to use the CMMS system?
8  A. I do.
9  Q. Were you trained on it?
10 A. I was.
11 Q. How often are you trained on the proper use of
12 CMMS?
13 A. It has been a while since I was trained on CMMS.
14 But I have used it for years now, and we get updates from
15 our IT side if there's new things implemented within CMMS.
16 Q. And who provides the trainings that are done on
17 CMMS?
18 A. Arthur Cervantes, one of our IT guys. He is the
19 one that has, for the most part, I believe, created the CMMS
20 system.
21 Q. And earlier you mentioned service order reports.
22 Are CMMS reports and service order reports the same thing?
23 A. Yes, they are.
24 Q. So it's fair to say you're responsible for
25 reviewing the CMMS reports created by workers in Zone B?

Page 78

1      (Connection briefly lost. The court reporter
2  reads back the last question.)
3      MR. MILLS: Vague and ambiguous. Calls for
4  speculation.
5  Q. (BY MR. PRASAD:) Mr. Jackson, feel free to answer
6  the question again.
7  A. So I am tasked with reviewing service orders that
8  are completed by Zone B. We don't necessarily generate the
9  request unless we call it ourselves, like we have spoken
10 about with generating requests for encampment-related
11 service orders.
12 Q. And if I recall your testimony correctly, correct
13 me if I'm wrong, you typically review a sampling of those
14 reports that are generated by individuals in Zone B; is that
15 right?
16 A. Yes. There's hundreds of service orders that come
17 in daily. I would spend my entire day trying to review
18 every one.
19 Q. Are you familiar with any changes in how CMMS is
20 supposed to be used for homeless-related work in the past
21 few years?
22      MR. MILLS: Objection. Vague and ambiguous.
23      THE WITNESS: Yes. I think that we are definitely
24 a lot more mindful of making sure that service orders are
25 generated through the CMMS and photos are taken, but that's

Page 79

1  probably about it, the details that have been needed to be
2  added through CMMS to document.
3  Q. (BY MR. PRASAD:) When would you say that change
4  you described occurred?
5  A. Years ago now. I can't say specifically. I'm not
6  exactly sure. I know probably early forms of us responding
7  to encampments, it was not always CMMS driven.
8  Q. Sorry. What do you mean by CMMS driven?
9  A. I'm saying it wasn't always something that we
10 wanted to make sure we had a service request number through
11 the CMMS, because that's where we were able to take photos
12 and whatnot.
13     MR. PRASAD: I'd like to show the witness what
14 I've sent the court reporter as Tab 4, which we'll label as
15 Plaintiff's Exhibit 1251.
16     (Exhibit 1251 was marked for identification.)
17     So, Mr. Friend, if you could please put that on
18 the screen for us. Thank you.
19     And, Mr. Friend, if you wouldn't mind just doing a
20 quick scroll through this so the witness can see it.
21     All right. Thank you. If you could please scroll
22 to the top, Mr. Friend.
23 Q. (BY MR. PRASAD:) Mr. Jackson, is this an example
24 of a CMMS report?
25 A. This actually looks like a service request

Page 80

1  generated. It doesn't necessarily look like a CMMS number.
2  It looks as if this report was generated maybe through 311
3  and not on the CMMS, but I can't say that for sure. But it
4  looks like it was a 311 request by the numbers. Typically,
5  the CMMS starts with a number 2.
6  Q. This is an example of a service order report; is
7  that right?
8  A. Yes.
9  Q. Have you seen reports like this before?
10 A. I have.
11 Q. Okay. And do you see sort of towards the middle
12 of the page, under crew hours, there is -- or under crew,
13 there's a heading that says employee/crew and then under
14 that it says CJackson?
15 A. Yes.
16 Q. Okay. Does that refer to you?
17 A. Yes, it is. That's my CMMS number. That would be
18 what I log in with, that number there.
19 Q. So does that mean that you generated this report?
20 A. It looks like I responded to this report. By
21 looking at this, it says the start time and the stop time of
22 my activity at this encampment.
23 Q. Right. So this documents your activity at a
24 specific encampment; is that right?
25 A. That's what it does, yeah.

Case 4:22-cv-05502-DMR   Document 366-33   Filed 04/17/25   Page 10 of 16

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Corey Jackson  
February 24, 2025

Page 117

1  A.  If it's unattended, we would also bag and tag and
2  leave a notice in the location where it was retrieved from.
3  Q.  And what does that notice look like?
4  A.  It is a paper that explains where and who took the
5  property and --
6  Q.  How would you leave it there?
7  A.  Excuse me?
8  Q.  Sorry.  Please finish your answer.  I apologize.
9  A.  I was just saying that the paper just says where
10  they can get their items and basically where it was taken.
11  Q.  Where would you leave that paper?
12  A.  In the location where we retrieved the items.
13  Q.  But physically where would you put it in that
14  location?
15  A.  On a cone or on an A-frame posted in the location.
16  Q.  Now, we discussed abandoned property a little bit.
17  Under the policy, what are you supposed to do with abandoned
18  property?
19     MR. MILLS:  Objection.  Incomplete hypothetical.
20     THE WITNESS:  If it's abandoned property that is
21  like the things that I described earlier that are trash,
22  then they will be discarded.
23  Q.  (BY MR. PRASAD:)  So what if you came across, for
24  example, a pile of clothes that are not in a bag or a
25  suitcase, just a pile of clothes?  What would you do with

Page 118

1  that?
2     MR. MILLS:  Objection.  Incomplete hypothetical.
3     THE WITNESS:  I would assess that pile of clothes.
4  And I would -- if it's trash, then it will be trashed.  If
5  it's in good standing, we will probably bag and tag and
6  leave the notice.
7  Q.  (BY MR. PRASAD:)  So it's the condition of the
8  clothes that would --
9  A.  That definitely plays a factor.
10  Q.  What else would be a factor?
11  A.  That's probably the biggest factor, their
12  condition.
13  Q.  What condition would cause you to trash the
14  clothes?
15     MR. MILLS:  Objection.  Incomplete hypothetical.
16  Calls for speculation.
17     THE WITNESS:  I guess if they're dirty, soiled,
18  anything of that nature.
19  Q.  (BY MR. PRASAD:)  Does the policy describe what
20  types of items can be discarded specifically?
21  A.  No.
22  Q.  What about items that present an immediate health
23  and safety risk?
24  A.  Yes.  I believe we do talk about things that can
25  provide a safety risk.

Page 119

1  Q.  How do you identify those items?
2  A.  Things that are like safety hazards or weapons or
3  needles, things of that nature.
4  Q.  And have you received any training on how to
5  identify those items?
6  A.  Yes.  We've talked about trying to safely, you
7  know, assess the encampment, so . . .
8  Q.  What is the policy -- let me rephrase that.
9     Does the policy address what you should do with
10  perishable items?
11  A.  Like food, et cetera.  Right?  Perishable?
12     If these items are perishable, then I imagine
13  that they typically would be discarded if they are going to
14  go bad or rotten, et cetera, if they're not in a container
15  or something that can preserve them.
16  Q.  What are contraband or illegal items under the
17  policy?  Let me rephrase that.
18     Does the policy address, to your knowledge,
19  contraband items?
20  A.  Like drug paraphernalia and whatnot?  Possible.
21  Q.  You're not sure; is that right?
22  A.  Yeah, I'm not exactly sure how to answer that
23  question.
24  Q.  As in you're not sure if the policy addresses
25  those items; is that right?

Page 120

1  A.  Specifically, no.  We have photos and whatnot in
2  our slide.  But does the policy specifically say if it's a
3  knife in there?  I'm not sure.
4  Q.  Have you received training on how to identify any
5  such items?
6     MR. MILLS:  Objection.  Vague and ambiguous.
7     THE WITNESS:  We received training as far as
8  identifying things that would cause you to trash items.
9  Q.  (BY MR. PRASAD:)  Are there items you would
10  consider to be contraband or illegal that are among those
11  items that you're supposed to trash under the policy?
12  A.  Yes.
13  Q.  What?
14  A.  Like I said earlier, like needles; I know there's
15  a photo before where there's a white powdery substance all
16  over the whole tent.  I know that was used as reference
17  before.  So stuff like that.
18  Q.  But to be clear, you're not sure whether the
19  policy specifically describes what's contraband and should
20  be discarded for that reason; is that right?
21     MR. MILLS:  Objection.  Misstates testimony.
22  Vague and ambiguous.
23     THE WITNESS:  I guess so, yes.
24  Q.  (BY MR. PRASAD:)  Now, you mentioned that sometimes
25  items are soiled.  If you're looking in a tent and you see

Case 4:22-cv-05502-DMR    Document 366-33    Filed 04/17/25    Page 11 of 16
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Corey Jackson
February 24, 2025

Page 77

1  THE WITNESS: Yeah, I guess, I have not reviewed
2  since I've been in Zone B, so yes.
3  Q. (BY MR. PRASAD:) Earlier you mentioned CMMS,
4  Mr. Jackson. What is CMMS?
5  A. CMMS would be the app in which we work through
6  that we receive and close out our service request orders.
7  Q. And do you know how to use the CMMS system?
8  A. I do.
9  Q. Were you trained on it?
10 A. I was.
11 Q. How often are you trained on the proper use of
12 CMMS?
13 A. It has been a while since I was trained on CMMS.
14 But I have used it for years now, and we get updates from
15 our IT side if there's new things implemented within CMMS.
16 Q. And who provides the trainings that are done on
17 CMMS?
18 A. Arthur Cervantes, one of our IT guys. He is the
19 one that has, for the most part, I believe, created the CMMS
20 system.
21 Q. And earlier you mentioned service order reports.
22 Are CMMS reports and service order reports the same thing?
23 A. Yes, they are.
24 Q. So it's fair to say you're responsible for
25 reviewing the CMMS reports created by workers in Zone B?

Page 78

1  (Connection briefly lost. The court reporter
2  reads back the last question.)
3  MR. MILLS: Vague and ambiguous. Calls for
4  speculation.
5  Q. (BY MR. PRASAD:) Mr. Jackson, feel free to answer
6  the question again.
7  A. So I am tasked with reviewing service orders that
8  are completed by Zone B. We don't necessarily generate the
9  request unless we call it ourselves, like we have spoken
10 about with generating requests for encampment-related
11 service orders.
12 Q. And if I recall your testimony correctly, correct
13 me if I'm wrong, you typically review a sampling of those
14 reports that are generated by individuals in Zone B; is that
15 right?
16 A. Yes. There's hundreds of service orders that come
17 in daily. I would spend my entire day trying to review
18 every one.
19 Q. Are you familiar with any changes in how CMMS is
20 supposed to be used for homeless-related work in the past
21 few years?
22 MR. MILLS: Objection. Vague and ambiguous.
23 THE WITNESS: Yes. I think that we are definitely
24 a lot more mindful of making sure that service orders are
25 generated through the CMMS and photos are taken, but that's

Page 79

1  probably about it, the details that have been needed to be
2  added through CMMS to document.
3  Q. (BY MR. PRASAD:) When would you say that change
4  you described occurred?
5  A. Years ago now. I can't say specifically. I'm not
6  exactly sure. I know probably early forms of us responding
7  to encampments, it was not always CMMS driven.
8  Q. Sorry. What do you mean by CMMS driven?
9  A. I'm saying it wasn't always something that we
10 wanted to make sure we had a service request number through
11 the CMMS, because that's where we were able to take photos
12 and whatnot.
13 MR. PRASAD: I'd like to show the witness what
14 I've sent the court reporter as Tab 4, which we'll label as
15 Plaintiff's Exhibit 1251.
16 (Exhibit 1251 was marked for identification.)
17 So, Mr. Friend, if you could please put that on
18 the screen for us. Thank you.
19 And, Mr. Friend, if you wouldn't mind just doing a
20 quick scroll through this so the witness can see it.
21 All right. Thank you. If you could please scroll
22 to the top, Mr. Friend.
23 Q. (BY MR. PRASAD:) Mr. Jackson, is this an example
24 of a CMMS report?
25 A. This actually looks like a service request

Page 80

1  generated. It doesn't necessarily look like a CMMS number.
2  It looks as if this report was generated maybe through 311
3  and not on the CMMS, but I can't say that for sure. But it
4  looks like it was a 311 request by the numbers. Typically,
5  the CMMS starts with a number 2.
6  Q. This is an example of a service order report; is
7  that right?
8  A. Yes.
9  Q. Have you seen reports like this before?
10 A. I have.
11 Q. Okay. And do you see sort of towards the middle
12 of the page, under crew hours, there is -- or under crew,
13 there's a heading that says employee/crew and then under
14 that it says CJackson?
15 A. Yes.
16 Q. Okay. Does that refer to you?
17 A. Yes, it is. That's my CMMS number. That would be
18 what I log in with, that number there.
19 Q. So does that mean that you generated this report?
20 A. It looks like I responded to this report. By
21 looking at this, it says the start time and the stop time of
22 my activity at this encampment.
23 Q. Right. So this documents your activity at a
24 specific encampment; is that right?
25 A. That's what it does, yeah.

Case 4:22-cv-05502-DMR    Document 366-33    Filed 04/17/25    Page 12 of 16

Coalition on Homelessness, et al. v                                      Corey Jackson
City and County of San Francisco, et al.                            February 24, 2025

Page 117

1  A.  If it's unattended, we would also bag and tag and
2  leave a notice in the location where it was retrieved from.
3  Q.  And what does that notice look like?
4  A.  It is a paper that explains where and who took the
5  property and --
6  Q.  How would you leave it there?
7  A.  Excuse me?
8  Q.  Sorry.  Please finish your answer.  I apologize.
9  A.  I was just saying that the paper just says where
10 they can get their items and basically where it was taken.
11 Q.  Where would you leave that paper?
12 A.  In the location where we retrieved the items.
13 Q.  But physically where would you put it in that
14 location?
15 A.  On a cone or on an A-frame posted in the location.
16 Q.  Now, we discussed abandoned property a little bit.
17 Under the policy, what are you supposed to do with abandoned
18 property?
19     MR. MILLS:  Objection.  Incomplete hypothetical.
20     THE WITNESS:  If it's abandoned property that is
21 like the things that I described earlier that are trash,
22 then they will be discarded.
23 Q.  (BY MR. PRASAD:)  So what if you came across, for
24 example, a pile of clothes that are not in a bag or a
25 suitcase, just a pile of clothes?  What would you do with

Page 118

1  that?
2      MR. MILLS:  Objection.  Incomplete hypothetical.
3      THE WITNESS:  I would assess that pile of clothes.
4  And I would -- if it's trash, then it will be trashed.  If
5  it's in good standing, we will probably bag and tag and
6  leave the notice.
7  Q.  (BY MR. PRASAD:)  So it's the condition of the
8  clothes that would --
9  A.  That definitely plays a factor.
10 Q.  What else would be a factor?
11 A.  That's probably the biggest factor, their
12 condition.
13 Q.  What condition would cause you to trash the
14 clothes?
15     MR. MILLS:  Objection.  Incomplete hypothetical.
16 Calls for speculation.
17     THE WITNESS:  I guess if they're dirty, soiled,
18 anything of that nature.
19 Q.  (BY MR. PRASAD:)  Does the policy describe what
20 types of items can be discarded specifically?
21 A.  No.
22 Q.  What about items that present an immediate health
23 and safety risk?
24 A.  Yes.  I believe we do talk about things that can
25 provide a safety risk.

Page 119

1  Q.  How do you identify those items?
2  A.  Things that are like safety hazards or weapons or
3  needles, things of that nature.
4  Q.  And have you received any training on how to
5  identify those items?
6  A.  Yes.  We've talked about trying to safely, you
7  know, assess the encampment, so . . .
8  Q.  What is the policy -- let me rephrase that.
9      Does the policy address what you should do with
10 perishable items?
11 A.  Like food, et cetera.  Right?  Perishable?
12     If these items are perishable, then I imagine
13 that they typically would be discarded if they are going to
14 go bad or rotten, et cetera, if they're not in a container
15 or something that can preserve them.
16 Q.  What are contraband or illegal items under the
17 policy?  Let me rephrase that.
18     Does the policy address, to your knowledge,
19 contraband items?
20 A.  Like drug paraphernalia and whatnot?  Possible.
21 Q.  You're not sure; is that right?
22 A.  Yeah, I'm not exactly sure how to answer that
23 question.
24 Q.  As in you're not sure if the policy addresses
25 those items; is that right?

Page 120

1  A.  Specifically, no.  We have photos and whatnot in
2  our slide.  But does the policy specifically say if it's a
3  knife in there?  I'm not sure.
4  Q.  Have you received training on how to identify any
5  such items?
6      MR. MILLS:  Objection.  Vague and ambiguous.
7      THE WITNESS:  We received training as far as
8  identifying things that would cause you to trash items.
9  Q.  (BY MR. PRASAD:)  Are there items you would
10 consider to be contraband or illegal that are among those
11 items that you're supposed to trash under the policy?
12 A.  Yes.
13 Q.  What?
14 A.  Like I said earlier, like needles; I know there's
15 a photo before where there's a white powdery substance all
16 over the whole tent.  I know that was used as reference
17 before.  So stuff like that.
18 Q.  But to be clear, you're not sure whether the
19 policy specifically describes what's contraband and should
20 be discarded for that reason; is that right?
21     MR. MILLS:  Objection.  Misstates testimony.
22 Vague and ambiguous.
23     THE WITNESS:  I guess so, yes.
24 Q.  (BY MR. PRASAD:)  Now, you mentioned that sometimes
25 items are soiled.  If you're looking in a tent and you see

Case 4:22-cv-05502-DMR    Document 366-33    Filed 04/17/25    Page 13 of 16
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Corey Jackson
February 24, 2025

Page 133

1  Now, the correct way that we're doing it,
2  especially now that we continue to reiterate it, each item
3  has a tag, so it will be listed more like this form as
4  opposed to the previous form that we showed.
5  Q. And when did that policy change?
6  A. I'm not aware. I'm not sure.
7  Q. Do you see, Mr. Jackson, that at the very bottom
8  it says "disposal date." Do you see that?
9  A. I do.
10 Q. What does that mean?
11 A. I believe that is the date in which the items are
12 no longer going to be held in the bag and tag because the
13 time allotted has expired.
14 Q. And do you see that there's a notation -- there's
15 a handwriting notation there?
16 A. Yeah. It looks like it says "broken into stolen"
17 on March 21st of '17.
18 Q. So what does that indicate to you?
19 A. I believe that indicates that the bag and tag cage
20 was broken into and items were stolen.
21 Q. So it suggests that this individual likely did not
22 get their property back. Correct?
23 A. Correct.
24    MR. PRASAD: Okay. And if we could scroll down
25 again a little bit, please, to the next page.

Page 134

1  Q. (BY MR. PRASAD:) Now, are these tags, Mr. Jackson?
2  A. These look like tags, yes.
3     MR. PRASAD: Now, if we could scroll down a little
4  bit more.
5  Q. (BY MR. PRASAD:) Do you see that the last two tags
6  here say "disposed" on them?
7  A. Mm-hmm.
8  Q. What does that indicate to you?
9  A. I imagine that they disposed of it and maybe it
10 went to the trash. I really don't know. I honestly find it
11 odd that anybody wrote on a tag.
12 Q. Why do you find it odd?
13 A. Because it's something that we don't do. We
14 wouldn't indicate on the tag that's listed on the property
15 as far as what happened. If something was disposed, it
16 should have been noted prior to or on a service request.
17 Q. Do you see that it says "ruined wet" on both of
18 those tags?
19 A. Yes.
20 Q. Are you aware of any instances where property has
21 been ruined at the DPW yard and then it's disposed before
22 individuals can claim it?
23    MR. MILLS: Objection. Incomplete hypothetical.
24    THE WITNESS: I believe there was a time where one
25 of our cages -- things were getting wet inside of it. I

Page 135

1  believe that happened once, if I can recall.
2  Q. (BY MR. PRASAD:) Do you agree it appears that this
3  person's property was disposed before they could claim it
4  because it was ruined wet?
5  A. It appears --
6     MR. MILLS: Objection. Misstates the document and
7  calls for speculation.
8     THE WITNESS: I'm not exactly sure, but it appears
9  that something along that line has happened because they
10 wrote on the tag reasons I don't really understand.
11    MR. PRASAD: Okay. Thank you. And we can take
12 this exhibit down.
13 Q. (BY MR. PRASAD:) Mr. Jackson, are you familiar
14 with any special policies that relate to interacting with
15 individuals with -- unhoused individuals with disabilities
16 at encampment resolutions or JFOs?
17 A. No.
18 Q. To your knowledge, are there any such policies?
19 A. Not that I'm aware of.
20 Q. If you're cleaning around an encampment and a
21 person there says that they have a disability, are there any
22 special procedures that you would follow?
23    MR. MILLS: Objection. Incomplete hypothetical.
24 Vague and ambiguous.
25    THE WITNESS: I'm not sure. I guess that would

Page 136

1  depend on what's communicated with me. Ultimately, like I
2  was saying before, I don't really want to have to deal with
3  the people mostly. But if it's about accommodation of some
4  sorts, I would hope that we're open to try to make it as
5  easy on people as possible that are already unhoused.
6  Q. (BY MR. PRASAD:) So if there's a person with an
7  obvious physical disability who can't move their stuff, for
8  example, what would you do in that instance?
9  A. I would typically reach out to the ASOC and DM
10 personnel that I know to try to help provide services to
11 that individual, let them know where that person is.
12 Q. But you're not aware of any specific procedures
13 related -- or specific policies, rather, related to how they
14 should move their stuff or how much time they should get or
15 anything like that?
16    MR. MILLS: Objection. Compound.
17    THE WITNESS: Not when it comes to unhoused people
18 with disabilities, no.
19 Q. (BY MR. PRASAD:) Have you ever come across
20 individuals with obvious disabilities when you're working
21 around encampments?
22    MR. MILLS: Objection. Vague and ambiguous.
23    THE WITNESS: Not that I recall.
24 Q. (BY MR. PRASAD:) Do you recall any training on how
25 to deal with individuals with disabilities that you would

# ERRATA SHEET

NAME OF CASE: *Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*
No. 4:22-cv-05502-DMR
DATE OF DEPOSITION: February 24, 2025
NAME OF DEPONENT: Corey Jackson

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| 40 | 3 | "ASOC" to "HSOC" | Typographical Error |
| 41 | 12 | "ASOC" to "HSOC" | Typographical Error |
| 41 | 14 | "ASOC" to "HSOC" | Typographical Error |
| 41 | 17 | "ASOC" to "HSOC" | Typographical Error |

| | | | |
|---|---|---|---|
| 41 | 23 | "ASOC" to "HSOC" | Typographical Error |
| 41 | 24 | "DM" to "DEM" | Typographical Error |
| 43 | 20 | "isn't" to "is" | Typographical Error |
| 49 | 6 | Mike Lunardelli | |
| 49 | 13 | "Mike Lonadairy" to "Mike Lunardelli" | Corrected spelling |
| 50 | 21 | "ASOC" to "HSOC" | Typographical Error |
| 51 | 11 | "DM" to "DEM" | Typographical Error |

| | | | |
|---|---|---|---|
| 51 | 12 | "ASOC" to "HSOC" | Typographical Error |
| 53 | 2 | "DMS" to "DEM" | Typographical Error |
| 59 | 11 | "Mike Lonadairy" to "Mike Lunardelli" | Corrected spelling |
| 136 | 9 | "ASOC" to "HSOC" | Typographical Error |
| 136 | 9 | "DM" to "DEM" | Typographical Error |

Corey Jackson

4/7/25
Date