# EXHIBIT 29

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v.*
*City and County of San Francisco*

*Khaled Shehadeh*
*January 13, 2025*

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 43907Shedhadeh_nl.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR    Document 366-35    Filed 04/17/25    Page 3 of 11
Coalition on Homelessness, et al. v.                                    Khaled Shehadeh
City and County of San Francisco                                        January 13, 2025

Page 89

1  A.  So we have to provide explanation anyway.
2  Q.  And that would be provided in CMMS; is that
3     correct?
4  A.  In an e-mail.
5  Q.  In an e-mail.
6     And who would that e-mail go to?
7  A.  Whoever -- Jonathan or the 311.
8  Q.  And did you receive the complaint through
9     e-mail?
10 A.  Yes.
11 Q.  Are you familiar with BSES daily sheets?
12 A.  Which one is that?
13 Q.  I can show you. I'm going to show you a
14    document that we will mark 1013.
15    (Deposition Exhibit 1013 was marked for
16    identification.)
17    BY ATTORNEY KATOVICH:
18 Q.  This is an e-mail dated January 12th, 2022,
19    from CMMS@sfdpw.org to a number of people. And the
20    Bates number starts at -187364.
21    Do you see your name among the recipients of
22    this e-mail?
23 A.  Yes.
24 Q.  And do you recall receiving this e-mail or
25    similar e-mails?

Page 90

1  A.  I think so.
2  Q.  And do you still -- do you regularly receive
3     e-mails attaching BSES daily sheets?
4  A.  No. I'm not in the Zone.
5  Q.  So this only goes to Zone supervisors?
6  A.  Yes.
7  Q.  And what does the BSES daily sheet include in
8     it?
9  A.  Usually how many requests are open or closed.
10    It should tell you how many requests are open or closed.
11 Q.  And so this would include all service requests
12    for one day; is that accurate?
13 A.  Yeah.
14 Q.  And so this would -- and this is from CMMS?
15 A.  Yes.
16 Q.  When you were in Zone and you got these
17    e-mails, would you review the daily sheets?
18 A.  Not really.
19 Q.  Why not?
20 A.  Because I check my own zone, my own requests.
21    Because this is -- this is too much information.
22 Q.  I see.
23    And how would you check your own requests?
24 A.  By zone. So where it says Zone A, I just type
25    in Zone B, and I see all my requests.

Page 91

1  Q.  So you would open up the file, and then you
2     would go straight to your zone and take a look; is that
3     correct?
4  A.  Yes.
5  Q.  Okay. And would you do that every day?
6  A.  Yes.
7  Q.  And when you looked at the requests for your
8     zone, what would you be looking for?
9  A.  Emergencies, priorities, safety.
10 Q.  And where would those appear in the daily
11    sheet?
12 A.  My own. That's why we -- that's why we check
13    on -- on my own, on my own zone.
14 Q.  But you would check within the daily sheet,
15    correct?
16 A.  No.
17 Q.  Where would you check for that?
18 A.  CMMS itself.
19 Q.  So when you were in Zone B, you would go into
20    CMMS -- CMMS and review the service requests that your
21    laborers had created?
22 A.  No. This is the people who complain. This is
23    our 311 complaints.
24 Q.  So did you ever review in CMMS reports that
25    your laborers created?

Page 92

1  A.  No -- case-by-case basis. If we get a
2     complaint, yes.
3  Q.  So if you got a complaint from the public about
4     a service request that your laborer was involved in, you
5     would review that?
6  A.  Yes.
7  Q.  But otherwise, you wouldn't review the CMMS
8     reports that your laborers created?
9  A.  No.
10 Q.  Are you familiar with BSES Daily Litter Patrol?
11 A.  That should be the same thing.
12 Q.  I'm going to show you another document that we
13    will mark as 1014.
14    (Deposition Exhibit 1014 was marked for
15    identification.)
16    BY ATTORNEY KATOVICH:
17 Q.  So this is an e-mail dated February 28, 2023,
18    and it is from CMMS@sfdpw.org, and it's sent to a number
19    of recipients. The first page is Bates-stamped -63858.
20    Do you recognize this e-mail?
21 A.  Yes.
22 Q.  What does this e-mail represent?
23 A.  Work being done.
24 Q.  And you see that you're one of the
25    recipients --

Case 4:22-cv-05502-DMR   Document 366-35   Filed 04/17/25   Page 4 of 11
Coalition on Homelessness, et al. v.                                    Khaled Shehadeh
City and County of San Francisco                                        January 13, 2025

Page 101

1  MONDAY, JANUARY 13, 2025; 1:49 P.M.
2  EXAMINATION RESUMED
3  BY ATTORNEY KATOVICH:
4  Q.  In your current position, where are you --
5     where do you physically work from?
6        Are you in an office?  Are you at the yard?
7  A.  The yard is at the office, the Operation Yard.
8     At my office over there.
9  Q.  And do you go into the field or do you --
10 A.  All the time.
11 Q.  All the time.
12       Where do you go when you go to the field?
13 A.  Citywide.  So I go all over.
14 Q.  And do you go with your laborers?
15 A.  No.
16 Q.  So under what circumstances do you go out in
17    the field?
18 A.  I go every day.  There's no circumstances.  I
19    like to be out.
20 Q.  And you're just going on your own to do what?
21 A.  Check the hot spots, the one we know -- like
22    now, tagging, the -- which area is being tagged.  We go
23    check them out every day.
24 Q.  When you say "we," who do you go with?
25 A.  I -- I go every day, but I let my supervisor

Page 102

1  know.  Because I don't want to have my crew go over
2  there and there's nothing.  So I will go first and check
3  so I can have a plan.
4     If it's big, then we can plan tomorrow.  If
5  it's in -- let's say we could handle it.  If I have
6  paint, I will do it myself.  So it depends on how big is
7  the tag.
8  Q.  So that's sort of proactively looking to see
9     where there are graffiti issues that your team should
10    respond to, or is that in response to 311 or other
11    service requests?
12 A.  No.  This is extra.
13 Q.  Okay.
14 A.  They already have the request on the tablet.  I
15    go just the location that we know that is going to be
16    tagged every day.  So we see -- it's a matter of how big
17    it is.
18 Q.  I see.  Yeah.
19       So you're just getting ahead of the complaints,
20    cutting it off, so to speak?
21 A.  Yes.
22 Q.  Okay.  How much of your day typically would you
23    say you're out in the field doing that?
24 A.  Five hours.
25 Q.  Five hours a day?

Page 103

1  A.  You can say.
2  Q.  Yeah.
3     And when you were a supervisor of Zone B, how
4  much of your day were you out in the field typically?
5  A.  Same thing.  Almost five.
6  Q.  And at that time, when you went out into the
7  field, what were you doing?
8  A.  Same thing.  Checking -- when I was in the
9  zone, I used to be in UN Plaza.  Make sure UN Plaza
10 clean, clear.  We will focus in on the people selling
11 stuff.  That's it.
12 Q.  And when you were out, for example, in UN
13 Plaza, were you on your own, or were you with other DPW
14 workers?
15 A.  I will be on my own until I have my steamer
16 come in to wash the plaza.
17 Q.  And were JFO people around when you would do
18 that --
19 A.  No.
20 Q.  -- or you were just on your own?
21    So you weren't really working with JFO when you
22 were out in the field?
23 A.  No.
24 Q.  And when you were a supervisor in Zone B, you
25 didn't observe your laborers who are working in JFO; is

Page 104

1  that right?
2  A.  Once in a while, I did.
3  Q.  Once in a while, you did?
4  A.  Yes.
5  Q.  About how many times would you estimate you
6  went to a JFO and observed your workers?
7  A.  I cannot give you an estimate.
8  Q.  Under five?
9  A.  I don't know.  It was a while back.  So...
10 Q.  Okay.  Do you remember any instances in
11 particular where you went to a JFO where your laborers
12 were working?
13 A.  They always working.  So I just -- when I pass
14 by, I would see them.  I would just keep going if
15 everything okay.  Because if there's something, they
16 would give me a call if there's an issue.
17 Q.  How often did they give you a call?
18 A.  Not often.
19 Q.  Would you estimate, like, once a week?  More?
20 Less?
21 A.  No.  Everything was going -- as far as I know,
22 everything was going good.
23 Q.  So it would be rare for you to get a call from
24 them about an issue?
25 A.  Yes.

Page 109

1 Yes.
2 Q. How does the policy treat unattended versus
3    attended property?
4 A. Well, attended, you can tell it's attended.
5    It's nice and neat. But still, you cannot -- you cannot
6    decide which one is attended and which one is
7    unattended.
8       Because we went through some locations, and you
9    got some debris scattered, and we would try to clean it
10   up; the person come, "That's mine." Those garbage might
11   not -- those garbage, he said, "I want it."
12      We tell him, "Keep it." We keep going.
13 Q. So you're saying it's very difficult for DPW
14   workers to determine what's attended versus unattended?
15 A. No. It depends on the circumstances and the
16   scenario. Some stuff you can tell it is somebody there;
17   and some stuff you think that it's garbage but it's not.
18   That's why we leave it.
19 Q. And you would leave it if you figure out that
20   it's not garbage because somebody comes and says,
21   "That's mine"?
22 A. We leave it regardless.
23 Q. So even if it looks like garbage to you, you
24   would leave it?
25 A. We will clean it up, put it in the side. At

Page 110

1    least we make it neat, and we keep going. After two,
2    three days, if it's still there, it depends. We're
3    going to call PD and do the proper work. So it depends.
4    Everything is circumstan- -- it's case-by-case basis.
5 Q. Does the current bag-and-tag policy explain
6    what is attended versus unattended property?
7 A. Yes.
8 Q. What is attended property?
9 A. When there is somebody present.
10 Q. And what is unattended property?
11 A. There's nobody over there.
12 Q. How would you identify unattended property?
13 A. If it's by -- left by itself, nobody around the
14   area.
15 Q. Nobody at all around the area?
16 A. Yes.
17 Q. And what is abandoned property under the
18   policy?
19 A. It depends. If it's abandoned, nobody there,
20   period.
21 Q. So how would you differentiate between
22   unattended property and abandoned property?
23 A. Some people tell us. This is nobody -- this
24   guy never having been here for a long time. So 90
25   percent of the time, people tell us.

Page 111

1 Q. And who are those people? Other City
2    employees?
3 A. No. Another encamp- -- another --
4    people next -- in the encampment.
5 Q. So mostly, 90 percent of the time, there's
6    somebody who's living there who can tell you this is
7    somebody's property versus this is -- this is no one's
8    property, this is abandoned; is that correct?
9 A. Or garbage, yes.
10 Q. And what if you come across an encampment where
11   there is no one present at the time? How would you
12   determine whether property is abandoned versus
13   unattended?
14 A. We leave it.
15 Q. So you just -- you don't make that
16   determination; you just leave everything?
17 A. Yes.
18 Q. Okay. And how do you ensure that your
19   employees follow that prescription, that they -- your
20   employees, when they see an encampment that -- with no
21   one around, that they're leaving it?
22 A. We let them know. If there's nobody there,
23   it's no bother; you just keep going. Why would you --
24   what would you do with it anyway? Why would we deal
25   with it anyway?

Page 112

1 Q. Does the bag-and-tag policy require property
2    like that to be -- to be bagged and tagged and stored?
3 A. No. I mean, there's nothing to -- it's -- you
4    make the decision. If you stop, then you're going to
5    deal with it. If you keep going, why -- why would you
6    be doing a bag and tag?
7 Q. Under what circumstances would you do a bag and
8    tag?
9 A. If PD told us.
10 Q. So you and your laborers would only conduct a
11   bag and tag if the PD instructed you to?
12 A. Yes.
13 Q. And that would be the police on site?
14 A. Or on the station, yes.
15 Q. And when you say "on the station," do you mean
16   that the police would be sending in a service request
17   from the station for you to go somewhere and do a bag
18   and tag?
19 A. It could be officers on the scene, or sometime
20   they -- sometimes they be in the station. They already
21   make -- have the property with the station. We go pick
22   it up, and we bag and tag from the station.
23 Q. What percentage of the bag-and-tags that your
24   team did would you estimate were picked up from a police
25   station?

Page 113

1  A.  I cannot give a number.
2  Q.  Would you say that most of the bag-and-tags
3     were in response to a police request?
4  A.  I cannot give you an estimate.
5  Q.  Would you be able to find out somehow by
6     looking in records?
7  A.  No.
8  Q.  No?  There's no way to find that out?
9  A.  I don't think so.  I'm not sure.
10 Q.  Does the bag-and-tag policy explain what kind
11    of items can be immediately discarded?
12 A.  Yes.
13 Q.  And what are those?
14 A.  Anything that cause harm, like needles, feces,
15    anything soiled, stuff like that.
16 Q.  And would that be -- you said "cause harm."
17    Like a harm to health and safety; is that accurate?
18 A.  Yes.
19 Q.  And how would you determine what causes harm to
20    health and safety?
21 A.  If you see a needle with blood in it, there you
22    go.  I mean, what else can we do?
23 Q.  Have you ever been trained on what items cause
24    harm to health and safety?
25 A.  Trained?  I think a while back.

Page 114

1  Q.  A while back?
2  A.  Yeah, I think a long time ago.
3  Q.  And your laborers, have they ever received
4     training on what causes harm to health and safety?
5  A.  I don't remember.
6  Q.  What does it mean for personal items to be
7     commingled with items that pose a risk to health and
8     safety?
9  A.  It means -- how am I going to describe it?  If
10    it's wrapped up with some feces or some kind of body
11    fluid, so you got the good stuff next to the bad stuff,
12    you got some mold and some wet clothes and all the stuff
13    next to each other, so it would be the good next to
14    the -- or mingled -- included with the bad.
15 Q.  And have you ever had training on what is or is
16    not commingled?
17 A.  Probably, long time ago.
18 Q.  And how would you determine if an item is
19    trash, garbage, or debris under the bag-and-tag policy?
20 A.  From looking at it, you can tell which one is
21    which.
22 Q.  Have you ever received training on determining
23    what is trash, garbage, or debris?
24 A.  From long time ago, yes, and recently with the
25    bag-and-tag policy and stuff.

Page 115

1  Q.  When you say "recently with the bag-and-tag
2     policy," what do you mean?
3  A.  The PowerPoint that we had.
4  Q.  What's that PowerPoint?
5  A.  About the bag-and-tag policy.
6  Q.  Was it a PowerPoint that was shown to you in a
7     meeting?
8  A.  Yes.
9  Q.  When was that?
10 A.  Last year.
11 Q.  Do you remember when last year?
12 A.  No.
13 Q.  Was it in the last three months?
14 A.  Something like that, yeah.
15 Q.  Something like that.
16    And who showed you the PowerPoint?
17 A.  Jonathan.
18 Q.  Jonathan.
19    Did he show you the PowerPoint at a Supe II
20    meeting?
21 A.  Yes.
22 Q.  Do you remember who was present at that
23    meeting?
24 A.  The Supe IIs.
25 Q.  And how long was that presentation?

Page 116

1  A.  It took an hour.
2  Q.  An hour.
3     Did your laborers ever receive that training?
4  A.  Yes.
5  Q.  When did they receive that training?
6  A.  A few months back.
7  Q.  Did you conduct it?
8  A.  No.  It was Jonathan.
9  Q.  Jonathan?
10 A.  Plus, we did the refresher.
11 Q.  The refresher.  Okay.
12 A.  We did both.
13 Q.  And you conducted refresher?
14 A.  Yes, me and my supervisor.
15 Q.  And did you provide your laborers with any
16    documents when you conducted the refresher?
17 A.  Yes.
18 Q.  What documents?
19 A.  The bag-and-tag policy.  We have a -- like
20    this, it comes -- we gave them a paper with the
21    bag-and-tag policy.  We also have bag-and-tag policy in
22    the vehicles.
23 Q.  When you say "like this," what do you mean?
24 A.  You know, that was stapled like this with the
25    bag-and-tag policy with all this stuff here.

Page 121

1  Q. And so if JFO knows where they're going to be
2  the next day, that's a preplanned encampment resolution?
3  A. I don't know. We -- they tell us: Meet us
4     9:00 o'clock on say 200 block of Eddy. We meet them at
5  200 block Eddy. How they plan it or not, we're over
6  there to support.
7  Q. Do you know how the bag-and-tag policy applies
8  differently to a preplanned operation versus a
9  non-preplanned operation?
10 A. You have to give them -- you have to give them
11 some time for them to leave.
12 Q. How much time?
13 A. If it's planned, they do -- they do the
14 outreach a day before.
15 Q. The day before?
16 A. Yes.
17 Q. Under what circumstances does 72 hours'
18 notice -- does the bag-and-tag policy require 72 hours
19 of notice before DPW comes on site and begins discarding
20 and bagging and tagging property?
21 A. That's the plan. JFO, they're going to go and
22 let them know that this is going to be going on. So
23 they give them the 72 hours.
24 Q. And who's "they"?
25 A. JFO.

Page 122

1  Q. JFO.
2     Do you know which --
3  A. Because I deal with JFO. I don't know about
4  HSOC.
5  Q. And JFO uses 72-hour notices?
6  A. That's -- whatever the plan they make, that's
7  on them.
8  Q. So you weren't informed of what notice was
9  provided by JFO?
10 A. They let us -- we ask out of curiosity: Have
11 they been informed? They said yes.
12    We go there to remove garbage.
13 Q. But you aren't kind of like sent confirmation
14 that the notice had been provided?
15 A. Could be. I don't know. I cannot give you an
16 answer over it.
17 Q. Have you ever observed a preplanned encampment
18 resolution conducted by HSOC?
19 A. Not really.
20 Q. Under the bag-and-tag policy, do you know how
21 much advanced notice people -- is required during an
22 HSOC preplanned encampment resolution?
23 A. I don't do HSOC, so I don't know.
24 Q. But are you familiar with that part of the
25 policy?

Page 123

1  A. I don't do HSOC.
2  Q. So, no, you're not familiar with that part of
3  the policy?
4  A. I would say I don't work with HSOC, so I have
5  no idea what HSOC do.
6  Q. But do you know about the bag-and-tag policy?
7  A. Yes.
8  Q. And do you know what the bag-and-tag policy
9  requires for HSOC preplanned encampment resolution?
10    ATTORNEY GRADILLA: Objection; asked and answered.
11    THE WITNESS: I cannot answer for HSOC.
12    BY ATTORNEY KATOVICH:
13 Q. Under the bag-and-tag policy, how is notice
14 provided to individuals living in an encampment?
15 A. Under bag-and-tag policy? What was the
16 question again?
17 Q. Under the bag-and-tag policy, how is notice
18 provided to individuals living in an encampment?
19 A. Who's giving them the notice?
20 Q. What does the bag-and-tag policy say?
21 A. I don't think there's anything in the
22 bag-and-tag policy -- I mean the bag-and-tag policy
23 about giving them a notice. We will go there as a
24 request from PD or -- mostly PD.
25 Q. When DPW arrives after a request, how much time

Page 124

1  are people living there given before DPW starts
2  cleaning?
3  A. Depends. Each person is different. It
4  depends. Sometimes it could be 30 and up, from 30
5  and -- depends.
6  Q. What does the bag-and-tag policy require?
7  A. To give them enough time. It's case-by-case
8  basis. It's -- you can never stick to the paper. It's
9  always going to be people need more, so you're always
10 going to be understanding and just give them time.
11 Q. And who determines how much time should be
12 given?
13 A. The person could decide.
14 Q. The DPW --
15 A. It's common sense.
16 Q. -- laborer? Sorry.
17 A. Yes.
18 Q. So the DPW laborer who --
19 A. Or supervisor --
20 Q. -- arrives --
21 A. -- or -- depends.
22 Q. But it would be someone from DPW who's on site
23 who would decide how much time to give a person?
24 A. Most of the time it's PD decide, not us.
25 Q. And under what circumstances does the policy

Page 133

1  A. I can't answer that.
2  Q. Have you ever received any copies of
3  administrative claims filed with the City claiming that
4  a person had their property destroyed?
5  A. I don't think so, or I remember.
6  Q. You described the intake form that's created at
7  the yard when an item is bagged and tagged.
8      After that's created, it's handed to Special
9  Projects; is that correct?
10 A. Yes.
11 Q. What does Special Projects then do with that?
12 A. They are documented in logbook, and they're
13 going to keep it with them in the -- with the records.
14 Q. And so every intake form would end up in a log,
15 correct?
16 A. Yes, as far as I know. Because I don't work
17 Special Projects. But as far as I know, yes.
18 Q. You talked about a training where you were
19 shown a PowerPoint during a Supe II meeting, correct?
20 A. Supe II, yeah.
21 Q. Was that only once that you were shown a
22 PowerPoint?
23 A. No. I think more than once.
24 Q. How many times?
25 A. Probably two -- two or three, two. I remember

Page 134

1  two.
2  Q. Do you remember when that was?
3  A. No. It was sometime last year.
4  Q. And did you ever show a PowerPoint to your
5  employees?
6  A. Not me. Jonathan did.
7  Q. And do you remember when that was?
8  A. Sometime last year.
9  Q. Sometime last year.
10     But you don't remember when last year?
11 A. No.
12 Q. You also mentioned conducting refreshers on the
13 bag-and-tag policy.
14 A. Yes.
15 Q. When was the last refresher you conducted?
16 A. December.
17 Q. And what did you say during that refresher?
18 A. Debris -- some debris issue, the bag-and-tag
19 policy, and tell them: If you are not sure, leave it,
20 case closed; no if, buts. If you're not sure if it's
21 abandoned, if it's -- if you don't know, leave it. We
22 would rather leave it for next time than do something
23 wrong. So -- I mean, to my group.
24     So we just -- that's -- that was my
25 instruction. If you -- if something you're confused,

Page 135

1  you cannot get ahold of supervisor, leave it, I mean,
2  for next time.
3  Q. Did you tell them anything else during the
4  refresher?
5  A. No. Because we always ask them: Do you have
6  question? Do you have anything to ask? So we document
7  everything that they even ask, but...
8  Q. You mentioned twice being shown a PowerPoint
9  presentation -- two or three times, I think you said; is
10 that correct?
11 A. Something like that.
12 Q. All of those times, was that during a Supe II
13 meeting?
14 A. That Supe II meeting and -- I know they did it
15 by zone, by group. So the zones, they did. So I seen
16 it again with my group, the Graffiti group.
17 Q. Would that be recorded in a sign-in sheet
18 somewhere?
19 A. Yeah, like this (indicating).
20 Q. Have you ever received a separate -- a training
21 separate from the bag-and-tag training on health and
22 safety?
23 A. We have -- we had those trainings for health
24 and safety from the Health and Safety unit.
25 Q. When were those trainings?

Page 136

1  A. I don't remember when we do.
2  Q. And what was covered during those trainings?
3  A. Everything. Everything that could harm you.
4  Q. Do you remember when that training was?
5  A. We do -- we do a refresher every year for the
6  health and safety. We got a binder that we're required
7  to do every -- every year.
8  Q. When you say --
9  A. So we have different -- we have different
10 subjects, because we have a binder every year that we --
11 you've got some, let's say, toxic -- tox- -- for the
12 weather; we have for liquids; we have for heat strokes.
13     So we have a binder that we do every year we're
14 required to do by Cal/OSHA.
15 Q. And when you say a "binder," that's something
16 that you're required to train your employees on?
17 A. Yes, including me.
18 Q. Okay. And you train yourself?
19 A. No. We get trained by the Health and Safety
20 officer; then we train them. But we have the -- the
21 binder that we're required to go on those trainings. It
22 doesn't have -- there's not -- like not in order; but in
23 a year, we have to finish the whole binder.
24 Q. And you said what's -- the trainings in that
25 binder are required by Cal/OSHA?

Page 137

1  A.  Yes.
2  Q.  Are you trained to recognize drugs?
3  A.  No.
4  Q.  Are you trained to recognize drug
5      paraphernalia?
6  A.  No.
7  Q.  Are you trained to recognize sharps?
8  A.  Sharps -- sharp objects?
9  Q.  Needles.
10 A.  What do you mean by...
11 Q.  Are you trained to recognize needles?
12 A.  Yes.
13 Q.  Are you trained to recognize urine?
14 A.  Recognize urine. Some urine was thrown at me,
15     so yes. I tell you -- I'll tell you straight up, yes.
16 Q.  But you never received an official training on
17     how to recognize urine?
18 A.  With that smell, I don't know what to tell you.
19 Q.  And what about feces; have you been trained to
20     recognize feces?
21 A.  Are you talking about pictures, pictures or how
22     we...
23 Q.  In any kind of training to recognize feces.
24 A.  I don't think so.
25 Q.  Have you been trained to recognize vermin?

Page 138

1  A.  What's vermin?
2  Q.  Rats, mice. Have you -- anything like that?
3  A.  I -- I don't know.
4  Q.  Have you been recognized -- trained to
5      recognize spoiled food?
6  A.  I don't think so.
7  Q.  Have you been trained to recognize perishable
8      food?
9  A.  What's a perishable food?
10 Q.  Food that could expire.
11 A.  No.
12 Q.  Have you been trained to safely dispose of
13     needles?
14 A.  Yes.
15 Q.  How are you trained to safely dispose of
16     needles?
17 A.  You have the needle container, and we have a
18     tong. We pick them up and put it and close it. And you
19     put it back in the -- we have a -- in the side of the
20     truck, there's a -- where the container goes.
21 Q.  And is that how you dispose of needles when you
22     are conducting an encampment cleaning?
23 A.  Yes. We don't touch nothing by hand.
24 Q.  And if there's a needle inside a tent, would
25     you extract the needle with the tongs and dispose of it

Page 139

1  in that way that you just described?
2  A.  We don't go inside tents.
3  Q.  What would you do with a tent with a needle
4     inside?
5  A.  You cannot go inside a tent.
6  Q.  What would do you with the tent?
7  A.  Leave it.
8  Q.  Are you trained to safely dispose of drugs?
9  A.  No. We don't -- no.
10 Q.  Are you trained to safely dispose of feces?
11 A.  Not me. The steamers do.
12 Q.  What training are they given to safely dispose
13     of feces?
14 A.  They wear their PPEs: the blue suit, the --
15     what you call it, the respirator, the glasses, the whole
16     suit with the cover.
17     They know how to dispose feces. That's why we
18     have steamers. They get steamer pay for that.
19 Q.  And do they receive any extra training beyond
20     what other DPW workers receive?
21 A.  Yes. For the steamers, yes.
22 Q.  Does that training cover what to do with
23     hazardous materials?
24 A.  You asked about feces. Yes. With feces, yes.
25 Q.  Have you ever attended one of those trainings?

Page 140

1  A.  I'm not a steamer.
2  Q.  Have any of your employees attended one of
3     those trainings?
4  A.  My -- see, Graffiti is different. So Graffiti
5     is different than that side. But we do attend the --
6     because we use chemicals, yes, we do. The same PPEs.
7     You have to have your same PPEs, your glasses and all
8     the stuff, yes.
9  Q.  Have you attended one of those trainings for
10     chemicals?
11 A.  We are not required for the -- a supervisor are
12     not required for the steamers.
13 Q.  But your laborers on Graffiti have attended the
14     same trainings as the steamers?
15 A.  They are steamers. They have no choice. Yes,
16     they have to if they want to be a steamer. It's in the
17     bidding sheet that you have to be respirator fit.
18 Q.  And so are you responsible for ensuring that
19     your laborers are trained with regard to how to handle
20     hazards, chemicals, anything like that?
21 A.  Yes.
22 Q.  And how do you ensure that they are adequately
23     trained?
24 A.  They have -- the respirator fit has to be up to
25     date. We do it every two years.

Page 141

1  Q.  Anything else that you would check besides the
2     respirator fit?
3  A.  No.
4  Q.  Have you received any training on how to
5     sanitize public rights-of-way?
6  A.  Not me.  The steamer -- that's why they have
7     steamers.
8  Q.  Have you ever used a steamer or been a steamer?
9     I'm not sure how --
10 A.  No.
11 Q.  No.
12    When you -- well...
13    Do you recall what team you were on in December
14 of 2022?
15 A.  Probably -- no, not sure.
16 Q.  Were you working on a zone team at that time?
17 A.  Most likely.
18 Q.  And were you supervising laborers who conducted
19    bag and tag?
20 A.  Possible.
21 Q.  Do you recall whether there was any change to
22    DPW's bag-and-tag practices around that time?
23 A.  No.
24 Q.  Were you aware that there was a preliminary
25    injunction issued by the Court in this case at that

Page 142

1  time?
2  A.  I heard about it.
3  Q.  When did you hear about it?
4  A.  Heard it from the news.
5  Q.  From the news.
6     Did you receive any DPW training around that
7  time on the bag-and-tag policy?
8  A.  We always have bag-and-tag training.  We always
9     did, because we always followed the policy.
10 Q.  But nothing out of the ordinary or new?
11 A.  No.
12 Q.  Sorry.  I've gotten all my pages mixed up.
13    I'm now going to show you another document.
14 And I believe that this one is 1017?
15    THE REPORTER:  -16.
16    ATTORNEY GRADILLA:  -16.
17    ATTORNEY KATOVICH:  -16.
18    (Deposition Exhibit 1016 was marked for
19    identification.)
20    BY ATTORNEY KATOVICH:
21 Q.  Have you seen this document before?
22 A.  No.
23 Q.  This is a document that was filed with the
24    Court at Docket No. 238-4.
25    Do you recognize the documents that are

Page 143

1  contained within this?
2  A.  It's a safety tailgate meeting.
3  Q.  So are these the sign-in sheets that you've
4     described being required for every tailgate meeting?
5  A.  Yes.
6  Q.  I'll have you turn to page 25.
7  A.  Mm-hmm.
8  Q.  And do you recognize this document?
9  A.  Yes.
10 Q.  Is this a training that you conducted during a
11    tailgate for your team?
12 A.  Yes, me and my Supe I.
13 Q.  And that would be Xavier?
14 A.  Yeah, his last name there.
15 Q.  Diangson?
16 A.  Yeah.
17 Q.  We got there.
18    And the date here is July 23rd, 2024.
19    Do you remember this tailgate?
20 A.  Yes.  You know, a few months back, yeah.
21 Q.  Do you remember what you told your team at this
22    tailgate?
23 A.  About the bag-and-tag policy.  We issued them
24    the bag-and-tag policy, and we asked them:  Do you have
25    any questions?

Page 144

1  Q.  Did you tell them anything else about the
2     bag-and-tag policy?
3  A.  We always like them to ask questions.  And we
4     could repeat ourselves all the time, but we like them to
5     ask questions.
6  Q.  Did you get any questions?
7  A.  Not really.
8     And we do this for the overtime.  Because, as
9     Graffiti, we don't deal with bag and tag.  So we do this
10    as just in case if they're going to work overtime in the
11    zone.  That's the main reason for this we do, because I
12    want to help them out.
13 Q.  Are you required to conduct bag-and-tag
14    tailgates for Graffiti?
15 A.  For Graffiti?  Because they are laborers, yes,
16    we have to -- we have to let all the -- on my side, I
17    have to let everybody know about the bag-and-tag policy
18    regardless, because you never know.
19 Q.  And did you conduct any tailgates about the
20    bag-and-tag policy between December 1st, 2022, and
21    July 23rd, 2024?
22 A.  I think so.
23 Q.  Would those be documented in a similar sign-in
24    sheet if you did?
25 A.  Yes.

Page 173

1  **ATTORNEY GRADILLA:** -20.
2  (Deposition Exhibit 1020 was marked for
3  identification.)
4  **ATTORNEY KATOVICH:** And this is another set of text
5  messages also between the witness and others that were
6  marked "Attorneys Eyes Only."  And the Bates number at
7  the beginning of this document is -415751.  It is a
8  five-page document.
9  BY ATTORNEY KATOVICH:
10 Q. So these text messages began on November 1st,
11 2023.
12     Were you still in Zone B at the time?
13 A. I guess, yes.
14 Q. Do you know whose number is the 628-223-4549
15 number?
16 A. No.  I'm not sure.
17 Q. Okay.  The third message down that whoever has
18 that number says: "We are out of clean trucks for
19 Baggin tag.  Is there a truck that could go to 301 Ellis
20 and meet with SFPD and Hot to secure that couples
21 belongings so they can go into Shelter.  Otherwise I can
22 standby and wait for a swing crew."
23     Do you remember this exchange concerning a
24 couple's belongings?
25 A. Not really.  What was my response?  No response

Page 174

1  here?
2  Q. So the message after that is from Mike Meaza,
3  who says: "Khaled, do you have someone who can do
4  this?"
5  A. Okay.
6  Q. And on the next page, Mike goes on to say:
7  "Calling the radio room."
8     You respond: "We can't be at 2 locations at
9  the same time."
10    And then after Mike likes that message, you
11 say: "To my knowledge hot has to provide a storage for
12 them.  That's not bag and tag if they're going to
13 shelter."
14 A. Yeah.
15 Q. Is it your understanding that under the
16 bag-and-tag policy, belongings -- personal property of
17 an individual who is going to shelter cannot be stored
18 at the DPW storage yard?
19 A. Yes.
20 Q. And that was your understanding at the time in
21 November of 2023?
22 A. Yes.
23 Q. And to your knowledge, that's still the policy
24 today?
25 A. I don't know.  I don't do bag and tag no more.

Page 175

1  Q. Okay.
2  A. Or encampments.
3  Q. And was it your understanding that Hot provided
4  its own version of bag and tag for -- for items
5  belonging to a person who was going to shelter?
6  A. What was that again?
7  Q. Was it your understanding that Hot had its own
8  system of storing belongings for people who are going to
9  shelter?
10 A. Yes.
11 Q. And how did you learn of that system?
12 A. I seen some of them, observed some of them.
13 Q. And do you know if there's a policy in place
14 that governs that system, that governs Hot's storage of
15 belongings?
16 A. No.
17 Q. Then turning the page, Mike Meaza says: "I
18 defer to your policy at dpw."
19    Then there's a message that follows with a
20 number of photos.  If you turn to the page after that,
21 you respond again: "That's not bag and tag if they go
22 to shelter."
23    Mike says: "Copy that."
24    The page after, you say: "Hot has to provide
25 storage for them.  It has been don't before" -- I

Page 176

1  imagine that's a typo; you meant to say "done before";
2  is that right?
3  A. Mm-hmm, yes.
4  Q. You say: "When I was in the Bayview."
5  A. Zone E.
6  Q. Zone E.  Okay.  Mike responds: "They don't do
7  that anymore."
8     To which you say: "Sorry."
9  A. What...
10 Q. Under the policies that you were aware of at
11 the time, what would happen to this couple's property if
12 Hot did not store it?
13 A. I have no idea.
14 Q. But you understood the policies at the time to
15 not allow you to bag and tag their property because they
16 were going to shelter; is that correct?
17 A. Yes.
18 Q. And to your knowledge, has the policy changed
19 since then?
20 A. I'm not -- that's why I said, I don't know
21 anymore about bag-and-tags, what they do.
22    **ATTORNEY KATOVICH:** Do you want to take another
23 short break?  And then I think we're almost done.
24    **THE WITNESS:** We can finish.
25    **ATTORNEY KATOVICH:** I just need one moment to