# EXHIBIT 31

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

*Darryl Dilworth*
*January 28, 2025*

Behmke Reporting and Video Services, Inc.
550 California Street, Suite 820
San Francisco, California  94104
(415) 597-5600

Original File 43985Dilworth_nl.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR   Document 366-37   Filed 04/17/25   Page 3 of 10
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Darryl Dilworth
January 28, 2025

Page 17

1  corridors in San Francisco.
2      Are you just talking about my current duties,
3  or are you -- the duties of a Sup. 2?  Because there's
4  other responsibilities that I can do as well.
5  Q.  Just your current duties.
6  A.  Okay.
7  Q.  I appreciate that.
8  A.  Okay.
9  Q.  Do you supervise the hot spot Team?
10 A.  No.
11 Q.  Okay.  Is there someone else who supervises the
12 hot spot Team?
13 A.  Right now?
14 Q.  Yes.
15 A.  Brittany Brandon.
16 Q.  And is Brittany Brandon a Supervisor 1 or
17 Supervisor 2?
18 A.  Supervisor 1.
19 Q.  Do you supervise Brittany Brandon?
20 A.  I do not.  At this point, no, I do not.
21 Q.  Who currently supervises Brittany Brandon?
22 A.  Kenny Bruce -- no.  John Riley.
23 Q.  Is John Riley a Sup. 2?
24 A.  He is a -- he is a Sup. 2, but he's currently
25 acting assistant superintendent.

Page 18

1  Q.  Was there a time that you did supervise
2  Brittany Brandon?
3  A.  Yes.
4  Q.  What were the dates that you supervised
5  Brittany Brandon?
6  A.  I've supervised Brittany Brandon on and off for
7  at least the last 12 years.
8  Q.  Okay.  Of those 12 years, were there years in
9  which you supervised Brittany Brandon as it related to
10 the Hot Spots Team?
11 A.  Yes.
12 Q.  Okay.  What were those years?
13 A.  Just recently, from -- I would say from
14 mid-2022 to December 2024.  And then previously to that,
15 I supervised her, I would say, probably from 2017 to
16 2019.
17 Q.  Okay.  During the years of 2020 and 2021, what
18 teams or activities did you supervise?
19     MR. GEORGE:  Objection.  Relevance.
20     You can go ahead and answer.
21 A.  I accepted an acting -- position as an acting
22 assistant superintendent during that particular time.
23 And the teams that I managed at that time was the hot
24 spot crew, the alley crew, the ERC alley crew, graveyard
25 night shift, and dispatch operations.

Page 19

1  Q.  Let's go ahead and mark this as Plaintiff's
2  Exhibit 1100.
3      (Exhibit 1100 was marked for
4  identification.)
5  A.  So I'm looking at this.  Can I add that my
6  last --
7  Q.  Let me ask you a question, actually.  I will
8  give you the opportunity.  I just want to --
9      MR. GEORGE:  You're not going to let him
10 amend his answer?
11     MS. TALLA:  Well, I'm happy to.  I just
12 want to pose a question so that he can do that
13 properly in the context of this document.
14     MR. GEORGE:  Okay.
15     BY MS. TALLA:
16 Q.  Okay.  Mr. Dilworth, do you recognize this
17 document?
18 A.  Yes.
19 Q.  Okay. Is this is a declaration that you
20 submitted in this case?
21 A.  Yes, it is.
22 Q.  Okay.  And then I'm going to turn your
23 attention to paragraph 2 of this declaration.  And in
24 this paragraph, you provide some information about your
25 employment history at the Department of Public Works,

Page 20

1  correct?
2  A.  Yes.
3  Q.  Okay.  Would you like to amend your answer
4  based on reading this document?
5  A.  I was over the -- let's see.  I was over the
6  Graffiti Abatement Team as well -- not Graffiti
7  Abatement, but Special Projects as well when I accepted
8  that acting assistant superintendent position.  So it
9  was Graveyard, it was Special Projects, it was Dispatch
10 Operations and it was the hot spot Crew.  So I just
11 added one to it.
12 Q.  Thank you, Mr. Dilworth.
13     At the time you wrote this declaration -- or at
14 the time you filed this declaration, you were the
15 supervisor of the Hot Spots Team, according to paragraph
16 2 of this declaration, correct?
17 A.  Yes.
18 Q.  Okay.  And you held that position since May
19 28, 2022, correct?
20 A.  Yes.
21 Q.  And you were also the supervisor of the Hot
22 Spots Team from 2018 to 2019, correct?
23 A.  Yes.
24 Q.  Okay.  And my understanding from your prior
25 testimony is that you continued to serve as the

Case 4:22-cv-05502-DMR   Document 366-37   Filed 04/17/25   Page 4 of 10
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Darryl Dilworth
January 28, 2025

Page 33

1  A.  A woman.
2  Q.  Okay.  Did Ms. Brandon and Mr. Graham work at
3  the same time as each other?
4      MR. GEORGE:  Objection.  Form.
5  A.  They worked the same hours, but they didn't
6  work the same days.
7  Q.  Okay.  Did they each supervisor their own crew?
8  A.  No.
9  Q.  Okay.  During this time period of mid-2022 to
10 December 2024, who were the individuals that Ms. Brandon
11 supervised?
12 A.  Give me the dates again.
13 Q.  Sure.
14 A.  Repeat the dates, please.
15 Q.  From mid-2022 to December 2024.
16 A.  Scott Branch; Gregory Shivers; Alavaro Castro;
17 Herbert Ruth, Jr.; Estoban Trujillo.
18     How many people is that so far?
19 Q.  Five.
20 A.  That's not very many, is it?  Excuse me.
21 Castro, Anthony Razzo.  That's all I can think of.
22 Q.  And during the period of mid-2022 to
23 December --
24 A.  Wait a minute.  One more.  Maybe Thomas
25 Jefferson.

Page 34

1  Q.  Good name.
2  A.  Yeah.
3  Q.  And so in the period of mid-2022 to December
4  2024, who were the people that Israel Graham supervised?
5  A.  Same individuals.
6  Q.  Now, in that period of mid-2022 to December
7  2024, when you supervised the hot spot Team, would you
8  discuss with the people that you supervised the bag and
9  tag policy?
10 A.  Repeat that question.
11 Q.  Sure.
12     MS. TALLA:  Could you repeat that
13 actually?
14     (Record read as follows:  Question:  Now,
15 in that period of mid-2022 to December 2024, when you
16 supervised the hot spot Team, would you discuss with the
17 people you supervised the bag and tag policy?)
18 A.  Yes.
19 Q.  Okay.  And what would you discuss with them?
20 A.  The entire policy.  We gave safety tailgates
21 once a month.
22 Q.  If the people you supervised had questions
23 about the bag and tag policy, would they raise them with
24 you?
25 A.  Yes.

Page 35

1  Q.  Okay.  What types of questions did people have
2  about the bag and tag policy?
3  A.  The bag and tag policy.  They didn't ask very
4  many questions.
5  Q.  Do you attend something called Sup. 2 meetings?
6  A.  Not now, I don't, but I have in the past.
7  Q.  In the period of mid-2022 to December 2024, did
8  you attend Sup. 2 meetings?
9  A.  Yes.
10 Q.  And what are those meetings?
11 A.  They are meetings -- weekly meetings with the
12 managers and all the Supervisor 2s for our department.
13 Q.  Okay.  Is there a sign-in sheet for Sup. 2
14 meetings?
15 A.  I don't recall.  I don't believe so.  Sometimes
16 there is.  Sometimes there's not.
17 Q.  And what's discussed at Sup. 2 meetings?
18     MR. GEORGE:  Objection.  Relevance.
19 A.  Special events, upcoming events, weekly events,
20 house cleaning items like disciplinary issues, truck
21 maintenance, clean corridors, safety tailgates.  It's
22 just updates about, you know, what we should be doing on
23 a regular basis.
24 Q.  At the Sup. 2 meetings you attended, was the
25 bag and tag policy ever discussed?

Page 36

1  A.  All the time.
2  Q.  And what was discussed at the Sup. 2 meetings
3  about the bag and tag policy?
4  A.  That we were to give our -- to make sure that
5  we were giving our monthly bag and tag policies and --
6
7     (REPORTER REQUESTS CLARIFICATION.)
8  A.  Giving monthly updates on the bag and tag
9  policy to make sure that we were doing it.  Or if there
10 were any updates to the policy, they would give us
11 updates to the policy or -- yeah.
12 Q.  Apart from giving monthly safety tailgates
13 about policy, were you ever told to do anything else
14 with respect to the bag and tag policy?
15     MR. GEORGE:  Objection.  Vague.
16 A.  Not that I can think of.
17 Q.  At the Sup. 2 meetings you attended, did you
18 ever review a PowerPoint presentation about the bag and
19 tag policy?
20 A.  Yes.
21 Q.  And what was the content of that prevention?
22 A.  All the slides that were in the bag and tag
23 process and basically going over it slide by slide, kind
24 of like a refresher.
25 Q.  When was that PowerPoint presentation presented

Case 4:22-cv-05502-DMR  Document 366-37  Filed 04/17/25  Page 5 of 10
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Darryl Dilworth
January 28, 2025

Page 57

1  A. Negative.
2  Q. Is taking someone's tent a way to reduce
3  reencampment?
4  A. We don't take individuals' tents.
5  Q. Is discarding someone's tent a way to reduce
6  reencampment?
7     MR. GEORGE: Objection. Asked and
8  answered.
9  A. We don't take individuals' tents. We only take
10 tents if someone gives it to us or if it's damaged, it's
11 torn, it's soiled. And if you're a homeless person and
12 there's a tent there and they want to discard it, yes,
13 we'll throw it away. But other than just taking
14 someone's tents, no. And I don't allow my crew to do
15 that.
16 Q. Is discarding someone's mattress a way to
17 reduce reencampment?
18 A. We only discard mattresses if they're a -- I
19 can't even remember somebody saying, "I want to keep
20 this mattress." In all our time, the mattresses are
21 a -- and like I said, we photo document -- they have
22 feces smeared on it, they wreak of urine, they have bed
23 bugs.
24    No, no. We -- that's the times that we discard
25 that type of stuff. And I would say 99.9 percent of the

Page 58

1  time, that's something that's going to be discarded
2  because it's soiled or it's bed bugs or it's just not
3  something that we need to bring back to the yard because
4  it could be hazardous.
5  Q. And what are the things that make it too
6  hazardous to bring back to the yard?
7  A. Beg bugs, soiled, wet, smeared with feces,
8  other human fluids, blood, that type of stuff.
9  Q. Is blood the only human fluid that you're
10 concerned about?
11 A. Urine.
12 Q. Anything else?
13 A. Just other unknown substances. We don't know
14 what it's saturated with. That's one of the reasons why
15 it's discarded.
16 Q. So if there's a mattress, are you generally
17 always discarding it?
18    MR. GEORGE: Objection. Incomplete
19 hypothetical. Foundation.
20 A. If it's within the guidelines of our bag and
21 tag policy. If it's soiled, if it has human feces on
22 it, or if it has blood on it or if it has bed bugs, yes,
23 we will discard it.
24 Q. Have you ever bagged and tagged a mattress?
25 A. No.

Page 59

1  Q. Okay. Do you know if there is somebody who is
2  in charge of HSOC?
3     MR. GEORGE: Objection. Form.
4  A. In charge? I know a couple of people, yes.
5  Q. Who are those people?
6  A. Sam Dodge would be one, I think, and then David
7  Nakanishi, something like that.
8  Q. Nakanishi?
9  A. Nakanishi, yes.
10 Q. Did you communicate directly with David
11 Nakanishi?
12 A. Yes.
13    MR. GEORGE: Objection. Form. Time
14 period.
15    MS. TALLA: Okay. I'm going to mark
16 another exhibit. This one, I'm going to mark as
17 1101.
18    MADAM REPORTER: Okay. 1101.
19    (Exhibit 1101 was marked for
20 identification.)
21    BY MS. TALLA:
22 Q. Okay. So this is an email that Mr. Dilworth
23 wrote to Mr. Nakanishi, dated February 8, 2023. Subject
24 line, "Stevenson @ 7th & 8th."
25    MR. GEORGE: Are you asking him that, or

Page 60

1  is that --
2     MS. TALLA: I'm just saying that for the
3  record.
4     MR. GEORGE: Noted. Okay. All right.
5     BY MS. TALLA:
6  Q. Mr. Dilworth, do you recall sending this email?
7  A. No, but obviously I sent it. Yes, I send these
8  types of emails.
9  Q. Okay. And attached to your email is
10 photographs on the next page, correct?
11 A. Yes.
12 Q. In your email, you're asking Mr. Nakanishi if
13 you could add this location to the resolution list,
14 correct?
15 A. Yes.
16 Q. And you know that there are seven to eight
17 encampments, correct?
18 A. Yes.
19 Q. The "seven to eight encampments," are you
20 referring to seven to eight tents?
21 A. Yes. Tents or structures.
22 Q. Okay. And what does it mean to add the
23 location to the resolution list?
24 A. Add it to a list so that we can -- so that his
25 team can put up a 72-hour notification so we can clean

Case 4:22-cv-05502-DMR   Document 366-37   Filed 04/17/25   Page 6 of 10

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Darryl Dilworth
January 28, 2025

Page 129

1  their belongings.
2  Q.  Okay.  And how do you give them that
3  information?
4  A.  I give it to them verbally.
5  Q.  Okay.  Do any provide them any document at the
6  time of the resolution?
7  A.  Of a bag and tag of somebody that's there?  Do
8  we give a copy of it?  No, we don't give them a copy of
9  the bag and tag, no, because it's a triplicate.  One
10  item -- the pink item --
11      (REPORTER REQUESTS CLARIFICATION.)
12  A.  The document is a triplicate.  So one goes to
13  our radio room, where they retrieve the -- no, we just
14  give them the location where they can pick it up.  And
15  nine times out of ten, they know exactly where it is.
16  Q.  How do you know that?
17  A.  Because -- how do I know they know exactly
18  where it is?
19  Q.  Correct.
20  A.  Because I give them the information.
21  Q.  Verbally.
22  A.  I give them the information verbally, yes --
23  Q.  Okay.
24  A.  -- where they can retrieve their items.
25  Q.  Okay.  So, then, why do you say "nine times out

Page 130

1  of ten"?
2  A.  I give them their information where they can
3  retrieve their items nine times out of ten.  I give them
4  their information.  Or like I said, nine times out of
5  ten, they know where our yard is because they've been
6  there previously.
7  Q.  How do you know they've been there previously?
8  A.  Because they tell me they've been there
9  previously.
10  Q.  I see.  Okay.  And are you familiar with the
11  Post-Removal Notice Form?
12  A.  Post -- yes.
13  Q.  Okay.  Do you give people a copy of a Post-
14  Removal Notice Form if they are present when you have
15  bagged and tagged their item?
16  A.  No.
17  Q.  Are there any limitations on the amount of
18  property that DPW bags and tags for an individual?
19  A.  It all depends on -- no, I don't believe so.
20  It all depends on what the items are.
21  Q.  What do you mean by that?
22  A.  It depends on how many -- the items that they
23  have.  It depends on what it is.  Is it furniture, is it
24  just clothing, or what is it?
25  Q.  If it's furniture, is there a limitation on

Page 131

1  what DPW can bag and tag?
2  A.  I don't know.  I would have to look at the
3  policy.
4  Q.  Are there any other types of items that DPW
5  would not bag and tag?
6  A.  Yeah, food items.
7      MR. GEORGE:  Objection.  Asked and
8  answered.
9      THE WITNESS:  Yeah.
10      BY MS. TALLA:
11  Q.  When a -- let's talk about items that can be
12  discarded under the policy.  What are items that present
13  an immediate health or safety risk?
14      MR. GEORGE:  Objection.  Asked and
15  answered.
16      BY MS. TALLA:
17  Q.  Actually, we never talked about any healthy and
18  safety risk specifically, what you consider an immediate
19  health and safety risk.
20  A.  Something that's soiled, something that has
21  needles in it, blood, feces, urine.
22  Q.  Have you ever received any training on how to
23  identify blood?
24      MR. GEORGE:  Objection.  Form.
25  Foundation.

Page 132

1  A.  I've given safety tailgates in regards to blood
2  pathogens, yes, I have.
3  Q.  That's a little different from my question,
4  which is, have you ever been trained on howl to identify
5  blood?
6  A.  No.  No.
7  Q.  Have you ever been trained on how to identify
8  unknown substances?
9      MR. GEORGE:  Objection.
10  A.  No.  That's why we don't handle them, because
11  we don't know what they are.  It could be anything.  It
12  could be fentanyl?
13  Q.  You don't know what those substances are?
14  A.  That's why we don't enter tents.  That's why we
15  don't handle the stuff, because we don't -- we're not
16  professionals.  We don't know what these substances are,
17  so that's why we don't handle them.
18  Q.  Are you familiar with the term "perishable
19  items" under the bag and tag policy?
20  A.  Yes.
21  Q.  What are "perishable items" under the bag and
22  tag policy?
23  A.  Food.
24  Q.  Any kind of food?
25  A.  Just food items.  No food items.  We do not bag

Case 4:22-cv-05502-DMR   Document 366-37   Filed 04/17/25   Page 7 of 10

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Darryl Dilworth
January 28, 2025

Page 133

1  and tag food items, any type.
2  Q. What about food in cans?
3  A. No.
4  Q. Are you familiar with the category of
5  "contraband" or "illegal items" under the bag and tag
6  policy?
7  A. Yes.
8  Q. What are those items?
9  A. Drugs, paraphernalia.
10 Q. Anything else?
11 A. Yeah, like pipes, smoking pipes. All types of
12 paraphernalia.
13 Q. When you say "drugs," are you talking about the
14 substance itself?
15 A. You said "paraphernalia." I'm not talking
16 about just -- I'm not talking about drugs. I'm talking
17 about the types of items that they use to do drugs.
18 That's the type of paraphernalia I'm talking about.
19 Q. I see. Okay. And do you receive any training
20 on how to identify contraband or illegal items?
21 A. No.
22 Q. Okay. Are you familiar with the category of
23 "bulky items" under the bag and tag policy?
24 A. Yes.
25 Q. What are "bulky items" under the bag and tag

Page 134

1  policy?
2  A. Large items. Dressers, couches, tables. Bulky
3  items, large items.
4     MS. TALLA: I'm sorry. Could you just
5  read back the answer for me.
6     (Record read as follows: Large items.
7  Dressers, couches, tables. Bulky items, large
8  items.)
9     BY MS. TALLA:
10 Q. Okay. Under the bag and tag policy, can you
11 bag and tag bulky items?
12 A. Yes.
13 Q. Is a mattress considered a bulky item under the
14 bag and --
15 A. Yes.
16 Q. -- and tag policy?
17 A. Yes. Oh, I'm sorry. Yes.
18 Q. Is a chair considered a bulky item under the
19 bag and tag policy?
20 A. I don't believe so.
21 Q. Have you ever bagged and tagged a chair?
22 A. No.
23 Q. Is a stroller considered a bulky item under the
24 bag and tag policy?
25 A. No.

Page 135

1  Q. Have you ever bagged and tagged a stroller?
2  A. Yes.
3  Q. Is a wheelchair considered a bulky item under
4  the bag and tag policy?
5  A. No.
6  Q. And can you bag and tag a wheelchair?
7  A. Yes.
8  Q. Have you ever bagged and tagged a wheelchair?
9  A. Yes.
10 Q. Is a bike considered a bulky item under the bag
11 and tag policy?
12 A. No.
13 Q. Have you bagged and tagged a bike?
14 A. Yes.
15 Q. How long are bulky items stored in the DPW
16 yard?
17 A. They have a storage container that's like a --
18 it looks like the containers that are in back of an
19 18-wheeler. It's like a large metal container from,
20 like, the end this wall here to the end of this room.
21 Q. And how long are bulky items stored at the DPW
22 yard?
23 A. 90 days.
24    MS. TALLA: Okay. It's 1:00, so I think
25 we had decided to do lunch now.

Page 136

1     MR. GEORGE: Yeah, let's do lunch now.
2     (A brief recess was taken off the record
3  from 1:00 P.M. to 1:53 P.M. of the same day.)
4     BY MS. TALLA:
5  Q. Mr. Dilworth, I wanted to return to something
6  we talked about earlier in the deposition, the Sup. 2
7  meetings where the issue of transferring bag and tag to
8  a different agency came up.
9     Do you recall that testimony?
10 A. Yes.
11 Q. Okay. You described employees seeking to
12 transfer bag and tag because they were scrutinizing it
13 so tightly. Do you recall that testimony?
14 A. Yes.
15 Q. Who was the "they" that were scrutinizing
16 things?
17 A. Management.
18 Q. Were there particular managers?
19 A. Not really -- I mean, not really scrutinizing.
20 It just got to the point where employees didn't want to
21 deal with it, you know what I mean, because it was too
22 much backlash. You know what I mean? You made a minor
23 mistake, you're going to get called on it. You know,
24 so -- so the managers was just trying to make sure that
25 employees was following the policy to the letter so that

Case 4:22-cv-05502-DMR   Document 366-37   Filed 04/17/25   Page 8 of 10
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Darryl Dilworth
January 28, 2025

Page 145

1  it's stored, then they dispose of it.
2  Q.  Okay.  So you said that you created this form
3  while at the encampment resolution; is that right?
4  A.  Yes.
5  Q.  Okay.  Was -- the tag number, though, and the
6  tag color, is that something -- are those fields that
7  you fill out when you're still at the resolution, or
8  later when you bring the item to the DPW yard?
9  A.  Later when I get to the DPW yard, because in
10 front of the container, you have two different holders.
11 One holder has the tags, and one holder has the forms if
12 you don't have this form.  So I keep these forms with
13 me.
14     And then, once I create all this information on
15 here, then when I get to the container, then I'll grab
16 the tags, dependent on how many I need, how many items
17 it is.  And then I'll attach the tags to this and put
18 the numbers in here.  These are actually -- yeah, the
19 numbers, yeah.
20 Q.  Do you keep copies of this form in your truck
21 or somewhere else?  How do you make sure -- let me just
22 stop there.
23     Do you keep copies of this form in your truck?
24 A.  Yes.
25 Q.  Okay.  For an instance like this, where it

Page 146

1  seems that there were at least two bags and a suitcase,
2  how did you take that tag and place it on all the items?
3  Do you collect the items --
4  A.  I already identified, I made a mistake.
5  Q.  I'm sorry, say that again?
6  A.  What I should have done -- we've done this in
7  the past, whereas one tag for all of these --
8  technically, I should have had one, two, three --
9  I should have had three tags for three different items.
10 You see, where you got the black bag, the red and white
11 bag, the blue bag, so it should have been four tags with
12 four different numbers.
13 Q.  I understand.
14 A.  It shouldn't have just been one tag, it should
15 have been four tags.  So that was an oversight on my
16 part.
17 Q.  Should each bag be receiving its own tag?
18 A.  It is now, yes.  We were doing it like that
19 before.  But then they were telling us to make sure that
20 we're not losing items; to itemize each piece of item
21 that you brought in, to make sure you tag each item.
22 Q.  And the "Intake Date" at the top, who was
23 supposed to fill in that information?  Is it supposed to
24 be you or someone else?
25 A.  Special projects.

Page 147

1  Q.  I see.  And when -- at what point in this
2  process are they supposed to be filling in that --
3  A.  Immediately.  Because when I come in, what I'm
4  doing is -- after I store the items and the container, I
5  bring this in, the white copy -- like I said, this is a
6  triplicate.
7     There's a white copy, there's a yellow copy,
8  and there's a pink copy.  The pink copy stays with the
9  belongings, the yellow copy goes to the radio room, and
10 this white copy with the tags attached to it goes to
11 special projects.
12    So when people come to retrieve their items,
13 they'll call the radio room, and they'll say where their
14 items were picked up at.  The radio room will look at
15 those yellow tags and figure out where it is and call
16 special projects.  They'll pull it and retrieve their
17 items.
18 Q.  Is the radio room at the DPW yard?
19 A.  Yes.
20 Q.  Okay.  And then do you personally
21 participate -- let me rephrase that.
22    Have you personally participated in that
23 retrieval process at the DPW yard?
24 A.  No.
25 Q.  Okay.  Are you familiar with something called

Page 148

1  an "intake form"?
2  A.  Not really.
3  Q.  Okay.  Would an intake form be, basically, this
4  document?
5  A.  Yeah.  Something like that, yeah.  But what I'm
6  saying is, I'm not sure if there's an identical form
7  just like this one or something like that or another
8  form that they use.  I guess this would be considered
9  their intake form, but that's not what we call it, an
10 "intake form."
11 Q.  Apart from the CMMS report that is created as
12 well as this form, are there any other documents that
13 are created when an item is bagged and tagged?
14 A.  No.
15 Q.  And I think you said that there was a change in
16 practice, where people were instructed to begin using
17 multiple tags for multiple bags, correct?
18 A.  Yes.
19 Q.  Do you recall when that change of practice
20 occurred?
21 A.  Probably within the last year, year and a half.
22 Because obviously, nobody flagged it.  Nobody came to me
23 and said, "Darryl, you made a mistake.  You should have
24 put multiple tags on it."  So at that time, this was an
25 acceptable practice.

Case 4:22-cv-05502-DMR   Document 366-37   Filed 04/17/25   Page 9 of 10
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Darryl Dilworth
January 28, 2025

Page 165

1  any instructions to that person about how much property
2  they could take to the shelter?
3  A. No, the incident commander normally answers
4  those questions.
5  Q. Do you have any understanding of how much
6  property a person can take to a shelter?
7  A. Yeah, I think they can -- well, see, I wouldn't
8  be the person to answer that question, because I'm not
9  the one that's taking them to the shelter. I think it's
10 two bags or something like that. Don't quote me though.
11 I mean, I'm not sure, that's not our policy.
12 Q. I understand, it's not your policy. It sounds
13 like -- well, let me ask you this: Have you heard
14 incident commanders tell unhoused people, "This is how
15 much property you can take to a shelter"?
16 A. I believe I heard two bags.
17 Q. And then how does -- if the person has more
18 than two bags of property, how does DPW handle that
19 additional property?
20 A. Bag and tag the additional items.
21 Q. In certain circumstances, would you discard the
22 additional property?
23    MR. GEORGE: Objection. Asked and
24 answered.
25    BY MS. TALLA:

Page 166

1  Q. After the person has accepted an offer of
2  shelter?
3  A. No, I wouldn't discard it. The only way I
4  would discard it is if they allow me to discard it or if
5  they ask me to discard it.
6  Q. Are you familiar with the concept of "special
7  needs" within the bag and tag policy?
8  A. Kind of, sort of, but not really. But I know
9  what you're talking about.
10 Q. Are people with special needs supposed to be
11 treated in a different way under the bag and tag policy?
12 A. I'm not sure what you mean by "special," can
13 you be specific?
14 Q. There is term called "special needs" in the bag
15 and tag policy; are you aware that?
16 A. I'm pretty sure there is.
17 Q. Do you assess whether somebody has special
18 needs when you encounter them at a resolution?
19 A. Oh, yes.
20 Q. And what qualifies as special needs under the
21 policy?
22 A. Somebody that is handicap.
23    MR. GEORGE: Objection. Form.
24    BY MS. TALLA:
25 Q. And so, have you ever found that somebody has

Page 167

1  special needs?
2  A. Yes.
3  Q. Okay. And what do you do in that situation?
4    MR. GEORGE: Objection. Form. Incomplete
5  hypothetical. You can answer.
6  A. Assist them as best we can, to accommodate
7  them, to make them feel comfortable.
8  Q. And what types of accommodations have you
9  provided to people who you've found to have special
10 needs?
11 A. We don't give accommodations for special needs.
12 Like I said, that's something that probably would go
13 through HSOC.
14 Q. Have you encountered people who are handicapped
15 at a resolution?
16 A. Yes.
17 Q. And what sorts of -- how -- do you treat them
18 differently in any way at the resolution?
19 A. Of course not, no. Try to be as helpful as
20 possible. But like I said, it's primarily -- they're
21 doing with HSOC and ERT, the emergency response team,
22 and they're addressing their special needs, not public
23 works.
24 Q. Do you provide -- the people that you've
25 encountered who are handicap, do you provide them any

Page 168

1  additional time to move their items?
2  A. I don't give out time restraints. That's the
3  commander, they give out times, and SFPD.
4  Q. Okay. So you have no role in determining
5  whether somebody you've encountered who's been
6  handicapped should receive additional time to move their
7  items?
8  A. No.
9  Q. Okay. Have you ever been instructed by SFPD to
10 bag and tag an item at a resolution?
11 A. No. Oh, yes.
12 Q. And in those circumstances, what happened? Why
13 did SFPD ask you to bag and tag that item?
14 A. Because SFPD, they'll -- I believe their
15 procedure is they check the person's record to see
16 whether or not they've been cited before. If they've
17 been cited before, immediately, all their items are to
18 be bagged and tagged.
19    And in that case, they'll turn to me and ask
20 me, "Darryl, hey, this person has be cited before. We
21 have to bag and tag their items." And then I would have
22 to provide a -- in that case, I would have to call my
23 dispatchers at 28 Clean.
24    And I would have to create a CMMS number to
25 document the bag and tag and to get all the officer's

Case 4:22-cv-05502-DMR    Document 366-37    Filed 04/17/25    Page 10 of 10

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Darryl Dilworth
January 28, 2025

Page 205

1  tell exactly what went on at that location.
2  Q.  So the purpose is to give the reader an
3  understanding of what the DPW crew had done at that
4  location?
5  A.  It should be clear cut when you look at it.
6  Q.  And so in these descriptions, are you supposed
7  to indicate whether or not you bagged and tagged any
8  items?
9  A.  Well, yes.  Bag and tag is going to be creating
10 an separate CMMS service order anyway.  So it would have
11 its own comments or texts.
12 Q.  Okay.  So when an item was bagged and tagged an
13 initial CMMS report would be created for that bag and
14 tag, correct?
15 A.  Yeah.  It should be, yes.
16 Q.  Okay.  And so if a bag and tag occurs at
17 resolution you would have two CMMS reports:  One for the
18 resolution itself and one to document the bag and tag.
19     Am I understanding that correctly?
20 A.  Yes.
21 Q.  In the CMMS report for the resolution, were
22 laborers supposed to state that they had bagged and
23 tagged something?
24     MR. GEORGE:  Objection.  Form, foundation,
25 assumes facts.

Page 206

1  A.  You mean on a separate service request for the
2  resolution?
3  Q.  For the resolution.
4  A.  No.  They can, but they don't have to.
5  Q.  And regardless of whether they put any
6  reference to bag and tag in that encampment CMMS report,
7  there should be a separate report for the bag and tag
8  itself?
9  A.  Yes, absolutely.
10 Q.  Okay.  Have you been trained on how to use
11 CMMS?
12 A.  Yes.
13 Q.  When you were supervising the hot spot team,
14 did the DPW workers you supervised receive that type of
15 training on CMMS?
16 A.  Yes.
17 Q.  Okay.  When was the last time you were trained
18 on CMMS?
19 A.  Last night.
20 Q.  What kind of training was that?
21 A.  It was like a refresher training.  Because when
22 you're on hot spot, hot spot doesn't -- we just really
23 started doing CMMS service report requests.  Prior to
24 that, we didn't use CMMS.  So everything that I
25 learned -- CMMS is so detailed.  Everything that I

Page 207

1  learned -- it's like a complicated system.  If you're
2  not doing it on a regular basis, you're going to need
3  retraining.
4  A.  So I was kind of refreshing my training last
5  night with another supervisor last night.
6  Q.  Got it.  I mean, when you supervise the hot
7  spots team, the hot spots team was using CMMS for each
8  resolution that they worked on, correct?
9  A.  They just started that not too long ago, maybe
10 within the last year.  Prior to that, no, they were not
11 using CMMS.
12 Q.  Okay.  For the last year or so that they were
13 using it, they were using it for each resolution that
14 they went to, correct?
15 A.  Yes.
16 Q.  And for each JFO operation they went to,
17 correct?
18 A.  We didn't go to JFO last year.
19 Q.  Got it.  So the hot spot team, when it attended
20 resolutions, would create CMMS reports for each one of
21 those resolutions?
22 A.  Yes.
23 Q.  Did you review CMMS reports created by people
24 you supervised?
25 A.  No.  Not recently, no.

Page 208

1  Q.  When you supervised the hot spot team, did you
2  review CMMS reports created by members of that hot spot
3  team?
4  A.  Periodically, when I was out in the field.
5  While they were creating the service order, they would
6  ask me questions while they were creating it, yes.  I
7  would review it then.  But when I got back to the
8  office, no.
9  Q.  Has anyone ever asked you to spot check CMMS
10 reports of bagged and tagged items?
11 A.  No, because we have the intake team is doing
12 that.  There's no reason for me to do it.  Okay.  Let me
13 mark this as 1114.
14     (Exhibit 1114 was marked for
15 identification.)
16     BY MS. TALLA:
17 Q.  And I'll just direct your attention to the
18 section under comments in that first row of information.
19 It says under comment, "Per Peter, Sup. Dilworth and
20 crew, cleaned up Ingerson and Griffith behind Bret Harte
21 school, would like to have Bayview Police Station
22 monitor location to keep homeless out weekly.  Message
23 relayed to Karen @ HSOC.  Email sent to Bayview
24 station."
25     Did you make a recommendation that the Bayview