# EXHIBIT 32

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

---

*Brittany Brandon*
*January 28, 2025*

---

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 43987Brandon_nl.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR   Document 366-38   Filed 04/17/25   Page 3 of 19
Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Brittany Brandon  
January 28, 2025

Page 33

1  information into that CMMS reports?
2  A.  If you do a service request, you would be
3  responsible to finish the service request you started.
4  Q.  And would your supervisor ever review the
5  CMMS reports that you finished?
6  A.  They can, if need be.
7  Q.  Do you know if your supervisor on Zone F
8  reviewed the CMMS reports that you completed?
9  A.  I don't recall.
10  Q.  Did you create any other documents as a
11  Supe 1 on the hot spot team?
12  A.  CMMS requests in the spreadsheet, that's it.
13  Q.  And when you were a Supe 1 on Zone F, how did
14  you supervise your direct reports?
15  A.  How --
16  Q.  How did you supervise the general laborers
17  that worked under you?
18  A.  The same, side by side in the field with
19  them, sign them in in the morning, have a quick
20  discussion, and dispatch.
21  Q.  Where did you sign them in?
22  A.  On our yard.
23  Q.  And when you signed them in and have a quick
24  discussion, is that sometimes referred to as a
25  "tailgate meeting"?

Page 34

1  A.  Tailgates are different.  We have -- we host
2  tailgates twice a month.  But we also have a meeting
3  with our crew every morning in certain locations on the
4  yard.
5  Q.  What do you mean by "certain locations"?
6  A.  It's like a daily dispatch.  Sorry.
7  Q.  What do you mean by "certain locations"?
8  A.  Well, we're all in the yard, but everybody
9  specifically meets to a certain area.  So some might
10  meet in the lunch room; some might meet in the lunch
11  room on this building.  Everybody has certain plots
12  that they have picked for their zone to meet.
13  Q.  And so did you run these daily dispatch
14  meeting when you were a Supe 1 on the zone team?
15  A.  No, unless my Supe 2 wasn't there.  Then I
16  would run them.
17  Q.  What were your responsibilities during the
18  daily dispatch?
19  A.  If she needed me to make any announcements, I
20  would make announcements.  We would dispatch trucks in
21  the zone, like telling them where they would be, what
22  LP they would be in the zone.
23  Q.  And LP is a section?
24  A.  Sorry.  Litter patrol.
25  Q.  And when you were Supe 1 on the hot spot

Page 35

1  team, did you also have daily dispatch meetings?
2  A.  Yes.
3  Q.  And were those also run by your supervisor,
4  Darryl Dilworth?
5  A.  Yes.
6  Q.  And you said that tailgates occur twice a
7  month?  Is that correct?
8  A.  Yes.  We do certain tailgates twice a month,
9  and then we do our safety tailgates as well, and that's
10  once a month.
11  Q.  So it's three tailgates, total?
12  A.  Yes.  Really, four.  Four tailgates, total, a
13  month.
14  Q.  So is that about once a week?
15  A.  Yeah.  I guess you could say it's like once a
16  week.
17  Q.  But not necessarily every week on the same
18  day.
19  A.  Yeah.  So it's basically we hosted two a
20  week, every other week.
21  Q.  And you said there's -- one of those is a
22  safety tailgate?
23  A.  Yes.  Two of those are safety tailgates.
24  Q.  And what is covered at other tailgates?
25  A.  Bag & tag.

Page 36

1  Q.  And has that always been the case?
2  A.  Yes.  That I can recall.
3  Q.  And was that true also on the Zone F team?
4  A.  Yes.
5  Q.  Is there anything else that's covered besides
6  safety at the safety tailgate?
7  A.  Policies.
8  Q.  What kind of policies?
9  A.  Work policies.
10  Q.  So those would be DPW policies?
11  A.  Yes.
12  Q.  And would that include the bag & tag policy?
13  A.  Yes.
14      (Reporter clarification)
15  BY MS. KATOVICH
16  Q.  And at the two bag & tag tailgates that are
17  held each month, is there anything else that's
18  discussed?
19  A.  If the crew has questions, they can ask
20  questions.
21  Q.  And they might ask questions about anything?
22  A.  Yeah.
23  Q.  And you said that in Zone F, you also had two
24  safety tailgates a month and two bag & tag tailgates a
25  month?

Case 4:22-cv-05502-DMR   Document 366-38   Filed 04/17/25   Page 4 of 19
Coalition on Homelessness, et al. v                                    Brittany Brandon
City and County of San Francisco, et al.                               January 28, 2025

Page 73

1  Q.  They're separate, but they're discussed at
2  the same call.  Is that correct?
3  A.  Yes.
4  Q.  Do you ever communicate with Mark Mazza?
5  A.  Yes, I have.
6  Q.  What have you communicated with him about?
7  A.  When I was on the reactionary crew I did JFO,
8  which, he's over JFO.  And so that's when we've had
9  contact.
10 Q.  And when you were on the reactionary crew,
11 did you attend the HSOC daily calls?
12 A.  Yes.
13 Q.  Who within HSOC is responsible for ensuring
14 that each agency's workers are trained on any policies
15 and procedures that apply to HSOC resolutions?
16 A.  I can't answer that.  I'm not sure.
17 Q.  Do you know who is responsible for ensuring
18 that each agency's workers comply with policies and
19 procedures?
20 A.  I can't really answer.  I would think it
21 would be on individual supervisors, from those
22 agencies.  Each agency is their own -- you know, like
23 DPH can't tell DPW how to do DPW's job, so, like...
24 Q.  Is compliance with policies ever discussed on
25 the HSOC daily calls?

Page 74

1  A.  Not that I can recall.
2  Q.  Is the bag & tag policy ever discussed on
3  those calls?bag & tag
4  A.  Not that I can recall.
5  Q.  When was the first time you participated in
6  an HSOC encampment resolution?
7  A.  It would -- I can't give a specific date, but
8  it was when I was a general laborer on the hot spot
9  crew.
10 Q.  About how many years ago was that?
11 A.  Oh, that was when I -- what are we looking
12 at, like 2018, so it was like seven years ago.
13 Q.  What policies, procedures, or guidelines
14 currently apply to HSOC resolutions?
15 A.  What do you mean by that?
16 Q.  What policies, procedures, or guidelines are
17 you aware of that have something to do with HSOC
18 resolutions?
19 A.  I know they have the 72-hour notices that
20 they post.  And we do our cleanup part.  I know that
21 the other agencies do their resourcing.  So we let them
22 do their part.
23      And then we do our part, which is just to
24 clean up.
25 Q.  Does the DPW bag & tag policy apply to

Page 75

1  encampment resolutions?
2  A.  Yes.  DPW bag and tag policy applies, all the
3  time.
4  Q.  And has that always been the case?
5  A.  Yes.  That I can recall.
6  Q.  Who has to follow the bag & tag policy at
7  encampment resolutions?
8  A.  Every DPW employee.
9  Q.  Do workers from other agencies have to follow
10 the bag & tag policy, to your knowledge?
11     MS. MURPHY: Object to form.
12     THE WITNESS: The DPW bag & tag policy is for
13 DPW.  Shouldn't any other, no agency be dealing with
14 bag & tags except for DPW.
15 BY MS. KATOVICH
16 Q.  Do you ever discuss bag & tags with workers
17 from other agencies at encampment resolutions?
18 A.  If they ask questions about it.
19 Q.  Do workers from other agencies ever request
20 DPW workers to conduct bag & tags?
21 A.  The police will ask us to bag and tag if they
22 are doing a site.
23 Q.  If they're doing a what?
24 A.  A site.
25 Q.  Does anyone from the Department of Emergency

Page 76

1  Management ever speak with you about the bag & tag
2  policy at encampment resolutions?
3  A.  Um, let me think.  I think me and Dave have
4  discussed bag & tag policies.
5  Q.  That's David Nakanishi?
6  A.  Yes.
7  Q.  What have you discussed?
8  A.  He just asked questions, refreshers of, like,
9  you know, what do we take, what can't we take because
10 of this or that.
11 Q.  So, he's asked you for clarification about
12 the policy?
13 A.  Yeah.
14 Q.  And when did those conversations take place?
15 A.  Rarely, at resolutions.
16 Q.  Rarely at --
17 A.  Like sometimes at resolutions he will show up
18 at the resolution, and if he has a question about
19 something that occurs with the bag & tag, he'll ask me.
20 Q.  Has anyone else asked you questions about the
21 bag & tag policy at resolutions?
22 A.  No, not that I can recall.
23 Q.  Who's responsible for ensuring that City
24 workers follow the bag & tag policy at encampment
25 resolutions?

Case 4:22-cv-05502-DMR    Document 366-38    Filed 04/17/25    Page 5 of 19

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Brittany Brandon
January 28, 2025

Page 109

1  can't bag & tag the items?
2  A.  Yes.
3  Q.  And then, would you tell them that they can
4  take it back?
5  A.  If they wanted to take it, yeah.
6  Q.  Would you tell them that they have the option
7  to take it?
8  A.  Yeah.  They always have the option, yeah.  We
9  always make sure to tell them.  They can take whatever.
10 Q.  If the hot team tells you that a person is
11 going into shelter and they have items that need to be
12 bagged and tagged, would you create an SR CMMS report,
13 a service report for that bag & tag, before evaluating
14 whether you can store the items?
15 A.  We would evaluate it first.
16 Q.  And if you determine that you can't evaluate
17 -- that you can't store the items, would you then
18 create a report?
19 A.  We would then document everything, take
20 pictures of why we can't store the items, and add it to
21 the current CMMS comments:  So-and-so asked to bag and
22 tag items, wasn't able to do so because of --
23 et cetera, et cetera, et cetera.
24     Pictures shown to display why we had to
25 dispose of items.

Page 110

1  Q.  And if SFPD asks you to bag & tag items when
2  they're issuing a citation, would you create a CMMS
3  service report before evaluating the items?
4  A.  It depends.  Sometimes we'll generate --
5  because when they do citations it's usually the only
6  things, because it's just a cite and release, so the
7  only things that need to be bagged and tagged are
8  whatever the structure is, maybe a tent, maybe a tarp.
9     So we have had times where we called in the
10 tent or called in the tarp before actually evaluating
11 it.  And then when we evaluate, we will see that
12 sometimes they can't be bagged and tagged.
13 Q.  And if you evaluate and determine that it
14 can't be bagged and tagged before you call in to create
15 a service report, do you document the -- the request
16 and the fact that you can't bag & tag it any more?
17 A.  Yes, to the encampment resolution CMMS
18 request that was already created for that resolution.
19 Q.  And what information would you include in
20 that CMMS report for the resolution about that for the
21 SFPD?
22 A.  Person's name, date of birth, they were
23 cited, officer they were cited by, could not bag & tag
24 tent for citation, and why.  And pictures showing.
25 Q.  Have you ever had a disagreement with anyone

Page 111

1  about whether property poses a health or safety risk?
2  A.  Not that I can recall.
3  Q.  Have you ever had a disagreement with anyone
4  about whether property is abandoned?
5  A.  Not that I can recall.
6  Q.  Have you ever had a disagreement with anyone
7  about whether property is trash or debris?
8  A.  Can you say it again?
9  Q.  Have you ever had a disagreement with someone
10 about whether an item is trash?
11 A.  Or debris?
12 Q.  I meant -- is trash different than debris?
13 A.  No.  I think they would be the same.  Debris
14 is trash.  We pick up most debris, things that we are
15 disposing of.
16 Q.  And have you ever had a disagreement with
17 anyone about whether something is trash, either trash
18 or debris?
19 A.  It can happen.
20 Q.  And, when has it happened?
21 A.  In a situation where maybe we're about to bag
22 and tag, and we come across those hazardous materials
23 of things being soiled, and feces and things, people
24 might say that they think they should be bagged and
25 tagged.  And on the other hand, we can't, because of

Page 112

1  the health risks.
2  Q.  And when you say "people," who are you
3  referring to?
4  A.  The unhoused individuals.  People living in
5  the encampments.
6  Q.  And so that would be a disagreement over
7  whether something is hazardous or soiled?
8  A.  Yeah.
9  Q.  And how do you resolve those disagreements?
10 A.  We just try to explain.  And then, I usually
11 have a -- I call the incident commander over and ask if
12 they can explain it better, so that we can kind of
13 understand each other.
14 Q.  What if you're not able to reach agreement?
15 A.  Documentation.  So we still do documentation,
16 so the documentation proves it.
17 Q.  ==Before items are bagged and tagged, does==
18 ==anyone from HSOC advise the owner of that property of==
19 ==anything?==
20 A.  ==Not to my knowledge.  I'm not sure.==
21 Q.  If items are bagged and tagged, do they go --
22 where do they go?
23 A.  To the DPW yard.
24 Q.  How are they transported there?
25 A.  City vehicles.

Case 4:22-cv-05502-DMR   Document 366-38   Filed 04/17/25   Page 6 of 19
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Brittany Brandon
January 28, 2025

Page 113

1  Q. How many vehicles do you typically have at an
2  encampment resolution?
3  A. It can range from four to six, seven
4  vehicles. Depends.
5  Q. And how many of those are DPW vehicles?
6  A. They are all DPW -- well, okay. Let me
7  backtrack. They're all City vehicles. DPW is the only
8  one responsible for transporting bag & tags. That's
9  our policy, we are the only ones who handle them.
10     At a resolution, we have -- hot team is there
11  with their vehicle; DPH is there with their vehicle.
12  Fire is there with their vehicle. Police are there
13  with their vehicles. And then DPW is there with their
14  vehicles. So it could range from having six total City
15  vehicles to maybe ten to 12 City vehicles, depending.
16     And then we also have -- DPT is there with
17  their vehicles, and then they have a transportation
18  that they offer the people in the encampment, they take
19  shelter, to transport them. So that's transport. So
20  they come with their vehicle.
21  Q. And when DPW transports the bagged and tagged
22  items, what vehicle are they placed in?
23  A. The DPW vehicle that is doing the bag and
24  tag. That person -- personnel who's doing the bag and
25  tag.

Page 114

1  Q. And are any other items placed in that
2  vehicle? Or is it only bagged and tagged items?
3  A. It's usually only bag and tag.
4  Q. And there is a separate DPW vehicle where the
5  trash and debris is collected?
6  A. Yes.
7  Q. And what about items that are determined to
8  be a health or safety risk? Where are those placed?
9  A. In the trash with the rest of the debris that
10  is being disposed of. Unless it's, like, chemicals and
11  things. Usually the supervisors will take those,
12  because we bring those to our HAZMAT area in the yard.
13  Q. And what -- what -- which items are taken to
14  the HAZMAT area?
15  A. Batteries, paint, oil, gas. Helium tanks.
16  That's it. Paint. So, I think, chemicals, things like
17  that are brought to the HAZMAT area.
18  Q. And that's the supervisor who is responsible
19  for transporting those?
20  A. Yes, but general laborers can as well.
21  Q. Who determines which items need to be
22  transported to the HAZMAT yard?
23  A. DPW personnel.
24  Q. And that could be either a general laborer or
25  a supervisor?

Page 115

1  A. Yes.
2  Q. If items are bagged and tagged, is notice of
3  the bag & tag provided?
4  A. Yes.
5  Q. How?
6  A. If the person is not there, we leave a notice
7  of removal at the location stating the SR number, what
8  we -- what we picked up, and the SR number. And where
9  to pick it up from, at the yard.
10  Q. And where is that notice left?
11  A. Wherever we got the items from.
12  Q. Is it --
13  A. It's on whatever remaining permanent
14  structure is there. Or it could be a cone.
15  Q. And if the person is present, are they
16  provided notice?
17  A. If the person is present and we bag & tag the
18  items, the incident commander and the police, I
19  believe, give them the SR number for that, so that they
20  can come pick it up.
21  Q. But DPW doesn't give the person any
22  documents?
23  A. We tell them it's at our yard, you know.
24  They will access the address.
25  Q. But you don't give them the same notice that

Page 116

1  you would put out if a person is not there. Is that
2  correct?
3  A. Yes.
4  Q. You said that sometimes SFPD asks you to bag
5  and tag items when they give out a citation. Right?
6  A. Yes.
7  Q. About how often does that occur?
8  A. Usually like 80 percent of the time.
9  Q. Eighty percent of --
10  A. Like, the time of the citations.
11  Q. So in 80 percent of times that SFPD is
12  issuing a citation, they'll ask for a bag & tag?
13  A. Yeah. Well, because they want the SR.
14  Because they attach it to the citation for when they do
15  their reports.
16  Q. And in order to get the SR number, they --
17  A. Come --
18  Q. -- ask you to do a bag & tag?
19  A. Yeah.
20  Q. And about how many times in a typical
21  encampment resolution are you asked to -- to bag and
22  tag items by the police?
23     MS. MURPHY: Object to form.
24     THE WITNESS: I can't really answer that,
25  because it's really -- you know, it depends. If they

Case 4:22-cv-05502-DMR   Document 366-38   Filed 04/17/25   Page 7 of 19
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Brittany Brandon
January 28, 2025

Page 129

1  property is always trash.
2  Q. Would abandoned property sometimes be
3  described as "debris" in a CMMS report?
4  A. Yes.
5     MS. MURPHY: Object to form.
6  BY MS. KATOVICH
7  Q. How do you identify abandoned property?
8  A. Like I said, it has no signs of ownership.
9  Nothing personal belongings inside, nothing neat. It's
10 just basically garbage.
11 Q. What happens to unattended property if no
12 owner or attendant is present at the time of an
13 operation?
14 A. It will be bagged and tagged along with
15 everything that we're -- that it's in. That unattended
16 property follows our guidelines and policy of our bag &
17 tag policy.
18 Q. What happens to abandoned property?
19 A. It gets thrown away.
20 Q. What kind of property can be immediately
21 discarded under the policy?
22 A. Hazardous and safety-risk materials, like --
23 I'll give a couple of examples. Needles. Chemicals
24 like paint. Urine, feces, things that are soiled.
25 Food debris.

Page 130

1  Q. Can abandoned property also be discarded
2  immediately?
3  A. Yes.
4  Q. How do you determine if an item is a health
5  or safety risk, under the policy?
6  A. It depends on the guidelines. If we see
7  chemicals, if we see soil debris, things that present
8  an imminent health risk, then we consider it hazardous
9  and we won't bag & tag it.
10 Q. What else might indicate that something is an
11 imminent health risk?
12 A. Stains, blood stains, different types of
13 unknown substances that we can't really determine. It
14 could be like a powdery substance that we're not sure
15 exactly what it is.
16 Q. What if a City employee is not certain
17 whether something's an imminent health risk or not?
18    MS. MURPHY: Object to form.
19    THE WITNESS: If they're not sure, the best
20 thing would be to ask your supervisor to get a second
21 opinion. But when in doubt, bag & tag.
22 BY MS. KATOVICH
23 Q. What does it mean for personal items to be
24 commingled with items deemed to be a health or safety
25 risk?

Page 131

1  A. "Commingled" means be put in together, right,
2  (Indicating), all touching, basically together.
3  Q. How do you determine if items are commingled?
4  A. If they -- if they could have touched all of
5  the things that are around them, then it's mostly
6  commingled. But if, let's say, something's at one side
7  and something is all the way at that side, and they
8  look like they could have never touched, they wouldn't
9  need to --
10 Q. When you say "that side," that side of
11 something or --
12 A. Yeah, it could be inside of a tent. And we
13 could say that maybe we have something in a bag right
14 here (Indicating that we deemed as hazardous, but it's
15 contained. And then over here (Indicating) we have
16 some personal belongings. We will bag & tag the
17 personal belongings, because they're not commingled.
18    But if that -- that thing that is an imminent
19 health risk is scattered around and we can't -- because
20 we're not going to go through to pinpoint what touched
21 and what not touched, then we consider it commingled,
22 and we will dispose of it.
23 Q. So if there's an item on the health and
24 safety list that is inside of a tent, that doesn't
25 necessarily mean that you are automatically going to

Page 132

1  discard everything in the tent.
2  A. You -- you can. You can, because in the
3  policy it says that we do not have to go through. But
4  sometimes, if it's not really commingled, we will bag &
5  tag it.
6  Q. Who decides whether to bag & tag it or not in
7  that situation?
8  A. Whatever DPW personnel is doing the bag &
9  tag.
10 Q. Have you ever had the experience where you
11 were -- you came across a tent where there was some
12 item that was on the health or safety list, but you
13 determined that other items in the tent could be bagged
14 and tagged?
15 A. Yes.
16 Q. When was that?
17 A. I can't pinpoint a specific number.
18 Q. Do you recall what the items were?
19 A. I believe that it had a powdery substance,
20 but it was in a bag tied up, like I said, in a corner.
21 And then I seen two backpacks, neatly packed, and a bag
22 attached to the backpacks.
23    But I disposed of the tent, because I don't
24 know if it touched that substance. But I did take the
25 personal belongings, and bag & tag them.

Case 4:22-cv-05502-DMR   Document 366-38   Filed 04/17/25   Page 8 of 19
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Brittany Brandon
January 28, 2025

Page 133

1  Q.  So you discarded the tent, even though the
2  substance was in a bag?
3  A.  Yeah.  But -- it being in the tent, usually
4  the tent is a little soiled at the bottom and things
5  like that, so it's easier to just get the belongings
6  out, personal belongings, and bag & tag them.
7     With the tents, it's a little bit different.
8  They're outside, again it's soiled, getting dirty; they
9  have a lot of different stains on them.  So we
10 sometimes can't bag & tag them.
11 Q.  How often would you say you're able to bag
12 and tag a tent?
13    MS. MURPHY: Object to form.
14    THE WITNESS: I can't -- I can't give you a
15 specific number.
16 BY MS. KATOVICH
17 Q.  But frequently you determine that you can't
18 bag & tag a tent, because it's soiled on the bottom?
19    MS. MURPHY: Same objection.
20    THE WITNESS: Not frequently.  Like I said,
21 it depends.  Different circumstances.
22 BY MS. KATOVICH
23 Q.  Do you recall the last time you personally
24 bag & tagged and tagged a tent?
25 A.  Um, I can't, I can't pinpoint, exactly.

Page 134

1  Q.  Do you recall the last time you saw another
2  DPW worker bag & tag a tent?
3  A.  I believe we bagged, tagged a tent last week.
4  Q.  That would be at the Thursday resolution --
5  A.  I think it was at the Wednesday.
6  Q.  Wednesday?
7  A.  Resolution.
8  Q.  And before that, when's the last time you saw
9  a worker bag & tag a tent?
10 A.  I can't directly recall.
11 Q.  How do you determine if an item is trash,
12 garbage, or debris?
13 A.  According to our bag & tag policy.  And
14 according to if the personnel that's there, people that
15 are in the -- living in the encampment, they're saying
16 they want to dispose of it.
17 Q.  What does the bag & tag policy say about what
18 is -- identifying something that's trash, garbage or
19 debris?
20 A.  Well, it tells us, it has guidelines for
21 things that we can't bag & tag.  And if we're cleaning
22 up and nobody is claiming anything, and it's deliberate
23 trash, wrappers, empty cartons, we will dispose of it.
24 Q.  What else is on the list of items that are
25 examples of trash, garbage or debris in --

Page 135

1  A.  Soiled clothing.  Things that carry mildew.
2  Different items.
3     MS. MURPHY: Object to form.  And also note
4  for the record that the witness hasn't been shown the
5  policy.
6  BY MS. KATOVICH
7  Q.  So you said some examples from the policy of
8  trash, garage or debris would be soiled items?
9  A.  Yes, soiled.
10 Q.  And mildew items?
11 A.  Yeah.
12 Q.  How do you determine whether something's
13 soiled?
14 A.  You see it.  Feel it.  It's soiled; it's wet.
15 You would see stains.  You could see the mildew, the
16 smell.  Things people can't see, right, the smells.
17 Things of that nature.
18    And then we would document that.
19 Q.  Does the bag & tag policy define "soiled"?
20 A.  Yes, I believe so.
21 Q.  Do you recall what the definition is?
22 A.  I don't recall.
23 Q.  What if the owner of property disagrees with
24 a City employee's assessment about the property?
25    MS. MURPHY: Object to form.

Page 136

1     THE WITNESS: That's -- that's not on me.
2  People disagree.
3  BY MS. KATOVICH
4  Q.  Does the policy -- sorry.  Does the policy
5  say anything about what should happen in that
6  situation?
7  A.  Not that I recall.
8  Q.  Is there a limit to the amount of personal
9  property that can be bagged and tagged from any one
10 individual?
11 A.  No, there's no limit.
12 Q.  What is the City's policy as to bulky
13 property?
14 A.  Bulky property can be stored up to 14 days.
15 Q.  Has that always been the case?
16 A.  Yes.
17 Q.  Where is property taken after it's bag &
18 tagged and tagged?
19 A.  To our DPW yard, to our bag & tag containers.
20 Q.  Is it tagged before it's transported to the
21 yard?
22 A.  It's transported to the yard, then tagged.
23 Q.  Is there -- how do you identify which bags or
24 bagged and tagged items -- how do you identify the
25 bagged and tagged items, once they're at the yard?

Case 4:22-cv-05502-DMR   Document 366-38   Filed 04/17/25   Page 9 of 19
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Brittany Brandon
January 28, 2025

Page 141

 1  BY MS. KATOVICH
 2  Q.  How far are they required to move?
 3  A.  Just the perimeter of where we are cleaning.
 4  Q.  And for how long do they have to stay outside
 5  of that perimeter?
 6     MS. MURPHY:  Same objection.
 7     THE WITNESS:  It's not no time limit.
 8  Usually when we leave, they come back.
 9  BY MS. KATOVICH
10  Q.  And does the policy say anything about how
11  long they have to stay away?
12  A.  Not to my knowledge.
13  Q.  Under the policy, how is notice provided to
14  individuals?
15  A.  The 72-hour notices.
16  Q.  Under the policy, is that 72-hour notice
17  written?
18  A.  Yes.  It is written, and they leave the
19  postings at the encampments.  And they also talk to the
20  people at the encampments when they are noticing the
21  encampments, from my knowledge.
22     (Reporter clarification)
23     THE WITNESS:  Noticing the encampments.
24     MS. MURPHY:  Ms. Brandon has been working
25  since 4:00 this morning.

Page 142

 1  BY MS. KATOVICH
 2  Q.  Is there any documentation created to show
 3  which individuals of the encampment were individually
 4  given notice?
 5  A.  That's out of my scope.  I'm not part of the
 6  outreach.
 7  Q.  Do you receive any documentation of posted
 8  notices?
 9  A.  I receive the schedule.
10  Q.  Do you know what a regular encampment
11  cleaning is under the bag & tag policy?
12  A.  I can't -- I don't really understand that
13  question.
14  Q.  Do you -- have you heard the term "regular
15  encampment cleaning"?
16  A.  I can't recall.
17  Q.  Is notice required for any other operation or
18  cleaning besides the encampment resolutions?
19  A.  If -- we have 24-hour notices and 48-hour
20  notices.
21  Q.  And when are you required to provide 48-hour
22  notices?
23  A.  Forty-eight hours, we have a specific
24  location, that maybe it's a special that they wanted --
25  that DPW wants to do, it's outside of HSOC, that they

Page 143

 1  would issue those.
 2  Q.  And so you would use 48-hour notices if DPW
 3  wants to clean a certain encampment, but it's not an
 4  HSOC operation?
 5  A.  Yes.
 6  Q.  And who at DPW would determine that?
 7     Who would decide to do a cleaning like that
 8  where 48 hours is required?
 9  A.  Probably a supervisor or manager.
10  Q.  Have you ever decided to conduct one of those
11  cleanings where a 48-hour notice is provided?
12  A.  No.
13  Q.  Have you ever participated in any cleaning
14  where a 48-hour notice was provided?
15  A.  No.
16  Q.  Who at DPW would be responsible for providing
17  that 48-hour notice?
18  A.  It would be on the supervisor to provide
19  those notices.
20  Q.  And has any supervisor in hot spot ever
21  provided a 48-hour notice since you have been employed
22  there?
23  A.  No.
24  Q.  Are you aware of any team where a supervisor
25  has provided 48-hour notice for a cleaning?

Page 144

 1  A.  Not to my knowledge.
 2  Q.  And you mentioned there's also a 24-hour
 3  notice?
 4  A.  Yes.
 5  Q.  Under the policy, when is 24-hour notice
 6  required?
 7  A.  For 24 hours.
 8  Q.  Under what circumstances is the 24-hour
 9  notice required?
10  A.  Maybe it's a special going on, and there's an
11  encampment there, they might do a 24-hour notice
12  cleaning, like maybe from a higher-up who wanted the
13  area cleaned.  But it's very rare that it happens.
14  Q.  In cleanings where 24-hour notice is
15  required, are individuals required to move from the
16  location?
17  A.  Just for the cleaning.
18  Q.  And in cleanings where a 48-hour notice is
19  required, are individuals required to move from the
20  area?
21  A.  Just for the cleaning.
22  Q.  So in both cases, individuals are permitted
23  to come back to the area after the cleaning?
24  A.  Yes.
25  Q.  How is the 24-hour notice provided to

Case 4:22-cv-05502-DMR   Document 366-38   Filed 04/17/25   Page 10 of 19

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Brittany Brandon  
January 28, 2025

Page 181

1  A.  One CMMS report for every location they go
2  to.  So every time they switch streets, they would call
3  in a new service order for it.
4  Q.  But it would just be one service order per
5  team for that particular street.  Is that correct?
6  A.  Yes.
7  Q.  And for JFO, are you -- are DPW workers also
8  required to create separate CMMS reports for items that
9  are bagged and tagged?
10 A.  Yes.
11 Q.  And what about for items that are discarded?
12 A.  They take pictures, and they would note it.
13 Q.  In the general --
14 A.  Yes.
15 Q.  -- CMMS report for that location.
16 A.  Yes.  If, if they're doing a bag & tag, and
17 they dispose of some of the items that are in the bag &
18 tag, they will note it in the bag & tag.  "I bagged and
19 tagged two backpacks.  I disposed of soiled clothing."
20     And then we will have the pictures to show.
21 Q.  But if a DPW worker or team determines that a
22 group of items are un-abandoned property, but they
23 can't be bagged and tagged, for one of -- whatever
24 reason, they wouldn't necessarily create a service
25 request about those items.  Correct?

Page 182

1  A.  Correct.
2  Q.  And they're not required to note those items
3  in the general CMMS report.  Correct?
4  A.  Yes, they will -- they will put that
5  information into the general service request for that
6  encampment.
7  Q.  And that's required?
8  A.  Yeah.  I don't know if it's -- I can't say if
9  it's required or not, but it's like a necessity.
10 Q.  Are the requirements around CMMS reports
11 discussed in the bag & tag policy?
12 A.  Can you say it again?
13 Q.  Are the requirements for CMMS reports
14 discussed in the bag & tag policy?
15 A.  I believe so.
16 Q.  Is it your responsibility to ensure that all
17 the people on your team comply with CMMS requirements?
18 A.  Yes, to the best of my knowledge.
19 Q.  And is it your responsibility to make sure
20 that they are trained on CMMS?
21 A.  Yes.
22 Q.  Have you ever been disciplined for not
23 correctly using CMMS?
24 A.  Not that I can recall.
25 Q.  What about for failing to use CMMS when it

Page 183

1  was required?
2  A.  Not that I can recall.
3  Q.  Have any of your supervisors -- supervisees,
4  the people you supervise, been disciplined for not
5  correctly using CMMS?
6  A.  The Thurmond Hollins situation.
7  Q.  Anyone else?
8  A.  Not that I can recall.
9  Q.  Would you know if they had been?
10 A.  I should know, yes.
11 Q.  I'm now going to show you a document, this
12 will be marked 1050.
13     (Exhibit 1050 marked for identification.
14 BY MS. KATOVICH
15 Q.  This is a service order report, dated
16 October 16, 2024.  Oh, oops, never mind.  Sorry, that's
17 not the date, that was the time this was run.  The
18 service report itself is dated January 30th, 2024.
19     Do you recognize this document?
20     (Witness examines document)
21 A.  Um, I recognize the area.  I'm not sure...
22 Q.  When we looked at the attachments to the
23 email that you sent to Darryl Dilworth earlier, you
24 said that that was a printout of a service order
25 report.  Correct?

Page 184

1  A.  Yeah.
2  Q.  Is this also a printout of the service order
3  request?  Or is this the -- what is -- what appears in
4  CMMS?
5  A.  This is what appears in CMMS.
6  Q.  So this document contains all of the
7  information that was entered into the service order
8  report.  Correct?
9  A.  From my best knowledge, yes.
10 Q.  It has all the categories that you would see
11 in the CMMS service order report.  Correct?
12 A.  Correct.
13 Q.  What -- so, I want to go through some of
14 these fields with you.
15     So on the first page, do you see that it says
16 "Description Encampment"?
17 A.  Yes.
18 Q.  Now, what does that mean?
19 A.  That's the description.  That's what is --
20 the title of it is an encampment cleaning.
21 Q.  So "Encampment" means encampment cleaning?
22 A.  Well "Encampment" means it's an encampment.
23 Q.  So it could be anything related to an
24 encampment?
25 A.  Yes.

Case 4:22-cv-05502-DMR   Document 366-38   Filed 04/17/25   Page 11 of 19

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Brittany Brandon
January 28, 2025

Page 205

1  what happened to the green tent?
2      (Witness examines document)
3  A.  From what I could -- what I believe, the
4  person probably packed that, took it with them.
5  Q.  But are you able to know whether that
6  happened, based on this report?
7  A.  No, I don't think you can determine by just
8  looking at the picture.
9  Q.  And there's nothing written in the report
10 comments or in the fields that we went over that would
11 tell you what happened to the tent?
12 A.  Right.  That's why we developed into more
13 comments now.
14 Q.  And now, the type -- you would expect that a
15 service report would state, for example, that the green
16 tent was taken by owner, in the comments?
17 A.  Yes.
18 Q.  And in your experience, is that level of
19 detail now provided in the event reports?
20 A.  Yes.
21 Q.  The three photos that follow, are those after
22 photos?
23 A.  Yes, these are after photos.
24 Q.  And you can tell because there are no longer
25 any items.  Right?

Page 206

1  A.  Yes.
2  Q.  That one's easy.  So then, turning the page
3  to -- the page is 813.
4  A.  Uh-huh.
5  Q.  So the top photo, is that also an after
6  photo?
7  A.  Yes.
8  Q.  And then, the next two photos are photos of
9  -- more closer-up photos of items?
10 A.  Yes.
11 Q.  The first is a photo that includes a
12 backpack, a little shelving unit, a water bottle, I
13 think another backpack.
14     Based on this photo, what do you understand
15 happened to those items?
16 A.  For us to go inside the tent, and take a
17 picture of the tent, that means that no one was there,
18 claiming these items.  And we went inside to examine
19 the tent to see if it could be bagged and tagged.
20     From what I see in this video -- I mean in
21 this picture, I see food debris, I see white unknown
22 substances.  So we're taking pictures of this to show
23 why we are going to dispose of these items.
24 Q.  And so based on this photo, would you expect
25 that all of the items in this -- in this photo were

Page 207

1  disposed of?
2  A.  Yes.
3  Q.  And why would the shelving unit be disposed
4  of?
5  A.  Because it's all commingled, all touching.
6  So we're not going to pick through.
7  Q.  And what is it that that shelving unit is
8  touching, that is a biohazard?
9  A.  It's touching the food; it looks like the
10 tent is soiled at the bottom.  So, yeah.
11 Q.  So all of -- you would consider everything in
12 this photo to be commingled?
13 A.  Yes.
14 Q.  And you said earlier that if there's a photo
15 of particular items in a service order report, like
16 this, the general one for the resolution, that means
17 that those items were discarded?
18 A.  Say it again?
19 Q.  If you have a photo of particular items like
20 this, in a service order report, does that mean that
21 those items were discarded?
22 A.  I would assume.
23 Q.  And the photo below that, that's a photo of a
24 bin with some items in it?
25 A.  With food debris.

Page 208

1  Q.  With food debris.  How would you -- so, how
2  would you decide what's food debris?
3     What is food debris?
4  A.  It looks like that is a sandwich, food.  We
5  don't -- we don't bag & tag that.
6     So this is all the same tent, I can tell by
7  the outline.  So this is just giving you more pictures
8  of what's inside of it, showing why we can't bag & tag
9  it.
10 Q.  And you said you would assume that this tent
11 was abandoned.  Correct?
12 A.  Yes.
13 Q.  And that's because otherwise, you would not
14 take pictures inside a tent?
15 A.  No, that -- unless they left it.  So if they
16 were there and could take their tent, they would take
17 their tent.
18 Q.  Are there circumstances in which a person
19 might have walked away from their tent, and you would
20 take photos inside of it?
21     MS. MURPHY:  Object to form.
22     THE WITNESS:  No.  If they walked away during
23 the resolution, then maybe we would take pictures of
24 the tent.  But if we see somebody there, we usually
25 wait for them to come back to figure out.

Case 4:22-cv-05502-DMR    Document 366-38    Filed 04/17/25    Page 12 of 19
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Brittany Brandon
January 28, 2025

Page 217

1 Tag/Disposed.
2 Q. Okay. And that would be when there's a mix
3 of items that were disposed, and which were bagged and
4 tagged, correct?
5 A. Yes.
6 Q. And then below that, the failure code is
7 "Damaged/Dirty/Safety." Do you see that?
8 A. Yes.
9 Q. What does that mean here?
10 A. I don't know. "Damage, Debris, Safety" would
11 be the failure code, sometimes. So I think what
12 happened in this situation is that I put it in as a
13 117, which would be encampment. And you have to put a
14 failure code for encampment to close it out.
15    But I don't believe anything was disposed of,
16 as I can tell from the pictures, as I see from the
17 pictures, and the comments.
18 Q. Is there an option for failure code that
19 would indicate that items weren't disposed?
20 A. Failure code just says Damaged/Dirty/Safety,
21 Debris. It doesn't automatically mean disposed of.
22 Q. Okay.
23 A. Yeah, it's just a failure code.
24 Q. I guess the concept of failure code is a
25 little confusing to me.

Page 218

1 A. Yeah.
2 Q. I don't know if you have more clarity on
3 that. Do you know what it's supposed to convey?
4 A. Not really. It's -- it's another development
5 when we switched over to the system, the system just
6 changed again. And they added this action code,
7 failure code.
8 Q. Okay.
9 A. So, I get a little confused about it
10 sometimes, too.
11 Q. Glad it's not just me.
12 A. Yeah.
13 Q. And here under "MEASURES," do you see that
14 there are one, two, three -- eight different actions
15 listed?
16 A. Yes. I see that.
17 Q. And it seems like they're, you know, "DPW -
18 Litter Receptacles Overflowing," "DPW-Steam." It looks
19 like they're all various DPW actions. Is that correct?
20 A. Yes.
21 Q. Do you know why those are all listed?
22 A. No.
23 Q. And, under "MEASURES" it says "Number of
24 Miscellaneous Debris - 4."
25    Do you know what that means?

Page 219

1 A. No. I think it's -- 4 is, if I had to guess,
2 maybe for 4, not urgent, but I'm not sure.
3 Q. Okay. In the -- there are two comments.
4 Both are created by HUB Integration. The first is
5 location, and then the second lists, says (As read):
6    "Location of arrest: Cesar Chavez
7    Street/Vermont Street.
8    "Officer Tiffer Star 577.
9    "Name of Person - Pending.
10    "items being collected: 3 bicycles."
11    And then it has a case number. What do you
12 understand that second comment to mean?
13 A. What, the "Officer Tiffer"?
14 Q. Yeah. "Location of Arrest," what does that
15 indicate?
16 A. That's giving you the description of what
17 happened. So an arrest was made on Cesar Chavez Street
18 and Vermont. Tiffer is the arresting officer. The
19 name of the person, that was pending. It probably was
20 updated, should have been updated later.
21    The items being collected is showing that we
22 took three bicycles that were bagged and tagged. That
23 case number is the police case number that's -- goes
24 with the three bicycles.
25 Q. And so would this be an example of a bag -- a

Page 220

1 service order request related to a bag & tag that SFPD
2 asked DPW to do?
3 A. Maybe. I'm not sure.
4 Q. Whenever -- if there's an arrest listed on a
5 service order report that is -- that has the problem
6 code "Bag & Tag," does that mean that the bag & tag is
7 related to an arrest?
8 A. Yes.
9 Q. And does that mean that SFPD asked DPW to bag
10 and tag items?
11 A. Most likely, or they were doing arresting.
12 We have to secure and look and see what items need to
13 be bagged and tagged.
14    MS. KATOVICH: I'll show you another service
15 report. And this will be Exhibit 1053.
16    (Exhibit 1053 marked for identification.)
17 BY MS. KATOVICH
18 Q. Take a moment to look this over. And when
19 you're ready, let me know if you recognize this
20 document.
21    (Witness examines document)
22 A. Okay. Um, I -- I can see what's going on. I
23 can't remember, you know, verbatim what happened that
24 day.
25 Q. Okay. So this is a service order request,

Case 4:22-cv-05502-DMR    Document 366-38    Filed 04/17/25    Page 13 of 19

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Brittany Brandon
January 28, 2025

Page 233

1  A.  Well, I would -- a biohazard would be that it
2  probably has hazardous materials that were like
3  chemicals, urine, feces, things like that.
4  Q.  And, is biohazard one of the items listed on
5  the bag & tag policy as something to be immediately
6  discarded?
7  A.  Yes.
8  Q.  And, based on looking at this narrative of
9  the incident report, it appears that you did not
10 provide a service request number.  Is that correct?
11 Based on looking at the report?
12    MS. MURPHY:  Feel free to review the entire
13 report before you answer.
14    THE WITNESS:  Yeah.
15    (Witness examines document)
16    THE WITNESS:  I don't believe that this --
17 that -- this doesn't -- I can't say that I didn't give
18 this person a service request number, because I don't
19 know how police fill out their reports.
20    So when I gave them the service request
21 number, I give it to them.  I don't know where they put
22 it at.
23 BY MS. KATOVICH
24 Q.  Absolutely.
25 A.  So there's no way for me to say I didn't give

Page 234

1  it.
2  Q.  That's fair.  But there is no service report
3  number listed in this report, correct?  That you've
4  seen.
5  A.  That I've seen; I'm not sure.
6  Q.  Okay.
7  A.  Because I don't know how they write these.
8  Q.  Under what circumstances would you deem an
9  entire encampment a biohazard?
10 A.  If I come across an encampment and it's
11 things spread across, feces, urine, things of that --
12 I'm not going to go through.  I would just disregard
13 all of the items, and deem it biohazard.
14 Q.  And in this case, the individual in question
15 is being arrested and taken to the jail, because the
16 arrest is for -- not for a cite-and-release.
17 A.  Yes.
18 Q.  If the items were not a biohazard, would you
19 bag & tag this person's belongings in this situation?
20 A.  Yes.
21 Q.  I'm now going to --
22    MS. MURPHY:  Before you move on, this
23 document contains information that's protected by
24 statute, related to the criminal defendant.  I ask that
25 you please not share your copy of the document with

Page 235

1  anyone else.
2     THE WITNESS:  Okay.
3     (Exhibit 1055 marked for identification.)
4  BY MS. KATOVICH
5  Q.  Hopefully this document looks a lot more
6  familiar to you.
7  A.  Yes.
8  Q.  This is a service order report that is dated
9  September 29, 2023.  Which is the same date that was on
10 the previous SFPD incident report.
11 A.  Yes.
12 Q.  And it looks like here, the problem code is
13 "Encampment."
14 A.  Uh-huh.
15 Q.  And the -- there are two crew members listed.
16 First, J Ramirez.  Do you know who that is?
17 A.  Yes.
18 Q.  Who is that?
19 A.  That's another supervisor.
20 Q.  And at the time, what team was he --
21 A.  I believe he was a Zone D supervisor at that
22 time.
23 Q.  And at the time, what team were you on?
24 A.  I'm on hot spot.
25 Q.  And you are -- and at the time, were you a

Page 236

1  supervisor on hot spot?
2  A.  Yes.
3  Q.  A Supe 1?
4  A.  Yes.
5  Q.  And you are the second crew listed there.
6  A.  Yes.
7  Q.  There are two measures listed here.
8     First:
9     "Miscellaneous Debris - 10."
10    And the second:
11    "Miscellaneous Debris - 150."
12    And then below that there are three comments.
13 The first is the location, which is Shotwell Street:
14 18th Street to 19th Street.
15    The second is from Jeffrey Ramirez, and say:
16    "Hot spot at location, removing encampments."
17    And then the third is:
18    "HSOC resolution."
19    So based on this service report, is it fair
20 to say that this was a report created during an HSOC
21 resolution at Shotwell Street between 18th and 19th
22 Street?
23 A.  Yes.
24 Q.  And turning back to the SFPD incident report
25 that we were just looking at, on the first page, you

Case 4:22-cv-05502-DMR   Document 366-38   Filed 04/17/25   Page 14 of 19

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Brittany Brandon
January 28, 2025

Page 237

1 can see that the location of the occurrence is 441
2 Shotwell Street?
3 A. Yes.
4 Q. And based on the information in the two
5 reports, is it fair to say that the SFPD incident
6 report, the incident described there took place at this
7 HSOC resolution?
8 A. I believe so.
9 Q. And in the service order report, is there any
10 indication of a biohazard?
11 A. It's not put into these comments, but this is
12 for the whole encampment. So it's -- she probably has
13 specifically certain things, and she's probably not the
14 only person that was at the encampment. So...
15 Q. And would you expect that if there were a
16 biohazard present at a resolution, that it would be
17 noted in the service order report?
18 A. It should be in the pictures.
19 Q. And in this case, a number of pictures have
20 Xs on them. Have you seen this?
21 A. I haven't seen this before. I don't know why
22 that --
23 Q. I'm not sure if that was a technical error,
24 but I wanted to ask, just in case.
25    If -- what personal protective order is

Page 238

1 required when dealing with a biohazard?
2 A. You mean by what --
3 Q. Personal protective --
4 A. Equipment we wear.
5 Q. Yes.
6 A. We have white suits, boots, gloves, safety
7 glasses, safety vests.
8 Q. And is that what you wear to encampment
9 resolutions?
10 A. Yes.
11 Q. All encampment resolutions?
12 A. Usually -- I don't wear white suits any more,
13 but -- they're not a requirement, but you can if you
14 want to.
15    The requirements are boots, gloves -- boots,
16 gloves, vest (Indicating), and glasses, when dealing
17 with packers and bigger trucks, things like that.
18 Q. And aside from the bag & tag policy training,
19 have you received any training on dealing with
20 biohazards?
21 A. Somewhat.
22 Q. What training is that?
23 A. They tell us how to handle. We do have --
24 that's in the helping -- health and safety tailgates,
25 showing us how to handle certain biohazards.

Page 239

1    But it counts -- we don't deal with big
2 biohazards. We will call HAZMAT. We just deal with,
3 like, oils, paints, chemicals. Feces and urine, our
4 steamers deal with that.
5 Q. When you're making a determination that an
6 encampment is -- can't be bagged and tagged because
7 there's feces or urine, would you be required to wear
8 certain protective gear that you might not otherwise be
9 required to wear?
10 A. It would probably be the same, what we wear.
11 Might put on a mask because of the smell's too strong,
12 things like that. We have masks.
13 Q. And you say the health and safety trainings
14 that you receive, about how often do you receive those?
15 A. We used to do them once a month.
16 Q. And now?
17 A. Now we -- we've been doing them twice, just
18 the supervisors, and then our health and safety.
19 There's a lot going on with the department right now.
20 Q. What do you mean by that?
21 A. They've been changing leads and stuff.
22 Q. And as they're changing, does that mean that
23 there are fewer trainings?
24 A. They're still doing trainings. It's fewer.
25 Q. And are those trainings taking place at the

Page 240

1 Supe 2 meetings?
2 A. No, those trainings are taken at the yard.
3 They host the trainings, themselves.
4    But now what they do is they give us a book
5 of all the health and safety code trainings, and we do
6 them at the tailgates for our teams.
7 Q. And in that book of trainings, is there a
8 training on biohazards?
9 A. Yes, it is.
10 Q. And what is covered in that biohazard
11 training?
12 A. I can't recall all of them that's going in
13 there.
14 Q. Are there different procedures that have to
15 be followed in terms of documentation when dealing with
16 biohazards?
17 A. I believe so.
18 Q. Do you know what those are?
19 A. I can't recall.
20 Q. I'm now going to show you a document that has
21 previously been marked as Exhibit 1035.
22    (Previously marked Exhibit 1035 marked
23    for reference.)
24    THE WITNESS: Thank you.
25

Case 4:22-cv-05502-DMR   Document 366-38   Filed 04/17/25   Page 15 of 19

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Brittany Brandon
January 28, 2025

Page 241

```
 1  BY MS. KATOVICH
 2  Q.  And this is a PowerPoint presentation.  And
 3  just take a look through and see if you recognize this
 4  PowerPoint presentation.
 5      (Witness examines document)
 6  A.  Yes, I know this PowerPoint.  It's our bag &
 7  tag PowerPoint.
 8  Q.  And is this the same PowerPoint that was
 9  shown to you this morning?
10  A.  Let me get all the way through it.
11  Q.  Yeah, take your time.
12      (Witness examines document)
13  A.  Yes, this is.
14  Q.  And is this the same PowerPoint that you used
15  to train your team about three weeks ago?
16  A.  It is, with the exception to the new page
17  with the form on it.  That we started using this week.
18  It will be on Page -- right here, should be 4453.
19      And -- do you see that?
20  Q.  I am --
21  A.  And 3953.
22  Q.  Oh, 44, I see.  Page 44 and --
23  A.  39.
24  Q.  And 39.  So other than that, it looks like
25  this is the same PowerPoint you used to present to your
```

Page 242

```
 1  team.
 2  A.  Yes.
 3  Q.  I'm going to direct your attention to Page 17
 4  of 53.  And here, it says (As read):
 5      "What items can be discarded?
 6      "1, Items that present an immediate health or
 7      safety risk.
 8      "2, Perishable items.
 9      "3, Contraband, illegal items.
10      "4, Trash, garbage and/or debris.
11      "5, Abandoned property."
12  A.  (Nods head)
13  Q.  Turning the page, this next page goes into
14  more depth about the items that present an immediate
15  health or safety risk.
16      And these include toxic sharps, chemicals,
17  items soiled with infectious materials, items infested
18  by rodents or insects, and items that present an
19  immediate health or safety risk.
20  A.  (Nods head)
21  Q.  Do you see "biohazard" listed as one of the
22  items that can be immediately discarded?
23  A.  "Biohazard" isn't specifically noted on here,
24  no.  But "human waste and body fluids" is.
25  Q.  That's a biohazard?
```

Page 243

```
 1  A.  Yes.  That's what I would consider a
 2  biohazard.
 3  Q.  Are you familiar with any official definition
 4  of a biohazard?
 5  A.  No, I am not.
 6  Q.  And, biohazard, would just the word
 7  "biohazard" inform you about what items were present?
 8  A.  To me, "biohazard" would be feces or -- or
 9  urine.  That would be to me.  I don't have the specific
10  definition for "biohazard."
11  Q.  Okay.  I'm now going to turn your attention
12  to -- I'm going to turn your attention to Page 37.
13      And here, it says (As read):
14      "Scenario 4:
15      "You encounter a tent with a bag of beer cans
16      and loose food inside the tent?"
17      And it shows a closeup photo of what looks
18  like food in a bag.
19      Based on your understanding of the bag & tag
20  policy, would you discard the tent and the belongings
21  inside?
22  A.  Yes.
23  Q.  I'll have you turn the page to Page 38.
24      (Request complied with by the Witness)
25  Q.  And there, the answer is (As read):
```

Page 244

```
 1      "The tent is not comingled [sic].
 2      "While you can discard the open bottles and
 3      cans because they are perishable items, they
 4      are not the type of health risk that would
 5      permit you to discard the entire tent and all
 6      its contents as comingled.
 7      "However, even when a tent is not comingled,
 8      the contents inside may be evidence that the
 9      tent is abandoned rather than unattended."
10      Having read this answer, you understand that
11  the tent could not be discarded under the policy simply
12  because it has beer cans and loose food inside the
13  tent?
14      MS. MURPHY: Object to form.
15      THE WITNESS: Looking in the tent, if you
16  open up the tent and it has open food debris in it, and
17  it's touched the tent, and the tent is soiled, you can
18  discard the tent.
19  BY MS. KATOVICH
20  Q.  Is that what you understand this PowerPoint
21  to --
22  A.  That's from what my understanding of it is.
23      If the tent is soiled -- just because I see
24  open beer cans, if the tent is soiled with those beer
25  cans and they're touching it, I take pictures of that;
```

Case 4:22-cv-05502-DMR   Document 366-38   Filed 04/17/25   Page 16 of 19

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Brittany Brandon
January 28, 2025

Page 245

 1  I should be able to get -- be able to discard the tent.
 2     Now, if the open bottles are just contained,
 3  and they haven't spilt over onto the tent and it
 4  doesn't have any food debris, yes, it will be bag &
 5  tagged, and not considered commingled.  But that's why
 6  you want to see the big picture.
 7  Q.  But based on the picture provided here, you
 8  believe that you could discard the entire tent.  Is
 9  that correct?
10     MS. MURPHY: Object, object to form.
11  Misstates prior testimony.
12     THE WITNESS: From what I see in the picture,
13  the best of my knowledge, from what I see in the
14  picture, I see food debris outside of the bag.  So I
15  will consider it commingled.
16     MS. KATOVICH: Okay.  I'm now going to
17  present another exhibit.  And this is another incident
18  report that has been marked Highly Confidential,
19  Attorneys' Eyes Only, that the witness is --
20     MS. MURPHY: I will allow this for today's
21  deposition.
22     Going forward, I don't think this is
23  appropriate, under the order.  The information that's
24  CORI CLETS in here has nothing to do with this witness,
25  so it's not appropriate to show her the protected

Page 246

 1  materials.
 2     I would prefer, going forward, if we can know
 3  in advance, and then redact the CORI CLETS information.
 4     MS. KATOVICH: Yeah, sure.  I thank you for
 5  accommodating it today.
 6     (Off-the-Record discussion)
 7     (Exhibit 1056 marked for identification.)
 8  BY MS. KATOVICH
 9  Q.  So this is another SFPD incident report.  The
10  date is January 23, 2024. And the charge is:
11  RESISTING, DELAYING OR OBSTRUCTING PEACE OFFICER
12  DUTIES.
13     So please take a minute and look at this
14  document.  And in this case, I would ask that, you
15  know, the narrative is quite long.  So I won't read it
16  all out loud to you, unless you would like me to.  But
17  I would ask that you read the first three paragraphs of
18  the narrative.  And let me know when you are done.
19     (Witness examines document)
20  A.  You said the first three paragraphs?
21  Q.  Uh-huh.
22     (Witness examines document)
23  A.  I finished reading the first three
24  paragraphs.
25  Q.  And do you recall this incident that's

Page 247

 1  described here?
 2  A.  No.
 3  Q.  Is it fair to say that this incident
 4  describes a situation where a person living where an
 5  encampment resolution had been noticed, had been
 6  provided 72 hours notice, and at -- after that, when
 7  HSOC arrived, he had not moved his belongings, and at
 8  that point, DPW began to clear his items?
 9     Is that what you understand is happening
10  here?
11  A.  No.  So I believe, yes, he was provided
12  72-hour notice it was a HSOC resolution.  But I believe
13  that when we got to the location, he was allowed even
14  more time to pack his belongings.
15  Q.  And then at a certain point, somebody
16  determined that he had had enough time, and DPW was
17  going to go in and remove items.  Is that correct?
18  A.  Yes.
19  Q.  And you said earlier that that would usually
20  be an incident commander or someone from a different
21  department who would determine when to go in.  Is that
22  right?
23  A.  Yeah.
24  Q.  And in this case, the person did not want his
25  items to be taken by DPW, and he advised you that his

Page 248

 1  -- it was his property, and that you weren't taking
 2  anything.
 3     Is that your understanding as well from this
 4  description?
 5  A.  From what I see, yes.
 6  Q.  And at that point, the -- and it also says
 7  that you -- you made a determination that his
 8  belongings were a hazard.  Correct?
 9  A.  Yes, that's what it says.
10  Q.  And at that point, the SFPD gets involved.
11  And tells him that he needs to leave.  And that he --
12  if he continues to protest the removal of his property,
13  that he'll be arrested.  And then they proceed to
14  arrest him.
15     Is it -- how often does something like this
16  occur, where SFPD arrests someone for trying to prevent
17  DPW from taking their property?
18     MS. MURPHY: Object to form.
19     THE WITNESS: I can't give a specific number,
20  but it happens.
21  BY MS. KATOVICH
22  Q.  Has it happened, in your experience, more
23  than ten times?
24  A.  I can't give specific numbers.
25  Q.  And have you ever discussed this type of

Case 4:22-cv-05502-DMR    Document 366-38    Filed 04/17/25    Page 17 of 19

Coalition on Homelessness, et al. v                                          Brittany Brandon
City and County of San Francisco, et al.                                   January 28, 2025

Page 249

1  scenario with SFPD officers?
2  A. What do you mean by "discuss"?
3  Q. Have you ever discussed SFPD's involvement in
4  arresting people for obstructing DPW's activities?
5  A. Well, when we are actually in the moment of
6  cleaning, from my knowledge, best of my knowledge, if
7  we -- if they interfere while we're cleaning, then the
8  police can step in.
9  Q. And have you ever discussed that practice
10 with anyone from SFPD?
11 A. I can't recall.
12 Q. And in your experience, does the -- does SFPD
13 typically get involved after you've determined that a
14 person's items are hazardous or soiled?
15 A. I mean, I believe from best of my knowledge,
16 that the police are involved from the beginning.
17 They're there from the beginning, so they're kind of
18 always involved.
19 Q. And this, this type of arrest for obstructing
20 DPW duties, does that typically occur after DPW has
21 determined that property is soiled or hazardous?
22 A. Yes.
23 Q. And in your experience, does SFPD arresting
24 someone allow for -- at this point in an encampment
25 resolution allow you to more quickly clear the area?

Page 250

1  A. It makes us be able to clean safely. It's a
2  safety concern.
3  Q. In this case, it seemed like the man was
4  adamantly saying that he wanted to keep the property
5  that was being discarded. And he was, it seems like,
6  grabbing it away from you as you were trying to move it
7  onto the truck. Is that correct?
8     MS. MURPHY: Object to form.
9     THE WITNESS: It seems like I probably was
10 about to put it in the truck, and he probably grabbed
11 it from me.
12 BY MS. KATOVICH
13 Q. How often does that happen, where you are
14 moving a person's property into a truck because you
15 have determined that it's hazardous or it's debris or
16 for some other reason, and the person is protesting and
17 asking to get it back?
18 A. I can't give specific numbers, but it happens
19 sometimes.
20 Q. Would you say it happens once a week?
21 A. I can't give specific numbers.
22 Q. But it's happened multiple times.
23 A. Yes, it has.
24 Q. Okay, put this aside.
25    I can use a little bit more of that, sorry.

Page 251

1  A. It's all good.
2  Q. Found it. You described trainings on the bag
3  & tag policy. When -- and sometimes you receive those
4  trainings at the Supe 2 meetings, is that correct?
5  A. Yes, sometimes.
6  Q. And if you were at a Supe 2 meeting where
7  there was training on bag & tag policy, would there be
8  a record of that?
9  A. Yes.
10 Q. And what form would that take?
11 A. It would be a sign-in sheet, tailgate sign-in
12 sheet.
13 Q. Did you ever receive training on the
14 preliminary injunction in this case?
15    MS. MURPHY: Object to form.
16    THE WITNESS: I can't recall.
17 BY MS. KATOVICH
18 Q. Did you receive training on the bag & tag
19 policy after December, 2022?
20 A. I believe so.
21    (Reporter clarification)
22    MS. KATOVICH: 2022, the year.
23 BY MS. KATOVICH
24 Q. And at that training, were you told anything
25 about what you needed to do to comply with the court

Page 252

1  order in this case?
2  A. Not that I can recall.
3  Q. About how many trainings on the bag & tag
4  policy did you attend between December, 2022, and
5  October, 2024?
6  A. I can't recall.
7  Q. More than one?
8  A. Yeah. More than one.
9  Q. Okay. And more than five?
10 A. I would say more than five.
11 Q. Okay. And were those all at Supe 2 meetings?
12 A. No, those were probably regular tailgates.
13 Q. And tailgates are when you're providing the
14 training, is that correct?
15 A. Or my Supe 2 is providing the tailgates.
16 Q. Okay. So at tailgates, your Supe 2 would
17 train you when you were a Supe 1 on --
18 A. Will refresh us, me and the crew. Yes.
19 Q. And at those tailgates between December,
20 2022, and October of 2024, did your Supe 2 who was
21 conducting those tailgates use a PowerPoint
22 presentation?
23 A. I can't recall, but -- I believe it was
24 printouts. I can't recall, though.
25 Q. Are you aware that in December, 2022, there

Case 4:22-cv-05502-DMR   Document 366-38   Filed 04/17/25   Page 18 of 19

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Brittany Brandon
January 28, 2025

Page 253

1  was an update to the bulky items policy?
2  A. Not that -- I don't...
3     (Reporter clarification)
4     THE WITNESS: I don't recall. I don't have
5  any knowledge of it.
6  BY MS. KATOVICH
7  Q. Have you ever received any training on
8  disability accommodations?
9  A. Have I what?
10 Q. Received training on disability
11 accommodations?
12 A. Not that I can recall right now.
13 Q. Have you ever received any training or
14 guidance on what to do if a person at an HSOC
15 resolution has a disability?
16 A. Not that I can recall.
17 Q. We have mostly been focusing on HSOC
18 resolutions, but I want to just briefly go back to JFOs
19 and some of the other operations.
20    So first, you described hot spot team going
21 on routes before resolutions, correct?
22 A. Uh-huh.
23 Q. Are those routes documented anywhere?
24 A. On their -- on the daily assignment sheets.
25 Q. And --

Page 254

1  A. Also --
2  Q. That would be the sheets that they turn in at
3  the end of the day?
4  A. Yes. It is also on weekly reports.
5  Q. And that would be the weekly hot spot report?
6  A. Yes.
7  Q. And during those routes, does the bag & tag
8  policy apply?
9  A. It always applies.
10 Q. Is notice required before those routes?
11 A. No.
12 Q. Even if items are discarded?
13 A. We are not removing encampments. We are
14 literally just picking up obvious trash.
15 Q. And do you ever bag & tag items during those
16 routes?
17 A. Usually, no. It -- it depends, but usually
18 no, we're not moving anybody or going close, we are
19 just getting obvious trash.
20 Q. What does it depend on?
21 A. It would depend on -- well, we do, we only
22 really remove encampments during resolutions. So when
23 we are running those routes we are focusing on debris.
24    So usually the unhoused individuals, they
25 create piles for us, we'll just come get the piles of

Page 255

1  debris, so we're not -- no interactions.
2  Q. Uh-huh.
3  A. So...
4  Q. And are those routes typically in places
5  where there has already been an encampment resolution?
6  A. It depends.
7  Q. It could be someplace that hasn't had an
8  encampment resolution.
9  A. Exactly.
10 Q. And is it just DPW who goes on those routes?
11 Or are other agencies also present?
12 A. I'm not sure who else goes on the routes.
13 Usually, we have -- hot spot is City-wide. So other
14 DPW personnel could be hitting those routes. I'm not
15 sure who all comes to those places, but DPW's
16 responsible for the trash.
17    But Recology could be picking up trash cans
18 from those routes, too. So I can't specify.
19 Q. But anyone outside of DPW would go -- because
20 it sounds like you plan the routes. Correct?
21 A. We write down the routes, yes. The
22 supervisors figure out which, like, areas to hit, if we
23 need to change anything.
24 Q. And do you ever request that a different City
25 agency accompany your hot spot team on those routes?

Page 256

1  A. Not that I can recall.
2  Q. Would those, the activities during those
3  routes, be documented in the CMMS?
4  A. The routes would be just on the daily
5  assignments.
6  Q. Are there any circumstances under which
7  somebody on the hot spot team would create a service
8  report during those routes?
9  A. We're starting to write service requests for
10 big pile cleanup. So if it's a big pile cleanup we'll
11 call it in and generate a service request for it.
12 Q. Any others circumstances?
13 A. Not that I can recall.
14    (Reporter clarification)
15    THE WITNESS: Service request report.
16 BY MS. KATOVICH
17 Q. And once you've finished with an encampment
18 resolution, do -- does the HSOC team -- and by that I
19 mean all the different agencies present -- do you
20 sometimes move on to different areas?
21    MS. MURPHY: Object to form.
22    THE WITNESS: Um, maybe, if time permits.
23 BY MS. KATOVICH
24 Q. And who decides whether you move from the
25 location where you planned to go to somewhere else

Case 4:22-cv-05502-DMR   Document 366-38   Filed 04/17/25   Page 19 of 19

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Brittany Brandon
January 28, 2025

Page 257

```
 1  after a resolution?
 2  A.  I believe, the incident commander.
 3      (Reporter clarification)
 4      THE WITNESS:  The incident commander.  I'm
 5  sorry.
 6      MS. MURPHY:  It's around Hour 13 for her work
 7  day today.
 8      THE WITNESS:  Sorry.
 9      MS. KATOVICH:  Trying to move as quickly as I
10  can, while speaking slowly.
11  BY MS. KATOVICH
12  Q.  And during the -- so now moving on to JFOs,
13  what is the difference between JFO and HSOC
14  resolutions?
15  A.  I believe, from my best knowledge, JFO is not
16  -- they're not doing notices.  They just have set
17  areas.
18      They're only, from my knowledge, in, like,
19  the lower downtown area, Tenderloin area.  They -- from
20  my knowledge, I've never seen them, like, in the
21  Mission or in the Bayview.
22      As for hot resolutions -- HSOC resolutions,
23  they are City-wide and can be -- and they are noticed.
24  BY MS. KATOVICH
25  Q.  And during a JFO operation, does DPW -- do
```

Page 258

```
 1  the DPW workers assigned create CMMS reports for each
 2  location?
 3  A.  Yes.
 4  Q.  And that would be just one CMMS report per
 5  location.  Not each worker creating a CMMS report.
 6  A.  Exactly.
 7  Q.  And if property is bagged and tagged at a
 8  JFO, would they create a separate CMMS report for that
 9  bag & tag?
10  A.  Yes.
11  Q.  And you stated that notice is not required
12  during JFOs.
13  A.  From my knowledge.
14  Q.  From your knowledge.  And in your experience,
15  you have not seen notice posted before JFOs?
16  A.  From my knowledge, no.
17  Q.  And does the bag & tag policy currently apply
18  to DPW responses to complaints from the public?
19  A.  Can you clarify that?
20  Q.  When DPW responds to a 311 complaint or
21  something like that, does the bag & tag policy apply?
22  A.  It always applies.
23  Q.  And that would be true also for the alley
24  crew when they're cleaning up alleys?
25  A.  (Nods head)  Yes.  Sorry.
```

Page 259

```
 1  Q.  You've been great about it; don't worry.
 2      What are DPW staff supposed to do if they
 3  witness or learn about a violation of the bag & tag
 4  policy?
 5      MS. MURPHY:  Object to form.
 6      THE WITNESS:  From the best of my knowledge,
 7  they should report it.
 8  BY MS. KATOVICH
 9  Q.  And that would be to their supervisor?
10  A.  Yes.
11  Q.  Under what circumstances would someone submit
12  an incident report about a bag & tag violation?
13  A.  If an incident occurred.
14  Q.  And so, would -- every time you view a
15  violation, you should create an incident report?  Is
16  that correct?
17  A.  I think it depends.  I wouldn't say that, no.
18  Q.  What does it depend on?
19  A.  Because, like I said, there's different
20  levels of disciplinary.  So, sometimes it could be a
21  coaching thing.  So I don't think that -- every time,
22  they might not write an incident report.  But it is
23  good to write an incident report, for the
24  documentation.
25  Q.  And do you know who receives incident
```

Page 260

```
 1  reports?
 2  A.  The managers.  The supervisors.
 3  Q.  And that would be all supervisors?
 4  A.  No.  For whatever area, specific area.
 5  Specific team, crew.
 6  Q.  And would the superintendent above them also
 7  receive the incident report?
 8  A.  Yes, if -- if the superintendent, that's who
 9  they would send it to, and then -- yes.
10  Q.  And are you responsible for taking any
11  corrective action when someone has not applied the bag
12  & tag policy when they were supposed to?
13  A.  If directed by my superior to do so.
14  Q.  But you -- you're required to report the
15  violation.  And then if your superior directs you to
16  issue a corrective action, that's when you would do so?
17  A.  Yes.
18  Q.  And have you ever reported a violation of the
19  bag & tag policy, aside from the incident we spoke
20  about earlier with Hollins?
21  A.  Not that I can recall.
22  Q.  And if you had, would there be a record of
23  that?
24  A.  It should be.
25  Q.  After December, 2022, did you change anything
```