# EXHIBIT 33

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

## In The Matter Of:

*Coalition on Homelessness, et al. v.*
*City and County of San Francisco, et al.*

---

*Israel Graham*
*January 30, 2025*

---

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 44011Graham_nl.txt
Min-U-Script® with Word Index

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 29

1   presentation at that tailgate a couple weeks ago?
2     A.  If it's about bag and tag, most likely we did.
3     Q.  Would there be any document showing for sure
4   whether or not you had shown the PowerPoint at that
5   tailgate meeting a couple of weeks ago?
6     A.  Yes, the sign-in sheet.
7       ATTORNEY TALLA: Okay.  So I'm going to mark as
8   Exhibit 1121 this document.  Bill is going to be my
9   assistant here today.
10      (Deposition Exhibit 1121 was marked for
11      identification.)
12  BY ATTORNEY TALLA:
13    Q.  Okay.  So you can take your time, Mr. Graham,
14  to read it.  I'll just say that the first couple pages
15  is actually a declaration from Darryl Dilworth, who was
16  your supervisor last year.
17      And then Exhibit A to his declaration are a
18  couple -- Exhibit A and Exhibit B to his declaration are
19  a couple of sign-in sheets.
20      So I can direct you directly to what I want to
21  ask you about --
22    A.  Okay.
23    Q.  -- but take your time and look through it if
24  you'd like.  Just let me know when you're ready.
25    A.  I'm ready.

Page 30

1     Q.  Okay.  All right.  So at the very top of the
2   page, you'll see a bunch of numbers.  And I'm directing
3   you to the document 238-6.
4       Do you see that at the top of the page that
5   you're looking at "238-6"?
6       ATTORNEY MURPHY: It's this one.
7       THE WITNESS: Yeah.  Exhibit A.  Okay.  Yeah,
8   mm-hmm.
9   BY ATTORNEY TALLA:
10    Q.  Okay.  So at the top of this page, it says:
11  "SES Tailgate - 2022."
12      Do you see that?
13    A.  Mm-hmm -- uh.  Where are we at?
14    Q.  So right here.
15    A.  Oh.
16    Q.  And then it says: "Supervisor/Trainer" --
17    A.  Oh, yeah.
18    Q.  -- "Darryl Dilworth."  And then underneath
19  that, it says: "Date: 12/13/23."
20      Do you see -- I just want to make sure we're
21  looking at the same one.
22    A.  Mm-hmm.
23    Q.  Okay.  Perfect.
24      So is this one of the sign-in sheets for the
25  tailgate meetings?

Page 31

1     A.  Yes.
2     Q.  And then do you see your name on the sign-in
3   sheet?
4     A.  Yes.
5     Q.  Okay.  And do you see your signature?
6     A.  Mm-hmm.
7     Q.  Okay.  And what is job class number?
8     A.  That's a classification.  That's the job class.
9     Q.  Okay.  And then the people who are listed under
10  you, are those some of the people that you mentioned
11  earlier that are part of the Hot Spot team?
12    A.  Mm-hmm.
13      (Reporter clarification.)
14    THE WITNESS: Yes.
15  BY ATTORNEY TALLA:
16    Q.  So this sign-in sheet -- let me strike that.
17      So at the top, it says:  "Bag & Tag
18  Procedures" -- do you see that -- "121323"?
19    A.  Mm-hmm.  Yes.
20    Q.  Does that indicate to you that bag and tag was
21  discussed on that day?
22    A.  Yes.
23    Q.  Okay.  And so then let's flip to the next page,
24  which is 238-6.  That's the docket number.
25      So the date -- is this also a sign-in sheet for

Page 32

1   a training?
2     A.  Yes.
3     Q.  And is this a tailgate meeting, or is this a
4   specific training meeting?
5     A.  It could have been probably just a training
6   meeting.
7     Q.  Okay.  At the top, it says:  "Supervisor:
8   D. Dilworth / I. Graham."
9       Do you see that?
10    A.  Yes.
11    Q.  Are you "I. Graham"?
12    A.  Yeah.
13    Q.  Does this sign-in sheet indicate that you were
14  at this training?
15    A.  Yes.
16    Q.  And the date of the training was August 6, '24,
17  correct?
18    A.  Yes.
19    Q.  Would this training have also occurred around
20  4:00 a.m. in the morning?
21    A.  Yes.
22    Q.  Okay.  And all the people on this sheet are
23  people who attended that training; is that right?
24    A.  Yes.
25    Q.  Okay.  And so then if you could flip to the

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 45

1    A.    No.
2    Q.    Now, at resolutions, are you the only person
3    who is creating CMMS reports?
4    A.    Me or -- me or Brittany.
5    Q.    Are any of the general laborers at a resolution
6    creating CMMS reports?
7    A.    No, not that I -- on my days off -- I don't
8    know how it is on my days off.  But when I'm there, no.
9    Q.    Okay.  So if you are at a resolution, it is you
10   creating the CMMS report?
11   A.    Mm-hmm.
12   Q.    Mm-hmm.
13   A.    Yes.
14   Q.    Okay.  Have you ever reviewed CMMS reports
15   created by people you supervise?
16   A.    No.
17   Q.    Do you create handwritten notes during a
18   resolution?
19   A.    No.
20   Q.    Do you maintain a spreadsheet of information
21   from CMMS reports?
22   A.    Yes.
23   Q.    And where is that spreadsheet saved?
24   A.    On the City's hard drive.
25   Q.    Okay.  Is that the V drive?

Page 46

1    A.    Yes.
2    Q.    And what does that Excel spreadsheet contain?
3    A.    The date, location, whether it was a bag and
4    tag or not, and a link to pictures.
5    Q.    And why do you have this Excel sheet?
6    A.    I guess to keep track of our work, if anybody
7    has to go and check it.
8    Q.    Do you take a look at this Excel sheet
9    regularly?
10   A.    Yes.  When I log it -- when I log in the
11   information.
12   Q.    And are you, you know, actually typing
13   information into the Excel sheet yourself?
14   A.    Mm-hmm, yes.
15   Q.    Okay.  Do your supervisors look at the Excel
16   sheet?
17   A.    I guess when they need to.
18   Q.    Have any of your supervisors ever talked to you
19   about what's in the Excel sheet?
20   A.    Well, they already know what's in the Excel
21   sheet.
22   Q.    And how do they already know that?
23   A.    Because they work on it too.
24   Q.    I see.  Okay.
25         What type of information are they -- or sorry.

Page 47

1          How do they work on the Excel sheet?
2    A.    They may have to intake information for the
3    days I'm not here.  So when I'm not here, they also got
4    to add in the same information I do.
5    Q.    Mm-hmm.
6          Do you take a look at the information they put
7    into the Excel sheet?
8    A.    No.
9    Q.    Have you ever gone back to the Excel sheet to
10   look up something you had previously entered?
11   A.    No.
12   Q.    Do you have any reason why the Excel -- let me
13   strike that.
14         Do you know who decided to create this Excel
15   sheet?
16   A.    No.
17   Q.    Did you decide to create the Excel sheet?
18   A.    No.
19   Q.    Did someone tell you to put the information
20   into the Excel sheet?
21   A.    Yes.
22   Q.    And who was that?
23   A.    Darryl Dilworth.
24   Q.    Do you have -- do you know why Mr. Dilworth
25   wanted this Excel sheet to be maintained?

Page 48

1    A.    No.  He's just very organized.  So probably
2    want to keep track of our work to make sure that the
3    department can see what we're doing.
4    Q.    Now, you mentioned earlier that you take
5    photographs at a resolution, right?
6    A.    Mm-hmm.
7    Q.    Are you required to take photographs at a
8    resolution?
9    A.    Yes.
10   Q.    And what are you required to take photographs
11   at a resolution of?
12   A.    The debris that's out there; the debris that,
13   after it's cleaned up, was taken; the homeless property,
14   what we're taking from them or what they're keeping;
15   bags -- the inside of bags, inside of tents.
16   Q.    I'm just going to run back through some of
17   those types of photographs.
18         By "debris," do you mean trash?
19   A.    Yes.
20   Q.    Okay.  And then you are supposed to take
21   photographs after you have finished the resolution?
22   A.    Mm-hmm.  Yes.
23   Q.    Okay.  And then you are required to take
24   photographs of homeless people themselves?
25   A.    No.  I'm just saying of their property.

Case 4:22-cv-05502-DMR    Document 366-39    Filed 04/17/25    Page 5 of 22

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 49

1   Q.  Do you take photos of homeless people?
2   A.  Not purposely, but they're always in the
3  camera.  They're always in the -- you know, in the
4  photos.
5   Q.  So then you take pictures, I think you said, of
6  homeless people's property, what they are keeping?
7   A.  Yes.
8   Q.  Okay.  And you take pictures of homeless
9  people's property what you are taking from them; is that
10  right?
11   A.  Mm-hmm.
12      (Reporter clarification.)
13   THE WITNESS: Yes.
14  BY ATTORNEY TALLA:
15   Q.  Sorry, Mr. Dilworth -- Mr. Graham.  This is
16  obviously not natural conversation.
17   A.  That's okay.
18   Q.  Okay.  So when you say take from them, do you
19  mean discard or bag and tag or both?
20   A.  It could be both.  Both.
21   Q.  Are you required to take pictures of the
22  property that you do bag and tag?
23   A.  Yes.
24   Q.  Okay.  And then you said -- are you required to
25  take pictures of the property you discard?

Page 50

1   A.  Yes.
2   Q.  And then you said you take photos of the inside
3  of bags, correct?
4   A.  Mm-hmm.  Yes.
5   Q.  Okay.  And why do you do that?
6   A.  Make sure that we're not throwing anything of
7  value away.
8   Q.  And what is a thing of value?
9   ATTORNEY MURPHY: Object to form.
10   THE WITNESS: Being their medication, legal
11  documents, clothes.
12  BY ATTORNEY TALLA:
13   Q.  Is there anything else you consider a thing of
14  value?
15   ATTORNEY MURPHY: Object to form.
16   THE WITNESS: That's probably about it.
17  BY ATTORNEY TALLA:
18   Q.  Okay.  And then I think you said you take
19  photographs of the inside of tents, correct?
20   A.  Yes.
21   Q.  And why are you taking photographs of
22  the inside of tents?
23   A.  I think to make sure -- see how -- show you
24  guys what the tents look like inside.
25   Q.  Are there particular things you are looking

Page 51

1  at -- looking for inside of tents?
2   A.  See if it's -- see if the tent is damaged any
3  kind of way.
4   Q.  What are some different kinds of ways that you
5  think a tent is damaged?
6   A.  Soiled, drug paraphernalia, holes.  Mm-hmm.
7  Holes in the tent or something like that.
8   Q.  Anything else?
9   A.  Hmm-mm.
10   Q.  What does "soiled" mean to you?
11   A.  Wet, dirty, smells.
12   Q.  Anything else?
13   A.  No.
14   Q.  And what do you consider to be drug
15  paraphernalia?
16   A.  Pipes, glass pipes, needles.  It's other
17  objects; I don't know what to call them, other, like,
18  plastic pieces that they use with the -- with the pipes,
19  foil paper, powder, any type of, like, powdery
20  substance.
21   Q.  Would you consider rolling paper drug
22  paraphernalia?
23   A.  It depends on how you use it, you know.
24   Q.  When you --
25   A.  What -- okay.  Go on.

Page 52

1   Q.  No, no.  I don't want to cut you off.
2   A.  I don't want to cut you off.
3   Q.  Okay.  So if you -- have you encountered
4  rolling paper in a tent before?
5   A.  Not that I can recall.
6   Q.  Okay.  So what are you required to do with the
7  photographs once you take them?
8   A.  Just keep them in the CMMS.
9   Q.  When you say keep in CMMS, do you mean upload
10  them into CMMS?
11   A.  Yeah.  They automatically upload once we take
12  them.
13   Q.  Do you have a separate set of photographs or
14  additional photographs in the V drive of -- that you
15  take at resolutions?
16   A.  No.
17   Q.  Has your supervisor ever talked to you about
18  photographs you've taken at a resolution?
19   A.  Yes.
20   Q.  And what did they say to you?
21   A.  Just make sure I take good photos.
22   Q.  Did your supervisor think there was something
23  wrong with the way you had taken the photos?
24   ATTORNEY MURPHY: Object to form.
25   THE WITNESS: No, not really.

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

---

Page 53

1  BY ATTORNEY TALLA:
2  Q.  When you say "not really," do you mean they did
3  think something was wrong?
4  A.  No.  No.
5  Q.  Okay.  And are you taking the photos with the
6  tablet or with your phone or something else?
7  A.  Tablet.
8  Q.  Do you take videos on the tablet?
9  A.  No.
10  Q.  Do any of the general laborers you work with at
11  a resolution take photographs at a resolution?
12  A.  No.
13  Q.  Okay.  Do you send or receive text messages
14  during a resolution?
15  A.  No.
16  Q.  Okay.  Are you aware that the incident
17  commanders at a resolution have a text-message chain
18  during the resolution?
19  A.  No.
20  Q.  Have you ever texted with the incident
21  commander at a resolution?
22  A.  No, I don't recall.
23  Q.  Okay.  Have you ever received any negative
24  feedback or discipline for your actions during a
25  resolution?

---

Page 54

1  A.  No.
2  Q.  Have you ever provided any negative feedback or
3  discipline to the general laborers for their work on a
4  resolution?
5  A.  No.
6  Q.  Okay.  So then I want to talk about the
7  bag-and-tag policy.
8      You're familiar with that policy, correct?
9  A.  Yes.
10  Q.  Okay.  Do you know how long the current policy
11  has been in effect?
12  A.  I don't know exact day.  No, I don't know.
13  Q.  Has it been -- has the current version been in
14  effect for as long as you've been a Supe I?
15  A.  Yes.
16  Q.  Now, according to the bag-and-tag policy, what
17  are you supposed to do when you encounter somebody with
18  their property at a resolution?  And by "person," I mean
19  unhoused person.
20  A.  Ask -- can you repeat that question?
21  Q.  Sure.  Let me -- let me rephrase it a little
22  bit better.
23      According to the bag-and-tag policy, when you
24  encounter somebody at a resolution with their property,
25  what are you supposed to do?

---

Page 55

1  A.  Let them take what they want.
2  Q.  Are there any limitations under the policy as
3  to what they can take with them?
4  A.  No.
5  Q.  If they wanted to take something that was
6  soiled, could they take that?
7  A.  Yes.
8  Q.  Have you ever prevented somebody from taking a
9  soiled item with them?
10  A.  No.
11  Q.  Have you ever prevented somebody from taking
12  any item that they wanted with them?
13  A.  No.
14  Q.  Have you ever encountered a situation at a
15  resolution where somebody said that they own something
16  but you didn't agree with that?
17  A.  No.
18  Q.  Do you impose any limits on how much time
19  someone has to remove property that they want to keep?
20  A.  No.
21  Q.  Under the bag-and-tag policy, are you supposed
22  to give people advisements about medications or anything
23  like that?
24  A.  No.
25  Q.  What do you do if somebody can't physically

---

Page 56

1  take all their property with them at a resolution?
2  A.  Hmm.  What do we do...  Hmm.  They can't take
3  their...
4      Normally, I don't -- I can't -- that's kind of
5  a tough one.  Normally, they take what they -- whatever
6  they can take, they take it with them.
7  Q.  Okay.  Have you ever encountered a situation
8  where people were unable to take everything they wanted
9  with them?
10  A.  I don't recall.
11  Q.  Have you ever been in a situation or -- I'm
12  sorry.  Strike that.
13      Have you ever discarded items because people
14  could not physically take them with them?
15  A.  No.
16    ATTORNEY MURPHY:  Object -- object to form.
17  BY ATTORNEY TALLA:
18  Q.  Are you familiar with the concept of attended
19  property in the bag-and-tag policy?
20  A.  Mm-hmm, yes.
21  Q.  Are there situations where you bag and tag
22  attended property?
23  A.  Meaning...  Okay.  Can you --
24  Q.  Sure.  Let me take a couple steps back.
25      Under the bag-and-tag policy, what is attended

---

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

---

Page 57

1    property?
2        A.   Attended property would be somebody there with
3    their belongings.
4        Q.   And does -- under the bag-and-tag policy, are
5    you ever permitted to bag and tag attended property?
6        ATTORNEY MURPHY:  Object to form.
7        THE WITNESS:  If it's -- if it's bagged -- if we can
8    bag and tag it.
9    BY ATTORNEY TALLA:
10       Q.   Have you ever bagged and tagged attended
11   property?
12       A.   Yes.
13       Q.   Can you tell me about some of those situations
14   in which you've bagged and tagged attended property?
15       A.   I can't give you anything specific.  But if
16   somebody is there and they're being detained, and
17   it's -- and they have a suitcase with some nice clothes
18   or something, then I will bag and tag that.
19       Q.   And when you say "detained," do you mean being
20   cited or arrested by the police?
21       A.   Mm-hmm.  Yes.
22       Q.   Okay.  So I want to talk about that situation
23   in a second.
24            But apart from being detained, is there a
25   situation where you have bagged and tagged attended

---

Page 58

1    property?
2        A.   I can't recall normally.  Yeah, I can't recall.
3        Q.   All right.  Well, let's pick up -- and we've
4    been going for an hour.  So if you would like to take a
5    break or just keep going...
6        A.   Mm-hmm, keep going.
7        Q.   Okay.  All right.  So let's talk about the
8    detain situation.
9            So there are circumstances where the police
10   department issues a citation or arrests someone at a
11   resolution, correct?
12       A.   Mm-hmm.
13            (Reporter clarification.)
14       THE WITNESS:  Yes.  Yes.
15   BY ATTORNEY TALLA:
16       Q.   And in those situations, what does the police
17   department ask you to do?
18       A.   To bag and tag certain items.
19       Q.   What are the items that they ask you to bag and
20   tag?
21       A.   Tents or certain belongings that they want
22   bagged and tagged.
23       Q.   Let's talk about the tent.
24            Do you bag and tag tents or also tarps?
25       A.   Both.

---

Page 59

1        Q.   When you bag and tag a tent or tarp, do you
2    take a photo of it for the CMMS report?
3        A.   Yes.
4        Q.   Do you create a Homeless Property Information
5    form for that tent or tarp?
6        A.   A homeless -- no.  I create a separate CMMS for
7    that bag and tag.
8        Q.   And then what do you do with that tent or tarp?
9        A.   Bag and tag it if it -- if it's -- you know, if
10   we could bag and tag it.
11       Q.   Okay.  Do you take that tent or tarp anywhere
12   in particular?
13       A.   Yes.  We got a storage bin on the yard.
14       Q.   Do you mean the DPW yard?
15       A.   Yes.
16       Q.   Okay.  Do you know whether the person who's
17   been cited or arrested can go to the yard and obtain
18   that tent or tarp?
19       A.   Yes.
20       Q.   And I'm sorry.  My question was unclear, so I
21   just want to clarify the answer.
22            That person can get the tent or tarp from the
23   DPW yard?
24       A.   Yes.  If it's bagged and tagged, yes, they can
25   go and pick it up.

---

Page 60

1        Q.   Okay.  And do you give them -- do you give that
2    person whose tent or tarp has been taken any written
3    document about whether -- where they can go to pick it
4    up?
5        A.   No.
6        Q.   Is there a separate storage bin for the tents
7    and tarps that you take from this process as compared to
8    other bag-and-tag items at the yard?
9        A.   No.  No.  We don't -- there's a whole 'nother
10   group that deals with the bag and tag separately.  I
11   just bring it to one location, and what they do is --
12   after that, I don't know what.
13       Q.   When you say separate team, do you mean DPW
14   workers who work at the yard?
15       A.   Mm-hmm.  Yes.
16       ATTORNEY MURPHY:  You just try your best to try to
17   say yes.  If you don't, it's Vasudha's job to follow up
18   and say, "Is that a yes?"  So try your best, but don't
19   worry if it doesn't come out.  I know you've been
20   working since 4:00.
21       THE WITNESS:  Okay.  Okay.
22   BY ATTORNEY TALLA:
23       Q.   Okay.  So then the other type of items that you
24   mentioned bagging and tagging when people are issued
25   citations or arrests are sort of other belongings that

---

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 61

1  they have; is that right?
2  A.  Mm-hmm.
3  Q.  Okay.  Is that a yes or a no?
4  A.  Yes.  Yes.  Yes.
5  Q.  Okay.  For example, I think you used the
6  example of a suitcase.
7  A.  Mm-hmm.
8  Q.  Is that a yes?
9  A.  Yes.  Yes.
10  Q.  And so in that situation when you are dealing
11  with a suitcase or another type of belonging, do you
12  take a photo of it?
13  A.  Yes.
14  Q.  And do you create a CMMS report?
15  A.  For a bag and tag.
16  Q.  For a bag and tag --
17  A.  Yeah.  So whatever we -- if I know I'm
18  bag-and-tagging, it's a separate CMMS.  And whatever
19  we're keeping, we take pictures and put it under that
20  CMMS number.
21  Q.  Do you take that suitcase or other type of
22  belongings to the DPW yard?
23  A.  Yes.
24  Q.  Do you give the person who has been cited or
25  arrested any written documentation about where they can

Page 62

1  go to pick up that suitcase or belongings?
2  A.  Yes.  They -- they know where to pick it up
3  before they leave.  They know to go to the yard.
4  Q.  Let me try to clarify something.
5  A.  Mm-hmm.
6  Q.  Do you provide them a piece of written
7  documentation advising them where they can go to pick up
8  a suitcase or some belongings?
9  A.  A written documentation...  If it's an
10  unattended item, then there would be a posting on the
11  wall with an address for them to go pick up their stuff.
12  If they are there, attended item, they will get
13  it from me or the incident commander or PD where to get
14  their stuff at.
15  Q.  And do you or the incident commander or PD tell
16  them that information orally?
17  A.  It could -- it's -- yes, it's orally.  And I
18  don't recall if they give them a piece of paper or not.
19  Q.  Do you give them a piece of paper?
20  A.  No.
21  Q.  So let's go back to something we just talked
22  about, which is unattended property.  Okay?
23  So you're familiar with the term "unattended
24  property" under the bag-and-tag policy; is that right?
25  A.  Yes.

Page 63

1  Q.  And what is unattended property?
2  A.  An abandoned encampment.
3  Q.  And how -- how do you determine whether
4  something is abandoned or not?
5  A.  When things is folded up nice and neatly and
6  you could tell, like, somebody's been there.
7  Q.  When you say "been there," you know, how -- how
8  recently?
9  A.  Probably just overnight, just there.  They
10  probably stepped away to get some breakfast or
11  something.
12  Q.  When you see something that looks like, you
13  know, someone's just been there and stepped away, how do
14  you deal with that situation?
15  A.  We'll put a 32 -- a 72-hour notice -- or no,
16  no.  Excuse me.  We would put a notice, unattended item
17  notice, and I will bag and tag what we think is, you
18  know, is salvageable, is good, and discard the debris.
19  Q.  How often are you bagging and tagging
20  unattended items at resolutions?
21  A.  Not much.
22  Q.  Is that once a week?  Once a month?
23  A.  You could say maybe once a month.
24  Q.  Could it be less frequently than that?
25  ATTORNEY MURPHY: Object to form.

Page 64

1  THE WITNESS: Could be.
2  BY ATTORNEY TALLA:
3  Q.  Do you recall the last time you bagged and
4  tagged an unattended item?
5  A.  Last week.
6  Q.  And what was that item that you bagged and
7  tagged last week?
8  A.  I believe some suitcases.
9  Q.  And why did you decide to bag and tag those
10  suitcases?
11  A.  Clothes was inside and neatly packed away and
12  stored.
13  Q.  I want to go back to abandoned encampment.
14  Are there -- apart from indications that
15  someone has been there recently, is there anything else
16  that you use to determine whether something is abandoned
17  or unattended?
18  A.  Can you repeat that question?
19  Q.  Sure.
20  Apart from signs that someone has been there
21  recently, are there any other factors that you look at
22  to determine whether a piece of property is abandoned or
23  not?
24  A.  If I see a lot of garbage.
25  Q.  And what kinds of garbage?

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 65

1    A.  Food debris, wet, moist stuff, just -- just
2  garbage, random -- random debris.
3    Q.  What kind of food are...
4    A.  Like garbage, food that you ate and threw away
5  and spread out over -- over the sidewalk that's blocking
6  the pathway of pedestrians getting by.
7    Q.  Have you ever bagged and tagged food?
8    A.  No.
9    Q.  What about food in cans?
10    A.  I don't recall.
11    Q.  Do you ever talk to anybody to determine
12  whether something is abandoned or not?
13    A.  If there's certain -- if there's homeless
14  people around in the area, you know, I ask them
15  questions.
16    Q.  And what are the types of things they've told
17  you?
18    A.  It'd be this is -- I know this person; I don't
19  know this person; nobody was here; this stuff doesn't
20  belong to anybody; the person just left.  You know, it'd
21  be all kind of things being said.
22    Q.  And when you were told that somebody has just
23  left, what do you do in that situation?
24    A.  Just left...  I can't -- I don't recall.
25    Q.  You don't recall that situation occurring?

Page 66

1    A.  No.  Every day is different.
2    Q.  So that might have occurred, but you just don't
3  remember it?
4    A.  Possibly.  But, you know, normally if somebody
5  has just abandoned something, we always give them time,
6  you know.  We might address this camp at the end of the
7  day, you know, to give a person time to see if they is
8  coming back or not.
9    Q.  I just want to understand.
10        In what types of situations are you giving
11  people time to see if they're coming back?
12    A.  It could be this row of tents here, and say we
13  clean up seven tents, and there's one here.  And, you
14  know, we didn't address somebody there, so we might
15  address that tent at the end of the day.
16    Q.  And what time is that?
17    A.  Say 10:30 to 11:00.
18    Q.  I see.
19        So at the end of the resolution?
20    A.  Mm-hmm.
21    Q.  Okay.  Are you ever leaving a tent in place
22  after 11:00 a.m.?
23    A.  No.  Everything should be -- should be gone off
24  the block.
25    Q.  Okay.  I want to talk about the post-removal

Page 67

1  notices that you mentioned before.  Okay?
2    A.  Mm-hmm.
3    Q.  Do you fill out that -- do you fill out any
4  information on that notice?
5    A.  The post-removal, the -- for unattended bag and
6  tag?
7    Q.  I think earlier you testified about a
8  post-removal notice.
9        Am I remembering correctly?
10    A.  You've got to clarify what you mean.
11    Q.  Okay.  Let me take a step back.
12        In instances involving unattended property, do
13  you bag and tag it?
14    A.  Depends if it's bag-and-taggable.
15    Q.  If it's bag-and-taggable, do you bag and tag
16  it?
17    A.  Yes.
18    Q.  And what do you do in that circumstance?
19    A.  After -- we post a notice.  We have to post the
20  notice if we bag and tag it.
21    Q.  Okay.  So that notice --
22    A.  Mm-hmm.
23    Q.  -- do you fill out anything on that notice?
24    A.  The last one, I didn't have to -- I didn't have
25  to fill anything out.  Brittany actually did that one.

Page 68

1    Q.  When was the last time you personally posted a
2  post-removal notice?
3    A.  I don't recall.  I don't remember.
4    Q.  Have you -- at a resolution, have you ever
5  encountered a pile of clothes that are not contained in
6  a bag or suitcase?
7    A.  Yes.
8    Q.  And what do you do in that situation?
9    ATTORNEY MURPHY: Object to form.
10    THE WITNESS: If it's on the ground, depending on
11  where we're at, most likely it's soiled and damaged.
12  BY ATTORNEY TALLA:
13    Q.  And then what do you do?
14    A.  If it's soiled and damaged, then we get rid of
15  it.
16    Q.  Have you ever limited the amount of property
17  that you have bagged and tagged?
18    ATTORNEY MURPHY: Object to form.
19    THE WITNESS: No.  No.
20  BY ATTORNEY TALLA:
21    Q.  To your knowledge, are there any limits on what
22  you can bag and tag?  I mean by volume or size.
23    A.  No.
24    Q.  To your knowledge, have the general laborers at
25  a resolution ever limited the amount of items they have

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 69

1  bagged and tagged?
2     A.  No.
3     ATTORNEY MURPHY: Vasudha, whenever you're at a
4  natural stopping point, I might need a restroom break.
5     ATTORNEY TALLA: Yeah.  This is fine.
6     ATTORNEY MURPHY: So agree to go off?
7     ATTORNEY TALLA: Yeah.  11:13 is what I have.
8     (Recess taken from 11:13 a.m. to 11:26 a.m.)
9     ATTORNEY TALLA: So 11:26.  Great.
10  BY ATTORNEY TALLA:
11     Q.  So before the break, we were talking about the
12  bag-and-tag policy.  So I would just like to ask you
13  some more questions about the bag-and-tag policy.
14     In the bag-and-tag policy, is there a category
15  for items that can be discarded because they present an
16  immediate health or safety risk?
17     A.  Yes.
18     Q.  Okay.  And how do you identify those types of
19  items?
20     A.  Any soiled, damaged, drug paraphernalia, it
21  smells.
22     Q.  I think you talked about soils and drug
23  paraphernalia and smells.
24     A.  Mm-hmm.
25     Q.  Have you ever received training on how to

Page 70

1  identify drug paraphernalia?
2     A.  Yes.
3     Q.  Okay.  What kind of training was that?
4     A.  Through the tailgates -- through the safety
5  tailgate meetings we have and the bag-and-tag sheets
6  that we use.
7     Q.  What are the bag-and-tag sheets that you use?
8     A.  Well, the same ones from, like, the video, the
9  projector screens that, say, the City have for us.  You
10  know, there's pictures -- there's all kinds of different
11  pictures on there.
12     Q.  During some of the tailgates, you've seen
13  pictures of items that represent drug paraphernalia?
14     A.  Mm-hmm.
15     Q.  And are those the pictures that you use to
16  guide how you identify drug paraphernalia?
17     A.  Yes.
18     Q.  Okay.  Have you received any other kind of
19  training on identifying immediate health or safety
20  risks?
21     A.  Yes.  It's -- yeah.
22     Q.  What kind of trainings?
23     A.  Pretty much just the same thing.  It would be a
24  sheet with information about, you know, safety
25  equipment, you know, masks to wear, being cautious about

Page 71

1  entering tents, you know, and encampments.
2     Q.  Do those trainings discuss how to identify
3  something that is a health or safety risk?
4     A.  I'm pretty sure.
5     Q.  And are these trainings on the bag-and-tag
6  policy?
7     ATTORNEY MURPHY: Object to form.
8     THE WITNESS: If they're on the bag-and-tag policy?
9  BY ATTORNEY TALLA:
10     Q.  Let me repeat the question.
11     So the trainings that you've been discussing
12  that are sheets with information about safety equipment
13  or masks or entering tents or encampments, are those
14  trainings part of the training you receive on the
15  bag-and-tag policy?
16     A.  Yes.
17     Q.  Okay.  Is there a category for perishable items
18  as something that can be discarded under the bag-and-tag
19  policy?
20     A.  We don't keep perishable items.
21     Q.  Okay.  And what is a perishable item?
22     A.  Like food.
23     Q.  Are all kinds of food perishable items?
24     A.  I would think probably a canned food is
25  probably okay.

Page 72

1     Q.  And I think you testified before you have never
2  encountered canned food at a resolution.
3     A.  Mm.
4     (Reporter clarification.)
5     THE WITNESS: No.
6  BY ATTORNEY TALLA:
7     Q.  Is there a category for contraband or illegal
8  items that's something that can be discarded under the
9  bag-and-tag policy?
10     A.  Contraband and drugs?  Is that what --
11     Q.  Contraband -- contraband are illegal items.
12     A.  Oh, no.  If it's illegal items, then we let the
13  PD know, and they deal with it.
14     Q.  What are some examples of illegal items you've
15  encountered at resolutions?
16     A.  Knives, guns.
17     Q.  Anything else?
18     A.  Probably bicycles, stolen bikes, stolen
19  scooters, stolen work -- work tools from job sites.
20     Q.  And when you see something that you believe to
21  be stolen, how do you suspect that it's been stolen?
22     A.  You could tell, the cost of the item, the
23  scratched-out VIN numbers.  Yeah.
24     Q.  Do you bag and tag anything that you suspect to
25  be a stolen item?

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 73

1     ATTORNEY MURPHY: Object to form.
2     THE WITNESS: No. I just refer to the PD, or I just
3   stay out of it.
4   BY ATTORNEY TALLA:
5     Q.  Does the PD ever ask -- has the PD ever asked
6   you to bag and tag an item that you suspect to be
7   stolen?
8     A.  No, not that I recall.
9     Q.  Okay. Is there a category under the
10  bag-and-tag policy for something called bulky items?
11    A.  Mm-hmm. Yes.
12    Q.  And what are -- what do you consider to be a
13  bulky item?
14    A.  Furniture.
15    Q.  Anything else?
16    A.  No. Just furniture.
17    Q.  Okay. Can a bulky -- have you bagged and
18  tagged bulky items?
19    A.  No, not that I recall.
20    Q.  Could you, under the bag-and-tag policy, bag
21  and tag furniture?
22    A.  Yes.
23    Q.  Could you bag and tag a couch?
24    A.  I guess we can, but we don't -- we don't run
25  into that problem.

Page 74

1     Q.  Could you bag and tag a chair?
2     A.  Yeah, I guess.
3     Q.  Have you ever bagged and tagged a chair?
4     A.  A wheelchair.
5     Q.  What about an office chair?
6     A.  Not that I recall.
7     Q.  Could you bag and tag a table under the policy?
8     A.  Yes.
9     Q.  Have you bagged and tagged a table under the
10  policy?
11    A.  Not that I recall.
12    Q.  Okay. Could you bag and tag a mattress under
13  the policy?
14    A.  Mm-hmm.
15    Q.  Have you bagged --
16    A.  Yes.
17    Q.  Have you bagged and tagged a mattress under the
18  policy?
19    A.  No.
20    Q.  Have you discarded mattresses at encampments?
21    A.  Yes.
22    Q.  And why is that?
23    A.  Because they're soiled.
24    Q.  Have you ever bagged and tagged a stroller?
25    A.  Not that I recall.

Page 75

1     Q.  Have you bagged and tagged a cart?
2     ATTORNEY MURPHY: Object to form.
3     THE WITNESS: Yes, I have, a small cart.
4   BY ATTORNEY TALLA:
5     Q.  Have you ever bagged and tagged a large cart?
6     A.  No, not that I recall.
7     Q.  Have you ever encountered a large cart at an
8   encampment?
9     A.  Yes.
10    Q.  And what did you do with that large cart?
11    A.  Most likely, we discarded it.
12    Q.  And why did you discard it?
13    ATTORNEY MURPHY: Object to form.
14    THE WITNESS: Because nothing was inside of the cart
15  salvageable.
16  BY ATTORNEY TALLA:
17    Q.  Have you ever bagged and tagged a bike?
18    A.  Yes.
19    Q.  Are bikes considered bulky items under the
20  policy?
21    A.  I believe so.
22    Q.  How long does DPW store bulky items?
23    A.  I don't know.
24    Q.  Okay. Let me show you --
25    Oh, thank you.

Page 76

1     All right. So I'm going to mark, I guess,
2   another exhibit as 1122.
3     (Deposition Exhibit 1122 was marked for
4       identification.)
5   BY ATTORNEY TALLA:
6     Q.  Okay. Do you recognize the document that's
7   been marked as Exhibit 1122?
8     A.  Yes, I see it.
9     Q.  Have you seen this type of document before?
10    A.  Mm-hmm.
11    Q.  And is this a Homeless Property Information
12  Form?
13    A.  Yes.
14    Q.  Okay. Is this an example of a form that you
15  filled out yourself?
16    A.  Yes.
17    Q.  Okay. And is that your name towards the bottom
18  of the sheet, where it says "Picked up by"?
19    A.  Yes.
20    Q.  Is this your handwriting?
21    A.  Yes.
22    Q.  Okay. So you personally wrote the entries in
23  this form --
24    A.  Yeah.
25    Q.  -- is that right?

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 85

1    And the tag itself, does it come apart in
2  pieces?
3    A.  Yes, two pieces.
4    Q.  And what do you do with each piece?
5    A.  One piece goes -- stays with the items.  The
6  other half goes with this paper itself.  And I hand this
7  in to Special Projects supervisors.  They deal with it.
8    Q.  And this form I believe is a triplicate form;
9  is that right?
10   A.  Yes.
11   Q.  So at the very bottom, it says "White Page to
12  Log Book."
13      Do you know what that means?
14   A.  Yes.  That's the -- that's the intake form for
15  the Special Projects who deal with the bag-and-tags.
16   Q.  And is the intake form just the white page of
17  this Homeless Property Information Form?
18   A.  As I know.  This is all I know.  I don't know
19  what they do on the computer or anything.
20   Q.  Okay.  So when you're using the phrase "intake
21  form," you're just referring to this Homeless Property
22  Information Form?
23   A.  Intake form for...
24   Q.  Well, you just used the phrase "intake form."
25  So --

Page 86

1    A.  Okay.  Okay.
2    Q.  -- I'm just trying to understand.
3      Is that a different piece --
4    A.  Oh, okay.  No, no --
5      (Simultaneous speakers; reporter
6      clarification.)
7  BY ATTORNEY TALLA:
8    Q.  So you used the phrase "intake form."
9      So I'm trying to understand:  Is that the same
10  piece of paper, Exhibit 1122, or a different piece of
11  paper?
12   A.  No.  This is the only paper I know about.
13   Q.  And where it says "Yellow page to Radio Room,"
14  do you know what that refers to?
15   A.  Yes.  One -- the yellow copy of this, I hand it
16  to the Radio Room.
17   Q.  And the "Pink page to remain with items brought
18  in," does that refer to where you described earlier where
19  you place this piece of paper with the items in the
20  container?
21   A.  Yes.
22   Q.  Okay.  Now, I just want to make sure I
23  understand.
24      You take the white page to Special Projects,
25  and you take the yellow page to the Radio Room; is that

Page 87

1  right?
2    A.  Yes.
3    Q.  And the Radio Room is a physical room at the
4  DPW yard?
5    A.  Yes.
6    Q.  And where is Special Projects?
7    A.  Their office is -- they sit next to me,
8  actually.  Their office is next to mine.  So when I come
9  in at the end of the shift, I have the tag attached to
10  this paper, and I put it in their cubby hole, in their
11  box.  So that way, they -- and then they do whatever
12  they do after that.
13   Q.  Is your office and the Special Projects office
14  within an office building at 2323 Cesar Chavez?
15   A.  Yes.  Yeah.  Yes.
16   Q.  And the Radio Room is inside that building as
17  well?
18   A.  No.  It's in another building.
19   Q.  At 20 -- at --
20   A.  Yeah.  At --
21   Q.  -- that general location?
22   A.  Yes, yes.
23   Q.  Okay.  We're doing good, but just pause for one
24  second as I finish so the reporter can get us both down.
25   A.  Okay.

Page 88

1    Q.  Okay.  Thank you.
2      Give me one second.
3      Do you know what Special Projects does with the
4  white page once they get it?
5    A.  No.
6    Q.  Okay.  You can put that away for now.
7      Have you ever been at a resolution where an
8  unhoused person has accepted an offer of shelter?
9    A.  Yes.
10   Q.  Do you have any role in telling them how much
11  property they can take with them to shelter?
12   A.  No.
13   Q.  Have you heard other City workers discussing
14  with an unhoused person how much property they can take
15  with them to the shelter?
16   A.  No.
17   Q.  Do you have any idea how much property people
18  can take with them to a shelter?
19   A.  I heard it's two bags.
20   Q.  And have you ever encountered a situation at a
21  resolution where somebody had more than two bags of
22  property with them?
23   A.  No.
24   Q.  Okay.  Are you familiar with the term "special
25  needs" that appears in the bag-and-tag policy?

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 89

1  A.  No.
2  Q.  Have you ever determined that somebody you
3  encountered at a resolution has special needs?
4  A.  No.
5  Q.  Have you ever encountered someone at a
6  resolution who was in a wheelchair?
7  A.  Yes.
8  Q.  And did you do anything -- did you treat that
9  person differently than you would treat any other person
10  at a resolution?
11     ATTORNEY MURPHY: Object to form.
12     THE WITNESS: No.  I treat them with respect.
13  BY ATTORNEY TALLA:
14  Q.  Understood.
15     Did you give that person in the wheelchair any
16  additional time to move their items?
17     ATTORNEY MURPHY: Same objection.
18     THE WITNESS: Yes, most likely.  I understand they
19  can't move, you know, fast as everyone else.  So
20  we didn't -- I didn't help them get across the street
21  and move their items for them.
22  BY ATTORNEY TALLA:
23  Q.  Okay.  When was the last time you encountered
24  someone in a wheelchair at a resolution?
25  A.  A few months ago.  I don't recall the exact

Page 90

1  date.
2  Q.  Did that person say anything to you about, you
3  know, their physical condition or having a disability?
4  A.  Not that I recall.
5  Q.  Did they ask you for more time to move?
6  A.  No, not that I recall.
7  Q.  Did they ask you for more time to move their
8  items?
9     ATTORNEY MURPHY: Objection; asked and answered.
10     THE WITNESS: No.
11  BY ATTORNEY TALLA:
12  Q.  Have you ever encountered a situation at a
13  resolution where someone told you that they had a
14  disability?
15     ATTORNEY MURPHY: Same objection.
16     THE WITNESS: Not that I recall.
17  BY ATTORNEY TALLA:
18  Q.  In your bag-and-tag trainings that you've
19  attended, have you received any training about what the
20  term "special needs" means?
21  A.  No.  I don't believe I heard of that phrase.
22  Q.  Okay.  I'm going to show you an exhibit that's
23  already been marked as 1108.
24     ATTORNEY TALLA: So I don't know if you want to
25  remark it, but it's already been marked as a deposition

Page 91

1  exhibit.
2     (Previously marked Deposition Exhibit 1108 was
3     presented.)
4  BY ATTORNEY TALLA:
5  Q.  This is an Excel sheet, which is bag-and-tag
6  logs.
7     ATTORNEY MURPHY: Yeah.  This could be in my memory.
8  This feels like it has more pages that what I thought
9  Scout introduced as 1108.  But, like I said, it's been a
10  couple of days.
11     ATTORNEY TALLA: Well, I introduced -- so Scout
12  introduced probably something, and then I personally
13  introduced this on Tuesday.  Yeah.
14     ATTORNEY MURPHY: Would you mind giving me the Bates
15  number as a native, if you've got it?  If you don't,
16  don't worry about it.
17     ATTORNEY TALLA: I most certainly do have it.  I
18  just don't have it with me.
19     ATTORNEY MURPHY: I'll follow up.
20     ATTORNEY TALLA: Yeah, I will definitely send it to
21  you.
22     ATTORNEY FREEMAN: It was also referred to in the
23  other transcript if you can find it there.
24     ATTORNEY MURPHY: Yeah.  I will send an e-mail after
25  this.

Page 92

1     ATTORNEY TALLA: Yeah.
2  BY ATTORNEY TALLA:
3  Q.  So this document is an Excel sheet that are
4  bag-and-tag logs for the year 2024.
5     Have you ever seen this Excel sheet before?
6  A.  No.
7  Q.  Okay.  Did you have any role in creating this
8  Excel sheet?
9  A.  No.
10  Q.  Do you know who creates any sorts of
11  bag-and-tag logs for DPW?
12     ATTORNEY MURPHY: Object to form.
13     THE WITNESS: No.
14  BY ATTORNEY TALLA:
15  Q.  So you can put that aside for now.
16     Have you ever heard the term "reencampment
17  prevention"?
18  A.  No.
19  Q.  Have you ever worked on something called a
20  reencampment prevention?
21  A.  No.
22  Q.  Do you know what a JFO is?
23  A.  Not really.  I've heard of JFO, and I know they
24  do something with the homeless encampments.  But, you
25  know, it's a little different from our HSOC resolution.

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

---

Page 125

1  Plaintiffs had been receiving additional PRA requests
2  since the lawsuit has been ongoing.  The plaintiffs'
3  counsel represented earlier in the case that they were
4  no longer using the PRA process to get material.
5      ATTORNEY TALLA: Oh.
6      ATTORNEY MURPHY: So we can discuss this offline,
7  but I would appreciate a response from Plaintiffs in
8  terms of whether you're doing this, if you're directing
9  other people to do it, and making sure the City gets
10  whatever you receive from the PRA requests.
11      ATTORNEY TALLA: Sure.  Let's talk about it after
12  the deposition.  I don't want to --
13      ATTORNEY MURPHY: Yeah.
14      ATTORNEY TALLA: I don't want to indicate something
15  that's been happening --
16      ATTORNEY MURPHY: Yeah.
17      ATTORNEY TALLA: -- which is just my deposition
18  preparation --
19      ATTORNEY MURPHY: Understood.
20      ATTORNEY TALLA: -- personal deposition preparation.
21      (Mr. Freeman exits the proceedings.)
22  BY ATTORNEY TALLA:
23      Q.  So the -- okay.  So this service report, do you
24  see in the middle where it says "Crew Hours" just on the
25  very first page?

---

Page 126

1      A.  Oh.  Yeah.
2      Q.  It says "Crew Hours," and then it says "Israel
3  Graham" in the middle.
4      Do you see that?
5      A.  Yeah.
6      Q.  Is that an indication that you were the one who
7  completed the CMMS report?
8      A.  Yes.
9      Q.  Then under "Comments," do you see several
10  entries?
11      A.  Yeah.
12      Q.  And there are created dates under those
13  entries, correct?
14      A.  Yes.
15      Q.  And the date is May 29, 2024.
16      Do you see that?
17      A.  Yes.
18      Q.  Okay.  And so then there is some comments that
19  are created by something called HUB Integration.
20      Do you see that?
21      A.  Yes.
22      Q.  Do you know what HUB Integration is?
23      A.  No.
24      Q.  Okay.  And then do you see some "Created By"
25  and then they have "Israel Graham" written in there?

---

Page 127

1      A.  Yes.
2      Q.  Does that indicate that you created those
3  comments?
4      A.  Yes.
5      Q.  Okay.  And then under "Comments," the first
6  comment reads:  "Stevenson at 14th Street camp removal."
7      Do you see that?
8      A.  Yes.
9      Q.  And underneath that, another comment:  "Also,
10  Treat Street between 16th & 17th."
11      Do you see that?
12      A.  Yes.
13      Q.  And underneath that, it says:  "Folsom between
14  17th to 15th camp removal."
15      Do you see that?
16      A.  Yes.
17      Q.  Okay.  Are those all locations where you
18  removed encampments?
19      A.  Yes.
20      Q.  Okay.  Do you know whether this was an HSOC
21  resolution that occurred on this date?
22      A.  It should have been.  Yes, it says that at the
23  top.
24      Q.  And in advance of HSOC resolutions, there are
25  notices posted, correct?

---

Page 128

1      A.  Yes.
2      Q.  Do you know whether all of the locations in
3  which you removed encampments were listed on that
4  advanced notice?
5      A.  I don't recall.
6      ATTORNEY TALLA: Okay.  I'm going to mark something
7  as Exhibit 1128.  I actually do not have another copy,
8  but I think you can probably share.
9      ATTORNEY MURPHY: Does this have a Bates number?
10  Oh, I see.  This is the service -- yeah.
11      (Deposition Exhibit 1128 was marked for
12  identification.)
13  BY ATTORNEY TALLA:
14      Q.  Mr. Graham, what I presented you in
15  Exhibit 1128 are the locations that were covered by the
16  advanced notice of the HSOC resolution.
17      Do you see the locations on that e-mail?
18      A.  Yes.
19      Q.  Okay.  Now, if you look at Exhibit 1127, it
20  states that a camp removal occurred at Stevenson at 14th
21  Street, correct?
22      A.  Oh.  Where?  On which one?  On this one?
23      Q.  Exactly.
24      A.  Okay.  Mm-hmm.
25      Q.  Do you see that language, "Stevenson at 14th

---

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 129

1    Street camp removal"?
2      A.  Yes.
3      Q.  Okay.  And is Stevenson at 14th Street a
4    location that's listed on the notice in Exhibit 1128?
5      A.  No.  I don't see it.
6      Q.  And was that a routine occurrence when -- was
7    it a routine occurrence to remove encampments not listed
8    on the advanced notice?
9        ATTORNEY MURPHY: Object to form.
10       THE WITNESS: Repeat that question again.
11   BY ATTORNEY TALLA:
12     Q.  Sure.
13       Would you routinely remove encampments from
14   locations that were not listed in the advanced notice?
15       ATTORNEY MURPHY: Same objection.
16       THE WITNESS: I'm only -- I go where I'm told to go
17   or asked to go and...  Yeah.
18   BY ATTORNEY TALLA:
19     Q.  And who would have told you to go to that
20   location of --
21     A.  It was probably within --
22     Q.  Sorry.  I didn't actually finish the question.
23   Just wait one second so I can finish my question.
24       Who would have told you to go to that location
25   at Stevenson at 14th Street?

Page 130

1      A.  It would have been David or the incident
2    commander.
3      Q.  And the incident commander is somebody at SF
4    Fire Department?
5      A.  Yes.
6      Q.  And who would have told you to remove an
7    encampment at that location?
8      A.  Either David or -- or the SF -- or the incident
9    commander.
10     Q.  And was that a routine occurrence that David or
11   the incident commander would tell you to remove an
12   encampment at a location that was not contained on the
13   advanced notice?
14       ATTORNEY MURPHY: Object to form.
15       THE WITNESS: I don't know about a routine.  But,
16   you know, it's -- it's happened.
17   BY ATTORNEY TALLA:
18     Q.  How frequently does it occur?
19       ATTORNEY MURPHY: Same objection.
20       THE WITNESS: I don't know about -- I don't know.
21   BY ATTORNEY TALLA:
22     Q.  Does it occur more than once a week?
23     A.  No.
24       ATTORNEY TALLA: I'm going to show you a document
25   that I'll mark as...  1129?

Page 131

1        THE REPORTER: 1129, yes.
2        (Deposition Exhibit 1129 was marked for
3        identification.)
4        ATTORNEY TALLA: 1129.
5        And so I believe, Kaitlyn, that this comes from
6    the City's production, Bates stamp ending in -364131.
7        ATTORNEY MURPHY: Thank you.
8    BY ATTORNEY TALLA:
9      Q.  So, Mr. Graham, by looking at the middle of the
10   document, does this indicate to you that this is a CMMS
11   report that you created?
12     A.  Yes.
13     Q.  Okay.  And was this a Hot Spot resolution?
14     A.  I'm assuming.
15     Q.  Okay.  In the middle of this report, there is a
16   set of comments.  And the middle comment says:
17   "ENCAMPMENT...HOT SPOT team along with OUTREACH, MTA,
18   SFFD, SFPD, and EMT for services at and around location;
19   miscellaneous debris..."
20       Do you see that?
21     A.  Yes.
22     Q.  Okay.  Does that indicate to you that this was
23   a resolution?
24     A.  I mean, if we're here, it's a resolution.
25     Q.  That's because Hot Spot teams engage in

Page 132

1    resolutions, correct?
2      A.  Yes.
3      Q.  And then underneath that, there's a comment
4    dated July 9, 2024.
5        Do you see that?
6      A.  Yes.
7      Q.  And is that a comment that you inserted?
8      A.  Yes.
9      Q.  Okay.  And it says:  "Removed encampments on
10   Fern Alley, Cedar Alley, and Myrtle Alley between Polk
11   and Larkin Street."
12       Do you see that?
13     A.  Yes.
14     Q.  Do you recall what locations were listed in the
15   advanced notice for this resolution?
16     A.  No.  It's probably the Polk Street corridor,
17   which would clean all the alleys from -- from, like,
18   City Hall all the way up to California Street.
19       ATTORNEY TALLA: Okay.  I'm going to mark this as
20   Exhibit 1130.  Again, this one I only have one copy of,
21   but I will give this to you to share.
22       (Deposition Exhibit 1130 was marked for
23       identification.)
24   BY ATTORNEY TALLA:
25     Q.  So this e-mail lists the locations that were

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 137

1    ATTORNEY TALLA: Then let me mark as Exhibit 1132
2  this document.
3    (Deposition Exhibit 1132 was marked for
4    identification.)
5    ATTORNEY TALLA: Okay.  And so Exhibit 1132 --
6    Is that right, 1132?
7    THE REPORTER: Yes.
8  BY ATTORNEY TALLA:
9    Q.  Exhibit 1132 is the advanced notice for the
10 resolution that occurred on this date, August 6, 2024.
11    Do you see behind Best Buy and 16th and Folsom
12 on this advanced notice?
13    A.  No.
14    Q.  Did you decide to clean behind Best Buy and
15 16th and Folsom?
16    A.  No.
17    Q.  Did someone tell you to clean behind Best Buy
18 and 16th and Folsom?
19    A.  Most likely.
20    Q.  And who was that person?
21    A.  It will be the incident commander or Dave --
22 Dave -- Dave's department.
23    Q.  Dave's department, you said, correct?
24    A.  Yeah, the Department of Emergency.
25    Q.  Department of Emergency Management, correct?

Page 138

1    A.  Yeah, yeah.  Yes.
2    Q.  And as part of this CMMS report, there are a
3  number of pictures, correct?
4    A.  Yes.
5    Q.  Okay.  And according to this CMMS report, were
6  any of these items bagged and tagged?
7    ATTORNEY MURPHY: Object to form.
8    THE WITNESS: I can't -- I don't recall.  But by the
9  looks of the pictures, it looks pretty bad.  But, no, I
10 don't recall.
11 BY ATTORNEY TALLA:
12    Q.  And when you say "it looks pretty bad," what
13 are you referring to?
14    A.  Just all the debris outside on the sidewalk.
15    Q.  Do you see tents depicted in these photographs?
16    A.  I believe so.
17    Q.  And do you see carts depicted in these
18 photographs?
19    A.  No.
20    Q.  Okay.  I'm going to direct your attention the
21 page at the bottom that says page 2213.
22    Do you see that?
23    A.  Yeah.  Yes.
24    Q.  And there are five photographs on this page,
25 correct?

Page 139

1    A.  Yes.
2    Q.  Do you recognize this location?
3    A.  Yes.
4    Q.  Where is this location?
5    A.  Best Buy.
6    Q.  Is this behind the Best Buy?
7    A.  Yes.
8    Q.  Okay.  This area was not a location that had
9  advanced notice of an encampment removal, correct?
10    ATTORNEY MURPHY: Object to form.
11    THE WITNESS: I don't know.
12 BY ATTORNEY TALLA:
13    Q.  It certainly wasn't listed -- this location was
14 not listed on the notice that I showed you in Exhibit
15 1132, correct?
16    A.  Yeah.
17    Q.  It was not listed, correct?
18    A.  No.
19    Q.  Okay.  So now I'm going to play a video that
20 was produced to Ms. Murphy yesterday.
21    A.  Okay.
22    ATTORNEY MURPHY: I will note my same objection to
23 the use of Exhibit 1133 and concerns about the
24 timeliness of Plaintiffs' production.  I will allow the
25 witness to answer questions, but I hope it doesn't

Page 140

1  happen again.
2    ATTORNEY TALLA: All right.  You'll have to bear
3  with me because this is on my laptop.
4    And so I'm going to mark this exhibit as
5  Exhibit 1133.  I can follow up with you after this
6  deposition about how best to transfer it to make it part
7  of this record.
8    (Deposition Exhibit 1133 was marked for
9    identification.)
10 BY ATTORNEY TALLA:
11    Q.  But do you recognize, based on this initial
12 image of the video, what location this is?
13    A.  Best Buy.  Behind Best Buy.
14    Q.  Okay.  And I'll represent to you that this is a
15 video that was taken on August 6th, 2024.  I'm going to
16 try to make this a little bit brighter.
17    Okay.  Can you see that okay?
18    A.  Oh, yeah.
19    Q.  Okay.  All right.  I'm also going to try to
20 play this for you.  Let me play it through once, and you
21 can just watch it.
22    (Video played.)
23 BY ATTORNEY TALLA:
24    Q.  Okay.  So we just finished watching the video
25 one time through.

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 141

1    ATTORNEY MURPHY: Can I pause for a minute? Does
2  this video have sound?
3    ATTORNEY TALLA: It does. And I will play it with
4  sound, but --
5    ATTORNEY MURPHY: That's fine. I just want the
6  record to reflect the witness was allowed to watch the
7  video without sound.
8    ATTORNEY TALLA: Great.
9  BY ATTORNEY TALLA:
10    Q. Did you see yourself depicted in the video we
11  just watched?
12    A. Yes.
13    Q. And were you the person who was holding a red
14  shovel?
15    A. Yes.
16    Q. And did the video depict you and other DPW
17  workers removing things and placing them on a truck to
18  be discarded?
19    A. Yes.
20    Q. Did you decide when to begin discarding the
21  items at that location?
22    A. I don't recall.
23    Q. Would there have been any other person who
24  would have told you to begin discarding the items at
25  that location?

Page 142

1    A. Could have been Fire or the incident commander.
2    Q. Are there occasions in which the incident
3  commander tells you to begin discarding items at a
4  resolution?
5    A. No. We might talk about it and come up with a
6  time, a given time on top of the three-day notice that
7  they already had. They should have been moved. So by
8  that time we get there, it's like, okay, you guys might
9  have advanced notice, advanced time, you know.
10  Sometimes it could just be a simple debris removal also,
11  you know. And then the people can take whatever they
12  want.
13    Q. You've acknowledged that this particular
14  location was not part of the advanced notice locations?
15    ATTORNEY MURPHY: Object to form.
16    THE WITNESS: No, I don't -- I don't know. I was
17  just doing what I was asked.
18  BY ATTORNEY TALLA:
19    Q. And who asked you to clean at this location?
20    A. Most likely the incident commander or the
21  Department of Emergency.
22    Q. And did they tell you when to begin cleaning at
23  this location?
24    A. I don't recall.
25    Q. Okay. I'm going to play it with sound now

Page 143

1  and...
2    (Video played.)
3  BY ATTORNEY TALLA:
4    Q. So let me just pause it for a second. There's
5  a very high-pitched something happening there. So --
6    A. Mm-hmm.
7    Q. -- apologies. But also, try to listen because
8  there is sound. And I can get this closer to you.
9    A. Okay. Okay.
10    ATTORNEY MURPHY: Looks like it's buffering.
11    ATTORNEY TALLA: Yeah. Let me just know if it...
12    Did it stop?
13    THE WITNESS: It's buffering right now still. It's
14  buffering a couple of seconds.
15    (Video played.)
16  BY ATTORNEY TALLA:
17    Q. Okay. Thank you.
18    Do you recognize the other DPW workers in that
19  video?
20    A. Yes.
21    Q. Who are those people?
22    A. Herbert Ruth, Scott Branch, Daniel Trayer, and
23  Greg Shivers.
24    Q. And was there a woman there in the video?
25    A. Yes.

Page 144

1    Q. Okay. Was that woman asking to have her
2  belongings not discarded?
3    A. No, not that I know of.
4    Q. Did you hear her say, "I need that cart"?
5    A. Yes, I heard her say something about a cart.
6    Q. You heard her say --
7    A. Yeah. Yeah.
8    Q. -- "I need that cart," correct?
9    A. I heard her say something about a cart to move
10  some items.
11    Q. And was there any reason why she was not
12  allowed to keep that cart?
13    ATTORNEY MURPHY: Object to the form; misstates
14  testimony.
15    THE WITNESS: It could have -- possibly she already
16  had another cart.
17  BY ATTORNEY TALLA:
18    Q. Is there a policy or rule that says that if an
19  unhoused person has one cart, they can't have another?
20    A. No. But -- no, not that I know of.
21    Q. Did you see DPW workers placing a suitcase on
22  the back of the truck?
23    A. Yes.
24    Q. Okay. And was that suitcase discarded?
25    A. Most likely.

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 145

1    Q.  And why was that suitcase discarded?
2       ATTORNEY MURPHY: Object to form.
3       THE WITNESS: It was probably given consent to
4    discard.  Nobody was there.  I mean, the lady -- if it
5    was belonged to the lady or the lady wanted it, she
6    could have -- she could've took it.
7    BY ATTORNEY TALLA:
8       Q.  And if she was there asking for it, should she
9    have been given that suitcase?
10      ATTORNEY MURPHY: Object to form.
11      THE WITNESS: Well, she was there.
12   BY ATTORNEY TALLA:
13      Q.  And did she ask for the suitcase?
14      A.  Most likely no.
15      Q.  Did you see anything depicted in the video that
16   was a violation of the bag-and-tag policy?
17      ATTORNEY MURPHY: Object to form.
18      THE WITNESS: No.
19      ATTORNEY TALLA: Okay.  I'm going to mark this as
20   Exhibit 1133.
21      THE REPORTER: -34.
22      ATTORNEY TALLA: 1134, right.
23      (Deposition Exhibit 1134 was marked for
24   identification.)
25      ATTORNEY TALLA: So this one I believe comes from

Page 146

1    the City's production, document Bates stamp ending in
2    -365763.
3       ATTORNEY MURPHY: Thank you.
4    BY ATTORNEY TALLA:
5       Q.  So this is a Service Order Report that you
6    wrote, Mr. Graham, correct?
7       A.  Yeah.
8       Q.  Okay.  And it's dated August 19th, 2024,
9    correct?
10      A.  Yes.
11      Q.  Okay.  And then under "Comments," there is an
12   entry by you, August 19th, 2024, at 10:40 a.m., correct?
13      A.  Yes.
14      Q.  Okay.  So I'm just going to read that out loud.
15      "Hot Spot crew cleaned on Leavenworth from
16   Golden Gate to O'Farrell Street.  We also cleaned and
17   removed encampments from the cross streets of Ellis,
18   Eddy, and O'Farrell Street.  Homeless encampments are
19   moving their camps to the side streets when they see us
20   coming.  Mayor London Breed came out today to see the
21   HSOC resolution.  Mayor London Breed wanted the large
22   camp with all the carts removed from Ellis cross
23   Leavenworth Street.  Sam Dodge also let me know that she
24   wanted encampment removed.  Our crew broke down the
25   camp" -- I'm sorry -- "Our crew broke the camp down, and

Page 147

1    one guy left with one cart filled with five luggage
2    bags."
3       Do you see that?
4       A.  Yes.
5       Q.  Okay.  In this comment, you wrote that "one guy
6    left with one cart filled with five luggage bags,"
7    correct?
8       A.  Yes.
9       Q.  Would you routinely enter a comment when
10   people -- unhoused people left with their items?
11      ATTORNEY MURPHY: Object to form.
12      THE WITNESS: Now that I've been trying to be more
13   detailed in the comments section, I will, like, you
14   know, put down in the comments that, you know, people
15   took certain items, you know, and take pictures also of
16   the items that they took.
17   BY ATTORNEY TALLA:
18      Q.  Was there a time that you started becoming more
19   detailed in the information you entered into the comment
20   section?
21      A.  I don't know about a specific time.  But, you
22   know -- but I know we just have to be more, you know,
23   detailed in the -- with these resolutions.
24      Q.  Has anyone asked you to be more detailed in the
25   comments you put in your CMMS reports?

Page 148

1    A.  Yes, our -- my supervisors.
2       Q.  And that is currently Ms. Brandon, and before
3    that Mr. Dilworth, correct?
4       A.  Yes.
5       Q.  Okay.  Are you aware of whether or not the
6    locations that you removed encampments from on this date
7    were listed on the advanced notice for this resolution?
8       A.  Yes, it should have been.  We cleaned up --
9    normally we clean up Leavenworth from, say, Golden Gate
10   Street all the way up to O'Farrell.
11      Q.  And the side streets, were those included in
12   the resolution advanced notice?
13      A.  No.  I mean, if it's right there on the
14   corner -- you know, if it's right on the corner, that's
15   part of the resolution.
16      Q.  And if it's around the corner, do you remove an
17   encampment?
18      ATTORNEY MURPHY: Object to form.
19      THE WITNESS: Depends on how deep they are.  You
20   know, if it's down the middle of the block, probably
21   not, you know.  But if it's right there on the corner, a
22   few feet away, then probably yes.
23   BY ATTORNEY TALLA:
24      Q.  Okay.  So then your note says: "Mayor London
25   Breed came out today to see the HSOC resolution,"

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 157

1    produced yesterday.
2       ATTORNEY MURPHY: And same objection to the prior
3    photographs exhibits.
4          (Deposition Exhibit 1136 was marked for
5          identification.)
6    BY ATTORNEY TALLA:
7    Q.  Okay.  The first photograph depicts a tent,
8    correct?
9    A.  Mm-hmm.  Yes.
10   Q.  Okay.  And the second photograph depicts the
11   interior of the tent, correct?
12   A.  Yes.
13   Q.  And the third photograph depicts the interior
14   of a tent, correct?
15   A.  Yes.
16   Q.  Okay.  And the fourth picture depicts DPW
17   workers breaking down a tent, correct?
18   A.  Yes.
19   Q.  Do you recognize yourself in the fourth
20   photograph?
21   A.  Yes.
22   Q.  And which one are you?
23   A.  The one with the red hat.
24   Q.  I'm going to represent that this -- these
25   photographs were taken on December 9th, 2024.

Page 158

1       Do you recall breaking down this tent?
2    A.  Yes.
3    Q.  Did you look inside the tent before you broke
4    it down?
5    A.  Yes.
6    Q.  And what did you conclude about whether the
7    tent was attended or unattended or abandoned?
8    A.  I believe the tent was abandoned.
9    Q.  And what about the exterior or the interior of
10   the tent or any other circumstances led you to the
11   conclusion that it was abandoned?
12   A.  The tent was soiled.  It was sitting in urine.
13   There was drug paraphernalia on the inside, some
14   need- -- I believe there was a needle in there.
15   Q.  And according to your practice, you would have
16   taken photographs of those items that you just listed,
17   correct?
18   A.  Yes.
19   Q.  And then did you discard this item?  Did you
20   discard this tent?
21   A.  I'm pretty sure.
22   Q.  And did you discard the items inside the tent?
23   A.  Possibly.
24   Q.  Is there a possibility that you bagged and
25   tagged the items inside the tent?

Page 159

1    A.  Anything's possible.
2    Q.  If you had bagged and tagged the items inside
3    the tent, would you have created a CMMS report for that
4    bag-and-tag?
5    A.  I should have.
6       ATTORNEY TALLA: Okay.  I'm going to show you an
7    exhibit marked 1136.
8       THE REPORTER: -37.
9       ATTORNEY TALLA: I'm always one behind.  I'm sorry.
10   Okay.
11         (Deposition Exhibit 1137 was marked for
12         identification.)
13      ATTORNEY TALLA: For the record, I am handing
14   Mr. Graham an excerpt from an incident report.  The
15   incident report number is 230637231, and the Bates
16   numbers that are part of this Exhibit 1137 are a Bates
17   number ending in -198691 and -198692.  And there's some
18   redactions on the exhibit that I've provided to
19   Mr. Graham.
20   BY ATTORNEY TALLA:
21   Q.  Okay.  So, Mr. Graham, have you -- do you ever
22   receive copies of incident reports from the
23   San Francisco Police Department?
24   A.  No.
25   Q.  Okay.  So have you ever seen this type of

Page 160

1    document before?
2    A.  No.
3    Q.  So I'm going to start reading -- actually,
4    could you read through this incident report and let me
5    know when you've finished.
6    A.  Okay.
7       (Examines document.)
8       Okay.
9    Q.  Okay.  Great.
10      So I've redacted the name of the person who was
11   arrested.  But based on what you could read, do you know
12   who -- which person was arrested?
13   A.  Yes.
14   Q.  Okay.  Is that some person who has been known
15   to you in the past?
16   A.  Yes.
17   Q.  Have you had multiple encounters with that
18   person?
19   A.  Yes.
20   Q.  Okay.  And according to this narrative, it
21   states that -- and I can direct your attention to the
22   fifth paragraph from the top: "Graham also told me that
23   he advised (the arrested person) on Sunday, September
24   3rd, 2023, that DPW would be cleaning the area."
25      Do you see that?

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 165

1    (Deposition Exhibit 1138 was marked for
2    identification.)
3    THE WITNESS: (Examines document.)
4    ATTORNEY TALLA: Just let me know when you've
5    finished.
6    THE WITNESS: Okay.
7    ATTORNEY TALLA: In the meantime, for the record,
8    what I have presented is an excerpt from the
9    San Francisco Police Department Incident Report for
10   Incident No. 240286652. And the Bates numbers of the
11   marked exhibit are ending in -353600 and -353601.
12   THE WITNESS: (Examines document.)
13   Okay.
14   BY ATTORNEY TALLA:
15   Q. Okay. So the exhibit I've given you has the
16   name of the arrested person redacted.
17   But from reading this report, do you know who
18   it is?
19   A. No.
20   Q. Okay. So this is not somebody you have
21   regularly interacted with?
22   A. I most likely seen -- I see everybody. I've
23   been seeing them for years.
24   Q. Okay. So fair point.
25   From this report, you can't tell whether or not

Page 166

1    this is somebody you regularly interacted with?
2    A. No, not from that.
3    Q. Okay. And I want to take you to the third
4    paragraph from the bottom of the first page. So it
5    says: "While members of DPW were clearing out debris
6    within the above listed location, I overheard what
7    appeared to be a commotion at a green/gray tent. Upon
8    arrival, I observed a person, later identified as (the
9    arrested person), standing between DPW and disregarding
10   them from taking debris away."
11   Do you know whether you were the one who was
12   being prevented from coming into the tent?
13   A. No, I don't -- I don't recall.
14   Q. "It appeared (the arrested person) was agitated
15   and confrontational as she was holding onto a propane
16   tank in the right hand and (what appeared to be) a
17   red/black camping grill in the left."
18   Do you recall seeing a person holding those two
19   items?
20   A. No, I don't recall.
21   Q. "(The arrested person) standing outside of the
22   tent actively interfered with DPW by refusing to move
23   out of the way of DPW. Officer Huerta 4284 and I
24   addressed (the arrested person) while she stood outside
25   of the tent. Officer Huerta gave opportunity to (the

Page 167

1    arrested person) to move away from the tent
2    (de-escalation) in which she didn't. I gave warning to
3    (the arrested person) I will place her into handcuffs
4    should she not move. By (the arrested person) being in
5    a confrontational state, potentially using the propane
6    tank and grill as weapon(s), not moving out of the way
7    for DPW to conduct clean up, I grabbed (the arrested
8    person) by the jacket placing her left hand behind her
9    back to place her under arrest. (The arrested person)
10   was successfully placed into handcuffs by Officer Huerta
11   and (refer to Officer Huerta's statements for details)."
12   Were you the DPW workers who were -- were you
13   one of the DPW workers that this person interfered with?
14   A. Possibly, but I don't recall that -- I don't
15   recall that day or where we were -- where we were at.
16   Q. And, you know, from the rest of this report,
17   does it indicate to you whether you completed a
18   citizen's arrest form for this incident?
19   A. Yes.
20   Q. You did complete the citizen's arrest form for
21   this arrest, correct?
22   A. Yes.
23   Q. Okay. Have you signed citizen arrest forms for
24   incidents where you were not personally the DPW worker
25   who was being interfered with?

Page 168

1    A. No, not that I recall.
2    Q. Have any of the DPW workers you supervise
3    filled out citizen arrest forms for arrests that occur
4    at resolutions?
5    A. Not that I recall.
6    Q. If a person is arrested at an encampment
7    resolution for resisting, delaying, or obstructing DPW's
8    duties, is it routinely a supervisor who fills out the
9    citizen's arrest form?
10   ATTORNEY MURPHY: Object to form.
11   THE WITNESS: No. I think -- I've only been in a
12   couple of incidents with the citizen's arrest, and
13   normally it was me being involved in -- in the arrest.
14   BY ATTORNEY TALLA:
15   Q. Have you ever been at a resolution where it was
16   another DPW worker whose work was being interfered or
17   delayed with?
18   A. Not that I recall.
19   Q. And how many citizen arrest forms have you
20   completed?
21   A. Maybe two or three.
22   ATTORNEY TALLA: I'm going to mark another exhibit.
23   1138?
24   THE REPORTER: -39.
25   ATTORNEY TALLA: Oh, my gosh. Sorry. It's actually

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 169

1  just one page, then.
2       (Deposition Exhibit 1139 was marked for
3       identification.)
4       ATTORNEY TALLA: Just let me know once you've
5  finished reading it.
6       In the meantime, so Exhibit 1139 is an excerpt
7  from an incident report with Incident No. 240302866.
8  And the Bates number for the page that's been marked as
9  Exhibit 1139 is Bates stamp ending -353689.
10      THE WITNESS: (Examines document.)
11      Okay.
12 BY ATTORNEY TALLA:
13  Q.  Do you recall this incident, Mr. Graham?
14  A.  No.
15  Q.  Okay.  I'm going to take your attention towards
16 the bottom of the page, where it states:  "Department of
17 Public Works Supervisor Graham provided me with SR No.
18 2268050.  D.P.W. disposed of the structure per their
19 policy."
20      Do you see that?
21  A.  Yes.
22  Q.  According to this incident report, was anything
23 bagged and tagged by DPW?
24  A.  This was on Quesada Ave. at Griffith?
25 Quesada...  No.  I'm pretty -- no, I don't believe --

Page 170

1  don't believe so.
2  Q.  You don't believe anything was bagged and
3 tagged at this location on that date; is that right?
4  A.  May 14th.  Where's the location at?
5  Q.  So at the very top, I'm reading:  "Today's
6 encampment resolution was on Crisp Road between Palou
7 Avenue, Revere Avenue, Quesada, and Shafter between
8 Hawes Street and Revere Avenue and areas within a block
9 radius."
10  A.  No.  It's horrible back there.
11  Q.  What does that mean?
12  A.  It's -- it's bad.  It's messed up.  It's trash.
13 It's garbage.
14  Q.  So I just want to make sure I understand.
15      Are you saying that you don't think anything
16 was bagged and tagged at that location on this day?
17  A.  No, I know.  It's just -- it's a dumping
18 ground.  Nothing was bagged and tagged back there.
19  Q.  Okay.  And in fact, at least according to this
20 narrative, it says:  "D.P.W. disposed of the structure
21 per their policy."
22      Do you see that?
23  A.  Mm-hmm.
24  Q.  Okay.  So my question is why you would have
25 given SFPD an SR number to use in their incident report.

Page 171

1  A.  Because somebody was probably detained.  If
2 somebody is detained, then once that person gets
3 detained, say if they have a structure or tent or a
4 tarp, then it's up to us to bag and tag it; it's up to
5 our discretion.
6       So if I say, you know, it's good, we'll bag and
7 tag it.  If it's not good, then we discard it.  And with
8 that, we give them the SR number for -- you know, so
9 they -- if they need to ever go back, they can find it.
10  Q.  So DPW still provides the SR number even though
11 DPW doesn't ultimately bag and tag an item?
12  A.  Well, yes, because they were detained.  So I
13 believe they -- that's what they wanted.  They wanted
14 the SR number, so I gave it to them for that location.
15  Q.  Okay.  So there are some SR numbers where, in
16 fact, items were not bagged and tagged?
17  A.  Say that again.
18  Q.  Sure.
19      So I think what I'm understanding you say is
20 that SFPD on occasion will request from DPW an SR number
21 because they've detained somebody.
22  A.  Yes.
23  Q.  And at that point -- and DPW will give the SFPD
24 the SR number.
25  A.  Yes.

Page 172

1  Q.  And at that point, it becomes DPW's discretion
2 whether or not to bag and tag the item or dispose of it?
3  A.  Yes.
4  Q.  And on occasion, DPW will decide to, in fact,
5 dispose of it?
6  A.  Yes, or bag and tag it.
7  Q.  Or bag and tag it.
8  A.  Mm-hmm.
9  Q.  But is it fair to say that some SR numbers will
10 have bagged and tagged items and some SR numbers will
11 not, because in the second situation DPW has decided to
12 discard it?
13  A.  Well, no.  If I was bag-and-tagging it, I
14 was -- I would start a whole new SR number.
15  Q.  Okay.
16  A.  So I will give a bag-and-tag, you know, SR
17 number for the PD to give that person; they can track
18 their stuff down.
19      But probably this particular day, since I gave
20 them the SR number and nothing was bagged and tagged,
21 that's just him asking for the SR number regardless, you
22 know.  They just doing their part.  So...
23  Q.  So this SR number does not correspond to an
24 item that was bagged and tagged?
25  A.  No.  That's probably just an overall SR for the

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

Israel Graham
January 30, 2025

Page 173

1    day, for the HSOC location.
2        ATTORNEY TALLA: Okay. Very close to the end. I'm
3    going to mark this as Exhibit 1140.
4        (Deposition Exhibit 1140 was marked for
5        identification.)
6        THE WITNESS: Mm-hmm. All right. I remember.
7        ATTORNEY TALLA: Oh, sorry. And for the record,
8    this Exhibit 1140 is an excerpt from an incident report
9    for Incident No. 240352037. And the Bates numbers are
10   ending in -263492 and -263493.
11   BY ATTORNEY TALLA:
12   Q. Okay. Do you recall this incident, Mr. Graham?
13   A. Yes.
14   Q. Was this the incident where you were maced?
15   A. Yes.
16   Q. Okay. Was this the only time you were maced,
17   or have you been maced before while, you know,
18   performing your duties at DPW?
19   A. I probably been sprayed I believe in the past.
20   You know, a knife pulled out, guns, you know, dogs.
21   It's pretty dangerous out there, you know.
22   Q. And was this an incident where you told SFPD
23   that you wanted an individual arrested and to press
24   charges?
25   A. Yes.

Page 174

1    Q. Was there any other individual involved in this
2    incident who was arrested?
3    A. No. Just the girl, I believe.
4    Q. Can you describe to me what occurred in this
5    incident?
6    A. We were doing our cleanup or HSOC resolution.
7    And I moved down the street from one corner to the next,
8    and we were cleaning up, picking up furniture or just
9    picking up debris.
10       And I remember the lady, you know, talking --
11   you know, yelling and talking a bunch of stuff, calling
12   me all kind of names. And then she -- but I wasn't
13   even -- I wasn't arguing with her or anything like that.
14   She was just mad and irate because we was there
15   cleaning.
16       People just don't like it when we come around.
17   And then she sprayed me with mace, you know.
18   Q. And then what happened?
19   A. And then I took the mace can from her, and I
20   flagged the police and told the police to arrest her.
21   Q. Do you mind keeping your voice elevated a
22   little bit, just so I can hear?
23   A. Yes, yes, yes.
24   Q. Okay. So you took the mace can.
25       And I'm sorry. What happened after that?

Page 175

1    A. And I asked the police. And, you know, she
2    flopped on the ground and was yelling like I was
3    attacking her or something.
4    Q. Okay. And what happened after that?
5    A. The police arrested, put her in handcuffs.
6    Q. And then what happened after that?
7    A. We continued to clean up.
8    Q. Did you stay on the scene to continue to clean
9    up?
10   A. Yes.
11   Q. And did you seek any sort of medical assistance
12   or anything else, you know, any other type of assistance
13   for being maced?
14   A. No.
15   Q. Okay. So I just want to go back and ask a
16   couple of questions.
17       You said that the woman who was arrested was
18   talking.
19   A. Mm-hmm.
20   Q. What did she say?
21   A. "Leave, nigger," and a bunch of other
22   derogatory names or whatever, you know.
23   Q. Is there anything else she said?
24   A. Just a bunch of profanity.
25   Q. Did she say -- did she say anything about items

Page 176

1    that were on that scene?
2    A. Not that I could recall.
3    Q. Did she say that certain items that were in
4    that location were hers?
5    A. Yeah. They had already -- I remember they had
6    already -- they already cleaned up. We was there. This
7    was at the end of the shift. So, you know, they were
8    kind of all around in the area.
9        But they picked their stuff up, and they put --
10   I remember putting their furniture on top of the car.
11   They put a couch up on top of the car.
12       And by the time -- that was on one corner. And
13   then we went to the next corner to continue to clean up.
14   And they came down there to that corner and was just
15   talking a bunch -- a bunch of crap.
16       And she didn't want us -- she didn't -- she
17   just didn't want us to do our job. We couldn't -- we
18   couldn't even clean nothing up because she was just in
19   the way.
20   Q. So you said they had cleaned up.
21       Who was the "they"?
22   A. My crew, our crew.
23   Q. And you said something about furniture being
24   put on top of a car.
25   A. Mm-hmm.