# EXHIBIT 34

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

---

*Alvaro Castro*
*March 5, 2025*
*Confidential*

---

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 44192Castro_NL.txt

Min-U-Script® with Word Index

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

Page 13

1  A.  Once.
2  Q.  Once.  And when was that?
3  A.  Twice.
4  Q.  Twice?  I apologize.
5      When was that?
6  A.  Yesterday and day before.
7  Q.  And day before?
8  A.  Yes.
9  Q.  And how much time in total would you say you
10  spent with Ms. Murphy to prepare for this deposition?
11  A.  Off the clock, I don't remember.
12  Q.  Would you say less than three hours?
13  A.  Yes, less than three hours.
14  Q.  Did you review any documents in preparation for
15  today's deposition?
16  A.  No documents.
17  Q.  Did counsel -- did Ms. Murphy provide any
18  documents for you?
19  A.  No.
20  Q.  And did you review old emails or text messages?
21  A.  No, no.
22  Q.  Did you take any notes while you were preparing
23  for this deposition?
24  A.  No.
25  Q.  Other than Ms. Murphy and Mr. Baruth, did you

Page 14

1  communicate with anyone else to prepare for this
2  deposition?
3  A.  No.
4  Q.  Did you speak with anyone at the Department of
5  Public Works about this deposition?
6  A.  About this deposition, no.
7  Q.  You didn't inform anyone that you would be here
8  at a deposition today --
9  A.  No.
10  Q.  -- at the Department of Public Works?
11  A.  No.  They gave me a date to come here, yes.
12  Q.  So you spoke with someone about the fact that
13  you were --
14  A.  Yeah.  Kaitlyn had told me that my deposition
15  was today.
16  Q.  "They" meaning Ms. Murphy?
17  A.  Yeah.  Well, they.  When I say "they" -- so,
18  okay, how do -- you're correct -- your question, it was
19  what now?  Did I speak with anybody?
20  Q.  Don't worry, Mr. Castro.  I'll rephrase.
21      Did you speak with anyone at the Department of
22  Public Works to --
23  A.  Yes, yes, yes.
24  Q.  -- about this deposition?
25      Okay.  Who did you speak with?

Page 15

1  A.  My supervisors, that's who.
2  Q.  Anyone else?
3  A.  No.
4  Q.  And who are your supervisors?
5  A.  Her name is Britney.
6  Q.  Do you know her last name?
7  A.  No.
8  Q.  And what did you speak with Britney about
9  regarding --
10  A.  About my deposition.  She just let me know that
11  my deposition was today.
12  Q.  And did you speak about any details of the
13  deposition other than it being today?
14  A.  No.
15  Q.  Did you talk about what might be discussed at
16  the deposition today?
17  A.  No, no.
18  Q.  All right.  Mr. Castro, what is your current
19  position?
20  A.  I'm a general laborer for the Department of
21  Public Works.
22  Q.  And are you assigned to a particular crew as a
23  general laborer?
24  A.  Yes.  I'm with the Bureau of Service --
25  Environmental Services.

Page 16

1  Q.  Also known as BSES?
2  A.  BSES.
3  Q.  And are you assigned to something called the
4  HOT Spot crew?
5  A.  Yes.  I'm with the HOT Spot crew.
6  Q.  What is the HOT Spot crew?
7  A.  We deal with encampments.  We go to different
8  spots in the city, taking down encampments with trash,
9  just trash.
10  Q.  When you say "encampments," what do you mean?
11  A.  An encampment is a homeless -- like a homeless
12  structure.
13  Q.  On the street?
14  A.  Yes.
15  Q.  And how long have you held this position with
16  the HOT Spot crew?
17  A.  I've been there for about a little over a year.
18  Q.  And what was your occupation before that?
19  A.  A union ironworker.
20  Q.  And did you work for the City?
21  A.  Not for the City, for a union.  International.
22  Q.  And what was it called?
23  A.  Excuse me?
24  Q.  Your --
25  A.  The local?

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

Page 17

1 Q.  -- place of employment before this.
2 A.  Local 377, Barneveld Street.
3 Q.  What are your duties -- what are your current
4 duties and responsibilities as a general laborer?
5 A.  General laborer.  We do a lot.  It's a lot.
6 You want me to highlight some for you?
7 Q.  Please.
8 A.  Yeah.  We just go throughout the city,
9 maintaining the city.
10 Q.  What's an example of maintaining the city?
11 A.  Garbage, trash, cleaning.
12 Q.  And when you say "cleaning," you also mean
13 cleaning homeless encampments?
14 A.  Encampments, streets.
15 Q.  So would you say that you have a role in the
16 city's response to homelessness?
17 A.  Of course.
18 Q.  And do you have a role in what are called HSOC
19 encampment resolutions?
20 A.  Yes.
21 Q.  You understand what I mean by HSOC?
22 A.  Yes.
23 Q.  How many encampment -- HSOC encampment
24 resolutions would you say you've participated in?
25 A.  50.

Page 18

1 Q.  Possibly more?
2 A.  Possibly, yes.  I figure one a day.
3 Q.  That's just a guess?
4 A.  Not a guess.  Just an estimate.
5 Q.  One a day?
6 A.  One a day, possibly two.
7 Q.  For the past year?
8 A.  Possibly two, yes.
9 Q.  One a day, possibly two for how long?
10 A.  For the average, about a year.
11 Q.  For about a year?  So --
12 A.  We do two a day, but for numbers right now
13 it's --
14 Q.  And do you --
15 A.  -- minimum 50.
16 Q.  Minimum 50.  Thank you.
17     And do you have a role in something called JFO
18 operations?
19 A.  No.
20 Q.  Do you understand what I mean by JFO
21 operations?
22 A.  Yes.
23 Q.  What are JFO operations?
24 A.  JFO, that's a different crew.  Yeah, I'm the
25 DPW.

Page 19

1 Q.  And do you understand what that crew does?
2 A.  I don't know what they do.
3 Q.  Do you have a role in something called
4 re-encampment preservation?
5 A.  No.
6 Q.  Have you ever heard the phrase "re-encampment
7 prevention"?
8 A.  (Witness shakes head.)
9 Q.  What about routine encampment cleaning?
10 A.  Yes.
11 Q.  What does routine encampment cleaning refer to?
12 A.  To me that sounds like it's cleaning the
13 encampments, making sure that they're -- when you go
14 back to them that they stay clean.
15 Q.  So re-encampment cleaning is when you return to
16 an encampment after cleaning it up; is that right?
17 A.  It sounds like it, yes.
18 Q.  And have you participated in those activities?
19 A.  No, I haven't done one.
20 Q.  You've never returned to an encampment --
21 A.  Oh, yes, I have.
22 Q.  -- following a resolution?
23 A.  I take that back.
24 Q.  You have?
25 A.  Yes.

Page 20

1 Q.  And is that what you're referring to by
2 encampment -- sorry -- by routine encampment cleaning?
3 A.  Yes.
4 Q.  How often do you participate in routine
5 encampment cleaning?
6 A.  I can't give you an exact number.  I can't
7 remember.
8 Q.  Would you be able to tell me how many times a
9 week you participate in routine encampment cleaning?
10 A.  Once every two weeks.
11 Q.  Are you familiar with the DPW bag and tag
12 policy?
13 A.  Yes.
14 Q.  And does the DPW bag and tag policy apply to
15 your work as part of the HOT Spot crew?
16 A.  Yes.
17 Q.  How many days a week do you work, Mr. Castro?
18 A.  Five.
19 Q.  And which days are those?
20 A.  Tuesday [sic] through Friday.
21 Q.  And do you have a specific shift in terms of
22 time?
23 A.  4:00 to 1:00.  4:00 a.m. to 1:00 p.m.
24 Q.  So you have to arrive at work at 4:00 a.m.?
25 A.  (Witness nods head.)

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

Page 21

1  Q.  Where do you check in at 4:00 a.m. for your
2    shift?
3  A.  Department of Public Works.
4  Q.  Is that at the yard?
5  A.  At the yard.
6  Q.  And do you have to go back to the yard when you
7    check out of your shift at 1:00 p.m.?
8  A.  Yes, yes.
9  Q.  Every time?
10  A.  Every day, yes.
11  Q.  What happens if there's still work to do at the
12    end of your shift?
13  A.  I haven't been in that situation.
14  Q.  Earlier you mentioned Britney as your
15    supervisor?
16  A.  Yes.
17  Q.  Do you have more than one supervisor?
18  A.  Yes.
19  Q.  Who are your other supervisors?
20  A.  His name's Israel.
21  Q.  Israel Graham?
22  A.  Yes.
23  Q.  Do you have any other supervisors?
24  A.  Supervisors, those are the main two.
25  Q.  And how often do you meet with Britney?

Page 22

1  A.  Every day.
2  Q.  Do ever discuss compliance with City
3    policies with Britney?
4  A.  City policies?
5  Q.  Yes.
6  A.  Yes.
7  Q.  What kinds of City policies?
8  A.  Our morning tailgates, just our routine, our
9    daily routines, what we're going to do for the day, what
10    we're going to do for the week.  Yeah, tailgate.  We
11    have a tailgate once every week.
12  Q.  And that's a -- is tailgate a meeting?
13  A.  Yes.
14  Q.  Do you ever discuss the bag and tag policy with
15    Britney at meetings?
16  A.  Yes.
17  Q.  What do you discuss about the bag and tag
18    policy?
19  A.  We discuss the new updates, the new -- what's
20    going on, what's in, what's out, what we can do, what we
21    can't do.
22  Q.  And how often would you say you discuss the bag
23    and tag policy with Britney?
24  A.  For the past two months we've been doing them a
25    lot lately.

Page 23

1  Q.  By "a lot" would you say multiple times a week?
2  A.  Multiple times, yes.
3  Q.  So if you have questions about the bag and tag
4    policy, would you bring those to Britney?
5  A.  Yes.
6  Q.  And if Britney provided you some direction on
7    how to implement the bag and tag policy, would you carry
8    out her instructions?
9  A.  Of course, yes.
10  Q.  Do you ever discuss compliance with City
11    policies with Israel Graham?
12  A.  Yes.
13  Q.  And by "policies" what do you mean?
14  A.  Policies, the policy on the bag and tag, the
15    updates, what we can do, what we can't do, what we can
16    throw away, what we can't touch, when to touch it, when
17    not to touch it, what we can touch.
18  Q.  And if you have questions about the bag and tag
19    policy, can you ask Israel about them?
20  A.  Of course, yes.
21  Q.  And how often would you say you discuss the bag
22    and tag policy with Mr. Graham?
23  A.  Every day.
24  Q.  And if Mr. Graham provides you direction on the
25    bag and tag policy, would you carry out his

Page 24

1    instructions?
2  A.  Yes.
3  Q.  Now, you mentioned tailgate meetings.  Are
4    those the meetings that happen every day?
5  A.  Once a week.
6  Q.  Once a week.  Okay.  But you have other
7    meetings every day where you discuss the bag and tag
8    policy?
9  A.  Yes -- no.  We have a meeting every day where
10    we're going to our route, what our operation for the day
11    is.
12  Q.  And does that happen at the start of your
13    shift?
14  A.  Yes.
15  Q.  And who's there at that meeting?
16  A.  The crew.
17  Q.  And who's the crew?
18  A.  Who is on our crew?
19  Q.  Yes.
20  A.  Me, Britney, Israel, Anthony, Esteban, Scotty.
21    That's six.  Daniel and a man named Herman.
22  Q.  Sorry.  I didn't hear the last one.
23  A.  Herman and Herb.  That's seven.
24  Q.  Those are two different people?
25  A.  Yeah.  Herman and Herb.

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

---

Page 29

1  Q.  Do you remember the last time you discussed the
2     bag and tag policy at a tailgate meeting?
3  A.  Yeah.  Last Tuesday -- well, I've been on
4     vacation, so the last day I was at work.
5  Q.  And when was that?
6  A.  I don't have my calendar with me.
7  Q.  But you'd say about a week ago or so?
8  A.  About a week ago.
9  Q.  And what did you discuss about the bag and tag
10    policy a week ago at a tailgate meeting?
11 A.  Just new updates on what has changed and what
12    we can and can't do.
13 Q.  Do you remember any of those updates from last
14    week?
15 A.  Yeah.  Let's see.  Let me think.  Let me see
16    what was discussed.
17       Bag and tag policies, procedures.  Yeah, just
18    don't -- we have to wait for the police to clear
19    everybody out and we take the trash.
20 Q.  And did you discuss any other procedures other
21    than waiting for the police --
22 A.  I can't remember right now.
23 Q.  Have you ever reviewed a PowerPoint
24    presentation regarding the bag and tag meeting --
25    regarding the bag and tag policy at a tailgate meeting?

---

Page 30

1  A.  A PowerPoint, we've had one, yes.  We've had
2     two or three of them since I've been there.
3  Q.  Two or three different PowerPoints?
4  A.  Yeah, different ones.
5  Q.  And those were discussed at tailgate meetings?
6  A.  It's not a tailgate, just like a general
7     meeting, a safety meeting.
8  Q.  Safety meeting?
9  A.  (Witness nods head.)
10 Q.  Would you think of that as a training meeting?
11 A.  Yeah, training of some of the policies.
12 Q.  And when was the last time that you --
13 A.  I'd say probably -- that was with the main --
14    with our main -- with one of our main supervisors.
15 Q.  And when would you say, you know, in terms of
16    time, when was the last time you --
17 A.  Less than a month ago.  About three weeks ago.
18 Q.  That you saw a PowerPoint --
19 A.  A PowerPoint.
20 Q.  -- at the training?
21 A.  Yes, two weeks ago.
22 Q.  Two weeks ago?
23 A.  Two to three weeks ago, yes.
24 Q.  Okay.  And when was -- do you recall when was
25    the last time before that that you reviewed a PowerPoint

---

Page 31

1     at a safety meeting?
2  A.  Between like three and four weeks, yeah, a
3     PowerPoint.
4  Q.  Okay.  And when discussing the bag and tag
5     policy at these training meetings, did you discuss
6     anything more than the PowerPoint presentation?
7  A.  Bag and tag.
8  Q.  Did you discuss bag and tag other than going
9     through the PowerPoint presentation?
10 A.  No.  Just bag and tag.  It was under the
11    PowerPoint.  Bag and tag, that's it.
12 Q.  So you only discussed -- just to clarify,
13    Mr. Castro, you only discussed bag and tag policy by
14    going through the PowerPoint; is that right?
15 A.  Yes.
16 Q.  And did somebody actually present the
17    PowerPoint?
18 A.  Yes.
19 Q.  And who was that person?
20 A.  Our supervisor, our superintendent.
21 Q.  And who is that?
22 A.  Well, there was three.  There was like -- it
23    was a crew.  I don't remember their names, but I
24    remember our superintendent was one of them.
25 Q.  And who was your superintendent?

---

Page 32

1  A.  I think his name's Jonathan.
2  Q.  Jonathan?  Could it be Jonathan Vaing?
3  A.  Yeah, that's him.
4  Q.  Now, you've mentioned that you've seen the
5     PowerPoint more than once.  Do you recall if the
6     PowerPoint was different --
7  A.  I can't remember.
8  Q.  -- on any of those occasions?
9       MR. BARUTH: Just wait for him to finish the
10    question, if you don't mind.  Thanks.
11      MR. PRASAD: I'll just ask it again.
12      MR. BARUTH: Sorry.
13      BY MR. PRASAD:
14 Q.  No problem, Mr. Castro.
15      Do you recall if there had been any changes
16    made to the PowerPoint presentation the last time that
17    you saw it from the prior time?
18 A.  I can't remember.
19 Q.  Now, when you've discussed the bag and tag
20    policy at these training meetings that we've been
21    discussing, do you discuss any concerns that DPW workers
22    have about the policy?
23 A.  Do I discuss any concerns?
24 Q.  Have they been discussed at those meetings?
25 A.  Not with me.

---

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

Page 33

1  Q.  Has anyone raised -- anyone at those meetings
2      raised concerns about the bag and tag policy?
3  A.  Not with me.
4  Q.  Have they raised -- has anyone at those
5      meetings asked questions about the bag and tag policy?
6  A.  Not with me.
7  Q.  What about with their supervisors that you
8      observed?
9  A.  I don't know.  Possibly.
10 Q.  You've never seen anyone ask questions about
11     the bag and tag policy at those meetings; is that right?
12 A.  At the meetings, yes, that's right.
13 Q.  Have you ever asked any questions about the bag
14     and tag policy at those meetings?
15 A.  Other than me being trained on how to do the
16     bag and tag policy, no.
17 Q.  And while being trained, had you asked any
18     questions about the policy?
19 A.  Yes, I have.
20 Q.  Okay.  And what questions have you asked?
21 A.  Just different tags, like, where different
22     documents go on different items of the bag and tag.
23 Q.  Do you remember exactly -- if you could
24     remember as close as possible what question that you
25     asked, what was it?

Page 34

1  A.  Yeah.  My question was where the documents go.
2  Q.  And what are you referring to when you mean
3      "the documents"?
4  A.  Documents.  Well, when we bag and tag a
5      personal belonging, there's different tags that go to
6      different places.  So that's one of my -- I asked one of
7      those questions.
8  Q.  So you asked a question about where those
9      documents go?
10 A.  (Witness nods head.)
11 Q.  And those documents being the tags themselves
12     or other documents?
13 A.  Just those tags.
14 Q.  So you asked a question about where the tags
15     go; is that right?
16 A.  (Witness nods head.)
17 Q.  Did you hear anyone else ask a question at the
18     same meeting?
19 A.  No.
20 Q.  And did you ask --
21 A.  It wasn't never at a meeting.  It was just
22     at -- it was actually doing a bag and tag.
23 Q.  So during a bag and tag you asked a question?
24 A.  It was during a bag and tag, yes.
25 Q.  Have you ever asked any other questions during

Page 35

1      a bag and tag about what to do at a certain time?
2  A.  Oh, yes.
3  Q.  So what kind of questions do you ask?
4  A.  If it's garbage, if it's not garbage.
5  Q.  And who do you ask those questions?
6  A.  Supervisors.
7  Q.  So who would that be?  Mr. Graham?
8  A.  Mr. who?
9  Q.  Israel Graham?
10 A.  That's his last name, yes.  Israel and Britney.
11 Q.  Israel and Britney, you have asked them other
12     questions?
13 A.  Other questions during a bag and tag or during
14     a cleanup?
15 Q.  When you say during a bag and tag, what do you
16     mean?
17 A.  When I say during a bag and tag, we do the bag
18     and tag only if we're going to take their items or throw
19     them or not throw them away, just take their items for
20     that situation.
21 Q.  So let's break this up a little bit.
22 A.  Yeah.
23 Q.  When you're doing a bag and tag --
24 A.  Yes.
25 Q.  -- we just discussed that you've asked a

Page 36

1      question about where the documents go?
2  A.  Yes.
3  Q.  What other questions have you asked during a
4      bag and tag?
5  A.  Like what is garbage and what is not.
6  Q.  And then your supervisor, whether it's Britney
7      or Israel, they would tell you whether an item is
8      garbage or not?
9  A.  Yes.
10 Q.  And you would follow their instructions?
11 A.  Yes, but sometimes it could be confusing.  It
12     could look like garbage but it could not be garbage.  It
13     could be just unattended property.
14 Q.  So could you give me an example of a time when
15     something looked like garbage but it was unattended
16     property?
17 A.  Yes.
18 Q.  What would be that example?
19 A.  Well, let's see.  A man had a bike and I
20     thought it was garbage and it wasn't.  It was property.
21 Q.  Why did you think it was garbage?
22 A.  So we bagged and tagged it months ago.
23 Q.  Why did you think it was garbage, the bike?
24 A.  Well, it was missing, like, a chain on it.
25 Q.  And how did you end up concluding that it

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

Page 37

1  wasn't garbage?
2  A.  Well, when he came back for it.
3  Q.  And did you ask your supervisors any questions
4    during this incident?
5  A.  Yeah.  I said, "Can I throw this away?"
6      He said, "No, give it back."
7  Q.  And why did they instruct you to give it back?
8  A.  'Cause it was not garbage.
9  Q.  And the man whose bike it was, was he there at
10   the time?
11  A.  No.  He came back.
12  Q.  He came back when you were there?
13  A.  Yeah.  He came back while we were taking down
14   his encampment.
15  Q.  And he claimed the bike?
16  A.  He claimed it.
17  Q.  And if that man hadn't come back, what would
18   you have done with the bike?
19  A.  If he hadn't come back?
20  Q.  Yeah.
21  A.  We would have thrown it away.
22  Q.  Because of the broken chain?
23  A.  Yes.
24  Q.  You used the phrase "attended property" just
25   now; is that right?

Page 38

1  A.  (Witness nods head.)
2  Q.  What does that mean?
3  A.  Unattended property?
4  Q.  You said attended; right?
5  A.  I said unattended.
6  Q.  You said unattended.  Okay.
7      What does it mean, unattended?
8  A.  Unattended is a structure that looks like it's
9    been lived in.
10  Q.  You call that unattended property?
11  A.  Unattended.
12  Q.  In this case why did you think the bike was
13   unattended property before the man came back to claim
14   it?
15  A.  It was in feces, it was in garbage, there was
16   trash around it, there was needles all around it.
17  Q.  So you thought it was unattended because of --
18  A.  Oh, and it had a flat tire.
19  Q.  So you thought it was unattended because it was
20   dirty, Mr. Castro?
21  A.  It looked like garbage.  It looked like trash.
22  Q.  Mr. Castro, this is just for the purpose of the
23   record.  I'd just ask you to wait until I finish asking
24   a question.  We can take it slow.  That's perfectly
25   okay.

Page 39

1      So is it your understanding that unattended
2    property that's dirty should be trashed according to the
3    bag and tag policy?
4      MR. BARUTH:  Vague and ambiguous.
5      You can go ahead.
6      THE WITNESS:  Say that again.
7      BY MR. PRASAD:
8  Q.  Yeah.  We were talking about this example with
9    the bike; correct?
10  A.  (Witness nods head.)
11  Q.  Okay.  And correct me if I'm wrong, but you
12   said that until the man came to claim the bike, you were
13   planning on trashing it; is that right?
14  A.  (Witness nods head.)
15  Q.  And you were planning on trashing it because it
16   was dirty and it had a broken chain; is that correct?
17      MR. BARUTH:  Misstates prior testimony.
18      THE WITNESS:  Yes, it had a broken chain, but
19   it was in feces.  It was around -- it was like in an
20   area where there was garbage there.  That's what I'm
21   trying to say.
22      BY MR. PRASAD:
23  Q.  And so --
24  A.  It was garbage.
25  Q.  -- because it was in garbage and there were

Page 40

1    feces present, until the man came to claim it, you were
2    planning to throw the bike away; is that right?
3  A.  (Witness nods head.)
4  Q.  And is that your understanding of how you're
5    supposed to implement the bag and tag policy when an
6    item has feces or is broken?
7  A.  Well, that's to our discretion, yes.
8  Q.  To your discretion?
9  A.  Yeah.
10  Q.  What do you mean by that?
11  A.  If I think it's garbage, to throw it away.
12  Q.  Now, earlier, Mr. Castro, we discussed the
13   concept of HSOC resolutions.  Do you recall that?
14  A.  Yes.
15  Q.  And you mentioned that your crew attends HSOC
16   resolutions; is that correct?
17  A.  (Witness nods head.)
18  Q.  How would you describe your crew's
19   responsibilities at an HSOC resolution?
20  A.  Our responsibilities?
21  Q.  Yes.
22  A.  How would I what?
23  Q.  Describe what your responsibilities are, your
24   crew's responsibilities are at HSOC.
25  A.  Trash, to throw away garbage.

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

---

Page 45

1  Q.  To your knowledge, is it part of Israel's
2  responsibilities to take that picture at every
3  resolution?
4  A.  At every resolution?  When there's a bag and
5  tag, yes.
6  Q.  And to your knowledge, is it Britney's -- part
7  of Britney's responsibilities --
8  A.  Yes.
9  Q.  -- to take a picture of the notice at --
10  A.  Yes.
11  Q.  -- a resolution?
12  A.  Yes.
13  Q.  Have you ever had an unhoused person at an
14  encampment tell you that they didn't receive notice?
15  A.  That they didn't receive notice?  Not to me.
16  Q.  Have you ever overheard an unhoused person
17  saying that they did not receive notice?
18  A.  No.
19  Q.  Have you ever heard an unhoused person complain
20  that there had been no notice for the resolution?
21  A.  No.
22  Q.  Now, when you arrive at the site of a
23  resolution, how much time are unhoused people given to
24  leave the area?
25  A.  As long as it takes.

---

Page 46

1      MR. BARUTH: May call for speculation.
2      BY MR. PRASAD:
3  Q.  You can answer.
4  A.  As long as it takes.
5  Q.  What do you mean by "as long as it takes"?
6  A.  As long as it takes for them to gather up their
7  belongings and leave.
8  Q.  Is there a time limit that's ever given to
9  them?
10  A.  I don't know.  I've never timed it.
11  Q.  Are they ever told that they should clean up
12  within a certain amount of time?
13  A.  Oh, you know, I have heard the San Francisco
14  Public -- the police department tell them, hey, you got
15  10 minutes or, hey, you got 20 minutes, 15 minutes,
16  we'll give you five minutes, yes.
17  Q.  So is it your experience that usually it's the
18  SFPD that tells unhoused people how much time they have?
19  A.  Yes.
20  Q.  And that's usually somewhere between five and
21  15 minutes?
22  A.  I don't know --
23      MR. BARUTH: May call for speculation.
24      THE WITNESS: I don't know what "usually" is.
25          ---o0o---

---

Page 47

1      BY MR. PRASAD:
2  Q.  What you've heard.
3  A.  I've heard them say that before.
4  Q.  You've heard them say five minutes before?
5  A.  Ten, five, yes.
6  Q.  Have you ever heard them say more than
7  30 minutes?
8  A.  Not 30.  I haven't heard them say 30 minutes.
9  Q.  You haven't heard them say 30 minutes?
10  A.  (Witness shakes head.)
11  Q.  So do you believe that it's SFPD who decides
12  how much time people have to leave the area?
13  A.  Yes.
14  Q.  Do Israel and Britney ever decide how much time
15  people have to leave the area?
16  A.  I don't think so.  I haven't heard them say
17  that.
18  Q.  Have you ever heard Israel or Britney telling
19  unhoused people how much time they have to leave the
20  area?
21  A.  No.
22  Q.  What happens if a person needs more time than
23  what the SFPD has given them?
24      MR. BARUTH: May call for speculation.
25      THE WITNESS: We give them time.  We give them

---

Page 48

1  all the time they need.
2      BY MR. PRASAD:
3  Q.  "We" meaning DPW?
4  A.  Yes.
5  Q.  What about the police department?  What do they
6  do when the time's expired?
7      MR. BARUTH: Calls for speculation.
8      THE WITNESS: I don't know exactly what they
9  do.
10      BY MR. PRASAD:
11  Q.  Have you received training or instructions
12  relating to how to deal with people at encampments with
13  special needs?
14  A.  Special needs?
15  Q.  Do you understand what I mean by "special
16  needs"?
17  A.  No.
18  Q.  Have you ever received training or instructions
19  related to people at -- dealing with people at
20  encampments who have disabilities?
21  A.  I don't know.
22  Q.  You've never received that training?
23  A.  I didn't say that.  I said I don't know.
24  Q.  Meaning you don't remember?
25  A.  I don't know the question.  Like what kind of

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

---

Page 49

1  disabilities?
2  Q.  Have you ever been given specific guidance
3  about how to work with people who have disabilities at
4  an encampment resolution?
5  A.  What do you mean?
6      MR. BARUTH: Vague and ambiguous.
7      THE WITNESS: What do you mean by a disability?
8      BY MR. PRASAD:
9  Q.  Physical disabilities, for example.
10  A.  Oh, physical disabilities?
11  Q.  Yes.
12  A.  I haven't ran across that one.
13  Q.  You've never been given training on that?
14  A.  What would the question be?  The policies?
15  Q.  My question, Mr. Castro, is:  Have you ever
16  received training or guidance that tells you any special
17  rules or procedures to use --
18  A.  Special?
19  Q.  -- when you encounter people with disabilities
20  at HSOC resolutions?
21  A.  I haven't encountered, no.  I'd say no.
22  Q.  Now, we were just earlier talking about people
23  giving -- being given a certain amount of time to pack
24  up; is that correct?
25  A.  Yes.

---

Page 50

1  Q.  And what happens once that time is over?
2      MR. BARUTH: May call for speculation.
3      THE WITNESS: When that time is over, they
4  leave and we go through their trash and figure out
5  what's trash and not and throw it away.  Just the trash.
6      BY MR. PRASAD:
7  Q.  So that's when you evaluate the items that are
8  present on the street to determine if they're trash or
9  not?
10  A.  No.  It is trash.  It's trash.
11  Q.  The items on the street?
12  A.  That they don't come claim and take, that's
13  trash.
14  Q.  So when the unhoused people leave the area, the
15  items that they've left --
16  A.  That they say we can throw away, that is trash
17  we throw away, yes.
18  Q.  Let's consider a situation where you haven't
19  spoken to any of them, but the police came, they gave
20  the unhoused people a certain amount of time to leave,
21  that time has now elapsed, and some property is left.
22      What happens to that property?
23  A.  We bag and tag.
24      MR. BARUTH: Incomplete hypothetical.
25      Go ahead.

---

Page 51

1      THE WITNESS: Thank you.
2      MR. BARUTH: You can answer the question.
3      THE WITNESS: Yeah, we bag and tag that.
4      BY MR. PRASAD:
5  Q.  You just said that that property is trash;
6  correct?
7  A.  We determine what's trash and what's a bag and
8  tag.  If it's soiled and it looks like, you know,
9  there's feces on it or, you know, there's a needle in
10  there, we'll throw it away.  But if it's like, let's
11  say, a purse with everything in it, we'll bag and tag
12  that.
13  Q.  Now, do unhoused people sometimes take things
14  with them when --
15  A.  A lot of times.
16  Q.  -- you arrive at a resolution?
17  A.  Yes.
18  Q.  Who decides whether an individual can take a
19  piece of property with them or not?
20      MR. BARUTH: May call for speculation.
21      THE WITNESS: Who decides that they can?  They
22  decide.
23      BY MR. PRASAD:
24  Q.  Does DPW ever decide?
25      MR. BARUTH: May call for speculation.

---

Page 52

1      BY MR. PRASAD:
2  Q.  In your experience, has DPW ever decided
3  whether an unhoused person can take a certain piece of
4  property with them or not?
5  A.  If it's theirs, they take it.
6  Q.  And have you ever seen anyone at DPW disagree
7  with that?
8  A.  No, no.
9  Q.  And who -- you mentioned that -- withdrawn.
10      Once the SFPD's given instructions for people
11  to leave the area, who then decides when DPW can start
12  cleaning up?
13      MR. BARUTH: May call for speculation.
14      THE WITNESS: Our supervisors.
15      BY MR. PRASAD:
16  Q.  So your supervisors tell you when you can start
17  cleaning up; is that right?
18  A.  Well, I know by -- yes.
19  Q.  And that could be Britney or it could also be
20  Israel?
21  A.  Yes, yes.  Or -- yes.
22  Q.  Who among your crew decides what items are --
23  should be bagged and tagged and which items are trash?
24  A.  Our supervisors.
25  Q.  Your supervisors decide.  Do you ever decide?

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

Page 53

1 A. No, I don't decide.
2 Q. Do you ever look at a piece of property and
3 decide what to do with it without receiving instructions
4 from your supervisors?
5 A. No.
6 Q. So your supervisors decide what is trash at the
7 site?
8 A. Decide what is trash? No. If it's -- by going
9 through the procedures, you see what's trash and what's
10 not and you throw it away if it's garbage.
11 Q. So sometimes you determine, you know, what you
12 believe is trash at the site?
13 A. Yes.
14 Q. And sometimes you determine what looks like
15 personal belongings and isn't trash at the site?
16 A. Yes. By going through the procedures that
17 we're doing, yes.
18 Q. And by "procedures" do you mean the bag and tag
19 policy?
20 A. Policies, yes.
21 Q. Now, earlier we discussed this concept of
22 attended and unattended property; is that correct?
23 A. (Witness nods head.)
24 Q. Who at the scene of an encampment resolution,
25 whose responsibility is it to decide what property is

Page 54

1 unattended and what property is abandoned instead?
2 MR. BARUTH: Calls for speculation. Sorry.
3 THE WITNESS: So when we come up to an
4 encampment and if it looks like it's living in -- living
5 and they're not there, that's the unattended property.
6 Then we give them some time while we break down other
7 things, clean up other things and clean up.
8 BY MR. PRASAD:
9 Q. Who makes that decision that it looks like it's
10 lived in?
11 A. Our supervisors.
12 Q. Supervisors. And do you sometimes make that
13 decision?
14 A. I mean, I make the decision, but it doesn't
15 mean that it's time to -- I'm not a supervisor. I don't
16 run anything. I don't give orders. I don't make calls.
17 Q. If you decided that something is trash by
18 looking at it --
19 A. If I decided. But then what happens after I
20 decided? What are you asking me?
21 Q. That's what I'm asking you, Mr. Castro.
22 Once you've decided that something is trash --
23 A. Just make a decision?
24 Q. -- do you get your -- just allow me to
25 finish -- do you get your supervisor's permission before

Page 55

1 trashing the item?
2 A. Yes.
3 Q. Always?
4 A. Always.
5 Q. Has there ever been a situation where you've
6 looked at something, saw that it was trash, and then
7 threw it in the trash truck without asking your
8 supervisor first?
9 A. No. I ask my supervisor first.
10 Q. So your supervisors always make the final
11 decision about what is trash?
12 A. What is trash and what's unattended, yes.
13 Q. Are there ever times where you come upon items
14 at encampments that pose a health and safety risk?
15 A. Every day.
16 Q. What's an example of that?
17 A. Health and safety risk? Needles, feces.
18 Q. And --
19 A. Smells of urine.
20 Q. Apologies for interrupting.
21 Now, if the owner of that property is there
22 when you've seen this health and safety risk, who
23 decides what happens to the property?
24 A. The property?
25 Q. Yes.

Page 56

1 A. They do.
2 Q. So have you ever let a person keep property
3 that posed a health and safety risk?
4 A. Yeah, a few times. Like a mattress, they want
5 to take their mattress, take it with them.
6 Q. Have you ever decided not to let them keep
7 property because it poses a health and safety risk?
8 A. No.
9 Q. Have your supervisors ever made that decision,
10 to your knowledge?
11 A. I don't think so. I can't answer that
12 question. I don't know.
13 Q. When there's property that poses a health and
14 safety risk but the owner decides to keep it, is that
15 documented somewhere?
16 MR. BARUTH: Incomplete hypothetical.
17 THE WITNESS: I don't know.
18 BY MR. PRASAD:
19 Q. If property's unattended and it poses a health
20 and safety risk, what do you do with it?
21 A. If property is what now?
22 Q. Unattended --
23 A. Unattended.
24 Q. -- and it poses a health and safety risk, what
25 do you with it?

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

---

Page 73

1  Q.  On the tablet?
2  A.  Yes.
3  Q.  So there's forms filled out on the tablet at
4  the DPW yard?
5  A.  Yes.
6  Q.  So those are CMMS forms as well?
7  A.  I believe they go together, yes.
8  Q.  Do you know when a CMMS service report is
9  created?
10  A.  The one that's generated?
11  Q.  Yes.
12  A.  Yes.  That's before we go to the jobsite.
13  Q.  Okay.  It's generated before you go to the
14  jobsite.  And who generates it?
15  A.  I don't know.
16  Q.  What kind of details are entered in the CMMS
17  report through the tablet?
18  A.  Just their belongings.
19  Q.  Do you mean descriptions of their belongings?
20  A.  Descriptions.  When we first go to the site, we
21  take a picture of the property or the property that --
22  you know.
23  Q.  So pictures of property are documented in the
24  CMMS report?
25  A.  Everything.  Everything.

---

Page 74

1  Q.  Everything?
2  A.  Everything.
3  Q.  The whole scene?
4  A.  Yes.
5  Q.  And that includes property that's going to be
6  trashed as well; correct?
7  A.  Yes.
8  Q.  And it also includes property that's going to
9  be bagged and tagged?
10  A.  Yes.
11  Q.  Other than putting pictures when you've used
12  the tablet, have you also written verbal -- sorry --
13  have you also provided written descriptions of property
14  in the tablet CMMS system?
15  A.  Written description?  Yes.
16  Q.  And those written -- so can you give me an
17  example of that?
18  A.  Yeah.  So if I take a picture of, let's say, a
19  mattress that has been soiled or smells of urine, in the
20  comments I'll write "also threw away a mattress that
21  smells of urine."
22  Q.  In the comments in the CMMS system?
23  A.  Yes.
24  Q.  Have you ever received any training on how to
25  fill out the CMMS tablet?

---

Page 75

1  A.  It was -- yeah, we had a training on it, yes.
2  Q.  And when was that?
3  A.  I had it a few times and they had also a
4  tailgate on it.
5  Q.  When was the last time you recall that you had
6  a CMMS training?
7  A.  CMMS training?  Probably less than a month ago.
8  Q.  When you were using the tablet at a resolution,
9  were you the person taking the photos that go in the
10  report?
11  A.  (Witness nods head.)
12  Q.  When you're not using the tablet, who takes the
13  photos?
14  A.  The supervisor.
15  Q.  That could be Israel?
16  A.  (Witness nods head.)
17  Q.  It could also be Britney?
18  A.  Or Britney, yes.
19  Q.  Do they take photos right when you arrive at
20  the location?
21  A.  When we get to the location, yes.
22  Q.  Are there other times when they take photos?
23  A.  If we go to, like you said, another -- switch
24  locations.
25  Q.  When you bag and tag property, do you place a

---

Page 76

1  tag on the items at the location where the property is
2  found?
3  A.  I haven't, no.
4  Q.  Where do the tags get placed?
5  A.  Cesar Chavez at the yard.
6  Q.  At the DPW yard?
7  A.  (Witness nods head.)
8  Q.  If one person has five items that are getting
9  bagged and tagged, how many tags would be used?
10  A.  Depending on how many bags they have.
11  Q.  So if there's more than one tag, would you
12  use -- more than one bag, would you use more than one
13  tag?
14  A.  Yes.
15  Q.  Have you ever used one tag for multiple bags?
16  A.  I don't remember.  I've only done it once.
17  Q.  You've only done the bagging and tagging once?
18  A.  The bag and tag once.
19  Q.  So the 50 resolutions you've only done a bag
20  and tag once?
21  A.  I've done it one time.  I didn't even get to do
22  that 100 percent.  I didn't fill it out 100 percent, the
23  tag part.
24  Q.  What do you mean by that?
25  A.  So they all get entered in the tablet, it goes

---

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Herbert Ruth, Jr.
March 21, 2025

Page 81

1  policy sometimes difficult to follow?
2      MS. MURPHY: Object to form.
3      THE WITNESS: It can be, sometime.
4  BY MR. PRASAD
5  Q.  And, and what about it can be difficult to
6  follow, sometimes?
7  A.  Just a -- just the form of -- from the
8  beginning of the bag & tag to the end.  Just the
9  procedures.
10 Q.  Are there any specific procedures that you
11 find hard to follow?
12 A.  No.
13 Q.  Are there any circumstances in your work
14 where the bag & tag policy doesn't apply?
15 A.  If they don't call the bag & tag in, then we
16 don't apply.
17 Q.  When you say "they," who do you mean?
18 A.  If the Police Department or DPW doesn't have
19 a bag & tag situation, it don't apply.  We'll just
20 clean up.
21 Q.  In other words, if the Police Department or
22 your supervisors don't tell you to bag & tag, then the
23 policy doesn't apply.  Is that what you mean?
24 A.  (Nods head)  Yes.  That --
25 Q.  Has it ever happened at an HSOC resolution?

Page 82

1  A.  Plenty of times.
2  Q.  What do you mean by that?
3  A.  You get to -- you get to the HSOC resolution,
4  and there's a tent.  And the individual is cooperating,
5  the individual has a nice tent, the individual's living
6  inside his tent.  There's no soil, there's no needles,
7  drugs, or anything like that.
8      That person can take his tent down, fold it
9  up, and walk away with it.
10 Q.  And so under those circumstances where a
11 person takes their property, that's when you say that
12 the bag & tag does not apply.
13     Is that right?
14 A.  Yes.
15 Q.  Are there any other circumstances where the
16 bag & tag policy does not apply?
17 A.  The only other protocol when you don't need
18 to bag & tag, when you don't need to bag & tag
19 something, that means the tent is soiled.  That mean
20 the property's damaged.  That mean there's feces,
21 there's urine, all over the place.
22 Q.  All right, Mr. Ruth.  And, we'll get to that
23 a little bit more.
24     But, are you familiar with the concept of
25 attended property in the bag & tag policy?

Page 83

1  A.  Yes.
2  Q.  Okay.  And what is attended property?
3  A.  Attended property is when someone's there
4  with the property.
5  Q.  And what are you supposed to do with attended
6  property, under the bag & tag policy?
7  A.  If that person's getting arrested, we bag &
8  tag it.  And if it's not -- if it's not soiled.  If
9  it's not -- if it's -- if it's in living conditions,
10 we'll bag & tag it.
11 Q.  Has there ever been a circumstance where
12 somebody said that property was theirs, but you
13 disagreed with them?
14 A.  No.
15 Q.  Now, when you come upon attended property --
16 actually, let me rephrase that.
17     Under the bag & tag policy, when you come
18 upon attended property that includes medications, are
19 you supposed to give that person an advisement about
20 their medications?
21 A.  No.
22 Q.  Do you know -- have you ever -- in the course
23 of your work, have you ever heard the term "advisement
24 to hold onto medication"?
25 A.  No.

Page 84

1  Q.  Does the bag & tag policy place any
2  limitations on what property an unhoused person can
3  take with them?
4  A.  Not sure.  Can you say -- can you repeat
5  that?
6  Q.  Yeah.  Does the bag & tag policy contain any
7  restrictions on what kinds of property an unhoused
8  person can take with them?
9  A.  I'm not sure.  The question you're asking is
10 -- is -- I sound like I heard you say this question
11 before, but you're saying it different.
12 Q.  For example, earlier you mentioned dressers.
13 Right?
14     Does the bag & tag policy contain any
15 restrictions on the types of property that people are
16 permitted to keep?
17 A.  Yes.
18 Q.  And what are those restrictions?
19 A.  Restrictions, there's only so much stuff you
20 can have on the street.  On the sidewalk.
21 Q.  And so, have you ever prevented someone from
22 taking property they wanted to take with them?
23 A.  Yes.
24 Q.  And other than dressers, what kinds of
25 property have you prevented somebody from taking with

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Herbert Ruth, Jr.
March 21, 2025

Page 93

1    THE WITNESS: It depends on if it's in the
2  tent.  Or if it's in a suitcase.  Or, you said not in a
3  suitcase.  It's just kind of like randomly sitting out?
4    Are we talking about suitcase, or no
5  suitcase?  Are we just talking about on the ground?
6  BY MR. PRASAD
7  Q.  A pile of clothes that are not in a bag or
8  suitcase.
9  A.  What about in a tent?
10 Q.  And not in a tent.
11 A.  So it's just sitting on the ground.
12 Q.  That's right.
13 A.  Unattended.
14 Q.  Yes.  Unattended.  How would you handle that?
15   MS. MURPHY: Object to form.
16   THE WITNESS: We pull up, and we doing a bag
17 -- we doing an HSOC resolution, and nothing's there.
18   Let's say, they -- 72 hours, they left on
19 time.  And they left some stuff there.  Let's say they
20 just left some clothes on the ground, like you state.
21 They just left some stuff that they don't want.
22   Well, we clean that area, still.  We're going
23 to come out, we're going to sweep that area, and we're
24 going to clean that area thoroughly.  Then we're going
25 to spray that area down.  So that the streets are

Page 94

1  clean, and people can utilize the sidewalks and
2  different nature like that.
3    So that -- that -- those pile of clothes
4  that's just sitting there, unattended, nobody's there,
5  nobody's there to ask any questions, "Does this belong
6  to you," that's going to the dump
7  BY MR. PRASAD
8  Q.  Now, you mentioned, I think, or we've
9  discussed items that might pose a health or safety
10 risk.  How do you identify those items?
11 A.  Those items could be sitting in a gang of
12 crap.  Feces everywhere.  All over it.
13   (Multiple speakers)
14 Q.  -- by the way?
15 A.  That's how we determine their property.
16   (Reporter clarification)
17 BY MR. PRASAD
18 Q.  Mr. Ruth, let me ask that again.
19   Other than a situation where there's feces,
20 are there other situations that -- where you would
21 consider it a health or safety risk?
22 A.  I'm not sure.
23 Q.  And have you received any training on how to
24 identify health and safety risks?
25 A.  Yes.

Page 95

1    MS. MURPHY: Vivake, whenever you get to a
2  natural breaking point, we have been going over an
3  hour.
4    MR. PRASAD: Sure.
5    I think we can do it in a couple of minutes,
6  if that's all right, Mr. Ruth.
7    THE WITNESS: I want to check on my car.  Can
8  we get ten more minutes?
9    MR. PRASAD: I'm sorry; did you say you would
10 like a moment?
11   MS. MURPHY: He asked for a ten-minute break.
12   MR. PRASAD: Um, okay.
13   Let me just ask two more question, Mr. Ruth,
14 real quick.
15 BY MR. PRASAD
16 Q.  You mentioned a training.  Just really
17 quickly, when was that training?
18 A.  What training?
19 Q.  You just mentioned you have been trained on
20 how to identify health and safety risks.  What training
21 are you referring to?
22 A.  For one full year, we have training, and we
23 -- we talk about unattended items.  We talk about items
24 that are soiled.
25   We -- we go over that.  And I have been going

Page 96

1  over that for one full year.
2  Q.  And when was the last time that you had a
3  training that concerned health and safety risks?
4  A.  This year.
5  Q.  And when, this year?
6  A.  We'd had about maybe -- we have went over it
7  this year.  I'm not sure what day it was or what month
8  it was, but we went over it several times.
9    MR. PRASAD: All right, yes.  We can take a
10 ten-minute break.  If you need longer than ten minutes,
11 that's all right as well.
12   MS. MURPHY: Let's agree to go off.
13   (Off-the-Record discussion)
14   (Luncheon recess was taken at 12:27 p.m.
15   until 1:14 p.m. of the same day.)
16   (Nothing omitted nor deleted.  See next
17   page.)
18
19
20
21
22
23
24
25

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

---

Page 97

1  Q.  Once items have been bagged --
2  A.  Yes.
3  Q.  -- as part of a bag and tag, is your crew
4  required to take photos of those bags --
5  A.  I don't know.
6  Q.  -- and put those photos in the tablet?
7  A.  I don't know.
8  Q.  Were you trained on that?
9  A.  Yeah, I was trained on CM -- I was trained on
10  bag and tag.  I just don't know if the picture's taken
11  in the bag.
12  Q.  Now, you testified that you've received
13  multiple CMMS trainings over the years that you've been
14  with DPW.
15      To your knowledge, have there been any changes
16  to how you're supposed to use CMMS that you've been told
17  at those trainings?
18  A.  Any changes?
19  Q.  Yeah.
20  A.  Yes.
21  Q.  What are those changes?
22  A.  Different -- a different training document.
23  Q.  What do you mean by "different training
24  document"?
25  A.  Just steps on how to use the tablet.

---

Page 98

1  Q.  So the trainings change in terms of how -- in
2  terms of what steps you're supposed to take when you use
3  the tablet?
4  A.  Well, I don't know if it changed, but I know it
5  updates.
6  Q.  What do you mean by "update"?
7  A.  Our document, how we use the tablet, step one,
8  step two, step three, step four.
9  Q.  And do you remember what specifically changed?
10  A.  (Witness shakes head.)
11  Q.  I know we've been talking a lot about the bag
12  and tag policy, but if you'll bear with me, I have a few
13  more questions about that, Mr. Castro.
14      Now, you've testified you're familiar with the
15  current DPW bag and tag policy; correct?
16  A.  (Witness nods head.)
17  Q.  How long has the current bag and tag policy
18  been in effect?
19  A.  Since I've been there.
20  Q.  So would you say the bag and tag policy
21  remained the same during the time you've been there?
22  A.  (Witness nods head.)
23      Remained the same?
24  Q.  The policy itself.
25  A.  Well, we got trained on it and it's been

---

Page 99

1  updated, but I don't know exactly what have changed.
2  Q.  Let me put it this way:  Have you been trained
3  on changes to the bag and tag policy at any time --
4  A.  The changes.
5  Q.  -- over the last one year?
6  A.  Yes, but I don't remember the changes.
7  Q.  In general, do you find the bag and tag policy
8  to be complicated?
9  A.  No.
10  Q.  Is it difficult to follow at all?
11  A.  Bag and tag?  No.
12  Q.  Under what circumstances does the bag and tag
13  policy apply to your work?
14  A.  How it applies to my work?
15  Q.  Yeah.
16  A.  That is the work, that bag and tag.
17  Q.  So would you say it always applies?
18  A.  Always.
19  Q.  Does the current bag and tag policy apply to
20  the removal of personal items from public property for
21  storage and retrieval?
22  A.  Yes.
23  Q.  That's a fair description of the bag and tag
24  policy?
25  A.  (Witness nods head.)

---

Page 100

1  Q.  Are there circumstances at all in your work
2  where the bag and tag policy doesn't apply?
3  A.  No.
4  Q.  Now, we talked about this concept of attended
5  property earlier; correct?
6  A.  (Witness nods head.)
7  Q.  That's a yes?
8  A.  Yes.
9  Q.  How do you determine whether property is
10  attended property?
11  A.  Well, we determine by the -- if it looks like
12  it's being lived in.
13  Q.  What do you mean "if it looks like it's being
14  lived in"?
15  A.  You know, if it's nice and organized, their
16  stuff's folded, you know, decent, there's a mattress in
17  there.  You can tell if somebody's been living in there,
18  and you can also tell when somebody's not.
19  Q.  How can you tell when somebody's not living
20  there?
21  A.  It's disgusting.  Feces everywhere.
22  Everywhere.  Needles.  A lot of needles.  It smells of
23  urine.
24  Q.  Now, under the bag and tag policy, what are you
25  supposed to do with attended property?

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

Page 101

1  A.  The policies are we bag and tag it.
2  Q.  Has there ever been a circumstance where
3   someone said that, you know, they owned a piece of
4   property but you disagreed with them?
5  A.  If -- so that's not -- that's not -- they
6   wouldn't ask me.  They would ask the supervisor.
7  Q.  Has there ever been a situation --
8  A.  I've heard them say that, yes.
9  Q.  So could you describe those situations for me?
10  A.  Just if they had, like, blankets and we were
11   throwing away blankets and they want to keep 'em, "Oh,
12   give me my blankets back."  If they were not soiled, we
13   let them keep 'em.
14  Q.  But has there ever been a situation where
15   somebody said "that's my property" and your crew
16   disagreed and determined that it wasn't their property?
17  A.  Disagreed?  I can't remember that, no.
18  Q.  Does the bag and tag policy require you to give
19   individuals an advisement about medications?
20  A.  I don't know.
21  Q.  Do you understand what I mean when I say --
22  A.  No.
23  Q.  -- "advisement about medications"?
24      Does the bag and tag policy require you to
25   explain to unhoused people what they should do with

Page 102

1   their medications?
2  A.  I don't know.
3  Q.  Have you ever explained to an unhoused person
4   at an encampment resolution that they should do
5   something with their medications?
6  A.  No, I haven't.
7  Q.  Have you ever seen anyone else in your crew do
8   that?
9  A.  (Witness shakes head.)
10  Q.  Is that a no?
11  A.  No, no.
12  Q.  Are there limitations on what items an unhoused
13   person can take with them?
14      MR. BARUTH:  Vague and ambiguous.
15      THE WITNESS:  Yes.
16      BY MR. PRASAD:
17  Q.  What are those limitations?
18  A.  Their personal belongings.
19  Q.  And so do you mean that if an item is not
20   someone's personal belongings they can't take it?
21  A.  Yes.
22  Q.  And how do you determine if something -- an
23   item is not someone's personal belongings?
24  A.  When we first go to the job when we first roll
25   up, when we first pull up.

Page 103

1  Q.  So has there ever been a situation where
2   somebody said these are my personal belongings and your
3   crew didn't believe them?
4  A.  No.
5  Q.  If an unhoused person wants to take something
6   that's soiled, would you let them?
7  A.  It's up to really our discretion.  We have.  I
8   have, I've let them.
9  Q.  You've let them, but it's up to your
10   discretion; is that right?
11  A.  Supervisors, yes.
12  Q.  Supervisors.  So if the supervisors decided
13   that the person shouldn't be able to take that property
14   with them, they could decide that?
15  A.  They could decide that.
16  Q.  Have you ever prevented anyone from taking
17   property they wanted to take?
18  A.  No.
19  Q.  Have you ever seen another DPW worker prevent
20   someone from taking property they wanted to take?
21  A.  No.  That's why --
22  Q.  Sorry.  Finish.
23  A.  That's why the police are there.
24  Q.  To prevent people from taking property they
25   want to take?

Page 104

1  A.  Yes.
2  Q.  Under what circumstances does the police
3   prevent people from taking property they want to take?
4  A.  When they know it's not theirs.
5  Q.  Have you ever seen that happen?
6  A.  Yes.
7  Q.  Can you give me an example?
8  A.  We'll be trying to throw away some garbage and
9   some people from across the street come in and start
10   sniffing around, try to take what's not theirs.
11  Q.  And in those circumstances the police tell
12   them?
13  A.  "Hey, get out of here."
14  Q.  Even though the items are being thrown away --
15  A.  (Witness nods head.)
16  Q.  -- the police don't let them take it?
17  A.  No.
18  Q.  And I just want to clarify.  You said "yes"
19   when I said even though the items were being thrown
20   away; correct?  You nodded yes; correct?
21  A.  (No verbal response.)
22  Q.  Let me reask that so it gets taken down.
23      There have been circumstances where you saw
24   police refuse to give items to people who said it was
25   theirs because the police didn't believe them; correct?

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

---

Page 105

1  A.  On the ground, yes, trash on the floor.
2  Q.  And sometimes the item is -- those are items
3  that you then discarded; correct?
4  A.  Yes.
5  Q.  And earlier you testified that the police give
6  unhoused people time limits to gather their property;
7  correct?
8  A.  Yes.
9  Q.  Has a HOT Spot crew ever given out time limits
10  for people to gather their property?
11  A.  No.
12  Q.  Have you ever seen a situation where an
13  unhoused person was taking too long to gather their
14  property?
15  A.  I haven't been in that situation.
16  Q.  Has there ever been a situation where an
17  unhoused person was refusing to move during an
18  encampment resolution?
19  A.  No.
20  Q.  You've never seen that before?
21  A.  (Witness shakes head.)
22  Q.  How does the bag and tag policy apply to a
23  situation where someone can't physically carry their
24  property with them?
25  A.  If they can't carry it, it shouldn't be with

---

Page 106

1  them.  They can't have -- certain policy -- in the
2  policy they can't have furniture, can't have -- there's
3  certain things in the policy they cannot have on the
4  street.  If they're blocking a sidewalk.
5  Q.  So if it's one of those items that they can't
6  have and the unhoused person can't take it with them,
7  what happens?
8  MR. BARUTH: Incomplete hypothetical.
9  THE WITNESS: Well, I haven't -- let's see.
10  Probably throw it away, yes.
11  BY MR. PRASAD:
12  Q.  What if something's -- what if an unhoused
13  person has a piece of property that's definitely theirs
14  but it's too big for them to carry?  What happens in
15  that --
16  A.  Too big for them to carry?
17  MR. BARUTH: Incomplete hypothetical.
18  THE WITNESS: Toss it, throw it away.
19  BY MR. PRASAD:
20  Q.  Have you ever seen an unhoused person abandon
21  their property because they just can't move it in the
22  amount of time that they've been given?
23  A.  No.
24  Q.  Have you ever seen an unhoused person leave
25  property behind because they just don't have enough time

---

Page 107

1  to move their stuff?
2  A.  I've heard them say to come back and pick it
3  up.
4  Q.  And have you ever -- in that scenario have you
5  seen a situation where the person didn't come back in
6  time?
7  A.  Well, no.  What I mean is, like, when they roll
8  their cart across the street.
9  Q.  Have you seen -- so to clarify, you've seen
10  situations where people have moved their items across
11  the street because they didn't have time to move all
12  their stuff to another place; is that right?
13  A.  That's where they go.  They just move across
14  the street.
15  Q.  And have you ever seen an unhoused person leave
16  items just because they have too much to take with them?
17  A.  No.
18  Q.  Have you ever limited the amount of property
19  that -- let me rephrase that.
20  We've gone over situations where a property
21  gets bagged and tagged; correct?
22  A.  (Witness nods head.)
23  Q.  Have you ever seen a situation where DPW
24  limited the amount of property that could be bagged and
25  tagged?

---

Page 108

1  A.  No.
2  Q.  And it would be a violation of the bag and tag
3  policy if somebody imposed that limitation; correct?
4  A.  Limitation?  I could see that, yes.
5  Q.  It would violate the policy; is that right?
6  A.  I don't know.  I don't know.
7  Q.  You don't know if putting limits on the amount
8  of property that gets bagged and tagged would violate
9  the policy or not?
10  A.  Putting limits?  I mean, they don't have a
11  limit, do they?  I don't think they do.  I've never
12  given them a limit.
13  Q.  But you're not sure if it violates the policy
14  or not?
15  A.  Yeah, I don't know if it violates the policy.
16  Q.  You're familiar with the concept of unattended
17  property under the bag and tag policy; correct?
18  A.  Yes.
19  Q.  And are you familiar with the concept of
20  abandoned property under the bag and tag policy?
21  A.  Yes.
22  Q.  If property's unattended, what are you supposed
23  to do with it under the bag and tag policy?
24  A.  Bag and tag it.
25  Q.  And are you supposed to provide some kind of

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

---

Page 117

1  A.  (Witness nods head.)
2  Q.  That's yes?
3  A.  Yes.
4  Q.  Now, we discussed items that pose a health and
5  safety risk.  What happens if those items are commingled
6  with other items?
7  A.  Commingled, stacked on top of each other, we
8  would just bag and tag it if it was not soiled.
9  Q.  Well, what does commingled mean to you as
10  relating to the bag and tag policy?
11  A.  Commingled.  We just went over this too.  If it
12  was stacked, like, if it was -- I can't remember.
13  Q.  So, for example, if there was a needle that was
14  on the floor of a tent --
15  A.  Always, yes.
16  Q.  -- that's otherwise in good shape, would you
17  consider that to be commingled?
18  A.  No.
19    MR. BARUTH:  Incomplete hypothetical.
20    THE WITNESS:  That's not commingled.
21    BY MR. PRASAD:
22  Q.  What does commingled mean to you, then?
23  A.  You know, I forgot, but I know it's not that.
24  Q.  How do you decide whether to throw away items
25  that are -- how do you decide whether to throw away

---

Page 118

1  items that are commingled with items that pose a health
2  and safety risk?
3  A.  Well, the items -- if there's an item -- one
4  item that poses a health and safety risk, throw it away.
5  Q.  Throw away everything; correct?
6  A.  (Witness nods head.)
7    Now, if it's commingled, yes, we'll bag and tag
8  it.
9  Q.  For example, if there was a needle on the floor
10  of a tent, you would throw away the whole tent; is that
11  correct?
12  A.  Yes.
13  Q.  What if there was a small stain in the corner
14  of a tent?  Would you throw away the whole tent?
15  A.  A stain?
16  Q.  Yes.
17    MR. BARUTH:  Incomplete hypothetical.  Vague
18  and ambiguous.
19    THE WITNESS:  What's a stain?
20    BY MR. PRASAD:
21  Q.  What if there's a small unidentifiable stain in
22  the corner of a tent?  Would you throw away the whole
23  tent?
24  A.  No.
25    MR. BARUTH:  Same objections.

---

Page 119

1    THE WITNESS:  A stain of what?  Like food?
2    BY MR. PRASAD:
3  Q.  If you can't tell what the stain is.
4  A.  Like blood?
5  Q.  If you can't tell what it is, what would you
6  do?
7    MR. BARUTH:  Same objections.
8    THE WITNESS:  We would know what it is.
9    BY MR. PRASAD:
10  Q.  You would always know what it is?
11  A.  A stain?
12  Q.  Yes.
13  A.  What kind of stain?
14  Q.  What if you can't tell what it is?  What would
15  you do to the tent?
16    MR. BARUTH:  Same objection.
17    THE WITNESS:  I would ask the supervisor.
18    BY MR. PRASAD:
19  Q.  Did you receive any training on how to
20  determine when something is so soiled that it should be
21  thrown away?
22  A.  Yes.
23  Q.  When is something so soiled that it should be
24  thrown away?
25  A.  When it's a hazard.

---

Page 120

1  Q.  And how do you determine that?
2  A.  Well, for me if it's just wet, we'd probably
3  just -- you can't have a mattress, so we probably end up
4  throwing it away.
5  Q.  So if you had a mattress that otherwise was in
6  good condition but one corner of it was wet, then what
7  would you do?
8    MR. BARUTH:  Incomplete hypothetical.
9    THE WITNESS:  Throw it away.
10    BY MR. PRASAD:
11  Q.  If there are loose food items in a tent, would
12  you throw away the tent?
13    MR. BARUTH:  Incomplete hypothetical.
14    THE WITNESS:  If it was just food?
15    BY MR. PRASAD:
16  Q.  Yes.
17  A.  Throw away the tent?  No.  You're supposed to
18  bag and tag.
19  Q.  What would you do with the loose food items?
20  A.  The food, throw it away.
21  Q.  If there's a tent that -- let me rephrase this.
22    If you come upon a tent with neatly folded
23  clothes inside, it appears someone is living there, and
24  there are no stains, but there are empty beer cans
25  strewn around, what would you do with the --

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

Page 121

1  A.  You said beer cans?
2  Q.  Yeah.
3      MR. BARUTH: Incomplete hypothetical.
4      THE WITNESS: That's commingled.
5      BY MR. PRASAD:
6  Q.  That's commingled.  So what would you do with
7   the tent and the contents of the tent?
8      MR. BARUTH: Incomplete hypothetical.
9      THE WITNESS: We'd still bag and tag it or we'd
10  let them take what they need and then throw the rest
11  away.
12     BY MR. PRASAD:
13 Q.  And if it was unattended, what would you do?
14 A.  If it was unattended, we'd still bag and tag.
15 Q.  Have you ever thrown away a tent because of
16  food that was inside?
17 A.  Not food, no.
18 Q.  Have you ever thrown away a tent because of a
19  needle that was inside of it?
20 A.  Yes.
21 Q.  Did you bag and tag the items other than the
22  needle in that circumstance?
23 A.  No.  We've -- oh, let me take that back.  If
24  there's a needle in it, no, we throw it away.
25 Q.  All of the items?

Page 122

1  A.  Everything.
2  Q.  If there was a piece of foil, what would you
3   do?
4  A.  That's -- yeah, throw it away.
5  Q.  Throw away all of the items?
6  A.  Yes.
7  Q.  Have you ever thrown away a tent because it was
8   torn?
9  A.  No.
10 Q.  Are there any guidelines that you know of on
11  what you're supposed to do with a torn tent?
12 A.  Torn?  Bag and tag.
13 Q.  Does the bag and tag policy have a separate
14  category for bulky items?
15 A.  Bulky.  I've heard that.
16 Q.  What are bulky items under the policy?
17 A.  Bulky items are big items.
18 Q.  Can you bag and tag a mattress?
19 A.  No.
20 Q.  Have you ever bagged and tagged a mattress?
21 A.  No.
22 Q.  Can you bag and tag a chair?
23 A.  A chair?  That's a good question.  No
24  furniture, no.
25 Q.  So safe to say you've never bagged and tagged a

Page 123

1   chair?
2  A.  (Witness shakes head.)
3  Q.  Same with a table?
4  A.  Same with a table.  No furniture.
5  Q.  What about a stroller?
6  A.  I've never bagged and tagged a stroller, but
7   I'd bag and tag it.
8  Q.  What about a wheelchair?
9  A.  No wheelchair.  You have -- you cannot throw
10  away a wheelchair.
11 Q.  So what would you do with a wheelchair?
12 A.  Roll it to the side.
13 Q.  Would you bag and tag it?
14 A.  No.  We'd just move it out of the way.
15 Q.  You'd just leave it there?
16 A.  Leave it.
17 Q.  What about a bicycle?
18 A.  Well, if the bicycle looks like it's up and
19  running, I mean, most of the time they're not, but we'd
20  throw it away.  Now, if it was a bicycle that was good,
21  usually they come and get it.
22 Q.  Would you bag and tag the bike if it was
23  unattended?
24 A.  If it was unattended, of course, yes.
25 Q.  Have you ever bagged and tagged a bike?

Page 124

1  A.  Yes.
2  Q.  How many times would you say you've bagged and
3   tagged a bike?
4  A.  I've never bagged and tagged one, but I've put
5   one in the back to be bagged and tagged.
6  Q.  By someone else?
7  A.  Yeah.  Bagged and tagged by someone else so
8   they could pick it up.
9  Q.  Have you ever -- actually, let me rephrase
10  that.
11     Can you bag and tag a cart?
12 A.  What kind of cart?
13 Q.  A rolling cart.
14 A.  No.
15 Q.  Have you ever bagged and tagged one?
16 A.  No.
17 Q.  Have you ever bagged and tagged a shopping
18  cart?
19 A.  Shopping cart, no.
20 Q.  Have you ever bagged and tagged one?
21 A.  (Witness shakes head.)
22 Q.  Do you know how long bulky items are stored in
23  the DPW yard after they've been bagged and tagged?
24 A.  I believe it's 30 days.
25 Q.  Now, earlier we talked about unhoused people

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

---

Page 141

1  white powdery substance and pills --
2  A.  Yeah.  That's garbage.
3  Q.  -- the pills would be garbage; correct?
4  A.  Yes.
5  Q.  And you wouldn't give an advisement to the
6  unhoused person that they should take the pills?
7      MR. BARUTH:  Incomplete hypothetical.
8      THE WITNESS:  I mean, we would ask them before.
9      BY MR. PRASAD:
10  Q.  What are you required to do in this
11  circumstance?
12  A.  In that circumstance?  I'd throw it away.  It's
13  garbage.
14  Q.  Did you receive any bag and tag trainings
15  between August and December 2024?
16  A.  Most likely.
17  Q.  Was there any specific training you recall in
18  the fall of 2024 that was different than other trainings
19  that you've had in the past?
20  A.  Just on -- I'm sure these things have to get
21  updated.
22  Q.  But you don't recall a specific training in the
23  fall of 2024 that was different --
24  A.  Different?
25  Q.  -- from the other trainings?

---

Page 142

1  A.  No.
2  Q.  Since the fall of 2024 has your supervisor done
3  anything -- has either of your two supervisors done
4  anything to assess whether bag and tag training is
5  working or any practices need to be changed?
6      MR. BARUTH:  Calls for speculation.
7      BY MR. PRASAD:
8  Q.  To your knowledge.
9  A.  No.  I do know that we just follow our
10  policies.  Just follow the policy.
11  Q.  Since the fall of 2024 have supervisors other
12  than Britney and Israel come out to observe resolutions?
13  A.  Other than Britney and -- I don't think so, no.
14  Q.  Have you ever been asked any questions about
15  the CMMS entries that you created?
16  A.  No.
17  Q.  Now, you testified that you've had various bag
18  and tag trainings; is that right?
19  A.  Yes.
20  Q.  Have any of those trainings ever changed the
21  way that you apply the bag and tag policy?
22  A.  No.
23  Q.  Do they change the way that you bag and tag
24  different types of items?
25  A.  Yes.

---

Page 143

1  I do remember something that's changed.  The
2  wheelchair policy.
3  Q.  When did that change?
4  A.  Six months before I got into DPW.
5  Q.  But it hasn't changed since you were at DPW; is
6  that right?
7  A.  The wheelchair.
8  Q.  Six months after you joined DPW or before?
9  A.  Yeah, I remember them -- I've never had to
10  throw away a wheelchair, but I remember them bringing
11  that up.  It's changed.
12  Q.  Do you remember what the change in the policy
13  was regarding the wheelchair?
14  A.  Oh, no.
15  Q.  You're not aware of what the change itself was?
16  A.  Yes.  We can't throw them away.
17  Q.  And what was the policy before the change?
18  A.  That we could throw wheelchairs away.
19  Q.  Did -- have any recent trainings changed
20  anything about the way you handle bulky items other than
21  wheelchairs?
22  A.  I'm not sure.
23  Q.  Have any recent trainings changed anything
24  about the way you assessed whether property's attended
25  or unattended?

---

Page 144

1  A.  I'm not sure.
2  Q.  And have any recent trainings changed anything
3  about the way you assess whether to throw away something
4  rather than bag and tag it?
5  A.  I'm not sure.
6  Q.  Have any recent trainings caused you to bag and
7  tag more items than you were before the training?
8  A.  Bag and tag more items?  Yes.
9  Q.  Could you explain that?
10  A.  Just a lot more property.
11  Q.  What -- was it one training that led to you
12  bagging and tagging more items?
13  A.  So I do -- when you say bagging and tagging,
14  that's me personally or the supervisor?
15  Q.  You personally.  You personally.
16  A.  Well, I don't normally do the bag and tag.
17  Q.  Have you observed any changes in the way your
18  supervisor applies the bag and tag policy?
19  A.  Have I observed?  I can't. . .
20  Q.  So to your knowledge, has there been a training
21  that led to your supervisor bagging and tagging more
22  items than before?
23      MR. BARUTH:  Vague and ambiguous.
24      THE WITNESS:  I don't know.
25      ---o0o---

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

---

Page 153

1  attempting to hold on to the tent; correct?
2  A.  I don't know what he's doing.
3  Q.  All right.  I'd like to show you Plaintiff's
4  Exhibit 1311, which is a video that Ms. Young is going
5  to play for you on her laptop.
6      (Plaintiff's Exhibit 1311 was marked.)
7  BY MR. PRASAD:
8  Q.  For the record, this video has been produced as
9  Bates COH 01528931.
10     So, Mr. Castro, please let us know if for some
11  reason you can't see it well.
12     MS. YOUNG: Can you see this?
13     THE WITNESS: I can see it.
14  BY MR. PRASAD:
15  Q.  Okay.  You can see the video; correct?
16  A.  Yeah.  I can see "Recording."
17  Q.  Okay.  So we'll play the entire video first.
18     MS. YOUNG: Sorry.  One moment.  Let me do it
19  again.  There we go.
20     (Video playing.)
21     THE WITNESS: Oh, wow.
22     MR. PRASAD: Is there no volume on the video?
23     MS. YOUNG: I put the volume on.
24     THE WITNESS: Yeah.  See, I wasn't there.
25     MR. PRASAD: Replay it with the volume, please.

---

Page 154

1      So for the record we'll replay the video with
2  the volume.
3      THE WITNESS: He was on the floor.
4      MR. BARUTH: You can wait till there's a
5  question.
6      While she's doing that, was there an exhibit
7  number on there?
8      MR. PRASAD: Yeah.  It's Exhibit 1311.
9      MR. BARUTH: Thank you.
10     (Video playing.)
11  BY MR. PRASAD:
12  Q.  Mr. Castro, were you able to view the entire
13  video?
14  A.  Yeah.
15  Q.  For the record, we played the entire video for
16  the witness, which is one minute and four seconds long.
17     Mr. Castro, do you recognize yourself in the
18  video?
19  A.  Yes.
20  Q.  Where were you located in the video?
21  A.  On top of the truck.
22  Q.  Fair to say that was a tense scene, Mr. Castro?
23  A.  Yeah.
24  Q.  Do you remember it?
25  A.  Yes.

---

Page 155

1  Q.  And this video depicts the same incident in the
2  picture from the news article I just showed you?
3  A.  Okay.
4  Q.  Is that right?
5  A.  Yes.
6  Q.  Now, the video shows a DPW worker engaged in a
7  tug-of-war with an unhoused person over a tent; correct?
8  A.  Yes.
9  Q.  And that DPW worker is someone named Greg?
10  A.  Yeah.
11  Q.  And eventually the DPW worker successfully
12  takes the tent from the man; correct?
13  A.  Did we?  I didn't see it.  In the video we took
14  it?
15  Q.  I'm asking you.
16  A.  Yeah.
17     MR. BARUTH: The video speaks for itself.
18     THE WITNESS: Yeah.
19  BY MR. PRASAD:
20  Q.  And the man is left without the tent; correct?
21  A.  Yes.
22  Q.  And you agree that the man was trying to hold
23  on to the tent in the video; right?
24  A.  Yes.
25  Q.  And the tent is being dragged away as he's

---

Page 156

1  trying to hold on to it; correct?
2  A.  Yeah.
3  Q.  Does the bag and tag policy permit DPW workers
4  to take property from an unhoused person who is holding
5  on to it?
6      MR. BARUTH: Lacks foundation.
7      THE WITNESS: Say that again.
8  BY MR. PRASAD:
9  Q.  Does the bag and tag policy permit DPW
10  workers --
11  A.  Permit.
12  Q.  -- to take property --
13  A.  No, it doesn't permit us.
14  Q.  -- from someone who's holding on to --
15  A.  No, it doesn't permit us.
16  Q.  Does the bag and tag policy permit DPW workers
17  to use force with unhoused people --
18  A.  Force.
19  Q.  -- to confiscate property?
20     MR. BARUTH: Vague and ambiguous.
21     THE WITNESS: No, it doesn't.
22  BY MR. PRASAD:
23  Q.  You agree there was some degree of force that
24  was used here; correct?
25  A.  No.

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

---

Page 161

1  A.  I don't know exactly.
2  Q.  And what were those changes?
3  A.  I don't know.
4  Q.  Do you recall them mentioning that the mayor
5  wanted encampments to be handled in a certain way?
6  A.  I don't remember.  Not that, "in a certain
7  way."  I don't remember.  I just knew that there were
8  policies that changed.
9  Q.  Did what the police officer said in the video
10  reflect your understanding of how the policies changed?
11  A.  Yeah, but I don't know if that was true or not.
12  Q.  But it did reflect your understanding of how
13  the policy changed; is that right?
14  A.  I knew that the policy had changed.
15  Q.  In a way that was similar to what the police
16  officer in the video was saying?
17  A.  I don't know what changed.  They were saying
18  something about the encampments, there's going to be
19  some changes, and I don't know exactly what changes that
20  they were but I knew there were.
21  Q.  And did you -- were you told that those changes
22  were a result of directions from the mayor?
23     MR. BARUTH:  Vague and ambiguous.
24     THE WITNESS:  It was a lot of big talk about
25  that.

---

Page 162

1     BY MR. PRASAD:
2  Q.  Including directions from the mayor; correct?
3  A.  Something.  I don't know exactly what it was,
4  though.
5  Q.  But it was -- whatever it was, it was
6  directions from the mayor?
7  A.  Oh, yeah, yeah.  Whatever the policy that was
8  the change was from the mayor, yeah.
9  Q.  And you would agree that's what the police
10  officer is talking about here in the video?
11  A.  Yes.
12  Q.  Okay.  I'd like to now show the witness what we
13  will mark as Plaintiff's Exhibit 1312.
14     (Plaintiff's Exhibit 1312 was marked.)
15     BY MR. PRASAD:
16  Q.  And I'll represent to you, Mr. Castro, that
17  these are notes prepared by plaintiff's investigator,
18  Mr. Dylan Verner-Crist, in this case.
19     I'd like to direct your attention to the page
20  which says "Verner-Crist" at 1999 at the bottom.  That
21  should be about three pages in.  And it's a photograph.
22  A.  Okay.
23  Q.  It should say 1999.
24  A.  I got it.
25  Q.  Yes.  Okay.

---

Page 163

1     So, Mr. Castro, is this also a photo of your
2  HOT Spot crew?
3  A.  Yes.
4  Q.  And do you recognize yourself in this photo?
5  A.  Yes.  At the top of the truck.
6  Q.  And who else do you recognize in this photo?
7  A.  I see Anthony, I see --
8  Q.  Where is Anthony?
9  A.  Handing him the pallet, or he's handing me the
10  pallet.
11  Q.  And who else do you see?
12  A.  I see Esteban, Scotty, and Herb.
13  Q.  Okay.  And where is Herb in this photo?
14  A.  Right next to me behind me, to the right of me.
15  Q.  He's the man between you and the white vehicle?
16  A.  Yes.
17  Q.  And where is Esteban in this photo?
18  A.  He's holding the table.
19  Q.  And he's all the way to the left; is that
20  right?
21  A.  All the way to the left, yes.
22  Q.  Who's the person in the center of the photo?
23  A.  Scotty.
24  Q.  Okay.  And --
25  A.  It looks like him, yeah.

---

Page 164

1  Q.  And in this photo a table is being put in a
2  trash truck; correct?
3  A.  Yes.
4  Q.  And a table should be handled according to the
5  bulky items portion of the bag and tag policy; correct?
6  A.  Yes.
7  Q.  Do you remember this incident, by the way?
8  A.  Yes.
9  Q.  So you would agree that your team here is
10  taking steps to trash this table; correct?
11  A.  Yes.
12  Q.  Why did the team trash the table?
13  A.  There was drugs on it.
14  Q.  There were drugs on the table?
15  A.  Yes, and around the table.
16  Q.  Was the table intact?
17  A.  No.
18  Q.  What do you mean by that?
19  A.  Was the table intact?  Was it just a regular
20  table?  No.  I remember it was blocking the sidewalk.
21  Q.  Was the table fully functional?
22  A.  I don't think so, no.
23  Q.  Why do you say that?
24  A.  I don't remember if it was fully functional.
25  Q.  Was the table standing when you approached it?

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Confidential
Alvaro Castro
March 5, 2025

Page 165

1  A.  Was it standing?  I don't remember.
2  Q.  Do you see anything in this photo that would
3  indicate the table was broken in any way?
4  A.  Broken, no.
5  Q.  Was the table broken?
6  A.  I don't remember, but I know -- I do remember
7  the only reason we would have thrown it away is if it
8  was soiled.  There was drugs on it.
9  Q.  And by "soiled" you mean there were drugs on
10  the table?
11  A.  Yeah.  Needle caps, needles.
12  Q.  Did you determine -- do you recall if the table
13  was unattended or abandoned?
14  A.  No, I can't remember that day if it was
15  abandoned or not.
16  Q.  But you would have thrown it away even if it
17  was unattended --
18  A.  No.
19  Q.  -- because there were drugs; correct?
20  A.  No -- oh, yeah, if it was -- yes, yes.
21  Q.  Was this a violation of the bag and tag policy?
22  A.  I don't see how it was, no.
23  Q.  All right.  I'd like to direct your attention
24  to the page with numbers ending in 2002, which is three
25  more pages forward.

Page 166

1  A.  Okay.
2     MR. BARUTH:  Counsel, I just want to note it
3  does say "Confidential: Privileged confidential work
4  product."  I assume you're aware of that.
5     MR. PRASAD:  Yes, yes.
6     MR. BARUTH:  I just wanted to double-check.
7     MR. PRASAD:  I appreciate that.  These have
8  been produced with these Bates numbers in this case, but
9  I appreciate that.
10     MR. BARUTH:  Sure.
11     BY MR. PRASAD:
12  Q.  Do you see the photo at the center and bottom
13  of this page, Mr. Castro?
14  A.  Yes.
15  Q.  Do you recognize any of the people in this
16  photo?
17  A.  Yeah.  It looks like Israel.
18  Q.  Do you remember this scene?
19  A.  No.
20  Q.  But in this photo some clothes appear to be on
21  hangers on a clothes rack; is that right?
22  A.  On hangers?  I don't see anything on hangers.
23  Q.  Do you see the blue shirt that's hanging in
24  front?
25  A.  Are we looking at the same page?

Page 167

1  Q.  Are you looking at 2002?
2  A.  Blue shirt hanging?  Oh, okay.  I'm on the
3  wrong page.
4  Q.  All right.  Let me know when you're at
5  page 2002, Mr. Castro.
6  A.  Okay.  Yeah, I see it.
7  Q.  Okay.  Do you recognize any of the individuals
8  in this photo?
9  A.  Yeah.  It looks like Israel.
10  Q.  Okay.  And here some clothes appear to be on
11  hangers on a clothes rack; correct?
12  A.  Yeah.
13  Q.  Okay.  And if I could direct you to page 2006,
14  which is four pages ahead.
15  A.  Okay.
16  Q.  This is another picture of the same clothes on
17  hangers; correct?
18  A.  Okay.  Where?
19  Q.  2006.
20  A.  Oh, okay.  Yeah, I see it.
21  Q.  And this is another picture of those same
22  clothes on hangers; correct?
23  A.  Yes.
24  Q.  Is it fair to say these clothes have been kept
25  in a neat and organized manner?

Page 168

1  A.  It looks like it, yes.
2  Q.  How would you evaluate clothes like those shown
3  on this page, page 2006, under the bag and tag policy?
4  A.  Commingled.
5  Q.  And why do you say that?
6  A.  'Cause it looks like they have more than one
7  item that could be ready to go.  But I'm saying if we
8  throw away this table and these clothes, it must have
9  been soiled with drugs around there.  It just probably
10  didn't get in the picture.
11  Q.  Do you see any drugs in this photograph,
12  Mr. Castro?
13  A.  Yeah, but this is just one picture.  I mean,
14  that's the only reason why we would have thrown it away.
15  Q.  And you saw a second picture of these same
16  items at page 2002; correct?
17  A.  If that's the same -- yeah, if that's the same
18  stuff.
19  Q.  In either picture do the clothes appear in the
20  pictures to be soiled?
21  A.  Well, in the picture they don't.  But, I mean,
22  that's the only reason why we would have thrown them
23  away.  You guys probably just got a good picture at that
24  time.  But at the same time, you know, we wouldn't throw
25  away anything if it wasn't --

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

---

Page 169

1  Q.  So is it your testimony today, Mr. Castro, that
2  the only reason under the bag and tag policy to throw
3  away clothes kept in this manner would be if they had
4  drugs or were otherwise soiled?
5  A.  Yeah, if there was something on the table or
6  something under it, you see something under it.
7  Q.  Now, the table is separate from the clothes on
8  the rack; correct?
9  A.  Yes.
10  Q.  If there was something on the table, would you
11  still throw away the clothes on the rack?
12  A.  No.
13  Q.  So the only way you would throw -- it would not
14  be a violation of the bag and tag policy to throw away
15  the clothes on the rack if there were some drugs or
16  other contamination --
17  A.  Like something -- yeah, if there was something.
18  Q.  -- with the clothes; correct?
19  A.  Yeah.
20    MR. BARUTH:  Incomplete hypothetical.
21    THE WITNESS:  Something sticking out of a
22  pocket or there was feces on it.
23    BY MR. PRASAD:
24  Q.  And you would agree if that's not the case, it
25  would be a violation of the bag and tag policy to throw

Page 170

1  away the clothes?
2  A.  It would be a violation, yes.
3  Q.  I'd like to show you one other page here,
4  Mr. Castro, which is two pages back which is 2004.
5  A.  Two pages back.  Okay.
6  Q.  Are you at page 2004, Mr. Castro?
7  A.  There.  Yep.
8  Q.  And do you see a chair in the middle of this
9  photograph?
10  A.  Yes, I do.
11  Q.  How would you assess this chair under the bag
12  and tag policy?
13  A.  Bulky item.
14  Q.  You would agree the chair does not appear to be
15  soiled; correct?
16  A.  Yeah.
17  Q.  And the chair appears to be in reasonable
18  working order; correct?
19  A.  Yes.
20  Q.  Okay.  So it would be a violation of the bag
21  and tag policy to throw away this chair; correct?
22    MR. BARUTH:  Incomplete hypothetical.
23    THE WITNESS:  It looked like -- this chair
24  looks like it's not put together, though.  It's not
25  fully function -- like, it's not a full chair.  It's

Page 171

1  like a garbage chair if it's not --
2    BY MR. PRASAD:
3  Q.  What -- the chair is standing on its legs;
4  correct?
5  A.  Yes, four legs.
6  Q.  It's standing on its four legs; correct?
7  A.  Yes.
8  Q.  And there's a cushion in the chair; correct?
9  A.  Yes.
10  Q.  And there's no visible -- at least in this
11  photograph, there's no visible stains or rips in the
12  chair; correct?
13  A.  Yeah, you're right.  It's on four legs, yep.
14  Q.  So would you agree this chair is usable?
15  A.  No.  It looks broken.
16  Q.  Why would you say it's broken?
17  A.  I could see right here for some reason -- okay.
18  I'm not there so I can't really tell you, but you said
19  it's functional?
20  Q.  Yes.  As in someone could sit in this chair;
21  correct?
22  A.  I doubt it.
23  Q.  Why do you doubt it?
24  A.  Well, a lot of them, it looks like it's broken.
25  But I could be wrong.

Page 172

1  Q.  But if a person wanted to keep this chair --
2  A.  Keep this chair?  I would let them keep it.
3  Q.  You would let them keep it; correct?
4  A.  I would let them keep it.
5  Q.  And the bag and tag policy would require you to
6  let them keep it; correct?
7  A.  Bulky items, yes.
8  Q.  So if the person wanted the chair and it was
9  thrown away, that would be a violation of the bag and
10  tag policy; correct?
11  A.  Well, no.  If the owner of the chair wanted to
12  keep it, yes.
13  Q.  It would be a violation of the bag and tag
14  policy; correct?
15  A.  Yes.
16  Q.  To throw away the chair?
17  A.  Yes.
18  Q.  Okay.  I'd like to take you three pages
19  forward, then, to page 2007.  Last photo in this group,
20  Mr. Castro.
21  A.  Okay.
22  Q.  Page 2007, this page, do you recognize the
23  individuals in this photograph?
24  A.  Yes.
25  Q.  Who are they?

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Confidential

Alvaro Castro
March 5, 2025

Page 173

1  A.  Anthony, Greg, Israel, and Scotty.
2  Q.  And --
3  A.  And Anthony.
4  Q.  There's a person holding the chair in this
5  photograph; correct?
6  A.  Yeah.
7  Q.  And who's that person?
8  A.  That's Israel.
9  Q.  Okay.  And that person is throwing the chair in
10  the back of a truck; correct?
11  A.  Yes.
12  Q.  So it appears that this chair was thrown out;
13  is that right?
14  A.  Yep.
15  Q.  I would now like to show you what we'll mark --
16  what has already been marked as Plaintiff's
17  Exhibit 1136.
18  (Plaintiff's Exhibit 1136 was previously
19  marked.)
20  BY MR. PRASAD:
21  Q.  Mr. Castro, I'll represent that these are
22  photos dated December 9th, 2024, taken by plaintiff's
23  investigator.
24  Now, the first photograph depicts a tent;
25  correct?

Page 174

1  A.  Yes.
2  Q.  And the second photograph depicts the interior
3  of a tent; correct?
4  A.  Yes.
5  Q.  And the third photograph depicts the interior
6  of a tent; correct?
7  A.  Oh, yeah, yes.
8  Q.  And the fourth photograph depicts DPW workers
9  breaking down the same tent; correct?
10  A.  Is that the same tent?  It looks like it, yeah.
11  Yes.
12  Q.  Do you recognize the individuals in this
13  photograph, the fourth photograph?
14  A.  Yes.
15  Q.  And who are they?
16  A.  That's our crew, my crew.
17  Q.  And who are the individuals you see in the
18  photograph?
19  A.  I see Scotty, Esteban, I see Tone.  He's not on
20  our crew.  I don't know why he was with our crew that
21  day, but he was there.  It looks like it.  And Israel.
22  Q.  So this is the HOT Spot crew?
23  A.  Yes.
24  Q.  Is Israel Graham the person in the red hat?
25  A.  Yes.

Page 175

1  Q.  Now, going back to the second page, which is
2  the second photo, would you agree that the tent appears
3  to be relatively tidy?
4  A.  That one.
5  MR. BARUTH: The picture speaks for itself.
6  THE WITNESS: Yeah.  That one's nice.
7  BY MR. PRASAD:
8  Q.  Would you say this tent is in better condition
9  than most tents you see at HSOC resolutions?
10  A.  Better condition?  Yes.
11  Q.  So if you came across this tent, would you
12  consider it unattended property?
13  A.  That looks like unattended property.
14  Q.  And why is that?
15  A.  For the same reason, clothes are folded, the
16  bed's made.
17  Q.  In other words, it looks like someone is living
18  there; correct?
19  A.  Exactly.
20  Q.  And you made that determination by looking at
21  the bed, the clothes and the shoes; correct?
22  A.  Just by that picture, yeah.
23  Q.  The general cleanliness of the --
24  A.  From the picture, yes.  But why they broke that
25  up, there must have been something in there that was

Page 176

1  contraband or something, drugs.  There must have been
2  something in there for them to throw it away.
3  Q.  And you would agree that without that reason it
4  would be a violation of the bag and tag policy to throw
5  away this tent; correct?
6  A.  Say that again.
7  Q.  You would agree that without drugs or
8  contamination --
9  A.  Oh, yeah, exactly, yes.
10  Q.  -- it would be a violation of the bag and tag
11  policy to throw away this tent; correct?
12  A.  Of course.
13  Q.  If you're looking at the picture on page 2
14  again of the tent, if there was a needle in -- on the
15  floor of this tent --
16  A.  Under those items?
17  Q.  -- would you throw away this tent entirely?
18  A.  If there was a needle, yes.
19  Q.  All of the items in this tent?
20  A.  Yes.
21  Q.  Even though the tent otherwise appears to be
22  neat and tidy?
23  A.  Yes.
24  Q.  And even if the other items aren't soiled?
25  A.  Soiled, yes.