# EXHIBIT 36

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

*Joel Martinez*
*February 25, 2025*

*Behmke Reporting and Video Services, Inc.*
550 California Street, Suite 820
San Francisco, California  94104
(415) 597-5600

Original File 44153Martinez_NL.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR   Document 366-42   Filed 04/17/25   Page 3 of 10
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Joel Martinez
February 25, 2025

Page 33

1  don't -- I don't remember the dates, you know, the exact
2  dates.
3  Q.  And were they -- do you remember approximately
4  how many months ago they were?
5  A.  Not really.  I mean, I -- like I said, the one
6  with Brittany could have been either November or
7  December.  And the one with -- with Jonathan was -- it
8  was -- it wasn't -- you know, it was -- it was before
9  the one Brittany had but it wasn't too long after.
10 That's kind of -- you know, Brittany's tailgate wasn't
11 too long after his, I guess.  Yeah.
12 Q.  And how many -- first, the tailgate that
13 Brittany did, do you remember how long that was?
14 A.  I think about the same.  Maybe 30 to
15 40 minutes.
16 Q.  And did you also get a document during that
17 tailgate?
18 A.  Yes.
19 Q.  What was that document?
20 A.  It was basically the same -- the same booklet.
21 It's just you know if they -- I guess if anything
22 changes or -- or if they add anything new, they just
23 kind of add it to that booklet.  They add new pictures
24 to it too sometimes, you know, because -- basically, you
25 know, pictures that kind of help out more with -- with

Page 34

1  the whole process basically.
2  Q.  And at that tailgate that Brittany did, did she
3  discuss anything outside of that booklet?
4  A.  I don't remember, yeah.  No, I don't remember.
5  I don't think so.
6  Q.  At the tailgate that Jonathan did before that,
7  did you also receive a document?
8  A.  I did, yeah.
9  Q.  And was it also one of those booklets?
10 A.  Yeah.
11 Q.  How long was that tailgate?
12 A.  I think that one was a little longer.  I think
13 that one did -- went for the whole hour, maybe an hour
14 and ten.
15 Q.  And was the booklet that Jonathan used and gave
16 you the same as the one that Brittany gave you?
17 A.  Yeah.
18 Q.  And at Jonathan's tailgate, did he cover
19 anything outside the booklet?
20 A.  I guess they -- they cover -- they just -- they
21 just told us basically to -- to change our approach, I
22 guess.
23    You know, I guess when I -- when I started --
24 when I started with DPW, right, they were like, "Oh,"
25 you know, "we only have like 15 minutes to" -- to

Page 35

1  basically -- I mean, you know, we have as long as we
2  need to do a cleanup, but -- but I guess, you know, we
3  will only allow, you know, the homeless occupancy --
4  like, we will only allow them maybe like 15 minutes.
5  And then -- and then -- I mean, if they will ask for
6  more time, you know, they will always get an extra 15,
7  but basically, it will be no longer than 30.  And then
8  after 30, we will initiate -- if they -- they will not
9  move, then we will initiate the -- the bag and tag
10 process.
11    And then after Jonathan gave that -- gave his
12 second -- I mean, or the tailgate, we were told to -- to
13 kind of have a different approach to basically allow
14 them more time.  So it went from 15 or 30, and then, you
15 know, if they needed extra time, it will -- it will go
16 all the way up to an hour for them, you know.  So they
17 will have as much time as they -- they needed -- they
18 needed to for them to move.
19    And I guess the other thing that changed, too,
20 was at the beginning, we were told that, right, if it
21 looked -- you know, if it was -- if it looked like
22 trash, right, like I said, a soiled blanket, and, you
23 know, basically we could -- we could throw it away.  And
24 then -- but after -- but after that tailgate, we were,
25 like, oh, you know, if they want to keep it, do not --

Page 36

1  do not wrestle, you know, over -- over an item.  Like,
2  they were, like, if they want to keep it, just let them
3  -- let them have it, you know.
4     Basically, they said have a more human
5  approach, you know.  That's kind of what they got.
6  Q.  And were there any other changes that Jonathan
7  Vaing discussed at that tailgate?
8  A.  No, that was it.
9  Q.  Do you ever -- outside of those tailgates, do
10 you ever discuss the Bag and Tag Policy with your
11 supervisors?
12 A.  Not really, no.
13 Q.  And if you had a question about the Bag and Tag
14 Policy, who would you ask?
15 A.  I would go up to Edgar or Brittany, yeah.
16 Well, yeah, back in 2024, it was Brittany.  Now, I would
17 go up to Dario.
18 Q.  And did you ever ask either Brittany or Dario
19 questions about the Bag and Tag Policy?
20 A.  I did a few times, yeah.
21 Q.  When did you ask those questions?
22 A.  I don't -- I don't remember when exactly, but I
23 mean, I -- I remember asking a few questions after, you
24 know, tailgates sometimes, you know, just for them to
25 like clarify stuff.

Case 4:22-cv-05502-DMR    Document 366-42    Filed 04/17/25    Page 4 of 10

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Joel Martinez  
February 25, 2025

Page 49

1  know, like the aftermath of the cleanup, basically.
2      But -- but we also take the -- you know,
3  during, like I said, when -- if somebody's collecting
4  their belongings or -- or, yeah -- yeah, basically
5  throughout -- throughout the whole -- throughout the
6  whole resolutions, we -- we -- we're always taking
7  pictures, kind of.
8  Q.  And when you said you take pictures of the
9  truck, is that the truck that's going to the dump?
10  A.  Yeah.  Yeah.
11  Q.  And how many trucks do you usually have at a
12  resolution?
13      MS. BERDUX:  Overbroad.  Compound.
14      THE WITNESS:  So we'll have two flats and -- it will
15  be two flats and four LPs, like, regular trucks
16  basically.  The flats being the bigger trucks.
17      BY MS. KATOVICH:
18  Q.  And is one of those LPs your vehicle?
19  A.  Yeah.
20  Q.  And aside from your vehicle, do all of those
21  trucks go to the dump?
22  A.  Not really.  For the most part, we just -- we
23  just fill up the -- the two flats.
24  Q.  You said that -- you just described the whole
25  process for an encampment resolution.  Was what you were

Page 50

1  describing the current process?
2  A.  Yeah.
3  Q.  And you said that when you first started, it
4  was a little bit different; right?
5  A.  Yeah, yeah.
6  Q.  Can you describe the process when you first
7  started?
8  A.  I mean, the process -- I guess the process has
9  -- has, to me, has always been the same.  What changed
10  was time -- time wise.  They would -- they would just
11  allow more time.  That was about it.
12      And I guess too -- what changed, too, was, I
13  guess -- I guess the meaning of what was trash, too,
14  changed because, right, what's trash to me might not be
15  trash to somebody else.
16      So -- so, basically, they said, you know, if --
17  if they really wanted to keep it, even -- you know, even
18  if it looked trash-like to me, right, but to them it
19  wasn't, then they were -- they were allowed to keep it.
20  Q.  And when you first started, if something looked
21  like trash to you, but the person wanted to keep it, you
22  would still take it?
23  A.  Yeah, but there were -- there were guidelines,
24  you know.  Like -- like, it would have to be soiled.
25  Like, you know, it would have to be -- like, if it was a

Page 51

1  blanket, it would have to -- it would have to have,
2  like, stains, or it would have to be, you know, kind of
3  wet, or it would have to kind of -- like a bad odor or
4  smell to it.  And then, basically, it was -- it was kind
5  of deemed -- you know, it was deemed trash.  And then we
6  were kind of, you know, allowed to -- to kind of take
7  it.  Yeah.
8  Q.  And those guidelines, were they written
9  anywhere?
10  A.  I think they were just in the -- in those
11  tailgates at the -- I don't remember which one, but
12  they were -- they were just -- they were in those
13  tailgates.
14  Q.  And so they would have been in the packet that
15  you got?
16  A.  Yeah, yeah.
17  Q.  And when you -- what you're describing when you
18  were deciding whether an item was trash, would you be
19  deciding that after the person had had the 15 minutes to
20  pack up?
21  A.  Let me -- can you -- can you repeat that one?
22  Q.  You said that when you first started --
23  A.  Yeah.
24  Q.  -- people had about 15 minutes to pack up.
25  A.  Yeah.

Page 52

1  Q.  Would you start taking items that you thought
2  were trash before those 15 minutes?
3  A.  Well, not really.  I think we would always
4  allow them an extra 15, so I mean, we would do it kind
5  of 30.
6      And then after that, I mean, if they -- if they
7  wouldn't move, then -- then, yeah, we will start -- we
8  will start the -- the bag and tag process.  And whatever
9  was storable, we would store.  And whatever was
10  disposable, we would just dispose.
11  Q.  And so aside from those two things, the time
12  the people had and what was trash and whether people got
13  to keep things that you thought was trash, did anything
14  else change in how encampment resolutions happened since
15  you started?
16      MS. BERDUX:  Overbroad.  Incomplete hypothetical.
17      THE WITNESS:  Not really.  Yeah, no.
18      BY MS. KATOVICH:
19  Q.  At an encampment resolution currently, who
20  decides how much time people have to pack up?
21  A.  I mean, we -- we've been advised to give them
22  as much as -- as they want to right now.  So I guess
23  nobody really decides.  That's -- you know, they have as
24  much time as they need to.  So, I mean, we -- we might
25  tell them, "Hey, you know, it's been an hour, please can

Case 4:22-cv-05502-DMR   Document 366-42   Filed 04/17/25   Page 5 of 10

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Joel Martinez  
February 25, 2025

Page 61

1  A.  Well, they -- I mean, I guess the only -- I
2  remember the only thing they said was, like, you know,
3  if -- if an encampment was commingled with either
4  perishable items or drug paraphernalia, then -- right, I
5  remember -- they said, you know, we were within
6  basically our rights to -- to dispose it.
7      But there was -- I guess Jonathan did say in
8  one of the tailgates right, that -- that, right, if it
9  was -- if it was kind of removable.  Like I said, powder
10 is not removable.  Right?  So I cannot -- you know, I
11 cannot remove it from -- from an encampment.
12     But if it was like -- like a pipe, basically,
13 you know, it's kind of easy to remove, so that's not
14 really -- you know, not really commingled.  So in that
15 case, you know, sometimes you -- you could make, you
16 know, the -- the -- I mean, you could make the case of
17 -- basically, you will store the items in that -- in
18 that situation, you know, but...
19 Q.  So -- and have you ever removed a pipe from
20 items and stored the rest?
21 A.  The thing is I feel like when -- when items --
22 when the items get disposed, it won't -- it won't be
23 just because of one reason.  You know, it will be -- it
24 will be a checklist kind of, you know, where you have --
25 you have a checklist of five items, right, and if out of

Page 62

1  those five items, those three gets checked, you dispose
2  of it.
3  Q.  And if there's only one item checked, what
4  would you do?
5  A.  Then -- then you'll store it.  Yeah, you'll
6  store it.
7  Q.  And what are those checks?  What's on that
8  list?
9  A.  For me, like I said, it will be -- it will be
10 drugs.  It will be -- it will be perishable items.  It
11 will be biohazards.  It will be wet -- you know, wet,
12 soiled -- like wet -- or -- or wet conditions or even a
13 really bad smell or odor, basically.
14 Q.  Anything else on your list?
15 A.  I mean, there's a bunch.  You know, we see
16 feces.  We see piss bottles in the tent.  So if I see --
17 you know, I see -- if I was to come across, you know,
18 three of those -- three of that checklist, basically,
19 I'm -- I'm -- I think I'm within -- I'm within the
20 policy for me to dispose the items.
21 Q.  And were you instructed that if you had three
22 or more of those items --
23 A.  Not really.  I just kind of came up -- just
24 kind of made that list on my own, kind of.  It helps me,
25 at least, you know, with the whole process.

Page 63

1  Q.  And have you ever discussed that list that you
2  have for yourself with anyone?
3  A.  Not really, no.
4  Q.  And you said one thing on that list is
5  biohazards.  What does "biohazard" mean?
6  A.  It would be like a used condom.
7  Q.  Anything else?
8  A.  Yeah.  Used needles.
9  Q.  Anything else?
10 A.  I mean, you know, piss bottles, blood -- like
11 blood -- like bandages, like -- or rags with blood.
12 Q.  And did you ever -- were you ever provided a
13 definition of biohazard at one of the tailgates?
14 A.  Not really.  Yeah, no.
15 Q.  And did -- were you ever provided a definition
16 of biohazard at any of the other trainings you've had?
17 A.  Not really, yeah.
18 Q.  You said one of the things on your list is piss
19 bottles.  Would you ever remove a piss bottle from a
20 tent?
21 A.  It depends, you know.  Sometimes they seal --
22 they kind of seal really well.  Sometimes they're
23 leaking.  If they're leaking, I won't -- I won't even,
24 like, attempt to remove it.
25 Q.  And when you're doing this assessment of items

Page 64

1  to determine if there are things on this list there, do
2  you make that assessment just visually?
3  A.  Not really because I also included smell,
4  right?  So I mean, if there's a bad odor to it...
5  Q.  Do you ever go through items with your hands?
6  A.  We just kind of move things around, you know,
7  because sometimes they might not be -- you know, like,
8  maybe -- maybe what we're looking for is not, you know,
9  like plain on sight, you know.  And it'll be kind of
10 like you just move a blanket, and boom, you'll see --
11 you'll see either -- you know, whatever it is.  And --
12 and that will just discard the whole thing.  Or -- or
13 sometimes you just move it around and, you know, it's
14 all clean -- it's all clean items.  But if they have,
15 you know, valuable items, and then, I mean, we just --
16 we just store them.
17 Q.  And during this bag and tag process, you said
18 that now there's a form that the IC gives people about
19 removing their medication and other things; is that
20 right?
21 A.  Yeah, yeah.
22 Q.  And at what point in the process does that
23 happen?
24 A.  Like I said, I mean, the -- the process is
25 really not -- not for me.  Right?  It'll be for the IC.

Case 4:22-cv-05502-DMR   Document 366-42   Filed 04/17/25   Page 6 of 10
Coalition on Homelessness, et al. v                                    Joel Martinez
City and County of San Francisco, et al.                          February 25, 2025

Page 73

1  A. Attended, you said? I guess, you know, that
2  the individual, the owner of the items, is -- is there
3  present.
4  Q. And how do you identify attended property?
5  A. Attended, how do -- I mean, sometimes the owner
6  claims it himself.
7  Q. And what is unattended property?
8  A. It would be the opposite. The owner's not
9  there.
10 Q. And how do you identify unattended property?
11 A. There's nobody with the items, claiming the
12 items.
13 Q. What is abandoned property?
14 A. It would almost be the same, but basically it
15 will be items that you could actually dispose of.
16 Q. And how do you identify what is abandoned
17 property?
18 A. I guess -- wait. Can you repeat that one more
19 time? I'm sorry.
20 Q. How do you identify abandoned property?
21 A. It would be through the same bag and tag
22 process. I mean, you will have to -- you will have to
23 inspect the items and either deem it abandoned or
24 unattended.
25 Q. And what is -- how do you differentiate between

Page 74

1  abandoned property and unattended property?
2  A. So I guess in abandoned, it would be mostly,
3  you know, nobody's claiming it. It would look mostly
4  like trash. Yeah. It'd look mostly like trash. In
5  some -- is some cases, it could be soiled, or it could
6  be, you know -- there's basically nothing of value in --
7  in an abandoned encampment, but -- I mean, but, I kind
8  of -- I still -- I still always go through the --
9  through the, you know, bag and tag process. I mean,
10 even -- even if I'm not calling the CMMS, or if I am,
11 you know, basically, I go through the same checklist I
12 mentioned before. And, you know -- and then -- because
13 I mean, even if it's abandoned, sometimes you -- you
14 could come across something of value. And then, that --
15 you know, that might thing -- you might have to bag and
16 tag that one thing and dispose -- and dispose of the
17 rest.
18 Q. So your process would be the same for property
19 that is abandoned and property that's unattended?
20 A. For me -- I mean, for me personally, yeah.
21 Yes.
22 Q. And how -- how do you identify -- actually,
23 withdrawn.
24    Do you find it difficult to determine whether
25 something is abandoned versus unattended?

Page 75

1  MS. BERDUX: Overbroad. Lacks foundation.
2  Incomplete hypothetical.
3  THE WITNESS: Not really.
4  BY MS. KATOVICH:
5  Q. Why not?
6  A. Because of the same -- because of the bag and
7  tag process. It allows me -- because you know, it
8  allows me basically to identify what -- what it is on
9  the -- on the -- on the -- under the bag and tag
10 protocol.
11 Q. And what is -- what part of the bag and tag
12 protocol allows you to determine whether something is
13 abandoned versus unattended?
14 A. Can you -- can you repeat that?
15 Q. You said the bag and tag protocol allows to you
16 determine --
17 A. Yeah.
18 Q. -- what is abandoned --
19 A. Yeah.
20 Q. - versus what is unattended?
21 A. Yeah.
22 Q. And what part of the protocol allows you to do
23 that?
24 A. Well, it's like I -- I mean, in the protocol,
25 it says if it's abandoned and it looks mostly like trash

Page 76

1  and, you know -- and it's commingled -- commingled with
2  either drug paraphernalia for -- or whatever it is,
3  then, basically, it -- it's abandoned. I mean, that's
4  -- that's kind of the bag and tag protocol already
5  itself, already as it is.
6  Q. And what are the different kinds of property
7  that can be immediately discarded?
8  A. I mean, it -- immediately, I mean, a tent,
9  that, you know, if -- if I come across a tent that has,
10 you, know drug paraphernalia, meaning -- and it's
11 commingled, right, with the -- with the tent, meaning
12 there's powder or -- or, you know -- or sometimes it
13 could be a -- sometimes they burn stuff in -- in -- in
14 the tent, and they left all the burnt residue, you know,
15 in the tent, so it -- basically that right there, it
16 will -- it'll -- it'll -- it'll mean that whoever left
17 it behind basically abandoned the property and just, you
18 know, didn't want it anymore or at least it allows me to
19 dispose of it under -- under the bag and tag protocol.
20 Q. And what other types of items can you dispose
21 of immediately under the bag and tag protocol?
22 A. I mean, anything that -- that kind of -- that
23 -- kind of -- I don't know how to -- if it's kind of,
24 like, a health risk for me, basically, it will be --
25 that will kind of make it, you know, like an abandoned.

Case 4:22-cv-05502-DMR   Document 366-42   Filed 04/17/25   Page 7 of 10
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Joel Martinez
February 25, 2025

Page 85

1  right.  And then -- and then basically you'll -- you'll
2  -- you'll go -- you'll go from there.
3  Q.  And then when you're at the yard filling out
4  the intake form, do you copy the case number --
5  A.  Yes, so in the CMMS, you could go -- you could
6  go -- you could access the comments.  And then, right,
7  you'll see the comments that the radio -- radio control
8  people left.  And then you could also make the comments
9  yourself, right.  Or Carlos, again, got arrested.  We
10 bag and tagged his tent, you know.
11 Q.  And does the Bag and Tag Policy explain what to
12 do with bulky items?
13 A.  Yeah.  I mean, they said some -- if they're in
14 good condition, they -- they will fall under the Bag and
15 Tag Policy and be -- and be stored.  Or thrown away if
16 they're not in good conditions.
17 Q.  So the Bag and Tag Policy treats bulky items
18 the same as any other items?
19 A.  But like I said, they would have to be in good
20 condition.  Like if you come across a -- like a brand
21 new mattress, I mean, if it is -- but I'm -- and I'm not
22 a hundred percent sure.  I think they're stored for -- I
23 think regular property gets stored for 90 days.  I
24 believe bulky items get stored for less.  But I'm not a
25 hundred percent sure.

Page 86

1  Q.  And have you ever bagged and tagged a mattress?
2  A.  No.
3  Q.  Have you ever bagged and tagged a sofa?
4  A.  No.
5  Q.  Have you ever bagged and tagged a wheelchair?
6  A.  Yes.
7  Q.  When did you do that?
8  A.  I don't remember.  I just done multiple -- I've
9  done multiple, though -- multiple bag and tags.
10 Q.  And would a wheelchair be considered a bulky
11 item?
12 A.  I actually don't -- don't know, but -- but, and
13 -- and -- and the tailgate -- in the last tailgate that
14 Jonathan gave, too, he did said, right, when that -- if
15 -- if -- bag and tag should almost be -- I mean,
16 wheelchairs should almost be bag and tagged almost all
17 the time except for like some exceptions, like, you
18 know, right, because -- and I think I was the one that
19 asked that question because I came across a wheelchair
20 that actually had like poop, basically on it.  So I was
21 like -- and they were like, oh, we got to store all of
22 them, like, no matter what.
23    And I'm like you guys want me to store you know
24 this wheelchair with pop on it, right.  I mean, I'll do
25 it, but -- and then basically that's -- that's when he

Page 87

1  kind of said, you know, if -- if -- in those conditions
2  I, guess, we -- we are within -- within our means to
3  dispose of it, basically.
4  Q.  And you said that it's usually you or Dario,
5  your supervisor --
6  A.  Yeah.
7  Q.  -- who transports the bag and tags to the yard
8  right?
9  A.  Yeah.
10 Q.  And do you do that after the -- let's say
11 you're doing an HSOC resolution in the morning.  Would
12 you take the bag and tag items to the yard after that
13 resolution but before the JFO shift?
14 A.  I like -- me, personally, I like to take care
15 of them kind of like right away.
16 Q.  Mm-hmm?
17 A.  So -- because if I don't, then, you know, I --
18 like I said, I do -- I do -- when it comes to paperwork
19 I do a lot of paperwork.
20    So if I don't take care of it, like, you know,
21 like right then and there, I kind of just fall behind.
22 And then it's more work for me at the end of the day
23 basically.  So I -- I like to do it kind of -- I get a
24 bag and tag, I like to take it to the yard right then
25 and there.

Page 88

1  Q.  And you'll do this even if the resolution is
2  ongoing?
3  A.  Yeah.  I mean, right, if -- if I'm the lead,
4  and Dario is there, then he could supervise.  I just
5  take -- you know, I take the items back to the yard and
6  be back in 45 minutes.
7  Q.  And if you do a bag and tag where the owner is
8  present, does the Bag and Tag Policy require you to tell
9  the owner where they can retrieve the items?
10 A.  Yeah, yeah.  I mean, you -- you could let them
11 know.  It's -- it's -- it's courtesy, you know.  I don't
12 think it's in the policy, but -- but I -- but we -- I
13 believe we've been -- we've been advised to actually
14 tell them, oh, you know, your items will be for you --
15 waiting for you at 2023 Cesar Chavez.
16 Q.  And do you give them the SR number that's
17 associated with the bag and tag?
18 A.  Well, if they get cited or arrested, I think
19 that's -- right, that's why PD asks -- asks for the
20 number.  I don't know if they included it in the -- in
21 the citation, but I believe they do.
22 Q.  But if a person is not being arrested, you
23 don't give them the SR number?
24 A.  Yeah, like I said, it will be up to -- up to
25 PD.  They usually get that number from us every -- every

Case 4:22-cv-05502-DMR    Document 366-42    Filed 04/17/25    Page 8 of 10
Coalition on Homelessness, et al. v                                            Joel Martinez
City and County of San Francisco, et al.                                   February 25, 2025

Page 89

1  time, even if the person is not being arrested. So I
2  believe they are the ones that -- that -- you know.
3  Q.  And if there's no PD involved, and you're
4  bagging and tagging an item where the owner is there, do
5  you give them the SR number?
6  A.  Well, for the most part, they kind of always
7  move -- I haven't come across -- I haven't come across,
8  I guess, one of them where the owner is -- is -- is
9  present, and -- and -- and he didn't take his belongings
10 with him.
11 Q.  So the only time you've bagged and tagged items
12 where the owner is present is if PD is involved?
13 A.  For the most part, yeah, yeah, yeah.
14 Q.  Yeah. You don't remember any other situations
15 where you've bagged and tagged items where the owner is
16 present?
17 A.  Not that I remember, yeah, no. Yeah, no.
18 Because even -- see, even sometimes -- even with the
19 owners present, I mean, we might have -- there might be,
20 like, what do they call it? Man, I'm forgetting the
21 word, but like he could have -- he could choose somebody
22 to basically take -- you know, he could -- he could
23 choose a designated person. That's -- it's within the
24 -- I guess within the Bag and Tag Policy. They could
25 choose a designated person for them to, like, keep the

Page 90

1  items, too, and then we wouldn't have to store them
2  because he chose somebody to watch after his items too,
3  so...
4  Q.  Under the Bag and Tag Policy, what is a
5  preplanned encampment resolution?
6  A.  Preplanned. I mean, it's kind of -- it's kind
7  of what HSOC is. It's just that -- I don't know how to
8  describe it. Yeah. But it's kind of what HSOC is.
9  Q.  And what kind of notice is required by the
10 policy for those preplanned encampment resolutions?
11 A.  I know it requires a notice, but I don't know
12 which one it is because there's -- I believe -- I
13 believe City and County, those two, either -- either the
14 72-hour or the -- or what is it -- 48-hour -- I'm not a
15 hundred percent sure.
16 Q.  And at those HSOC preplanned encampment
17 resolutions, are the homeless people who are living
18 there required to move away?
19 A.  I mean, basically that's -- that's kind of what
20 we -- what we tell them, right, that we -- that we're
21 there to clean up -- clean up the sidewalk for the most
22 -- yeah, we're there cleaning the sidewalk, so they --
23 they would have to move, you know -- I mean, we let them
24 -- because we have to power wash. We -- we don't want
25 anybody to kind of -- to get wet or -- you know.

Page 91

1  Q.  And at those HSOC encampment resolutions, are
2  people allowed to come back after you've cleaned?
3  A.  From what I know, no, they're not allowed to
4  come back.
5  Q.  And who tells them that they're not allowed to
6  come back?
7  A.  I believe it might be PD. Maybe the IC in
8  charge.
9  Q.  Under the Bag and Tag Policy, what is a regular
10 encampment cleaning?
11 A.  I believe it will be the same thing we do with
12 JFO and HSOC.
13 Q.  And is there notice required for a regular
14 encampment cleaning?
15 A.  I actually don't remember. I know it's in the
16 bag and tag training, but I actually don't remember.
17 Q.  And for JFO, how much notice is required?
18 A.  Same thing. I know -- I know the notices are
19 in the bag and tag training, but I actually don't
20 remember.
21 Q.  Under the current Bag and Tag Policy, when are
22 you required to provide a post removal notice?
23 A.  When we come across a unattended bag and tag.
24 Q.  And who is responsible for providing that
25 notice?

Page 92

1  A.  Whoever is doing the bag and tag. So for the
2  most part, in my crew, it'll be either me or Dario.
3  Q.  And how do you provide the notice?
4  A.  So we either -- I guess at first, we were
5  advised to leave a cone. And then you will -- I guess
6  with either blue tape or clear tape, you will attach
7  this note to the cone, and, right, the -- the note will
8  include the CMMS -- the service request number, CMMS
9  number, the items that were -- that were being
10 collected, that would be the person who collected the
11 items and basically where the items were being stored
12 at, and -- and yeah.
13     That's how we were doing it at first. But
14 then, we just kept leaving too many cones behind, so we
15 just started posting them on the walls, right --
16 right -- basically where we would collect the items, we
17 would just post a notice right there on that wall
18 basically.
19 Q.  And what do you mean by you were leaving too
20 many cones behind?
21 A.  You know, basically for bag and tags, we were
22 just, you know, leaving too many -- because we need the
23 cones for traffic control, and then if -- if -- if we're
24 leaving them for bag and tags, then we're not having
25 enough cones to do the traffic control part, so we just

Case 4:22-cv-05502-DMR   Document 366-42   Filed 04/17/25   Page 9 of 10

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Joel Martinez
February 25, 2025

Page 85

1  right. And then -- and then basically you'll -- you'll
2  -- you'll go -- you'll go from there.
3  Q. And then when you're at the yard filling out
4  the intake form, do you copy the case number --
5  A. Yes, so in the CMMS, you could go -- you could
6  go -- you could access the comments. And then, right,
7  you'll see the comments that the radio -- radio control
8  people left. And then you could also make the comments
9  yourself, right. Or Carlos, again, got arrested. We
10 bag and tagged his tent, you know.
11 Q. And does the Bag and Tag Policy explain what to
12 do with bulky items?
13 A. Yeah. I mean, they said some -- if they're in
14 good condition, they -- they will fall under the Bag and
15 Tag Policy and be -- and be stored. Or thrown away if
16 they're not in good conditions.
17 Q. So the Bag and Tag Policy treats bulky items
18 the same as any other items?
19 A. But like I said, they would have to be in good
20 condition. Like if you come across a -- like a brand
21 new mattress, I mean, if it is -- but I'm -- and I'm not
22 a hundred percent sure. I think they're stored for -- I
23 think regular property gets stored for 90 days. I
24 believe bulky items get stored for less. But I'm not a
25 hundred percent sure.

Page 86

1  Q. And have you ever bagged and tagged a mattress?
2  A. No.
3  Q. Have you ever bagged and tagged a sofa?
4  A. No.
5  Q. Have you ever bagged and tagged a wheelchair?
6  A. Yes.
7  Q. When did you do that?
8  A. I don't remember. I just done multiple -- I've
9  done multiple, though -- multiple bag and tags.
10 Q. And would a wheelchair be considered a bulky
11 item?
12 A. I actually don't -- don't know, but -- but, and
13 -- and -- and the tailgate -- in the last tailgate that
14 Jonathan gave, too, he did said, right, when that -- if
15 -- if -- bag and tag should almost be -- I mean,
16 wheelchairs should almost be bag and tagged almost all
17 the time except for like some exceptions, like, you
18 know, right, because -- and I think I was the one that
19 asked that question because I came across a wheelchair
20 that actually had like poop, basically on it. So I was
21 like -- and they were like, oh, we got to store all of
22 them, like, no matter what.
23    And I'm like you guys want me to store you know
24 this wheelchair with pop on it, right. I mean, I'll do
25 it, but -- and then basically that's -- that's when he

Page 87

1  kind of said, you know, if -- if -- in those conditions
2  I, guess, we -- we are within -- within our means to
3  dispose of it, basically.
4  Q. And you said that it's usually you or Dario,
5  your supervisor --
6  A. Yeah.
7  Q. -- who transports the bag and tags to the yard
8  right?
9  A. Yeah.
10 Q. And do you do that after the -- let's say
11 you're doing an HSOC resolution in the morning. Would
12 you take the bag and tag items to the yard after that
13 resolution but before the JFO shift?
14 A. I like -- me, personally, I like to take care
15 of them kind of like right away.
16 Q. Mm-hmm?
17 A. So -- because if I don't, then, you know, I --
18 like I said, I do -- I do -- when it comes to paperwork
19 I do a lot of paperwork.
20    So if I don't take care of it, like, you know,
21 like right then and there, I kind of just fall behind.
22 And then it's more work for me at the end of the day
23 basically. So I -- I like to do it kind of -- I get a
24 bag and tag, I like to take it to the yard right then
25 and there.

Page 88

1  Q. And you'll do this even if the resolution is
2  ongoing?
3  A. Yeah. I mean, right, if -- if I'm the lead,
4  and Dario is there, then he could supervise. I just
5  take -- you know, I take the items back to the yard and
6  be back in 45 minutes.
7  Q. And if you do a bag and tag where the owner is
8  present, does the Bag and Tag Policy require you to tell
9  the owner where they can retrieve the items?
10 A. Yeah, yeah. I mean, you -- you could let them
11 know. It's -- it's -- it's courtesy, you know. I don't
12 think it's in the policy, but -- but I -- but we -- I
13 believe we've been -- we've been advised to actually
14 tell them, oh, you know, your items will be for you --
15 waiting for you at 2023 Cesar Chavez.
16 Q. And do you give them the SR number that's
17 associated with the bag and tag?
18 A. Well, if they get cited or arrested, I think
19 that's -- right, that's why PD asks -- asks for the
20 number. I don't know if they included it in the -- in
21 the citation, but I believe they do.
22 Q. But if a person is not being arrested, you
23 don't give them the SR number?
24 A. Yeah, like I said, it will be up to -- up to
25 PD. They usually get that number from us every -- every

Case 4:22-cv-05502-DMR   Document 366-42   Filed 04/17/25   Page 10 of 10
Coalition on Homelessness, et al. v                                    Joel Martinez
City and County of San Francisco, et al.                               February 25, 2025

Page 101

1  A. No, no.
2  Q. Have you received any training on how to
3  dispose of any of the items I just went through?
4  A. We just -- I mean, we've been trained that if
5  we come across any of them items, that we're within our
6  policy to dispose of them.
7  Q. And have you received any instructions on how
8  to dispose of them?
9  A. I mean, safety is always, you know, is always
10 priority. Other than that yeah, no.
11 Q. And how do you safely dispose of the items that
12 we just went through?
13     MS. BERDUX: Compound.
14     THE WITNESS: Well, it depends. Right? So if you
15 come across needles, we usually have had like a little
16 red boxes where, you know, we pick them with the
17 pickers. We've been advised not to pick them up with
18 our hands. So you know, we just kind of pick them up
19 with a little picker, put them in the box, or -- or any
20 other hazards, too.
21     Like, the -- right? I mean, if it's powder,
22 you don't know what it is. It could be anything. So
23 you know, if it's a baggy, same thing, you pick it up
24 with the picker, and you throw it in a -- in a white
25 bag, and then that's kind of how we -- how we do it.

Page 102

1     BY MS. KATOVICH:
2  Q. And then what do you do with the white bag?
3  A. I mean, it goes -- it goes to Recology with the
4  rest -- you know, with the rest of it.
5  Q. And you said that you -- you've been --
6  A. Well, not the needles, the needle -- I believe
7  the needles get taken to the -- to the hazard -- hazard
8  place that I -- that I told you at the beginning. So
9  that's where kind of with the needles get -- well, once
10 you have a full container, then you could kind of take
11 that to the -- to the hazardous area and just leave it
12 there.
13 Q. And so if you were to come across a tent that
14 had some needles inside, are you supposed to use the
15 picker thing to take those needles out and put them in
16 the sharps container first?
17 A. Yeah, yeah.
18 Q. Are there circumstances under which you would
19 not remove the needles, and you would just put the whole
20 tent with the needles inside it in the -- in the trash?
21 A. I mean, if -- right, if there was -- I guess,
22 if there was -- let's say that there was needles, right,
23 but that was not the only reason why I'm disposing the
24 tent. Like I said, there's always a checklist of at
25 least three items.

Page 103

1  So if -- if -- if I do come across a tent where
2  it has needles, and it has -- you know, it -- it has a
3  wet -- wet -- wet floor basically, and on top of that,
4  it has a urine smell, then, yeah, I'm not -- I'm not
5  going to pick up needle by needle. I'm disposing of the
6  whole thing.
7  Q. Did you receive any training on how to safely
8  separate contaminated items from non contaminated items?
9  A. No.
10 Q. Did you receive any training on differentiating
11 between immediate and long-term health or safety risks?
12 A. No.
13 Q. Did you receive any training on how to
14 determine whether something is commingled?
15 A. No.
16 Q. Are you -- yes?
17 A. We were shown pictures, I guess, of you know,
18 of -- of commingled, you know, items. On the training,
19 I guess even in the -- in the document that they
20 provided, there is pictures of -- of -- basically kind
21 of all -- everything you -- you mentioned, there is --
22 there is -- because even in the document right there is
23 a sheet that you could -- that you could look basically
24 that kind of -- it's like a -- like a -- it's there to
25 assist you, basically, on the -- on the -- on the

Page 104

1  document that they provided.
2     So if you know, like, you will see -- you could
3  kind of look at these pictures and -- and go -- go for
4  that kind of.
5  Q. I'm going to show a document. And this is a
6  document that's previously been marked as Exhibit 1035.
7  Take a moment and just flip through this document.
8     Do you recognize this document?
9  A. Yeah.
10 Q. And is this the same document that you received
11 in the most recent training that you had on the Bag and
12 Tag Policy?
13    MS. BERDUX: Objection. Calls for speculation.
14    THE WITNESS: I'm not a hundred percent sure. The
15 one we got looked a little more thicker than this, but
16 it could be.
17    BY MS. KATOVICH:
18 Q. But you've seen all of the pages in this
19 before?
20 A. Yeah.
21    MS. BERDUX: Objection. Compound and overbroad.
22 It's a 53-page document.
23    BY MS. KATOVICH:
24 Q. And you were just talking about a training
25 where you -- there was some -- a cheat sheet about items