# EXHIBIT 38

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

## *Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*

### *David Nakanishi*
### *February 7, 2025*

---

*Behmke Reporting and Video Services, Inc.*
550 California Street, Suite 820
San Francisco, California 94104
(415) 597-5600

Original File 44066Nakanishi_nl.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR   Document 366-44   Filed 04/17/25   Page 3 of 5
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.
David Nakanishi
February 7, 2025

Page 153

1    So it may be a case where I go to further
2  assess the situation to kind of determine what's the
3  best need.
4    So, again, I would say there's a -- I think a
5  challenging distinction between HSOC as the resolutions
6  versus me, as HSOC manager, trying to assess and help
7  people on the street.
8    So a situation like this, I probably went to
9  look -- well, I probably did at least -- well, I
10 probably went to look because here I'm saying, you know,
11 there's only a few; it's not enough for an HSOC op, but
12 that I could potentially schedule it.
13   ATTORNEY DO: I'm going to pass you what will be
14 Exhibit 1181.
15   (Deposition Exhibit 1181 was marked for
16   identification.)
17 BY ATTORNEY DO:
18   Q. So I'm going to represent this is text messages
19 provided by the City. It starts at Bates No. -449245.
20   You use text message as a form of communication
21 when you're -- as part of work, correct?
22   A. Yes.
23   Q. And this is an official work phone, correct?
24   A. Yes.
25   Q. You can see the names of some of the recipients

Page 154

1  of the text messages here.
2    Do you recognize them?
3    A. Yes, I do, even though the font is super small.
4    Q. But is it fair to say these are people you
5  routinely communicate with while at work including while
6  out in the field?
7    A. Yes. I haven't reviewed every single one, but
8  I do recognize everyone that is on the text.
9    Q. If you could go to the second page where, at
10 the top, it says: "In at 2583 Mission cross 22nd St.
11 Individual refuse to move. Please help me out with an
12 issue. In front of Merchants & bus stop. Thanks in
13 advance."
14   And that is an e-mail from Alberto Zapata to
15 you?
16   A. Mm-hmm.
17   Q. And then in the message below that, it says --
18 in a message from Brittany Brandon to, again, you, it
19 says: "One person is the zones responsibility."
20   What does that mean?
21   A. I don't --
22   ATTORNEY MILLS: Objection; compound, vague,
23 ambiguous.
24   THE WITNESS: So my interpretation of this is
25 Alberto Zapata is the zone Supe II in the Mission. He's

Page 155

1  pointing out that there's a problem in front of a
2  business and in a bus shelter.
3    I'd have to see who -- so I'm assuming he
4  included Brittany, who is one of the supervisors on the
5  HSOC DPW Team -- or she was. I don't know -- what date
6  is this? This is in July of 2024. So I think she was
7  still either with the Reactionary Team or Hot Spot. So
8  working with -- she was part of the HSOC crew.
9    She's saying one person is a zone's
10 responsibility, meaning that this is not an HSOC
11 responsibility.
12   It goes back to your question of who deals with
13 one -- less than six tents.
14 BY ATTORNEY DO:
15   Q. Do you agree with that assessment?
16   A. Yes. This is not an HSOC -- this isn't
17 something that would fall under HSOC response, just this
18 one specific location.
19   Q. Okay. We can put that aside.
20   San Francisco has a re-encampment policy,
21 right?
22   A. Specify. I'm not sure what you're referring
23 to.
24   Q. Do you have any practices related to
25 re-encampment prevention?

Page 156

1    ATTORNEY MILLS: Objection; vague and ambiguous.
2    THE WITNESS: So I think we are mindful of trying to
3  prevent large -- yeah, areas, being reencamped or areas
4  that are known for inability to allow ADA access from
5  getting reencamped.
6    So I wouldn't say -- I'm not aware of a City
7  policy. It is something we refer to or practice that we
8  try to prevent areas that are known for encampments
9  restricting ADA, fire exits, things like that, to try to
10 prevent them from returning and creating the continual
11 problem.
12 BY ATTORNEY DO:
13   Q. So what are those practices that you implement
14 to prevent re-encampment?
15   ATTORNEY MILLS: Objection; vague, ambiguous,
16 incomplete hypothetical.
17   THE WITNESS: So practices include kind of if -- at
18 least today, I would say now, because the impact of
19 noticing and with the increased perception that there is
20 the chance for greater enforcement after all the mayor's
21 comments and the press releases, people tend to move
22 when they're noticed. So they're not there when we get
23 there.
24   So I do often shift the team to areas that
25 either I'd become aware of that ADA restriction in

Case 4:22-cv-05502-DMR   Document 366-44   Filed 04/17/25   Page 4 of 5

Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.

David Nakanishi
February 7, 2025

Page 157

1  particular has happened or known locations that I
2  suspect people or I know from experience they'll go
3  right back that have been addressed before.
4       So common practice is to return to an area
5  nearby to address looking for the fact that they have
6  again restricted ADA access.
7  BY ATTORNEY DO:
8    Q.  I'm sorry.  Nearby where?
9    A.  Wherever the resolution was.  So we're
10 citywide.  So we happen to be in the Tenderloin, and
11 we're dealing with one location that was noticed.  If
12 they're not there, it's pretty -- usually we can guess
13 either where there might be ongoing problems or where
14 they have moved to that are again causing problems.
15      So we'll try to address areas that we are in,
16 particularly -- especially looking for ADA violations.
17   Q.  So your practice is to revisit areas nearby
18 noticed resolutions, correct?
19   A.  Generally.  There are times that, you know, we
20 may go to a known location -- so nearby is -- different
21 people would define "nearby" differently.  You know,
22 we're a relatively small city.  So we generally try to
23 stay within the area, the neighborhood, that we're in.
24   Q.  So what does "nearby" mean to you?
25   A.  Generally the area of the neighborhood we're

Page 158

1  in.
2    Q.  So when you go to these nearby areas that
3  are -- let me start again.
4       When you go to these locations that are nearby
5  noticed resolutions, do those nearby locations also
6  receive notice?
7       ATTORNEY MILLS:  Objection; vague and ambiguous.
8       THE WITNESS:  So I was going to correct you, because
9  you said near -- when you go to these nearby noticed
10 places.
11      So when we do -- re-encampment prevention
12 oftentimes are areas that are not noticed.  The
13 difference of going to an unnoticed location is we will
14 give them ample time to comply to the request we're
15 making.
16      So in the original noticing, I believe the
17 language in there was also consistent with some of the
18 rulings that if they're told by especially PD -- and I
19 can't remember; there's someone else in there -- to not
20 return to an area, then they're not supposed to return.
21      But the biggest difference in an unnoticed
22 area, which has become more common, is we give them
23 ample time to comply.  So we usually tell them why we're
24 there, what the issue is.
25      A lot of the encampments create significant

Page 159

1  amount of dirtying the area.  So it could use being
2  washed.
3       So we give them ample time to comply.  The
4  process is the same in that we'll still offer them
5  shelter.  We'll go through the same process as a noticed
6  area.
7  BY ATTORNEY DO:
8    Q.  And by "we," are you -- you're referring to --
9    A.  The whole team.
10   Q.  The whole team.
11      So all the HSOC agencies?
12   A.  Mm-hmm.
13   Q.  That includes potentially SFPD?
14   A.  Mm-hmm.
15   Q.  SFFD?
16   A.  Mm-hmm.
17   Q.  And DPW?
18   A.  Mm-hmm.
19      ATTORNEY MILLS:  You have to say "yes."
20      THE WITNESS:  Yes, yes.  It's the entire team.
21 BY ATTORNEY DO:
22   Q.  Sorry.  Just for the record, to make sure we
23 got it, your entire team, the HSOC Team, will go to
24 unnoticed areas in re-encampment prevention; and that
25 entire team includes SFFD, SFPD, HOT, and DPW?

Page 160

1    A.  So it will -- so, yes, it will include the
2  incident commander, that's SF Fire; SFPD; MTA, because
3  we usually have parking control officers to include ERT;
4  the HOT Team; it will include DPW; it will include
5  usually our Transport Team.
6       These days, it would include the investigator
7  from the City Attorney's Office that's observing.  Right
8  now, it would probably include someone from the
9  Coalition and/or ACLU following us too.
10      But it's -- I think that's the whole team; it's
11 like everyone.  Occasionally BEST shows up, but that's
12 not part of the regular team.  I think that's everybody.
13   Q.  So these areas won't have received a written
14 notification, correct?
15   A.  They would not have, yes, if we're shifting.
16   Q.  Would they receive a verbal notification?
17   A.  So what do you mean by that?  Like, in...
18   Q.  Would they receive a verbal notification in
19 advance of you arriving?
20   A.  Generally not.  I would say today, now,
21 generally they're not getting advanced notice.
22      But once we're there, we'll give them -- we'll
23 let them know why, what the expectations are.  And we'll
24 give them time to comply, which might mean they're going
25 to vacate the area.

Case 4:22-cv-05502-DMR   Document 366-44   Filed 04/17/25   Page 5 of 5
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.
David Nakanishi
February 7, 2025

Page 161

1  Right now, the most -- in my experience,
2 probably everyone that's encamped out there usually
3 knows exactly when we show up what the expectations are.
4  Q. And why is that?
5  A. I think because there's so few people left that
6 are regularly encamped.
7  Early on, especially when I was an ERT
8 supervisor, there are people that were happy to accept
9 shelter. Most of the people now, we already know them.
10 They've been out there. They know us. They'll see us
11 coming.
12  There's some locations, they see my vehicle,
13 they'll start packing up and moving even though I'm not
14 coming.
15  Q. So what you mean is they recognize you and
16 therefore can anticipate --
17  A. No. They recognize the whole -- if the whole
18 group is coming, they know it's a resolution.
19  Q. Sorry.
20  A. Yeah.
21  Q. I misused the word "you" there.
22  But you're saying that they recognize the HSOC
23 crew?
24  A. Yes.
25  Q. And therefore can anticipate, once they see

Page 162

1 you, what's to come?
2  A. Yeah.
3  Q. You've had re-encampment prevention practices
4 the entire time that you've been at HSOC, right?
5  A. No. I don't think we -- we didn't shift like
6 this early on. In fact, we weren't able to because
7 usually the planned resolution was so big, there were
8 times that we couldn't finish.
9  Even when people voluntarily said, "You can
10 take all this," there were times we couldn't pick it all
11 up because there was so much to pick up.
12  Q. Oh. So you didn't have enough time to go
13 beyond a noticed area because there was enough to do in
14 that noticed area; is that right?
15  A. Early, yeah, when I first started as manager
16 and when I was with the ERT supervisor. It changed over
17 time.
18  Q. When did that change -- start over. Let me
19 rephrase that question.
20  How has it changed over time?
21  A. Well, I think the combination of the -- so
22 there were two ways. So going back, not current, but
23 going back a little ways, the number of people encamped
24 and the amount of items there that need to get picked up
25 were just smaller. And that they also would move

Page 163

1 sometimes well in advance of us showing up.
2  I mean, now, there's chances that it may have
3 started with six or more; and once it's noticed, there
4 will be nothing there or just debris. So then we go
5 more into the re-encampment prevention mode.
6  So I think it's shifted significantly in that
7 they're more mobile and they're more spread out. So we
8 tend to move a little bit more than we used to when I
9 first started.
10  Q. And do you make the determination of when to
11 shift and move?
12  A. Not totally. I'm one of the ones that either
13 will make that determination or they'll ask me.
14  But the incident commanders are generally also
15 versed on where we've been, what needs to get addressed.
16 So a lot of times I'm asking them to also look to see,
17 prior to an operation, where there might be problem
18 spots nearby.
19  Q. So when you say "they will ask me," are you
20 referring to incident commanders?
21  A. Yes.
22  Q. So it's fair to say that it's either you or the
23 incident commander who determines if you move to another
24 location, including an unnoticed location?
25  A. So I would say most of the time, I'm the one

Page 164

1 giving final approval. But there are times that the
2 incident commander is determining or suggesting where to
3 go. So it's usually also part of a text chain or phone
4 call.
5  Q. How far away do you move from a noticed
6 location when you're doing this re-encampment
7 prevention?
8  A. So, again, frankly, that varies. Generally
9 we're trying to stay close. So it goes back to my
10 earlier response: usually within a neighborhood.
11  Every once in a while, we will travel more
12 significant if I'm aware -- if I'm aware of a location
13 that's been reencamped that's really a problem and we
14 have time and the ability to address it.
15  So that could be, you know, miles away, not in
16 the same neighborhood.
17  Q. So you do re-encampment prevention of unnoticed
18 areas ranging from a block away to miles away; is that
19 fair?
20  A. Yeah. It's rare miles away, just because of
21 the time. Because it's all within the time frame of the
22 operation.
23  Q. Why don't you provide notice for this
24 re-encampment prevention?
25  ATTORNEY MILLS: Objection; vague and ambiguous.