# EXHIBIT 40

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

*Wayman Young*
*January 23, 2025*

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 43960Young_nl.txt
**Min-U-Script® with Word Index**

Case 4:22-cv-05502-DMR    Document 366-46    Filed 04/17/25    Page 3 of 10
Coalition on Homelessness, et al. v                                    Wayman Young
City and County of San Francisco, et al.                               January 23, 2025

Page 169

1  property?
2  A.  I believe so.
3  Q.  And are there circumstances where DPW does not
4  take the tent?
5     MR. WANG: Objection. Calls for speculation.
6     THE WITNESS: My understanding is that if
7  there's, for example, body fluids or worse on it, they
8  don't -- they dispose of it.
9     BY MS. KATOVICH:
10 Q.  Have you ever witnessed DPW disposing of a tent
11 that you've asked them to take custody of as evidence of a
12 crime?
13 A.  They have told us that, yes.
14 Q.  And have you -- you've seen them discard it?
15 A.  No. When we arrest somebody, we tell them hey,
16 you know, the same thing. They'll come -- they'll go and
17 do the assessment, and there's times they have told the
18 officers hey, this tent, we cannot bag and tag because it's
19 got whatever on it.
20 Q.  And have they told you that personally?
21 A.  On occasion, yes, when I've done the arrest
22 myself.
23 Q.  And have you ever taken any steps to verify
24 whether the tent is -- does actually have -- is soiled or
25 is -- has bodily fluids, or whatever else they're saying?

Page 170

1  A.  No.
2  Q.  Have you ever disagreed with their assessment of
3  whether or not a tent is soiled?
4  A.  No.
5  Q.  If you disagreed, would you say something?
6  A.  Yes.
7  Q.  Has anyone you supervised ever told that you they
8  disagreed with DPW's assessment of whether a tent could be
9  stored?
10 A.  No.
11 Q.  You said that you're required to take photos of
12 tents when you arrest people for illegal lodging, right?
13 A.  Yes.
14 Q.  And is that photo then used as evidence of the
15 crime?
16 A.  It can be, I guess if the DA needs it.
17 Q.  After you arrest someone for illegal lodging, do
18 you know whether the DA prosecutes that, I guess, booking
19 charged, whatever you call it?
20 A.  No.
21 Q.  Has the DA ever requested evidence from you or
22 your team to support an illegal lodging charge?
23 A.  No.
24 Q.  Typically, if the DA is prosecuting a crime,
25 would they request evidence that you collected?

Page 171

1  A.  Sometimes.
2  Q.  Under what circumstances?
3  A.  Um, regarding other crimes -- you know, arrests
4  I've made -- for example, could range from anything, shoes
5  to photos, a camera we find in the street.
6  Q.  And typically you would have that property in
7  SFPD custody; is that correct?
8  A.  Yes.
9  Q.  And if SFPD seizes -- seizes any property at a
10 crime scene other than at an encampment, is that property
11 ever destroyed because it's soiled?
12 A.  They wouldn't take it. They wouldn't -- if it
13 was soiled, they would take a photo of it, but there's no
14 way for us to book it or take it back to the station.
15 Q.  Are you familiar with the property control
16 section of the SFPD?
17 A.  Vaguely, yes.
18 Q.  Are you familiar with SFPD policies that govern
19 collection of evidence?
20 A.  Yes.
21 Q.  And do you recall what policy that is, the name
22 or number?
23 A.  It's the booking of evidence, the title.
24 Protocols, or something to that effect; protocols for
25 booking evidence.

Page 172

1  Q.  Let me show you. Would that be general order
2  6.02, do you know?
3  A.  I believe so. I don't know the exact numbers.
4  Q.  And is it your understanding that if evidence of
5  a crime contains blood or bodily fluids that that evidence
6  will not be stored by SFPD?
7     MR. WANG: Objection. Vague. Incomplete
8  hypothetical.
9     Go ahead.
10    THE WITNESS: I don't remember the details, but
11 there's protocols for dealing with blood.
12    BY MS. KATOVICH:
13 Q.  And what about evidence of a crime that involves
14 hazardous materials? Are there protocols for SFPD handling
15 that evidence?
16 A.  Yes.
17 Q.  And what about protocols for handling evidence
18 that includes -- that has drugs on it or includes drug
19 paraphernalia? Are there protocols in place for SFPD
20 handling those?
21 A.  Yes.
22 Q.  And in each of those cases, SFPD would be the
23 agency that retains possession of that evidence; is that
24 correct?
25 A.  Not in all of them.

Case 4:22-cv-05502-DMR   Document 366-46   Filed 04/17/25   Page 4 of 10

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Wayman Young
January 23, 2025

Page 173

1  Q. In which cases would SFPD surrender that evidence
2  to a different agency?
3  A. Probably like blood.
4  Q. And which agency takes possession of evidence
5  with blood on it?
6  A. I believe it's the people who test the drugs, the
7  -- I forget their names. It's just not popping up in my
8  head. There's protocol, they're supposed to bring the
9  blood into I believe it's 850, or put it in the fridge.
10 It's been a while. But there's protocols for that.
11 Q. And the fridge you're describing, that's within
12 SFPD?
13 A. It's within 850 Bryant.
14 Q. And what is 850 Bryant?
15 A. It's the building where the courts are, where we
16 used to have a police station, and there's a property
17 division down there.
18 Q. And are there any circumstances under which you
19 would discard evidence of a crime, aside from tents or
20 illegal lodging?
21 A. No.
22    MR. WANG: Objection. Incomplete hypothetical.
23 Vague.
24    Go ahead.
25 ///

Page 174

1    BY MS. KATOVICH:
2  Q. That was no, did you --
3  A. Yes.
4  Q. Which SFPD policies currently apply to treatment
5  of personal items on public property?
6  A. Which policy treatment of -- I'm sorry.
7  Q. To treatment of personal items on public
8  property.
9  A. I'm not sure I understand the question.
10 Q. Are you aware of any SFPD Department Notice or
11 other policy that applies to how SFPD handles personal
12 items on public property?
13 A. If it's related to a crime?
14 Q. Just generally treatment of personal items on
15 public property.
16 A. You mean like found property? I mean, we have
17 the found property Department Notice.
18 Q. Are you aware of any other notices that would
19 apply to SFPD, what SFPD should do if they come across
20 personal property on public property?
21 A. You mean like if they're just walking down the
22 street and they see a laptop?
23 Q. Sure. That's one example.
24 A. They would take it back, book it, write a report.
25 Q. Are there any circumstances in which they would

Page 175

1  not take a personal item they find in public back to the
2  station and book it?
3  A. No. We -- I don't see officers wanting to do
4  that. You don't know who it belongs to. Why would we just
5  take some property off the street? I'm not sure I
6  understand the question.
7  Q. You said that if you found a laptop, you would
8  take that off the street and bring it to the station; is
9  that correct?
10    MR. WANG: Objection. Misstates testimony.
11    THE WITNESS: If I want to take it. A lot of
12 times officers would just leave it alone.
13    BY MS. KATOVICH:
14 Q. And is there any kind of Department Notice that
15 guides officers as to whether they should or should not
16 take that kind of property back to the station?
17 A. If you were to take any property that you find in
18 the street, yeah, you should, you know, take it back to the
19 station and book it as property for safekeeping because
20 it's a found property report.
21 Q. And you would be required to do that under
22 department guidance?
23 A. Yes.
24    MR. WANG: Objection. Vague as to what part of
25 it is required.

Page 176

1    But go ahead.
2    THE WITNESS: I'm sorry. I lost my train of
3  thought. What's your question again?
4    BY MS. KATOVICH:
5  Q. You said that you would -- if you came across an
6  item, that you would take it back and book it as found
7  property; is that correct?
8  A. Correct.
9  Q. And is there a particular policy or guidance that
10 instructs officers to do that?
11 A. Yes. The found property, there's a general order
12 on found property report.
13 Q. And does that order apply to property, found
14 property, at encampments?
15 A. An encampment would be considered found property
16 -- I don't understand the question.
17 Q. It would be considered found property?
18 A. It would not.
19 Q. Why?
20 A. If it's an encampment, there's people there,
21 right? I'm not sure I understand the question.
22 Q. If there were not people at an encampment but you
23 come across property at an encampment without people
24 around --
25 A. Oh, okay. I understand the question. You're

Case 4:22-cv-05502-DMR   Document 366-46   Filed 04/17/25   Page 5 of 10

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Wayman Young
January 23, 2025

Page 201

1  A.  No.
2  Q.  Have officers under your supervision enforced
3  that Penal Code?
4  A.  Yes.
5  Q.  And in those situations did you approve arrest
6  under that section?
7  A.  Yes.
8  Q.  The paragraph I just read explains that the -- a
9  person may be cited where the city has complied with other
10 local laws.  And what other local laws might -- what do you
11 -- what other local laws do you understand this sentence to
12 be referring to?
13 A.  I don't know.
14 Q.  What is your understanding of which local laws
15 need to be complied with before you or your officers can
16 enforce Penal Code Section 148(a)?
17 A.  I'm assuming it's the citizen's arrest.
18 Q.  And what local law would that be, the citizen's
19 arrest?
20 A.  That wouldn't be a local law.  That would be a
21 Penal Code.
22 Q.  And that Penal Code, what does that Penal Code
23 say?
24 A.  What it states there.  When someone either
25 interferes, delays any public city agency trying to conduct

Page 202

1  their duties.
2  Q.  And you stated earlier that you understood that
3  it was required for police officers to obtain a citizen's
4  arrest form before enforcing this Penal Code; is that
5  correct?
6  A.  Yes.
7  Q.  And is that requirement set out in this
8  Department Notice?
9  A.  I don't believe so.  It's in another general
10 order for misdemeanor, it's that if we don't see -- if the
11 officer does not observe the crime, they must obtain a
12 citizen's arrest from the person who is either the victim
13 or the person who observed the crime.
14 Q.  The paragraph that I just read gives an example
15 of joint operations.  Do you understand joint operations to
16 mean HSOC operations?
17 A.  Yes.
18 Q.  And is Penal Code Section 148(a) regularly
19 enforced at HSOC operations?
20 A.  Yes.
21 Q.  How often would you say it's enforced at HSOC
22 operations?
23    MR. WANG:  Objection.  Vague as to "enforced."
24    Go ahead.
25    THE WITNESS:  I don't know the exact number, but

Page 203

1  we do enforce it.
2     BY MS. KATOVICH:
3  Q.  And if DPW were not complying with the Bag & Tag
4  policy and -- if DPW -- let's give an example of if DPW
5  were taking a person's personal property and that was clean
6  and putting it into the -- discarding it with other trash,
7  and the person was trying to get that property back.  Do
8  you think that they could be charged with this Penal Code
9  violation?
10    MR. WANG:  Objection.  Incomplete hypothetical.
11 Calls for expert opinion.
12    Go ahead.
13    THE WITNESS:  The officer wouldn't -- I could
14 speak for myself.  I wouldn't know if the DPW is violating
15 their own policy but, by law, we will accept a citizen's
16 arrest and make an arrest.
17    BY MS. KATOVICH:
18 Q.  And so a violation of DPW's policy would not be
19 considered the city not complying with local -- other local
20 laws?
21 A.  I don't -- I wouldn't -- not in my opinion.  I
22 don't understand what that portion means.
23 Q.  I'm going to show you an exhibit which we will
24 mark as 1039.
25    MR. FREEMAN:  40.

Page 204

1     MS. KATOVICH:  40.  Oh my God.
2     (Exhibit 1040 was marked for identification.)
3     BY MS. KATOVICH:
4  Q.  Are you familiar with this document?
5  A.  Yes.  This is a police report I wrote.
6  Q.  And how can you tell that you wrote this police
7  report?
8  A.  Because I'm the reporting officer signed on it.
9  Q.  Who is the reviewing officer?
10 A.  Myself.
11 Q.  What is -- what does a reviewing officer do?
12 A.  Looks for mistakes.  Crime elements.  Grammatical
13 errors.  Make sure all the needed boxes are filled.
14 Q.  And is this the person that you were describing
15 earlier as an officer would send their incident report to a
16 sergeant or to you to review?
17 A.  Yes.
18 Q.  And then whoever they sent it to would be listed
19 as the reviewing officer; is that correct?
20 A.  Yes.
21 Q.  And is that field automatically populated?
22 A.  Yes.  Whichever supervisor is using their
23 computer, when they hit the sign button or the approval
24 button, it would put their name and star number and time.
25 Q.  Okay.  And then below that do you see the field

Case 4:22-cv-05502-DMR   Document 366-46   Filed 04/17/25   Page 6 of 10
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Wayman Young
January 23, 2025

Page 225

1  required to take a photograph of that tent or tarp?
2      MR. WANG: Objection. Asked and answered.
3      Go ahead.
4      THE WITNESS: Yes.
5      BY MS. KATOVICH:
6  Q.  And in this case there's no photograph?
7  A.  No. I don't see it.
8  Q.  So that would mean that this incident report does
9  not comply with the SFPD Bag & Tag policy?
10 A.  No. It complies, but it's just a body-worn
11 camera.
12 Q.  So SFPD is not required to take a photograph of
13 the property given to DPW?
14     MR. WANG: Objection. Vague.
15     THE WITNESS: Probably they should.
16     BY MS. KATOVICH:
17 Q.  I'm going to now show you a document that will
18 be --
19     (Exhibit 1042 was marked for identification.)
20 Q.  Are you familiar with this document?
21 A.  Yes.
22 Q.  Is this the Department Notice concerning DPW's
23 Bag & Tag policy that is currently in place?
24 A.  Yes. This is the Department Bag & Tag policy.
25 Q.  And I'm going to direct you to the second page

Page 226

1  under Procedure and How to Contact DPW. Do you see
2  Number 4 under that, which says members shall photograph
3  and document the property in the report?
4  A.  Yes.
5  Q.  Do you understand that to be an optional
6  requirement?
7  A.  Yes.
8  Q.  Have you ever received instructions on
9  requirements for incident reports concerning enforcement of
10 illegal lodging?
11 A.  Yes.
12 Q.  Who provided you those instructions?
13 A.  Department bulletin.
14 Q.  So those instructions are what we're looking at
15 here?
16 A.  Yes.
17 Q.  And the instructions concerning photographs are
18 members shall photograph and document the property?
19 A.  Yes.
20 Q.  So if you came across an incident report like
21 this one which concerned an arrest for illegal lodging and
22 where DPW seized -- or took custody of the tent or other
23 structure, and there was no photograph attached, would you
24 take any action?
25 A.  As I stated earlier, I would next look for BWC,

Page 227

1  because the body-worn camera is like taking a photo. You
2  have the photo.
3  Q.  And what is the purpose of having either a
4  body-worn camera or a photo?
5  A.  It was always in the DN back then that you have
6  to turn on the body-worn camera.
7  Q.  And is the body-worn camera footage used as
8  evidence of the crime?
9  A.  I don't know.
10     MR. WANG: Objection. Vague.
11     Go ahead.
12     BY MS. KATOVICH:
13 Q.  Is -- are there other instances in which it's
14 required that a photograph or body-worn camera footage of
15 evidence of a crime be associated with an incident report?
16 A.  I'm sorry. Can you repeat that, please?
17 Q.  Are there other instances in which an incident
18 report must contain either a photograph of evidence or
19 body-worn camera footage of evidence?
20 A.  There is probably other incidents in serious
21 crimes. Like, if you have a gun, they should take a photo
22 of the gun, unless exigent circumstance -- for example, the
23 gun might get destroyed, get moved -- they should take the
24 photo of it. It's pretty important.
25 Q.  And in addition to taking the photo, they would

Page 228

1  also book the gun as evidence, correct?
2  A.  Yes.
3  Q.  If a police officer needed to retrieve a tent or
4  structure that is being stored as evidence by DPW, how
5  would they go about doing that?
6      MR. WANG: Objection. Vague. Lacks foundation.
7      Go ahead.
8      THE WITNESS: That hasn't happened.
9      BY MS. KATOVICH:
10 Q.  It's never happened?
11 A.  Correct.
12 Q.  Have you ever received instructions on how a
13 police officer could get property back from DPW?
14 A.  If that was to happen, I would first call DPW,
15 give them the SR number, and go, do you have this tent?
16     For example, I mean, hypothetical, let's say for
17 whatever reason someone asked for it, like a DA going
18 forward needs it, I'm assuming they know how to go about
19 it. But I would go about calling DPW.
20 Q.  But that's never happened, a DA has never asked
21 for evidence?
22 A.  Not to me. Not to my knowledge.
23 Q.  I'm going to show you another document which we
24 will mark as Exhibit 1042 --
25     THE COURT REPORTER: 43.

Case 4:22-cv-05502-DMR   Document 366-46   Filed 04/17/25   Page 7 of 10
Coalition on Homelessness, et al. v                                    Wayman Young
City and County of San Francisco, et al.                           January 23, 2025

Page 253

1  Q. And when did you conduct that training?
2  A. Within, we dated -- I don't remember the specific
3  date. When the officer signed it, it has the date on it.
4  It's around the time when that Department Notice came out.
5  Q. So this declaration is dated April 15th, 2024,
6  correct? I'm sorry. That's the trial date. Never mind.
7    It's dated September 1st, 2023. Is that correct?
8  A. Yes.
9  Q. And in this September 21, 2023, declaration you
10 say you're developing this training concerning 23-007,
11 right?
12 A. Yes.
13 Q. I'm now going to show you another document, it
14 will be 1046.
15   (Exhibit 1046 was marked for identification.)
16 Q. And do you recognize this document?
17 A. Yes.
18 Q. And this is the Department Notice 23-007 that you
19 were referring to in your declaration?
20 A. Yes.
21 Q. And do you see that it was published January
22 25th, 2023?
23 A. Yes.
24 Q. And referring back to the declaration we were
25 just looking at, 1045, in paragraph 4 you state that

Page 254

1  roll-call training on DN 23-007 was completed with the HSOC
2  officers sometime around mid-March 2023?
3  A. I'm sorry. Where is that? In paragraph 5?
4  Q. Paragraph 4. It's the last sentence of
5  paragraph 4.
6  A. Yes.
7  Q. And is that -- the training on DN 23-007 that was
8  completed around mid-March 2023, is that the training you
9  were just describing that took place soon after the
10 Department Notice was issued?
11 A. Yes.
12   MR. WANG: Objection. Misstates the testimony.
13 To the extent you're referring now to paragraph 5, I
14 think --
15   MS. KATOVICH: I'm referring to paragraph 4.
16   MR. WANG: Okay. So -- okay. That's fine. I
17 just feel like you're mixing up the training in paragraph 5
18 and paragraph 4, but --
19   BY MS. KATOVICH:
20 Q. I want to make sure we're clear here. Paragraph
21 4 describes roll-call training that took place around
22 mid-March 2023, correct?
23 A. Yes.
24 Q. And that would be about two months after the
25 Department Notice 23-007 was released, correct?

Page 255

1  A. Yes.
2  Q. And is that training that took place by March
3  2023 the training you were just describing that you
4  conducted soon after the injunction and after this new
5  Department Notice came out?
6    MR. WANG: Objection, to the extent it's vague.
7  That second part, you're referring to the training you
8  referred to in paragraph 5, whether that's the training?
9    MS. KATOVICH: No.
10   The training you were referring to just now we
11 were discussing.
12   MR. WANG: So when you were asking about
13 paragraph 5, he gave some response --
14   MS. KATOVICH: Yes.
15   MR. WANG: -- and now you're clarifying whether
16 that response was actually in paragraph 4?
17   MS. KATOVICH: Yes. Thank you.
18   MR. WANG: Sorry.
19   MS. KATOVICH: No, it's not --
20   THE WITNESS: Yes.
21   BY MS. KATOVICH:
22 Q. Okay. So in paragraph 5 you describe additional
23 training that you were developing beyond that March 2023
24 training, correct?
25 A. Yes.

Page 256

1  Q. Did you ever conduct additional training beyond
2  the roll-call training that took place in March 2023?
3  A. No.
4  Q. Why not?
5  A. At that time, after this, there was initially the
6  additional training was I believe the command staff wanted
7  every officer to be trained on it, and that wasn't feasible
8  so that was -- it didn't go through.
9  Q. So there was -- at some point a decision was made
10 not to train all SFPD officers on DN 23-007, correct?
11 A. Yes.
12 Q. And HSOC officers also did not receive additional
13 training, correct?
14 A. Correct.
15 Q. After the preliminary injunction was issued in
16 this case, which was in late December 2022, did you change
17 anything about the way you conducted encampment
18 resolutions?
19 A. Yes.
20 Q. What did you change?
21 A. As I stated earlier, a lot of the DN came out
22 with all these requirements, mainly that we have to
23 determine if they're involuntary or voluntary homeless, and
24 it provides a list of things that officers must do.
25 Q. And so after -- after the preliminary injunction

Case 4:22-cv-05502-DMR   Document 366-46   Filed 04/17/25   Page 8 of 10

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Wayman Young  
January 23, 2025

Page 257

1  and after this new DN was issued, you began, for the first
2  time, assessing whether people were involuntarily homeless;
3  is that correct?
4  A.  Once this DN for the injunction came out, yes, we
5  had to start determining and following Department Notice on
6  determining involuntary and voluntary homeless, correct.
7  Q.  Did you change anything else about the way you
8  conducted encampment resolutions?
9  A.  No.
10 Q.  Did you -- did encampment -- did the behavior of
11 other city agencies change at encampment resolutions after
12 the December 2022 injunction?
13 A.  Not that I'm aware of.  I don't -- I don't know.
14 Q.  Did -- after the preliminary injunction in
15 December 2022, did you change anything about the way you
16 conducted JFOs?
17 A.  We were not -- HSOC officers were not part of JFO
18 at that time.
19 Q.  But you testified that you yourself did sometimes
20 attend and participate in JFOs; is that correct?
21 A.  Yes.
22 Q.  And when you personally participated in JFOs
23 after December 2022, did you change anything about your
24 behavior?
25 A.  If I was to enforce, I would follow this DM.  But

Page 258

1  I did not do any enforcement.
2  Q.  And did other agencies present change their
3  behavior?
4  A.  I don't know.
5  Q.  And after the Supreme Court decision in
6  Grants Pass v. Johnson came out in late June 2024, did you
7  change anything about the way you conducted JFOs?
8  A.  Yes.
9  Q.  What changed?
10 A.  The involuntary and voluntary was taken out.  We
11 didn't have to follow those guidelines anymore.  And that
12 would be the main thing that we changed.
13 Q.  So you no longer determined whether someone was
14 voluntarily homeless before enforcing certain laws; is that
15 correct?
16 A.  Yes.
17 Q.  And after the Grants Pass decision, did you
18 change anything about the way you conducted encampment
19 resolutions?
20 A.  No.
21 Q.  So you continued to assess voluntary
22 homelessness?
23 A.  No.
24 Q.  Okay.  So that changed after Grants Pass?
25 A.  Correct.

Page 259

1  Q.  And did you -- after the Grants Pass decision in
2  late June 2024, did you witness other agencies change
3  anything about their behavior at encampment resolutions?
4  A.  Not that I noticed.
5  Q.  What about at JFOs?
6  A.  No.  I don't know.
7  Q.  After the Court issued its order granting
8  plaintiff's motion to enforce in August 2024, did you
9  change anything about the way you conducted HSOC
10 activities?
11 A.  No.
12 Q.  Did you witness any other agencies make changes
13 in the way that they behaved at HSOC activities?
14 A.  No.
15 Q.  Currently what, if any, steps do you take to
16 ensure that you're complying with the preliminary
17 injunction in this case?
18 A.  I'm sorry.  What steps am I currently taking?
19 Q.  To ensure that you and your -- that you and the
20 people you supervise are complying with the preliminary
21 injunction?
22     MR. WANG: Objection, to the extent it assumes
23 anything applies to the cops.
24     But go ahead.
25     THE WITNESS: We just follow the current

Page 260

1  instruction of the Department Notice.
2     BY MS. KATOVICH:
3  Q.  In the past, what steps did you take to ensure --
4  before Grants Pass, what steps did you take to ensure that
5  the officers you supervise, or supervised, were following
6  the preliminary injunction requirements?
7  A.  The training that we provided, if they have any
8  questions during lineup.  That's always been the case even
9  with every DN that comes out, I kind of go over this with
10 all the officers.
11 Q.  Did you review any documents to ensure that your
12 officers were complying with the preliminary injunction?
13 A.  I can't think of what documents you could be
14 referring to.
15 Q.  Incident reports?
16 A.  Yes.  Any report that I read, yes, I review it.
17 Q.  And did you look at any body-worn camera footage
18 to make sure that your officers were complying with the
19 injunction?
20 A.  No.
21 Q.  Are you able to determine whether -- or were you
22 able to determine whether or not your officers were
23 complying with the injunction by reviewing documents?
24 A.  When I review the police reports when they make
25 arrests, I look for that they're following the DN.

Case 4:22-cv-05502-DMR    Document 366-46    Filed 04/17/25    Page 9 of 10
Coalition on Homelessness, et al. v                                    Wayman Young
City and County of San Francisco, et al.                            January 23, 2025

Page 253

1  Q.  And when did you conduct that training?
2  A.  Within, we dated -- I don't remember the specific
3  date.  When the officer signed it, it has the date on it.
4  It's around the time when that Department Notice came out.
5  Q.  So this declaration is dated April 15th, 2024,
6  correct?  I'm sorry.  That's the trial date.  Never mind.
7      It's dated September 1st, 2023.  Is that correct?
8  A.  Yes.
9  Q.  And in this September 21, 2023, declaration you
10  say you're developing this training concerning 23-007,
11  right?
12  A.  Yes.
13  Q.  I'm now going to show you another document, it
14  will be 1046.
15     (Exhibit 1046 was marked for identification.)
16  Q.  And do you recognize this document?
17  A.  Yes.
18  Q.  And this is the Department Notice 23-007 that you
19  were referring to in your declaration?
20  A.  Yes.
21  Q.  And do you see that it was published January
22  25th, 2023?
23  A.  Yes.
24  Q.  And referring back to the declaration we were
25  just looking at, 1045, in paragraph 4 you state that

Page 254

1  roll-call training on DN 23-007 was completed with the HSOC
2  officers sometime around mid-March 2023?
3  A.  I'm sorry.  Where is that?  In paragraph 5?
4  Q.  Paragraph 4.  It's the last sentence of
5  paragraph 4.
6  A.  Yes.
7  Q.  And is that -- the training on DN 23-007 that was
8  completed around mid-March 2023, is that the training you
9  were just describing that took place soon after the
10  Department Notice was issued?
11  A.  Yes.
12     MR. WANG:  Objection.  Misstates the testimony.
13  To the extent you're referring now to paragraph 5, I
14  think --
15     MS. KATOVICH:  I'm referring to paragraph 4.
16     MR. WANG:  Okay.  So -- okay.  That's fine.  I
17  just feel like you're mixing up the training in paragraph 5
18  and paragraph 4, but --
19     BY MS. KATOVICH:
20  Q.  I want to make sure we're clear here.  Paragraph
21  4 describes roll-call training that took place around
22  mid-March 2023, correct?
23  A.  Yes.
24  Q.  And that would be about two months after the
25  Department Notice 23-007 was released, correct?

Page 255

1  A.  Yes.
2  Q.  And is that training that took place by March
3  2023 the training you were just describing that you
4  conducted soon after the injunction and after this new
5  Department Notice came out?
6     MR. WANG:  Objection, to the extent it's vague.
7  That second part, you're referring to the training you
8  referred to in paragraph 5, whether that's the training?
9     MS. KATOVICH:  No.
10     The training you were referring to just now we
11  were discussing.
12     MR. WANG:  So when you were asking about
13  paragraph 5, he gave some response --
14     MS. KATOVICH:  Yes.
15     MR. WANG:  -- and now you're clarifying whether
16  that response was actually in paragraph 4?
17     MS. KATOVICH:  Yes.  Thank you.
18     MR. WANG:  Sorry.
19     MS. KATOVICH:  No, it's not --
20     THE WITNESS:  Yes.
21     BY MS. KATOVICH:
22  Q.  Okay.  So in paragraph 5 you describe additional
23  training that you were developing beyond that March 2023
24  training, correct?
25  A.  Yes.

Page 256

1  Q.  Did you ever conduct additional training beyond
2  the roll-call training that took place in March 2023?
3  A.  No.
4  Q.  Why not?
5  A.  At that time, after this, there was initially the
6  additional training was I believe the command staff wanted
7  every officer to be trained on it, and that wasn't feasible
8  so that was -- it didn't go through.
9  Q.  So there was -- at some point a decision was made
10  not to train all SFPD officers on DN 23-007, correct?
11  A.  Yes.
12  Q.  And HSOC officers also did not receive additional
13  training, correct?
14  A.  Correct.
15  Q.  After the preliminary injunction was issued in
16  this case, which was in late December 2022, did you change
17  anything about the way you conducted encampment
18  resolutions?
19  A.  Yes.
20  Q.  What did you change?
21  A.  As I stated earlier, a lot of the DN came out
22  with all these requirements, mainly that we have to
23  determine if they're involuntary or voluntary homeless, and
24  it provides a list of things that officers must do.
25  Q.  And so after -- after the preliminary injunction

Case 4:22-cv-05502-DMR   Document 366-46   Filed 04/17/25   Page 10 of 10

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Wayman Young
January 23, 2025

Page 257

1  and after this new DN was issued, you began, for the first
2  time, assessing whether people were involuntarily homeless;
3  is that correct?
4  A.  Once this DN for the injunction came out, yes, we
5  had to start determining and following Department Notice on
6  determining involuntary and voluntary homeless, correct.
7  Q.  Did you change anything else about the way you
8  conducted encampment resolutions?
9  A.  No.
10 Q.  Did you -- did encampment -- did the behavior of
11 other city agencies change at encampment resolutions after
12 the December 2022 injunction?
13 A.  Not that I'm aware of.  I don't -- I don't know.
14 Q.  Did -- after the preliminary injunction in
15 December 2022, did you change anything about the way you
16 conducted JFOs?
17 A.  We were not -- HSOC officers were not part of JFO
18 at that time.
19 Q.  But you testified that you yourself did sometimes
20 attend and participate in JFOs; is that correct?
21 A.  Yes.
22 Q.  And when you personally participated in JFOs
23 after December 2022, did you change anything about your
24 behavior?
25 A.  If I was to enforce, I would follow this DM.  But

Page 258

1  I did not do any enforcement.
2  Q.  And did other agencies present change their
3  behavior?
4  A.  I don't know.
5  Q.  And after the Supreme Court decision in
6  Grants Pass v. Johnson came out in late June 2024, did you
7  change anything about the way you conducted JFOs?
8  A.  Yes.
9  Q.  What changed?
10 A.  The involuntary and voluntary was taken out.  We
11 didn't have to follow those guidelines anymore.  And that
12 would be the main thing that we changed.
13 Q.  So you no longer determined whether someone was
14 voluntarily homeless before enforcing certain laws; is that
15 correct?
16 A.  Yes.
17 Q.  And after the Grants Pass decision, did you
18 change anything about the way you conducted encampment
19 resolutions?
20 A.  No.
21 Q.  So you continued to assess voluntary
22 homelessness?
23 A.  No.
24 Q.  Okay.  So that changed after Grants Pass?
25 A.  Correct.

Page 259

1  Q.  And did you -- after the Grants Pass decision in
2  late June 2024, did you witness other agencies change
3  anything about their behavior at encampment resolutions?
4  A.  Not that I noticed.
5  Q.  What about at JFOs?
6  A.  No.  I don't know.
7  Q.  After the Court issued its order granting
8  plaintiff's motion to enforce in August 2024, did you
9  change anything about the way you conducted HSOC
10 activities?
11 A.  No.
12 Q.  Did you witness any other agencies make changes
13 in the way that they behaved at HSOC activities?
14 A.  No.
15 Q.  Currently what, if any, steps do you take to
16 ensure that you're complying with the preliminary
17 injunction in this case?
18 A.  I'm sorry.  What steps am I currently taking?
19 Q.  To ensure that you and your -- that you and the
20 people you supervise are complying with the preliminary
21 injunction?
22     MR. WANG:  Objection, to the extent it assumes
23 anything applies to the cops.
24     But go ahead.
25     THE WITNESS:  We just follow the current

Page 260

1  instruction of the Department Notice.
2     BY MS. KATOVICH:
3  Q.  In the past, what steps did you take to ensure --
4  before Grants Pass, what steps did you take to ensure that
5  the officers you supervise, or supervised, were following
6  the preliminary injunction requirements?
7  A.  The training that we provided, if they have any
8  questions during lineup.  That's always been the case even
9  with every DN that comes out, I kind of go over this with
10 all the officers.
11 Q.  Did you review any documents to ensure that your
12 officers were complying with the preliminary injunction?
13 A.  I can't think of what documents you could be
14 referring to.
15 Q.  Incident reports?
16 A.  Yes.  Any report that I read, yes, I review it.
17 Q.  And did you look at any body-worn camera footage
18 to make sure that your officers were complying with the
19 injunction?
20 A.  No.
21 Q.  Are you able to determine whether -- or were you
22 able to determine whether or not your officers were
23 complying with the injunction by reviewing documents?
24 A.  When I review the police reports when they make
25 arrests, I look for that they're following the DN.