# EXHIBIT 41

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

---

*Dennis Hoang*
*March 5, 2025*

---

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 44193Hoang_NL.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR   Document 366-47   Filed 04/17/25   Page 3 of 15
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Dennis Hoang
March 5, 2025

Page 33

1  officers, but me personally, I've never seen the DPW
2  bag-and-tag policy.
3  Q.  At encampment resolutions, do SFPD officers
4  speak with people about what will happen to their
5  property during the resolution?
6  A.  Yes.
7  Q.  And what is discussed in those situations?
8  A.  It might be a hypothetical, but in a situation
9  where if we were to arrest somebody for illegal
10 lodging, we would notify that homeless person that
11 their tarp or structure will be seized as evidence and
12 bagged and tagged by DPW.
13 Q.  And aside from the scenario where you are
14 enforcing illegal lodging and potentially -- or
15 potentially enforcing illegal lodging and potentially
16 receiving their tent or structure as evidence, are
17 there other -- are there other situations in which you
18 would discuss a homeless person's property with them?
19 A.  We would -- yeah.
20 Q.  What would you discuss?
21 A.  We would let them know that they would need
22 to -- DPW will enforce their bag and tag policies if
23 they do not obey the violations -- if there were a
24 violation.
25 Q.  What do you tell them about how DPW will

Page 34

1  enforce the bag-and-tag policy?
2  A.  Can you -- I'm not sure if I fully understand
3  the question.  Are you asking -- are you asking the
4  method that DPW would conduct clean up?
5  Q.  I'm asking what you tell homeless individuals
6  about DPW's bag-and-tag policy?
7  A.  I don't know what the officers would tell them.
8  If that were me personally, I would let them know that
9  DPW has a right to clean the streets and the sidewalks,
10 and if need be, they have it within their authority to
11 conduct clean up and bag and tag their property
12 according to their policy.
13 Q.  Do you ever receive questions about that policy
14 from homeless individuals?
15 A.  Yes.
16 Q.  What kind of questions have you received about
17 the policy?
18 A.  They would ask what can DPW take.
19 Q.  And have you responded to those questions?
20 A.  Yes.
21 Q.  And how have you responded?
22 A.  I tell them to go ask DPW.
23 Q.  Have you ever received any training on what to
24 tell homeless people about DPW's bag-and-tag policy?
25 A.  Can you repeat the question?

Page 35

1  Q.  Have you ever received any training about what
2  to tell homeless people about DPW's policy on bag and
3  tag?
4  A.  I don't know DPW's bag-and-tag policy so I --
5  there's nothing to train us on with DPW's bag-and-tag
6  policy.  I've never seen their bag-and-tag policy.
7     I hope that answers -- does that clarify?
8  Q.  Yeah.
9  A.  All right.
10 Q.  Do you ever -- well, withdrawn.
11    At encampment resolution, who decides how much
12 time a person has to move their property before DPW
13 begins cleaning?
14 A.  Typically the officers.
15 Q.  SFPD officers?
16 A.  Yes.
17 Q.  And how much time does SFPD give individuals to
18 move their property?
19 A.  That varies drastically.
20 Q.  Is there any -- is there any guidance that SFPD
21 officers are provided about how long people should be
22 given?
23 A.  We -- when I say "we," like the lieutenant and
24 supervisors, we've trained our officers to use an
25 objectively reasonable standard that -- just that

Page 36

1  reasonableness standard.
2  Q.  And how have you trained them to use that
3  reasonableness standard?
4  A.  Well, I don't want to -- it varies depending on
5  the person.  So to sort of give you -- the best way to
6  answer that would be to give you an example.  Hopefully
7  that clarifies it.
8     Like a young, able-bodied adult with minimal
9  belongings might only need five minutes versus, let's
10 say, an older person with some possible physical
11 disabilities with that same property might take ten
12 times longer.  Those are factors that we consider.
13 Q.  Is there any written guidance or policy on the
14 amount of time that SFPD is supposed to give people to
15 move their belongings?
16 A.  No, not to my knowledge.
17 Q.  And just to clarify, that's the amount of time
18 that individuals have before DPW begins cleaning; is
19 that correct?
20    MR. WANG:  Objection.  Calls for speculation.
21    Go ahead.
22    THE WITNESS:  That -- that is -- the reasonable
23 time that we provide the homeless people to abate the
24 violation is prior to us conducting enforcement.
25

Case 4:22-cv-05502-DMR    Document 366-47    Filed 04/17/25    Page 4 of 15
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Dennis Hoang
March 5, 2025

Page 37

1  BY MS. KATOVICH:
2  Q. And who decides when DPW begins moving in to
3  clear an area?
4     MR. WANG: Objection. Calls for speculation.
5     THE WITNESS: I don't know. Not us.
6  BY MS. KATOVICH:
7  Q. Does DPW ever begin clearing -- clearing an
8  area or addressing an individual's belongings before
9  the amount of time that individual had been given by
10 SFPD to abate the violation has passed?
11 A. I'm sorry. Can I make sure I understand the
12 question?
13 Q. Yeah.
14 A. Can you repeat that one more time, please.
15 Q. So you said that SFPD gives individuals some
16 reasonable amount of time to abate a violation before
17 SFPD would enforce that violation; is that correct?
18 A. Yes.
19 Q. And also at an encampment resolution DPW cleans
20 and clears areas and interacts with homeless peoples'
21 property, correct?
22 A. Yes.
23 Q. Does DPW ever begin cleaning and clearing an
24 area and interacting with a homeless person's property
25 before the amount of time that SFPD has given them to

Page 38

1  abate the violations has passed?
2     MR. WANG: Objection. Vague.
3     Go ahead.
4     THE WITNESS: Does DPW clear -- sorry. You're
5  asking if DPW cleared a homeless person's encampment
6  prior to PD's reasonable time to abate the violation?
7  Am I understanding that question correctly?
8     BY MS. KATOVICH:
9  Q. Yeah.
10 A. It's -- it's -- it's happened.
11 Q. About how often in your experience has that
12 happened?
13 A. I can't remember the last time. Probably
14 sometime in the middle of last year to my memory.
15 Q. And that's happened multiple times?
16 A. I have seen it happen more than once.
17 Q. More than five times?
18 A. It's been awhile. I couldn't give you an exact
19 number.
20 Q. At an encampment resolution, who decides
21 whether an individual can take a piece of property with
22 them?
23 A. Who? I'm sorry.
24 Q. Who decides whether an individual, a homeless
25 individual can take a piece of property with them as

Page 39

1  they leave the area?
2  A. I don't know. Not us.
3  Q. At an HSOC encampment resolution, who decides
4  whether DPW should bag and tag an item?
5  A. I can only speak for SFPD and if we -- the only
6  time we would request a bag and tag is if the subject
7  is arrested.
8  Q. Would you ever request a bag and tag if a
9  subject is cited and released?
10 A. Yes.
11 Q. And when you say "arrested," you mean custodial
12 arrests as well as cite and release?
13 A. Yeah. I'll clarify that.
14    We would request -- depending on the cite and
15 release violation. If the cite and release violation
16 is for illegal lodging and there's a tent, tarp or
17 structure which is the evidence to crime, then, yes, we
18 would request a bag and tag.
19 Q. Would a blanket ever be considered evidence of
20 illegal lodging?
21 A. Yes.
22 Q. And does that mean a blanket might be seized
23 and bagged and tagged by DPW?
24    MR. WANG: Objection. Incomplete hypothetical
25 and calls for speculation.

Page 40

1     Go ahead.
2     THE WITNESS: Possibly.
3     BY MS. KATOVICH:
4  Q. What would it depend on?
5  A. Well, our policy would state that if -- if they
6  use that blanket as a structure -- yeah, they utilize
7  that blanket to support them structurally, then that
8  would be the evidence to the crime and we would seize
9  that blanket.
10 Q. What do you mean by "support them
11 structurally"?
12 A. Well, our policy states that for illegal
13 lodging, if there's a tent, tarp or structure, we would
14 request a bag and tag for that.
15    Now, the structure could be the tent itself.
16 The structure could be a blanket held up by four poles.
17 You can make a structure out of anything. You name it,
18 use your imagination.
19 Q. And is it SFPD who decides what items are
20 evidence of illegal lodging?
21 A. Yes.
22 Q. And is it SFPD that decides what evidence to
23 seize as evidence of a violation of illegal lodging?
24 A. Yes.
25 Q. And you said that when SFPD enforces illegal

Case 4:22-cv-05502-DMR   Document 366-47   Filed 04/17/25   Page 5 of 15

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Dennis Hoang
March 5, 2025

Page 57

 1  June 7th.
 2      So that would be the schedule of -- does this
 3  look like it's the schedule of HSOC resolutions that
 4  occurred from the week of -- on the week of June 3rd,
 5  2024?
 6  A.  Yes.
 7  Q.  And so this is looking back at resolutions that
 8  already took place, correct?
 9  A.  Correct.
10  Q.  And if you look at the second bullet point
11  there -- am I looking at the right one?
12      So the second bullet point, it says, "6/4/24:
13      AM: Polk Street corridor, Fern (Larkin/VN), Hemlock,
14  Cedar, Geary, Myrtle, Willow (Larkin/VN) all from
15  Larkin to Polk unless indicated."
16      And then it says, "PM: Return to Polk Street
17  corridor for re-encampment prevention."
18      What is re-encampment prevention?
19  A.  I don't know the definition for the person who
20  wrote this.  But if I were to speculate, it would --
21  from my own definition, it would probably mean to
22  revisit a location that was previously outreached and
23  enforced to ensure that encampments do not reappear in
24  that same location.
25  Q.  And in this case, would it be returning to the

Page 58

 1  same area that was enforced earlier that day?
 2  A.  That is my understanding.
 3  Q.  And is it your understanding that this is
 4  talking about what the HSOC encampment resolution did?
 5  A.  Yes, this is the HSOC encampment resolution.
 6  Q.  This is the resolution schedule.  It's
 7  recounting what had happened already, correct?
 8  A.  Yes.
 9      THE WITNESS: Sorry.  Give me one moment.
10  There's a --
11      MS. KATOVICH: That happened to me on Monday.
12      (Counsel and witness confer.)
13      THE WITNESS: All right.  Okay.
14      BY MS. KATOVICH:
15  Q.  Looking at the next section here under the
16  title "Next Week's Schedule," looking at the third
17  bullet point for 6/12/24, it says -- it starts, "AM:
18  Polk Street corridor, start at Fern Larkin/Van Ness,
19  Hemlock, Cedar, Geary, Ellis, Myrtle, Willow,
20  (Larkin/Van Ness) others between Larkin/Polk."
21      Then "PM: Polk Street corridor, start at Fern
22  Larkin/Van Ness, Hemlock, Cedar, Geary, Ellis, Myrtle,
23  Willow (Larkin/Van Ness) others between Larkin/Polk for
24  re-encampment prevention."
25      Do you understand re-encampment prevention

Page 59

 1  there to mean returning to areas that had previously
 2  been addressed?
 3  A.  That sounds accurate.
 4  Q.  And in this case, this is a schedule looking at
 5  next week's schedule.
 6      So do you understand this to mean that the HSOC
 7  interagency team is planning in advance to return to
 8  the same area that they addressed in the morning and in
 9  the afternoon?
10  A.  Yes.
11  Q.  And in your experience, is that a common
12  practice for HSOC?
13  A.  I don't know if it's common, but I've seen it
14  on multiple occasions.
15  Q.  Has that been the case -- has that practice
16  been in existence since you starred with HSOC?
17  A.  Not the beginning of when I first was with
18  HSOC, but looking at this document and having it
19  refresh my memory, middle of last year seems about
20  accurate of when it started.
21  Q.  Was the -- was re-encampment prevention
22  discussed at one of these HSOC calls when it started?
23  A.  The term was -- I've heard the term used by
24  members of DEM during the 10:15 conference call.
25  Q.  And did members of DEM ever explain why they

Page 60

 1  were beginning to do re-encampment prevention?
 2  A.  Not to me.
 3  Q.  Do you have any understanding of why HSOC
 4  started to do re-encampment prevention?
 5  A.  It wasn't told to me.  I can only speculate.
 6  Q.  You haven't had conversations about it with
 7  anyone at HSOC?
 8  A.  No.  We don't because we don't make the
 9  determination of where we go.  We just -- we just go
10  where we're told to go.
11  Q.  And who does make the determination about where
12  to go?
13  A.  For the HSOC encampment resolution, my
14  understanding is David Nakanishi of DEM.
15  Q.  And what about for JFOs?
16  A.  My understanding is Mark Mazza of DEM.
17  Q.  I'm going to turn you back to the first page of
18  this.  Under the heading "HSOC Prior Operation," do you
19  understand that to be describing the HSOC resolutions
20  that took place that day or the day before?
21  A.  I'd have to read through this and see when it
22  was dated, but I think -- yeah, it says HSOC prior
23  operation.  I think that sounds self-explanatory, that
24  it was prior to -- it looks like a summary of prior to
25  when this was written.

Case 4:22-cv-05502-DMR    Document 366-47    Filed 04/17/25    Page 6 of 15
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Dennis Hoang
March 5, 2025

Page 73

1  Q.  And you said enforcement increased after around
2  July or August 2024, correct?
3  A.  Yes.
4  Q.  And that would be enforcement of what exactly?
5  A.  Typically illegal lodging.
6  Q.  You said earlier that it's SFPD policy to seize
7  tents or structures as evidence of illegal lodging and
8  call DPW to take custody, correct?
9  A.  For a bag and tag of such structures, yes.
10 Q.  And so each time you enforce illegal lodging,
11 SFPD seizes tents or structures?
12 A.  Yes, we would make the request for that, yes.
13 Q.  So is it fair to say that along with
14 enforcement increasing, seizure of tents and structures
15 increased?
16 A.  Yes.
17 Q.  And does SFPD keep any data on that?
18 A.  Do we keep data on the arrests or tents seized?
19 Q.  On tents or structures seized?
20 A.  It's in our police reports.  Every arrest that
21 we make is documented in an incident report and in all
22 the narratives we provide the DPW bag-and-tag service
23 request number in the body of the report so that way
24 it's recorded.
25 Q.  Now, when it comes to arrests and citations of

Page 74

1  unhoused individuals -- and I mean that for -- not
2  necessarily limited to illegal lodging -- are there --
3  if SFPD makes an arrest or issues a citation to an
4  unhoused individual, you said -- you testified earlier
5  that if that's an illegal lodging citation, then SFPD
6  would seize the tent or structure and call DPW,
7  correct?
8  A.  Correct.
9  Q.  Are there other instances where SFPD conducts
10 an arrest or issues a citation to an unhoused
11 individual where they would call DPW to take custody of
12 that individual's property?
13 A.  Yes.
14 Q.  What are those circumstances?
15 A.  Custodial arrests.
16 Q.  And would that be every time that SFPD conducts
17 a custodial arrest of an unhoused individual that they
18 call DPW to take custody of the property?
19 A.  In practice, yes.  If they had -- if the
20 individual arrested had bulk belongings that could not
21 be brought into county jail.
22 Q.  And who decides whether or not the individual
23 has more belongings than can be brought to the city
24 jail?
25 A.  The officers, after speaking with the

Page 75

1  individual.
2  Q.  Once you called DPW in a custodial arrest
3  situation like you just described, is it up to DPW to
4  decide whether or not they bagged and tagged those
5  items?
6  A.  Yes, we only make the request for the bag and
7  tag.
8  Q.  And when SFPD calls DPW to take custody of
9  evidence of illegal lodging, is it DPW that decides
10 whether or not to bag and tag that evidence?
11 A.  Yes.
12 Q.  And is DPW free to dispose of that evidence?
13 A.  I don't know what their policy is and I'm not
14 sure the definition of "dispose."  We just put in the
15 request and we allow DPW to seize the property per
16 their policy.
17 Q.  And when you put in the request and instruct
18 DPW to seize the property according to their policy, do
19 you give any special instructions about how long they
20 should keep the property?
21 A.  We don't.
22 Q.  Do you give any special instructions about
23 whether they need to ask SFPD for permission before
24 they can destroy the property?
25 A.  We don't instruct that.

Page 76

1  Q.  Has -- have you ever requested that DPW return
2  crime evidence?
3      MR. WANG:  Objection.  Vague as to "return."
4      But go ahead.
5      THE WITNESS:  I've personally never made that
6  request.
7      BY MS. KATOVICH:
8  Q.  And when I -- thank you for pointing out the
9  ambiguity of my question.
10     Have you ever asked DPW to give evidence of
11 illegal lodging back to SFPD after you've asked them to
12 take custody?
13 A.  Sorry, repeat the question one more time?
14 Q.  After you've asked DPW to take custody of a
15 tent or structure as evidence of illegal lodging and
16 they've taken it in accordance with their bag-and-tag
17 policy, at a later date have you ever contacted DPW and
18 asked them to return that evidence to SFPD?
19 A.  I've personally never done it and we don't
20 train our officers to do that.
21 Q.  Are you aware of any officer ever doing that?
22 A.  I am not aware.
23 Q.  Have -- have you ever been asked by a
24 prosecutor to provide evidence of illegal lodging?
25 A.  No, I've never gone to court for any illegal

Case 4:22-cv-05502-DMR   Document 366-47   Filed 04/17/25   Page 7 of 15

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Dennis Hoang  
March 5, 2025

Page 77

1  lodging case.
2  Q. Has anyone you supervised?
3  A. That, I don't know.
4  Q. Are you aware of anyone at SFPD ever being
5  asked by a prosecutor to provide evidence of illegal
6  lodging?
7  A. No.
8  Q. Has DPW ever contacted you to ask if they can
9  return a tent or structure that was seized as evidence
10 to the owner of that tent or structure?
11 A. I've never been asked that by DPW.
12 Q. Are you aware of DPW ever asking that of any
13 SFPD officer?
14 A. Not that I'm aware of.
15 Q. Would you know if the officers you supervise
16 were asked by DPW if they could -- if DPW could return
17 a tent or structure seized as evidence to the owner?
18 A. If they told me, then yes, but I've never been
19 told that by any of my officers that I supervise.
20 Q. Have you ever seen DPW discard a tent or
21 structure after you've requested that they take custody
22 of it as evidence of illegal lodging?
23 A. I don't understand "discard," but if you're
24 asking have they taken it, yes.
25 Q. Have you seen them put it in the trash after

Page 78

1  they've taken it?
2  A. I've seen them put it in their trucks.
3  Q. And when you see DPW take a tent or structure
4  as evidence of illegal lodging, can you tell whether
5  they are bagging and tagging it or putting it in their
6  truck for some other reason?
7  A. That, I don't know. I don't know what their
8  protocol is as far as storing the items that are bagged
9  and tagged.
10 Q. Have you been able to tell in any particular
11 case what's happening to that tent or structure?
12 A. Typically -- sorry, reverting back to the last
13 question. It's placed in a bag when it's bagged and
14 tagged so -- which is its definition. Sorry. If that
15 clarifies.
16 Q. Yes. That's helpful.
17    And of the instances that you've personally
18 participated in or seen where SFPD has asked DPW to
19 take custody of a tent or structure as evidence, about
20 what percentage of the time do they put that in a bag?
21 A. I could not give you an exact number. There
22 are times where we don't even watch them do it. We
23 just put the request in and notify what we're
24 requesting the bag and tag for. And we either see
25 them -- we see them take it and put it in their truck.

Page 79

1  Whether it's in a bag or not, I couldn't tell you an
2  exact percentage.
3  Q. And is SFPD required to find out whether DPW
4  has actually bagged and tagged an item?
5  A. No, not to my knowledge.
6  Q. If SFPD issues a -- you know, enforces illegal
7  lodging and seizes a tent or structure as evidence,
8  does SFPD provide the individual being arrested or
9  cited with a property receipt?
10 A. Yes.
11 Q. And does that property receipt tell them where
12 the tent or structure is located or how to retrieve it?
13 A. The property receipt is notifying the
14 individual that we're seizing their property as
15 evidence. It's common practice that we notify them
16 that it's going to be at the DPW yard off of -- I don't
17 know the exact address, but off of Cesar Chavez Street.
18 Q. Would that be notifying them verbally?
19 A. Yes.
20 Q. Is that written on the receipt itself?
21 A. No.
22 Q. And you've also mentioned situations where
23 you're making a custodial arrest and you call DPW to
24 take custody of the items that belong to the person
25 being arrested, right?

Page 80

1  A. I'm sorry.
2  Q. We've also discussed situations where SFPD is
3  making a custodial arrest and calling DPW to take
4  custody of the arrestee's items?
5  A. Yes.
6  Q. And in that situation, what happens to the
7  property?
8     MR. WANG: Objection. Calls for speculation.
9     Go ahead.
10    THE WITNESS: DPW takes their property when we
11 put the request in.
12    BY MS. KATOVICH:
13 Q. And do you know what DPW does with the property
14 after you put the request in?
15 A. We do not.
16 Q. And are you required to note anywhere in an
17 incident report or a property receipt what happens to
18 the property?
19 A. No.
20 Q. In those situations, do you provide the
21 arrestee with a property receipt?
22 A. No, because we are not seizing their property
23 as evidence.
24 Q. And does the arrestee get any written
25 documentation of what happens to their property?

Case 4:22-cv-05502-DMR   Document 366-47   Filed 04/17/25   Page 8 of 15

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Dennis Hoang
March 5, 2025

Page 81

1   MR. WANG: Objection. Calls for speculation.
2   Go ahead.
3   THE WITNESS: Not from us. We -- we would
4   obtain a service request number, but no, we would --
5   typically in that instance we would notify them that
6   DPW is seizing their property.
7   BY MS. KATOVICH:
8  Q. And would you provide the service request
9   number to the individual?
10 A. There's been instances where if they've asked,
11  we have. I can't say we always do that.
12 Q. And that would just be verbally?
13 A. Yes.
14 Q. In the two situations we've been discussing
15  where you're calling DPW to take custody of property,
16  do you ever take the property back to the police
17  station and have DPW pick it up there?
18 A. I've never done that.
19 Q. Are you aware of other SFPD officers doing
20  that?
21 A. I have -- I cannot recall ever seeing that ever
22  happen.
23 Q. Are you aware of any policy or department
24  notice that instructs officers on whether or when they
25  should do that?

Page 82

1  A. Yes, we have a -- in our department notice
2   regarding the bag-and-tag policy, the prior one did
3   allow us to bring property back to the station for
4   public works to pick up.
5  Q. When you said "the prior one," is that no
6   longer permitted?
7  A. No, not under the current bag-and-tag policy,
8   the SFPD bag-and-tag policy.
9  Q. Okay. And under the prior policy or while the
10  prior policy was in force, did any of the officers you
11  supervise ever take property back to the station for
12  bag and tag?
13 A. We've never done that.
14    MS. KATOVICH: I'll show you another document.
15  This will be 1371.
16    COURT REPORTER: 1372.
17    (Deposition Exhibit 1372 marked for
18    identification.)
19    BY MS. KATOVICH:
20 Q. Take a look at this document. Just the first
21  page for now.
22    Do you recognize this document?
23 A. Actually, I've never seen this before.
24 Q. You've never seen a homeless property
25  information page that looks like this before?

Page 83

1  A. Honestly, no.
2  Q. I will just have you briefly look at page --
3   let's look at page 3 of this document. And it's -- at
4   the bottom right corner, it's Bates stamped with a
5   number that ends 764. Do you see that?
6  A. 764, okay.
7  Q. I will represent to you that this is a homeless
8   property intake form that is used by DPW and that
9   represents information concerning items that they bag
10  and tag.
11 A. Okay.
12 Q. And so this particular one is dated
13  January 17th, 2025.
14 A. Okay.
15 Q. And if you look sort of about one-third of the
16  page down, it says -- it has a box for PD pickup and
17  that's checked.
18    Do you have any understanding of what that
19  means?
20 A. I don't.
21 Q. And below that, do you see that there's a field
22  for SFPD star number?
23 A. Yes, I see that.
24 Q. And it says 2745, right?
25 A. Yes.

Page 84

1  Q. Do you know whose star number that is?
2  A. I do not.
3  Q. And then below that, the pick up location is TL
4   police station. Do you see that?
5  A. Yes.
6  Q. And is the address listed below that the
7   address for the Tenderloin police station?
8  A. I don't know exactly, but I will assume so. I
9   know TL police station is on Eddie Street.
10 Q. Do you know someone by the name of Kenneth
11  Tuttle?
12 A. I don't know who that is.
13 Q. Do you know someone named Ernie Garcia?
14 A. I don't know Ernie Garcia.
15 Q. Do you know someone named -- well, never mind.
16    Okay. You can put that aside.
17    You said -- you mentioned earlier that DPW will
18  provide SFPD officers with service request numbers; is
19  that correct?
20 A. Yes.
21 Q. And is DPW supposed to provide SFPD with
22  service request numbers every time SFPD makes a request
23  that they take custody of property?
24 A. My understanding is any time we request for a
25  bag and tag, we should be receiving an SR number,

Case 4:22-cv-05502-DMR   Document 366-47   Filed 04/17/25   Page 9 of 15
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Dennis Hoang
March 5, 2025

Page 89

1  to determine the status of the property.
2  Q.  And how did SFPD officers determine the status
3  of property at that time?
4  A.  Our officers, even with the prior department
5  notice, in practice we still did not determine the
6  status, whether it was abandoned or unattended.  But
7  from the prior notice, it would -- if I recall it
8  correctly, it's typically an element of attended versus
9  abandoned.  If there's, like, another individual that
10 says, hey, this belongs to so-and-so or if it appears
11 neatly packed, in an example of a tent, if there's
12 evidence of a person staying in there.
13 Q.  And under the previous department notice, what
14 was SFPD supposed to do differently depending on
15 whether a tent was abandoned or unattended?
16 A.  We would still notify DPW.
17 Q.  And what about if SFPD determined that items
18 were trash, what would -- what -- under the previous
19 notice what was SFPD supposed to do?
20 A.  If SFPD found trash, we would notify DPW for
21 clean up.
22 Q.  And what if SFPD encountered items or property
23 that it believed was hazardous, under the previous
24 policy what was SFPD supposed to do?
25 A.  In practice, we would still do the same thing,

Page 90

1  notify DPW, but, out of courtesy, notify them of the
2  hazard or safety risk.
3  Q.  So is it fair to say that under the previous
4  notice, regardless of the status of property, SFPD
5  would contact DPW to handle the property but might tell
6  them what kind of property they had determined it was?
7  A.  That's accurate.
8  Q.  And under the current policy since it's been in
9  force, in practice, do SFPD members tell DPW what kind
10 of property they believe it is that they're calling
11 about?
12 A.  When you say "what kind of property," are you
13 referring to unattended versus abandoned?
14 Q.  Unattended, abandoned, hazardous, trash.
15 A.  We typically don't, but we would provide as
16 much information about the property to them -- to DPW
17 as we could.
18 Q.  And would that information sometime include
19 whether the property was hazardous?
20 A.  Absolutely.  If we determine -- if we saw
21 hazardous material in there, we would notify them for
22 courtesy and safety.
23 Q.  And would that information include whether or
24 not the property was attended or abandoned?
25 A.  We typically don't make that determination, but

Page 91

1  we would provide as much information that we know about
2  that property to DPW when we -- when we call.
3  Q.  And if you look at the bottom of this -- or the
4  third heading of this page, "Property of Arrested
5  Person"?
6  A.  Uhm-hmm.
7  Q.  It says, "Officers seizing personal property
8  that is evidence of a crime, other than illegal
9  lodging, from an individual who is arrested shall refer
10 to DGO6.02 and issue the individual a property
11 receipt."
12     And then it goes on to say, "Officers seizing
13 personal property that is evidence of an illegal
14 lodging violation should note in the incident report
15 that the evidence was captured on DWC."
16     Does this policy require SFPD officers to treat
17 evidence of illegal lodging differently from evidence
18 of all other kinds?
19 A.  If you're asking whether or not we issue a
20 property receipt only for illegal lodging, then no.
21 Q.  Does this department notice require SFPD to
22 treat evidence of every crime, other than illegal
23 lodging, based on the department DGO6.02?
24 A.  Sorry.  Repeat the question?
25 Q.  Withdrawn, withdrawn.

Page 92

1     Are you familiar with DGO6.02?
2  A.  I haven't read that in a while.  I believe it's
3  property of arrested persons.
4  Q.  Is it your understanding of this department
5  notice, 24-140, that it tells SFPD officers to treat
6  evidence of illegal lodging differently from how SFPD
7  should treat evidence of other crimes?
8  A.  Yes, in that we would request for DPW to bag
9  and tag the property.
10 Q.  And there's no other crime that SFPD would --
11 for which SFPD would instruct another agency to take
12 custody of evidence, correct?
13 A.  Well, yes.  Kind of going back to the
14 hypothetical example that I used previously.  If we --
15 if it was, like, a bloody mattress and we determined
16 that to be evidentiary to the case of whatever it might
17 be, it wouldn't be feasible to bring that mattress into
18 the station and into our evidence locker, and we would
19 require DPW to seize that property as evidence.
20 Q.  And have you ever personally asked DPW to seize
21 items as evidence of any crime, other than illegal
22 lodging?
23 A.  Have I personally?  I can't remember the last
24 time I did that.
25 Q.  Have you ever done that?

Case 4:22-cv-05502-DMR    Document 366-47    Filed 04/17/25    Page 10 of 15

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Dennis Hoang
March 5, 2025

Page 93

1  A.  I don't think I have.  I cannot remember if I
2  ever did that.
3  Q.  Are you aware of any time that other SFPD
4  officers have asked DPW to take custody of evidence of
5  some crime, aside from illegal lodging?
6  A.  Thinking back to my ten prior years of patrol,
7  I cannot remember if we ever called DPW to seize
8  evidence that was a crime outside of illegal lodging.
9  Q.  And looking again at this department notice,
10  24-140, we just -- we previously had read a sentence
11  saying that, "Officers seizing personal property that's
12  evidence of illegal lodging violation should note in
13  the incident report that the evidence was captured on
14  BWC."
15      I assume that's body worn camera?
16  A.  Yes.
17  Q.  Why are officers required to note that evidence
18  is captured on body-worn camera for illegal lodging
19  violations?
20  A.  I don't -- I didn't write the policy.  But if I
21  had to speculate the logic behind it, our body worn
22  cameras -- it is within the policy of -- it is our
23  body-worn camera policy that you have to have it on in
24  all incidents where a crime is being committed.  So it
25  would -- logically, this would coincide with our

Page 94

1  body-worn camera policy.
2  Q.  And are officers required to note that evidence
3  is captured on body-worn camera in the context of
4  enforcing other laws?
5  A.  I'm sorry.  Repeat that question one more time?
6  Q.  Is -- are SFPD officers required to note in
7  incident reports that evidence of other crimes, other
8  than illegal lodging, are captured on body-worn camera?
9  A.  Our body-worn camera policy dictates that we
10  should -- that we should put in the report that our
11  body-worn cameras were on.
12  Q.  Does it dictate that you should note whether or
13  not evidence was captured by those body-worn cameras?
14  A.  Outside of illegal lodging, yes, I would assume
15  so.
16  Q.  But you don't know if that's true?
17  A.  I don't have the -- if you can help me refresh.
18  I don't have the body-worn camera policy in front of
19  me.  We could pull it up and I could refresh my memory
20  as to the body-worn camera.
21  Q.  When officers enforce illegal lodging, are they
22  required to take photographs of evidence of that crime?
23  A.  We instruct our officers to take photographs of
24  the tent structure when doing illegal lodging
25  enforcement.

Page 95

1  Q.  And that's a requirement from this department
2  notice?
3  A.  I'm not seeing it in this notice.
4  Q.  Direct your attention to the second page on the
5  back of the document under "Procedures" and how to
6  contact DPW.
7  A.  Oh, I see it now.
8  Q.  So that's No. 4, "Members shall photograph and
9  document the property in the report"?
10  A.  Yes, I see that now.
11  Q.  And so members are required to take photographs
12  of evidence of illegal lodging, as well as to take
13  body-worn camera footage of illegal lodging; is that
14  correct?
15  A.  Yes.
16  Q.  And those photographs and body-worn camera
17  footage can be used as evidence of that crime?
18      MR. WANG: Objection.  Calls for legal
19  conclusion.  Calls for speculation.
20      Go ahead.
21      THE WITNESS: The photographs and the body-worn
22  camera captures the enforcement of the officers
23  conducting the illegal lodging enforcement.
24      BY MS. KATOVICH:
25  Q.  Is there any reason why you would need the

Page 96

1  physical tent or structure in addition to the
2  photograph and body-worn camera footage?
3      MR. WANG: Objection.  Incomplete hypothetical,
4  calls for speculation.
5      THE WITNESS: That would be a good question for
6  our people that write our policies.
7      BY MS. KATOVICH:
8  Q.  And I assume you did not write this policy?
9  A.  No.  Some things can get a little redundant.
10  Q.  If an officer was enforcing illegal lodging and
11  their incident report did not include a photograph,
12  would that be a violation of this department notice?
13  A.  As this department notice reads, yes.
14  Q.  And have you ever reviewed an incident report
15  for illegal lodging that did not include a photograph
16  of the lodging at issue?
17  A.  I don't recall reviewing -- I don't recall
18  approving a report of illegal lodging where a
19  photograph of the said structure or tent was not
20  included in the report.
21  Q.  And if you did review an incident report of one
22  of your supervisees for illegal lodging and there was
23  not a photograph, what would you do?
24      MR. WANG: Objection.  Incomplete hypothetical.
25      Go ahead.

Case 4:22-cv-05502-DMR   Document 366-47   Filed 04/17/25   Page 11 of 15

Coalition on Homelessness, et al. v  
City and County of San Francisco, et al.

Dennis Hoang  
March 5, 2025

Page 97

1    THE WITNESS: In that hypothetical situation, I
2    would require the officer obtain a photograph. And if
3    one wasn't there, to utilize the body-worn camera,
4    possibly like a still shot of body-worn camera, to show
5    the evidence in that manner.
6        BY MS. KATOVICH:
7    Q.  Would you expect the officer to note in the
8    incident report that they did not capture a photograph?
9    A.  In that hypothetical situation, yes, I would.
10   Q.  So looking here again at the procedure and how
11   to contact DPW list, under 3, No. 3 says, "DPW will
12   assess and process the property accordingly."
13       And then 3A says, "DPW will take custody of
14   what the arresting officers deem as evidence supporting
15   the arrest. Property shall be listed in the arrest
16   report as evidence."
17       Does this mean that the policy requires SFPD to
18   determine what items are evidence of illegal lodging?
19   A.  Yes.
20   Q.  And so SFPD instructs DPW what property to take
21   as evidence of illegal lodging?
22   A.  Yes.
23   Q.  And how does SFPD determine what those items
24   are that DPW should take as evidence of illegal
25   lodging?

Page 98

1    A.  Well, our policy on enforcement of illegal
2    lodging, it's tent/tarp structure.
3    Q.  And you testified earlier that structure could
4    be any number of items, correct?
5    A.  Yes.
6    Q.  Including a blanket?
7    A.  Including a blanket.
8    Q.  So below that, looking at No. 5, it says, "Note
9    DPW will not bag and tag evidence that presents an
10   immediate health or safety risk due to the presence of
11   potential biohazards. If DPW disposes of the property,
12   officers shall document in their report why the items
13   were discarded."
14       Do you understand this department notice to
15   require SFPD officers to note in the incident report
16   which particular items DPW discards?
17   A.  If we're made aware of it by DPW, yes.
18   Q.  And if -- does SFPD have any obligation to
19   inquire as to whether DPW discards items because they
20   are deemed a health or safety risk?
21   A.  To my understanding, that is not a requirement.
22   Q.  So an SFPD incident report may not -- if --
23   withdrawn.
24       If DPW is instructed to take custody of a tent
25   or structure and they determine that it's a health or

Page 99

1    safety risk and they can't bag and tag it and they
2    discard it, that would not necessarily be reflected in
3    the incident report that the SFPD officer writes up,
4    correct?
5    A.  If they did not notify us, then yes.
6    Q.  And do you instruct the officers that you
7    supervise to make any inquiries about whether DPW
8    discards items that are evidence of illegal lodging?
9    A.  We stay in our lane. We put the request for
10   DPW to bag and tag the property and we leave it up to
11   them.
12   Q.  And does SFPD ever discard other evidence of
13   crime outside of illegal lodging?
14       MR. WANG: Objection. Calls for speculation.
15       Go ahead.
16       THE WITNESS: Are you asking does SFPD destroy
17   evidence? Sorry, I'm not understanding.
18       BY MS. KATOVICH:
19   Q.  Sure. If SFPD seizes evidence of some other
20   crime, aside from illegal lodging --
21   A.  Okay.
22   Q.  -- are there other situations where SFPD allows
23   another agency to discard that evidence?
24       MR. WANG: Objection. Incomplete hypothetical,
25   calls for speculation.

Page 100

1        Go ahead.
2        THE WITNESS: We would seize the evidence.
3    Bulk property, larger items that's evidentiary to
4    whatever crime, we would request for DPW.
5        BY MS. KATOVICH:
6    Q.  And if -- let's say take the example of the
7    mattress that's got a bloodstain on it. Let's say it's
8    evidence of murder. Would it be up to DPW to decide
9    whether or not to store that evidence or to discard it?
10   A.  In that hypothetical situation, I believe so.
11   But given the severity of that hypothetical crime, I
12   wouldn't -- I probably wouldn't be too -- I probably
13   wouldn't be too happy if they discarded that mattress,
14   even if it had biohazard on it.
15   Q.  Does SFPD have any of its own internal policies
16   around how to handle items that are biohazards?
17   A.  I'd probably have to refresh myself with the
18   6.02DGO. It's been awhile since I've looked at it.
19       It's my understanding, yeah, if it's biohazard,
20   we would request for DPW to clean it up, unless we
21   could discard it ourselves.
22       MS. KATOVICH: Let's look at 6.02. This will
23   be 1373.
24       (Deposition Exhibit 1373 marked for
25   identification.)

Case 4:22-cv-05502-DMR   Document 366-47   Filed 04/17/25   Page 12 of 15

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Dennis Hoang
March 5, 2025

Page 101

 1    BY MS. KATOVICH:
 2  Q.  Take a look at this document and let me know if
 3    you recognize this?
 4  A.  Yes, I do recognize this.
 5  Q.  Is this DGO6.02?
 6  A.  Yes, it is.
 7  Q.  So this is the San Francisco Police Department
 8    general order that governs physical evidence, correct?
 9  A.  Yes.
10  Q.  And I'm going to turn your attention to 6.02.04
11    (I)(3). And I will point you to the page number as
12    well. Page 7.
13  A.  Biological?
14  Q.  So there -- this paragraph concerns biological
15    evidence. And it reads, "Biological evidence requires
16    careful handling not only to preserve evidence, but
17    also to protect members from possible contamination.
18    It is imperative that members wear fresh latex or
19    nitril gloves when handling any biological evidence.
20    Dry biological evidence does not require freezing to
21    maintain the integrity of DNA evidence. All such
22    evidence shall now be booked with only 'Biohazard'
23    labels, as appropriate, and shall be stored at
24    monitored room temperature in Property Control
25    Division. Members will follow the subsequent

Page 102

 1    procedures when handling or booking the following types
 2    of biological evidence."
 3        And then it goes on to have a list over the
 4    next couple of pages. And that includes narcotics and
 5    possibly hazardous evidence, No. 8.
 6        Having refreshed your memory of this department
 7    general order, is it your understanding that SFPD has
 8    its own policies for handling biohazards?
 9        MR. WANG: Quick objection. Vague.
10        But go ahead.
11        THE WITNESS: Yes, for biological evidence.
12        BY MS. KATOVICH:
13  Q.  And so under the hypothetical example we were
14    using earlier, SFPD would be capable of safely handling
15    an item that had blood on it, correct?
16        MR. WANG: Objection. Vague. Calls for
17    speculation.
18        Go ahead.
19        THE WITNESS: I suppose, yes. Yes, in the
20    biological evidence paragraph.
21        BY MS. KATOVICH:
22  Q.  So is there any reason why DPW would handle
23    items that have biohazardous -- are biohazards or that
24    have blood or other body fluids on them?
25        MR. WANG: Objection. Vague. Calls for

Page 103

 1    speculation. Incomplete hypothetical.
 2        Go ahead.
 3        THE WITNESS: Can you repeat the question one
 4    more time?
 5        BY MS. KATOVICH:
 6  Q.  Is there reason why DPW, and not SFPD, would
 7    handle a piece of evidence that was a biohazard or that
 8    had bodily fluids on it?
 9        MR. WANG: Same objections.
10        Go ahead.
11        THE WITNESS: If it's in relation to illegal
12    lodging, that's the only thing that I can think of.
13    It's bulk property that can't fit into the standard
14    evidence locker at a station.
15        BY MS. KATOVICH:
16  Q.  And is there anything in this policy that
17    governs the maximum size that SFPD can handle when it
18    comes to physical evidence?
19  A.  I'm not seeing it immediately, but I'm sure
20    with enough time to look through our DGOs I could
21    probably find it somewhere. I'm sure it references
22    something about a locker somewhere in there. That's my
23    working knowledge of whether or not we're able to take
24    that property back.
25  Q.  Turn your attention to page 2, and under

Page 104

 1    6.02.03(A), the heading is "Preventing Contamination of
 2    the Crime Scene and Major Incident Scene."
 3        It says, "It is the policy of the San Francisco
 4    Police Department to ensure that crime scenes are
 5    preserved for investigation and for the collection of
 6    uncontaminated and undisturbed evidence."
 7        And just looking at last sentence there, it
 8    says, "The careful and proper preservation, collection
 9    and booking, and the documentation of chain of custody
10    for all evidence collected is critical to investigative
11    efforts and to later court cases."
12        Do you -- what do you understand chain of
13    custody there to mean?
14  A.  Chain of custody is documenting who is in
15    control of said evidence.
16  Q.  And fair to say that it's important for SFPD to
17    maintain control of evidence of crimes?
18        MR. WANG: Objection. Incomplete hypothetical,
19    vague and ambiguous.
20        Go ahead.
21        THE WITNESS: Not all crimes.
22        BY MS. KATOVICH:
23  Q.  Not illegal lodging, right?
24        MR. WANG: Objection. Argumentative, vague.
25        Go ahead.

Case 4:22-cv-05502-DMR   Document 366-47   Filed 04/17/25   Page 13 of 15

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Dennis Hoang
March 5, 2025

Page 145

1  A.  I don't recall us telling them that they had to
2  leave.
3      MS. KATOVICH:  Now, I'll show you another
4  exhibit.  This will be 1377.
5      (Deposition Exhibit 1377 marked for
6  identification.)
7      BY MS. KATOVICH:
8  Q.  And I will represent to you that this is a log
9  of DPW bag and tags.
10     So the incident we were just looking at, the
11 incident report, that was -- that took place on
12 January 28th, 2025, and involved a gentleman named
13 David Gonzalez, correct?
14 A.  Yes.
15 Q.  So if you look on this log and it's, I'd say, a
16 little over a third of the way down, do you see an
17 entry on January 28th, 2025, where the name at the far
18 right column is David Gonzalez?
19 A.  Yes.
20 Q.  And do you see that the description of the item
21 just to the left of his name is one black bag?
22 A.  I see that.
23 Q.  And based on the incident report and your
24 personal experience, the property that was -- that DPW
25 was called to bag and tag on January 28th that belonged

Page 146

1  to the David Gonzalez who we were just discussing was a
2  tent, correct?
3  A.  Yes.
4  Q.  Do you have any idea why this DPW log lists
5  David Gonzalez as having a black bag bagged and tagged
6  on January 28th, 2025?
7  A.  I have no idea.
8  Q.  Have you ever taken any steps to verify that
9  items you directed DPW to bag and tag were correctly
10 logged?
11 A.  No, that is not -- that is not a requirement of
12 our policy.
13 Q.  Did you ever speak with the two officers you
14 directed to stay on site to wait for DPW to come get
15 the green tent about what happened once -- if -- about
16 what happened with DPW after you left?
17 A.  Can you repeat the question one more time?
18 Q.  You said earlier that you had directed two
19 officers to stay on scene with a green tent that DPW
20 had been called to bag and tag?
21 A.  Yes.
22 Q.  Did you ever speak with those two officers
23 after that about what had happened once you left?
24 A.  The only instruction I gave them after I left
25 was to provide Officer Young, the arresting officer,

Page 147

1  with the SR number.
2  Q.  Did you ever speak with them again about what
3  happened on scene with DPW?
4  A.  No.
5  Q.  I'm going to have you briefly look back at the
6  incident report.  That would be Exhibit 1376.
7      I'm going to turn your attention to the first
8  page of the narrative.
9  A.  Okay.
10 Q.  At the bottom Officer Young writes, "At DMACC,
11 I conducted a computer query of Gonzalez and discovered
12 the following SFPD incident reports where Gonzalez had
13 been previously been cited for the violation of
14 647(e)."
15     And then he lists four incident reports.  And
16 it looks like all four of those were in the last
17 year -- or in the year -- within one year of the date
18 of this incident report; is that correct?
19 A.  Yes.
20 Q.  Why did Officer Young query the previous
21 citations for 647(e)?
22     MR. WANG: Objection to the extent it calls for
23 speculation.
24     Go ahead.
25     THE WITNESS: As you -- as you know, this is --

Page 148

1  this counts as an arrest.  And the -- this is a way to
2  show the D.A. that this individual that was cited is a
3  repeat offender of the violation that we cited him for.
4      BY MS. KATOVICH:
5  Q.  And why do you want to show the D.A. that?
6      MR. WANG: Objection to the extent it calls for
7  speculation.
8      THE WITNESS: I think it's -- sorry, give me
9  one second.  I think some officers are more thorough
10 in -- like, you won't see this in every single police
11 report that we arrest for 647(e).  Obviously some
12 officers are much more thorough and stronger report
13 writers than other officers.  Andrew Young is more
14 thorough in the research that he does on the
15 individuals that he arrests and cites.
16     BY MS. KATOVICH:
17 Q.  Are SFPD officers supposed to look up past
18 violences of 647(e) when they -- whenever they enforce
19 illegal lodging?
20 A.  It's not a requirement.
21 Q.  Are they encouraged to?
22 A.  We -- some officers do it.  We don't tell them
23 to do it.  So we -- he wouldn't say -- we don't -- do
24 we encourage them?  No.
25 Q.  Seeing that this individual has been -- had

Case 4:22-cv-05502-DMR    Document 366-47    Filed 04/17/25    Page 14 of 15

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Dennis Hoang
March 5, 2025

Page 149

1  been cited four times already in the last year for
2  illegal lodging, what do you -- what is that -- what
3  does that mean to you?
4     MR. WANG: Objection. Vague.
5     THE WITNESS: It means -- what do you mean by
6  what does it mean?
7     BY MS. KATOVICH:
8  Q. Reading that and seeing that, do you have any
9  conclusions or?
10 A. It means --
11    MR. WANG: Sorry, just objection. Vague.
12    Go ahead.
13    THE WITNESS: From this individual, it means
14 that we've tried to get this individual in the shelter
15 and this person continually refuses shelter and
16 continually violates the law, is what this tells me.
17    BY MS. KATOVICH:
18 Q. Can you tell that they refused shelter from
19 this incident report?
20 A. From this specific incident, no. But speaking
21 with me being on scene, speaking with the arresting
22 officer who had verbally informed me that he's had
23 multiple prior contact with David Gonzalez, he knows
24 from multiple prior contacts that he has refused
25 shelter on multiple occasions.

Page 150

1  Q. And in your view does this -- does this
2  individual's history of enforcement of 647(e) indicate
3  that enforcing illegal lodging against this individual
4  is effective at getting him into shelter?
5     MR. WANG: Objection. Argumentative, vague,
6  calls for speculation.
7     THE WITNESS: Our goal is to always get
8  individuals in the shelter, but we are still law
9  enforcement and law enforcement agency and we will
10 enforce the law for people that break it.
11    BY MS. KATOVICH:
12 Q. We can set this aside.
13 A. Down over here?
14 Q. Yeah.
15    MS. KATOVICH: I'm going to show you another
16 exhibit. This will be 1377.
17    (Deposition Exhibit 1378 marked for
18    identification.)
19    COURT REPORTER: No. 1378.
20    BY MS. KATOVICH:
21 Q. Take a look at this incident report. This is
22 dated January 23rd, 2024. And do you see you're listed
23 as the reviewing officer and officer in charge?
24 A. Yes.
25 Q. Do you see that this is an incident report for

Page 151

1  resisting, delaying or obstructing peace officer
2  duties?
3  A. Yes.
4  Q. And is that one of the offenses that is
5  governed by the department notice on enforcement of
6  laws to address lodging encampments on public streets,
7  sidewalks, plazas or other public or on private
8  property blocking access to those areas?
9  A. Yes.
10 Q. Do you recall this incident?
11 A. I do not. I would have to review the report to
12 hopefully refresh my memory.
13 Q. Take a moment to look at the report.
14 A. Okay.
15 Q. Having refreshed -- did looking at this report
16 refresh your memory about this incident?
17 A. Somewhat. I do not know if I was -- I do not
18 believe I was on scene for this.
19 Q. And why do you believe you were not on scene?
20 A. If I were on scene typically I would have a
21 more active role with the incident and my star number
22 would be listed in either the BWC box and/or the
23 narrative, which it is not.
24 Q. So does that mean that you approved the arrest
25 at issue here based on a phone conversation?

Page 152

1  A. Yes, or a discussion with the arresting
2  officer.
3  Q. And what other form would that discussion take
4  besides a phone conversation?
5  A. Typically it's a phone call.
6  Q. Because you're listed as the reviewing officer
7  does that mean that you also at some point reviewed the
8  entirety of this incident report and signed off on it?
9  A. Yes.
10 Q. And looking back at this report now, do you
11 believe that the officers involved complied with all
12 applicable SFPD policies?
13 A. Yes.
14 Q. And this is an instance where the officers are
15 arresting an individual for interfering, for resisting,
16 delaying or obstructing a DPW worker, correct?
17 A. To clarify, this is SFPD officers facilitating
18 the citizen's arrest of an individual that interfered
19 with DPW.
20 Q. And the citizen at issue is the DPW worker,
21 correct?
22 A. The DPW supervisor, yes.
23 Q. And that's the same person that's the same
24 officer who -- who was being obstructed?
25 A. Britney Brandon, yes.

Case 4:22-cv-05502-DMR   Document 366-47   Filed 04/17/25   Page 15 of 15

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Dennis Hoang
March 5, 2025

Page 153

1  Q. And in this case, how would you characterize
2  what the individual who is arrested was doing that
3  constituted obstructing or interfering with an
4  officer's duties?
5     MR. WANG: Objection. Vague.
6     Go ahead.
7     THE WITNESS: Well, this is a -- this is a
8  citizen's arrest by the DPW so they are the ones
9  that -- that's technically making the arrest and we're
10 facilitating it on their behalf.
11    BY MS. KATOVICH:
12 Q. In that situation does SFPD have any obligation
13 to verify or to -- to verify that it is appropriate to
14 make an arrest?
15 A. To an extent, yes. We have our due diligence
16 of investigation.
17 Q. And what is that due diligence?
18 A. Well, interviewing the complainant and
19 interviewing the -- speaking with the subject at hand
20 and making that determination.
21 Q. Does SFPD have any responsibility to ensure
22 that the elements of 148(a)(1) are met?
23 A. Citizen arrest -- in this instance, yes.
24 Q. And what are those elements?
25 A. To keep it short and simple, public works had

Page 154

1  the authority to -- based on this report, public works
2  had the authority to conduct clean up, even with a
3  72-hour prior notice to this individual. This
4  individual did not allow public works to conduct their
5  clean up. Therefore, they signed a citizen's arrest
6  for resisting and delaying their duties and we
7  facilitated that.
8  Q. And when you said the individual did not allow
9  DPW to conduct their clean up, are you referring to the
10 person saying that he was not leaving, that he wanted
11 an attorney and, again, that he was not leaving without
12 his property and that he tried to grab the cart that
13 was being taken away from him?
14    MR. WANG: Objection. Compound, vague.
15    Go ahead.
16    THE WITNESS: That is part of it.
17    BY MS. KATOVICH:
18 Q. What else?
19 A. Give me one second as I reread this large
20 paragraph.
21    Yeah, that's -- those statement that he made
22 were essentially the resistance.
23 Q. And looking at the second paragraph, do you see
24 the second sentence there says, "We advised Cross that
25 DPW had the legal authority to move and/or seize his

Page 155

1  property in accordance with their policy and that if he
2  were to interfere with them as they engaged in the
3  performance of their duties that he could potentially
4  be arrested."
5  A. I see that sentence.
6  Q. And what is the basis for the statement that
7  DPW had the legal authority to move and/or seize his
8  property?
9     MR. WANG: Objection. Calls for speculation,
10 lacks foundation.
11    You can go ahead.
12    THE WITNESS: Sorry, I'm trying to read Public
13 Works Code 723. Our understanding is, is that public
14 works does have the authority to clean the streets.
15 And in this instance, where a 72-hour notice was given
16 to Cross, and after reading this report, it appears
17 that even after 72 hours' notice he still refused to
18 comply with the notice and with DPW to allow them to
19 enforce their authority to clean the sidewalks.
20    BY MS. KATOVICH:
21 Q. And do you know -- how did you know that he was
22 provided with 72 hours' notice?
23 A. This -- this arrest took place at one of the
24 HSOC encampment resolutions, and we do know that at
25 these encampment resolutions 72-hour notices were

Page 156

1  placed at predetermined locations.
2  Q. Do you know if notice is provided at those
3  locations?
4     MR. WANG: Objection. Vague.
5     THE WITNESS: A lot of encampment resolutions
6  I've gone to I have seen the notices posted.
7     BY MS. KATOVICH:
8  Q. Did the officer in this particular instance
9  check to see if notice had been posted?
10    MR. WANG: Objection. Calls for speculation.
11    THE WITNESS: I don't know.
12    BY MS. KATOVICH:
13 Q. Do you have any way to verify whether or not
14 DPW did, in fact, have the legal authority to move or
15 seize this man's property?
16 A. I don't know what DPW's policy on removing
17 people's' property is.
18 Q. Does Officer Michael Peralta know that?
19    MR. WANG: Objection. Calls for speculation.
20    Go ahead.
21    THE WITNESS: I don't know.
22    BY MS. KATOVICH:
23 Q. Would Officer Peralta have been trained on
24 DPW's legal authority to seize an individual's
25 property?