# EXHIBIT 43

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

**In The Matter Of:**

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

---

*Brandon Cunningham*
*February 25, 2025*

---

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California 94104*
*(415) 597-5600*

Original File 44149Cunningham_NL.txt

**Min-U-Script® with Word Index**

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Brandon Cunningham
February 25, 2025

Page 33

**to scheduling?**
A. No.
**Q. Do you ask him to place locations on the schedule?**
A. No.
**Q. When he tells you the locations that you'll go to, do you ever provide any feedback on that?**
A. Yes.
**Q. And what types of feedback do you provide?**
A. Depending on where we are, whether it's more suitable for the morning versus the afternoon, suggestions on if we have enough resources as far as DPW, depending how heavy of a job it is.
**Q. And generally what's the difference between A.M. and P.M. resolutions?**
A. Time, for one. You have a little bit more time in the morning. You also have more bodies, frankly. You have more people who work on the DPW side versus the P.M. resolution, which is a bit more thin.
**Q. Are there any other differences between A.M. and P.M. resolutions?**
A. It's a different crew on the P.M. So they'll have the same DPW workers in the morning and then the same DPW workers in the evening but different -- I don't see them both. The morning ones, they get off shortly

Page 34

after we finish up our resolution. So different DPW workers.
**Q. And you said you work on Sundays through Wednesdays each week, with the Wednesday being the flop day.**
**Are there any differences in the types of resolutions that are done Mondays, Tuesdays, or Wednesdays between each day?**
A. No.
**Q. Okay. Do you know how David Nakanishi decides where to conduct a resolution?**
A. I don't know.
**Q. And how far in advance of the resolution are you told that there will be a resolution at that location?**
A. Generally the tail end of the previous week, I'll know.
**Q. So if the resolution is happening on a Monday, you'll know around Thursday or Friday?**
A. Yes.
**Q. And does HSOC need to provide any notice to individuals at that location in advance of the resolution?**
A. You asked do they have to?
**Q. Yes.**

Page 35

A. No.
**Q. And do you know is -- why do you say that?**
A. Why do I say no?
**Q. Yeah.**
A. So you're asking -- so generally when we go to a resolution, it's noticed. So they get a 72-hour notice that says: We're coming in 72 hours. These are the resources that are going to be available. If you're not interested in these, please clear the area so we can clean the area.
If we go to that area, a lot of times, with the notice up, people will already leave. So if we go there and nobody's on that street that's been noticed, we won't just stop for the day; we'll generally still work in the area and address other areas that have encampments, generally in the same neighborhood, sometimes a block away, sometimes a little farther out.
**Q. So when you address encampments in the area, are those areas outside of the locations that have been formally noticed?**
A. Yeah. If we -- if we shift from the area that was formally noticed and there's nothing on that area, we will shift the whole team to an area that does need to be addressed generally close by.
**Q. Okay. So I want to ask you some questions**

Page 36

**about what happens after you shift, but let's talk for a moment about -- well, actually, let's go back to what you said before, which is that HSOC does not need to provide notice.**
**Are you basing that on anything in particular when you say that?**
A. I think when I say that, I mean when we shift to a different location, we can still operate. We don't -- we don't just call it simply because the area that was noticed, no one's there anymore.
The difference being, if we shift to a different area, we give people an adequate amount of time to gather their belongings. We still offer the same amount of resources. There's just more time in between.
And we give the courtesy of: Okay. We're going to be here. We've got to clean the area. Please break down your tent, gather what you want, leave what you don't. HOT Team is here if you want to speak with them. We have other resources if you're interested.
As opposed to an area that is noticed, we can generally, if we wanted to, start immediately at 8:00, which we don't. We still generally give people time because people don't pack by -- even within that 72-hour window. We'll give them time and the courtesy to gather

Min-U-Script® BEHMKE REPORTING AND VIDEO SERVICES, INC. (415) 597-5600 (9) Pages 33 - 36

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Brandon Cunningham
February 25, 2025

Page 37

their belongings, take what they want, leave what they don't.

I think the difference between the notice and not the notice is, with the notice, we could start immediately if we wanted to; but again, we generally do not.

**Q. Okay. And for the areas that have not been noticed, I'm understanding you to say that you can still clear encampments because you give people an adequate time to move; is that right?**

A. (Nods head.)

**Q. When you say "adequate," is there some sort of a number or amount of time you have in mind?**

A. 30 minutes at minimum, but that can vary depending on the individual and the situation.

**Q. When you say that it can vary according to the individual and situation, what types of factors in your experience have influenced how much time you've given somebody to move?**

A. Sure. Age, mobility issues, previous medical history, being under the influence potentially.

**Q. Anything else?**

A. No.

**Q. And when you say "mobility," what sorts of mobility issues have you seen that has led you to give somebody more time to move?**

Page 38

A. Yeah. I've seen people who need assistance to ambulate, whether it's a cane or just generally very slow-moving. Maybe they need a cane but they don't have a cane.

**Q. Have you encountered people in these unnoticed areas that are in wheelchairs?**

A. No.

**Q. Have you encountered individuals in these unnoticed areas that have prosthetic limbs or missing limbs?**

A. Yeah.

**Q. And has that played any role in the way that you've treated them at one of these non-noticed areas?**

A. It does play a role in it, yes.

**Q. Okay. And how have you treated that person differently than another person you've encountered in an unnoticed area?**

A. It's no different between the noticed or unnoticed. The difference being the mobility issue.

So if we're talking about somebody who has prosthesis, below-the-knee amputations, whether or not they're in an area that's noticed or not noticed, it's -- you need to give them -- you need to be patient and understanding that they are the way they are, and

Page 39

you need to be -- we understand that --

**Q. Okay.**

A. -- as a team, so we factor that.

**Q. So it sounds like one of the things that you do is you give people with mobility issues additional time to move their belongings; is that right?**

A. Yes.

**Q. Are there any other types of accommodation or specific types of treatment you give to people who have mobility issues?**

A. Treatment? No. But there is always the option of getting -- depending on -- it's very dynamic because I can't speak for everybody, because it's -- we obviously deal with different people on a daily basis. But everybody has their own individual needs.

Maybe this person needs to get connected with urgent care or some other resource. And if I speak with them for a short amount, I can hopefully figure out what direction as far as resources I could point them in.

Maybe we have it there with us at the moment during the time; if not, then I can get them connected through other means so they can hopefully get a better path to some resources.

**Q. And you also mentioned prior medical history being something -- being one of the reasons in which someone is given more than, let's say, 30 minutes to move; is that right?**

Page 40

A. (Nods head.)

**Q. What sorts of prior medical history would you take into account when giving somebody more than 30 minutes?**

A. People who are just in poor general health. We encounter people with open wounds, you know, bad cough. You know, I don't know. I'm not a doctor; I can't diagnose. But maybe they're fighting something off, they feel under the weather. They're obese. Things like that.

**Q. And then people under the influence, how have you addressed those situations in either non-noticed or noticed encampment resolutions?**

A. Generally no different than how I deal with people who are not under the influence so long as they have the capacity to have a conversation with me.

**Q. And do you give those people more than 30 minutes to move their belongings?**

A. Yes.

**Q. Now, do you know who in HSOC is responsible for providing notice of an encampment resolution?**

A. I believe it's ERT does the placements of the actual notice.

Min-U-Script® BEHMKE REPORTING AND VIDEO SERVICES, INC. (415) 597-5600 (10) Pages 37 - 40

Coalition on Homelessness, et al. v City and County of San Francisco, et al.
Brandon Cunningham February 25, 2025

Page 49

Q. **Do you compile any reports or -- rather, strike that.**
**Do you create any reports related to HSOC activities?**
A. I do.
Q. **And what are those reports?**
A. There's an application I use on the work phone called Survey 123 that basically records the location that we addressed, how many tents or structures we encountered, and how many were left.
Q. **The work phone that you just referenced, is it the same physical phone that every incident commander uses at an HSOC resolution, or are they multiple work phones?**
A. Yes, it's one phone.
Q. **And is it one single phone number?**
A. Yes.
Q. **Do you know what that phone number is?**
A. I do not.
Q. **Okay.**
A. Not off the top of my head.
Q. **All right. I may ask you to look it up a little bit later.**
**Okay. So that work phone has the app on it.**
**Do you know if Survey 123 is a Fire**

Page 50

**Department-specific application, or is it one for different City agencies?**
A. I don't think it's specific to the Fire Department. I think it's for other City agencies.
Q. **And do you have to create an app in that -- I'm sorry.**
**Do you to have to create a report in that app, or are certain reports already created for you?**
**Can you just walk me through what you actually do on the app?**
A. Yeah.
So you open up said app. You'll choose a location that we addressed. It will auto-populate some information there. And I'm just putting in how many tents or structures we encountered and how many tents or structures are left by the end of the resolution.
Q. **Any other information that you input?**
A. For HSOC?
Q. **Well, let me -- let me just talk specifically about HSOC and this app.**
**So any other information you input for HSOC in this app?**
A. No.
Q. **What is the information that auto-populates?**
A. Like, if I choose an address, so it will just

Page 51

say the neighborhood or district, ZIP code, things like that, nearest cross street.
Q. **And the location that you're choosing, are you choosing multiple locations or a single location?**
A. Generally a single location.
Q. **And the situations that you described before where you'll go to a particular location that's been noticed, no one will be there, so you will go to other locations nearby, would you enter those other locations nearby into the app?**
A. No. If it's nearby, I will just clump it into the one area.
Q. **Have you ever entered other locations other than the noticed location into the app?**
A. I have.
Q. **And why would you enter those other locations when you've done that?**
A. I was under the impression initially that that would be a better way to go about it, but I think it was -- I was told it would be confusing on the IT's part as far as data collection if I put a bunch of different individual small spots all within a small square -- square blocks.
So just stick with one -- one location and then just kind of lump it into the one location.

Page 52

Q. **Mm-hmm. Okay.**
**So as you currently use the app, you put in one location generally, if I understand it correctly.**
A. Yep.
Q. **And will that be the location of the noticed area, or would that be the location of, let's say, a non-noticed area?**
A. Depends on the day. If it's a day where we start where the area is -- that we -- is noticed that we start at, then that's the area put.
If we go somewhere -- say I go somewhere and the area is already cleared out and cleaned and there's nothing for us to do in that area that is noticed, and we go shift a different location, I'll put in that different location.
Q. **Have you ever encountered a situation where you'll do some clearing of a noticed location as well as some clearing in a non-noticed location?**
A. I'm sorry. Some clearing -- can you explain that?
Q. **Sorry.**
**Would you -- or are there situations that you encounter where you remove encampments from a noticed location and, after that, go to a non-noticed location and also remove encampments?**

Min-U-Script® BEHMKE REPORTING AND VIDEO SERVICES, INC. (415) 597-5600 (13) Pages 49 - 52

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Brandon Cunningham
February 25, 2025

Page 53

A. Yes.
**Q. And in those situations, do you have a practice of which location you're putting into the app?**
A. I put -- I lump in the initial location. So if that initial location is noticed and that's where we're starting, that's generally what I'll put in the app.
If that not- -- if the area that we go to initially that is noticed and there's nothing to do there and we shift out of there, then I'll put that other location as the starting location.
And that's the input -- data input I put in.
**Q. Understood.**
**In the situations where you've removed encampments both in the original noticed location and then another non-noticed location, do you combine the number of tents and structures that you've addressed in both locations together in the app?**
A. I do.
**Q. So do you use this app for anything other than HSOC?**
A. JFO.
**Q. Okay. And do you use it in a similar way as you just described using it for HSOC?**
A. Correct.
**ATTORNEY GRADILLA:** It's almost 11:30. So I just

Page 54

wanted to --
**ATTORNEY TALLA:** Yeah. This is a perfectly fine time to take a break, I guess 11:27. How long would you like to take a break four?
**ATTORNEY GRADILLA:** Ten minutes.
**ATTORNEY TALLA:** Yeah. All right. Sounds good.
(Recess taken from 11:27 a.m. to 11:39 a.m.)
**THE REPORTER:** 11:39.
**ATTORNEY TALLA:** 11:39. Okay.
**BY ATTORNEY TALLA:**
**Q. So I'm going to jump into a different section of questions which has to do with, you know, how an HSOC resolution unfolds. So I'm going to ask about HSOC resolutions, then some of this cleaning nearby, and then finally JFOs. So just to sort of organize the discussion.**
**So can you give me a general overview of how an HSOC resolution unfolds from the time you get there to the time that it concludes?**
A. Sure.
So, again, if we're starting at 8:00 in the morning, we generally will meet. Everybody will meet at said location. Generally people are there a little bit before then.
I'll speak with point of contacts from

Page 55

different departments and agencies and let them know a general plan of what we might be working on for the morning.
ERT generally does outreach first. So they're out there. ERT being the Encampment Resolution Team. So they'll go out and offer services, see who's interested in shelter, housing options, Journey Home, things like that.
And then they're usually told, whether it's from me or anybody else with the teams, that we're going to be cleaning the area. So, you know, please pack what you can. If a tent needs to be broken down, gather what you want, leave what you don't.
So we allow them time to do that.
As that's happening, ERT is generally doing the outreach. Sometimes they might move ahead and work on other areas that we're at. Once they've already outreached that one area that hasn't been cleaned yet, they might go skip ahead and outreach the next potential spot we might go to.
So generally people will pack their things, move their things. There's always debris left behind, things they don't want, little piles they don't want or just things that get left on the street when they leave.
DPW cleans it. Once it's cleaned, they usually

Page 56

power wash the street.
And that would be a smooth day for a resolution. Yeah.
**Q. Okay. How often are days smooth versus not?**
A. Most of the time, yeah. Majority.
**Q. Just one follow-up question about the app.**
**At what point in the day are you putting the information into the app? While you're at the resolution or at the end of the day or different times?**
A. I generally reserve the end of my day for -- to do that after we finish with the resolutions.
**Q. Okay. And so do you take notes, sort of handwritten notes, so that you have the information to input in the app?**
**Or how do you remember what to put in the app at the end of the day?**
A. I have -- yeah, I take hand notes.
**Q. And I think you had testified you generally arrive around 7:00 of the noticed location; is that right?**
A. It varies, but yes, 7:00, 7:30.
**Q. Okay. And does the resolution ever start before 8:00 a.m.?**
A. No.
**Q. Okay. And so between the time of 7:00, 7:30**

Min-U-Script® BEHMKE REPORTING AND VIDEO SERVICES, INC. (415) 597-5600 (14) Pages 53 - 56

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Brandon Cunningham
February 25, 2025

Page 65

**take that they weren't allowed to take, this particular person?**
A. No. Everything else, they were allowed to take. Just as far as the open needles and drug paraphernalia and the soiled tent, that was being disposed of, but they had time to gather whatever other particulars they wanted to.
**Q. Did you think that there was any rule or policy that prevented you from taking that person's tent?**
A. No.
**Q. Apart from this particular incident with the tent, are there any other incidents where you prevented someone from taking a piece of property that they wanted to take with them?**
A. Not me specifically, no.
**Q. Are there incidents in which you saw someone else preventing somebody from taking a piece of property that they wanted to take with them?**
A. Yeah.
**Q. Okay. Can you tell me about the incidents you remember in which someone else prevented somebody from taking a piece of property that --**
A. Sure.
**Q. -- they wanted to take?**
A. So coming -- say we came across something which

Page 66

was, quite frankly, a chop shop. So dozens and dozens of bicycle parts, frames, no complete bikes that was stacked up high in a big industrial laundry bin. I think on that particular time, DPW seized a lot of those bikes.
**Q. Any other incident that you recall?**
A. No.
**Q. Okay. Do people ever ask you for more time to move their belongings than the average of 30 minutes that you provide?**
A. Yeah.
**Q. And what do you do in those situations?**
A. Depends on the situation. But, yeah, it's, again, dynamic, but if I -- if they need more time, then we can give them more time.
**Q. Is there ever a point at which you say -- you tell this individual -- I'm sorry. Let me strike that.**
**Have there ever been instances where you've told an unhoused individual that they've had sufficient time to move?**
A. Yes.
**Q. And then what happens after that?**
**What do you do?**
A. I instruct DPW that they've been given enough time and we need to start cleaning.

Page 67

**Q. And are you the person who decides how much time is sufficient for the person to move their belongings?**
A. Yes.
**Q. Do you ever refer an individual to SFPD to be issued a citation or arrested?**
A. No.
**ATTORNEY TALLA:** Okay. I'm going to show you an exhibit that we'll mark 1256.
And I'll just note for the record that this is an excerpt from a San Francisco Police Department incident report that we have redacted all the personal identifying information.
**ATTORNEY GRADILLA:** Is this marked AEO?
**ATTORNEY TALLA:** It is. It is. My understanding from Kaitlyn -- do you want to go off the record for a second?
**ATTORNEY GRADILLA:** Sure.
(Discussion off the record from 11:55 a.m. to 11:55 a.m.)
(Deposition Exhibit 1256 was marked for identification.)
**ATTORNEY TALLA:** So we're going back on the record at 11:55.
**BY ATTORNEY TALLA:**

Page 68

**Q. So what I presented you is the narrative of the San Francisco Police Department Incident Report.**
**Have you seen this type of document before?**
A. No.
**Q. Okay. And would you read the first four paragraphs and just tell me when you've finished.**
A. Okay.
(Examines document.)
Okay.
**Q. Okay. Thanks.**

Min-U-Script® BEHMKE REPORTING AND VIDEO SERVICES, INC. (415) 597-5600 (17) Pages 65 - 68



Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Brandon Cunningham
February 25, 2025

Page 81

all your pertinent items? And then they ask what you want to do with the rest of your stuff.
**Q. What have you observed unhoused people say in response?**
A. A lot of the times, they'll abandon a lot of the things, given that they're off to a different situation. So I'd say that's the most common.
**Q. Do people say that they want to take it with them but they can't because of the two-bag limit?**
A. Yeah. I mean, I think sometimes people want to take more than they're allotted, sure.
**Q. Okay. Are you aware of any limitations on what DPW can bag and tag?**
A. I don't know their limitations of what they can and can't bag and tag.
**Q. Have you ever seen them bag and tag a mattress?**
A. A mattress? No.
**Q. Have you ever seen them bag and tag a bed frame?**
A. A bed frame? No.
**Q. Have you ever seen them bag and tag a wheelchair?**
A. Yes.
**Q. Okay. And when was the last time that you saw that happen?**

Page 82

A. I'd estimate a month ago.
**Q. And in that situation -- I'm sorry.**
**In that incident approximately a month ago, do you recall whether the owner was present or not?**
A. Not present.
**Q. And have you ever seen DPW bag and tag a cart?**
A. A cart, yes.
**Q. And when was the last time that happened?**
A. A couple months ago, I'd say.
**Q. And was the owner present or not present?**
A. Not present.
**Q. Have you ever seen DPW bag and tag a bicycle?**
A. Yes.
**Q. Okay. And when was the last time that happened?**
A. Three, four weeks ago.
**Q. Do you recall where that was, what neighborhood that was?**
A. Tenderloin.
**Q. Was that during a JFO or a resolution?**
A. Resolution I believe.
**Q. And was the owner present or not present?**
A. Present.
**Q. And do you recall why DPW bagged and tagged this bicycle when the owner was present?**

Page 83

A. No.
**Q. Have you ever seen DPW bag and tag a couch?**
A. A couch? No.
**Q. Have you ever seen them bag and tag a chair?**
A. Bag and tag a chair? I can't say I have.
I don't generally watch what they bag and tag and what they don't bag and tag, in all fairness, though. So it doesn't get filtered through me, if I am -- yeah. So they don't ask -- they don't tell me: Hey, we're going to bag and tag these specific items and these not.
You know, I might just point out that this is abandoned or whatever the case is, and they will go about as far as what needs to be bagging and tagged and what not to. So yeah.
**Q. And have you ever seen them bag and tag a table?**
A. A table? No.
**Q. Okay. Have you ever seen a DPW worker dispose of property that you thought should not be discarded?**
A. No.
**Q. Are -- okay. Actually, strike that.**
**Have you ever had an unhoused individual ask you any questions about whether they could keep a piece of property or not?**

Page 84

A. Yes.
**Q. And what are some of the types of questions you've been asked?**
A. Whether they can keep a particular item or not -- I --
**Q. And what -- oh, sorry. Go ahead. I apologize.**
A. Oh, I was just going to say I refer them to DPW.
**Q. And have you ever seen somebody try to retrieve belongings off of a DPW truck?**
A. Yes.
**Q. And what has happened in those situations?**
A. There has been instances where DPW has been able to find something and give them back to the individual, and there's been also other times where the person was asked to get off of the truck because they're physically climbing the side of the truck kind of thing.
**Q. And in those situations where they've been asked to get off the truck, were they able to retrieve the piece of property that was on the truck?**
A. I mean, it depends on the situation. I don't -- there has been times when they happen; and then depending on what they're asking for, yeah, they -- DPW, to my knowledge and to what I see, they do the best they can as far as allowing them to figure out what they can

Min-U-Script® BEHMKE REPORTING AND VIDEO SERVICES, INC. (415) 597-5600 (21) Pages 81 - 84

**Q. Have you ever witnessed -- well, it sounds like, based on what you said before, you have heard racial expletives used towards DPW workers?**
A. Yes.
**Q. And how frequently does that happen?**
A. If I had to estimate -- I don't know. I don't know. Maybe -- maybe a couple of times a month, give or take. I don't know. It's hard to say. That I witnessed personally, maybe a couple of times a month.
**Q. And have unhoused people at resolutions ever said anything offensive to you?**
A. Not -- not to that degree, but yes. Yeah.
**Q. Has that changed the way you respond to that individual who said something offensive to you?**
A. No. It doesn't change anything.
**Q. Should it change anything about the way you respond to an individual at a resolution if they say something offensive to you?**
A. No, it shouldn't.
**ATTORNEY TALLA:** Okay. I think this is a good time for a lunch break. So 12:54.
(At 12:54 p.m. a lunch recess was taken.)
(Nothing was omitted or deleted.)



TUESDAY, FEBRUARY 25, 2025, 1:35 P.M.
EXAMINATION RESUMED
**THE REPORTER:** It's 1:35.
**BY ATTORNEY TALLA:**
**Q. All right. Welcome back. I wanted to follow up on your description of using the app where you enter the tent count before and after the resolution.**
A. Mm-hmm.
**Q. Do you know whether a report is created from the information you put into the app?**
A. I don't know where the information goes. I presume so. I presume it's their data collecting, but I don't know.
**Q. Have you ever received a report containing the information that you put into the app?**
A. I was never told that my information is part of a report. I've seen reports as far as tent counts and how the City is tracking it throughout the time. I don't know if my -- me inputting in the app is part of that or all of that or -- I'm not sure.
**Q. You don't know whether the reports you've seen used the information that you've inputted into the app?**
A. I don't know if it's my information, correct. Yeah.
**Q. Okay. And has anyone asked you about the**

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Brandon Cunningham
February 25, 2025

Page 149

It's a shorter amount -- well, it's a longer amount of time, but it's only one operation in a day. So anywhere from, I think, 9:00 to 1:00 generally is JFO operations.

And instead of ERT, we use -- generally have the Homeless Outreach Team. So the HOT Team does the -- does the outreach as opposed to the ERT, Encampment Resolution Team.

**Q. What's your understanding of the difference between what ERT does and what the HOT Team does?**

A. I think they do similar work. They have similar bed allocations. I think one works under the umbrella of HSH, and I think HOT is contracted out, if I'm not mistaken.

**Q. Do both the ERT Team and the HOT Team make offers of shelters to unhoused individuals?**

A. Yes.

**Q. And what are your general duties and responsibilities as an incident commander at a JFO?**

A. Similar to HSOC. Just management, scene safety, and just time efficiency.

**Q. On the day of a JFO, do you go to multiple locations within a particular zone?**

A. It depends. It depends on what's -- the areas that we're going to go to. If JFO you're focused on the

Page 150

Tenderloin, the Tenderloin has a couple blocks that are very, very challenging. And more than likely, you'll be on that block for an extended amount of time.

So there's less -- probably less shifting around on JFO than there is on HSOC.

**Q. And that's because there are more encampments that you encounter during a JFO? Am I understanding that correctly?**

A. There's more of a concentration of encampments versus during HSOC. And, again, it varies, right? It varies day to day, place to place, where we're at in the City.

But there's certain blocks within the Tenderloin that are always troubled. So if you -- Willow Alley, for example, no longer as bad as it was. But when it was in its worst state, unlikely we would be able to move anywhere because the entire block is inundated with trash, debris, the whole nine.

So that's -- realistically, we're not going to be able to shift out of too many areas because of that, because one area is so heavily impacted.

(Cell phone interruption.)

**ATTORNEY TALLA:** Okay. Sorry. That was mine.

So we've been going for 50 minutes. Do you want to take a break or continue?

Page 151

**THE WITNESS:** I don't mind. We can keep rolling.

**ATTORNEY TALLA:** Okay.

**BY ATTORNEY TALLA:**

**Q. So in the instances where you do shift locations in a JFO, who decides what locations to shift to?**

A. Myself but also my point, being Mark Mazza. I might refer to him and see if there's any areas that he has an idea or I have ones to address. He might have something that he wants us to get eyes on, and I might do that for him and see if it's worth our time and kind of see if we have, time permitting, time to address it.

**Q. Is advanced written notice posted at a JFO?**

A. No.

**Q. And are people asked to remove their tents and belongings from an area during a JFO?**

A. Yes.

**Q. Do you know whether they're allowed to return to the area after the area has been cleared?**

A. I don't know if they're allowed to or not. I don't know if they're reprimanded or admonished. To my understanding, that's the whole 647(e), is to prevent the re-encampment prevention. But, yeah.

**Q. Do you tell people whether or not they can return to the area after the area is cleared during a**

Page 152

**JFO?**

A. I don't tell them they can return to it, no.

**Q. Do you tell them you cannot return to it?**

A. I do not.

**Q. Okay. So you just don't say it one way or another?**

A. Correct, yes.

**Q. Are you the individual who -- strike that.**

**Do you have conversations with people about how much time they have to remove their belongings?**

A. Yes.

**Q. And how much time do you generally give people to remove their belongings during a JFO?**

A. It varies. It could be 30 minutes, could be an hour.

**Q. And is it fair to say that the factors that go into how much time they're given are similar to the factors you use during HSOC resolutions?**

A. Yes.

**Q. And ultimately, is it you who decides how much time people have to remove their belongings?**

A. Yes.

**Q. Apologies if I already asked this.**

**But do you use the app during the JFO?**

A. I do.

Min-U-Script® BEHMKE REPORTING AND VIDEO SERVICES, INC. (415) 597-5600 (38) Pages 149 - 152