# EXHIBIT 44

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v.*
*City and County of San Francisco, et al.*

*Arielle Piastunovich*
*January 31, 2025*

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 44023Piastunovich_nl.txt
**Min-U-Script® with Word Index**

Case 4:22-cv-05502-DMR   Document 366-50   Filed 04/17/25   Page 3 of 4
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.
Arielle Piastunovich
January 31, 2025

Page 113

1  THE WITNESS: I agree. I think it's vague.
2  What do you mean by "furniture"? Like...
3  BY MR. DO:
4  Q. What does the word "furniture" mean to you?
5  A. I don't know. It's any kind of furnishings, so
6  it could be, like, the structure of a house. It could
7  be -- or a tent or -- you know. It could be a couch.
8  It could be lots of different things.
9  Q. Okay. Have you ever seen furnishings disposed
10 of by the City?
11 A. If they've been given up by the person
12 experiencing homelessness, yes. If they've been
13 abandoned on the streets, yes. Again, I don't witness
14 the -- I don't witness what DPW, per se, does very
15 often. But, you know, if there's a mattress, a soiled
16 mattress, on the street, and if it's next to the -- if
17 it's next to someone and they say, you know, it's
18 garbage, then they take it. And if there's no one
19 around and it's there, they may take it, I suppose. I'm
20 not -- I don't know how they determine -- I don't know
21 how DPW determines, again, whether belongings belong --
22 or furnishings belong to somebody.
23 Q. Have you seen furnishings disposed of in which
24 you do not know whether or not an individual has
25 abandoned the property?

Page 114

1  A. No, because I don't know -- I don't myself know
2  how to determine whether something is abandoned or not.
3  Q. So is it fair to say you have seen furnishings
4  disposed of by the City but not known one way or another
5  whether or not those furnishings have been abandoned or
6  not?
7  A. I would say I've seen that on occasion. I
8  don't see that often. I'm also not out that often to
9  see. But, yes. I guess the answer is yes,
10 occasionally.
11 Q. Have you seen wheelchairs disposed of by the
12 City?
13 MR. GRADILLA: Objection; vague.
14 THE WITNESS: I don't think I recall seeing a
15 wheelchair disposed of.
16 BY MR. DO:
17 Q. Have you seen mobility devices disposed of by
18 the City?
19 MR. GRADILLA: Same objection.
20 THE WITNESS: Walkers? Is that a mobility device?
21 BY MR. DO:
22 Q. Yes. Mobility devices like walkers.
23 A. Okay. No, I don't think I have personally.
24 Q. Have you seen bicycles disposed of by the City?
25 A. I have seen bicycle parts being disposed of.

Page 115

1  Q. Have you seen complete bicycles disposed of by
2  the City?
3  A. On a few occasions, I've seen bicycles being
4  disposed of, usually when they're given up by the
5  homeless person.
6  Q. But sometimes when they're not?
7  A. No, I don't think I've ever seen a bicycle
8  disposed of unless it's been, you know -- there's been
9  some -- the homeless person has, in some way, given it
10 up.
11 Q. What is the "some way" that an individual would
12 give it up?
13 A. Well, they just say, "You can take this."
14 And, again, I'm not close to what DPW does, so
15 I'm not really witnessing the cleanup portion as much as
16 I am offering shelter on the streets and talking to
17 individuals about what their options are and...
18 Q. Is it fair to say that even if you are present,
19 your focus is not on cleaning aspects of the resolution?
20 A. 100 percent fair to say that.
21 Q. Have you been at encampment resolutions where
22 there are members of the Coalition on Homelessness?
23 A. Yes.
24 Q. And what do members of the Coalition on
25 Homelessness do or don't do at the encampment

Page 116

1  resolutions that you've been at?
2  A. They do observe. Occasionally, they -- from --
3  you know, I don't -- I haven't observed much, but,
4  occasionally, I've seen them talking to the person
5  experiencing homelessness or advocating or trying to
6  help because they have developed some sort of
7  relationship with that person.
8  Sometimes they will -- you know, early on, I
9  remember that they would -- you know, occasionally, I
10 would see them actually helping, like, move somebody or,
11 I don't know, help them with transport somewhere or --
12 we didn't have -- in the very beginning, we had no
13 Transport Team, so it was always -- it was much harder
14 to get people from street to shelter. So sometimes they
15 would -- I think, in the early days, I remember once
16 somebody put one of the clients in the car and took them
17 to the -- to their shelter and -- where they had
18 developed a relationship with.
19 But I think they do a lot of observing and then
20 talking to the -- to people experiencing homelessness
21 with whom they have relationships.
22 Q. You mentioned advocacy.
23 What type of advocacy are you referring to?
24 A. Just, you know, to make sure that there's
25 shelter available and -- sometimes they will advocate

Case 4:22-cv-05502-DMR   Document 366-50   Filed 04/17/25   Page 4 of 4
Coalition on Homelessness, et al. v.
City and County of San Francisco, et al.
Arielle Piastunovich
January 31, 2025

Page 117

1  for a person to -- for an example -- as an example --
2  can I give an example for --
3    Q.  Yes.
4    A.  Okay.  If someone's in an RV and they can't
5  move the RV, you know, just to give some time for that
6  to happen, or for repairs to be done, or whatever it is
7  they want to advocate for.  Whatever the client might
8  need, they might advocate for.
9    Q.  Do you find that their presence is helpful for
10 clients?
11   MR. GRADILLA: Objection --
12   THE WITNESS: Yeah.
13      (Reporter clarification.)
14   MR. GRADILLA: Asks for speculation.
15   THE WITNESS: It does ask me to speculate what
16 clients think.
17 BY MR. DO:
18   Q.  I'm not -- I'm asking your opinion, not what
19 clients think.
20   A.  I think sometimes it's disruptive for clients.
21 It gets confusing.  And sometimes it's reassuring.  It
22 just depends.
23   Q.  Have you interacted with clients who are
24 Coalition members?
25   MR. GRADILLA: Objection; lacks foundation.

Page 118

1  BY MR. DO:
2    Q.  If you're aware.
3    A.  No, not that I'm aware of.  I don't know,
4  though.

