# EXHIBIT 46

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

*Allison Horky*
*February 24, 2025*

**Behmke Reporting and Video Services, Inc.**
*550 California Street, Suite 820*
*San Francisco, California 94104*
*(415) 597-5600*

Original File 44140Horky_NL.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR   Document 366-52   Filed 04/17/25   Page 3 of 5
Coalition on Homelessness, et al. v
City and County of San Francisco, et al.
Allison Horky
February 24, 2025

Page 117

1  Q.  Have you -- at encampment resolutions that
2  you've attended, did you ever witness DPW discarding
3  personal property?
4  A.  Yes.
5  Q.  What did you witness?
6  A.  It's -- one incident that I did see was there
7  was, like, a bike that was on the sidewalk, and I
8  don't -- I wasn't there for, like, the full, but what I
9  saw happened afterward was I did see the bike go onto
10 the truck and get covered by a tarp.
11      And then somebody came back and said, "That's
12 my bike.  Where did it go?"  I don't actually know if it
13 was that person's bike or not.
14      But DPW then said, "We don't have your bike."
15 Q.  What happened after that?
16 A.  That was sort of it.  The person was upset, and
17 I believe they walked away.
18 Q.  Do you know why DPW said they didn't have their
19 bike?
20 A.  I don't.
21     ATTORNEY GRADILLA: Objection; calls for
22 speculation.
23     THE WITNESS: I don't know why.
24     BY ATTORNEY KATOVICH:
25 Q.  Did you follow up with them about that at all?

Page 118

1  A.  I -- I -- I gave the feedback to the incident
2  commander.
3  Q.  And when you say "gave the feedback," what
4  exactly do you mean?
5  A.  I just said what I saw, which was -- I wasn't
6  sure if this was that person's bike or not.  I did see
7  them put a bike onto the truck and sort of cover it up
8  in a way that made it seem, like, to be hidden.
9  Q.  And which incident commander was that?
10 A.  Oh, gosh.  I cannot remember.  I cannot
11 remember.
12 Q.  Do you know if the incident commander took any
13 action following your report?
14 A.  Not sure.
15 Q.  You said that was one instance.
16     Are there other instances?
17 A.  No other instances that where -- and, I'm
18 sorry, the context for the question was...
19 Q.  Discarding personal property.
20 A.  Discarding personal property.
21     No, I didn't remember any other instances where
22 they discarded somebody's personal property.
23 Q.  And this -- the bike incident, when was that?
24 A.  Yeah, I'm trying to remember.  I remember
25 where -- what block we were on.  I know we were -- I

Page 119

1  believe we were in the Mission.  But I don't remember.
2  I don't recall the exact time it was.
3  Q.  Aside from that instance, have you ever
4  witnessed DPW discarding items that an unhoused person
5  expressed wanting to keep?
6  A.  I never saw them throw anything or discard
7  anything away when somebody was standing right there
8  saying, "These are my belongings."
9  Q.  Besides the bike incident?
10 A.  Right, besides the bike incident.
11 Q.  Have you ever witnessed DPW bag and tag items?
12 A.  I don't think I've ever watched that process
13 take place.
14 Q.  Have you ever witnessed DPW workers make a
15 determination that personal items could not be bagged
16 and tagged?
17 A.  Yes.
18 Q.  And when was that?
19 A.  I recall one incident with we were trying to
20 help a woman who had a lot of belongings, and she was
21 told she had to move for -- there was like some
22 logistical reason, something that was happening on the
23 block where really everyone needed to vacate.
24     And so she was trying to sort through some of
25 her stuff, and she would say, like, "I want this

Page 120

1  suitcase bagged and tagged."
2      And DPW said, "This isn't -- like, this is
3  soiled.  This is not something that we can -- we can bag
4  and tag."
5  Q.  And after they said that, what happened?
6  A.  I believe it was not bagged and tagged.
7  Q.  What happened to it?
8  A.  It was discarded.
9  Q.  And so that was DPW discarded it?
10 A.  Yeah.
11 Q.  Before discarding it, did they give the person
12 the opportunity to take it with them?
13 A.  I'm not sure.  It was a pretty --
14 a-lot-going-on moment.  Like I said, there was lots of
15 belongings in different piles all over the place.  And
16 she was not really in a regulated mood, emotional space.
17 And so it was very challenging.  And so I can't imagine
18 every piece of belonging was revisited to ask her.
19 Q.  And did you agree that the suitcase was soiled?
20     ATTORNEY GRADILLA: Objection; calls for
21 speculation.
22     THE WITNESS: Yeah, I can't make that determination.
23     BY ATTORNEY KATOVICH:
24 Q.  Do you know what DPW meant by "soiled"?
25 A.  "Soiled" generally means not clean.  Maybe it's

Case 4:22-cv-05502-DMR   Document 366-52   Filed 04/17/25   Page 4 of 5

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Allison Horky
February 24, 2025

Page 121

1  got water on it or a lot of dirt or other debris.
2  Q.  And were there other instances where you
3  witnessed DPW make a determination that they couldn't
4  bag and tag items?
5  A.  Not that I can recall.  We were -- I was not
6  often there while DPW was going through their portion.
7  Q.  And the incident that you just recalled with
8  the suitcase, when did that take place?
9  A.  That was early on.  I think that was one of the
10  first resolutions that I went to, which would have been
11  at the end of 2020, early twenty -- no, early 2021.
12  Q.  Have you ever witnessed the Police Department
13  take custody of a tent or structure when citing or
14  arresting someone?
15  A.  I don't -- I don't know if they -- yeah, I've
16  seen them take custody of a tent.
17  Q.  When did you see that?
18  A.  I can't recall exactly.  It would have been
19  during the time when I was going to resolutions,
20  sometime in that year in 2021.
21  Q.  And did they keep the tent; do you know?
22  A.  I don't know what they do with it when they
23  confiscate items.
24  Q.  Have any other DPH workers or any of the
25  contractors you work with ever told you that they had

Page 122

1  witnessed DPW discarding personal property?
2  A.  Yeah.
3  Q.  Who was that?
4  A.  I believe Michael O'Neill told me about one
5  incident where he felt like the client was being rushed
6  and that they weren't given enough time to pack up, and
7  some of their stuff was taken and discarded that, you
8  know, Michael didn't feel should have been.
9  Q.  And when was that?
10  A.  Yeah, I'm sorry.  It's hard to recall, like,
11  what a specific month would be for that, but it would be
12  sometime in 2021 probably is the most likely.
13  Q.  And when he told you that, did you take any
14  action?
15  A.  Yeah, I -- when the -- I would raise these --
16  the concern.  If anything that the DPH workers witnessed
17  on site that they felt, like, bothered them or they just
18  weren't sure what it was, like, was this the right way
19  that this was done, was this the wrong way this was
20  done, I would usually just follow up with the DEM person
21  and say, "Here's sort of what was told to me.  You know,
22  I don't have the full context of what was going on.  We
23  don't know what DPW's role was at the time, but this is
24  what it seemed like to my worker."
25  Q.  And how would you communicate that to the DEM

Page 123

1  person?
2  A.  Usually on a call.
3  Q.  And would that be a one-on-one call or at the
4  one of the HSOC calls?
5  A.  It would typically be a one-on-one call because
6  I want -- you know, I didn't want it to feel like it was
7  accusing anyone.  I wanted to be able to provide
8  context.
9  Q.  And when you did that, was there ever any
10  follow-up from the DEM person?
11  A.  Not usually back to me, but I would trust that
12  they would follow up with -- with, you know, whether it
13  was Sam Peoples -- usually they would maybe follow up
14  with Sam Peoples or one of the other DPW supervisors who
15  was on site more often.
16  Q.  And how do you know that they would follow up
17  with Sam Peoples?
18  A.  I mean, I can't say.  I don't have the
19  confirmation that they did, but we were all trying to
20  collaborate together.  So...
21  Q.  Why do you believe that it was Sam Peoples in
22  particular that they would then communicate with?
23  A.  Oh, because he was the DPW liaison.
24  Q.  Did you ever speak with Sam Peoples about
25  anything related to DPW's actions at encampment

Page 124

1  resolutions?
2  A.  No, not usually.  No.  I would either -- no.
3  Q.  Did you ever raise anything about DPW's actions
4  during encampment resolutions with anyone at DPW?
5  A.  No.
6  Q.  To your knowledge, did anyone else at DPH ever
7  raise anything about DPW actions during encampment
8  resolutions with DPW employees?
9  A.  I'm not sure.
10  Q.  So we were talking about an instance in which
11  another DPW employee or contractor reported to you that
12  they had witnessed DPW discarding personal property.
13     Were there other instances where that happened?
14  A.  I don't think so.
15  Q.  Did anyone from DPW or one of the contractors
16  you work with ever speak with you about DPW bag and tag?
17  A.  No.
18  Q.  Did anyone from DPH or any of the contractors
19  you work with ever report to you that they had witnessed
20  DPW make a determination that items could not be bagged
21  and tagged?
22  A.  Mm-hmm.  No, I don't -- I don't recall any
23  times when they said they witnessed that conversation.
24  Q.  Did they ever raise anything about a
25  determination that something couldn't be bagged and

Case 4:22-cv-05502-DMR   Document 366-52   Filed 04/17/25   Page 5 of 5
Coalition on Homelessness, et al. v                                     Allison Horky
City and County of San Francisco, et al.                           February 24, 2025

Page 169

1  Q. Can you tell me what those instances were?
2  A. I think there is like -- there's one situation
3     where we had a client in a specific location that HSOC
4     would go back to very regularly, and if they would
5     make -- and this person had a mental health ICM that
6     they were not connected to.
7        And so there were a couple of times where they
8     would have this person break down and we would lose
9     track of them for a period of time, but they would
10    always return.
11       And because HSOC was going there so regularly,
12    it became more of a conversation of, "We actually just
13    need to leave this person there because I'm working
14    really hard on getting them linked to this mental health
15    case manager."
16       And so they would -- so DEM or whoever would
17    make the schedule would say, "We understand that's
18    happening. As long as you're" -- "as long as that's
19    happening, we can keep letting them stay there."
20       So over time that person did get connected to
21    their mental health case manager. They were able to get
22    into shelter. But HSOC would still go and do
23    resolutions in that area regularly.
24 Q. So it took a little bit of trial and error to
25    find that balance; is that right?

Page 170

1  A. Mm-hmm. Mm-hmm.
2  Q. Are you familiar with any public health
3     research related to the health impacts of encampment
4     sweeps?
5  A. No.
6  Q. Have you worked with clients who have cycled in
7     and out of homelessness?
8  A. Yes.
9  Q. Would you say that's it's fairly common for
10    people to become unsheltered again at some point after
11    they get shelter or housing?
12       ATTORNEY GRADILLA: Objection; calls for
13    speculation.
14       Go ahead.
15       THE WITNESS: Yeah, I -- I don't think I would be
16    able to say what percentage of people aren't able to
17    maintain their housing.
18       BY ATTORNEY KATOVICH:
19 Q. But some number of your clients have gone from
20    unsheltered to sheltered and back again?
21 A. A smaller number.
22 Q. And, in your experience, do people who
23    currently have shelter sometimes spend time in
24    encampments?
25 A. Yes.

Page 171

1  Q. And someone who has a spot in a shelter may
2     still sleep in an encampment sometimes?
3  A. Yes.
4  Q. In your experience, do people who currently
5     have shelter sometimes keep some of their belongings on
6     the street?
7  A. Yes.
8  Q. Do you know why?
9  A. I think it's specific to each individual.
10 Q. And when you or other DPH contractors conduct
11    pre-resolution outreach, do you sometimes encounter
12    individuals who are currently housed or have shelter?
13 A. We don't typically ask if people are housed or
14    not.
15 Q. Is that because that's more of an HSH job?
16 A. Correct, yeah.
17 Q. Do you know if they ask about that before a
18    resolution takes place?
19 A. I don't know.
20 Q. At HSOC resolutions, have you encountered
21    unhoused people who currently have shelter?
22 A. Yes.
23 Q. And they would still be subject to the same
24    HSOC resolution process, correct?
25 A. I believe there's the additional policies that

Page 172

1     they started using for people who were in shelter but
2     also outside.
3  Q. And what were those policies?
4  A. This is more, I feel like, from when Kathleen
5     was more in the meetings and I wasn't as involved. But
6     I know that they were moving toward using -- where PD
7     was citing more and confiscating the tent, I believe, if
8     somebody had shelter and they were also outside. Or
9     they could leave. They could pack up and leave.
10 Q. So whether or not someone had shelter or had no
11    shelter, they would still have to leave the area --
12 A. Mm-hmm.
13 Q. -- of an HSOC resolution?
14 A. Mm-hmm.
15 Q. And they would still potentially have their
16    items bagged and tagged if they couldn't move them --
17 A. Mm-hmm.
18 Q. -- or if they asked?
19 A. I think so, yeah.
20 Q. Are you aware that there was a court order in
21    this case that was issued that's called a preliminary
22    injunction?
23 A. Yes.
24 Q. Do you understand what that order requires?
25 A. Sort of.