# EXHIBIT 48

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

```
 1            UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3                   OAKLAND DIVISION
 4   - - - - - - - - - - - - - - - -
 5   COALITION ON HOMELESSNESS,      )
 6   et al.,                         )
 7             Plaintiffs,           )
 8   v.                              )  CASE NO.
 9   CITY AND COUNTY OF SAN          )  4:22-cv-05502-DMR (LJC)
10   FRANCISCO, et al.,              )
11             Defendants.           )
12   - - - - - - - - - - - - - - - -
13    THIS TRANSCRIPT AND ITS EXHIBITS CONTAIN INFORMATION
14     SUBJECT TO A PROTECTIVE ORDER AND SHALL BE TREATED
15            AND USED ONLY IN ACCORDANCE THEREWITH
16
17           CONFIDENTIAL - ATTORNEYS' EYES ONLY
18            REMOTE DEPOSITION OF JASON ADAMEK
19               WEDNESDAY, FEBRUARY 12, 2025
20
21         BEHMKE REPORTING AND VIDEO SERVICES, INC.
22            BY: VALERIE E. RASMUSSEN, CSR NO. 8900
23                550 CALIFORNIA STREET, SUITE 820
24                SAN FRANCISCO, CALIFORNIA 94104
25                              (415) 597-5600
```

```
 1        A    Yes, I've seen a shelter.  I've seen a
 2   navigation center, and so I know what they look like.
 3   I've seen photographs of them in the newspaper as well.
 4   I've seen TV reports, you know, people being
 5   interviewed, shelters.  So I generally know what a
 6   shelter looks like.
 7        Q    And are there CAAP beneficiaries housed at
 8   navigation centers?
 9        A    Not to my knowledge.
10        Q    For any of the three facilities that you
11   mentioned, are any of them used primarily -- actually,
12   let me rephrase that.
13             Are any of the three facilities you mentioned
14   used primarily as places to sleep by people who receive
15   placements there?
16        MR. MILLS:  Objection.  Vague and ambiguous.  Calls
17   for speculation.  Incomplete hypothetical.
18   BY MR. PRASAD:
19        Q    You may answer.
20        A    Well, I assume people are sleeping there.  They
21   stay overnight.  So I don't know if they stay up all
22   night or sleep or what they do.
23        Q    And do you know if any of those facilities
24   provide people who are housed there with places to keep
25   their belongings?
```

```
 1       A    I can't be an expert.  You'd want to ask HSH
 2  that question.
 3       Q    Are you aware why CAAP clients assigned to beds
 4  in those shelters still spend significant time on the
 5  street?
 6       MR. MILLS:  Objection.  Vague.  Ambiguous.  Calls
 7  for speculation.  Incomplete hypothetical.
 8  BY MR. PRASAD:
 9       Q    You may answer.
10       A    I don't -- I don't know.  No idea.
11       Q    And are you aware whether any individuals
12  receiving CAAP placements in those shelters continue to
13  store their belongings on the street?
14       MR. MILLS:   Same objections.
15       THE WITNESS:   I don't know what they do.
16  BY MR. PRASAD:
17       Q    I'm sorry, I couldn't hear that.
18       A    I don't know what people do.
19       Q    Have you ever heard of any instances of that
20  taking place?
21       A    No.
22       Q    Have you heard of any instances where
23  individuals who are receiving CAAP benefits lost
24  belongings in City clearings of homeless encampments on
25  the street?
```

```
 1  BY MR. PRASAD:
 2      Q    And by "package," do you mean in-kind shelter
 3  placements?
 4      A    Yeah.
 5      Q    Well, then if that person is unhoused, they
 6  wouldn't receive housing; correct?
 7      MR. MILLS:  Objection.  Misstates testimony.
 8  Incomplete hypothetical.  Vague and ambiguous.
 9      THE WITNESS:  Sorry, I didn't mean to interrupt.
10           If you're saying the shelter doesn't exist,
11  then by virtue of that, we wouldn't be providing it.
12  BY MR. PRASAD:
13      Q    You can finish your answer.
14      A    Oh, I finished.
15      Q    Are you aware of any instances where there
16  weren't adequate shelter beds available for CAAP
17  recipients?
18      MR. MILLS:  Objection.  Vague and ambiguous.
19      THE WITNESS:  Yes, when -- when -- during the
20  pandemic, there were some temporary closures to some of
21  the shelters because of spacing and COVID-related
22  issues.
23  BY MR. PRASAD:
24      Q    And just a minute ago when I asked you if any
25  CAAP shelters closed, you answered no; correct?
```

```
 1       A    I did.  I misheard that.  Because when I think
 2   of "closed," I mean like you shut -- you know, I don't
 3   know, like close a restaurant business; you're no longer
 4   in business, you know.  That's what I -- that's what
 5   I -- that's what I heard from that question.
 6       Q    And so is it your testimony that there have
 7   been instances in the past where CAAP had not reserved
 8   sufficient shelter beds for unhoused CAAP recipients?
 9       A    Yes.
10       MR. MILLS:  Objection.  Misstates testimony.  Vague
11   and ambiguous.
12       THE WITNESS:  Sorry, I didn't mean to answer that
13   before the objection.
14       MR. MILLS:  It's okay.  Interesting process here.
15   So, thank you.
16   BY MR. PRASAD:
17       Q    And when did that last occur, to your best
18   recollection?
19       A    Well, pandemic was -- when the pandemic
20   started, that's when it -- 2020.
21       Q    And just to clarify, there were individuals who
22   were accepted into the CAAP program, but then there were
23   no shelter placements available for them to go spend the
24   night; is that correct?
25       A    Yes.
```

1  Q  Could you explain what that $605 is for?
2  A  That is -- that's a combination of the shelter,
3 utilities, and food that the shelter provides.
4  Q  And how does CAAP arrive at that number?
5  A  Well, if you look at our ordinance, it states
6 that where we get that information.  It's information
7 that CalWORKS also refers to.
8  Q  Now, Mr. Adamek, individuals must apply to CAAP
9 to receive benefits; correct?
10  A  Yes.
11  Q  What percentage of CAAP applications are
12 accepted?
13  A  Offhand, I don't know that figure.
14  Q  Are you able to estimate a proportion?
15  MR. MILLS:  Objection.  Calls for speculation.
16  THE WITNESS:  Somewhere in the 30 to 40 percent
17 range.
18 BY MR. PRASAD:
19  Q  So, to your best understanding, most
20 applications for CAAP benefits are denied; is that
21 correct?
22  A  Yes.  Well, you know, if you're -- not most.
23 More than 50 percent.  I don't know if you want to use
24 the word "most."
25  Q  What are some common reasons why applications

```
 1  are rejected?
 2      A    Income is too high.  Clients are on SSI so
 3  they're already receiving that benefit.  They're not a
 4  resident of San Francisco.  They don't show up for their
 5  appointment.
 6      Q    Anything else?
 7      A    Not that I can think of off the top of my head.
 8      Q    And today, as we're sitting here, what is that
 9  income threshold?
10      A    Well, if it's unearned income -- I mean, if
11  it's income -- I don't know the particular amount.  It's
12  around 1100, or so, you don't get any benefit if it's
13  earned income.
14      Q    I'm sorry, what was the last, after you said
15  "1100" dollars?
16      A    Well, if you're earning income, I think you max
17  out after $1100, but the majority of our clients don't
18  have any income.
19      Q    $1100 per month?
20      A    Yeah, where you would get any kind of benefit.
21  Most people are not in that situation.  The majority of
22  clients do not have income.
23      Q    And are applications sometimes rejected for
24  failure to submit required documents?
25      MR. MILLS:  Objection.  Vague and ambiguous.
```

```
 1        THE WITNESS:  Yes.
 2   BY MR. PRASAD:
 3        Q    Would you be able to estimate what percentage
 4   of rejections are due to the inability to provide
 5   requested documents?
 6        A    No.
 7        MR. MILLS:  Objection.  Vague and ambiguous.
 8   BY MR. PRASAD:
 9        Q    Is it a large amount, to your knowledge?
10        A    I don't know.
11        MR. MILLS:  Objection -- that's okay.
12        THE WITNESS:  I don't know.
13   BY MR. PRASAD:
14        Q    And in those cases where an application is
15   rejected due to lack of documentation, does anyone from
16   CAAP follow up with the applicant to help them complete
17   their application?
18        A    Yes, we do.  We send them information saying
19   you need to provide whatever it is we're asking for
20   within a certain amount of time.
21             And then if they don't provide it, then -- you
22   know, if we deny a case, then they get another notice
23   they can appeal if they want.
24        Q    And how do you send those notices?
25        A    By mail.  And if they provide an alternative
```

```
 1  like e-mail address, then we can e-mail the notice as a
 2  courtesy.
 3      Q    And according to your declaration, someone who
 4  has a child or is pregnant is ineligible for CAAP
 5  benefits; correct?
 6      A    That's right.
 7      Q    If a CAAP beneficiary becomes pregnant while
 8  they're receiving benefits, do they lose their benefits?
 9      A    Do they lose their CAAP benefits?
10      Q    Yes.
11      A    Yes.  Once we find, if we find out they're
12  pregnant, they're no longer eligible.  They'd be
13  eligible for CalWORKS.
14      Q    But they would lose their CAAP benefits;
15  correct?
16      A    They would lose their CAAP benefits.
17      Q    And that would include in-kind shelter
18  placements, for example?
19      A    Yes.
20      MR. PRASAD:  Now moving on to paragraph 5, if
21  Mr. Headrick could please show that on the screen.
22      Q    If you could please take a second to read that,
23  Mr. Adamek.
24      A    Yeah.
25      Q    This paragraph discusses renewal process;
```

```
 1  correct?
 2      A    Yes.
 3      Q    And CAAP beneficiaries are required to complete
 4  a renewal process every six months; is that right?
 5      A    That's right.
 6      Q    To your knowledge, in an average month, how
 7  many CAAP beneficiaries typically lose their benefits
 8  for failure to renew?
 9      A    I don't know.
10      Q    Is that a common occurrence, to your knowledge?
11      A    People discontinuing?  Yes.
12      Q    Through nonrenewal, specifically.
13      A    I don't know the number.  So is it common?  I
14  mean, it happens.  I don't know the number.
15      Q    So you would agree at least some beneficiaries
16  lose their benefits due to nonrenewal for some reason;
17  is that right?
18      A    Sure.
19      Q    And you observe fluctuations in the number of
20  unhoused people receiving benefits every month?
21      MR. MILLS:  Objection.  Vague and ambiguous.
22      THE WITNESS:  I mean, I look at data.  I see how
23  many clients are on aid from month to month.
24  BY MR. PRASAD:
25      Q    And does that number change from month to
```

```
 1   month?
 2       A    I don't know the number offhand.
 3       Q    Would you be able to put that in a proportion?
 4   Is it a third?  A half?
 5       A    No, it's not that large.
 6       Q    How large would you say it is?
 7       A    I don't want to say less than -- maybe around
 8   10 percent, but I can't be certain.
 9       Q    But it is fair to say that at least some number
10   of individuals have their benefits discontinued every
11   month; yes?
12       A    Some amount, yes.
13       Q    And according to your declaration, benefits can
14   be discontinued if a client does not show up for
15   required appointments; correct?
16       A    Yeah, eventually they would get discontinued.
17       Q    And does that refer only to renewal
18   appointments?
19       A    It can refer to other appointments as well.
20       Q    What kinds of other appointments?
21       A    Well, in CAAP, clients have to do a mandatory
22   activity, a lot of clients have to do mandatory activity
23   as part of their requirement to be on aid.  So if you're
24   able to work, then you would be doing some work
25   requirement.  And if you don't show up to your work
```

```
 1       A    Yes.
 2       Q    And therefore there are multiple ways CAAP
 3  recipients can lose their housing; correct?
 4       MR. MILLS:  Objection.  Vague and ambiguous.
 5       THE WITNESS:  Multiple ways you can lose your
 6  housing?  It's just one way:  You lose your housing.
 7  BY MR. PRASAD:
 8       Q    Let me rephrase that.  Because there are
 9  multiple avenues for someone to lose their CAAP
10  benefits, in turn, there are multiple avenues for
11  someone to lose their in-kind housing benefit; correct?
12       MR. MILLS:  Objection.  Vague and ambiguous.
13  Mischaracterizes testimony.  Incomplete hypothetical.
14       THE WITNESS:  There's only one way to lose your
15  in-kind benefits.  I mean, you lose it -- I don't
16  know -- maybe we're saying the same thing, I don't know.
17  You lose -- there are multiple ways to discontinue.
18  When you're discontinued, there's only one way you lose
19  your shelter, you just lose your shelter.  It's not like
20  it's a separate process for a specific type of
21  discontinuance.  You lose your shelter.
22  BY MR. PRASAD:
23       Q    You would agree generally there are multiple
24  sets of circumstances that could result in somebody
25  losing their benefits and then as a result of that
```

1  losing their shelter; right?
2      A    That's a better way to state it, yes.
3      Q    Now, is it common for individuals who lose
4  their benefits to reapply to CAAP?
5      A    Yes.
6      Q    Is there a waiting period before individuals
7  who lose their benefits can reapply to CAAP?
8      A    Depends on the situation.
9      Q    Could you elaborate on that?  What do you mean?
10     A    Well, if you have -- let's say you're
11 discontinued because you're no longer a resident, or
12 you've incomed off and you're no longer eligible due to
13 that, there's no waiting period; you can reapply.
14          If you've been discontinued for noncompliance
15 reasons, like missing appointments or missing your work
16 fair, etcetera, failing to turn in documentation, then,
17 in general, you would be served with a sanction period
18 of 30 days.
19          And then you can, what we call, reinstate.  So
20 you can call during any time during that, or come in,
21 anytime during that 30-day period, do an abbreviated
22 intake, and then get reinstated after the 30 days.
23     Q    So a person who loses their benefits and then
24 has them reinstated, could be without shelter for 30
25 days in between; is that right?

```
 1   Assumes facts not in evidence.  Calls for speculation.
 2        THE WITNESS:  I can't say if they'd be sheltered or
 3   not.  They wouldn't have access to the CAAP bed.  But
 4   there are other ways to get shelter in the city.
 5   BY MR. PRASAD:
 6        Q    Now, is it common, to your knowledge, for
 7   recipients to cycle between having benefits, losing
 8   them, and then reapplying and obtaining benefits again?
 9        A    There are people that do that, yes.
10        Q    What percentage of CAAP beneficiaries would you
11   say fall into that category?
12        A    I don't know.
13        Q    Is it at least a third?  Or half?
14        A    I couldn't speculate.
15        Q    Based on your testimony, is it fair to say that
16   there is some churn of individuals going on and off CAAP
17   over the course of a given year?
18        A    I think that, yeah, that's fair to say.
19        MR. PRASAD:  We can take that exhibit down.
20             And I'd like now to show the witness what I've
21   sent the court reporter as Tab 3, which we'll label as
22   Plaintiffs' Exhibit 1198.
23             (Exhibit 1198 was marked for identification and
24   is attached hereto.)
25        MR. PRASAD:  Mr. Headrick, if you could please
```