# EXHIBIT 58

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

1  DAVID CHIU, State Bar #189542
   City Attorney
2  YVONNE R. MERÉ, State Bar #173594
   Chief Deputy City Attorney
3  WAYNE SNODGRASS, State Bar #148137
   Deputy City Attorney
4  EDMUND T. WANG, State Bar #278755
   KAITLYN M. MURPHY, State Bar #293309
5  MIGUEL A. GRADILLA, State Bar #304125
   JOHN H. GEORGE, State Bar #292332
6  ZUZANA S. IKELS, State Bar #208671
   Deputy City Attorneys
7  City Hall, Room 234
   1 Dr. Carlton B. Goodlett Place
8  San Francisco, California 94102-4682
   Telephone:    (415) 554-4675 (Snodgrass)
9                (415) 554-3857 (Wang)
                 (415) 554-6762 (Murphy)
10               (415) 554-3870 (Gradilla)
                 (415) 554-4223 (George)
11               (415) 355-3307 (Ikels)
   Facsimile:    (415) 554-4699
12 E-mail:       wayne.snodgrass@sfcityatty.org
                 edmund.wang@sfcityatty.org
13               kaitlyn.murphy@sfcityatty.org
                 miguel.gradilla@sfcityatty.org
14               john.george@sfcityatty.org
                 zuzana.ikels@sfcityatty.org
15
   Attorneys for Defendants
16 CITY AND COUNTY OF SAN FRANCISCO, et al.

17              UNITED STATES DISTRICT COURT

18            NORTHERN DISTRICT OF CALIFORNIA

19
   COALITION ON HOMELESSNESS; TORO         Case No. 4:22-cv-05502-DMR
20 CASTAÑO; SARAH CRONK; JOSHUA
   DONOHOE; MOLIQUE FRANK; DAVID           DECLARATION OF JONATHAN VAING IN
21 MARTINEZ; TERESA SANDOVAL;              SUPPORT OF DEFENDANTS' RESPONSE TO
   NATHANIEL VAUGHN,                       COURT ORDER (ECF NO. 180)
22
23          Plaintiffs,                    Trial Date:       April 15, 2024

24      vs.

25 CITY AND COUNTY OF SAN
   FRANCISCO, et al.,
26
            Defendants.
27
                                           EXHIBIT ___1034___        PLTF.
28                                         WITNESS  J. Vaing         DEFT.
                                           CONSISTING OF __250__     PAGES
   Vaing Decl. ISO Defs. Resp. to Ct. Order     1    DATE 1·15·25
   CASE NO. 4:22-cv-05502-DMR                   BEHMKE REPORTING AND VIDEO SERVICES, INC.

I, Jonathan Vaing, hereby declare:

1.      I have personal knowledge of the matters stated herein, and if called and sworn as a witness could and would competently testify thereto.

2.      I have been employed by the City and County of San Francisco since 1996. I work within the Department of Public Works ("DPW") as part of the Bureau of Street and Environmental Services ("BSES"), which is one of four bureaus in DPW underneath the Operations Division. My title is the Assistant Superintendent of BSES Operations.

3.      BSES is the DPW Bureau primarily concerned with cleaning streets, curbs, and other right-of-ways in the City. We do this by using mechanical street sweepers, removing graffiti, managing litter receptacles, and utilizing manual cleaning crews. Our manual cleaning crews sweep and clean sidewalks in heavily used commercial corridors. DPW employees who work with Healthy Streets Operation Center ("HSOC") operations and Joint Field Operations ("JFO") are all part of BSES.

**Court's Request**

4.      I am informed and believe that the Court has required San Francisco to provide information regarding (1) how many DPW employees interact with homeless individuals with respect to cleaning; (2) the context in which they interact with homeless individuals with respect to cleaning; and (3) the training they receive on the bag and tag policy, including the frequency, length, and format of the training and details of any training materials. I am informed and believe that Interim DPW Director Carla Short is submitting a declaration to respond to the first and second topics in the Court's request to the extent it relates to any portions of DPW beyond BSES. My declaration will address the first and second questions as they relate to BSES and the third topic, DPW training on the bag and tag policy.

**Structure of BSES**

5.      BSES has approximately 400 employees. Of those approximately 400 employees, around a quarter have roles that involve interacting with homeless individuals with respect to cleaning. Those individuals work on the Zone, Hot Spot and Special Projects teams as described below.

6.    BSES is divided into eight teams each headed by one or two employees with the title Supervisor II. Those teams are: (1) Block Sweeping Group; (2) Alley Crews; (3) Mechanical Sweeping; (4) Zone; (5) Outreach and Enforcement; (6) HOT Spot Team; (7) Graffiti Unit; and (8) Special Projects.

7.    Only the Zone Crew, Hot Spot Team, and Special Projects Crew have jobs that DPW anticipates will require them to interact with homeless individuals with respect to cleaning.

8.    Below I provide more information about the number of employees assigned to, and the job responsibilities of, each of the eight BSES teams.

9.    **Block Sweeping** has approximately 122 DPW employees, with an additional approximately 60 employees who are paid for out of the San Francisco Human Services Agency's budget. Their staff do not engage with persons experiencing homelessness. The Block Sweeping team's responsibilities require sweeping around designated sidewalks carrying a garbage bag, trash picker, and broom. Employees on the Block Sweeping team do not ask anyone to move for purposes of cleaning and their work does not involve engaging with members of the public.

10.    **Alley Crew** has approximately 8 employees. This is a newly reconstituted group whose work is similar to the work that the Block Sweeping crew described above in Paragraph 9 does, but instead of sweeping sidewalks, the Alley Crew sweeps City alleyways. Employees on the Alley Crew team do not ask anyone to move for purposes of cleaning and their work does not involve engaging with members of the public.

11.    **Mechanical Sweeping** has approximately 38 employees. Employees on the Mechanical Sweeping team do their work from specialized vehicles that sweep and clean City streets. These are the vehicles that perform the type street cleaning for which street parking in prohibited at certain dates and times as shown in the video here: https://sfpublicworks.org/services/mechanical-street-sweeping-and-street-cleaning-schedule. The Mechanical Sweeping team does not ask anyone to move for purposes of cleaning and their work does not involve engaging with members of the public.

12.    **Zone** has approximately 84 employees. Zone is the complaint-driven part of BSES, responding to complaints raised through 311 or other channels. Zone laborers are assigned to one of six geographic "zones" in the City, designated as A-F. The Tenderloin, where Joint Field Operations

("JFO") occurs is part of Zone B and the Zone B team supports the JFO operation's needs from DPW. Zone laborers are dispatched to respond to complaints about the streets and sidewalks within their zone based on a number of factors including the severity or safety risk that the complaint presents. Both City employees and members of the public can call in complaints. Zone work does involve interactions with homeless individuals with respect to cleaning and laborers on the Zone team are trained on the City's bag and tag policy.

13.    **Outreach and Enforcement** has approximately 6 employees. Laborers on the Outreach and Enforcement team do not have responsibilities that involve cleaning the sidewalk directly and instead work with local businesses to educate and as necessary issue citations to business owners who do not have sufficient garbage services or who leave their trash and/or recycling out on the street in violation of the Public Works Code. Laborers on the Outreach and Enforcement do not ask anyone to move for purposes of their cleaning and their work does not involve any engagement with members of the public who are not property owners.

14.    **Hot Spot Team** has approximately 6 employees. Laborers on the Hot Spot Team are responsible for providing DPW support to HSOC resolutions. Their work involves interactions with homeless individuals with respect to cleaning and the Hot Spot Team is trained on the City's bag and tag policy.

15.    **Graffiti Unit** has approximately 23 employees. Laborers in the Graffiti Unit respond to complaints and/or reports of graffiti in the City. Although the job responsibilities for laborers in the Graffiti Unit do not involve interactions with homeless individuals with respect to cleaning, laborers in this unit may be eligible for overtime with the Zone Crew, whose work does involve interactions with homeless individuals with respect to cleaning and those individuals are trained on the City's bag and tag policy through Tailgate meetings described below.

16.    **Special Projects** has approximately 10 of employees. Laborers on the Special Projects team manage property that other BSES teams have bagged and tagged and staff the property storage area at the DPW Yard. The Special Projects team also manages DPW's work with parades and other celebrations or special events in the City, such as Bay to Breakers and the Pride Parade. Their work

may involve interactions with homeless individuals with respect to the DPW Storage Yard and would be expected to know and follow the bag and tag policy.

17.　　The numbers described above in Paragraphs 9-16 include only current active laborers. They do not include currently employed staff who may be on approved leave, such as FMLA, worker's compensation, or parental leave, etc.

**Training on the Bag and Tag Policy**

18.　　DPW's official bag and tag policy as set forth in the Public Works Procedures Manual is attached hereto as **Exhibit A.** There is a less formal and more reader-friendly recitation of the policy available on DPW's website at: https://sfpublicworks.org/services/bag-and-tag-process.

19.　　Generally, BSES's training regarding the bag and tag policy falls into three categories: (1) PowerPoint presentation trainings, (2) weekly refreshers and reminders, and (3) on-the-job training.

20.　　These trainings are provided to BSES employees who interact with homeless individuals as part of their work, including those working with: Zone, Hot Spot Team, and Special Projects. I discuss each category of training more fully below.

**(1)　　PowerPoint Presentation Trainings**

21.　　I personally drafted training materials to train DPW employees on the bag and tag policy. The current version of those training materials, which contains 14 PowerPoint slides, is attached as **Exhibit B.** This presentation covers:

      a.　Circumstances in which personal items may be collected and stored (Slide 1);

      b.　Pre-Removal Notices (Slide 2);

      c.　Procedures for Retrieval of Personal Items (Slide 3);

      d.　Flowchart of the bag and tag process as it relates to unattended items (Slide 4);

      e.　Flowchart of scheduled encampment outreach and clean up (Slide 5);

      f.　Explanation of items that will be discarded and not stored (Slide 6);

      g.　Notice used in advance of HSOC resolution (Slide 7);

      h.　Paperwork to fill out for bagged and tagged property (Slides 8-9)

      i.　Photographs documenting the bag and tag policy (Slides 10-13); and

Vaing Decl. ISO Defs. Resp. to Ct. Order
CASE NO. 4:22-cv-05502-DMR

4

1        j. Log of items bagged and tagged (Slide 14).

2      22.  I have led trainings using these PowerPoint materials to BSES employees at least three

3    times since January 2023. The training using my PowerPoint materials takes approximately 30

4    minutes.

5      **(2)**  **Weekly Refreshers And Reminders**

6      23.  In addition to my PowerPoint training, BSES regularly reminds employees of their

7    obligations under the bag and tag policy at weekly meetings. BSES generally has a two-tier structure

8    for its weekly meeting based on whether or not an individual has obtained the rank of Supervisor II.

9    The two-tiers of meetings are referred to as "Sup II" meetings and "Tailgate Meetings" as described

10   below.

11     24.  Generally, one a week on Tuesday mornings at 7:30 AM, all Supervisor II's in BSES

12   except those who work on the swing shift attend a meeting, referred to as a "Sup II" meeting. This

13   meeting includes supervisors from each of the eight BSES teams. Supervisors on the swing shift, who

14   are not working at 7:30 AM review the Sup II meeting minutes during their shift.

15     25.  Sup II meetings typically last 30 minutes and we keep meeting minutes.

16     26.  Sup II meetings address current issues relevant to BSES's work, ongoing issues, and

17   upcoming events. I personally frequently review the same content from the PowerPoint presentation

18   orally during the Sup II meetings.

19     27.  Attached as **Exhibit C** are true and correct copies of the Sup II meeting minutes for the

20   time period April 18, 2023 through September 5, 2023. These meeting minutes show that various

21   operations-related issues including the bag and tag policy were addressed repeatedly at Sup II meeting

22   during that period. Training on DPW's bag and tag policy is specifically called out in the majority of

23   Sup II meeting minutes during this period:

24       a. On April 18, 2023, there was a refresher on the bag and tag policy, including the

25        associated paperwork when items are bagged and tagged;

26       b. On April 24, 2023, there was a reminder regarding the bag and tag policy

27        including a reminder about training;

28

Vaing Decl. ISO Defs. Resp. to Ct. Order     5
CASE NO. 4:22-cv-05502-DMR

c.  On May 2, 2023, there was a discussion of the bag and tag policy, including the request to photograph the area before and after a bag and tag is performed;

d.  On May 16, 2023, there was a discussion of the bag and tag policy, including the request to photograph the area before and after a bag and tag is performed, as well as the training requirement on the bag and tag policy;

e.  On May 23, 2023 there was a discussion of the bag and tag policy, including the request to photograph the area before and after a bag and tag is performed;

f.  On May 30, 2023, there was a discussion of the bag and tag policy, including the request to photograph the area before and after a bag and tag is performed;

g.  On June 6, 6023, there was a discussion of the bag and tag policy, including the request to photograph the area before and after a bag and tag is performed;

h.  On June 13, 2023, there was a discussion of bag and tag policy, including the request to photograph the area before and after a bag and tag is performed, and a reminder for supervisors to inspect notes and photos from their subordinates and to take action when a team member does bag and tag property correctly;

i.  On June 20, 2023, there was a discussion of the bag and tag policy and a reminder for supervisors to inspect notes and photos from their subordinates and to take action when a team member does bag and tag property correctly;

j.  On July 5, 2023, there was a discussion of the bag and tag policy, including the request to photograph the area before and after a bag and tag is performed;

k.  On July 11, 2023, there was a discussion of the bag and tag policy and a reminder for supervisors to inspect notes and photos from their subordinates and to take action when a team member does bag and tag property correctly, and a reminder that supervisors are responsible for the work of their team members;

l.  On August 6, 2023, there was a discussion of the bag and tag policy, including the request to photograph the area before and after a bag and tag is performed;

m.  On August 22, 2023, there a discussion of the bag and tag policy, including the request to photograph the area before and after a bag and tag is performed; and

1                n.  On September 5, 2023, there was a discussion of the bag and tag policy,

2                    including a reminder that staff who do not follow the policy must be written-up.

3       28.    Following the Sup II meeting, supervisors are dispatched to their team and lead a

4 second weekly meeting disseminating information from the Sup II meeting. We refer to these as

5 "Tailgate Meetings." Tailgate Meetings last between 30 minutes to an hour. There are no meeting

6 minutes for Tailgate Meetings since there are no shifts that do not have in-person Tailgate Meetings.

7       29.    Although Tailgate meetings do not have meeting minutes, they may require a sign-in

8 sheet. Attached as **Exhibit D** are true and correct copies of Tailgate Meeting sign-in sheets from April

9 through August 2023. At these Tailgate Meetings, the team supervisor would have relayed the same

10 information he or she learned during the previous Sup II meeting, including reminders and training

11 regarding DPW's bag and tag policy.

12      30.    There are also some Tailgate Meeting sign-in sheets specifically showing bag and tag

13 issues were raised at the meeting for some subgroups or teams who engage with bagging and tagging

14 regardless of whether bag and tag issues came up at that week's Sup II meeting. Attached as **Exhibit E**

15 are true and correct copies of sign-in sheets specifically showing a Bag and Tag training.

16                a.  On October 25, 2022 there was a bag and tag training given to eight Zone A

17                    crew members and on January 12, 2023 there was a bag and tag training given

18                    to 11 Zone A crew members;

19                b.  On December 1, 2022 there was a bag and tag training given to 13 people

20                    working on the Zone B and Graffiti Abatement teams; and on August 30, 2023

21                    there was a tag and tag training given to 15 people working with the Graffiti

22                    Unit;

23                c.  On January 12, 2023, there was a bag and tag training given to eight people

24                    working on Zone C;

25                d.  On August 29, 2023 there was a bag and tag training given to nine people

26                    working on Zone D;

27                e.  On January 10, 2023 there was a bag and tag training given to nine Zone E crew

28                    members;

     f.   On November 9, 2022 there was a bag and tag training given to five Zone F crew members and on December 29, 2022 there was an additional bag and tag training given to five Zone F crew members; and

     g.   On November 5, 2022 there was a bag and tag training given to six Hot Spot Crew members.

**(3)    On-The-Job Training**

31.    BSES employees also receive on-the-job training related to DPW's bag and tag policy.

32.    For example, when materials are bagged and tagged from an HSOC resolution or a JFO engagement, a Supervisor is typically on-scene to help crew members determine whether materials should be bagged and tagged or whether they are discardable under the policy. For Zone workers who are responding to 311 calls, a supervisor can be reached for any questions through the radio room. These interactions provide opportunities for BSES crew members to ask questions of their supervisors in real time and get guidance on how to apply the bag and tag policy.

33.    There is also a review process for materials that have been bagged and tagged. When DPW bags and tags items for storage at the DPW Yard, the DPW laborer who bags and tags the property fill out two forms: (1) one Notice of Removal of Property, which is posted at the location where the property was bagged and tagged and (2) one Homeless Property Information intake form, which is an internal document DPW uses to track and store bagged and tagged property. Attached as **Exhibits F and G** are true and correct copies of both forms.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1  34. Supervisors for the employees who bag and tag property review these forms. To the

2 extent a supervisor notices anything missing from the paperwork, they have an opportunity to address

3 the issue with the employee and provide guidance on the bag and tag policy.

4

5  I declare under penalty of perjury under the laws of the United States and the State of

6 California that the foregoing is true and correct. Executed September 20, 2023 in San Francisco,

7 California.

8

9           9/21/23

10       JONATHAN VAING

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT B**

**TO**

**DECLARATION OF JONATHAN VAING IN
SUPPORT OF DEFENDANTS' RESPONSE TO
COURT ORDER (ECF NO. 180)**



REMOVAL AND TEMPORARY STORAGE OF PERSONAL ITEMS COLLECTED FROM PUBLIC PROPERTY

A. PURPOSE AND SCOPE:

Public Works staff adheres to this policy when removing personal items from public property for temporary storage and retrieval. These procedures are commonly known as "bag and tag." These rules apply to Public Works staff when they are working on City property, as well as when working with another agency or on property under the jurisdiction of another agency (i.e., Caltrans). This policy applies to both attended and unattended property, but it does not apply to the removal of abandoned property from the public right of way. (See definition of "abandoned" property below in Section II (A).).

## CIRCUMSTANCES IN WHICH PERSONAL ITEMS MAY BE COLLECTED AND STORED

1. Unattended Items

Upon inspection by street cleaning staff, unattended personal items - such as medication, tents, luggage, bedding, backpacks, personal papers, and operational wheelchairs- will be collected end stored for up to 90 days for retrieval. Only items listed below under "Items That Will Be Discarded" will be discarded immediately. All other items will be removed and stored. Staff will place a Post Removal Notice in the area from which the items were removed stating how, where and when the items may be retrieved. (See Section IV below regarding Notices).

**Under no circumstances may staff take or keep for themselves unattended personal items for their own use, or allow non-City personnel to take unattended property for their own use.**

Distinguishing Between Unattended vs. Abandoned Property: Temporarily unattended property is different from abandoned property, which may be immediately discarded. In determining if property is abandoned, staff should evaluate the facts and circumstances surrounding the items. Unattended property is not abandoned if it is accompanied by signs of ownership -for example, an unattended tent that is filled with personal belongings, or items that are being stored in an orderly manner (i.e., packed up, wrapped, or covered). In addition, if there is a third party present who states s/he has been designated to watch or secure the items during the owner's temporary absence, the items are not considered abandoned.

By contrast, abandoned items are unaccompanied by objective indications of ownership, for example, an empty or broken tent sitting by itself on a sidewalk with no other belongings, a bag of clothes open and strewn across a sidewalk, or items that are broken, disheveled, surrounded by trash, or show other signs of neglect. This policy does not apply to abandoned property.

# Pre-Removal Notice



NOTICES

1. Pre-Removal Notice

a. For pre-planned special cleanup events conducted with or without other City departments, for example permanent removals of encampments, the City will provide 72 hours advance written notice, so long as the site does not present any imminent health or safety hazards requiring immediate removal.

Pre-Removal Notice shall be provided in writing to individuals who are present and posted conspicuously on or near the personal property that will be removed. The Notice shall be in a form substantially similar to the "Pre-Removal Notice" attached to this policy.

b. For routine cleaning operations *(i.e., where individuals are allowed to return to the location following cleaning and there is no permanent removal)*, or when responding to 311 service requests, advance written notice is not required; however, staff shall give persons sufficient time to collect and move their items, taking into account that individuals may have special needs and the volume of belongings.

2. Post-Removal Notice

After any removal of unattended property- whether during a pre-planned special cleanup event or a routine cleaning operation - Public Works staff shall place a Post-Removal Notice in the area from which the items were removed. See attached sample Post-Removal Notice.

E. PROCEDURE FOR COLLECTING PERSONAL ITEMS

Public Works staff is required to wear necessary safety gear and personal protective equipment, and follow the department's code of safe practices for field and yard operations.

Public Works staff is required to follow these procedures when collecting personal items:

1. Items are assessed for safety under the criteria for collection or for discarding.

a. If items are found to be hazardous or unfit for collection, they are to be discarded.

b. If items are deemed personal property, then they are to be collected following these procedures.

2. If the owner of the items is present, under the direction of the San Francisco Police Department, staff will give oral notice that the items will be collected if they are not moved by the owner. Staff will comply with the rules set forth above for Attended Items.

# G. PROCEDURE FOR RETRIEVAL OF PERSONAL ITEMS

Owners of collected personal property may retrieve their items at the Public Works Operations Yard at 2323 Cesar Chavez Street.
• If collected within the previous 72 hours, owners can retrieve items anytime, day or night. If the items were collected more than 72 hours ago, the owner may retrieve items Monday through Friday, 9 a.m. to 3 p.m.
• Owners must provide satisfactory proof of ownership; i.e. describing the location of where the items were and when collected, or describing the specific items that were collected.
• No government or photo identification is required.
• There is no fee charged for temporary storage of items.
Owners of the items should arrive at the Kansas Street entrance, at Marin Street.
• Call for Public Works staff on intercom, or call the Radio Room at 415-695-2134.
• Owners of the items will wait at the gate for items to be delivered by Public Works staff, and will not enter the Operations Yard.
• Public Works staff will meet with the prospective owners at the gate to coordinate the property retrieval.
• Owners must sign and date the intake form to designate that the items have been picked up.
If it is Monday through Friday, 9 a.m. to 3 p.m.:
• The Radio Room will notify the Public Works "bag and tag" staff member to perform the procedures for the retrieval and documentation.
If during the first 72 hours and at a time not on a Monday through Friday, 9 a.m. to 3 p.m.:
• The Radio Room will notify the Public Works supervisor on duty to perform the procedures for the retrieval and documentation.
1. Prospective owners will describe the items to be retrieved.
2. Public Works staff will attempt to find the items in storage and the corresponding tag and intake form .
3. Upon confirmation that the items do belong to the owner, staff will deliver the items to the owner at the Kansas Street gate.
4. Staff will compare the tag on the items to the intake form to confirm that all of the items are accounted for.
5. Staff will request that the owner sign and date the intake form to designate that the items have been collected. Intake form is filed for documentation in triplicate: white page to log book, yellow page to radio room, pink page given to the owner along with the property.
At no time are members of the public allowed to visit storage area to look for items in the storage area.
Public Works "bag and tag" staff will regularly itemize and organize the stored items.
• After 90 days, unclaimed items are discarded. Public Works will record the date of disposal.
• Intake form is updated to note that the items went unclaimed.







## ITEMS THAT WILL DISCARDED AND NOT STORED

**ITEMS THAT WILL DISCARDED AND NOT STORED**

1. Items that present an immediate health or safety risk, such as:
   - toxic sharps: needles, scissors, knives
   - chemicals: bleach, paint, oils, etc.
   - items (including bedding and clothing) soiled by infectious materials: human waste, body fluids, moldy, mildewed items
   - items infested by rodents and insects: rats, mice, fleas, lice, bed bugs
   - personal belongings that are co-mingled or littered with needles, human waste, or other health risks – staff may dispose of the entire pile of belongings and are not required to sort through and attempt to remove the health or safety risks.
2. Furniture, mattresses, sheds, rolling structures, and bulky items. A "bulky item" is any single item that does not fit in a 60-gallon container with the lid closed, except for a tent, or an operational walker, operational wheelchair, operational crutches or operational bicycle. Personal belongings located inside a bulky item bin shall be stored even if the bulky item itself is discarded.
3. Perishable items, perishable food.
4. Contraband, illegal items; refer to San Francisco Police Department.
5. Trash, garbage, and/or debris. This includes property that appears to have been discarded by its owner and broken appliances or broken furniture. If staff has a reasonable doubt as to whether an item constitutes trash, it should be collected and stored.
6. Abandoned property (see definition above).
   *Procedure 16.05.08– Removal and Temporary Storage of Personal/Items Collected from Public Property Page 2 of 10 Rev. No. 01: Date Revised/Reviewed: December 2016 (San Francisco Public Works Departmental Procedures Manual – Vol. 16- Street Environmental Services*

NOTE: Shopping carts are governed by Public Works Procedure 16.05.05 and are not subject to this policy. However, personal property inside a shopping cart shall be bagged and tagged in accordance with this policy. There is no limit to the number or volume of personal items that Public Works will bag and tag for a particular individual so long as they are not bulky items, as defined above, or do not otherwise constitute "Items That Will Be Discarded" under this Section III. However, the Director of Public Works may, after determining that the storage facility at the Public Works Operations Yard is at or near full capacity and after clearing out property that is older than 90 days, issue a written directive imposing a temporary reasonable per-person limit on the volume.

Public Works staff collects the personal items while in the field and documents the collection with a "Personal Property Collection Bag and Tag Intake Form".

a) Forms are kept with Public Works cleaning staff and zone supervisors. See Appendix for example of form.
b) Information collected includes:
   - Date
   - Time
   - Location (as specific as possible, address preferred)
     o street address
     o cross street
     o what corner of intersection (if applicable)

## 72-HOUR NOTICE OF PLANNED REMOVAL OF PROPERTY



Date of posting: _____

Time of posting: _____

Posted by: _____ Vehicle# _____

**SAN FRANCISCO PUBLIC WORKS**

**72-HOUR NOTICE OF PLANNED REMOVAL OF PROPERTY**

Be advised that the [encampment and/or personal property] located at _____ is in violation of City law. Any individuals residing in this area need to immediately move off this site and remove any personal property they own.

On [Date] _____[Time] _____ the City and County of San Francisco Public Works will conduct a cleanup of the area, including the removal of all personal property, temporary shelters, junk and/or garbage from the area.

Any personal property removed will be taken to the Public Works Operations Yard at 2323 Cesar Chavez Street. Owners of the items should go to the Kansas Street entrance, at Marin Street, and call on the intercom or call 415-695-2134.

For the first 72 hours after items are collected and stored, they can be claimed by their owners 24 hours a day. After the first 72 hours, owners can retrieve items Monday through Friday, 9 a.m. to 3 p.m. There is no fee for property storage or retrieval. Property not claimed within 90 days of the date of removal will be deemed abandoned and will be destroyed.

Please be advised that the following types of items **will not be stored and may be discarded:**

1) Items that present an immediate threat to public health or safety (soiled, needles, infested with vermin)
2) Items that are evidence of a crime or contraband
3) Trash
4) Perishable food
5) Bulky items (i.e., furniture, mattresses, sheds, structures) except for tents and operational walkers, crutches, wheelchairs, and bicycles.

## PROPERTY INFORMATION (Intake Form)



## NOTICE OF REMOVAL OF PROPERTY (Form)





SAN FRANCISCO PUBLIC WORKS
NOTICE OF REMOVAL OF PROPERTY

Be advised that unattended personal property has been removed from this area because it was abandoned and/or blocking properly per Sections 603 and 606 Public Code Sections 372 and/or 1416(a), and/or San Francisco Public Code Sections 19.

Date and approximate time of removal: _____

BFCOMP#: _____

Location of removal: _____

General description of items removed: _____

_____

PW Station #: _____    Vehicle #: _____

You may retrieve your belongings at the Public Works Operations Yard located at 2323 Cesar Chavez Street (use the Kansas Street entrance at Marin Street), 415-695-2134. They can be claimed 24 hours a day after items is collected for the first 72 hours. Afterwards, owners may retrieve their items Monday through Friday, 9 a.m. to 3 p.m. There is no fee for storage or retrieval. Although you are not required to present official I.D., you must provide a reasonably specific and detailed description of the property in order to retrieve it. Property not claimed

within 90 days of the date of removal will be deemed abandoned and will be destroyed.

Scheduled cleaning location: required 72 hours noticed posting



## Discarded Items





# Notice posted of property removal

  

Photos -inside bag and tag storage




## Special Project: Sample of Intake log

