# EXHIBIT 139

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Case No. 3:22-cv-05502

**DECLARATION OF CHRISTIN EVANS**

I, Christin Evans, hereby declare pursuant to 28 U.S.C. § 1746:

1. My name is Christin Evans, and I am 48 years old. All facts set forth in this declaration are based upon my personal knowledge, and, if called upon to testify as to the truth of these facts, I could and would competently do so.

2. I am a long-standing resident and business owner in the San Francisco Bay Area. I graduated from Vassar College in 1995 with a Bachelor's Degree in Political Science and a minor in International Economics. I received my M.B.A. from the Ross School of Business at the University of Michigan in 2001.

3. My husband and I realized our dream of becoming small business owners in Haight-Ashbury in 2007. We purchased *The Booksmith*—a small independent bookstore known for its events, steady stream of lectures, and engagement with the broader community. In 2018, I purchased and now run a cocktail bar in Haight-Ashbury called *The Alembic*, which featured on the *San Francisco Chronicle*'s list of top cocktail bars in the City.

4. I am a founding member of the Haight-Ashbury Merchants' Association (HAMA). I also serve on the Haight-Ashbury Neighborhood Council and represent our neighborhood at San Francisco's Council of District Merchant Associations. I use these positions to help ensure that our local businesses are engaged in the surrounding community and supported by local government.

**Confronting San Francisco's Homelessness Crisis**

5. Haight-Ashbury is a primary neighborhood for San Francisco tourism. That makes it an exciting place to be a small business owner. But the neighborhood has also taken center stage in the political battle over homelessness. That started a journey for me to understand San Francisco's homelessness crisis—and to interrogate the City's role in perpetuating that crisis.

6. I got more directly involved in addressing San Francisco's homelessness crisis in 2010. The City passed a Sit/Lie law making it illegal for unhoused people to be on public sidewalks during the daytime. *See* S.F. Police Code § 168. It was the perverse parallel to an already existing law making it illegal for homeless people to sleep in public parks at night. *See* S.F. Park Code § 3.13. In other words, literally hundreds of people were shuffling between our streets and public parks with everything they owned—every single day. That chaos was not a solution to homelessness, and it hurt us business owners too. I often heard even from loyal customers that they chose to shop online or go to other locations because they did not want to see the visible homelessness. I felt I had to do more—to look for real solutions.

**Advocacy with the Coalition on Homelessness; Monitoring the City's "Healthy Streets" Operation**

7. For the past several years, I have been a volunteer with the Coalition on Homelessness (COH). I conduct street outreach to understand the needs of our unhoused community members. I learn people's stories and connect them to resources that meet their needs.

8. The pandemic was a challenging time for my businesses. Both our bookstore and our bar in Haight-Ashbury were temporarily shut down. Instead, I used my time to help the expanding population of San Franciscans who could no longer make ends meet. There were no safe, non-congregate shelter options for homeless people in the early pandemic. So I raised money to purchase tents in coordination with COH. The City's Homeless Outreach Team (HOT) helped me distribute them.

9. The City launched its Healthy Streets Operation Center (HSOC) in 2018 while I was a COH volunteer. This interagency program promised a services-first approach to resolving homelessness. Although I knew about HSOC since its inception, I started monitoring it more closely in the beginning of the pandemic. With my businesses shut, I had the time to volunteer with COH on a more regular basis. I also became increasingly concerned about peoples' belongings being taken.

10. I have personally witnessed over 50 large-scale homelessness sweeps conducted by the City since March 2020. I understand that the CDC told local governments not to disrupt homeless encampments during the pandemic to protect the health of our entire community. That call was unheeded by the City.

11. COH would often learn that a sweep was going to happen from HSOC meetings or other reported statements. Other times, unhoused people would have our contact information and would call us as a sweep was beginning to come assist them. As a result, I have seen the life of an HSOC sweep from start to finish many times. The sweeps follow a decided pattern.

**Timeline of a "Healthy Streets" Sweep**

12. I usually arrive at an HSOC sweep around 6:50AM or 7:00AM. SFPD and DPW are often just arriving around that time. The Homeless Outreach Team (HOT) arrives around 7:30AM. SFPD and DPW are often the teams to make first contact—letting homeless people know there is a sweep that day and that they needed to clear out their belongings and go.

13. At this point, homeless people have rarely received notice. In about 50 sweeps, I have never seen written notice posted at the site where an HSOC sweep is taking place. Some individuals report receiving verbal notice from officers driving by in their vehicles, but that is generally unhelpful. By the time crews arrive on the day of a sweep, most individuals who received a verbal warning are gone. I have seen most people learn about a sweep for the first time when DPW or SFPD starts shaking them out of their tents at 7AM. The lack of notice only increases the stress and anxiety of the experience. Individuals do not know to pack their belongings—and then are in a frenzy to do so.

14. Somewhere around 7:30AM, the HOT team usually makes contact. They approach homeless people and ask them their names and if they *might* be interested in receiving services that day. But there is never any offer of shelter at that time. In fact, I learned that the HOT team usually has no idea what services or shelter might be available that day until at least 9:30AM. Often times, if the HOT team thinks they have spoken to someone on a previous occasion, they will not approach them at all. Then the HOT team leaves for several hours.

15. By 8:00AM, DPW has already started to take people's belongings. My fellow volunteers and I call it the "swarm." DPW comes with a crusher truck and a flatbed truck, splashes chemicals all along the sidewalk and people's belongings, and starts blasting a very large power washer. They start grabbing everything they can see, as fast as possible. People

dance around the power washer to collect their belongings—now wet. They have to yell to be heard. Whatever homeless individuals do not have physically in their hands gets picked up and put in the back of a DPW crusher truck. If someone protests, the DPW workers usually say: "Sorry, I thought it was trash." But no one is allowed to recover their property once it is in the back of a truck. This only ramps up the pressure for people to leave the area immediately with whatever they can carry. Those who cannot move fast enough lose everything.

16. During this time, SFPD is standing watch. They intervene whenever someone protests the destruction of their property. Often, they take a more active role. If they perceive individuals are not leaving the area fast enough, they threaten them with arrest. Sometimes, DPW and SFPD have collectively forced every single person out of an area before the HOT team even returns. They do not tell people where they can go, they just tell them they cannot be there. At this point, no one has been offered any services and many have had their property destroyed. The sweep is, in effect, already over.

17. The HOT team usually returns around 9:30AM or 10:00AM at the earliest. Often times, they have very little to offer. If they are lucky, they have shelter beds to offer *some* of the homeless people still onsite—in a congregate shelter in the middle of the pandemic. Sometimes they do not even have that to offer. Meanwhile, homeless people are standing on the street corner having had their belongings taken and now desperate for assistance.

18. The few that remain often do not get that assistance. I have seen the HOT team return with only men's shelter beds when there are women who need shelter. I have seen them return with only women's shelter beds when there are men present. And yes, I have seen them return with no resources at all. And yet all homeless people are expected to pick up and move along—no matter what.

19. Under these circumstances, I find that some of the HOT team workers have become like ghosts. This is a demoralizing assignment for them. It is not what they were meant to do. So instead, they focus on their personal needs like getting coffee. They are not meticulous about approaching everyone who is left at the site, because if they were they would have to confront each person to explain why they have nothing appropriate to offer them.

20. The entire HSOC operation wraps up by about 11:30AM. For the most part, everyone has been displaced to just a couple blocks away. Those who have been swept have lost everything and must start over—until the City sweeps again.

4

1 - 24

**The City Ignores its Own Policies**

21. I know the City has policies about storing the property of homeless individuals and offering them shelter before conducting a sweep. But based on my observations, those policies are rarely followed. When they are, it is usually because an advocate from COH or another community group is present to demand them.

22. I have never seen the City initiate a bag and tag of someone's property. I understand that to happen extremely rarely. If I am present, I will approach SFPD and DPW and demand that individuals have their property bagged and tagged before it is destroyed. In many cases, officers refuse. They usually do not give a reason. Other times, they claim that belongings are soiled or trash when they clearly are not. Occasionally, we succeed in helping people have their belongings stored. But that is backwards. We should not have to tell the City to follow its own rules, and certainly the City should not refuse to follow its own rules.

23. DPW indiscriminately throws away the property of homeless people who are not present at a sweep—no matter how neatly packaged or clear it is that a person wanted to keep their property. All unattended property, not just abandoned property, is destroyed. The same goes for so-called "bulky items." Mattresses, wheelchairs, bicycles, and other property essential for shelter and mobility are summarily seized and destroyed because the City does not want to store them.

24. The City violates its own policies around shelter as well. Because the HOT team often does not approach people directly to offer services, I go ask the HOT team what options are available myself. I then go talk to the individuals at the site, and try to advocate for the appropriate shelter placement. This is work that the HOT team should be doing. My advocacy has resulted in people being placed in shelter or receiving services when they otherwise would have been left on the street with nothing. Regardless of whether I am successful in connecting people to placements, however, everyone is still forced to leave. I understand this to violate the City's own policies about when sweeps are authorized.

25. I have also seen informal sweeps without the presence of the HOT team. On those occasions, DPW and SFPD will disturb people in their sleep, force them to move, or seize their property without even the guise of offering services—contrary to the City's promise to carry out a service-driven response to homelessness.

**Documenting the City's Destructive Sweep Operations**

26. Below, I have memorialized specific information I can recall about many of the sweeps I have witnessed over the past two years.

| Date | Location | Agencies | Description of the Sweep |
|---|---|---|---|
| 3/24/20 | ~1745 Folsom | SFPD, DPW | No advance notice posted at the site. I was driving near Rainbow Grocery when I witnessed SFPD and DPW stopped by a tent. I circled around to observe the agencies onsite. DPW had taken the person's tent and belongings and thrown them into a garbage truck simply because the person was not present at the site. I discussed this matter with SFPD Officer J. Sylvester. He suggested there was nothing of "extreme" value in the property destroyed as an excuse for their behavior. |
| 6/15/20 | Turk & Hyde | SFPD, DPW HOT, SFFD | No advance notice posted at the site. A wheelchair, a walker, and several tents were placed in a dump truck while the property owners watched. |
| 7/23/20 | 1377 Fell | SFPD, DPW HOT, SFFD | No advance notice posted at the site. Individuals were told to remove their tents for a cleaning operation. Mischa, a homeless woman who was not present at the scene at the time, had her tent thrown away. |
| 8/11/20 | Noe & 14th | SFPD, DPW HOT, SFFD | No advance notice posted at the site. Some individuals offered hotels; some a safe outdoor sleeping site; but others offered only a congregate shelter during the pandemic—prior to anyone in the U.S. being vaccinated. One person at the site who did not receive a viable shelter offer was given his neighbor's tent. The DPW supervisor was angry. He slashed the tent with a box cutter to render it unusable. Michael Mason from EMS6 sent the DPW supervisor away to de-escalate the situation. |
| 8/21/20 | Market & 16th | SFPD, DPW HOT, SFFD | No advance notice posted at the site. I was not provided information about whether service offers were made and to whom. Most individuals present were preparing to relocate elsewhere in the neighborhood and were gathering their belongings when they were forced to leave. Toro Castaño asked repeatedly for DPW and SFPD to retrieve his Macbook Pro laptop and his tent before they destroyed the site. That request was not heeded. His property was destroyed. Toro was arrested for illegal camping. |
| 9/18/20 | Julien & 16th | SFPD, DPW HOT, SFFD | No advance notice posted at the site. One individual lost bicycles that were seized and never returned or bagged and tagged. Another individual storing items in their tent reported that their tent and belongings were taken during the sweep. I provided them with an administrative claim form to file a claim against the City. |
| 10/5/20 | Ashbury & Grove | SFPD, DPW HOT, SFFD | I arrived after the sweep had concluded. No notice posted at the site. One woman named Ria/Rita reported losing everything because she left to go to the bathroom. |
| 11/1/20 | Willow & Broderick | SFPD, DPW | No advance notice posted at the site. HOT team was not present and no services offered to the ~14 homeless people onsite. I spoke to SFPD Officers Brady (#4258) and Burkhart and asked about their rationale for ordering a "move-along." It appears they made |

| | | | |
|---|---|---|---|
| | | | that decision without consulting anyone else. They acknowledged that many people were forced to leave their tents behind because of the order to leave the area. People lost tents and other survival belongings. |
| 4/15/21 | Howard & Russ | SPFD, DPW HOT, SFFD | No advance notice posted at the site. I witnessed a woman who appeared to have a disability as she was swarmed by DPW workers who began indiscriminately grabbing her personal belongings and throwing them in the trash under protest. |
| 5/12/21 | Larkin & Turk | SFPD | No advance notice posted at the site. I observed SFPD as they approached a man sleeping in his tent. The SFPD officers told me they were responding to a call for services and were sent to remove the man from the location. There was no service offer made. No other agencies were present. |
| 5/12/21 | Olive | SFPD, DPH | No advance notice posted at the site. I came upon SFPD and DPH disposing of the tent of someone who had left the area momentarily to go to the bathroom. |
| 6/9/21 | Willow | SPFD, DPW HOT, SFFD | I witnessed this sweep in advance of a fundraising event hosted by Project Open Hand. The mayor & other VIPs were attending. The City was intent on clearing the area of visible homelessness. No advance notice posted at the site. There were ~30 homeless individuals living on that street and the HOT team did not have nearly enough services to offer everyone. Homeless people were told to "just move" under threat of arrest. SFPD led the sweep with no pretense that this was anything other than displacement. |
| 7/21/21 | Florida & 19th | SFPD, DPW HOT, SFFD DPH | No advance notice posted at the site. Four men were not offered services at all. They were asked to surrender their belongings nonetheless. One man's tent was dragged into the street. |
| 8/25/21 | Willow & Olive | SFPD, DPW HOT, SFFD DPH, DEM | No advance notice posted at the site. Jeff Kositsky from HSOC was leading the sweep. He personally spoke to one homeless woman, Dawn, four times urging her to leave the area. He promised a shelter in the Mission, transportation, and packing assistance. But he withdrew the offer later in the day after she had already prepared to leave. |
| 9/16/21 | Haight & Clayton | SFPD, DPW | No advance notice posted at the site. DPW power washed the street aggressively four times to try to force the homeless people on the block to depart. Belongings were soaked and destroyed. I provided one homeless woman, Lisa, with a replacement blanket and gloves. |

**Putting the City on Notice**

27. As a former management consultant, I wanted to educate the City about how its policies were being disregarded and suggest how to make improvements. I was sure they would recognize that property destruction and failing to provide services are counterintuitive, destructive responses to the homelessness crisis. After all, the City's recent rhetoric about their "Healthy Streets" program explicitly rejects a law enforcement approach to homelessness.

28. I contacted the City early in the pandemic to alert them to the realities on the ground. I met with Jeff Kositsky, who at the time was the head of HSOC, to inform him about

the City's violations of its own policies that I had seen. I also drafted a handout that I thought could be shared at sweeps to provide information about the appropriate protocols. Kositksy did not respond to me and we did not meet. I have tried to have the same conversation with DPW and SFPD supervisors on several occasions. They have said no.

29. I filed a civilian complaint against the SFPD in August 2020 for their repeated harassment of a homeless man. That man was targeted by police and told to move by at least 4 different officers in a 12-hour period—despite following every City policy. When I called SFPD Captain Pedrini on the phone before lodging my complaint, he dismissed my concerns out of hand. He informed me that SFPD would continue to respond to all calls and complaints made about homeless individuals who were living in tents, whether or not they were violating the law and regardless of the proper protocols for conducting a sweep operation. This kind of law enforcement harassment is common, and reflects another way that SFPD gets around the City's policies to push homeless people out. A copy of my civilian complaint is attached as **Exhibit A** to this declaration. To my knowledge, no action was taken in response to my complaint.

30. There is an accountability gap with HSOC. It is an amorphous City program without clearly defined leadership. At a sweep, it is seldom clear which City agency is in charge and who is calling the shots. Different agencies will tell homeless people and advocates different things. SFPD might tell people they have one hour to move, but DPW will tell them they have 10 minutes. The HOT team may tell someone to wait for a shelter placement, but SFPD will demand they move immediately. Without clear authority, no one knows who to listen to. That confusion achieves the goal. Homeless people are displaced one way or another, and each agency can point the finger at the other when they inevitably violate City policy.

**Reflections on the City's Conduct**

31. San Francisco is one of the richest cities in the richest country in the world. We innovate technological solutions that drive change on a global scale. It is unfathomable to me that our response to homelessness—a response we pay for at astronomical rates as tax payers—involves law enforcement displacing people from one alley to the next every day and stealing their belongings. That response is as cruel as it is senseless. What a waste of our precious resources.

32. San Francisco knows how to do this right. There was a flicker of hope during the pandemic where it seemed the City might actually get there. When the City opened thousands of hotel beds for homeless individuals, an unprecedented number of homeless people entered

stable housing. Contrary to the dominant narrative that homeless individuals prefer to be on the street, almost everyone offered a hotel room eagerly accepted. That program is now ending. Those people will be back on the street. But this example only goes to show that the solution to San Francisco's homelessness problem is housing itself.

33. We need our taxpayer dollars to be put towards affordable housing that combats San Francisco's homeless crisis at its roots. Not to punish people who have already been priced out of the place they call home. That is not just kinder. It is also better for business.

I have reviewed the information contained in this declaration by telephone. I declare under the penalties of perjury that the contents are true and correct to the best of my knowledge.

Executed on: November 5, 2021

Christin Evans

# EXHIBIT A

My name is Christin Evans.  I was present during an HSOC operation which took place on Noe at Duboce on Tuesday, August 11.  I was present from approximately 8:30am to 7:30pm with the exception of three short breaks in that time to pick up food & use the restroom. None of the breaks exceeded 30 minutes and I was present for a large portion of that time observing SF Hot, DPW and SFPD contact with campers from 16 tents located along the fence of the Davies Medical Center.  As a volunteer for the Coalition on Homelessness and a proponent of Prop C, a gross receipts tax to fund real housing solutions for homeless individuals, I had been interested in observing the city's response to people experiencing homelessness and had been present at approximately 30 similar HSOC operations since the March shelter in place order took effect.

What was different about the HSOC operation on August 11th was that there were primarily only offers of congregant shelter made to campers.  I witnessed SF Hot and EMS6 staff make offers of SIP hotel rooms to 2 campers only.  But the large number of individuals (over 14 campers) who had slept in tents in this location did not receive an offer of a hotel room or safe camping site instead I witnessed offers of congregant shelter beds.  There were a number of people who declined the offer of congregant shelter citing concerns about safety including from theft, violence they'd previously experienced in similar congregant shelters.  Additionally, some campers mentioned the Covid shetler outbreaks as another reason why congregant shelters were not a safe choice they could accept.

One camper who introduced himself to me as "Jim" had a very tidy tent.  There was no garbage or debris.  In compliance with the city's safe sleeping guidelines, Jim's tent had more than 48 inches on all sides.  He had hung a little "home" ornament at the doorway of his tent and lined his tent with a little wooden fence.  It was clear that Jim took great pride in keeping his home clean and welcoming.

He communicated to SF Hot team members that he would accept a hotel room but not congregant shelter citing prior issues at shelters he'd experienced and a concern that they were not safe.  The SF Hot team did not make him an offer of a hotel room.  As a result of their interaction, he relocated his tent temporarily around the corner to Duboce street next to the church, approximately 50 feet from his tent's original location.

Around 6pm, Jim saw that the HSOC operation was nearly complete so he started relocating his belongings to his prior tent site on Noe street. An officer approached him and asked him to remove his tent until the HSOC operation was complete.  Jim complied.  At around 7pm, the officer communicated to Jim & myself that the HSOC operation had been completed.

After the officer Jim relocated his tent to his prior location on Noe.  At approximately 8:25pm, I received a message that Jim was contacted by officers threatening him with arrest if he didn't relocate his tent.  Based on information I received from Park Station Sergeant K.Holder, I have learned those officers who were Officer Yessin and Officer Villanueva of Park Station.

On the morning of August 12th, I arrived at Jim's location at approximately 7:45am.  I saw Officer J Walker (badge 1590) from Park Station.  Officer Walker had a police vehicle with the lights on her vehicle tuned on.  Jim was agitated and in the process of packing up his belongings and I asked him what was taking place.  He reported that he was again being told that he couldn't have his tent where he was located at the moment.  There were no offers of a hotel room or a shelter being made to him.  He said a police vehicle or officer had been posted nearly continuously from the night before outside of his tent.  That he was unable to get a good night's rest.  And he was exhausted and was going to ask another camper to help him once again relocate his tent and belongings off of Noe street.

I requested Officer Walker to call her Sergeant to clarify the city's policy on why Jim was being asked to relocate since the HSOC operation was completed and his tent was in compliance with the safe sleeping guidelines.  While I was waiting for the Sergeant to arrive, another Officer C Dagit (badge 703) also interacted with Jim and nearby campers.

At approximately 8:05am, Sergeant K. Holder arrived & introduced herself.  She identified that she was currently acting Lieutenant.  I spoke with her about the situation and she said that Park Station Captain Pedrini had issued a "passing call" for the area the prior evening.  She explained that officers were told to "check to see how it was looking" and to ensure compliance with sleeping guidelines to ensure no furniture was accumulating or sidewalks were being blocked.  I asked if she believed Jim was in violation of guidelines and she said she was unaware if he was.   I asked her why officers had essentially established a fixed post outside of Jim's tent all night and she said that it was as a result of the Captain's orders.   Together we confirmed that Jim had been contacted by 4 different police officers between the hours of 8pm and 8am even though there was no unlawful or criminal behavior taking place.

Later that day, Captain Pedrini himself arrived at Duboce & Noe.   I spoke with him for about 30 minutes informing him what had taken place.  I communicated my concern that campers who are compliant with safe sleeping guidelines should be allowed to shelter in place and not be asked to move their location.  He expressed that campers had been offered hotel rooms and could be removed from the area if they did not accept.  I clarified to him that Jim did not receive an offer of a hotel room but that he had stated he would accept one if one was offered to him.

On Thursday August 13, Jim contacted me to say that he had been asked to relocate his tent an additional two times by SFPD officers.  He was no longer pitching his tent within the park station boundaries but instead inside the Mission station boundaries.  I sent this message to Captain Pedrini by email:

"Captain Pedrini,

Jim, the man who I mentioned to you who is a model camper (he knows the rules and keeps his tent tidy, and isn't a noise nuisance) called me today and he just broke down in tears.

1 - 32

He said that he had moved into an area near the Citibank on Sharon street and Mission officers told him to pack up and move again.

This is one of the campers who was forced to relocate multiple times off of Noe at Duboce. Four of your officers kept a fixed post and contacted him multiple times in a twelve hour period. He finally had a friend help him relocate to the Castro library area and he had multiple encounters with officers there as well.

He said he is sleep deprived, has lost more belongings and is now really struggling.

I need you to understand that this is SFPD directly traumatizing this man who already struggles with depression again and again.

I would like to find a location where Jim can set up his tent either in Mission or Park SFPD areas where police will not make frequent contact with him.

Please call me so we can identify that location. My cell is 510-459-5451.

Thank you,
Christin Evans"

On the afternoon of August 13, I received a phone call from Captain Pedrini. I believe we spoke for 10 minutes. He said that he didn't believe SFPD officers were doing any harm by making multiple contacts with Jim because the officers were acting professionally. He said that he could not identify a place for Jim to safely pitch his tent where he would be left alone by officers. He said that <u>SFPD officers would continue to respond to calls & complaints made to SFPD in regards to homeless individuals who have pitched their tent within the district, regardless if the tent was compliant with the city's safe sleeping guidelines</u>.

I believe that this statement made to me by Captain Pedrini indicates that he is directing his officers to make contact with homeless individuals, often repeatedly regardless of their tent compliance with city's safe sleeping guidelines. I believe that Captain Pedrini and officers under his command are in violation of city policy and CDC recommendations to allow homeless individuals to safely take shelter in a tent at this time during the Covid health crisis. I believe that Captain Pedrini's actions put his officers, homeless individuals and our broader community at greater risk for spreading the Covid virus. Homeless individuals require sleep and rest to remain healthy. Homeless individuals should be allowed to safely take shelter within their tent without disturbance. Our community is safer when housing and hotels are provided however that is not taking place in sufficient numbers in spite of unanimous support of the Board of Supervisors to open 8000 hotel rooms. I believe that the Mayor has put our whole community at greater risk by opening fewer than 3000 hotel rooms, shelter beds and safe campsites for the estimated 6000+ unsheltered people experiencing homelessness in our city before the Shelter In Place order took effect in March 2020.

1 - 33

I ask that SFPD take immediate action to refrain from contact unless there is actual criminal activity taking place. This is necessary to ensure campers like Jim can get a good night's sleep. He needs his sleep so he can remain healthy and successfully shelter in place. Our whole community will be safer if Jim and others like him can get a good night's sleep.

Signed,
Christin Evans
632 Ashbury Street
Cell 510-459-5451
christin@booksmith.com