**EXHIBIT 79**

**TO**

**DECLARATION OF STEVEN MILLS IN SUPPORT OF DEFENDANTS'
REPLY TO PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT**

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3      Before The Honorable Donna M. Ryu, Magistrate Judge

4

5    COALITION ON HOMELESSNESS,      )
     et al.,                         )
6                                    )
                                     )
             Plaintiffs,             )
7                                    )
     vs.                             )   No. C 22-05502-DMR
8                                    )
     CITY AND COUNTY OF SAN          )
9    FRANCISCO, et al.,              )
                                     )
10           Defendants.             )
     _____)
11

12                                   Oakland, California
                                     Thursday, August 24, 2023
13

14    TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
             RECORDING 1:03 - 2:34 = 91 MINUTES
15

     APPEARANCES:
16

     For Plaintiffs:
17                                   Latham & Watkins, LLP
                                     505 Montgomery Street
18                                   Suite 2000
                                     San Francisco, California
19                                     94111
                              BY:    KEVIN WU, ESQ.
20
                                     Latham & Watkins, LLP
21                                   650 Town Center Drive
                                     20th Floor
22                                   Costa Mesa, California 92626
                              BY:    JOSEPH HYUK LEE, ESQ.
23

24
                    (APPEARANCE CONTINUED ON NEXT PAGE)
25

2

1  <u>APPEARANCES</u>:  (Cont'd.)

2  For Plaintiffs:
                              Lawyers Committee for Civil
3                               Rights of the San Francisco
                                Bay
4                             131 Steuart Street, Suite 400
                              San Francisco, California
5                               94105
                         BY:  ZAL KOTVAL SHROFF, ESQ.
6
   For Defendants:
7                             San Francisco City Attorney's
                                Office
8                             Fox Plaza
                              1390 Market Street
9                             Sixth Floor
                              San Francisco, California
10                              94102
                         BY:  EDMUND T. WANG, ESQ.
11                       BY:  MIGUEL ANGEL GRADILLA, ESQ.
                         BY:  SUZANA S. IKELS, ESQ.
12

13 Transcribed by:            Echo Reporting, Inc.
                              Contracted Court Reporter/
14                            Transcriber
                              echoreporting@yahoo.com
15

16

17

18

19

20

21

22

23

24

25

3

1    Thursday, August 24, 2023                                    1:03 p.m.

2                    P-R-O-C-E-E-D-I-N-G-S

3                         --oOo--

4            THE CLERK:  Calling civil case C-22-5502-DMR,

5    Coalition on Homelessness, et al. versus City and County of

6    San Francisco, et al.

7      Counsel, please state your appearances, starting with

8    the Plaintiffs' attorneys first.

9            MR. WU (via Zoom):  Good afternoon, your Honor.

10   My name is Kevin Wu with the firm Latham and Watkins, on

11   behalf of Plaintiffs, and appearing with me are co-counsel,

12   who I'll let introduce themselves.

13           THE COURT:  Good afternoon, Mr. Woo.

14           MR. LEE (via Zoom):  Good afternoon, your Honor.

15   Joseph Lee also from Latham and Watkins, on behalf of

16   Plaintiffs.

17           THE COURT:  Mr. Lee.

18           MR. SHROFF (via Zoom):  Good afternoon, your

19   Honor.  Zal Shroff, Acting Legal Director at Lawyers

20   Committee for Civil Rights of the San Francisco Bay Area for

21   Plaintiffs.

22           THE COURT:  Mr. Shroff.

23           MR. WANG (via Zoom):  Good afternoon, your Honor.

24   Deputy City Attorney Edmund Wang on behalf of Defendants.

25           THE COURT:  Good afternoon, Mr. Wang.

4

1          MR. GRADILLA (via Zoom):  Good afternoon, your

2   Honor.  Miguel Gradilla, Deputy City Attorney, on behalf of

3   Defendants.

4          THE COURT:  Mr. Gradilla.

5          MS. IKELS (via Zoom):  Good afternoon, your Honor.

6   Suzana Ikels on behalf of San Francisco City Attorneys.

7          THE COURT:  Ms. Ikels, good afternoon.

8       I want to start with a housekeeping matter.  There was

9   a suggestion by San Francisco that I should consider closing

10  the courtroom to the public due to some privacy concerns

11  about some specific information.  I don't think that's

12  necessary because I don't plan to -- I don't anticipate

13  getting into any of the details that the lawyers were

14  concerned about.

15      Can I have agreement of counsel that you're not going

16  to be discussing any of those details today?

17         MS. IKELS:  Well, your Honor, I think that it --

18  we suggested two alternatives, one to seal or one to rule

19  that the material is not confidential subject to 10850.  And

20  those are both equally available to the Court.

21         THE COURT:  Well, Ms. Ikels, I -- I will rule on

22  the issue of -- the legal issues that you raised and how we

23  handle that material going forward, but I really need to

24  take care of the issue that's presented right now, which is

25  the hearing itself.

5

1    Is there anyone on the Defense side that believes they

2    need to be able to talk about the specifics that are

3    protected in today's hearing?

4         MS. IKELS:  I believe we do plan to discuss the

5    specifics because they discredit some of the statements that

6    have been publically made in public declarations by the

7    Plaintiffs.  So, the purpose was to ensure freedom of speech

8    on both sides and an even playing field that everyone could

9    speak freely about the record.

10        THE COURT:  Okay.  Well, that anticipates that

11   we're going to have argument at that granular level, and I

12   don't think that's going to happen, quite frankly.  But if

13   we get there -- what if -- how about this?  What if we --

14   can we at least have an agreement initially that if those --

15   if somebody wants to raise those details that they flag it

16   before they say it, so that I can address it.

17      Ms. Ikels, does that work for the Defense?

18        MS. IKELS:  I think that works, your Honor.

19        THE COURT:  Okay.  And how about on the

20   Plaintiffs' side?

21        MR. WU:  That works for the Plaintiffs, your

22   Honor, and we do not plan to -- we don't expect to need to

23   get into that level.

24        THE COURT:  Okay.  And that was Mr. Wu.

25        MR. WU:  Yes.

6

1        THE COURT:  I know it's awkward to say your name
2   every time, but because we don't have a court reporter,
3   we're doing this by recording.  In order to -- and we have
4   many people here on the platform for this argument.  I don't
5   know who's taking the lead, but potentially a number of you
6   may be speaking.  So, please just state your name for the
7   record before you speak every time you speak.  Okay.
8        All right.  So, this is the motion by the Plaintiffs to
9   seek relief due to what they say is noncompliance with the
10  preliminary injunction.  So, I want to start with the part
11  of the motion that addresses the Eighth Amendment issues in
12  the case.
13       Mr. Wu, are you going to be presenting argument
14  primarily for Plaintiffs' team?
15         MR. WU:  Yes.  This is Mr. Wu, and I will be
16  taking lead and conferring as necessary.  But your Honor can
17  direct your questions at me.
18         THE COURT:  Okay.  And, Ms. Ikels, can I -- are
19  you going to be taking the lead for the Defense?
20         MS. IKELS:  I will not, your Honor.  That's my
21  colleagues,  Mr. Gradilla and Mr. Wang.
22         THE COURT:  Okay.  Mr. Gradilla and Mr. Wang, how
23  will you -- how have you split your responsibilities for
24  today's hearing?
25         MR. GRADILLA:  Your Honor, I will be addressing

7

1  the Fourth Amendment bag and tag issues, and Mr. Wang will

2  be addressing the Eight Amendment ones, but he might jump in

3  depending on -- on the question.

4          THE COURT:  And that was Mr. Gradilla.

5          MR. GRADILLA:  Yes.  Sorry, your Honor.

6          THE COURT:  Okay.  So, Mr. Wu, let me start with a

7  few questions for the Plaintiffs.  Do the Plaintiffs -- so,

8  I'd like to start with Bulletin 23-007.  This is the

9  bulletin issued by San Francisco Police Department that is,

10 I believe, meant to provide guidance on the preliminary

11 injunction.

12     So, do Plaintiffs agree with the substance in Bulletin

13 23-007?

14         MR. WU:  On the whole -- this is Mr. Wu.  On the

15 whole, Plaintiffs do agree that the substance of that

16 bulletin that your Honor referenced does -- does accurately

17 and correctly lay out the City's obligations to comply with

18 the injunction.

19         THE COURT:  Okay.  So, is there anything

20 inaccurate in the bulletin?

21         MR. WU:  At a high level on -- at a -- in general,

22 no.  This is -- this is Mr. Wu again.  At -- there are --

23 Plaintiffs do not have an overall objection to anything in

24 that bulletin.  The observed instances of noncompliance that

25 we put before the Court today more go to instances where the

8

1  City has been shown not to be complying with that policy.

2          THE COURT:  Just to nail this down, though, is it

3  the Plaintiffs' position that Bulletin 23-007 is completely

4  accurate?

5          MR. WU:  Yes, it is.

6          THE COURT:  Okay.

7          MR. WU:  It is.

8          THE COURT:  So, if -- if officers comply with the

9  bulletin, do Plaintiffs agree that they are in compliance

10 with the preliminary injunction?

11         MR. WU:  On the whole, yes.

12         THE COURT:  Okay.  Just wanted to --

13         MR. SHROFF:  Sorry.  If I may, your Honor, just

14 with the one caveat --

15         THE COURT:  Who is this?  Who's speaking?

16         MR. SHROFF:  I do apologize, Judge Ryu.  This is

17 Zal Shroff with the Plaintiffs.

18     We do agree that the bulletin would satisfy compliance

19 with the injunction with just the caveat of the question of

20 how the four-foot rule fits in in that injunction.  And, so,

21 we -- we had sort of raised the issue of whether or not this

22 four-foot rule exists in any statute that is permissible to

23 be enforced.

24         THE COURT:  Okay.  So, with that little carve out,

25 does -- do Plaintiffs agree that if an -- if officers are

9

1   complying with the bulletin, they're complying with the

2   preliminary injunction?  Mr. Wu?

3           MR. WU:  This is Mr. Wu.  Yes.  Other than that

4   caveat, which is really more of a clarification, we do --

5   that is our position, correct.

6           THE COURT:  Okay.  And maybe you better spell out

7   for me exactly -- so, in the bulletin itself, point to the

8   language that you think is problematic with respect to the

9   ADA 48-inch rule that you think is inaccurate in the

10  bulletin.

11          MR. WU:  This is Mr. Wu.  I -- I wouldn't put it

12  as necessarily an inaccuracy.  It is on the top of page two

13  where the bulletin does accurately -- it follows from the

14  bulletin's discussion of the statutes that the City may

15  enforce under the injunction, and -- and that includes

16  accessibility statutes which, again, Plaintiffs do not take

17  the position that there's any -- any inaccuracy to the

18  bulletin with respect to the ability to enforce those

19  accessibility statutes.

20      We -- we do dispute the line that says, for example, if

21  an individual is obstructing access to a public facility or

22  not allowing a 48-inch wide path of travel on a public

23  sidewalk, the injunction still allows members to require the

24  individual to abate the instruction, and even within that

25  sentence, I think the -- the end of that sentence is fine.

10

1  We understand -- it's our position that the City may require

2  the individual to abate an obstruction, but just -- just by

3  being present in a 48-inch -- or narrowing a 48-inch-wide

4  access way we do not believe is encompassed within any of

5  the accessibility statutes that -- that the City may

6  enforce.

7          THE COURT:  So, to be clear, the only thing that

8  Plaintiffs think is inaccurate in this memo is that it's --

9  it would be inaccurate to -- or incorrect to -- well, let me

10 just -- it says:

11              "For example, an individual -- if

12              an individual is in obstructing" --

13              sorry -- "is obstructing access to a

14              public facility or not allowing a 48-

15              inch path of travel on a public

16              sidewalk."

17     It's just the 48-inch part that you think is

18 inaccurate, correct?

19          MR. WU:  Correct.  Or at the very least needs to

20 be qualified as may be enforced if there is a willful

21 obstruction under the -- under the accessibility statutes

22 that are referenced.

23          THE COURT:  But, as to the first part of the

24 sentence, if an individual's obstructing access to a public

25 facility, the injunction still allows members to require the

11

1    individual to abate the obstruction.  Is that accurate?

2              MR. WU:  Correct.  That --

3              THE COURT:  All right.

4              MR. WU:  Plaintiff believes that is accurate.

5              THE COURT:  We've nailed it down to the only beef

6    that Plaintiffs have with this bulletin is a clause in that

7    sentence that talks about not allowing a 48-inch-wide path

8    of travel?

9              MR. WU:  Correct.

10             THE COURT:  Okay.  So, let me -- I have some

11   questions about training on this bulletin.  Who's going to

12   answer that for the Defense?

13             MR. WANG:  Edmund Wang on behalf of Defendants.  I

14   will take the first step, your Honor, answering questions.

15             THE COURT:  Great.  Let me pull up my questions.

16   So, this bulletin went out I think in January of this year,

17   late January.

18        Is there any specific training provided to San

19   Francisco Police officers regarding this bulletin?

20             MR. WANG:  In the Young declaration, so the HSOC

21   Team has been trained on that bulletin by the -- the head of

22   the HSOC Team.  And then, other than that, I know that the

23   bulletin goes out to every officer, and they have to read --

24   you know, there's a mechanism by which they have to

25   acknowledge that they've received and read that bulletin.

1      THE COURT:  Okay.  So, HSOC Team has Young, a
2  Sergeant, and I believe seven assigned police officers,
3  correct?

4      MR. WANG:  That is correct.  I believe that's the
5  -- there might be some difference in the numbers  I don't
6  know off the top of my head, but that is correct.

7      THE COURT:  And when you say they've received
8  training about the bulletin, what do you mean by that?

9      MR. WANG:  This would be training from Lieutenant
10 Young --

11     THE COURT:  Does the staff --

12     MR. WANG:  -- discussing -- I'm sorry.  Go ahead.

13     THE COURT:  Sorry, Mr Wang.  I didn't mean to
14 interrupt you.  For -- does the personnel change on the HSOC
15 team, so, from the Police Department members?  So, in other
16 words, we -- at the time he wrote the declaration, there
17 were certain individuals who were performing that job.  Are
18 there other people who do that who are rotated on or perhaps
19 have to fill in once in a while, and do they get trained on
20 the bulletin?

21     MR. WANG:  I do not know the exact personnel
22 changes that have happened over the -- that period of time.
23 But Lieutenant Young, since taking over, has been in charge,
24 regardless of what the personnel changes are, and he does
25 discuss -- I think in his declaration he says he trains

13

those HSOC officers, in addition, has discussions with the officers underneath him about the bulletin.  The details about, you know, when the discussions happened or with whom, I don't know that.  But the personnel underlying Lieutenant Young certainly change.  The specific changes in the last couple of months, I don't know that.

THE COURT:  Okay.  Let me ask a slightly broader question, Mr. Wang.  This bulletin applies to police officers, correct?

MR. WANG:  Correct, your Honor.

THE COURT:  But do you agree that the same basic guidance applies to City employees who are involved with homeless individuals in these -- in enforcement actions or encampment resolutions who are not officers?  So, for example, do you agree that an HSOC outreach worker would be violating the preliminary injunction if they went up to somebody and said, you know, You have to move your tent or you're going to get arrested for a violation fo 647(e), even if that person can't make the arrest themselves?

MR. WANG:  I don't know that that is an issue that has been raised by any of the declarations in Plaintiffs' conditions.

THE COURT:  I'm just -- I'm just trying to understand whether that -- whether the city agrees with me on that.

14

1        MR. WANG:  As a -- as a practical matter, I don't
2   know that that ever happens.  The SFHOT workers are social
3   workers.  They are there trying to build relationships with
4   the individuals in these encampments.  But as a general
5   principle, I would agree that SFHOT workers should not be
6   threatening arrest, particularly when they don't have the
7   authority to arrest or cite anyone.
8        THE COURT:  Well, and that that would be a
9   violation of the preliminary injunction.  Do you agree with
10  that?
11       MR. GRADILLA:  Your Honor, if I may --
12       THE COURT:  This is Mr. Gradilla?
13       MR. GRADILLA:  Yeah.
14       THE COURT:  I would say that the injunction is
15  pretty clear that it -- it enjoins the threat of enforcement
16  and the enforcement of five -- of the five specific laws
17  outlined.  And since no one other than the SFPD officers can
18  enforce, I would say it wouldn't be a violation.
19       THE COURT:  Well, let's just say we're in an
20  encampment resolution situation.  There's a whole team
21  there, including officers.  Would it be a violation of the
22  injunction for an outreach worker or a DPW worker or someone
23  else involved on the team on behalf of the City to say to a
24  -- a person living in an encampment, You have to move your
25  tent or that officer is going to cite you for violation of

15

1  647(e)?

2          MR. GRADILLA:  Again, I would say that strictly

3  reading the injunction as written, I would say no.  And, to

4  Mr. (Zoom glitch) -- this is Mr. Gradilla.  I apologize.

5  And to Mr. Wang's point, as a practical matter, we're not

6  aware and I don't think any of the declarations state that

7  that actually occurs.

8          MR. WANG:  This is Edmund Wang on behalf of

9  Defendants again.  And I would also add that even the case

10  law cited by Plaintiffs, which we don't agree with that

11  that's the proper standard, but even the case law Plaintiffs

12  cite to help elucidate what a threat is suggests that it's a

13  totality of the circumstances involving whether the police

14  officer is in uniform, has a badge, things like that.  So,

15  when an SFHOT worker who is not in uniform, does not have a

16  badge, does not have any visible shields of authority, that

17  have relationships with these individuals in the encampment

18  and they know that they don't have the authority to cite

19  arrests, I think if they issue a verbal threat like that,

20  which, again, I don't believe ever happens, but to the

21  extent they do, I don't know that that's implicated by the

22  injunction.  It wouldn't be considered a -- a threat.

23          THE COURT:  Okay.  So, Mr. Wang, back to you on

24  training.  You talked about the HSOC Police officers.  Who

25  are -- which officers respond to 915 and 919 dispatch calls?

1          MR. WANG:  A lot of them are handled by HSOC

2   officers, but they can also be handled by patrol, you know,

3   the officers assigned to the -- to the District patrol.

4          THE COURT:  Because I think there were something

5   in the order of 3,000 or more dispatch calls for those codes

6   since the injunction went into place roughly.  IS that

7   correct, Mr. Wang?

8          MR. WANG:  Yes.  And, just to clarify, those are

9   dispatches in response to calls from the public and

10  complaints.  And even though there's 3,000 of these

11  dispatchers, the fact that someone was dispatched doesn't

12  tell you anything about what the interaction was like once

13  the officer got there.

14         THE COURT:  I understand.  I just -- I'm asking

15  questions because I want to understand the conditions on the

16  ground and -- and how this works.  Okay.  So, I'm not asking

17  for legal argument --

18         MR. WANG:  If I may just -- and I just want to

19  clarify one thing that wasn't mentioned is that in --

20  recently, some of these calls are not handled by the HEART

21  Team, H-E-A-R-T, which are not police officers.

22         THE COURT:  Okay.

23         MR. WANG:  But the volume of calls handled by them

24  versus others, I don't know that at this point.

25         THE COURT:  Mr. Wang, do you have any idea how

17

1  many -- roughly how many officers respond to the 915, 919

2  calls or have responded at least since the injunction went

3  into place?

4  MR. WANG:  I do not have that number, your Honor.

5  THE COURT:  Could be dozens, could be hundreds, we

6  don't know?

7  MR. WANG:  I -- no basis to provide an estimate,

8  your Honor.

9  THE COURT:  So, other than the seven or nine

10 people assigned -- officers assigned to the HSOC Team, every

11 other officer has to verify that they got the bulletin.  But

12 is there any other specific training about it?

13 MR. WANG:  I do not know that.  I do know that

14 when officers approach certain situations, they will

15 sometimes call Lieutenant Young or other members of the HSOC

16 Team who are used to dealing with situations like that to

17 ask them, you know, about the situation to get their advice.

18 But as far as any sort of formal training for officers

19 outside of HSOC, I don't know whether there is any or not,

20 aside from technology and receipt and review of the training

21 bulletin.

22 THE COURT:  Is there any reason why training can't

23 take place on the bulletin for -- for people who are

24 responding to those calls but may not have specific training

25 because they're not assigned to the HSOC or JFO team?

18

1          MR. WANG:  I think the training bulletin is pretty

2    self-explanatory, and to the extent people have questions

3    about their interactions with unhoused individuals, they do

4    know who the HSOC officers are and can talk to them.  And --

5    and the efforts are to have HSOC officers be the ones to

6    respond to most of these 915's and 919's now as set forth in

7    Lieutenant Young's declaration, as well as having the HEART

8    Team do it, who are not police officers at all.

9          THE COURT:  But you're not able to tell me today

10   what percentage of those 3,000 plus calls were handled by

11   the HSOC officers as opposed to others or how many officers

12   in total we're talking about?

13         MR. WANG:  I do not have that figure today, your

14   Honor, no.

15         THE COURT:  Does this -- is the City open to

16   considering doing more training for officers who are not on

17   the HSOC but who are responding potentially to those calls?

18         MR. WANG:  I don't know that that training is

19   necessary based on the evidence that had been provided in

20   this case so far.  HSOC --

21         THE COURT:  Well, that -- that's not my question.

22   That's not my question.  Is -- is the City open to the -- to

23   considering doing more training, specific training for

24   officers responding to those calls about the bulletin?

25         MR. WANG:  I did not confer with our client

19

1   departments about what that would entail.  I can't provide

2   an answer.  I don't know what the burdens are.  I don't know

3   what people -- you know, I don't know that the -- the

4   obstacles -- potential obstacles or burdens to providing

5   that training.  So, I don't have an answer for your Honor at

6   this time.

7           THE COURT:  Okay.  Is there anyone else here, Mr.

8   Gradilla or Ms. Ikels, who can speak to that?

9           MR. GRADILLA:  This is Mr. Gradilla.

10  Unfortunately, no, your Honor.

11          THE COURT:  Okay.  On the signs, there were some

12  "No Lodging Zone" signs that were pointed out by the

13  Plaintiffs.  Does the City agree that they violate the

14  preliminary injunction because they threaten enforcement,

15  specifically a 647(e) for lodging?

16          MR. WANG:  No, your Honor.  I don't believe they

17  threaten enforcement of that provision.  There is also --

18  those signs were erected long before this injunction was in

19  place.  They were erected at the request of private property

20  owners or by private property owners.  I don't know that the

21  City has authority to remove those signs from private

22  property.  But, setting aside that, there were also other,

23  you know, terms of the injunction.  We can't cite for that

24  law to prohibit sitting or lying or sleeping against someone

25  who's involuntarily homeless.  A sign that is on a fence,

20

1  private property fence, I don't know constitutes a threat of

2  enforcement against an involuntarily homeless individual.

3          THE COURT:  Okay.  So, there haven't been any

4  efforts by the City to locate them or take them down?

5          MR. WANG:  I'm not aware of any efforts to track

6  or to know where those signs have been erected.

7          THE COURT:  Okay.  Let me move to Plaintiffs'

8  team.  So, Mr. Wu, I'm struggling with what exactly you're

9  saying is the City's noncompliance with the preliminary

10 injunction order which prohibits very specific activity, and

11 the Plaintiffs don't really attempt to tie the evidence back

12 to language in -- in the preliminary injunction that -- that

13 they contend is being violated by the City.

14     So, instead, I have a lot of statements by different

15 people but no application of the law to those statements to

16 explain what the violations are.

17     So, let me start with enforcement.  The preliminary

18 injunction prohibits enforcement of five specific laws to

19 prohibit lying, sleeping, et cetera.  I won't read through

20 the whole preliminary injunction, but you know what I'm

21 talking about.

22     With respect to the word "enforce", I didn't see any

23 record evidence that people were being cited in

24 circumstances that they shouldn't be cited.  Is that

25 correct, Mr Wu?

1           MR. WU:  This is Mr. Wu.  Your Honor, thank you

2    for that question.  The specific way in which we alleged

3    noncompliance is primarily through threats of enforcement,

4    and when those threats of enforcement occur, individuals are

5    -- what is happening is the individuals are being asked to

6    move, and -- and they don't always know what is or is not

7    being -- what is or is not the basis of that threat of

8    enforcement.  And, under the City's bulletin, it is the

9    City's obligation to make clear that it is -- it is

10   enforcing -- or is threatening to enforce a law that is not

11   enjoined.

12           THE COURT:  So, the thrust of the motion is that

13   the City is violating the threaten to enforce portion of the

14   preliminary injunction.  Is that your position?

15           MR. WU:  That -- that is a portion of why we are

16   bringing the motion.  It's also -- it's also that at HSOC --

17   non-HSOC dispatches that you were discussing with the City,

18   that -- that we have no visibility into what the City is

19   doing during -- and -- or the -- or the extent of training

20   for those officers that are dispatched in those

21   circumstances, which is happening thousands of times since

22   the injunction.

23       So, it's -- it is not -- it is not only the instances

24   of noncompliance that -- that come from threats of

25   enforcement.  It is also our inability -- that gives us

22

1   concerns, but it's also our inability to see what the City's

2   doing otherwise in it's non-HSOC interactions.

3            THE COURT:  Here's the challenge you gave to me,

4   and this is why I'm not sure what to do with this.

5   Plaintiffs didn't explain, even at a very basic level, that

6   the City is violating the threaten to enforce portion and --

7   and then, you know, in order to explain this is what the

8   violation was, this is why this amounts to a threat of

9   enforcement of these particular laws, this is the law that

10  supports that this is a threat, so I -- you've left me here

11  to guess or try to figure out what you're arguing, and

12  there's a lot of assumptions that are being made in the

13  Plaintiffs' side of the papers that I can't -- I can't make

14  the assumptions.  I mean, these are all legal questions that

15  need to be teased out.

16       So, I'm not -- I don't know what to do with that, quite

17  frankly, Mr. Wu.

18            MR. WU:  The legal authority we believe we've

19  submitted in the briefing is -- is on the standard that

20  gives some contours to the standard of what constitutes a

21  threat of enforcement would be the totality of the

22  circumstances for a reasonable person.  And we also, I

23  believe, had submitted that San Francisco's own bulletin

24  does lay out appropriate language characterizing what would

25  be a threat and -- and that the instances that we've

23

1    submitted of -- of the City not sort of abiding by those

2    principles in its bulletin are -- are examples like when an

3    individual is told the injunction is gone and that you need

4    to move or -- or there -- perhaps a non -- even an non-SFPD

5    City worker will say, You need to move.  And if you don't,

6    I'm getting the police.  And then they do get the police,

7    and -- and that -- that person says, for instance, Get the

8    hell out of here.  We -- we contend that those instances of

9    non -- are instances of noncompliance where there is a clear

10   threat that -- and -- and the City is not being clear that

11   it's threatening to enforce one of the ordinances that

12   they're allowed to enforce under the injunction.  Simply

13   just telling people that they need to move and that message

14   coming from the police gives us concerns, and -- and I

15   believe we -- we've raised those concerns with the City and

16   the Court both in this proceeding and this briefing but also

17   earlier in January as well.

18          THE COURT:  Well, it's one thing to cite here and

19   there to statements made in the -- in the declarations and

20   another thing to make an argument which the way to do it is,

21   of course, you tell me the law.  You tell me the -- the

22   facts, and you apply the facts to the law.  But there was so

23   much missing of that analysis.  There -- there literally was

24   none.  So, for the Plaintiff -- so, you gave broad outlines,

25   but you didn't drill down and say this amounts to a threat

24

1  of enforcement because you look at, you know, the totality

2  of the circumstances or you look at the bulletin or whatever

3  standard you think I'm supposed to apply.  You should at

4  least tell me what it is and then say why it fails that

5  standard.  Of course, if it's totality of the circumstances,

6  we have to look at all of the circumstances, and some of the

7  declarations had partial circumstances.  I don't -- didn't

8  have enough facts to know whether there was a problem.

9        So, that -- I'm trying to describe to you --

10             MR. WU:  Yeah.

11             THE COURT:  -- what I'm struggling with here.

12             MR. WU:  Understood, your Honor.  And -- and I

13  think where we -- where we are couching the sort of -- or

14  how we are presenting the noncompliance is that the

15  injunction itself does prohibit the City from enforcing and

16  threatening to enforce these enumerated laws and that --

17  that -- and that the -- the standard here, we are not

18  bringing a contempt motion.  So, we're not -- we're not

19  seeking to punish the City for clear and convincing evidence

20  of noncompliance.  We're saying that what we have -- the

21  reports that we have gotten of what appear to be threats of

22  enforcement that are at best vague but certainly taken

23  seriously and compulsory, threats that appear to be made in

24  violation of San Francisco's policy do give us concerns that

25  we're not -- we don't have enough at our disposal -- at our

25

1  disposal to monitor the City's actions in realtime and

2  prevent any irreparable harm that may be -- that may be

3  befalling Plaintiffs and -- and other individuals who are

4  being enforced again in violation of the injunction.  So --

5            THE COURT:  Well, to -- to get to a point where

6  it's appropriate for me to order more, whether it's

7  reporting or -- or, you know, some level of different

8  accountability or the appointment of a special master, we

9  first need to get to what's the noncompliance.  And, as I

10 said, the Plaintiffs gave me a lot of vague information

11 without making the actual argument.  That is just completely

12 missing.  And I -- perhaps that was strategic.  I don't

13 know.  But I don't know what to do with that.  You can't

14 just mention, you know, one case or two.  You have to tell

15 me this amounts to a threat of enforcement.  Here's -- here

16 are the facts.  Here's the law.  This is why this actually

17 maps onto the injunction to show noncompliance, and this is

18 happening systemically.

19      Instead, there's just a lot of information that you

20 want me to somehow infer or -- or come up with my won

21 analysis and -- and come to the result that you want, and I

22 can't do that.  I'm not saying there's no noncompliance.

23 There is certainly some concerning behavior here.  But

24 without having more from the Plaintiffs so I can understand

25 your legal positions, you know, what is -- what constitutes

26

1  threatening to enforce, for example, you need to tease that

2  out.  And you --

3          MR. WU:  Your Honor, we --

4          THE COURT:  So, let me move on to some other

5  points.  Let me ask the City -- I don't know who's going to

6  answer this, but some of what's going on, from what I can

7  tell from the declarations, is ambiguity about people's

8  rights and what's going on and what people can and can't do.

9  Is San Francisco open to coming up with clear communication

10 about people's rights so that homeless individuals who are

11 encountering -- coming into encounters with the police have

12 a better understanding of what's going on?  So, for example,

13 an officer having some simple statements to say, Here's why

14 we're here today.  This is what we're doing.  This is what

15 your rights are?  Because there's a lot of misunderstanding

16 that could be cleared up, and it seems like the police are

17 in a better position to communicate the citizens' rights

18 than the other way around.

19     Mr. Wang?

20         MR. WANG:  Yes, your Honor.  Edmund Wang.  We do

21 not believe the evidence that Plaintiffs submitted suggests

22 there any sort of that vagaries.  Many of Plaintiffs'

23 declarations --

24         THE COURT:  Well, for example -- hold on.  For

25 example, you know, Plaintiffs say people aren't told this is

1 temporary.  People aren't told this is voluntary.  I don't

2 know what the City's position is on this, and the Plaintiffs

3 didn't -- didn't say this is -- this violates the

4 preliminary injunction because X, Y, Z.  They didn't analyze

5 that for me.  They just said people aren't being told it's

6 temporary or -- or voluntary.  I -- I am -- I'm guessing

7 that there's a lot of interactions on the street where

8 people really don't know what's going on and that maybe the

9 City of San Francisco and its members of its community, both

10 housed and unhoused, would benefit from having clearer

11 communication by its officers about what is going on, simple

12 statements that you could come up with that perhaps, you

13 know, you could do that with the assistance of -- of Judge

14 Cisneros or perhaps, you know, between counsel, just to make

15 things a little easier.

16         MR. GRADILLA:  And, your Honor, this is Mr.

17 Gradilla.  If I can just clarify the Court's question.  Is

18 the question is San Francisco open to providing I guess

19 guidance to the -- the public at large?  Is it about

20 homeless people's rights or certain housed people --

21 unhoused people themselves or people who are involuntarily

22 unhoused?  Because as -- as we read the injunction, the

23 injunction only applies to people who are involuntarily

24 homeless.  So, just clarifying who would be the audience for

25 -- for such an -- such guidance.

28

1      THE COURT:  My question is whether the City is
2 open to the idea of having officers come prepared with a few
3 simple statements so that when they encounter a homeless
4 person on the street where they are doing some level of
5 enforcement that they can say this is why we're here, this
6 is what's going to happen, these are your rights.  I'm -- I
7 don't want to put the words in -- out there right now
8 because I think they need to be crafted, but they'd be
9 simple and clear, but they might include -- for example,
10 even the bulletin says this.  If you're coming in there to
11 do cleaning, that it's temporary.  So, why not say this is
12 temporary, it's going to take two hours, you're allowed to
13 return?

14      MR. WANG:  Your Honor, if I may --

15      THE COURT:  Something else, you know, this -- you
16 are -- well, I don't want to get too far into the weeds on
17 -- on what other examples might come up, but I think that
18 that could help people understand their rights and maybe
19 make things go a little more smoothly.  So, I'm asking
20 whether San Francisco is willing to consider doing that.

21      MR. WANG:  Your Honor, Edmund Wang on behalf of
22 Defendants.  The evidence that has been presented with this
23 motion --

24      THE COURT:  Answer my question.

25      MR. WANG:  -- shows --

29

1          THE COURT:  My question -- Mr. Wang, excuse me.

2          MR. WANG:  I'm sorry.

3          THE COURT:  Mr. Wang, I'm asking --

4          MR. WANG:  The City is doing that.  The evidence

5   shows that the City is telling people that it is for

6   cleaning.  The SFHOT workers all declare that's what they

7   tell people.  The --

8          THE COURT:  Mr. Wang --

9          MR. WANG:  -- Plaintiffs' --

10         THE COURT:  -- stop --

11         MR. WANG:  -- declarants themselves --

12         THE COURT:  Excuse me --

13         MR. WANG:  -- admit.

14         THE COURT:  Excuse me.

15         MR. WANG:  Yes, your Honor.

16         THE COURT:  I get to wear a robe.  So, once in a

17  while, you get to use that to interject.  I really want an

18  answer to my question, okay.  It's not about what the

19  evidence shows or doesn't, and I'm not trying to tie it back

20  to the motion for noncompliance.  I'm -- I'm talking about

21  what I'm seeing generally in the record, and I'm asking

22  whether the City is open to improving their communication so

23  that it's something that, you know, people can expect that

24  it's a message that is crafted in advance so it's uniform

25  and clear and used in the various interactions.

30

1          MR. WANG:  The City is open --

2          THE COURT:  Is the City willing to do that?

3          MR. WANG:  The City is open to making clear

4 communications to the individuals, and -- and we do believe

5 that that is happening, but we are certainly open to making

6 our communications as clear as possible.

7          THE COURT:  Is the City open to working with Judge

8 Cisneros, for example, in coming up with simple statements

9 that could help people better understand what's going on and

10 what the City has -- the City employees who are doing the

11 enforcement actions are allowed to do and what the homeless

12 individuals' rights are?

13          MR. WANG:  The City is open and has been open to

14 working with Judge Cisneros to address various issues that

15 relate to this case.  So --

16          THE COURT:  Well, how about that one?

17          MR. WANG:  -- if that is one of the topics that

18 Judge Cisneros wants to help the parties mediate, the City

19 is open to addressing those topics.

20          THE COURT:  And is the City open to the idea that

21 I just expressed, which is having some simple uniform

22 statements that can be used in the various circumstances so

23 that people are saying the same basic things and that are

24 tailored to the various situations that come up and they're

25 receiving their rights?

1          MR. GRADILLA:  Your Honor, if I may, this is Mr.

2   Gradilla.  And -- and, just to follow up on what Mr. Wang

3   said, I think the City is always open to discussing how best

4   we can, you know, comply with our obligations.  I think,

5   just to flag two points that might raise some concern is the

6   City wouldn't want to open itself to being accused of being

7   in noncompliance, you know, with some obligation.  So, it

8   would be a concern.

9          And, secondly, you know, we can discuss this in a

10   little more detail with Judge Cisneros, but we would not

11   want to, you know, discuss any -- like anything that should

12   be confidential in terms of like what we're willing or not

13   willing to do and to -- in -- in open court right now.

14          THE COURT:  Understood.  And it wouldn't be build

15   into the injunction.  It's just simply a -- I'm making an

16   inquiry about what the City is willing to do in this

17   situation because it seems to me that clearer communication,

18   uniform communication would be helpful across the boards to

19   the people of San Francisco.  And, so, you've indicated your

20   willingness to look at that and to work with Judge Cisneros

21   on that.  So, we can move on from there, but I appreciate

22   that you're open to that.

23          MR. WU:  Your Honor, this is for Plaintiffs.

24   Could I --

25          THE COURT:  Yes.

1       MR. WU:  -- the discussion?  I -- the -- I think

2 that those would be appreciated measures from Plaintiffs'

3 perspective as well.  The -- the policy -- the SFPD bulletin

4 policy, as you noted, your Honor, does already indicate the

5 City's intent and encouragement that any orders to move, it

6 be communicated that it's voluntary and temporary.

7       THE COURT:  That's not true.  That is not true.

8 There is one statement in here that says that.  On page two,

9 it says if the sole basis for asking someone to move is for

10 temporary cleaning, members -- meaning officers -- should

11 make it clear that once the cleaning is completed, that

12 individual may return.  So, that is pone circumstance in

13 which the bulletin instructs them to make it clear you can

14 come back if it's just for cleaning.  This is temporary.

15 Okay.

16     So, maybe there's other circumstances that can be

17 clarified through communication.  But I don't -- but on the

18 Plaintiffs' side, you didn't make any case that there are

19 statements that have to be made, there's some kind of, you

20 know, Miranda type -- I don't mean to literally invoke the

21 Constitution.  I mean some -- that the -- my injunction

22 requires the City to state certain things.

23     I'm simply asking the City whether they're willing to

24 consider it because I -- as we move through the case, there

25 are people who live in San Francisco who I'm sure are very

33

1  affected by what's happening on the streets, and I think for

2  the sake of them primarily, both housed and unhoused, it

3  would be better for everyone, I think, if there was clear

4  communication to help people understand what their rights

5  and obligations are.

6          MR. WU:  Agreed, your Honor.  The -- this is Kevin

7  Wu.  The Plaintiffs' concern is simply that if the City does

8  make those commitments, we have no way of assessing what --

9  whether they are being held -- whether they complied with

10  those commitments.  We don't have the records -- we don't

11  have the records, and we don't know that the City is

12  maintaining the records that would allow us to assess

13  whether those obligations are being complied with.

14          THE COURT:  What obligations?

15          MR. WU:  Should the City make a commitment to --

16  to better communicate in that way, when we see -- when --

17  our perspective from individuals who are affected by these

18  orders to move suggest that what's being communicated is

19  simply you must go, without that additional more forthright

20  communication, and I don't see how Plaintiffs will be able

21  to assess the City's conduct given the unavailability of

22  information here.

23          MR. SHROFF:  Your Honor, if I may, this is --

24          THE COURT:  Hold on.  No.  Hold on, Mr. Shroff.

25  Just to -- we need to back up a little bit.  Okay.

34

1    Mr. Wu, the Plaintiffs did not make any argument, at
2   least a coherent analyzed one, that the -- the City has an
3   obligation to say or not say certain things.  Okay.  You
4   left it hanging there.  You made no argument.
5    So, I'm asking out of not -- not because of your motion
6   but really out of concern for what's going on about whether
7   they're willing to consider that.  That's ti.  I'm not --
8   they already expressed that they don't want to come up with
9   something that they then have to comply with because they're
10  worried that you're going to do exactly what you did.  Okay.
11  So, you're getting ahead of it.  You have not made any
12  record in front of this Court that they need to use certain
13  words or that the words they're using are wrong.
14        MR. WU:  Understood, your Honor.  That -- I think
15  that isn't -- it's not our position that they must under the
16  injunction use those certain words.  I think the -- what we
17  are trying to present is that under those circumstances,
18  these are indeed threats of enforcement and -- and
19  enforcement actions rather than to impose an additional
20  obligation to communicate certain things.
21        THE COURT:  And, had you analyzed that for me with
22  facts and law, I would be in a better position to render a
23  decision, but that didn't happen here.  So, I -- I don't --
24  I'm not seeing a basis upon which I can find noncompliance
25  except, you know, here or there perhaps, but that's hardly

35

your point.  I'm speaking about the Eighth Amendment.  We
haven't gotten to the Fourth Amendment yet because I have
some more concerns there.

     Mr. Shroff?

          MR. SHROFF:  Yes.  I apologize, your Honor.  I
think one of the insecurities that Plaintiffs have that we
mention in our opening brief is that at these hundreds of
dispatches, the body cam is not being turned on by the
Defendants.  So, to the extent that we would like to
discover information about what is happening at these
hundreds of interactions in the future as the case proceeds,
we won't be able to assess what police are telling to
unhoused individuals or what that is looking like because
the records indeed don't exist and aren't being created, and
that's one of the bases on which we had hoped to seek the
Court's guidance about how to handle that particular issue.

          THE COURT:  You have to first show me that there's
a problem.  I'm not saying there's no problem.  I just don't
know because you didn't do you work at the level that I need
-- that I need from you to enable me to render a decision.
So, that's by way of remedy, okay.  We don't get to remedy
until we work through liability.  I'm hearing the request as
a remedy.

     Is that true, Mr. Shroff?

          MR. SHROFF:  Your Honor, in the opening motion, I

36

think we had focused on not a history of noncompliance as
the binary basis for the request for further compliance
reports but more a question of the -- our inability see or
review what compliance would look like given the absence of
information based on the Ninth Circuit case law that says a
history of noncompliance is not necessary for the Court to
use its inherent powers to request some additional
monitoring or perhaps appoint a special master.

So, the observation on the lack of body cam at the
hundreds of interactions with unhoused individuals was more
to speak to that concern of the absence of information and
the inability to assess compliance in a meaningful way with
the injunction, before even getting to the question of what
is actually happening at those interactions and whether or
not there is evidence of noncompliance at them but really
the preliminary question of not being able to tell that
information because there is no body cam to review.

THE COURT:  So, you want me to somehow order the
City to turn on their body camera.  I don't -- well, this
isn't in the brief really, at least not in any meaningful
way, to say what authority is there for a judge to require
body worn camera to be operated.  I don't know what the
City's policy is on that.  So, I'm not sure how to answer
your question, Mr. Shroff.  Again, it's -- it's not really
keyed up for me in a meaningful way.

1      Overall, I think what the Plaintiffs are saying is it's

2  really tough to collect information because the City's so

3  big and there's only so much we can do because the coalition

4  has limited resources, ACLU has dedicated one investigator.

5  We wish we had more help, Judge, in getting information.

6  But there is discovery.  The Rules of Discovery apply.

7  We've worked through some of that.  There's the usual tools

8  of litigation to obtain information.  There are hard things

9  -- hard decisions I'm sure the Plaintiffs' team is having to

10  make about how to use their limited resources.  There are --

11  you have a lot of people, a lot of firms and organizations

12  on the Plaintiffs' team.  I'm not going to get into the

13  weeds about how you use those resources.  But that's a

14  matter of resource allocation that I can't get into and I

15  can't augment unless there's a problem that suggests I

16  should.  I'm not saying today that there's no problem.

17  There  might be.  I -- but I can't reach a decision unless

18  you spell out what you think the problem is legally and

19  factually so I can rule on that.

20      For example, you may say this is a -- you know, if the

21  police are there, that's a threat.  I don't know if that's

22  the position you're taking, but at least if you took that

23  position, I could make a ruling on it, right.  You haven't

24  done that here.  Or if you're saying the City has to say

25  this is voluntary or you don't have to -- you don't have to

38

1  leave.  We won't cite you, but you should leave or whatever

2  it might be -- I don't know what you think they have to do,

3  but whatever it is, you didn't tell me, and you didn't back

4  it up with the law.

5      Do you understand what I'm saying about it?

6          MR. SHROFF:  I (Zoom glitch), oh, please go ahead.

7          MR. WU:  That same -- same sentiment.  Understood,

8  and Plaintiffs are happy to submit supplemental analysis if

9  that would be appreciated.

10         THE COURT:  Well, it -- I don't want to -- you

11 know, what I'm likely to do -- we're not quite done yet, but

12 at least a big chunk of this is denied without prejudice

13 because I can't analyze it as is.  I'm not -- so, if you

14 want to re-raise it some other time having done a better job

15 with the analysis so I can look at it, then fine.  I am --

16 but we haven't gotten to the Fourth Amendment yet.  I am

17 concerned, I'll say to the City, about the training issues

18 just because it appears to be potentially many more officers

19 who are interacting with homeless individuals on these

20 issues than just the folks who are dedicated to HSOC or JFO.

21     So, just as point of information, I would like to have

22 you file something that just states, Mr. Wang, after you're

23 able to gather some information, how many officers we're

24 talking about who respond to 915, 919, at least since the

25 injunction's been in place, who are not on the HSOC Team,

39

1  and I know that they've received the bulletin.  But, perhaps

2  after consulting with your clients, you can also put in that

3  filing what the City is willing to do, if anything, to

4  augment the training that officers get who interact with

5  homeless individuals who are not members of the HSOC Team.

6  Okay.

7      How long do you need to do that?

8          MR. GRADILLA:  Your Honor, this is Mr. Gradilla.

9  I'm not exactly sure.  We have thoughts just --

10         THE COURT:  If I gave you two weeks, would that be

11 sufficient?

12         MR. GRADILLA:  We will endeavor to do that by

13 then, yes.  I -- I just don't know who exactly we'll need to

14 (Zoom glitch) to figure that out, but we will.

15         MS. IKELS:  Judge Ryu, if you could give us a

16 month.  The reason I say that is because everyone is

17 constantly on vacation during August and early parts of

18 September, and in order to get -- make sure we get to the

19 right people, we might need more additional time just

20 because of the -- the season right now.

21         THE COURT:  Okay.  Let's -- I understand that that

22 presents difficulties.  So, I'm going to peg it at -- I'll

23 give you till September 22nd.  It's a little over four

24 weeks.

25         MS. IKELS:  Thank you very much, your Honor.  this

40

1   is Ms. Ikels.

2          THE COURT:  Okay.  So, that's going to be a filing

3   that tells me how many officers have interacted with

4   homeless individuals on those 915, 919 calls who are not

5   members of HSOC or JFO and also indicate whether the City is

6   willing to consider providing more training on the bulletin

7   to those officers.

8          MR. GRADILLA:  Your Honor, if I may raise one

9   issue -- this is Mr. Gradilla -- that just came up in your

10  call inquiry with Plaintiffs' counsel.

11     They raised potentially filing another motion, and your

12  Honor did raise that we don't necessarily want to be here.

13  But I just wanted to I guess highlight our agreement that,

14  you know, this is more properly -- the issues that they've

15  raised in your colloquy with them is more properly raised in

16  discovery.  And, you know, we're always willing to engage in

17  that, and we really don't want to be in the situation where

18  we're tying up the Court's resources in this sort of motion.

19         THE COURT:  Well, I will say both sides have done

20  a pretty good job of tying up my resources with things that

21  really did not advance things or were not -- you know, could

22  have been raised in a better way, and I would hope that both

23  sides are taking that feedback to heart.  Again, I come back

24  to the City of San Francisco and its inhabitants.  They

25  deserve the best from all of us on that, on resolving or at

41

1  least litigating and working through the particular issues

2  that are before Court and that the lawyers are working on.

3  Okay.

4      So, if the Plaintiffs wanted to re-raise their motion

5  by doing hopefully -- creating an analysis that's more in

6  line of what I've discussed, then they can do that.  But I

7  take your point, Mr. Gradilla, that they may also better

8  serve their clients by having conversations with the City to

9  raise concerns to see if there are other ways to manage

10  them.

11      I'm not ordering anybody to do that.  You are bound by

12  the Rules of Litigation, right.  You have to follow those,

13  but I will say that some things are better handled through

14  informal consultations, and this may be one of them.  There

15  certainly are things in this motion that perhaps could be

16  handled that way, but I'm not going to order it.  If they

17  want to bring a motion, that's their right.  Okay.

18      Let me move on to the Fourth Amendment issues.  Give me

19  a moment.

20      (Pause.)

21          THE COURT:  Okay.  Fourth Amendment, bag and tag.

22  In this area, there was at least some evidence of property

23  being discarded that was not abandoned, is not trash, not

24  hazardous material, which is that there was a good deal of

25  evidence of that in the preliminary injunction round.

42

1    The evidence this time around is not as voluminous, and

2  some things are not entirely clear.  So, there were certain

3  instances that I couldn't tell really whether it was a

4  violation.  There wasn't enough information there, but some

5  of them felt like pretty clear violations.

6    So, for example, Verticrist (phonetic) describes seeing

7  the DPW worker throw away a blanket that was folded neatly

8  on top of two neat suitcases, and I saw the picture of that.

9  There's another one where Erickson describes in her

10  declaration that DPW took her belongings.  They'd been set

11  neatly to the side of her tent and covered with a tarp.

12  They included a brand new grill and camp gear and dishes and

13  -- and suitcases with her clothes.

14    Declarant Wise (phonetic) said that she saw a worker

15  put her -- I think it was take her jewelry out of a night

16  stand and put it in his pocket and get into his truck, and

17  when she wanted it back, he said, "Well, they belong to the

18  City now," which would be incorrect under any analysis.

19    So, some of those did stand out as very problematic,

20  and I'm coupling that with what looked like very little

21  training being done.  So, Mr. Wang, Mr. Gradilla, Ms. Ikels,

22  correct me if I've got the record wrong, but it seemed like

23  there was training done of the DPW workers who are on the

24  HSOC Team and on maybe JFO, but even that training, it's not

25  clear what it was.  I don't -- there were no training

43

1   materials submitted.  There was -- I have no idea whether it

2   was two sentences of saying something to somebody or -- or a

3   long discussion of the injunction and the -- and the bag and

4   tag policy.  I don't know, and I didn't see any evidence

5   submitted by the City that DPW workers who were not on HSOC

6   or JFO have gotten specific training about the injunction or

7   the bag and tag.

8       So, tell me the state of training.  Who wants to speak?

9           MR. GRADILLA:  Your Honor, this is Mr. Gradilla.

10  As to your Honor's question about the state of training as

11  to non-HSOC and non-JFO, DPW workers, I do not know right

12  now if it goes beyond the -- the bag and tag policy.  But I

13  -- I can -- we can get that information to the Court.

14      And -- and, as to the -- the -- the folks who for the

15  most part engaged with this, as Mr. Dilworth's (phonetic)

16  declaration states, you know, the HSOC and JFO teams that --

17  some of which he supervises, like, he -- he is very attuned

18  with, you know, meeting up with -- with folks before we go

19  ahead and actually implement these things, and we talk about

20  this every day when they're out there.

21      So, you know, beyond knowing what the -- explaining

22  what the policy is and telling folks to do that, you know,

23  they discuss this and reiterate those points, you know,

24  often, very often.

25          THE COURT:  Well, that seemed pretty conclusory,

44

1  just -- many of these statements in the declarations were

2  conclusory and didn't tell me much, and I -- so, for

3  example, how many DWP workers interact with homeless

4  individuals who are not on HSOC or JFO?  Because maybe some

5  of these happened outside of that particular circumstance.

6  I don't know.  What can you tell me?

7          MR. GRADILLA:  Again, your Honor, as to that

8  specific question of how many DPW workers, I -- I don't have

9  that number.  I'm happy to -- to investigate and update the

10 court with that, but I do not know that specific number.

11         THE COURT:  How does it work?  Do you know?  Is it

12 just HSOC folks who are -- are they primarily interacting

13 with homeless individuals across the City, whether it's an

14 encampment or something less than an encampment, or are

15 there other DPW workers who are doing that?  Do you have --

16         MR. GRADILLA:  It is my understanding that it is

17 the teams that engage in HSOC JFO resolutions that conduct

18 these cleaning operations.  But -- but, sitting here right

19 now, I -- I cannot tell you that it's only those folks, but

20 they are the ones who mostly engage in this.

21         THE COURT:  So, that's a pretty significant gap of

22 information, and same with the training, especially in light

23 of what looked like pretty concerning violations that --

24 that continue to persist even though -- and there was a lot

25 of this -- that was -- this kind of evidence that was

45

1    presented in the preliminary injunction papers.

2        So, let me open it up to a little argument here on the

3    motion with respect to the Fourth Amendment.  Who wants to

4    present argument from the Plaintiffs' side on what's going

5    on and what should happen?

6            MR. WU:  Your Honor, I think -- this is Kevin Wu.

7    Well, you're right to point out the instances of

8    noncompliance that give us concern, but it's not just the

9    noncompliance.  We're also -- Plaintiffs are also concerned

10   that -- in the City's briefing that they say that they

11   conduct bag and tagging that is storing property a few times

12   a month.  And -- and for anything that they destroy, we

13   understand their policy to be to -- the bag and tag policy

14   to encourage photo records to be -- to be kept.  And, so --

15   and since there are -- there's not much of either, we -- in

16   this instance too, we're not -- we're not confident that

17   discovery is really an answer to -- to allow us to sort of

18   make sure that any kind of noncompliance isn't happening in

19   realtime or to try and prevent it.  So -- so, it's the --

20   it's the record keeping that we have -- we take issue with

21   as well, which suggests that there is just sort of

22   widespread destruction of property rather than -- rather

23   than a compliance with the policy.

24           THE COURT:  I'm not following you.  Bag and tag

25   does require documentation, correct?

46

1          MR. WU:  That's correct.  And -- and the -- and

2    the fact that the logs reflect so few instances, if taken at

3    face value, suggests that what isn't bagged and tagged and

4    what isn't -- and what isn't allowed to be taken away with

5    individuals is destroyed.  And it's that -- it's that

6    widespread destruction of property -- of property that's

7    seized that gives us the concern when it's not the case --

8    the logs don't reflect that property is mostly being stored.

9    In fact, it's the rare instance in which it is stored.

10          THE COURT:  Okay.  Again, I'm not sure you're

11   connecting the dots for me.  I mean, I get that there --

12   Plaintiffs have said there is a lot of destruction of

13   property, and the bag and tag allows a fair amount of

14   destruction of property if -- if it falls into certain

15   categories of being public nuisance or dangerous or illegal

16   or, you know, inter -- if there's something that's

17   intermingled with dangerous materials, the City is allowed

18   to throw it away.

19      Would Plaintiffs agree with that?

20          MR. WU:  Correct, yes.

21          THE COURT:  But if it's separate usable material

22   that's not trash or -- then they are to -- if they're going

23   to take it, they need to bag and tag it, right?

24          MR. WU:  That's right.

25          THE COURT:  Okay.  So, some of these -- some of

47

1 the evidence you gave me that I just went through suggests

2 that there were things that were taken, and I guess you --

3 they weren't in the declaration, but I -- I guess they

4 weren't bagged and tagged.  So, we're going to assume that

5 those materials were destroyed for those three instances,

6 correct?

7          MR. WU:  Right, right.

8          THE COURT:  But there's lots of other instances

9 that were less clear about whether they were -- so, if we

10 say something is, let's see, bikes or a dog stroller, it

11 sounds like it might be something that should be kept, but

12 we don't know enough from the description whether it's

13 broken and really amounts to trash or something else.

14     Would you agree that if it was broken up, that the City

15 can throw that away?

16          MR. WU:  Correct.  And -- and Plaintiffs are

17 really just saying that we don't have a way of assessing

18 what the -- whether the contention that those items were

19 destroyed properly is -- there's no way to substantiate that

20 claim.

21          THE COURT:  Okay.  So --

22          MR. WU:  Could I rephrase?  I mean, when -- in

23 those instances, when it evidently appears that those items

24 are not in the categories of trash or abandoned or -- or a

25 health hazard, in the instance where the City claims that

48

1   it did properly discard those items because it fell into one

2   of those categories, if there's a dispute, the bag and tag

3   policy encourages them to keep a photo record, which would

4   -- and if that photo record existed, it would allow

5   Plaintiffs to have some way of -- of assessing that dispute

6   or assure Plaintiffs that what is being discarded was indeed

7   properly discarded.

8           THE COURT:  Again, are you asking me to have the

9   City do more than what's in the bag and tag as -- in order

10  to create documentation?

11          MR. WU:  No.  I think Plaintiffs are asking that

12  they do do what is suggested in their bag and tag.

13          THE COURT:  Okay.  So, there's at least some

14  evidence here -- and I want to turn it over to the Defense

15  to hear from them.  There's some evidence here that bag and

16  tag is not being followed in every instance, and there's

17  certainly reason to believe the training has not been very

18  robust in either its breadth or its depth.

19      So, let me hear from the City what do you want to argue

20  on the Fourth Amendment part of the motion?

21          MR. GRADILLA:  Your Honor, this is Mr. Gradilla

22  again.  First, some of -- some of the allegations that are

23  included in Plaintiffs' declarations, they're -- by the time

24  we heard about them in -- in May, when we filed this --

25  their motion, you know, they're pretty stale.  Had they

49

1  raised the issue closer in time to when it happened, we

2  would have been able to, you know, find out more information

3  likely.  You know, folks forget about what happened months

4  prior.  So, I think it would have been helpful to have

5  learned about, you know, any of these alleged issues to try

6  and -- and figure out exactly what happened and kind of

7  resolve issues then.  So, that would be -- that would be my

8  first point.

9       You know, second, I take your Honor's point about, you

10  know, some of the allegations you pointed out in some of the

11  declarations, but I would also point out I believe it is the

12  declaration of Ms. Hoffman (phonetic) at Docket 130-31,

13  submitted by Plaintiffs that she pretty much says in her

14  declaration that -- that DPW workers in that -- at least in

15  that instance, you know, follow the -- the bag and tag

16  policy pretty much to a T.

17       So, we would submit there's evidence in the record that

18  actually, you know, DPW records are following the bag and

19  tag policy.

20       Another point that I wanted to raise, and I was just --

21            THE COURT:  Well, Mr. Gradilla, I -- I take your

22  point.  I -- it's likely, at least on this record --

23            MR. GRADILLA:  Um-hmm.

24            THE COURT:  -- that there are DP workers -- DPW

25  workers who are following bag and tag, okay, but there also

50

1  appears to be some who are not, because some of the

2  instances that I just called out are pretty clear and pretty

3  blatant.  So, I have a concern that at least on the training

4  end, that that should be more robust, and that's one thing

5  that I'm considering requiring is more training on -- on the

6  Fourth Amendment side on the bag and tag and on the

7  injunction, but the injunction just says you have to follow

8  your bag and tag, because Plaintiffs have already conceded

9  the bag and tag policy itself is constitutional.  It's just

10  not being followed.  And I'm not hearing that there's been

11  much training on this, which is concerning.  But I think

12  before taking further steps that -- that step one is to make

13  sure everybody knows what they're allowed to do and what

14  they're not allowed to do, what that bag and tag policy

15  requires with respect to documentation and treatment of

16  various types of objects.

17          MR. WANG:  Your Honor, this is Edmund Wang on

18  behalf of Defendants.  My understanding is that all the DPW

19  workers who do cleaning are trained on the bag and tag

20  policy, and there -- I think there is a written as well as

21  an oral --

22          THE COURT:  There's --

23          MR. WANG:  -- training that they have to sign off

24  on.

25          THE COURT:  There is zero in the record to that

51

1  effect.

2          MR. WANG:  Yes, your Honor, and we didn't feel it

3  was responsive to any of the allegations that Plaintiffs are

4  necessarily making.  So, for example, when your Honor

5  brought up the Pauline Wise declaration that says her jewels

6  were stolen out of a drawer and a DPW worker told her this

7  is the City's now, that declaration didn't provide us like

8  specific date or location of where this happened, which

9  makes it impossible for us to be able to look into it and

10 find out whether this, in fact, happened or whether it was,

11 in fact, a DPW worker.

12      There are many instances in the declarations where it's

13 clear that they're talking about someone who's not a City

14 employee, a member of the community came up and said

15 something to them or -- you know, there's just no way for us

16 to be able to investigate any of these allegations unless

17 they come closer in time to when it happened and provide a

18 little bit more information.

19      I think part of the struggle in responding to their

20 motion was some of the vagueness and unspecificness of these

21 allegations, and I agree with your Honor that if someone did

22 steal someone's jewels out of a drawer, that would be a

23 violation of bag and tag, but we weren't able to confirm

24 whether that happened or not, and there's reason to believe

25 or suspect --

52

1          THE COURT:  For whatever reason --

2          MR. WANG:  -- that some of these discussions --

3          THE COURT:  Mr. Wang --

4          MR. WANG:  -- the allegations weren't --

5          THE COURT:  Mr. Wang, for whatever --

6          MR. WANG:  Yes, your Honor.

7          THE COURT:  -- reason -- you know, whatever

8  strategic reason or, you know, I don't know the reason, but

9  the City did not put anything in the record about the

10 training of DPW employees.  I think you're saying, Well, if

11 we did, it would show that everybody's been robustly

12 trained.  I don't know if that's true or not.  If you want

13 to do that, then you can do that, because I -- this is the

14 area in which I am considering some level of action that --

15 but it would probably be something along the lines of

16 requiring more training just as a first step, to see whether

17 some of these problems are resolved, okay.

18     So, I will -- I think I started to ask Mr. Gradilla or

19 Mr. Gradilla started to volunteer to pull some of this

20 together so we have a better understanding of how many DPW

21 workers are involved in working with homeless individuals

22 and what level of training they have on the bag and tag and

23 -- injunction so I can have a record of that and make a

24 decision from there.

25          MS. IKELS:  Could I make a suggestion, your Honor?

*Echo Reporting, Inc.*

53

1  This is Ms. Ikels.  Given you've given us a deadline to
2  provide the response as to the dispatch operators, could we
3  also provide you with the information as to the training
4  that has taken place and the scope of that training so that
5  you could evaluate whether that was a sufficient amount
6  before we get to how to -- how you might want to proceed, we
7  should improve on that if -- if at all necessary?
8         THE COURT:  I will give you tot hat same deadline
9  to give me more materials.  So, a declaration -- if there's
10 -- it would be great if there were training materials or
11 actual details about what happened, because what was given
12 to me was very conclusory.  So, it's not meaningful.  If
13 you --
14        MS. IKELS:  Will do, your Honor.
15        THE COURT:  And then I'd allow the Plaintiffs to
16 weigh in after that's filed, if -- but I'll -- I'll issue an
17 order about that later because I want to think about --
18 let's see.  If we get a declaration filed, what would the
19 Plaintiff like to do in response?  What makes sense?
20        MR. WU:  Your Honor, this is Kevin Wu.  On -- in
21 response to a declaration on training, I think it would make
22 sense --
23        THE COURT:  Supplemental briefing of -- very brief
24 to say this is our response to this and this is why you
25 should still do X, Y, Z, something like that?

54

1          MR. WU:  I think that would be welcome.

2          THE COURT:  Okay.  I don't want this to devolve

3   into a battle of, well, here's some more declarants coming

4   forward to way the following things.  This is really -- I'm

5   focusing on the training aspect.  I want to know what

6   training has taken place.  I want to know at a more granular

7   level.  So, I will allow the Plaintiffs to comment on that

8   in a five-page supplemental brief within -- how long would

9   yo like after the declaration, Mr. Wu?

10         MR. WU:  I think two weeks is sufficient.

11         THE COURT:  Okay.  Two weeks after the submission

12  of the declaration, and all of this is to assist the Court

13  in determining whether and what to -- to order to address

14  compliance concerns on the Fourth Amendment side of this.

15  Okay?

16         MR. WU:  Understood.  Thank you, your Honor.

17         THE COURT:  Okay.

18         MR. GRADILLA:  Your Honor --

19         MS. IKELS:  You --

20         MR. GRADILLA:  -- may I just raise two things?  A

21  point of clarification, your Honor.  I was just reviewing

22  Dilworth's declaration -- Mr. Dilworth's declaration -- I'm

23  sorry.  It's Mr. Gradilla -- at Docket 143-14, and at

24  paragraph five, he makes clear that it's a specific group

25  within DPW that engages in street cleaning.  So, it would

55

1   not be all of DPW but, rather, the Bureau of Street

2   Environmental Services, folks who work within that that

3   engage in this.  So, just I -- I wanted to -- to clarify

4   that for the Court.  And as to just --

5          THE COURT:  Hold on, Mr. Gradilla.  I -- I want to

6   make sure I understand that.  So, if it's an environment of

7   an encampment resolution or HSOC, then it's Dilworth and his

8   team, correct?

9          MR. GRADILLA:  That's my understanding, yes.

10          THE COURT:  If it's street cleaning that's -- that

11   involves homeless individuals that's outside of the context

12   of HSOC actions, then who's doing that interaction on behalf

13   of DPW or -- you know, if it's not DPW, performing the same

14   kind of work as DPW?

15          MR. GRADILLA:  It's folks within this Bureau of

16   Street Environmental Services.  So, you know, Mr. Dilworth's

17   group is within that -- that division, but there might be

18   other folks within the Bureau that also do that.

19          THE COURT:  Are they all DPW workers?

20          MR. GRADILLA:  Yes.

21          THE COURT:  Okay.  Okay.  So, that will be part of

22   what you fill me in on.  But I really want to understand

23   more globally is it -- are there -- those two groups of

24   workers who are doing all the work in interacting with

25   homeless individuals on cleaning issues throughout the City

1   or is it more like the police organization structure where

2   on dispatch it may be any number of officers who are

3   responding?  Are there random DPW workers who are called out

4   to the neighborhoods to respond to a resident complaint or

5   something like that?

6           MR. WANG:  Your Honor, this is EDMUND Wang on

7   behalf of Defendants.  I just wanted to -- to clarify my

8   understanding and one -- clarify my declaration's

9   forthcoming to the Court.  But I believe that everyone

10  within the BSES, which is a bureau within the DPW, they

11  handle all street cleaning.  And, so, all the people who do

12  street cleaning who would have the -- you know, the

13  opportunity to interact with someone who's unhoused while

14  they're doing street cleaning gets the bag and tag training,

15  and that's something we'll confirm and provide in a

16  declaration.  But I just wanted to make sure to clear up any

17  confusion.  You know, Mr. Dilworth's group is a subset

18  within BSES, and they focus on HSOC resolutions.  They're

19  the people who are divided into different areas of the City

20  zones, and so all those people also street clean, and they

21  would have received this training as well.  But there are

22  other bureaus that will not be addressed in our declaration

23  likely because it's like the Bureau of Urban Forestry who

24  handle trees.  There are people who do street mapping or

25  sidewalk repair who are not cleaning and do not, you know,

57

 1  deal with street cleaning who would not interact --

 2          THE COURT:  Well, I want your --

 3          MR. WANG:  -- with unhoused --

 4          THE COURT:  I want your declaration to address

 5  people who are interacting with homeless individuals with

 6  respect to cleaning the places where they are living.

 7  Whatever their denomination or agency may be, I want to know

 8  who they are or how many of them there are, who their

 9  organization is and whether they've gotten trained on this

10  or not and what that training is in some level of detail,

11  and if there's training materials or how long the training

12  is, all of those things that will flush this out a little

13  bit more.  Okay?

14          MR. WANG:  That's understood, your Honor.

15          MR. GRADILLA:  Your Honor, if I may, one more

16  thing.  This is Mr. Gradilla.  Just to -- to help us provide

17  the Court with more information, could we ask that

18  Plaintiffs provide us more details on some of the -- the

19  alleged issues that they raised, specifically the ones that

20  you raised earlier today with the Fourth Amendment issues?

21          THE COURT:  Give me an example of what you'd like

22  them to tell you.

23          MR. GRADILLA:  Sure.  Ms. Wise's declaration -- I

24  believe it was Ms. Wise's declaration that the pearls -- you

25  know, when that happened, details of that, but the --

58

1  assuming that  they have them.  But, you know, we would find

2  it helpful to -- to get information to be able to respond.

3          THE COURT:  So, I'm not going to order them to do

4  it, but I am telling both sides yet again it's helpful to

5  talk.  It will serve the people if you're having better

6  communication.  My sense of your filings is that

7  communication is not great, and I know I have really good

8  lawyers here.  I know you can improve on that because you

9  owe it to your clients on both sides and the people who are

10 affected by these issues.  If you raise something, bring

11 something to the other side's attention and have a

12 discussion before you run into court, it's probably going to

13 be better.  It usually is, but that's your choice on how you

14 want to litigate the case.  I'm just giving you, I guess,

15 free advice on that but not an order.

16     However -- so, let me just run through the rulings.

17 One is that the motion with respect to the Eighth Amendment

18 issue is denied without prejudice.  If you want to re-raise

19 it but in the fashion that I described, that's -- you can do

20 that.  I'm not going to rule that out, but I -- please make

21 sure if you file it, you have listened to what I need to be

22 able to rule on it.  Okay.

23     With respect to the Fourth Amendment, it stays open.

24 I'll need the declaration with respect to the DPW workers

25 and then the supplemental briefing.

59

1    I have also ordered more visibility into training on

2 the bulletin.  That's going to happen by the deadline I gave

3 you.  And, finally, I'm going to order you to meet with

4 Judge Cisneros, and she'll decide how she wants to conduct

5 this, whether it's going to be ex parte, settlement, or

6 joint settlement.  That's really her call.  And that's going

7 to be about -- to follow up on the City's statement to me

8 that they're open to the idea that there may be ways to more

9 clearly communicate with homeless individuals in these

10 enforcement actions or interactions about their rights or

11 obligations to clear up some of the ambiguity that -- or

12 confusion the people may have.  I think that the police are

13 in a better place -- or members of HSOC who are not police

14 are in a better -- are better positioned to be able to do

15 that.  Okay.

16    I'll leave the timing to her, but any -- any problem

17 with that, Mr. Gradilla, Mr. Wang, Ms. Ikels?

18         MR. WANG:  No, your Honor.

19         MS. IKELS:  Uh-uh.

20         THE COURT:  All right.  Is there anything further

21 from the Plaintiffs' side?

22         MR. WU:  No, your Honor.  This is Kevin Wu.  Thank

23 you.

24         THE COURT:  Okay. From the Defense?

25         MR. GRADILLA:  No, your Honor.

60

1          MR. WANG:  No, your Honor.

2          THE COURT:  Okay.  Thank you very much, everyone.

3  We're concluded.

4      (Proceedings adjourned at 2:34 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

61

1                    CERTIFICATE OF TRANSCRIBER

2

3       I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9       I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16

17         Echo Reporting, Inc., Transcriber

18              Monday, August 28, 2023

19

20

21

22

23

24

25