# EXHIBIT 25

Talla Declaration

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3

4    - - - - - - - - - - - - - - - -

5    COALITION ON HOMELESSNESS,      )

6    et al.,                         )

7                 Plaintiffs,     )

8    vs.                             )   CASE NO.

9    CITY AND COUNTY OF SAN          )   4:22-cv-05502-DMR

10   FRANCISCO, et al.,              )

11                 Defendants.     )

12   - - - - - - - - - - - - - - - -

13     THIS TRANSCRIPT AND ITS EXHIBITS CONTAIN INFORMATION

14      SUBJECT TO A PROTECTIVE ORDER AND SHALL BE TREATED

15           AND USED ONLY IN ACCORDANCE THEREWITH

16

17              VIDEOTAPED DEPOSITION OF

18                DYLAN VERNER-CRIST

19              TUESDAY, MARCH 4, 2025

20

21         BEHMKE REPORTING AND VIDEO SERVICES, INC.

22           BY:  SUZANNE I. ANDRADE, CSR NO. 10682

23               550 CALIFORNIA STREET, SUITE 820

24               SAN FRANCISCO, CALIFORNIA 94104

25                          (415) 597-5600

1   more generally, I'm there to observe what the City is

2   doing.

3       Q.    Okay.   And when you're out there observing what

4   the City is doing, when you observe a -- what you might

5   consider a violation of the bag-and-tag policy, that's

6   something you're writing down in your notes, right?

7       A.    Yes.

8       Q.    And are you writing down violations, or are you

9   just sort of trying to give a description of what's

10  happening?

11      A.    I try to keep it to just a description of what

12  is happening.

13      Q.    But if you see a violation, that's something

14  that you would want to write down in your notes?

15      A.    Yes.

16      Q.    Okay.

17      A.    Well, when you see -- say "see a violation,"

18  I'm not necessarily writing down that I think it's a

19  violation.

20      Q.    Right.

21      A.    I might be describing what I'm seeing.

22      Q.    Right.

23            But if you see something that you think is a

24  violation, you're going to write down a description of

25  what happened in your notes; is that right?

1      A.    Yes, generally.

2      Q.    Okay.  And so when you are doing that, when

3  you're, you know, observing something and it looks like

4  it might be a violation of the bag-and-tag policy, are

5  sometimes those violations related to the destruction of

6  unattended property that's not been abandoned?

7      A.    Yes.

8      Q.    So when you're sort of noting that in your head

9  before you write the description down, what sorts of,

10  sort of, factors are you thinking about for yourself to

11  decide that this is unattended versus abandoned?

12      A.    I'm looking at how the property is -- exists on

13  the sidewalk, how, you know, neatly packaged it is; and

14  does it contain any item -- the -- you know, what are

15  the objective criteria of ownership there; and is there

16  anything present that sort of falls into one of the

17  exceptions in the -- in the policy.

18          And then, of course, in addition to that, is --

19  is the owner or someone sort of saying they've been

20  designated by the owner there, that, you know, makes

21  this property attended or unattended.

22      Q.    You had mentioned other exceptions to what

23  needs to be bagged and tagged.

24      A.    Yes.

25      Q.    What are those exceptions --

1      A.   Might have some name in the vanti- -- this

2  would be a guess, frankly.  Sorry.

3      Q.   Do you know where it's stored --

4      A.   Yes.

5      Q.   -- like, in your file?

6           Okay.  Is it only stored electronically?

7      A.   Yes.

8      Q.   Okay.  Is it stored in a shared drive or, like,

9  locally in your computer?

10     A.   A shared drive.

11     Q.   And does it include any other individual's,

12  like, list of sweeps that they've observed, or is it

13  only yours?

14     A.   I believe it's just mine.

15     Q.   Okay.  And other than that list identifying all

16  the sweeps that you have observed, as we previously --

17  previously discussed, there is a written record for each

18  sweep that you've observed, right?

19     A.   Yes, there should be.

20     Q.   Okay.  It's either a declaration or some sort

21  of written note; is that right?

22     A.   Yes.

23     Q.   Okay.  Are you aware that you've been sort of

24  identified or listed as a likely trial witness in this

25  case?

1     A.   Yes.

2     Q.   Okay.  Do you intend -- sitting here today, as

3     far as you know now, do you plan or intend to testify at

4     trial about each and every sweep that you've observed

5     for this case?

6     A.   I don't know.

7     Q.   Is there any way today, as we're sitting here,

8     for me or the defendants to know which sweeps that

9     you've observed will be the subject of your testimony at

10    trial?

11    A.   I'm not sure what you mean by "any way."  You

12    could ask me, I guess.

13    Q.   Okay.  I -- you know, I can ask again.

14         I mean, do you -- do you have in your mind a

15    list of sweeps that you've observed that you plan or

16    intend to testify about at trial?

17    ATTORNEY TALLA:  Objection.  Ed, I'm going to

18    instruct him not to answer to the extent it reflects

19    communications or direction of counsel.

20    THE WITNESS:  I think it generally, yeah, reflects

21    communications from counsel.

22    BY ATTORNEY WANG:

23    Q.   Okay.  So you do have an idea of which sweeps

24    you have -- at least sitting here today, have some plan

25    or intention of testifying about, correct?

1      A.    There -- I would say there are instances from

2    sweeps that I have observed that I would expect to come

3    up.

4      Q.    I'm assuming maybe an objection will come.

5            But just to confirm, are you able to tell me

6    what those -- which sweeps you have in mind that you

7    expect to come up?

8      ATTORNEY TALLA:  Again, I'm going to object to the

9    extent that what he has in mind is a result of his

10   communications with counsel and a reflection of trial

11   counsel's strategy, and instruct him not to answer to

12   the extent it's based on that.

13     ATTORNEY WANG:  Okay.

14     THE WITNESS:  Yeah, it's from that.

15   BY ATTORNEY WANG:

16     Q.    Okay.  So you currently have an idea of which

17   sweeps will be the subject of your testimony at trial,

18   correct?

19     A.    Yes.

20     Q.    But you cannot tell me what those sweeps are

21   right now?

22     A.    Well, I could, but I've been directed not to.

23     Q.    Okay.

24     A.    I'm following my counsel's advice.

25     Q.    You will follow the advice of your counsel and

```
 1   not tell me --
 2       A.   Yes.
 3       Q.   -- which sweeps are going to be at issue in
 4   your trial testimony?
 5       A.   Yes.
 6       Q.   Okay.  This sort of list of sweeps or incidents
 7   that you expect to testify about at trial, is there a
 8   sort of written document or list sort of setting those
 9   out, or is it just what's in your head right now?
10       A.   I think there's nothing that explicitly says
11   this is the list of instances for trial.
12       Q.   Okay.  There's no subset of the list of all the
13   sweeps you've been to that sets forth the ones
14   that are -- you have in your mind you expect to testify
15   about at trial?
16       A.   Not in those terms.
17       Q.   Okay.  Is there any way that you can think of
18   for me or the defendants to know which sweeps you'll
19   testify about from reading your notes about each sweep?
20       A.   If you were to read my notes --
21       Q.   Correct.
22       A.   -- would you -- would you know?
23       Q.   Correct.
24            Is there something in your written notes that
25   would identify for me or for defendants whether it's a
```

```
 1   sweep that will be at issue at trial as part of your
 2   testimony?
 3        ATTORNEY TALLA:  Objection; vague.
 4        THE WITNESS:  Yeah.  I mean, that -- that is a hard
 5   question.  I would say my notes attempt to or give a
 6   plain description of what I observed.  And to the extent
 7   that they describe a plain and clear violation of the
 8   bag-and-tag policy, I'd say there's a likelihood that I
 9   would testify at trial about that.
10   BY ATTORNEY WANG:
11        Q.   Okay.  And you testified earlier that you don't
12   say in your written notes whether you think something is
13   a violation; you just describe the sort of facts and
14   surrounding circumstances; is that right?
15        A.   There may be exceptions to that, but my general
16   practice is to try to keep it just to the facts.
17        Q.   And did you witness something that you consider
18   a violation of DPW's bag-and-tag policy at each and
19   every sweep that you observed for this case?
20        A.   No.
21        Q.   And I know we just went over this, but just to
22   confirm.
23             If you saw something that you considered a
24   violation of DPW's bag-and-tag policy, you would have at
25   least described the facts and circumstances surrounding
```

```
 1  that violation in your written note for that sweep,
 2  right?
 3       A.   Yes, that's my practice.
 4       Q.   Are there -- well, this might be repetitive,
 5  but just to make sure I understand.
 6            Did you record in your notes each and every
 7  violation of DPW's bag-and-tag policy that you observed
 8  during a sweep?
 9       ATTORNEY TALLA:  Objection; asked and answered.
10       THE WITNESS:  Yes.
11  BY ATTORNEY WANG:
12       Q.   Okay.  So are -- are there -- I'm sure I'll get
13  the same objection.
14            But are there any violations of DPW's
15  bag-and-tag policy that you observed during a sweep that
16  you did not record in your written notes?
17       ATTORNEY TALLA:  Objection; asked and answered.
18            But you can answer.
19       THE WITNESS:  Not that I can recall.  That's why I
20  take notes.
21  BY ATTORNEY WANG:
22       Q.   Okay.  And in your sort of written notes, did
23  you write down all the facts that are relevant to sort
24  of each and every violation of DPW's bag-and-tag policy
25  that you observed?
```

```
 1        A.    Yes.

 2        Q.    For the violations of DPW's bag-and-tag policy

 3   that you observed during sweeps, are there any facts

 4   relevant to those violations that you did not record in

 5   your written notes?

 6        A.    Ask that one more time.

 7        Q.    Sure.

 8              For the violations of DPW's bag-and-tag policy

 9   that you observed, are there any facts relevant to those

10   violations that you omitted from your written notes?

11        A.    Not deliberately.   There may be details not in

12   there.   I'm not perfect, but my notes give my account --

13   my faithful account of what I observed.

14        Q.    Yeah.

15              So the intention when writing your notes was to

16   include -- to the extent you saw a violation of the

17   bag-and-tag policy, your intention was to include every

18   fact that you found relevant to that violation in your

19   notes?

20        A.    Yes.

21        Q.    Is there any way -- strike that.

22              I know that you don't always, you know, state

23   in your written notes whether -- you know, your

24   conclusion or your opinion about whether something is a

25   violation of the bag-and-tag policy, right?
```

1        A.    Correct.

2        Q.    Okay.  Do you have any sort of convention or

3   standard language you would use to describe a situation

4   that you, you know, considered a violation of DPW's

5   bag-and-tag policy?

6        A.    I'd -- I would have to look at my notes and do

7   a comparison like that --

8        Q.    Okay.

9        A.    -- I think.

10             Because, as I've said, generally my notes will

11  strive to give a plain description of what I saw.  And

12  so the notes will be contextual, right?

13       Q.    Right.

14       A.    So I would have --

15       Q.    Okay.

16       A.    -- to do a review of my notes to look for that

17  language.

18       Q.    Okay.  So the -- other than applying my own

19  understanding of the DPW bag-and-tag policy to the

20  descriptions you've written in your notes, is there any

21  other way for me to tell, when reading your notes,

22  whether it's something that you believe is a violation

23  of DPW's bag-and-tag policy?

24       A.    I think you might have asked this.  And I

25  would -- I mean, I think the -- the accurate answer is

1  you -- using the description and the photos of the

2  property at issue and then looking at what the language

3  of the DPW policy says, I think then you draw -- would

4  draw conclusions from that.

5      Q.  When you include photos in your written notes,

6  does that mean that there is, you know, a property

7  depicted in that photo -- strike that.

8          Let me think about this.

9          Do you include every photo you take at a sweep

10  into the final written note that you put together?

11      A.  No.

12      Q.  Okay.  How do you choose which photos to

13  include in your final written notes?

14      A.  At an encampment sweep, I might take 50 to a

15  hundred photos.  And if I included all of them in my

16  notes, it would, you know, become unmanageable.

17          I include photos if I think that they, you

18  know, show rather than tell the property that I'm

19  referring to in my notes.

20      Q.  Okay.

21      A.  And how -- you know...

22          I'd say generally, just to add to that, it's

23  not just the property that I'm looking at in my notes,

24  but if they help explain what I saw that day.

25      Q.  Okay.  In your written notes, did you record

```
 1        ATTORNEY WANG:  I think you can set aside that

 2   exhibit as well.

 3            I'm going to take, like, a two-minute break to

 4   see if there's anything else that I really want to go

 5   over.  Otherwise, I might want to end our day.

 6        THE VIDEO OPERATOR:  Going off the record.  The time

 7   is 5:22 p.m.

 8            (Recess taken from 5:22 p.m. to 5:24 p.m.)

 9        THE VIDEO OPERATOR:  Back on the record.  The time

10   is 5:24 p.m.

11        ATTORNEY WANG:  Next exhibit, 283.

12            (Deposition Exhibit 283 was marked for

13            identification.)

14   BY ATTORNEY WANG:

15        Q.   In an effort to move along quicker, I'll phrase

16   my questions a little bit differently.

17            Mr. Verner-Crist, is what's been marked as

18   Exhibit 283 your final written notes from the

19   January 6th, 2025, A.M. sweep?

20        A.   Yes.

21        Q.   If you turn to Bates stamp -1953.

22        A.   Okay.

23        Q.   The paragraph -- it's the last paragraph right

24   above the photograph; it says approximately 8:14.

25        A.   Yes.
```

1      Q.    If we look -- sort of, looks like, three lines

2    up from the photo, there's a sentence that begins

3    "Meanwhile, Graham..."

4      A.    Yes.

5      Q.    "...is taking photographs of the inside of the

6    tent."

7            Do you see that?

8      A.    Yes.

9      Q.    And it is -- then it writes:   "It is generally

10   clean, but there may be needles inside."

11           Do you see that?

12     A.    Yes.

13     Q.    Why did you believe there may be needles

14   inside?

15     A.    You know, I -- I took a photo of it below as

16   you can see.   And it looks generally clean from -- you

17   know, from that photo.

18           And there's another photo of it on the next

19   page where it still looks generally clean.   But, you

20   know -- you know, from my -- my vantage point where I

21   was in comparison to where the City workers were, I

22   couldn't see the corners of the tent --

23     Q.    Okay.

24     A.    -- and, like, further inside of the tent.

25           So I -- you know, I wanted to caveat my photos

1  and my -- with my observations with what I may not have

2  seen in that moment.

3      Q.   Is there some reason you thought that, you

4  know, you had -- you felt the need to caveat that there

5  might have been needles in there?

6          Did you hear someone talk about it, or did you

7  see something that wasn't captured in a photograph?

8          Anything like that?

9      A.   I mean, in my experience of -- you know, I've

10  seen Israel Graham take a lot of photos of the insides

11  of tents.  And in my experience, he often takes more

12  photos when he thinks there's -- well, I don't know what

13  he thinks -- but when there are -- when the tent appears

14  soiled.

15      Q.   Okay.  So the reason why you thought there may

16  be needles inside is because Israel Graham was taking a

17  lot of photos of that tent that day?

18      A.   Yeah.  And, you know, he -- again, that's why I

19  say maybe.  I don't know for certain.

20      Q.   Okay.  Do you often see needles inside tents

21  when you are observing sweeps?

22      A.   What do you mean by "often"?

23      Q.   I don't know.  Let's say, do you see needles

24  in -- in a tent, you know, once every five sweeps you

25  attend?

1     A.   I would be -- it's very hard to put a number on

2 that.  I haven't gone through and sort of done a count

3 like that.

4     Q.   Okay.  What about one every ten sweeps you've

5 seen?

6     A.   Again, I haven't sort of counted all the tents

7 that I've seen and counted whether there are needles in

8 them.

9         I have seen needles in tents before, but I

10 couldn't give you a number as to how many.

11     Q.   Do you see needles in tents at every sweep you

12 attend?

13     A.   No.

14     Q.   If we go to just page -1963 of the same

15 exhibit, 283.

16     A.   Yes.

17     Q.   And it's the very first --

18     A.   -1963, yes.

19     Q.   -- paragraph is approximately 8:59.

20         Do you see that?

21     A.   Yes.

22     Q.   Oh, sorry.  8:59, yeah.

23         It says:  "Graham is now down the block taking

24 photos of a small orange and green tent"?

25     A.   Yes.

1        Q.    It says:   "The tent looks fairly clean"?

2        A.    Yes.

3        Q.    And then at the bottom of that paragraph, it

4    says:   "Below and on the following pages are photos

5    taken at 9:01 showing the orange and green tent."

6              Do you see that?

7        A.    Yes.

8        Q.    In not the next paragraph but the next one

9    after that that begins approximately 9:07 --

10       A.    Yeah.

11       Q.    -- it references a detained man in a red jacket

12    who was released by the cops.

13              Do you see that?

14       A.    Mm-hmm.

15       Q.    And it says -- the last sentence of that

16    paragraph is:   "The man in the red jacket then leaves

17    the area, leaving his tent behind."

18              Do you see that?

19       A.    Mm-hmm.

20       Q.    Is that referring to the orange and green tent

21    that you've taken a photograph of?

22       A.    I -- I did not know for -- for certain here

23    whether this was his tent or not.   Well, so I say

24    "leaving his tent behind."

25              You know, I think I say earlier in my notes --

1  I need to go back and look, but I believe this was his

2  tent, and I was -- I think I discussed this somewhere.

3        "Cops were having one of the detained men sign

4  a citation."  I say that at approximately 9:04.

5        And then 9 -- approximately 9:12, the DPW break

6  down the tent.  He leave -- at 9:07, he left the tent.

7        Sorry if I'm skipping around.

8        But, you know, from -- and I can also -- you

9  know, I say at approximately 8:55:  "They are likely

10 citing people for lodging."

11        I -- and then, you know, below that, I say --

12 and I see them writing citations and property receipts.

13 I can hear the telltale chime of body-worn camera.  The

14 body -- the cops have their body-worn camera running.

15        You know, from the combination of those things,

16 I was sort of surmising that this tent belonged to this

17 man, that he had been cited for lodging, and that the

18 police had seized the tent, and that DPW were now

19 assessing whether or not to bag and tag.

20    Q.    Okay.

21    A.    And that is based from ob- -- observing things

22 like this multiple times, like, in that case example.

23    Q.    Got it.

24        This is not one of the situations where I know

25 that you have sometimes, like, gotten a photo of the

1  property receipt or something like that or a citation

2  that was issued?

3      A.   In this moment, no.   That's why I say

4  "surmised."   I did not have a photo of the property

5  receipt.   I did not talk to them.

6          I'd have to look at my notes to say this for

7  sure -- certain, top of my head, I do not remember

8  talking to the man.

9          But, you know, like, for instance, later in

10 that same sweep, pages 25 and 26, you know, I talked to

11 a different individual who did have -- you know, have a

12 tent seized like that.   So, yes.

13     Q.   Okay.   And going back to page -1963, or page 13

14 of these notes, at approximately 9:12 you write that the

15 DPW workers throw away the green and orange tent?

16     A.   Yes.

17     Q.   Okay.   And then you've got more photos in the

18 tent in the following two pages, correct?

19     A.   Correct.

20     Q.   Or even more, I guess.   It goes all the way

21 through page -1968, or page 18 of your notes?

22     A.   Yes.

23     Q.   It looks like at least on page -1963, page 13,

24 as well as on page 15, -1965, you've gotten some photos

25 of the inside of that tent.

1       A.    Yes.

2       Q.    Do you recall whether the inside of the tent

3  was soiled with any hazardous materials?

4       A.    The in- -- I mean, from the photos, I see some

5  bedding and what looks like potentially a lighter of

6  some sort and related items in there.

7       Q.    Do you recall seeing a -- like, a glass pipe

8  with some grayish-black residue on it inside the tent?

9       A.    I can't tell from these photos, and I think

10 you're about to show me a close-up.

11      ATTORNEY WANG:   This -- this is actually just the

12 same photo, just on bigger piece of paper.   This will be

13 284.

14             (Deposition Exhibit 284 was marked for

15             identification.)

16      ATTORNEY WANG:   And for the record, this is another

17 image that was produced native with

18 VERNER-CRIST_00000208.

19 BY ATTORNEY WANG:

20      Q.    If you could take a look at what's been marked

21 as Exhibit 284.

22      A.    Yes.

23      Q.    Is this the same photo that's shown on page

24 -1965 of Exhibit 283?

25      A.    Yes, it appears to be.

1      Q.    Okay.   In looking at the Exhibit 284, the lone

2   photo, are you able to see the -- glass pipe?

3      A.    Yes.   It appears to be a glass pipe on the blue

4   object.

5      Q.    Do you know what else is inside the tent?

6      A.    Um...

7      Q.    Go ahead.

8      A.    Only what's in the photo.

9      Q.    Do you know there were -- whether there were

10  any drugs inside that tent?

11     A.    No, I do not know.   No.   I -- you know, I

12  have -- there's these photos showing these items.   But,

13  you know, did I do a drug test kit of the drugs?   No.

14          I don't know.   I only have the photos.

15     Q.    Okay.   And did you -- you know, based on your

16  understanding of the bag-and-tag policy, would it be a

17  violation of it to dispose of the tent because there was

18  this glass pipe inside of it?

19     ATTORNEY TALLA:   Objection; calls for a legal

20  conclusion.

21     THE WITNESS:   I would not be certain on this.   And,

22  you know, in this instance, I -- you know, I described

23  what I observed.   And I think this is a -- a difficult

24  example.

25  BY ATTORNEY WANG: