# EXHIBIT 33

Talla Declaration

```
 1                  UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                         OAKLAND DIVISION
 4
 5   - - - - - - - - - - - - - - - -
 6   COALITION ON HOMELESSNESS,     )
 7   et al.,                        )
 8            Plaintiffs,           )
 9   v.                             )  CASE NO.
10   CITY AND COUNTY OF SAN         )  4:22-cv-05502-DMR
11   FRANCISCO, et al.,             )
12            Defendants.           )
13   - - - - - - - - - - - - - - - -
14
15
16                     REMOTE DEPOSITION OF
17                       HERBERT RUTH, JR.
18                    FRIDAY, MARCH 21, 2025
19
20
21          BEHMKE REPORTING AND VIDEO SERVICES, INC.
22                     BY:  BELLE BALL, CSR NO. 8785
23                  550 CALIFORNIA STREET, SUITE 820
24                  SAN FRANCISCO, CALIFORNIA  94104
25                                     (415) 597-5600
```

Confidential

```
 1    BY MR. PRASAD:
 2        Q.  Okay.  So I'd like to now show the witness
 3    Plaintiff's Exhibit 1310.
 4            And, Mr. Castro, I'll represent to you this is
 5    an article published in the San Francisco Standard on
 6    July 30th, 2024.
 7            Do you see there's a large photo on the front
 8    page?
 9        A.  Yes.
10        Q.  Do you recognize yourself in this picture?
11        A.  Yes.
12        Q.  And can you identify yourself?
13        A.  I'm on the truck.
14        Q.  You're the man in the truck in the hat?
15        A.  Yes.
16        Q.  And who else do you recognize here?
17        A.  That's my crew.
18        Q.  And could you describe them?  Let me put it
19    this way.
20            Who's the man in the red hat on the left?
21        A.  That's Greg.
22        Q.  Israel Graham?
23        A.  Greg.
24        Q.  Greg who?
25        A.  I don't know his last name.
```

```
 1        Q.   And who is the man sort of in the picture just
 2   underneath you next to the police officer?
 3        A.   Underneath me?
 4        Q.   Who is the man to the right of the police
 5   officer?
 6        A.   That's Herb.
 7        Q.   Herb Ruth?
 8        A.   I don't know his last name.
 9        Q.   And do you know this police officer?
10        A.   I've never seen him.
11        Q.   Well, you saw him on this day; correct?
12        A.   Yeah, but never before.
13        Q.   And the man in the white ski mask, do you
14   recognize that man?
15        A.   Yes, yes.
16        Q.   Who is that man?
17        A.   That's Scott.
18        Q.   And there's two men behind Scott.  Who are
19   they?
20        A.   That's Israel and Tone.
21        Q.   Which one is Israel?
22        A.   The one in the gray hoodie.  Well, that looks
23   like him.  I don't know if that's him.  It looks like
24   him.
25        Q.   Now, you recognize your crew.  Do you recognize
```

```
 1   this scene at all?
 2        A.   Yeah, I remember.
 3        Q.   You remember this incident?
 4        A.   Yes.
 5        Q.   Now, the picture depicts an encampment sweep.
 6   Sorry.   Let me put it this way.
 7             The picture depicts an encampment resolution;
 8   correct?
 9        A.   Yes.
10        Q.   And this picture shows an unhoused man clinging
11   on to a tent; correct?
12        A.   Yeah.
13        Q.   And he's clinging on to the tent while the man
14   in the red hat -- the DPW worker in the red hat appears
15   to be grabbing it from him; correct?
16        A.   Uh-huh.
17        Q.   And the man grabbing the tent from the unhoused
18   man is a DPW worker named Greg; is that right?
19        A.   Yes.  He was -- yes, but that man was -- I
20   think -- I know for a fact he was separated from that
21   tent before we took it.  That's why the police was there
22   trying to grab it.
23        Q.   What do you mean he was separated from the
24   tent?
25        A.   I mean, we told him to move and he kept trying
```

1    to get back in.
2         Q.   When you say "trying to get back in" --
3         A.   The police.
4         Q.   -- you mean trying to get back in the tent?
5         A.   No.  Maybe trying to grab something that maybe
6    looked like his.  I don't know.
7         Q.   So you told him to move away from the tent?
8         A.   He was away.  He was away.  The police had him
9    away.
10        Q.   And at what point did he come and grab the
11   tent?
12        A.   I don't know.  I don't know.  They must have
13   just got a good picture.
14        Q.   Okay.  And because an unhoused person is
15   holding on to the tent, this tent would be attended
16   property under the bag and tag policy; correct?
17        A.   That thing was covered in disgusting stuff, I
18   remember.
19        Q.   What was it covered in?
20        A.   There was feces in there.  There was needles.
21        Q.   But earlier you said if an unhoused person
22   wants to keep property even if it's soiled, you let them
23   keep it; correct?
24             MR. BARUTH:  Misstates prior testimony.
25             THE WITNESS:  I can't remember.

Confidential

```
 1   BY MR. PRASAD:
 2        Q.   But it's fair to say that --
 3        A.   The only -- go ahead.
 4        Q.   -- recalling this situation here, there are
 5   times when an unhoused person wants to keep something
 6   but DPW takes it because it's soiled; correct?
 7        A.   There was just trash.  It was trash in there.
 8   There's nothing in that tent that was worth having.  It
 9   was all garbage.
10        Q.   But do you agree that this man was trying to
11   keep the tent?
12        A.   No.
13        Q.   What do you think this man was trying to do?
14        A.   He looked like he was trying to attack them or
15   something.
16        Q.   Trying to attack someone?
17        A.   Or grab something.  I don't know.
18        Q.   What do you think he was trying to grab?
19        A.   Who knows.  I was on the truck.  I was doing
20   something else.  But we wouldn't take anything away from
21   anybody unless it was trash.
22        Q.   You would if it was trash; correct?
23        A.   It was trash.
24        Q.   You would take something away from someone if
25   it was trash; is that right?
```

1  A. Not take it. We would throw it away. We don't
2  take anything from anybody. That's why the police were
3  there.
4  Q. So if this man was trying to hold on to the
5  tent, you would be required to let him keep it; correct?
6  MR. BARUTH: Lacks foundation.
7  THE WITNESS: That's a good question. I don't
8  know.
9  BY MR. PRASAD:
10  Q. Does the bag and tag policy require you to let
11  individuals keep attended property if they want to keep
12  it?
13  A. Keep attended property? That's attended
14  property? Was it? I don't think that was attended
15  property.
16  Q. So your testimony here is that even though this
17  man was holding on to it, it wasn't attended property;
18  right?
19  MR. BARUTH: Lacks foundation.
20  THE WITNESS: Yeah, that wasn't his property.
21  BY MR. PRASAD:
22  Q. Why do you say it wasn't his property?
23  A. Well, you know, really I was on the top of the
24  truck. I don't know. I don't know.
25  Q. But you would agree that it appears the man is

Confidential

1      attempting to hold on to the tent; correct?
2           A.   I don't know what he's doing.
3           Q.   All right.  I'd like to show you Plaintiff's
4      Exhibit 1311, which is a video that Ms. Young is going
5      to play for you on her laptop.
6                (Plaintiff's Exhibit 1311 was marked.)
7      BY MR. PRASAD:
8           Q.   For the record, this video has been produced as
9      Bates COH 01528931.
10               So, Mr. Castro, please let us know if for some
11     reason you can't see it well.
12               MS. YOUNG:  Can you see this?
13               THE WITNESS:  I can see it.
14     BY MR. PRASAD:
15          Q.   Okay.  You can see the video; correct?
16          A.   Yeah.  I can see "Recording."
17          Q.   Okay.  So we'll play the entire video first.
18               MS. YOUNG:  Sorry.  One moment.  Let me do it
19     again.  There we go.
20               (Video playing.)
21               THE WITNESS:  Oh, wow.
22               MR. PRASAD:  Is there no volume on the video?
23               MS. YOUNG:  I put the volume on.
24               THE WITNESS:  Yeah.  See, I wasn't there.
25               MR. PRASAD:  Replay it with the volume, please.

1           So for the record we'll replay the video with
2   the volume.
3           THE WITNESS:  He was on the floor.
4           MR. BARUTH:  You can wait till there's a
5   question.
6           While she's doing that, was there an exhibit
7   number on there?
8           MR. PRASAD:  Yeah.  It's Exhibit 1311.
9           MR. BARUTH:  Thank you.
10          (Video playing.)
11  BY MR. PRASAD:
12      Q.  Mr. Castro, were you able to view the entire
13  video?
14      A.  Yeah.
15      Q.  For the record, we played the entire video for
16  the witness, which is one minute and four seconds long.
17          Mr. Castro, do you recognize yourself in the
18  video?
19      A.  Yes.
20      Q.  Where were you located in the video?
21      A.  On top of the truck.
22      Q.  Fair to say that was a tense scene, Mr. Castro?
23      A.  Yeah.
24      Q.  Do you remember it?
25      A.  Yes.

```
 1        Q.   And this video depicts the same incident in the
 2   picture from the news article I just showed you?
 3        A.   Okay.
 4        Q.   Is that right?
 5        A.   Yes.
 6        Q.   Now, the video shows a DPW worker engaged in a
 7   tug-of-war with an unhoused person over a tent; correct?
 8        A.   Yes.
 9        Q.   And that DPW worker is someone named Greg?
10        A.   Yeah.
11        Q.   And eventually the DPW worker successfully
12   takes the tent from the man; correct?
13        A.   Did we?  I didn't see it.  In the video we took
14   it?
15        Q.   I'm asking you.
16        A.   Yeah.
17             MR. BARUTH:  The video speaks for itself.
18             THE WITNESS:  Yeah.
19   BY MR. PRASAD:
20        Q.   And the man is left without the tent; correct?
21        A.   Yes.
22        Q.   And you agree that the man was trying to hold
23   on to the tent in the video; right?
24        A.   Yes.
25        Q.   And the tent is being dragged away as he's
```

1  trying to hold on to it; correct?
2      A.  Yeah.
3      Q.  Does the bag and tag policy permit DPW workers
4  to take property from an unhoused person who is holding
5  on to it?
6          MR. BARUTH:  Lacks foundation.
7          THE WITNESS:  Say that again.
8  BY MR. PRASAD:
9      Q.  Does the bag and tag policy permit DPW
10 workers --
11     A.  Permit.
12     Q.  -- to take property --
13     A.  No, it doesn't permit us.
14     Q.  -- from someone who's holding on to --
15     A.  No, it doesn't permit us.
16     Q.  Does the bag and tag policy permit DPW workers
17 to use force with unhoused people --
18     A.  Force.
19     Q.  -- to confiscate property?
20         MR. BARUTH:  Vague and ambiguous.
21         THE WITNESS:  No, it doesn't.
22 BY MR. PRASAD:
23     Q.  You agree there was some degree of force that
24 was used here; correct?
25     A.  No.

Confidential

1    Q.   The man wasn't pulling -- the DPW worker wasn't
2    pulling the tent?
3    A.   The DPW worker was, but this guy was a homeless
4    guy.
5    Q.   You would agree that --
6    A.   A crazy homeless guy.
7    Q.   You would agree that the DPW worker was pulling
8    the tent from the man?
9    A.   I wouldn't say he was pulling it from the man.
10   That man, he jumped on the tent.
11   Q.   And what happened after the man jumped on the
12   tent?
13        MR. BARUTH:   The video speaks for itself.
14        THE WITNESS:   We told him to back away so we
15   could take the tent.  There was feces in there.
16   BY MR. PRASAD:
17   Q.   You would agree there was moments in that video
18   where both the man and the DPW worker were holding on to
19   the tent; correct?
20   A.   Oh, yeah.
21        MR. BARUTH:   Video speaks for itself.
22   BY MR. PRASAD:
23   Q.   Do you recall if this tent was bagged and
24   tagged?
25   A.   This tent, it was soiled with feces, needles.

Confidential

1  Q.  To your best understanding, was this incident a
2  violation of the bag and tag policy?
3       MR. BARUTH:  Calls for speculation.
4       THE WITNESS:  I don't know.
5  BY MR. PRASAD:
6  Q.  Well, earlier you said the bag and tag policy
7  doesn't permit DPW workers to take property from an
8  unhoused person who wants keep it; correct?
9  A.  Yeah, I didn't understand your question.  But
10 there was garbage in there.  There was needles in there,
11 needles and feces.
12 Q.  So even though this man wanted to keep the
13 tent, your understanding is that this incident was not a
14 violation of the bag and tag policy?
15      MR. BARUTH:  Lacks foundation.
16      THE WITNESS:  It's not a violation.
17 BY MR. PRASAD:
18 Q.  And that's because of the condition of the
19 tent?
20 A.  (Witness nods head.)
21 Q.  Okay.  Now, you're not the person grabbing the
22 tent in the video; correct?
23 A.  No.
24 Q.  But at that moment did you see this happen?
25 A.  No, I wasn't watching it happen.

```
 1      Q.   There was quite a bit of commotion; correct?
 2      A.   Yes.
 3      Q.   You didn't look over at anybody?
 4      A.   I was working.  In the video you can see I
 5   was -- I didn't even know what was going on.
 6      Q.   To your knowledge, did anyone report this
 7   incident as a violation of the bag and tag policy?
 8      A.   The police was right there.  He should have
 9   been grabbing that man, right, for the protection.
10      Q.   To your knowledge, did any DPW worker report
11   this incident as a violation of the bag and tag policy
12   to their supervisor?
13      A.   I don't know.
14      Q.   And your supervisor Israel Graham was present
15   at this resolution; correct?
16      A.   Yeah, yep.
17      Q.   To your knowledge, was anyone investigated for
18   violating the bag and tag policy after this incident?
19      A.   I don't know.
20      Q.   And to your knowledge, was anyone disciplined
21   for violating the bag and tag policy after this
22   incident?
23      A.   I don't know.
24      Q.   Towards the end of the video did you hear the
25   police officer telling the unhoused person something to
```

Confidential

1  the effect of "Mayor Breed and Gavin Newsom say homeless
2  encampments are no more"?
3          MR. BARUTH:  Video speaks for itself.
4          THE WITNESS:  I didn't hear.
5          MR. PRASAD:  Can we replay the video from
6  45 seconds for Mr. Castro at full volume?
7          THE WITNESS:  45?
8          (Video playing.)
9  BY MR. PRASAD:
10      Q.  So, Mr. Castro, did you hear the officer say
11  something to the effect of "Mayor Breed and Gavin Newsom
12  say homeless encampments are no more"?
13      A.  That's what he said, yeah.
14      Q.  At the time of this video did you share the
15  same understanding as the police officer regarding
16  instructions from the mayor and Gavin Newsom?
17          MR. BARUTH:  Vague and ambiguous.
18          THE WITNESS:  I remember them talking about it.
19  BY MR. PRASAD:
20      Q.  Who do you remember talking about it?
21      A.  I remember our supervisors talking about it.
22      Q.  And what do you remember them talking about?
23      A.  Just what you said.  There was some changes,
24  some changes about encampments.
25      Q.  And what --

Confidential

1    A.   I don't know exactly.
2    Q.   And what were those changes?
3    A.   I don't know.
4    Q.   Do you recall them mentioning that the mayor
5  wanted encampments to be handled in a certain way?
6    A.   I don't remember.  Not that, "in a certain
7  way."  I don't remember.  I just knew that there were
8  policies that changed.
9    Q.   Did what the police officer said in the video
10 reflect your understanding of how the policies changed?
11   A.   Yeah, but I don't know if that was true or not.
12   Q.   But it did reflect your understanding of how
13 the policy changed; is that right?
14   A.   I knew that the policy had changed.
15   Q.   In a way that was similar to what the police
16 officer in the video was saying?
17   A.   I don't know what changed.  They were saying
18 something about the encampments, there's going to be
19 some changes, and I don't know exactly what changes that
20 they were but I knew there were.
21   Q.   And did you -- were you told that those changes
22 were a result of directions from the mayor?
23        MR. BARUTH:  Vague and ambiguous.
24        THE WITNESS:  It was a lot of big talk about
25 that.

Confidential

1  BY MR. PRASAD:
2      Q.  Including directions from the mayor; correct?
3      A.  Something.  I don't know exactly what it was,
4  though.
5      Q.  But it was -- whatever it was, it was
6  directions from the mayor?
7      A.  Oh, yeah, yeah.  Whatever the policy that was
8  the change was from the mayor, yeah.
9      Q.  And you would agree that's what the police
10 officer is talking about here in the video?
11     A.  Yes.
12     Q.  Okay.  I'd like to now show the witness what we
13 will mark as Plaintiff's Exhibit 1312.
14         (Plaintiff's Exhibit 1312 was marked.)
15 BY MR. PRASAD:
16     Q.  And I'll represent to you, Mr. Castro, that
17 these are notes prepared by plaintiff's investigator,
18 Mr. Dylan Verner-Crist, in this case.
19         I'd like to direct your attention to the page
20 which says "Verner-Crist" at 1999 at the bottom.  That
21 should be about three pages in.  And it's a photograph.
22     A.  Okay.
23     Q.  It should say 1999.
24     A.  I got it.
25     Q.  Yes.  Okay.