# EXHIBIT 34

Talla Declaration

1              UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                    OAKLAND DIVISION

4

5  - - - - - - - - - - - - - - -

6  COALITION ON HOMELESSNESS,    )

7  et al.,                       )

8          Plaintiffs,           )

9  v.                            )  CASE NO.

10 CITY AND COUNTY OF SAN        )  4:22-cv-05502-DMR

11 FRANCISCO, et al.,            )

12         Defendants.           )

13 - - - - - - - - - - - - - - -

14

15

16              REMOTE DEPOSITION OF

17                HERBERT RUTH, JR.

18             FRIDAY, MARCH 21, 2025

19

20

21        BEHMKE REPORTING AND VIDEO SERVICES, INC.

22               BY:  BELLE BALL, CSR NO. 8785

23               550 CALIFORNIA STREET, SUITE 820

24               SAN FRANCISCO, CALIFORNIA  94104

25                          (415) 597-5600

```
 1   written bag & tag policy?
 2        A     Today is Friday.  Yesterday.
 3        Q     And why did you review the written bag & tag
 4   policy yesterday?
 5        A     My supervisor went over the bag & tag
 6   procedures, before we left the yard.
 7        Q     And, and you looked at an actual copy of the
 8   policy?
 9        A     She had it on the screen.
10        Q     Have you ever received complaints -- have you
11   ever received copies of complaints from people saying
12   that their property has been destroyed during
13   encampment resolutions?
14        A     No.
15              MR. PRASAD:  I would like to show the witness
16   what I've sent the technician as Tab 4, and what's been
17   already introduced in this case as Plaintiff's
18   Exhibit 1310.
19              If we could please put that on the screen.
20              (Exhibit 1310, previously marked for
21               identification.)
22              (Document displayed)
23              MR. PRASAD:  And if we could zoom in on that
24   picture I would appreciate it.  Thank you.
25              (Document enlarged)
```

1   BY MR. PRASAD

2       Q     All right.   Can you see that picture,

3   Mr. Ruth?

4       A     Yes, I can.

5       Q     Okay.   So Mr. Ruth, I'll represent to you,

6   this is an article published in the San Francisco

7   Standard on July 30, 2024.

8             Do you recognize yourself in this photo?

9       A     That handsome guy right there.

10      Q     And where is the handsome guy in the photo?

11      A     That looked like me, standing over there,

12  looking at what's going on.

13      Q     So you are the man next to the police officer

14  in the photo; is that right?

15      A     The handsome guy.

16      Q     And you're the man to the right of the police

17  officer.   Is that right?

18      A     It look like to the left, right?

19      Q     Or, to the police officer's left and --

20      A     Yeah, where he got his hand out, yeah.

21      Q     Okay.

22      A     Standing there closer to the truck.

23      Q     Wearing blue gloves, is that right?

24      A     Yes.

25      Q     And in this photo you are looking right at a

```
 1   police officer and two -- a police officer, two DPW
 2   employees, and another man holding a tent.   Is that
 3   right?
 4       A    That's correct.
 5       Q    Do you recognize any of the other workers in
 6   this picture?
 7       A    Yes.
 8       Q    And who are they?
 9       A    My co-workers.
10       Q    So who is the man in the red hat and red
11   shirt?
12       A    It's G5.
13       Q    And do you know his full name?
14       A    Greg.
15       Q    Do you know his last name?
16       A    No.
17       Q    And who's the man in the face mask?
18       A    That look like Scott.
19       Q    And do you know Scott's last name?
20       A    No.
21       Q    And who's the man on the truck, in the hat?
22       A    I can't really see him.
23       Q    Do you have a sense of who that might be?
24       A    I can't see his face, so I'm not sure.
25       Q    And who is the man on the right-hand side of
```

1   the picture, between the fence and the truck?

2        A    That's my Latin partner.  Yeah.  That's

3   Anthony.

4        Q    And there's a man behind him, kind of looking

5   in the other direction, wearing a hood.  Do you know

6   who that man is?

7        A    I can't see his face.  I'm not sure.

8        Q    Are any of your supervisors in this photo?

9        A    No.  But that could be my supervisor back

10  there with that -- uh, that's looking the other way --

11  that could be my supervisor right there.

12          I remember this day.  I remember this day,

13  really well.

14        Q    What do you remember about this day,

15  Mr. Ruth?

16        A    This day right here was on Division.  And

17  this guy, he's got the whole sidewalk taken up.  The

18  whole sidewalk.  You couldn't walk by.  And we just

19  want this guy to break it down just a little bit.  He

20  had a bunch of cans; he had, like, two or three tents.

21  You couldn't walk by.

22          This guy was there for about a year.  He's

23  been sitting there, just sitting there, for a year.

24          So we addressed this guy.  And we asked him

25  to break it down.  This guy had -- he had recycled --

1  recycles.  And the beer smell with the recycle; the

2  tent was soiled, and it was a bad -- it was -- the tent

3  was really bad.

4          And we asked this guy to downsize just a

5  little bit.  And this guy, he start downsizing.  And

6  then there was a guy, I'm not sure if -- from the

7  Homeless Coalition, he was standing right there with

8  his phone.

9          And, um, the Police Department was with us.

10 And, um, they were kind of standing back a little bit.

11 But this one officer right here was kind of by himself.

12 And usually, there's more officers there.  And so we

13 had the officer there to help us address the guy.

14         And so we let the guy know that we're -- the

15 tent is soiled.  We need to take this tent, you know.

16 It's a health -- a health hazard.

17         So as we're, you know, helping him break down

18 the tent, and we're trying to, you know, remove the

19 tent, this guy jumps inside it.  He jumps inside the

20 tent.

21         And this guy snapped the photo of this guy

22 jumping in the tent.

23    Q    And what happened after this man jumped

24 inside his tent?

25         MS. MURPHY:  Object to form.  Misstates the

1  testimony.

2          THE WITNESS:  We -- we -- we actually stopped

3  right there, and let the officer finish handling this.

4          The tent was a go, in the beginning, when we

5  was talking to him.  When the officer addressed him and

6  let him know that this tent is soiled, DPW's going to

7  have to take the tent, it was a go.  When he said okay,

8  then we start to remove the tent.

9          As we were moving the tent, he changed his

10  mind and jumped right in it.  It's nothing we can do,

11  and this guy snapped this photo.  So he made us all

12  look bad like we were taking something from this guy,

13  and we wasn't.  We was just asking him to break it

14  down, and we asked him to let the soiled tent go.

15  BY MR. PRASAD

16      Q    When you say the tent was soiled, what do you

17  mean?

18      A    It was -- it was -- it was wet; it was dirty.

19  It had -- from recycling, it was dripping with all kind

20  of liquids and stuff like that.  And it had rips and

21  tears in the tent.

22          And this guy had cans for at least a half a

23  block, blocking the -- the street.  He has such a big

24  encampment going on, people couldn't pass by.  He had

25  over $500 worth of recyclables.  He could buy this tent

1  a few times.   He could buy this tent a few times.

2          He didn't want to let the tent go, at the

3  last minute.   After he acknowledged that we could take

4  the tent, he jumps right in.   Changed his mind, and

5  jumped right in the tent.

6          At that time, you could look at the -- you

7  could look at my face.   I'm like:   What's going on

8  here?   You just decided to let us take the tent.

9          I thought it was a go.   He surprised me when

10  he turned around and jumped in the tent, and the guy

11  took the photo.

12     Q     Now, would you -- is it fair to say that once

13  he jumped in the tent, that was an indication that he

14  wanted to keep it?

15          MS. MURPHY:   Object to form.

16          THE WITNESS:   Possibly.

17  BY MR. PRASAD

18     Q     And what does the bag & tag policy require

19  you to do in that circumstance?

20          MS. MURPHY:   Object to form.

21          THE WITNESS:   If the tent is soiled, and it

22  is a health hazard, and it's blocking the whole street,

23  it's rips and tears in it, that tent is deemed as

24  soiled.

25

1  BY MR. PRASAD

2      Q     Even if the man wants to keep it; is that

3  right?

4      A     Even if the man wants to keep it, we will

5  still get rid of this tent for him.

6      Q     Now, once the man -- let me rephrase that.

7            Do you recall what actually -- what happened

8  in the end here?

9      A     In the end?  I can't remember.

10     Q     Now, at this exact moment where the picture

11 is captured, both the man and Greg, the other DPW

12 worker, are holding on to the tent.

13           Is that right?

14     A     That's correct.

15     Q     What was Greg supposed to do under the bag &

16 tag policy in this circumstance, if the man doesn't let

17 go of the tent?

18           MS. MURPHY:  Object to form.

19           THE WITNESS:  He's supposed to let the tent

20 go, and let the Police Department continue handling it.

21           MR. PRASAD:  I would like to show what is

22 marked as Plaintiff's Exhibit 1311, which is a video.

23           (Exhibit 1311, previously marked for

24            identification.)

25           MR. PRASAD:  And as the technician brings

```
 1   that video up, I'll just for the record state that it's
 2   been produced as Bates No. COH-01528931.
 3              MS. MURPHY:  Vivake, just so I know, is this
 4   something that's been already previously marked in
 5   another deposition?  Or are you marking it for the
 6   first time?
 7              MR. PRASAD:  Yeah, it was previously marked
 8   at another deposition as Exhibit 1311.
 9              And if the technician can make sure there's
10   volume, and please play the entire video.
11              (Videotape played, not reported)
12              MR. PRASAD:  Okay.  And for the record, the
13   technician played the video for the witness, which is
14   about one minute and four seconds long.
15   BY MR. PRASAD
16       Q    Were you able to see that video, Mr. Ruth?
17       A    Yes.
18       Q    Fair to say that was a somewhat tense scene?
19       A    Intense scene?
20       Q    Tense scene.
21       A    Huh?
22       Q    Yeah.  Fair to say that was a tense, tense
23   scene?
24       A    I can't hear you.  Say that one more time?
25       Q    Yeah.  Is it fair to say that that was a
```

1  tense environment?

2       A    Yes.  It was -- it was intense.  It was

3  intense.  It was -- it was sprung on us by surprise.

4       Q    When you say it was sprung on you, do you

5  mean someone taking the video?  Or the actions of the

6  unhoused man in the video?

7       A    The actions of the unhoused man.  He was

8  cooperating at first.  And when we went to -- he was

9  cooperating with the Police Department at first.  And

10  after he let us start to remove the tent, he just

11  switched and wanted to keep it.  And jumped inside.

12          I'm not sure if it was something in that he

13  wanted out of it.  But, he just jumped inside.  And

14  Greg had the tent already, and was starting to do the

15  removal.  And he just jumped inside the tent.  I mean

16  -- and that kind of threw us all, you know, like, like:

17  What's going on?

18          And so the police officer, hisself, he was

19  trying to help us out as much as possible.  He is only

20  one -- there was only one police officer there.

21          And that's another thing that made it so

22  intense, is because there's only one officer there.

23  The other officers was a little further back

24  (Indicating).

25          And so you got one officer that can't do the

1    whole job by himself.  He needed -- excuse me -- he

2    need the rest of his co-workers.  Because when there's

3    more than one officer, sometimes the -- the person

4    we're getting the tent from cooperates a little better.

5    But seeing it's one officer by hisself, and it's all

6    these DPW guys, we can't do anything until the officer

7    says it's okay.

8            So, him being by hisself kind of put us in a

9    situation that made us look like we were taking this

10    guy's stuff.

11    Q    Well, would you agree that there's at least a

12    portion of that video where it appears that the

13    unhoused man and Greg are kind of in a tug-of-war for a

14    few seconds?

15    A    No.  I wouldn't say that.  It was a -- a go

16    with us taking the tent.  And so when he started to

17    remove, the guy jumped in (Indicating).  And that's

18    when he popped the picture.

19    Q    I understand about the picture.  But in the

20    video, it's clear that Greg holds onto the tent for

21    some period of time, while the man is reaching for it.

22            Is that right?

23    A    By surprise, only.

24    Q    And eventually, the man is left without the

25    tent.  Is that right?

1        A    I'm not sure how the outcome went.  I -- I

2   vaguely can remember the end of the story.

3        Q    And what do you remember about the end of the

4   story?

5        A    Not too much.

6        Q    You would agree with me, though, that there's

7   a portion of that video where the tent is being dragged

8   away while the man is holding on to it.

9             Is that right?

10       A    No.

11            MR. PRASAD:  Can I have the technician please

12   play the video again?

13            (Videotape played, not reported)

14            MR. PRASAD:  Can we pause the video?

15            MS. MURPHY:  (Inaudible)

16            MR. PRASAD:  Mr. Ruth --

17            MS. MURPHY:  If I may just note for the

18   record, we are doing this remotely on a normal-size or

19   just on a laptop screen.  The video, itself, is maybe

20   one fifth of the horizontal length and maybe one half

21   of the vertical height.

22            So, just for the record, to reflect the size

23   of the video that the witness is reviewing.

24            MR. PRASAD:  Thank you, Kaitlyn.

25

```
 1  BY MR. PRASAD
 2      Q    Mr. Ruth, were you able to see the video this
 3  time?
 4      A    Yes, I see the video.
 5      Q    Now, that part of the video does depict a DPW
 6  worker eventually snatching the tent away from the man.
 7  Is that right?
 8          MS. MURPHY:  Objection.  Asked and answered,
 9  and argumentative as to "snatched."
10          THE WITNESS:  The tent was a go.  He had
11  already said "Okay, you can take the tent."
12          As we removing, he jumps inside the tent and
13  pulls it.
14  BY MR. PRASAD
15      Q    But the video shows, Mr. Ruth, that the DPW
16  workers did retain the tent, even after the man jumped
17  onto it.
18          Is that right?
19      A    I'm not sure.
20      Q    Is there not a portion where a man pulls the
21  tent away, and the unhoused man is on the ground?
22      A    I seen him -- I seen him pulling the tent
23  back.
24      Q    And then eventually, in the video, you see
25  the tent go to the left of the DPW workers, and that
```

1   man on the ground with some of the stuff from the tent.

2           Isn't that right?

3       A   And just -- because I was there, I know for a

4   fact that the tent was already moving before the guy

5   jumped inside.

6       Q   Would you agree that the man jumping inside

7   the tent indicates the man's desire to keep the tent?

8           MS. MURPHY:   Object to form.

9   BY MR. PRASAD

10      Q   To you.

11      A   I cannot say that.   But what I can say is

12  this.

13          Sometime, when mental health situations, and

14  homelessness, and -- they change their mind, very fast.

15  One minute, it's okay to take the item.   The next

16  minute, they want it right back.

17      Q   I understand that, Mr. Ruth.

18          I guess my question, what I'm trying to

19  understand is:   What does the policy require you to do

20  when that happens?

21          MS. MURPHY:   Object to form.

22          THE WITNESS:   It requires us to stop.

23  BY MR. PRASAD

24      Q   And is that what you saw in this video here?

25          MS. MURPHY:   Objection, asked and answered.

```
 1              THE WITNESS:  Yes.
 2    BY MR. PRASAD
 3        Q    When you say "stop," does that mean to allow
 4    the man to have the tent back?
 5        A    No.
 6        Q    Then what do you mean by "stop"?
 7        A    That means stop, let the police -- let the
 8    police handle it, again.  Let the police officer talk
 9    to this man again; he's changed his mind.
10              So after the police officer talked to the guy
11    for a few more minutes, the tent was a go, again.
12              I can tell you this one thing.  After that
13    day, that spot right there, that man hasn't been there
14    since then.  He hasn't -- he hasn't came back and took
15    over the sidewalk, stopped pedestrians from walking
16    through.
17              And the guy was there for a long time.  I
18    remember seeing him for over three months, in the same
19    location.  You got kids walking by.  You got families,
20    you got people trying to get to or from work.  That's a
21    busy intersection right there.
22        Q    And am I right, Mr. Ruth, that your
23    understanding of the bag & tag policy is that because
24    the tent was soiled, DPW was permitted to confiscate
25    the tent?
```

1          Is that right?

2     A    That's right.

3     Q    So am I understanding that, to your

4    understanding, what happened here was not a violation

5    of the bag & tag policy?

6     A    Yes.

7     Q    Does the bag & tag policy permit DPW workers

8    to use force with unhoused people, to confiscate

9    property?

10         MS. MURPHY:  Object to form.

11         THE WITNESS:  No force.  We here to clean.

12   BY MR. PRASAD

13    Q    Do you recall if this tent was bagged and

14   tagged?

15    A    No.

16    Q    As in, it wasn't bagged and tagged?

17    A    It wasn't.

18    Q    Did your supervisor -- actually, let me

19   rephrase that.

20         Did any supervisor ever discuss this specific

21   incident with the crew?

22    A    It was brought up.

23    Q    And, and what was discussed when it was

24   brought up?

25    A    It was brought up that there was some photos

```
 1   taken from the Homeless Coalition, and it was -- it's
 2   getting looked at as we're taking someone's property,
 3   without them -- their consent.
 4              And that's what, you know, got us kind of
 5   like, you know, in the situation where we wasn't taking
 6   it for no reason; we had a reason to take it.  It was
 7   soiled, and ripped up, dirty, smelling.  It was our job
 8   to do this.
 9              And when the pictures came out, we, we talked
10   about it.
11        Q    And who was present when you talked about it?
12        A    My co-workers.
13        Q    Does that include any supervisors?
14        A    Yes.  It was brought up.
15        Q    Who, who's the supervisor -- who was the
16   supervisor -- was it a supervisor who brought it up?
17        A    Yes.
18        Q    And who was that supervisor?
19        A    Uh, Darryl brought it up; Israel brought it
20   up.
21        Q    And were you -- when it was brought up, were
22   you given any instructions about how you're supposed to
23   handle a situation like this in the future?
24        A    Yes.
25        Q    And what were those instructions?
```

1    A    We're not going to -- after that situation,

2    DPW decided not to -- not to -- not to -- uh, what's

3    the word I want to use?  We were told to let the

4    individuals keep whatever they want.

5            So for the next couple months, or month, we

6    didn't confiscate anything.  But we know what that

7    does, right?

8    Q    What --

9    A    One picture -- one picture, one video,

10   stopped the whole city.  So now everything's trash.

11   All around the city.

12           So everywhere we go, we letting people drag

13   tents, soiled tents, tires, dressers, from one location

14   to the next location.

15           That's not helping the City out.  We're not

16   doing our job.  We're not making our city great.

17   Q    And you said that lasted for about a month or

18   so after?

19   A    Yes.  DPW didn't want to -- they don't want

20   it.

21           We're here to help people.  This job, I could

22   see, it helps people.  We don't want to be looked at as

23   we're taking people's items, and -- by force.  We don't

24   want that.  And we're just -- we are out there to help

25   the community.  Keep it clean.

```
 1      Q     And, what happened after a month or so?
 2            Did -- did you receive instructions -- did
 3  you receive different instructions than letting people
 4  keep everything?
 5      A     Well, you know, everything got looked at with
 6  a fine comb, you know.  Most of the time, you know, the
 7  supervisors made the call on everything after that.
 8  You know, they made the call:  Okay let them have it,
 9  let them have it, let them have it, let them have it.
10            You got people sitting in feces, just sitting
11  there, rotten.  They're just -- they're laying in it,
12  their leg is busted open, they're bleeding, they're
13  just -- we can't help people if the City's not going to
14  help us, back us up.
15      Q     So just so I understand correctly, for about
16  a month after this video, you were instructed to sort
17  of let people keep everything that they want.
18            Is that right?
19      A     Yeah.  Just let them keep it.
20      Q     And then, did that change again, you know,
21  after a month or so?
22      A     Well, you know, you know, we got a new mayor,
23  you know, we got Gavin Newsom.  We got a lot of stuff
24  going on with the politics part of it.
25            You know, people, you know, the higher-ups,
```

1   they want to help out but, you know, they just kind of

2   like, you know, don't have the support, you know, to

3   keep the city clean.

4            And then we -- we out there working, and, and

5   they think that we're -- we're -- we're aggressively

6   taking stuff from people, when we're doing our job.

7        Q    I guess what I'm asking, Mr. Ruth, is you

8   said things changed for about a month or so.  I'm

9   trying to find out, after that month or so was over,

10  what changed after that?

11       A    Well, after that, you know, slowly but

12  surely, you know, we were able to grab a few items from

13  some -- from some people.  You know.  We come in, we

14  had long negotiations that take an hour just to kind of

15  talk to the person about the things that they can't

16  have.

17           So we might get some work done, but we're not

18  getting enough work done.  And it's making it look like

19  we're just standing around, doing nothing.  When we're

20  actually -- we have to wait an hour just to -- just to

21  clean up.  Just to get the spot clean.

22           Just to -- just to get the sidewalk back to

23  the City, we got to wait an hour.

24       Q    So just so I understand, you know, you

25  mentioned, you know, the rules kind of changing a

1    couple times.

2              What's the current state of the rules, you

3    know, when it comes to being able to confiscate things

4    that are soiled or are dirty?

5    A      Well, right now, it's -- it's -- it's kind of

6    still in a rocky situation, you know.  We -- we're not

7    able to, you know, confiscate some stuff from some

8    individuals.  And if they want to take this stuff with

9    them, and they can -- and they can take it with them,

10   we let them have it.

11   Q      But, I think you did say that if it's soiled,

12   you are allowed to confiscate it.  So --

13   A      Yes, yes.  But, but -- we are allowed to

14   confiscate it.  But if a person jumps up, and grab his

15   tent, and it's soiled, and he starts to walk off with

16   it, we have to let him take that tent.  We have to.

17   Q      Now, you mentioned the politics of it, the

18   mayor, Gavin Newsom.

19             Did you hear the police officer in the video

20   toward the end telling an unhoused person something to

21   the effect of:  Mayor Breed and Gavin Newsom say

22   homeless encampments no more?

23   A      I -- I didn't get that, I didn't hear that,

24   from the officer.

25   Q      Do you remember that from your time at the

1   incident?

2        A    I don't remember that.

3        Q    By the way, do you recall the name of the

4   officer that was there at this incident?

5        A    No, I don't recall that officer.   And I think

6   that was his first day.   I think he was coming back to

7   work; that was his first day back.

8        Q    Is that because you hadn't seen him before?

9        A    Yes.   Another reason I haven't seen him.   I,

10  like, got a chance to talk with him for a few minutes

11  before that.   And I think he was just coming back to

12  work.

13       Q    All right.

14            MR. PRASAD:  I would like to show what's been

15  previously marked at another deposition as Plaintiff's

16  Exhibit 1133.

17            If the technician could please bring that up?

18  That's Tab 6.

19            (Exhibit 1133, previously marked for

20             identification.)

21            (Portion of videotape played, not reported)

22            MR. PRASAD:  I didn't quite see, if the

23  technician or Ms. Ball could tell us what the time

24  stamp is that we stopped it at, I would appreciate it.

25            (Reporter clarification)