1

2

3

4

5

6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

7

8

9

10

11

12

| | |
|---|---|
| COALITION ON HOMELESSNESS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, et al., <br><br> Defendants. | Case No. 22-cv-05502-DMR <br><br> **ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Re: Dkt. No. 350 |

13

14

15

16

17

18

19

20

21

Plaintiffs are the Coalition on Homelessness ("Coalition"), Sarah Cronk, and Joshua Donohoe. They assert claims challenging the seizure and destruction of unhoused individuals' personal property against Defendants the City and County of San Francisco; San Francisco Police Department ("SFPD"); San Francisco Department of Public Works ("DPW"); San Francisco Department of Homelessness and Supportive Housing ("HSH"); San Francisco Fire Department ("SFFD"); and San Francisco Department of Emergency Management ("DEM") (collectively, "the City"). The City moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment on all of Plaintiffs' claims. [Docket No. 350.] Plaintiffs oppose [Docket No. 366], and the City filed a reply [Docket No. 369].[1] The court held a hearing on May 8, 2025. [Docket Nos. 382, 383.]

22

23

24

25

26

27

28

---

[1] On May 1, 2025, Plaintiffs filed objections to certain evidence cited in Defendants' Reply, citing L.R. 7-1(d)(1). [Docket No. 372.] The court overrules the objections based on Federal Rules of Evidence 401, 402, and 403. *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) ("[O]bjections for relevance are generally unnecessary on summary judgment because they are "duplicative of the summary judgment standard itself . . . . [P]arties briefing summary judgment motions would be better served to simply argue the import of the facts reflected in the evidence rather than expending time and resources compiling laundry lists of relevance objections.") (cleaned up); *Q. M. v. Cnty. of Los Angeles*, No. 21-CV-09382-SSS-MRWX, 2025 WL 1148283, at *3 (C.D. Cal. Mar. 18, 2025) ("[W]hile the court may consider whether evidence is material, it need not exclude evidence at the summary judgment stage for danger of unfair prejudice, confusion of issues, or any of the other grounds outlined in Fed.R.Evid. 403.") (cleaned up). As the court does not rely on Exhibits 69 or 71 to the Mills Declaration, the court overrules Plaintiffs' objections under 803,

For the following reasons, the City's Motion is denied.[2]

## I.    BACKGROUND

### A.    Plaintiffs[3]

The Coalition on Homelessness is a 501(c)(3) non-profit founded in 1986 in San Francisco whose "mission is to find permanent solutions to homelessness while recognizing the dignity and human rights of unhoused people." Talla Decl. Ex. 136 (6/28/22 Friedenbach Decl.) ¶ 2. Coalition's work includes policy advocacy, outreach campaigns to connect unhoused people to services, and engagement with volunteers to provide unhoused people with basic necessities for survival. *Id.* ¶¶ 4-5. Coalition has an informal membership structure, and its members are comprised almost entirely of unhoused people or people with lived experience of being unhoused. *Id.* ¶¶ 6-7. While Coalition does not track its members in a formal database, Coalition defines active membership as regular participation in Coalition meetings or volunteer activities. *Id.* ¶ 7; Talla Decl. Ex. 1 (Coalition 30(b)(6) Dep.) at 71:7-25.

Sarah Cronk and Joshua Donohoe are a couple who have been unhoused and have lived together on the streets of San Francisco. Talla Decl. Ex. 120 (9/26/24 Cronk Decl.) ¶¶ 2-3; Talla Decl. Ex. 119 (9/26/24 Donohoe Decl.) ¶¶ 2-3. Cronk testified that she lost property in at least half of the 30 HSOC encampment closures[4] she has experienced, including in February, May, June, and

---

901 and 902 to those Exhibits as moot.

[2] The court has not yet ruled on the parties' concurrently-filed motions to seal. [*See* Docket Nos. 300, 303, 307, 349, 367, 368, 370, 371 (sealing motions); Docket No. 388 (ordering parties to file joint proposed sealing order by June 18, 2025).] The court finds that none of the information discussed in this order satisfies the "compelling reasons" standard that applies to sealing requests made at summary judgment. *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1099 (9th Cir. 2016).

[3] On June 9, 2025, individual Plaintiffs Molique Frank, David Martinez, and Teresa Sandoval dismissed their claims with prejudice. [Docket No. 390.]

[4] "HSOC" is the Healthy Streets Operation Center, an interagency task force comprised of all Defendants. [Docket No. 289 (Third Am. Compl., "TAC") ¶ 4.] According to the City, the purpose of an HSOC encampment "resolution" is "to conduct outreach to clients, offer services and housing to clients, remove hazardous or abandoned tents, structures, and vehicles, and clean and secure the site after campers have relocated." [Docket No. 45-4 ¶ 7.] As explained in the Order on Motion for Preliminary Injunction, Defendants refer to these events as "resolutions" or "HSOC engagements." Plaintiffs call them "sweeps." The court uses the term "encampment closures." [Docket No. 65 at 2 n.1.]

United States District Court
Northern District of California

1

2

3

4

September 2022.  Talla Decl. Ex. 2 (Cronk) at 165:1-18, 200:14-204:3.  Donohoe testified that he lost property at resolutions in June, August, and September 2022, and January and April 2023.  Talla Decl. Ex. 6 (Donohoe) at 99:16-102:25, 119:13-124:14, 170:19-174:18, 187:12-190:16, 205:21-214:5.

5

### B.     Unhoused Persons in San Francisco

6

7

8

9

10

11

12

Lack of housing has been a persistent problem in many cities, including San Francisco. City-wide counts of unhoused San Franciscans found 8,035 unhoused persons in 2019 and 7,754 in 2022.  Talla Decl. Ex. 134 at 8, 14; Docket No. 9-7 at ECF pp.8, 17.]  The City has experienced a shortage of shelter beds to accommodate all unhoused persons.  In 2019, there were only 3,493 shelter beds available for 8,035 unhoused persons.  [Docket No. 9-7 at ECF pp.8, 12.]  In 2021, available beds increased to 5,080—a figure still thousands short of the number of unhoused individuals counted in 2019 and 2022.  *Id.* at ECF p.12.

13

14

15

16

17

18

19

20

21

22

According to Plaintiffs' expert, Dr. Christopher Herring, unsheltered homelessness is commonly transitory or episodic.  Herring Decl. Ex. 1 (Herring Rep.) at 57.  Dr. Herring reports that a survey of 584 unhoused individuals living in San Francisco found that "15% had been sheltered at some point in the last month, nearly 40% had utilized shelter in the past year, and 81% had either used or tried to access shelter in the past."  *Id.* at 57.  He determined that the amount of time spent in a shelter is also relatively brief, as "27% [of survey respondents] reported that they resided in shelter for the full year.  29% reported for staying less than a month, 22% 1-5 months, and 22% for 6-11 months."  *Id.* at 58 (citation omitted).  Thus, according to Dr. Herring, "shelters in San Francisco are more often a temporary rest-stop with bridges to nowhere and an eventual return to the street."  *Id.*

23

24

25

Unhoused individuals who reside in public areas of San Francisco and their encampments are often the subject of 311 calls for customer service.  Since January 2020, the City has logged 184,104 such calls concerning encampments, people and/or tents blocking sidewalks or streets,

26

27

28

1    accumulation of debris on the street, and unsanitary conditions.    Mills Decl. Ex. 44 (311

2    encampment complaints).

3        **C.    The City's Bag and Tag Policy**

4        The City has responded to these issues in part by enacting Procedure No. 16-05-08 REV 03,

5    titled "Removal and Temporary Storage of Personal Items Collected from Public Property,"

6    commonly known as the "bag and tag" policy.  Mills Decl. Ex. 1 (2/8/22 Bag & Tag Policy) (2/8/22

7    Bag & Tag Policy) at CCSF-COH_000385. [5]  The court's prior orders (Docket Nos. 65, 231) explain

8    the bag and tag policy in detail, but, in short, the policy applies to "Public Works staff . . . when

9    removing personal items from public property for temporary storage and retrieval."  Mills Decl.

10   Ex. 1 (2/8/22 Bag & Tag Policy) at CCSF-COH_000385.  Key aspects of the policy are summarized

11   below.  Plaintiffs acknowledge that the bag and tag policy is itself constitutional.  [Docket No. 68

12   (12/22/22 Hr'g Tr.) at 5:6-15, 8:16-20, 11:9-16.]   In this lawsuit, they assert that the City routinely

13   fails to follow the policy, resulting in unlawful seizures of property as well as deprivation of property

14   without due process.

15        **1.    Types and Treatment of Personal Property**

16       The policy distinguishes between personal property that is attended, unattended, and

17   abandoned.  When "the property's owner or someone who states that they have been designated by

18   the owner to watch the property is present[,]" such items are considered attended property.  Mills

19   Decl. Ex. 1 (2/8/22 Bag & Tag Policy) at CCSF-COH_000385.   Property is unattended when

20   "neither the owner nor anyone who states that they have been designated by the owner to watch the

21   property is present" and when "it is accompanied by signs of ownership" such as "an unattended

22   tent that is filled with personal belongings or items that are being stored in an orderly manner[.]"

23   *Id.*  The bag and tag policy requires that "all unattended property that is collected for storage will be

24   bagged and tagged upon collection and taken to the Public Works Operations Yard for storage."  *Id.*

25       Abandoned property is that which is "unaccompanied by objective indications of ownership,

26

27   ───────────────────
     [5] Plaintiffs and the City each submitted identical copies of the February 8, 2022 Bag and Tag Policy.
28   [Docket Nos. 350-6 and 366-6].  For ease of reference, the court cites only to Exhibit 1 of the Mills
     Declaration [Docket No. 350-6], which contains Bates stamps.

United States District Court
Northern District of California

United States District Court
Northern District of California

for instance, an empty or broken tent sitting by itself on a sidewalk with no other belongings . . . or items that are broken, disheveled, surrounded by trash or show other signs of neglect." *Id.* The bag and tag policy does not apply to abandoned property. *Id.*

The bag and tag policy allows Public Works staff to discard and not store certain items, such as items that present an immediate health and safety risk, items soiled by infectious materials or infested by rodents and insects, perishable items, contraband or illegal items, and garbage. *Id.* at CCSF-COH_000386. Staff members are not required to sort through piles of personal belongings if they are co-mingled or littered with needles, human waste or other health risks; in such cases, they may dispose of the entire pile. *Id.* What constitutes property that is soiled, abandoned, or co-mingled, however, can be a matter of dispute. *See, e.g.*, Talla Decl. Ex. 10 (Evans) at 143:24-144:18, 145:17-146:1.

## 2.    Notice Requirements

Absent imminent health or safety hazards requiring immediate removal, DPW is required to provide written pre-removal notice 72 hours in advance of any pre-planned encampment closure, and 24 hours before encampment or sidewalk cleaning. *Id.* at CCSF-COH_000386. For encampment closures, the notice must be provided to "individuals who are present" at the encampment and must be "posted conspicuously on or near the personal property that will be removed." *Id.* If unattended property is removed, DPW must place a post-removal notice that includes the time, date, and location of the provided notice. *Id.*

For regular encampment cleanings ("where individuals are allowed to return to a location following cleaning and there is no permanent removal") and encampment closures, "staff will provide the owner or owner's designee with a reasonable amount of time (approximately 30 minutes) to collect and move their belongings out of the public right of way[.]" *Id.* at CCSF-COH_000385-86.

## 3.    Collection and Retrieval of Personal Property

If DPW collects unattended property, they must document the collection with a personal property bag and tag intake form which includes, among other things: (1) the date, time, and location (including street address and cross street) of the collection; (2) the name and contact information of

1    the property owner; (3) a brief description of the collected items; and (4) identifying information of

2    the staff member who collects the property.  *Id.* at CCSF-COH_000386-87.

3           "Personal items are stored at the Public Works Operations Yard" for 90 days.[6]  *Id.* at CCSF-

4    COH_000387.  "For the first 72 hours after items are collected and stored," owners may collect their

5    property 24 hours a day.  *Id.*  Thereafter, the items are available for pick up Monday through Friday

6    from 9 a.m. to 3 p.m.  *Id.*  The owner of the property is required to show "satisfactory proof of

7    ownership; i.e., describing the location of where the items were and when collected, or describing

8    the specific items that were collected."  *Id.*  Unclaimed items are discarded after 90 days.  *Id.* at

9    CCSF-COH_000388. There is no limit to the number or volume of personal items that are to be

10   bagged and tagged for a particular individual.  CCSF-COH_000386.

11          **D.    Procedural History**

12          Plaintiffs commenced this action for declaratory and injunctive relief on September 27,

13   2022, alleging that the City has a "custom and practice of violating the constitutional rights of

14   unhoused people."  [Docket No. 1 ¶ 2.]  In December 2022, the court partially granted Plaintiffs'

15   motion for a preliminary injunction, and the City appealed.  [Docket Nos. 65, 88.]  On June 28,

16   2024, the United States Supreme Court issued *City of Grants Pass, Oregon v. Johnson*, 603 U.S.

17   520 (2024), effectively eliminating Plaintiffs' claims under the Eighth Amendment.[7]  The Ninth

18   Circuit subsequently affirmed the preliminary injunction directed to Plaintiffs' property claims,

19   holding that this court did not abuse its discretion "by requiring the City to comply with its 'bag and

20   tag' policy" as written.  [Docket Nos. 227, 228.]   On August 5, 2024, the court granted in part and

21   denied in part Plaintiffs' motion to enforce the preliminary injunction with respect to the property

22   claims and ordered the City to provide DPW employees with additional training on the bag and tag

23   policy.  [Docket Nos. 231, 241.]

24          On December 4, 2024, the court issued its order on the City's motion to dismiss the Second

25   _____

26   [6] "Bulky" items—that is, "any single item that does not fit in a 60-gallon container with the lid closed," including furniture or mattresses—are an exception to the 90-day rule and may be discarded

27   after 14 days.  Mills Decl. Ex. 1 (2/8/22 Bag & Tag Policy) at CCSF-COH_000387.

28   [7] *Grants Pass* held that the enforcement of generally applicable laws regulating camping on public property does not violate the Eighth Amendment's prohibition on cruel and unusual punishments.

1   Amended Complaint ("SAC"), finding among other things that the allegations in the SAC supported

2   Coalition's associational standing, but did not adequately plead its organizational standing for

3   Plaintiffs' Fourth and Fourteenth Amendment claims and related California constitutional claims.

4   [Docket No. 281 (Order re Motion to Dismiss SAC) at 8-14, 18-20.]  Plaintiffs filed the TAC on

5   December 18, 2024, adding allegations to support Coalition's organizational standing.  [Docket No.

6   289.]  On June 9, 2025, the court granted the City's partial motion to dismiss the TAC, finding that

7   even if Coalition were able to plead organizational standing, it could not pursue claims in its own

8   right because the organization itself had not suffered any unlawful seizure or destruction of property.

9   [Docket No. 391.]

10          On April 3, 2025, the City filed this motion for summary judgment along with a motion to

11  vacate the preliminary injunction.  [Docket Nos. 349, 353.]  On April 8, 2025, to preserve judicial

12  and party resources, the court denied without prejudice the City's motion to vacate because it was

13  largely duplicative of portions of the motion for summary judgment and was therefore dependent

14  on the outcome of the summary judgment motion.  [Docket No. 365.]

15  **II.    LEGAL STANDARD**

16          A court shall grant summary judgment "if . . . there is no genuine dispute as to any material

17  fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden

18  of establishing the absence of a genuine issue of material fact lies with the moving party.  *See*

19  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S.

20  317, 323 (1986)).  The court must view the evidence in the light most favorable to the non-moving

21  party.  *See Fresno Motors, LCC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir.

22  2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  A genuine issue of fact

23  exists if sufficient evidence favors the non-movant such that "a reasonable [judge or] jury could

24  return a verdict for the nonmoving party."  *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200

25  F.3d 1223, 1229 (9th Cir. 2000) (alteration in original) (quoting *Anderson*, 477 U.S. at 248).  The

26  court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of

27  fact.  *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir.

28  2014) (quoting *Anderson*, 477 U.S. at 255).

United States District Court
Northern District of California

7

1  **III.    DISCUSSION**

2          The City's arguments fall into three groups: (1) the court lacks subject matter jurisdiction

3  because neither Coalition nor the two remaining individual Plaintiffs Cronk and Donohoe have

4  Article III standing (Mot. at 5-19);[8] (2) Plaintiffs cannot obtain the equitable they seek (*id.* at 19-

5  20); and (3) Plaintiffs' claims fail on the merits because Coalition cannot bring a § 1983 claim on

6  behalf of its members and because the evidence does not support the claims (*id.* at 20-34).

7          **A.      Subject Matter Jurisdiction**

8          The City argues the court lacks subject matter jurisdiction over all claims because Coalition

9  has neither organizational[9] nor associational standing, and because Cronk and Donohoe do not have

10  standing as individual plaintiffs.  Mot. at 5-19.

11          Courts have "a continuing obligation to assure [their] jurisdiction."  *E. Bay Sanctuary*

12  *Covenant v. Trump*, 932 F.3d 742, 763 n.6 (9th Cir. 2018) (citations omitted).    Standing

13  requirements "must be supported in the same way as any other matter on which the plaintiff bears

14  the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages

15  of the litigation."  *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1057 (9th Cir. 2023) (quoting

16  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  At summary judgment, a plaintiff must

17  support standing "by affidavit or other evidence [of] 'specific facts,' which for purposes of the

18  summary judgment motion will be taken to be true."  *Lujan*, 504 U.S. at 561.  "The existence of

19  standing turns on the facts as they existed at the time the plaintiff filed the complaint."  *Skaff v.*

20  *Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007) (citing *Lujan*, 504 U.S.

21  at 569 n.4; footnote omitted).

22

23

24

25  _____

[8] In a footnote, Defendants suggest the court lacks subject matter jurisdiction pursuant to the political

26  question doctrine.  Mot. at 5 n.3.  The court need not address a throwaway argument made only in

passing.  *See Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487 (9th Cir. 2010).

27

[9] The court has since held that even if Coalition were able to establish organizational standing, it

28  could not pursue claims in its own right because it had not itself suffered an unlawful seizure or

deprivation of property.  [Docket No. 391.]  The question of organizational standing is now moot.

United States District Court
Northern District of California

### 1.    Coalition's Associational Standing

"The doctrine of associational standing permits an organization to 'sue to redress its members' injuries, even without a showing of injury to the association itself.'" *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003) (quoting *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996)). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The City reiterates the arguments it asserted in its pleadings challenge: that Coalition cannot meet the first and third prongs of the *Hunt* test to establish associational standing.  Mot. at 14.  As to the first prong, Plaintiffs respond that under Ninth Circuit law, Coalition need not identify particular injured members.  Opp'n at 17.  Plaintiffs further contend that in any event, evidence supports standing for at least one member and that many others have been or will be injured by the challenged practices.  *Id.* at 17-19.  As to the third *Hunt* prong, Plaintiffs assert that individual participation of Coalition's members is not required because this case seeks injunctive and declaratory relief and not monetary damages.  *Id.* at 22.

#### a.    *Hunt*'s First Prong

##### i.    Coalition's Membership

The City contends that because Coalition is not a "formal membership organization," it must establish it has certain "indicia of membership" to meet the first prong of the *Hunt* standard.  Mot. at 9.  According to the City, these "requisite" indicia include whether members (1) elect Coalition's leadership, (2) serve as Coalition's leadership, and (3) finance Coalition's activities, including the costs of litigation.  *Id.* (citing *Hunt*, 432 U.S. at 344-45).  The City argues that neither the organization nor its members are funding the case, the board of directors decided to bring this lawsuit and the board did not include any unhoused members, staff rather than unhoused members carry out Coalition's activities, and membership is ill-defined and many members are unaware of having any control over the organization.  *Id.*

9

United States District Court
Northern District of California

1    The court rejects the City's argument as "overly formalistic."  *Mink*, 322 F.3d at 1110.

2    Plaintiffs have submitted evidence supporting Coalition's associational standing to prosecute claims

3    in its representative capacity.

4    "In applying *Hunt*, [the Ninth Circuit] ha[s] not required *all* [the indicia of membership

5    enumerated in *Hunt*,] so long as 'the organization is sufficiently identified with and subject to the

6    influence of those it seeks to represent as to have a personal stake in the outcome of the

7    controversy.'" *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021) (quoting *Mink*,

8    322 F.3d at 1111; emphasis in original; additional citation omitted).  *Mink* found that nonprofit

9    Oregon Advocacy Center ("OAC") had associational standing even though it did not have a

10   membership structure because it "serve[d] a specialized segment of Oregon's community: the

11   disabled in general, including the mentally ill and, more specifically, incapacitated criminal

12   defendants.  Those groups [we]re the primary beneficiaries of OAC's activities, 'including the

13   prosecution of this kind of litigation.'" *Mink*, 322 F.3d at 1111 (quoting *Hunt*, 432 U.S. at 344).[10]

14   Drawing on *Mink*, *America Unites for Kids* found that nonprofit PEER, a group whose

15   organizational structure did not allow for membership, similarly had associational standing because

16   it "serve[d] a 'specialized segment' of the community: public employees concerned about exposure

17   to environmental risk at work," one of whom had submitted a declaration as "a supporter of PEER."

18   985 F.3d at 1096-97.  The court noted that the "close connection between PEER's mission and the

19   interests of its non-member teachers [wa]s enough to give the organization a personal stake in the

20   outcome of th[e] lawsuit." *Id.* at 1097.  "The ultimate consideration when determining whether an

21   organization has associational standing is whether it has a 'personal stake in the outcome of the

22   controversy.'" *Id.* (quoting *OAC*, 322 F.3d at 111); *see also La Asociacion De Trabajadores De*

23   *Lake Forest ("ALTF") v. City of Lake Forest*, No. 07-cv-250 DOC (ANx), 2008 WL 11411732,

24   at *4 (C.D. Cal. Aug. 18, 2008) (unincorporated association of day laborers had associational

25   standing even with amorphous structure, no address or phone number, no elected leadership or

---

[10] The City tries to distinguish *Mink* as a "representative suit[] requir[ing] statutory authority" where "Congress authorized, funded, and intended to confer standing." Reply at 6.  This ignores that *Mink* found that the statute "although relevant to the standing analysis—[did] not definitively answer the question whether OAC has standing" under Article III.  *Mink*, 332 F.3d at 1110.

10

1    governing body, no membership paperwork, and informal meetings held on street corners where

2    day laborers gather; court noted that day laborer activities "can, by their very nature, lead to

3    amorphous group definitions," and found that plaintiffs had shown actual membership, activities

4    and participation by members in working toward a common purpose.).

5          In this case, Coalition clearly has a "personal stake in the outcome" of this case, and plainly

6    serves a "specialized segment" of the community – namely, unhoused individuals living in San

7    Francisco.  There is a "close connection" between Coalition's mission and the interests of unhoused

8    individuals in San Francisco.  Coalition is a decades-old nonprofit chiefly concerned with

9    homelessness issues and "defines membership as people who are actively involved in [its] work[,]"

10   which includes individuals "coming to meetings, selling Street Sheets, . . . and acting as informants

11   out on the street . . . , folks who act as spokespersons in – with members of the media and in meetings

12   with policymakers in public hearings."  Talla Decl. Ex. 1 (Coalition 30(b)(6)) at 27:5-13, 50:6-22;

13   *see* Talla Decl. Ex. 136 (6/8/22 Friedenbach Decl.) ¶ 7 ("The Coalition defines active membership

14   as regular participation in Coalition meetings or volunteering activities.").[11]

15         Coalition has a "bottom up" structure that is deliberately informal, where unhoused people's

16   needs "direct[] [the organization's] advocacy agenda," and organizational processes such as the

17   working group on the board of directors, are open to members.  Talla Decl. Ex. 1 (Coalition

18   30(b)(6)) at 79:12-20.  Half of its board has lived experience with homelessness.  *Id.* at 80:21-81:1;

19   *see also* Talla Decl. Ex 136 (6/8/22 Friedenbach Decl.) ¶ 6 ("Our members are comprised almost

20   entirely of unhoused people or people with lived experience who supervise, direct, and lead the

21   Coalition's work.").

22         Plaintiffs Cronk and Donohoe have been Coalition members since prior to the lawsuit.

23   Cronk identifies as being a member since 2021 when she started "[d]oing specific volunteer work

24   with the people that [she] knew that were official members."  Talla Decl. Ex. 2 (Cronk) at 100:11-

25

26   ─────────────────────
     [11] As explained by Coalition's Executive Director and Rule 30(b)(6) designee, due to the nature of
27   Coalition's membership, "people kind of fluctuate from active involvement to not active.  And so I
     think that's a better differentiation is thinking about, you know, active members . . . . [C]ertainly
28   someone can communicate, hey, I don't want anything to do with you all, or someone moves away.
     Then they would no longer be a member."  Talla Decl. Ex. 1 (Coalition 30(b)(6)) at 75:1-9.

1    22.  Donohoe testified that he became a Coalition member in 2020 "[b]ecause [he has] done many

2    outreach things for [Coalition.]"  Talla Decl. Ex. 6 (Donohoe) at 199:2-9, 199:17-19.

3        These indicia of membership are sufficient to support associational standing under the *Hunt*

4    inquiry.  The evidence demonstrates that even though Coalition has an informal and amorphous

5    membership structure, it in fact has members, activities, and people working toward common

6    organizational goals, and the "primary beneficiaries" of its work and this litigation are the legions

7    of unhoused San Franciscans, whether those individuals are members or not.

8        The cases cited by the City are inapposite.  In *Hindu American Foundation v. Kish*, No. 22-

9    cv-01656-DAD-JDP, 2023 WL 5629296, at *6 (E.D. Cal. Aug. 31, 2023), an advocacy group

10   purporting to represent "all Hindu Americans" and "all Americans of faith" did not have

11   associational standing because it sought to represent "a constituency significantly larger and more

12   diffuse than those found appropriate" in other cases.  In *National Association of Consumer*

13   *Advocates v. Gemini Trust Co.*, No. 24-2356-JDB, 2024 WL 4817122, at *2-3 (D.D.C.

14   Nov. 18, 2024), the court granted plaintiff NACA's motion to remand for lack of subject matter

15   jurisdiction.  NACA itself did not assert associational standing.  Instead, defendant Gemini tried to

16   argue the existence of NACA's Article III associational standing to support Gemini's bid to keep

17   the case in federal court.  The court rejected Gemini's attempt to assert that NACA represented the

18   interests of "D.C. residents who use Gemini," because NACA's actual members were "consumer

19   protection lawyers and advocates scattered across the country."[12]  *Id.* at *2.

---

21   [12] The City also argues, without legal support, that Coalition must show it had prior consent in order
22   to assert claims on behalf of its members.  Mot. at 11.  The City points to two cases, both off-point.
     In *Natural Resources Defense Council, Inc. v. U.S. E.P.A.*, 507 F.2d 905, 910 (9th Cir. 1974), the
     court applied a different and more stringent standard for standing based on an enabling statute for
23   review of EPA decision-making.  With respect to the district court ruling in *National Coalition*
     *Government of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 344 n.16 (C.D. Cal. 1997), the City
24   misleadingly quotes a summary of the defendant's argument.  Moreover, the City fails to
     acknowledge the court was ruling on the third (not first) prong of *Hunt*.

26   Although Coalition does not have a formal legal agreement with its members to represent them in
     this lawsuit, (Mills Decl. Ex. 5 (Coalition 30(b)(6)) at 84:16-86:1), it was "hearing from [its]
27   members" that it needed to do something about "property confiscation," "[a]nd many brought up
     the idea of doing a lawsuit."  *Id.* at 103:5-9.  Coalition also testified that its "members had input
28   on . . . bringing up [the] issue" of whether to pursue a lawsuit for damages.  *Id.* at 102:10-103:21.
     The City's hearsay objection to this testimony is overruled because it is offered to support

United States District Court
Northern District of California

1        Next, the City argues Coalition cannot establish associational standing because no individual

2  member has demonstrated standing.  Mot. at 11-13.  Coalition "must show that a member suffers an

3  injury-in-fact that is traceable to the defendant and likely to be redressed by a favorable decision."

4  *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp*., 713 F.3d

5  1187, 1194 (9th Cir. 2013) (citations omitted).  Plaintiffs first respond that "[e]ven at summary

6  judgment, no 'particular injured members [need be identified] by name,' so long as 'it is clear and

7  not speculative that a member of a group will be adversely affected.'"  Opp'n at 17 (quoting *Mi*

8  *Familia Vota v. Fontes*, 129 F.4th 691, 708 (9th Cir. 2025)); citing *Nat'l Council of La Raza v.*

9  *Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015); *Freedom From Religion Found., Inc. v. Weber*, 951

10  F. Supp. 2d 1123, 1131 (D. Mont. 2013).

11        Citing *National Council of La Raza*, this court previously concluded that, even without

12  considering allegations about the experiences of individual members, Coalition adequately pleaded

13  associational standing because it is "'relatively clear, rather than merely speculative, that one or

14  more members have been or will be adversely affected by a defendant's action.'"  Order re Motion

15  to Dismiss SAC at 9-11 (quoting *Nat'l Council of La Raza*, 800 F.3d 1032, 1041 (9th Cir. 2015)).]

16  The Ninth Circuit subsequently issued *Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025),

17  which provides further support.  In *Mi Familia Vota*, the court reviewed the district court's rulings

18  on the merits of eight consolidated cases challenging two Arizona laws regulating voter registration,

19  including one that permitted the county recorder to perform a citizenship check if it had reason to

20  believe a registered voter was not in fact a citizen.  129 F.4th at 701.  The Ninth Circuit affirmed

21  the associational standing of Promise Arizona, an organization whose membership includes

22  naturalized citizens.  *Id.* at 708-09.  In so holding, the court held that "[b]ecause one or more

23  members of Promise America may be adversely affected by [the voter law at issue] and the State

24  does not need to know the identity of a particular member to respond to Promise America's claim

25  of injury, Promise America need not identify by name its members who would be injured [by the

26  voter law] absent the injunction," reaffirming *National Council of La Raza*.  *Mi Familia Vota*, 129

27

28
        Coalition's understanding of its members' support of the lawsuit.

F.4th at 709.

Here, the outcome is no different at summary judgment than it was at the pleadings stage. As discussed above, Coalition has a decades-long history of representing the interests of unhoused individuals in the City and County of San Francisco. As noted above, thousands of San Franciscans have experienced homelessness in recent years—as many as 8,035 persons in 2019 and 7,754 in 2022—and the City lacks adequate housing or shelters for them. [Docket No. 9-7 at ECF pp.8, 12, 17.] No party has offered evidence that the City is on track to reduce those numbers so as to render Coalition's services for the unhoused unnecessary any time in the near future. Plaintiffs are challenging the City's alleged custom and practice of seizing and destroying the property of unhoused individuals without a warrant or due process. They offer sufficient evidence to support their claims for municipal liability and to defeat summary judgment, as discussed below. Under these circumstances, it is clear and not speculative that the City's alleged systemic conduct, if proven true, adversely affects unhoused individuals who may not be actively involved with Coalition's work but whose property rights have been injured by the challenged conduct.

### ii.  Member with Individual Standing

In any event, there is sufficient evidence that at least one Coalition member has Article III standing to support Coalition's associational standing. To satisfy Article III, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (citing *Lujan*, 504 U.S. at 560-61).

At the hearing, Coalition identified Melodie as the "strongest" example. [Docket No. 383 (5/8/25 Hr'g Tr.) at 37:1-11, 37:23-38:11.] The court finds there is sufficient evidence to support Melodie's standing, which in turn supports Coalition's associational standing.

First, Plaintiffs submitted evidence that Melodie is a Coalition member and has been since 2008, when she began attending meetings. Talla Decl. Ex. 105 (Melodie Decl.) ¶ 3; Talla Decl. Ex. 14 (Melodie) at 53:5-6, 121:11-19; Talla Decl. Ex. 1 (Coalition 30(b)(6)) at 131:6-10 (Melodie has been a Coalition member for "at least a decade or more"); *id.* at 132:1-5 ("Q. What actions was she taking at that time that made her a member? A. She was coming to meetings. She was going to

14

1    hearings, mostly at the SFMTA. And she was -- I believe she might have been meeting with some

2    policymakers.").  She has volunteered with "Coalition to fight parking restrictions on streets where

3    unhoused people park[,]" including by "calling the Coalition to tell them about these parking

4    restrictions[.]"   Talla Decl. Ex. 105 (Melodie Decl.) ¶¶ 4-5.   Melodie has also attended and

5    participated in more than a dozen in Human Rights Working Group meetings.  Talla Decl. Ex. 14

6    (Melodie) at 123:5-9; Talla Decl. Ex. 1 (Coalition 30(b)(6)) at 132:6-12.

7        Second, Melodie has suffered an injury-in-fact that is traceable to the City and that is

8    "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*,

9    578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).   "For an injury to be 'particularized,' it 'must

10   affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1) "A

11   'concrete' injury must be "*de facto*"; that is, it must actually exist." *Id.* at 340 (citation omitted).

12       Plaintiffs offer Melodie's deposition testimony as a concrete instance of the City

13   confiscating her attended property.  Specifically, on July 16, 2024, DPW took her plastic boxes "that

14   were folded and leaned against the chain link fence" despite the fact that she told them that "that's

15   my stuff."  Talla Decl. Ex. 14 (Melodie) at 75:1-76:17; *see also* Talla Decl. Ex. 105 (Melodie Decl.)

16   ¶ 6 ("At one HSOC sweep approximately two months ago, City workers took some storage boxes

17   that I had outside my RV and that I was planning to use to organize my things.").  Melodie further

18   testified that she continues to live on the streets of San Francisco in two RVs and that she leaves her

19   items outside the vehicles.  Talla Decl. Ex. 14 (Melodie) at 33:4-10, 34:22-35:4, 35:14-36:11, 41:15-

20   42:3.

21       An unconstitutional seizure of Melodie's property obviously and inherently affects her in a

22   "personal and individual way": it deprives her of the use of her belongings.  In addition, Melodie

23   suffers from a brain injury.  Talla Decl. Ex. 105 (Melodie Decl.) ¶ 2. "The City's sweeps make [her]

24   disability worse" and "make [her] wish [she] was dead."  *Id.* ¶ 7.  Due to her injury, the sweeps

25   cause "her brain [to] get[] flooded and [she] cannot function."  *Id.*

26       Third, Melodie's injury is "likely to be redressed by a favorable judicial decision." *Spokeo*,

27   578 U.S. at 338.  Enjoining the City from improperly taking and disposing of unabandoned property

28   such as Melodie's, and requiring the City to take steps to ensure the implementation of the bag and

15

tag policy comports with the Fourth and Fourteenth Amendments, would redress Melodie's claim.

Lastly, Melodie's deposition testimony shows she has been living on the streets of San Francisco since 2018, including as of September 27, 2022 when the Complaint was filed. *See* Talla Decl. Ex. 14 (Melodie) at 35:14-36:4; *Lujan*, 504 U.S. at 571 n.5 ("[S]tanding is to be determined as of the commencement of suit[.]").  Neither the City's contention that Melodie lacks standing because she lives in her vehicles, nor the City's attempt to distinguish "vehicularly unhoused" persons from unhoused individuals, is persuasive. *See* Mot. at 13.  The City is incorrect that "the [operative third amended complaint ('TAC')] does not concern the vehicularly unhoused."  Mot. at 25.  In fact, the TAC (as well as all prior iterations of the complaint) defines "'homeless' to encompass persons who are both 'unhoused,' that is without a fixed residence, and 'unsheltered,' that is both unhoused and without physical shelter."  TAC ¶ 1 n.1.  Living in a vehicle on the street hardly qualifies as living in a "fixed residence."  As noted above, Melodie testified that she has left her belongings outside of her vehicles, and that such items have been unlawfully taken by the City.  Talla Decl. Ex. 14 (Melodie) at 75:1-76:17; *see also* Talla Decl. Ex. 105 (Melodie Decl.) ¶ 6.

Accordingly, the court finds there is sufficient evidence to conclude that Melodie has individual Article III standing, which supports Coalition's associational standing.[13]

### b.    *Hunt*'s Third Prong

As to *Hunt's* third prong, the City argues that the nature of Plaintiffs' claims and requested relief "requires the participation of individual members in the lawsuit."  Mot. at 14.

The third prong of the associational standing test is prudential rather than constitutional. *Mink*, 322 F.3d at 1109.  It is "best seen as focusing on . . . matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *United Food & Comm. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996).

---

[13] Coalition also contends that Sarah Cronk, Joshua Donahoe, David Martinez, Todd Bryant, and Shyhyene Brown are members who have standing.  Opp'n at 17-19.  Because the court has determined that Melodie has standing, it does not (and need not) evaluate standing as to the other identified members of Coalition here, but does address further below Cronk and Donohoe's standing as individual plaintiffs.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (associational standing requires "*at least one identified member* [who] had suffered or would suffer harm") (emphasis added).

United States District Court
Northern District of California

16

Thus, "individual participation is not normally necessary when an association seeks prospective or injunctive relief for its members[.]" *Id.* at 546 (cleaned up); *see also Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001) (finding third prong satisfied where plaintiff "request[ed] only injunctive and declaratory relief"); *Associated Gen. Contractors v. Metro. Water Dist. of S. Cal.*, 159 F.3d 1178, 1181 (9th Cir. 1998) ("Individualized proof from the members is not needed where, as here, declaratory and injunctive relief is sought rather than monetary damages.") (citation omitted).

The court already held that Coalition has satisfied the third prong of the *Hunt* standard. Order re Motion to Dismiss SAC at 11-12.[14] Plaintiffs have explained that they intend to offer trial testimony from some Coalition staffers, members, and other unhoused individuals, as well as the testimony of city workers and experts to support their claims of systemic municipal liability. *See* 5/8/25 Hr'g Tr. at 59:3-61:4. It remains true that the case will not require the participation of all Coalition members because Plaintiffs seek only declaratory and injunctive relief, rather than monetary relief requiring individual proof of damages. *See Columbia Basin Apartment Ass'n*, 268 F.3d at 799 ("Appellants request only injunctive and declaratory relief. Because these forms of relief do not require individualized proof, the third prong of the *Hunt* test is satisfied.") (citation omitted).

The City now asserts that the case will require the participation of individual members because Plaintiffs bear the burden of establishing the absence of lawful exceptions to the Fourth Amendment's warrant requirement that allow seizure of property.[15] Mot. at 14. This is incorrect. In fact, at the May 8, 2025 hearing, the parties agreed that while Plaintiffs ultimately bear the burden of proving the existence of a Fourth Amendment violation, the onus is on the City to demonstrate

---

[14] The City rehashes its previously rejected legal argument that Coalition does not have associational standing for § 1983 claims because an organization cannot assert the personal constitutional rights of its members. The court explained the basis for its ruling. Order re Motion to Dismiss SAC at 12-13. No intervening authority has changed the analysis, and there is no reason for the court to depart from its prior conclusion. "Even in the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth v. Seldin*¸ 422 U.S. 490, 511 (1975); *see also Am. Unites for Kids*, 985 F.3d at 1096 (following *Warth*).

[15] The City focuses only on the Fourth Amendment claim and does not address the Fourteenth Amendment with respect to the third prong of *Hunt*. *See* Mot. at 14-15.

1   the applicability of an exception to the Fourth Amendment's prohibition on warrantless seizures.

2   5/8/25 Hr'g Tr. at 53:11-58:25; *see California v. Acevedo*, 500 U.S. 565, 590 n.5 (1991) ("Because

3   each exception to the warrant requirement invariably impinges to some extent on the protective

4   purpose of the Fourth Amendment, the few situations in which a search may be conducted in the

5   absence of a warrant have been carefully delineated and the burden is on those seeking the

6   exemption to show the need for it.") (cleaned up).

7       In sum, the trial will not require the participation of Coalition's individual members.

8   Coalition satisfies the *Hunt* requirements and has associational standing to proceed to trial.

9           **2.     Individual Plaintiffs Cronk and Donohoe**

10      Because Coalition has established associational standing to proceed to trial, the court need

11  not analyze the individual Plaintiffs' standing for Coalition's purposes.   *See Nat'l Ass'n of*

12  *Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) ("As a

13  general rule, in an injunctive case [a] court need not address standing of each plaintiff if it concludes

14  that one plaintiff has standing.") (citing *Preminger v. Peake*, 552 F.3d 757, 764 (9th Cir. 2008)).

15  The court now considers whether Cronk and Donohoe have standing to assert their claims as

16  individuals.

17          **a.     Standing**

18      Injunctive relief "is unavailable absent a showing of irreparable injury, a requirement that

19  cannot be met where there is no showing of any real or immediate threat that the plaintiff will be

20  wronged again—a 'likelihood of substantial and immediate irreparable injury.'"   *City of Los*

21  *Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)).

22  "A plaintiff seeking prospective injunctive relief must demonstrate that he is realistically threatened

23  by a repetition of the violation."  *Nordstrom v. Ryan*, 762 F.3d 903, 911 (9th Cir. 2014) (cleaned

24  up).  A threat of repetition may be shown by "demonstrat[ing] that the harm is part of a pattern of

25  officially sanctioned behavior, violative of the plaintiffs' federal rights."  *Id.* (cleaned up).

26      The City argues that Cronk and Donohoe lack standing to pursue their claims for injunctive

27  and declaratory relief because any danger that their property would be unlawfully destroyed was

28  merely speculative when the lawsuit was filed in September 2022.  Mot. at 5-8.  The City further

United States District Court
Northern District of California

18

1   contends that, to the extent there was any risk of improper destruction, it was due to Cronk's and

2   Donohoe's decisions to remain "voluntarily" unhoused and to engage in illegal activities. *Id.* at 6-

3   7; *see* Reply at 3 ("Cronk and Donohoe lack standing because their claimed injury relies on engaging

4   in illegal lodging.").

5                   **i.    Injury**

6           According to the City, any injury—that is, property destruction—to Plaintiffs is speculative

7   because there is no evidence that "the claimed threat of unlawful property destruction was 'certainly

8   impending' in September 2022." Mot. at 6-7 (citation omitted). The City further argues that any

9   theory that the City may unconstitutionally destroy Cronk and Donohoe's property "is based entirely

10  on [an] unwarranted assumption" that they will be unhoused in the future. *Id.* at 6. In response,

11  Plaintiffs present evidence to support that, not only has the City unlawfully destroyed Cronk's and

12  Donohoe's property on several occasions both prior to and after the filing of this lawsuit, it is likely

13  to do so again in the future.

14          Cronk testified that she experienced at least 30 encampment closures in the five years leading

15  up to her September 2024 deposition. Talla Decl. Ex. 2 (Cronk) at 165:1-5; *see id.* at 168:1-25,

16  174:20-176:4, 176:8-177:12, 178:21-180:13, 181:2-182:9, 183:9-185:15, 188:9-25, 197:9-204:3.

17  She believed her property was "wrongly destroyed" in "[a]t least half" of them. *Id.* at 165:12-18.

18  Donohoe testified that, "[b]etween 2018 and the time that [he] w[as] no longer living on the streets

19  of San Francisco[,]" his property was destroyed more than 50 times in an encampment closure and,

20  in 2018 and 2019, at approximately once a month. Talla Decl. Ex. 6 (Donohoe) at 137:11-138:22.

21          There is evidence that Cronk and Donohoe continued to have their property confiscated by

22  the City in the months leading up to the filing of the lawsuit. Cronk testified that in February 2022,

23  the City conducted a sweep in which "they picked up specific items that were ours that were not

24  trash[,]" such as "pots and pans, our boots, [and] our tarp." Talla Decl. Ex. 2 (Cronk) at 200:14-

25  204:3. She was not given notice to move her belongings before the City started throwing them

26  away. *Id.* at 203:14-24.

27          In April 2022, Cronk witnessed DPW employees "trash[ing]" Donohoe's laptop along with

28  their tents, even though she and Donohoe were present. *Id.* at 109:7-110:24. Both Cronk's and

                                                    19

United States District Court
Northern District of California

1   Donohoe's request that the employees not take the computer away were ignored.  *Id.* at 110:25-

2   111:7.  They were not given an opportunity to gather their belongings, nor were they previously

3   informed that the City would be cleaning their street that day.  *Id.* at 111:16-112:16.

4       During a cleaning on June 23, 2022, a HOT team destroyed Donohoe's clothing, including

5   jackets, a hat, tee shirts, underwear, and socks, even though Donohoe was present and told them not

6   to take his belongings.  Talla Decl. Ex. 6 (Donohoe) at 187:12-191:6.

7       Donohoe also testified that in August 2022, DPW collected his "two tents, laptop, art

8   supplies, a cell phone, tools, clothes, [and] food," even though a friend was watching the items for

9   Donohoe.  *Id.* at 99:16-102:25.

10      On September 12, 2022, Donohoe witnessed DPW taking his clothing, blankets, "warm

11  stuff . . . to stay warm at night," and non-perishable food, even though he "stood [his] ground" and

12  "continued to say, you can't take my stuff."  *Id.* at 212:21-214:5.  Donohoe testified there were no

13  rodents or ants at his encampment.  *Id.* at 214:10-21.

14      There is also evidence that Cronk and Donohoe continued to have their property destroyed

15  after the lawsuit was filed.  In January 2023, DPW took another laptop that was "inside [his] tent,

16  inside of a backpack" even though a person named Manny was watching it at Donohoe's request.

17  *Id.* at 119:13-124:14.  Donohoe testified that, in April 2023, DPW took backpacks that he had left

18  with a friend, Krystal.  *Id.* at 170:22-172:18, 173:20-174:9.[16]

19

20  ───────────────

21  [16] The City makes a hearsay objection regarding several of the incidents (August 2022, January 2023, and April 2023).  Reply at 15 n.18.  The Ninth Circuit has clarified that at the summary judgment stage, the focus is not on the "admissibility of the evidence's form," but rather on the "admissibility of its contents."  *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (citing cases); *see also JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("[A]t summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony," citing *Fraser*).  Accordingly, district courts in this circuit have routinely overruled authentication and hearsay challenges at the summary stage where the evidence could be presented in an admissible form at trial, following Fraser.  *See, e.g.*, *Lawrence v. City & Cty. of San Francisco*, 258 F. Supp. 3d 977, 986 (N.D. Cal. 2017) (overruling objections to admissibility of police reports on authentication and hearsay grounds at summary judgment because the contents of the report "may be presented in an admissible form at trial"); *Faulks v. Wells Fargo & Co.*, 231 F. Supp. 3d 387, 397-98 (N.D. Cal. 2017) (overruling objections to admissibility of exhibit at summary judgment because "it is possible that the facts underlying [the exhibit] could be admissible at trial").  In this case, the determination of whether the challenged hearsay evidence ultimately can be offered in admissible form is more prudently reserved for trial.

Cronk and Donohoe's evidence about the City's repeated seizures of their property, combined with the testimony of others regarding similar and recent incidents, the testimony of City workers, and the expert opinions described further below, provide evidentiary support for Cronk and Donohoe's standing to seek injunctive relief. A reasonable fact finder could determine that this body of evidence demonstrates that Cronk and Donohoe are "realistically threatened by a repetition" that "is part of a pattern of officially sanctioned behavior, violative of [their] federal rights." *Nordstrom*, 762 F.3d at 911 (cleaned up; emphasis omitted).

The City argues there is no risk of future harm because Cronk and Donohoe are "voluntarily homeless," as Cronk and Donohoe have had access to shelter to which they have either availed themselves or chose to turn down. Mot. at 7; *see* Locher Decl. ¶ 6(b) ("Sarah Cronk . . . was registered in Emergency Shelter between March 16, 2022 and June 13, 2022, and January 5, 2023 and July 19, 2023, and Transitional Housing between December 5, 2023 and September 30, 2024."); *id.* ¶ 6(c) ("Joshua Donohoe was in Emergency Shelter between February 2, 2023 and April 1, 2023, and Transitional Housing between December 6, 2023 and September 30, 2024. Mr. Donohoe has been in Permanent Housing from October 1, 2024 through [February 14, 2025].").

However, Plaintiffs present evidence that for years, and for reasons beyond their choice, Cronk and Donohoe have repeatedly cycled between unsheltered homelessness and being sheltered. This evidence reasonably could lend support to a finding of a substantial likelihood that they are at risk of future injury absent an injunction. Cronk has spent more than a decade alternating between living in a shelter or temporary housing and experiencing homelessness. Talla Decl. Ex. 2 (Cronk) at 38:3-6 (Cronk testifying that she first became homeless in the 2008-2009 timeframe); Talla Decl. Ex. 120 (9/5/24 Cronk Decl.) ¶ 4 ("[T]he last time I had stable housing was in 2012, when I lived in housing provided by the city, and between then and January 2023 I was unsheltered.").

The record contains facts supporting that Cronk left shelters or housing due to circumstances beyond her control. For instance, she testified that in 2014, she left subsidized housing because "[t]he program changed from permanent housing to temporary housing, and people with leases were basically told they had to leave after a certain period of time." Talla Decl. Ex. 2 (Cronk) at 41:8-13. Cronk also testified that a lack of available beds and shelter restrictions or inadequacies

precluded her and Donohoe from availing themselves of such accommodations.  In 2021, she "tried to see if there was shelter available through an outreach team.  They said there were no beds at the time."  Talla Decl. Ex. 2 (Cronk) at 70:17-19.  In another instance, she and Donohoe declined City-provided shelter because they "were only allowed to take . . . [a total of] two bags with [them]" and the City "w[as] threatening to throw away all of [their] belongings if [they] left the area.  *Id.* at 67:10-68:16.  Cronk has epilepsy, which requires that she have "a railing or . . . place to sit down" when she takes a shower and makes it "difficult" for her to follow "time limits and things like that."  *Id.* at 71:20-25.  At a navigation center in 2019, she "was harassed while [she] was in the shower for taking too long . . . even though . . . nobody was waiting for the shower" and was eventually asked to leave.  *Id.* at 72:23-73:8.

Donohoe has been homeless in San Francisco since 2014.  Talla Decl. Ex. 6 (Donohoe) at 56:17-22.  Although he too has at times had access to shelter, it has been intermittent.  Donohoe and Cronk began living on the streets together in April 2022.  Mills Decl. Ex. 2 (Donohoe) at 36:17-24, 37:19-23.  In January 2023, he and Donohoe lived at an SIP hotel.  *Id.* at 61:9-17.  But he became homeless again between February 2023 until July 2023—a period that ended only when he was picked up by police on a warrant.  Talla Decl. Ex. 6 (Donohoe) at 65:7-25.

Although Cronk and Donohoe were living in subsidized housing at Parkmerced at the time of their depositions in September and November 2024, respectively, there is evidence from which a reasonable fact finder could conclude that their ability to stay there remains tenuous.  To live at Parkmerced, they are required to have a "[s]teady source of income," pay monthly rent of 30% of their monthly income, and also pay into a savings account.  Mills Decl. Ex. 2 (Donohoe) at 44:14-45:3; Talla Decl. Ex. 2 (Cronk) at 65:1-21.  As of September 26, 2024, Donohoe was working, but Cronk was not because she had to care for their young daughter.  Talla Decl. Ex. 119 (9/26/24 Donohoe Decl.) ¶¶ 7, 9; Talla Decl. Ex. 120 (9/26/24 Cronk Decl.) ¶¶ 7, 9.  As the sole source of income, Cronk and Donohoe's ability to remain housed is entirely dependent on Donohoe's ability to work.  If Donohoe were to lose his job, they would have to pay the full monthly rent of $3,300.  Talla Decl. Ex. 119 (9/26/24 Donohoe Decl.) ¶ 7; Talla Decl. Ex. 120 (9/26/24 Cronk Decl.) ¶ 7.  Cronk explained she was "currently not employed, and [was] relying on [Donahoe]'s income.

[Their] benefits from the city end in October [2024]. And if [Donohoe] loses his job, [they] will not have income." Talla Decl. Ex. 2 (Cronk) at 66:9-13; *see* Talla Decl. Ex. 119 (9/26/24 Donohoe Decl.) ¶ 9 ("I am afraid that if I am injured, lose my job, or if my hours are cut at work during the off season, then we will lose our subsidy or otherwise be unable to afford our rent and would be evicted."). While they have recently experienced a modicum of stability, both Cronk and Donohoe believe there is a very real possibility they could become homeless again. Talla Decl. Ex. 6 (Donohoe) at 170:11-14 ("I don't like thinking about the possibility of becoming homeless . . . even though I'm . . . definitely not that far away from it."); Talla Decl. Ex. 120 (9/26/24 Cronk Decl.) ¶ 6 ("Based on my personal experiences, I believe that there is a significant possibility that we could end up back on the streets in our future.").

Cronk's and Donohoe's testimony about their experiences of cycling between living on the street, in shelters, and in supportive housing is consistent with the findings of Plaintiffs' expert, Dr. Christopher Herring. *See* Herring Decl. Ex. 1 (Herring Rep.) at 57-62. Dr. Herring opines that "[r]esearch and the city's own data indicates that most of those currently experiencing both unsheltered homelessness, and homelessness in general within the city do so episodically, and that high percentages of those both in shelter and permanent supportive housing exit and return to homelessness." *Id.* at 57. According to a survey he conducted of 584 unhoused San Franciscans, "15% had been sheltered at some point in the last month, nearly 40% had utilized shelter in the past year, and 81% had either used or tried to access shelter in the past." *Id.* at 58. Moreover, the majority of them had spent less than a year in a shelter. *Id.* ("[O]nly 27% reported that they resided in shelter for the full year. 29% reported for staying less than a month, 22% 1-5 months, and 22% for 6-11 months.") (citation omitted). Finally, as discussed below, Plaintiffs have proffered evidence of ongoing unlawful seizure and destruction of unhoused individuals' property by City workers.

The evidence of repeated instances of property deprivation and ongoing unlawful property seizures, coupled with the evidence that Cronk and Donohoe risk becoming unsheltered again, distinguish this case from those cited by Defendants – *Lyons* and *Hogders-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999). Mot. at 6. In both *Lyons* and *Hodgers-Durgin*, unlike here, the plaintiffs

had experienced a single alleged constitutional violation. The *Lyons* plaintiff had been subjected to a chokehold by police during a traffic stop, and sought an injunction barring use of such control holds. 461 U.S. at 98. As Lyons had no evidence of an immediate risk of being put in another chokehold, "[t]he speculative nature of Lyons' claim of future injury require[d] a finding that this prerequisite of equitable relief has not been fulfilled." *Id.* at 111.

In *Hodgers-Durgin*, the plaintiffs sought to represent a class to obtain an injunction prohibiting U.S. Border Patrol from conducting unreasonable seizures. 199 F.3d at 1039. The *en banc* Ninth Circuit held there was no basis for injunctive relief because it was unlikely that the two named plaintiffs would be stopped by Border Patrol agents again. *Id.* at 1044 ("Mr. Lopez drives between 400 and 500 miles a week and sees Border Patrol agents nearly every day. Ms. Hodgers–Durgin drives between Rio Rico and Nogales at least four or five times a week and sees Border Patrol agents 'all over the place' whenever she travels. Yet Mr. Lopez and Ms. Hodgers–Durgin were each stopped only once in 10 years."). Because there was no likelihood of future injury, the two plaintiffs lacked standing to seek injunctive relief. *Id.*

In sum, there are triable issues of fact regarding the injuries Cronk and Donohoe assert they have suffered, as well as whether they remain at substantial risk of immediate future harm.

### ii. Illegal Activities

The City also argues that Cronk and Donohoe lack standing because they have resided on public streets in contravention of various California laws and have used illegal drugs. *See* Mot. at 7. These issues do not affect their standing.

The fact that California Penal Code section 647(e) makes it a misdemeanor to "lodge[] in a building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it" is irrelevant to the standing inquiry. It is well-established that "homeless persons' unabandoned possessions are 'property' within the meaning of the Fourteenth Amendment, [and] the City must comport with the requirements of the Fourteenth Amendment's due process clause if it wishes to take and destroy them." *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1032 (9th Cir. 2012) *cert. denied*, 133 S. Ct. 2855 (2013). To that end, any seizure of Cronk or Donohoe's property must also comport with the Fourth Amendment.

1    *Id.* at 1029; *id.* at 1030 (noting that people also have "protected possessory interests even in

2    contraband") (citing *United States v. Jacobson*, 466 U.S. 109, 124-25 (1984)).

3         *Lavan* is factually similar to the case at hand.  There, the plaintiffs, nine unsheltered

4    individuals, argued that "[Los Angeles'] practice of summarily confiscating and destroying the

5    unabandoned possessions of homeless persons living on Skid Row violated the Fourth, Fifth, and

6    Fourteenth Amendments of the United States Constitution." *Lavan*, 693 F.3d at 1026.  On appeal,

7    Los Angeles argued that its "seizure and destruction of [the plaintiffs'] unabandoned property

8    implicates neither the Fourth nor the Fourteenth Amendment" because the plaintiffs "ha[d] no

9    legitimate expectation of privacy in property left unattended on a public sidewalk in violation of

10   LAMC § 56.11." *Id.* at 1027. The Ninth Circuit disagreed.  The court explained that a code violation

11   does not obviate the protections of the Fourth Amendment's reasonableness requirement.  *Id.*

12   at 1029 ("Even if we were to assume, as the City maintains, that Appellees violated LAMC § 56.11

13   by momentarily leaving their unabandoned property on Skid Row sidewalks, the seizure and

14   destruction of Appellees' property remains subject to the Fourth Amendment's reasonableness

15   requirement.  Violation of a City ordinance does not vitiate the Fourth Amendment's protection of

16   one's property. Were it otherwise, the government could seize and destroy any illegally parked car

17   or unlawfully unattended dog without implicating the Fourth Amendment.").

18        Similarly, the court held that "even if [the plaintiffs] had violated a city ordinance, their

19   previously-recognized property interest is not thereby eliminated" and, therefore, "due process

20   requires law enforcement to take reasonable steps to give notice that the property has been taken so

21   the owner can pursue available remedies for its return." *Id.* at 1032 (cleaned up).  "And even if

22   LAMC § 56.11 provided for forfeiture of property, . . . [Los Angeles] [wa]s required to provide

23   procedural protections before permanently depriving [the plaintiffs] of their possessions." *Id.*

24        Such is the case here—a violation of California Penal Code section 647(e) or possession and

25   use of illegal substances does not give the City permission to ignore the protections of the Fourth or

26   Fourteenth Amendments.  While it is undisputed that the destruction of hazardous materials and

27   contraband is constitutional, as set forth above, Cronk's and Donohoe's testimony is that the items

28   the City collected from them included non-hazardous materials that should have been bagged and

1    tagged rather than destroyed.  Factual disputes about this must be tried.  The use of illegal drugs, in

2    and of itself, is not grounds for the City to confiscate and destroy Cronk's and Donohoe's property

3    under the bag and tag policy.

### b.    Mootness

5         The City argues that Cronk's and Donohoe's claims are moot, as they  "have been housed

6    in City-funded programs for the vast duration of this case, confirming the lack of imminent harm at

7    the time of filing and that they could have avoided the harm they claim by accepting housing."  Mot.

8    at 7-8.  Plaintiffs contend that "[m]ootness exceptions . . . apply because the claims are 'capable of

9    repetition, yet evading review' and 'inherently transitory.'"  Opp'n at 24 (quoting *Pitts v. Terrible*

10   *Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011); additional citation omitted).

11        "Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies,'

12   and 'an actual controversy must exist not only at the time the complaint is filed, but through all

13   stages of the litigation.'"  *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 169 (2016)

14   (citation omitted).  However, under some circumstances, there is "an exception to the mootness

15   doctrine for a controversy that is 'capable of repetition, yet evading review.'"  *Id.* at 170 (citation

16   omitted).  "A dispute qualifies for that exception only if (1) the challenged action is in its duration

17   too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable

18   expectation that the same complaining party will be subjected to the same action again."  *United*

19   *States v. Sanchez-Gomez*, 584 U.S. 381, 391 (2018) (cleaned up).

20        Plaintiffs' evidence, which must be taken as true, is sufficient to demonstrate that their

21   claims are not moot, or that an exception to the mootness doctrine applies.  As discussed, on this

22   evidentiary record, a fact finder could determine that Cronk and Donohoe have experienced years

23   of cycles of homelessness, that they have suffered repeated instances of unlawful property seizure

24   and destruction, that the challenged unlawful practices are systemic and ongoing, and that Cronk

25   and Donohoe's currently sheltered status may well be temporary.  A reasonable trier of fact could

26   thus conclude there is a reasonable expectation that Cronk and/or Donohoe will again be homeless

27   and subjected to the challenged practices.

28

United States District Court
Northern District of California

26

United States District Court
Northern District of California

1    The City argues that the mootness exception cannot apply here because "there is no

2 'freestanding exception to mootness outside of the class action context.'"  Mot. at 12 n.9 (quoting

3 *Sanchez-Gomez*, 584 U.S. at 387); *see* Reply at 4-5.  The City overstates *Sanchez-Gomez*'s holding.

4 In that case, four individual plaintiffs—criminal defendants—sought to enjoin the U.S. Marshal for

5 Southern District of California's district-wide policy of placing all full restraints on all in-custody

6 defendants during nonjury proceedings.  *Sanchez-Gomez*, 584 U.S. at 383.  Although the plaintiffs

7 brought their claims on their own behalf only and not on behalf of a putative class, the Ninth Circuit

8 treated the action as a "functional class action" because the plaintiffs "sought relief from the restraint

9 policy not merely for themselves, but for all in-custody defendants in the district."  *Id.* at 387, 389.

10 In so doing, the Ninth Circuit applied *Gerstein v. Pugh*, 420 U.S. 103 (1975), and held that the

11 plaintiffs' claims were not moot.  *Sanchez-Gomez*, 584 U.S. at 387.

12    The Supreme Court held that this was in error.  *Id.* at 386-90.  The Court explained that

13 *Gerstein* "provides a limited exception to [the] requirement that a named plaintiff with a live claim

14 [must] exist at the time of class certification."  *Sanchez-Gomez*, 584 U.S. at 388.  Specifically, "[t]he

15 exception applies when the pace of litigation and the inherently transitory nature of the claims at

16 issue conspire to make that requirement difficult to fulfill."  *Id.* at 388 (citing *Sosna v. Iowa*, 419

17 U.S. 393, 402 n.11 (1975); *Gerstein*, 420 U.S. at 110-11, n.11).

18    The Court did not, however, limit this exception to *only* the class action context as the City

19 contends.  Indeed, the Court went on to analyze whether two of the individual plaintiffs' claims

20 "'f[e]ll within the exception to the mootness doctrine for a controversy that is capable of repetition,

21 yet evading review."  *Id.* at 391 (cleaned up).  The Court thus considered whether "there [wa]s a

22 reasonable expectation that the [plaintiffs would] be subjected to the same action again."  *Id.* at 391;

23 *see id.* (only considering second prong as the first prong of the exception analysis—whether "the

24 challenged action [wa]s in its duration too short to be fully litigated prior to its cessation or

25 expiration" was undisputed).  Rejecting the plaintiffs' argument that they may be arrested and

26 subjected to the full restraint policy again, the Court held that the two individual plaintiffs did not

27 qualify for the mootness exception.  *Id.* at 391-94.

28

1    The court therefore finds that the mootness exception analysis can apply here.[17]

2    Accordingly, the court finds that summary judgment is not appropriate on the issue of

3    mootness of Cronk and Donohoe's claims.[18]  Their individual claims may proceed to trial.

4    **B.    Availability of Equitable Relief**

5    The City argues that an injunction is not available here because Plaintiffs have not met their

6    burden of establishing the lack of an adequate remedy at law and cannot demonstrate immediate or

7    irreparable harm.  Mot. at 19-20; Reply at 11.  For a court to issue a permanent injunction, a plaintiff

8    must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as

9    monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance

10   of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

11   public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange,*

12   *L.L.C.*, 547 U.S. 388, 391 (2006).  The City does not challenge the third and fourth prongs.  *See*

13   Mot. at 19-20; Reply at 11.

14   **1.    Adequate Remedies at Law**

15   The court previously rejected the City's argument that Plaintiffs' injuries are redressable

16   with damages and distinguished the City's cited case, *Campbell v. Miller*, 373 F.3d 834, 835 (7th

17   Cir. 2004).  Order re Motion to Dismiss SAC at 26-27.  The City presents no new evidence or

18   argument; it merely asserts, in a conclusory fashion, that "the legality of a pattern and practice can

19   be determined in a suit for damages" (*id.*), but offers no explanation as to why this is so.  *See* Mot.

20

21   _____

[17] The City does not cite any binding precedent supporting the proposition that the mootness
22   exception only applies in the class action context, and the court is unaware of any.  *See* Mot. at 12
     n.9; Reply at 4-5 (citing *Ramirez v. U.S. Immigr. and Customs Enf't*, 338 F. Supp. 3d 1, 35 (D.D.C.
23   2018)).  On the other hand, the Ninth Circuit has applied the mootness exception analysis to
     individual plaintiffs, organizational plaintiffs, and government entities.  *See, e.g.*, *Dep't of Fish &*
24   *Game v. Fed. Subsistence Bd.*, 62 F.4th 1177, 1181 (9th Cir. 2023) (state met first, but not second,
     prong of mootness exception); *Where Do We Go Berkeley v. Cal. Dep't of Transportation*, 32 F.4th
25   852 (9th Cir. 2022) (mootness exception applied); *Rico v. Robertson*, No. 21-16880, 2022 WL
     17424331, at *1 (9th Cir. Dec. 6, 2022) (individual plaintiff's claims not capable of repetition).

26   [18] Because a reasonable trier of fact could determine that Cronk and Donohoe's claims are not moot,
27   the court does not address the parties' arguments about whether the claims of members who had
     standing at the time of filing that were subsequently mooted can support associational standing.  *See*
28   Mot. at 12; Reply at 7; 5/8/25 Hr'g Tr. at 12:15-17:3, 38:12-42:5.

1  at 20. The court already ruled on this issue. The City fails to present new information or theories

2  that compel a different outcome.

3  ### 2.   Irreparable Harm

4  At the May 8, 2025 hearing, the City argued that *Hodgers-Durgin* supports its position that

5  an injunction is not warranted because there is no evidence of future irreparable harm. 5/8/25 Hr'g

6  Tr. at 68:5-10. *Hodgers-Durgin* is factually distinguishable. As explained above, the Ninth Circuit

7  held that equitable relief was not available because "Mr. Lopez and Ms. Hodgers–Durgin ha[d] not

8  demonstrated a sufficient likelihood of injury to warrant equitable relief" because each had only

9  been stopped by Border Patrol agents only once in ten years, despite seeing agents "nearly every

10  day" or "all over the place." *Hodgers-Durgin*, 199 F.3d at 1044. That is not the case here, as there

11  is evidence from which a reasonable fact finder could conclude that Melodie, Cronk, and Donohoe

12  have each had their attended property collected and destroyed on multiple occasions and are likely

13  to continue to experience such seizures in the future.

14  Plaintiffs also present evidence of property injury suffered by individuals other than

15  Melodie, Cronk, and Donohoe to support their claim of systemic constitutional violations.

16  Numerous individuals, both housed and unhoused, testified that they had items taken, or witnessed

17  items being taken unlawfully by the City. *See, e.g.*, Talla Decl. Ex. 3 (Frank) at 173:2-12; Talla

18  Decl. Ex. 10 (Evans) at 179:20-181:5, 217:6-17; Talla Decl. Ex. 12 (Orona) at 163:1-12, 175:17-

19  177:10; Talla Decl. Ex. 13 (Bryant) at 120:15-121:4; Verner-Crist Decl. ¶¶ 3-175; Illa Decl. ¶¶ 2-

20  14; *see also* Herring Decl. Ex. 1 (Herring Rep.) at 10-45.

21  The City attempts to eliminate this body of evidence by arguing that Plaintiffs cannot rely

22  on "(1) new facts and declarations not properly disclosed, and (2) allegations of unlawful conduct

23  not identified as unlawful in written discovery" to support their contention that recent instances of

24  alleged violations are irreparable or imminent. Reply at 1-2, 11. Following the hearing and at the

25  court's request, the parties submitted a joint letter outlining the dispute in greater detail. [Docket

26  No. 387.]

27  The court disagrees with the City's contention that the facts with which it takes issue are

28  new and undisclosed, and that Plaintiffs were required to supplement their interrogatory responses.

United States District Court
Northern District of California

1    The City learned about all of their challenged facts through depositions and documents produced

2    during discovery.  *See id.* at 3-5.  Thus, pursuant to Federal Rule of Civil Procedure 26(e)(1),

3    Plaintiffs were not obligated to supplement their interrogatory responses to add these facts because

4    all of them were made known to Defendants through discovery.  "A party who has . . . responded to

5    an interrogatory, request for production, or request for admission—must supplement or correct

6    its . . . response . . . in a timely manner if the party learns that in some material respect the disclosure

7    or response is incomplete or incorrect, *and if the additional or corrective information has not*

8    *otherwise been made known to the other parties during the discovery process or in writing*[.]"  Fed.

9    R. Civ. P. 26(e)(1)(A) (emphasis added); *see Arroyo v. Int'l Paper Co.*, 611 F. Supp. 3d 824, 831

10    (N.D. Cal. 2020) ("There is also an affirmative obligation to supplement these initial disclosures 'in

11    a timely manner' if they become incomplete or incorrect.  Supplementation, however, is not

12    mandatory if the additional or corrective information has been made known to the other parties

13    during the discovery process or in writing.") (cleaned up).  The court therefore overrules the City's

14    objections to the Declarations of Dr. Christopher John Herring, Dylan Verner-Crist, and Lukas Illa.

15    *See* Reply at 1-2.  The court also notes that, although the parties' joint letter identifies several other

16    documents to which the City takes issue, the City's Reply only identifies the aforementioned

17    declarations.  *Compare* Docket No. 387 at 1 *with* Reply at 1-2; *see also* Civ. L.R. 7-3(c) ("Any

18    evidentiary and procedural objections to the opposition must be contained within the reply brief or

19    memorandum.").

20        In sum, Plaintiffs may seek injunctive and declaratory relief at trial.

21    **C.    Plaintiffs' Claims**

22        The City argues that the evidence does not support Plaintiffs' § 1983 claims for violations

23    of the Fourth and Fourteenth Amendments.[19]

24    _____

25    [19]  Defendants also challenge the parallel claims for violations of the California Constitution.  The
parties agree that the outcome of the state claims will be the same as the federal constitutional claims.

26    5/8/25 Hr'g Tr. at 6:11-16; Mot. at 21 n.16.  Accordingly, the court does not separately analyze the
merits of the state constitutional claims.

27    The City argues that any § 1983 claims relying on alleged violations before September 27, 2020 are
time-barred by the two-year statute of limitations.  Mot. at 22 (acknowledging that Cronk, Donohoe,

28    and Martinez have alleged timely violations).  Plaintiffs respond that property seizures prior to that

30

1    Section 1983 allows a plaintiff to pursue a claim against any person who, under color of state

2    law, deprives another of "any rights, privileges, or immunities secured by the Constitution and laws"

3    of the United States.  The statute "does not create any substantive rights, but is instead a vehicle by

4    which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local

5    officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (citation omitted).

6    A municipality may face § 1983 liability if it "'subjects' a person to a deprivation of rights

7    or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60

8    (2011) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978)).

9    However, the municipality may be held liable "only for '[its] *own* illegal acts.'" *Id.* (quoting

10   *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986); emphasis in original).  It cannot be held

11   vicariously liable for its employees' actions.  *Id.* (citations omitted).

### 1.    Fourth Amendment Claim

13   "The Fourth Amendment protects individuals from unreasonable government seizures of

14   their property, even when that property is stored in public areas." *Garcia v. City of Los Angeles*, 11

15   F.4th 1113, 1118 (9th Cir. 2021) (citing *Recchia v. City of Los Angeles Dep't of Animal Servs.*, 889

16   F.3d 553, 558 (9th Cir. 2018)); *see also Lavan*, 693 F.3d at 1030 (the Fourth Amendment protects

17   homeless individuals from seizure and summary destruction of their unabandoned but temporarily

18   unattended personal property).

### a.    Coalition's § 1983 Claim on Behalf of Members.

20   According to the City, Coalition cannot assert a Fourth Amendment claim because it has not

21   had any of its own property seized and because it is not permitted to bring a derivative claim based

22   on a Fourth Amendment violation.  Mot. at 20-21, 25.  As already noted, the court previously

23   addressed and rejected this argument.  Order re Motion to Dismiss SAC at 12-13.  The City largely

24   makes the same argument, but cites a new case, *Health & Hospital Corporation of Marion County*

25   *v. Talevski*, 599 U.S. 166, 177 (2023), for the proposition that the Supreme Court "'consistently

---

27   date are still admissible evidence of custom and deliberate indifference and point out that the City's
     cited cases do not involve pattern-or-practice allegations or seek injunctive relief.    Opp'n at 25 &
28   n.23.  The court agrees with both parties and will not consider incidents prior to September 27, 2020
     as predicate acts.

United States District Court
Northern District of California

1    refuse[s] to read § 1983's 'plain language' to mean anything other than what it says.'"  Mot. at 21

2    (alteration in original); *see id.* ("By its plain terms, Section 1983 only makes a defendant 'liable *to*

3    *the party injured'* by a 'deprivation of any rights, privileges, or immunities secured by the

4    Constitution and laws.'") (emphasis in original).

5        *Health & Hospital Corporation* did not involve associational standing or an alleged

6    constitutional violation.  Rather, the respondent sought to use § 1983 as a mechanism to enforce the

7    Federal Nursing Home Reform Act on behalf of her husband.  *Health & Hosp. Corp. of Marion*

8    *Cnty.*, 599 U.S. at 171.  The City cites no authority applying *Health & Hospital Corporation* to

9    cases such as this one, where an organization seeks to vindicate a constitutional violation on behalf

10   of its members.

11       As the court previously explained, the proposition that "Fourth Amendment rights are

12   personal rights which . . . may not be vicariously asserted," *Rakas v. Illinois*, 439 U.S. 128, 133–34

13   (1978), is not as stringent or straightforward as the City contends.  Order re Motion to Dismiss SAC

14   at 12-13.  While courts have held that an individual may not assert a § 1983 claim on behalf of

15   another individual, *see, e.g.*, *Alderman v. United States*, 394 U.S. 165, 174 (1969), the same

16   prohibition does not clearly apply to organizations.  The City does not offer any binding authority

17   that an organization may not assert the constitutional rights of its members via § 1983, nor does it

18   acknowledge the circuit split on this issue.  *See* Order re Motion to Dismiss SAC at 13 (noting that

19   "[n]either the Supreme Court nor the Ninth Circuit have adopted such a rule, and other circuits that

20   have considered the issue have reached a different conclusion."); *see Garcia v. City of Los Angeles*,

21   No. CV 19-6182 DSF (PLAx), 2020 WL 6586303, at *3 (C.D. Cal. Sept. 15, 2020) (finding that

22   organization had associational standing to pursue its members' Fourth Amendment rights, noting

23   "[t]he other circuits to have considered the issue are split.") (collecting cases); *see also Watson v.*

24   *Weeks*, 436 F. 3d 1152, 1154, 1162 (9th Cir. 2006) (holding that individuals and an organization

25   that advocated on their behalf "have established a section 1983 rights" under the Medicaid Act

26   without differentiating between the organization and the individuals.)

27       Absent new facts or binding authority, the court sees no basis to deviate from its prior

28   reasoning and ruling.

United States District Court
Northern District of California

### b.      Evidence of Predicate Violations

The City argues there can be no finding of liability for the Fourth Amendment claim because there is no underlying constitutional violation.  Mot. at 22-26.  While Plaintiffs agree that a predicate violation is required (5/8/25 Hr'g Tr. at 45:4-10), they assert that "evidence of repeated unconstitutional property destruction, by multiple City agencies, across multiple years, including by supervisors" forms the basis for the underlying act.  Opp'n at 25-26.

"[M]unicipalities are only liable under Section 1983 if there is, at minimum, an underlying constitutional tort."  *Johnson v. City of Seattle*, 474 F.3d 634, 638 (9th Cir. 2007) (citing *Monell*, 436 U.S. at 691); *see Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001) ("Neither a municipality nor a supervisor . . . can be held liable under § 1983 where no injury or constitutional violation has occurred.").

The City cites three incidents on June 23, 2022, September 12, 2022, and January 5, 2023 in which Cronk and Donohoe had property destroyed, to argue that neither of them can establish an underlying Fourth Amendment violation to support their § 1983 claims.[20]  Mot. at 24-25.  Plaintiffs contend there are genuine issues of material fact as to whether the destruction of Cronk's and Donohoe's property violated the Fourth Amendment.  Opp'n at 28.  The court agrees with Plaintiffs.

As to the June 23, 2022 incident, Donohoe testified that DPW took clothes that were sitting in front of his and Cronk's tent in unsealed trash bags, and that he told DPW not to throw his belongings away.  Talla Decl. Ex. 6 (Donohoe) at 187:12-189:21.  Based on this testimony, a reasonable fact finder could conclude that the bags of clothes constituted attended property, and that DPW's seizure thereof violated the bag and tag policy and the Fourth Amendment.  The City argues they are entitled to judgment because the City offered Cronk and Donohoe a tiny home, and because Cronk and Donohoe did not ask "for assistance bagging and tagging items." Mot. at 24.  With respect to the "tiny home" issue, as discussed above, there are factual disputes about whether Cronk and Donohoe were "voluntarily" unhoused.  It is immaterial that Cronk and Donohoe did not ask for assistance with bagging and tagging, and that they "kept the majority of their items, undermining

---

[20] As discussed in footnote 16, *supra*, the court overrules the City's hearsay objections to the evidence regarding these incidents.

United States District Court
Northern District of California

1    any suggestion the City *summarily* destroyed their property."  Mot. at 24 (emphasis in original).

2    The existence of a Fourth Amendment violation does not depend on the relative amount of property

3    seized.  An improper seizure of even a modest amount of property can be sufficient to form the basis

4    for a predicate constitutional violation.

5            With respect to the September 12, 2022 incident, Donohoe testified that he told the DPW

6    worker that "none of this is trash" and pointed the worker towards the actual trash, which Donohoe

7    had already segregated.  Talla Decl. Ex. 6 (Donohoe) at 206:6-208:3.  According to Donahoe, DPW

8    nevertheless took Cronk and Donohoe's clothes and food.  *Id.* at 207:1-3.  A reasonable trier of fact

9    could conclude that the property at issue should have been bagged and tagged pursuant to the policy,

10   rather than discarded.

11           The City argues that, "given the position of their encampment, items would only be in a

12   roadway" and that "Donohoe and Cronk will not be able to establish that their items stored outside

13   of a tent on one of two streets was erroneously discarded given this evidence."  Mot. at 25.

14   According to the City, "[m]essy items in a right of way are an obstruction to traffic and can be

15   lawfully seized."  *Id.*  This misstates the law.  *See Lavan*, 693 F.3d at 1029 ("Even if we were to

16   assume, as the City maintains, that Appellees violated LAMC § 56.11 by momentarily leaving their

17   unabandoned property on Skid Row sidewalks, the seizure and destruction of [the plaintiffs']

18   property remains subject to the Fourth Amendment's reasonableness requirement."); *Recchia*, 889

19   F.3d at 557, 562 (in case involving "birds [living] in squalor on the public sidewalk," "[i]t d[id] not

20   matter whether Recchia's pigeons were properly seized under the statute or whether there was an

21   emergency here. . . . For the purposes of the Fourteenth Amendment analysis, we are not assessing

22   whether this particular seizure was proper, but instead whether the statute provides due process.").

23   It also misstates the mandates of the bag and tag policy, which requires DPW "staff to provide the

24   owner or the owner's designee with a reasonable amount of time (approximately 30 minutes) to

25   collect and move their belongings out of the public right of way . . . ."  Mills Decl. Ex. 1 (2/8/22

26   Bag & Tag Policy) at CCSF-COH_000385.  The policy does not provide that obstructing traffic in

27   and of itself is grounds to seize and destroy property, and the record is not clear that Donohoe and

28   Cronk were given the requisite time to move their belongings out of the street.  Finally, what

constitutes "messy" is also disputed and should be left to the trier of fact. *See, e.g.*, Talla Decl.
Ex. 10 (Evans) at 145:17-18:1.

In sum, the evidentiary record is sufficient to allow a finder of fact to find that Cronk's and
Donohoe's constitutional rights were violated.[21]  Accordingly, the court finds there are triable facts
supporting predicate Fourth Amendment violations giving rise to the § 1983 claims for all three
Plaintiffs.[22]

### 2.    Fourteenth Amendment Claim

The City argues that Plaintiffs cannot prevail on a Fourteenth Amendment claim for three
reasons: (1) the due process claims fail because they are contingent on an unlawful seizure, which
Plaintiffs fail to prove; (2) the availability of post-deprivation remedies such as damages precludes
a finding of a Fourteenth Amendment violation; and (3) Plaintiffs cannot show that the City failed
to provide notice before removing their property, or that Plaintiffs did not have an opportunity to
retrieve their property once collected.  Mot. at 26-29.

The court's earlier analysis addresses the City's first and second arguments.  In brief, there

---

[21] As a single violation is sufficient, the Court does not consider the January 5, 2023 incident and
therefore overrules the City's hearsay objection to this evidence as moot.

[22] The City relies on a single out-of-circuit case, *Bone v. University of North Carolina Health Care
System*, 678 F. Supp. 3d 660 (M.D.N.C. 2023), to contend that Coalition can only invoke the injuries
of its members to establish a predicate act, and that the member must have had standing at the time
the case was filed.  Mot. at 23; 5/8/25 Hr'g Tr. at 45:13-48:3.  *Bone* is distinguishable. It involved
violations of the American Disabilities Act of 1990, 42 U.S.C. §§ 12131-12134, 12181-12189,
Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and Section 1557 of the Patient Protection
and Affordable Care Act, 42 U.S.C. § 18116.  *Bone*, 678 F. Supp. 3d at 681.  At issue was the scope
of an injunction requiring the defendant, the University of North Carolina Health Care System
("UNCHCS"), to provide legally blind individuals "with meaningfully accessible communications."
*Id.* at 669-70.  That court limited the injunction to only two persons, the individual plaintiff and a
sole member of one of the organization plaintiffs.  *Id.* at 705.  It found that "the injury Plaintiffs
ha[d] established here [wa]s necessarily individualized and thus d[id] not warrant a broad mandatory
injunction to 'compl[y] with all requests by blind individuals for print communications . . . .'"  *Id.*
at 700 (citation omitted; third alteration in the original); *id.* ("A reasonable accommodation claim,
by its very nature, is fact-specific.") (citations omitted).  This was because the organizational
plaintiffs "identified only two of its thousands of members who have encountered problems
receiving accessible communications from a UNCHCS provider."  *Id.* at 704.

The court declines to rule on this legal question, given the paucity of the briefing by both parties.

United States District Court
Northern District of California

1    is a genuine dispute regarding the lawfulness of the City's seizures of unhoused persons' property.

2    *Supra*, § III(C)(1)(b).  The court has also found that the City has presented no new arguments or

3    facts to deviate from its prior ruling on the availability of post-deprivation remedies.  *Supra*,

4    § III(B)(1).

5         The City's third argument fails because Plaintiffs submit evidence from which a reasonable

6    fact finder could conclude that the City did not provide advance or adequate notice, and that

7    retrieving property was difficult, if not impossible.  For example, Plaintiffs offer deposition

8    testimony from unhoused persons who attempted to retrieve their belongings from the DPW Yard

9    but were informed that DPW did not have their property.  Talla Decl. Ex. 18 (Stromer) at 159:1-6

10   ("We got to gate, and we pushed a button.  Tell -- somebody that worked there came out, spoke to

11   us, disappeared for 15, 20 minutes, came back, and said, I'm sorry.  There's no claim number that

12   matches that number.  The officer must have wrote it down wrong."); *id.* at 159:17-160:5; Talla

13   Decl. Ex. 28 (Garcia) at 164:19-22, 169:10-170:5 (City employee testifying that DPW has been, on

14   occasion, unable to locate a person's belongings in the DPW yard); Talla Decl. Ex. 14 (Melodie) at

15   55:7-56:12 (testifying that people were "never" able to get any property back); Talla Decl. Ex. 13

16   (Bryant) at 60:9-19 ("Q. So your testimony is that you've gone dozens of times to the DPW yard,

17   in connection with every incident that you had property taken from you?  A. Yeah.  I had hoped to

18   get my stuff back, like they said they were gonna -- it was there, man.  It never was.  Every single

19   time, I did not get anything.  Q. Did you have a practice of going within a set window of time from

20   when your property was taken by DPW?  A. Yeah.  Usually as soon as possible, right the same day.");

21   Talla Decl. Ex. 16 (Stephenson) at 92:15-94:12 ("And she said, 'Oh, yeah.  You can get your things

22   at the yard.  You need to call this number.'  And so then I wrote that number down, and I called that

23   number.  And they said, 'No, we didn't do that.' . . . A. And then I said, But your other lady said

24   you did.'  And she said, 'Well, she was wrong.  We don't have your things.'").[23]

25   _____

26   [23] The City argues the court should disregard the testimony from Bryant and Stephenson because
     they lack standing, are not alleged in the TAC, and were not included in written discovery.  Reply

27   at 14.  As discussed above, the fact that Bryant and Stephenson were not identified in the TAC or
     written discovery is not a basis to exclude their testimony because their evidence was otherwise

28   made known to the City during the discovery process, per Rule 26(e)(1).

### 3.    *Monell* Claims

The City moves for summary judgment on Plaintiffs' *Monell* claims based on unconstitutional policies or customs and failure to train. [24]

#### a.    Violations Based on Policies or Custom

A municipality may be liable under § 1983 where the "'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflict[ed] the injury.'" *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 802 (9th Cir. 2018) (quoting *Monell*, 436 U.S. at 694). "A policy or custom may be found either in an affirmative proclamation of policy or in the failure of an official 'to take any remedial steps after [constitutional] violations.'" *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991) (holding that a jury could find a policy or custom of using excessive force from the police chief's failure to discipline officers for such conduct)); *see also Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1234-35 (9th Cir. 2011) ("evidence of a recurring failure to investigate and discipline municipal officers for constitutional violations can help establish the existence of an unconstitutional practice or custom" of using excessive force).

To prove a claim for municipal liability based on a policy, custom, or practice, a plaintiff must "demonstrate that an 'official policy, custom, or pattern' on the part of [the defendant] was 'the actionable cause of the claimed injury.'" *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022, 1026 (9th Cir. 2008)). "[A] plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).

The City contends there is no evidence that the City's practice or custom is inconsistent with its written bag and tag policy. Mot. at 30. The City asserts that the fact that there are undisputed

---

[24] The City's *Monell* arguments do not distinguish between the alleged Fourth and Fourteenth Amendment violations. *See* Mot. at 30-34; Reply at 15-17.

1    instances where the City followed the bag and tag policy, plus the fact that "Plaintiffs[*] discovery

2    responses do not identify any instances of alleged constitutional violations in the past two years"[25]

3    is sufficient proof at summary judgment that there is not an unconstitutional custom or policy. *Id.*

4    Defendants point to the high number of "interactions between City personnel and persons

5    experiencing homelessness": "2,382 HSOC resolutions since June 2020 (Ex. 42, CCSF-COH-

6    573455), 1,302 JFO operations since May 24, 2023 (Ex. 43, CCSF-COH-573456), and 184,104 311

7    complaints related to encampments since January 2020. (Ex. 44, CCSF-COH-573454)." *Id.* The

8    City asserts that therefore, "[i]n context Plaintiffs' evidence is insufficient to show a pattern or

9    practice." *Id.*

10        In response, Plaintiffs point to deposition testimony by unhoused witnesses of numerous

11   instances where the City destroyed their property both in and out of the witnesses' presence. Opp'n

12   at 2-5, 25-26. Plaintiffs also offer the expert opinion of Dr. Herring, supported by surveys and other

13   materials, that the City engaged in "widespread property destruction instead of appropriately

14   safeguarding and storing the belongings of unhoused individuals in accordance with the City's own

15   policies." Herring Decl. Ex. 1 (Herring Rep.) at 10-35. Notably, City workers also testified that

16   they did not follow the bag and tag policy, including, for instance, how to assess whether property

17   is unattended or abandoned. Opp'n at 5 (citing Talla Decl. Exs. 33, 143). As discussed above, there

18   is a triable issue of fact as to whether the City's seizure of property comported with the Fourth

19   Amendment. *See supra*, § III(C)(1)(b). This is sufficient to create a question of material fact as to

20   whether the City has a custom of violating the Fourth Amendment.

21        With respect to the Fourteenth Amendment claim, Plaintiffs identify three practices they

22   contend are evidence of a custom of violating the Fourteenth Amendment: (1) the City's failure to

23   provide advance notice of encampment closures, (2) the City's failure to provide constitutionally

24   adequate notice, and (3) the City's inadequate post-deprivation remedies. Opp'n at 1-2, 28-31.

25   Plaintiffs offer deposition testimony from unhoused individuals and Dr. Herring's observations

26   regarding insufficient notice or lack of notice, and the City does not dispute that Plaintiffs have

27

28   _____
     [25] The City's failed attempt to exclude the more recent evidence is discussed above.

United States District Court
Northern District of California

1    submitted evidence that "HSOC has no guidelines on how many notices to post, and [that]

2    supervisors have conflicting understandings on where to post notice." *Id.* at 1.

3         The City's criticism of Dr. Herring's opinions and methodology upon which Plaintiffs rely

4    (Reply at 15) does not compel a different result. "On a motion for summary judgment, the Court

5    does not weigh evidence or make assessments of credibility." *Alfaro v. United States*, No. CV 21-

6    09668-PA (RAO), 2025 WL 811100, at *4 (C.D. Cal. Jan. 15, 2025), *report and recommendation*

7    *adopted*, No. CV 21-09668 PA (RAO), 2025 WL 808238 (C.D. Cal. Mar. 13, 2025) (citing

8    *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596, (1993) ("Vigorous cross-examination,

9    presentation of contrary evidence, and careful instruction on the burden of proof are the traditional

10   and appropriate means of attacking shaky but admissible evidence.")). "The determination of the

11   credibility and weight of the expert's conclusions should be reserved for the trier of fact. In such a

12   situation, summary judgment is not appropriate." *Yu-Santos v. Ford Motor Co.*, No. 06–CV–

13   01773–AWI–DLB, 2009 WL 1392085, at *17 (E.D. Cal. May 14, 2009).

14        The court finds that Plaintiffs have established a triable issue of fact as to whether the City

15   has engaged in a custom or policy of Fourteenth Amendment violations.

16                          **b.    Failure to Train**

17        The City asserts that it adequately trains employees on the bag and tag policy and cites

18   evidence of training materials, training trackers, and weekly team meetings where trainings take

19   place. Mot. at 31-32. Plaintiffs dispute that this training adequately prevents constitutional

20   violations. Opp'n at 31-32.

21        "[A] local government can fail to train employees in a manner that amounts to 'deliberate

22   indifference' to a constitutional right, such that 'the need for more or different training is so obvious,

23   and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers

24   of the city can reasonably be said to have been deliberately indifferent to the need.'" *Rodriguez*,

25   891 F.3d at 802 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). In order to establish

26   § 1983 municipal liability based on a failure to train, a plaintiff must show: (1) deprivation of a

27   constitutional right; (2) a training policy that "amounts to deliberate indifference to the

28   [constitutional] rights of the persons with whom [the police] are likely to come into contact"; and

1    3) that his constitutional injury would have been avoided had the municipality properly trained the

2    officers. *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (quoting *Canton*, 489

3    U.S. at 388-89) (first alteration in original).

4    As to the first prong of the failure to train analysis, a reasonable trier of fact could conclude

5    that the City has engaged in violations of the Fourth and Fourteenth Amendments. *See supra*,

6    §§ III(A)(1)(ii), III(A)(2), III(C)(1)(b).

7    The second prong requires Plaintiffs to show "[a] pattern of similar constitutional violations

8    by untrained employees . . . to demonstrate deliberate indifference for purposes of failure to train.

9    *Connick*, 563 U.S. at 62 (citation omitted). On August 5, 2024, the court granted in part Plaintiffs'

10   motion to enforce the preliminary injunction on grounds, finding, among other things, that the City

11   had failed to adequately train employees on the application of the bag and tag policy. [Docket

12   No. 231 at 10-12.] The court thus "conclude[d] that additional training of DPW employees [wa]s

13   required to ensure Defendants follow the preliminary injunction with respect to the bag and tag

14   policy" and ordered the parties to submit updated training proposals. *Id.* at 11. On September 4,

15   2024, having considered the parties' submissions and proposal (Docket Nos. 237, 238, 240), the

16   court entered an order regarding future training on the bag and tag policy. [Docket No. 241.]

17   In light of the court's August 5, 2024 order, there is strong evidence from which a reasonable

18   fact finder could conclude that the City failed to adequately train employees on the bag and tag

19   policy up until that date. The City contends that its updated training is now sufficient. Mot. at 31-

20   33. As part of its motion, the City submits a January 25, 2025 PowerPoint training presentation,

21   bag and tag training trackers and logs, and the testimony of Brittany Brandon about her experiences

22   with the training. Mills Decl. Exs. 45-48.

23   In response, Plaintiffs offer evidence that the updated trainings are still inadequate. For

24   example, Dylan Verner-Crist, the lead investigator at the ACLU of Northern California, describes

25   encampment closures and joint field operations that took place between November 20, 2024 and

26   February 15, 2025 where City workers took attended property or where he did not observe any

27

28

United States District Court
Northern District of California

1   notice posted.[26]  Verner-Crist Decl. ¶¶ 54-175.

2          Plaintiffs also offer testimony by the City's own witnesses that supports that they still do not

3   know how to apply the bag and tag policy, even months after the City updated its training materials

4   and protocols.  For instance, at his January 30, 2025 deposition, Israel Graham testified that he did

5   not have to "give people advisements about medications," did not know how long the City stores

6   bulky items, and did not know what the term "special needs" meant as it is used in the policy.  Talla

7   Decl. Ex. 33 (Graham) at 55:21-24, 75:22-23, 88:24-89:1, 90:18-21.   Although Alvaro Castro

8   testified at his March 5, 2025 deposition that he was familiar with the bag and tag policy, he also

9   stated that he had not received any training on encountering persons with disabilities at resolutions,

10  did not know whether he was supposed to provide an advisement about medication, and did not

11  know what would present a health and safety risk besides the presence of feces.  Talla Decl. Ex. 34

12  (Castro) at 49:15-21, 83:17-25, 94:18-22, 98:11-22, 101:19-102:11.  Joel Martinez testified on

13  February 25, 2025 that he was not provided a definition of "biohazard" at any trainings, did not

14  receive any training on how to safely separate contaminated items from uncontaminated items, how

15  to differentiate between immediate and long-term health and safety risks, or how to determine

16  whether something is commingled.  Talla Decl. Ex. 35 (Martinez) at 63:12-17, 103:7-15.

17         Based on this evidence, a reasonable fact finder could conclude that the City's failure to

18  adequately train its employees on the bag and tag policy amounts to deliberate indifference.  None

19  of the City's arguments on this point lead to a different conclusion.  *See* Mot. at 33-34.  First, the

20  City's attempt to distinguish *Lavan* on grounds that that case involved "settlement rights to store

21  possessions on the street" (Mot. at 33) misses the point.  *Lavan* did not hold that Los Angeles could

22  not deprive unsheltered persons of their possessions without due process because of an earlier

23

24  _____

    [26] The City objects to the Verner-Crist Declaration on grounds that it "contain[s] only undisclosed
25  incidents."  Reply at 2; Docket No. 387 at 1.  According to Plaintiffs, "Verner-Crist's declaration
    was taken directly from his notes of 23 sweeps he observed, all produced unredacted on February
26  7, 2025 and February 18, 2025, while his photos and videos were produced even earlier on
    January 29, 2025."  [Docket No. 387 at 4; *see* Docket Nos. 387-17 - 387-39 (produced Verner-Christ
27  notes).]  The City also deposed Verner-Crist on March 4, 2025—two weeks after Plaintiffs had
    produced the last tranche of notes—and had the opportunity to question him about them.  Thus, for
28  the reasons stated above, Plaintiffs were not required to supplement their interrogatory responses
    per Rule 26(e)(1).

settlement agreement. Rather, the *Lavan* court held that unsheltered people are entitled to the protections of the Fourth and Fourteenth Amendments even if they violated a municipal code by virtue of their unhoused status.

Second, the City contends that there is no deliberate indifference where Plaintiffs have access to City shelters and storage. Mot. at 34. As explained above, Melodie, Cronk, and Donohoe have presented evidence about cycling in and out of shelters for reasons beyond their control. *See* §§ III(A)(1)(b), III(A)(2)(a). Disputed facts remain on this point.

The court thus finds that there is a genuine issue of material fact as to the failure to train claim.

## IV.    CONCLUSION

For the foregoing reasons, the court denies the City's motion for summary judgment.


**IT IS SO ORDERED.**

Dated: June 12, 2025

_____
Donna M. Ryu
Chief Magistrate Judge