# EXHIBIT C

CITY AND COUNTY OF SAN FRANCISCO



DAVID CHIU
City Attorney

OFFICE OF THE CITY ATTORNEY

JOHN H. GEORGE
Deputy City Attorney

Direct Dial: (415) 554-4223
Email: john.george@sfcityatty.org

September 10, 2024

**VIA EMAIL**

John Thomas H. Do
William S. Freeman
ACLU FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111

Andrew Ntim
Nisha Kashyap
LAWYERS COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY
131 Steuart Street, Suite 400
San Francisco, CA 94105

Wesley Tiu
Alfred Carroll Pfeiffer, Jr.
Kevin Wu
Tulin Gurer
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

Joseph Hyuk Lee
LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626

Rachel Mitchell
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130

Re: *Coalition on Homelessness, et al. v. City and County of San Francisco, et al.* United States District Court Case No. 4:22-cv-05502-DMR

Dear Counsel:

We write on behalf of Defendants in response to Plaintiffs' August 22, 2024 letters regarding non-custodial documents and search terms. Please let us know if you would like to meet and confer regarding any of these topics.

I.   **Non-Custodial Documents**

**"Pre- and post-encampment operation and property removal notices."** Defendants have been producing and will continue to produce photographs of HSOC resolution notices and post-removal property notices.

**"Heatmaps created by the City showing sites of frequent encampment resolutions and repeat contacts with encampments."** Defendants are unsure what you are referring to with this category and is unaware of a "heatmap" reflecting HSOC resolutions or bag and tag practices. While we disagree about your claims of relevance, to the extent Plaintiffs are seeking

Page 2
September 10, 2024

information about the locations of resolutions, that information is being provided in several types of documents, including the resolution schedules, documents tracking completed resolutions, and notes of resolutions. From this information, you can determine frequency and repetition of resolutions at particular locations.

**"Data on tents removed/tent counts."** Defendants have been producing and will continue to produce several types of documents showing the bagging and tagging and disposal of tents, including, for example, bag and tag forms and excel spreadsheets, CMMS entries and related photos, notes of resolutions and operations, and 647(e) incident reports reflecting requests for DPW to handle the property, pursuant to DPW's bag and tag policy, of the person cited. Your letter fails to explain *how* generalized data on the number of tents "removed" or "counted" is relevant to Plaintiffs' remaining claims. This information – for example, data reflecting the number of tents in a particular neighborhood at the time of a particular count – is unlikely to make any disputed fact more or less probable. Regardless, Defendants will continue to produce HSOC data reflecting the observed numbers of tents and structures before and after particular resolutions.

**"Data from Storage Yards."** Defendants have been producing and will continue to produce DPW bag and tag forms and excel spreadsheets showing property stored at the DPW Yard, as well as property forms showing property stored at the Recreation and Parks Department Yard.

**"DPW Service Order Reports."** Defendants have been producing and will continue to produce DPW service order records reflected in the CMMS entries back to January 1, 2020 for the problem codes "Encampment" and "Bag and Tag."

**"Photographs of property."** Defendants have been producing and will continue to produce CMMS entries with links to photographs, 647(e) incident reports with attached photographs, and other photos taken by City employees at HSOC resolutions. Your letter inaccurately portrays the bag and tag policy, which does not require a photograph in the event of a dispute. The policy provides that, "If there is a dispute between the owner and staff concerning whether an item of property should be discarded, the City *will endeavor* to photograph the item of property before discarding it." ECF No. 62-1 at 3 (emphasis added).

**"Emergency Protocols (e.g. Inclement Weather)."** Emergency protocols are not relevant to Plaintiffs' state-created danger or ADA claims. As the Court has already ruled, Plaintiffs' state-created danger claim is entirely insufficient to justify the breath of Plaintiffs' discovery demands. ECF No. 222 at 8-10. And the Defendants' pending motion to dismiss for lack of subject matter jurisdiction and motion for judgment on the pleadings demonstrates that no Plaintiff has standing in this case to justify disproportionate and burdensome discovery. Even if Plaintiffs' state-created danger claim were viable, Plaintiffs' SAC does not identify a Plaintiff who was intentionally put in grave danger by Defendants' alleged removal of them from a public space or destruction of their property. Theresa Sandoval alleges property destruction, but does not allege that she asked for an accommodation and does not explain how an emergency protocol would make any fact necessary to her ADA claim any more or less likely. The Coalition has not identified how it has suffered any alleged violation of the ADA and certainly hasn't identified

Page 3
September 10, 2024

how an emergency protocol would make any fact necessary to its undefined ADA claim any more or less likely.

**"Data and protocols on shelter availability and coordinated entry."** This case no longer concerns Defendants' offers of shelter or homeless persons' interactions with the coordinated entry system. And, for the reasons explained above, shelter availability and coordinated entry data and protocols are not relevant to Plaintiffs' state-created danger or ADA claims. Additionally, the system on which coordinated entry data is housed is not readily reproduced for an unspecified group of people. If Plaintiffs have a particular person in mind, you are welcome to identify them and we can discuss whether particular shelter and coordinated entry data specific to them is relevant and producible without undue burden.

**"Pre- and post-resolution charts (showing anticipated number of tents/clients)."** Defendants believe you are referring to documents like CCSF-COH_199139 and CCSF-COH_199140. Defendants disagree with Plaintiffs' contentions regarding the relevance of this information, but will nonetheless produce an updated version of CCSF-COH_199140 showing more recent data.

**"Weekly Log and Grids."** Defendants disagree with Plaintiffs' assertions regarding the relevance of the grid/client log referred to in response to Interrogatory No. 6 and contend that the production of the grid infringes on the privacy rights of non-parties to this litigation. Nonetheless, and without waiving its objections, Defendants will produce it for the period January 1, 2022 to the present with a Highly Confidential – Attorneys' Eyes-Only designation. The grid referred to in response to Interrogatory No. 6 is the Client Log, excerpts of which have been attached to declarations filed by Defendants (*e.g.* ECF No. 45-17).

**"Data, studies, or guidance related to health impacts on unhoused."** For the same reasons that "emergency protocols" are not relevant to Plaintiffs' claims, so too is this category irrelevant.

**"Body Worn Camera Footage."** Defendants responded to your November 30, 2023 question regarding CADs by email on December 22, 2023: "As we previously explained, CAD reports do not indicate the existence of corresponding BWC footage in any regular way. We understand that some CAD reports contain reference to BWC footage in the notes section, but there does not appear to be a way to, in all cases, determine from the CAD reports whether BWC footage exists." Defendants subsequently produced the excel reflecting approximately 80,000 CADs on January 9, 2024.

Plaintiffs seek two broad categories of BWC footage: (1) all BWC footage associated with incident reports of citations, arrests, or other enforcement of Penal Code 647(e); and (2) BWC footage from noticed encampment resolutions. Neither is proportional to the needs of this case. As Plaintiffs have seen from the significant amount of BWC footage already produced, many videos have no relevant information regarding claims of unconstitutional property destruction (*e.g.*, an officer in the patrol car filling out a citation for 15-20 minutes) and even those that involve DPW applying its bag and tag policy are overwhelmingly comprised of footage that has no bearing on Plaintiffs' claims. Identifying, collecting, reviewing, and producing the requested footage is wildly disproportionate to the needs of this case given the enormous burden and the limited relevance (especially since no party has standing and

Page 4
September 10, 2024

enforcement activity is unquestionably lawful following *Grants Pass*). Just identifying the footage associated with every noticed resolution will take hundreds of hours. BWC footage is not organized by resolution and must therefore be laboriously identified by looking for the officers involved and cross-referencing that information with other information, such as the resolution date and location and the video upload date. This process takes approximately 15 minutes for every resolution and with two resolutions per day, two years' worth of resolutions would likely take over 250 hours, or 6 weeks of full-time work, just to *identify* the BWC footage for those resolutions. Instead of spending weeks looking for a haystack in which to then search for the needle of potentially relevant video, Defendants propose that – as in the ongoing discovery process – Plaintiffs identify particular citations or incidents that they request video for and Defendants can then identify the length of related footage and produce it or, if necessary, discuss the request with Plaintiffs.

**II.        Search Terms and Custodians**

Plaintiffs' proposal of "prioritiz[ing]" 29 search terms and increasing the number of custodians is not proportionate to the needs of this case following *Grants Pass*, and Plaintiffs have not shown it is necessary to locate relevant documents. Plaintiffs' case involves claims of unlawfully destroyed property, an inchoate and unactionable claim of state-created danger brought on behalf of seven housed individuals and an organization that has failed to identify a member with an actionable claim, and disability claims based on a single event in June 2022 where the Plaintiff involved does not allege she requested the accommodation she seeks. Despite this narrow breath, Plaintiffs' proposed priority terms include many that generically refer to resolutions, encampments, beds, shelter allocations, referrals, and services without any limitation to property or the particular state-created danger or disability claims at issue. Similarly, the list of "priority" custodians includes many people uninvolved in the alleged unlawful property destruction or other remaining claims.

///
///
///
///
///

Page 5
September 10, 2024

   Further, Defendants have produced approximately 35,000 custodial documents to date. But Plaintiffs have not attempted to show, with actual custodial documents produced so far, why their prioritized terms or custodians are likely to result in the identification and production of relevant documents. Given the significant number of documents Plaintiffs are in possession of, Plaintiffs should be able to identify the particular types of documents they believe are relevant. This will allow Defendants to quickly identify similar documents and either produce them or clarify disputes regarding relevance. For example, as you have likely seen, photographs of posted notices are emailed to particular people on a regular basis. Defendants do not dispute the relevance of these photographs and are in the process of identifying remaining emails to which they are attached so they can be expeditiously produced. Using vastly overinclusive terms and custodians to attempt to find what Plaintiffs should be able to identify as relevant from the 35,000 custodial documents is neither productive nor proportional.

                 Very truly yours,

                 DAVID CHIU
                 City Attorney

                 John H. George
                 Deputy City Attorney