# Exhibit B

# REPORT OF KATHY PEZDEK, PH.D.
# PERTAINING TO COALITION ON HOMELESSNESS V. CITY AND COUNTY OF SAN FRANCISCO, CASE NO. 4:22-CV-05502-DMR

1. I, Kathy Pezdek, Ph.D., am a tenured Professor of Psychology at Claremont Graduate University, Claremont, California, where I have been on the faculty since 1981. My qualifications are detailed in the attached Vita. In brief, I received a B.S. in Psychology from the University of Virginia, Fredericksburg, in 1971; an M.A. in Psychology from the University of Massachusetts, Amherst, in 1972; and a Ph.D. in Psychology from the same institution in 1975. My specialty is cognitive science – that is, the study of perception, attention, and memory. My published research has focused on human memory and factors that affect the accuracy of memory. I have conducted research and scientific experiments relating to eyewitness memory, event memory, the suggestibility of memory, visual memory, autobiographical memory, and memory and comprehension. My research has addressed the factors that affect the accuracy of eyewitness memory for people and events. I teach graduate courses and conduct research on these topics at Claremont Graduate University.

2. I am a Fellow of both the Association for Psychological Science (APS) and the Psychonomic Society, and my research has been funded by a number of federal grants. I most recently received a three-year grant from the National Science Foundation's Program in Law and Social Sciences to study, "Cognitive Consequences of Viewing Body-Worn Camera Video Footage."[1] Prior to that, I had a three-year grant from the National Institute of Justice, and another from the National Science

---

[1] The first publication from this funded program of research can be found at: Pezdek, K., Shapland, T., & Barragan, J. (2022). Memory outcomes of police officers viewing their body-worn camera video. *Journal of Applied Research in Memory and Cognition*. Advance online publication. https://doi.org/10.1037/mac0000013

Report of Kathy Pezdek, Ph.D.

Foundation's program in Law and Social Sciences. In addition, I serve as a scientific reviewer for the National Science Foundation and the National Institutes of Health. I have served on the Governing Board of the Society for Applied Research in Memory and Cognition, an international group of researchers who address applied memory topics.

3. My research has been widely published, as indicated on the attached Vita. I have conducted numerous eyewitness memory experiments and have authored and co-authored numerous scholarly articles in peer-reviewed journals, as well as chapters in books and textbooks. I also regularly present my research at national and international professional conferences.

4. I also have served as an editor and reviewer of numerous scholarly works. From 1995 to 2000, I was Editor of the journal *Applied Cognitive Psychology*. I am currently an editorial reviewer for twelve professional journals in my field and have served as a textbook consultant and reviewer for four publishers. I am also a member of the Publications Committee for the Association for Psychological Science. This professional background in the area of cognitive science, with a specialty in memory for people and real-world events, has qualified me to testify as an expert witness on eyewitness memory in more than 350 cases, in federal and state trial courts, primarily in California but also in several other states. Although there are thousands of experimental psychologists around the world, and hundreds who specialize in memory, relatively few have specialized in memory for people and real-world events.

5. Attached to this report is a copy of my Vita that lists all of my scientific publications. Appendix A at the end of this report provides a list of the trials in which I have testified or been deposed, January 2021 through the present.

Report of Kathy Pezdek, Ph.D.

6. In retaining me on this case, counsel for Defendants asked me to describe the factors that affect event memory in general and to identify the principles likely to account for memory of the potential witnesses in this case. To perform this task, I have reviewed case materials provided to me by counsel. Included in Appendix B of this report is a list of the materials sent to me by counsel. I was provided with a large number of depositions and declarations. In light of time constraints, I was not able to review all of these materials. Although I read a large number of these depositions and declarations, I did not keep a log of which ones I actually read. However, in the text of my report that follows, I clearly reference which depositions I am referring to when doing so. This report is based on information available to me at this time, and I reserve the ability to modify or supplement the report should additional information become available. Also, should it become necessary, I reserve the right to respond to the opinions of Plaintiffs experts, if any.

7. I am being compensated for my work in this matter at a rate of $300 per hour, except in the event that I testify at a deposition or trial, my fee is $2,000 per day or part thereof. Neither the substance of my opinions nor the outcome of this litigation impacts my compensation in any way. My compensation is untethered to the substance of my opinions or the outcome of the case.

## Overview of the Research on Event Memory

8. Event memory relies on brain systems for the cognitive processes of attention, perception and memory. Specific over-arching principles guide these processes. At any point in time, we are surrounded by an almost infinite amount of information impinging on, for example, our systems of vision, audition, touch, etc. We

Report of Kathy Pezdek, Ph.D.

can only pay attention to a limited amount of this information at one time, and what we pay attention to determines what is ultimately encoded and stored in memory.

9. This report focuses on four major principles that characterize cognitive processing and memory for events. These principles (a) determine how event memories are constructed and remembered, and (b) are consistent with information I have reviewed regarding eyewitness accounts in this case. These four principles are:

Principle 1. Memory is a Constructive Process

Principle 2. Event Memory is a Schema-Driven Process

Principle 3: Memory for Gist Persists Longer than Memory for Detail

Principle 4: Inattentional Blindness

**Principle 1. Memory is a Constructive Process**

10. A common impression that people have regarding how memory works is wrong. Memory does not work like a camera or video recorder. People do not sit and passively take in information, recording it the way a video camera would. Rather, we take in information in segments, from different sources, at different times, interpret the information, and integrate these pieces to form a unified impression. And, in fact, much of what is retained in memory is actually information about the event – true or false – that was ascertained after the event and then used to "construct" memory for the event. The "memory as camera" model implies that when describing an event, an eyewitness simply "plays back" their film of the event and "reads off of the film" the details of the event. This commonly held "memory as camera model" of memory is incorrect and far too simple.

Report of Kathy Pezdek, Ph.D.

11. In the matter of the *Coalition on Homelessness v. City and County of San Francisco*, an example where a memory likely was a constructed process is seen in the February 10, 2025 deposition of Krystle Erickson. When asked details regarding what heating equipment she was using around the time of the sweep, she said, "Most likely the canisters. I believe, well, yeah, those were the, those are the best ways to heat things, so probably was there." In other words, Krystle Erickson likely did not have a specific memory for any of the details of her "camp" at the time of a sweep, but likely "constructed" a memory based on "what typically would have happened." Ms. Erickson gave similar answers to questions about other details as well, including what possessions she had at her "camp," whether the canister for disposing of needles was present, whether the garbage to be disposed was clearly marked, etc. Ms. Erickson's testimony is consistent with my opinion that memory is a constructive process.

**Principle 2. Event Memory is a Schema-Driven Process**

12. The constructive process of memories is not an arbitrary unstructured process. A major principle that drives the construction of memory is the notion that memory is schema driven. Schemas provide a mental framework that summarizes broad patterns of what we have learned to expect to happen in a situation. We have schemas for what happens in a grocery store, what happens in a restaurant, and even what happens in a courtroom. Schemas are helpful because they provide a structure for easily comprehending an experienced episode of an event, so you know what to do when you enter a new grocery store, a new restaurant, a new courtroom. ***It is the schema that drives the encoding of an event and provides the organizational structure for how the event is remembered.***

Report of Kathy Pezdek, Ph.D.

13. Schemas also help when information is recalled from memory by reminding us what the typical structure of that event is. Recall is facilitated by schemas when related segments of an event are primed by previously recalled segments. Schema-driven processing can be problematic, however, if a specific episode of an event did not include a feature of the schema for that event. For example, you may recall that in a restaurant you were handed a menu even if (for example during the pandemic) you were not actually handed a menu but accessed it with a QR code. You may recall that everyone stood when the Judge entered the courtroom even if on a specific occasion, everyone remained seated.

14. In a classic study[2] that illustrated how information processing is affected by schemas, participants read a passage that described a house and the details one might see walking through the house. Prior to reading the passage, subjects were instructed to read the story from the perspective of either (a) a potential homebuyer, (b) a burglar, or (c) with no special perspective (control condition). Details included in the story had been rated as relevant to a homebuyer (e.g., the size of rooms) or a burglar (e.g., portable items of value). Shortly after reading the story, subjects were asked to recall as much of the exact story as they could. The main finding was that subjects instructed to read the story from the perspective of the homebuyer, recalled significantly more details relevant to a homebuyer; those who read the story from the perspective of the burglar, recalled significantly more details relevant to a burglar. These findings support the notion that people typically have schemas for events that are activated when they process the events, and their schemas affect what they attend to and subsequently recall.

***Memory for an event is affected by the schema activated at the encoding of the event.***

---

[2] Anderson, R. C., & Pichert, J. W. (1978). Recall of previously unrecallable information following a shift in perspective. *Journal of Verbal Learning & Verbal Behavior, 17*(1), 1–12.

Report of Kathy Pezdek, Ph.D.

15. Event memory is also affected by the pre-existing schemas that people have for an event. This was demonstrated in a study in which people listened to the testimony of an eyewitness in a recording of a mock trial pertaining to a mugging, a bank robbery or a convenience store robbery.[3] In a pilot study, a sample of subjects identified a list of actions that comprise a typical crime of each type. Half of these "schema typical" actions were included in the mock trial and half were not. One week later, a significant number of the unstated "schema typical" actions were erroneously recalled and recognized as having been stated in the recording. Further, a high percentage of the unstated actions mentioned in "misleading" questions by the attorney in the mock trial recordings were recalled as having been stated by the eyewitness in the trial, and cautionary instructions warning of the possible misleading effect of the attorney's questions did not significantly reduce this misleading effect. ***People remember what they expect to happen and are not very accurate discriminating between what they remember from their own observations and what they remember from related episodes of an event conveyed by other people.***

16. For example, in the matter of the *Coalition on Homelessness v. City and County of San Francisco*, as reflected in the February 20, 2025 deposition of Lukas Illas (Illas Depo. Tr. 82:4-12, 91:1-93:11), the March 4, 2025 deposition of Dylan Verner-Crist (Verner-Crist Depo. Rough Tr. 50:8-,51:9) and March 6, 2025 deposition of a Larry Ackerman (Ackerman Depo. Rough Tr. 77:19-78:12), the individuals observing sweeps on behalf of the Coalition of Homelessness have been instructed on how to observe sweeps from the perspective of the Coalition on Homelessness and its legal

---

[3] Holst, V. F., & Pezdek, K. (1992). Scripts for typical crimes and their effects on memory for eyewitness testimony. *Applied Cognitive Psychology, 6*(7), 573-587. For a similar finding, also see: Bower, G.H., Black, J.B., and Turner, T.J. (1979). Scripts in memory for text. *Cognitive Psychology, 11*, 177-220.

Report of Kathy Pezdek, Ph.D.

team. These individuals likely have schemas for what happens at a sweep based on how they were instructed to observe the sweeps, and their memory likely was affected by that schema when they were encoding the events they observed.

17. Another example in the *Coalition* matter of a schema likely held by one of the witnesses can be seen in the February 10, 2025 deposition of Krystle Erickson. In her deposition, she said, "You know, DPW was a very, very, like scary and like problematic thing for us out there, you know. Like they - - I mean, it didn't seem like they were doing their job at all. Like, so you know, it felt more like, you know, they're out there being thugs and you know, thieves, and bullying, taking advantage of a situation, people that are in a situation, people that are in a situation." With this as an impression of DPW and this as a schema for a DPW sweep, any future sweep would likely have been interpreted to fit this schema. Ms. Erickson said that for many years she observed about 6 sweeps a year. Consistent with my opinion that event memory is a schema-driven process, memory for the details of each of these numerous sweeps would likely have been incorporated into this general "sweep schema."

18. Another example of a schema held by a potential witness is reflected in Corey Barkley's deposition on February 13, 2025. When asked what a "sweep" was he responded, "They come through and just take all of your things and throw it in the back of a truck." This schema, which lacks details and specificity, may have informed Mr. Barkley's memories of the events he experienced consistent with my opinion that event memory is a schema-driven process. .

19. In contrast, another example of a schema is reflected in Leslie Fong's deposition on February 18, 2025. Ms. Fong is an HSOC incident commander. When she was asked to explain what an encampment resolution is, she responded, "For HSOC,

Report of Kathy Pezdek, Ph.D.

it would be outreach to the individuals at the encampments and also cleaning of the area, the encampment area, and addressing any public safety issues." Ms. Fong, too, appears to have a schema for a "sweep," but it was more detailed and therefore would likely result in more specific memories of the events she experienced related to resolutions she attended.

20. *In each of these examples, the nature of the person's schema is important because it is the schema that drives the encoding of an event and provides the basic organizational structure for how the event is remembered.*

**Principle 3: Memory for Gist Persists Longer than Memory for Detail**

21. Remember, memory does not work like a camera. This is especially true of memory for personal events in which the observer is part of the event. When an event is experienced, the construction of an event memory requires integrating a variety of features – including perceptual, narrative, schematic, and personal information – into a coherent representation. Often event memories include not only features of the observed event, but also information that relates the observed event to one's autobiographical memory, thus contributing to the observer's personal life story. In that sense, recalling an event can be thought of as reliving the event, and that relived experience changes over time.[4] More specifically, as a general rule of memory, memory for gist persists over time longer than memory for details.[5] It would thus not be

---

[4] Neisser U. (1988). Five kinds of self-knowledge. *Philosophical Psychology, 1*, 35–59.
[5] Craik, F.I.M. (2002). Levels of processing: Past, present … and future? *Memory, 10*(5-6), 305-318.

Report of Kathy Pezdek, Ph.D.

surprising if over time, memory for specific details became less accurate while gist memory – "that the event happened" – remained relatively accurate and unchanged.

22. As memories for specific details fade over time, they become more vulnerable to the influence of what is known as "post-event suggestion."[6] Post-event suggestion is an unconscious process that occurs when information encountered after an event is incorporated into memory for the event and thus changes the memory. A common source of post-event suggestion is simply having conversations with other people about the event or a related event. Post event suggestion can also occur as a result of an interview process in which the questions are worded so as to bias the response of the observer.

23. To add to the complexity of this process, often an event, for example, packing up one's tent and moving to a location on a different sidewalk, is experienced multiple times. Research suggests that the encoding and retrieval of each new incident of an event is shaped by memory for past similar events; each incident of an event is not stored in memory independently of related incidents of that event.[7]

24. As a well-known example, John Dean, counsel to President Nixon, testified to the Watergate Investigation Committee about his many conversations with the President. It was later discovered that these conversations had been recorded, so Dean's memory could be compared to the actual recordings.[8] It was found that in general Dean accurately remembered the gist of what transpired in his meetings with President Nixon and was telling the truth. However, what he remembered about each

---

[6] Loftus, E. F., & Palmer, J. C. (1974). Reconstruction of automobile destruction: An example of the interaction between language and memory. *Journal of Verbal Learning & Verbal Behavior, 13*(5), 585–589.
[7] Rubin D.C., & Umanath S. (2015). Event memory: A theory of memory for laboratory, autobiographical, and fictional events. *Psychological Review. 122*(1). 1-23.
[8] Neisser U. (1981). John Dean's memory: A case study. *Cognition. 9*, 1–22.

Report of Kathy Pezdek, Ph.D.

specific meeting was inaccurate and erred in the direction of being self-serving. Dean's memory for his multiple meetings with President Nixon had become more generic and schematized over time without an accurate memory for each instance of their meetings. This is typical of memory for events that are experienced multiple times.

25. On a related point, it is important to note that event memory for people actively involved in an incident is actually *less accurate* than that for people who simply observed an incident. Hope et al. (2016) conducted a study in which police officers participated in a simulated scenario involving an armed perpetrator and were then tested on their memory for the scenario. Each officer was assigned to either an active condition in which they were armed and instructed to respond to the scenario as if it was a real incident or an observer condition in which they were instructed to simply observe the scenario. Officers in the active witness condition reported significantly fewer correct details of the critical event than officers in the observer condition.[9] This suggests that in the matter of the *Coalition on Homelessness v. City and County of San Francisco*, the eyewitnesses who were actively involved in a sweep could not be relied upon for having more accurate memory for the details of the sweep than those simply observing the sweep. In fact, viewers who were personally and actively more involved in a sweep likely had less accurate memory than observers.

26. An example in the *Coalition* matter consistent with gist persisting in memory longer than details appears in the declaration of Christin Evans. She described incidents at which DPW had thrown into a dump truck, both personal property of homeless individuals and items that DPW said they assumed to be "trash." The gist of

---

[9] Hope L, et al. (2016) Memory and the operational witness: Police officer recall of firearms encounters as a function of active response role. *Law and Human Behavior, 40*(1), 23-35.

11 | P a g e

Report of Kathy Pezdek, Ph.D.

this action would fit Ms. Evans' description that DPW indiscriminately confiscated all of the possessions in an encampment. However, it is possible that she did not notice, and thus did not remember, the individual items of trash that were in the mix of what was confiscated and thus assumed that all of the confiscated items were personally valuable items.

27. This principle of attention and memory is also notable in the depositions of several other people, including that of Carlos Wadkins. His testimony is also consistent with my opinion regarding gist-like memory as he reported without offering details that DPW crews indiscriminately dumped trash as well as personal possessions. The same can be seen in the gist-like memory of events reported in the April 4, 2022 declaration of Larry Ackerman, which also lack details.

**Principle 4: Inattentional Blindness**

28. Earlier in this report, the important role of attention in driving what is remembered was discussed. Inattentional blindness refers to the finding from a substantial body of research that people frequently fail to notice aspects of events – even salient and task-relevant aspects – when they are focusing their attention on something else.[10] In a frequently cited study on inattentional blindness[11], observers watched a video, 75 seconds long, that included two teams of three players each, passing a basketball among members of their team. One team was wearing black shirts; the other was wearing white shirts. The task of the observers was to count the number of passes

---

[10] Most, S.B., et al. (2001). How not to be seen: the contribution of similarity and selective ignoring to sustained inattentional blindness. *Psychological Science, 12*(1), 9–17.
[11] Simons, D. J., & Chabris, C. F. (1999). Gorillas in our midst: sustained inattentional blindness for dynamic events. *Perception, 28*(9), 1059–1074.

Report of Kathy Pezdek, Ph.D.

made by either the white team or the black team.[12] In about the middle of the video, a woman wearing a gorilla costume slowly walked through the scene and was visible for 5 seconds. When later asked if they noticed anything unusual in the video and then if they noticed a gorilla in the video, only 54% of the observers noticed the gorilla.

29. A more recent study examined the prevalence of inattentional blindness in a real-world task involving important and relevant objects rather than task-irrelevant objects (e.g., a gorilla).[13] Experienced police officers and trainees at a police academy participated in a simulated traffic stop. A pistol was positioned in plain sight on the dashboard of the stopped vehicle. The presence of a weapon in a traffic stop presents a potential threat to the officer, a threat for which they are trained to be vigilant. Officers were later asked if they noticed anything that might have been a danger to them, and then if they notice any weapons. Only 52.6% of the officers noticed the gun. Although experienced officers were significantly more likely to have noticed the gun (66.7%) than were trainees (42%), still, one third of the experienced officers missed the gun on the dashboard. These findings provide robust support for the notion of inattentional blindness by suggesting that when participating in an event, people frequently do not notice even personally relevant objects that are in plain sight. This is a failure of attention to even a salient dimension of an event.

30. In the matter of the *Coalition on Homelessness v. City and County of San Francisco*, an example consistent with inattentional blindness includes not noticing

---

[12] There were several versions of this task in this study. For succinctness, only one version is described here.
[13] Simons D.J., Schlosser M.D. (2017). Inattentional blindness for a gun during a simulated police vehicle stop. *Cognitive Research: Principles and Implications. 2*(1), Article 37.

posted notices at sites prior to a sweep. For example, Karina Ioffee, when asked whether DPW disposed of a particular trailer, responded, "It's not clear to me what happened to the trailer. I don't -- I don't remember right now. I think I was -- yeah. Diverted by other stuff that was going on." It is possible that in observing an encampment at the time of a sweep, in the chaos of the encampment and the commotion of the sweep, she was attentionally blind to the presence of a posted notice; understandably, she was focusing her attention elsewhere.

Report of Kathy Pezdek, Ph.D.

## Summary and Conclusions

31. This report (a) offers scientific evidence concerning the fallibility of event memory in general, focusing on four major principles that characterize cognitive processing and memory for events, and (b) and provides examples of these principles from the case of *Coalition on Homelessness v. City and County of San Francisco*. If I am permitted to testify in this trial, I would educate the trier of fact about how event memory works in general, and the scientific research relevant to the specific principles most likely to have affected event memory in this case.

Kathy Pezdek, Ph.D.
Professor of Psychology