# Exhibit C

```
 1   would apply to people in general in those circumstances.
 2        Q.   Would you agree that the principles that you're
 3   talking about would apply to all the witnesses in this
 4   case, no matter whether they're witnesses for the City
 5   or witnesses for Plaintiffs?
 6        A.   Yes.
 7        Q.   A couple more questions about compensation.
 8             In your expert report, you state that you're
 9   being compensated for your research and writing at the
10   rate of $300 an hour, correct?
11        A.   Yes.
12        Q.   Is that your standard rate for expert
13   engagements, consulting engagements?
14        A.   Yes.
15        Q.   You're also being compensated at the basis of
16   $2,000 per day spent in deposition or trial; is that
17   correct?
18        A.   Yes.
19        Q.   Is that also your standard rate?
20        A.   It varies -- that varies slightly by county,
21   but -- it varies by county.
22        Q.   What's the lowest and the highest that you
23   currently would charge for a day of testimony?
24        A.   A thousand dollars in L.A. County, $2,000 in
25   whatever county Portland, Oregon, is.
```

```
 1   details that pertain to a particular event.  And those
 2   are what are more vulnerable to suggestibility.
 3        Q.   We'll get back to that a little bit later.
 4             But is that a principle that applies generally
 5   across all witnesses in this case?
 6        A.   Yes, yes.
 7        Q.   It's a universal that would apply to all
 8   people?
 9        A.   Everything in my report is a principled memory
10   that would apply to the general population.
11        Q.   Let's -- again referring to the first page of
12   Exhibit 1410, one of your general research interests is
13   visual memory.
14             Can you explain what that is, please.
15        A.   Yeah.  That's memory for things that we see.
16             So I study memory.  There are all kinds of
17   memories.  I focus on memory for things that you see.
18   Face memory, those are faces that you see.  Event memory
19   are events that you see.  That's what --
20        Q.   So --
21        A.   -- I mean by that category.
22        Q.   I'm sorry.  I didn't mean to interrupt you.
23             So visual memory can be compartmentalized into
24   face memory and event memory?  Is that -- did I get that
25   right?
```

```
 1  multiple times.
 2  BY ATTORNEY FREEMAN:
 3      Q.  Go ahead, please.
 4      A.  I do, yes.
 5      Q.  Have you ever met any of the people who are --
 6  whose declarations or depositions you've reviewed?
 7      A.  No.
 8      Q.  Have you met any people who you understand may
 9  be witnesses in the case?
10      A.  No.
11      Q.  Would you agree that you'd need to get to know
12  an individual before assessing their ability to
13  perceive, pay attention, or remember an event?
14      A.  If I was going to assess an individual on their
15  cognitive ability, I would need to meet with them, yes.
16      Q.  Have you ever observed what we've come to refer
17  to as an HSOC, Healthy Streets Operation Center,
18  resolution, which our witnesses refer to as "sweeps"?
19          Have you ever observed a sweep?
20      A.  No.
21      Q.  Are you familiar with how HSOC resolutions, or
22  sweeps, are typically conducted in San Francisco?
23      A.  I'm aware of the various statements made by the
24  eyewitnesses in this case.  Other than that, I don't
25  know any policy statements or statements of practice or
```

```
 1   we have it.
 2           But what do you remember about those recent
 3   engagements without consulting notes?
 4       A.   One was a trial in Los Angeles, Superior Court
 5   case trial in Los Angeles.  And the other was a Superior
 6   Court case in San Jose.
 7       Q.   What did the L.A. Superior Court case involve
 8   in terms of your testimony?
 9       A.   Eyewitness -- well, actually, that was a case
10   that involved recognizing someone -- an eyewitness
11   recognizing someone from a surveillance video.
12       Q.   And the San Jose Superior Court case, what did
13   that involve?
14       A.   An eyewitness recognizing someone from the
15   scene of a crime.
16       Q.   All right.  Thank you.
17           Looking at Exhibit 1412, have you -- are these
18   all cases in which you've testified on behalf of
19   criminal defendants?
20       A.   These are all the cases in which I've testified
21   during that period of time -- testified or one of those
22   is a deposition.
23       Q.   Right.  But my question is a little bit more
24   specific.  You know, maybe you'll have to break it down
25   differently.
```

1          But are these all cases in which you testified
2    or were retained by counsel for a criminal defendant?
3        A.   Yes.
4        Q.   And again, if you need to be more specific,
5    tell me.
6             But generally, are these all cases in which
7    your testimony has involved the reliability of
8    eyewitness identifications?
9        A.   That's the only thing I testified to, yes.
10       Q.   So that covers all the cases --
11       A.   Yes.
12       Q.   -- on Exhibit 1412?
13       A.   Yes.
14       Q.   So is it fair to say that this assignment is a
15   little bit different from the ones that are listed on
16   1412 in that you're testifying more broadly about the
17   reliability of event memory?
18       A.   Some of the cases listed in this exhibit in
19   front of us are about event memory in terms of who did
20   what, what actually happened, and so forth.
21            So I do fairly often testify about event memory
22   issues.  Most -- most of the time, I'm testifying about
23   identification of a person; that is true.  But I do
24   testify about event memory as well.
25       Q.   Now, can you tell me which of the cases on

```
 1  without going through it.  I mean, go back up to the top
 2  of the list, because the most current are first.
 3          To some extent, almost all of these articles
 4  refer to different aspects of memory and eyewitness
 5  memory.  The second publication has to do with event
 6  memory for an officer-involved shooting by police
 7  officers and civilians.  That would certainly be
 8  relevant.
 9          Surveillance video identifications are not so
10  relevant.  So that would be not the next couple of
11  papers.
12          There aren't any -- the article about police
13  officers have no advantage over civilians, I think
14  that's relevant if you consider certain eyewitnesses to
15  be not police officers in this case but officials.
16  BY ATTORNEY FREEMAN:
17      Q.   Let me ask you about that for a second.
18  Because in this case, we have San Francisco employees.
19      A.   Yes.
20      Q.   Some police officers, one fire department
21  officer, DPW employees.
22          Would you agree with the statement that City
23  employees don't have any advantage over homeless persons
24  in terms of their ability to recall events?
25      A.   You put in homeless people.  I -- I don't know
```

1  if there are any special characteristics of memory for
2  homeless people, but I would certainly say the City
3  officials aren't advantaged in their memory over
4  civilians, over regular civilians.
5       Q.  Thank you.
6           Go ahead.  I interrupted your flow on
7  discussing the articles in 1410 that would be
8  particularly relevant to your testimony.
9       A.  Okay.  Scroll down, Mr. -- is it Friends?
10 Mr. Friends, is it?  Okay.  Scroll down.  Give me the
11 next screen, kind of fill the next screen.
12          The study on elevated stress would be relevant.
13 We're certainly talking about people observing stressful
14 situations in some --
15      Q.  Let me make sure that I understand which one
16 that is.
17      A.  Second from the bottom here, Pezdek, Abed,
18 Cormia, "Elevated stress impairs the accuracy of
19 eyewitness memory but not the accuracy-confidence
20 relationship."
21      Q.  Thank you.
22      A.  Laypeople's beliefs about memory probably not
23 so relevant, but it may be depending on what way our
24 discussion goes.
25          Can I see the next screenful of shots --

1    A.   Certainly not in the last 30 years.
2         In the beginning of this field, I think that
3    judges were more reluctant -- my experience is judges
4    were more reluctant to recognize the field of cognitive
5    science as an area; and therefore, I was not admitted as
6    an expert.
7         But that was before this field was better
8    established -- the field of eyewitness expert
9    identification was better established.
10   Q.   So I want to make sure that I understand your
11   testimony correctly.
12        In the past 30 years, you've never been offered
13   as an expert but had the Court decline to accept you as
14   an expert?
15   A.   Based on my professional background, that's
16   correct, yes.
17   Q.   Have you ever been allowed by a court to give
18   opinions on some subjects but not others?
19   A.   Yes.
20   Q.   All right.  Let me focus on the areas where the
21   Court has said you are not permitted to offer opinion
22   testimony.
23        What have those been?
24   A.   I'm almost always precluded from giving expert
25   opinion testimony about the memory ability of any

```
 1   particular eyewitness as an individual.
 2       Q.   Okay.  And do you recall any particular courts
 3   or cases in which that preclusion has happened?
 4       A.   Almost all of them.  That's a general principle
 5   that applies to my testimony.
 6       Q.   Okay.  But those are cases in which the
 7   attorneys that you're working with have offered you as
 8   an expert for those -- in that subject, and the Court
 9   has said no?
10       A.   No.  Attorneys on both sides usually recognize
11   that I am an eyewitness expert who testifies about the
12   factors that affect the accuracy of memory in general,
13   just as the bulk of what I would be testifying to in
14   this case; but not about any particular eyewitness, how
15   good their memory is, how good their eyewitness memory
16   is, and so forth.
17       Q.   Okay.  Do you know what a Daubert motion is?
18       A.   Yes.
19       Q.   Have you ever been excluded from providing
20   testimony in court by a motion in limine or a Daubert
21   motion?
22       A.   No.
23       Q.   Have you previously -- let's say within the
24   last four years, have you testified concerning a
25   person's ability to recall matters other than the
```

```
 1      Q.   I'm going to go down to paragraph 13.  You say,
 2   quote:  "Schema-driven processing can be problematic,
 3   however, if a specific episode of an event did not
 4   include a feature of the schema for the event," close
 5   quote.
 6           Did I read that correctly?
 7      A.   This is paragraph 13?
 8      Q.   Lines 4 and 5.
 9      A.   4 and 5.  I don't have the lines here.
10           (Examines document.)
11           Yes.
12      Q.   Can you tell me of any instances in this case
13   where this occurred, based on your review of records?
14      A.   Well, I should clarify.  I am not going to be
15   testifying, and I'm not prepared to do it here, about
16   the specific details of any person's memory or the
17   circumstances of any witness's memory.
18           I'm talking about general principles that apply
19   to people in general, not to any particular person.
20           So if you're asking me to go through -- scan
21   from memory details of where this happens, no, I'm not
22   prepared to do that.
23      Q.   Okay.  Well, in your report, you mentioned
24   quite a few examples where you cite witnesses for the
25   plaintiffs and cite examples of why their memory might
```

```
 1   Mr. Graham might have approached his job?
 2        A.   This is a DPW worker.
 3        Q.   Yes.
 4        A.   Yes, it could.  It could be.
 5        Q.   Okay.  I want to take you next to page 56 of
 6   his deposition.  And he's asked at line 7, quote:
 7   "Okay.  Have you ever encountered a situation where
 8   people were unable to take everything they wanted with
 9   them?"
10             Answer:  "I don't recall," close quote.
11             You testified earlier that you were looking for
12   examples of memory or recollection.
13             Is there a particular reason why you didn't
14   pick up on this one?
15        A.   Because I didn't read that deposition.
16        Q.   Okay.  You just never got to it in the time
17   allotted?
18        A.   Well, for all the reasons we talked about this
19   morning.
20        Q.   Okay.
21        A.   I'm not going to be testifying about particular
22   witnesses and their circumstances in this case.  I did
23   not prepare for that.  It was not what I'm going to do
24   when I testify in this case.
25        Q.   Okay.  Do you ever -- did you come across any
```

```
 1   necessarily untruthful about that.  She was asked a
 2   general impression question, and she gave a general
 3   impression answer, right?
 4        A.   Nothing in my report is implying a lack of
 5   truthfulness on the part of any of the witnesses.
 6        Q.   Okay.  Did you also read her testimony
 7   concerning specific recollections of the layout of the
 8   encampment?  We've gone through some of that.
 9        A.   Yes.  Yeah.
10        Q.   Do you have an opinion that when Ms. Erickson
11   testified about the details of her encampment, she was
12   being truthful or untruthful?
13        A.   Well, throughout this whole deposition today,
14   I'll just say as a general statement:  I'm not
15   implying -- I have no reason to think that any of the
16   eyewitnesses was -- were untruthful.
17        Q.   Okay.  Did any of the specific recollections,
18   like the fact that her dog food was taken, affect or
19   change your opinion about her testimony?
20             ATTORNEY LANIER:  Objection as to the use of the
21   word "specific."
22             THE WITNESS:  No.
23             ATTORNEY FREEMAN:  Let's move on to -- hold on a
24   second.  Let's --
25                  Mr. Friend, would you download Tab 12, which is
```

```
 1   deposition testimony of Corey Barkley?  We'll mark that
 2   as 1418.
 3            Is that correct?
 4      THE REPORTER:  Yes.
 5            (Deposition Exhibit 1418 was marked for
 6            identification.)
 7   BY ATTORNEY FREEMAN:
 8      Q.   Please look at paragraph 18 of your report,
 9   Dr. Pezdek.  You talk about Corey Barkley having a
10   schema when he talks about what happens during a sweep.
11            And you write in your report:  "When asked what
12   a 'sweep' was, he responded, 'They come through and just
13   take all of your things and throw it in the back of a
14   truck,'" close quote.
15            You then write:  "This schema, which lacks
16   details of specificity, may have informed Mr. Barkley's
17   memories of the events he experienced..."
18            I notice that you didn't use the word "likely"
19   there.
20            What did you intend to convey when you said
21   "may have informed" his memories?  That it's possible?
22      ATTORNEY LANIER:  Objection; form.
23      THE WITNESS:  I can't put a probability on that.
24   I'm sorry.
25   BY ATTORNEY FREEMAN:
```

```
 1  don't -- I don't agree with that.  That's not the point
 2  I made.
 3  BY ATTORNEY FREEMAN:
 4      Q.   Okay.  You wouldn't agree with that argument by
 5  the City, is what you're saying, right?
 6      ATTORNEY LANIER:  Same objections.
 7      THE WITNESS:  Say the argument again.  I don't
 8  understand.
 9  BY ATTORNEY FREEMAN:
10      Q.   It's a hypothetical question.
11           If the City were to argue in court, "Your
12  Honor, you shouldn't believe what Mr. Barkley says about
13  this particular sweep because of the testimony of
14  Dr. Pezdek that he's got schema, so he probably didn't
15  remember it" --
16      ATTORNEY LANIER:  Objection.
17  BY ATTORNEY FREEMAN:
18      Q.   -- would you agree that that's a misuse of your
19  expert testimony?
20      ATTORNEY LANIER:  Objection; argumentative, asked
21  and answered multiple times, incomplete hypothetical.
22      THE WITNESS:  Yeah.  I -- I would like the
23  hypothetical to include more relevant -- additional
24  relevant information about the incident.
25  BY ATTORNEY FREEMAN:
```

```
 1         Q.    I'm sorry.  Go ahead.
 2         A.    Yeah.  That -- that -- what you said I don't
 3    think would be the City's argument.  But hypothetically,
 4    if they argued that, it would be a misapplication of
 5    what I've said.
 6         Q.    Thank you.
 7               Let's go to paragraph 19 of your report.
 8    You've got it in front of you there, so we don't need it
 9    on the screen.
10               And in this paragraph, you discuss the
11    deposition testimony of Leslie Fong.
12               Do you see that?
13         A.    Yes.
14         Q.    Okay.  And you read Ms. Fong's deposition?
15         A.    The deposition, yes.
16         Q.    Did you read her entire deposition?
17         A.    Yes.
18         Q.    And you state that she also has a -- I'm
19    looking at the top of page 9 of your report, still in
20    paragraph 19, quote:  "Ms. Fong, too, appears to have a
21    schema for a 'sweep,' but it was more detailed and
22    therefore would likely result in more specific memories
23    of the events she experienced relating to resolutions
24    she attended," close quote.
25               Did I read that correctly?
```

# ERRATA SHEET

NAME OF CASE: *Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, No. 4:22-cv-05502-DMR
DATE OF DEPOSITION: April 7, 2025
NAME OF DEPONENT: Kathy Pezdek, Ph.D.

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| 33 | 9 | "Everything in my report is a principled memory…"<br>SHOULD BE<br>"Everything in my report is a principle of memory…" | Transcription error |
| 63 | 20-22 | "My testimony does not relate to the credibility of any witness."<br>SHOULD BE<br>"My testimony does not relate to the credibility of any specific witness." | Misstatement |
| 71 | 12 | "…that as just memories at the top and more detailed…"<br>SHOULD BE<br>"…that as gist memories at the top and more detailed…" | Spelling error |

*[signature: Kay Pezdek]*
Kathy Pezdek, Ph.D.