# EXHIBIT B

```
 1                    (A break was taken from 11:10 a.m. to 11:17
 2    a.m.)
 3         Q.   (BY MR. DO:) Dr. Asfour, earlier I asked you what
 4    were you tasked to doing in this case, and you mentioned
 5    that you were asked to offer an opinion with regards to
 6    infectious disease risks posed by homeless encampments.
 7    Correct?
 8         A.   That's correct.
 9         Q.   And part of that was any risk posed by storing of
10    unhoused people's belongings.  Correct?
11         A.   That is correct.
12         Q.   Anything else to add to that?
13         A.   That's the broad scope.
14         Q.   So what is your opinion with regards to what you
15    were tasked to answer?
16         A.   May I look at my report?
17         Q.   I'd like to ask what your memory is as of right
18    now, your opinion.
19         A.   Sure.
20         Q.   We'll certainly be going over the report.
21         A.   Okay.
22         Q.   I won't hide the ball.
23         A.   My opinion is that unhoused people suffer from a
24    variety of infections that are to a greater extent than
25    non -- than the general public in the United States.  There
```

1  are specific risks of airborne-transmitted diseases, such as

2  tuberculosis; some viruses such as one called respiratory

3  syncytial virus, or RSV.  There are risks of

4  gastrointestinal infections or rates of gastrointestinal

5  infections that are transmitted via the fecal-oral route

6  that are higher in unhoused populations than housed

7  populations.  That includes diseases such as hepatitis A,

8  Shigella, among others.

9           There are risks of skin and soft tissue

10  infections, including group A strep, which is the same kind

11  of strep that causes sore throat.  It can also cause skin

12  infections and M-R-S-A, or MRSA, as discussed already.

13  Those can be transmitted by contact.

14           And there are risks of blood-borne disease --

15  diseases, such as HIV, hepatitis B and hepatitis C, that are

16  transmitted via needles, for example, shared needles.  There

17  are increased rates of sexually-transmitted diseases, such

18  as syphilis, HIV as well, hepatitis B as well.

19           And there are increased rates of parasitic

20  infections, such as scabies or parasitic infestations.

21  Sometimes we call them infestations instead of infections.

22  Scabies, lice, and bedbugs, for example.

23           There are also infectious disease risks associated

24  with what we call vector-borne disease, such as one called

25  typhus.  There was an outbreak in Southern California, LA

1   County especially, in -- with a high proportion of persons

2   experiencing homelessness suffering from typhus.  There's

3   been a few outbreaks.  There's also been West Nile virus,

4   which is transmitted by mosquitoes in areas where --

5   mosquitoes breed in areas where water is collected or

6   collects.  So that's been reported in persons experiencing

7   homelessness as well.

8                So these are some of the risks of

9   homelessness or infections in persons experiencing

10  homelessness.

11               There are risks related to storage of items

12  that are found in encampments, including risks to the

13  workers that are charged with having contact with those

14  items.  Those risks include needlestick injuries and

15  contact -- diseases transmitted by fecal-oral route.

16               There is limited data on risks to the general

17  broader community.  However, there -- there are some -- it's

18  hard to study that situation, but, when, for example, a

19  disease -- or there's more rats in an area because of food

20  waste, for example, in an encampment, rats can transmit

21  diseases to local populations, including diseases like

22  typhus, and a disease like TB or MRSA when -- which are

23  higher in persons experiencing homelessness.  Those diseases

24  can also be transmitted when a patient presents for

25  healthcare before that is -- before the tuberculosis, for

1   exclusive ways of transmissions for those airborne diseases?

2       A.    For RSV, yes.  For TB, there are other ways to

3   transmit TB, but those other ways are not of concern in

4   homelessness encampments in San Francisco or really not too

5   much of a concern in the U.S.

6       Q.    Fair enough.

7           Earlier you mentioned -- have there been any

8   studies with regards to the transmission of these

9   respiratory diseases and the risks posed to the general

10  public?

11          MR. WANG:  Objection.  Vague.

12          THE WITNESS:  And the risk to the general --

13      Q.    (BY MR. DO:) Public, yes.

14      A.    -- public?

15              There's limited data.  No, there haven't been

16  widespread studies on that.

17      Q.    Sorry.  Just to confirm, I heard you say both

18  there's limited data and then I also heard that there are no

19  studies on this.  Is that the same thing?  It may be the

20  same thing and I'm mistaken.

21      A.    It's a similar thing.  I will say that there

22  are -- I did not come across any peer-reviewed literature or

23  good quality data suggesting -- strongly evidencing

24  transmission from homeless encampments to the general

25  population.

1              However, there is a practical and

2    theoretical -- there's certainly a risk.  There is certainly

3    a risk, in my opinion.

4        Q.   Is it fair to say that there's a theoretical risk?

5        A.   There is a theoretical risk.  And there's an

6    actual risk, as I mentioned, in the hospital setting, and

7    that, you know, transmission has occurred of things like

8    scabies, for example.  MRSA as well.  I don't know of cases

9    of TB.

10       Q.   And I'm asking specifically with regards to an

11   encampment context, not a hospital setting.

12              You're not aware of any studies, I believe.  And

13   so the subsequent question is you said that there may be a

14   theoretical risk.  Is there an actual risk that you're aware

15   of in, specifically, homeless encampments?

16              MR. WANG:  Objection.  Vague.

17              Go ahead, Doctor.

18              THE WITNESS:  Thank you.

19              There is an actual risk.

20       Q.   (BY MR. DO:) What's that based off of?

21       A.   It's based off of my experience and some case

22   reports.  For example, in the typhus outbreak in Los Angeles

23   County, a lot of persons were experiencing homelessness.  It

24   was transmitted by rats.  It is certainly possible, although

25   they didn't prove, that the rats were seen and rat feces

1    were seen around homeless encampments, it is certainly

2    possible that some of the people who weren't experiencing

3    homelessness who got typhus, they got it because of the rats

4    that were drawn to the homeless encampments in the local

5    area.

6              So this is not a proven event because it's

7    very difficult to prove such things.  However, the risk is

8    more than theoretical.  The risk is real.  It might not be

9    very, very high, but there is risk.

10       Q.   Well, risk is kind of a gradient; is that fair to

11   say?

12             Sorry, I see a reaction, but just a verbal

13   response?

14       A.   I didn't know that was a question.  Sorry.

15       Q.   Yes, it was a question.

16             So risk is kind of a gradient in the matter of

17   degree.  Correct?

18       A.   Yes.

19       Q.   And just to confirm, you mentioned typhus.  Typhus

20   is a vector-borne disease.  Correct?

21       A.   Correct.

22       Q.   And my question was specifically related to

23   airborne respiratory disease.

24       A.   Excuse me.  I don't know of -- I don't know of

25   airborne respiratory disease -- I don't know of studies

1    showing spillover of airborne respiratory disease

2    definitively into the community.  But there is -- but there

3    is risk that is more than just theoretical.

4         Q.   And by more than theoretical, do you mean -- and

5    I'm going to offer -- and I could be wrong, so feel free to

6    correct me.  Do you mean that there is a physical

7    transmission possibility, and, therefore, it could happen?

8              Is that what you mean by more than theoretical?

9         A.   Yes.

10        Q.   But you don't know whether or not it's likely to

11   happen.  Correct?

12             MR. WANG:  Objection.  Vague.

13                  Go ahead.

14             THE WITNESS:  Well, I'm not able to put a

15   probability, if you will, on how frequently or how easily it

16   could happen into the general population.  But there is a

17   risk.  And so infection prevention is about mitigating risk,

18   and that's what I do.  So there is a risk.

19        Q.   (BY MR. DO:) Can you say whether or not it is more

20   likely than not?  I'm not asking for an exact probability,

21   but is it more likely than not?

22        A.   I would have to --

23             MR. WANG:  Sorry.  Quickly, just objection, vague.

24   Incomplete hypothetical.

25                  Go ahead, Doctor.

1      THE WITNESS:  I have not made actual risk

2  assessments in any of those infections.  However, the risk

3  is not zero.

4      Q.   (BY MR. DO:) Aside from the risk of being not

5  zero, you haven't made any other estimation of risk as it

6  relates to sexually-transmitted diseases.  Correct?

7          MR. WANG:  Objection.  Vague.

8             Go ahead.

9          THE WITNESS:  In terms of spillover into the

10 general population?

11     Q.   (BY MR. DO:) That's correct.

12     A.   Correct.  I have not made those estimates.

13     Q.   Okay.  And you have not made that estimate for

14 vector-borne diseases as well.  Correct?

15         MR. WANG:  Objection.  Vague.

16         THE WITNESS:  Correct.

17     Q.   (BY MR. DO:) So when someone says that the risk is

18 not zero, that could mean the risk could be 1 percent, the

19 risk could be 99 percent.  Correct?

20     A.   That is correct.

21     Q.   When you were first -- sorry.  I'm going to step

22 back a little bit from this line of questioning.

23         When you were asked to offer these opinions in

24 this case, what did you do to go about answering the

25 question?

1   you know, the patient is already in a medical setting.  Most

2   of the telemedicine I do is not with patients at home.

3           So certainly if the patient is at home, there

4   could be a risk of -- they might be more appropriate to be

5   seen by a provider.  And if that's the case, I would say so.

6           In this case, I didn't think it was necessary

7   to form my opinion in actually doing a site visit, given the

8   information provided to me.

9       Q.   (BY MR. DO:) Again, I hate to go there.  My

10  question isn't whether or not it was necessary.  My question

11  is whether or not it would be helpful?

12          MR. WANG:  Objection.  Incomplete hypothetical.

13  Vague.  Asked and answered.

14          Go ahead.

15          THE WITNESS:  I think I provided you an answer.

16  In certain circumstances it could be helpful.

17      Q.   (BY MR. DO:) But you don't know in this situation

18  one way or another whether or not it would be helpful?

19      A.   I -- I do not think that a site visit would have

20  changed my opinion.

21      Q.   How do you know that having not done it?

22      A.   Based on my experience, my review of the records,

23  and my -- based on my experience and my review of the

24  records.

25      Q.   You agree that encampments range in terms of

1  characteristics.  Correct?

2      A.   I agree.

3      Q.   You also agree that you treat individuals as

4  individuals.  Correct?

5      A.   I agree.

6      Q.   And that includes when making assessments about

7  whether or not an individual has a potential risk for

8  infectious disease.  Correct?

9      A.   Correct.

10      Q.   You make an individual assessment.  Correct?

11      A.   Correct.

12      Q.   Here, you were asked to offer an opinion about

13  homeless encampments and their risk.  Correct?

14      A.   I was asked to offer an opinion on the broad risks

15  of homeless encampments, not on the particular risk of a

16  specific encampment.

17      Q.   So you're not offering any opinion with regards

18  the particular risk of a particular encampment in San

19  Francisco.  Correct?

20      A.   That is correct.

21      Q.   Are there any other grounds for your opinion that

22  haven't been disclosed in your expert report or in this

23  deposition so far?

24      A.   Not that I recall.

25      Q.   You mentioned a literature review that you did.

1    you did not originally define might not -- or the validity

2    of that statistical -- of that outcome, the secondary

3    outcome, might not be as good as the primary outcome.

4              Just to say that there's a lot of complexity

5    in designing trials of or literature reviews of all sorts.

6    And, again, without specific context of a specific article

7    and my reviewing that article, it's difficult to say how one

8    compares to another.

9         Q.   Are you an expert in comprising -- of developing

10   studies or systemic reviews?

11        A.   I am not.

12        Q.   Have you conducted systemic reviews?

13        A.   No.

14        Q.   Have you conducted meta-analyses?

15        A.   No.

16        Q.   Have you conducted any studies as it relates to

17   homelessness?

18        A.   No.

19        Q.   Did you review any literature as it relates to the

20   risk of infectious disease stemming from a homeless

21   individual's belongings?

22        A.   No.

23        Q.   Did you make an attempt to do so?

24        A.   Yes.

25        Q.   But you didn't locate any; is that correct?

1       A.    Correct.

2       Q.    Was that surprising to you?

3       A.    No.

4       Q.    Why is that?

5       A.    Those are hard studies to do.  And they also

6   require funding that may or may not be difficult to come by.

7   But it's -- also the absolute risk is not very high with

8   proper handling so that there's nobody that has done

9   significant research on that that I am aware of.

10      Q.    I just want to confirm.  So you said that the

11  absolute risk is not very high with appropriate handling of

12  people's property; is that correct?

13      A.    That is correct.

14      Q.    And when you say absolute risk, do you mean amount

15  of risk?

16      A.    I mean the amount of risk.

17      Q.    Okay.  Is that kind of like our zero to 100

18  percent scale that we were talking about earlier?

19      A.    Yes.

20      Q.    Okay.  And are we talking about the risk as it

21  relates to property?

22            MR. WANG:  Objection.  Vague.

23            MR. DO:  I'm sorry.  Let me -- thank you.  That

24  was a vague or poor question.  Let me reask that question.

25      Q.    (BY MR. DO:) When we're speaking about the

1          THE WITNESS:  I have not done those studies,

2   correct.

3      Q.   (BY MR. DO:)  You haven't reviewed any studies

4   about that, either.  Correct?

5      A.   That is incorrect.  The risk in -- the studies

6   I've reviewed talk about the risk of airborne transmissible

7   disease being higher in persons experiencing homelessness

8   than the general population.

9      Q.   But that is in regards to the individual in the

10  encampment themselves and their experience of disease.  I'm

11  talking about the risk to the general public.

12     A.   Correct.

13     Q.   Similarly, there are no studies like that as it

14  relates to, say, city employees who interact with

15  encampments.  Correct?

16     A.   There are none that I am aware of that deal with

17  that.

18     Q.   For any of the diseases that are listed in your

19  report.  Correct?

20     A.   I am not aware of those studies especially, yes,

21  correct.

22     Q.   Okay.  So earlier you mentioned again that the

23  absolute risk of infectious disease is not very high as it

24  relates to the handling of unhoused people's property with

25  appropriate handling.  Correct?

```
 1              MR. WANG:  Objection.  Vague.
 2              THE WITNESS:  Again, depends on the specific
 3    disease.  But with proper handling, the risks are -- are
 4    low.  I'm not willing to say how close to zero without
 5    defining a specific context.
 6         Q.   (BY MR. DO:) Okay.  Yeah.  My question was whether
 7    it was low, and I appreciate the answer.  And we'll go
 8    through a little bit more context now.
 9              So we talked about airborne diseases.  Would you
10    say the risk for transmission of airborne diseases from the
11    handling of unhoused people's property is close to zero with
12    appropriate handling?
13         A.   Yes.
14         Q.   Would you say it's zero, practically zero?
15         A.   No.
16         Q.   It's a non-zero still?
17         A.   Correct.
18         Q.   Okay.  And why is that?
19         A.   If somebody had influenza, for example, or RSV,
20    those can survive on inanimate objects for a period of time.
21    Dr. King also agrees with that.  So, you know, if somebody
22    touched one of those -- an object contaminated with a virus
23    and then touched their face, then that could be a potential
24    for disease transmission of an airborne transmitted disease.
25         Q.   Sorry.  My question wasn't why it's not zero.  My
```

1    get it from animal urine and theoretically from human urine,

2    too, although those studies are -- it's more of a

3    theoretical risk than an actual risk.

4        Q.   So it's a theoretical risk; however, you have one

5    study at least with regards to urban wildlife or dogs.

6    Correct?

7        A.   Yes.  And there's more in the literature that I

8    didn't pull in that leptospirosis can be a problem.  But,

9    yes, in terms of human urine to city workers, the risk is

10   low, very low.

11       Q.   Very low.  At least borderline theoretical.

12   Correct?

13       A.   For that one I would say almost zero.

14       Q.   Thank you.  That's helpful.

15            I'm going to ask if you'd put the report away for

16   now.  We'll probably go back to it in a little bit.

17            MR. DO:  Actually, can I ask how long have we been

18   going for?  Has it been another hour already?

19            THE WITNESS:  It has been, I think.  We started at

20   10 -- yeah.

21            MR. DO:  Why don't we go off the record, and then

22   we can talk about timing here.

23                 (A break was taken from 1:33 p.m. to 1:53

24   p.m.)

25       Q.   (BY MR. DO:) Dr. Asfour, we were going through

1    assume you would think that the use of gloves is perhaps

2    preferable to using bare hands when dealing with the

3    potential of skin and soft tissue infections.  Correct?

4        A.  Correct.

5        Q.  And, again, you're not aware of any studies that

6    have examined the risk to either the general public or city

7    workers that stem from the handling of unhoused people's

8    belongings.  Correct?

9        A.  Correct.

10        Q.  What is your opinion with regards to blood-borne

11    infections as it relates to homeless encampments?

12        A.  Needles are the biggest concern with blood-borne

13    pathogens.  So needlestick injuries and shared needles

14    within the encampments, those are risk factors.

15        Q.  You're of the opinion that there is a higher

16    prevalence of blood-borne infections within the homeless

17    community.  Correct?

18        A.  Yes.

19        Q.  Is that across the board with regard to

20    blood-borne infections or particular blood-borne infections?

21        A.  Particularly HIV, hepatitis B, and hepatitis C.

22        Q.  Are you an offering an opinion with regards to the

23    risk of blood-borne infections to city workers or the

24    general public from homeless encampments?

25        A.  Yes.  I am saying that there is a risk of

1  transmission, especially to city workers, from needles.

2      Q.   Okay.  What about to the general public?

3      A.   The risk to the general public is very low because

4  I would assume that the general public avoids the areas.

5  But there are instances where needles are -- where I have

6  stepped over needles in San Francisco.  But, again, the risk

7  to the general public would be quite low.  The risk is more

8  in handling waste containing sharps.

9      Q.   Are you aware of any situation in which a member

10  of the general public has gotten a blood-borne infection due

11  to a homeless encampment?

12      A.   No.

13      Q.   Are you aware of any city worker in San Francisco

14  being infected with a blood-borne illness from a homeless

15  encampment?

16      A.   No.

17      Q.   Are you aware of a city worker being infected by

18  blood-borne infection from a homeless encampment outside of

19  San Francisco?

20      A.   I am not aware.  I'm not sure how that data is

21  recorded, if it is even recorded.

22      Q.   Is that data recorded in San Francisco?

23      A.   I don't know.

24      Q.   Are you aware of any data that shows that a city

25  worker of San Francisco has contracted any disease

1  by the potential for transmission of especially these

2  incurrable diseases.

3      Q.    Thank you for that.  I'm just going to repeat my

4  question, though, because I don't think I heard a response.

5  I just want to confirm if you knew one way or another.

6          Which is are you aware of any situation in which a

7  San Francisco city worker has contracted an infectious

8  disease due to their work as it relates to homeless

9  encampments?

10      A.    No.

11      Q.    Are you aware of any situation outside of San

12  Francisco with regards to a city worker contracting an

13  infectious due to their work regarding homeless encampments?

14      A.    No.

15      Q.    Did you -- Dr. Asfour, I understand, of course,

16  you mentioned that you, yourself, has maybe had needlesticks

17  in the past.  Correct?

18      A.    Yes.

19      Q.    And you still continued to do your work

20  notwithstanding that.  Correct?

21      A.    Correct.

22      Q.    And that needlesticks are, for example, in a

23  hospital setting also a risk that workers face.  Correct?

24      A.    Correct.

25      Q.    And, Dr. Asfour, I assume you would agree with me

1    contracted the blood-borne infection, or are you opining

2    upon that homeless encampments just generally cause anxiety

3    due to blood-borne infections?

4        A.    I'm opining on, if a needlestick injury were to

5    happen, the person with the needlestick injury may suffer

6    from some anxiety around that.

7        Q.    Okay.  All right.  I appreciate that.  So your

8    opinion, to the extent you're offering one here, is that,

9    one, that the ramifications of a particular disease are not

10   limited to maybe the physical symptoms that they may face

11   and may include, for example, the psychological harm

12   associated with, for example, particularly devastating

13   diseases?

14       A.    Correct.  And the medication side effects from the

15   medications that we put people on for post-exposure

16   prophylaxis after a needlestick injury.

17       Q.    You're not opining that merely because there

18   exists people who live in encampments, that one should

19   assume that they have blood-borne infections.  Correct?

20       A.    Correct.  Just that the rates of blood-borne

21   infections are higher in homeless encampments.

22       Q.    Did you review any type of logs with regards to

23   needlesticks in San Francisco?

24       A.    You know, I don't remember if I was provided that.

25   Somewhere I saw mention of some needlesticks, but I don't

1    remember a log.

2         Q.    So you're, therefore, not going to opine with

3    regards to the prevalence of needlestick injuries in San

4    Francisco for city workers?

5         A.    Correct.

6         Q.    Thank you.  You are also not going to opine with

7    regards to the prevalence of needles in homeless encampments

8    themselves; are you?

9         A.    Not the actual prevalence, just that they are

10   often found in homeless encampments in San Francisco.

11        Q.    What do you mean by often?

12        A.    There are many instances where needles have been

13   found in homeless encampments in San Francisco.

14        Q.    But you have no opinion with regards to the

15   frequency of it, just that it happens, that there are

16   incidents of it existing.  Correct?

17        A.    Yes.

18        Q.    You haven't examined the prevalence of intravenous

19   drug use in San Francisco; have you?

20        A.    Aside from allusions to increased intravenous drug

21   use in persons experiencing homelessness -- well, I did in

22   terms of increased prevalence in persons experiencing

23   homelessness.

24        Q.    So is it your opinion that there is a higher

25   increase of intravenous drug use and, therefore, that is one

1  something, then that is a potentially biohazardous situation

2  or . . .

3     Q.    (BY MR. DO:) But you're not suggesting that you

4  should just presume that just because something is in a

5  homeless encampment that it is potentially contaminated with

6  that potentially infectious material.   Correct?

7     A.    Correct.

8        MR. WANG:  Objection.  Vague.

9            Sorry.  Go ahead.

10       THE WITNESS:   I'm not assuming that just the fact

11  that it was in a homeless encampment makes it contaminated,

12  that is correct.

13     Q.    (BY MR. DO:) Are you an expert in terms of

14  identifying whether or not something is contaminated with a

15  potentially infectious material?

16     A.    Not outside of the hospital setting or healthcare

17  setting.

18     Q.    Would you agree that in terms of identifying

19  potential health and safety risk, that is something that

20  someone with training should identify?

21        MR. WANG:  Objection.  Beyond the scope.  Vague.

22  Incomplete hypothetical.

23            Go ahead.

24        THE WITNESS:  Again, I'm not opining on who should

25  identify.  I'm just opining that if something is potentially

1  it.  But yesterday was the first time that I fully reviewed

2  the policy that's available on the website.

3       Q.    I'm sorry.  Did you just go on your own and review

4  the bag and tag policy in preparation for this deposition?

5       A.    No.  There was a link in one of the documents.

6       Q.    And so you just clicked on it, said, oh, here's

7  this link, and it brought you to the City's website, it

8  sounds like?

9       A.    Yes.  I was not asked to review that in forming my

10 opinion.

11      Q.    Are you offering any opinion on whether or not

12 unhoused people's belongings are an immediate health and

13 safety risk?

14           MR. WANG:  Objection.  Vague.

15           Go ahead.

16           THE WITNESS:  I'm not offering any opinions in

17 interpretation of the bag and tag policy or any of the

18 terminology that's used.

19      Q.    (BY MR. DO:) So counsel just mentioned that my

20 question was vague.  So can I ask, does immediate health and

21 safety risk mean anything to you?

22      A.    This is terminology that I don't use in the

23 hospital setting, so I'm not commenting on terminology used

24 in that policy in this context.

25      Q.    So it's fair to say it doesn't mean anything in

```
 1        Q.    What's that?
 2        A.    So Dr. King states in the first paragraph that my
 3   opinion centers on elevated incidence and prevalence of
 4   infectious diseases among people living in encampments and
 5   suggests that this creates a risk to the broader community
 6   through potential contamination of objects found in
 7   encampments and that the underlying thesis is that items
 8   from homeless encampments cannot be safely stored due to the
 9   supposed infectious diseases risk they pose.
10              That is not my opinion.  My opinion is that
11   there are infectious diseases of the homeless encampments
12   themselves that has nothing to do with the objects stored or
13   storing of objects.  And then there's a separate risk of
14   storing objects that is not a risk to the broader community
15   at large but is a risk to city health workers -- or city
16   workers.
17              So that's one issue.
18        Q.    Anything else?
19        A.    Yes.  So the second paragraph is that several
20   aspects of my opinion lack evidence and are incomplete
21   assessments of the public health risks, particularly that
22   all or most objects in encampments pose a public health
23   hazard.
24                   And that is not what I said.  I said the
25   items that are potentially soiled with, for example, fecal
```

1  Correct?

2      MR. WANG:  Objection.  Incomplete hypothetical.

3  Vague.

4          Go ahead.

5      THE WITNESS:  Again, I'm not opining on exactly

6  what the City should do with every single item that they

7  encounter.  But I'm not saying that every contaminated item

8  needs to necessarily be disposed of.

9      MR. DO:  Okay.  Let's take a five-minute break,

10 and hopefully we can finish up after that.

11     THE WITNESS:  Okay.

12         (A break was taken from 4:58 p.m. to 5:09

13 p.m.)

14     Q.  (BY MR. DO:) Dr. Asfour, have you ever been

15 excluded for being an expert witness by a court?

16     A.  No.

17     Q.  And how many cases again have you probably been --

18 gone to at least -- excuse me.

19         And how many cases have you been deposed in in the

20 past ten years?  Could you estimate?

21     A.  Deposed or trial --

22     Q.  Deposed.  I'm sorry.  I interrupted you.  Please.

23     A.  Yeah.  The combination of the two is something

24 like 23.

25     Q.  Okay.  Thank you.  You're not offering any opinion

1    with regards to whether or not an item that is potentially

2    contaminated should be destroyed.  Correct?

3        A.   I'm not offering opinions on how to handle

4    individual items, right, correct.

5        Q.   Are you offering an opinion about what you should

6    do writ large, either?  Correct?

7             MR. WANG:  Objection.  Vague.  Go ahead.

8             THE WITNESS:  Writ large with what?

9        Q.   (BY MR. DO:) I'm sorry.  You mentioned just now

10   that you aren't offering an opinion with regards to what

11   should be done with any particular piece of property.

12   Correct?

13       A.   Correct.

14       Q.   So you're also not offering an opinion with

15   regards to what potentially contaminated belongings should

16   be done with, in general, either.  Correct?

17       A.   Correct.  I'm just opining on the potential risks.

18       Q.   Do you think you have particular expertise with

19   regards to how to best address infection risks in

20   encampments?

21       A.   I -- that takes -- I have some expertise in that

22   area, but that takes a multidisciplinary team, sanitation

23   experts, other people.  So I'm not -- I'm not somebody who

24   can address those risks independently completely.

25       Q.   Are you suggesting that you would want to be part