# EXHIBIT C

Coalition on Homelessness, et al. v. City and County of San Francisco, et al., 22-cv-5022 (N.D. Cal.)
Expert Rebuttal Report of Ben King, PhD MPH
March 24, 2025 Confidential – Subject to Protective Order

**Basis of Opinion:**

I have been conducting research on the risks of homelessness and literature reviews on the issue of health risks related to the experience of homelessness for approximately 20 years. Recently, I led a team of researchers conducting multiple (13) systematic reviews of the associations between homelessness and a range of health risks, including viral and bacterial infections.[1] Systematic reviews are a rigorous and structured methodology for reviewing the entire pool of evidence on a given topic, using predetermined search and exclusion criteria, within a prespecified period of time. I also reviewed documents related to this case and observed, both in-person and within those documents, examples of property which do not necessarily pose an immediate risk to health or safety.[2] The foundation of my conclusions are also discussed in my initial expert report.[3]

**Response to Exhibit C. Dr. Asfour:**

Dr. Asfour's opinion centers on the elevated incidence and prevalence of infectious diseases among people living in encampments and suggests that this creates a risk to the broader community through potential contamination of objects found in encampments. The underlying thesis is that items from homeless encampments cannot be safely stored due to the supposed infectious disease risks they pose.

While individuals living in encampments may face increased health risks, including infectious diseases, several aspects of Dr. Asfour's opinion lack evidence and are incomplete assessments of the public health risks, particularly the assumption that all or most objects in encampments pose a public health hazard and the lack of attention to mitigation strategies that could reduce or eliminate such risks.

---

[1] Research Registry (ID#: reviewregistry1777): Factors mediating relationship between homelessness to Cardiovascular Disease progression and mortality. https://www.researchregistry.com/browse-the-registry#registryofsystematicreviewsmeta-analyses/registryofsystematicreviewsmeta-analysesdetails/659ddfb2b641a900297afc96/ (listing studies on 13 sets including weather, noise and light pollution, sanitation, sleep, injury and violence, bacterial/viral infection and parasites, disease (HIV, human immunodeficiency, AIDS, acquired immune deficiency, HCV, HBV, hepatitis), smoking, nutrition and diet, and access to care)

[2] I also received the background material associated with Dr. Asfour's and Dr. Durrani's expert reports, a supplemental production from investigator Karina Ioffee, and the deposition transcript from health worker, Shannon Ducharme, date March 20, 2025.

[3] I am being paid at the following rates for my time: $300/hour for background research and drafting this report; $100/hour for travel time; and $400/hour for time providing testimony at trial or deposition. My expert disclosure of March 10, 2025 is amended accordingly.

Coalition on Homelessness, et al. v. City and County of San Francisco, et al., 22-cv-5022 (N.D. Cal.)
Expert Rebuttal Report of Ben King, PhD MPH
March 24, 2025 Confidential – Subject to Protective Order

The omission of any specific discussion of a route of exposure to link infectious disease risks to encampment residents with risk to DPW workers or others visiting encampments is notable. The route of exposure is the way in which a hazard enters an organism (ex: ingestion, inhalation, or dermal absorption). Such a link is not supported and this demonstrates a fundamental gap in the rationale of this opinion. The risk of exposure for workers, other visitors, or the greater community resulting from interactions with objects found in encampments is not, and cannot, be quantified because evidence of such risks is not supported in published, peer-reviewed literature.

Firstly, Dr. Asfour's opinion does not address the threshold of "immediate risk to health and safety" that is explicitly stated in the City's Bag and Tag Policy. Instead, the opinion relies on a range of risk thresholds such as potential contamination, or risk for outbreaks of infectious diseases, or risks for infectious disease transmission, all of which provide a moving target for assessing items located in encampments. The absence of a clear definition of this threshold is critical because it determines what should be discarded versus what can and should be stored. There are undoubtedly items that could pose a health risk at the time of removal, but there are also many items that do not pose an immediate risk.

Second, Dr. Asfour broadly states that the storage of items that are "potentially contaminated by or contain biohazardous items pose infectious disease risks." This claim is problematic for multiple reasons. The phrase "potentially contaminated" is not the standard used in the city's bag and tag policy, which instead refers to items being "soiled by infectious materials." It is also not a term with an operational definition to my knowledge. The lack of a precise definition makes it impossible to consistently assess whether an item should be stored or discarded. The reliance on thresholds which are overly-sensitive to perceived risk (such as 'potentially contaminated') also applies a standard for risk assessment that the City's own policies do not attempt to measure. In the eventual conclusion of this rationale, this threshold would label everything in the DPW work environment as potentially contaminated. In other words, "potentially contaminated" is a vague and unmeasurable standard—there is no practical or scientific way for teams to assess whether an object meets this undefined standard. This imprecision creates the risk that property will be unnecessarily destroyed without a clear public health justification.

It is notable that the City's Bag and Tag Policy acknowledges that there is property that can be stored safely. The process of bagging and storing property in the city's facilities could either increase or mitigate potential health risks depending on the approach. Impermeable plastic bags can readily contain unknown biohazards as can hard plastics. Moreover, most viruses and bacteria do not survive long outside the body. And rodent proof bags are similarly available. Dr. Asfour makes no assessment as to whether the City's current bagging and tagging have these protections. Dr. Asfour's opinion with regard to the risks posed by storage of certain materials in plastic bags does not negate the availability of more optimal storage options or preventative treatment of these potential risks. Many materials would still be considered safe for storage, such as mobility aids, tarps, medications, and personal documents. Other materials may benefit from simple and routine treatment before being stored, such as drying of rain soaked materials.

Case 4:22-cv-05502-DMR   Document 421-4   Filed 06/20/25   Page 4 of 7

Coalition on Homelessness, et al. v. City and County of San Francisco, et al., 22-cv-5022 (N.D. Cal.)
Expert Rebuttal Report of Ben King, PhD MPH
March 24, 2025 Confidential – Subject to Protective Order

Third, while Dr. Asfour provides a broad discussion of the infectious disease risks associated with homeless encampments, some of the related claims are inaccurate or unsupported by the available evidence. In my own experience conducting literature reviews on this subject, there is very little published, peer-reviewed evidence indicating that encampments pose any infectious disease threat to the surrounding community. Furthermore, there is no evidence in the reviewed documents or scientific literature demonstrating that objects within encampments contribute to infectious disease transmission. While it is true that encampments can have unsanitary conditions, the primary health risks tend to affect those living within them rather than the broader public. Additionally, Dr. Asfour states that "a homeless encampment can increase the risk to the local community," but fails to provide evidence demonstrating a link between encampments and community-wide infectious disease transmission or outbreaks. While some of the examples provided, such as human waste exposure, can present localized sanitation concerns, they do not substantiate a broader claim of significant infectious disease transmission to the general public.

Finally, the best way to mitigate the health risks associated with encampments is not through the city's current removal operations, but through improved sanitation and public health services. The city's approach—displacing encampment residents and confiscating or discarding their property—actually exacerbates the health risks. As documented in my initial report, removal operations (including property destruction) disrupt access to healthcare, medications, sanitation facilities, basic needs, and stable shelter, all of which increase the risk of infectious disease transmission. Destruction of improvised, albeit suboptimal, attempts by encampment residents to contain organic or biological waste in their environment have a similar effect. Furthermore, the city's disposal practices—such as indiscriminately spraying sidewalks, hosing down areas, and discarding all waste into DPW trucks—are not aligned with best practices for public health and environmental sanitation. Instead, effective infectious disease mitigation strategies should focus on increasing access to routine cleaning, sanitation stations, needle disposal containers, and other harm-reduction interventions that have been shown to improve both individual and community health outcomes.

In sum, while Dr. Asfour raises possible health risks faced by individuals living in encampments, the opinion does not provide evidence supporting the claim that objects found in encampment pose a significant infectious disease threat to the broader community. The reliance on vague terms such as "potentially contaminated" fails to establish a clear, actionable standard for property storage, and the city's current approach to encampment removal is more likely to worsen health outcomes than to improve them. A public health-focused response, grounded in the provision of sanitation and other public health services, would be far more effective in addressing the legitimate health concerns associated with encampments.

**Response to Exhibit D. Dr. Durrani:**

Dr. Durrani's assessment of the occupational health risks associated with encampment removals, as well as the broader public health risks linked to homeless encampments, are so general as to be unhelpful in assessing the risks specifically associated with the City's encampment operations

3

that are the subject of this lawsuit and does not consider the mitigation measures readily available to reduce or eliminate occupational hazards. Additionally, the report does not acknowledge the significant health risks that encampment clearances pose to people experiencing homelessness.

A central issue with Dr. Durrani's report is that it does not differentiate between risks inherent to DPW work in general (or any work requiring physical tasks of a similar nature) and those specific to encampment removals. Many of the occupational hazards described, such as slips, falls, lacerations, thermal injury, and puncture wounds, are standard risks for public works employees performing a variety of tasks, including road maintenance, sanitation, and waste removal. The report suggests that exposure to certain chemicals, such as the flame retardant TCEP, presents a unique hazard in encampments, yet it does not establish how the risk of exposure in encampments is greater than in other urban environments where plastics and textiles treated with TCEP might also be routinely handled. TCEP, which was banned in products sold or distributed in California in January 2020 (with a threshold of >0.1% of TCEP or any similar chemicals), was used as a flame retardant in polyurethane foams and plastics used to make padded components in many household items like crib bumpers, sleeping mats, and portable mattresses. Without distinguishing between these general workplace hazards and those specifically related to encampment clearances, the report overstates the unique dangers of this particular work.

Additionally, Dr. Durrani's opinion suggests an increased risk of disease transmission for DPW workers involved in clearing encampments, yet it does not present sufficient evidence of any such risk. The literature cited focuses on the heightened burden of infectious disease among people experiencing homelessness, not on the risks to city workers who interact with encampments briefly during cleanup operations. I do not disagree that there are heightened health risks for those living in encampments and discuss some of those in my own report. Like Dr. Asfour's report, Dr. Durrani's report does not provide any explanation of the theorized routes of exposure (i.e. mechanism through or conditions under which infectious diseases might spread to workers cleaning or clearing areas where encampments have been erected). This risk is not supported by the scientific, peer-reviewed literature. Based on my review of the documents available to me, there is no clear documentation in the record of DPW workers contracting infectious diseases as a result of these operations (a similar concern is discussed in response to Exhibit C, above).

Dr. Durrani also mentions the increased risk of exposure to chemicals including drugs of abuse, but does not make clear the routes of exposure or the actual risks posed. Exposure to such substances are unlikely to pose health risks through skin contact or aerosolization, although this may be rooted in common misunderstandings about dermal or respiratory exposure to substances like fentanyl. As another example, Dr. Durrani cites workers seeing "drug paraphernalia" to support his claim, but provides no explanation of how this generic category of objects could lead to exposure or health risks. In particular, it's not clear what routes of exposure would be possible if proper personal protective equipment (PPE) was being utilized.

Case 4:22-cv-05502-DMR    Document 421-4    Filed 06/20/25    Page 6 of 7

Coalition on Homelessness, et al. v. City and County of San Francisco, et al., 22-cv-5022 (N.D. Cal.)
Expert Rebuttal Report of Ben King, PhD MPH
March 24, 2025 Confidential – Subject to Protective Order

Furthermore, the report does not fully consider the role of PPE and other safety procedures in mitigating exposure risks. Standard occupational health protocols—including the proper use of gloves, masks, and sharps containers—are specifically designed to minimize the risks of handling hazardous materials. They are also highly effective. As discussed in my prior report, improper disposal of certain materials, as opposed to the stored material itself, can also create or increase health risks. If the risks to workers are as significant as the report suggests, then an evaluation of whether the city's procedures align with OSHA's Hazardous Waste Operations and Emergency Response (HAZWOPER) standards should have been included, but it is not. The failure to address these available, routinely, and broadly-practiced mitigation strategies leaves the analysis incomplete.

The concerns about needle stick injuries raised in the report similarly lack discussion of prevention measures. As any healthcare professional in a hospital can attest to, and as Dr. Durrani is undoubtedly familiar with, there are established protocols for preventing and responding to needle stick incidents, including proper use of PPE, immediate post-exposure prophylaxis, and follow-up monitoring. The report references a needle stick log documenting such incidents, which demonstrates that the city is actively tracking and managing these risks. Yet, rather than acknowledging the effectiveness of these standard procedures, the report presents the risk of needle exposure without context, leaving an exaggerated impression of the threat posed to workers.

Dr. Durrani also highlights international sanitation standards, referencing guidelines from the UN High Commissioner for Refugees (while ignoring U.S. homeless specific guidance).[4,5] This is an important acknowledgment, particularly in the ways it does and does not apply to the conditions faced by those experiencing homelessness in the US. As the standards suggest, any risks would be best addressed by complying with sanitation standards. Critically, the report does not take the logical next step of addressing the fact that the city is failing to meet these sanitation standards, which are designed to promote public health and minimize risk. If these standards are relevant to this discussion, then the primary issue is how the city can ensure access to basic sanitation services such as clean water, toilets, and trash collection. The absence of these services contributes to the very public health risks that the report attributes to encampments themselves. The report also ignores the impact of destruction of belongings that unhoused people use for their own health and safety.

Perhaps the most glaring omission in Dr. Durrani's report, like Dr. Asfour's report, is its failure to acknowledge the health consequences of encampment clearances for the people being displaced. Available research consistently shows that displacement of encampments increases

---

[4] Dones, M. and Espinoza, M. (2024). Encampment Resolution Guide. UCSF Benioff Homelessness and Housing Initiative.
https://homelessness.ucsf.edu/resources/toolkit/encampment-resolution-guide

[5] US Interagency Council on Homelessness (USICH). (2024 Apr). 19 Strategies for Communities to Address Encampments Humanely and Effectively. https://www.usich.gov/guidance-reports-data/federal-guidance-resources/19-strategies-communities-address-encampments

Coalition on Homelessness, et al. v. City and County of San Francisco, et al., 22-cv-5022 (N.D. Cal.)
Expert Rebuttal Report of Ben King, PhD MPH
March 24, 2025 Confidential – Subject to Protective Order

health risks for individuals experiencing homelessness. Displacement disrupts access to medical care, medications, and harm reduction services, leading to worse health outcomes. During the COVID-19 pandemic, the Centers for Disease Control and Prevention (CDC) explicitly recommended that cities avoid clearing encampments to prevent the spread of the virus and to support access to testing and medical care. I understand that San Francisco implemented measures intended to comply with this guidance at the time, recognizing that encampment sweeps heightened public health risks to unsheltered individuals. Dr. Durrani's report does not mention this critical aspect of public health, nor does it engage with the growing body of research documenting the negative health consequences of displacement.

While Dr. Durrani's opinion raises a few valid concerns about occupational safety and public health risks, it ultimately lacks the necessary context and supporting evidence to justify its conclusions. The failure to differentiate between general DPW hazards and those specific to encampment cleanups, the omission of established safety measures that reduce worker risk, and the absence of any discussion on the health impacts of displacement all undermine the report's credibility and applicability. A more comprehensive public health approach would focus not only on occupational safety but also on addressing unsafe living conditions in encampments in the first place.

_/s/ Ben King_

Ben King, PhD MPH

March 24, 2025