# EXHIBIT B

1     UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3      OAKLAND DIVISION

4

5 - - - - - - - - - - - - - - - - -

6 COALITION ON HOMELESSNESS,  )

7 et al.,        )

8      Plaintiffs,  )

9 vs.         ) CASE NO.

10 CITY AND COUNTY OF SAN   ) 4:22-cv-05502-DMR

11 FRANCISCO, et al.,    )

12      Defendants.  )

13 - - - - - - - - - - - - - - - - -

14

15

16      REMOTE DEPOSITION OF

17    TIMUR DURRANI, MD, MPH, MBA

18    WEDNESDAY, APRIL 9, 2025

19

20

21   BEHMKE REPORTING AND VIDEO SERVICES, INC.

22    BY:  JONATHAN KIRSCH, CSR NO. 14460

23     550 CALIFORNIA STREET, SUITE 820

24     SAN FRANCISCO, CALIFORNIA  94104

25      (415) 597-5600

```
 1      A.   Not on the street, no.  I've been in forests
 2 and things like that, but I don't think --
 3      Q.   And that --
 4      A.   Again -- sorry.  Go ahead.
 5      Q.   No, finish what you're saying.
 6      A.   I don't think it relates to what you're asking.
 7 But I'm just trying to be correct, but I don't think
 8 it's related to what you're asking.
 9      Q.   Have you ever worked with individuals
10 experiencing homelessness?
11      A.   Yes.
12      Q.   And in what context have you worked with
13 individuals experiencing homelessness?
14      A.   In the hospital.
15      Q.   And that would be patients who come to the
16 hospital?
17      A.   Yes.
18      Q.   And are you their treating physician when --
19      A.   Yes.
20      Q.   When you encounter them?
21      A.   Sorry.  Yes, generally, yes.
22      Q.   And are there other roles that you have in the
23 hospital when you are working with individuals
24 experiencing homelessness?
25      A.   Usually as what's called the attending
```

1    the headphones.

2        A.    Sorry, I missed that last part.  Can you hear

3    me okay?

4        Q.    Let's just start again.  Dr. Durrani, have you

5    ever written or published any work that relates to

6    people experiencing homelessness?

7        A.    Not specifically to people experiencing

8    homelessness.  Most of my stuff is with regards to

9    workers and hazards that workers have.

10        Q.    Have you ever written or published any work

11    that relates to encampments?

12        A.    Again, that's not part of what I was asked to

13    do here.  But my work relates to occupational hazards

14    and things like that, so workers who may face hazards in

15    a scenario -- in a variety of scenarios.

16        Q.    And have you written or published any work that

17    relates to encampments in any way?

18        A.    Again, I don't think it's part of what I've

19    been asked to do here.  But no, I think most of my work

20    is on, you know, work -- risk for workers and things

21    like that.

22        Q.    And just to be clear, I'm not asking about what

23    you've been asked to do here.  I'm just asking about

24    over the course of your career in any context, have you

25    written or published works related to encampments?

1    setting, so I wasn't asking them about their own

2    personal injuries and things like that.  I was more

3    interested in sort of, you know, tell me about your

4    days, what it is you do, things like that.

5        Q.   Did any of the three laborers you spoke to tell

6    you about injuries that they had witnessed?

7        A.   I don't recall that.  But again, that wasn't

8    the focus of what we were discussing.

9        Q.   Did any of the DPW workers that you spoke with

10   describe specific instances where DPW workers were

11   injured during -- while cleaning or clearing

12   encampments?

13       A.   I don't have a recollection.  That -- I don't

14   recall that being the focus of our discussion, other

15   than what I'd talked about with the supervisor.

16       Q.   And the supervisor, what did the supervisor

17   tell you about specific instances?

18       A.   Oh, just that he was aware that, you know, this

19   had -- these things have occurred.  And so, you know,

20   part of his job is to remind his workers of, you know,

21   being aware of these hazards, things like that.

22       Q.   And aside from his being aware that these

23   hazards had occurred, did he describe specific instances

24   when they did occur?

25       A.   No.  But I mean, he may have.  I don't recall

1    that we had that discussion.

2        Q.    And did you also have a conversation with the

3    superintendent?

4        A.    Briefly.

5        Q.    And did you speak with the superintendent about

6    injuries that DPW workers have experienced?

7        A.    No, not really.  It was more just so she

8    understood.  I think, you know, she understood who I was

9    and who was asking her workers questions and things like

10   that.

11       Q.    About how long did you spend speaking with each

12   of the DPW workers?

13       A.    Oh, I don't know.  Five or ten minutes.  I

14   don't remember -- I don't -- I couldn't tell you.

15       Q.    And that would be about five or ten minutes

16   each?

17       A.    No.  We were in a group setting, and so it

18   was -- the first couple of minutes were with the

19   supervisor, and then it was, you know, mostly directed

20   to the supervisor.  The workers were in different shifts

21   of doing work at the time while we were talking.  And so

22   one would be doing something, and then come back, and

23   then another one would go, things like that.

24       Q.    So five to ten minutes total?

25       A.    Probably, yeah, between -- with that group.

1    MS. LANIER:  Objection.  Asked and answered.

2    A.    No.  I mean, look, the -- I think as we had

3    talked about earlier, worker -- you know, there are

4    risks that workers face that are -- you know, that occur

5    in and out of these encampments.  I think the question

6    that this focuses on are what are the risks -- what are

7    the increased risks that they would face in doing this

8    work, as comparing to not doing this work.  And so we

9    know that -- you know, that there are other components,

10   you know, that people can get other levels of exposure,

11   or other -- face other hazards and risks outside of

12   these encampments.  But this is as it's applied to

13   people doing the work to clear and potentially sort

14   through this material.

15   Q.   So is it your opinion that workers conducting

16   street cleaning and property removal at encampments are

17   at greater risk for certain injuries than workers

18   conducting street cleaning and property removal

19   elsewhere?

20   A.    I don't know that -- that wasn't really -- no.

21   The way the question's framed is not really how I

22   thought about this, or tried to answer this.  And so

23   with regards to clearing encampments at other places and

24   things like that, the comparison is sorting through and

25   clearing encampments of people experiencing homelessness

1       A.   Well, I considered --

2       MS. LANIER:  Asked and answered.

3       A.   I considered them all.  I don't have any notes,

4   but they're listed in my appendix, sure.  And as I said,

5   I think the same supervisor, and his name is escaping

6   me, is in those -- we had a conversation about the

7   physical injury, but it's also described in his

8   declaration.

9       Q.   And that declaration describes a physical

10  injury that occurred?

11      A.   I think it sort of describes the -- you know,

12  the risks of slips and things like that.  I think it

13  just describes the risk of physical injury.

14      Q.   Did you review any material that described a

15  slip, fall, or trip occurring at an encampment

16  resolution?

17      A.   It may be -- I'd have to go back and look.

18  That specific -- I don't have a specific recollection.

19  The reason why I say I have to go back and look is that

20  we had -- I have the request for the injury logs, and I

21  don't know -- I don't recall if they were in the injury

22  logs that have been provided.  I'm familiar -- I know

23  they're in the injury -- the -- I know they were in

24  existence for the City with regards to worker injury.  I

25  just don't know if they're in the injury logs that are

1  available in this case.

2       Q.  So you're not sure if the injury logs that you

3  reviewed show physical injuries occurring at encampment

4  resolutions?

5       MS. LANIER:  Asked and answered.

6       A.  Yeah, I would say there are injury logs that

7  exist.  The injury logs that were provided in this case

8  may have that.  Outside of that, based on my experience

9  in working with the City, I know people get, you know,

10  physical injuries and so forth.  That's where you would

11  find that information, is in the City's injury logs.

12      Q.  But you don't specifically recall reviewing

13  that information as related to injuries that occur at

14  encampment resolutions, correct?

15      A.  Well, I would say the -- I couldn't tell you

16  with regards to the voluminous amount of records that

17  are here where they are.  But I can tell you that I know

18  that they exist because, you know, we have workers who

19  get injured with regards to this, yes.

20      Q.  So you know that there are workers who have

21  suffered physical injuries at encampment resolutions?

22      A.  Yes.

23      Q.  And how do you know that?  What is that based

24  on?

25      A.  It's based on the injury logs that exist.

1  It's just a different type of physical injury.

2      Q.   Okay.  And this one specifically shows injuries

3  that occurred at encampment resolutions?

4      A.   That's my understanding, yes.

5      Q.   And what is that understanding based on?

6      A.   The request -- so this was -- so if you look at

7  how -- I think this is -- I think this is for fire, but

8  I -- yeah, I think this is for fire.  And so if you're

9  looking at location -- and so, like, I'm looking at

10  number ten.  And so if you go over to "Housing Status,"

11  it says "Experiencing Homelessness."  And so I think the

12  way that this was pulled was based on location of people

13  who had been at a -- you know, at a encampment.

14     Q.   And why do you think that this was pulled based

15  on people who had been at an encampment?  Where is that

16  information coming from?

17     A.   So I think like there, like 11th Street and

18  Howard and things like that, these are the addresses of

19  where these injuries occurred, which my understanding

20  is, those are at one point encampments.

21     Q.   And did you verify with anyone that these

22  injuries occurred during encampment cleanings?

23     A.   Well, I think -- I don't know that they -- I

24  couldn't tell you if they were cleanings or not.  I

25  don't think that's the way the data was sorted.  I think

1  it was with regards to an encampment.

2      Q.    And did you verify with anyone that these

3  injuries occurred at an encampment?

4      A.    Well, there was nothing to verify.  It has the

5  sort of date, location, date, and time.

6      Q.    And do you know that at that location on that

7  date and at that time, there was an encampment there?

8      A.    I --

9  MS. LANIER:   Asked and answered.

10     A.    Well, I think I know that -- that the date and

11 time and location of where this injury occurred, sure.

12     Q.    Okay.  And what information tells you that it

13 occurred at an encampment?

14 MS. LANIER:   Asked and answered.

15     A.    Well, I think -- what is this, row C, and then,

16 you know, marrying it up to row B.

17     Q.    So is your assumption that anytime in row C the

18 housing status of someone is listed as "Unhoused" or

19 "Experiencing Homelessness," that that person is in an

20 encampment at the time that the injury took place?

21     A.    Well --

22 MS. LANIER:   Vague.

23     A.    Yeah, I think if you go and look at where they

24 are located and then the address, the way to read this

25 report is that they're at a physical location of 11th

1  and Howard, and "Experiencing Homelessness," so yes.

2      Q.   So your assumption is that when there is an

3  incident on one of these injury reports listed involving

4  someone who's experiencing homelessness, and there's

5  also an address listed where the incident took place,

6  you're concluding that the injury took place in an

7  encampment?

8      MS. LANIER:   Asked and answered.

9      A.   No.  I think that misstates what I said.  What

10  I said was, the way these injury logs are created is

11  they come from the fire department, who has to track all

12  these things.  They searched by location and status,

13  because that's the way the data is kept, and provided

14  this information.  So when I asked for, what are the

15  injury logs with regards to -- or the injury that occurs

16  for people who are working in these environments, this

17  is what's provided.  And the way to sort of -- and the

18  proof of that is the location and the status as

19  described in row B and C.

20      Q.   So you received this injury log and the other

21  injury logs in response to a request for injuries that

22  took place at encampments; is that correct?

23      A.   Yes.  I mean, I was asking with regards to a --

24  I don't know that it was necessarily at encampments.  It

25  was activities as related to encampments.

1      Q.    Okay.  And your opinion is only about

2  occupational hazards that workers are at risk of when

3  cleaning encampments, correct?

4      MS. LANIER:  Misstates previous testimony.

5      A.    I'm not sure I follow.  But maybe this will

6  help clarify.  The -- you're using the term encampments,

7  which may be one person or it may be a bunch of

8  different people.  And so the way that this data is

9  pulled is by someone who is a City worker who had an

10  injury while addressing somebody who is experiencing

11  homelessness.  That may be a singular location with one

12  person, or it may be, as we described earlier, you know,

13  several people.

14      Q.    So what do you make of all of the individuals

15  in -- or incidents in row C involving people who are not

16  experiencing homelessness or who are housed?

17      A.    Well, I think we have to go and -- let's see.

18      Q.    I can zoom in as well.

19      A.    Maybe zoom out, because it's got -- there's

20  injury description.

21      Q.    So if you look at just the first injury

22  description, it says, "L index finger needle stick.

23  Needle stick occurred while en route to the hospital."

24  So this would be an occupational injury that occurs

25  outside of an encampment, correct?

1    A.   Well, I think the trigger was in an encampment,

2  right?  They went to Mission and 6th, had somebody they

3  were working with who was unhoused, and then suffered an

4  injury in the course of that activity.

5    Q.   Well, didn't they suffer an injury while

6  administering IM Zofran inside some kind of emergency

7  vehicle on the way to the hospital?

8    MS. LANIER:   Vague.

9    A.   Sure.  But -- yeah.  But I think the point of

10 this is when they pulled the log of people who were

11 injured while working with encampments or dealing with

12 somebody who was having -- you know, who's experiencing

13 homelessness, this is the injury that occurred.

14   Q.   And your understanding of them pulling this log

15 related to injuries -- of injuries related to

16 encampments is based on the requests that you made?

17   A.   Right, and the data --

18   MS. LANIER:   Asked and answered.

19   A.   Well, and the data that's there.  So you read

20 the first one.  If we read the first one, we have, "Was

21 exposed to a dirty needle with patients blood on it.

22 Patient is HIV positive."  You know, so it goes through

23 the whole thing.

24   Q.   But does that say anything about where this

25 occurred or what the context was?

1     A.     Not in row J.  If you go over to row B and D,

2  then it tells you where it occurred.

3     Q.     So 873 Missouri Street, where is that?

4     A.     I mean, I don't think I can answer your

5  question beyond what it says.

6     Q.     Is that an encampment?

7     A.     Well, it was a location where someone who was

8  unhoused and unsheltered was being treated.

9     Q.     Is every location where an unhoused and

10  unsheltered person is an encampment?

11     A.     I think that depends on how you define -- I'll

12  defer to you on what your definition of encampment is.

13     Q.     Well, what definition are you using for your

14  opinions?

15     A.     Well, my definition here was, can you please

16  provide the worker injuries that occurred with regards

17  to treating anybody who was unhoused.  So if they were

18  unhoused at this location, it may be an encampment of

19  one, but it was there -- that was their location where

20  they were unhoused.

21     Q.     So this spreadsheet and the injury logs you

22  requested concern injuries related to someone who's

23  unhoused, not necessarily injuries related to workers

24  who are cleaning and clearing encampments and other

25  areas where unhoused people are living; is that correct?

1       MS. LANIER:   Asked and answered.

2       A.   No.   I mean, I think the issue is the activity.
3   This is one example of the many activities that workers
4   face when going and treating, addressing, clearing
5   locations where people who are unhoused are living.

6       Q.   Okay.   But this injury report had a mix of
7   unhoused and housed people involved, right?

8       A.   At least that's --

9       MS. LANIER:   Document speaks for itself.

10      A.   At least I think that's what they have here.   I
11  couldn't tell you why -- you know, why some of those
12  things were included here or not.

13      Q.   Okay.

14      MS. KATOVICH:   Ms. Shulkin, I think we can go back
15  to Tab 1 now.

16      A.   Is this a -- probably if we're going to stop at
17  2:00, is this a good stopping place or to take a break?

18      Q.   I just want to ask you another question or two
19  about this section, and then we can stop.

20          So I'm just going to go back to the section
21  we've been discussing, which is this "Physical Injury"
22  section.   And in the second paragraph, you describe and
23  cite a report on "Fatal Operational Injuries in
24  California."  Do you see that?

25      A.   Yes.

1      A.   I think those are really the three, right?  So

2   the idea -- those are the three.  The idea from the

3   aerosolization is that these things can get aerosolized,

4   and then somebody can swallow them and things like that.

5   But those are really the three modes of exposure, I

6   think, here.

7      Q.   And I'm going to have you look at the footnote

8   to -- footnote one, which is the footnote that is

9   attached to the section we were just looking at on

10  infectious materials.  And here it says, "The following

11  references support statements made in this section."

12  And then it has a long list of articling.  Do any of the

13  articles that you cite here address transmission of

14  disease from people experiencing homelessness to

15  workers?

16     A.   Let's see.  I think these are mostly focused on

17  the outbreaks that occur in these environments.  But I

18  think they also describe some of the expose -- the

19  hazards to the community, so that would include workers.

20  But most of these are focusing on, you know, the risks

21  that -- the hazards that are -- that have been

22  documented in the literature with regards to these

23  encampments.

24     Q.   And do they document any spread of disease to

25  workers?

1    A.   Well, the focus of these was not on workers.

2  The focus of these were generally the outbreaks that

3  were occurring in these homeless encampments.  But when

4  you take that information and combine it with the work

5  that these people are doing, we see that there's

6  obviously an increased risk for the work that these

7  people are doing.

8    Q.   But there's no actual documented spread of

9  disease that you're aware of from people experiencing

10  homelessness to workers?

11    A.   No, I wouldn't say that.  We've -- as I

12  described, we have needlestick data that goes on.  We

13  have workers who are describing getting ill.  So we have

14  documentation about workers who are getting stuck by

15  needles that are in these encampments.

16    Q.   Are you aware of any literature, any articles

17  that document transmission of disease from people

18  experiencing homelessness to workers?

19    A.   I think so.  I think if we -- there's a couple

20  of papers that look at sort of infection within homeless

21  shelters, but they're not encampments.

22    Q.   I'm going to take you now to the next section

23  of this report, on "Chemical Exposure."  Do you see

24  that?

25    A.   Yes.

1  what that means.  That is the sewage, that is the

2  effluent that's coming off of, you know, these

3  encampments.  So it's not drinking water.

4      Q.   Right.  But there was no measurement in this

5  study of chemicals in an actual encampment itself; is

6  that correct?

7      A.   Well, the study was looking -- this is a sample

8  of what is in these encampments, and then gets excreted

9  from the encampment itself.  So yes, it's a measure of

10  what was in the encampment.

11      Q.   And in your section on chemical exposure here,

12  you list various chemicals including drugs of abuse and

13  their metabolites that workers are at increased risk of

14  exposure to.  How did you decide that -- on those

15  chemicals?

16      A.   That's what's listed in, for example, that

17  report.  That's a representative sample that's listed in

18  that report.

19      Q.   And again, that's a report concerning Las Vegas

20  and essentially the sewage coming out of areas where

21  unhoused people live?

22      A.   I mean, that's all correct.  I think the

23  important piece is that's a representative sample of

24  what workers would be exposed to.  If it's in the -- you

25  know, effluent, then that means it's also in the

1    encampment.  It's no surprise to anybody that we have
2    methamphetamine or other of these chemicals in these
3    encampments.  It's no surprise to me, because these are
4    patients I treat.  I know that they have these.  And so
5    I both treat patients who have these exposures, or, you
6    know, use these chemicals, and then I also have workers
7    who are being asked to go and clean these.  So --
8        Q.   And what --
9        A.   So --
10       Q.   -- forms of exposure to these chemicals or
11   drugs are dangerous?
12       A.   Well, it's all of the same routes that we had
13   talked about, right?  Inhalation, ingestion.  Most
14   people -- not ingestion.  Inhalation or injection.  Most
15   people -- you can ingest these.  You can swallow these.
16   But I don't think -- that would take a voluntary sort of
17   aspect that I don't think is a risk for a population of
18   workers.
19       Q.   And which of these drugs would it be -- would
20   pose a health risk to inhale?
21       A.   Well, it's not just their drugs.  It's not just
22   what was listed there, but also the -- either the
23   metabolites or the chemicals that are used to create
24   these.  Sometimes these are -- so when you find, let's
25   say, methamphetamine, it's also being, you know,

1    Q.   And in those declarations or depositions, is

2    there any indication that workers have been exposed to

3    health risks when they've encountered those paint cans

4    or other materials?

5    A.   Sure.  So the -- its presence is the hazard.

6    The exposure is then -- because they're there and having

7    to clear it, is the exposure, which increases the risk.

8    So I think if you're asking me, do we have any

9    documentation of a worker getting ill from this,

10   thankfully no.  And I don't think we want to get to that

11   point.  But there is -- the hazard exists.  And because

12   of their presence there, the risk exists.

13   Q.   And you identify a number of drugs here that

14   you say workers are at increased risk of exposure to.

15   What -- how much exposure would be necessary to create a

16   negative health consequence?

17   A.   Will, for a worker who -- I mean, any exposure,

18   right?  I mean, these workers shouldn't have these

19   exposures.  This is not part of their regular day.  And

20   so, you know, this is not a -- these are not regulated

21   workplace exposures that are tolerated.  There's no

22   threshold at which you would say, Well, a worker can get

23   exposed to X amount of cocaine.  And so if you're asking

24   what's the threshold at which somebody would be injured

25   from cocaine or high from cocaine, it's not really

1   "inhale," let's say.  But it's dependent on body weight

2   and concentration and things like that.  So I couldn't

3   give you, like, how many milligrams, because it all

4   depends on how much somebody weighs, and what the purity

5   and concentration of these things are.  So does it

6   exist?  Sure.  But it depends on -- you'd have to give

7   me more information for me to come back and give you a

8   number.

9        Q.   Would touching any of these drugs that are

10  listed here with gloves on pose a health risk?

11       MS. LANIER:  Incomplete hypothetical.

12       A.   With gloves on.  I assume you're talking about

13  sort of impermeable gloves and things like that.  And so

14  if they were handling sort of -- so first of all, when

15  we have workers who are handling something like

16  hazardous waste, it wouldn't just be gloves.  They have

17  to have respiratory protection and a variety of other

18  things.  But again, we're sort of ignoring all the

19  elimination, all the substitution.  Methamphetamine and

20  amphetamine and cocaine and so forth, with impermeable

21  gloves, it shouldn't be absorbed, but it ignores the

22  fact that this is commingled with sharps containers and

23  things like that, or sharps and things like that.

24       Q.   But there isn't a health risk involved in

25  touching methamphetamine or any of the other drugs

 1   determine that.

 2       Q.   And did any of those patients -- were any of

 3   those patients workers?

 4       A.   No, I don't think so.  That wasn't -- it wasn't

 5   work related that I'm aware of.

 6       Q.   And were any of those patients -- did any of

 7   those incidents occur at an encampment?

 8       A.   I don't -- I don't know.  I don't think so.  I

 9   have no idea.  Those were just patients that we had

10   dealt with.  But irregardless, it doesn't -- the --

11   it's -- again, it's the activity that is going on.  When

12   we have people who are handling these things, it

13   increases their risk.  And I'm giving you an example of

14   the outcome that can occur.

15       MS. KATOVICH:  Can we go back to Tab 1 now, please,

16   Ms. Shulkin.  So this is previously marked as

17   Exhibit 1427.

18       Q.   And looking at the last sentence of this first

19   paragraph under "Chemical Exposure," you say that

20   workers are at increased risk of exposure to chemicals

21   such as TCEP.  Why are they at increased risk of

22   exposure to that chemical?

23       A.   Well, it's just one of the chemicals that was

24   identified in that paper.  And so when they're going to

25   clear this, these chemicals are there based on this

1  paper.  And so it's by the nature of the chemical being

2  there that puts them at increased risk.

3      Q.    And did that chemical find or -- sorry.

4            Did that paper find that TCEP was found at

5  higher rates near encampments?

6      A.    It depends on what you describe for higher

7  rates.  I think what they described was the presence of

8  this in -- I think it was sort of a unique -- I don't

9  know about unique, but they called it out as a finding

10 with regards to what was also found, in addition to the

11 other methamphetamine, cocaine and so forth.

12     Q.    And do you have any other reason to believe

13 that TCEP presents a unique hazard in encampments?

14     A.    Well, it's an example of what is in the

15 peer-reviewed published literature about chemicals that

16 exist in these encampments.  And it's another risk that

17 workers face who are being asked to sort through these

18 encampments and so forth.

19     Q.    And what would be the mode of exposure that

20 workers would face with regard to TCEP?

21     A.    Generally, it would be inhalation.

22     Q.    And that would be inhalation of what?

23     A.    Of TCEP.

24     Q.    And where would the TCEP be found?

25     A.    Well, in the -- I don't know.  Maybe I'm

1    becoming circular.  It would be in the encampment.

2        Q.    And where, on what object?

3        A.    Well, it depends on -- again, you know, now

4    we're getting into sort of the specifics of this

5    hypothetical that you're describing.  So it could be in

6    the soil, it could be on an object, you know, things

7    like that.  It could be in the water, or, you know,

8    whatever -- if there's, you know, pooling liquid.

9        Q.    So you don't have any particular information

10   about TCEP being present on particular objects at

11   encampments?

12       A.    Well, no.  The TC -- the TCEP that was found

13   was in the refuge that -- effluent that exists in these

14   camps.  And so one place that you would find it is in

15   the effluent of these camps.

16       Q.    Okay.  And do you have any reason to believe

17   that workers cleans and removing property from

18   encampments would be exposed to TCEP at higher rates

19   than if they were cleaning and clearing other parts of

20   the city?

21       A.    Well, just based on this literature, sure.

22   What they have found on this literature is that there

23   were -- this was found in the effluent, and it was a

24   representative sample of what's found in these -- in,

25   you know, in these encampments.

1    Q.    Okay.  Let's look at that article, then.

2    MS. KATOVICH:  Could you pull up Tab 17, please,

3    Ms. Shulkin.

4         (Plaintiff's Exhibit 1431 was marked for

5         identification.)

6    Q.    So is this the article that you cite in that

7    section, Dr. Durrani?

8    A.    Yes.

9    Q.    And this article compared the Central washes,

10   and then -- of the profile of one -- the wash from one

11   area to the wash from other areas, correct?

12   A.    Yeah.  I don't know if it was one or multiple,

13   but yes, it was a comparison, sure.

14   Q.    Yes, okay.

15        And I just want to make sure that we have

16   correct, you know, what we're talking about here.  So

17   I'm going to go to Page 6 of this document.  Okay.  And

18   do you see this paragraph that begins, "On the other

19   hand"?

20   A.    Yes.

21   Q.    And do you see here that the -- it's describing

22   that "the Central wash profile was dominated by drugs of

23   abuse and their metabolites"?  Do you see that?

24   A.    Yes.

25   Q.    And it's comparing that to, I guess, WWTP

1  discharges.  And so is it your recollection from this

2  article that the Central wash profile, that was the wash

3  that was related to the encampments?

4      A.   That sounds right.

5      Q.   Okay.  So then moving down in this paragraph,

6  do you see there's a sentence here that starts, "Several

7  other common compounds, including naproxen, ibuprofen,

8  sucralose, sulfamethoxazole, and the flame retardant

9  TCEP, were frequently detected in the Central washes but

10 at lower average concentrations relative to the WWTP

11 discharges"?

12     A.   Yes.

13     Q.   Is it --

14     A.   But I think -- go ahead.

15     Q.   No, go ahead.

16     A.   But I think if you look at the supplemental,

17 because they're looking at the average.  One of the

18 things that -- I think if you look at the supplemental,

19 you'll find that there were instances where it was

20 higher and where it was lower.  Now, granted, you know,

21 this is something that is found -- and I think they talk

22 about TCEP in terms of its location.  But I think if you

23 look at the supplemental, you'll find that there are

24 scenarios where it's in higher amounts than certain

25 components, but on average, it was lower.

1    Q.   So is it your understanding looking at this
2  article that TCEP is found -- was found in this study in
3  the effluent associated both with encampments and not
4  associated with encampments, correct?
5    A.   Correct.  But workers aren't being asked to go
6  work in the effluent of non-encampments.
7    Q.   But is there any reason to believe, based on
8  this article, that TCEP is more prevalent in encampments
9  than elsewhere?
10   A.   Well, it's more prevalent than a place where
11 they wouldn't work otherwise.  It's not as if they're
12 working in effluent of non-encampments and encampments.
13 They're only working in scenarios where they're in an
14 encampment.  They're not cleaning up a non-encampment.
15 They're not cleaning up watersheds other otherwise of
16 non-encampments.  And so the relative risk is of the
17 TCEP in these encampments versus not working in these
18 encampments.
19   Q.   Do you have any reason to believe that workers
20 face a greater risk of encountering TCEP in encampments
21 than they do in their homes?
22   A.   In their homes?
23   Q.   Yes.
24   A.   Well, is the question, are they at greater risk
25 from -- are you asking from, like, a nonoccupational

1    setting?   Is that what you're asking?

2        Q.    Do you have any reason to believe that there is

3    greater risk of exposure to TCEP at encampments than in

4    any other setting?

5        MS. LANIER:   Incomplete hypothetical.

6        A.    Well, I think -- I'm not sure I totally follow

7    your question.   They -- they are at increased risk

8    because they're in a scenario where they're being

9    exposed to TCEP.

10       Q.    And what makes you believe that they're being

11   exposed to TCEP in encampments?

12       A.    This article you have right in front of you.

13       Q.    But this article describes TCEP being less

14   prevalent in discharges related to encampments than in

15   discharges found elsewhere in the City, correct?

16       A.    No.   What it says is, on average, it's lower in

17   the effluent of encampments compared to the effluent of

18   non-encampments.   The issue that we find in this case is

19   that we have workers who are only working in

20   encampments.   They're not working in effluent -- not

21   being exposed to effluent of non-encampment.

22       Q.    Well, they're also not working in effluence of

23   encampments, right?

24       A.    No, of course they are.   I mean, these are

25   encampments that don't have -- they have a variety of --

1  you know, they have a variety of different things in

2  there, including effluent.

3      Q.   So your -- okay.   So the assumption you're

4  making is that there -- based on this one sentence we

5  just read, which is the only place in this article that

6  TCEP appears, and the assumption you are making here is

7  that because this study found TCEP in effluence relating

8  to encampments and not related to encampments, that

9  workers in San Francisco who are working in encampments

10 have a greater risk of exposure to TCEP?

11     MS. LANIER:   Misstates previous testimony; document

12 speaks for itself.

13     A.   No, I wouldn't agree with that statement.   I

14 would say, one, TCEP is mentioned here and in the

15 supplement.   Two, this is a piece of scientific

16 literature that shows the effluent, including

17 methamphetamine, cocaine, and TCEP, that exists in the

18 effluent.   It's what's in the scientific literature

19 representing what's in these encampments and the

20 effluent that comes off of them.   There's also effluent

21 in the encampments.   There has to be where people are

22 congregating.   So this is an example of risks that

23 workers face by being in these -- being in the

24 encampments.

25     Q.   And what basis do you have for concluding that

1  workers in San Francisco who are engaged -- who are

2  involved in encampment resolutions are interacting with

3  effluence?

4       A.   Well, when you have -- so the -- when you have

5  an encampment of people who need to -- you know, it's a

6  natural result of where you have an encampment of

7  people, because they leave a biologic signature to

8  include their effluent.

9       Q.   And what basis do you have to believe that

10  workers in San Francisco in this case are interacting

11  with that effluent?  What is -- walk me through that.

12       A.   Well, I mean, they have -- I think if you go

13  back to that deposition you saw, you know, feces and all

14  the rest, that is the definition of effluent.  They are

15  clearly being exposed to human effluent, feces, urine,

16  body fluids and so forth.

17       Q.   And what is the mode of transmission or

18  exposure happening?

19       A.   Well, it's all three that we just described:

20  Inhalation -- inhalation is probably the most common.

21  The other two, you know, it depends on -- they

22  generally, hopefully are not being -- getting injects

23  with this.  And then with regards to aerosolize sayings,

24  yes, they could have injections.

25       Q.   So is it your opinion that workers at

1  encampment resolutions are inhaling TCEPs through feces

2  that's present at the encampment?

3      MS. LANIER:   Incomplete hypothetical.

4      A.   I think we're just mixing terms here now.   I

5  think initially you asked me about where -- what is the

6  evidence that there is effluent, and I just explained to

7  you that there is urine and feces and all the rest out

8  there.   That is the definition of effluent, which

9  includes other things, chemicals, you know, because it's

10 not like this is some pure mixture of things, right?

11 There's a variety of things that are there to include

12 the potential of these chemicals, to include the

13 potential of TCEP.

14     MS. KATOVICH:  Ms. Shulkin, can we go back to Tab 1

15 now, please.

16     Q.   And looking at "Thermal Exposure" here, what is

17 your opinion -- what opinion do you intend to offer in

18 this case related to thermal exposure?

19     A.   As I have there in my report, that by --

20 they're exposed to -- they have a potential to have

21 increased risk of exposure to thermal, you know, fires,

22 and the byproducts of fires that exist in these

23 encampments.

24     Q.   And what are -- what facts are you relying on

25 to reach that opinion?

1    exposure.

2        Q.    And the exposure as it relates to fire includes

3    exposure to -- exposure after the fire has been put out?

4        A.    Sure, yeah, toxic gases, other hazardous

5    substances, flying debris, things like that.

6        Q.    And did you review any data or other evidence

7    that workers who are cleaning encampments are in fact

8    exposed to those post fire hazards and debris?

9        A.    Yeah.  So as I have in my report, you know,

10   people witnessed these fires and open flames and so

11   forth, and, you know, the resultant, you know,

12   whatever's left after.

13       Q.    And what information would you need in order to

14   determine whether there is exposure in a particular

15   place to post-fire hazards?

16       A.    I'm not sure I follow you.

17       Q.    How would you determine whether or not there is

18   exposure to a hazard related to a fire having taken

19   place?

20       A.    The fact that a fire occurred.  I'm not sure

21   I'm following.

22       Q.    So anytime a fire occurs, anyone who then comes

23   into contact with the place where a fire occurred is at

24   risk of some kind of health harm; is that correct?

25       A.    No.  I would say that they're at risk for

1    potential exposure.

2        Q.    Okay.

3        A.    Which, then, again, risk being a function of

4    hazard and exposure, if you increase the hazard and you

5    increase the exposure, you increase the risk.

6        Q.    And were -- did you review any documents

7    indicating that workers were present at encampments

8    while there were fires or open flames?

9        A.    Yes.

10        Q.    And what were those documents?

11        A.    I think I have them.  If you scroll down, I

12    think they're listed there.  But they're in the

13    depositions.  And as I have them, you know, they have

14    the workers who are describing, you know, exposures,

15    seeing open flames and all the rest.

16        Q.    So you say several witnesses who spent time at

17    encampments acknowledge they observed campers using open

18    flames.  Were workers present in those instances?

19        A.    Yes.

20        Q.    And how do you know that?

21        A.    I think because that's where I'm getting that

22    information from.

23        Q.    From workers?

24        A.    Yes.

25        Q.    Well, you say "witnesses who spent time at

1    do you intend to offer in this case related to violence?

2         A.   Well, the workers -- there's evidence that

3    workers who work in this environment have increased risk

4    of violence.  And so you compound that with the

5    testimony that's been provided by DPW workers with

6    regards to exposure to violence, there's an increased

7    risk of exposure to violence in these workplace

8    scenarios.

9         Q.   And that's based on this article that you cite

10   here about public health field workers, as well as the

11   deposition testimony of Israel Graham; is that correct?

12        A.   That's correct.  And also in my -- you know, in

13   my experience and work, you know, education, training,

14   and experience in working with this, and, you know,

15   in -- yeah, and the deposition transcripts and so forth.

16   It may -- I may have talked about it with -- in my

17   visit, but I don't recall that.  But I know that it's

18   sort of -- it's a general theme in these environments.

19        Q.   And aside from the Israel Graham deposition

20   transcript, are there other deposition transcripts that

21   support this opinion?

22        A.   There may be.  That's the one that I was able

23   to recall, to put in the report.

24        Q.   And this next -- the last section of your

25   report is "Animal exposure."  What opinions do you

1    intend to offer related to animal exposure?

2        A.    Well, there is a risk of animal bites to

3    workers.   I think I describe it -- my visit there, I

4    think there was one person experiencing homelessness who

5    had an animal with them, and so there's a risk of animal

6    bites to workers who are clearing encampments.

7        Q.    And is that an increased risk of animal bites,

8    or just a risk?

9        A.    Well, increased as opposed to not having the --

10   to not being exposed in these encampments, so it's

11   increased.

12       Q.    Is it increased as compared to their other job

13   duties?

14       A.    I think it depends on what other job duties

15   you're describing.

16       Q.    And so that might depend from, you know, person

17   to person?

18       A.    No, I think it depends on the activity.   And so

19   what activity are we comparing this to?   The question

20   that I was asked is what are the risks that they face in

21   doing this, and I've compared it to if they weren't

22   doing this.   So if you have another hypothetical, then

23   it would be a different comparison.

24       Q.    And what information did you base this opinion

25   about animal exposure?

1      A.   So this was looking at the -- as we described,

2  I had mentioned I had asked for all of the sort of

3  injury logs and so forth around these potential

4  workplace exposures.  What I received, then, were the

5  incident reports as it related to animal exposure,

6  animal bites.  That was within these encampments.  But

7  the fact that there were 11 over this course of time,

8  over that period of time, means that there is that

9  hazard.  And if we put workers in that scenario, then

10  there is an increased risk, given that they would now

11  have a potential exposure to that hazard.

12      Q.   And did you rely on anything else in reaching

13  that opinion?

14      A.   I'm sure there was deposition -- I mean, I

15  recall some of the deposition testimony around animals

16  and things like that.

17      Q.   Anything in particular you recall?

18      A.   No.  I mean, again, there's a lot of

19  information there, so I'd have to go pull it.  But I

20  know that it was mentioned.

21      Q.   And the 11 instances of animal bites, those

22  were all animal bites to SFPD employees?

23      A.   I don't think so.  I think this -- these were

24  animal bites that were reported to SFPD.

25      Q.   Do you know -- why would the animal bites be

1  reported to SFPD if the animal bites were not related to

2  SFPD officers?

3      A.   Oh, well, I think these are incident reports

4  that were provided -- you know, that there were animal

5  bite -- I'd have to go back and look at them, but I'm

6  pretty sure that these were reports that were reported

7  to SFPD by persons in the encampments.

8      Q.   And so do you know who was bit by animals?

9      A.   I think it's the people who were in the

10  encampments.  And so it goes through and describes, I

11  was walking through an encampment, and somebody's animal

12  came and bit me.  Some of the people were residents of

13  the encampment, and some were passer -- you know, just

14  community members passing by.  But I don't think --

15      Q.   And none of these can -- sorry.  Go ahead.

16      A.   I don't think they were police -- I'd have to

17  go back and look and see if any of them were police

18  officers.  But I think they were community, you know,

19  community members.

20      Q.   And did any of the bites -- were any of the

21  bites of City workers?

22      A.   Again, if there's a PD -- if it was, it may

23  have been a police officer.  But I think they were

24  community members, not of City workers.

25      Q.   Okay.  Aside from the opinions that we've just

```
 1   surfactants and soap and things like that that are
 2   helpful.  But it's ultimately the -- you know, the
 3   removal of that -- I wouldn't say eliminate, but will
 4   decrease, particularly if there was, you know, open,
 5   obvious, let's -- let's say human, you know, waste and
 6   things like that.
 7       Q.   And looking at this -- back to the rebuttal
 8   report that's up on the screen, do you see in this
 9   number three here, you say, "Dr. King's report also does
10   not recognize that HAZWOPER and OSHA guidelines apply to
11   workers to ensure their safety, not to members of the
12   public.  Accordingly, it is unclear how it applies to
13   the claims in this case."  Your report --
14       MS. LANIER:  I'm sorry, Counsel.  Where is that
15   passage?  Forgive me.
16       MS. KATOVICH:  It's number three.
17       MS. LANIER:  Number three, thank you.
18       Q.   And Dr. Durrani, it's true that your report
19   concerns safety of workers, right?
20       A.   That's right.
21       Q.   And so how does your report apply to the claims
22   in this case?
23       A.   Well, again, I would take you back to what was
24   initially asked of me, you know, in the contract, and
25   then at the beginning of my report.  My report addresses
```

1    the risks that workers face when handling and addressing

2    the encampments.

3        Q.    And how does that apply to the claims in this

4    case?

5        A.    I'm not sure --

6        MS. LANIER:  Objection.  Calls for a legal

7    conclusion.

8        Q.    But you are qualified to assess whether or not

9    Dr. King's discussion of HAZWOPER applies to the claims

10   in this case?

11       A.    Oh, I see.  Well, so yeah, I mean, look, with

12   regards to the application of OSHA guidelines and

13   HAZWOPER, they're misapplied from an occupational health

14   standpoint.  You know, he's focusing on things that just

15   don't exist or are not done in the methodology of

16   occupational health.  And so from an occupational health

17   standpoint, you know, we don't sort materials that --

18   you know, you don't put workers in a position where

19   they're sorting hazardous materials where they should

20   just be eliminating it.  We don't solely focus on

21   personal protective equipment when we know that is the

22   least effective in the tools that we have in trying to

23   prevent worker hazard exposure, injury, things like

24   that.  And so it's the misunderstanding and the

25   misapplication of HAZWOPER and the OSHA guidelines are

1  drain into the sewer, but there wasn't -- there wasn't
2  that, so it was draining into this can.
3      MS. KATOVICH:  Well, I know that we are now at 5:15,
4  and that you probably have to go. So unless -- Counsel,
5  do you have any questions?  I think I'm all set.
6      MS. LANIER:  Just a couple, just two or three.
7                  EXAMINATION
8      BY MS. LANIER
9      Q.   Dr. Durrani, would it be accurate to say that
10 the opinions you're offering in this case include the
11 occupational risks of City workers handling items
12 located in and around encampments of persons
13 experiencing homelessness?
14     A.   Yes.
15     Q.   And to store items retrieved from and around
16 encampments of persons experiencing homelessness, a City
17 worker would be required to handle those items?
18     A.   Right, by definition, sure.
19     MS. LANIER:  Okay.  Those are all my questions.
20     MS. KATOVICH:  Okay.  I just have one follow-up
21 clarification.
22                 FURTHER EXAMINATION
23     BY MS. KATOVICH
24     Q.   So the opinions -- your opinions include
25 occupational risks of workers handling items in and

1    around encampments.  Which agencies do the workers work

2    for that those opinions would apply to?

3         A.   Well, I think as I have it in my report, City

4    workers, the examples that, you know, I provided you,

5    the examples of who I had observed on that day and what

6    my understanding is based on the depositions and

7    transcripts.  So I mean, could it -- I think I would say

8    City workers who are assigned to do that.

9         Q.   And that would be City workers from any agency,

10   so long as those City workers are handling items in and

11   around encampments; is that correct?

12        A.   Handling or, yeah, having the activity of being

13   in and around those, sure.  Handling, sure.

14        Q.   Well, do you mean being in and around

15   encampments or handling items in encampments?

16        A.   Well, I mean, both, right?  So there's a risk

17   to handling and all that kind of stuff.  And then, you

18   know, we've already talked about, like, Fire, and their

19   having -- the fire department, and their having to

20   respond to fires and deal with that.  Each -- you know,

21   the City -- the 24 City departments each have different,

22   you know, responsibilities, fire department, police

23   department, MTA, things like that.  Five or six of them

24   were at this -- you know, were a representative sample

25   of what -- at this resolution that I attended.  And so