**EXHIBIT A**

**TO**

**DECLARATION OF NATHAN THEOBALD IN SUPPORT OF
DEFENDANTS' MOTION IN LIMINE NO. 2 TO EXCLUDE OBSERVER
TESTIMONY REGARDING ALLEGED UNLAWFUL PROPERTY LOSS**

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3

4     - - - - - - - - - - - - - - - -

5     COALITION ON HOMELESSNESS,      )

6     et al.,                         )

7                     Plaintiffs,     )

8     vs.                             )  CASE NO.

9     CITY AND COUNTY OF SAN          )  4:22-cv-05502-DMR

10    FRANCISCO, et al.,              )

11                    Defendants.     )

12    - - - - - - - - - - - - - - - -

13

14

15                     VIDEOTAPED DEPOSITION OF

16                      DYLAN VERNER-CRIST

17                     TUESDAY, MARCH 4, 2025

18

19

20

21              BEHMKE REPORTING AND VIDEO SERVICES, INC.

22                 BY:  SUZANNE I. ANDRADE, CSR NO. 10682

23                   550 CALIFORNIA STREET, SUITE 820

24                   SAN FRANCISCO, CALIFORNIA 94104

25                               (415) 597-5600

1

2

3

4

5

6

7

8

9

10          Videotaped deposition of DYLAN VERNER-CRIST,

11   taken on behalf of Defendants, at 39 Drumm Street,

12   San Francisco, California, commencing at 10:02 A.M.,

13   TUESDAY, MARCH 4, 2024, before Suzanne I. Andreade,

14   Certified Shorthand Reporter No. 10682, pursuant to

15   Notice of Deposition.

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFFS AND THE DEPONENT:
 3        EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
 4        BY:  VASUDHA TALLA, ATTORNEY AT LAW
 5        1 Rockefeller Plaza, 8th Floor
 6        New York, New York  10020
 7        Telephone:  (212) 763-5000
 8        Email:  vtalla@ecbawm.com
 9   -AND-
10        AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF
11        NORTHERN CALIFORNIA
12        BY:  WILLIAM S. FREEMAN, ATTORNEY AT LAW
13        39 Drumm Street
14        San Francisco, California  94111
15        Telephone:  (415) 293-6393
16        Email:  wfreeman@aclunc.org
17
18   FOR DEFENDANTS:
19        CITY AND COUNTY OF SAN FRANCISCO
20        OFFICE OF THE CITY ATTORNEY
21        BY:  EDMUND WANG, DEPUTY CITY ATTORNEY
22        1390 Market Street, 7th Floor
23        San Francisco, California  94102
24        Telephone:  (415) 554-3857
25        Email:  edmund.wang@sfcityatty.org
```

1   APPEARANCES - CONTINUED:

2   ALSO PRESENT:

3          JOSHUA HEADRICK, VIDEO OPERATOR

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              TUESDAY, MARCH 4, 2024; 10:02 A.M.

 2       THE VIDEO OPERATOR:  Here begins Media No. 1 in the

 3   deposition of Dylan Verner-Crist in the matter of

 4   Coalition on Homelessness, et al., versus City and

 5   County of San Francisco, et al., in the United States

 6   District Court, Northern District of California,

 7   Case No. 4:22-cv-05502-DMR.

 8              Today's date is Tuesday, March 4th, 2025.  The

 9   time on the video monitor is 10:03 a.m. Pacific Standard

10   Time.

11              The video operator today is Joshua Headrick,

12   employed by Behmke Reporting and Video Services, Inc.

13              This video deposition is taking place at

14   39 Drumm Street, San Francisco, California 94111, and

15   was noticed by Edmund Wang, Deputy City Attorney of the

16   City and County of San Francisco.

17              Counsel, please voice-identify yourselves and

18   state whom you represent.

19       ATTORNEY TALLA:  Vasudha Talla, counsel for the

20   plaintiffs.

21       ATTORNEY FREEMAN:  William Freeman, counsel for

22   Plaintiffs.

23       ATTORNEY WANG:  Deputy City Attorney Edmund Wang on

24   behalf of Defendants.

25       ATTORNEY TALLA:  And apologies if this wasn't clear.
```

1   Also counsel on behalf of Mr. Verner-Crist today.

2       THE VIDEO OPERATOR:  The court reporter today is

3   Suzanne Andrade, Certified Shorthand Reporter,

4   contracted by Behmke Reporting and Video Services, Inc.

5           Would the reporter please introduce themselves

6   and then swear in the witness.

7       THE REPORTER:  Suzanne Andrade, California Shorthand

8   Reporter, CSR No. 10682.

9           Raise your right hand, please.

10                  DYLAN VERNER-CRIST,

11  after having been duly administered the oath to tell the

12  truth, the whole truth, and nothing but the truth,

13  testified as follows:

14      THE WITNESS:  I do.

15                      EXAMINATION

16  BY ATTORNEY WANG:

17      Q.   Good morning, Mr. Verner-Crist.

18      A.   Good morning.

19      Q.   I know we've met before, but my name is Edmund

20  Wang, Deputy City Attorney, representing the defendants.

21          Would you just please state and spell your full

22  name for the record, please.

23      A.   Sure.  Dylan Verner-Crist.  That's D-y-l-a, n

24  as in Nancy.  V-e-r, n as in Nancy, e-r, hyphen, C-r-i,

25  s as in Sam, t as in Tom.

 1          Would your interactions with Patrick Hardiman
 2   and Lieutenant Wayman Young have been recorded in your
 3   Google form entry?
 4       A.   They may have, but I haven't looked at those in
 5   quite some time.
 6       Q.   Okay.
 7       A.   I'd have to go back and look.
 8       Q.   If we look at Exhibit 271 at page 5 of 22,
 9   paragraph 8.
10       A.   Okay.
11       Q.   It says:  "At approximately 2 PM, Department of
12   Public Works ('DPW') workers began going through the
13   encampment and throwing away unhoused peoples'
14   property."
15          Do you see that?
16       A.   Yes.
17       Q.   And is it -- do you believe that the throwing
18   away of -- of the unhoused people's property that you've
19   described here was a violation of DPW's bag-and-tag
20   policy?
21       A.   I think it depends on the condition of the
22   property.  I think, from my recollection, some of it was
23   and some of it wasn't.
24       Q.   Okay.  And do you recall the property that was
25   wrongly discarded?  What was that property?

1    A.    I think I remember -- the declaration says -- I

2    remember writing this -- included numerous bikes,

3    people's clothing, food, sleeping items, and suitcases.

4    You know, my recollection is particular -- the bikes.

5    And I think I've -- unless I'm mistaken, I think there's

6    a photo attached.

7         There's two photos attached, Exhibit A and

8    Exhibit B.  Exhibit B shows bikes in the back of a

9    vehicle.

10    Q.    Okay.

11    A.    Yeah.

12    Q.    So just going back to paragraph 8, the -- in

13    that first sentence talking about throwing away unhoused

14    people's property, that property is, like, I guess

15    enumerated in more specific detail sort of later on in

16    that paragraph.

17         Is that what you mean --

18    A.    Yes.

19    Q.    -- when you mentioned bikes?  Okay.

20    A.    Yeah.  Lines 10 through 11.

21    Q.    Okay.

22    A.    And then described further -- in further detail

23    paragraph 9.

24    Q.    Okay.  Do you --

25    A.    Um...  And let me just add as well --

1       Q.    Sure.

2       A.    Because this sort of -- that first sentence of

3   paragraph 8 is sort of the first sentence of above

4   property.  And, like, further along in the declaration,

5   paragraph 11 describes sort of other -- one instance

6   of -- of property disposal in greater detail.

7       Q.    Okay.  Thank you.

8             Going back to lines 9 through 11 on -- it's

9   page 5 of 22 in the upper right-hand corner in

10  paragraph 8.

11      A.    Sorry.  What lines again?

12      Q.    Sorry.

13      A.    5 through 11?

14      Q.    Paragraph 8, lines 9 through 11.

15      A.    9 through 11.  Okay.  Sorry.

16      Q.    The first sort of full sentence begins:  "The

17  workers loaded a large number of obviously personal

18  items into their dump trucks..."

19            Do you see that?

20      A.    Yes.

21      Q.    And so those personal items that you're

22  referencing, are those the numerous bikes, people's

23  clothing, food, sleeping items, and suitcases that you

24  specify later in that sentence?

25      A.    Yes.

1    Q.   Okay.  And what made those items obviously
2  personal?
3    A.   The -- what they were.  You know, what we use
4  bikes, clothing, food, sleeping items, and suitcases
5  for.
6    Q.   And do you remember the condition of those
7  items?
8    A.   Roughly speaking, yes.
9    Q.   Okay.  What was the condition of those items?
10   A.   They appeared to be in good -- good condition.
11   Q.   Okay.  And what do you mean by "good
12  condition"?
13   A.   Not soiled, broken, you know, I think of -- I
14  say good condition in opposition to the sort of
15  exception in the bag-and-tag policy.
16   Q.   Do you recall how close you got to these
17  particular items that were being loaded into the dump
18  truck?
19   A.   Well, the photos, Exhibits A and B -- actually
20  A, B, C, and D show, you know, the photos I took.  But
21  several of these photos are -- you can see how close I
22  was.
23   Q.   Okay.  So let's go to Exhibit A, then, of the
24  declaration --
25   A.   Sure.

1    Q.    -- which is on page 11 of 22 --

2    A.    Yeah.

3    Q.    -- in the upper right-hand corner.

4    A.    Yes.

5    Q.    Or it begins there.  That's the cover page.

6    The actual photo is on page 12 of 22.

7         Do you see that?

8    A.    Yes.

9    Q.    And are these the items that you're referencing

10   in paragraph 8 of the declaration?

11   A.    Those are like- -- likely -- wait.  Let me go

12   back and see what my dec- -- because I describe in the

13   declaration this is a photo of a DPW truck containing

14   furniture and other property.

15        So this was some of the items that I observed

16   but -- but not all of them.

17   Q.    And from the photo that's Exhibit A, can you

18   see the items that you contend should not have been

19   discarded by DPW during the October 26th, 2022, sweep?

20   A.    It's a little difficult because this is in

21   black and white.  So -- so it's difficult to tell from

22   this photo the condition of the property.

23        But when I say "furniture" in the declaration,

24   I think I'm referring to the chair.

25   Q.    Okay.  And had you seen the property that is

1    shown in the -- you know, the dump truck in the photo at

2    Exhibit A, had you seen it prior to it being picked up

3    and loaded into the dump truck?

4        A.    As to that, I don't remember for this

5    particular photo.

6        Q.    Were you -- for the...

7             When you were observing the October 26, 2022,

8    sweep --

9        A.    Yes.

10       Q.    -- did you hear every conversation between

11   every encampment occupant and every City employee during

12   the sweep?

13       A.    No.

14       Q.    Do you know whether any encampment occupant

15   told any City employee that they could take the items

16   that, you know, you've referenced in paragraph 8?

17       A.    I do not.

18       Q.    The items that you referenced in paragraph 8

19   that you observed at the October 26th, 2022, sweep, did

20   you see whether those items were attended before they

21   were loaded into the dump truck?

22       A.    Tho- -- the items in the photo or -- in the

23   photo or in paragraph 8?

24       Q.    Let's talk about paragraph 8 first.

25       A.    Okay.  As I say in the -- in paragraph 8,

1  "...unhoused people in the encampment were continuing to

2  pack up their belongings as DPW workers picked up

3  materials without asking the...people present what items

4  they wanted to keep and what items should be discarded."

5      Q.    Okay.   But again, you didn't hear every

6  conversation between DPW employees and encampment

7  occupants?

8      A.    No.

9      Q.    And could you tell which of those items

10  belonged to which encampment occupant from your

11  observations?

12      A.    From my recollection, I don't recall.

13      Q.    Going to the -- you reference people's clothing

14  at line 10 in paragraph 8.

15      A.    Yes.

16      Q.    How do you know that the clothing wasn't

17  soiled?

18      A.    Soiled in general or soiled with hazardous

19  waste?

20      Q.    Let's say soiled with human waste or -- yeah,

21  just waste.

22      A.    Um, can't recall.

23      Q.    And then the suitcases that are referenced at

24  line 11 of paragraph 8, did you ever get to look inside

25  the suitcases?

1     A.   Um, you know, some of the suitcases -- like,
2   you know, if you look at Exhibit D, you know, one of
3   these luggage -- pieces of luggage is partially open.
4   And I recall I think with that property some of -- you
5   could -- some of it was partially open.
6          And one of the -- you know, if you look at
7   Exhibit C, one of the bags appears to be -- again, this
8   is black and white, so it's hard to tell -- but it
9   appears to be clear.
10    Q.   Okay.  So speaking of Exhibit D, I think that's
11  the subject of paragraph 11.  If you would take a look
12  and just confirm that that's your understanding as well.
13    A.   (Examines document.)
14         Yes, although very much related to that is
15  paragraph 10.
16    Q.   Okay.  So paragraph 10 on page 5 of 22 of your
17  declaration.
18    A.   Yes.
19    Q.   It says:  "I saw another man in the encampment
20  standing near a large grouping of belongings.  I asked
21  him whether they belonged to him."
22         Do you see that?
23    A.   Yes.
24    Q.   Okay.  And you say:  "He told me no and said
25  they belong to his friend, who is not there"; is that

1   right?

2        A.   Yes.

3        Q.   Did you ever see the friend; do you recall?

4        A.   He may have returned later, but I -- but that

5   is a faint memory.

6        Q.   And so Exhibit C is a photo of the belongings

7   that are referenced in paragraph 10?

8        A.   Yes.

9        Q.   So if we go to Exhibit C, which is -- the

10  actual photo is -- in the upper right-hand corner, it's

11  page 16 of 22.

12       A.   Yes.

13       Q.   Do you know whether there were any needles

14  within that pile of belongings?

15       A.   Within all of the pile of belongings?

16       Q.   Correct.

17       A.   I do not.

18       Q.   Do you know whether there was any item in that

19  pile of belongings that was soiled with hazardous waste?

20       A.   Not conclusively, no.

21       Q.   It looks like there is like a -- in the sort of

22  right-hand side of the pile of belongings, it looks like

23  there's, like, a box or a tub, plastic with some -- with

24  a covering over the top.

25            Do you see that?

1      A.    Like a storage tub?

2      Q.    Yeah, like a storage tub.

3      A.    Plastic storage tub, there's a label on it?

4      Q.    Correct.

5      A.    Yes.

6      Q.    Did you ever see what was in that storage tub?

7      A.    I think from the photo, it appears that it

8  looks like maybe a blanket or a tarp.  Again, it's hard

9  to tell black and white.

10         And then sort of on it, it looks like a

11  briefcase or a suitcase or backpack of some kind and

12  maybe another backpack behind it.  Those look like those

13  are in the tub.

14     Q.    Do you recall the condition of those items in

15  the tub?

16     A.    From my recollection of a property in this sort

17  of -- these belongings in the photo were all in quite

18  good condition.

19     Q.    And again, when you say "good condition," you

20  just mean the opposite of all the exceptions?

21     A.    Yes.

22     Q.    Do you know whether there were any needles in

23  that tub?

24     A.    No.

25     Q.    Do you know whether there was anything in that

1    tub that was soiled with human waste or hazardous waste?

2        A.   No.

3        Q.   And then going back to paragraph 11 now on page

4    6 of 22 of this declaration.   It's --

5        A.   Paragraph 6?

6        Q.   Paragraph 11.   Sorry.

7        A.   Oh, paragraph 11?   Sorry.

8             Yes.

9        Q.   It starts:   "The workers then began taking the

10   absent man's belongings and throwing them into their

11   trucks."

12            Do you see that?

13       A.   Yes.

14       Q.   And it continues:   "I asked the workers whether

15   they were going to throw out all the man's belongings.

16   After my question, the DPW workers agreed to leave a

17   small portion of the man's belongings there for him to

18   collect"; is that right?

19       A.   Yes.

20       Q.   And then Exhibit D is a photo of the belongings

21   that were left for the absent person to collect,

22   correct?

23       A.   Yes.

24       Q.   And you said you have a vague memory of that

25   person returning?

1      A.    At some point, he may have returned later
2  that -- that af- -- afternoon.
3      Q.    Do you recall how much longer after this
4  incident he returned?
5      A.    I do not.  It may be in my notes.
6      Q.    Okay.  Did you see the man collect the property
7  that was left behind for him to collect?
8      A.    I cannot reliably tell you.
9      Q.    Okay.  Did the person who said they were
10  watching the property for his friend, did he continue to
11  watch over the property that was, you know, left there
12  for the absent man to claim?
13      A.    I don't -- I don't actually say that he was
14  watching over the property for his friend.  If you look
15  back at paragraph 10, I say that "He told me no and said
16  they belonged to his friend, who was not there."
17      Q.    If we look at paragraph 9 of your
18  declaration --
19      A.    Yes.
20      Q.    -- this paragraph concerns a number of bikes in
21  the back of a DPW work truck?
22      A.    Yes.
23      Q.    It reads -- starting at line 15, sort of middle
24  of the page, middle of the sentence, it says:  "...one
25  of the unhoused people approached the DPW workers..."

```
 1            Do you see that?
 2       A.   Yes.
 3       Q.   "...and told them that she wanted to take one
 4  of the bikes, as it belonged to a friend of hers and she
 5  wanted to save it for them."
 6            Do you see that?
 7       A.   Yes.
 8       Q.   This is a conversation you overheard?
 9       A.   Yes.
10       Q.   Okay.  Do you know whether that bike actually
11  belonged to her friend?
12       A.   I only have what I observed.
13       Q.   Okay.  And then you've attached a picture of
14  the truck with the bikes in the back, is that right, as
15  Exhibit B?
16       A.   Yes.
17       Q.   Okay.  If we turn to Exhibit B now, it's page
18  14 of 22, as it says in the upper right-hand corner.
19       A.   Okay.
20       Q.   This is the truck with the bikes in the back?
21       A.   Yes.
22       Q.   Did all these bikes belong to one person or
23  multiple people, if you know or recall?
24       A.   I can't recall.
25       Q.   Do you recall the condition of these bikes
```

1  prior to being loaded into the dump truck?

2      A.   From my recollection, some of them were

3  complete and appeared to be functional bikes.

4      Q.   Do you know if the owners of any of these

5  bikes, you know, how many of those bikes belonged to

6  them?

7      ATTORNEY TALLA:   Objection; form.

8      THE WITNESS:   Of the owner -- of these bikes, how

9  many -- how many people these bikes belonged to?

10 BY ATTORNEY WANG:

11     Q.   Yeah.

12     A.   I do not know.

13     Q.   Do you recall whether these bikes were part of

14 a -- you know, a chop shop?

15     A.   I can't recall.   Some of them may be; others

16 may not have been.

17     Q.   If we go back to paragraph 9 -- sorry we keep

18 jumping around -- but now this is back on page 5 of 22.

19          Continuing on right after where it says

20 "Exhibit B," it says:   "The City workers at first told

21 the woman that she could not take the bike, but after

22 she pressed -- with you -- me looking on -- the workers

23 agreed to let her take the bike"; is that right?

24     A.   Yes.

25     Q.   Did you see anyone else ask the -- any City

1   employee for any of the bikes?

2        A.   No, I don't remember any of the City employees

3   asking anyone for the bikes.

4        Q.   If we go back to paragraph 10 -- sorry we're

5   jumping around again -- but the very last sentence of

6   that paragraph, paragraph 10 of Exhibit 271, it says:

7   "As shown in the photo, the items are arranged in a

8   cart, suggesting they were not abandoned."

9             Do you see that?

10       A.   Yes.

11       Q.   So, from your understanding of the DPW's

12   bag-and-tag policy, is being in a cart alone sufficient

13   to establish that something is not abandoned?

14       A.   Not alone.   I think it's contextual.

15            What the policy says, sort of unattended items

16   are sort of packed -- neatly packed up.   And if

17   something is on a cart, I think that is one indicia that

18   it was packed up.

19       Q.   And is that one indicia sufficient to establish

20   that something is unattended rather than abandoned?

21       ATTORNEY TALLA:   Objection; calls for a legal

22   conclusion.

23       THE WITNESS:   No.   I would say it depends on other

24   factors, including the condition of the property.

25   BY ATTORNEY WANG:

1       A.   I mean, as I say later in my notes, that, you

2   know, I -- Mike told me what he -- what he believed was

3   discarded.

4       Q.   Okay.  Going back to the photographs on -2207,

5   the television you mentioned.

6            Do you know if that television was working or

7   if it was broken?

8       A.   I do not know.

9       ATTORNEY WANG:  You can set aside all those exhibits

10  now.  Let's do one more, Exhibit 281.

11            (Deposition Exhibit 281 was marked for

12            identification.)

13  BY ATTORNEY WANG:

14      Q.   If you would take a look at what's been marked

15  as Exhibit 281 and just tell me whether you recognize

16  this document.

17      A.   Yes, I do.

18      Q.   And what is it?

19      A.   These appear to be my notes from the

20  December 4th, 2024, A.M. HSOC resolution.

21      Q.   In that first paragraph, it's says that you

22  observed the December 4th, 2024, A.M. HSOC resolution

23  noticed for Quint between Evans and Arthur Avenue,

24  Custer between 3rd and Rankin.

25      A.   Yes.

1    of standing in the middle of the photograph among the

2    DPW workers.

3         Do you see her?

4    A.   Yes.

5    Q.   Is that Flo Kelly?

6    A.   Yes, it is.

7    Q.   Is it your belief that some of the property

8    that is being taken by the DPW workers shown in the

9    photographs on -2143 through -2146, that that property

10   should have been bagged and tagged?

11   A.   I think, you know, I would say that from the

12   photos -- there's a photo of a walker at -2145.  You

13   know, without reviewing my notes, I can't recall what

14   they did with that walker.  But, you know, if they

15   disposed that walker, that walker appeared to be in good

16   shape.

17   Q.   Do you know if that walker was Yvette's?

18   A.   I would need to look at my notes to refresh my

19   memory on that.

20   Q.   Do you recall if Yvette needed to use a walker

21   or used the walker in front of you?

22   A.   I remember that she walked with some difficulty

23   and was moving slowly.  Whether she, you know, needed to

24   use a walker or -- I don't know if I had that

25   conversation with her.

```
 1    out for Norma.  As Flo, Scout, and I look on, the DPW
 2    workers got -- gets the bike out of the truck and gives
 3    it back to Norma."
 4         Q.   Okay.  So the bike was Norma's bike?
 5         A.   She said it was her bike and -- yes.
 6         Q.   Okay.  And Norma got her bike back?
 7         A.   Yes.
 8         Q.   Okay.  Going back to page -2149, you reference
 9    a cart that I think you write elsewhere was destroyed.
10         And I think you have photos of it showing it in
11    the back of the truck; is that right?
12         A.   Yes.
13         Q.   And so we're talking about the red shopping
14    cart?
15         A.   Yes.
16         Q.   I believe it is a red Lowe's shopping cart?
17         A.   Yes.
18         Q.   Okay.  Do you know whether that shopping cart
19    is stolen?
20         A.   No.
21         Q.   Do you know whether Lowe's sells shopping
22    carts?
23         A.   No.
24         Q.   Do you know where Yvette got the shopping cart?
25         A.   No.
```

1  STATE OF CALIFORNIA      ) ss.

2  COUNTY OF SAN MATEO      )

3          I hereby certify that the witness in the

4  foregoing deposition, DYLAN VERNER-CRIST, was by me duly

5  sworn to testify to the truth, the whole truth and

6  nothing but the truth, in the within-entitled cause;

7  that said deposition was taken at the time and place

8  herein named; and that the deposition is a true record

9  of the witness's testimony as reported by me, a duly

10 certified shorthand reporter and a disinterested person,

11 and was thereafter transcribed into typewriting by

12 computer.

13          I further certify that I am not interested in

14 the outcome of the said action, nor connected with nor

15 related to any of the parties in said action, nor to

16 their respective counsel.

17          IN WITNESS WHEREOF, I have hereunto set my

18 hand this 13th day of March, 2025.

19 Reading and Signing was:

20 __X__ Requested  _____ Waived  _____ Not Requested

21

22

23

24      SUZANNE I. ANDRADE, CSR NO. 10682

25      STATE OF CALIFORNIA