**EXHIBIT C**

**TO**

**DECLARATION OF NATHAN THEOBALD IN SUPPORT OF
DEFENDANTS' MOTION IN LIMINE NO. 2 TO EXCLUDE OBSERVER
TESTIMONY REGARDING ALLEGED UNLAWFUL PROPERTY LOSS**

1                 UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                       OAKLAND DIVISION

4    - - - - - - - - - - - - - - - - - -

5    COALITION ON HOMELESSNESS;          )

6    SARAH CRONK; JOSHUA DONOHOE;        )

7    MOLIQUE FRANK; DAVID MARTINEZ;      )

8    TERESA SANDOVAL,                    )

9              Plaintiffs,               )

10   v.                                  ) CASE NO.

11   CITY AND COUNTY OF SAN              ) 4:22-cv-05502-DMR

12   FRANCISCO, et al.,                  )

13             Defendants.               )

14   - - - - - - - - - - - - - - - - - -

15

16             VIDEOTAPED DEPOSITION OF

17                  KARINA IOFFEE

18              TUESDAY, MARCH 4, 2025

19

20

21        BEHMKE REPORTING AND VIDEO SERVICES, INC.

22             BY: SARAH K. MAKSIM, CSR NO. 14053

23               550 CALIFORNIA STREET, SUITE 820

24                SAN FRANCISCO, CALIFORNIA 94104

25                           (415) 597-5600

1

2

3

4

5

6

7

8         Videotaped deposition of KARINA IOFFEE, taken on

9   behalf of the Defendants, at 39 Drumm Street, San

10  Francisco, California, commencing at 9:59 A.M.,

11  TUESDAY, MARCH 4, 2025, before Sarah K. Maksim,

12  California Certified Shorthand Reporter No. 14053,

13  pursuant to Notice of Deposition.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:
 2   FOR THE PLAINTIFFS:
 3        EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
 4        BY:  VIVAKE PRASAD, ATTORNEY AT LAW
 5        One Rockefeller Plaza, 8th Floor
 6        New York, New York 10020
 7        Telephone:  (212) 763-5000
 8        Email:  Vprasad@ecbawm.com
 9   - AND -
10        AMERICAN CIVIL LIBERTIES UNION FOUNDATION
11        BY:  SCOUT KATOVICH, ATTORNEY AT LAW
12        39 Drumm Street
13        San Francisco, California 94111
14        Telephone:  (212) 549-2500
15        Email:  Skatovich@aclu.org
16   FOR THE DEFENDANTS:
17        SAN FRANCISCO CITY ATTORNEY'S OFFICE
18        BY:  JOHN GEORGE, DEPUTY CITY ATTORNEY
19        1390 Market Street, 7th Floor
20        San Francisco, California 94105
21        Telephone:  (415) 554-4223
22        Email:  John.george@sfcityatty.org
23   ALSO PRESENT:
24        KYLE FRIEND, VIDEOGRAPHER
25
```

```
 1              TUESDAY, MARCH 4, 2025; 9:59 A.M.
 2                       --- o0o ---
 3              BE IT REMEMBERED, that pursuant to Notice, and
 4    on March 4, 2025, commencing at 9:59 a.m. thereof, at
 5    39 Drumm Street, San Francisco, California, before me,
 6    Sarah K. Maksim, a Certified Shorthand Reporter, the
 7    following proceedings transpired:
 8              THE VIDEOGRAPHER:  Here begins Media Number 1
 9    in the deposition of Karina Ioffee in the matter of
10    Coalition of Homelessness et al. versus City and County
11    of San Francisco et al., in the United States District
12    Court, Northern District of California, Case
13    Number 4:22-cv-05502-DMR LJC.  Today's date is Tuesday,
14    March 4th, 2025.  Time on the video monitor is 9:59 a.m.
15              The video operator today is Kyle Friend
16    employed by Behmke Reporting and Video Services, Inc.
17    This video deposition is taking place at 39 Drumm
18    Street, San Francisco, California 94111 and was noticed
19    by John George, deputy city attorney of the City and
20    County of San Francisco.
21              Counsel, please voice identify yourselves.
22              MR. GEORGE:  Good morning.  This is John George
23    from the San Francisco City Attorney's Office on behalf
24    of Defendant.
25              MR. PRASAD:  Good morning.  Vivake Prasad on
```

```
 1    behalf of Plaintiffs.
 2            MS. KATOVICH:  And Scout Katovich on behalf of
 3    Plaintiffs as well.
 4            THE VIDEOGRAPHER:  The court reporter today is
 5    Sarah Maksim, Certified Shorthand Reporter Number 14053,
 6    contracted by Behmke Reporting and Video Services, Inc.
 7            Would the reporter please swear in the witness.
 8                        KARINA IOFFEE,
 9            who, called as a witness and, having been duly
10    sworn by the Certified Shorthand Reporter, was examined
11    and testified as hereinafter set forth.
12                    EXAMINATION BY MR. GEORGE
13        Q.  Good morning.  Have you ever been deposed
14    before?
15        A.  I have not.
16        Q.  Have you testified at trial?
17        A.  No.
18        Q.  Okay.  Do you understand that you're testifying
19    today under oath?
20        A.  Yes.
21        Q.  Any reason that you cannot give truthful
22    testimony today?
23        A.  No.
24        Q.  I'm going to go over a few ground rules.  This
25    will just help us have a clear record and an organized
```

1        A.  Because I believe that she had -- they asked
2   her and, you know, I really am just speculating.  I
3   don't -- I don't recall exactly how I came to that
4   conclusion.  I don't want to guess.
5        Q.  Did you nonetheless come to the conclusion that
6   those items were unwanted?
7        A.  Yes, I must have.  Yeah.
8        Q.  Does this sentence accurately reflect your
9   observations that day?
10       A.  Yes.
11       Q.  You referred to the woman trying to retrieve a
12  backpack that was on the DPW truck; is that correct?
13       A.  Yeah.
14       Q.  Who did that backpack belong to?
15            MR. PRASAD:  Objection, calls for speculation.
16            THE WITNESS:  I don't know.  I believe it was
17  hers.
18  BY MR. GEORGE:
19       Q.  Do you know if that backpack was this woman's,
20  the one who climbed onto the truck?
21       A.  Yeah.  I think so.  Because she -- she wanted
22  it back.  Or she believed her phone might be there.
23       Q.  Other than that, is there any basis that you
24  have to know that this backpack belonged to this woman
25  that you're describing here?

1      A.  No.

2      Q.  Did DPW dispose of that backpack in violation

3   of their bag and tag policy?

4          MR. GEORGE:  Objection, calls for speculation,

5   calls for a legal conclusion.

6          THE WITNESS:  I don't know.  I'm just -- I just

7   recorded, you know.  I wrote down what I saw which is

8   her backpack -- the backpack was in the truck, and she

9   was climbing after it.

10  BY MR. GEORGE:

11     Q.  Was the backpack among the items that you

12  described as unwanted?

13     A.  It appears that way, yeah.

14     Q.  Does the DPW bag and tag policy require -- did

15  it require the workers to return the backpack to this

16  woman?

17         MR. PRASAD:  Objection, calls for

18  speculation -- I mean, calls for a legal conclusion.

19         THE WITNESS:  I really don't know what the

20  policy requires them to do.  I just wrote down what I

21  saw.

22  BY MR. GEORGE:

23     Q.  Do you believe that DPW disposed of anything at

24  this particular sweep that you observed on January 6th

25  improperly?

1          MR. PRASAD:  Same objection.

2          THE WITNESS:  I can't make that assessment.  I

3    wasn't everywhere at once.  So, you know, I -- I

4    wouldn't be able to make that conclusion.

5    BY MR. GEORGE:

6        Q.  Reviewing your notes here, do you see anything

7    that was recorded as being disposed in the notes that

8    was disposed of improperly?

9          MR. PRASAD:  Same objection.

10          THE WITNESS:  You know, I really can't say.  I

11    don't -- I don't know.

12    BY MR. GEORGE:

13        Q.  Do you know whether or not the woman who was

14    trying to get the backpack back in her possession was a

15    drug user?

16          MR. PRASAD:  Objection, calls for speculation.

17          THE WITNESS:  I have no idea.

18    BY MR. GEORGE:

19        Q.  Is it your testimony that the backpack that she

20    was trying to retrieve belonged to her?

21          MR. PRASAD:  Same objection.

22          THE WITNESS:  I -- yeah.  I can't -- I don't

23    know.  She looked like she wanted it.

24    BY MR. GEORGE:

25        Q.  Do you recall observing a sweep the next day on

1   him?

2      A.  Yes.

3      Q.  Okay.  The backpacks that are pictured in the

4   photograph on page 318, at the bottom of the page, did

5   those look like trash to you?

6          MR. PRASAD:  Objection, calls for speculation.

7          THE WITNESS:  One man's trash is another's

8   treasure.  It's hard to say.

9   BY MR. GEORGE:

10      Q.  Would you have characterized those backpacks on

11   the bottom of page 318 as trash had the man not

12   indicated that they were trash?

13          MR. PRASAD:  Same objection.

14          THE WITNESS:  They don't look like trash to me.

15   BY MR. GEORGE:

16   ████ ████████████████████████████████████████

17   Designated CONFIDENTIAL by Plaintiffs ████████  ██

18   pursuant to Protective Order ████████████████

19   ███████████████

20   ██ ███

21   ██ ███████████████████████████

22   ████

23   ██ ████████████   ██████████████

24   ██ ███████████████████████████

25   ████████████████████████████

```
 1   word usable in it.  What did you mean by that?
 2        A.  I think what I meant is that it's not torn.
 3   It's not stained.  It looks perfectly fine, and I was
 4   surprised that such a nice-looking mattress would be
 5   left behind.
 6        Q.  Did this man abandon this mattress?
 7            MR. PRASAD:  Objection, calls for speculation,
 8   calls for a legal conclusion.
 9            THE WITNESS:  I don't know.
10   BY MR. GEORGE:
11        Q.  Did you see him come back for the mattress at
12   any point during this resolution?
13        A.  No.
14        Q.  Did you hear him speak -- and by him, I mean
15   this man who left the mattress.  Did you hear him speak
16   with any City workers?
17        A.  No.
18        Q.  Do you know if he spoke with any City workers?
19        A.  Not sure.  Can't be everywhere at once.
20        Q.  At the end of page 93, you refer to DPW not
21   taking any tents; is that correct?
22        A.  Yes.
23        Q.  Is that accurate?  Did DPW not take any tents
24   at this sweep?
25        A.  Correct.
```

1      Q.  And you say that DPW mostly throw away
2  mattresses and other small debris left behind.  Other
3  than the mattress that we were just discussing, did DPW
4  throw away another mattress that day?
5      A.  I believe so, because I used the plural.  And,
6  in fact, I don't know if this one here is the same one,
7  but I think if I wrote mattresses, that to mean there
8  was more than one disposed of.
9      Q.  On page 97 and 98, is there a mattress in the
10 photos that you have included in here?
11     A.  Yes.
12     Q.  Do you know whether or not that mattress is the
13 same mattress as pictured on page 94?
14     A.  Could be.
15     Q.  Do you know one way or the other whether that
16 is the same mattress?
17     A.  Can't say for sure.
18     Q.  Do you know -- so on page 97/98, assuming that
19 that is a different mattress than the one pictured on
20 94, do you know who that mattress belonged to?
21     A.  I -- I don't know exactly.  If it's the same
22 one, it belongs to the man who walked off.
23     Q.  If it's a different mattress than the one that
24 the man left behind, do you know anything about its
25 former owner?

1        A.   No.

2        Q.   Do you know if that mattress that's pictured on

3   97 and 98, assuming it was not the man's, do you know if

4   it was abandoned?

5        A.   I don't know.

6        Q.   Will you please turn back to page 93.  The last

7   sentence also refers to other small debris left behind.

8   What debris were you referring to there?

9        A.   Probably like cardboard boxes and things that

10  are -- that people sleep on or that they use to -- you

11  know, construction of a shelter.

12       Q.   Is any of the items that you were referring to

13  as debris pictured in any of the photos in the rest of

14  this report?

15       A.   Yeah, well, you see that there's a turquoise

16  kind of -- I don't know what that would even be called.

17  Like a storage chair, bench thing.  And there's also --

18  there's -- I think there's some plywood, cardboard

19  boxes, doors of some sort.  That sort of thing.

20       Q.   Were these all items that people who were at

21  this resolution had left behind?

22            MR. PRASAD:  Objection, calls for speculation.

23            THE WITNESS:  I don't know.

24  BY MR. GEORGE:

25       Q.   Looking at the photo on page 95, with a

```
 1    arrived?
 2         A.   Correct.
 3         Q.   Okay.  Did anyone show up at this particular
 4    sweep and claim the tent that was empty?
 5         A.   No.
 6         Q.   Do you know who that tent belonged to?
 7         A.   No.
 8         Q.   Do you know anything about who may have owned
 9    it?
10         A.   No.
11         Q.   Was it abandoned?
12              MR. PRASAD:   Calls for speculation.   Calls for
13    a legal conclusion.
14              THE WITNESS:   It's hard to say.   Is it
15    abandoned or did they just go get food?   I -- I
16    wouldn't -- I wouldn't be able to make that
17    determination.
18    BY MR. GEORGE:
19         Q.   On page 47, you wrote, this is the middle of
20    the page, about the empty tent, everything looks soiled,
21    but it's not clear if it's abandoned or the occupant had
22    stepped away.
23              So were you unsure one way or the other whether
24    it was abandoned?
25         A.   Correct.  I mean, it's hard to keep things
```

1        Q.   So the paragraph underneath the photo on 192 is

2   not describing what is pictured above the text?

3        A.   Correct.

4        Q.   Were -- was this structure pictured in the

5   photo on 192 associated with the gentleman who left and

6   who supposedly sleeps in his car?

7             MR. PRASAD:  Objection, calls for speculation.

8             THE WITNESS:  I don't know for sure.  But it

9   was all in the same place.

10  BY MR. GEORGE:

11       Q.   Do you know one way or the other who owns or

12  owned the items that are pictured in this structure

13  that's pictured on 192?

14            MR. PRASAD:  Same objection.

15            THE WITNESS:  I do not.

16  BY MR. GEORGE:

17       Q.   Were you able to examine the condition of the

18  items that are pictured inside of the structure on 192?

19       A.   No.

20       Q.   Do you know if the items that are pictured

21  inside here were abandoned?

22       A.   I have --

23            MR. PRASAD:  Objection, vague and calls for a

24  legal conclusion.

25            THE WITNESS:  I have no way of determining

1   that.
2   BY MR. GEORGE:
3       Q.  So you don't know one way or the other whether
4   these were abandoned?
5       A.  Correct.
6       Q.  Do you know if the person who owned these items
7   at one point in time intended to keep them?
8           MR. PRASAD:  Objection, calls for speculation.
9           THE WITNESS:  I wouldn't be able to say.
10  BY MR. GEORGE:
11      Q.  Do you know if the owner of these items was a
12  drug user?
13          MR. PRASAD:  Same objection.
14          THE WITNESS:  I have no idea.
15  BY MR. GEORGE:
16      Q.  Were you able to observe the condition of the
17  items in the Dumpster on page 194?
18      A.  I have to refer to my notes.  I don't -- I
19  don't think so.
20      Q.  Do you know one way or the other whether the
21  person who left behind the Dumpster intended to abandon
22  those items?
23          MR. PRASAD:  Objection, calls for speculation,
24  calls for a legal conclusion.
25          THE WITNESS:  I couldn't say.

```
 1  those items being put into the crusher truck?
 2       A.  Yes.
 3       Q.  Did you see the contents of the backpacks?
 4       A.  No.
 5       Q.  What was the condition of the couch that was
 6  being put in there?
 7       A.  I have to refer to this.  I think there's
 8  photos.  I don't see any photos of the couch.  So I -- I
 9  wouldn't be able to comment on that.
10       Q.  Is that the same for the backpacks and the
11  bicycle parts?
12       A.  Yeah.  You're asking me if they were torn or
13  new or dirty?  Or what would you like to know about
14  them?
15       Q.  Yeah.  Let me -- let me phrase it this way:  Do
16  you recall anything about the condition of the backpacks
17  that were put in the crusher that you were referencing
18  on page 200?
19       A.  I just remember that they seemed to be very
20  full.  Like that they weren't just an old backpack that
21  one would discard, but they were packed with items.
22       Q.  Do you know what they were packed with?
23       A.  No, they were zipped up.
24       Q.  Did you -- were you able to assess the
25  condition of the bicycle parts?
```

1        A.   I'm not a bicycle expert.

2        Q.   Who did those items belong to?

3        A.   I believe they -- I don't know exactly.  But

4   since Carlos said they weren't his, I believe it was

5   somebody who had been camping next to him.

6        Q.   Carlos said that he doesn't know the owner or

7   owners and that that person wasn't there; correct?

8        A.   Correct.

9        Q.   Did you have any more information about the

10  owner of those items than Carlos did?

11       A.   I did not.

12       Q.   Do you know if those particular items that were

13  put in the crusher truck were abandoned?

14            MR. PRASAD:   Objection, calls for speculation,

15  calls for a legal conclusion.

16            THE WITNESS:   I wouldn't be able to say.

17  BY MR. GEORGE:

18       Q.   You don't know one way or the other?

19       A.   Correct.

20       Q.   Did Carlos tell the DPW employees that they

21  could -- they could take his tarp?

22       A.   He never said -- Carlos does not speak English.

23  So he more, you know, made movements with his hand just

24  like, uh, just take it.  But there was never -- he

25  didn't actually -- he didn't actually say, you can take

1    were posted for this particular resolution?

2         A.  I think it says 131.  And I think if you go

3    further into the notes, there's some discussion about

4    the confusion over the noticing, that there were two

5    notices, and today's -- that that day's notices for

6    January 29th had been covered by the January 31 ones

7    which led to a lot of confusion by the homeless people.

8         Q.  Did you ultimately see the January 29th notice

9    after uncovering it?

10        A.  Yes.

11        Q.  Okay.  Will you please turn to page 262.

12        A.  Mm-hmm.

13        Q.  Do you see the photograph with the trash bags

14   in it?

15        A.  Yes.

16        Q.  Do you know what's in those trash bags?

17        A.  I do not.

18        Q.  Were those trash bags items that Carlos and

19   Elizabeth did not want anymore?

20             MR. PRASAD:  Asked and answered.  Asks for

21   speculation.

22             THE WITNESS:  I couldn't say.

23   BY MR. GEORGE:

24        Q.  Did you see the content of those trash bags?

25        A.  No.

```
 1   left pretty quickly.
 2   BY MR. GEORGE:
 3        Q.  So that day you didn't get a chance to speak
 4   with him; is that correct?
 5             MR. PRASAD:  Objection, asked and answered.
 6             THE WITNESS:  Correct.
 7   BY MR. GEORGE:
 8        Q.  Do you know if Armando was a drug user?
 9             MR. PRASAD:  Objection, calls for speculation.
10             THE WITNESS:  I don't know.
11   BY MR. GEORGE:
12        Q.  Were you able to observe the condition of each
13   of the items that are pictured on page 272?
14        A.  Each of the items in the tent?  Or in the
15   dwelling?
16        Q.  Yeah, in the dwelling.
17        A.  Not every single one, but his barbecue appeared
18   to be working properly, and tarp looked fine, and there
19   was a lot of bags filled with items.
20        Q.  Do you know what's in those bags?
21        A.  Not all the contents, no.
22        Q.  Do you know any of the contents of those bags?
23        A.  No.
24        Q.  Does it appear as though the tarp is ripped to
25   the left of the spray paint that's on it?
```

```
 1        A.   No.
 2        Q.   On page 306, it refers to -- on the -- in the
 3   entry at 117, it refers to the blue tent belonging to a
 4   person who accepted shelter.  Was that tent the one
 5   that's pictured on 307 and 308?
 6        A.   Correct.
 7        Q.   Was that -- did that tent belong to the person
 8   who accepted shelter?
 9        A.   Yes.
10        Q.   Did you hear that person's conversations with
11   all of the City workers that day?
12        A.   No.  Unfortunately, I arrived a little late
13   that date, and the person was already in the -- the --
14   the transport vehicle.
15        Q.   Do you know one way or the other whether that
16   person gave permission to the City to dispose of the
17   tent?
18             MR. PRASAD:  Objection, calls for speculation.
19             THE WITNESS:  I have -- I do not know.
20   BY MR. GEORGE:
21        Q.   Did you see inside of the tent?
22        A.   Did I see inside of the tent?  No, I only saw
23   it from the outside.
24        Q.   Do you know what was inside the tent, if
25   anything?
```

1      A.  No, I don't.

2      Q.  Do you know if the person who accepted shelter

3  and owned that tent was a drug user?

4          MR. PRASAD:  Objection, calls for speculation.

5          THE WITNESS:  I have no idea.

6  BY MR. GEORGE:

7      Q.  Did you see DPW dispose of that tent?

8      A.  Yes.

9      Q.  Is that reflected on page 308?

10     A.  Yes.

11     Q.  And then is the photo on 310 the tent in the

12  back of the DPW truck?

13     A.  Yes.

14     Q.  Was that tent disposed of improperly under the

15  bag and tag policy?

16          MR. PRASAD:  Objection, calls for speculation,

17  calls for a legal conclusion.

18          THE WITNESS:  Yeah, I wouldn't be able to say.

19  I'm not a lawyer.

20  BY MR. GEORGE:

21     Q.  Do you know if the person who accepted shelter

22  abandoned that tent?

23          MR. PRASAD:  Objection -- same objections.

24          THE WITNESS:  I have no way of knowing.

25  ///

```
1   pictured at the top of the page on 129?
2        A.  Yes.
3        Q.  Did you inspect that bicycle to see if it was
4   in good working condition?
5        A.  Only visually.  I didn't -- I didn't get on it
6   and ride it.
7        Q.  Do you know if the brakes worked?
8        A.  No.
9        Q.  Do you know whether that bicycle was abandoned?
10       MR. PRASAD:  Objection, calls for speculation,
11   calls for a legal conclusion.
12       THE WITNESS:  I have no idea.
13  BY MR. GEORGE:
14       Q.  On page 130, you again refer to a good bicycle.
15  Is that the pictured bike in the photo?
16       A.  Yeah, it's the same one.
17       Q.  Okay.  And at the bottom of the page, you say a
18  DPW worker tosses good, usable bicycle onto DPW truck.
19  Is that the picture in the photo?
20       A.  Yes.
21       Q.  Or I'm sorry, is that the bike in the picture?
22       A.  Yes.
23       Q.  Okay.  On page 132, you describe a good small
24  side table and a nice Scott Sub40 bicycle.  Was the
25  owner of either of those items present at the sweep?
```

```
1          A.  No.
2          Q.  Do you know who owned those items?
3          A.  No.
4          Q.  Do you know if they were abandoned?
5              MR. PRASAD:  Objection, calls for speculation,
6     calls for a legal conclusion.
7              THE WITNESS:  I had no way of telling.
8     BY MR. GEORGE:
9          Q.  Did anyone show up at the sweep that day to
10    claim either of those items?
11         A.  No.
12         Q.  Did you attempt to ride the Scott Sub40
13    bicycle?
14             MR. PRASAD:  Objection, asked and answered.
15             THE WITNESS:  No, I didn't.
16    BY MR. GEORGE:
17         Q.  On page 134, you describe a man inside a
18    makeshift dwelling who walks away quickly after the
19    police arrive.  Did he return during the operation?
20         A.  Not that I recall.
21         Q.  Do you know that person's identity?
22         A.  No.
23         Q.  Did you see him again that day?
24         A.  No.
25         Q.  Have you ever seen him since?
```

```
1        A.  No.

2        Q.  Do you have any idea whether he intended to

3   abandon anything that he left behind?

4            MR. PRASAD:  Objection, calls for speculation,

5   calls for a legal conclusion.

6            THE WITNESS:  I have no idea what he wanted to

7   do with those items.

8   BY MR. GEORGE:

9        Q.  Did you hear any conversations between that man

10  and any City employees?

11       A.  No.

12       Q.  At the top of page 135, you describe some

13  items.  You say, DPW workers load screens, decent coffee

14  table, and a bicycle with one wheel into the crusher

15  truck.  Do you see that?

16       A.  Yes.

17       Q.  Who owned those items?

18       A.  I have no idea.

19       Q.  Do you know if those items were abandoned?

20           MR. PRASAD:  Objection, calls for speculation,

21  calls for a legal conclusion.

22           THE WITNESS:  I didn't have a way to determine

23  that.

24  BY MR. GEORGE:

25       Q.  Did anyone return that day to claim those
```

```
 1    beginning of this sweep notes, on page 334.
 2    BY MR. GEORGE:
 3         Q.  Do you know how -- well, let me withdraw that.
 4              Did DJ tell you why he hadn't moved the items
 5    that were in this pile before the resolution started?
 6         A.  He did not.
 7         Q.  Did you know if the generator that he was
 8    talking about was operable?
 9         A.  I have no idea.
10         Q.  What types of tools was he describing or was he
11    referring to?
12         A.  My understanding -- okay.  I'm not an expert on
13    tools, but there was some welding things and other power
14    tools.  Things for like doing stuff with -- with metal.
15         Q.  Do you know if the power tools were operable?
16         A.  I have no idea.
17         Q.  Do you know where DJ acquired those power
18    tools?
19         A.  I do not.
20         Q.  Do you know where he acquired the generator?
21         A.  I don't.
22         Q.  Do you have any understanding of the condition
23    of the tools?
24              MR. PRASAD:  Objection, calls for speculation.
25              THE WITNESS:  I don't know.
```

```
 1              THE WITNESS:  Yeah.  I didn't hear all of the
 2    conversations, but they were visibly upset and crying.
 3    BY MR. GEORGE:
 4         Q.  Did you speak with DJ's siblings after the
 5    items were disposed?
 6         A.  During and after, yes.
 7         Q.  And are your conversations with them reflected
 8    in your notes?
 9         A.  They were mostly two overwhelmed to speak with
10    me.
11         Q.  Did you follow up with them after the
12    resolution?
13         A.  I did not.
14         Q.  Have you spoken with them since?
15         A.  No.
16         Q.  Will you please turn to page 354.  This
17    paragraph on 354 refers to a woman named Debbie.
18         A.  Yes.
19         Q.  Do you know if she is enrolled to stay at the
20    Navigation Center?
21         A.  I did not speak to her personally.  This is
22    information I got from John.
23         Q.  Do you know what she intended for the property
24    that is pictured on page 354?
25              MR. PRASAD:  Objection, calls for speculation.
```

1           THE WITNESS:  I do not.
2    BY MR. GEORGE:
3        Q.  Was that Debbie's property the -- in the
4    photograph on 354?
5           MR. PRASAD:  Objection, calls for speculation.
6           THE WITNESS:  I think as I stated here, the
7    luggage bag, shelves, and food were hers.
8    BY MR. GEORGE:
9        Q.  Are those pictured in any of the photos in this
10   report?
11       A.  Yes.  The luggage is on 355 also 356.  And I
12   don't -- 357, not sure what 357 -- who that -- whose
13   that is.
14       Q.  Did Debbie return before you left for the day?
15       A.  No.
16       Q.  Have you ever spoken with Debbie?
17       A.  No.
18       Q.  Do you know if Debbie was a drug user?
19          MR. PRASAD:  Objection, calls for speculation.
20          THE WITNESS:  I do not.
21   BY MR. GEORGE:
22       Q.  Do you know if Debbie had any conversations
23   before -- with City workers before she left to go to the
24   Navigation Center?
25          MR. PRASAD:  Objection, calls for speculation.

```
 1               THE WITNESS:  I don't know.
 2    BY MR. GEORGE:
 3        Q.  Do you know one way or another whether she gave
 4    permission to any City worker to dispose of her items?
 5               MR. PRASAD:  Same objection.
 6               THE WITNESS:  I have no way of knowing that.
 7    BY MR. GEORGE:
 8        Q.  Do you know one way or another what she
 9    intended for the items that she left behind when she
10    went to the Navigation Center?
11               MR. PRASAD:  Asked and answered, calls for
12    speculation.
13               THE WITNESS:  I don't know what she intended.
14    BY MR. GEORGE:
15        Q.  Do you know what was -- what, if anything, was
16    in the bags that are pictured on page 355 and 356?
17        A.  I don't.
18        Q.  On page 357 through 359, there are some tents
19    pictured.  Who did those tents belong to?
20        A.  I don't know.
21        Q.  Did any person show up while you were at this
22    sweep to claim the tents that were pictured on 357
23    through 359?
24        A.  Not that I recall.
25        Q.  Do you know one way or another whether or not
```

```
 1   STATE OF CALIFORNIA     ) ss.

 2   COUNTY OF CONTRA COSTA  )

 3           I, SARAH K. MAKSIM, a Certified Shorthand

 4   Reporter, holding a valid and current license issued by

 5   the State of California, CSR No. 14053, duly authorized

 6   to administer oaths, do hereby certify:

 7           That the witness in the foregoing deposition

 8   was administered an oath to testify to the whole truth

 9   in the within-entitled cause;

10           That said deposition was taken down by me in

11   shorthand at the time and place therein stated and

12   thereafter transcribed into typewriting, by computer,

13   under my direction and supervision.

14           I further certify that I am neither counsel for

15   nor related to any party in the foregoing depositions

16   and caption named nor in any way interested in the

17   outcome thereof.

18   Reading and Signing was:

19   __X__  Requested  ____  Waived  ____  Not Requested

20   Dated March 16, 2025

21

22

23

24   SARAH K. MAKSIM, CSR NO. 14053

25   STATE OF CALIFORNIA
```