**EXHIBIT B**

**TO**

**DECLARATION OF EDMUND T. WANG IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE NO. 3 TO EXCLUDE DISMISSED OR UNALLEGED CLAIMS**

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                   OAKLAND DIVISION

 4

 5  - - - - - - - - - - - - - - - - -

 6  COALITION ON HOMELESSNESS,        )

 7  et al.,                           )

 8               Plaintiffs,          )

 9  vs.                               )  CASE NO.

10  CITY AND COUNTY OF SAN            )  4:22-cv-05502-DMR

11  FRANCISCO, et al.,                )

12               Defendants.          )

13  - - - - - - - - - - - - - - - - -

14

15

16         30(b)(6) DEPOSITION OF DAVID LAZAR

17         RE: SAN FRANCISCO POLICE DEPARTMENT

18              MONDAY, MARCH 3, 2025

19

20

21         BEHMKE REPORTING AND VIDEO SERVICES, INC.

22         BY:  SUZANNE I. ANDRADE, CSR NO. 10682

23              550 CALIFORNIA STREET, SUITE 820

24              SAN FRANCISCO, CALIFORNIA 94104

25                   (415) 597-5600
```

1

2

3

4

5

6

7

8

9

10          30(b)(6) Deposition of DAVID LAZAR, on behalf

12   of THE SAN FRANCISCO POLICE DEPARTMENT, taken on behalf

13   of Plaintiffs, at 1390 Market Street, Seventh Floor,

14   San Francisco, California, commencing at 10:03 A.M.,

15   MONDAY, MARCH 3, 2024, before Suzanne I. Andrade,

16   Certified Shorthand Reporter No. 10682, pursuant to

17   Notice of Deposition.

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFFS:
 3        AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF
 4        NORTHERN CALIFORNIA
 5        BY:  SCOUT KATOVICH, ATTORNEY AT LAW
 6             JOHN H. DO, ATTORNEY AT LAW
 7        39 Drumm Street
 8        San Francisco, California  94111
 9        Telephone:  (415) 293-6393
10        Email:  skatovich@aclu.org
11                jdo@aclunc.org
12
13   FOR DEFENDANTS AND THE DEPONENT:
14        CITY AND COUNTY OF SAN FRANCISCO
15        OFFICE OF THE CITY ATTORNEY
16        BY:  EDMUND WANG, DEPUTY CITY ATTORNEY
17        1390 Market Street, 7th Floor
18        San Francisco, California  94102
19        Telephone:  (415) 554-3800
20        Email:  edmund.wang@sfcityatty.org
21
22
23
24
25
```

1                          INDEX

2   MONDAY, MARCH 3, 2024

3   DAVID LAZAR - 30(b)(6)                          PAGE

4   PROCEEDINGS

5        Examination by MS. KATOVICH               9

6   P.M. SESSION

7        Examination Resumed by MS. KATOVICH       93

8

9                       ---o0o---

10

11        QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

12                   PAGE      LINE

13                        None.

14

15

16

17

18

19

20

21

22

23

24

25

1    correct?

2        A.    Correct.

3        Q.    And when did that change?

4        A.    I'm going to say around six months ago or so,

5    approximately.

6        Q.    Why did that change?

7        A.    Well, we thought -- well, there's two --

8    there's two areas.  Issue one is we, again, are short

9    500 police officers.  So we're trying the make best use

10   of our resources.  And then, secondly, we felt like a

11   centralized model would be much more efficient than the

12   decentralized model that we've had for the last 21

13   years.

14       Q.    And why would it be more efficient?

15       A.    Because -- it would be more efficient because

16   they have the same supervisor, the communication is

17   better, and the coordination is better when they're

18   centralized.

19       Q.    And who made that decision?

20       A.    I made that decision.

21       Q.    Are you familiar with the term "re-encampment

22   prevention?"

23       A.    Yes.

24       Q.    What is re-encampment prevention?

25       A.    It's the ability to not let an encampment be

1   built again.

2       Q.   And how does SFPD engage in re-encampment

3   prevention?

4       ATTORNEY WANG:  Objection; vague.

5           Go ahead.

6       THE WITNESS:  The main way is to just have eyes on

7   an area and prevent a person from resetting up their

8   encampment.

9   BY ATTORNEY KATOVICH:

10      Q.   How does SFPD prevent a person from resetting

11  up their encampment?

12      A.   In most cases, they'll say to a person, "Please

13  don't set up this encampment.  It's against the law."

14  And we try to prevent by enforcing the law on this

15  individual.

16      Q.   And in other cases?

17      ATTORNEY WANG:  Objection; vague.

18      THE WITNESS:  I mean, in other cases, we may use

19  structure -- I don't want to say "structure."  Sorry.  I

20  meant bike rack, barricades, or other devices to hold

21  ground in an area.  In some cases, we'll use Urban

22  Alchemy to assist us.

23  BY ATTORNEY KATOVICH:

24      Q.   How do you use Urban Alchemy to assist?

25      A.   When we say to them, "Please do not let anybody

1      Q.    You said that in -- for 647(e), evidence of
2   that offense is seized by DPW, correct?
3      A.    Yes.
4      Q.    Are there other offenses where evidence of that
5   offense is seized by another City department outside of
6   SFPD?
7      A.    And outside of Public Works?
8      Q.    It could include Public Works as well.
9      A.    Not that I can think of.  Because if it's
10  evidence in a crime other than a structure or a tent,
11  we're going to collect that evidence.
12          So if I understand your question correctly, the
13  answer is no.  Hopefully I understand your question
14  correctly.
15          You want to try it again?  You want to ask it
16  another way?
17      Q.    We'll come back to it.
18          Is SFPD required to call DPW to bag and tag
19  property when an unhoused person is arrested?
20      ATTORNEY WANG:  Objection; incomplete hypothetical,
21  vague.
22          Go ahead.
23      THE WITNESS:  Yes.
24  BY ATTORNEY KATOVICH:
25      Q.    Every time?

1    Q.    So evidence of illegal lodging is the only
2    evidence that is seized by DPW, correct?

3    ATTORNEY WANG:  Objection; asked and answered,
4    vague.

5        Go ahead.

6    THE WITNESS:  Yes.

7    BY ATTORNEY KATOVICH:

8    Q.    And evidence of illegal lodging is the only
9    evidence that is seized by any department outside of
10   SFPD?

11   ATTORNEY WANG:  Same objections.

12       Go ahead.

13   THE WITNESS:  Based on the questions -- based on
14   your question, I'm going to say to the best of my
15   knowledge, to the best of my knowledge at this moment.

16   BY ATTORNEY KATOVICH:

17   Q.    Does SFPD take items that are going to be
18   bagged and tagged by DPW to SFPD stations?

19   A.    They're not allowed to according to our current
20   policy.

21   Q.    And were they previously allowed to?

22   A.    Yes.

23   Q.    And when did that change?

24   A.    To the best of my knowledge, at least with this
25   latest directive that was written last year.

```
 1  BY ATTORNEY KATOVICH:
 2      Q.    Does SFPD provide any documentation?
 3      A.    Not that I'm aware.
 4      Q.    Aside from evidence of illegal lodging, does
 5  SFPD discard any other crime evidence because it poses a
 6  health or safety risk?
 7      ATTORNEY WANG:  Quickly, just objection; beyond the
 8  scope, vague.
 9          Okay.  Go ahead.
10      THE WITNESS:  No.
11  BY ATTORNEY KATOVICH:
12      Q.    And aside from evidence of illegal lodging,
13  does SFPD allow any other crime evidence to be destroyed
14  by another City agency?
15      ATTORNEY WANG:  Same objections.
16          Go ahead.
17      THE WITNESS:  No.
18      ATTORNEY KATOVICH:  I'm going to introduce a
19  document into evidence.  This is actually a previously
20  marked exhibit, 1042.
21          (Previously marked Deposition Exhibit 1042 was
22          presented.)
23  BY ATTORNEY KATOVICH:
24      Q.    Take a moment to look this over and let me know
25  if it looks familiar to you.
```

1  "As such, items that present potentially infectious,

2  hazardous, or immediate health or safety risk shall not

3  be placed in a police vehicle nor brought into a station

4  to avoid unnecessary exposure to other officers."

5          Is it fair to say that the reason why officers

6  were instructed to determine whether items were

7  hazardous or posed an immediate health or safety risk

8  was in order to avoid exposure to those risks for other

9  officers?

10     A.   Yes.

11     Q.   And in other contexts, SFPD handles items that

12  are considered biohazards, correct?

13     ATTORNEY WANG:   Objection; incomplete hypothetical.

14          Go ahead.

15     THE WITNESS:   Yes.

16  BY ATTORNEY KATOVICH:

17     Q.   And SFPD has protocol for how to safely handle

18  items such as blood or that have had contact with bodily

19  fluids, correct?

20     A.   Yes.

21     Q.   Why do those protocols not apply to this

22  department notice?

23     A.   Because of capacity and volume.

24     Q.   What do you mean by that?

25     A.   The San Francisco Police Department is not a

1    Public Works agency.  We do not have the capacity to,

2    essentially, book into evidence every single piece of

3    property that we come in contact with.  For example, the

4    evidence of a tent or property that's left abandoned and

5    things like that.

6              We do have an obligation in evidence, other

7    than illegal lodging, to make sure that we're handling

8    those things safely.  But this is a capacity issue.

9    This is why it's the responsibility of Public Works to

10   deal with it.  And I'm sure they have -- I'm not going

11   to speculate about their training, but that's their job.

12       Q.   So property that is evidence of illegal lodging

13   is treated differently than other evidence because of

14   the capacity of SFPD?

15       A.   I would say because of capacity and because of

16   the health risks and because of the volume.

17       Q.   And the health risk, what do you mean by that?

18       A.   Well, oftentimes these -- just say a tent, for

19   example, that's confiscated will have some sort of

20   biological hazard or some -- or it may be -- you know,

21   it may be dirty or it may be -- there may be some sort

22   of health risk.  It could have needles in it.  There's

23   all types of different scenarios.  And so that's why the

24   determination was made that Public Works is best in

25   handling and storing these items.

1    Q.    But other evidence -- items that are evidence

2    of a crime might similarly pose a health risk, correct?

3    A.    Yes.

4    Q.    But those items are not handed over to Public

5    Works to handle, correct?

6    A.    No.

7    Q.    So looking at the third paragraph under

8    "Property of Arrested Person" --

9    A.    I'm sorry, what document are you referring to?

10   Q.    The same document, 20-167.

11   A.    Okay.

12   Q.    "In those cases where the personal property is

13   evidence of a crime and the personal property presents a

14   hazardous, infectious health or safety risk:"

15        First bullet point:  "Contact DPW."

16        Second point:  "DPW is to confiscate the

17   property.  (Take custody of what the arresting

18   officer(s) deems as evidence supporting the arrest.

19   Property be shall listed in the arrest report as

20   evidence.)

21        "Photograph and document the property in the

22   report.

23        "Note: DPW will not bag and tag evidence that

24   present an immediate health or safety risk due to

25   presence of potential biohazards such as fecal matter,

```
 1   department notices, protocols, or guidance relate to
 2   DPW's bag-and-tag policy?
 3       ATTORNEY WANG:  Objection; vague.
 4           Go ahead.
 5       THE WITNESS:  There's the current department notice
 6   is used as our guide, 24-140.
 7   BY ATTORNEY KATOVICH:
 8       Q.   And are there other department notices that
 9   reference the DPW bag-and-tag policy?
10       A.   There may -- there may under the current
11   illegal lodging policy.  I'd have to reference it.
12       ATTORNEY KATOVICH:  I'll provide you a document that
13   was previously marked as 1039, Exhibit 1039.
14           (Previously marked Deposition Exhibit 1039 was
15           presented.)
16   BY ATTORNEY KATOVICH:
17       Q.   Take a moment to look at this document.
18       A.   (Examines document.)
19       Q.   Is this the current department notice on
20   "Enforcement of Laws to Address Lodging, Encampments on
21   Public Streets, Sidewalks, Plazas, or Other Public or on
22   Private Property or Blocking Access to Those Areas"?
23       A.   Yes.
24       Q.   Is this the department notice that you were
25   just referring to?
```

1    how to address illegal lodging, which is in 24-126.

2         This 24-140 has to do with our policies related

3    to bag and tag.

4         Q.    And it also instructs officers how to handle

5    evidence of illegal lodging, correct?

6         A.    Yes.

7         Q.    I want to turn your attention in this

8    department notice to --

9         A.    Which one?  I'm sorry.

10        Q.    I'm sorry, the 24-126, the enforcement of laws

11   to address lodging, encampments on public streets.

12             And I'm going to turn your attention to page 4

13   out of 5 in the bottom right and to the section that

14   addresses California Penal Code 148(a).

15        A.    Mm-hmm.

16        Q.    The paragraph that follows that heading

17   "California Penal Code 148(a)" says that:  "This section

18   (misdemeanor) prohibits any person from willfully

19   resisting, delaying, or obstructing any public officer

20   or peace officer, including DPW, DPH, and HSH personnel,

21   who is discharging or attempting to discharge an

22   official duty, including the enforcement of any law.

23   For example, during joint operations Members may cite an

24   individual for violating Penal Code 148(a), where the

25   City has complied with other local laws and the

1    individual refuses to comply."
2          What is meant by "the City has complied with
3    other local laws"?
4        ATTORNEY WANG:  Objection; beyond the scope.
5          Go ahead, to the extent you know.
6        THE WITNESS:  I do not know.
7    BY ATTORNEY KATOVICH:
8        Q.   Do you know what other local laws this is
9    referring to?
10       ATTORNEY WANG:  Objection; beyond the scope.
11         Go ahead.
12       THE WITNESS:  I would be speculating to say that
13   maybe it has to do with cleaning up.  The City has
14   complied with cleaning up debris and trash or is
15   required to do so, but I'm just speculating.  I don't
16   know -- at the moment, I do not know what that last
17   sentence clearly means, but I do know what 148(a) means
18   and how to enforce it.
19   BY ATTORNEY KATOVICH:
20       Q.   And if you -- to enforce 148 -- would it be
21   appropriate to enforce 148(a) if DPW were not complying
22   with its own bag-and-tag policy?
23       ATTORNEY WANG:  Objection; beyond the scope, calls
24   for a legal conclusion, vague, incomplete hypothetical.
25       THE WITNESS:  I do not understand your question.

```
 1    You can definitely repeat it.  Let's see if --
 2    BY ATTORNEY KATOVICH:
 3        Q.    Let's say that at an encampment resolution DPW
 4    is -- has taken an individual's property and is in the
 5    process of discarding that property in violation of its
 6    own bag-and-tag policy and the individual is attempting
 7    to prevent the DPW officer from taking that property.
 8            In that situation, would it be appropriate to
 9    enforce 148(a) against the individual who is trying to
10    take their property back from DPW?
11        ATTORNEY WANG:  Objection.  Same objections.
12            Go ahead.
13        THE WITNESS:  The answer is yes.  And the onus would
14    rest on the Public Works employee as to whether their
15    work was lawful or within the procedures, et cetera.
16    But based on its face, yes.
17    BY ATTORNEY KATOVICH:
18        Q.    So if the Public Works employee told SFPD that
19    they were complying with their procedures and the
20    bag-and-tag policy, then SFPD would conclude that it was
21    appropriate to -- it could be appropriate to enforce
22    148(a)?
23        ATTORNEY WANG:  Objection.  Same objections.
24            Go ahead.
25        THE WITNESS:  Yes.
```

1    A.   Yes.  Thank you.  There are no policies, to the

2    best of my knowledge, that I can recall, for the reasons

3    that I've stated.

4        ATTORNEY KATOVICH:   I'm going to show you another

5    document, and this was a document that was previously

6    introduced as Exhibit 1038.

7            (Previously marked Deposition Exhibit 1038 was

8            presented.)

9    BY ATTORNEY KATOVICH:

10    Q.   Take a moment to look over this document and

11    let me know if you recognize it.

12    A.   (Examines document.)

13        I do recognize -- I may have read this.  I may

14    have read this.  There's a lot of things that come out

15    that have this header on it or had this header on it.

16    So not everything has -- I don't have quick

17    recollection, but I do remember reading an update on

18    Grants Pass in this format, but I don't know if its

19    exactly this document, and I don't know how many were

20    prepared on this topic.

21    Q.   I am going to direct your attention to the

22    paragraph that begins "Preventing Re-encampment."

23        Do you see that?

24    A.   Yes.

25    Q.   It says:  "Under the new rulings, HSOC staff

```
 1   and other city staff will be able to better enforce laws

 2   when refusals of shelter occur.  This will include being

 3   able to follow up at a later time to an area that has

 4   recently been cleared to prevent re-encampment."

 5          Is it your understanding that after Grants

 6   Pass, HSOC practices regarding re-encampment prevention

 7   changed?

 8       ATTORNEY WANG:  Objection to the extent it's beyond

 9   the scope.

10          Go ahead.

11       THE WITNESS:  Well, we always have worked to prevent

12   re-encampment by ways that I've stated earlier, but post

13   Grants Pass gave us the opportunity to do so without

14   requiring that the person be offered shelter.

15   BY ATTORNEY KATOVICH:

16       Q.   And here the -- this update says that after

17   Grants Pass, HSOC staff and other City staff will be

18   "able to follow up at a later time to an area that has

19   recently been cleared to prevent re-encampment."

20          Do you know what that means?

21       A.   Can you point to me what you just read?

22       Q.   That it starts on the second line, that

23   paragraph "Preventing Re-encampment."

24          "This will include being able to follow up at a

25   later time to an area that has recently been cleared to
```

1  prevent re-encampment."

2      A.    Yeah.   What that means to me is that the City

3  staff can go back to an area that's been cleaned up, go

4  back to that area.

5      Q.    And before Grants Pass, was that not the

6  practice?

7      A.    No, that was the practice as well.

8      Q.    So the re-encampment prevention practice did

9  not change post Grants Pass in terms of the location

10  that officers and HSOC were returning to; is that

11  correct?

12      A.    That --

13      ATTORNEY WANG:   Objection; vague.

14          But go ahead.

15      THE WITNESS:   That's correct.

16  BY ATTORNEY KATOVICH:

17      Q.    Looking down at the last paragraph of this page

18  that starts "Addressing Smaller Encampments," this

19  update reads:   "SFPD officers will work with Public

20  Works staff to address smaller encampments on a daily

21  basis.   The goal of these engagements is to prevent

22  re-encampments for areas recently cleared and to prevent

23  small encampments from becoming larger ones through

24  consistent coverage of the area.   District station

25  officers will conduct regular canvases of the areas to

1    identify any encampments, and then work with Public

2    Works staff to clear the areas."

3         Do you know what this paragraph is referring

4    to, what practice this is?

5       ATTORNEY WANG:  Objection; beyond the scope.

6         Go ahead.

7       THE WITNESS:  Yeah.  This is a practice of

8    addressing illegal lodging in our city, whether it's

9    small or large.

10   BY ATTORNEY KATOVICH:

11      Q.   And after Grants Pass, did SFPD officers begin

12   working with Public Works staff to address smaller

13   encampments on a daily basis?

14      A.   Yes.

15      ATTORNEY WANG:  Object --

16      THE WITNESS:  Sorry.

17      ATTORNEY WANG:  Sorry.  Objection; vague.

18         Go ahead.

19      THE WITNESS:  Yes.

20   BY ATTORNEY KATOVICH:

21      Q.   And was this a new practice?

22      A.   No, it's not a new practice.  No, it wasn't a

23   new practice.  In the middle of the injunction we still

24   had the ability to do some of this work.

25      Q.   So the paragraph that we've just been reading

1    these district station officers who are responsible for

2    these canvases?

3        ATTORNEY WANG:  Objection; vague to the extent it's

4    vague as to time.

5            Go ahead.

6        THE WITNESS:  I don't know the intention of the

7    mayor, what was meant by that, but, essentially, it

8    could either be the officers assigned to the --

9    addressing homelessness or it could have been any

10   officer on patrol with the intention of having them

11   prevent people from setting up, which has been the case.

12   BY ATTORNEY KATOVICH:

13       Q.   So this practice of district station officers

14   conducting regular canvases to identify encampments, was

15   that a practice that was newly started after the Grants

16   Pass decision?

17       A.   No.  This has been the practice since -- again,

18   since the first tent was put up in San Francisco, this

19   has been the practice.  It goes back to me being a

20   captain -- my time as a captain.

21       Q.   So the strategies described in this paragraph

22   are not new strategies that were put in place after

23   Grants Pass?

24       ATTORNEY WANG:  Objection to the extent it's beyond

25   the scope, calls for speculation.

1          Go ahead.

2     THE WITNESS:  I just want to be clear.  See, reading

3  the same thing.  We're talking about addressing smaller

4  encampments.

5  BY ATTORNEY KATOVICH:

6     Q.   Yes.

7     A.   I'm reading this briefly.

8     Q.   Yeah.  Go ahead.  Please take your time.

9     A.   (Examines document.)

10          Yeah, this practice has been going on since the

11  day the first tent went up in San Francisco.  I was the

12  captain of Central Police Station, and this was my

13  practice in 2014 and in 2015 and 2016.

14     Q.   And the last sentence of this paragraph says

15  that:  "This strategy will be evaluated and modified for

16  effectiveness based on outcomes."

17          Do you know how this strategy was evaluated?

18     ATTORNEY WANG:  Objection; calls for speculation,

19  lacks foundation, vague.

20          Go ahead.

21     THE WITNESS:  No, and I'm not convinced if it was

22  ever evaluated.

23  BY ATTORNEY KATOVICH:

24     Q.   Do you know what outcomes it's referring to?

25     ATTORNEY WANG:  Same objections.

1    THE WITNESS:  The outcomes that it is referring to,
2  based on my interpretation, is to whether we were
3  successful in preventing re-encampment.
4  BY ATTORNEY KATOVICH:
5    Q.   And you're not aware of any evaluation of these
6  strategies that actually took place?
7    A.   No.
8    ATTORNEY WANG:  Sorry.  Just quickly, beyond the
9  scope.
10        Go ahead.
11    THE WITNESS:  No.
12  BY ATTORNEY KATOVICH:
13    Q.   We spoke a little bit earlier about reports or
14  complaints of misconduct, and I want to return to that
15  topic a little bit.
16        If SFPD receives a complaint about misconduct
17  related to the handling of an unhoused person's
18  belongings, what steps does SFPD take to investigate?
19    ATTORNEY WANG:  Objection; vague as to time,
20  incomplete hypothetical.
21        Go ahead.
22    THE WITNESS:  Well, if that complaint is generated
23  by a citizen, under General Order 2.04, the requirement
24  is that that citizen's complaint be referred to the
25  Department of Police Accountability.  So I can stop

```
 1  STATE OF CALIFORNIA        )

 2                             ) ss.

 3  COUNTY OF SAN MATEO        )

 4          I hereby certify that the witness in the

 5  foregoing deposition, DAVID LAZAR, was by me duly sworn

 6  to testify to the truth, the whole truth and nothing but

 7  the truth, in the within-entitled cause; that said

 8  deposition was taken at the time and place herein named;

 9  and that the deposition is a true record of the

10  witness's testimony as reported by me, a duly certified

11  shorthand reporter and a disinterested person, and was

12  thereafter transcribed into typewriting by computer.

13          I further certify that I am not interested in

14  the outcome of the said action, nor connected with nor

15  related to any of the parties in said action, nor to

16  their respective counsel.

17          IN WITNESS WHEREOF, I have hereunto set my

18  hand this 13th day of March, 2025.

19  Reading and Signing was:

20  ____ Requested   ____ Waived   __X__ Not Requested

21

22

23

24          SUZANNE I. ANDRADE, CSR NO. 10682

25          STATE OF CALIFORNIA
```