**EXHIBIT C**

**TO**

**DECLARATION OF EDMUND T. WANG IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE NO. 3 TO EXCLUDE DISMISSED OR UNALLEGED CLAIMS**

1                    UNITED STATES DISTRICT COURT

2                    NORTHERN DISTRICT OF CALIFORNIA

3                           OAKLAND DIVISION

4

5    - - - - - - - - - - - - - - - - - -

6    COALITION ON HOMELESSNESS;           )

7    SARAH CRONK; JOSHUA DONOHOE;         )

8    MOLIQUE FRANK; DAVID MARTINEZ;       )

9    TERESA SANDOVAL,                     )

10              Plaintiffs,              )

11   v.                                   ) CASE NO.

12   CITY AND COUNTY OF SAN               ) 4:22-cv-05502-DMR

13   FRANCISCO, et al.,                   )

14              Defendants.              )

15   - - - - - - - - - - - - - - - - - -

16

17              DEPOSITION OF DENNIS HOANG

18                WEDNESDAY, MARCH 5, 2025

19

20

21              BEHMKE REPORTING AND VIDEO SERVICES, INC.

22                  BY: LAURA ESPINOSA, CSR. NO. 11400

23                   550 CALIFORNIA STREET, SUITE 820

24                        SAN FRANCISCO, CALIFORNIA

25                            (415) 597-5600

1

2

3

4

5

6

7        Deposition of Dennis Hoang, taken on behalf of

8   Plaintiffs, at 1390 Market Street, San Francisco,

9   California, commencing at 10:16 A.M., WEDNESDAY, MARCH

10  5, 2025, before Laura Espinosa, Certified Shorthand

11  Reporter No. 11400, pursuant to Notice of Deposition.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFFS:
 3        AMERICAN CIVIL LIBERTIES UNION FOUNDATION
 4        BY:  SCOUT KATOVICH, ATTORNEY AT LAW
 5        39 Drumm Street
 6        San Francisco, California 94111
 7        Telephone:  (212) 549-2500
 8        Email:  Skatovich@aclu.org
 9
10
11   FOR THE DEFENDANTS:
12        CITY ATTORNEY'S OFFICE
13        CITY AND COUNTY OF SAN FRANCISCO
14        BY:  EDMUND WANG, DEPUTY CITY ATTORNEY
15        1390 Market Street, 7th Floor
16        San Francisco, California 94104
17        Telephone: (415) 554-4700
18        Email:  Edmund.Wang@sfcityatty.org
19
20
21
22
23
24
25
```

```
1                            INDEX

2   WEDNESDAY, MARCH 5, 2025

3   DENNIS HOANG                                     PAGE

4        Examination by MS. KATOVICH                   8

5   P.M. SESSION

6        Examination Resumed by MS. KATOVICH         106

7

8

9                          ---oOo---

10

11

12       QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

13                       PAGE   LINE

14                          None.

15

16

17

18

19

20

21

22

23

24

25
```

1    Q.  Have you ever received any training about what

2  to tell homeless people about DPW's policy on bag and

3  tag?

4    A.  I don't know DPW's bag-and-tag policy so I --

5  there's nothing to train us on with DPW's bag-and-tag

6  policy.  I've never seen their bag-and-tag policy.

7          I hope that answers -- does that clarify?

8    Q.  Yeah.

9    A.  All right.

10   Q.  Do you ever -- well, withdrawn.

11         At encampment resolution, who decides how much

12  time a person has to move their property before DPW

13  begins cleaning?

14   A.  Typically the officers.

15   Q.  SFPD officers?

16   A.  Yes.

17   Q.  And how much time does SFPD give individuals to

18  move their property?

19   A.  That varies drastically.

20   Q.  Is there any -- is there any guidance that SFPD

21  officers are provided about how long people should be

22  given?

23   A.  We -- when I say "we," like the lieutenant and

24  supervisors, we've trained our officers to use an

25  objectively reasonable standard that -- just that

1  reasonableness standard.

2     Q.  And how have you trained them to use that

3  reasonableness standard?

4     A.  Well, I don't want to -- it varies depending on

5  the person.  So to sort of give you -- the best way to

6  answer that would be to give you an example.  Hopefully

7  that clarifies it.

8        Like a young, able-bodied adult with minimal

9  belongings might only need five minutes versus, let's

10 say, an older person with some possible physical

11 disabilities with that same property might take ten

12 times longer.  Those are factors that we consider.

13    Q.  Is there any written guidance or policy on the

14 amount of time that SFPD is supposed to give people to

15 move their belongings?

16    A.  No, not to my knowledge.

17    Q.  And just to clarify, that's the amount of time

18 that individuals have before DPW begins cleaning; is

19 that correct?

20        MR. WANG:  Objection.  Calls for speculation.

21        Go ahead.

22        THE WITNESS:  That -- that is -- the reasonable

23 time that we provide the homeless people to abate the

24 violation is prior to us conducting enforcement.

25

```
 1  BY MS. KATOVICH:
 2      Q.  And who decides when DPW begins moving in to
 3  clear an area?
 4          MR. WANG:  Objection.  Calls for speculation.
 5          THE WITNESS:  I don't know.  Not us.
 6  BY MS. KATOVICH:
 7      Q.  Does DPW ever begin clearing -- clearing an
 8  area or addressing an individual's belongings before
 9  the amount of time that individual had been given by
10  SFPD to abate the violation has passed?
11      A.  I'm sorry.  Can I make sure I understand the
12  question?
13      Q.  Yeah.
14      A.  Can you repeat that one more time, please.
15      Q.  So you said that SFPD gives individuals some
16  reasonable amount of time to abate a violation before
17  SFPD would enforce that violation; is that correct?
18      A.  Yes.
19      Q.  And also at an encampment resolution DPW cleans
20  and clears areas and interacts with homeless peoples'
21  property, correct?
22      A.  Yes.
23      Q.  Does DPW ever begin cleaning and clearing an
24  area and interacting with a homeless person's property
25  before the amount of time that SFPD has given them to
```

```
 1      A.  No.

 2      Q.  I believe you testified earlier that the only

 3   cite and release -- the only violation where you would

 4   seize evidence for a cite and release is illegal

 5   lodging; is that correct?

 6      A.  Yes.

 7      Q.  Does SFPD seize items belonging to unhoused

 8   individuals as evidence of a crime outside of the

 9   illegal lodging violation?

10          MR. WANG:  Objection.  Calls for speculation.

11          Go ahead.

12          THE WITNESS:  Yes.

13   BY MS. KATOVICH:

14      Q.  And in what situation does SFPD do that?

15      A.  Narcotics arrests are cite and release as well.

16   Typically if we were to arrest somebody for drugs and

17   drug paraphernalia, which is cite and release in San

18   Francisco, those would be as well.

19      Q.  If you're seizing narcotics, paraphernalia in a

20   cite and release situation, would you call DPW to bag

21   and tag those items?

22      A.  No.

23      Q.  Why not?

24          MR. WANG:  Objection to the extent it calls for

25   speculation.
```

```
 1        Go ahead.
 2        THE WITNESS:  Because we seize -- it's SFPD's
 3   policy that we seize the narcotics and the drug
 4   paraphernalia.
 5   BY MS. KATOVICH:
 6     Q.  Is there any other type of crime evidence that
 7   you would call DPW to take custody of besides evidence
 8   of illegal lodging?
 9     A.  Evidence, no.
10     Q.  And so outside of evidence of illegal lodging,
11   is it SFPD's policy to maintain custody of all crime
12   evidence?
13     A.  Sorry.  Repeat that one more time?
14     Q.  Outside of evidence of illegal lodging, is it
15   SFPD's policy to maintain custody of all crime
16   evidence?
17     A.  All crime evidence.  Yes, as long as it's
18   not -- how do you say -- giant bulk property.
19     Q.  What would -- what happens to evidence that's
20   giant bulk property?
21     A.  Per our policy, we would request DPW to bag and
22   tag if it's large -- large bulk property that's
23   evidence.
24     Q.  And what would, in your experience, large bulk
25   property be evidence of?
```

1     Q.   And you said enforcement increased after around

2  July or August 2024, correct?

3     A.   Yes.

4     Q.   And that would be enforcement of what exactly?

5     A.   Typically illegal lodging.

6     Q.   You said earlier that it's SFPD policy to seize

7  tents or structures as evidence of illegal lodging and

8  call DPW to take custody, correct?

9     A.   For a bag and tag of such structures, yes.

10    Q.   And so each time you enforce illegal lodging,

11 SFPD seizes tents or structures?

12    A.   Yes, we would make the request for that, yes.

13    Q.   So is it fair to say that along with

14 enforcement increasing, seizure of tents and structures

15 increased?

16    A.   Yes.

17    Q.   And does SFPD keep any data on that?

18    A.   Do we keep data on the arrests or tents seized?

19    Q.   On tents or structures seized?

20    A.   It's in our police reports.  Every arrest that

21 we make is documented in an incident report and in all

22 the narratives we provide the DPW bag-and-tag service

23 request number in the body of the report so that way

24 it's recorded.

25    Q.   Now, when it comes to arrests and citations of

```
 1          Are you familiar with DGO6.02?
 2     A.  I haven't read that in a while.  I believe it's
 3  property of arrested persons.
 4     Q.  Is it your understanding of this department
 5  notice, 24-140, that it tells SFPD officers to treat
 6  evidence of illegal lodging differently from how SFPD
 7  should treat evidence of other crimes?
 8     A.  Yes, in that we would request for DPW to bag
 9  and tag the property.
10     Q.  And there's no other crime that SFPD would --
11  for which SFPD would instruct another agency to take
12  custody of evidence, correct?
13     A.  Well, yes.  Kind of going back to the
14  hypothetical example that I used previously.  If we --
15  if it was, like, a bloody mattress and we determined
16  that to be evidentiary to the case of whatever it might
17  be, it wouldn't be feasible to bring that mattress into
18  the station and into our evidence locker, and we would
19  require DPW to seize that property as evidence.
20     Q.  And have you ever personally asked DPW to seize
21  items as evidence of any crime, other than illegal
22  lodging?
23     A.  Have I personally?  I can't remember the last
24  time I did that.
25     Q.  Have you ever done that?
```

1   safety risk and they can't bag and tag it and they

2   discard it, that would not necessarily be reflected in

3   the incident report that the SFPD officer writes up,

4   correct?

5       A.  If they did not notify us, then yes.

6       Q.  And do you instruct the officers that you

7   supervise to make any inquiries about whether DPW

8   discards items that are evidence of illegal lodging?

9       A.  We stay in our lane.  We put the request for

10  DPW to bag and tag the property and we leave it up to

11  them.

12      Q.  And does SFPD ever discard other evidence of

13  crime outside of illegal lodging?

14          MR. WANG:  Objection.  Calls for speculation.

15          Go ahead.

16          THE WITNESS:  Are you asking does SFPD destroy

17  evidence?  Sorry, I'm not understanding.

18  BY MS. KATOVICH:

19      Q.  Sure.  If SFPD seizes evidence of some other

20  crime, aside from illegal lodging --

21      A.  Okay.

22      Q.  -- are there other situations where SFPD allows

23  another agency to discard that evidence?

24          MR. WANG:  Objection.  Incomplete hypothetical,

25  calls for speculation.

1          Go ahead.

2          THE WITNESS:  We would seize the evidence.

3    Bulk property, larger items that's evidentiary to

4    whatever crime, we would request for DPW.

5    BY MS. KATOVICH:

6       Q.  And if -- let's say take the example of the

7    mattress that's got a bloodstain on it.  Let's say it's

8    evidence of murder.  Would it be up to DPW to decide

9    whether or not to store that evidence or to discard it?

10      A.  In that hypothetical situation, I believe so.

11   But given the severity of that hypothetical crime, I

12   wouldn't -- I probably wouldn't be too -- I probably

13   wouldn't be too happy if they discarded that mattress,

14   even if it had biohazard on it.

15      Q.  Does SFPD have any of its own internal policies

16   around how to handle items that are biohazards?

17      A.  I'd probably have to refresh myself with the

18   6.02DGO.  It's been awhile since I've looked at it.

19          It's my understanding, yeah, if it's biohazard,

20   we would request for DPW to clean it up, unless we

21   could discard it ourselves.

22          MS. KATOVICH:  Let's look at 6.02.  This will

23   be 1373.

24          (Deposition Exhibit 1373 marked for

25          identification.)

```
 1  BY MS. KATOVICH:
 2      Q.  Take a look at this document and let me know if
 3  you recognize this?
 4      A.  Yes, I do recognize this.
 5      Q.  Is this DGO6.02?
 6      A.  Yes, it is.
 7      Q.  So this is the San Francisco Police Department
 8  general order that governs physical evidence, correct?
 9      A.  Yes.
10      Q.  And I'm going to turn your attention to 6.02.04
11  (I)(3).  And I will point you to the page number as
12  well.  Page 7.
13      A.  Biological?
14      Q.  So there -- this paragraph concerns biological
15  evidence.  And it reads, "Biological evidence requires
16  careful handling not only to preserve evidence, but
17  also to protect members from possible contamination.
18  It is imperative that members wear fresh latex or
19  nitril gloves when handling any biological evidence.
20  Dry biological evidence does not require freezing to
21  maintain the integrity of DNA evidence.  All such
22  evidence shall now be booked with only 'Biohazard'
23  labels, as appropriate, and shall be stored at
24  monitored room temperature in Property Control
25  Division.  Members will follow the subsequent
```

1  procedures when handling or booking the following types

2  of biological evidence."

3        And then it goes on to have a list over the

4  next couple of pages.  And that includes narcotics and

5  possibly hazardous evidence, No. 8.

6        Having refreshed your memory of this department

7  general order, is it your understanding that SFPD has

8  its own policies for handling biohazards?

9        MR. WANG:  Quick objection.  Vague.

10        But go ahead.

11        THE WITNESS:  Yes, for biological evidence.

12  BY MS. KATOVICH:

13    Q.  And so under the hypothetical example we were

14  using earlier, SFPD would be capable of safely handling

15  an item that had blood on it, correct?

16        MR. WANG:  Objection.  Vague.  Calls for

17  speculation.

18        Go ahead.

19        THE WITNESS:  I suppose, yes.  Yes, in the

20  biological evidence paragraph.

21  BY MS. KATOVICH:

22    Q.  So is there any reason why DPW would handle

23  items that have biohazardous -- are biohazards or that

24  have blood or other body fluids on them?

25        MR. WANG:  Objection.  Vague.  Calls for

1  speculation.   Incomplete hypothetical.

2            Go ahead.

3            THE WITNESS:   Can you repeat the question one

4  more time?

5  BY MS. KATOVICH:

6      Q.   Is there reason why DPW, and not SFPD, would

7  handle a piece of evidence that was a biohazard or that

8  had bodily fluids on it?

9            MR. WANG:   Same objections.

10           Go ahead.

11           THE WITNESS:   If it's in relation to illegal

12 lodging, that's the only thing that I can think of.

13 It's bulk property that can't fit into the standard

14 evidence locker at a station.

15 BY MS. KATOVICH:

16     Q.   And is there anything in this policy that

17 governs the maximum size that SFPD can handle when it

18 comes to physical evidence?

19     A.   I'm not seeing it immediately, but I'm sure

20 with enough time to look through our DGOs I could

21 probably find it somewhere.   I'm sure it references

22 something about a locker somewhere in there.   That's my

23 working knowledge of whether or not we're able to take

24 that property back.

25     Q.   Turn your attention to page 2, and under

```
 1       Q.  And in your view does this -- does this
 2  individual's history of enforcement of 647(e) indicate
 3  that enforcing illegal lodging against this individual
 4  is effective at getting him into shelter?
 5           MR. WANG:  Objection.  Argumentative, vague,
 6  calls for speculation.
 7           THE WITNESS:  Our goal is to always get
 8  individuals in the shelter, but we are still law
 9  enforcement and law enforcement agency and we will
10  enforce the law for people that break it.
11  BY MS. KATOVICH:
12       Q.  We can set this aside.
13       A.  Down over here?
14       Q.  Yeah.
15           MS. KATOVICH:  I'm going to show you another
16  exhibit.  This will be 1377.
17           (Deposition Exhibit 1378 marked for
18           identification.)
19           COURT REPORTER:  No.  1378.
20  BY MS. KATOVICH:
21       Q.  Take a look at this incident report.  This is
22  dated January 23rd, 2024.  And do you see you're listed
23  as the reviewing officer and officer in charge?
24       A.  Yes.
25       Q.  Do you see that this is an incident report for
```

1  resisting, delaying or obstructing peace officer

2  duties?

3      A.  Yes.

4      Q.  And is that one of the offenses that is

5  governed by the department notice on enforcement of

6  laws to address lodging encampments on public streets,

7  sidewalks, plazas or other public or on private

8  property blocking access to those areas?

9      A.  Yes.

10     Q.  Do you recall this incident?

11     A.  I do not.  I would have to review the report to

12  hopefully refresh my memory.

13     Q.  Take a moment to look at the report.

14     A.  Okay.

15     Q.  Having refreshed -- did looking at this report

16  refresh your memory about this incident?

17     A.  Somewhat.  I do not know if I was -- I do not

18  believe I was on scene for this.

19     Q.  And why do you believe you were not on scene?

20     A.  If I were on scene typically I would have a

21  more active role with the incident and my star number

22  would be listed in either the BWC box and/or the

23  narrative, which it is not.

24     Q.  So does that mean that you approved the arrest

25  at issue here based on a phone conversation?

1        A.  Yes, or a discussion with the arresting

2    officer.

3        Q.  And what other form would that discussion take

4    besides a phone conversation?

5        A.  Typically it's a phone call.

6        Q.  Because you're listed as the reviewing officer

7    does that mean that you also at some point reviewed the

8    entirety of this incident report and signed off on it?

9        A.  Yes.

10        Q.  And looking back at this report now, do you

11    believe that the officers involved complied with all

12    applicable SFPD policies?

13        A.  Yes.

14        Q.  And this is an instance where the officers are

15    arresting an individual for interfering, for resisting,

16    delaying or obstructing a DPW worker, correct?

17        A.  To clarify, this is SFPD officers facilitating

18    the citizen's arrest of an individual that interfered

19    with DPW.

20        Q.  And the citizen at issue is the DPW worker,

21    correct?

22        A.  The DPW supervisor, yes.

23        Q.  And that's the same person that's the same

24    officer who -- who was being obstructed?

25        A.  Britney Brandon, yes.

1    Q.   And in this case, how would you characterize

2    what the individual who is arrested was doing that

3    constituted obstructing or interfering with an

4    officer's duties?

5         MR. WANG:  Objection.  Vague.

6         Go ahead.

7         THE WITNESS:   Well, this is a -- this is a

8    citizen's arrest by the DPW so they are the ones

9    that -- that's technically making the arrest and we're

10   facilitating it on their behalf.

11   BY MS. KATOVICH:

12   Q.   In that situation does SFPD have any obligation

13   to verify or to -- to verify that it is appropriate to

14   make an arrest?

15   A.   To an extent, yes.  We have our due diligence

16   of investigation.

17   Q.   And what is that due diligence?

18   A.   Well, interviewing the complainant and

19   interviewing the -- speaking with the subject at hand

20   and making that determination.

21   Q.   Does SFPD have any responsibility to ensure

22   that the elements of 148(a)(1) are met?

23   A.   Citizen arrest -- in this instance, yes.

24   Q.   And what are those elements?

25   A.   To keep it short and simple, public works had

1    the authority to -- based on this report, public works

2    had the authority to conduct clean up, even with a

3    72-hour prior notice to this individual.  This

4    individual did not allow public works to conduct their

5    clean up.  Therefore, they signed a citizen's arrest

6    for resisting and delaying their duties and we

7    facilitated that.

8        Q.  And when you said the individual did not allow

9    DPW to conduct their clean up, are you referring to the

10   person saying that he was not leaving, that he wanted

11   an attorney and, again, that he was not leaving without

12   his property and that he tried to grab the cart that

13   was being taken away from him?

14           MR. WANG:  Objection.  Compound, vague.

15           Go ahead.

16           THE WITNESS:  That is part of it.

17   BY MS. KATOVICH:

18       Q.  What else?

19       A.  Give me one second as I reread this large

20   paragraph.

21           Yeah, that's -- those statement that he made

22   were essentially the resistance.

23       Q.  And looking at the second paragraph, do you see

24   the second sentence there says, "We advised Cross that

25   DPW had the legal authority to move and/or seize his

1   property in accordance with their policy and that if he

2   were to interfere with them as they engaged in the

3   performance of their duties that he could potentially

4   be arrested."

5       A.  I see that sentence.

6       Q.  And what is the basis for the statement that

7   DPW had the legal authority to move and/or seize his

8   property?

9           MR. WANG:  Objection.  Calls for speculation,

10  lacks foundation.

11          You can go ahead.

12          THE WITNESS:  Sorry, I'm trying to read Public

13  Works Code 723.  Our understanding is, is that public

14  works does have the authority to clean the streets.

15  And in this instance, where a 72-hour notice was given

16  to Cross, and after reading this report, it appears

17  that even after 72 hours' notice he still refused to

18  comply with the notice and with DPW to allow them to

19  enforce their authority to clean the sidewalks.

20  BY MS. KATOVICH:

21      Q.  And do you know -- how did you know that he was

22  provided with 72 hours' notice?

23      A.  This -- this arrest took place at one of the

24  HSOC encampment resolutions, and we do know that at

25  these encampment resolutions 72-hour notices were

1  placed at predetermined locations.

2      Q.  Do you know if notice is provided at those

3  locations?

4          MR. WANG:  Objection.  Vague.

5          THE WITNESS:  A lot of encampment resolutions

6  I've gone to I have seen the notices posted.

7  BY MS. KATOVICH:

8      Q.  Did the officer in this particular instance

9  check to see if notice had been posted?

10         MR. WANG:  Objection.  Calls for speculation.

11         THE WITNESS:  I don't know.

12  BY MS. KATOVICH:

13     Q.  Do you have any way to verify whether or not

14  DPW did, in fact, have the legal authority to move or

15  seize this man's property?

16     A.  I don't know what DPW's policy on removing

17  people's' property is.

18     Q.  Does Officer Michael Peralta know that?

19         MR. WANG:  Objection.  Calls for speculation.

20         Go ahead.

21         THE WITNESS:  I don't know.

22  BY MS. KATOVICH:

23     Q.  Would Officer Peralta have been trained on

24  DPW's legal authority to seize an individual's

25  property?

1          MR. WANG:  Objection.  Calls for speculation.

2          Go ahead.

3          THE WITNESS:   It's not something that we train.

4    BY MS. KATOVICH:

5       Q.  So when Officer Peralta advised that DPW had

6    the legal authority to move and/or seize his property

7    in accordance with their policy, that would not be

8    based on any training that he received from SFPD?

9       A.   Correct.

10         MS. KATOVICH:  If we could take a quick break

11   now.  I'm just going to gather my thoughts and then

12   hopefully not have too many more questions for you.

13         THE WITNESS:  Sounds good.

14         (Recess was taken at 3:17 P.M. to 3:28 p.m.)

15         MS. KATOVICH:  Let's go back on at 3:28.

16         I'm going to show you a video that has been

17   Bates stamped CCSF-COH-049181.  And this is a video

18   that looks like it's body worn camera footage that's

19   dated June 6th, 2023.

20         I'll play it.

21         THE WITNESS:  Do you know whose body-worn

22   camera that is?

23         MS. KATOVICH:  I believe this is yours.

24         (Video played.)

25         MS. KATOVICH:  I'll pause the video now.

1   STATE OF CALIFORNIA    )

2                          )  ss.

3   CONTRA COSTA COUNTY    )

4          I hereby certify that the witness in the

5   foregoing deposition, DENNIS HOANG, was by me duly

6   sworn to testify to the truth, the whole truth nothing

7   but the truth, in the within-entitled cause; that said

8   deposition was taken at the time and place herein

9   named; and that the deposition is a true record of the

10  witness' testimony as reported by me, a duly certified

11  shorthand reporter and a disinterested person, and was

12  thereafter transcribed into typewriting by computer.

13         I further certify that I am not interested in

14  the outcome of the said action, nor connected with nor

15  related to any of the parties in said action, nor to

16  their respective counsel.

17         IN WITNESS WHEREOF, I have hereunto set my hand

18  this 15th day of March, 2025.

19  Reading and Signing was:

20  _____  Requested  _____  Waived  __X__  Not Requested

21

22                                  *Laura K Espinosa*

23                          _____

24                          LAURA ESPINOSA, CSR NO. 11400

25                          STATE OF CALIFORNIA