**EXHIBIT D**

**TO**

**DECLARATION OF EDMUND T. WANG IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE NO. 3 TO EXCLUDE DISMISSED OR UNALLEGED CLAIMS**

```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                       OAKLAND DIVISION
 4
 5   - - - - - - - - - - - - - - - -
 6   COALITION ON HOMELESSNESS,     )
 7   et al.,                        )
 8           Plaintiffs,            )
 9   v.                             ) CASE NO.
10   CITY AND COUNTY OF SAN         ) 4:22-cv-05502-DMR
11   FRANCISCO, et al.,             )
12           Defendants.            )
13   - - - - - - - - - - - - - - - -
14
15
16                DEPOSITION OF WAYMAN YOUNG
17                THURSDAY, JANUARY 23, 2025
18
19
20
21           BEHMKE REPORTING AND VIDEO SERVICES, INC.
22                 BY:  MICHELLE CORRIGAN, CSR NO. 9079
23                    550 CALIFORNIA STREET, SUITE 820
24                    SAN FRANCISCO, CALIFORNIA  94104
25                                      (415) 597-5600
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9            Deposition of WAYMAN YOUNG, taken on behalf of
10   Plaintiff, at the San Francisco City Attorney's Office,
11   1390 Market Street, 7th Floor, San Francisco, California,
12   commencing at 10:00 A.M., THURSDAY, JANUARY 23, 2025,
13   before Michelle Corrigan, Certified Shorthand Reporter for
14   the State of California, License No. 9079, pursuant to
15   Notice.
16
17
18
19
20
21
22
23
24
25
```

```
 1    APPEARANCES OF COUNSEL:
 2    FOR THE PLAINTIFFS:
 3            AMERICAN CIVIL LIBERTIES UNION
 4            FOUNDATION OF NORTHERN CALIFORNIA
 5            BY:  SCOUT KATOVICH, ATTORNEY AT LAW
 6            425 California Street, Suite 700
 7            San Francisco, California  94104
 8            Telephone:  (646) 905-8935
 9            Email:  skatovich@aclu.org
10    - AND -
11            AMERICAN CIVIL LIBERTIES UNION
12            FOUNDATION OF NORTHERN CALIFORNIA
13            BY:  WILLIAM S. FREEMAN, ATTORNEY AT LAW
14            39 Drumm Street
15            San Francisco, California  94111
16            Telephone:  (415) 293-6333
17            Email:  wfreeman@aclunc.org
18
19    FOR THE DEFENDANTS:
20            SAN FRANCISCO CITY ATTORNEY'S OFFICE
21            BY:  EDMUND T. WANG, ATTORNEY AT LAW
22            1390 Market Street, 7th Floor
23            San Francisco, California  94102
24            Telephone:  (415) 554-3800
25            Email:  edmund.wang@sfcityatty.org
```

```
 1                            INDEX
 2  WEDNESDAY, JANUARY 23, 2025
 3  WAYMAN YOUNG                                          PAGE
 4      Examination by MS. KATOVICH                         7
 5
 6
 7                          ---oOo---
 8
 9
10        QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
11                        PAGE     LINE
12                         (None.)
13
14
15                          ---oOo---
16
17
18
19
20
21
22
23
24
25
```

1  Q.        And was that also in the context of the large
2  meeting you're describing, or you described earlier?
3  A.        Yes.
4  Q.        And did anyone besides Lieutenant Sam Christ say
5  anything at that meeting about the advising individuals of
6  violations and performing enforcement?
7  A.        I'm sorry.  Can you repeat that?
8  Q.        Did anyone else at that meeting, besides Sam
9  Christ --
10 A.        Mm-hmm.
11 Q.        -- say anything about advising individuals of
12 violations and performing enforcement?
13 A.        I don't recall.
14 Q.        And did anyone else at that meeting discuss the
15 25-minute time period that individuals were to be given to
16 leave the area?
17 A.        I don't remember that.
18 Q.        Are you saying you don't remember the 25 minutes
19 at all?
20 A.        No.  I don't remember anybody talking about it.
21 Q.        Okay.  When you began at HSOC, what was your
22 understanding of the amount of time that individuals were
23 to be given to vacate the area during an encampment
24 resolution?
25 A.        Anything that's reasonable, giving them enough

```
 1   time to abate the situation.
 2   Q.       And what was your understanding of what was
 3   reasonable?
 4   A.       Based on a lot of criteria for myself.
 5   Q.       And were those criteria something you developed?
 6   A.       Yes, in a way.  It really depends because if a
 7   person is disabled, if it's an elderly person, depending on
 8   the amount of stuff.  Sometimes it's two, three of them.
 9   So I based it on that.
10   Q.       And did you ever receive instructions about what
11   would be a reasonable amount of time for -- to give
12   individuals at resolutions to vacate the area?
13   A.       No.
14   Q.       And did you ever discuss what a reasonable time
15   would be, with your supervisor?
16   A.       I believe I had a quick discussion with the
17   captain that came up.  I don't remember when it was.
18   Q.       Do you remember what you discussed?
19   A.       Same thing what I just said.  There was times
20   when -- I think it was a question, hey, you know, what if
21   they stayed there for a long time.  And I think that's how
22   it came up.
23   Q.       And you were asking that question?
24   A.       No.  He was.
25   Q.       And what he was -- he was asking that question to
```

1  you about what should be done if people are staying there
2  for a long time?
3  A.      He asked a question somewhere along the lines,
4  you know, what do we do, the patrol officers do in the
5  field.
6  Q.      And what was your response?
7  A.      Exactly what I just said.  Depending on the age,
8  any visible disability, how much items they have, how many
9  people is there to help, are they actively packing or are
10 they, you know, taking ten minutes just to move a pair of
11 socks.
12 Q.      And the amount of time that individuals are given
13 to vacate the area at encampment resolutions, is that
14 determined by SFPD who are present?
15 A.      Yes.  I guess.  Yeah.
16 Q.      And so would that be the whoever the most senior
17 SFPD officer is that makes that determination?
18 A.      Each individual officer, this is what I tell
19 them.
20 Q.      And have -- when you are present at an HSOC
21 encampment resolution, are you the one who makes the call
22 about how much time people should be given?
23 A.      Usually that doesn't come up.  We just give them
24 the time.  And almost barely any time has that ever been an
25 issue.  When it has been an issue, then we would say

```
 1    of whether a person has a tent or a structure up?
 2    A.        Yeah.  They have to have a tent or structure for
 3    illegal lodging.
 4    Q.        Okay.  And if a person doesn't have a tent or
 5    structure up, but they are in the process of moving their
 6    belongings and it's taking a long time and doesn't seem
 7    justified to you, would you enforce any laws?
 8    A.        If it qualifies.  Nuisance, public nuisance.
 9    Having -- obstructing the sidewalk.  We could use that.
10    Q.        Anything else you would enforce?
11              MR. WANG:  Objection.  Incomplete hypothetical.
12              Go ahead.
13              THE WITNESS:  Blocking a sidewalk.  Sharing a
14    sidewalk, 22 MPC.
15    BY MS. KATOVICH:
16    Q.        So during HSOC resolutions, does DPW begin
17    cleaning before people move their belongings?
18              MR. WANG:  Objection.  Vague.
19              Go ahead.
20              THE WITNESS:  Sometimes.
21    BY MS. KATOVICH:
22    Q.        Under what circumstances would they begin
23    cleaning while people are in the process of moving their
24    belongings?
25              MR. WANG:  Objection.  Vague as to where they're
```

```
 1   Q.       And if you weren't to enforce or cite them, who
 2   decides how much time they're given?
 3            MR. WANG:  Objection.  Calls for speculation.
 4            Go ahead.
 5            THE WITNESS:  There's no one that really decides.
 6   It's just, DPW, if they're -- amount of items, and we get
 7   there, and the person says I'm cooperating, I'm leaving,
 8   and they're actively packing, we just let them pack.
 9   BY MS. KATOVICH:
10   Q.       Have you ever seen a disagreement between an
11   unhoused person and DPW about certain items?
12   A.       On the news.
13   Q.       You've never personally witnessed it?
14   A.       No.
15   Q.       So you said it wasn't until sometime in 2024 when
16   SFPD began offering people shelter; is that correct?
17   A.       It's whenever that DN came out.  Once that DN
18   came out, we were required to offer shelter.
19   Q.       And about how long ago was that?
20   A.       Two years.  Year and a half, two years.
21   Q.       And once you were required to offer shelter, how
22   long did people have to accept shelter?
23   A.       15 minutes.
24   Q.       And if they accepted shelter, what happened to
25   their property?
```

```
 1   identify any encampments.  Are you aware of any practice
 2   where district station officers canvass areas, looking for
 3   encampments?
 4   A.      No.
 5   Q.      Do any of the officers you supervise canvass
 6   areas looking for encampments?
 7   A.      Yes.
 8   Q.      Have they always done that, or is that a new
 9   practice?
10   A.      We've always done that.
11   Q.      Do you instruct your officers to canvass areas
12   looking for encampments?
13   A.      Yes.
14   Q.      And what do you instruct them to do if they see
15   encampments?
16   A.      Same thing what we always do:  Try the best to
17   get them into a shelter; offer them a journey home; advise
18   them of, if we have the pamphlet on us, where the resources
19   are; and if not, we will arrest them.
20   Q.      And in those instances is there any notice
21   provided in advance of that engagement?
22   A.      No.
23   Q.      And in those instances, if you make an arrest,
24   you would call DPW -- is that correct? -- to bag and tag
25   evidence?
```

```
 1    A.         Yes.
 2    Q.         And in those instances, if you arrest a person
 3    for a charge that requires that they're transported to the
 4    jail, would you call DPW to bag and tag the items, all
 5    items?
 6    A.         Yes.
 7    Q.         In your experience, after the Grants Pass
 8    decision, did SFPD enforcement practices change towards
 9    unhoused people?
10    A.         No.
11    Q.         In your experience, after Grants Pass, did HSOC
12    practices change?
13    A.         No.
14    Q.         In your experience, after Grants Pass, have there
15    been more HSOC operations?
16    A.         No.
17    Q.         In your experience, after Grants Pass, has there
18    been more enforcement of anti-lodging laws?
19    A.         Yes.
20    Q.         And as a result, has there been more seizure of
21    tents as evidence?
22    A.         Yes.
23    Q.         Would you say significantly more?
24    A.         Yes.
25    Q.         Do you have an estimate of how much more?
```

1  Q.     In which cases would SFPD surrender that evidence
2  to a different agency?
3  A.     Probably like blood.
4  Q.     And which agency takes possession of evidence
5  with blood on it?
6  A.     I believe it's the people who test the drugs, the
7  -- I forget their names.  It's just not popping up in my
8  head.  There's protocol, they're supposed to bring the
9  blood into I believe it's 850, or put it in the fridge.
10 It's been a while.  But there's protocols for that.
11 Q.     And the fridge you're describing, that's within
12 SFPD?
13 A.     It's within 850 Bryant.
14 Q.     And what is 850 Bryant?
15 A.     It's the building where the courts are, where we
16 used to have a police station, and there's a property
17 division down there.
18 Q.     And are there any circumstances under which you
19 would discard evidence of a crime, aside from tents or
20 illegal lodging?
21 A.     No.
22        MR. WANG:  Objection.  Incomplete hypothetical.
23 Vague.
24        Go ahead.
25 ///

```
 1   Q.      And is there guidance policy that would tell you
 2   when you should take it as found property and when you
 3   should not?
 4   A.      Is there another one?  There's a policy for found
 5   property and what to do.
 6   Q.      And does that policy explain what property should
 7   be booked under the Found Property policy and what should
 8   not?
 9   A.      No.  If you take anything back to the station,
10   all of it should be booked.
11   Q.      And the policy doesn't tell the officer whether
12   they should take it back to the station; is that correct?
13   A.      Correct.
14   Q.      That decision is up to the officer?
15   A.      Yes.
16   Q.      Typically, if an SFPD officer arrests someone and
17   they have personal property on their person -- or a bag
18   next to them, for example -- is that SFPD officer
19   responsible for ensuring that if the person is taken into
20   custody that their personal property is safeguarded?
21   A.      It gets taken with them.
22   Q.      And SFPD is responsible for taking it, for making
23   sure it goes with them; is that correct?
24   A.      Yes.
25   Q.      And is SFPD also responsible for ensuring that
```

1   evidence of a crime is appropriately stored and
2   safeguarded?
3   A.      Yes.
4   Q.      And what SFPD policy generally governs personal
5   property following arrests?
6   A.      The Booking and Detention Manual, I believe.
7   Q.      Do you recall what number that is?
8   A.      No. It's not a number. It's the names. It's
9   just a booking and detention. It's a manual.
10  Q.      Okay. What policies govern storage of evidence,
11  generally?
12  A.      Probably under that manual as well, and along
13  with booking prisoner property.
14  Q.      And under those manuals, are there any
15  circumstances when SFPD would allow another agency to take
16  custody of personal property of someone who is being taken
17  into custody?
18  A.      Yeah. The Bag & Tag policy.
19  Q.      And the Bag & Tag policy is part of those
20  manuals?
21  A.      No. The Bag & Tag policy is just a separate
22  Department Notice.
23  Q.      And the Bag & Tag policy is the only circumstance
24  in which another agency would take possession of the
25  property of someone being taken into custody?

```
 1   also book the gun as evidence, correct?
 2   A.      Yes.
 3   Q.      If a police officer needed to retrieve a tent or
 4   structure that is being stored as evidence by DPW, how
 5   would they go about doing that?
 6           MR. WANG:  Objection.  Vague.  Lacks foundation.
 7           Go ahead.
 8           THE WITNESS:  That hasn't happened.
 9   BY MS. KATOVICH:
10   Q.      It's never happened?
11   A.      Correct.
12   Q.      Have you ever received instructions on how a
13   police officer could get property back from DPW?
14   A.      If that was to happen, I would first call DPW,
15   give them the SR number, and go, do you have this tent?
16           For example, I mean, hypothetical, let's say for
17   whatever reason someone asked for it, like a DA going
18   forward needs it, I'm assuming they know how to go about
19   it.  But I would go about calling DPW.
20   Q.      But that's never happened, a DA has never asked
21   for evidence?
22   A.      Not to me.  Not to my knowledge.
23   Q.      I'm going to show you another document which we
24   will mark as Exhibit 1042 --
25           THE COURT REPORTER:  43.
```

```
 1  situation that involves an encampment at 131 Russ Street?
 2  A.      From this email, it seems like somebody -- a
 3  citizen, if I have to speculate -- sent -- because we get
 4  those a lot where citizen would send them out to everybody,
 5  and many times includes supervisors, the Mayor's office,
 6  the chief's office, and it would eventually somehow, if it
 7  lands on my email to, if we can address the issue.
 8  Q.      So was your understanding that the Chief of
 9  Police and the Mayor wanted HSOC to address this encampment
10  that they received this complaint about?
11  A.      Yes.
12  Q.      And was -- and, in response, you asked Sam Dodge
13  if you could schedule an encampment resolution to address
14  that complaint, right?
15  A.      Yes.
16  Q.      And was there an encampment resolution scheduled,
17  do you know?
18  A.      Most likely.  Probably.
19  Q.      And was that common to schedule encampment
20  resolutions in part based on complaints forwarded from the
21  Chief of Police's office or the Mayor's office?
22  A.      Yes.
23          MS. KATOVICH:  I have no further questions.  Are
24  you all set?
25          MR. WANG:  I'm good.
```

```
 1    STATE OF CALIFORNIA   )
 2                          ) ss.
 3    COUNTY OF NAPA        )
 4
 5            I, MICHELLE CORRIGAN, Registered Professional
 6    Reporter and Certified Shorthand Reporter with the State
 7    of California, do hereby certify:
 8            That the testimony and proceedings were reported
 9    stenographically by me and later transcribed under my
10    direction by computer transcription; that the foregoing
11    is a true record of the proceedings taken at that time;
12    and that I am not a party to nor have I any interest in
13    the outcome of that action herein contained.
14            IN WITNESS WHEREOF, I have hereunto set my hand
15    and affixed my signature this 3rd day of February, 2025.
16
17            [signature]
18
19    MICHELLE CORRIGAN, RPR, CSR NO. 9079
20    STATE OF CALIFORNIA
21
22
23
24
25
```