# EXHIBIT F

# TO

# DECLARATION OF EDMUND T. WANG IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE NO. 3 TO EXCLUDE DISMISSED OR UNALLEGED CLAIMS

```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                       OAKLAND DIVISION
 4   - - - - - - - - - - - - - - - - - -
 5   COALITION ON HOMELESSNESS,          )
 6   et al.,                             )
 7                 Plaintiffs,           )  CASE NO.
 8   vs.                                 )  4:22-cv-05502-DMR
 9   CITY AND COUNTY OF SAN              )
10   FRANCISCO, et al.,                  )
11                 Defendants.           )
12   - - - - - - - - - - - - - - - - - -
13
14
15                DEPOSITION OF ALLISON HORKY
16                 MONDAY, FEBRUARY 24, 2025
17
18
19
20
21        BEHMKE REPORTING AND VIDEO SERVICES, INC.
22            BY:  SUZANNE I. ANDRADE, CSR NO. 10682
23                550 CALIFORNIA STREET, SUITE 820
24                SAN FRANCISCO, CALIFORNIA 94104
25                          (415) 597-5600
```

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFFS:
 3         AMERICAN CIVIL LIBERTIES UNION FOUNDATION
 4         OF NORTHERN CALIFORNIA
 5         BY:  SCOUT KATOVICH, ATTORNEY AT LAW
 6         39 Drumm Street
 7         San Francisco, California  94111
 8         Telephone:  (415) 293-6333
 9         Email:  skatovich@aclu.org
10
11   FOR DEFENDANTS AND THE DEPONENT:
12         CITY AND COUNTY OF SAN FRANCISCO
13         OFFICE OF THE CITY ATTORNEY
14         BY:  MIGUEL GRADILLA, DEPUTY CITY ATTORNEY
15         1390 Market Street, 7th Floor
16         San Francisco, California  94102
17         Telephone:  (415) 554-3800
18         Email:  miguel.gradilla@sfcityatty.org
19
20
21
22
23
24
25
```

```
 1   resolutions ever impact the -- how the resolution
 2   continued that day?
 3       A.   Can you be more specific?
 4       Q.   Would your assessment of medical concerns ever
 5   change the timeline for a resolution or change what
 6   other departments were doing at the resolution?
 7       A.   Yeah.  If we were able to consult and be able
 8   to determine that, let's say, for example, this person's
 9   medical needs were making it challenging for them to
10   pack up their stuff and vacate for the day, we would
11   pass on that recommendation to the incident commander.
12       Q.   And was the assessment of what a person's
13   medical needs might be affecting their ability to pack
14   up --
15       A.   Mm-hmm.
16       Q.   -- was that something that you and your team
17   assessed regularly at encampment resolutions?
18       A.   It would have been something that -- you know,
19   we didn't have a checklist that we went through.  But
20   if, when we're going up to assess someone, we can see
21   that there's a high medical need, then -- then that's
22   what we would assess for.  Just like if we see there's a
23   high behavioral health need, we'll assess for that.
24       Q.   And who would you tell if that were the case?
25       A.   The incident commander.
```

```
 1       Q.   And would you recommend that a person be
 2  provided more time or something else?
 3       A.   Yeah, we would pass on recommendations.
 4       Q.   And would the incident commander accept those
 5  recommendations and...
 6       A.   Majority of the time, yeah.
 7       Q.   Are there instances when you recommended that a
 8  person be provided more time and they weren't provided
 9  more time?
10       A.   There were probably a few instances where that
11  was the case where maybe we advocated for more time.  I
12  could see a situation where the person had been given
13  more time, maybe a few times already, and they made the
14  decision to -- to not that time.
15       Q.   And if you had a disagreement about whether a
16  person should be given more time, what would you do?
17       A.   I never had a disagreement with the incident
18  commander that I didn't feel like I could work out with
19  the incident commander.  I never had to escalate
20  anything beyond the incident commander in terms of an
21  issue like that.
22       Q.   If you did have a disagreement with the
23  incident commander about whether a person should have
24  more time and you weren't able to resolve it between the
25  two of you, who would you go to?
```

1  of quicker and it's even happening during that morning's
2  resolution, because the incident commander is on the
3  call during the resolution that's currently taking
4  place, if they bring up an issue there that can be
5  resolved, they would probably follow up with the client
6  directly in that moment.
7      But part of our role for DPH would be the
8  follow-up.  And so if it was one of the more complex
9  things going on, it would maybe be myself who would
10 follow up or one of the clinicians.  And we'd go out
11 outside of resolution time.
12     Q.   And has a request or a need for some kind of
13 accommodation ever been rejected?
14     A.   I'm sure it has.  I know -- just because it's
15 not framed that way as like a request for accommodation.
16 It's framed as like, "Here's sort of what -- this is
17 what the client is asking for, and here's what we assess
18 they need."
19     And that research just might not be available.
20 And so, in that case, it would be -- we need to figure
21 out something else.
22     Q.   And is there any kind of formalized disability
23 accommodations process for HSOC?
24     A.   Not that I'm aware of.
25     Q.   Have you ever worked with an ADA coordinator in

1  anything related to HSOC?
2       A.   No.
3       Q.   The FEST, RAMS, or other contracted employees
4  who do the pre-resolution outreach, is it correct that
5  they would also report to you if they encountered
6  individuals who did not understand the notice they
7  received or did not understand what would be happening
8  at the resolution?
9       A.   They would tell me if they felt like somebody
10 wasn't -- didn't have capacity or wasn't comprehending.
11      Q.   And what would you do if they reported that to
12 you?
13      A.   If they reported that, I would try to pass that
14 on to DEM or the incident commander, and then when we
15 would be on site, we would try to work with that person,
16 or I might try to do some care coordination, you know,
17 from the office side of doing a chart review, looking
18 into who their providers might be, seeing if there's
19 other interventions that we could offer.
20      Q.   And has that happened where one of the
21 contractors reported to you that an individual did not
22 understand what was going to be happening?
23      A.   I think not so directly.  It would -- they
24 would describe their presentation.  Maybe they are more
25 on the severe end of substance use disorder, or maybe

```
 1   within that context.
 2        Q.   When you say "work within that context," would
 3   that affect how the resolution took place that day?
 4        A.   It could, yeah.  It could mean that, again,
 5   that person we asked, today is just not a good day for
 6   them to move.  Yeah.
 7        Q.   About how many times have you suggested to the
 8   incident commander or someone else that today was not a
 9   good day for a person to move?
10        A.   Yeah, I think -- I think what I said earlier
11   was about once a month maybe that would come up.  But I
12   found that most of the time when we would ask and we
13   would say, "Here's what's going on, and we need time,"
14   that we found it was -- there was accommodation for
15   that.
16        Q.   And have you personally ever encountered an
17   individual at a resolution or during pre-resolution
18   outreach who was unable to read the notice?
19        A.   We -- I think maybe I've encountered one person
20   who we felt -- we were certain they were not able to
21   read.
22        Q.   And what did you do in that circumstance?
23        A.   In that circumstance, I alerted the clinicians
24   to make sure that they talked to the person.
25        Q.   And was that during a resolution?
```

```
 1  in the notice?
 2      ATTORNEY GRADILLA:  Objection; calls for
 3  speculation.
 4      THE WITNESS:  Yeah, I -- it -- without doing formal
 5  assessments on people, being able to identify what their
 6  reading level is I think would be hard.
 7  BY ATTORNEY KATOVICH:
 8      Q.  Did you ever identify an individual who was
 9  able to read but was not able to understand what was
10  written?
11      A.  I don't think so.  I think people comprehended
12  the content.
13      Q.  Have you ever encountered an individual who had
14  a learning disability or some kind of cognitive
15  impairment that made it difficult for them to understand
16  what was written on the notice?
17      A.  Yes.
18      Q.  And about how many times have you encountered
19  someone like that?
20      A.  Through our work, we've encountered, I think in
21  the HSOC resolution context, maybe five people who I
22  would put in that category.
23      Q.  And did you identify those people at the
24  resolution itself?
25      A.  Sometimes.  I'm not sure for any one of them.
```

```
 1   They could have been identified during the
 2   pre-resolution or during the resolution.
 3       Q.   And did you notify anyone else about that
 4   situation?
 5       A.   I probably talked to HSH about it so they knew
 6   what the barriers would be.
 7       Q.   And why did you speak with HSH about it?
 8       A.   Because we do more direct client care.  So I
 9   feel more comfortable discussing the specifics of client
10   care.
11            Like, the DEM folks can, like, know the
12   information, but in terms of what we might actually do,
13   our action plan, I collaborate more with HSH on that.
14       Q.   So you wouldn't necessarily tell the DEM
15   employees or the incident commander that there's a
16   person who wasn't able to understand the notice?
17       A.   I might say there's somebody with high needs
18   that we're working on connecting a little bit more.
19       Q.   But it might not be information particular to
20   their -- their having notice; is that correct?
21       A.   Right.  Yeah.
22            ATTORNEY KATOVICH:  Let's see.  Show you a document,
23   1238.
24            (Deposition Exhibit 1238 was marked for
25            identification.)
```

```
 1  STATE OF CALIFORNIA      ) ss.
 2  COUNTY OF SAN MATEO      )
 3           I hereby certify that the witness in the
 4  foregoing deposition, ALLISON HORKY, was by me duly
 5  sworn to testify to the truth, the whole truth and
 6  nothing but the truth, in the within-entitled cause;
 7  that said deposition was taken at the time and place
 8  herein named; and that the deposition is a true record
 9  of the witness's testimony as reported by me, a duly
10  certified shorthand reporter and a disinterested person,
11  and was thereafter transcribed into typewriting by
12  computer.
13           I further certify that I am not interested in
14  the outcome of the said action, nor connected with nor
15  related to any of the parties in said action, nor to
16  their respective counsel.
17           IN WITNESS WHEREOF, I have hereunto set my
18  hand this 3rd day of March, 2025.
19  Reading and Signing was:
20  ____ Requested   ____ Waived   __X__ Not Requested
21
22                    [signature]
23
24           SUZANNE I. ANDRADE, CSR NO. 10682
25           STATE OF CALIFORNIA
```