# EXHIBIT F

# TO

# DECLARATION OF STEVEN A. MILLS IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE NO. 4 TO TEMPORAL SCOPE OF STALE AND TIME-BARRED CLAIMS

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - -

COALITION ON HOMELESSNESS, )
et al., )
Plaintiffs, )
V. ) CASE NO.
CITY AND COUNTY OF ) 4:22-cv-05502-DMR
SAN FRANCISCO, et al., )
Defendants. )

- - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF

TODD DUTCH BRYANT

TUESDAY, MARCH 4, 2025

BEHMKE REPORTING AND VIDEO SERVICES, INC.
BY: BELLE BALL, CSR NO. 8785
550 CALIFORNIA STREET, SUITE 820
SAN FRANCISCO, CALIFORNIA 94104
(415) 597-5600

APPEARANCES OF COUNSEL:

FOR PLAINTIFFS:

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA
BY: AMANDA YOUNG, ATTORNEY AT LAW
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 293-6362
Email: ayoung@aclunc.org

FOR DEFENDANTS:

CITY AND COUNTY OF SAN FRANCISCO
SAN FRANCISCO CITY ATTORNEY'S OFFICE
BY: STEVEN MILLS, DEPUTY CITY ATTORNEY
1390 Market Street, 7th Floor
San Francisco, California 94102
Telephone: (415) 355-3304
Email: steven.mills@sfcityatty.org

ALSO PRESENT:

VINNY BEZERRA, VIDEOGRAPHER

A Okay.

Q So Mr. Bryant, I want to turn your attention to Page 4-4, Paragraph 19.

And I'll represent Paragraph 19 is the first paragraph that includes a date written in the declaration.

Do you know if any of the other property incident -- property destruction incidents before this paragraph postdated January 3, 2019?

And you can take a moment to look through it.

(Witness examines document)

A Okay. So what is it -- what's the -- okay. What's the question again, now, on this?

Q Yeah. So Paragraph 19 is the first paragraph up to that point in the property destruction section that refers to a specific date.

And so my question is: Are the preceding incidents, incidents that occurred before January 3, 2019?

A Let me see. What are those incidents?

(Witness examines document)

A Yeah, um, oh.

(Witness examines document)

A Okay. So, so that's the first one. And there's -- so by this thing, it shows that's the third

incident, recall. Okay, so...

(Witness examines document)

A Yeah. Because this one here, the one by the freeway, Kelley Cutler took pictures. That was before the documentary.

And what's the other one?

Q And by that one, are you referring to Paragraph 14, the second incident?

A Yeah, yeah. What's the first one? Trying to see what the first -- I can recall --

Q So just to make sure I understand, the second incident described in Paragraph 14 predated the stolen belonging --

A Yes, absolutely. Because that's -- the first person I met was Kelley Cutler. She took pictures of this whole incident. And that was before the one here that -- the one they made the documentary about.

But what's this other one? This one -- okay, this one here, I'm not sure about this one. This one is -- this first one I mentioned, that one took place right where the tiny tent cabins are. Actually, in that parking lot where they made them.

Q Uh-huh.

A And that one, yeah, that one was -- I think when that happened -- I'm not sure when this one

happened. This was a pretty traumatic incident, too.

Yeah, this was like -- the cops held me at Walgreen's, and then told my girlfriend to go look for me while they took all our stuff, in the pouring rain. That was pretty brutal.

Q Do you have --

A I'm not sure when that happ- -- I'm not sure when this was, though. It might have been -- this one here, I think, was definitely after this second one, I think.

Q Do you know if the incident that you're describing from Paragraphs 9 through 13 occurred before the Stolen Belonging Project incident?

A Um, I'm not sure. It might be after -- it might have been after. I'm not 100 percent sure, though; I'm not 100 percent sure.

This is -- because we -- we started -- McCoppin and -- let me think, where were we at?

We were at -- when the other one happened, we were over by the women's -- let's see. It's kind of close to that area.

But I think -- yeah, I'm pretty sure this one happened after that, yeah. Because this was right -- we came to that area when this one happened.

The women's drop-in center right there,

that's the first time we ever -- they kept -- they made us move five times that day. And they just kept on making us move.

So we kind of went -- we were over there by the Armory and stuff, and they kept on making us move, and we ended up right there.

And then, and then -- yeah, so I think this happened after -- so this one here, the first one happened in between the third and the fourth incident. Because the fourth incident was the last one that happened. The very last.

So I'm pretty sure this one (Indicating) was in between those.

Q And just to clarify, are you speculating that the incident described in Paragraphs 9 through 13 of your declaration occurred in between the third and fourth incidents?

Or do you have personal knowledge in your mind of that --

A Well, I was just trying to think about where I was, where they occurred.

And -- because I didn't, like, I -- when they move -- made us move, it was basically moved in a certain direction, and just kept on getting farther and farther. So I was just going by where -- where they

took place.

So, this one here, that's how -- that's how I know, you know, eventually where we were. It's like it kept on moving and moving. It was like a never-ending, um, thing.

So this one here, what's the...

(Witness examines document)

A Yeah, the third incident was the -- that was right there in front of the women's drop-in center.

So, yeah. I would say definitely the first one happened -- I can't say 100 percent. I'm almost positive. I'd have to ask my girlfriend about it. I'm not sure. But --

Q Is it fair to say you're speculating about when it occurred?

A I guess so, yeah. I'm not 100 percent. I just know, I think, if I was -- yeah, I'm not 100 percent, but I know the order is not the way it is on here.

The first incident didn't happen before these -- I know it didn't happen before the -- oh, wait a second. Wait a second.

Yeah, I'm not 100 percent, to be honest. Because this one by the freeway, I'm trying to think. The women's drop-in center, I might have went that way.

You know what I mean? That could have happened --

Q But we don't want you to speculate.

A I know. I don't want to speculate, yeah.

Q Is it fair to say you don't know the date --

A I don't know, yeah. I don't know 100 percent, no.

Q And just so we don't talk over one another --

A Gotcha, gotcha.

Q Yeah.

A I was trying to think about it, but I don't know 100 percent. It could be. I'm not really -- I'm not 100 percent on the timeline.

Q Okay. And having read the declaration, did the first incident that was described there near Gough Street and McCoppin include a date?

A Did it include a date? Let me see here.

(Witness examines document)

A No, doesn't have a date here.

Q And is it fair to say you don't know the date of the incident?

A Yeah. I don't know the exact date, no.

Q So I'm going to focus back on the third incident.

A Yeah.

Q That one has a date. And we are going to go

over some questions relating to that one.

A That's No. 19, right?

Q Yes.

A Okay.

Q So Paragraph 19 says this third incident occurred on or around January 3, 2019, near the women's drop-in shelter at Division and 13th Street.

Is that a true and correct statement?

A Yes. The only reason I know that is because she filmed it, and had it time stamped on her camera. You know what I mean? That's how -- that's how I know the exact date of that one.

Q And do you know who filmed that incident?

A Damn. Does it say her name here? It's not Kelley Cutler; it's the other lady. I can't remember her name. If I heard it, I'd know.

But --

Q Does the name "Leslie Dreyer" ring a bell?

A That's her, yeah. Leslie Dreyer. Thank you.

Q So the date, January 3, 2019, is based off of when Leslie Dreyer recorded the incident?

A Yeah.

Q And is that the same for the location, as well, at Division and 13th Street?

A That's where it happened. I know that

because that's where -- I mean, I remember that. The date is -- I got from her, from the recording on her phone. You know what I mean?

Q Okay.

A That's how I got that. But the location I know for a fact. Because it was right in front of the women's drop-in center. That's where it was located. It's where, you know where Duboce -- is it Duboce that turns into Division there? That's where.

I don't know why it says "13th." I guess -- I didn't know there was a 13th Street, to be honest.

Q Well, when you put in the declaration that the incident occurred at Division and 13th Street, did you know that the incident occurred at Division and 13th Street?

A No. I thought it was on Division where Duboce turns into Division. It was right in front of the women's drop-in center. Drop-in shelter. I just didn't -- I didn't know there was a 13th Street. I didn't think there was a 13th Street in San Francisco.

But...

Q And is the women's drop-in shelter on Division?

A Yeah. It's right there where Duboce crosses Mission, and then it -- I guess it turns into Division

Q And Mr. Brown, is that red building the women's shelter that you're describing?

A Yeah. Or that -- yeah. Right there. The red building -- not on the corner, but the one right next to it. Yeah. Where there's a parking lot right after it, it's right there.

Q Do you know how much further down the street Division is?

A I mean, I -- this -- this is Division here (Indicating), isn't it? That's what I always thought, it was Division.

Q So your testimony is you were on Mission and Division?

A Yeah. Like, Division, isn't this Division here (Indicating)? That's what I always thought, this was Division, because this way is Duboce and this way is Division all the way down, right?

But I guess it's not. I guess it's 13th Street. But there's no signs that say that, that I've ever seen.

Q So Mr. Bryant, if you look in the -- towards the bottom left-hand corner, there's a small rectangular box with a red dot, where the little yellow figure is at 13th and Mission.

A Where? Oh, this little thing on Google

video that's August of 2018, would that change your testimony for when that incident occurred?

A This video is timestamped as that, that date?

Q I'm just asking the question.

A Well, I asked -- I know the date, because I asked her when, when it was taken. You know what I mean? That's how I know.

Q And what time was the incident?

A It was just starting to get -- like, the sun was down already, and it was just -- it was starting to get dark. Like it was -- the sun had already gone down. So I'm not sure exactly what time it is.

And -- they said August, you're saying (Indicating)? She said it was January or February, or something? Right?

Q I'll represent that the metadata produced with this video was August 8, 2018.

Mr. Bryant, if the video indicates that it was from August 8, 2018, how did the incident take place on January 3, 2019?

A Well, I don't know. That's the date she gave me. Maybe that's the time she made the documentary? I -- I -- the way I got that date is from her, asking her when did she film this. You know what I mean?

So, they may have gotten the wrong

information from her, like maybe that's when she came out with the documentary and put it all together. But I was -- I was -- I was thinking -- I mean, I was under the assumption that the date they got was off the -- like, this, right here (Indicating).

Q Do you know who gave you the January 3, 2019, date?

A Um, whoever, whoever interviewed me for this deposition -- or declaration thing (Indicating). I asked them what was the date of the -- the film that was on here (Indicating). And that's how I got that date. That's how I got that, that date.

Q And when you signed this declaration on April 26, 2022, you knew that you were signing it under penalty of perjury?

A Yeah, but I assumed that was the date, right date. I didn't know it was a different date. That's the only way I knew.

I said that's one thing I could know, is when -- her thing she filmed on her phone should be timestamped, right? Date-stamped.

Q Would you agree that a date would be helpful to identify documents that would relate to the underlying incident?

A Sure.

CITY OF SAN FRANCISCO )
) ss.
COUNTY OF SAN FRANCISCO )

I, BELLE BALL, hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed; that the foregoing transcript is a true record of the testimony given.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: Friday, March 14, 2025

Reading and Signing was:

__X__ Requested ____ Waived ____ Not Requested

BELLE BALL, CSR 8785, CRR, RDR
STATE OF CALIFORNIA