DAVID CHIU, State Bar #189542
City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief Deputy City Attorney
EDMUND T. WANG, State Bar #278755
KAITLYN M. MURPHY, State Bar #293309
MIGUEL A. GRADILLA, State Bar #304125
JOHN H. GEORGE, State Bar #292332
STEVEN A. MILLS, State Bar #328016
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102-4682
Telephone:    (415) 554-3857 (Wang)
              (415) 554-6762 (Murphy)
              (415) 554-3870 (Gradilla)
              (415) 554-4223 (George)
              (415) 554-3304 (Mills)
Facsimile:    (415) 554-4699
Email:        edmund.wang@sfcityatty.org
              kaitlyn.murphy@sfcityatty.org
              miguel.gradilla@sfcityatty.org
              john.george@sfcityatty.org
              steven.mills@sfcityatty.org

WARREN METLITZKY, State Bar #220758
JESSICA ELAINE LANIER, State Bar #303395
NATHAN D. THEOBALD, State Bar #328837
**CONRAD | METLITZKY | KANE LLP**
217 Leidesdorff Street
San Francisco, CA 94111
Tel:    (415) 343-7100
Fax:    (415) 343-7101
Email: wmetlitzky@conmetkane.com
Email: jlanier@conmetkane.com
Email: ntheobald@conmetkane.com

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO, et al.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COALITION ON HOMELESSNESS; SARA CRONK; JOSHUA DONOHOE,<br><br>Plaintiffs,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>Defendants. | CASE NO. CASE NO. 4:22-cv-05502-DMR<br><br>**DEFENDANTS' MOTION TO EXCLUDE CHRISTOPHER HERRING'S EXPERT OPINIONS**<br><br>Judge:      Hon. Donna M. Ryu<br><br>Trial Date: July 28, 2025 |

Dr. Christopher Herring and the Coalition on Homelessness have enjoyed a symbiotic relationship for more than a decade. He assisted the Coalition with research and outreach, and, in turn, used his relationship with the Coalition to bolster his own career. *E.g.*, Decl. of Jessica Lanier (Lanier Decl.) Ex. A (Herring Dep. (Dep.)) 41:4-46:18; Ex. B (Ex. 342).) (describing relationship dating back to 2014). The bias created by this longstanding relationship is not just a cross-examination issue. Unfortunately, it has led Dr. Herring to cobble together a series of advocacy positions that masquerade as expert opinions and—as relevant to this *Daubert* motion—that use unscientific techniques and suspect information which fail the gatekeeping test for reliability. Here, Dr. Herring used grade-school arithmetic that anyone can do, and which requires no particular expertise, failed to account for any other explanation for his basic conclusions, used a sample size he *admits* is not statistically significant, took interview subjects "at their word" rather than confirming the veracity of their assertions, and, incredibly, intervened in events to which he was supposed to be applying his purported expertise. Together, these deficiencies, and others discussed below, render his opinions unreliable as a matter of law. The Court should exclude all four of them.

Herring, a sociologist with experience studying homelessness, offers four opinions: (i) HSOC, DPW, and SFPD engage in "widespread property destruction" (Property Destruction Opinion); (ii) encampment resolutions are not "consistent or adequate" (Inadequate Notice Opinion); (iii) recovering bagged and tagged property is "difficult and rare" due to practices and systems for storage (Property Recovery Opinion); (iv) and persons experiencing homelessness (PEH) will likely experience "involuntary unsheltered homelessness again" (within 1 month to 5 years) (Recurring Homelessness Opinion). Lanier Decl. Ex. C (Herring Report (Report) pp. 9-10.). Herring's opinions purport to be based on (i) his experiences as a sociologist and ethnographer, (ii) the most simplistic of data from city agencies, (iii) informal conversations with anonymized PEH, and (iv) a 'survey' he conducted (the Survey) using a sample size he admits is not statistically significant. Report pp. 6-9; Dep. 83:6-84:6. These issues are more than mere fodder for cross examination. Herring used faulty methods and practices, and his opinions should be excluded under *Daubert*.

Admissible expert testimony must be both relevant and reliable. *See Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 589 (1993); Fed. R. Evid. 702.  Testimony is relevant when it "assist[s] the trier of fact to understand or determine a fact in issue."  *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).  Testimony is reliable when it has a "basis in the knowledge and experience of the relevant discipline."  *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010).  Also pertinent to reliability is whether the expert's conclusion is an "unfounded extrapolation" from the facts, whether the expert has adequately accounted for alternative explanations, or whether the opinion unduly relies on anecdotal evidence.  *United States v. Redlightning*, 624 F.3d 1090, 1112-14 (9th Cir. 2010).  Plaintiffs have the burden to establish by a preponderance of the evidence that Herring's testimony meets the admissibility requirements of Rule 702.  *See* Fed. R. Evid. 702, Advisory Comm. Notes.  They do not meet this burden.

### A.     Herring's Numerical Analyses Require Only Basic Math—Not Expertise.

Expert testimony assists the factfinder and is admissible under Rule 702 only if the subject matter at issue is "beyond the common knowledge of the average layman." *United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997).  "Straightforward application of grade-school arithmetic to uncomplicated numbers is well within the ken of the average juror."  *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 6, 2017) (excluding expert testimony).

All of Herring's numerical deductions, the bases of his first three opinions, are the result of "grade-school" math calculations applied to "uncomplicated numbers" and should be excluded.  He purports to analyze data from his Survey, as well as City data concerning HSOC resolutions and JFOs (resolution summaries, notes from HSOC officials summarizing daily activities, and information from the "CMMS" database concerning DPW operations), logs of bagged and tagged property, and other similar documents.  Report pp. 7-9.  His analysis of this data, however, is merely addition, Report pp. 21, 22, 29, 30, 33, 37, subtraction *e.g.*, *id.*, pp. 21 23, 25, 30-32, and division, *e.g., id.* pp. 15, 21, 25, 29, 30-31, 33, 37—all math an elementary school student could do.  For instance, to purportedly calculate how frequently bagging and tagging occurs during HSOC resolutions, Herring *adds* the number of bag and tags from the bag and tag logs and then *subtracts* the number of entries with a pick-up address at a police station, before *comparing* the resulting number to the number of individuals and tents or

structures noted present at the beginning of each HSOC resolution, a figure he reaches by *addition*. *Id.* pp. 18-23. Plaintiffs are perfectly capable of elucidating these facts and figures from a fact witness, and the Court is equally able to add, subtract, divide, and multiply on its own. There is no reason for Herring's basic math "to serve as a mouthpiece for arguments that [Plaintiffs'] lawyers can make." *Waymo*, 2017 WL 5148390, at *5 (citations omitted); *see also Erhart v. Bofl Holding, Inc.*, 445 F. Supp. 3d 831, 840-41 (S.D. Cal. 2020) (excluding opinion where equation giving rise to analysis was nothing "other than basic arithmetic" and multiplication). To the extent Herring's first three opinions rely on basic calculations that require no expertise, they do not assist the Court and should be excluded.

**B.     Herring Fails to Account for Alternate Explanations of Data.**

In addition to being unhelpful to the Court, Herring's analysis of the data is unreliable: His first three opinions fail to account for obvious alternate explanations for his conclusions. *Perry v Schwarzenegger*, 704 F. Supp. 2d. 921, 946-47 (N.D. Cal. 2010) (excluding expert opinion where expert failed to account for obvious alternative explanations of data), *aff'd sub nom. Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012). For instance, Herring's Property Destruction Opinion overlooks two equally plausible interpretations for what he describes as the "extremely low" rate of bagging and tagging when compared to the number of resolutions: (i) that DPW allows PEH to keep belongings (consistent with its policy) or (ii) that DPW is discarding items as permitted to under the policy (*e.g.*, items posing a health hazard). Incredibly, at his deposition, ***Herring admitted that the low number of bag and tags could, in fact, indicate that DPW was following its own policy***. Dep. 141:10-13. This remarkable concession undercuts the Property Destruction Opinion entirely. Herring also fails to account for alternate explanations for the data he relies on for his Inadequate Notice Opinion and the Property Recovery Opinion. *See id.* 161:1-164:5; Report p. 50.

**C.     Herring Makes Improper and Unsupported Extrapolations from the Survey Data.**

Herring supports his first three opinions in part by referring to the results of the Survey, in which he posed eight questions to 203 PEH. Neither the size of the Survey data set nor its makeup supports the sweeping conclusions Herring makes about the unsheltered population of San Francisco. And Herring agrees none of the questions in his survey identify a violation of the Bag & Tag Policy.

First, Herring admits the Survey's sample size of 203—6% of PEH living in tents and on the street—is not statistically significant. Dep. 83:6-84:6. He also concedes small data sets have "greater margins of error" and can even "lead to inaccurate"—in other words, *unreliable*—results. *Id.* 76:8-77:6. Courts in the Northern District agree. In *In re: Autozone, Inc.*, for instance, the district court observed that an identical response rate of 6% would "generally not [be] considered adequate for being able to [] extrapolate the results of the survey to the wider population from which the sampled group was drawn." 2016 WL 4208200, at *17 (N.D. Cal. Aug. 10, 2016) (excluding survey). So, too, here.

The *composition* of the size also does not support Herring's conclusions because he seeks to draw conclusions about all unsheltered PEH (*E.g.*, Report pp. 12, 17) by examining a subset that deliberately excluded parts of the population. The Point in Time (PIT) count, a census of homeless people on which Herring relies, defines "unsheltered" homeless people as "those sleeping on streets, *in vehicles, or other places not meant for people to live.*" Lanier Decl. Ex. D (Ex. 346) at 1 (emphasis added). Yet, the subjects of Herring's Survey represent only a subset of that demographic, "visibly homeless" PEH living in tents and on streets, excluding those, like Melodie, who live in vehicles or other places not meant for people to live.[1] Dep. 84:7-15; 85:12-87:19. Herring's analysis of the Survey data, therefore, makes sweeping extrapolations without accounting for any variability the broader "unsheltered" population might experience relative to matters at issue. *See Autozone*, 2016 WL 4208200, at *17 (excluding expert opinion based on survey where expert offered "no explanation" why a small sample size was "adequate[] stand in" for the population as a whole).

Moreover, the analyses Herring conducts—simple counts, percentages, and averages, Dep. 77:17-78:22—cannot support inferences "outside of… [the] sample" set. *E.g.*, *Nat'l Fair Hous. All. v. Deutsche Bank Nat'l* , 2025 WL 975967, at *32-34 (N.D. Ill. Mar. 31, 2025) (excluding opinion based on "descriptive statistics"). Yet, this is precisely what Herring attempts: "The *survey findings* make

---

[1] There are other problems with Herring's Survey administration. Subjects were not randomly selected, but were targeted by the surveyors. *See Wallace v. Countrywide Home Loans, Inc.*, 2012 WL 11896333, at *4 (C.D. Cal. Aug. 31, 2012) (excluding survey where randomness not assured). Herring also does not account for self-interest bias, the risk that individuals agreed to participate in the Survey because the subject matter interested them, which skews results. *See Trahan v. U.S. Bank Nat'l Ass'n*, 2014 WL 3750053, at *3 (N.D. Cal. July 29, 2014) (citations omitted). Further, Survey participants were not told it was important to give truthful answers and were not under oath. Dep. 103:4-8.

clear that *the vast majority of unsheltered San Franciscans* have recently lost what they wanted to keep, do not consistently receive advanced notice of DPW operations, are not consistently given notice of how to retrieve their property, and are unsuccessful at retrieving it." Report p. 12. This is improper.

And Herring acknowledges that none of his survey questions—either alone or in combination—show a violation of the Bag & Tag Policy. Herring's extrapolations from a too-small sample size that does not represent the population upon which he purports to opine, on questions that do not impact the key issues in the case, render his first three opinions unreliable.

### D. Herring's First Three Opinions Are Nothing More Than Conduits for Hearsay.

Excluding Herring's Survey analysis and "grade-school"-level math calculations, his first three opinions are nothing more than bundles of inadmissible hearsay—sometimes hearsay within hearsay—from primarily anonymous sources. *E.g.,* Report pp. 36-37 ( "in the Bayview a man… reported…," "two men… said…,"), p. 55 ("Many I spoke with explained…," "Others reported…"),p. 46 ("Many" PEH reported "being told by others" that their property had been thrown away), p. 56 ("One man I spoke with . . ."). Herring merely parrots these out-of-court statements as true, "t[aking] them at their word" without verifying the truth of what these individuals told him[2] Dep. 232:10-234:10. This is improper. *E.g., 1440 Sports Mgmt. Ltd. v. PGA Tour, Inc.*, 2023 WL 7280444 at *6 (N.D. Cal. Oct. 6, 2023) (expert must serve as more than mere conduit for inadmissible hearsay). The Court should not permit Plaintiffs to use Herring's "aura of expertise," to submit favorable factual testimony while "keep[ing] discrediting warts out of [their] case and immuniz[ing] [their] case from cross examination." *See United States v. Cerna*, 2010 WL 11627594, at *5, 7 (N.D. Cal. Dec. 17, 2010) ("[E]xpert testimony must serve as an aid to understanding facts—not a summary of [Plaintiffs'] best case."). The Property Destruction, Inadequate Notice, and Property Recovery Opinions should be excluded.

### E. Herring's Firsthand Observations Altered the Subject of His Opinions.

---

[2] The Court should reject any argument that Herring is not offering these statements for their truth. *See, e.g.,* Report p. 36 (in support of Inadequate Notice Opinion, recounting statement of Bayview man who "reported not having received any advanced notice"). Assuming *arguendo* that these statements are not being offered for their truth, they have no relevance and should be excluded on that basis. *See Packer v. Hence*, 2010 WL 4009888, at *5 (N.D. Cal. 2010) ("The question is always: what's the relevance of it if it isn't offered for its truth?" (cleaned up)).

Herring's first three opinions are also unreliable because Herring, during his observations, polluted his own data by intervening, changing the course of events. *See Scalia v. E. Penn Mfg. Co. Inc.*, 2020 WL 5409164, at * 11(E.D. Pa. Sept. 9, 2020) (research studies should be designed in a way that avoids "powerful but undesirable" effect changing the behavior of subjects by observation); *see also Vieira v. Chappell*, 2015 WL 641433, at *118 (E.D. Cal. Feb. 5, 2015) (citation omitted).  For instance, for the purposes of his Property Recovery Opinion, Herring **convinces** a PEH named "Carlos" to attempt to do so, and it is clear from Herring's recounting that Carlos would not have traveled to the DPW Yard without Herring's prompting.  Report p. 50.  And, further, Herring even surmises that his presence alters the process by which Carlos retrieved his belongings at the DPW Yard.  *Id.* p. 54 ("The guard ends up calling Victoria in the radio room to take the request.  Again, Carlos looked to me and says this is only because I am there.").  This is far from the only time Herring's interactions changed the facts he was observing.  *E.g.*, Report p. 13 (for the Property Destruction Opinion), Report p. 39 (for Inadequate Notice Opinion, describing situation where Herring informed couple about a pending resolution after they claimed not to have seen a notice).  Herring's impulses to assist may be laudable, but his inability to observe at a distance undermines as a matter of law his objectiveness as a social scientist.  *See Santa Clarita Valley Water Agency v. Whittaker Corp.*, 2021 WL 6107023, at *2 (C.D. Cal. Nov. 12, 2021); *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 176 (N.D. Cal. 2015) (expert advocacy "akin to a supplemental brief" improper).  His failure to take measures to avoid tainting his own data renders at least his Inadequate Notice and Property Retrieval Opinions unreliable.

### F.     Herring Is Not Qualified to Offer Opinions on The Adequacy of Notice Or Processes for Bagging, Tagging, and Storing Belongings.

Any surviving components of Herring's Inadequate Notice and Property Recovery Opinions must be stricken because the subject matter falls outside the scope of his expertise as a sociologist.  He has disclosed no special expertise in public signage, including "visibility and font size," Dep. 184:24-185:14, or in the best practices for cataloguing, storing, and retrieving items, much less at scale.  Opinions about these topics also fall well within the realm of material a factfinder needs no assistance evaluating.  *See BladeRoom Grp. Ltd. v. Facebook, Inc.*, 2018 WL 1611835, at *5 (N.D. Cal. Apr. 3,

2018) (excluding opinion because facts at issue not "beyond the common knowledge of a layperson").

**G.  Herring's Fourth Opinion Is Speculative.**

Herring's Recurring Homelessness Opinion is too speculative to assist the court. *See Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019) (expert's opinion must rest on facts of which the expert is aware, not merely assumptions and speculation). He admits that whether a housed person becomes homeless again depends on that person's individual circumstances, Dep. 270:9- 276:19, and the risk of property destruction during a resolution depends on a number of variables, Dep. 276:20-282:21. He also admits he is unaware of the individual housing circumstances of PEH witnesses—including the individual Plaintiffs—and is not offering an opinion as to the likelihood that any particular individual becomes homeless again. Dep. 273:6-274:20; 276:7-19. Witnesses in this case who have experienced homelessness are fully capable of testifying about the stability of their own housing and their intents and plans for property storage in the event they return to homelessness. To that end, witnesses who are currently housed, including the remaining named Plaintiffs, each have no intent to become unhoused or to store property on the street again. *See e.g.*, Cronk Dep. 158:3-159:6, 239:9-14, ECF No. 350-8; Donohoe Dep. 43:21-44:13, 45:11-13, 58:23-59:1, 59:13-22, ECF 350-7. Herring's fourth opinion must also be excluded.

For the reasons argued above, Defendants respectfully request the Court exclude each of Herring's four opinions.

DATED: June 20, 2025                                      Respectfully submitted,

                                                          CONRAD | METLITZKY | KANE LLP


                                                          */s/ Jessica Lanier\**
                                                          WARREN METLITZKY
                                                          JESSICA LANIER
                                                          NATHAN THEOBALD

                                                          Attorneys for Defendants

**\*Pursuant to L.R. 5-1(i)(3), the e-filing attorney attests that each of the other Signatories have concurred in the filing of this document.**

7

CASE NO. 4:22-cv-05502-DMR                                DEFENDANTS' MOT. TO EXCLUDE
                                                          HERRING'S EXPERT OPINIONS