# EXHIBIT A

```
1                 UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                       OAKLAND DIVISION

4

5    - - - - - - - - - - - - - - - - -

6    COALITION ON HOMELESSNESS; SARAH )

7    CRONK; JOSHUA DONOHOE; MOLIQUE   )

8    FRANK; DAVID MARTINEZ; TERESA    )

9    SANDOVAL,                        )

10              Plaintiffs,           )

11   vs.                              )  CASE NO:

12   CITY AND COUNTY OF SAN           )  4:22-cv-05502-DMR

13   FRANCISCO; et al.                )

14              Defendants.           )

15   - - - - - - - - - - - - - - - - -

16                       CONFIDENTIAL

17           REMOTE VIDEOTAPED DEPOSITION OF

18                  CHRIS HERRING, PH.D.

19                MONDAY, APRIL 14, 2025

20

21            BEHMKE REPORTING AND VIDEO SERVICES, INC.

22             BY: JOHN FAHRENWALD, CA CSR 14369, RPR

23                  550 CALIFORNIA STREET, SUITE 820

24                  SAN FRANCISCO, CALIFORNIA 94104

25                       (415) 597-5600
```

1

2

3

4

5

6

7

8          Remote Videotaped Deposition of expert CHRIS HERRING,

9    taken on behalf of the Defendant, via videoconference, with

10   the witness located in Los Angeles, California, commencing

11   at 10:02 A.M., PDT, MONDAY, APRIL 14, 2025, before Reporter

12   John Fahrenwald, Certified Shorthand Reporter for the State

13   of California, CSR No. 14369, RPR.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL (VIA VIDEOCONFERENCE):
 2   FOR THE PLAINTIFFS AND THE DEPONENT:
 3        LAWYERS COMMITTEE FOR CIVIL RIGHTS OF THE
 4        SAN FRANCISCO BAY AREA
 5        BY:  NISHA KASHYAP, ATTORNEY AT LAW
 6        131 Steuart Street, Suite 400
 7        San Francisco, California 94105
 8        Telephone: (415) 543-9444
 9        Email:  nkashyap@lccrsf.org
10   - AND -
11        EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
12        BY:  ZOE SALZMAN, ATTORNEY AT LAW
13        One Rockefeller Plaza, 8th Floor
14        New York, New York 10020
15        Telephone:  (212) 763-5000
16        Email:  zsalzman@ecbawm.com
17
18   FOR THE DEFENDANTS CITY AND COUNTY OF SAN FRANCISCO, et al.:
19        SAN FRANCISCO CITY ATTORNEY'S OFFICE
20        BY:  KAITLYN M. MURPHY, DEPUTY CITY ATTORNEY
21             MIGUEL A. GRADILLA, DEPUTY CITY ATTORNEY
22        1390 Market Street, 7th Floor
23        San Francisco, California 94102
24        Telephone:  (415) 554-6762
25        Email:  kaitlyn.murphy@sfcityatty.org
```

1    APPEARANCES - CONTINUED (VIA VIDEOCONFERENCE):

2    ALSO PRESENT:

3        KYLE FRIEND, LEGAL VIDEOGRAPHER

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 MONDAY, APRIL 14, 2025; 10:02 A.M.
 2                           ---o0o---
 3
 4             VIDEOGRAPHER:  Here begins Media No. 1 in the
 5     deposition of Chris Herring in the matter of Coalition on
 6     Homelessness, et al., versus City and County of San
 7     Francisco, et al., in the United States District Court,
 8     Northern District of California, case No. 4:22-cv-05502-DMR.
 9             Today's date is Monday, April 14th, 2025.  The
10     time on the video monitor is 10:02 a.m.  The video operator
11     today is Kyle Friend, employed by Behmke Reporting and Video
12     Services, Inc.
13             This video deposition is taking place
14     remotely via Zoom and was noticed by Kaitlyn Murphy, Deputy
15     City Attorney for the City and County of San Francisco.
16             Counsel, please voice identify yourselves.
17             MS. MURPHY:  Kaitlyn Murphy, along with Miguel
18     Gradilla, on behalf of defendants.
19             MS. KASHYAP:  Nisha Kashyap, along with Zoe
20     Salzman, on behalf of plaintiffs and Dr. Herring.
21             VIDEOGRAPHER:  The court reporter today is John
22     Fahrenwald, certified shorthand reporter, contracted by
23     Behmke Reporting and Video Services, Inc.
24             Will the reporter please introduce himself
25     and then swear in the witness.
```

```
1                    (Whereupon the court reporter stated his name
2      and certification number on the record.)
3                          DR. CHRIS HERRING,
4       called as a witness herein, having been first duly sworn,
5                  was examined and testified as follows:
6                              EXAMINATION
7            BY MS. MURPHY:
8         Q.   Good morning, Dr. Herring.
9         A.   Good morning.
10        Q.   How many times have you been deposed?
11        A.   I've been deposed once before.
12        Q.   Are you familiar with the general admonitions at
13     the beginning of a deposition?
14        A.   You could review them.
15        Q.   You understand the oath you just took is the same
16     you would take if you were testifying in court?
17        A.   Yes.
18        Q.   You're under oath to tell the truth?
19        A.   Yes.
20        Q.   That includes not exaggerating?
21        A.   Yes.
22        Q.   I will do my best to ask you clear questions.
23     Sometimes I will make a mistake.  If you don't understand a
24     question that I ask, please let me know rather than trying
25     to guess at what I mean.
```

```
 1                    (Exhibit 342 was marked for identification.)
 2        A.    Yes, I can see it here.
 3        Q.    Okay.  Great.
 4              Do you recognize Exhibit 342?
 5        A.    Yes.
 6        Q.    What is it?
 7        A.    This is a letter to Jenny Friedenbach about
 8   getting a letter of rec.
 9        Q.    And this is a letter you sent to her on
10   November 26th, 2018.  Do you see that?
11        A.    Yes.
12        Q.    And in the letter you explain that you're applying
13   for a grant, and you're asking her to submit a letter of
14   recommendation on your behalf; is that fair?
15        A.    That is correct.
16        Q.    And you mention that she submitted a letter of
17   recommendation on your behalf for this same grant in a prior
18   year; is that correct?
19        A.    I'm going to read it carefully here.
20              Yes, that sounds correct.
21        Q.    And in both instances Jenny asked you to do a
22   draft of the letter of rec, kind of for her to review; is
23   that fair?
24        A.    Yes.
25        Q.    And if you turn to the second and third page of
```

1    Exhibit 342, that is the draft recommendation letter you

2    sent to Jenny Friedenbach in November of 2018; is that

3    correct?

4        A.   Yes, that looks correct.

5        Q.   And is it fair to say, then, since you drafted

6    this letter, everything in it is correct from your position;

7    is that fair?

8        A.   I'd have -- I can look at this.  I mean, that's

9    a -- yeah.  If I did draft all of this and it wasn't based

10   off of -- let me just read.

11              Yes.

12       Q.   Do you see the first sentence on the page ending

13   in Bates number 566 to the last page reads, "Beyond the

14   Coalition in San Francisco, I know Chris has worked closely

15   with the Lawyers' Committee for Civil Rights, Bay Area

16   Legal, and served as a research associate at the City's

17   Department of Homelessness and Supportive Housing."

18              Do you see that?

19       A.   Yes.

20       Q.   What were you referring to when in November of

21   2018 you said that you had worked closely with the Lawyers'

22   Committee for Civil Rights?

23       A.   Yes.  This was on, again, as I mentioned that

24   initial case regarding the destruction of people's property.

25   And as I mentioned, that involves emails that I believe I

1  was on, though I can't recall like, you know, meetings with
2  the Lawyers' Committee for Civil Rights for this.  This was,
3  you know, prior to this case.  It was dealing with something
4  that I believe was eventually settled in what became a
5  revised kind of DPW policy around these issues.
6      Q.   So your recollection is that, before this case,
7  there was a prior lawsuit where you worked with LCCR; is
8  that fair?
9           MS. KASHYAP:  Objection.  Misstates prior
10 testimony.
11          THE WITNESS:  There was a -- there was a broad
12 campaign of which LCCR was a part of that's in reference
13 here of which I was providing similar resources of my
14 research to explaining the research the way of which it
15 would be relevant to this case to this group that included
16 LCCR.
17     Q.   (BY MS. MURPHY:) And when you're referring to it
18 as a case, what do you mean by that?
19     A.   My understanding -- I was not -- you know, I never
20 saw the case.  This is just through what I've heard, was
21 that they were pressing the City on treatment of people's
22 belongings.  And my understanding was that it was settled
23 with a redefinition of what was considered unattended
24 property.
25               And the main way I was engaged with this

1    group is, as you can see for this letter, it was based on

2    both prior research I'd done with the Coalition as well as

3    organizing work.  But it was largely based on the ways of

4    which the research findings could contribute to informing

5    this case.

6         Q.   So, then, is it fair to say that your

7    understanding is that prior to this lawsuit there was an

8    earlier case in which LCCR challenged San Francisco's

9    policies around property, and that case led to a settlement

10   with a revised bag and tag policy?

11             MS. KASHYAP:  Objection.  Misstates prior

12   testimony.

13             THE WITNESS:  I knew there was a -- yes.  I was

14   involved in a case, and I don't -- it was around this issue

15   of unattended property that I believe was settled.

16        Q.   (BY MS. MURPHY:) And the settlement involved a

17   revision to the City's policy around unattended property; is

18   that fair?

19        A.   That was my understanding, yes.

20        Q.   Do you have a best estimate of the time frame of

21   this prior case where you worked closely with the Lawyers'

22   Committee for Civil Rights against San Francisco?

23        A.   I mean, it would have been prior to this letter

24   here.  So I would imagine that 2016 to 2018 would be the

25   possible years.  So it would be after the work on this

1    research and prior to this letter.

2           And, again, with this work closely, it's in

3    reference to this, you know, larger group of folks who were

4    working on this lawsuit.

5        Q.   When you're referencing a larger group of folks

6    who were challenging San Francisco's policies around

7    property in the 2016 to 2018 timeframe, to the best of your

8    recollection was the Coalition on Homelessness part of that

9    group?

10       A.   Yes.

11       Q.   And if you could turn one page back, so it's the

12   second page in Exhibit 342 that ends in 565.  Let me know

13   when you get there.

14       A.   Okay.  Yeah.

15       Q.   In the first paragraph, I'm looking at the second

16   sentence.  It reads, "Chris has worked with the San

17   Francisco Coalition on Homelessness, where I serve as

18   executive director, as a research associate and regular

19   member of our human rights work group since 2014."

20           Do you see that?

21       A.   Yes.

22       Q.   And is that a correct statement as of November

23   2018?

24       A.   Yes.

25       Q.   I'm also going to look at the last sentence one

```
 1    paragraph below, so the second paragraph on the page ending
 2    in 565.  It reads, "He is" --
 3                MS. KASHYAP:  Sorry, Kaitlyn.
 4                THE WITNESS:  I've got it.
 5        Q.   (BY MS. MURPHY:) You ready?
 6        A.   Yes.
 7        Q.   It reads, "He is a regular at the weekly meetings
 8    and has participated in the Coalition's work in a number of
 9    ways, from doing outreach to shelter users and encampments,
10    attending community meetings across the city on issues of
11    homelessness, and planning and participating in major
12    actions."
13                Did I read that correctly?
14        A.   Yes.
15        Q.   And is that an accurate statement of your
16    involvement with the Coalition on Homelessness as of
17    November 2018?
18        A.   Yes.
19        Q.   I think you mentioned that you have submitted a
20    declaration in the Oregon case and that you had a report in
21    the Berry case; is that correct?
22        A.   Yes.
23        Q.   Do you have any work product that came out of the
24    Albuquerque case as of today?
25        A.   No.
```

1    couple more questions before you get back into it.

2          Would you agree that it's important for surveys to

3    include a large enough sample size?

4          MS. KASHYAP:  Objection.  Form.

5          THE WITNESS:  Yes.  We should pay attention to

6    sample sizes when considering the results and conclusions

7    that are drawn.

8          Q.   (BY MS. MURPHY:) A survey that doesn't have a

9    large enough sample size risks yielding inaccurate results;

10    is that correct?

11         A.   Yes.  If the sample size for a specific task is

12    not large enough, it can -- it affects the accuracy and the

13    margin of error.

14         Q.   A survey that doesn't have a large enough sample

15    size risks unreliable results; is that correct?

16         MS. KASHYAP:  Objection:  Form.  Incomplete

17    hypothetical.

18              Go ahead.

19         THE WITNESS:  Yes.  Smaller sample sizes have

20    greater margins of errors, and along with, you know, many

21    other issues in terms of sampling can lead to inaccurate

22    results.

23         Q.   (BY MS. MURPHY:) A survey that doesn't have a

24    large enough sample size risks potentially misleading

25    results; is that correct?

1             MS. KASHYAP:  Objection.  Form.  Objection.
2    Incomplete hypothetical.
3                    Go ahead.
4             THE WITNESS:  Again, abstractly, of course, a
5    sample of, say, five people could be very misleading in a
6    larger population.
7        Q.   (BY MS. MURPHY:) And as a comparison to the survey
8    you performed in this case, you referenced two earlier
9    community-based surveys that you participated in; is that
10   fair?
11       A.   Yes.
12       Q.   In those earlier two community-based surveys, were
13   you the person responsible for analyzing the data?
14       A.   I was a member of a team.  The first time I was
15   close supervising with a colleague and as I was also in the
16   second survey as well.
17       Q.   And is it fair to say that in those surveys you
18   brought in someone whose specialty was in statistics or
19   statistical analysis?
20            MS. KASHYAP:  Objection.  Form.  Lacks foundation.
21               Go ahead.
22            THE WITNESS:  We -- I mean, none of these surveys
23   have, you know, run regression models or anything involving
24   statistical training.  That would be outside of our own
25   training as sociologists in gathering survey data.  We

1     certainly consulted with other faculty who are also trained

2     and skilled in survey and statistical methods.

3                    But there's nothing in these sort of

4     descriptive surveys that are outside of our own doctoral

5     training in sociology and statistics.

6        Q.   (BY MS. MURPHY:) Is it fair to say that statistics

7     is outside your area of expertise?

8                    MS. KASHYAP:  Objection.  Form.  Misstates prior

9     testimony.

10                   THE WITNESS:  I mean, as a Ph.D. in sociology, I

11    have doctoral training in statistics.  Do I consider -- do

12    I, you know, publish?  Do I consider it a subfield

13    specialty, that I am like a quantitative statistician, no.

14       Q.   (BY MS. MURPHY:) Is it fair to say, then, that a

15    statistical analysis of community-based surveys is outside

16    your area of expertise?

17       A.   No.

18                   MS. KASHYAP:  Objection.  Form.  Misstates prior

19    testimony.

20                   Go ahead.

21                   THE WITNESS:  No.  Not -- not -- not these

22    descriptive statistics and survey collection.

23                   MS. MURPHY:  I'll mark as Exhibit 345 a document

24    with the Bates number COH1036632.

25                   (Exhibit 345 was marked for identification.)

```
 1   relationship beyond the, you know, individual cases and
 2   stories that we had been hearing and looking at that level
 3   of between over 5 percent of the total population of
 4   interest, which in this case was unsheltered population, was
 5   our goal.
 6        Q.   (BY MS. MURPHY:) So your goal to have a
 7   statistically significant sample was to get your survey
 8   population to include at least 5 percent of San Francisco's
 9   unsheltered population; is that fair?
10             MS. KASHYAP:  Objection.  Misstates prior
11   testimony.
12                  Go ahead.
13             THE WITNESS:  Yeah.  We were not looking for a
14   statistically significant -- a level of statistical
15   significance.
16        Q.   (BY MS. MURPHY:) That's helpful.  So the survey
17   that you relied on in coming to your conclusions is not
18   statistically significant?
19             MS. KASHYAP:  Objection.  Form.  Misstates prior
20   testimony.
21             THE WITNESS:  It's just not something we were
22   evaluating in this case.  We're not making claims -- I mean,
23   we're not running regressions where we would use a model of
24   statistical significance in this way.
25        Q.   (BY MS. MURPHY:) Let me try to rephrase this one
```

1    more time.  Is it fair to say that you are not claiming the

2    survey you performed in this case is statistically

3    significant?

4                MS. KASHYAP:  Objection.  Lacks foundation.

5                    Go ahead.

6                THE WITNESS:  No.  I'm not claiming that either.

7        Q.    (BY MS. MURPHY:) And your goal was to get a survey

8    size that was greater than or equal to 5 percent of the

9    unsheltered population in San Francisco; is that right?

10       A.    Yes.

11       Q.    Do you believe you accomplished that?

12       A.    Of the unsheltered living in -- by unsheltered,

13   I'm not including those in vehicles.  Right?  So it's people

14   in the streets and tents who are in these areas.  Yeah,

15   200 -- that -- it would be the 203 individuals.

16       Q.    My question is a little different, which is do you

17   believe that the survey you conducted is -- contains at

18   least 5 percent of the unsheltered people in San Francisco?

19       A.    I believe it was 6 percent was what was in the

20   report.  Is that --

21       Q.    You believe it was 6 percent of the entire

22   unsheltered population in San Francisco?

23                MS. KASHYAP:  Objection.  Form.

24                THE WITNESS:  I'd have to look back in the report.

25   In the report I state the calculation there.  If you give me

```
 1    a minute, I could go to that area of the report and --
 2         Q.   (BY MS. MURPHY:) I think if you wouldn't mind
 3    taking a trip to page 15 of the report.  I think that's
 4    where you were headed.  Let me know when we get there.
 5         A.   Great.
 6              Yes.  This is where I was looking at and
 7    referring to.
 8         Q.   And in your report you state that the survey size
 9    you used was 6 percent of the city's overall unsheltered
10    population, which was 2,910 in persons; is that right?
11         A.   Yes.
12         Q.   But you compared this to the number of individuals
13    who were residing in the street or in a tent; is that right?
14         A.   Yes.
15         Q.   And you know that the term unsheltered actually
16    refers to a broader set of people?
17         A.   Yes.
18         Q.   And do you know how the percentage of survey
19    participants you looked at compares to the actual
20    unsheltered population in San Francisco from the point in
21    time?
22         A.   I mean, that's, to me, irrelevant to the analysis
23    which was focused on street or in a tent, which is what we
24    were -- what the goal was being set out and to get over 200
25    people for that reason.
```

```
 1              MS. MURPHY:  I'm going to drop into the chat a
 2   document that is a point in time count for 2024.  Let me
 3   know when you have a chance to get it open.
 4              If I could mark this as Exhibit 346.
 5              (Exhibit 346 was marked for identification.)
 6         MS. KASHYAP:  Okay.  We have it open.
 7    Q.   (BY MS. MURPHY:) And this Exhibit 346 is the
 8   summary of the 2024 point in time count.  This is the
 9   document you cite in your report.  Correct?
10    A.   Yes.  It's this -- yes.  I believe it's this page,
11   you know, 421 --
12    Q.   The citation -- you cite this document in footnote
13   11 of your report on page 15; is that fair?
14    A.   Let me go back and look here.
15              MS. KASHYAP:  The other tab in the top left of the
16   screen.
17              THE WITNESS:  Oh, okay.  Number 11.  Oh, it's at
18   the end of the document.
19              MS. KASHYAP:  It should be on the bottom of page
20   15, probably.  It's footnote 11.
21              THE WITNESS:  Okay.  Footnote 11, 2024 point in
22   time count.  And then it has a --
23              Yeah, this is the report that I cite.
24    Q.   (BY MS. MURPHY:) And this report defines
25   unsheltered on page 1 as those sleeping on streets, in
```

```
 1    vehicles, or other places not meant for people to live.
 2              Do you see that?
 3        A.   I can go up, but, yes, that's my understanding of
 4    unsheltered homelessness there, yeah.
 5        Q.   And they tabulate the number of unsheltered people
 6    in San Francisco on page 5 of the report as 4,354.
 7              Do you see that?
 8        A.   Yes.
 9        Q.   And is it fair to say that 203 responses isn't
10    6 percent of the total unsheltered population from this
11    point in time cap?
12              MS. KASHYAP:  Objection.  Misstates prior
13    testimony.
14              THE WITNESS:  I'm very clear that I'm only looking
15    at the people in streets or tents, and that's where the
16    2,910 number comes from.  Yeah, so I looked at this.  This
17    is unsheltered homelessness.  And this number is meaningless
18    or, you know, not the number I'm focused on in this
19    empirical exercise here.
20        Q.   (BY MS. MURPHY:) And it's fewer than -- you would
21    agree that your survey size is fewer than 5 percent of the
22    city's total unsheltered homeless; is that fair?
23        A.   Yes.  It's also less than 5 percent of all of its
24    homeless in the city and country.
25        Q.   That was going to be my next question.
```

1   from the survey questions?

2        A.   Those are what come immediately to mind right

3   here.

4        Q.   Were the survey participants under oath?

5        A.   No.

6        Q.   Were they told that it was important that they

7   gave you truthful answers?

8        A.   No.

9        Q.   Did you instruct the survey participants to answer

10  only based on their personal experience as opposed to what

11  they saw happen to someone else?

12       A.   The questions ask personally experienced.  Now,

13  there would be cases where people would say, I have not

14  personally experienced this; I know someone would.  The

15  surveyors were trained to focus in specifically on, you

16  know, personally experienced.  That's what most of the

17  training was about.  You ask people questions, they often

18  offer other answers, and the goal was to get them to answer

19  these questions accurately.  So personally experienced was

20  the focus, and surveyors were attentive to that.

21       Q.   Did the surveyors read the questions to the survey

22  participants?

23       A.   Yes.

24       Q.   And were they conducting it on a tablet or a

25  phone?  What type of device?

1    initial declaration, and along with these high numbers of

2    people reporting having belongings taken, then I might say

3    that this suggests that, you know, we are -- they are bag

4    and tagging and people aren't retrieving it.  But that is

5    not what I found.  I did not find a -- I saw a similar

6    disparity across this period in these numbers.

7            So that did not challenge the findings that I had

8    in the surveys that I was looking to possibly, you know,

9    contest or see how it would align with these other analyses.

10       Q.   (BY MS. MURPHY:) Do you agree that there are

11   circumstances where a low number of bag and tags could

12   indicate that DPW is following the bag and tag policy?

13       A.   Yes.

14           MS. KASHYAP:  Objection.  Form.

15                Sorry.  Go ahead.

16       Q.   (BY MS. MURPHY:) For example, if campers are given

17   a reasonable amount of time to leave, they will take the

18   items they want with them, and so there will be fewer items

19   for DPW to bag and tag.  Right?

20           MS. KASHYAP:  Objection.  Incomplete hypothetical.

21   Form.

22                Go ahead.

23           THE WITNESS:  Yes.  If people were given adequate

24   time to leave and proper notice ahead of time, then there

25   would be a low number of bag and tags.

1       Q.   Did you want to review any evidence of photographs

2   showing posted notices in coming to your opinions in this

3   case?

4              MS. KASHYAP:  Objection.  Form.

5                   Go ahead.

6              THE WITNESS:  I'm -- it was definitely something I

7   considered.  But with the limited time and the other points

8   of evidence, it didn't seem a priority.

9       Q.   (BY MS. MURPHY:) So it didn't seem a priority to

10  you to consider whether there were photographs showing that

11  the City provided advance written notice for HSOC

12  resolutions; is that fair?

13             MS. KASHYAP:  Objection.  Form.

14             THE WITNESS:  No.  I mean, I clearly saw that they

15  were putting up HSOC resolutions in various places.  I

16  didn't have the bandwidth to do sort of an analysis that

17  would at the time made sense.  As you see I -- we have the

18  analysis of where HSOC shifted their operations outside of

19  the zones that were designated, which I also observed, which

20  we would assume would not have included the notices posted.

21                  In a subsequent analysis on the new January

22  week where I looked at those notices, I then did ask and get

23  indications of where those notices would be posted, because

24  once I realized that shift was occurring, then I thought it

25  would be useful to look at what the City is recording as

1    posting notices to further confirm that.  So I did ask and

2    receive that in this January time period.  But in this

3    section, I did not.

4         Q.   (BY MS. MURPHY:) Would reviewing photographs

5    showing posted advance notices for HSOC resolutions in

6    February of 2025 have assisted you to make any of the

7    judgments you reached in this case?

8              MS. KASHYAP:  Objection.  Form.  Lacks foundation.

9              THE WITNESS:  No.  I don't -- not in -- it does

10   not undermine any of the claims or conclusions I came to in

11   this report which was looking at specific instances where

12   the notices, you know, were not seen, were not adequately,

13   you know, envisioned by the people there or within these

14   shifting locations.  Also, the cases of where I saw the

15   notices where the operation wasn't carried out.  I mean,

16   there were notices in those cases.

17              So I think my analysis stands as is without.

18   But, yes, as you will see in the analysis in January,

19   that -- looking at notices in the cases of the shifts can

20   also be useful.

21        Q.   (BY MS. MURPHY:) So for the four instances in the

22   week of February 3rd through February 9th, 2025, where you

23   state that posted notices appear to be absent, you actually

24   don't know whether notices were, in fact, posted for those

25   resolutions.  Right?

1      A.    No, I do not know if they were initially posted.

2      Q.    And it's possible that the City, in fact, posted

3   multiple notices in advance of each of those resolutions.

4   Right?

5            MS. KASHYAP:   Objection.   Calls for speculation.

6   Lacks foundation.

7            THE WITNESS:   Yes, it is possible.   But I would

8   not know.   It calls for -- yeah.   I would have to . . .

9            The point is that they -- on the day of the

10  resolution, they were not apparent.   I would speak with

11  people about their knowledge of the advance notice.   And

12  that is, you know, where we are able to conclude this, that

13  the people did not see them.

14     Q.    (BY MS. MURPHY:) Did you perform any investigation

15  into who took down notices about the HSOC resolutions

16  between February 3rd and February 9th, 2025?

17           MS. KASHYAP:   Objection.   Form.   Lacks foundation.

18           THE WITNESS:   No.   Because in no cases did people

19  report the notices being taken down in those cases.

20     Q.    (BY MS. MURPHY:) So regardless of whether or not

21  someone reported to you that a notice was taken down, did

22  you perform any investigation into how notices that were

23  posted in advance of HSOC resolutions the week of

24  February 3rd to February 9th, 2025, were removed?

25           MS. KASHYAP:   Same objection.   Lacks foundation.

1    Form.

2            THE WITNESS:  No.  Assuming they were removed.  In

3    certain parts, as I observed, they were carrying out

4    operations which were outside of the designated zone where

5    one would not assume there would be a posted notice.

6        Q.   (BY MS. MURPHY:) The first resolution that you

7    have complaints about in this section of your report was on

8    Wednesday, February 5th, near Duboce and Mission.

9            Do you see that?

10       A.   Mm-hmm.

11       Q.   Is that a "yes"?

12       A.   Yes.

13       Q.   And you agree that was the noticed location for

14   where the HSOC was planned.  Right?

15       A.   It was within the zone as I understood it, yes.

16       Q.   Did you visit that site 72 hours in advance to see

17   if notice was posted at that time?

18       A.   No.

19       Q.   Did you see notices posted anywhere for that

20   resolution?

21           MS. KASHYAP:  Objection.  Form.

22           THE WITNESS:  I'd have to check my notes.  But

23   that was the center of activity, and I did not see other

24   notices.  I did not see other notices posted.

25       Q.   (BY MS. MURPHY:) I'll drop in the chat and I'll

1    report?

2         A.   That's correct.

3         Q.   Did you specifically request data for the month of

4    October 2024, or was that the month that counsel chose to

5    give you on their own?

6              MS. KASHYAP:  Objection.  Form.

7              THE WITNESS:  I did not request specifically

8    October.  I forget if this was -- I often ask for like most

9    recent, which is the cause of the January one.  But, no, I

10   did not ask specifically for this month.

11        Q.   (BY MS. MURPHY:) Did you ever look at other months

12   to analyze whether the month of October 2024 happened to be

13   the highest number of shifts at any point prior to that

14   date?

15             MS. KASHYAP:  Objection.  Form.

16             THE WITNESS:  I did not.  I asked for the more

17   recent ones to see if this is a -- you know, continuing or

18   more common trend.

19        Q.   (BY MS. MURPHY:) I'm going to ask you some

20   questions about your opinion that notice is not reasonably

21   visible to encampment residents, which I think starts on

22   page 39 of your report.  Let me know when you're ready.

23        A.   Yes, I am here.

24        Q.   What, if any, special expertise do you have in

25   determining where a notice would be most visible?

1          MS. KASHYAP:  Objection.  Form.

2          THE WITNESS:  I have contextual expertise from my

3    ethnographic experience spending time out on the streets

4    with encampment residents who are interacting with City

5    workers and processes.  I can imagine to a greater extent

6    than others what that experience is like, entails, and can

7    be seen.  But many of the opinions offered here I think are

8    also -- do not require that same level of expertise to

9    determine the issues with visibility here.

10         Q.   (BY MS. MURPHY:) What, if any, special expertise

11   do you have in determining the font size necessary for a

12   notice to be visible?

13         A.   I have no particular special expertise in

14   visibility and font size.

15         MS. KASHYAP:  Sorry.  Late objection.  Form to

16   that question.

17              Go ahead.

18         Q.   (BY MS. MURPHY:) Is it your opinion that the bag

19   and tag policy would require the City to reposition notices

20   if people move within 72 hours before a resolution?

21         MS. KASHYAP:  Objection.  Form.

22         THE WITNESS:  The notices should be -- the idea --

23   no.  I mean, the expectation that is -- that people are

24   given advance notice and aware, and that, as you said, can

25   be done both through signage and through, you know, verbal

```
1          A.   I don't -- I don't remember the names
2    specifically.  I believe it was actually written in my
3    report of a story of a person who had -- was able to
4    retrieve their wallet, which included that personal
5    identification, but in the process had lost a number of
6    other items that were meaningful to them as well.
7          Q.   Mr. Carlos Ruiz told you there were some items he
8    wanted to keep that were not bagged and tagged.  Correct?
9          A.   Yes.
10         Q.   Did you ever follow up to look at any body-worn
11   camera from his citation to see whether or not there was
12   evidence that those items existed?
13         A.   No.
14         Q.   Did you ever follow up to look at any CMMS
15   photographs to see whether there was evidence of those items
16   existing?
17         A.   No.
18         Q.   Mr. Carlos Ruiz told you that the City had taken
19   speakers, electronics, and a laptop from him; is that
20   correct?
21         A.   Yes.
22         Q.   Did you rely on the accuracy of his statement in
23   coming to your conclusions in this case?
24              MS. KASHYAP:  Objection.  Form.
25                   Sorry.  Go ahead.
```

1              THE WITNESS:  Yeah.  I mean, my role as -- in

2    interviewing people is to document what it is they report in

3    their interviews, the same way that I report what I hear in

4    my other work with, you know, police officers, sanitation

5    workers, et cetera, and then to include that and align with

6    other observations included in the report from surveys,

7    conversations with other folks, et cetera.

8         Q.   (BY MS. MURPHY:) Did you assume the accuracy of

9    the statements you documented from Mr. Carlos Ruiz?

10             MS. KASHYAP:  Objection.  Form.

11                  Go ahead.

12             THE WITNESS:  In all of the interviews and

13   discussions that I'm having with people, I am taking their

14   word.  And I'm also, you know, skeptical of these reports on

15   the individual level and consistently looking to see how

16   they line up with others.

17                  So if it's widely reported in the

18   conversations I'm having with people or in the survey data,

19   if I'm able to observe certain processes that confirm or

20   challenge these narratives, this is how I'm looking at all

21   this data.  But the points in this report reflect what is

22   reported to me by the individuals who I'm interacting and

23   discussing their experiences with.

24        Q.   (BY MS. MURPHY:) Why are you skeptical of the

25   information that persons experiencing homelessness reported

1  to you on an individual level?

2          MS. KASHYAP:  Objection.  Misstates prior

3  testimony.

4          THE WITNESS:  It's the same way I'm skeptical of

5  testimony from any individual in my research, whether it be

6  police officers, city officials, or whatnot.  So I look at

7  the individual person, I take them at their word, I report

8  this, and I apply a healthy skepticism as I'm looking at the

9  broader trends and data that I'm analyzing throughout the

10  cases as I continue.

11          These are all items that were repeatedly

12  mentioned in other people's, you know, cases and instances.

13  It's not to say anything specific of an individual case

14  except that it is not something uniquely reported here.

15      Q.  (BY MS. MURPHY:) I'm not trying to be difficult.

16  I just want to understand what you're saying, because I

17  thought I heard you say in your last response that you both

18  are skeptical of what individuals tell you but also you take

19  what individuals tell you at their word.

20          And so I just want to get a better understanding

21  of do you accept as true information that people gave you

22  about their personal experience when forming your opinions

23  in this case?

24          MS. KASHYAP:  Objection.  Form.

25          THE WITNESS:  Yes.

```
 1    your report to ask you questions about the fourth opinion,
 2    which I believe starts on page 57.
 3              THE WITNESS:  Is that the tab over here?
 4              MS. KASHYAP:  It's 3.  That is it.
 5              THE WITNESS:  Which page again?
 6        Q.   (BY MS. MURPHY:) 57.  Let me know when you get
 7    there.
 8        A.   Okay.  57.  Okay.  Yes, I'm here.
 9        Q.   Do you agree that people experiencing homelessness
10    in San Francisco are a diverse group?
11        A.   Yes.
12        Q.   Do you agree that there's multiple reasons a
13    person is unsheltered rather than sheltered in San
14    Francisco?
15        A.   Yes.
16        Q.   Do you agree that there are some people who are
17    voluntarily unsheltered in San Francisco?
18              MS. KASHYAP:  Objection.  Form.
19              THE WITNESS:  This has become a loaded term.  But
20    there are people who are offered shelter, you know, refuse
21    it.  And in that way some definitions consider that
22    voluntary homeless, and they are definitely individuals in
23    that category.
24        Q.   (BY MS. MURPHY:) Do you agree that there are some
25    individuals in San Francisco who have permanently exited
```

1    homelessness after living in City-provided housing?

2           MS. KASHYAP:  Objection.  Form.

3           THE WITNESS:  I mean, permanently as of today,

4    yes.

5       Q.   (BY MS. MURPHY:) Do you agree that there are some

6    people who have been homeless in San Francisco and choose to

7    leave San Francisco permanently, live somewhere else?

8       A.   Yes.

9       Q.   Do you agree that there are some people who are

10   homeless in San Francisco only for a short duration before

11   they leave for other cities?

12      A.   Yes.

13      Q.   Do you agree that those individual differences

14   impact how likely a person who has already experienced

15   unsheltered homelessness is to experience unsheltered

16   homelessness again?

17           MS. KASHYAP:  Objection.  Form.

18           THE WITNESS:  Sorry.  Can you repeat the question?

19      Q.   (BY MS. MURPHY:) Yeah.  Do you agree that

20   individual differences impact how likely a person who has

21   experienced unsheltered homelessness is to experience

22   unsheltered homelessness again?

23      A.   Yes.

24           MS. KASHYAP:  Same objection.  Sorry.

25      Q.   (BY MS. MURPHY:) Do you agree that to have an

```
 1    opinion about whether a specific individual is likely to
 2    experience unsheltered homelessness in the future you'd need
 3    information about that person in particular rather than just
 4    generalized population information?
 5            MS. KASHYAP:  Objection.  Form.
 6            THE WITNESS:  I think you can, you know, look at
 7    the likelihood of that being greater or less depending on
 8    broader population data and other research, which can form
 9    the likelihood of that.  But being able to determine with a
10    hundred percent certainty whether that specific individual
11    will become homeless again or not, no.  That evidence will
12    not be able with certainty to, you know, predict that.
13        Q.   (BY MS. MURPHY:) Are you offering an opinion in
14    this case about another individual plaintiff in particular
15    is likely to experience unsheltered homelessness again in
16    San Francisco?
17            MS. KASHYAP:  Objection.  Form.
18            THE WITNESS:  I'm only speaking to the likelihood
19    of that experience.
20        Q.   (BY MS. MURPHY:) But is your opinion of the
21    likelihood of that experience based at all on the particular
22    circumstances of an individual plaintiff?
23        A.   I mean, they're based on their current status,
24    whether they are sheltered in transitional housing or in
25    that permanent sort of housing.  Of course, there are
```

 1  further differences within those categories of individuals

 2  that can also influence it.

 3        But the broad -- broadest based data coming from

 4  the general population is also often an indication of that

 5  likelihood.

 6      Q.   Do you know what kind of housing Sarah Cronk has

 7  today?

 8      A.   This very day, no.

 9      Q.   Do you know what kind of housing she had at any

10  point in 2025?

11      A.   In 2025?  No.

12      Q.   Do you know what kind of housing Joshua Donohoe

13  had at any point in 2025?

14      A.   No, not in 2025.

15      Q.   Do you know what kind of housing Toro Castano had

16  at any point in 2025?

17      A.   Not in 2025, no.

18      Q.   Do you know what kind of housing David Martinez

19  had at any point in 2025?

20      A.   No, not in 2025.

21      Q.   Do you know what kind of housing Melody ███ had

22  at any point in 2025?

23      A.   No.

24      Q.   Do you know what kind of housing Todd Bryant had

25  at any point in 2025?

1          A.    No.

2          Q.    Do you know what kind of housing Cheyenne Brown

3    had at any point in 2025?

4          A.    No.

5          Q.    Do you know what kind of housing Shaina Arona --

6    excuse me -- Shaina Cooper Arona had at any point in 2025?

7          A.    No.

8          Q.    Do you know what kind of housing Sarah Stevenson

9    had at any point in 2025?

10         A.    No.

11         Q.    Do you know what kind of housing James Green had

12   at any point in 2025?

13         A.    No.

14         Q.    Are you offering any opinions about whether Sarah

15   Cronk is likely to experience homelessness again?

16              MS. KASHYAP:  Objection.  Form.

17              THE WITNESS:  Not except the opinion that is

18   offered in this expert report which is the likelihood of

19   these individuals in this sort of housing as is evidenced

20   from the City's own data and broader research.

21         Q.    (BY MS. MURPHY:) Are you offering an opinion about

22   whether any person in particular is likely to store their

23   property on the public right-of-way in the future?

24              MS. KASHYAP:  Objection.  Form.

25              THE WITNESS:  No.  The opinion is about the

1    likelihood of experiencing homelessness again.  And then,

2    you know, simply noting that in my observations and also the

3    City's own data captures instances of people who are in this

4    shelter or in this housing who are still experiencing camp

5    clearances.

6        Q.    (BY MS. MURPHY:) Not every person who's homeless

7    stores their property on public rights-of-way.  Right?

8        A.    Correct.

9        Q.    Are you offering an opinion about whether or not

10   any person in particular is likely to store their property

11   on a public right-of-way if they become homeless in the

12   future?

13              MS. KASHYAP:  Objection.  Form.

14              THE WITNESS:  If they become homeless in the

15   future and are then unsheltered or, rather, staying in the

16   street or the tent, you know, if they're back on the street

17   or in a tent, you know, they are living -- a door is on a

18   public right-of-way, I cannot say, no, not on a public

19   right-of-way.

20       Q.    (BY MS. MURPHY:) Are you offering an opinion in

21   your report on whether any particular individual is

22   reasonably likely to experience property destruction as a

23   result of storing their property in a public right-of-way in

24   the future?

25              MS. KASHYAP:  Objection.  Form.

1          THE WITNESS:  Well, the first opinion from the
2    survey results suggests there's a high likelihood of people
3    who are staying out on the street or in tents will
4    experience property destruction.  So if individuals become
5    homeless again and are on the street or in a tent, that
6    likelihood would be high.
7          Q.   (BY MS. MURPHY:) Are any of the opinions in your
8    report based on information related to Toro Castano in
9    particular?
10          A.   In this expert report, I do not draw on the
11    plaintiffs' information or case directly.
12          Q.   Is the answer the same for Sarah Cronk, Joshua
13    Donohoe, David Martinez, Melody ██████, Todd Bryant,
14    Cheyenne Brown, Shaina Cooper Arona, Sara Stevenson, and
15    James Green?
16          MS. KASHYAP:  Objection.  Form.
17          THE WITNESS:  In this expert report, I do not
18    reference any of those individuals, the plaintiffs which you
19    just mentioned.
20          Q.   (BY MS. MURPHY:) Do you agree that some people
21    unsheltered in San Francisco store their property with
22    friends?
23          MS. KASHYAP:  Objection.  Form.
24          THE WITNESS:  Store their property with friends?
25    Yes, both on the street and indoors.

1      Q.   (BY MS. MURPHY:) Do you agree that some
2  unsheltered people in San Francisco store their property
3  with family members?
4           MS. KASHYAP:  Objection.  Form.
5           THE WITNESS:  Yes.  I've met people in my research
6  who have belongings with family members.
7      Q.   (BY MS. MURPHY:) Do you agree that some
8  unsheltered people in San Francisco store property inside a
9  vehicle?
10          MS. KASHYAP:  Same objection.
11          THE WITNESS:  Yes.  People have their belongings
12  in their vehicles.
13     Q.   (BY MS. MURPHY:) Are you aware that San Francisco
14  partners with a local nonprofit to offer storage space to
15  people experiencing homelessness?
16     A.   I am aware.
17     Q.   And do you know the name of that nonprofit?
18     A.   I do not know the name of the nonprofit.
19     Q.   Did the fact that San Francisco partners with a
20  local nonprofit to offer storage space to persons
21  experiencing homelessness impact your opinions in this case?
22          MS. KASHYAP:  Objection.  Form.
23              Go ahead.
24          THE WITNESS:  No.
25     Q.   (BY MS. MURPHY:) I'd like to mark as Exhibit 368

1    the document with the Bates number CCSF-COH_713877.  And

2    take as much time as you need to look at it.

3              My first question will be:  Do you recognize

4    Exhibit 368?

5              (Exhibit 368 was marked for identification.)

6              Do you recognize Exhibit 368?

7         A.   No.  I have not seen this specific document

8    before.

9         Q.   And this appears to be the rules for a storage

10   place on Bryant Street, 860 Bryant Street in San Francisco?

11        A.   Yes.

12        Q.   And if you look at the first page of the report on

13   Exhibit 368, it says that this program can serve 352

14   homeless individuals annually.  Do you see that?

15        A.   Yes.

16        Q.   And under amenities, it says that each person is

17   allowed two bins that are 20-gallon plastic bins.

18              Do you see that?

19        A.   Yes.

20        Q.   And under program amenities, the bolded No. 1 says

21   participants can store their property for up to six months

22   with approved 30-day extensions after the first six months.

23              Do you see that?

24        A.   Yes.

25        Q.   There's also on the third column on the first page

1    of Exhibit 368 is an approved property list.  Do you see

2    that?

3         A.    Yes.

4         Q.    And under the approved property list, individuals

5    can store clothes, shoes, paperwork, folded tents, clean

6    bedding, luggage, and one each of laptop, cellphone, tablet,

7    as long as the items weigh 50 pounds or less.

8              Do you see that?

9         A.    Yes.

10        Q.    Are you aware whether or not this is the only

11   homeless property storage program in San Francisco?

12             MS. KASHYAP:  Objection.  Form.  Lacks foundation.

13             THE WITNESS:  This is the one I was familiar with.

14   I thought I heard that there might be another one as well.

15        Q.    (BY MS. MURPHY:) I'm going to mark as Exhibit 369

16   a document with the Bates number CCSF-COH_713875.

17             (Exhibit 369 was marked for identification.)

18             Take as much time as you need to look at it.

19             My first question is:  Do you recognize

20   Exhibit 369?

21        A.    I have not seen this before.

22        Q.    Does this appear to be the policies for a second

23   homeless property storage program, this one located at 74

24   6th Street in San Francisco?

25             MS. KASHYAP:  Objection.  Lacks foundation.

```
1               THE WITNESS:  Yes, I see this.
2        Q.   (BY MS. MURPHY:) And the program described in
3    Exhibit 369 can serve 424 homeless individuals annually?
4        A.   Yes, I see that.
5        Q.   And on the third column of the first page it has a
6    list of approved property.
7               Do you see that?
8        A.   Yes, I do.
9        Q.   That approved property includes clothes, shoes,
10   important paperwork, books limited to 3 to 5, folded tents,
11   clean bedding, and one each of a laptop, cellphone, or
12   tablet as long as the items weigh 50 pounds or less.
13              Do you see that?
14       A.   Yes, I do.
15       Q.   Did you consider either the storage program
16   described in Exhibit 368 or the storage program described in
17   Exhibit 369 in coming to your opinions in this case?
18              MS. KASHYAP:  Objection.  Form.  Lacks foundation.
19              THE WITNESS:  Not in the expert report.  And it
20   does not affect my opinion.
21       Q.   (BY MS. MURPHY:) Are you aware of how San
22   Francisco selects the locations it uses for homeless
23   encampment operations?
24              MS. KASHYAP:  Objection.  Form.
25              Go ahead.
```

1              THE WITNESS:  Not most recently.  In the past,

2     they -- I understood that process to a degree of being

3     driven by 311 complaints and visual DPW observations.

4          Q.    (BY MS. MURPHY:) So your most recent understanding

5     is that the location of HSOC resolutions is in part driven

6     by the number of 311 complaints the City receives at that

7     location; is that fair?

8          A.    That would be in line with the process as I

9     understood it earlier.

10         Q.    Do you know whether or not San Francisco publicly

11    posts that kind of 311 data?

12         A.    In terms of being able to see where the call's

13    being made in or those being dispatched out?

14         Q.    Dispatched out.

15         A.    Well, I imagine -- I believe so.  I know that with

16    311, it's very transparent.  You can see the reports as

17    well, and then you can see them as closed or resolved.

18         Q.    And when you're talking about the transparent 311

19    reports, those are calls coming in.  Right?  The complaints

20    about a certain location?

21         A.    Yes.

22         Q.    And so if a person was unsheltered in San

23    Francisco and they wanted to avoid a HSOC resolution, they

24    could avoid the highest frequency places on the 311 report;

25    is that fair?

1              MS. KASHYAP:  Objection.  Form.  Lacks foundation.
2    Calls for speculation.
3              THE WITNESS:  I mean, the numbers of calls and
4    reports are very high.  They cover large parts of the city.
5    I've not heard of individuals using that tool, and I can't
6    imagine how that would be operationalized, how an individual
7    would be able to use that successfully in a meaningful way.
8         Q.   Do you agree -- I didn't mean to cut you off.
9    Were you finished?
10        A.   Yeah, I'm finished.
11        Q.   Do you agree that a person could decrease the
12   likelihood of a larger number of complaints about their
13   encampment by keeping their items neat and orderly?
14             MS. KASHYAP:  Objection.  Form.  Incomplete
15   hypothetical.
16             THE WITNESS:  In -- as I -- you know, in my own
17   research which I published, I've noted the ways of which
18   individuals who are keeping their property clean and
19   orderly, how the DPW workers do not -- it can reduce.  It
20   can certainly not prevent an eventual resolution.  But, yes,
21   it matters in some cases in terms of the cleanings.
22        Q.   (BY MS. MURPHY:) Do you understand that someone
23   who stores their property with them while lodging on the
24   streets of San Francisco is in violation of the law?
25             MS. KASHYAP:  Objection.  Calls for a legal

```
 1   STATE OF ARIZONA  ) ss.
 2   COUNTY OF PIMA     )
 3             I, the undersigned, a Certified Shorthand
 4   Reporter of the State of California, do hereby certify:
 5             That the foregoing proceedings were taken before
 6   me via videoconferencing at the time and place herein set
 7   forth; that any witnesses in the foregoing proceedings,
 8   prior to testifying, were duly sworn; that a verbatim record
 9   of the proceedings was made by me using machine shorthand
10   which was thereafter transcribed under my direction; that
11   the foregoing transcript is a true record of the testimony
12   given.
13             I further certify I am neither financially
14   interested in the action nor a relative or employee of any
15   attorney or party to this action.
16             IN WITNESS WHEREOF, I have this date subscribed my
17   name.
18             Dated:  April 16, 2025.
19   Read and sign was:
20   __X__ Requested  ____ Waived  ____ Not Requested
21
22
23
24             JOHN FAHRENWALD CA CSR 14369
25             STATE OF CALIFORNIA
```