**EXHIBIT A**

**TO**

**DECLARATION OF MIGUEL A. GRADILLA IN SUPPORT OF
DEFENDANTS CITY AND COUNTY OF SAN FRANCISCO, ET AL.'S
MOTION TO EXCLUDE EXPERT TESTIMONY OF BENJAMIN KING,
PH.D. MPH**

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

# Expert Report of Ben King, PhD MPH

## I.        Introduction

1.        I was asked to provide my expert opinion on the policies and practices of the City and County of San Francisco related to homeless encampment removal operations, and the City's policies and practices related to seizing and discarding items, including the City's "Bag and Tag Policy" (Rev 003), documentation of those operations, and the training provided to the City's Department of Public Works ("DPW") employees. I was also asked to review other policy and procedure documents and deposition transcripts. I was also asked to observe several City encampment removal operations in person to assess how those operations reflected the City's policies and practices.

2.        Based on my review of the materials provided to me and my observations of encampment removal operations in February 2025, my opinions are: (a) the City's existing "Bag and Tag" policy and training material lack clear definitions and objective standards for the factors that are used to justify disposal of property, do not provide a standardized process for evaluating public health and safety risks in the field, vests untrained city workers with an excessively discretionary role, and fails to align with public health principles; (b) my in-person observations confirmed that these deficiencies in the "Bag and Tag" policy and training result in City workers making superficial and inappropriate assessments of whether property is an "immediate health and safety risk"; (c) the CMMS reports prepared by City workers do not contain sufficient details about the property being assessed for disposal and the reasons for disposal to conclude that the property was appropriately evaluated and did, in fact, present an immediate health or safety risk; (d) a revised "Bag and Tag" policy is necessary that incorporates clearly defined health and safety risk criteria, mandatory assessments by trained public health personnel, and improved training for City personnel.

3.        In rendering these opinions, I was given documents provided by counsel, described in Appendix A to this report. I also used my extensive background and expertise in the field of public health as the foundation for my opinions.

4.        My analyses and opinions contained in this report are based upon the information available to date. To the extent that additional information becomes available to me, I reserve the right to supplement or revise my opinions accordingly.

5.        The opinions that I express in this Report are true and are based upon methodologies commonly used in my profession. I am being compensated at the rate of $300.00 per hour. The compensation I receive for my time does not depend on my opinions or conclusions provided.

## II.        Education and Qualifications

6.        I earned a Doctorate in Epidemiology, Human Genetics, and Environmental Sciences in 2018, providing me with a strong foundation in the study of disease patterns, environmental exposures, and population health. My expertise spans clinical epidemiology,

environmental epidemiology, and biostatistics, with a particular focus on vulnerable populations, including individuals experiencing homelessness.

7.  Since 2020, I have served as a Clinical Assistant Professor in the Department of Health Systems and Population Health Sciences at the University of Houston Tilman J. Fertitta Family College of Medicine. In this role, I teach and mentor medical students in evidence-based medicine, public health, and population health strategies. Concurrently, I have worked as a statistician in the Humana Integrated Health Systems Sciences Institute at the University of Houston, applying advanced quantitative methods to analyze health outcomes and healthcare system performance.

8.  My background includes extensive experience in methods for enumeration and encampment outreach strategies. While working with the Continuum of Care (CoC) lead agency in Austin, Texas, I was involved in outreach and data collection efforts to assess the needs of individuals living in unsheltered environments. I now serve as a consultant on the Point-in-Time (PIT) count methodology and reporting for the Houston-area CoC, contributing to efforts to refine data collection practices and improve the accuracy of homelessness estimates.

9.  Before joining the University of Houston, I was an Assistant Professor at the University of Texas at Austin, where I taught Environmental Health coursework in the public health program. This experience strengthened my expertise in environmental exposures and their impacts on population health, particularly in marginalized communities.

10.  Additionally, I have expertise on toxicology and regulatory science. I hold Special Government Employee status with the U.S. Environmental Protection Agency (EPA). In this capacity, I contributed to the scientific review of the updated Toxicology Report on Hexavalent Chromium-6 (Cr(VI)), a known environmental contaminant with significant public health implications (<u>EPA Toxicology Report</u>).

11.  At the University of Houston Tilman J. Fertitta Family College of Medicine, I co-teach or lead the Evidence-Based Medicine classes in the pre-clerkship course *Physicians, Patients, and Populations (PPP)*. I also co-teach sections on *Introduction to Public Health, Climate Change, and the Built Environment* in the same course, reinforcing my focus on population-level health determinants and the structural factors that influence health disparities.

12.  Currently, I am working to publish a series of systematic reviews examining health-harming exposures related to the experience of homelessness. These reviews focus on critical issues such as environmental hazards and sleep disturbances, with the goal of informing policy and healthcare interventions for individuals experiencing homelessness.

13.  Attached as Appendix B is a copy of my current CV, which contains a list of my authored publications in the past ten years.

14.  I have not testified as an expert at trial or by deposition within the previous four years.

## III.    The Department of Public Works "Bag and Tag" Policy

15.    The "Bag and Tag" policy,[1] established by the San Francisco Department of Public Works (DPW), outlines the procedures for handling personal belongings of unhoused individuals, including during Healthy Streets Operation Center (HSOC) encampment resolution operations, Joint Force Operations, and DPW cleanings. The stated purpose of this policy is to provide a process for the collection, storage, and retrieval of personal property belonging to individuals experiencing homelessness while also addressing public health and safety concerns.[2]

16.    In theory, the "Bag and Tag" policy may ensure that belongings left unattended but not posing an immediate health or safety risk are collected, documented, and stored for retrieval by their owners. However, certain categories of items—such as those deemed to be an immediate health or safety risk, abandoned, or contraband—are discarded instead of stored. The policy attempts to distinguish between unattended property that must be stored and unattended property that can be disposed of due to "immediate health or safety risks."

17.    San Francisco Police Department (SFPD) policies also address treatment of property belonging to individuals experiencing homelessness in San Francisco. In particular, SFPD Department Notice 24-140, "Protocol for Processing Property Consistent with DPW's 'Bag & Tag' Policy" directs SFPD officers to request DPW to take custody of property belonging to individuals experiencing homelessness who are arrested and taken into custody and directs DPW to take custody of evidence of illegal lodging violations. In both cases, the policy provides that DPW will then treat property of individuals experiencing homelessness according to their Bag and Tag policy, including disposing of property seized by SFPD that DPW determines presents an immediate health or safety risk.

18.    Additional SFPD department notices, policy memoranda, and a DPW procedure manual reviewed for this report did not introduce any new or meaningfully differentiating information. It did not provide additional insight into the procedure for assessment of "immediate health or safety risks" or introduce standards to apply. Instead, these materials were observed to be consistent with, and typically directed back to or borrowed language from, the Bag and Tag Policy.

---

[1] *See* San Francisco Department of Public Works, *Bag and Tag Process*, https://sfpublicworks.org/services/bag-and-tag-process.

[2] The Bag and Tag Policy, including the provisions on immediate health or safety risks, does not appear to have been crafted in consultation with San Francisco's Department of Public Health (DPH) and DPH employees have no role in evaluating health or safety risks under the policy or training DPW workers who conduct such evaluations. *See* Allison Horky Deposition Transcript (Horky Tr.), pp. 111-13, 131-44.

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

## IV.    Analysis of the "Bag and Tag" Policy Deficiencies

19.    The "Bag and Tag" policy lacks clear definitions and objective standards, leading to widespread discretionary enforcement and misapplication by city staff, resulting in wrongful destruction of personal property.[3]

20.    No definition for "immediate health or safety risk": The "Bag and Tag" policy, as written, stipulates that unattended belongings should be stored unless they present an "immediate health or safety risk." Risk is typically conceived as a combination of the probability of a potential hazard and the severity of such an exposure.[4] However, the policy fails to define what standard should be applied to assess risk, instead offering the term "immediate" and a list of examples—including needles, scissors, knives, chemicals, and bedding soiled by "infectious materials"—without providing an objective or reasonable framework for assessing how likely and how severe exposure to these items and how severe the danger posed to public health or safety.

21.    The inclusion of the term "immediate" in "immediate health or safety risk" could be assumed to suggest that the standard only applies to situations with a very high probability of a given hazard causing harm.

22.    Further, the policy does not contain objective standards for determining whether something is a public health or safety risk. The phrase "health or safety risk" is used as a decisive criterion for whether property is stored or destroyed, yet the policy provides no standard for

---

[3] Testimony from DPW workers is consistent with the conclusion that the lack of clear definitions and objective standards in the policy results in disparate understandings of what constitutes an "immediate health or safety risk" and how to identify those risks. *See, e.g.*, Brittany Brandon Deposition Transcript (Brandon Tr.), pp. 130-135; Darryl Dilworth Deposition Transcript (Dilworth Tr.), pp. 45-58; Israel Graham Deposition Transcript (Graham Tr.), pp. 50-52, 70-72, 99-100; Corey Jackson Deposition Transcript (Jackson Tr.), pp. 43-44, 106-107, 112-124.

[4] The terms "hazard" and "hazardous" do not appear in the bag and tag policy section on items that will be discarded. Under the section on "procedures for collecting personal items," the policy states that "[i]f items are found to be hazardous or unfit for collection, they are to be discarded," but does not define "hazardous" or "unfit" or explain the relationship between "hazardous" items and "items that present an immediate health or safety risk." According to OSHA, a hazardous substance includes "[a]ny biologic agent and other disease causing agent which after release into the environment and upon exposure, ingestion, inhalation, or assimilation into any person, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavioral abnormalities, cancer, genetic mutation, physiological malfunctions (including malfunctions in reproduction) or physical deformations in such persons or their offspring." 29 CFR § 1910.120(a)(3). In line with this definition, throughout this report, the use of the term "hazard" or "health hazard" refers to anything reasonably anticipated to cause damage or harm to health, regardless of the level of risk assessed.

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

evaluating when an item—or a collection of items—poses such a risk. Although the policy provides examples of items that may be classified as hazardous, it does not explain why or under what conditions these items qualify as an immediate threat. For example, the policy categorizes "needles, scissors, knives" as "toxic sharps" but does not clarify what makes these items toxic or when their mere presence justifies property disposal.  A pair of scissors, for instance, does not inherently pose a health or safety risk unless it is being wielded in a dangerous manner. Similarly, a container of oil, bleach, chemicals or waste may not present an immediate threat unless spilled or improperly stored.

23.     By providing examples but omitting standards for hazard identification and risk assessment, the formal process for reviewing an environment and documenting hazardous circumstances in the context of probability and severity (defined as risk)[5], the policy creates a scenario in which city employees must rely on their own subjective judgment, leading to inconsistent application and potential misuse. Without clear guidelines, city workers can misclassify property as hazardous. For example, a single capped syringe, a sealed bottle of oil, or a container of cleaning chemicals might be categorized as an "immediate health and safety risk" without any assessment of whether the item is actually dangerous, could be safely stored, or left with the owner.  Without proper definitions, city workers may treat all instances of certain items as hazardous.

24.     The phrase "soiled by infectious materials" in the bag and tag policy is problematic due to its lack of clear definition and scientific basis in environmental health and safety standards. The term "soiled" is not a technical descriptor used in hazardous materials regulations, nor does it provide any objective threshold for determining when an item poses a genuine health risk. Additionally, "infectious materials" is an ambiguous term—while bodily fluids such as blood and feces can potentially carry pathogens, they are not inherently infectious unless contaminated with a specific transmissible agent. Even then, established environmental health protocols provide methods for safe decontamination rather than outright disposal. Without standardized criteria for assessing contamination, this vague language allows for broad and inconsistent interpretations.[6]

25.     One of the most glaring oversights in the policy is its treatment of needles and other items that may be perceived as health risks. While the policy states that needles and sharp

---

[5] *See* United States Department of Labor, Occupational Safety and Health Administration (OSHA), 29 CFR Part 1910.120: Hazardous waste operations and emergency response, https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.120.

[6]  *See* Patricia Guevara, *Understanding the Types of Biological Hazards*, Safety Culture, July 26, 2024, https://safetyculture.com/topics/workplace-hazards/types-of-biological-hazards/ ("While blood isn't considered a biological hazard, it can still bring potential risks if it's contaminated or its source is in any way infected."); United States Department of Labor, Occupational Safety and Health Administration (OSHA), Application of OSHA's HAZWOPER standard to homeless camp cleanup operations, Standard Interpretations, July 30, 2021, https://www.osha.gov/laws-regs/standardinterpretations/2021-07-30 ("However, in general, human feces would not meet the definition of hazardous substance because they are not reasonably anticipated to cause death or disease.").

objects may be discarded, it does not distinguish between used, contaminated needles and new, safely stored syringes. This omission is particularly problematic given that San Francisco operates needle disposal programs designed to safely collect and manage used syringes. The City's acknowledged,[7] existing infrastructure for proper disposal makes it unnecessary to discard all belongings simply because they contain a single needle. Rather than providing guidance on how to handle and dispose of sharps properly, the policy allows City workers to discard all associated belongings.

26.    The "Bag and Tag" Policy also contains no definition or threshold for "commingling." This is another vague term in the policy. The policy states that entire piles of belongings may be discarded if they are "co-mingled" with hazardous materials, but it does not explain what "co-mingled" means or specify what level of contamination warrants full disposal. This is a critical omission, as it permits city staff to discard all of an individual's property rather than distinguish or make any attempt to readily separate hazardous items from safe ones. For example, if a person's possessions include a single capped hypodermic needle, the entire collection—including clothing, bedding, and personal documents—could be discarded without any attempt to isolate and remove only the hazardous item.

27.    Disposal of an entire collection of property due to "co-mingled" hazardous materials is not actually the best practice for addressing identified hazards. Instead, a process of mitigation or remediation of health risks posed is recommended. Disposal of collections of property when it contains a health hazard has the potential to increase the probability of exposure. For example, bedding or clothing soiled with infectious substances is more likely to result in exposure to individuals if it is moved in bulk, such as taking steps for disposal by moving those materials within a tent. If sharps are not handled according to an appropriate "sharps" protocol and a safe storage container, then individuals handling that property are at increased risk of exposure.

28.    This blanket provision on "commingling" does not require city staff to separate contaminated from non-contaminated belongings, even in cases where such sorting would be both feasible and appropriate. If a resident's possessions include a single item under the policy (3). Items that will be discarded and not stored), the entire collection of personal belongings, including clothing, bedding, survival gear, and important documents, may be discarded without further evaluation. Based on the policy, such single items might include perishable food, clothing "soiled by infectious materials, such as human waste, body fluids, mold and mildew",[8] scissors, or a hypodermic needle, regardless of whether it is capped or safely contained. This indiscriminate approach disregards the practical reality that many personal items can be used, salvaged or decontaminated, and it effectively punishes individuals for possessing items that are, in many cases, necessary for their survival.

---

[7] *See, e.g.*, Khaled Shehadeh Deposition Transcript (Shehadeh Tr.), pp. 138-139; Jonathan Vaing Deposition Transcript (Vaing Tr.), p. 244; Horky Tr., pp. 145-153.

[8] *See* San Francisco Department of Public Works, *Bag and Tag Process*, https://sfpublicworks.org/services/bag-and-tag-process.

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

29.     The "Bag and Tag" policy also has no standardized process for assessing health and safety risks in the field. The policy does not provide a procedural framework for assessing risk, meaning that decisions about the fate of personal belongings are left to individual, untrained judgment rather than guided by established public health and safety standards.[9] The policy fails to incorporate a structured process for evaluating and mitigating health risks before deciding to discard an individual's belongings.

30.     The "Bag and Tag" policy's failure to incorporate recognized health and safety standards is especially concerning given federal Occupational Safety and Health Administration (OSHA) guidance on encampment cleanups. In a formal interpretation issued on July 30, 2021, OSHA affirmed that hazardous waste operations and emergency response (HAZWOPER) standards[10] apply to municipal encampment cleaning operations.[11] OSHA made clear that city workers conducting these cleanups must follow specific health and safety protocols to protect themselves and the individuals affected by these operations. The ruling emphasized that improper handling of potentially hazardous materials requires trained personnel and proper protective measures to ensure safe removal and mitigation. The San Francisco policies and practices, however, fail to align with this federal guidance by neither providing training for city staff nor requiring them to follow standardized procedures for identifying and mitigating risks. Instead of adopting evidence-based safety protocols, the policy allows for arbitrary decision-making, resulting in unnecessary property destruction and creating potential health risks for both workers and encampment residents.

31.     By neglecting to define health and safety risks, failing to implement field assessment standards, and providing insufficient documentation of health risks, the policy promotes a flawed approach that prioritizes property removal over proper risk evaluation and mitigation. A more effective policy would include clear criteria guided by regulatory standards like the HAZWOPER framework for assessing potential hazards, require staff to separate contaminated from non-contaminated items whenever possible, and mandate training on safe handling practices in accordance with OSHA and public health guidelines. Without these critical

---

[9] This is consistent with DPW worker testimony indicating that workers make decisions about whether items pose a health or safety risk not through a consistent evaluation framework or process, but based on their own subjective and individualized approaches. *See, e.g.*, Brandon Tr., pp. 129-135, 202-212, 242-245; Dilworth Tr., pp. 46-48, 57-58, 102, 120-133, 211-214, 224; Edgar Garcia Deposition Transcript (Garcia Tr.), pp. 109-110; Graham Tr., pp. 50-52, 68-69, 99-100, 113-123; Jackson Tr., pp. 43-44, 106-107, 112-126.

[10] *See* United States Department of Labor, Occupational Safety and Health Administration (OSHA), 29 CFR Part 1910.120: Hazardous waste operations and emergency response, https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.120.

[11] United States Department of Labor, Occupational Safety and Health Administration (OSHA), Application of OSHA's HAZWOPER standard to homeless camp cleanup operations, Standard Interpretations, July 30, 2021, https://www.osha.gov/laws-regs/standardinterpretations/2021-07-30.

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

revisions, the policy remains an instrument of indiscriminate property destruction rather than a legitimate public health measure.

## V.    Lack of Proper Training for City Staff

32.    The current policy governing the removal and storage of personal property from public spaces fails to require appropriate training for city staff, particularly in making determinations about what constitutes a health or safety risk. Employees of the Department of Public Works (DPW), who are primarily responsible for implementing the policy, are not equipped with a public health framework to assess health risks accurately. Without this expertise, they may misidentify items as hazardous, leading to the wrongful disposal of safe personal property, if any assessment is made at all.

33.    The reviewed training materials for DPW staff reinforce this issue.[12] The training on the "Bag and Tag" policy is framed primarily around procedural compliance rather than substantive compliance with a meaningful public health risk assessment. The materials lack detailed guidance on how to identify genuine health hazards. Workers are given a "cheat sheet" for deciding whether to bag, tag, or discard items, yet the criteria for what constitutes an "immediate health or safety risk" remain vague and prone to misinterpretation. For example, the training repeats the policy's examples such as "soiled with infectious materials" and "infested by rodents or insects" as discardable, but it does not provide guidance on how to identify hazards, assess the degree of risk to health, or whether an item can be sanitized rather than thrown away.

34.    Furthermore, testimony from DPW staff provides examples of departures from the assessment criteria provided in the training materials as well. One staff identified photographs of beer cans in a tent as an example of hazardous materials being "co-mingled" and sufficient cause for discarding an entire tent.[13]  This is in contradiction to the training materials which use this photograph as an example of items that are *not* co-mingled. The policy and training materials specifically permit discarding "personal belongings that are co-mingled or littered with needles, human waste, or other health risks",[14][15] while separately stating the perishable food would still be ineligible for storage. The beer cans could not be reasonably expected to reflect an "other health risk" in most contexts.

35.    Another major issue is the lack of training on the safe handling of hazardous materials in the specific context of encampments. The reviewed documents do not indicate that

---

[12] Dkt. 292-2, Exhibit B to Declaration of Jonathan Vaing, San Francisco Public Works Training on Bag and Tag Policy; *see also* Vaing Tr.

[13] Brandon Tr., pp. 241-245.

[14] San Francisco Department of Public Works, *Bag and Tag Process*, https://sfpublicworks.org/services/bag-and-tag-process.

[15] CCSF-COH_437437-CCSF-COH_437489, San Francisco Public Works Training on Bag and Tag Policy, Last Updated January 27, 2025.

DPW staff receive specific instruction on how to safely remove and dispose of the items on the policy's list of examples, such as bedding "soiled by infectious materials," sharps, or rodent-infested items. It does appear that staff receive some training on how to handle some hazards such as separation of chemicals and flammable items for alternate methods of disposal. [16] Without this context-specific training with specific instruction on the health risks laid out in the policy, workers may either expose themselves to unnecessary risk or default to discarding everything in an abundance of caution.

36.     As an example of the ambiguous training instruction, one set of minutes from a training session[17] describe an action from that session, "Teach your staff how to identify what is garbage and what is to be bag & tag". By omission, it demonstrates that training fails to address assessment of health and safety risks or distinction between abandoned and unattended property.

37.     Deposition testimony confirms that DPW workers do not receive specific training on identifying "items that pose an immediate health or safety risk" generally or on identifying the specific examples provided in the bag and tag policy, such as infectious materials, mold, mildew, or items infested by rats. This testimony also confirms that DPW workers receive no specific training on how to safely handle these items, once identified. The only training related to these items appears to be the general training on the bag and tag policy, and, potentially, a separate training on disposing of hazardous materials such as chemicals.[18] Based on my review of the training materials and depositions, the training provided to DPW workers does not adequately prepare DPW workers to identify, assess, or handle items that pose an immediate health or safety risk.

## VI.    Observed Failures of Department of Public Works (DPW) in Assessing Threats

38.     I attended three distinct cleanup operations which occurred on February 12th and 13th. The first two occurred in the morning and afternoon of the 12th, the third occurred on the morning of February 13th. The first was near the intersection of Evans and Selby (under 280). The second was around the intersection of Napolean and Jerrold. The third was in the Mission area around the 300 to 400 block of Jones. In each case there were representatives of the Department of Public Works (4-20 individuals), Emergency Management (1), Housing and Supportive Housing (3-5), and law enforcement (4-8), typically working in multiple teams. I introduced myself to the paramedic incident commander from the Department of Emergency Management in each instance. Before operations started, each site included at least 4 tents arranged in close proximity and anywhere between 5 and 12 residents.

39.     During the three encampment resolution operations I attended, it was evident that DPW staff were not conducting meaningful health and safety risk assessments before discarding

---

[16] *See, e.g.,* Garcia Tr., pp. 172-175; Graham Tr., pp. 116-18.

[17] Dkt. 292-4, Exhibit D to Declaration of Jonathan Vaing.

[18] *See* Shehadeh Tr., pp.135-141; Brandon Tr., pp. 238-240; Dilworth Tr., pp.42-45, 131-133; Graham Tr., pp. 70-72; Garcia Tr., p. 175; Jackson Tr., pp.119-120.

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

property. Instead, belongings were routinely removed and disposed of with little to no effort by DPW or any other city worker to determine whether they posed any actual and immediate health or safety risk. The process appeared to be driven by expediency towards the end of the shift rather than adherence to the City's own "Bag and Tag" policy. The lack of systematic evaluation resulted in the destruction of personal property, often including essential survival items, sentimental belongings, and even hazardous materials that required specialized disposal if taken.

40.    One of the most striking patterns I observed was the way entire tents were removed without examination. DPW workers would often open a tent door briefly, take a photograph, then collapse the structure entirely and discard it without further inspection. There was no clear, observable standard for determining whether a tent should be stored or destroyed. Unattended tents were routinely disposed of, regardless of whether they contained personal belongings that could have been salvaged. This observation was informed by applying the criteria from part 1a-1d of the bag and tag policy[19] where brief descriptions of unattended property are made, with examples. In my perspective there were multiple examples of unattended tents (i.e. "for example, an unattended tent that is filled with personal belongings or items that are being stored in an orderly manner (i.e., packed up, wrapped or covered)") treated in this way. This practice contradicts the policy's own stated intent, which is to store unattended property unless it presents an immediate health or safety risk. Without thoroughly assessing either the tent itself or the contents of a tent, workers had no way of determining whether it posed such a risk and how to properly/safely dispose or store it.

41.    Similarly, other large personal items were discarded without appropriate evaluation. I observed a full-sized mattress that was in good condition, not appearing to present any health or safety risk, left unattended during the sweep. When a nearby resident attempted to claim it, they were unable to carry it far enough to retain possession. Such an item is identified in training materials as a "bulky item" which should be bagged and tagged and stored for 14 days. When the resident walked away, DPW workers immediately disposed of the mattress without appropriate assessment despite it being apparently usable, without stains, dry, and the resident's attempt to claim it. At another site, a full couch was removed and destroyed, even though it had been placed beside an RV that had been moved as instructed by enforcement officers. While used, there was no visible sign that it was contaminated or hazardous. Chairs were similarly discarded *en masse* at each site, even though they were in usable condition. These examples illustrate the failure to distinguish between trash and personal property that poses no health or safety risk, a key failure of the city's approach to encampment resolutions.

42.    The "Bag and Tag" process was rarely observed in practice. Over the course of my first observations, the only items that were bagged and stored were a few tarps—one of which was placed in a large construction-site trash bag. A larger tarp, which had been used to construct a lodging over a canopy frame, was not retained at all. It was destroyed after SFPD officers called DPW workers over to take it, without any health and safety assessment despite it

---

[19] San Francisco Department of Public Works, *Bag and Tag Process*, https://sfpublicworks.org/services/bag-and-tag-process.

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

appearing to serve as a safe, functional cover to the resident's sleeping area. This indicates a departure from the stated policy: property should not be discarded based on its placement or association alone, but rather on whether it meets specific criteria for being a health or safety risk.[20] In practice, however, these decisions were being made arbitrarily if at all.

43.    Another observation was the disposal of personal belongings stored in containers. In one instance, a plastic storage container with a set of drawers was searched by DPW staff—belongings were pulled out, bags were opened and photographed, and then the entire container, including at least one drawer full of still-sealed canned food, was thrown away. This was observed in opposition to the city's policy stating that only perishable food items would be discarded (3b).

44.    In other instances, full, closed luggage cases were observed being destroyed without examination on multiple occasions. These actions were taken despite the fact that the City's policy (1d) "items that are being stored in an orderly manner (i.e., packed up…") should be treated as temporarily unattended. The policy also clearly states that (3d) "If staff has a reasonable doubt as to whether an item constitutes trash, it should be collected and stored." The policy also does not define when storage containers, including luggage, should be considered a health or safety risk. Had there been clear guidelines and a consistent process for reviewing and sorting items, many of these personal belongings could or should have been salvaged rather than summarily destroyed.

45.    The handling of hazardous materials was another area where DPW workers failed to follow proper procedures, creating new safety risks in the process. At one site, a flammable liquid—safely stored in an appropriate and labeled container—was thrown into a compactor vehicle, causing a large amount of liquid to spill onto the ground. Workers responded by using a chemical powder to absorb the spill, acknowledging that it was a hazard, yet they had not taken appropriate precautions in handling the material in the first place. In contrast, at another location, a propane tank was removed from a barbecue grill at the last moment and placed in a different truck, alongside batteries.  The grill itself, despite posing no risk, was then destroyed.   These incidents demonstrate that the city has the capacity to remove hazardous materials in a safe way—the San Francisco Environment Department provides guidance for disposing of household hazardous waste—but this capacity was inconsistently applied in practice.[21] Some hazardous materials were set aside for proper disposal, while others were handled haphazardly, potentially creating greater environmental and safety risks.[22]

---

[20] *See* Exhibit 1042 to the Deposition of Wayman Young, SFPD Department Notice 24-140.

[21] The existence of DPW procedures for separately disposing of hazardous items such as chemicals, batteries, paint, oil, and gas was also described by DPW workers in their deposition testimony. *See* Garcia Tr., pp. 172-175, Brandon Tr., p. 114, Graham Tr., pp. 116-118.

[22] Deposition testimony confirms that items deemed to pose an immediate health or safety risk are placed in the same truck that contains trash or debris, unless they are items like chemicals or

46.     I observed the destruction of a resident's personal memorial to his deceased brother. This collection of personal effects did not appear to pose any health or safety risk, yet no assessment was conducted before it was thrown away including signs, unlit candles, chairs, and dried flowers. Some, but not all, of the photographs from the memorial were set aside, but the majority of the items were discarded. In the process of dismantling the memorial, DPW workers broke glass items, creating an immediate safety hazard in an area where individuals were walking barefoot or in inadequate footwear. The resident stood nearby, crying as his brother's memorial was taken from him and destroyed. This was an example of not only procedural failure but also a complete disregard for the dignity of the people affected by these operations.

47.     The pattern across all three encampment resolutions was clear: DPW staff were not conducting substantive health and safety risk assessments before discarding property. Instead, removals were largely indiscriminate, with decisions based on expediency rather than objective criteria. Unattended property was frequently treated as abandoned and discarded, even when it was in good condition or clearly belonged to someone who was present. Items that should have been properly stored, tagged, or handled through hazardous materials procedures were instead destroyed or mismanaged. The end result was an operation that created harm, both through the unnecessary loss of personal belongings and through unsafe handling of hazardous materials. The lack of training, clear definitions, and procedural oversight in these operations is a direct consequence of the policy's failures.

48.     A review of several CMMS reports documenting encampment resolution operations proved to be consistent with my in-person observations. Review of these reports revealed a consistent lack of transparency and insufficient detail regarding the handling of personal property, risk assessments for health and safety, and adherence to established procedures such as the "Bag and Tag" policy. These reports fail to provide adequate information for a third party to determine which items from the "before" photos were stored versus discarded, nor do they consistently document a justification for disposal. While some reports mention specific items sent to storage or include photos of bagged belongings, there is no systematic approach to documenting the items identified as posing an immediate health or safety risk, what health risk assessment was conducted, the probability or "immediacy" of the assessed risk, which items were removed, on what basis, and whether residents were given a meaningful opportunity to reclaim their possessions.

49.     Foremost, the reports do not contain enough information about how determinations of health and safety risks were made. While terms like "biohazard" or "soiled" appear in some comments, the accompanying photos do not consistently depict clear evidence of hazardous materials. For example, in the March 7, 2024, report (CCSF-COH_359933.pdf), there are photos of feces in the general area, but these are not shown in direct contact with any belongings, raising questions about whether their presence was used as a blanket justification for discarding property. Similarly, in the March 11, 2024, report (CCSF-COH_267755.pdf), officials

_____

flammable gas, in which case they are separately transported to a designated area of the DPW Yard. *See e.g.*, Brandon Tr., p. 114.

state that a tent, bedding, and bags were disposed of due to infestation and being "ripped and soiled", yet the photos do not show visible evidence of these conditions and the report does not explain how these conclusions were reached. The absence of a standardized health risk assessment process or clear documentation of hazardous conditions calls into question the legitimacy of these claims and whether they meet public health standards.

50.     Additionally, these reports fail to meet documentation standards for a hazardous waste operations, such as those outlined for site characterization[23] under HAZWOPER procedures. There is no detailed site characterization process recorded, no structured health risk assessment, and no clear protocol for identifying, handling, or disposing of potentially hazardous materials that were identified through a preliminary or detailed evaluation. The August 23, 2024, report (CCSF-COH_363095-84.pdf) includes references to drug paraphernalia in a blue tent, but it is unclear whether the entire tent was disposed of or just the paraphernalia itself. Similarly, the November 7, 2023, report (CCSF-COH_357341.pdf) includes references to biohazards on the sidewalk but does not document what specific actions were taken in response, whether property was in contact or affected, or if any effort was made to protect either non-contaminated or non-co-mingled belongings.

51.     A distinct subgroup of CMMS reports reviewed includes cases where individuals are being arrested, and their property must be collected and stored. In these instances, the reports frequently document the storage location with photographs and occasionally include explicit comments stating that the property was "not soiled." This contrasts with standard encampment resolution operation reports, where such affirmations are commonly absent, and the decision-making process around property storage or disposal remains opaque. This pattern suggests that in other encampment resolution reports, where no such final storage photos exist, the property photographed on-site was more likely discarded rather than stored—raising concerns about inconsistent adherence to property protection policies and potential wrongful destruction of belongings. However, as previously mentioned, there is not enough information in those reports to determine the outcome of most property photographed.

52.     Further, CMMS reports regularly use the terms "biohazard" and "soiled" to justify discarding items. But "biohazard" is not used in the Bag and Tag policy at all and "soiled" alone is not in the policy (only items soiled *with infectious materials*). This inconsistent use of vague and undefined language that does not even appear in the policy further suggests that workers are discarding items based not on any standardized process, or even the terms of the Bag and Tag policy itself, but rather their subjective belief that an item should be discarded. The use of terms that do not appear in the policy also makes it difficult to determine, based on review of the CMMS reports, whether items are being discarded in compliance with the policy and based on which provision of the policy.

53.     In sum, the reviewed CMMS reports offer no consistent documentation of health risk assessments, and do not meet basic hazardous waste operation reporting standards.

---

[23] *See* 29 CFR § 1910.120(c).

54.     Deposition testimony describing how DPW workers evaluate items, determine whether they are to be stored under the policy, and document this process in the CMMS reports is consistent with the conclusions I reached based on my personal observations and review of CMMS reports. This testimony suggests that DPW workers do not apply a consistent framework for evaluating health or safety risks, instead applying their own judgment about what constitutes hazardous materials that is at times untethered from policy, common public health terminology, definitions or best practices.[24]

## VII.    The City Does Not Use Proper Measures to Handle Supposedly Hazardous Material

55.     The way city staff actually handle encampment resolutions contradicts the claim that certain items pose an immediate health or safety threat. If these items were truly hazardous, one would expect rigorous safety measures to be in place, including the use of proper protective equipment and thorough sanitation protocols. However, observations from multiple encampment resolutions indicate that city workers do not consistently follow best practices for handling dangerous materials.

56.     Despite the clear regulatory requirements under HAZWOPER[25] for site characterization, hazard identification, and monitoring, there is no apparent evidence that these procedures are consistently conducted at encampment resolution sites. The absence of systematic hazard assessments and employee health protections raises significant concerns about compliance with federal safety standards, particularly regarding the identification of inhalation or skin absorption hazards, the use of appropriate personal protective equipment (matched to the hazards identified during evaluation), and the ongoing evaluation of site conditions that could pose immediate dangers to workers and displaced individuals.

57.     One of the clearest indications that these operations are not conducted with real concern for health and safety is the inconsistent and ineffective use of personal protective equipment (PPE) by city staff. While City workers are supposedly handling hazardous materials, their protective gear is often inadequate or improperly worn. Gloves are universal but are made of partial fabric rather than impermeable materials that would protect against hazardous substances. Hazmat suits, when worn, are frequently tucked into boots, rendering them ineffective against chemical or biological exposure. Eyewear, which should be standard when handling biohazards, was observed in only one case before the third encampment site. Masks, when used, were typically loose-knit fabric balaclavas that provided no real protective effect against airborne contaminants. The only individual who wore a full protective mask was the worker spraying water on chemically contaminated surfaces. If the items being discarded truly

---

[24] *See, e.g.*, Brandon Tr., pp. 129-135, 202-212, 242-245; Dilworth Tr., pp. 46-48,57-58, 102, 120-133, 211-214, 224; Garcia Tr., pp. 109-110; Graham Tr., pp. 50-52, 68-69, 99-100, 113-123; Jackson Tr., pp. 43-44, 106-107, 112-126.

[25] *See* 29 CFR § 1910.120(c).

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

posed an immediate risk to health and safety, the city would require staff to consistently follow proper PPE protocols, yet this is not happening.[26] The inconsistent and often careless use of protective equipment undermines the claim that public health hazards are being meaningfully addressed.

58.     Cleaning practices observed at these encampment sweeps further demonstrate the lack of genuine public health concern. Instead of thorough sanitation, the primary cleaning agent used was a spray deodorant containing glycol, alcohols, ammonium, and other chemicals. The apparent intention was to address smells rather than eliminate health hazards. Notably, the chemical spray did not contain sodium hypochlorite (bleach), a standard disinfectant for biohazard cleanup. This is consistent with deposition testimony indicating that the household cleaner Pinesol, not bleach, was used to clean.[27] If human waste, bodily fluids, or other biohazards were present, proper disinfection protocols would require the use of more effective cleaning agents, as well as careful handling procedures. Instead, city staff often sprayed deodorant indiscriminately over areas where belongings had been removed, without taking further steps to sanitize the space. This superficial approach is inconsistent with legitimate biohazard mitigation.

## VIII.    Background on Public Health Impacts of Clearing of Homeless Encampments

59.     Assessing health and safety risks during encampment operations, including DPW's decisions about whether items should be discarded because they pose an immediate health or safety risk, should be contextualized and understood within a broader understanding of the public health implications of encampment clearings. Aside from the "Bag and Tag" policy's reference to medication, the material I have reviewed thus far and my observations do not generally indicate these considerations are taken into account.

60.     Multiple studies, including those specific to San Francisco and California, consistently indicate that encampment clearings result in significant harm to encampment residents. The peer-reviewed literature indicates that even-temporary displacement and property confiscation involves significant loss of personal belongings, including essential documents, identification, valuable possessions (whether monetary or emotional value), and items necessary or supportive of daily survival including medical items.  The additional burden of regaining access to property that has been stored is significant, given the widely acknowledged barriers to transportation access for people experiencing homelessness. The result of confiscation is the temporary disruption of access to the materials and resulting effects similar to those described here.

61.     Property loss and associated displacement resulting from encampment resolution procedures likely exacerbate health risks for residents, increasing their vulnerability to

---

[26] This is consistent with DPW testimony about PPE requirements. *See, e.g.,* Brandon Tr., pp. 237-239.

[27] *See* Garcia Tr., p. 172.

illness, injury, and environmental hazards. A significant portion of encampment residents
experience these displacements frequently, with an estimated 36% of those in homelessness in
California reporting at least one such incident in a six-month period according to a recent
statewide survey.[28] Of course, those living unsheltered were disproportionately affected. The
consequences extend beyond the immediate loss of a temporary shelter. Many individuals lose
essential belongings such as medications, cell phones, and important documents like birth
certificates and IDs, which are necessary for accessing housing and services. The survey also
reported on residents' fear of losing their pets during these displacements. The cumulative effect
of these disruptions exacerbates instability, making it even more difficult for individuals to
secure the resources and support needed to exit homelessness.[29]

      62.     The forced displacement of encampment residents disrupts access to
essential services, including healthcare, mental health support, and social outreach programs—
resources that are already scarce and underfunded. Interviews with healthcare providers in San
Francisco suggest that two of the most significant ways displacement negatively impacts health
are through geographic displacement and loss to follow-up. When individuals are forced to move
away from familiar service locations, they often lose contact with providers, interrupting medical
treatment, mental health care, and case management efforts that are critical for their well-being.[30]

      63.     The stress associated with property destruction and displacement
contributes to psychological distress, increased social isolation, and sleep disruptions. Interviews
with participants in encampments and service providers indicate that forced relocation not only
results in the confiscation or destruction of valuable personal belongings but also fragments
social connections within encampments.[31] The Colorado survey found a direct correlation
between increased police contact and worsening sleep, mental health symptoms, and overall

---

[28] Kushel, M., Moore, T., et al. (2023). Toward a New Understanding: The California Statewide
Study of People Experiencing Homelessness. UCSF Benioff Homelessness and Housing
Initiative. https://homelessness.ucsf.edu/sites/default/files/2023-06/CASPEH_Report_62023.pdf.

[29] This is consistent with testimony from an employee of San Francisco's own Public Health
Department, who explained that displacement and property loss associated with San Francisco's
encampment resolutions can harm unhoused individuals' health, including because medication is
lost or destroyed; make it harder for unhoused individuals to stay connected to care teams; and
erode trust between unhoused individuals and city medical and social workers. *See* Horky Tr., pp.
128-133, 140, 162-170.

[30] Qi D, Abri K, Mukherjee MR, Rosewohl-Mack A, Khoeur L, Barnard L, Knight KR. Health
Impact of Street Sweeps from the Perspective of Healthcare Providers. J Gen Intern Med. 2022.
37(14):3707–3714. DOI: 10.1007/s11606-022-07471.

[31] *Id.*

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

well-being.[32] Additionally, the study from Santa Clara County found that displacement heightened anger, stress, and distrust, making individuals more reluctant to seek or accept formal assistance.[33] These contacts also build mistrust and may lead to less engagement on services, to the extent they exist.

64.      Despite frequent claims that encampments pose environmental or public health hazards to surrounding communities, there is minimal evidence supporting such assertions. Studies examining the impact of encampments on environmental contamination have found no consistent evidence of increased risks beyond the immediate conditions of encampments themselves. One study analyzing water quality upstream and downstream of encampments found similar levels of contaminants in both locations, apart from a minor increase in E. coli bacteria downstream.[34] However, the lack of comprehensive research on this topic underscores the unverified nature of claims that encampments inherently pose significant health risks to the broader community.

65.      Public health concerns often cited to justify encampment clearings include the presence of litter, discarded food, chemicals, vermin, human waste, and used hypodermic needles. While these issues reflect real sanitation challenges, they do not constitute justification for eviction or property destruction without alternative solutions. Moreover, certain aspects of these claims are frequently mischaracterized.

## IX.    Recommendations

66.      Given the deficiencies in the "Bag and Tag" policy and the improper practices observed, a revised policy must be developed that incorporates expert guidance on public health and hazards. This policy must clearly delineate when and how personal belongings may be handled. Specifically, this policy should prohibit discretionary destruction of property, mandate structured assessment protocols, and require meaningful engagement with affected individuals before removals take place. Public health experts should play a critical role in shaping these

---

[32] Westbrook M, Robinson T. Unhealthy by design: health & safety consequences of the criminalization of homelessness. Journal of Social Distress and Homelessness. 2021; 30(2):107-115. doi: 10.1080/10530789.2020.1763573.

[33] Chang JS, Riley PB, Aguirre RJ, Lin K, Corwin M, Nelson N, Rodriguez M. Harms of encampment abatements on the health of unhoused people. Qualitative Research in Health. 2022. 2: 100064. doi: 10.1016/j.ssmqr.2022.100064.

[34] Verbyla ME, Calderon JS, Flanigan S, Garcia M, Gerberg R, Kinoshita AM, Mladenov N, Pinongcos F, Welsh M. An Assessment of Ambient Water Quality and Challenges with Access to Water and Sanitation Services for Individuals Experiencing Homelessness in Riverine Encampments. Environmental Engineering Science. 2021 May; 38(5): 389-401. doi: 10.1089/ees.2020.0319.

revisions to ensure that encampment resolutions do not contribute to worsened health outcomes by depriving individuals of necessary medications, identification documents, and survival gear.

67.     As discussed above, additional protections are necessary, particularly in light of the consistent and reliable evidence, including San Francisco and California specific studies finding increased harms to homeless residents through the practice of encampment cleaning.[35]

68.     A revised policy must include:

- **Clear, standardized definitions of health and safety risks.** Without objective criteria, city workers have too much latitude to discard belongings based on arbitrary or subjective determinations. The revised policy should specify what constitutes a true health hazard, ensuring that minor contamination does not justify wholesale destruction of property.

- **A requirement for trained public health personnel to assess alleged risks to health and safety.** City workers are not qualified to make health and safety determinations. A revised policy should mandate that qualified public health personnel—not law enforcement, social services, or sanitation workers—assess whether items pose genuine health hazards before any belongings are removed.

- **A prohibition on discarding entire collections of belongings based on minor contamination.** The current practice of discarding all belongings in an area due to "comingling" with the presence of a single contaminated item is excessive and punitive. The policy must explicitly prohibit the destruction of entire property collections unless there is clear and documented evidence that all items pose a substantial health risk.

- **Practices and Standards for remediation of health hazards when identified.** In order to avoid discarding entire collections of property (see above), hazards can and should be mitigated using best practices for containing and remediating health hazards. During review of materials, multiple sources discussed the capacity for and methods available to the teams involved in these processes, such as storage of sharps and treatment of biological wastes.

- **Improved training for city staff on health and safety assessments.** Staff should receive specialized training in environmental health and hazardous materials handling. This training should be developed in collaboration with public health professionals and should focus on accurately identifying risks while preserving as much personal property as possible.

69.     Further, a more effective approach would involve public health inspectors taking the lead in determining which belongings pose legitimate health risks. Public health

---

[35] Qi D, et al., Health Impact of Street Sweeps from the Perspective of Healthcare Providers; Westbrook M, et al., Unhealthy by design: health & safety consequences of the criminalization of homelessness.

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

professionals have the necessary training to assess environmental hazards, differentiate between actual threats to public safety and mere signs of poverty, and apply evidence-based criteria to their decisions. San Francisco appears to have public health officials and teams that are equipped to conduct such evaluations, but they do not appear to have any role in addressing encampments.[36]

## X.    Conclusion

70.    This report reveals critical deficiencies in the City's encampment resolution operations, particularly in the documentation and decision-making processes surrounding property confiscation and disposal. Based on my observations, the "Bag and Tag" policy is inconsistently applied, with reports failing to provide sufficient detail to determine what was stored versus discarded. Furthermore, the classification of property as posing an "immediate health and safety risk" is vague and poorly documented, with little evidence that standard protocols for hazard identification and risk assessment are followed. The broader public health impacts of property destruction and displacement—including disruption of healthcare access, loss of essential personal belongings, increased vulnerability to violence, and heightened psychosocial distress—are consistently, and fairly well documented. However, there is little credible evidence that encampments themselves pose substantial health hazard outside of those posed to the residents themselves, while the harms of forced displacement are more clearly identified in the literature. The findings underscore the urgent need for a shift toward evidence-based public health interventions, including clear and enforceable standards for property handling, improved definitions and documentation of "health and safety risks," and strengthened oversight of the "Bag and Tag" policy.

*Benjamin T King*

_____

Ben King, PhD MPH
March 10, 2025

---

[36] *See* Horky Tr., pp. 111-14; David Nakanishi Deposition Transcript, p. 53.

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

# Appendix A

## Appendix A - Material Considered

To the extent not listed here, I have considered all other documents cited within the expert report, exhibits, and appendices.

### Case Documents

Dkt. 193-4, Exhibit A to Declaration of Jonathan Vaing, Bag and Tag Policy

Dkt. 231, Order on Motion to Enforce the Preliminary Injunction RE: Fourth Amendment Claim

Dkt. 239, Order on Joint Letter re: Training

Dkt. 241, Order re: Joint Bag and Tag Policy Training in Response to Order on Motion to Enforce the Preliminary Injunction re: Fourth Amendment Claim (ECF No. 231)

Dkt. 289, Plaintiffs' Third Amended Complaint for Declaratory and Injunctive Relief against All Defendants

Dkt. 292, Declaration of Jonathan Vaing Pursuant to Order re: Joint Bag and Tag Training in Response to Order on Motion to Enforce the Preliminary Injunction re: Fourth Amendment Claim (ECF No. 241)

Dkt. 292-1, Exhibit A to Declaration of Jonathan Vaing, Unattended and Abandoned Property Bag & Tag Process

Dkt. 292-2, Exhibit B to Declaration of Jonathan Vaing, San Francisco Public Works Training on Bag and Tag Policy

Dkt. 292-3, Exhibit C to Declaration of Jonathan Vaing

Dkt. 292-4, Exhibit D to Declaration of Jonathan Vaing

Dkt. 292-5, Exhibit E to Declaration of Jonathan Vaing

Dkt. 292-6, Exhibit F to Declaration of Jonathan Vaing

### Discovery Documents

CCSF-COH_064559-CCSF-COH_064565, Emails and Attachments Between DPW officials

CCSF-COH_227866-CCSF-COH_227870, San Francisco Recreation & Parks Department, Policy Memorandum — Property Found on Park Property – Revised, dated February 6, 2020

CCSF-COH_263651-CCSF-COH_263656, San Francisco Recreation & Parks Department, Policy Memorandum — Property Found on Park Property – Revised, dated April 4, 2024

CCSF-COH_267257-CCSF-COH_366389, Defendants' CMMS/Service Order Reports, including those that contained one or more of the following terms:

- Soil!
- Hazard!
- Contaminat!
- food
- Needle!
- Wet
- Feces
- Urine
- Drug
- infested

CCSF-COH_437437-CCSF-COH_437489, San Francisco Public Works Training on Bag and Tag Policy, Last Updated January 27, 2025

CCSF-COH_573449, Video containing CMMS training

CCSF-COH_573450-CCSF-COH 573453, Document titled "CMMS Digital Work: DPW-BSES CREW STEPS ENCAMPMENT"

IOFFEE_00000001-IOFFEE_00000365, Notes Prepared by Plaintiffs' Investigator Karina Ioffee

VERNER-CRIST_00000001-VERNER-CRIST_00003261, Notes Prepared by Plaintiff's Investigator Dylan Verner-Crist

**Deposition Transcripts and Exhibits**

Transcript and Exhibits, Deposition of Brittany Brandon, dated January 28, 2025

Transcript and Exhibits, Deposition of Darryl Dilworth, dated January 28, 2025

Transcript and Exhibits, Deposition of Edgar Garcia dated February 6, 2025

Transcript and Exhibits, Deposition of Israel Graham, dated January 30, 2025

Transcript and Exhibits, Deposition of Allison Horky, dated February 24, 2025

Transcript and Exhibits, Deposition of Corey Jackson, dated February 24, 2025

Transcript and Exhibits, Deposition of David Nakanishi, dated February 7, 2025

Transcript and Exhibits, Deposition of Khaled Shahadeh, dated January 13, 2025

Transcript and Exhibits, Deposition of Jonathan Vaing, dated January 15, 2025

Transcript and Exhibits, Deposition of Wayman Young, dated January 23, 2025

**<u>Emails</u>**

Email from Sophia Garcia, [Sophia.Garcia@sfcityatty.org](mailto:Sophia.Garcia@sfcityatty.org), dated February 9, 2025, subject: Coalition on Homelessness et al. v. CCSF et al – 72-hour notice

Email from Sophia Garcia, [Sophia.Garcia@sfcityatty.org](mailto:Sophia.Garcia@sfcityatty.org), dated February 10, 2025, subject: Coalition on Homelessness et al. v. CCSF et al – 72-hour notice

# Appendix B

**Curriculum Vitae**

**Ben King, PhD MPH**

Clinical Assistant Professor, Tilman J Fertitta Family College of Medicine
Department of Health Systems and Population Health Sciences
Department of Behavioral and Social Sciences
Statistician, UH-Humana Integrated Health Systems Sciences Institute
The University of Houston

**Office**
University of Houston, Tilman J Fertitta Family College of Medicine
Medical Building 1 (MED1)
5055 Medical Circle, Room #1315
Houston, TX 77304
Cell: 713-398-5528
Email: KingB@central.uh.edu
Personal Email: Bentayorking@gmail.com
LinkedIn: https://www.linkedin.com/in/methodsandresults/

**EDUCATION**

**PhD** in Epidemiology, 2018, The University of Texas School of Public Health, Austin Regional Campus;
Minor in Biostatistics, Breadth in Measurement.
Dissertation Topic: *Assessment and findings of the Vulnerability Index (VI-SPDAT) survey of individuals experiencing homelessness in Travis County, TX.*

**Masters of Public Health**, Community Health Management, 2011, The University of Texas School of Public Health.

**Bachelor of Arts**, Major in Biology & Psychology; Premed Studies, 2003, Bard College.

**CURRENT POSITIONS**

**Clinical Assistant Professor**, Department of Health Systems and Population Health Sciences, College of Medicine, University of Houston, 2020-present

Secondary Appointment: Department of Behavioral and Social Sciences, College of Medicine, University of Houston, 2021-present

Statistician: UH Humana Integrated Health Systems Sciences Institute, 2020-present

Affiliated Faculty: HEALTH Center for Addictions Research and Cancer Prevention, 2023-present

**President**, Methods and Results LLC, 2013-present

**FORMER POSITIONS**

**Special Government Employee**, United States Environmental Protection Agency, Scientific Advisory Board, 2022-2023
**Clinical Assistant Professor**, Public Health Program, School of Human Ecology, College of Natural Sciences, The University of Texas at Austin, 2020-2020
**Research Scientist**, Department of Neurology, UT Dell Medical School, The University of Texas at Austin, 2017-2020
**Instructor**, Graduate School of Integrative Medicine, Academy of Oriental Medicine of Austin,2019-2021
**Adjunct Professor**, Graduate School of Social Work, University of Houston, 2019-2020
**Research Scientist**; Seton-UT Southwestern Clinical Research Institute, 2013-2017
**Research Coordinator & Project Manager**; Hospital Physicians in Clinical Research, 2009-2013
**Research Coordinator**; University Medical Cater at Brackenridge, 2008-2009
**Infection Control Practitioner**; Infection Prevention and Management Associates, 2008-2008
**Graduate Research Assistant**; UT MD Anderson Cancer Center, Gastrointestinal Medical Oncology, 2007-2008
**Graduate Research Assistant**; UT School of Public Health, Center for Biosecurity and Public Health Preparedness, 2007-2007
**Graduate Research Assistant**; UT School of Public Health, Center for Health Promotion and Prevention Research, 2005-2007
**Psychiatric Assistant**; Queens Medical Center, Family Treatment Center, 2003-2005
**Clerk III & Psychiatric Tech**; Seton Shoal Creek Mental Hospital, 2001-2002

**TEACHING**

**Clinical Assistant Professor;** University of Houston, College of Medicine, Evidence Based Medicine: 2020-present
**Community Preceptor;** UT Houston, School of Public Health, Practicum: 2009-current (26 MPH students)
**Clinical Assistant Professor;** The University of Texas at Austin, Public Health Program, PBH 338 Environmental Health: Spring 2020
**Instructor;** Austin Oriental Medicine Academy, INQ 5011 Paradigms of Inquiry; INQ 5012 Quantitative and Qualitative Assessment, INQ 5013 Methods of Inquiry and Research Design: 2019-2021
**Adjunct Professor;** University of Houston, Graduate College of Social Work, SOCW 7305 Evaluation of SW Practice: 2019-2020
**Guest Lecturer;** UT Austin, Department of Psychology, Understanding Homelessness: 2019, 2020
**Guest Lecturer;** MassChallenge TX: Demonstrating Your Impact for the Empirical Audience, 2018-2020
**Instructor;** University of Texas at Austin, Dell Medical School, Emergency Medicine GME: 2018-2019
**Co-Instructor;** UT Medical Branch Galveston, School of Medicine, Behavioral and Health Sciences Electives: Emergency Medicine Research & Neurology Research: 2009-2015 (14 MD students)
**Mentor;** Texas State University, Clinical Health Psychology, Community Internship: 2010 (1 MS student)
**Journal Club Instructor;** University of Texas Southwestern, Emergency Medicine GME: 2012-2014
**National Disaster Life Support Instructor**; certification as of 5/07

**PROFESSIONAL COMMITTEE MEMBERSHIPS AND ADVISORY BOARDS**

| | |
|---|---|
| Chair, APHA Medical Care section | 2024-2026 |
| Strategic Outcomes Subcommittee, American Heart Assoc. | 2022-2025 |
| University of Houston, Health Promoting University Task Force | 2021-current |
| Review Editor, Frontiers in Neurology – Neuroepidemiology | 2021-current |

| | |
|---|---|
| Early Career Cmt, American Heart Association, EPI Council | 2020-2024 |
| Science Board, American Public Health Assoc. | 2019-2025 |
| Review Editor, Frontiers in PH, Life-Course Epidemiology | 2019-current |
| Board Treasurer, Caucus on Homelessness | 2018-current |
| Mentor, MassChallenge Texas | 2018-current |
| Board Member, Texas Homeless Network | 2017-current |
|     Board Vice-Chair, Texas Homeless Network | 2019-2021 |
|     Board Chair, Texas Homeless Network | 2021-2023 |
| Scientific Advisory Board, Austin Speech Labs | 2017-2020 |
| Editor, Neurology & Neurotherapy Open Access Journal | 2017-current |
| Section Councilor, APHA Medical Care Section | 2016-2024 |
| Policy Chair, APHA Medical Care Section | 2016-2023 |
| Chair, Caucus Collaborative, American Public Health Assoc. | 2015-2017 |
| Chair, APHA Caucus on Homelessness | 2009-2016 |
| Membership Board, | 2014-2016 |
| Chair, Data Work Group, | 2011-2015 |
|     Ending Community Homelessness Coalition (ECHO) | |
| Research Committee, | 2010-current |
|     National Health Care for the Homeless Council | |

**PROFESSIONAL ORGANIZATION MEMBERSHIPS**

| | |
|---|---|
| American Heart Association | 2014-current |
| American Public Health Association | 2008-current |
| Ending Community Homelessness Coalition | 2009-current |
| Texas Homeless Network | 2017-current |

**MANUSCRIPT REVIEWER (past and present)**

Administration and Policy in Mental Health and Mental Health Services Research
Children & Youth Services Review
Current Hypertension Reviews
Current Psychiatry Research and Reviews
Journal of Social Distress and Homelessness
Journal of Stroke and Cerebrovascular Disease
Frontiers in Neurology: Neuroepidemiology
Frontiers in Public Health: Life-Course Epidemiology
Medical Care
Neurology & Neurotherapy Open Access Journal
New England Journal of Medicine
Psychiatric Services
Texas Public Health Journal

**GUEST EDITOR FOR JOURNAL SPECIAL ISSUE**

Medical Care - 2021

**CONFERENCE ABSTRACT REVIEWER (past and present)**

American Public Health Association
American Heart Association EPI | Lifestyle Conference
American Heart Association International Stroke Conference
National Health Care for the Homeless Council
Texas Homeless Network
Central Texas Clinical Research Forum

**AWARDS & HONORS**

| | |
|---|---|
| HOMES Clinic - Faculty Advisor for Research | 2024 |
| University of Houston HEALTH Research Institute - Affiliate Faculty | 2023 |
| American Heart Association - Sandra A Daugherty Award Finalist | 2021 |
| University of Houston New Faculty Program Award | 2021 |
| National Violent Death Reporting System (NVDRS) New Investigator Research Award | 2020 |
| American Heart Association - HEADS-UP Early Stage Investigator Award | 2020 |
| UT Staff Council Professional Development Grant | 2019 |
| American Heart Association- Award for Excellence in Research Addressing Cardiovascular Health Equity | 2019 |
| APHA Injury Control President's Road Safety Scholar | 2018 |
| APHA Student Assembly Scholarship | 2018 |
| Doctoral Dissertation Award, UT School of Public Health | 2018 |
| American Heart Association- Stroke Rehabilitation Award | 2018 |
| Finalist, Stallones Lecture Series Student Competition | 2017 |
| APHA Student Assembly Scholarship | 2017 |
| APHA Caucus on Homelessness Student Award | 2017 |
| Finalist, Barbara Starfield Medical Care Scholar | 2017 |
| SAEM Academy of Geriatric Emergency Medicine Award | 2017 |
| Hatton W. Sumners Scholarship, New Politics Forum | 2017 |
| Hatton W. Sumners Scholarship | 2015 |

**PEER-REVIEWED PUBLICATIONS**

1. Nguyen C, **King B,** Diep J, Gilbert L, & Nguyen BM. (2025). Perspectives of Vietnamese Americans regarding COVID-19 vaccine acceptance, trusted sources of information, and pandemic-related challenges. Journal of Racial and Ethnic Health Disparities. Epub ahead of print.

2. Warach SJ, Davis LA, Lawrence P, Gajewski B, Wick J, Shi F, Shang TT, Olson DM, Prasad S, Birbaum L, Richardson JM, Savitz S, Goldberg MP, Cruz-Flores S, Alba I, Anderson J, Kimmel B, Rao CPV, **King B,** Dula AN, Milling TJ. (2025). Optimal Delay Time to Initiate Anticoagulation After Ischemic Stroke in Atrial Fibrillation. *JAMA Neurology*. Accepted.

3. Tuli A, Escamilla C, **King B.** (2025). Addressing the Lack of Nutritional Interventions Tailored to the Experiences of the Homeless: A Perspective. Journal of Public Health Management and Practice. Epub ahead of print.

4. **King B,** Khorsandi S, Swamy S. (2025). Early Mortality and Medical Complexity Among Medicolegal Cardiovascular Disease Deaths in Homelessness. *The Gerontologist*. Epub ahead of print.

5. Le A, Siddiqi S, Nguyen C, **King B,** Yeh PG, Diep J, Gilbert L, & Nguyen BM. (2025). Examining Health Insurance and Non-Medical Challenges Among Vietnamese Americans in Texas During the COVID-19 Pandemic. *International Journal of Environmental Research and Public Health, 22*(2), 189.

6. Janda K, **King B**, Adepoju O, Chavez S, Bejerano G, Braun RT, Ho V, Liaw W. Consolidation in an era of population health and value-based care: Implications for effectiveness, costs, and equity. *Medical Care*. Accepted.

7. Patil A, Brash M, Brunet L, Eckert JC, Odom-Konja R, Patel A, Piston S, Than T, **King B.** (2025). Unchained Care: A Public Health Perspective on Ending Shackling of Incarcerated Patients Seeking Health Care, A Policy Statement Adopted by the American Public Health Association. *Medical Care*. 63(3):185-188.

8. Meehan AA, **King BT**, Biggs R, Boyer AP, Berner-Davis L, DiPietro B. (2024). Review of Local Homeless Mortality Efforts: A Call for Standardized Data and Reporting. *Journal of Public Health Management and Practice*. Online ahead of print. doi: 10.1097/PHH.0000000000002070. PMID: 39321357

9. Vargas S, Siddiqi S, **King B**, Nguyen C, Diep J, Gilbert L, Nguyen BM. (2024) Vietnamese Americans' Level of Trust in Sources of Information and Willingness to Participate in COVID-19 Clinical Trials. *Journal of Clinical and Translational Science*. 8(1):e88. DOI: 10.1017/cts.2024.495

10. **King B**, Berg L, Koenig J. (2024) Popular Musician Occupational Stress and Psychological Ill-Health: An Exploratory Factor Analysis. *Medical Problems of Performing Artists*. 39(2):72-81.

11. Novick T, **King B.** (2024) Addressing Housing Issues Among People With Kidney Disease: Importance, Challenges, and Recommendations. *American Journal of Kidney Diseases*. 84(1):111-119. DOI: 10.1053/j.ajkd.2024.01.521

12. Liaw W, **King B**, Olaisen H, Pastoor S, Kiaghadi A, Cloven N, Reed B, Matuk-Villazon O, Waldren S, Spann S. (2024) How An Academic Direct Primary Care Clinic Served Patients from Vulnerable Communities. *Journal of the American Board of Family Medicine*. 37(3):455–464. DOI: 10.3122/jabfm.2023.230346R1

13. **King B**, Adepoju OA, Woodard L, Oluyomi A, Zhang X, Amos CI, Badr H. (2023) The Effects of COVID-19 Lockdown on Social Connectedness and Psychological Distress in US Adults with Chronic Diseases. *International Journal of Environmental Research and Public Health*. 20(13): 6218.

14. Sattler ELP, Ogungbe O, Wallace AS, Aryan Z, Castilla-Ojo N, Dai J, Anda-Duran ID, Foti K, German CA, Hyde ET, Jafarian-Kerman SR, Kendrick KN, **King B**, Lang AE, Tang O, Turkson-Ocran RA, Rodriguez LA, Wang FM, Zhang M, Hivert MF, & Lutsey PL. (2023) American Heart Association EPI | Lifestyle Scientific Sessions: 2022 Meeting Highlights. *Journal of the American Heart Association*. 12(8): e028695.

15. Woodard L, Gilbert L, **King B**, Adepoju O, Bruce MA, McDougle L, Moultry AM, Beech BM. (2023) Examining Black and Hispanic physicians and other healthcare providers' attitudes toward the COVID-19 vaccine. *Journal of the National Medical Association*. Epub Jan 5; 115(1): 53-65.

16. **King B**, Spadaro A, Schiff G, Rodriguez-Monguio R, Jordan A, Flaherty L, Lee WC, Zito J, Fein O, on behalf of the APHA Medical Care Section. (2022) The American Public Health Association Endorses Single-Payer Health System Reform. *Medical Care*. 60(6):397-401.

17. Raza SA, Zhang X, Oluyomi A, Adepoju OE, **King B**, Amos CI, Badr H. (2022) Predictors of COVID-19 perceived susceptibility: insights from population-based self-reported survey during lockdown in the United States. Journal of Infection and Public Health. 15(5):508-514.

18. Adepoju O, Jennings S, Schrader P, Reeves K, McManaham-Bridges T, Gilbert L, **King B**, Cockerell T, Woodard L, Torres L. (2022) Leveraging Public-Private Partnerships during COVID-19: Providing Virtual Field Opportunities for Learners and Addressing Social Isolation in Older Adults. Journal of Applied Gerontology. 41(7)1657-1664.

19. Berg L, **King B,** Koenig J, McRoberts L. (2022) Musician Occupational and Financial Stress and Mental Health Burden. Psychology of Music. 50(6):1801-1815.

20. Tsai J, **King B**, Elder J. (2021) Multimorbidity and Social Drivers of Homelessness and Health: Introduction to This Special Issue. *Medical Care*. 59(4S2):S101-S102.

21. Milling TJ, **King B**, Yue P, Middeldorp S, Beyer-Westendorf J, Eikelboom JW, Crowther M, Xu L, Verhamme P, Siegal D, Connolly SJ, on behalf of the ANNEXA-4 Investigators. (2021) Restart of Anticoagulant Therapy and Risk of Thrombotic and Hemorrhagic Events After Factor Xa Inhibitor Reversal in Major Bleeding Patients. *Thrombosis and Haemostasis*. 121(8):1097-1106.

22. Milling TJ, Warach S, Johnston S, Gajewski B, Costantini T, Price M, Wick J, Roward S, Mudranthakam D, Dula A, **King B**, Muddiman A, Lip G. (2021) Restart tICrH Trial Design: an adaptive randomized trial of time intervals to restart direct oral anticoagulants after traumatic intracranial hemorrhage. *Journal of Neurotrauma*. 38(13): 1791-1798.

23. **King B**, Milling TJ, Gajewski B, Costantini T, Wick Jo, Price MA, Mudaranthakam D, Stein D, Connolly S, Valadka A, & Warach S. (2021) Restarting and timing of oral anticoagulation after traumatic intracranial hemorrhage: A review and summary of ongoing and planned prospective randomized clinical trials. *Trauma Surgery and Acute Care Open*. 5(1):e000605.

24. **King B**, Alrahwan I. (2020) Breaking the Rules of Respiratory Diseases: Reviewing the Current Perspectives Regarding Thrombotic Conditions Associated with SARS-CoV-2 Infection. *Neurology and Neurotherapy Open Access Journal*. Online: Aug 18;5(2):000151.

25. Harvin J, Zarzaur B, Nirula R, **King B,** Malholtra A. (2020) Alternative Clinical Trial Designs. *Trauma Surgery and Acute Care Open*. 5(1): e000420.

26. **King B**, Lawrence P, Detry M, Milling T, Warach S. (2019) Optimal Delay Time to Initiate Anticoagulation after Ischemic Stroke in Atrial Firbrillation (START): methodology of a pragmatic, response-adaptive, prospective randomized clinical trial. *International Journal of Stroke*. 14(9):977-982.

27. **King B**, Berg L, Koenig J, Adair J, Tirado C. (2019) A Revised Occupational Stress Measure for Popular Musicians: Pilot Test of Validity and Reliability. *Medical Problems of Performing Artists*. 34(2):85-92.

28. Elder J, **King B.** (2019) Housing and Homelessness as a Public Health Issue: Executive Summary of policy adopted by the American Public Health Association. *Medical Care*. 57(6):401-405.

29. Dula A, Luby M, **King B,** Sheth S, Magadan A, Davis L, Gealogo G, Merino J, Hsia A, Latour L, & Warach S. (2019) Neuroimaging Evolution of Ischemia in Men and Women: An Observational Study. *Annals of Clinical and Translational Neurology*. 6(3):575-585.

30. Berg L, **King B,** Koenig J, & McRoberts R. (2018) Popular Musician Responses to Mental Health Treatment. *Medical Problems of Performing Artists*. 33(2): 124-130.

31. Wilkinson M, **King B**, Iyer S, Higginbotham E, Wallace A, Hovinga C, & Allen C. (2018) Comparison of a Rapid Albuterol Pathway with a Standard Pathway for the Treatment of Children with a Moderate to Severe Asthma Exacerbation in the Emergency Department. *Journal of Asthma*. 55(3):244-251.

32. **King B**, Abrego D, Narendorf S, & Santa Maria D. (2017) Representations of Homelessness, Home Environments, and Authority in the Context of Runaway Behaviors Reported by Foster Care Youth Residing in Emergency Shelter. *Journal of Social Distress & Homelessness*. 26(2): 138-147.

33. Abello A, Brieger B, Dear K, **King B,** Ziebell C, Ahmed A, & Milling T (2012) Care Plan Program Reduces the Number of Visits for Challenging Psychiatric Patients in the Emergency Department. *American Journal of Emergency Medicine*. 30(7): 1061-7.

34. Crocker P, Higginbotham E, **King B**, Taylor D, & Milling T. (2012) Comprehensive pain management protocol reduces children's memory of pain at discharge from the pediatric ED. *American Journal of Emergency Medicine*. 30(6): 861-71.

35. Crocker P, **King B**, Cooper H, & Milling T. (2012) Self-reported alcohol use is an independent risk factor for head and brain injury among cyclists but does not confound helmets' protective effect. *Journal of Emergency Medicine*. 43(2): 244-50.

36. Wendlandt D, **King B**, Ziebell C, & Milling T. (2011) Atypical Presentation of Fatal Meningococcemia: Peritonitis & Paradoxical Purpura Fulminans of Late Onset. *American Journal of Emergency Medicine*. 29 (8): 960.e3-5.

37. Crocker P, Zad O, Milling T, Maxson T, **King B**, & Whorton E. (2010) Human cytokine response to Texas Crotaline envenomation before and after antivenom administration. *American Journal of Emergency Medicine*. 28 (8), 871-879.

38. Buck D & **King B.** (2009) Medical Student Self-Efficacy and Attitudes toward Homeless Patients. *Virtual Mentor (AMA Ethics Journal)*. 11(1): 32-37.

39. Hoffman K, Potter L, Adkins J, Bemben W, Bracero-Rodriguez J, Burke L, **King B,** Lo E, Lindauer S, Morales A, Mahmood N, & Nzegwu N. (2008) Medical students and their passion for Street Medicine. *European Network of Homeless Health Workers*. 7: 14-15.

**OTHER PUBLICATIONS**

**King B,** Stratemann C, Khorsandi S, Attri S, Swamy S. Housing & Homelessness Service Utilization Among Those Who Died in Homelessness in Harris County (2021-2022). *University of Houston Tilman J Fertitta Family College of Medicine*. August 2024.

**King B**, Synovec C. Fidelity to the Guiding Principles of Medical Respite Care: Development and Use of a Fidelity Measure. HRSA White Paper. June 2023.

**King B**, Attri S, Nichols R, Swamy S, Khorsandi S. (2023) Harris County Homelessness Mortality Report 2022. *University of Houston Tilman J Fertitta Family College of Medicine*. November 2023.

**King B**, Azadi W, Alvarez A. (2023). 2021 Harris County Homelessness Mortality Report: Addendum on Toxicity Deaths. *University of Houston Tilman J Fertitta Family College of Medicine*. April 2023.

**King B**, Curren E, McFarland E, Childress C. (2022). Harris County Homelessness Mortality Report (Pilot). *University of Houston Tilman J Fertitta Family College of Medicine*. Sept 2022. (Updated July 2023).

Fein O, Flaherty L, Jordan AO, **King B**, Lee WC, Lu K, Rodriguez-Monguio R, Schiff G, Spadaro T, Zito J (alphabetical). (2021) Adopting a Single-Payer Health System. *Policy Statement*. Washington, DC: American Public Health Association.

Homeless Mortality Data Workgroup of the National Health Care for the Homeless Council. (2021 Jan). Homeless Mortality Data Toolkit: Understanding and Tracking Deaths of People Experiencing Homelessness. Nashville, TN: National Health Care for the Homeless Council, Inc. (King, B acknowledged for contributions)

Caughlin J, Gelberg L, Hwang S, Jenkins D, **King B,** Lepore SW, Svnovec C, Tatlock T, Lemsky C. (2018). Adapting your Practice: Recommendations for the care of Patients who are Homeless or Unstably Housed Living with the Effects of Traumatic Brain Injury. Nashville, TN: National Health Care for the Homeless Council, Inc.

Elder J, **King B,** J. (2017) Homelessness and Housing as a Public Health Issue. *Policy Statement*. Washington, DC: American Public Health Association.

Milling T, Refaai M, Goldstein J, et al. (2015) Thromboembolic Events after Vitamin K Antagonist Reversal With 4-Factor Prothrombin Complex Concentrate: Exploratory Analyses of Two Randomized, Plasma-Controlled Studies. *Annals of Emergency Medicine*. 67(1):96-105. (King, B acknowledged for contributions to the analysis and interpretation of data)

Wright D, Yeatts S, Silbergleit R, et al. (2014) Very Early Administration of Progesterone for Acute Traumatic Brain Injury. *N Engl J Med*. 371(26): 2457-66. (King, B. listed in Appendix)

Cannon C, Holthaus C, Zubrow M, et al. (2012) The GENESIS Project (GENeralized Early Sepsis Intervention Strategies): A Multicenter Quality Improvement Collaborative. *Journal of Intensive Care Medicine*. 28(6): 355-68. (King, B. listed in Appendix)

Silbergleit R, Durkalski V, Lowenstein D, et al. (2012) Intramuscular versus intravenous therapy for prehospital status epilepticus. *N Engl J Med*. 2012 Feb 16; 366(7): 591-600.  (King, B. listed in Appendix)

**ONLINE PUBLICATIONS (recent)**

Liaw W, Janda K, King B. (2024). Survival of the Biggest: How Consolidation through Private Equity is Reshaping Primary Care. *The Medical Care Blog*. 7/25/24. https://www.themedicalcareblog.com/survival-of-the-biggest/

King B. (2024). Impacts of Climate Change on Health and Health Care Utilization. *The Medical Care Blog*. 5/2/24. https://www.themedicalcareblog.com/impacts-of-climate-change-on-health-and-health-care-utilization/

King B. (2024). History of Climate Policy and Advocacy by the American Public Health Association. *The Medical Care Blog*. 2/23/24. https://www.themedicalcareblog.com/apha-climate-policy/

King B. (2023). Special Issue of Medical Care: Implementation and Cost of evidence-based, patient-centered programs. *The Medical Care Blog*. 11/30/23. https://www.themedicalcareblog.com/pcori-special-issue/

KingB, Stevens G, Lines L. (2024).

Attri S, King B. (2023) Health Plans with Deductibles See Lower Lung Cancer Screening Rates. *The Medical Care Blog*. 11/23/23. https://www.themedicalcareblog.com/hdhp-lung-cancer-screening/

Nichols R, King B. (2023) Making PrEP Accessible to Patients Experiencing Homelessness. *The Medical Care Blog*. 11/9/23. https://www.themedicalcareblog.com/prep-accessible-to-patients-experiencing-homelessness/

Lines L, Stevens G, King B. (2023) Meet the Blog's Newest Addition to the Editorial Team: Ben King. *The Medical Care Blog*. 11/2/23. https://www.themedicalcareblog.com/new-editor-ben-king/

King B. (2022) APHA Calls for Single-Payer Health Reform. *The Medical Care Blog*. 7/6/22. https://www.themedicalcareblog.com/apha-policy-single-payer/

King B. (2021) Multimorbidity and Psychosocial Aspects of Homelessness. *The Medical Care Blog*. 9/13/21. https://www.themedicalcareblog.com/multimorbidity-in-homelessness/

King B. (2020) Health and Housing Equity: a new report released by the American Public Health Association. *The Medical Care Blog*. 10/12/2020. https://www.themedicalcareblog.com/health-and-housing-equity/

King B. (2020) Implementation of HCV Treatment Programs. *The Medical Care Blog*. 7/30/2020. https://www.themedicalcareblog.com/hcv-treatment/

King B, Foyt A. (2020) Framing Success for Supportive Housing Services. *The Medical Care Blog*. 6/11/2020. https://www.themedicalcareblog.com/supportive-housing-services/

King B, Baldazo S. (2020) COVID-19 and homelessness. *The Medical Care Blog*. 4/30/2020. https://www.themedicalcareblog.com/covid19-homelessness/

King B. (2020) COVID-19: High risk of severe illness. *The Medical Care Blog*. 4/13/2020. https://www.themedicalcareblog.com/covid19_severe_illness/

King B. (2020) Healthcare utilization in the SARS-CoV-2 pandemic. *The Medical Care Blog*. 3/19/2020. https://www.themedicalcareblog.com/sars-cov-2/

King B. (2019) Witnessing and Responding to Homelessness. *The Medical Care Blog*. 12/12/2019. https://www.themedicalcareblog.com/witnessing-homelessness/

King B. (2019) The ICD-10 transition changed the game more than you think. *The Medical Care Blog*. 7/25/2019. https://www.themedicalcareblog.com/icd-10-coding/

King B & Elder J. (2019) Homelessness as a Public Health Issue. *The Medical Care Blog*. 6/13/2019. https://www.themedicalcareblog.com/homelessness-public-health-policy/

King B. (2019) Veteran Access to Hepatitis C Treatment. *The Medical Care Blog*. 5/9/2019. https://www.themedicalcareblog.com/hepc-geography-veterans/

King B. (2019) Tailoring VA primary care to address the social determinants of health. *The Medical Care Blog*. 3/14/2019. https://www.themedicalcareblog.com/vahomeless/

King B. (2019) Hospitalizations of Individuals Experiencing Homelessness Driven by Behavioral Health Concerns. *The Medical Care Blog*. 2/7/19. https://www.themedicalcareblog.com/homeless_hospitalizations/

King B. (2019) Homeless Management Information System (HMIS) Data Sharing Can Improve the Lives of Clients and Services Providers. *Texas Homeless Network blog*. 1/17/2019. https://www.thn.org/2019/01/17/homeless-management-information-system-hmis-data-sharing-can-improve-the-lives-of-clients-and-services-providers/

King B. (2019) Big differences in detection rates between different data sources: sky falling or business as usual? *The Medical Care Blog*. 1/3/2019. https://www.themedicalcareblog.com/mi-surveillance-study

**PRESENTATIONS (peer-reviewed)**

1. Liaw W, Adepoju O, Womack P, **King B,** Prewitt T, Dobbins J, Glasheen W, Woodard L, & Kakadiaris I. Factors associated with accumulating diabetes complications in a Medicare Advantage cohort to inform a prediction tool. Presented at the North American Primary Care Research Group Annual Meeting. (2024, November 20–24). Québec City, Quebec, Canada.
2. **King B**, Olivo E, Wong R, Castaneda A, Saldana G, Gilbert L. Transitions into and from homelessness during substance use treatment and relationship to program completion. Oral Presentation. American Public Health Association, Annual Meeting. (2024, October 26-30). Minneapolis, MN.
3. Stratemann C, Attri S, Khorsandi S, Swamy S, **King B**. Examining social service utilization among individuals experiencing homelessness before death. Oral Presentation. American Public Health Association, Annual Meeting. (2024, October 26-30). Minneapolis, MN.
4. **King B**, Olivo E, Berner-Davis L, Attri S, Hunter C, Boyer A, Buck D. Unique health care for the homeless patient features and outcomes from the 2022 health center patient survey. Poster. American Public Health Association, Annual Meeting. (2024, October 26-30). Minneapolis, MN.
5. Khorsandi, S., Swamy, S., Attri, S., Stratemann, C., **King, B.** Early mortality and medical complexity among medicolegal deaths associated with early aging in homelessness. Poster. American Public Health Association, Annual Meeting. (2024, October 26-30). Minneapolis, MN.

6. Kim M, Nguyen BM, **King B**. Rethinking BMI: Evaluating diabetes risk among Asian subgroups in the United States. Poster. American Public Health Association, Annual Meeting. (2024, October 26-30). Minneapolis, MN.

7. Berner-Davis L, **King B**, Kenkel J. Let's Chat about Housing Prioritization. Facilitated Discussion Panel: National Health Care for the Homeless Conference and Policy Symposium. (2024, May 13-16). Phoenix, AZ.

8. **King B**, Wheeler J, Synovec C. Design of a Novel Fidelity Measure for Use in Accreditation of Medical Respite Programs. Oral Presentation: National Health Care for the Homeless Conference and Policy Symposium. (2024, May 13-16). Phoenix, AZ.

9. **King B**, Modersbach D, Leopold J, DiPietro B. Using Homeless Mortality Data to Drive Policy & Program Change: A Discussion of Local Approaches. Moderated Panel: National Health Care for the Homeless Conference and Policy Symposium. (2024, May 13-16). Phoenix, AZ.

10. Berner-Davis L. (Facilitator: **King B**). Evaluations in Health Care for the Homeless Programs. Learning Lab: National Health Care for the Homeless Conference and Policy Symposium. (2024, May 13-16).

11. Elder W, **King B**, Smith B. Longitudinal Changes in Compassion, Concern for the Underserved and Well-Being Reported by Medical Students. Poster. 2024 Society of Teachers of Family Medicine Annual Spring Conference. (2024, May 4-7). Los Angeles, CA.

12. Powers S, **King B**. Prison Inmate Awareness of Heart Disease Status While Incarcerated in State and Federal Prisons, 2016. Poster. 2024 American Heart Association Epi | Lifestyle Conference. (2024, March 18-21). Chicago, IL.

13. **King B**, Attri S, Buck D. Differences in Cardiovascular Disease Burden, Screening, Education, and Care by Clinic Type in the 2022 Health Center Patient Survey (HRSA). Poster. 2024 American Heart Association Epi | Lifestyle Conference. (2024, March 18-21). Chicago, IL.

14. **King B**, Sanchez S, Medford D, Liaw W, Tran L, Arocha M, Adepoju OE, Woodard L, Moscoso B, Sharma I. Health-Harming Legal Needs Are Associated With Blood Pressure, Quality of Life, and Utilization. Poster. 2024 American Heart Association Epi | Lifestyle Conference. (2024, March 18-21). Chicago, IL.

15. Swamy S, Khorsandi S, Attri S, Nichols R, **King B**. Clinical, Demographic, and Geographic Trends in Cardiovascular Causes of Deaths Associated With Homelessness. Poster. 2024 American Heart Association Epi | Lifestyle Conference. (2024, March 18-21). Chicago, IL.

16. **King B**, Liaw W. Development of a Medical School Advanced Elective for Environmental Health Emphasizing Active, Problem Based Learning Techniques. University of Texas Systems Kenneth I Shine MD, Academy of Health Science Education, 2024 Innovations in Health Science Education Conference. (2024, Jan 27-28). Austin, TX.

17. Castaneda A, Saldana G, Okeke CM, Pham C, Gilbert LR, **King B**. Factors Affecting Treatment Completion in Those with Substance Use Disorder or Dependence. Poster. 2024 Latino Medical Student Association, Southwest Region, Annual Regional Conference.

18. **King B**, Wheeler J, Synovec C. Design of a novel fidelity measure for use in accreditation of medical respite programs. Oral Presentation. 2023 American Public Health Association: Medical Care Section.

19. Tuli A, Escamilla C, Thomas S, Dhurjati VNN, Truong K, **King B**. Associations of exposure to homelessness with risk of tobacco smoking or e-cigarette use: A systematic review. Poster. 2023 American Public Health Association: Alcohol Tobacco and Other Drugs Section.

20. **King B**, Powers S. Prison inmate awareness of heart disease status and association with ADHD while incarcerated in state and federal prisons, 2016. Poster. 2023 American Public Health Association: Mental Health Section.

21. King J, Delorey C, **King B**. Panel Discussion: How Does Congress Allocate our Tax Dollars for Public Health and Foreign Wars (a collaborative session organized by the Peace Caucus and Medical Care

section). Oral Presentation. 2023 American Public Health Association Annual Meeting: Medical Care Section and Peace Caucus.

22. Siddiqi S, Vargas S, Nguyen C, **King B**, Gilbert L, Le A, Nguyen A, Diep J, Nguyen BM. CEAL survey Examining Vietnamese Americans' level of trust in sources of information ad willingness to participate in COVID-19 clinical trials. Oral Presentation. 2023 **American Public Health Association: Asian & Pacific Islander Caucus for Public Health.**

23. Nguyen C, Le A, Siddiqi S, Vargas S, **King B**, Diep J, Nguyen A, Gilbert L, Nguyen BM. CEAL Survey: Vietnamese American health insurance coverage and challenges during the COVID-19 pandemic. Poster. 2023 **American Public Health Association: Asian & Pacific Islander Caucus for Public Health.**

24. Nguyen C, Le A, Siddiqi S, Vargas S, Nguyen A, Diep J, **King B**, Gilbert L, Nguyen BM. Qualitative study examining barriers and facilitators of COVID-19 vaccination in Vietnamese American youth. Poster. 2023 **American Public Health Association: Public Health Education and Health Promotion Section.**

25. Nguyen C, Le A, Siddiqi S, Vargas S, **King B**, Diep J, Nguyen A, Gilbert L, Nguyen BM. Examining health insurance and challenges among Vietnamese Americans during the COVID-19 pandemic through CEAL survey. Poster. 2023 **American Public Health Association: Medical Care Section.**

26. Sanchez S, Medford D, **King B**, Sharma I, Dobbins J, Liaw W, Tran L. Health-Harming Legal Needs are Associated with Blood Pressure, Quality of Life, and Utilization. Poster. 2023 **North American Primary Care Research Group (NAPCRG) Annual Meeting.**

27. Danforth J, **King B**. Addressing the trauma of unsheltered homelessness through holistic encampment strategies – and the mental health consequences of callous politics. Workshop. 2023 **NAMI Texas Conference.**

28. Saldana G, Castaneda A, Pham C, Okeke CM, **King B**, Gilbert LR. The Role of Self-Help Groups on SUD Treatment Completion. Poster. 2023 **Latino Medical Student Association National Conference.**

29. Castaneda A, Saldana G, Pham C, Okeke CM, Gilbert LR, **King B**. The Effect of Medicaid Expansion on MAT Treatment Completion Completion Among Those with Opioid Use Disorder. Poster. 2023 **Latino Medical Student Association National Conference.**

30. **King B**, Nguyen A, Harrison S. Evaluating the Equity and Validity of a Novel Housing Prioritization Tool. Oral Presentation. 2023 **National Health Care for the Homeless Council annual meeting.**

31. **King B**, Alegria M, Azadi W, Alvarez A. Disparities in Age of Death in Individuals Experiencing Homelessness. Oral Presentation. 2023 **National Health Care for the Homeless Council annual meeting.**

32. Tran T, Truong K, Thomas S, **King B**. Dual Systematic Review Characterizing the Relationship Between Homelessness and Infectious Diseases. University of Houston, Undergraduate Research Day. Poster, 04/13/23.

33. Truong K, Tran T, Syed S, Philip S, Warren V, Benandi K, **King B**. Systematic Review of the Lower Perceived Access to Care Among Homeless Populations. University of Houston, Undergraduate Research Day. Poster, 04/13/23.

34. Warach SJ, Milling TJ, Lawrence P, **King B**; Lone Star Stroke Consortium Researchers. Optimal Delay Time to Initiate Anticoagulation after Ischemic Stroke in Atrial Fibrillation (START): A pragmatic, adaptive, randomized clinical trial. Poster. 2023 **AHA International Stroke Conference.**

35. **King B**. Tracking and Defining Mortality Associated with Homelessness in Harris County, 2009-2021: A Collaboration Between Public Health and Community Programs. Assistant Professor of Excellence (APEx) Lecture Series, 01/25/23.

36. **King B**. Violent Deaths Associated with Homelessness: 15 states, 2005-2017. UH Tilman J Fertitta Family College of Medicine Grand Rounds, 01/10/23.

37. **King B**, Childress C, Curran E, Frost L, Buck D. Surveillance of Mortality associated with Homelessness: Excess mortality estimates over time, geography, sex, and racial disparities. Oral Presentation. 2022 **American Public Health Association.**

38. Curran E, **King B**, Syed S, Escamilla C. Characteristics of Suicides associated with Homelessness: Cohort study of excess mortality and violent deaths across 15 states from 2003-2017. Oral Presentation. 2022 American Public Health Association.

39. Truong K, Tran T, Syed S, Philip S, Warren V, Benandi K, **King B**. Systematic Review of the Lower Perceived Access to Care Among Homeless Populations. Oral Presentation. 2022 American Public Health Association.

40. Syed S, Philip S, Warren V, Benandi K, **King B**. Systematic Review Identifies Increased Physical Activity associated with Experience of Homelessness. Poster. 2022 American Public Health Association.

41. Nguyen C, Gilbert L, Diep J, **King B**, Nguyen BM. CEAL Survey Exploring Impact of COVID-19 on Vietnamese Americans in Texas. Poster. 2022 American Public Health Association.

42. Chae M, Adepoju OE, **King B**, Luo J, Pierett J, Glasheen W, Dobbins J, Woodard L. Predictors of Participation in a Telephone-based Social Connectedness Intervention for Older Adults. Poster. 2022 American Public Health Association.

43. Berg L, Flowers K, Fraher D, **King B**. Teaching Empathy Through Lived Experience: Understanding Homelessness Course for Health Professionals. Poster. University of Texas Dell Medical School Educational Innovation, Research and Awards Symposium, 10/22.

44. **King B**, Gai L, Thesen T, Martinez A, Buck D. Utilization trends in persons with homelessness experience varied by dementia comorbidity. Oral Presentation. 2022 Alzheimer's Association: Addressing Health Disparities, 06/21/22.

45. **King B**, Benandi K, Warren V. A Systematic Scoping Review of Sleep Disruption and Environmental Exposures Related to Homelessness. Oral Presentation. 2022 National Health Care for the Homeless Conference and Policy Symposium, 05/12/22.

46. Synovec C (panelists: Boyer A, **King B**). Rebuilding Systems: Adapting Housing Assessments to Prioritize Health, Equity, and Belonging. Oral Presentation. 2022 National Health Care for the Homeless Conference and Policy Symposium, 05/11/22.

47. Elder W, **King B**. Longitudinal Mission-Based Evaluation and Research (LMBER). Oral Presentation. 2022 Beyond Flexner Conference, 03/28/22.

48. Fraher D, Flowers K, **King B**, Berg L. Teaching empathy through lived experience: Development, application, and evaluation of the Understanding Homelessness course for health professionals. Poster. University of Texas Shine Academy 2022 Innovations in Health Science Education Annual Conference, 02/22.

49. Curran E, Chandler C, **King B**, Buck D. Homeless Status of Decedents in Harris County. Harris County Institute of Forensic Sciences Grand Rounds, 02/11/22.

50. **King B**. Increased risk and distinct characteristics of homicide victimization for persons experiencing homelessness, a study of 15 states, 2005-2017. Oral Presentation. 2021 American Public Health Association.

51. **King B,** Adepoju A, Woodard L, Shetty S, Oluyomi A, Zhang X, Adel Fahmideh M, Raza S, Gilbert L, Badr H. Impact of the early 2020 Lockdown on Social Networks and Mental Health symptom burden. Oral Presentation. 2021 American Public Health Association.

52. **King B,** Woodard L, Adepoju O, Mak R, Oluyomi A, Zhang X Adel Fahmideh M, Raza S, Gilbert L, Badr H. Identifying associations between Social Network Impacts and Health Behavior Changes unique to Chronic Illness status during onset of 2020 Lockdown. Oral Presentation. 2021 American Public Health Association.

53. **King B** & Gilvar J. Introduction to participatory design and validation of fair, effective housing prioritization tools. Facilitated Discussion. 2021 National Health Care for the Homeless Annual Meeting.

54. **King B**. Odds of Heart Disease and Arrhythmia Associated with Exposure Dose to Homelessness. Poster. 2021 AHA EPI | Lifestyle Conference. <u>AHA Sandra A. Daugherty Award for Excellence in Cardiovascular Disease or Hypertension Epidemiology Nominee.</u>

55. **King B**. Vulnerability model variance by gender, race, and ethnicity in housing prioritization tools may explain disparities in housing allocation. Oral Presentation. 2020 American Public Health Association.

56. **King B**. Under-reporting of medical conditions a bigger problem in housing prioritization assessment than over-reporting /gaming the system. Oral Presentation. 2020 American Public Health Association.

57. **King B**. Racial disparities in the new paradigm of penumbra approximated by MRI perfusion-diffusion mismatch: Targeting for stroke treatment. Poster. 2020 American Public Health Association.

58. **King B**. APHA policy on single payer. Oral Presentation. 2020 American Public Health Association.

59. **King B**, Latour L, Luby M, Warach S. Racial Disparities in Perfusion-Diffusion Mismatch Targets. Poster. 2020 International Stroke Conference. <u>ISC Health Equity and Actionable Disparities in Stroke-Understanding and Problem-solving (HEADS-UP) Award winner.</u>

60. Lawrence P, Detry M, **King B**, Milling T, Warach S. Optimal Delay Time to Initiate Anticoagulation after Ischemic Stroke in Atrial Fibrillation (START). Poster. 2020 International Stroke Conference.

61. **King B**, Fleming V. Hepatitis C Treatment Efficacy and Treatment Completion Rates in patients with and without housing during treatment. Oral Presentation. 2019 American Public Health Association.

62. **King B**, Shamapant S, Warach S. Objective Measures of Improvement from Intensive Communication Therapy by Treatment Duration, Dose, and Density. Poster. 2019 American Public Health Association.

63. **King B**. Validation and Psychometric Testing of the Vulnerability Index – Service Prioritization Decision Assistance Tool. Facilitated Discussion. 2019 National Health Care for the Homeless Annual Meeting.

64. **King B**, Elliott C, Milling T. Simulating an Adaptive, Randomized, Clinical Trial of Dose-Response from Time to OAT Reinitiation (Restart) after ICH. Oral Presentation. 2019 World IntraCranial Hemorrhage (WICH) Conference.

65. **King B**. Heart Disease and Arrhythmia in a Sample Experiencing Homelessness: Epidemiology, Prior History, and Risk Factors. Oral Presentation. 2019 AHA EPI | Lifestyle Conference. <u>AHA Award for Excellence in Research Addressing Cardiovascular Health Equity winner.</u>

66. Dula A, **King B**, Luby M, Davis L, Latour L, Warach S. Ischemic Stroke Imaging and Outcomes: Differences between Sexes. Poster. 2019 International Stroke Conference.

67. Lawrence P, Detry M, **King B**, Milling T, Warach S. Optimal Delay Time to Initiate Anticoagulation after Ischemic Stroke in Atrial Fibrillation (START). Poster. 2019 International Stroke Conference.

68. **King B**, Shamapant S, Warach S. Objective Measures of Improvement from Intensive Communication Therapy by Treatment Duration, Dose, and Density. Oral Presentation. 2019 International Stroke Conference.

69. **King B**, Muddiman A, Mahlmann O, Milling T. Reinitiating Oral Anticoagulation Therapy after Intracranial Hemorrhage: Identifying the Timing, Setting, and Changes to Treatment. Poster. 2018 American Public Health Association.

70. **King B**, Shamapant S, Warach S. Validation of an Ordinal, 6-item Functional Outcome Scale for Speech and Language Disability in Stroke: the Communication Disability Scale. Poster. 2018 American Public Health Association.

71. **King B**. A Three Factor Model of Vulnerability for Individuals Experiencing Homelessness. Oral Presentation. 2018 American Public Health Association.

72. **King B,** Dula A, Luby M, Latour L, Warach S. The Probability of an Endovascular Intervention Target Independent of Time from Last Known Well. Poster. 2018 International Stroke Conference.

73. Dula A, **King B,** Luby M, Davis L, Latour L, Warach S. The Probability of Ischemic Stroke Endovascular Targets: Extended Treatment Window for Women. Oral Presentation. 2018 International Stroke Conference.

74. Warach S, **King B,** Shamapant S. Validation of an Ordinal, 6-item Functional Outcome Scale for Speech and Language Disability in Stroke. Oral Presentation. 2018 International Stroke Conference. ISC Stroke Rehabilitation Award winner.

75. Dula A, **King B,** Davis L, Latour L, Warach S. Women's Imaging of Stroke Hemodynamics Study (WISHeS). Poster. 2018 International Stroke Conference.

76. Warach S, Milling T, Lawrence P, **King B.** Optimal Delay Time to Initiate Anticoagulation after Ischemic Stroke in Atrial Fibrillation (START). Poster. 2018 International Stroke Conference.

77. **King B.** Health Vulnerability in Individuals Experiencing Homelessness: Patterns of Association and Mediation of Racial and Sex Disparities in a Coordinated Assessment. Poster. 2018 American Public Health Association Annual Meeting. APHA Caucus on Homelessness Student Award winner.

78. **King B,** Thorngren C, Winegar A, Hydari I, Ledet S, Robertson H, Milling T. Innovative Approaches to Age Adjustment of D-Dimer Values for Pulmonary Embolus Across a Hospital Network. Poster. 2018 American Public Health Association Annual Meeting.

79. Thorngren C, Winegar A, **King B,** Hydari I, Ledet S, Robertson H, Milling T. Applying Age Adjusted D-Dimers for Pulmonary Embolus Across a Hospital Network. Oral Presentation. 2017 Society for Academic Emergency Medicine Annual Meeting. Academy of Geriatric Emergency Medicine (AGEM) Award winner.

80. Berg L, **King B,** Koenig J, Adair J, Tirado C. Impact of Work and Economic Stress on Musician Mental Health Burden in the 'Live Music Capital of the World'. Oral Presentation. 2017 Innovation in Healthcare Delivery Systems Symposium.

81. **King B,** Salazar M, Petty P. Gender and Race Disparities of Individuals Experiencing Homelessness: Medical, Trauma, and Injury History, Risk Factors and Service Utilization within the Coordinated Assessment. Poster. 2017 St. David's Center for Health Promotion & Disease Prevention Research in Underserved Populations Annual Conference.

82. **King B,** Berg L, Koenig J, Pierson B, Tirado C. Impact of Work and Economic Stress on Musician Mental Health Burden in the 'Live Music Capital of the World.' Poster. 2017 St. David's Center for Health Promotion & Disease Prevention Research in Underserved Populations Annual Conference.

83. McCaslin K, Dula A, **King B,** Warach S. Sex Differences in Stroke Risk Factors and Severity at Presentation. Poster. 2017 International Stroke Conference.

84. Dula A, Luby M, **King B,** Davis L, Latour L, Warach S. Sex Differences in Therapeutic Targets in Ischemic Stroke. Poster. 2017 International Stroke Conference.

85. Tabas I, **King B,** Milling T, Daley M. Effect of Comorbidities on Hemostatic Recovery After Coagulopathy Reversal with 4-Factor Prothrombin Complex Concentrate. Poster. 2016 American Public Health Association Annual Meeting.

86. Berg L, **King B,** Koenig J, McRoberts L. Popular Musician Attitudes Regarding Mental Health Services. Oral Presentation. 2016 Performing Artists Medical Association Meeting.

87. Berg L, Koenig J, **King B,** McRoberts L. Musician Mental Health Service Delivery and Impact in the Live Music Capital of the World. Oral Presentation. 2016 McCombs Business School Healthcare Symposium.

88. Warach S, **King B,** Chandler K, Topel C, Tabas I, Morton J, Milling T. Feasibility Of Mobile, Wearable Telestroke Devices. Poster. 2016 International Stroke Conference.

89. Murthy M, Helmink B, **King B,** Milling T, Murphy M, Tabas I, Peterson E, Daley M. Does Early PCC Administration Influence Outcomes for Warfarin-Associated Intracranial Hemorrhage? Oral Presentation. 2016 Society of Critical Care Medicine.

90. Helmink B, **King B,** Milling T, Murphy M, Tabas I, Murthy M, Shuman C, Daley M. Efficacy and Safety of 4-PCC for Coagulopathy Reversal Stratified by FDA Approval Status. Oral Presentation. 2016 Society of Critical Care Medicine.

91. Adamson R, Peterson E, Knight T, **King B**. Prevalence of drug-drug interactions with the novel oral anticoagulants (NOACs). Poster. 2015 American Society of Health-System Pharmacists Midyear Clinical Meeting.

92. Warach S, **King B**, Chandler K, Hartman A, Milling T. Assessment of the Feasibility of Using Wearable Technology as an Innovative Tool for Telestroke Services: Initial Results of Google Glass Evaluation. Poster. 2015 European Stroke Organisation Conference.

93. Held T, Barrera P, Arroyo M, **King B**. Transforming Care Delivery Through the Development of Street Medicine Approach to Mobile Health. Oral Presentation. 2015 University of Texas Healthcare Initiative Symposium.

94. Wilbert C, Shea K, **King B,** Garrett S, Ziebell C. Retrospective Evaluation of an Antimicrobial Stewardship Treatment Pathway for the Management of Cystitis and Acute Uncomplicated Pyelonephritis in an Emergency Department Setting. Poster. 2012 American Society of Health Systems Pharmacists Annual Meeting.

95. **King B**, Pease D, Gore D. Epidemiology, Evaluation, and Data Management Impact for Homeless Populations. Oral Presentation. 2012 National Health Care for the Homeless Council Annual Meeting.

96. Milling T, Higginbotham E, **King B**, Taylor D, Barron G, Crocker P. PEWS Assessment in the Emergency Department Halves Unanticipated In-Hospital Transfers to a Higher Level of Care. Poster. 2012 Society for Academic Emergency Medicine Scientific Assembly.

97. Ziebell C, Crocker P, Wood R, **King B**, Cooper H, Rice C, Milling T. Review of Methicillin Resistant Staphylococcus Aureus Treatment Outcomes in the Emergency Department. Poster.  2011 American Academy of Emergency Medicine Scientific Assembly.

98. Buck D, Brown C, **King B**. Evaluation of Medical Student Attitudes through Assessment of Two Attitudinal Inventories: the HPATHI and the ATHI. Poster. 2010 Society for Teachers of Family Medicine: Conference on Medical Student Education.

99. McMorries R, Crocker P, Spear D, Weston R, Kempema J, Polden H, Summers M, **King B**, Milling T. Focused Assessment with Sonography for Trauma (FAST) on the helicopter ambulance: A feasibility study.  Poster. 2010 American College of Emergency Physicians Research Forum.

100. Ziebell C, Crocker P, Wood R, **King B**, Cooper H, Rice C, Milling T. Review of Methicillin Resistant Staphylococcus Aureus Treatment Outcomes in the Emergency Department. Poster. 2010 Central Texas Clinical Research Forum.

101. McMorries R, Crocker P, Spear D, Weston R, Kempema J, Polden H, Summers M, **King B**, Milling T. Focused Assessment with Sonography for Trauma (FAST) in Aeromedical Transports: An Efficacy Study. Oral Presentation. 2010 Society for Academic Emergency Medicine Western Regional Scientific Assembly.

102. McMorries R, Crocker P, Spear D, Weston R, Kempema J, Polden H, Summers M, **King B**, Milling T. Focused Assessment with Sonography for Trauma (FAST) on the helicopter ambulance: An efficacy study. Poster. 2010 American Academy of Emergency Medicine Scientific Assembly.

103. **King B**, Brown C, Buck D. Evaluation of Differences and Changes in Medical Student Attitudes through Assessment and Comparison of Two Attitudinal Inventories: the HPATHI and ATHI. Oral Presentation. 2009 American Public Health Association Scientific Assembly.

104.    Abello A, Brieger B, Ziebell C, Dear K, Milling T, **King B**. Care plan program reduces the number of visits for high-utilizing psychiatric patients in the emergency department. Poster. 2009 American College of Emergency Physicians Scientific Assembly.
105.    Abello A, Brieger B, Ziebell C, Dear K, Milling T, **King B**. Impact of enrollment in the emergency department (ED) High Alert Program (HAP) on high-utilizing psychiatric patients' service patterns. Poster. 2009 Central Texas Clinical Research Forum.  *Winner: First Place Poster.*
106.    Crocker P, Milling T, **King B**. Bicycle Helmets Impact in Prevention of Traumatic Brain Injury. Poster. 2009 Central Texas Clinical Research Forum.
107.    Crocker P, Zad O, Milling T, Maxson T, **King B**, Whorton E. Human cytokine response to Texas Crotaline envenomation before and after antivenom administration.  Poster. 2009 Central Texas Clinical Research Forum.
108.    **King B,** Fernando R, Bull L, Williams L, McCurdy S. Role of public health in a student-run health clinic. Oral Presentation. 2008 American Public Health Association Conference.
109.    Welsh K, McCurdy S, Patel C, Williams L, Agbim U, Fernando R, **King B,** Buck D, Bull L. Houston Outreach Medicine, Education, and Social Services' (HOMES) homeless population demographics, descriptions and barriers to care. Poster. 2007 American Public Health Association Conference.

**FEDERALLY FUNDED RESEARCH (completed)**

**Principal Investigator. "**Identifying Opportunities for Interventions to Prevent Overdose Deaths Associated with Homelessness." University of Houston (UH) HEALTH Center for Tobacco and Addictions Research (NIMHD R03 equivalent; 10/2023-10/2024). $50k direct costs.

**Principal Investigator.** "Trends in Mortality Rates and Causes of Death Among People Experiencing Homelessness in Harris County." University of Houston (UH) Small Grants Award (03/2022-12/2023). $6k direct costs. Award #I0508176.

**Principal Investigator/Contractor.** "Characteristics and Circumstances Associated with Violent Deaths in Homelessness." National Violent Death Reporting System (NVDRS) New Investigator Research Award. (08/2020-01/2021). $5k direct costs.

**Research Scientist; grant writer.** "A Patient Centered Approach to Restarting Oral Anticoagulant Therapy After Major Hemorrhage". National Heart, Lung and Blood Institute. #1K23 HL 127227-01. PI: Truman Milling, MD.

**Research Scientist; grant writer.** "Innovative trial design for the timing of restarting anticoagulants after major hemorrhage". National Heart, Lung and Blood Institute. #X01 HL 143311-01. PI: Truman Milling, MD.

**Project Manager; sub-award, grant writer.** "Neurological Emergencies Treatment Trials Southeast Texas Clinical Site Hub". National Institute of Neurological Disorders and Stroke. Principal Investigator: Elizabeth Jones, MD.

**Spoke Coordinator; sub-award.** "POINT: Platelet-Oriented Inhibition in New TIA and minor ischemic stroke". National Institute for Neurological Disorders and Stroke. FOA: R01 NS062835-01; FDA IND #: waived. National PI: S. Claiborne Johnston, MD, PhD.

**Spoke Coordinator; sub-award.** "Progesterone for the Treatment of traumatic brain injury: Experimental Clinical Trial (ProTECT)". National Institute of Neurological Disorders and Stroke. FOA: U01 NS062778; 104118. National PI: David Wright, MD.

**Site Coordinator; sub-award.** "Transforming Traumatic Brain Injury Research and Clinical Care". National Institutes of Health: Recovery Act Limited Competition for NIH Grants: Research and Research Infrastructure Grand Opportunities (RC2). FOA: OD09-004; 1RC2 NS069409-01. National PI: Geoff Manley, MD PhD.

**Spoke Coordinator; sub-award.** "Rapid Anticonvulsant Medication Prior to Arrival Trial (RAMPART)". National Institute of Neurological Disorders and Stroke. FOA: 201 NS056975. National PI: Robert Silbergleit.

**FUNDED RESEARCH (completed)**

**Principal Investigator.** "Systematic Review of the relationship between Homelessness and Progression of Cardiovascular Disease." University of Houston (UH) New Faculty Program Award. (03/2021-09/2022). $6k direct costs. Award #000181666.

**Statistician / Research Scientist.** "Lone Star Stroke Consortium". State of Texas, Department of State Health Services: 2016-048097-001. $5M direct cost per biennium. PI: Steven Warach, MD PhD.

**Research Scientist; grant writer.** "Optimal Delay Time to Initiate Anticoagulation after Ischemic Stroke in Atrial Fibrillation (START)". State of Texas, Department of State Health Services. $1.2M direct cost per biennium. PIs: Steven Warach, MD PhD & Truman Milling, MD.

**Research Scientist; grant writer.** "Independent and Combined Assessment of Risk Factors and Imaging Markers in a Retrospective Stroke Cohort: a multi-site study (MVT-AF)". State of Texas, Department of State Health Services. $400,000 direct cost per biennium. PI: Steven Warach, MD PhD.

**INDUSTRY FUNDED RESEARCH (completed)**

Co-Investigator, industry contract. "Tenecteplase in Stroke Patients Between 4 and 24 Hours (TIMELESS)". NCT03785678. Genentech, Inc. PI: Steven Warach, MD PhD.

Statistician / DSMB Member; grant writer. "Comparison of a Breath Enhanced High Density Jet Nebulizer with a Standard Jet Nebulizer for the Treatment of Children with a Moderate to Severe Asthma Exacerbation in the Emergency Department". Nebutech, Inc. $150,000 direct cost. PI: Matt Wilkinson, MD.

Statistician; grant writer. "Examining the Feasibility of Using Wearable Technology as an Innovative Tool for Telestroke Services in a Rural Environment". Genentech Foundation. $300,000 direct cost. PI: Steven Warach, MD PhD.

Data analyst; grant-writer. "Dabigatran reversal strategies, a multi-center retrospective review". Boehringer Ingelheim. $150,000 direct cost. PI: Truman Milling, MD.