**EXHIBIT B**

**TO**

**DECLARATION OF MIGUEL A. GRADILLA IN SUPPORT OF DEFENDANTS CITY AND COUNTY OF SAN FRANCISCO, ET AL.'S MOTION TO EXCLUDE EXPERT TESTIMONY OF BENJAMIN KING, PH.D. MPH**

```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3   - - - - - - - - - - - - - - - - - -
 4   COALITION ON HOMELESSNESS,        )
 5   et al.,                           )
 6              Plaintiffs,            )
 7   vs.                               )  CASE NO.
 8   CITY AND COUNTY OF SAN            )  4:22-cv-05502-DMR
 9   FRANCISCO, et al.,                )
10              Defendants.            )
11   - - - - - - - - - - - - - - - - - -
12
13
14
15            REMOTE VIDEOTAPED DEPOSITION OF
16                BENJAMIN KING, Ph.D., MPH
17                WEDNESDAY, APRIL 9, 2025
18
19
20
21          BEHMKE REPORTING AND VIDEO SERVICES, INC.
22             BY:  SUZANNE I. ANDRADE, CSR NO. 10682
23                550 CALIFORNIA STREET, SUITE 820
24                SAN FRANCISCO, CALIFORNIA  94104
25                           (415) 597-5600
```

```
 1   APPEARANCES OF COUNSEL (VIA VIDEOCONFERENCE):
 2   FOR PLAINTIFFS AND THE DEPONENT:
 3        EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
 4        BY:  VASUDHA TALLA, ATTORNEY AT LAW
 5        1 Rockefeller Plaza, 8th Floor
 6        New York, New York  10020
 7        Telephone:  (212) 763-5000
 8        Email:  vtalla@ecbawm.com
 9
10   FOR DEFENDANTS:
11        CITY AND COUNTY OF SAN FRANCISCO
12        OFFICE OF THE CITY ATTORNEY
13        BY:  MIGUEL A. GRADILLA, DEPUTY CITY ATTORNEY
14             KAITLYN M. MURPHY, DEPUTY CITY ATTORNEY
15        1390 Market Street, 7th Floor
16        San Francisco, California  94102
17        Telephone:  (415) 554-3870
18        Email:  miguel.gradilla@sfcityatty.org
19
20   ALSO PRESENT:
21        DASHA MOORE, VIDEOGRAPHER
22
23
24
25
```

```
 1    it's when new input no longer provides any variance from
 2    the understanding obtained.
 3            So you collect enough information that you have
 4    a stable understanding of what exists in those reports.
 5    That's -- again, there was an opinion, and the report --
 6    the review of the reports was highly confirmatory
 7    while -- of -- of the initial impression that there was
 8    not enough information to make a determination about
 9    health assessment process.
10            The fact that that information wasn't there did
11    not change over a significant number of reports
12    reviewed.  That's -- that's as best as I can offer.
13         Q.  I see.
14            Okay.  Now, the -- is there anything else that
15    you -- any other information that you -- that opinion
16    (c) is based on?
17         A.  In that the beginning, that that incorporates
18    all of the prior evidence that I had talked about under
19    (a) and (b) as well to inform that review.
20         Q.  Okay.  Now, (d): "a revised 'Bag and Tag'
21    policy is necessary that incorporates clearly defined
22    health and safety risk criteria, mandatory assessments
23    by trained public health personnel, and improved
24    training for City personnel."
25            Do you see that?
```

```
 1        A.    Yes.
 2        Q.    And what, if any, information is that opinion
 3   based on?
 4        A.    That's really a summation in some ways or a
 5   byproduct of the prior three opinions or parts; that
 6   revision would strengthen the ability of -- of HSOC
 7   operations to pro- -- produce a standardized and more
 8   effectively documented approach to assessing health and
 9   safety risks if, indeed, that threshold is what the --
10   the policy deems to be of the appropriate threshold.
11        Q.    Anything else?
12        A.    And all of the evidence prior that went into
13   the prior three opinions also informs including my
14   understanding of terminology; in particular, my
15   understanding of terminology and the complexity of the
16   HAZWOPER guidance, which is -- which is, I -- I think --
17   I hold applies to this based on OSHA's own comments.
18        Q.    Okay.
19        A.    Yeah, that's all.  That's it.
20        Q.    All right.  So let's move on to paragraph 5.
21   So paragraph 5 say:  "The opinions that I express in
22   this Report are true and are based upon methodologies
23   commonly used in my profession."
24             Do you see that?
25        A.    Yes.
```

1        So the method of the opinion, as I mentioned
2   earlier, was in the -- in the -- you know, with the
3   background of experience in the fields and the
4   appropriate methodologies as the background that I
5   mentioned previously, contrasting that with the observed
6   language, record, descriptions in depositions of
7   process, and how those differed from my own experience
8   and my own understanding of the terminology, the
9   procedures that are commonly recommended.
10          So I would say that the methodology is really
11  just in contrasting what I reviewed with my own
12  understanding and experience.
13       Q.   Sorry.  I don't think I understand that -- that
14  piece.
15          The contrasting what you reviewed to your
16  experience and understanding con- -- can you explain,
17  when you say your experience and your understanding,
18  what are you referring to there?
19       A.   Collectively the experience of my career and
20  the -- and the formal education that we've discussed
21  previously, all combined.
22       Q.   Okay.
23       THE WITNESS:  I'm about to be joined.  And so I
24  don't -- I hate to do this, because I know we're a
25  little bit ahead of the hour.

```
1            Can I take a -- just even a two-minute break?
2       ATTORNEY GRADILLA:  Sure.
3       THE WITNESS:  Okay.
4       ATTORNEY GRADILLA:  Off the record.
5       THE VIDEO OPERATOR:  This is the end of Media 3.
6  We're going off the record at 4:09 p.m.
7            (Recess taken from 4:09 p.m. to 4:12 p.m.)
8       THE VIDEO OPERATOR:  We're back on the record.  This
9  is the beginning of Media 4.  The time is 4:12 p.m.
10 Central Time.
11 BY ATTORNEY GRADILLA:
12      Q.   So before the break, Dr. King, you were
13 explaining to me a little bit about the methodology you
14 employed in writing this report, correct?
15      A.   Hmm.
16      Q.   I guess I'm -- maybe that's why I'm a lawyer.
17 I don't really understand what you were -- so try again,
18 please.
19           Can you explain to me the methodology that you
20 employed in writing your report?
21      A.   I'm just considering if there's another way to
22 frame this, but I -- I really see the process of this
23 being almost like a -- like a comparison, like a
24 validation sort of assessment.
25           Again, taking the material that's being
```

1    reviewed and, in the background -- or applying that
2    through the lens, I guess you could say, of prior
3    experience.
4            That prior experience I think we've summarized
5    pretty effectively.  I can go through it again.
6            I also -- I think I spoke to this a little bit
7    at the beginning of the rebuttal report, if that's
8    helpful.  Because one of the other experts mentioned
9    using the methodology of a literature review, I thought
10   it would be helpful.
11           And in discussion with counsel, decided to
12   include a statement that, while there was not a specific
13   literature review conducted about the health risks or
14   the excess vulnerability of infectious disease for
15   people experiencing homelessness, that the reason that
16   that can't be pointed to is because I've spent the last
17   five years studying, for example, drivers of mortality
18   and excess health risk in homelessness.
19           And I've done that same literature review, I
20   don't -- I don't know how many times.  I assign
21   articles, some of which were cited, you know, for
22   students to review and discuss and re- -- present back
23   to me for discussion.
24           This is something that is, you know, acutely
25   part of my working life, so to speak.  And so I'm not

```
 1   sure how else to contextualize that element of it.
 2           But with that experience in reviewing these
 3   materials, you can see where there are gaps between the
 4   terminology, for example; such as "soiled" or even
 5   "immediate health and safety risk," for example, as a
 6   threshold, which is not commonly applied in federal
 7   regulation or in public health definitions.
 8           There were gaps in what is considered a health
 9   risk based on review of the policy, the trainings,
10   et cetera.
11           So those differences are where I identify those
12   gaps, and that's what I point to in forming those
13   opinions.  And that's what's outlined in (a), (b), (c),
14   and (d).
15       Q.  Got it.  So let me see if I -- if I understand
16   what you're saying correctly.
17           So -- so based on your experience and your
18   knowledge in the field and those sorts of -- what we've
19   talked about a little bit, that's kind of like a -- for
20   lack of a better word, like a standard upon which you
21   compare --
22       A.  Hmm.
23       Q.  -- you compare what you reviewed; is that
24   right?
25       A.  Yeah.  A standard is a great word.  That
```

```
 1   guidelines and frameworks in the field of public health.
 2        Q.   And did you do anything to confirm whether DPW
 3   intended to use the specialized public health
 4   definition, the terms you use in your report?
 5        A.   No, which is why I've tried to allow for the
 6   fact that there may be many definitions possible with
 7   the terms they use.
 8        Q.   Have you ever drafted a bag-and-tag policy?
 9        A.   No.
10        Q.   Have you ever been consulted in connection with
11   someone drafting a bag-and-tag policy by any
12   jurisdiction?
13        A.   No.
14        Q.   Did you consider reviewing the policy similar
15   to the bag-and-tag policy for any jurisdiction?
16        A.   Policies that are similar to San Francisco's
17   bag-and-tag or policies that are similar to the idea of
18   a bag-and-tag?
19        Q.   Policies similar to San Francisco's bag-and-tag
20   policy.
21        A.   As I mentioned, I did look up what a few
22   other places are doing.  I can't remember the names
23   of different cities or jurisdictions; you used that
24   term.
25        Q.   Sorry.  Maybe I misunderstood your prior
```

```
 1  STATE OF CALIFORNIA    ) ss.
 2  COUNTY OF SAN MATEO     )
 3            I hereby certify that the witness in the
 4  foregoing deposition, BENJAMIN KING, Ph.D., MPH, was by
 5  me duly sworn to testify to the truth, the whole truth
 6  and nothing but the truth, in the within-entitled cause;
 7  that said deposition was taken at the time and place
 8  herein named; and that the deposition is a true record
 9  of the witness's testimony as reported by me, a duly
10  certified shorthand reporter and a disinterested person,
11  and was thereafter transcribed into typewriting by
12  computer.
13            I further certify that I am not interested in
14  the outcome of the said action, nor connected with nor
15  related to any of the parties in said action, nor to
16  their respective counsel.
17            IN WITNESS WHEREOF, I have hereunto set my
18  hand this 14th day of April, 2025.
19  Reading and Signing was:
20  ____ Requested   ____ Waived   __X__ Not Requested
21
22       [signature: Suzanne Andrade]
23
24       SUZANNE I. ANDRADE, CSR NO. 10682
25       STATE OF CALIFORNIA
```