EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL LLP
Vasudha Talla (SBN 316219)
1 Rockefeller Plaza, 8th Floor
New York, New York
Telephone: (212) 763-5000
vtalla@ecbawm.com

*Attorney for Plaintiffs*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

| | |
|---|---|
| COALITION ON HOMELESSNESS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, et al., <br><br> Defendants. | Case No. 4:22-cv-05502-DMR <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE CHRISTOPHER HERRING** <br><br> **Judge:** The Hon. Donna M. Ryu |

I.  **Introduction**

The Court should reject Defendants' attempt to exclude Dr. Herring's opinions; they mischaracterize his report, his testimony, and the case law. For almost two decades, Dr. Herring has focused his research and scholarship on homelessness and homeless encampments, co-directing two major surveys on individuals experiencing homelessness in San Francisco and authoring numerous peer-reviewed publications. City leaders themselves have recognized Dr. Herring's expertise; the Department of Homelessness and Supportive Housing hired Dr. Herring as a research affiliate, he served on SFPD's Homeless Advisory Board, and he has presented by invitation to the Police Commission, the Homeless Coordinating Board, and the Board of Supervisors. Ex. A (Herring Report) at 69, 73.[1]

Dr. Herring draws upon this wealth of knowledge and experience, as well as survey data, an analysis of City data, and field observations, to provide detailed and well-supported expert opinions on the practices that are at the core of this case. This Court has already relied on Dr. Herring's opinions twice—when granting a preliminary injunction and when denying Defendants' motion for summary judgment—demonstrating their value in assisting the factfinder. Dkt. 65 at 43; Dkt. 400 at 3. For the reasons outlined below, Dr. Herring's opinions are clearly admissible.

II.  **Legal Standard**

Federal Rule of Evidence 702 "contemplates a broad conception of expert qualifications," which may be obtained through "knowledge, skill, experience, training, or education." *Thomas v. Newton Intern. Enterprises*, 42 F.3d 1266, 1269 (9th Cir. 1994). District courts have "broad latitude . . . in deciding how to determine [expert] testimony's reliability." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 139 (1999).

---

[1] All exhibits are attached to the Declaration of Nisha Kashyap dated June 27, 2025. References to "Br." are to Defendants' motion, Dkt. 428.

"Rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee Notes, 2000 Amendments (citing cases). Once a court has found by a preponderance of the evidence that the admissibility requirement has been met, challenges to the expert "go only to the weight of the evidence." Fed. R. Evid. 702, Advisory Committee Notes, 2023 Amendments.

### III.  Dr. Herring Easily Meets the Requirements for Admissible Expert Testimony

#### A.  Dr. Herring's Extensive Analysis of City Data Should Not Be Excluded

The City's attempt to attack Dr. Herring's thorough, comparative analysis of multiple sources of City administrative data as "basic math" is specious. In his expert report, Dr. Herring completed *five* separate analyses comparing data from DPW, HSH, and SFPD databases, including replicating prior analysis he conducted in 2022, which the Court cited in issuing its preliminary injunction. *See* Ex. A at 18 (explaining prior analysis); Dkt. 65 at 43 (concluding that Plaintiffs had demonstrated a likelihood of success based in part on analysis by Dr. Herring showing a "large disparity" between bagged and tagged property and the number of people displaced at encampment resolutions).

Each of these five analyses drew upon his prior field work and his deep expertise in the City's encampment operations and City policies and practices. For example, Dr. Herring relied upon his knowledge of HSOC encampment resolutions to explain the inclusion of data on the number of tents or structures (Ex. A at 19-20), and his knowledge of SFPD policy to account for a notable increase in bag and tag numbers in August 2024. *Id.* at 25. Dr. Herring also explained the various City data sources he drew upon—and why he selected them. *See, e.g., id.* at 23-25 (explaining basis for focusing on police station pick-ups) and 31-32 (explaining how he selected data fields to estimate completed encampment operations). Additionally, Dr. Herring compared the conclusions of these analyses with the more-limited analysis the Court cited in support of the preliminary injunction. *Id.* at 21, 31.

The mere fact that Dr. Herring's methodology included—but certainly was not limited to—use of addition and subtraction does not render it "grade-school arithmetic . . . within the ken

of the average juror." *Waymo LLC v. Uber Techs., Inc.*, No. 17-cv-00939, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 6, 2017). Defendants' cases—both of which involved the exclusion of damages experts whose sole contribution was a single act of multiplication—are plainly inapposite. *Waymo LLC*, 2017 WL 5148390, at *5; *Erhart v. BofI Holding, Inc.*, 445 F. Supp. 3d 831, 841 (S.D. Cal. 2020). Dr. Herring's analysis, which requires applying knowledge of the City's practices to multiple sources of City data and drawing comparative conclusions, is not something "counsel can do on an easel." *Cf. Waymo*, 2017 WL 5148390, at *5.

### B. Dr. Herring's Opinions Account for Alternate Explanations

Dr. Herring's analysis should not be excluded for failure to account for alternate explanations. As a threshold matter, whether an expert accounts for alternate explanations is just one of many factors that may be considered by a court assessing the reliability of an expert's opinions; it is not dispositive. Fed. R. Evid. 702, Advisory Committee Notes, 2000 amendments. Further, Dr. Herring plainly accounts for alternate explanations in his opinions. In fact, one of the five numerical analyses he conducts is *intended* to assess alternate explanations for the data: whether the change in bag and tag rates is attributable to changes in arrests and citations or to DPW's conduct. Ex. A at 26-27. Dr. Herring also explicitly explained that his conclusions about the high rates of property destruction were not solely based on the data analysis—which showed little bagging and tagging—but also on corroboration from survey data and field research, which allowed him to rule out alternative conclusions, such as people keeping their property. Ex. B (Herring Depo) at 139:6-143:3 (explaining how he used survey data to corroborate results from numerical analysis and rule out alternate possibilities); *see also* Ex. A at 26-27 (discussing using additional data to ascertain whether increase in bagging and tagging was due to arrests or citations), 34-35 (explaining how data analysis corroborates survey findings); 44 (explaining how field observations corroborate survey findings and findings of other researchers); 56 (noting that field observations closely matched prior fieldwork).

Defendants cite *Perry v. Schwarzenegger*, where the court excluded a so-called marriage expert who held no relevant degrees, whose publications had not been peer-reviewed, and whose

work lacked the "intellectual rigor characterizing the practice of . . . sociologists." *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 946-51 (N.D. Cal. 2010). *Perry* has no bearing on the conclusions of a peer-reviewed sociology expert like Dr. Herring, whose conclusions were developed by considering—and, based on multiple sources of data, excluding—alternate explanations.

### C. Dr. Herring's Survey Properly Serves as the Basis for His Opinions

Defendants' criticisms of Dr. Herring's survey of over 200 unsheltered San Franciscans in February 2025 are predicated on inaccuracies or mischaracterizations; none warrant exclusion. As Dr. Herring explained in his deposition, Defendants' use of the phrase "statistically significant" is misleading. Ex. B at 83:6-24 ("[Statistical significance is] just not something we were evaluating in this case. . . . [W]e're not running regressions where we would use a model of statistical significance in this way."). Instead, Dr. Herring sought to survey enough people to draw broader conclusions—"over 5 percent of the total population of interest"—a sample size that Dr. Herring notes is comparable to "other survey data used by the City in their own PIT count survey, as well as other peer-reviewed academic publications covering homeless populations." Ex. B at 82:18-83:5; Ex. A at 14-15. Dr. Herring achieved his sought-after survey size—surveying 6% of who he deemed the relevant population: the number of San Franciscans residing "on street or in a tent." Ex. A at 14-15; Ex. B at 85:18-25.[2]

Defendants conflate this valid *survey size* with the low *response rate* that was excluded in *In re Autozone, Inc.*[3] Br. at 4. Defendants present no evidence that a 6% sample size of people residing on the streets or in tents is invalid for its size or composition, particularly where other

---

[2] These facts distinguish Dr. Herring's survey from the "descriptive statistics" excluded in *National Fair Housing Alliance v. Deutsche Bank National Trust*, where the expert did not explain how her sample comported with accepted methodology, was an appropriate sample size or adequately representative, or compared to research conducted by others. Br. at 4 (citing 2025 WL 975967, at * 33 (N.D. Ill. Mar. 31, 2025)).

[3] Defendants also cite another irrelevant case involving a survey with a low *response rate*, which was excluded for failure to ensure that the *nonresponses* were random. Br. at 4, n.1 (citing *Wallace v. Countrywide Home Loans Inc.*, No. 08-cv-1463, 2012 WL 11896333, at *4 (C.D. Cal. Aug. 31, 2012)).

academics and the City itself use comparable methods. *In re Autozone, Inc.*, No. 10-md-02159, 2016 WL 4208200, at *17 (N.D. Cal. Aug. 10, 2016).

Defendants' other critiques of the survey similarly fall flat. Survey respondents—who are not parties to the litigation—were not told that survey responses would be for use in a lawsuit, obviating the self-interest bias at issue in the cases Defendants cite. Defendants also offer no support for their contention that survey participants had to respond under oath; Dr. Herring certainly did not testify that surveys in his field are conducted under oath. Finally, Defendants' observation that Dr. Herring's survey questions do not *per se* demonstrate violations of the Bag and Tag Policy—or the Constitution, serves at most as a point for cross-examination. Dr. Herring's survey does not—and cannot—opine on the ultimate issues in the case.

### D. Dr. Herring May Consider Hearsay in Forming His Opinions

As a sociologist using a methodology that is standard in his field, Dr. Herring may rely on statements gathered during his field research. Experts may offer opinions based on hearsay "if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, Fed. R. Evid. 703, and if they are applying their training and experience to the sources before them and reaching an independent judgment." *Erhart*, 445 F. Supp. 3d at 839 (quoting *United States v. Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013)). Sociologists like Dr. Herring use field research as one of multiple sources of data. *See Garcia v. Los Banos Unified Sch. Dist.*, No. 1:04-CV-6059, 2007 WL 715526, at *11 (E.D. Cal. Mar. 8, 2007) (recognizing "sociological research methods including survey, field research, experimentation, and collection and analysis of data from different sources").

Moreover, as Dr. Herring described, he formed his opinions by "triangulat[ing] the data from the[] different sources," including the data analysis, survey data, and review of City records, and none of his conclusions "relied solely on . . . one individual or another." Ex. B at 52:12-25; 139:6-19; *see also Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 402 F. Supp. 3d 615, 719 (N.D. Cal. 2019), *aff'd sub nom. Planned Parenthood Fed'n of Am., Inc. v. Newman*, No. 20-16068, 2022 WL 13613963 (9th Cir. Oct. 21, 2022) (describing

triangulation as a "widely-accepted method" to validate research that is common in the field of qualitative research); *Garcia*, 2007 WL 715526, at *11 (describing triangulation as "taking different sources of data and relating the sources to each other to discern the presence of" gaps, inconsistencies, or errors). Dr. Herring specifically assesses individual statements against the "broader trends and data" to reach his conclusions. Ex. B at 232:22-234:19. Because Dr. Herring applied his independent judgment, training, and experience to assess the statements he gathered in his field research, none of Dr. Herring's opinions are excludable for considering hearsay.

### E. Dr. Herring's Field Observations Are Not Excludable Simply Because He Was Present

Defendants misconstrue Dr. Herring's presence in the field as impermissible "intervention," a distortion that is unsupported by either facts or law. What Defendants characterize as "intervention," was simply Dr. Herring asking an unhoused individual whose property was seized by the City to observe the post-seizure process at the Yard. Ex. B at 226:15-227:4 ("I explained to [the unhoused individual] my interest in seeing how this process worked. And when I told him this, he wanted – he agreed to go to the yard with me."). And it is unclear why Defendants care; neither Dr. Herring nor Defendants suggest that Dr. Herring's presence made City workers *more* likely to violate City policy or the law.

Even a cursory review of the cases Defendants cite makes clear the weakness of their argument. Defendants misleadingly cite *Scalia v. East Penn Manufacturing. Co,. Inc.* and *Vieira v. Chappell* for the proposition that Dr. Herring's opinions are excludable because he *may* have affected the behavior of his subjects in some unspecified way. Br. at 6. Neither case says this. In both cases, courts were considering whether to allow an expert to testify *about* this so-called effect. *Scalia v. E. Penn Mfg. Co.*, No. 18-cv-1194, 2020 WL 5409164, at *11 (E.D. Pa. Sept. 9, 2020); *Vieira v. Chappell*, No. 05-cv-01492, 2015 WL 641433, at *118 (E.D. Cal. Feb. 5, 2015). Defendants have no support to preclude Dr. Herring on the basis of speculative allegations of this purported effect.

Dr. Herring's report is based on sociology, not "personal opinions" of the type excluded in *Santa Clarita Valley Water Agency v. Whittaker Corp.*, No. 18-cv-06825, 2021 WL 6107023,

at *2 (C.D. Cal. Nov. 12, 2021), or excludable opinions on legal issues. *Cf. Williams v. Lockheed Martin Corp.,* No. 09-cv-1669, 2011 WL 2200631, at *16 (S.D. Cal. June 2, 2011) (excluding report opining on legal conclusions because it "amounts to written advocacy") (citation omitted).

### F. Dr. Herring Is Qualified to Opine on Notice and Post-Seizure Processes

Dr. Herring's opinions on notice and post-seizure process are based on methodology used by sociologists, including survey data, field research, and analysis of City records. *Cf. Garcia,* 2007 WL 715526, at *11. Using facts gathered through these methods, Dr. Herring offers information beyond common knowledge including firsthand observations of deficits in posted notices, the property retrieval process, and the storage yard itself (Ex. A at 39-42, 50-56); a comparison of City records to identify a pattern of shifting outside the noticed location (Ex. A at 37-39; Dkt. 366-1 at 1-2); and the City's practice of canceling scheduled resolutions without notice and the impact that this practice has on the decision-making of encampment residents. Ex. A at 43-44. His opinions are not excludable as common knowledge.

### G. Dr. Herring's Opinion on the Cyclical Nature of Homelessness is Well-Supported

Dr. Herring's opinion on the shifting and transitory nature of homelessness is supported by multiple sources, including a representative survey of nearly 600 unhoused San Franciscans Dr. Herring supervised, the City's own data, and research conducted by others. Ex. A at 57-61. The Court cited Dr. Herring's opinion in denying Defendants' Motion for Summary Judgment. Dkt. 400 at 3. The remainder of the City's critiques of this opinion are recitations of their standing arguments—which the Court rejected at summary judgment and Defendants are free to renew at trial. None of these legal arguments support excluding Dr. Herring's opinion.

## IV. CONCLUSION

The Court should deny Defendants' Motion to Exclude Christopher Herring's Expert Opinions.

Dated: June 27, 2025                                    Respectfully submitted,

                                                        By: */s/ Vasudha Talla*

                                                        EMERY CELLI BRINCKERHOFF

ABADY WARD & MAAZEL LLP
Vasudha Talla, SBN 316219
Zoe Salzman, *pro hac vice*
Vivake Prasad, *pro hac vice*
Bianca Herlitz-Ferguson, *pro hac vice*
1 Rockefeller Plaza, 8th Floor
New York, NY 10020
Telephone: (212) 763-5000
vtalla@ecbawm.com
zsalzman@ecbawm.com
vprasad@ecbawm.com
bherlitz-ferguson@ecbawm.com

By: */s/ Nisha Kashyap*

LAWYERS' COMMITTEE FOR CIVIL RIGHTS OF THE SAN FRANCISCO BAY AREA
Nisha Kashyap SBN 301934
Andrew Ntim SBN 347084
131 Steuart Street, Ste. 400
San Francisco, CA 94105
Telephone: (415) 543-9444
nkashyap@lccrsf.org
antim@lccrsf.org

By: */s/ John Thomas H. Do*

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA
John Thomas H. Do, SBN 285075
William S. Freeman SBN 82002
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
jdo@aclunc.org
wfreeman@aclunc.org

By: */s/ Scout Katovich*

AMERICAN CIVIL LIBERTIES UNION
Scout Katovich, *pro hac vice*
425 California Street
Suite 700
San Francisco, CA 94104
212-549-2500

skatovich@aclu.org

*Attorneys for Plaintiffs*

9