# EXHIBIT A

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| COALITION ON HOMELESSNESS; SARAH CRONK; JOSHUA DONOHOE; MOLIQUE FRANK; DAVID MARTINEZ; TERESA SANDOVAL, <div align="center">*Plaintiffs*,</div> <div align="center">*v.*</div> CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO POLICE DEPARTMENT; SAN FRANCISCO DEPARTMENT OF PUBLIC WORKS; SAN FRANCISCO DEPARTMENT OF HOMELESSNESS AND SUPPORTIVE HOUSING; SAN FRANCISCO FIRE DEPARTMENT; SAN FRANCISCO DEPARTMENT OF EMERGENCY MANAGEMENT <div align="center">*Defendants*.</div> | Case No.: 4:22-CV-05502-DMR |

# EXPERT REPORT OF CHRIS HERRING, PH.D.

CONFIDENTIAL

## Qualifications and Expertise

I am an Assistant Professor of Sociology at the University of California Los Angeles (UCLA). Attached as **Appendix A** is my Curriculum Vitae. Prior to my appointment at UCLA, I was appointed as a postdoctoral fellow at Harvard University's Faculty of Arts and Sciences. I received my Ph.D. in Sociology from the University of California, Berkeley. I also hold a master's degree in social Anthropology from Central European University and a B.A. in Economics from Bard College.

My areas of expertise as a professor and academic researcher include homelessness, housing, poverty, criminal justice, and welfare. I have taught undergraduate and graduate level university courses on homelessness since 2012. I have also conducted nearly two decades of research on homelessness, homeless encampments, shelters, affordable housing, and the impact of local government policies on homelessness and housing in the United States. I regularly peer-review scientific articles on these topics for leading journals in the social sciences. I also regularly conduct ethnographic research observing those experiencing homelessness in both unsheltered and sheltered settings.

I have written and published extensively on local government responses to homelessness—and often particularly on San Francisco's response to homelessness. These publications include seven peer-reviewed articles in leading journals and four book chapters in volumes of academic scholarship. *See* **Appendix A**. I am also currently writing a book on the policing and punishment of homelessness in San Francisco.

My research and commentary on these areas of expertise have been featured in the New York Times, Washington Post, Los Angeles Times, UK Guardian, and several other journalistic outlets.[1] I have also served as an external reviewer for Seattle University Law School's Homeless Advocacy Project and the University of California (Berkeley) Law School's Policy Advocacy

---

[1] *See, e.g.*, Sarah Holder, *Why Calling the Police About Homeless People Isn't Working*, BLOOMBERG (Sept. 25, 2019), https://www.bloomberg.com/news/articles/2019-09-25/should-you-call-to-report-a-homeless-person; Benjamin Oreskes, *San Francisco tests campsites as a homelessness solution*, LOS ANGELES TIMES (May 7. 2021), https://www.latimes.com/homeless-housing/story/2021-05-07/san-francisco-tests-campsites-homelessness-solution.

CONFIDENTIAL

Clinic on issues related to homelessness and the law—which has resulted in those institutions producing five full-length reports on the subject.[2]

Homelessness in San Francisco has been one of my major areas of study since I began my career as an academic. In addition to significant research and fieldwork on the ground with local government in San Francisco and with unhoused communities, I have also co-directed two major community-based surveys of people experiencing homelessness in San Francisco.[3] I am therefore deeply knowledgeable about homeless encampments, shelter availability, law enforcement practices, and the local government response to homelessness in San Francisco.

The opinions contained in this expert report are the result of my years of experience as a researcher and expert on homelessness in San Francisco and across the United States, as well as a collection of public records about San Francisco's recent response to homeless encampments and records produced in discovery in this case. These records—which were provided to me by Plaintiffs' counsel—specifically include recent data regarding encampment sweep and cleaning schedules, citation and arrest data, and property storage logs related to homeless encampments. A list of materials which I considered in developing my opinions contained in this report is attached as **Appendix B**.

I am being compensated at my standard hourly rates for my work on this report. My compensation is not affected by the substance of the opinions I am offering in this report. My standard rates are as follows: regular work at $200; deposition and testimony in trial at $300; and travel at $100 per hour.

---

[2] *See, e.g.*, Selbin, Jeffrey and Campos-Bui, Stephanie and Epstein, Joshua and Lim, Laura and Nacino, Shelby and Wilhlem, Paula and Stommel, Hannah, Homeless Exclusion Districts: How California Business Improvement Districts Use Policy Advocacy and Policing Practices to Exclude Homeless People from Public Space (July 27, 2018). UC Berkeley Public Law Research Paper, *available at* SSRN: https://ssrn.com/abstract=3221446.

[3] *See* Herring, Chris, Dilara Yarbrough, and Lisa Marie Alatorre. 2020. "Pervasive Penality: How the Criminalization of Poverty Perpetuates Homelessness." *Social Problems* 67 (1): 131–49 and Herring, Chris, Olivia Glowacki, Sam Lew, Christoph Hansmann, Jamie Chang, Pike Long, Dilara Yarbrough, Kelsey Ludwig, and Jenny Friedenbach. 2020. "Stop the Revolving Door: A Street Level Framework for a New System." *San Francisco: San Francisco Coalition on Homelessness*, https://www.cohsf.org/wp-content/uploads/2020/11/Stop-the-Revolving-1.pdf.

CONFIDENTIAL

All opinions contained herein are based on my significant expertise and the public records and other documents I have reviewed. I also reserve the right to amend my testimony with any new information as additional evidence becomes available, and to modify my analysis and resulting conclusions accordingly.

### Prior Sociological and Field Research on Homelessness in San Francisco

My ethnographic and field research on homelessness in San Francisco began in 2014. Between 2014 and 2016, I conducted an ethnographic study of San Francisco's unhoused population. During the study, I spent 57 nights sleeping out on sidewalks, parks, and beneath underpasses in San Francisco; 96 nights living among hundreds of other men in shelters; and 76 nights staying in daily or weekly hotels with people who were marginally housed.

I spent most days during the study period alongside a variety of homeless men and women acquiring the means of survival through charity, informal work, begging, and the illicit economy or through interacting with the local welfare and justice systems. I observed homeless individuals as they navigated access to shelter, meals, and benefits, and as they struggled to navigate the criminal process both in courts and in jails.

On a weekly basis—and often daily—I witnessed interactions between police, DPW, and unhoused people. I witnessed countless encampment clearances, cleanings, arrests, citations, and "move-along" orders directed towards unhoused people.[4] While residing on the streets of San Francisco for the purposes of this study, I personally experienced these cleanings and clearances, and was given dozens of "move-along" orders and threatened with citation and arrest on numerous occasions.

I also have first-hand experience observing front-line workers addressing homelessness in San Francisco through my ethnographic research. Between 2015 and 2017, I conducted 23 ride-

---

[4] A "move-along" order occurs when police officers order unhoused people to move from their location or face arrest or citation.

CONFIDENTIAL

alongs with police officers, shadowed public health workers on street outreach, and observed sanitation workers on encampment cleanings, clearances, and resolutions. For this case specifically, I carried out two weeks of targeted observations at and around scheduled HSOC resolutions and Joint Field Operations (JFOs), spent hours with individuals trying to reclaim their property at the DPW yard, and conducted a survey of 203 currently unsheltered homeless San Franciscans.

In 2016, I worked for three months in San Francisco City Hall as the research assistant to Samuel Dodge—who is the present director of Street Response Coordination but who at the time was the Director of the Mayor's Housing Opportunity, Partnerships and Engagement office. My work primarily focused on reforming City policies and linking people into supportive housing. I also worked with the San Francisco Treasurer's Office Financial Justice Initiative and the San Francisco Superior Court on reforms around unpaid citations for "quality of life" ordinances that punished homelessness.[5]

I have co-directed two major community-based surveys of people experiencing homelessness in San Francisco from 2014-2015 and 2019-2020.[6] One survey examined the impacts of policing on those experiencing homelessness in San Francisco with a sample of 351 survey participants and including 43 in-depth interviews of currently homeless San Franciscans (2014-2015). The other survey was a needs-assessment study involving 589 survey participants and 25 focus groups, each comprised of between five and twelve participants who were homeless at the time (2019-2020). These studies have been completed in collaboration with other academics, advocacy groups, and service providers.

Another method of analysis in my research is the analysis of City administrative data. Sections of my peer-reviewed publications on the subject have included the analysis of 7 years of Department of Emergency Management police dispatch data, amounting to over 3 million records,

---

[5] The SFPD and Courts define "homeless related quality of life ordinances" to include penal and municipal code violations that predominantly involve homelessness such as their sit-lie ordinance, illegal lodging, panhandling, blocking sidewalk, ban on tents, etc.
[6] *See* Chris Herring, *supra* note 3.

CONFIDENTIAL

311 reports from its publicly available portal, citation data from the courts, and the scrutiny of agency reports, memos, and emails including those of San Francisco's DPW, SFPD, HSH, and HSOC.

As a result of these research studies and my expertise, I have been called on to provide expert testimony on my research to the San Francisco Board of Supervisors, San Francisco's Local Homeless Coordinating Board, and the San Francisco Police Commission on at least seven occasions from 2015 to 2024.

From 2014-2020, I also volunteered with the Coalition on Homelessness. Among other activities, I performed outreach to unhoused individuals as well as proposed improvements to San Francisco's law enforcement and street cleaning policies to prevent the unwanted destruction of homeless people's property.

My sociological and ethnographic work in San Francisco is reflective of the kind of research work I have done across California and the United States more broadly. For example, between 2010 and 2011, I spent three months residing in both legally sanctioned encampments and informal settlements in Fresno, California as part of an ethnographic study aimed at understanding the social organization of encampments and the impacts of state regulations on surviving homelessness. From 2008 to 2012, I also completed a comparative study of twelve large sanctioned and informal homeless encampments across eight West Coast cities. For that study, I interviewed 14 City officials, 23 non-profit administrators and staff, and 32 homeless residents in various local jurisdictions.

This intensive ethnographic and field research into homelessness in San Francisco and beyond heavily informs my expertise in the field, in addition to my academic research and peer-reviewed publications on local government responses to homelessness in the United States.

**Expert Opinions Regarding San Francisco's Recent Response to Homelessness**

As described above, my expert opinions and conclusions identified in this report are based on my significant experience and familiarity with San Francisco's response to homelessness as an

CONFIDENTIAL

academic researcher, my general body of knowledge in the field of sociology and the study of homelessness in the United States, publicly available information regarding homelessness in San Francisco, and a review of the records provided to me by Plaintiffs' counsel detailing San Francisco's recent response to homelessness—which includes information about the day-to-day operations of the Healthy Streets Operation Center (HSOC), San Francisco's street homelessness task force. The foundation of these opinions is also based on my long-term embedded first-hand research observations alongside those experiencing homelessness on the streets, with City agency employees, and officials. This research has resulted in academic publications that I have authored or co-authored in the journals *American Sociological Review* (2019)*, Social Problems* (2020), and the *Annals of the American Academy of Political and Social Sciences* (2021).

Generally, the records provided by Plaintiffs' counsel spanned approximately three years of available data regarding DPW encampment operations, HSOC sweeps at homeless encampments, bag and tags, and property storage. *See* **Appendix B**. The records I reviewed included the following categories:

- Survey of unsheltered San Franciscans experiences with camp clearances and cleanings related to personal belongings: A survey of 203 unsheltered San Franciscans about their experiences with encampment clearances and City procedures around people's belongings between August 2024 and February 2025. The survey was conducted by myself and small team of PhD researchers between February 5 – February 8, 2024.

- Post HSOC resolution summaries. San Francisco's encampment resolution summaries include information about when and where sweeps of homeless individuals and their belongings were scheduled to and did in fact take place over the last several years. These schedules and reports include information about the number of unhoused people at the site, and numbers of tents and structures.

CONFIDENTIAL

- <u>Bag and tag tracker</u>. Per City policy, San Francisco's Department of Public Works (DPW) crews are required to keep a log of all property of unhoused people taken and stored following a sweep. These logs filled out at the DPW Yard in excel spreadsheet workbooks indicate dates of bag and tags, where the property was located when it was removed, what the property was, and information about who it belonged to.

- <u>CMMS database excel workbooks:</u> The CMMS database records all DPW encampment operations as well as all activities related to bag and tags. Two excel workbooks, one with all "encampment" entries and one with all "bag and tag" entries were provided by the City through a PRA request.

- <u>CMMS data scrape excel workbook:</u> PDFs of CMMS reports produced by the City were also scraped for data and used to create an excel workbook with additional fields beyond those in the City-provided CMMS spreadsheets from the PRA request, specifically the "comments" fields, which were used for my analysis of bag and tags related to arrests.

- <u>Homeless property information forms:</u> These are forms filled out by hand at the DPW Yard during intake of bag and tags into storage, which include the same information recorded into the bag and tag tracker. Including dates of bag and tags, where the property was located when it was removed, what the property was, and information about who it belonged to.

- <u>Observations and discussions with camp residents during camp resolutions, cleanings, and property retrieval:</u> I draw on observations of encampment cleanings and resolutions and conversations during two field visits during the weeks of August 25, 2024 and February 2, 2025 and their associated fieldnotes.

CONFIDENTIAL

- <u>Inspection of DPW yard:</u>  I draw on observations and conversations with DPW staff from my inspection of the DPW Yard on February 4, 2025.

- <u>DPW bag and tag training PowerPoint presentation</u>: A PowerPoint presentation detailing the DPW's bag and tag policies and procedures.

- <u>HSOC and JFO call notes</u>: Notes from HSOC officials summarizing each day's activities, including shifts in locations outside the designated zones with notifications.

- <u>Depositions:</u> Excerpts of transcripts from the depositions of Edgar Garcia, Jonathan Vaing, and Israel Graham.

I understand that the records Plaintiffs' counsel have provided to me is relevant data obtained by Plaintiffs through discovery in this case or through Public Records Act requests to a variety of City agencies including DPW, SFPD, and HSH—among others. Plaintiffs' counsel also responded to my several additional requests for data. To the extent my opinions below draw upon these records, I draw my conclusions based on the data as it has been provided to me. I reserve the opportunity to supplement my opinions in this matter if and when additional data becomes available. However, my findings below are opinions I hold based on my expertise in the field, my knowledge of San Francisco in particular, and the information currently available to me.

My review of the data, analysis, and research described in the above and foregoing paragraphs and my general expertise as an academic and researcher studying homelessness in San Francisco has led me to the following opinions:

**Opinion #1:** HSOC, the DPW, and SFPD engage in widespread property destruction instead of appropriately safeguarding and storing the belongings of unhoused individuals in accordance with the City's own policies.

CONFIDENTIAL

**Opinion #2:** Notice prior to encampment resolutions and cleanings does not conform with the Bag and Tag and HSOC policies and is not consistent or adequate.

**Opinion #3**: Recovering property taken by City agencies is difficult and rare due to the City's practices of bagging, tagging, and storing people's belongings.

**Opinion #4**: The shifting and transitory nature that is characteristic of homelessness means that individuals who have already exited unsheltered homelessness will likely experience involuntary unsheltered homelessness again in the short to medium term (1 month -5 years). They will be subject to the city's encampment clearances, which occur daily across the city.

\*\*\*

**Opinion #1:** HSOC, the DPW, and SFPD engage in widespread property destruction instead of appropriately safeguarding and storing the belongings of unhoused individuals in accordance with the City's own policies.

**Summary**

San Francisco agencies *require* its employees to allow unhoused individuals to take with them belongings they wish to keep. They are required to provide a "reasonable amount of time" to collect their belongings and to post advanced written notification during all encampment resolutions and regular encampment cleanings. *See* Department of Public Works Procedure 16.05.08, or https://sfpublicworks.org/services/bag-and-tag-process (hereinafter "Bag &Tag Policy"). Employees are required to collect, or what the DPW refers to as "bag and tag," and store the belongings of unhoused people who are not present following a sweep operation as well as any

CONFIDENTIAL

belongings people present may want to keep but are unable to move. If the City collects unattended property, a notice is supposed to be posted that property was collected with instructions for their retrieval. If items are bagged and tagged when the owner of the belongings is present, a person should be given the written notice with instructions on how to receive their belongings.

The written Bag and Tag Policy is in line with the Federal guidance issued by the Interagency Council on Homelessness (USICH), which makes clear that storing the valuable personal property of unhoused individuals is of paramount importance. The USICH guidelines,[7] which are also prominently linked on the City's own website for HSOC,[8] state, "Communities should take special care to avoid destroying personal belongings when an encampment closes and provide storage for an adequate period to allow a person the opportunity to collect their belongings. Fear of losing belongings can be a determining factor in whether a person chooses to move into a shelter or not. When an encampment is closing, or a person chooses to go into a shelter or treatment program that cannot accommodate all their belongings, providing secure, accessible storage options can ensure that they do not lose personal items, including clothing and identification."[9]

In this first opinion of my report, I carry out three sets of analysis broadly assessing the City's property collection and storage practices. One analysis draws on a survey of 203 unsheltered San Franciscans about their experiences with encampment clearances and City procedures around people's belongings between August 2024 and February 2025. Two other analyses draw on the City's own administrative data, comparing the number of bag and tags to the overall number of DPW operations as well as SFPD interactions that would require DPW to bag and tag and store people's belongings. The analysis of administrative data follows similar lines as those completed in my initial declaration in support of Plaintiffs' motion for a preliminary injunction with more refined data sources and over broader periods of times.

---

[7] USICH (US Interagency Council on Homelessness). 2022. "7 Principles for Addressing Encampments | United States Interagency Council on Homelessness (USICH)." Washington DC. https://www.usich.gov/tools-for-action/7-principles-for-addressing-encampments/. Last accessed March 4, 2024.

[8] https://www.sf.gov/healthy-streets. Last accessed March 9, 2024.
[9] https://www.usich.gov/sites/default/files/document/Principles_for_Addressing_Encampments_1.pdf. Last accessed March 4, 2024. (p7)

CONFIDENTIAL

The survey findings make clear that the vast majority of unsheltered San Franciscans have recently lost property that they wanted to keep, do not consistently receive advanced notice of DPW operations, are not consistently given notice of how to retrieve their property, and are unsuccessful at retrieving it. *90% of survey participants reported having belongings taken by DPW, SFPD, or other City employees in the past six months and 91% reported notices being inconsistent. Only 8% of participants reported being given notices about property retrieval each time belongings were taken and less than 1% (only 2 individuals of the entire sample) reported successfully recovering all their belongings.*

The analysis of administrative data shows that bag and tags are relatively rare occurrences during DPW encampment operations. *The data shows that in 2023 and 2024 an average of 24 bags are bagged and tagged each month during DPW encampment clearances and cleanings, while the operations encounter an average of 390 individuals and 284 structures at HSOC resolutions each month, and hundreds, if not thousands, more during other JFO operations, street cleanings, and 311 requests. In 2024, DPW recorded carrying out bag and tags at only 370 of its 1,693 encampment operations. The data also makes apparent that the majority of bag and tags collected and stored in the DPW yard between 2023-2024 were not instances where DPW workers are collecting and storing people's belongings from unattended property or encampment resolutions. They were instead largely police-driven bag and tags, carried out (a) to store the belongings of unhoused people who were brought into custody for an arrest or (b) to confiscate tents as "evidence" of illegal lodging citations.*

This is consistent with my findings covered in my initial declaration, which found "the disparity between the sheer number of people subjected to encampment resolutions and the number of logged bag and tags by DPW suggests that San Francisco fails to comply with its bag and tag policies during interactions with individuals experiencing homelessness." The updated analysis can examine the frequencies of bag and tags across not only HSOC resolutions as covered in my initial declaration, but across other DPW operations involving encampments. The analysis also relies on more refined data from DPW and the SFPD than that used for the initial declaration.

CONFIDENTIAL

I also personally spoke with more than 100 unhoused individuals during my observations of camp clearances between August 2024 and February 2025. Their experiences with property destruction are consistent with the survey data collected for this report, current and past surveys of San Francisco's unhoused conducted by myself and other faculty between 2015-2025, and experiences of hundreds of the unhoused individuals I interviewed in my earlier research in San Francisco. Their experiences also confirm what the City's administrative data itself implies—that the City is failing to properly collect and store individuals' belongings following encampment resolutions because the City is in fact engaging in widespread property destruction when it interacts with unhoused individuals.

**Survey Findings on the City's Handling of Houseless People's Belongings:**

<u>Methodology</u>

To evaluate whether the City is following its requirements for collecting and storing people's belongings, I conducted a survey of 203 unsheltered individuals in San Francisco during the first week of February 2025 about their experiences with camp clearances and cleanings. The short survey was designed to answer specific questions for analysis in this case but followed similar standards and processes for recruitment and data collection as in the surveys I have conducted in my own academic research that has been published in peer-reviewed journals.[10]

The survey asked participants about their experiences with encampment cleanings and clearances over the past 6 months. This time period was chosen to focus on the City's recent actions while the preliminary injunction was in effect. It also allows us to gauge to what degree the new training and reforms have or have not had. The survey asked eight questions about people's experiences with encampment cleanings and clearances (see **Appendix C**).

---

[10] Herring, Chris, Dilara Yarbrough, and Lisa Marie Alatorre. 2020. "Pervasive Penality: How the Criminalization of Poverty Perpetuates Homelessness." *Social Problems* 67 (1): 131–49.

CONFIDENTIAL

The survey was designed by myself in consultation with the legal team, with me ultimately determining how best to design and administer the survey consistent with standard best practices in my field. I collected survey responses and supervised a small team of three UC Berkeley graduate student researchers in the departments of sociology and public health who each had prior experience and were currently working with San Francisco's homeless population. The students received training both prior to entering the field and on-site by myself to assure consistency in recruitment standards and understanding of the survey questions. I personally carried out 35% of the surveys.

Recruitment for the survey took place in areas of Downtown San Francisco. 152, or about two-thirds of the surveys took place in the zones identified for the City's Joint Force Operations (JFO) in the Tenderloin and South of Market Areas where HSOC activities are also most highly concentrated. Another 51 were carried out in the Mission neighborhood and South of Market outside JFO areas, but that also are frequent sites of HSOC operations.

Most of the survey responses (147) were collected on a single day, February 8, 2025. Pairs of survey proctors were dispatched to discrete zones within the survey area. These measures greatly reduce the risk of duplicate responses. The other surveys were largely carried out by me from February 5 – February 8 in areas outside those surveyed on February 8.  Surveys typically took 2-3 minutes to conduct, and as is typical in the surveys I conduct for my academic research, respondents were paid $5 for their participation, regardless of the content of the answers they provided.

 All 203 survey participants were currently unsheltered in San Francisco at the time of the survey. To ensure fidelity of responses, participation was not limited to those who had experienced encampment clearances. When asked the question "In the past six months have you personally experienced an encampment clearance by DPW, the police, or other City employees?" of the 203 surveyed, 86% (174) answered yes. It is from this subset of responses that findings are drawn from to assess the City's handling of individual's belongings. This sample size of unsheltered homeless in San Francisco is a sizeable sample (6%) of the City's overall unsheltered homeless population

CONFIDENTIAL

on any given night, which was found in the most recent Point in Time Count to be 2,910 persons residing on the "street or in a tent."[11] This sample size is comparable to other survey data used by the City in their own PIT count survey, as well as peer-reviewed academic publications covering homeless populations.[12]

The finding that 86% of unsheltered people in our survey reported to have experienced encampment clearances in the past six months aligns with findings in an ongoing survey being conducted by an independent team of researchers at UCSF and RTI International, which similarly found that 82% (n=294) of the survey participants who were unsheltered were forcibly moved by police in the past three months. [13]

Survey Findings

- The City's provision of advance notice of clearances and cleanings is inconsistent. Of the 174 respondents who had recently experienced cleanings and clearances, only 8.6% reported being given advance notice of camp clearances each time.  91% reported the notices being inconsistent, reporting they had not been given notice each time of cleaning or clearance.

- It is common for City employees to take belongings that unhoused people wish to keep. Of the 174 respondents who had recently experienced cleanings and clearances, when asked "In the past six months have you had belongings taken by DPW, SFPD, or other City workers that you wanted to keep," 90% of respondents answered yes, while only 10% had not.

---

[11] https://www.sf.gov/reports--september-2024--2024-point-time-count

[12] Herring et al. 2020

[13] A National Institute on Drug Abuse funded research study currently being conducted among people who use drugs in San Francisco by researchers at RTI International and UCSF (personal communication: Alex Kral, March 4, 2025). The overall survey population for the UCSF survey was focused on people who use drugs in San Francisco of which 294 had experienced homelessness in the past three months.

CONFIDENTIAL

- The City rarely gives notice or a receipt of property removal to individuals whose belongings are taken. Of the 159 respondents who had their belongings taken by City officials, only 8% reported being given information about how to receive their belongings on each occasion.

- The City's process for retrieving confiscated property is almost never successful. Among the 159 respondents who had belongings taken, when asked "In the past six months have you been successful in retrieving all the belongings that you lost that you wanted to keep?" 99% answered no. Only 2 respondents reported successfully retrieving all their belongings.

Analysis

The survey data makes clear that losing one's belongings at the hands of City employees is a common and widespread experience for those experiencing homelessness in San Francisco. The finding that 90% of those who experienced an encampment clearance in the past six months lost property is also corroborated by findings in the ongoing survey research of the UCSF and RTI researchers previously mentioned, which found 65% of those forced to move by police experienced property loss in the past three months.[14] Receiving one's property back after the City has taken it is even rarer.

Together, these two findings indicate a systematic failure of the City's homeless property collection and storage process in handling people's belongings. The evidence is overwhelming clear that the City routinely seizes and destroys people's belongings that they wish to keep. This occurs despite the City's bag and tag policy currently in place and Healthy Streets Operation Centers encampment resolution protocols, which are both designed explicitly to prevent the destruction of people's belongings and protect people's constitutional rights.

---

[14] A National Institute on Drug Abuse funded research study currently being conducted among people who use drugs in San Francisco by researchers at RTI International and UCSF (personal communication: Alex Kral, March 4, 2025.

CONFIDENTIAL

These findings also represent a systematic failure in following the City's homeless street response guidelines and goals. According to HSOC's own "Mission and Values," HSOC's "Mission is to provide unified and coordinated City services and responses to unsheltered persons experiencing homelessness" and to "lead with compassion and respect."[15] To accomplish these goals, HSOC purportedly follows the federal guidance of procedures and processes outlined by the US Interagency Council on Homelessness. The USICH guidelines for encampment resolutions,[16] which are prominently linked on the City's own website for HSOC[17] states, "Communities should take special care to avoid destroying personal belongings when an encampment closes and provide storage for an adequate period to allow a person the opportunity to collect their belongings. Fear of losing belongings can be a determining factor in whether a person chooses to move into a shelter or not." HSOC encampment resolution policies include "Issue 72-hour notice of the encampment resolution (verbal and written)," "Conduct robust and culturally competent outreach to residents of the encampment to understand their shelter, housing, health, behavioral health and service needs."[18] The survey findings point to HSOC's systemic failures in their policy and processes on accounts of consistently providing advanced notice, coordinating agency response of agencies to avoid loss of people's belongings, and its goals of leading with compassion and respect.

In conclusion, the survey findings make clear that the on-the-ground reality for unsheltered San Franciscans in being able to maintain their belongings remains unchanged since before the preliminary injunction, or with the recent increase in encampment clearances and resolutions since the United States Supreme Court's decision in *Johnson v. Grants Pass*, even worse. The survey findings show the City's failure to protect its unhoused residents' rights to personal property by

---

[15] https://www.sanfranciscopolice.org/sites/default/files/Documents/PoliceCommission/PoliceCommission090518-HSOCPresentation.pdf

[16] https://www.usich.gov/sites/default/files/document/Principles_for_Addressing_Encampments_1.pdf

[17] https://www.sf.gov/healthy-streets. Last accessed March 9, 2024.

[18] https://www.sf.gov/sites/default/files/2024-10/HSOC%20Encampment%20Resolution%20Policy.pdf

CONFIDENTIAL

making it possible for them to keep valued belongings or recover them in the rare circumstances that they are stored.

**Comparing HSOC and DPW homeless related operations and Bag and Tag Records:**

In my original declaration in support of Plaintiffs' motion for a preliminary injunction, I compared the total number of bag and tag records of each month against the total number of people recorded present at HSOC encampment resolutions over six months between January and June 2021. (Dkt. No. 9-1 at 29-31.) During that time, DPW only logged 195 bag tag forms, while during the same period HSOC reported displacing at least 1,282 people in encampment resolutions.  I concluded that the disparity between the sheer number of people subjected to encampment resolutions and the number of logged bag and tags by DPW suggested that San Francisco failed to comply with its bag and tag policies during interactions with individuals experiencing homelessness. In my supplemental declaration in support of Plaintiffs' reply to the motion for preliminary injunction, I examined a more recent time-period and came to the same conclusion, as the data showed a similar disparity with no significant increase in the rate of bag and tags. (Dkt. No. 49 at 15-16.) To assess to what degree bag and tag rates may have changed now as compared to this initial period, I carried out a set of analysis with the data provided to me.

***How often do Bag and Tags Occur Compared to the Number of People of Experiencing Homelessness, Tents, and Structures at HSOC Resolutions?***

<u>Methodology</u>

*HSOC Post Resolution Data compared to Bag and Tag Tracker*

To assess to what degree bag and tag rates may have changed relative to the number of

CONFIDENTIAL

individuals recorded as being present at HSOC operations since the injunction, I conducted the same analysis during the most recent period of which I was given both bag and tag log data and Post HSOC resolution data in 2024. For this analysis, I used the DPW's Bag and Tag Tracker excel sheets for 2024 (CCSF-COH_356951), and 2023 (CCSF-COH_357329), which is the same dataset I used in my PI analysis for earlier years. This spreadsheet I understand to be filled out at the DPW Yard along with the Homeless Property Information forms; it documents the bag and tags that are processed for intake and ultimately stored in the locked containers dedicated to homeless storage.

The Bag and Tag Tracker spreadsheets allowed me to determine how many bag and tags occurred each month. The excel workbooks provided to me included data from 2020 to Dec 6, 2024. I carried out my analysis only on the two most recent years available from covering the period of January 1, 2023 – December 6, 2024. Since I did not have a full month of data for December 2024, I limited my analysis to the first 11 months of the 2024 year.[19] I then compared these bag and tag numbers to the number of people experiencing homelessness recorded to be initially present at each HSOC resolution and the number of tents or structures at the start of each HSOC resolution during the months of 2024 and 2023. These numbers are recorded in the "Post-HSOC Resolution Summaries" (CCSF-COH_573455) under the fields "number of individuals onsite at start" and "number of tents or structures at start." In the PI analysis I only included the number of individuals present. This is important because bag and tags of people's property who are present can occur when individuals are either not given adequate time to collect their belongings, are unable to move their belongings, or if they are arrested or cited. However, because unattended property is also often destroyed or could be bagged and tagged, I have

CONFIDENTIAL

included the HSOC team's counts of tents and structures as well.

Findings and Analysis

**Table 1 & 2: Bag and Tag Entries compared to Number of Individuals at HSOC Resolutions and Number of Tents or Structures at HSOC Resolutions Source: Bag and Tag Tracker; Post-HSOC Resolution Summary**

| 2023 | Bag and Tags | # of individuals at HSOC resolutions | # of tents or structures at HSOC resolutions |
|---|---|---|---|
| January | 52 | 305 | 300 |
| February | 49 | 391 | 321 |
| March | 43 | 390 | 361 |
| April | 41 | 370 | 395 |
| May | 49 | 375 | 340 |
| June | 41 | 289 | 195 |
| July | 45 | 260 | 253 |
| August | 66 | 359 | 308 |
| September | 53 | 402 | 310 |
| October | 54 | 417 | 285 |
| November | 47 | 350 | 281 |
| December | 43 | 330 | 276 |
| | | | |
| Total | 583 | 4238 | 3625 |

| 2024 | Bag and Tags | # of individuals at HSOC resolutions | # of tents or structures at HSOC resolutions |
|---|---|---|---|
| January | 36 | 325 | 281 |
| February | 54 | 351 | 311 |
| March | 69 | 387 | 359 |
| April | 63 | 424 | 331 |
| May | 55 | 481 | 298 |
| June | 47 | 551 | 248 |
| July | 59 | 514 | 290 |
| August | 80 | 563 | 227 |
| September | 121 | 332 | 215 |
| October | 77 | 554 | 213 |
| November | 66 | 333 | 145 |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **Total** | **727** | **4815** | **2918** |

According to the Bag and Tag Tracker, DPW logged 583 bag and tags in 2023, while during the same period HSOC reported displacing 4,238 individuals in encampment resolutions involving 3,625 tents or structures. In 2024, DPW logged 727 bag and tags in the first 11 months of 2024, while during the same period HSOC reported displacing at least 4,815 people in encampment resolutions involving 2,918 tents or structures. While both years represent a marked increase in bag and tags as compared to the period I examined in the PI, they also show a higher number of individuals being displaced. And although bag and tags are occurring at a higher rate in relation to the number of those being displaced in HSOC resolutions than in the past, the disparity between the sheer number of people and structures being handled a encampment resolutions and the number of logged bag and tags by DPW, alongside the fact that HSOC resolutions represent just a subset of DPW encampment operations involving hundreds if not thousands of additional unhoused individuals and structures not accounted for in this analysis, suggests that San Francisco continues to fail to comply with its bag and tag policies during interactions with individuals experiencing homelessness.

Methodology

*HSOC Post Resolution Data compared to DPW Bag and Tag Logs subtracting Police Station Pick-ups*

While the findings above point to the overall number of bag and tags compared to the number of people and structures at HSOC operations, most bag and tags occur outside of HSOC

CONFIDENTIAL

resolutions. This was also noted in my declaration in support of the preliminary injunction. (Dkt. No. 9-1 at 30.)  Ideally, I would be able to compare just the number of bag and tags occurring at HSOC operations to the numbers of people and structures involved, but the City does not track the number of bag and tags at HSOC resolutions on its log, or at least in any easily analyzable way that I found. Nor does the Bag and Tag Tracker or CMMS data clearly denote this.

However, in examining the data provided to me for this report, I noticed that a large number of addresses listed on the Bag and Tag Tracker and CMMS data are SFPD police stations. This matched the homeless property forms that noted the police station addresses and included a box checked "PD pickup." These "police pick-up bag and tags" listed with police station addresses represent instances where, following police and DPW protocol, a police officer would call a DPW employee *to the police station* to pick up (a) the property of an unhoused person who the police have taken into custody or (b) a tent (or similar covering) that has been taken by the police as evidence of a misdemeanor citations for illegal lodging. This indicated that these police pick-up bag and tags occurred outside of HSOC operations, JFOs or other DPW street cleanings and camp clearances since, in those instances where DPW is already present, the property would otherwise be taken directly to the DPW Yard rather than a police station.

These facts of police pickup bag and tags were confirmed in a few ways. First, during my inspection of the DPW Yard, I asked Edgar Garcia, an operations supervisor that oversees the DPW Special Projects Crew and the Reactionary Crew, about the Police Station Bag and Tag pick-up process. We were inside one of the Bag and Tag Storage containers and I was asking him about the various belongings with red tags that included arrest information and beige tags that listed citation information. Garcia told me that DPW picks up those belongings from police stations. He noted that he doesn't know what happens with those belongings at the police station,

CONFIDENTIAL

and that the red and beige tags are filled out there or can be put on bags in the field with officers.

This is confirmed in Garcia's deposition where he says he believes the red and beige tagged

items come in exclusively from the police station pick-ups (P74, 1-25). During my inspection of

the DPW Yard I also spoke with the communications dispatcher, Eric, in the radio room, he

described instances where a person comes to retrieve property following an arrest or citation,

which DPW does not have, in which case they call the police to see if it's being kept by them at

either the police station or jail. Israel Graham, a DPW General Labor Supervisor, also describes

his experience picking up items from police stations for DPW (p79-81) in his deposition, and

Jonathan Vaing, Acting Superintendent for DPW BSES, confirmed that the bag and tag tracker

entries that list the police station address are pick-ups of unhoused people's belongings at the

police station (p176, 7-22).

     To provide a more accurate picture then of how frequently bag and tags are occurring in

relation to the number of people present at formal encampment clearances (where DPW is

present), it would therefore make sense to *subtract* from the total number of bag and tag records

the number of police pickup bag and tag records with police station addresses as the pick-up

location.

     To do this, I used the Bag and Tag Tracker and repeated the same initial analysis after

removing all those bag and tag entries that listed a police station address. As seen in the findings

below this shows that there are in fact even a far lower number of bag and tags occurring at

coordinated encampment clearances or street cleanings and provides a more accurate rate of

which bag and tags occur at HSOC and DPW operations (see table 2).

Findings and Analysis

CONFIDENTIAL

**Table 3&4: Bag and Tag Logs Excluding Police-Station Pick-ups to Number of Individuals at HSOC Resolutions**
**Source: Bag and Tag Tracker**

| 2023 | Bag and Tags Excluding PD Pick-Ups | # of individuals at HSOC resolutions | # of tents or structures at HSOC resolutions |
|---|---|---|---|
| January | 10 | 305 | 300 |
| February | 15 | 391 | 321 |
| March | 10 | 390 | 361 |
| April | 16 | 370 | 395 |
| May | 16 | 375 | 340 |
| June | 9 | 289 | 195 |
| July | 18 | 260 | 253 |
| August | 23 | 359 | 308 |
| September | 11 | 402 | 310 |
| October | 18 | 417 | 285 |
| November | 14 | 350 | 281 |
| December | 11 | 330 | 276 |
| | | | |
| Total | 171 | 4238 | 3625 |

| 2024 | Bag and Tags Excluding PD Pick-Ups | # of individuals at HSOC resolutions | # of tents or structures at HSOC resolutions |
|---|---|---|---|
| January | 5 | 325 | 281 |
| February | 16 | 351 | 311 |
| March | 23 | 387 | 359 |
| April | 24 | 424 | 331 |
| May | 23 | 481 | 298 |
| June | 20 | 551 | 248 |
| July | 23 | 514 | 290 |
| August | 56 | 563 | 227 |
| September | 93 | 332 | 215 |
| October | 50 | 554 | 213 |
| November | 46 | 333 | 145 |
| | | | |
| Total | 379 | 4815 | 2918 |

*Months highlighted in grey represent period after SFPD policy change regarding property collection (see below for details)

CONFIDENTIAL

Removing the bag and tags that were picked up at police stations by DPW reduces the total number of bag and tags by almost exactly half of the total in the Bag and Tag Tracker data. This gives us a more accurate picture of how much bag and tagging is occurring at encampment operations such as HSOC resolutions relative to the level of individuals and structures being displaced. In 2023, DPW recorded only 171 bag and tags outside of police station pick-ups, while during the same period HSOC reported displacing 4,238 individuals in encampment resolutions involving 3,625 tents or structures. In 2024, DPW logged 379 bag and tags outside of police station pickups in the first 11 months of 2024, while during the same period HSOC reported displacing at least 4,815 people in encampment resolutions involving 2,918 tents or structures.

As is apparent in the data, we see a significant jump in the number of bag and tags excluding PD pick-ups starting in August 2024 and continuing through November 2024. This is likely due to SFPD Department Notice 24-114 issued July 8, 2024 (an update to DN 20-167) that outlines policy and procedures for processing property for removal or collection or property subject to an incident of arrest of a homeless subject. The directive instructs that "[SFPD] Members **should not** determine the status of the property. Members should contact DPW to respond to the scene who will assess and determine the status of the property (i.e. unattended, abandoned, or presents an immediate health or safety risk)" (bold in original). Therefore, the increased numbers during these months likely do not so much represent an increased amount of property being bagged and tagged at DPW encampment operations, but rather DPW being proactively called by police to collect property as a result of an arrest or citation of an unhoused person.

CONFIDENTIAL

**Therefore, the data shows that in most months, there are typically only between 20-24 bag and tags during DPW encampment operations, even though DPW makes contact with not only the hundreds of unhoused people at HSOC resolutions but hundreds, if not thousands, more unhoused people each month when including the JFO operations, street cleanings, and 311 requests.** The persistent and even greater disparity between the sheer number of people and structures being handled at HSOC encampment resolutions and the number of logged bag and tags by DPW outside of PD pickups, alongside the survey findings previously discussed, suggests that San Francisco continues to fail to comply with its bag and tag policies during interactions with individuals experiencing homelessness.

*What Portion of Bag and Tags are Police Driven and Arrest-Related as compared to Bag and Tags Related to Storing Belongings of Individuals at DPW Encampment Resolutions?*

<u>Methodology</u>

One concern that dovetails with the findings above is what proportion of bag and tagging are a result of police arrests and citation and what proportion represent DPW workers bag and tagging unattended belongings or those belongings of people at encampment clearances. As discussed above, if a homeless person is arrested, DPW is called to bag and tag their belongings while they are in custody and if a person is given a 647e citation for illegal lodging, their tent may be bag and tagged as "evidence." This is distinctly different than situations where DPW workers in the course of HSOC resolutions or street cleanings come across unattended property or need to store belongings of an individual who may not be able to move all their property. We would also want to be able to determine to what degree a change in bag and tagging might be

CONFIDENTIAL

attributed to say an increase in arrests or citations vs. DPW workers increasingly bag and tagging

property at encampment operations in greater compliance with City policies.

Expanding the analysis in the previous section, I followed the same methodology in

identifying police station pick-ups. I used the Bag and Tag Tracker data to examine the number

bag and tags logged with police station addresses listed as the location as a proportion of the total

number of bag and tags for the 11-month period of data I had available for 2024.

Next, the CMMS data also denotes whether the bag and tag was a result of an arrest. This

can be found in the "comments" section of the CMMS data, where it lists the "arresting officer"

and "arrestee." This gives us an additional data-point to address the question as to Bag and Tags

that are driven by police enforcement as opposed to DPW workers collecting and storing

people's property at cleanings as they go about their work. As earlier mentioned, citations and

arrests of houseless persons occur both outside DPW operations as well as during DPW

encampment cleanings, clearances, and resolutions. This section analyzes what proportion of bag

and tags are arrest related captures *both* instances – whereas the other analysis focused on police

station pickups leaves out the bag and tag arrests occurring *at* DPW encampment operations. If a

bag and tag occurs due to an arrest during an encampment operation and requires a bag and tag

for someone in custody, this again is very different than the case of DPW workers determining to

store unattended belongings or the belongings of people onsite during encampment operations

who for whatever reason cannot maintain their property.

For this analysis I drew from an excel sheet created that scraped the data from CMMS

reports produced in PDF format by Defendants (see e.g. COH_363002 to CCSF-COH_363006).

I used this scrape because the CMMS data produced in excel format in response to Plaintiffs'

CONFIDENTIAL

Public Records Act request did not include the comments section related to each service request that listed arrest information, whereas the PDF format CMMS reports did contain the comments.

    This analysis was completed only with the CMMS data and limited to the Bag and Tag problem code entries marked as "resolved," which had service codes matching those in the Bag and Tag Tracker. I then filtered the comments sections to only include entries that contained "arrest" in the field. This could include "arresting officer" "arrestee" or other discussions of an arrest associated with the bag and tag. The Bag and Tag Tracker data does not provide a similar indication of an arrest. Therefore, table 7 includes CMMS data on arrests for 2023 and 2024 alongside the bag and tag counts from the Bag and Tag Tracker.

Findings

**Table 5 & 6: Police Station Bag and Tags as Proportion of Total Bag and Tags 2023 and 2024**
**Source: Bag and Tag Tracker**

| 2023 | Bag and Tags | PD Station Bag and Tags | PD Station Bag and Tags as % of Total |
|---|---|---|---|
| January | 52 | 42 | 81% |
| February | 49 | 34 | 69% |
| March | 43 | 33 | 77% |
| April | 41 | 25 | 61% |
| May | 49 | 33 | 67% |
| June | 41 | 32 | 78% |
| July | 45 | 27 | 60% |
| August | 66 | 43 | 65% |
| September | 53 | 42 | 79% |
| October | 54 | 36 | 67% |
| November | 47 | 33 | 70% |
| December | 43 | 32 | 74% |
| | | | |
| **Total** | **583** | **412** | **71%** |

CONFIDENTIAL

| 2024 | Bag and Tags | PD Station Bag and Tags | PD Station Bag and Tags as % of Total |
|---|---|---|---|
| January | 36 | 31 | 86% |
| February | 54 | 38 | 70% |
| March | 69 | 46 | 67% |
| April | 63 | 39 | 62% |
| May | 55 | 32 | 58% |
| June | 47 | 27 | 57% |
| July | 59 | 36 | 61% |
| August | 80 | 24 | 30% |
| September | 121 | 28 | 23% |
| October | 77 | 27 | 35% |
| November | 66 | 20 | 30% |
| | | | |
| Total | 727 | 348 | 48% |

**Table 7: Bag and Tags Involving Arrest Compared to Total Bag and Tags 2024**
**Source: CMMS Scrape and Bag and Tag Tracker**

| 2024 | Bag and Tags | PD Arrest Bag and Tags | % of Total Bag and Tags related to Arrest |
|---|---|---|---|
| January | 36 | 27 | 75% |
| February | 54 | 34 | 63% |
| March | 69 | 53 | 77% |
| April | 63 | 35 | 56% |
| May | 55 | 33 | 60% |
| June | 47 | 24 | 51% |
| July | 59 | 46 | 78% |
| August | 80 | 42 | 53% |
| September | N/A | N/A | N/A |
| October | N/A | N/A | N/A |
| November | N/A | N/A | N/A |
| | | | |
| Total | 463 | 294 | 63% |

CONFIDENTIAL

Analysis

These findings indicate that the bagging and tagging the property of people experiencing homelessness in San Francisco is largely, if not primarily, a police-driven activity related to storing the belongings of homeless people in custody or confiscating tents as "evidence" for illegal lodging violations. In 2023, 71% of all bag and tags recorded by DPW were police-related, listing police stations as the location for bag and tags. In 2024, 63% of all bag and tags recorded were recorded as police station pick-ups.

From these findings, we can see that DPW workers bag and tagging unattended property or unhoused person's property at camp clearances and cleanings only represent between 14%-49% of bag and tags in any given month. When assessing whether the City is following its bag and tag policies, this distinction is important for gauging the total number of bag and tags occurring at camp cleaning and clearances as opposed to overall bag and tag numbers and data, further indicating how little collection and storage of people's property is occurring in these activities.

The finding that arrest-related bag and tags comprised 54% of the total bag and tags in August 2024 also suggests that the increase in bag and tags occurring outside "police pick-ups" that began that month (see Table 4) was due to a change in police procedure in handling property under the departmental notice issued in July 2024 vs. an increase in DPW driven bag and tags at cleanings and clearances or a decrease in arrests or citations. This is further supported by

CONFIDENTIAL

publicly available police incident reports, which show a marked uptick in citations for illegal

lodging beginning in August 2024 after the overturning of *Johnson v. Grants Pass* and lifting of

the preliminary injunction as to the former Eighth Amendment claim in this lawsuit. However,

despite this departmental notice makes clear that officers should no longer bring back personal

belongings of homeless arrestees or evidence for illegal lodging, the data presented in Table 6

shows this still frequently occurs. Although there has been a reduction in both the number and

proportion of bag and tags with police station pickups listed as the address after the notice, in the

first four months that the policy has been in place, from August 1 -  December 1, 99 of the total

344 bag and tags in this period have listed police station addresses, or 29% of the total bag and

tags.

### How often do Bag and Tags Occur Compared to the Number of DPW Encampment Operations?

<u>Methodology</u>

*DPW Encampment Operations compared to Bag and Tags in the DPW CMMS logs*

As previously mentioned, DPW logs all homeless encampment operations in their

CMMS database. I did not have this data for my initial declaration. Unlike the Post-HSOC

Resolution Reports, this data set does not record the number of people present at a given

encampment. Rather than comparing the number of bag and tags to the number of people and

structures, this dataset allows us to estimate how often bag and tags occur in comparison to the

total number of DPW encampment operations, including, but not limited to HSOC operations.

In this analysis I compared the total number of DPW operations labeled "encampment" in

the CMMS system's "problem code" field and compared this to the number of "bag and tags"

CONFIDENTIAL

recorded in the Bag and Tag Tracker. I used the excel sheet, provided by the City in response to Plaintiffs Public Records Act request, entitled "encampment 22-25." In the "completion code" field I removed all entries labeled as "Not in Public Works Scope: Referred to Police Department," "Area was cleaned, and no encampment was found," "no work needed," "duplicate," "null," "transferred," and "duplicate request." The remaining records clearly indicate that DPW workers interacted with an encampment in their operation. These codes included "Area was cleaned around the encampment. Tent remains due to COVD-19", "Area was cleaned around the encampment; referred to the Police Dept," and "Encampment was removed." I did this to get the best estimate of encampment operations that actually occurred, and to not overcount by including irrelevant requests. However, this could very well be a conservative undercount depending on the labeling practices of DPW workers of their operations. While the CMMS data included entries up until February 25, 2025, because I only had available bag and tag data from the Bag and Tag Tracker up until December 6, 2024, I limited my analysis up until December 2024. I used the "reported date" to sort entries by year.

Again, as covered in the previous section, I removed the bag and tag entries that included a police station address. This provides a more accurate picture of how frequently bag and tags are occurring in the field where people's belongings are being bag and tagged because they are unattended or because they are unable to move all their belongings, rather than bag and tags where unhoused people's belongings are being picked up from a police station because the unhoused person is in custody. This also helps clarify how or if an increase of bag and tag is being driven by increased numbers of arrest and citations, which require bag and tags, as opposed to bag and tags carried out by DPW to protect and store unhoused people's belongings who are not being criminally processed.

CONFIDENTIAL

Findings

**Table 5: Total Bag and Tags compared to Total DPW Encampment Operations (excluding police station pick-ups)**
**Source: CMMS PRA Data; Bag and Tag Tracker**

| 2024 | DPW Encampment Operations | Bag and Tags Excluding PD Pick-Ups |
|---|---|---|
| **January** | 61 | 5 |
| **February** | 101 | 16 |
| **March** | 128 | 23 |
| **April** | 153 | 24 |
| **May** | 144 | 23 |
| **June** | 132 | 20 |
| **July** | 162 | 23 |
| **August** | 262 | 56 |
| **September** | 178 | 93 |
| **October** | 208 | 50 |
| **November** | 164 | 46 |
| | | |
| **Total** | 1693 | 379 |

Analysis

      According to the Bag and Tag Tracker and CMMS, DPW logged 379 bag and tags in the first 11 months of 2024 across at least 1,693 encampment operations. This disparity between the number of operations and the number of logged bag and tags by DPW, alongside the survey and other data, suggests that San Francisco continues to fail to comply with its bag and tag policies during interactions with individuals experiencing homelessness.

**Conclusion**

CONFIDENTIAL

Since my analysis of the preliminary injunction, the City has increased the number of times it bag and tags people's property, and increased the amount of documentation and data collection of this process. However, much of the bag and tagging relates primarily to police activities as opposed to DPW workers bag and tagging unattended property or individuals at camp resolutions. In addition, the number of camp resolutions and routine cleanings have increased. According to the City's own data, the rate of bagging and tagging remains extremely low.

Meanwhile, the survey findings make clear, that the on-the-ground reality of those experiencing homelessness and their ability to maintain property remains the same, or possibly worse, than three years ago. The belongings lost of those I spoke with in surveys included essential survival gear for protection, health, and safety including prescription medicine, tents, tarps, shelter, clothing, coats, shoes, sleeping bags, blankets, flashlights, bicycles, cell phones, and chargers; valuables including laptops, money, electronics, tools; important documentation including birth certificates, IDs, drivers licenses, and passports, all of which are often necessary for accessing social services, jobs, and housing; and sentimental items such as the last remaining photographs of family members and sentimental keepsakes. As research consistently shows, such property loss at the hands of City employees inflicts substantial material and psychological harms on individuals, increases the risks to both personal and public safety and health, deepens people's poverty, and extends individual's homelessness.[20]

---

[20] *See, e.g.*, CDC. 2022. "Guidance on Management of COVID-19 in Homeless Service Sites and in Correctional and Detention Facilities." Centers for Disease Control and Prevention. 2022.
https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html; Chang, Jamie Suki, Philip Boo Riley, Robert J. Aguirre, Katherine Lin, Marius Corwin, Nicole Nelson, and Madison Rodriguez. 2022. "Harms of Encampment Abatements on the Health of Unhoused People." *SSM-Qualitative Research in Health* 2:100064; Darrah-Okike, Jennifer, Sarah Soakai, Susan Nakaoka, Tai Dunson-Strane, and Karen Umemoto. 2018. "'It Was Like I Lost Everything': The Harmful Impacts of Homeless-Targeted Policies." *Housing Policy Debate* 28 (4): 635–51; Goldshear, J. L., N. Kitonga, N. Angelo, A. Cowan, B. F. Henwood, and R. N. Bluthenthal. 2023. "'Notice of Major Cleaning': A Qualitative Study of the Negative Impact of Encampment Sweeps on the Ontological Security of Unhoused People Who Use Drugs." *Social Science & Medicine* 339:116408.; Herring, Chris. 2019. "Complaint-Oriented Policing: Regulating Homelessness in Public Space." *American Sociological Review* 84 (5): 769–800; Herring, Chris, Dilara Yarbrough, and Lisa Marie Alatorre. 2020. "Pervasive Penality: How the Criminalization of Poverty Perpetuates Homelessness." *Social Problems* 67 (1): 131–49; Westbrook, Marisa, and Tony Robinson. 2021. "Unhealthy by Design: Health & Safety Consequences of the Criminalization of Homelessness." *Journal of Social Distress and Homelessness* 30 (2): 107–15.

CONFIDENTIAL

Together, along with the findings presented and subsequent sections of this report lead me to conclude that HSOC, the DPW, and SFPD engages in widespread property destruction instead of appropriately safeguarding and storing the belongings of unhoused individuals in accordance with the City's own policies.

<div align="center">***</div>

**Opinion #2:** Notice prior to encampment resolutions and cleanings does not conform with the Bag and Tag and HSOC policies and is not consistent or adequate

San Francisco agencies *require* its employees to post advanced written notification during all encampment resolutions and regular encampment cleanings (Bag &Tag Policy, page 7). HSOC Encampment Resolution Policies requires issuing "72-hour notice of the encampment resolution (verbal and written)."[21] The USICH guidelines, which are also prominently linked on the City's own website for HSOC,[22] state, "When an encampment is going to be closed, ample, visible public notice must be given." [23] If those unsheltered can reliably know when camp clearances are going to occur, they are able to move ahead of time, or prepare their belongings to be ready to move and to be sure to be onsite to maintain their personal belongings. The same is true for routine cleanings.

The survey findings discussed in the first opinion found that advance notice of clearances and cleanings is inconsistent. Of the 174 respondents who had recently experienced cleanings and clearances, only 8.6% reported being given advance notice of camp clearances each time.  91% reported the notices being inconsistent, reporting they had not been given notice each time of cleaning or clearance. During my periods of observations at HSOC resolutions for this case I noted issues with the City's system of advanced notification on a near daily basis. These included instances of notice not being posted at all, notices posted that were not reasonably visible, and

---

[21] https://www.sf.gov/sites/default/files/2024-10/HSOC%20Encampment%20Resolution%20Policy.pdf
[22] https://www.sf.gov/healthy-streets. Last accessed March 9, 2024.
[23] USICH (US Interagency Council on Homelessness). 2022. "7 Principles for Addressing Encampments | United States Interagency Council on Homelessness (USICH)." Washington DC. https://www.usich.gov/tools-for-action/7-principles-for-addressing-encampments/. Last accessed March 4, 2024. Page 3.

CONFIDENTIAL

notices posted that were inaccurate. In this section of the report, I include the observations and discussions I had with individuals about the various ways the City fails to provide the required notice when carrying out encampment resolutions and routine cleanings.

## Notice is Not Consistently Posted

Out of the seven scheduled HSOC resolutions I observed during my San Francisco visit from February 3 – February 9, posted notices appeared to be absent at four of them. Three of these occurred in areas where HSOC had scheduled resolutions, two others occurred outside of areas scheduled for HSOC resolutions. On Wednesday, February 5 at an operation in the traffic median of Duboce near Mission St. there were three tents and three people when I arrived at 1:05pm. In this limited space between two highway pillars there was clearly no notice posted. I asked all three of the individuals there if they had seen any written notice or been given any verbal notice beforehand. None of them had, even though this area was included in the pre-scheduled zone for HSOC operations that day.

Earlier that day, in the Bayview a man was removed near 1305 Carrol St, who was cited and had his tarp taken away as "evidence" and shelter destroyed. He reported not having received any advanced notice, and no posted notice was visibly posted.   On the morning of February 7, I observed two men being moved in an HSOC resolution at Minna and Sixth Street, an area within that day's scheduled HSOC operations. No notice was posted anywhere on the street, although across the street there was notice for a future resolution for next Tuesday, February 11 posted. After the two men were relocated, I asked if they had been given any advanced notice, and they said nothing was posted, but that a DPW worker had verbally told them the day before.

On Monday February 3, the HSOC resolution scheduled for the Polk Street Corridor and its nearby alleys, I witnessed DPW workers and police officers target a camp outside the designated HSOC zone on Larkin Street. No notice was posted on Larkin Street. When I asked the individual

CONFIDENTIAL

who was being displaced if they had been given notice of the resolution, they said they hadn't seen written notice, but that he had gotten verbal notice when he was set-up on Cedar St, which was why he had moved to Larkin in the first place.

**HSOC Frequently "Shifts" Operations Outside the Noticed Zones**

There is also a widespread practice of HSOC shifting their operations last minute outside their scheduled resolution areas that where notices are supposed to have been posted. This can be seen in the HSOC Call Notes. In reviewing just a sample of these notes from October 4, 2024 – November 4, 2024, shifts outside the scheduled designates resolutions zones occurred at least 10 times according to the summaries. This comprises 23% of the 44 HSOC operations for that month, meaning that in nearly a quarter of the HSOC resolutions that month, teams shifted outside areas that should have been given the required 72-hour notice. For instance, in the Tuesday October 22 call notes for the HSOC operation designated for "Merlin, Oak Grove, and Morris off of Harrison," the notes describe "everyone relocating prior to arrival, so no tent/structures," and goes onto describe the same occurring on Oak Grove. The notes then go onto describe "Shifted to 4th btw Harrison and Bryant" where they handled 6 tents/structures, which included 1 citation for 647e (illegal lodging), and two warrant arrests out of the 7 individuals present. Like the case I observed on Larkin Street, where an individual having complied with the posted notification of the camp resolution moved to a new location, these individuals similarly found themselves unexpectedly caught up in a camp clearance without prior notice.

| Date of Sweep (AM/PM) | Bates Number for HSOC/JFO Call Notes | Noticed Location | Location Shifted To |
|---|---|---|---|
| 10/3/24 (AM) | CCSF-COH_570955 | Leavenworth from Turk to Geary | 300 Jones |

CONFIDENTIAL

| 10/7/24 (PM) | CCSF-COH_568214 | Polk Street corridor, start and focus on Fern, notice too Hemlock, Cedar, Myrtle, Olive, Willow | Larkin btwn Bush and Frank Norris |
|---|---|---|---|
| 10/10/24 (AM) | CCSF-COH_568224 CCSF-COH_568229 | Leavenworth from Eddy to Geary | Fern |
| 10/17/24 (PM) | CCSF-COH_568249 | Treat btw 17th/18th, notice Folsom between 18/19, 19th between Folsom/Harrison, Shotwell between 18/19th | 15th between Harrison and Folsom |
| 10/18/24 (PM) | CCSF-COH_568254 | Polk Street corridor, start on Fern, notice Hemlock, Cedar, Myrtle, Olive, Willow | 200 Taylor |
| 10/21/24 (AM) | CCSF-COH_568264 | Merlin, Oak Grove, Morris all off of Harrison | 4th between Harrison and Bryant |
| 10/25/24 (AM) | CCSF-COH_568294 | 6th street Corridor, including at Howard, Natoma, Minna, Mission, Jessie, Mint/Mint Plaza | Minna between 5th and 6th |
| 10/28/24 (PM) | CCSF-COH_568299 | Polk Street corridor notice Hemlock, Cedar, Myrtle | Larkin just past Post |
| 10/29/24 (AM) | CCSF-COH_568304 | Cesar Chavez just past Vermont to Potrero, Cesar Chavez "triangle area" adjacent to the | Napoleon at Jerrold |

CONFIDENTIAL

|  |  | Potrero off ramp @ the Hairball |  |
|---|---|---|---|
| 11/4/24 (AM) | CCSF-COH_568324 | 6th Street Corridor, notice Jessie, Mint & Mint Plaza | 6th & Mission; 13th & Mission |

These notes of HSOC resolutions without notice further corroborate the discussions I had with dozens of individuals experiencing homelessness at and around encampment clearances and cleanings during my field visits. Many described seeing more notices posted in the past year than previous periods, but that it was still incredibly inconsistent, as the surveys also indicate.

**Notice is Not Reasonably Visible or Communicated to Encampment Residents**

At many of the resolutions I observed in both August 2024 and February 2025, notices were not clearly visible or were awkwardly or haphazardly placed. Many individuals at resolutions explained not seeing these posted notices prior to the resolution. I frequently observed single notices being placed on just the corner of entire blocks, as seen in the photo I took below during the August 27 resolution on Minna and 6th Street (see Image 1). Arriving prior to the resolution I spoke to a couple on the other side of the long block who had a tent set up if they had seen the notice. They had not, but were grateful I'd alerted them.

Another practice I observed were notices being taped onto just a single pole on the block. On that same day, August 27th I spoke with four unsheltered individuals who had just been moved off of Merlin Street from an HSOC resolution. I asked if any had seen an advanced notice posted, and they said they had not. When I went searching to see for myself, I located only a

CONFIDENTIAL

single notice on a pole along the block that stretches underneath both overpasses of the I-80 (See

Images 2 and 3).



Image1. Minna and 6th Street. August 27th. Photo by Chris Herring



CONFIDENTIAL

Image 2. Left. Single notice posted on Merlin St. August 27th. Photo by Chris Herring.
Image 3. Right. Google Maps Streetview of Merlin Street for perspective.


During the HSOC resolution on February 4, there was a notice posted directly behind a tent for the day's resolution (see Image 4). When I spoke to one person staying in a tent further down the street and asked if they'd seen a notice about a resolution for today, they said no. We realized that the small text of the notice with the dates are nearly impossible to read from the distance of the point of the sidewalk one would have to be standing at without encroaching upon the tent in an intrusive way. Adding to the confusion was the fact that just a few feet away is another HSOC resolution notice, that appears identical, except for having a date from the prior week, January 23 in small font (see Image 5). This is especially confusing because many HSOC resolutions occur at the same location every few weeks, weekly, or even twice in the same week as was the case at this site on Ellis and Jones, which was scheduled for a resolution on both February 4 and February 7. Yet, at many of the resolution sites I observed over my field visits old, expired notices were regularly posted and left up in the same areas where new notices were posted. Yet, if one did not realize this to be the case, we could easily imagine the situation where a person were to see one of the expired notices, check the date, see that the resolution had passed and therefore ignore the other postings just feet away, assuming that the notice would be for the same expired date.

CONFIDENTIAL



Image 4. Left. Notice posted behind tent at Ellis and Jones for Feb. 4 resolution.
Image 5. Right. Notice posted from previous resolution on Jan 23 just a few feet away.

These recent observations are in line with observations recorded in my earlier research that began a decade ago in San Francisco. During my research I would hear officials claim that they posted a 24-hour or 72-hour notice "on site," or that outreach workers had visited the encampment prior to the clearing to alert those there. As my observations with outreach workers showed, rarely were all those in encampments present when outreach workers would notify residents of an upcoming eviction. Residents were often at work, getting a meal or a shower, trying to find a toilet, at an appointment, visiting friends, or completing any number of daily tasks of survival. In other cases, I witnessed people moving into an encampment after some notice was given, which they missed, only to find their tent and belongings confiscated the following day. In other cases, I witnessed people moving into an encampment resolution zone after some notice may have been verbally given, which they missed, or in the evening at dark where posted notices wouldn't be visible, only to find their tent and belongings confiscated the following day.

CONFIDENTIAL

**Notices are inaccurate**

Many unsheltered people I spoke to in observing resolutions for this case, described of having advanced notices posted at their camps or being told by City employees that a cleaning or clearance would occur on a certain date and certain time, and then no such cleaning or clearance would occur. In some cases, they described instances when DPW and HSOC teams would never show at all. More frequently, they described instances where notice of a camp clearance would be given to several camps residing on a certain street or set of blocks, but only a select group of tents would be forced to move and be cleared. On August 28, speaking with residents of a camp behind the Best Buy on Division Street, they told me that DPW had come by the day before they would have to move because they were going to clean, but then never showed up. In recounting a resolution that occurred just a few days before, a man at a resolution in the Bayview near Revere and Fitch explained how he had seen a notice for the resolution but explained he hadn't moved in advance because he'd received many notices before where they didn't come.

During my February trip I observed a case of this sort of inaccurate notice firsthand, where a resolution notice was posted claiming that the area would be clear, but the resolution was called off, and individuals were allowed to remain. This occurred on February 4 at Ellis and Jones, where the hardly visible and confusing notices previously described were posted (see Images 4 and 5). In this area comprised of 5 tents tightly placed against building walls and relatively well organized. While the team of 7 police officers, two HOT members, the fire paramedic who served as the incident commander, and several DPW workers were on the block for over an hour and a half, from 1-2:30, occasionally cleaning the area, but largely just standing around, people were ultimately allowed to stay and no one was forced to move or even pack-up their belongings. This demonstrates how even when DPW crews show up onsite to carry out a cleaning or resolution, uncertainty remains as to whether people should actually pack up their

CONFIDENTIAL

belongings and shelter for a move, or just tidy up for a cleaning. During my ride-alongs in 2015

with the DPW alley crews and SFPD escorts, the DPW supervisor would frequently tell those in

encampments across the street, or adjacent blocks that they needed to move for her crew to clean,

even when she was aware that the team would not have the time to clean that day. In our

conversations she referred to this as being a "scare-tactic".

However, just three days later, on February 7, I would return to this site to witness the

same encampment forced to pack up and move in the pouring rain during another scheduled

HSOC resolution. During that subsequent clearance, I asked two of the camp residents if they

were given verbal notice or told during the clearance earlier that week that HSOC would be

returning in a few days, and they'd have to leave. Both reported that none of the several DPW

workers, HOT team members, SFPD officers, or Fire Paramedic mentioned anything about

coming back later that week or the need to relocate.

As I found in my earlier research, such inconsistencies lead many unsheltered individuals

to make the calculated decision to stay until the clearance was underway. While some may

question why it is people remain until the last minute of an announced clearance, it is important

to remember that camp residents in San Francisco and other locations I have studied are

frequently given false threats of removal that are not carried out. Especially when there is no

adequate relocation plan offered guaranteeing camp residents' protection from future evictions,

many saw little reason to pre-emptively self-evict and relocate to a site to which they were

uncertain of having any more protection from a future sweep.

**Conclusion**

My observations in the field corroborate my survey findings: the City's notices are inconsistent,

inadequate, and fail to conform with its own Bag and Tag policies. The City could easily provide

clear and consistent notices, not unlike how street cleanings are marked for parking spots on

CONFIDENTIAL

streets. The inability of knowing when an encampment cleaning or clearance will occur increases the likelihood of property destruction, and as researchers have consistently found, also interferes with individuals seeking medical care, services, or working from fears of property loss.[24]

\* \* \*

**Opinion #3**: Recovering property taken by City agencies is difficult and rare due to the City's practices of bagging, tagging, and storing people's belongings.

According to the DPW Bag and Tag Policy, when unattended property or attended property are bagged and tagged in the field. "Staff must bag and tag personal items that the owner or owner's designee do not remove themselves and provide information on how and where the items may be retrieved. In addition, HSOC staff must provide the advisement concerning medications, medical devices and personal identification and documents. If there is a dispute between the owner and staff concerning whether an item of property should be discarded, the City will endeavor to photograph the item before discarding it. If a camp is unattended, but with objective indications of ownership, DPW is supposed to bag and tag the property and post on-site a notice of property removal with information of how persons can retrieve their property  There is no limit to the number or volume of personal items that DPW will bag and tag for a particular individual, that do

---

[24] *See, e.g.*, CDC. 2022. "Guidance on Management of COVID-19 in Homeless Service Sites and in Correctional and Detention Facilities." Centers for Disease Control and Prevention. 2022. https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/unsheltered-homelessness.html; Chang, Jamie Suki, Philip Boo Riley, Robert J. Aguirre, Katherine Lin, Marius Corwin, Nicole Nelson, and Madison Rodriguez. 2022. "Harms of Encampment Abatements on the Health of Unhoused People." *SSM-Qualitative Research in Health* 2:100064; Darrah-Okike, Jennifer, Sarah Soakai, Susan Nakaoka, Tai Dunson-Strane, and Karen Umemoto. 2018. "'It Was Like I Lost Everything': The Harmful Impacts of Homeless-Targeted Policies." *Housing Policy Debate* 28 (4): 635–51; Goldshear, J. L., N. Kitonga, N. Angelo, A. Cowan, B. F. Henwood, and R. N. Bluthenthal. 2023. "'Notice of Major Cleaning': A Qualitative Study of the Negative Impact of Encampment Sweeps on the Ontological Security of Unhoused People Who Use Drugs." *Social Science & Medicine* 339:116408.; Herring, Chris. 2019. "Complaint-Oriented Policing: Regulating Homelessness in Public Space." *American Sociological Review* 84 (5): 769–800; Herring, Chris, Dilara Yarbrough, and Lisa Marie Alatorre. 2020. "Pervasive Penalty: How the Criminalization of Poverty Perpetuates Homelessness." *Social Problems* 67 (1): 131–49; Westbrook, Marisa, and Tony Robinson. 2021. "Unhealthy by Design: Health & Safety Consequences of the Criminalization of Homelessness." *Journal of Social Distress and Homelessness* 30 (2): 107–15.

CONFIDENTIAL

not otherwise constitute items that will be discarded (i.e., perishable items, contraband, belongings co-mingled with health risks, shopping carts, etc.). Once belongings are bagged and tagged in the field, they are brought to the DPW Yard at 2323 Cesar Chavez St. to be stored for 90 days. For the first 72 hours, items can be claimed by their owners 24 hours a day. After the first 72 hours they can be retrieved 9am to 3pm.

**Failures To Properly Bag and Tag Valuables and Failures to Provide Notice on How to Retrieve Belongings**

Despite these policies of property collection, storage, and notification, the survey findings discussed in opinion one found that the City rarely gives consistent notice or a receipt of property removal to individuals whose belongings are taken. Of the 154 respondents who had their belongings taken by City officials, only 8% reported being given information about how to receive their belongings on each occasion.  The HSOC resolution advanced notice does list information on where and how to retrieve bag and tagged property, however as previously discussed, these notices are not always present or visible. Furthermore, this information is in small text at the bottom of the posted document.

Many I spoke with around the encampment resolutions during my field visits described witnessing their belongings not being bagged and tagged and simply thrown onto the DPW truck or trash compactor or being told by others present that this had occurred. Therefore, these individuals would never have received notice for retrieval because it was never collected, and the DPW has no policy of notifying about property removal and destruction. However, many I spoke with were unaware of if their belongings left unattended were disposed of or stored. Others who did have their property bagged and tagged reported not having their belongings properly collected, or not being given proper notice or receipt for retrieval.

During my August field visit I met Carlos at his camp on Division and Bryant. He showed me a citation from August 16 that he needed to take care of for illegal lodging. He had also received a "notice of removal of property" given to him (see Image 6). I asked him if he planned to retrieve

CONFIDENTIAL

his property. He said, they'd never have it. He had gone twice in the past and both times came back empty handed. More importantly, he said that all the things he really valued and lost were taken by DPW and put on the truck and not bagged and tagged. He described the bag and tags as "tokens to show they're doing something." Carlos said that he had told the workers he wanted to keep or have bag and tagged numerous items including speakers, electronics, and a laptop. These items were not listed on the receipt or presumably bagged and tagged.



Image 6. Notice of Removal of Property. Aug 27, 2024. Photo by Chris Herring

As we were reading over Carlos' notice of property removal, the person in the tent next to Carlos approached asking why he hadn't received a notice or receipt, saying that he had lost his clothes and a tent the same day. I asked Carlos if he'd also filled out and received the advisement concerning medications, medical devices and personal identification and documents that is supposed to be gone over and signed with each individual experiencing a bag and tag and he said no. This aligns with the broader findings of journalist Madison Alvarado of San Francisco Public

CONFIDENTIAL

Press who requested to see records of these signed acknowledgement for the 11 months up until mid-November 2024 and the City was unable to produce a single acknowledgement from someone saying they separated these items.[25]

The perspective that some items may be bagged and tagged, but that many others would be disposed of, or the truly valuable items would be stolen or destroyed was communicated by a number of those I spoke with conducting the surveys and around encampment resolutions. When speaking to a man in the Bayview near Revere and Fitch who was arrested at an encampment resolution, he described getting back one small bag with his wallet and phone that was bagged and tagged, but lost all his clothes and survival gear, including tent, tarps, comforter, hair clippers he used for work, and sentimental keepsakes, even though he requested for them to be bagged and tagged, and was told that the tent would be bagged and tagged for retrieval. He said he did not receive any receipt or notice of property removal detailing the items bagged and tagged.

On August 26, a woman at camp on Treat between 16th and 17th told me that the DPW has bagged and tagged some of her belongings, but never all her stuff. Most recently her and her partner had gone to the DPW Yard to pick up items and they just had one bag when they should have had four. She said that she had not received any receipt or notice of property removal. One man who was arrested at a camp clearance and managed to get all his belongings back, said he was never told how or where he could get his items, which really frustrated him. A man I spoke with in the Bayview told me "Anything of value, they're (DPW) taking." Another woman I spoke with in the Bayview near Jerrold and Napolean told me "They may keep clothes and gear but they won't keep valuables. If there's a Bluetooth speaker or nice e-bike they are going to take it." Both asserted, like Carlos, that DPW workers would steal valuable property.

This assertion of theft by DPW workers was made by three other individuals I spoke with taking the survey, many I spoke to during my field visits, one widely believed to be true during my earlier fieldwork in San Francisco's encampments between 2015-2020. In August of 2024, the

---

[25] See: https://www.sfpublicpress.org/san-francisco-lacks-evidence-compliance-bag-and-tag-encampment-clearing/ and https://www.kalw.org/2025-02-04/san-franciscos-bag-tag-policy-for-homeless-encampment-sweeps

CONFIDENTIAL

same month I spoke to Carlos and the woman in the Bayview, two ProPublica reporters observed San Francisco Public Works employees clear an encampment of tents, plastic bins of clothing, a cot and bikes. [26] According to Pro Publica, nothing was set aside to be stored. According to Pro Publica, one employee did slip into his uniform's oversized pocket a tin of baseball cards taken from the encampment; he then placed it in the cab of a work truck rather than the back, where other belongings were stacked. While I cannot verify any of these assertions, the wide circulation of this belief was a major reason given as to why individuals did not trust the bag and tag process or believe it might not be worth attempting to receive valuable items they had lost.



Image 7. A tin of baseball cards was taken from a San Francisco encampment and placed inside of a City vehicle. Photo by Nicole Santa Cruz/ProPublica

---

[26] https://www.propublica.org/article/homeless-encampment-removals-property-storage

CONFIDENTIAL

**Challenges to and Failures of Retrieving Property from the DPW Yard**

When survey participants who had belongings taken were asked "In the past six months have you been successful in retrieving all the belongings that you lost that you wanted to keep?" 99% answered no. Only two respondents reported successfully retrieving all their belongings. While a large part of these failures to retrieve property is due to the minimal bag and tagging going on the first place, several survey participants who described their experiences outside the set survey questions and those I spoke to across my field visits described having attempted at one point or another trying to retrieve their belongings at the DPW Yard. Nearly all described the experience as challenging and frustrating, with no or only partial success at retrieving any belongings.

Despite Carlos' belief that none of his belongings listed on the notice would not be retrievable from the DPW yard, and his reluctance to pick up belongings that he no longer much cared for since the belongings he wished to keep that day were not bagged and tagged, I convinced him to give it a try with me later during my week's visit on Thursday, August 29, 2024. We arrived at the Marin Street entrance to the DPW Storage Yard at 11:45am. Carlos showed the security guard his bag and tag receipt, and the guard called into the radio room. We were soon told that the worker who retrieves the items just went on lunch and that he would be back in about an hour. We were told this, despite the fact that the Notice of Removal of Property Form Carlos had in his hand, as well as the large sign posted on the DPW Yard Gate, noted that the hours for pickups as being between 9am -3pm that day.

CONFIDENTIAL



Image 8. Signs indicating hours for bag and tag pick-up on the gates of the DPW Yard.
August 29, 2024. Photo by Chris Herring

When the security guard said this, another man with a small cart with his belongings, approached the security guard asking what had happened to his property. The guard said that he called it in and wasn't sure. The man was furious since he had arrived an hour earlier at 10:40am to retrieve his tent. Turns out this man, named AK, had been given a citation for illegal lodging just hours earlier at 8:05am that morning in the Mission (see Image 9). No notice or warning was given beforehand, and he was ticketed by a single officer who confiscated his tent as evidence. AK walked to the yard, which took him a little over an hour, since it is not easily accessible to downtown or by public transit. AK showed me the citation but noted that he did not receive any other property receipt. He was told by the officer though that he could come to the DPW Yard to pick-up his tent. Because AK's property was collected within the past 72-hours according to the Bag and Tag Policy as well as the large sign posted on the DPW gate entrance, AK should have been able to pick up his property 24 hours a day.

CONFIDENTIAL



Image 9. AK's citation for illegal lodging, from which he had his tent confiscated as evidence. August 29, 2024. Photo by Chris Herring

AK, Carlos, and I returned to the DPW yard at 12:50. The guard called in their belongings again, and a worker came out at 1pm to take down information about both Carlos' and AK's paperwork, although it had also been communicated over the phone to the radio room by Carlos and myself. The guard first let Carlos speak to Victoria in the radio room, but she could not understand Carlos' broken English, so I got on the phone and gave her the information on his property sheet. The first thing she asked was for the date and time of the bag and tag, but the form had no date listed. Fortunately, we also had Carlos' citation for illegal lodging from that same day with the date, which I gave her as the date. Carlos looked to me and said "they are fast because you are here. If I were here or just me it would take all day."

After meeting the DPW worker at 1pm, we did not hear back or see anyone until 2pm, when the worker returned with AK's tent and the one bike of Carlos' listed on his form. The DPW worker told us "I got your bike but I have to go down to the lower unit and find your other

CONFIDENTIAL

stuff, but it's gonna be another 15 minutes. Do you want to hang?" We had already been waiting

for more than two hours, and the question came off like a mean joke and was hard to take

seriously. To make things worse, there is only a single two-seater bench by the security gate for

people to wait. So, we sat on the curb. Over the course of our time two other people come to

collect their belongings and sat on the curb as they waited.

       One of the people who came during this time, was a woman named Kristen Nicholson

who like AK had her tent and tarps confiscated for a Penal Code 647e citation (anti-lodging), but

was allowed to keep her other property. Unlike AK, Kristen had been given a receipt for her

property by the officer issuing the citation (see Images 10 and 11). When Kristen spoke to

Victoria in the radio room with her information from the property receipt form, she was told that

her property was not at the yard. According to Victoria the records showed that the person with

that case number was allowed to leave with all her belongings and nothing was delivered. When

Kristen told Victoria that she has the receipt in hand, Victoria said she didn't know what to say

except that she can fill out a claim form that can be brought out to her, but Kristen declined.



CONFIDENTIAL



Image 9. Front and back sides of property receipt for illegal lodging, which the owner was unable to receive at the DPW Yard. August 29, 2024. Photos by Chris Herring

Another woman arrived at 2:05 to collect her property. When she asked the guard, he told her that they do not do collection after 2pm. The woman points to the sign and shows it's open until 3pm. The guard ends up calling Victoria in the radio room to take the request. Again, Carlos looked to me and says this is only because I am there. By this time the guard must recognize me as some sort of advocate, social worker, or researcher based on all the questions I am asking and with my references and knowledge to the Bag and Tag policy.

At 2:45pm, DPW finally delivers Carlos' other belongings to him. To his surprise all the belongings listed on the property notice form were stored and retrieved. For Carlos it is bittersweet. Once we walk down the block, he goes through the property returned in the four bags and suitcase. Carlos tells me that at the sweep he lost his good bikes, the good tires, good tools, his speakers, his laptop, and his big tent. He goes through the bags and suitcase returned to him and consolidates the few useful items into a single backpack. He leaves the remaining property and the bike on the curb by the DPW Yard before we catch an uber back to his campsite.

CONFIDENTIAL

These experiences matched both the reports I had heard from dozens of individuals across my two visits in August 2024 and February 2025. Many I spoke with explained that they had tried to receive property in the past but failed, like Kristen, who even had a property receipt in hand. As discussed in the previous section, others described having some belongings bagged and tagged, but not the ones most valuable to them as had been Carlos' case. Furthermore, the general challenges in the process to retrieve property faced by all those I observed that day at the DPW Yard were referenced as a deterrent to many for trying when considering the low chance of success of retrieving items of value. The DPW Yard location is not easily accessible to the City's homeless population that is largely concentrated downtown. The limited hours from 9-3pm are not amenable to many people's schedules, but even then, as I observed at various points during the day, these hours are not even consistently maintained. Others reported belongings being retrieved, but damaged.

On this day all of those I spent time with trying to receive property had paperwork in hand. However, neither Carlos or AK had all the proper paperwork given to them or filled out by those doing the Bag and Tagging in the field. Kristen, who did have the proper paperwork, was the only one not to receive her property at all. However, those who lose belongings when they are not present during an encampment resolution, or like many others I spoke with and surveyed, who were not given property removal notifications would not even have this basic paperwork to help retrieve their items in this process.

One take-away from my visit to the DPW Yard and inspecting the storage containers were their unorganized nature. The belongings were tagged with the homeless property information forms and color-coded by month, but beyond that there was little organization. Bags were simply piled on top of and behind one another with little numerical or organizational order.

CONFIDENTIAL

During this inspection photos depicting these storage units were taken by an investigator of the legal team.  One could easily imagine a basic organizational system like a gym locker-room, or museum coat room, where items would be ordered and easily locatable in discretely labeled locations. Although it is still hard for me to imagine why it took the DPW worker an hour and forty-five minutes to find the belongings of Carlos, a single client, I am not surprised the process was not a matter of minutes.

One man I spoke with during the Merlin HSOC resolution previously mentioned had a friend who went to retrieve his new clothes back from the DPW Yard and found they had been eaten by rats. In the initial PI declaration, I noted various instances on the homeless property information form that noted property being damaged or stolen. While I did not see this noted on property forms of the Bag and Tag Tracker in this more recent period, the conditions of storage unit C during my inspection raised some concerns that made this experience of a rat infestation plausible. Storage unit C which was used as the bulky items storage area, but also served as an overflow area for every current month was not climate controlled and its floor wet, which I pointed the investigator to photograph.


**Conclusion**

My observations and discussions with unsheltered people's experiences trying to retrieve property closely matched my observations and interviews conducted during my fieldwork between 2015-2020. During those years, I similarly made two attempts to retrieve items with individuals who lost belongings in DPW encampment operations that proved similarly challenging, although in both of those cases, they left empty-handed. While DPW has expanded and updated some of their property storage containers, and has more diligently filled out the

CONFIDENTIAL

homeless property information forms and data tracking systems, the overall situation remains the same: recovering property taken by City agencies is difficult and rare due to the City's practices of bagging, tagging, and storing people's belongings.

<center>***</center>

**Opinion #4**: The shifting and transitory nature that is characteristic of homelessness means that individuals who have already exited unsheltered homelessness will likely experience involuntary unsheltered homelessness again in the short to medium term (1 month -5 years). They will be subject to the city's encampment clearances, which occur daily across the city.

Research and the city's own data indicates that most of those currently experiencing both unsheltered homelessness, and homelessness in general within the city do so episodically, and that high percentages of those both in shelter and permanent supportive housing exit and return to homelessness. In what follows I consider existing research and data on the transitory nature of homelessness as it relates to shifts between (a) sheltered and unsheltered homelessness and (b) shifts between homelessness and government supported transitional and permanent housing to help inform the court's decision.

*Shifts between sheltered and unsheltered homelessness*

The episodic pattern of revolving between sheltered and unsheltered homelessness (or what may also be sheltered homelessness and housing as will be discussed in the next section) is common among those who experience homelessness in San Francisco. In a study I supervised with other faculty members from UC Berkeley, UCSF, SF State, and Santa Clara University (Herring et al. 2020b) in collaboration with the Our City Our Home Coalition, we conducted a representative survey of 584 unhoused San Franciscans asking participants about their experiences with residing unsheltered vs. sheltered.[27] The survey participants current shelter

---

[27] Herring, Chris, Dilara Yarbrough, Jamie Chang, Jenny Friedenbach, Olivia Glowacki, Christoph Hansmann, Sam Lew, Pike Long, and Kelsey Ludwig. 2020b. "Stop the Revolving Door: A Street Level Framework for a New System." San Francisco: San Francisco Coalition on Homelessness.

CONFIDENTIAL

status was representative of the city's overall demographic proportion of sheltered vs. unsheltered homeless at the time of the study. What we found, was a significant revolving door between street and shelter. Among those individuals living on the streets or in their vehicles surveyed (n=321), 15% had been sheltered at some point in the last month, nearly 40% had utilized shelter in the past year, and 81% had either used or tried to access shelter in the past. Moreover, as I described in a prior declaration filed in this case, formerly unsheltered individuals who are presently in shelter or housing may continue to store personal property in encampments. (Dkt. No. 247-1 at 13.)

When survey participants who had been homeless for one year or more and had stayed in shelter at some point in the past year were asked, "In the past year how much time you have spent in shelter?" only 27% reported that they resided in shelter for the full year. 29% reported for staying less than a month, 22% 1-5 months, and 22% for 6-11 months (Herring et al. 2020b, p30). Rather than a stepping-stone out of homelessness, shelters in San Francisco are more often a temporary rest-stop with bridges to nowhere and an eventual return to the street. This finding complicates the static vision and distinction given in Point-In-Time Counts that define certain people as "sheltered" and others as "unsheltered."

The reasons for leaving shelter were varied. A large number (32%) were exits due to time limits, which to my understanding are no longer in place in most San Francisco shelters, but others included mistreatment by staff (30%), that shelter rules and environment weren't accommodating, healthy, or safe (15%), being kicked out for a violation (12%), hospitalization (6%), or incarceration (4%). When participants were asked "after the last time you left shelter where did you go?" the majority (54%) reported returning to living outside. A significantly high response compared to the second largest proportion (18%) staying at a family or friend's place or (14%) another shelter (Herring et al. 2020b, p13). Other researchers have similarly documented how those experiencing homelessness also shift between sleeping rough and other temporary

CONFIDENTIAL

accommodations such as motels and hotels, in vehicles, doubled-up or couch surfing with friends and family, which straddle various federal and local classifications of homelessness.[28]

*Shifts between homelessness and government supported transitional and permanent housing*

Most people experiencing homelessness do so intermittently rather than constantly or as single lifetime event. For instance, in San Francisco's most recent Point in Time Count survey only 22% reported their current episode of homelessness as being their first.[29] This means that for an estimated 78% of those experiencing homelessness on any given night have moved into and out of homelessness in the past. Of course, of those 22% who reported this being their first episode of homelessness, many, if not most will unfortunately experience homelessness again some point during their life course. This aligns with research conducted across the US, where survey studies consistently find that it is far less common than experiencing homelessness episodically.[30]  Either becoming homeless for brief spells in response to short-term changes in their economic, social, or psychological circumstances, or in situations of "chronic homelessness," which is not primarily comprised of individuals who have only experienced homelessness once, but rather those who have experienced homelessness greater than a year over multiple periods of homelessness with intermittent periods of being temporarily housed.[31]

The recurrence of homelessness is especially high among those who are currently residing in forms of government provided temporary, transitional, and permanent supportive

---

[28] Desmond, Matthew. 2016. *Evicted: Poverty and Profit in the American City*. Crown; Knight, Kelly Ray. 2015. *Addicted.Pregnant.Poor*. Durham: Duke University Press Books; Hallett, Ronald E. 2012. *Educational Experiences of Hidden Homeless Teenagers: Living Doubled-Up*. Routledge; Pruss, Graham J. 2023. "Homes without Homes: An Ethno-Archaeology of Vehicle Residency in Public Parking." *Human Organization* 82 (2): 153–68.

[29] ASR (Applied Survey Research). 2024. "San Francisco Homeless Point in Time Count."

[30] Culhane, Dennis P., and Randall Kuhn. 1998. "Patterns and Determinants of Public Shelter Utilization among Homeless Adults in New York City and Philadelphia." *Journal of Policy Analysis and Management: The Journal of the Association for Public Policy Analysis and Management* 17 (1): 23–43; Culhane, Dennis P., Stephen Metraux, Jung Min Park, Maryanne Schretzman, and Jesse Valente. 2007. "Testing a Typology of Family Homelessness Based on Patterns of Public Shelter Utilization in Four US Jurisdictions: Implications for Policy and Program Planning." *Housing Policy Debate* 18 (1): 1–28.

[31] (HUD) US Department of Housing and Urban Development. 2019. "Annual Homelessness Assessment Report." Washington DC.

CONFIDENTIAL

housing. While this form of housing, under the umbrella of what is commonly called "Housing First," has consistently shown to be more effective and stable than emergency shelter and earlier "staircase models" over decades of academic research, it is still relatively precarious and unstable, with many residents returning to homelessness.

How stable and permanent is this housing and how likely do PSH residents return to homelessness? According to an audit carried out by San Francisco's Budget and Legislative Analyst's Office that followed an entire cohort of those entering PSH in San Francisco in 2010-2011. The study found that four years later 46% were no longer in their original housing placement.[32] An even higher percentage of exits (66%) were among those in what at the time was classified as the "HSA Master Lease" covering CAAP participants. Among those who exited PSH, the average length of stay was only 1.5 years.  Other studies that track housing retention in PSH for 2-5 years elsewhere find similar rates of exit hovering between 50% – 65%.[33]

Among those exiting PSH in San Francisco, many return to homelessness. In the survey study I conducted with colleagues covered in the previous section, we asked study participants currently experiencing homelessness in San Francisco (n=584) if they had ever been in PSH before.[34]  Eighteen percent, or nearly one in five of those currently homeless in San Francisco, reported that they had at some point resided in PSH. The survey also asked participants what sort of housing they were living in directly prior to their current episode of homelessness. Thirteen

---

[32] BLA (Budget and Legislative Analyst of the City and County of San Francisco). 2016. "Impact of Supportive Housing on the Costs of Homelessness." San Francisco, CA.

[33] Nelson, Geoffrey, Ana Stefancic, Jennifer Rae, Greg Townley, Sam Tsemberis, Eric Macnaughton, Tim Aubry, Jino Distasio, Roch Hurtubise, and Michelle Patterson. 2014. "Early Implementation Evaluation of a Multi-Site Housing First Intervention for Homeless People with Mental Illness: A Mixed Methods Approach." *Evaluation and Program Planning* 43:16–26; Harkness, Joseph, Sandra J. Newman, and David Salkever. 2004. "The Cost-Effectiveness of Independent Housing for the Chronically Mentally Ill: Do Housing and Neighborhood Features Matter?" *Health Services Research* 39 (5): 1341–60; Lipton, Frank R., Carole Siegel, Anthony Hannigan, Judy Samuels, and Sherryl Baker. 2000. "Tenure in Supportive Housing for Homeless Persons With Severe Mental Illness." *Psychiatric Services* 51 (4): 479–86; Stefancic, Ana, and Sam Tsemberis. 2007. "Housing First for Long-Term Shelter Dwellers with Psychiatric Disabilities in a Suburban County: A Four-Year Study of Housing Access and Retention." *The Journal of Primary Prevention* 28 (3–4): 265–79.

[34] Herring, Chris, Dilara Yarbrough, Jamie Chang, Jenny Friedenbach, Olivia Glowacki, Christoph Hansmann, Sam Lew, Pike Long, and Kelsey Ludwig. 2020b. "Stop the Revolving Door: A Street Level Framework for a New System." San Francisco: San Francisco Coalition on Homelessness.

CONFIDENTIAL

percent reported that they had become homeless after leaving PSH.  Of the 107 survey participants who had previously been in supportive housing and were now homeless, 65 percent had been in PSH within the last 5 years. The most common reasons for no longer being in that housing were eviction (25%) and the threat of eviction (13%) or being unable to pay rent (36%) most often due to a break in benefits (14%).

These findings align with recent widespread news coverage and public hearings in 2022 and 2023 on the eviction crisis within the city's permanent supportive housing programs.[35] In all providers of permanent supportive housing have evicted 774 people since 2018.[36] However, from my own ethnographic research in the city's PSH buildings and interviews with PSH provider staff, the number of those served eviction notices is likely to be at least three times higher, and the number of those verbally threatened or warned of an eviction much higher. As multiple PSH case managers informed me, they typically encourage their clients who are facing what appear to be unstoppable evictions to leave prior to eviction proceedings, to avoid having the eviction going on their record and increasing their ability to re-enter PSH at a later point. As found in our survey, providers point to the failure to pay rent as a leading cause. In my ethnographic study, I observed this failure among many PSH residents to be a cause of a break in benefits, such as CAAP or SSI often for bureaucratic reasons of missing an appointment, failure to submit paperwork, or bureaucratic errors.

Interrogating the data on PSH from a different angle of analysis in California's other major city researchers at UCLA examined Los Angeles' Homeless Management Information Systems (HMIS) administrative data and its Housing Departments data on PSH placements to see what percentage of those placed in PSH between 2010-present are currently homeless, as

---

[35] Thadani, By Joaquin Palomino and Trisha. 2022. "S.F. Is Evicting Its Most Vulnerable Tenants Closer to Pre-Pandemic Levels. But Official Numbers Don't Show Scope of the Crisis." *San Francisco Chronicle*, September 7, 2022; Thadani, Joaquin Palomino, Trisha. 2023. "Supes Question Rash of Evictions from S.F. Housing Programs." San Francisco Chronicle. March 21, 2023.
[36] Sjosted, David. 2023. "Evictions of Formerly Homeless People Prompt Scrutiny From Survivors." *The San Francisco Standard*, March 21, 2023.

CONFIDENTIAL

registered in the HMIS. The researchers found that 22% of those who had exited PSH were also currently on the city's shelter or street outreach rolls.[37] Transitional housing programs, are even less secure than the permanent supportive housing discussed above.

## Conclusion

As identified above, my review of the data, analysis, and research described in the above and foregoing paragraphs and my general expertise as an academic and researcher studying homelessness in San Francisco has led me to the following opinions:

1. **Opinion #1:** HSOC, the DPW, and SFPD engages in widespread property destruction instead of appropriately safeguarding and storing the belongings of unhoused individuals in accordance with the City's own policies.

2. **Opinion #2:** Notice prior to encampment resolutions and cleanings does not conform with the Bag and Tag and HSOC policies and is not consistent or adequate

3. **Opinion #3**: Recovering property taken by City agencies is difficult and rare due to the City's practices of bagging, tagging, and storing people's belongings.

4. **Opinion #4**: The shifting and transitory nature that is characteristic of homelessness means that individuals who have already exited unsheltered homelessness will likely experience involuntary unsheltered homelessness again in the short to medium term (1 month -5 years). They will be subject to the city's encampment clearances, which occur daily across the city.

March 10, 2025

_____

Christopher Herring

---

[37] Milburn, Norweeta G., Earl Edwards, Dean Obermark, and Janey Rountree. 2021. "Inequity in the Permanent Supportive Housing System in Los Angeles: Scale, Scope and Reasons for Black Residents' Returns to Homelessness."

**Appendix A**

**Chris Herring Curriculum Vitae**



cherring@soc.ucla.edu
@cherring_soc
chrisherring.org

## CHRIS HERRING

### Appointments

2021 – present    Assistant Professor of Sociology, University of California Los Angeles
                  Affiliate Faculty: Luskin Institute on Inequality and Democracy, UCLA Skid
                              Row Gateway @ UCLA Downtown.
2020 – 2022       Postdoctoral Fellow, Inequality in America Initiative, Harvard University

### Education

Ph.D.         Sociology, University of California, Berkeley 2020
M.A.          Sociology, University of California, Berkeley, 2013
M.A.          Social Anthropology, Central European University, 2010
B.A.          Economics, Bard College, 2008

### Research and Teaching Interests

Urban Sociology, Poverty, Housing and Homelessness, Criminal Justice, Welfare, Employment, Social Theory, Ethnography, Community Action Research, Social Policy.

### Publications

Journal Articles

Chris Herring. 2021. "Complaint-Oriented 'Services:' Shelters as Tools for Criminalizing Homelessness." *The Annals of the American Academy of Political and Social Sciences*, *693*(1), 264-283.

Chris Herring, Dilara Yarbrough, and Lisa Marie Alatorre. 2020. "Pervasive Penality: How the Criminalization of Homelessness Perpetuates Poverty." *Social Problems*, 67(1), 131-149.

Chris Herring. 2019. "Complaint-Oriented Policing: Regulating Homelessness in Public Space." *American Sociological Review*, *84*(5), 769-800.
*American Society of Criminology Joan Petersilia Outstanding Article Award. 2021.

Chris Herring and Emily Rosenman. 2016. "Engels in the Crescent City: Revisiting the Housing Question in Post-Katrina New Orleans." *ACME: An International Journal for Critical Geographies*, 15(3), 616-638.

Chris Herring, Manuel Rosaldo, Josh Seim, and Benjamin Shestakovsky. 2016. "Living Theory: Principles and Practices for Teaching Social Theory Ethnographically." *Teaching Sociology*, 12(1), 1-12.

Chris Herring and Manuel Lutz. 2015. "The Roots and Implications of the United States' Homeless Tent Cities." *City*, 19 (5), 689-701.

Chris Herring. 2014."The New Logics of Homeless Seclusion: A Comparative Study of Homeless Encampments in the Western United States." *City and Community*, 13(4), 285-309.

Book Chapters

Chris Herring. 2024. "Regulating Homeless Encampments." In D. Culhane, S. Fitzpatrick, G. Johnson, S. Metreaux, and E. O'Sullivan (eds), *"Research Handbook on Homelessness."* Edward Elgar Publishing.

Chris Herring. 2023. "Housing Deprivation: Homelessness and the Reproduction of Poverty." In B. McCabe and E. Rosen (eds), *The Sociology of Housing*. Chicago: University of Chicago Press.

Chris Herring and Paul Boden. 2021. "Criminalizing Homelessness" in *Counterpoints: A Bay Area Atlas by the Anti-Eviction Mapping Project*. Oakland, CA: PM Press.

Bilal Ali, Lisa Marie Alatorre, Jennifer Friedenbach, Chris Herring, TJ Johnston, and Dilara Yarbrough. 2020. "Fighting Anti-Homeless Laws through Participatory Action Research: Reflections from the San Francisco Coalition on Homelessness' Criminalization Study." In S. Greenbaum and P. Zinn (eds), *Collaborating for Change: A Participatory Action Research Casebook*. New Brunswick: Rutgers University Press.
*Society of Social Problems, Community Partner Paper Award. 2019.

Chris Herring. 2019. "Between Street and Shelter: Homeless Seclusion and the Neutralization of Poverty." In J. Flint and R. Powell (eds.) *Class, Ethnicity, and State in the Polarized Metropolis: Putting Wacquant to Work*. London: Palgrave.

Chris Herring. 2013. "The Housing Question of Disaster Reconstruction: Rebuilding New Orleans on the Tenants of an Ownership Society." In E. Murphy and N. Hourani (eds.), *The Housing Question: Tensions, Continuities, and Contingencies in the Modern City*. Ashgate Press.

Zoltan Gluck and Chris Herring. 2012. "The Homeless Question of Occupy." In *Occupy!: Scenes from Occupy America.* New York: Verso Press.

<u>Essays, Reviews, and Commentary</u>

Chris Herring. 2024. "High Court Upholds Law Criminalizing Homelessness, Making things Worse." *Fulcrum*. (Opinion).

Chris Herring. 2024. *European Journal of Homelessness*. Parsell, Cameron. *Homelessness: A Critical Introduction*. (John Wiley & Sons, 2023) (International Book Review. Symposium).

Neil Gong and Chris Herring. 2020. "The Case for Commandeering Hotel Rooms: San Francisco Has a Model to House the Homeless During the COVID-19 Pandemic." *Cal Matters*. (Opinion).

Chris Herring and Neil Gong. 2020. "San Francisco Has the Authority, Vacancies, and Funds to House Homeless People in Hotels." *San Francisco Examiner*. (Opinion).

Chris Herring. 2019. "Democrats hate Trump's plan for homelessness: But it's their plan too." *The Washington Post*. (Opinion Essay) Outlook sections front-page feature of the Sunday print edition.

Chris Herring. 2019. "Concentrated Poverty." In *The Wiley-Blackwell Encyclopedia of Urban and Regional Studies*, 1-10. Wiley-Blackwell. (Encyclopedia Article)

Chris Herring. 2019. "Evicting the Evicted: Zur Kriminalisierung von Obdachlosigkiet. Ein Gespräch mit dem Soziologen Chris Herring" in *Technopolis: Urbane Kämpfe in der San Francisco Bay Area.* Katja Schwaller (ed). Berlin: Association A. (Translated Interview)

Gretchen Purser, Lisa Bates, Erin McElroy, Manissa McCleave Maharawal, Daniela Aiello, Pamela Phan, Terra Graziani.  2018. "Eviction Lab Misses the Mark." *Shelterforce.* (Essay)

Chris Herring, Miranda Smith, and Thomas Gilbert (eds). 2017. "The Roots and Implications

of the Trump Election." *Berkeley Journal of Sociology*. 61: 23-42. (Volume Editor)

Chris Herring. 2015. "Tent City, America." *Places: Public Scholarship of Architecture, Landscape and Urbanism*. Princeton University Press. December. (Research Essay)

Chris Herring. 2015. "Evicting the Evicted: The Spurious Rationales of 'Homeless Sweeps.'" *Progressive Planning Magazine*. Fall, 29-32. (Research Essay)

Chris Herring. 2015. "Sheltering Those in Need: Architects Confront Homelessness." Introductory Essay for the 2016 Berkeley Prize Essay Competition. UC Berkeley, College of Environmental Design.

Chris Herring, Dilara Yarbrough, and Tony Sparks. 2015. "Punishing the Poorest." *Street Sheet*. San Francisco. Six articles for San Francisco's Homeless Street newspaper based on the report *Punishing the Poorest.*

Chris Herring. 2014. "Four Fallacies of the Jungle Eviction." *Beyond Chron*. San Francisco. (Opinion).

Manissa McCleave Maharawal and Chris Herring (eds). 2014. "Struggles for the Public University." *Berkeley Journal of Sociology*. 58: 23-42. (Special Issue co-editor).

Chris Herring. 2014. "The Magical Bum: The Cinematic Paradox of Positive Portrayals of Homelessness." *The State of Things Film Journal.* Los Angeles. (Film Essay)

Chris Herring. 2013. *California Historical Society Magazine*. Mark Wyman, *Hoboes: Bindlestiffs, fruit tramps, and the harvesting of the west.* (New York: Hill and Wang, 2010), 336 pp. & Art Hazelwood, *Hobos to Street People: Artists Responses to Homelessness from the New Deal to the Present.* (San Francisco: Freedom Voices, 2011).

Zoltan Gluck and Chris Herring. 2012. "Rearticulating the Struggle for Education." *The Occupy Gazette*. New York: N+1 Publishing.

Chris Herring. 2012. "Occupy Academia!" London School of Economics' Impact Blog.

Chris Herring. 2010. *Central European University Journal of Political Science*. Loïc Wacquant, Punishing the Poor: The Neoliberal Government of Social Insecurity (London: Duke University Press, 2009), 365 pp.


Policy Briefs and Reports

Social Scientist's Amicus Brief for Supreme Court Hearing of *Johnson v. Grants Pass*. Lead author. 2024.

Chris Herring (lead contributor with RPS staff). 2023. "RPS Brief Series: Unhoused Persons." NYU's Reimagining Public Safety Initiative. New York.

Sandra Smith and Chris Herring. 2022. "The Limits of Ban the Box." Institute for Labor and Employment Research. University of California, Berkeley.

Adriana Camarena, Stella Kunkat, Jennifer Friedenbach, John Hamanski, Chris Herring, Samantha Lew, Courtney McDonald, Sara Shortt, John Stiefell. 2021. "Compassionate Alternative Response Team (CART): A Community Plan for San Francisco." San Francisco Coalition to End the Policing of Homelessness. San Francisco.

Chris Herring, Dilara Yarbrough, Jamie Chang, Mark Flemming, Chris Hanssmann, Pike Long, Kelsey Ludwig. 2020. "Stop the Revolving Door: A Street Level Framework for a New System." Our City Our Home Coalition. San Francisco.

Kamran Abri Lavasani, Haruna Aridomi, Collette Auerswald, Zachary Butzin-Dozier, Brigid Cakouros, Joey Chiang, Brandon Chu, Jack Colford, Hoaian Dang, Sarah Ferrell, Jay Graham, Madeleine Kane, Toshali Katyal, Christine Ma, Dough Martin, Matt Matusieqicz, SandraMcCoy. 2020. "For the Good of Us All: Addressing the Needs of Our Unhoused Neighbors During the Covid-19 Pandemic." UC Berkeley School of Public Health. Berkeley.

Chris Herring, Dilara Yarborough, Lisa Marie Alattore, and the San Francisco Coalition on Homelessness. 2015. "Punishing the Poorest: How San Francisco's Criminalization of

Homelessness Perpetuates Poverty." San Francisco Coalition on Homelessness. San Francisco.

Chris Herring, Dilara Yarbrough, and Lisa Marie Alattore. 2015. "How Quality of Life Enforcement Affects Homelessness." Policy brief for California State Senate Bill SB608 "The Right to Rest Act."

Chris Herring. 2010. "Tent Cities in America: A Pacific Coast Report." National Coalition for the Homeless. Washington DC.

## In Progress

Chris Herring. *Cruel Survival: Policing and Punishing the Unhoused in the American City* (Under contract with University of California Press)

Chris Herring. "Precarious Housing Fixes: The Limits of Homeless Housing Programs in San Francisco."

Jeff Garnand and Chris Herring. "Public-Private Parasites: How Business Improvement Districts Criminalize Homelessness."

Charles Musoff, Chris Herring, Dilara Yarbrough, Jennifer Friedenbach, and Mark Fleming. "From Precariously Housed to Homelessness: Lessons for Homelessness Prevention from San Francisco"

Sandra Smith and Chris Herring. "Undoing the Mark of a Criminal Record: Ban the Box and the Limits of Fair Chance Employment Policies."

## Presentations
## 2021-2024

"Complaint-Oriented 'Services:' Shelters as Tools for Criminalizing Homelessness"
- Panelist. Urban Affairs Association Annual Meeting. New York, NY. 2024.
- Invited lecture. Oregon Housing Conference. Portland, OR. 2023.
- International Sociological Association Congress. Melbourne. 2023.
- Invited panelist. American Sociological Association Sociological Association Meeting. Los Angeles. 2022.
- Invited lecture. University of Southern California Price School of Public Policy. Social Innovations Series. 2022.
- Invited panelist. Webinar on "Ending Family Homelessness" hosted by the American Academy of Political and Social Sciences. 2021.
- Law and Society Association Annual Meeting. Virtual. 2021.
- Invited panelist. Conference for the special issue *Dynamics of Homelessness* in the Annals of the American Academy of Political and Social Sciences. Virtual. 2020.

"Cruel Survival: Policing and Punishing the Unhoused in the American City"
- Invited lecture. University of Washington. Western Poverty Center Working Group. 2024.
- Invited lecture. University of Chicago. Critical Social Sciences Workshop. 2023.
- Draft Book Talks/Workshops: UCLA Sociology 237 Workshop (2024), University of Oregon. Sociology Undergraduate "Community and Crime" (2024), Harvard University. Sociology Undergraduate Honors Course in Ethnography (2023).

"Precarious Housing Fixes: The Limits of Housing First."
- Invited panelist. National Alliance to End Homelessness Research Summit. Washington DC 2024.
- Invited panelist. University of Oregon Housing Conference. Eugene. 2022.
- Invited panelist. *The Sociology of Housing*. Georgetown University. 2019.

"Pervasive Penality: How the Criminalization of Homelessness Perpetuates Poverty"
- Invited lecture. UCLA Division of Population Behavioral Health. 2024.
- Invited lecture. Penn State Criminology Department Graduate Workshop. 2022.
- Invited panelist. National Law Center on Homelessness Criminalization Report Release. 2020.
- Society of Social Problems Annual Meeting. With Dilara Yarbrough and Lisa Marie Alattore. New York. 2019.
- American Sociological Association Meeting. With Dilara Yarbrough. Philadelphia. 2018.
- Power at the Margins: An Academic and Organizing Conference. With Dilara Yarbrough and Kelley Cutler. University of Minnesota, Minneapolis. 2018.
- Invited Course Lectures: Penn State "Homelessness in America" undergraduate course, 2024. USC Sociology of Housing Undergraduate course, 2024. UC Berkeley School of Law Punishment, Culture, and Society course. 2023. Pomona College Undergraduate Qualitative Methods Seminar. 2023.

"Fighting Anti-Homeless Laws through Participatory Action Research: Lessons from the San Francisco Coalition on Homelessness' Criminalization Study."
- Invited lecture. With Lisa Marie Alatorre. University of California, Irvine Sociology Graduate Seminar in Research Design. 2024.
- Invited lecture. American University Anthropology Department's Graduate Workshop in Public Anthropology. 2021.
- Panel co-organizer with Faranak Miraftab, "Engaged Scholarship for Social Justice." American Sociological Association Annual Meeting. With Dilara Yarbrough. 2020 (Cancelled due to pandemic).
- Society of Social Problems Annual Meeting. With Dilara Yarbrough and Lisa Marie Alatorre. New York City. 2019.
- UC Berkeley Human Rights Center. With Dilara Yarbrough. 2016.

"Complaint-Oriented Policing: Regulating Homelessness in Public Space"
- Invited lecture. UC Berkeley Sociology Graduate Student Writing Workshop. 2023
- Invited panelist. "Policing the Crisis" Conference Rockefeller College, SUNY Albany. 2022.
- American Association of Geographers Annual Conference. New York. 2022.
- Invited panelist. Harvard Faculty of Arts and Science's Symposium. 2021.
- Invited lecture. Harvard Urban Theory and Data Lab. 2021.
- Invited panelist. UC Berkeley Social Science Matrix. 2020.
- Invited lecture. Northeastern University, Urban Anthropology Graduate Workshop. 2020.
- Invited lecture. University of Illinois Urbana Champaign. Department of Sociology. 2019.
- Invited lecture. UCLA, Department of Sociology. 2019.
- Invited lecture. UC Berkeley Global Urban Humanities colloquium. 2019.

"Organizing Against Homelessness in the Pandemic City"
- International Sociological Association Congress. Melbourne. 2023.
- Invited panelist. University of Oregon Housing Conference. Eugene. 2022.
- American Anthropological Association Annual Meeting. Baltimore. 2021.
- Invited panelist. Verso Books and Relational Poverty Network. Virtual. 2020.

"Compassionate Alternative Response Team (CART): A Community Plan for San Francisco."
- Invited Presentation to the San Francisco Police Commission. 2023.
- Press conference for the report release. With research team members. 2021.

Discussant
- UCLA Law School. "The Supreme Court, Grants Pass, and The Criminalization of Homelessness." Invited Panelist. 2024.
- National Alliance to End Homelessness Researchers Network. "How Research Can Support Legal Advocacy." 2024.
- Royal Society of Geography. Social and Cultural Geography Group. "Teaching and Career Development in Higher Education." 2023.
- The Struggle for Housing Justice Workshop. Council of European Studies. ICSU-Lisboa + Sirigaita. Lisbon. 2022.
- Book Launch for "Better Lives: Hope, Freedom, and Home-Making Among People Sleeping Rough in Paris" by Johannes Lenhard. 2022.

<u>>2021</u>

"Stop the Revolving Door: A Street Level Framework for a New System."
- Press conference for the report release. With research team members. 2020.
- Invited presentation to San Francisco Department of Public Health and Homeless Emergency Services Provider Association. 2019.
- Invited panelist. Code for America. San Francisco. 2018.

"For the Good of Us All: Addressing the Needs of Our Unhoused Neighbors During the Covid-19 Pandemic."
- Press conference for the report release. With research team members. 2020.

"Therapeutic Penal Populism: Criminalizing Poverty in the Progressive City."
- Bay Area Politics Workshop. University of San Francisco and UC Berkeley Political Science Departments. Berkeley. 2019.

"Public-Private Parasites: How Business Improvement Districts Criminalize Homelessness."
- Urban Affairs Association Annual Meeting. With Jeff Garnand. Los Angeles. 2019.

"New Logics of Homeless Seclusion: A Comparative Study of Large-Scale Homeless Encampments."
- Invited lecture. Santa Clara University. 2019.
- Invited lecture. Santa Clara Homelessness Task Force. San Jose. 2019.
- Invited lecture and two policy roundtables on homeless encampments. West Coast Poverty Center. University of Washington. 2017.
- Invited lecture. Metropolitan Dallas Homeless Alliance. Dallas. 2015.
- Invited lecture. Pyatok Architects. Oakland. 2015.
- RC21 International Sociological Association Committee on Urban Research. Berlin. 2013.
- American Association of Geographers Annual Meeting. Los Angeles. 2013.
- Urban Affairs Association Annual Meeting. San Francisco. 2013.
- American Anthropological Association Annual Meeting. San Francisco. 2012.
- Spaces and Flows: An international conference of urban and extraurban studies. UCLA. 2011.
- American Sociological Association Annual Meeting. Las Vegas. 2011.

"Healthy Streets Operation Center's Impact on the Criminalization of Homelessness in San Francisco."
- Invited presentation. San Francisco Police Commission. 2019.
- Invited presentation. San Francisco Police Commission. 2018.
- Invited presentation. San Francisco Homeless Coordinating Board. 2018.
- Invited presentation. San Francisco Board of Supervisors. 2018.

"Urban Revanchism Reloaded: Gentrification, Homelessness, and Policing."

- Session organizer with Manissa Maharawal, Don Mitchell, and Amanda Huron. American Association of Geographers Annual Meeting. New Orleans. 2018.

"Punishing the Poorest: How the Criminalization of Homelessness Perpetuates Poverty in San Francisco."
  - Invited presentation to UN Special Rapporteur on Human Rights and Extreme Poverty. With Dilara Yarbrough. San Francisco. 2017.
  - Invited presentations with peer researchers Dilara Yarbrough and Lisa Marie Alattore to 13 San Francisco city agencies and commissions, 11 city supervisors, 6 state senators, and 13 community forums. San Francisco and Sacramento. 2015-2017.
  - Invited presentation to investigators of the US Department of Justice. 2016.
  - Invited panelist. Center for Solutions Based Journalism. San Francisco. 2016.

"Re-evaluating Expertise and Reversing Stigma: A Community Action Research Approach to Empirical Legal Studies."
  - Invited lecture. With TJ Johnston. UC Berkeley School of Social Work's Annual Social Justice Symposium. Berkeley. 2016.
  - Invited panelist. With Dilara Yarbrough. UC Berkeley and Sciences Po Mini Conference, "Social Solidarity." Berkeley. 2016.

"Towards a Compassionate City."
  - Co-organizer, moderator, and speaker on three panels over three evenings at San Francisco's Storefront Lab examining encampments and addressing interim measures for addressing homelessness. San Francisco. 2016.

"The Roots and Implications of US Tent Cities."
  - American Sociological Association Annual Meeting. Chicago. 2015.

"Advocacy and Research"
  - Invited panelist. With Dilara Yarbrough and Jennifer Friedenbach. National Summit to End the Criminalization of Homelessness. National Coalition on Homelessness. Denver. 2015.

"The Housing Question of Disaster Reconstruction: Homeownership as the Sine Qua Non of Citizenship."
  - "Infrastructures of Home and City: The Problem of Housing in Modern Urban Society" Conference. Michigan State University. 2012.
  - American Association of Geographers Annual Meeting. New York City. 2012.
  - Urban Affairs Association Annual Meeting. New Orleans. 2010.
  - World Ecologies Conference. Lund University. 2010.

"Homeless by Law: Crafting a Photo-ethnography of California's Transient Sex-Offenders."
  - Invited lecture. with Getty award winning photographer Ian Martin. UC Berkeley Center for Urban Ethnography "Images from the Field" lecture series. Berkeley. 2012.

"Author Meets Critic: Teresa Gowan, *Hobos, Hustlers, and Backsliders*."
  - Invited discussant. Ann Lucas Lecture Series, San Jose State University. San Jose. 2011.

## Awards

American Society of Criminology Joan Petersilia Outstanding (Faculty) Article Award. 2021.

Society of Social Problems, Community Partner Paper Award. With Dilara Yarbrough and Lisa Marie Alatorre. 2019.

UC Berkeley Sociology Alumni Prize for Public Sociology. 2016.

UC Berkeley Sociology Alumni Prize for Public Sociology. With the Berkeley Journal of Sociology Editorial Collective. 2015.

UC Berkeley Teaching Effectiveness Award. 2015.

UC Berkeley Outstanding Graduate Student Instructor Award. 2014.

Central European University Department of Social Anthropology Academic Achievement Award. Highest ranked student in MA program. 2010.

Leon Botstein Award. Bard College. Highest interdisciplinary achievement of graduating

class. 2008.

## Fellowships and Grants

National Alliance to End Homelessness Research Grant. 2024-2026. $100,000.
UCLA Hellman Society of Fellows. 2024-2025. $20,000.
UCLA Center for Community Engagement, Social Impact Collaborative Grant. 2024
2025. $10,000.
UCLA Equity, Diversity, & Inclusion Early Career Development Award. 2023-2024.
$12,000.
UCLA Faculty Senate Grant. 2023. $6,683.

Horowitz Foundation for Social Policy Dissertation Grant. 2019.
Center for Engaged Scholarship Fellow. 2018.
Herbert Blumer Teaching Fellow, UC Berkeley Sociology Department. 2018.
UC Berkeley Empirical Legal Studies Fellow, UC Berkeley Law School and Center for the
Study of Law and Society. 2017.
National Science Foundation Dissertation Improvement Grant. 2016.
UC Berkeley Global Metropolitan Studies Summer Research Fellowship, 2015.
UC Berkeley Sociology Social Justice Fellowship. 2015.
UC Berkeley Human Rights Fellowship, UC Berkeley Law School. 2015.
Sociological Initiatives Foundation Grant. with Dilara Yarbrough and the San Francisco
Coalition on Homelessness. 2015.
National Science Foundation Graduate Research Fellow. 2011-2015.
Thomas J. Watson Fellowship (Declined). 2008.

## Teaching and Mentorship

*UCLA Courses Taught*
Urban Sociology Graduate Seminar
Urban Sociology Undergraduate Lecture
Urban Sociology Undergraduate Honors Seminar: Contemporary Los Angeles
Poverty Ethnography Undergraduate Seminar
Divided Cities: A Global Sociology of Urban Inequality. Undergraduate Seminar

*UC Berkeley Courses Taught*
Pedagogy Graduate Seminar (w/ Christina Mora)
Summer Workshop in Qualitative Methods Undergraduate Seminar (w/ Neil Gong)
Teaching Assistantships: Contemporary Social Theory (Michael Burawoy), Classical
Social Theory (Michael Burawoy) / Urban Sociology (Joanna Reed).

*PhD and MA Committees (*denotes chair)*
*Current:* Sam Lutzker,* Victoria Tran, Irene Del Mastro, Rebecca Kauffman, Kate Smock,
Yvonne Carrillo, William Schuppman, Niahm Costello (social welfare), Jason Contino, Kai
Bovik, Arlo Hatcher, Zac Clark (urban planning),
*Past:* Chris Giamarino (urban planning), Nicolas Gutierrez (UCLA Casanova Scholar, SDSU
MA thesis).

*Undergraduate mentoring*

*Current:* Frank Godinez (Mellon Mays Scholar), Sydney Do (McNair Scholar); Meg Houseworth, Gordon Krauss, Jillian Steinman (UCLA undergraduate research scholar program).
*Past:* Veronika Vucetic, Amelie Wu (UCLA undergraduate research scholar program), CC D'Arms (Harvard honors thesis), Eric Forter, Raquel Zitani-Rios (UC Berkeley honors thesis).

## Editorial Service

Reviewer for *American Journal of Sociology, American Sociological Review, Social Problems, Social Forces, Ethnography*, City and Community, Law and Society*, Urban Affairs Review*, Urban Geography, Urban Studies, Annals of the American Association of Geographers, CITY, Journal of Planning Education and Research, Qualitative Sociology, International Journal of Comparative Sociology, Environment and Planning C: Politics and Space, Environment and Planning D: Society and Space, Social Movement Studies, Criminal Justice Studies, Political Geography, Antipode, Radical Housing Journal, Housing and Society, Law and Social Inquiry, Qualitative Research in Health, Socius, Social Currents, Sociological Compass, Sociological Forum, Criminology and Public Policy, The Howard Journal of Crime and Justice, Canadian Journal of Criminology and Criminal Justice, Journal of Social Distress and Homelessness, Yale State and Local Policy Review, Canadian Journal of Nursing Research.*

Managing Editor and Co-Founder of the revised online-first Berkeley Journal of Sociology. 2012-2014. 2016-2017. Editorial Collective Member, Berkeley Journal of Sociology, 2010-2019.

## University and Professional Service

*University of California, Los Angeles*
Faculty sponsor of Urban Sociology Working Group, 2022 – ongoing.
Faculty coordinator of the Urban Sociology Qualifying Exam, 2024 – ongoing.
UCLA Unhoused Task Force, 2024 – ongoing.
Luskin Institute Inequality and Democracy Activist in Resident Selection Committee. 2024.
Holistic Evaluation of Teaching Framework Committee, 2022-2023.

*Professional Associations*
American Society of Criminology Outstanding Article Award Selection Committee. 2024.

*University of California, Berkeley*
Co-organizer with Laura Belik, Eric Goldfischer, and Rob Robinson of multi-day conference "Power at the Margins: Mobilizing Across Housing Injustice." Spring 2020.
Jury Member for the Berkeley Prize Essay Competition. UC Berkeley, College of Environmental Design, 2016.
Coordinator of Center for Ethnographic Research Speakers Series, 2013 – 2018.
Director of Departmental Conference, "Critical Approaches to Financialization," 2013.
Berkeley Journal of Sociology Conference Organizer: 2011, 2012.

*Central European University, Budapest*
Student Representative to the Provost, 2009-2010.
Social Anthropology Representative to the Student Senate, 2009-2010.

## Community Engaged Scholarship
### Participatory-Action Research

PI with LA Tenants Union. "The Causes and Consequences of Unstable Exits from
  Permanent Supportive Housing." 2024 – present.
Co-Director of Research with Dilara Yarbrough and Our City Our Home Coalition.
  San Francisco Homeless Needs Assessment. 2018-2020.
Co-Director of Research with Dilara Yarbrough and Lisa Marie Alatorre with the San
  Francisco Coalition on Homelessness. San Francisco Criminalization of
Homelessness
  Study. 2014-2015.

### Community and Policy Work

Member. National Alliance to End Homelessness Research Network. 2024 – present.
Advisory Board Member. Reimagining Public Safety @ New York University School of
  Law's Policing Project. 2022 – present.
Member. Coalition for Alternatives to Policing Homelessness. Compassionate
Alternative Response Team (CART) implementation committee. 2020 – present.
Cal Humanities Grant Supervisor. "We are Home" community arts project with DISH
  Supportive Housing, San Francisco. 2022 – 2024.
Member. San Francisco Police Department Homeless Advisory Board. 2017-2020.
Member. San Francisco Coalition on Homelessness Human Rights Workgroup. 2014
  2020.
Member. Bay Area Safe and Organized Spaces Coalition. 2017-2018.
Research Affiliate. SF Department of Homelessness and Supportive Housing. Summer
  2016.
Research Affiliate. National Coalition for the Homeless. 2009-2010.
Project Manager. New York City Department of Housing Preservation and Development,
  division of multi-family housing new construction, New York, NY. 2008-2009.

### Legal Work

Lead Organizer and Contributor to Social Scientist's Amicus Brief to Supreme Court *City
  of Grants Pass, Oregon v. Johnson*. 2024.
Expert Witness in *Duncan v. City of Portland*. With Oregon Law Center. 2023 – present.
Expert Witness in *Berry vs. Hennepin County*. With ACLU Minnesota. 2021- present.

## Media Appearances

Commentary and coverage of my research has appeared multiple times on CNN, the LA
Times, San Francisco Chronicle, Bloomberg City Lab, San Francisco Examiner, UK
Guardian, Al Jazeera, Huffington Post, San Jose Mercury, ABC News, San Francisco
Public Press, LA Public Press, SF Weekly, Vice, The Bold Italic, 48 Hills, Hoodline, The
Frisc, Mission Local, San Francisco Standard, East Bay Express, and NPR affiliates
KCRW and KQED, and the Daily Bruin.

Commentary and coverage of my research has appeared in the New York Times, Washington Post, Harpers, The New Yorker, Politico, The New Republic, BBC, Newsweek, New York Magazine, In These Times, Daily Telegraph (London), Seattle Times, Miami Herald, Baltimore Sun, Associated Press, The Globe and Mail (Canada), US News and World Report, New Statesmen City Monitor (London), The Appeal, Curbed LA, Las Vegas Sun, Long Beach Post, Vanity Fair Italy, Bolt Magazine, Voice of America, High Country News, Culver City Observer, Santa Monica Mirror, San Francisco Bay View National Black Newspaper, Richmond Review/Sunset Beacon, VT Digger, United Nations Newsletter, California Planning Association's Newsletter, Urban Institute's Housing Matters Newsletter, Education News, and California Healthline.

I've been featured in program-length interviews on the podcasts/radio shows "Against the Grain" on KPFA, "Civic" by the SF Public Press, "Your Call with Rose Aguilar" on KPFA, and "Simply Superior" on Wisconsin Public Radio.  I've made appearances or my research has been referenced on Fox News, San Francisco Kron 4 News, KCBS San Francisco, CBS Austin, Al Jazeera, WFFA Dallas Evening News, KERA News North Texas, 99% Invisible Podcast, and Last Week Tonight with John Oliver. For links to media coverage visit chrisherring.org.

## Professional Affiliations

American Sociological Association

Society for the Study of Social Problems

Law and Society Association

Urban Affairs Association

American Association of Geographers

International Sociological Association: RC21 & RC43

Scholars Strategy Network

Unequal Cities Network

American Society of Criminology

American Anthropological Association

# Appendix B

# Material Considered

**Material Considered**

To the extent not listed here, I have considered all other documents cited within the expert report, exhibits, and appendices.

## Case Documents

Dkt. 231, Order on Motion to Enforce the Preliminary Injunction re: Fourth Amendment Claim

Dkt. 239, Order on Joint Letter re: Training

Dkt. 241, Order re: Joint Bag and Tag Policy Training

## Discovery Documents

Bag and Tag Logs, CCSF-COH_016893, CCSF-COH_073734, CCSF-COH_344557, CCSF-COH_356951, CCSF-COH_357329

CMMS Training, CCSF-COH_573449, CCSF-COH_573450

Homeless Property Information Forms, CCSF-COH_436648, CCSF-COH_436673, CCSF-COH_436689

San Francisco Public Works Training on bag and Tag Policy, last updated January 27, 2025, CCSF-COH_437437

Post HSOC Resolution Summaries, CCSF-COH_356848, CCSF-COH_573455, CCSF-COH_199140, CCSF-COH_266847, CCSF-COH_352123

Service Order Reports, CCSF-COH_308017, CCSF-COH_359933, CCSF-COH_363095

HSOC & JFO Call Notes, CCSF-COH_570955, CCSF-COH_568214, CCSF-COH_568224, CCSF-COH_568229,CCSF-COH_568249, CCSF-COH_568254, CCSF-COH_568264, CCSF-COH_568294, CCSF-COH_568299, CCSF-COH_568304, CCSF-COH_568324, CCSF-COH_564145, CCSF-COH_568214, CCSF-COH_568224, CCSF-COH_568249, CCSF-COH_568254, CCSF-COH_568264, CCSF-COH_568294, CCSF-COH_568299, CCSF-COH_568304, CCSF-COH_568324, CCSF-COH_570955

Excel Spreadsheet of CMMS Report Data, from 2020 to 2024

Excel Spreadsheet of Incident Report Data, from 2018 to 2025

Excel Spreadsheet of PRA CMMS Bag and Tag Data, from 2022 to 2025

Excel Spreadsheet of PRA CMMS Encampment Data, from 2022 to 2025

## Deposition Transcripts and Exhibits

Transcript and Exhibits, Deposition of Edgar Garcia, dated January 30, 2025

Condensed Transcript, Deposition of Edgar Garcia, dated January 30, 2025

Transcript and Exhibits, Deposition of Israel Graham, dated January 30, 2025

Transcript and Exhibits, Deposition of Jonathan Vaing, dated January 15, 2025

Jonathan Vaing Deposition Transcript Errata, dated February 21, 2025

**Emails**

HSOC and JFO Email Notices received from Sophia Garcia, <u>Sophia.Garcia@sfcityatty.org</u>, between October 27, 2023 and February 3, 2025

**Field Notes**

Field Notes from observations of encampment cleanings and resolutions and conversations during two field visits during the weeks of August 25, 2024 and February 2, 2025

**Appendix C**

**Survey Questions and Reponses**

# SF Encampment Clearance Survey

203 responses



## Survey Proctor

166 responses

Copy

- Amber
- Chris
- Shukri
- Xavier

28.3%
15.7%
27.1%
28.9%

## In the past six months have you personally experienced an encampment clearance by DPW, the police, or other city employees?

203 responses

Copy

- Yes
- No

85.7%
14.3%

Section 2: Six Month Experience + Property Screening

In the past six months how many encampment clearances have you experienced?

173 responses

Copy



Legend:
- 1
- 2
- 3
- 4
- 5
- 6
- 7
- 8

38.2%
13.9%
12.7%
9.2%
5.8%

1/2

Copy

In the past six months, were you given advanced notice of the camp clearance each time?

174 responses



- Yes
- No

91.4%
8.6%

Copy

In the past six months have you had belongings taken by DPW, SFPD, or other city workers that you wanted to keep?

174 responses



- Yes
- No

90.2%
9.8%

Section 3: Six Month Property Questions



In the past six months, when you had belongings taken by city workers were you given information about how to receive your belongings on each occasion?

159 responses

Yes
No

91.8%   8.2%

In the past six months have you been successful in retrieving all the belongings that you lost that you wanted to keep?

159 responses

Yes
No

98.7%

Section 4: Two Year Screening

In the past two years have you personally experienced an encampment clearance by DPW, the police, or other city employees?    Copy

23 responses



Section 5: Two Year Experience

In the past two years have you personally experienced an encampment clearance by DPW, the police, or other city employees?    Copy

18 responses

In the past two years how many encampment clearances have you experienced?    Copy

16 responses





Section 6: Two Year Property Screening



Section 7: Two Year Property Questions

In the past two years, when you had belongings taken by city workers were you given written information about how to receive your belongings on each occasion?

⧉ Copy

22 responses



- ● Yes
- ● No

72.7%

27.3%

In the past two years have you been successful in retrieving all the belongings that you lost and that you wanted to keep?

⧉ Copy

21 responses



- ● Yes
- ● No

100%

Section 8: Length of Homelessness

How long have you currently been homeless?

Copy

167 responses



- ● Less than 3 months
- ● 3-6 months
- ● 7 months - 11 months
- ● 1 year
- ● 2 years
- ● 3 years
- ● 4 or more years

This content is neither created nor endorsed by Google. - Terms of Service - Privacy Policy

Does this form look suspicious? Report

Google Forms

| Timestamp | In the past six months have you personally experienced an encampment clearance by DPW, the police, or other city employees? | In the past six months how many encampment clearances have you experienced? | In the past six months, were you given advanced notice of the camp clearance each time? | In the past six months have you had belongings taken by DPW, SFPD, or other city workers that you wanted to keep? | In the past six months, when you had belongings taken by city workers were you given information about how to receive your belongings on each occasion? | In the past six months have you been successful in retrieving all the belongings that you lost that you wanted to keep? | How long have you currently been homeless? | In the past two years have you personally experienced an encampment clearance by DPW, the police, or other city employees? |
|---|---|---|---|---|---|---|---|---|
| 2/5/2025 14:00:09 | Yes | 6 | No | Yes | No | No | 4 or more years | |
| 2/5/2025 14:42:53 | Yes | 10 | Yes | Yes | No | No | 4 or more years | |
| 2/5/2025 14:44:28 | Yes | 6 | Yes | Yes | No | No | 4 or more years | |
| 2/5/2025 14:45:10 | Yes | 4 | No | Yes | No | No | 4 or more years | |
| 2/5/2025 14:46:48 | Yes | More than 10 | No | Yes | No | No | 4 or more years | |
| 2/5/2025 14:50:40 | Yes | 4 | No | Yes | Yes | No | 3-6 months | |
| 2/5/2025 14:59:01 | Yes | 3 | No | Yes | No | No | 4 or more years | |
| 2/5/2025 15:12:59 | Yes | 5 | No | Yes | No | No | 4 or more years | |
| 2/5/2025 15:13:34 | Yes | 4 | No | Yes | No | No | 4 or more years | |
| 2/5/2025 15:31:12 | Yes | 4 | No | Yes | No | No | 4 or more years | |
| 2/5/2025 15:32:32 | Yes | 10 | No | Yes | No | No | 4 or more years | |
| 2/5/2025 15:33:07 | Yes | 10 | No | No | No | No | 4 or more years | |
| 2/5/2025 15:34:40 | Yes | 7 | No | Yes | No | No | 4 or more years | |
| 2/5/2025 15:45:12 | No | | | | | | | No |
| 2/5/2025 15:46:52 | No | | | | | | | No |
| 2/5/2025 15:47:57 | No | | | | | | | Yes |
| 2/5/2025 15:50:12 | No | | | | | | | Yes |
| 2/5/2025 15:50:51 | Yes | 6 | Yes | No | | | | Yes |
| 2/5/2025 15:52:16 | Yes | More than 10 | No | Yes | No | No | 4 or more years | |
| 2/5/2025 15:55:02 | No | | | | | | | Yes |
| 2/5/2025 15:56:39 | Yes | 5 | No | Yes | No | No | 4 or more years | |
| 2/5/2025 15:59:07 | Yes | More than 10 | No | Yes | No | No | 4 or more years | |
| 2/5/2025 15:59:39 | Yes | 7 | No | Yes | No | No | 4 or more years | |
| 2/5/2025 16:14:45 | Yes | More than 10 | No | No | | | 2 years | |
| 2/5/2025 16:27:53 | No | | | | | | | No |
| 2/5/2025 16:28:05 | Yes | 3 | No | Yes | No | No | 4 or more years | |
| 2/7/2025 12:12:34 | Yes | More than 10 | No | Yes | No | No | 3 years | |
| 2/7/2025 12:14:42 | Yes | 4 | No | Yes | No | No | 4 or more years | |
| 2/7/2025 12:16:29 | Yes | 7 | No | Yes | No | No | 4 or more years | |
| 2/7/2025 14:44:04 | Yes | 4 | No | Yes | No | No | 4 or more years | |
| 2/7/2025 14:58:57 | Yes | 1 | Yes | No | | | | |
| 2/7/2025 15:00:10 | Yes | 2 | No | Yes | No | No | 4 or more years | |
| 2/7/2025 15:04:59 | Yes | 3 | No | Yes | No | No | 4 or more years | |
| 2/7/2025 15:05:46 | Yes | 4 | No | Yes | No | No | 4 or more years | |
| 2/7/2025 15:09:00 | Yes | 3 | Yes | Yes | Yes | No | 4 or more years | |
| 2/7/2025 15:11:51 | Yes | 1 | Yes | No | | | | |
| 2/7/2025 15:36:52 | Yes | 3 | No | Yes | No | No | 4 or more years | |

| Timestamp | Count | | | | | Duration |
|---|---|---|---|---|---|---|
| 2/7/2025 15:57:37 Yes | | 2 No | Yes | No | No | 3 years |
| 2/7/2025 15:59:50 Yes | More than 10 | No | Yes | No | No | 4 or more years |
| 2/7/2025 16:03:59 Yes | | 10 No | Yes | No | No | 4 or more years |
| 2/7/2025 16:07:08 Yes | | 3 No | No | Yes | No | 4 or more years |
| 2/7/2025 16:48:16 Yes | | 2 No | Yes | No | Yes | 4 or more years |
| 2/7/2025 16:53:34 Yes | | 2 Yes | Yes | Yes | No | 4 or more years |
| 2/7/2025 16:55:59 Yes | | 3 No | Yes | No | No | 4 or more years |
| 2/7/2025 17:26:52 Yes | | 6 No | Yes | No | No | 1 year |
| 2/8/2025 10:19:10 Yes | | 1 No | Yes | Yes | No | |
| 2/8/2025 10:19:27 Yes | More than 10 | No | No | | | |
| 2/8/2025 10:19:55 Yes | | 1 No | Yes | No | No | |
| 2/8/2025 10:20:45 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 10:21:11 No | | | | | | |
| 2/8/2025 10:21:18 Yes | | 8 No | Yes | No | No | |
| 2/8/2025 10:23:20 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 10:23:58 Yes | More than 10 | No | No | | | |
| 2/8/2025 10:23:59 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 10:27:17 Yes | | 8 No | Yes | No | No | |
| 2/8/2025 10:27:19 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 10:31:34 Yes | | 6 No | Yes | No | No | |
| 2/8/2025 10:33:05 Yes | | 10 No | Yes | No | No | |
| 2/8/2025 10:38:47 Yes | | 4 No | Yes | No | No | |
| 2/8/2025 10:40:32 Yes | | 9 No | Yes | No | No | |
| 2/8/2025 10:42:08 Yes | | 3 No | No | | | |
| 2/8/2025 10:43:16 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 10:43:33 Yes | More than 10 | No | No | | | |
| 2/8/2025 10:44:22 Yes | | 3 No | Yes | No | No | |
| 2/8/2025 10:44:29 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 10:45:40 Yes | | 5 No | Yes | No | No | |
| 2/8/2025 10:47:18 Yes | | 5 No | Yes | No | No | |
| 2/8/2025 10:49:50 No | | | | | | |
| 2/8/2025 10:54:15 Yes | | 2 No | Yes | No | No | |
| 2/8/2025 10:56:16 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 10:57:39 Yes | | 2 No | Yes | No | No | |
| 2/8/2025 10:57:50 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 10:58:06 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 10:58:55 Yes | | 4 No | Yes | No | No | |
| 2/8/2025 10:59:22 Yes | | 1 Yes | Yes | No | No | |
| 2/8/2025 11:00:31 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 11:00:31 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 11:02:09 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 11:03:09 Yes | | 3 No | Yes | No | No | |
| 2/8/2025 11:03:44 Yes | More than 10 | No | No | | | |
| 2/8/2025 11:05:59 Yes | More than 10 | No | Yes | Yes | No | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2/8/2025 11:07:06 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 11:09:04 Yes | | 1 No | Yes | No | No | |
| 2/8/2025 11:09:45 Yes | | 6 No | Yes | No | No | |
| 2/8/2025 11:10:03 Yes | | 2 No | Yes | No | No | |
| 2/8/2025 11:11:34 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 11:12:28 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 11:12:54 Yes | | 1 No | Yes | No | No | |
| 2/8/2025 11:13:16 Yes | | 5 No | Yes | No | No | |
| 2/8/2025 11:15:53 No | | | | | | |
| 2/8/2025 11:18:59 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 11:27:34 Yes | | 2 Yes | Yes | Yes | No | |
| 2/8/2025 11:30:00 Yes | | 3 No | Yes | No | Yes | |
| 2/8/2025 11:44:04 Yes | | 5 No | Yes | No | No | |
| 2/8/2025 11:44:08 No | | | | | | |
| 2/8/2025 11:45:42 Yes | | 1 No | Yes | No | No | |
| 2/8/2025 11:47:08 Yes | | 4 No | Yes | No | No | |
| 2/8/2025 11:51:14 No | | | | | | Yes |
| 2/8/2025 11:54:43 Yes | | 4 No | Yes | No | No | |
| 2/8/2025 11:55:29 No | | | | | | |
| 2/8/2025 11:59:10 Yes | | 2 No | Yes | No | No | |
| 2/8/2025 11:59:13 No | | | | | | Yes |
| 2/8/2025 11:59:43 Yes | | 3 No | Yes | No | No | |
| 2/8/2025 12:01:06 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 12:03:38 Yes | | 10 No | Yes | No | No | |
| 2/8/2025 12:14:33 Yes | | 2 No | Yes | No | No | |
| 2/8/2025 12:15:01 Yes | More than 10 | No | Yes | Yes | No | |
| 2/8/2025 12:17:09 Yes | | 2 No | Yes | Yes | No | |
| 2/8/2025 12:19:56 Yes | | 6 No | Yes | No | No | |
| 2/8/2025 12:21:14 No | | | | | | Yes |
| 2/8/2025 12:22:02 Yes | | 1 No | No | | | |
| 2/8/2025 12:22:28 No | | | | | | Yes |
| 2/8/2025 12:22:49 Yes | | 10 No | Yes | No | No | |
| 2/8/2025 12:23:23 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 12:24:29 Yes | | 5 No | Yes | No | No | |
| 2/8/2025 12:25:03 Yes | | 4 No | Yes | No | No | |
| 2/8/2025 12:26:26 Yes | More than 10 | No | Yes | Yes | No | |
| 2/8/2025 12:27:36 Yes | | 2 Yes | Yes | No | No | |
| 2/8/2025 12:28:29 Yes | More than 10 | No | Yes | Yes | No | |
| 2/8/2025 12:28:49 Yes | | 2 No | Yes | No | No | |
| 2/8/2025 12:29:06 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 12:30:31 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 12:30:43 Yes | | 3 No | No | | | |
| 2/8/2025 12:30:55 No | | | | | | |
| 2/8/2025 12:33:00 Yes | More than 10 | No | Yes | No | No | |

| Timestamp | | Count | | | | | |
|---|---|---|---|---|---|---|---|
| 2/8/2025 12:33:04 | Yes | 3 | No | Yes | No | No | |
| 2/8/2025 12:33:42 | Yes | 6 | No | Yes | No | No | |
| 2/8/2025 12:41:08 | No | | | | | | Yes |
| 2/8/2025 12:50:02 | Yes | 2 | No | Yes | No | No | |
| 2/8/2025 12:52:17 | No | | | | | | |
| 2/8/2025 12:53:36 | Yes | 2 | No | Yes | No | No | |
| 2/8/2025 12:53:53 | Yes | 2 | No | Yes | No | No | |
| 2/8/2025 12:54:26 | Yes | 2 | No | Yes | Yes | No | |
| 2/8/2025 12:55:46 | No | | | | | | Yes |
| 2/8/2025 12:55:56 | No | | | | | | |
| 2/8/2025 12:57:00 | Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 12:58:37 | No | | | | | | Yes |
| 2/8/2025 12:59:14 | Yes | 4 | No | Yes | No | No | |
| 2/8/2025 13:00:10 | Yes | 6 | No | Yes | No | No | |
| 2/8/2025 13:01:16 | Yes | 2 | No | Yes | No | No | |
| 2/8/2025 13:02:29 | Yes | 3 | No | Yes | No | No | |
| 2/8/2025 13:03:42 | Yes | 2 | No | Yes | No | No | |
| 2/8/2025 13:04:49 | Yes | 2 | Yes | No | | | |
| 2/8/2025 13:05:27 | Yes | 4 | No | Yes | No | No | |
| 2/8/2025 13:06:28 | Yes | 3 | No | Yes | No | No | |
| 2/8/2025 13:07:13 | Yes | 1 | No | Yes | No | No | |
| 2/8/2025 13:07:51 | Yes | 3 | No | Yes | No | No | |
| 2/8/2025 13:13:31 | No | | | | | | |
| 2/8/2025 13:14:45 | Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 13:15:42 | No | | | | | | |
| 2/8/2025 13:16:00 | No | | | | | | Yes |
| 2/8/2025 13:17:00 | Yes | 3 | No | Yes | No | No | |
| 2/8/2025 13:19:32 | Yes | More than 10 | Yes | Yes | No | No | |
| 2/8/2025 13:19:34 | Yes | More than 10 | Yes | Yes | No | No | |
| 2/8/2025 13:21:46 | Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 13:22:58 | Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 13:23:07 | Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 13:24:34 | Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 13:26:55 | Yes | 2 | No | Yes | No | No | |
| 2/8/2025 13:29:07 | Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 13:31:35 | Yes | 1 | Yes | Yes | No | No | |
| 2/8/2025 13:34:44 | No | | | | | | |
| 2/8/2025 13:35:46 | Yes | 2 | No | Yes | No | No | |
| 2/8/2025 13:36:35 | Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 13:37:33 | No | | | | | | Yes |
| 2/8/2025 13:46:36 | Yes | 2 | No | Yes | No | No | |
| 2/8/2025 13:47:47 | No | | | | | | |
| 2/8/2025 13:48:06 | No | | | | | | Yes |
| 2/8/2025 13:49:48 | Yes | More than 10 | No | Yes | No | No | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2/8/2025 13:50:54 Yes | | 5 No | Yes | No | No | |
| 2/8/2025 13:51:50 Yes | | 2 No | Yes | No | No | |
| 2/8/2025 13:52:54 Yes | | 6 No | Yes | No | No | |
| 2/8/2025 13:54:07 Yes | | 3 No | Yes | No | No | |
| 2/8/2025 14:41:56 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 14:45:45 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 14:48:49 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 14:51:26 Yes | | 10 No | Yes | Yes | No | |
| 2/8/2025 14:53:56 No | | | | | | Yes |
| 2/8/2025 14:56:44 Yes | | 8 No | Yes | No | No | |
| 2/8/2025 14:59:09 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 15:02:08 Yes | | 3 No | Yes | No | No | |
| 2/8/2025 15:06:47 Yes | | 4 No | Yes | No | No | |
| 2/8/2025 15:20:41 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 15:24:37 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 15:37:42 Yes | More than 10 | No | No | | | |
| 2/8/2025 16:17:23 Yes | | 3 Yes | Yes | No | No | |
| 2/8/2025 16:29:37 Yes | | No | No | | | |
| 2/8/2025 16:40:53 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 16:48:19 Yes | | 5 No | Yes | No | No | |
| 2/8/2025 16:52:06 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 16:54:47 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 16:59:25 Yes | More than 10 | No | No | | | |
| 2/8/2025 17:05:20 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 17:08:45 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 17:11:15 Yes | | 4 No | Yes | No | No | |
| 2/8/2025 17:12:55 Yes | | 3 No | Yes | No | No | |
| 2/8/2025 17:17:31 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 17:22:29 Yes | More than 10 | No | Yes | No | No | |
| 2/8/2025 17:28:08 Yes | More than 10 | No | Yes | No | No | |
| 2/20/2025 17:37:02 Yes | More than 10 | No | Yes | No | No | |
| 2/20/2025 17:38:28 Yes | More than 10 | No | Yes | No | No | |
| 2/20/2025 17:39:14 Yes | More than 10 | No | Yes | No | No | |
| 2/20/2025 17:40:04 Yes | More than 10 | No | Yes | No | No | |

| In the past two years how many encampment clearances have you experienced? | In the past two years, were you given advanced written notice of the camp clearance each time? | In the past two years have you had belongings taken by DPW, SFPD, or other city workers that you wanted to keep? | In the past two years, when you had belongings taken by city workers were you given written information about how to receive your belongings on each occasion? | In the past two years have you been successful in retrieving all the belongings that you lost and that you wanted to keep? | How long have you currently been homeless? | Survey Proctor | Column 16 | In the past two years have you personally experienced an encampment clearance by DPW, the police, or other city employees? | Section 2: Six Month Experience + Property Screening |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1 year | | | | |
| | | | | | 4 or more years | | | | |
| 2 No | | Yes | No | No | 4 or more years | | | | |
| 2 No | | No | No | No | 7 months - 11 months | | | | |
| | | No | No | | 4 or more years | | | | |
| 3 Yes | | No | | | 4 or more years | | | | |
| | | | | | | | | | |
| | | No | | | 2 years | | | | |
| | | | | | 3 years | | | | |
| | | | | | | | | | |
| | | No | | | 4 or more years | | | | |
| | | | | | | | | | |
| | | No | | | 4 or more years | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Chris | |
| | | | | Chris | |
| | | | | Chris | |
| | | | | Chris | |
| | | | | Chris | |
| | | | | Chris | |
| | | | | Chris | |
| | | | 4 or more years | Shukri | |
| Yes | Yes | No | 3 years | Chris | |
| | | | 4 or more years | Amber | |
| | | | 4 or more years | Xavier | |
| | | | 3 years | Amber | No |
| | | | 7 months - 11 months | Shukri | |
| | | | 2 years | Xavier | |
| Yes | Yes | No | 4 or more years | Chris | |
| | | | 4 or more years | Shukri | |
| | | | 2 years | Shukri | |
| | | | 4 or more years | Chris | |
| | | | 4 or more years | Shukri | |
| | | | 4 or more years | Shukri | |
| | | | 1 year | Shukri | |
| | | | 4 or more years | Shukri | |
| Yes | Yes | No | 3 years | Xavier | |
| | | | 4 or more years | Xavier | |
| Yes | No | No | 2 years | Shukri | |
| | | | 1 year | Amber | |
| | | | 4 or more years | Xavier | |
| | | | 4 or more years | Xavier | |
| | | | 4 or more years | Shukri | |
| | | | 4 or more years | Shukri | No |
| | | | 4 or more years | Shukri | |
| | | | 4 or more years | Amber | |
| | | | 2 years | Shukri | |
| | | | 4 or more years | Amber | |
| | | | 3 years | Xavier | |
| | | | 4 or more years | Xavier | |
| | | | 4 or more years | Shukri | |
| | | | 3 years | Amber | |
| | | | 4 or more years | Xavier | |
| | | | 3 years | Xavier | |
| | | | 3 years | Xavier | |
| Yes | No | No | 4 or more years | Amber | |
| | | | 3 years | Xavier | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | 1 year | Amber | |
| | | | | | 4 or more years | Xavier | |
| | | | | | 4 or more years | Amber | |
| | | | | | 4 or more years | Xavier | |
| | | | | | 4 or more years | Xavier | |
| | | | | | 4 or more years | Xavier | |
| | | | | | 3 years | Amber | |
| | 1 No | No | | | 4 or more years | Xavier | |
| | | | | | 4 or more years | Xavier | Yes |
| | | | | | 3 years | Shukri | |
| | | | | | 4 or more years | Shukri | |
| | | | | | 2 years | Shukri | |
| | | | | | 3 years | Shukri | |
| | | | | | 2 years | Xavier | No |
| | | | | | 2 years | Shukri | |
| | | | | | 2 years | Shukri | |
| | 3 No | Yes | Yes | No | 4 or more years | Shukri | Yes |
| | | | | | 4 or more years | Shukri | |
| | | | | | 2 years | Shukri | No |
| | | | | | 2 years | Shukri | |
| | 1 No | Yes | Yes | No | 2 years | Shukri | Yes |
| | | | | | 4 or more years | Amber | |
| | | | | | 4 or more years | Amber | |
| | | | | | 1 year | Shukri | |
| | | | | | 7 months - 11 months | Amber | |
| | | | | | 1 year | Shukri | |
| | | | | | 2 years | Xavier | |
| | | | | | 4 or more years | Xavier | |
| More than 10 | No | Yes | No | No | 4 or more years | Amber | Yes |
| | | Yes | No | No | 7 months - 11 months | Xavier | |
| | 4 No | Yes | No | No | 4 or more years | Shukri | Yes |
| | | | | | 2 years | Amber | |
| | | | | | 4 or more years | Xavier | |
| | | | | | 4 or more years | Xavier | |
| | | | | | 4 or more years | Amber | |
| | | | | | 4 or more years | Shukri | |
| | | | | | 3 years | Xavier | |
| | | | | | 4 or more years | Shukri | |
| | | | | | 4 or more years | Amber | |
| | | | | | 4 or more years | Xavier | |
| | | | | | 4 or more years | Xavier | |
| | | No | | | 4 or more years | Amber | |
| | | | | | Less than 3 months | Shukri | No |
| | | | | | 4 or more years | Xavier | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | 4 or more years | Amber | |
| | 3 No | Yes | Yes | No | 4 or more years | Xavier | |
| | | | | | 4 or more years | Shukri | Yes |
| | | | | | 4 or more years | Chris | |
| | | | | | 4 or more years | Amber | No |
| | | | | | 1 year | Xavier | |
| | | | | | 7 months - 11 months | Amber | |
| | 1 No | Yes | No | No | Less than 3 months | Shukri | |
| | 2 No | No | | | 4 or more years | Chris | Yes |
| | | | | | 3-6 months | Xavier | Yes |
| More than 10 | No | Yes | No | No | 4 or more years | Shukri | |
| | | | | | 3 years | Shukri | Yes |
| | | | | | 3 years | Chris | |
| | | | | | 4 or more years | Shukri | |
| | | | | | 2 years | Xavier | |
| | | | | | 4 or more years | Xavier | |
| | | | | | 4 or more years | Xavier | |
| | | Yes | No | No | 4 or more years | Amber | |
| | | | | | 4 or more years | Xavier | |
| | | | | | 4 or more years | Xavier | |
| | | | | | 1 year | Amber | |
| | | | | | 4 or more years | Xavier | |
| | | | | | Less than 3 months | Xavier | No |
| | | | | | 3 years | Xavier | |
| | | | | | 4 or more years | Xavier | No |
| | 6 No | Yes | No | No | 3-6 months | Amber | Yes |
| | | | | | 4 or more years | Shukri | |
| | | | | | 7 months - 11 months | Amber | |
| | | | | | 3 years | Xavier | |
| | | | | | 2 years | Shukri | |
| | | | | | 4 or more years | Chris | |
| | | | | | 3 years | Shukri | |
| | | | | | 3 years | Shukri | |
| | | | | | 4 or more years | Chris | |
| | | | | | 4 or more years | Chris | |
| | | | | | 3-6 months | Chris | |
| | | | | | 2 years | Shukri | No |
| | | | | | 2 years | Shukri | |
| | | | | | 2 years | Chris | |
| | 4 No | Yes | No | No | 4 or more years | Shukri | Yes |
| | | | | | 4 or more years | Amber | |
| | 2 No | Yes | No | No | 4 or more years | Xavier | No |
| | | | | | 4 or more years | Shukri | Yes |
| | | | | | 4 or more years | Shukri | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | 4 or more years | Shukri | |
| | | | | | 4 or more years | Shukri | |
| | | | | | 4 or more years | Shukri | |
| | | | | | 4 or more years | Shukri | |
| | | | | | 4 or more years | Chris | |
| | | | | | 4 or more years | Chris | |
| | | | | | 2 years | Chris | |
| | | | | | 3 years | Chris | |
| More than 10 | No | Yes | No | No | 4 or more years | Chris | Yes |
| | | | | | 4 or more years | Chris | |
| | | | | | 3-6 months | Chris | |
| | | | | | 4 or more years | Chris | |
| | | | | | 4 or more years | Chris | |
| | | | | | 1 year | Chris | |
| | | | | | 4 or more years | Chris | |
| | | Yes | No | No | 4 or more years | Chris | |
| | | | | | 4 or more years | Chris | |
| | | No | | | | Chris | |
| | | | | | 4 or more years | Chris | |
| | | | | | 4 or more years | Chris | |
| | | | | | 4 or more years | Chris | |
| | | | | | 4 or more years | Chris | |
| | | No | | | 4 or more years | Chris | |
| | | | | | 4 or more years | Chris | |
| | | | | | 4 or more years | Chris | |
| | | | | | 3 years | Chris | |
| | | | | | 4 or more years | Chris | |
| | | | | | 4 or more years | Chris | |
| | | | | | 7 months - 11 months | Chris | |
| | | | | | 4 or more years | Chris | |
| | | | | | 2 years | Xavier | |
| | | | | | Less than 3 months | Xavier | |
| | | | | | 2 years | Xavier | |
| | | | | | 4 or more years | Xavier | |