# EXHIBIT B

```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                      OAKLAND DIVISION
 4
 5  - - - - - - - - - - - - - - - - -
 6  COALITION ON HOMELESSNESS; SARAH  )
 7  CRONK; JOSHUA DONOHOE; MOLIQUE    )
 8  FRANK; DAVID MARTINEZ; TERESA     )
 9  SANDOVAL,                         )
10            Plaintiffs,             )
11  vs.                               )  CASE NO:
12  CITY AND COUNTY OF SAN            )  4:22-cv-05502-DMR
13  FRANCISCO; et al.                 )
14            Defendants.             )
15  - - - - - - - - - - - - - - - - -
16                      CONFIDENTIAL
17            REMOTE VIDEOTAPED DEPOSITION OF
18                  CHRIS HERRING, PH.D.
19                 MONDAY, APRIL 14, 2025
20
21         BEHMKE REPORTING AND VIDEO SERVICES, INC.
22            BY: JOHN FAHRENWALD, CA CSR 14369, RPR
23                550 CALIFORNIA STREET, SUITE 820
24                SAN FRANCISCO, CALIFORNIA 94104
25                              (415) 597-5600
```

1        A.   Well, I noted it.  And as you can also see in my
2   notes, I was very clear in terms of things I observed versus
3   what I was told versus, you know, what people have told me.
4   So these are all taken into account.
5        Q.   I see.  Let me try to ask a better question.
6             I'm not trying to distinguish between what you
7   personally observed and what someone told you.  I'm trying
8   to distinguish between what someone told you about their own
9   personal experience versus what they told you secondhand.
10            Does that distinction make sense?
11       A.   Yes.
12       Q.   In coming to your conclusions in this case, did
13  you distinguish between what people told you about their own
14  personal experience versus what they told you secondhand?
15       A.   Yes.  Things that people had personally witnessed
16  or experienced I distinguished from those that people had
17  said they heard from other people.
18       Q.   How did you do that?
19       A.   Well, no conclusions I came to relied solely on,
20  you know, one individual or another.  As I was composing the
21  expert report, my goal was to triangulate the data from
22  these different sources.  And, as I'm doing so, I would
23  prioritize including the, you know, data that would include
24  personal observations to, you know, direct personal
25  experiences.

```
 1          A.   Yes.
 2          Q.   And that included 355 -- excuse me -- 351 people?
 3          A.   Yes.
 4          Q.   In the second survey you collect data from 2019
 5     and 2020?
 6          A.   Yes.
 7          Q.   And that included 584 people?
 8          A.   Yes.
 9          Q.   So the survey results that you collected in this
10     case were smaller than either of the two prior
11     community-based surveys you referenced; is that fair?
12          A.   In total, yes.  But in terms of unsheltered
13     individuals, which was the subpopulation of focus, they were
14     much more comparable.  I believe it was like 183 unsheltered
15     in that first survey where we -- and so when we're looking
16     at that group specifically relative to that total population
17     size specifically, they're much more comparable.
18          Q.   In coming to your opinions in this case, did you
19     come up with an alpha level or some level of
20     representativeness that you wanted the survey to match?
21               MS. KASHYAP:  Objection.  Lacks foundation.  Form.
22               Go ahead.
23               THE WITNESS:  We were looking at, again, targeting
24     a sample that would be above -- that would be -- with the
25     resources and time we have, be able to show a broader
```

1  relationship beyond the, you know, individual cases and
2  stories that we had been hearing and looking at that level
3  of between over 5 percent of the total population of
4  interest, which in this case was unsheltered population, was
5  our goal.
6         Q.   (BY MS. MURPHY:) So your goal to have a
7  statistically significant sample was to get your survey
8  population to include at least 5 percent of San Francisco's
9  unsheltered population; is that fair?
10             MS. KASHYAP:   Objection.   Misstates prior
11 testimony.
12                  Go ahead.
13             THE WITNESS:   Yeah.   We were not looking for a
14 statistically significant -- a level of statistical
15 significance.
16        Q.   (BY MS. MURPHY:) That's helpful.   So the survey
17 that you relied on in coming to your conclusions is not
18 statistically significant?
19             MS. KASHYAP:   Objection.   Form.   Misstates prior
20 testimony.
21             THE WITNESS:   It's just not something we were
22 evaluating in this case.   We're not making claims -- I mean,
23 we're not running regressions where we would use a model of
24 statistical significance in this way.
25        Q.   (BY MS. MURPHY:) Let me try to rephrase this one

```
 1  a minute, I could go to that area of the report and --
 2       Q.   (BY MS. MURPHY:)  I think if you wouldn't mind
 3  taking a trip to page 15 of the report.  I think that's
 4  where you were headed.  Let me know when we get there.
 5       A.   Great.
 6            Yes.  This is where I was looking at and
 7  referring to.
 8       Q.   And in your report you state that the survey size
 9  you used was 6 percent of the city's overall unsheltered
10  population, which was 2,910 in persons; is that right?
11       A.   Yes.
12       Q.   But you compared this to the number of individuals
13  who were residing in the street or in a tent; is that right?
14       A.   Yes.
15       Q.   And you know that the term unsheltered actually
16  refers to a broader set of people?
17       A.   Yes.
18       Q.   And do you know how the percentage of survey
19  participants you looked at compares to the actual
20  unsheltered population in San Francisco from the point in
21  time?
22       A.   I mean, that's, to me, irrelevant to the analysis
23  which was focused on street or in a tent, which is what we
24  were -- what the goal was being set out and to get over 200
25  people for that reason.
```

```
 1                MS. KASHYAP:  Objection.  Form.
 2                Go ahead.
 3                THE WITNESS:  I used the term "suggest" in all of
 4   these analyses.  None of these single analyses show that DPW
 5   violates its bag and tag policy on its own.
 6         Q.     (BY MS. MURPHY:)  So none of your analyses in this
 7   case show that DPW violates the bag and tag policy in
 8   isolation.  It's only when you look at them collectively
 9   that you feel like you can come to a stronger conclusion; is
10   that fair?
11                MS. KASHYAP:  Objection.  Form.
12                THE WITNESS:  In the specific analyses that are
13   comparing the numbers of bag and tags to individuals and
14   tents and structures, none of them alone are able to show a
15   violation of the bag and tag.
16                Collectively looked together but in relation
17   to the survey data to the observations, triangulating the
18   data with the other parts of the report, there are, I feel,
19   useful indicators and pieces of this analysis as a whole.
20         Q.     (BY MS. MURPHY:)  That's helpful.  I think I heard
21   you use the word "suggest" instead of "evidence."  So is it
22   fair to say that one of your conclusions is that the number
23   of bag and tags compared to the number of people at HSOC
24   resolutions suggests that DPW doesn't follow its bag and
25   tag; is that more accurate?
```

1          A.   I was just referring to the exact language that I
2     use in this area of the report, which I was very careful
3     with.   For instance, I'm on page 18 right now.   I write, "I
4     concluded that the disparity between" -- and this is
5     referring to the earlier declaration of the PI -- "I
6     conclude that the disparity between the sheer number of
7     people subjected to encampment resolutions and the number of
8     logged bags and tags by DPW suggested that San Francisco
9     failed to comply with its bag and tag policies during
10    interactions with individuals experiencing homelessness,"
11    and is that language that I'm using throughout this part of
12    the report consistently.
13         Q.   So your assumption is that if DPW were following
14    its bag and tag policy, you would expect to see a larger
15    number of bag and tags; is that fair?
16              MS. KASHYAP:   Objection.   Form.
17              THE WITNESS:   I would say that is fair in
18    considering the survey data as well.   So if the survey
19    data -- you know, the survey data is indicating a high level
20    of property destruction of items that, you know, that
21    should -- that would be bagging and tagged, that, you know,
22    I could look to this analysis here to see if they were
23    bagging and tagging more.
24              So, for instance, if I saw high levels of bag
25    and tagging in these numbers as opposed to what I saw in the

1  initial declaration, and along with these high numbers of
2  people reporting having belongings taken, then I might say
3  that this suggests that, you know, we are -- they are bag
4  and tagging and people aren't retrieving it.  But that is
5  not what I found.  I did not find a -- I saw a similar
6  disparity across this period in these numbers.
7          So that did not challenge the findings that I had
8  in the surveys that I was looking to possibly, you know,
9  contest or see how it would align with these other analyses.
10     Q.   (BY MS. MURPHY:) Do you agree that there are
11  circumstances where a low number of bag and tags could
12  indicate that DPW is following the bag and tag policy?
13     A.   Yes.
14          MS. KASHYAP:  Objection.  Form.
15              Sorry.  Go ahead.
16     Q.   (BY MS. MURPHY:) For example, if campers are given
17  a reasonable amount of time to leave, they will take the
18  items they want with them, and so there will be fewer items
19  for DPW to bag and tag.  Right?
20          MS. KASHYAP:  Objection.  Incomplete hypothetical.
21  Form.
22              Go ahead.
23          THE WITNESS:  Yes.  If people were given adequate
24  time to leave and proper notice ahead of time, then there
25  would be a low number of bag and tags.

1                   But as my analysis points out in the section
2     on notices where there should be notices, this is not
3     consistent.  And also in my observations, people are not
4     given adequate time during the encampment resolutions to
5     successfully move and keep the belongings that they wish to.
6         Q.    (BY MS. MURPHY:) Do you agree that there are times
7     where DPW sees items on a street and they don't address
8     them, meaning they leave them right where they are?
9         A.    Yes.  As included in my expert report, there are
10    cases where they are giving notice of an encampment
11    resolution and they arrive and they do not clear the
12    encampment.
13        Q.    And so there would be a lower number of bag and
14    tags if DPW wasn't discarding people's items; they were just
15    leaving it where they found it.   Right?
16              MS. KASHYAP:  Objection.  Incomplete hypothetical.
17    Lacks foundation.
18              THE WITNESS:  Yes.  That could be the case if it
19    was not such that people are -- again, this is when I look
20    at the other survey data and see the widespread
21    destruction -- the people reporting widespread destruction.
22    The city's own data pointing to the reduction of tents.  The
23    tents before and after show that this is frequently
24    happening, et cetera.
25                   But, yeah, you see the idea here, that I --

1    every question I can see potential outcomes here in the
2    isolated cases you're given, but I then look to the other
3    data given to me to determine the likelihood of that.
4         Q.   (BY MS. MURPHY:) Were your opinions in this case
5    based on an understanding that post Grants Pass it's lawful
6    for the City to enforce its sit/lie laws?
7              MS. KASHYAP:  Objection.  Calls for a legal
8    conclusion.  Form.
9              THE WITNESS:  Yeah.  My understanding is that
10   after the Grants Pass decision, I don't know -- well, that
11   this would -- could allow San Francisco to enforce its
12   homeless-related quality of life ordinances without an offer
13   of shelter.
14        Q.   (BY MS. MURPHY:) The one possibility is that
15   people might voluntarily downsize the number of items they
16   have because they know now that they need to move even if
17   not given an offer of shelter.  Right?
18             MS. KASHYAP:  Objection.  Calls for speculation.
19   Incomplete hypothetical.  Go ahead.
20             THE WITNESS:  I mean, you're asking me to give my
21   opinion on if a scenario could be that people voluntarily
22   downsize because -- or I guess just repeat the question.
23        Q.   (BY MS. MURPHY:) Yeah.  Let me ask a better
24   question, which is have you done any research to determine
25   one way or the other if the effect of the Grants Pass ruling

```
 1   of what he lost and what were in those bags and suitcases,
 2   yes, I would.
 3        Q.   (BY MS. MURPHY:)  You initially asked Carlos if he
 4   was going to pick up items from the DPW storage yard, but he
 5   told you no.  Right?
 6        A.   Yes.
 7        Q.   He said he no longer much cared for the items that
 8   were bagged and tagged?
 9        A.   Yes.  But him, like most I talk to, had very low
10   belief that he would be able to get anything.
11        Q.   He told you that he, quote, no longer much cared,
12   end quote, for the items that were bagged and tagged.
13   Right?
14        A.   Yes.
15        Q.   But you convinced him to go try to retrieve the
16   items?
17             MS. KASHYAP:  Objection.  Form.
18             THE WITNESS:  I explained to him my interest in
19   seeing how this process worked.  And when I told him this,
20   he wanted -- he agreed to go to the yard with me.
21        Q.   (BY MS. MURPHY:)  Would you use the word
22   "convinced" to describe the conversation you had with
23   Mr. Ruiz?
24             MS. KASHYAP:  Objection.  Form.
25             THE WITNESS:  Well, he was convinced.  I don't --
```

1  the actual interaction, how it went, also had a level of him
2  wanting to prove to me an aspect of it.  But, yes, he was
3  convinced to go with me to the yard after I asked him to --
4  I asked him.
5          Q.   (BY MS. MURPHY:) He was convinced by you.  Right?
6               MS. KASHYAP:  Objection.  Form.  Asked and
7  answered.
8               THE WITNESS:  Yeah, I think I characterized the
9  conversation accurately.
10         Q.   (BY MS. MURPHY:) How did you convince Mr. Ruiz to
11 go see if the DPW storage yard had his items?
12              MS. KASHYAP:  Objection.  Form.
13              THE WITNESS:  I can't recall specifically.  I know
14 he -- I introduced myself as a researcher trying to
15 understand that, and I think he was definitely concerned and
16 interested in showing the reality of how this works.
17         Q.   (BY MS. MURPHY:) So you went to the DPW storage
18 yard with Mr. Ruiz on Thursday, August 29th, 2024.  Right?
19         A.   Yes.
20         Q.   You arrived there at 11:45 a.m.?
21         A.   As the time in my report states, that sounds
22 right.
23         Q.   And within three hours, he left with everything
24 DPW had bagged and tagged a few days before.  Right?
25              MS. KASHYAP:  Objection.  Form.

```
 1        A.   I don't -- I don't remember the names
 2   specifically.  I believe it was actually written in my
 3   report of a story of a person who had -- was able to
 4   retrieve their wallet, which included that personal
 5   identification, but in the process had lost a number of
 6   other items that were meaningful to them as well.
 7        Q.   Mr. Carlos Ruiz told you there were some items he
 8   wanted to keep that were not bagged and tagged.  Correct?
 9        A.   Yes.
10        Q.   Did you ever follow up to look at any body-worn
11   camera from his citation to see whether or not there was
12   evidence that those items existed?
13        A.   No.
14        Q.   Did you ever follow up to look at any CMMS
15   photographs to see whether there was evidence of those items
16   existing?
17        A.   No.
18        Q.   Mr. Carlos Ruiz told you that the City had taken
19   speakers, electronics, and a laptop from him; is that
20   correct?
21        A.   Yes.
22        Q.   Did you rely on the accuracy of his statement in
23   coming to your conclusions in this case?
24             MS. KASHYAP:   Objection.  Form.
25             Sorry.  Go ahead.
```

1          THE WITNESS: Yeah. I mean, my role as -- in
2    interviewing people is to document what it is they report in
3    their interviews, the same way that I report what I hear in
4    my other work with, you know, police officers, sanitation
5    workers, et cetera, and then to include that and align with
6    other observations included in the report from surveys,
7    conversations with other folks, et cetera.
8          Q.   (BY MS. MURPHY:) Did you assume the accuracy of
9    the statements you documented from Mr. Carlos Ruiz?
10         MS. KASHYAP: Objection. Form.
11              Go ahead.
12         THE WITNESS: In all of the interviews and
13   discussions that I'm having with people, I am taking their
14   word. And I'm also, you know, skeptical of these reports on
15   the individual level and consistently looking to see how
16   they line up with others.
17              So if it's widely reported in the
18   conversations I'm having with people or in the survey data,
19   if I'm able to observe certain processes that confirm or
20   challenge these narratives, this is how I'm looking at all
21   this data. But the points in this report reflect what is
22   reported to me by the individuals who I'm interacting and
23   discussing their experiences with.
24         Q.   (BY MS. MURPHY:) Why are you skeptical of the
25   information that persons experiencing homelessness reported

1  to you on an individual level?
2          MS. KASHYAP:  Objection.  Misstates prior
3  testimony.
4          THE WITNESS:  It's the same way I'm skeptical of
5  testimony from any individual in my research, whether it be
6  police officers, city officials, or whatnot.  So I look at
7  the individual person, I take them at their word, I report
8  this, and I apply a healthy skepticism as I'm looking at the
9  broader trends and data that I'm analyzing throughout the
10 cases as I continue.
11              These are all items that were repeatedly
12 mentioned in other people's, you know, cases and instances.
13 It's not to say anything specific of an individual case
14 except that it is not something uniquely reported here.
15      Q.   (BY MS. MURPHY:) I'm not trying to be difficult.
16 I just want to understand what you're saying, because I
17 thought I heard you say in your last response that you both
18 are skeptical of what individuals tell you but also you take
19 what individuals tell you at their word.
20          And so I just want to get a better understanding
21 of do you accept as true information that people gave you
22 about their personal experience when forming your opinions
23 in this case?
24          MS. KASHYAP:  Objection.  Form.
25          THE WITNESS:  Yes.

**ERRATA SHEET**

Re: COALITION ON HOMELESSNESS, ET AL. V. CITY AND COUNTY OF SAN FRANCISCO, ET AL.

Case No.: 4:22-CV-05502-DMR

Witness: CHRIS HERRING, PH.D.

Date of Deposition: MONDAY, APRIL 14, 2025

Control Number: 44407

Reporter: JOHN FAHRENWALD, CSR 14369

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 13 | 19 | "Zall Schoff" should be "Zal Shroff" | Spelling error |
| 13 | 20 | "Zall Schoff" should be "Zal Shroff" | Spelling error |
| 19 | 17 | "Zall" should be "Zal" | Spelling error |
| 77 | 15 | "close supervising" should be "co-supervising" | Court reporter misheard |
| 140 | 11 | "is" should be "it's" | Court reporter misheard |
| 146 | 7 | "TB" should be "PD" | Court reporter misheard |
| 152 | 9 | "to it" should be "it to" | Typographical error |
| 152 | 17 | "empirical" should be "the empirical" | Typographical error |
| 176 | 10 | "isn't" should be "is" | Court reporter misheard |
| 191 | 1 | "Melody" should be "Melodie" | Spelling error |
| 191 | 1 | "Cheyenne" should by "Shyhyene" | Spelling error |
| 191 | 2 | "Shaina Cooper" should be "Shanna Couper" | Spelling error |
| 191 | 2 | "Green" should be "Reem" | Spelling error |

1

| 191 | 10 | "Melody's" should be "Melodie's" | Spelling error |
| --- | --- | --- | --- |
| 195 | 20 | "Melody" should be "Melodie" | Spelling error |
| 195 | 21 | "Cheyenne" should by "Shyhyene" | Spelling error |
| 195 | 21 | "Shaina Cooper" should be "Shanna Couper" | Spelling error |
| 195 | 22 | "Green" should be "Reem" | Spelling error |
| 213 | 4 | "CARP" should be "CART" | Correcting acronym |
| 213 | 5 | "Compassionate Alternative Response to Policing" should be "Compassionate Alternative Response Team" | Correcting acronym |
| 273 | 21 | "Melody" should be "Melodie" | Spelling error |
| 274 | 2 | "Cheyenne" should by "Shyhyene" | Spelling error |
| 274 | 5 | "Shaina" should be "Shanna" | Spelling error |
| 274 | 6 | "Shaina Cooper" should be "Shanna Couper" | Spelling error |
| 274 | 11 | "Green" should be "Reem" | Spelling error |
| 275 | 17 | "a door is" should be "outdoors" | Court reporter misheard |
| 276 | 13 | "Melody" should be "Melodie" | Spelling error |
| 276 | 14 | "Cheyenne" should by "Shyhyene" | Spelling error |
| 276 | 14 | "Shaina Cooper" should be "Shanna Couper" | Spelling error |
| 276 | 14 | "Sara" should be "Sarah" | Spelling error |

| 276 | 15 | "Green" should be "Reem" | Spelling error |
| 296 | 22 | "Melody" should be "Melodie" | Spelling error |

_____  Dated June 3, 2025

Chris Herring

3