# EXHIBIT A

```
 1               UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3  - - - - - - - - - - - - - - - - - -

 4  COALITION ON HOMELESSNESS,        )

 5  et al.,                           )

 6                  Plaintiffs,       )

 7  vs.                               )  CASE NO.

 8  CITY AND COUNTY OF SAN            )  4:22-cv-05502-DMR

 9  FRANCISCO, et al.,                )

10                  Defendants.       )

11  - - - - - - - - - - - - - - - - - -

12

13

14

15           REMOTE VIDEOTAPED DEPOSITION OF

16                BENJAMIN KING, Ph.D., MPH

17                WEDNESDAY, APRIL 9, 2025

18

19

20

21        BEHMKE REPORTING AND VIDEO SERVICES, INC.

22           BY:  SUZANNE I. ANDRADE, CSR NO. 10682

23              550 CALIFORNIA STREET, SUITE 820

24              SAN FRANCISCO, CALIFORNIA  94104

25                            (415) 597-5600
```

```
1              So let me ask you a different question.
2              So for your diagnostics work through Methods
3    and Results, did you work on anything that you think is
4    relevant for your opinions in this case?
5        A.   No.
6        Q.   Okay.  So for your -- so you're going to have
7    to tell me what this means, the nonprofits, Continuum of
8    Care, for -- what does that mean?
9              What -- what do you do in that capacity?
10       A.   So Continua of Care -- plural; singular,
11   continuum -- is the lead agency funded by HUD to
12   coordinate homeless response services in each community.
13   So there's one in almost every mid to large urban area,
14   and most states then have a balance of state continuum
15   to cover the rest of their area.
16             They fund -- they handle the funds and
17   distribute the funds for homeless response systems, case
18   management, shelter services, all kinds of different
19   programs.  There's a number of different grant
20   mechanisms.  We do not want to get lost in that today.
21             They have a lot of different responsibilities,
22   including providing the Homeless Management Information
23   Service, HMIS, which is very similar to sort of an
24   aggregate medical record, but not medical, right, so
25   social service record aggregation across all of the
```

1    services funded by HUD in a given community.

2            And, in addition to that, they provide, you

3    know, vision and strategic planning, coordination of

4    services across all of the member organizations that are

5    funded.

6        Q.    Got it.

7            So -- sorry.

8        A.    Yeah.  No, go ahead.  Stop me.

9        Q.    I was just going to interject and ask, so in

10   your capacity, I guess, as president of Methods and

11   Results --

12       A.    Hmm.

13       Q.    -- what work would you do in working with the

14   nonprofits that you described for that Continuum of Care

15   work?

16       A.    Sure.  As an example, currently, I'm working

17   with a local Continua of Care to provide analysis and

18   reporting of their annual point-in-time count.  This is

19   another -- I believe lawyers would call it a term of --

20   no, I don't know what you would call it.  I shouldn't

21   say that.

22            Point-in-time count is a specific procedure

23   that's required by HUD to be conducted in January.  They

24   enumerate, as best they can, the sheltered and

25   unsheltered population and summarize it and report that

1    to the federal government.

2        Q.    Got it.

3              So you're helping with analysis and reporting

4    related to point-in-time count for which --

5        A.    Yes.

6        Q.    -- nonprofit?

7              Which nonprofit?

8        A.    That is for the Coalition for the Homeless of

9    Houston/Harris, Fort Bend, and Montgomery County.    We

10   just call it CFTH.

11       Q.    Any relation to the Coalition on Homelessness

12   in San Francisco?

13       A.    No, there is not.    Gre- -- yeah, no.

14       Q.    Besides the Coalition For Homelessness of

15   Houston and Harris County, I think you said it was

16   called, are you currently working with any other

17   nonprofits through Methods and Results?

18       A.    Yes.

19       Q.    Which ones?

20       A.    The Continua of Care for the Fort Worth area,

21   called Partnership Home.

22       Q.    Any others?

23       A.    No.

24       Q.    In the past, have you worked with others, other

25   Continuum of Care nonprofits?

```
 1    wrong -- if there were other organizations with whom
 2    you've maybe started conversations with but didn't
 3    actually provide work for?
 4              Is that -- is that what you're saying?
 5    A.    Certainly, that.   And, also, I've volunteered
 6    work which wouldn't have involved anything.   My
 7    dissertation, for example, was with another Continua of
 8    Care in Austin.
 9    Q.    Mm-hmm.
10    A.    But that wouldn't have involved a consulting
11    role.
12    Q.    Got it.
13              So can you tell me about your volunteer work,
14    then, with Continuum of Care --
15    A.    Sure.
16    Q.    -- nonprofits?
17    A.    Sure.   I worked on the -- here's another sort
18    of very technical mechanism.   Coordinated entry is
19    something that I've been involved with for a while.   My
20    dissertation was on the subject, assessing the
21    prioritization tool.   And I'm happy to go back and
22    revisit any of this.
23              I've worked with the Coalition for the Homeless
24    in a volunteer capacity to assess -- evaluate,
25    essentially, their coordinated entry system and
```

```
 1    prioritization tool.
 2         Q.    I'm sorry.  I'm going to stop you there.
 3         A.    Mm-hmm.
 4         Q.    Which Coalition for the Homeless?
 5               The one in Houston?
 6         A.    I'm sorry.  That's important, yes.
 7               CFTH, the one in my area.  I have never worked
 8    with the Coalition for the Homeless of San Francisco.
 9         Q.    Okay.  Sorry.  Continue.  You were saying...
10         A.    In case I misstate that again, I don't want
11    that to be confused, obviously.
12               The continuum for the care, Central Texas,
13    Travis County, as I --
14         Q.    Sure.
15         A.    -- mentioned was involved with my dissertation.
16    And I've had relationships and data sharing with the
17    Texas Homeless Network, where I was board chair and
18    served on the board for, I think, seven years, which is
19    our Balance of State Continuum of Care.
20         Q.    Got it.
21               And so tell me a little bit more about that.
22               What is the Texas Homelessness Network?
23         A.    That is the -- so Balance of State refers to --
24    I'd have to look it up.  Don't tell them that I don't
25    remember.  But it's 200-and-something, 21 counties,
```

1    roughly, of Texas who are not incorporated by another

2    Continuum of Care.  They have similar planning and HMIS

3    management roles, as well as distributing the funds

4    based on their internal review process -- distributing

5    the funds for homeless services across the state of

6    Texas.

7        Q.   Got it.

8             And were you -- as board -- a member of the

9    board of Texas Homeless Network, were you compensated,

10   or is that a volunteer role?

11       A.   No, I was not compensated.  Quite the opposite.

12       Q.   Any other volunteer work related to Continuum

13   of Care coordinated entry-type things that we have not

14   discussed yet?

15       A.   I can't say that's an exclusive list.  I try to

16   volunteer my time a lot.

17       Q.   Got it.

18            On homelessness issues?

19       A.   Yes, including on homelessness issues.

20   Currently, I serve as the faculty advisor for the HOMES

21   Clinic in Houston, which is a student-run clinic

22   partnering -- sort of an operation of an FQHC, which is

23   Federally Qualified Health Center, called Healthcare for

24   the Homeless Houston.  I am an advisor for research

25   purposes and evaluation of that clinic, similar.

1          I volunteer my time as a mentor for the Albert

2    Schweitzer Fellowship on projects typically that involve

3    service projects by students in population -- usually in

4    populations experiencing homelessness, just because

5    that's when I got involved.

6          Q.   Got it.

7          A.   I think that's -- I think that's it currently,

8    if that's helpful.

9          Q.   Okay.  Yeah, that is.

10         Okay.  Going back to Methods and Results, just

11    to kind of close the loop on that, or in your work for

12    that.

13         Do you have any employees through Methods and

14    Results, or is that just you?

15         A.   No.  It's a sole proprietorship.

16         Q.   Oh, I think you mentioned that.

17         A.   Or sole -- sole member.  Whatever the term is.

18    Sorry.

19         Q.   Got it.

20         And do you ever, like, subcontract work or

21    engage in, like, you know, agreements where you have

22    someone working for you, or no?

23         A.   No.

24         Q.   And do you -- do you make money through Methods

25    and Results?

1      Q.    So are you offering an opinion about whether

2   the City and County of San Francisco violated any law in

3   this case?

4      A.    No.   That's not part of my opinion.

5      Q.    Are you offering an opinion about whether any

6   employee of the City and County of San Francisco

7   violated any law in this case?

8      A.    I don't -- I don't think my opinion addresses

9   that directly, no.

10     Q.    Are you offering an opinion about whether any

11  individual experienced a deprivation of their Fourth

12  Amendment rights?

13     A.    No.

14     Q.    Are you offering an opinion about whether any

15  individual experienced a deprivation of their due

16  process rights?

17     A.    No.

18     Q.    Are you offering an opinion about whether the

19  City has a policy, custom, or practice of violating

20  anyone -- any individual rights?

21     A.    No.

22     Q.    Are you offering an opinion about whether the

23  City was deliberately indifferent to a violation of

24  anyone's rights?

25     A.    Hmm.   No.

1    beginning.  "Based on my review of the materials
2    provided to me and my observations of encampment removal
3    operations in February 2025, my opinions are..."
4         And the first one under (a) says:  "the City's
5    existing 'Bag and Tag' policy and training material lack
6    clear definitions and objective standards for the
7    factors that are used to justify disposal of property,
8    do not provide a standardized process for evaluating
9    public health and safety risks in the field, vests
10    untrained city workers with an excessively discretionary
11    role, and fails to align with -- with public health
12    principles."
13         Do you see that?
14    A.    Yes.
15    Q.    And so what, if any, information was that
16    opinion based on, or what is it based on?
17    A.    That is based on past experience teaching
18    environmental health terminology and frameworks; my
19    understanding of occupational health and safety
20    language, including federal code and trainings that
21    are -- stem from federal code, of course; and experience
22    working in the health care setting since -- well, for
23    more than a couple of decades; and then reviewing the
24    policy, the supporting documents, including, you know,
25    memos and other materials that we've discussed

```
1   previously, looking for operational definitions that
2   would help to further characterize what was missing from
3   the initial policy and not finding those.
4           That -- yeah, that my conclusion is that the
5   policy itself is written with terms that would not
6   normally be used in the context of environmental health
7   or public health instruction.
8   Q.   Okay.  Anything -- anything else?  Any other
9   information that opinion is based on?
10  A.   I think that was the best summary I can provide
11  right now.
12  Q.   Okay.  Let's move on to the second one under
13  (b).  It says -- this opinion is:  "my in-person
14  observations confirmed that these deficiencies in the
15  'Bag and Tag' policy and training result in City workers
16  making superficial and inappropriate assessments of
17  whether property is an 'immediate health and safety
18  risk.'"
19          Do you see that?
20  A.   Yes.
21  Q.   And what, if any, information is this opinion
22  based on?
23  A.   That was informed, as it says, by the in-person
24  observations of the handling of HSOC operations over a
25  day and a half and observing the process or what process
```

1    that there might be in the staff who are conducting
2    those operations and how they handled materials and how
3    they assessed this threshold which the policy holds
4    forth of immediate health and safety risk.
5        Q.    Anything else?
6        A.    Again, I would point back to the experience in
7    teaching environmental health frameworks, terminology
8    and experience in health care settings and -- yeah,
9    and -- and with the familiarity with the OSHA, or
10   Occupational Health and Safety federal code, training
11   materials, et cetera.  What I said before.
12       Q.    All right.  Moving on to the next one.  Under
13   (c):  "the CMMS reports prepared by City workers do not
14   contain sufficient details about the property being
15   assessed for disposal and the reasons for disposal to
16   conclude that the property was appropriately evaluated
17   and did, in fact, present an immediate health or safety
18   risk."
19           What, if any, information was that opinion
20   based on?
21       A.    I would say it was informed by everything I
22   mentioned previously plus careful review of a large
23   number of the CMMS reports themselves to assess whether
24   there was sufficient information documented to either
25   capture the process or the out- -- or even the outcomes

1    of immediate health and safety risk, or whether or not

2    public health procedures, such as HAZWOPER guidelines or

3    other occupational health and safety guidelines, were

4    being documented in those reports.  And I came to that

5    opinion.

6        Q.   When you say a large number of CMMS records, do

7    you have an estimate in mind when you say that?

8        A.   Estimate?  I would say that I reviewed enough

9    of them that I feel confident in my assessment of their

10   content over -- over a -- a longitudinal period of time.

11       Q.   And when you say "enough," like, how -- how did

12   you -- how do you gain that comfort, I guess?

13       A.   The -- by reviewing sufficient to where there

14   is no longer variability in what I'm encountering.

15            I found a large enough number to review that

16   the opinion that I had formed based on my initial and

17   direct observation was confirmed and that nothing in

18   those reports challenged my concerns that you mentioned

19   under part (b) of this.

20       Q.   Got it.

21            I guess I'm -- I'm just trying to understand, I

22   guess, the methodology --

23       A.   Mm-hmm.

24       Q.   -- of how --

25       A.   Mm-hmm.

1      Q.    -- you gain that comfort, right?

2      A.    Mm-hmm.

3      Q.    Can you explain that a little bit in more
4    detail?

5            Like, is there a principle of, like, in
6    percentage?

7      A.    Yeah.   So -- so the term -- the term that
8    you're looking for perhaps, although I'm -- I love the
9    term "methodology."   I think that the -- the threshold
10   that we're interested in, particularly when conducting
11   qualitative review like this, is something along the
12   lines of saturation.

13           What that means is I'm gathering enough
14   information until there's no longer variability applied
15   or variability in the inputs because it's offering the
16   same breadth of information that was collected
17   previously.

18           So you continue to collect qualitative data in
19   particular, is commonly done under this method.   And I
20   think that applies to this kind of review of materials
21   as well.

22     Q.    I see.

23           And is that -- or how do you know when you
24   reach saturation?

25     A.    Again, I'll point to what I just offered, that

1    it's when new input no longer provides any variance from

2    the understanding obtained.

3            So you collect enough information that you have

4    a stable understanding of what exists in those reports.

5    That's -- again, there was an opinion, and the report --

6    the review of the reports was highly confirmatory

7    while -- of -- of the initial impression that there was

8    not enough information to make a determination about

9    health assessment process.

10            The fact that that information wasn't there did

11   not change over a significant number of reports

12   reviewed.  That's -- that's as best as I can offer.

13   Q.   I see.

14           Okay.  Now, the -- is there anything else that

15   you -- any other information that you -- that opinion

16   (c) is based on?

17   A.   In that the beginning, that that incorporates

18   all of the prior evidence that I had talked about under

19   (a) and (b) as well to inform that review.

20   Q.   Okay.  Now, (d): "a revised 'Bag and Tag'

21   policy is necessary that incorporates clearly defined

22   health and safety risk criteria, mandatory assessments

23   by trained public health personnel, and improved

24   training for City personnel."

25           Do you see that?

1      A.   Yes.

2      Q.   And what, if any, information is that opinion

3 based on?

4      A.   That's really a summation in some ways or a

5 byproduct of the prior three opinions or parts; that

6 revision would strengthen the ability of -- of HSOC

7 operations to pro- -- produce a standardized and more

8 effectively documented approach to assessing health and

9 safety risks if, indeed, that threshold is what the --

10 the policy deems to be of the appropriate threshold.

11      Q.   Anything else?

12      A.   And all of the evidence prior that went into

13 the prior three opinions also informs including my

14 understanding of terminology; in particular, my

15 understanding of terminology and the complexity of the

16 HAZWOPER guidance, which is -- which is, I -- I think --

17 I hold applies to this based on OSHA's own comments.

18      Q.   Okay.

19      A.   Yeah, that's all.  That's it.

20      Q.   All right.  So let's move on to paragraph 5.

21 So paragraph 5 say:  "The opinions that I express in

22 this Report are true and are based upon methodologies

23 commonly used in my profession."

24      Do you see that?

25      A.   Yes.

1          Can I take a -- just even a two-minute break?

2      ATTORNEY GRADILLA:  Sure.

3      THE WITNESS:  Okay.

4      ATTORNEY GRADILLA:  Off the record.

5      THE VIDEO OPERATOR:  This is the end of Media 3.

6  We're going off the record at 4:09 p.m.

7          (Recess taken from 4:09 p.m. to 4:12 p.m.)

8      THE VIDEO OPERATOR:  We're back on the record.  This

9  is the beginning of Media 4.  The time is 4:12 p.m.

10  Central Time.

11  BY ATTORNEY GRADILLA:

12      Q.   So before the break, Dr. King, you were

13  explaining to me a little bit about the methodology you

14  employed in writing this report, correct?

15      A.   Hmm.

16      Q.   I guess I'm -- maybe that's why I'm a lawyer.

17  I don't really understand what you were -- so try again,

18  please.

19          Can you explain to me the methodology that you

20  employed in writing your report?

21      A.   I'm just considering if there's another way to

22  frame this, but I -- I really see the process of this

23  being almost like a -- like a comparison, like a

24  validation sort of assessment.

25          Again, taking the material that's being

1    reviewed and, in the background -- or applying that

2    through the lens, I guess you could say, of prior

3    experience.

4              That prior experience I think we've summarized

5    pretty effectively.  I can go through it again.

6              I also -- I think I spoke to this a little bit

7    at the beginning of the rebuttal report, if that's

8    helpful.  Because one of the other experts mentioned

9    using the methodology of a literature review, I thought

10   it would be helpful.

11             And in discussion with counsel, decided to

12   include a statement that, while there was not a specific

13   literature review conducted about the health risks or

14   the excess vulnerability of infectious disease for

15   people experiencing homelessness, that the reason that

16   that can't be pointed to is because I've spent the last

17   five years studying, for example, drivers of mortality

18   and excess health risk in homelessness.

19             And I've done that same literature review, I

20   don't -- I don't know how many times.  I assign

21   articles, some of which were cited, you know, for

22   students to review and discuss and re- -- present back

23   to me for discussion.

24             This is something that is, you know, acutely

25   part of my working life, so to speak.  And so I'm not

1    sure how else to contextualize that element of it.

2          But with that experience in reviewing these

3    materials, you can see where there are gaps between the

4    terminology, for example; such as "soiled" or even

5    "immediate health and safety risk," for example, as a

6    threshold, which is not commonly applied in federal

7    regulation or in public health definitions.

8          There were gaps in what is considered a health

9    risk based on review of the policy, the trainings,

10   et cetera.

11         So those differences are where I identify those

12   gaps, and that's what I point to in forming those

13   opinions.  And that's what's outlined in (a), (b), (c),

14   and (d).

15      Q.   Got it.  So let me see if I -- if I understand

16   what you're saying correctly.

17         So -- so based on your experience and your

18   knowledge in the field and those sorts of -- what we've

19   talked about a little bit, that's kind of like a -- for

20   lack of a better word, like a standard upon which you

21   compare --

22      A.   Hmm.

23      Q.   -- you compare what you reviewed; is that

24   right?

25      A.   Yeah.  A standard is a great word.  That

1    actually gets back to the diagnostic validation

2    methodology that I was kind of alluding to as an

3    analogy; that there's a standard, and then there's

4    something that you compare to that standard.   Yeah.

5        Q.   Okay.  That helped me.  Thank you.

6        A.   Okay.  Thank you.

7        Q.   Um...

8        A.   Well, thank you for your patience in letting me

9    try to find that explanation.  But I -- I think you

10   understand what I was trying to say, then, right?

11       Q.   Yes.  Okay.

12            So moving on to -- oh, I stopped sharing the

13   screen, screen share.

14            So now at paragraph 8 -- can you see my screen?

15       A.   Yes.

16       Q.   So at paragraph 8, you note that you have

17   "extensive experience in methods for enumeration and

18   encampment outreach strategies."

19            Do you see that?

20       A.   Let's see.  "...experience... methods for

21   enumeration and outreach strategies."

22            Yes, I do.

23       Q.   Can you explain what that means?

24       A.   So that is based on, in particular, engagement

25   with encampments and unsheltered individuals really

1    living in lots of different contexts, from operating or

2    advising point-in-time counts, which are -- again, we

3    described this earlier.  Let me know if I need to go

4    over it again.

5         It is a process which involves enumeration of

6    sheltered and unsheltered individuals, the unsheltered

7    piece of which is much more difficult, of course.

8         And that those engagement strategies include

9    everything from survey development and flow to

10   engagement strategies.  I've even, you know, been part

11   of -- although I always partnered with somebody to talk

12   about de-escalation techniques, because it's good to

13   have a behavioral health person work with you on that.

14        Yeah.  I could -- I could go on.  Let me know

15   where the gap is in that, but that is something that

16   I've done for a number of years.

17   Q.   Okay.  That's helpful.

18        So going down a little further to paragraph 12.

19   So here, you describe some of your current work related

20   to systematic reviews --

21   A.   Mm-hmm.

22   Q.   -- examining health-harming exposures.

23        Do you see this?

24        Related --

25   A.   Mm-hmm.

1        Q.    -- to the experience of homelessness.

2              Do you see that?

3        A.    Yes.

4        Q.    Okay.  Can you -- can you tell me about this?

5   Like, what -- what does this mean?

6        A.    A passion project in some ways and a way to get

7   a team together to be really thoughtful about when we

8   say the relationship between health and homelessness, to

9   be really careful and really empirical about how we talk

10  about it.

11             We collected a team, mostly students, who have

12  completed 13 individual systematic literature reviews --

13  which is really the top tier of evidence, just below,

14  you know, meta-analysis, which is a calculation that

15  stems from systematic literature reviews -- seeking to

16  summarize what the actual health exposures are

17  specifically associated with measuring excess risk for

18  experience of homelessness.

19             That includes summarizing how homelessness is

20  captured in those studies and what the effect measures

21  were, what kinds of samples, whether it was sheltered

22  unsheltered, et cetera.

23             We went through all the studies that we were

24  able to pull together off of those different -- 13

25  different systematic literature review searches.

1              If you -- actually, you know what might be

2     helpful, if you're looking for too much context, is to

3     go, again, to the beginning of the rebuttal report.  I

4     think, as an addition, I cited my own pre-registration

5     of that study, which might be helpful, since all of

6     those papers are now pre-publication except for one

7     which has come out, which is -- which is not very

8     helpful because it's the one that found no evidence of

9     an association between the two, although we wrote up

10    that we think that there's just a lack of evidence about

11    it.

12             So if we could switch over to that, or I could

13    pull it up and just share a link or any of those things.

14    But if you look at the rebuttal report, early on in a

15    footnote, there should be -- I hope I'm recalling this

16    correctly.  Ah, yeah, No. 1, in fact.

17        Q.   I see.

18        A.   And so that's probably a much better

19    comprehensive and clearer perspective.  Because we

20    pre-register our systematic reviews in order to

21    demonstrate that we weren't just willy-nilly searching

22    for literature.

23             You pre-specify the search terms and the

24    exclusion criteria, and then you use a system of

25    software.  And we actually set up dyads of reviewers,

1    which is really -- you know, best practices is not to

2    have one person review the articles but to have teams

3    review and then adjudicate any disparities so that you

4    don't accidentally miss an article, in other words.

5            And we went through some -- more than 9,000

6    articles listed in the initial 13 searches combined,

7    deduplicated, and then assessed them for appropriateness

8    for each of the searches that we were conducting.

9            That's what -- I hope that's enough.  Maybe

10   I've overstayed my welcome on that question.  You let me

11   know.

12   Q.   Yeah.  That's -- that's a lot of information,

13   but thank you.

14           I was just going to ask you if this article --

15   would that list all of your collaborators on this,

16   besides the students I mean?

17   A.   No, no.  That wouldn't actually list.  We -- I

18   think it's just listed under my name, actually.  Yeah.

19           I don't think that there's a public framing of

20   the team member names, although I obviously have

21   documentation of who contributed to those reviews

22   because we're working on the papers now to publish

23   everyone who was involved who will be added to the

24   searches that they were contributing to.

25   Q.   I see.

```
1            So paragraph 26, you discuss commingling,
2    correct?
3        A.   Yes.
4        Q.   So you say that the policy doesn't define
5    commingle or specify what level of contamination
6    warrants full disposal of an item.
7            Do you see that?
8        A.   Yes.
9        Q.   So -- so, in your view, at what level of
10   contamination would hazardous items mixed in with
11   nonhazardous items would warrant disposal of all items?
12       A.   I'm not sure I have an opinion on what that
13   threshold should be.  I would suggest that this is a
14   good place where discretion is probably always going to
15   have a role.
16           But again, the decision of how to safely
17   address a hazard -- I use the example of a single capped
18   hypodermic needle -- to be a fairly low threshold of
19   mitigation of a hazard that does not require disposal;
20   as opposed to, you know, on -- on the other end of the
21   spectrum, I guess you could come up with any number of
22   hypotheticals of, you know, extreme contamination with
23   hazards.
24       Q.   So do have a view or thoughts on how you would
25   propose that a City worker gauge, you know, that --
```

```
1       A.    Sure.  So --
2       Q.    -- job --
3             (Simultaneous speakers.)
4       THE REPORTER:   I'm sorry.   Could you repeat the
5  question, please.
6       ATTORNEY GRADILLA:   Sure.
7  BY ATTORNEY GRADILLA:
8       Q.    I'm just wondering if Dr. King has any thoughts
9  on how he would propose that a City worker gauge that
10 threshold of contamination while on the job?
11      A.    Yes.  And I'm going to point us back to the
12 frameworks that I've mentioned previously.
13            After a site characterization study, which
14 involves hazard identification, risk assessment is the
15 combination of probability and severity of the hazard
16 that's been identified.  Those processes are
17 standardizable, particularly through routine
18 documentation and training by people who really do have
19 the -- the correct amount of -- of experience in
20 assessing environmental risks.
21            That would improve the ability to make a
22 decision about what process would be most appropriate.
23            So, again, it's not -- it's not a question of
24 commingled or not, necessarily; that is how the policy
25 is developed.
```

1    wouldn't have been able to obtain from documentation

2    because that information's not really documented,

3    obviously.

4        Q.   Okay.  And going back to the statement that we

5    pulled out at the beginning at the first sentence of

6    paragraph 39.

7            What do you mean by "meaningful health and

8    safety risk assessments"?

9        A.   I -- I -- I'm going to have to point you to the

10   same framework that I've been describing of structured

11   assessment of risk based on the identification of the

12   hazard characterization of the site and then assessment

13   of risk based on severity and probability of the hazard.

14       Q.   So moving down to paragraph 40, here you say

15   that you observed the entire -- the way entire tents

16   were removed without examination.

17           Do you see that?

18       A.   Yes.

19       Q.   Can you just describe for me in a bit more

20   detail what you actually observed?

21       A.   I observed tents being not even -- well, either

22   collapsed or carried whole, belongings inside, and moved

23   to the waste truck and then discarded in -- through a

24   variety of techniques.

25       Q.   And when you say "without examination," what --

```
 1   in order to ask for cumulative time?
 2        Q.   Yes.
 3        A.   Okay.  Then I'll wait.
 4        Q.   So your fourth opinion, (d), at paragraph 2,
 5   is:  "a revised 'Bag and Tag' policy is necessary that
 6   incorporates clearly defined health and safety risk
 7   criteria, mandatory assessments by trained health
 8   personnel, and improved training for City personnel,"
 9   correct?
10        A.   Oh, I'm -- I see.  Yes, I see where you're
11   citing that.
12        Q.   What do you base that opinion on?
13        A.   What do I base that upon?  My recommendation?
14        Q.   Well, that opinion, the one I just read at
15   2(d).
16        A.   Yeah.  That is based on the prior opinions
17   throughout and statements throughout this report which
18   document the gaps.
19             And the recommendations are, you know,
20   constructive recommendations based on my experience,
21   training, and what I understand the process outcomes to
22   be.
23             Yeah.  That's -- that's my opinion.
24        Q.   Anything else?  Do you base it on anything
25   else?
```