# Exhibit A

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

# Expert Report of Ben King, PhD MPH

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

## I.    Introduction

1.      I was asked to provide my expert opinion on the policies and practices of the City and County of San Francisco related to homeless encampment removal operations, and the City's policies and practices related to seizing and discarding items, including the City's "Bag and Tag Policy" (Rev 003), documentation of those operations, and the training provided to the City's Department of Public Works ("DPW") employees. I was also asked to review other policy and procedure documents and deposition transcripts. I was also asked to observe several City encampment removal operations in person to assess how those operations reflected the City's policies and practices.

2.      Based on my review of the materials provided to me and my observations of encampment removal operations in February 2025, my opinions are: (a) the City's existing "Bag and Tag" policy and training material lack clear definitions and objective standards for the factors that are used to justify disposal of property, do not provide a standardized process for evaluating public health and safety risks in the field, vests untrained city workers with an excessively discretionary role, and fails to align with public health principles; (b) my in-person observations confirmed that these deficiencies in the "Bag and Tag" policy and training result in City workers making superficial and inappropriate assessments of whether property is an "immediate health and safety risk"; (c) the CMMS reports prepared by City workers do not contain sufficient details about the property being assessed for disposal and the reasons for disposal to conclude that the property was appropriately evaluated and did, in fact, present an immediate health or safety risk; (d) a revised "Bag and Tag" policy is necessary that incorporates clearly defined health and safety risk criteria, mandatory assessments by trained public health personnel, and improved training for City personnel.

3.      In rendering these opinions, I was given documents provided by counsel, described in Appendix A to this report. I also used my extensive background and expertise in the field of public health as the foundation for my opinions.

4.      My analyses and opinions contained in this report are based upon the information available to date. To the extent that additional information becomes available to me, I reserve the right to supplement or revise my opinions accordingly.

5.      The opinions that I express in this Report are true and are based upon methodologies commonly used in my profession. I am being compensated at the rate of $300.00 per hour. The compensation I receive for my time does not depend on my opinions or conclusions provided.

## II.    Education and Qualifications

6.      I earned a Doctorate in Epidemiology, Human Genetics, and Environmental Sciences in 2018, providing me with a strong foundation in the study of disease patterns, environmental exposures, and population health. My expertise spans clinical epidemiology,

environmental epidemiology, and biostatistics, with a particular focus on vulnerable populations, including individuals experiencing homelessness.

7.      Since 2020, I have served as a Clinical Assistant Professor in the Department of Health Systems and Population Health Sciences at the University of Houston Tilman J. Fertitta Family College of Medicine. In this role, I teach and mentor medical students in evidence-based medicine, public health, and population health strategies. Concurrently, I have worked as a statistician in the Humana Integrated Health Systems Sciences Institute at the University of Houston, applying advanced quantitative methods to analyze health outcomes and healthcare system performance.

8.      My background includes extensive experience in methods for enumeration and encampment outreach strategies. While working with the Continuum of Care (CoC) lead agency in Austin, Texas, I was involved in outreach and data collection efforts to assess the needs of individuals living in unsheltered environments. I now serve as a consultant on the Point-in-Time (PIT) count methodology and reporting for the Houston-area CoC, contributing to efforts to refine data collection practices and improve the accuracy of homelessness estimates.

9.      Before joining the University of Houston, I was an Assistant Professor at the University of Texas at Austin, where I taught Environmental Health coursework in the public health program. This experience strengthened my expertise in environmental exposures and their impacts on population health, particularly in marginalized communities.

10.     Additionally, I have expertise on toxicology and regulatory science.  I hold Special Government Employee status with the U.S. Environmental Protection Agency (EPA). In this capacity, I contributed to the scientific review of the updated Toxicology Report on Hexavalent Chromium-6 (Cr(VI)), a known environmental contaminant with significant public health implications (EPA Toxicology Report).

11.     At the University of Houston Tilman J. Fertitta Family College of Medicine, I co-teach or lead the Evidence-Based Medicine classes in the pre-clerkship course *Physicians, Patients, and Populations (PPP)*. I also co-teach sections on *Introduction to Public Health, Climate Change, and the Built Environment* in the same course, reinforcing my focus on population-level health determinants and the structural factors that influence health disparities.

12.     Currently, I am working to publish a series of systematic reviews examining health-harming exposures related to the experience of homelessness. These reviews focus on critical issues such as environmental hazards and sleep disturbances, with the goal of informing policy and healthcare interventions for individuals experiencing homelessness.

13.     Attached as Appendix B is a copy of my current CV, which contains a list of my authored publications in the past ten years.

14.     I have not testified as an expert at trial or by deposition within the previous four years.

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

## III.    The Department of Public Works "Bag and Tag" Policy

15.    The "Bag and Tag" policy,[1] established by the San Francisco Department of Public Works (DPW), outlines the procedures for handling personal belongings of unhoused individuals, including during Healthy Streets Operation Center (HSOC) encampment resolution operations, Joint Force Operations, and DPW cleanings. The stated purpose of this policy is to provide a process for the collection, storage, and retrieval of personal property belonging to individuals experiencing homelessness while also addressing public health and safety concerns.[2]

16.    In theory, the "Bag and Tag" policy may ensure that belongings left unattended but not posing an immediate health or safety risk are collected, documented, and stored for retrieval by their owners. However, certain categories of items—such as those deemed to be an immediate health or safety risk, abandoned, or contraband—are discarded instead of stored. The policy attempts to distinguish between unattended property that must be stored and unattended property that can be disposed of due to "immediate health or safety risks."

17.    San Francisco Police Department (SFPD) policies also address treatment of property belonging to individuals experiencing homelessness in San Francisco. In particular, SFPD Department Notice 24-140, "Protocol for Processing Property Consistent with DPW's 'Bag & Tag' Policy" directs SFPD officers to request DPW to take custody of property belonging to individuals experiencing homelessness who are arrested and taken into custody and directs DPW to take custody of evidence of illegal lodging violations. In both cases, the policy provides that DPW will then treat property of individuals experiencing homelessness according to their Bag and Tag policy, including disposing of property seized by SFPD that DPW determines presents an immediate health or safety risk.

18.    Additional SFPD department notices, policy memoranda, and a DPW procedure manual reviewed for this report did not introduce any new or meaningfully differentiating information. It did not provide additional insight into the procedure for assessment of "immediate health or safety risks" or introduce standards to apply. Instead, these materials were observed to be consistent with, and typically directed back to or borrowed language from, the Bag and Tag Policy.

---

[1] *See* San Francisco Department of Public Works, *Bag and Tag Process*, https://sfpublicworks.org/services/bag-and-tag-process.

[2] The Bag and Tag Policy, including the provisions on immediate health or safety risks, does not appear to have been crafted in consultation with San Francisco's Department of Public Health (DPH) and DPH employees have no role in evaluating health or safety risks under the policy or training DPW workers who conduct such evaluations. *See* Allison Horky Deposition Transcript (Horky Tr.), pp. 111-13, 131-44.

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

## IV.  Analysis of the "Bag and Tag" Policy Deficiencies

19.    The "Bag and Tag" policy lacks clear definitions and objective standards, leading to widespread discretionary enforcement and misapplication by city staff, resulting in wrongful destruction of personal property.[3]

20.    No definition for "immediate health or safety risk": The "Bag and Tag" policy, as written, stipulates that unattended belongings should be stored unless they present an "immediate health or safety risk." Risk is typically conceived as a combination of the probability of a potential hazard and the severity of such an exposure.[4] However, the policy fails to define what standard should be applied to assess risk, instead offering the term "immediate" and a list of examples—including needles, scissors, knives, chemicals, and bedding soiled by "infectious materials"—without providing an objective or reasonable framework for assessing how likely and how severe exposure to these items and how severe the danger posed to public health or safety.

21.    The inclusion of the term "immediate" in "immediate health or safety risk" could be assumed to suggest that the standard only applies to situations with a very high probability of a given hazard causing harm.

22.    Further, the policy does not contain objective standards for determining whether something is a public health or safety risk. The phrase "health or safety risk" is used as a decisive criterion for whether property is stored or destroyed, yet the policy provides no standard for

---

[3] Testimony from DPW workers is consistent with the conclusion that the lack of clear definitions and objective standards in the policy results in disparate understandings of what constitutes an "immediate health or safety risk" and how to identify those risks. *See, e.g.*, Brittany Brandon Deposition Transcript (Brandon Tr.), pp. 130-135; Darryl Dilworth Deposition Transcript (Dilworth Tr.), pp. 45-58; Israel Graham Deposition Transcript (Graham Tr.), pp. 50-52, 70-72, 99-100; Corey Jackson Deposition Transcript (Jackson Tr.), pp. 43-44, 106-107, 112-124.

[4] The terms "hazard" and "hazardous" do not appear in the bag and tag policy section on items that will be discarded. Under the section on "procedures for collecting personal items," the policy states that "[i]f items are found to be hazardous or unfit for collection, they are to be discarded," but does not define "hazardous" or "unfit" or explain the relationship between "hazardous" items and "items that present an immediate health or safety risk." According to OSHA, a hazardous substance includes "[a]ny biologic agent and other disease causing agent which after release into the environment and upon exposure, ingestion, inhalation, or assimilation into any person, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavioral abnormalities, cancer, genetic mutation, physiological malfunctions (including malfunctions in reproduction) or physical deformations in such persons or their offspring." 29 CFR § 1910.120(a)(3). In line with this definition, throughout this report, the use of the term "hazard" or "health hazard" refers to anything reasonably anticipated to cause damage or harm to health, regardless of the level of risk assessed.

evaluating when an item—or a collection of items—poses such a risk. Although the policy provides examples of items that may be classified as hazardous, it does not explain why or under what conditions these items qualify as an immediate threat. For example, the policy categorizes "needles, scissors, knives" as "toxic sharps" but does not clarify what makes these items toxic or when their mere presence justifies property disposal. A pair of scissors, for instance, does not inherently pose a health or safety risk unless it is being wielded in a dangerous manner. Similarly, a container of oil, bleach, chemicals or waste may not present an immediate threat unless spilled or improperly stored.

23.    By providing examples but omitting standards for hazard identification and risk assessment, the formal process for reviewing an environment and documenting hazardous circumstances in the context of probability and severity (defined as risk)[5], the policy creates a scenario in which city employees must rely on their own subjective judgment, leading to inconsistent application and potential misuse. Without clear guidelines, city workers can misclassify property as hazardous. For example, a single capped syringe, a sealed bottle of oil, or a container of cleaning chemicals might be categorized as an "immediate health and safety risk" without any assessment of whether the item is actually dangerous, could be safely stored, or left with the owner. Without proper definitions, city workers may treat all instances of certain items as hazardous.

24.    The phrase "soiled by infectious materials" in the bag and tag policy is problematic due to its lack of clear definition and scientific basis in environmental health and safety standards. The term "soiled" is not a technical descriptor used in hazardous materials regulations, nor does it provide any objective threshold for determining when an item poses a genuine health risk. Additionally, "infectious materials" is an ambiguous term—while bodily fluids such as blood and feces can potentially carry pathogens, they are not inherently infectious unless contaminated with a specific transmissible agent. Even then, established environmental health protocols provide methods for safe decontamination rather than outright disposal. Without standardized criteria for assessing contamination, this vague language allows for broad and inconsistent interpretations.[6]

25.    One of the most glaring oversights in the policy is its treatment of needles and other items that may be perceived as health risks. While the policy states that needles and sharp

---

[5] *See* United States Department of Labor, Occupational Safety and Health Administration (OSHA), 29 CFR Part 1910.120: Hazardous waste operations and emergency response, https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.120.

[6] *See* Patricia Guevara, *Understanding the Types of Biological Hazards*, Safety Culture, July 26, 2024, https://safetyculture.com/topics/workplace-hazards/types-of-biological-hazards/ ("While blood isn't considered a biological hazard, it can still bring potential risks if it's contaminated or its source is in any way infected."); United States Department of Labor, Occupational Safety and Health Administration (OSHA), Application of OSHA's HAZWOPER standard to homeless camp cleanup operations, Standard Interpretations, July 30, 2021, https://www.osha.gov/laws-regs/standardinterpretations/2021-07-30 ("However, in general, human feces would not meet the definition of hazardous substance because they are not reasonably anticipated to cause death or disease.").

objects may be discarded, it does not distinguish between used, contaminated needles and new, safely stored syringes. This omission is particularly problematic given that San Francisco operates needle disposal programs designed to safely collect and manage used syringes. The City's acknowledged,[7] existing infrastructure for proper disposal makes it unnecessary to discard all belongings simply because they contain a single needle. Rather than providing guidance on how to handle and dispose of sharps properly, the policy allows City workers to discard all associated belongings.

26.     The "Bag and Tag" Policy also contains no definition or threshold for "commingling." This is another vague term in the policy. The policy states that entire piles of belongings may be discarded if they are "co-mingled" with hazardous materials, but it does not explain what "co-mingled" means or specify what level of contamination warrants full disposal. This is a critical omission, as it permits city staff to discard all of an individual's property rather than distinguish or make any attempt to readily separate hazardous items from safe ones. For example, if a person's possessions include a single capped hypodermic needle, the entire collection—including clothing, bedding, and personal documents—could be discarded without any attempt to isolate and remove only the hazardous item.

27.     Disposal of an entire collection of property due to "co-mingled" hazardous materials is not actually the best practice for addressing identified hazards. Instead, a process of mitigation or remediation of health risks posed is recommended. Disposal of collections of property when it contains a health hazard has the potential to increase the probability of exposure. For example, bedding or clothing soiled with infectious substances is more likely to result in exposure to individuals if it is moved in bulk, such as taking steps for disposal by moving those materials within a tent. If sharps are not handled according to an appropriate "sharps" protocol and a safe storage container, then individuals handling that property are at increased risk of exposure.

28.     This blanket provision on "commingling" does not require city staff to separate contaminated from non-contaminated belongings, even in cases where such sorting would be both feasible and appropriate. If a resident's possessions include a single item under the policy (3). Items that will be discarded and not stored), the entire collection of personal belongings, including clothing, bedding, survival gear, and important documents, may be discarded without further evaluation. Based on the policy, such single items might include perishable food, clothing "soiled by infectious materials, such as human waste, body fluids, mold and mildew",[8] scissors, or a hypodermic needle, regardless of whether it is capped or safely contained. This indiscriminate approach disregards the practical reality that many personal items can be used, salvaged or decontaminated, and it effectively punishes individuals for possessing items that are, in many cases, necessary for their survival.

---

[7] *See, e.g.*, Khaled Shehadeh Deposition Transcript (Shehadeh Tr.), pp. 138-139; Jonathan Vaing Deposition Transcript (Vaing Tr.), p. 244; Horky Tr., pp. 145-153.

[8] *See* San Francisco Department of Public Works, *Bag and Tag Process*, https://sfpublicworks.org/services/bag-and-tag-process.

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

29.     The "Bag and Tag" policy also has no standardized process for assessing health and safety risks in the field. The policy does not provide a procedural framework for assessing risk, meaning that decisions about the fate of personal belongings are left to individual, untrained judgment rather than guided by established public health and safety standards.[9] The policy fails to incorporate a structured process for evaluating and mitigating health risks before deciding to discard an individual's belongings.

30.     The "Bag and Tag" policy's failure to incorporate recognized health and safety standards is especially concerning given federal Occupational Safety and Health Administration (OSHA) guidance on encampment cleanups. In a formal interpretation issued on July 30, 2021, OSHA affirmed that hazardous waste operations and emergency response (HAZWOPER) standards[10] apply to municipal encampment cleaning operations.[11] OSHA made clear that city workers conducting these cleanups must follow specific health and safety protocols to protect themselves and the individuals affected by these operations. The ruling emphasized that improper handling of potentially hazardous materials requires trained personnel and proper protective measures to ensure safe removal and mitigation. The San Francisco policies and practices, however, fail to align with this federal guidance by neither providing training for city staff nor requiring them to follow standardized procedures for identifying and mitigating risks. Instead of adopting evidence-based safety protocols, the policy allows for arbitrary decision-making, resulting in unnecessary property destruction and creating potential health risks for both workers and encampment residents.

31.     By neglecting to define health and safety risks, failing to implement field assessment standards, and providing insufficient documentation of health risks, the policy promotes a flawed approach that prioritizes property removal over proper risk evaluation and mitigation. A more effective policy would include clear criteria guided by regulatory standards like the HAZWOPER framework for assessing potential hazards, require staff to separate contaminated from non-contaminated items whenever possible, and mandate training on safe handling practices in accordance with OSHA and public health guidelines. Without these critical

---

[9] This is consistent with DPW worker testimony indicating that workers make decisions about whether items pose a health or safety risk not through a consistent evaluation framework or process, but based on their own subjective and individualized approaches. *See, e.g.*, Brandon Tr., pp. 129-135, 202-212, 242-245; Dilworth Tr., pp. 46-48, 57-58, 102, 120-133, 211-214, 224; Edgar Garcia Deposition Transcript (Garcia Tr.), pp. 109-110; Graham Tr., pp. 50-52, 68-69, 99-100, 113-123; Jackson Tr., pp. 43-44, 106-107, 112-126.

[10] *See* United States Department of Labor, Occupational Safety and Health Administration (OSHA), 29 CFR Part 1910.120: Hazardous waste operations and emergency response, https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.120.

[11] United States Department of Labor, Occupational Safety and Health Administration (OSHA), Application of OSHA's HAZWOPER standard to homeless camp cleanup operations, Standard Interpretations, July 30, 2021, https://www.osha.gov/laws-regs/standardinterpretations/2021-07-30.

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

revisions, the policy remains an instrument of indiscriminate property destruction rather than a legitimate public health measure.

## V.    Lack of Proper Training for City Staff

32.    The current policy governing the removal and storage of personal property from public spaces fails to require appropriate training for city staff, particularly in making determinations about what constitutes a health or safety risk. Employees of the Department of Public Works (DPW), who are primarily responsible for implementing the policy, are not equipped with a public health framework to assess health risks accurately. Without this expertise, they may misidentify items as hazardous, leading to the wrongful disposal of safe personal property, if any assessment is made at all.

33.    The reviewed training materials for DPW staff reinforce this issue.[12] The training on the "Bag and Tag" policy is framed primarily around procedural compliance rather than substantive compliance with a meaningful public health risk assessment. The materials lack detailed guidance on how to identify genuine health hazards. Workers are given a "cheat sheet" for deciding whether to bag, tag, or discard items, yet the criteria for what constitutes an "immediate health or safety risk" remain vague and prone to misinterpretation. For example, the training repeats the policy's examples such as "soiled with infectious materials" and "infested by rodents or insects" as discardable, but it does not provide guidance on how to identify hazards, assess the degree of risk to health, or whether an item can be sanitized rather than thrown away.

34.    Furthermore, testimony from DPW staff provides examples of departures from the assessment criteria provided in the training materials as well. One staff identified photographs of beer cans in a tent as an example of hazardous materials being "co-mingled" and sufficient cause for discarding an entire tent. [13]  This is in contradiction to the training materials which use this photograph as an example of items that are *not* co-mingled. The policy and training materials specifically permit discarding "personal belongings that are co-mingled or littered with needles, human waste, or other health risks",[14][15] while separately stating the perishable food would still be ineligible for storage. The beer cans could not be reasonably expected to reflect an "other health risk" in most contexts.

35.    Another major issue is the lack of training on the safe handling of hazardous materials in the specific context of encampments. The reviewed documents do not indicate that

---

[12] Dkt. 292-2, Exhibit B to Declaration of Jonathan Vaing, San Francisco Public Works Training on Bag and Tag Policy; *see also* Vaing Tr.

[13] Brandon Tr., pp. 241-245.

[14] San Francisco Department of Public Works, *Bag and Tag Process*, https://sfpublicworks.org/services/bag-and-tag-process.

[15] CCSF-COH_437437-CCSF-COH_437489, San Francisco Public Works Training on Bag and Tag Policy, Last Updated January 27, 2025.

DPW staff receive specific instruction on how to safely remove and dispose of the items on the policy's list of examples, such as bedding "soiled by infectious materials," sharps, or rodent-infested items. It does appear that staff receive some training on how to handle some hazards such as separation of chemicals and flammable items for alternate methods of disposal. [16] Without this context-specific training with specific instruction on the health risks laid out in the policy, workers may either expose themselves to unnecessary risk or default to discarding everything in an abundance of caution.

36.     As an example of the ambiguous training instruction, one set of minutes from a training session[17] describe an action from that session, "Teach your staff how to identify what is garbage and what is to be bag & tag". By omission, it demonstrates that training fails to address assessment of health and safety risks or distinction between abandoned and unattended property.

37.     Deposition testimony confirms that DPW workers do not receive specific training on identifying "items that pose an immediate health or safety risk" generally or on identifying the specific examples provided in the bag and tag policy, such as infectious materials, mold, mildew, or items infested by rats. This testimony also confirms that DPW workers receive no specific training on how to safely handle these items, once identified. The only training related to these items appears to be the general training on the bag and tag policy, and, potentially, a separate training on disposing of hazardous materials such as chemicals.[18] Based on my review of the training materials and depositions, the training provided to DPW workers does not adequately prepare DPW workers to identify, assess, or handle items that pose an immediate health or safety risk.

## VI.     Observed Failures of Department of Public Works (DPW) in Assessing Threats

38.     I attended three distinct cleanup operations which occurred on February 12th and 13th. The first two occurred in the morning and afternoon of the 12th, the third occurred on the morning of February 13th. The first was near the intersection of Evans and Selby (under 280). The second was around the intersection of Napolean and Jerrold. The third was in the Mission area around the 300 to 400 block of Jones. In each case there were representatives of the Department of Public Works (4-20 individuals), Emergency Management (1), Housing and Supportive Housing (3-5), and law enforcement (4-8), typically working in multiple teams. I introduced myself to the paramedic incident commander from the Department of Emergency Management in each instance. Before operations started, each site included at least 4 tents arranged in close proximity and anywhere between 5 and 12 residents.

39.     During the three encampment resolution operations I attended, it was evident that DPW staff were not conducting meaningful health and safety risk assessments before discarding

---

[16] *See, e.g.*, Garcia Tr., pp. 172-175; Graham Tr., pp. 116-18.

[17] Dkt. 292-4, Exhibit D to Declaration of Jonathan Vaing.

[18] *See* Shehadeh Tr., pp.135-141; Brandon Tr., pp. 238-240; Dilworth Tr., pp.42-45, 131-133; Graham Tr., pp. 70-72; Garcia Tr., p. 175; Jackson Tr., pp.119-120.

property. Instead, belongings were routinely removed and disposed of with little to no effort by DPW or any other city worker to determine whether they posed any actual and immediate health or safety risk. The process appeared to be driven by expediency towards the end of the shift rather than adherence to the City's own "Bag and Tag" policy. The lack of systematic evaluation resulted in the destruction of personal property, often including essential survival items, sentimental belongings, and even hazardous materials that required specialized disposal if taken.

40.     One of the most striking patterns I observed was the way entire tents were removed without examination. DPW workers would often open a tent door briefly, take a photograph, then collapse the structure entirely and discard it without further inspection. There was no clear, observable standard for determining whether a tent should be stored or destroyed. Unattended tents were routinely disposed of, regardless of whether they contained personal belongings that could have been salvaged. This observation was informed by applying the criteria from part 1a-1d of the bag and tag policy[19] where brief descriptions of unattended property are made, with examples. In my perspective there were multiple examples of unattended tents (i.e. "for example, an unattended tent that is filled with personal belongings or items that are being stored in an orderly manner (i.e., packed up, wrapped or covered)") treated in this way. This practice contradicts the policy's own stated intent, which is to store unattended property unless it presents an immediate health or safety risk. Without thoroughly assessing either the tent itself or the contents of a tent, workers had no way of determining whether it posed such a risk and how to properly/safely dispose or store it.

41.     Similarly, other large personal items were discarded without appropriate evaluation. I observed a full-sized mattress that was in good condition, not appearing to present any health or safety risk, left unattended during the sweep. When a nearby resident attempted to claim it, they were unable to carry it far enough to retain possession. Such an item is identified in training materials as a "bulky item" which should be bagged and tagged and stored for 14 days. When the resident walked away, DPW workers immediately disposed of the mattress without appropriate assessment despite it being apparently usable, without stains, dry, and the resident's attempt to claim it. At another site, a full couch was removed and destroyed, even though it had been placed beside an RV that had been moved as instructed by enforcement officers. While used, there was no visible sign that it was contaminated or hazardous. Chairs were similarly discarded *en masse* at each site, even though they were in usable condition. These examples illustrate the failure to distinguish between trash and personal property that poses no health or safety risk, a key failure of the city's approach to encampment resolutions.

42.     The "Bag and Tag" process was rarely observed in practice. Over the course of my first observations, the only items that were bagged and stored were a few tarps—one of which was placed in a large construction-site trash bag. A larger tarp, which had been used to construct a lodging over a canopy frame, was not retained at all. It was destroyed after SFPD officers called DPW workers over to take it, without any health and safety assessment despite it

---

[19] San Francisco Department of Public Works, *Bag and Tag Process*, https://sfpublicworks.org/services/bag-and-tag-process.

appearing to serve as a safe, functional cover to the resident's sleeping area. This indicates a departure from the stated policy: property should not be discarded based on its placement or association alone, but rather on whether it meets specific criteria for being a health or safety risk.[20] In practice, however, these decisions were being made arbitrarily if at all.

43.     Another observation was the disposal of personal belongings stored in containers. In one instance, a plastic storage container with a set of drawers was searched by DPW staff—belongings were pulled out, bags were opened and photographed, and then the entire container, including at least one drawer full of still-sealed canned food, was thrown away. This was observed in opposition to the city's policy stating that only perishable food items would be discarded (3b).

44.     In other instances, full, closed luggage cases were observed being destroyed without examination on multiple occasions. These actions were taken despite the fact that the City's policy (1d) "items that are being stored in an orderly manner (i.e., packed up…") should be treated as temporarily unattended. The policy also clearly states that (3d) "If staff has a reasonable doubt as to whether an item constitutes trash, it should be collected and stored." The policy also does not define when storage containers, including luggage, should be considered a health or safety risk. Had there been clear guidelines and a consistent process for reviewing and sorting items, many of these personal belongings could or should have been salvaged rather than summarily destroyed.

45.     The handling of hazardous materials was another area where DPW workers failed to follow proper procedures, creating new safety risks in the process. At one site, a flammable liquid—safely stored in an appropriate and labeled container—was thrown into a compactor vehicle, causing a large amount of liquid to spill onto the ground. Workers responded by using a chemical powder to absorb the spill, acknowledging that it was a hazard, yet they had not taken appropriate precautions in handling the material in the first place. In contrast, at another location, a propane tank was removed from a barbecue grill at the last moment and placed in a different truck, alongside batteries.  The grill itself, despite posing no risk, was then destroyed.   These incidents demonstrate that the city has the capacity to remove hazardous materials in a safe way—the San Francisco Environment Department provides guidance for disposing of household hazardous waste—but this capacity was inconsistently applied in practice.[21] Some hazardous materials were set aside for proper disposal, while others were handled haphazardly, potentially creating greater environmental and safety risks.[22]

---

[20] *See* Exhibit 1042 to the Deposition of Wayman Young, SFPD Department Notice 24-140.

[21] The existence of DPW procedures for separately disposing of hazardous items such as chemicals, batteries, paint, oil, and gas was also described by DPW workers in their deposition testimony. *See* Garcia Tr., pp. 172-175, Brandon Tr., p. 114, Graham Tr., pp. 116-118.

[22] Deposition testimony confirms that items deemed to pose an immediate health or safety risk are placed in the same truck that contains trash or debris, unless they are items like chemicals or

46.    I observed the destruction of a resident's personal memorial to his deceased brother. This collection of personal effects did not appear to pose any health or safety risk, yet no assessment was conducted before it was thrown away including signs, unlit candles, chairs, and dried flowers. Some, but not all, of the photographs from the memorial were set aside, but the majority of the items were discarded. In the process of dismantling the memorial, DPW workers broke glass items, creating an immediate safety hazard in an area where individuals were walking barefoot or in inadequate footwear. The resident stood nearby, crying as his brother's memorial was taken from him and destroyed. This was an example of not only procedural failure but also a complete disregard for the dignity of the people affected by these operations.

47.    The pattern across all three encampment resolutions was clear: DPW staff were not conducting substantive health and safety risk assessments before discarding property. Instead, removals were largely indiscriminate, with decisions based on expediency rather than objective criteria. Unattended property was frequently treated as abandoned and discarded, even when it was in good condition or clearly belonged to someone who was present. Items that should have been properly stored, tagged, or handled through hazardous materials procedures were instead destroyed or mismanaged. The end result was an operation that created harm, both through the unnecessary loss of personal belongings and through unsafe handling of hazardous materials. The lack of training, clear definitions, and procedural oversight in these operations is a direct consequence of the policy's failures.

48.    A review of several CMMS reports documenting encampment resolution operations proved to be consistent with my in-person observations. Review of these reports revealed a consistent lack of transparency and insufficient detail regarding the handling of personal property, risk assessments for health and safety, and adherence to established procedures such as the "Bag and Tag" policy. These reports fail to provide adequate information for a third party to determine which items from the "before" photos were stored versus discarded, nor do they consistently document a justification for disposal. While some reports mention specific items sent to storage or include photos of bagged belongings, there is no systematic approach to documenting the items identified as posing an immediate health or safety risk, what health risk assessment was conducted, the probability or "immediacy" of the assessed risk, which items were removed, on what basis, and whether residents were given a meaningful opportunity to reclaim their possessions.

49.    Foremost, the reports do not contain enough information about how determinations of health and safety risks were made. While terms like "biohazard" or "soiled" appear in some comments, the accompanying photos do not consistently depict clear evidence of hazardous materials. For example, in the March 7, 2024, report (CCSF-COH_359933.pdf), there are photos of feces in the general area, but these are not shown in direct contact with any belongings, raising questions about whether their presence was used as a blanket justification for discarding property. Similarly, in the March 11, 2024, report (CCSF-COH_267755.pdf), officials

---

flammable gas, in which case they are separately transported to a designated area of the DPW Yard. *See e.g.*, Brandon Tr., p. 114.

state that a tent, bedding, and bags were disposed of due to infestation and being "ripped and soiled", yet the photos do not show visible evidence of these conditions and the report does not explain how these conclusions were reached. The absence of a standardized health risk assessment process or clear documentation of hazardous conditions calls into question the legitimacy of these claims and whether they meet public health standards.

50.     Additionally, these reports fail to meet documentation standards for a hazardous waste operations, such as those outlined for site characterization[23] under HAZWOPER procedures. There is no detailed site characterization process recorded, no structured health risk assessment, and no clear protocol for identifying, handling, or disposing of potentially hazardous materials that were identified through a preliminary or detailed evaluation. The August 23, 2024, report (CCSF-COH_363095-84.pdf) includes references to drug paraphernalia in a blue tent, but it is unclear whether the entire tent was disposed of or just the paraphernalia itself. Similarly, the November 7, 2023, report (CCSF-COH_357341.pdf) includes references to biohazards on the sidewalk but does not document what specific actions were taken in response, whether property was in contact or affected, or if any effort was made to protect either non-contaminated or non-co-mingled belongings.

51.     A distinct subgroup of CMMS reports reviewed includes cases where individuals are being arrested, and their property must be collected and stored. In these instances, the reports frequently document the storage location with photographs and occasionally include explicit comments stating that the property was "not soiled." This contrasts with standard encampment resolution operation reports, where such affirmations are commonly absent, and the decision-making process around property storage or disposal remains opaque. This pattern suggests that in other encampment resolution reports, where no such final storage photos exist, the property photographed on-site was more likely discarded rather than stored—raising concerns about inconsistent adherence to property protection policies and potential wrongful destruction of belongings. However, as previously mentioned, there is not enough information in those reports to determine the outcome of most property photographed.

52.     Further, CMMS reports regularly use the terms "biohazard" and "soiled" to justify discarding items. But "biohazard" is not used in the Bag and Tag policy at all and "soiled" alone is not in the policy (only items soiled *with infectious materials*). This inconsistent use of vague and undefined language that does not even appear in the policy further suggests that workers are discarding items based not on any standardized process, or even the terms of the Bag and Tag policy itself, but rather their subjective belief that an item should be discarded. The use of terms that do not appear in the policy also makes it difficult to determine, based on review of the CMMS reports, whether items are being discarded in compliance with the policy and based on which provision of the policy.

53.     In sum, the reviewed CMMS reports offer no consistent documentation of health risk assessments, and do not meet basic hazardous waste operation reporting standards.

---

[23] *See* 29 CFR § 1910.120(c).

54.     Deposition testimony describing how DPW workers evaluate items, determine whether they are to be stored under the policy, and document this process in the CMMS reports is consistent with the conclusions I reached based on my personal observations and review of CMMS reports. This testimony suggests that DPW workers do not apply a consistent framework for evaluating health or safety risks, instead applying their own judgment about what constitutes hazardous materials that is at times untethered from policy, common public health terminology, definitions or best practices.[24]

## VII.   The City Does Not Use Proper Measures to Handle Supposedly Hazardous Material

55.     The way city staff actually handle encampment resolutions contradicts the claim that certain items pose an immediate health or safety threat. If these items were truly hazardous, one would expect rigorous safety measures to be in place, including the use of proper protective equipment and thorough sanitation protocols. However, observations from multiple encampment resolutions indicate that city workers do not consistently follow best practices for handling dangerous materials.

56.     Despite the clear regulatory requirements under HAZWOPER[25] for site characterization, hazard identification, and monitoring, there is no apparent evidence that these procedures are consistently conducted at encampment resolution sites. The absence of systematic hazard assessments and employee health protections raises significant concerns about compliance with federal safety standards, particularly regarding the identification of inhalation or skin absorption hazards, the use of appropriate personal protective equipment (matched to the hazards identified during evaluation), and the ongoing evaluation of site conditions that could pose immediate dangers to workers and displaced individuals.

57.     One of the clearest indications that these operations are not conducted with real concern for health and safety is the inconsistent and ineffective use of personal protective equipment (PPE) by city staff. While City workers are supposedly handling hazardous materials, their protective gear is often inadequate or improperly worn. Gloves are universal but are made of partial fabric rather than impermeable materials that would protect against hazardous substances. Hazmat suits, when worn, are frequently tucked into boots, rendering them ineffective against chemical or biological exposure. Eyewear, which should be standard when handling biohazards, was observed in only one case before the third encampment site. Masks, when used, were typically loose-knit fabric balaclavas that provided no real protective effect against airborne contaminants. The only individual who wore a full protective mask was the worker spraying water on chemically contaminated surfaces. If the items being discarded truly

---

[24] *See, e.g.*, Brandon Tr., pp. 129-135, 202-212, 242-245; Dilworth Tr., pp. 46-48,57-58, 102, 120-133, 211-214, 224; Garcia Tr., pp. 109-110; Graham Tr., pp. 50-52, 68-69, 99-100, 113-123; Jackson Tr., pp. 43-44, 106-107, 112-126.

[25] *See* 29 CFR § 1910.120(c).

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

posed an immediate risk to health and safety, the city would require staff to consistently follow proper PPE protocols, yet this is not happening.[26] The inconsistent and often careless use of protective equipment undermines the claim that public health hazards are being meaningfully addressed.

58.    Cleaning practices observed at these encampment sweeps further demonstrate the lack of genuine public health concern. Instead of thorough sanitation, the primary cleaning agent used was a spray deodorant containing glycol, alcohols, ammonium, and other chemicals. The apparent intention was to address smells rather than eliminate health hazards. Notably, the chemical spray did not contain sodium hypochlorite (bleach), a standard disinfectant for biohazard cleanup. This is consistent with deposition testimony indicating that the household cleaner Pinesol, not bleach, was used to clean.[27] If human waste, bodily fluids, or other biohazards were present, proper disinfection protocols would require the use of more effective cleaning agents, as well as careful handling procedures. Instead, city staff often sprayed deodorant indiscriminately over areas where belongings had been removed, without taking further steps to sanitize the space. This superficial approach is inconsistent with legitimate biohazard mitigation.

## VIII.    Background on Public Health Impacts of Clearing of Homeless Encampments

59.    Assessing health and safety risks during encampment operations, including DPW's decisions about whether items should be discarded because they pose an immediate health or safety risk, should be contextualized and understood within a broader understanding of the public health implications of encampment clearings. Aside from the "Bag and Tag" policy's reference to medication, the material I have reviewed thus far and my observations do not generally indicate these considerations are taken into account.

60.    Multiple studies, including those specific to San Francisco and California, consistently indicate that encampment clearings result in significant harm to encampment residents. The peer-reviewed literature indicates that even-temporary displacement and property confiscation involves significant loss of personal belongings, including essential documents, identification, valuable possessions (whether monetary or emotional value), and items necessary or supportive of daily survival including medical items.  The additional burden of regaining access to property that has been stored is significant, given the widely acknowledged barriers to transportation access for people experiencing homelessness. The result of confiscation is the temporary disruption of access to the materials and resulting effects similar to those described here.

61.    Property loss and associated displacement resulting from encampment resolution procedures likely exacerbate health risks for residents, increasing their vulnerability to

---

[26] This is consistent with DPW testimony about PPE requirements. *See, e.g.,* Brandon Tr., pp. 237-239.

[27] *See* Garcia Tr., p. 172.

illness, injury, and environmental hazards. A significant portion of encampment residents experience these displacements frequently, with an estimated 36% of those in homelessness in California reporting at least one such incident in a six-month period according to a recent statewide survey.[28] Of course, those living unsheltered were disproportionately affected. The consequences extend beyond the immediate loss of a temporary shelter. Many individuals lose essential belongings such as medications, cell phones, and important documents like birth certificates and IDs, which are necessary for accessing housing and services. The survey also reported on residents' fear of losing their pets during these displacements. The cumulative effect of these disruptions exacerbates instability, making it even more difficult for individuals to secure the resources and support needed to exit homelessness.[29]

62.     The forced displacement of encampment residents disrupts access to essential services, including healthcare, mental health support, and social outreach programs—resources that are already scarce and underfunded. Interviews with healthcare providers in San Francisco suggest that two of the most significant ways displacement negatively impacts health are through geographic displacement and loss to follow-up. When individuals are forced to move away from familiar service locations, they often lose contact with providers, interrupting medical treatment, mental health care, and case management efforts that are critical for their well-being.[30]

63.     The stress associated with property destruction and displacement contributes to psychological distress, increased social isolation, and sleep disruptions. Interviews with participants in encampments and service providers indicate that forced relocation not only results in the confiscation or destruction of valuable personal belongings but also fragments social connections within encampments.[31] The Colorado survey found a direct correlation between increased police contact and worsening sleep, mental health symptoms, and overall

---

[28] Kushel, M., Moore, T., et al. (2023). Toward a New Understanding: The California Statewide Study of People Experiencing Homelessness. UCSF Benioff Homelessness and Housing Initiative. https://homelessness.ucsf.edu/sites/default/files/2023-06/CASPEH_Report_62023.pdf.

[29] This is consistent with testimony from an employee of San Francisco's own Public Health Department, who explained that displacement and property loss associated with San Francisco's encampment resolutions can harm unhoused individuals' health, including because medication is lost or destroyed; make it harder for unhoused individuals to stay connected to care teams; and erode trust between unhoused individuals and city medical and social workers. *See* Horky Tr., pp. 128-133, 140, 162-170.

[30] Qi D, Abri K, Mukherjee MR, Rosewohl-Mack A, Khoeur L, Barnard L, Knight KR. Health Impact of Street Sweeps from the Perspective of Healthcare Providers. J Gen Intern Med. 2022. 37(14):3707–3714. DOI: 10.1007/s11606-022-07471.

[31] *Id.*

well-being.[32] Additionally, the study from Santa Clara County found that displacement heightened anger, stress, and distrust, making individuals more reluctant to seek or accept formal assistance.[33] These contacts also build mistrust and may lead to less engagement on services, to the extent they exist.

64.    Despite frequent claims that encampments pose environmental or public health hazards to surrounding communities, there is minimal evidence supporting such assertions. Studies examining the impact of encampments on environmental contamination have found no consistent evidence of increased risks beyond the immediate conditions of encampments themselves. One study analyzing water quality upstream and downstream of encampments found similar levels of contaminants in both locations, apart from a minor increase in E. coli bacteria downstream.[34] However, the lack of comprehensive research on this topic underscores the unverified nature of claims that encampments inherently pose significant health risks to the broader community.

65.    Public health concerns often cited to justify encampment clearings include the presence of litter, discarded food, chemicals, vermin, human waste, and used hypodermic needles. While these issues reflect real sanitation challenges, they do not constitute justification for eviction or property destruction without alternative solutions. Moreover, certain aspects of these claims are frequently mischaracterized.

## IX.    Recommendations

66.    Given the deficiencies in the "Bag and Tag" policy and the improper practices observed, a revised policy must be developed that incorporates expert guidance on public health and hazards. This policy must clearly delineate when and how personal belongings may be handled. Specifically, this policy should prohibit discretionary destruction of property, mandate structured assessment protocols, and require meaningful engagement with affected individuals before removals take place. Public health experts should play a critical role in shaping these

---

[32] Westbrook M, Robinson T. Unhealthy by design: health & safety consequences of the criminalization of homelessness. Journal of Social Distress and Homelessness. 2021; 30(2):107-115. doi: 10.1080/10530789.2020.1763573.

[33] Chang JS, Riley PB, Aguirre RJ, Lin K, Corwin M, Nelson N, Rodriguez M. Harms of encampment abatements on the health of unhoused people. Qualitative Research in Health. 2022. 2: 100064. doi: 10.1016/j.ssmqr.2022.100064.

[34] Verbyla ME, Calderon JS, Flanigan S, Garcia M, Gerberg R, Kinoshita AM, Mladenov N, Pinongcos F, Welsh M. An Assessment of Ambient Water Quality and Challenges with Access to Water and Sanitation Services for Individuals Experiencing Homelessness in Riverine Encampments. Environmental Engineering Science. 2021 May; 38(5): 389-401. doi: 10.1089/ees.2020.0319.

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

revisions to ensure that encampment resolutions do not contribute to worsened health outcomes by depriving individuals of necessary medications, identification documents, and survival gear.

67.    As discussed above, additional protections are necessary, particularly in light of the consistent and reliable evidence, including San Francisco and California specific studies finding increased harms to homeless residents through the practice of encampment cleaning.[35]

68.    A revised policy must include:

- **Clear, standardized definitions of health and safety risks.** Without objective criteria, city workers have too much latitude to discard belongings based on arbitrary or subjective determinations. The revised policy should specify what constitutes a true health hazard, ensuring that minor contamination does not justify wholesale destruction of property.

- **A requirement for trained public health personnel to assess alleged risks to health and safety.** City workers are not qualified to make health and safety determinations. A revised policy should mandate that qualified public health personnel—not law enforcement, social services, or sanitation workers—assess whether items pose genuine health hazards before any belongings are removed.

- **A prohibition on discarding entire collections of belongings based on minor contamination.** The current practice of discarding all belongings in an area due to "comingling" with the presence of a single contaminated item is excessive and punitive. The policy must explicitly prohibit the destruction of entire property collections unless there is clear and documented evidence that all items pose a substantial health risk.

- **Practices and Standards for remediation of health hazards when identified.** In order to avoid discarding entire collections of property (see above), hazards can and should be mitigated using best practices for containing and remediating health hazards. During review of materials, multiple sources discussed the capacity for and methods available to the teams involved in these processes, such as storage of sharps and treatment of biological wastes.

- **Improved training for city staff on health and safety assessments.** Staff should receive specialized training in environmental health and hazardous materials handling. This training should be developed in collaboration with public health professionals and should focus on accurately identifying risks while preserving as much personal property as possible.

69.    Further, a more effective approach would involve public health inspectors taking the lead in determining which belongings pose legitimate health risks. Public health

---

[35] Qi D, et al., Health Impact of Street Sweeps from the Perspective of Healthcare Providers; Westbrook M, et al., Unhealthy by design: health & safety consequences of the criminalization of homelessness.

*Coalition on Homelessness, et al. v. City and County of San Francisco, et al.*, 22-cv-5022 (N.D. Cal.)
Expert Report of Ben King, PhD MPH
March 10, 2025
Confidential – Subject to Protective Order

professionals have the necessary training to assess environmental hazards, differentiate between actual threats to public safety and mere signs of poverty, and apply evidence-based criteria to their decisions. San Francisco appears to have public health officials and teams that are equipped to conduct such evaluations, but they do not appear to have any role in addressing encampments.[36]

## X.    Conclusion

70.    This report reveals critical deficiencies in the City's encampment resolution operations, particularly in the documentation and decision-making processes surrounding property confiscation and disposal. Based on my observations, the "Bag and Tag" policy is inconsistently applied, with reports failing to provide sufficient detail to determine what was stored versus discarded. Furthermore, the classification of property as posing an "immediate health and safety risk" is vague and poorly documented, with little evidence that standard protocols for hazard identification and risk assessment are followed. The broader public health impacts of property destruction and displacement—including disruption of healthcare access, loss of essential personal belongings, increased vulnerability to violence, and heightened psychosocial distress—are consistently, and fairly well documented. However, there is little credible evidence that encampments themselves pose substantial health hazard outside of those posed to the residents themselves, while the harms of forced displacement are more clearly identified in the literature. The findings underscore the urgent need for a shift toward evidence-based public health interventions, including clear and enforceable standards for property handling, improved definitions and documentation of "health and safety risks," and strengthened oversight of the "Bag and Tag" policy.

*Benjamin T King*

_____
Ben King, PhD MPH
March 10, 2025

---

[36] *See* Horky Tr., pp. 111-14; David Nakanishi Deposition Transcript, p. 53.