# Exhibit A

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                         OAKLAND DIVISION

4

5     - - - - - - - - - - - - - - - -

6     COALITION ON HOMELESSNESS,      )

7     et al.,                         )

8           Plaintiffs,               )

9     v.                              ) CASE NO.

10    CITY AND COUNTY OF SAN          ) 4:22-cv-05502-DMR

11    FRANCISCO, et al.,              )

12          Defendants.               )

13    - - - - - - - - - - - - - - - -

14

15

16                    DEPOSITION OF WAYMAN YOUNG

17                    THURSDAY, JANUARY 23, 2025

18

19

20

21            BEHMKE REPORTING AND VIDEO SERVICES, INC.

22                BY:  MICHELLE CORRIGAN, CSR NO. 9079

23                    550 CALIFORNIA STREET, SUITE 820

24                    SAN FRANCISCO, CALIFORNIA  94104

25                              (415) 597-5600

```
 1   A.        No.
 2   Q.        Have you ever disagreed with their assessment of
 3   whether or not a tent is soiled?
 4   A.        No.
 5   Q.        If you disagreed, would you say something?
 6   A.        Yes.
 7   Q.        Has anyone you supervised ever told that you they
 8   disagreed with DPW's assessment of whether a tent could be
 9   stored?
10   A.        No.
11   Q.        You said that you're required to take photos of
12   tents when you arrest people for illegal lodging, right?
13   A.        Yes.
14   Q.        And is that photo then used as evidence of the
15   crime?
16   A.        It can be, I guess if the DA needs it.
17   Q.        After you arrest someone for illegal lodging, do
18   you know whether the DA prosecutes that, I guess, booking
19   charged, whatever you call it?
20   A.        No.
21   Q.        Has the DA ever requested evidence from you or
22   your team to support an illegal lodging charge?
23   A.        No.
24   Q.        Typically, if the DA is prosecuting a crime,
25   would they request evidence that you collected?
```

```
 1   Q.          In which cases would SFPD surrender that evidence
 2   to a different agency?
 3   A.          Probably like blood.
 4   Q.          And which agency takes possession of evidence
 5   with blood on it?
 6   A.          I believe it's the people who test the drugs, the
 7   -- I forget their names.  It's just not popping up in my
 8   head.  There's protocol, they're supposed to bring the
 9   blood into I believe it's 850, or put it in the fridge.
10   It's been a while.  But there's protocols for that.
11   Q.          And the fridge you're describing, that's within
12   SFPD?
13   A.          It's within 850 Bryant.
14   Q.          And what is 850 Bryant?
15   A.          It's the building where the courts are, where we
16   used to have a police station, and there's a property
17   division down there.
18   Q.          And are there any circumstances under which you
19   would discard evidence of a crime, aside from tents or
20   illegal lodging?
21   A.          No.
22               MR. WANG:  Objection.  Incomplete hypothetical.
23   Vague.
24               Go ahead.
25   ///
```

1          So there's many times you can only have access to

2     sign the reviewing if you're a sergeant and above rank.

3     But there's a lot of times lieutenants go out and make

4     arrests, there's times sergeants go out and make arrests,

5     and there's no sergeants around, they're the only person,

6     so they have to sign all three.

7     Q.        And does that mean that no one else reviewed this

8     incident report?

9     A.        Correct.

10    Q.        I want you to turn to the third page in the

11    narrative.  And it starts by saying, "On the above date and

12    time I responded to the 100 block of Willow Street.  I

13    observed a blue tent on the north sidewalk mid-block,

14    completely blocking the entire sidewalk.  See attached

15    uploaded photo to this report.  Prior to engaging with the

16    occupant inside the tent, I confirmed with Dispatch

17    Supervisor Heather Grives, who advised me there were three

18    shelter space available at the Bayview Navigation Center."

19              In this case were you responding to a complaint?

20    A.        Yes.

21    Q.        So this was not part of an HSOC resolution?

22    A.        No.

23    Q.        Was it part of an HSOC re-encampment prevention?

24    A.        I don't recall.

25    Q.        Would an incident report that was made during a

1  re-encampment prevention indicate that it was made during a
2  re-encampment prevention?
3  A.        No.
4  Q.        Would it indicate that it was made during an
5  encampment resolution?
6  A.        Yes.
7  Q.        Would it indicate that it was made during a JFO
8  operation?
9  A.        Most likely.
10  Q.        But you wouldn't be able to tell the difference
11  between a response to a complaint and a re-encampment
12  prevention; is that correct?
13  A.        Depends on what the officers write in the report.
14  Q.        So sometimes, but not necessarily?
15  A.        The thing is, we don't see re-encampment
16  prevention as something that's distinguished from what we
17  do daily.
18  Q.        Mm-hmm.
19  A.        The only thing is, like, we work with HSOC, as a
20  group, same thing with JFO, where the officer out there is
21  just doing their job.
22  Q.        So if -- you mentioned earlier that at the daily
23  HSOC calls there will sometimes be planning of a
24  re-encampment prevention; is that correct?
25  A.        (Nods head.)

1    Q.        And in those cases, if one of those planned

2    re-encampment preventions led to an arrest, would the

3    incident report note that it was part of an HSOC operation?

4              MR. WANG:  Objection, to the extent that it

5    misstates and mischaracterizes prior testimony.

6              Go ahead.

7              THE WITNESS:  If HSOC went back to a location

8    where there's the wording is re-encampment, the officer

9    would probably just write on the report on this date at

10   this location I was working with HSOC, and so forth.

11   BY MS. KATOVICH:

12   Q.        Okay.  So I'm going to skip down now to the

13   fourth paragraph which says, "Portillo only verbally

14   provided me with his name and date of birth but could not

15   provide any form of documented identification.  Officer

16   Tiffer, Number 577, ran a computer history check on

17   Portillo in an effort to positively identify him with

18   negative results, therefore I could not cite and release

19   Portillo on scene."

20             Is it department policy not to cite and arrest a

21   person if they do not have identification on them?

22   A.        If we cannot -- it is department policy if you

23   cannot verify who you're trying to cite, you shall book

24   them.

25   Q.        And in this case you were trying to cite them for

```
1    also book the gun as evidence, correct?
2    A.        Yes.
3    Q.        If a police officer needed to retrieve a tent or
4    structure that is being stored as evidence by DPW, how
5    would they go about doing that?
6              MR. WANG:  Objection.  Vague.  Lacks foundation.
7              Go ahead.
8              THE WITNESS:  That hasn't happened.
9    BY MS. KATOVICH:
10   Q.        It's never happened?
11   A.        Correct.
12   Q.        Have you ever received instructions on how a
13   police officer could get property back from DPW?
14   A.        If that was to happen, I would first call DPW,
15   give them the SR number, and go, do you have this tent?
16             For example, I mean, hypothetical, let's say for
17   whatever reason someone asked for it, like a DA going
18   forward needs it, I'm assuming they know how to go about
19   it.  But I would go about calling DPW.
20   Q.        But that's never happened, a DA has never asked
21   for evidence?
22   A.        Not to me.  Not to my knowledge.
23   Q.        I'm going to show you another document which we
24   will mark as Exhibit 1042 --
25             THE COURT REPORTER:  43.
```

```
 1   A.        Yes.

 2   Q.        And is that training that took place by March

 3   2023 the training you were just describing that you

 4   conducted soon after the injunction and after this new

 5   Department Notice came out?

 6            MR. WANG:  Objection, to the extent it's vague.

 7   That second part, you're referring to the training you

 8   referred to in paragraph 5, whether that's the training?

 9            MS. KATOVICH:  No.

10            The training you were referring to just now we

11   were discussing.

12            MR. WANG:  So when you were asking about

13   paragraph 5, he gave some response --

14            MS. KATOVICH:  Yes.

15            MR. WANG: -- and now you're clarifying whether

16   that response was actually in paragraph 4?

17            MS. KATOVICH:  Yes.  Thank you.

18            MR. WANG:  Sorry.

19            MS. KATOVICH:  No, it's not --

20            THE WITNESS:  Yes.

21   BY MS. KATOVICH:

22   Q.        Okay.  So in paragraph 5 you describe additional

23   training that you were developing beyond that March 2023

24   training, correct?

25   A.        Yes.
```

1  Q.        Did you ever conduct additional training beyond
2  the roll-call training that took place in March 2023?
3  A.        No.
4  Q.        Why not?
5  A.        At that time, after this, there was initially the
6  additional training was I believe the command staff wanted
7  every officer to be trained on it, and that wasn't feasible
8  so that was -- it didn't go through.
9  Q.        So there was -- at some point a decision was made
10 not to train all SFPD officers on DN 23-007, correct?
11 A.        Yes.
12 Q.        And HSOC officers also did not receive additional
13 training, correct?
14 A.        Correct.
15 Q.        After the preliminary injunction was issued in
16 this case, which was in late December 2022, did you change
17 anything about the way you conducted encampment
18 resolutions?
19 A.        Yes.
20 Q.        What did you change?
21 A.        As I stated earlier, a lot of the DN came out
22 with all these requirements, mainly that we have to
23 determine if they're involuntary or voluntary homeless, and
24 it provides a list of things that officers must do.
25 Q.        And so after -- after the preliminary injunction