# Exhibit B

```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                       OAKLAND DIVISION
 4
 5   - - - - - - - - - - - - - - - - - -
 6   COALITION ON HOMELESSNESS,        )
 7   et al.,                           )
 8               Plaintiffs,           )
 9   vs.                               )  CASE NO.
10   CITY AND COUNTY OF SAN            )  4:22-cv-05502-DMR
11   FRANCISCO, et al.,                )
12               Defendants.           )
13   - - - - - - - - - - - - - - - - - -
14
15
16          30(b)(6) DEPOSITION OF DAVID LAZAR
17          RE: SAN FRANCISCO POLICE DEPARTMENT
18                 MONDAY, MARCH 3, 2025
19
20
21         BEHMKE REPORTING AND VIDEO SERVICES, INC.
22             BY:  SUZANNE I. ANDRADE, CSR NO. 10682
23                550 CALIFORNIA STREET, SUITE 820
24                 SAN FRANCISCO, CALIFORNIA 94104
25                         (415) 597-5600
```

```
 1  built again.
 2      Q.   And how does SFPD engage in re-encampment
 3  prevention?
 4      ATTORNEY WANG:  Objection; vague.
 5          Go ahead.
 6      THE WITNESS:  The main way is to just have eyes on
 7  an area and prevent a person from resetting up their
 8  encampment.
 9  BY ATTORNEY KATOVICH:
10      Q.   How does SFPD prevent a person from resetting
11  up their encampment?
12      A.   In most cases, they'll say to a person, "Please
13  don't set up this encampment.  It's against the law."
14  And we try to prevent by enforcing the law on this
15  individual.
16      Q.   And in other cases?
17      ATTORNEY WANG:  Objection; vague.
18      THE WITNESS:  I mean, in other cases, we may use
19  structure -- I don't want to say "structure."  Sorry.  I
20  meant bike rack, barricades, or other devices to hold
21  ground in an area.  In some cases, we'll use Urban
22  Alchemy to assist us.
23  BY ATTORNEY KATOVICH:
24      Q.   How do you use Urban Alchemy to assist?
25      A.   When we say to them, "Please do not let anybody
```

```
 1      Q.   You said that in -- for 647(e), evidence of
 2  that offense is seized by DPW, correct?
 3      A.   Yes.
 4      Q.   Are there other offenses where evidence of that
 5  offense is seized by another City department outside of
 6  SFPD?
 7      A.   And outside of Public Works?
 8      Q.   It could include Public Works as well.
 9      A.   Not that I can think of.  Because if it's
10  evidence in a crime other than a structure or a tent,
11  we're going to collect that evidence.
12           So if I understand your question correctly, the
13  answer is no.  Hopefully I understand your question
14  correctly.
15           You want to try it again?  You want to ask it
16  another way?
17      Q.   We'll come back to it.
18           Is SFPD required to call DPW to bag and tag
19  property when an unhoused person is arrested?
20      ATTORNEY WANG:  Objection; incomplete hypothetical,
21  vague.
22           Go ahead.
23      THE WITNESS:  Yes.
24  BY ATTORNEY KATOVICH:
25      Q.   Every time?
```

```
 1        ATTORNEY WANG:  Objection; vague.
 2        THE WITNESS:  You'd have to ask them.
 3   BY ATTORNEY KATOVICH:
 4        Q.   DPW, not SFPD, would determine whether or not
 5   the property of an arrestee can be discarded, correct?
 6        A.   Yeah -- oh.
 7        ATTORNEY WANG:  Sorry.  Objection; incomplete
 8   hypothetical.
 9             Go ahead.
10        THE WITNESS:  Yes.
11   BY ATTORNEY KATOVICH:
12        Q.   And DPW, not SFPD, would determine whether and
13   how the property of an arrestee is stored, correct?
14        ATTORNEY WANG:  Objection; incomplete hypothetical.
15             Go ahead.
16        THE WITNESS:  Yes, yes.  If they're seizing it, yes.
17   BY ATTORNEY KATOVICH:
18        Q.   What written documentation is provided to an
19   unhoused individual who is cited or arrested when their
20   property is bagged and tagged?
21        A.   I don't know.
22        Q.   Is SFPD required to call DPW to take custody of
23   evidence of illegal lodging?
24        A.   Yes.
25        Q.   So every time that SFPD enforces illegal
```

```
 1        Q.   Does SFPD provide DPW with any instructions
 2   about what DPW should do with that evidence of illegal
 3   lodging?
 4        A.   Public Works knows their job, and I'm sure
 5   there are conversations that officers in Public Works
 6   have at the scene of the encampment just to make sure
 7   that everyone's on the same page.  But the police
 8   officers and Public Works must follow their policies.
 9        Q.   Is there any SFPD policy that requires or
10   instructs SFPD officers to provide instructions to DPW
11   about what to do with evidence of illegal lodging?
12        A.   Well, I'd have to reference the department
13   notice to verify whether or not that is the case, but as
14   I have stated here this morning, Public Works makes
15   determinations about property.  And if you want me to
16   reference it, I will, the department notice.
17        Q.   And it's DPW, not SFPD, that decides whether
18   evidence of illegal lodging should be bagged and tagged
19   or discarded, correct?
20        A.   Yes.
21        Q.   Does DPW need SFPD's permission to return
22   bagged-and-tagged evidence to its owner?
23        A.   No, not that I -- no.
24        Q.   Does SFPD ever retrieve evidence from DPW?
25        ATTORNEY WANG:  Objection; vague.
```

```
 1   BY ATTORNEY KATOVICH:
 2       Q.   Does SFPD provide any documentation?
 3       A.   Not that I'm aware.
 4       Q.   Aside from evidence of illegal lodging, does
 5   SFPD discard any other crime evidence because it poses a
 6   health or safety risk?
 7       ATTORNEY WANG:   Quickly, just objection; beyond the
 8   scope, vague.
 9            Okay.  Go ahead.
10       THE WITNESS:  No.
11   BY ATTORNEY KATOVICH:
12       Q.   And aside from evidence of illegal lodging,
13   does SFPD allow any other crime evidence to be destroyed
14   by another City agency?
15       ATTORNEY WANG:   Same objections.
16            Go ahead.
17       THE WITNESS:  No.
18       ATTORNEY KATOVICH:  I'm going to introduce a
19   document into evidence.  This is actually a previously
20   marked exhibit, 1042.
21            (Previously marked Deposition Exhibit 1042 was
22            presented.)
23   BY ATTORNEY KATOVICH:
24       Q.   Take a moment to look this over and let me know
25   if it looks familiar to you.
```

```
 1  BY ATTORNEY KATOVICH:
 2       Q.   What evidence does it govern?
 3       A.   I believe it just governs evidence other -- it
 4  only -- it only involves evidence of illegal lodging as
 5  reflected on the bottom paragraph of this notice that
 6  you've given me.
 7       Q.   And is that the paragraph that begins:
 8  "Officers seizing personal property that is evidence of
 9  a crime, other than illegal lodging, from an individual
10  who is arrested shall refer to DGO 6.02 and issue the
11  individual a property receipt"?
12       A.   Yes.
13       Q.   And that paragraph goes on to say that:
14  "Officers seizing personal property that is evidence of
15  an illegal lodging violation should note in the incident
16  report that the evidence was captured on BWC," correct?
17       A.   Yes.
18       Q.   And this protocol requires officers seizing --
19  officers enforcing an illegal lodging violation to
20  capture evidence of that violation on body-worn camera,
21  correct?
22       A.   Yes.
23       Q.   Why is that?
24       A.   Because we use the body-worn camera often to
25  capture evidence, capture statements, capture things
```

1  that we witness. But it's also a good tool to be used
2  because that illegal lodging item is being taken by
3  Public Works, so we're going to show that we did have
4  knowledge, we're aware of it and had our hands on it
5  before it was taken away.
6      Q.  And would that body-worn camera footage be used
7  to substantiate the enforcement of illegal lodging?
8      ATTORNEY WANG:  Objection; vague, incomplete
9  hypothetical.
10          Go ahead.
11     THE WITNESS:  It could be.
12 BY ATTORNEY KATOVICH:
13     Q.  Under what circumstances could it be?
14     ATTORNEY WANG:  Same objections.
15     THE WITNESS:  Well, if the District Attorney
16 prosecuted a case of illegal lodging, it would be used
17 as evidence, given over as discovery, maybe used in a
18 preliminary hearing or a trial.
19 BY ATTORNEY KATOVICH:
20     Q.  And would that be the only evidence that's
21 given over in that circumstance?
22     A.  No.
23     Q.  What else would be given over?
24     A.  Witness testimony.
25     Q.  Anything else?

```
 1        ATTORNEY WANG:  Objection; incomplete hypothetical.
 2             Go ahead.
 3        THE WITNESS:  An incident report.
 4   BY ATTORNEY KATOVICH:
 5        Q.   Anything else?
 6        A.   Maybe photographs.
 7        Q.   Does this department notice require officers to
 8   take photographs of evidence of illegal lodging?
 9        A.   No.
10        Q.   I'm going to turn your attention to the second
11   page under "Procedure and How to Contact DPW."
12             Under No. 4, do you see that it says:  "Members
13   shall photograph and document the property in the
14   report"?
15        A.   Yes.
16        Q.   Does that apply to evidence of illegal lodging?
17        A.   Well, it doesn't -- the previous paragraph on
18   property of arrested person, it talks about evidence
19   related to body-worn camera.
20             But the way that I interpret this portion that
21   you've pointed out to me is that -- well, it also
22   mentions photograph, I will say that.  So they shall
23   photograph and document the property in a report, which
24   is interesting because it's not referenced in the first
25   paragraph that I was referring to.
```

```
 1   place before 24-114 came into force?
 2       A.   Yes.
 3       Q.   And 24-114 replaced this department notice?
 4       A.   Yes.
 5       Q.   And this Department Notice 20-167 was in place
 6   from December 15th, 2020, until July 8th, 2024, correct?
 7       A.   Yes.
 8       Q.   How did this version of the department notice
 9   of the protocol for processing homeless property,
10   consistent with DPW's bag-and-tag policy, differ from
11   the two that we were just talking about?
12       A.   I do not know.  I'd have to analyze it.  And
13   usually when I see a new policy, I try to completely
14   forget the prior policy so I don't mix it all up.
15       Q.   Did you review this or other department
16   policies in preparation for this deposition?
17       A.   I did.
18       Q.   Which policies did you review?
19       A.   I reviewed 20-167, 24-114, 24-140, and the
20   policies related to illegal lodging -- enforcement of
21   illegal lodging.
22       Q.   And do you recall, based on your review in
23   preparation for today's deposition, what the difference
24   is between 20-167 and the department notice currently in
25   force on protocol for processing property?
```

```
 1        A.    No, I didn't analyze it that closely.
 2        Q.    Do you recall any differences?
 3        A.    No.
 4        Q.    So in 20-167, the -- under the first heading
 5   here, "Unattended Property vs. Abandoned Property," this
 6   paragraph describes "Temporarily unattended property,"
 7   which it says, "is different from abandoned property,
 8   which may be immediately discarded.  In determining if
 9   property is abandoned, officers should evaluate the
10   facts and circumstances surrounding the items."
11              Based on looking at this paragraph, did this
12   policy -- did this version of the protocol require SFPD
13   members to determine the status of property?
14        A.    Yes.
15        Q.    And currently, under 24-140, officers are not
16   supposed to determine the status of property, correct?
17        A.    Correct.
18        Q.    And why did that change?
19        A.    I don't know why.
20        Q.    Who made that change?
21        A.    I don't know who.
22        Q.    From December 15th, 2020, until July 8th, 2024,
23   is it fair to say that SFPD officers were directed to
24   make a determination about whether property they
25   encountered was unattended or abandoned, and if property
```

```
1   was abandoned, ensure that that property was immediately
2   discarded?
3        A.   Yes.
4        ATTORNEY WANG:  You need to read the whole thing.
5        THE WITNESS:  I may need to read the whole --
6        ATTORNEY WANG:  Take your time.
7        THE WITNESS:  Yeah.  Again, it's a five year old --
8   four and a half -- four year old policy, and I should
9   just take a quick read at it so I can answer your
10  questions accurately.
11  BY ATTORNEY KATOVICH:
12       Q.   Just to be clear, this policy was in force up
13  until July 8, 2024, correct?
14       A.   Yes.
15       Q.   Do you want to take a moment to read this?
16            Would that help you answer questions about it?
17       A.   Yes.
18       Q.   Okay.  Why don't you do that.
19       A.   (Examines document.)
20       ATTORNEY WANG:  You'll need a couple minutes.  We
21  can go off the record.
22       ATTORNEY KATOVICH:  If we could go off the record
23  that would be great.  Thank you.
24            (Recess taken from 1:14 p.m. to 1:16 p.m.)
25       THE REPORTER:  It's 1:16.
```

```
 1  BY ATTORNEY KATOVICH:
 2      Q.   Chief Lazar, have you now had a chance to read
 3  this Department Notice 20-167?
 4      A.   Yes.
 5      Q.   And based on your review of this notice, is it
 6  your understanding that this department notice
 7  instructed SFPD members to determine whether property
 8  was unattended or abandoned?
 9      A.   Yes.
10      Q.   And if the SFPD officer determined that
11  property was abandoned, what were they required to do?
12      A.   If the property -- if they determined the
13  property was abandoned, they evaluate the facts, and
14  then they have to make some determinations.  There's a
15  third party that was guarding it, in which case it
16  wasn't abandoned.  And then if that's -- you know, if
17  that's not the case, then Public Works is called for a
18  removal or recovery -- removal of the property.
19      Q.   Under this version of the policy, it was SFPD,
20  not Public Works, that was determining that property was
21  abandoned, correct?
22      ATTORNEY WANG:   Objection; incomplete hypothetical.
23          Go ahead.
24      THE WITNESS:   Well, it didn't -- it doesn't
25  necessarily say that.  It say -- it just gives
```

```
 1   instructions for when officers come across what they
 2   believe is abandoned property.
 3   BY ATTORNEY KATOVICH:
 4        Q.   And in those situations, the officer would
 5   determine that it was abandoned and direct Public Works
 6   to discard it, correct?
 7        ATTORNEY WANG:   Objection; vague, incomplete
 8   hypothetical.
 9             Go ahead.
10        THE WITNESS:   Or bag and tag it.
11   BY ATTORNEY KATOVICH:
12        Q.   SFPD would instruct DPW to bag and tag
13   abandoned property?
14        A.   No, not abandoned property.   I'm sorry.   If
15   it's abandoned and we don't know the ownership, then
16   they would -- then they would discard it.   But if it
17   was -- if there's owner -- if we can identify an owner,
18   then it should be bagged and tagged.
19        Q.   And SFPD would be communicating to DPW whether
20   or not that -- the property had -- was unattended but
21   had an owner or if it was abandoned, correct?
22        A.   Yes, they should.
23        Q.   Looking at under "Property of Arrested Person"
24   there, the department notice reads:   "Officers may
25   determine that an individual who is arrested has
```

```
 1   personal property that is infectious, hazardous, or
 2   present an immediate health or safety risk due to the
 3   presence of potential biohazards such as fecal matter,
 4   needles, etc.  As such, items that present potentially
 5   infectious, hazardous, or immediate health or safety
 6   risk shall not be placed in a police vehicle nor brought
 7   into a station to avoid unnecessary exposure to other
 8   officers.  Rather, officers shall contact DPW for
 9   disposal of the property.  Officers shall photograph and
10   document in their report why the items were discarded."
11           Based on this department notice, were SFPD
12   officers required to make a determination whether the
13   property of a person they were arresting was infectious,
14   hazardous, or presented an immediate health or safety
15   risk?
16      A.   Yes.
17      Q.   And based on that determination, would they --
18   were they required to instruct DPW to discard property?
19      A.   Yes.
20      Q.   And how did officers determine whether personal
21   property of an arrestee was infectious, hazardous, or
22   presented an immediate health or safety risk?
23      A.   By their own experience.
24      Q.   Did officers receive any training on what
25   constitutes infectious, hazardous, or immediate health
```

```
 1   or safety risks?
 2        A.   Well, you know, in the police academy, there is
 3   discussions about safety.  There is discussions about
 4   the collection of evidence that may be hazardous.
 5   Again, back to the -- I think there's also an infectious
 6   disease document or manual.  There's definitely, as I
 7   mentioned, the Injury and Illness Prevention Program
 8   Manual.  And then some -- then the rest of it is --
 9   yeah.
10             So the answer is yes, but maybe not specific to
11   this -- specifically to this topic.
12        Q.   And under this department notice, are officers
13   or were officers directed to refer to any of those other
14   documents or guidance or training manuals that you just
15   described?
16        A.   At what point?  I'm sorry.
17        Q.   Were officers instructed to refer to those
18   other documents, protocols, training that you just
19   described in determining whether or not property of an
20   arrested person was infectious, hazardous, or presented
21   an immediate health or safety risk?
22        A.   Not that I'm aware of.  Just because we have a
23   big department, and I'm not sure if or when these items
24   were discussed as part of the overall training.
25        Q.   And this section on property of an arrested
```

```
1       A.   I don't know.
2       Q.   Taking a look at the third page of this
3  document, there's a list here.  And the notice says:
4  "Items that will be discarded and not stored consistent
5  with DPW's Procedure 16.05.08," and then it lists out a
6  number of categories of documents.
7            Are these categories of documents taken
8  directly from DPW's procedures?
9       A.   I don't know.  I have to look at DPW's
10 procedures that you just handed to me.  I have to read
11 and compare.
12      Q.   You don't know anything about the process of
13 creating this department notice and whether the items
14 listed here in this department notice were provided by
15 DPW?
16      A.   I do not know.
17      Q.   Looking at item (c) it says:  Furniture,
18 mattresses, sheds, rolling structures, and bulky items
19 "will be discarded and not stored consistent with DPW's
20 procedure"; is that correct?
21      A.   Yes.
22      Q.   And is it your understanding that from --
23 during the period of time that this department notice
24 was in force, DPW was not storing furniture, mattresses,
25 sheds, rolling structures, and bulky items?
```

```
 1        ATTORNEY WANG:  Objection; beyond the scope, calls
 2   for speculation.
 3            Go ahead.
 4        THE WITNESS:  Just based on this directive, yes.
 5   BY ATTORNEY KATOVICH:
 6        Q.  And would officers use this list of items that
 7   would be discarded and not stored by DPW to make
 8   determinations about whether or not they should call DPW
 9   to pick up items?
10        A.  Yes.
11        Q.  And so if there was an item on this list,
12   how -- what would they do?
13        ATTORNEY WANG:  Objection; vague.
14        THE WITNESS:  They would call Public Works and ask
15   them to come out and pick these items up.
16   BY ATTORNEY KATOVICH:
17        Q.  And that would be to pick them up to discard
18   them?
19        ATTORNEY WANG:  Objection; vague, calls for
20   speculation.
21            Go ahead.
22        THE WITNESS:  According to this policy, they would
23   be discarded.
24   BY ATTORNEY KATOVICH:
25        Q.  What other San Francisco Police Department
```