# Exhibit D

```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                      OAKLAND DIVISION
 4
 5   - - - - - - - - - - - - - - - - - -
 6   COALITION ON HOMELESSNESS;          )
 7   SARAH CRONK; JOSHUA DONOHOE;        )
 8   MOLIQUE FRANK; DAVID MARTINEZ;      )
 9   TERESA SANDOVAL,                    )
10              Plaintiffs,              )
11   v.                                  ) CASE NO.
12   CITY AND COUNTY OF SAN              ) 4:22-cv-05502-DMR
13   FRANCISCO, et al.,                  )
14              Defendants.              )
15   - - - - - - - - - - - - - - - - - -
16
17             DEPOSITION OF DENNIS HOANG
18                WEDNESDAY, MARCH 5, 2025
19
20
21        BEHMKE REPORTING AND VIDEO SERVICES, INC.
22              BY: LAURA ESPINOSA, CSR. NO. 11400
23                 550 CALIFORNIA STREET, SUITE 820
24                        SAN FRANCISCO, CALIFORNIA
25                                   (415) 597-5600
```

```
 1        Q.   Have you ever received any training about what
 2   to tell homeless people about DPW's policy on bag and
 3   tag?
 4        A.   I don't know DPW's bag-and-tag policy so I --
 5   there's nothing to train us on with DPW's bag-and-tag
 6   policy.  I've never seen their bag-and-tag policy.
 7             I hope that answers -- does that clarify?
 8        Q.   Yeah.
 9        A.   All right.
10        Q.   Do you ever -- well, withdrawn.
11             At encampment resolution, who decides how much
12   time a person has to move their property before DPW
13   begins cleaning?
14        A.   Typically the officers.
15        Q.   SFPD officers?
16        A.   Yes.
17        Q.   And how much time does SFPD give individuals to
18   move their property?
19        A.   That varies drastically.
20        Q.   Is there any -- is there any guidance that SFPD
21   officers are provided about how long people should be
22   given?
23        A.   We -- when I say "we," like the lieutenant and
24   supervisors, we've trained our officers to use an
25   objectively reasonable standard that -- just that
```

```
 1  reasonableness standard.
 2      Q.  And how have you trained them to use that
 3  reasonableness standard?
 4      A.  Well, I don't want to -- it varies depending on
 5  the person.  So to sort of give you -- the best way to
 6  answer that would be to give you an example.  Hopefully
 7  that clarifies it.
 8          Like a young, able-bodied adult with minimal
 9  belongings might only need five minutes versus, let's
10  say, an older person with some possible physical
11  disabilities with that same property might take ten
12  times longer.  Those are factors that we consider.
13      Q.  Is there any written guidance or policy on the
14  amount of time that SFPD is supposed to give people to
15  move their belongings?
16      A.  No, not to my knowledge.
17      Q.  And just to clarify, that's the amount of time
18  that individuals have before DPW begins cleaning; is
19  that correct?
20          MR. WANG:  Objection.  Calls for speculation.
21          Go ahead.
22          THE WITNESS:  That -- that is -- the reasonable
23  time that we provide the homeless people to abate the
24  violation is prior to us conducting enforcement.
25
```

1          Go ahead.
2          THE WITNESS:  Because we seize -- it's SFPD's
3    policy that we seize the narcotics and the drug
4    paraphernalia.
5    BY MS. KATOVICH:
6       Q.  Is there any other type of crime evidence that
7    you would call DPW to take custody of besides evidence
8    of illegal lodging?
9       A.  Evidence, no.
10      Q.  And so outside of evidence of illegal lodging,
11   is it SFPD's policy to maintain custody of all crime
12   evidence?
13      A.  Sorry.  Repeat that one more time?
14      Q.  Outside of evidence of illegal lodging, is it
15   SFPD's policy to maintain custody of all crime
16   evidence?
17      A.  All crime evidence.  Yes, as long as it's
18   not -- how do you say -- giant bulk property.
19      Q.  What would -- what happens to evidence that's
20   giant bulk property?
21      A.  Per our policy, we would request DPW to bag and
22   tag if it's large -- large bulk property that's
23   evidence.
24      Q.  And what would, in your experience, large bulk
25   property be evidence of?

```
 1   were beginning to do re-encampment prevention?
 2        A.   Not to me.
 3        Q.   Do you have any understanding of why HSOC
 4   started to do re-encampment prevention?
 5        A.   It wasn't told to me.  I can only speculate.
 6        Q.   You haven't had conversations about it with
 7   anyone at HSOC?
 8        A.   No.  We don't because we don't make the
 9   determination of where we go.  We just -- we just go
10   where we're told to go.
11        Q.   And who does make the determination about where
12   to go?
13        A.   For the HSOC encampment resolution, my
14   understanding is David Nakanishi of DEM.
15        Q.   And what about for JFOs?
16        A.   My understanding is Mark Mazza of DEM.
17        Q.   I'm going to turn you back to the first page of
18   this.  Under the heading "HSOC Prior Operation," do you
19   understand that to be describing the HSOC resolutions
20   that took place that day or the day before?
21        A.   I'd have to read through this and see when it
22   was dated, but I think -- yeah, it says HSOC prior
23   operation.  I think that sounds self-explanatory, that
24   it was prior to -- it looks like a summary of prior to
25   when this was written.
```

```
 1  Whether it's in a bag or not, I couldn't tell you an
 2  exact percentage.
 3       Q.  And is SFPD required to find out whether DPW
 4  has actually bagged and tagged an item?
 5       A.  No, not to my knowledge.
 6       Q.  If SFPD issues a -- you know, enforces illegal
 7  lodging and seizes a tent or structure as evidence,
 8  does SFPD provide the individual being arrested or
 9  cited with a property receipt?
10       A.  Yes.
11       Q.  And does that property receipt tell them where
12  the tent or structure is located or how to retrieve it?
13       A.  The property receipt is notifying the
14  individual that we're seizing their property as
15  evidence.  It's common practice that we notify them
16  that it's going to be at the DPW yard off of -- I don't
17  know the exact address, but off of Cesar Chavez Street.
18       Q.  Would that be notifying them verbally?
19       A.  Yes.
20       Q.  Is that written on the receipt itself?
21       A.  No.
22       Q.  And you've also mentioned situations where
23  you're making a custodial arrest and you call DPW to
24  take custody of the items that belong to the person
25  being arrested, right?
```

```
 1        Q.   And that's a requirement from this department
 2   notice?
 3        A.   I'm not seeing it in this notice.
 4        Q.   Direct your attention to the second page on the
 5   back of the document under "Procedures" and how to
 6   contact DPW.
 7        A.   Oh, I see it now.
 8        Q.   So that's No. 4, "Members shall photograph and
 9   document the property in the report"?
10        A.   Yes, I see that now.
11        Q.   And so members are required to take photographs
12   of evidence of illegal lodging, as well as to take
13   body-worn camera footage of illegal lodging; is that
14   correct?
15        A.   Yes.
16        Q.   And those photographs and body-worn camera
17   footage can be used as evidence of that crime?
18             MR. WANG:  Objection.  Calls for legal
19   conclusion.  Calls for speculation.
20             Go ahead.
21             THE WITNESS:  The photographs and the body-worn
22   camera captures the enforcement of the officers
23   conducting the illegal lodging enforcement.
24   BY MS. KATOVICH:
25        Q.   Is there any reason why you would need the
```

```
 1   physical tent or structure in addition to the
 2   photograph and body-worn camera footage?
 3           MR. WANG:  Objection.  Incomplete hypothetical,
 4   calls for speculation.
 5           THE WITNESS:  That would be a good question for
 6   our people that write our policies.
 7   BY MS. KATOVICH:
 8       Q.  And I assume you did not write this policy?
 9       A.  No.  Some things can get a little redundant.
10       Q.  If an officer was enforcing illegal lodging and
11   their incident report did not include a photograph,
12   would that be a violation of this department notice?
13       A.  As this department notice reads, yes.
14       Q.  And have you ever reviewed an incident report
15   for illegal lodging that did not include a photograph
16   of the lodging at issue?
17       A.  I don't recall reviewing -- I don't recall
18   approving a report of illegal lodging where a
19   photograph of the said structure or tent was not
20   included in the report.
21       Q.  And if you did review an incident report of one
22   of your supervisees for illegal lodging and there was
23   not a photograph, what would you do?
24           MR. WANG:  Objection.  Incomplete hypothetical.
25           Go ahead.
```

1          THE WITNESS:  In that hypothetical situation, I
2   would require the officer obtain a photograph.  And if
3   one wasn't there, to utilize the body-worn camera,
4   possibly like a still shot of body-worn camera, to show
5   the evidence in that manner.
6   BY MS. KATOVICH:
7       Q.  Would you expect the officer to note in the
8   incident report that they did not capture a photograph?
9       A.  In that hypothetical situation, yes, I would.
10      Q.  So looking here again at the procedure and how
11  to contact DPW list, under 3, No. 3 says, "DPW will
12  assess and process the property accordingly."
13          And then 3A says, "DPW will take custody of
14  what the arresting officers deem as evidence supporting
15  the arrest.  Property shall be listed in the arrest
16  report as evidence."
17          Does this mean that the policy requires SFPD to
18  determine what items are evidence of illegal lodging?
19      A.  Yes.
20      Q.  And so SFPD instructs DPW what property to take
21  as evidence of illegal lodging?
22      A.  Yes.
23      Q.  And how does SFPD determine what those items
24  are that DPW should take as evidence of illegal
25  lodging?

```
 1        A.   Well, our policy on enforcement of illegal
 2   lodging, it's tent/tarp structure.
 3        Q.   And you testified earlier that structure could
 4   be any number of items, correct?
 5        A.   Yes.
 6        Q.   Including a blanket?
 7        A.   Including a blanket.
 8        Q.   So below that, looking at No. 5, it says, "Note
 9   DPW will not bag and tag evidence that presents an
10   immediate health or safety risk due to the presence of
11   potential biohazards.  If DPW disposes of the property,
12   officers shall document in their report why the items
13   were discarded."
14             Do you understand this department notice to
15   require SFPD officers to note in the incident report
16   which particular items DPW discards?
17        A.   If we're made aware of it by DPW, yes.
18        Q.   And if -- does SFPD have any obligation to
19   inquire as to whether DPW discards items because they
20   are deemed a health or safety risk?
21        A.   To my understanding, that is not a requirement.
22        Q.   So an SFPD incident report may not -- if --
23   withdrawn.
24             If DPW is instructed to take custody of a tent
25   or structure and they determine that it's a health or
```

1  safety risk and they can't bag and tag it and they
2  discard it, that would not necessarily be reflected in
3  the incident report that the SFPD officer writes up,
4  correct?
5     A.  If they did not notify us, then yes.
6     Q.  And do you instruct the officers that you
7  supervise to make any inquiries about whether DPW
8  discards items that are evidence of illegal lodging?
9     A.  We stay in our lane.  We put the request for
10 DPW to bag and tag the property and we leave it up to
11 them.
12    Q.  And does SFPD ever discard other evidence of
13 crime outside of illegal lodging?
14        MR. WANG:  Objection.  Calls for speculation.
15        Go ahead.
16        THE WITNESS:  Are you asking does SFPD destroy
17 evidence?  Sorry, I'm not understanding.
18 BY MS. KATOVICH:
19    Q.  Sure.  If SFPD seizes evidence of some other
20 crime, aside from illegal lodging --
21    A.  Okay.
22    Q.  -- are there other situations where SFPD allows
23 another agency to discard that evidence?
24        MR. WANG:  Objection.  Incomplete hypothetical,
25 calls for speculation.

1            Go ahead.
2            THE WITNESS:  We would seize the evidence.
3   Bulk property, larger items that's evidentiary to
4   whatever crime, we would request for DPW.
5   BY MS. KATOVICH:
6       Q.  And if -- let's say take the example of the
7   mattress that's got a bloodstain on it.  Let's say it's
8   evidence of murder.  Would it be up to DPW to decide
9   whether or not to store that evidence or to discard it?
10      A.  In that hypothetical situation, I believe so.
11  But given the severity of that hypothetical crime, I
12  wouldn't -- I probably wouldn't be too -- I probably
13  wouldn't be too happy if they discarded that mattress,
14  even if it had biohazard on it.
15      Q.  Does SFPD have any of its own internal policies
16  around how to handle items that are biohazards?
17      A.  I'd probably have to refresh myself with the
18  6.02DGO.  It's been awhile since I've looked at it.
19          It's my understanding, yeah, if it's biohazard,
20  we would request for DPW to clean it up, unless we
21  could discard it ourselves.
22          MS. KATOVICH:  Let's look at 6.02.  This will
23  be 1373.
24          (Deposition Exhibit 1373 marked for
25          identification.)

1  BY MS. KATOVICH:
2      Q.  Take a look at this document and let me know if
3  you recognize this?
4      A.  Yes, I do recognize this.
5      Q.  Is this DGO6.02?
6      A.  Yes, it is.
7      Q.  So this is the San Francisco Police Department
8  general order that governs physical evidence, correct?
9      A.  Yes.
10     Q.  And I'm going to turn your attention to 6.02.04
11 (I)(3).  And I will point you to the page number as
12 well.  Page 7.
13     A.  Biological?
14     Q.  So there -- this paragraph concerns biological
15 evidence.  And it reads, "Biological evidence requires
16 careful handling not only to preserve evidence, but
17 also to protect members from possible contamination.
18 It is imperative that members wear fresh latex or
19 nitril gloves when handling any biological evidence.
20 Dry biological evidence does not require freezing to
21 maintain the integrity of DNA evidence.  All such
22 evidence shall now be booked with only 'Biohazard'
23 labels, as appropriate, and shall be stored at
24 monitored room temperature in Property Control
25 Division.  Members will follow the subsequent

1  procedures when handling or booking the following types
2  of biological evidence."
3         And then it goes on to have a list over the
4  next couple of pages.  And that includes narcotics and
5  possibly hazardous evidence, No. 8.
6         Having refreshed your memory of this department
7  general order, is it your understanding that SFPD has
8  its own policies for handling biohazards?
9         MR. WANG:  Quick objection.  Vague.
10        But go ahead.
11        THE WITNESS:  Yes, for biological evidence.
12 BY MS. KATOVICH:
13    Q.  And so under the hypothetical example we were
14 using earlier, SFPD would be capable of safely handling
15 an item that had blood on it, correct?
16        MR. WANG:  Objection.  Vague.  Calls for
17 speculation.
18        Go ahead.
19        THE WITNESS:  I suppose, yes.  Yes, in the
20 biological evidence paragraph.
21 BY MS. KATOVICH:
22    Q.  So is there any reason why DPW would handle
23 items that have biohazardous -- are biohazards or that
24 have blood or other body fluids on them?
25        MR. WANG:  Objection.  Vague.  Calls for

1  speculation.  Incomplete hypothetical.
2          Go ahead.
3          THE WITNESS:  Can you repeat the question one
4  more time?
5  BY MS. KATOVICH:
6      Q.  Is there reason why DPW, and not SFPD, would
7  handle a piece of evidence that was a biohazard or that
8  had bodily fluids on it?
9          MR. WANG:  Same objections.
10          Go ahead.
11          THE WITNESS:  If it's in relation to illegal
12  lodging, that's the only thing that I can think of.
13  It's bulk property that can't fit into the standard
14  evidence locker at a station.
15  BY MS. KATOVICH:
16      Q.  And is there anything in this policy that
17  governs the maximum size that SFPD can handle when it
18  comes to physical evidence?
19      A.  I'm not seeing it immediately, but I'm sure
20  with enough time to look through our DGOs I could
21  probably find it somewhere.  I'm sure it references
22  something about a locker somewhere in there.  That's my
23  working knowledge of whether or not we're able to take
24  that property back.
25      Q.  Turn your attention to page 2, and under