# EXHIBIT 2

# TO

# DECLARATION OF MIGUEL GRADILLA IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF EXPERT ASFOUR

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                      OAKLAND DIVISION
 4   - - - - - - - - - - - - - - - - - -
 5   COALITION ON HOMELESSNESS; SARAH  )
 6   CRONK; JOSHUA DONOHOE; MOLIQUE    )
 7   FRANK; DAVID MARTINEZ; TERESA     )
 8   SANDOVAL,                         )
 9             Plaintiffs,        ) CASE NO.
10   v.                                ) 4:22-cv-05502-DMR
11   CITY AND COUNTY OF SAN FRANCISCO; )
12   et al.,                           )
13             Defendants.        )
14   - - - - - - - - - - - - - - - - - -
15
16
17              REMOTE DEPOSITION OF
18              F. RAMZI ASFOUR, M.D.
19              FRIDAY, APRIL 11, 2025
20
21          BEHMKE REPORTING AND VIDEO SERVICES, INC.
22              BY:  JOHN FAHRENWALD, CSR NO. 14369
23                  550 CALIFORNIA STREET, SUITE 820
24                  SAN FRANCISCO, CALIFORNIA  94104
25                            (415) 597-5600
```

```
 1   APPEARANCES OF COUNSEL (VIA VIDEOCONFERENCE):
 2   FOR THE PLAINTIFFS:
 3        AMERICAN CIVIL LIBERTIES UNION
 4        FOUNDATION OF NORTHERN CALIFORNIA
 5        BY:  JOHN THOMAS H. DO, ATTORNEY AT LAW
 6        39 Drumm Street
 7        San Francisco, California  94111
 8        Telephone: (415) 293-6333
 9        Email:  jdo@aclunc.org
10   FOR THE DEFENDANTS:
11        SAN FRANCISCO CITY ATTORNEY'S OFFICE
12        BY:  EDMUND T WANG, DEPUTY CITY ATTORNEY
13        1390 Market Street, 7th Floor
14        San Francisco, California  94102
15        Telephone:  (415) 554-3800
16        Email:  edmund.wang@sfcityatty.org
17   - ALSO -
18        CONRAD METLITZKEY CANE
19        BY:  JESSE LANIER, ATTORNEY AT LAW
20        217 Leidesdorff Street
21        San Francisco, California  94111
22        Telephone:  (415) 469-1719
23        Email:  jlanier@conmetkane.com
24   ALSO PRESENT:
25        KYLE FRIEND, VIDEOCONFERENCE TECHNICIAN
```

```
 1              (A break was taken from 11:10 a.m. to 11:17
 2   a.m.)
 3        Q.   (BY MR. DO:) Dr. Asfour, earlier I asked you what
 4   were you tasked to doing in this case, and you mentioned
 5   that you were asked to offer an opinion with regards to
 6   infectious disease risks posed by homeless encampments.
 7   Correct?
 8        A.   That's correct.
 9        Q.   And part of that was any risk posed by storing of
10   unhoused people's belongings.  Correct?
11        A.   That is correct.
12        Q.   Anything else to add to that?
13        A.   That's the broad scope.
14        Q.   So what is your opinion with regards to what you
15   were tasked to answer?
16        A.   May I look at my report?
17        Q.   I'd like to ask what your memory is as of right
18   now, your opinion.
19        A.   Sure.
20        Q.   We'll certainly be going over the report.
21        A.   Okay.
22        Q.   I won't hide the ball.
23        A.   ==My opinion is that unhoused people suffer from a==
24   ==variety of infections that are to a greater extent than==
25   ==non -- than the general public in the United States.  There==
```

1  are specific risks of airborne-transmitted diseases, such as
2  tuberculosis; some viruses such as one called respiratory
3  syncytial virus, or RSV.  There are risks of
4  gastrointestinal infections or rates of gastrointestinal
5  infections that are transmitted via the fecal-oral route
6  that are higher in unhoused populations than housed
7  populations.  That includes diseases such as hepatitis A,
8  Shigella, among others.
9           There are risks of skin and soft tissue
10 infections, including group A strep, which is the same kind
11 of strep that causes sore throat.  It can also cause skin
12 infections and M-R-S-A, or MRSA, as discussed already.
13 Those can be transmitted by contact.
14          And there are risks of blood-borne disease --
15 diseases, such as HIV, hepatitis B and hepatitis C, that are
16 transmitted via needles, for example, shared needles.  There
17 are increased rates of sexually-transmitted diseases, such
18 as syphilis, HIV as well, hepatitis B as well.
19          And there are increased rates of parasitic
20 infections, such as scabies or parasitic infestations.
21 Sometimes we call them infestations instead of infections.
22 Scabies, lice, and bedbugs, for example.
23          There are also infectious disease risks associated
24 with what we call vector-borne disease, such as one called
25 typhus.  There was an outbreak in Southern California, LA

 1  County especially, in -- with a high proportion of persons
 2  experiencing homelessness suffering from typhus.  There's
 3  been a few outbreaks.  There's also been West Nile virus,
 4  which is transmitted by mosquitoes in areas where --
 5  mosquitoes breed in areas where water is collected or
 6  collects.  So that's been reported in persons experiencing
 7  homelessness as well.
 8          So these are some of the risks of
 9  homelessness or infections in persons experiencing
10  homelessness.
11          There are risks related to storage of items
12  that are found in encampments, including risks to the
13  workers that are charged with having contact with those
14  items.  Those risks include needlestick injuries and
15  contact -- diseases transmitted by fecal-oral route.
16          There is limited data on risks to the general
17  broader community.  However, there -- there are some -- it's
18  hard to study that situation, but, when, for example, a
19  disease -- or there's more rats in an area because of food
20  waste, for example, in an encampment, rats can transmit
21  diseases to local populations, including diseases like
22  typhus, and a disease like TB or MRSA when -- which are
23  higher in persons experiencing homelessness.  Those diseases
24  can also be transmitted when a patient presents for
25  healthcare before that is -- before the tuberculosis, for

1  example, or MRSA is recognized as such.
2       Q.   Thank you, Dr. Asfour.
3            Understanding that I have your report, you've said
4  many things in the report as well, and so I'm certainly
5  aware of those things in the report.
6            Is there anything else that you wanted to add
7  sitting here right now based on the opinions that you have
8  reached?
9            MR. WANG:  Objection.  Vague.
10                Go ahead.
11           THE WITNESS:  That's the basis of my report.
12 If -- there are some arguments that Dr. King made in his
13 rebuttal report that I disagree with, arguments in rebuttals
14 to my -- in his section on rebuttals to what I reported I
15 disagree with, some things he said.  But we can get to that
16 if we review the rebuttal report.  I would like to have that
17 in front of me when I answer those questions.
18      Q.   (BY MR. DO:) Understood.  And, again, it's fine if
19 you were.  But just to confirm, were you referencing your
20 report just now or looking at any documents before?
21      A.   No, no.  I'm just looking at the --
22      Q.   That's what I suspected, but, you know, I'm
23 sometimes looking off screen, too, and I just wanted to
24 confirm.
25           So I want to go over a couple of those opinions

1         THE WITNESS: I have not made actual risk
2    assessments in any of those infections.  However, the risk
3    is not zero.
4         Q.   (BY MR. DO:) Aside from the risk of being not
5    zero, you haven't made any other estimation of risk as it
6    relates to sexually-transmitted diseases.  Correct?
7         MR. WANG: Objection.  Vague.
8              Go ahead.
9         THE WITNESS: In terms of spillover into the
10   general population?
11        Q.   (BY MR. DO:) That's correct.
12        A.   Correct.  I have not made those estimates.
13        Q.   Okay.  And you have not made that estimate for
14   vector-borne diseases as well.  Correct?
15        MR. WANG: Objection.  Vague.
16        THE WITNESS: Correct.
17        Q.   (BY MR. DO:) So when someone says that the risk is
18   not zero, that could mean the risk could be 1 percent, the
19   risk could be 99 percent.  Correct?
20        A.   That is correct.
21        Q.   When you were first -- sorry.  I'm going to step
22   back a little bit from this line of questioning.
23             When you were asked to offer these opinions in
24   this case, what did you do to go about answering the
25   question?

```
 1        A.   I reviewed the literature and combined it with my
 2   own experience.
 3        Q.   Did you do anything else?
 4        A.   Reviewed the documents in the case.
 5        Q.   Oh, I'm sorry.  I thought you had said that
 6   before.  So maybe I misunderstood your prior answer.
 7        A.   Okay.
 8        Q.   So --
 9        A.   I reviewed the documents in the case, the medical
10   literature on infections related to a person experiencing
11   homelessness, and my own experience.
12        Q.   By your own experience, do you mean your personal
13   experience or your professional experience?
14        A.   Both.
15        Q.   Okay.  So this isn't a trick question.  I just
16   want to make sure that we're on the same page in terms of
17   when you say your experience, what you mean by that.
18             So by your experience, I assume you mean you being
19   a treating physician and an academic in the infectious
20   disease field.  Correct?
21        A.   That's my professional opinion, yes.
22        Q.   Your professional experience, you mean?  You said
23   opinion.
24        A.   Experience.
25        Q.   Anything else with regards to your personal
```

```
 1   to the infectious disease risk posed by homeless
 2   encampments?
 3        A.   I would say that I have reviewed the literature
 4   and visited a large encampment before.  So I have -- my
 5   opinion is that homeless encampments present a degree of
 6   risk for transmission of infections -- of infectious
 7   diseases.  And it's the same risk that I have elucidated and
 8   described in my report and in this testimony so far.
 9        Q.   So is it fair to say that your opinion has not
10   changed from when -- prior to you being engaged in this case
11   and now?
12        A.   My opinion was informed by the facts of this case
13   and the particularities of multiple different encampments
14   and sizes of encampments in San Francisco, the updated
15   literature that I have reviewed, and the depositions and
16   other documents that I have reviewed.
17             So my opinion was informed by -- by the
18   particularities of this case but has not changed
19   significantly.
20        Q.   So it's fair to say, broadly speaking, the opinion
21   has -- you are of the same opinion with regards to
22   infectious disease risk as it relates to homeless
23   encampments last year as you are today?
24        A.   Yes.
25        Q.   In offering your opinion in this case, did you
```

```
 1      A.   I did.
 2      Q.   And how long ago was that?
 3      A.   Probably three years ago.
 4      Q.   And on whose behalf did you offer that report for?
 5      A.   Caltrans or the state of California.
 6      Q.   So we'll call that the Caltrans case, if that's
 7 okay.
 8      A.   Okay.
 9      Q.   Aside from the Caltrans case, have you ever been
10 retained to offer an opinion as it relates to homeless
11 encampments?
12      A.   No.
13      Q.   Did you review the report of Dr. Durrani?
14      A.   I don't think so.
15      Q.   You know who I'm referring to when I say
16 Dr. Durrani, just to confirm.  Correct?
17      A.   I do.
18      Q.   Have you ever been on a case with Dr. Durrani
19 before?
20      A.   No.
21      Q.   Is this case the first time you became aware of
22 who Dr. Durrani is?
23      A.   Yes.
24      Q.   Okay.  So stepping back again, going back to your
25 expert opinion again, what methodology did you use to reach
```

1  the conclusions that you did with regards to offering
2  opinion about infectious disease risk posed by homeless
3  encampments?
4       A.   A literature review, reading the materials
5  provided to me that we've discussed, and my personal
6  experience -- professional experience.
7       Q.   Any other methodologies that you used?
8       A.   Those are the main methodologies.
9       Q.   And why did you choose to use those methodologies?
10      A.   Well, I think it's always prudent to do a
11 literature review and to read the documents provided to an
12 expert in a case and to use your professional and personal
13 experience.
14      Q.   In the Wood Street encampment, you did a site
15 visit.  Correct?
16      A.   That is correct.
17      Q.   Did you think that site visit was important for
18 your expert opinion?
19      A.   I think it was helpful.  I don't think it was
20 absolutely necessary, but it was -- it was helpful.
21      Q.   Did you ask to do the site visit in the Caltrans
22 case?
23      A.   They wanted me to do one.
24      Q.   So do you think a site visit here in San Francisco
25 for this case would have been helpful?

```
 1   Correct?
 2       A.   Yes.
 3       Q.   Was the literature review specific for this case?
 4       A.   Yes.
 5       Q.   So just to confirm, you conducted -- just to
 6   confirm, you did not rely on a prior literature review.
 7   Correct?
 8       A.   I used some of the articles from the prior
 9   literature review, but I did a new review.
10       Q.   Is that because the new review didn't pick up the
11   other articles?
12       A.   Can you restate your question?
13       Q.   Sorry.  I guess I just would have assumed -- and
14   maybe I'm mistaken -- that when you do -- since you did a
15   more recent literature review, that it would have picked up
16   maybe some of the older articles that you already had.
17            Are you suggesting that it didn't?
18       A.   No, I'm not.  I just already had those articles
19   downloaded.  And it's a matter of practicality.  It's --
20   sometimes it's a bit of a hassle to get the actual PDF of an
21   article, so I save those.
22       Q.   Understood.  And did the new literature review
23   that you did pick up a lot of new material compared to what
24   you already had?
25       A.   It picked up articles that I don't recall having
```

```
 1  STATE OF ARIZONA   )
 2                     ) ss.
 3  COUNTY OF PIMA     )
 4           I hereby certify that the witness in the
 5  foregoing deposition, F. RAMZI ASFOUR, M.D., was by me
 6  duly sworn to testify to the truth, the whole truth and
 7  nothing but the truth, in the within-entitled cause;
 8  that said deposition was taken at the time and place
 9  herein named; and that the deposition is a true record
10  of the witness's testimony as reported by me, a duly
11  certified shorthand reporter and a disinterested
12  person, and was thereafter transcribed into typewriting
13  by computer.
14           I further certify that I am not interested in
15  the outcome of the said action, nor connected with nor
16  related to any of the parties in said action, nor to
17  their respective counsel.
18           IN WITNESS WHEREOF, I have hereunto set my
19  hand this 15th day of April, 2025.
20  Reading and Signing was:  Not Requested
21
22           [signature]
23
24  JOHN FAHRENWALD, CSR. NO. 14369
25  STATE OF CALIFORNIA
```