**EXHIBIT N**

**TO**

**DECLARATION OF STEVEN MILLS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE REGARDING SHELTER AVAILABILITY (ECF NO. 418)**

```
 1                UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3                      OAKLAND DIVISION
 4   - - - - - - - - - - - - - - - - - -
 5   COALITION ON HOMELESSNESS,         )
 6   et al.,                            )
 7               Plaintiffs,            )
 8   vs.                                )  CASE NO.
 9   CITY AND COUNTY OF SAN             )  4:22-cv-05502-DMR
10   FRANCISCO, et al.,                 )
11               Defendants.            )
12   - - - - - - - - - - - - - - - - - -
13      THIS TRANSCRIPT AND ITS EXHIBITS CONTAIN INFORMATION
14       SUBJECT TO A PROTECTIVE ORDER AND SHALL BE TREATED
15              AND USED ONLY IN ACCORDANCE THEREWITH
16
17            DEPOSITION OF ARIELLE PIASTUNOVICH
18                 FRIDAY, JANUARY 31, 2025
19
20
21            BEHMKE REPORTING AND VIDEO SERVICES, INC.
22                 BY:  SUZANNE I. ANDRADE, CSR NO. 10682
23                     550 CALIFORNIA STREET, SUITE 820
24                     SAN FRANCISCO, CALIFORNIA  94104
25                                      (415) 597-5600
```

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFFS:
 3       AMERICAN CIVIL LIBERTIES UNION FOUNDATION
 4       NORTHERN CALIFORNIA
 5       BY:  JOHN H. DO, ATTORNEY AT LAW
 6       39 Drumm Street
 7       San Francisco, California  94111
 8       Telephone:  (415) 293-6393
 9       Email:  jdo@aclunc.org
10
11   FOR DEFENDANTS and THE DEPONENT:
12       CITY AND COUNTY OF SAN FRANCISCO
13       OFFICE OF THE CITY ATTORNEY
14       BY:  MIGUEL A. GRADILLA, DEPUTY CITY ATTORNEY
15       1390 Market Street, 7th Floor
16       San Francisco, California  94102
17       Telephone:  (415) 554-3870
18       Email:  miguel.gradilla@sfcityatty.org
19
20
21
22
23
24
25
```

```
 1       MR. GRADILLA:  Sorry.  What is the exhibit
 2   number?
 3       MR. DO:  1038.  It was previously marked as
 4   1038.
 5       MR. GRADILLA:  Thank you.
 6   BY MR. DO:
 7       Q.   Are you familiar with any changes in policies
 8   or practices following the Supreme Court decision Grants
 9   Pass?
10       A.   No.  The only shift is -- I just understand
11   that it's not so much about making -- ensuring that
12   we -- you know, we still do -- I don't -- there haven't
13   been any changes, as far as the HSOC operations, as far
14   as I understand.  But the pressure to have shelter beds
15   is slightly reduced, as I recall.
16       Q.   What do you mean by "the pressure" for shelter
17   beds is reduced?
18       A.   Well, we try to make sure that wherever we go,
19   we have enough shelter to offer.  But there's a lot
20   of -- there -- shelter has been -- you know, there are
21   times when there's not as much shelter available.  And
22   so, you know, we want to make sure that, you know, if
23   we're going and doing resolutions from HSH -- the HSH
24   perspective, that we have shelter to offer people.
25       Q.   Do you always have shelter to offer people
```

1  currently?
2       A.   We always have shelter to offer.  And when we
3  don't have any more shelter to offer, we just continue
4  outreaching with -- you know, just help or we stop the
5  resolution.  That's --
6       Q.   I'm sorry.  What was that?  I missed -- I
7  didn't hear that last part.  Sorry.
8       A.   Sometime -- in the past, I don't know if this
9  is the current practice, but when shelter beds ran out,
10 we would stop -- we would not ask people to move because
11 we have -- we had to have a shelter bed available.  I'm
12 not sure what the current practice is, but we do try to
13 always ensure that we have shelter beds to offer.
14      Q.   And by "we" here, who are you referring to?
15      A.   HSH.  So that's -- you know, that they're -- we
16 get an allocation every day for HSOC.
17      Q.   So HSH, you're saying, in the past, has asked
18 people to move?
19      A.   Not HSH.
20      Q.   That's what I meant by "we" earlier.  Okay.
21      A.   We -- HSH is -- we -- they are responsible for
22 allocating shelter beds based on what's available in the
23 system.
24      Q.   Previously, have you seen resolutions continue
25 despite there being a shortfall of available shelter

```
 1   beds?
 2       A.    Outreach and cleaning has continued.
 3       Q.    But requesting or enforcing movement of people
 4   and belongings have not?
 5       A.    No, not that I've witnessed.
 6       Q.    If you could look at this Exhibit 1038 --
 7       A.    Mm-hmm.
 8       Q.    -- where it says "Preventing Re-encampment."
 9       A.    Yes.
10       Q.    There, it says:  "Under new rulings, HSOC staff
11   and other city staff will be able to better enforce laws
12   when refusals of shelter occur."
13       A.    Mm-hmm.
14       Q.    "This will include being able to follow up at a
15   later time to the area -- an area that has recently been
16   cleared to prevent re-encampment."
17       A.    Mm-hmm.
18       Q.    "The goal of this enforcement is for people to
19   accept offers of shelter and how they cannot remain --
20   and know that they cannot remain where they are.  Staff
21   will not be required to re-offer shelter in an area
22   where they've recently been working to clear an
23   encampment if individuals return to that same area."
24             Is this statement an accurate description of
25   your current practice?
```

```
 1        A.   (Examines document.)
 2             Mm-hmm.  Yes.
 3        Q.   Is there anything that is not current or that
 4   you would like to change?
 5        A.   Yes, the date of the meetings.
 6        MR. GRADILLA:  Sorry.  To clarify, are you
 7   asking about paragraphs 6 and 7 or just paragraph 6?
 8        MR. DO:  6 and 7.
 9        THE WITNESS:  Oh, hold on.
10             (Examines document.)
11             Yes, besides the timing of everything.
12   BY MR. DO:
13        Q.   I'll go ahead and have you finish the
14   declaration.
15        A.   Okay.
16             (Examines document.)
17             The timing of the meeting is also different.
18   It's at 10:15 now.  Oh, no, at 9:30.  Yeah.  "HSOC
19   confirms with HSH..."  Okay.
20             (Examines document.)
21             Okay.
22        Q.   Any other changes that you've identified?
23        A.   Not really.  Pretty -- pretty accurate, save
24   timing.
25        Q.   Is it still fair to say that HSOC resolutions
```

1  begin prior to knowing the shelter allocation for the
2  day?
3      A.   I think they begin -- it usually coincides with
4  the first information we get about -- with what
5  allocations we're getting for the day.  So now that we
6  start at 8:00 and not at 7:00, we usually get the
7  allocations, at least the first draft of the
8  allocations -- everything is confirmed by 9:30.  But by
9  8:30 or 8:00 -- you know, 8:00 -- between 8:15 and 8:30.
10          And, you know, that's when ERT begins to engage
11 people.  They start at 8:00 o'clock.  They go from tent
12 to tent and ask if people are interested in shelter and
13 see what they want.  And then when they get the
14 allocations, they'll come back and, you know, see if
15 they're interested in what we have.
16      MR. GRADILLA:  Sorry.  I don't want to cut her
17 off, but relevance objection to that question.
18      THE WITNESS:  That's all.
19 BY MR. DO:
20      Q.   Anything further?
21      A.   (No audible response.)
22      Q.   Okay.
23          (Reporter clarification.)
24      THE WITNESS:  No.
25 BY MR. DO:

```
 1      Q.   Have you ever observed DPW engage prior to your
 2   knowing of the shelter allocation?
 3      A.   Uh-uh.  No.  Sorry.
 4      Q.   You've never observed DPW begin cleaning prior
 5   to you knowing the shelter allocation?
 6      MR. GRADILLA:  Objection; relevance.
 7      THE WITNESS:  Not that I'm aware of, no.
 8   BY MR. DO:
 9      Q.   Do you understand whether or not San Francisco
10   is -- has a shelter shortfall, given its unhoused
11   population?
12      MR. GRADILLA:  Objection; relevance.
13      THE WITNESS:  Can you -- I mean, what are you asking
14   me exactly?  Like, about the politics, about the number
15   of shelters available, about...
16   BY MR. DO:
17      Q.   By "shortfall," I mean numbers.
18      A.   I do think --
19      MR. GRADILLA:  Same objection.
20           Go ahead.
21      THE WITNESS:  What's that?
22      MR. GRADILLA:  I just said "same objection" for
23   the record.
24      THE WITNESS:  I do think that the City is trying to
25   increase the number of shelter spaces, because -- you
```

```
 1  STATE OF CALIFORNIA        )
 2                             ) ss.
 3  COUNTY OF SAN FRANCISCO    )
 4          I hereby certify that the witness in the
 5  foregoing deposition, ARIELLE PIASTUNOVICH, was by me
 6  duly sworn to testify to the truth, the whole truth and
 7  nothing but the truth, in the within-entitled cause;
 8  that said deposition was taken at the time and place
 9  herein named; and that the deposition is a true record
10  of the witness's testimony as reported by me, a duly
11  certified shorthand reporter and a disinterested person,
12  and was thereafter transcribed into typewriting by
13  computer.
14          I further certify that I am not interested in
15  the outcome of the said action, nor connected with nor
16  related to any of the parties in said action, nor to
17  their respective counsel.
18          IN WITNESS WHEREOF, I have hereunto set my
19  hand this 10th day of February, 2025.
20  Reading and Signing was:
21  ___ requested    ___ waived    _x_ not requested
22
23                  [signature: Suzanne Andrade]
24
25          SUZANNE I. ANDRADE, CSR NO. 10682
```