UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

COALITION ON HOMELESSNESS, et al.,

Plaintiffs,

v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

Defendants.

Case No. 22-cv-05502-DMR

**PRETRIAL ORDER NO. 1**

[Docket Nos. 418, 419, 420, 421, 422, 423, 424, 425, 426, 427, 428, 429]

Following the pretrial conference held on July 9, 2025, the court sets forth the following pretrial orders and rulings.

I.      **CONDUCT OF TRIAL**

    A.      **Trial Schedule**

The bench trial will begin on July 28, 2025 and will proceed on ten consecutive court days through August 8, 2025. With the exception of August 1, 2025, trial will run from 9:00 a.m. to 3:00 p.m., with two 15-minute breaks and a 30-minute lunch break, resulting in five hours of trial time each day. On August 1, 2025, trial will run from 12:00 p.m. to 6:00 p.m. and will also include two 15-minute breaks and a 30-minute mid-afternoon break. Counsel must arrive by 8:30 a.m. each day (11:30 a.m. on August 1), and shall be prepared to stay as needed after the close of trial each day.

Trial time is limited to 25 hours per side, for a total of 50 hours. This limit includes up to 20 minutes per side for opening argument. After the close of trial, each side will submit proposed findings of fact and conclusions of law with citations to the record. Closing arguments will be scheduled if determined to be helpful to the court. The trial time clock will begin at the start of each trial day and will only be stopped for the two breaks and lunch.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

### B.   Raising New Issues

Trial time is for presentation of evidence.  The court will not hear lengthy arguments during the time designated for trial.  Issues can be addressed before the trial starts for the day (i.e., at 8:30 a.m., or at 11:30 a.m. on August 1) by providing notice of the issue to the court (DMRPO@cand.uscourts.gov) and opposing counsel by 6:00 p.m. on the prior trial day.

### C.   Tech Check

The parties may test their trial presentation equipment in Courtroom 3 on **July 24, 2025** from 2:30 p.m. to 3:30 p.m. by making an appointment with Courtroom Deputy Ivy Garcia at DMRCRD@cand.uscourts.gov.

### D.   Objections

Please stand to make an objection.  Do not make speaking objections or offer argument. State the rule or basis for the objection (e.g., "403," or "hearsay").  Do not offer a rebuttal unless requested.

### E.   Witnesses and Exhibits

***Testifying at Trial; Trial Attendance:*** No witness may testify unless they have been identified in the pretrial submissions, except for true rebuttal or impeachment witnesses.  The parties shall cooperate in accommodating witness schedules.  For witness convenience and trial efficiency, the parties have stipulated that witnesses who appear on both witness lists shall first be called by Plaintiffs, followed immediately by Defendants' examination, which may exceed the scope of Plaintiffs' direct exam, followed by redirect/cross until questioning of the witness is complete.

The individual Plaintiffs and one representative for the Plaintiff organization may sit at counsel table.  One representative from each Defendant organization may sit at counsel table.  All other witnesses will be excluded from the courtroom until they have completed their trial testimony. As discussed at the pretrial conference, the parties will meet and confer and submit a joint request **by July 21, 2025** for providing witnesses with a space in the courthouse while they wait to be called to the stand (e.g., a conference room in the attorney lounge).

No exhibit may be used unless it has been identified in the pretrial submissions except for true rebuttal or impeachment exhibits.  Counsel shall provide the court with two hard copies of any

United States District Court
Northern District of California

1    exhibit the party wishes to introduce at trial – one for the court and one to be marked by the

2    courtroom deputy.  The parties are responsible for moving exhibits into the record.  After trial, the

3    parties shall choose one side to be responsible for uploading all admitted exhibits onto the docket.

4           ***Disclosure of Witnesses and Exhibits; Objections to Exhibits:***  The parties shall disclose

5    witnesses and exhibits to be admitted through the witness's direct examination no later than 9:00

6    a.m. three business days before the witness is to be called.  If applicable, the party shall also identify

7    the date, time, and location of any incident(s) about which the party will testify.  The identification

8    shall be as specific as possible.

9           Exhibits to be admitted through the opposing parties' examination of the witness shall be

10   disclosed no later than 12:00 p.m. two business days before the witness is to be called on direct

11   examination.  The parties are not required to disclose exhibits used strictly for impeachment

12   purposes or to refresh the witness's recollection.  The parties shall meet and confer in good faith to

13   narrow, if not resolve, their objections to exhibits.

14          In the event the parties cannot resolve all disputes regarding exhibit(s), no later than 6:00

15   p.m. two business days before the witness is to be called, the parties shall send a joint email to

16   DMRPO@cand.uscourts.gov that identifies the exhibit(s) and the objection(s) thereto.  No argument

17   is permitted.  If the objection is to a portion of an exhibit as opposed to the exhibit as a whole, the

18   objecting party must specifically identify the disputed portion of the document.  With the exception

19   of categorical objections to voluminous exhibits (*see* Docket No. 410), the parties may not add new

20   objections not included in their objections to exhibit lists (Docket Nos. 456, 460).  The email shall

21   also attach electronic copies of the exhibit(s) at issue.  The court will not entertain argument on

22   objections that are not timely disclosed to the court.  Should the parties further narrow or resolve

23   disputes before the witness is called, they shall promptly notify the court at

24   DMRPO@cand.uscourts.gov, copying all counsel.

25          The court will address the objections to exhibits at 8:30 a.m. the morning the witness is to

26   be called.

27          ***Testimony by Deposition Designation:***  The court will rule on the parties' submitted

28   deposition designations, counter designations, and objections regarding trial testimony through

1  Rule 30(b)(6) witness deposition designations.  After the court rules, the parties will be responsible

2  for filing the admitted testimony on the docket within one business day of the court's ruling.  The

3  parties' trial time limits will not be affected by the admitted Rule 30(b)(6) witness deposition

4  designations.

5      In accordance with Federal Rule of Civil Procedure 32(a)(4)(E) and Federal Rule of

6  Evidence 804(a), a witness may testify via deposition in lieu of live testimony only upon a showing

7  of unavailability.  If a party seeks to admit deposition testimony as an admission by a party opponent,

8  the court prefers live testimony but will entertain testimony by deposition designation if the witness

9  is unavailable.

10      If there is a video recording for any deposition designations, the parties shall lodge a USB

11  drive containing video clips of only the admitted designations for the court's review within two

12  business days of the admission of the designation(s).

13      **Witness Objections:**  The parties shall meet and confer regarding all objections to witnesses,

14  including disputes about (1) whether the witness was disclosed in the parties' initial disclosures;

15  (2) whether the scope of the witness's testimony identified in the trial witness lists exceeds that

16  which was identified in the initial disclosures; (3) whether the witness is unavailable so as to require

17  testimony via deposition designation; and (4) the admissibility of declarations by unavailable

18  witnesses, including the declaration submitted by Todd Bryant, who Plaintiffs understand is now

19  deceased.  The parties should be mindful that the court will not exclude witness testimony on

20  grounds that the witness was not disclosed in the parties' initial disclosures or that the subject of the

21  witness's testimony exceeds the description in the parties' initial disclosures, if the witness was

22  deposed or made available for deposition and the opposing party had fair opportunity to question

23  the witness about the topic(s) at issue.  In other words, the moving party will need to demonstrate

24  unfair prejudice to obtain an exclusion.

25      If the parties cannot resolve their witness disputes, they shall file a single-spaced joint letter

26  covering all witness disputes.  The letter shall be no longer than six pages (three pages per side),

27  exclusive of any attached exhibits to support the parties' demonstration of unfair prejudice.  The

28  joint letter shall be filed no later than **July 21, 2025.**

United States District Court
Northern District of California

United States District Court
Northern District of California

### F.    Demonstratives for Opening Statements

Demonstratives for use in opening statements must be exchanged **by 12:00 p.m. on July 24, 2025**. The parties must meet and confer about any disputes.  If there are unresolved disputes, the parties shall email electronic copies of the disputed demonstratives to the court at DMRPO@cand.uscourts.gov **by 9:00 a.m. on July 25, 2025,** and shall be prepared to argue the dispute on **July 28, 2025 at 8:30 a.m.** before the start of trial.

### G.    Settlement

The parties must promptly notify the court of a settlement by sending an email to DMRPO@cand.uscourts.gov.  The email shall set forth all remaining steps to finalize the settlement, plus a timeline for those steps.  The parties are advised that the trial and all trial-related dates will not be moved or vacated unless the court is satisfied that the case will settle.

### H.    Compliance with Court Orders

Failure to comply with the rulings and obligations set forth in any court order, either written or oral, will result in sanctions appropriate to the gravity of the failure, including but not limited to monetary sanctions, evidence exclusion, the striking of witness testimony, and terminating sanctions.

Counsel are personally responsible for making sure that the court's orders, including rulings on motions in limine, are clearly communicated to clients and witnesses, including expert witnesses, so that the presentation of evidence complies with those rulings in every respect.

### I.    Use of Deposition Transcripts at Trial

For deposition testimony used for impeachment purposes, the parties shall provide a hard copy of the transcript for the witness.  The parties shall also provide the court with a copy of the transcript, unless already submitted.

### J.    Undisputed Facts

At the parties' request, the court accepted as record facts the undisputed facts identified at page 4, line 9 through page 8, line 4 of the parties' pretrial statement (Docket No. 415).

**K.**     **Stipulations**

At the pretrial conference, the parties stipulated to the following:

1.     Absent good cause, the parties stipulate to the authenticity of, but not the truth of the contents of, (a) any records produced by the parties in this action and (b) any records produced by third parties subject to subpoenas in this action.  Good cause includes, but is not limited to, issues related to the document's completeness (e.g., missing or incomplete pages) or information that brings into question whether the document was created by the party or third-party that produced it.

2.     Any exhibit identified in the parties' joint exhibit list is admissible.  [*See* Docket No. 487 at 3-4 (ordering parties to create and file a joint exhibit list for which the parties seek pre-admission by July 21, 2025).]

3.     Plaintiffs' Exhibits 434-443 are judicially noticed.

[*See* Docket No. 415 at 8:5-9:27.]

## II.     MOTIONS IN LIMINE ("MILs")

### A.     Defendants' MIL 1, Docket No. 422 (68 Incidents)

Defendants move to exclude evidence regarding 68 incidents of allegedly unlawful property destruction.  [Docket No. 422.]  Defendants' sole basis for excluding this body of evidence is that Plaintiffs did not include them in their supplemental response to Interrogatory No. 5, which asks for identification of every instance where Plaintiffs contend Defendants unlawfully destroyed property of a person experiencing homelessness.  Defendants raised the same argument as part of their motion for summary judgment.  [Docket No. 369 at 1-2.]  The court rejected the argument in its order denying summary judgment [Docket No. 400 at 29-30], and rejects it again for the same reasons.  Defendants now cite *Lawman v. City & County of San Francisco*, 159 F. Supp. 3d 1130, 1140 (N.D. Cal. 2016).  It is distinguishable.  In *Lawman*, the defendants attempted to raise an entirely new theory of probable cause at the summary judgment stage, even though the theory had not been disclosed in a contention interrogatory.  *Id.* This deprived the plaintiff of the opportunity to pursue discovery on that theory.  *Id.*  Here, Plaintiffs have not asserted a new theory of liability, and all facts that Defendants seek to exclude were disclosed in the discovery process.

6

United States District Court
Northern District of California

1    Defendants' MIL 1 is denied.  Nevertheless, for trial management purposes, Plaintiffs are

2    ordered to supplement their response to Interrogatory No. 5 **by July 21, 2025**.  This will define the

3    universe of unlawful incidents Plaintiffs can attempt to establish at trial, will assist Defendants in

4    organizing their defense, and will help the court  to manage trial in an orderly and efficient way.

5    **B.      Defendants' MIL 2, Docket No. 424 (Observer Testimony)**

6    Defendants move to preclude "observer" testimony offered to establish (rather than

7    corroborate) incidents of property loss experienced by others.  For purposes of this motion, the

8    observer testimony falls into two categories: (1) evidence used to establish a predicate claim of a

9    constitutional violation, and (2) evidence supporting municipal liability for the predicate claim(s)

10   pursuant to *Monell*.

11   As to the first category, at the pretrial conference, Plaintiffs argued as a matter of law that

12   they are permitted to establish predicate claims for violations of the Fourth and Fourteenth

13   Amendment through "observer" testimony instead of the testimony of the owner of the property at

14   issue.  [Docket No.  481 (7/9/25 Hr'g Tr.) at 23:11-25:15.]  As neither side briefed this issue, the

15   court ordered the parties to file a 4-page joint letter on this question **by July 18, 2025**.  *Id.* at 29:8-

16   15, 113:21-113:2.

17   As to the second category, Defendants' MIL 2 is denied.  To prove a claim for municipal

18   liability based on a policy, custom, or practice, a plaintiff must "demonstrate that an 'official policy,

19   custom, or pattern' on the part of [the defendant] was 'the actionable cause of the claimed injury.'"

20   *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (quoting *Harper v. City of Los*

21   *Angeles*, 533 F.3d 1010, 1022, 1026 (9th Cir. 2008)).  "[A] plaintiff may be able to prove the

22   existence of a widespread practice that, although not authorized by written law or express municipal

23   policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'"

24   *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398

25   U.S. 144, 167-68 (1970)).  In order to establish § 1983 municipal liability based on a failure to train,

26   a plaintiff must show: (1) deprivation of a constitutional right; (2) a training policy that "amounts to

27   deliberate indifference to the [constitutional] rights of the persons with whom [the police] are likely

28   to come into contact"; and (3) that his constitutional injury would have been avoided had the

1    municipality properly trained the officers.  *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th

2    Cir. 2007) (quoting *Canton*, 489 U.S. at 388-89) (first alteration in original).

3         Plaintiffs may offer observer testimony to support their claims regarding the existence of a

4    custom of unlawful property seizure and destruction, a custom of providing an inadequate

5    opportunity and process to retrieve seized property, and the provision of inadequate training that

6    amounts to deliberate indifference to constitutional rights, as well as for any other relevant purpose.

7         Evidentiary objections such as hearsay or lack of personal knowledge can be made and

8    addressed at trial.  Defendants will have the opportunity to challenge the content and quality of

9    observer testimony through cross-examination.

10        Incidents that have been dismissed with prejudice, through settlement or otherwise, cannot

11   be used to establish predicate claims but can be offered to support the *Monell* claims.  The court

12   declines to order the wholesale exclusion of observer testimony about incidents where the owner of

13   the property previously was listed on Plaintiffs' potential witness but is not identified as a trial

14   witness.  If Defendants want to establish that Plaintiffs' presentation of incidents through an

15   observer rather than a property owner is designed to avoid weaknesses in an owner's testimony,

16   they can address this through cross-examination and presentation of their own case.

17   **C.     Defendants' MIL 3, Docket No. 425 (Evidence Relating to Dismissed Claims)**

18        Pursuant to Federal Rules of Evidence 402 and 403, Defendants move to exclude evidence

19   on four topics as "going beyond" Plaintiffs' remaining claims:

20        (1) the San Francisco Police Department's ("SFPD") enforcement of,
         and/or threats to enforce, laws regulating lodging on public property,
21        (2) City interactions with individuals with disabilities and the City's
         training on accommodating disabilities; (3) property destruction
22        claims of dismissed plaintiffs;[1] and (4) SFPD policies unrelated to
         encampments or unhoused people.
23

24    [Docket No. 425 at 1.]

25        Defendants' MIL 3 is denied.  Evidence obviously cannot be presented to support dismissed

26   claims, such as violation of the Eighth Amendment or the Americans with Disabilities Act ("ADA").

27

28   _____
     [1] The third topic is covered by the ruling on Defendants' MIL 2, above.

United States District Court
Northern District of California

[*See* Docket No. 445 at 1 (Plaintiffs representing that "Plaintiffs do not seek to prove dismissed or unalleged claims . . .").]  However, not all of the aforementioned categories of evidence relate solely to dismissed claims.  For example, with respect to the first and fourth topics, the policies and activities of Defendant SFPD may be relevant to the remaining claims because (1) SFPD participates in some property removal activities involving unhoused people; and (2) Plaintiffs' expert, Dr. Christopher Herring, opines that the volume of bag and tag activity reflects an increase in SFPD-ordered evidence collection relating to enforcement of illegal public lodging laws, and the treatment of this evidence is different from how SFPD handles evidence related to other crimes.  As to the second topic, the Bag and Tag Policy itself requires, under certain circumstances, that "staff shall give persons a reasonable amount of time (approximately 30 minutes) to collect and move their items, *taking into account that individuals may have special needs* and the volume of belongings." [Docket No. 447-2 (Bag & Tag Policy) at CCSF-COH_00385-86 (emphasis added).]  Therefore, evidence within the scope of the second topic may be relevant to the remaining claims.

D.    **Defendants' MIL 4, Docket No. 426 (Temporal Scope of Claims and Evidence)**

Pursuant to Federal Rules of Evidence 402 and 403, Defendants move to exclude time-barred predicate acts, stale evidence, and evidence outside the February 14, 2025 stipulated and court-ordered deadline for new facts to be admitted at trial.

With respect to time-barred claims, Plaintiffs concede they cannot use incidents predating the September 27, 2020 statute of limitations to establish predicate claims for purposes of *Monell* liability.  [Docket No. 443 at 1 ("Plaintiffs will not use incidents prior to September 27, 2020 as "predicate acts" for purposes of Monell liability.").]  Therefore, this portion of Defendants' motion is denied as moot.  Defendants' MIL 4 is otherwise denied.  As recognized in the summary judgment order, pre-September 27, 2020 incidents may be admissible to establish custom and deliberate indifference.  [Docket No. 400 at 30 n.19].  The court declines to grant Defendants' general request for an exclusion of incidents prior to September 27, 2020, about which they argue they will be prejudiced by having to litigate against stale evidence.  Defendants do not assert they have been prejudiced by lack of a fair opportunity to obtain discovery regarding pre-September 2020 incidents. Their generalized concern about stale evidence can be addressed in context through cross-

United States District Court
Northern District of California

United States District Court
Northern District of California

1    examination and argument.  In addition, the trial time limits will serve to encourage the parties to

2    present their best cases and to avoid presentation of marginally relevant facts.

3        Defendants also move to exclude Plaintiffs' Exhibits 74, 147, and 148, which Defendants

4    contend post-date the February 14, 2025 stipulated and court-ordered deadline for facts that can be

5    presented at trial.  At the pretrial conference, Defendants withdrew their motion with respect to

6    Exhibits 147 and 148.  [Docket No. 481 at 48:14-23.]  With respect to Exhibit 74, Plaintiffs stated

7    that they intend to use this exhibit, if needed, to address potential testimony by defense witness

8    Samuel Dodge.  *Id.* at 48:24-49:15.   As such, it is premature to rule on the admissibility of

9    Exhibit 74.  *Id.* at 49:16-19.

### E.    Defendants' MIL 5, Docket No. 427 (Evidence or Argument that the Bag and Tag Policy is Unlawful as Written)

12       Pursuant to Federal Rule of Evidence 401, Defendants move to exclude evidence or

13   argument that the Bag and Tag Policy needs to be modified to comply with the U.S. and California

14   Constitutions.

15       Defendants' MIL 5 is granted in part.  Plaintiffs repeatedly have conceded that the Bag and

16   Tag Policy is constitutional as written.  [*See, e.g.*, Docket No. 68 at 5:6-24, 8:16-20, 11:12-16.]

17   Plaintiffs therefore are estopped from arguing or presenting evidence to establish the opposite: that

18   the Bag and Tag Policy must be revised in order to be constitutional.  For this reason, as discussed

19   below, Plaintiffs' expert Dr. Benjamin King is precluded from testifying about his fourth opinion to

20   the extent he opines that "a revised 'Bag and Tag' policy is necessary."  However, Plaintiffs may

21   present evidence and argument to establish that Defendants' interpretation, implementation and/or

22   application of the Bag and Tag Policy have resulted in a custom of constitutional violations, and

23   Defendants' inadequate training on the Bag and Tag Policy amounts to deliberate indifference to

24   constitutional rights.

25       Plaintiffs are also estopped from offering the testimony and opinion of Dr. Christopher

26   Herring that the specific location of the DPW yard contributes to a custom of violating the Fourteenth

27   Amendment.  This is because the address of the DPW yard is specified in the Bag and Tag Policy,

28   which Plaintiffs concede is constitutional as written.

United States District Court
Northern District of California

Defendants' MIL 5 is otherwise denied to the extent it seeks a blanket exclusion of witness testimony about the failure to receive written notice in situations where the Bag and Tag Policy does not require it.  A blanket exclusion is inappropriate because Plaintiffs intend to present evidence that Defendants are interpreting and implementing the Bag and Tag Policy in ways designed to avoid its notice requirements (for example, by mischaracterizing events that would otherwise require advance notice under the Policy, or by posting advance notice regarding a particular location but collecting and destroying property in nearby areas beyond the scope of the notice.)

### F.  Plaintiffs' MIL 1, Docket No. 418 (Shelter Availability)

Plaintiffs seek to exclude evidence "regarding the City's 'shelter programs' or the 'nature and availability of the City's and HSH's shelter . . . offerings, shelter programs for Plaintiffs and other witnesses.'"  [Docket No. 418 at 1.]  Plaintiffs argue that exclusion is proper because Defendants refused to respond to discovery requests related to shelter availability and because such evidence is not relevant to Plaintiffs' claims.  *See id.*  Defendants oppose on grounds that "[t]he City produced the information [Plaintiffs] claim they do not have" and "Plaintiffs strategically declined to depose known witnesses."  [Docket No. 451 at 1.]

Plaintiffs' MIL 1 is granted.  Plaintiffs offer evidence that, following the Supreme Court's June 28, 2024 decision in *City of Grants Pass, Oregon v. Johnson*, 603 U.S. 520 (2024), Defendants repeatedly refused to respond to discovery requests that concerned shelter availability on grounds that the requested discovery is irrelevant to Plaintiffs' remaining claims.  The court reviewed Defendants' discovery responses and correspondence submitted with Plaintiffs' MIL 1.  [Docket Nos. 418-3, 418-4, 418-5, 418-6.]  The discovery requests broadly cover subjects related to this topic, including shelter availability; eligibility for different kinds of shelter; prioritization of who is given access to shelter; data, protocols, policies, practices, procedures and training on offering shelter to unhoused persons; and tracking of that information.  [*See, e.g.*, Docket No. 418-5 at 53 ("Describe in detail how Homeless Persons seeking shelter can obtain access to shelter outside of the context of HSOC Encampment Resolutions, including all steps needed to do so, and how long it takes to obtain a shelter bed by each different available means, and identify all facts, Databases, and information on which You rely."); Docket No. 418-6 at 8 ("Your policies, procedures, and

1    training for offering specific shelter to Homeless Persons in connection with Sweep Operations, and

2    providing transportation to individuals to the shelter."); *id.* at 9 ("Your policies, practices, and

3    procedures for recording, tracking, analyzing, monitoring, or reporting shelter offers made in

4    connection with Sweep Operations.")].   After the issuance of *Grants Pass*, Defendants took the

5    unequivocal position that all of this information is irrelevant to the remaining claims in the case.

6    [*See, e.g.*, Docket No. 418-3 at 1 ("As your email states, Rog No. 14 seeks information about the

7    criteria for shelter eligibility and prioritization assessments.   This information is not relevant to

8    Plaintiffs' remaining claims."); Docket No. 418-4 at 3 ("This case no longer concerns Defendants'

9    offers of shelter or homeless persons' interactions with the coordinated entry system."); Docket

10   No.  418-5 at 6, 19, 23, 25, 30, 53, 55, 71 (responses to Interrogatory Nos. 1, 4-7, 13-14, 20); Docket

11   No. 418-6 at 7-9, 15-17, 20-21, 25 (responses to 30(b)(6) Topic Nos. 5, 7, 8).]  Having staked out

12   that legal position, Defendants are estopped from claiming that these subjects are now relevant.

13   They had the opportunity to provide notice to Plaintiffs of their change in legal position by

14   supplementing their discovery responses, but they did not do so.

15        That Defendants provided discovery on these topics before *Grants Pass*, or that they

16   provided some limited shelter-related information after *Grants Pass,* does not change the outcome.

17   In making strategic decisions about conducting discovery or preparing for trial, Plaintiffs were

18   entitled to rely on Defendants' unequivocally stated legal position: that the subject of shelter

19   availability is "no longer relevant or proportional to the needs of the case."  [Docket No. 418-5 at 6,

20   19, 23, 25, 30, 53, 55, 71; *see* Docket No. 418-6 at 7-9, 15-17, 20-21, 25 (objecting to 30(b)(6)

21   deposition topics as "not relevant and not reasonably calculated to lead to the discovery of

22   admissible evidence" in light of *Grants Pass*).]  Defendants are precluded from now asserting it is

23   relevant to the remaining claims, and from presenting evidence regarding shelter availability.  The

24   sole exception is that Defendants may present shelter availability evidence to support their standing

25   and mootness arguments regarding Plaintiffs Cronk and Donohoe, as Plaintiffs have been on clear

26   notice of those arguments.

27

28

United States District Court
Northern District of California

### G.  Plaintiffs' MIL 2, Docket No. 419 (Drug Use, Bad Acts, Criminal History)

Plaintiffs move to exclude evidence regarding witnesses' alleged drug use, bad acts, and criminal history to the extent it exceeds the scope of the court's discovery ruling about deposition questioning.  [*See* Docket No. 326.]

To the extent it seeks blanket rulings, Plaintiffs' MIL 2 is denied.  Plaintiffs may raise objections to specific testimony or evidence at trial.  In general, as stated in its oral ruling on deposition questioning [Docket No. 326], evidence of drug use cannot be used as a general attack on credibility.  To that end, the parties should refrain from asking broad questions about drug use.  However, drug use around the time of an incident may be relevant to the ability to perceive or remember events.  The presence of drugs could also be relevant to, but not dispositive of, the question of whether property was lawfully seized because it presented an "immediate health and safety risk" or was "co-mingled" with needles, pursuant to the terms of the Bag and Tag Policy.  [*See* Docket No. 447-2 (Bag & Tag Policy) at CCSF-COH_00386 ("Items that will be discarded and not stored" include "[i]tems that present an immediate health and safety risk, such as . . . needles" and "contraband, illegal items"; "personal belongings [that] are co-mingled or littered with needles, human waste or other health risks" need not be sorted through before disposal.).]  In certain circumstances, evidence regarding drug use may also be used for impeachment (for example, witness testimony may be used to rebut the denial of another witness about drug use around the time of an alleged unlawful destruction of property).

Evidence regarding convictions will be subject to Federal Rules of Evidence 609 and 403. Objections to evidence of specific alleged bad acts will be addressed in context at trial.

### III.   MOTIONS TO EXCLUDE EXPERT TESTIMONY

Federal Rule of Evidence 702 governs testimony by expert witnesses.  It provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Federal Rule of Evidence 702 "contemplates a broad conception of expert qualifications," which may be obtained through "knowledge, skill, experience, training, or education." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). "In *Daubert* the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony." Fed. R. Evid. 702 Adv. Comm. Notes, 2000 Am. (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). "The rejection of expert testimony is the exception rather than the rule." *Id.* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

"*Daubert* does not require a court to admit or to exclude evidence based on its persuasiveness; rather it requires a court to admit or exclude evidence based on its scientific reliability and relevance." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010)).

### A.    Plaintiffs' Motion to Exclude Dr. Pezdek (Docket No. 420)

Defendants offer Dr. Kathy Pezdek to testify "regarding the science concerning the fallibility of event memory in general . . . and how these principles apply in the instant matter." [Docket No. 420-2 (Defs. Expert Discl.) at 1.] Plaintiffs move to exclude Dr. Pezdek's testimony because it is "not relevant to any issue in this case and will not assist the trier of fact." [Docket No. 420 at 1.] Plaintiffs also challenge Pezdek's testimony because of the potential for "misapplication" of her theories to unfavorably compare the reliability of Plaintiffs' fact witnesses to that of witnesses

14

United States District Court
Northern District of California

1    offered by Defendants, and to "insinuate that the memories of [Defendants'] witnesses are more

2    trustworthy than those of unhoused persons." *Id.* at 4-5.

3        Plaintiffs' motion is granted. Rule 702 requires that expert testimony assist the trier of fact,

4    which "goes primarily to relevance." *Daubert*, 509 U.S. at 591. Dr. Pezdek's testimony will not aid

5    the trier of fact, which in this case, is the court. Her opinions cover basic concepts about memory

6    of events. As described by Dr. Pezdek, her testimony is only about "general principles that apply

7    to people in general." [Docket No. 420-4 (Pezdek Dep.) at 100:18-19.] In essence, she opines that

8    (1) memory does not operate like a camera and instead is constructed; (2) memories of events are

9    driven by schemas that organize events into broader patterns; (3) the memory of the gist of

10   something lasts longer than memory of details; and (4) a person can miss salient details if they are

11   focusing attention elsewhere. [Docket No. 420-3 (Pezdek Rpt.) ¶ 9.] These opinions do not

12   meaningfully add to what is known or knowable through common sense and experience, especially

13   for a judicial fact finder. Furthermore, this case does not present any unique circumstances for

14   which a memory expert could provide specialized knowledge to help the decisionmaker understand

15   the evidence or determine a fact. *See, e.g.*, *Trulove v. D'Amico*, No. 16-CV-050 YGR, 2018 WL

16   1090248, at *4 (N.D. Cal. Feb. 27, 2018) (expert testimony on the certainty of an eyewitness

17   identification and the suggestiveness of the identification procedures were "relevant to the jury's

18   evaluation of the eyewitness testimony and of whether defendants used investigative techniques that

19   were so coercive as to yield false information.").

20       Moreover, Dr. Pezdek misleadingly presents her opinions in a manner that intrudes upon the

21   role of the trier of fact as the sole determiner of witness credibility. *See United States v. Mendoza*,

22   No. 16-CR-00150-BLF-3, 2021 WL 1238314, at *4 (N.D. Cal. Apr. 2, 2021) ("In general, expert

23   testimony which does nothing but vouch for the credibility of another witness encroaches upon the

24   jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist

25   the trier of fact' as required by Rule 702.") (cleaned up); *Seals v. Mitchell*, No. CV 04-3764 NJV,

26   2011 WL 1399245, at *9 (N.D. Cal. Apr. 13, 2011) ("Nor may an expert . . . make credibility

27   determinations, which is the exclusive role of the jury.") (citation omitted). Although Dr. Pezdek

28   stated in deposition that she cannot testify about the specific details or circumstances of any

1    particular witness's memory [Docket No. 420-4 (Pezdek Dep.) at 103:21-24], a significant portion

2    of her expert report does exactly that.  For example, her report singled out deposition testimony of

3    Plaintiffs' witness Krystle Erickson and opined that Erickson "likely did not have a specific memory

4    for any of the details of her 'camp' at the time of a sweep, but likely 'constructed' a memory based

5    on 'what typically would have happened.'"  [Docket No. 420-3 (Pezdek Rpt.) ¶ 11.]  Dr. Pezdek

6    also pointed to Erickson's testimony about her negative impression of City workers as a "schema"

7    that "likely" influenced her memory of sweeps.  *Id.* ¶ 17.  In total, Dr. Pezdek's report discussed the

8    testimony of nine of Plaintiffs' witnesses as examples of the fallibility of memory, often singling

9    out specific details that a witness may have missed, such as trash being mixed into confiscated items

10   or the presence of a posted notice.  *Id.* ¶¶ 11, 16-18, 26-27, 30.  In contrast, Dr. Pezdek's report

11   discussed the testimony of only one of Defendants' witnesses, Leslie Fong, and praised Fong's

12   "schema" as "more detailed and therefore . . . likely [to] result in more specific memories of the

13   events she experienced."  *Id.* ¶ 19.  These highly suggestive "examples" intrude on the role of the

14   fact finder.

15        In sum, Dr. Pezdek's testimony and opinions are excluded because they do not meaningfully

16   assist the trier of fact and are also misleading and invade the province of the fact finder as the sole

17   arbiter of witness credibility.

18        **B.    Plaintiffs' Motion to Exclude Dr. Asfour (Docket No. 421)**

19        Defendants offer Dr. F. Ramzi Asfour to testify about "the infectious disease risks posed by

20   homeless encampments." [Docket No. 420-2 (Defs. Expert Discl.) at 1.]  Plaintiffs move to exclude

21   Dr. Asfour's expert opinions because they "lack any support in the literature, are based on nothing

22   more than speculation, do not meaningfully advance any issue in the case, and only prolong the

23   trial." [Docket No. 421 at 1.]

24        Dr. Asfour is a board-certified doctor in infectious diseases and internal medicine who has

25   been practicing in the field of infectious diseases for 17 years.  [Docket No. 421-2 (Asfour Rpt.)

26   at 2.]  Dr. Asfour first provides an overview of various infectious diseases that persons experiencing

27   homelessness are at risk for, as well as their modes of transmission.  *Id.* at 5-8.  He then analyzes

28   each category of infectious disease and how items at homeless encampments may contribute to their

United States District Court
Northern District of California

16

1    spread.  *Id.* at 9-12.  Lastly, he identifies examples from the record of items found at or around

2    homeless encampments that may affect health and safety.  *Id.* at 12-15.

3        Plaintiffs argue that Dr. Asfour's testimony and opinions are not relevant because

4    "[i]nfectious disease susceptibility and transmission among unhoused individuals has no bearing on

5    the property destruction and notice issues in this case."  [Docket No. 421 at 3.]  The court disagrees.

6    For example, Dr. Asfour's testimony could help the finder of fact in interpreting the "immediate

7    health or safety risk" exception to the Bag and Tag Policy.  Dr. Asfour discusses the health and

8    safety risks presented by items such as discarded food, human waste, unwashed bedding and

9    clothing, and contaminated needles.  [Docket No. 421-2 (Asfour Rpt.) at 5, 9-10.]  Dr. Asfour's

10   testimony, while at a high level of generality, is largely relevant, even if he does not opine on the

11   health and safety risks posed by particular encampments or pieces of property, or quantify the risks

12   faced by City workers or the community in or around encampments.   Plaintiffs' arguments go to

13   weight, not admissibility.  To the extent there may be some questions about the relevance of

14   particular testimony, they can be tested through objections at trial and do not warrant wholesale

15   exclusion.

16       Plaintiffs also challenge the reliability of Dr. Asfour's opinions.  "The test of reliability is

17   flexible. . . .  The court must assess the expert's reasoning or methodology, using as appropriate

18   criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and

19   general acceptance."  *City of Pomona*, 750 F.3d at 1044 (cleaned up).  "But these factors are meant

20   to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's

21   reliability as well as whether the testimony is reliable, based on the particular circumstances of the

22   particular case."  *Id.* (cleaned up).  "Challenges that go to the weight of the evidence are within the

23   province of a fact finder."  *Id.*

24       Plaintiffs argue that Dr. Asfour cannot tie documented risks of infection among unhoused

25   individuals to "risks to the local community" because he has not identified any studies showing

26   transmission of such diseases from unhoused individuals to others.  [Docket No. 421 at 4-5.]

27   Dr. Asfour also could not identify any documented instance of a City worker contracting an

28   infectious disease due to work related to homeless encampments.  *Id.* at 5 (citing Docket No. 421-3

(Asfour Dep.) at 125:6-14). Similarly, he could not identify any studies on the risk of infectious disease spreading from unhoused individuals' belongings. *Id.* (citing Docket No. 421-3 (Asfour Dep.) at 80:19-81:19, 87:9-13). Dr. Asfour concedes he "did not come across any peer-reviewed literature or good quality data . . . strongly evidencing transmission from homeless encampments to the general population." [Docket No. 421-3 (Asfour Dep.) at 47:22-24.] But he also opines it is "very difficult" to prove that an outbreak of disease had actually spread from a homeless encampment. *Id.* at 48:12-49:9. He explains that the reason he could not locate literature about infectious diseases spread by a homeless individual's belongings was because "[t]hose are hard studies to do. And they also require funding that may or may not be difficult to come by. . . . [A]lso the absolute risk is not very high with proper handling so that there's nobody that has done significant research on that that I am aware of." *Id.* at 80:19-81:19.

The court finds that Plaintiffs' arguments go to the weight of the evidence, not its admissibility. Dr. Asfour was not required to find studies that specifically address the risk of disease caused by unhoused individuals' belongings, nor was he required to find definitive instances of disease spreading into the local community. *See Primiano*, 598 F.3d at 565 ("Peer reviewed scientific literature may be unavailable because the issue may be too particular, new, or of insufficiently broad interest, to be in the literature. Lack of certainty is not, for a qualified expert, the same thing as guesswork."). The court's role at this stage is to determine whether an expert "had sufficient factual grounds on which to draw conclusions." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025-26 (9th Cir. 2022) (quoting *Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1475 (1st Cir. 1996)). Although a court ultimately may conclude "'there is simply too great an analytical gap between the data and the opinion proffered,' Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage." *Id.* at 1026 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "Experts working in specialized, scientific, and uncertain fields regularly extrapolate from existing data and generate novel hypotheses about complex issues. For this reason, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand

1  knowledge or observation." *Id.* (cleaned up).[2]

2  Dr. Asfour based his opinions on his experience as a treating physician and an academic in

3  the infectious disease field, combined with his review of the medical literature on infections related

4  to persons experiencing homelessness.  [Docket No. 421-2 (Asfour Rpt.) at 17-19; Docket No. 447-

5  3 (Asfour Dep.) at 52:23-53:11, 68:3-4.]  He also discussed case reports of past disease outbreaks

6  that may have been related to homeless encampments.  [Docket No. 421-2 (Asfour Dep.) at 48:22-

7  49:9.]  The court finds that Dr. Asfour's opinions are based on sufficient factual grounds.  "Shaky

8  but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to

9  the burden of proof, not exclusion."  *Primiano*, 598 F.3d at 564.

10  Plaintiffs' motion to exclude Dr. Asfour is denied.

11  **C.      Plaintiffs' Motion to Exclude Dr. Durrani (Docket No. 423)**

12  Defendants offer Dr. Timur Durrani to testify about "the dangers and hazards . . . City

13  workers face in conducting street cleaning and property removal, particularly of encampments and

14  related places of human habitation in public spaces."  [Docket No. 420-2 (Defs. Expert Discl.) at 2.]

15  Plaintiffs move to exclude his testimony because it is "irrelevant to the claims of property

16  destruction and notice . . . and based on nothing more than Dr. Durrani's unsupported assertions."

17  [Docket No. 423 at 1.]  Plaintiffs attack both relevance and reliability.  They also argue that

18  Dr. Durrani conducted a site visit on February 25, 2025, after the court-ordered deadline for new

19  facts to be offered at trial, so his observations and opinions based on the February 25, 2025 site visit

20  should be excluded.  *Id.* at 7.

21  Dr. Durrani is a Clinical Professor of Medicine and Pharmacy in the Division of

22  Occupational, Environmental, and Climate Medicine at the University of California San Francisco

23  (UCSF).  [Docket No. 423-2 (Durrani Rpt.) ¶ 1.]  He has been licensed to practice medicine in

24  California since 2005.  *Id.*  He is currently an Attending Physician for the Medical Toxicology

25  Inpatient Service at UCSF, San Francisco General Hospital and Trauma Center.  *Id.*  He has

26

27  ────────────

28  [2] The court notes that many of the legal principles governing expert testimony cited here and earlier also apply to the other rulings on experts in this order, and vice-versa.  For economy, the court does not repeat them.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    previously prepared reports regarding toxic chemical exposures in the workplace and how they may

2    cause occupational diseases such as cancer.  *Id.* at 2-3.

3        Dr. Durrani's report provides an overview of different "[d]angers and/or hazards, including

4    but not limited to health-related dangers, City workers face in conducting street cleaning and

5    property removal, particularly of encampments and related places of human habitation in public

6    spaces."  *Id.* at 4.  The categories of hazards identified by Durrani are: (1) physical injury due to

7    slipping and falling; (2) increased risk of contracting infectious diseases; (3) increased risk of

8    exposure to chemicals including drugs of abuse and TCEP (a flame retardant that can cause health

9    issues); (4) increased risk of being exposed to burning material, as well as the toxic gases and other

10   hazardous substances that may be released by the fire; (5) threats of violence or physical attack,

11   such as assaults committed by persons experiencing homelessness; and (6) animal bites.  *Id.* at 4-7.

12       Plaintiffs argue that Dr. Durrani's testimony is not relevant because "[o]pinions about

13   potential occupational risks faced by City workers simply by virtue of working in and around

14   encampments do not help answer questions about whether City workers' seizures are lawful."

15   [Docket No. 432 at 4.]  Defendants respond that Dr. Durrani's opinions are relevant to Plaintiffs'

16   Fourth Amendment claims alleging that the seizure of Plaintiffs' property was reasonable.  [Docket

17   No. 448 at 2-4.]  They also argue that Dr. Durrani's opinions relate to the Bag and Tag Policy, which

18   includes an exception for items that present an immediate health or safety risk.  *Id.* at 3.  They further

19   contend that the general risks faced by City employees tasked with cleaning encampments must be

20   accounted for when balancing interests and hardships for injunctive relief.  *Id.*

21       Unlike Dr. Asfour's opinions, which address infectious disease risks posed by property or

22   items found in encampments, Dr. Durrani's opinions are not tethered to property and instead more

23   broadly discuss the environmental and occupational risks faced by City workers when they are

24   working in encampments.  Although the relevance of Dr. Durrani's opinions is somewhat attenuated

25   (some more than others, such as his opinions about the risks of experiencing slip and falls, animal

26   bites, or assaults), the court cannot say they are so wholly irrelevant they warrant exclusion.  For

27   example, Defendants intend to argue that the various hazards faced by workers when they clean or

28   clear encampments bear on whether their implementation of the Bag and Tag Policy was reasonable

1   under the circumstances.  [Docket No. 481 (7/9/25 Hr'g Tr.) at 66:25-67:4.]  Again, to the extent

2   there may be questions about the relevance of particular statements, Plaintiffs can challenge them

3   through objections and cross-examination.

4        Plaintiffs also argue that Dr. Durrani's opinions are unreliable because there is "simply too

5   great an analytical gap between the data and the opinion proffered."  [Docket No. 423 at 4 (quoting

6   *Joiner*, 522 U.S. at 146).]  First, Plaintiffs argue that his conclusion about infectious diseases was

7   based only on his review of scientific literature about infectious diseases among unhoused people,

8   not on any studies or cases of infectious disease spreading from unhoused people to those who work

9   with that population such as City workers.  For the same reasons as explained above for Dr. Asfour,

10  Plaintiffs' argument goes to weight, not admissibility.  Dr. Durrani sufficiently supported his

11  conclusions about the risk of infectious diseases by citing to relevant studies and facts.

12       Next, Plaintiffs argue that Dr. Durrani's opinions about the risk of chemical exposure are

13  unreliable because he based his findings on a single study that identified the chemicals in effluent

14  associated with homeless encampments in Las Vegas.  Plaintiffs point out that Dr. Durrani did not

15  discuss routes of exposure or concentrations of the chemicals necessary to pose a health risk to

16  workers.  Dr. Durrani based his conclusions on a relevant scientific study and his own experience

17  as a physician treating patients.  [Docket No. 423-3 (Durrani Dep.) at 224:11-225:7.]  These are

18  "sufficient factual grounds on which to draw conclusions."  *Elosu*, 26 F.4th at 1025-26.  Plaintiffs'

19  challenges go the weight of the evidence, not admissibility.

20       Plaintiffs also argue that Dr. Durrani's opinions about thermal exposure lack any evidence

21  that workers conducting street cleaning and property removal have ever been present during a fire

22  or exposed to burned materials, and that Dr. Durrani fails to support his opinions about the risk of

23  physical violence and animal bites because they are based on anecdotal evidence and isolated

24  incidents around encampments.  Dr. Durrani bases these opinions on his experience and his record

25  review.  Although the support is thin, at this point it is sufficient and can be tested through cross-

26  examination.

27       However, the court excludes Dr. Durrani's testimony and opinions to the extent they rest on

28  his February 25, 2025 site visit.  The parties stipulated to, and the court ordered a February 14, 2025

21

1    deadline for new facts to be offered at trial.  [Docket No. 264.]  There is no good cause supporting

2    the Durrani Report's violation of that agreement and order.  Defendants erroneously rely on *United*

3    *States v. W.R. Grace*, 504 F.3d 745, 763 (9th Cir. 2007) and Federal Rule of Evidence 703, which

4    recognize that experts may base their opinions on inadmissible evidence if it is of a type reasonably

5    relied upon by experts in the particular field in forming inferences or opinions on the subject.  Here,

6    Dr. Durrani's report is not based on inadmissible hearsay; it is based on facts which are off-limits

7    as a result of the parties' agreement and the court's order.

8        Plaintiffs' motion to exclude Dr. Durrani is denied in part, but granted to the extent his

9    testimony and opinions are based on facts after February 14, 2025.

10       **D.    Defendants' Motion to Exclude Dr. Herring (Docket No. 428)**

11       Defendants move to exclude the testimony and opinions of Dr. Christopher Herring.

12   Dr. Herring is an Assistant Professor of Sociology at UCLA who focuses his research on

13   "homelessness, housing, poverty, criminal justice, and welfare."  [Docket No. 440-2 at 2 (Herring

14   Rpt.).]  He has "conducted nearly two decades of research on homelessness, homeless encampments,

15   shelters, affordable housing, and the impact of local government policies on homelessness and

16   housing in the United States" and "peer-reviews scientific articles on these topics for leading

17   journals in the social sciences."  *Id.*  He has focused his studies on homelessness in San Francisco,

18   conducting "significant research and fieldwork on the ground with local government in San

19   Francisco and with unhoused communities" and "co-direct[ing] two major community-based

20   surveys of people experiencing homelessness in San Francisco."  *Id.* at 3.

21       He offers four opinions:

22       (1) HSOC, the DPW, and SFPD engage in widespread property destruction instead of

23           appropriately safeguarding and storing the belongings of unhoused individuals in

24           accordance with the City's own policies.

25       (2) Notice prior to encampment resolutions and cleanings does not conform with the Bag and

26           Tag and HSOC policies and is not consistent or adequate.

27       (3) Recovering property taken by City agencies is difficult and rare due to the City's practices

28           of bagging, tagging, and storing people's belongings.

United States District Court
Northern District of California

1    (4) The shifting and transitory nature that is characteristic of homelessness means that
2        individuals who have already exited unsheltered homelessness will likely experience
3        involuntary unsheltered homelessness again in the short to medium term (1 month-5
4        years).  They will be subject to the city's encampment clearances, which occur daily
5        across the city.

6    *Id.* at 9-10.

7        Defendants seek to exclude all four opinions.  They contend that the first three opinions

8    should be excluded because they are (1) unhelpful to the trier of fact, (2) "nothing more than bundles

9    of inadmissible hearsay," and (3) based on polluted data.  [Docket No. 428 at 2-3, 5-6.]  They also

10   argue that Dr. Herring's methodology is unreliable and that he, as a sociologist, is unqualified to

11   offer opinions about the adequacy of notice or processes for bagging, tagging, and storing property.

12   *Id.* at 3-5, 6.  Lastly, Defendants assert that Dr. Herring's fourth opinion should be excluded as

13   speculative.  *Id.* at 7.

14       Defendants argue that Dr. Herring's first three opinions should be excluded because they are

15   based on "'grade-school' math calculations applied to 'uncomplicated numbers[.]'"  *Id.* at 2.  By

16   way of example, the City contends that Dr. Herring uses nothing more than addition and subtraction

17   to determine how often bagging and tagging occurs during HSOC resolutions.  *Id.*  The court rejects

18   this argument as an over-simplification.  Dr. Herring's opinions involve several analyses of data

19   from DPW, SHS, and SFPD databases and a survey of 203 unsheltered San Franciscans he

20   conducted in February 2025.  [Docket No. 440 at 2; *see, e.g.*, Docket No. 440-2 (Herring Rpt.) at 11,

21   35, 46].  Dr. Herring does not merely add numbers; he analyzes the data and surveys based on his

22   knowledge and expertise to opine on the significance and implications thereof.  *See, e.g.*, *id.* at 12,

23   16-18.  This may prove helpful to the finder of fact.  *See, e.g.*, *F.T.C. v. BurnLounge, Inc.*, 753 F.3d

24   878, 888 (9th Cir. 2014) (district court properly allowed expert testimony interpreting defendant's

25   sales data; expert's "testimony was . . . reliable given his doctorate in economics and advanced

26   degree in mathematics, which he called on to interpret BurnLounge's sales data . . .").

27       Defendants also move to exclude Dr. Herring's first three opinions as unreliable.  First, they

28   contend that Dr. Herring's analyses do not "account for obvious alternate explanations for his

United States District Court
Northern District of California

United States District Court
Northern District of California

conclusions."[3]  [Docket No. 428 at 3.]  Defendants argue that Dr. Herring's first opinion "overlooks two equally plausible interpretations for what he describes as the 'extremely low' rate of bagging and tagging when compared to the number of resolutions: (i) that DPW allows PEH to keep belongings (consistent with its policy) or (ii) that DPW is discarding items as permitted to under the policy (e.g., items posing a health hazard)"—the latter of which Dr. Herring admitted could be true. *Id.*

Rule 702's Advisory Committee's Notes identifies "other factors [besides those identified in *Daubert*] relevant in determining whether expert testimony is sufficiently reliable to be considered by the trier of fact," including "[w]hether the expert has adequately accounted for obvious alternative explanations[.]"  Fed. R. Evid. 702 Adv. Comm. Notes, 2000 Am. (cleaned up). The court finds that Dr. Herring did not fail to consider obvious alternative explanations for his first opinion.  Although he conceded "there are circumstances where a low number of bag and tags could indicate that DPW is following the bag and tag policy" [Docket Nos. 428-2 & 440-3 (Herring Dep.) at 141:10-13], he also explained why he ultimately concluded this was not the case—namely, other data and surveys corroborated his conclusion that if DPW were following the Bag and Tag Policy, there would be a greater number of bag and tags.  [Docket No. 440-3 (Herring Dep.) at 140:17-23; *see id.* at 139:12-19 ("In the specific analyses that are comparing the numbers of bag and tags to individuals and tents and structures, none of them alone are able to show a violation of the bag and tag.  Collectively looked together but in relation to the survey data to the observations, triangulating the data with the other parts of the report, there are, I feel, useful indicators and pieces of this analysis as a whole.").]

At this stage, this is sufficient.  Defendants may challenge Dr. Herring's assumptions on cross-examination.  *See In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 967 (N.D. Cal. 2018) ("It traditionally falls upon cross-examination to negate the facts or factual assumptions underlying an expert's opinion.").

---

[3]  Here, the court rejects Defendants' undeveloped arguments with respect to the second and third opinions, because they state in a conclusory fashion that Dr. Herring "fails to account for alternate explanations for the data he relies on for his Inadequate Notice Opinion and the Property Recovery Opinion" (Docket No. 428 at 3), but do not identify what those alternative explanations might be.

United States District Court
Northern District of California

1    Defendants also seek to exclude Dr. Herring's first three opinions on grounds that the survey

2   upon which Dr. Herring relies does not support his conclusions.  [Docket No. 428 at 3-5.]  They

3   contend that (1) the survey is unreliable due to its small sample size and composition of respondents,

4   and (2) Dr. Herring improperly extrapolates data to render opinions beyond the sample set.[4]  *Id.*

5    Defendants' criticism of how the survey was conducted goes to the weight of the evidence,

6   not admissibility.  *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618

7   F.3d 1025, 1036 (9th Cir. 2010) ("[T]echnical inadequacies in a survey, including the format of the

8   questions or the manner in which it was taken, bear on the weight of the evidence, not its

9   admissibility.") (cleaned up); *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1262 (9th

10  Cir. 2001) ("Technical unreliability goes to the weight accorded a survey, not its admissibility.");

11  *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997) ("Challenges to survey methodology go

12  to the weight given the survey, not its admissibility."); *Vans, Inc. v. Walmart, Inc.*, No. SA CV 21-

13  01876-DOC-KESx, 2023 WL 6927344, at *3 (C.D. Cal. Oct. 11, 2023) ("[C]ourts generally leave

14  the job of determining the significance of a survey's under or over-inclusivity to the jury."); *Alcantar*

15  *v. Hobart Serv.*, No. ED CV 11-1600 PSG, 2013 WL 156530, at *4 (C.D. Cal. Jan. 15, 2013) ("[A]ny

16  problems with the response rate affect the weight, and not the admissibility of the study.") (citing

17  *Harris v. Vector Mktg. Corp.*, 753 F.Supp.2d 996, 1001-02 (N.D. Cal. 2010)).    Similarly,

18  Defendants' argument that Dr. Herring's analyses cannot be extrapolated beyond the sample set

19  does not support exclusion.  "[T]he fact that surveys can be used for larger populations does not

20  diminish their efficacy as to smaller populations[.]"  *Alcantar*, 2013 WL 156530, at *4.

21    Dr. Herring states that "[t]he short survey was designed to answer specific questions for

22  analysis in this case but followed similar standards and processes for recruitment and data collection

23  as in the surveys I have conducted in my own academic research that has been published in peer-

24  reviewed journals."  [Docket No. 440-2 (Herring Rpt.) at 13.]  If Defendants contend the survey's

25  ───────────────

26  [4] In a footnote and without development, Defendants identify other issues with Dr. Herring's survey
    that they contend render it unreliable, including the fact that survey participants were not randomly
27  selected and "were not told it was important to give truthful answers and were not under oath."
    [Docket No. 428 at 4 n.1.]  As the court previously stated, "[t]he court need not address a throwaway
28  argument made only in passing."  [Docket No. 400 at 8 n.8 (citing *Christian Legal Soc. Chapter of
    Univ. of Cal. v. Wu*, 626 F.3d 483, 487 (9th Cir. 2010)).]

United States District Court
Northern District of California

methodology was not conducted in accordance with accepted principals, they have not so argued. In any event, they can address this through cross-examination. Defendants also argue that Dr. Herring's first three opinions are unreliable because he "polluted his own data by intervening, changing the course of events." [Docket No. 428 at 5-6 (citing Docket No. 440-2 (Herring Rpt.) at 13, 39, 50, 54).] Again, this goes to methodology, and such criticisms can be tested through trial.

Next, Defendants assert that Dr. Herring's first three opinions should be excluded because they are "nothing more than bundles of inadmissible hearsay—sometimes hearsay within hearsay—from primarily anonymous sources." [Docket No. 428 at 5.] As discussed above with respect to Dr. Durrani, "if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. The case upon which Defendants rely, *1440 Sports Mgmt. Ltd. v. PGA Tour, Inc.*, No. 22-CV-02774-TLT, 2023 WL 7280444, at *6 (N.D. Cal. Oct. 6, 2023), *appeal dismissed sub nom. 1440 Sports Mgmt. Ltd. v. Fortinet, Inc.*, No. 23-3346, 2023 WL 9511412 (9th Cir. Dec. 18, 2023), is distinguishable. There, the court excluded meeting notes as hearsay to which no exception applied, and excluded the expert's opinion "because he [wa]s simply asserting the content of [the] notes are true." *Id.* That is not the case here, where Dr. Herring relies on out-of-court statements to form his opinions and does not merely parrot them in an attempt to avoid a hearsay objection. As noted at the pretrial conference, if Dr. Herring testifies about otherwise inadmissible evidence to support his opinions, the court will only hear such testimony in the context of Rule 703, and will not consider the inadmissible evidence for direct support of a claim on the merits. [Docket No. 481 (7/9/25 Hr'g Tr.) at 76:23-78:11.]

Defendants contend that Dr. Herring is not qualified to offer his second and third opinions about notice and property recovery because "the subject matter falls outside the scope of his expertise as a sociologist" and "[h]e has disclosed no special expertise in public signage." [Docket No. 428 at 6-7.] The court disagrees. Dr. Herring's opinions are based on survey findings and his own observations and interactions with unhoused persons—not merely studying signs. [Docket No. 440-2 (Herring Rpt.) at 35 ("The survey findings discussed in the first opinion found that advance notice of clearances and cleanings is inconsistent. Of the 174 respondents who had recently

experienced cleanings and clearances, only 8.6% reported being given advance notice of camp clearances each time. 91% reported the notices being inconsistent, reporting they had not been given notice each time of cleaning or clearance."); *id.* at 36 ("Out of the seven scheduled HSOC resolutions I observed during my San Francisco visit from February 3 – February 9, posted notices appeared to be absent at four of them."); *id.* at 46 ("Of the 154 respondents who had their belongings taken by City officials, only 8% reported being given information about how to receive their belongings on each occasion."); *id.* ("However, many I spoke with were unaware of if their belongings left unattended were disposed of or stored. Others who did have their property bagged and tagged reported not having their belongings properly collected, or not being given proper notice or receipt for retrieval.").] This properly falls within Dr. Herring's realm of expertise.

Dr. Herring's fourth opinion is that "[t]he shifting and transitory nature that is characteristic of homelessness means that individuals who have already exited unsheltered homelessness will likely experience involuntary unsheltered homelessness again in the short to medium term (1 month -5 years). They will be subject to the city's encampment clearances, which occur daily across the city." [Docket No. 440-2 (Herring Rpt.) at 57.] According to Defendants, this opinion is "too speculative to assist the court," and that "[w]itnesses in this case who have experienced homelessness are fully capable of testifying about the stability of their own housing and their intents and plans for property storage in the event they return to homelessness." [Docket No. 428 at 7.] This ignores the fact that Dr. Herring bases this opinion on a survey that he conducted of 584 unhoused San Franciscans, literature by other scholars, and San Francisco's most recent Point in Time Count. [Docket No. 440-2 (Herring Rpt.) at 57-60.] As his opinion is rooted in scientific studies and research, there is no basis for excluding it as speculative.

Defendants' motion to exclude Dr. Herring is denied.

**E.    Defendants' Motion to Exclude Dr. King (Docket No. 429)**

Dr. King is an epidemiologist whose expertise includes "clinical epidemiology, environmental epidemiology, and biostatistics, with a particular focus on vulnerable populations, including individuals experiencing homelessness." [Docket No. 429-2 (King Rpt.) ¶ 2.] Since 2020, he has served as an Assistant Professor in the Department of Health Systems and Population

United States District Court
Northern District of California

Health Sciences at the University of Houston Tilman J. Fertitta Family College of Medicine, where he teaches evidence-based medicine, public health, and population health strategies.  *Id.* ¶ 7.  In addition, Dr. King is a statistician in the Humana Integrated Health Systems Sciences Institute at the University of Houston, applying advanced quantitative methods to analyze health outcomes and healthcare system performance.  *Id.*    His background includes "experience in methods for enumeration and encampment outreach strategies," including "outreach and data collection efforts to assess the needs of individuals living in unsheltered environments."  *Id.* ¶ 8.  He is currently a consultant on the PIT count methodology and reporting for the Continuum of Care, "the lead agency funded by HUD to coordinate homeless response services in each community."  *Id.*; [Docket No. 441-2 (King Dep.) at 58:10-12.]    Dr. King also has expertise on toxicology and regulatory science, and he holds a Special Government Employee status with the U.S. Environmental and Protection Agency.  [Docket No. 429-2 (King Rpt.) ¶ 10.]  He is working to "publish a series of systematic reviews examining health-harming exposures related to the experience of homelessness" and, in particular, "environmental hazards and sleep disturbances, with the goal of informing policy and healthcare interventions for individuals experiencing homelessness."  *Id.* ¶ 12.

Dr. King offers four opinions.  They are, in brief:

> (a) the City's existing "Bag and Tag" policy and training material lack clear definitions and objective standards for the factors that are used to justify disposal of property, do not provide a standardized process for evaluating public health and safety risks in the field, vests untrained city workers with an excessively discretionary role, and fails to align with public health principles;

> (b) my in-person observations confirmed that these deficiencies in the "Bag and Tag" policy and training result in City workers making superficial and inappropriate assessments of whether property is an "immediate health and safety risk";

> (c) the CMMS reports prepared by City workers do not contain sufficient details about the property being assessed for disposal and the reasons for disposal to conclude that the property was appropriately evaluated and did, in fact, present an immediate health or safety risk; [and]

> (d) a revised "Bag and Tag" policy is necessary that incorporates clearly defined health and safety risk criteria, mandatory assessments by trained public health personnel, and improved training for City personnel.

1    [Docket No. 429-2 (King Rpt.) ¶ 2.]

2        Defendants move to exclude all four opinions as irrelevant and unreliable. They also assert

3    that the third opinion invades the role of the fact finder, and that Dr. King is unqualified to offer his

4    fourth opinion that a new Bag and Tag Policy is required. [Docket No. 429.]

5        Defendants argue that Dr. "King's opinions do not advance a 'material aspect' of Plaintiffs'

6    case, nor do they have a 'valid connection' with the pertinent inquiry." *Id.* at 2-3. Specifically, they

7    contend that although the parties agree the Bag and Tag Policy is constitutional as written, Dr. King

8    criticizes that policy and its related training, rather than addressing whether Defendants' practices

9    are constitutional. *Id.* at 3. Plaintiffs dispute that Dr. King's opinions challenge the Bag and Tag

10   Policy's plain meaning. [Docket No. 441 at 2.] Plaintiffs contend that Dr. King's opinions relate

11   to Defendants' interpretation and application of the Bag and Tag Policy, inadequate training on the

12   policy, and Defendants' practice of destroying property without a public health justification. *Id.*

13   (citing Docket No. 429-2 (King Rpt.) ¶¶ 47, 49, 54).

14       As noted above with respect to Defendants' MIL 5, the court grants Defendants' motion to

15   exclude Dr. King's testimony about his fourth opinion to the extent it opines that "a revised Bag and

16   Tag Policy is necessary," because it is irrelevant. Plaintiffs concede the Bag and Tag Policy is

17   constitutional as written. They cannot argue the opposite through Dr. King – that it is

18   unconstitutional and "a revised Bag and Tag Policy is necessary."

19       Dr. King's opinions are otherwise relevant. Dr. King opines that by interpreting,

20   implementing, and providing training on the Bag and Tag Policy without clear definitions or

21   standards, Defendants leave "city employees [to] rely on their own subjective judgment, leading to

22   inconsistent application and potential misuse" and "[misclassification of] property as hazardous."

23   [Docket No. 429-2 (King Rpt.) ¶ 23.] As one example, he points to CMMS reports that use the

24   terms "biohazard" and "soiled" for property that was discarded—terms that are not found in the Bag

25   and Tag Policy and, according to Dr. King, "suggests that workers are discarding items based not

26   on any standardized process, or even the terms of the Bag and Tag Policy itself, but rather their

27   subjective belief that an item should be discarded." *Id.* ¶ 51.

28

United States District Court
Northern District of California

1    With respect to reliability, Defendants attack Dr. King's methodology as being grounded

2 only in his subjective standards and general qualifications.  [Docket No. 429 at 4-5.]  As an example,

3 they argue that Dr. King's opinion regarding the deficiencies of the Bag and Tag Policy's definition

4 of "co-mingled" is "not tie[d] to any data or other source other than himself."  *Id.* at 5 (citing Docket

5 No.429-2 (King Rpt.) ¶¶ 26-28.  This argument is unpersuasive because it fails to acknowledge

6 Dr. King's discussion of the Hazardous Waste Operations and Emergency Response

7 ("HAZWOPER") requirements, 29 C.F.R. § 1910.120, an OSHA "regulatory standard[] . . . for

8 assessing potential hazards" that is applicable to, among other things, encampment clean ups.

9 [Docket No.429-2 (King Rpt.) ¶ 31; *id.* ¶ 30 & n.11 (citing OSHA letter of interpretation of

10 HAZWOPER to homeless camp cleanup operations).]  Dr. King also testified that his opinion

11 regarding the lack of clear definitions and objective standards "is based on past experience teaching

12 environmental health terminology and frameworks; my understanding of occupational health and

13 safety language, including federal code and trainings that are -- stem from federal code, of course;

14 and experience working in the health care setting since -- well, for more than a couple of decades[.]"

15 [Docket No. 441-2 (King Dep.) at 147:17-23].

16    Defendants next assert that Dr. King's opinions should be excluded because they "do not

17 help the fact finder understand factual evidence but rather reach conclusions on the Court's behalf."

18 [Docket No. 429 at 5 (citing Docket No. 429-2 (King Rpt.) ¶¶ 39, 48-49); *id.* at 6 ("King's

19 conclusions that City workers destroy personal property without first assessing it and that the

20 CMMS reports are insufficiently detailed do not require specialized knowledge.").]  The court

21 disagrees.  Dr. King is an epidemiologist who focuses on health and environmental safety risks

22 among the unhoused population.  [Docket No. 429-2 (King Rpt.) ¶¶ 6, 8-9, 12.]  For example, his

23 knowledge about industry standards, such as HAZWOPER, may help the finder of fact understand

24 whether and how the Bag and Tag Policy trainings are deficient.  Defendants' contention that

25 Dr. King's opinion related to the CMMS reports does not require specific knowledge is

26 unpersuasive.  In his report, Dr. King does more than simply summarize the CMMS reports. He

27 offers an opinion that the CMMS "reports do not contain enough information about how

28 determinations of health and safety risks were made" and that "these reports fail to meet

documentation standards for a hazardous waste operations, such as those outlined for site characterization under HAZWOPER procedures." [Docket No. 429-2 (King Rpt.) ¶¶ 49-50 (footnote omitted).] This goes beyond parroting the reports and draws on Dr. King's specialized knowledge and experience.

In sum, Defendants' motion to exclude is granted in part. Dr. King may not testify about how a revised Bag and Tag Policy is necessary. Defendants' motion is otherwise denied.

**IT IS SO ORDERED.**

Dated: July 15, 2025

_____
Donna M. Ryu
Chief Magistrate Judge

United States District Court
Northern District of California