# EXHIBIT 14

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al., v*
*City and County of San Francisco, et al.*

*Melodie*
*March 14, 2025*

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 44247Melodie_NL.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR    Document 520-2    Filed 10/20/25    Page 3 of 9
Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Melodie
March 14, 2025

Page 29

1  A.  (Nods head.)
2  Q.  We have been going about close to 30 minutes.
3  A.  Mm-hmm.
4  Q.  So would it help to take a little break?
5  A.  I'm good.
6  Q.  Okay.  Do you know why you're here today as it
7    relates to the litigation?
8  A.  I think so.
9  Q.  And what's that understanding from your
10   perspective, why you're here today?
11 A.  I don't know if I can articulate it.  Can you
12   ask the question better?
13 Q.  Yeah.
14     Do you know why you're here to testify and tell
15   your story today?
16     ATTORNEY DO: Calls for a narrative.
17     You can continue.
18     THE WITNESS: I mean, like, I could answer the
19   question, but we might be here, like, five years.
20     BY ATTORNEY MILLS:
21 Q.  Okay.  Let me ask a different question.
22 A.  Okay.
23 Q.  Try to narrow it down.
24     Do you know that the City and County of
25   San Francisco has been sued by the Coalition on

Page 30

1    Homelessness?
2  A.  And that's what this is, right?
3  Q.  Yes.
4  A.  Okay.
5  Q.  Do you know about that lawsuit?
6  A.  Not a lot about it.
7  Q.  What do you know about that lawsuit brought by
8    the Coalition on Homelessness against the City and
9    County of San Francisco?
10 A.  Well, I can only say what I know about it from
11   the perspective of a homeless person.
12 Q.  Do you know what conduct the City has done that
13   it's being sued for?
14 A.  I'm afraid I'm going to start screaming.
15     ATTORNEY DO: Melodie, you can pause and think.
16     BY ATTORNEY MILLS:
17 Q.  Yeah.  No rush.  No rush.  I don't want to rush
18   you.
19 A.  Okay.
20 Q.  And if you'd like to take a break, we could
21   take one.
22 A.  Okay.  Ask me the question again.
23 Q.  Yeah.
24     Do you know what the City's conduct is that has
25   gotten it sued by the Coalition on Homelessness?

Page 31

1  A.  Yeah.  I'm afraid I'm going to start screaming.
2    I can only tell you from the perspective of a
3  homeless person.  I don't really know that much about
4  the legal part of it.  I just know that, as a homeless
5  person, they're torturing us, and they're stealing our
6  things.  And you can't stop it.  Nobody is listening to
7  us.
8     ATTORNEY DO: Okay.
9     BY ATTORNEY MILLS:
10 Q.  Okay.  That's okay.  I appreciate it.
11 A.  I mean, I just -- I'm just, like, I could -- I
12   could, like -- I could just, like, go on and on about
13   what the City has been doing for all these years.  I
14   think that the term for it is "legalized theft" and
15   "legalized torture."
16 Q.  Based on your understanding of the lawsuit
17   brought by the Coalition on Homelessness, as you sit
18   here today, do you know that the Coalition on
19   Homelessness is claiming to invoke your rights on your
20   behalf in a federal court?
21 A.  I hope so.
22 Q.  But did you know about that before today?
23 A.  I mean, I've been hoping that that's what
24   they're doing.
25     I read someplace -- I don't remember where I

Page 32

1  read it -- that the City is saying:  Oh, if DPW takes
2  your stuff, you can just take them to small claims
3  court.
4     It's, like, there is no homeless person with
5  the skills to do that.  That's not fair.
6  Q.  Do you know when you first learned about the
7    lawsuit?
8  A.  I guess it was a couple of years ago in one of
9  the e-mails I got from the Coalition.  I'm not sure
10   which year it was or what the date was, but it was -- I
11   remember it saying something about it's been filed or
12   we're filing it or something.  So it had been around
13   that time.
14 Q.  Did you hear about their intention to bring
15   that lawsuit before it was filed?
16     ATTORNEY DO: Objection; asked --
17     THE WITNESS: How would I know?
18     ATTORNEY DO: -- asked and answered.
19     BY ATTORNEY MILLS:
20 Q.  So is the answer that you didn't hear about it
21   before they brought it?
22     ATTORNEY DO: Objection; asked and answered.
23     THE WITNESS: I only found about it when they did
24   it.  I mean, they don't -- they don't go, "Oh, we're
25   going to do this.  We think we're going to do that."

Case 4:22-cv-05502-DMR    Document 520-2    Filed 10/20/25    Page 4 of 9

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Melodie
March 14, 2025

Page 33

1  It's like you'd get, like, 90 billion e-mails from every
2  thought that crossed anybody's head.
3      BY ATTORNEY MILLS:
4  Q.  Where do you currently live?
5  A.  Right now, I'm living at -- on McKinnon at
6  Toland.
7  Q.  And are you living in a vehicle?
8  A.  Correct.
9  Q.  And is that an RV or a camper?
10 A.  Uh-huh.
11 Q.  Do you also have access to a shelter bed?
12 A.  Currently, David -- that guy (indicating),
13 David -- he -- I don't know if the word is coerced or
14 pressured me to agree to a room at the Monarch.
15     And it's very complex.  It's hard to access.
16 And I need to be with my property.  If I'm not with my
17 property, things get stolen.  Every time I go there,
18 things get stolen.
19     And I have high blood pressure and high blood
20 sugar and high cholesterol.  And I told that counselor,
21 whoever -- whatever their name is, I have -- I have high
22 blood pressure, high blood sugar.  And they don't allow
23 you to bring food.
24     So every time I stay there, I have to go 8, 12
25 to 16 hours without eating.  And that is not helping me

Page 34

1  with my memory.  It's not helping me function.
2  Q.  So I understand that you have access to the bed
3  at the Monarch, and then you have your -- your RV.
4      Do you intend to abandon your shelter that you
5  have at the Monarch?
6      ATTORNEY DO: Objection; form.
7      You can answer the question if you understand
8  it, Melodie.
9      THE WITNESS: I intend to put one foot in front of
10 the other.  That's all I'm capable of.
11     BY ATTORNEY MILLS:
12 Q.  So, based on the experience that you've had at
13 the Monarch, do you plan to leave the Monarch completely
14 and not go back?
15     ATTORNEY DO: Objection --
16     THE WITNESS: I just answered --
17     ATTORNEY DO: Melodie --
18     THE WITNESS: I just answered the question.  I just
19 answered the question.
20     ATTORNEY DO: Objection; asked and answered.
21     BY ATTORNEY MILLS:
22 Q.  Have you made any requests to go to a different
23 kind of shelter that the City may have other than the
24 Monarch since you've started living there?
25 A.  I'm not living there.  I'm living on Toland

Page 35

1  Street.  You asked me if I had access to shelter.  I'm
2  living on Toland Street.
3  Q.  Okay.
4  A.  I've been on Toland Street since, like, 2018.
5      ATTORNEY DO: I'd like to take a break.
6      ATTORNEY MILLS: Yeah.  We'll go off the record.  I
7  have 11:44.
8      THE VIDEO OPERATOR: We are going off the record at
9  11:44.
10     (Recess taken from 11:44 a.m. to 12:04 p.m.)
11     THE VIDEO OPERATOR: The time is 12:04.  We are back
12 on the record.
13     BY ATTORNEY MILLS:
14 Q.  All right.  So, Melodie, right before the
15 break, you mentioned that you've been living, I believe,
16 on McKinnon and Toland --
17 A.  Mm-hmm.
18 Q.  -- is that correct?
19 A.  Yes.
20 Q.  And how long have you been living in that
21 general vicinity?
22 A.  I've been living on Toland Street since
23 probably 2018.
24 Q.  And have you always been living in an RV or
25 camper?

Page 36

1  A.  Since 2008.
2  Q.  Had there been any periods since 2018 where you
3  weren't living at Toland?
4  A.  No.
5  Q.  And do you currently have more than one RV?
6  A.  Correct.
7  Q.  How many RVs do you have?
8  A.  It's complicated.
9  Q.  Do you have an estimate of how many you
10 currently have?
11 A.  It's two RVs.
12 Q.  And can you describe the first one for me?
13     And just so you know where I'm going, I'm going
14 to ask about the second one too so I can understand kind
15 of how they look.
16 A.  Look in what way?
17 Q.  So, like, RVs can be a -- like, a full-on bus;
18 it could be a camper attached to a truck.  I just want
19 to kind of get an idea of what your two setups are like,
20 if that makes sense.
21 A.  Okay.  What's the question?
22 Q.  Yeah.
23     So what -- so I understand you have two things
24 that are like an RV right now, correct?
25 A.  Mm-hmm.

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Melodie
March 14, 2025

Page 41

1  in the vehicles.  I have memory problems, and it's not
2  always possible.
3  Q.  With your memory problems, are you able to
4  recall what property you store in the green Dodge
5  compared to the yellow Chevy?
6  A.  Sometimes I get it mixed up which ones are
7  which.  With, like -- like, did I leave the screwdriver
8  in this camper or a screwdriver in that camper?  I get
9  it mixed up.
10  Q.  So I know that you write a lot of things down.
11    Do you inventory the property that you have so
12  you can keep track of it?
13  A.  I don't have that skill.  Which would be very
14  helpful if I could do that.
15  Q.  So in the times where some property might be
16  left outside of one of your RVs, what is typically being
17  left outside as opposed to inside of the RV?
18  A.  Okay.  So if I come and go, like I need to go
19  to Martin de Porres and get food, I'm -- I'm -- I need
20  to take this with me.  And so I take it outside of the
21  camper, and I set it down.
22    But I might forget and just leave it there.  Or
23  coming back, I might have my food with me and set it
24  down to get the door open and forget and leave it
25  outside.

Page 42

1    I mean, it's -- often it's going to be things
2  where I'm coming -- coming and going and set things down
3  and forget.
4  Q.  Okay.  When you see those items that are
5  outside, does your memory kind of come back that you're
6  supposed to put that inside?
7  A.  Yes.  It's very upsetting.
8  Q.  And when you have those moments where you see
9  your property outside and remember that you left it out,
10  do you then take it back inside with you?
11  A.  Duh.
12  Q.  During this period from 2018 since you started
13  living on Toland, did you ever live somewhere other than
14  San Francisco?
15    ATTORNEY DO:  Asked and answered.
16    You can answer the question, Melodie.
17    THE WITNESS:  Why are you asking me that question?
18    BY ATTORNEY MILLS:
19  Q.  Because your travel and where you've been
20  living is relevant in the case.  So that's why I'm just
21  asking if you've been anywhere other than San Francisco
22  during 2018 --
23  A.  Have I been anywhere?
24  Q.  Have you lived --
25  A.  You asked have I lived anywhere.  No.  And we

Page 43

1  already told you.
2  Q.  Okay.
3    ATTORNEY DO:  Just a late objection.  As noted, the
4  first question was lived -- one question was lived
5  anywhere; the other question was been anywhere.
6    BY ATTORNEY MILLS:
7  Q.  In 2022, was there a period where you were
8  living in Los Angeles?
9  A.  Absolutely not.
10  Q.  Did you travel to Los Angeles?
11  A.  My mother is not well, and I've had to go down
12  and assist with different things that she needs.
13  Q.  How often are you going down to L.A. to assist
14  your mother?
15  A.  It depends.
16  Q.  When you go down to visit your mother, do you
17  typically stay there for a few days, or is it a couple
18  weeks?
19  A.  It completely depends on what my capabilities
20  are at the moment.
21  Q.  When you go to Los Angeles, do you drive one of
22  your three vehicles with you?
23  A.  No.  I have to borrow a vehicle to go down.
24  Q.  Okay.  Are you able to recall if you were in
25  L.A. in September 2022, based off of your memory?

Page 44

1    ATTORNEY DO:  Asked and answered many times.
2    THE WITNESS:  Tell me again.  What?
3    BY ATTORNEY MILLS:
4  Q.  Yeah.
5    Were you specifically -- based off of your
6  memory, do you know if you were in L.A. in September of
7  2022 specifically, which is different than my question
8  before just about generally being in L.A.?
9    ATTORNEY DO:  Asked and answered and relevance.
10    THE WITNESS:  I would have to look at my records.
11    BY ATTORNEY MILLS:
12  Q.  Do you have records that would show when you
13  were in L.A. to help your mom?
14  A.  I mean, if you've got a really long, long,
15  long, long time, I could figure it out.
16  Q.  And would you figure that out based off of
17  notes that you've put somewhere?
18  A.  I just don't know where.
19  Q.  What's your mom's name?
20    ATTORNEY DO:  You can go with first name, Melodie.
21    THE WITNESS:  I don't want to tell anybody what her
22  name is.
23    BY ATTORNEY MILLS:
24  Q.  So --
25    ATTORNEY DO:  I'm going to -- I will object;

Case 4:22-cv-05502-DMR    Document 520-2    Filed 10/20/25    Page 6 of 9

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Melodie
March 14, 2025

Page 53

1     And that's an army of people.
2  Q.  How long have you had this understanding of
3   what HSOC is?
4  A.  I think since -- I believe since the beginning
5   of HSOC.  Because I'm a member of the Coalition, and
6   we've been witnessing sweeps for a long time.
7     So whenever HSOC came into existence is when I
8   was witnessing this army of people that they call a
9   team.
10 Q.  Have you heard of the phrase "bag and tag"
11  before?
12 A.  Yes, I have.
13 Q.  And what does that phrase, "bag and tag," mean
14  to you?
15 A.  Nothing.
16 Q.  And what do you mean by it means nothing to
17  you?
18 A.  They don't do it.
19 Q.  Have you ever read DPW's bag-and-tag policy?
20 A.  I wish I had.
21 Q.  Is it fair to say that you haven't read DPW's
22  bag-and-tag policy?
23 A.  Correct.
24 Q.  Has anyone ever told you what that bag-and-tag
25  policy requires?

Page 54

1  A.  I have a general idea of it from the different
2   interactions I've had with the Homeless Coalition.
3  Q.  Based off of those interactions and your
4   understanding of DPW's work, what is supposed to happen
5   with bagging and tagging?
6  A.  What is supposed to happen is that when the
7   army comes, when the sweep comes, when the HSOC comes,
8   magically some person is supposed to say, "Oh, this is
9   your stuff.  What's your name?"  They're supposed to
10  write a tag on it, and those belongings in those bags
11  are supposed to go to the DPW on -- okay, not Army -- on
12  Cesar Chavez.
13 Q.  Are you aware that DPW workers are allowed to
14  discard items under certain circumstances?
15 A.  I don't think "allowed" is the right word.
16 Q.  But based off of your understanding of the
17  bag-and-tag policy from your interactions with the
18  Coalition on Homelessness, are you aware that that
19  policy has exceptions for when items can be discarded?
20 A.  It doesn't matter if there are exceptions.
21  Everything is always discarded at every single sweep I
22  have ever attended.
23 Q.  Are you aware that DPW can discard items that
24  are a health and safety hazard?
25     ATTORNEY DO: Objection --

Page 55

1     THE WITNESS: It doesn't matter.  Everything is
2   always discarded.  There's no discretion.  They throw
3   everything away.
4     ATTORNEY DO: Just a late objection; asked and
5   answered.
6     BY ATTORNEY MILLS:
7  Q.  You mentioned the DPW yard at Cesar Chavez.
8  A.  Yes, uh-huh.
9  Q.  Have you ever gone?
10 A.  Yes, I have.
11 Q.  And have you gone to try to obtain property?
12 A.  No.  I've been with the Homeless Coalition
13  there.
14 Q.  Did you go there in connection with, like, a
15  protest?
16 A.  Correct.
17 Q.  Outside of that incident, had you ever gone to
18  Cesar Chavez DPW yard?
19 A.  I go past there all the time.
20 Q.  Just to make sure I understand, is it fair to
21  say you haven't tried to get property back from DPW --
22 A.  I've been --
23 Q.  -- at the DPW yard?
24 A.  -- with people who have tried to get property
25  back.

Page 56

1  Q.  How many times do you think you've experienced
2   that, where you've gone with other people to try to get
3   their property back?
4  A.  Probably twice.
5  Q.  Was one of those during the event with the
6   Coalition on Homelessness?
7  A.  It was around that time.
8  Q.  Do you know who those people are?
9  A.  I can't remember their name right now.
10 Q.  Do you know if those people were able to get
11  any property back?
12 A.  Never.
13 Q.  Do you know, for those people, how many days it
14  had been since their property was taken and when they
15  then showed up to DPW to ask?
16 A.  I could guess.
17 Q.  I don't want you to guess.
18     But in your brain and your memory --
19 A.  All I can do is guess.
20 Q.  I appreciate that.
21     ATTORNEY MILLS: So maybe we could go off the record
22  and then take a lunch break, and then I could pivot into
23  the next use of her declaration once we come back.
24     THE WITNESS: Pivot, like a ballerina.
25     ATTORNEY MILLS: If that works, just so people can

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Melodie
March 14, 2025

Page 73

1  Q.  So if this declaration was signed in September
2   of 2024, is it fair to say that the incident may have
3   been sometime in July?
4  A.  Correct.
5  Q.  Do you know the date of the incident?
6  A.  Can I just bring up the document?
7      ATTORNEY DO: Melodie, you can ask to look at
8   documents, sure.
9      THE WITNESS: Can I show him the document?
10     ATTORNEY DO: You can, yes.
11     THE WITNESS: Okay.
12     So this is my log of the incident on July 16th.
13     BY ATTORNEY MILLS:
14  Q.  Okay.  So what I'm going to do next is
15   introduce the next exhibit, which will be a copy of what
16   you just showed me.  Okay?
17  A.  All right.
18     ATTORNEY MILLS: And this is going to be Exhibit
19   224.
20     THE REPORTER: 324.
21     ATTORNEY MILLS: I'm sorry.  324.
22     (Deposition Exhibit 324 was marked for
23     identification.)
24     THE WITNESS: Okay.  Now, are we going back and
25   forth?  Are we --

Page 74

1      BY ATTORNEY MILLS:
2  Q.  We'll have the two declarations and the --
3  A.  Okay.  So --
4  Q.  -- picture.
5  A.  So don't put this away yet?
6  Q.  Don't put it away.
7  A.  Okay.  Got it.
8  Q.  Yeah.
9  A.  Okay.
10  Q.  So, Melodie, I just handed you what is
11   Exhibit 324.
12     Is this a fair and accurate copy of the notes
13   that --
14  A.  Yes.
15  Q.  -- you have?
16     And are these notes in your phone?
17  A.  Uh-huh.
18     ATTORNEY DO: That's a yes, Melodie?
19     THE WITNESS: Yes.  Sorry.
20     ATTORNEY MILLS: No worries.
21     ATTORNEY DO: No worries.
22     BY ATTORNEY MILLS:
23  Q.  Okay.  So it says, at the very top here, 7
24   dash -- or dot 16 dot 24.
25  A.  Correct.

Page 75

1  Q.  So does that mean that this incident was on
2   July 16th, 2024?
3  A.  Absolutely.
4  Q.  Do you know what time the incident was?
5  A.  The incident happened at 9:31 a.m. on Toland
6   Street at McKinnon.  Oh, just like it says.  Look, it
7   says it right there.  Okay.
8  Q.  Do you know how long after the incident you
9   were typing this?
10  A.  I was typing it within a minute of it happening
11   so I would remember what he said and what happened.
12  Q.  Do you know if this was the green-stripe Dodge
13   RV, or was this the yellow Chevy van?
14  A.  It doesn't say.  Oh, the yellow.  It was the
15   yellow one.
16  Q.  And how do you know it was the yellow one?
17  A.  Because it says Y-e-l-T-r-k.  That's my -- my,
18   like, shorthand for the yellow camper.
19  Q.  Okay.  So where I'm saying in kind of the
20   middle of the photograph, it says:  Walk between car and
21   yellow truck up 2C --
22  A.  Up to coach door.
23     So should I just tell you what it says?
24  Q.  Yeah.  If you can read for me --
25  A.  Okay.

Page 76

1  Q.  -- what your note --
2  A.  Okay.  So at 9:31 a.m., DPW takes the plastic
3   boxes that are outside of the yellow truck.
4      So my notes to myself is I'm parked at
5   McKinnon, Toland -- I'm parked.  So I know I'm parked at
6   Toland at McKinnon.  So the crew of the DPW, they were
7   coming down Toland from J, which is Jerrold, to O, which
8   is Oakland -- Oakdale.
9      So I see in the rearview mirror that DPW walked
10   between the car I'm sitting in and the yellow truck --
11   the yellow camper up to the coach door of the yellow
12   camper.  And they take my empty, empty boxes -- M- --
13   M-t -- empty boxes that were folded and leaned against
14   the chain link fence.  I can't get my shoes on in time
15   to get out to stop them.
16      And I yell out the door, "Hey, that's my stuff.
17   Those are my boxes."  And DPW yells, "It's debris."
18  Q.  Okay.  That was really helpful.  So I
19   appreciate you reading that for me.
20  A.  I mean, it's like some of this stuff is just in
21   my head; it doesn't all come out on the -- like parked.
22   I know where I'm parked.
23  Q.  So were you not inside of the yellow truck?
24  A.  No.  I was in the car.
25  Q.  And is that the white --

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Melodie
March 14, 2025

Page 121

1  A.  Yes.
2  Q.  -- in the interview?
3  A.  Correct.
4  Q.  Okay.  Done with that one.
5      ATTORNEY DO: We're moving on.
6      ATTORNEY MILLS: Getting there.  I don't have too
7  much longer to go.
8      THE WITNESS: I'm, like, I never seen this dumpster
9  before.
10      BY ATTORNEY MILLS:
11  Q.  So, Melodie, I understand earlier you testified
12  that you're a member of the Coalition on Homelessness.
13  A.  Uh-huh.  Yeah.
14  Q.  When did you first become a member of the
15  Coalition?
16  A.  2008.
17  Q.  And did you have to do anything to become a
18  member of the Coalition?
19  A.  Show up.
20  Q.  So you didn't sign anything to become a member?
21  A.  No.
22  Q.  Have you ever had to pay any dues?
23  A.  No.
24  Q.  When you became a member of the Coalition on
25  Homelessness, did you understand that the Home- -- the

Page 122

1  Coalition on Homelessness would represent your rights in
2  a federal court by being a member?
3  A.  Say that one more time.
4  Q.  Yeah.
5      When you became a member of the Coalition on
6  Homelessness, did you understand that the Coalition on
7  Homelessness could represent your rights in federal
8  court on your behalf?
9  A.  I would have to reword what you're saying,
10  which is that there was no opportunity that I was aware
11  of I would ever be represented until September.
12  Q.  That's September 2024?
13  A.  Correct.
14  Q.  Do you know what your rights are as a member in
15  the Coalition on Homelessness?
16  A.  The same rights as any other human being.
17  Q.  But so my question is a little bit different.
18      So, by becoming a member of the Coalition on
19  Homelessness, did you know if you had any particular
20  rights to be in that organization?
21  A.  Just as a human being.
22  Q.  As a member of the Coalition on Homelessness,
23  are you allowed to vote on its activities?
24  A.  I -- I haven't voted on its activities.  I
25  think there's times when I could have, but usually I

Page 123

1  just leave that to people that know what they're doing.
2  Q.  And have you been a participant in the Human
3  Rights Working Group?
4  A.  Yes.
5  Q.  How many times would you say you've
6  participated in the Human Rights Working Group?
7  A.  Oh, God.  It's too many to tell you.
8  Q.  Is it fair to say more than a dozen?
9  A.  Oh, God.  Yeah.
10  Q.  More than a hundred?
11  A.  I don't know how many weeks there are in a
12  year.  So I just...  There have been times when I've
13  been able to go every week and other times when, you
14  know, I haven't been able to go every week.
15  Q.  Have there ever been any years where you just
16  didn't participate in the Coalition on Homelessness at
17  all?
18  A.  There's always something that you're doing with
19  them because they're just involved in -- in so many
20  aspects of being homeless.
21  Q.  Have you ever gotten a homeless verification
22  form from the Coalition on Homelessness?
23  A.  The last time I needed a verification, I was
24  sent to someplace on Tenth Street.
25  Q.  Do you know if that was the Coalition?

Page 124

1  A.  No.  The Coalition's on Turk.
2  Q.  But as you sit here today, can you ever recall
3  an instance where you got a homeless verification form
4  from the Coalition specifically?
5  A.  They've -- I think at least one time they went
6  with me somewhere to get my verification because I
7  needed help.  I don't -- I don't recall off the top of
8  my head if they ever gave me a homeless verification.
9  Q.  Understood.
10      Are you aware that the Coalition on
11  Homelessness does a lot of work to build and increase
12  the number of shelters that may exist in San Francisco
13  through its advocacy?
14  A.  Okay.  Tell me that one more time.
15  Q.  Yeah.
16      Do you know -- do you have knowledge of
17  Coalition's work to build shelters in San Francisco?
18  A.  I haven't been involved in that aspect.
19  Q.  Is that something you know that they do,
20  though?
21      ATTORNEY DO: Objection in terms of vague, in
22  terms -- or misstates the Coalition's projects.
23      You can answer the question if you understand
24  it.
25      THE WITNESS: I don't know how to answer the

Case 4:22-cv-05502-DMR    Document 520-2    Filed 10/20/25    Page 9 of 9
Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Melodie
March 14, 2025

Page 129

1  idea.
2  Q.  So my question is just a little bit different.
3  I get that.  So I understand your testimony on that.
4      Has the Coalition on Homelessness helped you
5  maintain consistency in trying to get services?
6  A.  They don't get it.  They don't get brain injury
7  at all.  How can they help me?
8  Q.  So the Coalition on Homelessness doesn't get
9  brain injury?
10  A.  Absolutely not.  I'm one of over 8,000 homeless
11  people that they are trying to help.
12  Q.  Have you felt like, as a member of the
13  Coalition on Homelessness, that they've given up on you
14  at any periods in trying to help you not get services?
15  A.  No.
16      ATTORNEY DO: Object --
17      THE WITNESS: Oh.
18      ATTORNEY DO: The answer is no.  But objection;
19  argumentative.
20      BY ATTORNEY MILLS:
21  Q.  Do you know if the Coalition's Human Rights
22  Working Group meetings are held open to the public?
23  A.  Absolutely.
24  Q.  So anybody can attend?
25  A.  As far as I understand.

Page 130

1  Q.  Do you know anything about their Human Rights
2  Working Group Listserv --
3  A.  What?
4  Q.  -- for e-mails?
5      Do you know anything about their Human Rights
6  Working Group Listserv for e-mail correspondence?
7  A.  Listserv?
8  Q.  Listserv, yeah.  Like a --
9  A.  I don't know what Listserv is.
10  Q.  Do you know how people can sign up with their
11  e-mail to get communications sent out to them?
12  A.  I think I'm on the list.
13  Q.  Okay.  But do you know how that list is
14  maintained at all?
15  A.  No clue.
16  Q.  Has the Coalition on Homelessness ever given
17  you a tent?
18  A.  No.
19  Q.  Have they ever given you clothing?
20  A.  No.
21  Q.  Have they ever given you blankets?
22  A.  No.
23  Q.  Have they given you sleeping bags?
24  A.  No.
25  Q.  Have they given you anything as far as like

Page 131

1  survival gear might be concerned?
2  A.  Oh, wait.  Okay.  Oh -- okay.  Oops.
3      When we were -- the day we were protesting at
4  the DPW, I think I got a tent -- but I may have gotten
5  the tent for somebody else that was on the sidewalk.
6  I -- I can't remember right now.
7      You know, they were giving out maybe like --
8  they always give out hygiene kits, that type of stuff.
9  And then that particular day, it was different.  Like,
10  they probably gave out, like, a kit with, like, hand
11  warmers, like just little trinkety-type stuff.
12      But that was -- that would be the only time
13  that I ever got -- received any material possessions
14  from them.
15  Q.  Okay.  Do you -- so you mentioned that event
16  where going to the DPW yard for the -- for the protest
17  activities.
18  A.  Yes.
19  Q.  Do you know if people were given gift cards
20  that day?
21  A.  I don't remember.
22  Q.  Are you familiar with the Housing Justice
23  Workgroup at the Coalition?
24  A.  I don't remember that much about it.
25  Q.  That's okay.

Page 132

1  A.  Okay.
2      ATTORNEY MILLS: So maybe we can take just a quick
3  break, and then I can run through my notes, and then
4  we'll figure out if I am done.
5      THE WITNESS: Okay.
6      ATTORNEY DO: Okay.  Thank you.
7      ATTORNEY MILLS: Close, yeah.  So now we'll go off
8  the record.
9      THE VIDEO OPERATOR: This marks the end of Media
10  No. 2.  We are off the record at 3:23.
11      (Recess taken from 3:23 p.m. to 3:35 p.m.)
12      THE VIDEO OPERATOR: This is the beginning of Media
13  No. 3.  We are on the record at 3:35.
14      BY ATTORNEY MILLS:
15  Q.  All right.  Thanks, Melodie.  So I don't have
16  too much more.  So just a couple of hopefully quicker
17  questions --
18  A.  Okay.
19  Q.  -- for us to get out.
20      Earlier you mentioned kind of the small claims
21  process --
22  A.  Right.
23  Q.  -- where homeless people could go to court.
24  A.  Uh-huh.
25  Q.  Have you ever done that yourself?