# EXHIBIT 28

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al. v*
*City and County of San Francisco, et al.*

---

*Edgar Garcia*
*February 6, 2025*

---

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 44057Garcia_NL.txt
**Min-U-Script® with Word Index**

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

---

Page 81

1 wheelchair that are battery-powered, due to the fact
2 that when they were doing the purge, it was raining.
3    So when they disposed of all the other items,
4 those were going to Recology. So we couldn't load up
5 the wheelchair and scooter with those items because we
6 couldn't dump that at Recology.
7 Q. Okay. But in the future, G will be your
8 overflow?
9 A. Overflow, yes.
10 Q. Currently your overflow goes to C; is that
11 right?
12 A. Yes.
13 Q. And also there are bulky items that go to C?
14 A. Yes.
15 Q. Are there also bulky items stored in A and B
16 and D and E?
17 A. There can be.
18 Q. What --
19 A. Not --
20 Q. Who decides -- well, let's define bulky
21 items --
22 A. Yes.
23 Q. -- to start.
24    What do you consider to be bulky items?
25 A. Large items that will take up a lot of space.

---

Page 82

1 Q. Okay. Give me some examples, please.
2 A. A couch, mattress, wheelchair, bicycle,
3 cabinets, barbecue pit.
4 Q. What determines whether a bulky item will go
5 into the cage, C, as opposed to going into A or B?
6 A. For the most part, we usually bring all bulky
7 items to C, but if it's at the end of the month and the
8 item fits with the month it's been brought in, we just
9 leave it there.
10 Q. You also mentioned that at Supe II meetings
11 there's occasionally discussion of missing items on the
12 intake form - --
13 A. Mm-hmm.
14 Q. -- correct?
15 A. Yes.
16 Q. What items tend to be omitted more than others?
17 A. Like details. If -- let's say I'm bringing in
18 a bicycle. We try to ask for more details, like what
19 type of bicycle. You can say a black Schwinn bike
20 missing a seat as opposed to just a black bicycle.
21 Q. Do forms sometimes come in missing a name of
22 the person whose possessions they are?
23 A. Yes.
24 Q. Is that -- does that create an issue for you?
25    ATTORNEY MURPHY: Object to form.

---

Page 83

1    THE WITNESS: Yes.
2    BY ATTORNEY FREEMAN:
3 Q. What is the issue?
4 A. Well, sometimes the name isn't available
5 because the items are unattended.
6 Q. Okay.
7 A. And sometimes when somebody comes to retrieve
8 their items, they forget where they were at. They
9 forget the date and the time it happened, and all they
10 have is their name.
11 Q. Does it sometimes happen that an item is
12 missing a name because the person who bagged and tagged
13 the item either doesn't recall it or doesn't put it
14 down?
15 A. The name, I'm not aware of.
16 Q. We've talked about tailgate meetings.
17 A. Mm-hmm.
18 Q. First of all, tell me what a tailgate meeting
19 is.
20 A. A tailgate meeting is just something that they
21 call like a -- like a -- I guess it's an old name that
22 they use, but it's basically a training between a
23 supervisor to their crew or the managers to their
24 supervisors.
25 Q. Okay.

---

Page 84

1 A. I guess before they're held in the field,
2 somebody would open the tailgate to the pickup truck and
3 hold the meeting there.
4 Q. Have you conducted tailgate meetings?
5 A. Yes.
6 Q. Have you trained on bag and tag at tailgate
7 meetings?
8 A. Yes.
9    ATTORNEY FREEMAN: Let's mark Exhibit 1165.
10    (Deposition Exhibit 1165 was marked for
11    identification.)
12    BY ATTORNEY FREEMAN:
13 Q. Take a moment to look at it.
14 A. (Examines document.)
15    ATTORNEY MURPHY: Two-sided.
16    ATTORNEY FREEMAN: It's a two-sided document.
17    ATTORNEY MURPHY: There's a back.
18    BY ATTORNEY FREEMAN:
19 Q. There's an e-mail on the front and an SES
20 tailgate form.
21 A. Mm-hmm.
22 Q. Attendance form on the back.
23    It looks like something that you sent from the
24 first page to Jonathan Vaing and some others.
25    Do you recognize both the e-mail and the form

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

---

Page 89

1  to those meetings?
2  A.  We have a table in the lunch -- well, the ones
3  that I hold with my crew, they're in the Annex Building.
4  Q.  Okay.  And is that building equipped with a
5  computer and projection equipment?
6  A.  Yes.
7  Q.  Do you use that when you conduct trainings?
8  A.  Yes.
9  Q.  Did you use that when you conducted trainings
10  at the end of 2022, beginning of 2023?
11  A.  We weren't in that building at that time.
12  Q.  Okay.  Where were you conducting tailgate
13  trainings then?
14  A.  At that time we had the zone -- sorry,
15  Building A lunchroom -- or break room, Building A break
16  room inside the Operations Yard.
17  Q.  Okay.
18  A.  We actually walked by that during the walk.
19  Q.  Yes.  That's 2323 Cesar Chavez?
20  A.  Yes.
21  Q.  And was that room equipped with a computer and
22  projection --
23  A.  No.
24  Q.  -- equipment?
25       How often since December of 2022 have you

---

Page 90

1  trained employees on the bag-and-tag policy?
2       ATTORNEY MURPHY: Object to form.
3       THE WITNESS: It was quarterly, and then it became
4  monthly.  I don't know when it became monthly, but at
5  some point it was quarterly and then it became monthly.
6       BY ATTORNEY FREEMAN:
7  Q.  So, as we sit here today, your training on bag
8  and tag monthly --
9  A.  Yes.
10  Q.  -- who attends your trainings?
11  A.  My trainings will be the 15 staff that work for
12  me.
13  Q.  Okay.  And that -- that's the --
14  A.  Reactionary and Special Projects.
15  Q.  Reactionary and the Special Projects, correct?
16  A.  Yes.
17  Q.  And do you yourself receive periodic trainings
18  on bag and tag?
19  A.  Yes.
20  Q.  Who do you receive them from?
21  A.  From Jonathan Vaing or Mark Roumbanis.
22  Q.  And how do those trainings occur?
23  A.  During the Supe II meetings, a PowerPoint.
24  Q.  Is that done with the aid of a computer or a
25  handout or some other way?

---

Page 91

1  A.  Computer.  There's a projector up top.
2  Q.  These Supe II meetings, are they all in person?
3  A.  Yes.
4  Q.  Okay.  You're not doing it by video --
5  A.  No.
6  Q.  -- or phone or anything?
7  A.  No.
8  Q.  And when you are doing your monthly trainings
9  today with your 15 employees, are you doing that in the
10  Annex --
11  A.  Yes.
12  Q.  -- building --
13  A.  Yes.
14  Q.  -- with a -- with a computer and a projector?
15  A.  Yes.
16  Q.  And you go through the slides on the --
17  A.  Yes.
18  Q.  -- bag-and-tag training?
19  A.  (Nods head.)
20  Q.  And I take it you've also, prior to being in
21  your current position, you've conducted bag-and-tag
22  operations in the field, right?
23  A.  Yes.
24  Q.  When was the last time you routinely did that?
25  A.  I don't -- I don't remember.  It's been a long

---

Page 92

1  time.
2       ATTORNEY MURPHY: Belated objection to the word
3  "routinely."
4       BY ATTORNEY FREEMAN:
5  Q.  How often are bulky items received as a result
6  of the bag-and-tag process at the yard?
7       ATTORNEY MURPHY: Object to form.
8       THE WITNESS: I don't know if there's a way of -- of
9  providing, you know.
10       BY ATTORNEY FREEMAN:
11  Q.  Does it happen every day?
12  A.  It may or may not.  It's something that's --
13  every day is different.
14  Q.  When did the yard begin storing bulky items?
15  A.  I'm not aware of it.  I'm not -- I'm not aware
16  of when the date started.
17  Q.  Was there ever a time that you know of that the
18  yard did not store bulky items?
19  A.  Yes.
20  Q.  When was that?
21  A.  I don't remember the date, but...
22  Q.  And was that during the time since January of
23  2023 when you became the operations manager?
24  A.  Was that the time of what?
25  Q.  Yeah.

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

---

Page 93

1    So you said that there was a time when the yard
2  did not store bulky items.
3  A.  Yes.
4  Q.  And was that during your time of being the
5  operations manager?
6  A.  Yes.  At the beginning of -- of when I was
7  the -- set to be the Supe II over the Special Projects,
8  there were no bulky items being brought in.
9  Q.  To your knowledge, what happened to bulky
10  items?
11  A.  They just weren't being bagged and tagged.
12  Q.  They were being disposed of?
13  A.  Mm-hmm.
14  Q.  Yes?
15  A.  Yes.
16  Q.  When did that change?
17  A.  I'm not sure on the date.
18  Q.  What caused it to be changed?
19  A.  I'm not aware of that either.
20  Q.  Did you get a directive that, "From now on,
21  we're going to start storing" --
22  A.  Yes.
23  Q.  -- "bulky items"?
24    Who did that direction come from?
25  A.  I don't know the exact person, but I know it

---

Page 94

1  was a manager.
2  Q.  Do you recall why that change was made?
3  A.  No.
4  Q.  How long after you became Supe -- operations
5  manager did that change happen?
6  A.  I'm not sure.
7  Q.  Was it before you got the added responsibility
8  for the Reactionary Crew?
9  A.  I believe so.
10  Q.  So let's -- I know we've covered parts of this,
11  but I'd like to make sure we get it all in one place.
12    Let's talk about the typical process by which
13  items arrive from a resolution to the yard to be stored
14  there.  Okay?
15    First of all, how are they brought to the yard?
16  A.  In a pickup truck.
17  Q.  Is there any particular time of day when items
18  are brought?
19  A.  No, no particular time.
20  Q.  Whenever the operation is concluded?
21  A.  No.  When -- after the item is ready to be --
22  after the item needs to be bagged and tagged, they bring
23  it in.
24  Q.  Okay.  And the people who bring it in are the
25  workers who have participated in the resolution,

---

Page 95

1  correct?
2  A.  Yes.
3  Q.  So that can be people from -- well, I just
4  have -- exclusively HSOC people, or is it someone else?
5  A.  From the resolution?
6  Q.  Yeah.
7  A.  Yes.
8  Q.  When items arrive at the yard, have they
9  already been bagged?
10  A.  At times, yes.
11  Q.  But sometimes no?
12  A.  Sometimes no.
13  Q.  What distinguishes things that have been bagged
14  from things that haven't?
15    ATTORNEY MURPHY: Object to form.
16    BY ATTORNEY FREEMAN:
17  Q.  Is it size or something else?
18    ATTORNEY MURPHY: Same objection.
19    THE WITNESS: Some items might already be in a
20  backpack.  So it might be a backpack, so it's easy to
21  just put a tag on a backpack as well as, for retrieval
22  purposes, we can have, say, a red duffle bag.
23    BY ATTORNEY FREEMAN:
24  Q.  So those things wouldn't be put in a separate
25  bag?

---

Page 96

1  A.  No.
2  Q.  Because they already have a container?
3  A.  Yes.
4  Q.  But, generally speaking, items that don't have
5  their own container, you would expect they would arrive
6  already bagged?
7    ATTORNEY MURPHY: Object to form.
8    THE WITNESS: What do you mean by a "separate
9  container"?
10    BY ATTORNEY FREEMAN:
11  Q.  Well, like a backpack or a suitcase or a --
12  A.  Yeah.
13  Q.  -- duffle bag.
14  A.  Depends.  If it's like a guitar, we're not
15  going to bag a guitar.  We'll put the tag around the
16  guitar.
17  Q.  Or if it's a wheelchair or a bicycle?
18  A.  Yes.
19  Q.  Did the items come with any documentation
20  attached to them when they arrive at the yard?
21  A.  From a resolution?
22  Q.  Yes.
23  A.  No.
24  Q.  And what is the process by which the intake
25  form is created and a copy of it attached to an item?

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

Page 97

1    In other words, does that happen at the yard?
2  A.  At the yard.
3  Q.  It doesn't happen at the resolution?
4  A.  No.
5  Q.  Let's do this.  I'll show you something that's
6  already been marked as an exhibit, so we don't have to
7  mark it again.  It's Exhibit 1107.
8      (Previously marked Deposition Exhibit 1107 was
9      presented.)
10     BY ATTORNEY FREEMAN:
11 Q.  This is -- I'll just be clear.
12     I believe this is a previous version of this
13 intake form --
14 A.  Yes.
15 Q.  -- not the one you're using now.  I just want
16 to be clear about that.
17     In fact, why don't we do this.  I'll also give
18 you what has been previously marked as Exhibit 1122,
19 which I believe is the current version of the intake
20 form.
21     (Previously marked Deposition Exhibit 1122 was
22     presented.)
23     BY ATTORNEY FREEMAN:
24 Q.  So if you'll look at the old form, 1107, is
25 this a version of the form that is no longer in use?

Page 98

1  A.  Yes.
2  Q.  When did you start using a different form than
3  this one?
4  A.  I'm not aware of a date.
5  Q.  Just for reference, it looks as though the date
6  on Exhibit 1107 is December 27th of 2022.
7      Does that refresh your memory at all about the
8  change having happened after that, the change in form?
9  A.  No, but it just clarifies that it happened
10 after the 22nd.
11 Q.  So you arrive in January of 2023, just shortly
12 after --
13 A.  Yes.
14 Q.  -- Exhibit 1107 was created.
15     At the time that you arrived and took
16 responsibility for your operation, was this older form
17 still being used?
18 A.  Yes.
19 Q.  Okay.  Do you remember when the form changed?
20 A.  No.
21 Q.  Do you remember knowing why it changed?
22 A.  It changed because the pickup date and intake
23 date was confusing as well as the location of the -- of
24 the -- the request number was down at the bottom.  And
25 the request number is something important, and it's also

Page 99

1  important that there be a CMMS request number.  So
2  that's why that got brought up to the top.
3  Q.  Again, service request and CMMS request number,
4  that's the same thing?
5  A.  Same thing.
6  Q.  So I see in the new form, Exhibit 1122, the
7  CMMS request number is at the top.
8  A.  Mm-hmm.
9  Q.  I also notice that in the new form, there's a
10 name field, and there isn't one in the old form.
11     Do you see that?
12 A.  Yes.
13 Q.  Was it a subject of discussion that there
14 needed to be a name field added?
15 A.  Not that I can remember.  But before, they
16 would put the name inside of the description of the
17 items.
18 Q.  Okay.  But it wouldn't be on the intake form?
19 A.  No.  Right here.
20 Q.  Oh, I see.
21 A.  It would have included the name inside here.
22 Q.  In which field in Exhibit 11 --
23 A.  Where it says "Number of Carts or Bags" and
24 then "Detailed Description Please," it would have the
25 name there, too.

Page 100

1  Q.  Okay.  I notice it looks as though -- and
2  Mr. Dilworth did testify about this -- it looks like
3  Exhibit 1107 is one that he filled out.
4      Do you see his name down there?
5  A.  Yes.
6  Q.  And it does not look as though there is a name
7  of an owner --
8  A.  No.
9  Q.  -- on that.
10     Was that a common occurrence that you would get
11 these forms without names attached to them?
12     ATTORNEY MURPHY: Object to form.
13     THE WITNESS: It depends.
14     BY ATTORNEY FREEMAN:
15 Q.  What would it depend on?
16 A.  If it was an unattended item, like written
17 here, there's no way of getting that person's name.
18 Q.  What other changes were made between the old
19 form, Exhibit 1107, and the newer form, Exhibit 1122?
20 A.  There's a spot for the name, date of birth.  I
21 believe I see a change in -- there's a case number.
22 Q.  What is that case number?
23 A.  The police case number, I believe.
24 Q.  On the new form, Exhibit 1122, there's a box
25 about a third of the way down, which is not checked on

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

---

Page 101

1  this one, for "Evidence."
2      What does that refer to?
3  A.  I guess that's checked.  The intake form reads:
4  "Evidence: (if a citation is issued then it is
5  considered evidence)."
6  Q.  So that means if someone is either cited or
7  arrested at the time of the encounter with SFPD, the
8  item that's bagged and tagged is considered evidence.
9      Is that your understanding?
10      ATTORNEY MURPHY: Object to form.
11      THE WITNESS: Yes.
12      BY ATTORNEY FREEMAN:
13  Q.  To your knowledge, has the police ever called
14  the yard to retrieve items of evidence?
15  A.  No.
16  Q.  So I think you testified to this earlier, but I
17  want to make sure I understand.
18      So when something comes in even if that
19  "Evidence" box is checked, you treat it just like
20  everything else?
21  A.  Yes.
22  Q.  And you'll either keep it or dispose of it
23  according to the rules that you apply to everything
24  else?
25  A.  Yes.

---

Page 102

1  Q.  I guess the question is:  Why have this box at
2  all, the "Evidence" box?
3      ATTORNEY MURPHY: Object to form.
4      BY ATTORNEY FREEMAN:
5  Q.  Do you know?
6  A.  I don't know.
7      ATTORNEY MURPHY: Belated objection to form,
8  argumentative.
9      BY ATTORNEY FREEMAN:
10  Q.  There's also a box on the newer form, 1122,
11  that says "Bag & Tag."
12      What does that refer to?
13  A.  I'm not sure.
14  Q.  What does the box "Field Pick Up" refer to?
15  A.  I believe that might be possibly for like an
16  unattended item pickup.
17  Q.  And "P.D. Pick up," is that referring to a
18  pickup at a police station?
19  A.  Yes.
20  Q.  Could it also be referring to a pickup, like we
21  talked about earlier, that the police calls from a
22  location and says, "Come pick this up at the site of the
23  encampment," or do you know?
24  A.  That would just be a matter of -- of the
25  person's opinion which they should use.  I would

---

Page 103

1  consider that a field pickup, something at the field.
2  Q.  So, in your mind, "P.D. Pick up" is at the
3  police station?
4  A.  Yes.
5  Q.  "Field Pick up" is at the site where things
6  have been collected?
7  A.  Yes.
8  Q.  And you just don't know what "Bag & Tag" refers
9  to?
10  A.  Yeah.
11  A.  I see there's a new field, a more complete
12  field, down at the bottom for retrieval by the claimant
13  with their signature and so forth.
14  A.  Yes.
15  Q.  That doesn't exist on the older form?
16  A.  Yes.
17  Q.  When items are brought into the yard from the
18  field and somebody fills out the intake form -- first of
19  all, they get the intake form from that slot or box
20  that's outside of Container A?
21  A.  Yes.
22  Q.  Physically where do they actually fill it out?
23      Do they do it outdoors at Container A, or do
24  they go into an indoor location?
25  A.  They have different options.  They can fill the

---

Page 104

1  inside of their truck.  There's also a table with a
2  chair inside of it in Container A that they can use.
3  Q.  At the time that -- the personnel bringing the
4  item in, when they bring it in, do they have any notes
5  that they could refer to to fill out the intake form?
6  A.  Yes.
7  Q.  What are the notes they have?
8  A.  It's on CMMS.  So if -- if it's like a pickup
9  from a police station, the information will be on the
10  CMMS as well.
11  Q.  So when someone goes out into the field and
12  they decide to do a bag and tag, do they open up a CMMS
13  number?
14  A.  Yes.
15  Q.  And they do that from the tablet that they
16  have --
17  A.  Yes.
18  Q.  -- in the field, and they'll put in the
19  information about the name of the person or...
20  A.  Yes.
21  Q.  So they already have that information, and
22  they're using that information to fill out the intake
23  form?
24  A.  Yes.
25  Q.  Why do you even need the intake form if things

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

Page 133

1  discard."
2      Do you see that?
3  A.  Mm-hmm.
4  Q.  Yes?
5  A.  Yes.
6  Q.  So that's the point at which the employee makes
7  a determination of whether a particular item is to be
8  bagged and tagged or discarded, correct?
9  A.  Yes.
10  Q.  And they have a cheat sheet that they refer to
11  that essentially gives them criteria to make that
12  determination?
13  A.  Yes.
14  Q.  Okay.  Moving from there to the left on
15  Exhibit 1167.
16      If there's a decision not to bag and tag,
17  photos are noted on the associated CMMS, and the CMMS is
18  closed, correct?
19  A.  Yes.
20  Q.  And then things can be taken in the truck and
21  discarded?
22  A.  Yes.
23  Q.  Those things go directly to a Recology dump?
24  A.  Yes.
25  Q.  And moving from that third box down in the

Page 134

1  center to the right.
2      If a determination is made to bag and tag, it
3  says:  "Complete personal property information form &
4  Post on site Notice for property removal - take photos
5  on CMMS# - Except items pick up from PD station."
6      So this box suggests that the personal property
7  information, which we've been calling the intake form,
8  gets completed on-site.
9      Is that what that suggests to you?
10      ATTORNEY MURPHY: Object to form.
11      BY ATTORNEY FREEMAN:
12  Q.  Because it comes below -- it comes before the
13  step below it.
14  A.  You can't complete this form.
15  Q.  Yeah.
16  A.  To complete this form, you have to have the
17  tags --
18  Q.  Yeah.
19  A.  -- which are at the --
20  Q.  So that actually is not quite correct, is it,
21  that "Complete personal property information form"?
22      You can't do that at the site, correct?
23  A.  No.
24  Q.  Okay.
25      ATTORNEY MURPHY: Object to form.

Page 135

1      BY ATTORNEY FREEMAN:
2  Q.  And then from there, it says -- that arrow
3  down, because then you "bring belonging with information
4  to PW Lower Yard."
5      So it's not until you bring the belongings to
6  the yard that you can complete the personal property
7  information form, right?
8  A.  Yes.
9  Q.  Okay.  Now, it says:  "Bring belonging with
10  information to lower yard inside cage."
11      But these days you don't bring it to the Lower
12  Yard, do you?  You bring it to A, to Container A?
13  A.  Yes.
14  Q.  Okay.  So that actually isn't quite accurate,
15  is it?
16      ATTORNEY MURPHY: Object to form.
17      THE WITNESS: No.
18      BY ATTORNEY FREEMAN:
19  Q.  And then you take photos and associated --
20  those are associated with the CMMS number, correct?
21  A.  Yes.
22  Q.  Okay.  Now, after that, if you -- going from
23  the lower right-hand side of the document to the center
24  bottom square.
25      "Special project team" -- that's your team,

Page 136

1  right?
2  A.  Yes.
3  Q.  -- "intake Log and document information on
4  share drive."
5      So describe that process to me.
6  A.  So it says:  "intake Log and document
7  information on share drive."  So we'll grab the white
8  form with the tag matching the color.  We will enter it
9  into the spreadsheet that we have.  And then the
10  spreadsheet -- that -- the hard copy, the paper copy
11  goes into a binder.
12      And then the information has been entered into
13  an Excel sheet that we have that saves all that
14  information.
15  Q.  Actually, let's refer back to Exhibit 1122,
16  which is the current version of the intake form.
17      So this is the legend along the bottom of this
18  document?  That's what you're referring to, the white?
19  A.  Yes.
20  Q.  So this intake form has three copies?
21  A.  Yes.
22  Q.  One's white, one's yellow, one's pink, right?
23  A.  Yes.
24  Q.  Once this has been filled out by the DPW
25  worker, the white page goes into your logbook?

Case 4:22-cv-05502-DMR    Document 520-3    Filed 10/20/25    Page 9 of 23

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

Page 145

1  A.  Yes.
2  Q.  428 Union Street?
3  A.  I'm not sure.
4  Q.  Okay.  From that, it looks as though in January
5    of 2024 the great majority of the items that were bagged
6    and tagged are actually from police stations; is that
7    correct?
8      ATTORNEY MURPHY: Object to form.
9      THE WITNESS: I'd have to count them.
10     BY ATTORNEY FREEMAN:
11  Q.  Okay.  But we could make that determination.
12    If I knew all of these addresses and could determine
13    which ones were police stations, I could determine what
14    number of the bag-and-tags for January of 2024 were
15    picked up from police stations and which ones were not,
16    correct?
17  A.  Yes.
18  Q.  I think the cross street is self-evident, but
19    there are some that have a cross street that's blank.
20     Do you know why?
21  A.  No.
22  Q.  Maybe in the middle of a block --
23     ATTORNEY MURPHY: Object to form.
24     BY ATTORNEY FREEMAN:
25  Q.  -- or don't you know?

Page 146

1  A.  Don't know.
2  Q.  Okay.  The "Request #," is that the CMMS
3    number?
4  A.  Yes.
5  Q.  And what does the number under "Intake" refer
6    to?
7  A.  Items.
8  Q.  So it's the number of discrete either bags or
9    physical items that were received?
10  A.  Yes.
11  Q.  Each one of those items should have its own
12    colored tag?
13  A.  Yes.
14  Q.  "Bike(s)" refers to the number of bikes that
15    were received in a particular intake?
16  A.  Yes.
17  Q.  The "Tag" column lists -- is that the printed
18    number on each of the colored tags --
19  A.  Yes.
20  Q.  -- affixed to the item?
21  A.  Yes.
22  Q.  Please wait for me to finish.  I know you know
23    the answers --
24  A.  Okay.
25  Q.  -- but I need to get the question out.

Page 147

1  A.  Sorry.
2  Q.  And the color of the tags, it's January, so
3    they're all the same color, red, right?
4  A.  Yes.
5  Q.  Okay.  Now, the "Description," where is the
6    description taken from?
7  A.  The intake form.
8  Q.  Okay.  If I were to look at Exhibit 1122, for
9    example, I should be able to match up the description
10    that's on 1122 with what is on this intake spreadsheet?
11  A.  Yes.
12  Q.  "DOB" is that the date of birth of the presumed
13    owner?
14  A.  Yes, when available.
15  Q.  I see it's not available for all of them.
16     And the "Name," is that the name of the owner?
17  A.  Yes, when available.
18  Q.  "Pickup Date," is that when the item was
19    retrieved by the owner?
20  A.  Yes.
21  Q.  Okay.  So if an item was not -- if there's no
22    pickup date, that means the item was not retrieved?
23     ATTORNEY MURPHY: Object to form.
24     THE WITNESS: Yes.
25     BY ATTORNEY FREEMAN:

Page 148

1  Q.  So if you have a log for January of 2024, is
2    that being continually updated?
3     So, for example, if in March someone comes to
4    pick up their item, someone will go back into the
5    spreadsheet and enter a pickup date for it?
6  A.  Yes.
7  Q.  So -- and I don't know -- I don't know when
8    this document was actually physically created, but
9    let's, for purposes of this exercise, if this document
10    was created on December 31st and there's no pickup date,
11    can one conclude that the doc-- the item was
12    destroyed?
13     ATTORNEY MURPHY: Object to form.
14     THE WITNESS: Can you repeat that question?
15     BY ATTORNEY FREEMAN:
16  Q.  Sure.
17     If this is January 2024, if the spreadsheet was
18    updated as of December 31st, end of the year, so it's
19    now eleven months later, and there's no pickup date, can
20    one assume that the item was disposed of, destroyed?
21     ATTORNEY MURPHY: Same objection.
22     THE WITNESS: Yes.
23     BY ATTORNEY FREEMAN:
24  Q.  What is the meaning of the column "Before and
25    After Photos"?

Case 4:22-cv-05502-DMR   Document 520-3   Filed 10/20/25   Page 10 of 23

Coalition on Homelessness, et al. v                                      Edgar Garcia
City and County of San Francisco, et al.                              February 6, 2025

Page 149

1  A.  Where before and after pictures were taken and
2  documented on CMMS.
3  Q.  Okay.  If you look several pages in, it looks
4  as though -- go four pages in, and it looks as though
5  there are -- there are no entries in this column after
6  February 27th.
7       Do you see that?
8       Apparently for the rest of the year.  Do you
9  know why that is?
10 A.  No, I don't.
11      ATTORNEY MURPHY: Object to form.
12      BY ATTORNEY FREEMAN:
13 Q.  And there's a disposal date here, and there's
14 just no entry for several months.
15      Do you know why that is?
16 A.  No.
17 Q.  There's a notation about seven pages in -- I
18 can show it to you to make it easier for you.  In a
19 column that's highlighted yellow, it says "Purged
20 8/1/24," which I presume is August 1, 2024.
21      Do you know what that notation means?
22 A.  That means that the items were disposed of
23 August 1st, 2024, if the items were not picked up.
24 Q.  Okay.  So that would refer to everything on the
25 right-hand column?

Page 150

1  A.  That was not picked up.
2  Q.  That was not picked up.  Got it.
3       And then two pages further down, it says
4  "Purged 9/1/24."
5       If no retrieval date, same thing?
6       If the pickup date is blank, then it means that
7  the item was destroyed?
8  A.  Yes.
9       ATTORNEY MURPHY: Object to form.  Belated
10 objection.
11      BY ATTORNEY FREEMAN:
12 Q.  And the same thing two pages further on the
13 June log, "If no retrieval date, purged 10/1/24."
14      That means if there's nothing in the retrieval
15 column that those items were destroyed?
16 A.  Yes.
17      ATTORNEY MURPHY: Same objection.
18      BY ATTORNEY FREEMAN:
19 Q.  Is there any way to tell from this document
20 when any of these pages was created and last updated?
21      ATTORNEY MURPHY: Object to form.  And I note that
22 the witness doesn't have the metadata that you received
23 with the document.
24      ATTORNEY FREEMAN: I understand.
25      BY ATTORNEY FREEMAN:

Page 151

1  Q.  You can answer if you --
2  A.  Not that I know.
3  Q.  Okay.
4       ATTORNEY MURPHY: Also note that I believe this was
5  designated Confidential, and that's not noted on the
6  exhibit itself, just for the record.
7       ATTORNEY FREEMAN: Yeah, yeah.
8       ATTORNEY MURPHY: I don't have a problem with you
9  questioning about it, but I note this has been used in
10 several depositions.  Nothing on the document reflects
11 the confidentiality.
12      ATTORNEY FREEMAN: Okay.  You're free to -- well,
13 it's not being entered as an exhibit in this deposition.
14 If you want to designate a portion of the transcript as
15 Confidential, there's a way to do that, which is fine
16 with us.
17      ATTORNEY MURPHY: Understood.
18      BY ATTORNEY FREEMAN:
19 Q.  Thank you.  I think we can put this away.
20      Who is the -- well, before we put that away,
21 who is the person responsible for creating the Bag and
22 Tag Spreadsheet?
23 A.  Christopher Seisay.
24 Q.  Okay.  That's one of his duties?
25 A.  Yes.

Page 152

1  Q.  Was he doing that throughout 2024?
2  A.  Yes.
3  Q.  And he's still doing it today?
4  A.  Yes.
5  Q.  Now, those -- one more question about that
6  spreadsheet.
7       The places where a police station address is
8  listed as the address, does that indicate that the item
9  was physically picked up at a police station versus
10 police calling from the site and saying come pick this
11 up?
12 A.  It's a possibility.  You never know.  It's --
13 there's also the possibility that there was an arrest
14 made outside of the police station, that -- you know,
15 and the address was used.
16 Q.  Who would know the answer to that for sure?
17 A.  The police.
18 Q.  But, in any event, it is a police-involved
19 pickup; is that fair to say?
20 A.  Yes.
21 Q.  On that form that you have in front of you, the
22 Bag and Tag Log, Exhibit 1108, is there any way to
23 determine which property is -- has been bagged and
24 tagged because it's seized as evidence?
25 A.  No.

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

Page 157

1  Q.  I understand, but I'm asking for your estimate.
2  You work there.  You know what's going on.
3      Is it more than half of the things that you
4  store that get reclaimed?
5      ATTORNEY MURPHY: Object to form, asked and
6  answered.  The witness said he would be guessing.
7      ATTORNEY FREEMAN: I'm probing this.
8      BY ATTORNEY FREEMAN:
9  Q.  Go ahead.
10 A.  Less than half.
11 Q.  Less than half.
12     Is it less than a quarter?
13     ATTORNEY MURPHY: Same objection.
14     THE WITNESS: Like I said, I'd be guessing.
15     BY ATTORNEY FREEMAN:
16 Q.  Okay.  More than 10 percent?
17     ATTORNEY MURPHY: Same objection.
18     THE WITNESS: It would be a guess as well.  Only
19 answer I feel comfortable saying is it's less than half.
20     BY ATTORNEY FREEMAN:
21 Q.  Okay.  At the time that the end of a month
22 comes and your crew is discarding the three-months-ago
23 items from either Container D or Container E, are those
24 containers typically pretty full?
25     ATTORNEY MURPHY: Object to form.

Page 158

1      THE WITNESS: It depends.
2      BY ATTORNEY FREEMAN:
3  Q.  What does it depend on?
4  A.  On the months.  Sometimes they are.  Sometimes
5  they're not.
6  Q.  Okay.  Does it depend on how full they were at
7  any time?
8      In other words, if you have a half-full
9  container, it's obviously not going to be full at the
10 end of the month, right?
11 A.  It depends on a lot of things, how many things
12 were brought in, how many things were retrieved.
13 Q.  Is there anything that you can say is typical?
14     ATTORNEY MURPHY: Object to form.
15     THE WITNESS: No.
16     BY ATTORNEY FREEMAN:
17 Q.  I may have asked this before, so forgive me if
18 I did.
19     But do you keep a separate record of things
20 that are destroyed after three months?
21 A.  No.
22 Q.  Do you keep a record of the tonnage of things
23 or the cubic -- you know, the cubic volume or anything
24 else, any other measurement of the things that are
25 destroyed after three months?

Page 159

1  A.  No.
2  Q.  Do you keep a record of the truckloads that you
3  send to the Recology yard when things are sent there
4  after three months?
5  A.  No.
6  Q.  Let's talk about what happens when someone
7  comes to retrieve an item.
8      Who is the first person at the yard that the
9  claimant interacts with?
10     Who is the first person they see?
11 A.  It depends.
12 Q.  Give me the possibilities.
13 A.  Depends on the time of day.
14 Q.  Okay.  Let's say it's the middle of the day,
15 it's working hours.
16 A.  Middle of the day, working hours, the first
17 person they will see is the security guard at the front
18 booth.
19 Q.  Does the security guard have a responsibility
20 to receive information to relay it to somebody else?
21 A.  Yes.
22 Q.  What do they do?
23 A.  They gather basic information and call the
24 Radio Room and provide it to them.
25 Q.  And what's the basic information that they

Page 160

1  gather?
2  A.  Name, date, possible location, any -- date of
3  birth.
4  Q.  Okay.  And there's a person in the Radio
5  Room -- I believe there's someone there by the name of
6  Eric, but what is that person's title?
7  A.  He's a radio dispatcher.
8  Q.  So the security guard calls the radio
9  dispatcher and says, "There's someone here, name of
10 such-and-such," basic description of the items.
11     Does the person claiming the item -- I'll call
12 them the claimant -- does that person ever talk to the
13 radio operator?
14 A.  No.
15 Q.  So it's the security guard calls the radio
16 operator.
17     And what does the radio operator do with that
18 information?
19 A.  They inform somebody on my crew that that
20 person is there to retrieve their items and provides us
21 with the same info that was given to them, and they'll
22 start looking through the database to see if they can
23 assist us with information to where the items might be.
24     Like, you know, if the person doesn't have a
25 date, they might be able to find a date and provide us a

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

Page 161

1  date so we know which container to look at.
2  Q.  There might be -- let me ask you about this.
3      There might be a step that comes before that.
4  In other words, does the radio operator first try to
5  match the information that comes from the security guard
6  to the information that he already has on CMMS?
7  A.  Yes.
8  Q.  Okay.  And if there's a solid match and you
9  could match up a name, you can match up an item, what
10  does the radio operator do?
11  A.  Inform us.
12  Q.  Okay.  He informs someone in Special Projects?
13  A.  He or she.
14  Q.  All right.  Informs someone in Special
15  Projects?
16  A.  Yes.
17  Q.  One of your employees?  Not you personally,
18  right?
19  A.  Not me personally.
20  Q.  Okay.  And then that person will go and then
21  search the appropriate bin --
22  A.  Yes.
23  Q.  -- for the month and try to find the item?
24  A.  Yes.
25  Q.  Okay.  Let's leave that there for a minute.

Page 162

1      Let's suppose there is no obvious match.  The
2  radio operator takes the information, compares that to
3  what's in CMMS, and can't come up with a match.
4  A.  Yes.
5  Q.  What does the radio operator do?
6  A.  They inform us.
7  Q.  Okay.  They say, "We have no match" --
8  A.  Mm-hmm.
9  Q.  -- "See what you can do."
10  A.  To look at your information to see what you can
11  find.
12  Q.  Okay.  Let's hold that one for a second.
13      If the radio operator -- the radio operator
14  will know if something's -- if there's a match but the
15  item is being held at a police station, will the radio
16  operator know that?
17  A.  They can find that information.
18  Q.  Okay.  And if the radio operator calls -- knows
19  that information, they won't involve you at all, but
20  they'll call -- they'll call the police administration
21  or they'll tell the -- or will they tell the security
22  guard to tell the individual his stuff is at the police
23  station?
24      ATTORNEY MURPHY: Object to form.
25      THE WITNESS: There's two different ways.  They

Page 163

1  might inform one of our guys that we don't have their
2  items, but they are at the police station, and we
3  might -- we might let them know, also.
4      BY ATTORNEY FREEMAN:
5  Q.  Okay.  But somehow that information will get
6  out to the claimant who's standing at the front gate,
7  "Your things are at the police station"?
8  A.  Yes.
9  Q.  Now, in the situation where the radio operator
10  can find a match and calls one of your employees, what
11  does that employee then do?
12  A.  Look for the items.
13  Q.  And how will he or she look for the item?
14  A.  They identify -- they'll have the information
15  of what date it happened on so they'll know what -- and
16  they'll either receive that information from the Radio
17  Room of what color tag they're looking for, so they'll
18  know what month they're -- what container they're
19  looking for.
20      They also know the number of the tags that
21  they're looking for, or they'll look for that
22  information themselves and identify what container the
23  items are in and look for the items.
24  Q.  So within a particular container, let's say
25  Container B --

Page 164

1  A.  Yes.
2  Q.  -- which today holds everything from January,
3  correct?
4  A.  Yes.
5  Q.  Okay.  Within Container B, as an example, are
6  things sorted out, organized either by tag number or by
7  date?
8      ATTORNEY MURPHY: Object to form.
9      THE WITNESS: No.
10      BY ATTORNEY FREEMAN:
11  Q.  So they're basically all mixed together without
12  having been sorted by tag number or date, correct?
13      ATTORNEY MURPHY: Same objection.
14      THE WITNESS: Well, you start loading -- or you
15  start putting the items in order -- not order, but as
16  you're getting them so you can assume that the items
17  that are the oldest will be all the way in the back.
18      BY ATTORNEY FREEMAN:
19  Q.  Okay.  So does it ever happen that the radio
20  operator tells your employees, "I have a match," and
21  your employees can't find the item?
22  A.  It's happened in the past.
23  Q.  Okay.  What happens in that circumstance?
24  A.  We give the person, an individual, a claim
25  form.

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

Page 169

1  Q.  What then happens?
2     Does the operator then call one of your
3  employees and ask them to look for the item anyway?
4  A.  They call one of our employees to go speak with
5  the person to see if we can gather more information.
6  Maybe they were wrong about the date.  And this happened
7  before where they provided the wrong date.  We work with
8  the person to get a better date, better location, a
9  better description of what was found.
10 Q.  Okay.  And so let's -- I'm sure it happens from
11 time to time, that even after getting additional
12 information, there's no match, the radio operator cannot
13 find a match.
14    What do you do in that circumstance?
15 A.  Give the person a claim form.
16 Q.  So you don't undertake a search in the
17 containers if you haven't found a match from the Radio
18 Room through CMMS; is that correct?
19 A.  Can you repeat that differently?
20 Q.  Sure.
21    If somehow you can't come up with a match in
22 the Radio Room from the information that's been provided
23 to CMMS, then you won't -- you won't start a manual
24 search just looking through everything to try to find an
25 item --

Page 170

1  A.  No.
2  Q.  -- is that correct?
3  A.  No.
4  Q.  Correct?
5  A.  Correct.
6     ATTORNEY MURPHY: I think we've been going about an
7  hour.
8     ATTORNEY FREEMAN: That's fine.  We can break now.
9     (Recess taken from 1:41 p.m. to 1:51 p.m.)
10    BY ATTORNEY FREEMAN:
11 Q.  Mr. Garcia, in your work at the yard, do you or
12 your employees ever have an occasion to clean up any
13 health or safety hazards?
14 A.  In the yard?
15 Q.  Yes.
16 A.  No.
17 Q.  Okay.  Is there ever a situation where
18 something arrives for a bag and tag, and someone at the
19 yard determines, "No, that's hazardous"?
20 A.  Not that I'm aware of.
21 Q.  So all of those issues are addressed in the
22 field?
23 A.  They should be, yes.
24 Q.  So now let's talk about the field, because I
25 know you've been in the field yourself.  You used to

Page 171

1  work in the field.
2     In the field, during your time there, did DPW
3  personnel clean up after any health or safety hazards?
4  A.  Would you be able to specify "health or safety
5  hazards"?
6  Q.  Sure.
7     I mean, we've heard references from various
8  witnesses about items that are soiled or hazardous or
9  contaminated with blood or feces or urine.
10 A.  Yes.
11 Q.  So let's take that as a category.
12    So your folks have dealt with that kind of
13 bodily fluids, let's say?
14 A.  Yes.
15 Q.  Any other safety hazards, like chemicals?
16 A.  I mean, paint is considered hazardous --
17 Q.  Right.
18 A.  -- oils.
19 Q.  So you've come across things in encampments
20 that would fall under that category, paints or oils?
21 A.  Yes.
22 Q.  Okay.  Gasoline or oil or anything flammable?
23 A.  Yes.
24 Q.  So let's take those -- am I missing something?
25    Are there other health or safety hazards that

Page 172

1  DPW employees have encountered in the field that you
2  know of?
3     ATTORNEY MURPHY: Object to form.
4     THE WITNESS: I might be missing something, but I...
5     BY ATTORNEY MURPHY:
6  Q.  Let's take those categories.  If something else
7  occurs to you, interrupt me, let me know.
8  A.  Okay.
9  Q.  I want to cover it all.
10    So when DPW employees encounter items that are
11 either soiled or just, you know, feces or urine or blood
12 that's loose, what steps do they take to clean them up?
13 A.  It depends on what it is.
14 Q.  Okay.  Give me the various possibilities.
15 A.  If it's a bucket or a tank of gas,
16 they'll put it in one of the pickup trucks and bring it
17 back to the hazmat area.
18    If it's a soiled blanket, they'll throw it in
19 the back of a dump truck and dispose of it at Recology
20 with the rest.
21 Q.  Do they use any cleaners or disinfectants or
22 other chemicals to treat the area where they've
23 encountered those items?
24 A.  Yes.
25 Q.  What do they use?

Case 4:22-cv-05502-DMR    Document 520-3    Filed 10/20/25    Page 14 of 23

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

Page 173

1  A.  I don't know what the actual chemical is, but
2    typically like Pine-Sol type.
3  Q.  Pine-Sol?
4  A.  Yeah.
5  Q.  A general purpose household cleanser?
6  A.  Yes.  For like the sidewalk, for steaming the
7    sidewalks, and when there's feces left behind, yes.
8  Q.  That's what you use, not to be too loose about
9    it, but the same kind of stuff I might use in my kitchen
10   or bathroom?
11  A.  Yes.
12  Q.  Okay.  So we've talked about human waste and
13   blood.
14     What about contamination by animals or bedbugs
15   or anything like that?
16  A.  Yes.
17  Q.  What kind of treatment is applied to those?
18  A.  Bedbugs and those items, all the items are
19   disposed of.
20  Q.  Okay.  And is there any particular cleaning
21   agent or disinfectant or chemical agent that's applied
22   to those areas?
23  A.  No.
24  Q.  The same thing?  The Pine-Sol?
25  A.  Yes.

Page 174

1    Other hazardous stuff is like drug
2    paraphernalia --
3  Q.  Okay.
4  A.  -- needles.
5  Q.  What happens when -- and I assume they're
6    wearing some kind of safety equipment, too?
7  A.  Yes.
8  Q.  What do they wear?
9  A.  Over -- full cover, like a white or blue suit,
10   safety gloves, safety vest, face mask.
11  Q.  And what chemicals or substances, if any, are
12   they treating those areas with?
13  A.  Same, the same.
14  Q.  Okay.  So in the DPW tool bag or truck or
15   whatever it is, they have Pine-Sol or something like
16   Pine-Sol?
17  A.  Yes.
18  Q.  Is there any other chemical agent that they use
19   to deal with contaminated substances or areas?
20  A.  Not that I'm aware of.
21  Q.  Is there ever any post-action assessment when
22   hazardous substances are removed?
23     ATTORNEY MURPHY: Object to form.
24     THE WITNESS: Not that I'm aware of.
25     BY ATTORNEY FREEMAN:

Page 175

1  Q.  Is there any particular training that is given
2    for cleaning up hazardous substances?
3  A.  Not that I'm aware of.
4  Q.  Are there any environmental standards that
5    you're aware of that you're instructed on to apply to
6    cleaning up hazardous areas?
7  A.  Not that I'm aware of.
8  Q.  Any labor standards that are applied to
9    cleaning up hazardous areas?
10  A.  Not that I'm aware of.
11  Q.  Now, for things that are -- you talked this
12   morning about electric batteries on scooters, and when
13   those are bagged and tagged, during the time, you know,
14   before they're -- the first 90 days they're kept in the
15   containers with the other bagged-and-tagged items,
16   correct?
17  A.  Yes.
18  Q.  Okay.  And then afterwards, rather than being
19   taken to Recology, to the dump, the batteries will be
20   taken to the hazmat area, correct?
21  A.  Yes.
22  Q.  Ultimately, eventually, what happens to those
23   batteries?
24  A.  I don't know.
25  Q.  Okay.  But it sounds like there's a separate

Page 176

1    treatment for paints and oils that get picked up on a
2    bag and tag.
3      They get immediately taken to the hazmat area?
4  A.  Yes.
5  Q.  So but they're not bagged and tagged.  They're
6    just -- they're essentially disposed of, but instead of
7    going taking them to the dump, you take them to your own
8    hazmat area; is that correct?
9  A.  Yes.
10  Q.  And what ultimately happens to those paints and
11   oils; do you know?
12  A.  They get disposed of.
13  Q.  In a special hazmat area, or -- I assume you
14   can't take them just to the dump.
15  A.  It's a separate department that comes up and
16   picks that up.
17  Q.  Who does that?
18  A.  I believe DPH.
19  Q.  Public Health?
20  A.  Yeah.
21  Q.  At the HSOC or JFO operations where hazardous
22   substances are encountered, is there some group other
23   than DPW employees that is tasked with dealing with
24   them?
25  A.  No.

Case 4:22-cv-05502-DMR    Document 520-3    Filed 10/20/25    Page 15 of 23

Coalition on Homelessness, et al. v                                    Edgar Garcia
City and County of San Francisco, et al.                          February 6, 2025

Page 181

1  A.  I don't.
2  Q.  The next item, the next exhibit.
3       Before we do, do you recall any discussions
4  about security issues relating to the bag-and-tag items
5  at the yard?
6  A.  During this meeting --
7  Q.  No.
8  A.  -- or in general?
9  Q.  At any time.
10  A.  Yes, there was always concerns of break-ins in
11  that cage.
12  Q.  Okay.  And tell me when you first became aware
13  of those concerns.
14  A.  When I -- in January when I became the Supe II
15  of the location.
16  Q.  And what did you learn?
17  A.  That there were frequent break-ins.
18  Q.  And at the time, was the cage locked?
19  A.  It was locked, but they were still cutting
20  holes into the fence and trying to find ways in.
21  Q.  Okay.
22  A.  It was never -- it was never -- it was never
23  them trying to break in through the main door.  It's
24  always -- whoever was trying to break in was breaking
25  into the sides.

Page 182

1  Q.  Okay.  Did you ever -- did anyone ever
2  determine who was trying to break into the cage?
3  A.  No.  There was video footage of when people
4  were trying to break in, but nobody was ever caught.
5  Q.  Nobody was ever apprehended or arrested?
6  A.  No.
7  Q.  How frequently did this happen?
8       ATTORNEY MURPHY: Object to form.
9       THE WITNESS: I -- I wouldn't be able to give a
10  solid answer for that one.
11       BY ATTORNEY FREEMAN:
12  Q.  Is the yard itself surrounded by a security
13  perimeter?
14  A.  Yes.
15  Q.  So, in order to get to the cage, someone would
16  first have to either scale a fence or cut a hole in
17  something or get past a security guard, correct?
18  A.  Yes.
19  Q.  Okay.  So what was happening was, as far as you
20  knew, someone was getting inside the outside perimeter
21  of the yard and cutting a hole in the fence --
22  A.  Yes.
23  Q.  -- in the cage?
24  A.  Yes.
25  Q.  Was that problem ever solved?

Page 183

1  A.  Was it ever solved?
2  Q.  Yes.
3  A.  Adding these new containers deterred it from
4  happening.
5  Q.  Does it still occur that there are break-ins to
6  the cage area?
7  A.  I haven't been informed of one in a while.
8  Q.  When was the last one that you heard about?
9  A.  I can't recall.  Sometime last year.
10  Q.  Did you ever hear any report that a DPW
11  employee was taking things from any of the storage, the
12  bag-and-tag storage areas?
13  A.  No.
14  Q.  Did you ever hear any reports that any DPW
15  person was taking, for their personal use, any items
16  from an unhoused person?
17  A.  Like out in the field?
18  Q.  Yes.
19  A.  Yes.
20  Q.  What did you hear in that regard?
21  A.  They were a part of HSOC resolution, and they
22  took some baseball cards home.  The person claimed that
23  they didn't want anything from that pile.  And the
24  lead -- the lead identified that the items were not
25  bagged and tagged, like -- they didn't meet the criteria

Page 184

1  for bag and tag, but in -- they bagged and tagged some
2  of the stuff.  But in the pile where there was these
3  baseball cards, the person took it upon themselves,
4  since the items were not being bagged and tagged and the
5  person didn't want them anymore, he took them home for
6  his own.
7  Q.  Was that person -- was the employee ever
8  disciplined?
9  A.  Yes.
10  Q.  What happened?
11  A.  They were released.
12  Q.  Is that the only incident that you are aware of
13  where --
14  A.  That I am aware of.
15  Q.  Let me finish the question.
16       Is that the only incident that you're aware of
17  where a DPW employee took items belonging to an unhoused
18  person for their personal use?
19  A.  Yes.
20       ATTORNEY FREEMAN: Let's mark the next exhibit.
21       (Deposition Exhibit 1169 was marked for
22       identification.)
23       BY ATTORNEY FREEMAN:
24  Q.  1169 is an e-mail dated April 24th, 2022.  And
25  I realize this is before the time that you assumed your

Case 4:22-cv-05502-DMR    Document 520-3    Filed 10/20/25    Page 16 of 23

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

Page 197

1    Can you explain that?
2        ATTORNEY MURPHY: Object to form.  Misstates the
3    testimony.  The witness said these reports were for
4    Zone, not Special Projects.
5        ATTORNEY FREEMAN: Understand.
6        BY ATTORNEY FREEMAN:
7    Q.  Was the "Bag & Tag" listing an Exhibit 1172, is
8    that a new requirement as of at least 2023, as far as
9    you're aware?
10       ATTORNEY MURPHY: Object to form.
11       THE WITNESS: I'm not sure before I was there.  But
12   when I was there, I was asked to do that in my weekly.
13       BY ATTORNEY FREEMAN:
14   Q.  Sorry.  Say that again.
15   A.  I'm not sure before I was there, but when -- as
16   soon as I got there, I was asked to add that to my
17   weekly.
18   Q.  Who asked you to add that?
19   A.  My manager.
20   Q.  Who was that?
21       ATTORNEY MURPHY: Object to form; misstates the
22   testimony to the extent you used the word "add."
23       ATTORNEY FREEMAN: Would you read the answer back
24   from a couple of answers ago, please.  "I was asked to
25   add that..."

Page 198

1    (Record read as follows:
2    "ANSWER: I'm not sure before I was there,
3    but when -- as soon as I got there, I was asked
4    to add that to my weekly.")
5        BY ATTORNEY FREEMAN:
6    Q.  Who asked you to add that to your weekly
7    report?
8    A.  Jonathan Vaing.
9    Q.  Did he explain to you why he wanted that
10   information?
11   A.  I don't recall why.  I might have received a
12   previous weekly and instructed to continue what's on
13   that weekly.  It's been almost two years since that.
14   Q.  Okay.  Let's go back to 1171.
15       ATTORNEY FREEMAN: Because you're right, Counsel,
16   there is a Special Projects report that includes "Bag &
17   Tag."
18       BY ATTORNEY FREEMAN:
19   Q.  So let's take a look at page -79504.
20       That's a bag and tag -- excuse me.
21       That's a report from Alison Mickels.
22   M-i-c-k-e-l-s, who you testified earlier was the Special
23   Projects manager before you, right?
24   A.  Yes.
25   Q.  And she has written under "Bag & Tag" a number

Page 199

1    of items.
2        I'd just like you to explain each of these
3    entries because they appear on your report as well.
4    A.  Mm-hmm.
5    Q.  "Persons coming to Ops Yard."
6        Is that people coming to retrieve their things?
7    A.  Yes.
8    Q.  Okay.  And there's a number sign and 4.
9        Does that mean four different people came to
10   the Ops Yard during the week to retrieve things?
11   A.  Mm-hmm.
12   Q.  Yes?
13   A.  Yes.
14   Q.  What is "Received Items into Ops Yard"?
15   A.  The amount of items received into the
16   Operations Yard.
17   Q.  So everything that was bagged and tagged that
18   came in that received a separate colored tag?
19   A.  Yes.
20   Q.  "Returns to owner 1."
21   A.  Yes.
22   Q.  "Items Not returned to Owners/Nothing found 3."
23   A.  Yes.
24   Q.  So that means that of the four people who came
25   to the yard that week, one was able to get their things

Page 200

1    returned and three were not; is that correct?
2        ATTORNEY MURPHY: Object to form.
3        BY ATTORNEY FREEMAN:
4    Q.  Is that correct?
5    A.  Yes.
6    Q.  Has there ever been any investigation into --
7    you know, either in any particular incident or as a
8    whole into why people can't get their things back?
9    A.  This was before my time.
10   Q.  I understand that.  But I'm saying at any time.
11   Because I assume -- let me back up.
12       I assume that during your time there were also
13   occasions when people would come to the yard and they
14   couldn't get their things back, correct?
15   A.  Yes.
16   Q.  In that circumstance, was there ever any
17   investigation by anyone higher up than you as to why
18   that happened?
19       ATTORNEY MURPHY: Object to the form.
20       THE WITNESS: Not that I'm aware of.
21       BY ATTORNEY FREEMAN:
22   Q.  Back to Exhibit 1172, your weekly report.
23       On the third page, there are two photographs.
24   A.  Yes.
25   Q.  Okay.  They say:  "Pictures of Bag and Tag cage

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

---

Page 201

1  clean up and Organization." There's a before picture
2  and an after picture.
3      What was the reason those photographs were put
4  in your weekly report?
5  A.  Just showing one of the projects that the crew
6  worked on that day, that week.
7  Q.  Okay.  Which area is depicted here?
8      Is this the area now known as C?
9  A.  Yes.
10 Q.  The cage?
11 A.  Yes.
12 Q.  And at the time -- this is early 2023 -- that
13 was the only storage area, correct?
14 A.  Yes.
15 Q.  And did someone outside of your organization
16 ask you to initiate a cleanup action?
17 A.  No.
18 Q.  You just decided to do that on your own?
19 A.  Yes.
20 Q.  Why did you decide to do that on your own?
21 A.  It's hard to tell.  You know, it's a while
22 back.  But this might have been the beginning of the
23 month when you're, you know, disposing of the previous
24 month and organizing what's left behind.
25 Q.  Okay.  All right.  That does look like the area

---

Page 202

1  is a little neater and cleaner in the right-hand photo
2  than this left-hand photo.
3      Would you agree?
4  A.  Yes.
5  Q.  Take a look at the next page.  And there are a
6  series of entries for Thursday, February 7th, entries 1
7  through 7 on this page and continuing on through 11 on
8  the next page.
9      Can you describe generally what these entries
10 are?
11     ATTORNEY MURPHY: I think you might have misspoke.
12 It's Tuesday, not Thursday, February 7th.
13     ATTORNEY FREEMAN: If I said "Thursday," I misspoke.
14 It is Tuesday, February 7.
15     THE WITNESS: So this is a GPS report on a vehicle.
16 The -- the red indicator indicates an issue with the
17 vehicle.
18     BY ATTORNEY FREEMAN:
19 Q.  What kind of issue?
20 A.  It could be an engine fault, like a check
21 engine light, idling, speeding, no seat belt.  You'd
22 have to click on every item to -- and it gives you a
23 detail of what's going on.
24 Q.  Is this, for want of a better word, an
25 exception report?

---

Page 203

1      In other words, it only lists items where there
2  was some issue?
3  A.  No.  This lists the whole route for the whole
4  day.
5  Q.  Okay.  So what vehicle was doing this route,
6  the ones on the first two pages, numbers 1 through 11?
7  A.  This vehicle is 43100066.  It is known as a can
8  truck.  It is a crane truck that is used to -- lift
9  and install or remove concrete cans.
10 Q.  To remove what?
11 A.  Concrete cans, concrete city cans, city
12 receptacles.
13 Q.  Is there any particular reason that these items
14 were attached to your weekly report?
15 A.  We're asked to attach one weekly -- one GPS to
16 the weekly report.
17 Q.  Is there anything unusual or problematic about
18 the data that's on this report that caused you to attach
19 it?
20 A.  No.  It's just -- was a random GPS report.  I
21 go off of alphabetical letter, and that's whose GPS
22 report I ran for that day.
23 Q.  I asked you a little while ago about instances
24 where people are not able to -- where someone comes to
25 the yard and their items can't be located.

---

Page 204

1      They're given a claim form, correct?
2  A.  Yes.
3  Q.  Other than they're being given a claim form, is
4  there any notation made in any document at the yard that
5  a person has come and been unable to find their --
6  A.  No.
7  Q.  -- their stuff?
8  A.  No.
9  Q.  Are you aware of any discipline or corrective
10 action being initiated at any time because someone could
11 not find things that they claimed were theirs?
12 A.  No.
13 Q.  Are you familiar with something called the
14 SP Playbook?
15 A.  Yes.
16 Q.  What is it?
17 A.  The Special Projects Playbook.
18 Q.  And tell me what's in that.
19 A.  I haven't seen it in a while, but I believe
20 it's all the job duties for different positions and
21 the -- a list of events happening.
22     ATTORNEY FREEMAN: Okay.  Can we mark the next
23 exhibit, please.
24     (Deposition Exhibit 1173 was marked for
25 identification.)

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

---

Page 205

1    BY ATTORNEY FREEMAN:
2 Q.  Exhibit 1173 is an e-mail from you to Jonathan
3    Vaing and other people dated February 19th, 2023.
4    Do you see that?
5 A.  Yes.
6 Q.  The subject is "Special project Play book."
7    And below that, actually on the back page, the bottom or
8    the first-in-time e-mail in this chain, is from
9    Mr. Vaing, saying:
10    "Hi Edgar,
11    "Thanks for finalizing the S P Playbook."
12    Is the Special Projects Playbook something that
13    was new that you created, or were you just updating it
14    from a previous version?
15 A.  I think I was updating it from a previous
16    version.
17 Q.  And Mr. Vaing is saying:  "Please print
18    attached Power Point and insert information into binders
19    of All events."
20    Do you know what PowerPoint he was referring
21    to?
22 A.  The Bag and Tag PowerPoint.
23 Q.  Okay.  So this was a new PowerPoint as -- as of
24    February 2023?
25 A.  New PowerPoint as in -- what do you mean by

---

Page 206

1    that?
2 Q.  Well, it was --
3 A.  It was new to the binder.  I just -- I'm not
4    sure when it was created.
5 Q.  He says at the bottom e-mail on the front page
6    of 1173, Mr. Vaing says:
7    "Edgar,
8    "Please print and include attached Bag and Tag
9    process into all binders."
10    Do you see that?
11 A.  Yeah.
12 Q.  What was Mr. Vaing asking you to do?
13 A.  To include and attach the bag-and-tag process
14    to all the binders.
15 Q.  Okay.  Was a separate binder given to each of
16    your employees?
17 A.  No.
18 Q.  And so when Mr. Vaing --
19 A.  Not at this time.
20 Q.  When Mr. Vaing refers to "all binders," what
21    binders is he referring to?
22    ATTORNEY MURPHY: Object to form.
23    THE WITNESS: There was -- I can't remember the
24    exact count, whether there was three or four binders
25    created.

---

Page 207

1    BY ATTORNEY FREEMAN:
2 Q.  Okay.  And where were those physically housed?
3 A.  I had one, Jonathan Vaing had one, and DiJaida
4    Durden had the other.
5 Q.  Now, you suggested that maybe there did come a
6    time when all the employees received binders.
7    Did that happen?
8 A.  Yes.
9 Q.  When?
10 A.  Sometime this year.
11 Q.  Well, "this year" would be 2025 or...
12 A.  2024 -- 2025, yes.
13 Q.  2025.
14    And why did that happen?
15    ATTORNEY MURPHY: Object to form.
16    THE WITNESS: I was instructed to.
17    BY ATTORNEY FREEMAN:
18 Q.  By whom?
19 A.  By Jonathan Vaing.
20 Q.  Did he explain why he wanted binders given to
21    every employee?
22 A.  It was when that -- the new crew got hired.  He
23    wanted binders in all of their vehicles --
24 Q.  Okay.
25 A.  -- to include incident reports, accident

---

Page 208

1    reports, policies and procedures, the bag-and-tag
2    process.  A lot of -- lot -- the accident reports,
3    packages.
4 Q.  And this is the Reactionary Crew?
5 A.  The Reactionary Crew, yes.  And I created one
6    for the Special Projects Crew as well.
7 Q.  And what is the Special -- I'm sorry.
8    The "Bag and Tag process" that's referred to in
9    that e-mail, is that the --
10 A.  The PowerPoint.
11 Q.  Okay.  That's the entire training PowerPoint?
12 A.  Yes.
13    ATTORNEY FREEMAN: Okay.  Let's mark the next
14    exhibit.
15    (Deposition Exhibit 1174 was marked for
16    identification.)
17    BY ATTORNEY FREEMAN:
18 Q.  I've handed you Exhibit 1174, Mr. Garcia.  The
19    top e-mail on that is one from you to Mr. Vaing dated
20    January 3, 2023:  "Re: Bag Tag Cage 1/3/2023."
21    Do you see that?
22 A.  What page?
23    (Examines document.)
24    Yes.
25 Q.  Is that your mechanical signature?

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

Page 209

1  A.  Yeah.
2  Q.  That's a signature that you can place on your
3  e-mails --
4  A.  Yeah.
5  Q.  -- as kind of a signature block?
6  A.  Yes.
7  Q.  So is this an e-mail you sent to Mr. Garcia on
8  January 3 of 2023?
9      ATTORNEY MURPHY: I think you misspoke.
10     ATTORNEY FREEMAN: I'm sorry.
11     BY ATTORNEY FREEMAN:
12 Q.  To Mr. Vaing?
13 A.  Yeah.
14 Q.  It appears as though, reading from the bottom
15 up, as we always read e-mails, Adam Maroney earlier that
16 day had sent to Maria Espina and Mark Roumbanis and
17 others photos of an incident report of a break-in at the
18 bag-and-tag cage on January 3.
19     Do you see that?
20 A.  Yes.
21 Q.  Do you recall that incident?
22 A.  Yes.
23 Q.  It was apparently right at the beginning of
24 your tenure --
25 A.  Yeah.

Page 210

1  Q.  -- in the yard, right?
2  A.  Yeah.
3  Q.  What do you recall about it?
4  A.  I just recall seeing the incident report of a
5  bag-and-tag break-in that happened at the yard.
6  Q.  And what do you recall about it?  Do you recall
7  any details about it?
8  A.  No, I don't.
9  Q.  When there was a break-in at the yard at the
10 bag-and-tag cage, was there any way for you or your
11 employees to figure out what had been taken out of the
12 cage?
13 A.  No.
14 Q.  So you -- yeah.  Okay.
15     So you didn't try to go in and do an inventory
16 of everything in the cage and figure out what had been
17 taken?
18 A.  We -- I mean, we would look at the immediate
19 area.  A lot of those break-ins, like, they weren't full
20 break-ins to where somebody walked all the way in.  You
21 can see they ripped a piece of the cage out, and they
22 started digging through it.  So we would look in the
23 immediate area.
24 Q.  But could you determine from any investigation
25 that you did what had been taken?

Page 211

1  A.  No.
2  Q.  What was the result of this incident?
3      Was there any formal investigation of it?
4      ATTORNEY MURPHY: Object to form.
5      THE WITNESS: I don't know.
6      BY ATTORNEY FREEMAN:
7  Q.  Was anybody disciplined because of it?
8  A.  I don't know.
9  Q.  But not that you know?
10 A.  No.
11     ATTORNEY FREEMAN: Next exhibit?
12     THE REPORTER: 1172.
13     ATTORNEY MURPHY: I have 1175.
14     ATTORNEY FREEMAN: 1175.
15     ATTORNEY MURPHY: Do you have a copy?
16     ATTORNEY FREEMAN: If you're nice to me.
17     ATTORNEY MURPHY: This is my best.  Thanks, Bill.
18     THE REPORTER: Oh, you're right.  I was looking at
19 the wrong sticker.
20     (Deposition Exhibit 1175 was marked for
21 identification.)
22     BY ATTORNEY FREEMAN:
23 Q.  Exhibit 1175 is an e-mail from you to Mr. Vaing
24 and others on February 16th of 2023, "Subject: FW:
25 break-in."

Page 212

1      Do you see that?
2  A.  Yes.
3  Q.  Is this an e-mail that you sent?
4  A.  Yes.
5  Q.  And you wrote -- and it has an attachment, by
6  the way.
7      You wrote:  "This is a report of the same break
8  in but the damage to the fence was not reported until
9  the 12/03/2022 since the table was covering it."
10     Now, what I'm trying to figure out, it appears
11 that this is a different break-in from the one that was
12 discussed in the previous exhibit because that was
13 January 3rd of 2023, correct?
14     And this is one that happened sometime in --
15 before December 3rd of the previous year, right?
16 A.  Yeah, I believe so.
17 Q.  And do you recall there being a break-in
18 before that couldn't -- was not discovered for a
19 while because something was covering the hole in that
20 fence?
21 A.  I don't remember the exact dates, but I do
22 remember a break-in that was not reported due to the
23 fact that there was a -- we had a table set up so
24 that people could fill out the form.  And the table
25 was wedged up against the cage holding the cage

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

---

Page 213

1  together.
2  Q.  You say it was holding the cage together?
3  A.  Yeah.
4  Q.  Was it covering a hole in the cage or --
5  A.  Well, the -- there wasn't necessarily a hole.
6  Like, the part of the -- part of the fencing was pulled
7  off.
8  Q.  Okay.
9  A.  Yeah.
10  Q.  So there was an opening that --
11  A.  Yeah.
12  Q.  -- someone could get through?
13  A.  Yeah.
14  Q.  And it was concealed or covered up by the
15  table?
16  A.  Yes.
17  Q.  And so someone concluded that there was a
18  break-in, but it had remained unreported for a while
19  because that table was there?
20  A.  Yes.
21  Q.  Okay.  What ended up happening with that
22  break-in?
23  A.  I'm unaware.
24  Q.  Was there any discipline that was given to
25  anybody over it?

---

Page 214

1  A.  Not that I'm aware of.
2  Q.  Any report other than this e-mail that was sent
3  to anybody about that break-in?
4  A.  I don't know.
5  Q.  Okay.  Was there any corrective action that was
6  taken after these two break-ins that we've been talking
7  about were discovered in late 2022 and early 2023?
8      ATTORNEY MURPHY: Object to form.
9      THE WITNESS: I don't know.
10     BY ATTORNEY FREEMAN:
11  Q.  Would there be someone who would know if you
12  didn't know?  I mean --
13  A.  Possibly one of the managers.
14  Q.  Okay.  But you'd expect to be informed about
15  that, wouldn't you?
16  A.  Yes.
17     ATTORNEY FREEMAN: Let's mark the next exhibit.
18     (Deposition Exhibit 1176 was marked for
19     identification.)
20     BY ATTORNEY FREEMAN:
21  Q.  1176 is an e-mail from you to Mr. Vaing dated
22  February 16th, 2023, regarding -- we already -- well,
23  "Kent Sergeant Bag & Tag Info."
24     Do you see that?
25  A.  Yes.

---

Page 215

1  Q.  What appears, if you start reading from the
2  bottom up -- is it Kent Sergeant -- and correct me if I
3  get this wrong, but I'm just going to tell you what I
4  take from this document, that Kent Sergeant appeared at
5  the yard, was unable to retrieve -- or the personnel
6  were unable to retrieve or find his items.  He was given
7  a claim form.
8      Is that right so far?
9  A.  Yes.
10  Q.  And the previous supervisor, Alison Mickels,
11  was requesting surveillance?
12  A.  Mm-hmm.
13  Q.  I guess she was requesting surveillance video;
14  is that right?
15  A.  Yes.
16  Q.  And if you look at the top e-mail, which is the
17  one that you sent, you said, quote:  "I found that the
18  items were picked up on November 20, 2022 by Jose
19  Cabrera."
20     Now, picked up -- is Jose Cabrera one of your
21  employees?
22  A.  Yes.
23  Q.  Okay.  So he was the person who did the bag and
24  tag, correct?
25  A.  Yeah.

---

Page 216

1  Q.  And you wrote a little further down:
2  "Unfortunately no pictures were taken and comments on
3  SR" -- that's service report, right?
4  A.  Mm-hmm.
5  Q.  -- "are a little off."
6      What did you mean by that?
7  A.  I -- I don't know.
8  Q.  Was there a problem with the way Mr. Cabrera
9  filled out the intake form?
10     ATTORNEY MURPHY: Object to form.
11     THE WITNESS: I don't remember.
12     BY ATTORNEY FREEMAN:
13  Q.  Do you recall there being any discipline of
14  Mr. Cabrera over this incident?
15  A.  I don't know.
16  Q.  Who would know, if anyone did?
17  A.  Jonathan Vaing.
18  Q.  And you said:  "Kent Sergeant came in to claim
19  his items on November 23, 2022, and there is no proof of
20  break-ins from 11/20/22 to 11/23/22."
21     Do you see that?
22  A.  Yes.
23  Q.  Were break-ins fairly common at that time?
24     ATTORNEY MURPHY: Object to form.
25     THE WITNESS: 11/20 I wasn't -- I didn't oversee

---

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

---

Page 217

1  that crew, so I wasn't sure.
2      BY ATTORNEY FREEMAN:
3  Q.  But you might have heard from others as to
4  whether or not there's a frequency of break-ins.
5      Did you hear anything to that regard?
6      ATTORNEY MURPHY: Object to form.
7      THE WITNESS: I don't -- I don't remember.
8      ATTORNEY MURPHY: We've been going about an hour.
9  If we're close enough, we can keep going.  But if you
10 think you've got more, maybe it's a good time for a
11 break.
12     ATTORNEY FREEMAN: We can probably take a break.
13 Probably 15, 20 minutes after that.
14     ATTORNEY MURPHY: Agree to go off?
15     ATTORNEY FREEMAN: Sure.
16     (Recess taken from 2:54 p.m. to 3:09 p.m.)
17     BY ATTORNEY FREEMAN:
18 Q.  Mr. Garcia, I want to make sure that I got the
19 information about this -- all the information I need
20 about this bag-and-tag form, which is Exhibit 1108.
21     You had mentioned that Christopher Seisac was
22 the person who --
23 A.  Seisay.
24 A.  Seisay.
25 A.  S-e-i-s-a-y.

---

Page 218

1  Q.  S-a-y.  Thank you.
2      He was the person responsible for -- is he
3  responsible for all of the input on that form?
4  A.  Yes.
5  Q.  So the last few columns for pickup date and
6  disposable date, those -- if there was information to
7  input, he would be the person to input it?
8  A.  Yes.
9  Q.  Thank you.
10     ATTORNEY FREEMAN: Let's mark the next exhibit.
11     (Deposition Exhibit 1177 was marked for
12 identification.)
13     BY ATTORNEY FREEMAN:
14 Q.  Mr. Garcia, this is the top e-mail on
15 Exhibit 1177, is one that you were copied on -- and
16 you'll see it there -- from Mr. Redjil McLeod dated
17 February 24th, 2023.
18     Do you recall receiving this e-mail?
19 A.  Yes.
20 Q.  And if you go to the second page, the back
21 page, the first-in-time e-mail is from Mr. McLeod to
22 Mr. Vaing and you and others.
23     It says:  "Please see attached Supervisor's
24 report of incident investigation form dated 2/23/23."
25     Do you see that?

---

Page 219

1  A.  Yes.
2  Q.  First of all, who is Redjil McLeod?
3  A.  He's another supervisor that was with Special
4  Projects when I first started.
5  Q.  And do you recall or do you know what report
6  he's referring to in this e-mail?
7  A.  No.
8  It says there's a "Supervisor report of
9  incident investigation form."
10 A.  The next page says -- it has more details.
11 It says:  "Bag and Tag Cage attempted Break-In."
12 Q.  Right.
13     So there apparently was yet another
14 bag-and-tag cage attempted break-in sometime in
15 February of 2023?
16     ATTORNEY MURPHY: Object to form.  Misstates the
17 record.  I don't know that we've heard testimony about
18 an attempted break-in before.
19     BY ATTORNEY FREEMAN:
20 Q.  Okay.  What do you recall about the attempted
21 break-in in late February 2023?
22 A.  I don't remember.
23 Q.  Do you know whether it was a successful
24 break-in?
25 A.  I -- I don't know.

---

Page 220

1  Q.  Do you know, what is the Supervisor's Report of
2  Investigation?
3      Is that a form that the name of which is
4  familiar to you?
5  A.  It's supervisor's report.  It's a special
6  report used to report any incident, whether it be
7  injury, accident, and sometimes for the break-ins.
8  Q.  From what you could tell from this e-mail, did
9  Mr. McLeod fill out a supervisor's report for this
10 attempted break-in?
11 A.  Yes.
12 Q.  Have you seen that before?
13 A.  No.
14 Q.  Do you recall anything about it?
15 A.  Have I seen it before?  I might have.  I don't
16 remember.
17 Q.  Do you know if any corrective action was taken
18 regarding this attempted break-in?
19 A.  I don't know.
20     ATTORNEY MURPHY: Belated objection to form.
21     BY ATTORNEY FREEMAN:
22 Q.  Do you know whether anyone was ever found to
23 have acted negligently or improperly with respect to
24 this incident?
25     ATTORNEY MURPHY: Same objection.

---

Case 4:22-cv-05502-DMR    Document 520-3    Filed 10/20/25    Page 22 of 23

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

Page 221

1    THE WITNESS: I don't know.
2    BY ATTORNEY FREEMAN:
3  Q.  On the same document, Mr. Vaing has written
4    back to Mr. McLeod bottom of the front page:  "We are
5    hoping our new storage container arrive early next
6    week."
7        Do you recall what container that's referring
8    to?
9  A.  I don't.  Possibly Container A and B.
10 Q.  But you're not certain of that?
11 A.  I'm not certain.
12 Q.  It says we "Will need to talk with BBR team
13   regarding shelving, lighting, etc."
14       What's the BBR Team?
15 A.  Bureau of Building Repair.  That would be
16   installing shelving, lighting, and ventilation in
17   those.
18       ATTORNEY FREEMAN: The next exhibit we'll mark.
19   (Deposition Exhibit 1178 was marked for
20   identification.)
21       BY ATTORNEY FREEMAN:
22 Q.  Mr. Garcia, this is an e-mail from you dated
23   August 6, 2022, to the Radio Room and others with an
24   attachment, "Zone B Radio Room Sheet," for Saturday,
25   August 6, 2022.  And on the back side of the page is

Page 222

1    what appears to be the Radio Room worksheet.
2        Can you tell me what this is, please.
3  A.  This is the daily radio sheet that we send out
4    to the -- to the Radio Room to inform who's working
5    where.
6  Q.  At this point you were responsible for Zone B?
7  A.  Yes.  This is the time, remember, when I said
8    that I was assisting Nicole De La Garza when she was
9    off.
10 Q.  Yes.
11 A.  Because this most likely was on a Sun- --
12   Friday or Saturday, which was her off day.
13 Q.  This is a form that the person in charge of a
14   particular zone would send to the Radio Room to inform
15   them of who was on duty?
16 A.  Yes.
17 Q.  And how they could be contacted?
18 A.  Yes.
19 Q.  And what was the reason for completing this
20   form?
21 A.  Just so that we know where everybody's at in
22   case of an emergency, in case of an accident, or in case
23   you need to call them to, you know, address a certain
24   location, you know, who's -- who's the closest person to
25   that location.

Page 223

1  Q.  Okay.  Put that one away.  Thank you.
2        To your knowledge, has anybody ever been
3    disciplined for violating the bag-and-tag policy?
4  A.  Yes.
5  Q.  Tell me when and who.
6  A.  I don't know the date, but it was this year.
7    Thurmond Hollins.
8  Q.  And what was -- what happened that caused --
9  A.  Termination.
10      Oh, he -- that's the one -- that's the guy that
11   took the baseball cards home.
12 Q.  Were the cards ever recovered?
13 A.  Yes.
14 Q.  Were they returned to their owner?
15 A.  They were never requested.
16 Q.  Okay.
17 A.  I'm not sure if they were returned to the owner
18   or not, but they were never requested.
19 Q.  Did anybody make a determination that these
20   were particularly valuable cards or more like they were
21   just someone's collection?
22 A.  I don't know.
23 Q.  And how many cards were involved; do you know?
24 A.  It was a tin, a tin full of baseball cards.
25 Q.  Oh, so it was not just like a bubble gum pack?

Page 224

1  A.  No.
2  Q.  It was a lot?
3  A.  Like a small tin about this big (indicating).
4        ATTORNEY FREEMAN: Okay.  Just for the record, the
5    witness is holding his hands about six to eight inches
6    apart.
7        THE WITNESS: Yes.
8        BY ATTORNEY FREEMAN:
9  Q.  Okay.  And what was the name of that person?
10 A.  Thurmond Hollins, Jr.
11 Q.  Other than Mr. Hollins, has anybody ever been
12   disciplined for violating the bag-and-tag policy?
13 A.  I've heard of, but he's the one that I know
14   that for sure was because he was -- he was under me.
15 Q.  Okay.  And this is 2025, you said, this year?
16 A.  No.  Sorry.  2024.
17 Q.  Okay.  Do you recall when in 2024?
18 A.  No.  The end of 2024.
19 Q.  What would be the name of the form that
20   reflects the discipline that was applied to him?
21 A.  There was a Weingarten meeting.  So if you
22   request a Weingarten meeting information, that might
23   have the details.
24 Q.  Wine Garden, like a restaurant name?
25 A.  Garten, g-a-r-t-e-n.

Coalition on Homelessness, et al. v
City and County of San Francisco, et al.

Edgar Garcia
February 6, 2025

Page 229

1 the managers.

2 Q. At the Supe II meeting or --

3 A. Through e-mail.

4 Q. Through e-mail. Okay.

5    So you'll pass the information on to the

6 manager of the employee who filled out the form?

7 A. A description of, you know, what issues were

8 found, what information was missing.

9 Q. And does discipline ever result from any of

10 those discoveries?

11 A. I don't know.

12 Q. Have you ever yourself taken any corrective

13 action towards someone who has not completed

14 documentation correctly?

15 A. No.

16 Q. And if corrective action is taken, how is it

17 documented?

18 A. I don't know.

19    ATTORNEY MURPHY: Object -- belated object to form.

20    BY ATTORNEY FREEMAN:

21 Q. Don't know, mm-hmm.

22    Have you had any involvement in responding to

23 or investigating administrative claims?

24 A. Can you -- administrative claims as in?

25 Q. The claims that are filled out by people who

Page 230

1 can't get their property back.

2 A. Yes.

3 Q. Okay. What's the nature of what you do,

4 generally speaking?

5    ATTORNEY MURPHY: Objection. Instruction not to

6 answer to the extent any work that you do is at the

7 direction of the City Attorney's Office investigating

8 those claims. I would instruct you not to answer.

9    And you can simply say, "I can't answer because

10 I'm following Counsel's instruction."

11    THE WITNESS: I can't answer because I'm following

12 Counsel's instruction.

13    BY ATTORNEY FREEMAN:

14 Q. Mr. Garcia, would you prefer to see the

15 bag-and-tag responsibilities handled by some other

16 department of the City and County of San Francisco?

17    ATTORNEY MURPHY: Object to form.

18    BY ATTORNEY FREEMAN:

19 Q. You can answer.

20 A. No.

21 Q. Do you think there's an agency or department of

22 the City and County that's better suited to handle bag

23 and tag than DPW?

24    ATTORNEY MURPHY: Same objection.

25    THE WITNESS: No.

Page 231

1    BY ATTORNEY FREEMAN:

2 Q. Have you heard colleagues at DPW express that

3 opinion?

4 A. Yes.

5 Q. Who?

6 A. I don't have names.

7 Q. Okay. Is it something that people talk about

8 that, "Why do we have to do this?"

9 A. Yes.

10 Q. Is there a general sense that people are

11 unhappy about having to perform the bag and tag --

12    ATTORNEY MURPHY: Object --

13    ATTORNEY FREEMAN: -- responsibilities?

14    ATTORNEY MURPHY: Object to form.

15    THE WITNESS: I don't know.

16    BY ATTORNEY FREEMAN:

17 Q. But some are, certainly?

18 A. Some are.

19    ATTORNEY MURPHY: Same objection.

20    ATTORNEY FREEMAN: Let me take a moment just to see

21 if I have any other questions.

22    (Brief pause.)

23    ATTORNEY FREEMAN: Thank you, Mr. Garcia. I have no

24 further questions.

25    THE WITNESS: Thank you.

Page 232

1    ATTORNEY MURPHY: Before we go off, provisionally

2 designate the transcript as Confidential. And I've got

3 3:26 for the time.

4    (At 3:26 p.m. the deposition proceedings

5 concluded.)

6

7

8    _____

9 EDGAR GARCIA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25