# EXHIBIT 30

## To

## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al., v*
*City and County of San Francisco, et al.*

---

Samuel L. Peoples, III
March 18, 2025

---

*Behmke Reporting and Video Services, Inc.*
550 California Street, Suite 820
San Francisco, California 94104
(415) 597-5600

Original File 44262Peoples_NL.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR   Document 520-4   Filed 10/20/25   Page 3 of 7
Coalition on Homelessness, et al., v
City and County of San Francisco, et al.
Samuel L. Peoples, III
March 18, 2025

Page 33

1 weekly schedule?
2    ATTORNEY GEORGE: Objection; form, misstates his
3 testimony.
4    You can go ahead.
5    THE WITNESS: No.
6    BY ATTORNEY TALLA:
7 Q. Do you personally attend HSOC encampment
8    resolutions?
9 A. At times.
10 Q. And how often do you attend the HSOC
11   resolutions?
12 A. Not that often.
13 Q. Does that mean once a month, less than once a
14   month, more --
15 A. Less than once a month.
16 Q. And how long do you stay when you do attend an
17   HSOC resolution?
18 A. Maybe anywhere from 30 minutes to an hour.
19 Q. And why do you attend the HSOC resolution?
20 A. Just to observe.
21 Q. Is there anything in particular that you are
22   observing or looking for?
23 A. No.
24 Q. Do you take any notes when you attend the HSOC
25   resolution?

Page 34

1 A. No.
2 Q. Do you take any photos when you attend?
3 A. Yes.
4 Q. Okay. And what do you take photos of?
5 A. Before, sometimes after, depending what time I
6   get there.
7 Q. And what do you do with those photos?
8 A. I would share them.
9 Q. By e-mail or by text or another method?
10 A. Text, sometimes. And e-mail. Both.
11 Q. And who do you share them with?
12 A. My superiors.
13 Q. Who are those people?
14 A. Jonathan Vaing, DiJaida Durden.
15 Q. And why are you sending them the photos?
16 A. Just because they inquire about certain hot
17   spots at times, hot spots or -- area.
18 Q. And so you want to let them know what's
19   happened?
20 A. Yes.
21 Q. Do you attend JFOs, or have you attended JFOs?
22 A. No.
23 Q. Have you been involved in setting up the
24   schedule for JFOs?
25 A. No.

Page 35

1 Q. And have you been involved, in any way, in
2   planning JFOs?
3 A. No.
4 Q. Okay. So I'm going to show you some documents.
5    ATTORNEY TALLA: Let's start with 1388.
6   (Deposition Exhibit 1388 was marked for
7   identification.)
8    BY ATTORNEY TALLA:
9 Q. So it's an e-mail. Take a look at it. Very
10   long recipient list.
11 A. (Examines document.)
12 Q. And so while you're reviewing it, I'll just
13   note for the record, that's an e-mail dated July 18th,
14   2024, from David Nakanishi, to a number of different
15   people. I'm looking for your name. I believe you are
16   on this e-mail. I cannot find it.
17    And the e-mail's titled "HSOC Joint Field
18   Operation Notes for Thursday July 18th." There is an
19   attachment, not printed and made part of this exhibit,
20   but that says "HSOC Notes 071824."
21    Do you receive e-mails like the one in
22   Exhibit 1388?
23 A. Yes.
24 Q. And are these e-mails ones in which the notes
25   from the daily calls are circulated?

Page 36

1 A. Yes.
2 Q. Okay. And so, on this one, if you go to the
3   third page of the exhibit, the text from David Nakanishi
4   that begins: "Good morning all."
5    Do you see that?
6 A. Yes.
7 Q. Okay. And so he says: "Thank you all for
8   joining the HSOC operations call, highlights below and
9   notes attached."
10    Do you see that?
11 A. Yes.
12 Q. And so then -- I'm not going to read it out
13   loud, but there is some text in bold.
14    Do you see that?
15 A. I -- I do.
16 Q. And so this appears to be a description, at
17   least in part, of the next HSOC operation and the next
18   JFO operation, where those will occur.
19    Do you see that?
20 A. Yes.
21 Q. And so the one that says "Next HSOC operation,"
22   do you see that paragraph?
23 A. Yes.
24 Q. So it says: "Next HSOC operation will be on
25   Friday 100 & 200 blocks of Leavenworth (between golden

Case 4:22-cv-05502-DMR   Document 520-4   Filed 10/20/25   Page 4 of 7
Coalition on Homelessness, et al., v                                           Samuel L. Peoples, III
City and County of San Francisco, et al.                                       March 18, 2025

Page 113

 1  Q.  And when you say "it's not relevant for these
 2  folks," could you just clarify what you mean by that?
 3  A.  It's like me walking into Department of
 4  Homelessness and Housing and asking them to share with
 5  me what their protocol is for the intake at one of their
 6  shelters.  It takes away from -- it's a time waste.
 7      We know what we're doing as far as our jobs.
 8  It's one of those things.  I tried to get this meeting
 9  to happen, and that was the response I got from people,
10  like, ugh.
11      So I was in the middle of that, and I'm, like,
12  yeah, I can see how that could make sense.  Because then
13  someone would have to take time from their breaks, from
14  on the street, from their staff, you know, their day,
15  whatever that is, just to go meet with them.
16      They wouldn't even want to meet us at our site.
17  They wanted us to come to them.  It was just -- it was
18  really an ask.  I mean, it was nice.  But what was
19  behind it was not this.  It was, like, you know, "You
20  guys come over to us.  We're only going to be here at
21  such-and-such date," not taking into consideration that
22  our department has responsibilities.
23      And then so I said it wasn't relevant to what
24  we were doing, because, you know -- if you guys asked us
25  for us to do the prot- -- you know, do it, yeah,

Page 114

 1  absolutely.  But, you know, it's like, why?  Why are you
 2  guys doing this to us?
 3  Q.  So to just break it down a little bit, so
 4  Arielle P. made the request for a presentation on the
 5  bag-and-tag policy?
 6  A.  Yeah.  And I provided her the protocol -- or
 7  the policy.  Excuse me.  Synonymous.
 8  Q.  You sent her the actual policy?
 9  A.  Yes.
10  Q.  So then she asked for an actual presentation?
11  A.  Yes.
12  Q.  And it sounds like you then relayed that
13  request to other people inside DPW?
14  A.  And they got frustrated.
15  Q.  And did they say no, they would not --
16  A.  Yes.
17  Q.  -- do the presentation?
18  A.  Yes.
19  Q.  So then, ultimately, the presentation never
20  happened?
21  A.  It never happened.
22  Q.  Got it.  Okay.
23      So there's this incident, obviously, from
24  September 2022.
25      Has there ever been a presentation, to your

Page 115

 1  knowledge, to Arielle P. about the bag-and-tag policy?
 2  A.  Not to my knowledge.
 3  Q.  To your knowledge, has there ever been a
 4  presentation to DEM about the bag-and-tag policy?
 5  A.  I believe Peter -- God, what's Peter's last
 6  name?  He was our superintendent, three superintendents
 7  ago.  Is it Peter Lau?  Peter Lau?  Peter Lau, yes.
 8      Our superintendent provided DEM with a
 9  presentation when I first started, Sam Dodge's request,
10  at Turk Street address.  That was provided.  So he --
11  he -- it took that to get it done.
12      So this was just, like, we've already done this
13  before.  You know, why do we have to keep doing this,
14  type of thing.
15  Q.  Mm-hmm.  Okay.
16  A.  But Arielle wasn't there, though.  I mean, this
17  was -- but the people on the list, the Meccas and all
18  those folks, they were there at the time that it
19  happened, so it's just Groundhog Day.
20  Q.  Okay.  So let's put away 1402.  I'm going to
21  show you 1403.
22      (Deposition Exhibit 1403 was marked for
23      identification.)
24      THE WITNESS: Thank you.
25      (Examines document.)

Page 116

 1      BY ATTORNEY TALLA:
 2  Q.  This is an e-mail from yourself to Charles
 3  Hardiman, dated June 27, 2022, ccing Sam Dodge.  And, at
 4  least on this e-mail, it has an attachment referenced,
 5  Public Works Bag and Tag.pdf.
 6      Do you see that?
 7  A.  I do see it.
 8  Q.  And then, just for the record, Exhibit 1403
 9  doesn't actually have the attachment.  It's just the
10  cover e-mail.
11      And it says -- you write:
12      "Hi Captain Hardiman,
13      "Here is our policy on the abandoned versus
14  unattended tents.
15      "Let me know if you have any questions."
16      Do you see that?
17  A.  I do.
18  Q.  And Captain Hardiman is with the Fire
19  Department, correct?
20  A.  That is correct.
21  Q.  Okay.  Did he have a role in HSOC?
22  A.  I believe so, yes.  I -- yes.
23  Q.  Was he an incident commander?
24  A.  Yes.
25  Q.  Is he an incident commander any longer?

Case 4:22-cv-05502-DMR   Document 520-4   Filed 10/20/25   Page 5 of 7

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Samuel L. Peoples, III
March 18, 2025

Page 141

1  proceed forward with the resolution because there's
2  an -- what's the word for it -- a crime, I guess, so to
3  speak, infraction, you know, they're blocking the
4  sidewalk, there's something there, the police will tell
5  them they have to move, right? Then that's the
6  enforcement piece.
7      From a standpoint from Public Works -- this is
8  what I know what we would do -- we would allow that
9  person a reasonable amount of time to move their stuff
10 so we can conduct or continue the cleaning, whatever
11 that is. That's typically like 30 minutes. Outside of
12 that, I don't know.
13 Q. And so I just want to make sure I understand
14 what you're saying.
15     In the situations where there's a person who's
16 in violation of some ordinance or statute, there's an
17 enforcement that can happen?
18 A. Yes.
19 Q. And when there's an enforcement that can
20 happen, then the amount of time that the person will be
21 given is the -- I guess, did you say --
22 A. 30 minutes.
23 Q. -- 30 minutes?
24 A. Yes.
25 Q. Okay. So in that situation, is it fair to say

Page 142

1  that you think notice doesn't matter?
2      ATTORNEY GEORGE: Objection; form.
3      THE WITNESS: I think notice does matter in all
4  cases, in every case. I think people have a right to be
5  aware. They need that due process so they can, you
6  know, adjust, whatever that means, right?
7      However, if there's something egregious going
8  on, someone's in violation of some kind of statute, as
9  you mentioned, then we should be able to proceed forward
10 with our cleaning. I'll leave it at that.
11     BY ATTORNEY TALLA:
12 Q. Mm-hmm.
13     And in those situations where enforcement
14 occurs, that enforcement is done by SFPD, correct?
15 A. That's correct.
16 Q. And in those situations where SFPD does
17 enforcement, what role does DPW play, if anything?
18     ATTORNEY GEORGE: Objection; form.
19     THE WITNESS: We would just clean and bag and tag.
20 If there was a -- the high level enough law that was
21 broken -- if, say, for instance, there was an arrest or
22 whatever, then we would do the bag-and-tag policy and
23 implement that.
24     BY ATTORNEY TALLA:
25 Q. Mm-hmm.

Page 143

1  Do you have any role in looking at before and
2  after photos that are taken at encampment resolutions?
3  A. I don't have a role in it, no.
4  Q. Do you look at them?
5  A. Sometimes, yes.
6  Q. And how do you get access to them?
7  A. I have access to -- there's a website for HSOC,
8  Healthy Streets Operations Center. They would have a
9  posting of, you know, the before and after.
10 Q. And that HSOC website, is that a website that's
11 publicly accessible or --
12 A. I'm not sure. I don't think it is. I think --
13 yeah, because I've been locked out myself a couple
14 times.
15 Q. I see. Okay.
16     So you have to log in to access it?
17 A. Yes.
18 Q. Got it.
19     And under the bag-and-tag policy, in certain
20 situations, DPW is required to post something called a
21 post-removal notice, correct?
22 A. That's correct.
23 Q. And do you have any role in reviewing those
24 photographs of post-removal notices?
25 A. I don't have a role in that, no.

Page 144

1  Q. Have you ever looked at any photographs of
2  post-removal notices?
3  A. I have not -- oh, yes. I've seen one in the
4  example of the Visio or the flowchart. That's the only
5  time I've seen one of those things.
6  Q. And in your personal -- the times that you've
7  personally gone out to see an HSOC resolution, have you
8  ever seen a post-removal notice posted?
9  A. I haven't observed one, no.
10 Q. The times that you went out to the HSOC
11 resolutions, have you ever seen anything bagged and
12 tagged?
13 A. Yes.
14 Q. Okay. And do you recall when that happened?
15 A. Years ago.
16 Q. I'm not sure I asked you this question.
17     When was the last time you personally observed
18 an HSOC resolution?
19 A. It was the Hairball. Probably -- sorry. Cesar
20 Chavez and Hampshire. Three weeks ago, four -- a month
21 ago, maybe.
22 Q. Okay. So you can put that aside.
23     ATTORNEY TALLA: It's -- we've definitely been going
24 over an hour. I will say I have about maybe half an
25 hour more of questions. So we could either take a lunch

Case 4:22-cv-05502-DMR   Document 520-4   Filed 10/20/25   Page 6 of 7
Coalition on Homelessness, et al., v City and County of San Francisco, et al.
Samuel L. Peoples, III
March 18, 2025

Page 169

1  Citywide Team and then the Tenderloin Northern Team and
2  then the Mission Team are --
3  A.  You know, actually -- actually, Citywide -- no.
4  They're going to be just -- it's just going to be us and
5  the Police Department on that one.  Sorry.  Sorry.
6  Q.  No, it's okay.  I mean, that was my question,
7  is that --
8  A.  Yeah, yeah.
9  Q.  -- you know, it sounds --
10     ATTORNEY GEORGE:  Hang on.
11     (Reporter clarification.)
12     BY ATTORNEY TALLA:
13 Q.  Finish your answer, please.
14 A.  I'm done.
15 Q.  Okay.  So I'll ask a question.
16    So you had said that the Tenderloin Northern
17 Team and the Mission Team will have essentially the same
18 agencies as HSOC currently, correct?
19 A.  Yes.
20 Q.  Okay.  And so the Citywide Team, am I
21 understanding you correctly to say that it will have
22 only DPW and SFPD?
23 A.  That's correct.
24 Q.  Do you know how the locations that the Citywide
25 Team will go to will be determined?

Page 170

1  A.  I believe 311s.
2  Q.  Okay.  Do you know how long this pilot project
3  will be in place?
4  A.  I don't.
5  Q.  Has anyone told you that it will end at a
6  certain point in time?
7  A.  No.
8  Q.  Do you know whether the pilot project is
9  related to an executive order by Mayor Lurie yesterday?
10 A.  I don't know.
11 Q.  And I think, before, you had referenced
12 something called the policy group or the policy leads.
13 Is that right?
14 A.  Yes.
15 Q.  Who would you consider to be part of the policy
16 group?
17 A.  I would see -- think it'd be safe to put every
18 department head in that group, or some of their
19 lieutenants.
20 Q.  Okay.  Are you looking forward to the job
21 change?
22 A.  Yes.  Yes, I -- yes.  I -- I think it's going
23 to be good.  Just because, like I said, get more streets
24 in, interact with more people, right?  You know, we're
25 not -- people move all the time, right?  They're moving

Page 171

1  around, and, you know, we'll be able to help more people
2  and clean the streets as we go.  So, yeah, I think it's
3  going to be more beneficial.
4  Q.  Okay.
5  A.  I might be naive, but you never know.
6     ATTORNEY TALLA:  Let's go off the record.  I think I
7  just want to look through my notes for five minutes.
8  It's 1:15.
9     THE REPORTER:  Yes, it's 1:15.
10    (Recess taken from 1:15 p.m. to 1:16 p.m.)
11    ATTORNEY TALLA:  We can go back on the record.
12    BY ATTORNEY TALLA:
13 Q.  So until now, have you had any involvement in
14 issuing corrective action or discipline?
15 A.  Yes.
16 Q.  Okay.  And what has your role been?
17 A.  Director of business development.  Not with the
18 City, though.  Are you talking specifically about the
19 City?
20 Q.  Specifically about the City.
21 A.  Oh, sorry.  Okay.  Yeah.  Sorry, sorry.
22 Q.  So let --
23 A.  No.
24 Q.  -- me rephrase my question.
25 A.  Yes, to answer -- go ahead.

Page 172

1  Q.  Since you've been a manager in DPW, have you
2  had any role in the disciplinary process?
3  A.  No.
4  Q.  Have you yourself received any negative
5  feedback or corrective action?
6  A.  No.
7     ATTORNEY GEORGE:  Objection; form.
8     BY ATTORNEY TALLA:
9  Q.  In your role as a manager, have you conducted
10 any analysis of DPW's work related to homeless
11 encampments?
12    ATTORNEY GEORGE:  Objection; form.
13    THE WITNESS:  Yes.
14    BY ATTORNEY TALLA:
15 Q.  And what kind of analysis have you done?
16 A.  I guess, putting together this -- this new
17 operation would be one.  When I first started in HSOC,
18 we had to put together, like, the weekly things, you
19 know, before there was a David Nakanishi.  And I
20 replaced Sam Dodge, so I had to deal with the analysis
21 and the encampment focus-type stuff then.  But outside
22 of that, no, not -- yeah.
23 Q.  Have you ever done any reports or analysis on
24 how many resolutions have been conducted?
25 A.  No.

Case 4:22-cv-05502-DMR   Document 520-4   Filed 10/20/25   Page 7 of 7
Coalition on Homelessness, et al., v City and County of San Francisco, et al.
Samuel L. Peoples, III
March 18, 2025

Page 173

1  Q. Have you ever done any reports or analysis on
2  how many items have been bagged and tagged?
3  A. Yes.
4  Q. And what type of analysis have you done?
5  A. Just reports. Just providing reports.
6  Q. And how did you create or generate those
7  reports?
8  A. A Word document.
9  Q. And what was in those reports?
10 A. Just the number of bag-and-tags. Just
11 basically count. Just, like, counts.
12 Q. How did you make those counts?
13 A. I just worked with our Special Projects, the
14 people that oversee that, and found out how many
15 bag-and-tags we did in a particular week, or something
16 to that effect, and provided that to HSOC.
17 Q. When was the last time you created one of these
18 reports?
19 A. Years.
20 Q. And do you remember why you created that
21 report?
22 A. I think it was requested from -- maybe from the
23 Homeless Coalition at some point in time. I think it
24 was even prior to COVID.
25 Q. Is it fair to say that you haven't created a

Page 174

1  report recently on how many bag-and-tags have occurred?
2  A. That's safe to say.
3  Q. Okay.
4     ATTORNEY TALLA: I think that's actually it. Thank
5  you so much.
6     THE WITNESS: Thank you.
7     THE REPORTER: It's 1:18.
8  (At 1:18 p.m. the deposition proceedings
9  concluded.)
10
11
12  _____
13  SAMUEL L. PEOPLES, III

Page 175

1  STATE OF CALIFORNIA    ) ss.
2  COUNTY OF SAN MATEO    )
3        I hereby certify that the witness in the
4  foregoing deposition, SAMUEL L. PEOPLES, III, was by me
5  duly sworn to testify to the truth, the whole truth and
6  nothing but the truth, in the within-entitled cause;
7  that said deposition was taken at the time and place
8  herein named; and that the deposition is a true record
9  of the witness's testimony as reported by me, a duly
10 certified shorthand reporter and a disinterested person,
11 and was thereafter transcribed into typewriting by
12 computer.
13        I further certify that I am not interested in
14 the outcome of the said action, nor connected with nor
15 related to any of the parties in said action, nor to
16 their respective counsel.
17        IN WITNESS WHEREOF, I have hereunto set my
18 hand this 20th day of March, 2025.
19 Reading and Signing was:
20 __X__ Requested    ____ Waived    ____ Not Requested
21
22  /s/ Suzanne Andrade
23
24     SUZANNE I. ANDRADE, CSR NO. 10682
25     STATE OF CALIFORNIA