# EXHIBIT 35

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

# In The Matter Of:

*Coalition on Homelessness, et al., v*
*City and County of San Francisco, et al.*

*Herbert Ruth, Jr.*
*March 21, 2025*

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California 94104*
*(415) 597-5600*

Original File 44287Ruth_NL.txt
Min-U-Script® with Word Index

Case 4:22-cv-05502-DMR    Document 520-5    Filed 10/20/25    Page 3 of 16

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Herbert Ruth, Jr.
March 21, 2025

Page 25

1  about what to do and what not to do.
2  Q.  And have you ever been given an example of
3  someone, you know, not doing something correctly, and
4  then told how you can do it correctly?
5  A.  Um, yes.
6  Q.  And Mr. Ruth, do you recall some of those
7  examples of when individuals didn't do something
8  correctly, and then you were explained on how to do
9  that correctly?
10 A.  No.
11 Q.  And do you supervise anyone, Mr. Ruth?
12 A.  No.
13 Q.  Do you attend meetings known as "tailgate
14 meetings"?
15 A.  Yes.
16 Q.  Okay.  And what are tailgate meetings?
17 A.  They're meetings about bag & tag, defensive
18 driving.
19 Q.  And how often are tailgate meetings held?
20 A.  Maybe once a week.
21 Q.  And do you -- you attend those meetings once
22 a week, Mr. Ruth?
23 A.  Yes.
24 Q.  Who leads those meetings?
25 A.  Darryl Dilworth, Brittany, or Israel.

Page 26

1  Q.  Is it usually just one of them or all three
2  of them?
3  A.  On occasion, maybe all three.
4  Q.  All three of them?  Okay.  And is there a
5  sign-in sheet for those meetings that you attend?
6  A.  Yes.
7  Q.  And have you ever signed in to one?
8  A.  Yes.
9  Q.  What's discussed at tailgate meetings?
10 A.  Bag & tag policy.
11 Q.  Anything else?
12 A.  Defensive driving.
13 Q.  When you discuss the bag & tag policy at
14 tailgate meetings, have you ever been given a
15 PowerPoint presentation regarding the bag & tag policy?
16 A.  Yes.
17 Q.  Okay.  And during those times, did you ever
18 -- were you ever given any instructions other than the
19 instructions in the PowerPoint presentation?
20    MS. MURPHY:  Object to form.
21    THE WITNESS:  I don't understand what you're
22 saying.
23 BY MR. PRASAD
24 Q.  Put another way, Mr. Ruth, when you've gone
25 over the PowerPoint presentation at tailgate meetings,

Page 27

1  do you typically just go through the PowerPoint, or is
2  there a broader discussion that happens?
3  A.  We just --
4     MS. MURPHY:  Same objection.
5     (Reporter clarification)
6     MS. MURPHY:  The last time I said, apologies,
7  "Same objection."
8     (Reporter clarification)
9  BY MR. PRASAD
10 Q.  Ms. Ball, could you read back the last
11 question to Mr. Ruth, please.
12    (Last question and answer read back by the
13    Reporter)
14 BY MR. PRASAD
15 Q.  Is what you meant to say, Mr. Ruth, that you
16 just go through the PowerPoint?
17    Is that right?
18 A.  We --
19    MS. MURPHY:  Object to form.
20 BY MR. PRASAD
21 Q.  You can answer, Mr. Ruth.
22 A.  Yes.
23 Q.  You mentioned earlier that you've asked your
24 supervisors questions about the bag & tag policy.
25    Have you ever asked questions about the bag &

Page 28

1  tag policy at a tailgate meeting?
2     Mr. Ruth?
3  A.  Yes.
4  Q.  Okay.  And what questions have you asked at a
5  tailgate meeting?
6  A.  Uh, what to do at a bag & tag, when I'm in
7  the field, what's the procedure.
8  Q.  Anything else?
9  A.  That's it.
10 Q.  And have you ever discussed -- at tailgate
11 meetings, have you ever discussed any complaints that
12 people have about DPW workers not following the bag &
13 tag policy?
14
15 A.  No.
16 Q.  Now, earlier you mentioned HSOC, Mr. Ruth.
17 Are there City policies that you are required to follow
18 at HSOC resolutions?
19 A.  Say that again.
20 Q.  Yeah.  Are there City policies or rules that
21 you are required follow at HSOC resolutions?
22 A.  Yes.
23 Q.  What are those?
24 A.  Um, some policies, you need to take a
25 picture.

Case 4:22-cv-05502-DMR   Document 520-5   Filed 10/20/25   Page 4 of 16

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Herbert Ruth, Jr.
March 21, 2025

Page 37

1  what you're saying is that people get 20, 30 minutes or
2  sometimes an hour to move from that area?
3  A.  Uh-huh, yeah.
4  Q.  Who decides how much time that they get?
5  A.  San Francisco Police Department, the Fire
6  Department.
7  Q.  So is it usually someone from the Police
8  Department or the Fire Department who tells the
9  unhoused people there how much time they have?
10 A.  Yes.
11 Q.  You said 20, 30 minutes, sometimes an hour.
12 Have you ever heard the Police Department or Fire
13 Department give anyone less than 20 minutes?
14 A.  No.
15 Q.  How often would you say they give people more
16 than 30 minutes?
17 A.  Often.
18 Q.  How many times a week have you seen people
19 get more than 30 minutes?
20 A.  All week.
21 Q.  And how many times a week have you seen
22 people get less than 30 minutes?
23 A.  Never.
24 Q.  Well, you said 20 minutes sometimes.
25 Correct?

Page 38

1  A.  Yes.
2  Q.  And 20 minutes is less than 30 minutes,
3  right?
4  A.  Yes.
5  Q.  So how many times would you say people -- a
6  week do people only get about 20 minutes?
7  A.  There's -- sometime people just are not
8  organized and ready to move, so we give them a little
9  more time.  The PD give them a little more time, the
10 Fire Department give them a little more time.  And we
11 sit there and wait.  We're just there to clean.
12 Q.  Does anyone from DPW ever tell people how
13 much time they have to clean their items?
14 A.  No.
15 Q.  What happens after the amount of time that
16 people have been given to pack up is over?
17 A.  That's -- that's between PD, San Francisco
18 Police Department and the Fire Department.  We're just
19 there to clean.
20 Q.  So who tells you when you can start cleaning?
21 A.  After PD, after Police Department and the
22 Fire Department does their job, then we come in and
23 clean.
24 Q.  And when you say "after the Police Department
25 does their job," what do you mean, exactly?

Page 39

1  A.  They talk to the -- the homeless, or they
2  talk to maybe someone that's on drugs or, you know,
3  somebody that's just squatting.
4  Q.  And then do the Police Department tell you
5  when you can start cleaning?
6  A.  After the Police Department is done talking
7  with the individuals, and they figure out what they're
8  going to do, as far as if someone's going to jail, or
9  if they're moving, then we come in and clean.
10 Q.  But my question, Mr. Ruth, is:  Who tells you
11 when it's okay to start cleaning?
12     Is it your supervisor?  Is it the Police
13 Department?  Who is it?
14 A.  Hm, most of the time it's -- it's kind of
15 like a shared responsibility.  Um, when they're done we
16 kind of move in, and clean.  But it's the supervisor in
17 the field with us.
18 Q.  And you mentioned that unhoused people
19 sometimes have tents or other property with them at the
20 site.  Correct?
21 A.  Yes.
22 Q.  Who decides whether an individual, an
23 unhoused individual, can take a piece of property with
24 them or not?
25 A.  DPW.

Page 40

1  Q.  And who decides -- and is it usually your
2  supervisor?  Or anyone at DPW can decide whether an
3  unhoused person gets to take a certain piece of
4  property with them or not?
5  A.  Well, we got, uh, a couple items that we, uh,
6  I would like to confiscate.
7  Q.  And what are those items that you confiscate?
8  A.  A bed, a dresser.  A toilet.  A tub.  Um,
9  pieces of bicycles.  Wood --
10 Q.  Sorry.  Please continue, Mister...
11 A.  Wood.  Paint.  Pieces of scooters.
12 Q.  So you're just telling me, Mr. Ruth, that DPW
13 gets to decide whether to confiscate the types of items
14 you just mentioned, or not?
15 A.  Say that again, please?
16 Q.  Yeah.  Does -- is it your -- let me rephrase
17 that.
18     Those items that you just mentioned, does DPW
19 get to decide whether to confiscate those items or not?
20 A.  Yes.
21 Q.  And when you say DPW decides, do you mean the
22 individual workers?  Or do you mean your supervisors?
23 Or both?
24 A.  Both.
25 Q.  And who decides which items among those gets

Case 4:22-cv-05502-DMR   Document 520-5   Filed 10/20/25   Page 5 of 16

| | |
|---|---|
| Coalition on Homelessness, et al., v<br>City and County of San Francisco, et al. | Herbert Ruth, Jr.<br>March 21, 2025 |

Page 65

1  taking pictures?
2  A.  No.
3  Q.  Mr. Ruth, have you ever received any kind of
4  negative feedback from your supervisors about anything
5  you did at a resolution?
6  A.  No.
7  Q.  And have you ever been disciplined for your
8  actions at a resolution?
9  A.  No.
10 Q.  Now, when you bag & tag items -- well,
11 actually, let me rephrase that.
12    Mr. Ruth, have you ever bagged items at a
13 resolution?
14 A.  Yes.
15 Q.  And when -- when you bag items at a
16 resolution, are there any kind of forms that are filled
17 out at the location?
18 A.  You asking me is there any forms that we fill
19 out at the actual location.
20 Q.  Yes.
21 A.  No.
22 Q.  What about at the DPW yard.  Are there forms
23 you fill out there?
24 A.  Yes.
25 Q.  Okay.  And what are those forms?

Page 66

1  A.  Bag & tag policies.
2  Q.  What do those forms look like?
3  A.  A white piece of paper.
4  Q.  Sitting here today, do you remember anything
5  that's written on that white piece of paper?
6  A.  They want to know name of the person, date of
7  birth of the person, um, and the date.  And they want
8  the pictures from the site where it came from.  They
9  want to see pictures of it on the trucks.
10    And they want to see a picture of it going
11 inside the -- the bag & tag lockers or wherever they
12 putting this stuff.
13 Q.  And does any of that information go in the
14 tablet?
15 A.  Yes.
16 Q.  And what information goes in the tablet?
17 A.  We get a bag & tag, it's a separate order.
18 So we call that order in.  Let them know that we got a
19 bag & tag.  We get an SR number for that bag & tag.
20 That's separate.  We get the SR number for the bag &
21 tag.  We take the pictures.
22    And then after we take the pictures, we -- we
23 move that to the truck.  We move from the truck, we
24 take it to the yard.
25    We take more pictures of it going inside the

Page 67

1  lockers where it's stored, and has a tag on it.  One
2  tag goes with the bag, with the name and everything on
3  it, the person.  And the other tag goes inside the
4  dispatch, and a form goes to the supervisor.
5     So it's documented all the way from the time
6  the bag & tag starts to where it goes all the way to
7  the yard, to the dispatch, to the supervisor.  With
8  pictures taken.
9  Q.  And you mention the tags, themselves.  Where
10 do the tags get -- at what location do the tags get
11 placed on property?
12 A.  They get tags on -- in the yard, before it
13 goes into the container, the locker.  There's a tag
14 that goes on it.  Those tags has different dates and
15 times on it.  So, the tags go together so they can know
16 whose it is, and where it's at.
17 Q.  And, does -- do you ever use one tag for
18 multiple bags?
19 A.  No.
20 Q.  Now, you mentioned earlier that -- actually,
21 let me rephrase that.  Yeah.
22    You mentioned earlier, Mr. Ruth, that when
23 you bag & tag an item, the owner gets information about
24 where to retrieve their items.  Correct?
25 A.  Yes.

Page 68

1  Q.  Now, if the owner is not there at the
2  location when you bag & tag the items, then what
3  happens?
4  A.  We leave -- we leave documentation that -- at
5  their location where we -- we got the items, we leave
6  documentation on the wall, at a stationary spot,
7  something that can't leave or be knocked down or blown
8  away.  We leave something there, to let them know that
9  their items will be at the DPW yard.
10 Q.  And have you ever personally left one of
11 those notices?
12 A.  Yes.
13 Q.  How many times would you say you've left one
14 of those notices?
15 A.  Once.
16 Q.  And how long ago was that?
17 A.  Couple months ago.  Last year.
18 Q.  You mentioned the process that takes place at
19 the yard.  What role do you personally have for the
20 tasks that take place at the yard related to bag & tag?
21 A.  Same role as any other employee.
22 Q.  And what's that?
23 A.  Take the pictures, leave a notice, bring it
24 to the yard, take the pictures, off the truck, take the
25 pictures inside the container.  Take the proper

Case 4:22-cv-05502-DMR   Document 520-5   Filed 10/20/25   Page 6 of 16
Coalition on Homelessness, et al., v
City and County of San Francisco, et al.
Herbert Ruth, Jr.
March 21, 2025

Page 69

1  documents where they supposed to go.
2  Q. Now, Mr. Ruth, have unhoused people at
3  resolutions ever asked you to bag & tag items?
4  A. Uh, unhoused people. Say that again?
5  Q. Yeah. Has an un- -- has a homeless person at
6  a resolution ever asked you to bag & tag their items?
7  A. It depends.
8  Q. Well, has it ever happened?
9  A. No.
10 Q. Now, you mentioned the police, that police
11 are present at resolutions. Correct?
12 A. Yes.
13 Q. Have SFPD officers ever asked you to
14 specifically bag & tag certain items?
15 A. Yes.
16 Q. What kinds of items?
17 A. Personal items.
18 Q. Such as?
19 A. Whatever's in the bag. As long as it's not a
20 dresser, a toilet, pieces of bikes.
21 Q. What would happen to a dresser, Mr. Ruth?
22 A. You have to take that off the streets.
23 Q. And what would happen to the dresser?
24 A. Well, that dresser is probably going -- no.
25 It's going to the dump.

Page 70

1  Q. Even if it's in good working condition?
2  A. Well, you can't have a dresser on the
3  streets.
4  Q. Is that a rule somewhere that's in the bag &
5  tag policy?
6  A. They do -- they do bulky items, but they
7  don't do dressers, toilets. You know, stuff that's not
8  supposed to be on the streets, beds, they don't do.
9     But they do bulky items. We do bulky items.
10 We've done a lawnmower, that's like a bulky item. So,
11 I've seen a bulky item, a lawnmower, inside the
12 storage. I've seen a bike inside the storage.
13 Q. But not --
14 A. -- things.
15 Q. But not a dresser; is that right?
16 A. Not a dresser.
17 Q. Okay. Now we were discussing police
18 officers. Have police officers ever asked you to bag &
19 tag items because they were evidence of a -- of a
20 crime?
21    MS. MURPHY: Object to form.
22    THE WITNESS: Yes.
23 BY MR. PRASAD
24 Q. Can you give me an example of such a
25 scenario?

Page 71

1  A. Yeah. So the guy has a warrant for his
2  arrest. He's going to jail.
3  Q. And that was a -- you recall an instance
4  where a man was going -- or a person was going to jail,
5  and the police officers asked you to bag & tag their
6  items?
7  A. Uh-huh.
8  Q. What --
9  A. Or bag -- or bag & tag the tent.
10 Q. Or bag & tag their tent.
11 A. Uh-huh.
12 Q. Because those items or the tent are evidence
13 in the police case? Is that right?
14 A. That's right, that's right.
15    MS. MURPHY: A late objection to form.
16    THE WITNESS: Yes. But those items still
17 might not get bagged and tagged.
18 BY MR. PRASAD
19 Q. And why is that?
20 A. Might find needles. Drugs. It might be
21 soiled. The tent might be torn, and full of feces.
22 The tent --
23 Q. Would that have been --
24 A. -- might have --
25 Q. -- Mr. Ruth, where the police asked to you

Page 72

1  bag & tag an item, but you did not because it was
2  soiled, or for any other reason?
3  A. Exactly. Yes.
4  Q. When the police instruct you to bag & tag the
5  items, or instances where the police have instructed
6  you to bag & tag items, have they given you special
7  instructions about how long to keep those items?
8  A. No. Our policy is 14 days. And then, then,
9  then another -- I think, another item's 30 days.
10 Q. And so in the instances where the Police
11 Department or police officer has instructed you to bag
12 & tag the item, have they instructed you to get their
13 permission before destroying those items?
14 A. Once the police -- if the police -- if the
15 police is taking this guy for a warrant or for some
16 reason why he's going to jail, they'll ask: Hey, we
17 want to get this bagged and tagged.
18    Okay. We okay it. We look at the items.
19 See what kind of condition these items in -- are in.
20 If the items can be salvaged, if they look like it's
21 soiled or something like that, or is -- is -- is -- got
22 feces in it, we're going to have to get rid of that
23 tent. Or we're going to have to get rid of that
24 property.
25    But if the items are clean, they look like

Case 4:22-cv-05502-DMR    Document 520-5    Filed 10/20/25    Page 7 of 16

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Herbert Ruth, Jr.
March 21, 2025

Page 81

1  policy sometimes difficult to follow?
2     MS. MURPHY: Object to form.
3     THE WITNESS: It can be, sometime.
4  BY MR. PRASAD
5  Q. And, and what about it can be difficult to
6  follow, sometimes?
7  A. Just a -- just the form of -- from the
8  beginning of the bag & tag to the end. Just the
9  procedures.
10 Q. Are there any specific procedures that you
11 find hard to follow?
12 A. No.
13 Q. Are there any circumstances in your work
14 where the bag & tag policy doesn't apply?
15 A. If they don't call the bag & tag in, then we
16 don't apply.
17 Q. When you say "they," who do you mean?
18 A. If the Police Department or DPW doesn't have
19 a bag & tag situation, it don't apply. We'll just
20 clean up.
21 Q. In other words, if the Police Department or
22 your supervisors don't tell you to bag & tag, then the
23 policy doesn't apply. Is that what you mean?
24 A. (Nods head) Yes. That --
25 Q. Has it ever happened at an HSOC resolution?

Page 82

1  A. Plenty of times.
2  Q. What do you mean by that?
3  A. You get to -- you get to the HSOC resolution,
4  and there's a tent. And the individual is cooperating,
5  the individual has a nice tent, the individual's living
6  inside his tent. There's no soil, there's no needles,
7  drugs, or anything like that.
8     That person can take his tent down, fold it
9  up, and walk away with it.
10 Q. And so under those circumstances where a
11 person takes their property, that's when you say that
12 the bag & tag does not apply.
13    Is that right?
14 A. Yes.
15 Q. Are there any other circumstances where the
16 bag & tag policy does not apply?
17 A. The only other protocol when you don't need
18 to bag & tag, when you don't need to bag & tag
19 something, that means the tent is soiled. That mean
20 the property's damaged. That mean there's feces,
21 there's urine, all over the place.
22 Q. All right, Mr. Ruth. And, we'll get to that
23 a little bit more.
24    But, are you familiar with the concept of
25 attended property in the bag & tag policy?

Page 83

1  A. Yes.
2  Q. Okay. And what is attended property?
3  A. Attended property is when someone's there
4  with the property.
5  Q. And what are you supposed to do with attended
6  property, under the bag & tag policy?
7  A. If that person's getting arrested, we bag &
8  tag it. And if it's not -- if it's not soiled. If
9  it's not -- if it's -- if it's in living conditions,
10 we'll bag & tag it.
11 Q. Has there ever been a circumstance where
12 somebody said that property was theirs, but you
13 disagreed with them?
14 A. No.
15 Q. Now, when you come upon attended property --
16 actually, let me rephrase that.
17    ==Under the bag & tag policy, when you come==
18 ==upon attended property that includes medications, are==
19 ==you supposed to give that person an advisement about==
20 ==their medications?==
21 ==A. No.==
22 ==Q. Do you know -- have you ever -- in the course==
23 ==of your work, have you ever heard the term "advisement==
24 ==to hold onto medication"?==
25 ==A. No.==

Page 84

1  Q. Does the bag & tag policy place any
2  limitations on what property an unhoused person can
3  take with them?
4  A. Not sure. Can you say -- can you repeat
5  that?
6  Q. Yeah. Does the bag & tag policy contain any
7  restrictions on what kinds of property an unhoused
8  person can take with them?
9  A. I'm not sure. The question you're asking is
10 -- is -- I sound like I heard you say this question
11 before, but you're saying it different.
12 Q. For example, earlier you mentioned dressers.
13 Right?
14    ==Does the bag & tag policy contain any==
15 ==restrictions on the types of property that people are==
16 ==permitted to keep?==
17 ==A. Yes.==
18 ==Q. And what are those restrictions?==
19 ==A. Restrictions, there's only so much stuff you==
20 ==can have on the street. On the sidewalk.==
21 Q. And so, have you ever prevented someone from
22 taking property they wanted to take with them?
23 A. Yes.
24 Q. And other than dressers, what kinds of
25 property have you prevented somebody from taking with

Case 4:22-cv-05502-DMR   Document 520-5   Filed 10/20/25   Page 8 of 16
Coalition on Homelessness, et al., v                                    Herbert Ruth, Jr.
City and County of San Francisco, et al.                                March 21, 2025

Page 85

1  them?
2      MS. MURPHY: Object to form, misstates the
3  testimony.
4      THE WITNESS: A guy got five bikes, all
5  parted out. All over the ground. Blocking the
6  sidewalk. All pieces. Stretched out. Those pieces,
7  we have to confiscate those pieces and put those --
8  and, and take that to the dump.
9      Now, any whole pieces, they can keep. If
10 it's a whole bike, put together. And they want to keep
11 it? Go right ahead.
12     But, we can't have pieces of bikes stretched
13 out from one end of the corner to the next.
14 BY MR. PRASAD
15 Q.  So is it your understanding that in those
16 types of situations where a person has parts of a bike,
17 the bag & tag policy permits you to confiscate those
18 items?
19 A.  Yes.
20 Q.  Now, has there ever been a situation where
21 the police came, gave unhoused people a certain amount
22 of time to move, and then those people refused to move?
23 A.  Yes, all the time.
24 Q.  And what happens in those situations?
25 A.  We stand there for an hour.

Page 86

1  Q.  And what happens when that hour goes by?
2  A.  Wait for the police to take action, and do
3  their job.
4  Q.  And what do the police do in those
5  circumstances?
6  A.  Whatever they got to do.
7  Q.  And what do you -- other than wait, what does
8  DPW do in those circumstances?
9  A.  Clean. While we're waiting on the Police
10 Department and the Fire Department, we clean.
11 Q.  Does the bag & tag policy specify what to do
12 when someone physically can't carry their property with
13 them that they want to keep?
14     MS. MURPHY: Object to form.
15     THE WITNESS: Are you asking me, if a person
16 can't carry all this property, what do we do with it?
17 Is that what you're asking me?
18 BY MR. PRASAD
19 Q.  Yeah. What do you do?
20 A.  First off, the streets need to be clean, the
21 sidewalks need to be clean, so people can walk down the
22 sidewalks. Kids and -- and -- and families are walking
23 through the streets of San Francisco.
24     And one person has enough to -- to take the
25 whole sidewalk? And can't leave with it? We'll ask

Page 87

1  that person to downsize, if it's possible. "Can you,
2  can you please downsize, get rid of some of the stuff,
3  so you're able to move?"
4  Q.  And what happens with the property that you
5  want them to downsize?
6  A.  Sometimes it takes an hour, to, to, you know,
7  just kind of like negotiate, you know, let them know,
8  you know: You got way too much stuff. You can't carry
9  this stuff.
10     Sometime the drugs and whatever's going on in
11 their head, this might be all they have. It's all the
12 property that they have. They want to hold onto it.
13 And we understand that.
14     This is all you have. But, can you please
15 downsize? That way you can move around with it. Not
16 make this corner or this block your home. Or the
17 street or this sidewalk.
18 Q.  So am I understanding right, Mr. Ruth, that
19 when somebody has more property than they can carry
20 with them, that they take some property, but some
21 property gets trashed?
22     Is that right?
23     MS. MURPHY: Object to form. Misstates the
24 prior testimony.
25     THE WITNESS: They usually, after so long,

Page 88

1  after standing there for an hour, they'll give it away.
2  BY MR. PRASAD
3  Q.  And what happens if they want to keep a
4  certain piece of property, but they simply can't carry
5  it with them?
6  A.  We let them make their decision. And pretty
7  much, after about an hour of them moving, they'll start
8  to see that they have way too much, and they'll give it
9  to us.
10     MS. MURPHY: Object to form.
11     (Reporter clarification)
12     MS. MURPHY: Yes, object to form.
13 BY MR. PRASAD
14 Q.  So Mr. Ruth, have you ever seen a homeless
15 person abandon their property because they just can't
16 move it in the amount of time they have been given?
17     MS. MURPHY: Object to form.
18     THE WITNESS: So you asking me, have I ever
19 seen someone that has too much property abandon it.
20     Is that what you're asking me?
21 BY MR. PRASAD
22 Q.  I'm asking, Mr. Ruth, have you ever seen
23 somebody abandon their property because they can't move
24 it in time?
25     MS. MURPHY: Same objection.

Case 4:22-cv-05502-DMR   Document 520-5   Filed 10/20/25   Page 9 of 16
Coalition on Homelessness, et al., v                                    Herbert Ruth, Jr.
City and County of San Francisco, et al.                                March 21, 2025

Page 89

1  THE WITNESS: Yes.
2  BY MR. PRASAD
3  Q. Has there ever been a situation where
4  somebody has too much property to be bag & tagged?
5  MS. MURPHY: Object to form.
6  THE WITNESS: Yes.
7  BY MR. PRASAD
8  Q. What happens in that situation?
9  MS. MURPHY: Same objection.
10  THE WITNESS: Just like the shelter
11  situation. We only can bag & tag personal items. We
12  can't -- we can't -- we can't take dressers and -- and
13  toilets and -- and -- and two-by-fours, and crates. We
14  can't take all that.
15     We can take personal items. Maybe bulky
16  item, if it's like a bike, or a lawnmower, or something
17  in the nature of him having to work. Maybe his tools
18  or something.
19  BY MR. PRASAD
20  Q. We've been talking about attended property,
21  Mr. Ruth. But, are you familiar with the concept of
22  unattended property under the bag & tag policy?
23  A. Yes.
24  Q. Okay. And what is unattended property?
25  A. Property that's unattended, but it looks like

Page 90

1  someone's living here.
2     So, that's like us coming to a resolution.
3  We see a tent. Nobody's home. We take a look inside
4  the tent. We see things are neat. We see clothes
5  folded onto the side. Bed made up.
6     When we see things like that, that's called
7  "unattended property." So we'll bag & tag that. Leave
8  a notice: This is where this property will be at. And
9  this is how long the property will be stored for.
10     I was waiting on this question. You took a
11  long time to get around to it.
12  Q. Are you supposed to take pictures of
13  unattended property, Mr. Ruth?
14  A. All the same procedures get done. Nothing's
15  changed.
16     From the time we get there, we take the
17  pictures. When we looking inside the tent, we take the
18  pictures. Before we take the tent and put it on the
19  truck, we take another picture of it.
20     When we get it to the yard, we take pictures
21  of it. Inside the container. We got a tag.
22  Q. Mister--
23  A. One tag goes to the Radio Room, the other tag
24  goes -- stays on the bag, and the supervisor gets a
25  copy of the bag & tag.

Page 91

1  Q. Are you familiar, Mr. Ruth, with the concept
2  of abandoned property under the bag & tag policy?
3  A. Now we rolling. Yes.
4  Q. Okay. And what's the difference between
5  something that's unattended and abandoned?
6  A. Abandoned property look like no one's been
7  there in months. It's been sitting there, off to the
8  side, maybe in some bushes where you barely can see it.
9  So people been walking by there -- you just can't see
10  it.
11     And it's got debris, it's dirty. It looks
12  like it's been sitting there for months, not being
13  used.
14  Q. Have you ever --
15  A. That's what we call "abandoned property."
16  Q. Do you ever talk to people at the scene to
17  determine whether something is unattended or whether
18  it's abandoned?
19  A. Yes, we always ask questions. If someone, if
20  it's someone walking by or someone standing around, we
21  ask: Hey, does this belong to you? Is this yours? Do
22  you know if anyone's living here?
23     Whatever -- they might say no. They might
24  say: Someone here all the time.
25     We always ask questions.

Page 92

1  Q. And do you inspect an open -- let me put it
2  this way. Do you open tents to determine whether they
3  are unattended or abandoned?
4  A. That's the only way we'll know.
5  Q. Now, you mentioned that you ask questions.
6  How do you handle property if someone says that they
7  know who owns the property; that person's not there but
8  they're coming back?
9  A. Unattended property. Bag & tag it, if it's
10  -- if it's not soiled.
11  Q. How about if someone says they know who owns
12  the property, but they don't know if that person's
13  coming back?
14  MS. MURPHY: Object to form.
15  THE WITNESS: Depending on what the property
16  looks like, it might get bagged and tagged. If it's
17  soiled, if the property's no good, it's going to the
18  dump. If it -- if it has a health risk, we can't take
19  it. Needles, and drug paraphernalia and different
20  stuff like that, we can't take it. We can remove it.
21  BY MR. PRASAD
22  Q. How would you assess a pile of clothes that
23  are not in a bag or suitcase under the bag & tag
24  policy?
25  MS. MURPHY: Object to form.

Case 4:22-cv-05502-DMR   Document 520-5   Filed 10/20/25   Page 10 of 16
Coalition on Homelessness, et al., v
City and County of San Francisco, et al.
Herbert Ruth, Jr.
March 21, 2025

Page 93

1    THE WITNESS: It depends on if it's in the
2  tent. Or if it's in a suitcase. Or, you said not in a
3  suitcase. It's just kind of like randomly sitting out?
4     Are we talking about suitcase, or no
5  suitcase? Are we just talking about on the ground?
6  BY MR. PRASAD
7  Q. A pile of clothes that are not in a bag or
8  suitcase.
9  A. What about in a tent?
10 Q. And not in a tent.
11 A. So it's just sitting on the ground.
12 Q. That's right.
13 A. Unattended.
14 Q. Yes. Unattended. How would you handle that?
15    MS. MURPHY: Object to form.
16    THE WITNESS: We pull up, and we doing a bag
17 -- we doing an HSOC resolution, and nothing's there.
18    Let's say, they -- 72 hours, they left on
19 time. And they left some stuff there. Let's say they
20 just left some clothes on the ground, like you state.
21 They just left some stuff that they don't want.
22    Well, we clean that area, still. We're going
23 to come out, we're going to sweep that area, and we're
24 going to clean that area thoroughly. Then we're going
25 to spray that area down. So that the streets are

Page 94

1  clean, and people can utilize the sidewalks and
2  different nature like that.
3     So that -- that -- those pile of clothes
4  that's just sitting there, unattended, nobody's there,
5  nobody's there to ask any questions, "Does this belong
6  to you," that's going to the dump
7  BY MR. PRASAD
8  Q. Now, you mentioned, I think, or we've
9  discussed items that might pose a health or safety
10 risk. How do you identify those items?
11 A. Those items could be sitting in a gang of
12 crap. Feces everywhere. All over it.
13    (Multiple speakers)
14 Q. -- by the way?
15 A. That's how we determine their property.
16    (Reporter clarification)
17 BY MR. PRASAD
18 Q. Mr. Ruth, let me ask that again.
19    Other than a situation where there's feces,
20 are there other situations that -- where you would
21 consider it a health or safety risk?
22 A. I'm not sure.
23 Q. And have you received any training on how to
24 identify health and safety risks?
25 A. Yes.

Page 95

1    MS. MURPHY: Vivake, whenever you get to a
2  natural breaking point, we have been going over an
3  hour.
4    MR. PRASAD: Sure.
5    I think we can do it in a couple of minutes,
6  if that's all right, Mr. Ruth.
7    THE WITNESS: I want to check on my car. Can
8  we get ten more minutes?
9    MR. PRASAD: I'm sorry; did you say you would
10 like a moment?
11    MS. MURPHY: He asked for a ten-minute break.
12    MR. PRASAD: Um, okay.
13    Let me just ask two more question, Mr. Ruth,
14 real quick.
15 BY MR. PRASAD
16 Q. You mentioned a training. Just really
17 quickly, when was that training?
18 A. What training?
19 Q. You just mentioned you have been trained on
20 how to identify health and safety risks. What training
21 are you referring to?
22 A. For one full year, we have training, and we
23 -- we talk about unattended items. We talk about items
24 that are soiled.
25    We -- we go over that. And I have been going

Page 96

1  over that for one full year.
2  Q. And when was the last time that you had a
3  training that concerned health and safety risks?
4  A. This year.
5  Q. And when, when this year?
6  A. We'd had about maybe -- we have went over it
7  this year. I'm not sure what day it was or what month
8  it was, but we went over it several times.
9     MR. PRASAD: All right, yes. We can take a
10 ten-minute break. If you need longer than ten minutes,
11 that's all right as well.
12    MS. MURPHY: Let's agree to go off.
13    (Off-the-Record discussion)
14    (Luncheon recess was taken at 12:27 p.m.
15 until 1:14 p.m. of the same day.)
16    (Nothing omitted nor deleted. See next
17 page.)

Case 4:22-cv-05502-DMR   Document 520-5   Filed 10/20/25   Page 11 of 16
Coalition on Homelessness, et al., v
City and County of San Francisco, et al.
Herbert Ruth, Jr.
March 21, 2025

Page 97

1  FIRDAY, MARCH 21, 2025; P.M. SESSION
2  ---oOo---
3     THE REPORTER: We are back on the record at
4  1:14 p.m.
5     EXAMINATION RESUMED
6  BY MR. PRASAD
7  Q.  All right, Mr. Ruth, we have been talking
8  about the bag & tag policy.
9     Do you recall, Mr. Ruth, whether there's
10 specific instructions in the bag & tag policy regarding
11 perishable items?
12 A.  You talking about food and fruit and
13 different stuff like that, right?
14 Q.  I'm asking about perishable items.  What do
15 you understand perishable items to be?
16    MS. MURPHY: Object to form.
17    THE WITNESS: I'm not understanding what you
18 want, what you -- what you -- what question you are
19 asking.
20 BY MR. PRASAD
21 Q.  Mr. Ruth, to your knowledge, is the term
22 "perishable items" used in the bag & tag policy?
23 A.  I'm not sure.
24 Q.  You mentioned food, though.  What does the
25 bag & tag policy require you to do with food?

Page 98

1  A.  It depends on the individual.  We don't bag &
2  tag food.
3  Q.  Have you received -- are there other items?
4     Let me rephrase that.  Have you received any
5  training on what to do with food that you encounter at
6  HSOC resolutions?
7  A.  No.
8     MS. MURPHY: Object to form.
9  BY MR. PRASAD
10 Q.  Was that a no?
11 A.  No.
12 Q.  Is there a category under the bag & tag
13 policy for contraband or illegal items?
14 A.  I'm not sure.
15 Q.  Have you received any training on how to
16 identify contraband or illegal items?
17 A.  Not sure.
18 Q.  Do you know if you are supposed to bag & tag
19 contraband or illegal items?
20 A.  No.
21 Q.  As in, you don't know?  Or you're not
22 supposed to bag & tag those items?
23 A.  I'm not sure.
24 Q.  You mentioned the word "soiled" a couple of
25 times.  What does "soiled" mean to you?

Page 99

1  A.  Urine, poop, feces.
2  Q.  If an item --
3  A.  Water.
4  Q.  -- was wet in rain, would it be soiled?
5     MS. MURPHY: Object to form.
6     THE WITNESS: I --
7     MR. PRASAD: Kaitlyn, I couldn't hear that.
8  If you could just --
9     THE WITNESS: Yes.
10    MR. PRASAD: -- repeating that, or Ms. Ball,
11 you could repeat that to me as well.
12    Kaitlyn, I couldn't hear, if you objected to
13 the last question, what it was.
14    MS. MURPHY: Object to form, incomplete
15 hypothetical.
16    Cut out a bit.  Sorry, if -- you might have
17 cut out a bit, because I didn't hear the request on
18 your end.
19    MR. PRASAD: Oh I apologize, I couldn't hear
20 you, and I guess you couldn't hear.
21    All right.
22 BY MR. PRASAD
23 Q.  Mr. Ruth, I asked you if an item is wet from
24 rain, would it be considered soiled under the bag & tag
25 policy?

Page 100

1     MS. MURPHY: Same objection.
2     THE WITNESS: Yes.
3  BY MR. PRASAD
4  Q.  And what are you required to do with an item
5  that's wet from rain under the bag & tag policy?
6  A.  I want to take that back.  I'm not sure.
7  Q.  So we have discussed items that are health
8  and safety risks before.  Do you recall that?
9  A.  Yes.
10 Q.  What happens when -- or let me rephrase that.
11    Under the bag & tag policy, what are you
12 required to do with items that pose a health and safety
13 risk that are commingled with other items?
14 A.  We are going to take those items, and we're
15 going to dump those items.  They're going to the trash.
16 Q.  And what does "commingled" mean to you, in
17 the context of the bag & tag policy?
18 A.  It means everything's all together.  Maybe,
19 like, food, urine, blankets, books, everything
20 together.
21 Q.  So whenever items that are -- pose health and
22 safety risks are commingled with other items,
23 everything needs to be thrown away.  Is that right?
24 A.  Yes.
25 Q.  And is there a particular amount of

Case 4:22-cv-05502-DMR   Document 520-5   Filed 10/20/25   Page 12 of 16

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Herbert Ruth, Jr.
March 21, 2025

Page 101

1  contamination needed before you discard something, you
2  know, as commingled?
3  A.  No.
4  Q.  So for example, if there's a small stain in
5  the corner of a tent, would you consider that -- how
6  would you assess that?
7      MS. MURPHY: Object to form.
8      THE WITNESS: It's a chance that tent will be
9  going to the dump.  Because if -- if it's a health -- a
10 health and safety hazard, we can -- we can't let that
11 shit on the streets.
12 BY MR. PRASAD
13 Q.  And in the case where there's a small stain
14 in the corner of a tent but you don't know what that
15 stain is, would you consider it to be soiled?
16     MS. MURPHY: Object to form.
17     THE WITNESS: I'm not sure.  I might have to
18 have a supervisor look at that, take a second look at
19 that.
20 BY MR. PRASAD
21 Q.  Did you receive any training on how to
22 determine when something is so soiled that it should be
23 discarded?
24 A.  Yes.
25 Q.  And when did you receive that training?

Page 102

1  A.  It's been going on for one full year.
2  Q.  And when is something so soiled that it
3  should be discarded?
4  A.  When the conditions are bad.  When you see
5  that it can't live like this, or you feel like, you
6  know, they could just -- they could be -- it can cause
7  a health and safety hazard to a person.
8  Q.  So for example, if you came across a
9  mattress, and one corner of it appeared to be wet, what
10 would you do with that mattress?
11     MS. MURPHY: Object to form.
12     THE WITNESS: The mattress itself, period, is
13 going to the dump.
14     We don't -- we don't -- we don't bag & tag
15 mattresses
16 BY MR. PRASAD
17 Q.  Even mattresses that are in good condition?
18 A.  No mattresses, period.
19 Q.  And is that rule in the bag & tag policy
20 somewhere?
21 A.  I'm not sure.
22 Q.  And how did you learn that rule?
23 A.  For one full year I have been working with
24 this company.  And there's certain items that are not
25 allowed on the streets.

Page 103

1  Q.  And that includes mattresses, is that right?
2  A.  Or any type of furniture.
3  Q.  Now, earlier today you mentioned needles.  If
4  you saw one needle in the corner of an otherwise
5  orderly tent, would you throw away the whole tent?
6      MS. MURPHY: Object to form.
7      THE WITNESS: Yes.
8  BY MR. PRASAD
9  Q.  If there's loose food spilled in the corner
10 of a tent, would you discard the whole tent?
11     MS. MURPHY: Object to form.
12 BY MR. PRASAD
13 Q.  You may answer, Mr. Ruth.
14 A.  I'm not sure.
15 Q.  Have you received training on what to do when
16 there's loose food present in an otherwise orderly
17 tent?
18 A.  What I have seen is -- is -- is a tent looked
19 -- that -- really nice.  Things were folded up, the bed
20 was made; it looked like, you know, someone's coming
21 back for his tent.  But there's food in the corner.
22     What happened was that tent got bagged and
23 tagged.  But what we did was we took the important
24 items out that we felt that the person would need, and
25 we took the food out, and, and put it to the side, and

Page 104

1  we put that in the trash.  And we bagged and tagged the
2  important stuff.  The tent, the clothes, um, some of
3  the belongings, books or whatever the case may be.
4      We didn't just take the -- the whole tent and
5  get rid of it because some food in the corner or
6  something like that.  If we feel like, you know, the
7  tent is salvageable, we salvage it.
8  Q.  Can wet or loose food make a tent soiled, for
9  the purposes of the bag & tag policy?
10     MS. MURPHY: Object to form.
11     THE WITNESS: Yes.  If it's all over stuff.
12 If it's -- commingled, tangled in with everything, yes.
13 BY MR. PRASAD
14 Q.  Have you ever thrown away a tent because of
15 open food inside?
16     MS. MURPHY: Object to form.
17     THE WITNESS: Yes.  Especially if it smells.
18 BY MR. PRASAD
19 Q.  Have you ever thrown away a tent because of a
20 piece of foil in the tent?
21     MS. MURPHY: Object to form.
22     THE WITNESS: No.
23 BY MR. PRASAD
24 Q.  Have you ever thrown away a tent because
25 there was a rip or a tear on the tent?

Case 4:22-cv-05502-DMR   Document 520-5   Filed 10/20/25   Page 13 of 16

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Herbert Ruth, Jr.
March 21, 2025

Page 105

```
 1    MS. MURPHY: Same objection.
 2    THE WITNESS: No.
 3  BY MR. PRASAD
 4  Q.  Now, you mentioned the phrase "bulky items" a
 5  few times.  What are bulky items under the bag & tag
 6  policy?
 7  A.  When I seen the lawnmower; that's all I keep
 8  thinking about.
 9  Q.  Does the bag & tag policy explain what --
10  what are considered bulky items?
11  A.  Yeah.  Something like a lawnmower.  Or a
12  bike.
13  Q.  Do you remember any other detail about what
14  -- what's considered a bulky item?
15  A.  No.
16  Q.  Now, earlier you said that mattresses can't
17  be bagged and tagged.  Correct?
18  A.  Yes.
19  Q.  What about a chair?
20  A.  No.
21  Q.  Chairs cannot be bagged and tagged?
22  A.  No.  We haven't bagged and tagged a chair.
23  Q.  Have you ever bagged and tagged a table?
24  A.  No.
25  Q.  Can a table ever be bagged and tagged?
```

Page 106

```
 1  A.  (Shakes head)  No furniture.
 2  Q.  Have you ever bagged and tagged a stroller?
 3  A.  Yes.
 4  Q.  And under the bag & tag policy, can you bag &
 5  tag strollers?
 6  A.  I'm not sure, but if it has belongings and
 7  it's sorted out, and it got maybe some baby clothes and
 8  some formula, and it looks like maybe mom stepped away
 9  or something like that, we will bag & tag that.
10  Q.  Under the bag & tag policy, can you bag & tag
11  a wheelchair?
12  A.  Yes.
13  Q.  Have you ever bagged and tagged a wheelchair?
14  A.  Yes.
15  Q.  How many times?
16  A.  Several.  Enough times.
17  Q.  Are you familiar with any changes to the bag
18  & tag policy regarding how to deal with wheelchairs
19  that's been made in the past one year?
20  A.  Well, I know that wheelchairs is kind of
21  like, you know, an ADA thing.  And, um, we don't want
22  to throw away someone's means of getting around.  So if
23  we do run across a wheelchair, we don't throw those
24  wheelchairs away.  We will bag & tag that wheelchair.
25  Q.  Was there ever a time, to your knowledge,
```

Page 107

```
 1  where the rule was to discard wheelchairs?
 2  A.  Only way is if the wheelchair has one wheel
 3  or two wheels missing.
 4  Q.  And if one wheel or two wheels is missing,
 5  then under the bag & tag policy, are you supposed to
 6  discard the wheelchair?
 7  A.  It's -- it's not in use, there's no way you
 8  can use the chair, so the chair will get sent to the
 9  dump.
10  Q.  Have you ever discarded a wheelchair?
11    MS. MURPHY: Object to form.
12    THE WITNESS: Only in a sense where it wasn't
13  working.  Or, it was given to us by someone that wants
14  to get rid of it.
15  BY MR. PRASAD
16  Q.  Have there been any changes, to your
17  knowledge, regarding how you are supposed to handle
18  wheelchairs in the past year or so?
19  A.  No.  Usually it -- nothing's changed.  It's
20  that, you know, if a wheelchair is out there and it's a
21  working wheelchair, and -- we might leave that chair
22  there.  Someone might come back and pick it up; we're
23  not sure.  But we's not just throwing away wheelchairs.
24  Not unless that wheelchair is not working properly,
25  missing wheels, or is in pieces.
```

Page 108

```
 1  Q.  Have you ever bagged and tagged a bicycle?
 2  A.  Yes.
 3  Q.  What about a cart?
 4  A.  Cart.  We don't bag & tag carts.
 5  Q.  And if someone, if someone comes across an
 6  unhoused person with a cart, then what do you do?
 7  A.  If they -- if they have a cart, we will let
 8  them leave with that cart.  But if they got two carts,
 9  we'll just ask them to downsize, and put everything on
10  one cart.  And you can take that with you.
11  Q.  And what would you do with the other cart?
12  A.  We -- we're going to get rid of that cart.
13  It's going to the dump.
14  Q.  How long are bulky items stored in the yard
15  after they have been bagged and tagged?
16  A.  You know, it's between 14 days and 30 days.
17  Q.  Now, are you aware of any policies that apply
18  to situations when you are dealing with unhoused people
19  who have disabilities?
20  A.  Can you say that question again?
21  Q.  Yeah.  Are there any special policies that
22  apply when you're dealing with homeless people who have
23  disabilities?
24  A.  What's the question you're trying to ask?
25  Q.  Is there any policy in the -- let me put it
```

Case 4:22-cv-05502-DMR   Document 520-5   Filed 10/20/25   Page 14 of 16

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Herbert Ruth, Jr.
March 21, 2025

Page 109

1  this way.
2     Are there any rules you are supposed to
3  follow when you come across homeless people who have
4  disabilities?
5  A.  There's no rules.  I mean, there's nothing
6  inside the policy that says anything about that.  I'm
7  not sure.
8  Q.  Have you received any training on dealing
9  with homeless people who have disabilities?
10 A.  I can't remember.
11 Q.  In a situation where a disabled person is
12 there at a resolution, and they tell you they need more
13 time because of their disability, what would you do?
14 A.  Those services are for the HOT Team,
15 San Francisco Police Department, and the paramedics.
16 The Fire Department.  We are there to clean.
17 Q.  Am I right that sitting here today, you're
18 not aware of any -- anything in the bag & tag policy
19 that tells you what to do if there's a -- if you are
20 dealing with someone with disabilities who needs more
21 time?
22    Is that right?
23 A.  That's right.  We usually let the services of
24 the City take care of that.  And we take care of
25 cleaning.

Page 110

1  Q.  Does the bag & tag policy explain how to take
2  into account special needs?
3  A.  That's part of San Francisco's services that
4  they're providing.  We're there to clean.
5  Q.  So as far as you know, there's nothing in the
6  bag & tag policy about that.  Is that right?
7  A.  I'm not sure.
8  Q.  Does DPW have an ADA coordinator?
9  A.  I'm not sure.
10 Q.  Now, you mentioned that you receive training
11 fairly often on the bag & tag policy.  Is that right?
12 A.  Yes.
13 Q.  Were there any formal trainings in the fall
14 of 2024 that were different than the sort of regular
15 trainings that you receive?
16    MS. MURPHY: Object to form.
17    THE WITNESS: I'm not sure.
18 BY MR. PRASAD
19 Q.  Since the fall of 2024, have you witnessed
20 your supervisor do anything to assess whether trainings
21 on the bag & tag policy are working?
22    MS. MURPHY: Object to form.
23    THE WITNESS: The bag & tag policy's been the
24 same; it hasn't changed.
25

Page 111

1  BY MR. PRASAD
2  Q.  Does Darryl Dilworth come out to the
3  resolutions, regularly?
4     MS. MURPHY: Object to form.
5     THE WITNESS: Yes.  He comes out.
6  BY MR. PRASAD
7  Q.  Every time?
8  A.  Not every time.
9  Q.  Has he been coming more often since the fall
10 of 2024?
11    MS. MURPHY: Object to form.
12    THE WITNESS: He's there, always.
13 Occasionally, maybe not, but he's there.
14 BY MR. PRASAD
15 Q.  Since the fall of 2024, have you changed
16 anything in the way that you apply the bag & tag
17 policy?
18 A.  No.
19 Q.  Mr. Ruth, have you ever seen another worker
20 violate the bag & tag policy?
21 A.  No.
22 Q.  Have you ever been trained on what you're
23 supposed to do if you see another worker violate the
24 bag & tag policy?
25 A.  When I got hired for the job, they said:  If

Page 112

1  you see something, say something.
2  Q.  So what specifically are you supposed to do?
3  A.  Let your supervisor know.
4  Q.  But you've never had occasion to do that; is
5  that right?
6  A.  That's correct.
7  Q.  Are you aware of any internal investigations
8  into misconduct related to encampment resolutions or
9  the implementation of the bag & tag policy?
10 A.  No.
11 Q.  Are you aware of any DPW worker who was ever
12 terminated for violating the bag & tag policy?
13 A.  I've heard.
14 Q.  Who was terminated for violating the bag &
15 tag policy?
16 A.  I don't know, but I heard.
17 Q.  What did you hear, Mr. Ruth?
18 A.  Somebody got fired.
19 Q.  And do you know what that person did to get
20 fired?
21 A.  I just don't want it to happen to me.
22 Q.  Are there any details about that incident
23 that you recall?
24 A.  No.  I just don't want it to happen to me.
25 Q.  Do you know anything about why that person

Case 4:22-cv-05502-DMR   Document 520-5   Filed 10/20/25   Page 15 of 16
Coalition on Homelessness, et al., v
City and County of San Francisco, et al.
Herbert Ruth, Jr.
March 21, 2025

Page 133

1  they want to help out but, you know, they just kind of
2  like, you know, don't have the support, you know, to
3  keep the city clean.
4      And then we -- we out there working, and, and
5  they think that we're -- we're -- we're aggressively
6  taking stuff from people, when we're doing our job.
7  Q.  I guess what I'm asking, Mr. Ruth, is you
8  said things changed for about a month or so.  I'm
9  trying to find out, after that month or so was over,
10 what changed after that?
11 A.  Well, after that, you know, slowly but
12 surely, you know, we were able to grab a few items from
13 some -- from some people.  You know.  We come in, we
14 had long negotiations that take an hour just to kind of
15 talk to the person about the things that they can't
16 have.
17     So we might get some work done, but we're not
18 getting enough work done.  And it's making it look like
19 we're just standing around, doing nothing.  When we're
20 actually -- we have to wait an hour just to -- just to
21 clean up.  Just to get the spot clean.
22     Just to -- just to get the sidewalk back to
23 the City, we got to wait an hour.
24 Q.  So just so I understand, you know, you
25 mentioned, you know, the rules kind of changing a

Page 134

1  couple times.
2      What's the current state of the rules, you
3  know, when it comes to being able to confiscate things
4  that are soiled or are dirty?
5  A.  Well, right now, it's -- it's -- it's kind of
6  still in a rocky situation, you know.  We -- we're not
7  able to, you know, confiscate some stuff from some
8  individuals.  And if they want to take this stuff with
9  them, and they can -- and they can take it with them,
10 we let them have it.
11 Q.  But, I think you did say that if it's soiled,
12 you are allowed to confiscate it.  So --
13 A.  Yes, yes.  But, but -- we are allowed to
14 confiscate it.  But if a person jumps up, and grab his
15 tent, and it's soiled, and he starts to walk off with
16 it, we have to let him take that tent.  We have to.
17 Q.  Now, you mentioned the politics of it, the
18 mayor, Gavin Newsom.
19     Did you hear the police officer in the video
20 toward the end telling an unhoused person something to
21 the effect of:  Mayor Breed and Gavin Newsom say
22 homeless encampments no more?
23 A.  I -- I didn't get that, I didn't hear that,
24 from the officer.
25 Q.  Do you remember that from your time at the

Page 135

1  incident?
2  A.  I don't remember that.
3  Q.  By the way, do you recall the name of the
4  officer that was there at this incident?
5  A.  No, I don't recall that officer.  And I think
6  that was his first day.  I think he was coming back to
7  work; that was his first day back.
8  Q.  Is that because you hadn't seen him before?
9  A.  Yes.  Another reason I haven't seen him.  I,
10 like, got a chance to talk with him for a few minutes
11 before that.  And I think he was just coming back to
12 work.
13 Q.  All right.
14     MR. PRASAD:  I would like to show what's been
15 previously marked at another deposition as Plaintiff's
16 Exhibit 1133.
17     If the technician could please bring that up?
18 That's Tab 6.
19     (Exhibit 1133, previously marked for
20     identification.)
21     (Portion of videotape played, not reported)
22     MR. PRASAD:  I didn't quite see, if the
23 technician or Ms. Ball could tell us what the time
24 stamp is that we stopped it at, I would appreciate it.
25     (Reporter clarification)

Page 136

1      MR. PRASAD:  I see it now.  So, just for the
2  record we showed the video, the first one minute and 30
3  seconds of this video, which is Exhibit 1133.
4  BY MR. PRASAD
5  Q.  Mr. Ruth, were you able to see the video
6  clearly?
7  A.  Yes.
8  Q.  And are you in this video?
9  A.  Yes.
10 Q.  And could you describe how you appear in the
11 video?
12 A.  I appear to be working.
13 Q.  And, could you describe the color of the
14 clothing that you're wearing in this video?
15 A.  Same thing as everybody else, the suit with
16 the DPW vest.
17 Q.  Were you the man in the red sweatshirt in
18 this video, Mr. Ruth?
19 A.  I'm not sure if I had a red sweater on.
20 Q.  You did see yourself in the video, correct?
21 A.  Yes.
22 Q.  And are there other people that you recognize
23 in this video?
24 A.  Yes.
25 Q.  And who are those people?

Case 4:22-cv-05502-DMR    Document 520-5    Filed 10/20/25    Page 16 of 16
Coalition on Homelessness, et al., v                                    Herbert Ruth, Jr.
City and County of San Francisco, et al.                                March 21, 2025

Page 153

1   is going to the dump.
2   Q.  So, just to be clear, even though in this
3   video that woman asked for the cart, it was thrown
4   away.
5       Is that right?
6   A.  In the first part of the video, the video
7   that you don't have where she talked and agreed to let
8   these things go?  You don't have that part of the
9   video.  You don't know what happened.
10  Q.  Let me rephrase that, Mr. Ruth.
11      Even though she later asked for the cart
12  back, it was still thrown away.  Correct?
13  A.  She agree, or someone agree, or her and her
14  friends agree to let us clean, and take the rest of
15  their belongings.
16  Q.  But even in this part of the video that we
17  have here, even though she's asking for the cart, it
18  was thrown away.  Correct?
19  A.  She's in a work area now.  Now this -- now
20  this -- now this place is getting cleaned up.  So she's
21  standing inside the work area.  You see we moving
22  around.
23      Maybe they heard her, maybe they didn't.  I
24  could hear, from the video.  And we're just trying to
25  work.  We're not really trying to, you know, go back

Page 154

1   and forth with the lady, argue with the lady.  We're
2   not here to argue, and do that with her.
3       If she wants to talk to someone -- in the
4   first part of the video, that's the part you need.
5   Where she was talking to the Police Department and the
6   Fire Department.
7       That's how this is done.  This is called
8   "procedure."
9   Q.  Simple question, Mr. Ruth.
10      Even though she's asking for it back in this
11  portion of the video, they were thrown away.  Right?
12  A.  That's what it looked like.
13  MR. PRASAD: I think this would be a good
14  time to take our last break.
15  MS. MURPHY: Yeah.  We've been going about an
16  hour and a half at this point.
17  MR. PRASAD: Yeah.  Are we off the record?
18  (Off-the-Record discussion)
19  (Recess taken from 2:41 p.m. to 2:51 p.m.)
20  BY MR. PRASAD
21  Q.  Mr. Ruth, I just want to clarify something
22  from the last couple of videos.
23      You mentioned that when you get the
24  permission to clean, you know, then you just, you just
25  clean what's there.  Right?

Page 155

1   I mean, that's -- that's -- you said that was
2   procedure.  Correct?
3   A.  Yes.
4   Q.  Um, does that mean that when you get
5   permission to clean, that means that there's no bagging
6   and tagging that's going to take place at that point?
7   A.  No.  It doesn't mean that.
8   Q.  So why was there no bagging and tagging at
9   the last video that we watched?
10      MS. MURPHY: Object to form.
11      THE WITNESS: I didn't see anything in that
12  video that looked at bag and -- well, hold on, let me
13  slow down.  Let me slow down.
14      Whatever happens in the beginning, the video
15  that we don't have is when they talking to the Police
16  Department, and they talking to the HOT Team, and they
17  talking to the -- the Fire Department.
18      They're going to go in, they're going to look
19  at all of this stuff before we start, and say: Do you
20  want keep that?  Do you -- you want this, or you want
21  that?
22      And if that's not -- if that's not -- if the
23  bag & tag is not brought up, and no one wants to bag &
24  tag anything or no one wants to keep anything, then, we
25  don't bring the bag & tag up.  We don't bag & tag it if

Page 156

1   it's not needed.
2   BY MR. PRASAD
3   Q.  So under the -- we were talking earlier about
4   this concept of unattended property, attended property,
5   and abandoned property.  Correct?
6   A.  Uh-huh.  Yes.
7   Q.  So is it my -- is my understanding right that
8   what you're saying is what we saw in these videos was
9   abandoned property?
10      MS. MURPHY: Object to form.
11      THE WITNESS: In this last video?
12  BY MR. PRASAD
13  Q.  Sure.
14  A.  It looked it like -- to me?  I'm not sure.
15      The reason why I say I'm not sure is because
16  in the beginning of the video, which we don't have,
17  that makes it look like -- you can't tell.
18      You can't tell what -- if it was a situation
19  where you need to bag & tag something, or if it's
20  attended, or what.  We don't know.
21      And sometimes --
22  Q.  Am I right then, Mister -- sorry.
23  A.  Excuse me.
24      And sometimes, some of the people, their
25  friends walk up and say: Oh, can I have this?  Oh, I