# EXHIBIT 47

## To
## Declaration of Vasudha Talla in Opposition to Defendants' Motion for Summary Judgment

**In The Matter Of:**

*Coalition on Homelessness, et al., v*
*City and County of San Francisco, et al.*

---

*Shannon Ducharme*
*March 20, 2025*

---

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 44277Ducharme_NL.txt
**Min-U-Script® with Word Index**

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

Page 29

1  example.
2      And then in the afternoon, I would be assisting
3  with INSPIRE.
4      And so the perinatal outreach is wherever
5  people are.  Most of the time, they're in the
6  Tenderloin.
7  Q.  Do you work particular neighborhoods, or is it,
8  for the most part, across the city, essentially?
9  A.  It's across the city, essentially.  I'm in the
10  Haight three nights a -- three nights a week, though.
11  Q.  And are the majority of -- do you call them
12  clients or patients?
13      What would you --
14  A.  Patients.
15  Q.  Are the majority of your patients individuals
16  living outside?
17  A.  Yes.
18  Q.  The vast majority?
19  A.  Yes.
20  Q.  Almost exclusively?
21  A.  Almost.
22  Q.  Is it not uncommon for -- let me start that
23  question again.
24      Do you often have patients who may have a
25  placement at, for example, a city shelter, who

Page 30

1  nonetheless are living on the street?
2  A.  Yes.
3  Q.  Is that common?
4  A.  It happens.  I don't know if common.  I don't
5  know the ratio, so I couldn't say if it is common or
6  not.
7  Q.  Fair enough.
8      And maybe you won't like this description
9  either, but is it not uncommon?
10  A.  It is not uncommon.  That, I can say.  Yes.
11  Q.  Do you ever work with individuals who live out
12  of their vehicles?
13  A.  Yes.
14  Q.  Is that common?
15  A.  There is a large portion of people who are
16  living in their vehicles.
17  Q.  And do you consider those encampments?
18  A.  No.
19  Q.  In your experience, individuals who are living
20  in their RVs, do they often have other belongings next
21  to their vehicles?
22  A.  Yes.  Well, not all the time.
23  Q.  It's not uncommon?
24  A.  It's not uncommon.
25  Q.  So you mentioned that you will sometimes work

Page 31

1  at fixed locations indoors.
2      Is a lot of your work nonetheless outdoors?
3  A.  I think it's maybe balanced.  I think it's
4  probably half and half.  But the work I'm doing indoors
5  is to follow up with the people that I've met outdoors,
6  if that makes sense.
7  Q.  No, that does make sense.
8      I'm just trying to get a sense in terms of you
9  compared to, say, maybe your other colleagues in DPH,
10  whether or not you're an individual who, in particular,
11  works with individuals who are living outside.
12  A.  That's -- our whole program, that is our -- the
13  foundation of our program, of Street Medicine.
14  Q.  Could you give an estimate, in terms of your
15  typical workday, what percentage of your time is spent
16  working with individuals living outside?
17  A.  I mean, I work ten hour days, and maybe two of
18  them are admin.  So eight hours a day.
19  Q.  Fair enough.
20      When you engage patients, what do you do?
21  A.  I mean, if it's a new person I've never met, I
22  introduce myself, I let them know who I am, who I work
23  for, and just try and generally get to -- to just even,
24  A, have them talk to me, which is always lovely, and
25  just see what kind of services I can offer them.  I

Page 32

1  mean, I've been doing this for a long time, so I know a
2  lot of the systems and can help navigate people pretty
3  well.
4  Q.  Is part of your job doing, say, a needs
5  assessment?
6  A.  Yes.
7  Q.  What's a needs assessment?
8  A.  Figuring out, you know, psychosocial,
9  biopsychosocial, what people -- if they need housing or
10  what their medical needs are, or shelter or safety.
11  Like, what they need to be safe or feel safe.
12  Q.  So it is assessing people's needs for
13  psychosocial needs, medical needs, safety needs --
14  A.  Yeah.
15  Q.  -- is that correct?
16  A.  Yes.
17  Q.  Anything else?
18  A.  I guess psychiatric, but that kind of goes with
19  all of it.
20  Q.  And what do you do in -- let me rephrase the
21  question.
22      What does that assessment entail?
23  A.  Well, I don't usually do forms.  I am more of
24  an organic person and will just talk to someone and
25  tease out the information, like, through conversation.

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

---

Page 33

1   But I usually figure out, like, where they're
2   from, how long they've been here, how long they've been
3   outside, do they have any medical -- like, medical
4   needs, which can range from chronic diseases to acute
5   things.  And I figure out if I need to connect them with
6   our medical team or if they'd be a good referral for the
7   HOT Team or whichever direction would be good to point
8   them in.
9   Q.  And this is often done in conjunction with
10  another health care worker?
11  A.  (No audible response.)
12      (Reporter clarification.)
13      THE WITNESS: Yes.  Sorry.  Yes.
14      BY ATTORNEY DO:
15  Q.  You mentioned that you typically don't do
16  forms; is that correct?
17  A.  Not like -- not in the field.  Like, when I go
18  back, I chart and would put in the information in the
19  medical chart.
20  Q.  And it's fair to say you rely on that
21  information in terms of making an assessment, correct?
22  A.  Yes.
23  Q.  Is it fair to say that doctors, nurses, nurse
24  practitioners similarly rely --
25  A.  Yes.  Sorry.  Yeah.

---

Page 34

1  Q.  -- similarly rely on that information?
2  A.  Yes.
3  Q.  I'm just going to repeat the question just so
4  that we have it all -- all in a row.
5      Is it fair to say that, in addition to
6  yourself, that nurses, nurse practitioners, and doctors
7  rely on the information that you gather in the
8  assessment --
9  A.  Yes.
10  Q.  -- in order to make treatment recommendations?
11  A.  Yes.
12  Q.  You make recommendations and assessments
13  yourself, correct?
14  A.  Yes, but I am unlicensed, so it's more of,
15  like, I bring in a licensed professional who then will
16  say what treatments they think should happen.
17  Q.  That professional is often there or is
18  otherwise conferred with later?
19  A.  Yes.  Or via phone.
20  Q.  So you've been describing a lot of the current
21  work that you do, but you nonetheless have had this
22  position for eight years.
23      In terms of the job description that you just
24  laid out, how long has your position been the way that
25  you just described?

---

Page 35

1  A.  For almost the entire eight years.  There was
2  less time inside the first, like, two or three years, I
3  would say.  It was, like, all street-based, with, like,
4  a little bit of time in a clinic, because we only really
5  had, like, one clinic at that time.  And so -- yeah.
6  Q.  And when you are doing this needs and treatment
7  assessment, do you often inquire or learn about property
8  destruction from the patients?
9  A.  Yes.
10  Q.  And I'm not asking for names of particular
11  individuals, to be clear, but is property destruction a
12  common occurrence for your patients, as they've
13  expressed to you?
14  A.  Yes.
15  Q.  As they've expressed to you in these
16  assessments?
17  A.  Yes.
18  Q.  Is that property destruction by the City?
19  A.  Yes.
20      ATTORNEY GRADILLA: Just object to that on hearsay
21  grounds.
22      ATTORNEY DO: Understood.
23      BY ATTORNEY DO:
24  Q.  How often do your patients report property
25  destruction from the City?

---

Page 36

1      ATTORNEY GRADILLA: Same objection.
2      THE WITNESS: Often.
3      BY ATTORNEY DO:
4  Q.  Is it so often that you're having difficulty
5  providing an estimate?
6  A.  I mean, I could say that roughly between 60 to
7  40 percent of my time in my job, of my duties, is
8  helping people recover items, like IDs or medications or
9  different documentations, that have been destroyed that
10  they need to then get one more time.
11  Q.  Due to the City's destruction of it?
12  A.  Yes.
13      ATTORNEY GRADILLA: Objection; hearsay.
14      THE WITNESS: Oh, sorry.  I have to wait.
15      ATTORNEY DO: You're welcome to have a standing
16  objection on that.
17      ATTORNEY GRADILLA: We'll make a standing objection.
18      BY ATTORNEY DO:
19  Q.  Have you seen that rate increase recently?
20  A.  I don't know.
21  Q.  Has it been more or less consistent in the past
22  five years?
23  A.  Yes.
24  Q.  Has it been more or less consistent in the past
25  two years?

---

Case 4:22-cv-05502-DMR     Document 520-6     Filed 10/20/25     Page 5 of 21

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

Page 37

1 A. Yes.
2 Q. Can you recall specific instances in your needs
3   assessments of property destruction of your patients'
4   belongings?
5 A. Repeat the question.
6 Q. Sure.
7   Can you recall specific instances in which
8   your -- you learn of property destruction of your
9   patients' belongings through needs assessments?
10 A. Yes.
11 Q. How many specific instances can you name, do
12   you think?
13 A. There's, like, multiple every day. I -- I -- I
14   don't know. I couldn't give you a number.
15 Q. But you said there are multiple every day?
16 A. Often. I mean, that's a very broad statement,
17   which it's... Yes. I mean, working in clinic, people
18   come in in distress because all of their things have
19   been destroyed again.
20 Q. So I've been saying destroyed by the City.
21   Do you know whether or not it's destroyed by
22   DPW?
23 A. Yes.
24   ATTORNEY GRADILLA: Objection; hearsay.
25   BY ATTORNEY DO:

Page 38

1 Q. Why is this information with regards to
2   property destruction important as part of your needs or
3   treatment assessments?
4 A. My job is to help people get their needs met,
5   their immediate needs. And many times, their immediate
6   needs is needing a new ID or a Direct Express card so
7   they have access to their funds and the -- their
8   lifeline things that have been destroyed by the City.
9 Q. Have you ever assisted an individual trying to
10   retrieve their belongings from the DPW yard?
11 A. I have not.
12 Q. Is there any particular reason why?
13 A. It feels overwhelming, for me and the patient.
14 Q. Uh --
15 A. I honestly -- also, only one time do I know
16   someone that actually was, like, "My stuff is there;
17   help me go get it." And that was like eight years ago.
18   "My stuff is at the DPW yard. Can you help me go get
19   it?"
20 Q. So is it, therefore, fair to assume -- I'm
21   going to restate this question.
22   In your experience, patients' belongings have
23   been destroyed, correct?
24 A. Correct.
25 Q. And not stored, correct?

Page 39

1 A. Correct.
2 Q. Therefore, if they're not stored, do you see
3   any reason why to make an attempt to go to the DPW yard?
4   ATTORNEY GRADILLA: Objection; leading. Standing
5   objection to this whole line of questioning as hearsay
6   and assuming facts not in evidence.
7   THE WITNESS: It would be hard to get something
8   that's not there, that is correct.
9   BY ATTORNEY DO:
10 Q. Earlier, you said it would be overwhelming to
11   try, both for you and for the individual, correct?
12 A. Correct.
13 Q. And what do you mean by "overwhelming"?
14 A. There's a lot of emotional work that goes into
15   that for myself personally. And navigating that system
16   is something that I don't really understand, so it's
17   overwhelming for me.
18 Q. And for the patient, same reasons?
19 A. I don't know for certain, but I would assume
20   so. I can't speak for them.
21 Q. So we've discussed instances in which -- that
22   property destruction has been covered as part of your
23   treatment and needs assessments, correct?
24 A. (Nods head.)
25 Q. My next questions are about you learning of

Page 40

1   property destruction outside the context of your doing a
2   needs assessment.
3   Have you personally observed property
4   destruction by the City of belongings of unhoused folks?
5 A. Yes.
6 Q. How many times have you seen that?
7 A. I mean, over the years, probably like around
8   20, but that's not a specific number.
9 Q. And, yes, you reminded me. I think you said
10   about 20 times earlier.
11 A. Yes.
12 Q. And I understand that is an estimate. Correct?
13 A. Right. Correct.
14 Q. And that you frequently do outreach on the
15   street, correct?
16 A. Correct.
17 Q. That's an estimate of 20 times over what period
18   of time?
19 A. Since Ed Lee. Since Mayor Ed Lee. I don't
20   know, however long ago that was. So five -- five years,
21   six -- six years' time span.
22 Q. What's your estimate in terms of how many times
23   you have personally observed property destruction by the
24   City in the past -- in the past year?
25 A. Around ten.

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

Page 41

1   Q.   I want, as best we can, to try to go over those
2        instances.
3   A.   Okay.
4   Q.   So in the past year, can you think of the first
5        instance in the past year?
6            Does it come to mind?
7   A.   I don't know what the first one is.  There's...
8   Q.   Let me withdraw the question.
9   A.   Okay.
10  Q.   Okay.
11  A.   Yeah.
12  Q.   Can you describe a specific instance of those
13       approximately ten times that you've seen?
14  A.   Yes.  I was walking to get a patient for an
15       appointment at the DMV, and -- who was camping outside
16       of the DMV.  And all of the trucks were there, the DPW
17       trucks, and some of the HOT Team workers, I think, but
18       they were -- looked like they were leaving, like, it was
19       kind of towards the end or whatever.
20           Anyway -- and I was going to get a patient to
21       take them to an appointment, but he couldn't leave to go
22       to the appointment because all of his belongings were
23       being thrown -- thrown away.  And everybody was just
24       trying to gather and save what they could and get out of
25       there.

Page 42

1   Q.   So this instance, I'm going to call this "the
2        DMV incident."
3   A.   Okay.
4   Q.   Is that fair?
5   A.   Yeah.  I mean, there were multiple DMV
6        instances, but this one was, I think, the one that
7        stands out the most.
8   Q.   So at least for this DMV instance, you
9        mentioned that a patient's belongings were being thrown
10       away, correct?
11  A.   Yes.
12  Q.   And then other people's belongings were being
13       thrown away, correct?
14  A.   Yes.
15  Q.   What did you observe being thrown away?
16  A.   Things.  I couldn't tell you specifically what
17       the things were.  I wasn't looking that hard.  I was
18       just more trying to support the people whose things were
19       being thrown away.
20  Q.   How could you tell whether or not those things
21       were not trash?
22  A.   Well, because the people whose items they were
23       were saying they weren't trash.
24  Q.   Were the people there in distress?
25  A.   Yes.

Page 43

1   Q.   Because this was happening live while you were
2        there?
3   A.   Yes, yes.
4   Q.   And they were expressing their sentiments as
5        this was happening?
6   A.   Yes.
7   Q.   And what were those sentiments?
8   A.   People -- they were upset and sad and angry.
9   Q.   Do you have any reason to believe that those
10       items were trash?
11  A.   I don't know.  I mean, it's -- what is trash?
12       I -- the people whose belongings they were, were not
13       trash to them.
14  Q.   Are you aware of any justification the City
15       provided for the destruction of those belongings?
16  A.   I did not talk to the people who were throwing
17       the things away.
18  Q.   Were the individuals actively protesting the
19       destruction of their belongings?
20  A.   I think, by the point that I got there, that --
21       so, no, not at that point.
22  Q.   No, they weren't, or you're not sure?
23  A.   I'm not sure.
24  Q.   About how many people's belongings, do you
25       think, were destroyed that day?

Page 44

1   A.   At least three.
2   Q.   You mentioned that you were supporting a
3        patient during this time, correct?
4   A.   Yes.  Well, I was going to support them;
5        trying, yeah.
6   Q.   And did you try to support them at the time
7        of --
8   A.   Yes.
9   Q.   -- at the time of this property destruction?
10  A.   Yes.
11  Q.   Is that part of your job?
12  A.   Well, I didn't know the property destruction
13       was happening.  That was not why I was going there.
14  Q.   But once you were there --
15  A.   Yeah.
16  Q.   But once you were there --
17  A.   Yeah.
18  Q.   -- were you engaging in your job --
19  A.   Yes.
20  Q.   -- in terms of assessing their needs?
21  A.   Yes.
22  Q.   Do you recall any specific -- do you recall any
23       specific belongings that were destroyed that day?
24  A.   Not specifically.
25  Q.   Okay.  So that's one of the instances that

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

**Page 45**

1    we've just covered.
2        ATTORNEY GRADILLA: Before you move on, we've been
3    going about an hour.
4        Do you want a break, or are you still good to
5    go?
6        THE WITNESS: I'm okay.  We can keep going, unless
7    you guys need a break.
8        ATTORNEY DO: I'm good.
9        BY ATTORNEY DO:
10   Q.  So that's one of the instances which we're
11   calling a D- -- that's one of the instances which we're
12   calling DMV instance.
13       Is there another instance in the past year that
14   comes to mind?
15   A.  Yeah, in the Tenderloin on Leavenworth.
16   Q.  What do you recall about that instance on
17   Leavenworth?
18   A.  I don't know if it was HSOC or not, or if they
19   were just trying to do cleaning, like a routine sidewalk
20   cleaning, so -- I don't really know how those are run.
21   That's not my job.  But --
22   Q.  But you don't --
23   A.   -- I had a person who was camping there.  I
24   wasn't there to be working.  I just was across the
25   street, checking on another person who was there.  And

**Page 46**

1    another woman who is one of our patients had a tent
2    there, and they -- and she was crying while they were
3    throwing her stuff in the back of the truck.
4    Q.  Why was she crying?
5    A.  Because they were taking her stuff.
6    Q.  How do you know that?
7    A.  Because she said so after I went and checked in
8    with her afterwards.
9    Q.  Did you see the destruction of her tent?
10   A.  I didn't see them take her tent.  They were
11   taking just her belongings.
12   Q.  Did you see them -- so you saw them take her
13   belongings?
14   A.  Yeah.
15   Q.  Do you recall any specific things in those
16   belongings?
17   A.  No.  I know, earlier in the week, she had
18   gotten her -- her granddaughter some things, because it
19   was like around Christmastime, that she was really
20   excited about giving to her granddaughter.  And I -- if
21   I recall, those were some of the items that were taken.
22   Q.  So it's your understanding that some sort of
23   gift for the granddaughter was taken by the City that
24   day --
25   A.  Yes.

**Page 47**

1    Q.  -- and destroyed?
2    A.  Yes.
3    Q.  Is it your understanding it was DPW?
4    A.  Yes.
5        ATTORNEY GRADILLA: Objection; hearsay.
6        BY ATTORNEY DO:
7    Q.  To confirm, you saw DPW?
8    A.  I did.
9    Q.  And you did see them take belongings?
10   A.  Yes.
11   Q.  Do you recall whether or not those belongings
12   looked like trash?
13   A.  I -- I didn't see them close enough to see if
14   they were trash, but the patient stated they were not
15   trash.
16   Q.  Say that to you or to DPW, or to both?
17   A.  To me.  I don't know what she said to DPW.
18   Q.  Is it fair to say that she was there attending
19   to her belongings?
20   A.  Yes.
21   Q.  How do you know that?
22   A.  I saw her.  She was there.
23   Q.  She was physically in proximity --
24   A.  Yes.
25   Q.  She was physically in proximity to her

**Page 48**

1    belongings, correct?
2    A.  Yes, correct.
3    Q.  And you observed that?
4    A.  Yes.
5    Q.  Did you observe her do anything physically with
6    regards to demonstrate a desire to keep those
7    belongings?
8    A.  She was trying to organize and put together
9    what she could that was there, that she was able to do.
10   Q.  Did DPW nonetheless take her belongings?
11   A.  Yes.
12   Q.  Despite her attempts to try to physically
13   organize it?
14   A.  Yes.
15   Q.  Do you recall whether or not they were
16   containers?
17   A.  No.
18   Q.  Do you not recall one way or another, or you
19   recall they --
20   A.  I don't recall.  I don't remember there being
21   containers.
22   Q.  Do you recall whether or not there was
23   clothing?
24   A.  Some.
25   Q.  Do you recall whether or not there was -- I'm

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

---

**Page 49**

1   going to say survival gear, if you --
2   A.   Yes.
3   Q.   -- if you understand that term.
4   A.   Yeah. I don't know for certain.
5   Q.   Do you recall whether or not there was any
6   documents?
7   A.   I don't know.
8   Q.   Do you recall whether these were large, bulky
9   items?
10   A.   I don't know.
11   Q.   Do you recall whether or not the items that you
12   did see, such as clothing, were usable?
13   A.   I don't know. But I do know that this person
14   is very, like, clean, is a very -- like, they're a
15   germaphobe, so I can't imagine. But this is, right,
16   speculation, I guess, that she would have unusable
17   things.
18   Q.   Is it fair to say -- and you've worked with
19   this individual before?
20   A.   Yes.
21   Q.   And through your work with them, you understand
22   what their living habits are?
23   A.   Yes.
24   Q.   And it's your understanding that they tend to
25   be a clean individual?

**Page 50**

1   A.   Yes.
2   Q.   Do you understand them to be a particularly
3   organized individual?
4   A.   Yes.
5   Q.   Do you recall anything else that the individual
6   reported to you that day?
7   A.   No.
8   Q.   Do you understand any the -- let me start this
9   question again.
10   Were there any -- are you aware of any adverse
11   impacts on this patient of yours due to this property
12   destruction?
13   A.   I mean, emotional impact, for that particular
14   one. I mean, for the DMV incident, later, the person
15   came to clinic, that their meds had been thrown away,
16   and we had to help reorder the meds.
17   Q.   So I just want to be --
18   A.   Sorry. Not to jump through.
19   Q.   No, no, no. I'm going to go back to the DMV
20   now --
21   A.   Yeah.
22   Q.   -- just so we know what world we're talking
23   about.
24   A.   Yeah.
25   Q.   So it's your understanding that, at the DMV

**Page 51**

1   incident, your patient's medication was destroyed,
2   correct?
3   A.   Yes. Which I didn't know at the time. I
4   didn't know till later, when they came to clinic.
5   Q.   Do you know what type of medication it was?
6   A.   They were heart medications. It was -- I don't
7   remember exactly what they are, but they're for his
8   heart.
9   Q.   Still at the DMV incident.
10   Do you recall whether or not there was clothing
11   taken?
12   A.   I was informed that there were also paintings
13   and art supplies and canvases that were taken and
14   destroyed.
15   Q.   Do you recall whether or not there were any
16   backpacks or containers taken?
17   A.   I don't know.
18   Q.   Similarly, is it, in your experience, whether
19   or not this individual's living habits tended to keep
20   clean and organized belongings?
21   A.   Yes.
22   Q.   Yes, they do?
23   A.   Yes, they do.
24   That same patient actually came back a week
25   later because his meds had been thrown away again by --

**Page 52**

1   he said by DPW. But the way that Medi-Cal works, you
2   can only get one refill a year, like, of lost meds. So
3   we weren't able to replace his meds that time.
4   Q.   So he went without the medication?
5   A.   (No audible response.)
6   (Reporter clarification.)
7   THE WITNESS: Yes.
8   BY ATTORNEY DO:
9   Q.   And, again, is gathering this information part
10   of your job in terms of determining what needs and
11   treatment an individual needs?
12   A.   Yes.
13   Q.   Is this the type of information that is often
14   documented?
15   A.   Yes, I -- I -- yes. Yeah.
16   Q.   Yes, but not necessarily?
17   A.   Correct. Like in -- when we're meeting with --
18   yes. Yes, but not necessarily.
19   Q.   And this is the type of information that,
20   again, is relied upon by you, nurses, nurse
21   practitioners, and doctors, correct?
22   A.   Yes, correct.
23   Q.   Therefore, it's used for diagnoses and
24   treatment purposes?
25   A.   Yes.

---

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

---

**Page 53**

1   Q.   Okay.  We're still at the DMV one.  You
2   described some art supplies being taken, medication.  I
3   asked whether or not there were clothes.
4        Do you recall clothes?
5   A.  I don't know.
6   Q.   But also thinking about not just your patient
7   but the other individuals there as well?
8   A.  Right.
9   Q.   You don't recall any containers, backpacks?
10  A.  I don't recall exactly what...
11  Q.   Bicycles?
12  A.  I don't know.
13  Q.   Okay.
14  A.  I don't know.
15  Q.   Okay.  So we -- I just want to now go back to
16  the Leavenworth incident.
17  A.  Mm-hmm.
18  Q.   I was a little bit confused.
19       Were you there in your work capacity or no?
20  A.  I was across the street in my work capacity,
21  helping somebody else, and I just witnessed this
22  happening to another patient that I work with.
23  Q.   Got it.  Okay.
24  A.  Yeah.
25  Q.   So you were on the clock?

---

**Page 54**

1   A.  I was on the clock, yes.
2   Q.   You were on the clock.
3   A.  Yeah.
4   Q.   And would you say working with that other
5   individual who was having their property taken was part
6   of your job nonetheless, even though you had not planned
7   on seeing that person that day?
8   A.  Yes.  Yes.
9   Q.   Okay.  So we've now covered a DMV incident,
10  Leavenworth incident.
11       Is there another incident in the past year of
12  property destruction that you recall?
13  A.  Different places.  And I don't remember the
14  details, honestly.  I just remember being on outreach
15  and, like, walking up on -- on the resolutions happening
16  at different places, like in the Tenderloin mostly, and
17  then a few times at the DMV.  And then on Fell -- is
18  that Fell?  Yeah, Fell.  But I don't really remember a
19  lot of the specifics for -- for those ones.
20  Q.   So you recall the Tenderloin -- occurring in
21  the Tenderloin, the DMV, on Fell.
22       Any other geographic locations?
23  A.  Oh, Willow.
24  Q.   Willow Street?
25  A.  Yes.

---

**Page 55**

1   Q.   Okay.
2   A.  Yeah.
3   Q.   So Tenderloin, DMV, Fell, Willow Street.
4        Any other locations coming to mind in the past
5   year?
6   A.  That's mostly them.
7   Q.   Can I ask you to try to recall what you can
8   from Willow Street?
9   A.  Yeah.  I think there -- well, from what I can
10  remember -- because we did a clinic there pretty
11  regularly.  Every Thursday, we would have a clinic on
12  Willow to help get people antibiotics and things like
13  that.  And, I mean, Willow got cleared and cleaned
14  pretty regularly, so there was a lot of replacing of
15  antibiotics and meds and things.
16       I can't really give you, like, specifics just
17  because it's been so long.  That may have even been last
18  year.
19       Well, you mean, like, in the last year from
20  March of '24 to March of '25, yeah.  That's what you
21  mean, in the last year?
22  Q.   I mean whatever you -- what you meant --
23  A.  Okay.
24  Q.   -- when I've been asking the past year.
25  A.  Yeah, I mean, that's kind of the last year.

---

**Page 56**

1        I mean --
2   Q.   To be clear --
3   A.  -- there's lots of tents being taken then, but
4   they were trying to get rid of the encampment that was
5   there.
6   Q.   Full disclosure, I may later ask you about
7   things in the past two years, but -- so I'm just trying
8   to categorize some things here.
9   A.  Yeah.
10  Q.   So we're talking about roughly the past year.
11       You mentioned Willow Street, correct?
12  A.  Yes.
13  Q.   You mentioned that you do clinics there, and
14  that there was often replacement of antibiotics,
15  correct?
16  A.  Yes.  And other meds.
17  Q.   And other meds?
18  A.  Yeah.
19  Q.   And so I just want to confirm, is that an
20  instance in which you observed property destruction that
21  you learned was --
22  A.  I mean, I've walked -- sorry.  Finish your
23  sentence.
24  Q.   No worries.
25       When you're specifically referring to the

---

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

Page 57

1  incident of taken medicine --
2  A.  Yes.
3  Q.  -- are those instances in which you observed
4  the property destruction yourself and -- or not?
5  A.  No.
6  Q.  Okay.  Are those instances in which you
7  observed property destruction and then later learned
8  that they included the destruction of medication?
9  A.  I don't know how connected the two were from
10  the ones that I witnessed to needing to replace the
11  meds.
12  Q.  Okay.  So let me talk about specifically
13  instances of your recollection of observing property
14  destruction on Willow Street.
15      Have you?
16  A.  Yes.
17  Q.  Okay.  In the past year or so?
18  A.  Yes.
19  Q.  Can you describe, to the best of your ability,
20  what you have seen or observed?
21  A.  I was on outreach, just walking through, and
22  they happened to be doing a resolution that day.  And
23  they were having people break down their tents, and some
24  of the tents that were broken down or being broken down,
25  they threw in the back of the vehicle, the DPW vehicle.

Page 58

1  I can't tell you if the owner of the tent was there or
2  not.  I don't know the answer to that.
3      I mean, that was pretty much it.  I just, like,
4  did a walk-through and just checked in with folks and
5  let them know that, you know, they could come to clinic
6  later, whatever, you know.  But that was that one time.
7  Q.  So that's one instance.
8  A.  Yeah.
9  Q.  Do you recall another instance on Willow
10  Street?
11  A.  Yeah.  I didn't go in, though.  I didn't have
12  the emotional bandwidth to -- to -- like, I walked up
13  and I saw what was happening, and I just -- I had to --
14  to leave.
15  Q.  When you say you "didn't have the emotional
16  bandwidth," what do you mean?
17  A.  It's -- it's a lot to hold, people grieving the
18  loss of their things, especially in an encampment
19  setting when there's multiple people.  And so if I don't
20  have the bandwidth to do that, then I can't participate.
21  Q.  Is it fair to say because it's traumatic?
22  A.  Yes.
23  Q.  Okay.  For yourself?  Yeah.
24  A.  Yes.
25  Q.  To observe other people's trauma?

Page 59

1  A.  Yes.
2  Q.  And, again, if you need a break, feel free to
3  let me know.
4      ATTORNEY GRADILLA:  Maybe we should take a break.
5      THE WITNESS:  Yeah.
6      THE REPORTER:  It's 11:19.
7      (Recess taken from 11:19 a.m. to 11:38 a.m.)
8      THE REPORTER:  It's 11:38.
9      ATTORNEY GRADILLA:  We went off the record at 11:20,
10  right?
11      THE REPORTER:  I have 11:19.
12      ATTORNEY GRADILLA:  19.
13      BY ATTORNEY DO:
14  Q.  So right before the break, we were talking
15  about your -- property destruction that you learned of
16  on Willow Street.
17      Do you recall that?
18      And there were a couple different categories of
19  instances.  There was instances where you learned about
20  needing to replace antibiotics, and then -- correct?
21  A.  Correct.
22  Q.  And then there were at least two instances of
23  property destructions that you at least -- that you
24  observed or learned of through your own senses?
25  A.  Correct.

Page 60

1  Q.  One of them was where you saw lots of tents
2  being broken down and destroyed, correct?
3  A.  Correct.
4  Q.  And a second instance was one in which you saw
5  but didn't engage in further because it was too
6  emotionally burdensome, correct?
7  A.  Correct.
8  Q.  So I want to start with that last one.
9      In that, prior to you deciding that you did not
10  have the emotional bandwidth to engage in that incident
11  of property destruction, what do you recall seeing?
12  A.  Just the DPW trucks there and all of the
13  many -- the police and DPW and the HOT Team.  The
14  encampment resolution part of the HOT Team.
15  Q.  Do you recall seeing any of the City workers
16  destroy belongings?
17  A.  I don't recall.
18  Q.  Do you recall DPW -- or any of the City workers
19  doing cleaning?
20  A.  I didn't focus on what any of them were
21  actually doing.  I just saw what was happening and left.
22  Q.  So all you recall during that instance is the
23  presence of --
24  A.  Yeah.
25  Q.  -- is the presence of the encampment team,

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

---

**Page 61**

1  essentially?

2  A.  Yes.

3  Q.  You did not see, at that instance, anytime in

4  which a City employee put things into a City vehicle?

5  A.  Correct.

6  Q.  Okay.  Now I'm going to talk about the instance

7  where you saw tents being broken down and thrown away.

8  A.  Okay.

9  Q.  So that was on Willow Street, correct?

10  A.  Correct.

11  Q.  You believe in the -- roughly, in the past

12  year, correct?

13  A.  Correct.

14  Q.  Do you know one way or another whether or not

15  those tents were attended?

16  A.  I do not know.

17  Q.  One way or another?

18  A.  One way or another.

19  Q.  Do you recall seeing any of the tents prior to

20  them being destroyed?

21  A.  I don't understand the question.

22  Q.  Sure.

23     Earlier, you mentioned that you saw tents being

24  broken down and destroyed, correct?

25  A.  Correct.

---

**Page 62**

1  Q.  Did you see the tents before they were broken

2  down?

3  A.  Yes.  On other days, yes.

4  Q.  On other days?

5  A.  Yes.

6  Q.  But you're certain that these are the same

7  tents that you previously have seen?

8  A.  Yes.

9  Q.  From your recollection of seeing of those

10  tents, did they belong to anybody?

11  A.  Yes.

12  Q.  From your recollection of those tents, did they

13  appear usable?

14  A.  Yes.

15     ATTORNEY GRADILLA: Objection; calls for

16  speculation.

17     BY ATTORNEY DO:

18  Q.  Do you recall them appearing functional?

19  A.  Yes.

20     ATTORNEY GRADILLA: Same objection.

21     BY ATTORNEY DO:

22  Q.  And, in fact, you know they were being used,

23  correct?

24  A.  Yes.  I mean, I can't -- I wasn't -- the person

25  was -- I don't know if the people were there, but they

---

**Page 63**

1  had been being used previously.

2  A.  Yes.  That's my question.  Yes.

3     Do you recall prior to -- how recently you saw

4  those tents in use prior to them being broken down?

5  A.  No less than one day.

6  Q.  So the best of your recollection is the tents

7  that you saw destroyed by the City were in use the day

8  before?

9  A.  Correct.

10  Q.  If not earlier?

11  A.  Correct.

12  Q.  Or if not sooner, I should say.

13  A.  Right.

14  Q.  Did you personally know any of the individuals

15  at that encampment?

16  A.  Yes.

17  Q.  Therefore, did you know any individuals whose

18  tent belonged to them?  Sorry.

19  A.  I don't --

20  Q.  That --

21  A.  I think I understand the question, but you can

22  repeat it, if you'd like.

23  Q.  Did you know any of the owners of those tents?

24  A.  I don't remember.

25  Q.  One way or another?

---

**Page 64**

1  A.  One way or the other.

2  Q.  So, earlier, you said that the tents were

3  broken down.

4     By "broken down," do you mean destroyed?

5  A.  Some of them, yes.  And then some of them were

6  being taken down by the people who owned them.  Uh --

7  Q.  For -- please finish your sentence.

8  A.  No, no, I'm done.

9  Q.  For the individuals who were taking down their

10  own tents, did they -- were they able to keep their

11  tents?

12  A.  I don't know.  I don't know the answer to that.

13  Q.  So I just wanted to clarify, when we use the

14  word -- the phrase "broken down," broken down can mean

15  you can take a tent and break it down in the way it's

16  intended to be broken down --

17  A.  Right.

18  Q.  -- versus break it down as, like, to break.

19  A.  Right.

20  Q.  When you saw these tents being broken down,

21  which do you mean?

22  A.  Both.

23  Q.  Both.  Okay.

24     Did you see the City break, as in destroy,

25  tents?

---

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

---

**Page 65**

1  A.  Yes.

2  Q.  From what you recall seeing, do you recall

3  there being any type of health and safety risk with

4  regards to those tents?

5      ATTORNEY GRADILLA: Objection; calls for

6  speculation, assumes facts not in evidence, lacks

7  foundation.

8      THE WITNESS: I don't know.

9      BY ATTORNEY DO:

10 Q.  You don't know or you don't recall?

11 A.  I don't know.

12 Q.  Is part of your job responsibilities to assess

13 health and safety needs?

14 A.  Yes.

15 Q.  To assess health and safety risks?

16 A.  Yes.

17 Q.  For the property destructions that we've

18 named -- that you've discussed so far today, do you

19 recall any immediate health and safety risks related to

20 that property?

21 A.  Not that I can recall.

22 Q.  Do you recall any statements made by the City

23 or owners of the property that day as it relates to the

24 property destruction?

25     ATTORNEY GRADILLA: Objection; vague.

---

**Page 66**

1      THE WITNESS: I don't know.

2      BY ATTORNEY DO:

3  Q.  Did you engage with the City -- did you engage

4  the City that day?

5  A.  Not with the --

6      ATTORNEY GRADILLA: Objection; vague.

7      THE WITNESS: -- City employees.

8      BY ATTORNEY DO:

9  Q.  Did you engage the unhoused folks that day?

10 A.  Yes.

11 Q.  While the property destruction was happening?

12 A.  Between, yeah.  Yes.

13 Q.  What did they report?

14 A.  They were in distress, but there were no, like,

15 direct reportings.  It was just more of helping people

16 feel supported.

17 Q.  Perhaps it's obvious, but why were they in

18 distress?

19 A.  Oh, because their things were being thrown

20 away.

21 Q.  And how do you know that?

22 A.  Because they were saying their things were

23 being thrown away.  And DPW is there with their trucks

24 throwing people's things away.

25 Q.  Do you know whether or not DPW was throwing

---

**Page 67**

1  people's things away despite individuals reporting that

2  they were throwing their things away?

3      ATTORNEY GRADILLA: Objection; calls for

4  speculation.

5      THE WITNESS: I don't know.  I don't know.  I don't

6  recall.

7      BY ATTORNEY DO:

8  Q.  When individuals were reporting to you what had

9  been happening, do you know whether or not City

10 employees heard their report?

11     ATTORNEY GRADILLA: Objection; calls for

12 speculation.

13     THE WITNESS: I don't know.

14     BY ATTORNEY DO:

15 Q.  Do you recall whether or not the City employees

16 were in earshot of your conversations with these

17 individuals?

18     ATTORNEY GRADILLA: Same objection.

19     THE WITNESS: I don't know.  Don't recall.

20     BY ATTORNEY DO:

21 Q.  Do you recall whether or not there was any drug

22 paraphernalia for the tents that were destroyed?

23 A.  I don't recall.

24 Q.  Let me restate the question a little cleaner.

25     Do you recall whether or not there was any drug

---

**Page 68**

1  paraphernalia intermingled with the tents that were

2  destroyed that day?

3  A.  I don't know.  I don't recall.

4  Q.  Do you recall whether or not the tents that

5  were destroyed that day were soiled?

6  A.  I don't recall.

7  Q.  Okay.  So we just discussed two incidents where

8  you observed actual or possible property destruction on

9  Willow Street.

10     Any other instances of property destruction on

11 Willow Street that you can think of, again, putting

12 aside what you learned of through your clinic there?

13 A.  Not that I can recall.

14 Q.  Okay.  I'm going to go over possible property

15 destruction on Fell Street.  You named Fell Street as a

16 location.

17     What do you recall with regards to your

18 observations of the City's actions on Fell Street?

19     ATTORNEY GRADILLA: Objection; vague.

20     THE WITNESS: I -- I don't know that I was actually

21 on the clock when that one happened.  Does that matter?

22     BY ATTORNEY DO:

23 Q.  I'm asking your observations, not whether you

24 were on the clock.

25 A.  Okay.  I was on my way to a clinic.  I guess,

---

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

---

**Page 69**

1  technically, I was on the clock, then.
2  Q.  So, I'm sorry, did you --
3  A.  Oh, sorry.  I said, technically, I guess I was
4  on the clock, but --
5  Q.  Okay.
6  A.  -- I wasn't actively doing outreach.
7  Q.  Got it.
8  A.  And DPW was there with some of the folks that
9  were camping on Fell at the time, and they were putting
10  their belongings into the truck.  But I was just like a
11  drive-by, so...
12  Q.  Were you literally driving by?
13  A.  Correct.  In traffic.
14  Q.  By "traffic," do you mean that you were slowly
15  moving?
16  A.  Yeah.  I was, like, stopped there, and I looked
17  over and see one of my patients and his things in the
18  truck.
19  Q.  And by see "things in the truck," do you
20  understand whether or not those belongings were being
21  destroyed?
22  A.  I can't say for certain.
23  Q.  Are you familiar with bag and tag?
24  A.  I am, yes.
25  Q.  Have you ever seen a bag and tag?

---

**Page 70**

1  A.  Eight years ago.
2  Q.  Eight years ago.  Okay.
3     Do you have any reason to believe that the
4  belongings that you saw being put in the DPW truck were
5  being bagged and tagged?
6  A.  I have no idea.  I have no idea.
7  Q.  What type of DPW truck was it?
8  A.  It was one of the ones with the big back.  They
9  can throw stuff into.
10     (Reporter clarification.)
11     THE WITNESS: It's like a trash compactor looking
12  one.
13     BY ATTORNEY DO:
14  Q.  Okay.  So it's a trash compacting looking
15  truck?
16  A.  Correct.
17  Q.  Do you think it's reasonable to believe that
18  belongings being put in a trash compacting looking truck
19  are being destroyed?
20  A.  Yes, it would --
21     ATTORNEY GRADILLA: Objection; calls for
22  speculation, assumes facts not in evidence.
23     THE WITNESS: Yes, it is reasonable to assume.
24     BY ATTORNEY DO:
25  Q.  So let me ask the question again.

---

**Page 71**

1  Q.  Do you believe that the belongings being put in
2  the back of the DPW truck were being destroyed?
3     ATTORNEY GRADILLA: Same objections.
4     THE WITNESS: It appeared that way to me.
5     BY ATTORNEY DO:
6  Q.  Any other reasons why you believe that those
7  belongings were being destroyed that day, based on your
8  observations?
9  A.  Report from patient later in the evening.
10  Q.  What did that patient report to you?
11  A.  I checked in with him, letting him know that I
12  saw what was happening, and asked him how he was doing.
13  And he was like, "Well, they threw most of my stuff
14  away."
15  Q.  What belongings were --
16  A.  (Inaudible.)
17     (Reporter clarification.)
18     THE WITNESS: Oh.  He said, "They threw most of my
19  stuff away."
20     BY ATTORNEY DO:
21  Q.  Anything else?
22  A.  (No audible response.)
23     (Reporter clarification.)
24     THE WITNESS: No.
25     ATTORNEY GRADILLA: I'll have a standing hearsay

---

**Page 72**

1  objection to that line of questions.
2     ATTORNEY DO: Mm -- hmm.
3     BY ATTORNEY DO:
4  Q.  Do you know whether or not they threw away any
5  medication?
6  A.  Not that I'm aware of.
7  Q.  Is checking in -- is checking in with this
8  patient part of your job?
9  A.  Yes.
10  Q.  Is it, again, part of your needs assessments?
11  A.  Yes.
12  Q.  And is this -- this is the type of information
13  that is -- that informs the type of services and
14  treatment that this person may need, correct?
15  A.  Yes.
16  Q.  That's a "yes"?
17  A.  Yes.
18  Q.  Okay.  Going back, you're driving on Fell
19  Street.  You're paused at traffic.
20     Could you estimate how long you were able to
21  actually look at the scene at that time?
22  A.  At least a minute.
23  Q.  So you report DPW workers putting your
24  patient's belongings into the DPW truck, correct?
25  A.  Correct.

---

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

---

Page 73

1  Q.  Did you see it happen just once?
2  A.  Yes.
3  Q.  So it is one carry of a DPW worker putting
4  belongings of your patients into the trash compactor
5  looking truck, correct?
6  A.  Correct.
7  Q.  Do you recall anything about those belongings?
8  A.  No.
9  Q.  Do you recall -- what do you recall of your
10  patient at that time?
11      ATTORNEY GRADILLA: Objection; vague.
12      THE WITNESS: He appeared to be in distress.
13      BY ATTORNEY DO:
14  Q.  What is that based off of?
15  A.  His body language and -- his body language.
16  Q.  Anything else?
17  A.  No.
18  Q.  Is it fair to say you are trained in
19  understanding body language?
20  A.  Yes.
21  Q.  You've actually had trainings on this --
22  A.  Yes.
23  Q.  -- very --
24  A.  Sorry.
25  Q.  And does that include understanding whether or

---

Page 74

1  not someone, an individual, is in distress?
2  A.  Yes.
3  Q.  Is it fair to say that based on that training,
4  you've assessed that that individual was in distress at
5  the time in which you were making your observations
6  about property destruction?
7  A.  Yes.
8  Q.  Was that individual in distress when they
9  reported the property destruction to you?
10  A.  Yes.
11      ATTORNEY GRADILLA: Objection; calls for
12  speculation.
13      BY ATTORNEY DO:
14  Q.  How soon after the report -- excuse me.
15      How soon after the incident of property
16  destruction did you speak with your patient?
17  A.  It was probably eight hours after, around.
18  Q.  Do you recall what you did when he informed --
19  excuse me.
20      Do you recall what you did when the patient
21  informed you about the property destruction?
22  A.  Gave him space to grieve the loss of his
23  belongings and asked if there was anything that I could
24  do to help, and whatever that would look like.
25  Q.  Do you recall what he report -- excuse me.

---

Page 75

1      Do you recall what the patient reported back to
2  you?
3  A.  At that time, he just needed the space to be
4  sad.
5  Q.  Do you recall any other actions you took, based
6  on this report back with him?
7  A.  Not at the time. I don't recall beyond that.
8  Q.  How long have you been working with that
9  individual?
10  A.  Probably like five years.
11  Q.  Do you recall whether or not that individual
12  tended to keep his living space clean or tidy?
13  A.  I don't recall.
14  Q.  Do you have any reason to believe that that
15  patient's belongings were an immediate health and safety
16  risk?
17  A.  I have no reason to believe that.
18  Q.  Okay.  So are there any other incidents on Fell
19  Street that you recall, roughly in the past year?
20  A.  No.
21  Q.  Okay.  You mentioned another location is the
22  DMV.  We previously have spoken about an encampment
23  clearing at the DMV.
24      Is there a different incident at the DMV that
25  you recall of property destruction within the past year?

---

Page 76

1  A.  There were like three, I think, total that I
2  saw happening.  The one -- the first one that I spoke of
3  was the one that I think I was the most, like, there
4  for.  The other two were similar to the time on Willow,
5  where I just -- I didn't have the bandwidth to get in
6  it.
7  Q.  Understood.
8      So do you know, in terms of the three incidents
9  at the DMV, whether one that we discussed earlier was
10  the most recent in time or the earliest in time?
11  A.  I think it was probably in the middle.
12  Q.  Okay.  If we can try to think of the first time
13  in the past year that you recall property destruction of
14  the DMV, let's focus on that one, if we can.
15      What do you recall happening in that instance?
16  A.  This is not the one that we already talked
17  about.
18  Q.  Not the one that we already talked about.
19  A.  Okay.  I mean, I --
20  Q.  We'll give this one a different name once
21  you --
22  A.  Right.
23  Q.  -- are able to describe it --
24  A.  Right.
25  Q.  -- to the extent that you can.

---

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

---

**Page 77**

1  A.  I mean, I don't really have a lot of details,
2  to be honest.  It was just more of, like, I saw the
3  multiple agencies again.  I knew what was going on.  I
4  didn't -- I didn't have the bandwidth to do it.
5  Q.  What do you mean, you "knew what was going on"?
6  A.  Well, there were -- I mean, the DPW and the
7  police and the HOT Team being there, I knew that
8  people's belongings were going to be taken and they were
9  going to be moved.
10  Q.  How do you know that that was going to happen?
11  A.  Because that's what happens.  I don't know how
12  to answer that question.
13  Q.  Because it -- is it because, in your mind, it
14  happens all the time?
15      ATTORNEY GRADILLA: Objection; vague.
16      THE WITNESS: You can -- it's from experience, I
17  guess.
18      BY ATTORNEY DO:
19  Q.  So from your experience of -- what experience
20  is that?
21  A.  Oh.  Watching people's things being taken and
22  destroyed, and them just trying to gather what few
23  survival gears they can hold onto and then find some
24  other place to go.
25  Q.  So based on that experience, you understand

---

**Page 78**

1  that what you were seeing at the DMV that day was likely
2  property destruction?
3  A.  Correct.
4      ATTORNEY GRADILLA: Objection; calls for
5  speculation.
6      BY ATTORNEY DO:
7  Q.  On that day, do you recall any City employee
8  taking belongings and destroying them?
9  A.  I don't know.  I didn't focus in on...
10  Q.  Do you recall seeing any belongings in the back
11  of a DPW truck?
12      ATTORNEY GRADILLA: Objection; assumes facts not in
13  evidence.
14      THE WITNESS: I don't know.
15      BY ATTORNEY DO:
16  Q.  Did you get any report-backs about property
17  destruction at this incident?
18  A.  Yes.
19      ATTORNEY GRADILLA: Objection; vague.
20      THE WITNESS: Yes.
21      BY ATTORNEY DO:
22  Q.  What was the report back?
23  A.  That people's tents were taken.  And other
24  belongings.  I don't remember specifically what, but I
25  remember one person was upset about their tent.

---

**Page 79**

1  Q.  How did you learn about this property
2  destruction?
3  A.  They came into clinic later in the evening and
4  reported.
5  Q.  So these are patients?
6  A.  Correct.
7  Q.  How many people reported this?
8  A.  One specifically, because they needed an ID
9  replacement.
10  Q.  Aside from that individual, did other
11  individuals report property destruction being taken that
12  day?
13  A.  Not directly to me.
14  Q.  Do you recall whether or not they reported to
15  other people that day?
16      ATTORNEY GRADILLA: Objection; calls for speculation
17  and hearsay.
18      THE WITNESS: Yeah, other members of the clinic that
19  I was working in.
20      BY ATTORNEY DO:
21  Q.  So coworkers?
22  A.  Correct.
23  Q.  Coworkers who do the same -- or excuse me.
24      Are these coworkers who do similar treatment
25  assessments as you do?

---

**Page 80**

1  A.  They work in the -- a different part of the
2  program.  They're in the -- the HYA side, the Homeless
3  Youth Alliance side, which I believe they are also, yes,
4  trained to do the same needs assessments.
5  Q.  Who are these coworkers?
6      Again, I'm not asking for individual's patient
7  names.  I'm asking for coworkers.
8  A.  Right.  Staff at the Homeless Youth Alliance,
9  Karin Adams and Mary Howe.
10  Q.  Are these individuals employed by the City or
11  are they employed by Homeless Youth Alliance?
12  A.  They are employed by Homeless Youth Alliance.
13  Q.  And what was reported to them with regards to
14  property destruction?
15      ATTORNEY GRADILLA: Objection; calls for hearsay.
16      THE WITNESS: I don't know.
17      BY ATTORNEY DO:
18  Q.  Earlier, we took like a 15-minute break.
19      Do you recall that?
20  A.  Yes.
21  Q.  Did you speak with counsel during that break?
22  A.  No.
23  Q.  Not even pleasantries?
24  A.  Oh, wait.
25      Well, you're counsel?

---

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

Page 81

1  Q.  Yes.
2  A.  Oh, okay.  Yeah.  Sorry.  I was thinking of
3    Kaitlyn.  Yes.
4  Q.  Did you talk about your testimony today?
5  A.  Not specifically.
6  Q.  What did you speak about?
7  A.  Tips on answering questions.
8  Q.  What were those tips?
9  A.  Yes, nos.
10 Q.  Any other tips?
11 A.  No.
12 Q.  So is it -- just so I understand, was -- the
13   tip for answering questions at this deposition today is
14   to attempt to limit your responses to yes and no?
15     ATTORNEY GRADILLA: Objection to the extent you're
16   calling for attorney-client privilege, but also --
17     You can answer.
18     THE WITNESS: I mean, yes, I guess.
19   BY ATTORNEY DO:
20 Q.  Yes, that was the tip?
21 A.  Yes.
22 Q.  Anything else?
23 A.  No.
24 Q.  Okay.
25     ATTORNEY DO: I'm just going to put an objection to

Page 82

1    the extent that was inappropriate coaching, but
2    otherwise, we can keep on going.
3      BY ATTORNEY DO:
4  Q.  Okay.  I'm going to go back to the individual
5    that specifically reported about the lost -- the taken
6    ID.
7      That was your patient, correct?
8  A.  Correct.
9  Q.  Did they report anything else, aside from the
10   ID?
11 A.  Not that I recall.  That was the main thing.
12   And the tent.  There was a tent and -- his tent was
13   taken, and he needed help getting a new ID.
14 Q.  Have you seen that individual's tent before?
15 A.  I don't recall his tent.
16 Q.  You have no recollection of ever seeing his
17   tent?
18 A.  I don't remember what it looked like.  I
19   remember there was a tent.  I don't remember what it
20   looked like.
21 Q.  Do you recall whether or not it was usable?
22 A.  I don't remember.
23 Q.  Do you recall whether or not it was functional?
24 A.  Yes, it was functional.
25 Q.  So you don't recall any significant damage to

Page 83

1    it?
2  A.  Not that I remember.
3  Q.  Do you recall any reason why his tent would be
4    a health and safety risk?
5  A.  I don't know.
6  Q.  My question is:  Do you have any reason to
7    believe that there was a health and safety risk for his
8    tent?
9  A.  No, I have no reason to believe that.
10 Q.  Do you recall whether or not this individual,
11   in your experience, generally kept a tidy living space?
12 A.  I don't recall, for him.
13 Q.  Did you help the individual try to get an ID?
14 A.  I got him a free identification form so that he
15   could get an ID replacement.
16 Q.  And this is typical -- it's a typical thing for
17   you to do as part of your job?
18 A.  Correct.
19 Q.  Did you do anything else in response to his
20   report back to you?
21 A.  Other than hold space and give him an ID
22   voucher.  That was all that happened in that visit.
23 Q.  Do you recall any other statements he made to
24   you with regards to property destruction?
25 A.  Not at this time.

Page 84

1  Q.  Do you recall -- do you know -- excuse me.
2      Do you have any information on whether or not
3    there was notice of the arrival of the City and DPW at
4    DMV that day?
5  A.  I don't know.
6  Q.  You have no information on it, one way or
7    another?
8  A.  Yeah.
9  Q.  Did the individual report back to you whether
10   or not he was aware that the City was coming that day?
11 A.  Is this for Fell or DMV?
12 Q.  This is the DMV incident with the taken tent
13   and ID.
14 A.  That was on Fell.  Sorry.  Did I get things
15   confused?  I don't remember -- sorry.
16 Q.  No worries.
17     Just so that we're both clear on what --
18 A.  Yeah.
19 Q.  -- we're talking about --
20 A.  Yeah.
21 Q.  So I'm going to go back to Fell.
22 A.  Okay.
23 Q.  On Fell Street, that's the one where you were
24   stopped in traffic --
25 A.  Correct.

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

---

Page 85

1  Q.  -- and you observed --
2  A.  Right.
3  Q.  -- a patient --
4      (Reporter clarification.)
5      BY ATTORNEY DO:
6  Q.  We're going back to Fell, the incident on Fell
7  Street, where you were stopped in traffic, correct?
8  A.  Correct.
9  Q.  And you observed DPW taking your patient's
10  belongings and putting them in what looked like a trash
11  compactor truck, correct?
12  A.  Correct.
13  Q.  And that's an incident in which the patient
14  later reported back to you that his belongings were
15  taken, correct?
16  A.  Correct.
17  Q.  What did he report being taken?
18  A.  His tent and his ID.
19  Q.  Okay.
20  A.  Yes.
21  Q.  Okay.  So now we're moving to the DMV.
22  A.  Okay.
23  Q.  We had earlier spoken about the DMV incident in
24  which an individual's medication, art supplies, and
25  other belongings were taken.  That's one DMV incident in

---

Page 86

1  the past year.
2  A.  Correct.
3  Q.  Then I asked you to describe the other two DMV
4  incidents to the best of your ability.
5      One instance is one in which you mentioned that
6  you saw the encampment resolution team, essentially, but
7  did not do significant engagement because it was
8  emotionally overwhelming, correct?
9  A.  Correct.
10  Q.  And, in your view, you knew what was going on,
11  correct?
12  A.  Correct.
13  Q.  And that includes property destruction,
14  correct?
15  A.  Correct.
16  Q.  Okay.  In that instance, my question was:  Did
17  anyone report back to you about specific property
18  destruction from that incident in which you did not
19  engage in at the DMV?
20  A.  Not that I can remember specifically.  I don't
21  remember any specifics.
22  Q.  Okay.  Do you recall anyone reporting back
23  property destruction related to this DMV incident in
24  which you did not engage in -- in which you did not
25  engage?

---

Page 87

1  A.  Not to me specifically.
2  Q.  Do you recall anyone reporting it to anyone?
3  A.  I heard -- which is, like, speculation --
4  through other patients and stuff that were upset for
5  their people that were there.
6  Q.  I'm sorry.
7      You're not -- are you speculating that other
8  property destruction that day, correct?
9  A.  Correct.
10      ATTORNEY GRADILLA: Objection; hearsay.
11      BY ATTORNEY DO:
12  Q.  I just want to confirm.
13      You're not -- are you speculating that other
14  people said it, or did you know other people said it?
15  A.  No, other -- other people said it to me on
16  behalf of the people whose stuff was taken.
17      ATTORNEY GRADILLA: Same objection; hearsay.
18      BY ATTORNEY DO:
19  Q.  And who -- just to be clear, you can say
20  hearsay.
21      Who reported it to you?
22  A.  Other people who participate in the HYA
23  program.  Participants.
24  Q.  So other -- like, the unhoused folks?
25  A.  Yes.

---

Page 88

1  Q.  And why did they report back to you?
2      ATTORNEY GRADILLA: Objection; calls for
3  speculation.
4      THE WITNESS: I am a trusted person in the
5  community.
6      BY ATTORNEY DO:
7  Q.  What did they report back happened?
8  A.  That DPW was there taking people's things.
9  Q.  Any other additional details?
10  A.  They weren't specific.
11  Q.  Even if they weren't specific, any other
12  information?
13  A.  Not that I recall.
14  Q.  Okay.  So we've covered now -- oh.
15      Do you have any reason -- do you have any
16  information on whether or not there was notice of the
17  encampment team coming that day?
18  A.  I don't know.
19  Q.  You don't have any information, or you don't
20  know whether or not there was notice?
21  A.  I don't know whether or not there was notice.
22  Q.  Okay.  My question is:  Do you have any
23  information about whether or not there was notice?
24  A.  I don't have any information either about...
25  Q.  Okay.

---

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

---

Page 89

1   A.  Yeah.
2   Q.  So we've covered two of the three DMV
3   incidents.  I want to cover the last, the third, DMV
4   incident.
5       What do you recall of that?
6   A.  It was similar to the first one, of -- that I
7   just -- I saw what was going on and chose to not
8   participate.
9   Q.  Did you learn of whether or not there was
10  property destruction that day?
11  A.  Yes.
12  Q.  From who?
13  A.  A patient.
14  Q.  What did the patient report?
15  A.  That his meds were -- he needed to refill his
16  meds because they were taken.
17  Q.  By the City?
18  A.  Correct.
19  Q.  At the resolution that you observed earlier,
20  correct?
21  A.  Correct.
22  Q.  I know that you said it was similar to the one
23  you previously described, but could you describe what
24  you recall seeing before you left?
25  A.  Yeah.  It was DPW and the police and the HOT

---

Page 90

1   Team.  And people were gathering their things.  I didn't
2   see anything being put directly into the DPW truck,
3   though.
4   Q.  Did you see your patient there?
5   A.  I didn't really focus on -- so I don't know if
6   he was there or not.
7   Q.  Okay.  You don't recall?
8   A.  I don't recall.
9   Q.  Did your patient report being there?
10  A.  Yes.
11  Q.  In addition to medicine, what else did the
12  patient report getting taken by the City?
13  A.  Quote/unquote, everything.
14  Q.  How long after your observations of the
15  encampment resolution did your patient report that
16  everything was taken by the City?
17  A.  It was -- the resolution happened earlier in
18  the day, and the clinic is in the evening, so, I don't
19  know, six hours maybe.
20  Q.  Was your patient still distressed at the time?
21  A.  Yeah.  Yes.
22  Q.  Why do you say that?
23  A.  He was very frazzled and upset that all of his
24  things were taken once again in such a short period of
25  time.

---

Page 91

1   Q.  Is this the same individual who was at a prior
2   DMV sweep who had their medication and art taken?
3   A.  Yes.
4   Q.  Did that individual live in a tent at -- at the
5   DMV?
6   A.  Yes.
7   Q.  And I want to make sure, in terms of time,
8   we're talking about the second time that this happened?
9   A.  Yes.
10  Q.  Do you recall whether or not that individual
11  had a generally tidy living space?
12  A.  He was always -- yes.
13  Q.  Do you recall -- you have visited this
14  individual at their, I'll call it encampment, before?
15  A.  Yes.
16  Q.  Do you recall any health and safety risk at his
17  encampment?
18  A.  No.
19  Q.  Do you recall whether or not his tent was
20  soiled?
21  A.  No.
22  Q.  No, it was not soiled, or no, you don't recall?
23  A.  I don't recall seeing any soiled-ness on the
24  tent.
25  Q.  Did you replace this individual's medication?

---

Page 92

1   A.  Yeah -- we couldn't the second time, no,
2   because Medi-Cal won't cover more than one replaced.
3   And we had already replaced it from the last encampment
4   sweep before that.
5   Q.  Okay.  Do you know how long, therefore, this
6   individual was without their medication due to the
7   inability to refill it?
8   A.  It took him a few months to finally get back
9   into clinic and get them refilled again after that.
10  Q.  Why did it take so long?
11  A.  Competing priorities.  He was --
12  Q.  Your priorities or his priorities?
13  A.  His priorities.  He was trying to survive.
14      ATTORNEY GRADILLA:  Just objection to speculation to
15  that last question.
16      BY ATTORNEY DO:
17  Q.  Is part of trying to survive trying to replace
18  his belongings?
19  A.  Yes.
20  Q.  And this is heart medication, to the best of
21  your recollection, correct?
22  A.  Yes, correct.
23  Q.  Is it detrimental for an individual to be
24  without that medication?
25  A.  Yes.

---

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

---

Page 93

1   Q.   Do you know why it's detrimental?
2   A.   Yes.  He -- he's had a procedure done on his
3      heart where he requires certain medications to do things
4      so it works better.
5   Q.   How long -- sorry.
6   A.   It's okay.
7   Q.   You mentioned that you couldn't refill it due
8      to a Medicare restriction, correct?
9   A.   Medi-Cal, yes.
10  Q.   Excuse me.
11       A Medi-Cal restriction, correct?
12  A.   Correct.
13  Q.   How long would an individual have to wait, due
14     to that Medi-Cal restriction, in order to get a
15     prescription again, if everything was done as quickly as
16     possible?
17  A.   30 days.
18  Q.   So regardless of whether or not he had other
19     competing life priorities, this individual would have
20     been out of medication for probably about 30 days, if
21     not longer?
22  A.   Yes, yes.
23  Q.   Do you know whether or not this individual
24     experienced any symptoms due to lack of medication?
25  A.   Yes.

---

Page 94

1   Q.   What are those symptoms?
2   A.   His blood pressure was higher.
3   Q.   And do you know all this as part of him being
4      your patient?
5   A.   Yes.
6   Q.   All right.  So we've gone over DMV, Fell,
7      Willow Street, and we've gone over Leavenworth, which I
8      assume you mean Leavenworth in the Tenderloin?
9   A.   Yes.
10  Q.   Okay.  Are there -- but there were other, I'm
11     going to call them encampment resolutions, that you saw
12     in the Tenderloin, correct, in the past year?
13  A.   Correct.
14  Q.   Can you recall any other ones, aside from the
15     Leavenworth one, that have occurred roughly in the past
16     year?
17  A.   Not specifics, no.  And most of those were also
18     I walk up, I see what's happening, and I leave, like,
19     not able to...
20  Q.   How many -- sorry.  I didn't want to interrupt.
21       Did you finish your thought there?
22  A.   Yes.
23  Q.   How many times do you think that has happened
24     in the Tenderloin in the past year, roughly?
25  A.   I couldn't even tell you a number.  I don't

---

Page 95

1      know.  Because they do different blocks on different
2      days, so...  I -- I don't know.
3   Q.   Are you familiar with a term "JFO"?
4   A.   Yes.
5   Q.   That's Joint Field Operation, perhaps?
6   A.   Yes.
7   Q.   Is that what you were referring to when you say
8      that they do different blocks different days?
9   A.   Probably.
10  Q.   Okay.  Thinking about your past observations in
11     the past year in the Tenderloin, aside from the instance
12     on Leavenworth, have you ever seen City workers destroy
13     people's belongings in the Tenderloin in the past year,
14     roughly?
15  A.   I -- I feel like the answer is yes, but I
16     wouldn't be able to give any specifics, so I don't know
17     how viable that would be.
18  Q.   Do you recall seeing what looked to be
19     individual belongings placed into DPW trucks?
20  A.   Yes.
21       ATTORNEY GRADILLA: Objection; calls for
22  speculation, lacks foundation.
23       THE WITNESS: Sorry.
24       BY ATTORNEY DO:
25  Q.   Similar question:  Do you recall seeing --

---

Page 96

1      putting aside the Leavenworth incident, in the roughly
2      past year, have you seen individuals' belongings being
3      placed in DPW trucks in the past year in the Tenderloin?
4   A.   Well, yes, Willow.
5       ATTORNEY GRADILLA: Same objection.
6       THE WITNESS: Right.
7       BY ATTORNEY DO:
8   Q.   Sorry.
9       Aside from --
10  A.   Willow.
11  Q.   -- the Willow Street incidents and the
12     Leavenworth incidents, in the roughly past year, have
13     you seen individuals' belongings being placed in DPW
14     trucks?
15       ATTORNEY GRADILLA: Same objections.
16       THE WITNESS: I -- I mean, I have, but I don't
17  remember specifics, so...
18       BY ATTORNEY DO:
19  Q.   And do you understand, when you saw -- when you
20     see that, that that is your understanding of belongings
21     being destroyed by DPW?
22  A.   Yes.
23  Q.   Okay.
24       ATTORNEY GRADILLA: Objection; calls for
25  speculation.

---

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

---

Page 109

1   THE WITNESS: I don't care.
2   How long would you like to take?
3   ATTORNEY GRADILLA: I don't want to --
4   ATTORNEY DO: We're off the record. My apologies.
5   THE REPORTER: Okay. So it's 12:49.
6   (At 12:49 p.m. a lunch recess was taken until
7   1:31 p.m. of the same day.)
8   (Nothing omitted nor deleted. See next page.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 110

1   THURSDAY, MARCH 20, 2025; P.M. SESSION
2   EXAMINATION RESUMED
3   THE REPORTER: It is 1:31.
4   BY ATTORNEY DO:
5   Q.  Shannon, right before the break, you recall we
6   were going through some commonly reported taken
7   belongings that your patients referred to.
8   Do you recall that?
9   A.  Yes.
10  Q.  I'm not going to ask you to go through all your
11  specific memories of specific patients, but I do want to
12  confirm: Do you have specific memories of specific
13  individuals reporting to you that their property had
14  been taken by the City?
15  A.  Yes.
16  Q.  Given the large number in which you've reported
17  this has happened, can you report what is a typical
18  example of what your patients report to you?
19  A.  Medication, documentation, clothing, sleeping
20  bags, tents, things of -- like that. Yeah.
21  Q.  Typically, do -- are your patients reporting
22  whether or not the belongings were taken when they were
23  not there as opposed to when they were there?
24  A.  Both.
25  Q.  You typically hear both, instances of both

---

Page 111

1   property being taken when it's attended and when it's
2   unattended?
3   A.  Yes.
4   Q.  Have you ever heard of instances where people
5   reported that their belongings were taken by the City
6   but they were able to retrieve them?
7   A.  Not that I can recall.
8   Q.  Do you recall whether or not your patients
9   report that they had advance notice of the City coming
10  to conduct an encampment resolution?
11  A.  Not that I can recall any specifics. I feel
12  like there were a couple times when there was advance
13  notice given.
14  Q.  Are there other instances in which no notice
15  was given?
16  A.  I couldn't tell you for certain. I don't know.
17  Q.  So you recall maybe a couple times in which
18  they reported notice being given?
19  A.  That I knew of.
20  Q.  That you knew of.
21  A.  Yeah.
22  Q.  Okay. Well, how did you know it, that notice
23  was given?
24  A.  By report of patients.
25  Q.  Okay. Great.

---

Page 112

1   A.  Yeah.
2   Q.  Do you recall any instances in which they
3   reported no notice?
4   A.  Not that I recall.
5   Q.  And by the couple of times in which people
6   reported notice, it's fair to say that was a handful of
7   times, that you recall?
8   A.  Less than. Like a few.
9   Q.  Okay.
10  A.  Yeah.
11  Q.  Less than a handful, a few?
12  A.  Yeah.
13  Q.  Okay. Do you recall any instances in which
14  your patients report a justification for the City's
15  destruction or taking of their belongings?
16  ATTORNEY GRADILLA: Objection; vague.
17  THE WITNESS: Not that I'm aware of.
18  BY ATTORNEY DO:
19  Q.  Do you have any reason to believe that your
20  patients' belongings were taken due to them being health
21  and safety risks?
22  A.  No, not that I'm aware of.
23  Q.  Do you have any reason to believe that your
24  patients' belongings were taken because they were
25  abandoned?

---

Coalition on Homelessness, et al., v
City and County of San Francisco, et al.

Shannon Ducharme
March 20, 2025

Page 129

1  A.  Make sure the environment is healthy.

2  Q.  Do you know whether or not they deem

3  encampments nuisances?

4  A.  The City or the Department of Public Health?

5  Q.  The Department of Public Health, specifically

6  their Environmental Health component.

7  A.  Oh, I don't know.

8  Q.  I want to go back to some of the associated

9  harms that we spoke about with regards to property

10  destruction.

11      In your experience with your patients, does the

12  property destruction by the City impact individuals'

13  willingness to accept services?

14      ATTORNEY GRADILLA: Objection; calls for

15  speculation.

16      THE WITNESS: I feel that it does, yes.

17      BY ATTORNEY DO:

18  Q.  And in your opinion, what's the impact?

19  A.  It creates some distrust, in my experience from

20  talking with patients, around working with the HOT Team,

21  who are really the ones to have access to shelter and,

22  like, places for people to go, as far as that goes.  I

23  mean, that's kind of one of the biggest ones I can think

24  of.

25  Q.  In your experience with your patients, does

Page 130

1  property destruction by the City lead to increased

2  vulnerability to illness?

3      ATTORNEY GRADILLA: Objection; calls for

4  speculation.

5      THE WITNESS: Yes, yes.

6      BY ATTORNEY DO:

7  Q.  Does it lead to increased exposure to the

8  elements?

9      ATTORNEY GRADILLA: Same objection.

10      THE WITNESS: Yes.

11      BY ATTORNEY DO:

12  Q.  To other environmental hazards?

13      ATTORNEY GRADILLA: Same objection.

14      THE WITNESS: Yes.

15      BY ATTORNEY DO:

16  Q.  Does it increase instability, making it more

17  difficult for an individual to access resources and

18  support to exit homelessness?

19      ATTORNEY GRADILLA: Same objection.

20      THE WITNESS: In my experience, yes.

21      BY ATTORNEY DO:

22  Q.  Does it exacerbate mental health?

23      ATTORNEY GRADILLA: Same objection.

24      THE WITNESS: Yes.

25      BY ATTORNEY DO:

Page 131

1  Q.  Does it increase social isolation?

2      ATTORNEY GRADILLA: Same objection.

3      THE WITNESS: It has the potential to, yeah.

4      BY ATTORNEY DO:

5  Q.  Does it lead to sleep disruption or

6  deprivation?

7      ATTORNEY GRADILLA: Same objection.

8      THE WITNESS: Yes.

9      BY ATTORNEY DO:

10  Q.  Does it lead to individuals moving to more

11  marginalized, risky locations?

12      ATTORNEY GRADILLA: Same objection.

13      THE WITNESS: It has, yes.

14      BY ATTORNEY DO:

15  Q.  You mentioned potential impact on access to

16  housing, correct?

17  A.  Correct.

18  Q.  What about employment?

19  A.  Yes.

20  Q.  In your experience with working with folks

21  living outside, do you often find individuals cycle

22  through homelessness?

23  A.  Do you mean, by "cycle through homelessness,"

24  being housed and being unhoused again?

25  Q.  Correct.

Page 132

1  A.  Yes.

2  Q.  Is it common?

3  A.  Yes.

4  Q.  Do you work with individuals who have hoarding

5  tendencies?

6  A.  Yes.

7  Q.  In your professional opinion, what is the best

8  way of addressing hoarding and collective behaviors?

9      ATTORNEY GRADILLA: Objection; assumes facts not in

10  evidence.

11      THE WITNESS: It's complex.  And hard.  I don't

12  really have an answer for that.

13      I mean, helping people pare down their stuff is

14  the time -- takes -- takes time and patience and trust,

15  and a person's ability to -- like, a patient's ability

16  to work with you on it.  And sometimes it's being

17  creative in coming up with different ways of storing

18  their belongings or creating a system of, these are the

19  things I really need to these are the things I don't

20  really need, and then working from there.

21      BY ATTORNEY DO:

22  Q.  By paring down an individual's belongings, is

23  that a voluntary process that you're recommending?

24      ATTORNEY GRADILLA: Objection; vague.

25      THE WITNESS: With me, it is, yes.