## <u>REDACTED</u>

## EXHIBIT 2

## TO

## DECLARATION OF STEVEN MILLS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## DOCUMENT SEALED PURSUANT TO ECF NO. 509

```
 1                UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3

 4    - - - - - - - - - - - - - - - - -

 5    COALITION ON HOMELESSNESS,        )

 6    et al.,                           )

 7                    Plaintiffs,       ) CASE NO.

 8    v.                                ) 4:22-cv-05502-DMR

 9    CITY AND COUNTY OF SAN            )

10    FRANCISCO, et al.,                )

11                    Defendants.       )

12    - - - - - - - - - - - - - - - - -

13

14

15        HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16              PURSUANT TO PROTECTIVE ORDER

17        VIDEOTAPED DEPOSITION OF JOSHUA DONOHOE

18                TUESDAY, NOVEMBER 12, 2024

19

20

21            BEHMKE REPORTING AND VIDEO SERVICES, INC.

22                    BY:  CYNTHIA TURI, CSR NO. 11812

23                    550 CALIFORNIA STREET, SUITE 820

24                    SAN FRANCISCO, CALIFORNIA  94104

25                            (415) 597-5600
```

```
 1
 2
 3
 4
 5
 6
 7
 8            Videotaped deposition of JOSHUA DONOHOE,
 9   taken on behalf of Defendants, at Lawyers Committee
10   for Civil Rights of the San Francisco Bay Area at 131
11   Steuart Street, Suite 400, San Francisco, California,
12   commencing at 10:14 A.M., TUESDAY, NOVEMBER 12, 2024,
13   before Cynthia Turi, Certified Shorthand Reporter
14   No. 11812, pursuant to Notice.
15
16
17
18
19
20
21
22
23
24
25
```

1        Q.   And what did you do to prepare for your

2   deposition today?

3        A.   I reviewed the declarations that I submitted.

4        Q.   Do you know how many declarations you reviewed?

5        A.   Three.   Three or four.

6        Q.   And do you know when you reviewed those

7   declarations?

8        A.   Probably for the last five days.

9        Q.   How many times do you think you reviewed those

10  declarations in the last five days?

11       A.   Once every day.

12       Q.   Did you review any documents other than those

13  declarations?

14       A.   No.

15       Q.   And did you speak with anybody about your

16  deposition today?

17       A.   Yes.

18       Q.   Who did you speak with?

19       A.   My partner, Sarah Cronk.

20       Q.   When did you talk to Sarah Cronk about your

21  deposition?

22       A.   Probably three out of the five days.

23       Q.   Did you talk about Ms. Cronk's deposition?

24       A.   Yes.

25       Q.   And did you talk about what questions Ms. Cronk

```
 1   was asked in her deposition?
 2       A.  No.
 3       Q.  Did you talk about what Ms. Cronk testified to
 4   in her deposition?
 5       A.  Yes.
 6       Q.  What did you talk about?
 7       A.  The emotional impact on her.  And also, just
 8   kind of, you know, trying to figure out timelines and
 9   making sure that, you know, we could recollect correctly
10   what happened to both of us.
11       Q.  Did you happen to review the transcript of
12   Ms. Cronk's deposition?
13       A.  No.
14       Q.  I want to go back.  There's one more instruction
15   that I meant to give.  You'll be getting a copy today --
16   after your deposition of everything that was written
17   down, and you'll be provided an opportunity to review
18   that.  And if you make any corrections, the City is
19   allowed to point that out at trial, if it's something
20   that goes to the substance.
21           So for instance, if the sky was rainy that day
22   and it gets changed to a sunny day, that's the type of
23   thing we may be able to comment on.  But that will be an
24   opportunity that you do have.
25           So I want to circle back since we were on the
```

```
 1   topic of the transcript.

 2          Did Ms. Cronk tell you about any specific

 3   questions that she was asked in her deposition?

 4      A.  No.

 5      Q.  Did she tell you about any exhibits that she was

 6   shown in her deposition?

 7      A.  Yes.

 8      Q.  What exhibits did Ms. Cronk tell you that she

 9   was shown?

10      A.  They weren't specific.  It was just more, like,

11   kind of -- like, it was under the umbrella of what to

12   expect and kind of preparing myself for this.

13      Q.  Did you talk about Google photographs?

14      A.  We did.

15      Q.  What did you talk about about those photographs?

16      A.  Mentioning of our encampments and places we

17   stayed at before.

18      Q.  And did you look at those photographs?

19      A.  No.

20      Q.  Did you talk about photographs from places other

21   than Google?

22      A.  No.

23      Q.  Did you talk about testimony relating to drug

24   use?

25      A.  Yes.
```

```
 1   you know, where they got it, what time, what date, you

 2   know, all the things that help someone locate it.

 3           And put for storage or safekeeping for someone

 4   to pick up.  Or the owner to pick up, I should say.

 5      Q.  And when do you think you learned about that

 6   kind of perception of what the bag -- what bag and tag

 7   is?

 8      A.  I've known about bag and tagging since

 9   pre-COVID, so 2017 or '18.

10      Q.  Have you ever read the Department of Public

11   Works, or DPW's, bag and tag policy?

12      A.  No.

13      Q.  Have you ever spoken with anybody about DPW's

14   bag and tag policy?

15      A.  Yes.

16      Q.  And who did you speak to about DPW's bag and tag

17   policy?

18      A.  Aside from, you know, the general DPW workers

19   and police officers and City officials, Shanna Couper

20   or -- I don't know her last name.  I know her as Couper.

21      Q.  Did Shanna Couper ever show you the bag and tag

22   policy?

23      A.  No.

24      Q.  Did Ms. -- did Shanna Couper hold herself out as

25   being familiar with the bag and tag policy?
```

1      A.  Yes.  And her -- her definition matched --
2   matched what I was hearing from DPW.
3      Q.  Do you know who from DPW you heard about it
4   from?
5      A.  No one specifically.
6      Q.  So if I understood your testimony, you knew
7   about bag and tagging sometime in 2017 or 2018.
8         Is that -- when did you hear about bag and
9   tagging from Shanna Couper?
10      A.  Probably roughly around that time.
11      Q.  Are you familiar with the stolen belongings
12   project?
13      A.  Not -- no.
14      Q.  Did you ever hear Shanna Couper talk about
15   working on a documentary concerning DPW's bag and tag
16   policy?
17      A.  Yes.
18      Q.  When did you learn about that?
19      A.  Probably 2018 or 2019.
20      Q.  And what did Shanna Couper tell you about that
21   project?
22      A.  That she was going to be basically part of a
23   documentary, and that there were going to be certain
24   people, you know, questioned and interviewed for that
25   documentary, and was very excited about it.

1    street that's down there.

2         There's a lot of the railroads -- not

3    railroads -- freeway intersections and bridges in that

4    area.

5         Q.  Did you stay with Ms. Cronk at the Navigation

6    Center?

7         A.  No.

8         Q.  At some point in time, did you start staying

9    with Ms. Cronk on the streets of San Francisco?

10        A.  Yes.

11        Q.  And when was that?

12        A.  Shortly after.

13        Q.  Do you have a best estimate of the month that

14   you first started living on the streets of San Francisco

15   with Ms. Cronk?

16        A.  Probably end of April.

17        Q.  And where did you start living with Ms. Cronk in

18   roughly the end of April?  That's 2022?

19        A.  Correct.

20        Q.  So roughly -- where did you start living with

21   Ms. Cronk on the streets of San Francisco in roughly

22   April of 2022?

23        A.  It was really all over.  We never really stayed

24   in one spot for more than three or four days.

25        Q.  After April of 2022 and before -- strike that.

```
 1          When you started living with Ms. Cronk on the
 2   streets of San Francisco in April of 2022, were there
 3   ever any periods where you began living inside with
 4   Ms. Cronk after that?
 5       A.  Yes.
 6       Q.  When was that?
 7       A.  January of 2023.
 8       Q.  And where was that?
 9       A.  That was in a shelter-in-place hotel.  I don't
10   know the name of it.  But it was located on Larkin and
11   Ellis.
12       Q.  Between April of 2022 and January of 2023, were
13   there ever any periods where you did not live with
14   Ms. Cronk?
15       A.  No.
16       Q.  Were there any days during that period where you
17   were not living with Ms. Cronk?
18       A.  No.
19       Q.  When you started living with Ms. Cronk in
20   April of 2022, were you living in the -- like, at the
21   same shared camp spot, or did you both maintain separate
22   camps?
23       A.  We were in the same tent.
24       Q.  Did that continue to be kind of your habit until
25   January of 2023?
```

1      A.  Yes.

2           MR. MILLS:  So we've been going for about an

3      hour.  Does a ten-minute break work for people?

4           So we'll go off the record at 11:15.

5           THE VIDEOGRAPHER:  Going off the record.  The

6      time is 11:15 a.m.

7           (Recess taken from 11:15 to 11:27 a.m.)

8           THE VIDEOGRAPHER:  This marks the beginning of

9      Media No. 2.  We are back on the record.  The time is

10     11:27 a.m.

11          MR. MILLS:  Just a quick housekeeping, I'd like

12     to mark Exhibit 68.  This is a signed protective order

13     that Mr. Donohoe signed before the start of the

14     deposition.

15          (Deposition Exhibit 68 marked for

16          identification.)

17     BY MR. MILLS:

18     Q.  And, Mr. Donohoe, during the break, did you talk

19     to anybody other than your lawyer about the deposition?

20     A.  No.

21     Q.  Thank you.  And so just to circle back, do you

22     currently live in San Francisco?

23     A.  Yes.

24     Q.  And where is that?

25     A.  Parkmerced.

1       Q.  How long have you been at Parkmerced?

2       A.  For roughly a month.

3       Q.  Can you describe for me what that living

4   situation is at Parkmerced?

5       A.  Yeah.  We -- we obtained housing through a

6   voucher called Flex Pool.

7       Q.  And do you have a lease at Parkmerced?

8       A.  Yes.

9       Q.  Does the lease have an end date?

10      A.  No.

11      Q.  So are you allowed to stay at Parkmerced as long

12  as you want?

13      A.  Yes.

14      Q.  Are there any program rules or requirements that

15  you have to satisfy in order to live at Parkmerced?

16      A.  Through Flex Pool, yes.

17      Q.  What are those requirements?

18      A.  Steady source of income.  And I think that's

19  pretty much it.

20      Q.  And do you have to pay monthly rent at

21  Parkmerced?

22      A.  Yes.

23      Q.  What's that?

24      A.  At the moment, I do not know.

25      Q.  Do you know if it's, like, a percentage of how

 1   much you make?

 2       A.   Yeah.   It's supposed to be 30 percent of our

 3   monthly income.

 4       Q.   And does that amount vary from month to month?

 5       A.   Only if they do a reevaluation of our income.

 6       Q.   So every month, do you have to submit paperwork

 7   for what your income looks like?

 8       A.   Not that I know of.

 9       Q.   Do you know when you do the reevaluations?

10       A.   I -- I'm not quite sure.

11       Q.   Has anybody told you that you'd have to be out

12   of Parkmerced by a certain date?

13       A.   No.

14       Q.   At Parkmerced, can you describe, like, what type

15   of unit you have?

16       A.   Yeah.   It's a two-bedroom, two-bath loft on the

17   11th floor.

18       Q.   And do you live in that unit with just Ms. Cronk

19   and your daughter?

20       A.   Yes.

21       Q.   Do you have any shared spaces at Parkmerced with

22   other tenants?

23       A.   Laundry room.

24       Q.   And where were you living before Parkmerced?

25       A.   Hamilton -- Hamilton Houses Family -- Hamilton

1    Transitional Families.

2         Q.  How long were you at Hamilton Transitional

3    Families?

4         A.  For ten months.

5         Q.  Did any individuals at Hamilton help connect you

6    to your current housing at Parkmerced?

7         A.  No.

8         Q.  Did you have any program rules at Hamilton that

9    you had to follow?

10        A.  Yes.

11        Q.  What were those?

12        A.  Curfew; signing in and out; no -- you know, no

13   illicit drug use.  You know, other than the basic

14   respect other people's area and all that stuff.

15        Q.  Thank you.  And did they do any type of drug

16   testing at Hamilton?

17        A.  Yes.

18        Q.  How regularly did you have to do drug testing at

19   Hamilton?

20        A.  I did not have to do drug testing specifically.

21        Q.  Did Ms. Cronk have to do drug testing?

22        A.  No.

23        Q.  Who typically does drug testing then at

24   Hamilton House?

25             MR. NTIM:  Objection.  Calls for speculation.

```
 1    in Alamo, would not have allowed me to secure -- secure
 2    that.
 3         Q.  So how long were you living in Alamo?
 4         A.  For 30 days.
 5         Q.  And is that a place that you could live if
 6    anything happened and you were to lose your housing at
 7    Parkmerced?
 8         A.  I don't know.
 9         Q.  Have you talked to your mom about whether you
10    could live with her in Alamo if you were to lose housing
11    at Parkmerced?
12         A.  I have not.
13         Q.  Would you ask your mom if you could live with
14    her in Alamo if you lost housing at Parkmerced?
15              MR. NTIM:  Objection.  Calls for speculation.
16              THE WITNESS:  I don't know.
17    BY MR. MILLS:
18         Q.  Do you have anybody else that you would ask to
19    live with if you were to lose housing at Parkmerced?
20              MR. NTIM:  Objection.  Calls for speculation.
21              THE WITNESS:  I -- no.
22    BY MR. MILLS:
23         Q.  If you were to lose your housing at Parkmerced,
24    would you return to the streets?
25              MR. NTIM:  Objection.  Calls for speculation.
```

```
 1              THE WITNESS:  I would try my best not to.
 2    BY MR. MILLS:
 3       Q.  In the period that you've been housed or in
 4    treatment since January of 2023, have you ever put any
 5    property -- left any property on the streets of
 6    San Francisco at encampments?
 7              MR. NTIM:  Objection.  Ambiguous as to "left any
 8    property on the ground."
 9              THE WITNESS:  Yeah.  Can you --
10    BY MR. MILLS:
11       Q.  In the time --
12       A.  -- go back?
13       Q.  Let me provide some context.  Some people, we
14    understand, will still keep property at encampments even
15    though they're living somewhere else.
16              Between the period of -- from January 2023
17    onwards, have you left property in any encampments even
18    though you were physically living inside somewhere else?
19       A.  Yes.
20       Q.  And when were you doing that?
21       A.  During the short period of time I was living at
22    the SIP hotel.
23       Q.  And what -- when was that?
24       A.  January and beginning of February of 2023.
25       Q.  Where were you leaving your property outside of
```

1      Q.  That was Five Keys?

2      A.  Yeah, Five Keys.

3      Q.  Thank you.  And in January and February of 2023,

4  what type of property were you leaving outside?

5      A.  A bicycle.  You know, stuff that we thought that

6  we could bring in, like a coffee maker.  Any clothes

7  that didn't fit in the two-bag minimum.  You know, our

8  tent, yeah.

9      Q.  And were you living with Ms. Cronk at the SIP

10  hotel in January of 2023?

11      A.  Yes.

12      Q.  And do you know when that started?

13      A.  Yeah.  It was the day or two after my birthday,

14  so January 4th or 5th.

15      Q.  And were you living with Ms. Cronk the entire

16  time at the SIP hotel?

17      A.  Yes.

18      Q.  Was there ever any period where you and

19  Ms. Cronk were separated while having access to the SIP

20  hotel?

21      A.  Define "separated."

22      Q.  Not physically living in the same location as

23  one another.

24      A.  No.

25      Q.  Do you know when Ms. Cronk started obtaining

1      A.  No.

2      Q.  When was the last time you had employment before

3  Fertado Heating and Air?

4      A.  Portland.  2013, I think.

5      Q.  And what type of work were you doing in

6  Portland?

7      A.  I was a cashier and stocker for Dollar Tree.

8      Q.  So is it fair to say that between 2014 and when

9  you started working at Fertado Heating and Air, you

10  didn't have any employment in San Francisco?

11      A.  Yes.

12      Q.  And what would you do for earning any type of

13  money or income?

17      I also helped people -- I traded services for

18  certain things.

19      Q.  What kind of services are you talking about when

20  you say traded services?

21      A.  I helped people inject their drugs, yeah.  Also,

22  watching people's stuff, you know, just giving them a

23  hand moving.

24      Q.  So aside from stealing for trade, the trade

25  services, watching people's stuff, did you do any other

```
 1   type of work that would allow you to obtain money to
 2   survive?
 3        A.  No.
 4        Q.  Were you getting any type of government benefits
 5   during that time?
 6        A.  Food stamps every once in a while.  I think I
 7   had food stamps twice in the entire time.
 8        Q.  Are you familiar with the County Adult
 9   Assistance Program --
10        A.  Yes.
11        Q.  -- CAAP?
12            Have you ever obtained CAAP benefits?
13        A.  No.
14        Q.  Have you ever applied for CAAP benefits?
15        A.  I have applied, yes.
16        Q.  Did you ever get benefits because of those
17   applications?
18        A.  No.
19        Q.  Do you know why?
20        A.  I -- I don't know why.
21        Q.  Did anybody tell you that you weren't eligible
22   for CAAP benefits?
23        A.  No.  Well, correction.  The interviews that were
24   scheduled were most of the time phone interviews, and
25   my -- I couldn't hold on to a phone number for long
```

1    Q.  And it's talking about your aspirations going

2    forward.  Is it fair to say that you believe you're

3    turning your life around after experiencing treatment?

4    A.  Yes.

5    Q.  And what do you hope to get out of your life

6    going forward as far as your professional growth is

7    concerned?

8    A.  A career where I don't have to worry about a

9    paycheck to paycheck, the ability to invest and make

10   sure that my daughter has a life that I can be proud of.

11   Yeah.  I just want to be able to take care of my

12   family, and make sure that, you know, I don't have to

13   worry about ever being homeless again.

14   Q.  Based off of your personal experience, do you

15   think you're taking all of the steps necessary, based

16   off of your experience, to stay on that track?

17   A.  I hope I am.

18   Q.  And when did you get enrolled into the

19   apprentice program?

20   A.  I was indentured in June of this year.

21   Q.  June of 2024?

22   A.  Yes.

23   MR. NTIM:  This would be a good time for a

24   break.

25   MR. MILLS:  We'll go off the record.  It's

1      Q.  Thank you.  Have you heard -- are you familiar

2   with the concept of a government claim?

3      A.  In regards to?

4      Q.  So some context, people can get injured or lose

5   property and submit something called a government claim

6   and try to get money back from the City and County of

7   San Francisco through that process.

8          With that description, have you heard of the

9   government claims process before?

10     A.  No.

11     Q.  So is it fair to say you've never filed a

12  government claim?

13     A.  Correct.

14     Q.  Have you ever been a party to any other lawsuit?

15     A.  No.

16     Q.  So I'm going to mark our next exhibit, which

17  will be Exhibit No. 70 and Exhibit No. 71.  So

18  Exhibit No. 70 is plaintiff's response to defendants'

19  first set of interrogatories.  And 71 will be a

20  verification.

21          (Deposition Exhibits 70 and 71 marked for

22          identification.)

23  BY MR. MILLS:

24     Q.  So, Mr. Donohoe, if you could take a moment to

25  flip through the document that I have handed you that's

```
 1   were both living together unhoused in San Francisco?

 2       A.  Just the one that got stolen -- that got taken

 3   in August.

 4       Q.  So I'll represent that Ms. Cronk testified that

 5   you would sometimes have a red sharps bin in your tent.

 6           Do you know if you had one in your tent on

 7   August -- in the August 2022 incident?

 8       A.  Yes.  And also, for the fourth laptop, I just

 9   remembered when that one was taken.

10       Q.  Okay.  Mr. Donohoe, on the break, did you talk

11   to anybody about the laptop?

12       A.  No.

13       Q.  And, Mr. Donohoe, when was the last laptop

14   taken?

15       A.  January of 2023.

16       Q.  And where were you staying when the laptop was

17   taken in January of 2023?

18       A.  That was when I moved into the SIP hotel.

19       Q.  And where was it taken from?

20       A.  The rest of my belongings that I could not take

21   to the SIP hotel when they were on 13th and Folsom.

22       Q.  And who took the laptop?

23       A.  It was told to me that DPW had taken our stuff.

24       Q.  Who told you that DPW took your stuff?

25       A.  A couple of the other people on the block.
```

1      Q.  You didn't see DPW take your stuff?

2      A.  No.

3      Q.  Is it possible that somebody else other than DPW

4  could have taken your laptop?

5      A.  I don't know.

6      Q.  Are you speculating that DPW took your laptop?

7      A.  No.

8      Q.  What day was that?

9      A.  Like, January 5th or 6th.

10     Q.  What's your birthday?

11     A.  January 3rd.

12     Q.  You testified earlier that there was an incident

13  prior to your birthday or that you got into the SIP

14  hotel before your birthday?

15     A.  No.  It was a couple of days after.  The day --

16  the day or the day -- like, two days after my birthday.

17     Q.  So two to three days after your birthday, you

18  went into a SIP hotel?

19     A.  No.  One or two days after my birthday.

20     Q.  So when you believe that the laptop was taken

21  from [sic] DPW, where did you leave it?

22     A.  It was inside my tent, inside of a backpack.

23     Q.  And where exactly were you on the street?

24     A.  Very close to Folsom, on 13th.

25     Q.  Do you know if you were by any specific

1    buildings that can serve as a landmark for where you

2    were at?

3        A.  Like, right behind Target.

4        Q.  Is that before -- is that close to Total Wine?

5        A.  It's close, yeah.

6        Q.  How close to Total Wine were you?

7        A.  Total Wine would be, like, a block away and

8    across the street.

9        Q.  Did you ever stay in front of Total Wine?

10       A.  Yes.

11       Q.  When did you stay in front of Total Wine?

12       A.  Middle of December, yeah, of 2022.

13       Q.  Do you know how many people were -- you were

14   camping with around January 5th or January 6th, 2023?

15       A.  Yeah.  There were, like, three other tents that

16   were nearby.  And then farther down the block, there was

17   a whole -- I don't know how many people were staying

18   there.

19       Q.  And to make sure I understand, did you leave the

20   items behind because you accepted a placement in the

21   SIP?

22       A.  Yes.

23       Q.  Did you ask anybody specifically to watch your

24   stuff?

25       A.  Yes.

1      Q.  Who was that?

2      A.  I don't remember his name.

3      Q.  Do you know --

4      A.  I'm sorry.  His name was Manny.

5      Q.  Is that a nickname, or is that Manny's actual

6  name?

7      A.  I just knew him as Manny.  I'm not sure.

8      Q.  Do you know -- can you describe Manny's physical

9  appearance?

10     A.  Yeah.  He's a little shorter than I am, kind of

11  stout, maybe mid 40s, white, male.  Not -- he had kind

12  of, like, dirty blond, gray hair, but short, and --

13  yeah.

14     Q.  Do you have any contact information for Manny?

15     A.  I don't.

16     Q.  Did you take any videos of the property that you

17  were leaving behind?

18     A.  No.

19     Q.  Did you take any photos of the property you were

20  leaving behind?

21     A.  No.

22     Q.  Did you write in a journal anywhere, that

23  property that you were leaving behind?

24     A.  No.

25     Q.  Do you know if Sarah Cronk took any photos of

1    the property that was being left behind?

2        A.  I don't.

3        Q.  Do you know if Sarah took any videos?

4        A.  I don't.

5        Q.  Do you know if Sarah journaled of anything that

6    was left behind?

7        A.  Not specifically, no.

8        Q.  So from the time that you -- what was the time

9    in between when you accepted your shelter at the SIP and

10   learned that the laptop had been stolen?

11       A.  About a day.  We had moved in, and we went to go

12   check on our stuff because we were planning on moving it

13   closer to the SIP hotel.

14           And by the time we got there, it was gone.  And

15   Manny, along with, like -- like, a couple of the other

16   guys were gone too.  Like, our neighbors were gone as

17   well.

18       Q.  So did you talk to Manny at all after you had

19   gone to the SIP hotel and returned to see if your

20   property was still there?

21       A.  Yes.  Can you rephrase that again?  Not rephrase

22   it, but repeat.

23       Q.  Yeah.  Did you talk to Manny at all after you

24   left for the SIP hotel and then returned to see if your

25   property was still there?

```
 1        A.  After all that, yes.

 2        Q.  And where was that?

 3        A.  I think we ran into him downtown near

 4   Civic Center.

 5        Q.  Do you know how many days after you accepted the

 6   SIP hotel that was?

 7        A.  Probably a couple of days.  Like, I'd say, about

 8   four or five.

 9        Q.  And what did you learn from Manny about your

10   property?

11        A.  That DPW had come and -- you know, he doesn't

12   deal with -- he doesn't like dealing with cops and

13   everything.  And so he tried to start packing our stuff

14   up for us.

15            And they got -- they kind of pushed on him to --

16   you know, if it's not yours, you can't take it.  So he

17   took what he could, but then he had lost it between that

18   day and when we ran into him.

19        Q.  Do you know if Manny had warrants?

20        A.  I don't.

21        Q.  Do you know if Manny was afraid of interactions

22   with law enforcement?

23        A.  I just know he doesn't like dealing with them.

24        Q.  Was it your understanding that Manny left your

25   stuff behind so that he didn't have to interact with law
```

1   enforcement?

2       A.  I mean, I believed what he had said about trying

3   to grab as much as he could without, you know, causing

4   too much of a disturbance.  And probably left a lot of

5   stuff behind, yeah.

6       Q.  So is the answer, yes, Manny did have to leave

7   stuff behind because he wanted to avoid interacting with

8   law enforcement?

9       A.  Yes.

10      Q.  And Manny didn't take your laptop when he left

11  the items behind?

12      A.  I don't believe so.

13      Q.  And you have no contact information for Manny?

14      A.  Correct.

15      Q.  Do you know if Manny is still on the streets

16  unhoused?

17      A.  I believe so.

18      Q.  Do you know where Manny is living unhoused?

19      A.  No.

20      Q.  Is it -- based off of your experience living on

21  the streets in San Francisco, do unhoused individuals

22  typically try to avoid interactions with law enforcement

23  officers?

24      A.  Yes.

25      Q.  And with what frequency do you believe that

 1    individuals, based off of your personal perceptions,

 2    have tried to avoid interactions with law enforcement?

 3        A.   You're asking how --

 4        Q.   Uh-huh.

 5        A.   -- do they do that?

 6        Q.   What percentage of the time do you think you've

 7    seen that?

 8        A.   Probably, like, 80 to 90 percent.

 9        Q.   And when law enforcement comes in these 80 --

10    strike that.

11             When law enforcement officers come, do unhoused

12    individuals typically just leave their belongings and

13    walk away?

14        A.   No.

15        Q.   What do they do?

16        A.   They frantically pack up what they can, and then

17    leave before any -- to kind of lessen the amount of

18    interaction that they have to have.

19        Q.   So is it fair to say that law enforcement would

20    see individuals packing up certain items and then

21    intentionally leaving items behind when they walk away?

22        A.   Yes.

23        Q.   Do you think DPW's seen that as well?

24        A.   Yes.

25        Q.   Do you think, given those circumstances, it's

1  really difficult for officers to distinguish between

2  what property people want versus what property they're

3  just abandoning altogether?

4          MR. NTIM:  Objection.  Calls for speculation.

5          THE WITNESS:  Yes.  I feel -- I mean, my own

6  personal experience with it, though, is that they're not

7  leaving with everything that they want to grab.  They're

8  leaving with everything that they could possibly need in

9  order to not get harassed more.  Yeah.

10 BY MR. MILLS:

11     Q.  Have you ever seen instances where unhoused

12 individuals were approached by law enforcement, asked

13 more time -- for more time to move their belongings, and

14 was provided the time?

15     A.  Yes.

16     Q.  How many times do you think you've seen that?

17     A.  Probably about maybe, like, 50 percent of the

18 time.

19     Q.  Based off of your own personal situation living

20 on the streets of San Francisco, was it your practice to

21 always leave your items when you knew that law

22 enforcement was coming?

23     A.  No.

24     Q.  What percentage of the time do you think you

25 would stay behind and interact with law enforcement when

1              Mr. Donohoe, when we took the break, did you

2      have any conversations with anybody about that?

3          A.   Aside from my attorney, no.

4          Q.   And, Mr. Donohoe, have you ever read the bag and

5      tag policy that outlines some of the tiers?

6          A.   No.

7          Q.   So is your only knowledge the knowledge from

8      your attorney?

9          A.   From my own experience and...

10         Q.   Prior to the break, did you have that

11     understanding?

12         A.   Yes.

13         Q.   So as a person that's experienced homelessness

14     on the streets of San Francisco, you're aware that there

15     are instances where the City can ask individuals to move

16     along without 72 hours' notice?

17         A.   Yes.

18         Q.   So in January of -- January 31st, 2023, why did

19     you default to looking for posted notices?

20         A.   Because at that point, my interaction with the

21     Coalition and -- and Couper and a couple of the other

22     people who were advocates for civil rights, it was just

23     common practice to make sure that, you know, posts were

24     there.

25              I also am in the understanding that the 72-hour

1        A.   I think that's -- yeah.

2        Q.   Is it your understanding that anything -- sorry.

3             Is it your experience that anything less than

4    72 hours' notice when law enforcement is present is not

5    enough time for you to move your stuff?

6        A.   In an efficient and, like, safe and thorough

7    manner, no.

8        Q.   So you only relied upon the Coalition and Couper

9    for your understanding of this kind of tiered system

10   that you've outlined?

11       A.   No.  I -- my tiered system comes from my own

12   experiences.  These are the -- my own experiences fuel

13   the pieces that I've categorized.

14       Q.   Have you ever gone online to read the policies

15   around this?

16       A.   No.

17       Q.   So when you were telling people that they were

18   entitled to a written notice, that was just based off of

19   your own personal experience and not any policy that you

20   read on January 31st, 2023?

21       A.   Not that I have read, no.

22       Q.   Are you aware that under DPW's bag and tag

23   policy, items that are commingled with health hazards

24   can be discarded?

25       A.   No.

1    Q.  Were you aware that if there were needles

2  present in a tent, that DPW could just discard the items

3  underneath a bag and tag policy?

4    A.  No.

5    Q.  So no one communicated that to you ever?

6    A.  That particular -- that -- those things in

7  particular, no.  It was my understanding that, you

8  know -- yeah.  Yeah -- keep it clean, and it should be

9  fine.

10    Q.  So your understanding is a person that was

11  experiencing homelessness in San Francisco, that as long

12  as you kept your tent clean, your items should be bagged

13  and tagged?

14    A.  Yes.

15    Q.  And you didn't know of any exceptions?

16    A.  No.

17    Q.  Have you ever heard of the people on the street

18  being told about exceptions?

19    A.  The exceptions being the health hazards and all

20  that?

21    Q.  Uh-huh.

22    A.  Yes.

23    Q.  When have you heard those?

24    A.  I couldn't give you a specific date.  I mean, it

25  would be the aftermath of certain sweeps or just talking

1    formal, you got to get out and you got to move.

2         Those ones, I, for the most part, was able to

3    get out with everything.  So the destruction, I'm not

4    quite sure about.

5         But for routine cleanings on a regular basis,

6    like, five times a day [sic], where trash was only

7    supposed to be picked up, other items were also

8    disturbed and taken that were not trash, that I perceive

9    as pretty obvious not being trash.

10       Q.  So is it your testimony that in 2022, your

11   property was destroyed in instances where there was

12   routine cleaning in an encampment?

13       A.  Yes.

14       Q.  Were there any other instances where property

15   was destroyed outside of routine cleanings?

16       A.  Yes.

17       Q.  And what types of incidents were those?

18       A.  One in particular was in June -- this is 2022,

19   correct?

20       Q.  Correct, still 2022.

21       A.  And -- yeah.  More than a routine cleaning,

22   yeah.  That -- just the June.

23       Q.  Do you know what day in June it was?

24       A.  Late June.  I think June 23rd, yeah.

25       Q.  And was it in the morning or the night?

```
 1        A.  It was all day.

 2        Q.  So all day, DPW was doing a cleaning at --

 3        A.  Yes.

 4        Q.  And where was this encampment located?

 5        A.  13th and Folsom.

 6        Q.  And how close were you to Target?

 7        A.  Right behind it.

 8        Q.  Were you next to the pillar again?

 9        A.  I believe so, yes.

10        Q.  Do you know how many campers were there on

11   June 23rd, 2022?

12        A.  I don't.  I mean, more than 20.

13        Q.  Do you know how many tents there were?

14        A.  Definitely more than 10.

15        Q.  And what property do you think that the City

16   destroyed of yours that day?

17        A.  That day, they took -- let's see.  I'm not

18   really -- I didn't do an itemized, like, breakdown of

19   everything that was missing, only because there was a

20   lot going on that day.  Yeah.

21            It was -- that was, like, their HOT team.  That

22   was a day that HOT team and everyone else came in and --

23   there was just a lot going on.  I just know that while I

24   was talking to different officials and trying to get,

25   like, certain things happening with HOT team, I kept on
```

```
 1   having to swat -- almost, like, push DPW off our stuff,
 2   saying, you can't tell us to talk to these guys and then
 3   turn around and take our stuff while we're talking to
 4   them.
 5           We were busy.
 6      Q.   So were you offered shelter that day by the HOT
 7   team?
 8      A.   I -- I was.  I was offered the idea of shelter.
 9      Q.   What type of shelter were you being offered?
10      A.   A tiny home that was located off of
11   Gough Street.  I think that's Gough, yeah.
12      Q.   As you sit here today, can you think of any
13   actual item of yours that the City destroyed that day?
14      A.   Clothing.  Yeah.  I'm not 100 percent sure.  I
15   know clothing went missing, but --
16      Q.   What type of clothing went missing?
17      A.   Like, what do you mean by "what type"?
18      Q.   What type of clothing items did you lose that
19   day in June of 2022?
20      A.   I lost -- we lost jackets.  I know a hat
21   specifically that I really liked.  And everything else
22   was, like, T-shirts, underwear.  I think socks.  I think
23   a lot of our socks went -- got taken that day.
24           And it was -- like I said, there was more stuff.
25   There was a lot going on that day.
```

```
 1        Q.  Just to clarify, are you speculating about the
 2   items that you lost that day, because there was some
 3   hesitation in your answer?
 4        A.  No.  I vividly remember thinking, I'm going --
 5   we have to get new socks.  Also, the jackets and
 6   everything.  My favorite jacket got missing.
 7        Q.  And what was that favorite jacket?
 8        A.  It was just a hoodie that fit me and kept me
 9   warm.  I can't remember the make.
10        Q.  And were these items inside of your tent or
11   outside of your tent?
12        A.  Well, at the time that they were taken, they
13   were outside of the tent because we were asked to move.
14        Q.  Were they organized in a pile, or were they kind
15   of strewn all across the street?
16        A.  They were in trash bags, separated other things
17   in our belongings still.
18        Q.  So the clothing items that you claim that you
19   lost on June of 2022 were clothing items that were in a
20   trash bag?
21        A.  That were not sealed up and in front of our
22   tent, yes.
23        Q.  Did DPW give you the trash bag?
24        A.  No.
25        Q.  How did you get the trash bag?
```

1      A.   That's how we kind of kept our clothing inside

2  of our tent sometimes.

3      Q.   Did you see DPW physically take the bag that had

4  your clothing in it in June of 2022?

5      A.   Physically, no -- well, I saw them taking things

6  away from our -- away from our area before I had

7  separated the stuff that I wanted to go in the trash

8  while I was talking to the HOT team, and I was unable

9  to -- you know, I was -- they told us to move.  We

10  started moving.

11          They started pulling things out.  And then I got

12  distracted by HOT team.  And DPW came in and started

13  throwing stuff away.  Whenever I told them not to, they

14  continued to do it.

15          So I broke away from HOT team to pull all my

16  stuff back into my tent and actually move my whole tent

17  away and face the wall so they could not take anything

18  else from my tent.

19          I did not see what they -- like, which bags they

20  had taken.  I did not realize what was gone until later

21  on that night.

22      Q.   How many feet away from your camp were you with

23  the HOT workers?

24      A.   10 feet.

25      Q.   And were both you and Sarah Cronk talking to the

```
 1   HOT workers together?

 2       A.  Yes.

 3       Q.  Did you ask if one of you can stay behind as the

 4   other spoke with the HOT team about the tiny home?

 5       A.  We did eventually once we realized that one of

 6   us was going to have to safeguard our stuff and continue

 7   packing.

 8       Q.  Did one of you go back to watch the rest of your

 9   stuff?

10       A.  Yes.

11       Q.  Did you end up moving the rest of your

12   belongings?

13       A.  We ended up dragging our tent across the street.

14       Q.  So nothing else other than the clothing was

15   destroyed in June of 2022?

16       A.  That I remember, yes.

17       Q.  Did you have notice that that resolution was

18   going to be taking place?

19       A.  I don't remember.

20       Q.  Is it possible you had notice?

21           MR. NTIM:  Objection.  Calls for speculation.

22           THE WITNESS:  Yeah.  I don't -- I don't recall.

23   BY MR. MILLS:

24       Q.  Do you know how much time you were given to move

25   your belongings on the day of?
```

1    A.  Initially, it was a few hours.  Once we got

2    contact with the HOT team, they gave us, like, maybe

3    another hour.  But we had to make a decision that day,

4    so it had shifted from us moving our stuff to making a

5    very quick decision on whether or not we wanted to move

6    to the tiny home.

7    Q.  So what was different between this day where you

8    were offered a shelter, a tiny home, and the incident in

9    January of 2023 where you accepted a SIP and left your

10   property behind?

11   A.  First and foremost, the SIP hotel was actually,

12   like, orchestrated and, like, put in the works by a

13   friend of mine, who I -- I am not sure.  She worked for

14   some part of the City or some kind of outreach program.

15   But I'm not sure what -- which one it is.

16        I ran into her at Target, and I told her about

17   Apple being pregnant.

18        And she said, oh, my God.  We need to get that

19   taken care of.  And she pulled some strings, like,

20   within a week or two.  They came specifically for us.

21   It was not a sweep.  It was not a -- it was them coming

22   out to us and saying, we have a place for you.

23   Q.  Do you know the name of that employee?

24   A.  Yeah.  Nikia Hanes or Heinz.  I'm not quite sure

25   how to spell her last name.

1       Q.  That's okay.

2       A.  Whereas -- yeah.  To continue answering that

3   other question, whereas, the one in June was a

4   full-blown sweep that was -- it was focused on making

5   people move.

6           Only us and one other person got offered a

7   shelter, and we only got offered the tiny home or

8   shelter because we were quickly assessed for priority on

9   getting housing.

10          And they were, like, you're priority one.  You

11  get to go today.  Almost like it was all, you won this.

12      Q.  And did you expressly decline the offer to move

13  into a tiny home?

14      A.  Not initially.

15      Q.  But you did?

16      A.  Eventually, yes.

17      Q.  So you told somebody, no, I don't want to move

18  into the tiny home?

19      A.  After it was told to us that we don't deserve

20  one.

21      Q.  Who told you you don't deserve a tiny home?

22      A.  The fire department chief of command, Patrick --

23  I don't know his last name.

24      Q.  And when did you hear that?

25      A.  During the whole ruckus before DPW left, before

1    HOT team had left.  It was while we were trying to find

2    a -- somebody to watch our things, while we went --

3    because same stipulation, we had -- we could only bring

4    two bags each.  Obviously, it's not enough for

5    everything we needed or we wanted to bring or wanted to

6    make sure it didn't get destroyed.

7         So we needed to find somebody else to watch our

8    stuff.  And as we were doing that, that is when Patrick

9    had said, you guys don't even deserve it.

10   Q.  Are tiny homes -- and based off of your

11   experience being unhoused in San Francisco, are tiny

12   homes a preferred shelter option that people get

13   communicated to them?

14        MR. NTIM:  Objection.  Ambiguous as to

15   "preferred."

16        THE WITNESS:  I also don't know what other

17   people might want.

18   BY MR. MILLS:

19   Q.  Based off of your experience living on the

20   streets in San Francisco, did you hear unhoused

21   individuals saying that they would like to get into a

22   tiny home?

23   A.  Yes.

24   Q.  And did you hear those individuals say they

25   would like to get into a tiny home because tiny homes

1    are a better place to live than on the street of

2    San Francisco?

3        A.  Yes.

4        Q.  And did you hear any other reasons why people

5    like tiny homes?

6        A.  Yes.

7        Q.  And what are those reasons?

8        A.  Food.  They offer food.  They also offer, like,

9    a shower, if you need one, a place to use the restroom.

10   Also, I know another use for them was to store items and

11   continue, like, just checking in, and living -- having

12   an encampment outside of it.

13       Q.  Were you told that you could bring more items

14   into the tiny home after you moved?

15       A.  Yes.

16       Q.  So you could have brought the items that you

17   left behind with you back to the tiny home?

18       A.  As long as they were still there, yeah.

19       Q.  You could ask DPW to bag and tag the items for

20   you to pick up and then take to the tiny home?

21       A.  I did not know I could do that, nor do I trust

22   them to do that.

23       Q.  But you didn't do that?

24       A.  No.

25       Q.  Did you talk to the HOT team about doing that?

```
 1        A.  No.

 2        Q.  Did you talk to the HOT team about trying to bag

 3   and tag anything that day so you could go to the tiny

 4   home?

 5        A.  No.  It was not offered as an option.

 6        Q.  But you didn't ask about it?

 7        A.  Correct.

 8        Q.  You are familiar with the bag and tag policy

 9   because of your conversations and experience living on

10   the streets of San Francisco?

11             MR. NTIM:  Objection.  Misstates prior

12   testimony.  He did not state that he was familiar with

13   the specifics of the bag and tag policy.

14             THE WITNESS:  My experience with bag and tag is

15   that it's just another -- I know what the theory -- or I

16   have an idea of what the theory behind what the policy

17   might be.

18             But I know in action, it's just another word

19   for, I'm trashing your things.

20             MR. MILLS:  So how about we go off the record

21   and take a quick break.

22             THE VIDEOGRAPHER:  This marks the end of

23   Media No. 5.  We are going off the record.  The time is

24   5 o'clock.

25             (Recess taken from 5:00 to 5:27 p.m.)
```

```
 1         THE VIDEOGRAPHER:  This is the beginning of
 2   Media No. 6.  We are back on the record.  The time is
 3   5:27 p.m.
 4   BY MR. MILLS:
 5       Q.  Mr. Donohoe, just a couple of questions to try
 6   to streamline the process for us a little bit.
 7           Have you ever heard of programs where people
 8   that are experiencing homelessness can go store certain
 9   items?
10       A.  No.
11       Q.  Have you ever sought any of those types of
12   programs out?
13       A.  No.
14       Q.  And, Mr. Donohoe, have you ever pooled resources
15   with anybody else to try to afford storage?
16       A.  No.
17       Q.  Have you heard of that happening?
18       A.  Yes.
19       Q.  And how does that typically happen?
20       A.  Like, the process for that?  Like, normally, two
21   or three people will get together and take on, you know,
22   half or a third of the rent, whatever portion, equal
23   rent -- part of the payment for it.
24           It goes for a little bit, and then somebody ends
25   up not paying.  And, you know, you don't pay, everybody
```

1        A.   No.

2        Q.   Have you obtained any physical injuries in

3   connection with a City sweep?

4        A.   No.

5        Q.   To the extent that you're presently housed, do

6   you fear that you're going to be exposed to extreme

7   weather out on the street?

8        A.   Where I'm currently housed?

9        Q.   Correct.

10        A.   No.

11        Q.   And you mentioned the Coalition on Homelessness

12   a couple of times.  What is the Coalition's mission,

13   from your perspective?

14        A.   To find out solutions to end chronic

15   homelessness and to have more of, like, a political and

16   outreach front to address the issues and hopefully find

17   some, like I said, solutions.

18        Q.   When did you first learn about the Coalition on

19   Homelessness?

20        A.   Probably, like, 2017 or 2018.

21        Q.   And do you know if the Coalition on Homelessness

22   was monitoring the City's sweeps in 2017?

23        A.   I do not know.

24        Q.   Are you familiar with the idea of, like, joining

25   organizations to be a member?

1      A.  Yes.

2      Q.  Are you a member of the Coalition on

3  Homelessness?

4      A.  I consider myself to be.

5      Q.  And why do you consider yourself to be a member

6  of the Coalition on Homelessness?

7      A.  Because I have done many outreach things for

8  them.  I stand by a lot of the things that they stand

9  by.

10         I've also been -- I've had also close contact

11  with a few of the actual active members.  I -- yeah.

12  I've even claimed -- you know, claimed being part of

13  the -- I've gone to their, you know, headquarters where

14  they meet, and I've met some of the higher-up people.

15         I have never gone to an actual meeting.  But

16  like I said, I've done a lot of outreach for them.

17      Q.  And when, based off of your experience, do you

18  think that you first became a member of the Coalition?

19      A.  Probably 2020.

20      Q.  And have you been a member since 2020?

21      A.  Off and on, yeah.

22      Q.  Were you a member on September 27th, 2022?

23      A.  Yes.

24      Q.  Were you a member when you were preparing the

25  declaration with Couper?

 1      A.  Yes.

 2      Q.  Did you do anything -- did you tell Coalition

 3  that you were a member?

 4      A.  I didn't.  I mean, I guess, clarification on

 5  that one.

 6      Q.  Did you ever sign anything with Coalition saying

 7  that you wanted to be a member of the Coalition?

 8      A.  No.

 9      Q.  Did you ever sign, like, a contract that you

10  could represent me in court for my constitutional

11  rights?

12      A.  I don't know.

13          MR. NTIM:  Objection.  Calls for legal

14  conclusion.

15  BY MR. MILLS:

16      Q.  Have you ever told the leadership at the

17  Coalition on Homelessness that you can represent me for

18  issues that impact homeless people in San Francisco?

19      A.  Yes.

20      Q.  And when did you tell them that?

21      A.  In -- somewhere between 2022 -- like, the

22  beginning of 2022 or 2021.

23      Q.  And who did you tell?

24      A.  The -- I can't remember their exact names, but

25  my -- specifically, you know, the person that Couper got

```
 1   me in contact with to, you know, start calling if there
 2   was ever any issues or if there was a sweep going on
 3   that wasn't documented, Brian Edwards.  He was still --
 4   I don't know his last name.  I'm sorry.  I'm
 5   speculating.
 6         But Brian, while he was still alive, yeah.
 7      Q.  Did you ever go to any meetings at the Coalition
 8   on Homelessness to vote on issues?
 9      A.  No.
10      Q.  Did you ever sign up to participate in the human
11   rights working group?
12      A.  No.
13      Q.  Did you ever sign up to work for the housing
14   justice group?
15      A.  No.
16      Q.  What type of outreach did you do for the
17   Coalition?
18      A.  Like I said, if I witnessed a sweep in my
19   travels that -- you know, that there was no
20   representation that I could see, I was supposed to
21   contact one of the -- contact either Couper or this
22   other person -- I forgot his name -- and let them
23   know -- there were a couple of people I'd contact -- let
24   them know what's going on.
25         And they instructed me to kind of, like, stay
```

```
 1    put and start videotaping or just, like, being an
 2    observer to -- not to approach anybody specifically,
 3    especially not aggressively, but just to show that I am
 4    somebody watching, to make sure that things were, you
 5    know -- that people were acting right, basically.
 6         Q.  And were you doing that outreach before the
 7    lawsuit was filed in this case?
 8         A.  No.
 9         Q.  So after the lawsuit, you started doing
10    outreach, monitoring sweeps, and responding to -- with
11    what you saw?
12         A.  Yes.
13         Q.  I'm going to go through a couple of names, and
14    ask them if you know that individual.
15             Do you know Jennifer Friendenbach?
16         A.  Yes.
17         Q.  And how do you know Jennifer Friendenbach?
18         A.  I'm not sure.  I just very much recognize that
19    name.
20         Q.  Kelley Cutler?
21         A.  Yes.
22         Q.  Ian James?
23         A.  Rings a bell, but not sure.
24         Q.  Carlos Watkins?
25         A.  No.
```

1     Q.  Did you ever fill out any online polls about the

2  issues that Coalition should focus on?

3     A.  I'm not sure.

4     Q.  Did you ever vote on issues for the Coalition on

5  Homelessness to focus on?

6     A.  Not that I -- not that I can remember.

7     Q.  I'm going to go back to some of the instances of

8  property destruction that we were talking about.

9         In this case, do you intend to testify about any

10  experiences of property destruction that you haven't

11  disclosed in written discovery or declarations?

12     A.  No.

13     Q.  So with that in mind, you submitted a

14  declaration in this case.  I'll represent that it was

15  submitted on September 13th -- dated September 13th,

16  2022.  And in that declaration, you refer to an incident

17  on September 12th, 2022.

18         As you sit here today, can you recall an

19  incident in September -- on September 12th of 2022?

20     A.  Yes.

21     Q.  What can you recall about that incident?

22     A.  So early morning, like, maybe -- you know, sun

23  was not up and it wasn't going to be up for a little

24  while -- I'd say maybe 5:00, DPW came by and started

25  pretty much harassing us.  It was part of those routine

```
 1   okay.  Didn't think it was going to be necessary to hand
 2   over.
 3        Q.  Did you throw that piece of paper -- sorry.
 4            Did you throw that piece of paper away when you
 5   were done with it?
 6        A.  No.  We put it back in the journal.
 7        Q.  Do you still have that journal?
 8        A.  No.
 9        Q.  When did that journal go missing?
10        A.  I do not know.
11        Q.  Do you know how it went missing?
12        A.  No.
13        Q.  Did you look for it?
14        A.  Many times.  I mean, I don't really recall
15   exactly when we couldn't find it anymore.
16        Q.  And after you had the vehicle number of the DPW
17   vehicle, did you report that to DPW?
18        A.  No.
19        Q.  Did you report it to any City agency?
20        A.  No.
21        Q.  So I believe you testified that you lost
22   clothes.  What type of clothing items did you lose?
23        A.  Jackets, a lot of Sarah's clothes, and -- yeah.
24   Some boots that she was working on.
25            So I think blankets might have been part of
```

1    that.  It was -- it was, like, bags that went missing

2    were, like, our warm stuff, like -- yeah, just to stay

3    warm at night, so...

4         Q.  And do you know what the weather was like in

5    San Francisco around September 12th, 2022?

6         A.  Yeah.  Warm during the day and cold at night.

7         Q.  What type of food did you lose?

8         A.  Non-perishables.

9         Q.  And, yeah, what were those?

10        A.  I can't remember exactly.  Yeah.

11        Q.  How do you know they were non-perishable items

12   then?

13        A.  Because we didn't really get regular

14   perishable -- not regular -- we don't have access to a

15   fridge.

16            Every once in a while, we would have a cooler,

17   but, like, you know, we ate the things that would go bad

18   quickly -- as quick as possible, so I guess -- you know.

19        Q.  Were all of these items that were taken outside

20   of your tent?

21        A.  Yes.

22        Q.  And so the food was outside of the tent?

23        A.  Yes.

24        Q.  Do you know if you had any open food containers?

25        A.  If they were, it was all inside of a closed,

1    like, container, so...

2        Q.  So the food was in some kind of a container?

3        A.  Like, a bin or something.

4        Q.  And did the entire bin get taken?

5        A.  Yes.

6        Q.  And can you describe what the bin looked like?

7        A.  I want to say it was, like, a large Tupperware

8    kind of box.  Not Tupperware.

9            Like, a Rubbermaid box with a lid, closes.

10       Q.  And as a person that had been living in that

11   area, had you seen rodents, such as mice?

12       A.  No.

13       Q.  Had you seen rats?

14       A.  Not where we were living.

15       Q.  Did you ever hear of rats existing at 13th and

16   Folsom?

17       A.  No.

18       Q.  And no mice?

19       A.  No mice.

20       Q.  Ants?

21       A.  No ants.

22       Q.  Would you want to keep food stored so rodents

23   don't come to the camp?

24       A.  Yes.

25       Q.  And I heard you say that Sarah Cronk was in a

1     Q.  In 2022, yeah.

2     A.  That weren't part of, like, the routine cleanups

3  and stuff like that?  Any one that stands out aside from

4  the June -- the one in June?  No.

5     Q.  And to clarify, the idea of a routine

6  cleaning -- so I understood that you testified earlier

7  that it's your understanding or expectation that you be

8  provided 72 hours' notice when there's law enforcement

9  present.

10        How much time do you think you need when it's

11  just DPW?

12     A.  It depends on if we were being asked to move and

13  not come back or vacate specifically or if it's just a

14  routine cleaning.

15     Q.  So if you're being asked just to move, how much

16  time do you think you need?

17     A.  I think at least one day.

18     Q.  So if it's just DPW and DPW is asking you to

19  move so they can clean, it's your expectation that you

20  be given at least one day to move your belongings?

21     A.  Right.  At least, moving -- move the belongings

22  or be prepared to move when they come so that we can

23  move back.

24        The idea is it's informal, and we don't have to

25  vacate.

1    Q.  Are you going to try to resolve the warrant

2  before a trial in this matter?

3         MR. NTIM:  Objection.  Calls for speculation.

4         THE WITNESS:  I'm going to definitely reach out

5  and figure out if this is still active.  This puts a

6  very big damper in a lot of things that I'm working for.

7  BY MR. MILLS:

8    Q.  Did you do anything in Marin County around

9  September 7th, 2023, that could have resulted in a

10  warrant being issued?

11    A.  No.

12         MR. NTIM:  Same objection.  Relevance.

13  BY MR. MILLS:

14    Q.  Are you on probation in Marin County?

15    A.  No.  Not that I'm aware of.

16    Q.  Are you on any diversion programs in

17  Marin County?

18    A.  Not that I'm aware of or know.

19    Q.  Thanks.  And, Mr. Donohoe, I know that we've

20  talked some about your drug use.  Between 2018 and 2023,

21  what types of drugs were you consuming on the streets of

22  San Francisco?

23         MR. NTIM:  Objection.  Privacy.  And relevance.

24         THE WITNESS:  What dates again?  Sorry.

25  ///

```
 1  BY MR. MILLS:

 2      Q.  Between 2018 and 2023.

 3      A.  Primarily methamphetamine.  Although, I picked

 4  up a fentanyl habit in 2020.

 5      Q.  And typically, how do you consume

 6  methamphetamine?

 7          MR. NTIM:  Same objection.

 8          THE WITNESS:  Injecting.

 9  BY MR. MILLS:

10      Q.  And do you smoke methamphetamine too?

11          MR. NTIM:  Same objection.  Continuing objection

12  for this line of questioning.

13          THE WITNESS:  I prefer not to.

14  BY MR. MILLS:

15      Q.  At any period during 2018 and 2023, were you

16  smoking methamphetamine?

17      A.  Yes.

18      Q.  And would you smoke methamphetamine inside of

19  your tent?

20      A.  Yes.

21      Q.  Does meth, when smoked, have any particular type

22  of smell that comes to mind to you?

23      A.  Yes.

24      Q.  What is that?

25      A.  I mean, it's pretty distinct.  It's kind of
```

```
 1  sweet, kind of chemically -- or chemical -- chemically.
 2  I don't know how to say that specifically, but --
 3       Q.  Does it smell like ammonia?
 4       A.  I -- no.
 5       Q.  Does it smell like rotten eggs?
 6       A.  No.
 7       Q.  Does it have a strong repulsive smell?
 8            MR. NTIM:  Objection.  Calls for speculation.
 9            THE WITNESS:  I mean, no.
10  BY MR. MILLS:
11       Q.  Based off of your experience smoking
12  methamphetamine, how long does this smell typically last
13  in the area where you were smoking?
14       A.  Seconds.
15       Q.  If you smoked inside of a tent, would it still
16  smell like the meth after you were done?
17       A.  No.
```



20          In the times that you were living on the streets

21  in 2022 with Sarah Cronk, roughly what percentage of the

22  time do you think you had a sharps bin?

23      A.  While I was living with Sarah, all the time.

24      Q.  And if you left your tent, would you take the

25  sharps bin with you, or would you leave it behind for

1    reasons other than taking it to a safe injection site to

2    drop it off?

3        A.  Most of the time, I had one for in-tent use and

4    home use.  And then I had one on my person for

5    traveling, like, a small black box designated for

6    biohazard.

7        Q.  Did you ever leave your sharps bin out on the

8    street outside of the tent while you're camping with

9    Sarah Cronk?

10       A.  No.

11       Q.  So is it fair to say that your practice was

12   generally to keep it within the tent or concealed off of

13   the street?

14       A.  Yes.





```
23        Q.  In 2022 when you were camping outside of Target
24   with Sarah Cronk, were you using fentanyl then?
25        A.  Yes.
```

```
 1        Q.   How many -- with what regularity were you using
 2   fentanyl?
 3        A.   During 2022, I had graduated to using it
 4   probably, like, every other day.  So not fully
 5   regularly, but getting there.
 6        Q.   So were you using methamphetamine and fentanyl
 7   in 2022 when you were camping outside of the Target?
 8        A.   Yes.
 9        Q.   Any other drugs?
10        A.   While I was outside of Target, no.
```

███
███
███
███

5      Q.   Do you know how often Sarah Cronk was using

6   opioids in the time that you were living with her

7   outside of the Target area in 2022?

8      A.   How often?   Every day.

9      Q.   Do you know how many pills she would consume in

10  a given day?

11     A.   She didn't do pills at the time.

12     Q.   What was she doing?

13     A.   Fentanyl.

14     Q.   So Sarah Cronk also consumed fentanyl?

15     A.   Uh-huh.

16     Q.   Would she do that by smoking it?

17     A.   Injecting.

18     Q.   And did you inject fentanyl?

19     A.   No.

20     Q.   Did Sarah Cronk have her own sharps bin?

21     A.   For her own personal use, like, in her own bag,

22  yes.

23     Q.   So Sarah Cronk, at the time that you were living

24  outside of Target in 2022, used fentanyl,

25  methamphetamine, and opioids?

1        A.   I mean, regularly, fentanyl and meth.

2             Opioids, if she could get her hands on them, if

3    she had them, if we had access to them.





19        Q.  And in 2022 when you were using these substances

20  outside of the Target where you were camping with

21  Sarah Cronk, would you do it at certain times during the

22  day, or throughout the day?  Can you provide a little

23  context for when you would actually use?

24        A.  Yeah.  If I -- I would do it morning, wake up,

25  because it also -- I also used it for pain relief

```
 1   because my back would get really stiff from sleeping.

 2          And then I would get up and do -- do whatever

 3   was going on that day.  And then after about probably --

 4   after lunchtime-ish, like, the beginning of the

 5   afternoon-ish, I'd do another shot.

 6          And then most of the time, do one towards the

 7   end of the night.  And -- yeah.  If I had -- you know,

 8   if I was able to sleep that night, I would do one -- I

 9   mean, basically would go the whole night, and I would

10   only get a couple of hours of sleep a night.

11          So I needed to do one in the middle of the night

12   or in the morning again.

13       Q.  Did you ever use any of the drugs that we've

14   discussed in the morning, knowing that a sweep was going

15   to be taking place that day?

16       A.  No, especially if the cops or DPW were already

17   there.  I didn't like doing -- I didn't like doing my

18   drugs with people sitting outside my tent at -- I didn't

19   feel it was their, you know, their business.

20          So I would do my, you know, due diligence to try

21   and get out of there as soon as possible so I could, you

22   know, normalize out away from prying eyes.

23          I was pretty private about it.
```





```
 1        Q.  Do you know Teresa Sandoval?

 2        A.  Yes.

 3        Q.  And is Teresa Sandoval a double amputee?

 4        A.  If it's the -- I don't know her last name, but

 5   if it was the Teresa I'm thinking of.  I know a Teresa

 6   who is a double amputee.

 7        Q.  Did that Teresa live on 13th Street?

 8        A.  Yes, farther up the street than us.

 9        Q.  Do you know if Teresa Sandoval uses drugs?

10        A.  I do not know.

11        Q.  Do you know Nathaniel Vaughn?

12        A.  No.

23   BY MR. MILLS:

24        Q.  Have you ever stolen from an encampment?

25        A.  No.
```

```
 1   for substance abuse?
 2       A.  I don't know if the -- if the route that I took
 3   was through really City programming.
 4       Q.  Okay.  Do you agree that you've benefitted from
 5   housing services that the City provides?
 6       A.  Yes.
 7       Q.  Do you agree that homelessness is a complex
 8   problem?
 9       A.  Yes.
10       Q.  Do you think homelessness is a complex problem
11   that defies a ready and easy solution?
12       A.  Yes.
13           MR. NTIM:  Objection.  Calls for speculation.
14   BY MR. MILLS:
15       Q.  That was a yes?
16       A.  Yes.
17       Q.  Do you agree that people who make claims against
18   the City should have to produce evidence to support
19   their claims?
20           MR. NTIM:  Same objection.  And calls for legal
21   conclusion.
22           The WITNESS:  Repeat that one more time.
23   BY MR. MILLS:
24       Q.  Do you agree that people who make claims against
25   the City should have to produce evidence to support
```

```
 1  STATE OF CALIFORNIA      )
 2  COUNTY OF SAN FRANCISCO ) ss.
 3          I hereby certify that the witness in the
 4  foregoing deposition, JOSHUA DONOHOE, was by me duly
 5  sworn to testify to the truth, the whole truth, and
 6  nothing but the truth in the within-entitled cause; that
 7  said deposition was taken at the time and place herein
 8  named; and that the deposition is a true record of the
 9  witness's testimony as reported by me, a duly certified
10  shorthand reporter and a disinterested person, and was
11  thereafter transcribed into typewriting by computer.
12          I further certify that I am not interested in
13  the outcome of the said action, nor connected with nor
14  related to any of the parties in said action, nor to
15  their respective counsel.
16          IN WITNESS WHEREOF, I have hereunto set my hand
17  this November 25, 2024.
18  Reading and signing was:
19  _x_ requested __ waived __ not requested
20
21
22
23              CYNTHIA TURI, CSR NO. 11812
24              STATE OF CALIFORNIA
25
```