## <u>REDACTED</u>

## EXHIBIT 12

## TO

## DECLARATION OF STEVEN MILLS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## DOCUMENT SEALED PURSUANT TO ECF NO. 509

```
 1                UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3

 4   - - - - - - - - - - - - - -

 5   COALITION ON HOMELESSNESS,  )

 6   et al.,                     )

 7            Plaintiffs,        )

 8   vs.                         )  CASE NO.

 9   CITY AND COUNTY OF          )  4:22-cv-05502-DMR (LJC)

10   SAN FRANCISCO, et al.,      )

11            Defendants.        )

12   - - - - - - - - - - - - - -

13

14

15              VIDEOTAPED DEPOSITION OF

16              SHANNA COUPER ORONA

17             FRIDAY, FEBRUARY 28, 2025

18

19

20

21         BEHMKE REPORTING AND VIDEO SERVICES, INC.

22              BY:  CYNTHIA TURI, CSR NO. 11812

23              550 CALIFORNIA STREET, SUITE 820

24              SAN FRANCISCO, CALIFORNIA 94104

25                        (415) 597-5600
```

1

2

3

4

5

6

7

8          Videotaped Deposition of SHANNA COUPER ORONA,

9     taken on behalf of the Defendant, at 39 Drumm Street,

10    San Francisco, California, commencing at 10:10 A.M.,

11    FRIDAY, FEBRUARY 28, 2025, before Cynthia Turi,

12    Certified Shorthand Reporter No. 11812, pursuant to

13    Notice of Taking Deposition.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFFS:

 3       AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF

 4       NORTHERN CALIFORNIA

 5       BY:  SCOUT KATOVICH, ATTORNEY AT LAW

 6             JOHN H. DO, ATTORNEY AT LAW

 7       39 Drumm Street

 8       San Francisco, California  94111

 9       Telephone:  (646) 905-8935

10       Email:  skatovich@aclu.org

11

12   FOR THE DEFENDANTS:

13       OFFICE OF THE CITY ATTORNEY

14       CITY AND COUNTY OF SAN FRANCISCO

15       BY:  STEVEN A. MILLS, DEPUTY CITY ATTORNEY

16       1390 Market Street, 7th Floor

17       San Francisco, California  94102

18       Telephone:  (415) 355-3304

19       Email:  steven.mills@sfcityatty.org

20

21   ALSO PRESENT:

22       JOSHUA HEADRICK, VIDEOGRAPHER

23

24

25
```

```
 1        A.  March 11, 1973.
 2        Q.  And where were you born?
 3        A.  Tacoma, Washington.
 4        Q.  When did you first move to San Francisco?
 5        A.  I don't know the exact -- yeah.  I don't know
 6   the exact date, but I -- I've been in and out of
 7   San Francisco for, like, 35 years or so, so...
 8        Q.  Do you currently live in San Francisco?
 9        A.  Yes, I do.
10        Q.  And where do you live?
██        █   ████████████████████████████
12        Q.  And what kind of living situation is that at
██   █████████████
14        A.  It's, like, an apartment.
15        Q.  How long have you been living at
██   █████████████
17        A.  I think approximately two years, maybe.
18        Q.  Do you know if you were living at
██   █████████████████  before September of 2022?
20        A.  Yeah.  I think I -- I think so.
21        Q.  Where were you living before ████████████
22        A.  I was living at the Panoramic on 9th and
23   Mission.
24        Q.  And what's the Panoramic at 9th and Mission?
25        A.  It's an apartment complex -- an apartment.
```

```
 1        Q.   How long had you been living at the Panoramic?
 2        A.   One year.
 3        Q.   Where were you living before the Panoramic?
 4        A.   In my RV.
 5        Q.   Were you living in your RV in San Francisco?
 6        A.   Yes.
 7        Q.   How long were you living in an RV in
 8   San Francisco?
 9        A.   Probably four years.
10        Q.   From the time that you lived -- started living
11   in the RV ████████████████████████, have you ever
12   lived on the street outside in a tent or structure?
13        A.   Yes.
14        Q.   When were you living on a -- in a tent or
15   structure?
16        A.   Before I was able to get the RV.  So I -- I
17   guess I was on the street in a tent for about two --
18   almost two years, I think.
19        Q.   My question was a little bit different.
20        A.   Sorry.
21        Q.   Were you ever in -- were you ever on the street
22   after you got the RV?
23        A.   Oh, no.
24        Q.   So you've been inside -- living inside for
25   roughly six years?
```

1      A.  Well, I guess, yeah, if you put the RV.  Yes.

2      Q.  Do you currently store property outside on the

3  streets of San Francisco?

4      A.  Not at this moment.

5      Q.  When's the last time you stored property on the

6  streets of San Francisco?

7      A.  When I had my RV and when I was in a tent.  That

8  was the last time I can recall.

9      Q.  Do you know what year that was when you last had

10  property on the streets in San Francisco?

11      A.  I don't know.

12      Q.  Do you know if it was 2017?

13      A.  I don't know.

14      Q.  Do you know when the Stolen Belonging project

15  started?

16      A.  I don't remember the exact date.  But --

17      Q.  Do you know if you were living on the street

18  when the Stolen Belonging project started?

19      A.  Yes, I was.  I was in my RV.

20      Q.  Silly question, but do you have any intention of

21  living on the street in the future?

22          MS. GRIJALVA:  Objection.  Objection.

23  Speculation.

24          THE WITNESS:  I hope not.

25  ///

1  BY MR. MILLS:

2      Q.  Do you have any intention of being homeless in

3  the future?

4          MS. GRIJALVA:  Objection.  Speculation.

5          THE WITNESS:  I don't -- try not to.

6  BY MR. MILLS:

7      Q.  And do you have any intention of storing

8  property on the streets of San Francisco outside of a

9  residence in the future?

10     A.  No.

11         MS. GRIJALVA:  Objection.  Speculation.

12 BY MR. MILLS:

13     Q.  And do you have any intention of storing

14 property on the streets of San Francisco even though you

15 have a residence?

16         MS. GRIJALVA:  Objection.  Speculation.

17         THE WITNESS:  No.

18 BY MR. MILLS:

19     Q.  Do you know if there's an entity that currently

20 owns your housing?

21     A.  What do you mean?

22     Q.  Do you have, like, a landlord?  What's that

23 situation like?

24     A.  It's -- it's -- I guess it's family housing.

25 It's a -- a provider, I guess they're called.  Yeah.

```
 1        A.  Well, they didn't take it.  I mean, you know.
 2        Q.  How long were you an on-site manager for
 3   Michael Thomas?
 4        A.  Approximately, maybe, a year and a half,
 5   two years.  Maybe.  Less than two years.
 6        Q.  And where were you an on-site manager?
 7        A.  Where I live now.
 8   ███    ████████████████████████████████████████
 9   on-site manager?
10        A.  I don't know the exact date.  But when I left
11   the Panoramic, which is one year, I moved -- they
12   offered me that job, and it was the beginning of the
13   year, whatever year that was.
14            I can't recall what year it was.  A couple of
15   years ago.
16        Q.  Does Michael Thomas have any roles or
17   responsibilities with the Panoramic?
18        A.  The Panoramic and City Gardens were -- they were
19   built by the same people and managed by the same people
20   but not any longer.  The City owns both of those places
21   now.
22        Q.  Were you an on-site manager at the Panoramic?
23        A.  No.
24        Q.  So I'm going to mark Exhibit 217.
25   ///
```

```
 1          (Deposition Exhibit 217 marked for
 2          identification.)
 3    BY MR. MILLS:
 4      Q.  I will represent that this is an e-mail produced
 5    by the Coalition on Homelessness in the case.  If you
 6    could take a moment to look through the document and let
 7    me know when you're done.
 8          And my first question is going to be, do you
 9    recognize this document?
10      A.  Yeah.  I recognize it.  I recognize it, but I
11    don't remember -- I don't remember when I -- when I got
12    it or when -- I have a hard time seeing.  My eyes are
13    real blurry.
14          I remember when this happened because the City
15    was buying the building as well.  That's why I lost my
16    job.
17      Q.  And is this your e-mail,
18    couperuwnt4get1@gmail.com?
19      A.  Yeah.
20      Q.  And looking at this e-mail, does it refresh your
21    recollection of where you were living?
22      A.  Well, I was living where I'm at now.
```



1    I was -- when I had my phone out, I was pretending like
2    I was going to video.  They started talking all nice and
3    all.
4            If I put my phone away, they were yelling at
5    Josh, just being very rude, and saying things and the
6    women, bitches and stuff.
7            All right.  Let me just pop this right here.  So
8    I put my phone there, and I walked off, and I was
9    checking out the end of Division -- Division and
10   South Van Ness.  I walked to the end.
11       Q.  So was that Joshua Donohoe and Apple Cronk in
12   the video?
13       A.  Yeah.
14       Q.  Is this the video that you were referring to
15   earlier where you put your phone out and just left it --
16       A.  No.
17       Q.  -- to record people?
18       A.  No.
19       Q.  But you physically weren't there with the
20   device?
21       A.  No, I wasn't.  But it was where you could see
22   it.  It was in plain sight.
23       Q.  So when the video started, were you there to
24   leave the phone?
25       A.  What?

1            So they just rubbed him wrong.

2        Q.  What do you mean he's a little messy?

3        A.  If he didn't sweep his area or -- usually, most

4    people keep their stuff squared away.  If he didn't do

5    it, and there were certain things that DPW -- like,

6    there was more work for them to do.

7            They expected him to keep his area clean, which

8    I agree with too.  You should keep your stuff clean.  I

9    think it started off like that, that there was a -- he

10   said, I don't have to do it.  This is where I live.  I

11   can leave it how I want, that kind of situation, that

12   started some issues and disagreements.

13       Q.  Just to make sure I understand, was it that his

14   encampment was messy?

15       A.  A little bit, yeah.  But it was -- it was the --

16   where their encampment is, they're not blocking the

17   sidewalk where anyone walks or anything.  They're under

18   the freeway.

19           But in front where the curb is, he would have,

20   like, you know, maybe a little bit of litter here and

21   there, and maybe they felt like he should have picked it

22   up.

23           And he felt like he didn't have to do it -- he

24   didn't have to if he didn't want to in that moment.

25       Q.  If they testified that they were clean

1  individuals, would you disagree with them?

2      A.  I would say they're in the middle.

3          MS. GRIJALVA:  I'll object to that as vague.

4  BY MR. MILLS:

5      Q.  So not super messy, but not clean?

6      A.  Yeah.  I mean, he's living under the freeway.

7  It's just, like, dust, the cars go by.  You know,

8  there's trash all around you.  So sometimes some folks

9  just leave it the way it is.

10     Q.  Was this next to Target?

11     A.  Yeah.

12     Q.  Do you know how long they had been living there?

13         MS. GRIJALVA:  Objection.  Speculation.

14         THE WITNESS:  I don't know exactly how long.

15  BY MR. MILLS:

16     Q.  Do you know what time it was in this video?

17     A.  Maybe it was between 4 and 6 a.m., possibly.

18     Q.  Do you know if a resolution was taking place

19  that day?

20     A.  I'm not sure, but I don't think so, because

21  there's only, I think, maybe three DPW trucks, maybe

22  four, no HOT team, no -- there were -- those guys were

23  out there sweeping and raking, so more likely than not,

24  it was just probably that crew for that area.

25     Q.  Do you know if at any point in time that

1      Q.  What does it mean to you to be a member on the

2   Coalition on Homelessness?

3      A.  Basically --

4          MS. GRIJALVA:  Objection.  Vague.

5          THE WITNESS:  To help out wherever needed.  If

6   it's from outreach or helping someone navigate their way

7   through our system.  Anything that -- that's happening,

8   anything they need help with on there.

9   BY MR. MILLS:

10     Q.  Do you know when you became a member of the

11  Coalition on Homelessness?

12     A.  Not exactly, but it's been -- wow.  It's been

13  maybe -- I don't -- maybe six or seven years, maybe.

14     Q.  Are you still a member of the Coalition on

15  Homelessness?

16     A.  Yes.

17     Q.  And do you intend to stay a member of the

18  Coalition on Homelessness?

19     A.  Yeah.

20     Q.  As a member of the Coalition on Homelessness,

21  have you been able to vote on projects that the

22  Coalition does?

23     A.  I haven't -- I haven't done anything like that.

24  I mean, I -- I'm not -- I'm not there all the time, you

25  know.  I'm there when I'm there.  And it's -- I'm not,

1  like, an everyday person there every second.

2        So no, there's nothing that I -- I'm not -- I

3  haven't been able to do that.

4      Q.  As a member of the Coalition on Homelessness,

5  did you get to say that you wanted them to sue the City

6  and County of San Francisco for property destruction?

7      A.  Did I get -- what do you mean?

8      Q.  Did you get to have a say in whether they sued

9  the City and County of San Francisco?

10     A.  No.  I'm low on the totem pole there.

11        MS. GRIJALVA:  I'll object to that as vague.

12 BY MR. MILLS:

13     Q.  Would it surprise you to learn that the

14 Coalition on Homelessness has called you an active core

15 member?

16     A.  No.

17     Q.  And I believe earlier you said you've

18 participated in some Human Rights workgroup meetings; is

19 that correct?

20     A.  Yes.

21     Q.  How many of those do you think you've

22 participated in?

23     A.  Probably -- it's been a lot.  Since probably --

24 I don't even know.  Like, maybe 20, throughout the

25 years, maybe.  I can't always make it on the days they

1  do it because my -- you know, different things that I
2  do, you know.
3      Q.  Did you have to sign anything to become a member
4  of the Coalition on Homelessness?
5      A.  I don't think so.
6      Q.  Are you aware that the Coalition on Homelessness
7  is claiming in this case that you were subject to a risk
8  of property destruction in the future?
9      A.  What?  Can you rephrase?  I don't understand
10 that.
11     Q.  Are you aware that the Coalition on Homelessness
12 is claiming that you were at risk of property
13 destruction in the future?
14     A.  I don't -- I'm confused about that.  I don't
15 understand what that means.
16     Q.  Do you have any knowledge on the Coalition of
17 Homelessness claiming that you are at risk of future
18 property destruction in San Francisco in order to
19 maintain this case?
20     A.  No.
21         MS. GRIJALVA:  Objection.  Vague.
22         THE WITNESS:  I don't -- I don't know.
23 That's -- no.  I don't know.  That makes no sense to me.
24 Sorry.  I don't know what to say.
25 ///

```
 1  with people about property destruction?
 2      A.  I don't -- the only time I ever did anything
 3  with a consent form is when we did Stolen Belonging.  We
 4  were asking them to consent to speak with them and
 5  record them, if that's what you mean.
 6      Q.  Do you have those consent forms?
 7      A.  No.  That was all Leslie, and she handled that
 8  kind of stuff.  I was just, yeah, the low man on the
 9  totem pole.
10      Q.  Do you know why you were getting consent forms?
11      A.  Why?  To get consent.  They were recording,
12  having, you know, their stories, their words, and the
13  things.
14          So legally they -- you know, it's a protection
15  for both us -- for both them, as well us doing the
16  project.
17      Q.  I'm going to mark the next exhibit, which I
18  believe will be 222.
19          (Deposition Exhibit 222 marked for
20          identification.)
21  BY MR. MILLS:
22      Q.  And I will represent that Exhibit 222 was
23  produced by the Coalition on Homelessness in this case.
24  And it has Bates No. CO -- COH 01376417.
25          So, Couper, if you could look on the first page,
```

BEHMKE REPORTING AND VIDEO SERVICES, INC.    185
(415) 597-5600

1  it has an address listed as 1321 Mission Street.

2      Do you see that?

3      A.  Yeah.

4      Q.  Where is that address?

5      A.  That's the Panoramic.

6      Q.  And then do you see the date of this e-mail is

7  December 13th, 2021?

8      A.  Uh-huh.

9      Q.  Were you living at the Panoramic?

10     A.  I just was just moving in.  Wait.  Did you

11  say -- yeah.  So I was -- I think -- if -- I just know

12  that I moved in the 9th or 10th of December, within that

13  week, I think.  I couldn't remember if it was 2020 or

14  2021.

15     Q.  Once you moved into the Panoramic, were you

16  there until you moved into your current address?

17     A.  Yeah.  I stayed at the Panoramic for a year.

18     Q.  Did you move from there into your current

19  location?

20     A.  Yes.

21     Q.  Was there ever a break where you were back on

22  the street in the middle?

23     A.  No.  There was -- I think there was a week,

24  maybe, that -- till -- yeah, maybe not even a week.

25  Maybe five to six days, maybe, till I could get into the

2        Q.  Were you getting paid to participate in the

3    Stolen Belonging project?

4        A.  Yeah.  A little bit.  Yeah.

5        Q.  How much were you getting paid?

6        A.  I don't -- actually, I don't remember actually

7    what it was.  I don't remember.

8            It was kind of a -- it was, I think, if I'm --

9    if I remember correctly, it was decent.  It wasn't like

10   chump change.  It was something.

11           The hours we worked was very -- maybe two hours

12   here, an hour here.  So we just worked when we were able

13   to work.

14       Q.  When the team for the Stolen Belonging project

15   was interviewing people, were gift cards provided for

16   them providing their story?

17       A.  I -- shoot.  Yeah.  I think so.

18       Q.  Do you know how much those gift cards were?

19       A.  I think there was Safeway gift cards so it was,

20   like, $20.  I think it was a $20 Safeway gift card.

21       Q.  Before individuals were interviewed, were they

22   told why you were interviewing them?

23       A.  Yeah.

24       Q.  And were they told they were being interviewed

25   about property destruction?

```
 1  STATE OF CALIFORNIA      )

 2                           ) ss.

 3  COUNTY OF SAN FRANCISCO )

 4        I hereby certify that the witness in the

 5  foregoing deposition, SHANNA COUPER ORONA, was by me

 6  duly sworn to testify to the truth, the whole truth, and

 7  nothing but the truth in the within-entitled cause; that

 8  said deposition was taken at the time and place herein

 9  named; and that the deposition is a true record of the

10  witness's testimony as reported by me, a duly certified

11  shorthand reporter and a disinterested person, and was

12  thereafter transcribed into typewriting by computer.

13        I further certify that I am not interested in the

14  outcome of the said action, nor connected with nor

15  related to any of the parties in said action, nor to

16  their respective counsel.

17        IN WITNESS WHEREOF, I have hereunto set my hand

18  this March 12, 2025.

19  Reading and signing was:

20  __X__ Requested ____ Waived ____ Not requested.

21

22

23

24                    CYNTHIA TURI, CSR NO. 11812

25                    STATE OF CALIFORNIA
```