<u>**UNREDACTED**</u>

**EXHIBIT 13**

**TO**

**DECLARATION OF STEVEN MILLS IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**DOCUMENT UNSEALED PURSUANT TO ECF NO. 509**

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3

 4    - - - - - - - - - - - - - - - - -

 5    COALITION ON HOMELESSNESS,        )

 6    et al.,                          )

 7                 Plaintiffs,         )

 8    vs.                              )   CASE NO.

 9    CITY AND COUNTY OF SAN           )   4:22-cv-05502-DMR

10    FRANCISCO, et al.,               )

11                 Defendants.         )

12    - - - - - - - - - - - - - - - - -

13

14

15

16         VIDEOTAPED DEPOSITION OF MELODIE

17              FRIDAY, MARCH 14, 2025

18

19

20

21         BEHMKE REPORTING AND VIDEO SERVICES, INC.

22         BY:  SUZANNE I. ANDRADE, CSR NO. 10682

23              550 CALIFORNIA STREET, SUITE 820

24              SAN FRANCISCO, CALIFORNIA 94104

25                   (415) 597-5600
```

1

2

3

4

5

6

7

8

9

10          Videotaped deposition of MELODIE, taken on

11   behalf of Defendants, at 39 Drumm Street, Third Floor,

12   San Francisco, California, commencing at 11:06 A.M.,

13   FRIDAY, MARCH 14, 2025, before Suzanne I. Andrade,

14   Certified Shorthand Reporter No. 10682, pursuant to

15   Notice of Deposition.

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS AND THE DEPONENT:

 3        AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF

 4        NORTHERN CALIFORNIA

 5        BY:  JOHN H. DO, ATTORNEY AT LAW

 6             LARISSA GRIJALVA, ATTORNEY AT LAW

 7             (VIA TELECONFERENCE)

 8        39 Drumm Street

 9        San Francisco, California  94111

10        Telephone:  (415) 293-6393

11        Email:  jdo@aclunc.org

12                lgrijalva@aclunc.org

13

14   FOR DEFENDANTS:

15        CITY AND COUNTY OF SAN FRANCISCO

16        OFFICE OF THE CITY ATTORNEY

17        BY:  STEVEN MILLS, DEPUTY CITY ATTORNEY

18        1390 Market Street, 7th Floor

19        San Francisco, California  94102

20        Telephone:  (415) 355-3304

21        Email:  steven.mills@sfcityatty.org

22

23   ALSO PRESENT:

24         KYLE FRIEND, VIDEO OPERATOR

25
```

```
 1   read it -- that the City is saying:  Oh, if DPW takes
 2   your stuff, you can just take them to small claims
 3   court.
 4           It's, like, there is no homeless person with
 5   the skills to do that.  That's not fair.
 6       Q.   Do you know when you first learned about the
 7   lawsuit?
 8       A.   I guess it was a couple of years ago in one of
 9   the e-mails I got from the Coalition.  I'm not sure
10   which year it was or what the date was, but it was -- I
11   remember it saying something about it's been filed or
12   we're filing it or something.  So it had been around
13   that time.
14       Q.   Did you hear about their intention to bring
15   that lawsuit before it was filed?
16       ATTORNEY DO:  Objection; asked --
17       THE WITNESS:  How would I know?
18       ATTORNEY DO:  -- asked and answered.
19   BY ATTORNEY MILLS:
20       Q.   So is the answer that you didn't hear about it
21   before they brought it?
22       ATTORNEY DO:  Objection; asked and answered.
23       THE WITNESS:  I only found about it when they did
24   it.  I mean, they don't -- they don't go, "Oh, we're
25   going to do this.  We think we're going to do that."
```

1    It's like you'd get, like, 90 billion e-mails from every
2    thought that crossed anybody's head.
3    BY ATTORNEY MILLS:
4        Q.    Where do you currently live?
5        A.    Right now, I'm living at -- on McKinnon at
6    Toland.
7        Q.    And are you living in a vehicle?
8        A.    Correct.
9        Q.    And is that an RV or a camper?
10       A.    Uh-huh.
11       Q.    Do you also have access to a shelter bed?
12       A.    Currently, David -- that guy (indicating),
13   David -- he -- I don't know if the word is coerced or
14   pressured me to agree to a room at the Monarch.
15           And it's very complex.  It's hard to access.
16   And I need to be with my property.  If I'm not with my
17   property, things get stolen.  Every time I go there,
18   things get stolen.
19           And I have high blood pressure and high blood
20   sugar and high cholesterol.  And I told that counselor,
21   whoever -- whatever their name is, I have -- I have high
22   blood pressure, high blood sugar.  And they don't allow
23   you to bring food.
24           So every time I stay there, I have to go 8, 12
25   to 16 hours without eating.  And that is not helping me

```
 1  Street.  You asked me if I had access to shelter.  I'm
 2  living on Toland Street.
 3       Q.   Okay.
 4       A.   I've been on Toland Street since, like, 2018.
 5       ATTORNEY DO:  I'd like to take a break.
 6       ATTORNEY MILLS:  Yeah.  We'll go off the record.  I
 7  have 11:44.
 8       THE VIDEO OPERATOR:  We are going off the record at
 9  11:44.
10            (Recess taken from 11:44 a.m. to 12:04 p.m.)
11       THE VIDEO OPERATOR:  The time is 12:04.  We are back
12  on the record.
13  BY ATTORNEY MILLS:
14       Q.   All right.  So, Melodie, right before the
15  break, you mentioned that you've been living, I believe,
16  on McKinnon and Toland --
17       A.   Mm-hmm.
18       Q.   -- is that correct?
19       A.   Yes.
20       Q.   And how long have you been living in that
21  general vicinity?
22       A.   I've been living on Toland Street since
23  probably 2018.
24       Q.   And have you always been living in an RV or
25  camper?
```

1       A.    Since 2008.

2       Q.    Had there been any periods since 2018 where you

3   weren't living at Toland?

4       A.    No.

5       Q.    And do you currently have more than one RV?

6       A.    Correct.

7       Q.    How many RVs do you have?

8       A.    It's complicated.

9       Q.    Do you have an estimate of how many you

10  currently have?

11      A.    It's two RVs.

12      Q.    And can you describe the first one for me?

13            And just so you know where I'm going, I'm going

14  to ask about the second one too so I can understand kind

15  of how they look.

16      A.    Look in what way?

17      Q.    So, like, RVs can be a -- like, a full-on bus;

18  it could be a camper attached to a truck.  I just want

19  to kind of get an idea of what your two setups are like,

20  if that makes sense.

21      A.    Okay.  What's the question?

22      Q.    Yeah.

23            So what -- so I understand you have two things

24  that are like an RV right now, correct?

25      A.    Mm-hmm.

1    Q.   Okay.  Can you just describe the first one for
2  me that comes to mind?
3    ATTORNEY DO:  Calls for a narrative.
4    THE WITNESS:  What does that mean, "calls for a
5  narrative"?
6    ATTORNEY DO:  So it's an objection where I think the
7  question calls for a narrative, meaning a long answer.
8    THE WITNESS:  Narrative...  And that's an objection?
9    ATTORNEY DO:  I'm objecting because it calls for a
10  narrative.
11    THE WITNESS:  Okay.  But you're not telling me to
12  answer.  So I should answer?
13    ATTORNEY DO:  If you understand the question, you
14  can answer, correct.  But maybe we should ask the
15  question again, since you --
16    THE WITNESS:  Okay.  Thank you.
17  BY ATTORNEY MILLS:
18    Q.   Can you describe for me the first RV that you
19  have right now that comes to mind?
20    A.   Well, I call it the green camper because it has
21  a green stripe.
22    ATTORNEY DO:  Same objection.
23  BY ATTORNEY MILLS:
24    Q.   And do you know the kind of make or model of
25  that RV?  Like a Dodge?  Honda?  The brand.

1    A.    It's a Dodge.   The first one is a -- the green

2    camper is a Dodge.

3    Q.    And do you know what brand the second one is?

4    A.    Yes.   It's yellow and it's a Chevy van.

5    Q.    Okay.   So I understand you have the

6    green-stripe Dodge and a yellow Chevy van.

7    A.    Uh-huh.

8    Q.    Are those the only vehicles that you have

9    currently?

10    A.    There is a white Honda.

11    Q.    And are both the green-stripe Dodge and yellow

12    Chevy van parked at McKinnon and Toland?

13    A.    Uh-huh.

14    Q.    How long have -- well, ignore that.   I'll start

15    over.

16    A.    Okay.

17    Q.    Since 2018, have you always had more than one

18    camper at a time?

19    A.    It's always been that.

20    Q.    Okay.   So always these two, the yellow Chevy

21    van and the Dodge with a green stripe?

22    A.    Correct.

23    Q.    Have you had the white Honda since 2018?

24    A.    Correct.

25    Q.    Since 2018, when you've had these three

1    vehicles, have you camped on the street in a tent at

2    all?

3        A.    No.

4        Q.    Okay.  So is it fair to say since 2018, you

5    haven't camped on the street?

6        A.    In a tent, no.

7        Q.    Okay.  Do you use the yellow Chevy van for some

8    purposes and the green Dodge for other purposes?

9        ATTORNEY DO:  Objection; vague, confusing.

10        THE WITNESS:  Does that mean I'm not supposed to

11    answer?

12        ATTORNEY DO:  You can answer if you understand.

13        THE WITNESS:  Okay.  Tell me again.

14    BY ATTORNEY MILLS:

15        Q.    Yeah.  Let me ask a maybe slightly better

16    question.

17            Do you use the green Dodge for some purposes

18    that you don't use the yellow Chevy van for?

19        ATTORNEY DO:  Same objections.

20        THE WITNESS:  I don't know how to answer the

21    question.

22    BY ATTORNEY MILLS:

23        Q.    Okay.  And I appreciate that.

24            Do you sleep in both of those?

25        A.    Depending on where I feel safe.

1    Q.   How far in proximity from one another do you
2  park your RVs?
3    A.   That is completely dependent on the parking
4  availability at any moment.
5         And why does that matter?
6    Q.   I'm just understanding if, like, they are
7  parked right next to each other.  I'm just trying to get
8  a picture.
9    A.   Why does that matter?
10   Q.   Just to understand if you've parked them in the
11 same area and if you have your property in the same
12 vicinity or if you might have vans in different places
13 that you have to keep track of.  That's why I'm asking.
14   A.   Well, why does that -- I don't understand why
15 that would matter.
16   Q.   Just to understand your experience being
17 homeless in San Francisco, how you've done it, since
18 everybody does it a little bit different.
19   ATTORNEY DO:  So, Melodie, I'm going to make a late
20 relevancy objection.
21 BY ATTORNEY MILLS:
22   Q.   Do you keep all of your belongings inside of
23 the vehicles that you have, or do you store belongings
24 outside of your vehicles?
25   A.   I always, always, always try to keep everything

1    in the vehicles.  I have memory problems, and it's not

2    always possible.

3        Q.   With your memory problems, are you able to

4    recall what property you store in the green Dodge

5    compared to the yellow Chevy?

6        A.   Sometimes I get it mixed up which ones are

7    which.  With, like -- like, did I leave the screwdriver

8    in this camper or a screwdriver in that camper?  I get

9    it mixed up.

10       Q.   So I know that you write a lot of things down.

11            Do you inventory the property that you have so

12   you can keep track of it?

13       A.   I don't have that skill.  Which would be very

14   helpful if I could do that.

15       Q.   So in the times where some property might be

16   left outside of one of your RVs, what is typically being

17   left outside as opposed to inside of the RV?

18       A.   Okay.  So if I come and go, like I need to go

19   to Martin de Porres and get food, I'm -- I'm -- I need

20   to take this with me.  And so I take it outside of the

21   camper, and I set it down.

22            But I might forget and just leave it there.  Or

23   coming back, I might have my food with me and set it

24   down to get the door open and forget and leave it

25   outside.

1        I mean, it's -- often it's going to be things
2   where I'm coming -- coming and going and set things down
3   and forget.
4        Q.   Okay.  When you see those items that are
5   outside, does your memory kind of come back that you're
6   supposed to put that inside?
7        A.   Yes.  It's very upsetting.
8        Q.   And when you have those moments where you see
9   your property outside and remember that you left it out,
10  do you then take it back inside with you?
11       A.   Duh.
12       Q.   During this period from 2018 since you started
13  living on Toland, did you ever live somewhere other than
14  San Francisco?
15       ATTORNEY DO:  Asked and answered.
16           You can answer the question, Melodie.
17       THE WITNESS:  Why are you asking me that question?
18  BY ATTORNEY MILLS:
19       Q.   Because your travel and where you've been
20  living is relevant in the case.  So that's why I'm just
21  asking if you've been anywhere other than San Francisco
22  during 2018 --
23       A.   Have I been anywhere?
24       Q.   Have you lived --
25       A.   You asked have I lived anywhere.  No.  And we

1    already told you.

2        Q.    Okay.

3        ATTORNEY DO:  Just a late objection.  As noted, the

4    first question was lived -- one question was lived

5    anywhere; the other question was been anywhere.

6    BY ATTORNEY MILLS:

7        Q.    In 2022, was there a period where you were

8    living in Los Angeles?

9        A.    Absolutely not.

10       Q.    Did you travel to Los Angeles?

11       A.    My mother is not well, and I've had to go down

12   and assist with different things that she needs.

13       Q.    How often are you going down to L.A. to assist

14   your mother?

15       A.    It depends.

16       Q.    When you go down to visit your mother, do you

17   typically stay there for a few days, or is it a couple

18   weeks?

19       A.    It completely depends on what my capabilities

20   are at the moment.

21       Q.    When you go to Los Angeles, do you drive one of

22   your three vehicles with you?

23       A.    No.  I have to borrow a vehicle to go down.

24       Q.    Okay.  Are you able to recall if you were in

25   L.A. in September 2022, based off of your memory?

```
 1      ATTORNEY DO:  Asked and answered many times.
 2      THE WITNESS:  Tell me again.  What?
 3  BY ATTORNEY MILLS:
 4      Q.   Yeah.
 5          Were you specifically -- based off of your
 6  memory, do you know if you were in L.A. in September of
 7  2022 specifically, which is different than my question
 8  before just about generally being in L.A.?
 9      ATTORNEY DO:  Asked and answered and relevance.
10      THE WITNESS:  I would have to look at my records.
11  BY ATTORNEY MILLS:
12      Q.   Do you have records that would show when you
13  were in L.A. to help your mom?
14      A.   I mean, if you've got a really long, long,
15  long, long time, I could figure it out.
16      Q.   And would you figure that out based off of
17  notes that you've put somewhere?
18      A.   I just don't know where.
19      Q.   What's your mom's name?
20      ATTORNEY DO:  You can go with first name, Melodie.
21      THE WITNESS:  I don't want to tell anybody what her
22  name is.
23  BY ATTORNEY MILLS:
24      Q.   So --
25      ATTORNEY DO:  I'm going to -- I will object;
```

```
 1      Q.    Ready for the next one?

 2      A.    Maybe.

 3      Q.    Okay.  So in addition to having the three

 4  vehicles, have you ever had, like, a private storage

 5  unit since 2018?

 6      A.    Correct.

 7      Q.    Okay.  And how many of those do you have?

 8      A.    Three.

 9      Q.    And have you had three storage units since

10  2018?

11      A.    Correct.

12      Q.    Are those all with one company?

13      A.    Correct.

14      Q.    And what company is that?

15      THE WITNESS:  Do I have to tell them?

16      ATTORNEY DO:  You can tell them.

17      THE WITNESS:  It's Amador Storage.

18  BY ATTORNEY MILLS:

19      Q.    In addition to those three storage units and

20  the three vehicles that have been identified, do you

21  have other places that you've stored property since

22  2018?

23      A.    My bedroom at my mom's house.

24      Q.    And is that your mom's house in Los Angeles?

25      A.    Correct.
```

```
 1      A.   Yes.

 2      Q.   -- in the interview?

 3      A.   Correct.

 4      Q.   Okay.  Done with that one.

 5      ATTORNEY DO:  We're moving on.

 6      ATTORNEY MILLS:  Getting there.  I don't have too

 7   much longer to go.

 8      THE WITNESS:  I'm, like, I never seen this dumpster

 9   before.

10   BY ATTORNEY MILLS:

11      Q.   So, Melodie, I understand earlier you testified

12   that you're a member of the Coalition on Homelessness.

13      A.   Uh-huh.  Yeah.

14      Q.   When did you first become a member of the

15   Coalition?

16      A.   2008.

17      Q.   And did you have to do anything to become a

18   member of the Coalition?

19      A.   Show up.

20      Q.   So you didn't sign anything to become a member?

21      A.   No.

22      Q.   Have you ever had to pay any dues?

23      A.   No.

24      Q.   When you became a member of the Coalition on

25   Homelessness, did you understand that the Home- -- the
```

1    Coalition on Homelessness would represent your rights in

2    a federal court by being a member?

3         A.   Say that one more time.

4         Q.   Yeah.

5              When you became a member of the Coalition on

6    Homelessness, did you understand that the Coalition on

7    Homelessness could represent your rights in federal

8    court on your behalf?

9         A.   I would have to reword what you're saying,

10   which is that there was no opportunity that I was aware

11   of I would ever be represented until September.

12        Q.   That's September 2024?

13        A.   Correct.

14        Q.   Do you know what your rights are as a member in

15   the Coalition on Homelessness?

16        A.   The same rights as any other human being.

17        Q.   But so my question is a little bit different.

18             So, by becoming a member of the Coalition on

19   Homelessness, did you know if you had any particular

20   rights to be in that organization?

21        A.   Just as a human being.

22        Q.   As a member of the Coalition on Homelessness,

23   are you allowed to vote on its activities?

24        A.   I -- I haven't voted on its activities.  I

25   think there's times when I could have, but usually I

1    just leave that to people that know what they're doing.

2        Q.    And have you been a participant in the Human

3    Rights Working Group?

4        A.    Yes.

5        Q.    How many times would you say you've

6    participated in the Human Rights Working Group?

7        A.    Oh, God.  It's too many to tell you.

8        Q.    Is it fair to say more than a dozen?

9        A.    Oh, God.  Yeah.

10       Q.    More than a hundred?

11       A.    I don't know how many weeks there are in a

12   year.  So I just...  There have been times when I've

13   been able to go every week and other times when, you

14   know, I haven't been able to go every week.

15       Q.    Have there ever been any years where you just

16   didn't participate in the Coalition on Homelessness at

17   all?

18       A.    There's always something that you're doing with

19   them because they're just involved in -- in so many

20   aspects of being homeless.

21       Q.    Have you ever gotten a homeless verification

22   form from the Coalition on Homelessness?

23       A.    The last time I needed a verification, I was

24   sent to someplace on Tenth Street.

25       Q.    Do you know if that was the Coalition?

```
 1   STATE OF CALIFORNIA      )

 2                            ) ss.

 3   COUNTY OF SAN MATEO      )

 4            I hereby certify that the witness in the

 5   foregoing deposition, MELODIE, was by me duly sworn to

 6   testify to the truth, the whole truth and nothing but

 7   the truth, in the within-entitled cause; that said

 8   deposition was taken at the time and place herein named;

 9   and that the deposition is a true record of the

10   witness's testimony as reported by me, a duly certified

11   shorthand reporter and a disinterested person, and was

12   thereafter transcribed into typewriting by computer.

13            I further certify that I am not interested in

14   the outcome of the said action, nor connected with nor

15   related to any of the parties in said action, nor to

16   their respective counsel.

17            IN WITNESS WHEREOF, I have hereunto set my

18   hand this 19th day of March, 2025.

19   Reading and Signing was:

20   __X__ Requested   ____ Waived   ____ Not Requested

21

22

23

24        SUZANNE I. ANDRADE, CSR NO. 10682

25        STATE OF CALIFORNIA
```