**REDACTED**

# EXHIBIT 14

# TO

# DECLARATION OF STEVEN MILLS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**DOCUMENT SEALED PURSUANT TO ECF NO. 509**

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

- - - - - - - - - - - - - - -

COALITION ON HOMELESSNESS, et al., Plaintiffs,

v.

CITY AND COUNTY OF SAN FRANCISCO, et al., Defendants.

CASE NO. 4:22-cv-05502-DMR

- - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF

TODD DUTCH BRYANT

TUESDAY, MARCH 4, 2025

BEHMKE REPORTING AND VIDEO SERVICES, INC.

BY: BELLE BALL, CSR NO. 8785

550 CALIFORNIA STREET, SUITE 820

SAN FRANCISCO, CALIFORNIA 94104

(415) 597-5600

Videotaped Deposition of TODD DUTCH BRYANT taken on behalf of Defendants, at 1390 Market Street, Seventh Floor, San Francisco, California, TUESDAY, MARCH 4, 2025, commencing at 10:02 A.M., before BELLE BALL, Certified Shorthand Reporter No. 8785, pursuant to Notice and Deposition.

APPEARANCES OF COUNSEL:

FOR PLAINTIFFS:

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA
BY: AMANDA YOUNG, ATTORNEY AT LAW
39 Drumm Street
San Francisco, California 94111
Telephone: (415) 293-6362
Email: ayoung@aclunc.org

FOR DEFENDANTS:

CITY AND COUNTY OF SAN FRANCISCO
SAN FRANCISCO CITY ATTORNEY'S OFFICE
BY: STEVEN MILLS, DEPUTY CITY ATTORNEY
1390 Market Street, 7th Floor
San Francisco, California 94102
Telephone: (415) 355-3304
Email: steven.mills@sfcityatty.org

ALSO PRESENT:

VINNY BEZERRA, VIDEOGRAPHER

by any other names?

A No.

Q So, fair -- strike that.

So my understanding is when some people are experiencing homelessness in San Francisco, they go by something other than their government name, such as a nickname.

Did you have, like, a street nickname?

A No. No. I know what you mean, though. Everyone has some other name that's not really -- I went by my regular, just "Todd."

Excuse me.

Q And what is your date of birth?

[REDACTED] [REDACTED]

Q And where were you born?

A At Mary's Help Hospital in Daly City, California.

Q Have you always lived in the Bay area?

A Yes.

Q Have you ever lived outside of the Bay area?

A When I was, like, 15, for a little while I moved in with my dad in Chicago, but it wasn't very long. Like, less than -- less than a half year, something like that.

Q Do you currently live in San Francisco?

A Yes.

Q And what's your current address?

[redacted]

[redacted]

A Yes.

Q And how long have you lived in the [redacted] [redacted]

A Approximately two years.

Q Do you know if you were living in the [redacted] [redacted] in September of 2022?

A No. I wasn't -- well, it's 2025, right? Excuse me. That would be no, I guess.

Because, well, I've been there almost two years so -- yeah, that would be longer than two years, right?

Q And what's your basis for thinking that it's been two years?

A Because my two-year review had recently come up, I guess. So I had to reapply for the place I was staying at.

Q Do you know how long ago that review period was?

A A few months back. I'm not sure exactly. Like, last few months.

Q Do you have a lease at the [redacted]?

A Yeah.
Q Do you have any intention of leaving the ██████████?
A No. Not until I can find something better, or something like that.
Q And how long is your current lease?
A Um, I'm pretty sure it's just, like, a year, and then you have to reapply.
Q In order to live at the ██████████, do you have to follow any rules?
A Yeah.
Q And what are those?
A There's a bunch of them, but, you can't loiter out front, and -- I'm not sure of all of them, but you have to be, you know, a respectful neighbor; you can't be abusive -- all kinds of crazy stuff, you know. Normal things you see in a lease, I think, you know. Not sure all of the exact terminology, but...
I know one of them was not -- because some of the people there stay out front and hang out front with other homeless people, and we have had meetings about that. They don't like that at all. They don't want that.
Q Since the time you started living in the ██████████, have you ever had to live somewhere else?

A No.

Q So is it fair to say that since you started living in the ███████, you have stayed in the Dudley House?

A Yeah. Except my girlfriend, my girlfriend ████████████████████████ ████ And she -- and we were supposed to live together, but she didn't get moved there.

So, she was over there in the beginning. So I had to visit her there, and stuff. But I stayed, I stayed there.

It's pretty nice. Not as filthy as a lot of the places you see on Sixth Street, you know, so...

█ ███████████████████

████ ██████████

█ ███████████████████████

███████████████████████████ there. That's before I got the place.

Q Do you know when you were living in the tiny homes?

A Yeah. From the time that they moved -- after I was -- when I last became homeless they moved us to an encampment between the library and City Hall. I mean, library and Asian Art Museum.

And when they closed that down, they made us

all -- that's how I got the place -- I checked out the place on Sixth Street, and they -- it was still being repaired and everything like that.

So they moved us into the tiny homes until that was ready, and then (Indicating), I moved over there.

Q Do you know approximately how long you were living in the tiny home?

A I'm not sure. Not sure, exactly.

Q Do you have an estimate?

A Um, it was like months or something, I think. My girlfriend was there after I left.

Q Do you know if you were living in the tiny homes in September of 2022?

A Probably, yeah. I mean, I'm not 100 percent sure, but I'd say probably. 2022, this is '22, '24 -- well, maybe not. I might have been -- I'm not really sure, to be honest. It could have been in the tent -- tent encampment.

Q Did you live on the street at all between the time that you were in the tiny home and the time you moved into the [REDACTED]?

A Was I homeless, are you saying?

Q Yes.

A No.

Q So is it fair to say that once you entered the tiny home, you have been housed since?

A Yes.

Q And so you mentioned the word "homeless." What does that mean to you?

A It means to me that -- that you don't have a home to go to that's your own. You are living on the street or wherever, you know.

I used to think it meant like -- I used to think that living in your car was not homeless. But that is homeless, I mean.

It's -- it's a nightmare. That's what it is. You know, you don't have anywhere, bathroom to use, or access to clean water or anything. It's just -- it's horrible. Nightmare.

Q Do you consider yourself homeless now?

A No. I don't.

Q And it's a silly question, but do you have any intention of being homeless again?

A Never.

Q So I understand that some individuals, when they are living inside, may store property outside in encampments.

Has that been your experience?

A Since I've lived inside I haven't stored

items outside, no.
Q Do you have any intention of storing items outside?
A No. Why would I -- it gets taken, everything. That's the whole point of being inside, is that you don't have to worry about them stealing your stuff anymore.
Q Is it fair to say that you have not been homeless since the time you were in the tiny homes?
A That's fair to say, yes.
Q Do you have a personal private storage unit?
A Not anymore, I don't, no.
Q At some point in time, did you have one of those?
A Yeah.
Q When's the last time you had one?
A I've only had a couple -- I had a couple of them. I had two of them. I'm not sure when, the exact date when we lost them, but...
Q Did you have any private storage unit in the times that you were experiencing homelessness on the streets of San Francisco?
A Yes, I did.
Q Do you know how many you had?
A Two.

either it was -- they claimed -- that last one with the toolbox and everything? They claimed to me, the DPW workers, that -- that they had the Fire Department coming in with the jaws of life, trying to open the box up, and then they ended up throwing it in the packer, which is a big garbage truck that crushes everything.

So that -- that means -- they're trying to claim they destroyed it, which is -- I don't believe that -- they could not lift that box up, and throw it into the back of the garbage truck. I don't -- that's impossible.

Q The question is a little bit different.

Are you aware that, in the future, the Coalition on Homelessness is claiming that you will be subject to property destruction?

A That's what they're saying? I don't -- I didn't know that, no.

Q Does that make sense to you?

A No, I'm inside. So unless I was put back on the street, I don't see that as a possibility. Unless they have stuff of mine still that they're destroying; I don't know.

Q Are you aware that the Coalition on Homelessness is trying to invoke your personal Constitutional rights in this case?

A What do you mean? You mean they're trying to invoke my personal Constitutional rights?

Q Correct.

A Yeah, I guess so.

Q And how are you aware of that?

A Just, just me? Or are you talking about every -- all, everybody who's homeless?

Q You.

A Just me, only? No, I didn't know that they were invoking my -- I mean, I -- what does that mean, exactly, to invoke my personal Constitutional rights?

Q Do you know that the Coalition is claiming to bring a lawsuit on your behalf, to invoke your Constitutional rights in a Federal Court, for risk of property destruction that you may experience?

A Yeah. That I may experience?

Q Correct. In the future?

A Oh, I didn't know that, no. I mean, I thought it was for what I had already experienced. What I witnessed. And they -- you know, they did do already.

Not the future because, I mean, I'm inside.

Q Is it fair to say that you didn't consent to Coalition bringing that claim on your behalf for property destruction that you may experience in the

Some of them were cool, but most of them were just like -- just wanting to steal your stuff, you know.

Q So my question is going to be a little bit different.

Have you ever physically read a copy of DPW's bag & tag policy, as opposed to hearing from --

A From a DPW handbook? No, I don't think so. Maybe not.

Q So is it fair to say you've never read a written document from the City and County of San Francisco, outlining what DPW's bag & tag policy is?

A Yes, I guess I never -- I mean, that I can recall.

Q So is your only understanding of DPW's bag & tag policy things that you have heard from other people?

A From the DPW workers, yeah.

Q Are you aware that DPW is allowed to discard certain items in the bag & tag policy?

A Well, yeah. Like I said, they couldn't -- they don't keep things that are, like, coolers, things like food and stuff like that. They said they couldn't save that.

A The one -- is there more than one office, or what? Just that one?

Q I'm just asking if you've ever gone to --

A Yeah.

Q -- a Coalition office for a meeting.

A Yeah.

Q Have you ever voted on activities that the Coalition on Homelessness is deciding to engage in?

A No. They -- sometimes they have meetings in communities -- like when I first met them, I was on Florida Street behind Best Buy. And that's how I noticed them. There was, like, a big crowd of people, and they were -- they were discussing with people: What do you want to do, how -- what do you want to do to -- you know. They had ideas, like, you know: What do you -- how do you want to do to stop this.

And they were discussing everyone going and camping on the lawn in front of City Hall. That'll get the Mayor's attention. That's how I first saw them. That was my first experience with them.

And I was like -- they were talking about different things they did to try to stop all this stuff, because I guess it's been going on for a long time. This -- this same kind of stuff.

So -- and it just so happened that these two

different times, people who were walking by, like Kelley Cutler and -- and what's-her-name, they just happened to be walking by when this was going on to me. This was happening to me.

I mean, it was -- you know, I guess, dozens of times; one of these times it was bound to happen, you know?

Q When is the last time you participated in a meeting with the Coalition on Homelessness?

A I don't know. I'm not sure of the exact date.

Q Have you communicated with the Coalition on Homelessness since you started living in a tiny home?

A Yeah. I discussed -- yeah. I talked to them. They let me know, or -- about the court dates coming up, and stuff like that.

Q Have you spoken to the Coalition on Homelessness since you've lived in the [REDACTED]?

A Yeah. That's -- that's how -- that's where I was staying when -- when you gave me that subpoena, remember? Yeah.

Q Yeah, but did you hear specifically from anybody at the Coalition on Homelessness at the time that you've been living in the [REDACTED]?

A Um, let me think. I think so. Somebody

called me up to let me know that the stuff was coming up, and stuff.

I mean, I'm not sure who's -- what -- the name of anybody, but they called to let me know.

Q Do you remember me speaking with you about this lawsuit, and the subpoena?

A When you handed me the subpoena? Yeah.

Q Do you remember any phone conversations --

A With you?

Q -- with me, about this lawsuit?

A No. I talked to you on the phone? Did I?

Q I'm just asking if you remember.

A No, I don't recall that. I remember you handing me a subpoena in the pouring rain, that really thick one. That's the only time I remember talking to you, or seeing you.

Q Did you talk to anybody from the Coalition on Homelessness since you were served with that subpoena?

A Um --

Q In the rain.

A No, I don't think so. I don't think so. Because those people who were there decided to help me reply -- respond to it. You know?

So, I haven't, no.

Q Do you intend to testify at trial to any

CITY OF SAN FRANCISCO )
) ss.
COUNTY OF SAN FRANCISCO )

I, BELLE BALL, hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand, which was thereafter transcribed; that the foregoing transcript is a true record of the testimony given.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: Friday, March 14, 2025

Reading and Signing was:

__X__ Requested ____ Waived ____ Not Requested

Belle Ball

BELLE BALL, CSR 8785, CRR, RDR
STATE OF CALIFORNIA