# UNREDACTED

# EXHIBIT 15

# TO

# DECLARATION OF STEVEN MILLS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# DOCUMENT UNSEALED PURSUANT TO ECF NO. 509

```
 1                 UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3
 4   - - - - - - - - - - - - - - - - - -
 5   COALITION ON HOMELESSNESS,         )
 6   et al.,                            )
 7                  Plaintiffs,         )
 8   vs.                                )  CASE NO.
 9   CITY AND COUNTY OF SAN             )  4:22-cv-05502-DMR
10   FRANCISCO, et al.,                 )
11                  Defendants.         )
12   - - - - - - - - - - - - - - - - - -
13
14
15                  VIDEOTAPED DEPOSITION OF
16                      JAMES J. REEM, JR.
17                 THURSDAY, FEBRUARY 27, 2025
18
19
20
21           BEHMKE REPORTING AND VIDEO SERVICES, INC.
22              BY:  SUZANNE I. ANDRADE, CSR NO. 10682
23                  550 CALIFORNIA STREET, SUITE 820
24                   SAN FRANCISCO, CALIFORNIA 94104
25                              (415) 597-5600
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10          Videotaped deposition of JAMES J. REEM, JR.,
11   taken on behalf of Defendants, at 39 Drumm Street,
12   San Francisco, California, commencing at 9:49 A.M.,
13   THURSDAY, FEBRUARY 27, 2025, before Suzanne I. Andrade,
14   Certified Shorthand Reporter No. 10682, pursuant to
15   Notice of Deposition.
16
17
18
19
20
21
22
23
24
25
```

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFFS AND THE DEPONENT:
 3        EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
 4        BY:  VASUDHA TALLA, ATTORNEY AT LAW
 5        600 Fifth Avenue, 10th Floor
 6        New York, New York  10020
 7        Telephone:  (212) 763-5075
 8        Email:  vtalla@ecbawm.com
 9
10   FOR DEFENDANTS:
11        CITY AND COUNTY OF SAN FRANCISCO
12        OFFICE OF THE CITY ATTORNEY
13        BY:  KAITLYN M. MURPHY, DEPUTY CITY ATTORNEY
14        1390 Market Street, 7th Floor
15        San Francisco, California  94102
16        Telephone:  (415) 554-6762
17        Email:  kaitlyn.murphy@sfcityatty.org
18
19   ALSO PRESENT:
20        KYLE FRIEND, VIDEOGRAPHER
21
22
23
24
25
```

```
 1  people who are housed, people who have shelter, people
 2  who are unhoused, people who are homeless.
 3          I want to make sure I'm using the words that
 4  you use.
 5          So how -- how would you describe the way you
 6  live right now?
 7      A.  I'm homeless.  It's -- it's -- yeah.
 8      Q.  And what does "homeless" mean to you?
 9      A.  Not having a place to secure your things and,
10  you know, not a residence.  No residence.
11      Q.  When's the last time you had a residence?
12      A.  It was in March, I believe, '23.
13      Q.  Where were you living in March of 2023?
14      A.  709 Clayton Street.
15      Q.  How long had you been living at 709 Clayton
16  Street in March of 2023?
17      A.  From 2020 in -- about the same time, in March,
18  March 2020.
19      Q.  And where were you living immediately before
20  March of 2020?
21      A.  I was out on Treasure Island.
22      Q.  How long were you living on Treasure Island?
23      A.  Just a brief period.  It was through Walden
24  House.
25      Q.  Is Walden House like a -- a rehab or substance
```

```
 1  stay?
 2      A.   We just -- that's what we call the shelters.
 3  You know, we call them the shelter.
 4      Q.   Yeah.  Okay.  Let me ask a better question,
 5  then, using "shelter."
 6      A.   Okay.
 7      Q.   How many times have you been inside a shelter
 8  between, let's say, when your FedEx truck was towed and
 9  today?
10      A.   Just the one time.
11      Q.   Okay.  Has anybody ever offered you a space
12  inside a Navigation Center or a shelter in
13  San Francisco?
14      A.   Yes.
15      Q.   Best estimate, the number of times you've been
16  offered a space there?
17      A.   15, 20.
18      Q.   And the time frame for those offers?
19      A.   It's over the last two years.
20      Q.   I'm going to switch now and ask some questions
21  about the property that you mentioned before for
22  storage.
23           Do you currently store any of your stuff at a
24  place other than on the street with you?
25      A.   Yes.
```

```
 1      Q.   Okay.  Where do you store your stuff?
 2      A.   At the location I mentioned, the --
 3      Q.   The -- your friend Joe's shed?
 4      A.   Yeah.  I don't even know the address, actually.
 5      Q.   How long have you been storing stuff there?
 6      A.   Probably two -- maybe two months.  Limited --
 7 really limited access too.
 8      Q.   What do you mean by "limited access"?
 9      A.   I mean it has to -- it has to be arranged to
10 go, you know.  And he's got to, you know, sort things
11 out to make sure that it's okay.
12      Q.   Do you have a best estimate of the dimensions
13 for the amount of space you've got in the shed?
14      A.   It's smaller than a prison cell, really.  It's,
15 you know -- it's maybe 3 feet by 8 feet.
16      Q.   Okay.
17      A.   So barely enough to -- you know, I can't do
18 anything really.
19      Q.   So your -- for the past two months, your friend
20 Joe has offered you space in his shed to store your
21 stuff.  And it's -- you said it was 3 feet by -- what
22 was the dimension?
23      A.   It's 3 feet by 8 feet.
24      Q.   What type of stuff do you keep in the shed?
25      A.   My art materials and my art, my art.
```

```
 1     Q.   Any other categories of stuff you store there?
 2     A.   No.  I don't even have a change of clothes
 3  there.
 4     Q.   Other than your friend Joe's shed, any other
 5  places where you've stored stuff?
 6     A.   No.
 7     Q.   Have you ever had a storage locker?
 8     A.   Yeah, a long time ago.
 9     Q.   When was that?
10     A.   That was -- I can't remember the years.  It was
11  in the '90s, I think.
12     Q.   Okay.  So your best estimate is that you
13  haven't had a storage locker since the 1990s?
14     A.   Correct.
15     Q.   Did you ever store anything at 709-A Clayton
16  Street, Storage Space GA?
17     A.   It was -- he -- that was another reason why
18  I -- I ended up leaving.  That's where I was living.
19     Q.   I see.
20     A.   I was in a storage locker.  And it wasn't a
21  storage facility.  It was -- he was just getting away
22  with -- you know, they...
23     Q.   So, in other words, when you were housed, you
24  kept your possessions with you in the place you were
25  living --
```

```
 1  from and what you're wanting to know.  But, yeah, it's
 2  just -- I basic- -- essentially, I mean, my mindset is
 3  that what I can see is what I own.  And outside of this
 4  room, I don't own anything.
 5       Q.   So, for example, do you -- do you currently
 6  have any art supplies?
 7       A.   On me?
 8       Q.   No, not on you.
 9            Just, like, are there things that you would say
10  you currently possess?
11       A.   I could -- I could say I could go back to them,
12  but I couldn't say that they're there.
13       Q.   So you think that there's a chance when you
14  leave the building today -- well, let me ask a better
15  question.
16            You left art supplies somewhere when you came
17  to the deposition today; is that correct?
18       A.   Correct.
19       Q.   What were the dimensions of the amount of stuff
20  that you left on the street when you came to the
21  deposition?
22       A.   I didn't leave anything on the street.  I
23  didn't leave anything on the street.  I mean, I -- I've
24  got a storage area where I've got maybe -- what --
25  what -- what is the size of my worldly possessions in
```

```
 1   this life right now?  2 feet by 4 feet by 6 feet, you
 2   know, just like (indicating).
 3        Q.   I want to acknowledge that these are really
 4   personal and hard questions.  I'm sorry to make you go
 5   through this.  I don't want you to feel like --
 6        A.   It's okay.
 7        Q.   -- I'm not sensitive to your situation.
 8        A.   I understand.
 9        Q.   I'm just trying to get a sense of the facts
10   that might be relevant to the lawsuit.
11             But, please, if you need a minute --
12        A.   No.  It just comes up, you know.
13        Q.   Yeah, of course.  Of course.
14             To make sure I'm tracking, outside of the items
15   that you brought to the deposition today, the -- your
16   best estimate of the dimensions for the other things
17   that are your property are 2 feet by 4 feet by 6 feet?
18        A.   6 feet, yeah.
19        Q.   And are those all items that you store in your
20   friend Joe's shed?
21        A.   Yeah.
22        Q.   Anything that you consider your property that's
23   not either with you today or in your friend Joe's shed?
24        A.   No.
25        Q.   Okay.  Did you bring anything other than a
```

```
 1       A.   I think -- no.  That's -- I think that's where
 2  I was con- -- yeah, it was contained within that at that
 3  point.
 4       Q.   Are you currently seeking shelter or housing?
 5       A.   Yes, but I'm waiting for -- yes.
 6       Q.   I think I understand where you're going.
 7            Are there specific types of shelter or housing
 8  that you're looking for compared to others?
 9       A.   Yeah.
10       Q.   What are the types of shelter or housing that
11  you're kind of holding out for?
12       A.   Well, I want a place that's my own, you know.
13  I mean, I don't want to -- I don't want to be living in
14  a hotel.  I don't want to be in a drug-infested area.  I
15  don't want to be submitted to that kind of environment.
16  And that's -- you know, unfortunately, most of these
17  shelters, that's all they have to offer, you know, is
18  that environment.
19       Q.   Yeah.
20       A.   I can't be in that environment.  I mean, I
21  would just -- you know, I'd just, you know, jump off the
22  bridge.
23       Q.   Is there -- for you, personally --
24       A.   Mm-hmm.
25       Q.   -- is there a reason why you don't want to be
```

```
 1      Q.   There -- there might not be.  That's what I'm
 2   asking.
 3           Do you --
 4      A.   I -- I don't know.  It just --
 5      Q.   Let me -- let me try to go faster.
 6      A.   Sorry.
 7      Q.   No.  You're doing great.  You're giving me
 8   honest answers, and I appreciate it.  I need to ask you
 9   better questions.
10      A.   Okay.
11      Q.   So is it fair to say that you're not aware of
12   any specific requirements somebody needs to meet to
13   become a member of a Coalition on Homelessness; is that
14   true?
15      A.   I'm -- I'm -- all I can say is I know there has
16   to be a desire to make sure that -- that people that are
17   homeless are taken care of in a humane fashion.  I mean,
18   I just...
19      Q.   That's great.  So let me try again.
20           The only requirement that you're aware of for
21   somebody to become a member of the Coalition on
22   Homelessness is a desire to -- to advocate for or to
23   help the homeless community; is that fair?
24      A.   Yeah, I would say so.
25      Q.   Have you ever voted on any business that the
```

```
 1   Coalition on Homelessness does?
 2        A.   Not to this point.
 3        Q.   Okay.  Do you receive communications from them
 4   that are directed only to their members?
 5        A.   Yeah.
 6        Q.   What are those communications?
 7        A.   Just -- just, like, a -- a sweep is going to be
 8   taking place; you know, we need some people present.
 9        Q.   Okay.  Tell me about -- how do you get that
10   communication?
11        A.   Just in an e-mail.
12        Q.   Okay.  So the Coalition on Homelessness sends
13   e-mails to people asking them to be present during a
14   sweep?
15        A.   The members.
16        Q.   Members.
17             And they sent those to you?
18        A.   I've received some.
19        Q.   Okay.  How many of those e-mails have you
20   received?
21        A.   Mm.  Maybe -- I don't know -- five, six.
22        Q.   Did the Coalition on Homelessness give you any
23   instructions about how to observe or things to note at
24   an HSOC resolution?
25        A.   No, not that I -- no.
```

```
 1       Q.   So if -- in other words, if the Coalition is
 2  sending you an e-mail asking for people to be present,
 3  what are those people supposed to do when they show up?
 4       A.   Well, those -- those are things that are --
 5  they're -- they're outlined in the e-mails, you know,
 6  meeting -- the meetings to -- I've never attended a
 7  meeting yet.
 8       Q.   Okay.  This is helpful.
 9            So you've received e-mails from the Coalition
10  looking for people to volunteer to show up at a
11  resolution --
12       A.   That -- and then to have it -- they're going to
13  discuss it beforehand.
14       Q.   Yeah.
15       A.   Except for -- except for actually mine, which
16  I -- which I was present for and...
17       Q.   So have you ever attended any of the meetings
18  that the members of the Coalition on Homelessness have
19  before they go out to observe an HSOC resolution?
20       A.   Just mine.
21       Q.   Okay.
22       A.   Just mine.
23       Q.   So there was --
24       A.   There was the one -- yeah, the one meeting that
25  I went to for my situation.
```

```
 1       Q.   Did you ever ask the Coalition on Homelessness
 2  to help you file a claim?
 3       A.   Yes.  I -- yes.
 4       Q.   And what did they say?
 5       A.   I haven't -- I -- it's my fault that I haven't
 6  proceeded.  And it's -- it's -- it's still building.  I
 7  mean, it's still -- it's still -- it hasn't reached its
 8  apex yet, as far as I'm concerned.  I don't think
 9  it's -- it's -- it's worked itself out.
10            I would rather it work out than to have to sue,
11  but there's other people involved too.  There's other
12  homeless people in my group that are losing things
13  still.
14       Q.   Did the Coalition on Homelessness offer to help
15  you file a government claim to get money for the
16  property you lost?
17       A.   Yeah.  And I didn't pursue it yet.
18       Q.   And you have an intention in the future to do
19  it; you just haven't started it yet?
20       A.   Yeah.  It's a lot larger than I -- than I
21  anticipated at first too as well, you know.  I mean,
22  it's multiple agencies involved.  It's just -- it seems
23  almost too big for me personally.
24       Q.   What do you do in your role as a member of the
25  Coalition on Homelessness?
```

1   A.   Observe what's happening.
2   Q.   Anything else?
3   A.   Share that information when I can.
4   Q.   Other than observe what's happening at the HSOC
5   resolutions and share that with the Coalition, anything
6   else you do as a member of the Coalition on
7   Homelessness?
8   A.   No, I don't think so.
9   Q.   Anybody else you share that information with
10  other than the Coalition on Homelessness?
11  A.   Other -- other people that are homeless as well
12  that are in my group.
13  Q.   Anybody else?
14  A.   Not really.
15  Q.   And other than the meeting in the April-May
16  2024 time frame, any other meetings you've ever attended
17  with the Coalition on Homelessness?
18  A.   I see them periodically, and we talk, you know.
19  Q.   This question is a little different, which
20  is --
21  A.   Not formalized.
22  Q.   Okay.  Not.
23       Are there any committees in the Coalition on
24  Homelessness that you participate in?
25  A.   No.

```
 1      Q.   Do you have any documents that show you're a
 2   member of the Coalition on Homelessness?
 3      A.   I don't believe so.  I've got -- no.
 4      Q.   When you said "I've got," what were you
 5   thinking of?
 6      A.   I was thinking of the flyers and some
 7   information about them, but...
 8      Q.   Do you know what the Coalition on Homelessness
 9   Human Rights Workgroup is?
10      A.   No.
11      Q.   Have you ever been employed by the City of
12   San Francisco?
13      A.   No.
14      Q.   Have you ever been employed by any public
15   entity?
16      A.   No.
17      Q.   Like a government?
18      A.   No.
19      Q.   And do you know what it means to be an
20   abolitionist?
21      A.   Historically speaking, I think I do.
22      Q.   Yeah.
23      A.   It was -- yeah.
24      Q.   So, like, historically, an abolitionist was a
25   person who wanted to end slavery, right?
```

```
 1  STATE OF CALIFORNIA          ) ss.
 2  COUNTY OF SAN MATEO          )
 3           I hereby certify that the witness in the
 4  foregoing deposition, JAMES J. REEM, JR., was by me duly
 5  sworn to testify to the truth, the whole truth and
 6  nothing but the truth, in the within-entitled cause;
 7  that said deposition was taken at the time and place
 8  herein named; and that the deposition is a true record
 9  of the witness's testimony as reported by me, a duly
10  certified shorthand reporter and a disinterested person,
11  and was thereafter transcribed into typewriting by
12  computer.
13           I further certify that I am not interested in
14  the outcome of the said action, nor connected with nor
15  related to any of the parties in said action, nor to
16  their respective counsel.
17           IN WITNESS WHEREOF, I have hereunto set my
18  hand this 10th day of March, 2025.
19  Reading and Signing was:
20  __X__ Requested    ____ Waived    ____ Not Requested
21
22           [signature: Suzanne Andrade]
23
24           SUZANNE I. ANDRADE, CSR NO. 10682
25           STATE OF CALIFORNIA
```