**REDACTED**

# EXHIBIT 66

# TO

# DECLARATION OF STEVEN MILLS IN SUPPORT OF DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

**DOCUMENT SEALED PURSUANT TO ECF NO. 509**

```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                      OAKLAND DIVISION
 4
 5   - - - - - - - - - - - - - - - - - -
 6   COALITION ON HOMELESSNESS; SARAH  )
 7   CRONK; JOSHUA DONOHOE; MOLIQUE    )
 8   FRANK; DAVID MARTINEZ; TERESA     )
 9   SANDOVAL,                         )
10             Plaintiffs,             )
11   vs.                               )  CASE NO:
12   CITY AND COUNTY OF SAN            )  4:22-cv-05502-DMR
13   FRANCISCO; et al.                 )
14             Defendants.             )
15   - - - - - - - - - - - - - - - - - -
16                       CONFIDENTIAL
17           REMOTE VIDEOTAPED DEPOSITION OF
18                  CHRIS HERRING, PH.D.
19                MONDAY, APRIL 14, 2025
20
21          BEHMKE REPORTING AND VIDEO SERVICES, INC.
22             BY: JOHN FAHRENWALD, CA CSR 14369, RPR
23                  550 CALIFORNIA STREET, SUITE 820
24                  SAN FRANCISCO, CALIFORNIA 94104
25                                   (415) 597-5600
```

1
2
3
4
5
6
7
8        Remote Videotaped Deposition of expert CHRIS HERRING,
9   taken on behalf of the Defendant, via videoconference, with
10  the witness located in Los Angeles, California, commencing
11  at 10:02 A.M., PDT, MONDAY, APRIL 14, 2025, before Reporter
12  John Fahrenwald, Certified Shorthand Reporter for the State
13  of California, CSR No. 14369, RPR.
14
15
16
17
18
19
20
21
22
23
24
25

```
 1   APPEARANCES OF COUNSEL (VIA VIDEOCONFERENCE):
 2   FOR THE PLAINTIFFS AND THE DEPONENT:
 3        LAWYERS COMMITTEE FOR CIVIL RIGHTS OF THE
 4        SAN FRANCISCO BAY AREA
 5        BY:  NISHA KASHYAP, ATTORNEY AT LAW
 6        131 Steuart Street, Suite 400
 7        San Francisco, California 94105
 8        Telephone: (415) 543-9444
 9        Email:  nkashyap@lccrsf.org
10   - AND -
11        EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
12        BY:  ZOE SALZMAN, ATTORNEY AT LAW
13        One Rockefeller Plaza, 8th Floor
14        New York, New York 10020
15        Telephone:  (212) 763-5000
16        Email:  zsalzman@ecbawm.com
17
18   FOR THE DEFENDANTS CITY AND COUNTY OF SAN FRANCISCO, et al.:
19        SAN FRANCISCO CITY ATTORNEY'S OFFICE
20        BY:  KAITLYN M. MURPHY, DEPUTY CITY ATTORNEY
21             MIGUEL A. GRADILLA, DEPUTY CITY ATTORNEY
22        1390 Market Street, 7th Floor
23        San Francisco, California 94102
24        Telephone:  (415) 554-6762
25        Email:  kaitlyn.murphy@sfcityatty.org
```

```
 1    APPEARANCES - CONTINUED (VIA VIDEOCONFERENCE):
 2    ALSO PRESENT:
 3         KYLE FRIEND, LEGAL VIDEOGRAPHER
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    A.   No.
2    Q.   Do you have any degrees in psychology or
3  psychiatry?
4    A.   No.
5    Q.   Same series of questions.  This is going to be yes
6  or no whether you're offering an opinion about a certain
7  topic.
8         So are you offering an opinion about whether the
9  Coalition on Homelessness has standing to bring this
10 lawsuit?
11        MS. KASHYAP:  Objection.  Calls for a legal
12 conclusion.
13        THE WITNESS:  No.  In the opinion, I understand
14 that was asked related to this and involved empirical
15 questions around the nature of -- the shifting nature of
16 homelessness, of which I do have expertise and am providing
17 an opinion on.
18   Q.   (BY MS. MURPHY:) Are you offering an opinion about
19 whether any of the individual plaintiffs have standing to
20 bring this lawsuit?
21        MS. KASHYAP:  Objection.  Calls for a legal
22 conclusion.
23        THE WITNESS:  Again, I'm not intending to draw
24 legal conclusions.  I'm looking at the plaintiffs' case
25 along with the existing research in my field of study to

```
 1  draw conclusions that should help inform the Court.
 2       Q.   (BY MS. MURPHY:)  Are you offering any opinions in
 3  this case about whether Coalition is a membership
 4  organization?
 5       A.   Can you repeat that?
 6       Q.   Sure.  Are you offering any opinions in this case
 7  about whether the Coalition on Homelessness is a membership
 8  organization?
 9       A.   No.  That's not in my report.
10       Q.   Are you offering any opinions in this case about
11  whether a person who previously submitted a declaration was
12  truthful in their declaration?
13       A.   No.
14       Q.   Are you offering any opinions in this case about
15  whether any of the statements you relied on in coming to
16  your conclusions were truthful?
17            MS. KASHYAP:  Objection.  Vague.
18            THE WITNESS:  Yeah, I guess -- I guess -- could
19  you repeat or clarify?
20       Q.   (BY MS. MURPHY:)  Sure.  Let me try repeating, and
21  then if you don't understand, let me know what part you
22  don't understand.
23            Are you offering any opinions about whether any of
24  the statements you relied on in coming to your conclusions
25  in this case were truthful?
```

1  Q. Are you offering any opinion in this case about
2  whether or not San Francisco has violated any law?
3  A. My opinions are looking specifically at how --
4  well, in some opinions, looking at the ways of which the DPW
5  is following its bag and tag procedures, so not specific law
6  in that case.
7  Q. In other cases you have offered opinions about
8  whether or not a government entity was violating the law; is
9  that fair?
10 A. I don't recall in the -- again, in the -- I don't
11 recall specifically in the Berry verse Hennepin. I know,
12 again, I was looking -- I was tasked with looking at
13 following procedures stated in various guidelines of various
14 city, county, and federal guidelines, yes.
15 Q. I think I understand. So is it fair to say, as
16 you sit here today, you don't recall one way or the other if
17 in a different case you offered opinions about whether or
18 not a government entity was violating the law; is that fair?
19         MS. KASHYAP: Objection.
20            Go ahead.
21         THE WITNESS: Yes.
22 Q. (BY MS. MURPHY:) But in this case, your opinions
23 are limited to whether or not San Francisco followed its own
24 bag and tag policy, not whether or not the same conduct was
25 unlawful; is that fair?

```
 1   relationship beyond the, you know, individual cases and
 2   stories that we had been hearing and looking at that level
 3   of between over 5 percent of the total population of
 4   interest, which in this case was unsheltered population, was
 5   our goal.
 6        Q.   (BY MS. MURPHY:) So your goal to have a
 7   statistically significant sample was to get your survey
 8   population to include at least 5 percent of San Francisco's
 9   unsheltered population; is that fair?
10             MS. KASHYAP:  Objection.  Misstates prior
11   testimony.
12              Go ahead.
13             THE WITNESS:  Yeah.  We were not looking for a
14   statistically significant -- a level of statistical
15   significance.
16        Q.   (BY MS. MURPHY:) That's helpful.  So the survey
17   that you relied on in coming to your conclusions is not
18   statistically significant?
19             MS. KASHYAP:  Objection.  Form.  Misstates prior
20   testimony.
21             THE WITNESS:  It's just not something we were
22   evaluating in this case.  We're not making claims -- I mean,
23   we're not running regressions where we would use a model of
24   statistical significance in this way.
25        Q.   (BY MS. MURPHY:) Let me try to rephrase this one
```

1                VIDEOGRAPHER:  This is media No. 3.  We are on the
2       record at 1:22.
3            Q.   (BY MS. MURPHY:) Welcome back, Dr. Herring.
4            A.   Hello.
5            Q.   Before the break I asked you a question about
6       whether the pie charts in your report or the separate CSV
7       files were a better place to look at the specific questions
8       the survey participants were asked.
9                Do you have a sense between those two sources
10      which is the one you'd like to use?
11           A.   Upon my review, the ones in the pie chart are, as
12      I recall, the questions that we asked.
13           Q.   So let's take a look, then, at the pie chart which
14      I think begins on page 79 of your report.  And let me know
15      when you get there.
16           A.   Great.  I'm here.
17           Q.   For all of the questions you asked the survey
18      participants, are there any in your opinion that, if true,
19      show a confirmed violation of the bag and tag policy?
20               MS. KASHYAP:  Objection.  Form.
21                Go ahead.
22               THE WITNESS:  Any single question alone would not
23      show a violation of the bag and tag policy.
24           Q.   (BY MS. MURPHY:) Are there any combination of
25      questions in your survey that, if true, together show a

```
 1   confirmed violation of the bag and tag policy?
 2            MS. KASHYAP:  Same objection.
 3            THE WITNESS:  No.
 4       Q.   (BY MS. MURPHY:) Is it fair to say that for some
 5   of these questions they're identical except for the
 6   timeframe?  Meaning you ask the same question for a
 7   six-month period and the same question for a two-year
 8   period?
 9       A.   As written, yes.  But, you know, people who were
10   asked and answered affirmatively to six months were not
11   asked about the two years.
12       Q.   I see.  So if someone said that they an experience
13   of property destruction within the past six months, you
14   didn't also ask whether they had had any in the past two
15   years?
16       A.   In general, if they had experienced -- there was
17   another skip question down below.  One second.
18            So if they had had belongings taken in the
19   last six months, they were asked no questions about their
20   experiences in the past two years.  So that's one way that
21   it worked, to answer your question.
22       Q.   That's helpful.  So to make sure I'm tracking, the
23   reverse of that would mean if somebody had not had a
24   reported property destruction in the past six months, then
25   they were asked about the two-year period; is that right?
```

```
 1  engages in widespread property destruction; is that fair?
 2      A.   Yes.
 3      Q.   What do you mean by widespread?
 4      A.   Widespread in the sense that large portions of San
 5  Francisco's homeless population have lost property at the
 6  hands of City employees as was shown in the -- so that's
 7  what I mean there.  And then -- yeah.
 8      Q.   Is there a quantitative line for you between when
 9  property destruction is widespread versus occurring but not
10  widespread?
11           MS. KASHYAP:  Objection.  Form.  Lacks foundation.
12           THE WITNESS:  I'm -- I imagine I would use a
13  different term, a different threshold, but I'm comfortable
14  using widespread due to the survey responses of my own study
15  and other studies that the other study referenced.
16      Q.   (BY MS. MURPHY:) My question is a little
17  different, which is for you, as you use the word
18  "widespread" in your report, what's the metric where there
19  would be some property destruction but it doesn't meet your
20  threshold of widespread?
21           MS. KASHYAP:  Objection.  Lacks foundation.  Form.
22           THE WITNESS:  I don't know of an exact cutoff, but
23  I would certainly use widespread to discuss -- to describe
24  the findings in the survey here.
25      Q.   (BY MS. MURPHY:) What I'm trying to understand is
```

```
 1  where the cutoff point would be for you.  So as you sit here
 2  today, do you have an opinion about the cutoff point between
 3  where property destruction is something you would consider
 4  widespread and where property destruction exists but you
 5  would not consider it widespread?
 6           MS. KASHYAP:  Objection.  Lacks foundation.
 7  Objection.  Form.
 8           Go ahead.
 9           THE WITNESS:  I haven't -- yeah.  I don't know
10  where I would draw that line.
11      Q.   (BY MS. MURPHY:) Is it your opinion that all of
12  the what you're calling widespread property destruction
13  you're identifying in San Francisco violated the bag and tag
14  policy?
15           MS. KASHYAP:  Objection.  Form.
16           Go ahead.
17           THE WITNESS:  In this section, the opinion is
18  looking at the widespread level of property destruction
19  and -- which -- and then looking, you know, at the bag and
20  tag data to see whether this, you know, challenges or aligns
21  with survey data and also to look at how or if the bag and
22  tag volume in relation to individuals and structures has
23  significantly changed over time.
24      Q.   (BY MS. MURPHY:) So as you sit here today, do you
25  have an opinion about what you're calling the widespread
```

```
 1   property destruction in San Francisco if all of that
 2   destruction was done in violation of the bag and tag policy?
 3            MS. KASHYAP:  Objection.  Form.
 4            THE WITNESS:  I mean, the bag and tag policy, as
 5   you know, stated it's designed to prevent the loss of
 6   people's belongings which they wish to keep and as in line
 7   with the HSOC policy, which, you know, in their
 8   presentations and also the federal guidelines link, note the
 9   negative effects of the property destruction.  And so if the
10   bag and tag policy's goals are the safeguarding and storing
11   of belongings, you know, that is not being carried out as
12   such.
13       Q.   (BY MS. MURPHY:) I don't mean to be rude, but do
14   you remember the question I asked?
15       A.   No.  I'm just -- can you repeat the question?
16       Q.   Yeah.  Let me try this one again.
17            As you sit here today, do you have an opinion one
18   way or the other if all of the property destruction that
19   you're calling widespread property destruction was done in
20   violation of the bag and tag policy?
21            MS. KASHYAP:  Same objection.
22            THE WITNESS:  Okay.  Not all of it, but a portion
23   of it.
24       Q.   (BY MS. MURPHY:) And do you have a percentage of
25   the property destruction that you're observing in your
```

```
 1   report you believe was done in violation of the bag and tag
 2   policy as compared to consistent with the bag and tag
 3   policy?
 4           MS. KASHYAP:  Objection.  Form.
 5           THE WITNESS:  No.  That would be asking me to
 6   guess, and you told me not to do that.
 7       Q.   (BY MS. MURPHY:) Thank you.  I appreciate you
 8   flagging the guess.
 9           And same opinion, the first sentence under the
10   summary says, "San Francisco agencies require its employees
11   to allow unhoused individuals to take with them belongings
12   they wish to keep."  Do you see that?
13       A.   Yes.
14       Q.   You agree that that's not true in all
15   circumstances.  Right?
16       A.   Yes.
17       Q.   So there are circumstances where, even if a person
18   wants to keep items, the bag and tag policy empowers DPW to
19   discard it?
20       A.   If the person is not there, yes.
21       Q.   So are the opinions in your report based on a
22   belief that DPW cannot discard items a person wishes to keep
23   when that person is present?
24           MS. KASHYAP:  Objection.  Form.  Misstates prior
25   testimony.
```

1   initial declaration, and along with these high numbers of
2   people reporting having belongings taken, then I might say
3   that this suggests that, you know, we are -- they are bag
4   and tagging and people aren't retrieving it.  But that is
5   not what I found.  I did not find a -- I saw a similar
6   disparity across this period in these numbers.
7           So that did not challenge the findings that I had
8   in the surveys that I was looking to possibly, you know,
9   contest or see how it would align with these other analyses.
10       Q.   (BY MS. MURPHY:) Do you agree that there are
11  circumstances where a low number of bag and tags could
12  indicate that DPW is following the bag and tag policy?
13       A.   Yes.
14           MS. KASHYAP:  Objection.  Form.
15              Sorry.  Go ahead.
16       Q.   (BY MS. MURPHY:) For example, if campers are given
17  a reasonable amount of time to leave, they will take the
18  items they want with them, and so there will be fewer items
19  for DPW to bag and tag.  Right?
20           MS. KASHYAP:  Objection.  Incomplete hypothetical.
21  Form.
22              Go ahead.
23           THE WITNESS:  Yes.  If people were given adequate
24  time to leave and proper notice ahead of time, then there
25  would be a low number of bag and tags.

```
 1              MS. KASHYAP:  Objection.  Lacks foundation and
 2    misstates prior testimony.  Form.
 3              THE WITNESS:  Can you repeat that?
 4         Q.   (BY MS. MURPHY:) Yeah.  So is it your opinion that
 5    the portion of bag and tags that are police driven suggests
 6    a violation of the bag and tag policy?
 7              MS. KASHYAP:  Objection.  Misstates prior
 8    testimony.
 9              THE WITNESS:  I'm sorry.  I'm -- the -- the --
10    the -- well, I could explain the point of this.  The -- does
11    the percentage of those that are PD pickup, does that
12    indicate a violation of the bag and tag policy?  No.
13         Q.   (BY MS. MURPHY:) Do you have any opinion about the
14    percent -- the maximum percentage of bag and tags that can
15    derive from police encounters for you to believe there is no
16    widespread violation of the bag and tag policy?
17              MS. KASHYAP:  Objection to form.  Lacks
18    foundation.  Misstates prior testimony.
19              THE WITNESS:  No.  I mean, the goal -- yeah.  The
20    goal of this analysis is not to show a percent of -- to show
21    that even if it was a hundred percent police that it would
22    violate that.  It's just to show what percentage of the bag
23    and tags are occurring at DPW operations.
24         Q.   (BY MS. MURPHY:) As you sit here today, you have
25    no opinion on the maximum threshold for the number of bag
```

1  opinion about whether a specific individual is likely to
2  experience unsheltered homelessness in the future you'd need
3  information about that person in particular rather than just
4  generalized population information?
5          MS. KASHYAP:  Objection.  Form.
6          THE WITNESS:  I think you can, you know, look at
7  the likelihood of that being greater or less depending on
8  broader population data and other research, which can form
9  the likelihood of that.  But being able to determine with a
10 hundred percent certainty whether that specific individual
11 will become homeless again or not, no.  That evidence will
12 not be able with certainty to, you know, predict that.
13      Q.  (BY MS. MURPHY:) Are you offering an opinion in
14 this case about another individual plaintiff in particular
15 is likely to experience unsheltered homelessness again in
16 San Francisco?
17         MS. KASHYAP:  Objection.  Form.
18         THE WITNESS:  I'm only speaking to the likelihood
19 of that experience.
20      Q.  (BY MS. MURPHY:) But is your opinion of the
21 likelihood of that experience based at all on the particular
22 circumstances of an individual plaintiff?
23      A.  I mean, they're based on their current status,
24 whether they are sheltered in transitional housing or in
25 that permanent sort of housing.  Of course, there are

```
 1    further differences within those categories of individuals
 2    that can also influence it.
 3              But the broad -- broadest based data coming from
 4    the general population is also often an indication of that
 5    likelihood.
 6         Q.   Do you know what kind of housing Sarah Cronk has
 7    today?
 8         A.   This very day, no.
 9         Q.   Do you know what kind of housing she had at any
10    point in 2025?
11         A.   In 2025?  No.
12         Q.   Do you know what kind of housing Joshua Donohoe
13    had at any point in 2025?
14         A.   No, not in 2025.
15         Q.   Do you know what kind of housing Toro Castano had
16    at any point in 2025?
17         A.   Not in 2025, no.
18         Q.   Do you know what kind of housing David Martinez
19    had at any point in 2025?
20         A.   No, not in 2025.
21         Q.   Do you know what kind of housing Melody ▓▓▓▓ had
22    at any point in 2025?
23         A.   No.
24         Q.   Do you know what kind of housing Todd Bryant had
25    at any point in 2025?
```

```
 1   STATE OF ARIZONA  ) ss.
 2   COUNTY OF PIMA    )
 3              I, the undersigned, a Certified Shorthand
 4   Reporter of the State of California, do hereby certify:
 5              That the foregoing proceedings were taken before
 6   me via videoconferencing at the time and place herein set
 7   forth; that any witnesses in the foregoing proceedings,
 8   prior to testifying, were duly sworn; that a verbatim record
 9   of the proceedings was made by me using machine shorthand
10   which was thereafter transcribed under my direction; that
11   the foregoing transcript is a true record of the testimony
12   given.
13              I further certify I am neither financially
14   interested in the action nor a relative or employee of any
15   attorney or party to this action.
16              IN WITNESS WHEREOF, I have this date subscribed my
17   name.
18              Dated:  April 16, 2025.
19   Read and sign was:
20   __X__ Requested   ____ Waived   ____ Not Requested
21
22
23
24                      JOHN FAHRENWALD CA CSR 14369
25                      STATE OF CALIFORNIA
```