## REDACTED

**EXHIBIT 90**

**TO**

**DECLARATION OF STEVEN MILLS IN SUPPORT OF DEFENDANTS'
REPLY TO PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY
JUDGMENT**

**DOCUMENT SEALED PURSUANT TO ECF NO. 509**



**Carla Short, Director** | Director's Office

carla.short@sfdpw.org | T. 628.271.3078 | 49 South Van Ness Ave. Suite 1600, San Francisco, CA 94103

**SENT VIA CERTIFIED MAIL**

January 11, 2025



**Class: 7514 General Laborer**
**SFPW Bureau of Street and Environmental Services**
**Union: Laborers Local 261**

## Re: NOTICE OF DISMISSAL FROM PERMANENT CIVIL SERVICE POSITION

Dear

By receipt of this letter, you are notified that effective close of business Saturday, January 11, 2025, you are dismissed from your employment as a Permanent Civil Service ("PCS") 7514 General Laborer with San Francisco Public Works ("PW or Department"), Bureau of Street Environmental Services ("BSES").

A *Skelly* meeting was held on December 12, 2024, to discuss your proposed dismissal. You attended the *Skelly* meeting with your union representative, Theresa Foglio-Ramirez, Laborers Union Local 261 Field Representative. Also present at the *Skelly* were Vito Saccheri, Senior Employee & Labor Relations Analyst, San Francisco Public Works, and Jesse Franklin, Senior Employee & Labor Relations Analyst, San Francisco Public Works.

Enclosed is a copy of the Skelly officer's recommendation stating that you should be dismissed from your employment. After carefully reviewing all the information and materials in this matter, I concur with the Skelly officer's recommendation.

All City property issued to you, including but not limited to your City badge and any City-issued keys and equipment, must be immediately returned to Mark Roumbanis, Assistant Superintendent, BSES.

1. Any accrued vacation pay you may have remaining will be paid out to you within 30 days of the last day of your employment.

Daniel Lurie, Mayor | Carla Short, Director | sfpublicworks.org | @sfpublicworks

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY          CCSF-COH_437249

If you have health benefits questions, please call Health Services at (628) 652-4700 or visit their website at https://sfhss.org. If you have San Francisco Employees' Retirement System (SFERS) or Deferred Compensation questions, please call SFERS Member Services at (415) 487-7000 or visit their website at https://mysfers.org.

The City's Employee Assistance Program (EAP) is available to former employees, up to 30 days past the former employee's separation date. Attached is the EAP brochure.

If you have any questions, please contact Vito Saccheri, Senior Employee and Labor Relations Analyst, San Francisco Department of Public Works, at (415) 518-4673 or via email at vito.saccheri@sfdpw.org.

Sincerely,

073CF73A4EA6486

Carla Short
Director San Francisco Public Works

Enclosures:

(A) Skelly officer recommendation - ten (10) pages,
(B) Separation report - two (2) pages,
(C) Notice of future restrictions – three (3) pages,
(D) EAP Brochure – two (2) pages

cc:     DiJaida Durden, Deputy Director of Operations, San Francisco Public Works*
        Karen Hill, Director of Human Resources, San Francisco Public Works*
        Christine Cayabyab, Manager, Employee and Labor Relations, San Francisco Public Works*
        Mark Roumbanis, Assistant Superintendent, Street Environmental Services, San Francisco Public Works*
        Kenneth Bruce, Assistant Superintendent, Street Environmental Services, San Francisco Public Works*
        Personnel File*

*Electronic Copy Only

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

# EXHIBIT A

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



**Human Resources**

dpw-hr@sfdpw.org | T. 628.271.3200 | 49 South Van Ness Ave. Suite 1600, San Francisco, CA 94103

# Memorandum

DATE:       January 9, 2024

TO:         Carla Short, Director, San Francisco Public Works

THROUGH:    Christine Cayabyab, Employee and Labor Relations Manager, San Francisco
            Public Works Human Resources

FROM:       Jesse Franklin, Senior Employee and Labor Relations Analyst, Department of
            Public Works Human Resources

SUBJECT:    *Skelly* Meeting Report and Recommendation Regarding the Proposed Dismissal
            of

---

The Department of Public Works (PW or Department) has proposed that Bernard O. Sices
(Sices), a classification 7514 General Laborer with the Bureau of Street Environmental Services
("BSES"), be dismissed from his Permanent Civil Service ("PCS") position based on the
following charges:

> 1. Violation of the Employee Handbook Policy Regarding the Treatment of Co-
>    Workers and Members of the Public
> 2. Violation of the City and County of San Francisco Equitable, Fair, and Respectful
>    Workplace Policy
> 3. Violation of the Citywide Vehicle Use Policy
> 4. Dishonesty
> 5. Violation of the Bag & Tag Standard Operating Procedure
> 6. Inattention to Duty

**The City and County of San Francisco Employee Handbook Policy Regarding the
Treatment of Co-Workers and Members of the Public** states:

*City policy requires employees to treat co-workers and members of the public with courtesy and
respect. City employees and managers are responsible for maintaining a safe and productive
workplace which is free from inappropriate workplace behavior.*

**The City and County of San Francisco Equitable, Fair, and Respectful Workplace Policy** in
the relevant part states:

London N. Breed, Mayor | Carla Short, Director | sfpublicworks.org | @sfpublicworks

CCSF-COH_437252

*Skelly* Recommendation
Page **2** of **10**

*The City and County of San Francisco (City) is committed to promoting and maintaining a safe and healthy working environment where every individual is treated with civility, dignity, and respect. To this end, it is the policy of the City to provide a workplace where each employee has the right to work in a positive, professional, and mutually respectful atmosphere free from Disrespectful Behavior (defined below). This Equitable, Fair and Respectful Workplace (Respect) Policy sets forth many of the City's values, supplements and is in addition to the City's current policies prohibiting discrimination, harassment and retaliation and prohibiting violence and threats of violence.*

*All City employees and City officers play a role in contributing to a truly welcoming, safe, and inclusive working environment that encourages mutual respect and promotes civil and collaborative relationships with the public and among staff, at all levels. The diversity of our employees – the wide range of backgrounds, ideas and lived experiences they bring to City employment – enriches our workplace and enhances our work. To promote and sustain a workplace where all employees and members of the public are treated with respect and dignity, and where employees feel welcomed and valued for who they are and what they can contribute, each City employee is expected to abide by the values and standards below and in this Respect Policy generally of interpersonal behavior, communication, and professionalism:*

- *Work honestly, earnestly, collegially and collaboratively with employees and others;*
- *Listen to and value the views and opinions of others, particularly when they differ from your own;*
- *Abide by all rules, regulations, policies, and laws and promptly bring concerns about potential violations to your supervisor or departmental Human Resources personnel.*

*All City employees and City officers have a responsibility to set a positive example and must refrain from engaging in Disrespectful Behavior, whether deliberate or unintentional. The City will not tolerate Disrespectful Behavior in any City workplace and seeks to intervene at the earliest sign or stage of Disrespectful Behavior to correct that misconduct and prevent its reoccurrence. Any employee or officer who violates this policy will be subject to disciplinary actions up to and including termination.*

*Disrespectful Behavior is defined as discourteous, rude, impolite, or offensive words, gestures or other behavior that may devalue and undermine a person and their dignity or self-esteem or creates an intimidating, hostile, abusive or offensive environment. Examples of Disrespectful Behavior can include, but are not limited to, the following:*

*Communication is nuanced and Interpersonal conflict is a normal part of work and life. Maintaining a respectful workplace relies on effective and respectful communication, patience, professionalism and understanding. All City employees and City officers shall sign an acknowledgement of receipt and compliance with this Respect Policy.*

**The City and County of San Francisco Citywide Vehicle Use Policy**, in relevant part states:

*Operating an organizational vehicle is a privilege. All drivers will be responsible and accountable for the following:*

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    CCSF-COH_437253

3. *Operate motor vehicles in a safe manner at all times.*
4. *Comply with all applicable federal, state, and local laws and regulations.*

A *Skelly* meeting was held on Thursday December 12, 2024, to review the charges against ▮▮▮▮
The following persons were present at this meeting:

- Vito Saccheri, Senior ELR Analyst, Public Works
- ▮▮▮▮▮▮▮▮, 7514 General Laborer, Public Works
- Theresa Foglio-Ramirez, Business Agent, Laborers Local, 261
- Jesse Franklin, *Skelly* Officer

## Background and Basis for Proposed Dismissal

On August 23, 2024, the Department received a Whistleblower Complaint from the Office of the Controller. The complaint alleged that two PW employees, later identifying one of them as being ▮▮▮▮▮▮ 7514 General Laborer, interfered with emergency personnel responding to an overdose situation on Jessie Street. The complaint alleged that you delayed moving your City assigned vehicle to allow the ambulance to reach the overdose victim in the alley and render lifesaving aid.

On September 19, 2024, PW Employee and Labor Relations Division ("ELR") was notified of a video posted to social media that showed PW employees engaging in an alarming way with members of the public. The video was posted to the X platform by user @war24182236 on September 18, 2024, at 2:48 PM PT. ELR learned that one of the employees captured in the video was ▮▮▮▮, 7514 General Laborer. In the video, PW employees were seen confiscating items from the street and screaming at members of the public in a hostile and aggressive manner.

On November 8, 2024, the Department issued ▮▮ the Notice of Intent to Dismiss and *Skelly* Meeting (Notice). The Notice directed ▮▮ to attend a *Skelly* meeting schedule for November 20, 2024. At the request of the Union, the *Skelly* was then rescheduled to December 12, 2024.

The in-person *Skelly* meeting was conducted at 10 a.m. in the Public Works offices located at 49 South Van Ness.

## Employee Response to the Charges

▮▮▮ responses were captured verbatim.

## Violation of the City and County of San Francisco Employee Handbook Policy Regarding the Treatment of Coworkers and Members of the Public

"*It's a good question. I have respect for the employees and the City. I take pride in working for the City. My intention was never to be disrespectful to coworkers or the people that live here. I need to be on my best behavior at all time. I am not perfect but when I am on the clock, I need to do the best I can because they are watching.*"

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Docusign Envelope ID: 900556CE-5BA4-4BC4-905F-78959AAC4506
Case 4:22-cv-05502-DMR     Document 521-39     Filed 10/20/25     Page 8 of 74

*Skelly* Recommendation
Page **4** of **10**

### Violation of the City and county of San Francisco Equitable, Fair, and Respectful Workplace Policy

During the *Skelly* meeting, [REDACTED] offered the following statement regarding the allegation that he violated the City and County of San Francisco's Equitable, Fair, and Respectful Workplace Policy:

"*The policy is in place for all of us. One thing that is not clear is the passing of information in the training. We rarely get training about this. It's easy to give someone a paper and say read it. It would be helpful to get real training on how to treat the homeless, mental health issues, or substance issues. The real training comes in the field when we aren't even trained to handle the situation when it comes up.*"

This policy, along with the Policy Regarding the Treatment of Coworkers and Members of the Public cover some of the same ground, with a couple of distinctions.

### Violation of the City and County of San Francisco Citywide Vehicle Use Policy

"*Once again, these trucks are city trucks. We know we have to take our test at the job. It tells us how to drive in SF, leave a way out, how to pull in mirrors, put cones out. Beacon on when working. We drive for a living.*

*I have pictures showing I am in the alley in SF. I have pictures showing where my truck was at in the alley, surrounded by unhoused people, with another vehicle in front of me. We use safety first before anything. That was one of the things that registered to me. If I move and hit the unhoused person than me not moving the truck. Every time we enter an alley 40-50 people doing what they were doing. I didn't see that my truck needed to be moved where it was parked at. Even if I could move it, I could not move it.*

*Look at the picture. That light right there is the first response there. I couldn't pull up because of the truck, and I couldn't go to the left because of the unhoused. I couldn't go right because of the car.*"

### Dishonesty

"*I was asked by the gentleman (Saccheri) over here in the Weingarten have I ever had a disciplinary action. I have never had anything before. I did have an incident where an unhoused person spit on me, I grabbed him, the PD asked me if I wanted to press charges. I was never reprimanded, given a counseling, nothing. I wasn't being dishonest. I was never given anything in my file that said what happened.*"

### Violation of the City and County of San Francisco Bag and Tag Operating Procedure

"*Well, our policy for our crew is that we don't bag and tag. When we are sent to a location, we are only dispatched to clean and disinfect. We were told to go there to clean, remove debris, and was. If it were to be bagged and tagged it would have been another crew, not us.*"

### Inattention to Duty

                                                CCSF-COH_437255

█ asked for clarification from Saccheri about why he was charged with Inattention to Duty. Saccheri explained that the bag and tag allow for people to gather their items and given time to gather their items. They needed an appropriate amount of time to do that.

█ provided the following response:

"*In the video and heard me stating to them, that I have already asked you guys to get your personal belongings. The tarp that was taken down was soiled. It had dog urine and dog feces. The superintendent parks there and asked us to go there to clean it up. It had been there all week. Take pictures and bring it back. We don't operate like that. We go talk to the people, give them the bags, don't worry about the garbage. Some of the guys help. We don't go down there to mistreat these people. We call them homeless and unhoused; they are a part of this City now. I have only worked in PW since 2013. I have only done this work. My intention is to never go out there to treat someone poorly.*"

Foglio-Ramirez added, "*We have an annual shift bid. Even when* █ *would bid out, they ask him to come back and work these shifts and this work. Using his size and his race to help. They always ask him to give up his bided position to work in these units.*"

In addition to the responses captured here, █ through the Union, submitted several photographs, certificates, and a news article he was featured in.

The photographs show past text messages between █ and SFPD officers who requested his assistance with homeless encampment clean-up. The certificates █ provided show a successful completion of an apprenticeship craft labor program from 2016, and a certificate that █ received the "Montoya Award" from Local 261 in 2019. Lastly, the article █ provided pictures from is from a 2019 San Francisco Chronicle article titled "S.F. faces increasing pressure to clean sidewalks as city grows."

## Findings and Recommendations

At issue are two sets of incidents that occurred on different days and featured alleged violations of policies on each day. The first incident was on August 23, 2024, and centered on an unhoused member of the public who seemed to be having an emergency which required medical attention.

The second incident occurred on September 19, 2024, where it was alleged that PW employees where combative and disrespectful when attempting to clear and clean an encampment located on Jessie Street in San Francisco. The Department obtained video of the interaction because it was posted to X, formerly Twitter.

### A. Violation of the City and County of San Francisco Employee Handbook Policy Regarding the Treatment of Coworkers and Members of the Public

The Policy Regarding the Treatment of Co-workers and Members of the Public states:

"City policy requires employees to treat co-workers and members of the public with courtesy and respect. City employees and managers are responsible for maintaining a safe and productive workplace which is free from inappropriate workplace behavior."

### 1. Jessie Street August 23, 2024

████ claims that he has respect for the employees and the City, and that he never had the intention of being disrespectful to his coworkers or the people that live in the areas he services. Further, ████ acknowledged that he needs to maintain the standards set for City employees because they are so frequently filmed when problems arise.

During the *Skelly,* ████ did not directly deny saying anything to medical staff who were trying to intervene in the situation that was unfolding on Jessie Street on August 23rd. However, per the Investigatory Report provided by the Department in the *Skelly* packet, ████ has denied that a confrontation took place and that he said, "Let that motherfucker die."

Per the Investigatory Report, two interagency staff were present for the alleged confrontation. The person who claims to have been on the other end of ████ statement, "Let that motherfucker die", was the Assistant Director of the Baldwin Navigation Center who had been administering Cardiopulmonary Resuscitation on a member of the public at the time. The second party that was present was a King American paramedic who stated that, though he could not hear the words exchanged from his position, he could tell that a heated conflict was happening. Lastly, another DPW employee confirmed that a conflict had occurred that morning

Per the Investigatory Report, ████ denies ever engaging with any members of the public or medical personnel. According to ████ there was no commotion or verbal altercation between anyone that day. In ████ own words, "We are totally professionals. We are not going to jeopardize a job. I have seven (7) kids, an ex-wife, and a wife. It doesn't make sense to risk a job to do that. That's not how we operate at Public Works."

Three of the four people involved in this incident confirmed that a conflict occurred between PW employees and emergency medical staff who were trying to intervene to tend to someone in crisis. ████ who has a vested interest in avoiding disciplinary action, also has a motivation to minimize what occurred. On balance, the weight of the preponderance of the evidence shifts away from ████ who claimed nothing tense at all occurred that morning, and toward the parties who claimed a conflict occurred.

The matter then shifts from what was specifically said, to why a conflict would arise in the first place. The Policy Regarding the Treatment of Co-Workers and Members of the Public requires employees to treat co-workers and members of the public with courtesy and respect. City employees and managers are responsible for maintaining a safe and productive workplace which is free from inappropriate workplace behavior. I have established that ████ claims cannot be trusted, and that an argument occurred - an argument which was noticed by the other parties present. This argument fundamentally would be conducted with a lack of courtesy and respect and would neither be productive nor appropriate in the workplace.

## 2. Jessie Street September 19, 2024

During the *Skelly* meeting, ████ did not specifically address how he did or did not violate the Policy Regarding the Treatment of Coworkers and Members of the Public, instead he made a blanket statement about alleged violation, saying, "it's a good question. I have respect for the employees and the City. I take pride in working for the City. My intention was never to be disrespectful to coworkers or the people that live here. I need to be on my best behavior at all

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

time. I am not perfect but when I am on the clock, I need to do the best I can because they are watching."

In the video provided, [redacted] was filmed saying to a presumably unhoused member of the public, "Nope, nope, I got a job to do." Then later he can be seen yelling "All of this is garbage" and "let's get some chemicals down," while ripping a tarp that was attached to a chain link fence.

The Policy Regarding the Treatment of Coworkers and Members of the Public requires employees to treat everyone with courtesy and respect. The video shows [redacted] removing the tarp and kicking items into a pile while a man in an orange hoodie, and a woman in a blue jacket are actively trying to collect their belongings. The unhoused are certainly members of the public, and they should be treated with just as much respect and courtesy as any other person. Furthermore, due to their specific placement in society and the City of San Francisco, at minimum. they need to be given enough grace to collect their belongings.

Poignantly, the unhoused woman in the video says, "If you got all your shit taken from you, you'd feel the same way."

For these reasons, I find that [redacted] violated the City and County of San Francisco's Policy Regarding the Treatment of Coworkers and Members of the Public.

**B. Violation of the City and county of San Francisco Equitable, Fair, and Respectful Workplace Policy**

During the *Skelly* meeting, [redacted] offered the following statement regarding the allegation that he violated the City and County of San Francisco's Equitable, Fair, and Respectful Workplace when dealing with members of the public on both August 23, 2024, and September 18, 2024:

"The policy is in place for all of us. One thing that is not clear is the passing of information in the training. We rarely get training about this. It's easy to give someone a paper and say read it. It would be helpful to get real training on how to treat the homeless, mental health issues, or substance issues. The real training comes in the field when we aren't even trained to handle the situation when it comes up."

The Equitable, Fair, and Respectful Workplace Policy provides the following relevant passage regarding the expectations of City employees:

All City employees and City officers play a role in contributing to a truly welcoming, safe, and inclusive working environment that encourages mutual respect and promotes civil and collaborative relationships with the public and among staff, at all levels.

The policy goes on to further say:

Each City employee is expected to abide by the values and standards below and in this Respect Policy generally of interpersonal behavior, communication, and professionalism:

- Work honestly, earnestly, collegially and collaboratively with employees and others;
- Listen to and value the views and opinions of others, particularly when they differ from your own;

- Abide by all rules, regulations, policies, and laws and promptly bring concerns about potential violations to your supervisor or departmental Human Resources personnel.

Disrespectful Behavior is defined as discourteous, rude, impolite, or offensive words, gestures or other behavior that may devalue and undermine a person and their dignity or self-esteem or creates an intimidating, hostile, abusive or offensive environment. Examples of Disrespectful Behavior can include, but are not limited to, the following:

**Hostility**: yelling,  interpersonal hostility or spiteful conduct, that is deliberate or repeated and/or causes harm to the targeted person's or persons' mental or physical wellbeing, safety, or economic status. This includes physical intimidation, unwanted touching, or isolation;

**Belittling conduct**: name calling; playing "pranks" on a person; making fun of someone or telling jokes at their expense; taking, vandalizing, or otherwise damaging a person's personal or work property; and spreading false information or rumors about someone; seeking submission or misuse of power, authority, rank, status, or other privilege

During the *Skelly* meeting⬛⬛ did little to countervail the evidence that Saccheri submitted to support the allegations that⬛⬛ actions on both August 23, 2024, and September 18, 2024.

While⬛⬛ raised valid concerns about a lack of training of how to deal with the unhoused, it does not divorce him from responsibility for his actions.

### C. Violation of the City and County of San Francisco Citywide Vehicle Use Policy

### 1. Jessie Street August 23, 2024

The Citywide Vehicle Use Policy Appendix C provides the following the following relevant requirement:

"Comply with all applicable federal, state, and local laws and regulations."

Per the Department's Investigation, when the emergency situation began⬛⬛ was arguing with the Baldwin staff member, then when the ambulance arrived, Sices was outside of his truck cleaning and did not hurry back to his vehicle.

In the *Skelly* meeting,⬛⬛ offered this statement regarding the charge:

*"Once again, these trucks are city trucks. We know we have to take our test at the job. It tells us how to drive in SF, leave a way out, how to pull in mirrors, put cones out. Beacon on when working. We drive for a living.*

*I have pictures showing I am in the alley in SF. I have pictures showing where my truck was at in the alley, surrounded by unhoused people, with another vehicle in front of me. We use safety first before anything. That was one of the things that registered to me. If I move and hit the unhoused person than me not moving the truck. Every time we enter an alley 40-50 people doing what they were doing. I didn't see that my truck needed to be moved where it was parked at. Even if I could move it, I could not have moved it."*

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

The Investigation established that the King American Paramedics ambulance entered Jessie Street just after a few PW trucks entered. Per the King American Paramedics employee on-scene, they turned on their lights, sirens, and honked their horn to encourage the blocking PW vehicles to move. By █████ admission in his Weingarten, he was the lead vehicle. California Vehicle Code 21806 requires motorists shall yield the right-of-way and shall immediately drive to the right-hand edge or curb of the highway, clear of any intersection, and thereupon shall stop and remain stopped until the authorized emergency vehicle has passed.[1]

█████ statement that he could not move out of the ambulance's way due to the unhoused is not believable. Because the Citywide Vehicle Use requires all employees who drive a City vehicle to comply with all laws and regulations, and because █████ made no attempt to move his vehicle, not to pull forward so the ambulance could get closer to the emergency situation, and not to pull right so the ambulance could pull by, I find the Department's case that █████ violated the policy by attempting no action which would comport with the Vehicle Use Policies requirement to obey the laws of traffic. Further, █████ inaction speaks to a callousness toward the situation and the unhoused.

### D. Violation of the Bag and Tag Standard Operating Procedures

█████ response to the allegation of violating the Bag and Tag Policy is that his team is not responsible for bagging and tagging the eligible belongings of the unhoused. The Department included in the *Skelly* packet a copy of the Bag and Tag Policy document.

The Department has met its burden to show that █████ conduct violated the policy when, in the video from September 18, 2024, he can be seen ripping the tent down, in the personal space of the unhoused trying to gather their belongings, is shouting to put chemicals down, and is seen kicking items together into a pile.

█████ statements during the *Skelly* did nothing to countervail the Department's findings. As such, I find that █████ conduct on September 18, 2024, as shown in the video provided, grossly violated the Department's Bag and Tag policy.

### E. Dishonesty

█████ claimed to be unaware of being the subject of several Whistleblower complaints and there does not seem to be any record that he was made aware via a Weingarten or associated Written Reprimand or other discipline. I find that it is more than plausible that █████ was honest about not being aware and thus, I find that he was, more likely than not, not dishonest.

### F. Inattention to Duty

As a member of the San Francisco Department of Public Works, █████ has a duty to serve the public first and foremost above all other tasks, duties, and responsibilities assigned. And when completed any of them he is expected to perform this aligned with the Policy Regarding the Treatment of Coworkers and Members of the Public, the Equitable, Fair, and Respectful Workplace Policy, and the Citywide Vehicle Use Policy.

---

[1] Taken from www.leginfo.legislature.ca.gov

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

The way that ▇▇▇ conducted himself on August 23, 2024, when he argued with medical staff trying to potentially save a life speaks volumes about the type of person ▇▇▇ is. Whether it violated a policy or not, it is deplorable to treat anyone with such callous disdain. The unhoused are the most vulnerable citizens of our City, but they are also still who we serve. ▇▇▇ was callous and disrespectful to staff tying to help someone, he ignored CA law when he did not attempt in the slightest to allow emergency medical staff to rend potentially life-saving treatment, and he did not even try to get back in his vehicle or assist in any way.

▇▇▇ further displayed this same level of disdain when dealing with the homeless encampment on September 18, 2024. This time video evidence was captured which showed ▇▇▇ not allowing enough time for the homeless onsite to sufficiently gather their belongings before he bellies right up to their makeshift tent and begins tearing it down and yelling to get chemicals down. The video provided shows a man in an orange hoodie seemingly shocked about what is happening.

▇▇▇ conduct during the breadth of this investigation amounts to violations of each of the Policy Regarding the Treatment of Coworkers and Members of the Public, The City's Equitable, Fair, and Respectful Workplace Policy, and the Citywide Vehicle Use Policy, and the City's Bag and Tag Procedures Policy. Which in totality represents gross negligence and inattention to duty.

## Conclusion

The Department did not include any disciplinary history for ▇▇▇ in its *Skelly* packet. The basic tenets of progressive discipline are foundational to disciplining a permanent employee. However, there are cases which are so egregious or serious that they may require a Department to seek a more severe disciplinary outcome where progression is set aside.

The unhoused must be treated with the utmost dignity and respect, and certainly while they are actively in the process of having their possessions ripped down, kicked around, and thrown away. The policies ▇▇▇ violated on both August 23, 2024, and September 18, 2024, speak to a fundamental lack of compassion for the unhoused, who are still members of society, and citizens of San Francisco. The abhorrent callousness displayed by ▇▇▇ on both days meets the criteria for egregiousness and I find the Department has not violated progressive discipline on this basis. Any public servant has a fundamental duty to serve the public, regardless of station and circumstances.

Based on the information provided by the Department, and incorporating the responses provided by ▇▇▇ I find the Department has a reasonable basis for seeking to dismiss ▇▇▇ from his classification 7514 General Laborer position with the Bureau of Steet Environmental Services, for violations of the City and County of San Francisco Employee Handbook's Policy Regarding the Treatment of Coworkers and Members of the Public, violation of City of San Francisco's Equitable, Fair, and Respectful Workplace Policy, violation of the Citywide Vehicle Use Policy, and Inattention to duty. However, I do not find a basis for a charge of dishonesty. For and in consideration of the above, I support the Department's recommendation.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

# EXHIBIT B

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

City and County of San Francisco
Carol Isen
Human Resources Director

Department of Human Resources
*Connecting People with Purpose*
www.sfdhr.org

# SEPARATION REPORT

INSTRUCTIONS: Please complete the Separation Report to:

1. Document internal departmental processes. Please do not send to DHR.
2. Document that the employee separation is not a complete separation from City service, Separation Report must be completed by the sending department and submitted to the receiving department to be attached to the AP ESR.
3. To process a layoff. Please send to the DHR layoff coordinator.
4. To administer a settlement agreement involving the separation of the employee-submit documentation to your Client Services Representative. (Reference TER_RZA)*

Date of Request: January 10, 2025

Department Contact: Vito Saccheri Email: vito.saccheri@sfdpw.org Phone: (415) 518-4673

## SECTION I: PERSONAL AND JOB INFORMATION

Name (Last, First, M.I.): [redacted] Employee I.D: [redacted]

Job Code: 7514 Job Title: General Laborer

Position Number: [redacted] Hourly Rate: $43.0500 Step: 5 Effective Date: January 12, 2025

Empl. Class: PCS Work Schedule: Full-Time

Is the employee serving a probationary period at the time of the separation? ☐ Yes ☑ No

Is this a complete separation from City and County Service? ☑ Yes ☐ No

If no, continuing in:
Department Code: (Select One) Status:____ Job Code:____ Effective Date:____

Is employee granted leave pursuant to Civil Service Rule 120.31? ☐ Yes ☑ No

If no, is employee a transfer? ☑ No ☐ Yes, type of Transfer: (Select One)

## SECTION II: SEPARATION INFORMATION

☐ Resignation

☐ Satisfactory Services (TER_RSS) ☐ Unsatisfactory Services (TER_RUS) (Form DHR 1-13 must be on file)

By the appointee: I hereby freely and voluntarily resign from the above position. I request approval of this resignation as of the effective date with the full understanding that once approved, I may acquire another position in this class only as provided in the rules of the Civil Service Commission (see employee copy and CSC Rules 114&119).

Employee Signature Date

☐ Lay-off

☐ Involuntary Leave (PCS_LIL) ☐ Elective Involuntary Leave (PCS_EIL)

☐ Involuntary Lay-off (PCS_LIO) ☐ Voluntary Lay-off (PCS_LVO)

☐ (PV & EX Only): (Select One)

Reason for lay-off: (Select One)

Employee acknowledges receipt of the DHR information leaflet.

Employee Signature Date

# SEPARATION REPORT

DEPARTMENT USE ONLY

☑ **Termination**

☐ Settlement Agreement (TER_RZA)
*(Separation Report and Settlement Agreement must be forwarded to Client Services Rep.)

☐ Release from appointment: (Select One)

☐ Release from probation: (Select One)

☑ Dismissal: PCS (DPE) ▼

☐ Terminated for cause (TFC) (TPV,NCS, & Exempts only)

☐ Automatic Resignation (ARS)

☐ Never Reported to Work (DSH)

☐ Death of an employee (DEA)

☐ Other (Specify):_____

☐ **Retirement:** (Select One)

DEPARTMENT CERTIFICATION

*The Appointing Officer/Authorized Designee named below hereby certifies that the information provided on this Separation Report is accurate, complete, and in compliance with applicable CCSF rules and policies.*

DocuSigned by:

_[signature]_                                    628-271-3078
0F3CF73A4EA6486
Appointing Officer/Authorized Designee Signature                    Telephone

Name/Title: Carla Short, Director

Department Number: 90                    Department Name: San Francisco Public Works

Personnel File Forwarded?    ☐ Yes    ☑ No

Forwarded to:
Department:_____    Contact:_____

-------------------------------------------------------------------------------------------------------

DHR USE ONLY

Action Pending?    ☐ Yes    ☐ No

                                                628-271-3078
Analyst Name                                    Telephone

☐ SR Ref Number:_____    Holdover Canvass:_____

Reference Number used for layoff actions:_____

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    CCSF-COH_437264

# EXHIBIT C

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437265

**City and County of San Francisco**
Carol Isen
Human Resources Director



**Department of Human Resources**
*Connecting People with Purpose*
www.sfdhr.org

# NOTICE OF FUTURE EMPLOYMENT RESTRICTIONS

|  |  |  |  |
|---|---|---|---|
| ████████████ | | | January 11, 2025 |
| Employee Name | | | Mailing Date |
| ████████████ | | | Public Works/BSES |
| Street Address | | | Department/Division |
| ████████████ | | | PCS |
| City | State | Zip | Type of Appointment |

This notice is to inform you that a future employment restriction is being imposed along with your separation action, or with the action of automatic resignation, reported to the Department of Human Resources separating you from your position in Class 7514, Title General Laborer , effective 01/12/2025 , for the reasons outlined in the attached document(s).

The items checked below are the restrictions made by the department on your future employability for positions covered by the San Francisco civil service system:

| | |
|---|---|
| ☐ No Restrictions on Employment | ☑ Citywide    ☐ Department(s): _____ |
| ☐ Permanent Restriction | ☐ DOT/SAPP    ☐ Job Code(s): _____ |
| ☑ Conditional Restriction | ☐ Cancel Current Examination & Eligibility Status |

*Conditional restrictions may be lifted by proving you have satisfactorily met the following requirements:*

| Requirement Type | Description: | Level of Measurement: | Measurement Value: |
|---|---|---|---|
| CER: Certification | | | |
| EXP: Work Experience | Satisfactory work experiece | Years | 3 |
| LIC: Licensure | | | |
| SAP: Substance Abuse Program | | | |
| Other: | | | |

*In addition to the noted conditional restrictions, you are also restricted from specific attributes of a job class and/or department until you satisfactorily prove you meet the requirements to lift the restriction(s) as noted below:*

| Future Employment Restrictions | Description: | Level of Measurement: | Measurement Value: |
|---|---|---|---|
| 001: Vehicle/Heavy Machinery | | | |
| 002: Vulnerable Populations | | | |
| 003: Face to Face Contact w/Public | | | |
| 004: Contact w/Animals | | | |
| 005: Signing/Approving City Docs | | | |
| 006: Financial Instruments | | | |
| 007: Confidential/Privileged Information | | | |
| 008: IT Infrastructure | | | |
| 009: Means of Entry to Living Spaces | | | |
| 010: Pharmaceutical/Drug Inventory | | | |
| 011: CDC Defined Toxins | | | |
| 012: Weapons/Explosives | | | |
| 013: City Property Valued > $100 | | | |

One South Van Ness Avenue, 4ᵗʰ Floor ● San Francisco, CA 94103-5413 ● (415) 557-4800

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437266

| 014: Electronic Voting Systems | | |
|---|---|---|

You may request a hearing before the Civil Service Commission on your future employability with the City and County of San Francisco. The Civil Service Commission has the authority to remove restrictions or impose additional restrictions on your future employability. You may request a hearing for review of any restrictions on your future employability with the Civil Service Commission within __20__ calendar days of the mailing date of this notice or from the date of separation, whichever is later. The request must be submitted in writing to the Executive Officer, Civil Service Commission, 25 Van Ness Avenue, Suite 720, San Francisco, CA 94102 by __01/31/2025__. Requests received after this date will not be considered and your right to a hearing will be forfeited. If you do not request a hearing or file an appeal, the Human Resources Director will take final administrative action to confirm the restriction(s) in effect on the date of separation (Note: Future Employment Restriction(s) effective immediately).

If this matter is subject to the Code of Civil Procedures (CCP) Section 1094.5, the time by which judicial review must be sought is set forth in CCP Section 1094.6. (SEE BELOW)

---

**List #:** 901563    **Rank #:** 1.00    ☐ Pending    ✔ **Final**    **Status of Action**

**DSW:** 156129

**Emp Organization:** Laborers, Local 261

DocuSigned by:

*[signature]*

METHOD OF SERVICE:                          **SIGNATURE**

☑ **Hand Delivered**

Carla Short

**NAME**

☑ **Certified Mail**    7020 2450 0001 2152 6128    Director, San Francisco Public Works

**TITLE**

---

## INFORMATION FOR FORMER EMPLOYEE FOLLOWING SEPARATION

1. This document serves as an official notice of future employment restrictions imposed with the Notice of Automatic Resignation from Employment to the former employee or with a Separation Action that is subject to the provisions of a collective bargaining agreement, to the Civil Service Commission, and the Department of Human Resources.
2. A separated employee may request a hearing before the Civil Service Commission <u>only</u> for review of any restrictions on their future employability with the City and County of San Francisco.
3. Such appeals or requests for hearing must be in writing and received from the employee or the employee's representative by the date specified on this notice, or within twenty (20) calendar days from the mailing date of this notice, or the effective date of the separation, whichever is later. The request must be submitted to the Executive Officer, Civil Service Commission, 25 Van Ness Avenue, Suite 720, San Francisco, CA 94102.
4. An employee who requests a hearing within the time limits is entitled to:
    a. Representation by an attorney or authorized representative of the employee's own choice.
    b. Notification of date, time, and place of hearing at a reasonable time in advance.
    c. Inspection by the employee's attorney or authorized representative of those records and materials on file with the Civil Service Commission which relate to the restrictions on future employability.
5. Any interested party may request that the hearing be continued or postponed.
6. The decision of the Civil Service Commission is final and not subject to reconsideration.
7. In the absence of a timely request for a hearing as provided above, no later request for a hearing will be considered.

DHR 1-13e (Revised 10-2017)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY    CCSF-COH_437267

**DEPARTMENT INSTRUCTIONS FOR COMPLETING FORM DHR 1-13E**

- Refer to related provisions of appropriate collective bargaining agreements
- Refer to CSC Rule 122, Article VI: Absence From Duty Without Leave (Misc)
- Refer to CSC Rule 222, Article IV: Absence From Duty Without Leave (UPPD)
- Refer to CSC Rule 322, Article VI: Absence From Duty Without Leave (UPFD)

**Use this form when:**

The appointing officer or Human Resources Director has taken action of automatic resignation on an employee on the basis of abandonment of position, regardless of employment status; and/or the separation action is subject to the provisions of the collective bargaining agreement.

Complete the information on the top section of the form: Name, Address, City, State, Zip, Mailing Date, Department/Division, Type of Appointment, Type of Separation.

In the first paragraph of the notice, enter the Class Number, Title and effective date of the separation.

If there are no restrictions imposed with the separation, the box *"no restrictions on future employability,"* must be checked to indicate this action, and attach applicable documents, e.g., a settlement agreement.

Indicate the restrictions on future employability by checking the appropriate boxes. If the restrictions are conditional, you must complete the section on the requirements needed to lift the restrictions, including the level of measurement (entry, journey, etc.) and values (length of time in months, years, etc.) of the requirements.

If Future Employment Restrictions are included, complete that section including details on the requirements needed to lift the restrictions. Attach a copy of all separation-related letters and supporting documentation. Documentation must provide justification and the rationale for the imposed restrictions.

The separated employee may request a hearing for review of any restrictions on future employability. Indicate the date by which the appeal must be filed in the space provided. Consistent with the separation action, count twenty (20), or thirty (30), calendar days from the mailing date of the notice or the effective date of release, whichever is applicable. When counting the days, count the day after the mailing date as the first day.

Complete the information on the bottom section of the form: Rank, List#, DSW#, and Employee Organization. Check the method of service used and tracking # if applicable.

Indicate status of action:
- Select "Pending" if Notice of Future Employment Restrictions is subject to the provisions of a collective bargaining agreement
- Select "Final" if the status is not subject to the provisions of a collective bargaining agreement, or to update a previously reported "Pending" action.

Type in the name and title of the appointing officer. The appointing officer must sign the form.

Send the *original* Notice of Future Employment Restrictions along with the *original* Notice of Automatic Resignation from Employment (DHR 1-48a) to the employee. Make two sets of copies of the notices; send one set of *copy* to DHR - Client Services along with the *original* Separation Report (DHR Form 1-67); and retain the other set of *copy* in the Official Employee Personnel Folder.

<u>Reminder:</u> Imposed restrictions on future employability are effective immediately, and must be reported to DHR – Client Services concurrent with the departmental notice to separate the employee. This will enable timely and appropriate updates to DHR systems and other dependent programs, such as exams, adoptions of eligible lists, citywide recruitments, and certifications/referrals.

DHR 1-13e (Revised 10-2017)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

# EXHIBIT D

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437269

# **E**MPLOYEE **A**SSISTANCE **P**ROGRAM



## **EAP counselors are here for you, offering confidential, voluntary, free services to help support your emotional well-being.**

- Individual Counseling

- Couples Counseling

- Referrals

- Mediation

- Critical Incident | Disruptive Event Response

- Workshops, Brown Bag Seminars, Trainings

**Contact EAP for a consultation or to schedule an appointment**

**415-554-0610 or 800-795-2351**

**Monday – Friday 8:00am – 5:00pm**

1145 Market Street, Suite 100, easily accessible by public transportation

**SAN FRANCISCO**
**HEALTH SERVICE SYSTEM**
Better Every Day

**E**MPLOYEE **A**SSISTANCE **P**ROGRAM

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

# EAP counselors offer a variety of services

## COUNSELING

Emotional stress can affect your physical health, relationships, sense of well-being and work performance. Communication difficulties can interfere with relationships at work and at home.

**Getting help early can make a difference** – You or an immediate family member may use up to six (6) EAP counseling session per year. Call EAP for a consultation or to schedule an appointment for individual or couple counseling.

## REFERRALS

If you need additional services, EAP can provide guidance on accessing mental health care and substance abuse services offered through your health plan or a community resource. EAP can also provide resources for domestic violence, elder care, legal support and financial concerns.

## WORKSHOPS, BROWN BAG SEMINARS & TRAININGS

EAP offers opportunities to help increase your well-being and capabilities in the workplace. Ask your Wellness Champion or your manager about bringing a workshop, seminar or training to your work group.



## MEDIATION

Mediation is available to help you find resolution of interpersonal workplace problems that result from personality conflicts, communication difficulties and duty disagreements. Mediation must be arranged by your supervisor with an EAP counselor.

## CRITICAL INCIDENT | DISRUPTIVE EVENT RESPONSE

Even emotionally resilient people may experience strong reactions when exposed to a traumatic or disruptive event. EAP is here to help support you process such an event so you can return to your regular routine.

WE'RE HERE *For You*

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



**Carla Short, Director** | Director's Office

carla.short@sfdpw.org | T. 628.271.3078 | 49 South Van Ness Ave. Suite 1600, San Francisco, CA 94103

### AMENDED AND REISSUED

### SENT VIA CERTIFIED MAIL AND EMAIL

███████████████████████

November 08, 2024



**Re:  NOTICE OF PROPOSED DISMISSAL FROM EMPLOYMENT WITH THE
CITY AND COUNTY OF SAN FRANCISCO AND *SKELLY* NOTIFICATION**

**Class: 7514 General Laborer
SFPW Bureau of Street and Environmental Services
Union: Laborers Local 261**

Dear ███████████████

Please be advised that San Francisco Public Works ("PW" or "Department") has recommended
you be dismissed from your position as a Permanent Class 7514 General Laborer based on the
following charges:

(1) Violation of the Employee Handbook Policy Regarding the Treatment of Co-Workers
    and Members of the Public

(2) Violation of City and County of San Francisco's Equitable, Fair, and Respectful
    Workplace Policy.

(3) Violation of City-wide Vehicle use Policy

(4) Dishonesty

(5) Violation of the Bag & Tag Standard Operating Procedure

(6) Inattention to Duty

### 1.  BACKGROUND

You were hired by San Francisco Human Services Agency ("HSA") on May 3, 2013, as a
Temporary Exempt ("TEX") classification 9916 Public Service Aide. On December 21, 2013,
you assumed a TEX 9916 position with PW. On May 10, 2014, you assumed a TEX 7510
General Laborer Apprentice role with PW. On July 30, 2016, you were promoted to a TEX

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY    CCSF-COH_437272

classification 7514 General Laborer. On March 3, 2017, you were converted to Permanent Civil Service status("PCS") with the City and County of San Francsico ("CCSF"). On October 19, 2019, you were promoted to a Temporary Provisional ("TPV") 7215, General Laborer Supervisor 1 classification. On July 23, 2022, you were reverted to your PCS 7514, General Laborer classification. On February 26, 2023. You were again promoted to a Permanent Exempt ("PEX") 7215, General Laborer Supervisor 1 classification. On March 18, 2023, you were once again reverted to your 7514, General Laborer role.

On August 23, 2024, the Department received a Whistleblower Complaint from the Office of the Controller. The complaint alleged that two PW employees, later identifying one of them as being ████████ 7514 General Laborer, interfered with emergency personnel responding to an overdose situation on Jessie Street. The complaint alleged that you delayed moving your City assigned vehicle to allow the ambulance to reach the overdose victim in the alley and render lifesaving aid.

On September 19, 2024, PW Employee and Labor Relations Division ("ELR") was notified of a video posted to social media that showed PW employees engaging in an alarming way with members of the public. The video was posted to the X platform by user @war24182236 on September 18, 2024 at 2:48 PM PT. ELR learned that one of the employees captured in the video was ████████ 7514 General Laborer. In the video, PW employees were seen confiscating items from the street and screaming at members of the public in a hostile and aggressive manner.

Attached to this notice as Exhibit A and Exhibit B are copies of the investigative reports ("Reports") and supporting exhibits. The Reports and supporting exhibits detail the evidence supporting the charges.

## 2. *SKELLY* MEETING

The in-person *Skelly* meeting is scheduled for 9:00 AM on December 12, 2024, at 49 South Van Ness, Conference Room 1135, San Francisco, CA 94103 to address the charges. The meeting will provide you the opportunity to respond to the charges and proposed dismissal of employment. Please check in at the security desk upon arrival, and someone will escort you to the conference room

You have the right to representation at the meeting. If you wish to have representation, it is your responsibility to make the necessary arrangements. If you are unable to attend the Skelly meeting, you may have your union representative represent you at the meeting or you or your representative may submit a written response with any relevant written materials for the Skelly officer and the Department to consider before making a final decision. If you choose this option, you must submit your written materials to Vito Saccheri, Senior Employee and Labor Relations Analyst at 25 Van Ness, Suite 210, CA 94102 or vito.saccheri@sfdpw.org by no later than the close of business on December 10, 2024.

If you need to reschedule the Skelly meeting, you must inform Vito at (415) 518-4673 by close of business December 10, 2024. Please be advised that the Department allows for only one reschedule of the Skelly meeting. If you neither appear at the meeting nor submit any written materials, a decision will be made by the Department based on the enclosed information and materials and referred (if applicable) to the Appointing Officer for a final decision. If you have any questions on this matter, please contact Vito.

Sincerely,



Carla Short, Director
San Francisco Public Works

cc:    DiJaida Durden, Deputy Director for Operation, San Francisco Public Works*
       Karen Hill, Director of Human Resources, San Francisco Public Works*
       Christine Cayabyab, Manager, Employee and Labor Relations, San Francisco Public
       Works*
       Mark Roumbanis, Assistant Superintendent, Bureau of Street Environmental Services*
       Kenneth Bruce, Assistant Superintendent, Bureau of Street Environmental Services*


*Electronic Copy Only


## EXHIBITS

    **A.** Investigatory Report for August 23, 2024, Incident
    **B.** Investigatory Report for Member of the Public Video Incident
    **C.** Employee Handbook Policy Regarding the Treatment of Co-Workers and Members of
    the Public
    **D.** City's Equitable, Fair, and Respectful Workplace Policy
    **E.** Citywide-Vehicle-Use-Policy - Business Use Section
    **F.** California Vehicle Code Section 21806
    **G.** Department of Emergency Management Records Request
    **H.** Photos Provided by Andrew Young of the scene on August 23, 2024
    **I.** San Francsico Public Works Bag & Tag Standard Operating Procedures
    **J.** Incident Video from X Platform (Via Email)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

# EXHIBIT A

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437275



**Carla Short, Director** | Director's Office

carla.short@sfdpw.org | T. 628.271.3078 | 49 South Van Ness Ave. Suite 1600, San Francisco, CA 94103

## Investigative Report

TO:        Christine Cayabyab
           Manager, Employee and Labor Relations
           San Francisco Public Works

FROM:      Vito Saccheri
           Senior Labor and Employee Relations Analyst
           San Francisco Public Works

DATE:      November 25, 2024

SUBJECT:   Jessie Street Whistleblower Complaint

           7514 General Laborer, Bureau of Streets and Environmental Services

## I.  **ALLEGATION SUMMARY**

On August 23, 2024, Public Works ("PW") received a Whistleblower Complaint from the Office of the Controller. The complaint alleged that two PW employees, later identified as
7514 General Laborer, and                              7514 General Laborer, interfered with emergency personnel responding to an overdose situation on Jessie Street. The complaint alleged that                delayed moving their City assigned vehicles to allow the ambulance to reach the overdose victim in the alley and render lifesaving aid.

## II.  **ALLEGATIONS REQUIRING INVESTIGATION**

The allegations being investigated are very concerning, and do not reflect PW's values. Employees of PW are guided by clear codes of conducts, and all employees are expected to abide by them when interacting with one another, but especially when dealing with members of the public. Every employee is a representative of PW, and there is no tolerance for anyone representing PW in a negative light. If the allegations are substantiated, Sices will have violated the Employee Handbook Policy Regarding the Treatment of Co-Workers and Members of the Public, and the CCSF Equitable, Fair, and Respectful Workplace Policy.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    CCSF-COH_437276

## III.    **BACKGROUND**

███ was hired by San Francisco Human Services Agency ("HSA") on May 3, 2012, as a TEX classification 9916 Public Service Aide. On December 21, 2013, ███ assumed a TEX 9916 position with PW. On May 10, 2014, ███ assumed a TEX 7510 General Laborer Apprentice role with PW. On July 30, 2016, ███ was promoted to a TEX classification 7514 General Laborer. On March 3, 2017, ███ was converted to Permanent Civil Service status with CCSF. On October 19, 2019, ███ was promoted to a TPV 7215, General Laborer Supervisor 1 classification. On July 23, 2022, ███ was reverted to his PCS 7514, General Laborer classification. On February 26, 2023, ███ was again promoted to a Permanent Exempt ("PEX") 7215, General Laborer Supervisor 1 classification. On March 18, 2023, ███ was once again reverted to his 7514, General Laborer role.

### Previous Incidents

- 2020 Reprimand: Preventable Motor Vehicle Accident
- 2021 Whistleblower Complaint #587872s6
- 2021 EEO Incident
- 2022 Member of the Public Incident
- 2022 Whistleblower Complaint #qgj9U5Ph
- 2022 Whistleblower Complaint #w2PVF5hD

### The Investigation

The following interviews were conducted as part of the investigation on the allegations:

1. Dawn McKnight (Witness) – Assistant Director, Baldwin Navigation Center
2. Zachary Tibbits – San Francisco Fire Department
3. Peter Jacoby – Paramedic Chief, King American Ambulance
4. Stephen Harty (Witness) – Recruit, San Francisco Fire Department

███████████████████████████ 7514 General Laborer
███████████████████████████ 514 General Laborer

### Dawn McKnight

PW Employee and Labor Relations ("ELR") unit interviewed Dawn McKnight ("McKnight"), Assistant Director, Baldwin Navigation Center ("Baldwin") on September 5, 2024 by phone. McKnight was present on Jessie Street on August 23, 2024, the date of the incident. McKnight stated that she and her staff from the Baldwin responded to an overdose on Jessie Street. She and her staff jumped into action and began performing Cardiopulmonary Resuscitation ("CPR") on the patient while calling 911 and waiting for emergency response personnel to arrive. McKnight stated there were PW staff on the scene whose city vehicles were blocking access to the alley, and she alerted the PW employees that emergency personnel were on the way and they needed to make room for the emergency personnel to get through to the patient. McKnight claims that at this point, ███ began to mock her and her staff for being concerned for the patient's wellbeing. ███ was identified by photograph, McKnight indicated that it was the employee wearing the blue cap. McKnight stated that ███ showed no concern for the patient and kept making comments like "let him fucking die." McKnight further stated that while ███ was out of his

truck walking in the alley, ▮▮▮▮▮ remained in his City vehicle and she asked him to please move his vehicle to allow the responding paramedics to get through the alley to reach the patient. ▮▮▮ continued to further antagonize the Baldwin staff by yelling to ▮▮▮ "fuck them, let them die. You don't move." McKnight claimed that this was not the first time that she, her staff, or residents of the Baldwin had experienced hostility from PW employees. McKnight further added that she did not report this to cost anyone their job, but she felt it was imperative to raise awareness of this behavior on the part of public employees.

## Lieutenant Zachary Tibbets

PW ELR placed a call with San Francsico Fire Department ("SFFD") requesting assistance with its investigation of this matter. PW ELR received a call back from Lieutenant Zachary Tibbets ("Tibbits") on September 17, 2024. Tibbets was able to confirm that Captain Christopher Blair ("Blair"), and Engine Medic Timothy Kelly ("Kelly") responded to a call on Jessie and 6th Streets in an SFFD truck but were only on the scene for approximately two (2) minutes before a King American ambulance arrived on the scene. It was determined not to be an emergency situation, so Blair and Kelly departed the scene and let the King American medical crew attend to the patient.

## Peter Jacoby

PW ELR interviewed Peter Jacoby ("Jacoby"), Paramedic Chief, King American Ambulance, on September 17, 2024. Jacoby confirmed that a King American ambulance was dispatched to Jessie Street at 6th Street at approximately 10:00 AM on August 23, 2024. He stated that upon arrival, the patient refused medical care and was released. Jacoby stated that he could not connect the Department with the King American staff that responded to the call, but that he would give them ELR's contact information. Jacoby added that participation in the investigation was entirely up to them. PW ELR never heard from the King American paramedics. Jacoby also stated that one of the paramedics on the scene had recently left King American and joined the SFFD.

## Stephen Harty

After learning from Jacoby that one of the King American paramedics on the scene was now with SFFD, PW ELR called Tibbits back to see if he could connect us with this individual. Tibbits was extremely helpful and determined it was Recruit Stephen Harty ("Harty"). Tibbits informed PW that as a new recruit, Harty would be attending Fire Academy, but he would work with Captain Oscar Thadeo ("Thadeo"), SFFD Division of Training, to coordinate a call between Harty and PW. A call was scheduled for PW ELR and Harty on September 18, 2024. Harty confirmed that he was working for King American Ambulance on August 23, 2024, and responded to a call of an overdose on Jessie and 6th Streets that day. Harty recounted that the ambulance was able to get approximately 10 feet into Jessie Street, but was prevented from going any further because two white trucks were blocking the alley. Harty recalls the ambulance alerting motorists by turning on their lights, sirens, and sounding their horn, but the trucks still did not move. According to Harty, a member of the public informed the ambulance crew that the trucks were PW crews cleaning the alley. The member of the public asked the emergency personnel on-site to report the PW employees for their hostile behavior towards the Baldwin staff and the patient. Harty said he did not witness what happened, or hear what was said, but could

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

tell from the member of the public's demeanor that a confrontation of some sort had occurred. While Harty could not corroborate the accounts provided by the staff of Baldwin regarding comments made, Harty did not see any urgency in the PW's staff's attempts to move out of their way. According to Harty, one of the trucks was unoccupied, and it seemed like the employee was "taking their time" to return to their vehicle. The ambulance crew decided to grab their gear and approach the patient on foot instead of waiting for the PW staff to move out of their way to allow them to approach their ambulance. According to Harty, the delay in rendering aid to the patient could have cost a life in an emergency situation. This was not a medical emergency, and the patient refused treatment, but had circumstances have been different the patient could have bled out. Harty wanted to make clear that he has encountered PW staff in the field before, and they have always been very helpful and cooperative.

PW ELR interviewed ▮ on September 27, 2024. Also present were Rheuben Johnson, 7215 General Laborer, Union Steward, Laborers Local 261, and Christine Cayabyab, Manager Employee and Labor Relations, PW. ▮ confirmed that he was on duty on August 23, 2024, and operating his City assigned vehicle, 431-494, that day ▮ explained that on the day in question, approximately six (6) PW trucks and one (1) mini-sweeper, called a Rovo, were dispatched to Jessie and 6th Streets. According to ▮ entered Jessie Street in his City assigned vehicle, 43100289, first, followed by ▮ stated that as he entered the alley behind ▮ an ambulance pulled in directly behind his vehicle, cutting into the line of PW trucks dispatched to the scene. ▮ stated that people were spilling into the road from the sidewalk, approximately two hundred and fifty (250) people, preventing the trucks from making their way into the alley or allowing the ambulance to reach the patient.

PW ELR interviewed ▮ on September 27, 2024. Also present were Rheuben Johnson, 7215 General Laborer, Union Steward, Laborers Local 261, and Christine Cayabyab, Manager Employee and Labor Relations, PW. ▮ confirmed that he was on duty on August 23, 2024, and operating his City assigned vehicle, 43100289, that day. According to ▮ he was the first one in the alley that morning and immediately got to work sweeping the area. ▮ provided an account of the scene that day; "the paramedics made their way into the alley and made their procedure with the man that was in the alley. I was further up in the alley. I was there that day, but the medical people never said anything to me or the other staff. There were probably six (6) vehicles, with two (2) Rovos as well. Now you're looking at eight (8) vehicles coming in the alley. Some of these alleys are full of people, it's a five (5) mile an hour place. They're gathering on the streets, fifty (50) guys, some on wheelchairs, some on crutches, some just lying there. They are having a dope party. That's ok, that's what they want to do. We can't rush in at twenty (20) miles an hour. If they don't want to move, we just stand there. We don't blow the horn we just wait it out." ▮ denies ever engaging with any members of the public or medical personnel. According to ▮ there was no commotion or verbal altercation between anyone that day. In ▮ own words, "We are totally professionals. We are not going to jeopardize a job. I have seven (7) kids, an ex-wife, and a wife. It doesn't make sense to risk a job to do that. That's not how we operate at Public Works." Furthermore, ▮ stated that he found the alleged comments about letting the patient die extremely offensive. ▮ said that he would not allow anyone to make such a comment, and he had nothing else to say about it. According to ▮ he was in the alley doing his work and had no reason to interfere with medical personnel or engage

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

in any hostility with members of the public. ▮▮▮ concluded that the only obstruction to the ambulance was the crowds of people congregating in the alley, not any acts of sabotage. When asked if he was the subject of any previous Whistleblower Complaints, ▮▮▮ responded "no". This was found to be untrue, ▮▮▮ has three (3) other Whistleblower Complaints in his file: Whistleblower Report #587872s6 from February 22, 2021; Whistleblower Complaint #w2PVFhD from March 11, 2022; Whistleblower Complaint #qgj9U5Ph from April 6, 2022. These previous Whistleblower complaints show a concerning pattern of behavior on ▮▮▮ behalf of aggressive, volatile, hostile, and bullying behavior to both members of the public and other City employees.

## IV.    **DOCUMENTS REVIEWED**

- CCSF Employee Handbook
- CCSF Equitable, Fair, and Respectful Workplace Policy
- Citywide Vehicle Use Policy
- California Vehicle Code Section 21806
- Department of Emergency Management Records Request

## V.    **ANALYSIS AND DISCUSSION**

### **Allegation 1: Violation of the Employee Handbook Policy Regarding the Treatment of Co-Workers and Members of the Public**

The investigation concluded that ▮▮▮ did not exhaust all options to assist responding medical personnel to reach the patient on Jessie Street. ▮▮▮ per his own admission, was out of his vehicle tending to his duties on Jessie Street. Based on testimony by Harty, ▮▮▮ took his time returning to his vehicle, which was the first to pull into the alley. While we understand that circumstances in the field can be tense, and some of the unhoused population our Operations crew comes into contact with may be in altered states of mind, as employees of the City and County of San Francisco, we are all obligated to abide by the Employee Handbook Policy Regarding the Treatment of Co-Workers and Members of the Public which states, *"City policy requires employees to treat co-workers and members of the public with courtesy and respect."* Engaging in a hostile or combative way with anyone while on duty is a violation of this policy.

Based on the aforementioned, the allegation is substantiated.

### **Allegation 2: Violation of the Equitable, Fair, and Respectful Workplace Policy**

According to the CCSF Equitable, Fair, and Respectful Workplace Policy, *"Disrespectful Behavior is defined as discourteous, rude, impolite, or offensive words, gestures or other behavior that may devalue and undermine a person and their dignity or self-esteem or creates an intimidating, hostile, abusive or offensive environment."* The behavior displayed by ▮▮▮ undermined the dignity of the patient in need of medical attention. It seems counterintuitive to amble around the scene while Baldwin staff administered CPR to a patient, as testified by McKnight, and an ambulance is pulling into the alley behind PW vehicles. As public employees of the City and County of San Francisco, all residents of San Francisco are our customers whether housed or unhoused. It is imperative that all agencies work together to provide the

critical services we provide to these customers, and it is not our responsibility to cast any aspersions or make any judgments on who is worthy of these services. Equity is fairness in the way people are treated, ██████ inaction on the scene August 23, 2024, did not provide this patient equity. ██████ reluctance to help with the medical emergency are examples of his hostility.

Based on the aforementioned, the allegation is substantiated.

**Allegation 3: Violation of the Citywide Vehicle Use Policy**

Appendix C of The Citywide Vehicle Use Policy states in relevant part that all drivers will be responsible and accountable for:

*"Comply with all applicable federal, state, and local laws and regulations."*

Failing to yield to an emergency vehicle is a violation of California Vehicle Code 21806, and can result in a fine of at least $410, a point on your driving record, and other penalties. The point will remain on your record for three years. Per his own admission, ██████ did not make any effort to yield to the responding ambulance. ██████ who was the first to enter the alley in his truck, had exited his vehicle to clean the alley, and according to Harty's testimony, did not seem in a hurry to get back to his vehicle when the emergency personnel arrived. ██████ did not comply with California Vehicle Code 21806, and violated the Citywide Vehicle Use Policy.

Based on the aforementioned, the allegation is substantiated.


## V.    **FINDINGS AND CONCLUSION**

- Violation of the Employee Handbook Policy Regarding the Treatment of Co-Workers and Members of the Public – SUBSTANTIATED
- Violation of the CCSF Equitable, Fair, and Respectful Workplace Policy – SUBSTANTIATED
- Violation of the Citywide Vehicle Use Policy - SUBSTANTIATED

The investigation found that all allegations against ██████ are substantiated. The severity of the allegations is high, and the fact that they were reported by a member of the public could have irreparable damage to the Department. Based on the above, appropriate discipline should be considered for the employee.

# EXHIBIT B

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



**Carla Short, Director**  |  Director's Office

carla.short@sfdpw.org  |  T. 628.271.3078  |  49 South Van Ness Ave. Suite 1600, San Francisco, CA 94103

## Investigative Report

TO:          Christine Cayabyab
             Manager, Employee and Labor Relations
             San Francisco Public Works

FROM:        Vito Saccheri
             Senior Labor and Employee Relations Analyst
             San Francisco Public Works

DATE:        November 25, 2024

SUBJECT:     Jessie Street X Video Posting Investigation

             7514 General Laborer Bureau of Streets and Environmental Services

### I.   **ALLEGATION SUMMARY**

On September 19, 2024, San Francisco Public Works ("PW") Employee and Labor Relations
Division ("ELR") was notified of a video posted to social media that showed PW employees
engaging in an alarming way with members of the public. The video was posted to the X
platform by user @war24182236 on September 18, 2024 at 2:48 PM PT. ELR learned that the
employees captured in the video were                                    7514 General Laborer,
                    7514 General Laborer, and                              7514 General
Laborer. In the video, PW employees were seen confiscating items from the street and screaming
at members of the public in a hostile and aggressive way.

### II.  **ALLEGATIONS REQUIRING INVESTIGATION**

The employees in the video are members of PW's Bureau of Street and Environmental Services'
("BSES") Alley Crew, and they are obligated to follow strict guidelines as part of the Bureau's
Bag & Tag initiative. The investigation will determine if the employee's confiscation of items
violated the Bag & Tag Standard Operating Procedure. As employees of the City and County of
San Francisco ("CCSF"), all employees are expected to abide by the Employee Handbook Policy
Regarding the Treatment of Co-Workers and Members of the Public, and the CCSF Equitable,
Fair, and Respectful Workplace Policy. The investigation will determine if the behavior captured
in the video violated either of these policies.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                      CCSF-COH_437283

III.   **BACKGROUND**

█████ was hired by San Francisco Human Services Agency ("HSA") on May 3, 2012, as a TEX classification 9916 Public Service Aide. On December 21, 2013, █████ assumed a TEX 9916 position with PW. On May 10, 2014, █████ ssumed a TEX 7510 General Laborer Apprentice role with PW. On July 30, 2016, █████ was promoted to a TEX classification 7514 General Laborer. On March 3, 2017, █████ was converted to Permanent Civil Service status with CCSF. On October 19, 2019, █████ was promoted to a TPV 7215, General Laborer Supervisor 1 classification. On July 23, 2022, █████ was reverted to his PCS 7514, General Laborer classification. On February 26, 2023, █████ was again promoted to a Permanent Exempt ("PEX") 7215, General Laborer Supervisor 1 classification. On March 18, 2023, █████ was once again reverted to his 7514, General Laborer role.

**Previous Incidents**

- 2020 Reprimand: Preventable Motor Vehicle Accident
- 2021 Whistleblower Complaint #587872s6
- 2021 EEO Incident
- 2022 Member of the Public Incident
- 2022 Whistleblower Complaint #qgj9U5Ph
- 2022 Whistleblower Complaint #w2PVF5hD

**The Investigation**

The following SFPW employees were interviewed regarding the allegations:

1. ███████████ – 7514 General Laborer
2. ███████████ 7514 General Laborer
3. ███████████ – 7514 General Laborer

PW ELR interviewed █████ on September 27, 2024. Also present were Rheuben Johnson, 7215 General Laborer, Union Steward, Laborers Local 261, and Christine Cayabyab, ELR Manager, PW. █████ confirmed that he attended a Bag & Tag tailgate on August 1, 2024. █████ also stated that he was familiar with the Bag & Tag Standard Operating Procedures ("SOP") and follows them "to the best of my ability" while on duty. The video posted to X on September 18, 2024 was played during the meeting, and █████ confirmed that he was one of the people captured in the video. When asked if he has ever been provided with de-escalation training, █████ said no, but that would probably be a good idea, as well as sensitivity training.

PW ELR interviewed █████ on September 27, 2024. Also present were Rheuben Johnson, 7215 General Laborer, Union Steward, Laborers Local 261, and Christine Cayabyab, ELR Manager, PW. █████ confirmed that he attended a Bag & Tag tailgate on August 1, 2024. █████ also stated that he was familiar with the Bag & Tag Standard Operating Procedures ("SOP") and follows them while on duty. The video posted to X on September 18, 2024 was played during the meeting, and █████ confirmed that he was captured in the video. █████ can be seen tearing a blue

tarp from a fence, and shouting "I've got a job to do, you gonna make me lose my job." while a group of unhoused individuals grab their belongings. When asked if his actions align with the tenets of the Bag and Tag SOP and the City's Respect Policy, ▮ replied "Where we at, we're working. That behavior is called for. We are dealing with people who are not in the right state of mind. If we just leave that trash, we are out of job, people will say why is this trash sitting there for five (5), seven (7) days. I didn't see any disrespect; I see us working really hard to gather trash they've been laying on for three (3) days. They're gonna be talking and cursing us out all day." While ▮ is not filmed using any expletives or speaking to members of the public in a hostile way, he is seen tearing a tarp that was presumably being used for shelter, and kicking items off the sidewalk as people continued to pick through them while collecting what few belongings they have. ▮ was asked if he had been the subject of any investigations of previous Whistleblower incidents, to which he responded "no". ▮ was dishonest in his response because there were in fact three (3) previous Whistleblower complaints in his file. These previous Whistleblower complaints show a concerning pattern of behavior on ▮ behalf of aggressive, volatile, hostile, and bullying behavior to both members of the public and other City employees.

▮

PW ELR interviewed ▮ on October 23, 2024. Also present was Khaled Shehadeh, 7281 Street and Environmental Services Operations Supervisor, Union Steward, Laborers Local 261. ▮ stated that he has been trained on the Bag & Tag SOP but could not recall when he took that training. ▮ added that he has not been trained on the latest Bag & Tag SOP, but the Bag & Tag program is frequently addressed by supervisors at Tailgate meetings.

## IV.    **DOCUMENTS REVIEWED**

- CCSF Employee Handbook
- CCSF Equitable, Fair, and Respectful Workplace Policy
- Procedure 16.05.08 Removal and Temporary Storage of Personal Items Collected from Public Property
- Video posted to the X platform by user @war24182236 on September 18, 2024 at 2:48 PM PT

## V.    **ANALYSIS AND DISCUSSION**

### Allegation 1: Violation of the Bag & Tag Standard Operating Procedure

Regarding the collection of "Attended Items", the Bag & Tag SOP states in Section B 2(a),

*"In the case of routine cleaning operations (i.e., where individuals are allowed to return to location following cleaning and there is no permanent removal), staff will provide the owner sufficient time to collect and move their belongings out of the public right of way, taking into account any special needs that individuals may have and the volume of belongings.*

- *If the owner is unwilling to collect and move his/her belongings, staff may either (i) clean around the belongings, or (ii) call the Police Department for assistance. If (ii),*

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

> *under the direction of the San Francisco Police Department, staff will give oral notice that the items will be collected if they are not moved by the owner, and then bag and tag unremoved belongings in accordance with this policy.*

- *If the owner is unable to collect and move his/her belongings, staff may either (i) clean around the belongings, or (ii) bag and tag personal items in accordance with this policy.*

- *If attended items are bagged and tagged, staff shall provide the owner with information on how and where the items may be retrieved from Public Works' storage facility."*

The video showed concerning behavior on the part of ██████ who disregards and violates several key City policies governing routine cleaning operations, especially concerning personal belongings and interactions with the unhoused. ██████ is seen aggressively tearing a tarp from a fence that was presumably being used as shelter from the elements without allowing adequate time for retrieval, as required by policy. Despite the presence of individuals collecting belongings, ██████ aggressively pulls at the tarp, tethered to a bicycle and a tent, and those other items can be seen tumbling over. His actions further escalated when ██████ screamed at the crowd to let him do his job, and at the 1:04 mark of the video, ██████ is seen kicking items on the sidewalk into a pile while a member of the public was still collecting personal belongings. This is in violation of the policy's "Bag and Tag" procedure and displays a lack of respect and decorum expected by City employees.

While to most average people these items would appear to be trash, the individuals living in these conditions have little to no personal belongings. This incident reflects poorly on the City's efforts to maintain a balanced approach to public health and safety while treating the unhoused population with dignity. With the City's approach to clearing and cleaning encampments, such as the one at 6th Street and Jessie Street, under constant scrutiny, it's the obligation of our employees' out in the field to follow policies like the Bag & Tag SOP to the letter to demonstrate a commitment to humane treatment and to protect the City's reputation. ██████ actions, as documented in the video, undermine these efforts by portraying the City's approach as one of disrespect and callousness, potentially eroding public trust and fueling criticism of the Department's actions.

This incident represents a serious lapse in adherence to City policies for routine cleaning operations, specifically where the personal belongings of unhoused individuals are involved. The Department is walking a tightrope in its attempts to keep the streets clean and healthy for all, while still treating the unhoused population with the empathy and respect they deserve. While these efforts present obvious challenges, it is imperative that all Department staff, and the City at large, do their part to contribute to these shared goals.

Based on the aforementioned, this allegation is substantiated.

## **Allegation 2: Violation of CCSF's Employee Handbook Policy Regarding the Treatment of Co-Workers and Members of the Public**

The CCSF Employee Handbook Policy Regarding the Treatment of Co-Workers and Members of the Public states,

"*City employees and managers are responsible for maintaining a safe and productive workplace which is free from inappropriate workplace behavior.*"

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Much of the behavior displayed in the video would be defined as generally inappropriate, and certainly constitutes inappropriate workplace behavior. The use of raised tones and derogatory remarks is explicitly against the policy, which promotes a safe and constructive work environment.

Although ▆▆▆ efrained from explicit hostile language, his actions (e.g., aggressively removing the tarp and kicking items) indicate a lack of respect for the personal space and property of members of the public. His dismissive attitude, further compounded by dishonesty regarding previous Whistleblower complaints, raises significant concerns about his ability to treat the public with the respect mandated by the policy.

Employees representing any City Department should always follow the rules and regulations, particularly when out in the field in full view of members of the public.

Based on the aforementioned, this allegation is substantiated.

### Allegation 3: Violation of the CCSF Equitable, Fair, and Respectful Workplace Policy

The CCSF's Equitable, Fair, and Respectful Workplace Policy states,

*"All City employees and City officers play a role in contributing to a truly welcoming, safe, and inclusive working environment that encourages mutual respect and promotes civil and collaborative relationships with the public and among staff, at all levels."*

The behavior displayed in the video and confirmed through the investigation's responses falls short of this standard and represents clear violations that could erode public trust and compromise the safety and respect the policy aims to uphold. It was not warm, safe, inclusive, or an example of mutual respect. Instead, the behavior aligned more closely with what the Equitable Fair and Respectful Workplace Policy defines as inappropriate conduct: bullying, hostility, belittling, and microaggressions. The behavior shown in the video could be perceived as a threat to the public. It must be acknowledged that the duties and responsibilities of our 7514 General Laborers come with some very unique, and serious, challenges. Some of the members of the public they come into contact with are not in the right state of mind and are under the influence of illicit substances. However, it is our employee's responsibility to stay focused on their work, and not engage or retaliate with members of the public. Instead, it would serve our employees well to learn how to adapt to the circumstances and environments they are working in and escalate matters to a supervisor under specific circumstances. The behavior captured in the video is precisely what we, as a Department, want to avoid at all times.

▆▆▆ actions—tearing a tarp used as shelter, kicking items, and failing to allow "sufficient time" per SOP—reflect a disregard for the personal nature of belongings and a hostile approach to interactions. His dismissal of the Respect Policy and repeated pattern of aggressive behavior, substantiated by prior complaints, highlight an ongoing failure to foster a respectful environment. ▆▆▆ belief that challenging work conditions justify such conduct, coupled with dishonesty in past investigations, indicates a persistent issue with meeting policy standards.

These actions directly undermine the City's efforts to foster mutual respect and safety, especially amid public scrutiny regarding interactions with the unhoused. Employees are responsible for maintaining a safe, welcoming environment, de-escalating tensions, and upholding City values. This incident signals a need for targeted training in de-escalation and procedural compliance to

reinforce the City's commitment to equitable and respectful treatment, ensuring alignment with policy standards and preserving public trust.

Based on the aforementioned, this allegation is substantiated.

VI.  **FINDINGS AND CONCLUSION**

- Violation of the Bag & Tag Standard Operating Procedure -  Substantiated
- Violation of CCSF's Employee Handbook Policy Regarding the Treatment of Co-Workers and Members of the Public – Substantiated
- Violation of the CCSF Equitable, Fair, and Respectful Workplace Policy – Substantiated

In conclusion, the investigation responses reveal violations of all three policies, with varying degrees of severity. The employee's actions not only breach specific guidelines but also challenge the broader principles of fairness, respect, and safety that the policies uphold. This behavior represents precisely what the Department must work to prevent, as it jeopardizes public safety, undermines the City's mission, and risks damaging the trust that the public places in the Department's efforts. The use of expletives and insensitive comments directly contradicts the policy's mandates, presenting both a behavioral and reputational concern. Such conduct must be addressed promptly to reinforce the policy's values, uphold the City's standards, and deter similar incidents in the future. Given these findings, appropriate disciplinary action should be considered.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

# EXHIBIT C

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

or privileged information obtained by virtue of your office or employment for non-business purposes, and you may not use that information to advance the financial or other private interest of yourself or others.

- For a period of one (1) year after you leave City employment, you may not contact your former department on behalf of any person for the purpose of influencing a governmental decision. You also may not work for or receive compensation from any party to a City contract if, within the previous twelve (12) months, you were personally and substantially involved in the City's award of that contract. For other post-employment restrictions, please visit www.sfethics.org.

- Depending on your level of decision-making authority, you may be required to file a statement of economic interests. For a list of those employees who are required to file these statements, and instructions on how to do so, contact your supervisor.

The San Francisco Ethics Commission investigates violations of these rules and other improper government activities. If you are aware of any such violations or activities, or if you have any questions concerning the ethics rules for City employees, contact the Ethics Commission at (415) 252-3100. All complaints will be kept confidential to the extent permitted by law.

## Policy Regarding the Treatment of Co-Workers and Members of the Public
City policy requires employees to treat co-workers and members of the public with courtesy and respect. City employees and managers are responsible for maintaining a safe and productive workplace which is free from inappropriate workplace behavior.

## Smoke-Free Workplace
Smoking is not permitted in City offices, or within 20 feet of entrances, exits, or operable windows of public buildings.

## Drug-Free Workplace
You may not manufacture, distribute, dispense, possess, use or be under the influence of alcohol or illegal drugs in workplace. This prohibition includes prescription drugs used improperly (e.g., those not prescribed for the user). Any violation of this policy may be grounds for discipline up to and including dismissal.

If you perform activities in your job that are funded by a federal grant, you must notify your department head of any drug convictions for violation of drug laws that took place in the workplace within five days of any such conviction. Employees in certain safety-sensitive positions, or in positions where testing is required by federal law, may be required to submit to periodic drug tests. All employees may be required to submit to drug testing under certain circumstances consistent with federal, state, and local laws and applicable collective bargaining agreements.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437290

# EXHIBIT D

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437291



**City and County of San Francisco**
Carol Isen
Human Resources Director

**Department of Human Resources**
Connecting People with Purpose
www.sfdhr.org

## <u>Equitable, Fair, and Respectful Workplace Policy</u>

The City and County of San Francisco (City) is committed to promoting and maintaining a safe and healthy working environment where every individual is treated with civility, dignity, and respect. To this end, it is the policy of the City to provide a workplace where each employee has the right to work in a positive, professional, and mutually respectful atmosphere free from Disrespectful Behavior (defined below). This Equitable, Fair and Respectful Workplace Policy (Respect Policy) sets forth many of the City's values, supplements and is in addition to the City's current policies prohibiting discrimination, harassment and retaliation and prohibiting violence and threats of violence.

All City employees and City officers play a role in contributing to a truly welcoming, safe, and inclusive working environment that encourages mutual respect and promotes civil and collaborative relationships with the public and among staff, at all levels. The diversity of our employees – the wide range of backgrounds, ideas and lived experiences they bring to City employment – enriches our workplace and enhances our work. To promote and sustain a workplace where all employees and members of the public are treated with respect and dignity, and where employees feel welcomed and valued for who they are and what they can contribute, each City employee is expected to abide by the values and standards below and in this Respect Policy generally of interpersonal behavior, communication, and professionalism:

- Work honestly, earnestly, collegially and collaboratively with employees and others;
- Listen to and value the views and opinions of others, particularly when they differ from your own;
- Abide by all rules, regulations, policies, and laws and promptly bring concerns about potential violations to your supervisor or departmental Human Resources personnel.

All City employees and City officers have a responsibility to set a positive example and must refrain from engaging in Disrespectful Behavior, whether deliberate or unintentional. The City will not tolerate Disrespectful Behavior in any City workplace, and seeks to intervene at the earliest sign or stage of Disrespectful Behavior to correct that misconduct and prevent its reoccurrence. Any employee or officer who violates this policy will be subject to disciplinary actions up to and including termination.

Disrespectful Behavior is defined as discourteous, rude, impolite, or offensive words, gestures or other behavior that may devalue and undermine a person and their dignity or self-esteem or creates an intimidating, hostile, abusive or offensive environment.  Examples of Disrespectful Behavior can include, but are not limited to, the following:

- <u>Bullying</u>: bullying is a pattern of repeated behavior that a reasonable person would find hostile, offensive, intimidating, oppressive, subjugating, threatening, and unrelated to the City's legitimate business interests.

  Bullying behavior may take many forms including physical, verbal, or written acts or behaviors. Workplace bullying often involves repeated abuse or misuse of power. A single physical, verbal, or written act or behavior generally will not constitute bullying unless especially severe and egregious but could nonetheless violate this Respect Policy;

- <u>Hostility</u>: yelling,  interpersonal hostility or spiteful conduct, that is deliberate or repeated and/or causes harm to the targeted person's or persons' mental or physical wellbeing, safety, or economic status. This includes physical intimidation, unwanted touching, or isolation;

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

- <u>Belittling conduct</u>: name calling; playing "pranks" on a person; making fun of someone or telling jokes at their expense; taking, vandalizing, or otherwise damaging a person's personal or work property; and spreading false information or rumors about someone; seeking submission or misuse of power, authority, rank, status, or other privilege

- <u>Microaggressions</u>: statements, actions, or incidents regarded as indirect or subtle invalidation, insult, irritant, disregard, prejudice, and/or discrimination against members of a marginalized group such as those having actual or perceived unequal power across economic, political, social and cultural dimensions. Microaggressions can harm someone or unfairly advantage others;

- <u>Intimidation</u>: using threatening or abusive language, profanity or language that is intended to be, or is perceived by others to be, demeaning, berating, belittling, rude, threatening, intimidating, coercive, hostile or offensive;

- <u>Violence</u>: throwing tools, office equipment, or other objects as an expression of frustration or anger or implying that one will act with violence as a method of influencing the actions of others;

- <u>Sabotage</u>: intentionally interfering with a process of work or otherwise undermining a person's work.

- <u>Invasive use of technology</u>: using social media or other technology, to harass or bully, using statements, photographs, video, or audio that could reasonably viewed as malicious, obscene, threatening or intimidating.

Communication is nuanced and Interpersonal conflict is a normal part of work and life. Maintaining a respectful workplace relies on effective and respectful communication, patience, professionalism and understanding.

All City employees and City officers shall sign an acknowledgement of receipt and compliance with this Respect Policy.

**Management's Responsibilities**
Department appointing officers, managers and supervisors must lead by example by creating and maintaining a workplace that demonstrates respect and professionalism and follows the tenets of this Respect Policy. They must respond to Disrespectful Behavior in their respective workplaces including Disrespectful Behavior by vendors, consultants or members of the public. Each city department is required to ensure that all employees receive the accompanying and required training concerning this Policy. When any employee reports that Disrespectful Behavior has occurred, human resources, managers and supervisors must treat the complaint seriously. Management should follow the guidance on managing interpersonal conflict in the workplace and contact their human resources representative      for guidance on handling these kinds of situations. Human Resources must provide support to managers and supervisors upon request for guidance on conflict resolution strategies. Any appointing officer, human resources official, manager or supervisor who observes or otherwise becomes aware of Disrespectful Behavior, has a duty to take appropriate and immediate corrective and preventative action to ensure the workplace is safe for all employees. Departments shall communicate to employees that Disrespectful Behavior will not be tolerated, condoned, or ignored and there are appropriate consequences for violations of the Respect Policy. The City will provide support to its department managers or supervisors with implementation of the Respect Policy.

**Training**
The City will provide:
1. Mandatory training for all employees and City officers on the policy and strategies for maintaining a respectful workplace
2. Training on conflict management for managers, supervisors, and HR Professionals
3. Ongoing learning and development options on effective communication and interpersonal relationships

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

# EXHIBIT E

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**Appendix C**
**Business Use Declaration of the Program**

**[Department]**
**Motor Vehicle Incident Prevention Program**
**Driver Acknowledgment**

Operating an organizational vehicle is a privilege. All drivers will be responsible and accountable for the following:

1.  Possess a valid motor vehicle driver's license issued by the State of California. This license must have the appropriate classification and any required endorsements needed for operating the vehicle(s) assigned to the operator.
2.  Be subject to a driver's motor vehicle record check, and if such records show a suspension or revocation of driving privileges, the driver will not be authorized to operate a motor vehicle for the organization.
3.  Operate motor vehicles in a safe manner at all times.
4.  Comply with all applicable federal, state, and local laws and regulations.
5.  Report any mechanical or safety defects immediately.
6.  Comply with maintenance schedules as prescribed by the Department.
7.  Report moving violations or parking citations to their supervisor by the end of their work shift.
8.  Upon notification report changes in driver's licensure status to their supervisor within twenty-four (24) hours or by the next business day to their supervisor.
9.  Accurately record and report vehicle mileage in accordance with organization procedures.
10. Participate in required driver safety education and training Programs including an annual review of the Driver's Guide.
11. Require all occupants to use seat belts, child safety seats, booster seats or other age or weight appropriate restraint devices at all times.
12. Pay all tolls, moving/parking violation fines, and fees in a timely manner, unless otherwise specified in a MOU.
13. Not alter in any way without their supervisors' approval vehicles or equipment within a vehicle leased, owned or rented by the organization in any way.
14. Special permission is required to transport children in City vehicles. If you are authorized to transport children in your City vehicle, always transport children under age thirteen (13) in the back seat. Infants in rear-facing infant seats and other children under age thirteen (13) should never be in the front passenger seat facing an airbag.
15. Never operate a computer or other electronic device while driving a motor vehicle.
16. Pull off the road to a safe location prior to making or receiving phone calls or using an electronic device.
17. Do not transport any personal guest in a City vehicle, unless approved by the Department Head and the guest is essential to municipal business. Department vehicles specifically utilized for the purpose of transporting clients of the Department shall be exempt from this requirement.
18. Do not transport animals in a City vehicle, unless the animal is associated with City business and the vehicle is properly equipped to do so.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

19. The City reserves the right to install GPS systems in order to complement the City's Asset Management Program.  GPS data may be used during the course of vehicular incident or personnel disciplinary investigations.

Operating privileges shall be revoked if:

1. Driver does not adhere to responsibilities listed above.
2. The driver's license is revoked, suspended, withdrawn or denied.
3. Driver refuses to undergo drug or alcohol testing in accordance with organizational policies or as required by applicable state or local jurisdiction.
4. Operating outside the limitations of a restricted license.

I, _____, have read and understand the Business Use Policy established by [Department], I agree to abide by the provisions of this policy. I understand that violation of this policy will result in disciplinary action, up to and including termination of employment.

Driver Signature: _____ Date: _____

Supervisor Signature: _____ Date: _____

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

# EXHIBIT F

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437297



Up^    << Previous    Next >>    cross-reference chaptered bills    PDF | Add To My Favorites

Search Phrase:                                              | Highlight

**VEHICLE CODE - VEH**
    **DIVISION 11. RULES OF THE ROAD [21000 - 23336]**  *( Division 11 enacted by Stats. 1959, Ch. 3. )*

    **CHAPTER 4. Right-of-Way [21800 - 21809]**  *( Chapter 4 enacted by Stats. 1959, Ch. 3. )*

**21806.** Upon the immediate approach of an authorized emergency vehicle which is sounding a siren and which has at least one lighted lamp exhibiting red light that is visible, under normal atmospheric conditions, from a distance of 1,000 feet to the front of the vehicle, the surrounding traffic shall, except as otherwise directed by a traffic officer, do the following:

(a) (1) Except as required under paragraph (2), the driver of every other vehicle shall yield the right-of-way and shall immediately drive to the right-hand edge or curb of the highway, clear of any intersection, and thereupon shall stop and remain stopped until the authorized emergency vehicle has passed.

    (2) A person driving a vehicle in an exclusive or preferential use lane shall exit that lane immediately upon determining that the exit can be accomplished with reasonable safety.

(b) The operator of every street car shall immediately stop the street car, clear of any intersection, and remain stopped until the authorized emergency vehicle has passed.

(c) All pedestrians upon the highway shall proceed to the nearest curb or place of safety and remain there until the authorized emergency vehicle has passed.

*(Amended by Stats. 1996, Ch. 1154, Sec. 68. Effective September 30, 1996.)*

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                                                    CCSF-COH_437298

**EXHIBIT G**

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437299



**Department of Emergency Management**



SAN FRANCISCO DEPARTMENT
OF EMERGENCY MANAGEMENT

London Breed
Mayor

Mary Ellen Carroll
Executive Director

To:   DEPT OF PUBLIC WORKS
      ATTN: VITO SACCHERI
      25 VAN NESS #210
      SAN FRANCISCO, CA 94102

From: Custodian of Records Unit

Date: October 16, 2024

RE:   Records Request
_____

Enclosed are your requested records.

Portions of your requested document(s) that include personal information have been redacted because disclosure would constitute an unwarranted invasion of privacy per California Government Code §7927.700 and San Francisco Administrative code §67.24.d.2.

Additionally, portions of your requested document that contain personal and/or protected health information have been redacted from the documents based on the privacy considerations expressed in the Federal Health Insurance Portability and Accountability Act (45 CFR §164), and the California Constitution (Article I, Section I), the Public Records Act (California Government Code §7927.700 and the San Francisco Sunshine Ordinance (SF Administrative Code §67.1(g)).

If you wish to receive a less redacted record, you will need to resubmit your request and include a HIPAA release form completed by the patient or patient's next of kin, a copy of your client's ID, in addition to ambulance transport log identifying the patient.

Please contact the department below to request the transport log:

**SFFD - EMS Division**
**Medical Records Unit**
**1415 Evans Avenue**
**San Francisco, CA 94124**
**https://sf-fire.org/medical-billing-records**
**Ph 415-920-2956    Fax 415-920-2962**

If you have any questions, please contact the Custodian of Records at (415) 558-3826 Monday through Friday 08:00am to 4:00pm.

1011 Turk Street, San Francisco, CA 94102
Custodian of Records • (415) 558-3826 • Fax: (415) 558-3869
https://index.sfgov.org/#/home

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

 SAN FRANCISCO DEPARTMENT OF EMERGENCY MANAGEMENT
Custodian of Records
**Request for Dispatch Records**
(San Francisco Sunshine Ordinance, Administrative Code §67.1.seq.)



| | |
|---|---|
| Date of Request: | September 10, 2024 |

**NOTE: No Same Day Service Available**

| | |
|---|---|
| Requestor Name: | Vito Saccheri |
| Address: | 25 Van Ness Avenue Suite 210 |
| City/State/Zip: | San Francisco, CA, 94102    Telephone: 415-425-2673 |

Records Requested: ☑ CAD Printout  ☐ Telephone Audio ($35)  ☐ Radio Audio ($35)
☐ Other (specify):

| | |
|---|---|
| CAD Number: | Case or Incident Number: |
| Date of Incident: | August 23, 2024    Time of Incident: 10:00 AM Approx |
| Incident Location: | Jessie Alley at 6th St. |

Other identifying information or details (be specific): Emergency personelle were responding to a call about

an overdose. Investigating allegations that there was a confrontation with DPW workers.

**Fee Schedule:** (City / County employees - DO NOT USE THIS FORM )

**Audio:** $35.00 for phone audio for each CAD requested; $35.00 for radio audio for each CAD requested.
**Print:** Printouts over 100 pages billed at $0.10 per page.
*Payment is by cash, check or money order*

**When Requesting by Email:** Send the completed form to dem.records@sfgov.org.
(If you are requesting audio files, please mail the request form with exact payment to avoid a delay in receipt of the records requested. We cannot process electronic payments.)

**Method of Delivery:** Please check an option below. **We cannot currently send records by email**

☑ I would like to inspect records by **mail**. Please send the records to the address above.  I understand I must pay any applicable fees before the Department will send the records.

☐ I would like to inspect & **pick up a copy** of the records from the Department of Emergency Management. Please advise when the records are ready. I understand I must pay any applicable fees before the Department will release copies to me.

**For Office Use Only**

Date Completed: _____ Completed By: _____
Comments: CAD 24270 1 0023

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY      CCSF-COH_437301

| CommandCAD | EVENT HISTORY DETAIL: Call 242361063<br>SAN FRANCISCO FIRE DEPARTMENT | Wednesday, October 16, 2024<br>6:54:52 |
|---|---|---|



SF242361063    █████    █████████████    6TH ST/JESSIE ST, SF (200 ft NE)

[08/23/2024]

| 10:02:25 | DT28 | CREATE | Location:6TH ST/JESSIE ST, SF Type: █████ Name: █████████ Address: █████<br>█████ SF Phone: █████ DAREA:B02 Area:2248 TypeDesc:OD ARREST<br>LocDesc:<64/ 500> Priority:E Class:F OO Agency:SF Map:A1 |
|---|---|---|---|
| 10:02:55 | DT28 | ENTRY | Address: █████ ORIGIN:WPH2 Sector/Stn:01 Map:A1 |
| 10:02:55 | DT28 | ALI | Comment: █████ |
| 10:02:55 | DT28 | ALIGEO | |
| 10:02:55 | DT28 | CASE | Case#:FD24115927 Comment: █████ |
| 10:02:55 | MSSAPF | PREMIS | Comment:PPR, FPR |
| 10:03:04 | DT37 | SELECT | |
| 10:03:04 | DT37 | SGGEST | Unit:E01 KM115 RC1 Comment:Standard |
| 10:03:07 | DT37 | DISP | E01 Operator: █████████ OperNames:BENDO, DONNY (H20);<br>PACHECO MAGANA, JORGE F (H2); KELLY, TIMOTHY P (H3); DIETZEN, TYLER R(H2); - |
| 10:03:07 | DT37 | DISP | KM115 Operator: █████████ OperNames:GOMEZ RAYMOND (KING); HARTY,<br>STEPHEN (KING) |
| 10:03:07 | DT37 | DISP | RC1 Operator: █████████ OperNames:BLAIR, CHRISTOPHER M (H33); - |
| 10:03:07 | DT37 | PRIU | E01 |
| 10:03:24 | DT28 | PROQA | |
| 10:03:38 | DT25 | INFO | Location:6TH ST/JESSIE ST, SF->JESSIE ST/6TH ST, SF Name █████████<br>█████████████ DAREA:B02->B03 Area:2248->2251<br>LocDesc:<64/ 500>-><500/ 64> Comment:ANOTHER CALLER // |
| 10:03:38 | DT25 | ALI | |
| 10:03:38 | DT25 | ALIGEO | |
| 10:04:07 | DT28 | PROQA | |
| 10:04:08 | DT28 | CHANGE | Type<br>Class |
| 10:04:37 | F843 | ENRTE | RC1 |
| 10:04:38 | DT43 | ENRTE | KM115 |
| 10:06:42 | DT28 | INFO | Name █████████ Comment:PT GOT UP AND WALKED UP ON HIS OWN ******<br>CANCEL MEDICS |
| 10:06:59 | DT28 | REQCAN | Comment:PT GOT UP ****CAN CAN CAN CAN |
| 10:07:11 | DT28 | INFO | Comment: █████████ |

Click here for the<br>original master file on the<br>disk, labeled as COH Record.<br>DO NOT DUPLICATE<br>Dept. of emergency management<br>City of County of San Francisco

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY     CCSF-COH_437302



| CommandCAD | EVENT HISTORY DETAIL: Call 242361063 SAN FRANCISCO FIRE DEPARTMENT | Wednesday, October 16. 2024 6:54:52 |
|---|---|---|

| 10:08:06 | F421 | ONSCN | E01 | |
| 10:08:39 | F843 | ONSCN | RC1 | |
| 10:09:08 | DT39 | ONSCN | KM115 | |
| 10:10:38 | F843 | AOR | RC1 | |
| 10:10:38 | F843 | CLEAR | RC1 | |
| 10:11:28 | F421 | AOR | E01 | |
| 10:11:28 | F421 | CLEAR | E01 | |
| 10:30:05 | DT39 | CHANGE | KM115 | Dispo: ███████ |
| 10:44:00 | DT39 | AOR | KM115 | |
| 10:44:00 | DT39 | CLEAR | KM115 | |
| 10:44:00 | DT39 | CLOSE | | |

**CALL RECAP:**

| INITIATE: | 10:02:25 08/23/2024 | CALL NUMBER: | #1063 |
| ENTRY: | 10:02:55 08/23/2024 | CURRENT STATUS: | CLOSE |
| DISPATCH: | 10:03:07 08/23/2024 | ALARM LEVEL: | |
| ON SCENE: | 10:08:06 08/23/2024 | JURISDICTION: | SF |
| CLOSE: | 10:44:00 08/23/2024 | DISPOSITION: | NON |
| ADDRESS: | 6TH ST/JESSIE ST, SF (200 ft NE) | | |
| DAREA: | B02 | REPORT NUMBER: | FD24115927 |
| STATION: | 01 | TYPE: | ███████ |
| RA: | 2248 | PRIORITY: | 3 |
| | | PRIOR HISTORY: | Yes |

CP:
ADDRESS:
PHONE:

**OPERATOR ASSIGNMENTS:**

| DT28 | A25783 |
| MSSAPP | TIBMSS |
| DT37 | A23903 |
| DT25 | A24523 |
| F843 | RC1Z |
| DT43 | A23458 |
| F421 | E01Z |
| DT39 | A08955 |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437303

# EXHIBIT H

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437304



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437305



CCSF-COH_437306



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437307



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437309



HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437310

# EXHIBIT I

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437311

PROCEDURE 16.05.08

# REMOVAL AND TEMPORARY STORAGE OF PERSONAL ITEMS COLLECTED FROM PUBLIC PROPERTY

## A. PURPOSE AND SCOPE

Public Works staff adheres to this policy when removing personal items from public property for temporary storage and retrieval. These procedures are commonly known as "bag and tag." These rules apply to Public Works staff when they are working on City property, as well as when working with another agency or on property under the jurisdiction of another agency (*i.e.,* Caltrans). This policy applies to both attended and unattended property, but it does not apply to the removal of <u>abandoned</u> property from the public right of way. (See definition of "abandoned" property below in Section II (A).).

## B. CIRCUMSTANCES IN WHICH PERSONAL ITEMS MAY BE COLLECTED AND STORED

### 1. Unattended Items

Upon inspection by street cleaning staff, <u>unattended</u> personal items – such as medication, tents, luggage, bedding, backpacks, personal papers, and operational wheelchairs – will be collected and stored for up to 90 days for retrieval. Only items listed below under "Items That Will Be Discarded" will be discarded immediately. All other items will be removed and stored. Staff will place a Post-Removal Notice in the area from which the items were removed stating how, where and when the items may be retrieved. (See Section IV below regarding Notices).

Under no circumstances may staff take or keep for themselves unattended personal items for their own use, or allow non-City personnel to take unattended property for their own use.

**Distinguishing Between Unattended vs. Abandoned Property:** Temporarily unattended property is different from <u>abandoned</u> property, which may be immediately discarded. In determining if property is abandoned, staff should evaluate the facts and circumstances surrounding the items. Unattended property is not abandoned if it is accompanied by signs of ownership – for example, an unattended tent that is filled with personal belongings, or items that are being stored in an orderly manner (*i.e.*, packed up, wrapped, or covered). In addition, if there is a third party present who states s/he has been designated to watch or secure the items during the owner's temporary absence, the items are not considered abandoned.

By contrast, abandoned items are unaccompanied by objective indications of ownership, for example, an empty or broken tent sitting by itself on a sidewalk with no other belongings, a bag of clothes open and strewn across a sidewalk, or items that are broken, disheveled, surrounded by trash, or show other signs of neglect. This policy does not apply to abandoned property.

### 2. Attended Items

a. In the case of **routine cleaning operations** (*i.e.*, where individuals are allowed to return to a location following cleaning and there is no permanent removal), staff will provide the owner sufficient time to collect and move their belongings out of the public right of way, taking into account any special needs that individuals may have and the volume of belongings.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    CCSF-COH_437312

> ➢ If the owner is <u>unwilling</u> to collect and move his/her belongings, staff may either (i) clean around the belongings, or (ii) call the Police Department for assistance. If (ii), under the direction of the San Francisco Police Department, staff will give oral notice that the items will be collected if they are not moved by the owner, and then bag and tag unremoved belongings in accordance with this policy.
> ➢ If the owner is <u>unable</u> to collect and move his/her belongings, staff may either (i) clean around the belongings, or (ii) bag and tag personal items in accordance with this policy.
> ➢ If attended items are bagged and tagged, staff shall provide the owner with information on how and where the items may be retrieved from Public Works' storage facility.

b. In the case of **pre-planned special cleanup events, such as encampment removals, or when responding to 311 service requests**, staff should (a) provide the owner with sufficient time to collect and move his/her belongings, taking into account any special needs that individuals may have and the volume of belongings, (b) bag and tag those personal items that the owner cannot or does not remove him/herself, and (c) provide information on how and where the items may be retrieved from Public Works' storage facility.

c. **Upon request of the San Francisco Police Department.** Officers encountering individuals who are, for example, being connected with social services, being asked to clear the public right of way, or are subject to arrest, may call on Public Works to collect and store personal belongings. Public Works employees should treat those individuals' belongings as attended items and comply with the rules for attended items above. Officers also may collect personal items themselves and deliver to Public Works for storage.

**NOTE:** Staff may discard any attended items the owner affirmatively states that he or she does not want.

## C.  ITEMS THAT WILL BE DISCARDED AND NOT STORED

- **Items that present an immediate health or safety risk,** such as:
  o toxic sharps: needles, scissors, knives
  o chemicals: bleach, paint, oils, etc.
  o items (including bedding and clothing) soiled by infectious materials: human waste, body fluids, moldy, mildewed items
  o items infested by rodents and insects: rats, mice, fleas, lice, bed bugs
  o NOTE: If personal belongings are co-mingled or littered with needles, human waste, or other health risks, staff may dispose of the entire pile of belongings and are not required to sort through and attempt to remove the health or safety risks.

- **Furniture, mattresses, sheds, rolling structures, and bulky items**.  A "bulky item" is any single item that does not fit in a 60-gallon container with the lid closed, except for a tent, or an operational walker, operational wheelchair, operational crutches or operational bicycle.  Personal belongings located inside a bulky item bin shall be stored even if the bulky item itself is discarded.
- **Perishable items, perishable food**.
- **Contraband, illegal items**; refer to San Francisco Police Department.
- **Trash, garbage, and/or debris**. This includes property that appears to have been discarded by its owner and broken appliances or broken furniture.  If staff has a reasonable doubt as to whether an item constitutes trash, it should be collected and stored.
- **Abandoned property** (see definition above).

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    CCSF-COH_437313



**San Francisco**
**Public Works**

*Departmental Procedures Manual*
*Vol. 16 – Street Environmental Services*

**NOTE:** Shopping carts are governed by Public Works Procedure 16.05.05 and are not subject to this policy. However, personal property <u>inside</u> a shopping cart shall be bagged and tagged in accordance with this policy.

There is no limit to the number or volume of personal items that Public Works will bag and tag for a particular individual so long as they are not bulky items, as defined above, or do not otherwise constitute "Items That Will Be Discarded" under this Section III. However, the Director of Public Works may, after determining that the storage facility at the Public Works Operations Yard is at or near full capacity and after clearing out property that is older than 90 days, issue a written directive imposing a temporary reasonable per-person limit on the volume of property to be stored that will remain in effect until additional capacity is identified and funded.

**D.  NOTICES**

1. <u>Pre-Removal Notice</u>

   a.  For **pre-planned special cleanup events** conducted with or without other City departments, for example permanent removals of encampments, the City will provide 72 hours advance written notice, so long as the site does not present any imminent health or safety hazards requiring immediate removal.

Pre-Removal Notice shall be provided in writing to individuals who are present and posted conspicuously on or near the personal property that will be removed. The Notice shall be in a form substantially similar to the "Pre-Removal Notice" attached to this policy.

   b.  For **routine cleaning operations** (*i.e.*, where individuals are allowed to return to the location following cleaning and there is no permanent removal), or when responding to 311 service requests, advance written notice is not required; however, staff shall give persons sufficient time to collect and move their items, taking into account that individuals may have special needs and the volume of belongings.

2. <u>Post-Removal Notice</u>

   After any removal of unattended property – whether during a pre-planned special cleanup event or a routine cleaning operation –  Public Works staff shall place a Post-Removal Notice in the area from which the items were removed. See attached sample Post-Removal Notice.

**E.  PROCEDURE FOR COLLECTING PERSONAL ITEMS**

Public Works staff is required to wear necessary safety gear and personal protective equipment, and follow the department's code of safe practices for field and yard operations.

Public Works staff is required to follow these procedures when collecting personal items:

1. Items are assessed for safety under the criteria for collection or for discarding.
   a.  If items are found to be hazardous or unfit for collection, they are to be discarded.
   b.  If items are deemed personal property, then they are to be collected following these procedures.

2. If the owner of the items is present, under the direction of the San Francisco Police Department, staff will give oral notice that the items will be collected if they are not moved by the owner. Staff will comply with the rules set forth above for Attended Items.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                                                    CCSF-COH_437314

3. Public Works staff collects the personal items and while in the field documents the collection with a "Personal Property Collection Bag and Tag Intake Form."

   a. Forms are kept with Public Works cleaning staff and zone supervisors. See Appendix for example of form.

   b. Information collected includes:
- i. date
- ii. time
- iii. location (as specific as possible, address preferred)
  - street address
  - cross street
  - what corner of intersection (if applicable)
- iv. name of owner of personal items (if property is attended, or if the name is otherwise known because the property is labeled or another individual present provides staff with the name of the owner)
- v. brief description of items
- vi. contact information of owner (if applicable)
- vii. Public Works staff name
- viii. Public Works staff supervisor name
- ix. San Francisco Police Department officer name (if applicable)
- x. San Francisco Police Department badge number (if applicable)
- xi. tag color (corresponds to month)
- xii. tag number
- xiii. service request number (if applicable)

4. If owner of the items is present but is unable or unwilling to remove their belongings themselves, Public Works staff will provide written and oral information on how, where and when the items may be retrieved. If the owner is not present (*i.e.*, the items are unattended), staff will place a "Post-Removal Notice" in the area from which the items are removed. The notice will be posted for 24 hours.

5. Public Works staff delivers the items and the intake form to the Public Works Operations Yard at 2323 Cesar Chavez Street. Items are delivered to the lower yard at the locked "First 72 Hours" storage container.

   a. If during working hours, Public Works "bag and tag" staff will intake the items for storage:
- i. place the items in the "First 72 Hours" storage container
- ii. fill out a colored "tag" for the items with the corresponding information from the intake form
- iii. place the tagged items in the 72-hour holding area

   b. If after working hours, Public Works cleaning staff delivering the items will:
- i. place the items in the "First 72 Hours" storage container
- ii. fill out a colored "tag" for the items with the corresponding information from the intake form
- iii. place the tagged items in the 72-hour holding area

6. When items are dropped off by anyone other than Public Works staff (by the San Francisco Police Department, for example), they must be logged in following the same procedure with a completed form and corresponding colored tag.

## F.  TEMPORARY STORAGE

Personal items are stored at the Public Works Operations Yard at 2323 Cesar Chavez Street for 90 days. After 90 days, unclaimed items are discarded.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437315

For the first 72 hours after items are collected and stored, they can be claimed by their owners 24 hours a day.
- Starting from the date and time of the collection of items for three days (72 hours), owners can come to the Public Works Operations Yard at 2323 Cesar Chavez Street any time of the day and retrieve their items.
- Personal items will be stored in the 72-hour holding area.

After the first 72 hours and up to 90 days from the item collection, owners can come to the Public Works Operations Yard 2323 Cesar Chavez Street, Monday through Friday, 9 a.m. to 3 p.m. to retrieve their items.

## G.  PROCEDURE FOR RETRIEVAL OF PERSONAL ITEMS

Owners of collected personal property may retrieve their items at the Public Works Operations Yard at 2323 Cesar Chavez Street.
- If collected within the previous 72 hours, owners can retrieve items anytime, day or night. If the items were collected more than 72 hours ago, the owner may retrieve items Monday through Friday, 9 a.m. to 3 p.m.
- Owners must provide satisfactory proof of ownership; i.e. describing the location of where the items were and when collected, or describing the specific items that were collected.
- No government or photo identification is required.
- There is no fee charged for temporary storage of items.

Owners of the items should arrive at the Kansas Street entrance, at Marin Street.
- Call for Public Works staff on intercom, or call the Radio Room at 415-695-2134.
- Owners of the items will wait at the gate for items to be delivered by Public Works staff, and will not enter the Operations Yard.
- Public Works staff will meet with the prospective owners at the gate to coordinate the property retrieval.
- Owners must sign and date the intake form to designate that the items have been picked up.

If it is Monday through Friday, 9 a.m. to 3 p.m.:
- The Radio Room will notify the Public Works "bag and tag" staff member to perform the procedures for the retrieval and documentation.

If during the first 72 hours and at a time not on a Monday through Friday, 9 a.m. to 3 p.m.:
- The Radio Room will notify the Public Works supervisor on duty to perform the procedures for the retrieval and documentation.

1. Prospective owners will describe the items to be retrieved.
2. Public Works staff will attempt to find the items in storage and the corresponding tag and intake form.
3. Upon confirmation that the items do belong to the owner, staff will deliver the items to the owner at the Kansas Street gate.
4. Staff will compare the tag on the items to the intake form to confirm that all of the items are accounted for.
5. Staff will request that the owner sign and date the intake form to designate that the items have been collected.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY    CCSF-COH_437316

 San Francisco
Public Works

6. Intake form is filed for documentation in triplicate: white page to log book, yellow page to radio room, pink page given to the owner along with the property.

At no time are members of the public allowed to visit storage area to look for items in the storage area.

Public Works "bag and tag" staff will regularly itemize and organize the stored items.
- After 90 days, unclaimed items are discarded. Public Works will record the date of disposal.
- Intake form is updated to note that the items went unclaimed.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437317

**Date of posting:**
**Time of posting:**

# SAN FRANCISCO PUBLIC WORKS
# 72-HOUR NOTICE OF PLANNED REMOVAL OF PROPERTY

Be advised that the [encampment and/or personal property] located at [describe location] is in violation of City law. Any individuals residing in this area need to immediately move off this site and remove any personal property they own.

On [insert date], at [insert time], the City and County of San Francisco Public Works will conduct a clean-up of the area, including the removal of all personal property, temporary shelters, junk and/or garbage from the area.

Any personal property removed will be taken to the Public Works Operations Yard at 2323 Cesar Chavez Street. Owners of the items should go to the Kansas Street entrance, at Marin Street, and call on the intercom or call 415-695-2134. For the first 72 hours after items are collected and stored, they can be claimed by their owners 24 hours a day. After the first 72 hours, owners can retrieve items Monday through Friday, 9 a.m. to 3 p.m. There is no fee for property storage or retrieval. Property not claimed within 90 days of the date of removal will be deemed abandoned and will be destroyed.

Please be advised that the following types of items will not be stored and may be discarded: (1) items that present an immediate threat to public health or safety (soiled, needles, infested with vermin), (2) items that are evidence of a crime or contraband, (3) trash, (4) perishable food, and (5) bulky items (i.e., furniture, mattresses, sheds, structures), except for tents and operational walkers, crutches, wheelchairs, and bicycles.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                                                    CCSF-COH_437318

 San Francisco
Public Works

# SAN FRANCISCO PUBLIC WORKS
## NOTICE OF REMOVAL OF PROPERTY

Be advised that unattended personal property has been removed from this area because it was stored on City or State property in violation of California Penal Code Sections 372 and/or 647(e), and/or San Francisco Police Code Section 22.

**Date and approximate time of removal:** _____

**Location of removal:** _____

**General description of items removed**: _____

---

You may retrieve your belongings at the **Public Works Operations Yard located at 2323 Cesar Chavez Street (use the Kansas Street entrance, at Marin Street),** 415-695-2134. For the first 72 hours after items are collected, they can be claimed 24 hours a day. Afterwards, owners may retrieve their items Monday through Friday, 9 a.m. to 3 p.m. There is no fee for storage or retrieval. Although you are not required to present official I.D., you must provide a reasonably specific and detailed description of the property in order to retrieve it. Property not claimed **within 90 days** of the date of removal will be deemed abandoned and will be destroyed.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437319

 **San Francisco**
**Public Works**

**Personal Property Collection Bag and Tag Intake Form (example)**

# PERSONAL PROPERTY INFORMATION
*(please print clearly)*

Date items collected: _____

Time: _____

Number of items or bags: _____

Description of the items: _____

Location:

Street _____

   (*include number of building, if it applies*)

Cross street: _____

Circle intersection corner, if it applies:   N/W    S/W    N/E    S/E

Name of owner: _____

Contact information of owner (if known):

SFPD officer and star #:_____

Public Works staff: _____

Public works staff supervisor name: _____

Service Request #: _____

Intake date: _____

Tag color: _____

Tag #: _____

Retrieval date _____

Owner's signature: _____

Disposal date _____

***Distribution: white page to log book; yellow page to radio room; pink page to remain with items collected

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                                                  CCSF-COH_437320



San Francisco
Public Works

**RECOMMENDED:**

X

Larry Stringer
Deputy Director for Operations

**APPROVED:**

X

Mohammed Nuru
Director of Public Works

**Prepared by:** Rachel Gordon, Director of Policy and Communications, Greg Crump, Director's Office, and Larry Stringer, Deputy Director of Operations

**APWA Practice No.:** 5.6 (8ᵗʰ Edition)

**File Name:** Proc16-05-08R01 _ *Removal and Temporary Storage of Personal Items Collected from Public Property*.docx

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

CCSF-COH_437321